# EXHIBIT A

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| NORTHTOWN AUTOMOTIVE COMPANIES INC., <br><br>       *Plaintiff*, <br><br>    v. <br><br> CDK GLOBAL, LLC; and THE REYNOLDS AND REYNOLDS COMPANY <br><br>       *Defendants*. | CASE NO. 18-cv-833 |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Northtown Automotive Companies Inc., ("Plaintiff" or "Northtown"), by and through the undersigned counsel, individually and on behalf of all others similarly situated, bring this class action against Defendants CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("R&R") (collectively "Defendants") for damages, injunctive relief, and other relief pursuant to federal antitrust laws; and state antitrust, unfair competition, consumer protection, and unjust enrichment laws. Plaintiff demands a jury trial and alleges as follows:

## NATURE OF ACTION

1. This proposed class action lawsuit is brought against Defendants CDK and R&R for unlawfully allocating markets and customers to monopolize and artificially raise (or stabilize) prices throughout the United States for: data management systems ("DMS"); the service of extracting, formatting, integrating, and organizing the data stored on DMS ("Data Integration Services"); and the service of business management applications ("Vendor Services"). Defendants anticompetitive scheme was accomplished by: agreeing not to compete against each other for automobile dealership customers; forcing automobile dealership customers to work exclusively

1

with either CDK or R&R to meet all "back office" needs; and acquiring or foreclosing independent competitors from the market. The net effect of Defendants' unlawful scheme was the creation of side-by-side data monopolies that raised prices to dealerships and downstream purchasers needing access to data to provide supplemental services to dealerships.

2. The conspiracy was and is a restraint of trade and an attempt to monopolize markets in violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2; and state antitrust, unfair competition, consumer protection laws, and the common law of unjust enrichment. Plaintiff seeks to represent all automobile dealerships that, during the period from and including January 1, 2015 through the present (the "Class Period"), purchased DMS from one or both Defendants, and any current or former subsidiaries of the Defendants.

3. Automobile dealerships purchase DMS to manage everyday "back room" operations, such as tracking vehicle sales, tracking part sales and inventory, recording customer information, and providing Finance and Insurance (F&I) services. A DMS has a database component that allows automobile dealerships to enter and store data generated in real time. A DMS provides a dealership with comprehensive control over all departments of that dealership, storing inventory, customers, sales, and maintenance data. A dealership cannot function normally without its DMS. The software facilitates every step of a dealership's retail business from processing sales transactions to sharing repair orders among its different departments and personnel.

4. The data stored in the DMS is owned by the dealerships. Both CDK and R&R recognize that in their contracts and elsewhere. However, CDK and R&R do not equate owning the data to controlling that data. In addition to controlling basic portal access, Defendants control access to makers of "applications" based on the dealership data that is also sold at supra-

competitive prices.

5.　Defendant R&R sells DMS to Plaintiff and thousands of other dealerships; and CDK sells DMS to other members of the Classes (defined below). Defendants' DMS dominates the DMS landscape, controlling approximately 70 percent of the United States DMS market by number of dealerships. Defendants' market share is higher if the market is even measured by the number of vehicles sold. Defendants have unlawfully maintained their dominance of the DMS market for over thirty years. DMS is big, big business. CDK's total revenues for 2016 were $2.2 billion.[1] R&R's estimated revenues were $1.7 billion.[2]

6.　Defendants exercise their DMS chokehold though a series of interlocking agreements. First, Defendants lock automobile dealerships into long-term service contracts for DMS, lasting between five and seven years. Often, these contracts include terms that automatically extend the contract's length and impose higher monthly fees if new services are ordered in the middle of the contract. Despite significant reservations, automobile dealerships have little recourse but to accept the terms of the contract. Changing DMS providers at the end of a contract involves hardware and software changes so cumbersome, expensive, inconvenient, and disruptive that preparation and training for the transition may take up to twelve months or longer. Any transition, therefore, significantly interferes with a dealership's daily retail business operations. Switching DMS providers may cost a dealership $50,000 in up-front costs for servers that run the new DMS software.[3] Defendants also resist assisting automobile dealerships with any transition. Defendants' contractual and practical barriers to switching forces dealerships to remain with CDK or R&R, which empowers Defendants to charge excessive service fees with little concern that

---

[1] *See* CDK Global Inc., Annual Report for the fiscal year ended June 30, 2017, Form 10-K, http://www.sec.gov.

[2] *See* Financial Information for The Reynolds and Reynolds Company, http://www.hoovers.com.

[3] *See* David Barkholz, DMS dilemma: Why it's so hard to switch, Automotive News, May 10, 2010.

dissatisfied dealerships would terminate their contracts.

7.     Second, Defendants misuse their power over DMS data to dominate the Integration field.  Dealerships also purchase services from third-party application providers (or "Vendors"). Vendor Services' applications may handle inventory management, customer relationship management, warranty services, repair orders, electronic vehicle registration and titling, and more. A single dealership may use ten or more separate applications.  Vendors' applications require access to a dealerships' DMS data, which is acquired through Data Integrators ("Integrators"). Integrators extract data from DMS databases, and then aggregate and standardize the data before delivering it to Vendors.  Dealerships authorize but typically do not pay integrators to pull their data.  Instead, Vendors pay Integrators for their Data Integration Services.  Dealerships purchase Vendor Services directly from Vendors.  CDK and R&R sell Data Integration Services in addition to DMS service.  CDK's integration product is called "Third Party Access" ("3PA") and R&R's is called the "R&R Certified Interface" ("RCI").  Defendants have divided up this market, and agreed to foreclose other Integrators from the market.

8.     For over a decade, Defendants competed in the market for Data Integration Services.  CDK provided Data Integration Services for dealerships using R&R DMS, competing directly with R&R's RCI program.  When dealerships and Vendors had a choice of Integrators, the data integration market flourished.  Over a dozen Integrators provided secure, reliable, and cost-effective access to dealerships' data.  With that access, Vendors innovated and created numerous new software applications to help automobile dealerships sell and service cars.

9.     Then, in 2011, R&R began to block other data integrators, including CDK, from accessing data on R&R DMS platforms by disabling integrators' login credentials.  For a time, CDK continued to allow non-CDK data integrators to access dealerships' DMS data on CDK

4

DMS.  However, on February 18, 2015, CDK and R&R entered into a written agreement to divide the market and stop competing to provide Dealer Data Integration Services.  CDK agreed to stop providing Data Integration Services for dealerships using the R&R DMS, ceding that ground exclusively to R&R.  The agreement even provided for coordination between the Defendants to transition Vendors using Data Integration Services from CDK to R&R.  Because R&R already did not compete with CDK in providing access to data for dealerships using CDK's DMS, the agreement ensured that CDK and R&R would be the exclusive providers of Data Integration Services on CDK or R&R DMS platforms.

