# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

BOB BAKER VOLKSWAGEN,

                    Plaintiff,                  Case No.

    vs.

CDK GLOBAL, LLC and THE REYNOLDS         Jury Trial Demanded
AND REYNOLDS COMPANY,

                    Defendants.

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

PARTIES ...............................................................................................................5

JURISDICTION AND VENUE .............................................................................6

FACTUAL ALLEGATIONS ..................................................................................7

     A.     Defendants' Dealer Management Systems ..................................7

     B.     Defendants' DMS Houses Dealers' Data ....................................9

     C.     The Dealers Own Their Data ....................................................11

     D.     Defendants' Misappropriation of the Economic Value of Dealers' Data ....................................................................................15

     E.     Defendants' Unlawful Horizontal Agreements .........................17

     F.     CDK's Imposition of Anticompetitive Agreements On Vendors.............22

     G.     Defendants' Conduct Harmed Competition In the DMS and Dealer Data Integration Markets and, In Turn, Dealers ........................23

CLASS ALLEGATIONS .......................................................................................24

COUNT I: HORIZONTAL CONSPIRACY IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT (ON BEHALF OF PLAINTIFF AND DMS PURCHASER CLASS AGAINST DEFENDANTS) ..................................................................28

COUNT II: UNLAWFUL VERTICAL RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT (ON BEHALF OF PLAINTIFF AND DMS PURCHASER CLASS AGAINST CDK) ...............................................................29

COUNT III: UNLAWFUL TYING IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT (ON BEHALF OF PLAINTIFF AND DMS PURCHASER CLASS AGAINST CDK)...................................................................................30

COUNT IV: UNLAWFUL MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT (ON BEHALF OF PLAINTIFF AND DMS PURCHASER CLASS AGAINST CDK) ........................................................................31

COUNT V: VIOLATION OF STATE ANTITRUST STATUTES (ON BEHALF OF PLAINTIFF AND THE DEALER DATA INTEGRATION INDIRECT PURCHASER CLASS AGAINST DEFENDANTS) .......................................................32

COUNT VI: VIOLATION OF STATE CONSUMER PROTECTION STATUTES  (ON
  BEHALF OF PLAINTIFF AND THE CONSUMER PROTECTION CLASS
  AGAINST DEFENDANTS) ..............................................................................52

COUNT VII: UNJUST ENRICHMENT (ON BEHALF OF PLAINTIFF AND THE
  UNJUST ENRICHMENT CLASS AGAINST CDK)......................................................75

COUNT VIII:  CONVERSION (ON BEHALF OF PLAINTIFF AND THE
  CONVERSION CLASS AGAINST CDK)....................................................................102

JURY DEMAND .....................................................................................................106

PRAYER FOR RELIEF ...........................................................................................106

## INTRODUCTION

1.     Plaintiff Bob Baker Volkswagen ("Plaintiff") brings this action against Defendants CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") (collectively, "Defendants") to recover millions of dollars in ill-gotten gains that they have obtained by charging supracompetitive prices in the markets for Dealer Management System ("DMS") software services and data integration services as a result of their unlawful conspiracy in violation of federal and state antitrust, consumer protection, and other laws. Through a variety of anticompetitive practices, CDK and Reynolds eliminated competition for the provision of these vital services to automotive dealers nationwide, thus enabling them to raise prices to exorbitant levels. Other market players were left powerless to compete to offer lower prices for these services, leaving customers (the dealers) no option but to pay the higher prices.

2.     CDK and Reynolds were able to effectuate their unlawful conduct by exploiting and retaining the economic value of data owned by automobile dealers nationwide but stored on Defendants' computer systems. Dealers' data is the life-blood of the automotive industry. In the course of their operations, automobile dealerships generate important data, including vehicle and parts inventory, customer name and contact information, completed and pending sales, vehicle financing and insurance information, and much more.

3.     The economic value of dealers' data is immense. Providers of software applications used by dealerships – known in the industry as "vendors" – ascribe significant value to dealers' data because they need it to provide dealers with software that supports important dealership services, such as inventory management, customer relationship management, and electronic vehicle registration and titling.

4.     Dealer data is entered into a database within their DMS. The DMS is the mission-critical enterprise software that manages nearly every function of a dealer's business.

Defendants are by far the two largest providers of DMS services, controlling approximately 75 percent of the United States market by number of dealers, and a significantly higher percentage when measured by vehicles sold.

5.    All DMS providers, including CDK and Reynolds, have recognized that dealers own the data they input into their DMS.  For example, as set forth below, for many years CDK has repeatedly and publicly represented that "dealerships own their data."  Reynolds likewise has publicly declared: "The data belongs to the dealers. We all agree on that."  For many years, dealers had the right to grant data access to third-party "data integrators," such as Wisconsin-based Authenticom, Inc. ("Authenticom"), which could then extract the data and provide it to vendors.

6.    Reynolds changed that position over a number of years and began blocking data integrators, including Authenticom, from accessing dealer data on the Reynolds DMS by disabling login credentials.  In fact, even CDK criticized this change at the time, with CDK's CEO explaining that CDK would not prohibit data integrators' access to the dealers' own data.  CDK stood its ground over the next eight years, continuing to favor open access to dealers' data and permitting companies like Authenticom to access the data.

7.    In 2014, however, CDK – eager to inflate its profits after a recently completed initial public offering ("IPO") – hatched a scheme to capture the economic value of dealers' data for itself.  To the surprise of the entire market, CDK abruptly abandoned its decades-old acknowledgment that dealers own and control their data, and took the position that CDK is entitled to control access to and use of dealers' data because it resides on CDK's physical computer systems.  In effect, CDK took dealers' data hostage.

8.     Since its about-face, CDK has refused to allow dealers to use third-party integrators to access their data, and has actively blocked access by third-party integrators to its systems. Instead, CDK now requires all dealers that want to provide their vendors access to their data to use CDK's own data-integration service to obtain access to the dealers' own data. The prices CDK charges to vendors for that service dwarf that of independent third-party integrators. Authenticom's fees for data integration range from $30 to $75 per month per dealership. Indeed, when CDK offered third-party integration services prior to engaging in the unlawful conduct alleged here, it charged approximately $50 per month per dealership connection. Now, CDK charges vendors $300 per month on average for the same services, and some vendors must pay more than $800 per month. These higher fees are then passed on by the vendors to the dealers, which have no choice but to pay them. The perverse result is that CDK dealers now pay exorbitant amounts for access to their own data.

9.     The bloated fees CDK charges for access to dealers' data far exceed the market value of the data integration services that CDK actually provides. Rather, CDK's prices capture the economic value of the data owned by the dealers. CDK's exploitation of the economic value of dealers' data contributed significantly to CDK's overall financial performance, including the substantial and rapid rise in its stock price after its 2014 IPO.

10.     As set forth more fully below, CDK has, through its uniform pattern of corporate conduct, improperly reaped the economic value of dealers' data for itself, by exploiting the physical control it possesses over the data through its control of the DMS. As a result of that conduct, CDK has improperly deprived dealers of the economic benefits associated with their own data – and instead retained those benefits for itself. Plaintiff, on behalf of itself and other

similarly situated dealers, seeks restitution of the millions of dollars in ill-gotten profits that CDK has obtained – and continues to obtain – from the misappropriation of dealers' data.

11.     But CDK did not act alone.  CDK's about-face was the product of an unlawful horizontal coordination with CDK's main rival in the DMS market, Reynolds.  CDK and Reynolds entered into an unlawful group boycott of Authenticom, both agreeing to block Authenticom's access to dealer data on their systems.  In addition, in 2015, CDK and Reynolds entered into a written market-division agreement – in which they agreed not to compete for data integration services – and also to block third-party access to their DMSs.  The purpose of their illegal collusion was both to increase the prices they could charge for access to dealers' own data but also to secure and enhance their market power in the DMS market.  As part of the written agreement, Defendants agreed that CDK would stop providing integration services for dealers using the Reynolds DMS, ceding that ground exclusively to Reynolds.  Moreover, the agreement provided for coordination between Defendants to transition vendors from CDK to Reynolds.

12.     CDK knew that third-party vendor applications enabled by lower-cost data integration services posed a serious threat to its (and Reynolds') dominance in the DMS market.  Such applications offered dealers a cheaper, more attractive alternative to the suite of software that CDK offered as part of its DMS.  As third-party applications achieved greater market penetration, it undermined dealers' willingness to enter into long-term and expensive contracts for CDK's DMS.  Dealers even began forgoing DMSs altogether, instead relying solely on third-party applications.  This threat was known as the "hollowing out" of the DMS.  By seizing control over dealer data, CDK sought to forestall that threat to their DMS market power.  The result has been supracompetitive DMS prices to dealers nationwide.

13.     Having agreed not to compete with each other in the data integration market, Defendants also took steps to eliminate their remaining competitors, including engaging in a group boycott of Authenticom.  Defendants took many other steps to obstruct data integration providers from obtaining access to dealers' data, including purchasing several integrators and initiating litigation.

14.     Defendants' unlawful conduct was meant to, and did, raise prices of both DMS and data integration services to dealers.  As a result, dealers were injured by paying more for these services than they would have absent the unlawful conduct.  Plaintiff, on behalf of the Classes set forth below, seeks to recover for their losses under the Sherman Act, state antitrust statutes, unfair competition and consumer protection statutes under various state laws, unjust enrichment, and conversion.

## PARTIES

15.     Bob Baker Volkswagen ("Plaintiff") is a corporation organized and existing under the laws of California with its principal place of business at 5500 Paseo del Norte, Carlsbad, CA 92008.  Bob Baker Volkswagen is affiliated with four other car dealership franchises in Carlsbad, California, known as the Bob Baker Auto Group.  For many years, up until December 2017, Bob Baker Volkswagen purchased DMS services from CDK.  During that same period, Bob Baker Volkswagen purchased software applications from vendors.  As a result of Defendants' unlawful conduct, Bob Baker Volkswagen paid supracompetitive prices for its DMS.  Bob Baker Volkswagen also paid supracompetitive prices for data integration because the vendors from which Bob Baker Volkswagen purchased software applications passed on Defendants' inflated data integration fees.

16.     Defendant CDK is a publicly traded Delaware corporation with its corporate headquarters and principal place of business at 1950 Hassell Road, Hoffman Estates, Illinois

60169. CDK provides DMS software and services to automobile dealerships throughout the United States, including to Plaintiff, and has more than $2 billion in annual revenues. In 2014, CDK was spun off from ADP, LLC, and is now an independent, publicly traded company in which ADP retains no ownership interest. Prior to the spin-off, CDK was referred to as ADP Dealer Services (collectively, referred to herein as "CDK").

17.     Defendant Reynolds is an Ohio corporation with its corporate headquarters and principal place of business at One Reynolds Way, Kettering, Ohio 45430. Like CDK, Reynolds provides DMS software and services to automobile dealerships throughout the United States. Though formerly a publicly traded company, Reynolds was acquired by Bob Brockman in 2006.

## JURISDICTION AND VENUE

18.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; and state statutory and common law.

19.     The Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

20.     This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1332(d) because one or more of the plaintiffs is a citizen of a State different from Defendants CDK and Reynolds and the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs. Supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 is also appropriate because Plaintiff's state law claims arise out of the same case or controversy as its federal claims.

21.     This Court has personal jurisdiction over Defendants subject to the nationwide service provisions in Section 12 of the Clayton Act, 15 U.S.C. § 22. Furthermore, Defendants have engaged in the unlawful acts described in this Complaint with the foreseeable or intended

effect of causing substantial economic harm to automobile dealers in Illinois. Moreover, Defendants purposefully availed themselves of the privilege of doing business in Illinois through the widespread promotion, sale, marketing, and distribution of their products and services in the state. Defendants are registered to do business, transacted business, were found, and had agents in this District.

22. Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26 because Defendants are found in this District and transact business in this District. Defendants also reside in this District for purposes of 28 U.S.C. § 1391(b), (c).

23. Defendants' unlawful conduct substantially affected interstate commerce by harming competition, increasing prices, and reducing quality and output in the DMS and Dealer Data Integration Markets, to the detriment of Bob Baker Volkswagen and other auto dealers nationwide.

## FACTUAL ALLEGATIONS

### A. Defendants' Dealer Management Systems

24. Dealer Management System software is enterprise software designed specifically for retail automotive dealerships. The DMS has been analogized to the central nervous system of a car dealership because it manages virtually every aspect of a dealer's business. Those functions include sales, financing, inventory management (both vehicle and parts), repair and service, accounting, payroll, human resources, marketing, and more. Industry publications describe the DMS as "the center of a dealer's entire retail management platform. It's impossible to operate without it."

25. Critically, the DMS is also the place where a dealer's own data is stored, such as its inventory, customer, sales, and service information. In this way, the DMS also operates as a

database. The physical storage of the data typically takes place either onsite at the dealership (on servers owned by the dealer or the DMS provider), offsite at private data centers operated by the DMS provider, or with cloud-based data storage companies.

26. A dealer only has one DMS provider at a time. It would be functionally impossible for a dealership to operate with two separate DMS platforms – DMS providers have completely different and incompatible operating software for their respective systems.

