1   Michael N. Nemelka (*pro hac vice*)
      mnemelka@kellogghansen.com
2   Aaron M. Panner (*pro hac vice*)
      apanner@kellogghansen.com
3   Joshua D. Branson (*pro hac vice*)
      jbranson@kellogghansen.com
4   Joshua Hafenbrack (*pro hac vice*)
      jhafenbrack@kellogghansen.com
5   KELLOGG, HANSEN, TODD,
      FIGEL & FREDERICK, P.L.L.C.
6   1615 M Street, N.W.
    Suite 400
7   Washington, D.C. 20036
    Telephone:  (202) 326-7900
8   Fax:  (202) 326-7999

9   Gary Salomons (SBN 126280)
      gary@gabrielsalomons.com
10  Daniel J. Friedman (SBN 289670)
      daniel@gabrielsalomons.com
11  GABRIELSALOMONS, LLP
    16311 Ventura Blvd., Ste. 970
12  Encino, CA 91436
    Telephone:  (818) 906-3700
13  Fax:  (818) 906-2142

14  *Counsel for Plaintiff Motor Vehicle*
    *Software Corporation*

15

## UNITED STATES DISTRICT COURT

16

## CENTRAL DISTRICT OF CALIFORNIA

17

| | |
|---|---|
| MOTOR VEHICLE SOFTWARE CORPORATION<br><br>                             Plaintiff,<br><br>        vs.<br><br>CDK GLOBAL, INC.; THE REYNOLDS AND REYNOLDS COMPANY; COMPUTERIZED VEHICLE REGISTRATION, INC. a/k/a CDK VEHICLE REGISTRATION, INC.<br><br>                             Defendants. | CASE NO.:  2:17-cv-00896-DSF-AFM<br><br>**MVSC'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>Hearing: January 8, 2018<br>Time: 1:30 pm<br>Place: Courtroom 7D<br><br>Judge: The Hon. Dale S. Fischer |

18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 2

    I.     MVSC Has Alleged that CDK Unlawfully Monopolized and Attempted To Monopolize the Illinois and California EVR Markets ......................... 2

          A.     CDK is a Participant in the EVR Market ........................................ 2

          B.     CDK Acquired and Maintained Its Monopoly Through Anti-Competitive Practices ..................................................................... 9

    II.    MVSC Has Plausibly Alleged Conspiracy to Monopolize ..................... 13

          A.     MVSC Has Pleaded Facts Sufficient to Allege a Conspiracy To Monopolize the Illinois and California EVR Markets ................. 14

          B.     Defendants Are Capable of Conspiring ........................................ 16

    III.    MVSC Has Plausibly Alleged Antitrust Standing ................................. 20

          A.     Reynolds' Argument Rests on a Misreading of the Complaint ..... 20

          B.     The Doctrine of Law of the Case Precludes Reynolds from Re-litigating Antitrust Standing at the Rule 12(b)(6) Stage ............... 21

          C.     Reynolds' CFAA Argument is Meritless ...................................... 23

CONCLUSION ......................................................................................................... 25

i

# TABLE OF AUTHORITIES

Page

## CASES

*Am. Needle, Inc. v. Nat'l Football League*,
    560 U.S. 183 (2010) ...............................................................17, 18, 19

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ................................................................. 10, 13

*Authenticom, Inc. v. CDK Global, LLC*,
    874 F.3d 1019 (7th Cir. 2017) ........................................................23

*Barba v. Seung Heun Lee*,
    2009 WL 8747368 (D. Ariz. Nov. 4, 2009) ........................................8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................15

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*,
    148 F.3d 1080 (D.C. Cir. 1998) .....................................................3, 6

*Cascade Health Sols. v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) ............................................................9

*Catch Curve, Inc. v. Venali, Inc.*,
    519 F. Supp. 2d 1028 (C.D. Cal. 2007) ..............................................2

*Cervantes v. City of San Diego*,
    5 F.3d 1273 (9th Cir. 1993) .........................................................23-24

*Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.*,
    810 F.2d at 869 (9th Cir. 1987) ......................................................21

*Church & Dwight Co., Inc. v. Mayer Labs., Inc.*,
    2011 WL 1225912 (N.D. Cal. Apr. 1, 2011)......................................10

*Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*,
    611 F.3d 495 (9th Cir. 2010) ............................................................2

*Consol. Express, Inc. v. New York Shipping Ass'n, Inc.*,
    602 F.2d 494 (3d Cir. 1979) .......................................................24, 25

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984) .............................................................16, 17, 18

*Corp. v. Arxan Techs., Inc.*,
    2015 WL 3799585 (N.D. Cal. June 18, 2015) .....................................6

*Custom Packaging Supply, Inc. v. Phillips*,
    2015 WL 8334793 (C.D. Cal. Dec. 7, 2015)......................................24

*EF Cultural Travel BV v. Zefer Corp.*,
    318 F.3d 58 (1st Cir. 2003) ............................................................24

ii

MVSC'S CONSOLIDATED OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT

*Evergreen Helicopters, Inc. v. Erickson Air-Crane Inc.*,
  2011 WL 285201 (D. Or. Jan. 26, 2011)..............................................................12

*Fin. & Sec. Prods. Ass'n v. Diebold, Inc.*,
  2005 WL 1629813 (N.D. Cal. July 8, 2005) ........................................................9

*Freeman v. San Diego Ass'n of Realtors*,
  322 F.3d 1133 (9th Cir. 2003) ..........................................................................19

*Greene v. New Dana Perfumes Corp.*,
  287 B.R. 328 (D. Del. 2002) ...............................................................................6

*Guadiana v. State Farm Fire & Cas. Co.*,
  2009 WL 3763693 (D. Ariz. Nov. 10, 2009) ....................................................21

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*,
  2013 WL 3214983 (N.D. Ind. Mar. 13, 2013) ..................................................10

*Hamilton v. State Farm Fire & Cas. Co.*,
  270 F.3d 778 (9th Cir. 2001) ............................................................................16

*Helicopter Transp. Servs., Inc. v. Erickson Air-Crane Inc.*,
  2008 WL 151833 (D. Or. Jan. 14, 2008) ..........................................................12

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  --- F. Supp. 3d --, 2017 WL 3473663 (N.D. Cal. Aug. 14, 2017)....................24

*Horisons Unlimited v.*
  *Santa Cruz-Monterey-Merced Managed Med. Care Comm'n*,
  2014 WL 3342565 (E.D. Cal. July 2, 2014) ......................................................14

*Intellectual Ventures I LLC v. Cap. One Fin. Corp.*,
  2016 WL 160263 (D. Md. Jan. 14, 2016) .......................................................3, 5

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ..........................................................................16

*Lamp Liquors, Inc. v. Adolph Coors Co.*,
  563 F.2d 425 (10th Cir. 1977) ..........................................................................25

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) ............................................................................23

*Lenhoff Enters., Inc. v. United Talent Agency, Inc.*,
  2015 WL 7008185 (C.D. Cal. Sept. 18, 2015) ................................................14

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
  847 F.3d 1221 (10th Cir. 2017) ........................................................................17

*LiveUniverse, Inc. v. MySpace, Inc.*,
  304 F. App'x 554 (9th Cir. 2008)................................................................11, 12

*Mahoney v. Sessions*,
  871 F.3d 873 (9th Cir. 2017) ............................................................................24

*Memorex Corp. v. Int'l Bus. Machs. Corp.*,
  555 F.2d 1379 (9th Cir. 1977) ............................................................... 24

*MetroNet Servs. Corp. v. Qwest Corp.*,
  383 F.3d 1124 (9th Cir. 2004) ................................................... 11, 12, 13

*Monaco v. Liberty Life Assurance Co.*,
  2007 WL 1140460 (N.D. Cal. Apr. 17, 2007) ......................................... 7

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
  311 F. Supp. 2d 1048 (D. Colo. 2004) ................................... 3, 4, 5, 7, 8

*Otter Tail Power Co. v. United States*,
  410 U.S. 366 (1973) .......................................................................... 12, 13

