**MAYER BROWN LLP**
John Nadolenco (SBN 181128)
*jnadolenco@mayerbrown.com*
350 South Grand Ave
25th Floor
Los Angeles, CA 90071-1503
(213) 229-9500
(213) 625-0248 – Facsimile

Britt M. Miller (*pro hac vice*)
*bmiller@mayerbrown.com*
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
(312) 701-7711 – Facsimile

Attorneys for Defendant
CDK Global, Inc.

*Additional Counsel Listed on Signature Page*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOTOR VEHICLE SOFTWARE CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>CDK GLOBAL, INC.; THE REYNOLDS AND REYNOLDS COMPANY; COMPUTERIZED VEHICLE REGISTRATION, INC., a/k/a CDK VEHICLE REGISTRATION, INC.,<br><br>Defendants. | Case No. 2:17-cv-896-DSF-AFM<br><br>**REPLY IN SUPPORT OF DEFENDANT CDK GLOBAL, INC.'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Complaint Filed: Nov. 2, 2017<br><br>Date: January 8, 2018<br>Time: 1:30 p.m.<br>Place: Courtroom 7D<br><br>Judge: Hon. Dale S. Fischer |

# INTRODUCTION

Plaintiff Motor Vehicle Software Corporation's ("MVSC") Section 2 claim against CDK Global, Inc. ("CDK"), and its derivative Illinois Antitrust Act claim, should be dismissed. To state a claim for monopolization or attempted monopolization under those laws, MVSC must plausibly allege *both* that CDK competes in the market for electronic vehicle registration ("EVR") services by exerting "substantial control" over Computerized Vehicle Registration ("CVR") *and* that CDK's alleged refusal to deal with MVSC constituted monopolizing conduct. MVSC has not plausibly alleged either.

CDK's motion to dismiss the Second Amended Complaint showed that "substantial control" requires day-to-day control of a subsidiary by its parent (sufficient to satisfy corporate law's agency test), and that none of MVSC's allegations establishes day-to-day control on the part of CDK. Instead of engaging on the question of day-to-day control, MVSC argues that a less stringent control test applies. But that argument flies in the face of precedent from courts of appeals and a court in this District, and it should be rejected.

The Court should likewise reject MVSC's argument that CDK's alleged conduct constituted unlawful monopolization. MVSC's argument that CDK's purported conspiracy with The Reynolds and Reynolds Company ("Reynolds") satisfies Section 2 is a nonstarter in the Ninth Circuit, which distinguishes between concerted conduct subject to Section 1 and unilateral conduct subject to Section 2. And MVSC's allegations that CDK unlawfully refused to deal with it fare no better. CDK had no obligation to help MVSC compete in the EVR market by offering it access to CDK's 3PA data interface at MVSC's preferred price. And in any event, MVSC has not adequately alleged that CDK offered MVSC terms different from the terms CDK offered any other EVR provider. The Court should accordingly dismiss with prejudice MVSC's Section 2 and Illinois Antitrust Act

claims with respect to CDK.

## ARGUMENT

### A.  CDK does not participate in the market for EVR services.

MVSC concedes that CDK does not participate in the markets relevant to MVSC's Section 2 claim—*i.e.*, the EVR markets in Illinois and California. MVSC contends, rather, that it has sufficiently alleged that CDK can be considered a market participant by virtue of its ownership stake in CVR. Opp. 2-3. MVSC is mistaken.

As CDK's opening memorandum explained (at 6-7), the new allegations of "substantial control" in the Second Amended Complaint are inadequate. These allegations do not indicate that CDK exercises day-to-day control over CVR, as the substantial-control test requires. On the contrary, each of the allegations is defective because it (1) indicates nothing more than part ownership of CVR by CDK; (2) involves high-level policy direction rather than day-to-day control; and/or (3) is too factually undeveloped to survive scrutiny.

MVSC does not defend the adequacy of *any* of its specific allegations. Instead, it simply compiles them in a chart and argues that its *overall* array of allegations is comparable to the collections of allegations or facts that were found sufficient in three district court cases where motions to dismiss or for summary judgment were denied.[1] *See* Opp. at 4-5 (citing *Intellectual Ventures I LLC v. Cap. One Fin. Corp.*, 2016 WL 160263, at *5 (D. Md. Jan. 14, 2016); *Nobody in*

---

[1] MVSC also protests that the substantial-control inquiry is "fact-specific" and cannot be resolved on a motion to dismiss. Opp. 5 (quoting *Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC*, 317 F. Supp. 2d 301, 325 (S.D.N.Y. 2003)). In fact, however, numerous decisions dismiss substantial-control allegations (or alter ego/agency allegations) at the pleading stage. *See, e.g.*, *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1075 (11th Cir. 2004); *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1088 (D.C. Cir. 1998); *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1065 (S.D. Cal. 2017).

Case: 1:18-cv-00864 Document #: 49 Filed: 02/13/18 Page 4 of 11 PageID #:473

*Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1071-72 (D. Colo. 2004); and *Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC*, 317 F. Supp. 2d 301, 322, 324 (S.D.N.Y. 2003)). But those cases did not apply the stringent agency test required to find that a parent company exercises "substantial control" over its subsidiary for antitrust purposes. Thus, two of those cases (*Intellectual Ventures* and *Nobody in Particular*) failed to analyze whether the factors they relied on amounted to day-to-day control and can be dismissed as wrongly decided. And while *Reading International* at least mentioned the concept of day-to-day control, its facts are distinguishable. The court in *Reading International* analyzed whether the plaintiffs had adequately alleged that two defendant investment firms had conspired to control chains of movie theaters in which they were minority investors. 317 F. Supp. 2d at 322. It held that the plaintiffs had sufficiently alleged that one of the investors had enough control over the movie theater companies to facilitate the conspiracy, based largely on the presence of two executives of the investor on the boards of the allegedly controlled firms—a fact that is common to many parent-subsidiary relationships and thus would never satisfy an agency test. Moreover, although MVSC claims that *Reading International* involved a parent and subsidiary that described themselves as "sharing a 'partnership'" (Opp. 5), that misstates the facts. The purported "partnership" in *Reading International* was between the two investment firms—which were not accused of controlling *each other*—rather than between a parent and a subsidiary. *Reading Int'l*, 317 F. Supp. 2d at 322.

MVSC baldly asserts that veil-piercing cases involving the agency test are "irrelevant under Section 2" (Opp. 6), but appellate precedent holds otherwise. In articulating the substantial-control standard in *Caribbean Broadcast System, Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1088 (D.C. Cir. 1998), the D.C. Circuit

cited several decisions applying the agency test. *See* 148 F.3d at 1088.[2] And in *Spanish Broadcast System of Florida, Inc. v. Clear Channel Communications, Inc.*, 376 F.3d 1065, 1075 (11th Cir. 2004), another substantial-control case, the Eleventh Circuit cited *Caribbean Broadcast System* and similarly required "control over day-to-day operations." 376 F.3d at 1075 & n.6. Moreover, in *Top Rank, Inc. v. Haymon*, a court of this District agreed that agency is the proper test for substantial control. *See* 2015 WL 9948936, at *17 (C.D. Cal. Oct. 16, 2015) ("To be a competitor at the level of the subsidiary, the parent must have substantial control over the affairs and policies of the subsidiary. *In other words, Top Rank would have to allege a principal-agent relationship between the Waddell Defendants and the Haymon Defendants.*" (emphasis added) (internal quotation marks omitted)).

MVSC cites the Ninth Circuit's later-reversed decision in *Crocker*, which merely rejected the proposition that acts of a subsidiary can "never be considered" in determining whether its parent competes with the plaintiff, without mentioning the agency test. *See United States v. Crocker Nat'l Corp.*, 656 F.2d 428, 450 (9th Cir. 1981), *rev'd on other grounds sub nom. Bankamerica Corp. v. United States*, 462 U.S. 122 (1983). Moreover, *Crocker* was a case under Section 8 of the Clayton Act that asked when a parent company should be considered a competitor of an interlocked corporation by virtue of its subsidiary's business. It did not determine what constitutes "substantial control" for purposes of a Sherman Act Section 2 claim. *Id.* On the contrary, the court presumed that parent bank holding companies controlled their subsidiaries "as a matter of law" under the Bank Holding Company Act. 656 F.2d at 450. But CDK does not argue that a subsidiary's acts can *never* be

---

[2] MVSC states that *whiteCyrption Corp. v. Arxan Techs., Inc.*, 2015 WL 3799585, at *3 (N.D. Cal. June 18, 2015), and *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 658 F. Supp. 1061, 1084 (D. Del. 1987), applied the alter ego test (Opp. 6 n.4), but that is mistaken; both applied the agency test.

-4-

attributed to its parent for purposes of a Section 2 claim; rather, doing so is appropriate only when the agency test is satisfied.

MVSC's reliance on *In re Pennsylvania Title Insurance Antitrust Litigation*, 648 F. Supp. 2d 663, 689 (E.D. Pa. 2009), is equally misplaced. In the passage MVSC quotes, the *Pennsylvania Title* court was quoting *another* court explaining why a parent and subsidiary can sometimes be treated as a single enterprise for Section 1 purposes under the Supreme Court's decision in *Copperweld*. The *Pennsylvania Title* court was not offering any view about when a parent company can be said to compete in its subsidiary's market.

MVSC does invoke a veil-piercing test of its own—the alter ego test (Opp. 7-8)—but it has not stated a claim under this test, either. MVSC again tries to analogize its case to three others, all of which are inapposite. In *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 962 (N.D. Cal. 2015), the plaintiff alleged facts sufficient to show "a disregard of corporate formalities, commingling of corporate funds, or failure to segregate records." In *Barba v. Seung Heun Lee*, 2009 WL 8747368, at *5 (D. Ariz. Nov. 4, 2009), the plaintiffs alleged the same lack of formalities and commingling of funds; that the officers and directors of the defendants were the same; and that the defendants conducted business without holding any corporate meetings or keeping any records or minutes of any "corporate proceedings." And in *Sawyer v. Bill Me Later, Inc.*, 2010 WL 11492736, at *14 (C.D. Cal. Dec. 14, 2010), the plaintiff alleged that the defendants had integrated an acquired business into their enterprise. MVSC's allegations are a far cry from the ones in these cases.

In any event, MVSC has not adequately alleged the second element of alter ego liability—*i.e.*, that it would be inequitable to honor corporate separateness. *See, e.g.*, *Gerritsen v. Warner Bros. Entm't Inc.*, 116 F. Supp. 3d 1104, 1143 (C.D. Cal. 2015). On this issue, MVSC argues that it would be "contrary to federal

-5-

1  antitrust law" to "allow CDK to evade scrutiny" because it does not do business in
2  the EVR market. Opp. 8. But the same could be argued in *any* antitrust case where
3  a subsidiary participates in a market while its parent does not. MVSC has not
4  alleged facts showing that honoring CDK and CVR's separate legal status "would,
5  *under the particular circumstances*, sanction a fraud or promote injustice."
6  *Gerritsen*, 116 F. Supp. 3d at 1143 (emphasis added) (internal quotation marks
7  omitted). Nor has MVSC pled facts showing that CDK organized its ownership of
8  CVR in a way that demonstrates bad faith—which is a "critical factor in the
9  analysis." *Id.* On the contrary, it is completely implausible that bad faith exists
10 here: CVR exists to facilitate a joint venture, not to shield its owners from liability.
11 MVSC's allegations of substantial control are therefore inadequate, requiring
12 dismissal of its Section 2 claim against CDK.

### B.  MVSC has not plausibly alleged that CDK engaged in exclusionary conduct under Section 2.

MVSC's Section 2 claim against CDK is also fatally flawed because, even assuming that CDK participates in the market for EVR services through CVR (which it does not), MVSC has not alleged conduct on CDK's part that is actionable under Section 2.[3]

MVSC first argues that its allegations that CDK conspired with Reynolds are sufficient to state a claim under Section 2. Opp. 9. But as this Court recognized in its opinion on the motion to dismiss the First Amended Complaint (MTD Op. 8), this alleged conspiracy cannot be the basis for Section 2 liability because the Ninth Circuit, relying on "[t]he bare text of the Sherman Act," distinguishes between Section 1 claims, which involve concerted activity, and Section 2 monopolization and attempted monopolization claims, which involve unilateral activity. *Alaska*

---

[3] For the reasons explained in CDK's opening memorandum (at 12), the dismissal of MVSC's Section 2 claim against CDK requires dismissal of its claim under the Illinois Antitrust Act as well.

*Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 540 (9th Cir. 1991). Accordingly, MVSC's Section 2 claim cannot stand to the extent it rests on MVSC's conspiracy allegations.[4]

Nor does MVSC state a Section 2 claim based on CDK's purported refusal to deal. MVSC acknowledges (Opp. 10) that, for a refusal to deal to give rise to a Section 2 claim, the refusal must fit into the "limited exception" to the no-duty-to-deal rule that the Supreme Court recognized in *Aspen Skiing*. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004). MVSC argues that it has cleared *Aspen*'s high bar by alleging that CDK refused to deal with it for purely anticompetitive reasons. Opp. 10-11. But MVSC's arguments on this score fail at every turn. As an initial matter, there was no refusal to deal by CDK. As CDK's opening memorandum explained (at 10-11), CDK did offer to deal with MVSC; MVSC simply chose not to accept the terms. In response, MVSC falls back on its claim that the offered terms amounted to a *de facto* refusal to deal because the price quoted to MVSC was too high. Opp. 13. But as CDK observed (Mem. 11), MVSC has not alleged that CDK offered terms different from the ones CDK offered any other EVR provider. Apart from repeating the conclusory claim, without any specifics, that CDK "refused to extend [its] generally available terms to MVSC" (Opp. 11), MVSC has no response to this point.

MVSC also argues that it has demonstrated "anticompetitive malice" through its new allegation that CDK would not sell 3PA access to any EVR provider that competed with CVR. Opp. 10-11. But that allegation does nothing to advance MVSC's case. As the Seventh Circuit explained in *Authenticom*, "[e]ven

---

[4] Even if CDK's alleged conspiracy with Reynolds were actionable under Section 2, it would have no practical significance to the case, for MVSC's Section 1 claim, which the Court declined to dismiss, already encompasses that purported conspiracy.

1  monopolists are almost never required to assist their competitors." *Authenticom,*
2  *Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1025 (7th Cir. 2017). A refusal to deal
3  cannot be declared unlawful simply because the alleged monopolist did not want to
4  aid a competitor; if it could, virtually any refusal to deal would be suspect, the
5  opposite of established law. *See supra* p. 7.

6       MVSC's Section 2 claim also fails on the independent ground that MVSC
7  has not alleged (and cannot allege) that CDK abandoned any prior, voluntary
8  course of dealing with MVSC. Mem. 9-10 (citing *LiveUniverse, Inc. v. MySpace,*
9  *Inc.*, 304 F. App'x 554, 556 (9th Cir. 2008); *Duty Free Ams., Inc. v. Estée Lauder*
10 *Cos.*, 797 F.3d 1248, 1266-67 (11th Cir. 2015); *Novell, Inc. v. Microsoft Corp.*,
11 731 F.3d 1064, 1074 (10th Cir. 2013); and *In re Elevator Antitrust Litig.*, 502 F.3d
12 47, 52 (2d Cir. 2007)). MVSC argues that the Ninth Circuit's decision in
13 *LiveUniverse* is distinguishable because the defendant there "did not sell at retail
14 any services to other third-party social network sites like the plaintiff" (Opp. 11-
15 12), but that is no distinction at all. Nothing in *LiveUniverse* turned on whether
16 MySpace was selling a product at retail; rather, *LiveUniverse* held that under
17 *Trinko*, a plaintiff cannot allege an actionable refusal to deal without alleging the
18 "unilateral termination of a voluntary and profitable course of dealing."
19 *LiveUniverse*, 304 F. App'x at 556 (internal quotation marks omitted). While not
20 binding precedent, it is highly persuasive and should be followed—particularly
21 because it accords with the published holdings of three other courts of appeals.
22 Thus, while MVSC protests that a few district courts in this Circuit have declined
23 to treat a prior course of dealing as a mandatory element of a refusal to deal claim
24 (Opp. 12), the weight of appellate authority clearly establishes that a prior course
25 of dealing must be pled.

26      *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973), is not to the
27 contrary. As the leading antitrust treatise explains, *Otter Tail* is distinguished by a
28

-8-

number of "peculiarities." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles & Their Application* ¶ 772b3 (3d & 4th eds. 2010-2016). First, the defendant there had a "natural monopoly" over power transmission, making the case for judicial intervention especially compelling. *Id.* Second, the decision "ought to be read in light of strong historical formulations from the common law imposing broad duties to deal on public utilities." *Id.* Given that those concerns are absent here, there is no ground for applying *Otter Tail's* pre-*Trinko* holding to this case.

In any event, even if a prior course of dealing between MVSC and CDK were not strictly required by Section 2, it would at least be "very close to dispositive" in light of *Trinko*. Areeda & Hovenkamp ¶ 772d3; *see also id.* (suggesting that *Trinko* left "barely open" the possibility of *Aspen* liability in the absence of a change in a course of dealing). Given the lack of any change in the parties' course of dealing here, the Court should decline MVSC's invitation to second-guess CDK's business judgment and hold that MVSC has not alleged any unlawful refusal to deal by CDK.

## **CONCLUSION**

The Second Amended Complaint's second, third, fourth, and fifth causes of action should be dismissed with prejudice with respect to CDK.

Respectfully submitted,

By: */s/ John Nadolenco*_____
MAYER BROWN LLP
John Nadolenco (SBN 181128)
*jnadolenco@mayerbrown.com*
350 South Grand Ave
25th Floor
Los Angeles, CA 90071-1503
(213) 229-9500

|  |  |
|---|---|
| 1 | (213) 625-0248 – Facsimile |
| 2 | |
| 3 | Britt M. Miller (*pro hac vice*) |
|   | *bmiller@mayerbrown.com* |
| 4 | 71 South Wacker Drive |
|   | Chicago, IL 60606 |
| 5 | (312) 782-0600 |
| 6 | (312) 701-7711 – Facsimile |
| 7 | |
|   | Mark W. Ryan (*pro hac vice*) |
| 8 | *mryan@mayerbrown.com* |
|   | 1999 K Street, NW |
| 9 | Washington, DC 20006-1101 |
| 10 | (202) 263-3000 |
|    | (202) 263-3300 – Facsimile |
| 11 | |
| 12 | *Attorneys for Defendant CDK Global, Inc.* |

-10-
REPLY IN SUPPORT OF CDK GLOBAL, INC.'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT; CASE NO. 2:17-CV-896