## Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
HONORABLE DALE S. FISCHER, U.S. DISTRICT JUDGE

- - -

```
MOTOR VEHICLE SOFTWARE      )
CORPORATION,                )
                            )
              PLAINTIFF,    )
                            )
     vs.                    ) No. CV17-896-DSF (AFMX)
                            )
CDK GLOBAL, INC., ET AL.,   )
                            )
              DEFENDANTS.   )
_____)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS
LOS ANGELES, CALIFORNIA
MONDAY, JANUARY 8, 2018
1:19 p.m.

_____

CINDY L. NIRENBERG, CSR 5059, FCRR
U.S. Official Court Reporter
350 W. 1st Street, #4455
Los Angeles, CA 90012
*www.msfedreporter.com*

## Page 2

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:
```
        GABRIEL SALOMONS
        BY: GARY K. SALOMONS, ATTORNEY AT LAW
        16311 VENTURA BOULEVARD
        SUITE 970
        ENCINO, CA 91436
        818-906-3700

        KELLOGG HANSEN TODD FIGEL & FREDERICK
        BY: MICHAEL N. NEMELKA, ATTORNEY AT LAW
        1615 M STREET NW
        SUITE 400
        WASHINGTON, DC 20036
        202-326-7900
```

FOR THE DEFENDANTS CDK AND CVR:
```
        MAYER BROWN
        BY: BRITT M. MILLER, ATTORNEY AT LAW
        71 SOUTH WACKER DRIVE
        CHICAGO, IL 60606
        312-782-0600

        MAYER BROWN
        BY: JOHN NADOLENCO, ATTORNEY AT LAW
        350 SOUTH GRAND AVENUE
        25TH FLOOR
        LOS ANGELES, CA 90071
        213-229-9500

        MAYER BROWN
        BY: MARK W. RYAN, ATTORNEY AT LAW
        1909 K STREET NW
        WASHINGTON, DC 20006
        202-263-3338
```

## Page 3

APPEARANCES OF COUNSEL (CONTINUED):

FOR THE DEFENDANT THE REYNOLDS AND REYNOLDS COMPANY:
```
        GIBBS & BRUNS
        BY: AUNDREA K. GULLEY, ATTORNEY AT LAW
        1100 LOUISIANA STREET
        SUITE 5300
        HOUSTON, TX 77002
        713-650-8805

        SHEPPARD MULLIN RICHTER & HAMPTON
        BY: LEO D. CASERIA, ATTORNEY AT LAW
        333 SOUTH HOPE STREET
        43RD FLOOR
        LOS ANGELES, CA 90071
        213-620-1780
```

## Page 4

LOS ANGELES, CALIFORNIA; MONDAY, JANUARY 8, 2018
1:19 P.M.
- - - - -

THE CLERK: Calling item Number 16, CV17-896, Motor Vehicle Software Corporation versus CDK Global, Inc., et al.

THE COURT: Plaintiffs on the side of the jury (indicating), unless the defense has the burden of proof, in which case, it's switched.

All right. Counsel, your appearances.

MR. SALOMONS: Good afternoon, Your Honor. Gary Salomons of Gabriel Salomons for the plaintiff.

MR. NEMELKA: Michael Nemelka from Kellogg Hansen on behalf of the plaintiff.

MR. RYAN: Mark Ryan from Mayer Brown on behalf of the defendant CDK and the defendant CVR.

MS. MILLER: Good afternoon, Your Honor. Britt Miller of Mayer Brown on behalf of defendant CDK Global and defendant CVR.

MR. NADOLENCO: John Nadolenco also of Mayer Brown on behalf of defendants CDK and CVR.

MS. GULLEY: Good afternoon, Your Honor. Aundrea Gulley from Gibbs & Bruns on behalf of defendant The Reynolds and Reynolds Company.

MR. CASERIA: And Leo Caseria from Sheppard Mullin Richter & Hampton on behalf of the defendant, The Reynolds and

5

1 Reynolds Company.
2 THE COURT: Okay. Is this case going to an MDL?
3 MS. MILLER: Yes, Your Honor.
4 MR. NEMELKA: Possibly.
5 THE COURT: So why are you bothering me? I have
6 enough to do.
7 MS. MILLER: Your Honor, we've moved for a
8 consolidation of this and a number of cases.
9 THE COURT: We stand when we speak to the Court in
10 federal court.
11 MS. MILLER: I apologize, Your Honor.
12 We have moved for consolidation of this case and a
13 number of other cases before the JPML, and the JPML is
14 scheduled to have a hearing on the matter on January 25th.
15 THE COURT: So what is your position on whether I
16 should rule?
17 MS. MILLER: Your Honor, we are perfectly happy to
18 have Your Honor rule on the motion to dismiss, but with respect
19 to the scheduling order, we think Your Honor should hold off on
20 scheduling any discovery or further proceedings until it can be
21 coordinated as part of the MDL because discovery should be
22 coordinated with the other cases.
23 THE COURT: Well, then that will go to some other
24 judge because nobody's even asked me to handle it.
25 MS. MILLER: Yes, Your Honor.

6

1 THE COURT: There are some cases now already
2 coordinated; is that right?
3 MS. MILLER: No, Your Honor. There are eight cases
4 that have been filed in five different jurisdictions around the
5 country: Several jurisdictions in the Western District of
6 Wisconsin, this one here, one in Illinois, one in Mississippi
7 and several in New Jersey.
8 THE COURT: So where is the proposal for it to go?
9 MS. MILLER: We have asked for consolidation in the
10 Northern District of Illinois. Some of the other parties have
11 asked for consolidation in the Western District of Wisconsin
12 and others have asked for the District of New Jersey.
13 THE COURT: Okay.
14 MR. NEMELKA: Your Honor, on behalf of the MVSC, we
15 have put forth a vigorous paper before the MDL panel that MVSC
16 should not be consolidated with the other cases --
17 THE COURT: Well, if it's vigorous, I'm sure --
18 MR. NEMELKA: Yeah.
19 -- given the unique conspiracy at issue here that is
20 not at issue in the other cases.
21 THE COURT: So you're suggesting just this case
22 remain separate?
23 MR. NEMELKA: That this case remain separate here and
24 stay in this Court, yes.
25 THE COURT: All right. So I'll hear from the

7

1 plaintiff. And, please, everybody, for my sake and the court
2 reporter's, before you speak, repeat your name again.
3 I'll hear from the plaintiff.
4 Tell me exactly what was changed from the previous
5 complaint so I make sure both of you and the Court are at least
6 close to being on the same page.
7 MR. NEMELKA: Absolutely. Michael Nemelka from
8 Kellogg Hansen on behalf of plaintiff.
9 There are two primary changes in order to address the
10 issues in the Court's prior ruling. The first is changes with
11 respect to the allegations on CDK's substantial control over
12 CVR such that CDK is considered a competitor in the EVR
13 markets, and those are at paragraphs 56 through 60.
14 And the allegations there that were added make very
15 clear that CVR, which is 80 percent owned by CDK, 20 percent by
16 Reynolds, is -- that CDK has a substantial control over CVR.
17 THE COURT: You're not claiming Reynolds anymore?
18 MR. NEMELKA: For purposes of competing in the EVR
19 market, no. The Section 2 monopolization claim is just against
20 CDK and CVR.
21 THE COURT: Well, is there another purpose for which
22 you're claiming something different?
23 MR. NEMELKA: Excuse me, Your Honor?
24 THE COURT: Is there another purpose for which you're
25 claiming something different?

8

1 MR. NEMELKA: Well -- and then there's also the
2 Section 2 conspiracy to monopolize claim in which we still
3 include Reynolds because of the conspiracy to monopolize those
4 CVR markets, but the actual --
5 THE COURT: That's a different issue from substantial
6 control?
7 MR. NEMELKA: Correct.
8 THE COURT: Okay. So, again, my question was is
9 there another purpose for which you're claiming something
10 different? I meant with regard to substantial control.
11 MR. NEMELKA: No. It is about that CDK is properly
12 considered a competitor in the EVR market, given their
13 substantial control over CVR.
14 THE COURT: Okay.
15 MR. NEMELKA: And the allegations that were added
16 made clear that CDK doesn't just own 80 percent of CVR, doesn't
17 just roll up its finances in CDK's own financials, but that
18 they actually control the day-to-day operations and make hiring
19 and firing decisions at CVR. They make day-to-day operating
20 decisions in terms of where they should market. They go on --
21 they go on marketing visits with CVR to dealerships.
22 CVR executives have CDK email addresses. CDK posts
23 job listings for CVR. They share physical offices on the same
24 floor. Their top executive at CVR is also an executive at CDK.
25 Under the cases we've cited, it clearly establishes

9

            substantial control for purposes of the Section 2 monopoly claims.

            THE COURT: All right. And what other changes?

            MR. NEMELKA: Then the second primary changes are with respect to the conspiracy allegations with respect to CVR participating in the conspiracy to block MVSC from the programs, and those are at paragraphs 109 through 114.

            And to address Your Honor's statement in the prior ruling that there had not been sufficient allegations that CVR itself participated in conspiratorial conversations to block MVSC, we had additional facts that we learned that at these board of director meetings for CVR, on which both CDK and Reynolds representatives sit, they specifically discussed -- and this is a former board member that admitted, as stated in the complaint, to MVSC in a private conversation that they not only discussed MVSC, but that they discussed needing to keep MVSC at a disadvantage with respect to data access, which is the group boycott that they will not allow MVSC to participate in their data access programs, which is absolutely necessary to provide the services at issue here.

            We named the CVR executives who were involved, and so we added -- and we also added allegations that internal presentations at CDK -- we had alleged as much, but we found out after -- their internal presentations at CDK, at which CVR participated, to specifically state EVR is a closed category to

10

competitors of CVR, that, "We will not let them in unless they participate in a territory not at interest to CVR," meaning in states where CVR does not operate.

            THE COURT: So in the allegations, I did not take the time, frankly, to figure out whether the persons whom you named were just CVR or whether they were also CDK employees, officers, whatever you want to call them, so --

            MR. NEMELKA: So in paragraph 111, Scott Herbers was not only CVR's general manager but also vice president at CDK.

            Jim Quinlan, who is the current CVR general manager, the complaint does not allege that he has current responsibilities at CDK. But Scott Herbers, who was the general manager at CVR for much of the time at issue in the complaint, was also a vice president at CDK.

            THE COURT: Yeah, but the point would be how do I know who they're representing or speaking on behalf of if they're both. So who is it who wasn't a member of CDK but was of CVR?

            MR. NEMELKA: At least John Roeder and possibly Jim Quinlan. That's in paragraph 111.

            THE COURT: Okay. All right. And we talked briefly about Reynolds and you've changed your position with regard to the allegations of control. Do you just get to do that and change your mind?

            MR. NEMELKA: Well, in the complaint before, it was

11

that as owners of CVR, CDK and Reynolds control -- CDK and Reynolds control CVR.

            The current allegations that for purposes of the substantial control test that they actually --

            THE REPORTER: Can you slow down, please.

            MR. NEMELKA: Okay. Thank you. I apologize.

            It was a general statement in the complaint that as owners -- joint owners of CVR, they controlled it.

            Here we made clear that CDK is the parent that actually exercises the substantial control over the day-to-day operations of CVR, so we don't view them as being inconsistent.

            THE COURT: All right. And with regard to Reynolds, do you agree there's no new allegations with regard to conversations?

            MR. NEMELKA: We do not.

            THE COURT: And where are the new allegations?

            MR. NEMELKA: Paragraph 109 and 110, which specifically describe the conversations that were had at CVR board of director meetings where Reynolds had representatives.

            And at these board of director meetings, they specifically discussed the need to keep MVSC at a disadvantage. And this board member who told us this also said that board members recognize that MVSC out-competed CVR with respect to technology and services, and so the board members, including Reynolds, agreed that CVR needed a competitive advantage as

12

compared to MVSC regarding access to dealer data. That is in paragraph 110.

            THE COURT: Is there anything else you want to point out?

            MR. NEMELKA: We think with those two -- you know, those two substantive topics that were bolstered, we believe that we do state a claim under Section 2.

            THE COURT: All right. I'll hear from defense.

            MR. RYAN: Good afternoon again, Your Honor. Mark Ryan from Mayer Brown on behalf of defendant CVR and defendant CDK Global.

            And let me turn to CVR first, if I might. The Court ruled earlier that with respect to CVR and the monopolization and attempted monopolization claims -- those are Counts Two and Three of the Complaint -- that the plaintiffs had not alleged sufficient anticompetitive conduct by CVR to establish a claim. In the amended complaint, they don't add to those allegations at all.

            And we pointed out in our motion to dismiss the amended complaint that they just hadn't done anything to fix the problem, the deficiency that had been identified by the Court, and they don't challenge that in their briefs.

            So on Counts Two and Three, CVR is a defendant, and they haven't fixed the deficiencies that the Court identified, so those should be dismissed as to CVR.

13

1 Now, Count Four is the conspiracy to monopolize claim
2 that now goes against all three defendants.
3 So CVR is owned 80 percent by CDK and 20 percent by
4 Reynolds. As a matter of law, as we point out in our briefs,
5 CDK, as the 80 percent owner, is incapable of conspiring for
6 Section 1 purposes with CVR.
7 And the same principles apply to conspiracy
8 allegations under Section 2. So you have -- under the
9 Copperweld case, you have a partnership, an entity that CDK
10 controls 80 percent of, and it simply can't conspire with CVR.
11 So that part of Count Four, the conspiracy to monopolize claim
12 against CVR, should be out.
13 Now, as to Reynolds -- and I'm not arguing on behalf
14 of Reynolds, but with respect to CVR and Reynolds, they have
15 alleged quite clearly that Reynolds also controls and has a
16 common economic interest with CVR. And our position is under
17 the same principles that govern -- of Copperweld apply to
18 Section 2 conspiracy claims. There can't be a statement of
19 agreement, a conspiratorial agreement, between Reynolds and an
20 entity that Reynolds also controls, CVR.
21 So those are the claims against CVR, the two that
22 they didn't address and then the conspiracy to monopolize
23 claims that are defective as a matter of law.
24 And then the state claims are derivative of the
25 federal claims. So if the federal claims go against CVR, the

14

1 state claims go as well.
2 THE COURT: All right. Thank you.
3 MR. RYAN: So I'll let --
4 I apologize for the confusion. Mark Ryan again.
5 As to CDK -- just as to CDK -- and I won't repeat the
6 conspiracy allegations, the theory now on Counts Two and Three,
7 monopolization and attempted monopolization, previously the
8 Court ruled that because CDK does not compete in the EVR
9 markets in Illinois and California, you cannot state a Section
10 2 claim. Plaintiffs cannot state a Section 2 claim against
11 CDK. They're not a competitor, not subject to Section 2,
12 liability for monopolization or attempted monopolization.
13 So now their theory is, well, because CDK controls
14 CVR, whatever CVR does -- CDK is a competitor because of that
15 control, and our view, Your Honor, is that that's simply not
16 the law. Our ownership of, our 80 percent control of, of CVR
17 does not give rise to a claim that we are CDR -- CVR, I'm
18 sorry -- CVR for Section 2 purposes.
19 It's a very high standard under the cases that we
20 cite and under basic principles of corporate law to disregard
21 that corporate forum where we exist separately -- we, CDK,
22 exist separately from CVR.
23 And those few cases that talk about attributing our
24 CVK's business -- CDK -- CVR's business to us, it's very rarely
25 done, and you have to have some allegation that somehow

15

1 something -- there's something amiss; there's something bad
2 afoot where we're intentionally trying to use the corporate
3 forum to avoid responsibility for actions that we are, in fact,
4 taking, and there's no allegation of that here.
5 CVR's a legitimate joint venture. The allegations
6 that suggest that we exercise day-to-day control, really when
7 you look at them -- and there's a chart in our opposition and
8 motion to dismiss that summarizes the allegations -- all
9 they're saying -- all they're saying is, "We exercise
10 supervision. We exercise our rights to look out for our
11 investment in the company, and at times we coordinate with them
12 when we approach certain customers because, of course, they're
13 our customers, too, because we sell these DMS services to the
14 same auto dealers that CVR is selling services to."
15 So that's the one issue on Counts Two and Three.
16 The second issue is in order to hold us liable for
17 monopolization or attempted monopolization, they've got to
18 allege a predatory act, some anticompetitive act by CDK.
19 And what is that act? We won't cooperate with them.
20 We won't make it easier for MVSC -- there's a lot of initials
21 in this case, Your Honor -- we won't make it easier for MVSC to
22 compete. We won't extend them a helping hand and allow them
23 access to our DMS systems.
24 There is -- in current state of Section 2 law, there
25 is no obligation for us to deal with them. The only

16

1 circumstance which courts recognize today grows out of the
2 Aspen case, which I know the Court is familiar with, is if
3 there's a pre-existing, profitable course of dealings and
4 somehow we -- we cut them off and we sacrifice short-term
5 profits for the longer goal of putting them out of business.
6 We had no pre-existing course of dealings with them. There's
7 no allegation that we've ever dealt with them because we
8 haven't.
9 And, again, under Trinko and I think the Aerotec case
10 that we cite from the Ninth Circuit -- and I think we cite some
11 other cases, too, Your Honor. It's not Live -- it's Live
12 Universe. It's not Live Nation. It's Live Universe, Your
13 Honor, an unpublished opinion, but it lays out -- of the Ninth
14 Circuit, but it lays out the principles that we think govern
15 here in recognizing several other circuits.
16 So with that, Your Honor, if the Court doesn't have
17 any questions, I'll yield to counsel for Reynolds. Thank you.
18 THE COURT: All right. Thank you.
19 MS. GULLEY: Thank you, Your Honor.
20 Reynolds and Reynolds is in on only Counts One and
21 Four, so at this point they're in on the conspiracy allegation
22 under Section 1 with CDK, as well as on claim 4 under Section 2
23 for conspiracy to monopolize through CVR, so -- I should say on
24 the federal side and then the corresponding state claims as
25 well.

17

1  Just to back up for a second, we kind of dove into
2  how's your claim different and jumped from there into CVR's
3  response to that, but circling back around, just to kind of set
4  the stage for what this case is really about, you know, these
5  are sophisticated computer systems that run the whole back
6  office of dealerships.
7  It's not like a database or a data warehouse or data
8  switching center. It's a computer system that runs all of the
9  accounting and all that for dealerships. And so, you know,
10 access to these systems by anyone, hackers or vendors or third
11 parties, has serious consequences the same way that giving your
12 user name and password to your laptop would have consequences
13 in terms of both how would that work if somebody was running it
14 at the same time as you or just the security of your system,
15 obviously.
16 So this isn't about unilateral conduct. Right?
17 Mr. Ryan was mentioning about the right to refuse
18 access to a computer system. Right? Trinko explains clearly
19 that that's beyond dispute. Reynolds can deny access if it
20 wants to deny access.
21 So then that brings us to the claims that MVSC -- or
22 I should say plaintiff maybe is an easier way to deal with
23 these initials -- has brought.
24 On the conspiracy to monopolize claim against
25 Reynolds, the only entity that can monopolize -- it has to be

18

1  one, not two or three -- is CVR in the EVR market.
2  Even if Reynolds could conspire with itself, with its
3  own joint venture, it's not alleged to have done so. There are
4  no new allegations of conspiratorial conversations.
5  Mr. Nemelka pointed to paragraphs 109 and 110, but
6  the Court has already discussed the weight of conversations at
7  board meetings, and that's all those are. It doesn't describe
8  who was at the board, what Reynolds representative or
9  representatives or when. And the when of this conspiracy is
10 important because the acts alleged to have been committed by
11 Reynolds occurred only in 2014. Those are -- those allegations
12 occur in paragraphs 126, 127 and 165 of the Second Amended
13 Complaint.
14 Reynolds has not alleged to have committed some acts
15 that are alleged to be in restrain of trade after 2014. So we
16 do need to know when were these meetings and who was there from
17 Reynolds. Were they acting for Reynolds or were they there as
18 members of the board as alleged in these paragraphs acting on
19 behalf of CVR.
20 But in any event, Reynolds really can't conspire with
21 CVR because that's what the case that plaintiff cites over and
22 over, American Needle, is really about. The rule of Copperweld
23 and American Needle is that we look at the reality of what is
24 this JV. Are they trying to shelter -- are competitors CDK and
25 Reynolds trying to shelter a way to set prices or some

19

1  conspiracy or is it a real thing that they don't otherwise have
2  a competing interest in, as the NFL teams did in American
3  Needle.
4  Here it is exactly the kind of entity that the
5  antitrust laws support and encourage. It's a totally separate
6  business relating to the EVR market in which neither company
7  competed before that was created for that purpose of venturing
8  into the EVR market. It's a pro-competitive business with a
9  single economic focus. Reynolds doesn't have some other EVR
10 interests separate from this, like the NFL teams did in
11 American Needle.
12 So, in other words, under the state of the Supreme
13 Court precedent, Reynolds cannot conspire with CVR.
14 MVSC warns in its briefs of allowing competitors to
15 hide conspiracies and joint ventures, but, actually, the
16 opposite is true. If this were not the rule, if you couldn't
17 form legitimate pro-competitive businesses, every agreement
18 would be a conspiracy, and that's obviously not the rule.
19 And this is exactly -- what MVSC warns of is exactly
20 what did not happen here. There wasn't some conspiracy to do
21 anything with respect to CVR. In fact, that's why the First
22 Amended Complaint came about is because MVSC needed to find
23 some other market to talk about, the DMS market, but with
24 respect to the EVR market, there's been no allegations that
25 Reynolds could, would or has or had any reason to conspire with

20

1  its own JV CVR.
2  The only other claim that Reynolds is in on and has
3  moved to dismiss is the Section 1 conspiracy claim, which has
4  now alleged agreement with CDK to block MVSC.
5  The elements of a Section 1 conspiracy are the
6  existence of a conspiracy, the intention to restrain trade and
7  the actual injury to competition.
8  Obviously, Reynolds disputes the existence of a
9  conspiracy vigorously, or whatever the phrase is, but even if
10 you assume for purposes of this hearing that there was
11 otherwise an existence of a conspiracy between Reynolds and
12 CDK, MVSC -- even if you assume they have plausibly pled that
13 in light of the timing considerations that I pointed out
14 earlier, the Computer Fraud and Abuse Act and California
15 Computer Crime Act or Section 502 really take out the second
16 and third elements.
17 You cannot be liable for restraining an illegal
18 trade. This is not an unclean hands argument. It is not an in
19 pari delicto argument. It's not any argument about anyone's
20 motives or state of their heart. It is simply the state of the
21 law that you cannot be liable for restraining trade that is
22 otherwise illegal.
23 And, likewise, the flip side of the same coin as it
24 relates to actual injury to competition, is that when you --
25 when the thing that is preventing you from restraining trade is

21

something that is prohibited by law, there is a break in the chain of causation of that injury.

So, in other words, this is a computer system. The Computer Fraud and Abuse Act is actually very simple and straightforward, and the Ninth Circuit has a beautiful case, the Facebook case, that lays it out very specifically. The Supreme Court recently denied cert in that case. When the access is without authorization, it is a violation of the Computer Fraud and Abuse Act.

MVSC admits that the acts are not authorized by Reynolds. In fact, they pleaded affirmatively repeatedly that they're not authorized to do it. That's one of the pieces of the alleged conspiracy, in fact, so it's affirmatively pled.

They admit that this lack of access to Reynolds' proprietary computer system, the fact that they cannot trespass on Reynolds computer system, is the basis of their claim. That is where their damages come from; they cannot access the computer system.

In other words, the violation -- it's not that I'm standing here saying I can prove to you right now that on this record that there is a CFAA violation by MVSC. What I'm saying is the basis of their claim is something that is illegal. They want to do something that they affirmatively plead is illegal under the Computer Fraud and Abuse Act, and that just can't form the basis of an antitrust claim because it's a restrain of

22

trade that's an illegal trade and there's a break in the chain of what's causing their problem. Their problem is we don't have to do this and the law prevents it.

You've let me go on long enough. Thank you.

THE COURT: Thank you. Anything further?

MR. NEMELKA: Thank you, Your Honor. Mike Nemelka.

Listening here, it's as if they're ignoring this Court's ruling on the Section 1 claim already.

CDK and Reynolds are two competitors that absolutely are able to conspire, and that is the group boycott that is at issue in the Section 1 claim that this Court under these allegations has already denied their motion to dismiss.

And -- so Reynolds' counsel talking about the CFAA and antitrust injury, the injury that MVSC has suffered is because they have agreed to block MVSC from their programs. It has nothing to do with getting data from anywhere else. Their argument is completely irrelevant.

And then it also goes to Mr. Ryan's point in terms of anti-competitive conduct to achieve the monopoly. A violation of Section 1 is the quintessential anticompetitive means of achieving a monopoly. CDK and CVR conspiring to block MVSC is the anti-competitive conduct that allowed CVR, which is substantially controlled by CDK, to obtain their monopoly.

So putting aside this unilateral to deal, it's irrelevant. Yes, we still allege it and we can meet it, but

23

CDK and Reynolds are not able to get together and conspire, and that is the claim that is already going forward.

On the unilateral to deal, we cite many cases where a product is freely offered. There is no requirement of the pre-existing course of dealing. Otter Tail, the Supreme Court's very case that Trinko acknowledged that that is not necessary and we discuss in our brief, make that very clear.

Here CDK offers on -- to the market, "Come to us and you can get data over which we have control. Nobody else can provide you access to this data but us.

So MVSC comes, "Okay. Can we please participate?"

"No, you can't."

"Why?"

"Because you compete with CVR."

We found out and we go to Reynolds. "Can we join your program so we can get your data?"

Reynolds says, "No, you can't."

There's no other place to get the data for MVSC to compete with CVR that they would agree with. That conspiracy between them, which this Court has already allowed to go forward, is the anticompetitive means for the Section 2 claim, and that's why the substantial control is important is because CDK is considered under the antitrust laws to compete.

And I would -- Mr. Ryan says there's no case where -- Mr. Ryan said that there's no case where a court has held that

24

a parent can be considered a competitor in a subsidiary's market. The Ninth Circuit in Crocker said -- I would just like to read it for this Court.

"As meaning that" --

"To interpret the antitrust laws as meaning that the" --

THE REPORTER: Slow down, please.

MR. NEMELKA: Okay. I won't do it. Okay.

THE COURT: You can't speed along.

MR. NEMELKA: Okay. It's just incorrect.

The Ninth Circuit in Crocker stated, "To interpret the antitrust laws as meaning that the business activity of the subsidiary can never be considered the parent as a competitor would assume that congress intended to permit such a simple and obvious means after avoidance as to render the statute meaningless."

So --

THE COURT: All right. Thank you.

And the hearing on the MDL is when?

MR. NEMELKA: Your Honor, the hearing on the MDL is January 25th in Miami.

THE COURT: Well, I hope it stops snowing by then.

I'm going to go ahead and set dates because otherwise I will lose track of your case, if, in fact, it's my case, too. Lose track of or keep track of, as the case may be.

## Page 25

 1   I'm going to do what I always do, which is -- or
 2   almost always do -- set the later dates because everybody comes
 3   in, asks for a continuance anyway.
 4          If any of these falls on the wrong day of the week,
 5   Ms. Plato will fix it when she sends out my order.
 6          I suppose you should put off discovery at least until
 7   the 25th when you find out what's going on.
 8          And I don't know what the MDL will do. I'm not sure
 9   if they're stuck with my ruling if it goes there. So I think
10   you probably should not engage in discovery until at least you
11   get my ruling and find out what the MDL is going to do.
12          So May 31, 2019, for trial. And, yes, the 17200
13   claims, if they remain, are not going to be tried to a jury.
14          May 3, 2019, for pretrial conference and hearing on
15   motions in limine.
16          April 19 for -- I guess you decided to tinker with my
17   form, so all of those things that you've listed, April 12th, as
18   well, for the category of things.
19          Last day to conduct an ADR proceeding, March 8, 2019.
20          I'm going to order you to outside ADR.
21          Last day for hearing motions, February 22, 2019.
22          I'm not sure what you were doing with these other
23   dates, but that's fine with me.
24          If you want to internally set dates for briefing, so
25   long as I have at least two weeks between your reply brief and

## Page 26

 1   the hearing -- and on this case, probably more than that would
 2   be helpful -- on a summary judgment motion so you can get the
 3   answer before you have to start preparing too much by way of
 4   pretrial documents.
 5          Fact and expert discovery cutoff, September 21, 2018,
 6   for experts, July 20, 2018, for facts.
 7          Last day to serve rebuttal expert reports, September
 8   7, 2018.
 9          Last day to serve response expert reports, August 17.
10          Last day to serve initial expert reports, July 13.
11          Last day to amend pleadings or add parties -- I don't
12   know what that means. Don't tell me "as per federal rules."
13   That means I have to go look it up. That's why I said add a
14   date. What date do you want?
15          MS. GULLEY: Your Honor, I believe that our problem
16   was not knowing when we'd answer.
17          THE COURT: Oh, pick a day.
18          MS. GULLEY: I mean, after the ruling on the motion
19   to dismiss. Okay. So --
20          (Counsel confer off the record.)
21          MS. GULLEY: Would 14 days after the ruling on the
22   motion to dismiss be okay?
23          THE COURT: Okay. That's fine. Anything else?
24          MS. MILLER: No, Your Honor.
25          THE COURT: All right. Thank you.

## Page 27

 1          MS. GULLEY: Thank you, Your Honor.
 2          MS. MILLER: Thank you.
 3          MR. NEMELKA: Thank you, Your Honor.
 4      (Proceedings concluded 2:11 p.m.)
 5                  --oOo--

## Page 28

                        CERTIFICATE

    I hereby certify that pursuant to Section 753,
Title 28, United States Code, the foregoing is a true and
correct transcript of the stenographically reported
proceedings held in the above-entitled matter and that the
transcript page format is in conformance with the
regulations of the Judicial Conference of the United States.

Date: JANUARY 16, 2018


            /s/   Cindy L. Nirenberg, CSR No. 5059
                  Official Court Reporter