PUBLIC VERSION - REDACTED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

Authenticom, Inc.,

    *Plaintiff*,

    vs.

CDK Global, LLC; and The Reynolds
and Reynolds Company,

    *Defendants*.

Case No. 17-cv-318

Hon. James D. Peterson

---

# DEFENDANT CDK GLOBAL, LLC'S REPLY
# IN SUPPORT OF ITS MOTION TO DISMISS

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 2 of 31 PageID #:911
Case: 3:17-cv-00318-jdp Document #: 222 Filed: 03/02/18 Page 2 of 31
**PUBLIC VERSION - REDACTED**

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................... ii

Introduction ..................................................................................................................................1

Argument ......................................................................................................................................2

I.  The Court's Decision On The Preliminary Injunction Does Not Bind The Court On The Motions To Dismiss, Which The Court Should Resolve On The Basis Of Authenticom's Allegations ...........................................................................................................2

II.  Each Of Authenticom's Causes Of Action Is Either Implausible Or Illogical And Should Be Dismissed ...........................................................................................................4

    A.  Authenticom's first cause of action (Section 1 horizontal conspiracy) should be dismissed ...........................................................................................................4

        1.  The complaint does not plausibly allege that CDK and Reynolds conspired to drive Authenticom from the market ....................................................4

        2.  Authenticom's "group boycott" theory is a factual mismatch ...............................8

        3.  Authenticom lacks standing to challenge a supposed "market division" agreement, which is unsupported in any event ...........................................................9

    B.  Authenticom's second cause of action (exclusive dealing) should be dismissed ...........11

    C.  Authenticom's third cause of action (illegal tying) should be dismissed ......................13

    D.  Authenticom's fourth cause of action (monopolization) should be dismissed ..............14

        1.  There can be no unfair lock-in given the acknowledged terms of CDK's service contracts with dealers ...........................................................................................14

        2.  The allegations of a lock-in are insufficient to support a monopolization claim ...........................................................................................18

        3.  Authenticom has not plausibly alleged exclusionary conduct ...............................19

    E.  Authenticom's fifth cause of action (tortious interference) should be dismissed ..........20

III.  Authenticom's Claims Fail For Additional Independent Reasons ........................................21

    A.  The complaint does not adequately allege reduced output ...............................................21

    B.  Authenticom's claims fail because defendants' conduct has been lawful under the Rule of Reason ...........................................................................................22

        1.  Defendants' policies protect their systems from cybersecurity risks .....................22

        2.  CDK's conduct has improved its DMS ...................................................................23

Conclusion ...................................................................................................................................24

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 3 of 31 PageID #:912
Case: 3:17-cv-00318-jdp Document #: 222 Filed: 03/09/18 Page 3 of 31
PUBLIC VERSION - REDACTED

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A.O. Smith Corp. v. Lewis, Overbeck & Furman*,
  979 F.2d 546 (7th Cir. 1992) ...................................................13

*Adam v. Frantz*,
  2002 WL 32341816 (W.D. Wis. 2002)...........................................16, 17

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................21

*Assoc. Gen. Contractors of Cal., Inc. v. Carpenters*,
  459 U.S. 519 (1983)............................................................3

*Avaya Inc. v. Telecom Labs, Inc.*,
  2014 WL 2940455 (D.N.J. June 30, 2014) ......................................17

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................3

*Blizzard Entm't Inc. v. Ceiling Fan Software LLC*,
  941 F. Supp. 2d 1227 (C.D. Cal. 2013) ........................................18

*Burbank Grease Servs., LLC v. Sokolowski*,
  717 N.W.2d 781 (Wis. 2006)....................................................20

*Burda v. Wendy's International, Inc.*,
  659 F. Supp. 2d 928 (S.D. Ohio 2009) .........................................17

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
  157 F.3d 1340 (Fed. Cir. 1998)................................................24

*Collins Inkjet v. Eastman Kodak*,
  2014 WL 11516553 (S.D. Ohio Mar. 21, 2014)................................18, 19

*Cromeens, Holloman, Sibert, Inc v. AB Volvo*,
  349 F.3d 376 (7th Cir. 2003) ...............................................11, 15

*Datel Holdings, Ltd. v. Microsoft Corp.*,
  712 F. Supp. 2d 974 (N.D. Cal. 2010) .........................................17

*Dig. Equip. Corp. v. Uniq Dig. Techs., Inc.*,
  73 F.3d 756 (7th Cir. 1996) ..................................................15

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 4 of 31 PageID #:913
Case: 3:17-cv-00318-jdp Document #: 222 Filed: Page 4 of 31 PageID #:913
PUBLIC VERSION - REDACTED

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Dos Santos v. Columbus-Cuneo-Cabrini Medical Center*,
    684 F.2d 1346 (7th Cir. 1982) ...........................................................................13, 14

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
    747 F.3d 145 (2d Cir. 2014) ......................................................................................16

*DSM Desotech Inc. v. 3D Sys. Corp.*,
    749 F.3d 1332 (Fed. Cir. 2014) ................................................................................15

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ....................................................................................................3

*Geinosky v. City of Chicago*,
    675 F.3d 743 (7th Cir. 2012) ......................................................................................3

*Hunter v. Atchison, T. & S.F. Ry.*,
    188 F.2d 294 (7th Cir. 1951) ......................................................................................2

*Jacobs v. City of Chicago*,
    215 F.3d 758 (7th Cir. 2000) ......................................................................................3

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
    641 F.3d 834 (7th Cir. 2011) ......................................................................................7

*N. Pac. Ry. v. United States*,
    356 U.S. 1 (1958) ......................................................................................................13

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) .............................................................................14, 15

*Phillips v. Prudential Insurance*,
    714 F.3d 1017 (7th Cir. 2013) ....................................................................................3

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir.1997) ..................................................................................17, 18

*Sanderson v. Culligan Int'l Co.*,
    415 F.3d 620 (7th Cir. 2005) ....................................................................................11

*Schachar v. Am. Academy of Opthalmology, Inc.*,
    870 F.2d 397 (7th Cir. 1989) ................................................................................7, 11

*Scheurer v. Fromm Family Foods LLC*,
    863 F.3d 748 (7th Cir. 2017) ....................................................................................16

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 5 of 31 PageID #:914
Case: 3:17-cv-00513-jdp Document #: 222 Filed: 03/07/18 Page 5 of 31
**PUBLIC VERSION - REDACTED**

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015)..................................................................24

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961)..................................................................8, 12

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) ..................................................................3

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ..................................................................7, 8

*United States v. Am. Express Co.*,
    838 F.3d 179 (2d Cir. 2016)..................................................................13

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919)..................................................................19

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001)..................................................................24

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981)..................................................................2

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..................................................................19, 20

*Whitehead v. Discover Bank*,
    118 F. Supp. 3d 1111 (E.D. Wis. 2015)..................................................................3

**RULES**

Fed. R. Civ. P. 12(b)(6)..................................................................3

Fed. R. Civ. P. 12(c)..................................................................3

Fed. R. Civ. P. 15..................................................................3

**OTHER AUTHORITIES**

18B Fed. Prac. & Proc. § 4478.5 (2d ed. 2017)..................................................................2

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
    Principles and Their Application* ¶ 2202 (June 2017)..................................................................8, 11

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 6 of 31 PageID #:915
Case: 3:17-cv-00318-jdp   Document #: 222   Filed: 10/09/17   Page 6 of 31

PUBLIC VERSION - REDACTED

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Restatement (Second) of Torts* § 773 (Am. Law Inst. 1979) .......................................................20

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 7 of 31 PageID #:916
Case: 3:17-cv-00318-jdp Document #: 222 Filed: Page 7 of 31 Pages
PUBLIC VERSION - REDACTED

## INTRODUCTION

Plaintiff's opposition notwithstanding, the fact remains that the conduct alleged in the complaint is at least as (indeed, more) consistent with lawful conduct as it is with an unlawful conspiracy. Neither CDK nor Reynolds needed the other's cooperation to block Authenticom's access to their respective DMSs, and both had ample, independent reasons to protect their proprietary computer systems from hostile third-party data extractors like Authenticom. Moreover, as demonstrated in our opening brief, Authenticom's theories of liability are either mismatched to, or unsupported by, the allegations in the complaint:

- because it claims it is a competitor and not a consumer, Authenticom could not have suffered antitrust injury from—and thus cannot challenge—any "market division" agreement;

- because CDK and Reynolds license third-party access to their systems to vendors, not dealers, and because dealers have always been aware of the contractual restrictions on unauthorized access in any event, there could not have been an unlawful tie;

- because there are no allegations concerning the market for vendor applications sufficient to demonstrate the foreclosure of a substantial share of that market, Authenticom has not adequately alleged an illegal exclusive-dealing arrangement;

- because there is no brand-specific aftermarket for "data integration" services or any duty on CDK's part to permit Authenticom to access CDK's proprietary DMS, the allegations are inadequate to support a monopolization claim; and

- because CDK's enforcement of its dealer contracts is privileged conduct, Authenticom's tortious interference claim fails.

Authenticom's opposition largely repeats its previous arguments on these issues without offering any direct answers to these legal deficiencies. It continues to insist that CDK and Reynolds had something to gain from collusion, but without explaining *what*. It continues to insist that it has "suffered harm" from the supposed market division agreement, but without explaining *how*. And it continues to insist that CDK's and Reynolds's procompetitive explanations for blocking hostile data extraction are pretextual, but without explaining *why*. But Authenticom's efforts to augment its allegations with evidence from the preliminary injunction hearing do not save the complaint, not the

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 8 of 31 PageID #:917
Case: 3:17-cv-00318-jdp Document #: 222 Filed: Page 9 of 31 PageID #:917
PUBLIC VERSION - REDACTED

least because it is impermissible, at this stage of the litigation, to look beyond the complaint and the incorporated documents. The motion to dismiss should be granted.

## ARGUMENT

## I. THE COURT'S DECISION ON THE PRELIMINARY INJUNCTION DOES NOT BIND THE COURT ON THE MOTIONS TO DISMISS, WHICH THE COURT SHOULD RESOLVE ON THE BASIS OF AUTHENTICOM'S ALLEGATIONS

Given Authenticom's heavy reliance in its opposition on the evidence adduced at the preliminary injunction hearing and this Court's subsequent decision, it is important to address at the outset the interrelation between that decision and the standard applicable to the motion to dismiss.

To be sure, we appreciate that the Court heard testimony and reviewed evidence at the preliminary injunction hearing and that those materials are "in the record." At the same time, "[this] case is complicated both factually and legally." PI Op. 1 (Dkt. 172). As we noted in our opposition to Authenticom's request for summary denial of the motions to dismiss, the motion for a preliminary injunction was litigated on a compressed timetable, and the Court did not "set out all the facts established by the parties' evidence or to review comprehensively that evidence." *Id*. at 2. The Court's decision was therefore necessarily "tentative." 18B Fed. Prac. & Proc. § 4478.5 (2d ed. 2017). More fundamentally, the Court was unable to resolve a number of Authenticom's claims.

Authenticom nevertheless suggests that because the Court found that Authenticom had a "moderate chance of success" on its collusion and exclusive-dealing theories at the preliminary injunction stage, it "necessarily" must find that the claims based on those theories survive Defendants' motions to dismiss. Opp. 20-21, 27. That is incorrect. It is well understood that "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding" on the Court at later stages of the litigation. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). A decision "granting or denying [a] temporary injunction does not constitute the law of the case," in other words, "and will not estop the parties nor the court as to the merits of the case." *Hunter v. Atchison, T. & S.F. Ry.*, 188 F.2d 294, 299 (7th Cir. 1951). A careful and searching review

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 9 of 31 PageID #:918
Case: 3:17-cv-00318-jdp Document #: 222 Filed: 03/15/18 Page 9 of 31

PUBLIC VERSION - REDACTED

of the entire complaint is especially warranted in a complex antitrust case like this one, where courts must "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed," with its attendant risk of "*in terrorem*" pressure to settle even "largely groundless claim[s]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-59 (2007) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) and *Assoc. Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983)).

Whatever the Court concluded about Authenticom's horizontal conspiracy claim at the preliminary injunction hearing, a full and fresh review of the complaint is warranted under Rule 12(b)(6). That is especially so with respect to the claims not reached by the Court at the PI hearing; in a complex case like this one, with multiple theories of liability (some inconsistent with others), it would be particularly useful to dismiss the obviously deficient claims and narrow the issues for the parties to address in discovery.[1] *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 625–26 (7th Cir. 2010) ("When a district court . . . allows a complex case of extremely dubious merit to proceed, it bids fair to immerse the parties in the discovery swamp—'that Serbonian bog ... where armies whole have sunk'—and by doing so create irrevocable as well as unjustifiable harm to the defendant." (citation omitted)).

---

[1] On a related (albeit more technical) point, Authenticom insists that it may use evidence presented at the preliminary injunction hearing to effect an amendment to its complaint and in opposing the motion to dismiss. Opp. 19. That is not the law. *See Jacobs v. City of Chicago*, 215 F.3d 758, 766 (7th Cir. 2000) (A "district court's reliance on matters outside the complaint in ruling on [a] motion to dismiss [is] error."). No doubt, Authenticom's theory of this case has changed since seeing the evidence at the PI hearing; but if it wishes to amend its complaint to reflect new-found facts, it should do so formally, through the procedures prescribed in Rule 15. Neither *Phillips v. Prudential Insurance*, 714 F.3d 1017 (7th Cir. 2013), nor *Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012), suggests otherwise. Neither case fairly can be read as a license for a plaintiff to use its opposition to a motion to dismiss to incorporate evidence and make wholesale factual amendments to its complaint. If the Court is inclined to "consider matters outside the complaint," Rule 12(c) requires the Court to "convert[] the motion into one for summary judgment." *Whitehead v. Discover Bank*, 118 F. Supp. 3d 1111, 1117 (E.D. Wis. 2015). But we respectfully suggest that now is not the time for a ruling on summary judgment. The Court's pretrial conference order has set deadlines for plenary discovery and contemplates separate motions for summary judgment in the ordinary course (*see* Dkt. 215, at 1-3), as is appropriate in a case like this one.

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 10 of 31 PageID #:919
Case: 3:17-cv-00318-jdp Document #: 222 Filed: 03/15/18 Page 10 of 31
PUBLIC VERSION - REDACTED

## II. EACH OF AUTHENTICOM'S CAUSES OF ACTION IS EITHER IMPLAUSIBLE OR ILLOGICAL AND SHOULD BE DISMISSED

### A. Authenticom's first cause of action (Section 1 horizontal conspiracy) should be dismissed

#### 1. The complaint does not plausibly allege that CDK and Reynolds conspired to drive Authenticom from the market

The written agreements between CDK and Reynolds providing for an orderly wind down of DMI's and IntegraLink's data extraction activities on Reynolds's DMS were entirely lawful and unremarkable. Opening Mem. 10-11. Nothing in any of the agreements affects either party's DMS access policies or their interactions with third parties like Authenticom. Both CDK and Reynolds remain free to compete with each other as DMS providers and application vendors, and both are free to let Authenticom into their respective systems if they wish. Indeed, this Court acknowledged that the agreements' plain terms do not say that CDK and Reynolds will "work together to eliminate third-party integrators." PI Op. 12.

Now that Authenticom has seen the innocent terms of the actual written agreements, it has pivoted, focusing instead on allegations of a purported *unwritten* agreement "to block Authenticom's access to dealer data" (Opp. 19-20)—a theory that received limited attention in the complaint. But Authenticom's allegation that CDK and Reynolds conspired to block access to their DMSs is implausible because—as we explained (Opening Mem. 11-14)—CDK and Reynolds each had the ability to block Authenticom unilaterally and thus had nothing to gain from collusion. Authenticom offers a number of rejoinders, none of which save its theory on this score.

***First***, Authenticom asserts that its "direct evidence of an agreement"—*i.e.*, the testimony of Steve Cottrell concerning purported conversations with CDK and Reynolds employees—moots the question whether its group blocking theory is plausible because it obviates the need to draw any inferences at all. Opp. 21. That is wrong for two reasons. As an initial matter, Cottrell's testimony is outside that complaint, and as already explained, is therefore not something the Court may consider

4

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 11 of 31 PageID #:920
Case: 3:17-cv-00318-jdp Document #: 222 Filed: 01/09/18 Page 11 of 31

PUBLIC VERSION - REDACTED

in resolving the motions to dismiss. But even setting that aside, Cottrell's testimony is not the unambiguous, direct evidence of an unlawful agreement that Authenticom makes it out to be. To be sure, if a jury credited Cottrell's testimony, it would be a basis for concluding that CDK and Reynolds had entered *an* agreement. But the question isn't whether CDK and Reynolds entered *an* agreement (they did)—it's whether the *substance* of the agreement (spoken or written) violated the Sherman Act. On this score, Cottrell's testimony is ambiguous—it is more understood as a reference to CDK's and Reynolds's lawful written contracts from 2015. *See* PI Op. 8 (the statements were made "on the heels of the February 2015 agreements"). We made these points expressly in the opening memorandum (at 13-14) and in our briefing before the Seventh Circuit (CA7 Opening Br. 34), but Authenticom simply ignores them.

*Second*, Authenticom cites to the language in Section 4.5 of the Data Exchange Agreement, in which CDK and Reynolds agreed "not to sell, transfer, or assign to any affiliate or third party any technology, business process, or other such knowledge regarding integration with the other party's DMS or take any other steps to assist any person that it reasonably believes to have plans to access or integrate with the other party's DMS without the other party's written consent." Defs.' Ex. 1 § 4.5. From this language, Authenticom says the Court can draw "the inference that Defendants discussed independent integrators' role in the industry and reached a meeting of the minds that they should be eliminated." Opp. 22. On its face, the quoted language is an agreement not to use knowledge gained in the parties' course of dealing to help hostile data extractors gain access to either DMS. Defs.' Ex. 1 § 4.5 (agreeing not to transfer "knowledge regarding integration with the other party's DMS"). These sorts of clauses, limiting the use of knowledge gained in negotiations, are commonplace in agreements of all kinds. No aspect of this clause amounts to a restraint of trade—not the least because there is no allegation (and not a speck of evidence) that either defendant had ever "assisted" hostile third-party data extractors like Authenticom with access to the other's system in the first place.

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 12 of 31 PageID #:921
Case: 3:17-cv-00318-jdp Document #: 222 Filed: 03/09/17 Page 12 of 31
PUBLIC VERSION - REDACTED

**Third**, Authenticom points to "substantial additional evidence" of an unwritten agreement comprising certain "[i]nternal CDK documents" produced during litigation on the preliminary injunction motion that purportedly called for ████████████████████████████████████ ████████████████████████████████████████

As an initial matter, these documents are not referred to or otherwise incorporated in the complaint and are therefore out of bounds for purposes of the motion to dismiss. *See supra* pages 2-3. But in any event, the documents do not have the untoward meaning that Authenticom's out-of-context quotations suggest. ████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████ The lawful, procompetitive explanation for wanted to enter such agreements is clear: ████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████ Opening Mem. 6-8. Evidence that CDK was undertaking this strategy is not evidence of unlawful conspiracy; rather, it is evidence of CDK's procompetitive interest in broadening the market for each company's app offerings.

**Finally**, Authenticom insists that CDK and Reynolds *did* have a motive to conspire. It says that Reynolds wanted CDK to close its system to hostile data extraction because (1) Reynolds had been losing market share to CDK due to CDK's tolerance of hostile access prior to 2015, and (2) if CDK began actively blocking hostile access, Reynolds would itself be "freed to move more aggressively to block independent integrators." Opp. 23. On the flipside, Authenticom asserts that CDK also would gain from unlawful collusion: in particular, it would have Reynolds's "assurance" that Reynolds "would maintain its own policy of blocking independent integrators," rather than seizing the opportunity to open its system and steal customers from CDK. *Id.*

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 13 of 31 PageID #:922
Case: 3:17-cv-00318-jdp Document #: 222 Filed: 03/15/18 Page 13 of 31

PUBLIC VERSION - REDACTED

These assertions—made without development or explanation—are not logical. As Authenticom effectively admits, Reynolds was by 2015 already doing everything it could to block hostile data extractors like Authenticom. *See* Opp. 8 (acknowledging that Reynolds began "more effective[ly] blocking" hostile third-party access beginning in 2013 (citing PI Op. 5)); Compl. ¶¶ 189, 220 (similar allegations from the complaint). Moreover, Reynolds' motive and capability to block hostile data extraction are (and have always been) independent of CDK's decision to begin actively enforcing its own policies as to the CDK DMS, a fact that Authenticom has not denied. And Authenticom tellingly does not allege in its complaint or assert in its brief that Reynolds's conduct shifted in any way after the supposed agreement. It notes only that at some unidentified point in 2015, Reynolds blocked an unnamed data extractor. *See* Opp. 23. But all that shows is that Reynolds's technology was constantly disrupting hostile data extractors.

Nor does Authenticom's "assurance" theory (Opp. 23) hold up. To offer any "assurance" to CDK that Reynolds would not change its policy on third-party access, the alleged agreement would have to be "accompanied by some sort of 'enforcement mechanism' designed somehow to coerce or compel" Reynolds to comply with its terms. *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 850-51 (7th Cir. 2011). Otherwise, Reynolds could simply ignore the agreement any time it pleased, meaning the "assurance" would amount to no assurance at all. Yet Authenticom does not identify any enforcement mechanism, any means by which CDK could bind Reynolds to the supposed arrangement. This is critical, for in a case like this one, the "enforcement mechanisms" themselves are what would constitute "the 'restraints' of trade." *Schachar v. Am. Academy of Opthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989). "Without them there is only uncoordinated individual action." *Id*. That is all we have here.

Authenticom's reliance on *Toys "R" Us* (see Opp. 20, 23 n.3) is therefore misplaced. There was a clear incentive in that case for the alleged boycotters to collude, because the scheme to boycott sales to warehouse clubs would not have worked unless each supplier "could be sure its competitors

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 4 of 31 PageID #:923
Case: 3:17-cv-00318-jdp Document #: 222 Filed: 10/09/18 Page 14 of 31
PUBLIC VERSION - REDACTED

were doing the same thing." *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000). Here, CDK and Reynolds were unilaterally able to block third-party access to their respective DMSs effectively and successfully, regardless of whether the other followed suit. *See* Compl. ¶¶ 189, 220 (allegations of Reynolds's unilateral blocking). As we demonstrated in our opening memorandum (at 1-2, 13), collusion here would have added nothing.

### 2.    *Authenticom's "group boycott" theory is a factual mismatch*

Authenticom's "group boycott" theory also is a conceptual mismatch to the facts of this case. *See* Opening Mem. 12-14. A group boycott is really a "concerted refusal to deal" (Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2202 (June 2017) ("Areeda & Hovenkamp")), and here neither defendant "deals" with Authenticom in the relevant way and thus had nothing to boycott.

We also explained that the Court, in its decision on the preliminary injunction, conclud[ed] that defendants had boycotted Authenticom, not in their capacity as DMS service providers, but "in their capacity as *app* providers." PI Op. 13 (emphasis added). The problem is that Authenticom has not alleged, and in its opposition brief does not defend, a group boycott theory based on CDK's and Reynolds's roles as app providers. That is likely because there is no allegation or evidence that CDK's or Reynolds's apps account for a substantial share of the market for app services. *See* Opening Mem. 12-13 (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)).

Authenticom's response (buried in a footnote) is to assert that a defendant can be liable for a group boycott, not only by directly joining the boycott itself, but also by "inducing" other market participants to "stop selling" to a third party. *See* Opp. 23 n.3. But once again, Authenticom does not allege any such theory in its complaint and does not otherwise explain in its opposition brief whom CDK and Reynolds attempted to induce to engage in a boycott of Authenticom's services. Perhaps Authenticom means to imply that CDK and Reynolds worked together to induce *dealers* to stop granting access to Authenticom. But no such inducement would have been necessary; both

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 15 of 31 PageID #:924
Case: 3:17-cv-00318-jdp Document #: 222 Filed: 02/09/18 Page 15 of 31
PUBLIC VERSION - REDACTED

companies had service contracts that permitted them to block unauthorized access unilaterally. Plus, the complaint alleges nothing about dealers suddenly refusing to grant Authenticom access because of improper inducements from CDK or Reynolds (much less both of them working together). No matter how the facts are spun, there is no way in which a "group boycott" or "concerted refusal to deal" theory makes any sense on the facts alleged (or evidence adduced at the PI hearing).

### 3. Authenticom lacks standing to challenge a supposed "market division" agreement, which is unsupported in any event

Authenticom faces similar problems with respect to its market division theory. We showed in the opening memorandum (at 11) that a market-division theory is a mismatch to this case because Authenticom casts itself as a *competitor* with CDK and Reynolds, not as one of their *customers*. A true market division agreement—one by which CDK agreed to "stay out" of Reynolds's "territory" in the data extraction market and vice-versa, so they could each charge higher prices as monopolists within their respective territories—therefore would have helped Authenticom. Such an agreement would have eliminated DMI and IntegraLink as Authenticom's competitors for vendors using data from the Reynolds DMS (as would have Reynolds's supposed agreement not to enter the hostile data extraction market for vendors using data from the CDK DMS). The upshot is clear: Because Authenticom is not a consumer and does not purchase services from CDK or Reynolds, it cannot have suffered an antitrust injury (or any injury) resulting from a market division agreement. Authenticom ignores this point.

Regardless, Authenticom is wrong that the 2015 agreements divide any market. *See* Opp. 23. Those agreements provided merely that (1) DMI and IntegraLink would cease attempting to hostilely access the Reynolds DMS for a period of time and for certain apps, (2) certain Reynolds apps would integrate with the CDK DMS through 3PA, and (3) certain CDK apps would integrate with the Reynolds DMS through RCI. *See* Opening Mem. 10-11. Authenticom does not deny that it was economically rational for CDK to enter these agreements, because (as Authenticom knows firsthand)

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 16 of 31 PageID #:925
Case: 3:17-cv-00318-jdp Document #: 222 Filed: 03/09/18 Page 16 of 31
PUBLIC VERSION - REDACTED

Reynolds had been increasingly successful at blocking unauthorized access to data in the Reynolds DMS. *See* Compl. ¶ 189. The best course, in CDK's judgment, was to obtain an orderly wind-down from Reynolds that would avoid both disruption to DMI's and IntegraLink's lines of business and stave off the kind of litigation that Reynolds had brought against other data extractors.

Authenticom takes issue with this explanation, asserting that "[i]f Reynolds was able to block CDK, it could have done so" without the need for a wind-down agreement with CDK. Opp. 25. But as Authenticom knows well, Reynolds regularly offered third-party data extractors wind-down agreements (*e.g.*, Pl. Ex. 46 (Dkt. 65-21)) because bringing hostile access to an orderly conclusion meant that Reynolds's dealer customers would have more consistent and predictable access to their apps. What is more, although Reynolds had been successful at blocking most unauthorized access attempts, its efforts were not flawless (Compl. ¶¶ 195-97), and the continued need to disrupt third-party access was costly.

Authenticom asserts more generally—but without citing any specific contract language—that the agreements "replaced competition with cooperation" because "CDK and Reynolds competed to provide data integration services" for Reynolds dealers before the agreement, whereas "CDK agreed to shutter that business and to steer its existing customers to Reynolds" afterward. Opp. 24. That is wrong in two respects.

First, CDK assuredly did *not* agree to "steer" its customers to Reynolds. Authenticom's assertion on this point appears to be a reference to Section 4.4 of the Data Exchange Agreement, which required CDK to assist Reynolds with "communication" and with transitioning customers "who *choose* to join the Reynolds RCI program." Defs. Ex. 1 § 4.4 (Dkt. 106-1) (emphasis added). A promise to communicate with customers who choose a course on their own is not a restraint of trade. In any event, there is no allegation in the complaint that CDK actually did anything pursuant to Section 4.4 of the DEA. Thus, neither the terms of the agreement nor CDK's alleged conduct in any way foreclosed Authenticom from competing for DMI's or IntegraLink's vendor customers after the

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 7 of 31 PageID #:926
Case: 3:17-cv-00318-jdp Document #: 222 Filed: 03/09/18 Page 17 of 31

PUBLIC VERSION - REDACTED

wind-down agreement was signed. "'There can be no restraint of trade without a restraint.'" *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 624 (7th Cir. 2005) (quoting *Schachar*, 870 F.2d at 397).

Second, CDK also did not agree to "shutter" its data extraction business. By the plain terms of the agreements, CDK remained free, through DMI and IntegraLink, to attempt to hostilely access Reynolds's DMS after the expiration of the agreements, and even during the terms of the agreements with respect to any application other than the seven CDK applications listed in the RCI agreement. *See* Defs. Ex. 3 (Dkt. 106-3) § 1.5 ("this RCI Agreement applies only to those CDK Applications identified in Exhibit RCI A"); *id.* § 5.1 (agreement can be terminated after five years). Authenticom does not recite a single phrase or clause in the actual agreements that suggests otherwise.[2]

### B.    Authenticom's second cause of action (exclusive dealing) should be dismissed

Authenticom's exclusive dealing claims also should be dismissed. Although Authenticom insists that the complaint plausibly alleges an unlawful tying claim with respect to CDK and *dealers* (Opp. 26), it does not offer any real defense of that theory. That is unsurprising; as we noted in the opening memorandum (at 16-17), an exclusive dealing agreement is one in which a buyer agrees to purchase exclusively from just one seller (or a seller agrees to sell to just one buyer), foreclosing a portion of the market for other sellers (or buyers) of the relevant good or service. *See* Areeda & Hovenkamp ¶ 1800a. The only thing that CDK sells to dealers is DMS services. There is no allegation in the complaint that CDK requires its dealers to purchase DMS services from CDK alone, nor would Authenticom (which does not compete in the market for DMS services) have standing to challenge such terms.

---

[2]    Authenticom cites Schaefer's hearing testimony in support of its description of the agreements as a market division arrangement. Opp. 24. Schaefer's testimony is outside of the complaint. *Supra* pages 3-4. And in any event, "[t]he interpretation or legal effect of a contract is a question of law to be determined by the court," and when a contract is "reduced to writing," the contract "speaks for itself," without regard for ex-post "extrinsic evidence." *Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003).

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 18 of 31 PageID #:927
Case: 3:17-cv-00318-jdp Document #: 292 Filed: 03/09/18 Page 18 of 31

PUBLIC VERSION - REDACTED

That leaves Authenticom's exclusive dealing theory with respect to vendors, which is the focus of its opposition brief (at 27-29). That theory fails for a separate reason: "even though a contract is found to be an exclusive-dealing arrangement, it does not violate the [antitrust laws] unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." Opening Mem. 12-13 (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)).[3] On this point, Authenticom insists that CDK's agreements with vendors meet this threshold requirement because CDK has "30% or more of the market," and its vendor agreements "prevent or effectively prevent dealers and vendors from working with Authenticom." Opp. 27. This argument does not hold up under scrutiny.

Although it is true that CDK is alleged to have 30% or more of the *DMS* market, the question is whether CDK's vendor agreements have foreclosed a substantial share of the market in which Authenticom operates—which is to say, the alleged data integration market. On that point, there are no allegations concerning the size of the data integration market, CDK's share of it, or the portion of the market that has been foreclosed. There are no allegations of how many purchasers (vendors) there are in the market, how many apps those vendors provide, or how many platforms they provide them on. And there are no allegations of how many vendors have signed up with 3PA, how many apps those vendors are servicing through 3PA, and whether any vendors are abiding or disregarding the access provisions of their 3PA contracts and using hostile data extractors nevertheless. Without allegations concerning these facts, there is no basis for determining whether CDK's agreements with vendors—assuming for the sake of argument they were subject to antitrust scrutiny as exclusive-dealing arrangements—have affected a substantial share of the relevant market.

---

[3]    It also fails because, as explained in our opening memorandum (at 17), 3PA is not a competing data integrator, but a managed interface integral to CDK's DMS itself, allowing vendors to obtain data directly from CDK rather than engaging third parties.

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 19 of 31 PageID #:928
Case: 3:17-cv-00318-jdp Document #: 222 Filed: Page 9 of 31 PageID #:928
PUBLIC VERSION - REDACTED

### C.  Authenticom's third cause of action (illegal tying) should be dismissed

Tying, as we demonstrated (Opening Mem. 15-16), requires that a seller use its market power in a primary product to force a single buyer to take a secondary product that it would rather not have. *See N. Pac. Ry. v. United States*, 356 U.S. 1, 5-6 (1958); *A.O. Smith Corp. v. Lewis, Overbeck & Furman*, 979 F.2d 546, 547 (7th Cir. 1992). A tying theory therefore does not map onto the circumstances here, because, whereas *dealers* are the purchasers of DMS servicers, *vendors* are the purchasers of data integration services. Authenticom now admits this: "Data integration services are sold separately from the DMS, to different customers—with the DMS sold to dealers and data integration sold to vendors." Opp. 28. On the basis of this admission alone, the Court should find that CDK's sales to vendors in the market for data integration cannot be "tied," within the meaning of the antitrust laws, to sales to dealers in the market for DMS services.[4]

Authenticom replies that "[d]ealers are . . . the relevant targets of Defendants' tying arrangement" because their authorization is needed for integrators to access CDK's DMS. Opp. 38. But Authenticom's own authority on this point, *Dos Santos v. Columbus-Cuneo-Cabrini Medical Center*, 684 F.2d 1346 (7th Cir. 1982), is not even a tying case and is easily distinguishable. In *Dos Santos*, an anesthesiologist alleged that a hospital and a medical group had entered into an unlawful exclusive dealing arrangement because the medical group agreed to serve as the sole provider of anesthesia services at the hospital. *Id.* at 1348. In a discussion that the court itself described as dictum, the court commented that it might be "more appropriate for antitrust purposes" to treat the hospital, rather than individual patients, as the purchaser of anesthesia services. *Id.* at 1354. But the court based that comment on the observations that (1) patients "generally take[] no part in the selection of a particular anesthesiologist" and (2) "the expense of anesthesia services to the patient is

---

[4]    In this respect, the DMS market and data integration markets are better understood as a "two sided market," rather than a foremarket and aftermarket than can be tied to one another. *See, e.g.*, *United States v. Am. Express Co.*, 838 F.3d 179, 185 (2d Cir. 2016) (discussing two-sided markets and collecting sources); *see also* CA7 Argument Audio 45:35-46:05.

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 20 of 31 PageID #:929
Case: 3:17-cv-00318-jdp Document #: 222 Filed: 03/15/18 Page 20 of 31

PUBLIC VERSION - REDACTED

ordinarily at least partially insured or otherwise payable by a third party," so it would be "anomalous to treat the patient as a buyer." *Id.*

Even assuming that *Dos Santos*'s rationale for treating a party other than the purchaser as the buyer for antitrust purposes could be extended to the tying context, it would not apply here. First, dealers are not alleged to choose data extractors for vendors in the way that surgeons chose anesthesiologists for patients. Indeed, just a few pages earlier in its brief (at 28), Authenticom asserts that it is *vendors*' preference for its integration services that matters most. And second, vendors pay for integration services directly themselves; they do not rely on third parties to make their payments and are, by Authenticom's own admission, price-sensitive.[5]

### D. Authenticom's fourth cause of action (monopolization) should be dismissed

Authenticom's monopolization claims are flawed in two respects: (1) the complaint does not adequately allege a single-brand aftermarket for integration services on CDK's DMS; and (2) Authenticom has not alleged any unlawful exclusionary conduct. *See* Opening Mem. 20-25. Authenticom does not adequately address these deficiencies.

#### 1. There can be no unfair lock-in given the acknowledged terms of CDK's service contracts with dealers

Authenticom's allegation that there is a single-brand aftermarket for integration services on CDK's DMS fails foremost because dealers agreed not to give third parties like Authenticom access to CDK's DMS. Authenticom does not (and cannot) disagree that "the law prohibits an antitrust [plaintiff] from [complaining of] market power that arises solely from contractual rights that consumers knowingly and voluntarily gave to the defendant." Opening Mem. 22 (quoting *Newcal*

---

[5] CDK denies that it has market power in the DMS market. *Contra* Opp. 37-38. The evidence at the preliminary injunction hearing showed that dealer customers regularly switch DMS providers and more generally that "competition to gain and retain DMS customers is vigorous." Decl. of Sumanth Addanki ¶ 47 (Dkt. 130). We recognize, however, that the complaint alleges (however wrongly) that CDK has market power (Compl. ¶¶ 28, 33, 38-45, 214-225, 257) and that the Court may not consider evidence outside the complaint at this stage of the litigation.

PUBLIC VERSION - REDACTED

*Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1048 (9th Cir. 2008) (emphasis omitted)). The rationale is straightforward: Because CDK's service contracts forbade dealers from granting third-party access to the DMS to data extractors like Authenticom "from the outset," dealers "could have shopped around for competitive life-cycle prices" all along and cannot, as a matter of law, be unfairly locked in. *Dig. Equip. Corp. v. Uniq Dig. Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996); *accord, e.g.*, *DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1346 (Fed. Cir. 2014).

The underlying allegations on this score are clear: The complaint alleges the CDK's dealer contracts provide that dealers "shall not allow access to [the CDK DMS] by any third parties." Compl. ¶ 151 (quoting Defs.' Ex. 10 § 6(D)); *see also* Defs.' Ex. 10 § 6(B) (similar). Thus, CDK's service agreements "give CDK an exclusive right to access dealer data on the CDK DMS for purposes of data integration and syndication." Compl. ¶ 151. Accordingly, Authenticom cannot maintain a Section 2 claim predicated on any purported market power over the alleged submarket for data integration services for CDK dealers.

Authenticom now attempts to back away from its own allegations. First, it says that, notwithstanding the plain terms of its service contracts with dealers, CDK's decision to begin actively blocking and disrupting unauthorized third-party access to its DMS represented a "change[]" in its "actual real-world policies with regard to third-party integration services . . . after the dealers were already locked-in." Opp. 43. But as we noted in the opening memorandum (at 21-22), CDK's policy on unauthorized access was plainly and expressly memorialized in the terms of its service contracts, and "[a] party is not justified in relying on representations outside of or contrary to the written terms of a contract he or she signs when the signer is aware of the nature of the contract and had a full opportunity to read it." *See AB Volvo*, 349 F.3d at 394. Simply put, CDK has always had the "contractual right[]" to block third-party data extractors (*Newcal*, 513 F.3d at 1048), as agreed by dealers. This point is central to the monopolization claim, but Authenticom offers no response.

PUBLIC VERSION - REDACTED

Second, Authenticom asserts that, "far from prohibiting third-party access, CDK's DMS contracts expressly allow dealers to authorize 'agents' to access the DMS on the dealers' behalf." Opp. 43. There are two problems with that theory. To begin, Authenticom is alleging inconsistent facts. It asserts for its exclusive-dealing theory that CDK's service contracts categorically bar dealers from giving Authenticom credentials to extract data from the DMS. *See* Opp. 26. Thus, according to the complaint, the contracts provide that dealers "'shall not allow access to [the CDK DMS] by any third parties,'" and CDK's service agreements "give CDK an exclusive right to access dealer data on the CDK DMS for purposes of data integration and syndication." Compl. ¶ 151 (quoting Defs.' Ex. 10 § 6(D)); *see also* Defs.' Ex. 10 § 6(B) (similar).[6] Authenticom then asserts for its single-brand monopolization claim that dealers are *not* in fact bound by a contractual limitation barring them from giving login credentials to Authenticom, because Authenticom acted as the dealers' agent. Opp. 43. It cannot have it both ways: Allegations that are factually inconsistent and self-contradictory are inherently implausible and not entitled to a presumption of truth. *See, e.g.*, *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 151-52 (2d Cir. 2014).

More to the point, Authenticom does not allege any facts permitting a plausible inference that either it or any other hostile data extractor actually acts as the agent of any of the dealers. Establishing an agency relationship is no simple task: "Wisconsin law of agency requires 'an agreement of two parties, embodying three factual elements: (1) the manifestation of the principal that the agent is to act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to control the undertaking.'" *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 755 n.4 (7th Cir. 2017). There are no allegations in the complaint along these lines. That is not surprising: Authenticom's access agreement with dealers *expressly disavows an agency relationship*. Pl. Ex. 28 (Dkt. 63-3) § 10.4 ("The Parties expressly agree that they are inde-

---

[6]  CDK's dealer contract is incorporated into the complaint (at ¶ 151) and thus may be considered on the motion to dismiss. *See Adam v. Frantz*, 2002 WL 32341816, at *2 (W.D. Wis. 2002).

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 23 of 31 PageID #:932
Case: 3:17-cv-00318-jdp Document #: 222 Filed: 03/05/18 Page 23 of 31

PUBLIC VERSION - REDACTED

pendent contractors and do not intend for these Terms and Conditions to be interpreted as an employment agency, joint venture, or partnership relationship.").[7] If anything, Authenticom would be the agent of *vendors*, on whose behalf (and for whose use) it pulls data (*see, e.g.*, Compl. ¶ 60)—and its vendor contracts *also disavow an agency relationship*. Pl. Ex. 76 (Dkt. 147-4) § 7.1 ("No partnership, joint venture, employment, agency, or other relationship is formed, intended, or to be inferred under this Agreement."). Against this backdrop, Authenticom cannot seriously say that dealers who signed CDK's service agreement would have believed, as a legal matter, that Authenticom was their agent, permitted to access CDK's DMS.

Authenticom points to cases in which it says courts found a lock-in despite contractual language authorizing the complained-of restriction. Opp. 44. None of these cases is on point. In *Datel Holdings, Ltd. v. Microsoft Corp.*, 712 F. Supp. 974, 989 (N.D. Cal. 2010), the court denied a motion to dismiss because there was "ambiguity" in the relevant contract language, which the defendant's counterparties (individual consumers, not sophisticated business) may not have understood. Likewise, in *Burda v. Wendy's International, Inc.*, 659 F. Supp. 2d 928, 935 (S.D. Ohio 2009), the court held that there was "no language in [the contract] that would put a potential franchisee on notice" that it might be required to purchase all supplies from an exclusive supplier. Neither case is helpful to Authenticom because here CDK's contracts plainly prohibited hostile data extraction, and there is no basis for thinking that dealers (sophisticated businesses that negotiate contracts all the time) did not understand the terms. As for *Avaya Inc. v. Telecom Labs, Inc.*, 2014 WL 2940455 (D.N.J. June 30, 2014), nothing in that case addressed the significance of a contractual restriction on Avaya phone purchasers' ability to use unauthorized service providers.

Authenticom's attempt to distinguish *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir.1997), is also unpersuasive. Authenticom appears to suggest that under *Queen City*

---

[7]   Authenticom's agreement with dealers is incorporated into the complaint (at ¶ 80) and thus may be considered on the motion to dismiss. *See Adam*, 2002 WL 32341816, at *2.

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 24 of 31 PageID #:933
Case: 3:17-cv-00318-jdp Document #: 222 Filed: 03/16/18 Page 24 of 31
PUBLIC VERSION - REDACTED

*Pizza*, a contractual agreement undermines an aftermarket monopolization claim only when the contractual agreement is the "sole reason" that alternative aftermarket products cannot be used. Opp. 45. But as Authenticom's own authority explains, the question is simply "whether the market power is derived from contractual *provisions* [the defendant] obtained in the initial market, as in *Queen City Pizza*, or through the contractual *relationship* it has with its consumers, as in *Eastman Kodak*." *Blizzard Entm't Inc. v. Ceiling Fan Software LLC*, 941 F. Supp. 2d 1227, 1235 (C.D. Cal. 2013). Here, any power that CDK may have in the market for data extraction from its own DMS derives from CDK's service agreements with dealers. Crucially, this conclusion does not require the Court to say anything about market definition. *Contra* Opp. 29, 45-46.

### 2. *The allegations of a lock-in are insufficient to support a monopolization claim*

CDK's contracts with dealers is a clear and simple ground for dismissing the monopolization claim. But even if that were not so, Authenticom has not adequately alleged that dealers are "locked in" and unable to switch away from CDK if they prefer a DMS that permits hostile integration in the first place. On this point, Authenticom now concedes that 17 percent of dealers whose contracts are up for renewal each year switch DMS providers—which is a significant amount of switching. Opp. 40-41. It attempts to distract from the 17 percent switching rate by noting that only three percent of the *overall* number of dealers switch DMS providers each year. Opp. 40. But what matters here is whether or not dealers are able to switch when they wish to do so, not the overall "churn rate" in the market—otherwise, antitrust courts would penalize defendants for providing superior services from which consumers *choose* not to switch. Likewise irrelevant is Authenticom's allegation that the average tenure of a DMS customer is more than 20 years (*id.*), which is no less indicative of dealers' satisfaction with their DMS providers than it is of "stickiness."[8]

---

[8]     Given the frequency with which dealers' DMS contracts come up for renewal, moreover, *Collins Inkjet v. Eastman Kodak*, 2014 WL 11516553 (S.D. Ohio Mar. 21, 2014), is distinguishable. There, the court found that customers purchased printers expecting to use them for as long as 20 years—and

PUBLIC VERSION - REDACTED

Authenticom notes that DMS contracts typically last five to seven years. Opp. 40. But the question for the Court is whether dealers are able to switch to another DMS provider as a general matter, not whether they can do so immediately, on demand. Were it otherwise, any contract not terminable at will would create a single-brand market. That is not the law.

Authenticom also argues that dealers are locked in by the purported "information costs" of switching DMS providers, but its allegations here fall well short of plausibility. Opp. 42. Authenticom alleges, in particular, that CDK (along with Reynolds) uses "price secrecy provisions" that are intended to prevent vendors from passing data integration costs on to dealers and thus to prevent dealers from "learning how much Defendants charge for data integration." Opp. 41. Even if that were true, Authenticom never alleges that these provisions actually succeed at keeping dealers in the dark. On the contrary, Authenticom argues elsewhere that vendors *do* pass on their costs to dealers (*id.* at 38), and it alleges that dealers are aware of CDK's data extraction fees and have complained about them to CDK (Compl. ¶ 191). Once again, internally inconsistent allegations of this sort are inherently implausible and disentitled to a presumption of truth.

### 3. *Authenticom has not plausibly alleged exclusionary conduct*

There is yet another problem with Authenticom's monopolization claim: Authenticom has not alleged that CDK engaged in exclusionary conduct. As we explained, CDK is under no duty to permit Authenticom to access its systems for Authenticom's benefit under *Trinko* and its progeny. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). Consistent with this argument, Chief Judge Wood expressed "concern[]" with the "premise" of Authenticom's theory that "there is some duty that either of these companies has . . . to make its work product available for scraping for

that customers were likely to stick with printers as long as possible in light of the sunk costs and other factors that discouraged purchasing new equipment. *Id.* at *9. Here, by contrast, dealers have no investment in a durable good and have a clear opportunity to switch when their contracts come up for renewal; Authenticom has not alleged market forces like those in *Collins Inkjet*.

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 26 of 31 PageID #:935
Case: 3:17-cv-00318-jdp Document #: 222 Filed: 03/16/18 Page 26 of 31
PUBLIC VERSION - REDACTED

free to others." CA7 Argument Audio 26:08-26:32. So did Judge Easterbrook. *See id.* at 30:26-32:42; 36:41-39:48.

Authenticom asserts that *Trinko* is inapposite because it does not "seek[] Defendants' *cooperation*," but rather challenges "affirmative . . . anticompetitive actions that Defendants have taken to interfere with [its] voluntary business relationships" with dealers and vendors. Opp. 47. But Authenticom *does* seek CDK's cooperation, inasmuch as Authenticom's business model requires it to trespass upon CDK's systems and co-opt CDK's technologies to pull data from CDK's DMS and furnish it to vendors. That is the kind of "forced sharing" of an "economically beneficial facilit[y]" that *Trinko* condemned. *Trinko*, 540 U.S. at 408. In short, CDK's "blocking" of Authenticom cannot be an exclusionary practice under Section 2, requiring dismissal of this claim.[9]

### E. Authenticom's fifth cause of action (tortious interference) should be dismissed

Authenticom's final claim, for tortious interference with contract under Wisconsin law, also should be dismissed. Even assuming that the other four elements of a tortious claim could be satisfied here, Authenticom cannot satisfy the last element—*i.e.*, that CDK "was not justified or privileged to interfere." *Burbank Grease Servs., LLC v. Sokolowski*, 717 N.W.2d 781, 796 (Wis. 2006). CDK's actions were privileged because, as we have shown (Opening Mem. 25-26), CDK was acting to vindicate its "legally protected interest" in enforcing its dealer contracts, which prohibit hostile integration. *Restatement (Second) of Torts* § 773 (Am. Law Inst. 1979). CDK's contractual limitations on access to its system are commonplace in the digital economy. Indeed, Authenticom includes a substantively identical prohibition in its own agreements with dealers. Pl. Ex. 28 § 6.7.

---

[9]   Authenticom attempts to shore up the deficiency in its Section 2 claim by arguing that all of CDK's other alleged conduct under Section 1—*i.e.*, the alleged horizontal conspiracy and exclusive dealing—is "also sufficient to show" exclusionary conduct under Section 2. But because those claims fall short under Section 1, they cannot support a claim under Section 2, either.

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 27 of 31 PageID #:936
Case: 3:17-cv-00318-jdp Document #: 222 Filed: 03/27/18 Page 27 of 31
PUBLIC VERSION - REDACTED

CDK's actions to protect its legally protected interest in enforcing that prohibition are thus privileged, irrespective of Authenticom's meritless antitrust allegations.

## III.    AUTHENTICOM'S CLAIMS FAIL FOR ADDITIONAL INDEPENDENT REASONS

### A.    The complaint does not adequately allege reduced output

Authenticom acknowledges that it must allege reduced output. Opp. 15, 17, 29-30. And it cannot be disputed that, in doing so, Authenticom must offer more than mere labels or conclusory assertions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do."). Yet that is all Authenticom offers here. The only paragraphs that Authenticom cites on this point (*see* Opp. 30 (citing Compl. ¶¶ 226-231)) allege, but only in general terms, that "Defendants' conduct is also reducing output in the data integration market, as well as the downstream market for third-party applications." Compl. ¶ 228. The complaint insists that "dramatically more expensive data access means fewer new vendors and less opportunity for vendors to innovate" and asserts that some vendors have gone out of business. *Id*. at ¶ 229. These are all bald assertions devoid of the necessary factual development. In response, Authenticom cites hearing testimony, which it says establishes that two vendors were "forced . . . to stop producing applications." Opp. 30. Here, again, Authenticom relies on evidence outside the complaint. But even if the Court could consider this testimony at this stage of the litigation, evidence that just two app providers stopped producing an unidentified number of applications is not enough to support a sprawling, treble-damages antitrust claim like Authenticom's.[10]

---

[10]    As Reynolds demonstrates at length in its separate motion to dismiss (Dkt. 176, at 6-21), Authenticom's antitrust claims must be dismissed because the antitrust laws cannot be invoked to protect illegal conduct. CDK incorporates Reynolds's reply arguments by reference.

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 28 of 31 PageID #:937
Case: 3:17-cv-00318-jdp Document #: 222 Filed: Page 28 of 31 PageID #:937
PUBLIC VERSION - REDACTED

**B.  Authenticom's claims fail because defendants' conduct has been lawful under the Rule of Reason**

Dismissal is warranted additionally because CDK's restrictions on hostile integration serve procompetitive purposes—among them protecting CDK's DMS against cybersecurity threats, which is a lawful and valuable improvement to CDK's product. Authenticom's claims thus fail because the challenged restrictions are lawful under the rule of reason.[11]

Authenticom's first response to this argument is procedural: It argues that it did not have the burden to plead "a lack of procompetitive justifications." Opp. 30-31. But our point is not that Authenticom's complaint omits necessary allegations; it is that in light of the procompetitive explanations for defendants' policies—at least one of which is acknowledged in the complaint—Authenticom's claims fail as a matter of law. Authenticom's assertion that it adequately pleaded a "*prima facie* rule of reason case*" (*id.* at 31) is thus beside the point.

**1.  *Defendants' policies protect their systems from cybersecurity risks***

Authenticom argues that it has adequately alleged that the cybersecurity rationale for defendants' conduct was pretextual—citing almost no specific facts from its complaint and instead relying on evidence produced at the evidentiary hearing. For example, Authenticom cites a CDK presentation mentioning "increased prices." Opp. 31. But CDK's preference to extract further value from its technology investments is not mutually exclusive with also aiming to improve the security of its system. Indeed, the same presentation mentioned "eliminating opportunities for key enablers of hostile integration" as a means of "[s]ecur[ing] the CDK DMS" (Defs.' Ex. 31 at 24), a fact that Authenticom omits.

Authenticom also asserts that CDK's ownership of DMI and IntegraLink, and its alleged retention of Authenticom as a data extractor on other DMSs, undermines CDK's concern about

---

[11]  We noted in the opening memorandum (at 16) that Authenticom's tying claim must be evaluated under the rule of reason. Authenticom's opposition repeats the complaint's assertion that defendants' alleged tying is unlawful per se (Opp. 36), but it does not join issue with our argument.

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 29 of 31 PageID #:938
Case: 3:17-cv-00318-jdp   Document #: 222   Filed: ...   Page 29 of 31
PUBLIC VERSION - REDACTED

cybersecurity (Opp. 32), but that is untrue. There is no allegation in the complaint that DMI and IntegraLink hostilely extract data from DMS providers that forbid such conduct (as a matter of fact, they do not); nor is there any allegation that CDK has ever retained Authenticom for that purpose (as a matter of fact it has not). CDK's concern has been for the cybersecurity of its *own* systems, not the systems of other DMS providers who permit third-party data extraction.

Next, Authenticom argues that its systems are secure and "has never had a data breach." Opp. 32. That misses the point. The possibility of Authenticom *itself* being breached is not the only source of cybersecurity risk to CDK from Authenticom's activities; the fact that dealers create login credentials for Authenticom (Compl. ¶ 55) and then share those credentials over the phone or email is what increases the risk that CDK will be hacked. Even if it were otherwise, CDK's access policies apply to all hostile integrators, as to which evidence concerning Authenticom's security is irrelevant. We made this point, too, in the motion to dismiss (Opening Mem. 18), and Authenticom does not respond.

Finally, Authenticom's alleged absence of past data breaches is no guarantee that it will not experience one in the future—and CDK is manifestly permitted to take steps to guard against that possibility. Authenticom has no response to this argument.

### 2. CDK's conduct has improved its DMS

CDK's policies prohibiting hostile integration also survive rule of reason scrutiny because they are procompetitive product improvements. As we have shown (Opening Mem. 19-20; *supra* at 19-20), CDK was under no duty to take Authenticom's business into account as it improved its DMS to make it more secure and provide better service to its dealer customers.

Authenticom's principal response on this score is to cite the testimony of a vendor, which it says shows that CDK "permit[s] third-party access to [its] systems . . . when it is in [its] business interest to do so." Opp. 33. That testimony is not a part of the complaint and contradicts Authenticom's allegation (Compl. ¶ 76) that CDK (and Reynolds) has driven every data extractor but

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 30 of 31 PageID #:939
Case: 3:17-cv-00318-jdp Document #: 222 Filed: 04/09/17 Page 30 of 31 Page ID #:
PUBLIC VERSION - REDACTED

Authenticom out of business. And Authenticom does not allege any facts indicating why the exception was granted, or for how long, so it is impossible to draw any conclusions from it.

Authenticom also says that a design change to a product can still violate the Sherman Act if it "offer[s] no benefit to consumers." Opp. 34. But in the cases that Authenticom cites, the evidence was clear that the sole purpose of the defendants' conduct was to reduce competition, with no pro-competitive benefits. *See New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 658 (2d Cir. 2015); *United States v. Microsoft Corp.*, 253 F.3d 34, 66 (D.C. Cir. 2001); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1382 (Fed. Cir. 1998). That is not the case here, according either to the complaint or the evidence. *See* Opening Mem. 18.

## CONCLUSION

For the reasons above and in the opening memorandum, the complaint should be dismissed.

Case: 1:18-cv-00864 Document #: 62 Filed: 03/15/18 Page 31 of 31 PageID #:940
Case: 3:17-cv-00318-jdp Document #: 222 Filed: 10/06/17 Page 31 of 31
PUBLIC VERSION - REDACTED

Dated: October 6, 2017

Respectfully submitted,

/s/ *Mark W. Ryan*

MARK W. RYAN
MICHAEL B. KIMBERLY
MATTHEW A. WARING
   *Mayer Brown LLP*
   *1999 K Street NW*
   *Washington, DC 20006*
   *(202) 263-3000*

BRITT M. MILLER
MATTHEW D. PROVANCE
   *Mayer Brown LLP*
   *71 S Wacker Drive*
   *Chicago, IL 60606*
   *(312) 782-0600*

JEFFREY A. SIMMONS
JOSEPH S. HARPER
   *Foley & Lardner LLP*
   *150 East Gilman Street*
   *P.O. Box 1497*
   *Madison, WI 53701-1497*
   *(608) 257-5035*

*Counsel for Defendant*
*CDK Global, LLC*