PUBLIC – REDACTED VERSION

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This filing relates to:* | Hon. Amy J. St. Eve |
| *Cox Automotive, Inc, et al. v. CDK Global, LLC*, Case No. 1:18-CV-1058 (N.D. Ill.) |  |

**DEFENDANT CDK GLOBAL, LLC'S MEMORANDUM
IN SUPPORT OF ITS MOTION TO DISMISS**

# TABLE OF CONTENTS

Table of Authorities ......................................................................................................... ii

Introduction ........................................................................................................................1

Background .........................................................................................................................2

    A.   The DMS "market" .............................................................................................2

    B.   Hostile integration.............................................................................................3

    C.   CDK's SecurityFirst initiative and 3PA program...........................................4

    D.   Reynolds provides an orderly wind-down of CDK subsidiaries' hostile access .............4

Argument .............................................................................................................................7

I.    Cox Has Failed To State a Claim Under Section 1 ................................................7

    A.   Cox's horizontal conspiracy claims are inadequate as a matter of law ...........7

        1.   The allegations of a market-division agreement are inadequate .............8

        2.   CDK did not agree to a "group boycott" .................................................10

    B.   CDK's agreements with its dealers are not "tying" agreements.....................12

    C.   CDK has not engaged in exclusive dealing .....................................................14

    D.   CDK's conduct easily survives the Rule of Reason .......................................15

II.   Cox Has Failed To State A Claim Under Section 2 ..............................................17

    A.   There are no brand-specific aftermarkets for data integration services.........17

    B.   CDK has no duty to set aside the plain terms of its service agreements .......19

III.  Cox's Cartwright Act and California UCL claims also fail ..................................21

IV.  Cox Has Failed to State a Claim Related to Its 3PA Contract .............................23

V.   Cox Has Failed to State a Claim for Defamation .................................................25

Conclusion .........................................................................................................................25

PUBLIC – REDACTED VERSION

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adams v. Pull'R Holding Co., LLC,*
2010 WL 1611078 (N.D. Ill. Apr. 20, 2010) ...........................................................................25

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP,*
592 F.3d 991 (9th Cir. 2010) ............................................................................................17, 20

*Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.,*
135 F. Supp. 2d 1031 (N.D. Cal. 2001) ...................................................................................24

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
472 U.S. 585 (1985)........................................................................................................ *passim*

*Authenticom, Inc. v. CDK Glob., LLC,*
874 F.3d 1019 (7th Cir. 2017) ....................................................................................... *passim*

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007).................................................................................................................7

*Brown v. State of Wis.,*
2017 WL 371915 (W.D. Wis. Jan. 25, 2017) ..........................................................................25

*Brownmark Films, LLC v. Comedy Partners,*
682 F.3d 687 (7th Cir. 2012) ....................................................................................................4

*Cal. Comput. Prods. v. Int'l Bus. Machs. Corp.,*
613 F.2d 727 (9th Cir. 1979) ..................................................................................................17

*Cal. ex rel. Harris v. Safeway, Inc.,*
651 F.3d 1118 (9th Cir. 2011) .................................................................................................10

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
973 P.2d 527 (Cal. 1999) ........................................................................................................22

*Craigslist Inc. v. 3Taps Inc.,*
964 F. Supp. 2d 1178 (N.D. Cal. 2013) ...................................................................................19

*Cromeens, Holloman, Sibert, Inc. v. AB Volvo,*
349 F.3d 376 (7th Cir. 2003) ...................................................................................................18

*In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.,*
60 F. Supp. 3d 914 (N.D. Ill. 2014) ..........................................................................................8

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.*,
  16 Cal. App. 4th 202 (1993) ........................................................................24

*Dig. Equip. Corp. v. Uniq Dig. Techs., Inc.*,
  73 F.3d 756 (7th Cir. 1996) .........................................................................18

*DSM Desotech Inc. v. 3D Sys. Corp.*,
  749 F.3d 1332 (Fed. Cir. 2014)....................................................................18

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992)......................................................................................15

*Eastman v. Quest Diagnostics Inc.*,
  2016 WL 1640465 (N.D. Cal. Apr. 26, 2016) ............................................22

*EF Cultural Travel BV v. Explorica, Inc.*,
  274 F.3d 577 (1st Cir. 2001) ........................................................................19

*Facebook, Inc. v. Power Ventures, Inc.*,
  844 F.3d 1058 (9th Cir. 2016) ......................................................................19

*Firestone Fin. Corp. v. Meyer*,
  796 F.3d 822 (7th Cir. 2015) .........................................................................2

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986)......................................................................................10

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984)...................................................................................12, 13

*Khorrami v. Rolince*,
  539 F.3d 782 (7th Cir. 2008) .........................................................................7

*Kleen Prods. LLC v. Int'l Paper*,
  276 F. Supp. 3d 811 (N.D. Ill. 2017) .............................................................8

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)..............................................................................7, 9, 11

*Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*,
  309 F. Supp. 2d 1156 (N.D. Cal. 2004) .......................................................19

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ......................................................................11

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
    795 F.3d 1124 (9th Cir. 2015) ........................................................................21

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ........................................................................18

*Persian Gulf Inc. v. BP W. Coast Prods. LLC*,
    2016 WL 4574357 (S.D. Cal. July 14, 2016) ................................................21

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
    104 F.3d 811 (6th Cir. 1997) ..........................................................................18

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997).............................................................................19

*Schor v. Abbott Labs.*,
    457 F.3d 608 (7th Cir. 2006) ..........................................................................20

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ........................................................................................15

*In re Text Messaging Antitrust Litig.*,
    782 F.3d 867 (7th Cir. 2015) ............................................................................7

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919)........................................................................................20

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966).........................................................................................17

*VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*,
    2015 WL 5693735 (N.D. Ill. Sept. 28, 2015) ................................................22

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004).................................................................................10, 20

*Viamedia, Inc. v. Comcast Corp.*,
    2017 WL 698681 (N.D. Ill. Feb. 22, 2017) ..............................................15, 22

*Wigod v. Wells Fargo Bank, N.A.*,
    673 F.3d 547 (7th Cir. 2012) ..........................................................................17

**STATUTES AND RULES**

15 U.S.C. § 1 ..............................................................................7, 10, 12, 14

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

15 U.S.C. § 2 .................................................................................................11, 17, 20, 21

18 U.S.C. § 1030(a)(2)(C) ...................................................................................19

Cal. Bus. & Prof. Code § 17045 .........................................................................24

Cal. Bus. & Prof. Code § 17200 .........................................................................21

Ga. Code Ann. § 9-3-33 ......................................................................................25

Ill. Comp. Stat. Ann. 5/13-201 ...........................................................................25

Fed. R. Civ. P. 8 .................................................................................................25

Fed. R. Civ. P. 12(b)(6) ........................................................................................7

## OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (June 2017)
  ¶ 772c2 ...........................................................................................................21
  ¶ 1752b ............................................................................................................12
  ¶ 1800 ..............................................................................................................14
  ¶ 2202 ..............................................................................................................10

*Request for Information Regarding Consumer Access to Financial Records,*
  Bureau of Consumer Fin. Prot., Dkt. No. CFPB-2016-0048 (Nov. 14, 2016),
  perma.cc/F28M-5TZU ....................................................................................17

PUBLIC – REDACTED VERSION

## INTRODUCTION

The plaintiffs in this case are Cox Automotive Inc. and eight of its subsidiaries (collectively "Cox"). As its complaint details, Cox is a massive presence in the automotive industry with "approximately 34,000 employees worldwide," serving "virtually all of the 17,000 franchised new car dealers in the United States." Compl. ¶ 31. It runs the nation's third largest DMS, owns "the leading online destination" for buying and selling cars and trucks, partners with "[s]ixty percent of United States dealerships" with its virtual automotive showrooms, operates a credit application "portal" that "connects more than 22,000 dealer clients to approximately 1,700 lender partners," (*id.* ¶ 7), and is, by all indications, the largest third-party automotive application vendor.

Despite its commanding presence in the industry, Cox decided to pile-on to this antitrust litigation, complaining about an access restriction that defendant CDK Global, LLC ("CDK") imposed to protect *its own* proprietary dealer management system ("DMS"). As CDK's competitor in the DMS space, Cox cannot bring an antitrust claim about CDK's business policies, so it contrived to sue CDK on behalf of its application vendor subsidiaries. According to Cox, CDK is required by the antitrust laws to do business with vendors on the vendors' preferred terms, including by allowing them to access CDK's DMS through third-party data "integrators" rather than through secure methods overseen by CDK.

That premise is clearly faulty: the Seventh Circuit already has rejected it in one of the cases consolidated in this litigation, holding that CDK is not a monopolist and has no duty to deal with rival firms—let alone on their preferred terms. Thus, although data integrators were at one time technically able to access CDK's DMS without CDK's authorization and without paying anything, CDK was not required by the antitrust laws to tolerate that conduct indefinitely. Rather, it was entitled to address the security vulnerabilities, data corruption, and free riding associated with third-

PUBLIC – REDACTED VERSION

party integration by requiring application vendors to access data through a secure interface built into the DMS. The antitrust laws do not condemn this kind of innovation; they *encourage* it.

Cox is left attempting to evade the bedrock no-duty-to-deal rule by alleging that CDK engaged in a horizontal conspiracy and market-division scheme with The Reynolds and Reynolds Company ("Reynolds"), another DMS provider. But the plain terms of the written agreements that Cox relies upon belie this allegation and demonstrate that CDK's conduct is wholly consistent with lawful conduct. None of Cox's remaining federal antitrust claims—tying, group boycott, or exclusive dealing—fits the facts alleged, either. Because the remainder of Cox's boilerplate state-law claims rise or fall with the antitrust claims, and because Cox's contract-based claims are refuted by the facts it has pled, the complaint should be dismissed in its entirety.

## BACKGROUND

We describe here the allegations in the complaint, which are assumed true solely for purposes of this motion. *See Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015).

### A.  The DMS "market"

Automobile dealerships generate large volumes of data in the course of their operations, including inventory, customer, sales, financing, and insurance information. Compl. ¶ 2. DMSs are the enterprise software platforms that dealerships use to manage their businesses. *Id.* ¶ 48.

The market for DMS services in the United States comprises a number of firms of various sizes. Reynolds and CDK are two of the largest firms serving new vehicle franchised dealers.[1] Compl. ¶ 33. Cox alleges that, by number of franchised stores served, CDK has an approximate 45% share of the U.S. DMS market. *Id.* ¶ 52. Reynolds purportedly has an approximate 30% share. *Id.* Notably, Cox operates the "third largest DMS provider," called Dealertrack DMS. *Id.* ¶ 54. The

---

[1]  Although Cox describes the relevant DMS market as the market for DMS services for franchised new car dealers in the United States (Compl. ¶ 51), independent new car dealers and used car dealers use DMS services as well, and Cox offers no reason why they should be excluded from the market.

PUBLIC – REDACTED VERSION

various DMS providers compete fiercely to attract dealers' business from one another. *See, e.g.*, *id.* ¶ 97 (describing CDK's gain in market share at the expense of Reynolds).

### B.      Hostile integration

Many dealers contract with various third-party vendors, which offer software applications that perform assorted dealership functions using data on the DMS. Compl. ¶ 61. Hundreds of different vendors—including several Cox subsidiaries—offer a wide variety of services to dealerships in this way. *See id.* ¶¶ 32-39. Several of these Cox subsidiaries' "leading" applications are used by thousands of dealers across the country. *Id.* ¶ 7. Between its DMS and its vendor applications, Cox "serves virtually all of the 17,000 franchised new car dealers in the United States." *Id.* ¶ 31.

These third-party vendors often utilize certain data stored on a DMS for their applications to perform their specified functions. And while many vendors seek only the ability to obtain data from dealers, others also prefer the ability to "push" or "write-back" altered or edited data into the DMS so that they can populate the DMS's various proprietary workflows, as when a vendor amends individual customer records. Compl. ¶ 63.

Some vendors wishing to access the DMS contract with independent data "integrators," who—acting as middlemen—access the DMS in order to provide data to vendors through the integrator's own software interface. Compl. ¶ 65. Dealers have typically facilitated data integrator access to the DMS by either sharing existing login credentials or creating new ones for the integrators. These integrators then use those credentials to emulate dealership employees, pulling data from the DMS in an automated fashion, providing the data to vendors, and, in some instances, pushing altered or amended data back into the DMS. As to CDK's DMS, this process has necessarily required dealers to violate the terms of their DMS contracts with CDK, since those contracts forbid

dealers from giving third parties access to the DMS. Compl. ¶ 142. For this reason, access by third-party integrators is known as "hostile" access.[2]

### C.    CDK's SecurityFirst initiative and 3PA program

Cybersecurity and system performance are essential to the proper functioning of any large enterprise system provider. In part to ensure that CDK is able to maintain the security and stability of its systems, the terms of its contracts with dealers have long expressly prohibited dealers from granting any unauthorized third party access to the DMS, including by creating login credentials for third parties. *See* Ex. 1.[3]

Beginning in 2015, CDK recommitted itself to improving DMS security by enhancing its Third-Party Access (3PA) program, which relies on a managed data interface for transporting data to and from CDK's DMS. Compl. ¶ 82. This change was made as part of CDK's SecurityFirst initiative. Under the refreshed 3PA program, vendors could no longer obtain data from hostile third parties; instead, they were required to obtain data through the CDK maintained interfaces. *Id.*

### D.    Reynolds provides an orderly wind-down of CDK subsidiaries' hostile access

As Cox admits (Compl. ¶ 96), Reynolds has blocked unauthorized third-party access to its DMS for years. By 2013, its blocking activities had "increased" to the point that its ability to disrupt automated hostile integrators was virtually total. *Authenticom* Compl. ¶ 189 ("Reynolds's [blocking] actions resulted in an almost complete collapse of Authenticom's integration business for dealer data

---

[2]    Cox alleges that CDK's dealer contracts allow hostile integrators to access its DMS because they allow access by dealers' "agents." Compl. ¶ 20. But Cox has not alleged *any* facts that would establish that hostile integrators, by virtue of receiving login credentials, become dealers' "agents," and the contrary is established by Cox's allegations. *See infra* at 4 & n.2. This inadequately-pled allegation is not entitled to any presumption of truth for purposes of this motion.

[3]    A sample CDK dealer contract is attached as Exhibit 1. The court can consider the contract because Cox cites and relies on it in its complaint. *See, e.g.*, *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012).

for dealers using the Reynolds DMS.")[4] At the time, ADP (from which CDK was spun off in 2014) owned two subsidiaries—Digital Motorworks ("DMI") and IntegraLink—that operated as, among other things, data integrators. Compl. ¶ 86. Both DMI and IntegraLink engaged in unauthorized access of Reynolds's systems. *Id.* Reynolds—as it had with all other similarly-situated integrators— demanded that DMI and IntegraLink cease their activities. Shortly after the spin-off from ADP, CDK decided to cease DMI and IntegraLink's hostile integration activities entirely and thus agreed to stop attempting to access Reynolds's DMS without authorization. *Id.*

So as to ensure that the vendors who used DMI and IntegraLink's services to service Reynolds dealers were not adversely affected, Reynolds and CDK negotiated an agreement for a voluntary wind-down of DMI and IntegraLink's hostile access to Reynolds's system. Compl. ¶ 106. The agreement, entered into in February 2015, was the "Data Exchange Agreement" ("DEA").[5]

Cox describes the DEA as a market division agreement, but the agreement's plain text belies that conclusion. On its face the DEA does not relate to Reynolds's access to CDK's DMS (indeed, Cox does not allege that Reynolds has *ever* hostilely integrated on CDK's DMS or any other), and it makes no mention of CDK's access policies with respect to its own DMS at all. *See* Ex. 2 (Data Exchange Agreement). Indeed, the only restriction on the parties with respect to third-party integration is § 4.5, which provides, in relevant part:

> **Prohibition on Knowledge Transfer and DMS Access**. Each of Reynolds and CDK further covenants and agrees not to sell, transfer, or assign to any affiliate or third party any technology, business process, or other such knowledge regarding integration with the other party's DMS or take any other steps to assist any person that it reasonably believes to have plans to access or integrate with the other party's DMS without other party's written consent.

---

[4]    The court can consider the *Authenticom* complaint because Cox relies extensively on Authenticom's allegations throughout its own complaint.

[5]    The agreements are attached as Ex. 2-4.

PUBLIC – REDACTED VERSION

In other words, all CDK and Reynolds were prohibited from doing was sharing any information they learned about integration with the other party's DMS during the course of the agreement or taking any steps to assist any other party trying to integrate with the other's DMS. The contract does ***not*** obligate CDK or Reynolds to block hostile integrators or "close" their respective DMSs. It did not impinge on DMI and IntegraLink's ability to integrate (hostilely or otherwise) using their existing technology or know-how. And any hostile integrator could attempt to hostilely integrate (including into CDK and Reynolds' systems) on their own without help from CDK or Reynolds.

Concurrent with the DEA, the parties signed two additional contracts. First, in consideration for the orderly wind-down of DMI's and IntegraLink's unauthorized access, CDK granted certain of Reynolds's third-party applications certification under the 3PA program for free (up to a certain dollar amount), for five years. *See* Ex. 3 (3PA Agreement). This provision increased competition in the market for vendor applications by allowing a competing DMS provider's applications into CDK's supported integration program (and thereby giving CDK dealers access to those applications). Second, consistent with its decision to end its subsidiaries' hostile integration to Reynolds's DMS, CDK enrolled seven of its vendor applications in the RCI program at Reynolds's standard pricing and consistent with Reynolds's standard RCI policies (thereby giving Reynolds dealers access to those applications). *See* Ex. 4 (RCI Agreement).

According to their plain terms, nothing in the 3PA or RCI Agreements obligates CDK or Reynolds to block hostile integrators from or otherwise "close" their respective DMSs. Any new applications or any applications not specifically identified in the agreements were fair game for hostile integration, and once the 3PA and RCI agreements were concluded, DMI and IntegraLink could revert to hostile integration for the applications those agreements covered if they so chose. Again, third parties were free to try to hostilely integrate with either CDK's or Reynolds's systems,

6

both CDK and Reynolds remained free to compete with each other as DMS providers and as application providers, and both remained free to do business (or refrain from doing business) with third parties as each unilaterally saw fit.

## ARGUMENT

In determining whether a complaint has failed to state a claim under Rule 12(b)(6), a court must assess whether the complaint "include[s] 'enough facts to state a claim to relief that is plausible on its face.'" *Khorrami v. Rolince*, 539 F.3d 782, 788 (7th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Cox's complaint does not clear this bar:

## I.     COX HAS FAILED TO STATE A CLAIM UNDER SECTION 1

### A.     Cox's horizontal conspiracy claims are inadequate as a matter of law

The centerpiece of Cox's horizontal conspiracy claim is its allegation that CDK and Reynolds entered into written "agreements designed to eliminate competition in the provision of dealer data integration services." Compl. ¶ 105. But Cox is simply wrong about what the agreements provide. The agreements effect only a wind-down of CDK's hostile access to Reynolds's DMS; they do not divide any market, restrain any competition, or even mention anything regarding CDK's or Reynolds's third-party access policies.

Neither can Cox state a Section 1 claim based on CDK's and Reynolds's independent decisions—made many years apart—to prohibit third-party access. Section 1 does not prohibit mere parallel or follow-the-leader conduct. *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015) ("[C]onscious parallelism[] does not violate section 1 of the Sherman Act."). It is commonplace for firms in concentrated markets to copy each other, and substantive antitrust law therefore forbids inferring collusion from allegations that firms in the same industry employ similar business strategies. As the Supreme Court has explained, "antitrust law limits the range of permissible inferences from ambiguous evidence in a Section 1 case." *Matsushita Elec. Indus. Co.,*

*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Allegations that firms charge the same prices, employ similar distribution policies, or otherwise imitate each other therefore do not suffice to establish a conspiracy. *See, e.g.*, *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811 (N.D. Ill. 2017); *In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 947 (N.D. Ill. 2014).

Cox's conspiracy claim thus fails as a matter of law, because Cox has not come close to alleging facts suggesting something more than permissible, parallel conduct. Indeed, the complaint concedes, explicitly or by omission, that (1) Reynolds's decision preceded CDK's decision by several years; (2) Reynolds did not need CDK's assistance or agreement in order to close its DMS to hostile integration or to keep it closed; (3) CDK likewise did not need Reynolds's assistance or agreement to close the CDK DMS to hostile integration; (4) Reynolds accomplished the wholly legitimate business objective of increasing its revenue from vendors as a result of closing its system; (5) CDK also sought to increase its vendor revenue by closing its system; and (6) the contractual provisions in CDK's dealer agreements prohibiting dealers from sharing login credentials with hostile integrators were not the product of any conspiracy with Reynolds. In short, the non-conclusory allegations of Cox's complaint show, at most, one firm's decision to copy the longstanding practice of a competitor in an industry where the practice at issue was in the independent interests of both firms. As the facts alleged make clear, either firm was able to close its system unilaterally without violating the antitrust laws.

### 1.     *The allegations of a market-division agreement are inadequate*

The alleged "2015 agreement" between Reynolds and CDK comprises three separate contracts: (1) a DEA between Reynolds and CDK related to winding down DMI's and IntegraLink's unauthorized access to the Reynolds systems; (2) a 3PA Agreement providing a limited subset of Reynolds's third-party applications with hosted integration to the CDK DMS; and (3) an RCI

agreement governing integration between Reynolds's DMS and a small number of CDK applications. There is no agreement by either party with respect to each other's DMS system access policies or anything else about their policies regarding interactions with data integrators. *See* Exs. 2-4. The supposed "market division" agreement is, in actuality, an agreement to facilitate CDK's decision to wind down the unauthorized access of its subsidiaries to Reynolds's systems, while at the same time expanding the number of third party applications available to CDK's dealer customers.

Cox alleges that the agreement "eliminate[d] competition in the provision of dealer data integration services" (Compl. ¶ 105), in that CDK and Reynolds "agreed that they themselves would no longer access data on each other's DMS" (*id.* ¶ 107). But it is clear from the language of the agreements, and from the facts that Cox itself alleges, that that is not so. Reynolds has aggressively enforced its service contracts to prevent unauthorized access to its DMS for many years (*see* Compl. ¶ 96); it needed no agreement with CDK to continue doing so. The same goes for CDK, which independently introduced SecurityFirst and began enforcing its own bans on unauthorized third-party access in 2015. *Id.* ¶ 98. Neither company agreed or needed to agree with the other to enforce their prohibitions on unauthorized system access to their respective DMSs. And if two firms "had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Matsushita*, 475 U.S. at 596-97. That is the case here. Cox offers no answer to this problem because there is none.

Nor does the 2015 agreement amount to a market-division scheme as a logical matter. To the extent that CDK was agreeing that DMI and IntegraLink would stop hostilely accessing Reynolds's DMS (and it was not), this would have *helped* other hostile integrators by eliminating two of their competitors. Again, Cox offers no explanation. For its part, Reynolds has never provided hostile integration on CDK's (or any other DMS provider's) system, so any agreement on its part plainly

does not fit with this market division theory in any event. *Cal. ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1137 (9th Cir. 2011) (illegal "market-allocation agreements" are "among competitors at the same market level").

### 2. CDK did not agree to a "group boycott"

Cox also alleges that CDK and Reynolds engaged in a "group boycott" in violation of Section 1 of the Sherman Act. In Cox's telling, CDK and Reynolds sought to "block all third-party access to their respective DMS." Compl. ¶ 182. This theory is likewise conceptually flawed. A group boycott occurs when "firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986). The theory is one, therefore, of a "concerted refusal to deal." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2202 (June 2017) ("Areeda & Hovenkamp"). There are myriad problems with this claim.

To begin, there is no refusal to deal here; CDK and Reynolds do not "deal" with hostile integrators, which get their login credentials from dealers and have service relationships with vendors. That is the point—these integrators are non-contracting third parties who bear no accountability to CDK or Reynolds for undermining their systems' security and performance. As the Seventh Circuit framed it in the *Authenticom* appeal, "Reynolds [and CDK were] indifferent to [third-party integrators'] market presence, save for [their] interest in preventing [integrators] from seeking free, unauthorized access to [the DMSs]." *Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019, 1025 (7th Cir. 2017).

Regardless, refusals to deal almost never amount to antitrust violations. "Even monopolists are almost never required to assist their competitors, and [in any event] neither Reynolds nor CDK is a monopolist." *Id.* (citing *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004)). And "this case is a far cry from *Aspen Skiing*, which represented the high-water

mark in section 2 cases for a duty-to-deal theory," so "such a theory cannot support relief" in this case. *Id*. at 1026 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp*., 472 U.S. 585 (1985)).

Finally, Cox's "group boycott" theory falters logically for the same reasons as does its "market division" theory. In order to prove that CDK and Reynolds entered into an unlawful horizontal conspiracy, Cox must show both that they engaged in parallel conduct and that other facts "tend[] to exclude the possibility" that they acted out of lawful motives. *Matsushita*, 475 U.S. at 597 (internal quotation marks omitted). It has not even made the first showing, because there is no "parallel" conduct here. It is undisputed that Reynolds unilaterally forbade access to its DMS by hostile integrators *years* before CDK's SecurityFirst initiative. As the Ninth Circuit has held in respect to similar facts, "such slow adoption of similar policies does not raise the specter of collusion." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015). And second, Cox has not plausibly alleged facts that tend to exclude the possibility that CDK and Reynolds acted independently. Once again, there was nothing to gain from any supposed collusion, since both had the ability to shut down unauthorized third-party access to their systems unilaterally. *See Matsushita*, 475 U.S. at 596-97. And as the *Authenticom* complaint suggests, there is an obvious innocent explanation for the agreements: Neither wanted to be sued by the other for tortious interference, as Reynolds is alleged to have done in prior cases. *Authenticom* Compl. ¶¶ 107, 185.

In an attempt to bolster its conspiracy theory, Cox relies on allegations from *Authenticom* that claim that representatives of CDK and Reynolds openly confessed to a conspiracy. But those allegations are inconsistent with the documents incorporated in the complaint. For example, Cox alleges that Robert Schaefer from Reynolds told Authenticom's Steve Cottrell in a May 2015 phone conversation that CDK and Reynolds had an agreement "to support each other's third-party access agreements *and* to block independent integrators such as Authenticom." Compl. ¶ 113. But as shown

above, the 3PA and RCI agreements at issue do not "block" Authenticom or any other hostile integrator from anything. Indeed, the agreements do not mention hostile integrators *at all*.

Cox also alleges that, nearly a year after the alleged Schaefer-Cottrell conversation, Dan McCray, a CDK employee, told Cottrell that "CDK and Reynolds had agreed to '[l]ock [Authenticom] and the other third parties out.'" Compl. ¶ 114. This alleged statement, without more, does not tend to exclude independent conduct—CDK *had* made the decision to block unauthorized access, and it needed no agreement to do it. Again, the true indicator of CDK's and Reynolds's agreement is the actual written contracts that the companies signed, each of which contains an integration clause stating that the written contracts are the parties' entire agreement. *See* Ex. 2 § 11.2; Ex. 3 § 11(c); Ex. 4 § 6.13. The contracts notably say nothing about restricting access by third parties, and there is no logical reason why CDK and Reynolds would have illegally colluded beyond the terms of their written agreements.

### B.     CDK's agreements with its dealers are not "tying" agreements

Cox's next Section 1 theory—that CDK's agreements with dealers are "tying" agreements—fails as a matter of law and of logic. The Seventh Circuit, while not professing to be ruling on the merits, explained that it was "dubious in the extreme" that the relationship between DMS sales and data integration services "amounts to tying, rather than simply participation at two levels of the market." *Authenticom*, 874 F.3d at 1026. That skepticism is amply warranted: tying is a specialized concept in antitrust law with a narrow definition, and Cox's attempt to shoehorn the facts of this case into that definition is plainly meritless. A tying arrangement occurs when a seller conditions its sale of one product on its selling a second product *to the same buyer*: "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force *the buyer* into the purchase of a tied product that *the buyer* either did not want at all." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) (emphases added); *accord* Areeda & Hovenkamp

¶ 1752b ("There is no tie for any antitrust purpose unless the defendant improperly imposes conditions that . . . require buyers to take the second product if they want the first one.").

Cox alleges that CDK's dealer agreements meet this description because, "[w]hen a dealer purchases CDK's DMS, CDK also forces the dealer to rely on CDK's data integration product, 3PA." Compl. ¶ 199. But Cox never pleads that *dealers* buy hostile data extraction services, and dealers do not. Where hostile data integrators are involved in pulling data, it is *vendors* who engage them. Indeed, dealers can pull data directly or use software applications that do not require access to the DMS, thus bypassing integration services altogether.

Cox posits that, although vendors pay for data extraction, dealers should be considered the purchasers of data integration services because they "make the decision regarding which data integration product to 'purchase'" by authorizing a vendor to use a particular integrator. Compl. ¶ 200. But the role dealers might play in facilitating transactions between vendors and data integrators is beside the point. Tying requires that the *buyer* of the two tied products be the same, because the essence of a tying violation is a seller's use of economic leverage over a buyer to force *that buyer* to make additional purchases it prefers not to make. *See Jefferson Par. Hosp.*, 466 U.S. at 12. As Cox admits that dealers do not buy data extraction services, its tying claim necessarily fails.

There is, perhaps, a simpler way of putting all of this: So far as dealers are concerned, there is just one product being offered to them for purchase—dealer management systems. Whatever competition there is with respect to how data is accessed on those systems occurs in the DMS market itself. Dealers who insist that their DMS data be accessible to third-party data extractors unchecked can and will sign up with Cox (or the dozens of other DMS providers), and those who prefer to prioritize cybersecurity and system integrity will sign up with CDK or Reynolds. The antitrust laws do not forbid this kind of competition—they encourage it.

13

In any event, even if CDK's service agreements with dealers did impose a tie (which they plainly do not), those agreements would have to be upheld under the Rule of Reason, in light of their procompetitive justifications. *See* pp. 15-17, *infra*.

**C.     CDK has not engaged in exclusive dealing**

Cox's final Section 1 theory is that CDK's agreements with dealers and vendors are "exclusive deals" that foreclose competition. This theory, too, is a conceptual mismatch for the facts that Cox alleges. An exclusive dealing agreement is one in which a buyer and seller agree to deal with each other exclusively with respect to a particular good or service, foreclosing a portion of the market for other sellers of the good or service. *See* Areeda & Hovenkamp ¶ 1800a (explaining that an exclusive-dealing agreement "forbids the buyer from purchasing the contracted good from any other seller" or "requires the buyer to take all of its needs in the contracted good from that [seller]"). For example, a manufacturer may require a dealer not to sell the goods of rival manufacturers. Or a seller may forbid a buyer from buying products from any other supplier.

CDK's contracts with its dealers do not fit either description. To begin with, Cox's argument is inapt with respect to CDK's service contracts with dealers because (once again) *dealers* are not the purchasers of data extraction or system integration services. Nor can CDK's agreements with vendors who wish to integrate with CDK's DMS be exclusive dealing agreements. As Cox sees it, the agreements require vendors exclusively to "use 3PA alone to integrate with data on [the] CDK DMS[]." Compl. ¶ 122. But 3PA is not a competing data integrator; it is a "managed interface" that is integral to CDK's DMS, allowing vendors to obtain data directly from CDK rather than via third parties. *See id.* ¶ 80.

What is more, Cox's allegation that CDK's contract terms with dealers forbidding unauthorized access are violations of the antitrust laws is deficient on its face, given that such licensing terms are commonplace throughout the economy and essential to countless companies'

cybersecurity practices. If such practices are not anticompetitive with respect to dealers, Cox cannot seriously argue that the same restrictions on access are anticompetitive in vendor contracts.

And in any event, it is fundamental that "even though a contract is found to be an exclusive-dealing arrangement, it does not violate the [antitrust laws] unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (Clayton Act case). There is not even a suggestion in the complaint that CDK's dealer or vendor contracts foreclosed Cox from a substantial share of any market; Cox has not been excluded from dealing with CDK or any dealer. To the extent Cox complains that hostile integrators are "excluded" by the contracts, it is doubtful that Cox has standing to make that argument—and even if it did, it would fail because hostile integrators are still able to deal with DMS providers covering a sizable portion of the market for car dealership DMS services.

### D.   CDK's conduct easily survives the Rule of Reason

Even if everything we had said so far were wrong, CDK's conduct would be a basis for antitrust liability only if it could not be explained by "valid business reasons." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985)); *accord, e.g.*, *Viamedia, Inc. v. Comcast Corp.*, 2017 WL 698681, at *4 (N.D. Ill. Feb. 22, 2017) ("[P]laintiffs seeking to establish an unlawful refusal to deal must show that the defendant's actions serve no rational procompetitive purpose."). Here, as Cox acknowledges, CDK's conduct rested on a clear and important business justification: the need to protect its system and the data on that system from cybersecurity threats. Compl. ¶ 170. That justification exonerates CDK, no matter what label Cox attempts to place on its conduct.

Cox's complaint does not allege that cybersecurity is not a concern for DMS providers (or for any other modern business, for that matter). Nor does it allege that any company (including Cox

PUBLIC – REDACTED VERSION

itself) permits unfettered access to its systems on users' preferred terms. Rather, Cox alleges that unauthorized third-party system access creates no cybersecurity risk and that CDK is using cybersecurity as a pretext. Compl. ¶ 171. That allegation holds no water, for several reasons.

For starters, Cox has not plausibly alleged that hostile integration creates no cybersecurity risk to CDK's systems. To be sure, it argues that CDK has not presented any examples of data breaches involving hostile integrators. Compl. ¶ 174. But that is hardly a guarantee that one will not occur, or that concern for such risk is invalid. CDK is not required to leave itself defenseless against cyber risks until *after* a breach been identified.

Cox's other "pretext" arguments are likewise unpersuasive. It first alleges that CDK has engaged in hostile integration on *other* companies' DMSs through DMI and IntegraLink. Compl. ¶ 171. That is a red herring. CDK has strong and legitimate reasons for preventing unauthorized access to its proprietary systems. That other DMS providers allegedly do not actively block unauthorized access only means that they weigh the security risks and costs differently than CDK. In any event, Cox does not allege that DMI or IntegraLink has engaged in *hostile* integration since 2015, when CDK strengthened its own access and security policies.

Cox also argues that hostile integrators in the DMS industry are comparable to "integrators" that extract data for banking or healthcare applications (*id.* ¶ 173), but it offers no support for that assertion—or support for its claim that the data in banking and healthcare systems is "much more sensitive than anything accessible from dealers" (*id.*). Nor does Cox provide any facts supporting its insinuation that banks condone the practice. Indeed, the Consumer Financial Protection Bureau regulation that Cox cites (*id.*) in support of this kind of extraction also notes that "consumer financial account providers have raised concerns about whether account aggregators or permissioned parties [*i.e.*, data "integrators"] employ adequate security and privacy procedures with respect to consumers'

online account credentials and consumer account data obtained through aggregation." *Request for Information Regarding Consumer Access to Financial Records*, Bureau of Consumer Fin. Prot., Dkt. No. CFPB-2016-0048, at 12-13 (Nov. 14, 2016), perma.cc/F28M-5TZU.[6]

In short, CDK "had the right to [design or] redesign its products to make them more attractive to buyers" through "improved performance," including improved cybersecurity. *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999 (9th Cir. 2010) (quoting *Cal. Comput. Prods. v. Int'l Bus. Machs. Corp.*, 613 F.2d 727, 744 (9th Cir. 1979)).

## II.  COX HAS FAILED TO STATE A CLAIM UNDER SECTION 2

"The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Given the Seventh Circuit's holding that "neither Reynolds nor CDK is a monopolist," *Authenticom*, 874 F.3d at 1025, Cox's attempt to make a Section 2 claim here based on the very same facts is doomed to fail.

### A.    There are no brand-specific aftermarkets for data integration services

In order to prevail on a Section 2 theory, Cox must demonstrate that CDK has monopoly power in a relevant market. Cox alleges that CDK has monopolized a brand-specific "Dealer Data Integration aftermarket" limited to its own DMS. Compl. ¶ 208. But that claim cannot succeed, because as shown below and as a matter of law, this alleged market does not exist.

Cox's claim fails because CDK has included express terms in its service contracts prohibiting dealers from permitting third-party access to the DMS by disseminating login credentials. *See, e.g.*,

---

[6]    As a public document prepared by a government agency, and as a document quoted in the complaint, this document is subject to judicial notice on a motion to dismiss. *See, e.g.*, *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556 (7th Cir. 2012).

PUBLIC – REDACTED VERSION

Ex. 1. Dealers therefore had the opportunity, when contracting for DMS service, to choose whether or not to use a DMS that permitted hostile data extraction, and to weigh the potential lifecycle costs of each approach. That precludes any claim that dealers are unfairly "locked in" to CDK's DMS. As the Seventh Circuit explained, if a seller "informed customers about its policies before they bought," "purchasers could have shopped around" and thus cannot have been unfairly locked in. *Dig. Equip. Corp. v. Uniq Dig. Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996). On this point, there is no room for debate: If a secondary product or service is "bundled" with a secondary service or product "from the outset," it follows that "purchasers could have shopped around for competitive life-cycle prices" and are not unfairly locked in. *Id.*; *see also, e.g.*, *DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1346 (Fed. Cir. 2014); *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 819 (6th Cir. 1997).

To be sure, prior to 2015, CDK is alleged not to have enforced its contractual bars on third-party DMS access—but that is no help to Cox. Even if dealers believed there was a chance that CDK might not enforce the express prohibition on hostile, third-party data extraction, they would have been aware of the term and the possibility that the provision *could* be enforced. "A party is not justified in relying on representations outside of or contrary to the written terms of a contract he or she signs when the signer is aware of the nature of the contract and had a full opportunity to read it." *See Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003).

Thus, even assuming (contrary to fact) that there were a brand-specific aftermarket for data integration on CDK's DMS, Cox could not complain about CDK's market power in that market because dealers voluntarily agreed to restrictions on third-party access to that DMS. As a number of courts have held, "the law prohibits an antitrust [plaintiff] from resting on market power [in an aftermarket] that arises solely from contractual rights that consumers knowingly and voluntarily gave to the defendant." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1048 (9th Cir. 2008)

18

PUBLIC – REDACTED VERSION

(emphasis omitted). The reason is clear: When a primary market is competitive and restrictions on any aftermarkets are accepted by consumers in the primary market, competition in the primary market will necessarily discipline the aftermarkets. *See, e.g.*, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 441 (3d Cir. 1997). That principle is controlling here. Because dealers all along have freely agreed that they will not give unauthorized access to CDK's DMS to third parties, the enforcement of such contractual restrictions does not offend the antitrust laws.

That is all the more true in this case because CDK's decision to prohibit third-party access to its DMS renders any hostile integration unlawful under the Computer Fraud and Abuse Act ("CFAA"), which imposes liability on anyone who "[1] intentionally accesses a computer without authorization or exceeds authorized access, and [2] thereby obtains . . . information from any protected computer." 18 U.S.C. § 1030(a)(2)(C); *see, e.g.*, *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1065-66 (9th Cir. 2016) (defendant's unauthorized access of plaintiff's computers to aggregate users' data violated CFAA), *cert. denied*, 138 S. Ct. 313 (2017); *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 581 (1st Cir. 2001) (defendants' unauthorized access of website to obtain information through "scraper" violated CFAA); *Craigslist Inc. v. 3Taps Inc.*, 964 F. Supp. 2d 1178, 1187 (N.D. Cal. 2013) (same). Cox cannot complain about the alleged foreclosure of competition in a market for services that not only violate contractual terms that dealers voluntarily accepted, but that are (as a consequence) unlawful. "Courts have long recognized that 'an action under the antitrust laws will not lie where the business conducted by the plaintiff, and alleged to have been restrained by the defendant, was itself unlawful." *See Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*, 309 F. Supp. 2d 1156, 1169-70 (N.D. Cal. 2004).

**B.     CDK has no duty to set aside the plain terms of its service agreements**

Cox also fails to establish predatory conduct of any kind. On this score, Cox asserts that it was "exclusionary" for CDK to refuse to allow hostile data integrators to gain access to its secure,

proprietary DMS platform for free. But the Seventh Circuit rejected this argument (*Authenticom*, 874 F.3d at 1026), and this Court should do the same. As we have explained, CDK's decision to begin actively blocking hostile third-party data integrators is a necessary element of its procompetitive SecurityFirst program. Again, CDK "had the right to [design and] redesign its products to make them more attractive to buyers" through "improved performance," and the antitrust laws do not impose a duty on it to limit "product development so as to facilitate sales of [hostile integrators'] products." *Allied Orthopedic*, 592 F.3d at 999.

More fundamentally, "the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Trinko*, 540 U.S. at 408 (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). That unassailable maxim of antitrust law is based on the simple premise that "[c]ooperation is a problem in antitrust, not one of its obligations." *Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006) (emphasis omitted).

Of course, the right to refrain from aiding other businesses is not "unqualified." *Aspen Skiing*, 472 U.S. at 601. But courts have been "very cautious in recognizing" exceptions to this right, "because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm." *Trinko*, 540 U.S. at 408. For example, in *Aspen Skiing*, the Court recognized that a refusal to deal was anticompetitive if the defendant's behavior was economically irrational absent a desire to monopolize, in that the defendant sacrificed short-term gain (sales at its own retail price) in order to destroy a rival. 472 U.S. at 608. But this example, the Court later explained, "is at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409. In general, where a refusal to deal has any rational business justification, the courts will not declare the

refusal to be a violation of the antitrust laws. *See* Areeda & Hovenkamp ¶ 772c2 ("*Aspen* leaves monopolists free to refuse to deal or cooperate with rivals for legitimate business reasons.").

That principle alone disposes of Cox's Section 2 claim. Cox complains that CDK declines to give hostile integrators access to its DMS platform—but CDK had no duty to give that access in the first place. As the Seventh Circuit held in the *Authenticom* appeal, "this case is a far cry from *Aspen Skiing*." 874 F.3d at 1026. CDK's DMS is a proprietary platform that has been developed through enormous investments of time and resources, and its service contracts with dealers expressly forbid the kind of access to which Cox claims hostile integrators are entitled. Cox may wish that hostile integrators were free to offer cut-rate data extraction service that parasitize CDK's considerable investments in the creation and maintenance of its DMS platform. Section 2, however, simply does not require CDK to reorder its own practices to prop up other, free-riding business models, and Cox's Section 2 claim therefore fails as a matter of law.

## III.  COX'S CARTWRIGHT ACT AND CALIFORNIA UCL CLAIMS ALSO FAIL

The dismissal of Cox's Sherman Act claims would be fatal to its antitrust-related claims under the Cartwright Act. "[T]he analysis under the Cartwright Act is identical to that under the Sherman Act." *See, e.g.*, *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015) (citation omitted). Cox's claims under the "unlawful" prong of the California UCL (which prohibits any "unlawful, unfair or fraudulent business act or practice," Cal. Bus. & Prof. Code § 17200) are also derivative of its federal antitrust claims[7] and rise and fall with those claims. *See, e.g.*, *Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 2016 WL 4574357, at *6 (S.D. Cal. July 14, 2016) (dismissing UCL claim that was "entirely derivative of [plaintiff's]

---

[7]    Cox purports to base its claim under the "unlawful" prong of the UCL on common-law violations as well—specifically, tortious interference with prospective economic relations and defamation. Compl. ¶ 217. But the complaint provides no basis whatsoever for Cox's throwaway assertion that CDK has tortiously interfered with its prospective economic relations, and the doctrine of tortious interference appears nowhere else in the complaint. Cox's defamation claim, meanwhile, is inadequately pled. *See* p. 25, *infra*.

Cartwright Act claim"); *Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465, at *13 (N.D. Cal. Apr. 26, 2016) (same).

Cox also asserts a claim under the "unfair" prong of the UCL based on allegations that CDK "plac[es] anticompetitive restrictions on competing services and products that it does not place on its own corresponding solutions." Compl. ¶ 222. According to Cox, CDK places "artificial" restrictions on Cox's access to its DMS in order to make Cox applications less attractive to dealers. *Id.* ¶ 163. But those allegations are not cognizable under the UCL. The California Supreme Court has held that "unfair" conduct is "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws . . . or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999). But the conduct that Cox alleges is (as we have shown) not a violation of the antitrust laws. Even if CDK is treated as a monopolist (which it is not), Cox's "tilt the table" allegations still would not rise to the level of an antitrust violation. Simply put, CDK is not required to allow Cox's applications to access every DMS function or data element that Cox would prefer.

Cox will no doubt argue that CDK's alleged actions fall into the *Aspen Skiing* exception to the no-duty-to-deal rule because they are, in Cox's words, "purely anticompetitive." *E.g.*, Compl. ¶ 167. But Cox has not come close to alleging what it would need to allege to satisfy the stringent standard of that case, which condemns practices only when they "serve *no* rational procompetitive purpose." *See Viamedia*, 2017 WL 698681, at *4 (emphasis added); *see also, e.g.*, *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 2015 WL 5693735, at *9 (N.D. Ill. Sept. 28, 2015) ("[T]he question is not whether Amtrak chose the most competitive offer but whether it had *any* procompetitive purpose."). Here, CDK's alleged restrictions on third-party applications were based on *several* procompetitive business justifications. *E.g.*, Compl. ¶ 165; *Authenticom* Dkt. 163 at 140:18-25,

PUBLIC – REDACTED VERSION

141:23-25.[8] Thus, as the Seventh Circuit held in *Authenticom*, "this case is a far cry from *Aspen Skiing*." 874 F.3d at 1026. That dooms the UCL claim.

## IV. COX HAS FAILED TO STATE A CLAIM RELATED TO ITS 3PA CONTRACT

Cox also fails to state a claim regarding its 3PA contract with CDK. On this point, Cox appears to allege both fraud in the inducement and straightforward breach. Cox alleges that CDK represented to it that it would " ███████████████████████ " offered to any vendor (Compl. ¶ 126) and that those representations were false (or otherwise breached) because the 3PA Agreement had given certain Reynolds applications "free 3PA integration for five years" (*id.* ¶ 128).

But Cox's own allegations reveal that no false statements were made. Even taking Cox's account as true, the alleged statements concerned "3PA *pricing*." Compl. ¶ 127; *see also id.* ¶ 126 (referring to "representations regarding best pricing"). In other words, CDK is alleged to have represented that no other vendor would be offered or would pay a lower *price* for 3PA service.

The 3PA Agreement with Reynolds does not contradict these alleged representations regarding pricing, as it does not set any special price for Reynolds's access to 3PA. The agreement specifies that Reynolds will not be charged for 3PA access for a certain, capped number of instances of integration for a period of five years (Ex. 3 (3PA Agreement) § 3(a))—but it provides that Reynolds will pay "CDK's then standard monthly rates" for any instances exceeding the cap (*id.*) and for *all* instances after the five-year "No Fee Term" ends (*id.* § 3(b)). This temporary, limited fee waiver connected to the parties' overall agreement to wind down CDK's hostile integration on Reynolds's DMS did not establish a lower "price" for the CDK-provided integration.

For similar reasons, Cox cannot state a claim for "breach" of the 3PA contract. The contract provides that if CDK offers another vendor a " █████████████████████ " for an application

---

[8]   Malcolm Thorne of CDK testified to this justification for CDK's practices on the very same pages of the preliminary injunction transcript that Cox selectively quotes in support of its claim that the "real reason" for CDK's conduct was a desire to harm other application providers. *See supra* note 3.

"████████████████" to one of Cox's applications, CDK will give "██████████████" to Cox. Compl. ¶ 130. But the 3PA Agreement did not offer or grant to Reynolds any "████████████████████ ██████████"; rather, it granted a certain number of Reynolds applications access without charging a cash price for a limited time, while otherwise retaining CDK's standard pricing. Moreover, CDK's commitment to Cox was prospective, and it postdated CDK's agreement with Reynolds. Thus, the 3PA Agreement is no breach of Cox's contract.

Neither can Cox state a claim with respect to its 3PA contract under California's Unfair Practices Act. As relevant here, that statute prohibits a business from offering secret "rebates, refunds, commissions, or unearned discounts" to certain purchasers. *See* Cal. Bus. & Prof. Code § 17045. But the "No Fee Period" that CDK afforded certain Reynolds applications in the 3PA Agreement was not a discount—it was a temporary fee waiver negotiated as part of an overall resolution and wind-down of CDK's hostile integration on Reynolds's DMS. Cox's claim also fails because it has not alleged that it was injured by the alleged improper "discount." In order to state a claim under the Act, a plaintiff must plead three elements: "First, there must be a 'secret' allowance of an 'unearned' discount. Second, there must be 'injury' to a competitor. Third, the allowance must tend to destroy competition." *See, e.g.*, *Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.*, 16 Cal. App. 4th 202, 212 (1993). Thus, even if Cox had alleged secret "discounts" (it has not), it would need to show that the alleged "discounts" caused it actual injury. But there is no such showing in the complaint. Cox does not allege that the "discounts" caused any detriment to Cox Automotive or its vendor subsidiaries. Its Unfair Practices Act claim must be dismissed. *See, e.g.*, *Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1043 (N.D. Cal. 2001) (granting summary judgment for defendant because "plaintiffs cannot show that they suffered actual injury as a result of defendants' receipt of allegedly unlawful discounts").

PUBLIC – REDACTED VERSION

## V. COX HAS FAILED TO STATE A CLAIM FOR DEFAMATION

Finally, Cox has failed to state a claim for defamation. Its allegations regarding defamation are paper-thin: just *two* of the 178 paragraphs that precede Cox's recitation of its causes of action appear to have anything to do with the alleged defamation, and they offer next to nothing. Cox offers no detail about the substance of the defamatory statements—when they were made, who made them, under what circumstances, and in what context—leaving CDK and the Court guessing about the nature of the conduct CDK allegedly attributed to Cox, the speakers and hearers of the alleged statements, and virtually every other relevant detail.

Such vague and conclusory allegations are plainly insufficient to satisfy Rule 8. Although a plaintiff need not "set forth the exact words of the allegedly defamat[ory] statements" to state a defamation claim, "[i]t is, however, necessary that the complaint allege the basic substance of the statements so that the defendant is placed on notice of the claim." *Adams v. Pull'R Holding Co., LLC*, 2010 WL 1611078, at *5 (N.D. Ill. Apr. 20, 2010). Allegations far more detailed than Cox's have been found not to meet this standard. *See, e.g.*, *Brown v. State of Wis.*, 2017 WL 371915, at *18 (W.D. Wis. Jan. 25, 2017) (claim that defendant "insinuated" at staff hearing that professor submitted an "improper" invoice to the county was "too vague to provide fair notice").[9]

## CONCLUSION

The irony of Cox, one of CDK's largest competitors and a titan of the industry, piling onto this MDL by bringing the instant suit should not be lost on the Court. But, as demonstrated above, its conclusory and inconsistent allegations do not pass muster and should be dismissed in their entirety.

---

[9] The vagueness of Cox's allegations have bearing on more than just the Rule 8 question. Although Cox does not allege sufficient facts to permit CDK to determine which state's law would apply, two of the states whose law would be most likely to apply—Illinois, where CDK is located, and Georgia, where Cox is located—have one-year statutes of limitations for defamation. *See* 735 Ill. Comp. Stat. Ann. 5/13-201; Ga. Code Ann. § 9-3-33. The defamation claim is therefore likely time-barred.

Dated: March 16, 2018                                  Respectfully submitted,

                                                     _/s/ Britt M. Miller_
                                                     Britt M. Miller
                                                     Matthew D. Provance
                                                     MAYER BROWN LLP
                                                     71 South Wacker Drive
                                                     Chicago, IL 60606
                                                     (312) 782-0600
                                                     bmiller@mayerbrown.com
                                                     mprovance@mayerbrown.com

                                                     Mark W. Ryan
                                                     MAYER BROWN LLP
                                                     1999 K Street NW
                                                     Washington, DC 20006
                                                     (202) 263-3000
                                                     mryan@mayerbrown.com

                                                     _Counsel for Defendant_
                                                     _CDK Global, LLC_

PUBLIC – REDACTED VERSION

## CERTIFICATE OF SERVICE

I, Britt M. Miller, an attorney, hereby certify that on March 16, 2018, I caused a true and correct copy of the foregoing **DEFENDANT CDK GLOBAL, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS, PUBLIC-REDACTED VERSION** to be filed and served electronically via the court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

*/s/ Britt M. Miller*_____
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL  60606
Phone:  (312) 782-0600
Fax:  (312) 701-7711
E-mail:  bmiller@mayerbrown.com