# EXHIBIT 4

Execution Copy

## REYNOLDS INTERFACE AGREEMENT

This Reynolds Interface Agreement ("RCI Agreement") is entered into as of the latest signature date of the parties below ("RCI Effective Date") by and between The Reynolds and Reynolds Company, Dealer Computer Services, Inc., Universal Computer Systems Holding, Inc. and their respective affiliates (collectively, "Reynolds") and CDK Global, LLC, and its affiliates (collectively, "CDK") (Reynolds and CDK collectively, "the Parties"). The Parties for good and valuable consideration agree as follows:

This RCI Agreement is entered concurrently with the Data Exchange Agreement between the Parties ("Data Exchange Agreement"). With respect to the matters covered by this RCI Agreement, the terms of this RCI Agreement are in addition to the terms of the Data Exchange Agreement. However, in the event of a conflict between this RCI Agreement and the Data Exchange Agreement with respect to the matters covered by this RCI Agreement, this RCI Agreement and its exhibits shall control. Capitalized terms not otherwise defined herein shall have the meaning assigned to them in the Data Exchange Agreement.

### 1. DEFINITIONS

1.1. **Certification** – Upon completion of Reynolds testing and the Joint Pilot, an Interfaced Product will be declared ready for GCA by Reynolds, and Reynolds shall provide written notification to CDK that CDK's Interfaced Product has been certified under the Reynolds' Certified Interface Program.

1.2. **Confidential Information** – A Party's trade secrets and other confidential research, development, and commercial information that is disclosed to the other Party pursuant to or relating to this Agreement. For the avoidance of doubt, Confidential Information includes but is not limited to this RCI Agreement, its Exhibits, and all of their terms and any information relating to the Reynolds Interface, the implementation of the Reynolds Interface, the CDK Application products, the Interfaced Product, and the Reynolds System(s). Confidential Information excludes information that: (1) was publicly available at the time it was disclosed to the Receiving Party, or which, through no act or omission of the Receiving Party, becomes publicly available before the Receiving Party discloses it to a third party; (2) the Receiving Party already rightfully possessed free of any obligation of confidentiality before the Party Disclosing Party disclosed it to the Receiving Party; (3) the Receiving Party rightfully receives without obligation of confidentiality from a third party who is entitled to disclose such information without breaching an obligation of confidentiality; (4) the Receiving Party develops independently without using any of the Disclosing Party's Confidential Information; or (5) is identified in writing by the Disclosing Party as not Confidential Information. Confidential Information excludes Reynolds System Output and Input.

1.3. **Disclosing Party** – The Party who discloses Confidential Information to the other Party.

1.4. **GCA** – General Customer Availability. The date which Reynolds declares the Interfaced Product certified and ready for implementation.

1.5. **Interfaced Product(s)** – The CDK Application product(s) identified in Exhibit RCI A (including all subparts) and described in Exhibit RCI B (including all respective subparts), which are licensed by CDK to a Reynolds Dealer. For the avoidance of doubt, this RCI Agreement applies only to those CDK Applications identified in Exhibit RCI A (including all subparts) unless otherwise agreed in writing by both Parties. The Interfaced Products must comply with the Reynolds Interface specifications, or incorporate the Reynolds Interface so that CDK Application products will meet CDK's obligations under this Agreement and will function as described in the respective subparts of Exhibit RCI B, including, but not limited to, displaying and/or integrating the Reynolds System Output and/or Reynolds System Input accurately and not causing any errors or conflicts with the Reynolds System.

1.6. **Interface Test** – Testing the Interfaced Product to determine if it properly displays the Reynolds System Output and/or properly delivers the Reynolds System Input, complies with the Reynolds Interface and does not conflict with the operation of the Reynolds System.

1.7. **Joint Pilot** – One (1) or more Reynolds Dealers provided by CDK, to pilot test the Reynolds Interface and the Interfaced Product in collaboration with CDK. Pilot selection and number of pilots will be at the sole discretion of Reynolds.

1.8. **Non-Approved Access** – Any direct or indirect access of the Reynolds System for the benefit of the Interfaced Products by CDK or an agent acting on behalf of CDK other than with Reynolds' prior written consent. Non-Approved Access specifically does not include access for the benefit of the Interface Products necessary to convert a Reynolds Dealer to the use of a CDK DMS.

1.9. **Non-Approved Use** – CDK utilization of the Reynolds Interface(s) and/or Reynolds System Output with any product or service other than for the benefit of the Interfaced Product(s) in accordance with this RCI Agreement. Neither (i) the use of Reynolds Output Data received directly from a Reynolds Dealer without the use of a third party application or service nor (ii) any use of vehicle inventory data shall be considered a Non-Approved Use.

1.10. **Receiving Party** – The Party receiving Confidential Information of the Disclosing Party.

1.11. **Reynolds Dealer or Qualified End User** – A single automobile and/or truck dealership store and application area (or branch) combination (and its associated employees) using a Reynolds DMS.

1.12. **Reynolds Interface(s)** – Processes developed by Reynolds, which include, but are not limited to, software, hardware, specifications, Operational Data documentation (i.e., formats, elements, etc.), security codes, and access methods, designed to provide: (i) application providers with the ability to access, send and receive data to/from Reynolds Dealers through Reynolds Systems and (ii) Reynolds Dealers with the ability to access and receive data provided by application providers and to send and receive data to/from such application providers through the Reynolds Systems.

Highly Confidential - Filed Under Seal

1.13. **Reynolds System(s)** – Any Reynolds product, service, application, or Reynolds DMS sold and marketed by Reynolds in North America.

1.14. **Reynolds System Input** – The data transferred into the Reynolds System from CDK's Interfaced Product through the use of the Reynolds Interface for purposes other than logging or requesting data.

1.15. **Reynolds System Output** – The data transferred from the Reynolds System to CDK's Interfaced Product through the use of the Reynolds Interface for purposes other than logging or requesting data. Reynolds System Output does not include data (including, exact copies of the Data) that CDK may acquire in an alternative manner (e.g., data exports directly from the Reynolds Dealer).

## 2. <u>DUTIES</u>

2.1. REYNOLDS' SERVICES. Reynolds will use commercially reasonable efforts to provide to CDK the Reynolds Interface(s) described in Exhibit RCI A (including all subparts) as necessary to certify the Interfaced Product(s). Reynolds will provide to CDK development assistance up to the maximum assistance identified in Exhibit RCI E (including the respective subparts) in order to enable CDK to incorporate the Reynolds System Output and/or Reynolds System Input into the Interfaced Products. Reynolds will notify CDK if it appears that the maximum assistance may be exceeded. In the event that the maximum assistance is exceeded, Reynolds may charge CDK on a time and materials basis for additional assistance based on the rates in Exhibit RCI E (including the respective subparts).

Reynolds agrees that (A) if CDK acquires another application after the date hereof that is substantially similar in nature to one of the Interfaced Products then Reynolds agrees, at CDK's request, to add such new application as another Interfaced Product; provided, however, that (i) such new application shall otherwise be subject to all the terms hereof and (ii) the integration points provided for such new application shall be exactly the same as those provided to the similar existing application and (B) if Reynolds enters into an agreement to provide a competing dealer management system provider with integration services with respect to any application, and CDK requests the same integration services with respect to a substantially similar CDK application, then Reynolds agrees to add such application as another Interfaced Product; provided, however, that (i) such new application shall otherwise be subject to all the terms hereof and (ii) the integration points provided for such new application shall be exactly the same as those provided to the competing application.

2.2. OWNERSHIP. All Reynolds intellectual property provided to CDK hereunder shall be considered for all purposes of this RCI Agreement to be part of the Reynolds Interface. Any license granted herein is not a sale of the original Reynolds Interface(s) or any copies thereof. Reynolds retains the ownership of the Reynolds Interface(s) and all copies thereof, including all rights and interests in contributions and additions communicated by CDK to Reynolds related to the Reynolds Interface(s), or the Reynolds System(s) software. Reynolds claims patent, copyright, trade secret and/or confidential information protection in the Reynolds

Highly Confidential - Filed Under Seal

Interface and Reynolds Systems, including the way in which Reynolds System(s) software, database(s), and the Reynolds Interface(s) organize and store data. CDK releases any rights or interests it may have in the Reynolds Interface(s) or the organization, format and structure of the Reynolds System Output and/or Reynolds System Input that might result from CDK's contribution and additions. The CDK Application(s) including any software are, and will at all times remain, the sole and exclusive property of CDK.

2.3. CDK'S DEVELOPMENT. CDK agrees, represents and warrants:

2.3.1. The CDK Applications operate with all of the functionality described in the respective subparts of Exhibit RCI B and in accordance with any applicable operating manuals or other documentation included by reference.

2.3.2. CDK will provide competent technical resources to properly develop the Interfaced Product.

2.3.3. The CDK Applications will properly integrate with the Reynolds Interface(s), and CDK will be generally available to begin the Interface Test(s) for each Integrated Product within a mutually agreed upon period of time after the date that the Reynolds Interface(s) described in the respective subparts of Exhibit RCI A are made available to CDK.

2.3.4. If ninety (90) days pass after the date the respective Reynolds Interface(s) have been made available to CDK for a CDK Application, and the Parties are still unable to mutually agree on a schedule to begin and complete the Interface Test(s), the Joint Pilot(s), and to achieve Certification for such CDK Application, and such delay is not a result of any action or inaction by Reynolds (including, without limitation, any unreasonable rejection by Reynolds of any proposed Schedule), then Reynolds may terminate this Agreement with respect to such CDK Application only and have no further obligation to protect or otherwise facilitate Reynolds DMS access for such CDK Application, notwithstanding anything to the contrary in the Data Exchange Agreement.

If CDK fails to meet any of the provisions set forth in Sections 2.3.1-2.3.3, Reynolds may terminate this RCI Agreement as set forth in Section 5.2.2. Such termination right shall be Reynolds sole remedy, and CDK's sole liability, with any such failure to meet the provision of Sections 2.3.1-2.3.4.

2.4. PAYMENT BY CDK. CDK will pay all fees set forth in the respective subparts of Exhibit RCI E of this RCI Agreement.

2.4.1. The submission of any invoices by Reynolds to CDK and any payment by CDK to Reynolds shall be governed by the terms set forth in Exhibit RCI E (including all subparts) to this RCI Agreement. CDK shall pay all amounts due to Reynolds within thirty (30) days of receipt of invoice.

2.4.2. Except as otherwise set forth on Exhibit RCI E, all pricing detailed in Exhibit RCI E to this RCI Agreement shall be increased only based upon the Consumer Price Index for All Urban Consumers (CPI-U): U.S. city average using the unadjusted 12 month

index for the month of the price change announcement, until the five (5) year anniversary of the date hereof. Thereafter, pricing may be increased once per year, in Reynolds discretion, upon at least sixty (60) days written notice to CDK.

2.4.3. CDK shall pay Reynolds for all amounts due Reynolds pursuant to Exhibit RCI E to this RCI Agreement in accordance with the time provisions set forth in the RCI Agreement and Exhibit RCI E. In the event that CDK does not timely pay an amount due under Exhibit RCI E to this RCI Agreement, CDK will be referred to Reynolds' Customer Account Services department in accordance with Reynolds' normal collection process. Further, Reynolds may charge CDK a late charge, calculated at the rate of 1½% per month or the maximum rate currently permitted by law, whichever is less. Amounts that remain unpaid may result in discontinuation of services by Reynolds, will require additional fees for services to be reinstated, and will be deemed a material breach as described in Section 5.2 of this RCI Agreement.

2.4.4. CDK agrees to pay all taxes (whether billed at the time of invoicing or determined to be due by a taxing authority at a later time) other than those taxes based on Reynolds' income, or provide appropriate exemptions. Taxes shall include, but are not limited to, personal property tax, sales tax, use tax or excise tax, which may be imposed by any taxing authority as a result of Reynolds' provision of services to CDK under this RCI Agreement.

2.5. CDK'S OBLIGATIONS.

2.5.1. NONDISCLOSURE. Except as expressly permitted herein, CDK will not disclose or publish the Reynolds System Output provided by the Reynolds Interface in any way except as set forth in Exhibit RCI A (including all subparts) for each CDK Application respectively.

2.5.2. USE OF REYNOLDS SYSTEM OUTPUT. CDK will not permit the Reynolds System Output provided by the Reynolds Interface(s) to be used for any purpose other than the limited purpose described in the respective subparts of Exhibit RCI A for each respective CDK Application unless passing the System Output to another entity is for the purpose of performing a service required by the CDK Application(s) and is on behalf of the Reynolds Dealer. The Reynolds Dealer, on whose behalf CDK has paid the applicable fees set forth in the respective subparts of Exhibit RCI E, may use the contracted for Interfaced Product and the Reynolds System Output for that CDK Application. CDK will not permit any other uses of the Reynolds System Output or allow any access to the Reynolds System Output by CDK or other parties unless: (a) the transfer of the Reynolds System Output has been authorized in writing by Reynolds in Reynolds' sole discretion; (b) the transfer of the Reynolds System Output has been authorized in writing by the Reynolds Dealer that originally collected the data; and (c) the transfer of the Reynolds System Output otherwise complies in all respects with this RCI Agreement and any applicable laws and regulations.

Highly Confidential - Filed Under Seal

2.5.3. COMPLIANCE WITH CERTIFICATION. Unless otherwise identified in Exhibit RCI A or in the Data Exchange Agreement, upon Certification, CDK acknowledges that any Non-Approved Access and/or Non-Approved Use is strictly prohibited and is considered a material breach of this RCI Agreement. CDK agrees that any violation(s) of these access and use restrictions will be subject to any or all of the following in Reynolds' sole discretion:

2.5.3.1. Reynolds has the right to immediately remove, discontinue, disable and/or uninstall all current and future Reynolds Interface(s) and/or instances or methods of Non-Approved Access and/or Non-Approved Use.

2.5.3.2. Reynolds has the right to assess the Monthly Interface Fee(s) (as defined in Exhibit RCI E1-E7) for the number of Reynolds Dealers that utilized Non-Approved Access and/or Non-Approved Use during the period of the violation.

2.5.4. USE OF DATA. CDK warrants that Exhibit RCI A (including all subparts) fully and accurately describes all data sets and uses of the data, including: the purposes of the data sets; the identities or categories of any other parties to whom CDK may transfer the data; and CDK's or any other party's uses of the data. Other than as specified in Exhibits RCI A (including all subparts) and the Data Exchange Agreement, CDK is prohibited from providing access to or transferring the data obtained through the Reynolds Interfaces to another party and/or re-selling the data it obtains through the Reynolds Interfaces. CDK understands and agrees that Reynolds does not endorse or warrant or accept any legal consequences for CDK's services described in Exhibits RCI A (including all subparts), and CDK shall not make representations to the contrary.

2.5.5. DATA PRIVACY. In addition to the data privacy provisions of the Data Exchange Agreement, CDK (i) will comply with all laws, rules and regulations with respect to the privacy, security and integrity of data collected from or written to the Reynolds DMS with the use of the Reynolds Interfaces and (ii) will obtain signed authorization from each Reynolds Dealer with which it contracts for an CDK Application that allows for CDK to use the data it obtains through the Reynolds Interface and meets the requirements (in all material respects) set forth in Exhibit RCI C.

2.5.6. NOTIFICATION OF SECURITY BREACH. Subject to requirements of law, or actions of any regulatory or law enforcement authority that prohibits, restricts, or delays them from doing so, CDK or any third party acting on behalf of CDK having access to data collected from a Reynolds Dealer provided under the terms of this RCI Agreement, shall provide prompt written notice to Reynolds of any security breach of Customer NPI data collected from a Reynolds Dealer obtained through such access, which at the time of the breach was in the possession or custody of CDK or such third party. The disclosure notification shall be made within two (2) business days of CDK's discovery of such breach and shall describe, at a minimum, the scope of the data breach and measures taken to restore the integrity, security, and confidentiality of such data. Such measures and corrective actions shall be implemented as soon as

Highly Confidential - Filed Under Seal

practicable by CDK. Notification shall be by email to the security email address: datasecurity@reyrey.com.

2.5.7. CANCELLATION OF INTERFACED PRODUCT. CDK will notify Reynolds within one (1) business day of a Reynolds Dealer cancelling any Interfaced Product(s) currently provided by CDK by submitting a termination request to Reynolds for the corresponding Reynolds Interface(s). Should a Reynolds Dealer contact Reynolds and request the Reynolds Interface(s) being provided to CDK's Interfaced Product be stopped immediately, Reynolds reserves the right to comply with this request and will notify CDK within one (1) business day of the Reynolds Dealer request and Reynolds' compliance. Should CDK contact the Reynolds Dealer and reach agreement to reinstate the Interfaced Product within three (3) business days of receiving such notice from Reynolds, Reynolds will re-install / turn on the corresponding Reynolds Interface(s) for no additional Installation Fee(s). Reynolds will use commercially reasonable efforts to terminate billing for the month subsequent to the submission of a termination request. Reynolds does not prorate the Monthly Fee(s).

2.6. NO REVERSE ENGINEERING. CDK will not reverse engineer or decompile the Reynolds Interface or any other Reynolds software or other element of the Reynolds System(s). Reynolds will not reverse engineer or decompile the CDK Applications, provided that Reynolds may take whatever action is necessary to discontinue or remove any Reynolds Interface, Non-Approved Access and/or Non-Approved Use in accordance with the terms of this RCI Agreement. CDK will not otherwise attempt to determine how the Reynolds Interface works or how the data is structured or organized within the database created and stored by any Reynolds System(s) or software.

2.7. CONFIDENTIALITY. Each Party shall only use the other Party's Confidential Information in connection with the performance of its duties hereunder. Neither Party will disclose any Confidential Information of the other Party to anyone, for any purpose, except: (a) employees and consultants that have executed agreements obligating them to comply with the provisions of this Confidentiality provision; (b) pursuant to a valid subpoena or an Order by a Court of competent jurisdiction or as otherwise required by law, provided that unless otherwise prohibited by law, the Party intending to disclose such information under this exception provides written notice to the other Party and provides the other Party an opportunity to seek a protective order or other appropriate protection at its election; (c) pursuant to written consent of the Disclosing Party; or (d) as required by law in instances in which a Party brings proceedings as permitted by this RCI Agreement to enforce rights under this RCI Agreement. The parties acknowledge and agree that the disclosure of any Confidential Information to the other Party does not confer upon a Party any license, interest or rights of any kind in or to the Confidential Information, except as provided in this Agreement. Except as permitted by this RCI Agreement, neither Party will disclose, disseminate, use or otherwise make available the Confidential Information of the other. Each Party will use reasonable efforts, but in no event less than the security precautions such Party undertakes to protect its own proprietary and confidential information of like nature, to prevent any Confidential Information of the other Party from being disclosed to third parties.

Although the specific terms of this RCI Agreement are considered Confidential Information, the existence and general nature of this Agreement may be publicized by CDK and/or Reynolds in order to promote the Reynolds Interface and the CDK Applications. It shall not be considered a breach of confidentiality for Reynolds to use or otherwise disclose standard terms from this Agreement without specifying their application to CDK.

The Parties agree that written confidentiality agreements substantially similar to the terms contained herein will be obtained for any employees or contractors permitted access to Confidential Information. Prior to the time an employee or contractor of Receiving Party receives any Confidential Information of the Disclosing Party, the Receiving Party will instruct that employee or contractor about the obligations of the Receiving Party hereunder and instruct that employee or contractor not to disclose or use any Confidential Information, except as specifically provided herein.

At the Disclosing Party's request or upon completion of the Receiving Party's use of Confidential Information, the Receiving Party will make reasonable efforts to return all copies of Confidential Information to the Disclosing Party or destroy the Confidential Information and certify such destruction to the Disclosing Party. The Receiving Party may retain a copy of Confidential Information, for archival purposes or to the extent required by law, subject to the Receiving Party's continuing obligations under this Section 2.7.

The provisions of this Section 2.7 pertaining to Confidential Information shall survive termination or expiration of this Agreement.

2.8. USE OF TRADEMARKS. Neither CDK nor Reynolds will use the name of the other Party or any of the other Party's trademarks, service marks, trade names or logos (collectively "Trademarks"), with the following exceptions: (i) a Party may use such Trademarks with the express prior written consent of the other Party; (ii) CDK may use such Reynolds' Trademarks as set forth in Section 4.5 hereof; and (iii) Reynolds may use the Trademarks of relevant CDK Applications to display and advertise (with a CDK-approved logo and hyperlink) such CDK Applications as authorized, certified vendors (or pre-certified vendors, as the case may be). Reynolds agrees to list the CDK Applications on its internet site as approved by Reynolds for integration into the Reynolds DMS and to provide CDK with a letter to such effect that CDK may share with Reynolds Dealers.

2.9. REYNOLDS DEALER REQUEST FOR INFORMATION. Should a Reynolds Dealer contact Reynolds directly to request information relating to a CDK Interfaced Product, including the specific data fields included in the Reynolds System Input and / or Reynolds System Output used for the Interfaced Product, Reynolds may comply with the Reynolds Dealers' request and provide such information. This action by Reynolds will not be considered a breach of any of the confidentiality provisions of this RCI Agreement or the Data Exchange Agreement.

Highly Confidential - Filed Under Seal

## 3. CERTIFICATION PROCESS

3.1. INTERFACE TESTING. For each CDK application, prior to Certification, CDK must provide access to the Interfaced Product(s) to Reynolds for the Interface Test(s). The parties will mutually agree upon the date for the Interface Test(s). No later than fifteen (15) days prior to the date of the Interface Test(s), CDK will submit all test scripts to Reynolds for review prior to executing the Interface Test. If Reynolds requests modifications to the test scripts, Reynolds will notify CDK of such modifications in writing within seven (7) days of receipt of the test scripts. If modifications are requested, CDK may make modifications and re-submit test scripts to Reynolds for approval in accordance with the process set forth herein. All Interface Tests are conducted in a test environment designated by Reynolds. Reynolds will notify CDK upon successful completion of the Interface Test(s).

3.2. INTERFACE TESTING RESOURCES. For each CDK Application, Reynolds will supply CDK with access to an applicable test environment for the Interface Test and ongoing testing of the Interfaced Product and the Reynolds Interface for CDK's employees and consultants that have executed agreements obligating them to comply with the provisions of this RCI Agreement.

3.3. JOINT PILOT. For each CDK Application, after the Interface Test is complete, if Reynolds and CDK mutually determine that the Interfaced Product satisfies the Interface Test, then Reynolds and CDK will mutually agree upon the scope and length of the Joint Pilot. CDK will suggest potential Reynolds Dealer(s) to participate in the Joint Pilot. Reynolds will not provide a list of Reynolds Dealers to CDK for preliminary pilot selection.

3.4. CERTIFICATION. For each CDK Application, after the Joint Pilot is successfully completed and the Interfaced Product is ready for GCA then Reynolds will provide CDK with written notice of Certification. Declaration of Certification will be in Reynolds sole discretion.

3.5. RE-CERTIFICATION.

3.5.1. Initial Certification of an Interfaced Product will be valid until one of the following events occurs, at which time CDK will be required to re-certify the Interfaced Product:

3.5.1.1. CDK requests additional Reynolds Interface(s), thereby changing the integration with Reynolds System.

3.5.1.2. A new release of the Interfaced Product by CDK that interacts with the Reynolds Interface in a different manner than when the Interfaced Product was originally certified.

3.5.1.3. CDK elects to utilize an enhanced Reynolds Interface made available by Reynolds.

3.5.1.4. Twenty-Four (24) months have expired since the most recent Certification or Re-Certification of the Interfaced Product.

Re-Certification (except for Re-Certification solely as a result of Section 3.5.1.4 above) may require an amendment to this RCI Agreement, or a separate Reynolds Interface Agreement and additional fees.

3.5.2. Distribution of Reynolds Interfaces not defined in Exhibit RCI A, or the distribution of the Reynolds Interface with an Interfaced Product not defined in Exhibits RCI A, will require amendment of this RCI Agreement, or a separate Reynolds Interface Agreement. The occurrence of either of these events may require additional fees.

3.5.3. New releases of a CDK Application in which CDK makes changes that do not materially modify the Interfaced Product and do not impact the Reynolds Interface will not require Re-Certification, but will require CDK to notify Reynolds in advance of such changes. CDK will provide test scripts or other documentation to Reynolds to certify that the changes have been successfully tested by CDK.

3.6. SUSPENSION/TERMINATION OF CERTIFICATION. After Certification, Reynolds may suspend and/or subsequently terminate Certification for a specific CDK Application if Reynolds determines that such CDK Application:

3.6.1. does not display or integrate the Reynolds System Output and/or the Reynolds System Input in all material respects;

3.6.2. does not comply in all material respects with any Reynolds Interface specifications provided to CDK by Reynolds and included by reference in the respective subpart of Exhibit RCI A;

3.6.3. an Interfaced Product(s) materially degrades or otherwise materially adversely affects the operation of the applicable Reynolds System;

3.6.4. [Intentionally omitted]

3.6.5. [Intentionally omitted]

3.6.6. utilizes the Reynolds Interface(s) in a way that places a Reynolds Dealer at operational or security risk, in which case the termination would only be effective with respect to such Reynolds Dealer (unless the risk is determined to be systemic); or

3.6.7. utilizes the Reynolds Interface(s) in a way that places Reynolds at operational or security risk.

Reynolds will provide CDK with written notice and explanation of such suspension, and CDK must make all corrections within thirty (30) days to become re-certified. CDK will be required to pay the standard Re-Certification Fee described in the respective subpart(s) of Exhibit RCI E. During any suspension of Certification CDK must not distribute, use or access the Reynolds Interface. If CDK fails to become re-certified in accordance with this

Highly Confidential - Filed Under Seal

Section 3.6 within ninety (90) days, Reynolds may terminate Certification and/or this RCI Agreement. In the event of termination, CDK will be responsible for payment of the Certification Process Fee(s) and any other fees that have been agreed between the parties up to the date of termination.

3.7. REYNOLDS DEALER AGREEMENT FORM. The Interfaced Product(s) may only be licensed to Reynolds Dealers that (i) have executed an agreement containing terms that are substantially similar to those in the attached Exhibit RCI C; and (ii) are separately licensed by Reynolds to use the Reynolds System. Reynolds shall have the right, upon reasonable notice and with reasonable cause, to inspect and copy such end user license agreements that have been executed by Reynolds Dealers at any given time, provided that such inspection and copying will not take place more often than once per year.

## 4. LICENSE RIGHTS AND OBLIGATIONS

4.1. LICENSE GRANT. After CDK receives notice of Certification and pays all sums then due and payable to Reynolds, Reynolds grants to CDK a non-exclusive, revocable license in the Territory or Territories (as indicated in the "Reynolds System(s)" section of the respective subpart of Exhibit RCI A) to (i) use the Reynolds Interface(s) provided to CDK pursuant to this RCI Agreement solely with CDK's Interfaced Product in accordance with the terms of this RCI Agreement; (ii) publicly display the "Reynolds Certified Interface" logo on all marketing material and website(s) describing the Interfaced Product in accordance with the provisions set forth in Section 4.5 of this RCI Agreement; and (iii) demonstrate, sublicense, and distribute the Reynolds Interface(s), only as incorporated into the Interfaced Product, to Reynolds Dealers during the Initial Term (and any applicable Renewal Term) as permitted by this RCI Agreement.

4.2. REYNOLDS SUPPORT. For the fees set forth in Exhibit RCI E, Reynolds will provide the services necessary to implement the Reynolds Interface, first line support to CDK regarding the use of the Reynolds Interface, and any other services set forth in this RCI Agreement during the Initial Term (and any applicable Renewal Term).

4.3. REYNOLDS UPDATES. During the Initial Term (and any applicable Renewal Term), Reynolds will provide to CDK specifications for any Reynolds Interface enhancements and revisions applicable to the Interfaced Product(s). CDK will promptly comply with any enhancements or revisions provided by Reynolds and test the revised Interfaced Product with Reynolds within sixty (60) days of when the revised Reynolds Interface is made available to CDK. Reynolds will make available to CDK a test environment and/or data for testing of these revisions.

4.4. REYNOLDS ASSISTANCE. During the Initial Term (and any applicable Renewal Term), Reynolds will provide CDK with reasonable technical assistance, up to the maximum assistance defined in the respective subpart of Exhibit RCI E, in the development of the Interfaced Product.

Highly Confidential - Filed Under Seal

4.5. REYNOLDS LOGO AND COMMUNICATION. Notwithstanding anything to the contrary in this Agreement or the Data Exchange Agreement, CDK may include the RCI Logo for print and electronic marketing of the certified Interfaced Products (i.e., to indicate on CDK's owned internet sites that such CDK Application(s) use a Reynolds approved interface). Such advertisement by CDK shall be subject to Reynolds' "Logo Usage Standards," which are reflected in Exhibit RCI F. Reynolds may amend or replace Exhibit RCI F to reflect any program-wide changes in Reynolds' Logo Usage Standards in the future, so long as Reynolds provides CDK with at least thirty (30) days advance notice of the revised standards. Reynolds shall have the right to review and approve all references to Reynolds or the Reynolds Certified Interface Program contained in marketing materials by CDK, or any third parties acting on behalf of CDK, before such information is published. Prior to Certification, CDK is prohibited from claiming integration with the Reynolds System(s). Except as specifically provided in this Section 4.5, CDK shall not represent in any way that its applications are produced, developed, endorsed or otherwise affiliated with Reynolds.

4.6. CDK ASSISTANCE. CDK will provide appropriate support, maintenance and error correction services for the Interfaced Product(s) as reasonably requested by Reynolds or as required in the end user agreement between CDK and the Reynolds Dealers.

4.7. DISTRIBUTOR(S) OF INTERFACED PRODUCT(S). During the Initial Term (and any applicable Renewal Term), CDK may distribute the Interfaced Product(s) through distributors. CDK warrants that any distributor of the Interfaced Product on behalf of CDK has entered into a written agreement with CDK which binds the distributor to the same obligations as CDK under this RCI Agreement.

4.8. ENDORSEMENT. Reynolds does not endorse, warrant, support, or certify any functionality, capabilities or any other aspects of the Interfaced Product(s).

## 5. TERM/TERMINATION

5.1. TERM. The initial term of this RCI Agreement and any license granted herein shall be for the period commencing on the RCI Effective Date and ending on the fifth anniversary of the RCI Effective Date ("Initial Term"). This RCI Agreement will thereafter renew automatically for additional one (1) year terms (each, a "Renewal Term") unless either Party gives a notice of its intent not to renew at least thirty (30) days prior to the end of the Initial Term or the then applicable Renewal Term. Each provision of this RCI Agreement that would by its nature or terms survive any termination of this RCI Agreement shall survive any termination of this RCI Agreement, regardless of the cause.

5.2. TERMINATION WITH NOTICE. If either Party commits a material breach of Section 2, 3, or 4 of this RCI Agreement, then the non-breaching party may terminate this RCI Agreement by thirty (30) days written notice unless the breaching party cures such breach or begins a good faith effort to cure the breach within thirty (30) days after notice is delivered to the breaching party. Notwithstanding anything to the contrary herein, the following circumstances, without limitation, shall be considered material breaches for which the

applicable Party may terminate this RCI Agreement as described below, subject to the notice and cure provisions set forth in this Section 5.2:

5.2.1. CDK may terminate this RCI Agreement if Reynolds, after using commercially reasonable efforts, is unable to make the Reynolds Interface(s) function in accordance with the documentation and agreed upon specifications in all material respects.

5.2.2. Reynolds may terminate this RCI Agreement if CDK fails to comply with the provisions set forth in Sections 2.3.1-2.3.3, in which case CDK is responsible for payment of the Certification Process Fee(s) and any other fees that have been agreed between the parties up to the date of termination.

5.2.3. Reynolds may terminate this RCI Agreement for failure of CDK to pay any fees defined in Exhibit RCI E or any other properly invoiced amounts.

5.2.4. CDK may terminate this RCI Agreement with respect to any CDK Application that it decides to cease offering (or "sunset") with respect to Reynolds Dealers.

5.3. IMMEDIATE TERMINATION. Reynolds may, immediately upon written notice to CDK, terminate this RCI Agreement if CDK: (i) becomes insolvent, (ii) files or has filed against it and not dismissed within sixty (60) days, a proceeding under any federal or state insolvency, bankruptcy or other law for the relief of creditors, or (iii) ceases or admits in writing its intention to cease the operation of its business in the ordinary course of this RCI Agreement.

5.4. TERMINATION FOR FAILURE TO RESOLVE CERTIFICATION SUSPENSION EVENT. Reynolds may, in its sole discretion, terminate this RCI Agreement pursuant to Section 3.6.

5.5. MUTUAL TERMINATION. After the Initial Term, either Party may terminate this RCI Agreement in its entirety or with respect to an Interfaced Product at any time with or without cause by giving the other Party one hundred-eighty (180) days written notice of intent to terminate.

5.6. PHASE-OUT. If an Interfaced Product has achieved Certification, upon expiration or termination of this RCI Agreement in its entirety or with respect to an Interfaced Product, Reynolds must continue providing such certified Interfaced Product(s) with access to the relevant Reynolds Interface(s) (under the terms of this RCI Agreement) without changes in service until the conclusion of CDKs' then effective contract term with any relevant Reynolds Application customers ("**CDK Phase Out Access**"), provided that (a) the CDK Phase Out Access shall not exceed two (2) years; (b) CDK continues to pay all applicable fees; and (c) as a condition of CDK Phase Out Access, CDK must give Reynolds thirty (30) days prior written notice of the following: (i) a list of the certified Interfaced Products for which such CDK Phase Out Access is needed, (ii) a list of Reynolds Dealers (including name, address, and information reasonably necessary to identify such Reynolds Dealer) for which such CDK Phase Out Access is needed, and (iii) the date of the conclusion of the then effective contract term with the relevant Reynolds Dealers. During any CDK Phase Out

Highly Confidential - Filed Under Seal

Access period, the Parties shall continue to perform under the terms of this RCI Agreement in effect at the time of termination, except no new installations of the applicable CDK Application will be allowed. At the conclusion of any CDK Phase Out Access period or immediately upon termination of this Agreement in its entirety or with respect to any Interfaced Product if the CDK Phase Out Access period is not invoked, CDK must cease all use, distribution, and sublicensing of the Reynolds Interface(s) for such Interfaced Product. If the CDK Phase Out Access period is invoked for any Interfaced Product, CDK is also responsible for payment to Reynolds of any positive difference between the Minimum Fees, prorated on a monthly basis to the end of the CDK Phase Out Access period, and the sum of Installation Fee(s) and Monthly Interface Fee(s) (or transaction fees, where applicable). Notwithstanding anything to the contrary herein, CDK Phase Out Access is not available if this RCI Agreement is terminated pursuant to the Assignment provision of Section 6.4 of this RCI Agreement.

## 6. GENERAL

6.1. NOTICES. With the exception of a notification of security breach as described in Section 2.5.6, all notices, requests and approvals required by this RCI Agreement shall be as noted in the Data Exchange Agreement.

6.2. AUDIT. Reynolds may, in its sole discretion, elect to conduct an audit of CDK records that relate to this RCI Agreement no more frequently than once per calendar year during the Initial Term (and any applicable Renewal Term) of this RCI Agreement. Audits shall be conducted by an independent, third Party auditor upon fifteen (15) days written notice to CDK. Audits shall be conducted during normal business hours in the offices of CDK. CDK shall have the right to approve the third Party auditor; however, such approval shall not be unreasonably withheld. CDK shall retain all records associated with this RCI Agreement (other than Customer NPI, where destruction or return of such Customer NPI would be required by this RCI Agreement or applicable law) for three (3) years following termination of this RCI Agreement and conclusion of wind-down period, if any. In the event that an audit reveals any issue that amounts to a material breach of the RCI Agreement, or an under payment by CDK to Reynolds of five percent (5%) or more within any twelve month period, CDK shall immediately pay (i) any amounts due for the audit period, (ii) a service charge equal to one and one-half percent (1.5%) per month on the outstanding balance compounded monthly since the date of each monthly under payment and (iii) the actual cost of the audit including auditor and reasonable expenses. Notwithstanding the foregoing, CDK shall not be liable for amounts specified in clauses (ii) and (iii) above if any under-payment by CDK was due exclusively to Reynolds failing to properly invoice CDK. The third Party auditor shall sign a confidentiality agreement prior to commencing the audit, agreeing to keep confidential any information obtained by such examination, provided however that the auditor can disclose the details to Reynolds of any non-compliance with this RCI Agreement.

6.3. NON-EXCLUSIVE. This RCI Agreement is non-exclusive and does not limit Reynolds' right to otherwise license, develop, market or distribute the Reynolds Interface(s).

Highly Confidential - Filed Under Seal

6.4. ASSIGNMENT. Neither party may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other party hereto; provided, however, that such consent shall not be required for (i) any assignment to an affiliate of such party as part of a corporate reorganization of such party or (ii) any assignment made as part of a sale of the majority of the assets or equity securities of such party as long as the acquirer (A) does not, prior to the acquisition, sell any application programs or services that compete with the non-assigning party and (B) is not, prior to the acquisition, affiliated with an entity that sells any application programs or services that competing with the non-assigning party. This Section shall be deemed, without limitation, to apply to any direct or indirect change in the control of either party including, without limitation, pursuant to any merger, acquisition, consolidation or other corporate restructuring in which it participates. Any attempted assignment in violation of this provision shall be void and shall be grounds for termination after 30 days notice. This Agreement shall be binding upon and inure to the benefit of the parties' respective successors and assigns.

6.5. INDEMNITY. Each Party ("Indemnitor") must defend, indemnify and hold harmless the other party, its affiliates and their employees, successors and assigns ("Indemnitees") against all damages, losses, costs, expenses (including reasonable attorneys' fees, costs and expenses) and other liabilities arising out of any claims, demands, suits, or causes of action by third parties, arising out of or in connection with this RCI Agreement to the extent that such damages, losses, costs, expenses and other liabilities result or are claimed to result in whole or in part from: (i) any breach of this RCI Agreement by Indemnitor, its affiliates or their employees or agents; (ii) the violation by Indemnitor, its affiliates or their employees or agents of applicable law or regulation in connection with the data access and data extraction described in this RCI Agreement; (iii) any access by Indemnitor, or its affiliates or their employees or agents to Indemnitee's proprietary hardware and/or software facilitated pursuant to this RCI Agreement for any purpose falling outside the scope of this RCI Agreement; (iv) Indemnitor's or its affiliates' or their employees' or agent's failure to obtain the rights and consents necessary for Indemnitee to gain access to (and extract) Operational Data pursuant to this RCI Agreement; and (v) any publication, breach of confidentiality, dissemination, conversion, misappropriation or other use of any Operational Data facilitated by this RCI Agreement by Indemnitor, or its affiliates or their employees or agents in a manner (a) not authorized by the Reynolds Dealer, or (b) in violation of relevant law.

6.6. WARRANTIES. In addition to any other warranties in this RCI Agreement, CDK warrants to Reynolds that: (i) the Interfaced Product and subsequent new releases of the Interfaced Product will operate in accordance with their specifications; (ii) CDK has the right and power to enter into this RCI Agreement and to grant to Reynolds Dealers all of the rights and licenses in the Interfaced Product as set forth in this RCI Agreement; (iii) CDK has obtained or shall obtain all necessary permission and licenses regarding data to offer the Interfaced Product; (iv) CDK shall provide all required notices to Reynolds Dealers and shall obtain all required consents from Reynolds Dealers, and (v) CDK has all right and authority required to collect, disclose and use such information as described in Exhibit RCI A. (collectively the "CDK Warranties").

Reynolds warrants to CDK that: (i) the Reynolds Interface will operate in a manner

consistent with the written specifications provided to CDK; and (ii) Reynolds has the right and power to enter into this RCI Agreement and to grant to CDK the rights and licenses in the Reynolds Interface as set forth in this RCI Agreement (collectively the "Reynolds Warranties").

NO OTHER WARRANTIES. EXCEPT AS SPECIFIED HEREIN, NEITHER CDK NOR REYNOLDS MAKES ANY OTHER WARRANTIES, CONDITIONS OR REPRESENTATIONS, EXPRESS OR IMPLIED, ORAL OR WRITTEN, REGARDING THE INTERFACE, THE INTERFACED PRODUCTS, THE REYNOLDS SYSTEM OR ANYTHING ELSE AND HEREBY EXPRESSLY DISCLAIMS ALL OTHER EXPRESS AND IMPLIED WARRANTIES AND CONDITIONS, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE. REYNOLDS DOES NOT WARRANT THE OPERATION OF THE INTERFACE WILL BE UNINTERRUPTED OR ERROR FREE.

6.7. DAMAGES. EXCEPT FOR A CLAIM BASED SOLELY UPON BREACH OF THE CONFIDENTIALITY PROVISIONS OF SECTION 2.7, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ITS AFFILIATES, SUCCESSORS OR ASSIGNS FOR ANY INCIDENTAL, CONSEQUENTIAL DAMAGES INCURRED BY SUCH PERSONS (INCLUDING, WITHOUT LIMITATION, ANY LOST REVENUE OR LOST PROFITS) OR FOR SIMILAR DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES (IT BEING AGREED THAT THIRD PARTY CLAIMS FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES AGAINST THE OTHER PARTY WOULD CONSTITUTE DIRECT DAMAGES INCURRED BY THE OTHER PARTY). EXCEPT FOR WILLFUL MISCONDUCT BY A PARTY, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ITS AFFILIATES, SUCCESSORS OR ASSIGNS FOR ANY PUNITIVE OR EXEMPLARY DAMAGES.

6.8. EXCUSE FOR NONPERFORMANCE. Neither party shall be held responsible for any delay or failure to perform hereunder where such delay or failure is due to any cause beyond its direct control including, but not limited to, Acts of God, fire, explosion, flood, strikes or other labor dispute, riot, communications or power supply failure, delay in delivery, failure or malfunction of equipment, lack of or inability to obtain data, or any other causes, contingencies or circumstances beyond its control which prevent or hinder performance hereunder or make such performance hereunder impracticable. Should a Party be delayed or unable to perform hereunder where such delay or inability to perform is due to any cause described in this Section 6.8, it will notify the other party and make reasonable efforts to perform hereunder.

6.9. CDK ACKNOWLEDGEMENT. CDK acknowledges that Reynolds may now or in the future provide products and services that may be similar or the same as the Interfaced Product.

6.10. DISPUTE RESOLUTION PROCEDURES.

6.10.1. **Confidential Binding Arbitration.** In the event of any dispute, claim, question or disagreement arising from or relating to this RCI Agreement or an alleged breach thereof ("Dispute"), the Parties agree that all Disputes shall be submitted to confidential binding arbitration in accordance with the then applicable commercial rules of the American Arbitration Association ("AAA"). Notwithstanding anything to the contrary in this RCI Agreement or the AAA Rules, the Parties agree that arbitration under this Section 6.10: (a) shall be governed by the Federal Arbitration Act exclusive of any state arbitration laws; (b) shall be before a single neutral arbitrator who is a licensed attorney with prior experience as an arbitrator; (c) shall be conducted in Nashville, TN ; and (d) shall be conducted pursuant to a confidentiality agreement that provides at a minimum that the arbitration and all documents and pleadings exchanged in connection therewith shall be held confidential and used only for purposes of the arbitration, except that a Party may nevertheless: (i) seek to reduce the binding arbitration award to a judgment in court; (ii) seek enforcement of the award pursuant to the Federal Arbitration Act and this RCI Agreement; and (iii) disclose information regarding the arbitration as required by law (e.g., to auditors or regulatory agencies).

6.10.2. **Arbitration Fees.** Aside from filing or other fees required to initiate the arbitration, all arbitration fees will be split evenly between the Parties unless and until an award is made by the arbitrator regarding arbitration fees. If a Party does not pay its respective share of arbitration fees, then all claims (including counterclaims) of the non-paying Party shall be dismissed by the arbitrator or AAA, and the non-paying Party shall not be permitted to bring any further claims in the arbitration for affirmative relief. The non-paying Party may still participate in the arbitration to defend claims brought against it.

6.10.3. **Temporary Injunctive Relief for IP Disputes.** Notwithstanding anything to the contrary contained in this Section 6.10 or elsewhere in this RCI Agreement, however, if a dispute arises that relates to misappropriation of proprietary, confidential or trade secret information or other intellectual property; or a breach of the Confidentiality or Data Security provisions of this Agreement and/or its Exhibits ("IP Dispute"), a Party, at its election may seek Temporary Injunctive Relief from a court of competent jurisdiction related exclusively to the IP Dispute.

6.10.4. "**Temporary Injunctive Relief**" means only a temporary restraining order and/or a temporary injunction. A claim for Temporary Injunctive Relief brought in court may not be combined with: (a) a request for any other type of relief whether legal or equitable; or (b) any Dispute other than an IP Dispute. All other Disputes, including whether a permanent injunction shall issue, are to be arbitrated concurrently with any court action relating to Temporary Injunctive Relief.

6.11. RESPECT FOR EMPLOYEES. Reynolds and CDK acknowledge and agree that the other Party's personnel have been acquired and trained by said Party at considerable expense. Throughout the term of this RCI Agreement, neither Reynolds nor CDK shall knowingly directly solicit for employment or employ any employee of the other Party directly involved in the negotiation or performance of this RCI Agreement until the expiration of one (1) year following such employee's termination of employment with the other party or (1) year following the termination of this RCI Agreement, whichever is shorter.

6.12. GOVERNING LAW AND CONSTRUCTION. Unless specifically otherwise provided herein, this Agreement will be governed by the substantive laws of the State of Ohio, regardless of conflict of laws principles. The section headings are for convenience only and will not be used in interpretation of this Agreement. The language of all parts of this Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against either of the parties.

6.13. ENTIRE AGREEMENT. This RCI Agreement, together with the Data Exchange Agreement to the extent incorporated herein, and the Exhibits identified herein and incorporated by reference and listed below, constitutes the entire agreement between the parties. For the avoidance of doubt, this Agreement supersedes all prior oral and written representations and agreements between the Parties with respect to the matters addressed herein including, but not limited to, the Reynolds Interface Agreement dated December 4, 2004 between Reynolds and IntraVision Technologies, LLC ("Prior IntraVision Agreement") and the Reynolds Interface Agreement, dated October 9, 2013 between The Reynolds and Reynolds Company and ONE-EIGHTY CORP ("Prior 180 Agreement"). Any modification to this RCI Agreement must be by written amendment signed by authorized representatives of each Party.

6.13.1. Exhibit RCI A (including all subparts) – CDK Product(s) Submitted for Certification
6.13.2. Exhibit RCI B (including all subparts) – CDK Product Description(s)
6.13.3. Exhibit RCI C – Reynolds Dealer Required Provisions
6.13.4. [Intentionally Omitted]
6.13.5. Exhibit RCI E (including all subparts) – Fees
6.13.6. Exhibit RCI F – Logo Usage Standards

6.14. SEVERABILITY. If any of the provisions or portions of this Agreement are determined to be invalid or unenforceable, such provision shall be ineffective and severed from this Agreement to the extent of such invalidity, and the remainder of such provision and all other provisions hereof shall remain in full force and effect.

6.15. RELATIONSHIP OF THE PARTIES. This Agreement will not be deemed or construed to create any partnership, joint venture, fiduciary, employment or agency relationship between the parties. Nothing in this Agreement will be construed to constitute or appoint either Party as the agent or representative of the other Party for any purpose whatsoever, or to grant to either party any right or authority to assume or create any obligation or responsibility, express or implied, for or on behalf of or in the name of the other, or to bind the other in any way or manner whatsoever. Moreover, the Parties expressly acknowledge and agree that no

fiduciary relationship existed between them at the time of the negotiation and execution of this Agreement.

An authorized representative of each Party has executed this RCI Agreement as of the date last written below.

| **CDK Global, LLC** | **The Reynolds and Reynolds Company**<br>Dealer Computer Services, Inc.,<br>Universal Computer Systems Holding, Inc. |
|---|---|
| By: [signature] | By: R. T. Brockman |
| Ronald E. Workman<br>Printed Name and Title | Chairman/CEO<br>Printed Name and Title |
| Date: 2/18/15 | Date: 2/18/15 |

Highly Confidential - Filed Under Seal

## EXHIBIT RCI B1

## CDK COBALT PRODUCT DESCRIPTION(S)

***Digital Marketing Products***

*(The following products utilize Vehicle Data)*

- Dealer | Dealer Group Websites – Websites are the base product provided to dealers for the purposes of marketing vehicles and dealership services. This product set includes the ability for dealers to export / publish vehicle information to additional properties such as autotrader.com, usedcars.com, etc.
- Retargeting Advertising – *Optional, Add-On* Advertising product which may market individual vehicle data to consumers via display advertising.
- Email Marketing – *Optional, Add-On* Advertising product used for direct marketing sales and service messaging to consumers who have provided email addresses to the dealership.
- Lead Generation Services – ADP Dealer services lead generation network. Product consists of a marketing portal which presents inventory from multiple dealers with the purpose of generating leads, as well as syndication to a network of advertising partners.

*(The following products utilize Transactional records – Vehicle Sales Data, Repair Order Data, Parts Order Data)*

- Reputation Management – *Optional, Add-On* Product used for soliciting customer reviews for use on dealer website.
- Email Marketing – *Optional, Add-On* Advertising product used for direct marketing sales and service messaging to consumers who have provided email addresses to the dealership.

| **CDK Cobalt Product** | Inventory Data | Repair Order Data | Special Order Parts Data | F&I Closed Deal |
|---|---|---|---|---|
| Dealer \| Dealer Group Websites | X | | | |
| Retargeting Advertising | X | | | |
| Email Marketing | X | X | X | X |
| Lead Generation Services | X | | | |
| Reputation Management Services | | X | X | X |

Highly Confidential - Filed Under Seal

**EXHIBIT RCI B2**

**CDK MENUVANTAGE PRODUCT DESCRIPTION(S)**

CDK Menu gives you custom Sales tools, proven to help you effectively overcome objections and receive your fair share of gross profit.
Over the past few years, the use of menu selling in F&I has grown, with most dealerships taking advantage of CDK Menu to drive the sale of add-on products. But, not all dealership F&I menu-selling products are the same. CDK Menu is a proven solution that can help you increase your back-end grosses by up to 30%*.

CDK Menu auto-matches extended warranties to selected vehicles and shows a pre-set list of add-on products that you can consistently present to every customer during the F&I process. It helps you eliminate or reduce human error, forgetfulness and possible liability, while selling more warranties, insurance and dealer-installed options. Your F&I office can grow profits and reduce errors.

**As reported by MenuVantage®. Results may vary.*

Highly Confidential - Filed Under Seal

## EXHIBIT RCI B3

## CDK PARTSVOICE PRODUCT DESCRIPTION(S)

PartsVoice is the largest open OEM parts locator in the US and Canada-- we have over 8 million unique parts listed on our website every day by over 1,800 dealers. PartsVoice.com is used by retail consumers and parts professionals around the globe.

We update our parts inventory data daily, so you know you're looking at the most up-to-date listings, not parts that are sold out or on backorder.

Spend less time looking and more time finding on PartsVoice.

PartsVoice offers the Cash Discovery Program (CDP), an online marketplace matching buyers and sellers. So get out from under your idle problem and free up your working capital.

Highly Confidential - Filed Under Seal

Execution Copy

## EXHIBIT RCI B4

## CDK F&I RESULTS PRODUCT DESCRIPTION(S)

Know What Goes On When the F&I Office Door Closes

As a dealer, you know the final F&I steps are vital to your gross profits. A slight increase of $20-$25 per transaction could make a huge impact on your bottom line.

**Designed specifically for dealerships, F&I Results is an integrated training solution created to**

**help your F&I department:**

- Increase product sales
- Improve product penetration
- Enhance your CSI score
- Minimize your compliance risk
- Grow your gross profits

**Improve your training results**

By reviewing actual conversations and situations, you can help keep your dealership in line with its compliance requirements, as well as help keep you in compliance with local, state and federal laws.

F&I Results is unlike other video training solutions which need to be turned on and off by the F&I Manager, allowing them to choose which customers they want to record. The integration of F&I Results with your CDK or Reynolds and Reynolds Dealer Management System (DMS) ensures you will capture every transaction for training purposes.

**When deals go smoothly, everyone wins**

You want to present every available F&I product to every customer, keeping sales and profitability up. You also know it is important to keep every customer presentation consistent, so items do not fall through the cracks and to ensure customer satisfaction. With F&I Results, we are making it possible to

Case: 1:18-cv-00864 Document #: 73-4 Filed: 03/16/18 Page 25 of 34 PageID #:1303

do all of that and more by providing you with a training solution that uses real-life examples, not textbook theory.

**Perfecting the art of selling**

Only Video Training offers you insight into what really happened on the deal. No longer will your F&I team work their compensation plan, they will perfect their art of selling by learning how to consistently overcome objections and know when and how to present the right options at the right time. Selling is an art; simply looking your F&I stats will not give you the insight you need to improve your employees.

**Simply putting a camera in your F&I offices will not work—that is why we developed a full training solution, which includes:**

- Integration with your CDK DMS or R&R DMS
- A foolproof way to capture 100% of your F&I transactions
- Comprehensive training programs for your dealership
- A secure web-based portal to view your videos
- Insightful reports on your employees results and trends

**F&I Results** was formerly known as Intravision Technologies, LLC

**EXHIBIT RCI B5**

**CDK LOT MANAGEMENT PRODUCT DESCRIPTION(S)**

| Modules | Features |
|---|---|
| Appraisals | Mobile and desktop centric used vehicle appraisal/bookout application which analyzes historical data, market pricing, Market IQ data as well as regional transaction data and provides stocking recommendations. Includes book and auction values. |
| Smart Price | Used car pricing solution which automatically adjusts the pricing of the used car inventory based on client-defined parameters against market conditions |
| Equity | Uses sales history and local auction data to calculate the equity position of sales and service customers. Provides recommendations for potential alternative vehicles for the consumer based client defined parameters |
| Smart App | Private label smartphone application which allows the consumer to connect with the dealer in real-time to begin the appraisal process to seek a price for their vehicle |
| Back Office Dashboard | Dashboard which identifies client installed applications, provides utilization statistics by module along with sales and profit results |
| Smart Suite | SmartLot, Smart Drive, Smart Price - RB applications branded and sold to non-ADP dealers |
| Consumer Lane | Gathers consumer vehicle's for sale from a variety of sources and alerts retailer of vehicles they should acquire based on a set of pre-determined rules |
| Smart Lot Lite | Non-DMS integrated application designed for independent dealers or small franchise dealers. Functionality includes Market IQ, Scanning tool with book values, vehicle history and market data |

Highly Confidential - Filed Under Seal

Execution Copy

# EXHIBIT RCI B6

## CDK ONE-EIGHTY PRODUCT DESCRIPTION(S)

ONE·EIGHTY
LEADS
Showroom Traffic
Inventory Web Links/ Data Feeds
BDC
Dealer Ads
Customer/ Prospect Retention (CPR)
ONE-EIGHTY A-Z Sales Process
Program Change Campaigns
Missed Prospect Recovery
Sales, Products & Store Events
70% - 80%
Anniversary/ Birthday Greetings
The Sale
Cash/Finance Portfolio Retention
Lease Portfolio Retention
Dealership Customer/ Prospect & Deal OEC Database
Service Customer Retention
Accessory Promotions
Copyright ONE-EIGHTY CORP. ©
More specifically for Dealerships:
• Lead Management
• Prospect /Customer Management
• Point of Sales Materials
• Sales Administration
• Guided Sales Processes
• Quoting & Desking
• Menu Selling
• eSignatures
• Customer Lifecycle Management
• Reporting (Management and Operational)
• Customer Single View
• Head Office BDC
• Lead Depository & Dispositioning
• National Sales Activity Reporting
• Credit Portal Integration

44

JA 74

Highly Confidential - Filed Under Seal

CDK-0000083

## EXHIBIT RCI B7

## CDK PERFORMANCE 20 PRODUCT DESCRIPTION(S)

Automotive dealership financial composites used to identify opportunities when compared to other same franchise, similar size and similar local economic area dealerships. Composite is the basis for discussion on sales volume, gross profits, expense management, asset management and personnel productivity.

Highly Confidential - Filed Under Seal

## EXHIBIT RCI C

## REYNOLDS DEALER REQUIRED PROVISIONS

The Reynolds Interface may be made available by CDK to Reynolds Dealer(s) only if CDK has obtained from the Reynolds Dealer an agreement that contains the following terms in all material respects:

C.1. Provide a limited license authorizing the operation of the Reynolds Interface only with the Interfaced Product and only for one Reynolds Dealer.

C.2. Prohibit copying, disassembly, decompilation, and/or reverse engineering of the Interfaced Product and the Reynolds Interface;

C.3. Reserve to CDK all rights, title and interest in and to Interfaced Product and to Reynolds all rights, title and interest in and to the Reynolds Interface;

C.4. Prohibit: (a) transfer of or access to the Interfaced Product and the Reynolds Interface to or by third parties; (b) lending, leasing, sublicensing or pledging of the Interfaced Product and the Reynolds Interface by Reynolds Dealer; and (c) service bureau or outsourcing uses of the Interfaced Product and Reynolds Interface;

C.5. Include a statement substantially similar to the following: "Product(s) provided under this Agreement contain portions of program code owned by third party licensors and such licensors will be entitled to enforce this License as an intended third party beneficiary and the obligations of the licensee cannot be modified or terminated without the written consent of such third Party licensors. Licensee shall not disclose any passwords or other security information that are related to the Reynolds Interface or other software licensed by this License. ALL LICENSORS DISCLAIM ALL WARRANTIES, INCLUDING (WITHOUT LIMITATION) ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. In no event will any licensor be liable for indirect, incidental, consequential or exemplary damages arising from use, or inability to use Reynolds Interface(s), even if they knew of the possibility of such damages.";

C.6. Provide that all rights to use or maintain possession of the Interfaced Product and the Reynolds Interface will terminate immediately upon the Reynolds Dealer's breach of any material provision of such agreement.

C.7. Prohibit the Reynolds Dealer from using the Interfaced Product and Reynolds Interface outside the definitions and process defined for the specified CDK Application the in the relevant subpart of Exhibit RCI A.

C.8. Generally describe the Customer NPI that may be accessed by CDK pursuant to the agreement and the third parties to whom CDK may provide access to the Customer NPI.

Requires that the Reynolds Dealer warrants that for purposes of the data that may be accessed by CDK and/or the Reynolds DMS pursuant to this RCI Agreement that the Reynolds Dealer has provided any required privacy notices to its customers as required by applicable law, including the Gramm-Leach-Bliley Act and its implementing regulations (the "GLBA"), and to the extent applicable, the privacy laws of any state, Canada's Personal Information Protection and Electronic Documents Act ("PIPEDA"), and any other relevant privacy laws Canada or of any province of Canada or other relevant jurisdiction.

C.9. Requires CDK to implement and maintain appropriate safeguards to protect any Customer NPI that CDK obtains pursuant to the agreement for so long as CDK has access to any such Customer NPI.

C.10. Prohibits CDK from accessing, storing, sharing, disclosing, or using any Customer NPI obtained pursuant to this agreement [between CDK and the Dealer] other than as necessary to carry out the purposes for which the Reynolds Dealer has provided access to the Customer NPI or as otherwise required by law.

C.11. Grants the Reynolds Dealer's DMS provider and the CDK Application permission to access Customer NPI to the extent necessary to provide the services contracted for under the agreement (including the Interfaced Product and the Reynolds Interfaces) and specifically permits Reynolds and the CDK Application to provide access to Customer NPI to one another for that purpose.

C.12. Include a statement substantially similar to the following:

As part of its Reynolds Certified Interface program, your Dealer Management System ("DMS") provider The Reynolds & Reynolds Company or its affiliates (collectively "Reynolds") has developed certain processes that allow certain third party software vendors including [CDK Application] to receive from Reynolds certain data from your DMS and/or allow [CDK Application] to send data to your DMS ("RCI Integration"). By signing this agreement, you are providing your written consent to: (a) Reynolds' providing [CDK Application] access to data from your DMS; and (b) to [CDK Application] providing Reynolds with access to [CDK Application] data, both of which may include, without limitation, non-public information regarding your customers. By signing this agreement you agree that: (a) Reynolds makes no representations, assurances, warranties or guarantees with respect to [CDK Application] or [CDK Application]'s obtaining access to data from your DMS through RCI Integration or otherwise; (b) Reynolds shall have no liability whatsoever for any damages you may suffer as a result of using [CDK Application] or because of [CDK Application]'s access to data from your DMS; (c) Reynolds has no responsibility for the activities of [CDK Application] with respect to its access to data from your DMS, including without limitation, with respect to Customer NPI obtained or used by [CDK Application]; (d) Reynolds may terminate the integration described in this agreement at any time if Reynolds determines that such integration may conflict with or adversely affect the operation or security of your DMS (including without limitation the integrity or security of the data) or such access may violate any applicable laws or regulations; (e) problems caused by the data access described in this agreement will not be covered by any software support and equipment maintenance services or fees previously agreed between you and Reynolds; and (g) Reynolds has the right to enforce its rights under this agreement. NOTICE TO NORTH CAROLINA DEALERS: THIS END USER

Highly Confidential - Filed Under Seal

Case: 1:18-cv-00864 Document #: 73-4 Filed: 03/16/18 Page 31 of 34 PageID #:1309

AGREEMENT RELATES TO THE TRANSFER AND ACCESSING OF CONFIDENTIAL INFORMATION AND CUSTOMER RELATED DATA.

C.13. To the extent the Reynolds Dealer operates in Canada and CDK has access to Customer NPI for the purposes of processing the data, the Reynolds Dealer Agreement shall:

(a) identify the individual at CDK who supervises compliance with privacy aspects of the Reynolds Dealer Agreement;

(b) specify that CDK will direct persons seeking access to their personal information to the Reynolds Dealer;

(c) Require the Reynolds Dealer to provide its customers in Canada with a notice specifying that the Customer NPI or other personal information as defined under Canadian law may be transferred to and stored in the United States and may be subject to disclosure pursuant to the laws of the United States;

(d) Require that the Reynolds Dealer comply fully with the applicable Canadian privacy laws;

(e) Specify that the Reynolds Dealer has obtained all consents from its clients required under the applicable Canadian privacy laws for the collection, use and disclosure of personal information by the Reynolds Dealer and by CDK; and

(f) Require that CDK comply fully with all applicable Canadian privacy laws.

Highly Confidential - Filed Under Seal

Execution Copy

**EXHIBIT RCI D – INTENTIONALLY OMITTED**

49

JA 79

Highly Confidential - Filed Under Seal

CDK-0000088

# EXHIBIT RCI F

Reynolds and Reynolds established the Reynolds Certified Interface (RCI) Program to ensure that your product provides safe, secure, and seamless integration with Reynolds' Dealership Management Systems (DMS) and minimizes disruption to the dealer's business.

This document and the accompanying logos provide the standards by which you can proudly tell our customers, the dealers, that you are a certified RCI member. Certification, and display of the exclusive RCI logo with the appropriate DMS tagline, gives your solution an important competitive advantage over a non certified product.

Candidates who successfully complete the RCI Program requirements may use the appropriate RCI logo with tagline as a graphic symbol to signify the certification, and for no other purpose. The tagline accompanying the RCI logo indicates the specific Reynolds DMS for which your solution is certified. You are required to display the RCI logo with the tagline that correctly reflects your certification.

## Usage

The Reynolds Certified Interface logo with tagline may be used in print or electronic media, i.e., vendor Web pages.

## Logo Artwork

The logo type is a special typeface and cannot be typeset from regular fonts. Only camera ready artwork from an electronic file furnished by Reynolds and Reynolds can be used to reproduce the signature.

## Color Applications

The logo may not be screened or used in any size other than the ones provided in black and white, 2 color process (PMS280), or 4 color process.

## Minimum Size

The minimum acceptable size for the logo with tagline is 1.77" (width). The mark should not be larger or more prominent than your own logo or company name.

## Staging

The logo should be separated on all sides from all other copy, photos or illustrations, or the edge of the page by a clear staging area of at least 1/4X (X=logo width). This is a minimum clear space around the logo. The staging area requirement applies to the general background the logo appears upon. This area should always be even and continuous, free of any pronounced texture or graphic variation.

Execution Copy

## Logo Elements

[illegible]

## Unacceptable Logo Usage

- [illegible]
- [illegible]
- [illegible]
- [illegible]

67

JA 81

Highly Confidential - Filed Under Seal

CDK-0000106