# EXHIBIT E

James E. Cecchi
Lindsey H. Taylor
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Peggy J. Wedgworth
Andrei V. Rado
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

Leonard A. Bellavia
Steven Blatt
**BELLAVIA BLATT & CROSSETT, PC**
200 Old Country Road, Suite 400
Mineola, New York 11501
(516) 873-3000

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TETERBORO AUTOMALL, INC. d/b/a TETERBORO CHRYSLER DODGE JEEP RAM, and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>    v.<br><br>CDK GLOBAL, LLC and THE REYNOLDS AND REYNOLDS COMPANY,<br><br>                Defendants. | Civil Action No.<br><br><br><br>**CLASS ACTION COMPLAINT**<br>**AND DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

THE NATURE OF THE ACTION ............................................................................................. 1

BACKGROUND ..................................................................................................................... 6

   A. The Data .................................................................................................................. 6

   B. Data Management And Integration Providers ........................................................ 7

   C. Defendants Have Utilized Their Market Power To Impose Exclusive Dealing
      Agreements On Dealers And Vendors .................................................................... 8

   D. Defendants Entered Into A Per Se Illegal Horizontal Agreement To Allocate Market
      Share In The Data Integration Services Market ................................................... 10

   E. Defendants' Illegal Conduct Increased The Price Of DMSs And Data Integration ......... 11

THE PARTIES ...................................................................................................................... 12

CO-CONSPIRATORS ........................................................................................................... 13

JURISDICTION AND VENUE ............................................................................................... 13

INTERSTATE TRADE & COMMERCE ................................................................................. 14

FACTUAL ALLEGATIONS ................................................................................................... 14

   A. Defendants Have Unlawfully Restrained Trade In The Dealer Management Software
      Market And Have Illegally Tied The Provision of DMSs To The Provision Of Data
      Integration Services ............................................................................................ 14

      (i) The DMS Market ........................................................................................ 14

      (ii) CDK And Reynolds Control And Dominate The DMS Market ................... 15

      (iii) CDK And Reynolds Exploit Their Dominance In The DMS Market By Charging
          Artificially Inflated Prices For The Provision Of DMS ................................. 16

      (iv) CDK And Reynolds Have Utilized Their Market Power In The DMS Market To
          Tie Dealers To The Purchase Of Their Data Integration Services ............... 18

   B. Defendants Have Unlawfully Restrained Trade In The Dealer Data Integration
      Service Market ................................................................................................... 19

      (i) The Data Integration Services Market ........................................................ 19

(ii)   CDK And Reynolds Have Also Imposed Exclusive Dealing Provisions On Vendors Further Restricting Competition In The Data Integration Market And Inflating Prices ........................................................................................... 20

(iii)   To Further Reduce Competition, CDK And Reynolds Entered An Illegal Anticompetitive Agreement To Divide The Data Integration Market ........................ 23

(iv)   CDK's And Reynolds's Per Se Illegal Agreement Has Artificially Inflated The Price Of Data Integration Services .............................................................. 26

(v)   Defendants Claim Inflated Prices Are A Result Of Heightened Data Security, But Security Is Merely A Pretext for Defendants' Illegal Conduct ........................... 29

CLASS ACTION ALLEGATIONS ........................................................................ 32

ANTITRUST INJURY ............................................................................................. 36

CLAIMS FOR RELIEF ........................................................................................... 37

PRAYER FOR RELIEF ........................................................................................... 49

DEMAND FOR JURY TRIAL ................................................................................ 51

Plaintiff Teterboro Automall, Inc., d/b/a/ Teterboro Chrysler Dodge Jeep Ram ("Plaintiff"), individually and on behalf of the Class defined below, brings this action for damages and injunctive relief against Defendants CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") (collectively, "Defendants"), based upon personal knowledge with respect to itself, and upon information and belief.

## THE NATURE OF THE ACTION

1.     This antitrust action arises out of a conspiracy among Defendants and certain unnamed co-conspirators extending from at least January 1, 2011 through the present (the "Class Period"), with the purpose and effect of allocating market share, reducing competition, and fixing, raising, and maintaining and/or stabilizing prices in the market for the provision of data management systems ("DMS") to retail automotive dealerships ("Dealers" or "Dealerships"), and in the related subsidiary market for the provision of services for extracting, formatting, integrating, and organizing the data housed on the data management systems ("Data Integration Services").

2.     CDK (and its affiliates) and Reynolds (and its affiliates) are in the business of providing DMS services to Dealers.  CDK and Reynolds dominate the DMS industry, and control approximately 75 percent of the United States market for the supply of DMS by number of dealers, and approximately 90 percent when measured by vehicles sold.[1]  Because of their dominant market share and the significant barriers to entry of the DMS market, the CDK and Reynolds duopoly has enormous leverage over Dealers in their provision of DMSs.

---

[1] *See* First Amended Complaint for Damages & Injunctive Relief ¶ 31 (the "MVSC Complaint"), *Motor Vehicle Software Corp. v. CDK Global Inc*, No. 17-cv-00896 (C.D. Cal. May 1, 2017), ECF No. 58.

3. CDK's and Reynolds's dominance in the marketplace has left Dealers with no choice but to enter into long-term contracts for the provision of DMSs with Defendants. These long-term contracts have variable fee provisions, and Defendants have utilized their duopoly power to impose artificially inflated fees for the provision of DMSs to Plaintiff and Dealers throughout the Class Period.

4. CDK (and its affiliates) are also in the business of providing Data Integration Services. Data Integration Services are critical to the proper functioning of Dealerships. Data Integration enables Dealers, and third-party application service providers engaged by Dealers ("Vendors"), to extract, organize, and integrate the *Dealer's own data* on its DMS into a usable format. CDK and Reynolds utilize their dominance of the DMS market to include unlawful exclusive dealing provisions in their long-term contracts with Dealers. These exclusive dealing provisions effectively require Plaintiff and Class members to cede control of *their own data* to Defendants, and provide Defendants with the ability to block other data integration service providers ("Data Integrators") from accessing Dealer data.[2]

5. Dealers have no choice but to utilize the Data Integration Services provided by the Defendants. As such, Defendants unlawfully tie the provision of Data Integration Services to the supply of DMSs.

6. To effectively run their retail automotive dealerships, Dealers engage Vendors to utilize their data to provide Dealers with necessary services such as inventory management,

---

[2] A Californian electronic vehicle registration and titling service company, Motor Vehicle Software Corporation ("MVSC"), has commenced proceedings against CDK and Reynolds, accusing them of colluding to block MVSC's access to dealer data in California, for the benefit of another electronic vehicle registration service jointly owned by CDK and Reynolds. *See* MVSC Complaint ¶ 31.

customer relationship management, and electronic vehicle registration and titling. Vendors, to perform their services, must integrate the Dealers' data stored on the Dealers' DMS.

7.     In addition to tying the provision of Data Integration Services to the supply of DMSs, Defendants have utilized their control of the Data Integration Services market to impose exclusive dealing provisions on Vendors. These exclusive dealing provisions mean that any Vendor that must do business with CDK or Reynolds cannot contract with any other company that provides Data Integration Services. These exclusive dealing provisions are purportedly infinite in duration. Accordingly, Vendors, engaged by Dealers to utilize the Dealers' own data are also required to utilize Defendants' Data Integration Services.

8.     Defendants have exploited the uncompetitive and unlawful exclusive dealing provisions in Dealer and Vendor contracts to impose exorbitant charges for data integration on Vendors; and those charges are passed on to Dealers.

9.      Prior to February 2015, CDK and Reynolds were competitors in the Data Integration Services market.[3] In February 2015, Defendants entered into an illegal express horizontal agreement to exclude competition in the Data Integration Services market.[4]

---

[3] One of the last remaining competitors in the data integration market, Authenticom, Inc. ("Authenticom"), has commenced proceedings against Reynolds and CDK accusing them of engaging in antitrust violations through a coordinated campaign to block Authenticom's access to dealer data and thereby destroy its business, and drive it out of the data integration market. *See* Complaint ¶¶ 178-210 (the "Authenticom Complaint"), *Authenticom, Inc. v. CDK Global, LLC* ("*Authenticom*"), No. 17-cv-318 (W.D. Wis. May 5, 2017), ECF No. 4.

[4] In *Authenticom*, Authenticom sought, and was granted, a preliminary injunction against CDK and Reynolds on the basis that Defendants had engaged in a horizontal conspiracy, in violation of § 1 of the Sherman Act. *See* Opinion & Order ("Authenticom Injunction Order"), *Authenticom*, No. 17-cv-318, 2017 U.S. Dist. LEXIS 109409 (W.D. Wis. July 14, 2017). The Authenticom Injunction Order is currently subject to appeal.

10. Defendants' illegal agreement expressly provides that only CDK is to have access to the data housed on a Dealer's CDK DMS, and only Reynolds is to have access to data housed on the Reynold's DMS.

11. In their illegal domination of the Data Integration Services market, Defendants have effectively eliminated competition in the DMS market. Defendants have utilized their duopoly power to limit the number of data integrators to Defendants and their affiliates. As the provision of Data Integration Services is limited to Defendants and their affiliates as a result of Defendants' unlawful anticompetitive conduct, Dealers have no choice but to acquire Defendants' DMS so as to ensure that *its own data* can be integrated and thus converted into a usable format – crucial in operating a retail automobile dealership.

12. In addition to tying the provision of Data Integration Services to the supply of DMSs, Defendants have utilized their control of the Data Integration Services market to impose exorbitant – and supra-competitive – charges for data integration on Vendors; and those charges are passed on to Dealers.

13. Defendants do not deny that massive price increases have followed their illegal February 2015 agreement, but justify their artificially and illegally inflated prices on the basis of alleged increased data security costs. Defendants' justification is a mere pretext for the imposition of increased charges from their illegal anticompetitive conduct.

14. As a result of Defendants' anticompetitive conduct, Plaintiff and members of the Class (defined in ¶ 105 below) ("Class members") have directly paid the Defendants inflated prices for the provision of DMSs and have indirectly paid the Defendants inflated prices for the Data Integration Services required by Vendors.

15.     Plaintiff brings this action on behalf of itself and all retail automotive dealers that directly purchased DMS from Defendants or their predecessors, subsidiaries, or affiliates during the Class Period.

16.     Plaintiff also brings this action on behalf of itself and all retail automotive dealers that acquired services from third parties that were required to purchase Data Integration Services from Defendants or their predecessors, subsidiaries, or affiliates during the Class Period and indirectly paid inflated prices for the Data Integration Services.

17.     Plaintiff brings this action on behalf of retail automotive dealers to obtain declaratory and injunctive relief to prevent Defendants from continuing their unlawful conduct and to recover damages and costs, including reasonable attorneys' fees, for the injuries that Plaintiff and Class members have sustained as a result of the Defendants' conspiracy to monopolize the DMS and the Data Integration Service markets and fix, raise, maintain and stabilize, allocate markets for, and limit, reduce, and otherwise manipulate the price and supply of DMSs and Data Integration Services.

18.     Plaintiff also brings this action on behalf of retail automotive dealers doing business in New Jersey to obtain declaratory and injunctive relief to prevent Defendants from continuing their unlawful conduct and to recover damages and costs, including reasonable attorneys' fees, for the injuries that Plaintiff and Class members have sustained as a result of the Defendants' conspiracy to monopolize the DMS and the Data Integration Service markets and fix, raise, maintain and stabilize, allocate markets for, and limit, reduce, and otherwise manipulate the price and supply of DMSs and Data Integration Services.

19.     Defendants' horizontal conspiracy to eliminate competition is a per se violation of Section 1 of the Sherman Act and the New Jersey Antitrust Act, N.J. Stat. § 56:9-3; Defendants'

exclusive dealing arrangements with Vendors and Dealers are a violation of Section 1 of the Sherman Act and the New Jersey Antitrust Act, N.J. Stat. § 56:9-3; and the illegal tying of their integration service to their DMS service is also unlawful under Section 1 of the Sherman Act and the New Jersey Antitrust Act, N.J. Stat. § 56:9-3. Defendants' monopolization of the DMS and Dealer Data Integration Service markets is unlawful under Section 2 of the Sherman Act and the New Jersey Antitrust Act, N.J. Stat. § 56:9-4. Plaintiff, on its own behalf and on behalf of the Class , seeks an injunction (1) enjoining Defendants from blocking independent Data Integration Service providers from serving Dealers and Vendors; (2) enjoining the enforcement of Defendants' exclusive dealing provisions with Dealers and Vendors; and (3) releasing Dealers from the multi-year terms in their contracts with Defendants so that Vendors (and Dealers) can select a data integrator of their choice. In addition, Plaintiff and the Class also seek to recover the damages they have suffered as a result of Defendants' violations of federal antitrust laws.

## BACKGROUND

### A. The Data

20. Dealership data is crucial to success in the retail automotive industry, and Dealers input that data into a database within their Dealer Management System or DMS. A Dealership's DMS is the critical software that operates as the business's central database and is the repository of all of its operational information. Dealerships utilize the DMS to run generated data, including accounting, payroll, insurance information, vehicle and parts inventory, customer information, completed and pending sales, vehicle financing, and service and industry management. Both Dealer and customer data are stored in the DMS.

21. It is widely accepted in the retail automotive industry that Dealers retain ownership over the data they create and store on their DMS database, as well as control access to that data. CDK and Reynolds have both made public statements confirming that Dealers own

and control their data.  For example, Reynolds spokesman, Tom Schwartz, admitted that, "[t] he data belongs to the dealers.  We all agree on that."[5]  CDK (formerly known as ADP Dealer Services Inc.), similarly confirmed that, "[CDK] has always understood that dealerships own their data and enjoy having choices on how best to share and utilize that data with others."[6]

22.     Dealers authorize access to their data to third-party application providers or Vendors that are engaged by Dealers to provide services in the operation of their retail automotive businesses.  In providing their services to Dealers, Vendors utilize the data, with the Dealer's authorization, to provide Dealers with services such as inventory management, customer relationship management, and electronic vehicle registration and titling.

23.     To access and extract the data stored on the DMS, data integrators convert the Dealers' raw data into a usable format.  Vendors engage data integrators to extract, format, and organize the data stored on the Dealer's DMS into a form suitable for the specific service provided by the Vendor to the Dealer.  In turn, Vendors pass on most, if not all, of their data access fees paid to data integrators, to the Dealers.[7]

**B.     Data Management And Integration Providers**

24.     CDK and Reynolds have enormously lucrative DMS businesses.  A single, small dealership will pay up to $150,000 per year for the DMS software license and services offered by CDK and Reynolds.  Mid-size dealership groups (5 to 10 stores) will pay $1,500,000 or more per

---

[5]  David Barkholz, *Dealers Decry Reynolds Crackdown*, Automotive News, http://www. autonews.com/article/20111121/RETAIL07/311219997/dealers-decry-reynolds-crackdown (Nov. 21, 2011).

[6]  CDK Global Press Release, *ADP Announces New Approved Vendors for ADP's Third Party Access Program*, http://www.cdkglobal.com/company/news/adp-annnounces-new-approved-vendors-adps-third-party-access-program#sm (Apr. 16, 2013).

[7]  Brian Maas, President of the California New Car Dealers Association, has stated that it is his "understanding that vendors pass on most, if not all, of the large data access fees to the dealers." Declaration of Brian Mass, President of the California New Car Dealers Association, *Authenticom*, (May 18, 2017), ECF No. 56.

year, and large dealerships can easily pay over $5,000,000 per year.  Given the thousands of

dealerships that CDK and Reynolds serve, and with profit margins exceeding 40 percent, CDK

and Reynolds are tremendously profitable.  CDK's market capitalization is almost $9 billion.[8]

25.     CDK and Reynolds also provide Data Integration Services to Vendors.  In doing

so, CDK and Reynolds transform the Dealers' raw data into a usable form appropriate to the

particular services each Vendor provides to the particular Dealer.  Vendors depend on, and

cannot provide their services, without access to Dealers' Data.

### C.     Defendants Have Utilized Their Market Power To Impose Exclusive Dealing Agreements On Dealers And Vendors

26.     CDK and Reynolds have used their market dominance to impose a series of

exclusive dealing provisions on Dealers.  The exclusive dealing provisions prevent Dealers from

providing access to their own data to anyone other than their DMS provider – either CDK or

Reynolds.  To perform contracted services for Dealers, Vendors are required to extract Dealer

information; however, the Dealer cannot engage the most competitively priced data integrator:

to extract a Dealer's data from a CDK or Reynolds DMS, Vendors are left no choice but to

engage either CDK or Reynolds.

27.     CDK and Reynolds also prevent Vendors that use CDK or Reynolds Data

Integration Services from obtaining the service from any other provider by imposing exclusive

dealing provisions in their Vendor contracts.  These exclusive dealing provisions mean that any

Vendor that must do business with CDK or Reynolds cannot contract with any other company

---

[8] According to CDK's Form 10-K dated August 8, 2017, the "aggregate market value of
common stock held by non-affiliates of the registrant, as of December 31, 2016, the last business
day of the registrant's most recently completed second fiscal quarter, was approximately $8.7
billion."  Form 10-K, Annual Report Pursuant To Section 13 or 15(D) Of The Securities
Exchange Act of 1934 for the Fiscal Year Ended June 30, 2017, dated Aug. 8, 2017, at 1.  *See
also* *http://www.nasdaq.com/symbol/cdk* (market capitalization of $8,890,550,550 as of
September 7, 2017).

that provides Data Integration services. In addition, these Vendor contracts are purportedly infinite in duration, meaning that even if a Vendor is no longer contracted with CDK for Data Integration Services, it would not be permitted to access data from any CDK dealer using an alternative data integrator, for all time.

28.     Defendants have used their control of Dealer data to impose exorbitant fees on any party wishing to extract that data. As a result, Dealers are paying excessive fees to Vendors that reflect the large fee increases imposed by CDK and Reynolds for data integration, so that their crucial application providers can access the Dealer's own data.

29.     Reynolds charges Vendors excessive fees, between $200-$900 a month, in order to access a Dealer's own data.[9] Plaintiff indirectly pays Reynolds these fees.[10] As such, Plaintiff effectively pays Reynolds so that Vendors can access Plaintiff's own data.

---

[9] The Lexus of Westminster car dealership, located in Orange County, California – a medium-sized dealership – indirectly pays CDK between $200 and $800 a month to access its own data. Declaration of Chris Longpre, President of Lexus of Westminster, ¶ 5, *Authenticom*, ECF No. 55 (May 18, 2017). *Id.* ¶¶ 7, 8 ("As a result of CDK's integration fees, DealerSocket [a Vendor] has informed me they are raising the prices it charges my dealership by $500 a month. In short, I am indirectly footing the bill for a large fee increase so that one of my key application providers can access my own data.").

[10] In the Authenticom Injunction Order, the Court accepted evidence of the increase in the fees CDK and Reynolds charged to Vendors:

> Although Reynolds' information for pricing RCI integration services is not public, one witness, Alan Andreu, testified that when his software company, Dominion, first began using RCI in 2011, it was paying $247 per month per dealer. Come September 2017, that same data package will cost $893. Andreu also testified that Dominion was paying $457 per dealership for 3PA, CDK's integration service. ("So compared to Reynolds' 893, it's cheap—it's only $457—until you compare it to that $30 that I could have paid Authenticom."). A second vendor witness, Matthew Rodeghero with AutoLoop, testified that in 2015, Reynolds charged approximately $700 per month for a dealer using "the full suite of AutoLoop's products." Now, that price has gone up to $835, plus additional write-back fees. Access to the CDK DMS via 3PA cost approximately $160 in 2014, $694 in 2016, and $735 in July 2017, without "any noticeable product improvements."

**D.** **Defendants Entered Into A Per Se Illegal Horizontal Agreement To Allocate Market Share In The Data Integration Services Market**

30.     For many years, DMS providers, including CDK and Reynolds, recognized and publicly acknowledged that Dealers own their own data and have the right to grant data access to integrators and Vendors of their choosing.  Prior to 2015, CDK and Reynolds competed in providing Data Integration Services, and CDK would provide Data Integration Services from Reynold DMSs.  Reynolds did not compete with CDK in providing access to data for Dealers using the CDK DMS.  However, in 2007, Reynolds began blocking data integrators from accessing dealer data on the Reynolds DMS.  CDK was a vocal opponent of Reynolds' access restriction until eight years later, in 2015.

31.     In February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the Data Integration market and to eliminate competition in the Dealer Integration market.  CDK agreed that it would no longer compete in providing access to Dealer data on the Reynolds DMS, ceding that ground exclusively to Reynolds.  Moreover, because Reynolds already did not compete with CDK in providing access to data for Dealers using the CDK DMS, the agreements ensured that CDK and Reynolds would be the exclusive providers of Data Integration Services for Dealer data on their respective DMS platforms.

32.     The agreements provided that CDK would exit the market for the provision of Data Integration Services for Dealers using the Reynolds DMS, and leave that segment exclusively to Reynolds.[11]  The agreements also provided that the Defendants would coordinate the transition of Vendors from CDK to Reynolds.  These horizontal market-share agreements further reduced competition in the Data Integration Services market.

---

Authenticom Injunction Order at *14.

[11] *See* Authenticom Complaint, ¶¶ 139-48.

33.     According to the District Court of Wisconsin, these February 2015 agreements between CDK and Reynolds "suggest a horizontal conspiracy."

> Although the agreements do not explicitly state that defendants will work together to eliminate third-party data integrators, the agreements have that effect. The parties agree that they will not attempt to access, or help others access, the other's DMS without permission (although Reynolds gives CDK a long wind-down period to transition out of the Reynolds integration business). Both parties agree to cooperate in facilitating their dealers' access to each other's software applications. And their agreements with third-party vendors—like the 3PA Agreement and the RCI Agreement—are exclusive, in the sense that defendants agreed that in their capacity as app providers, their sole access to one another's DMSs would be through the in-house interfaces. In other words, by signing up for 3PA or RCI, defendants agreed not to use third-party integrators to access the CDK DMS or the Reynolds DMS, respectively. After the agreements, there is little room in the market for third-party integrators.

Authenticom Injunction Order at *18-19.

### E.     Defendants' Illegal Conduct Increased The Price Of DMSs And Data Integration

34.     Defendants' anticompetitive conduct was designed to and did artificially inflate the price of DMSs and the cost of acquiring Data Integration Services, throughout the Class Period.   Independent data integrator service providers, before Defendants' anticompetitive conduct, charged Vendors approximately $50 per month per dealership connection.   Since the unlawful 2015 agreement, CDK and Reynolds have charged Vendors, on average, $300 per month for the same services, and other Vendors as much as $800 per month.   Vendors pass this increased data integrator charges onto Dealers.[12]   Dealers have also incurred increased fees for the acquisition of DMS – fees that far exceed those in competitive markets.

---

[12] *See supra* n.9.

35.     As a result, Plaintiff and Class members have been forced to pay supra-competitive prices for DMSs and Data Integration Services and, as a result of Defendants' illegal actions, have suffered antitrust injury to their property or business.

## THE PARTIES

36.     Plaintiff Teterboro Automall, Inc. ("Plaintiff" or "Teterboro") is a corporation organized and existing under the laws of the state of New Jersey with its principal place of business located in Little Ferry, New Jersey. Teterboro is engaged in the business of purchasing and selling automobiles.

37.     Plaintiff owns and operates the retail car dealership doing business as Teterboro Chrysler Dodge Jeep Ram, located at 469 RT 46, Little Ferry, New Jersey.

38.     Defendant CDK is a publicly traded Delaware corporation with its corporate headquarters and principal place of business located at 1950 Hassell Road, Hoffman Estates, Illinois.  CDK provides DMS software and services to automobile dealerships throughout the United States, including in Illinois, and has more than $2 billion in annual revenue.  In 2014, CDK was spun off from ADP, LLC, and is now an independent, publicly traded company in which ADP retains no ownership interest.  Prior to the spin-off, CDK was referred to as ADP Dealer Services Inc.

39.     Defendant Reynolds is an Ohio corporation with its corporate headquarters and principal place of business located at One Reynolds Way, Kettering, Ohio.  Like CDK, Reynolds provides DMS software and services to automobile dealerships throughout the United States, including in New Jersey.  Reynolds was formerly a publicly traded company, but was privately acquired by Bob Brockman in 2006.

## CO-CONSPIRATORS

40.     Various others, presently unknown to Plaintiff, participated as co-conspirators in the violations alleged in this Complaint and performed acts and made statements in furtherance thereof.

41.     The acts charged in this complaint have been done by Defendants and their co-conspirators or were authorized, ordered or done by their respective officers, agents, employees, or representatives while actively engaged in the management of each Defendant's business or affairs.

## JURISDICTION AND VENUE

42.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).  The amount in controversy exceeds $5 million exclusive of interest and costs.  At least one Plaintiff and one Defendant are citizens of different states. There are more than 100 putative Class members.

43.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

44.     This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.  This Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367 because it is so closely related to the federal claims that they form part of the same case or controversy.

45.     This Court has personal jurisdiction over Defendants because they have engaged in the unlawful acts described in this Complaint with the foreseeable or intended effect of causing substantial economic harm to Plaintiff in New Jersey.

46.     Venue is proper in this Court pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d).  Defendants are

registered to do business, transacted business, were found, and had agents in the District; a substantial part of the events giving rise to Plaintiff's claims arose in the District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in the District.

47.     As described throughout the Complaint, Defendants' unlawful conduct has substantially affected interstate commerce by harming competition and increasing prices to the detriment of the Plaintiff, Dealers and Vendors throughout the nation.

## INTERSTATE TRADE & COMMERCE

48.     The actions complained of in this Complaint have restrained and adversely affected interstate commerce because Defendants provide their products and services across the nation, and the markets for DMS and Data Integration Services are both nationwide markets. Furthermore, during the Class Period Defendants sold a substantial amount of DMSs and provided extensive Data Integration Services within the continuous and uninterrupted flow of interstate and foreign commerce, and as intended, their actions substantially affected that commerce.

## FACTUAL ALLEGATIONS

49.      The relevant product markets for Plaintiff's claims are (1) the United States DMS Market; and (2) the Data Integration Services market.

**A.     Defendants Have Unlawfully Restrained Trade In The Dealer Management Software Market And Have Illegally Tied The Provision of DMSs To The Provision Of Data Integration Services**

      **(i)     The DMS Market**

50.     DMS software is enterprise software designed specifically for retail automotive dealerships.  It is the "lifeblood" software of a dealership.  Dealerships rely on DMS software to manage its operations, in that it "clearly measures, reports and controls the functions within a

dealership yielding quantifiable, reliable and timely information of significant importance to the dealer and dealership management."[13]

51.     Dealerships use the DMS to store data such as inventory, customer lists, and sales data, on the DMS's database and it integrates the critical business functions of a car dealership, including sales, financing, inventory management (both vehicle and parts), repair and service, accounting, payroll, human resources, marketing, and more.  The Dealer's own data, as well as customer data, is stored on the DMS.  A Dealer has only one DMS provider at a time.

52.     The DMS market consists of suppliers that sell and market DMS services to automobile dealerships in the United States.  The relevant geographical market is the DMS market in the United States.  There are no reasonable substitutes for the enterprise software and services provided by DMS providers to retail automotive dealerships.

53.     Plaintiff has participated in the DMS market through its direct purchases of the DMS from Reynolds.

### (ii)     CDK And Reynolds Control And Dominate The DMS Market

54.     During the Class Period, the DMS industry was dominated by relatively few companies.  In fact, CDK and Reynolds, referred to as "the Big 2" providers and "two giants" of the industry,[14] together dominate the DMS market, controlling approximately 75 percent of the

---

[13] *See* Deal Pack Blog, *Dealer Management System: What Is It and Which Dealers Need It?* http://www.dealpack.com/dealer-management-system-what-is-it-and-which-dealers-need-it/ (July 20, 2012); Jeff Smelley, *What Exactly Is DMS?* Autodealer Today, http://www.autodealermonthly.com/channel/dps-office/article/story/2006/08/what-exactly-is-dms.aspx (Aug. 2006).

[14] Michael Cross, *Dealer Management Systems: An Industry Ripe for Change*, Autosoft Dealer Management System, https://www.drivingsales.com/autosoftdms/blog/dealer-management-systems-an-industry-ripe-for-change (May 2, 2017); David Barkholz, *DMS dilemma:  Why it's so hard to switch*, Automotive News, http://www.autonews.com/article/20100510/retail07/305109976/dms-dilemma%3A-why-its-so-hard-to-switch (May 10, 2010); Vince Bond Jr.,

DMS market in the United States for dealerships (measured using franchised stores), with CDK controlling approximately 45 percent of the market and Reynolds controlling 30 percent (and more than 90 percent on the basis of vehicles sold from franchised dealers).[15]  Defendants' high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate and enforce activities.

### (iii)  CDK And Reynolds Exploit  Their Dominance In The DMS Market By Charging Artificially Inflated Prices For The Provision Of DMS

55.    A dealership's DMS operates as the business's central database and repository of all of its operational information.  Changing a DMS provider – akin to replacing its central database – disrupts the entire business operations of a dealership.  There are also significant costs associated with implementing the new alternative system involving many months, or even up to a year, of training of the dealer's staff, via online tutorials and in person sessions, to learn how to operate the new system.[16]  In addition, the financial costs to switch DMS providers are overwhelming.  As such, there are significant barriers to entry into the DMS market and it is extremely difficult and disruptive for a dealer to switch DMS providers, with some dealers analogizing a DMS change to a "heart transplant or a knee replacement.  Others say it's akin to reading a foreign language or teaching someone how to write with their opposite hand."[17]

---

*CDK's 'fantastic win' is now lost*, http://www.autonews.com/article/20161107/RETAIL07/311079964/cdks-fantastic-win-is-now-lost (Nov. 17, 2016).

[15] CDK has an approximate 45 percent share of the market, by number of franchised stores, and Reynolds has an approximate 30 percent share of the U.S. market for DMS services to new vehicle dealerships.  *See* Appellant CDK Global, LLC's Opening Brief and Circuit Rule 30(A) Appendix at 5n.1, *Authenticom, Inc. v. CDK Global, LLC and Reynolds & Reynolds, Co.*, No. 17-2540 (7th Cir. Aug. 4, 2017), ECF No. 47 ("CDK Appeal Brief").

[16] *Id.*

[17]  Vince Bond Jr., "*Survivors of DMS shifts tell their tales*," Automotive News, http://www.autonews.com/article/20170508/RETAIL07/305089978/survivors-of-dms-shifts-tell-their-tales (May 18, 2017).

56. These significant barriers to entry are exacerbated by the lengthy duration of Defendants' DMS contracts with Dealers, which are, on average, five to seven years in length, frequently with automatic extensions, and Dealers are "locked in" to these lengthy contracts; so only a fraction of the market is available to other DMS providers to compete for on an annual basis.

57. For instance, Plaintiff's present contract with Reynolds commenced in 2014, for a term of six years. These long-term contracts have variable fee provisions. For example, Reynold's "Customer Guide" provides for "Recurring Fees For Items and Services" and states:

> After that initial twelve (12) month period, the recurring fees for Items and Services may be adjusted from time to time to *our then-current, applicable rates*. However, during the Initial Services Term, the average increase in the list prices for recurring fees for Items or Services in the Reynolds Price List will not exceed the increase in the Consumer Price Index plus two percent (2%) during the period between rate changes. . . .

> *The foregoing limitation does not apply to: (a) Rental Fees, Transaction Fees and Database Update Services, time and materials charges, freight and Delivery charges, training fees, or any Incidental Charges – all of which will be available art our then-current rates,* or (b) Items we no longer offer for sale, or (c) when any Other Provider increases the fees it charges us beyond the limitation provided above, in which case we reserve the right to pass such additional fees on to you.

Customer Guide at 5-6 (emphasis added).

Defendants, as a result of their duopoly power, have imposed artificially inflated and supra-competitive fees for the provision of necessary services associated with the provision of DMS to Dealers.

58. From a practical standpoint, because of the lengthy contracts and the financial costs and disruption to business associated with switching DMS platforms, there is little recourse for Dealers to address or prevent Defendants' abusive practices by switching DMS providers,

thus Dealers and Vendors are locked into the exclusive dealing conduct exhibited by CDK and Reynolds.

59.     CDK's and Reynolds's dominance in the marketplace has left Dealers with no choice but to enter into long-term contracts for the provision of data managements systems with Defendants, to the exclusion of other potential DMS providers.

60.     Plaintiff and Class members have paid and continue to pay artificially inflated prices for DMS as a consequence of Defendants' dominance of the DMS market – their duopoly power – and their anticompetitive and illegal conduct.

> **(iv)     CDK And Reynolds Have Utilized Their Market Power In The DMS Market To Tie Dealers To The Purchase Of Their Data Integration Services**

61.     CDK and Reynolds have also utilized their market dominance in the DMS market to impose exclusive dealing provisions in Dealer contracts for the supply of DMSs.  In their DMS contracts with Dealers, both CDK and Reynolds require Dealers to agree that they will not provide anyone other than the DMS provider or its affiliates access to their data for purposes of data integration and syndication to Vendors.  The exclusive dealing provisions provide that Dealers cannot grant access to their own data on the DMS database, and only Defendants can access the Dealers' data on the DMS.

62.     The standard Reynolds Master Agreement stipulates that Dealers cannot "provide access to any Licensed Matter [the Reynolds DMS software] or non-public portions of the Site to any third party."  Likewise, Section 6.B of the CDK standard Master Services Agreement provides that **"[DEALER] IS NOT AUTHORIZED TO CAUSE OR PERMIT ANY THIRD PARTY SOFTWARE TO ACCESS TO CDK DEALER MANAGEMENT SYSTEM EXCEPT AS OTHERWISE PERMITTED BY THIS AGREEMENT."**  (bold and emphasis in original).

63.     These rights and restrictions last for the duration of the DMS contract, typically five to seven years.

64.     As such, pursuant to this standard provision, Dealers can only provide access to their data to CDK and Reynolds, and if they want to utilize their data stored on the DMS, must obtain CDK's and/or Reynolds's permission.  Thus, the contractual terms prohibit Dealers from granting access to *their* data to anyone else, including alternative Data Integration Service providers.  Accordingly, in acquiring a CDK or Reynolds DMS, Plaintiff and Class members are unlawfully tied to purchasing Reynolds or CDK data integration services.

**B.     Defendants Have Unlawfully Restrained Trade In The Dealer Data Integration Service Market**

**(i)     The Data Integration Services Market**

65.     Dealers frequently engage Vendors to perform essential services for the Dealer. These services require access to the Dealers' data.  Vendors do not obtain the data directly from the Dealer.  To access Dealer data, Vendors engage dealer data integration service providers to extract, aggregate, and format the pertinent data from the Dealer's DMS database.

66.     The Data Integration Services market consists of those companies that specialize in accessing and aggregating Dealers' data from DMS databases and provide services to Dealers and Vendors by extracting, formatting and aggregating data.  The relevant geographical market for the provision of Data Integration Services is the United States.  There are no reasonable substitutes for the services provided by data integrators to Dealers and Vendors engaged in the retail automotive industry.

67.     Vendors must have access to data stored on a Dealer's DMS in order to provide crucial services to the Dealer.  For example, Plaintiff engages BlueBird Auto Rental Systems ("BlueBird") to provide daily rental car services.  BlueBird requires access to Plaintiff's data to

provide its rental car services. The only place for Bluebird, like all Vendors, to access data in from the Dealers' DMS; the data is not stored anywhere else.

68. The Dealer authorizes the data integrator to extract their data from their DMS database, but does not directly pay the data integrator; the Vendors pay the Data Integration Service providers for extracting the Dealer's data. The Vendor typically passes on the cost of the Data Integration Service provider to the Dealer as part of its contract with the Dealer to perform its services.

69. CDK and Reynolds also provide Data Integration Services, separate from their DMS Services.[18]

> **(ii)** **CDK And Reynolds Have Also Imposed Exclusive Dealing Provisions On Vendors Further Restricting Competition In The Data Integration Market And Inflating Prices**

70. Pursuant to the exclusive dealing provisions in the Defendants' Master Service Agreements, Dealers cannot provide access to their data directly to alternative data integrators potentially engaged by the Vendors, but must attain the authorization of Defendants to enable Vendors to gain access to the dealer data stored on the DMS.[19]

---

[18] At one time, over a dozen integrators competed for Dealers' business. However, after Reynolds was privately acquired by Bob Brockman in 2006, Reynolds began blocking Data Integrators from accessing dealer data on the Reynolds DMS by disabling the integrators' dealer-created login credentials. CDK had issues with Reynolds's actions. When asked by Automotive News whether Dealers should be permitted to hand out passwords or user IDs to a Vendor for data extraction, Steven Anenen, now retired CEO of CDK replied, "We're not going to prohibit that or get in the way of that. I think we've stated pretty emphatically, we really believe the dealer owns the data. Obviously, they have to grant permission . . . . I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it when in fact it's really the data belonging to the dealer. As long as they grant permission, how would you ever go against that wish? I don't understand that." Ralph Kisiel, *ADP provides dealers 3 options on data access*, Automotive News, http://www.autonews.com/article/20070219/SUB/70215040/?template=print (Feb. 19, 2007).

[19] "Reynolds' standard vendor contract provides that the vendor and its agents are not authorized to directly or indirectly access the Reynolds DMS; they have to use RCI. A similar provision

71.     CDK and Reynolds also impose illegal exclusive dealing provisions in their contracts with Vendors.  In performing their contracted services for Dealers, are required to extract Dealer information from obtaining Data Integration Services.  The Vendor contracts include an exclusive dealing provision that stipulates that any Vendor, on performing its services to a Dealer, must extract data from a CDK or Reynolds DMS cannot contract with any other company that provides Data Integration Services.  These Vendor contracts are purportedly infinite in duration, meaning that even if a Vendor is no longer contracted with CDK or Reynolds for Data Integration Services, it would not be permitted to access data from any CDK dealer from another source, for all time.

72.     Defendants are also engaged in the data integration business.  Reynolds provides access to dealer data on the Reynolds DMS through the Reynolds Certified Interface, or RCI, program.[20]  CDK provides access to dealer data on the CDK DMS through CDK's Third Party Vendor or 3PA data integration product.[21]

---

appears in the standard 3PA agreement. ('Vendor agrees that it will . . . access data on, and provide data to, CDK Systems exclusively through the Managed Interface System[.]')." Authenticom Injunction Order at *21.  Indeed, in CDK's opening brief in its appeal of the Authenticom Injunction Order, CDK expressly stated that "the terms of its DMS service contracts expressly prohibit dealers from granting any unauthorized third-party access to the DMS, including by sharing login credentials." (internal citations omitted).  CDK Appeal Brief at 6.

[20] CDK's SecurityFirst is similar to Reynolds's RCI.  One Vendor stated that participation in RCI cost him more than $700 per month per Reynolds store, and a Dealer discussed after switching his DMS from Reynolds to a less expensive provider, he saved $450 per month per store because he was no longer paying for the Vendor's RCI.  David Barkholz, *Dealers Will Pay Up for Vendors' Data*, Automotive News, http://www.autonews.com/article/20150720/RETAIL07/ 30729962/dealers-will-pay-up-for-vendors-data-access-after-cdk-switch (July 20, 2015).

[21] Reynolds does not have an independent data integration business that pulls data from other DMS platforms.  Therefore, unlike CDK with its Digital Motorworks and IntegraLink businesses, Reynolds does not compete in the Dealer data integration market outside of the Reynolds DMS.

73.     As only CDK and Reynolds (and soon only CDK pursuant to a per se illegal horizontal agreement referred to below) have access to the Dealer data stored on Dealer DMSs pursuant to the exclusive dealing provisions, Defendants have effectively and illegally tied Dealers to engaging Defendants to provide Data Integration Services to their Vendors (third-party software application providers).

74.     The imposition of exclusive dealing provisions on Dealers for the provision of Data Integration Services has reduced competition in the Data Integration Services market and has artificially inflated the price of the Data Integration Services provided by CDK and Reynolds.

75.     Defendants have used their control of Dealer data to impose exorbitant fees on any party wishing to extract that data. Reynolds charges Vendors between $200-$900 per month in order to access a Dealer's own data.[22] Plaintiff indirectly pays Reynolds these fees.[23] As

---

[22] The Lexus of Westminster car dealership, located in Orange County, California – a medium sized dealership – indirectly pays CDK between $200 and $800 a month to access its own data. Declaration of Chris Longpre, President of Lexus of Westminster ¶ 5, *Authenticom*, ECF No. 55 (May 18, 2017). *Id.* ¶¶ 7, 8 ("As a result of CDK's integration fees, DealerSocket [a Vendor] has informed me they are raising the prices it charges my dealership by $500 a month. In short, I am indirectly footing the bill for a large fee increase so that one of my key application providers can access my own data.").

[23] In the Authenticom Injunction Order, the Court accepted evidence of the increase in the fees CDK and Reynolds charged to Vendors:

> Although Reynolds' information for pricing RCI integration services is not public, one witness, Alan Andreu, testified that when his software company, Dominion, first began using RCI in 2011, it was paying $247 per month per dealer. Come September 2017, that same data package will cost $893. Andreu also testified that Dominion was paying $457 per dealership for 3PA, CDK's integration service. ("So compared to Reynolds' 893, it's cheap—it's only $457—until you compare it to that $30 that I could have paid Authenticom."). A second vendor witness, Matthew Rodeghero with AutoLoop, testified that in 2015, Reynolds charged approximately $700 per month for a dealer using "the full suite of AutoLoop's products." Now, that price has gone up to $835, plus additional write-back fees. Access to the

22

such, Plaintiff effectively pays Reynolds so that Vendors can access Plaintiff's own data. As a result, Dealers are paying excessive fees to Vendors that reflect the large fee increases imposed by CDK and Reynolds for data integration, so that their crucial application providers can access the Dealer's own data.

76.     Plaintiff has participated in the Data Integration market by engaging Vendors to provide services that require the integration of the Plaintiff's own data stored on the Plaintiff's DMS system provided by Reynolds.

77.     Defendants' imposition of exclusive dealing provisions on Dealers and Vendors reduces competition in the Data Integration Services market that impacts Dealers both directly and indirectly, and violates federal and state antitrust laws.

> **(iii)    To Further Reduce Competition, CDK And Reynolds Entered An Illegal Anticompetitive Agreement To Divide The Data Integration Market**

78.     Not only are Dealers and Vendors unlawfully tied to engaging Defendants to provide Data Integration Services, Defendants have carved up the Data Integration Market and all but eliminated any competition. In February 2015, CDK and Reynolds entered into illegal written market division agreements to divide the Data Integration Market. Reynolds agreed that it would no longer compete with CDK in providing access to Dealer data on the Reynolds DMS.[24]

---

> CDK DMS via 3PA cost approximately $160 in 2014, $694 in 2016, and $735 in July 2017, without "any noticeable product improvements."

Authenticom Injunction Order at *14.

[24] In the Authenticom Injunction Order, the District Court of Wisconsin, described the Agreements as follows:

> The first of the three agreements was a so-called Data Exchange Agreement. In the Data Exchange Agreement, CDK agreed to wind down certain aspects of DMI, CDK's third-party integrator—specifically, those aspects that

79.     Defendants have different affiliated businesses that provide Data Integration Services — with different pricing — than their DMS services.  In 2002, CDK acquired Digital Motorworks, one of the largest dealer integrators in the market, which enabled CDK to "extract, transform and standardize data" from thousands of dealerships.   In 2010, CDK acquired IntegraLink, another data integrator that specialized in collecting data from dealerships.

80.     Until 2011, Data Integrators, including CDK, through Digital Motorworks and IntegraLink, extracted data from the Reynolds DMS databases.  In 2011, Reynolds blocked and disabled CDK's usernames, disrupting Digital Motorworks' and IntegraLink's pulling of data. As described by CDK to Dealers at the time, "Reynolds has instituted policies designed to prevent automated processes such as those used by IntegraLink, Digital Motorworks, and other

---

involved "hostilely integrating" with the Reynolds system. Reynolds agreed that it would not block DMI's access to the Reynolds system during the wind-down period, which might last as long as five years. And CDK agreed to cooperate with Reynolds to have DMI clients—vendors using DMI to poll data from the Reynolds system—transition to RCI, Reynolds' in-house "data integrator."  Defendants further agreed that they would not assist any person that attempts to access or integrate with the other party's DMS….

The remaining agreements in the set—the 3PA Agreement and the RCI Agreement—granted reciprocal access to defendants' in-house data integration platforms. Both Reynolds and CDK provide add-on software applications for dealers, just like third-party vendors. CDK wanted access to the Reynolds DMS for its applications, and Reynolds wanted access to the CDK DMS for its applications. Under the agreements, CDK's applications could access the Reynolds DMS via RCI, and vice versa. Reynolds received five free years of 3PA access, purportedly as consideration for its allowing DMI's access to the Reynolds system during the wind down. By signing up for 3PA, Reynolds agreed that it would access the CDK DMS exclusively through 3PA, and Reynolds agreed that it would not "otherwise access, retrieve, license, or otherwise transfer any data from or to a CDK System (including, without limitation, pursuant to any 'hostile interface') for itself or any other entity," or contract with any third parties to access the system. The RCI Agreement contains similar restrictions: "Non-Approved Access" is any access to the Reynolds DMS made without Reynolds' prior written consent.

Authenticom Injunction Order at *9-11 (internal citations omitted).

third-party data-collection services from collecting data for programs you have enrolled in."[25] "In short," CDK explained, "when Reynolds and Reynolds blocks our access to your data on your dealership management system, we cannot perform the tasks you have asked us to perform." *Id.*

81. It was reported in Automotive News that as per Reynolds spokesman, Tom Schwartz, Reynolds had shut noncertified vendors out of approximately 150 dealerships nationwide, ostensibly under the pretext of consumer privacy concerns.[26]

82. Automotive News cited several Dealers whose businesses were severely disrupted and financially damaged by Reynolds' "crackdown on other vendors' accessing dealers' software systems without Reynolds' authorization." For example, a Dealer in Toledo, Ohio estimated the store lost more than $20,000 in business during a five-day period when Reynolds shut off IntegraLink's computer access that extracted inventory and sales data, and thus IntegraLink was unable to share that data with other Vendors used by that Dealer and the inventory was not posted on the networks for five days.[27]

83. One Vendor stated that Reynolds' crackdown "interrupted data flow [and] caused huge chaos . . . . Incentive payments couldn't be made to dealers. . . . Rebates [and] dealer payments were interrupted. They were held ransom."[28]

---

[25] IntegraLink, *Smart-R for Reynolds ERA Dealers*, https://www.integralink.com/downloads/smartr/

[26] David Barkholz, *Dealers Decry Reynolds Crackdown*, Automotive News, http://www.autonews.com/article/20111121/RETAIL07/311219997/dealers-decry-reynolds-crackdown (Nov. 21, 2011).

[27] *Id.*

[28] Vince Bond Jr., *'Held Hostage': Dealer asks NADA's help in DMS dispute*, Automotive News, http://www.autonews.com/article/20161226/RETAIL07/312269969/dealer-ask-nadas-help-in-dms-dispute (Dec. 26, 2016).

84. To circumvent Reynolds's blocking, CDK developed an application called "SMART-R" that "automates the process of running [Reynolds DMS data] reports (7601/7602), captures and encrypts the output, and then securely transfers the data to IntegraLink" or Digital Motorworks.[29] In short, with the help of its workaround, CDK continued to pull data of dealers using the Reynolds DMS.

85. CDK's concern for the protecting the proprietorship of Dealer's data was short-lived.

86. As discussed, in February 2015, CDK and Reynolds entered into an illegal written market division agreement to divide the data integration market. CDK agreed that it would no longer compete in providing access to dealer data on the Reynolds DMS. Moreover, because Reynolds already did not compete with CDK in providing access to data for Dealers using the CDK DMS, the agreement ensured that CDK and Reynolds would be the exclusive providers of Data Integration Services for Dealer data on their respective DMS platforms.

### (iv) CDK's And Reynolds's Per Se Illegal Agreement Has Artificially Inflated The Price Of Data Integration Services

87. To enhance their profitability, Defendants and their co-conspirators have engaged in a contract, combination, trust, or conspiracy, the effect of which has been to raise, fix, maintain, and/or stabilize the prices at which they provided DMS services since February 2015.

88. The agreement has given CDK exclusive control over data for Dealers using the CDK DMS, and Reynolds the same for Dealers using the Reynolds DMS. By seizing control

---

[29] IntegraLink, Smart-R for Reynolds ERA Dealers, https://www.integralink.com/downloads/smartr/

over access to Dealer data, CDK and Reynolds have been able to impose massive price increases for their Data Integration Services and obtain monopoly profits.[30]

89.     While those massive price increases have been imposed on Vendors that engage the Data Integration Service providers (namely CDK and/or Reynolds), the Vendors pass the data integration charges onto the Dealers.[31]   The fees charged by Reynolds for Plaintiff's Vendors to access its own data through Reynolds's Dealer Data Integration Services have been passed onto Plaintiff.

90.     Mitch Walters, president of the Friendship Family of Dealerships in Bristol, Tennessee, authored a December 20, 2016 letter to Peter Welch, President of the National Automobile Dealers Association ("NADA").   Walters informed Automotive News that he felt Dealers are "stuck in the middle of a war between DMS providers and third-party vendors as more companies decide to charge for access."[32]

91.     The December 20, 2016 letter stated in pertinent part:

> I am writing to ask for the assistance of NADA in helping not only me, but other retail automobile dealers, resolve the issue of the integration surcharges that are being charged to dealerships as a result of a conflict between the DMS providers (e.g., CDK and Reynolds & Reynolds) and most every third party vendor that a retail automobile dealership maintains a partner relationship.

---

[30] "[T]estimony from software vendors suggests that data integration prices have risen considerably, particularly in comparison to prices charged by third-party integrators." Authenticom Injunction Order at 21.

[31] Dealers cannot determine the amount of the excessive fees passed onto them by Vendors because the standard RCI vendor contract prohibits the vendor from discussing RCI costs and, "[s]imilarly, CDK prevents vendors from putting a line item on their bills attributable to 3PA charges." Authenticom Injunction Order at 15.

[32] Vince Bond Jr., Dealer asks NADA's help in DMS dispute, Automotive News, http://www.autonews.com/article/20161226/RETAIL07/312269969/dealer-asks-nadas-help-in-dms-dispute (Dec. 26, 2016).

I struggle with the fact that dealerships provide data to a DMS provider and then the DMS provider charges a third party vendor an 'integration surcharge' to access the data, which actually belongs to the dealership. The third party vendor is then compelled to pass this unfair charge or assessment to the dealer who created the data in the first place.

It is like a dealership is "held hostage" with its own data. This is unfair and unreasonable. The DMS providers insist that the only way for a dealer not to experience this unfair surcharge is to utilize products that are exclusive to the DMS provider in lieu of a dealership choosing the vendor it desires. I believe that a dealership should be able to partner with the third party vendor that has the best solution to assist the dealership with making more sales and more gross profit, and not an internal vendor that is owned and controlled by a DMS provider.

Each dealership should have the right to control its own data and authorize partners (vendors) that provide software and programs that use the dealer's data to achieve operational efficiencies and the best ROI.[33]

92.     NADA released a statement in response that, "NADA is aware of the concerns voiced by many dealers about the third-party certification requirements imposed by some of the DMS companies, and about limited options in the DMS marketplace generally. Transparency, choice and fairness are just as important to dealers running their businesses as they are to the customers those dealers serve . . . ."[34]

93.     Walters stated that his eight stores had been using customer-relationship management tools from the Vendor, VinSolutions, owned by Cox Automotive. Between VinSolutions and being charged a data surcharge by CDK, which added approximately $2,400 to the monthly bills of his dealerships for both products, Walters concluded that, "We've got $30,000 overhead now that we shouldn't have. It's our data."[35]

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

94.     Dealerships that have more than 20 rooftops (stores) are likely to work with more than 80 Vendors that need third-party access from CDK.  Accordingly, if a dealership works with 80 Vendors and has to pay $200 fees that are passed on from a Vendor, they could end up paying an extra $16,000 per month.[36]

95.     Plaintiff has purchased services from dozens of Vendors and has been injured by paying supra-competitive prices for Vendor services.

96.     Furthermore, in effectively cornering the Data Integration Market, Defendants have effectively eliminated competition in the DMS market.  To effectively run their retail automotive dealerships, Dealers engage Vendors to utilize their data to provide Dealers with necessary services such as inventory management, customer relationship management, and electronic vehicle registration and titling.  However, Defendants have utilized their market dominance and duopoly power to significantly limit the number of Data Integrators and Vendors willing to provide their services on alternative DMSs.  Accordingly, Dealers have little, if any, choice but to acquire Defendants' DMS and pay artificially inflated fees – supra-competitive prices – for DMS.

> **(v)     Defendants Claim Inflated Prices Are A Result Of Heightened Data Security, But Security Is Merely A Pretext for Defendants' Illegal Conduct**

97.     Reynolds has adopted a data security and vendor-access program known as RCI. In June 2015, CDK announced its own initiative called "SecurityFirst," to provide better protection of customer data from being accessed by unauthorized users.  CDK planned to start

---

[36] *Id.*

charging higher fees to Vendors, such as customer relationship and inventory management software providers, to obtain access to Dealers' data.[37]

98.    Automotive News reported that Vendors in the CDK program "lament that they plan to pass those extra costs on to their dealer customers," asserting that the costs charged by CDK far exceeded any alleged value of increased data security.[38]   Automotive News also reported that Vendors estimated that CDK's charge of approximately $475 per dealership for Dealer access would be approximately $1,600 in a year's time – a net increase of $1,125 if all the increases are passed onto the Dealers.

99.    CDK announced that it intended to charge each third-party vendor in SecurityFirst between $250-$300 per month per store for each software product, when charges were currently substantially lower – about $70.00 per software product – in 2015.[39]   Automotive News reported that "[a] vendor executive who asked not to be named called the data-access cost a surcharge under the guise of data security."

100.    Automotive News also reported that they spoke with senior executives of three large third-party Vendors that were in CDK's Vendor-access at that time.  Those Vendors (part of the approximately 120 Vendors in CDK's program) only spoke on the condition of anonymity because they "fear[ed] reprisals" from CDK, stated that CDK began serving them termination notices in the spring, effectively notifying them that Vendors would lose access to Dealer data needed to perform their services until they got certified under SecurityFirst.  The new program would raise monthly data fees from approximately $50 per store per month to as much as $600

---

[37]    David Barkholz, *Dealers Will Pay Up for Vendors' Data*, Automotive News, http://www.autonews.com/article/20150720/RETAIL07/30729962/dealers-will-pay-up-for-vendors-data-access-after-cdk-switch (July 20, 2015).

[38] *Id.*

[39] *Id.*

for customer relationship management software. "That extra cost will be passed along to dealerships, the executive said."[40] Some Vendors reported that monthly fees doubled after SecurityFirst.[41]

101. The Banks Report, an automotive industry publication, discussed that at the Digital Dealer Conference in Las Vegas, held in October 2015, Vin Solution (a Cox Automotive subsidiary), as well as other Cox subsidiaries, were refusing to sign CDK's new data access agreements that were part of its SecurityFirst initiative. If companies refused to sign the agreements, CDK would cut off their access to data on the CDK systems.[42]

102. The Banks Report discussed that prices to access data in CDK's systems could increase from 300 percent to 800 percent, and that one Vendor alleged that it was already paying $6 million combined to CDK and Reynolds for access to data. Significantly, the article stated that Vendors said they would have to pass the costs to the Dealers if CDK continued with their new prices.[43] The article cited Reynolds as "play[ing] this game for years." Vendors that failed to participate in Reynolds's RCI program, were denied access to Reynolds' systems. "Vendors get shut out, and then find a way to work around the problem by finding a 'hostile' or backdoor entry. Reynolds then finds the backdoor entry and shuts its [sic] down. It's almost like 'Whack-A-Mole.'"[44]

---

[40] *Id.*

[41] Vince Bond Jr., *Dealer asks NADA's help in DMS dispute*, http://www.autonews.com/article/20161226/RETAIL07/312269969/dealer-asks-nadas-help-in-dms-dispute (Dec. 26, 2016).

[42] Cliff Banks, The Banks Report, *Data Access Battle Goes Nuclear, http://www.thebanksreport.com/legalpolitical/data-access-battle-goes-nuclear/* (Oct. 12, 2015).

[43] *Id.*

[44] *Id.*

103.    The Banks Report continued that Vendors would have to choose whether to fight CDK or pay their higher prices, a concern since early 2014, that CDK would engage in such practices when they were spun off from ADP Dealer Services.   The article concluded that Dealers "are caught in the middle – either they'll end up seeing increased charges from their vendors or, they'll see a sudden drop off in service from their vendors."   The Report also noted that passing their costs onto Dealers might be a viable strategy for Vendors, and that Dealers could soon be paying much higher prices for Vendor services.[45]

104.    Defendants' assertion that the inflated prices it imposes for Data Integration Services is a result of the costs of implementing heightened data security systems is thus merely a pretext for Defendants' illegal conduct.[46]

## CLASS ACTION ALLEGATIONS

105.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3) on its own behalf and on behalf of the following Class, of which Plaintiff is a member:

> All persons and entities residing in the United States engaged in the business of the retail sale of automobiles who directly purchased DMS from one or more Defendants or co-conspirator, or any predecessor, successor, subsidiary or affiliate, and indirectly purchased the Data Integration Services from one or more Defendants or co-conspirator, or any predecessor, successor,

---

[45] *Id.*

[46] In the Authenticom case, Defendants attempted to justify the increased costs of its data integration services as resulting from undertaking "the burden of maintaining the DMS and preserving its security."   Authenticom Injunction Order at 23.   However, the Western District of Wisconsin was not persuaded because "defendants did not present evidence of the cost of data integration [and]  the dealers already pay a lot for the DMS, and defendants did not put in any evidence to quantify the additional expense of providing data integration."   *Id.*   Furthermore, "defendants did not show that properly managed third-party access, even using dealer credentials and screen scraping, really poses additional security risks."   *Id.*   The Court also noted that "Reynolds allows significant exceptions by 'whitelisting' certain third parties that it allows to access its system, most notably DMI, CDK's third-party integrator."   *Id.*

> subsidiary or affiliate, between January 1, 2011 to the present, or
> until the anticompetitive effects of Defendants' conduct cease.

Plaintiff also brings this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3) on its own behalf and on behalf of the following sub-class (the "New Jersey Sub-Class"), of which Plaintiff is also a member:

> All persons and entities residing in the state of New Jersey engaged in the business of the retail sale of automobiles who directly purchased DMS from one or more Defendants or co-conspirator, or any predecessor, successor, subsidiary or affiliate and indirectly purchased the Data Integration Services from one or more Defendants or co-conspirator, or any predecessor, successor, subsidiary or affiliate, between January 1, 2011 to the present, or until the anticompetitive effects of Defendants' conduct cease.

106. Excluded from the Class are (a) Defendants and their officers, including any entity or division in which Defendants have a controlling interest, as well as their directors, management, employees, agents, officers, trustees, subsidiaries, affiliates, assigns, and successors, and other persons or entities related to, or affiliated with Defendants; and (b) the Judges to whom this case is assigned, their staff, and their immediate families.

107. The exact number of Class members is unknown to Plaintiff. Due to the nature of the trade and commerce involved, Plaintiff believes there are likely thousands of Class members geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

108. There are questions of law and fact common to the Class, including but not limited to the following:

> (a) Whether Defendants engaged in or entered into a contract combination or conspiracy among themselves to fix or artificially inflate prices, and allocate customers of DMSs and Data Integration Services supplied in the United States;

(b)     Whether Defendants' unlawful conduct has enabled them to artificially inflate or fix prices and allocate customers of DMSs and Data Integration Services supplied in the United States;

(c)     The effect of the combination or conspiracy on the prices of DMSs and Data Integration Services supplied in the United States during the Class Period;

(d)     Whether Defendants agreed allocate customers by not pursuing those customers' business in the Data Integration Services market;

(e)     The identity of the co-conspirators;

(f)     Whether Defendants and their co-conspirators violated Sections 1 and 2 of the Sherman Act;

(g)     Whether Defendants and their co-conspirators violated N.J.S.A § 56:9-4;

(h)     Whether the conduct of Defendants and their co-conspirators caused injury to the business of Plaintiff and Class members;

(i)     The appropriate measure of damages sustained by Plaintiff and Class members;

(j)     Whether injunctive relief is appropriate;

(k)     If injunctive relief is appropriate, what types of relief are suitable in this matter; and

(l)     Whether Plaintiff and the Class members should be awarded attorney' fees and costs.

109.    These common questions and others predominate over questions, if any, that affect only individual Class members.

110.    Plaintiff is a member of the Class.  Plaintiff's claims are typical of the claims of the Class because Plaintiff purchased its DMS directly from one or more Defendants or their co-conspirators and Plaintiff indirectly purchased Data Integration Services from one or more Defendants or their co-conspirators.  As a result, Plaintiff and all Class members were injured by the same wrongful conduct of Defendants, and the relief sought is common to all Class members.

111.    Plaintiff will fairly and adequately protect and represent the interests of the Class.  The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Class.  By advancing its claim, Plaintiff will also advance the claims of all Class members, because Defendants participated in activities that caused all Class members to suffer similar injuries.

112.    Plaintiff and its counsel will fairly and adequately protect the interests of absent Class members.  There are no material conflicts between Plaintiff's claims and those of absent Class members that would make class certification inappropriate.  Counsel for Plaintiff are highly experienced in complex class action litigation, including antitrust litigation, and will vigorously assert Plaintiff's claims and those of absent Class members.

113.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

114.    A class action is superior to other methods for the fair and efficient resolution of this controversy.  The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court.  The damages suffered by Plaintiff and each Class member are relatively small as compared to the expense and burden of individual prosecution of claims asserted in this litigation.  Thus, absent class certification, it would not be feasible for Plaintiff and Class

members to redress the wrongs done to them. It would also be grossly inefficient for the judicial system to preside over large numbers of individual cases. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the judicial system.

## ANTITRUST INJURY

115. The aforesaid conspiracy had the following effects, among others:

    (a)    Price competition among the Defendants and co-conspirators in the sale and supply of DMSs and Data Integration Services was restrained and suppressed;

    (b)    Prices of for the sale and supply of DMSs and Data Integration Services in the United States was fixed, raised, maintained and/or stabilized at supra-competitively higher, non-competitive levels;

    (c)    Direct purchasers of DMSs, including Plaintiff and Class members, were deprived of the benefit of free and open competition in the purchase of DMSs; and

    (d)    Indirect purchasers of Data Integration Services, including Plaintiff and Class members, were deprived of the benefit of free and open competition in the purchase of Data Integration Services.

116. The effect of Defendants' and co-conspirators' anticompetitive conduct, as alleged herein, has been to artificially inflate the prices for the sale and supply of DMSs and Data Integration Services in the United States. By engaging in a price-fixing conspiracy, prices have been supported at artificially high levels throughout the United States, and as a result, direct purchasers of DMSs have paid supra-competitive prices, and indirect purchasers of Data Integration Services have paid supra-competitive prices.

117.    As a result of the Defendants' anticompetitive conduct, Plaintiff and Class members paid more for the sale and supply of DMSs and Data Integration Services in the absence of the conspiracy than they would have, and thus suffered substantial damages.

## CLAIMS FOR RELIEF

### COUNT I

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR ENTERING A HORIZONTAL AGREEMENT TO REDUCE COMPETITION IN THE DATA INTEGRATION SERVICES MARKET

118.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

119.    CDK and Reynolds are horizontal competitors of one another in the DMS market and the Data Integration Services market.

120.    In February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the Data Integration Services market with the intention of eliminating or significantly curtailing competition in the Data Integration Services market.

121.    In doing so, Defendants CDK and Reynolds have entered into and continue to engage in an agreement in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

122.    These horizontal market-share agreements did reduce competition in the Data Integration Services market.

123.    The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding, or concerted action to eliminate competition in the DMS market and the Data Integration Services market.

124.    Plaintiff and the Class have no adequate remedy at law and will suffer irreparable harm unless Defendants are enjoined from continuing to implement their unlawful agreement in

the future, and the Court remedies the conditions Defendants created in the DMS market and the Data Integration Services market. Otherwise, Plaintiff and the Class will continue to pay more for DMS Services and Data Integration Services than they would have in the absence of the conspiracy.

**COUNT II**

**VIOLATION OF**
**SECTION 1 OF THE SHERMAN ACT FOR THE IMPOSITION OF**
**EXCLUSIVE DEALING PROVISIONS**

125.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

126.    CDK and Reynolds entered into contracts with Dealers and Vendors that contain exclusive dealing provisions that unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

127.    Pursuant to their conspiracy to eliminate competition in the Data Integration Services market, CDK and Reynolds inserted exclusive dealing provisions in their contracts with Dealers and Vendors. The contracts with Dealers provide that Dealers cannot provide access to their Data to any data integrator except CDK or Reynolds, respectively. Likewise, the contracts with Vendors provide that Vendors cannot obtain data for Dealers using the CDK or Reynolds DMS from any data integrator except CDK or Reynolds, respectively. These provisions are standard throughout Defendants' contracts with Dealers and Vendors.

128.    CDK and Reynolds were able to impose these exclusive dealing provisions on Dealers and Vendors as a result of their market power in the DMS Market (Dealers) and the Data Integration Services market (Vendors).

129.    Because CDK and Reynolds imposed these exclusive dealing provisions pursuant to their conspiracy to eliminate competition in the Data Integration Services market they are per se illegal.

130.    These exclusive dealing provisions have caused actual injury to competition in the DMS market and the Data Integration Services market.

131.    Defendants' exclusive dealing agreements do not enhance efficiency or competition in the DMS or Data Integration Services markets.  On the contrary, the agreements have produced only anticompetitive effects in both markets.

132.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury to their business or property.

133.    Plaintiff and the Class are entitled to treble damages for the violations of the Sherman Act alleged herein.

134.    Plaintiff and the Class have no adequate remedy at law and will suffer irreparable harm unless Defendants are enjoined from continuing to impose unlawful exclusive dealing provisions in the future, and the Court remedies the conditions Defendants created in the DMS and Data Integration Services markets.  Otherwise, Plaintiff and the Class will continue to pay more for DMS and Data Integration Services than they would have in the absence of the conspiracy.

## COUNT III

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR ILLEGALLY TYING THE PROVISION OF DATA INTEGRATIONS SERVICES TO THE <u>PURCHASE OF DMS</u>

135.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

136. CDK and Reynolds have imposed tying arrangements on Dealers that unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

137. CDK and Reynolds have tied Dealers' use of Defendants' integration services to their DMS services. That is, as a condition of Dealers using Defendants' DMS services, Defendants also require Dealers to use Defendants' own integration services and not use their competitors' integration services. Thus, Defendants coerce customers of their DMS systems — i.e., the Dealers — into using Defendants' Data Integration Services.

138. DMS systems are a separate and distinct product from Dealer Data Integration Services.

139. Defendants have sufficient market power in the market for DMS, where they have had a longstanding duopoly, to appreciably restrain free competition in the market for the tied product (Data Integration Services). Defendants have demonstrated their ability to leverage their market power in the DMS market to control prices and exclude competition in the tied market (the market for Data Integration Services).

140. Defendants' tying arrangements have affected a substantial amount of interstate commerce.

141. Defendants' tying arrangements are a per se violation of the federal antitrust laws and are, in any event, unreasonable and unlawful restraints of trade and commerce.

142. As a direct and proximate result of Defendants' unlawful tying arrangement, Plaintiff and the Class have suffered injury to their business or property.

143. Plaintiff and the Class are entitled to treble damages for the violations of the Sherman Act alleged herein.

144.     Plaintiff and the Class have no adequate remedy at law and will suffer irreparable harm unless Defendants are enjoined from continuing to implement their unlawful tying arrangements in the future, and the Court remedies the conditions Defendants created in the Data Integration Services and DMS markets.  Otherwise, Plaintiff and the Class will continue to pay more for DMSs and Data Integration Services than they would have in the absence of the conspiracy.

## COUNT IV

### VIOLATION OF SECTION 2 OF THE SHERMAN ACT FOR MONOPOLIZATION OF THE DMS AND DATA INTEGRATION SERVICE MARKETS

145.     Plaintiff repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

146.     CDK and Reynolds have unlawfully monopolized the Data Integration Services Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

147.     In the primary DMS product market, Defendants have a longstanding duopoly. When Dealers purchase Defendants' brand of DMS, they are "locked in" to that brand through a long-term contractual relationship and the significant financial costs and time associated with implementing a new alternative system.

148.     Because of customer lock-in in the primary DMS market, Defendants have monopolized the markets for Dealer Data Integration Services on their respective DMS platforms.  CDK and Reynolds have demonstrated their ability to control prices and exclude competition by blocking third-party integrators from accessing Dealer data stored on their systems and by profitably raising integration fees to supra-competitive levels.

149.     CDK and Reynolds used anti-competitive means to acquire and maintain their monopolies in the market for Dealer Data Integration Services, including, *inter alia*, by blocking

and disabling third-party integrators from accessing Dealer data, entering into a market division agreement pursuant to which they agreed not to compete in the aftermarkets, and imposing anticompetitive exclusive dealing arrangements on Vendors and Dealers.

150.   Defendants' ability to exclude competition and impose massive price increases demonstrates their market power in the market.   And such conduct has no procompetitive business justification.

151.   As a direct and proximate result of Defendants' unlawful use of their duopoly power, Plaintiff and the Data Integration Class have suffered injury to their business or property.

152.   Plaintiff and the Data Integration Class are entitled to treble damages for the violations of the Sherman Act alleged herein.

## COUNT V

**VIOLATION OF NEW JERSEY ANTITRUST ACT, N.J.S.A. § 56:9-4**
**FOR ENTERING A HORIZONTAL AGREEMENT TO REDUCE COMPETITION IN**
**THE DATA INTEGRATION SERVICES MARKET**

(On Behalf Of The New Jersey Sub-Class For Injunctive Relief Only)

153.   Plaintiff repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

154.   Defendants are engaged in the conduct of trade and commerce in the state of New Jersey.

155.   CDK and Reynolds are horizontal competitors of one another in the DMS market and the Data Integration Services market.

156.   In February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the Data Integration Services market with the intention of eliminating or significantly curtailing competition in the Data Integration Services market.

157.    In doing so Defendants CDK and Reynolds have entered into and continue to engage in an agreement in restraint of trade in violation of N.J.S.A. § 56:9-4.

158.    These horizontal market-share agreements did reduce competition in the Data Integration Services market.

159.    The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding, or concerted action to eliminate competition in the Data Integration Services market.

160.    Plaintiff and the New Jersey Sub-Class have no adequate remedy at law and will suffer irreparable harm unless Defendants are enjoined from continuing to implement their unlawful agreement in the future, and the Court remedies the conditions Defendants created in the Data Integration Services market.  Otherwise, Plaintiff and the New Jersey Sub-Class will continue to pay more for Data Integration Services than they would have in the absence of the conspiracy.

161.    Plaintiff and the New Jersey Sub-Class have suffered, and will continue to suffer, injury to their business or property.

162.    Plaintiff and the New Jersey Sub-Class are entitled to injunctive relief for the violations of the N.J.S.A. § 56:9-4 alleged herein.

## COUNT VI

### VIOLATION OF NEW JERSEY ANTITRUST ACT, N.J.S.A. § 56:9-4 FOR THE IMPOSITION OF EXCLUSIVE DEALING PROVISIONS

(On Behalf Of The New Jersey Sub-Class For Injunctive Relief Only)

163.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

164.    Defendants are engaged in the conduct of trade and commerce in the state of New Jersey.

165.    CDK and Reynolds entered into contracts with Dealers and Vendors that contain exclusive dealing provisions that unreasonably restrain trade in violation of N.J.S.A. § 56:9-4.

166.    Pursuant to their conspiracy to eliminate competition in the Data Integration Services market, CDK and Reynolds inserted exclusive dealing provisions in their contracts with Dealers and Vendors.  The contracts with Dealers provide that Dealers cannot provide access to their Data to any data integrator except CDK or Reynolds, respectively.  Likewise, the contracts with Vendors provide that Vendors cannot obtain data for Dealers using the CDK or Reynolds DMS systems from any data integrator except CDK or Reynolds, respectively.  These provisions are standard throughout Defendants' contracts with Dealers and Vendors.

167.    CDK and Reynolds were able to impose these exclusive dealing provisions on Dealers and Vendors as a result of their market power in the DMS Market (Dealers) and the Data Integration Market (Vendors).

168.    Because CDK and Reynolds imposed these exclusive dealing provisions pursuant to their conspiracy to eliminate competition in the Data Integration Services market and respective aftermarkets, they are per se illegal.

169.    These exclusive dealing provisions have caused actual injury to competition in the Data Integration Services market.

170.    Defendants' exclusive dealing agreements do not enhance efficiency or competition in the Data Integration Services market.  On the contrary, the agreements have produced only anticompetitive effects in that market.

171.     Plaintiff and the New Jersey Sub-Class have no adequate remedy at law and will suffer irreparable harm unless Defendants are enjoined from continuing to implement their unlawful agreement in the future, and the Court remedies the conditions Defendants created in the Data Integration Services market.  Otherwise, Plaintiff and the New Jersey Sub-Class will continue to pay more for Data Integration Services than they would have in the absence of the conspiracy.

172.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the New Jersey Sub-Class have suffered, and will continue to suffer, injury to their business or property.

173.     Plaintiff and the New Jersey Sub-Class are entitled to injunctive relief for the violations of the N.J.S.A. § 56:9-4 alleged herein.

## COUNT VII

### VIOLATION OF NEW JERSEY ANTITRUST ACT, N.J.S.A. § 56:9-4 FOR ILLEGALLY TYING THE PROVISION OF DATA INTEGRATIONS SERVICES TO THE PURCHASE OF DMS

(On Behalf Of The New Jersey  Sub-Class For Injunctive Relief Only)

174.     Plaintiff repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

175.     Defendants are engaged in the conduct of trade and commerce in the state of New Jersey.

176.     CDK and Reynolds have imposed tying arrangements on Dealers that unreasonably restrain trade in violation of N.J.S.A. § 56:9-4.

177.     CDK and Reynolds have tied Dealers' use of Defendants' integration services to their DMS services.  That is, as a condition of Dealers using Defendants' DMS services, Defendants also require Dealers to use Defendants' own integration services and not use their

competitors' integration services.  Thus, Defendants coerce customers of their DMS systems —
i.e., the Dealers — into using Defendants' Dealer Data Integration Services.

178.    DMS systems are a separate and distinct product from Dealer Data Integration
Services.

179.    Defendants have sufficient market power in the tying market (the market for DMS
services, where they have had a longstanding duopoly) to appreciably restrain free competition in
the market for the tied product (Dealer Data Integration Services).  Defendants have
demonstrated their ability to leverage their market power in the tying market (DMS services) to
control prices and exclude competition in the tied market (integration services).

180.    Defendants' tying arrangements have affected a substantial amount of interstate
commerce.

181.    Defendants' tying arrangements are a per se violation of the federal antitrust laws
and are, in any event, unreasonable and unlawful restraints of trade and commerce.

182.    As a direct and proximate result of Defendants' unlawful tying arrangement,
Plaintiff and the New Jersey Sub-Class have suffered, and will continue to suffer, injury to their
business or property.

183.    Plaintiff and the New Jersey Sub-Class have no adequate remedy at law and will
suffer irreparable harm unless Defendants are enjoined from continuing to implement their
unlawful agreement in the future, and the Court remedies the conditions Defendants created in
the Data Integration Services market.

184.    Plaintiff and the New Jersey Sub-Class are entitled to injunctive relief for the
violations of the N.J.S.A. § 56:9-4 alleged herein.

## COUNT VIII

## MONOPOLIZATION OF THE DMS AND DATA INTEGRATION SERVICES MARKETS IN VIOLATION OF NEW JERSEY ANTITRUST ACT, N.J.S.A. § 56:9-4

(On Behalf Of The New Jersey Sub-Class For Injunctive Relief Only)

185.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

186.    Defendants are engaged in the conduct of trade and commerce in the State of New Jersey.

187.    CDK and Reynolds have unlawfully monopolized the Data Integration Services Market in violation of N.J.S.A § 56:9-4.

188.    In the primary DMS product market, Defendants have a longstanding duopoly. When Dealers purchase Defendants' brand of DMS, they are "locked in" to that brand through a long-term contractual relationship and the significant financial costs and time associated with implementing a new alternative system.

189.    Because of customer lock-in in the primary DMS market, Defendants have monopolized the markets for Dealer Data Integration Services on their respective DMS platforms.  CDK and Reynolds have demonstrated their ability to control prices and exclude competition by blocking third-party integrators from accessing Dealer data stored on their systems and by profitably raising integration fees to supra-competitive levels.

190.    CDK and Reynolds used anti-competitive means to acquire and maintain their monopolies in the market for Dealer Data Integration Services, including, *inter alia*, by blocking and disabling third-party integrators from accessing Dealer data, entering into a market division agreement pursuant to which they agreed not to compete in the aftermarkets, and imposing anticompetitive exclusive dealing arrangements on Vendors and Dealers.

191.    Defendants' ability to exclude competition and impose massive price increases demonstrates their market power.   And such conduct has no procompetitive business justification.

192.    As a direct and proximate result of Defendants' unlawful tying arrangement, Plaintiff and the New Jersey Sub-Class have suffered injury to their business or property.

193.    Plaintiff and the New Jersey Sub-Class have no adequate remedy at law and will suffer irreparable harm unless Defendants are enjoined from continuing to implement their unlawful agreement in the future, and the Court remedies the conditions Defendants created in the Data Integration Market.   Otherwise, Plaintiff and the New Jersey Data Sub-Class will continue to pay more for Data Integration Services than they would have in the absence of the conspiracy.

194.    Plaintiff and the New Jersey Sub-Class are entitled to injunctive relief for the violations of the N.J.S.A. § 56:9-4 alleged herein.

### COUNT IX

### <u>UNJUST ENRICHMENT</u>

(On Behalf Of The New Jersey Sub-Class)

195.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

196.    Defendants are engaged in the conduct of trade and commerce in the state of New Jersey.

197.    Defendants charge dealers exorbitant fees for DMS services by which they gain access to Dealers' data, and then overcharge them to utilize their own data by foreclosing competition in the Data Integration market.   Defendants have wrongfully profited at the expense of Plaintiff and the New Jersey Sub-Class.

198.    It would be unjust for Defendants to retain these ill-gotten profits.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and Class members pray for relief as set forth below:

A.    Certification of the action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiff as Class Representative and its counsel of record as Class Counsel;

B.    Declaring that the unlawful horizontal agreement alleged in Count I be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    Declaring that the exclusive dealing provisions alleged in Count II be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

D.    Declaring that the tying arrangements alleged in Count III be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

E.    Declaring that the monopolization of the Data Integration Services Market alleged in Count IV be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

F.    Declaring that the unlawful horizontal agreement alleged in Count V be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of N.J.S.A. 59:9-3;

G.    Declaring that the exclusive dealing provisions alleged in Count VI be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of N.J.S.A. 59:9-3;

H.    Declaring that the tying arrangements alleged in Count VII be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of N.J.S.A. 59:9-3;

I.     Declaring that the monopolization of the Data Integration Services Market alleged in Count VIII be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of N.J.S.A. 59:9-3;

J.     By ordering an accounting and disgorgement of Defendants' ill-gotten gains, namely artificially inflated revenues as a consequence of their unlawful anticompetitive conduct.

K.     Permanent injunctive relief which enjoins Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claims to act on their behalf, from, in any manner, continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and from otherwise violating the antitrust laws by entering into and carrying out their illegal agreements, and requires them to take affirmative steps to dissipate the effects of the violation;

L.     Declaring that Plaintiff and the Class recover treble their damages as caused by the conspiracy alleged herein, as provided by law, and that judgment in favor of Plaintiff and the Class be entered against Defendants in that amount;

M.     By awarding Plaintiff and Class members pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the complaint in this action;

N.     That Plaintiff and Class members recover their costs of this suit, including reasonable attorneys' fees and costs, as provided by law; and

O.     Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Trial by jury is demanded on all issues so triable.


Dated:  October 19, 2017                        Respectfully submitted,

                                                Attorneys for Plaintiff

                                                By: _____*/s/ James E. Cecchi*_____
                                                James E. Cecchi
                                                Lindsey Taylor
                                                **CARELLA, BYRNE, CECCHI,**
                                                **OSTEIN, BRODY & AGNELLO P.C.**
                                                5 Becker Farm Road
                                                Roseland, New Jersey 07068
                                                Tel.: (973) 994-1700
                                                JCecchi@carellabyrne.com
                                                LTaylor@carellabyrne.com

                                                Peggy J. Wedgworth
                                                Andrei V. Rado
                                                **MILBERG LLP**
                                                One Pennsylvania Plaza
                                                New York, NY 10119
                                                Tel.: (212) 594-5300
                                                pwedgworth@milberg.com
                                                arado@milberg.com

                                                Leonard A. Bellavia
                                                Steven Blatt
                                                **BELLAVIA BLATT & CROSSETT, PC**
                                                200 Old Country Road, Suite 400
                                                Mineola, New York 11501
                                                Tel.: (516) 873-3000
                                                lbellabia@dealerlaw.com
                                                smalone@dealerlaw.com

                                                *Attorneys for Plaintiff*

**JS 44** (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Peterboro Automall, Inc.

**DEFENDANTS**

CDK Global, LLC and The Reynolds and Reynolds Company

**(b)** County of Residence of First Listed Plaintiff    Bergen
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Carella, Byrne, Cecchi, Olstein Brody & Agnello, 5 Becker Farm Road, Roseland, New Jersey 07068

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product   Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability   ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &   Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander   ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'   Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability   Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine   **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product   ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability   ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability   ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal   Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting   ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment   Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/   **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations   ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare   ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment   ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities -   ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. sec. 1
Brief description of cause:
This is a claim for conspiracy to restrain trade with respect to auto dealer computer systems.

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions)

JUDGE       DOCKET NUMBER

DATE

10/19/2017

SIGNATURE OF ATTORNEY OF RECORD

James E Cecchi

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE