# EXHIBIT 4

# autodealer MONTHLY
## YOUR DAILY OPERATIONS MAGAZINE

October 1, 2014

# Judge Allows Antitrust Lawsuit Against CARFAX to Proceed

MINEOLA, N.Y. — This week, A federal judge denied a motion filed by CARFAX to dismiss a $350 million antitrust lawsuit brought against the provider of vehicle history reports by more than 750 dealerships. The case, filed by Bellavia Blatt on behalf of the dealers in April 2013, is being heard in the U.S. District Court for the Southern District of New York.

With the ruling, the case is now headed into the discovery phase. The lawsuit alleges that Carfax has forged illegal alliances with key players in the auto industry, freezing out competition and forcing dealers to pay higher prices for unreliable vehicle history reports. The suit notes that Carfax then uses its inflated revenues on ads that disparage dealers as dishonest.

"This recent decision is a substantial victory for the dealers, as the court held that we have asserted legally cognizable claims under the various antitrust laws," said Bellavia Blatt Senior Partner Leonard A. Bellavia, which is seeking substantial money damages per dealership and an injunction against the alleged illegal conduct. "This is an important initiative to redress wrongs being committed against both dealers and consumers."

Carfax declined to comment on the federal court's decision.



Leonard A. Bellavia, Esq.

© 2014 Auto Dealer Monthly. All Rights Reserved.

Amy Wilson | Automotive News | October 13, 2014 - 12:01 am EST

# Automotive News

## Factories, dealers clash over canceled store sales

Automakers are increasingly exercising their right to reject dealers' agreements to sell their stores, putting factories and retailers at odds over the question of what's best for the future of a franchise.



*Dealer Nicholas Parks, who has had two run-ins with automakers' right of first refusal, says he doesn't let the tactic keep him from trying to buy desirable stores.*

When Mercedes-Benz scuttled Jona-than Sobel's $30 million deal to buy a New Jersey dealership last year by exercising its right of first refusal, Sobel sued. And he got a lot more cautious about where he'd buy more dealerships to add to his stores in New York.

Sobel declined to discuss specifics of his lawsuit. But in general "right of first refusal has a chilling effect on the buy-sell market," he told Automotive News. "Why would I spend the time and the effort to structure a complex transaction only to find out a manufacturer is going to use their right of first refusal to cherry pick my best deals?"

Sobel is one of many dealers caught up in the increasing use of right of first refusal by manufacturers in buy-sell transactions. Franchise agreements have long given most automakers the right to refuse the original buyer on a dealership transaction and assign the sale, with no changes to the terms, to a dealer of its choosing.

In the past couple of years, automakers are exercising that right at an unprecedented level, say dealers, buy-sell advisers and dealer lawyers.

Automakers say they're doing so for good reasons: to support their minority dealer development programs, make sure franchises go to high-performing dealers with strong customer-satisfaction track records and preserve the long-term value of the brand for the sake of both the automaker and its entire dealer network.

But others say it's happening for what appear to be inexplicable reasons, shutting the door on buyers who are considered high-quality candidates.

For dealers, automakers' invoking that option can delay transaction closings and cost would-be buyers time and money that can't be fully reimbursed. The increased use ultimately will hurt dealership valuations and reduce competition for selling dealerships, some dealers and buy-sell advisers warn.

Audi, Mercedes, General Motors, Nissan and Jaguar Land Rover have all exercised right of first refusal in a number of recent transactions.

Some of those cases have triggered recent lawsuits. In suits earlier this decade, in Virginia regarding Ford Motor Co. and in Georgia regarding Mercedes, courts sided with the manufacturers.

In two more current cases, Sobel sued Mercedes-Benz USA in August 2013, saying the manufacturer missed its deadline to exercise the option. Another dealer, Ed Napleton, who runs a 24-store group based in Illinois, sued Jaguar Land Rover this year, saying the manufacturer improperly used the option when Napleton tried to buy the five-store Long Island Automotive Group. Miami lawyer Manuel Kadre was the assigned buyer in both the Mercedes deal and the Long Island Automotive deal.

> "For decades, it was extremely rare that buyers and sellers needed to worry about the right of first refusal," said New York dealer lawyer Leonard Bellavia, who represents both Sobel and Napleton. But now it's a problem, Bellavia and others say.

In the Sobel case, the sale of the dealership in question, Globe Motor in Fairfield, N.J., has been in limbo for more than a year with the owner, also named in the lawsuit, unable to complete the sale. A settlement is in the works.

Sobel, a former Goldman Sachs partner who bought the first of his four dealerships in 2010, is still looking for acquisitions -- outside New Jersey. He is searching in Florida and North Carolina, where right of first refusal is prohibited. He said he is also being careful about which franchises he considers.

### 'A stink'

Examples like Globe have created "a stink all over high-end franchises [in New Jersey] because manufacturers won't select anybody other than one of their cronies," said Jim Appleton, president of the New Jersey Coalition of Automotive Retailers.

The use of right of first refusal has ramped up in New Jersey in the past 24 months, Appleton said. In response, the state dealer association is pushing legislation that, among other things, would prohibit its use other than for minority dealer development reasons. Automakers vigorously oppose the legislation.

In testimony before a New Jersey Senate committee in June, Anna-Lisa Corrales, general counsel for Jaguar Land Rover North America, called the right of first refusal measure the "icing on the cake" of legislation that is "egregious" in favoring dealers over automakers.

Jaguar Land Rover has used the tool rarely, she said, because it costs a lot of money.

A manufacturer generally is obligated to reimburse a rejected buyer for costs incurred trying to buy the dealership, though dealers typically say reimbursements don't fully compensate them for all costs and their time.

# Automotive News

**Judge denies U.S. motion to dismiss suit over Chrysler dealer terminations**



**Dealers terminated during Chrysler's 2009 bankruptcy will be allowed to proceed with a lawsuit against the U.S. Treasury Department, alleging the government violated the Constitution in taking their store franchises.**

### Christina Rogers

**2/28/12 12:03 pm ET** Dealers terminated during Chrysler's 2009 bankruptcy will be allowed to proceed with a lawsuit against the U.S. Treasury Department, alleging the government violated the Constitution in taking their store franchises.

A ruling handed down Monday by the U.S. Court of Federal Claims denied the government's motion to dismiss the case. The lawsuit, filed in February 2011, contends that the Obama administration violated the Fifth Amendment, which says private property shall not "be taken" for public use "without just compensation".

The suit also alleges the terminations violated state legal rights by taking the franchises without adequate compensation.

"We received a very important decision today," the dealers' attorney, Leonard Bellavia of Mineola, N.Y., said Monday. He added: "After this decision, I expect those dealers sitting on the sidelines to join the case."

So far, 75 eliminated dealers have signed on to the suit, which seeks at least $200 million.

A Treasury department spokesman referred questions to the U.S. Department of Justice. A DOJ spokesman declined comment. Chrysler isn't named in the lawsuit.

The Treasury's auto task force, which was then headed by financier Steven Rattner, asked Chrysler and General Motors to make deeper cuts than the companies had originally planned.

As part of Chrysler's restructuring, 789 U.S. dealers were terminated, representing about one-quarter of the automaker's U.S. dealer body.

The decision clears the way for the case to move to discovery, Bellavia said. He added that he'll be seeking depositions from Treasury's auto task force.

Entire contents © 2018 Crain Communications, Inc

F&I and Showroom

THE INDUSTRY'S LEADING SOURCE FOR F&I, SALES AND TECHNOLOGY

# U.S. Court of Appeals Rules in Favor of Dropped Chrysler Dealers

April 10, 2014

WASHINGTON, D.C. — On Monday, the U.S. Court of Appeals rejected arguments for the dismissal of a lawsuit filed on behalf of 148 Chrysler dealerships against the U.S. government. The dealerships were closed as part of Chrysler's 2009 federal bailout agreement, and the dealers allege they were not fairly compensated.

The court's decision upholds the decision of a federal district court, but it requires that the complaint be amended to include allegations that the dealerships would still have value even if the government did not bail out Chrysler.

"What we'll probably allege is that Chrysler could have filed its own bankruptcy without a federal bailout and accomplished the same thing without having to terminate these dealers," Leonard Bellavia, senior partner of Bellavia Blatt Andron & Crossett P.C., told F&I and Showroom. The firm filed the lawsuit in February 2011.

"They could have sold it to Fiat or anybody else who was interested," Bellavia added. "And they didn't need the government to bail it out because a traditional Chapter 11 filing does not involve the U.S. government."

As part of its bailout agreement, Chrysler was required to terminate 25% of its dealerships, or 789 stores. A later report issued by the special investigator general concluded that the dealership closures were unnecessary.

"The government assumed wrongfully that the dealerships represented an overhead expense for Chrysler," Bellavia explained. "They didn't understand or appreciate at the time — it was all happening so quickly — that the dealerships paid 100% of their own expenses."

The law firm is arguing that the dealership closures amount to a "taking" under the Fifth Amendment. "Under the Fifth Amendment of the Constitution, it says that the government has the right to seize private property for the public benefit but it must pay responsible compensation," Bellavia added. "We're saying here the government committed a 'taking' but failed to pay the dealers the reasonable value of their businesses."

Monday's decision means that the lawsuit is a legally viable takings case under the Fifth Amendment.

"Now that this appeal has been decided in our favor, there's really no reason why the rest of the rejected Chrysler dealers shouldn't join this case as well," Bellavia added.

Copyright © 2014 F&I and Showroom. All Rights Reserved.

# F&I and Showroom

THE INDUSTRY'S LEADING SOURCE FOR F&I, SALES AND TECHNOLOGY

# Mass Action Suit Filed Against TrueCar

By Brittany-Marie Swanson | March 10, 2015



MINEOLA, N.Y. — The law firm of Bellavia Blatt & Crossett filed a mass action lawsuit against TrueCar today, claiming that dealers have been injured by the lead provider's business practices. So far, 117 dealerships are part of the suit — a number Senior Partner Leonard Bellavia expects to rise drastically.

"I have another 50 [dealers] I could have included, but I never would have been able to file the case in a reasonable amount of time," Bellavia tells F&I and Showroom. "Now that I've filed the case, I'm adding more dealers."

The lawsuit filed today in Federal Court for the Southern District of New York represents non-TrueCar affiliated dealerships, meaning dealers that either have not subscribed to TrueCar's services, or dealers that are former TrueCar subscribers. A second suit representing current TrueCar dealer customers will be filed in the coming weeks. The firm is also currently representing more than 1,000 dealers in an antitrust lawsuit against Carfax.

"Simply because a dealer is using TrueCar does not mean that they are happy with the business practices of TrueCar," Bellavia notes.

The business practices in question include offering customers a "no haggle" price, a promise Bellavia says the lead provider breaks right at the start of a transaction, violating the Lanham Act and unfair competition and deceptive trade practices under New York statutes.

"When a customer logs on to the website and puts in their data, the information gets shot out to three separate dealers right off the bat," he explains. "So as soon as the consumer clicks send, they will get inundated with texts, phone calls, emails and letters from three different dealers, each promising to do better than the other. So that's ipso facto haggling."

In addition, Bellavia says that TrueCar's business model forces its dealer clients into "bait-and-switch" situations by promising car shoppers that its dealers have certain colors and equipment in stock, even if that is untrue. The firm also alleges that TrueCar claims that its pricing is "below invoice," which conveys to the consumer that they are getting a vehicle below dealer cost.

"It's just blatantly misleading to the consumer," Bellavia adds.

As for the non-TrueCar affiliated dealerships represented in the lawsuit filed today, Bellavia says they are adversely affected by the presence of TrueCar dealers in their market.

"[TrueCar] deceives customers in their market area, essentially poaching them," the firm's senior partner notes. "If you live within a mile of a dealership, you will see TrueCar commercials and when you go online you will get a certificate for three dealers that are further away than the non-TrueCar dealerships. So dealers are losing business."

3/7/2018 Automotive News

# Automotive News

**New GM disclosure form riles dealers**
Critics see power play by the factory, breach of franchise agreement



Batey: Penalties if form not used

GM dealers could face major penalties, even termination, if they fail to use a new disclosure form for customers who buy non-GM service contracts.

Hannah Lutz

General Motors dealers could face major penalties, even termination, if they fail to use a new disclosure form for customers who buy non-GM service contracts, a new or with non-GM accessories or used vehicles with non-GM parts, the automaker told dealers last month.

But by enforcing the new disclosure process and draconian penalties, GM itself may be violating its franchise agreement, said dealership lawyers and associations, pushing the automaker's notice.

Under GM's franchise agreement, dealers for several years have been required to disclose when a service contract, part or accessory is a non-GM product. But now they m standardized form to make the disclosure, Alan Batey, president of GM North America, told dealers in a letter dated Aug. 10.

GM says the move is intended, in part, to make clear to consumers the limits of its responsibility and liability for non-GM products. But opponents see it as an attempt to products at the expense of competitors'. Given the size of the accessories, parts and service contract markets, the stakes are huge.

Dealers whose stores ignore the new disclosure form could be required to pay $500 per incident. They could become ineligible to buy other GM dealerships or to benefit f incentive programs, including the Essential Brand Elements program. Ultimately, the dealer could face possible franchise termination.

GM's letters to dealers

... failing to comply with these disclosure requirements may subject the dealer to an appropriate remedy, including but not limited to:

- Up to a $500 surcharge per incident/VIN;
- Rendering the Dealer ineligible for consideration for additional GM Dealership opportunities;
- Suspension from various current and future sales programs including, but not limited to SFE and EBE; or
- Termination of the Dealer Sales and Service Agreement.

- Aug. 10 letter from Alan Batey, president, GM North America

- This process is not intended to be punitive.

- Aug. 24 letter from Steve Hill, GM vice president, U.S. sales, service and marketing

The disclosure form makes clear to customers that GM "has no obligations to the customer under a non-GM service contract" and that "GM is not responsible for the cons installing non-GM parts, equipment, or accessories on the vehicle," the letter says.

If dealerships have installed non-GM parts, say while reconditioning a used vehicle, or accessories on a new or used vehicle, then dealership personnel must disclose that with the form. Customers may receive a list of non-GM parts installed by the dealership on request. If a previous owner of a used vehicle has installed non-GM parts or ac does not require the dealership to make such a disclosure and customers will not receive a list of non-GM installed parts, a spokesman for the automaker said. Over-the-co are also exempt from the disclosure.

3/7/2018                                                                Automotive News

In a follow-up Aug. 24 letter to dealers, Steve Hill, vice president of U.S. sales, service and marketing, clarified that most dealers sell GM parts, accessories and service cc properly disclose when they sell non-GM products. The new, standardized disclosure form is meant to ensure that consumers understand the source of the product, he said "For the disclosure requirements to have any meaning, however, there must be a consequence for a dealer who ignores or refuses to make these very important disclosures added. *Automotive News* obtained copies of both GM letters. The first letter was first reported in *F&I and Showroom*.

Dealers have 90 days from Sept. 1 to add the form to their sales and service process. After that, the GM zone and central office teams would consider the dealership's discl and the severity of the violations before imposing penalties.



Hill: Penalties are necessary.
**Pushback**
Dealership associations and lawyers for dealers oppose the new form and penalties.

Jim Moors, senior counsel for the National Automobile Dealers Association, said in an Aug. 17 letter to NADA members that some states restrict manufacturers from requ sell or favor the sale of the automaker's service contract or parts.
"These laws may be applicable to GM in this situation," he said. "While NADA cannot offer dealers legal advice, we strongly recommend that you not take any action tha agreement with the new requirements without consulting your legal counsel," he added.
Robert Vancavage, president of the New York State Automobile Dealers Association, requested in an Aug. 29 letter to Batey that GM rescind the letters and refrain from e policies as they are currently written in the letters.
Vancavage, with guidance from legal counsel Bellavia Blatt & Crossett, said that the policies do not comply with GM's own franchise agreement. In response to queries fr *News*, the GM spokesman said: "The new form is designed to be simple" and to create a consistent process throughout GM's dealer network.
Vancavage also said the policies violate the federal Dealer's Day in Court Act and six sections of the New York Vehicle and Traffic Law. Other states have similar provisio York's Vehicle and Traffic Law, said Len Bellavia, a partner at the law firm.
Vancavage added that the purpose of the disclosure form seems to be to "persuade GM dealers to sell, on an exclusive basis, among other things, GM parts, service contrac accessories," adding, "Such a requirement would be prejudicial to the monetary interests of a GM dealer and, in contrast, only benefit GM."



Bellavia: A ruse to lift GM sales?
**'Onerous'**
Because there is a disclosure requirement in the franchise agreement, dealers are provoked by GM's claim that the form was developed to boost transparency with custom( said. "The only thing that's being accomplished is to make the requirement more onerous so that the customer is reminded repeatedly that he's not buying a GM product," l "You could take that two ways. It could be belts and suspenders or it could be a ruse to try to increase sales of GM products."
Bellavia doubts that the new disclosure form and consequences for disregarding it will be implemented, but if they take effect, dealers are unlikely to change the way they predicted.
"It's not that [dealers] don't want to sell GM extended service contracts," for example, he said. "But there are circumstances where third-party contracts offer the same cov price."
Dealers aren't "looking to defeat General Motors," he said. "They're looking to [abide by] policies that make sense for everyone, especially consumers. This seems to be counterproductive."
But if dealers don't address their concerns with the automaker, other automakers may follow GM's lead, Bellavia said.
"It has far-reaching effects not only for GM sales but also for other manufacturers who might view this as an ability to apply the same pressure to their dealers."

Entire contents © 2018 Crain Communications, Inc