# EXHIBIT A

Case: 1:18-cv-00864 Document #: 119-1 Filed: 04/13/18 Page 2 of 74 PageID #:2

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| APEX MOTOR CO. d/b/a SHEARER ACURA | ) ) ) ) | CASE NO.: |
| *Plaintiff,* | ) ) ) | |
| v. | ) ) | |
| CDK GLOBAL, LLC; and THE REYNOLDS AND REYNOLDS COMPANY | ) ) ) | |
| *Defendants.* | ) ) ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Apex Motor Co. d/b/a Shearer Acura ("Plaintiff" or "Shearer"), by and through the undersigned counsel, individually and on behalf of all others similarly situated, bring this class action against Defendants CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("R&R") (collectively "Defendants") for damages, injunctive relief, and other relief pursuant to federal antitrust laws; and state antitrust, unfair competition, consumer protection, and unjust enrichment laws. Plaintiff demands a jury trial and alleges as follows:

## <u>NATURE OF ACTION</u>

1.     This lawsuit is brought as a proposed class action against Defendants CDK and R&R for unlawfully allocating markets and customers, which permitted them to artificially raise, and/or stabilize prices for data management systems ("DMS"), the service of extracting, formatting, integrating, and organizing the data stored on DMS ("Data Integration Services"), and the service of business management applications ("Vendor Services") throughout the United States.  Defendants accomplished this goal by forcing dealers into dealing exclusively with one

defendant or the other in meeting their extensive "back office" needs; agreeing not to compete for each other's customers; and by forcing independent competitors out of the market. The net effect was to create side-by-side data monopolies that raised prices to dealers and to downstream purchasers who need data to provide other services to dealers.

2.     The conspiracy was and is a restraint of trade and attempt to monopolize that violates the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2; and state antitrust, unfair competition, consumer protection laws, and the common law of unjust enrichment.

3.     Plaintiff seeks to represent all automobile dealerships that, during the period from and including January 1, 2015 through the present (the "Class Period"), purchased DMS from one or more Defendants, and any current or former subsidiaries of the Defendants.

4.     Automobile dealerships purchase DMS for the purpose of managing their everyday "back room" operations such as tracking vehicle and parts sales and parts inventory, recording customer information, and or providing Finance and Insurance (F&I) services. A DMS has a database component that allows automobile dealerships to enter and store data generated in real time. A DMS provides a dealership with comprehensive control over all departments of that dealership.

5.     A dealership cannot function normally without its DMS, as that software facilitates every step of a dealerships' retail business from processing sales transactions to sharing repair orders among its different departments and personnel.

6.     Defendant CDK sells DMS to Shearer and thousands of other dealers; and R&R sells its DMS to other members of the Classes (defined below). Defendants' DMS dominates the DMS landscape.

7.     The data that dealers store within the DMS, such as inventory, customers, sales, and maintenance, belongs to the dealerships.  Both CDK and R&R recognize in their contracts and elsewhere that dealers own their data.

8.     To CDK and R&R's way of thinking, owning the data is not the same as controlling that data. In addition to basic portal access, CDK and R&R control access to makers of "applications" based on the dealer data that they sell at anticompetitive prices. The addition of any service utility adds an immediate upcharge.

9.     Defendants control approximately 70 percent of the United States DMS market by number of dealers, and more if measured by the number of vehicles sold. They have maintained dominance of the DMS market for over thirty years.

10.     DMS is big, big business. CDK's total revenues for 2016 were $2.2 billion.[1] R&R's estimated revenues were $1.904 billion, an increase in revenues of more than $200 million in less than 6 months.[2]

11.     Defendants exercise their DMS chokehold though a series of interlocking agreements.  First, Defendants lock automobile dealerships into long-term service contracts for DMS, lasting between five and seven years, often with terms that allow automatic extensions and higher monthly fees if new services are ordered in the middle of the contract.  As much as an automobile dealer may have concerns about the terms of the contracts, changing DMS providers at the end of a contract involves hardware and software changes so cumbersome, expensive, inconvenient, and disruptive that preparation and training for the transition takes up to twelve months or longer.  Any transition would interfere with a dealer's daily retail business operations.

---

[1] *See* CDK Global Inc., Annual Report for the fiscal year ended June 30, 2017, Form 10-K, http://www.sec.gov.

[2] *See* Financial Information for The Reynolds and Reynolds Company, http://www.hoovers.com.

Switching can cost a dealership $50,000 up front for servers to run the DMS software.[3]

Defendants also resist assisting with the process of transition. These contractual and practical

barriers tie in a dealer to remain with CDK or R&R. These barriers to switching empower

Defendants to continue to charge dealers excessive service fees with little concern that

dissatisfied dealers would terminate their contracts any time soon.

12.     Dealerships also purchase services from third-party application providers

("Vendors," in industry parlance). Vendor Services' applications may handle inventory

management, customer relationship management, warranty services, repair orders, electronic

vehicle registration and titling, and more. A single dealership rooftop typically uses ten or more

separate applications. Vendors' applications require access to a dealers' DMS data, which they

acquire through Data Integrators ("Integrators"). Integrators extract data from DMS databases,

aggregate and standardize the data; then deliver it to Vendors. Dealerships authorize but

typically do not pay integrators to pull their data. Instead, Vendors pay Integrators for their Data

Integration Services. Dealerships purchase Vendor Services directly from Vendors.

13.     Defendants misuse their power over DMS data to dominate the Integration field.

CDK and R&R sell Data Integration Services in addition to DMS service. CDK's integration

product is called "Third Party Access" ("3PA") and R&R's is called the "R&R Certified

Interface" ("RCI"). As explained below, Defendants have divided up this market and agreed to

foreclose other integrators from the market.

14.     When dealerships and Vendors had a choice of integrators, the data integration

market flourished. Over a dozen integrators provided secure, reliable, and cost-effective access

---

[3] *See* David Barkholz, <u>DMS dilemma: Why it's so hard to switch</u>, Automotive News, May 10, 2010.

to dealerships' data. With that access, Vendors innovated and created numerous new software applications to help automobile dealerships sell and service cars.

15.     CDK and R&R used to compete with each other in the market for Data Integration Services. For over a decade, CDK provided Data Integration Services for dealers using R&R DMS, competing directly with R&R's RCI program.

16.     In 2011, R&R began to block other data integrators, including CDK, from accessing data on R&R DMS platforms by disabling integrators' login credentials. CDK continued to allow non-CDK data integrators to access dealerships' DMS data on CDK DMS.

17.     Then, the world changed. On February 18, 2015, CDK and R&R entered into a written agreement to divide the market and stop competing to provide Dealer Data Integration Services. CDK agreed to stop providing Data Integration Services for dealerships using the R&R DMS, ceding that ground exclusively to R&R. The agreement even provided for coordination between the Defendants to transition Vendors that had been using Data Integration Services from CDK to R&R. Because R&R already did not compete with CDK in providing access to data for dealers using CDK's DMS, the agreement ensured that CDK and R&R would be the exclusive providers of Data Integration Services on CDK or R&R DMS platforms.

18.     In conjunction with their illegal agreement to not compete, Defendants also agreed to block independent integrators. They were successful in carrying out this plan because they control access to automobile dealerships' DMS data. Ironically, the owners of this data – Plaintiff and members of the Classes – are not able to stop Defendants from blocking access to the dealer data.

19.     CDK had additional plans to eliminate competition by acquiring a competitor, Auto/Mate, Inc., at an offered price far in excess of its original standalone valuation of the

company, so that it could "substantially downgrade" Auto/Mate's "features and service, raise []
prices, and prevent CDK's larger customers from migrating…." See FTC's Complaint, *In the
Matter of CDK Global, Inc., et al.*, March 19, 2018. The FTC stopped the potential merger
because it concluded the proposed acquisition would reduce competition.

20.     After Defendants agreed to not compete and after they successfully foreclosed
other competitors in the Data Integration Services market, they charged artificially inflated prices
for DMS and related services that Plaintiff and other members of the putative Classes had to pay.
DMS fees have increased significantly between 2014 and now.

21.     Defendants not only control which integrator service Vendors can use in order to
sell their services to dealerships, but they also prohibit Vendors from informing dealers about the
reasons their Vendor fees have increased by using "Price Secrecy Provisions" in their Vendor
contracts. These provisions prevented dealers from discovering that higher Vendor fees are
being caused by the increased Data Integration access fees Defendants are charging Vendors.

22.     Defendants' anticompetitive conduct resulted in significant price increases for
dealer Data Integration Services and Vendor Services. Independent data integrators were
normally charging Vendors about $50 per month per dealership connection before 2015. CDK
charged Vendors a similar price before it entered into its agreement with R&R. Since the illegal
agreement was entered in 2015, CDK and R&R have charged Vendors an average of $300 per
month for the same services, and other Vendors as much as $800 per month. This increased
charge is ultimately borne by the Plaintiff and other members of the Classes.

23.     Defendants' illegal agreement made it impossible for Vendors to lower their
prices as they cannot access dealerships' data through an integrator of their choice. Even when a
data integrator offered better-priced and higher-quality integration services, Vendors were forced

to give up purchasing that service because Defendants blocked that integrators' access to DMS data. Consequently, more and more data integrators were driven out of the market as they lost clients. In a market where the Defendants dominate Data Integration Services and effectively control access to DMS data, Vendors and dealers are left with no choice but to pay supra-competitive prices demanded by the Defendants.

24. Because Plaintiff and members of the Classes pay Vendors for their third-party application services, they are the ultimate victims of Defendants' illegal conduct. The increased prices Plaintiff and members of the Classes have to bear do not bring them any higher quality or higher value services. All it does is afford Defendants monopoly profits.

25. As a direct result of the anticompetitive and unlawful conduct alleged herein, Plaintiff and the Classes (as defined below) paid artificially inflated prices for Dealership Management Systems Service, Data Integration Services, and Vendor Services during the Class Period and have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

24. This action arises under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, consumer protection, and unjust enrichment laws, and seek to obtain restitution, recover damages, and secure other relief against Defendants for violations of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state laws.

25. This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 6 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because those

Case: 1:18-cv-02656 Document #: 1-1 Filed: 04/12/18 Page 9 of 74 PageID #:8

claims are so closely related to the federal claims that they form part of the same case or controversy.

26.     This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different from the Defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

27.     Venue is proper in this Court pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d).  One or more of the Defendants resided, transacted business, were found, or had agents in the District; a substantial part of the events giving rise to Plaintiff's claims arose in the District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.  In particular, CDK is headquartered in this District, and CDK and R&R serve dealerships in this District.

28.     This Court has personal jurisdiction over Defendants because they have engaged in the unlawful acts described in this Complaint with the foreseeable or intended effect of causing substantial economic harm as a result of business conducted in the State of Illinois.

29.     Defendants are registered to do business, transacted business, were found, and had agents in this District.

30.     As described throughout the Complaint, Defendants' unlawful conduct has substantially affected interstate commerce by harming competition and increasing prices to the

detriment of the Plaintiff and other retail automobile dealers in Illinois, Vermont, and throughout the United States.

## FACTUAL ALLEGATIONS

### A.  The DMS Market

30.  Dealer Data Management System software is software for retail automotive dealerships. The software underlies, directly or indirectly, virtually every aspect of a dealer's business. The DMS is the nervous system of a car dealership.  DMS software handles business functions of a dealership, including sales, financing, inventory management (both vehicle and parts), repairs and service, accounting, payroll, human resources, marketing, and more. DMS software is the lifeblood software that enables dealerships to run their operations and function as a business. A DMS has a database component that allows dealerships to enter and store data from its daily business operations, such as its inventory, customers, sales, and service information. The storage of the data typically takes place either onsite at the dealership (on servers owned by the dealer or the DMS provider), offsite at private data center operated by the DMS provider, or with cloud-based data storage companies.

31.  The DMS market is comprised of those providers that sell and market DMS services to automobile dealerships in the United States. The relevant geographical market is the DMS market in the United States. There is public and industry recognition of the DMS market. There are no reasonable substitutes for the software and services provided by DMS providers to retail automotive dealerships.

32.  DMS providers license and sell their software and services to automobile dealerships pursuant to written contracts of between five and seven years in length. A single, small dealership will pay up to $150,000 per year for the DMS software license and services

9

offered by CDK and R&R. Mid-size dealership groups (5 to 10 stores) can pay $1,500,000 or more per year, and large dealerships can easily pay over $5,000,000 per year.

33.     CDK and R&R are tremendously profitable.

34.     A dealership only has one DMS provider at a time. It would be functionally impossible for a dealership to operate with two separate DMS platforms – DMS providers have different and incompatible operating software for their respective systems. Transitioning to a different DMS provider is cumbersome and rare because it would take up to a year or longer, and is expensive.

35.     Plaintiff and members of the Classes purchase DMS directly from the Defendants.

      **1.      CDK and R&R Dominate the DMS Market**

36.     CDK and R&R together dominate the DMS market. CDK and R&R serve approximately 70% of the DMS market in the United States or approximately 12,500 dealer rooftops in the United States.[4]

37.     CDK's and R&R's domination of the DMS market has been stable for decades. Because of the barriers to entry described below, other DMS provider and new entrants have not been able to break CDK's and R&R's stranglehold. The DMS market is highly concentrated, with CDK and R&R controlling 70% or more of the market.  The remaining top 5 franchise DMS providers in the U.S., Auto/Mate, Autosoft, and Dealertrack, have much smaller shares of the market and are typically small, occupy particular niches, and/or serve smaller car dealerships.

---

[4] *See* Vincent Bond, Jr. <u>Reynolds Sells a Revolution</u>, Automotive News, November 14, 2016; National Automobile Dealers Association, 2016 Annual Report.

## 2. The Structure and Characteristics of the DMS Market Render the Conspiracy More Plausible

38.     CDK and R&R use leverage to protect their dominant positions and constrain dealers' behavior.

39.     CDK and R&R sell their DMS software and services under long-term contracts, typically between five and seven years in length, often with automatic extensions if new services are ordered in the middle of the contract. CDK and R&R therefore lock in their dealers to deal with only one or the other of them.

40.     It is both expensive and cumbersome for a dealer to switch DMS providers. Switching DMS providers is so difficult because it disrupts and changes nearly every process that a dealer uses to operate. For a typical dealership to change its DMS provider, it takes at least a year of preparation, staff training, and testing before the new system is even put into operation. The financial costs are enormous.

41.     The costs of switching DMS platforms are heightened because CDK and R&R can paralyze a dealer's business by restricting critical third-party applications from accessing a dealer's data. The DMS houses a dealer's data, and third-party applications must be able to access that data in order to perform important services for the dealership. Although dealers own the data stored by DMS, Defendants CDK and R&R exercise control over access to dealer data. CDK and R&R can severely disrupt a dealer's business simply by switching off third-party access to essential dealer data.

42.     CDK and R&R punish dealerships that try to switch DMS providers. This makes switching DMS providers not only a logistical nightmare, but a risky and litigious proposition. CDK and R&R sue dealers who try to switch.  Only a small percentage of dealers are up for grabs each year – because of the long-term contracts and high switching costs – which means

that there is little a dealer can do to constrain Defendants' abusive practices such as switching DMS providers. It is all the more difficult to curb abusive conduct by R&R and CDK when they have coordinated their misconduct. For example, whether a dealer chooses CDK or R&R, dealerships are locked into the same anticompetitive exclusive dealing arrangements, as are the Vendor Services providers that serve the dealerships.

43. Plaintiff and members of the Classes have no choice but to pay a price that is artificially inflated by the Defendants in order to obtain DMS to effectively run their business.

**B.  The Dealer Data Integration Services Market**

44. The Dealer Data Integration Services market consists of those companies that provide services to dealers and application providers by pulling dealer data from a DMS, formatting and aggregating it, and then providing it to an application provider – a Vendor that uses that data to sell a product to dealers.

**1.  Vendors Must Be Able to Obtain Dealer Data Stored on a DMS**

45. Dealers use software "applications" to perform important sales and operational functions. These applications perform services in addition to or to replace functions provided by the DMS software. Such tasks include vehicle inventory management, customer relationship management, electronic vehicle registration and titling, and scheduling service and repair appointments. A single dealership rooftop typically uses ten or more separate application providers (*i.e.*, Vendors).

46. The only way for Vendors to obtain the required dealer data is from the dealer's DMS. The data is not stored anywhere else.

47. Vendors cannot provide their services without access to the data stored on a dealer's DMS. For example, Vendors that provide electronic vehicle registration and titling – a service that dealerships are mandated to provide in some states – must be able to retrieve purchaser, vehicle, and financing information about the sale of a car. Without access to that data, Vendors cannot register and title the car.

48. Some applications "push" data back into the database. Customer relationship management software, which helps dealers record and track potential customers, is a familiar example. When a car buyer contacts the dealer, the customer's information and vehicle preferences are entered into the customer relationship management application, which then handles the relationship to the conclusion of the car sale. To do so, the application requires a dealer's car inventory, which is "pulled" from the DMS. At the conclusion of the process, the application must then be able to "push" the customer and sales information back into the DMS database.

49. CDK and R&R have their own applications separate from their DMS services. For example, CDK and R&R both have customer relationship management applications, and they have a wholly-owned joint venture that provides electronic vehicle registration and titling. CDK's and R&R's own applications often compete with those offered by third-party application Vendors.

50. Car manufacturers also need access to dealer data to help manage car and parts inventory, process warranty claims and recall notices, apply rebate and special promotions to car sales, and assist dealers with marketing and lead generation.

51. When R&R began blocking data integrators from pulling dealer data in 2007, DaimlerChrysler AG issued a letter to its dealers stating: "A large DMS provider has announced

13

their intent to discontinue the ability of third-party [integrators] to extract data via your DMS…DaimlerChrysler has concern with this new policy, as it may have a significant impact to your business."[5] Referring to CDK's Digital Motorworks and IntegraLink, DaimlerChrysler noted that "[t]hese companies have been p[u]lling dealership data on our behalf for over 10 years . . . ."[6]

### 2. CDK and R&R Control Access to DMS Data that Belongs to Automobile Dealerships

52. Vendors no longer obtain data directly from dealers. Instead, there is a separate market comprised of companies that specialize in extracting dealers' data from DMS databases, aggregating that data, putting it into a standardized format, and then delivering to Vendors the specific data required. Data integrators pull and deliver data in an automated, seamless way without the need for manual intervention by dealers.

53. Before an integrator can pull data, a dealer must authorize it to do so and establish separate login credentials for the integrator to pull the data.

54. Integrators pull data from the dealer's DMS database and then convert that data from a raw, unorganized state into a standardized format that is easy for Vendors to use. DMS providers maintain data in different formats, and dealers themselves enter data differently. Data integrators interpret, reformat, and translate the disparate data into a standardized format. They also may correct data-entry errors or anomalies in the data set, such as missing digits from vehicle identification numbers ("VINs") or incorrect customer contact information.

55. An Integrator then delivers the data to those Vendors whose applications the dealer has decided to use. The data provided to Vendors is limited to that information

---

[5] *See* Ralph Kisiel, <u>DaimlerChrysler Fears Data Security Concerns Will Cost Dealers</u>, Automotive News, Feb. 5, 2007.

[6] *Id.*

specifically required by the application. For example, for electronic vehicle registration, the application receives vehicle sale and financing information, but nothing more.

56.     At one time, there were numerous Integrators. Today, there are only CDK, R&R, and Authenticom, which is hanging on by its fingernails.[7] Defendants drove every other competitor out of the market, including Superior Integrated Solutions, Inc. ("SIS"), which was a leading data integration provider.  Defendants successfully excluded SIS from the market by August 2016, through blocking and litigation tactics.

57.     CDK owns two of the largest dealer data integrators in the industry, Digital Motorworks and IntegraLink.  Digital Motorworks and IntegraLink obtain login credentials from dealers to pull data and then provide that data to Vendors. CDK also has data integration product for direct access to data on the CDK DMS – the "Third Party Access" program.

58.     Similarly, R&R has an integration product for direct access to data on the R&R DMS – the "R&R Certified Interface" program. R&R does not, however, have a product that pulls data from dealers that use non-R&R DMS systems.

### 3.     Automobile Dealerships Now Pay Supracompetitive Prices For Access To Their Own Data

59.     Until they began their anticompetitive conduct, CDK and R&R publicly recognized that dealers, as owners of their data, controlled their data, and could share it with data integrators. Every other industry participant in the industry – including industry organizations, Vendors, dealers, and car manufacturers – also recognize this fundamental principle.

---

[7] *Authenticom, Inc. v. CDK Global, LLC and The Reynolds and Reynolds Company*, Case No. 17-cv-00318 (W.D. Wisc.), has been consolidated into *In re: Dealer Management Systems Antitrust Litigation*, MDL No. 2817, Case No. 18 C 864 (N.D. Ill.).  Per Court Order, one of the first orders of business after consolidation will be taking a Rule 30(b)(6) deposition to address the financial condition of Authenticom, Inc.

60.     On February 2, 2007, the National Auto Dealer Association and American International Automobile Dealer Association, the two largest automobile dealer associations in the United States, issued a "Joint Policy Statement on Data Accessibility." The purpose of the statement was to "guide the use and protection of data in dealership management systems." The joint statement set forth the following principles. First, "[d]ealers should control access to data stored in their dealership management systems." Second, "[d]ealers, not dealership management system vendor[s] or other entities, should have the sole right and the practical means to authorize third parties to access and extract dealer data." And third, "[d]ealers expect all parties involved in storing and using dealer data to . . . [r]efrain from unreasonably impeding dealer-authorized access to dealer data."

61.     The R&R and CDK DMS contracts also "spell out which party owns the data and there is generally little dispute: the data belongs to the dealer. This makes sense; after all, it's the dealership's customer, inventory, and transactional data that the dealership is putting into the DMS system."[8]

62.     Before 2015, CDK's subsidiaries – Digital Motorworks and IntegraLink– used the login credentials provided by dealers to pull dealer data from R&R's DMS.

63.     After CDK and R&R entered into their market division agreement in 2015, CDK stopped pulling data only from the R&R's DMS, while continuing to pulldealer data from other DMS systems, using login credentials provided by the dealers.

64.     Through their conspiracy, CDK and R&R have seized control over who can access the DMS data. CDK and R&R prohibit dealerships from providing data stored on the

---

[8] *See* The Hidden Data Tax That Dealers Don't Know They Are Paying, Driving Sales News, Oct. 17, 2013.

dealer's DMS to third-party Vendors through "unauthorized means" – which CDK and R&R interpret to mean any access not specifically approved by them. To provide "unauthorized" access, according to CDK and R&R, constitutes a "hostile integration" with the DMS and is a breach by the dealer of the DMS contract. CDK and R&R thereby control the flow of data from a dealer's DMS to Vendors.

65. Through their conspiracy, CDK and R&R also have the capacity to charge Vendors artificially inflated prices for accessing dealer data stored on CDK's or R&R's DMS. Doing so is a major and growing revenue source for CDK and R&R, a driving factor behind their large margins and high profitability. In turn, the Vendors pass the cost of access to dealer data on to the dealers themselves in the form of higher service fees.

### 4. CDK and R&R Entered into a *Per Se* Illegal Written Agreement

66. For many years, CDK and R&R competed in the market for Data Integration Services. For over a decade, CDK had provided Data Integration Services for dealers using the R&R DMS, competing directly with R&R's own RCI integration product. Effective February 18, 2015, CDK and R&R entered into a written agreement categorized as a "Wind Down Access Agreement" whereby Defendants agreed that they would no longer compete in the Dealer Data Integration Services market.

67. It is a classic illegal market division: CDK agreed that it would no longer compete in providing access to dealer data on the R&R DMS, ceding that ground exclusively to R&R. In antitrust terms, it's no different than if they had agreed to divide the dealers by whether they were East of the Mississippi or West of the Mississippi.

68.     Because R&R already did not compete with CDK in providing access to data for dealers using the CDK DMS, the agreement ensured that CDK and R&R would be the exclusive providers of data integration services for dealer data on their respective DMS platforms.

69.     The agreement mandated coordination between the former competitors in transitioning all of CDK's Vendor clients (*i.e.*, those Vendors for whom CDK provided access to dealer data on the R&R DMS) into the R&R RCI program. In short, the written agreement embodies CDK's and R&R's collusion to eliminate competition for data integration, and be the sole providers of Data Integration Services for dealers using their respective DMS platforms. This leaves Vendors with no choice but pay to CDK and R&R in order to obtain data from the CDK and R&R DMS platforms.

70.     CDK's and R&R's decision to divide the market, block other data integrators, and seize control over access to dealer data was the function of an agreement between them, not unilateral decision-making. CDK and R&R – horizontal competitors in the DMS market and, before their market division agreement, competitors in the Dealer Data Integration Services market – coordinated their actions and have actively worked together to achieve their aim. These agreements are *per se* violations of the Sherman Antitrust Act.

71.     By seizing control over access to dealer data, CDK and R&R have been able to impose massive price increases for their data integration services and force Plaintiff and members of the Classes to pay inflated, supra-competitive prices for DMS and Vendor Services.

### 5.     The Agreement Divides the Dealer Data Integration Market

72.     The agreement's key provision provides that CDK agreed to stop accessing any R&R DMS and to no longer provide any Data Services Integration that involves pulling data from an R&R DMS for use by any application provider.

18

73.     The agreement granted CDK a "Wind Down Period" of one year to stop pulling dealer data stored on R&R's DMS. During the wind-down period, R&R agreed that CDK could continue to pull dealer data just as it had before.

### 6.    The Agreement Required Coordination in Transitioning Vendor Clients from CDK to R&R.

74.     Because CDK agreed that it would no longer provide Vendors with data from dealers using R&R's DMS, CDK and R&R agreed that they would work together to transition those Vendors into the R&R RCI program.  Specifically, the agreement mandated that CDK cooperate with R&R's efforts to convince Vendors to join the RCI program.

75.     In connection with coordinating the transition of Vendors from CDK's data pulling services into the RCI program, the wind down agreement also required CDK to give R&R full information about the Vendors that CDK served, including their name, contact information, contract terms, data pulling requirements, usernames used to pull the data, and more.

76.     As a result, Plaintiff and members of the Classes have to pay artificially inflated prices for CDK and R&R's DMS as well as for Vendor applications.

### 7.    CDK and R&R Implemented the Illegal Agreement

77.     CDK stopped providing dealer data integration services with respect to R&R's DMS dealers after the wind-down period.

78.     CDK and R&R coordinated the transition of Vendors from CDK to R&R.

79.     On March 2, 2015, CDK sent a letter to its Vendor clients announcing that the Vendors "will be provided with a roadmap to transition to the Reynolds Certified Interface (RCI) program without any further risk of interruption to existing services." CDK explained that "we are in a transition period to allow time for [Digital Motorworks] clients to enroll in the RCI

program in support of your R&R dealers," and that "we will assist you to facilitate a smooth

transition." The letter noted that R&R had "agreed to protect the current [Digital Motorworks]

process for collecting data from R&R dealers during this transition" and promised "a more

detailed letter within the next couple of weeks that outlines the transition process."

80.     On April 1, 2015, CDK sent that promised follow-up letter to its Vendor

customers. The letter begins: "As announced earlier this month, the recent business agreement

between CDK Global and The Reynolds and Reynolds Company (R&R) provides for the clients

of Digital Motorworks, Inc. (DMI) a streamlined process to enroll in the Reynolds Certified

Interface (RCI) program for their R&R dealers. We are now in the transition period to allow

sufficient time for this enrollment, and R&R has agreed to provide a grace period for the existing

DMI process for R&R data collection during this time."

81.     The letter gave Vendors a deadline to enroll in the RCI program: "Your deadline

for RCI Certification, listed above, refers to when you need to be RCI Certified and the R&R

grace period is scheduled to end. R&R is ready to assist you with your transition to the RCI

process." Not only would R&R assist them, but so would CDK: "If you would prefer assistance,

just let me know, and I will be happy to schedule and participate in an introductory conference

call on your behalf."

82.     CDK's letter then made the sales pitch for RCI participation: "We are pleased to

be working with R&R to bring you this streamlined, supported process for handling dealership

data for your R&R dealers." In relation to CDK's agreement not to compete, the letter stated that

if the Vendor was "not RCI Certified, it will be more difficult to reliably receive dealership data

since DMI is no longer extracting data directly from Reynolds systems."

83.     As a pretext, CDK and R&R attempt to justify their agreements not to compete by arguing that it will make dealers' data more secure.  But the level of security protections and protocols for dealer data should be up to dealers purchasing Dealer Integration Services and Vendor Services.  The data in question is, after all, the Dealers' data.

84.     R&R followed up with its own letters to CDK's Vendor clients as they transitioned customers from CDK to R&R.

85.     The agreement had its intended effect: Vendors were forced from Digital Motorworks' and IntegraLink's data integration services into R&R's RCI program. With the switch, Vendors now pay far higher prices for the same services. Consequently, Plaintiff and members of the Classes also pay the Defendants far higher prices for the same services.

**8.      CDK And R&R Require Dealers to Enter Into Anticompetitive Exclusive Dealing Arrangements**

86.     CDK and R&R's standard dealer contracts include exclusive dealing provisions prohibiting dealers from providing access to their own data to anyone else.  These dealers must agree that they will not provide anyone other than their assigned DMS provider access to their data for purposes of data integration to Vendors.

87.     CDK and R&R's contracts with Vendors likewise impose exclusive dealing contracts, prohibiting Vendors from obtaining dealer data from anyone but CDK and R&R Data Integration Services providers.

88.     CDK's current standard DMS contract contains an exclusive dealing provision that forecloses dealers from authorizing access to their DMS by Vendors of their own choice, and, at the same time, explicitly authorizes CDK to fully access that data and provide it to Vendors.  Taken together, this gives CDK an exclusive right to provide data integration services

21

to the dealers using CDK DMS for the term of the contract, and prevents others from competing with CDK to provide Integration Services to dealers using CDK's DMS because Integrators depend on dealer authorization to access dealers' data. The anticompetitive effects of CDK's conduct is prolonged by the life of the contracts, which last a minimum of five years.

89.     R&R also has similar provisions in its current standard DMS contract prohibiting dealers from granting access to their own data on the R&R DMS database to anyone other than R&R through R&R's Data Integration Service.

90.     For dealers using either the CDK or R&R DMS platforms, these exclusive dealing provisions foreclose the entire data integration market other than data integration services also provided by CDK or R&R.

91.     CDK and R&R vigilantly enforce the restrictive terms in their DMS contracts. These provisions are harmful to dealers, yet CDK and R&R are able to force dealers to agree to them because of their market power in the DMS Market. Many dealers do not even realize that CDK and R&R have inserted the exclusive dealing provisions into the DMS contracts.

92.     More recently, CDK added the following warning to dealers on its dealer login page: "Please be advised that the creation of User IDs for use by unauthorized third parties violates the terms of your CDK [DMS] Agreement."

93.     R&R has taken the extra step of not only disabling login credentials for Data Integration Service providers, but also filing lawsuits against competing data integrators for tortious interference with the DMS contracts.

94.     The exclusive dealing provisions in Defendants' dealer contracts are anticompetitive. They are *per se* illegal because they are part of Defendants' agreement with one another to eliminate competition. The impact of the exclusive dealing provisions is amplified by

22

their lengthy duration. Defendants' DMS contracts with dealers typically last five to seven years often with terms that allow automatic extension if new services are ordered in the middle of the contract.

### C.    Defendants' Anticompetitive Conduct Has Resulted in Massive Price Increases

95.    Having eliminated their competitors, CDK and R&R have exercised their market power and imposed enormous price increases on Data Integration Services. Data integrators charge Vendors per dealership rooftop, sometimes referred to as a "connection." If a dealer has ten rooftops (*i.e.*, ten individual locations) then the Vendor would need ten separate connections for that dealer. Before the conspiracy went into effect, to pull data, a data integrator would normally charge approximately $50 per month per dealership connection.[9]  Today, on average, Authenticom charges Vendors between $30 and $40 a month per connection. For bi-directional access to dealer data, Authenticom has generally charged $75 per connection. Other independent data integrators charged similar rates.  Between 2008 and 2016, SIS charged around $40 per connection for pulling data and $70 per connection for bi-directional access (until it was forced out of the data integration market).

96.    CDK and R&R now charge far higher rates than those charged by former data integrators. One Vendor used to pay $35 per month to pull data but when it was forced to join the RCI program for Data Integration Services, the monthly rate charged by R&R was $210, a 500% increase. Another large Vendor purchased Data Integration Services at a rate of $45 to $50 per month in the past. That Vendor now pays R&R and CDK monthly charges of between $300 and $866 (R&R) and between $300 and $700 (CDK).

---

[9]  *See* David Barkholz, <u>Dealers will pay up for vendors' data access after CDK switch</u>, Automotive News, July 20, 2015.

1. **CDK dramatically raised its data integration fees upon entering into their conspiracy in February 2015.**

97.     Before entering the agreement with R&R in February 2015, CDK charged an average of $70 per connection. Since 2015, the average cost per connection has risen to at least $250 to $300 (and often much more). This constitutes, at the conservative end, an increase in the range of 250% to 325% in the price of Data Integration Services.

98.     CDK's prices for the 3PA program stand in stark contrast to the prices CDK charges for data access to non-CDK dealers.  Today, CDK (through Digital Motorworks and IntegraLink) charges between $25 and $50 per connection to non-CDK dealers, while it charges on average between $250 and $300 for the same services to CDK dealers.

99.     As for R&R, before 2010, R&R generally charged Vendors less than $100 per month per connection.  By 2013 – after it began to block independent data integrators and impose (and enforce) exclusivity provisions in its contracts with dealers and Vendors – R&R raised its monthly prices per connection from less than $100 to between $300 and $500.  This constitutes a price increase in the range of 200% to 400% in the price of data integration services. And since Defendants entered the agreement in 2015, R&R has been raising its prices for data integration services even more, including by charging many Vendors a transaction charge for every data pull. CDK has instituted the same practice of charging some Vendors an additional per-transaction fee on top of their already large monthly fees. This in turn causes Plaintiff and members of the Classes to pay a supracompetitive prices for their DMS and Vendor services.

2. **Prices Increased by Exorbitant Amounts**

100.     Leading industry publications have reported widely on the price increases imposed by CDK and R&R on Data Integration Services.

101.    In July 2015, shortly after CDK and R&R entered their agreement, Automotive
News reported that "CDK said it intends to charge each third-party vendor . . . between $250 and
$300 a month per store for each software product. The current fees average about $70 per
software product."  As for R&R, participation costs one Vendor more than $700 a month per
R&R store.

102.    Because Vendors cannot absorb the massive price increases imposed by CDK and
R&R, Vendors pass the enormous fees for Data Integration Services to Plaintiff and members of
the Classes.

### 3.    CDK and R&R Charge Dealers Escalating Fees for DMS Services

103.    CDK and R&R ratchet up the DMS fees year after year, with no price break to
dealers to make up for the pass-through costs for data integration.

104.    Both CDK and R&R have fee escalation clauses in their DMS contracts with
dealers. The standard R&R contract provides that DMS fees go up every year on March 1. The
price increase is therefore automatic, and is measured by the Customer Price Index plus 2%. The
standard CDK contract gives dealers price protection for the first year of the DMS contract, but
imposes a 6% automatic yearly price increase thereafter. As a result, dealers are hit from both
sides: rapidly escalating fees for Data Integration Services and contractually mandated, annual
DMS price hikes.

### THE PARTIES

105.    Plaintiff Apex Motor Co. d/b/a Shearer Acura ("Plaintiff" or "Shearer") is a
corporation organized and existing under the laws of the State of Vermont with its principal
place of business, a retail car dealership, located at 1301 Shelburne Road, South Burlington,

Vermont.  Shearer is engaged in the business of purchasing and selling automobiles.  Shearer

purchases DMS services from Defendant CDK.

106.     Defendant CDK Global, LLC is a Delaware company and serves as the operating

subsidiary of CDK Global, Inc., which reported more than $2 billion in revenue in its last annual

report.  CDK provides integrated information technology and digital marketing solutions for the

automotive retail industry, including DMS software and services to automobile dealerships

throughout the United States.  CDK also provides Vendor Services for automobile retailers that

address vehicle inventory, sales, and the finance and insurance process.  CDK Global, LLC has

its principal place of business at 1950 Hassell Road, Hoffman Estates, Illinois 60169.

107.     Defendant The Reynolds and Reynolds Company ("R&R") is an Ohio corporation

with its corporate headquarters and principal place of business in Montgomery County at One

Reynolds Way, Kettering, Ohio 45340.  R&R provides DMS software and services to

automobile dealerships throughout the U.S.  Although R&R was once a publicly traded company

known as Universal Computer Systems, Inc., it changed its name when it was privately acquired

in 2006.

## CLASS ACTION ALLEGATIONS

108.     Plaintiff brings this action on behalf of itself and others similarly situated as a

class action under Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure,

seeking equitable and injunctive relief and damages on behalf of the following class (the

"Nationwide Class"):

> All automobile dealerships, during the period from and including
> January 1, 2015[10] through the present, who purchased DMS from
> one or more Defendants, any predecessor, successor, current or

---

[10]  Plaintiffs may amend the class period as warranted by information learned from investigation
or discovery.

former subsidiary or affiliate of the Defendants, or any co-conspirator of the Defendants.

109.   Plaintiff also brings this action on behalf of itself and others similarly situated as a class action under Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief and damages pursuant to state antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states whose laws are set forth in the Third and Fourth Claims below.  The states whose laws are set forth in the Second and Third Claims below are collectively referred to as the "Indirect Purchaser States."  These claims are brought by Plaintiff on behalf of themselves and entities in the Indirect Purchaser States listed in the Third and Fourth Claims as follows on behalf of the following class ("Damages Class"):

> All automobile dealers residing in the Indirect Purchaser States that, during the period from and including January 1, 2015[11] through the present, who indirectly purchased Dealer Integration Services when they purchased DMS from one or more Defendants or through Vendors, any predecessor, successor, current or former subsidiary or affiliate of the Defendants, or any co-conspirator of the Defendants.

110.   The Nationwide Class and the Damages Class are referred to herein as the "Classes."  Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators of Defendants. Also excluded are automobile dealerships in which any Judges or judicial personnel involved in this case hold any financial interest.  While Plaintiffs do not know the exact number of the members of the Classes,  there are thousands of members in the Nationwide Class and hundreds of members of the Damages Class.

---

[11]  Plaintiffs may amend the class period as warranted by information learned from investigation or discovery.

111.   Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

a.      Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of DMS and Data Integration Service sold in the United States;

b.      The identity of the participants of the alleged conspiracy;

c.      The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d.      Whether the alleged conspiracy violated the Sherman Antitrust Act, as alleged in the First and Second Claims for Relief;

e.      Whether the alleged conspiracy violated state antitrust and unfair competition law, and/or state consumer protection law, as alleged in the Third and Fourth Claims for Relief;

f.      Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all of the benefits derived by Defendants, as alleged in the Fifth Claim for Relief;

g.      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

h.      The effect of the alleged conspiracy on the prices of DMS and Vendor

Services sold in the United States during the Class Period;

        i.      The effect of the alleged conspiracy on the prices of Dealer Integration Services sold in the United States during the Class Period;

        j.      Whether Plaintiffs and the members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

        k.      The appropriate injunctive and related equitable relief for the Classes ; and,

        l.      The appropriate class-wide measure of damages for the Classes.

112.    Plaintiff's claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Classes.  Plaintiff and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for DMS purchased from Defendants and/or their co-conspirators.

113.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

114.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

115.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and

expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

116.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

### PLAINTIFF AND THE CLASSES SUFFERED ANTITRUST INJURY

117.    The purpose of the conspiracy between Defendants was to jointly create a monopoly that would enable them to raise their own profits by excluding competition for the provision of DMS, Data Integration Services, and Vendor Services, which allowed Defendants to increase prices automobile dealerships directly pay for DMS provided by Defendants, and Vendor Services, which must use Defendants' Data Integration Services, as well as the prices automobile dealerships indirectly pay for Data Integration Services used by Vendors.

118.    In order to accomplish their goal, Defendants reached agreements that have the effect of excluding competitors from providing Data Integration Services and Vendor Services by limiting access to dealer-owned data stored on CDK's or R&R's DMS.

119.    Defendants' conspiracy had the following effects, among others:

a.    Automobile Dealership options for purchasing DMS, Data Integration Services, and Vendor Services have been severely limited.

b.    Automobile Dealerships have had to pay increased prices for DMS, Data Integration Services, and Vendor Services.

c.    Prices for the sale and/or supply of DMS in the United States were

maintained and/or stabilized at supra-competitive levels;

        d.      Competition based on price for the direct supply of DMS to automobile dealerships in the United States was restrained or eliminated;

        e.      Competition based on the quality of DMS provided directly to automobile dealerships in the United States was restrained or eliminated;

        f.      Prices for the sale and/or supply of Data Integration Systems in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels;

        g.      Competition based on price for the indirect supply of Data Integration Systems to automobile dealerships in the United States was restrained or eliminated;

        h.      Competition based on the quality of Data Integration Services provided indirectly to automobile dealerships in the United States was restrained or eliminated;

        i.      Prices for the sale and/or supply of Vendor Services in the United States were fixed, raised, maintained, and/or stabilized at supracompetitive levels;

        j.      Competition based on price for the direct and indirect supply of Vendor Services to automobile dealerships in the United States was restrained or eliminated.

        k.      Competition based on the quality of Vendor Services provided directly to automobile dealerships in the United States was restrained or eliminated.

120.    As a result of Defendants' conspiracy, Plaintiff and the putative Classes have paid and continue to pay supracompetitive prices when directly purchasing DMS and Vendor Services.

121.    As a result of Defendants' conspiracy, Plaintiff and the putative Classes have paid and continue to pay supracompetitive prices when indirectly purchasing Data Integration Services.

122.     By reason of the violations of the antitrust laws alleged herein, Plaintiff and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for DMS, Data Integration Services, and Vendor Services than they would have paid in the absence of the Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

123.     Defendants' anticompetitive conduct has also harmed competition by eliminating and/or limiting the ability of non-Defendant providers of Data Integration Services and Vendor Services to compete with Defendant entities providing those services.  As such, Defendants' anticompetitive conduct has injured competition in the market as a whole.  Defendants' conduct has also limited Dealer options for non-Defendant providers of Data Integration Services and Vendor Services. By eliminating non-Defendant providers of Data Integration Services and Vendor Services and/or limiting the ability of these competitors to compete, Defendants' conduct has inflated prices for their services, curtailed output in the Data Integration Services and Vendor Services markets, lowered product quality in the Data Integration Services and Vendor Services markets, and reduced innovation.

## CLAIMS FOR RELIEF

## COUNT I

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

124.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in above paragraphs.

125.     Defendants CDK and R&R entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

126.     Defendants CDK and R&R are horizontal competitors in the Dealer Management Services market.  CDK and R&R have subsidiaries and affiliates which similarly compete horizontally in the Data Integration Services and Vendor Services markets.

127.     Defendants CDK and R&R possess a dominant position in the Dealer Management Services market, holding approximately a 70% market share, which has helped to further their conspiracy.

128.     At least as early as 2015, and continuing through at least the present, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade to fix, raise, maintain, and/or stabilize at artificial and non-competitive levels the prices paid by automobile dealerships for DMS.

129.     Defendants' conspiracy, is a *per se* unlawful violation of the federal antitrust laws, an unreasonable and unlawful restraint of trade, was intended to and did harm interstate commerce, and has had an actual, substantial effect on interstate commerce in the United States.

130.     The conspiracy between Defendants CDK and R&R have allowed them to raise prices paid by Plaintiff, and other members of the Classes, for accessing their own dealer information.

131.     As a result of their conspiracy, Defendants caused actual injury to competition in the DMS, Data Integration Services, and Vendor Services markets in the United States.

132.    As a direct and proximate result of Defendants' conspiracy, Plaintiff and members of the Classes have suffered actual injury to their business or property, including but not limited to costs for DMS, Data Integration Services, and Vendor Services.

133.    Plaintiff and members of the Classes are entitled to treble damages for the violations of the Sherman Act alleged herein.

## COUNT II

## CONSPIRACY TO MONOPOLIZE THE DEALER DATA INTEGRATION MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

134.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the above paragraphs.

135.    Defendants CDK and R&R have, with the specific intent to create monopoly power both could exploit, unlawfully and in a coordinated way used their market power in the DMS market to monopolize the Dealer Data Integration market in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.  Together CDK and R&R control approximately 70% of the DMS market by number of dealers.

136.    When dealers purchase Defendants' DMS, they are locked into that system through Defendants' use of long-term contracts and the fact that changing providers is expensive and cumbersome for auto dealers.

137.    By blocking non-Defendant Data Integration Service providers from using CDK's and R&R's DMS and/or disabling non-Defendant dealer Data Integration Services from accessing dealer data, CDK and R&R have demonstrated that they can and do control the Data Integration Services market, resulting in harm to competition and increased prices in that market.

138.    The exclusion of competitors from the Data Integration Services market has no procompetitive business justification, such as improving dealer data security, and stifles innovation.

139.    Plaintiff and members of the Classes are entitled to treble damages for the violations of Section II of the Sherman Act alleged herein.

## COUNT III

### VIOLATION OF STATE ANTITRUST STATUTES
### (on behalf of Plaintiff and the Damages Class)

140.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in above paragraphs.

141.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Data Integration Services in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

142.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to eliminate competition and raise prices for Data Integration Services.

143.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes:

144.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

    a.    Defendants' combinations or conspiracies had the following effects:
(1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout Arizona; (2) prices for Dealer Integration Services were raised, fixed, maintained and

stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the

Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of

the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration

Services.

        b.      During the Class Period, Defendants' illegal conduct substantially affected

Arizona commerce.

        c.      As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.

        d.      By reason of the foregoing, Defendants entered into agreements in

restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq*. Accordingly, Plaintiffs and

members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-

1401, *et seq*.

145.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of the California Business and Professions Code, §§ 16700, *et seq*.

        a.      During the Class Period, Defendants and their co-conspirators entered into

and engaged in a continuing unlawful trust in restraint of the trade and commerce described

above in violation of Section 16720, California Business and Professions Code. Defendants, each

of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of,

and allocate markets for Dealer Integration Services at supracompetitive levels.

        b.      The aforesaid violations of Section 16720, California Business and

Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of

action among the Defendants and their co-conspirators, the substantial terms of which were to

fix, raise, maintain, and stabilize the prices of, and to allocate markets for Dealer Integration Services.

      c.     For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following: (1) Fixing, raising, stabilizing, and pegging the price of Dealer Integration Services; and (2) Allocating among themselves the production of Dealer Integration Services.

      d.     The combination and conspiracy alleged herein has had, *inter alia*, the following effects upon the commerce of California: (1) Price competition in the sale of Dealer Integration Services has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Dealer Integration Services sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Dealer Integration Services provided by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

      e.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Dealer Integration Services than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

     146.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

a.      Defendants' combinations or conspiracies had the following effects:

(1)  price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout the District of Columbia; (2) prices for Dealer Integration Services were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Dealer Integration Services in the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Dealer Integration Services in the District of Columbia, paid supracompetitive, artificially inflated prices for Dealer Integration Services.

b.      During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq*.

147.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*.

a.      Defendants' combinations or conspiracies had the following effects:

(1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout Illinois; (2) prices for Dealer Integration Services were raised, fixed, maintained, and

stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration Services.

      b.      During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

      c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq.*

148.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

      a.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout Iowa; (2) prices for Dealer Integration Services were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration Services.

      b.      During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq*.

149.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq*.

a.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout Kansas; (2) prices for Dealer Integration Services were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration Services.

b.      During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq*.

150.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.

a.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout Maine; (2) prices for Dealer Integration Services were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration Services.

b.    During the Class Period, the Defendants' illegal conduct substantially affected Maine commerce.

c.    (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    (d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.

151.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq*.

a.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout Michigan; (2) prices for Dealer Integration Services were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the

Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration Services.

      b.     During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

      c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

152.     Defendants have entered into an unlawful agreement in unreasonable restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

      a.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout Minnesota; (2) prices for for Dealer Integration Services were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration Services.

      b.     During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

        c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

        d.      By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

153.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq*.

        a.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout Mississippi; (2) prices for Dealer Integration Services were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Dealer Integration Services in Mississippi, were deprived of free and open competition, including in Mississippi; and (4) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Dealer Integration Services in Mississippi paid supracompetitive, artificially inflated prices for Dealer Integration Services, including in Mississippi.

        b.      During the Class Period, the Defendants' illegal conduct substantially affected Mississippi commerce.

        c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq*.

    154.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq*.

    a.  Defendants' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout Nebraska; (2) prices for Dealer Integration Services were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration Services.

    b.  During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

    c.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq*.

155.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

a.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout Nevada; (2) prices for Dealer Integration Services were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Dealer Integration Services in Nevada, were deprived of free and open competition, including in Nevada; and (4) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Dealer Integration Services in Nevada, paid supracompetitive, artificially inflated prices for Dealer Integration Services.

b.     During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

156.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

a.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated

throughout New Hampshire; (2) prices for Dealer Integration Services were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration Services.

b.    During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

157.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

a.    Defendants' combinations or conspiracies had the following effects: (1)  price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout New Mexico; (2) prices for Dealer Integration Services were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration Services.

      b.      During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

      c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

158.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq*.

      a.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout New York; (2) prices for Dealer Integration Services were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Dealer Integration Services in New York, were deprived of free and open competition, including in New York; and (4) Plaintiffs and members of the Damages Class, including those who resided in New York, paid supracompetitive, artificially inflated prices for Dealer Integration Services when they purchased Dealer Integration Services, or purchased, including in New York, Dealer Integration Services that were otherwise of lower quality than they would have been absent the Defendants' and their co-conspirators' illegal acts, or were unable to purchase Dealer Integration Services that they would have otherwise purchased absent the illegal conduct.

       b.    During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

       c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

       d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.* The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

159.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

       a.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout North Carolina; (2) prices for Dealer Integration Services were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Dealer Integration Services in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Dealer Integration Services in North Carolina, paid supracompetitive, artificially inflated prices for Dealer Integration Services, including in North Carolina.

       b.    During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

        c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

        d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq*.

160.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq*.

        a.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout North Dakota; (2) prices for Dealer Integration Services were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration Services.

        b.      During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

        c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

        d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*. Accordingly,

Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

161.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq*.

a.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout Oregon; (2) prices for Dealer Integration Services were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration Services.

b.    During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

162.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Gen. Laws § 6-37-1, *et seq*.

a.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated

throughout Rhode Island; (2) prices for Dealer Integration Services were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration Services.

   b.    During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce.

   c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

   d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Rhode Island Gen. Laws § 6-37-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island Gen. Laws § 6-37-1, *et seq*.

163.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq*.

   a.    The Defendants' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout South Dakota; (2) prices for Dealer Integration Services were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Dealer Integration Services in South Dakota, were deprived of free and open competition, including in South Dakota; and (4) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Dealer Integration Services in South

Dakota, paid supracompetitive, artificially inflated prices for Dealer Integration Services, including in South Dakota.

     b.    During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

     c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

     d.    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

164.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq*.

     a.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for Dealer Integration Services were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class, including those who resided in Tennessee and/or purchased for Dealer Integration Services in Tennessee, were deprived of free and open competition, including in Tennessee; and (4) Plaintiffs and members of the Damages Class, including those who resided in Tennessee, and/or purchased Dealer Integration Services in Tennessee, paid supracompetitive, artificially inflated prices for Dealer Integration Services.

     b.    During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

      c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      d.      By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

165.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-3101, *et seq*.

      a.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout Utah; (2) prices for for Dealer Integration Services were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration Services.

      b.      During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

      c.      As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      d.      By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq*.

166.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq.*

a.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout Vermont; (2) prices for Dealer Integration Services were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration Services.

b.     During the Class Period, the Defendants' illegal conduct had a substantial effect on Vermont commerce.

c.     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.* Plaintiffs are entitled to relief pursuant to Vermont Stat. Ann. 9 § 2465 and any other applicable authority.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

167.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

a.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout West Virginia; (2) prices for Dealer Integration Services were raised, fixed,

54

maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class, including those who resided in West Virginia, and/or purchased Dealer Integration Services in West Virginia, were deprived of free and open competition, including in West Virginia; and (4) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Dealer Integration Services in West Virginia, paid supracompetitive, artificially inflated prices for Dealer Integration Services.

      b.     During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

      c.     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

168.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq*.

      a.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout Wisconsin; (2) prices for Dealer Integration Services were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration Services.

b.     During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

169.     Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiffs and members of the Damages Class have paid more for Dealer Integration Services than they otherwise would have paid in the absence of the Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

170.     In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

171.     Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## COUNT IV

### VIOLATION OF STATE CONSUMER PROTECTION STATUTES
### (on behalf of Plaintiff and the Damages Class)

172.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in above paragraphs.

173.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

174.    Defendants knowingly engaged in unlawful, unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

175.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*.

a.    Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Dealer Integration Services were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

b.    The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

c.    Defendants' unlawful conduct had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout Arkansas; (2) prices for Dealer Integration Services were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of

the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration Services.

        d.      During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

        e.      As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

        f.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

      176.      The Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

        a.      During the Class Period, Defendants marketed, sold, or distributed Dealer Integration Services in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

        b.      During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

        c.      This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from the Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

d.　Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Antitrust Act, as set forth above; (2) the violations of Section 16720, *et seq*., of the California Business and Professions Code, set forth above;

e.　Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq*., of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

f.　Defendants' acts or practices are unfair to purchasers of Dealer Integration Services in the State of California within the meaning of Section 17200, California Business and Professions Code; and

g.　Defendants' unlawful conduct had the following effects: (1) Dealer Integration Services price competition was restrained, suppressed, and eliminated throughout California; (2) Dealer Integration Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased Dealer Integration Services in California, were deprived of free and open competition, including in California; and (4) Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased Dealer Integration Services in California, paid supracompetitive, artificially inflated prices for Dealer Integration Services.

59

        h.       Defendants' acts and practices are unlawful, fraudulent, or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

        i.       The illegal conduct alleged herein is continuing and there is no indication that the Defendants will not continue such activity into the future.

        j.       The unlawful, fraudulent, deceptive, and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supracompetitive and artificially-inflated prices for Dealer Integration Services. Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

        k.       As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

177.      Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

        a.       The Defendants' unlawful conduct had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout Florida; (2) prices for Dealer Integration Services were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of

the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration Services; and (5) Reasonable purchasers in Florida were deceived into believing that they were paying competitive prices for Dealer Integration Services.

b.      During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      Defendants have engaged in unfair competition or unlawful, unfair, or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

178.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1 *et seq*.

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Dealer Integration Services were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

b.      The aforementioned conduct on the part of the Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11.

c.      Defendants' unlawful conduct had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated

61

throughout Massachusetts; (2) prices for Dealer Integration Services were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration Services.

d.      During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.

e.      As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

f.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, §§ 2, 11 and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

179.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq*.

a.      Defendants engaged in the conduct described herein in connection with the sale of Dealer Integration Services in trade or commerce in a market that includes Missouri.

b.      During the Class Period, Defendants' illegal conduct substantially affected Missouri commerce and consumers.

c.      Defendants agreed to, and did in fact affect, fix, control, and/or maintain at artificial and non-competitive levels, the prices at which Dealer Integration Services were sold, distributed, or obtained in Missouri which conduct constituted unfair practices in that it was

unlawful under federal and state law, violated public policy, was unethical, oppressive, and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

       d.     Defendants concealed, suppressed, and omitted, as well as failed to disclose, material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Dealer Integration Services. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of Dealer Integration Services purchased.

       e.     Defendants' unlawful conduct had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout Missouri; (2) prices for Dealer Integration Services were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration Services.

       f.     The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

       g.     As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property.

       h.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in

trade or commerce...," as further interpreted by the Missouri Code of State Regulations, which provides for the relief sought in this count.

180.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*.

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Dealer Integration Services were sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

b.     Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Dealer Integration Services.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.  Moreover, Plaintiffs lacked any meaningful choice in purchasing Dealer Integration Services because they were unaware of the unlawful overcharge and because they had to purchase Dealer Integration Services in order to be able to operate their dealerships.  Defendants' conduct with regard to sales of Dealer Integration Services, including their illegal conspiracy to secretly fix the price of Dealer Integration Services at supracompetitive levels and overcharge automobile dealers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.  Defendants took grossly unfair advantage of Plaintiffs.

c.     The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. § 57-12-3, in that such conduct*, inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the

Damages Class and the prices paid by them for Dealer Integration Services as set forth in

N.M.S.A. § 57-12-2E, due to the inflated prices paid by Plaintiffs and Class members for Dealer

Integration Services.

        d.     Defendants' unlawful conduct had the following effects: (1) price

competition for Dealer Integration Services was restrained, suppressed, and eliminated

throughout New Mexico; (2) prices for Dealer Integration Services were raised, fixed,

maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and

the members of the Damages Class were deprived of free and open competition; and (4)

Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated

prices for Dealer Integration Services.

        e.     During the Class Period, Defendants' illegal conduct substantially affected

New Mexico commerce and consumers.

        f.     As a direct and proximate result of the unlawful conduct of Defendants,

Plaintiffs and the members of the Damages Class have been injured in their business and

property and are threatened with further injury.

        g.     Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and

the members of the Damages Class seek all relief available under that statute.

     181.    Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

        a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce

by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the

prices at which Dealer Integration Services were sold, distributed or obtained in New York and

took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

      b.     Defendants deceptively led purchasers, such as Plaintiffs and Class members, to believe that the Dealer Integration Services they had purchased had been sold at legal competitive prices, when they had in fact been sold at collusively obtained inflated prices, that were ultimately borne by automobile dealers.

      c.     The conduct of the Defendants described herein constitutes consumer oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in injuries to purchasers and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

      d.     Because of Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased Dealer Integration Services were misled to believe that they were paying a fair price for Dealer Integration Services or the price increases for Dealer Integration Services were for valid business reasons; and similarly situated purchasers were potentially affected by Defendants' conspiracy.

      e.     Defendants' unlawful conduct had the following effects: (1) Dealer Integration Services price competition was restrained, suppressed, and eliminated throughout New York; (2) Dealer Integration Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of Dealer Integration Services in New York, were deprived of free and open competition and were subject to Defendants' deceptive practices in New York; and (4) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of Dealer Integration Services in New York, paid supracompetitive, artificially inflated prices for Dealer Integration Services and were subjected to Defendants' deceptive practices.

f.      Defendants knew that their unlawful trade practices with respect to pricing Dealer Integration Services would have an impact on all purchasers in New York and not just the Defendants' direct customers.

g.      Defendants knew that their unlawful trade practices with respect to pricing Dealer Integration Services would have a broad impact, causing class members who indirectly purchased Dealer Integration Services to be injured by paying more for Dealer Integration Services than they would have paid in the absence of Defendants' unlawful trade acts and practices.

h.      During the Class Period, Defendants marketed, sold, or distributed Dealer Integration Services in New York, and Defendants' illegal conduct substantially affected New York commerce and New York purchasers.

i.      During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, sold and/or distributed Dealer Integration Services in New York.

j.      Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

182.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Dealer Integration Services were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

b.      Defendants' unlawful conduct had the following effects: (1) Dealer Integration Services price competition was restrained, suppressed, and eliminated throughout

North Carolina; (2) Dealer Integration Services prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Dealer Integration Services in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Dealer Integration Services in North Carolina, paid supracompetitive, artificially inflated prices for Dealer Integration Services.

      c.     During the Class Period, the Defendants' illegal conduct substantially affected North Carolina commerce and purchasers of Dealer Integration Services.

      d.     Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation, and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware. Moreover, Defendants deceptively concealed their unlawful activities by conducting meetings and conversations in secret.

      e.     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, marketed, sold and/or distributed Dealer Integration Services in North Carolina.

      f.     Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

183. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq*.

a. Defendants' combinations or conspiracies had the following effects: (1) price competition for Dealer Integration Services was restrained, suppressed, and eliminated throughout South Carolina; (2) prices for Dealer Integration Services were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Dealer Integration Services.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

## COUNT V

## UNJUST ENRICHMENT

184. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

185. Plaintiffs bring this claim under the laws of all States listed in Counts III and IV, *supra*.

186.     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Dealer Integration Services, DMSes and applications for dealerships to use in conjunction with their DMSes.

187.     Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for Dealer Integration Services.

188.     Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis resulting from the overpayments made by Plaintiff or members of the Classes for DMS, Data Integration Services, and Vendor Services.

189.     Pursuit of any remedies against any non-Defendant or co-conspirator providers of DMS, Data Integration Services, or Vendor Services subject to the conspiracy of Defendants or co-conspirators would have been futile given that those providers did not take part in Defendants' conspiracy.

## DEMAND FOR JURY TRIAL

190.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims as described in this Complaint so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following relief:

191. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

192. That the unlawful conduct, contract, conspiracy, or combination alleged here be adjudged and decreed by the Court to be:

      a.      An unreasonable restraint of trade or commerce in violation of Sections 1 and 2 of the Sherman Act;

      b.      A *per se* violation of Sections 1 and 2 of the Sherman Act;

      c.      An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

      d.      Acts of unjust enrichment by Defendants as set forth herein.

193. That the Court determine that the Plaintiff and the members of the Classes may recover damages, to the maximum extent allowed under the cited laws, and that a joint and several judgment in favor of Plaintiff and the members of the putative Classes be entered against Defendants in an amount to be trebled to the extent such laws permit.

194. That the Court award Plaintiff and the members of the Classes damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them.

195. That the Court permanently enjoin Defendants, and any of Defendants' subsidiaries or affiliates, from engaging in any of the conduct described herein.

196.     That the Court award Plaintiff and members of the Classes pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of services of this Complaint.

197.     That the Court award Plaintiff and members of the Classes the costs of their suit, including reasonable attorneys' fees, as provided by law; and

198.     That the Court award Plaintiff and members of the Classes such other and further relief as the case may require and the Court may deem just and proper.

Dated:  April 12, 2018                              Respectfully submitted,

                                                    By:

                                                    s/ Robert A. Clifford
                                                    ROBERT A. CLIFFORD

                                                    **CLIFFORD LAW OFFICES, P.C.**

                                                    Robert A. Clifford
                                                    Shannon M. McNulty
                                                    120 N. LaSalle Street, Suite 3100
                                                    Chicago, IL 60602
                                                    Telephone:  312/899-9090
                                                    312/251-1160 (fax)
                                                    rac@cliffordlaw.com
                                                    smm@cliffordlaw.com

                                                    /s/ Victoria Romanenko

                                                    **CUNEO GILBERT & LaDUCA, LLP**

                                                    Jonathan W. Cuneo
                                                    Joel Davidow
                                                    Jennifer E. Kelly
                                                    Victoria Romanenko
                                                    Yifei "Evelyn" Li
                                                    Suite 200

4725 Wisconsin Avenue, NW
Washington, DC 20016
Telephone: (202) 789-3960
jonc@cuneolaw.com joel@cuneolaw.com
jkelly@cuneolaw.com
vicky@cuneolaw.com
evelyn@cuneolaw.com


**LANGROCK SPERRY AND WOOL LLP**

Erin Miller Heins, Esq. *(not admitted in N.D. Ill.)*
Langrock Sperry & Wool, LLP
210 College Street
PO Box 721
Burlington, VT 05402-0721
Phone: 802.864.0217
Fax:     802.864.0137
eheins@langrock.com