**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

---

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817<br>Case No. 18 C 864 |
| This Document Relates to:<br>*Cox Automotive, Inc., et al. v. CDK Global, LLC,*<br>Case No. 1:18-cv-1058 (N.D. Ill.) | Hon. Amy J. St. Eve<br>**PUBLIC-REDACTED** |

---

**COX AUTOMOTIVE, INC., ET AL.'S
OPPOSITION TO DEFENDANT CDK GLOBAL, LLC'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

BACKGROUND AND NEW EVIDENCE ......................................................... 2

STANDARD ....................................................................................................... 6

ARGUMENT ...................................................................................................... 7

    I.    Cox Has Alleged Plausible Claims Under Section 1 Of The Sherman Act ........... 7

        A. CDK and Reynolds' *Per Se* Unlawful Horizontal Conspiracy ........................ 7

            1.    The Complaint Alleges an Unlawful Group Boycott .................... 7

            2.    The Complaint Alleges Unlawful Market Division ....................... 9

            3.    Law of the Case Forecloses Dismissal of the Core Conspiracy Claims ......................................................................... 11

        B. Cox Properly Alleges Unlawful Exclusive Dealing ........................................ 12

            1.    CDK's Exclusive Dealing Terms Foreclose Independent Integrators from a Substantial Share of the Data Integration Market .......................................................................................... 13

            2.    CDK's Exclusive Dealing Has Led to an Increase in Price and a Reduction in Output ............................................................. 14

        C. The Complaint Properly Alleges Unlawful Tying ......................................... 16

    II.    Cox Has Plausibly Alleged Monopolization Under Section 2 Of The Sherman Act ..................................................................................................... 17

        A. CDK Has Market Power in the Data Integration Aftermarket ....................... 18

        B. CDK Acquired and Maintains its Monopoly Through Anticompetitive Means ............................................................................................................ 21

    III.    Cox Has Properly Alleged Violations Of California Antitrust And Unfair Competition Law ................................................................................. 22

    IV.    Cox Has Properly Alleged Breach Of Contract And Fraudulent Inducement ...... 23

    V.    Cox Has Properly Alleged A Violation of California's Unfair Practices Act ...... 24

    VI.    Cox Has Properly Alleged Defamation ................................................................ 24

CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010).................................................................................................................16

*Almblad v. Scotsman Indus., Inc.*, 2013 WL 4600209 (N.D. Ill. Aug. 28, 2013).........................25

*Am. Needle, Inc. v. NFL*, 560 U.S. 183 (2010) ...........................................................................10

*Am. Needle Inc. v. New Orleans*, 2012 WL 4327610 (N.D. Ill. Sept. 21, 2012)...........................14

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)....................................16

*Authenticom, Inc. v. CDK Global, LLC*,
    2017 WL 3017048 (W.D. Wisc. July 14, 2017), *rev'd*, 874
    F.3d 1019 (7th Cir. 2017) .............................................................1, 7, 8, 12, 13, 14, 15, 16

    874 F.3d 1019 (7th Cir. 2017) .......................................................................1, 15, 17, 18

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588 (7th Cir. 1998) ....................................................................................................................................7

*Broiler Chicken Antitrust Litig., In re*, 2017 WL 5574376 (N.D. Ill. Nov. 20, 2017)....................9

*Brown v. State of Wisconsin*, 2017 WL 371915 (W.D. Wis. Jan. 25, 2017) .................................25

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297 (10th Cir. 2017).........22

*Burda v. Wendy's Int'l, Inc.*, 659 F. Supp. 2d 928 (S.D. Ohio 2009)............................................21

*Carl Sandburg Vill. Condo. Ass'n No. 1 v. First Condo. Dev. Co.*, 758 F.2d 203 (7th Cir. 1985) ..................................................................................................................................17

*Chisholm v. Foothill Capital Corp.*, 940 F. Supp. 1273 (N.D. Ill. 1996).....................................25

*Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376 (7th Cir. 2003)..............................20

*Datel Holdings, Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974 (N.D. Cal. 2010).........................20

*Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.*, 20 Cal. Rptr. 2d 62 (Cal. Ct. App. 1993)........................................................................................................24

*Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346 (7th Cir. 1982) ...................17

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ................16, 18, 19, 20, 21

*Eddins v. Redstone*, 35 Cal. Rptr. 3d 863 (Cal. Ct. App. 2005) ....................................24

*Enhance A Colour Corp. v. Dainippon Screen Graphics (USA), LLC*, 2015 WL 514938
    (N.D. Ill. Feb. 6, 2015)........................................................................23

*Estate of Moreland v. Dieter*, 395 F.3d 747 (7th Cir. 2005).........................................24

*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986) ...............................................18

*First Class Vending, Inc. v. Hershey Co.*, 2015 WL 12426155 (C.D. Cal. July 28, 2015)...........24

*Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012) ........................................7, 8

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588 (7th Cir. 1984) .................9, 10

*Giant Screen Sports LLC v. Sky High Entm't*, 2007 WL 627595 (N.D. Ill. Feb. 27, 2007)..........25

*Glaberson v. Comcast Corp.*, 2006 WL 2559479 (E.D. Pa. Aug. 31, 2006)...............................22

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*,
    2016 WL 6091244 (N.D. Ind. Oct. 19, 2016)....................................................18
    2013 WL 3214983 (N.D. Ind. Mar. 13, 2013)...................................................21

*High Fructose Corn Syrup Antitrust Litig., In re*, 295 F.3d 651 (7th Cir. 2002) ...........................8

*Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930 (7th Cir. 2012) ..........................25

*Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707 (D. N.J. 2013)................................12

*Lerma v. Univision Commc'ns, Inc.*, 52 F. Supp. 2d 1011 (E.D. Wis. 1999)..............................21

*McGreal v. AT & T Corp.*, 892 F. Supp. 2d 996 (N.D. Ill. 2012)....................................24

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 2016 WL 5817176 (C.D. Ill.
    Sept. 30, 2016), *aff'd*, 859 F.3d 408 (7th Cir. 2017) ........................................13

*Motor Vehicle Software Corp. v. CDK Global, Inc.*, 2017 WL 5643163 (C.D. Cal.
    Oct. 2, 2017) ......................................................................2, 8, 11, 12

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284 (1985)..............7

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697 (7th Cir. 2011) .....................................9

*PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811 (6th Cir. 1997) ....................................20

*Pharmacy Benefit Managers Antitrust Litig., In re*, 582 F.3d 432 (3d Cir. 2009) ........................11

*Plasma-Derivative Protein Therapies Antitrust Litig., In re*, 764 F. Supp. 2d 991 (N.D. Ill. 2011).........................................................................................................................9

*Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037 (N.D. Ill. 2016)........................................14

*Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358 (7th Cir. 1987)......................................................................................................................10

*Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218 (E.D. Cal. 1999)....................19

*Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312 (7th Cir. 2006) .................................................17

*Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717 (7th Cir. 2004) ................................13

*Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380 (7th Cir. 1984)................................13, 15

*Rubio v. Capital One Bank*, 613 F.3d 1195 (9th Cir. 2010) ..........................................................22

*SanDisk Corp. v. Kingston Tech. Co.*, 863 F. Supp. 2d 815 (W.D. Wis. 2012) ............................18

*Schor v. Abbott Labs.*, 457 F.3d 608 (7th Cir. 2006)....................................................................20

*Serfecz v. Jewel Food Stores*, 67 F.3d 591 (7th Cir. 1995)...........................................................14

*Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) ..................................................................7

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)...................................................................17

*United States v. Trudeau*, 812 F.3d 578 (7th Cir. 2016)................................................................12

*Verizon Commc'ns Inc. v. Law offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)................22

*Viamedia, Inc. v. Comcast Corp.*, 2017 WL 698681 (N.D. Ill. Feb. 22, 2017)..............6, 7, 16, 22

*Wallace v. Free Software Found., Inc.*, 2005 WL 3239208 (S.D. Ind. Nov. 28, 2005) ................15

*Wilk v. Am. Med. Ass'n*, 895 F.2d 352 (7th Cir. 1990)............................................................18, 19

*Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liability Litig., In re*, 2011 WL 2746086 (S.D. Ill. July 11, 2011) ..................................................................11

**STATUTES AND RULES**

18 U.S.C. § 1030(a)(2)(C) ...........................................................................................21

Cal. Bus. & Prof. Code § 17045 .................................................................................24

Fed. R. Civ. P.
    Rule 8 ...............................................................................................................25
    Rule 12 ...............................................................................................................8
    Rule 12(b)(6)................................................................................................12, 16

**OTHER AUTHORITIES**

AMERICAN HERITAGE DICTIONARY (5th ed. 2018) ...................................................23, 24

Manual for Complex Litigation (Fourth) § 20.131 (2004) ...........................................11

## INTRODUCTION

Plaintiffs Cox Automotive, Inc., Autotrader.com, Inc., Dealer Dot Com, Inc. ("Dealer.com"), Dealertrack, Inc., HomeNet, Inc., Kelley Blue Book Co., Inc., vAuto, Inc., VinSolutions, Inc., and Xtime, Inc. (collectively, "Cox") brought this suit principally to redress the anticompetitive harm caused by the horizontal conspiracy between Defendant CDK Global, LLC ("CDK") and its non-defendant co-conspirator The Reynolds and Reynolds Company ("Reynolds") to exclude competition from the data integration market. CDK and Reynolds conspired (1) to boycott independent integrators such as Authenticom, Inc. ("Authenticom") and (2) to divide the data integration market between them. Those *per se* unlawful agreements have allowed CDK and Reynolds to dramatically raise prices for data integration services, including to Cox, which is CDK's and Reynolds' largest customer of those services.

Cox's conspiracy allegations are not only factually plausible, but they are supported by ample evidence. Indeed, prior decisions in these cases foreclose CDK's request for dismissal. In *Authenticom*, after hearing testimony from 21 witnesses and seeing some of CDK's inculpatory internal documents, Chief Judge James D. Peterson of the Western District of Wisconsin found the evidence so compelling that he granted a preliminary injunction based on a likelihood of success on the merits. *Authenticom, Inc. v. CDK Global, LLC*, 2017 WL 3017048, at \*6 (W.D. Wis. July 14, 2017) ("*Authenticom I*"), *rev'd on other grounds by* 874 F.3d 1019 (7th Cir. 2017) ("*Authenticom II*"). On appeal from that ruling, the Seventh Circuit indicated that the evidence was sufficient to warrant a trial. *See Authenticom II*, 874 F.3d at 1026 ("*After trial*, the court will be better able to assess the competitive significance of CDK and Reynolds' business models, of the 2015 agreements, and of any other agreement Authenticom is able to prove.") (emphasis added). And in *MVSC*, Judge Dale S. Fischer of the Central District of California rejected the same arguments that CDK makes here, in finding that MVSC had stated a claim for conspiracy

to "eliminate independent data integrators." *Motor Vehicle Soft. Corp. v. CDK Global, Inc.*, 2017 WL 5643163, at *4 (C.D. Cal. Oct. 2, 2017) ("*MVSC*").

The evidence before those courts – already sufficient to succeed on the merits – is just the tip of the iceberg: the documents CDK and Reynolds have produced since those prior proceedings include numerous communications in which CDK and Reynolds expressly colluded to block Authenticom and divide the data integration market. The direct evidence of CDK's and Reynolds' collusion – highlighted below – is extraordinary. In short, Cox has not only pled actionable violations of the Sherman Act (and the common law), but those allegations have already been confirmed in discovery. The Court should deny CDK's motion to dismiss.

## BACKGROUND AND NEW EVIDENCE

1. Cox is the nation's largest provider of automotive software solutions, including well-known applications like AutoTrader, Dealer.com, and Kelley Blue Book. Compl. ¶¶ 6-7, 36. These applications have revolutionized the car business for dealers and consumers. *Id.* The data that dealers generate in operating their businesses – such as sales, inventory, service, and customer information – is the lifeblood of these applications. *Id.* ¶ 8. Dealers store this data on a database that is part of separate enterprise software known as a Dealer Management System ("DMS"). *Id.* ¶ 62. Together Defendant CDK and non-defendant Reynolds have dominated the DMS market for decades. *Id.* ¶¶ 52-56. They respectively have 45% and 30% market shares by number of dealerships ("rooftops") and jointly over 90% when calculated by car sales. *Id.* ¶ 52.

Vendors of software applications like Cox rely on data integrators to provide them with access to dealer data. *Id.* ¶¶ 62-65. For many years there was a competitive market for data integration services. *Id.* ¶ 79. Independent integrators like Authenticom competed with the offerings provided by CDK and Reynolds. *Id.* ¶¶ 65, 79. CDK welcomed that competition, stating: "We don't tell the dealer, if someone wants access to their data, they have to come to

- 2 -

[CDK] to gain access to the data.  It's ultimately the dealer's data."  *Id.* ¶ 76.  As CDK's CEO publicly stated, "As long as [dealers] grant permission, how would you ever go against that wish?"  *Id*. ¶ 75.  In competition with independent integrators, CDK provides data integration services through its Third-Party Access ("3PA") program, and Reynolds does the same through its Reynolds Certified Interface ("RCI") program.  *Id.* ¶¶ 79-80.  CDK itself owns two independent integrators – DMI and IntegraLink – that provide data integration services across DMS platforms, including at one time for Reynolds dealers.  *Id.* ¶¶ 83, 86.  When the data integration market was competitive, prices were low.  Cox's applications generally paid $50 to $100 per month per dealer for access to that dealer's data.  *Id.* ¶¶ 90, 152.

2.      That changed in early 2015 when CDK and Reynolds entered into an illegal conspiracy.  The Complaint makes detailed factual allegations regarding the who, what, when, where, and why of the conspiracy.  *See id.* ¶¶ 105-117.  By at least early 2015, CDK and Reynolds had agreed to block independent integrators and divide the integration market between the two of them.  *Id.* ¶¶ 105-108, 113-114.  The conspiracy was formed by the top executives at each company:  CDK executives Howard Gardner (VP, Data Strategy), Ron Workman (SVP, Global Corporate Development), and Dan McCray (VP, Product Management); and Reynolds executives Bob Brockman (Chairman and CEO) and Robert Schaefer (VP, Data Services).  *Id.* ¶¶ 116-117.  As to the why, by eliminating competition, CDK and Reynolds could drastically increase the prices they charged for data integration services, and indeed, prices skyrocketed.  *See id.* ¶¶ 149-157.  After entering into the conspiracy with Reynolds, CDK immediately increased the prices Cox paid by ███████████ without any improvement in service.  *See id.* ¶¶ 152-153, 155, 157.  Moreover, by eliminating competing data integrators, CDK restricted the data available to other vendors' applications, thereby "tilting the table" – as CDK's own

documents put it – in favor of CDK's applications that compete with those offered by Cox and other vendors. *See id.* ¶¶ 162-169. As other vendors' software applications began to provide many of the same features as a DMS, thus threatening CDK's and Reynolds' core DMS businesses, CDK and Reynolds also wanted to preserve their DMS duopoly by preventing the natural progression of dealer operations away from the DMS and towards more efficient and less expensive software solutions. *See id.* ¶ 100.

Reynolds had one very important additional motivation. Before 2015, CDK marketed its DMS product with the promise that dealers could use independent data integrators, while Reynolds had taken steps to prevent dealers from doing so. *Id.* ¶¶ 96-98. Dealers much preferred the ability to choose how and with whom they shared their data, and Reynolds' market share therefore began to decline slowly. *See id.* By convincing CDK to join forces in blocking independent integrators, Reynolds could (and did) stop the loss of dealers to CDK. *See id.*

**3.** The Complaint's detailed factual evidence of the conspiracy include the following: (1) CDK and Reynolds executives *admitted* the conspiracy to Authenticom CEO Steve Cottrell. Mr. Schaefer of Reynolds told Mr. Cottrell that Reynolds had an "agreement" with CDK "to block independent integrators such as Authenticom," and Mr. McCray of CDK told Mr. Cottrell that Reynolds and CDK were "working collaboratively" to "[expletive] destroy" Authenticom. *Id.* ¶¶ 113-114. (2) Internal CDK documents corroborate those statements. A 2014 CDK strategy document stressed the need to obtain "***reciprocal agreements***" with Reynolds to eliminate competing data integrators, specifically naming Authenticom. *Id.* ¶ 104. (3) CDK and Reynolds memorialized portions of the conspiracy – including the market division agreement – in a series of written agreements dated February 2015, in which the erstwhile competitors agreed, *inter alia*, not to compete with one another in the provision of data

integration on their respective DMS platforms. *See id.* ¶¶ 106-112. (4) CDK and Reynolds implemented the conspiracy: CDK did an about face and began blocking independent integrators, and they stopped competing with each other in the data integration market, just as their written agreements said they would. *See id.* ¶¶ 118-121.

**4.** **New Evidence:** Discovery to date has provided abundant further evidence of the conspiracy between CDK and Reynolds, much of it startling in its directness.[1]



*See* Ex. 1[2] (CDK-2182930).

*Id.*

Ex. 2 (CDK-1424529, at 31-32).

---

[1] The discovery is also contrary to the sworn testimony – offered by senior CDK and Reynolds executives in the preliminary injunction proceedings – that they never discussed blocking Authenticom or cooperated in taking customers away from Authenticom. The consequences of such contradictions will need to be addressed at a later time.

[2] Citations marked as "Ex." are Exhibits attached to the Declaration of Derek T. Ho and List of Exhibits in Support of Cox's Opposition to CDK's Motion to Dismiss.



Ex. 3 (CDK-1974207).

Ex. 4 (CDK-0048430) (emphasis added).

CDK's internal documents show its callous infliction of harm on Authenticom and the market.

Ex. 5 (CDK-0855506).

Ex. 6 (CDK-0018738).

One final note: CDK has designated all of these – and the many other collusive communications with Reynolds – as "Highly Confidential" so that counsel cannot show them to the plaintiff parties. There is nothing Highly Confidential about such communications, yet CDK has refused to de-designate them. The issue will have to be decided by the Court.

## STANDARD

Under Federal Rule of Civil Procedure 8, the Complaint must include "a short and plain statement" that "raise[s] a right to relief above the speculative level." *Viamedia, Inc. v. Comcast Corp.*, 2017 WL 698681, at *2 (N.D. Ill. Feb. 22, 2017). The Court must "accept all well-

pleaded facts as true and draw reasonable inferences in [Cox's] favor." *Id.* As the plaintiff opposing CDK's motion to dismiss, Cox may "elaborate on [its] factual allegations" and "submit materials outside the pleadings to illustrate the facts the party expects to be able to prove." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (collecting cases).

## ARGUMENT

### I. Cox Has Alleged Plausible Claims Under Section 1 Of The Sherman Act

#### A. CDK and Reynolds' *Per Se* Unlawful Horizontal Conspiracy

Cox alleges that CDK conspired with Reynolds to (1) boycott and block independent data integrators such as Authenticom; and (2) divide between themselves the market for data integration. CDK does not (and cannot) dispute that these claims – if supported by well-pled allegations – would establish *per se* violations of Section 1 of the Sherman Act. *See Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000) (group boycott); *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 591 (7th Cir. 1998) (market division).

Cox's detailed allegations of horizontal conspiracy (including eyewitness testimony and written agreements) easily surpass the plausibility threshold applicable to a motion to dismiss. Moreover, the doctrine of law of the case prevents CDK from re-litigating this issue here.

#### 1. The Complaint Alleges an Unlawful Group Boycott

**a.** "[J]oint efforts by a firm or firms to disadvantage competitors by . . . persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle" are *per se* unlawful. *Toys "R" Us,* 221 F.3d at 936 (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985)). Cox alleges precisely that type of conduct occurred. Executives from both CDK and Reynolds told Authenticom's Mr. Cottrell that the two companies had agreed to work together to block Authenticom's access to dealer data so it could no longer compete. *See* Compl. ¶¶ 99-117. After evaluating Mr.

Cottrell's in-person testimony at the preliminary injunction hearing, Judge Peterson credited Mr. Cottrell's "detailed" and "persuasive" testimony (and found the cursory denials from CDK and Reynolds executives to be unpersuasive). *Authenticom I*, 2017 WL 3017048, at *6. CDK's admissions are "all the proof" Cox would need at trial; they thus clearly state a claim under Rule 12. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002).

Cox's allegations of conspiracy go well beyond Mr. Cottrell's testimony. CDK's own documents show that it needed to enter into "reciprocal agreements" with Reynolds so that neither would defect and resume allowing independent integrators. Compl. ¶ 104; *see also id.* ¶¶ 99-103. The February 2015 written agreements provide further confirmation. In those agreements, CDK and Reynolds agreed (in perpetuity) not to assist "any person . . . to access or integrate with the other party's DMS," in addition to agreeing not to use Authenticom or any other independent integrator (which, prior to their agreement, they both did extensively). *Id.* ¶¶ 106-112. As Judge Peterson found, the agreements "suggest a horizontal conspiracy" to eliminate independent data integrators. *Authenticom I*, 2017 WL 3017048, at *6.

And now in discovery, the evidence of CDK's and Reynolds' agreement to block independent integrators – removing them as a viable alternative for vendors and dealers alike – has become overwhelming. *See supra* pp. 5-6. That evidence, which is properly considered on a Rule 12 motion, *see Geinosky*, 675 F.3d at 745 n.1, shows that, as the Seventh Circuit in *Authenticom* and the district court in *MVSC* have already held even without the benefit of this additional evidence, these claims cannot be dismissed on a 12(b)(6) motion (or even at summary judgment). *See supra* pp. 1-2 (discussing prior rulings).

**b.** CDK ignores all this evidence in contending (at 7-8) that Cox alleges mere "conscious parallelism." But Cox's complaint does not rely on "[p]arallel behavior by putative

competitors (i.e., competitors following the same course of conduct)" as "circumstantial evidence of an [unlawful] agreement." *In re Broiler Chicken Antitrust Litig.*, 2017 WL 5574376, at *8 (N.D. Ill. Nov. 20, 2017). Rather, Cox's Complaint recites *direct evidence* of the agreements between CDK and Reynolds – and the discovery record is already replete with more such evidence. *See Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011) ("[W]ith direct evidence the fact finder is not required to make inferences to establish facts.").

CDK incorrectly argues that Cox has alleged no plausible motive for Reynolds and CDK to enter into the agreement. Evidence of motive is a "plus factor" that can warrant an inference of conspiracy from circumstantial evidence. *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 998 (N.D. Ill. 2011). But such evidence gilds the lily where there is direct evidence that two parties conspired. At any rate, Cox alleges – and the evidence thus far confirms – four plausible motives for CDK and Reynolds to enter into the agreement: (1) to eliminate competition so they could raise data integration prices; (2) to hamstring competing software vendors by restricting their access to dealer data; (3) to protect their DMS duopoly from standalone software solutions that were beginning to erode the primacy of the DMS for dealers; and (4) to stop the defection of Reynolds DMS customers. *See* Compl. ¶¶ 100, 149-157, 162-169; *supra* pp. 3-4.

### 2. The Complaint Alleges Unlawful Market Division

**a.** The February 2015 agreement between CDK and Reynolds also divided the market for data integration services – "a per se violation of section 1." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 595 (7th Cir. 1984). Pursuant to that agreement, CDK would be the sole provider of integration services for dealers using a CDK DMS, and Reynolds would be the sole provider of integration services for dealers using a Reynolds DMS. As Mr. Schaefer of Reynolds confirmed at the *Authenticom* hearing, Section 4.5 of the agreement

prohibits each company from providing data integration services to dealers on the other company's platform. Compl. ¶ 107. Moreover, CDK and Reynolds further agreed to steer each other's existing data integration customers to each other to effectuate that agreement. *Id.* ¶¶ 106-108. Section 4.5 of the agreement states: "For the avoidance of doubt, this Section 4.5 is not intended as a 'covenant not to compete,' but rather as a contractual restriction of access and attempted access." *Id*. ¶ 107. This is a classic case of protesting too much: CDK and Reynolds knew they were on thin antitrust ice, or they would not have included such a (hollow) disclaimer. Replacing competition with cooperation in this manner is *per se* unlawful. *See Gen. Leaseways*, 744 F.2d at 595.

      **b.** CDK argues (at 7-9) that the agreement was a decision to "wind down" the provision of data integration services for dealers using a Reynolds DMS. But that characterization condemns CDK's conduct; it does not exculpate it. CDK's agreement to "wind down" its efforts to compete for Reynolds customers, in exchange for Reynolds' agreement not to compete for CDK customers, *see* Compl. ¶¶ 106-107, is market division – no matter what innocuous labels CDK wishes to use. *See Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 376 (7th Cir. 1987) ("[w]hen private parties help themselves to a reduction in competition, the antitrust laws apply"); *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 193 (2010) ("[T]he Sherman Act . . . is aimed at substance rather than form.").

      As with the group boycott, Cox's allegations of an unlawful market division are supported not only by allegations but by evidence adduced in discovery. ████████

████████████████████████████████████████

████████████████████████████████████████

Ex. 7 (CDK-0222945, at 46).[3] ███████████████████████████

█████████████████ *see* Ex. 8 (CDK-0774207); █████████████████████████

██████████████████████ *see* Ex. 9 (CDK-0061228) (Slide 1); and provide

Reynolds with five years of free data integration from CDK, *see* Compl. ¶ 128.[4]

### 3. Law of the Case Forecloses Dismissal of the Core Conspiracy Claims

Two federal courts have rejected the same arguments that CDK makes here. The rulings

of a transferor court remain law of the case even after MDL transfer. *See In re Pharmacy Benefit*

*Managers Antitrust Litig.*, 582 F.3d 432, 440-41 (3d Cir. 2009) (applying law of the case to

decisions of MDL transferor court and explaining "we do not believe that Congress intended that

a 'Return to Go' card would be dealt to parties involved in MDL transfers"); *accord In re*

*Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liability Litig.*, 2011 WL

2746086, at *6 (S.D. Ill. July 11, 2011). Given the fundamental objective of the MDL process to

"avoid conflicting rulings," Manual for Complex Litigation (Fourth) § 20.131 (2004), this Court

should apply those prior decisions to all cases, rather than create inconsistency within this MDL.

**a.** In *MVSC*, Judge Fischer held that MVSC – which, like Cox, is a provider of

software applications to dealers – plausibly alleged that "CDK and Reynolds agreed and took

affirmative steps to block MVSC's access to dealer data . . . by seeking to *eliminate independent*

*data integrators*." *MVSC*, 2017 WL 5643163, at *4 (emphasis added). Judge Fischer therefore

denied CDK's motion to dismiss the same horizontal conspiracy claim at issue in this case. *Id.* at

---

[3] *See also* Ex. 10 (CDK-0189652) █████████████████████████
█████████████████████

[4] CDK's argument that no agreement was necessary is also contradicted by the evidence.
CDK falsely asserts (at 9) that, before the 2015 agreement, Reynolds had already effectively
blocked CDK's access. ████████████████████████████████
██████████████████████ Ex. 11 (CDK-0602338).

*5.[5]  CDK provides no grounds to reconsider Judge Fischer's decision – indeed, CDK does not even mention the decision.  Nor could CDK make such an argument:  In requesting MDL consolidation, CDK acknowledged that all cases in this MDL "center[] on essentially the same alleged antitrust conspiracy between CDK and Reynolds to secure control of the purported data 'integration' market."  Mot. of Defs. for Transfer, at 9 (J.P.M.L. Nov. 7, 2017), Dkt. 1-1.  CDK cannot now argue that differences in the *MVSC* allegations warrant a different result.  *See United States v. Trudeau*, 812 F.3d 578, 584 (7th Cir. 2016) (judicial estoppel precludes party that prevailed at an earlier stage from relying on a contrary argument later in the case).

    **b.**    Likewise, in *Authenticom*, after a multi-day evidentiary hearing with over a dozen witnesses and hundreds of documents, Judge Peterson found that Authenticom had "adduced evidence that could establish the existence of a per se horizontal conspiracy."  *Authenticom I*, 2017 WL 3017048, at *6.  Because that *evidence* was sufficient to show a likelihood of success on the merits, Cox's *allegations* are necessarily sufficient under Rule 12(b)(6).  *See, e.g.*, *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 778 (D.N.J. 2013) ("the standard for obtaining injunctive relief is considerably higher than the standard for surviving dismissal.").[6]

### B.  Cox Properly Alleges Unlawful Exclusive Dealing

    Cox alleges CDK has imposed unlawful exclusive dealing provisions on vendors and dealers, in violation of Section 1 of the Sherman Act.  In particular, CDK requires Cox (and other vendors) to obtain dealer data ████████████████████████████ – an exclusive

---

    [5] Judge Fischer also ruled that MVSC had plausibly alleged a second conspiracy – not raised in Cox's case – between CDK and Reynolds to prevent MVSC from participating in Defendants' in-house data integration programs.  *MVSC*, 2017 WL 5643163, at *4.

    [6] Procedurally, Judge Peterson allowed CDK to file a motion to dismiss after the preliminary injunction hearing.  But Judge Peterson stated that it was "unlikely that the court would dismiss the core antitrust claims on a Rule 12 motion" given the Court's preliminary injunction findings.  *Authenticom* Dkt. 209, at 1.  The Court entertained the motion principally to address certain theories – in particular, tying, monopolization, and tortious interference – that the Court did not address in the preliminary injunction ruling.  *See id.*

dealing requirement that never expires. Compl. ¶¶ 136, 132-134. That exclusive dealing provision is unlawful if: (1) it "foreclose[s] competition in a substantial share of the line of commerce at issue," *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 738 (7th Cir. 2004), such that "at least one significant competitor of the defendant" is excluded "from doing business in a relevant market," *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984); and (2) "the probable (not certain) effect of the exclusion" is to "raise prices above (and therefore reduce output below) the competitive level, or otherwise injure competition," *id.* Both elements are satisfied here. Indeed, Judge Peterson has already found that Authenticom "made the requisite likelihood of success showing" with respect to these exclusive-dealing claims, *Authenticom I*, 2017 WL 3017048, at *7-8, and so the law of the case again applies.

### 1. CDK's Exclusive Dealing Terms Foreclose Independent Integrators from a Substantial Share of the Data Integration Market

**a.** As Judge Peterson already held, CDK's exclusive dealing arrangements "effectively cut [independent integrators] out of the data integration market," *Authenticom I*, 2017 WL 3017048, at *7, because they prevent dealers and vendors (such as Cox) from working with independent integrators (such as Authenticom). *See* Compl. ¶¶ 122, 132-134. The foreclosure effect is substantial: data integrators are barred from competing for the 45% of dealership rooftops that use a CDK DMS (and more by car sales). *See Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 2016 WL 5817176, at *8 (C.D. Ill. Sept. 30, 2016) ("Courts typically require a plaintiff to make an initial showing of foreclosure from competing in at least 30 to 40 percent of a market."), *aff'd*, 859 F.3d 408 (7th Cir. 2017).

**b.** CDK nevertheless contends (at 14) that no competition has been foreclosed because "3PA is not a competing data integrator; it is a 'managed interface' that is integral to CDK's DMS." But that contention requires a "deeply fact-intensive inquiry" that cannot be

credited on a motion to dismiss. *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1070 (N.D. Ill. 2016). At this stage, Cox's allegation that CDK's 3PA service is a separate product from CDK's DMS, *see* Compl. ¶¶ 65-67, is surely plausible; indeed, the court in *Authenticom* found it true as a factual matter. *See Authenticom I*, 2017 WL 3017048, at *6-9, 14. There is separate demand for integration services. *See* Compl. ¶ 67; 2017 WL 3017048, at *3 (finding the existence of a "market for data integration services" that was "competitive"). Moreover, CDK's 3PA service is a market substitute for similar services provided by independent data integrators. *See* Compl. ¶¶ 90, 157; *Am. Needle Inc. v. New Orleans*, 2012 WL 4327610, at *1 (N.D. Ill. Sept. 21, 2012) ("Products are in the same market if they are reasonably interchangeable for the purposes for which they are produced."). And CDK's businesspeople certainly think that the CDK integration product competes directly with independent integrators like Authenticom. *See*, *e.g.*, Ex. 12 (CDK-0105062) (Slide 9) ██████████████████████████████ ████████████████████████████ Ex. 13 (CDK-0215041) ███████████ ████████████████████████████████████████

CDK also argues (at 15) that Cox itself has "not been excluded from dealing with CDK or any dealer," but that is irrelevant. Exclusive dealing harms competitors that are foreclosed from competing, but it also harms customers through increased prices, diminished quality, and/or reduced choice. That consumer harm certainly qualifies as antitrust injury. *See, e.g.*, *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 598 (7th Cir. 1995) (consumers and competitors generally have antitrust standing).

> **2.  CDK's Exclusive Dealing Has Led to an Increase in Price and a Reduction in Output**

**a.** Cox has sufficiently alleged that the "effect of the exclusion" has been to "raise prices above (and therefore reduce output below) the competitive level, or otherwise injure

- 14 -

competition." *Roland Mach.*, 749 F.2d at 394. Following its agreement with Reynolds, CDK dramatically raised integration fees for software vendors, often more than doubling or tripling the price. *See* Compl. ¶¶ 149-155, 157, 161. ███████████████████████████████████████

████████████████████████████████████████████ *See id.* ¶ 153; *see Authenticom I*, 2017 WL 3017048, at *4 (discussing evidence of price increases); *Authenticom II*, 874 F.3d at 1023 ("bloated fees"). Initial discovery has further confirmed massive price increases; ███████████████████████████████████████████████████████

███ *See* Ex. 14 (CDK-0841087) (Slide 4) ██████████████████████████████; *see also* Ex. 15 (CDK-0248042) (Slide 5)████████████████████████████████████

████████████████████████████ CDK's conduct also caused a reduction in output. Defendant's excessive fees have caused vendors to shutter applications, lay off employees, and halt growth. *See* Compl. ¶ 148. This was precisely CDK's goal: to artificially "tilt the table" in favor of its own applications to the detriment of those offered by competitors. *See id.* ¶¶ 162-169.

CDK's conduct has also reduced the quality of data integration services. As Cox alleges – and the evidence at the *Authenticom* preliminary injunction hearing showed – Authenticom's DealerVault "already won acceptance in the market" because of its high quality and competitive prices. *Authenticom I*, 2017 WL 3017048, at *10; *see id.* at *2 (DealerVault is "popular with dealers"). CDK's product is more expensive and inferior. *See* Compl. ¶ 144 ("prices have skyrocketed and quality has stagnated or even decreased"). This "deterioration in quality of goods and services" reflects harm to competition and Cox as a consumer. *Wallace v. Free Software Found., Inc.*, 2005 WL 3239208, at *3 (S.D. Ind. Nov. 28, 2005).

    **b.** CDK does not deny these competitive harms; nor could it on a motion to dismiss.

- 15 -

Rather, CDK argues (at 15-17) that a purported pro-competitive security justification outweighs the anticompetitive effects. But that argument is one for trial; CDK's factual assertions cannot be credited at the pleading stage.[7] Moreover, Cox specifically alleges – and the district court in *Authenticom* agreed – that CDK's security justification is pretextual. *See* Compl. ¶¶ 170-178; *Authenticom I,* 2017 WL 3017048, at *9 (stating it was "not convinced" by Defendants' security rationale). Among other things, until it conspired with Reynolds, CDK had itself touted the benefits of independent data integrators, *see* Compl. ¶¶ 73-77; data integrators are common in industries with far more sensitive data (such as banking) and CDK itself owns two independent data integrators (DMI and IntegraLink), *see id.* ¶¶ 171, 173; and CDK (and Reynolds) have used (and continue to use) Authenticom and other independent integrators for their own applications, *see id.* ¶ 175.[8] CDK's own internal documents reveal that the actual reason for its conduct was revenue, not security: ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████ Ex. 16 (CDK-0843493) (emphasis added).

## C.     The Complaint Properly Alleges Unlawful Tying

CDK's vertical agreements with dealers also constitute unlawful tying in violation of Section 1 of the Sherman Act. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-62 (1992). CDK does not dispute that it requires dealers who purchase its DMS (the tying

---

[7] CDK (at 15) cites *Viamedia*, but this Court's ruling on the Rule 12(b)(6) motion in that case did not concern whether procompetitive benefits outweighed anticompetitive harm. *See* 2017 WL 698681, at *4. Rather, the motion addressed a unilateral refusal to deal under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), which is not at issue here.

[8] CDK's passing citation to *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010), is misplaced. That case "stand[s] for the uncontroversial proposition that product improvement *by itself* does not violate Section 2." *Id.* at 999 (emphasis added). But even a product improvement (and the Complaint contains no allegation that any product was improved) does not immunize "associated conduct" that is anticompetitive, such as the horizontal conspiracy, tying, and exclusive dealing arrangements here. *Id.*; *see id.* at 996-98.

product) to also purchase CDK's 3PA integration service (the tied product). *See* Compl. ¶¶ 199-204.[9]  CDK merely contends (at 12-13) that there is no single entity that purchases both the DMS and data integration.   According to CDK, dealers pay for the DMS, and vendors pay for integration services.  Cox, however, alleges (and CDK does not contest) that dealers make the purchasing decision for both the DMS and the integration service, *see id.* ¶ 66, and that dealers pay a portion of the integration fees that are passed through to them, *id.* ¶ 145.  Under Seventh Circuit precedent, a tying claim is viable here because the dealers are the subjects of the illegal "forcing," which is the focal point of a tying claim.  *See Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346, 1354 (7th Cir. 1982) (hospital, rather than patient, may be relevant purchaser because the "patient generally takes no part in the selection of a particular anesthesiologist," even though the hospital may bear none of the costs).[10]

## II.  Cox Has Plausibly Alleged Monopolization Under Section 2 Of The Sherman Act

Unlawful monopolization "has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power."  *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).  Cox has plausibly pleaded both elements.

---

[9] CDK's tying is unlawful *per se* because: (1) two separate "products" are involved (DMS and data integration); (2) CDK, which has more than 40% market share in the DMS market, has "sufficient economic power in the tying market to appreciably restrain free competition in the market for the tied product"; and (3) CDK's tying arrangements affect a substantial volume of interstate commerce.  *See Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 316 (7th Cir. 2006).  Even if CDK's tying arrangements are not *per se* unlawful, Cox has plausibly alleged the tying arrangements violate the Sherman Act under the Rule of Reason.  *See Carl Sandburg Vill. Condo. Ass'n No. 1 v. First Condo. Dev. Co.*, 758 F.2d 203, 210 (7th Cir. 1985).

[10] CDK cites (12) dicta from the Seventh Circuit expressing doubt on Authenticom's tying claim, but the court was careful to acknowledge that there may be "more to the claim than meets the eye on this record."  *Authenticom II*, 874 F.3d at 1026.  Indeed, Authenticom's likelihood of success on the merits of its tying claim was never briefed to the Seventh Circuit because the district court did not assess that claim as part of the basis for the injunction.

### A.    CDK Has Market Power in the Data Integration Aftermarket

**1.**    "Market power may be . . . shown by direct evidence of anticompetitive effects on price or output."  *SanDisk Corp. v. Kingston Tech. Co.*, 863 F. Supp. 2d 815, 824 (W.D. Wis. 2012).  "[A] firm is a monopolist if it can profitably raise prices substantially above the competitive level . . . [W]here evidence indicates that a firm has in fact profitably done so, the existence of monopoly power is clear."  *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp.*, 2016 WL 6091244, at *7 (N.D. Ind. Oct. 19, 2016).

The Complaint alleges that CDK has, in fact, raised prices for data integration far above competitive levels – allegations that have been backed with evidence at the *Authenticom* hearing.  *See supra* p. 3.  The prices charged to certain Cox applications tripled overnight.  Compl. ¶ 27.  Where, as here, the Complaint demonstrates "proof of actual detrimental effects" such as supracompetitive prices or reduced output, there is no "need for an inquiry into market power, which is but a surrogate for detrimental effects."  *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 360 (7th Cir. 1990) (quoting *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986)).

**2.**    In any event, the Complaint squarely alleges that CDK possesses market power in a relevant antitrust aftermarket under *Eastman Kodak*.  There, the Supreme Court recognized that antitrust markets may appropriately be divided into brand-specific "sub-markets" (here, data integration on CDK's DMS platform) where "significant information and switching costs" impede consumers from switching between brands in the primary market (here, the DMS market).  *Eastman Kodak*, 504 U.S. at 473.[11]

---

[11] CDK references (at 17) the Seventh Circuit's statement that "neither Reynolds nor CDK is a monopolist," *see Authenticom II*, 874 F.3d at 1025, but that statement concerned the *DMS* market, not the aftermarket for data integration on the CDK DMS.  Moreover, as with tying, *see supra* note 10, Section 2 monopolization was not the basis for the preliminary injunction, and that issue was not presented to the Seventh Circuit on appeal.

**a.** **Switching Costs:** The Complaint alleges significant switching costs in the primary DMS market. CDK requires dealers to sign long term contracts of five to seven years. Compl. ¶ 56. Dealers also invest substantially in their DMS, which is the mission-critical enterprise software that manages a dealer's business. *Id.* ¶¶ 57-60 (switching DMS providers is "mission impossible"). Indeed, the *average* DMS client tenure is more than 20 years, further proof of high switching costs and market stickiness. *Authenticom* Dkt. 146, ¶ 15; *see*, *e.g.*, *Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218, 1232 (E.D. Cal. 1999) (where there is competing evidence on lock-in, "disputed issues for trial" preclude even summary judgment).

**b.** **Information Costs:** The Complaint further alleges substantial "information . . . costs" that create a "less responsive connection" between data integration prices and competition in the primary DMS market. *Eastman Kodak*, 504 U.S. at 473. Vendors, not dealers, directly pay for data integration. Taking full advantage of this disjunction, CDK imposes price secrecy provisions on vendors, which are designed to prevent dealers from learning how much CDK charges for data integration. *See* Compl. ¶¶ 132-135. Indeed, CDK's internal documents emphasized the importance of keeping dealers in the dark on its massive price increases post-2015. *See Authenticom* Dkt. 106-30, at 3.

As *Eastman Kodak* recognized, the "proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers." 504 U.S. at 482; *see also Wilk*, 895 F.2d at 360 ("Whether market power exists in an appropriately defined market is a fact-bound question."). CDK offers no basis to short-circuit that factual inquiry on a motion to dismiss.

**3.** CDK argues (at 15-16) the presence of an "unauthorized access" provision in its DMS contracts negates Cox's *Eastman Kodak* claim. That is unpersuasive.

- 19 -

*First*, far from prohibiting third-party access, CDK's DMS contracts expressly allow dealers to authorize "agents" – such as independent integrators – to access the DMS on the dealers' behalf. Compl. ¶¶ 66, 74. And that is exactly how CDK interpreted the DMS contracts for many years. *See id.* ¶¶ 75-77 (CDK VP of Sales: "That is the dealer's right. We have no right to tell them they can't do that."). Indeed, Judge Peterson rejected CDK's reading of its contracts in *Authenticom*. *See Authenticom* Dkt. 166, at 100:5-6 (Judge Peterson: "It does seem that CDK allows the dealer to designate agents.").

*Second*, whatever CDK's contracts say or mean, the Complaint alleges that CDK's actual real-world policies changed after the dealers were already locked-in. CDK's own cases (at 18) state that a "change in policy" is "the crucial factor" in the *Eastman Kodak* inquiry. *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997); *Schor v. Abbott Labs.*, 457 F.3d 608, 614 (7th Cir. 2006) (under *Eastman Kodak*, firms with market power may not deal in "complementary products . . . in ways that take advantage of customers' sunk costs"). Before colluding with Reynolds, CDK repeatedly – and publicly – stated that nothing prohibited CDK dealers from using independent data integrators. Compl. ¶¶ 73-77. With long-term contracts and the average DMS client tenure exceeding 20 years, most of CDK's dealer customer were "locked in" long before CDK's abruptly changed positions in 2015 (when it colluded with Reynolds) and 2016 (when it began aggressively locking out independent integrators).[12]

*Third*, courts recognize *Eastman Kodak* claims notwithstanding an "unauthorized access" provision in the initial contract. *See*, *e.g.*, *Datel Holdings*, *Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 988-90 (N.D. Cal. 2010) (rejecting attempt to dismiss an *Eastman Kodak* claim on the

---

[12] Tellingly, the only case CDK cites to support the (incorrect) proposition that real-world policies are irrelevant to the lock-in analysis is not even an antitrust case. *See Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376 (7th Cir. 2003).

basis of an "unauthorized" access provision, because it was a factual question whether customer would understand the contract as prohibiting unauthorized accessories); *Burda v. Wendy's Int'l, Inc.*, 659 F. Supp. 2d 928, 935 (S.D. Ohio 2009) (*Eastman Kodak* claim cognizable despite "approved suppliers" provision in initial franchise agreement). Here, where CDK's DMS contracts specifically permit access by authorized agents and CDK publicly stated that under those contracts dealers had the right to use independent integrators, there is at least a question of fact as to whether CDK's abrupt change in policy – without any change in contractual language – is efficacious in prohibiting such dealer-authorized access.

CDK makes passing reference (at 19) to the Computer Fraud and Abuse Act, but that statute is inapplicable. As noted above, CDK's DMS contract permits dealers to authorize "agents" to access their DMS, and dealers specifically authorize access by data integrators who then act as the dealers' agents. *See* Compl. ¶ 74. For that reason alone, third-party integrators like Authenticom do not access the CDK DMS "without authorization," 18 U.S.C. § 1030(a)(2)(C) – a fact that CDK's own internal documents recognize. *See* Ex. 17 (CDK-0032559, at 62) ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████ [13]

## B.  CDK Acquired and Maintains its Monopoly Through Anticompetitive Means

The allegations (and evidence) that support Cox's claims under Section 1 – horizontal conspiracy, exclusive dealing, and tying, *see supra* pp. 2-17 – are also sufficient to show that CDK acquired or maintains its "monopoly power through anticompetitive or exclusionary means." *Lerma v. Univision Commc'ns, Inc.*, 52 F. Supp. 2d 1011, 1018 (E.D. Wis. 1999); *see Gumwood HP Shopping Partners,* 2013 WL 3214983, at *7 ("Where defendant has engaged in

---

[13] CDK's passing invocation of the CFAA is wrong and misleading for many additional reasons, *see Authenticom* Dkt. 216, at 47-54, but the Court need not consider them given that CDK has not made a sustained argument for dismissal on that basis.

unlawful restraint of trade that would independently violate Section 1 of the Sherman Antitrust Act, it is well established that it also violates Section 2 if it acquires or maintains a monopoly by means of that restraint of trade.").

CDK's attempt (at 19-21) to shoehorn this case into the unilateral refusal-to-deal doctrine and *Verizon Commc'ns v. Trinko*, 540 U.S. 398 (2004) is a red herring. Cox's monopolization claim does not rest on CDK's unilateral refusal to deal with Cox or anyone else. Rather, the anticompetitive conduct at issue is CDK's horizontal conspiracy with Reynolds and the exclusive dealing and tying provisions it has imposed on vendors and dealers. *See supra* pp. 2-17. That conduct forms a clear-cut basis for Section 2 liability. *See*, *e.g.*, *Viamedia*, 2017 WL 698681, at *3-4; *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1308-09 (10th Cir. 2017) ("*Trinko* simply does not speak to claims . . . alleging concerted refusals to deal."); *Glaberson v. Comcast Corp.*, 2006 WL 2559479, at *10 (E.D. Pa. Aug. 31, 2006) ("*Trinko* does not provide a basis for insulating claims based on well-established examples of anticompetitive conduct, such as horizontal market allocations, from judicial review.").

## III. Cox Has Properly Alleged Violations Of California Antitrust And Unfair Competition Law

CDK seeks (at 21-23) dismissal of Cox's California-law claims solely on the ground that they are derivative of Cox's federal antitrust and defamation claims. Because CDK's motion to dismiss should be denied with respect to those claims, it should likewise be denied as to the Cartwright Act and California UCL claims. Furthermore, even if CDK's conduct were not "unlawful" as a matter of federal antitrust law, the Complaint still plausibly alleges CDK's conduct is "unfair" under the UCL. *See Rubio v. Capital One Bank,* 613 F.3d 1195, 1205 (9th Cir. 2010) ("unfair" practices actionable if their utility is "outweighed" by resulting harm to consumers, or if they violate established public policy).

## IV.    Cox Has Properly Alleged Breach Of Contract And Fraudulent Inducement

**A.**    Cox has adequately alleged that CDK both fraudulently induced Cox to sign its 3PA contract and breached that contract once it went into effect.



Compl. ¶ 127.  That representation was knowingly false, as CDK had recently agreed to give Reynolds *free* 3PA integration for five years, giving Reynolds a tremendous competitive advantage over Cox.  *See id*. ¶ 128.  CDK's assurances fraudulently induced Cox to sign the 3PA contract.  *See id.* ¶ 129.

*Id*. ¶ 130.  CDK has breached that provision since the inception of the contract by not reducing its pricing to Cox to reflect Reynolds' free 3PA access.  *See id.*

**B.**    CDK contends (at 23-24) that it did not "set any special price" for Reynolds; it merely gave Reynolds a five-year "fee waiver."  That distinction does not survive even cursory scrutiny.  "Price" means "the amount of money or goods, asked for or given in exchange for something else."  *Price*, AMERICAN HERITAGE DICTIONARY (5th ed. 2018).  Giving a "fee waiver" – especially for five years – lowers the "amount of money . . . asked for or given in exchange" for 3PA services, and therefore lowers the "price" – to zero.  Crediting CDK's semantic argument would render ▮▮▮▮ provisions a nullity, as operation of those provisions could be avoided through "fee waivers."  In all events, the believability of CDK's reading of its representations should be resolved by the trier of fact.  *See Enhance A Colour Corp. v. Dainippon Screen Graphics (USA), LLC*, 2015 WL 514938, at *2 (N.D. Ill. Feb. 6, 2015).[14]

---

[14] CDK also argues in passing (at 24) that the contractual commitment to lower Cox's 3PA pricing was "prospective" and thus did not apply to CDK's agreement with Reynolds that

## V. Cox Has Properly Alleged A Violation of California's Unfair Practices Act

California's Unfair Practices Act ("UPA") makes unlawful the "secret payment or allowance of rebates . . . or unearned discounts . . . or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions." Cal. Bus. & Prof. Code § 17045; *see Eddins v. Redstone*, 35 Cal. Rptr. 3d 863, 898 (Cal. Ct. App. 2005). CDK's waiver of the 3PA integration fee for Reynolds – but no other customer – violates that provision. *See Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.*, 20 Cal. Rptr. 2d 62, 67 (Cal. Ct. App. 1993) (finding secret rebate where defendant "expressly informed [plaintiff]" that a competitor "was receiving the 'same pricing'"); *First Class Vending, Inc. v. Hershey Co.*, 2015 WL 12426155 (C.D. Cal. July 28, 2015) (similar).

Here again, CDK's contention (at 24) that a "fee waiver" is not a "discount" is incredible. Because a "discount" is a "reduction from the full or standard amount of a price," *see Discount*, AMERICAN HERITAGE DICTIONARY, offering something for free is clearly a "discount." CDK also wrongly claims (at 24) that Cox has not alleged injury from the discounts given to Reynolds. To the contrary, Cox has alleged the "fee waiver" places its applications "at a severe competitive disadvantage in the marketplace," Compl. ¶ 28, because Reynolds – who makes competing applications, *see id.* ¶ 41 – receives free 3PA access. *See also id.* ¶ 147.

## VI. Cox Has Properly Alleged Defamation

"When filed in federal court, a claim for defamation . . . is held to the usual rules for notice pleading established by Rule 8." *McGreal v. AT & T Corp.*, 892 F. Supp. 2d 996, 1016

---

predated Cox's 3PA agreement. This argument is waived because CDK asserts it in a single sentence without reference to – or analysis of – the contractual language. *See Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived."). The argument also has no merit. The operative contractual language has no time restriction. ██████████████████████████████████ Compl. ¶ 130 (emphasis added).

(N.D. Ill. 2012). "An allegation is considered specific enough if the statement permits the defendant to understand the specific nature of the claim and form a responsive pleading." *Giant Screen Sports LLC v. Sky High Entm't*, 2007 WL 627595, at *3 (N.D. Ill. Feb. 27, 2007). Cox alleges the party that made the defamatory statements (CDK), the recipients of the statements (Nissan and Honda), and the reason the statements were false (CDK had decided to "tilt the table" against Cox's applications but blamed Cox for those problems). *See* Compl. ¶¶ 167-168. Contrary to CDK's argument (at 25), Rule 8 requires nothing more. *See Chisholm v. Foothill Capital Corp.*, 940 F. Supp. 1273, 1285 (N.D. Ill. 1996) (declining to dismiss defamation claims where "Plaintiff has alleged the basic substance of the statements . . . . The exact details of the exchange may be discerned through discovery."); *Almblad v. Scotsman Indus., Inc.*, 2013 WL 4600209, at *3 (N.D. Ill. Aug. 28, 2013) (similar). CDK's reliance on *Brown v. State of Wisconsin*, 2017 WL 371915, at *18 (W.D. Wis. Jan. 25, 2017), is misplaced because, unlike in *Brown*, Cox specifically alleged how CDK's false statements harmed its reputation.[15]

## CONCLUSION

CDK's motion to dismiss should be denied.

---

[15] In a footnote, CDK raises the possibility that Cox's defamation claim may be time-barred. But it is well established that "[a] statute of limitations provides an affirmative defense, and a plaintiff is not required to plead facts in the complaint to anticipate and defeat affirmative defenses." *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012).

Dated: April 16, 2018                              Respectfully submitted,


Jennifer L. Gregor                                 Derek T. Ho
Kendall W. Harrison                                Michael N. Nemelka
**GODFREY & KAHN S.C.**                            Aaron M. Panner
One East Main Street, Suite 500                    David L. Schwarz
Madison, Wisconsin 53703                           Kevin J. Miller
Telephone: (608) 284-2629                          Daniel V. Dorris
Fax: (608) 257-0609                                Joshua Hafenbrack
jgregor@gklaw.com                                  Daniel S. Guarnera
kharrison@gklaw.com                                **KELLOGG, HANSEN, TODD,**
                                                     **FIGEL & FREDERICK, P.L.L.C.**
                                                   1615 M Street, N.W., Suite 400
                                                   Washington, D.C. 20036
                                                   Telephone: (202) 326-7900
                                                   Fax: (202) 326-7999
                                                   dho@kellogghansen.com
                                                   mnemelka@kellogghansen.com
                                                   apanner@kellogghansen.com
                                                   dschwarz@kellogghansen.com
                                                   kmiller@kellogghansen.com
                                                   ddorris@kellogghansen.com
                                                   jhafenbrack@kellogghansen.com
                                                   dguarnera@kellogghansen.com

                                                   *Counsel for Plaintiffs Cox Automotive, Inc.,*
                                                   *Autotrader.com, Inc., Dealer Dot Com, Inc.,*
                                                   *Dealertrack, Inc., HomeNet, Inc.,*
                                                   *Kelley Blue Book Co., Inc., vAuto, Inc.,*
                                                   *VinSolutions, Inc., and Xtime, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I, Derek T. Ho, an attorney, hereby certify that on April 16, 2018, I caused a true and correct copy of the foregoing **COX AUTOMOTIVE, INC., ET AL.'S OPPOSITION TO DEFENDANT CDK GLOBAL, LLC'S MOTION TO DISMISS** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by email to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

Derek T. Ho
**KELLOGG, HANSEN, TODD,**
**FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com