# Exhibit A

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   IN RE:                    ) Docket No. 18 C 864
                               )
 4     DEALER MANAGEMENT SYSTEMS    )
       ANTITRUST LITIGATION.        )
 5                               ) Chicago, Illinois
                                 ) April 6, 2018
 6                               ) 10:00 o'clock a.m.

 7           TRANSCRIPT OF PROCEEDINGS - STATUS
            BEFORE THE HONORABLE AMY J. ST. EVE
 8
     APPEARANCES:
 9
     For Plaintiffs:          KELLOGG, HANSEN, TODD, FIGEL &
10                               FREDERICK, PLLC
                             BY:  MR. DEREK T. HO
11                               MR. MICHAEL N. NEMELKA
                             1615 M Street, N.W., Suite 400
12                           Washington, D.C.  20036

13                           MR. SAMUEL ISSACHAROFF
                             40 Washington Square South
14                           New York, New York  10012

15                           MILBERG, LLP
                             BY:  MS. PEGGY J. WEDGWORTH
16                           1 Penn Plaza, Suite 4800
                             New York, New York  10119
17
                             KAPLAN, KILSHEIMER & FOX, LLP
18                           BY:  MR. ROBERT N. KAPLAN
                             805 Third Avenue
19                           New York, New York  10022

20                           CUNEO, GILBERT & LADUCA, LLP
                             BY:  MS. VICTORIA ROMANENKO
21                           4725 Wisconsin Avenue, N.W.
                             Suite 200
22                           Washington, D.C.  20016

23                           ROBERTS LAW FIRM, P.A.
                             BY:  MR. MIKE L. ROBERTS
24                               MR. JANA K. LAW,
                                   via teleconference,
25                           20 Rahling Circle
                             Little Rock, Arkansas  72223
```

```
 1    APPEARANCES (Cont'd):

 2    For Plaintiffs (Cont'd):    ROBBINS, GELLER, RUDMAN & DOWD, LLP
                                  BY:  MS. ALEXANDRA S. BERNAY
 3                                655 West Broadway, Suite 1900
                                  San Diego, California  92101
 4
                                  ROBBINS, GELLER, RUDMAN & DOWD, LLP
 5                                BY:  MR. JAMES E. BARZ
                                  200 South Wacker Drive, Suite 3100
 6                                Chicago, Illinois  60606

 7                                LABATON SUCHAROW, LLP
                                  BY:  MR. CHRISTOPHER J. McDONALD
 8                                140 Broadway, 34th Floor
                                  New York, New York  10005
 9
      For CDK and Computerized    MAYER BROWN, LLP
10    Vehicle Registration:       BY:  MS. BRITT M. MILLER
                                       MR. MATTHEW D. PROVANCE
11                                71 South Wacker Drive
                                  Chicago, Illinois  60606
12
      For The Reynolds and        GIBBS & BRUNS, LLP
13    Reynolds Company:           BY:  MS. AUNDREA K. GULLEY
                                       MR. BRIAN T. ROSS
14                                1100 Louisiana, Suite 5300
                                  Houston, Texas  77002
15
                                  SHEPPARD, MULLIN, RICHTER
16                                  & HAMPTON, LLP
                                  BY:  MR. LEO CASERIA
17                                333 South Hope Street, 43rd Floor
                                  Los Angeles, California  90071
18
      Also Present:               MR. JONATHAN EMMANUAL,
19                                  Reynolds and Reynolds

20    Court Reporter:             MR. JOSEPH RICKHOFF
                                  Official Court Reporter
21                                219 S. Dearborn St., Suite 1232
                                  Chicago, Illinois  60604
22                                (312) 435-5562

23               * * * * * * * * * * * * * * * * *

24                      PROCEEDINGS RECORDED BY
                        MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED BY COMPUTER
```

```
1          (Proceedings had in open court, in part via telephone
2   conference:)
3              THE CLERK:  18 C 864, In Re: Dealer Management
4   Systems Antitrust Litigation.
5              THE COURT:  Good morning.
6              MR. BARZ:  Good morning, your Honor, Jim Barz on
7   behalf of the plaintiff Baystate Ford and also the majority
8   dealer plaintiff group.
9              MS. WEDGWORTH:  Peggy Wedgworth from Milberg on
10  behalf of plaintiffs Teterboro Automall and JCF Autos, 440
11  Jericho Turnpike and Patchogue 112 Motors.
12             MR. HO:  Derek Ho from Kellogg, Hansen on behalf of
13  Authenticom and other individual plaintiffs.
14             MR. ROBERTS:  Your Honor, mike Roberts on behalf of
15  Hoover Automotive and Massey Automotive.
16             MR. McDONALD:  Chris McDonald, Labaton Sucharow, on
17  behalf of Bob Baker Volkswagen.
18             MR. KAPLAN:  Robert Kaplan, your Honor -- good
19  morning.
20             THE COURT:  Good morning.
21             MR. KAPLAN:  -- on behalf of Hartley Buick, Cox
22  Motors and Northtown Automotive Companies.
23             MS. ROMANENKO:  Your Honor, Victoria Romanenko from
24  Cuneo, Gilbert & LaDuca on behalf of Hartley Buick GMC.
25             THE COURT:  Good morning.
```

1          MS. MILLER:  Good morning, your Honor, Britt Miller

2     and my partner Matt Provance on behalf of CDK Global and CDR.

3          MS. GULLEY:  Good morning, your Honor, Andi Gulley,

4     my partner Brian Ross, with Leo Caseria, for Reynolds and

5     Reynolds.  And Jon Emmanual from in-house is also here.

6          THE COURT:  Good morning.

7          And, then, we have one person on the phone.  If you

8     would identify yourself, please.

9          MS. LAW:  Yes, ma'am.

10          Good morning, your Honor, this is Jana Law on behalf

11     of Hoover Automotive.

12          Thank you for allowing me to participate by phone.

13          THE COURT:  You are welcome.

14          Good morning.  You are here for a status this

15     morning.

16          I have a partial ruling for you on lead counsel and

17     some questions, and you will get the rest of the ruling soon.

18          I am appointing Mr. Ho co-MDL lead counsel.  I am

19     making it "co" because I am going to appoint a second co-lead

20     counsel and interim class counsel.  That is the decision I am

21     not ready to make today.

22          But I am appointing you, Mr. Ho, given all of the

23     work that you have already done in this case, given your

24     extensive and your firm's extensive experience in antitrust

25     law.  I think you have devoted roughly 16,000 -- or over

1  16,000 -- attorney hours already on this case and incurred

2  over $200,000 in out-of-pocket expenses to litigate vigorously

3  the claims up in Wisconsin, including the preliminary

4  injunction hearing.  For all of those reasons -- and you were

5  the first one out of the box on one of these cases and put the

6  theories together.  So, I am appointing you as one of the

7  co-lead counsel.

8          I am going to appoint a second co-lead counsel, given

9  the complexity and the potential conflict.  I am not a hundred

10 percent sure that there is a conflict, but there is a

11 potential; and, given that and just the overall complexity of

12 the case and some of the potentially divergent interests, I am

13 going to appoint a second co-lead counsel.

14         Mr. Ho, I had a couple of questions for you.  Now

15 that you know I am doing that --

16         MR. HO:  Yes, your Honor.

17         THE COURT:  -- I have a couple of questions for you.

18         Knowing that I am going to appoint a second co-lead

19 counsel, are there any proposals that you have made in your

20 structure that you would change or modify?

21         So, you have given me a very specific structure with

22 liaison counsel and coordinating counsel.  Is there anything

23 that you would change, knowing what I am going to do?

24         MR. HO:  I don't think so, your Honor.

25         We still think that Ms. Gregor is very well-suited to

6

1    be liaison counsel, although she does not have an office in

2    this district.  She would play a very vital role, we think, in

3    helping whoever is lead counsel for the class and interim

4    class counsel get up to speed on this case.  She, as you know,

5    has deep experience with the case.  She was there shoulder to

6    shoulder with us at the preliminary injunction hearing and, I

7    think, could serve a very useful role in both liaising with

8    the Court, as well as with counsel for the class.

9            And as for Professor Issacharoff -- as you say, there

10   are some unusual complexities to this case -- Professor

11   Issacharoff has been at our side advising us on creative ways

12   to try to make this MDL work more efficiently for all parties

13   while still acknowledging the, you know, differences in

14   interests among some of the individual plaintiffs in this

15   case.

16           Either way, we would intend to rely -- continue to

17   rely -- on both of them, and we thought that it would be

18   useful for the Court and for all of the parties in this MDL

19   for them to have a formal role.

20           THE COURT:  Can you explain to me a little bit more,

21   please, what role you anticipate Professor Issacharoff having

22   as coordinating counsel and how might that differ from a

23   steering committee or -- that is not a term I am familiar with

24   with MDLs.  It is not something -- I think it is something

25   maybe you created, which is fine.  But it does not give me,

1   and your papers do not give me, enough of a sense of exactly

2   what it is you would anticipate having him do.

3          MR. HO:  And I'll let Professor Issacharoff speak for

4   himself, as well, but what he has been doing, and what I think

5   he could be very helpful in assisting the parties and

6   continuing to do, is with respect to issues like scheduling

7   and with respect to issues where there are some differences of

8   interest, perhaps, among the various parties, being a kind of

9   guru and adviser in how we can make this MDL achieve the

10  coordination that the statute calls for with respect to common

11  issues and yet also try to sort of effectuate the interests of

12  particular individual plaintiffs.

13         MR. ISSACHAROFF:  If I may, your Honor, just --

14         THE COURT:  Yes.  Just make sure I can hear you.

15         MR. ISSACHAROFF:  Yes.

16         THE COURT:  You can let him in.  I will let you back

17  up.

18     (Laughter.)

19         MR. ISSACHAROFF:  What we had in mind was an

20  acknowledgment early on before the Court of the role I've

21  played in several other large MDLs, like the BP case or

22  Volkswagen or the NFL Concussion litigation, where I've

23  basically been counsel to the lead of the MDL on these kinds

24  of issues.  And Mr. Ho and I, in talking about this, thought

25  it was better just to put that role formally before the Court.

1    I'm going --

2             THE COURT:  I am fine with putting something

3    different.  I am just trying to understand exactly what it is

4    you anticipate that role would be.

5             MR. ISSACHAROFF:  So, the role I played in those

6    cases was I was not -- I did not take discovery.  I did not do

7    those sorts -- I did not --

8             THE COURT:  If you told me you took discovery, I

9    would have been quite surprised.

10            MR. ISSACHAROFF:  Right.

11       (Laughter.)

12            MR. ISSACHAROFF:  And somebody would have been guilty

13   of malpractice if that had been the case.

14            But what I do do is just try to organize the

15   settlement track versus the litigation track, keep those going

16   in sync.  If there are settlement -- I'm not saying there is

17   going to be a settlement here --

18            THE COURT:  I understand.

19            MR. ISSACHAROFF:  -- but if there were to be a

20   settlement track and a litigation track, anticipate what legal

21   issues should be teed up early and have an eye on the

22   appellate side -- potential appellate issues -- much earlier

23   on in the litigation.  That's the role I've played in these

24   other cases.

25            And we just -- again, it hasn't been formalized

1   except that in every one of those cases, the district court --

2   the transferring court -- was advised that I was playing that

3   role, and we just thought we would put it forward formally in

4   front of you, your Honor.

5           THE COURT:  Okay.  Thank you.

6           Mr. Ho, if the Court decides to put a steering

7   committee together, which I likely will -- that is not

8   something that was in your proposal -- what proposal would you

9   have for the Court to do that?

10          And you do not have to identify specific lawyers.  I

11  will not put you in that position.  But you can refer to it in

12  terms of whomever I might appoint as co-lead counsel.

13          What would your proposal be for putting a steering

14  committee together, and how would you anticipate the

15  coordinating counsel working with that steering committee?

16          MR. HO:  I think, your Honor, if there's going to be

17  co-lead counsel, there could be a steering committee of two or

18  three firms that could be -- play a supporting role, if called

19  upon, to assist in the prosecution of the various cases.

20          You know, we have explicitly sort of thrown our

21  support for two firms that have been working with us.  So, we

22  would support them in that role if they're not selected as

23  lead counsel.  I think two to three is probably a sufficient

24  number.

25          THE COURT:  How would you anticipate coordinating

1    counsel working with them?

2              Or, Professor Issacharoff, if you want to address

3    that, you can.  I do not care who addresses it.

4              MR. ISSACHAROFF:  What has happened in other cases is

5    as the PSC takes form and there are different tasks that are

6    assigned to different members of the PSC or that they have

7    lead responsibility on, the experience has been they have

8    direct access to me.  I report always to Mr. Ho.  He's -- I

9    see myself as the counsel to one -- to the leadership of the

10   MDL.  But it just becomes a working relationship over time,

11   depending upon the tasks that are before them.

12             THE COURT:  Okay.

13             Mr. Ho, anything else you want to add before I --

14             MR. HO:  No, I don't think so, your Honor.

15             THE COURT:  Thank you.

16             I am going to ask each of the potential candidates

17   for lead counsel the same questions.  I am doing it in

18   alphabetical order, so do not read anything into the order I

19   am asking you questions in; and, at times, I will do things in

20   reverse alphabetical order.

21             So, I am doing it in alphabetical order today.  If

22   you want to read something into that, you are making a

23   mistake.  But go right ahead if you want to.

24             Mr. Barz, since you are alphabetically first, you

25   gave me a particular proposal.  Knowing now that I am going to

```
 1   have co-lead counsel, is there anything about your proposal

 2   that would change?

 3              MR. BARZ:  I guess the question I would have is we

 4   had proposed three co-leads.

 5              THE COURT:  Right.

 6              MR. BARZ:  Is your --

 7              THE COURT:  I am only doing two.

 8              MR. BARZ:  So, one --

 9              THE COURT:  And one is Mr. Ho's firm.

10              MR. BARZ:  And, obviously, I'd want to talk to these

11   folks, but I'll tell you right now one of the things we

12   proposed within our three-firm co-lead was to have a chair.

13   We proposed we be the chair because we understand that defense

14   counsel -- and we always knew that there would be a role for

15   Kellogg because they have those individual clients that we

16   weren't attempting to represent -- would want to have one-stop

17   shopping for an answer.

18              So, you know, I'm sensitive to the fact that I came

19   in here, you know, supporting a three-firm, co-lead structure,

20   because I think we provide a lot of complements.  Mr. Cuneo's

21   firm already has extensive experience representing dealers for

22   the last six years.  They've been through the documents.  They

23   understand their issues.

24              Mr. Kaplan has a tremendous amount of expertise,

25   particularly with experts and the like.
```

 1          And, of course, we believe that we're well-qualified.

 2    We're leading the largest antitrust class ever in the

 3    Interchange case, so -- and we've done many, many others.

 4          With that, since we were the chair, I guess I would

 5    propose that we be the other co-lead.  We've worked very well

 6    with Kellogg, Hansen in many cases in the past.  Some of the

 7    great Supreme Court cases they describe were our cases and we

 8    went to them to help us on the Supreme Court level.

 9          Ms. Miller is a law school classmate of mine.  We

10    graduated with your co-nominee to the Seventh Circuit, all of

11    us.  So, I think we could work very well cooperatively with

12    Mr. Ho and with defense counsel.

13          The only hesitation I have is, because I've got these

14    two other firms that we've really partnered with, I would

15    strongly hope that they'd be on the PSC, because we do believe

16    they're incredibly valuable, given their experience.

17          THE COURT:  Mr. Barz, I know you have extensive

18    securities fraud --

19          MR. BARZ:  Correct.

20          THE COURT:  -- experience, and I know how good you

21    are at that because you have been in here on those multiple

22    times.  Do you personally have any antitrust experience?

23          MR. BARZ:  So, my antitrust --

24          THE COURT:  And I know there is overlap, but --

25          MR. BARZ:  Well, we had -- one case was we had text

1    messaging and I was getting ready to join the trial team.

2    Unfortunately, that got dismissed at summary judgment.  So, I

3    have had it on the plaintiff's side.  I've also had it on the

4    defense side.  Back when I was at Mayer Brown, I represented

5    BASF, and that was one of the largest class action cases ever.

6            However, if the Court has a concern, it doesn't have

7    to be Jim Barz as the co-lead.

8            THE COURT:  Right.

9            MR. BARZ:  David Mitchell, Zan Bernay, who is here

10   with me, they're both on -- they have greater antitrust

11   experience than I do, and I'd be delighted for you to appoint

12   either one of them.

13           THE COURT:  Okay.

14           And one last question for you:  One of the reasons I

15   am appointing co-lead counsel, there is some tension between

16   the Seventh Circuit's directive on the preliminary injunction

17   to get this moving and get to trial, given what is at issue

18   there, and a massive MDL with lots of litigation and being

19   fair to the defendants, so that they do not have to do things

20   two or three times.

21           How would you propose walking the line of meeting

22   both of those directives?

23           MR. BARZ:  So, since we were last here, we've worked

24   incredibly hard to try to walk that line.  We're not here to

25   be in any way antagonist to Authenticom.  We just wanted to

1    make clear that some of the concerns that were expressed by

2    their counsel -- you know, the statement by Mr. Issacharoff

3    that, "We're in a position or we're more eager to go to trial

4    than we are to engage in extensive discovery" -- on behalf of

5    the dealership class, we couldn't quite commit to that, right?

6    So, that was some of the concerns.

7          The good news is we've had a lot of discussions with

8    Mr. Ho and Mr. Nemelka since then, and we've proposed a

9    solution that we believe works. We presented it to the

10   defense counsel. They have some concerns with it from their

11   side. We all met. I mean, we've had many, many discussions,

12   but even before this. We're not quite there yet. But I do

13   believe that we can bridge that gap where all the common

14   discovery can be coordinated, which is the goal of this thing.

15         And we think there's a lot of overlap. If you looked

16   at the Venn diagram, many, many issues would overlap.

17   However, our view was and our proposal was we would commit to

18   coordinating all that to avoid duplication of any of the

19   common issues that -- the devil's always in the details. What

20   do you consider common?

21         And some of those things might have to be worked out.

22   If there's disagreement, you might have to tell us this is

23   duplicative, this is not, but then also give us time for our

24   class certification -- which is not an individual action

25   issue -- and any non-duplicative discovery, like the pass-on

 1    issues, where we might want to subpoena additional vendors

 2    that aren't necessarily relevant to Authenticom proving its

 3    case.  And those issues that might not come up, we want to

 4    reserve the right to have time to do those after.

 5             And we think it's a workable solution.  The devil's

 6    in the details.  The defendants are concerned.  Well, what

 7    will we consider duplicative versus them, and so on and so

 8    forth.  And I think if we get another couple days or a week,

 9    we can get there, provided we also get some guidance from the

10    Court.  Because I think there's also just a dispute between

11    Authenticom, if you will, and the defendants, if you will, as

12    to whether there needs to be a prioritization of Authenticom

13    or whether Authenticom should just fold in with everybody

14    else.

15             THE COURT:  You were not suggesting that class

16    certification will have to be addressed before Authenticom can

17    proceed to trial, were you?

18             MR. BARZ:  No, after.  After, actually.

19             THE COURT:  I misheard you then.

20             MR. BARZ:  And I think we're -- yeah, I'm sorry if I

21    misspoke.

22             And I think we're in agreement on that part, that

23    class cert. can be pushed off until after Authenticom.

24             THE COURT:  Okay.  Thank you.

25             Anything else you want to add before I move on?

```
 1            MR. BARZ:  No.  I would just stand on all the
 2    arguments we made for -- you know.
 3            And I would just add one last thing, because I know
 4    some people talked about reaching out and making agreements.
 5    I mean, we tried very hard to, but we also tried to be
 6    sensitive to comments we've heard from -- you know, Judge
 7    Durkin in the broiler chicken, said, as sure as night follows
 8    day, the more lawyers I appoint, the less efficient it will
 9    become.
10            Judge Koh in the Anthem data breach case appointed
11    two co-leads.  At the end of the case, she saw 53 firms and
12    331 billers.
13            Now, we've had a lot of experience in MDLs.  We won't
14    do that to this Court.  We can work with other firms, even the
15    ones that were hitched to us, and will come up with billing
16    guidelines -- we've had experience with that -- and keeping
17    things lean and mean as we can.
18            So, it wasn't that we can't cooperate.  We've worked
19    with all these firms at some point.  It's just we want to be
20    respectful and responsive to keeping it as lean as could be.
21            THE COURT:  Mr. McDonald.
22            MR. McDONALD:  Yes.
23            THE COURT:  Same questions for you.
24            And I have read all the submissions.  And the good
25    news for me is I know all of you lawyers are extremely
```

 1   talented.  That is the good news for me.

 2        Are there any changes you would have to your proposal

 3   in light of what I have told you this morning -- that I am

 4   going to appoint co-lead counsel and Mr. Ho and Kellogg will

 5   be one of them?

 6        Is there anything that you want to modify or anything

 7   else you want to tell the Court that I should consider in

 8   making the choice for a second co-lead counsel?

 9        MR. McDONALD:  I don't think so.  In part, because we

10   anticipated that in our papers.  We had identified the

11   possibility that the Court would split the MDL lead into two.

12   And, so, that's baked into our application already.

13        Given the fact that your Honor has discussed having a

14   structure underneath that, I mean, we had anticipated that I

15   would play the role of co-lead, along with Mike Roberts, on

16   behalf of the class.  It seems that that may not be the way

17   that you are going.  So, we would have maybe some thoughts as

18   to who some of the other participants would be.

19        But I think that, generally, since we anticipated the

20   possibility, there's not much we would change.

21        THE COURT:  Okay.

22        And you know the tension between the Seventh

23   Circuit's directive on Authenticom and the other, reining in

24   the MDL and moving the MDL forward.

25        Do you have any specific proposals on how to walk

 1    that line to make sure that all interests are addressed and,

 2    again, to make sure that the defendants aren't doing things

 3    two and three times unnecessarily?

 4              MR. McDONALD:  Yes, actually.  And Mr. Barz had

 5    touched on this.

 6              I mean, there have been -- we're in the midst of

 7    negotiations with the defendants on that.  We've actually also

 8    been in the midst of negotiations with each other on that.

 9    There have been some ridiculously late-night phone calls and

10    e-mails among ourselves, because we're not in a hundred

11    percent agreement on how to position things ourselves.

12    Obviously, once your Honor makes the decision on leadership,

13    that issue will be less relevant.

14              But I do think that if we're not able to come to an

15    agreement quickly with the defendants, we'll be able to very

16    quickly put before the Court what our disagreements are.  And

17    I think that we could do that probably by the middle of next

18    week.

19              THE COURT:  Okay.

20              Anything else, Mr. McDonald?

21              MR. McDONALD:  I'll let our papers speak for

22    themselves.

23              THE COURT:  Thank you.

24              Ms. Wedgworth, anything that you would change about

25    your proposal, knowing the Court's directive that I am going

1   to appoint co-lead counsel?

2         MS. WEDGWORTH:  My only thought is on the PSC.  Did I

3   hear you right, you were thinking three to four attorneys?

4         THE COURT:  I have not given a number.

5         MS. WEDGWORTH:  Because right now we have five

6   attorneys that represent three firms.  So, somewhere between

7   three and five on a PSC sounds like the right number to me.

8         The reason I think it might end up at the five range

9   is because this case is unique, the auto industry.  And I

10   think an attorney who is really on top of the auto industry

11   and has a close link to it and has done nothing but auto

12   industry work, like Mr. Bellavia -- Len Bellavia -- from

13   Bellavia, Blatt, in our complaints -- he and I filed the very

14   first complaint in the auto dealership -- his expertise and,

15   more importantly, his access to dealerships as a group is

16   second to none.

17         So, it would not only be valuable during the

18   litigation to -- almost as a liaison to the auto dealers, but

19   certainly if it ever got to settlement, trial, all those

20   things where you really need to be able to reach out to auto

21   dealers, he's certainly well-suited to that.

22         As to the other points, I think, again, with five

23   people on a PSC with one of them having that auto dealer

24   specialty, that leaves four attorneys to really manage the

25   litigation, the discovery, et cetera.

1          And given, as Mr. Barz points out, what Judge Koh has

2    done recently and what other judges are now doing, that's one

3    of the reasons I proposed the protocol guidelines that I had

4    in my declaration.  We're certainly willing to do -- in fact,

5    in Equifax, after Judge Thrash appointed that group and we now

6    have put in place in that case -- I think they're in the final

7    negotiation -- to have monthly billing and time and, of

8    course, within the plaintiffs' group to monitor it, so that

9    type of situation won't occur again, keep those things

10   streamlined.  If you have five attorneys on the PSC, that

11   allows a division of work and everything can be very organized

12   and coordinated.

13          THE COURT:  Okay.

14          And same question about the walking the line of the

15   Seventh Circuit's directive versus the amount of discovery the

16   MDL will have overall.

17          MS. WEDGWORTH:  Lots of discussion, as you've heard.

18          THE COURT:  Yes.

19          MS. WEDGWORTH:  I would say this week alone, I've

20   been on the phone more than 20 hours between the

21   confidentiality order, the protective order and the

22   scheduling.

23          We definitely want Authenticom to go to trial as soon

24   as they can possibly go.  We don't want to jeopardize the

25   class claims.  We have the additional issues of the

1    pass-through, which we think that discovery for damages on the

2    pass-through can go forward after the Authenticom trial.  We

3    are discussing that there's a pause for the Authenticom trial

4    after all fact discovery's gone forward and then possibly

5    class discovery going forward, which could include the experts

6    for the pass-through, the damages, the class issues, thereby

7    allowing Authenticom to get to trial as soon as possible, and

8    yet we are still protected with regard to whatever discovery

9    we need for class certification.

10            And, of course, very sensitive to non-duplicative

11   discovery.  We would definitely coordinate every deposition

12   that Authenticom tees up.  We will be ready to go.  We will

13   ensure that anything that we have access to we make sure we've

14   incorporated our questions on any of those documents or data

15   or whatever.  The only issue would become if additional data

16   and discovery comes up after that, documents come up later.

17            But duplication is not what we're into.  So, if we

18   can -- we will be ever-vigilant to get there at the same time

19   on depositions for the fact discovery.

20            THE COURT:  Okay.  Thank you.

21            I will rule soon on the co-lead and the rest of the

22   structure for going forward.

23            MS. ROMANENKO:  Your Honor, if I may make one

24   comment?

25            THE COURT:  Yes.

1          MS. ROMANENKO:  Victoria Romanenko again from Cuneo,

2     Gilbert & LaDuca.

3          As Mr. Barz mentioned, we are counsel for dealers in

4     50 jurisdictions.  We represent individual dealers in the auto

5     parts litigation, which is going on before Judge Battani in

6     the Eastern District of Michigan for the last six years.  We

7     have done data pulls from our clients' dealer management

8     systems.  We are very familiar with our clients' documents.

9     We understand how dealerships operate.

10         So, in terms of your Honor's interest in both

11    accommodating the Authenticom desire to go to trial more

12    quickly and defendant's desire to avoid duplication, we can

13    obviously offer the ability to hit the ground running, both in

14    making productions on behalf of our clients, in dealing with

15    defending dealerships and in dealing with the various DMS

16    issues.

17         We understand how dealer management systems work.

18    We've hired Authenticom to do our clients' data pull for the

19    auto parts litigation.  So, we're going to be able to offer a

20    variety of efficiencies for this litigation.

21         THE COURT:  Okay.  Thank you.

22         MR. KAPLAN:  Your Honor, it's Robert Kaplan.  May I

23    address you for a minute?

24         THE COURT:  Sure.  Of course.

25         MR. KAPLAN:  I'm one of the three proposed leads --

```
 1                THE COURT:  Yes.

 2                MR. KAPLAN:  -- that Mr. Barz --

 3                THE COURT.  I have read it all.  I am well aware.

 4                MR. KAPLAN:  Okay.

 5           So, I have been specializing in antitrust law for

 6    many, many years.  I was -- I clerked for a federal judge.  I

 7    was then in the Antitrust Division of the Justice Department.

 8    I tried cases there.  I've been doing antitrust --

 9    complex antitrust -- litigation for many years.  I argued the

10    Flat Glass case in the Third Circuit.  My partner, Greg

11    Arenson, argued High Fructose Corn Syrup; got a very good

12    decision from Judge Posner in the Seventh Circuit.  These are

13    seminal decisions.

14           We specialize in the complex economics that's

15    necessary for class certification.  Greg Arenson is brought in

16    by other plaintiff's law firms to handle the econometrics with

17    the economists even where we're not a lead.  So, we would

18    bring a lot to the table on that.

19           I'm very creative.  As Thurgood Marshall once said at

20    a conference where I was, if you don't toot your own horn, no

21    one will toot it for you.  So, I was responsible for the idea

22    that enabled us to do the protective order on a consensual

23    basis.  I came up with a concept to expand the definition of

24    "authors and recipients," which defendants accepted at the --

25    11:30 we were about to file contested POs and they accepted my
```

1    suggestion.

2          So, I think, you know, I would bring -- and my firm,

3    I have Elana Katcher, who was on a call trying to work out the

4    Authenticom issue past midnight the night before last.

5          By the way, we have -- all the plaintiffs have an

6    agreement on a schedule.  We have worked that out with

7    Authenticom.  We presented it to the defendants yesterday

8    morning.  They came back with a letter last night.  They don't

9    like it, so we're continuing to talk to them.

10         But all the plaintiffs have worked very hard.  We're

11   on the same page, so that Authenticom can go quickly and the

12   dealers are not prejudiced.  We have additional discovery

13   after Authenticom finishes.

14         So, all of the attorneys here are very good, but I

15   think that my firm and I would bring a lot to the table to

16   move this case along and would appreciate your consideration.

17         Thank you.

18         THE COURT:  Thank you.

19         MR. ROBERTS:  Your Honor, may it please the Court, I

20   feel like I'm the only one who hasn't exhausted any of the

21   oxygen in the room.  So, if you don't mind, 20 seconds.

22         THE COURT:  You can take as long as you want.

23         MR. ROBERTS:  My name is Mike Roberts, may it please

24   the Court.  I, too, have submitted an application, along with

25   Labaton.

 1          THE COURT:  Yes.

 2          MR. ROBERTS:  The two distinct differences that's not

 3   in the papers, your Honor, that we've submitted is -- they

 4   both go to efficiency.  Number one, our law firm, Roberts Law

 5   Firm, has an in-house document management platform.  We have a

 6   computer scientist of 35 years who also is a partner in the

 7   firm, Ms. Karen Halbert, and she has primarily done ESI

 8   document discovery over the last 18 years.  That will save the

 9   class money because we won't have to go out and hire

10   third-party vendors who would tack on an up-charge.  So, it

11   saves the class money in terms of cost.  That would be

12   provided to the class at cost.

13          And, secondly, and more -- I guess just as

14   importantly, is the fact that it's ready Day One rather than

15   having to go out and negotiate an agreement with a third-party

16   vendor to host and manage the documents, your Honor.  We're

17   ready to upload those documents Day One and start reviewing

18   them.

19          Secondly -- and it's not in the papers either --

20          THE COURT:  I am sorry, it is --

21          MR. ROBERTS:  It's not in the papers either, your

22   Honor, is the joint status report regarding the schedules.

23   The Labaton firm and Roberts firm have promoted a more

24   expeditious, yet reasonable, schedule for class certification

25   than the other plaintiff applicants.

```
 1              And, so, in terms of answering your question about

 2     schedule, Roberts and Labaton really want to try to move the

 3     class schedule along more efficiently.

 4              THE COURT:  Thank you.

 5              MR. ROBERTS:  Thank you, your Honor.

 6              THE COURT:  Okay.

 7              I am going to keep that last aspect under advisement,

 8     of co-lead and structure; but, as I said, I will get you a

 9     ruling soon.

10              Ms. Miller, I know you are just dying to say

11     something.  Go ahead.

12              MS. MILLER:  Thank you, your Honor.

13              Well, there's been a lot said about the different

14     possible paths forward, and we wanted to make sure that our

15     voice --

16              THE COURT:  Of course.

17              MS. MILLER:  -- was heard on that, as well.

18              THE COURT:  Are the defendants in agreement in

19     general?

20              MS. MILLER:  Yes.

21              THE COURT:  Okay.

22              MS. GULLEY:  In general, yes, your Honor.

23              MS. MILLER:  It is true -- and I'm sure that

24     plaintiffs' counsel spent a lot of late hours -- I'm sure all

25     the counsel in this case have -- trying to come up with a
```

1    scheduling proposal that would try to balance Authenticom's

2    professed need to go faster, as well as to accommodate the

3    needs of the MDL and the needs of defendants to not be

4    prejudiced.

5         Plaintiffs did present a schedule that we have no

6    question they are happy with, because they get everything they

7    want.  Authenticom gets to go superfast with a matter of

8    months for oral discovery and expert reports in the middle of

9    fact discovery and trial coming three weeks after reply briefs

10   on summary judgment; and, then, the class gets to start a

11   whole new round of discovery and new document requests and new

12   depositions.

13        And although they've told us they won't call the same

14   witnesses, they have reserved the right to do whole new rounds

15   of discovery.  So, we will have to do more search terms and go

16   collect more data and potentially have to deal with more

17   custodians.

18        What defendants put forward to plaintiffs was what we

19   thought was something that would accomplish both goals.  While

20   not giving Authenticom everything it wanted, it did take eight

21   months off of the schedule that we had originally proposed in

22   the joint defense -- or in the joint status report, but had

23   all discovery coordinated upfront, so that we aren't doing

24   discovery in two different phases; so we aren't doing

25   dispositive motions at two different times; so our experts

1    aren't putting forward two different reports -- and, in some

2    instances, three different reports -- on different issues at

3    different times and certain plaintiffs will get a sneak peek

4    and, you know, a chance to fix things in their second report

5    that we didn't address in our first report.

6         So, we're trying -- we tried to produce a schedule

7    that really addressed both parties' concerns, so that we

8    aren't the ones that are prejudiced.  We have no doubt that

9    the schedule that was proposed by plaintiffs doesn't prejudice

10   the dealers, but it does prejudice defendants.

11        MS. GULLEY:  Your Honor, just, for example, discovery

12   would begin where -- under the plaintiffs' proposal where the

13   class would be requesting discovery of the defendants months

14   before the plaintiffs have filed their consolidated complaint,

15   told us who are the defendants, what are the claims, what's

16   the definition of the class.

17        We did ask the defendants -- so that we could seek

18   some sort of compromise -- I mean, we did ask the plaintiffs

19   in seeking some sort of compromise, can you identify issues

20   that are truly different other than the class certification

21   issue that your Honor already raised.

22        You heard Ms. Wedgworth mention this pass-through

23   issue.  But Authenticom's discovery request seeks pass-through

24   information multiple times.  They have not identified any

25   issue that wasn't in the hundreds of topics that Authenticom

1   has identified it wants in its 30(b)(6) depositions in its

2   numerous -- and they just added, per your Honor's order,

3   numerous new requests and new search terms on last Friday, as

4   your Honor ordered.

5           And, so, there does not appear to be any witness or

6   issue, other than the class certification issue, that is not

7   duplicative.  So, we're just asking that everyone participate

8   on a schedule that everyone can live with in a coordinated

9   way.

10          The defendants -- the primary point is just that we

11  would much sooner have a sooner schedule than have to put up

12  our witnesses twice, review the same documents twice.

13          MS. MILLER:  And to be clear, our proposal did

14  contemplate that class certification proceedings would happen

15  after the Authenticom trial to try to accommodate that, so

16  that the Authenticom plaintiffs would not have to wait around

17  for class certification.  It's really the -- what we had in

18  our schedule was all of the other -- all discovery, all

19  dispositive motions, and whatnot, happening upfront so we only

20  have to do those things once; and, then, we can -- and, then,

21  to the extent there's anything left to certify for a class, we

22  can go through the class certification proceedings and go from

23  there.

24          THE COURT:  I am going to wait until co-lead counsel

25  is selected to put any more firm discovery in place, so that

1    co-lead counsel can have that.  Hopefully, you can come to an

2    agreement on it.  If you cannot, I will give you the

3    direction.

4          But thinking about this in advance of today, the

5    class certification, I do not know what all of you know about

6    the facts.  I only know what I have read in the complaints and

7    the submissions you have made to me.  But class certification

8    did seem like one piece that could come after Authenticom.

9          I am mindful of the Seventh Circuit's directive.  And

10   I am mindful of the potential harm to Authenticom, which is

11   why they gave their directive that that piece should move as

12   quickly as possible.  But I am also mindful of the expense and

13   the issues of making the defendants do things multiple times.

14         So, I am going to try to help you, if you cannot come

15   to a solution on your own, to creatively achieve both of those

16   goals to the best extent possible.

17              MS. GULLEY:  Your Honor --

18              THE COURT:  But I do anticipate that whatever that

19   will be -- and it sounds like you are all in agreement -- that

20   class certification would come at some point after the

21   Authenticom trial.

22              MS. MILLER:  We agree the class certification

23   briefing and experts would happen after the Authenticom trial,

24   yes.

25              THE COURT:  Okay.

```
 1            MR. HO:  Your Honor, just to be clear about the
 2   proposal, as we discussed earlier today, the proposal was that
 3   there will be common -- discovery on common issues that would
 4   end in -- the parties are off by about a month, but January,
 5   February of 2019.  And the issue that I think the parties
 6   continue to disagree about is, can there be any even
 7   non-duplicative discovery for class-specific issues after that
 8   time such that Authenticom can then go off and do its thing
 9   even while the class can continue to obtain discovery on
10   issues that might be particular to the class cases?
11            So, I just don't want it to -- the record to suggest
12   that what is being proposed is some kind of redo by the class
13   of what has already been done in the initial discovery period.
14   That's not the proposal.
15            THE COURT:  I did not think that is what was being
16   said, and I know that there is always overlap; that it is
17   never as clean as, we will do all of this and then class; that
18   there is always, always overlap.
19            MS. MILLER:  The concern -- it's not -- we don't
20   think that we're necessarily going to get the same search
21   terms again, but we're going to have to -- we're going to get
22   new requests.  We're going to have to go collect data.  We're
23   going to have to potentially get new custodians.  We're going
24   to have to search these things again.  We're going to have to
25   rehire vendors to do this stuff again.
```

```
 1              We're going to potentially -- they don't know whether
 2    or not -- although they've committed to not deposing a witness
 3    that's deposed during the front-end period in the back-end
 4    period, they have reserved their rights to, if another
 5    document gets produced, for example, in a response to their
 6    new document requests where --
 7              MS. GULLEY:  Or at trial.
 8              MS. MILLER:  -- or at trial of Authenticom, that they
 9    might call that witness again.
10              So, there's -- we have zero assurances that what
11    holds true now will actually be reality and we won't be
12    redoing witnesses and redoing discovery six to eight months
13    apart, which is why we tried to come up with something that
14    got it into next year.  And we thought it was reasonable that
15    accommodated both.
16              It's not a schedule we're particularly happy with
17    because it's superfast, but we're trying to be accommodating
18    of Authenticom's professed concerns, recognizing that, you
19    know, the Seventh Circuit's directive came well before any of
20    the other people in this room came into being and didn't
21    contemplate the complexities of having to deal with that
22    reality.
23              MS. GULLEY:  And before discovery into Authenticom's
24    financial --
25              THE COURT:  I did not hear you.  I am sorry?
```

1           MS. GULLEY:  And before discovery into Authenticom's

2      financial position.

3           Obviously, your Honor, we are working hard to cut out

4      the time, but we very much do not agree that its position is

5      such that a difference of six months in a trial date makes any

6      difference to the status of the company.

7           MR. KAPLAN:  And, your Honor, we're cooperating with

8      Authenticom, trying to satisfy its needs, and we made a

9      proposal of non-duplicative discovery.

10          MR. BARZ:  Your Honor, if I could just make two

11     points on this.

12          In light of everything I've heard, the amount of work

13     that we all agree needs to be done and your Honor's direction

14     that it's inclined to appoint two co-leads, I would just make

15     the point that I think that raises the need for that other

16     co-lead to have sufficient resources.  And I know you are very

17     familiar with all the firms, their background, and I would

18     just advocate in terms of our firm the size we have, the

19     long-running antitrust history.  Some of these firms while

20     their individual lawyers are very talented, much smaller

21     firms.  We have the capability to host all these documents

22     easily.  We have a local presence --

23          THE COURT:  I know resources are important.

24          MR. BARZ:  Yeah.

25          And I don't want to leave you with a misimpression.

1    I wouldn't have come here if I didn't think I was qualified to

2    represent this class.

3              THE COURT:  I understand.

4              MR. BARZ:  But there's no ego in it for me, either.

5    If you're inclined to appoint individuals rather than firms,

6    I'd be delighted for you to appoint my colleagues.  But I also

7    believe if you appointed me, I could absolutely fulfill those

8    responsibilities.

9              THE COURT:  I have no doubt you could.  I was not

10   suggesting otherwise.  I just did not see it in the papers.

11             MR. BARZ:  Sure.

12             THE COURT:  And, so, I wanted to make sure I was not

13   --

14             MR. BARZ:  I'm more modest.

15             THE COURT:  I am sorry?

16             MR. BARZ:  Sometimes I'm more modest.

17             MS. WEDGWORTH:  May I respond briefly to defendants'

18   argument?

19             THE COURT:  Yes.  And, then, we are going to talk

20   about some next steps.

21             Go ahead.

22             MS. WEDGWORTH:  As to duplication, as we've said,

23   we're not interested in doing that.

24             As to some overlap, as you describe in the class

25   cert. process, in any litigation, as simple as it may be,

1    there can always be documents and data that show up later, be

2    it not even in the context of a trial.  Just as discovery goes

3    forward, different things change.  So, with any litigation,

4    you always reserve your rights to go back in.

5            THE COURT:  Lawyers always reserve their rights.  I

6    know.

7            MS. WEDGWORTH:  It's not a disingenuous thing.  We're

8    not trying to backdoor something we could get through the

9    front door.  We're truly trying to only have one witness be

10   deposed one time.  But there have to be some safeguards for

11   any witness in any litigation, this one not being different.

12           THE COURT:  The proposal I would make for something

13   like that is you can reserve your rights, but the Court gets

14   the final decision.

15           MS. WEDGWORTH:  And we agree entirely with that.

16           MR. BARZ:  We're closer than this all sounds, in my

17   view.

18           THE COURT:  It sounds like you have made progress

19   since you were last here.

20           The Authenticom financials.  What is the status of

21   discovery into their financials?

22           MS. GULLEY:  We have requested discovery into their

23   financials.  They've produced some.  We've also got some

24   third-party discovery from their bank.  But we're still

25   awaiting additional discovery from them.

1        MR. HO:  And there was significant information

2   disclosed about their financials at the preliminary injunction

3   stage.  So, there has been that kind of discovery.

4        MS. GULLEY:  Between the hearing and the Seventh

5   Circuit argument, Authenticom made public press statements

6   about the state of its financial position having improved and

7   changing their business structure, and so forth, and changing

8   their business model.  We raised that with Judge Peterson in

9   getting the stay.

10        And he then balanced what he knew -- this was after

11   the Seventh Circuit ruling.  He then balanced what he knew

12   about their financial position from the injunction hearing

13   against the needs of the absent class members and what he saw

14   in the public press statements from Authenticom and issued the

15   stay, so that here in this MDL we could all coordinate on a

16   single schedule that makes sense for the plaintiffs, as well

17   as Authenticom, your Honor.

18        MR. HO:  Your Honor --

19        THE COURT:  Let's make that discovery a priority, to

20   the extent that it has not been, because that was the driving

21   force behind the Seventh Circuit's directive.  So, if they are

22   really -- if they are in dire financial -- I have no idea one

23   way or the other.  So, my comments should not suggest that I

24   have a notion of this.  I do not know.

25        But if they are in dire financial straits, we might

1  push certain things faster; and, if they are not, then maybe

2  two months, three months would not make a difference.

3  MR. HO:  We're happy to do that, your Honor, because

4  that discovery will show, as we already previewed in our

5  papers, that in February they had to layoff 60 percent of

6  their workforce.  They're down from about 125 employees to

7  30-something.  They're literally being deprived of the oxygen

8  of their business by the conduct that's alleged to be unlawful

9  in this case.  And they have employees that are wondering, how

10  long is this company going to be here?  And you can't run a

11  company when you can't give your employees any sense of, you

12  know, whether --

13  THE COURT:  And I have read the opinions.  I know

14  that that was an issue.

15  But so that I can make a more informed decision,

16  let's make that a priority, even 30(b)(6) deposition on the

17  financial issue only.

18  MS. GULLEY:  Right.

19  And in terms -- obviously, the defendants do not

20  agree that anything that defendants have done has caused any

21  -- Reynolds hasn't been a customer --

22  THE COURT:  I did not think you did.

23  MS. GULLEY:  -- since 2013.

24  THE COURT:  I did not think you did.

25  MR. HO:  I said "alleged to be unlawful," I thought.

```
 1              MS. GULLEY:  Yes, but I'm not saying the allegation.

 2   I'm saying the causation, we obviously don't agree to that.

 3              THE COURT:  So, I want you to continue with the

 4   discovery on the Authenticom issues, as we talked about last

 5   time and as I have just given direction on.

 6              I want the lawyers to continue having your

 7   discussions regarding a master discovery plan going forward.

 8   I will rule quickly on the lead counsel and structure issue.

 9   And I am going to have you come back here --

10              MS. MILLER:  Can I get my calendar?

11              THE COURT:  Sure, get your calendar.

12              I am trying to work around my trials.

13              MS. MILLER:  Sure.

14              THE COURT:  Unless you want to come in really early

15   in the morning.

16              MR. KAPLAN:  We can do that.

17              MR. ROBERTS:  Sure.

18              THE COURT:  Music to my ears.

19              MS. MILLER:  We don't sleep.  It's okay.

20              MS. GULLEY:  I sleep, your Honor.

21         (Laughter.)

22              THE COURT:  So do I.

23         (Laughter.)

24         (Brief pause.)

25              THE COURT:  Sorry.  Just bear with me a minute here.
```

```
 1        (Brief pause.)

 2              THE CLERK:  April 25th at 11:00 a.m.

 3              THE COURT:  And I will give you direction when I rule

 4   on the class -- the co-lead and other lawyer structure.  I am

 5   going to want a discovery proposal before then.  Hopefully, it

 6   will be joint.  If not, I will give you direction and

 7   deadlines when you come in.

 8              So, I do not know the exact timing of that, but it

 9   will be in advance of the 25th.  It will be in my order when I

10   rule on direct -- on the counsel issue.

11              MS. GULLEY:  And the 30(b)(6)-type discovery into

12   Authenticom's financials also before then --

13              THE COURT:  If --

14              MS. GULLEY:  -- if we can?

15              THE COURT:  -- you can get that done before then,

16   that would be very helpful to know.  I do not know exactly how

17   much is left to be produced.  And if you can get somebody

18   ready for a 30(b)(6) before then.  But that would be ideal if

19   that could be done before then.

20              And if what you are representing is accurate, Mr.

21   Ho -- and I am not suggesting you would misrepresent

22   something, but if what you are representing about the

23   financials is accurate -- it would be to your advantage to get

24   that done before then.

25              MS. MILLER:  And some of it will depend on third
```

```
 1    parties.

 2              THE COURT:  Which may not be able to be done before

 3    then.

 4              MS. MILLER:  Sure.

 5              THE COURT:  I understand.

 6              Is there anything else for the Court this morning?

 7              MS. WEDGWORTH:  I have a housekeeping issue.

 8              THE COURT:  Sure.

 9              MS. WEDGWORTH:  In one of the judicial references,

10    the judge contacted me to say -- for you to use his cell phone

11    number.  I've prepared a letter with his cell phone number.

12    But, obviously, he wants to keep it confidential, and I've

13    redacted it.

14              Can I hand up the letter --

15              THE COURT:  Sure.

16              MS. WEDGWORTH:  -- to you?  And, then, I have copies

17    with the redacted for anyone else and can e-mail that to them,

18    as well.

19              THE COURT:  Okay.  That is fine.

20              MS. MILLER:  Your Honor, in terms of interim dates,

21    it doesn't matter for anyone else's, but I'm moving next week.

22    So, if we can avoid the deadlines the first part of next week,

23    that would be appreciated.

24              THE COURT:  Yes.

25              I have one more question for you.
```

```
 1              The motion -- pending motion -- to dismiss in the

 2    Motor Vehicle Software case that was transferred here, this

 3    cites Ninth Circuit law throughout.

 4              Do you want to -- and you are not in the Ninth

 5    Circuit anymore.  Do you want to update it?

 6              I am trying to see which lawyers submitted this.

 7              MS. MILLER:  We can if your Honor --

 8              MR. CASERIA:  If your Honor wants us to update it, we

 9    can --

10              MS. MILLER:  We certainly can.

11              THE COURT:  Since the MDL is here now, I think

12    Seventh Circuit law would apply unless somebody --

13              MS. GULLEY:  We think that ultimately Trinko and the

14    other Supreme Court cases are going to be dispositive of that

15    motion, but certainly we're happy to do that.

16              MS. MILLER:  We're happy to do it.

17              MR. HO:  We are, as well.

18              THE COURT:  I hate to do that to you, but -- even if

19    you wanted to supplement it somehow --

20              MR. CASERIA:  That might be best --

21              THE COURT:  -- in short order.

22              MS. MILLER:  Yeah, we could do that.

23              MR. CASERIA:  -- a short supplement.

24              THE COURT:  I know you rely on the Supreme Court

25    cases, but there is a lot of Ninth Circuit case law in here.
```

```
 1              MR. CASERIA:  Right.

 2              THE COURT:  So, you have two choices:  You can either

 3      do some type of supplement or you can just let me do my own.

 4              MS. MILLER:  We're happy to supplement it for you.

 5              MR. CASERIA:  I'll supplement.

 6          (Laughter.)

 7              THE COURT:  But then you do not get to respond to

 8      what I am doing.

 9              MS. MILLER:  There you go.

10              THE COURT:  Which I am happy to do, but --

11              MR. CASERIA:  Right.

12              Rather than redo everything from scratch, maybe a

13      single or simultaneous supplemental briefs or something like

14      that.

15              THE COURT:  Let's do that.  And, then, if it is just

16      the law is the same and here are the cases, you can do that.

17              I would like that -- I am working on these.  So, I

18      would like that in short order.

19              MS. MILLER:  Okay.

20              MR. HO:  Could I raise one other housekeeping issue?

21              THE COURT:  Let me give you deadlines first on this.

22              So, supplement the Motor Vehicle Software Corp.

23      motion-to-dismiss briefing with Seventh Circuit law.  I would

24      like the defendants to file their supplement -- can you do it

25      by next Friday?
```

```
 1              MR. CASERIA:  Sure.

 2              MS. MILLER:  As in a week from?

 3              THE COURT:  As in the 13th.

 4              MS. MILLER:  Yeah.

 5              THE COURT:  April 13th.

 6              MS. MILLER:  A week from today, I meant.

 7              THE COURT:  Yes, a week from today.

 8              So, April 13th, please, for the defendants to file

 9    their supplement.

10              And plaintiffs file their supplement one week later.

11              I do not need a reply supplement.  You already know

12    what the replies say.  If I want a reply supplement, I will

13    ask for it; but, otherwise, I do not want it.

14              MS. MILLER:  And to be clear, your Honor, you are

15    just asking us to supplement the law and not re-argue the

16    points?

17              THE COURT:  I do not need you to re-argue them.  The

18    facts are in there.

19              MS. MILLER:  Great.

20              THE COURT:  I do not know if there is a difference in

21    where the Seventh Circuit comes out and the Ninth Circuit

22    comes out that the Supreme Court has not addressed.  I know

23    there is quite a bit of juris prudence in the Seventh Circuit

24    on antitrust law.  Maybe there is no difference and you can

25    tell me that.
```

1          MS. MILLER:  Okay.

2          THE COURT:  Okay.

3          Yes, Mr. Ho.

4          MR. HO:  One other housekeeping issue, your Honor.

5    As I mentioned at the last status conference, we are about to

6    file another case on behalf of another vendor.  We've been

7    working with the defendants on a stipulation by which the

8    parties would agree -- or at least the defendants would not

9    oppose -- a process where we would direct file in this

10   district, but the case would be deemed to have been filed in

11   the Western District of Wisconsin, preserving their right to

12   object to venue.

13         THE COURT:  That makes the most sense.

14         MS. MILLER:  We said, your Honor, we would not -- we

15   weren't sure why the Western District of Wisconsin.  It's a

16   Florida company, at least from what we can tell, not

17   registered in Wisconsin.  But we said if your Honor was

18   inclined to allow a direct file, we would not oppose the

19   motion, but we weren't going to stipulate to its filing.

20         THE COURT:  I will allow -- and I thought my original

21   scheduling order said that you can file -- directly file.  It

22   makes the most sense from an efficiency and cost standpoint.

23         So, yes, you may directly file that here.

24         THE CLERK:  But please make sure on the civil cover

25   sheet, mention the MDL or it's not going to get sent to her.

1    MR. HO:  We will, and we'll submit a proposed order,

2  as well.

3    MS. MILLER:  Do we need a proposed order or do they

4  just have to file?

5    THE CLERK:  Just file and just mention on the civil

6  cover sheet the MDL.

7    MS. MILLER:  Okay.

8    MR. HO:  Okay.

9    THE COURT:  Then it will come directly here.  So,

10 just make sure you have the MDL number and my name and an

11 indication that it is being filed directly in here.  I think

12 if you need to cite a prior order, I am pretty sure I put that

13 in my initial --

14    MR. HO:  Okay.  We'll double --

15    THE COURT:  -- scheduling order here.

16    Anything else?  Any other housekeeping?

17    MR. BARZ:  No, your Honor.

18    MR. KAPLAN:  No, your Honor.

19    MS. GULLEY:  Thank you.

20    MS. MILLER:  Thank you.

21    MR. HO:  Thank you, your Honor.

22    THE COURT:  I will see you later this month.

23                    *    *    *    *    *
   I certify that the foregoing is a correct transcript from the
24 record of proceedings in the above-entitled matter.

25 /s/ Joseph Rickhoff                    April 11, 2018
   Official Court Reporter