**PUBLIC – REDACTED VERSION**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This filing relates to:* | Hon. Amy J. St. Eve |
| *Cox Automotive, Inc, et al. v. CDK Global, LLC*, Case No. 1:18-CV-1058 (N.D. Ill.) | |

**DEFENDANT CDK GLOBAL, LLC'S REPLY MEMORANDUM
IN SUPPORT OF ITS MOTION TO DISMISS**

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................... ii

Introduction ..................................................................................................................1

Argument .......................................................................................................................1

I.   Cox Has Failed To State A Claim Under Section 1 ..............................................1

    A.   Cox has not stated a claim of market division ..................................................2

    B.   Cox has no viable group-boycott theory ..........................................................3

    C.   The *Authenticom* and *MVSC* holdings are not binding here ...........................6

    D.   Cox's tying claim should be dismissed..............................................................8

    E.   Cox's exclusive dealing claim should be dismissed .........................................9

II.   Cox's Section 2 Claim Fails ...............................................................................11

    A.   There can be no unfair lock-in given the acknowledged terms of CDK's service contracts with dealers........................................................................11

    B.   The allegations of a lock-in are insufficient to support a monopolization claim............14

    C.   Cox has not plausibly alleged exclusionary conduct ......................................15

III.  Cox's Cartwright Act And California UCL Claims Should Be Dismissed ...........16

IV.  Cox's Contract-Related Claims Are Inadequate .................................................17

V.   Cox Has Failed To State A Claim For Defamation..............................................19

Conclusion ...................................................................................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almblad v. Scotsman Industries, Inc.*,
  2013 WL 4600209 (N.D. Ill. Aug. 28, 2013) .......................................................................19

*Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*,
  135 F. Supp. 2d 1031 (N.D. Cal. 2001) ...............................................................................19

*Associated Gen. Contractors of Cal., Inc. v. Carpenters*,
  459 U.S. 519 (1983)................................................................................................................7

*Authenticom v. CDK Glob. LLC*,
  874 F.3d 1019 (7th Cir. 2017) ....................................................................................... *passim*

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................................................7

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)................................................................................................................9

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*,
  846 F.3d 1297 (10th Cir. 2017) ...........................................................................................16

*Burda v. Wendy's International, Inc.*,
  659 F. Supp. 2d 928 (S.D. Ohio 2009) ................................................................................13

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
  973 P.2d 527 (Cal. 1999) .....................................................................................................16

*Chisholm v. Foothill Capital Corp.*,
  940 F. Supp. 1273 (N.D. Ill. 1996) ......................................................................................19

*Cromeens, Holloman, Sibert, Inc. v. AB Volvo*,
  349 F.3d 376 (7th Cir. 2003) ...............................................................................................13

*Datel Holdings, Ltd. v. Microsoft Corp.*,
  712 F. Supp. 2d 974 (N.D. Cal. 2010) .................................................................................13

*Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.*,
  16 Cal. App. 4th 202 (1993) ................................................................................................19

*Dig. Equip. Corp. v. Uniq Dig. Techs., Inc.*,
  73 F.3d 756 (7th Cir. 1996) .................................................................................................11

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*,
   684 F.2d 1346 (7th Cir. 1982) ................................................................8, 9

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
   747 F.3d 145 (2d Cir. 2014)..................................................................4, 12

*DSM Desotech Inc. v. 3D Sys. Corp.*,
   749 F.3d 1332 (Fed. Cir. 2014)...............................................................11

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005)...................................................................................7

*Estate of Moreland v. Dieter*,
   359 F.3d 747 (7th Cir. 2009) ..................................................................18

*Estate of Moreland v. Dieter*,
   576 F.3d 691 (7th Cir. 2009) ..................................................................18

*Fleet Nat'l Bank v. Anchor Media Television, Inc.*,
   45 F.3d 546 (1st Cir. 1995).....................................................................18

*Gallagher v. Lenart*,
   874 N.E.2d 43 (Ill. 2007) ........................................................................17

*Geinosky v. City of Chicago*,
   675 F.3d 743 (7th Cir. 2012) ....................................................................1

*Glaberson v. Comcast Corp.*,
   2006 WL 2559479 (E.D. Pa. Aug. 31, 2006) ........................................16

*Hunter v. Atchison, T. & S.F. Ry. Co.*,
   188 F.2d 294 (7th Cir. 1951) ....................................................................7

*Koulouris v. Chalmers*,
   779 F. Supp. 99 (N.D. Ill. 1991) ..............................................................6

*Motor Vehicle Software Corp. v. CDK Glob., Inc.*,
   2017 WL 5643163 (C.D. Cal. Oct. 2, 2017)............................................6

*Newcal Indus., Inc. v. Ikon Office Sol.*,
   513 F.3d 1038 (9th Cir. 2008) ..........................................................11, 13

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
   797 F.2d 370 (7th Cir. 1986) ....................................................................5

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*QSRSoft, Inc. v. Rest. Tech., Inc.*,
  2006 WL 3196928 (N.D. Ill. Nov. 2, 2006) .............................................................1

*Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*,
  870 F.3d 682 (7th Cir. 2017) ................................................................................17

*Sanderson v. Culligan Int'l Co.*,
  415 F.3d 620 (7th Cir. 2005) ...................................................................................3

*Schachar v. Am. Acad. of Ophthalmology, Inc.*,
  870 F.2d 397 (7th Cir. 1989) ...................................................................................3

*Scheurer v. Fromm Family Foods LLC*,
  863 F.3d 748 (7th Cir. 2017) .................................................................................12

*Serfecz v. Jewel Food Stores*,
  67 F.3d 591 (7th Cir. 1995) .............................................................................10, 11

*Sullivan v. Alcatel-Lucent USA, Inc.*,
  2013 WL 228244 (N.D. Ill. Jan. 22, 2013) (St. Eve, J.) ..........................................1

*Toys "R" Us, Inc. v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ...................................................................................4

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919).................................................................................................15

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981).................................................................................................7

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004).........................................................................................15, 16

*Ward v. Dixie Nat'l Life Ins. Co.*,
  595 F.3d 164 (4th Cir. 2010) .................................................................................18

**Statutes, Rules and Regulations**

28 U.S.C. § 1407(a) .....................................................................................................6

Fed. R. Civ. P. 8 ........................................................................................................19

Fed. R. Civ. P. 12(b)(6)................................................................................................7

**PUBLIC – REDACTED VERSION**

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**Miscellaneous**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2202 (June 2017) ............................................................... 3

Charles Alan Wright et al., 18B *Federal Practice and Procedure* § 4478.1 (2018) ....................................................................................... 6

## INTRODUCTION

There are glaring deficiencies in Cox's antitrust complaint, which is based, in large part, on CDK's and Reynolds's alleged "boycott" of Authenticom and other hostile integrators. But Cox does little in its opposition to address these problems. Instead, it spills much of its ink rehashing the district court decision in the *Authenticom* case—a decision the Seventh Circuit rejected in part and did not endorse—and to highlight "new evidence" that Cox's counsel obtained in discovery in the *Authenticom* matter. But whatever weight is given to this "new evidence," Cox's complaint remains legally defective. Cox has no explanation for why it is plausible that CDK and Reynolds conspired; no tenable legal argument why CDK's unilateral conduct violated Section 2; no conceptual support for its exclusive dealing and tying claims; and insufficient allegations to substantiate its contract and defamation claims. The complaint should be dismissed.

## ARGUMENT

### I.      COX HAS FAILED TO STATE A CLAIM UNDER SECTION 1

Even if viewed along with the documents that Cox inappropriately introduced with its opposition ("Opp."),[1] Cox's complaint fails to state a claim of a horizontal conspiracy.

---

[1]     Cox's opposition relies heavily on documents obtained in discovery in *Authenticom*. *See, e.g.*, Opp. 5-6. But these documents were produced pursuant to a confidentiality order that provided that confidential discovery information "shall not be used or disclosed . . . for any purpose whatsoever other than in the above captioned case"—*i.e.*, in *Authenticom* itself. *Authenticom* Dkt. 85 at 5. And as Cox's counsel have acknowledged, the documents were not deemed to be filed in this MDL proceeding—and thus available to Cox—until April 20 (after Cox filed its opposition). By relying on *Authenticom* documents in this case, therefore, Cox violated the clear terms of the *Authenticom* protective order. That tactic was both inappropriate and wholly unnecessary, given that a motion to dismiss tests the "sufficiency of the *pleadings*" and, with few exceptions, does not entail the weighing of evidence outside the complaint. *See, e.g.*, *QSRSoft, Inc. v. Rest. Tech., Inc.*, 2006 WL 3196928, at *9 (N.D. Ill. Nov. 2, 2006) (emphasis added); *see also Sullivan v. Alcatel-Lucent USA, Inc.*, 2013 WL 228244, at *2 (N.D. Ill. Jan. 22, 2013) (St. Eve, J.).

     *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)—cited by Cox's counsel to justify their similar behavior in the *MVSC* case—does not excuse Cox's conduct. In *Geinosky*, the Court stated that, in certain circumstances, a party opposing a motion to dismiss may submit factual material for illustrative purposes without converting the motion into one for summary judgment. But, again, none of the subject documents had been produced to Cox at the time it filed its response.

### A.   Cox has not stated a claim of market division

Cox's market division claim rests upon the 2015 written agreements between CDK and Reynolds. But the Seventh Circuit, in vacating the preliminary injunction in *Authenticom*, correctly recognized that these agreements are not, on their face, unlawful, given that "nothing in any of the three agreements required either CDK or Reynolds to block third-party access to its own data management system." *See Authenticom v. CDK Glob. LLC*, 874 F.3d 1019, 1023 (7th Cir. 2017). Instead, as the motion to dismiss ("Mem.") explained, the agreements provided merely that (1) DMI and IntegraLink would cease attempting to hostilely access the Reynolds DMS for a period of time and for certain apps, (2) certain Reynolds apps would integrate with the CDK DMS through 3PA, and (3) certain CDK apps would integrate with the Reynolds DMS through RCI. *See* Mem. 5-7, 8-10. Cox does not deny that it was economically rational for CDK to enter these agreements, because Reynolds had been increasingly successful at blocking unauthorized access to data in the Reynolds DMS. *See* Compl. ¶ 96. Given that reality, the best course for CDK was to obtain an orderly wind-down from Reynolds that would avoid both disruption to DMI's and IntegraLink's lines of business and stave off the kind of litigation that Reynolds had brought (or threatened) against other data extractors.

Cox nonetheless asserts that the agreements "prohibit[] each company from providing data integration services to dealers on the other company's platform" and provide that each would "steer each other's existing data integration customers to each other." Opp. 10. But that is wrong, in two respects.

First, CDK assuredly did *not* agree to "steer" its customers to Reynolds. Cox's allegations on this point rely on Section 4.4 of the Data Exchange Agreement, but that section only required CDK to assist Reynolds with "communication" and with transitioning customers "who *choose* to join the Reynolds RCI program." Mem. Ex. 2 § 4.4 (emphasis added). The allegations in the complaint are consistent with that limited understanding of CDK's commitment: Cox alleges that CDK informed

its customers about RCI in letters and promised to assist them *if* they chose to transition to RCI. Opposition Exhibit 8 similarly indicates only that ███████████████████████████ ███████. Opp. Ex. 8. Thus, neither the terms of the agreement nor CDK's alleged conduct in any way foreclosed Authenticom from competing for DMI's or IntegraLink's vendor customers after the wind-down agreement was signed. "'There can be no restraint of trade without a restraint.'" *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 624 (7th Cir. 2005) (quoting *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 397 (7th Cir. 1989)).

Second, CDK also did not agree to shut down its hostile integration business (Reynolds, for its part, was not engaged in hostile integration in the first place). By the plain terms of the agreements, CDK remained free, through DMI and IntegraLink, to attempt to hostilely access Reynolds's DMS after the expiration of the agreements—and even during the terms of the agreements with respect to any application other than the seven CDK applications listed in the RCI agreement. *See* Mem. Ex. 4 § 1.5 ("this RCI Agreement applies only to those CDK Applications identified in Exhibit RCI A"); *id.* § 5.1 (agreement can be terminated after five years). Cox does not recite a single phrase or clause in the actual agreements that suggests otherwise. Nor does Cox's so-called "new evidence" suggest an unlawful agreement on this point: ██████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████ Opp. Ex. 7 at CDK-022946. ██████████████████ ████████████████████████████████████████████ (Opp. 11), which finds little support in Opposition Exhibit 9 in any event, has nothing at all to do with dividing any market.

## B.     Cox has no viable group-boycott theory

As CDK's opening brief explained, Cox's "group boycott" theory is a conceptual mismatch for the facts of this case. *See* Mem. 10-12. A group boycott is really a "concerted refusal to deal."

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2202 (June 2017) ("Areeda & Hovenkamp"). Cox does not allege any course of dealings at any time between CDK and Authenticom or other hostile integrators—there were no relevant dealings—and thus there was nothing to boycott.

Cox essentially ignores this problem, instead citing *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000), for the proposition that a defendant can be liable for a group boycott, not only by directly joining the boycott itself, but also by "coercing" other market participants to "deny relationships" that the allegedly boycotted firm needs. *See* Opp. 7. Cox does not clarify whom CDK and Reynolds "coerc[ed]" to boycott hostile integrators, but if the theory is that CDK and Reynolds worked together to induce *dealers* to stop working with hostile integrators, that theory fails because Cox is unable to offer any plausible reason why CDK would have entered into such a conspiracy. Cox argues that eliminating hostile integrators allowed CDK to increase prices for its own products (Opp. 3-4), but CDK could have chosen (indeed, *did* choose) to prevent hostile integration unilaterally: it needed no cooperation from Reynolds. Cox also suggests that hostile integrators had created "standalone software solutions" that threatened to replace the DMS. Opp. 9. But that allegation (which relies on *one* paragraph in Cox's complaint (*see* Compl. ¶ 100)) contradicts Cox's repeated insistence elsewhere that CDK and Reynolds have a stranglehold on the "DMS market" and that switching away from CDK and Reynolds's products is impossible, and is therefore not entitled to any presumption of truth. *See, e.g.*, *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 151-52 (2d Cir. 2014).[2]

Cox denies that it needs to provide any evidence of motive, given its "direct evidence that [the] two parties conspired." Opp. 9. But all of this purported "direct evidence" is consistent with the

---

[2]     Given the lack of a plausible theory of motive here, Authenticom's reliance on *Toys "R" Us* is misplaced. There was a clear incentive in that case for the alleged boycotters to collude, because the scheme to boycott sales to warehouse clubs would not have worked unless each supplier "could be sure its competitors were doing the same thing." *Toys "R" Us*, 221 F.3d at 936. Here, CDK and Reynolds were unilaterally able to block third-party access to their respective DMSs, regardless of whether the other followed suit.

PUBLIC – REDACTED VERSION

limited and lawful commitments made by CDK and Reynolds in their written agreements, which the Seventh Circuit agreed do not jibe with the theory now advanced by Cox. CDK's opening brief made this point with respect to the alleged conversations between CDK and Reynolds employees and Steve Cottrell described in Cox's complaint, explaining why those conversations reflect the lawful purposes of the written agreements (Mem. 11-12); indeed, apart from waving its hands at the *Authenticom* court's (nonbinding) weighing of the evidence at the preliminary injunction hearing, Cox makes no attempt to defend the significance of those conversations. Cox's so-called "new evidence" is no different. Cox makes much of ███████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████. Compl. ¶ 136. Opposition Exhibit 2, read as a whole, confirms what the written agreements themselves spell out—namely, that CDK and Reynolds's roles in transitioning vendors to the other's platform were limited to sending an initial, informative communication to vendors. It was obviously preferable, from both sides' perspective, that vendors be given advance warning of the transition, rather than learning about it when their unauthorized access to a DMS through an integrator was cut off. The communication in Opposition Exhibit 3 concerned ██████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████ (Opp. 6). ████████████████████████████████████ (Opp. Ex. 4) ██ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████. And Cox's reliance on █████████████████████ ████████████████████ (Opp. 6 (citing Opp. Exs. 5-6)) is meritless. It is no surprise and no secret that CDK and its personnel disliked Authenticom, a company that makes money by parasitically free-riding on proprietary technology that took CDK years of substantial investment to develop. But dislike for another firm is not an antitrust violation. *See, e.g.*, *Olympia Equip. Leasing*

*Co. v. W. Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986) ("[I]f conduct is not objectively anticompetitive the fact that it was motivated by hostility to [other firms] is irrelevant.").

### C.    The *Authenticom* and *MVSC* holdings are not binding here

Seeking to shore up its conspiracy allegations, Cox invokes the law-of-the-case doctrine, arguing that this Court is bound by prior decisions of the *Authenticom* and *MVSC* courts to deny the motion to dismiss with respect to Cox's "core conspiracy claims." Opp. 11-12. But Cox is wrong: the decisions it cites were both interlocutory orders and thus do not implicate the law-of-the-case doctrine. *See, e.g.*, *Koulouris v. Chalmers*, 779 F. Supp. 99, 101 (N.D. Ill. 1991); *see also* Charles Alan Wright et al., 18B *Federal Practice and Procedure* § 4478.1 (2018) (collecting cases). And in any event, neither court's order decided the issues presented in this motion.

The conspiracy claims that the *MVSC* court declined to dismiss were substantially different from Cox's claims. That court was assessing whether MVSC had stated a claim that "CDK and Reynolds (1) conspired to block MVSC from participating in their respective third-party access programs, (2) in order to restrain competition in the EVR [*i.e.*, electronic vehicle registration] market." *Motor Vehicle Software Corp. v. CDK Glob., Inc.*, 2017 WL 5643163, at *4 (C.D. Cal. Oct. 2, 2017). Cox's complaint has nothing to do with MVSC or EVR. Moreover, MVSC has amended its complaint, and the conspiracy claims are the subject of a pending motion to dismiss.

Clearly aware that *MVSC* is distinguishable, Cox seeks to preempt CDK from distinguishing it, by arguing that CDK is estopped because CDK stated during the MDL consolidation proceedings that the cases in the MDL all involved "essentially the same alleged antitrust conspiracy." Opp. 12. But that "gotcha" argument is unpersuasive. CDK's statements in the MDL proceedings were aimed at showing that *MVSC* shared "one or more common questions of fact" with the other cases proposed for consolidation, as required by 28 U.S.C. § 1407(a); CDK did not take the position that the allegations in *MVSC* were *identical* to those of the other cases. And in any event, if CDK is to be

estopped from arguing that *MVSC* is not binding here, Cox should equally be estopped from arguing that it *is* binding, given that Cox's counsel argued in the MDL proceedings that "MVSC's claims go to a different conspiracy . . . , aimed at a different market . . . , and entered into for a different purpose" and that "the basis for MVSC's conspiracy claim is centered on the group boycott of MVSC targeted at the EVR market[,]" rather than the data integration market. Opp. to Mot. for Transfer at 5-6 (J.P.M.L. Nov. 28, 2017), ECF No. 33.

The preliminary injunction decision in *Authenticom* likewise has no bearing on CDK's motion to dismiss *Cox's* complaint here. It is well understood that "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding" on the Court at later stages of the litigation. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Thus, a decision "granting or denying [a] temporary injunction does not constitute the law of the case, and will not estop the parties nor the court as to the merits of the case." *Hunter v. Atchison, T. & S.F. Ry. Co.*, 188 F.2d 294, 299 (7th Cir. 1951). That rule is critical because, in a complex antitrust case like this one, courts must "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed," with its attendant risk of "*in terrorem*" pressure to settle even "largely groundless claim[s]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-59 (2007) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005), and *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983)). Accordingly, whatever the *Authenticom* court concluded about Authenticom's horizontal conspiracy claim at the preliminary injunction hearing, a full and fresh review of the *Cox* complaint is warranted here under Rule 12(b)(6).[3]

---

[3]     Needless to say, the *Authenticom* court's statement in an order that it was "unlikely" that it would dismiss the conspiracy claims there under Rule 12(b)(6) (Opp. 12 n.6) is not binding on this court—particularly given that the order in question *rejected* Authenticom's argument that the motion to dismiss could be summarily denied in light of the preliminary injunction ruling. *See Authenticom* Dkt. 209.

PUBLIC – REDACTED VERSION

### D.    Cox's tying claim should be dismissed

Cox's tying claim, as the motion to dismiss showed (Mem. 12-14), is a complete mismatch for the facts of this case. Tying occurs when a seller of two products requires buyers of one product to take the second product as well, restraining competition in the market for the tied product. That description does not fit Cox's allegations, because the buyers of the alleged tying and tied products are not the same: *dealers* purchase DMS services, whereas *vendors* purchase "integration" services. That is why the Seventh Circuit professed itself to be "dubious in the extreme" that CDK's and Reynolds's conduct "amounts to tying, rather than simply participation at two levels of the market." *Authenticom*, 874 F.3d at 1026.[4]

Cox argues that "a tying claim is viable here because the dealers are the subjects of the illegal 'forcing,'" in that their authorization is needed in order for vendors to obtain data. Opp. 17 (citing *Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346, 1354 (7th Cir. 1982)). But Cox's authority on this point, *Dos Santos*, is neither a tying case nor on point here. In *Dos Santos*, an anesthesiologist alleged that a hospital and a medical group had entered into an unlawful exclusive dealing arrangement because the medical group agreed to serve as the sole provider of anesthesia services at the hospital. *Id.* at 1348. In a discussion that the court itself described as dictum, the court commented that it might be "more appropriate for antitrust purposes" to treat the hospital, rather than individual patients, as the purchaser of anesthesia services. *Id.* at 1354. The court based that comment on the observations that (1) patients "generally take[] no part in the selection of a particular anesthesiologist"; (2) "the expense of anesthesia services to the patient is ordinarily at least partially insured or otherwise payable by a third party," so it would be "anomalous to treat the patient as a

---

4    Cox brushes aside this statement by noting the Seventh Circuit's comment that there might be "more to the [tying] claim than meets the eye on this record" (Opp. 17 n.10), but that dodge is unavailing: Cox has not offered anything in support of its tying claim beyond what Authenticom did, apart from a citation to the inapposite *Dos Santos* decision.

buyer"; and (3) the hospital was responsible for making anesthesia available and could be liable for negligent rendition of anesthesia services. *Id.*

Even assuming that *Dos Santos*'s rationale for treating a party other than the purchaser as the buyer for antitrust purposes could be extended to the tying context, it would not apply here. Dealers are not alleged to choose data extractors for vendors in the way that surgeons use their expertise to choose anesthesiologists on behalf of lay patients. And vendors pay for integration services directly themselves; they do not rely on third parties to make their payments and are, by Cox's own repeated admission, price-sensitive.

### E.  Cox's exclusive dealing claim should be dismissed

Cox's final Section 1 theory of exclusive dealing must also be dismissed. As the opening brief explained (Mem. 14-15), CDK's dealer contracts cannot be characterized as exclusive dealing arrangements because there is no allegation in the complaint that CDK requires its dealers to purchase DMS services from CDK alone. The alleged "exclusive deals" here pertain to data integration services, which dealers do not purchase.[5] Cox unsurprisingly pivots to defending its allegation that CDK's *vendor* contracts constitute exclusive dealing—but its allegations here are scarcely stronger and fall well short of stating a claim.

For one thing, by Cox's own admission, 3PA is a "managed interface" that is part of CDK's DMS, not a separate product. *See* Compl. ¶ 80. Cox backtracks on this subject in its opposition, arguing that there is a separate market for data integration services because there is "separate demand" for such services. Opp. 14. But market demand is not the only determinant of whether a separate market exists; other factors are also relevant, including "the product's peculiar characteristics and uses." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Were the law

---

[5]  We also pointed out that unauthorized-access provisions like those in CDK's dealer contracts are commonplace throughout the economy; Cox has no response to this.

otherwise, a firm like CDK could *never* incorporate a functionality provided by separate firms into its core product without facing an exclusive dealing claim. Here, the "peculiar characteristics" of 3PA—including its incorporation into the CDK DMS and its lack of functionality with any other DMS—preclude any finding that it is a separate product.[6]

In addition, Cox has not shown that it has been substantially foreclosed from competing in any market: Cox, which by its own words is a massive presence in the automotive industry serving "virtually all of the 17,000 franchised new car dealers in the United States" (Compl. ¶ 31), is still able to deal with any dealer and any DMS provider.[7] Cox does not dispute this, but focuses instead on the *Authenticom* court's findings that Authenticom had been foreclosed from contracting with dealers (Opp. 13), arguing that it has standing as a customer of Authenticom to challenge this foreclosure. As noted above, however, the *Authenticom* court's conclusions at the preliminary injunction hearing were necessarily tentative and are not controlling here. And *Serfecz v. Jewel Food Stores*, 67 F.3d 591 (7th Cir. 1995), does not stand for the proposition that Cox has standing to complain about Authenticom's alleged foreclosure. *Serfecz* held that a mall owner lacked standing to sue a grocery company and a rival mall owner under the Sherman Act. *Id.* at 598-99. In dicta that

---

[6]    Cox makes much of certain statements by CDK employees that purportedly show that 3PA "competes directly with independent integrators." Opp. 14. But those statements by laypeople, which use the term "compete" in a colloquial sense, have no bearing on the legal question whether hostile integration services and 3PA are in the same product market for antitrust purposes.

[7]    Cox argues that Authenticom and other integrators are "barred from competing for the 45% of dealership rooftops that use a CDK DMS" and that this constitutes substantial foreclosure (Opp. 13), but the complaint alleges no such thing. CDK is alleged to have 45% of the "DMS market" (as Cox defines it), but there is no material in the complaint regarding the size of the data integration market, CDK's purported share of it, or the portion of the market that has been foreclosed. There are no allegations of how many purchasers (vendors) there are in the market, how many apps those vendors provide, or how many platforms they provide them on. And there are no allegations of how many vendors have signed up with 3PA, how many apps those vendors are servicing through 3PA, and whether any vendors are abiding or disregarding the access provisions of their 3PA contracts and using hostile data extractors nevertheless. Without allegations concerning these facts, there is no basis for determining whether CDK's agreements with vendors—assuming for the sake of argument they were subject to antitrust scrutiny as exclusive-dealing arrangements—have affected a substantial share of the relevant market.

discussed which parties *would* potentially have standing, the court suggested that, if the defendants had excluded competing grocery stores from the market, allowing them "to engage in monopoly pricing," consumers could sue. *Id.* at 598. That kind of situation does not exist here: "neither Reynolds nor CDK is a monopolist," *Authenticom*, 874 F.3d at 1025, and as discussed below, Cox's Section 2 monopolization claim warrants dismissal.

## II. COX'S SECTION 2 CLAIM FAILS

Cox's monopolization claim is flawed in two respects: (1) the complaint does not adequately allege a single-brand aftermarket for integration services on CDK's DMS; and (2) Cox has not alleged any unlawful exclusionary conduct. *See* Mem. 17-21. Cox's opposition does not adequately address these deficiencies.

### A. There can be no unfair lock-in given the acknowledged terms of CDK's service contracts with dealers

Cox's allegation that there is a single-brand aftermarket for integration services on CDK's DMS fails at the outset because dealers agreed not to give independent integrators or other third parties access to CDK's DMS. Cox does not (and cannot) disagree that "the law prohibits an antitrust [plaintiff] from [complaining of] market power that arises solely from contractual rights that consumers knowingly and voluntarily gave to the defendant." Mem. 18 (quoting *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1048 (9th Cir. 2008) (emphasis omitted)). In light of that rule, because CDK's service contracts forbid dealers from granting third-party access to the DMS to data extractors like Authenticom "from the outset," dealers "could have shopped around for competitive life-cycle prices" all along and cannot, as a matter of law, be unfairly locked in. *Dig. Equip. Corp. v. Uniq Dig. Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996); *accord, e.g.*, *DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1346 (Fed. Cir. 2014). The contracts could not be clearer on this point, providing that a dealer "IS NOT AUTHORIZED TO CAUSE OR PERMIT ANY THIRD PARTY SOFTWARE TO ACCESS THE CDK DEALER MANAGEMENT SYSTEM EXCEPT AS

OTHERWISE PERMITTED BY THIS AGREEMENT." Mem. Ex. 1, § 6(B). Accordingly, Cox cannot maintain a Section 2 claim predicated on any purported market power over the alleged submarket for data integration services solely for CDK dealers.

Cox's responses on this point are unpersuasive. It argues that the contracts permit access by dealers' "agents" (Opp. 20)—but there are two problems with that theory. For one thing, Cox is alleging inconsistent facts. It asserts for its exclusive-dealing theory that CDK's service contracts categorically bar dealers from giving hostile integrators credentials to extract data from the DMS. *See* Opp. 13 ("CDK's exclusive dealing arrangements . . . prevent dealers and vendors (such as Cox) from working with independent integrators."). Cox then asserts for its single-brand monopolization claim that dealers are *not* in fact bound by these contractual limitations, because Authenticom and other integrators acted as dealers' agents. Opp. 20. Cox cannot have it both ways. *See DPWN Holdings*, 747 F.3d at 151-52.

More to the point, Cox does not allege any facts permitting a plausible inference that either Authenticom or any other hostile integrator actually acts as the agent of any dealer. Establishing an agency relationship is no simple task: the law of agency "requires 'an agreement of two parties, embodying three factual elements: (1) the manifestation of the principal that the agent is to act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to control the undertaking.'" *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 755 n.4 (7th Cir. 2017) (applying Wisconsin law). There are no allegations in the complaint along these lines. Moreover, if anything, hostile integrators would be the agents of *vendors*, on whose behalf (and for whose use) they pull data. Against this backdrop, Cox cannot seriously suggest that dealers who signed CDK's service agreement would have believed, as a legal matter, that Authenticom or another integrator was their agent, permitted to access CDK's DMS.

Cox also attempts to sidestep the actual language of the dealer contracts by arguing that, notwithstanding the plain terms of its service contracts with dealers, CDK's "actual real-world policies

changed after the dealers were already locked-in." Opp. 20. But as we noted in the opening memorandum (at 17-18), CDK's policy on unauthorized access was plainly and expressly memorialized in the terms of its service contracts, and "[a] party is not justified in relying on representations outside of or contrary to the written terms of a contract he or she signs when the signer is aware of the nature of the contract and had a full opportunity to read it." *See Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003).[8] Simply put, CDK has always had the "contractual right[]" to block third-party data extractors (*Newcal*, 513 F.3d at 1048), as agreed by dealers. This point is central to (and fatal to) Cox's monopolization claim.

Cox lastly points to cases in which it says courts found a lock-in despite contractual language authorizing the complained-of restriction. Opp. 20-21. But none of these cases is on point. In *Datel Holdings, Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 989 (N.D. Cal. 2010), the court denied a motion to dismiss because there was "ambiguity" in the relevant contract language, which the defendant's counterparties (individual consumers, not sophisticated business) may not have understood. Likewise, in *Burda v. Wendy's International, Inc.*, 659 F. Supp. 2d 928, 935 (S.D. Ohio 2009), the court held that there was "no language in [the contract] that would put a potential franchisee on notice" that it might be required to purchase all supplies from an exclusive supplier. Neither case is helpful to Cox, because here CDK's contracts plainly prohibited hostile data extraction, and there is no basis for thinking that dealers (sophisticated businesses that negotiate contracts all the time) did not understand the terms.

---

[8]    Cox's dismissal of *Cromeens* as "not even an antitrust case" (Opp. 20 n.12) is unwarranted, because Cox offers no reason why the well-established principle that a party may not rely on representations that contradict the terms of a written contract—particularly one with a merger clause disavowing any agreement outside the four corners of the document (Mem. Ex. 1, § 18(A))—would lose its force in the antitrust context. If no court has yet had occasion to apply this principle in the context of a *Kodak* aftermarket claim, that is likely because few plaintiffs have yet had the temerity to argue, as Cox does, for the existence of an "aftermarket" that is squarely foreclosed by unambiguous contract language.

## B.     The allegations of a lock-in are insufficient to support a monopolization claim

Given that CDK's restrictions on third-party access to the DMS were clearly communicated to dealers before they contracted with CDK, Cox's argument that dealers are locked in to CDK's DMS services is beside the point. But in any event, Cox has not adequately alleged that dealers are "locked in" and unable to switch away from CDK if they prefer a DMS that permits hostile integration in the first place. Cox does not dispute CDK's assertions that dealers who prefer the ability to use hostile integrators can sign up with Cox or another DMS provider that permits this.[9] Instead, it alleges that the actual level of switching that occurs is low, based on the average tenure of a DMS client. Opp. 19. But what matters here is whether or not dealers are *able* to switch when they wish to do so, not the overall "churn rate" in the market—otherwise, antitrust courts would be penalizing defendants for providing superior services from which consumers *choose* not to switch. Likewise irrelevant is the average length of a DMS contract; again, the question for the Court is whether dealers are *able* to switch to another DMS provider, not whether they can do so immediately, on demand. Were it otherwise, any contract not terminable at will would create a single-brand market.

Cox also argues that dealers are locked in by the purported "information costs" of switching DMS providers, but its allegations here fall well short of plausibility. Opp. 19. Cox alleges, in particular, that CDK (along with Reynolds) uses "price secrecy provisions" that are intended to prevent vendors from passing data integration costs on to dealers and thus to prevent dealers from "learning how much CDK charges for data integration." *Id.* But even if that were true, Cox never alleges that these provisions actually succeed at keeping pricing information from dealers. On the

---

[9]     Nor could it. As Judge Easterbrook of the Seventh Circuit observed at oral argument, notwithstanding the length of CDK and Reynolds contracts, switching is quite possible, as evidenced by Reynolds's loss of market share to CDK prior to 2015. *See Authenticom* Oral Argument 35:59, http://media.ca7.uscourts.gov/sound/2017/ab.17-2540.17-2540_09_19_2017.mp3 ("Over the course of five years under these contracts [Reynolds] can go from whatever [market share] they have to zero.").

contrary, Cox argues elsewhere that vendors pass on their costs to dealers (*id.* at 17), and it alleges that dealers are aware of CDK's data extraction fees and have complained about them to CDK (Compl. ¶ 147). Once again, internally inconsistent allegations of this sort are inherently implausible and disentitled to a presumption of truth.

### C. Cox has not plausibly alleged exclusionary conduct

If all this were not enough to doom Cox's Section 2 claim, the claim would nonetheless fail because, as a matter of law, Cox has not alleged that CDK engaged in exclusionary conduct. As the opening brief explained, CDK is under no duty to permit Authenticom or other hostile integrators to access its systems for their own benefit under *Trinko* and its progeny. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). Consistent with this argument, Chief Judge Wood expressed "concern[]" in *Authenticom* with the "premise" of Authenticom's theory that "there is some duty that either of these companies has . . . to make its work product available for scraping for free to others." *Authenticom* Oral Argument Audio 26:08-26:32. So did Judge Easterbrook. *See id.* at 30:26-32:42; 36:41-39:48.[10]

Cox does not even attempt to argue, as Authenticom has, that some kind of exception to the no-duty-to-deal rule applies. Instead, it argues that the rule is a "red herring" because the real basis for its Section 2 claim is "CDK's horizontal conspiracy with Reynolds and the exclusive dealing and

---

[10]    Cox seeks to downplay the Seventh Circuit's manifest skepticism of Authenticom's Section 2 claim by arguing that (1) the court's statement that "neither Reynolds nor CDK is a monopolist" "concerned the *DMS* market, not the aftermarket for data integration on the CDK DMS" and (2) "monopolization was not the basis for the preliminary injunction" in *Authenticom*. Opp. 18 n.11. But both objections are misplaced. The court of appeals *was* referring to the purported integration aftermarket in Authenticom's Section 2 claim, as made clear by its later statement that "Authenticom has not argued that either Reynolds or CDK has sufficient market power on its own to trigger either a monopolization or an attempt-to-monopolize claim under section 2 of the Sherman Act, 15 U.S.C. § 2. And as we have noted, even if it did, this case is a far cry from *Aspen Skiing*, which represented the high-water mark in section 2 cases for a duty-to-deal theory." *Authenticom*, 874 F.3d at 1026. And although the district court in *Authenticom* did not base the preliminary injunction on Authenticom's Section 2 claim, the court of appeals nonetheless considered the potential merits of that claim, in order to determine whether there was any basis on which to sustain the district court's injunction. *Id.*

tying provisions it has imposed." Opp. 22. But that is incorrect. To the extent that Cox's Section 2 claim rests on its allegations of exclusive dealing and tying, those claims boil down to complaints about CDK's unilateral refusal to allow hostile integrators like Authenticom to access its systems—a decision within its power to make under *Trinko*. And to the extent that the claim rests on a horizontal conspiracy, it is not a Section 2 claim, but rather a *Section 1* claim—as Cox's own authorities make clear. *See Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1309 (10th Cir. 2017) (plaintiff's allegation of a concerted refusal to deal stated a claim under *Section 1*); *Glaberson v. Comcast Corp.*, 2006 WL 2559479, at *10 (E.D. Pa. Aug. 31, 2006) (same).

## III. COX'S CARTWRIGHT ACT AND CALIFORNIA UCL CLAIMS SHOULD BE DISMISSED

Because Cox's Sherman Act claims are deficient, its antitrust claims under the Cartwright Act and the "unlawful" prong of the UCL are as well; indeed, Cox does not disagree that these claims rise and fall with its Sherman Act claims.

Cox contends that, independent of its antitrust claims, it has stated a claim under the "unfair" prong of the UCL,[11] but it ignores CDK's argument that, in the context of a suit involving a firm's conduct toward rival firms, "unfair" conduct is limited to "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws . . . or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999). In any event, Cox has not plausibly alleged that CDK's actions caused harm that outweighed their benefit, or violated public policy. As CDK has shown, there is no policy consideration in favor of forcing firms like CDK to open their systems to all comers; on the

---

[11]   If, as Cox later suggests (Opp. 23-24 n.14), an argument can be waived by being made in a single sentence, this argument has been waived, as well, since Cox devotes only one sentence of its opposition to its "unfair" UCL claim.

contrary, the law abhors such arrangements. *See* Mem. 20-21. Cox's UCL claim should therefore be dismissed.

## IV.     COX'S CONTRACT-RELATED CLAIMS ARE INADEQUATE

Cox's allegations that CDK (1) fraudulently induced Cox to contract with it, (2) breached the parties' contract, and (3) violated the Unfair Practices Act ("UPA") must be dismissed. The common thread between these allegations is that CDK purportedly promised Cox that ████████████ ████████████████. But Cox does not point to ██████████████ ████████████████████████████████ ████████████████████. Instead, Cox claims that when CDK and Reynolds negotiated a resolution of their differences over CDK's unauthorized access to Reynolds's DMS—which resolution included allowing Reynolds to offer certain applications through 3PA— CDK violated its agreements with Cox by waiving Reynolds' first five years of 3PA fees. That is an apples-to-oranges comparison that does not establish a breach of contract. *See* Mem. 23-24.

Cox derides this as a "semantic argument" (Opp. 23), but it requires nothing more than a straightforward application of the principle that the words of a contract must be "given [their] plain and ordinary meaning." *Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*, 870 F.3d 682, 690 (7th Cir. 2017) (quoting *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007)). The ordinary meaning of "price" does not extend to situations like this: if, for example, a cable company offered a new customer two months of service at no charge before regular billing began, one would not say that the customer had been given a special "price," but rather a concession, bonus, or other temporary consideration.[12] Nor would one say that the customer had received a "discount," which is

---

[12]     CDK's argument does not, as Cox suggests, ██████████████████████ ████████████████████████████████████████████████████████

PUBLIC – REDACTED VERSION

the statutory term on which Cox hangs its UPA claim and which must also be construed according to its ordinary meaning. *See, e.g.*, *Estate of Moreland v. Dieter*, 576 F.3d 691, 695 (7th Cir. 2009).

Cox's contract-law claims also fail because CDK's purported commitment was prospective—it allegedly promised Cox that it █████████████████████████████████████ ███████████████████████████████████████████████████████████. Cox effectively concedes this is the correct reading of the contract as all it offers in response is a hyper-technical "waiver" argument based on a rule of appellate briefing. Opp. 24 n. 14. The plaintiffs in *Estate of Moreland v. Dieter*, 359 F.3d 747, 759 (7th Cir. 2009), were found to have waived an argument because they relied "almost entirely on a series of string citations to affidavits and other documents in the record," thus forcing the court to "scour [the] record" for the relevant evidence. Here, the Court need not "scour" the record for anything, as the relevant contractual language was identified in the complaint. Cox also argues that the "operative contractual language has no time restriction" (Opp. 24 n.14), but that, too, is incorrect: as Cox omits to mention, the contract states that ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████, and it is well established that "shall" connotes the future tense. *See, e.g.*, *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 175 (4th Cir. 2010); *Fleet Nat'l Bank v. Anchor Media Television, Inc.*, 45 F.3d 546, 556 (1st Cir. 1995).

Cox's UPA claim also independently fails because Cox failed to establish that it was actually injured by the purportedly improper "discount" given to Reynolds. Mem. 24. Cox argues that it satisfied this requirement by alleging that the fee waiver to Reynolds placed it at a "competitive disadvantage" (Opp. 24), but that is not sufficient: even where a plaintiff alleges that some "discount" put it at a disadvantage, it must still allege that the discount specifically caused it actual

██████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████.

injury. *Compare, e.g.*, *Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1043 (N.D. Cal. 2001) (holding that even though alleged discounts had a "tendency to destroy competition," plaintiffs had not shown actual injury), *with Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.*, 16 Cal. App. 4th 202, 213 (1993) (plaintiff established actual injury by showing that "its gross sales and profits drastically declined"). Cox has failed to do this, which warrants dismissal of its UPA claim even if the temporary fee waiver given to Reynolds is construed as a "discount."

## V.    COX HAS FAILED TO STATE A CLAIM FOR DEFAMATION

CDK's motion to dismiss challenged Cox to provide any details about the defamatory statements it alleges that CDK made. *See* Mem. 25. But Cox's opposition declines the invitation. Rather than substantiate its allegations, Cox simply protests that "Rule 8 requires nothing more" than the meager details it has provided, *i.e.* that the statements were made by "CDK" to "Nissan and Honda" and generally blamed Cox for being uncooperative with CDK. Opp. 25. That is incorrect: merely alleging that one corporate entity made statements on a particular subject to other corporate entities, without giving any details about the individuals who made the statements, when they were made, and the like, does not satisfy Cox's pleading burden. Cox's authorities are not to the contrary; indeed, they highlight the inadequacy of Cox's own allegations. In *Chisholm v. Foothill Capital Corp.*, 940 F. Supp. 1273, 1285 (N.D. Ill. 1996), the plaintiff identified the speaker of the statements at issue. The plaintiff in *Almblad v. Scotsman Industries, Inc.*, 2013 WL 4600209, at *1 (N.D. Ill. Aug. 28, 2013), did even more, identifying the author of the statement, the audience, and the date it was made. Cox's own sparse allegations are not comparable to the ones in these cases.

The fact that the defamation claim is likely time-barred only highlights the problematic lack of detail regarding Cox's allegations. That claim is very likely subject to a one-year statute of limitations (*see* Mem. 25 n.9), and even after CDK raised this point in its opening brief, Cox has

PUBLIC – REDACTED VERSION

declined to offer the Court any assurance that the claim is timely. Cox instead argues that it is not required to plead the absence of an affirmative defense. Opp. 25 n.15. But whether or not that is so, Cox *is* required to plead sufficient details in order to put CDK and the Court on notice of its claims. Cox should not be permitted to avoid dismissal of this claim by refusing to disclose the date and other details of the alleged defamatory statements.

## **CONCLUSION**

For the reasons stated above and CDK's opening memorandum, the complaint should be dismissed.

Dated: April 30, 2018

Respectfully submitted,

/s/ *Britt M. Miller*
Britt M. Miller
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant*
*CDK Global, LLC*

PUBLIC – REDACTED VERSION

## CERTIFICATE OF SERVICE

I, Britt M. Miller, an attorney, hereby certify that on April 30, 2018, I caused a true and correct copy of the foregoing **DEFENDANT CDK GLOBAL, LLC'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS**, to be filed **UNDER SEAL** and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/ Britt M. Miller*_____
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Phone: (312) 782-0600
Fax: (312) 701-7711
E-mail: bmiller@mayerbrown.com