**PUBLIC VERSION**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This filing relates to:* | Hon. Amy J. St. Eve |
| *Loop, LLC, d/b/a AutoLoop v. CDK Global, LLC*, Case No. 18-cv-2521 (N.D. Ill.) | |

**DEFENDANT CDK GLOBAL, LLC'S MEMORANDUM
IN SUPPORT OF ITS MOTION TO DISMISS**

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................ ii

Introduction .......................................................................................................................... 1

Background ............................................................................................................................ 1

    A.   The DMS "market" ............................................................................................ 1

    B.   Hostile integration ............................................................................................. 2

    C.   CDK's SecurityFirst initiative and 3PA program ............................................ 3

    D.   Reynolds provides an orderly wind-down of CDK subsidiaries' hostile access ............. 3

Argument .............................................................................................................................. 4

I.    AutoLoop Fails To State A Claim Under Section 1 ................................................... 5

    A.   AutoLoop's horizontal conspiracy claims are inadequate as a matter of law ............. 5

        1.   Allegations of a market-division agreement are inadequate ................... 6

        2.   CDK did not agree to a "group boycott" ................................................ 7

    B.   CDK's agreements with its dealers are not "tying" agreements ..................... 8

    C.   CDK has not engaged in exclusive dealing ..................................................... 9

    D.   CDK's conduct easily survives the Rule of Reason ...................................... 10

II.   AutoLoop Fails To State A Claim Under Section 2 ................................................. 13

    A.   There are no brand-specific aftermarkets for data integration services .......... 13

    B.   CDK has no duty to ignore the plain terms of its service agreements ........... 14

III.  AutoLoop's Florida-Law Claims Also Fail ............................................................ 15

Conclusion .......................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*,
135 F.3d 740 (11th Cir. 1998) ................................................15

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010) .............................................12, 14

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985).................................................10, 14, 15

*Authenticom, Inc. v. CDK Glob., LLC*,
874 F.3d 1019 (7th Cir. 2017) ........................................ *passim*

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................5

*Brownmark Films, LLC v. Comedy Partners*,
682 F.3d 687 (7th Cir. 2012) ...............................................3

*Cal. Comput. Prods., Inc. v. IBM*,
613 F.2d 727 (9th Cir. 1979) ...........................................12, 14

*Cromeens, Holloman, Sibert, Inc. v. AB Volvo*,
349 F.3d 376 (7th Cir. 2003) ...............................................14

*Dig. Equip. Corp. v. Uniq Dig. Techs., Inc.*,
73 F.3d 756 (7th Cir. 1996) .................................................13

*DSM Desotech Inc. v. 3D Sys. Corp.*,
749 F.3d 1332 (Fed. Cir. 2014)..............................................13

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992).........................................................10

*Fin-S Tech, LLC v. Surf Hardware Int'l-USA, Inc.*,
2014 WL 12461350 (S.D. Fla. Aug. 27, 2014).................................15

*Firestone Fin. Corp. v. Meyer*,
796 F.3d 822 (7th Cir. 2015) ................................................1

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986).........................................................7

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ........................................................................................8, 9

*Khorrami v. Rolince*,
    539 F.3d 782 (7th Cir. 2008) ..............................................................................5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ......................................................................................5, 7

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ............................................................................7

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
    104 F.3d 811 (6th Cir. 1997) ............................................................................13

*QSGI, Inc. v. IBM Glob. Fin.*,
    2012 WL 1150402 (S.D. Fla. Mar. 14, 2012) ...................................................15

*Schor v. Abbott Labs.*,
    457 F.3d 608 (7th Cir. 2006) ............................................................................14

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ..........................................................................................10

*In re Text Messaging Antitrust Litig.*,
    782 F.3d 867 (7th Cir. 2015) ..............................................................................5

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919) ..........................................................................................14

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ..........................................................................................13

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*,
    540 U.S. 398 (2004) ..........................................................................................14

*Wigod v. Wells Fargo Bank, N.A.*,
    673 F.3d 547 (7th Cir. 2012) ............................................................................12

**STATUTES**

15 U.S.C. § 1 ................................................................................... *passim*

15 U.S.C. § 2 ...............................................................................1, 13, 15

Fla. Stat. Ann. § 501.204 ..............................................................................15

Fed. R. Civ. P. 12(b)(6) ..................................................................................4

## OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (June 2017)

¶ 772c2 ................................................................................................................................15

¶ 1752b..................................................................................................................................9

¶ 1800a ..................................................................................................................................9

*Request for Information Regarding Consumer Access to Financial Records*, Bureau of Consumer Fin. Prot., Dkt. No. CFPB-2016-0048 (Nov. 14, 2016), perma.cc/F28M-5TZU ......................................................................................................12

## INTRODUCTION

This is the latest in a string of cases filed by plaintiffs' counsel in this multidistrict litigation. Counsel already represent plaintiffs in three suits in the MDL and have now brought a fourth suit, on behalf of AutoLoop, a software vendor. AutoLoop's allegations fall into the same two buckets as the allegations in these other cases. First, AutoLoop alleges that CDK sought to eliminate independent data "integrators" through a purported conspiracy with Reynolds (Count I), unlawful exclusive dealing agreements (Count II), and tying arrangements (Count III). Second, AutoLoop alleges that CDK sought to monopolize a purported single-brand aftermarket for software applications provided to dealers using its DMS by refusing to deal with AutoLoop and other vendors on their preferred terms (Count IV). AutoLoop then adds derivative Florida state-law claims (Counts V and VI).

Both categories of argument are meritless, as they are in the other MDL suits from which AutoLoop recycles them. AutoLoop's Section 2 monopolization argument is already undermined by the Seventh Circuit's recognition that CDK is not a monopolist and has no duty to deal with rival firms—let alone on their preferred terms. AutoLoop's Section 1 allegations fail under the plain terms of the written agreements on which AutoLoop principally relies. AutoLoop's remaining federal antitrust claims—tying, group boycott, and exclusive dealing—are conceptual mismatches for AutoLoop's allegations and cannot succeed. Finally, because AutoLoop's state-law claims depend on its federal causes of action, the complaint should be dismissed in its entirety.

## BACKGROUND[1]

### A.    The DMS "market"

Automobile dealerships generate large volumes of data in the course of their operations, including inventory, customer, sales, financing, and insurance information. Compl. ¶ 40. DMSs are

---

[1]    We describe here the allegations in the complaint, which are assumed true solely for purposes of this motion. *See Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015).

the enterprise software platforms that dealerships use to manage their businesses. *Id.* ¶ 39.

The market for DMSs in the United States comprises a number of firms of various sizes. Reynolds and CDK are two of the largest firms serving new vehicle franchised dealers. Compl. ¶ 43. AutoLoop alleges that, by number of franchised stores served, CDK has an approximate 45% share of the U.S. DMS market. *Id.* The market also comprises a number of other DMS firms (*id.* ¶ 45); CDK, Reynolds, and these other firms compete fiercely to attract dealers' business from one another. *See, e.g.*, *id.* ¶ 87 (describing CDK's gain in market share at Reynolds' expense).

## B. Hostile integration

Dealers often contract with various third-party vendors, which offer software applications that use data in the DMS, to perform assorted dealership functions. Comp. ¶¶ 52, 53. While many vendors seek only the ability to obtain or "extract" data, others also prefer the ability to "push" or "write-back" altered data into the DMS to populate the DMS's various proprietary workflows, as when a vendor amends individual customer records. *Id.* ¶ 54.

Some vendors wishing to access the DMS contract with independent data "integrators," who—acting as middlemen—access the DMS to provide data to vendors through the integrator's own software interface. Compl. ¶ 56. Dealers have facilitated data integrator access to the DMS by either sharing existing login credentials or creating new ones for the integrators. As to CDK's DMS, this process has necessarily required dealers to violate the terms of their DMS contracts with CDK, because those contracts forbid dealers from giving unauthorized third parties access to the DMS. *Id.* ¶ 123. For this reason, unauthorized access by third-party integrators is known as "hostile" access.[2]

---

[2] AutoLoop alleges that CDK's dealer contracts allow hostile integrators to access its DMS because they allow access by dealers' "agents." Compl. ¶ 123. But AutoLoop has not alleged *any* facts to establish that hostile integrators, by virtue of receiving login credentials, become dealers' "agents." This inadequately-pled allegation is not entitled to any presumption of truth for purposes of this motion.

## C. CDK's SecurityFirst initiative and 3PA program

Cybersecurity and system performance are essential to the proper functioning of any large enterprise system provider. In part to ensure that CDK is able to maintain the security and stability of its systems, its contracts with dealers have long expressly prohibited dealers from granting any unauthorized third party access to the DMS. *See* Ex. 1, § 6(B).[3] Beginning in 2015, CDK recommitted itself to improving DMS security by enhancing its Third-Party Access (3PA) program, which relies on a managed data interface for transporting data to and from CDK's DMS. Compl. ¶ 72. This change was made as part of CDK's SecurityFirst initiative. Under the refreshed 3PA program, vendors could no longer obtain data from hostile third parties; instead, they were required to obtain data through the CDK-maintained interface. *Id.*

## D. Reynolds provides an orderly wind-down of CDK subsidiaries' hostile access

As AutoLoop concedes (Compl. ¶ 86), Reynolds has blocked unauthorized third-party access to its DMS for years. By 2013, Reynolds's blocking activities had increased to the point where hostile integrators were being substantially disrupted. *See Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019, 1023 (7th Cir. 2017). At the time, ADP (from which CDK spun off in 2014) owned two subsidiaries—Digital Motorworks ("DMI") and IntegraLink—that operated as, among other things, data integrators. Compl. ¶ 73. Both DMI and IntegraLink engaged in unauthorized access of Reynolds's systems. *Id.* ¶ 76. Reynolds—as it had with other similarly-situated integrators— demanded that DMI and IntegraLink cease this activity, and both eventually did so. *Id.* To ensure that vendors using DMI and IntegraLink to service Reynolds dealers were not adversely affected, Reynolds and CDK negotiated an agreement for a voluntary wind-down of DMI and IntegraLink's hostile access to Reynolds's system. *Id.* ¶ 96. The agreement, entered into in February 2015, was the

---

[3]  A sample CDK dealer contract is attached as Exhibit 1. The court may consider the contract because AutoLoop cites and relies on it in its complaint. *See, e.g.*, *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012); *see also, e.g.*, Compl. ¶ 123.

"Data Exchange Agreement" ("DEA").[4]

AutoLoop describes the DEA as a market division agreement, but its plain text belies that conclusion. The DEA says nothing about Reynolds's access to CDK's DMS (indeed, AutoLoop does not allege that Reynolds has *ever* hostilely integrated on CDK's DMS or any other), nor does it address CDK's access policies with respect to its own DMS. *See* Ex. 2 (Data Exchange Agreement). Indeed, the only restriction on the parties with respect to third-party integration appears in § 4.5, which simply prohibits CDK and Reynolds from sharing information they learned about integration with the other party's DMS during the course of the agreement or helping another party integrate with the other's DMS. The contract does *not* obligate CDK or Reynolds to block hostile integrators or "close" their respective DMSs.

Concurrent with the DEA, the parties signed two additional contracts. First, as consideration for the orderly wind-down of DMI's and IntegraLink's unauthorized access, CDK granted certain of Reynolds's third-party applications certification under the 3PA program without charge (up to a set dollar amount), for five years. *See* Ex. 3 (3PA Agreement). This provision increased competition in the market for vendor applications by allowing a competing DMS provider's applications into CDK's supported integration program (thereby giving CDK dealers access to those applications). Second, consistent with its decision to end its subsidiaries' hostile integration to Reynolds's DMS, CDK enrolled seven of its vendor applications in the RCI program at Reynolds's standard pricing and consistent with Reynolds's standard RCI policies (thereby giving Reynolds dealers access to those applications). *See* Ex. 4 (RCI Agreement).

## ARGUMENT

In determining whether a complaint fails to state a claim under Rule 12(b)(6), a court must assess whether the complaint "include[s] 'enough facts to state a claim to relief that is plausible on

---

[4]    The agreements are attached as Exhibits 2-4.

its face.'" *Khorrami v. Rolince*, 539 F.3d 782, 788 (7th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). AutoLoop's complaint fails that test.

## I. AUTOLOOP FAILS TO STATE A CLAIM UNDER SECTION 1

### A. AutoLoop's horizontal conspiracy claims are inadequate as a matter of law

AutoLoop centers its horizontal conspiracy claim on the allegation that CDK and Reynolds entered into written "agreements designed to eliminate competition in the provision of dealer data integration services." Compl. ¶ 95. But that is simply not the case. The agreements effect only a wind-down of CDK's hostile access to Reynolds's DMS; they do not divide any market, restrain any competition, or say anything about CDK's or Reynolds's third-party access policies.

Nor can AutoLoop state a Section 1 claim based on CDK's and Reynolds's independent decisions—made many years apart—to bar third-party access. Section 1 does not prohibit mere parallel or follow-the-leader conduct. *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015) ("[C]onscious parallelism[] does not violate section 1 of the Sherman Act."). It is commonplace for firms to copy each other, and substantive antitrust law therefore forbids inferring collusion from allegations that firms in the same industry employ similar business strategies. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

AutoLoop's conspiracy claim accordingly fails as a matter of law, because AutoLoop has not come close to alleging facts suggesting anything other than permissible, parallel conduct. The complaint concedes, explicitly or by omission, that (1) Reynolds's decision preceded CDK's by several years; (2) Reynolds did not need CDK's assistance or agreement to close its DMS to hostile integration or to keep it closed; (3) CDK likewise did not need Reynolds's assistance or agreement to close the CDK DMS to hostile integration; (4) Reynolds accomplished the legitimate business objective of increasing its revenue from vendors by closing its system; (5) CDK also sought to increase its vendor revenue by closing its system; and (6) the contractual provisions in CDK's dealer

agreements prohibiting dealers from sharing login credentials with hostile integrators were not the product of any conspiracy with Reynolds. In short, the non-conclusory allegations of AutoLoop's complaint show, at most, one firm's decision to copy a competitor's long-standing practice in an industry where that practice was in the independent interests of both firms.

### 1. Allegations of a market-division agreement are inadequate

The alleged "2015 agreement" between Reynolds and CDK comprises three separate contracts: (1) a DEA between Reynolds and CDK related to winding down DMI's and IntegraLink's unauthorized access to the Reynolds system; (2) a 3PA Agreement providing a limited subset of Reynolds's third-party applications with hosted integration to the CDK DMS; and (3) an RCI agreement governing integration between Reynolds's DMS and a small number of CDK applications. There is no agreement by either party with respect to DMS system access policies or anything else about their policies regarding interactions with data integrators. *See* Exs. 2-4.

AutoLoop alleges that the agreement "eliminate[d] competition in the provision of dealer data integration services" (Compl. ¶ 95), in that CDK and Reynolds "agreed that they themselves would no longer access data on each other's DMS" (*id.* ¶ 97). But the language of the agreements, and the facts that AutoLoop alleges, are to the contrary. Reynolds has aggressively enforced its service contracts to prevent unauthorized access to its DMS for many years (*see id.* ¶ 86); it needed no agreement with CDK to continue doing so. The same goes for CDK, which independently intro-duced SecurityFirst and began enforcing its own bans on unauthorized third-party access in 2015. *Id.* ¶ 72. Neither company agreed or needed to agree with the other to enforce its policies.

Nor does the 2015 agreement amount to a market-division scheme as a logical matter. To the extent that CDK was agreeing that DMI and IntegraLink would stop hostilely accessing Reynolds's DMS (and it was not), this would have *helped* other hostile integrators by eliminating two of their competitors. For its part, Reynolds has never provided hostile integration on CDK's (or any other

6

PUBLIC VERSION

DMS provider's) system, so any agreement on its part plainly does not fit with this market division theory in any event.

### 2. *CDK did not agree to a "group boycott"*

AutoLoop also alleges that CDK and Reynolds engaged in a "group boycott" in violation of Section 1 of the Sherman Act. CDK and Reynolds allegedly sought to "block all third-party access to their respective DMS." Compl. ¶ 165. But this theory likewise fails. A group boycott occurs when "firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986). But hostile integrators are neither suppliers nor customers of CDK and Reynolds; they deal instead with dealers and vendors. And with extraordinarily rare exceptions not relevant here, refusals to deal are not antitrust violations in any case. "Even monopolists are almost never required to assist their competitors, and [in any event] neither Reynolds nor CDK is a monopolist." *Authenticom*, 874 F.3d at 1025 (citation omitted).

In addition, AutoLoop's "group boycott" theory falters for the same reasons its "market division" theory fails. To prove that CDK and Reynolds entered into an unlawful horizontal conspiracy, AutoLoop must show both that they engaged in parallel conduct and that other facts "tend[] to exclude the possibility" that they acted out of lawful motives. *Matsushita*, 475 U.S. at 597 (internal quotation marks omitted). But there is no "parallel" conduct here. It is undisputed that Reynolds unilaterally forbade access to its DMS by hostile integrators *years* before CDK's SecurityFirst initiative. "[S]uch slow adoption of similar policies does not raise the specter of collusion." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015). Nor has AutoLoop plausibly alleged facts tending to exclude the possibility that CDK and Reynolds acted independently. Once again, there was nothing to gain from any supposed collusion, because both could shut down unauthorized third-party access to their systems unilaterally.

In an attempt to bolster its conspiracy theory, AutoLoop relies on allegations from *Authenticom* that representatives of CDK and Reynolds openly confessed to a conspiracy. But those allegations are inconsistent with documents incorporated in the complaint. For example, AutoLoop alleges that Robert Schaefer from Reynolds told Authenticom's Steve Cottrell in a May 2015 phone conversation that CDK and Reynolds had an agreement "to support each other's third-party access agreements *and* to block independent integrators such as Authenticom." Compl. ¶ 103. But as shown above, the 3PA and RCI agreements do not "block" Authenticom or any other hostile integrator from anything. Indeed, the agreements do not mention hostile integrators *at all*.

AutoLoop also alleges that, nearly a year after the alleged Schaefer-Cottrell conversation, Dan McCray, a CDK employee, told Cottrell that "CDK and Reynolds had agreed to '[l]ock [Authenticom] and the other third parties out.'" Compl. ¶ 104. But this alleged statement does not tend to exclude independent conduct, as it must to state a claim—CDK *had* made the decision to block unauthorized access, and it needed no agreement to do it. Again, the best evidence of CDK's and Reynolds's agreement is the actual written contracts that the companies signed.

### B. CDK's agreements with its dealers are not "tying" agreements

AutoLoop's next Section 1 theory—that CDK's agreements with dealers are "tying" agreements—likewise fails. The Seventh Circuit was "dubious in the extreme" that the relationship between DMS sales and data integration services "amounts to tying, rather than simply participation at two levels of the market." *Authenticom*, 874 F.3d at 1026. That skepticism is amply warranted. A tying arrangement occurs when a seller conditions its sale of one product on its sale of a second product *to the same buyer*: "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force *the buyer* into the purchase of a tied product that *the buyer* either did not want at all, or might have preferred to purchase elsewhere." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) (emphasis added); *accord* Phillip E.

Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1752b (June 2017) ("Areeda & Hovenkamp") ("There is no tie for any antitrust purpose unless the defendant improperly . . . require[s] buyers to take the second product if they want the first one."). And dealers do not buy hostile data extraction services; vendors do.

AutoLoop posits that, although vendors pay for data extraction, dealers should be considered the purchasers of data integration services because they "make the decision regarding which data integration product to 'purchase'" by authorizing a vendor to use a particular integrator. Compl. ¶ 183. But the role dealers might play in facilitating transactions between vendors and data integrators is beside the point. Tying requires the *same buyer* to purchase the two tied products, because the essence of a tying violation is a seller's use of economic leverage over a buyer to force *that buyer* to make additional purchases it prefers not to make. *See Jefferson Par. Hosp.*, 466 U.S. at 12. As AutoLoop admits that dealers do not buy data extraction services, its tying claim fails.

### C. CDK has not engaged in exclusive dealing

AutoLoop's final Section 1 theory is that CDK's agreements with dealers and vendors are "exclusive deals" that foreclose competition. This theory, too, is a conceptual mismatch for the facts that AutoLoop alleges. An exclusive dealing agreement is one where a buyer and seller agree to deal with each other exclusively with respect to a particular good or service, foreclosing a portion of the market to other sellers. *See* Areeda & Hovenkamp ¶ 1800a (explaining that exclusive-dealing agreement "forbids the buyer from purchasing the contracted good from any other seller" or "requires the buyer to take all of its needs in the contracted good from that [seller]").

CDK's contracts with its dealers do not fit this description. AutoLoop's argument is inapt with respect to CDK's service contracts with dealers because (once again) *dealers* are not the purchasers of data extraction or system integration services. Nor can CDK's agreements with vendors wishing to integrate with CDK's DMS be exclusive dealing agreements. As AutoLoop sees

it, the agreements require vendors exclusively to "use 3PA alone to integrate with data on [the] CDK DMS[]." Compl. ¶ 112. But 3PA is not a competing data integrator; it is a "managed interface" that is integral to CDK's DMS, allowing vendors to obtain data directly from CDK. *See id.* ¶ 70.

What is more, AutoLoop's allegation that CDK's contract terms with dealers forbidding unauthorized access are violations of the antitrust laws is deficient on its face, given that such licensing terms are commonplace throughout the economy and essential to countless companies' cybersecurity practices. If such practices are not anticompetitive with respect to dealers, AutoLoop cannot seriously argue that the same restrictions on access are anticompetitive in vendor contracts.

And in any event, it is fundamental that "even though a contract is found to be an exclusive-dealing arrangement, it does not violate the [antitrust laws] unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (Clayton Act case). There is no suggestion in the complaint that CDK's dealer or vendor contracts foreclosed AutoLoop from a substantial share of any market; AutoLoop has not been excluded from dealing with CDK or any dealer. To the extent AutoLoop complains that hostile integrators are "excluded" by the contracts, it is doubtful that AutoLoop has standing to make that argument—and even if it did, it would fail because hostile integrators are still able to deal with DMS providers covering a sizable portion of the market for car dealership DMS services.

### D.  CDK's conduct easily survives the Rule of Reason

Even if everything we had said so far were wrong, CDK's conduct would be a basis for antitrust liability only if it could not be explained by "valid business reasons." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985)). Here, as AutoLoop acknowledges, CDK's conduct rested on a clear and important business justification: the need to protect its system and the data on that

PUBLIC VERSION

system from cybersecurity threats. Compl. ¶ 152.

AutoLoop's complaint does not deny that cybersecurity is a concern for DMS providers (and for all modern business, for that matter). Nor does it allege that any company permits unfettered access to its systems on users' preferred terms. Rather, AutoLoop alleges that unauthorized third-party system access creates no cybersecurity risk and that CDK is using cybersecurity as a pretext. Compl. ¶ 152. But that allegation fails for several reasons.

As an initial matter, AutoLoop does not plausibly allege that hostile integration poses no cybersecurity risk to CDK's systems. To be sure, AutoLoop argues that CDK has not presented examples of data breaches involving hostile integrators. Compl. ¶ 156. But that is neither a guarantee that one will not occur nor an indicator that concern for such risk is invalid. CDK is not required to leave itself defenseless against cyber risks until *after* a breach is identified.

AutoLoop's other "pretext" arguments are likewise unpersuasive. It first alleges that CDK has engaged in hostile integration on *other* companies' DMSs through DMI and IntegraLink. Compl. ¶ 153. That is a red herring. CDK has strong and legitimate reasons for preventing unauthorized access to its proprietary systems. That other DMS providers allegedly do not actively block unauthorized access only means that they weigh the security risks and costs differently than CDK does. In any event, AutoLoop does not allege that DMI or IntegraLink has engaged in *hostile* integration since 2015, when CDK strengthened its own access and security policies.

AutoLoop also argues that hostile integrators in the DMS industry are comparable to "integrators" that extract data for banking or healthcare applications (Compl. ¶ 155), but it offers no support for that assertion—or for its claim that the data in banking and healthcare systems is "much more sensitive than anything accessible from dealers" (*id.*). Nor does AutoLoop provide any facts supporting its insinuation that banks condone the practice. Indeed, the Consumer Financial

11

Protection Bureau regulation that AutoLoop cites (*id.*) also notes that "consumer financial account providers have raised concerns about whether account aggregators or permissioned parties [*i.e.*, data "integrators"] employ adequate security and privacy procedures with respect to consumers' online account credentials and consumer account data obtained through aggregation."[5]

AutoLoop next alleges that it is permitted to use an independent integrator, SIS, as long as it pays the 3PA integration fees necessary for doing so, which purportedly "shows that profit—not security—is the sole motivation for the 3PA program." Compl. ¶ 157. But as the Managed Interface Agreement between CDK and AutoLoop indicates (Ex. 5, § 1(f)),[6] ███████████████████ █████████████████████████████████████████████████████ ████████████████████████████████████████████████ Nothing about this temporary accommodation suggests that CDK's long-term security concerns are invalid.

Lastly, AutoLoop alleges that in certifying AutoLoop's applications for 3PA, "CDK does not ask any questions actually related to AutoLoop's security practices." Compl. ¶ 158. But that allegation has no relation to CDK's stated security concerns, which involve how third parties access CDK's *own* system. If AutoLoop or other vendors access data through 3PA, there is no risk to CDK's systems, which obviates the need to ask questions about AutoLoop's own internal security.

In short, CDK "had the right to [design or] redesign its products to make them more attractive to buyers" through "improved performance," including improved cybersecurity. *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999 (9th Cir. 2010) (quoting *Cal. Comput. Prods., Inc. v. IBM*, 613 F.2d 727, 744 (9th Cir. 1979)). That principle

---

[5]   *Request for Information Regarding Consumer Access to Financial Records*, Bureau of Consumer Fin. Prot., Dkt. No. CFPB-2016-0048, at 12-13 (Nov. 14, 2016), perma.cc/F28M-5TZU. As a public document prepared by a government agency and quoted in the complaint, this document is subject to judicial notice on a motion to dismiss. *See, e.g.*, *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556 (7th Cir. 2012).

[6]   This document is incorporated by reference into AutoLoop's complaint. *See, e.g.*, Compl. ¶ 113-14.

requires dismissal of AutoLoop's Section 1 claims.

## II.     AUTOLOOP FAILS TO STATE A CLAIM UNDER SECTION 2

"The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Given the Seventh Circuit's recognition that "neither Reynolds nor CDK is a monopolist," *Authenticom*, 874 F.3d at 1025, AutoLoop's attempt to make out a Section 2 claim here based on the same facts is doomed to fail.

### A.     There are no brand-specific aftermarkets for data integration services

To prevail on a Section 2 theory, AutoLoop must demonstrate that CDK has monopoly power in a relevant market. AutoLoop alleges that CDK has monopolized a "brand-specific aftermarket" for data integration for dealers using the CDK DMS. Compl. ¶ 82. But this alleged market does not exist as a matter of law. CDK has included terms in its service contracts prohibiting dealers from permitting third-party access to the DMS by disseminating login credentials. *See* p.3, *supra*. Dealers therefore had the opportunity, when contracting for DMS service, to choose whether to use a DMS that permitted hostile data extraction, and to weigh the potential lifecycle costs of each approach. And as the Seventh Circuit has held, if a seller "informed customers about its policies before they bought," "purchasers could have shopped around" and thus cannot have been unfairly locked in. *Dig. Equip. Corp. v. Uniq Dig. Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996). The law is clear on this point: If a secondary product or service is "bundled" with a primary service or product "from the outset," it follows that purchasers are not unfairly locked in. *Id.*; *see also, e.g.*, *DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1346 (Fed. Cir. 2014); *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 819 (6th Cir. 1997).

AutoLoop alleges that prior to 2015, CDK failed to enforce its contractual bars on third-party DMS access—but that does not save its claim. Even if dealers believed there was a chance that CDK

might not enforce the express prohibition on hostile, third-party data extraction, they would have been aware of the provision and the possibility that it *could* be enforced. "A party is not justified in relying on representations outside of or contrary to the written terms of a contract he or she signs when the signer is aware of the nature of the contract and had a full opportunity to read it." *See Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003).

### B. CDK has no duty to ignore the plain terms of its service agreements

AutoLoop also fails to establish predatory conduct of any kind. AutoLoop asserts that it was "exclusionary" for CDK to refuse to allow hostile data integrators to access its secure, proprietary DMS platform for free. But the Seventh Circuit rejected this argument (*Authenticom*, 874 F.3d at 1026), and this Court should do the same. As explained, blocking hostile third-party data integrators is a necessary element of CDK's procompetitive SecurityFirst program. And the antitrust laws do not impose a duty to limit "product development so as to facilitate sales of [hostile integrators'] products." *Allied Orthopedic*, 592 F.3d at 999 (quoting *Cal. Comput. Prods., Inc.*, 613 F.2d at 744).

More fundamentally, "the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). That unassailable maxim of antitrust law is based on the simple premise that "[c]ooperation is a problem in antitrust, not one of its obligations." *Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006) (emphasis omitted).

To be sure, the right to refrain from aiding other businesses is not "unqualified." *Aspen Skiing*, 472 U.S. at 601. But courts have been "very cautious in recognizing" exceptions to this right "because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm." *Trinko*, 540 U.S. at 408. In general, where a refusal to

deal has any rational business justification, the courts will not find a violation of the antitrust laws. *See* Areeda & Hovenkamp ¶ 772c2 ("*Aspen* leaves monopolists free to refuse to deal or cooperate with rivals for legitimate business reasons."). That principle disposes of AutoLoop's Section 2 claim.

## III.    AUTOLOOP'S FLORIDA-LAW CLAIMS ALSO FAIL

The dismissal of AutoLoop's Sherman Act claims would be fatal to its parallel claim under the Florida Antitrust Act. "Federal and Florida antitrust laws are analyzed under the same rules and case law." *See, e.g.*, *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 n.11 (11th Cir. 1998). Thus, "the law under the Sherman Act is equally applicable to [Florida] state antitrust claims." *Id.* It follows that, just as AutoLoop's Sherman Act claims must be dismissed, its Florida Antitrust Act claim must be as well. *See, e.g.*, *Fin-S Tech, LLC v. Surf Hardware Int'l-USA, Inc.*, 2014 WL 12461350, at *2 (S.D. Fla. Aug. 27, 2014).

AutoLoop also alleges that CDK violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), which prohibits "[u]nfair methods of competition" and "unfair or deceptive acts or practices." Fla. Stat. Ann. § 501.204. This claim is specifically addressed to AutoLoop's allegations that CDK "plac[es] anticompetitive restrictions on competing services and products that it does not place on its own corresponding products" (Compl. ¶ 200). But when "a plaintiff's FDUTPA claim is based on the same allegations as its antitrust claim, failure to establish a violation of antitrust law is sufficient to conclude that the plaintiff has also failed to state a FDUTPA claim." *QSGI, Inc. v. IBM Glob. Fin.*, 2012 WL 1150402, at *4 (S.D. Fla. Mar. 14, 2012). And as we have shown, the conduct that AutoLoop alleges is not a violation of the antitrust laws. CDK is not required to grant AutoLoop access to every DMS function or data element on whatever terms AutoLoop prefers.

## CONCLUSION

The complaint should be dismissed in its entirety.

Dated: May 9, 2018                         Respectfully submitted,

                                           /s/ *Britt M. Miller*
                                           Britt M. Miller
                                           Matthew D. Provance
                                           MAYER BROWN LLP
                                           71 South Wacker Drive
                                           Chicago, IL 60606
                                           (312) 782-0600
                                           bmiller@mayerbrown.com
                                           mprovance@mayerbrown.com

                                           Mark W. Ryan
                                           MAYER BROWN LLP
                                           1999 K Street NW
                                           Washington, DC 20006
                                           (202) 263-3000
                                           mryan@mayerbrown.com

                                           *Counsel for Defendant*
                                           *CDK Global, LLC*

PUBLIC VERSION

## <u>CERTIFICATE OF SERVICE</u>

I, Britt M. Miller, an attorney, hereby certify that on May 9, 2018, I caused a true and correct copy of the foregoing **DEFENDANT CDK GLOBAL, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**, to be filed **UNDER SEAL** and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

<div style="margin-left: 40%;">

*/s/ Britt M. Miller*_____

Britt M. Miller

MAYER BROWN LLP

71 South Wacker Drive

Chicago, IL 60606

Phone: (312) 782-0600

Fax: (312) 701-7711

E-mail: bmiller@mayerbrown.com

</div>