# EXHIBIT 2

Case: 3:17-cv-00318-jdp Document #: 106-1 Filed: 06/16/17 Page 2 of 14
Case: 1:18-cv-00864 Document #: 172-2 Filed: 05/09/18 Page 2 of 14 PageID #:3894
Case: 17-2540   Document: 48   Filed: 08/22/2017   Pages: 100   (21 of 100)

Execution Copy

# DATA EXCHANGE AGREEMENT

This Data Exchange Agreement (the "**Agreement**") is entered into as of the latest signature date of the parties below (the "**Effective Date**"), by and between CDK Global, LLC, and its affiliates (collectively, "**CDK**") and The Reynolds and Reynolds Company, Dealer Computer Services, Inc., Universal Computer Systems Holding, Inc. and their respective affiliates (collectively, "**Reynolds**").

WHEREAS, CDK provides retail automobile and truck dealers ("**Dealer(s)**") with a variety of Elite®, webSuite® and DRIVE® dealer management computer systems (collectively, "**CDK DMS**").

WHEREAS, CDK also provides DMI Third Party Clients with a data service that involves the polling of data from Reynolds DMS by CDK's Integralink and DMI affiliates (collectively "**DMI**") for use by such automotive manufacturers or other third parties.

WHEREAS, CDK also provides Dealers with application programs and services for use with dealer management computer systems (collectively the "**CDK Applications**").

WHEREAS, Reynolds provides Dealers with a variety of ERA® and POWER dealer management computer systems (collectively, "**Reynolds DMS**").

WHEREAS, Reynolds also provides Dealers with application programs and services for use with dealer management computer systems (collectively the "**Reynolds Applications**").

WHEREAS, CDK has developed a Managed Interface Program ("**CDK 3PA Program**") that provides application providers with the ability to receive information from a CDK DMS and to send information to a CDK DMS.

WHEREAS, Reynolds has developed a Reynolds Certified Interface Program ("**Reynolds RCI Program**") that provides application providers with the ability to receive information from a Reynolds DMS and to send information to a Reynolds DMS.

WHEREAS, CDK wishes to access data on, and/or provide data to, Reynolds DMS for use with certain CDK Applications.

WHEREAS, Reynolds wishes to access data on, and/or provide data to, CDK DMS for use with certain Reynolds Applications.

WHEREAS, Reynolds has agreed to provide CDK an orderly Wind Down Period (the "**Wind Down Period**") during which Reynolds will not attempt to prevent DMI from polling data from Reynolds DMS.

WHEREAS, CDK and Reynolds desire to set forth the process by which the Wind Down Period will take place.

Highly Confidential - Filed Under Seal

CDK-0000001

Case: 3:17-cv-00318-jdp Document #: 106-1 Filed: 06/16/17 Page 3 of 14
Case: 1:18-cv-00864 Document #: 172-2 Filed: 05/09/18 Page 3 of 14 PageID #:3895
Execution Copy
Case: 17-2540   Document: 48   Filed: 08/22/2017   Pages: 100   (22 of 100)

NOW, THEREFORE, in consideration of the promises, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Reynolds and CDK agree as follows:

## 1.0 DEFINITIONS

**1.1 CDK Dealer** – A single franchised motor vehicle dealership location (including a location with multiple motor vehicle franchises) using a CDK DMS.

**1.2 DMI Third Party Client(s)** – an entity that provides products or services to automotive retailers, automotive original equipment manufacturers or other stakeholders within the motor vehicle retailing environment on whose behalf DMI electronically collects and transmits data from a Reynolds DMS, among other DMS.

**1.3 Reynolds Dealer** – A single automobile and/or truck dealership store and application area (or branch) combination (and its associated employees) using a Reynolds DMS.

**1.4 Wind Down Period** – For each DMI Third Party Client, the period beginning on the Effective Date of this Agreement and concluding on the later of:

(i) the end of the current term of such DMI Third Party Client's agreement with DMI ("Third Party Client Agreement") up to a maximum of one year; provided, however, that (a) the maximum time period under this subsection 1.4(i) for Third Party Client Agreements whose renewal term will begin after the Effective Date but whose deadline to give notice not to renew passed before the Effective Date shall be extended to the end of such renewal term so long as the renewal term is no more than one year, (b) the maximum time period under this subsection 1.4(i) for the Third Party Client Agreements listed on Exhibit DEA-1 hereto shall be as set forth on Exhibit DEA-1 hereto and (c) for each Third Party Client Agreement that has a deadline to give notice not to renew that passes during the ten (10) business day period immediately after the Effective Date, and that is renewed by DMI during such ten business day period for a term of no more than one year, the maximum time period under this subsection 1.4(i) shall be extended to the end of such renewal term (but, provided further, that such extensions of the Wind Down Period shall not apply to more than five (5) such agreements so renewed after the Effective Date, and it being stipulated that Reynolds shall have no obligations under Section 4.3 herein or otherwise to facilitate or protect interim access for any such Third Party Client Agreement renewals that exceed the five-agreement limit set forth this sentence); and

(ii) May 13, 2015.

Notwithstanding anything to the contrary herein, Reynolds may, at its discretion, extend the Wind Down Period for any DMI Third Party Client by providing DMI with notice of the length of the extension no later than 30 days prior to the date it would otherwise end (it being agreed that Reynolds may so extend a Wind Down Period multiple times),

Highly Confidential - Filed Under Seal
CDK-0000002

Case: 3:17-cv-00318-jdp Document #: 106-1 Filed: 06/16/17 Page 4 of 14
Case: 1:18-cv-00864 Document #: 172-2 Filed: 05/09/18 Page 4 of 14 PageID #:3896
Case: 17-2540    Document: 48    Filed: 08/22/2017    Pages: 100    (23 of 100)
Execution Copy

except that in no event shall the Wind Down Period for any DMI Third Party Client exceed five (5) years from the Effective Date. For purposes of this provision, notice by email to Mr. Howard Gardner and/or any other person duly designated by CDK, shall be sufficient. When 'Wind Down Period' is used in the context of the termination of this Agreement it shall mean when the Wind Down Periods of all DMI Third Party Clients have concluded.

1.5 **Operational Data** – Data that is stored in the CDK DMS or Reynolds DMS as part of a Dealer's business process and is accessible by a CDK Dealer or Reynolds Dealer, respectively. Operational Data does not include any data that is stored on the CDK DMS or Reynolds DMS as a bulk data set or table, that is directly accessed by a CDK DMS or Reynolds DMS for the purpose of validating, calculating and/or cleansing data for a given business process (i.e. OEM purchased data, factory masters, tax tables, labor operation code tables, etc).

2.0 **CDK 3PA PROGRAM**

This Agreement is entered concurrently with the certain Managed Interface Agreement dated the date hereof between Reynolds and CDK (the "**3PA Agreement**").

3.0 **REYNOLDS RCI PROGRAM**

This Agreement is entered concurrently with the certain Reynolds Interface Agreement dated the date hereof between Reynolds and CDK (the "**RCI Agreement**").

4.0 **WIND DOWN OF NON-RCI ACCESS TO REYNOLDS SYSTEMS**

4.1 **CDK Cooperation; Agreements with DMI Third Party Clients.** CDK agrees to reasonably cooperate with Reynolds' efforts, if any, to have DMI Third Party Clients execute agreements to become part of the Reynolds RCI Program during the Wind Down Period. During the Wind Down Period, Reynolds and CDK shall discuss in good faith the technical and operational aspects of the Wind Down Period as they relate to the ongoing servicing by DMI of DMI Third Party Clients and their transition to the Reynolds RCI Program after the Wind Down Period.

4.2 **Third-Party Communications.** CDK will communicate to the DMI Third Party Clients: (a) that CDK intends to wind down its Reynolds DMS related integration and does not intend to extend service for such integration beyond the current primary term of its agreement with such DMI Third Party Client, (b) expressing words to the effect that CDK looks forward to doing its part to ease each CDK Third Party Client's transition away from CDK's integration with respect to dealers using the Reynolds DMS during its current contract term with CDK so that the CDK Third Party Clients will not experience a gap in service; and (c) providing them Reynolds contact information for purposes of any inquiries regarding the Reynolds Certified Interface ("RCI") program. Prior to the dissemination of any written press releases or market communications by either Party regarding this Agreement (including, without limitation, communications directed to

Highly Confidential - Filed Under Seal
CDK-0000003

Case: 3:17-cv-00318-jdp Document #: 106-1 Filed: 06/16/17 Page 5 of 14
Case: 1:18-cv-00864 Document #: 172-2 Filed: 05/09/18 Page 5 of 14 PageID #:3897
Case: 17-2540 Document: 48 Filed: 08/22/2017 Pages: 100 (24 of 100)
Execution Copy

DMI Third Party Clients or OEMs), the template for such press releases or market communications shall be tendered to the other Party for its review and approval (such approval not to be unreasonably withheld) with respect to all references to the Agreement, the Wind Down Period, or the respective reasons for each.

4.3 **Interim Reynolds DMS Access Assistance; No Disturbance.** During the Wind Down Period, the parties intend that, consistent with the terms of this Agreement, CDK will continue providing its integration services through DMI in accordance with its contracts without interruption from Reynolds security enhancements. During the Wind Down Period Reynolds (i) shall protect and facilitate current Reynolds DMS access by CDK and DMI for all DMI Third Party Clients and CDK Applications, including, without limitation, providing CDK and DMI with the appropriate Reynolds-defined access to the Reynolds DMS necessary for DMI to perform its services (i.e., the "**Interim Solution**") and (ii) shall not take any measures to block or otherwise disrupt DMI's normal Reynolds DMS access during such Wind Down Period. CDK understands and agrees that, in order for Reynolds to be able to provide such Interim Solution pursuant to this Section 4.3, CDK shall provide Reynolds with: (i) within 5 business days of the Effective Date, a list of Reynolds Dealers System Numbers and the DMS User Logins being used by CDK for each Dealer for whom such Interim Solution is needed; and (ii) provided CDK has secured any permission necessary to provide such information, within 60 days of the Effective Date, the information described in Exhibit DEA-2 hereto. In the event that CDK is unable to timely provide at least items #1, #2, #4(b), #4(f), and #4(i) from Exhibit DEA-2 (bolded for reference in that exhibit) for any given DMI Third Party Client(s), Reynolds shall have no further obligation to provide the Interim Solution for such DMI Third Party Client(s) and may continue to provide such Interim Solution only in Reynolds' sole discretion. CDK understands that reasonable efforts may be required on the part of CDK, the DMI Third Party Clients, and/or the applicable Reynolds Dealers in order to facilitate such Interim Solution.

4.4 **CDK Wind Down Cooperation.** CDK agrees to provide ongoing service to DMI Third Party Clients during the Wind Down Period, for so long as Reynolds complies with Section 4.3 above and the DMI Third Party Client is not in breach of the relevant Third Party Client Agreement. If CDK elects to end ongoing service to any DMI Third Party Client during the Wind Down Period pursuant to this Agreement, CDK will provide notice to Reynolds within three (3) business days of such election. During the Wind Down Period for each DMI Third Party Client, CDK agrees to reasonably assist and cooperate with Reynolds, with respect to: (1) communication with DMI Third Party Clients, their Reynolds Dealer customers and the automotive industry in general during the Wind Down Period; (2) Reynolds' development and testing of interfaces for DMI Third Party Clients who choose to join the Reynolds RCI Program; and (3) the transition of such customers to the Reynolds RCI program with respect to Reynolds Dealers.

4.5 **Prohibition on Knowledge Transfer and DMS Access.** Each of Reynolds and CDK further covenants and agrees not to sell, transfer, or assign to any affiliate or third party any technology, business process, or other such knowledge regarding integration with the other party's DMS or take any other steps to assist any person that it reasonably believes

Highly Confidential - Filed Under Seal
CDK-0000004

Case: 3:17-cv-00318-jdp Document #: 106-1 Filed: 06/16/17 Page 6 of 14
Case: 1:18-cv-00864 Document #: 172-2 Filed: 05/09/18 Page 6 of 14 PageID #:3898
Case: 17-2540 Document: 48 Filed: 08/22/2017 Pages: 100 (25 of 100)
Execution Copy

to have plans to access or integrate with the other party's DMS without other party's written consent. For the avoidance of doubt, this Section 4.5 is not intended as a "covenant not to compete," but rather as a contractual restriction of access and attempted access intended to protect the operational and data security integrity of the Reynolds DMS and the CDK DMS and protection of intellectual property.

4.6 **Limitations on Use.** During the Wind Down Period for a DMI Third Party Client, CDK will collect, transmit, and/or store Operational Data from the Reynolds DMS for such DMI Third Party Client only if (i) CDK obtains or has obtained written consent from the Reynolds Dealer(s) either directly from the Reynolds Dealer or indirectly through a DMI Third Party Client; (ii) the collection, transmission and/or storage relates to a CDK or DMI product or service; and (iii) CDK's access to the Reynolds DMS does not materially degrade or otherwise materially adversely affect the operation of the applicable Reynolds DMS or place Reynolds and/or a Reynolds Dealer at a material operational or security risk—provided, however, (a) that any such material adverse effect or risk covered by this Section 4.6 must be demonstrated to CDK by Reynolds with clear and direct evidence; and (b) CDK shall be given a reasonable opportunity to cure any such material adverse effect or risk.

## 5.0 PRIVACY COMPLIANCE

5.1 With respect to any data access permitted by this Agreement, CDK and Reynolds agree that they will comply with all relevant privacy and security related law, including the Gramm-Leach-Bliley Act and its implementing regulations (the "**GLBA**"), and to the extent applicable, the privacy laws of any state, Canada's Personal Information Protection and Electronic Documents Act ("**PIPEDA**"), and any other relevant privacy laws in Canada or of any province of Canada or other relevant jurisdiction.

5.2 To the extent CDK or Reynolds obtains access to any Operational Data from or about an individual retail customer that contains "non-public personal information," as such term is defined in Title V of the GLBA ("**Customer NPI**") pursuant to this Agreement, CDK and Reynolds agree to comply with all aspects of the GLBA and any other privacy laws applicable to them with respect to such Customer NPI.

5.3 The provisions of this Section 5 shall survive the term and/or termination of this Agreement and/or any part thereof.

## 6.0 TERM AND TERMINATION

6.1 **Term.** With the exception of the obligations set forth in Sections 4.5 [Prohibition on Knowledge Transfer and DMS Access], 5.0 [Privacy Compliance], 7.0 [Confidentiality], the terms of which are set forth more specifically therein, this Agreement shall terminate at the end of the Wind Down Period.

6.2 **Termination for Breach.** If either Party commits a material breach of this Agreement then the non-breaching party may terminate this Agreement by thirty (30) days written

Highly Confidential - Filed Under Seal
CDK-0000005

Case: 3:17-cv-00318-jdp Document #: 106-1 Filed: 06/16/17 Page 7 of 14
Case: 1:18-cv-00864 Document #: 172-2 Filed: 05/09/18 Page 7 of 14 PageID #:3899
Case: 17-2540 Document: 48 Filed: 08/22/2017 Pages: 100 (26 of 100)
Execution Copy

notice unless the breaching party cures such breach or begins a good faith effort to cure the breach within thirty (30) days after notice is delivered to the breaching party.

## 7.0 CONFIDENTIALITY

7.1 "**Confidential Information**" shall include each Party's trade secrets and other confidential research, development, and commercial information that is disclosed to the other Party pursuant to or relating to this Agreement. For the avoidance of doubt, Confidential Information includes but is not limited to this Agreement, its Exhibits, and all of their terms and any information relating to the CDK DMS (and any associated products, service or applications), Reynolds DMS (and any associated products, service or applications), CDK Applications, Reynolds Applications, interfaces associated with the CDK 3PA Program, and interfaces associated with the Reynolds RCI Program. Confidential Information excludes information that: (1) was publicly available at the time it was disclosed to the other party ("**Receiving Party**"), or which, through no act or omission of the Receiving Party, becomes publicly available before the Receiving Party discloses it to a third party; (2) the Receiving Party already rightfully possessed free of any obligation of confidentiality before the Party disclosing it ("**Disclosing Party**") disclosed it to the Receiving Party; (3) the Receiving Party rightfully receives without obligation of confidentiality from a third party who is entitled to disclose such information without breaching an obligation of confidentiality; (4) the Receiving Party develops independently without using any of the Disclosing Party's Confidential Information; or (5) is identified in writing by the Disclosing Party as not Confidential Information.

7.2 Each Party shall only use the other Party's Confidential Information in connection with the performance of its duties hereunder. Neither Party will disclose any Confidential Information of the other Party to anyone, for any purpose, except: (a) employees and consultants that have executed agreements obligating them to comply with the provisions of this Confidentiality provision; (b) pursuant to a valid subpoena or an Order by a Court of competent jurisdiction or as otherwise required by law, provided that unless otherwise prohibited by law, the Party intending to disclose such information under this exception provides written notice to the other Party and provides the other Party an opportunity to seek a protective order or other appropriate protection at its election; (c) pursuant to written consent of the Disclosing Party; or (d) as required by law in instances in which a Party brings proceedings as permitted by this Agreement to enforce rights under this Agreement. The parties acknowledge and agree that the disclosure of any Confidential Information to the other Party does not confer upon a Party any license, interest or rights of any kind in or to the Confidential Information, except as provided in this Agreement. Except as permitted by this Agreement, neither Party will disclose, disseminate, use or otherwise make available the Confidential Information of the other. Each Party will use reasonable efforts, but in no event less than the security precautions such Party undertakes to protect its own proprietary and confidential information of like nature, to prevent any Confidential Information of the other Party from being disclosed to third parties.

Highly Confidential - Filed Under Seal
CDK-0000006

Case: 3:17-cv-00318-jdp Document #: 106-1 Filed: 06/16/17 Page 8 of 14
Case: 1:18-cv-00864 Document #: 172-2 Filed: 05/09/18 Page 8 of 14 PageID #:3900
Case: 17-2540    Document: 48    Filed: 08/22/2017    Pages: 100    (27 of 100)
Execution Copy

7.3 The terms of this Agreement, the 3PA Agreement and the RCI Agreement shall be considered Confidential Information and neither party may disclose to any third party the specific terms of such agreements, or the existence or general nature of such agreements, other than as permitted in this Agreement, the 3PA Agreement and the RCI Agreement, without the prior written consent of the other party hereto.

7.4 The Parties agree that written confidentiality agreements substantially similar to the terms contained herein will be obtained for any employees or contractors permitted access to Confidential Information. Prior to the time an employee or contractor of Receiving Party receives any Confidential Information of the Disclosing Party, the Receiving Party will instruct that employee or contractor about the obligations of the Receiving Party hereunder and instruct that employee or contractor not to disclose or use any Confidential Information, except as specifically provided herein.

7.5 At the Disclosing Party's request or upon completion of the Receiving Party's use of Confidential Information, the Receiving Party will make reasonable efforts to return all copies of Confidential Information to the Disclosing Party or destroy the Confidential Information and certify such destruction to the Disclosing Party. The Receiving Party may retain a copy of Confidential Information, for archival purposes or to the extent required by law, subject to the Receiving Party's continuing obligations under this Section 7.

7.6 The provisions of this Section 7 pertaining to Confidential Information shall survive termination or expiration of this Agreement.

## 8.0 INDEMNIFICATION AND DAMAGES

8.1 Each party ("Indemnitor") shall defend, indemnify and hold harmless the other party, its affiliates and their employees, successors and assigns ("Indemnitees") against all damages, losses, costs, expenses (including reasonable attorneys' fees, costs and expenses) and other liabilities arising out of any claims, demands, suits, or causes of action by third parties, arising out of or in connection with this Agreement to the extent that such damages, losses, costs, expenses and other liabilities result or are claimed to result in whole or in part from: (i) any breach of this Agreement by Indemnitor, its affiliates or their employees or agents; (ii) the violation by Indemnitor, its affiliates or their employees or agents of applicable law or regulation in connection with the data exchange activities described in this Agreement; (iii) any access by Indemnitor, or its affiliates or their employees or agents to Indemnitee's proprietary hardware and/or software facilitated pursuant to this Agreement for any purpose falling outside the scope of this Agreement; (iv) Indemnitor's or its affiliates' or their employees' or agent's failure to obtain the rights and consents necessary for Indemnitee to gain access to (and extract) Operational Data pursuant to this Agreement; and (v) any publication, breach of confidentiality, dissemination, conversion, misappropriation or other use of any Operational Data facilitated by this Agreement by Indemnitor, or its affiliates or their employees or agents in a manner (a) not authorized by the Dealer, or (b) in violation of relevant law.

Highly Confidential - Filed Under Seal                    CDK-0000007

Case: 3:17-cv-00318-jdp Document #: 106-1 Filed: 06/16/17 Page 9 of 14
Case: 1:18-cv-00864 Document #: 172-2 Filed: 05/09/18 Page 9 of 14 PageID #:3901
Case: 17-2540   Document: 48   Filed: 08/22/2017   Pages: 100   (28 of 100)

Execution Copy

8.2 Promptly upon learning of any claim pursuant to which indemnification may be sought hereunder, the Indemnitee shall notify Indemnitor of such claim and shall furnish to Indemnitor all information known and reasonably available to the Indemnitee related to such claim; provided, however, that any failure to provide such notice will not relieve Indemnitor of its indemnification obligations under this Agreement except to the extent, and only to the extent, that Indemnitor suffers a loss as a result of such failure. In order to receive the benefits of the indemnification provided this Agreement, the Indemnitee shall give Indemnitor the opportunity to take over, settle or defend such action, claim or suit through counsel of Indemnitor's choice and under Indemnitor's sole direction and expense, and shall fully cooperate with Indemnitor (at Indemnitor's expense) in the defense of any such claim. Indemnitor shall not settle any such claim without the prior written consent of the Indemnitee, which consent shall not be unreasonably withheld or delayed. To the extent that Indemnitor, on the one hand, and the Indemnitee, on the other hand, are required to bear losses with respect to a particular claim, the intent of the parties is that they shall bear such losses in proportion to their respective degrees of fault or responsibility for such claim.

8.3 EXCEPT FOR A CLAIM BASED SOLELY UPON BREACH OF THE CONFIDENTIALITY PROVISIONS OF SECTION 7, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ITS AFFILIATES, SUCCESSORS OR ASSIGNS FOR ANY INCIDENTAL, CONSEQUENTIAL DAMAGES INCURRED BY SUCH PERSONS (INCLUDING, WITHOUT LIMITATION, ANY LOST REVENUE OR LOST PROFITS) OR FOR SIMILAR DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES (IT BEING AGREED THAT THIRD PARTY CLAIMS FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES AGAINST THE OTHER PARTY WOULD CONSTITUTE DIRECT DAMAGES INCURRED BY THE OTHER PARTY). EXCEPT FOR WILLFUL MISCONDUCT BY A PARTY, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ITS AFFILIATES, SUCCESSORS OR ASSIGNS FOR ANY PUNITIVE OR EXEMPLARY DAMAGES.

9.0 **DISPUTE RESOLUTION**

9.1 **Confidential Binding Arbitration.** In the event of any dispute, claim, question or disagreement arising from or relating to this Agreement or an alleged breach thereof ("**Dispute**"), the Parties agree that all Disputes shall be submitted to confidential binding arbitration in accordance with the then applicable commercial rules of the American Arbitration Association ("AAA"). Notwithstanding anything to the contrary in this Agreement or the AAA Rules, the Parties agree that arbitration under this Section 9: (a) shall be governed by the Federal Arbitration Act exclusive of any state arbitration laws; (b) shall be before a single neutral arbitrator who is a licensed attorney with prior experience as an arbitrator; (c) shall be conducted in Nashville, TN; and (d) shall be conducted pursuant to a confidentiality agreement that provides at a minimum that the arbitration and all documents and pleadings exchanged in connection therewith shall be held confidential and used only for purposes of the arbitration, except that a Party may

Highly Confidential - Filed Under Seal
CDK-0000008

Case: 3:17-cv-00318-jdp Document #: 106-1 Filed: 06/16/17 Page 10 of 14
Case: 1:18-cv-00864 Document #: 172-2 Filed: 05/09/18 Page 10 of 14 PageID #:3902
Execution Copy
Case: 17-2540   Document: 48   Filed: 08/22/2017   Pages: 100   (29 of 100)

nevertheless: (i) seek to reduce the binding arbitration award to a judgment in court; (ii) seek enforcement of the award pursuant to the Federal Arbitration Act and this Agreement; and (iii) disclose information regarding the arbitration as required by law (e.g., to auditors or regulatory agencies).

9.2 **Arbitration Fees.** Aside from filing or other fees required to initiate the arbitration, all arbitration fees will be split evenly between the Parties unless and until an award is made by the arbitrator regarding arbitration fees. If a Party does not pay its respective share of arbitration fees, then all claims (including counterclaims) of the non-paying Party shall be dismissed by the arbitrator or AAA, and the non-paying Party shall not be permitted to bring any further claims in the arbitration for affirmative relief. The non-paying Party may still participate in the arbitration to defend claims brought against it.

9.3 **Temporary Injunctive Relief for IP Disputes.** Notwithstanding anything to the contrary contained in this Section 9 or elsewhere in this Agreement, however, if a dispute arises that relates to misappropriation of proprietary, confidential or trade secret information or other intellectual property; or a breach of the Confidentiality or Data Security provisions of this Agreement and/or its Exhibits ("IP Dispute"), a Party, at its election may seek Temporary Injunctive Relief from a court of competent jurisdiction related exclusively to the IP Dispute. "**Temporary Injunctive Relief**" means only a temporary restraining order and/or a temporary injunction. A claim for Temporary Injunctive Relief brought in court may not be combined with: (a) a request for any other type of relief whether legal or equitable; or (b) any Dispute other than an IP Dispute. All other Disputes, including whether a permanent injunction shall issue, are to be arbitrated concurrently with any court action relating to Temporary Injunctive Relief.

10.0 **RESPECT FOR EMPLOYEES.** Reynolds and CDK acknowledge and agree that the other Party's personnel have been acquired and trained by said Party at considerable expense. Throughout the term of this Agreement, neither Reynolds nor CDK shall knowingly directly solicit for employment or employ any employee of the other Party directly involved in the negotiation or performance of this Agreement until the expiration of one (1) year following such employee's termination of employment with the other party or (1) year following the termination of this Agreement, whichever is shorter.

11.0 **MISCELLANEOUS**

11.1 **Nature.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

11.2 **Entire Agreement.** This Agreement, together with its Exhibits, sets forth the entire agreement of the parties as to the subject matter hereof and supersedes all prior agreements and all other oral, written or other communications concerning its subject matter. There are no warranties, representations or agreements other than those set forth in this Agreement.

Highly Confidential - Filed Under Seal
CDK-0000009

Case: 3:17-cv-00318-jdp Document #: 106-1 Filed: 06/16/17 Page 11 of 14
Case: 1:18-cv-00864 Document #: 172-2 Filed: 05/09/18 Page 11 of 14 PageID #:3903
Execution Copy
Case: 17-2540 Document: 48 Filed: 08/22/2017 Pages: 100 (30 of 100)

11.3 **No Reliance.** Both Parties expressly disclaim that they are relying upon any statements, understandings, representations, expectations or agreements by the other Party except as may be specifically set forth in this Agreement. Moreover, both CDK and Reynolds are knowingly waiving any claim that this Agreement was induced by any misrepresentations or nondisclosure of any material facts. Each Party has had an opportunity to review this Agreement with counsel of its choosing, and no presumption or rules of interpretation based upon the identity of the party preparing or drafting this Agreement, or any part thereof, shall be applicable or invoked.

11.4 **Modification.** This Agreement may be modified only in a writing signed by both parties. Email and other electronic communications are considered "signed" by the sender for purposes of this Modification provision.

11.5 **No Waiver.** No failure or delay on the part of either party to this Agreement to fully enforce its rights hereunder shall be construed as a waiver by such party of any default hereunder or acquiescence therein, nor shall any failure to exercise such right preclude any future exercise of such right. All rights and remedies under this Agreement shall be cumulative and not exclusive of any other rights or remedies otherwise available.

11.6 **Counterparts.** This Agreement may be executed in one or more counterparts.

11.7 **Governing Law.** Unless specifically otherwise provided herein, this Agreement will be governed by the substantive laws of the State of Ohio, regardless of conflict of laws principles.

11.8 **Construction.** The section headings are for convenience only and will not be used in interpretation of this Agreement. The language of all parts of this Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against either of the parties.

11.9 **Severability.** If any of the provisions or portions of this Agreement are determined to be invalid or unenforceable, such provision shall be ineffective and severed from this Agreement to the extent of such invalidity, and the remainder of such provision and all other provisions hereof shall remain in full force and effect.

11.10 **Relationship of the Parties.** This Agreement will not be deemed or construed to create any partnership, joint venture, fiduciary, employment or agency relationship between the parties. Nothing in this Agreement will be construed to constitute or appoint either Party as the agent or representative of the other Party for any purpose whatsoever, or to grant to either party any right or authority to assume or create any obligation or responsibility, express or implied, for or on behalf of or in the name of the other, or to bind the other in any way or manner whatsoever. Moreover, the Parties expressly acknowledge and agree that no fiduciary relationship existed between them at the time of the negotiation and execution of this Agreement.

Highly Confidential - Filed Under Seal
CDK-0000010

Case: 3:17-cv-00318-jdp Document #: 106-1 Filed: 06/16/17 Page 12 of 14
Case: 1:18-cv-00864 Document #: 172-2 Filed: 05/09/18 Page 12 of 14 PageID #:3904
Case: 17-2540 Document: 48 Filed: 08/22/2017 Pages: 100 (31 of 100)

Execution Copy

11.11 Notices. All notices required by this Agreement shall be: (i) in writing, (ii) addressed to the parties as indicated below unless otherwise notified in writing of a change in the address to be noticed, and (iii) deemed to have been delivered either when personally delivered, sent by overnight courier, or three (3) business days after sent by postage prepaid, certified, return receipt requested mail. The addresses of the parties to be noticed are as follows:

To CDK:
CDK Global, LLC
1950 Hassell Road
Hoffman Estates, IL 60169

Title: VP, Business Development

Copy to: Legal Department

To Reynolds:
The Reynolds and Reynolds Company
One Reynolds Way
Kettering, OH 45430

Title: VP, Data Services

Copy to: Legal Department

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the last date written below.

The Reynolds and Reynolds Company
Dealer Computer Services, Inc.,
Universal Computer Systems Holding, Inc.

By: R.T. Brockman
Title: CHAIRMAN/CEO
Date: 2/18/15

CDK Global, LLC

By: _____
Title: _____
Date: 2/6/15

Case: 3:17-cv-00318-jdp Document #: 106-1 Filed: 06/16/17 Page 13 of 14
Case: 1:18-cv-00864 Document #: 172-2 Filed: 05/09/18 Page 13 of 14 PageID #:3905
Case: 17-2540 Document: 48 Filed: 08/22/2017 Pages: 100 (32 of 100)
Execution Copy

## EXHIBIT DEA-1
## MAXIMUM WIND DOWN PERIOD
## FOR FIVE "EXCEPTION" DMI THIRD PARTY CLIENTS

| DMI Third Party Client | Number of R&R Dealers (approximate) | Current Contract Term End Date and Agreed Wind Down End Date |
|---|---|---|
| A | 500 | June 27, 2016 |
| B | 500 | July 8, 2016 |
| C | 200 | August 10, 2016 |
| D | 300 | December 13, 2016 |
| E | 200 | January 9, 2017 |

Highly Confidential - Filed Under Seal
CDK-0000012

Case: 3:17-cv-00318-jdp Document #: 106-1 Filed: 06/16/17 Page 14 of 14
Case: 1:18-cv-00864 Document #: 172-2 Filed: 05/09/18 Page 14 of 14 PageID #:3906
Case: 17-2540 Document: 48 Filed: 08/22/2017 Pages: 100 (33 of 100)
Execution Copy

# EXHIBIT DEA-2
# DMI THIRD PARTY CLIENT AND DEALER INFORMATION
# FOR INTERIM SOLUTION

1. **Vendor or OEM Legal Name (and DBA Name if different)**

2. **Primary and Secondary Points of Contact**

3. Product Name(s) as would be reasonably recognized in the market by dealers

4. For each Vendor, the following information about the Reynolds Dealers being supported:

    a. Dealer Legal Name / Name of Dealer Group / Holding Company
    b. **Dealer DBA Name**
    c. Dealer Address (including city, state, and zip code)
    d. Dealer Phone Number
    e. Dealer Contact Name(s) and Title(s) at dealership
    f. **DMS System Number**
    g. DMS Store Number (i.e. Store03)
    h. DMS Branch Number (i.e. Sales02)
    i. **DMS User Login being used by CDK**
    j. DMS Report / Query Name(s) being run by CDK

5. Name(s) of any third party to whom any DMS data is being passed (if any data is being moved outside of DMI Third Party Clients)

6. Specify in detail the data access currently being provided by CDK to the DMI Third Party Client (i.e. interface(s), accessed ERA screen(s), processes, technology, third party utilities or tools, transmission protocols, terminal emulation software methodology, etc.)

7. Data Interfaces used and data elements for each data interface

8. Frequency of the data provided (i.e. once per night, every 90 minutes, etc.)

9. Any deadlines for data delivery to DMI Third Party Client (e.g. must be there by 3am, etc)

10. Format of the data (e.g. comma/pipe delimited, XML, etc.)

11. Additional details regarding the method of CDK's existing access (e.g. scripts, applications and usernames utilized, software on the dealership PC's, LAN, etc.) as may be reasonably necessary to support such access for the interim period

Highly Confidential - Filed Under Seal
CDK-0000013