# EXHIBIT 3

Case: 3:17-cv-00318-jdp Document #: 106-2 Filed: 06/16/17 Page 2 of 27
Case: 1:18-cv-00864 Document #: 172-3 Filed: 05/09/18 Page 2 of 16 PageID #:3908
Case: 17-2540   Document: 48   Filed: 08/22/2017   Pages: 100   (35 of 100)

Execution Copy

# 3PA AGREEMENT

This **3PA AGREEMENT** ("**3PA Agreement**") entered into as of the latest signature date of the parties below ("**3PA Effective Date**") between Digital Motorworks, Inc. ("**DMI**") and CDK Global, LLC (collectively, "**CDK**") and The Reynolds and Reynolds Company, Dealer Computer Services, Inc., and Universal Computer Systems Holding, Inc. (collectively, "**Vendor**").

## BACKGROUND

CDK provides retail automobile and truck dealers with a variety of Elite®, webSuite® and DRIVE® dealer management computer systems (collectively, "**CDK Systems**"; dealers using CDK Systems are referred to as "**CDK Clients**").

Vendor provides its application programs (as further described in Section 2 of Exhibit 3PA-B (including all subparts), the "**Application(s)**") to certain CDK Clients (such CDK Clients using the Application(s) shall be referred to herein as "**Vendor Clients**"). For the avoidance of doubt, this 3PA Agreement applies only to those Application(s) identified in the respective subparts of Section 2 of Exhibit 3PA-B (as may be amended pursuant to Section 1(i) of this 3PA Agreement).

CDK has developed both (A) a managed interface system (the "**Managed Interface System**") designed to provide (i) third party software application vendors (such as Vendor) with the ability to access, send and receive data to CDK Clients through CDK Systems and (ii) CDK Clients with the ability to access and receive data provided by such third party vendors and to send data to such third party vendors and (B) a service whereby CDK directly or indirectly collects (by accessing, polling, copying, extracting, downloading) information from automotive and/or motor vehicle dealerships chosen by DMI's customer and reformats, aggregates, compiles and/or enhances such information using DMI's proprietary InfoIQ technology for delivery to such customer (the "**InfoIQ Service**"). The Managed Interface System and the InfoIQ Service are each described in more detail in Exhibit 3PA-A hereto. The Managed Interface System includes the pre-defined integration points ("**Pre-Defined Integration Points**") developed by CDK and described in more detail in Section 1 of Exhibit 3PA-B hereto.

Each subpart of Section 2 Exhibit 3PA-B hereto shall indicate whether, with respect to each Application, the data is provided via the Managed Interface System or the InfoIQ Service, or both.

Vendor and CDK are also parties to that certain Data Exchange Agreement dated the date hereof (the "**Data Exchange Agreement**"). With respect to the matters covered by this 3PA Agreement, the terms of this 3PA Agreement are in addition to the terms of the Data Exchange Agreement. However, in the event of a conflict between this 3PA Agreement and the Data Exchange Agreement with respect to the matters covered by this 3PA Agreement, this 3PA Agreement and its exhibits shall control.

Highly Confidential - Filed Under Seal
CDK-0000014

Case: 3:17-cv-00318-jdp Document #: 106-2 Filed: 06/16/17 Page 3 of 27
Case: 1:18-cv-00864 Document #: 172-3 Filed: 05/09/18 Page 3 of 16 PageID #:3909
Case: 17-2540 Document: 48 Filed: 08/22/2017 Pages: 100 (36 of 100)

Execution Copy

## Terms and Conditions

NOW, THEREFORE, CDK and Vendor agree as follows:

1. **Provision of InfoIQ Service; Use of Managed Interface System and InfoIQ Service; Data Access; Other Obligations**

    (a) Vendor shall be solely responsible for the deployment of its integration to Vendor Clients to allow the Managed Interface System to operate properly with the Application(s) that use the Managed Interface System to receive Data. CDK agrees to use commercially reasonable efforts to provide Vendor with the InfoIQ Service for the Applications using the InfoIQ Service. Subject to the other terms of this 3PA Agreement, CDK hereby grants Vendor a license to, throughout the term of this 3PA Agreement, (i) use the Data (as hereinafter defined) solely in connection with providing the Applications to Vendor Clients and (ii) use and access the Managed Interface System, including the Pre-Defined Integration Points, solely to access, receive and use the Data in connection with, and only in connection with, providing the Application(s) that use the Managed Interface System for Vendor Clients. "**Data**" means only the data described in Section 3 of Exhibit 3PA-B hereto. Vendor agrees that the Data may include personally identifiable information and Vendor represents that it has all necessary consents and authority to have such Data transferred to Vendor and for Vendor to use such Data. Prior to its deployment of its integration to the Managed Interface System to Vendor Clients Vendor shall provide CDK with a list of its clients who have licensed the Application(s) as of such date. CDK agrees to use commercially reasonable efforts to assist Vendor in its deployment efforts of the Managed Interface System. Vendor's use of the Managed Interface System must adhere at all times to CDK's "messaging standards" as they exist from time to time. Vendor acknowledges, without limiting any other rights CDK may have, that CDK owns a copyright in the InfoIQ Service and the Managed Interface System, including without limitation the Pre-Defined Integration Points and all pre-existing software and specifications used by CDK to develop the Managed Interface System and the Pre-Defined Integration Points (the foregoing, including, without limitation, the Pre-Defined Integration Points and any such pre-existing software and specifications used by CDK to develop the InfoIQ Service and the Managed Interface System, together with any associated intellectual property rights therein shall be collectively referred to herein as the "**CDK Property**"). Nothing in this 3PA Agreement shall transfer any title in the CDK Property to Vendor and nothing in this 3PA Agreement shall give Vendor any rights in or to the CDK Property, except for the license granted above in this Section 1(a). Vendor agrees that if ninety (90) days pass after the date the Managed Interface System have been made available to Vendor for an Application, and the Parties are still unable to mutually agree on a schedule for the integration for such Application, and such delay is not a result of any action or inaction by CDK (including, without limitation, any unreasonable rejection by CDK of any proposed schedule), then CDK may terminate this Agreement with respect to such Application only. Subject to this Agreement, including the terms of the exhibits hereto (which more specifically define the integration to be provided under this 3PA Agreement) and Section 1(i) hereof (which sets forth the Parties' agreement regarding potential future additional services), the integration provided for the Applications by this 3PA Agreement is extract only.

Highly Confidential - Filed Under Seal
CDK-0000015

Case: 3:17-cv-00318-jdp Document #: 106-2 Filed: 06/16/17 Page 4 of 27
Case: 1:18-cv-00864 Document #: 172-3 Filed: 05/09/18 Page 4 of 16 PageID #:3910
Case: 17-2540    Document: 48    Filed: 08/22/2017    Pages: 100    (37 of 100)

Execution Copy

(b)  Use of the Managed Interface System or InfoIQ Service by Vendor is limited to accessing and receiving and otherwise using the Data in connection with providing the Application(s) that use the Managed Interface System or InfoIQ Service (as set forth in Section 2 of Exhibit 3PA-B) to Vendor Clients. Specifically, the Managed Interface System and InfoIQ Service may not be used by Vendor to access any other data on any CDK System or to provide any other application or business function to any CDK Client or any other entity wishing to access data on a CDK System or to provide any data residing on any CDK System to any other entity unless passing the Data to another entity is for the purpose of performing a service required by the Application(s) and is on behalf of the CDK Client (i.e. cleansing and standardizing Data, mailings, etc.) and the process is identified in the respective subparts of Section 2 of Exhibit 3PA-B. Vendor agrees that it shall not copy, license, sell or otherwise transfer the Data to any third party for any purpose whatsoever and Vendor agrees that it shall only use the Data in connection with providing the Application(s) to Vendor Clients. Vendor agrees that (i) it has no right, title or interest in the Data and (ii) except as otherwise specifically agreed to between Vendor and a CDK Client, nothing contained herein shall be deemed to provide Vendor with any such right, title or interest. Further, without limiting the generality of the foregoing, Vendor acknowledges and agrees that it may not use any database elements, including, without limitation, any vehicle, customer, deal, accounting, parts and service database, extracted from any CDK System to recreate or reengineer, a new index database for use in any Vendor product or service.

(c)  Vendor agrees that nothing in this 3PA Agreement shall give it any right to have any access to or use of any CDK System, including any and all software applications residing thereon, for any reason, nor to access or use for any reason any data residing on any CDK System other than as described on the respective subparts of Section 2 of to Exhibit 3PA-B hereto; provided, however, that nothing in this agreement prohibits access necessary to convert a CDK Client to the use of a Reynolds DMS. In addition, notwithstanding anything to the contrary in this 3PA Agreement, pending approval by CDK of the Application(s) that use the Managed Interface System or InfoIQ Service ("Pre-Approval Period") such Application(s) may continue to access the CDK Systems and, during this Pre-Approval Period: (a) such access will not constitute a violation of this 3PA Agreement or the Data Exchange Agreement; and (b) CDK shall not take any measures to block or otherwise disrupt Vendor's normal CDK Systems access.

(d)  Vendor warrants to CDK that: (i) the Application(s) and subsequent new releases of the Application(s) will operate in accordance with their specifications; (ii) Vendor has the right and power to enter into this 3PA Agreement and to grant to CDK Clients all of the rights and licenses in the Application(s) as set forth in this 3PA Agreement; (iii) Vendor has obtained or shall obtain all necessary permission and licenses regarding data to offer the Application(s); (iv) Vendor shall provide all required notices to CDK Clients and shall obtain all required consents from CDK Clients, and (v) Vendor has all right and authority required to collect, disclose and use such information as described in the respective subparts of Section 2 of Exhibit 3PA-B.

CDK warrants to Vendor that: (i) the Managed Interface System or InfoIQ Service will operate in a manner consistent with the written specifications provided to Vendor; and (ii) CDK

Highly Confidential - Filed Under Seal    CDK-0000016

Case: 3:17-cv-00318-jdp Document #: 106-2 Filed: 06/16/17 Page 5 of 27
Case: 1:18-cv-00864 Document #: 172-3 Filed: 05/09/18 Page 5 of 16 PageID #:3911
Case: 17-2540 Document: 48 Filed: 08/22/2017 Pages: 100 (38 of 100)

Execution Copy

has the right and power to enter into this 3PA Agreement and to grant to Vendor the rights and licenses in the Managed Interface Agreement or InfoIQ Service as set forth in this 3PA Agreement.

NO OTHER WARRANTIES. EXCEPT AS SPECIFIED HEREIN, NEITHER CDK NOR VENDOR MAKES ANY OTHER WARRANTIES, CONDITIONS OR REPRESENTATIONS, EXPRESS OR IMPLIED, ORAL OR WRITTEN, REGARDING THE MANAGED INTERFACE SYSTEM OR INFOIQ SERVICE, THE APPLICATION(S), THE CDK SYSTEM OR ANYTHING ELSE AND HEREBY EXPRESSLY DISCLAIMS ALL OTHER EXPRESS AND IMPLIED WARRANTIES AND CONDITIONS, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE. CDK DOES NOT WARRANT THE OPERATION OF THE MANAGED INTERFACE SYSTEM OR INFOIQ SYSTEM WILL BE UNINTERRUPTED OR ERROR FREE.

(e) Vendor agrees (I) that it will, with respect to the Applications that will use the Managed Interface System or InfoIQ Service and within one hundred eighty (180) days following the date CDK approves the use of the Application(s) with the Managed Interface System or InfoIQ Service, access data on CDK Systems for use with such Application(s) exclusively through the Managed Interface System or InfoIQ Service in the manner described on the respective subparts of Section 2 of Exhibit 3PA-B hereto and (II) that it will, with respect to the Applications that receive Data from the InfoIQ Service, only access data on CDK Systems for use with such Applications through the InfoIQ Service, unless in each case, as otherwise agreed to in writing by CDK or Vendor is receiving the data directly from the Vendor Client without the use of any third party service or application. Vendor agrees that it will not, with respect to the Application(s) (i) otherwise access, retrieve, license, or otherwise transfer any data from or to a CDK System (including, without limitation, pursuant to any "hostile interface") for itself or any other entity or (ii) contract with, or otherwise engage, any third party to access, retrieve, license or otherwise transfer any data from or to an CDK System. In furtherance of the foregoing agreement Vendor agrees: (i) as part of CDK's approval of the use of the Application(s) with the Managed Interface System or InfoIQ Service, the Vendor shall provide CDK with step-by-step instructions they plan to use to uninstall any Vendor code, data, files, directories or other structures on an CDK System prior to the installation of the Managed Interface System or InfoIQ Service on such CDK System (or provide CDK with an uninstall script that will remove all of the Vendor's code, data, file, directories and any other structures resident on the CDK System) and demonstrate the de-installation is both complete and harmless to the CDK System and (ii) if, after cancellation of an CDK Client's use of the Managed Interface System or InfoIQ Service for use with the Application(s) (by such CDK Client or otherwise) any Vendor code, data, files, directories or other structure remains on such CDK Client's system CDK reserves the right to remove the foregoing and charge the Vendor CDK's then prevailing rate to so remove such items. If, after CDK's approval of the use of the Application(s) with the Managed Interface System or InfoIQ Service, Vendor still continues to use any alternative integration methods for any CDK Client for an Application(s) Vendor shall, nonetheless, pay CDK under this 3PA Agreement as if such CDK Client was using the Managed Interface System or InfoIQ Service unless: (i) the data is received by Vendor directly from the Vendor Client without using any third party service, or (ii) the application data is vehicle

Highly Confidential - Filed Under Seal
CDK-0000017

Case: 3:17-cv-00318-jdp Document #: 106-2 Filed: 06/16/17 Page 6 of 27
Case: 1:18-cv-00864 Document #: 172-3 Filed: 05/09/18 Page 6 of 16 PageID #:3912
Case: 17-2540 Document: 48 Filed: 08/22/2017 Pages: 100 (39 of 100)

Execution Copy

inventory data received from a third party authorized by the dealer.

(f) Vendor shall be solely responsible to provide, at its sole cost and expense, all necessary communications lines (and related equipment) from Vendor's computer servers, including procurement of ISP services deemed necessary to provide Vendor server connectivity to the Managed Interface System or InfoIQ Service site.

(g) Vendor acknowledges and agrees that it will only be able to use the Managed Interface System or InfoIQ Service with respect to Vendor Clients that use an CDK System that, at a minimum, (a) runs a webSuite2007 (R4.5) or higher dealer management system on a Linux or ASP platform in the U.S. or Canada and (b) includes IP network connectivity with GetWired.

(h) Vendor agrees to provide CDK with a written list of all Vendor Clients once every year after the date hereof.

(i) CDK agrees that (A) if Vendor acquires another application after the date hereof that is substantially similar in nature to one of the Applications set forth in Section 2 of Exhibit 3PA-B hereto then CDK agrees, at Vendor's request, to add such new application to Section 2 of Exhibit 3PA-B hereto; provided, however, that (i) such new application shall otherwise be subject to all the terms hereof and (ii) the integration points provided for such new application shall be exactly the same as those provided to the similar existing Application (including, without limitation, if applicable, the same Pre-Defined Integration Points) and (B) if CDK enters into an agreement to provide a competing dealer management system provider with integration services with respect any application, and Vendor requests the same integration services with respect to a substantially similar Vendor application, then CDK agrees to add such application to Section 2 of Exhibit 3PA-B hereto; provided, however, that (i) such new application shall otherwise be subject to all the terms hereof and (ii) the integration points provided for such new application shall be exactly the same as those provided to the competing application (including, without limitation, if applicable, the same Pre-Defined Integration Points). For the avoidance of doubt, nothing in this Section shall be deemed to require CDK to consent to the assignment of any agreement from a third party to Vendor.

(j) Vendor will inform CDK within one (1) business day of a Vendor Client cancelling any Application by submitting a termination request to CDK for the corresponding Managed Interface System or InfoIQ Service components. Should a Vendor Client contact CDK and request the Managed Interface System or InfoIQ Service being provided to the Application be stopped immediately, CDK reserves the right to comply with this request and will notify Reynolds within one (1) business day of the request and CDK's compliance. Should Reynolds contact the Vendor Client and reach agreement to reinstate the Application within three (3) business days of receiving such notice from CDK, CDK will re-install / turn on the corresponding Managed Interface System or InfoIQ Service components for no additional installation fee(s). CDK will use commercially reasonable efforts to terminate billing for the month subsequent to the submission of a termination request. CDK does not prorate the Monthly Fee(s).

JA 37
Highly Confidential - Filed Under Seal
CDK-0000018

Case: 3:17-cv-00318-jdp Document #: 106-2 Filed: 06/16/17 Page 7 of 27
Case: 1:18-cv-00864 Document #: 172-3 Filed: 05/09/18 Page 7 of 16 PageID #:3913
Case: 17-2540    Document: 48    Filed: 08/22/2017    Pages: 100    (40 of 100)

Execution Copy

2. **Vendor Indication of Approved Status**

(a) Vendor may not make any use of the CDK name or any CDK logo without the prior written consent of CDK.

(b) Vendor shall not represent in any way that its Application(s) are produced, developed, endorsed or otherwise affiliated with CDK.

(c) CDK agrees to (i) indicate on its internet site that Vendor is an approved integration vendor with respect to the Applications and (ii) provide a letter to Vendor that states Vendor is an approved integration vendor with respect to the Applications that Vendor may provide to Vendor Clients.

3. **Fees; Payment**

(a) **No Fee Term.** Until the earlier to occur of (i) the five (5) year anniversary of the 3PA Effective Date or (ii) any material breach by Vendor under the Data Exchange Agreement (the "No Fee Period"), CDK shall not charge Vendor any fees under this Agreement; provided, however, that (i) if, at any time during the No Fee Period, the number of copies of the Applications licensed by Vendor Clients exceeds six hundred (600) (the "Cap") then Vendor shall pay CDK's then standard monthly rates for the services provided hereunder for each copy of an Application in excess of the Cap for such portion of the No Fee Period during which the number of Applications exceeds the Cap; and (ii) Vendor shall pay CDK's standard installation fee for any installations of an Application after the first six hundred (600) Application installations have been performed even if, at the time of such installation, the number of Applications then in use is below the Cap (although in that circumstance there would be no monthly fees owed pursuant to this subsection). For example and for the avoidance of doubt, it is agreed that if a Vendor Client licenses two separate Applications it shall count as two copies of the Applications toward the Cap. The standard CDK rates referred to in this Section 3(a) are set forth in Exhibit 3PA-C and, during the No Fee Term, may be increased only based upon the Consumer Price Index for All Urban Consumers (CPI-U): U.S. city average using the unadjusted 12 month index for the month of the price change announcement. Thereafter, pricing may be increased once per year, in CDK's discretion, upon at least sixty (60) days written notice to Vendor.

(b) **Fee Term.** After the expiration of the No Fee Term, Vendor shall pay CDK's then standard fees at such time for the services provided hereunder for all copies of the Applications (and not just for those in excess of the Cap). For the sake of clarity, Vendor agrees that, any changes made to the Pre-Defined Integration Points, or the addition of any Pre-Defined Integration Points, shall be at the further expense of Vendor, including, without limitation, installation and monthly fees associated with such additional Pre-Defined Integration Points (whether during or after the No Fee Term). CDK and Vendor will agree on the associated additional fees at the time such modified/additional Pre-Defined Integration Point is provided by CDK. CDK will invoice Vendor for all such fees and taxes (if any) to Vendor. Invoices shall be payable within 30 days after the date of the applicable invoice from CDK. Vendor agrees to submit any disputes regarding any fees in writing to CDK within 60 days of the invoice for such

Highly Confidential - Filed Under Seal

CDK-0000019

Case: 3:17-cv-00318-jdp Document #: 106-2 Filed: 06/16/17 Page 8 of 27
Case: 1:18-cv-00864 Document #: 172-3 Filed: 05/09/18 Page 8 of 16 PageID #:3914
Case: 17-2540 Document: 48 Filed: 08/22/2017 Pages: 100 (41 of 100)

Execution Copy

fees otherwise such dispute will be waived and such fees will be final and not subject to challenge. Invoices which are not paid by Vendor within the time required for payment shall bear interest at the rate of eighteen percent (18%) per annum compounded monthly or the maximum rate permitted by law, whichever is less. The fees set forth above are exclusive of sales, use or other applicable taxes (other than taxes based on CDK's net income), and Vendor agrees to pay any such taxes. After the expiration of the No Fee Term, CDK may increase the monthly fees at any time once per calendar year by providing Vendor with written notice of such increase at least 60 days prior to the effectiveness of such price increase. If Vendor fails to timely pay an invoice hereunder then CDK may stop providing the InfoIQ Service and block access to the Managed Interface System or InfoIQ Service and the Data until such time as Vendor pays such past due amount.

(c) CDK shall have the right to have an independent auditor audit the books and records of Vendor for the sole purpose of verifying the amounts due and payable hereunder up to once per calendar year upon twenty days' notice to Vendor. Vendor shall maintain business records, books, account information, and related materials sufficient to permit such audit. Vendor's officers and/or directors shall cooperate fully in any such audit. The cost of such an audit shall normally be at CDK's expense; provided, however, that Vendor shall bear the cost of the audit if the audit reveals any underpayment that is greater than five percent (5%) of the amount actually due for any month for the period being audited. Vendor shall pay any shortfalls, plus interest at 18% annually, dating from the due dates in question, within thirty (30) days after notice from CDK of the shortfall. CDK shall refund Vendor any overpayments, plus interest as set forth above, dating from the date of overpayment, revealed by such audit.

For one (1) year after the date of each license of the Application(s), Vendor shall maintain records showing the CDK Client's name and address, date of sale, installation address, and date of installation. If Vendor goes out of business or is otherwise unable to comply with the requirements of this Section, Vendor shall immediately provide CDK with copies of such records.

4. **Term and Termination.**

(a) The term of this 3PA Agreement shall be for the period commencing on the date hereof and ending on fifth anniversary of the date hereof (the "Initial Term") and shall thereafter automatically renew for consecutive one year renewal periods (each a "Renewal Term") until terminated by either party with at least 90 days written notice prior to the end of the Initial Term or any Renewal Term. Upon expiration or termination of this 3PA Agreement in its entirety or with respect to an Application, CDK must continue providing the Managed Interface System and the InfoIQ Service (under the terms of this 3PA Agreement) for use with the Application(s) without changes in service until the conclusion of Vendor's then effective contract term with any relevant then existing Vendor Clients ("**Phase Out Access**"), provided that (a) the Phase Out Access shall not exceed two (2) years; (b) Vendor continues to pay all applicable fees; and (c) as a condition of Phase Out Access, Vendor must give CDK thirty (30) days prior written notice of the following: (i) a list of the Applications for which such Phase Out Access is needed; (ii) a list of Vendor Clients (including name, address, and information reasonably necessary to identify such Vendor Client) for which such Phase Out Access is needed, and (iii) the date of the

Highly Confidential - Filed Under Seal
CDK-0000020

Case: 3:17-cv-00318-jdp Document #: 106-2 Filed: 06/16/17 Page 9 of 27
Case: 1:18-cv-00864 Document #: 172-3 Filed: 05/09/18 Page 9 of 16 PageID #:3915
Case: 17-2540 Document: 48 Filed: 08/22/2017 Pages: 100 (42 of 100)

Execution Copy

conclusion of the then effective contract term with the relevant Vendor Clients. During any Phase Out Access period, the Parties shall continue to perform under the terms of this 3PA Agreement in effect at the time of termination, except no new installations of the applicable Application(s) will be allowed. At the conclusion of any Phase Out Access period or immediately upon termination of this 3PA Agreement in its entirety or with respect to an Application if the Phase Out Access period is not invoked, Vendor must cease all use of the Managed Interface System and InfoIQ Service with respect to the relevant Application(s). Notwithstanding anything to the contrary herein, Phase Out Access is not available if this 3PA Agreement is terminated pursuant to the Assignment provision of Section 10 of this 3PA Agreement.

(b)  Either party may terminate this 3PA Agreement if (i) the other party commits a material breach of any of the terms hereof that is capable of being cured and is not cured within 30 days after receipt of notice from the other party of specifying such material breach (provided, however, that the cure period with respect to Vendor's breach of its payment obligations shall only be 10 days), or (ii) the other party commits a material breach of any of the terms hereof that is not capable of being cured and fails to permanently terminate the conduct causing the breach immediately after receiving notice specifying such material breach.

This Agreement shall automatically terminate if the RCI Agreement between Vendor and CDK of even date hereof terminates for any reason unless CDK intentionally and in bad faith causes such termination of the RCI Agreement.

In addition, after the Initial Term, either party may terminate this Agreement in its entirety or with respect to an Application at any time for any reason, or no reason at all, with at least one hundred eighty (180) days' written notice to the other party.

(c)  CDK may terminate this 3PA Agreement, the InfoIQ Service, and access to the Managed Interface System and InfoIQ Service immediately upon written notice to Vendor in the event that CDK reasonably determines that the continued operation of this 3PA Agreement violates, or could violate, any applicable federal, state or local law, rule or regulation including any "privacy" or data security laws.

(d)  If a CDK Client objects to CDK's provision of its Managed Interface System hereunder or the InfoIQ Service CDK may terminate the access to the Managed Interface System or its provision of the InfoIQ Service for the specific Application(s) with respect to such CDK Client immediately upon written notice to Vendor.

(e)  CDK may terminate this 3PA Agreement if CDK elects to "sunset" the Managed Interface System or InfoIQ Service on a general basis (i.e., with respect to third party participants generally, and not only with respect to Vendor) and does not offer any similar service or program to any other third party vendors.

(f)  Except as otherwise specifically set forth herein, Vendor may not, after termination of this 3PA Agreement, continue to use the Managed Interface System or InfoIQ Service for any purpose whatsoever related to an CDK System or an CDK Client.

Highly Confidential - Filed Under Seal
CDK-0000021

Case: 3:17-cv-00318-jdp Document #: 106-2 Filed: 06/16/17 Page 10 of 27
Case: 1:18-cv-00864 Document #: 172-3 Filed: 05/09/18 Page 10 of 16 PageID #:3916
Case: 17-2540    Document: 48    Filed: 08/22/2017    Pages: 100    (43 of 100)

Execution Copy

## 5. Indemnification.

(a) Except as provided in this Section, all Data is transferred to Vendor in "AS IS, WHERE IS" condition. No warranty whatsoever as to the content, condition of, or usability of the Data is made by CDK, EXCEPT THAT CDK REPRESENTS AND WARRANTS THAT IT WILL NOT INTENTIONALLY INTRODUCE ANY BUGS, ERRORS, OR VIRUSES INTO THE DATA AND THAT THE DATA SUBMITTED TO VENDOR WILL NOT BE CHANGED, ALTERED, OR MODIFIED FROM THE FORM AND CONTENT RECEIVED BY CDK, EXCEPT FOR NORMAL CDK EDITING PROCESSES AS MAY BE AGREED UPON BY CDK AND VENDOR. The Managed Interface System and InfoIQ Service are provided on an "AS IS, WHERE IS" basis. CDK makes no representations or warranties to Vendor or any CDK Clients with respect to the Managed Interface System or InfoIQ Service. Without limiting the foregoing, CDK EXPRESSLY DISCLAIMS THE IMPLIED WARRANTIES OF MERCHANTABILITY, INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE. CDK DOES NOT WARRANT THAT THE MANAGED INTERFACE SYSTEM WILL BE AVAILABLE AT ALL TIMES, THAT IT WILL MEET THE REQUIREMENTS OF VENDOR OR THAT ITS OPERATION WILL BE UNINTERRUPTED OR ERROR FREE.

(b) Each Party ("Indemnitor") must defend, indemnify and hold harmless the other party, its affiliates and their employees, successors and assigns ("Indemnitees") against all damages, losses, costs, expenses (including reasonable attorneys' fees, costs and expenses) and other liabilities arising out of any claims, demands, suits, or causes of action by third parties, arising out of or in connection with this 3PA Agreement to the extent that such damages, losses, costs, expenses and other liabilities result or are claimed to result in whole or in part from: (i) any breach of this 3PA Agreement by Indemnitor, its affiliates or their employees or agents; (ii) the violation by Indemnitor, its affiliates or their employees or agents of applicable law or regulation in connection with the data access and data extraction described in this 3PA Agreement; (iii) any access by Indemnitor, or its affiliates or their employees or agents to Indemnitee's proprietary hardware and/or software facilitated pursuant to this 3PA Agreement for any purpose falling outside the scope of this 3PA Agreement; (iv) Indemnitor's or its affiliates' or their employees' or agent's failure to obtain the rights and consents necessary for Indemnitee to gain access to (and extract) Data pursuant to this 3PA Agreement; and (v) any publication, breach of confidentiality, dissemination, conversion, misappropriation or other use of any Data facilitated by this Agreement by Indemnitor, or its affiliates or their employees or agents in a manner (a) not authorized by the relevant Vendor Client, or (b) in violation of relevant law.

6. **Limitation of Liability.** EXCEPT FOR A CLAIM BASED SOLELY UPON BREACH OF THE CONFIDENTIALITY PROVISIONS OF SECTION 8, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ITS AFFILIATES, SUCCESSORS OR ASSIGNS FOR ANY INCIDENTAL, CONSEQUENTIAL DAMAGES INCURRED BY SUCH PERSONS (INCLUDING, WITHOUT LIMITATION, ANY LOST REVENUE OR LOST PROFITS) OR FOR SIMILAR DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES (IT BEING AGREED THAT THIRD PARTY CLAIMS FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES AGAINST THE OTHER

Highly Confidential - Filed Under Seal
CDK-0000022

Case: 3:17-cv-00318-jdp Document #: 106-2 Filed: 06/16/17 Page 11 of 27
Case: 1:18-cv-00864 Document #: 172-3 Filed: 05/09/18 Page 11 of 16 PageID #:3917
Case: 17-2540 Document: 48 Filed: 08/22/2017 Pages: 100 (44 of 100)

Execution Copy

PARTY WOULD CONSTITUTE DIRECT DAMAGES INCURRED BY THE OTHER PARTY). EXCEPT FOR WILLFUL MISCONDUCT BY A PARTY, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ITS AFFILIATES, SUCCESSORS OR ASSIGNS FOR ANY PUNITIVE OR EXEMPLARY DAMAGES.

7. **Laws and Governmental Regulations; Relationship of Parties.** Each party shall be responsible for compliance with all laws and governmental regulations affecting its respective business, and neither CDK nor Vendor shall have any responsibility relating to the other party's responsibility therefor, including, without limitation, advising the other party of its responsibilities in complying with any laws or governmental regulations affecting its business.

8. **Confidentiality.** Each party to this 3PA Agreement agrees that the terms of confidentiality in the Data Exchange Agreement shall govern the exchange of confidential information under this 3PA Agreement. However, notwithstanding anything to the contrary in the Data Exchange Agreement, Data, as defined herein, is specifically excluded from the definition of Confidential Information.

9. **Notices.** All notices shall be in writing and shall be delivered or sent by recognized courier or registered or certified mail, return receipt requested, to the addresses indicated below or to such other addresses as the parties shall specify by notice given pursuant hereto:

if to CDK, to:

CDK Global, LLC
1950 Hassell Road
Hoffman Estates, IL 60169
Attn: Group President

with a copy to:

Attn: General Counsel

if to Vendor, to:

The Reynolds and Reynolds Company
One Reynolds Way
Kettering, OH 45430

Title: VP, Data Services

with a copy to:

Attn: Legal Department

Page 10 of 26

JA 42

Highly Confidential - Filed Under Seal
CDK-0000023

Case: 3:17-cv-00318-jdp Document #: 106-2 Filed: 06/16/17 Page 12 of 27
Case: 1:18-cv-00864 Document #: 172-3 Filed: 05/09/18 Page 12 of 16 PageID #:3918
Case: 17-2540    Document: 48    Filed: 08/22/2017    Pages: 100    (45 of 100)

Execution Copy

10. **Assignment.** Neither party may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other party hereto; provided, however, that such consent shall not be required for (i) any assignment to an affiliate of such party as part of a corporate reorganization of such party or (ii) any assignment made as part of a sale of the majority of the assets or equity securities of such party as long as the acquirer (A) does not, prior to the acquisition, sell any application programs or services that compete with the non-assigning party and (B) is not, prior to the acquisition, affiliated with an entity that sells any application programs or services that competing with the non-assigning party. This Section shall be deemed, without limitation, to apply to any direct or indirect change in the control of either party including, without limitation, pursuant to any merger, acquisition, consolidation or other corporate restructuring in which it participates. Any attempted assignment in violation of this provision shall be void and shall be grounds for termination after 30 days notice. This Agreement shall be binding upon and inure to the benefit of the parties' respective successors and assigns.

11. **General.**

(a) This 3PA Agreement shall become valid and binding upon the parties upon execution and delivery of this 3PA Agreement by the duly authorized signatories of CDK and Vendor.

(b) This 3PA Agreement shall not be changed, modified or amended except by a writing signed by both parties, and this 3PA Agreement may not be discharged except by performance in accordance with its terms.

(c) This 3PA Agreement sets forth the entire agreement of the parties as to the subject matter hereof and supersedes all existing agreements and all other oral, written or other communications between them concerning its subject matter, including but not limited to any and all prior or existing contracts related to integration to CDK Systems for any of the Applications. Without limiting the generality of the foregoing, it is specifically agreed that this Agreement supercedes that certain ADP Partners Program Agreement between ADP, Inc. and KeyTrak, Inc.; and InfoIQ Service Agreement between Digital Motorworks, Inc. and HCD Software LLC. There are no warranties, representations or agreements other than those set forth in this 3PA Agreement.

(d) If any provision of this 3PA Agreement is held to be invalid, illegal, or unenforceable, the validity, legality or enforceability of the remaining provisions shall not be affected or impaired thereby.

(e) The headings in this 3PA Agreement are intended for convenience of reference only and shall not affect its interpretation.

(f) **Confidential Binding Arbitration.** In the event of any dispute, claim, question or disagreement arising from or relating to this 3PA Agreement or an alleged breach thereof ("Dispute"), the Parties agree that all Disputes shall be submitted to confidential binding arbitration in accordance with the then applicable commercial rules of the American Arbitration

Highly Confidential - Filed Under Seal
CDK-0000024

Case: 3:17-cv-00318-jdp Document #: 106-2 Filed: 06/16/17 Page 13 of 27
Case: 1:18-cv-00864 Document #: 172-3 Filed: 05/09/18 Page 13 of 16 PageID #:3919
Case: 17-2540    Document: 48    Filed: 08/22/2017    Pages: 100    (46 of 100)

Execution Copy

Association ("AAA"). Notwithstanding anything to the contrary in this 3PA Agreement or the AAA Rules, the Parties agree that arbitration under this Section 11(f): (a) shall be governed by the Federal Arbitration Act exclusive of any state arbitration laws; (b) shall be before a single neutral arbitrator who is a licensed attorney with prior experience as an arbitrator; (c) shall be conducted in Nashville, TN ; and (d) shall be conducted pursuant to a confidentiality agreement that provides at a minimum that the arbitration and all documents and pleadings exchanged in connection therewith shall be held confidential and used only for purposes of the arbitration, except that a Party may nevertheless: (i) seek to reduce the binding arbitration award to a judgment in court; (ii) seek enforcement of the award pursuant to the Federal Arbitration Act and this 3PA Agreement; and (iii) disclose information regarding the arbitration as required by law (e.g., to auditors or regulatory agencies).

(g) **Arbitration Fees.** Aside from filing or other fees required to initiate the arbitration, all arbitration fees will be split evenly between the Parties unless and until an award is made by the arbitrator regarding arbitration fees. If a Party does not pay its respective share of arbitration fees, then all claims (including counterclaims) of the non-paying Party shall be dismissed by the arbitrator or AAA, and the non-paying Party shall not be permitted to bring any further claims in the arbitration for affirmative relief. The non-paying Party may still participate in the arbitration to defend claims brought against it.

(h) **Temporary Injunctive Relief for IP Disputes.** Notwithstanding anything to the contrary contained in this 3PA Agreement, however, if a dispute arises that relates to misappropriation of proprietary, confidential or trade secret information or other intellectual property; or a breach of the Confidentiality or Data Security provisions of this Agreement and/or its Exhibits ("IP Dispute"), a Party, at its election may seek Temporary Injunctive Relief from a court of competent jurisdiction related exclusively to the IP Dispute. **"Temporary Injunctive Relief"** means only a temporary restraining order and/or a temporary injunction. A claim for Temporary Injunctive Relief brought in court may not be combined with: (a) a request for any other type of relief whether legal or equitable; or (b) any Dispute other than an IP Dispute. All other Disputes, including whether a permanent injunction shall issue, are to be arbitrated concurrently with any court action relating to Temporary Injunctive Relief.

(i) This 3PA Agreement shall be governed by the laws of the State of Illinois.

(j) No failure or delay on the part of either party to this 3PA Agreement to fully enforce its rights hereunder shall be construed as a waiver by such party of any default hereunder or acquiescence therein, nor shall any failure to exercise such right preclude any future exercise of such right. All rights and remedies under this 3PA Agreement shall be cumulative and not exclusive of any other rights or remedies otherwise available.

(h) This 3PA Agreement may be executed in one or more counterparts.

(i) Each of the parties to this 3PA Agreement is acting only as an independent contractor and assumes full responsibility for each of its employees and shall be solely responsible for the payment of compensation to its personnel. This 3PA Agreement does not constitute either party hereto as the agent or legal representative of the other party and does not

Page 12 of 26

JA 44

Highly Confidential - Filed Under Seal
CDK-0000025

Case: 3:17-cv-00318-jdp Document #: 106-2 Filed: 06/16/17 Page 14 of 27
Case: 1:18-cv-00864 Document #: 172-3 Filed: 05/09/18 Page 14 of 16 PageID #:3920
Case: 17-2540 Document: 48 Filed: 08/22/2017 Pages: 100 (47 of 100)

Execution Copy

create a partnership or joint venture between them.

(j) All defined terms used in this 3PA Agreement shall be deemed to refer to the masculine, feminine, neuter, singular and/or plural, in each instance as the context and/or particular facts may require. Use of the terms "hereunder", "herein", "hereby", and similar terms refer to this 3PA Agreement.

(k) Each provision of this 3PA Agreement that would by its nature or terms survive any termination of this 3PA Agreement shall survive any termination of this 3PA Agreement, regardless of the cause.

IN WITNESS WHEREOF, the parties hereto have executed this 3PA Agreement as of the first date written above.

THE REYNOLDS AND REYNOLDS CO.
DEALER COMPUTER SERVICES, INC.
UNIVERSAL COMPUTER SYSTEMS
HOLDING, INC.

By: R. T. Brockman
Title: Chairman/CEO
Date: 2/18/15

CDK GLOBAL, LLC
DIGITAL MOTORWORKS, INC.

By: _____
Title: SR VP Gen __
Date: 2/8/15

Page 13 of 26

JA 45

Highly Confidential - Filed Under Seal
CDK-0000026

Case: 3:17-cv-00318-jdp Document #: 106-2 Filed: 06/16/17 Page 15 of 27
Case: 1:18-cv-00864 Document #: 172-3 Filed: 05/09/18 Page 15 of 16 PageID #:3921
Case: 17-2540    Document: 48    Filed: 08/22/2017    Pages: 100    (48 of 100)

Execution Copy

## Exhibit 3PA-A

### Description of Managed Interface System

The Managed Interface System uses hardware and software components that allow Vendor to create standard data messages in SOAP format to request data from, or convey data to, a CDK controlled Internet based server (the "Managed Interface Server"). CDK then uses (a) network connectivity between CDK Systems and the Pre-Defined Integration Points, (b) an open application program interface and data objects resident on CDK Systems that, collectively, provide access to the data residing on CDK Systems, and (c) standard web services, including web pages and web scripts, to move the dealer's data to and from the CDK Systems to the Managed Interface Server and on to Vendor. Vendor acknowledges and agrees that the Pre-Defined Integration Points included in the Managed Interface System requires knowledge of the CDK application release level. Vendor acknowledges and agrees that bulk extracts of data may be done only between the hours of 10pm and 5am Central Time. Vendor acknowledges and agrees that extracts of data may be done no more than every 15 minutes from a CDK client and will work with CDK to ensure CDK System responsiveness is not impeded through integration. Notwithstanding the foregoing, it is agreed that the interfaces initially used to provide the Data to the Key Tracking Applications shall be E Integration Points instead of Pre-Defined Integration Points. Vendor agrees that it shall switch to the use of Pre-Defined Integration Points with respect to the Key Tracking Applications within 180 days after written notice from CDK to switch to Pre-Defined Integration Points.

Highly Confidential - Filed Under Seal

CDK-0000027

Case: 3:17-cv-00318-jdp Document #: 106-2 Filed: 06/16/17 Page 16 of 27
Case: 1:18-cv-00864 Document #: 172-3 Filed: 05/09/18 Page 16 of 16 PageID #:3922
Case: 17-2540    Document: 48    Filed: 08/22/2017    Pages: 100    (49 of 100)

Execution Copy

## Description of InfoIQ Service

InfoIQ is a service whereby DMI directly or indirectly collects (by accessing, polling, extracting, downloading) information from automotive and/or motor vehicle dealerships chosen by DMI's customer. The InfoIQ service also reformats, aggregates, compiles and/or enhances such information using DMI's proprietary InfoIQ technology prior to delivery to a customer.

Highly Confidential - Filed Under Seal                                    CDK-0000028