10.    In conjunction with their illegal agreement to not compete, Defendants also agreed to block independent Integrators.  Defendants successfully carried out this plan because they controlled access to automobile dealerships' DMS data.  Ironically, the owners of this data – Plaintiff and members of the Classes – were not able to stop Defendants from blocking Integrator access to their data.  Consequently, Defendants began charging supra-competitive prices for DMS to the detriment of Plaintiff and other members of the putative Classes.  For example, the fee Defendants' charged to each Vendor to access a dealership's DMS data increased about 250 percent from July 2014 to July 2016.

11.    Defendants not only control the Integrator service Vendors use to sell their services to dealerships, but simultaneously prohibit Vendors from informing dealerships about the reasons their Vendor fees have increased.  By imposing "Price Secrecy Provisions" in their Vendor contracts, Defendants prevented dealerships from discovering that higher Vendor fees are being caused by the increased Data Integration access fees Defendants are charging Vendors.

12.    Defendants' anticompetitive conduct resulted in significant price increases for dealership Data Integration Services and Vendor Services.  Prior to entering into its unlawful and

anticompetitive agreement with R&R, CDK and independent data integrators were normally charging Vendors about $50 per month per dealership connection before 2015. However, since the illegal agreement went into effect in 2015, CDK and R&R have charged Vendors an average of $300 per month for the same services, while other Vendors may pay up to $800 per month. This increased charge is ultimately borne by Plaintiff and other members of the Classes.

13.     Defendants' illegal agreement made it impossible for Vendors to lower their prices. Vendors cannot access dealerships' data through an integrator of their choice even when a data integrator offered better-priced and higher-quality integration services. Vendors must purchase services from Defendants because Defendants block other integrators' access to DMS data. Consequently, more and more data integrators were acquired by Defendants or driven out of the market due to lost clients.

14.     As a direct result of the anticompetitive and unlawful conduct alleged herein, Plaintiff and the Classes (as defined below) paid artificially inflated prices for Dealership Management Systems Service, Data Integration Services, and Vendor Services during the Class Period and have thereby suffered antitrust injury to their business or property. Defendants dominate Data Integration Services and effectively control access to DMS data, leaving Vendors and dealerships with no choice but to pay supra-competitive prices demanded by the Defendants. The increased prices sustained by Plaintiff and members of the Classes has not lead to higher quality or higher value services. All it does is afford Defendants monopoly profits.

## JURISDICTION AND VENUE

15.     This action arises under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and New York state law.

16.     This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 6 of the Clayton Act, 15 U.S.C. §§ 15 and 26.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because those claims are so closely related to the federal claims that they form part of the same case or controversy.

17.     This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different from the Defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

18.     Venue is proper in this Court pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d).  One or more of the Defendants resided, transacted business, were found, or had agents in the District; a substantial part of the events giving rise to Plaintiff's claims arose in the District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.  Moreover, CDK is headquartered in this District, and CDK and R&R serve dealerships in this District.

19.     This Court has personal jurisdiction over Defendants because they have engaged in the unlawful acts described in this Complaint with the foreseeable or intended effect of causing substantial economic harm because of business conducted in the State of Illinois.

20.     Defendants are registered to do business, transacted business, were found, and had agents in this District.

21.     As described throughout the Complaint, Defendants' unlawful conduct has

substantially affected interstate commerce by harming competition and increasing prices to the detriment of the Plaintiff and other retail automobile dealers in Illinois, New York, and throughout the United States.

## **PARTIES**

22.     Plaintiff Northtown Automotive Companies Inc. ("Plaintiff" or "Northtown") is a corporation organized and existing under the laws of the State of New York with its principal place of business, a retail car dealership, located at 1135 Millersport Highway, Amherst, New York, 14226.  Plaintiff is engaged in the business of purchasing and selling automobiles.  Plaintiff purchases DMS services from Defendant CDK.

23.     Defendant CDK Global, LLC is a Delaware company and serves as the operating subsidiary of CDK Global, Inc., which reported more than $2 billion in revenue in its last annual report.  CDK provides integrated information technology and digital marketing solutions for the automotive retail industry, including DMS software and services to automobile dealerships throughout the United States.  CDK also provides Vendor Services for automobile retailers that address vehicle inventory, sales, and the finance and insurance process. CDK Global, LLC has its principal place of business at 1950 Hassell Road, Hoffman Estates, Illinois 60169.

24.     Defendant The Reynolds and Reynolds Company ("R&R") is an Ohio corporation with its corporate headquarters and principal place of business in Montgomery County at One Reynolds Way, Kettering, Ohio 45340.  R&R provides DMS software and services to automobile dealerships throughout the United States.  Although R&R was once a publicly traded company known as Universal Computer Systems, Inc., it changed its name when it was privately acquired in 2006.

## FACTUAL ALLEGATIONS

### A.     The DMS Market.

25.     Dealer Data Management System software is software for retail automotive dealerships.  The software underlies, directly or indirectly, virtually every aspect of a dealership's business.  The DMS is the nervous system of a car dealership.  DMS software handles business functions of a dealership, including sales, financing, inventory management (both vehicle and parts), repairs and service, accounting, payroll, human resources, marketing, and more.  DMS software is the lifeblood software that enables dealerships to run their operations and function as a business.  A DMS has a database component that allows dealerships to enter and store data from its daily business operations, such as its inventory, customers, sales, and service information.  The storage of the data typically takes place either on-site at the dealership (on servers owned by the dealer or the DMS provider), off-site at private data center operated by the DMS provider, or with cloud-based data storage companies.

26.     The DMS market is comprised of providers that sell and market DMS services to automobile dealerships in the United States.  The relevant geographic market is the United States DMS market.  There is public and industry recognition of the DMS market.  There are no reasonable substitutes for the software and services provided by DMS providers to retail automotive dealerships.

27.     DMS providers license and sell proprietary software and services to automobile dealerships pursuant to written contracts, lasting between five and seven years.  A single, small dealership may pay up to $150,000 per year for DMS software license and services offered by CDK and R&R.  Mid-size dealership groups (5 to 10 stores) may pay $1,500,000 or more per year, and large dealerships may pay in excess of $5,000,000 per year for CDK and R&R's DMS software

and services.

28.     A dealership may only have one DMS provider at a time.  It would be functionally impossible for a dealership to operate on two separate DMS platforms because DMS providers have different and incompatible operating software for their respective systems.  Transitioning to a different DMS provider is cumbersome and rare because it is expensive and may take up to a year or longer.

### 1.     CDK and R&R Dominate the DMS Market.

29.     CDK and R&R dominate the DMS market.  CDK and R&R serve approximately 70 percent of the DMS market in the United States, or approximately 12,500 dealer rooftops.[4]

30.     CDK's and R&R's DMS market share has been stable for decades.  Because of the barriers to entry described below, other DMS provider and new entrants have been unable to break CDK's and R&R's stranglehold on the market.

31.     Aside from CDK and R&R, the DMS market is diffuse.  An array of providers divides up the remaining market share.  These providers are typically small, occupy market niches, and serve smaller car dealerships.

### 2.     The Structure and Characteristics of the DMS Market Render the Conspiracy More Plausible.

32.     CDK and R&R use their market power to protect their dominant positions, foreclose competition, and constrain dealership behavior.

33.     CDK and R&R sell their DMS software and services under long-term contracts, typically between five and seven years in length.  These contracts often include automatic extensions if new services are ordered in the middle of the contract.  CDK and R&R, therefore,

---

[4] *See* Vincent Bond, Jr. <u>Reynolds Sells a Revolution</u>, Automotive News, November 14, 2016; National Automobile Dealers Association, 2016 Annual Report.

lock dealerships into exclusive, long-term deals.

34.     Dealerships struggle to switch DMS providers, which is both expensive and cumbersome.  Switching DMS providers disrupts nearly every operating process.  For a typical dealership to change its DMS provider, it may take at least a year of preparation, staff training, and testing before the new system is operation ready.  The financial costs are also enormous.

35.     The costs of switching DMS platforms are heightened because CDK and R&R may paralyze a dealer's business by restricting critical third-party applications from accessing a dealership's data.  The DMS houses a dealership's data and third-party applications require access to that data to perform important services for the dealership.  Although dealers own the data stored by DMS, Defendants CDK and R&R exercise portal control, thereby limiting access to the data.  CDK and R&R may severely disrupt a dealer's business simply by preventing third-party access to essential dealer data.

36.     CDK and R&R punish dealerships that try to switch DMS providers, adding additional cost and risk to dealerships thinking about switching DMS providers.  CDK and R&R are known to sue dealerships that try to switch.

37.     Moreover, only a small percentage of dealers are up for grabs each year because of the long-term contracts and high switching costs, which makes it difficult for a dealership to constrain Defendants' abusive practices by switching DMS providers.  It is even more difficult to curb abusive conduct by R&R and CDK when the misconduct is coordinated.  For example, dealerships are locked into the same anticompetitive exclusive dealing arrangements whether a dealer chooses CDK or R&R.  The same issue extends to the Vendor Services providers that serve the dealerships.

38.     CDK and R&R have exercised such tight control over the DMS Market for so long,

and the barriers to entry are so high, that even Microsoft Corp., the global software behemoth, could not compete against Defendants. In 2006, Microsoft unsuccessfully tried to enter the DMS market. In trying to take on CDK and R&R, a Microsoft executive publicly conceded, "We kind of got ahead of ourselves."

39. Plaintiff and members of the Classes have no choice but to pay a price that is artificially inflated by the Defendants to obtain DMS to effectively run their business.

**B.     The Dealer Data Integration Services Market.**

40. The Dealer Data Integration Services market consists of companies that provide services to dealerships and application providers by pulling dealer data from a DMS, formatting and aggregating the data, and then providing the data to an application provider – *i.e.*, a Vendor – that uses that data to sell a product to dealers.

**1.     Vendors Must Be Able to Obtain Dealer Data Stored on a DMS.**

41. Dealerships use software "applications" to perform important sales and operational functions. These applications perform services in addition to or to replace functions provided by the DMS software. Such tasks include vehicle inventory management, customer relationship management, electronic vehicle registration and titling, and scheduling service and repair appointments. A single dealership rooftop typically uses ten or more separate Vendors.

42. The only way for Vendors to obtain the required dealership data is from the dealer's DMS. The data is not stored anywhere else. Vendors cannot provide their services without access to the data stored on a dealer's DMS. For example, Vendors that provide electronic vehicle registration and titling – a service that dealerships are mandated to provide in some states – must be able to retrieve purchaser, vehicle, and financing information about the sale of a car. Without access to that data, Vendors cannot register and title the car.

43.     Some applications "push" data back into the database. For example, customer relationship management software, which helps dealerships record and track potential customers. When a car buyer contacts the dealership, the customer's information and vehicle preferences are entered in the customer relationship management application, which then handles the relationship to the conclusion of the sale.   The application, however, requires access to the dealer's car inventory, which is "pulled" from the DMS.   Then, once the process is complete, the application "pushes" the customer and sales information back into the DMS database.

44.     Separate from their DMS services, both CDK and R&R have customer relationship management applications, operated under a wholly-owned joint venture that provides electronic vehicle registration and titling.   CDK's and R&R's own applications often compete with those offered by third-party application Vendors.

45.     Car manufacturers need access to dealership data to help manage car and parts inventory, process warranty claims and recall notices, apply rebate and special promotions to car sales, and assist dealerships with marketing and lead generation.   When R&R began blocking data integrators from pulling dealership data in 2007, DaimlerChrysler AG issued a letter to its dealership stating: "A large DMS provider has announced their intent to discontinue the ability of third-party [integrators] to extract data via your DMS . . . DaimlerChrysler has concern with this new policy, as it may have a significant impact to your business."[5]   Referring to CDK's Digital Motorworks and IntegraLink, DaimlerChrysler noted that "[t]hese companies have been p[u]lling dealership data on our behalf for over 10 years . . . ."[6]

---

[5] *See* Ralph Kisiel, <u>DaimlerChrysler Fears Data Security Concerns Will Cost Dealers</u>, Automotive News, Feb. 5, 2007.

[6] *Id.*

2. **CDK and R&R Control Access to DMS Data that Belongs to Automobile Dealerships.**

46.     Vendors no longer obtain data directly from dealerships.  Instead, there is a separate market comprised of companies that specialize in extracting dealerships' data from DMS databases, aggregating that data, putting it into a standardized format, and then delivering to Vendors the specific data required.  Data Integrators pull and deliver data in an automated, seamless way without the need for manual intervention by dealerships.

47.     Before an integrator can pull data, a dealership must authorize it to do so, and establish login credentials for the Integrator to pull the data.  Integrators pull data from the dealer's DMS database and then convert that data from a raw, unorganized state into a standardized format that is easy for Vendors to use.  DMS providers maintain data in different formats, and dealerships themselves enter data differently.  Data Integrators interpret, reformat, and translate the disparate data into a standardized format.  Integrators also may correct data-entry errors or anomalies in the data set, such as missing digits from vehicle identification numbers ("VINs") or incorrect customer contact information.

48.     An Integrator then delivers the data to those Vendors whose applications the dealer has decided to use.  The data provided to Vendors is limited to the information specifically required by the application.  For example, for electronic vehicle registration, the application receives vehicle sale and financing information, but nothing more.

49.     At one time, there were numerous Integrators.  Today there are only three companies: CDK, R&R and Authenticom, which is hanging on by its fingernails.[7]  Defendants

---

[7] Authenticom obtained a preliminary injunction against CDK and R&R for their anticompetitive conduct in the Data Integration Services market.  *See Authenticom, Inc. v. CDK Global, LLC and The Reynolds and Reynolds Company*, Case No. 17-cv-00318 (W.D. Wisc.).  The Seventh Circuit vacated the injunction, but ordered expedited briefing.  Oral arguments were held on September 19, 2017.

coordinated scheme successfully drove every other competitor out of the market through acquisition or market foreclosure. Superior Integrated Solutions, Inc. ("SIS") used to be a leading data integration provider. However, by August 2016, Defendants successfully foreclosed SIS from the market through market exclusion and litigation tactics.

50. Today, CDK owns two of the largest dealer data integrators in the industry, Digital Motorworks and IntegraLink. Digital Motorworks and IntegraLink obtain login credentials from dealerships to pull data and then provide that data to Vendors. CDK also has data integration product for direct access to data on the CDK DMS – the "Third Party Access" program. Similarly, R&R has an integration product for direct access to data on the R&R DMS – the "R&R Certified Interface" program. R&R does not, however, have a product that pulls data from dealerships that use non-R&R DMS systems.

### 3. Automobile Dealerships Now Pay Supra-Competitive Prices for Access to Their Own Data.

51. Prior to the inception of Defendants' anticompetitive conspiracy, CDK and R&R publicly recognized that dealerships, as owners of their data, controlled their data, and could share it with data Integrators. Every other industry participant – including industry organizations, Vendors, dealers, and car manufacturers – recognizes this fundamental principle.

52. On February 2, 2007, the National Auto Dealer Association and American International Automobile Dealer Association, the two largest automobile dealer associations in the United States, issued a "Joint Policy Statement on Data Accessibility." The purpose of the statement was to "guide the use and protection of data in dealership management systems." The joint statement set forth the following principles. First, "[d]ealers should control access to data stored in their dealership management systems." Second, "[d]ealers, not dealership management system vendor[s] or other entities, should have the sole right and the practical means to authorize

third parties to access and extract dealer data." And third, "[d]ealers expect all parties involved in storing and using dealer data to . . . [r]efrain from unreasonably impeding dealer-authorized access to dealer data."

53.     The R&R and CDK DMS contracts "spell out which party owns the data and there is generally little dispute: the data belongs to the dealer. This makes sense; after all, it's the dealership's customer, inventory, and transactional data that the dealership is putting into the DMS system."[8] For more than a decade, CDK's subsidiaries – Digital Motorworks and IntegraLink– pulled dealer data from R&R's DMS using the standard industry method: using login credentials provided by dealerships. When CDK and R&R entered into their market division agreement in 2015, CDK changed its policy and stopped pulling data from the R&R's DMS.

54.     Through their conspiracy, CDK and R&R seized control over access to DMS data. CDK and R&R prohibit dealerships from providing data stored on the dealer's DMS to third-party Vendors through "unauthorized means." CDK and R&R interpret any access not specifically approved by them to be "unauthorized." According to CDK and R&R, "unauthorized" access is a "hostile integration" with the DMS and is alone sufficient to constitute a breach of the DMS contract. CDK and R&R, therefore, maintain exclusive control over the flow of data from a dealer's DMS to Vendors.

55.     Through their conspiracy, CDK and R&R also have the capacity to charge Vendors artificially inflated prices for accessing dealer data stored on CDK's or R&R's DMS, which is a major and growing revenue source for CDK and R&R. In turn, Vendors pass the cost of access to dealership data on to the dealers themselves in the form of higher service fees.

---

[8] *See* The Hidden Data Tax That Dealers Don't Know They Are Paying, Driving Sales News, Oct. 17, 2013.

### 4. CDK and R&R Entered into a *Per Se* Illegal Written Agreement.

56.     For many years, CDK and R&R competed in the market for Data Integration Services. For over a decade, CDK provided Data Integration Services for dealers using the R&R DMS, competing directly with R&R's own RCI integration product.  Effective February 18, 2015, CDK and R&R entered into a written agreement categorized as a "Wind Down Access Agreement," whereby Defendants agreed that they would no longer compete in the Dealer Data Integration Services market.

57.     The Wind Down Access Agreement is a classic illegal market division: CDK agreed it would not compete in providing access to dealer data on the R&R DMS, ceding that ground exclusively to R&R.  In antitrust terms, it's no different than if they had agreed to divide the dealers by whether they were East of the Mississippi or West of the Mississippi.

58.     Because R&R already did not compete with CDK in providing access to data for dealers using the CDK DMS, the agreement ensured that CDK and R&R would be the exclusive providers of data integration services for dealer data on their respective DMS platforms.  The agreement mandated coordination between the former competitors in transitioning all CDK Vendor clients (i.e., those Vendors for whom CDK provided access to dealer data on the R&R DMS) to the R&R RCI program. The written agreement embodies CDK's and R&R's collusion to eliminate competition for data integration and become the sole providers of Data Integration Services for dealerships using their respective DMS platforms.  Vendors are left with no choice but pay to CDK and R&R to obtain data from the CDK and R&R DMS platforms.

59.     CDK's and R&R's decision to divide the market, block other data integrators, and seize control over access to dealer data was the function of an agreement between them, not unilateral decision-making. CDK and R&R were horizontal competitors in the DMS market and,

before their market division agreement, competitors in the Dealer Data Integration Services market. CDK and R&R then began to coordinate their actions and actively worked together to monopolize the market. Such an agreement constitutes a *per se* antitrust violation.

60. Moreover, by seizing control over access to dealer data, CDK and R&R have successfully imposed massive price increases for their data integration services and forced Plaintiff and members of the Classes to pay supra-competitive prices for DMS and Vendor Services.

### 5. The Agreement Divides the Dealer Data Integration Market.

61. The agreement's key provision provides that CDK agreed to stop accessing R&R DMS and to stop providing Data Services Integration that involves pulling data from an R&R DMS for use by any application provider. The agreement granted CDK a "Wind Down Period" of one year to stop pulling dealer data stored on R&R's DMS. During the wind-down period, R&R agreed that CDK could continue to pull dealer data just as it had before.

### 6. The Agreement Required Coordination in Transitioning Vendor Clients from CDK to R&R.

62. Because CDK agreed that it would no longer provide Vendors with data from dealers using R&R's DMS, CDK and R&R agreed to work together to transition those Vendors to R&R RCI program. Specifically, the agreement mandated that CDK cooperate with R&R's efforts to convince Vendors to join the RCI program.

63. Relating to coordinating the transition of Vendors from CDK's data pulling services into the RCI program, the Wind Down Agreement also required CDK to give R&R full information about Vendors that CDK served, including their name, contact information, contract terms, data pulling requirements, usernames used to pull the data, and more. As a result, Plaintiff and members of the Classes must pay artificially inflated prices for CDK and R&R's DMS as well as for Vendor applications.

### 7.     CDK and R&R Implemented the Illegal Agreement.

64.     CDK stopped providing dealer data integration services with respect to R&R's DMS dealers after the Wind Down Period.  CDK and R&R coordinated the transition of Vendors from CDK to R&R.

65.     On March 2, 2015, CDK sent a letter to its Vendor clients announcing that Vendors "will be provided with a roadmap to transition to the Reynolds Certified Interface (RCI) program without any further risk of interruption to existing services."  CDK explained that "we are in a transition period to allow time for [Digital Motorworks] clients to enroll in the RCI program in support of your R&R dealers," and that "we will assist you to facilitate a smooth transition."  The letter noted that R&R had "agreed to protect the current [Digital Motorworks] process for collecting data from R&R dealers during this transition" and promised "a more detailed letter within the next couple of weeks that outlines the transition process."

66.     On April 1, 2015, CDK sent the promised follow-up letter to its Vendor customers. The letter begins: "As announced earlier this month, the recent business agreement between CDK Global and The Reynolds and Reynolds Company (R&R) provides for the clients of Digital Motorworks, Inc. (DMI) a streamlined process to enroll in the Reynolds Certified Interface (RCI) program for their R&R dealers. We are now in the transition period to allow sufficient time for this enrollment, and R&R has agreed to provide a grace period for the existing DMI process for R&R data collection during this time."

67.     The letter gave Vendors a deadline to enroll in the RCI program: "Your deadline for RCI Certification, listed above, refers to when you need to be RCI Certified and the R&R grace period is scheduled to end.  R&R is ready to assist you with your transition to the RCI process." Not only would R&R assist them, but so would CDK: "If you would prefer assistance, just let me

know, and I will be happy to schedule and participate in an introductory conference call on your behalf."

68.     CDK's letter then made the sales pitch for RCI participation: "We are pleased to be working with R&R to bring you this streamlined, supported process for handling dealership data for your R&R dealers."  In relation to CDK's agreement not to compete, the letter stated that if the Vendor was "not RCI Certified, it will be more difficult to reliably receive dealership data since DMI is no longer extracting data directly from Reynolds systems."

69.     As a pretext, CDK and R&R attempt to justify their agreements not to compete by arguing that it will make dealers' data more secure.  The level of security protections and protocols for dealer data should be up to dealers purchasing Dealer Integration Services and Vendor Services.  The data in question is, after all, the dealers' data.  R&R followed up with its own letters to CDK's Vendor clients as they transitioned customers from CDK to R&R.

70.     The agreement had its intended effect: Vendors were forced from Digital Motorworks' and IntegraLink's data integration services into R&R's RCI program.  With the switch, Vendors now pay far higher prices for the same services.  Consequently, Plaintiff and members of the Classes also pay Defendants far higher prices for the same services.

### 8.     CDK and R&R Require Dealers to Enter into Anticompetitive Exclusive Dealing Arrangements.

71.     CDK and R&R imposed exclusive dealing provisions in dealer contracts (dealers cannot provide access to their data to anyone else) and Vendor contracts (Vendors cannot obtain dealer data from anyone other than CDK and R&R Data Integration Services providers).  For independent data integrators, these exclusive dealing provisions have foreclosed the entire data integration market for dealers using either the CDK or R&R DMS platforms.

72.     In their DMS contracts with dealers, both CDK and R&R required dealers to agree

to not provide anyone, other than their assigned DMS provider, access to their data for purposes of data integration to Vendors. CDK's current standard DMS contract contains an exclusive dealing provision that forecloses dealers from authorizing access to their DMS by Vendors of their own choice, and, at the same time, explicitly authorizes CDK to fully access that data and provide it to Vendors. Taken together, CDK has the exclusive right to provide data integration services to dealerships, using CDK DMS for the term of the contract. Others are prevented from competing with CDK to provide Integration Services to dealers using CDK's DMS because Integrators depend on dealer authorization to access dealers' data. The anticompetitive effects of CDK's conduct is prolonged by the life of the contracts, which last a minimum of five years.

73. R&R also has the same provisions in its current standard DMS contract. R&R has interpreted these provisions to mean that dealers cannot grant access to their own data on the DMS database. Like the CDK dealer contract, the R&R contract explicitly gives R&R the right to access dealer data through R&R's Data Integration Service. These rights and restrictions last the length of the DMS contract, typically five to seven years. As with the CDK contract, these provisions together give R&R an exclusive right to access dealer data on the R&R DMS for purposes of data integration, to the exclusion of all other would-be Data Integration Service providers.

74. CDK and R&R vigilantly enforce the restrictive terms in their DMS contracts. These provisions are harmful to dealers, yet CDK and R&R force dealers to agree to them because of their market power in the DMS Market. Many dealers do not even realize that CDK and R&R have inserted the exclusive dealing provisions into the DMS contracts.

75. More recently, CDK added the following warning to dealerships on its dealer login page: "Please be advised that the creation of User IDs for use by unauthorized third parties violates the terms of your CDK [DMS] Agreement." R&R has taken the extra step of not only disabling

21

login credentials for Data Integration Service providers, but also filing lawsuits against competing data integrators for tortious interference with the DMS contracts.

76.    The exclusive dealing provisions in Defendants' dealer contracts are anticompetitive. They are *per se* illegal as part of Defendants' agreement to eliminate competition. The impact of the exclusive dealing provisions is amplified by their lengthy duration. Defendants' DMS contracts with dealers typically last five to seven years often with terms that allow automatic extension if new services are ordered in the middle of the contract.

### C.    Defendants' Anticompetitive Conduct Has Resulted in Massive Price Increases.

77.    Having eliminated their competitors, CDK and R&R exercised their market power to impose enormous price increases on Data Integration Services. Data Integrators charge Vendors per dealership rooftop, sometimes referred to as a "connection." If a dealer has ten rooftops (*i.e.*, ten individual locations) then the Vendor needs ten separate connections for that dealer. Before the conspiracy, a data integrator would normally charge approximately $50 per month per dealership connection to pull data.[9] Today, on average, Authenticom charges Vendors between $30 and $40 a month per connection. For bi-directional access to dealer data, Authenticom has generally charges $75 per connection. Other independent data integrators charged similar rates. Between 2008 and 2016, SIS charged around $40 per connection for pulling data and $70 per connection for bi-directional access (until it was forced out of the data integration market).

78.    CDK and R&R, however, now charge far higher rates. One Vendor used to pay $35 per month to pull data, but when it was forced to join the RCI program for Data Integration Services, the monthly rate charged by R&R increased 500 percent to $210. Another large Vendor

---

[9] *See* David Barkholz, <u>Dealers will pay up for vendors' data access after CDK switch</u>, Automotive News, July 20, 2015.

purchased Data Integration Services at a rate of $45 to $50 per month in the past. That Vendor now pays R&R monthly charges of between $300 and $866, and CDK between $300 and $700 in monthly charges.

> **1.  CDK dramatically raised its data integration fees upon entering into a conspiracy with R&R in February 2015.**

79.     Before the February 2015 agreement with R&R, CDK charged an average of $70 per connection. Since 2015, the average cost per connection has risen to at least $250 to $300 (and often much more). This estimate is at the conservative end, and still equals an increase in the range of 250 to 325 percent in the price of Data Integration Services.

80.     CDK's prices for the 3PA program stand in stark contrast to the prices CDK charges for data access to non-CDK dealers. Today, CDK (through Digital Motorworks and IntegraLink) charges between $25 and $50 per connection to non-CDK dealers, while it charges on average between $250 and $300 for the same services to CDK dealers.

81.     As for R&R, before 2010, R&R generally charged Vendors less than $100 per month per connection. By 2013 – after it began to block independent data integrators and impose (and enforce) exclusivity provisions in its contracts with dealers and Vendors – R&R raised its monthly prices per connection to between $300 and $500, a price increase of 200 to 400 percent.

82.     Moreover, since Defendants entered the agreement in 2015, R&R has raised its prices for data integration services even higher by charging many Vendors a per transaction charge for every data pull. CDK followed R&R's lead, instituted the same practice of charging some Vendors an additional per-transaction fee on top of their already large monthly fees. This in turn causes Plaintiff and members of the Classes to pay supra-competitive prices for their DMS and Vendor services.

### 2. Prices Increased by Exorbitant Amounts.

83.     Leading industry publications have reported widely on the price increases imposed by CDK and R&R on Data Integration Services.

84.     In July 2015, shortly after CDK and R&R entered their agreement, Automotive News reported that "CDK said it intends to charge each third-party vendor . . . between $250 and $300 a month per store for each software product. The current fees average about $70 per software product." As for R&R, participation costs one Vendor more than $700 a month per R&R store.

85.     Because Vendors cannot absorb the massive price increases imposed by CDK and R&R, Vendors pass most (if not all) of the increased fees for Data Integration Services to Plaintiff and members of the Classes.

### 3. CDK and R&R Charge Dealers Escalating Fees for DMS Services.

86.     CDK and R&R ratchet up the DMS fees year after year, with no price break to dealers to make up for the pass-through costs for data integration. Both CDK and R&R have fee escalation clauses in their DMS contracts with dealerships. The standard R&R contract provides that DMS fees go up every year on March 1. The price increase is therefore automatic, and is measured by the Customer Price Index plus 2 percent. The standard CDK contract gives dealers price protection for the first year of the DMS contract, but imposes a 6 percent automatic yearly price increase thereafter. As a result, dealerships are hit from both sides: rapidly escalating fees for Data Integration Services and contractually mandated, annual DMS price hikes.

### CLASS ACTION ALLEGATIONS

87.     Plaintiff brings this action on behalf of themselves and others similarly situated as a class action under Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief and damages on behalf of the following class (the

"Nationwide Class"):

> All automobile dealerships, during the period from and including January 1, 2015[10] through the present, who purchased DMS from one or more Defendants, any predecessor, successor, current or former subsidiary or affiliate of the Defendants, or any co-conspirator of the Defendants.

88.     Plaintiff also brings this action on behalf of themselves and others similarly situated as a class action under Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief and damages pursuant to state antitrust, unfair competition, unjust enrichment, and consumer protection laws of New York.  These claims are brought by Plaintiff on behalf of themselves and entities in New York (the "New York Class"):

> All automobile dealers residing in the state of New York, during the period from and including January 1, 2015[11] through the present, who indirectly purchased Dealer Integration Services when they purchased DMS from one or more Defendants or through Vendors, any predecessor, successor, current or former subsidiary or affiliate of the Defendants, or any co-conspirator of the Defendants.

89.     The Nationwide Class and the New York Class are referred to herein as the "Classes."

90.     Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators of Defendants.  Also excluded are automobile dealerships in which any Judges or judicial personnel involved in this case hold any financial interest.

91.     While Plaintiffs do not know the exact number of the members of the Classes, there are thousands of members in the Nationwide Class and hundreds of members of the New York Class.

92.     Common questions of law and fact exist as to all members of the Classes.  This is

---

[10] Plaintiffs may amend the class period as warranted by information learned from investigation or discovery.

[11] Plaintiffs may amend the class period as warranted by information learned from investigation or discovery.

particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

a. Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of DMS and Data Integration Service sold in the United States;

b. The identity of the participants of the alleged conspiracy;

c. The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d. Whether the alleged conspiracy violated the Sherman Antitrust Act, as alleged in the First and Second Claims for Relief;

e. Whether the alleged conspiracy violated state antitrust and unfair competition law, and/or state consumer protection law, as alleged in the Third and Fourth Claims for Relief;

f. Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fifth Claim for Relief;

g. Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

h. The effect of the alleged conspiracy on the prices of DMS and Vendor Services sold in the United States during the Class Period;

i. The effect of the alleged conspiracy on the prices of Dealer Integration Services sold in the United States during the Class Period;

j. Whether Plaintiffs and the members of the Classes had any reason to know or suspect the conspiracy, or any means to

26

discover the conspiracy;

k.     The appropriate injunctive and related equitable relief for the Classes; and

l.     The appropriate class-wide measure of damages for the Classes.

93.     Plaintiff's claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for DMS purchased from Defendants and/or their co-conspirators.

94.     Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

95.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

96.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit many similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

97.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## PLAINTIFF AND THE CLASSES SUFFERED ANTITRUST INJURY

98.     The purpose of the conspiracy between Defendants was to jointly create a monopoly that would enable them to raise their own profits by excluding competition for the provision of DMS, Data Integration Services, and Vendor Services, which allowed Defendants to increase prices automobile dealerships directly pay for DMS provided by Defendants, and Vendor Services, which must use Defendants' Data Integration Services, as well as the prices automobile dealerships indirectly pay for Data Integration Services used by Vendors.

99.     To accomplish their goal, Defendants reached agreements that have the effect of excluding competitors from providing Data Integration Services and Vendor Services by limiting access to dealer-owned data stored on CDK's or R&R's DMS.

100.    Defendants' conspiracy had the following effects, among others:

   a.    Automobile Dealership options for purchasing DMS, Data Integration Services, and Vendor Services have been severely limited;

   b.    Automobile Dealerships have had to pay increased prices for DMS, Data Integration Services, and Vendor Services;

   c.    Prices for the sale and/or supply of DMS in the United States were maintained and/or stabilized at supra-competitive levels;

   d.    Competition based on price for the direct supply of DMS to automobile dealerships in the United States was restrained or eliminated;

   e.    Competition based on the quality of DMS provided directly to automobile dealerships in the United States was restrained or eliminated;

28

     f.     Prices for the sale and/or supply of Data Integration Systems in the United States were fixed, raised, maintained and/or stabilized at supra-competitive levels;

     g.     Competition based on price for the indirect supply of Data Integration Systems to automobile dealerships in the United States was restrained or eliminated;

     h.     Competition based on the quality of Data Integration Services provided indirectly to automobile dealerships in the United States was restrained or eliminated;

     i.     Prices for the sale and/or supply of Vendor Services in the United States were fixed, raised, maintained, and/or stabilized at supra-competitive levels;

     j.     Competition based on price for the direct and indirect supply of Vendor Services to automobile dealerships in the United States was restrained or eliminated; and

     k.     Competition based on the quality of Vendor Services provided directly to automobile dealerships in the United States was restrained or eliminated.

101.    As a result of Defendants' conspiracy, Plaintiff and the putative Classes have paid and continue to pay supra-competitive prices when directly purchasing DMS and Vendor Services.

102.    As a result of Defendants' conspiracy, Plaintiff and the putative Classes have paid and continue to pay supra-competitive prices when indirectly purchasing Data Integration Services.

103.    By reason of the violations of the antitrust laws alleged herein, Plaintiff and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for DMS, Data Integration Services, and Vendor Services than they would have paid in the absence of the Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

104.     Defendants' anticompetitive conduct has also harmed competition by eliminating and/or limiting the ability of non-Defendant providers of Data Integration Services and Vendor Services to compete with Defendant entities providing those services.  As such, Defendants' anticompetitive conduct has injured competition in the market as a whole.  Defendants' conduct has also limited Dealer options for non-Defendant providers of Data Integration Services and Vendor Services.  By eliminating non-Defendant providers of Data Integration Services and Vendor Services and/or limiting the ability of these competitors to compete, Defendants' conduct has inflated prices for their services, curtailed output in the Data Integration Services and Vendor Services markets, lowered product quality in the Data Integration Services and Vendor Services markets, and reduced innovation.

## CLAIMS FOR RELIEF

### COUNT I:
### VIOLATION OF SECTION 1
### OF THE SHERMAN ACT

105.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in above paragraphs.

106.     Defendants CDK and R&R entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

107.     Defendants CDK and R&R are horizontal competitors in the Dealer Management Services market.  CDK and R&R have subsidiaries and affiliates which similarly compete horizontally in the Data Integration Services and Vendor Services markets.

108.     Defendants CDK and R&R possess a dominant position in the Dealer Management Services market, holding approximately a 70 percent market share, which has helped to further

their conspiracy.

109.     At least as early as 2015, and continuing through at least the present, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade to fix, raise, maintain, and/or stabilize at artificial and non-competitive levels the prices paid by automobile dealerships for DMS.

110.     Defendants' conspiracy, is a *per se* unlawful violation of the federal antitrust laws, an unreasonable and unlawful restraint of trade, was intended to and did harm interstate commerce, and has had an actual, substantial effect on interstate commerce in the United States.  The conspiracy between Defendants CDK and R&R have allowed them to raise prices paid by Plaintiff, and other members of the Classes, for accessing their own dealer information.

111.     As a result of their conspiracy, Defendants caused actual injury to competition in the DMS, Data Integration Services, and Vendor Services markets in the United States.

112.     As a direct and proximate result of Defendants' conspiracy, Plaintiff and members of the Classes have suffered actual injury to their business or property, including but not limited to costs for DMS, Data Integration Services, and Vendor Services.

113.     Plaintiff and members of the Classes are entitled to treble damages for the violations of the Sherman Act alleged herein.

## COUNT II:
## CONSPIRACY TO MONOPOLIZE
## THE DEALER DATA INTEGRATION MARKET
## IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

114.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the above paragraphs.

115.     Defendants CDK and R&R have, with the specific intent to create monopoly power both could exploit, unlawfully and in a coordinated way used their market power in the DMS

market to monopolize the Dealer Data Integration market in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. Together CDK and R&R control 70 percent of the DMS market by number of dealers.

116. When dealers purchase Defendants' DMS, they are locked into that system through Defendants' use of long-term contracts and the fact that changing providers is expensive and cumbersome for auto dealers.

117. By blocking non-Defendant Data Integration Service providers from using CDK's and R&R's DMS and/or disabling non-Defendant dealer Data Integration Services from accessing dealer data, CDK and R&R have demonstrated that they can and do control the Data Integration Services market, resulting in harm to competition and increased prices in that market.

118. The exclusion of competitors from the Data Integration Services market has no procompetitive business justification, such as improving dealer data security, and stifles innovation.

119. Plaintiff and members of the Classes are entitled to treble damages for the violations of Section II of the Sherman Act alleged herein.

## COUNT III:
## VIOLATION OF STATE
## ANTITRUST STATUTES

120. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in above paragraphs.

121. Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq*.

122. Defendants' combinations or conspiracies had the following effects: (1) Data Integration price competition was restrained, suppressed, and eliminated throughout New York;

(2) Data Integration Services' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the New York Class, including those who resided in New York and indirectly purchased Data Integration Services in New York, were deprived of free and open competition, including in New York; and (4) Plaintiff and members of the New York Class, including those who resided in New York, paid supra-competitive, artificially inflated prices for Data Integration Services when they purchased Vendor Services which required use of Data Integration Services, including in New York, purchased Data Integration Services through Vendors and/or Vendor Services that required use of Data Integration Services that were otherwise of lower quality than they would have been absent the Defendants' and their co-conspirators' illegal acts, or were unable to purchase Data Integration Services through Vendors and/or Vendor Services that required use of Data Integration Services through Vendors that they would have otherwise purchased absent the illegal conduct.

123.    During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

124.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Classes have been injured in their business and property and are threatened with further injury.

125.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.*  The conduct set forth above is a *per se* violation of the Act.  Accordingly, Plaintiff and members of the New York Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

## COUNT IV:
## VIOLATION OF STATE
## CONSUMER PROTECTION STATUTES

126.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in above paragraphs.

127.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*.

128.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Data Integration Services were sold, distributed, or obtained in New York.

129.    Defendants deceptively led purchasers, such as Plaintiff and members of the Classes, to believe that the Data Integration Services they provided were sold at legal competitive prices, which increased to improve data security.  In fact, the Data Integration Services were sold at collusively obtained and inflated prices under the false pretext of "improved data security." These inflated prices were ultimately born by automobile dealers.

130.    The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in injuries to purchasers and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

131.    Because of Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased Data Integration Services were misled to believe that they were paying a fair price for Data Integration Services, or the price increases for Data Integration Services and Vendor Services were for valid business reasons. Similarly situated

34

purchasers were potentially affected by Defendants' conspiracy.

132.    Defendants' unlawful conduct had the following effects: (1) Data Integration Services price competition was restrained, suppressed, and eliminated throughout New York; (2) Data Integration Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the New York Class, who resided in and made direct or indirect purchases of Data Integration Services or Vendor Services in New York, were deprived of free and open competition and were subject to Defendants' deceptive practices in New York; and (4) Plaintiff and members of the New York Class, who resided in and made purchases of Data Integration Services or Vendor Services in New York, paid supra-competitive, artificially inflated prices for Data Integration Services, or Vendor Services using Data Integration Services, and were subjected to Defendants' deceptive practices.

133.    Defendants knew that their unlawful trade practices with respect to Data Integration Services would have an impact on all purchasers in New York and not just the Defendants' direct customers.

134.    Defendants knew that their unlawful trade practices with respect to Data Integration Services would have a broad impact, causing members of the Classes who indirectly purchased Data Integration Services to be injured by paying more for Data Integration Services, and Vendor Services requiring use of Data Integration Services, than they would have paid in the absence of Defendants' unlawful trade acts and practices.

135.    During the Class Period, Defendants marketed, sold, or distributed Data Integration Services in New York, and Defendants' illegal conduct substantially affected New York commerce and New York purchasers.

136.    During the Class Period, each of the Defendants named herein, directly, or

indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Data Integration Services in New York.

137.     Plaintiff and members of the New York Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

## COUNT V:
## UNJUST ENRICHMENT

138.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

139.     Plaintiff brings this claim under the laws of the State of New York.

140.     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of DMS, Data Integration Services, and Vendor Services to Plaintiff and similarly situated automobile dealerships.

141.     Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff or members of the Classes for DMS, Data Integration Services, and Vendor Services.

142.     Plaintiff and members of the Classes are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and the members of the New York Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the members of the New York Class may make claims on a *pro rata* basis.

143.     Pursuit of any remedies against non-Defendant providers of DMS, Data Integration Services, and Vendor Services would have been futile given that those providers did not take part in Defendants' conspiracy.

## DEMAND FOR JURY TRIAL

144.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury

of all claims as described in this Complaint so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

A.     The Court determine that this action may be maintained as a class action

under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that

reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil

Procedure, be given to each and every member of the Classes;

B.     That the unlawful conduct, contract, conspiracy, or combination alleged

here be adjudged by the Court to be:

1.     An unreasonable restraint of trade or commerce in violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2; the New York Donnelly Act, §§ 340, *et seq.*, and N.Y. Gen. Bus. Law § 349, *et seq.*;

2.     A *per se* and/or otherwise unlawful restraints of trade in violation of Sherman Act §1 and §2, the New York Donnelly Act, §§ 340, *et seq.*, and N.Y. Gen. Bus. Law § 349, *et seq.*;

3.     An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

4.     Acts of unjust enrichment by Defendants as set forth herein;

C.     That the Court determine that the Plaintiff and the members of the Classes

recover damages, to the maximum extent allowed under the cited laws, and that a joint and several

judgments in favor of Plaintiff and the members of the putative Classes be entered against

Defendants in an amount to be trebled to the extent such laws permit.

   D. That the Court awards Plaintiff and the members of the Classes damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them.

   E. That the Court permanently enjoin Defendants, and any of Defendants' subsidiaries or affiliates, from engaging in any of the conduct described herein.

   F. That the Court awards Plaintiff and members of the Classes pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of services of this Complaint.

   G. That the Court awards Plaintiff and members of the Classes the costs of their suit, including reasonable attorneys' fees, as provided by law; and

   H. That the Court awards Plaintiff and members of the Classes such other and further relief as the case may require and the Court may deem just and proper.

Dated: February 1, 2018     Respectfully submitted,

          By: _/s/ Gary L. Specks_____
          **KAPLAN FOX & KILSHEIMER LLP**
          423 Sumac Road
          Highland Park, Illinois 60035
          Telephone: (847) 831-1585
          Facsimile: (847) 831-1580
          gspecks@kaplanfox.com

          -and

          Robert N. Kaplan
          Matt McCahill
          Aaron Schwartz
          **KAPLAN FOX & KILSHEIMER LLP**
          850 Third Avenue, 14th Floor
          New York, NY 10022
          Telephone: (212) 687-1980

Facsimile: (212) 687-7714
rkaplan@kaplanfox.com
mmcahill@kaplanfox.com
aschwartz@kaplanfox.com


Arthur N. Bailey
R. Anthony Rupp, III
Marco Cercone
**RUPP BAASE PFALZGRAF
CUNNINGHAM, LLC**
1600 Liberty Building
424 Main Street
Buffalo, New York 14202
Telephone: (716) 664-2967
bailey@ruppbaase.com
rupp@ruppbaase.com
cerconeruppbaase.com

*Counsel for Plaintiff Northtown
Automotive Companies Inc.*