27. CDK and Reynolds together dominate the DMS market. Combined, CDK and Reynolds control approximately 75 percent of the DMS market in the United States when measured using dealership rooftops (i.e., franchised stores), with CDK controlling approximately 45 percent of the market and Reynolds controlling 30 percent. When measured using the number of vehicles sold from franchised dealers – which is more relevant for antitrust purposes – CDK's and Reynolds' market dominance is even more pronounced with a combined market share exceeding 90 percent.

28. On May 24, 2017, CDK announced an agreement – pending regulatory approval – to buy another DMS provider, Auto/Mate, which has an additional eight percent of the DMS market when measured by rooftops.

29. Defendants are known in the industry as the "Duopoly," the "Big 2," and the "400-pound gorillas" or "big giants" of the DMS market.

30. Dealers pay CDK and Reynolds extremely high prices to use their DMS. A single, small dealership will pay up to $150,000 per year for the DMS software license and services offered by CDK and Reynolds. Mid-size dealership groups (5 to 10 stores) can pay $1,500,000 or more per year, and large dealerships can easily pay over $5,000,000 per year. Given the thousands of dealerships that CDK and Reynolds serve, and with profit margins

exceeding 40 percent, CDK and Reynolds are tremendously profitable. CDK's market capitalization is $9.2 billion.

31.    The profitability of CDK's DMS business is enhanced by the extraordinary leverage CDK exerts over dealers.  Among other things, it is enormously difficult and disruptive for a dealer to switch DMS providers.  One industry executive stated that changing DMS providers "is akin to a heart transplant."  CDK's CEO recently acknowledged that "switching DMS providers can be very difficult.  It [is] quite a process [to] change and takes time, which is part of the reason that many dealers are hesitant to switch."[1]  Both Reynolds and CDK have publicly touted that their market positions are secure because of this very fact.  Indeed, the *average* DMS client tenure is over 20 years.

32.    Moreover, CDK and Reynolds sell their DMS software and services pursuant to long- term contracts, typically between five and seven years in length, often with automatic extensions if new services are ordered in the middle of the contract. CDK and Reynolds therefore lock in their dealers with lengthy contracts.

**B.    Defendants' DMS Houses Dealers' Data**

33.    The DMS also has a database component; it is where dealers input and store their own data.  The dealer data stored on the DMS includes vehicle and parts inventory, customer name and contact information, completed and pending sales, vehicle service and repair history, manufacturer pricing and rebate details, vehicle financing and insurance information, and much more.  The physical storage of the data typically takes place either onsite at the dealership (on servers owned by the dealer or the DMS provider), offsite at private data centers operated by the DMS provider, or with cloud-based data storage companies.

---

[1] Thomson Reuters StreetEvents, *Edited Transcript: CDK – Q1 2017 CDK Global, Inc. Earnings Conference Call*, at 3 (Nov. 2, 2016) (statement by CDK Global CEO Brian MacDonald).

34.     Third-party application providers (vendors) value dealers' data because they need it to develop and sell software applications for use in the automotive industry.  For example, vendors that provide electronic vehicle registration and titling – a critical service that dealers are legally mandated to provide in some states – must be able to retrieve purchaser, vehicle, and financing information about the sale of a car from the dealer's DMS.  Without access to that data, vendors cannot register and title the car with the state.

35.     A single dealership rooftop typically uses about 10-15 separate application providers (i.e., vendors) – and often more.

36.     The only way for dealers to supply their data to application providers is to obtain it from the dealer's DMS database.  Dealers do not store that data on any other system or database.  As CDK describes it, the dealer's data on a dealer's DMS is "irreplaceable."

37.     Dealers find it cumbersome to retrieve their own data from their DMS.  To obtain the economic benefit of that data, therefore, dealers generally use "data integrators" that specialize in extracting dealers' data from their DMS databases.  Data integrators also correct errors in the data, organize it into a standard format, and deliver to vendors the specific data they require.  Data integrators do this in an automated fashion; manual extraction is not a feasible alternative.

38.     Vendors typically contract with data integrators to extract dealer data pursuant to the dealer's authorization.  A portion of the cost vendors pay to data integrators is passed on to the dealer when it purchases the vendor's software application.

39.     At one time, there were numerous participants in the Dealer Data Integration Market.  Today, there are only CDK, Reynolds, and Authenticom.  Defendants have succeeded in driving every other competitor out of the market.

### C.     The Dealers Own Their Data

40.     The data on a dealer's DMS is not owned by the DMS provider.  Rather, the data is owned by the dealers that generated it.  CDK and Reynolds have repeatedly acknowledged dealers' ownership rights in their data in public statements by senior executives, on their websites, and in their DMS contracts.

41.     Tom Schwartz, Reynolds' chief spokesperson, publicly declared: "The data belongs to the dealers.  We all agree on that."[2]  On its website, Reynolds represents to dealers: "Your Data, Your Way.  You own your data. Reynolds recognizes you need to share that data outside your dealership."

42.     For CDK's part, Howard Gardner, CDK's vice president over data strategy, has stated that CDK "has always understood that dealerships own their data and enjoy having choices on how best to share and utilize that data with others."[3]

43.     CDK's website likewise states: "[D]ealerships own their data."

44.     Reynolds' and CDK's DMS contracts also "spell out which party owns the data and there is generally little dispute: the data belongs to the dealer.  This makes sense; after all, it's the dealership's customers, inventory, and transactional data that the dealership is putting into the DMS system."[4]

45.     Until they began their anticompetitive conduct, CDK and Reynolds also publicly recognized that dealers, as owners of their data, have the right to control who has access to their data, including by sharing it with data integrators.  Every other category of participant in the

---

[2] David Barkholz, *Dealers Decry Reynolds Crackdown*, Automotive News (Nov. 21, 2011).

[3] CDK Dealer Services, Inc. Press Release, *[CDK] Announces New Approved Vendors for [CDK]'s Third Party Access Program* (July 12, 2013).

[4] DrivingSalesNews, *The Hidden Data Tax That Dealers Don't Know They Are Paying*, Driving Sales (Oct. 17, 2013).

industry – including industry organizations, vendors, dealers, and car manufacturers – also recognizes this fundamental principle.

46.    Steve Anenen, CDK's longtime and recently retired CEO, publicly stated that dealers have the right to grant third parties, such as data integrators, access to their data. "We're not going to prohibit that or get in the way of that," he told the industry publication *Automotive News*.[5]  "I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it, when in fact it's really the data belonging to the dealer. As long as they grant permission, how would you ever go against that wish?"  *Id.*

47.    Matt Parsons, CDK's vice president of sales and marketing, similarly stated: "We're not going to limit the ability of a dealer to give an ID to someone else to, in essence, dial into their system.  That is the dealer's right.  We have no right to tell them they can't do that."[6]

48.    Kevin Henahan, CDK's senior vice president of product marketing, delivered the same message to dealers and the industry: "We don't tell the dealer, if someone wants access to their data, they have to come to [CDK] to gain access to the data.  It's ultimately the dealer's data.  If he wants to give that data to somebody, for us to try to charge a toll doesn't seem like the right thing to do.  So we're not going to go down this path."[7]

49.    In addition to these statements, CDK put these principles into practice.  For more than a decade, CDK's subsidiaries – Digital Motorworks ("DMI") and IntegraLink – have

---

[5] Ralph Kisiel, *ADP Provides Dealers 3 Options on Data Access*, Automotive News (Feb. 19, 2007).

[6] Ralph Kisiel, *NADA, AIADA Weigh Reynolds Data Security Debate*, Automotive News (Feb. 4, 2007).

[7] Ralph Kisiel, *Dealer Security Stirs Insecurity: Vendors Wary of Reynolds Plan for Computer Systems*, Automotive News (Dec. 4, 2006).

operated as data integrators and have pulled dealer data from other DMS systems on behalf of dealers. DMI and IntegraLink continue to do so to this day.

50.     CDK also issued press releases stating that it "believes in the fair competitive environment and does not use its leverage through supply of the dealer management system to reduce competition through the restriction of dealer access."[8] Yet as alleged here, CDK has done just that – restricted dealer access to its own data in order to reduce competition in the DMS and Dealer Data Integration Markets.

51.     Industry organizations have likewise recognized that dealers own and control their data. On February 2, 2007, the National Automobile Dealers Association (NADA) and American International Automobile Dealers Association (AIADA), the two largest automobile dealer associations in the United States, issued a "Joint Policy Statement on Data Accessibility."[9] The purpose of the statement was to "guide the use and protection of data in dealership management systems." *Id.* The joint statement set forth the following three principles. First, "[d]ealers should control access to the data stored in their dealership management systems." *Id.* Second, "[d]ealers, not dealership management system vendors or other entities, should have the sole right and the practical means to authorize third parties to access and extract dealer data." *Id.* And third, "[d]ealers expect all parties involved in storing and using dealer data to . . . [r]efrain from unreasonably impeding dealer-authorized access to dealer data." *Id.*

52.     CDK also was a founding member of Open Secure Access, Inc., "a coalition of companies that believe dealers should control access to the data they own and determine how it

---

[8] Automatic Data Processing Inc., Press Release, *ADP Announces Its Third-Party Access Program* (Feb. 2, 2007).

[9] NADA Press Release, *NADA, AIADA, Issue Joint Policy Statement on Data Accessibility* (Feb. 2, 2007); *see also* Ralph Kisiel, Automotive News (Feb. 4, 2007).

is used."[10]  The group published a set of basic principles to guide the industry, including that "dealers should control who accesses their data," "[t]hird parties that have dealer permission to utilize a dealer's data should be able to access the data through their own efforts or through the services of an independent company," and "DMS companies should facilitate interaction with all data available to a DMS user by providing technologically advanced means to interact with (read and write) that data, either through a robust set of APIs, system functionality, or direct access to the database."[11]

53.     Until 2014, consistent with the principle that dealers own the data on the DMS, CDK generally allowed dealers to control the commercial uses of that data.  Among other things, CDK permitted dealers the freedom to decide how dealers would extract that data from the DMS, and for what purposes.  CDK's own Third Party Access program, or 3PA, allowed dealers – at no cost – to "suppl[y] third-party vendor[s] a user ID and password to access [the] dealership's system."[12]  The provision of free third-party access was a recognition that dealers own their data, and thus CDK has no right to impose a toll on the extraction of that data from its DMS.

54.     To the extent dealers voluntarily chose to have CDK extract their data on their behalf, CDK also offered dealers an additional service known as "Third-Party Integration."  That service – which included "real-time access" and a "bi-directional interface," allowing for both pulling data from and pushing data into the DMS – cost an average of approximately $70 per month per dealership rooftop.  Importantly, dealers could choose whether to purchase this

---

[10] Open Secure Access, Inc. Press Release, *Open Secure Access Releases Automotive Retail Data Security Guidelines* (June 28, 2007).

[11] https://web.archive.org/web/20070304104838/http://www.opensecureaccess.com/.

[12] Ralph Kisiel, *ADP Provides Dealers 3 Options on Data Access*, Automotive News (Feb. 19, 2007).

additional service on a vendor-by-vendor basis, giving dealers flexibility in managing how their vendors obtained data.

### D. Defendants' Misappropriation of the Economic Value of Dealers' Data

55.     Starting in 2013, CDK's largest rival, Reynolds, began vigorously blocking dealers' access to dealer data on its DMS.  The strategy was highly profitable:  by requiring dealers to use Reynolds to extract their data, and by eliminating the ability of independent data integrators such as Authenticom to serve dealers using the Reynolds DMS, Reynolds succeeded in obtaining substantially higher fees for data integration.

56.     Starting in 2014, around the time of its September 2014 IPO, CDK decided it wanted to increase its own profits through the same tactics.  Thus, in 2015, CDK fundamentally revised its policies with respect to access to dealer data through a "refresh" of its 3PA program.

57.     The revised 3PA program no longer permitted dealers to authorize third-party access to their own data.  Instead, CDK prohibited dealers from extracting their own data using any service other than CDK's.  Moreover, CDK began actively blocking any effort by dealers to use other integrators (such as Authenticom) to extract that data on its behalf.  For example, in August 2016, CDK disabled Authenticom's login credentials at thousands of dealerships that had authorized Authenticom to access their data.

58.     In addition to eliminating dealers' control over their data, CDK's new 3PA program imposed much higher prices for the use of that data.  On average, CDK began charging vendors on average between $250 and $300 per month per connection, almost triple the $70 that it charged before for the exact same services.[13]

---

[13] *See* David Barkholz, *Dealers Will Pay Up for Vendors' Data Access After CDK Switch*, Automotive News (July 20, 2015).

59.     The prices CDK has charged for data integration under its "refreshed" 3PA program do not reflect the value of its data integration services.  Indeed, independent third-party data integrators such as Authenticom charge only $30 for similar services.  And CDK itself, prior to 2014, charged prices comparable to Authenticom's.  Instead, CDK's prices largely reflect the fact that CDK has captured the economic value of the data owned by the dealers, by barring dealers' access to and ability to control their own data.

60.     In an effort to prevent dealers from realizing that it was reaping huge profits from dealers' own data, moreover, CDK has attempted to prevent vendors from informing dealers about the price of data integration services.  CDK prevents vendors from separately identifying CDK's 3PA charges in vendors' invoices to dealers, to prevent vendors from informing dealers of CDK's exorbitant prices.

61.     Importantly, CDK does not offset its massive data integration fees with lower DMS prices.  On the contrary, because of their market power in the DMS market, CDK's prices for DMS service continue to rise each year – at a rate much higher than inflation – without any cost justification.  Moreover, dealers indirectly bear the increased costs CDK imposes on vendors for access to dealers' own data, in the form of higher prices for software applications.  Dealers thus are doubly worse off:  they bear the brunt of higher prices for DMS and higher costs for software applications.

62.     Although CDK implemented these changes as part of its so-called "SecurityFirst" initiative, CDK's security rationale is largely pretextual, as the industry itself recognized at the time.[14]  Vendors and dealers received little, if anything, in return for the dramatically higher prices.  "Vendors briefed on CDK's new data-security program said nothing will change in the

---

[14] *See* David Barkholz, *CDK Global Sees Earnings Boost from Cost-Cutting, Improved Efficiency*, Automotive News (Nov. 3, 2015).

way they get data from CDK-served DMS dealerships under SecurityFirst except for a higher price."[15]  Indeed, vendors "in the CDK program . . . say the costs being charged far exceed the value of any increased data security."  *Id.*  One "vendor executive who asked not to be named called the data-access cost a surcharge under the guise of data security."  *Id.*

63.     In short, although CDK maintains physical possession of dealer data on its DMSs, CDK has long acknowledged that data is owned not by CDK but by the dealers.  Nonetheless, beginning in approximately 2014, CDK has used its physical control over dealer data to deprive dealers of their right to control the use of that data.  By doing so, CDK has extracted exorbitant fees from dealers simply to access their own data, and has improperly obtained the economic value of that data for itself.

64.     As for Reynolds, before 2010, Reynolds generally charged vendors less than $100 per month per connection.  By 2013 – after it had begun to block independent data integrators and impose (and enforce) exclusivity provisions in its contracts with dealers and vendors – Reynolds raised its monthly prices per connection from less than $100 to between $300 and $500.  This constitutes a price increase in the range of 200 to 400 percent for data integration services.  And since Defendants entered the agreement in 2015, Reynolds has been raising its prices for data integration services even more, including by charging many vendors a transaction charge for every data pull.  CDK has instituted the same practice of charging some vendors an additional per-transaction fee on top of their already large monthly fees.

        **E.      Defendants' Unlawful Horizontal Agreements**

65.     CDK sought and obtained Reynolds's agreement in seizing dealers' data.  In an October 2014 presentation, CDK stated that it wanted to enter into "reciprocal agreements with

---

[15] David Barkholz, *Dealers Will Pay Up for Vendors' Data Access After CDK Switch*, Automotive News (July 20, 2015).

DMS providers" – i.e., Reynolds – to "Secure the CDK DMS through eliminating opportunities for key enablers of hostile integration (R&R – Authenticom, Dominion, SelectQu)." CDK (and Reynolds) saw low-cost data integration as a threat to their duopoly in the DMS market. The increasing market penetration of standalone applications – especially sales and service customer relationship management applications – posed a direct threat to CDK's core business and profitability. That was especially true because many of those standalone applications generate much of the dealer data that resides on the DMS in the first place. For example, customer relationship management software is often where dealers capture and store information about their customers and sales transactions. If dealers began entering their data outside the DMS – in standalone applications – that would not only reduce demand for CDK's DMS software, but also reduce CDK's ability to exert leverage over dealers by seizing their data. It was thus imperative for CDK to forestall the "hollowing out" of the DMS. CDK therefore decided, in 2015, to enter into a mutual pact with Reynolds to seize dealers' data to help address the threat to their DMS duopoly posed by standalone applications.

66.     Specifically, in February 2015, CDK and Reynolds agreed – including through three written agreements – to cooperate in closing their respective DMSs and to drive third-party data integrators out of the market. These agreements eliminated competition between CDK and Reynolds in the DMS market based upon dealers' ability to grant access to their data, which before 2015 was the primary point of competition and differentiation between the duopolists.

67.     **Market Division Agreement.**  The centerpiece was a so-called "Data Exchange Agreement" – also referred to as a "wind-down" agreement – pursuant to which CDK agreed to wind down its data integration business on the Reynolds DMS, with Reynolds promising not to block CDK's access to the Reynolds system during the wind-down period, which might last as

long as five years – until the year 2020. *See* Data Exchange Agreement § 1.4. During that period, Reynolds agreed that CDK could continue to extract dealer data just as it had before, using login credentials provided by the dealer. *See id.* § 4.3. As for other independent integrators, CDK and Reynolds agreed that they would not "take any steps to assist any person that it reasonably believes to have plans to access or integrate with the other party's DMS." *Id.* § 4.5.

68.     CDK and Reynolds also agreed that they themselves would no longer access data on each other's DMSs. *Id.* (agreeing to "[p]rohibition on . . . DMS Access"). Specifically, the agreement states: "For the avoidance of doubt, this Section 4.5 is not intended as a 'covenant not to compete,' but rather as a contractual restriction of access and attempted access." *Id.* This restriction lasts forever. *See id.* § 6.1. Reynolds' own top executive confirmed that Section 4.5 prohibits CDK and Reynolds from accessing each other's DMS. Robert Schaefer, Reynolds' Vice President of Data Services, has testified under oath to the following: "Q: In this contract by its plain term Section 4.5, Reynolds agreed not to access the CDK DMS; isn't that right? A: That would be correct." Dkt. No. 163, at 76:6-9.[16] Mr. Schaefer offered similar sworn testimony with respect to CDK's prohibition on access of Reynolds' DMS. *Id.* at 73:11-16; 75:16-76:1.

69.     Further, the agreement also mandated coordination between CDK and Reynolds in transitioning all of CDK's vendor clients (*i.e.*, those vendors for whom CDK provided access to dealer data on the Reynolds DMS) into the Reynolds Certified Interface ("RCI") program. *See* Data Exchange Agreement § 4.4. The agreement specifically required CDK to "cooperate with Reynolds" in the "transition of [CDK] customers to the Reynolds RCI program with respect

---

[16] Citations to the Transcripts of the Hearing held June 26-28, 2017 in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318 (W.D. Wis.), are referred to by their respective docket numbers (Dkt. Nos. 162-166).

to Reynolds Dealers." *Id.* In connection with that effort, CDK agreed to give Reynolds full information about the vendors CDK served, including their name, DMS number, store number, branch number, user login, specific data access provided by CDK, data interfaces, the frequency of the data provided, the deadlines for data delivery, the format of the data, and more. *See id.* § 4.3, Exhibit DEA-2. Absent an agreement not to compete, CDK would treat this information as a highly confidential customer trade secret and would not share it with rivals. Indeed, Mr. Schaefer of Reynolds admitted under oath that Reynolds would never share such highly sensitive information with a competitor absent an agreement with that competitor.

70. **Integration Agreements.** Two additional written agreements between CDK and Reynolds "granted reciprocal access" to each other's data integration products – the 3PA and RCI programs, respectively. Under the agreements, CDK's proprietary applications could access the Reynolds DMS via RCI, and vice versa. Reynolds received five free years of 3PA access from CDK, while CDK pays for the data integration services from Reynolds. Moreover, by signing up for 3PA, Reynolds agreed that it would access the CDK DMS exclusively through 3PA, and not obtain data for its applications from anywhere else. CDK agreed to the same in its integration contract with Reynolds for the RCI program.

71. **Agreement To Block Third-Party Data Integrators.** In addition to the written agreements, CDK and Reynolds have also engaged in a coordinated group boycott of independent integrators, such as Authenticom. In fact, senior CDK and Reynolds executives have admitted that they have agreed to restrict access to dealer data and destroy data integrators like Authenticom, SIS, and others. During a phone conversation with Steve Cottrell – Authenticom's founder and CEO – in May 2015, Mr. Schaefer of Reynolds said that Reynolds had "made agreements with the other major DMS providers" – there is only CDK – "to support

each other's third-party access agreements *and* to block independent integrators such as Authenticom." Dkt. No. 164, at 139:6-13. Mr. Schaefer said that Reynolds' owner, Bob Brockman, was "adamant" that all third-party data integrators must be cut off. *Id*. As a result, Mr. Schaefer said that Authenticom should wind down its operations and leave the market. *See id*. at 138:3-139:19.

72. A top executive at CDK delivered the same message to Mr. Cottrell. *Id*. at 140:1-143:1. On April 3, 2016, at an industry convention in Las Vegas, Dan McCray (CDK's former Vice President of Product Management) stopped by Authenticom's booth to talk with Mr. Cottrell, who was occupied with a customer. *Id*. After Mr. Cottrell finished with the customer, he walked to CDK's booth, where he saw Mr. McCray "standing off to the side" with "three other individuals." *Id*. After cordial greetings, Mr. McCray took Mr. Cottrell by the arm and said, "Let's take a walk." *Id*. Mr. McCray led Mr. Cottrell off the convention floor and down a service ramp to a secluded area. *See Id*. Mr. McCray then confirmed the existence of the illegal agreement, stating that CDK and Reynolds had agreed to "[l]ock you and the other third parties out," and that they were "working collaboratively to remove all hostile integrators from our DMS system." *Id*. at 140:1-143:1. Mr. McCray then grew threatening: "I wanted to look you in the eye and let you know man to man, I have been mandated by our new CEO to seek you out and destroy your business on our systems." "For god's sake," he concluded, "you have built a great little business, get something for it before it is destroyed otherwise I will f***ing destroy it." Mr. Cottrell rejected Mr. McCray's threats, and insisted that Authenticom would continue to serve its dealer and vendor customers.

73. CDK and Reynolds even have employees actively working together to coordinate the technical aspects of blocking third-party access. In December 2016, during one particular

vendor's discussions with CDK about joining the 3PA program and leaving Authenticom, Steve French – CDK's senior director of client and data services – told the vendor that a large portion of his job was to work with Reynolds to ensure third-party data integrators like Authenticom remain locked out. Mr. French suggested that resistance to getting dealer data from CDK and Reynolds was futile as they were working together to lock out third-party access.

### F. CDK's Imposition of Anticompetitive Agreements On Vendors

74. CDK has inserted exclusive dealing provisions in its data integration contracts with vendors. As a result, a vendor using CDK for data integration services must agree *only* to use CDK, and forgo using any other data integration provider.

75. Specifically, CDK's 3PA contracts contain exclusive dealing provisions that prohibit vendors from obtaining dealer data from anyone other than CDK. Thus, if a vendor obtains dealer data through the 3PA program (for CDK dealers) or the Reynolds RCI program (for Reynolds dealers), the vendor is barred from obtaining the dealer data from any other integrator.

76. The 3PA contract prohibits vendors from having Authenticom (or any other data access provider or even the dealer itself) provide the data to the vendor. Moreover, the exclusivity provision applies to every software application a vendor has. Thus, if a vendor uses CDK's integration product for one application, the vendor must then use CDK for every other application too.

77. These exclusive terms purportedly last forever. By extending the life of the prohibitions into perpetuity, the contract ties the vendor to the 3PA program indefinitely. Even if the vendor were no longer to participate in the 3PA program, it would still be barred – forever – from obtaining data from any CDK dealer from any other source. That gives CDK carte blanche to abuse vendors and raise prices once they enter the 3PA program, because few, if any, vendors

could survive without access to nearly half the franchised dealerships in the United States (i.e., those that use the CDK DMS).

### G. Defendants' Conduct Harmed Competition In the DMS and Dealer Data Integration Markets and, In Turn, Dealers

78.     Defendants' unlawful conduct harmed competition in the DMS and Dealer Data Integration Markets.  In turn, Defendants' anticompetitive conduct directly harmed dealers by causing them to pay higher prices for DMS and by causing them to pay higher prices for applications.

79.     First, Defendants' seizure of dealers' data has resulted in dealers being forced to pay supracompetitive prices for DMS.  As explained above, standalone applications facilitated by independent data integration constrain the prices that Defendants can charge for its DMS, because such standalone applications can pose a competitive alternative to some or all of the functionality of the DMS.  Defendants' conduct inhibited the competitiveness of these standalone applications by charging prohibitive dealer integration fees to vendors for access to dealers' data.

80.     Second, Defendants' conduct resulted in dealers bearing a significant portion of the increased cost of data integration fees, because vendors passed a part of those increased costs to dealers in the form of higher prices for software applications.

81.     Defendants' conduct harmed Bob Baker Volkswagen by forcing it to bear the cost of supracompetitive prices for DMS and increased software application prices from vendors that passed through all or a portion of CDK's sky-high integration fees.

82.     There are no pro-competitive justifications that justify Defendants' anticompetitive behavior.  Defendants have claimed that "closing" the DMS is necessary to protect "data security" because, it asserts other data integrators are "unsecure."  But that is

simply not true; the security rationale is simply a pretext for its effort to seize the economic value of dealers' data and protect its DMS business from competition, to the detriment of dealers. Indeed, the district court in the Authenticom matter concluded that Defendants failed to present evidence of a pro-competitive justification for its anticompetitive acts.

## CLASS ALLEGATIONS

83.    Plaintiff brings this action, on behalf of itself and all others similarly situated, as a class action pursuant to Federal Rule of Civil Procedure 23.

84.    Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking damages and equitable and injunctive relief on behalf of the following class:

**DMS Purchaser Class**:  All automobile dealers (i.e., persons or entities engaged in the retail sale of automobiles) located in the United States that, at any time since January 1, 2015, directly purchased DMS from CDK or any predecessor, successor, subsidiary, or affiliate.

85.    Plaintiff also brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure seeking damages and injunctive relief pursuant to state antitrust, consumer protection, unjust enrichment, and conversion law on behalf of the following classes:

**Dealer Data Integration Indirect Purchaser Class**:  With respect to injunctive relief, all automobile dealers located in the United States that, at any time since January 1, 2015, had dealer data stored on CDK's DMS.  With respect to damages, all automobile dealers located in the following states that, at any time since January 1, 2015, had dealer data stored on CDK's DMS: Arizona, California, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, North

Case: 1:18-cv-00864 Document #: 2-3 Filed: 02/05/18 Page 29 of 114 PageID #:23

Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

**Consumer Protection Class**: All automobile dealers located in the following states that, at any time since January 1, 2015, had dealer data stored on CDK's DMS: Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Massachusetts, Michigan, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, South Carolina, South Dakota, West Virginia, and Wisconsin.

**Unjust Enrichment Class**: All automobile dealers located in the following states that, at any time since January 1, 2015, had dealer data stored on CDK's DMS: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

**Conversion Class**: All automobile dealers located in the following states that, at any time since January 1, 2015, had dealer data stored on CDK's DMS: Arkansas, California, Florida, Indiana, Maryland, Massachusetts, Nevada, New York, Ohio, Oregon, Utah, Virginia, and Washington.

86.     Excluded from all of the foregoing Classes are CDK and Reynolds and any of their officers, directors, management, employees, subsidiaries, and affiliates.

87.     This action may properly be brought as a class action because it satisfies the requirements of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

88.     The Members of the Classes are so numerous that individual joinder of all Class Members is impracticable.  There are approximately 18,000 automobile dealers in the United States.  On information and belief, nearly half of those dealers use CDK's DMS.  The precise number of Class Members, as well as their names and addresses, are currently unknown to Plaintiff but may be ascertained through CDK's books and records.

89.     Common questions of law and fact exist as to the Classes, as required by Rule 23(a)(2), and those questions predominate over any questions that may affect only individual Class Members, as required by Rule 23(b)(3).  The common questions of law and fact include, but are not limited to:

   a.     whether dealers own the data maintained on CDK's DMS, as CDK has acknowledged;

   b.     whether, through the acts complained of herein, Defendants were unjustly enriched;

   c.     whether the acts complained of herein constitute unlawful and/or unfair business acts or practices; and

   d.     whether the acts complained of herein constitute unconscionable and/or unfair trade or business practices or unfair competition;

90.     Alternatively, this action may be certified under Rule 23(b)(1) or Rule 23(b)(2) because:  (a) the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendants; (b) the prosecution of separate actions by individual Class Members would create a risk of adjudicative rulings as to them that would, as a practical matter, be dispositive of the interests of the other Class Members not parties

26

to the adjudications or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds that apply generally to the Class Members, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

91.     Plaintiff's claims are typical of the claims of the Classes it seeks to represent, as required by Rule 23(a)(3), because Plaintiff and the Class Members have been subject to the same wrongful practices and have been injured in the same manner thereby.

92.     Plaintiff will adequately represent the interests of Class Members as required by Rule 23(a)(4).  Plaintiff has no interests adverse to any Class Members.  Plaintiff is committed to the prosecution of this action and has retained competent and experienced counsel.

93.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial harms suffered by Plaintiff and each Class Member are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for each Class Member to individually seek redress for Defendants' wrongful conduct.  Even if Class Members could afford individual litigation, individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, a class action presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

Case 1:18-cv-00864 Document #: 2-3 Filed: 02/05/18 Page 32 of 114 PageID #:313

## COUNT I:
## HORIZONTAL CONSPIRACY IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT (ON BEHALF OF PLAINTIFF AND DMS PURCHASER CLASS AGAINST DEFENDANTS)

94.     Plaintiff incorporates by reference the preceding allegations.

95.     CDK and Reynolds entered into and engaged in an agreement in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

96.     CDK and Reynolds are horizontal competitors of one another in the DMS and Dealer Data Integration Markets.

97.     The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding, or concerted action to eliminate competition in the DMS and Dealer Data Integration Markets.  In furtherance of that conspiracy, CDK and Reynolds engaged in a group boycott of Authenticom.  In addition, in February 2015, CDK and Reynolds entered into a written market division agreement pursuant to which they agreed to not compete in the Dealer Data Integration Market.  The group boycott and agreement not to compete between CDK and Reynolds are per se violations of the Sherman Act and are, in any event, unreasonable and unlawful restraints of trade and commerce.

98.     The purposes of the collusion include (1) to protect Defendants' DMS duopoly (thereby protecting their monopoly profits), and (2) to monopolize the Dealer Data Integration Market on their respective DMS so they can reap monopoly profits.

99.     Through their conspiracy, CDK and Reynolds have caused actual injury to competition in the DMS Market.

100.    The CDK and Reynolds agreement has cut off access to dealer data that application providers need in order to offer applications to dealers and compete with CDK's and Reynolds' DMSs.

101.    CDK and Reynolds possess dominant positions in the DMS market, which they have utilized to further their conspiracy.

102.    CDK's and Reynolds' conspiracy and anticompetitive conduct in furtherance thereof do not enhance efficiency or competition in any market. On the contrary, their conduct has produced only anticompetitive effects.

103.    As a proximate result of the conspiracy, Plaintiff and the DMS Purchaser Class have suffered injury in the form of inflated DMS fees and reduced competition and innovation in the DMS market, as well as other injuries to their business or property in an amount to be proven at trial and automatically trebled. They are entitled to appropriate injunctive relief.

**COUNT II:**
**UNLAWFUL VERTICAL RESTRAINT OF TRADE IN VIOLATION OF SECTION 1**
**OF THE SHERMAN ACT**
**(ON BEHALF OF PLAINTIFF AND DMS PURCHASER CLASS AGAINST CDK)**

104.    Plaintiff incorporates by reference the preceding allegations.

105.    CDK entered into contracts with dealers and vendors that contain provisions that unreasonably restrict trade or commerce in violation of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

106.    CDK's contracts with vendors provide that vendors cannot access the DMS except through 3PA. These provisions are standard throughout CDK's contracts with dealers and vendors.

107.    CDK was able to impose these exclusive dealing provisions on vendors as a result of its market power in the DMS and Dealer Data Integration Markets.

108.    CDK's vertical restraints are unlawful because they have led to increased prices and reduced output.

109.    Through its exclusive dealing provisions, CDK has injured competition in the DMS and Dealer Data Integration Markets.

110.    The anticompetitive provisions of CDK's vendor agreements are not justified by any enhancement of efficiency or competition in any market.  On the contrary, the agreements have produced only anticompetitive effects.

111.    As a proximate result of CDK's unlawful conduct, Plaintiff and the DMS Purchaser Class have suffered injury to their business or property.  They are entitled to appropriate injunctive relief.

**COUNT III:**
**UNLAWFUL TYING IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
**(ON BEHALF OF PLAINTIFF AND DMS PURCHASER CLASS AGAINST CDK)**

112.    Plaintiff incorporates by reference the preceding allegations.

113.    CDK has imposed an unlawful tying arrangement on dealers in violation of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

114.    CDK has market power in the DMS market.  When a dealer purchases CDK's DMS, CDK also forces the dealer to rely on CDK's data integration product, 3PA.  Dealers have no choice to rely on other data integration products for CDK's DMS.

115.    Dealers, not vendors, make the decision of which data integration product to "purchase."  Dealers must provide authorization for any data integrator to access a DMS, and a vendor cannot use a data integrator that a dealer has not approved.  Accordingly, the dealer is the purchaser of both the tying product (the DMS) and the tied product (data integration).

116.    CDK has sufficient market power in the tying market (DMS) to appreciably restrain free competition in the market for the tied product (data integration).  CDK has

demonstrated its ability to leverage its market power in the tying market to control prices and exclude competition in the tied market.

117.    CDK's tying arrangement has affected a substantial amount of commerce in the market for the tied product.

118.    As a proximate result of CDK's unlawful tying arrangement, Plaintiff and the DMS Purchaser Class have suffered injury to their business or property.  They are entitled to appropriate injunctive relief.

**COUNT IV:**
**UNLAWFUL MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE**
**SHERMAN ACT**
**(ON BEHALF OF PLAINTIFF AND DMS PURCHASER CLASS AGAINST CDK)**

119.    Plaintiff incorporates by reference the preceding allegations.

120.    CDK has unlawfully monopolized the aftermarket for dealer data integration services with respect to dealer data stored on the CDK DMS, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

121.    When dealers purchase DMS services from CDK, they are "locked in" to that purchase through a long-term contractual relationship and high switching and information costs.

122.    Because of customer lock-in in the primary DMS market, CDK has monopoly power – and in fact has monopolized – the Dealer Data Integration aftermarket on its DMS platform.  CDK has demonstrated its ability to control prices and exclude competition by blocking third-party access to its DMS by raising data access fees to supracompetitive levels.

123.    CDK used anticompetitive means to acquire and maintain its monopoly, including, *inter alia*, by blocking third-party access to the DMS, entering into a market division agreement pursuant to which it agreed with Reynolds that neither DMS provider would provide

Case: 1:18-cv-00864 Document #: 2-3 Filed: 02/05/18 Page 36 of 114 PageID #:147

third-party access to the other's DMS, and imposing anticompetitive exclusive dealing and price secrecy arrangements on vendors and dealers.

124.    As a direct and proximate result of CDK's monopolization, Plaintiff and the DMS Purchaser Class have suffered damage to their business or property.  They are entitled to appropriate injunctive relief.

### COUNT V:
### VIOLATION OF STATE ANTITRUST STATUTES[17]
### (ON BEHALF OF PLAINTIFF AND THE DEALER DATA INTEGRATION INDIRECT PURCHASER CLASS AGAINST DEFENDANTS)

125.    Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

126.    During the Class Period, the conspiracy between CDK and Reynolds has consisted of a continuing agreement, understanding, or concerted action to eliminate competition in the DMS and Dealer Data Integration Markets.  In furtherance of that conspiracy, in February 2015, CDK and Reynolds entered into a written market division agreement pursuant to which they agreed to "close" their DMS and not to compete in the Dealer Data Integration Market. CDK and Reynolds also engaged in a group boycott of Authenticom to block third-party access to their respective DMSs.  The group boycott and agreement not to compete between CDK and Reynolds are per se violations of the Sherman Act and similar state antitrust statutes and are, in any event, unreasonable and unlawful restraint of trade and commerce.

127.    The purposes of the conspiracy include (1) to protect Defendants' DMS duopoly (thereby protecting their monopoly profits), and (2) to monopolize the Dealer Data Integration Market so they can reap monopoly profits.

---

[17] Statutory antitrust violations are alleged herein for the following jurisdictions: Arizona, California, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

128.    Through their conspiracy, CDK and Reynolds have caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets.

129.    The CDK and Reynolds agreement has cut off access to dealer data that vendors need in order to compete with CDK and Reynolds.

130.    Defendants have also entered in unlawful agreements with vendors that have restricted competition and increased pricing in an anticompetitive manner.

131.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes:

**Arizona**

132.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, *et seq*.  Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market.   During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.  Defendants' violations of Arizona law were flagrant. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq*.  Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

**California**

133.    Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 *et seq.*  During the Class Period, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among CDK and Reynolds.  For the purpose of forming and effectuating the unlawful trust, CDK and Reynolds have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above.  The unlawful acts alleged herein have had, *inter alia*, the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property in that they paid more for DMS and Data Integration services than they otherwise would have paid in the absence of Defendants' unlawful conduct.  During the Class Period, Defendants' illegal conduct substantially affected California commerce.  As a result of Defendants' violation of § 16720, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to California Business and Professions Code § 16750(a).

**District of Columbia**

134.    Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, *et seq.* Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market, each of which had direct impacts in and throughout the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, *et seq.* Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq.*

**Hawaii**

135.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq.* Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration

competitors out of the market. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-4, *et seq.* Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all forms of relief available under Hawaii Revised Statutes Annotated § 480-4, *et seq.*

**Illinois**

136. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*) Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all forms of relief available under the Illinois Antitrust Act.

**Iowa**

137.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*.  Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market.    During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.    By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*.    Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all forms of relief available under Iowa Code § 553, *et seq*.

**Kansas**

138.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, *et seq*.  Defendants combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of DMS and Data Integration services, increasing the prices of these services, and preventing competition in these relevant markets, in a manner that created monopolistic pricing and precluded free and unrestricted competition, in violation of Kan. Stat. Ann. § 50-101, *et seq*.  Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration

37

Case: 1:18-cv-00909 Document #: 2-3 Filed: 02/02/18 Page 42 of 114 PageID #:42

services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq.* Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq.*

**Maine**

139.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Annotated Statutes (Maine Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*). Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, *et seq.* Accordingly, Plaintiff

and members of the Dealer Data Integration Indirect Purchaser Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq*.

**Michigan**

140.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, *et seq*.  Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market.  During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, *et seq*.  Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq*.

**Minnesota**

141.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Statutes § 325D.49, *et seq*.  Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other

dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, *et seq.* Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all relief available under Minnesota Stat. § 325D.49, *et seq.*

**Mississippi**

142.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq.* Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury. By

reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

### Nebraska

143.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq.* Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Rev. Stat. § 59-801, *et seq.* Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all relief available under Nebraska Rev. Stat. § 59-801, *et seq.*

### Nevada

144.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, *et seq.* Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the

DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, *et seq*. Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq*.

**New Hampshire**

145. Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of

trade in violation of New Hampshire Rev. Stat. § 356:1, *et seq.*  Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all relief available under New Hampshire Rev. Stat. § 356:1, *et seq.*

**New Mexico**

146.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq.*  Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market.    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, *et seq.*  Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq.*

**New York**

147.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New York's Donnelly Act, New York General Business Law § 340, *et seq.* Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS

and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the New York's Donnelly Act, New York Gen. Bus. Law § 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all relief available under New York Gen. Bus. Law § 340, *et seq*.

**North Carolina**

148. Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, *et seq*. Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in

violation of North Carolina Gen. Stat. § 75-1, *et seq.* Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all relief available under North Carolina Gen. Stat. § 75-1, *et. seq.*

**North Dakota**

149. Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, *et seq.* Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, *et seq.* Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq.*

**Oregon**

150. Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq.* Defendants acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3)

caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market.  During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Rev. Stat. § 646.705, *et seq*.  Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all relief available under Oregon Rev. Stat. § 646.705, *et seq*.

**Rhode Island**

151.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq*. Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market.  During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property on or after January 1, 2015, and are threatened with further injury.  By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island Gen. Laws § 6-

36-1, *et seq.* Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all relief available under Rhode Island Gen. Laws § 6-36-1, *et seq.*

**South Dakota**

152.    Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq.* Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, *et seq.* Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, *et seq.*

**Tennessee**

153.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, *et seq.* CDK's unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class,

and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, *et seq.* Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq.*

**Utah**

154. Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.* Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.* Accordingly, Plaintiff and members of the Dealer

Data Integration Indirect Purchaser Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq.*

**Vermont**

155.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq.* Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq.* Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all relief available under Vermont Stat. Ann. 9 § 2453, *et seq.*

**West Virginia**

156.    Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq.* Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the

Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all relief available under West Virginia Code § 47-18-1, *et seq*.

**Wisconsin**

157. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, *et seq*. Defendants' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiff and members of the Classes in the United States. Specifically, Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Dealer Data Integration Indirect Purchaser Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in

violation of Wisconsin Stat. § 133.01, *et seq*. Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class seek all relief available under Wisconsin Stat. § 133.01, *et seq*.

**As to All Jurisdictions Above**

158. Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class have paid more for DMS and Data Integration services than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

159. In addition, Defendants have profited significantly from their conspiracy. Defendants' profits derived from their anticompetitive conduct at the expense and detriment of Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class.

160. Accordingly, Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust laws, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## COUNT VI:
## VIOLATION OF STATE CONSUMER PROTECTION STATUTES[18]
## (ON BEHALF OF PLAINTIFF AND THE CONSUMER PROTECTION CLASS
## AGAINST DEFENDANTS)

161.    Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

162.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

**Alaska**

163.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq.*  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which DMS and Data Integration services were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiff and members of the Consumer Protection Class.  The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.  Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the

---

[18] Statutory consumer protection violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Massachusetts, Michigan, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, South Carolina, South Dakota, West Virginia, and Wisconsin.

market. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Consumer Protection Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*, and, accordingly, Plaintiff and members of the Consumer Protection Class seek all relief available under that statute.

**Arkansas**

164. Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq.* Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which DMS and Data Integration services were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiff and members of the Consumer Protection Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff and members of the Consumer Protection Class have been injured in their business and property and are threatened with further injury.

Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiff and members of the Consumer Protection Class seek all relief available under that statute.

**California**

165.     Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*.  During the Class Period, Defendants marketed, sold, or distributed DMS and Data Integration services in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above.  This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.  Defendants' conduct as alleged herein violated § 17200.  The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq*. of the California Business and Professions Code, set forth above.  Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, *et seq*. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are

unfair to automobile dealers in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of § 17200 of the California Business and Professions Code. Plaintiff and members of the Consumer Protection Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, as described above, have caused and continue to cause Plaintiff and members of the Consumer Protection Class to pay supracompetitive and artificially-inflated prices for DMS and Data Integration services. Plaintiff and members of the Consumer Protection Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants have been unjustly enriched as a result of its wrongful conduct and by Defendants' unfair competition. Plaintiff and members of the Consumer Protection Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§ 17203 and 17204.

**Colorado**

166. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev.

Stat. § 6-1-101, *et seq.* Defendants engaged in unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class as actual or potential consumers of the Defendants' goods/services and which caused Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class to suffer injury. Defendants took efforts to conceal their agreements from Plaintiff. Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Consumer Protection Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq.*, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute and as equity demands.

**Delaware**

167. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which DMS and Data Integration services were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiff and members

of the Consumer Protection Class concerning Defendants' unlawful activities. Defendants misrepresented to all purchasers during the Class Period that Defendants' DMS and Data Integration services were competitive and fair. Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Consumer Protection Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of DMS and Data Integration services, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing DMS and Data Integration services at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiff and members of the Consumer Protection Class seek all relief available under that statute.

### District of Columbia

168. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing,

controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which DMS and Data Integration services were sold, distributed or obtained in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce and consumers. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiff and members of the Consumer Protection Class were not aware of Defendants' conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set those prices and Plaintiff and members of the Consumer Protection Class had no power to negotiate a lower price. Moreover, Plaintiff and members of the Consumer Protection Class lacked any meaningful choice in purchasing DMS and Data Integration services because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiff and members of the Consumer Protection Class could avoid the overcharges. Defendants' conduct with regard to sales of DMS and Data Integration services was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff, members of the Consumer Protection Class, and the public. Defendants took grossly unfair advantage of Plaintiff and members of the Consumer Protection Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for DMS and Data Integration services. Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors

out of the market.  As a direct and proximate result of Defendants' conduct, Plaintiff and members of the Consumer Protection Class have been injured and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq*., and, accordingly, Plaintiff and members of the Consumer Protection Class seek all relief available under that statute.

**Florida**

169.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*.  Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market.  During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Consumer Protection Class have been injured and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiff and members of the Consumer Protection Class seek all relief available under that statute.

**Georgia**

170.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade

Case 1:18-cv-00909 Document #: 3 Filed: 02/02/18 Page 63 of 111 PageID #:63

or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which DMS and Data Integration services were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Consumer Protection Class concerning Defendants' unlawful activities. Defendants misrepresented to all purchasers during the Class Period that their DMS and Data Integration services prices were competitive and fair. Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Consumer Protection Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of DMS and Data Integration services, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing DMS and Data Integration services at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia Code § 10-1-370, *et seq.*, and, accordingly, Plaintiff and members of the Consumer Protection Class seek all relief available under that statute and as equity demands.

### Hawaii

171.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated § 480-1, *et seq.* Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market.  During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Consumer Protection Class have been injured and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. Ann. § 480-1 *et seq.*, and, accordingly, Plaintiff and members of the Consumer Protection Class seek all relief available under that statute.

### Massachusetts

172.     Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch. 93A, § 1, *et seq.*  Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which DMS and Data Integration services were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiff and members of the Consumer Protection Class.  The aforementioned conduct on the

part of Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch. 93A, §§ 2, 11.  Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market.  During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff and members of the Consumer Protection Class have been injured in their business and property and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch. 93A, §§ 2, 11, that were knowing or willful, and, accordingly, Plaintiff and members of the Consumer Protection Class seek all relief available under that statute, including multiple damages.

**Michigan**

173.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which DMS and Data Integration services were sold, distributed, or obtained in Michigan.  Defendants deliberately failed to disclose material facts to Plaintiff and members of the Consumer Protection Class concerning Defendants' unlawful activities.  Defendants misrepresented to all purchasers during the Class Period that Defendants'

DMS and Data Integration prices were competitive and fair. Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Consumer Protection Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of DMS and Data Integration services, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing DMS and Data Integration services at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, *et seq.*, and, accordingly, Plaintiff and members of the Consumer Protection Class seek all relief available under that statute.

**Minnesota**

174. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.* Defendants engaged in unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class as actual or potential consumers of the

Defendants' goods/services and which caused Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class to suffer injury. Defendants took efforts to conceal their agreements from Plaintiff and members of the Dealer Data Integration Indirect Purchaser Class. Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Consumer Protection Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq.*, and, accordingly, Plaintiff and members of the Class seek all relief available under that statute and as equity demands.

**Montana**

175.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, *et seq.* Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants marketed, sold, or

distributed DMS and Data Integration services in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Consumer Protection Class have been injured and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, § 30-14-103, *et seq*., and § 30-14-201, *et. seq*., and, accordingly, Plaintiff and members of the Consumer Protection Class seek all relief available under that statute.

**Nebraska**

176.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*.  Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market.  During the Class Period, Defendants marketed, sold, or distributed DMS and Data Integration services in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Consumer Protection Class have been injured and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiff and members of the Consumer Protection Class seek all relief available under that statute.

**Nevada**

177.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which DMS and Data Integration services were sold, distributed, or obtained in Nevada.  Defendants deliberately failed to disclose material facts to Plaintiff and members of the Consumer Protection Class concerning Defendants' unlawful activities.  Defendants misrepresented to all purchasers during the Class Period that their DMS and Data Integration services prices were competitive and fair.   Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market.  During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers.  As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Consumer Protection Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.  Defendants' deception likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing DMS and Data Integration services at prices set by a free and fair market.  Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq*., and,

accordingly, Plaintiff and members of the Consumer Protection Class seek all relief available under that statute.

**New Hampshire**

178.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq*.  Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market.  During the Class Period, Defendants marketed, sold, or distributed DMS and Data Integration services in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Consumer Protection Class have been injured.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq*., and, accordingly, Plaintiff and members of the Consumer Protection Class seek all relief available under that statute.

**New Jersey**

179.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which DMS and Data Integration services were sold, distributed,

or obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Consumer Protection Class concerning Defendants' unlawful activities. Defendants misrepresented to all purchasers during the Class Period that Defendants' DMS and Data Integration services prices were competitive and fair. Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Consumer Protection Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing DMS and Data Integration services at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Stat. Ann. § 56:8-1, *et seq*., and, accordingly, Plaintiff and members of the Consumer Protection Class seek all relief available under that statute.

### New Mexico

180. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico Stat. Ann. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling

and/or maintaining at non-competitive and artificially inflated levels, the prices at which DMS and Data Integration services were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiff and members of the Consumer Protection Class The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M. Stat. Ann. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiff and members of the Consumer Protection Class and the prices paid by them for DMS and Data Integration services as set forth in N.M. Stat. Ann. § 57-12-2E. Plaintiff and members of the Consumer Protection Class were not aware of Defendants' conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set pricing, and Plaintiff and members of the Consumer Protection Class had no power to negotiate a lower price. Moreover, Plaintiff and members of the Consumer Protection Class lacked any meaningful choice in purchasing DMS and Data Integration services because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiff and members of the Consumer Protection Class could avoid the overcharges. Defendants' conduct with regard to sales of DMS and Data Integration services was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff, members of the Consumer Protection Class, and the public. Defendants took grossly unfair advantage of Plaintiff and members of the Consumer Protection Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for DMS and Data Integration services. Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2)

increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff and members of the Consumer Protection Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq*., and, accordingly, Plaintiff and members of the Consumer Protection Class seek all relief available under that statute.

**North Dakota**

181. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Cent. Code § 51-15-01, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which DMS and Data Integration services were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Consumer Protection Class concerning Defendants' unlawful activities and artificially inflated prices for DMS and Data Integration services. Defendants misrepresented to all purchasers during the Class Period that their DMS and Data Integration services prices were competitive and fair. Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other

70

dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Consumer Protection Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing DMS and Data Integration services set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Cent. Code § 51-15-01, *et seq*., and, accordingly, Plaintiff and members of the Consumer Protection Class seek all relief available under that statute.

**South Carolina**

182.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*. Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Consumer Protection Class have been injured in their business and property and are threatened

with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq*., and, accordingly, Plaintiff and the members of the Consumer Protection Class seek all relief available under that statute.

### South Dakota

183.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which DMS and Data Integration services were sold, distributed, or obtained in South Dakota.  Defendants deliberately failed to disclose material facts to Plaintiff and members of the Consumer Protection Class concerning Defendants' unlawful activities and artificially inflated prices for DMS and Data Integration services.  Defendants misrepresented to all purchasers during the Class Period that Defendants' DMS and Data Integration services prices were competitive and fair. Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market.  Defendants' illegal conduct substantially affected South Dakota commerce and consumers.  As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Consumer Protection Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by

Defendants' willful and deceptive conduct, as described herein. Defendants' deception likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing DMS and Data Integration services at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Consumer Protection Class as they related to the cost of DMS and Data Integration services they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq*., and, accordingly, Plaintiff and members of the Consumer Protection Class seek all relief available under that statute.

**West Virginia**

184. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A-6-101, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which DMS and Data Integration services were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Consumer Protection Class concerning Defendants' unlawful activities and artificially inflated prices for DMS and Data Integration services. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' DMS and Data Integration services prices were competitive and fair. Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection

Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market. Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Consumer Protection Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing DMS and Data Integration services at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Consumer Protection Class as they related to the cost of DMS and Data Integration services they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq*., and, accordingly, Plaintiff and members of the Consumer Protection Class seek all relief available under that statute.

**Wisconsin**

185. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wis. Stat. § 100.18, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which DMS and Data Integration services were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' DMS and Data Integration prices were competitive and

74

fair.  Defendants' unlawful acts had the following effects: (1) caused actual injury to competition for applications and in the DMS and Dealer Data Integration Markets; (2) increased pricing for DMS and Dealer Data Integration services; (3) caused Plaintiff, members of the Consumer Protection Class, and other dealers to pay monopolistic prices; and (4) forced DMS and Dealer Data Integration competitors out of the market.  Defendants' illegal conduct substantially affected Wisconsin commerce and consumers.  As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Consumer Protection Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.  Defendants' deception likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing DMS and Data Integration services at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiff and members of the Consumer Protection Class as they related to the cost of DMS and Data Integration services they purchased.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.18, *et seq*., and, accordingly, Plaintiff and members of the Consumer Protection Class seek all relief available under that statute.

## COUNT VII:
## UNJUST ENRICHMENT[19]
## (ON BEHALF OF PLAINTIFF AND THE UNJUST ENRICHMENT CLASS AGAINST CDK)

186.    Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

---

[19] Unjust enrichment claims are alleged herein under the laws of all States (except Ohio and Indiana) as well as the District of Columbia.

187.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

188.    CDK has been unjustly enriched and has obtained money, earnings, profit, and benefits from Plaintiff and the Unjust Enrichment Class to which CDK is not otherwise entitled and which it would not have obtained but for its misappropriation of the economic value of dealer data owned by Plaintiff and the Unjust Enrichment Class and maintained in CDK's DMS.

189.    CDK's practices were intentional, knowing, malicious, and done with the intent to reap significant benefits at the expense of Plaintiff and the Unjust Enrichment Class.  CDK consciously accepted the benefits and continues to do so as of the date of this filing.

190.    Furthermore, CDK has overcharged dealers, who made purchases of DMS and Data Integration services at prices that were more than they would have been but for CDK's unlawful actions.  Plaintiff and the Unjust Enrichment Class have conferred upon CDK an economic benefit in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class.

191.    CDK's financial benefits resulting from its unlawful and inequitable acts are traceable to CDK's overcharges for data integration with its DMS, which were paid by vendors and passed through to Plaintiff and the Unjust Enrichment Class.

192.    The benefits conferred upon CDK are measurable, in that the revenue CDK has earned due to its unlawful overcharges of DMS and Data Integration services are ascertainable by review of sales records.

193.    It would be inequitable under unjust enrichment principles under the laws of all States (except Ohio and Indiana) and of the District of Columbia, for CDK to be permitted to retain the unjust enrichment it obtained by seizing and selling access to dealers' data and by

overcharging for DMS and Data Integration services derived from CDK's unlawful, unfair, and unconscionable practices as alleged in this Complaint.

194.    CDK should be stripped of its ill-gotten gains resulting from unauthorized interference with data belonging to Plaintiff and the Unjust Enrichment Class and compelled to disgorge to Plaintiff and the Unjust Enrichment Class its unlawful or inequitable proceeds.  CDK should also be compelled to disgorge any overcharge resulting from its sales of DMS and Data Integration services.  Furthermore, a constructive trust should be imposed upon all unlawful or inequitable sums received by CDK that are traceable to indirect purchases of DMS and Data Integration services by Plaintiff and the Unjust Enrichment Class.

195.    Plaintiff and the Unjust Enrichment Class have no adequate remedy at law.

196.    By engaging in the foregoing unlawful or inequitable conduct, CDK has been unjustly enriched in violation of the common law of various states, as outlined below:

**Alabama**

197.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Alabama dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also overcharged dealers, who made purchases of DMS and Data Integration services in Alabama at prices that were more than they would have been but for CDK's actions. CDK received money from Plaintiff and the Unjust Enrichment Class as a direct result of the unlawful overcharges, and it has retained this money.  CDK has benefitted at the expense of Plaintiff and the Unjust Enrichment Class from revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges for DMS and Data Integration services.  It is inequitable for CDK to accept and retain the benefits received from selling access to dealers' data, and for

overcharging for its DMS and Data Integration services, without compensating Plaintiff and the Unjust Enrichment Class.

**Alaska**

198.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Alaska dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also overcharged dealers, who made purchases of DMS and Data Integration services in Alaska at prices that were more than they would have been but for CDK's actions. Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges to the economic detriment of Plaintiff and the Unjust Enrichment Class.  CDK appreciated the benefits bestowed upon it by Plaintiff and the Unjust Enrichment Class.  CDK accepted and retained the benefits bestowed upon it under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiff and the Unjust Enrichment Class.   Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**Arizona**

199.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Arizona dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also overcharged dealers, who made purchases of DMS and Data Integration services in Arizona at prices that were more than they would have been but for CDK's actions. CDK has been enriched by revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges for DMS and Data Integration services.   Plaintiff and the Unjust Enrichment Class have been impoverished by the overcharges for DMS and Data Integration

services resulting from CDK's unlawful conduct. CDK's enrichment and Plaintiff's and the Unjust Enrichment Class's impoverishment are connected. There is no justification for CDK's receipt of the benefits causing their enrichment and Plaintiff's and the Damages Class's impoverishment, because Plaintiff and the Unjust Enrichment Class paid supracompetitive prices that inured to CDK's benefit, and it would be inequitable for CDK to retain any revenue gained from their unlawful overcharges or misappropriation of dealers' data. Plaintiff and the Unjust Enrichment Class have no remedy at law.

**Arkansas**

200. CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Arkansas dealers. CDK profited by charging vendors and dealers for access to that data. CDK has also overcharged dealers, who made purchases of DMS and Data Integration services in Arkansas at prices that were more than they would have been but for CDK's actions. CDK received money from Plaintiff and the Unjust Enrichment Class as a direct result of the misappropriation of dealer data and unlawful overcharges, and CDK has retained this money. CDK has paid no consideration to any other person in exchange for this money. Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**California**

201. CDK intentionally misappropriated the economic value of dealer data stored in the DMS of California dealers. CDK profited by charging vendors and dealers for access to that data. CDK has also overcharged dealers, who made purchases of DMS and Data Integration services in California at prices that were more than they would have been but for CDK's actions. CDK has received a benefit from Plaintiff and the Unjust Enrichment Class as a direct result of

the unlawful overcharges. CDK retained the benefits bestowed upon it under inequitable and unjust circumstances at the expense of Plaintiff and the Unjust Enrichment Class.

**Colorado**

202. CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Colorado dealers. CDK profited by charging vendors and dealers for access to that data. CDK has also overcharged dealers, who made purchases of DMS and Data Integration services in Colorado at prices that were more than they would have been but for CDK's actions. CDK has received a benefit from Plaintiff and the Unjust Enrichment Class in the nature of revenue resulting from CDK's misappropriation of dealer data and the unlawful overcharges. This revenue resulted from anticompetitive prices that inured to the benefit of CDK. CDK has benefitted at the expense of Plaintiff and the Unjust Enrichment Class. Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**Connecticut**

203. CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Connecticut dealers. CDK profited by charging vendors and dealers for access to that data. CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Connecticut at prices that were higher than they would have been but for CDK's actions. CDK benefitted in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class. CDK has paid no consideration to any other person in exchange for this benefit. CDK retained the benefits bestowed upon it under inequitable and unjust circumstances at the expense of Plaintiff and the Unjust Enrichment Class.

**Delaware**

204.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Delaware dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Delaware at prices that were more than they would have been but for CDK's actions.  CDK has been enriched by revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges for DMS and Data Integration services.  Plaintiff and the Unjust Enrichment Class have been impoverished by the overcharges for DMS and Data Integration services resulting from CDK's unlawful conduct.  CDK's enrichment and Plaintiff's and the Unjust Enrichment Class's impoverishment are connected.  There is no justification for CDK's receipt of the benefits causing their enrichment, because Plaintiff and the Unjust Enrichment Class had the right to control access to their data and paid supracompetitive DMS and Data Integration prices that inured to CDK's benefit, and it would be inequitable for CDK to retain any revenue gained from their unlawful overcharges.  Plaintiff and the Unjust Enrichment Class have no remedy at law.

**District of Columbia**

205.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of District of Columbia dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in the District of Columbia at prices that were more than they would have been but for CDK's actions.  Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff

and the Unjust Enrichment Class.  CDK retained the benefit bestowed upon it under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiff and the Unjust Enrichment Class.  Under the circumstances, it would be inequitable and unjust for CDK to retain such benefits.

**Florida**

206.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Florida dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Florida at prices that were more than they would have been but for CDK's actions.  Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class.  CDK appreciated the benefits bestowed upon it by Plaintiff and the Unjust Enrichment Class.  Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**Georgia**

207.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Georgia dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Georgia at prices that were more than they would have been but for CDK's actions.  Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class.

Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**Hawaii**

208.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Hawaii dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Hawaii at prices that were more than they would have been but for CDK's actions.  Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class.  Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**Idaho**

209.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Idaho dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Idaho at prices that were more than they would have been but for CDK's actions.  Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class.  CDK appreciated the benefit conferred upon it by Plaintiff and the Unjust Enrichment Class.  Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**Illinois**

210.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Illinois dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Illinois at prices that were more than they would have been but for CDK's actions.  Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class.  CDK retained the benefits bestowed upon it under unjust circumstances arising from unlawful overcharges to Plaintiff and the Unjust Enrichment Class.  It is against equity, justice, and good conscience for CDK to be permitted to retain the revenue resulting from their unlawful overcharges.

**Iowa**

211.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Iowa dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Iowa at prices that were more than they would have been but for CDK's actions.  CDK has been enriched by revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges for DMS and Data Integration services, resulting in anticompetitive prices paid by Plaintiff and the Unjust Enrichment Class, which inured to CDK's benefit.  CDK's enrichment has occurred at the expense of Plaintiff and the Unjust Enrichment Class.  Under the circumstances, it would be unjust for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**Kansas**

212.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Kansas dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Kansas at prices that were more than they would have been but for CDK's actions.  Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class.  CDK retained the benefits bestowed upon it under unjust circumstances arising from unlawful overcharges to Plaintiff and the Unjust Enrichment Class.  Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**Kentucky**

213.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Kentucky dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Kentucky at prices that were more than they would have been but for CDK's actions.  Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class.  CDK appreciated the benefit conferred upon it by Plaintiff and the Unjust Enrichment Class.  Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**Louisiana**

214.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Louisiana dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Louisiana at prices that were more than they would have been but for CDK's actions.  CDK has been enriched by revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges for DMS and Data Integration services.  Plaintiff and the Unjust Enrichment Class have been impoverished by the overcharges for DMS and Data Integration services resulting from CDK's unlawful conduct.  CDK's enrichment and Plaintiff's and the Unjust Enrichment Class's impoverishment are connected.  There is no justification for CDK's receipt of the benefits causing their enrichment, because Plaintiff and the Unjust Enrichment Class paid supracompetitive prices that inured to CDK's benefit, and it would be inequitable for CDK to retain any revenue gained from their unlawful overcharges.  Plaintiff and the Unjust Enrichment Class have no other remedy at law.

**Maine**

215.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Maine dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Maine at prices that were more than they would have been but for CDK's actions.  Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class.  CDK was aware of or appreciated the benefit bestowed upon it by Plaintiff and the Unjust

Enrichment Class. Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

### Maryland

216. CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Maryland dealers. CDK profited by charging vendors and dealers for access to that data. CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Maryland at prices that were more than they would have been but for CDK's actions. Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class. CDK was aware of or appreciated the benefit bestowed upon it by Plaintiff and the Unjust Enrichment Class. Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

### Massachusetts

217. CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Massachusetts dealers. CDK profited by charging vendors and dealers for access to that data. CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Massachusetts at prices that were more than they would have been but for CDK's actions. Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges to the economic detriment of Plaintiff and the Unjust Enrichment Class. CDK was aware of or appreciated the benefit conferred upon it by Plaintiff and the Unjust

Enrichment Class. Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**Michigan**

218. CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Michigan dealers. CDK profited by charging vendors and dealers for access to that data. CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Michigan at prices that were more than they would have been but for CDK's actions. CDK has received a benefit from Plaintiff and the Unjust Enrichment Class in the nature of revenue resulting from CDK's misappropriation of dealer data and the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of CDK. CDK retained the benefits bestowed upon it under unjust circumstances arising from unlawful overcharges to Plaintiff and the Unjust Enrichment Class. Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**Minnesota**

219. CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Minnesota dealers. CDK profited by charging vendors and dealers for access to that data. CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Minnesota at prices that were more than they would have been but for CDK's actions. Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class. CDK appreciated and knowingly accepted the benefits bestowed upon it by Plaintiff and the

Unjust Enrichment Class. Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**Mississippi**

220.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Mississippi dealers. CDK profited by charging vendors and dealers for access to that data. CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Mississippi at prices that were more than they would have been but for CDK's actions. CDK received money from Plaintiff and the Unjust Enrichment Class as a direct result of CDK's misappropriation of dealer data and the unlawful overcharges. CDK retains the benefit of overcharges received on the sales of DMS and Data Integration services, which in equity and good conscience belong to Plaintiff and the Unjust Enrichment Class on account of CDK's anticompetitive conduct. Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**Missouri**

221.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Missouri dealers. CDK profited by charging vendors and dealers for access to that data. CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Missouri at prices that were more than they would have been but for CDK's actions. Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class. CDK appreciated the benefit bestowed upon it by Plaintiff and the Unjust Enrichment Class. CDK accepted and retained the benefit bestowed upon it under inequitable and unjust

circumstances arising from unlawful overcharges to Plaintiff and the Unjust Enrichment Class. In justice and fairness, CDK should disgorge such money and remit the overcharged payments back to Plaintiff and the Unjust Enrichment Class.

**Montana**

222.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Montana dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Montana at prices that were more than they would have been but for CDK's actions.  Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class. Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**Nebraska**

223.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Nebraska dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Nebraska at prices that were more than they would have been but for CDK's actions.  CDK received money from Plaintiff and the Unjust Enrichment Class as a direct result of CDK's misappropriation of dealer data and the unlawful overcharges, and it has retained this money. CDK has paid no consideration to any other person in exchange for this money.  In justice and fairness, CDK should disgorge such money and remit the overcharged payments back to Plaintiff and the Unjust Enrichment Class.

**Nevada**

224.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Nevada dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Nevada at prices that were more than they would have been but for CDK's actions.  Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges.  CDK appreciated the benefits bestowed upon it by Plaintiff and the Unjust Enrichment Class, for which it has paid no consideration to any other person.  Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**New Hampshire**

225.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of New Hampshire dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in New Hampshire at prices that were more than they would have been but for CDK's actions.  CDK has received a benefit from Plaintiff and the Unjust Enrichment Class in the nature of revenue resulting from CDK's misappropriation of dealer data and the unlawful overcharges.  This revenue resulted from anticompetitive prices that inured to the benefit of CDK.  Under the circumstances, it would be unconscionable for CDK to retain such benefits.

**New Jersey**

226.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of New Jersey dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in New Jersey at prices that were more than they would have been but for CDK's actions.  CDK has received a benefit from Plaintiff and the Unjust Enrichment Class in the nature of revenue resulting from CDK's misappropriation of dealer data and the unlawful overcharges, which inured to the benefit of CDK.  The benefits conferred upon CDK were not gratuitous, in that they resulted from CDK's misappropriation of dealer data and the unlawful overcharges.  CDK has paid no consideration to any other person for any of the unlawful benefits they received from Plaintiff and the Unjust Enrichment Class with respect to CDK's sales of DMS and Data Integration services.  Under the circumstances, it would be unjust for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**New Mexico**

227.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of New Mexico dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in New Mexico at prices that were more than they would have been but for CDK's actions.  CDK has knowingly benefitted at the expense of Plaintiff and the Unjust Enrichment Class from revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges for DMS and Data Integration services.  To allow CDK to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to

CDK's benefit and because CDK has paid no consideration to any other person for any of the benefits they received.

**New York**

228.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of New York dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in New York at prices that were more than they would have been but for CDK's actions.  CDK has been enriched by revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges for DMS and Data Integration services, which revenue resulted from anticompetitive prices paid by Plaintiff and the Unjust Enrichment Class, which inured to CDK's benefit.  CDK's enrichment has occurred at the expense of Plaintiff and the Unjust Enrichment Class.  It is against equity and good conscience for CDK to be permitted to retain the revenue resulting from their unlawful overcharges.

**North Carolina**

229.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of North Carolina dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in North Carolina at prices that were more than they would have been but for CDK's actions.  Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class. Plaintiff and the Unjust Enrichment Class did not interfere with CDK's affairs in any manner that conferred these benefits upon CDK.  The benefits conferred upon CDK were not gratuitous,

in that they resulted from CDK's misappropriation of dealer data and the unlawful overcharges. The benefits conferred upon CDK are measurable, in that the revenue CDK has earned due to unlawful overcharges are ascertainable by review of sales records. CDK consciously accepted the benefits conferred upon it.

**North Dakota**

230. CDK intentionally misappropriated the economic value of dealer data stored in the DMS of North Dakota dealers. CDK profited by charging vendors and dealers for access to that data. CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in North Dakota at prices that were more than they would have been but for CDK's actions. CDK has been enriched by revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges for DMS and Data Integration services. Plaintiff and the Unjust Enrichment Class have been impoverished by the overcharges for DMS and Data Integration services resulting from CDK's unlawful conduct. CDK's enrichment and Plaintiff's and the Unjust Enrichment Class's impoverishment are connected. There is no justification for CDK's receipt of the benefits causing their enrichment, because Plaintiff and the Unjust Enrichment Class paid supracompetitive prices that inured to CDK's benefit, and it would be inequitable for CDK to retain any revenue gained from their unlawful overcharges. Plaintiff and the Unjust Enrichment Class have no remedy at law. Under the circumstances, it would be unjust for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**Oklahoma**

231. CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Oklahoma dealers. CDK profited by charging vendors and dealers for access to that

data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Oklahoma at prices that were more than they would have been but for CDK's actions.  CDK received money from Plaintiff and the Unjust Enrichment Class as a direct result of the unlawful overcharges, and CDK has retained this money.  CDK has paid no consideration to any other person in exchange for this money.  Plaintiff and the Unjust Enrichment Class have no remedy at law.  It is against equity and good conscience for CDK to be permitted to retain the revenue resulting from their unlawful overcharges.

**Oregon**

232.  CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Oregon dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Oregon at prices that were more than they would have been but for CDK's actions.  Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class.  CDK was aware of the benefit bestowed upon it by Plaintiff and the Unjust Enrichment Class.  Under the circumstances, it would be unjust for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**Pennsylvania**

233.  CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Pennsylvania dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Pennsylvania at prices that were more than they would have been but for

CDK's actions. Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class. CDK appreciated the benefit bestowed upon it by Plaintiff and the Unjust Enrichment Class. Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**Rhode Island**

234.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Rhode Island dealers. CDK profited by charging vendors and dealers for access to that data. CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Rhode Island at prices that were more than they would have been but for CDK's actions. Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class. CDK appreciated the benefit bestowed upon it by Plaintiff and the Unjust Enrichment Class. Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**South Carolina**

235.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of South Carolina dealers. CDK profited by charging vendors and dealers for access to that data. CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in South Carolina at prices that were more than they would have been but for CDK's actions. The benefits conferred upon CDK were not gratuitous, in that they resulted from

CDK's misappropriation of dealer data and the unlawful overcharges. CDK realized value from the benefit bestowed upon it by Plaintiff and the Unjust Enrichment Class. Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**South Dakota**

236.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of South Dakota dealers. CDK profited by charging vendors and dealers for access to that data. CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in South Dakota at prices that were more than they would have been but for CDK's actions. CDK has received a benefit from Plaintiff and the Unjust Enrichment Class in the nature of revenue resulting from CDK's misappropriation of dealer data and the unlawful overcharges. This revenue resulted from anticompetitive prices that inured to the benefit of CDK. CDK was aware of the benefit bestowed upon it by Plaintiff and the Unjust Enrichment Class. Under the circumstances, it would be inequitable and unjust for CDK to retain such benefits without reimbursing Plaintiff and the Unjust Enrichment Class.

**Tennessee**

237.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Tennessee dealers. CDK profited by charging vendors and dealers for access to that data. CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Tennessee at prices that were more than they would have been but for CDK's actions. Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class.

CDK appreciated the benefit bestowed upon it by Plaintiff and the Unjust Enrichment Class. Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class. It would be futile for Plaintiff and the Unjust Enrichment Class to seek a remedy from any party with whom they have privity of contract. CDK has paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiff and the Unjust Enrichment Class with respect to CDK's sales of DMS and Data Integration services. It would be futile for Plaintiff and the Unjust Enrichment Class to exhaust all remedies against the entities with which Plaintiff and the Unjust Enrichment Class have privity of contract because Plaintiff and the Unjust Enrichment Class did not purchase Data Integration services directly from any Defendant.

**Texas**

238. CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Texas dealers. CDK profited by charging vendors and dealers for access to that data. CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Texas at prices that were more than they would have been but for CDK's actions. CDK has received a benefit from Plaintiff and the Unjust Enrichment Class in the nature of revenue resulting from CDK's misappropriation of dealer data and the unlawful overcharges. This revenue resulted from anticompetitive prices that inured to the benefit of CDK. CDK was aware of or appreciated the benefit bestowed upon it by Plaintiff and the Unjust Enrichment Class. The circumstances under which CDK has retained the benefits bestowed upon it by Plaintiff and the Unjust Enrichment Class are inequitable in that they result from CDK's unlawful overcharges for DMS and Data Integration services. Plaintiff and the Unjust Enrichment Class have no remedy at law.

**Utah**

239.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Utah dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Utah at prices that were more than they would have been but for CDK's actions.  Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class.  CDK was aware of or appreciated the benefit bestowed upon it by Plaintiff and the Unjust Enrichment Class.  Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**Vermont**

240.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Vermont dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Vermont at prices that were more than they would have been but for CDK's actions.  Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class.  CDK accepted the benefit bestowed upon it by Plaintiff and the Unjust Enrichment Class.  Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**Virginia**

241.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Virginia dealers.  CDK profited by charging vendors and dealers for access to that data.  CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Virginia at prices that were more than they would have been but for CDK's actions.  Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class. CDK was aware of the benefit bestowed upon it.  CDK should reasonably have expected to repay Plaintiff and the Unjust Enrichment Class.  The benefits conferred upon CDK were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from CDK's illegal and unfair actions to inflate the prices of DMS and Data Integration services.  CDK has paid no consideration to any other person for any of the benefits it has received from Plaintiff and the Unjust Enrichment Class.

**Washington**

242.    CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Washington dealers.  CDK profited by charging vendors and dealers for access to that data. CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Washington at prices that were more than they would have been but for CDK's actions.  Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class. CDK was aware of or appreciated the benefit conferred upon it by Plaintiff and the Unjust

Enrichment Class. Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

### West Virginia

243. CDK intentionally misappropriated the economic value of dealer data stored in the DMS of West Virginia dealers. CDK profited by charging vendors and dealers for access to that data. CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in West Virginia at prices that were more than they would have been but for CDK's actions. Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class. CDK was aware of or appreciated the benefit bestowed upon it by Plaintiff and the Unjust Enrichment Class. Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

### Wisconsin

244. CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Wisconsin dealers. CDK profited by charging vendors and dealers for access to that data. CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Wisconsin at prices that were more than they would have been but for CDK's actions. Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class. CDK appreciated the benefit bestowed upon it by Plaintiff and the Unjust Enrichment Class.

Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

**Wyoming**

245. CDK intentionally misappropriated the economic value of dealer data stored in the DMS of Wyoming dealers. CDK profited by charging vendors and dealers for access to that data. CDK has also unlawfully overcharged dealers, who made purchases of DMS and Data Integration services in Wyoming at prices that were more than they would have been but for CDK's actions. Plaintiff and the Unjust Enrichment Class have conferred an economic benefit upon CDK, in the nature of revenue resulting from CDK's misappropriation of dealer data and unlawful overcharges, to the economic detriment of Plaintiff and the Unjust Enrichment Class. CDK accepted, used, and enjoyed the benefits bestowed upon it by Plaintiff and the Unjust Enrichment Class. Under the circumstances, it would be inequitable for CDK to retain such benefits without compensating Plaintiff and the Unjust Enrichment Class.

## COUNT VIII:
## CONVERSION[20]
## (ON BEHALF OF PLAINTIFF AND THE CONVERSION CLASS AGAINST CDK)

246. Plaintiff incorporates by reference the preceding allegations.

247. Defendant CDK unlawfully converted Plaintiff's data by intentionally barring dealers from accessing that data, thus effectively dispossessing dealers of the data, in the following states.

**Arkansas**

248. CDK has unlawfully converted the property of Plaintiff and the Conversion Class by wrongfully committing a distinct act of dominion over the property of another in violation of

---

[20] Conversion claims are alleged herein for the following jurisdictions: Arkansas, California, Florida, Indiana, Maryland, Massachusetts, Nevada, New York, Ohio, Oregon, Utah, Virginia, and Washington.

the rights of the owners.  CDK had the requisite intent to exercise dominion over the property of Plaintiff and the Conversion Class.  As a direct and proximate result of CDK's unlawful conduct, Plaintiff and members of the Conversion Class have been injured in their business and property and are threatened with further injury.

**California**

249.    CDK has unlawfully converted the property of Plaintiff and the Conversion Class because Plaintiff and the Conversion Class own, or have a right to possess, their data, and CDK wrongfully disposed of dealers' data in a manner that was inconsistent with the property rights of Plaintiff and the Conversion Class.  As a direct and proximate result of CDK's unlawful conduct, Plaintiff and members of the Conversion Class have been injured in their business and property and are threatened with further injury.

**Florida**

250.    CDK has unlawfully converted the property of Plaintiff and the Conversion Class by wrongfully asserting an act of dominion over another's property in a manner inconsistent with the ownership interest therein.  As a direct and proximate result of CDK's unlawful conduct, Plaintiff and members of the Conversion Class have been injured in their business and property and are threatened with further injury.

**Indiana**

251.    CDK has unlawfully converted the property of Plaintiff and the Conversion Class by exerting unauthorized control over property belonging to Plaintiff and the Conversion Class. As a direct and proximate result of CDK's unlawful conduct, Plaintiff and members of the Conversion Class have been injured in their business and property and are threatened with further injury.

**Maryland**

252.    CDK has unlawfully converted the property of Plaintiff and the Conversion Class by intentionally exerting ownership or dominion over the property of Plaintiff and Conversion Class in a manner that is a denial of or inconsistent with their rights to the property.  As a direct and proximate result of CDK's unlawful conduct, Plaintiff and members of the Conversion Class have been injured in their business and property and are threatened with further injury.

**Massachusetts**

253.    CDK has unlawfully converted the property of Plaintiff and the Conversion Class by intentionally and wrongfully exercising control over the property of Plaintiff and the Conversion Class.  As a direct and proximate result of CDK's unlawful conduct, Plaintiff and members of the Conversion Class have been injured in their business and property and are threatened with further injury.

**Nevada**

254.    CDK has unlawfully converted the property of Plaintiff and the Conversion Class by wrongfully committing a distinct act of dominion over the property of another in violation of the rights of the owners.  CDK had the requisite intent to exercise dominion over the property of Plaintiff and the Conversion Class.  As a direct and proximate result of CDK's unlawful conduct, Plaintiff and members of the Conversion Class have been injured in their business and property and are threatened with further injury.

**New York**

255.    CDK has unlawfully converted the property of Plaintiff and the Conversion Class by wrongfully assuming and exercising the right of ownership over the property of another in violation of the rights of the owners.  CDK had the requisite intent to exercise ownership over

the property of the Plaintiff and the Conversion Class. As a direct and proximate result of CDK's unlawful conduct, Plaintiff and members of the Conversion Class have been injured in their business and property and are threatened with further injury.

**Ohio**

256.    CDK has unlawfully converted the property of Plaintiff and the Conversion Class by wrongfully committing a distinct act of dominion over the property of another in violation of the rights of the owners. CDK had the requisite intent to exercise dominion over the property of Plaintiff and the Conversion Class. As a direct and proximate result of CDK's unlawful conduct, Plaintiff and members of the Conversion Class have been injured in their business and property and are threatened with further injury.

**Oregon**

257.    CDK has unlawfully converted the property of Plaintiff and the Conversion Class by wrongfully committing a distinct act of dominion over the property of another in violation of the rights of the owners. CDK had the requisite intent to exercise dominion over the property of Plaintiff and the Conversion Class. As a direct and proximate result of CDK's unlawful conduct, Plaintiff and members of the Conversion Class have been injured in their business and property and are threatened with further injury.

**Utah**

258.    CDK has unlawfully converted the property of Plaintiff and the Conversion Class by wrongfully committing a distinct act of dominion over the property of another in violation of the rights of the owners. CDK had the requisite intent to exercise dominion over the property of Plaintiff and the Conversion Class. As a direct and proximate result of CDK's unlawful conduct,

Plaintiff and members of the Conversion Class have been injured in their business and property and are threatened with further injury.

**Virginia**

259.    CDK has unlawfully converted the property of Plaintiff and the Conversion Class by wrongfully assuming and exercising the right of ownership over the property of another in violation of the rights of the owners.  CDK had the requisite intent to exercise ownership over the property of Plaintiff and the Conversion Class.  As a direct and proximate result of CDK's unlawful conduct, Plaintiff and members of the Conversion Class have been injured in their business and property and are threatened with further injury.

**Washington**

260.    CDK has unlawfully converted the property of Plaintiff and the Conversion Class by willfully interfering with the property of another without justification, such that Plaintiff and the Conversion Class were deprived of possession of the property.  As a direct and proximate result of CDK's unlawful conduct, Plaintiff and members of the Conversion Class have been injured in their business and property and are threatened with further injury.

**JURY DEMAND**

In accordance with Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment in its favor, and against Defendants, and order the following relief:

(a)    certification of this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the Classes defined above;

(b)     declaration, judgment, and decree that the conduct alleged herein:  (a) unjustly enriched the Defendants; and (b) constitutes unconscionable and/or unfair business acts or practices;

(c)     restitution and/or disgorgement of Defendants' ill-gotten gains;

(d)     an order permanently enjoining Defendants and all others acting in concert with them from engaging in the foregoing unlawful conduct;

(e)     an award of damages, as provided under the Sherman Act and state law, and hold Defendants jointly and severally liable for all damages resulting from their unlawful conspiracy in restraint of trade, to be entered against Defendants in an amount to be trebled in accordance with the Sherman Act and, if applicable, state law;

(f)     pre- and post-judgment interest;

(g)     reasonable costs and expenses incurred in this action, including expert fees and attorneys' fees; and

(h)     any such further relief that the Court may deem just and proper.

February 2, 2018                           Respectfully submitted,

                                           /s/ Richard J. Prendergast
                                           Richard J. Prendergast
                                           Michael T. Layden
                                           Collin M. Bruck
                                           RICHARD J. PRENDERGAST, LTD.
                                           111 W. Washington Street, Suite 1100
                                           Chicago, Illinois 60602
                                           Telephone: (312) 641-0881
                                           rprendergast@rjpltd.com
                                           mlayden@rjpltd.com
                                           cbruck@rjpltd.com

                                           Michael N. Nemelka (*pro hac vice pending*)
                                           Aaron M. Panner (*pro hac vice pending*)
                                           Derek T. Ho (*pro hac vice pending*)
                                           KELLOGG, HANSEN, TODD,
                                            FIGEL & FREDERICK, P.L.L.C.
                                           1615 M Street, N.W., Suite 400
                                           Washington, D.C. 20036
                                           Telephone:  (202) 326-7900
                                           Fax:  (202) 326-7999
                                           mnemelka@kellogghansen.com
                                           apanner@kellogghansen.com
                                           dho@kellogghansen.com

                                           Gregory S. Asciolla (*pro hac vice pending*)
                                           Christopher J. McDonald (*pro hac vice pending*)
                                           Brian Morrison (*pro hac vice pending*)
                                           LABATON SUCHAROW LLP
                                           140 Broadway
                                           New York, NY  10005
                                           Telephone:  (212) 907-0700
                                           Fax:  (212) 818-0477
                                           gasciolla@labaton.com
                                           cmcdonald@labaton.com
                                           bmorrison@labaton.com

                                             *Counsel for Plaintiff*

ILND 44  (Rev. 07/10/17)

# CIVIL COVER SHEET

The ILND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(See instructions on next page of this form.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| Bob Baker Volkswagen | CDK Global, LLC, and The Reynolds and Reynolds Company |

| **(b)**  County of Residence of First Listed Plaintiff  San Diego, CA | County of Residence of First Listed Defendant |
|---|---|
| *(Except in U.S. plaintiff cases)* | *(In U.S. plaintiff cases only)* |
| | *Note: In land condemnation cases, use the location of the tract of land involved.* |

| **(c)**  Attorneys *(firm name, address, and telephone number)* | Attorneys *(if known)* |
|---|---|
| Richard J. Prendergast | |
| **Richard J. Prendergast, Ltd.** | |
| 111 W. Washington Street, Suite 1100 | |
| Chicago, Illinois 60602 | |
| (312) 641-0881 | |

## II.  BASIS OF JURISDICTION *(Check one box, only.)*

- [ ] 1  U.S. Government
      Plaintiff
- [x] 3  Federal Question
      *(U.S. Government not a party)*
- [ ] 2  U.S. Government
      Defendant
- [ ] 4  Diversity
      *(Indicate citizenship of parties in Item III.)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(For Diversity Cases Only.)*
*(Check one box, only for plaintiff and one box for defendant.)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business in This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business in Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV.  NATURE OF SUIT *(Check one box, only.)*

| CONTRACT | TORTS | | PRISONER PETITIONS | LABOR | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 510 Motions to Vacate Sentence | [ ] 710 Fair Labor Standards Act | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - | **Habeas Corpus:** | [ ] 720 Labor/Management Relations | [ ] 376 Qui Tam (31 USC 3729 (a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Product Liability | [ ] 530 General | [ ] 740 Railway Labor Act | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | Liability | [ ] 367 Health Care/ | [ ] 535 Death Penalty | [ ] 751 Family and Medical | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & Slander | Pharmaceutical | [ ] 540 Mandamus & Other | Leave Act | [ ] 430 Banks and Banking |
| & Enforcement of Judgment | [ ] 330 Federal Employers' | Personal Injury | [ ] 550 Civil Rights | [ ] 790 Other Labor Litigation | [ ] 450 Commerce |
| [ ] 151 Medicare Act | Liability | Product Liability | [ ] 555 Prison Condition | [ ] 791 Employee Retirement | [ ] 460 Deportation |
| [ ] 152 Recovery of Defaulted Student | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury | [ ] 560 Civil Detainee – Conditions | Income Security Act | [ ] 470 Racketeer Influenced and |
| Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | Product Liability | of Confinement | | Corrupt Organizations |
| [ ] 153 Recovery of Veteran's Benefits | [ ] 350 Motor Vehicle | | | | [ ] 480 Consumer Credit |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle | **PERSONAL PROPERTY** | | **PROPERTY RIGHTS** | [ ] 490 Cable/Sat TV |
| [ ] 190 Other Contract | Product Liability | [ ] 370 Other Fraud | | [ ] 820 Copyrights | [ ] 850 Securities/Commodities/ |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal Injury | [ ] 371 Truth in Lending | | [ ] 830 Patent | Exchange |
| [ ] 196 Franchise | [ ] 362 Personal Injury – | [ ] 380 Other Personal | | [ ] 835 Patent – Abbreviated | [ ] 890 Other Statutory Actions |
| | Medical Malpractice | Property Damage | | New Drug Application | [ ] 891 Agricultural Acts |
| | | [ ] 385 Property Damage | | [ ] 840 Trademark | [ ] 893 Environmental Matters |
| | | Product Liability | | | [ ] 895 Freedom of Information Act |
| | | | | | [ ] 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **BANKRUPTCY** | **FORFEITURE/PENALTY** | **SOCIAL SECURITY** | [ ] 899 Administrative Procedure |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | [ ] 422 Appeal 28 USC 158 | [ ] 625 Drug Related Seizure | [ ] 861 HIA (1395ff) | Act/Review or Appeal of |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 423 Withdrawal 28 USC 157 | of Property 21 USC 881 | [ ] 862 Black Lung (923) | Agency Decision |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | | [ ] 690 Other | [ ] 863 DIWC/DIWW (405(g)) | [ ] 950 Constitutionality of |
| [ ] 240 Torts to Land | [ ] 443 Housing/ | | | [ ] 864 SSID Title XVI | State Statutes |
| [ ] 245 Tort Product Liability | Accommodations | **IMMIGRATION** | | [ ] 865 RSI (405(g)) | |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities - | [ ] 462 Naturalization  Application | | | |
| | Employment | [ ] 463 Habeas Corpus – | | | |
| | [ ] 446 Amer. w/Disabilities - | Alien Detainee | | **FEDERAL TAXES** | |
| | Other | (Prisoner Petition ) | | [ ] 870 Taxes (U.S. Plaintiff | |
| | [ ] 448 Education | [ ] 465 Other Immigrant | | or Defendant) | |
| | | Actions | | [ ] 871 IRS—Third Party | |
| | | | | 26 USC 7609 | |

## V.  ORIGIN *(Check one box, only.)*

- [x] 1  Original
      Proceeding
- [ ] 2  Removed from
      State Court
- [ ] 3  Remanded from
      Appellate Court
- [ ] 4  Reinstated or
      Reopened
- [ ] 5  Transferred from
      Another District
      *(specify)*
- [ ] 6  Multidistrict
      Litigation
- [ ] 8  Multidistrict
      Litigation
      Direct File

| VI.  CAUSE OF ACTION (Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.) | VII.  Previous Bankruptcy Matters (For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.) |
|---|---|
| Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, Antitrust Conspiracy | |

| VIII.  REQUESTED IN COMPLAINT: | [ ] Check if this is a **class action** under Rule 23, F.R.CV.P. | DEMAND $ | Check Yes only if demanded in complaint. JURY DEMAND:  [ ] Yes  [x] No |
|---|---|---|---|

## IX.  RELATED CASE(S) *(See instructions)*

| IF ANY In Re: Dealer Manageme | Judge  Honorable Amy J. St. Eve | Case Number  1:18-cv-00864 |
|---|---|---|

| X.  Is this a previously dismissed or remanded case? [ ] Yes [x] No  If yes, Case # | | Name of Judge |
|---|---|---|
| Date | Signature of attorney of record | |

_____       _____

Authority for Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.**     **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

          (b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of  filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

          (c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an  attachment, noting in this section "(see attachment)".

**II.**     **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are  included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; NOTE: federal question actions take  precedence over diversity cases.)

**III.**     **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**     **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**     **Origin.** Place an "X" in one of the six boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.**     **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. Do not cite jurisdictional statutes unless diversity. Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**     **Previous Bankruptcy Matters**  For nature of suit 422 and 423 enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this court. Use a separate attachment if necessary.

**VIII.**     **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P. Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**IX.**     **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**X.**     **Refiling Information.** Place an "X" in the Yes box if the case is being refiled or if it is a remanded case, and indicate the case number and name of judge. If this case is not being refiled or has not been remanded, place an "X" in the No box.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

Rev. 1 – 04/13/16