*Packaged Seafood Prods. Antitrust Litig., In re*,
  242 F. Supp. 3d 1033 (S.D. Cal. 2017) ................................................... 8

*Paladin Assocs., Inc. v. Montana Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) ............................................................... 14

*Pennsylvania Title Ins. Antitrust Litig., In re*,
  648 F. Supp. 2d 663 (E.D. Pa. 2009) ...................................................... 7

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
  392 U.S. 134 (1968) ............................................................................... 25

*Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*,
  658 F. Supp. 1061 (D. Del. 1987) ........................................................... 6

*Ranza v. Nike, Inc.*,
  793 F.3d 1059 (9th Cir. 2015) ............................................................. 7, 8

*Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC*,
  317 F. Supp. 2d 301 (S.D.N.Y. 2003) .................................................. 3, 5

*Rebel Oil Co. v. Atlantic Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) .................................................................. 2

*Safeway Inc. v. Abbott Labs.*,
  761 F. Supp. 2d 874 (N.D. Cal. 2011) .................................................. 12

*Sawyer v. Bill Me Later, Inc.*,
  2010 WL 11492736 (C.D. Cal. Dec. 14, 2010) ................................... 7, 8

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
  376 F.3d 1065 (11th Cir. 2004) .............................................................. 6

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
  2010 WL 3521979 (E.D. Cal. Sept. 3, 2010) ....................................... 19

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010) ................................................................. 19

iv

*Stewart v. Screen Gems-EMI Music, Inc.*,
   81 F. Supp. 3d 938 (N.D. Cal. 2015)................................................................8

*Stokes v. Dallas Cty.*,
   2012 WL 12897344 (N.D. Tex. Mar. 6, 2012) ...................................................6

*Suarez v. Pac. Gas & Co. PG&E*,
   2017 WL 574378 (C.D. Cal. Feb. 13, 2017) .....................................................20

*Taylor v. Calipatria*,
   2007 WL 2712225 (S.D. Cal. Sept. 13, 2007) ...................................................21

*Top Rank, Inc. v. Haymon*,
   2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) .................................................3, 6

*United States v. Alexander*,
   106 F.3d 874 (9th Cir. 1997).........................................................................22

*United States v. Bestfoods*,
   524 U.S. 51 (1998) .......................................................................................6

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919) ....................................................................................10

*United States v. Crocker Nat'l Corp.*,
   656 F.2d 428 (9th Cir. 1981), *rev'd*,
   *Bankamerica Corp. v. United States*, 462 U.S. 122 (1983) ..............3, 6, 7, 8, 24

*United States v. Griffith*,
   334 U.S. 100 (1948) ......................................................................................9

*United States v. Lummi Indian Tribe*,
   235 F.3d 443 (9th Cir. 2000).........................................................................21

*United States v. Lummi Nation*,
   763 F.3d 1180 (9th Cir. 2014).......................................................................22

*United States v. Nosal*,
   676 F.3d 854 (9th Cir. 2012).........................................................................23

*United States v. Philadelphia Nat'l Bank*,
   374 U.S. 321 (1963) ....................................................................................24

*United States v. Yellow Cab Co.*,
   332 U.S. 218 (1947) ......................................................................................7

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) .................................................................9, 10, 11, 12, 13

*Vollrath Co. v. Sammi Corp.*,
   1989 WL 201632 (C.D. Cal. Dec. 20, 1989)....................................................18

*whiteCryption Corp. v. Arxan Techs., Inc.*,
   2015 WL 3799585 (N.D. Cal. June 18, 2015) ....................................................6

v

*Zinc Antitrust Litig., In re,*
    2016 WL 3167192 (S.D.N.Y. June 6, 2016) ...................................................... 17

**STATUTES AND RULES**

15 U.S.C. § 1 .................................................................................... *passim*

15 U.S.C. § 2 .................................................................................... *passim*

18 U.S.C. § 1030 .................................................................................... 23

California Comprehensive Computer Data Access and Fraud Act,
    Cal. Penal Code § 502 (2016) ........................................................ 24

Fed. R. Civ. P. 12(b)(6) .................................................................... *passim*

Local Rule 7-18 .................................................................... 20, 22, 23

**OTHER AUTHORITIES**

Black's Law Dictionary (10th ed. 2014) ................................................ 5

MVSC'S CONSOLIDATED OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT

## INTRODUCTION

On October 2, 2017, this Court denied Defendants' motions to dismiss MVSC's antitrust claims under Section 1 of the Sherman Act, while granting – with leave to amend – their motions to dismiss MVSC's claims under Section 2 of the Sherman Act. Dkt. 73 ("MTD Order"). In accordance with this Court's ruling, on November 2, 2017, MVSC filed its Second Amended Complaint ("SAC"), amending its Section 2 claims (monopolization and attempted monopolization against CDK and conspiracy to monopolize against CDK, Reynolds, and CVR) and supporting allegations to address the issues raised by the Court. *See* Dkt. 76. As amended, the SAC states plausible claims for relief under Section 2.

*First*, the SAC plausibly alleges that CDK Global, LLC ("CDK") substantially controls its subsidiary, Computerized Vehicle Registrations ("CVR"); is, for this reason, a "competitor" in the relevant markets for Electronic Vehicle Registration ("EVR") services; and is thus subject to claims for monopolization and attempted monopolization of those markets. CDK owns 80 percent of CVR, receives 80 percent of its profits (with the remainder paid to Reynolds), and controls CVR's corporate governance and the minutiae of its day-to-day operations. SAC ¶¶ 7, 56-60. Moreover, CDK has acquired and maintained its monopoly by means of its horizontal conspiracy with Reynolds – the group boycott of MVSC is anti-competitive conduct that supports MVSC's claim under Section 2 – and its refusal to sell to MVSC a service that CDK willingly and profitably sells to non-competitors.

*Second*, MVSC has plausibly alleged a claim of conspiracy to monopolize against CDK, Reynolds, and CVR. This Court has already held that CDK and Reynolds are capable of conspiring for Section 1 purposes. Reynolds is likewise capable of conspiring to monopolize, for purposes of Section 2, with either CDK and CVR separately or the combined CDK/CVR entity. Moreover, the SAC contains

new allegations showing that CVR executives actively participated in conspiratorial conversations with CDK and Reynolds.  SAC ¶¶ 109-114.

*Third*, the Court should refuse Reynolds' attempt to relitigate its antitrust standing argument, which this Court has already rejected.  Reynolds' argument is not only barred by law of the case but also is based on a misreading of the SAC; relies on assertions about a non-party (Authenticom) that Reynolds has never proven and no court has ever accepted; and misinterprets the Computer Fraud and Abuse Act and its relationship to the antitrust laws.

## ARGUMENT

## I.   MVSC Has Alleged that CDK Unlawfully Monopolized and Attempted To Monopolize the Illinois and California EVR Markets

To establish a Sherman Act Section 2 violation for monopolization, MVSC must allege that CDK (1) possesses "monopoly power in the relevant market"; and (2) "the acquisition or perpetuation of [that] power by illegitimate 'predatory' practices."  *See Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 506 (9th Cir. 2010) (citation omitted).  MVSC has sufficiently alleged both elements.

### A.   CDK is a Participant in the EVR Market

CDK does not dispute that CVR, by virtue of its 95 percent market share, presumptively has market power in the EVR market in Illinois.[1]  Instead, CDK argues (at 5-6) that CDK itself does not compete in the EVR market – and therefore

---

[1] CDK claims (at 11-12 n.5) that it cannot be liable for attempting to monopolize the California EVR market because MVSC is the current market leader in that state.  But CDK cites no authority in support of that argument, and this fact is in no way inconsistent with the SAC's allegation that CVR/CDK will soon take MVSC's place and gain a dominant position.  The SAC alleges that CVR/CDK has a 40% share of the California EVR market, SAC ¶ 85, and, as a result of its exclusionary tactics, will likely gain a monopoly share, *see id.* ¶ 107.  It is therefore a question of fact whether CDK has a dangerous probability of achieving a monopoly.  *See Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1432-33 (9th Cir. 1995); *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1035 (C.D. Cal. 2007).  The SAC alleges factors that would support a finding of dangerous probability.  SAC ¶¶ 52, 155-156.  In particular, CDK has "control of an essential or superior resource" – access to dealer data – that gives CDK the ability to make it difficult if not possible for dealers to do business with MVSC.  *Rebel Oil*, 51 F.3d at 1439.

cannot be liable for Section 2 monopolization. That argument is legally incorrect, because the SAC alleges that CDK participates in that market through its substantial control over the governance and day-to-day operations of its 80 percent subsidiary, CVR. SAC ¶¶ 7, 56-60, 153-154. Those allegations of substantial control – if proven at trial – would render CDK a competitor in the Illinois and California EVR markets and subject to liability under Section 2.[2]

1. The SAC alleges that CDK is "a competitor at the level of the subsidiary," that is, CVR, because it alleges that CDK has "substantial control over the affairs and policies of the subsidiary." *Top Rank, Inc. v. Haymon*, 2015 WL 9948936, at *17 (C.D. Cal. Oct. 16, 2015) (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1088 (D.C. Cir. 1998); *see also United States v. Crocker Nat'l Corp.*, 656 F.2d 428, 450 (9th Cir. 1981), *rev'd on other grounds*, *Bankamerica Corp. v. United States*, 462 U.S. 122 (1983) (test is whether the "parent substantially controls the policies of its subsidiary"). In other words:

> "[A] parent can be considered a competitor in a market where its subsidiary is a participant if, and only if, the parent sufficiently controls, dictates, or encourages the policies of the subsidiary. When the parent controls, directs, or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act."

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1070 (D. Colo. 2004).[3] That is precisely what the SAC establishes.

Specifically, the SAC alleges that CDK "wields complete control over CVR's direction and management," SAC ¶ 56, and receives 80 percent of CVR's profits

---

[2] This Court previously rejected (MTD Order 9) MVSC's allegation that CDK, Reynolds, and CVR are jointly and severally liable for monopolization as joint venturers.

[3] *See also, e.g., Intellectual Ventures I LLC v. Cap. One Fin. Corp.*, 2016 WL 160263, at *5 (D. Md. Jan. 14, 2016) (plaintiff adequately alleged market participation of defendant where the defendant "is a parent company, controlling or directing the anticompetitive conduct" of its affiliates); *Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC*, 317 F. Supp. 2d 301, 325 (S.D.N.Y. 2003) ("If [the defendant] Oaktree in fact stands as the decisionmaking entity behind [the subsidiary], calling the shots on its daily decisions and deriving benefit from its activities, then it may be understood as a 'competitor in the market.'").

(with Reynolds, which owns a 20 percent minority share in CVR, receiving the remainder). The SAC sets forth specific facts that document CDK's total dominance and control over CVR, *see id.* ¶¶ 56-58, including:

| Substantial Control Allegations | |
|---|---|
| 1. | CDK owns 80% of CVR, *id.* ¶ 56; |
| 2. | CDK controls the CVR board of directors (and CDK executives occupy most seats), *id.*; |
| 3. | CVR's general manager reports directly to a CDK Vice President, *id.*; |
| 4. | CVR executives are concurrently CDK executives (with CVR's longtime general manager also serving as a top executive at CDK), *id.*; |
| 5. | In public filings, CDK informs investors that it holds a "controlling" financial and management interest in CVR, *id.*; |
| 6. | CDK treats CVR as a division rather than a separate subsidiary – for example, by rolling up CVR's financial results into CDK's consolidated financial statements, *id.* ¶ 57; |
| 7. | CDK controls CVR's budget and capital investments, *id.*; |
| 8. | CVR employees have CDK email addresses and job descriptions, *id.*; |
| 9. | CDK makes hiring and firing decisions of CVR employees, *id.*; |
| 10. | CDK posts new job listings for CVR on the CDK website, *id.*; |
| 11. | CDK houses CVR's offices within CDK's California headquarters – on the same floor as CDK employees, *id.*; |
| 12. | CVR is a marketing conduit for CDK, as CDK dictates where CVR should focus its sales efforts and CDK executives accompany CVR sales representatives on trips to dealerships, *id.*; and |
| 13. | CDK touts CVR as "our" EVR service, *id.* ¶ 58. |

Courts have repeatedly recognized Section 2 antitrust claims – at both the motion to dismiss and summary judgment stages – based on similar (or indeed less-extensive) allegations of substantial control. In *Nobody in Particular Presents*, for example, the court held the plaintiff created a triable issue of fact on substantial control sufficient to survive summary judgment where the defendant corporation, *inter alia*, (1) "set[] the vision, strategy, and culture of all subsidiaries"; (2) operated subsidiaries as divisions; (3) required the subsidiary to submit written reports to the

4

parent; (4) participated in and directed the subsidiary's budgeting; and (5) represented in 10-K filings that it exercised "broad policy" control over the subsidiary. 311 F. Supp. 2d at 1071-72. Similarly, in *Reading Int'l*, the court held that the plaintiff adequately alleged substantial control – even though the defendant owned only a 17% share of the subsidiary – where the complaint alleged the parent and subsidiary "share an office," the parent held seats on the subsidiary's board, and the parent and subsidiary "describe themselves in official documents as sharing a 'partnership.'" 317 F. Supp. 2d at 322, 324; *see also Intellectual Ventures*, 2016 WL 160263, at *5 (allegations that subsidiary reports to the parent sufficient to plead substantial control at the motion-to-dismiss stage).

Whether a parent exercises "substantial control" over the affairs of its subsidiary is a "fact-specific inquiry hinging on the particular structure and dynamics of the two entities." *Reading Int'l*, 317 F. Supp. 2d at 325; *see id.* at 322-23 ("While the existence of actual 'control' over Regal is a question of fact that must be determined after discovery or trial, plaintiffs' assertion that there is a sufficient measure of control to influence the behavior of Regal must be accepted as true for the purposes of a motion to dismiss."). Given the specific allegations of the SAC that clearly meet the "substantial control" standard, CVR's monopoly power in Illinois (and dangerous probability of achieving monopoly power in California) is imputed to CDK.

**2.** CDK does not dispute that the "substantial control" standard applies. Instead, it claims (at 5-6) that MVSC's allegations of substantial control are "conclusory," but that contention cannot be reconciled with the SAC's detailed factual allegations. A "conclusory" allegation is one that "express[es] a factual inference without stating the underlying facts on which the inference is based." Black's Law Dictionary (10th ed. 2014). As shown above, the SAC explains in detail the "underlying facts" showing that CDK completely controls CVR's day-to-

5

day activities.  SAC ¶¶ 56-60; *Stokes v. Dallas Cty.*, 2012 WL 12897344, at *2 (N.D. Tex. Mar. 6, 2012) (allegations not conclusory "because they explain the underlying facts upon which they are based").

CDK (at 5) cites three cases where a court dismissed a Section 2 claim under Rule 12(b)(6) because the plaintiff failed to plead substantial control, but in all of those cases, the defendant-parent corporation owned a minority share of the subsidiary and the complaint included no allegations that the parent controlled the activities of the subsidiary.  *Caribbean Broad.*, 148 F.3d at 1088-89 (27% stake and no allegations of control); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1075 (11th Cir. 2004) (26% stake and no allegations of control); *Top Rank*, 2015 WL 9948936, at *17 ("minority ownership interest," without more, not sufficient).  Here, CDK owns 80% of CVR and the SAC squarely alleges that CDK exercises day-to-day control over CVR.  SAC ¶¶ 56-60.  CDK's other cases do not address whether a parent corporation substantially controls a subsidiary for Section 2 purposes; rather, they involve attempts to pierce the corporate veil in non-antitrust contexts.[4]  Veil piercing analysis is irrelevant under Section 2.

In *Crocker*, the Ninth Circuit described the standard as whether the "parent substantially controls the policies of its subsidiary" and found the defendant was a "competitor" at the level of its subsidiary with no reference to alter-ego analysis. 656 F.2d at 450.  As the *Crocker* court explained, to interpret the antitrust laws "as meaning that the business activity of the subsidiary can never be considered in determining whether the parent is a 'competitor' . . . would assume that Congress

---

[4] *See whiteCryption Corp. v. Arxan Techs., Inc.*, 2015 WL 3799585, at *2-3 (N.D. Cal. June 18, 2015) (alter ego analysis in contract case); *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 658 F. Supp. 1061, 1084 (D. Del. 1987) (alter ego analysis in contract case, applying Delaware law); *United States v. Bestfoods*, 524 U.S. 51, 55 (1998) (federal environmental case involving attempt to pierce the corporate veil)*; Greene v. New Dana Perfumes Corp.*, 287 B.R. 328, 342-43 (D. Del. 2002) (bankruptcy case involving attempt to pierce the corporate veil under Delaware law for purposes of personal jurisdiction).

MVSC'S CONSOLIDATED OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT

intended to permit such a simple and obvious means of avoidance as to render the statute meaningless, and would ignore the Supreme Court's admonition that the antitrust laws are 'aimed at substance rather than form.'" *Id.* (quoting *United States v. Yellow Cab Co.*, 332 U.S. 218, 227 (1947)); *see also In re Pennsylvania Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 689 (E.D. Pa. 2009) (calling it "counterintuitive" to allow a "parent to direct . . . anticompetitive conduct of its subsidiaries, . . . [but] then escape antitrust liability by hiding behind its separate incorporation") (quoting *Nobody in Particular Presents*, 311 F. Supp. 2d at 1069).

**3.** Even if the alter-ego test applied (and it does not), MVSC has alleged specific facts that CVR is the "alter-ego or agent of CDK." SAC ¶ 60.

"To satisfy the alter ego test, a plaintiff must make out a prima facie case (1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015) (internal quotation marks omitted). "[T]he alter ego analysis is a fact-intensive inquiry, not appropriately resolved in the context of a motion to dismiss." *Monaco v. Liberty Life Assurance Co.*, 2007 WL 1140460, at *3 (N.D. Cal. Apr. 17, 2007); *Sawyer v. Bill Me Later, Inc.*, 2010 WL 11492736, at *14 (C.D. Cal. Dec. 14, 2010) ("An alter ego determination is fact specific and requires the Court to consider the totality of the circumstances."). MVSC has adequately alleged both elements of the alter-ego test.

As to "unity of interest," MVSC's allegations – if proven – would allow the fact-finder to conclude that CDK controls CVR "to such a degree as to render the latter the mere instrumentality of the former." *Ranza*, 793 F.3d at 1073. "This test envisions pervasive control over the subsidiary, such as when a parent corporation dictates every facet of the subsidiary's business — from broad policy decisions to routine matters of day-to-day operation." *Id.* (internal quotation marks omitted).

MVSC'S CONSOLIDATED OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT

That is precisely what MVSC alleges: CDK, which owns 80% of CVR and receives 80% of its profits, has pervasive control over CVR's broad policy decisions (CDK controls CVR's board of directors, management, budgeting, and capital investments) and day-to-day operations (CDK control's CVR's job postings, hiring and firing decisions, daily sales efforts, physical office space, and more). *See* SAC ¶¶ 56-60; *see also Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 962 (N.D. Cal. 2015) (non-conclusory allegations sufficient to allege alter ago, even when stated on information and belief); *Barba v. Seung Heun Lee*, 2009 WL 8747368, at *5 (D. Ariz. Nov. 4, 2009) ("more than conclusory statements" in complaint adequately alleged alter ego theory); *Sawyer*, 2010 WL 11492736 (finding "unity of interest" factor adequately alleged even when allegations were also "consistent with a normal parent-subsidiary relationship").[5]

As to the second element, it would be unjust – and contrary to federal antitrust policy – to allow CDK to evade scrutiny under the Sherman Act by "simply spread[ing] [its] anticompetitive scheme over multiple entities, such that no one entity met all the requirements for unlawful monopolization." SAC ¶ 153; *see Stewart*, 81 F. Supp. 3d at 960 (alter ego doctrine requires an "inequitable result"); *cf. Crocker*, 656 F.2d at 450; *Nobody in Particular Presents*, 311 F. Supp. 2d at 1070. The SAC alleges that CDK's anticompetitive conduct, which includes its use of CVR to perpetuate a monopoly in Illinois and elsewhere, has harmed not only MVSC but also dealerships and car buyers in the form of reduced choices, thwarted innovation, and inferior service for vehicle registration. SAC ¶¶ 194-201.

---

[5] CDK cites (at 6-7) *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033 (S.D. Cal. 2017), but that case supports MVSC. There, the district court found, at the motion-to-dismiss stage, that the plaintiff's "allegations as a whole plausibly suggest a unity of interest" between the parent and subsidiary. *Id.* at 1061-62. In particular, the plaintiff alleged the parent and subsidiary shared a "common global marketing image" and "physical office space"; the parent used its subsidiary as a "marketing conduit"; and the parent attempted to "shield itself from liability based on its subsidiaries' activities." *Id.* MVSC's allegations are strikingly similar to – and if anything more extensive than – those in *Packaged Seafood Prods.*

8

**B.    CDK Acquired and Maintained Its Monopoly Through Anti-Competitive Conduct**

MVSC has also sufficiently alleged that CDK used anti-competitive means to acquire or maintain its monopoly in Illinois and to attempt to acquire a monopoly in California.  "Anti-competitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way."  *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008).  MVSC alleges that CDK conspired with Reynolds to deny MVSC access to dealer data – a conspiracy that has facilitated CDK's monopoly of EVR services in Illinois and attempted monopolization in California.  Separately, CDK's refusal to sell to MVSC the very service that it voluntarily sells to non-competitors – solely because MVSC is a competitor – supports a claim under Section 2 for unlawful monopolization, notwithstanding *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).

**1.**    CDK argues (at 1, 9) that its "unilateral refusal to deal" with MVSC cannot be unlawful exclusionary conduct under *Trinko*.  But CDK ignores MVSC allegations – which this Court has already held plausibly state a claim under Section 1 – that CDK and Reynolds conspired to prevent MVSC from joining the 3PA and RCI programs and conspired to eliminate third-party avenues to data integration.  MTD Order 7-8.  Horizontal collusion is anti-competitive conduct that supports liability under Section 2.

A defendant violates "Section 2 of the Sherman Act . . . [if he] 'has acquired or maintained his strategic position, or sought to expand his monopoly, or expanded it by means of those restraints of trade which are cognizable under [Section] 1.'"  *Fin. & Sec. Prods. Ass'n v. Diebold, Inc.*, 2005 WL 1629813, at *4 (N.D. Cal. July 8, 2005) (quoting *United States v. Griffith*, 334 U.S. 100, 106 (1948)).  Put differently: "Where defendant has engaged in unlawful restraint of trade that would

9

independently violate Section 1 of the Sherman Antitrust Act, it is well established that it also violates Section 2 if it acquires or maintains a monopoly by means of that restraint of trade." *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, 2013 WL 3214983, at *7 (N.D. Ind. Mar. 13, 2013); *see also Church & Dwight Co., Inc. v. Mayer Labs., Inc.*, 2011 WL 1225912, at *7 (N.D. Cal. Apr. 1, 2011) (noting it is "not unusual" for the "same anticompetitive conduct" to form the basis for both the Section 1 and Section 2 claims).

By conspiring with Reynolds to prevent MVSC from obtaining necessary dealer data (whether from Defendants or third parties), CDK has prevented MVSC from gaining a foothold in the Illinois market and vying for CDK/CVR's dealership customers there. SAC ¶ 68. CDK has thus maintained its monopoly in Illinois (and attempted to acquire a monopoly in California) by means of its horizontal conspiracy with Reynolds.

**2.** Separate and apart from the horizontal conspiracy, the SAC also plausibly alleges that CDK's refusal to provide dealer data integration service to MVSC – a service that it voluntarily and profitably provides to non-competitors – constitutes unlawful exclusionary conduct under Section 2. To be sure, "as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Trinko*, 540 U.S. at 408 (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). At the same time, "[t]he high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified." *Id.* (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985)).

The SAC's allegations, if proven, would allow a fact-finder to conclude that CDK's refusal to deal was motivated "not by competitive zeal but by anticompetitive malice" against MVSC as a competing EVR provider. *Trinko*, 540 U.S. at 409. As

MVSC'S CONSOLIDATED OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT

the SAC alleges, CDK voluntarily sells integration services to vendors, at a significant profit. SAC ¶ 92. CDK offers integration at rates it publishes online. *Id.* ¶¶ 97, 125. But CDK refused to extend those generally available terms to MVSC not because it would be unprofitable to sell service to MVSC, but instead to undermine MVSC's ability to compete with it in the EVR market. *See id.* ¶¶ 109-128. A refusal "to provide to . . . competitors products that [are] already sold [by defendants] in a retail market to other customers" may support a claim under Section 2. *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1133 (9th Cir. 2004) (quoting *Trinko*, 540 U.S. at 409-10); *see id.* ("refusal to sell [generally available products] to the plaintiff 'even if compensated at retail price'" suggests "'a calculation that its future monopoly retail price would be higher.'").

The SAC includes new allegations – based upon an internal CDK document – showing that CDK has imposed "Category Restrictions" to prevent "CVR Competitors" from obtaining dealer data through the 3PA program. SAC ¶ 112. The document states that CVR's competitors (such as MVSC) are "[n]ot allowed to sign" a 3PA data contract "even with extract, *unless in a territory not of value to CVR.*" *Id.* (emphasis added). CDK, in short, has admitted to using its control over dealer data to selectively hobble one category of EVR providers – those that compete with CVR – to ensure that CDK/CVR remains the dominant provider in multiple states nationwide, including Illinois. CDK's second motion to dismiss completely ignores these allegations.

CDK misplaces reliance (at 9-10) on the unpublished opinion in *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 556-58 (9th Cir. 2008). *LiveUniverse* cited *MetroNet* for the proposition that "the refusal to deal exception, . . . requires, *inter alia,* 'the unilateral termination of a voluntary and profitable course of dealing.'" 304 Fed. App'x at 556 (quoting *MetroNet,* 383 F.3d at 1132). But in *LiveUniverse* – in contrast to this case – the defendant MySpace did not sell at retail any services to

other third-party social network sites like the plaintiff in that case. *Compare LiveUniverse*, 304 F. App'x at 557, with SAC ¶¶ 88-94, 119. There was thus no basis for any inference that MySpace's refusal to provide services to the plaintiff reflected anything other than legitimate business judgment.

In any event, as courts before and after *LiveUniverse* have explained, a fact-finder can "consider the termination of a prior course of dealing as a factor related to a defendant's intent (as opposed to a required element of a refusal to deal claim)." *Evergreen Helicopters, Inc. v. Erickson Air-Crane Inc.*, 2011 WL 285201, at *6 (D. Or. Jan. 26, 2011) (citing *MetroNet*, 383 F.3d at 1132 and *Trinko*, 540 U.S. at 409); *see also Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 894 (N.D. Cal. 2011); *Helicopter Transp. Servs., Inc. v. Erickson Air-Crane Inc.*, 2008 WL 151833, at *9 (D. Or. Jan. 14, 2008) ("That Erickson and HTS had no prior course of dealing is immaterial. The Supreme Court has never held that termination of a preexisting course of dealing is a necessary element of an antitrust claim.").

*Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973), is instructive. There, the Supreme Court found that defendant Otter Tail was liable under Section 2 for its refusal to sell power transmission to newly established, competing municipal power providers – even though Otter Tail never sold power to the plaintiff specifically. *See id.* at 370-72, 377-78. The Court reasoned that Otter Tail generally sold transmission services to non-competing wholesale customers, and so its refusals to sell the same services to the plaintiff were designed to "prevent municipal power systems from eroding its monopolistic position." *Id.* at 378. This case is more akin to *Otter Tail* than *Trinko*, because CDK is refusing to sell to MVSC a product – data integration services – that it offers at standardized retail prices to other automotive

vendors in order to protect (in Illinois) or acquire (in California) a monopoly.[6]  In short, CDK's practice of selling integration services to other vendors supports an allegation that the refusal to sell to MVSC is unlawfully exclusionary – whether or not CDK made any prior sales to MVSC specifically.  *See also MetroNet*, 383 F.3d at 1132-33.

      **3.**     CDK finally suggests (at 10-11) that it did not refuse to deal with MVSC; rather, according to CDK, MVSC simply did not want to pay CDK's prices.  That argument is inconsistent with the SAC's allegations.  MVSC alleges that CDK's price quote was so exorbitant, it would cause MVSC to lose money on every transaction – in other words, it was an offer only in form, and a refusal to deal in substance.  SAC ¶¶ 123, 127.  Moreover, CDK knew and intended to quote prices that MVSC could never accept – in keeping with CDK's admitted strategy to keep the 3PA program as a "Closed Category" to "CVR competitors."  *Id.* ¶¶ 108, 112.  In any event, CDK's assertion that MVSC rejected terms that it could have accepted at most creates an issue of fact for discovery and trial; it does not provide any basis for dismissing the claim.

## II.    MVSC Has Plausibly Alleged Conspiracy to Monopolize

      In its MTD Order, the Court held that MVSC had plausibly alleged that CDK and Reynolds violated Section 1 by "conspir[ing] to block MVSC from participating in their respective third-party access programs . . . in order to restrain competition in the EVR market."  MTD Order 6-7.  But the Court found that MVSC had not alleged sufficient facts to demonstrate that CVR conspired with CDK and Reynolds to monopolize the EVR market.  *See id.* at 11.  The SAC includes detailed allegations showing CVR conspired to monopolize the Illinois and California EVR markets.

---

[6] Indeed, *Trinko* distinguished *Otter Tail* by noting that, in that case, "the defendant was already in the business of providing a service to certain customers . . . , and refused to provide the same service to certain other customers."  540 U.S. at 410; *see also id.* (distinguishing *Aspen Skiing*, on the basis that "what the defendant refused to provide to its competitor was a product that it already sold at retail").

13

1    A Section 2 conspiracy has four elements: "(1) the existence of a combination

2 or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the

3 specific intent to monopolize; and (4) causal antitrust injury."  *Paladin Assocs., Inc.*

4 *v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).  CDK does not contest

5 that MVSC has properly alleged a Section 2 conspiracy claim,[7] and CVR and

6 Reynolds focus their objections exclusively on the first element – the existence of a

7 conspiracy – but their arguments provide no basis for dismissal.

8    **A.    MVSC Has Pleaded Facts Sufficient to Allege a Conspiracy To**

9        **Monopolize the Illinois and California EVR Markets**

10    MVSC's SAC "plead[s] facts sufficient to state a plausible claim that CVR

11 conspired with CDK and Reynolds."  MTD Order 11.  The SAC includes specific

12 factual allegations supporting the conclusion that "CVR was not a bystander to the

13 CDK and Reynolds conspiracy to block MVSC from their respective 3PA and RCI

14 programs.  Instead, CVR executives actively participated in conspiratorial

15 conversations with CDK and Reynolds, specifically discussing the need to block

16 MVSC from accessing dealer data."  SAC ¶ 109.  For example, based on admissions

17 from a former CVR board member, MVSC alleges that the CVR board – where CVR

18 representatives were present[8] – "agreed that CVR needed a competitive advantage . .

19

---

20    [7] CDK argues instead (at 8) that "shared monopolization" is insufficient as a theory for

21 monopolization and attempted monopolization.  But a conspiracy to monopolize under Section 2
necessarily includes multiple parties supporting the monopolization of a single entity (here,

22 CDK/CVR).  *See, e.g.*, *Lenhoff Enters., Inc. v. United Talent Agency, Inc.*, 2015 WL 7008185, at
*3-4 (C.D. Cal. Sept. 18, 2015) ("Ninth Circuit case law holds that to sufficiently state a claim

23 under § 2 … the plaintiff must allege facts indicating that a conspiracy exists to create *a monopoly*

24 *in a single entity*.") (emphasis added); *Horisons Unlimited v. Santa Cruz-Monterey-Merced
Managed Med. Care Comm'n*, 2014 WL 3342565, at *11 (E.D. Cal. July 2, 2014) (denying motion

25 to dismiss Section 2 conspiracy claim alleging that a government credentialing body and county
government conspired with a managed care provider to help the provider monopolize the Medicaid

26 services market).

27    [8] The SAC names Scott Herbers (former CVR general manager), Jim Quinlan (current CVR
general manager), and John Roeder (CVR Senior Executive of Sales and Operations) as three CVR

28 executives involved in those conspiratorial conversations and others.  *Id.* ¶ 111.

1    . regarding access to dealer data" and "specifically discussed keeping MVSC at a

2    disadvantage with respect to data access." *Id*. ¶ 110.  Because CDK and Reynolds

3    controlled "data access," CVR's policy necessarily required coordinated conduct

4    with its parent owners.  Beyond board meetings, CVR executives are alleged to have

5    participated in CDK's decision to enforce "Category Restrictions" in which "CVR

6    Competitors" were "[n]ot allowed to sign [up for 3PA] . . . unless in a territory not of

7    value to CVR." *Id*. ¶ 112 (italics omitted); *see also id*. ¶ 113 (describing

8    conversations involving CVR executives Messrs. Herbers, Quinlan, and Roeder in

9    which they, along with CDK executives, decided to keep MVSC out of 3PA because

10    Defendants would be "giving up [profit] by allowing a competitor" to access dealer

11    data).

12       MVSC also alleges that Mr. Quinlan, CVR's general manager, discussed "the

13    blocking of independent integrators as it related to MVSC," and the ways in which

14    CVR salespeople could "target" MVSC customers and "be prepared" to handle the

15    influx of dealers leaving MVSC because MVSC could no longer obtain data from

16    independent integrators.  *Id*. ¶ 114.

17       In sum, MVSC has alleged that CVR did not merely tell MVSC, "We don't

18    want you in the [certified data access] program," *id*. ¶ 128 (italics omitted), it

19    actively worked to keep MVSC out of the 3PA and RCI programs.  These

20    allegations, in conjunction with those already found sufficient to state a Section 1

21    claim, go well beyond a "naked assertion of conspiracy" and state an actionable

22    Section 2 conspiracy claim regarding the who, what, when, where, and how of

23    CVR's participation in the conspiracy.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557

24    (2007).[9]

---

25       [9] CVR mischaracterizes many of MVSC's allegations.  For example, CVR argues (at 6) that

26    CVR executives should be expected to discuss CVR's competitive landscape.  But MVSC alleges
that "the board specifically discussed keeping MVSC at a disadvantage with respect to *data*

27    *access*" – the heart of the group boycott.  SAC ¶ 110 (emphasis added).  Such discussions are
unlawful antitrust conspiracies, not mere "sharp business practices."  *See* CVR Br. 6 n.4.

28

MVSC'S CONSOLIDATED OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT

Reynolds argues (at 4-5) that MVSC has not pled sufficient facts about Reynolds' involvement in the conspiracy. But the Court has already held that the allegations regarding Reynolds' involvement in the conspiracy to boycott MVSC are sufficient to plead a claim under Section 1. *See* MTD Order 7. Now that MVSC has pled more detailed allegations of CVR's involvement in the conspiracy to boycott MVSC, Reynolds is liable for the Section 2 conspiracy as well.[10]

## B. Defendants Are Capable of Conspiring

CVR and Reynolds argue that they, with CDK, form a single unified entity and therefore cannot conspire together. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771-72 (1984). That argument (1) contradicts the position that Reynolds took in its prior filings (and the Court accepted), where it argued that it was not a participant in the EVR market; and (2) is inconsistent with the SAC.

**1.** Reynolds argues (at 8-9) that "antitrust law treats Defendants as a single entity that cannot conspire with itself" because "Reynolds and CDK jointly own CVR." But in its first motion to dismiss, Reynolds argued that it was *not* united with CVR: "Reynolds does not have an EVR software product, and cannot monopolize that market." Dkt. 63-1, at 14; *see also id.* at 15 ("Reynolds does not compete in the EVR market."). The Court adopted Reynolds' argument. MTD Order 9.

Reynolds is now estopped from arguing that it is, after all, a single entity with CVR. *See Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782-83 (9th Cir. 2001) ("Judicial estoppel . . . precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position."). Reynolds "cannot have it both ways" and "invoke . . .

---

[10] Furthermore, Reynolds is incorrect to argue (at 4) that the SAC says nothing new about Reynolds. MVSC alleges that Reynolds representatives sat on CVR's board and therefore were directly involved in the conversations in which CVR executives expressed the need to prevent MVSC's data access. *See* SAC ¶¶ 106, 110, 111. Since Reynolds knows who it sent to serve on CVR's board during the period of the conspiracy (January 2014 to the present), MVSC's allegations "give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

*Copperweld*" to argue that Defendants are "incapable of conspiring with each other for purposes of forming an anticompetitive agreement" while also arguing that Reynolds does not compete (through CVR) in the EVR market. *In re Zinc Antitrust Litig.*, 2016 WL 3167192, at *21 (S.D.N.Y. June 6, 2016).[11] Either Reynolds and CVR are one entity (in which case Reynolds competes in the EVR market and is subject to a Section 2 monopolization and attempted monopolization claims) or they are distinct (in which case they can conspire). Having already taken the latter position, Reynolds is estopped from arguing the former.

**2.** In any event, contrary to the arguments of CVR (at 3-4) and Reynolds (at 6-7), all three Defendants are not a single entity incapable of conspiring. With respect to the exclusionary conduct that is relevant here – conspiring to deny MVSC access to generally available data integration services – the CDK/CVR entity and Reynolds are each capable of making their own economic decision.[12]

To determine whether a parent and subsidiary are a single entity for conspiracy purposes, the "key" inquiry is whether they can engage in "concerted action – that is, whether [the conspiracy] joins together separate decisionmakers." If the conspiracy is between "'separate economic actors pursuing separate economic interests,' such that the agreement 'deprives the marketplace of independent centers of decisionmaking,'" then it is actionable. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (quoting *Copperweld*, 467 U.S. at 769). The parent's degree of control over the subsidiary is determinative: If "the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests," then their "corporate actions are guided or determined not by two separate

---

[11] *See also Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1234-36 (10th Cir. 2017) (holding that because Plaintiff could not bring conspiracy claims against affiliated firms held to be a single entity under *Copperweld*, Plaintiff "was permitted under the antitrust laws to assert § 2 monopolization and attempted monopolization claims" aggregating the market shares of the affiliated firms).

[12] The Court previously noted the parties' disagreement on this point but did not rule on the merits. *See* MTD Order 11.

corporate consciousnesses, but one." *Copperweld*, 467 U.S. at 771-72. But if two firms enter into an agreement as "substantial, independently owned, and independently managed business[es]," then they do not "possess either the unitary decisionmaking quality or the single aggregation of economic power characteristic of" a single entity, and they can conspire. *Am. Needle*, 560 U.S. at 196.

This Court has already determined that CDK and Reynolds are capable of conspiring under Section 1. Therefore, they cannot be a single entity with respect to Section 2. *See Vollrath Co. v. Sammi Corp.*, 1989 WL 201632, at *15 (C.D. Cal. Dec. 20, 1989) ("The *Copperweld* rule should be equally applicable to an allegation of conspiracy under section 2."); *cf.* Areeda & Hovenkamp, ¶ 1464g ("Affiliated corporations that constitute a single entity so as to be incapable of conspiring for the purposes of Sherman Act § 1 are equally incapable of conspiring to monopolize under Sherman Act § 2."). Nor could Defendants plausibly assert otherwise: the nation's two largest DMS competitors, SAC ¶ 32, do not operate as a single economic entity, and each is capable of making its own decision with respect to such matters as access to dealer data integration services.

Nor are CVR and Reynolds a single entity. Reynolds and CDK cannot simultaneously "assert full control [over CVR] at any moment if the subsidiary fails to act in the parent's best interests." *Copperweld*, 467 U.S. at 771-72. Because Reynolds' 20% stake (SAC ¶ 56) is insufficient to give it "full control" over CVR, Reynolds and CVR cannot be a single entity – as CVR's own citations indicate. *See* CVR Br. 3 n.3; *see also* Areeda & Hovenkamp, ¶ 1467.

CVR (at 3) and Reynolds (at 8-9) imply that there is an exception to *Copperweld* and *American Needle* for joint ventures, but there is not. *See Am. Needle*, 560 U.S. at 202 ("[C]ompetitors cannot simply get around antitrust liability by acting through a . . . joint venture."). For example, Reynolds argues (at 8-9) that it is a single entity with CVR because it shares in CVR's profits and losses.

18

*American Needle* rejected this test: "If the fact that potential competitors shared in profits or losses from a venture meant that the venture was immune from § 1, then any cartel could evade the antitrust law simply by creating a 'joint venture' to serve as the exclusive seller of their competing products." *Id.* at 201.[13]

Because CDK and Reynolds – and Reynolds and CVR – are capable of conspiring, MVSC's Section 2 conspiracy claim does not turn on whether, as MVSC alleges, "CVR is treated as a division of CDK, not as an independent corporate entity." SAC ¶ 57; *see also* ¶¶ 56-60, 153-154. Either the CDK/CVR entity can conspire with Reynolds, or all three Defendants can conspire with each other.

Finally, CVR and Reynolds claim to be a single entity because MVSC alleges that "CDK and Reynolds . . . control the management and decisionmaking of CVR." SAC ¶ 152. Relatedly, they argue that the SAC's detailed allegations about CDK's day-to-day control over CVR contradict statements in the First Amended Complaint ("FAC") that both CDK and Reynolds "controlled" CVR. CVR Br. 4; Reynolds Br. 7-8. But the FAC's allegations simply reflected Reynolds' 20% ownership stake, and do not suggest that Reynolds, by itself, exercised control over CVR: "CVR is a wholly owned joint venture of CDK and Reynolds and is therefore *controlled* by them. . . . They have representatives on CVR's board of directors." *See* FAC ¶ 55

---

[13] Reynolds also cites (at 9) *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1147-48 (9th Cir. 2003), but that case held that members of a joint venture were capable of conspiring because "where firms are not an economic unit and are at least potential competitors, they are usually not a single entity for antitrust purposes." *Id.* at 1149. CDK and Reynolds are actual competitors and distinct economic units, and thus capable of conspiring notwithstanding their joint venture.

In *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2010 WL 3521979 (E.D. Cal. Sept. 3, 2010), cited by CVR (at 3) and Reynolds (at 9), the court held that two parent firms and their joint venture were a single entity because "[t]here are no allegations that defendants are 'independent centers of decision making'" and "Plaintiff does not allege that the defendants compete with one another." 2010 WL 3521979, at *23. These facts alone distinguish *Stanislaus* from MVSC. *See* SAC ¶ 32 (CDK and Reynolds are competitors); ¶¶ 101-102. Moreover, the plaintiff in *Stanislaus* effectively challenged the lawfulness of the joint venture's existence. *See* 2010 WL 3521979, at *18-19. Here, in contrast, "the complaint contains . . . allegations of conduct that took place outside of the joint venture[]" itself. *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 327 (2d Cir. 2010).

MVSC'S CONSOLIDATED OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT

(CVR is a wholly owned joint venture of CDK and Reynolds and is therefore controlled by them).  Likewise, the SAC does not contradict the First Amended Complaint, which pleaded that CDK was closely aligned with CVR.  *See, e.g.*, FAC ¶ 21 (CDK is an 80% shareholder in CVR and they share office space), ¶ 98 (CDK and CVR share executives in common); ¶ 146 (CDK and CVR coordinate marketing).  *See Suarez v. Pac. Gas & Co. PG&E*, 2017 WL 574378, at *6 (C.D. Cal. Feb. 13, 2017) (holding that amended allegations can only be disregarded if they are "patently inconsistent with prior pleadings").

### III.  MVSC Has Plausibly Alleged Antitrust Injury

MVSC has properly alleged antitrust injury because it was directly harmed by Defendants' conspiracy to boycott it.  Reynolds argues that MVSC lacks antitrust injury, however, because MVSC once obtained dealer data from independent integrators, which Reynolds contends was in violation of the Computer Fraud and Abuse Act (or "CFAA").  That contention (1) mischaracterizes the SAC's allegations; (2) is barred by the doctrine of law of the case and Local Rule 7-18; and (3) is wrong on the merits.

### A.  Reynolds' Argument Rests on a Misreading of the Complaint

Reynolds' antitrust injury argument rests on the contention (at 9) that MVSC's "entire conspiracy theory" is "premised on the notion that MVSC was harmed because it could no longer access DMS data through third party screen scrapers such as Authenticom," which access Reynolds contends is illegal under the CFAA.  That mischaracterizes the SAC and MVSC's claims.

MVSC has alleged that Reynolds and CDK conspired to deny MVSC entry into the RCI and 3PA programs – a *per se* unlawful group boycott.  *See*, *e.g.*, SAC ¶¶ 68, 164.  The Court already found MVSC's well-supported allegations in this regard to be sufficient.  MTD Order 6-7.  MVSC was harmed because Defendants conspired to deny MVSC authorized access through Defendants' official data

integration programs – not because they additionally conspired to deny MVSC access through third parties.  To be sure, MVSC also alleges it was harmed by Defendants' conspiracy to drive out third-party integrators such as Authenticom. This Court credited those allegations as plausible, too.  *See id.*  But, contrary to Reynolds' claims (at 9-10), Defendants' conspiracy related to third-party integrators is not MVSC's "entire conspiracy theory" or sole source of harm.

Reynolds, of course, does not argue that access through its own, authorized RCI program would violate the CFAA.  Regardless of the merits of Reynolds' CFAA argument, therefore, MVSC's Section 1 claim still plausibly alleges cognizable antitrust harm stemming from Defendants' group boycott.  *See Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.*, 810 F.2d at 869, 876 (9th Cir. 1987) ("On the basis of their proven anticompetitive effect, group boycotts are considered unreasonable *per se*."); *see also* Dkt. 66, at 30-32.

**B.      Law of the Case and the Local Rules Precludes Reynolds from Re-litigating Antitrust Injury at the Rule 12(b)(6) Stage**

In seeking to dismiss the First Amended Complaint, Reynolds raised precisely the same argument: that MVSC lacked antitrust injury because Authenticom's conduct allegedly violated the CFAA.  Because the Court did not credit that argument once before when directed at the sufficiency of identical pleadings, the same arguments should now be rejected as law of the case.

**1.**      For the doctrine of law of the case to apply, "the issue in question must have been 'decided explicitly or by necessary implication in [the] previous disposition.'"  *United States v. Lummi Indian Tribe*, 235 F.3d 443, 452 (9th Cir. 2000).  District courts regularly apply law of the case to deny successive motions to dismiss raising arguments previously rejected.  *See, e.g.*, *Guadiana v. State Farm Fire & Cas. Co.*, 2009 WL 3763693, at *5-6 (D. Ariz. Nov. 10, 2009); *Taylor v. Calipatria*, 2007 WL 2712225, at *7 (S.D. Cal. Sept. 13, 2007).

That doctrine applies here. In their first motions to dismiss, both Reynolds and CDK argued that MVSC lacked standing because it had not adequately alleged antitrust injury. *See* Dkt. 63-1, at 10 (Reynolds) ("MVSC lacks antitrust standing"); Dkt. 61-1, at 19-20 (CDK) ("MVSC has not shown antitrust injury" and thus lacks antitrust standing). Reynolds argued in its reply brief (Dkt. 69, at 5, 11) that "MVSC lacks antitrust standing" because any "alleged action by Reynolds to block unauthorized access to its DMS cannot result in an antitrust injury because such access violates the CFAA." That is the exact argument Reynolds makes now (at 9-10) (arguing MVSC has no standing because third-party access "violates the CFAA.").

This Court implicitly rejected that argument in its prior order. In its MTD Order denying Defendants' motions to dismiss MVSC's Section 1 claim, this Court acknowledged that "CDK and Reynolds argue that MVSC lacks standing to allege an antitrust violation," *see* MTD Order 7 n.6, but went on to conclude that MVSC stated a plausible claim for relief. By necessary implication, the Court rejected Defendants' antitrust standing arguments. *United States v. Lummi Nation*, 763 F.3d 1180, 1185 (9th Cir. 2014) ("For the doctrine [of law of the case] to apply, the issue in question must have been decided explicitly or by necessary implication in the previous disposition.") (emphasis added).

Because no "intervening change in the law" or "changed circumstances" between then and now requires departure from that decision, the doctrine of law of the case should preclude Reynolds' second motion under Rule 12(b)(6) on the basis of antitrust injury. *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997).

**2.** To the extent Reynolds now contends the MTD Order was wrongly decided on the issue of antitrust injury, the time for filing a Motion for Reconsideration has long since passed and Reynolds has made no attempt to comply with Local Rule 7-18. Nor could it. Under that rule, any Motion for

Reconsideration must be based on one of three enumerated grounds, none of which is present here. Moreover, Local Rule 7-18 states: "No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion." Yet that is what Reynolds does: repeating the same CFAA argument it made in support of its first motion to dismiss.

### C. Reynolds' CFAA Argument is Meritless

In any event, Reynolds' assertion that third-party integrators such as Authenticom operate illegally under the CFAA – and that this somehow deprives MVSC (which is not a data integrator) of antitrust injury – is wrong on the merits.

As an initial matter, the fact that MVSC received data from an independent integrator does not establish a violation of the CFAA. *See* 18 U.S.C. § 1030 (violator must "*knowingly access*[] a computer without authorization") (emphasis added). A holding to the contrary would put thousands of companies in legal jeopardy.

Moreover, Reynolds has never established – and no court has ever found – that Authenticom operates illegally under the CFAA, the 1986 criminal "anti-hacking statute," *United States v. Nosal*, 676 F.3d 854, 857 (9th Cir. 2012), that criminalizes unauthorized computer access in enumerated circumstances. Reynolds' argument thus would require this Court, without any discovery or any factual showing, to rule that Authenticom operates illegally – all in the context of a Rule 12(b)(6) motion and based on factual assertions that are not only outside MVSC's SAC but are contradicted by it.[14] *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) ("[W]hen the legal sufficiency of a complaint's allegations is tested by a motion under Rule 12(b)(6),"'[r]eview is limited to the complaint.'") (quoting

---

[14] *Compare, e.g.*, Reynolds Br. 11-12 ("Reynolds … has always forbidden"; "Reynolds has <u>never</u> authorized … third party data integrators to access its proprietary DMS") (citing *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1022 (7th Cir. 2017)), *with* SAC ¶ 137 ("During the wind-down period, Reynolds agreed that CDK could continue to pull dealer data just as it had before.").

MVSC'S CONSOLIDATED OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT

1  *Cervantes v. City of San Diego*, 5 F.3d 1273, 1274 (9th Cir. 1993); *see also Mahoney*
2  *v. Sessions*, 871 F.3d 873, 877 (9th Cir. 2017).

3      In any event, the CFAA does not immunize Reynolds' violations of the
4  antitrust laws.  The Sherman Act prohibits Reynolds and CDK from agreeing to
5  boycott a competitor (including Authenticom); their agreement to do so harmed
6  MVSC, and it can seek a remedy for it.  That is so whether or not any action by
7  Authenticom might potentially violate the CFAA.[15]  *See Crocker*, 656 F.2d at 440-41
8  (noting "settled canon of construction that '(i)mmunity from the antitrust laws is not
9  lightly implied,' a principle 'which reflects the felt indispensable role of antitrust
10 policy in the maintenance of a free economy.'" (quoting *United States v.*
11 *Philadelphia Nat'l Bank*, 374 U.S. 321, 348 (1963)); *Consol. Express, Inc. v. New*
12 *York Shipping Ass'n, Inc.*, 602 F.2d 494, 525-26 (3d Cir. 1979) (noting the
13 "inappropriateness of requiring that the federal antitrust enforcement policy yield to
14 unrelated regulatory policies, state or federal"); *cf. EF Cultural Travel BV v. Zefer*
15 *Corp.*, 318 F.3d 58, 62-63 (1st Cir. 2003) (Boudin, J.) ("public policy" may "limit
16 certain restrictions" under the CFAA); *hiQ Labs, Inc. v. LinkedIn Corp.*, --- F. Supp.
17 3d ---, 2017 WL 3473663, at *6 (N.D. Cal. Aug. 14, 2017) (defendant cannot use
18 CFAA to block data scraping of websites).

19     Indeed, Reynolds' argument would not provide a defense in an action by
20 Authenticom itself:  "[I]llegality is not to be recognized as a defense to an antitrust
21 action," because "[a] wrongful act committed against one who violates the antitrust
22 laws must not become a shield in the violator's hands against operation of the
23 antitrust laws."  *Memorex Corp. v. Int'l Bus. Machs. Corp.*, 555 F.2d 1379, 1382 (9th

24 
    [15] California's state-law analog to the CFAA, the California Comprehensive Computer Data
25 Access and Fraud Act, ("CDAFA"), does not deprive MVSC of antitrust injury for the same
reasons that apply to Reynolds' CFAA argument.  Indeed, the CDAFA gives even less support to
26 Reynolds.  No facts alleged in the SAC demonstrate that Authenticom "overc[ame] technical or
code-based barriers" to access the Reynolds DMS, as is required to support a finding of liability
27 under the CDAFA.  *Custom Packaging Supply, Inc. v. Phillips*, 2015 WL 8334793, at *3 (C.D.
Cal. Dec. 7, 2015).

28
MVSC'S CONSOLIDATED OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT

1   Cir. 1977); *see also Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139

2   (1968) ("the [antitrust] plaintiff . . . may be no less morally reprehensible than the

3   defendant, but the law encourages his suit to further the overriding public policy in

4   favor of competition.").[16]  The CFAA provides no shield to protect Reynolds from its

5   antitrust violations.  And here, the purported illegality does not even concern MVSC

6   but rather a non-party to this litigation, Authenticom.

7                                 **CONCLUSION**

8        The Defendants' motions to dismiss the SAC should be denied.

---

[16] Other courts have held the same.  *See Consol. Express*, 602 F.2d 494, 525-526 (holding that *Perma Life* "abolished the defense of illegality even when the plaintiff's wrongdoing is unrelated to antitrust policy."); *Lamp Liquors, Inc. v. Adolph Coors Co.*, 563 F.2d 425, 431 (10th Cir. 1977) ("[I]llegality is no bar to a Sherman Act suit.").

25

Dated: December 6, 2017

Respectfully submitted,

*/s/ Michael N. Nemelka*

Gary Salomons (SBN 126280)
Daniel J. Friedman (SBN 289670)
GABRIELSALOMONS, LLP
16311 Ventura Blvd., Suite 970
Encino, CA 91436
Telephone:  (818) 906-3700
Fax:  (818) 906-2142
gary@gabrielsalomons.com
daniel@gabrielsalomons.com

Michael N. Nemelka
Aaron M. Panner
Joshua D. Branson
Joshua Hafenbrack
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Fax:  (202) 326-7999
mnemelka@kellogghansen.com
apanner@kellogghansen.com
jbranson@kellogghansen.com
jhafenbrack@kellogghansen.com

*Counsel for Plaintiff*
*Motor Vehicle Software Corporation*

MVSC'S CONSOLIDATED OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT