**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION**<br><br>**This Document Relates To:**<br><br>**THE DEALERSHIP CLASS ACTION** | MDL No. 2817<br>Case No. 18-cv-00864<br><br>Honorable Robert M. Dow, Jr.<br>Magistrate Judge Jeffrey T. Gilbert<br><br><br>Demand for Jury Trial |

**CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 2

CLASS ACTION ALLEGATIONS .................................................................... 8

THE PARTIES .................................................................................................. 16

JURISDICTION AND VENUE ........................................................................ 28

FACTUAL ALLEGATIONS ............................................................................ 30

    A.    The Relevant Product Markets ................................................ 30

    B.    CDK and Reynolds Dominate The DMS Market
And Unlawfully Exploited Their Duopoly Power ................................ 30

        (i)    Data Management Systems and the DMS Market ................... 30

        (ii)    Significant Switching Costs Facilitate an Antitrust Conspiracy ............ 33

        (iii)    Defendants' Market Dominance of the DMS Market
and Their Vertical Integration Enabled Them to
Unlawfully Divide Both the DMS Market and the DIS Market ............ 34

    C.    CDK And Reynolds Entered Into A *Per Se* Illegal Market Division
Agreement And Colluded To Destroy Competition In The DIS Market ........... 36

        (i)    Dealership Data and the DIS Market ...................................... 36

        (ii)    Dealers Own Their Data and Authorize Access to Vendors
and Data Integrators .................................................................. 36

        (iii)    Defendants Entered into a *Per Se* Illegal Horizontal
Agreement to Allocate Market Share in the DIS Market ....................... 40

            (a) The Data Exchange or "Wind Down" Agreement ........................... 41

            (b) The Data Integration Agreements ..................................... 43

        (iv)    CDK and Reynolds Illegally Colluded to Implement
the *Per Se* Illegal Agreements ............................................... 44

i

(v)    CDK and Reynolds Colluded to Restrain Competition in the DIS Market ................................................................. 46

D.    CDK And Reynolds Forced Vendors Into Anticompetitive Exclusive Dealing Agreements Which Contained Price Secrecy Provisions ..................... 53

(i)    CDK and Reynolds Impose Contracts on Vendors Granting Defendants an Exclusive Right to Integrate Data ................... 53

(ii)    The Exclusive Dealing Agreements Include Anticompetitive Price Secrecy Provisions ................................. 57

(iii)    The Vendor Exclusive Dealing Provisions are Anticompetitive and Prevent Competition in the Single-Brand Aftermarket for Data Integration ....................................... 59

E.    Defendants' Anticompetitive Conduct Has Resulted In Massive Increases To Data Integration Fees And Dealers Have Been Damaged By These Increased Fees ..................................................................... 61

(i)    Defendants' Anticompetitive Conduct has Massively Increased Data Integration Fees ................................................ 61

(ii)    These Increased Data Integration Fees are Passed On to Dealers ........... 64

(iii)    Defendants' Dominance of the DMS Market and Their Illegal Agreements Enabled Them to Sharply Reduce the Functionality of the DMS and Charge Artificially Inflated Prices for DMS ....................................................... 68

F.    Defendants' "Security" Claim is a Pretext ......................................... 70

ANTITRUST INJURY ........................................................................................... 75

CLAIMS FOR RELIEF .......................................................................................... 76

PRAYER FOR RELIEF .......................................................................................... 165

DEMAND FOR JURY TRIAL ............................................................................... 167

## GLOSSARY OF KEY AGREEMENTS REFERENCED IN COMPLAINT

1.      **Defendants' *Per Se* Illegal Horizontal Agreement (February 2015):** The agreement(s) between CDK and Reynolds to stop competing and profit from their duopoly as the "Big 2" in the automobile industry's Dealer Management Systems ("DMS") market, principally by cornering the related market for Data Integration Services ("DIS") (programs used to extract data from DMS's for the benefit of application Vendors), as memorialized in three (3) written contracts.

> (a)    **The Data Exchange Agreement (a.k.a. the "Wind Down" Agreement):** The contract wherein CDK agreed to wind down (and ultimately stop) providing integration services relating to data stored on Reynolds DMS's, and cooperate with Reynolds to transition CDK third party Vendor clients to start using Reynolds' RCI program for integration of data from Reynolds DMS's.

> (b)    **The 3PA Agreement (a.k.a. the "Third Party Access Agreement"):** The contract wherein Reynolds agreed it would not access data on CDK DMS's through any DIS other than CDK's 3PA program, and in exchange, CDK provided five free years of 3PA use for Reynolds applications.

> (c)    **The RCI Agreement (a.k.a. the Reynolds Interface Agreement signed by CDK):** The contract wherein CDK agreed it would not access data on Reynolds' DMS's through any means other than Reynolds' RCI program.

2.      **CDK Managed Interface Agreements:** The 3PA contracts which CDK began forcing its Vendor customers to sign in 2015, stating the Vendors would use 3PA for all integration of data from CDK DMS's.

3.      **Standard Reynolds Interface Agreements:** The Reynolds' Vendor contracts which, beginning in 2013, have required Vendors to use Reynolds' DIS for all integration of data from Reynolds DMS's.

4.      **Proposed Authenticom Wind Down Access Agreement:** The contract which Reynolds proposed to Authenticom, which stated that Authenticom would shutter its data integration business and, during a one-year wind down process, Reynolds would stop blocking Authenticom's access to Reynolds DMS's.

Plaintiffs ACA Motors, Inc. d/b/a Continental Acura; Baystate Ford Inc.; Cherry Hill Jaguar; Cliff Harris Ford, LLC d/b/a Warrensburg Ford; Continental Autos, Inc. d/b/a Continental Toyota; Continental Classic Motors, Inc. d/b/a Continental Autosports; 5800 Countryside, LLC d/b/a Continental Mitsubishi; HDA Motors, Inc. d/b/a Continental Honda; H & H Continental Motors, Inc. d/b/a Continental Nissan; Gregoris Motors, Inc.; Hoover Automotive, LLC d/b/a Hoover Dodge Chrysler Jeep of Summerville; JCF Autos LLC d/b/a Stevens Jersey City Ford; Jericho Turnpike Sales LLC d/b/a Ford & Lincoln of Smithtown; Jim Marsh American Corporation d/b/a Jim Marsh Mitsubishi Suzuki Kia Mahindra; John O'Neil Johnson Toyota, LLC; Kenny Thomas Enterprises, Inc. d/b/a Olathe Toyota; Marshall Chrysler Jeep Dodge, LLC d/b/a Marshall Chrysler Jeep Dodge Ram; Naperville Zoom Cars, Inc. d/b/a Continental Mazda; NV Autos, Inc. d/b/a Continental Audi; Patchogue 112 Motors LLC d/b/a Stevens Ford; Pitre Imports, LLC d/b/a Pitre Kia; Pitre, Inc. d/b/a Pitre Buick GMC; Teterboro Automall, Inc. d/b/a Teterboro Chrysler Dodge Jeep Ram; Waconia Dodge, Inc. d/b/a Waconia Dodge Chrysler Jeep Ram; and Warrensburg Chrysler Dodge Jeep, L.L.C. d/b/a Warrensburg Chrysler Dodge Jeep Ram Fiat (collectively, "Dealership Plaintiffs"), individually and on behalf of the Classes, defined below, of retail automobile dealerships ("Dealers" or "Dealerships"), bring this Consolidated Class Action Complaint against defendants CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") (collectively, "Defendants") for damages, declaratory, injunctive, and other relief pursuant to the federal Sherman Act and state antitrust and consumer protection laws. Dealership Plaintiffs allege the following based upon information and

belief, except as to those allegations that are based on Dealership Plaintiffs' personal knowledge.

## INTRODUCTION

1.      This antitrust action concerns the illegal and anticompetitive practices of Defendants, CDK and Reynolds, frequently referred to in the retail automobile industry as the "Duopoly" or "Big 2," who unlawfully colluded and conspired to restrain and/or eliminate competition by charging supracompetitive prices in the markets for: (1) Dealer Management System ("DMS") software services; and (2) Data Integration Services ("DIS"), the services for extracting, formatting, integrating, and organizing the data stored on Dealers' DMS's.

2.      CDK and Reynolds are in the business of providing DMS software and services to Dealerships, and dominate the DMS industry, with total annual revenues of approximately $2.2 billion and $1.7 billion, respectively. They control a combined 75% of the United States DMS market measured by the number of franchised automobile Dealerships using their systems, and their market share is even higher in terms of revenue[1] Because of Defendants' dominant DMS market share and the significant barriers to entry into the DMS market, the CDK and Reynolds duopoly has enormous leverage over Dealers.

3.      The DMS, described as a Dealership's "central nervous system," is an enterprise software system designed specifically for automobile Dealerships, and functions as the businesses' central database and repository of all its operational

---

[1] CDK and Reynolds control approximately 45% and 30% of the DMS market, respectively. The remaining 25% is divided among various other significantly smaller DMS providers that typically service smaller Dealerships in niche submarkets.

information, including payroll, inventory, human resources, marketing, repair and service, and customet information.[2] The DMS includes a database and data storage component that allows Dealerships to enter and store data in real time. A Dealership's data, stored on its DMS, belongs to and is controlled by the Dealership, which has been explicitly and repeatedly acknowledged in public statements made by Defendants over the years.

4.      Switching DMS providers is extremely difficult, enormously expensive, and highly disruptive to a Dealership's business. Changing DMS providers requires new hardware and software, can cost as much as $50,000 up front, and typically requires up to a year or more lead time for preparation and training of a Dealership's staff in order to learn how to operate a new system. Switching DMS providers has been analogized by some Dealers as akin to a "heart transplant or knee replacement."

5.      CDK and Reynolds also provide Data Integration Services (DIS), separate from their DMS offerings. DIS services are critical to the proper functioning of Dealerships. DIS enables Dealers and third-party software application providers ("Vendors") to extract, organize, and integrate the Dealer's own data on its DMS into a usable format. To effectively run their Dealerships, Dealers engage Vendors to utilize their data and to provide Dealers with necessary services such as inventory management, customer relationship management, warranty services, repair orders, and electronic vehicle registration and titling. A single Dealership typically uses multiple Vendors, with

---

[2] The physical storage of the data is either onsite at the Dealership, at private data centers operated by the DMS provider, or with cloud-based data storage companies.

3

each Vendor requiring access to the Dealership's data stored in its DMS database. Vendors generally engage DIS providers that charge Vendors for their services.



6. Historically, the DIS market was active, with numerous DIS providers competing to provide affordable, secure, and reliable access to DMS data for Dealerships and Vendors. Previously, competition thrived, and Vendors provided innovative software application products to help Dealerships sell and service vehicles.

7. Prior to January 2015, CDK and Reynolds were competitors. A major point of differentiation was that, starting in 2006, Reynolds took steps to block third party data integrators from accessing Reynolds DMS's (with more vigorous efforts starting in

2013), whereas CDK publicly touted the openness of CDK systems. Leading up to 2015, CDK had succeeded in wresting market share away from Reynolds in the DMS space.

8.     In February 2015, however, competition between Defendants ceased, as they entered into a *per se* illegal horizontal agreement to: (1) exclude competition in the DIS market; (2) allow only CDK to access data housed on Dealers' CDK DMS's; and (3) allow only Reynolds to access data housed on Dealer's Reynolds DMS's. Defendants' agreement involved restricting and blocking independent third party data integrators' access to Dealers' DMS's, whereby forcing third party data integrators out of the DIS industry.

9.     Defendants agreed in writing to close their respective DMS's to independent data integrators, driving third-party DIS providers out of the market, or crippling them in such a way as to cause them to exit the business. These written agreements also eliminated competition between Defendants in the DMS market. Prior to 2015, competition between the duopolists existed based upon Dealers' ability to grant access to their data, which was the primary point of differentiation.

10.    Specifically, on February 18, 2015, CDK and Reynolds entered into three anticompetitive written agreements which destroyed competition in the DIS marketplace. The primary anticompetitive agreement is referred to as the Data Exchange Agreement or the "Wind Down" Agreement, and the other two are the 3PA and RCI data integration agreements (collectively, the three are the "Agreements"). In particular, CDK agreed that it would no longer compete in providing access to Dealer data on Reynolds' DMS, ceding that ground exclusively to Reynolds. At the same time, Reynolds agreed not to block CDK's access to the Reynolds DMS during the wind down period, which lasts until

5

2020. Accordingly, in making the Agreements, CDK and Reynolds agreed they would no longer compete against each other in the DIS market. These three Agreements are currently in effect.[3]

11.     During the wind down period, Reynolds agreed that CDK could continue to extract Dealer data from Reynolds' DMS. At the same time, the Agreements also provided that CDK and Reynolds were to transition all of CDK's Vendor clients (those Vendors for whom CDK provided access to Dealer data on the Reynolds DMS) into the Reynolds RCI program. The Agreements specifically required CDK to "cooperate with Reynolds" in the "transition of [CDK] customers to the Reynolds RCI program with respect to Reynolds Dealers." The Agreements also provided that CDK and Reynolds would no longer access data on each other's DMS. That is, Reynolds agreed not to access the CDK DMS and CDK agreed not access the Reynolds DMS. In doing so, Reynolds agreed not to provide DIS for Dealers, Vendors or data integrators using a CDK DMS and vice-versa.

12.     Capitalizing on their DMS market dominance, through implementation of a *per se* illegal written horizontal market division agreement, Defendants eliminated competition for the provision of these crucial DIS to Dealers nationwide, as well as to Vendors that require access to DMS data to provide a variety of vital services to Dealers.

---

[3] Although not necessary in cases such as this where Dealership Plaintiffs are alleging direct evidence of Defendants' anticompetitive agreements, there are at least four plausible motives for Defendants entering into these unlawful agreements, as discussed more fully herein: (1) to eliminate competition so they could raise data integration prices; (2) to gain a competitive advantage over competing software Vendors by restricting their access to Dealer data; (3) to protect their DMS duopoly from standalone software solutions that were beginning to erode the primacy of the DMS for Dealers; and (4) to stop the defection of Reynolds DMS customers who lauded its "closed" DMS to CDK's previously "open" DMS.

13.     As part of their scheme, Defendants have utilized their control of the DMS market to impose exclusive dealing provisions on Vendors. These exclusive dealing provisions necessitate that any Vendor doing business with CDK or Reynolds cannot contract with any other independent DIS provider, and these exclusive dealing provisions are purportedly infinite in duration. Accordingly, Vendors engaged by Dealers to utilize the Dealers' own data are also required to utilize Defendants' affiliated DIS. For example, if a Vendor does business with CDK then, pursuant to these exclusive dealing provisions, it can only use CDK's DIS, "Third Party Access" or "3PA" (as opposed to an independent DIS provider such as Authenticom, Inc. ("Authenticom") to utilize its Dealer client's own data. Defendants have thus exploited the uncompetitive and unlawful exclusive dealing provisions in Vendor contracts to impose exorbitant charges for data integration on Vendors, and those charges are ultimately passed through to Dealers.

14.     Defendants colluded to drive out any vestige of competition in the two markets, and their conspiracy increased DMS and DIS prices to exorbitant levels. Defendants now charge Vendors an average of $300 per month for the DIS for one Dealership (and some Vendors are charged as much as $800 per month), whereas before the illegal conspiracy data integrators (including CDK subsidiaries) typically charged Vendors about $50 per month per Dealership for DIS. Vendors pass on these artificially inflated fees to Dealers, but Defendants prohibit Vendors from informing Dealerships that the reason for the increased Vendor charges is Defendants' increased data integration fees.

15.     These significant barriers to entry are exacerbated by the lengthy duration of Defendants' DMS contracts with Dealers, which are, on average, five to seven years in

7

length, frequently with terms that impose automatic extensions and higher monthly fees if new services are ordered in the middle of the contracts. Dealerships are "locked in" to these lengthy contracts, so only a fraction of the market is available to other DMS providers to compete for on an annual basis.

16.     Defendants purport to justify their artificially and illegally inflated prices on the basis of an alleged increase in data security costs. Defendants' justification, however, is a pretext for the imposition of increased charges resulting from their illegal anticompetitive conduct. In fact, Defendants' security concerns do not surface until after the Agreements are in place. Defendants' unlawful actions prevented Dealership Plaintiffs and the Classes from receiving the benefits of a fair and competitive marketplace for DMS and DIS. Defendants were able to charge higher prices than would otherwise have prevailed had there been robust competition between Defendants, and among Defendants and third-party DIS providers. As a direct and proximate consequence of Defendants' anticompetitive and illegal conduct, Dealership Plaintiffs and members of the Classes have directly paid the Defendants supracompetitive prices for the provision of DMS, and have indirectly paid the Defendants supracompetitive prices for the DIS required by Vendors. Dealership Plaintiffs bring this antitrust class action to recover damages to the maximum extent permitted by law as a result of their payment of artificially inflated prices for DMS and DIS, and for injunctive relief.

## <u>CLASS ACTION ALLEGATIONS</u>

17.     Dealership Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3) on their own behalf and on behalf of the following Classes, of which one or more Dealership Plaintiffs are members:

**THE NATIONWIDE CLASS**

> All persons and entities located in the United States engaged in the business of the retail sale of automobiles (Dealership Plaintiffs) who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the period from January 1, 2015 to the present ("Class Period").

> Dealership Plaintiffs and the Nationwide Class are claiming damages and/or injunctive relief for violations of Sections 1 and 2 of the Sherman Act during the Class Period.

**THE STATE CLASSES**

> Dealership Plaintiffs and the State Classes who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period seek damages and/or injunctive relief for violations of various state antitrust, trade practices and consumer protection laws in the following states:

> **Alabama Class:** All persons and entities located in Alabama engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

> **Alaska Class:** All persons and entities located in Alaska engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

> **Arizona Class:** All persons and entities located in Arizona engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

> **Arkansas Class:** All persons and entities located in Arkansas engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

> **California Class:** All persons and entities located in California engaged in the business of the retail sale of automobiles who directly purchased DMS

and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Colorado Class:** All persons and entities located in Colorado engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Delaware Class:** All persons and entities located in Delaware engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**District of Columbia Class:** All and entities persons located in the District of Columbia engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Florida Class:** All persons and entities located in Florida engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Georgia Class:** All persons and entities located in Georgia engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Hawaii Class:** All persons and entities located in Hawaii engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Illinois Class:** All persons and entities located in Illinois engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Iowa Class:** All persons and entities located in Iowa engaged in the business of the retail sale of automobiles who directly purchased DMS

and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Kansas Class:** All persons and entities located in Kansas engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Maine Class:** All persons and entities located in Maine engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Massachusetts Class:** All persons and entities located in Massachusetts engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Michigan Class:** All persons and entities located in Michigan engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Minnesota Class:** All persons and entities located in Minnesota engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Mississippi Class:** All persons and entities located in Mississippi engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Nebraska Class:** All persons and entities located in Nebraska engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period..

**Nevada Class:** All persons and entities located in Nevada engaged in the business of the retail sale of automobiles who directly purchased DMS

and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period..

**New Hampshire Class:** All persons and entities located in New Hampshire engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**New Jersey Class:** All persons and entities located in New Jersey engaged in the business of the retail sale of automobiles who directly purchased DMS and/or and indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**New Mexico Class:** All persons and entities located in New Mexico engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**New York Class:** All persons and entities located in New York engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**North Carolina Class:** All persons and entities located in North Carolina engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**North Dakota Class:** All persons and entities located in North Dakota engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Oregon Class:** All persons and entities located in Oregon engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Rhode Island Class:** All persons and entities located in Rhode Island engaged in the business of the retail sale of automobiles who directly

purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**South Carolina Class:** All persons and entities located in South Carolina engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**South Dakota Class:** All persons and entities located in South Dakota engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Tennessee Class:** All persons and entities located in Tennessee engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Utah Class:** All persons and entities located in Utah engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Vermont Class:** All persons and entities located in Vermont engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**West Virginia Class:** All persons and entities located in West Virginia engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Wisconsin Class:** All persons and entities located in Wisconsin engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

18.     Excluded from the Classes are Defendants, including any entity or division in which any Defendant has a controlling interest, as well as Defendants' joint ventures, subsidiaries, affiliates, assigns, and successors.

19.     The exact number of Class members is unknown to Dealership Plaintiffs. Due to the nature of the trade and commerce involved, Dealership Plaintiffs believe there are likely thousands of Class members geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

20.     There are questions of law and fact common to the Class, including but not limited to the following:

> (a)     Whether Defendants engaged in or entered into a contract(s), combination or conspiracy to restrain competition;
>
> (b)     Whether Defendants' unlawful conduct has enabled them to artificially inflate or fix prices for DMS and/or DIS;
>
> (c)     The impact of Defendants' unlawful conduct on the prices of DMS and DIS during the Class Period;
>
> (d)     Whether Defendants violated Sections 1 and 2 of the Sherman Act;
>
> (e)     Whether Defendants violated federal and state laws;
>
> (f)     Whether Defendants caused injury to the business of Dealership Plaintiffs and Class members;
>
> (g)     The appropriate measure of damages sustained by Dealership Plaintiffs and Class members; and
>
> (h)     Whether injunctive relief is appropriate.

21.     These common questions and others predominate over questions, if any, that affect only individual Class members.

22.     Dealership Plaintiffs' claims are typical of the claims of the Classes. Dealership Plaintiffs directly purchased DMS and indirectly purchased DIS from one or both Defendants. As a result, Dealership Plaintiffs and Class members were injured by Defendants' unlawful conduct.

23.     Dealership Plaintiffs and their counsel will fairly and adequately protect and represent the interests of the Classes. Counsel for Dealership Plaintiffs are experienced in complex class action litigation, including antitrust litigation, and will vigorously assert the claims of Class members.

24.     A class action is superior to other methods for the fair and efficient resolution of this controversy. The class action device presents fewer management difficulties; moreover, any difficulties are far outweighed by the benefit of a single adjudication and the comprehensive supervision of this controversy by a single court. The damages suffered individually by Dealership Plaintiffs and each Class member are relatively small as compared to the overall expense and burden of individual prosecution of claims asserted in this litigation. Thus, absent class certification, it would be difficult and inefficient for Dealership Plaintiffs and Class members to redress the wrongs challenged herein.

25.     This action may be also certified under Rule 23(b)(1) or Rule 23(b)(2) because: (a) the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants; (b) the

prosecution of separate actions by individual Class members would create a risk of adjudicative rulings as to them that would, as a practical matter, be dispositive of the interests of the other Class members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds that apply generally to the Class members, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

## THE PARTIES

26. Dealership Plaintiff ACA Motors, Inc., doing business as Continental Acura ("Continental Acura"), is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 2275 Aurora Avenue, Naperville, Illinois. Continental Acura is engaged in the business of purchasing and selling automobiles. During the Class Period, Continental Acura, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Continental Acura also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Continental Acura purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Continental Acura suffered antitrust injury.

27. Dealership Plaintiff Baystate Ford Inc. ("Baystate Ford") is a corporation organized and existing under the laws of the state of Massachusetts with its principal place of business located at 703 Washington Street, South Easton, Massachusetts. Baystate Ford is engaged in the business of purchasing and selling automobiles. During the Class Period, Baystate Ford, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Baystate Ford also paid

supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Baystate Ford purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Baystate Ford suffered antitrust injury.

28.     Dealership Plaintiff Cherry Hill Jaguar ("Cherry Hill Jaguar") is a corporation organized and existing under the laws of the state of New Jersey with its principal place of business located at 2000 Route 70 East, Cherry Hill, New Jersey. Cherry Hill Jaguar is engaged in the business of purchasing and selling automobiles. During the Class Period, Cherry Hill Jaguar, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Cherry Hill Jaguar also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Stevens Jersey City Ford purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Cherry Hill Jaguar suffered antitrust injury.

29.     Dealership Plaintiff Cliff Harris Ford, LLC, doing business as Warrensburg Ford ("Warrensburg Ford"), is a corporation organized and existing under the laws of the state of Missouri with its principal place of business located at 330 E. Young Street, Warrensburg, Missouri. Warrensburg Ford is engaged in the business of purchasing and selling automobiles. During the Class Period, Warrensburg Ford, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Warrensburg Ford also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Warrensburg Ford purchased

software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Warrensburg Ford suffered antitrust injury.

30.     Dealership Plaintiff Continental Autos, Inc., doing business as Continental Toyota ("Continental Toyota"), is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 6701 South La Grange Road, Hodgkins, Illinois. Continental Toyota is engaged in the business of purchasing and selling automobiles. During the Class Period, Continental Toyota, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Continental Toyota also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Continental Toyota purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Continental Toyota suffered antitrust injury.

31.     Dealership Plaintiff Continental Classic Motors, Inc., doing business as Continental Autosports ("Continental Autosports"), is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 420 E. Ogden Avenue, Hinsdale, Illinois. Continental Autosports is engaged in the business of purchasing and selling automobiles. During the Class Period, Continental Autosports, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Continental Autosports also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Continental Autosports purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Continental Autosports suffered antitrust injury.

32.     Dealership Plaintiff 5800 Countryside, LLC, doing business as Continental Mitsubishi ("Continental Mitsubishi"), is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 5800 South La Grange Road, Countryside, Illinois. Continental Mitsubishi is engaged in the business of purchasing and selling automobiles. During the Class Period, Continental Mitsubishi, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Continental Mitsubishi also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Continental Mitsubishi purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Continental Mitsubishi suffered antitrust injury.

33.     Dealership Plaintiff HDA Motors, Inc., doing business as Continental Honda ("Continental Honda"), is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 5901 South La Grange Road, Countryside, Illinois. Continental Honda is engaged in the business of purchasing and selling automobiles. During the Class Period, Continental Honda, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Continental Honda also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Continental Honda purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Continental Honda suffered antitrust injury.

34.     Dealership Plaintiff H & H Continental Motors, Inc., doing business as Continental Nissan ("Continental Nissan"), is a corporation organized and existing under

the laws of the state of Illinois with its principal place of business located at 5750 South La Grange Road, Hodgkins, Illinois. Continental Nissan is engaged in the business of purchasing and selling automobiles. During the Class Period, Continental Nissan, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Continental Nissan also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Continental Nissan purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Continental Nissan suffered antitrust injury.

35.    Dealership Gregoris Motors, Inc. ("Gregoris Motors") is a corporation organized and existing under the laws of the state of New York with its principal place of business located at 555 West Merrick Road, Valley Stream, New York. Gregoris Motors is engaged in the business of purchasing and selling automobiles. During the Class Period, Gregoris Motors, who currently purchases DMS directly from Reynolds, paid supracompetitive prices for its direct purchases of DMS. Gregoris Motors also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Gregoris Motors purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Gregoris Motors suffered antitrust injury.

36.    Dealership Plaintiff Hoover Automotive, LLC, doing business as Hoover Dodge Jeep of Summerville ("Hoover Automotive"), is a corporation organized and existing under the laws of the state of South Carolina with its principal place of business located at 195 Marymeade Drive, Summerville, South Carolina. Hoover Automotive is engaged in the business of purchasing and selling automobiles. During the Class Period,

Hoover Automotive, who currently purchases DMS directly from Reynolds, paid supracompetitive prices for its direct purchases of DMS. Hoover Automotive also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Hoover Automotive purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Hoover Automotive suffered antitrust injury.

37. Dealership Plaintiff JCF Autos LLC, doing business as Stevens Jersey City Ford ("Stevens Jersey City Ford"), is a corporation organized and existing under the laws of the state of New Jersey with its principal place of business located at 740 Route 440, Jersey City, New Jersey. Stevens Jersey City Ford is engaged in the business of purchasing and selling automobiles. During the Class Period, Stevens Jersey City Ford, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Stevens Jersey City Ford also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Stevens Jersey City Ford purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Stevens Jersey City Ford suffered antitrust injury.

38. Dealership Plaintiff Jericho Turnpike Sales LLC, doing business as Ford & Lincoln of Smithtown ("Smithtown Ford & Lincoln"), is a corporation organized and existing under the laws of the state of New York with its principal place of business located at 440 Jericho Turnpike, Smithtown, New York. Smithtown Ford & Lincoln is engaged in the business of purchasing and selling automobiles. During the Class Period, Smithtown Ford & Lincoln, who currently purchases DMS directly from CDK, paid

supracompetitive prices for its direct purchases of DMS. Smithtown Ford & Lincoln also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Smithtown Ford & Lincoln purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Smithtown Ford & Lincoln suffered antitrust injury.

39.     Dealership Plaintiff Jim Marsh American Corporation, doing business as Jim Marsh Mitsubishi Suzuki Kia Mahindra ("Jim Marsh Mitsubishi") is a corporation organized and existing under the laws of the state of Nevada with its principal place of business located at 8555 W. Centennial Parkway, Las Vegas, Nevada. Jim Marsh Mitsubishi is engaged in the business of purchasing and selling automobiles. During the Class Period, Jim Marsh Mitsubishi, who currently purchases DMS directly from Reynolds, paid supracompetitive prices for its direct purchases of DMS. Jim Marsh Mitsubishi also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Jim Marsh Mitsubishi purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Jim Marsh Mitsubishi suffered antitrust injury.

40.     Dealership John O'Neil Johnson Toyota, LLC ("Johnson Toyota") is a corporation organized and existing under the laws of the state of Mississippi with its principal place of business located at 2900 Highway 39 North, Meridian, Mississippi. Johnson Toyota is engaged in the business of purchasing and selling automobiles. During the Class Period, Johnson Toyota, who currently purchases DMS directly from Reynolds, paid supracompetitive prices for its direct purchases of DMS. Johnson Toyota also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from

which Johnson Toyota purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Johnson Toyota suffered antitrust injury.

41. Dealership Plaintiff Kenny Thomas Enterprises, Inc., doing business as Olathe Toyota ("Olathe Toyota"), is a corporation organized and existing under the laws of the state of Delaware with its principal place of business located at 685 N. Rawhide Drive, Olathe, Kansas. Olathe Toyota is engaged in the business of purchasing and selling automobiles. During the Class Period, Olathe Toyota, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Olathe Toyota also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Olathe Toyota purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Olathe Toyota suffered antitrust injury.

42. Dealership Plaintiff Marshall Chrysler Jeep Dodge, L.L.C. doing business as Marshall Chrysler Jeep Dodge Ram ("Marshall Chrysler") is a corporation organized and existing under the laws of the state of Missouri with its principal place of business located at 1450 W. Arrow Street, Marshall, Missouri. Marshall Chrysler is engaged in the business of purchasing and selling automobiles. During the Class Period, Continental Acura, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Marshall Chrysler also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Marshall Chrysler purchased software applications passed on Defendants' artificially inflated data

integration fees. As a result of Defendants' unlawful conduct, Marshall Chrysler suffered antitrust injury.

43.     Dealership Plaintiff Naperville Zoom Cars, Inc., doing business as Continental Mazda ("Continental Mazda"), is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 2363 Aurora Avenue, Naperville, Illinois. Continental Mazda is engaged in the business of purchasing and selling automobiles. During the Class Period, Continental Mazda, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Continental Mazda also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Continental Mazda purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Continental Mazda suffered antitrust injury.

44.     Dealership Plaintiff NV Autos, Inc., doing business as Continental Audi ("Continental Audi"), is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 1527 Aurora Avenue, Naperville, Illinois. Continental Audi is engaged in the business of purchasing and selling automobiles. During the Class Period, Continental Audi, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Continental Audi also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Continental Audi purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Continental Audi suffered antitrust injury.

45.     Dealership Plaintiff Patchogue 112 Motors LLC, doing business as Stevens Ford ("Stevens Ford") is a corporation organized and existing under the laws of the state of New York with its principal place of business located at 507 Route 112, Patchogue, New York. Stevens Ford is engaged in the business of purchasing and selling automobiles. During the Class Period, Stevens Ford, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Stevens Ford also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Stevens Ford purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Stevens Ford suffered antitrust injury.

46.     Dealership Plaintiff Pitre Imports, LLC, doing business as Pitre Kia ("Pitre Kia"), is a corporation organized and existing under the laws of the state of New Mexico with its principal place of business located at 9640 Eagle Ranch Road NW, Albuquerque, New Mexico. Pitre Kia is engaged in the business of purchasing and selling automobiles. During the Class Period, Pitre Kia, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Pitre Kia also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Pitre Kia purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Pitre Kia suffered antitrust injury.

47.     Dealership Plaintiff Pitre, Inc., doing business as Pitre Buick GMC ("Pitre Buick"), is a corporation organized and existing under the laws of the state of New Mexico with its principal place of business located at 9737 Eagle Ranch Road NW,

Albuquerque, New Mexico. Pitre Buick is engaged in the business of purchasing and selling automobiles. During the Class Period, Pitre Buick, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Pitre Buick also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Pitre Buick purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Pitre Buick suffered antitrust injury.

48.     Dealership Plaintiff Teterboro Automall, Inc., doing business as Teterboro Chrysler Dodge Jeep Ram ("Teterboro Chrysler"), is a corporation organized and existing under the laws of the state of New Jersey with its principal place of business located at 469 Route 46, Little Ferry, New Jersey. Teterboro Chrysler is engaged in the business of purchasing and selling automobiles. During the Class Period, Teterboro Chrysler, who currently purchases DMS directly from Reynolds, paid supracompetitive prices for its direct purchases of DMS. Teterboro Chrysler also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Stevens Jersey City Ford purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Teterboro Chrysler suffered antitrust injury

49.     Dealership Plaintiff Waconia Dodge, Inc. ("Waconia Dodge") is a corporation organized and existing under the laws of the state of Minnesota with its principal place of business located at 905 Strong Drive, Waconia, Minnesota. Waconia Dodge is engaged in the business of purchasing and selling automobiles. During the Class Period, Waconia Dodge, who currently purchases DMS directly from CDK, paid

supracompetitive prices for its direct purchases of DMS. Waconia Dodge also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Waconia Dodge purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Waconia Dodge suffered antitrust injury.

50.     Dealership Warrensburg Chrysler Dodge Jeep, L.L.C. doing business as Warrensburg Chrysler Dodge Jeep Ram Fiat ("Warrensburg Chrysler") is a corporation organized and existing under the laws of the state of Missouri with its principal place of business located at 329 E. Young Street, Warrensburg, Missouri. Warrensburg Chrysler is engaged in the business of purchasing and selling automobiles. During the Class Period, Warrensburg Chrysler, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Warrensburg Chrysler also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Warrensburg Chrysler purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Warrensburg Chrysler suffered antitrust injury.

51.     Defendant CDK is a publicly-traded Delaware corporation with its corporate headquarters and principal place of business located at 1950 Hassell Road, Hoffman Estates, Illinois. CDK provides DMS software and services to automobile dealerships throughout the United States, including in Illinois, and has more than $2 billion in annual revenue. In 2014, CDK was spun off from ADP, LLC, and is now an independent, publicly-traded company in which ADP retains no ownership interest. Prior to the spin-off, CDK was referred to as ADP Dealer Services Inc. CDK and ADP are

collectively referred to herein as "CDK." In addition to providing DMS services, CDK also provides DIS indirectly to Dealerships throughout the United States, including in Illinois.

52.     Defendant Reynolds is an Ohio corporation with its corporate headquarters and principal place of business located at One Reynolds Way, Kettering, Ohio. Reynolds was formerly a publicly-traded company before it was privately acquired by Bob Brockman in 2006. Reynolds provides DMS software and services to automobile dealerships throughout the United States, including in Illinois. In addition to providing DMS services, Reynolds also provides DIS indirectly to Dealerships throughout the United States, including in Illinois.

## JURISDICTION AND VENUE

53.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; and various state laws.

54.     This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

55.     This Court has jurisdiction over the state law claims under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs, and at least one plaintiff and one defendant are citizens of different states. There are more than 100 putative Class members.

56.     This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because such claims are so closely related to the federal claims that they form part of the same case or controversy.

57.     This Court has personal jurisdiction over Defendants subject to the nationwide service provisions of Section 12 of the Clayton Act, 15 U.S.C. § 22. Furthermore, Defendants have engaged in the unlawful acts described in this Complaint with the foreseeable or intended effect of causing substantial economic harm to automotive dealers in the state of Illinois. Moreover, Defendants purposefully availed themselves of the privilege of doing business in Illinois through the widespread promotion, sale, marketing, and distribution of their products and services in the state of Illinois.

58.     Venue is proper in this Court pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d). Defendants are registered to do business, transacted business, were found, and had agents in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District. Among other things, CDK is headquartered in this District and Reynolds conducts business in this District.

59.     As described throughout the Complaint, Defendants' unlawful conduct has substantially affected interstate commerce by harming competition and increasing prices to the detriment of the Dealership Plaintiffs throughout the United States. The actions complained of herein have restrained and adversely affected interstate commerce throughout the United States because Defendants provide their products and services across the nation, and the markets for DMS and DIS are both nationwide markets. Furthermore, during the Class Period, Defendants sold a substantial amount of DMS and

provided extensive DIS within the continuous and uninterrupted flow of interstate commerce, and as intended, their actions substantially affected that commerce.

## FACTUAL ALLEGATIONS

### A.    The Relevant Product Markets

60.    The relevant product markets in this antitrust class action are (i) the DMS market; and (ii) the DIS market, including the single-brand aftermarkets for DIS.[4] Participants in the DMS market include Dealers and the providers of DMS. Participants in the DIS market include entities that specialize in accessing and aggregating Dealers' data from DMS databases and provide services to Dealers and Vendors by extracting, formatting and aggregating data. The single-brand aftermarkets for DIS are the derivative markets for the provision of DIS on each of the Reynolds and CDK DMS.[5] There are no reasonable substitutes for DMS or the services provided by data integrators to Dealers and Vendors engaged in the retail automobile industry. The relevant geographical market for both the DIS and DMS markets is the United States.

### B.    CDK and Reynolds Dominate The DMS Market And Unlawfully Exploited Their Duopoly Power

#### (i)    Data Management Systems and the DMS Market

61.    DMS is enterprise software designed for and used by retail automobile Dealerships. It is the critical software that operates as a Dealer's central database and is the repository of critical operational information. Dealerships input their important business data, including sales, financing, inventory management (both vehicle and parts),

---

[4] There are cognizable and separate markets for the provision of DIS on the respective Reynolds and CDK DMS.

[5] The aftermarket for Dealer data integration is derivative of the primary DMS Market because if there were no DMS systems in the first place, there would be no demand for integration services for Dealer data on those systems.

repair and service, accounting, payroll, human resources, marketing, and car manufacturer ("Original Equipment Manufacturer" or "OEM") certifications into their DMS. The physical storage of the data is either onsite at the Dealership, at private data centers operated by the DMS provider, or with cloud-based data storage companies.

62.     Dealerships rely on DMS to manage their operations because it "measures, reports and controls the functions within a dealership yielding quantifiable, reliable and timely information of significant importance to the dealer and dealership management."[6] A publication by a leading industry technology consultancy has described DMS as "the center of a dealer's entire retail management platform. It's impossible to operate without it."[7]

63.     Defendants' DMS business is enormously lucrative. A single, small Dealership will pay up to $150,000 per year for the DMS software license and DMS services offered by Defendants. Mid-size Dealership groups (5 to 10 stores) will pay $1,500,000 or more per year, and large Dealerships (10+ stores) can easily pay over $5,000,000 per year. Given the thousands of Dealerships that use Defendants' DMS, and with profit margins exceeding 40%, Defendants are tremendously profitable. CDK's market capitalization is well over $8 billion.[8]

---

[6] *See* Deal Pack Blog, *Dealer Management System: What Is It and Which Dealers Need It?* http://www.dealpack.com/dealer-management-system-what-is-it-and-which-dealers-need-it/ (July 20, 2012); Jeff Smelley, *What Exactly Is DMS?* Autodealer Today, http://www.autodealermonthly.com/channel/dps-office/article/story/2006/08/what-exactly-is-dms.aspx (Aug. 2006) (both websites last accessed May 30, 2018).

[7] Gillrie Institute, "5 Dealership Technology Projects for 2016 … Dealership Management System (DMS)," http://paulgillrie.com/5-dealership-technology-projects-for-2016/ (last accessed May 30, 2018).

[8] *See* CDK 2017 Form 10-K Annual Report, http://investors.cdkglobal.com/static-files/b1712448-ee99-4e77-a248-864931905650 (Aug. 8, 2017), 1 ("aggregate market value of common stock held by non-affiliates of the registrant, as of December 31, 2016, the last business day of the

64.    The DMS market is extremely concentrated and it is dominated by Defendants.[9] Defendants control approximately 75% of the DMS market in the United States for Dealerships when measured by franchised stores, and their market share is even higher when measured by the number of vehicles sold by franchised Dealers on Defendants' systems.[10]

---

registrant's most recently completed second fiscal quarter, was approximately $8.7 billion."); *see also* Nasdaq Key Stock Data, http://www.nasdaq.com/symbol/cdk (reporting CDK's market capitalization of $8,347,831,756 as of May 29, 2018) (last accessed May 29, 2018).

[9] One of the last remaining competitors in the DIS market, Authenticom, commenced proceedings against Reynolds and CDK, accusing them of engaging in antitrust violations through the horizontal agreements and a coordinated campaign to block Authenticom's access to Dealer data and thereby destroy its business, and drive it out of the DIS market. *See Authenticom, Inc. v. CDK Global, LLC*, No. 17-CV-00318 (W.D. Wis. May 5, 2017), ECF No. 4, ¶¶ 178-210 ("Authenticom Complaint" or "Authenticom Case"). As part of the Authenticom Case, an evidentiary hearing regarding Authenticom's application for a preliminary injunction was held on June 26 and 27, 2017. *See* Transcript of Second Day of Evidentiary Hearing, Afternoon Session (Jun. 27, 2017), ECF No. 163 ("Authenticom Tr., ECF No. 163"), 250:14-18 (CDK's economic expert, Dr. Sumanth Addanki, testifying that the DMS market is "concentrated."). Excerpts of Authenticom Tr., ECF No. 163, are attached hereto as Exhibit 1.

[10] *See* Transcript of First Day of Evidentiary Hearing, Morning Session (Jun. 26, 2017), ECF No. 164 ("Authenticom Tr., ECF No. 164"), 150:6-151:2 (Authenticom CEO Stephen Cottrell testifying that CDK and Reynolds account for "ballpark 70% of the market"); Transcript of Second Day of Evidentiary Hearing, Morning Session (Jun. 26, 2017), ECF No. 165 ("Authenticom Tr., ECF No. 165"), 95:2-95:25 (Authenticom expert witness Hal Singer testifying that, on a revenue basis, CDK and Reynolds have a market share much higher than 72%); ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ Excerpts of Authenticom Tr., ECF No. 164, and Authenticom Tr., ECF No. 165, are attached hereto as Exhibits 2 and 3, respectively; a copy of the email and attachment is attached hereto as Exhibit 4 (composite exhibit).

CDK recently attempted to increase its market share even further. In the fall of 2016, CDK competitor, Auto/Mate Dealership Systems, a smaller provider of DMS, placed itself up for sale. CDK attempted to purchase the company in order to eliminate a strong competitor. CDK entered into a stock purchase agreement with Auto/Mate to purchase 100% of Auto/Mates shares. However, after the filing of the FTC complaint (which followed the initiation of this litigation), CDK abandoned the proposed acquisition. *See* Federal Trade Commission Media Release, *FTC Challenges CDK Global, Inc.'s Proposed Acquisition of Competitor Auto/Mate, Inc. - Acquisition Would Harm Competition in Dealer Management System Software For New Car Dealers*, March 20, 2018.

65.     CDK and Reynolds are referred to as "the Big 2" and the "two giants" of the industry.[11] They are also frequently referenced as the industry's "duopoly."[12]

### (ii)     Significant Switching Costs Facilitate an Antitrust Conspiracy

66.     It is extremely difficult and disruptive for a Dealer to switch DMS providers, with some Dealers analogizing a DMS change to a "heart transplant or a knee replacement. Others say it's akin to reading a foreign language or teaching someone how to write with their opposite hand."[13] There are also significant costs to switching DMS, including a Dealer's need to spend up to a year or more to train staff, via online tutorials and in person sessions, to learn how to operate the new system.[14] In November 2016, CDK's CEO acknowledged that "switching DMS providers can be very difficult. It [is] quite a process [to] change and takes time, which is part of the reason that many dealers are hesitant to switch."[15]

67.     Switching DMS providers is not only a costly and lengthy procedure, it is also extremely risky. Dealers store vital data on their DMS, and access to their data is

---

[11] Michael Cross, *Dealer Management Systems: An Industry Ripe for Change, Autosoft Dealer Management System*, https://www.autosoftdms.com/dealer-management-systems-an-industry-ripe-for-change/ (April 7, 2017); David Barkholz, *DMS dilemma: Why it's so hard to switch*, Automotive News, http://www.autonews.com/article/20100510/RETAIL07/305109976/dms-dilemma%3A-why-its-so-hard-to-switch (May 10, 2010); Vince Bond Jr., *CDK's 'fantastic win' is now lost*, http://www.autonews.com/article/20161107/RETAIL07/311079964/cdks-fantastic-win-is-now-lost (Nov. 17, 2016) (websites last accessed May 29, 2018).

[12] *See, e.g.*, Barkholz, *supra*, n.11 (describing the position of Reynolds and CDK as a "duopoly.").

[13] Vince Bond Jr., *"Survivors of DMS shifts tell their tales,"* Automotive News, http://www.autonews.com/article/20170508/RETAIL07/305089978/survivors-of-dms-shifts-tell-their-tales (May 8, 2017) (last accessed May 29, 2018).

[14] *Id.*

[15] Thomson Reuters StreetEvents, *Edited Transcript: CDK – Q1 2017 CDK Global, Inc. Earnings Conference Call* (Nov. 2, 2016), 3 (statement by CDK CEO, Brian MacDonald), http://investors.cdkglobal.com/static-files/729bb97d-d7d9-46b2-a711-b7fba4a0a4ce          (last accessed May 31, 2018).

crucial to the daily operation of their business. Defendants control access to the DMS and can restrict or deny access to the DMS,[16] thus severely crippling the Dealer's business, as retribution for changing DMS providers.[17]

68.     As further evidence of the high costs of switching data integration providers, ██████████████████████████████████████[18]

69.     Because of their substantial power in the DMS market, Defendants have the ability to raise prices and obtain profits substantially above the levels that would exist in a competitive market.

> **(iii)     Defendants' Market Dominance of the DMS Market and Their Vertical Integration Enabled Them to Unlawfully Divide Both the DMS Market and the DIS Market**

70.     CDK and Reynolds dominate the DMS market. They are also vertically integrated businesses and provide DIS. Vertical integration enabled them to leverage their market power in the DMS market into the DIS market.

71.     CDK's 2017 Annual Report states:

> We are a leading global provider of integrated information technology and digital marketing solutions to the automotive retail and adjacent industries. *Focused on enabling end-to-end*

---



[16] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

[17] Even software giant Microsoft could not overcome the barriers to entry and enter the DMS market. In 2006, Microsoft tried to enter the DMS market but failed. *See* David Barkholz, *Dealers get new management system option Dominion-Microsoft product battles giants ADP, Reynolds,* http://www.autonews.com/article/20121202/RETAIL07/312039973/dealers-get-new-management-system-option, Automotive News (Dec. 2, 2012) (last accessed May 31, 2018).

[18] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████

> *automotive commerce…Our solutions automate and integrate all parts of the buying process from targeted digital advertising and marketing campaigns to the sale, financing, insuring, parts supply, repair, and maintenance of vehicles.* We believe the breadth of our integrated solutions allows us to more comprehensively address the varied needs of automotive retailers than any other single competitor in our industry.[19]

CDK's data integration service is known as 3PA (Third Party Access), and Reynolds' as RCI (Reynolds Certified Interface).[20] CDK and Reynolds control access to their respective DMS's and therefore restrict the ability of independent data integrators to service their clients.

72.     Defendants' domination of the DMS market, together with the formidable barriers to entry, has enabled them to divide and monopolize the DMS market and increase DMS prices. At the same time, CDK and Reynolds have been able to transfer their control of the DMS market into the DIS market and unlawfully divide the DIS market between CDK's 3PA and Reynolds' RCI data integration platforms and destroy any competition in the DIS market.[21]

---

[19] *See* CDK 2017 Form 10-K Annual Report, *supra*, n.8, at 3 (emphasis added).

[20] CDK and Reynolds also provide software applications offered by other Vendors, including digital marketing services, customer relationship management solutions, and finance and insurance services. Indeed, CDK and Reynolds have even entered a joint venture to provide electronic registration and titling services through Computerized Vehicle Registration, Inc. ("CVR"). *See* CVR Home Page, *About Us*, http://www.cvrconnect.com/about-us (last accessed May 29, 2018) ("[W]e are committed to creating a better customer vehicle purchasing experience through seamless, secure digital titling and registration solutions ... Our solutions incorporate both customer and state needs, and we are backed by the leading DMS providers in the industry – CDK Global and Reynolds & Reynolds.").

[21] Although the DMS and DIS markets are interrelated and CDK's DMS products have been described as an "ecosystem," because there is demand for DIS that is distinct and separate from the primary service, DMS and DIS remain separate markets. *See* Authenticom Tr., ECF No. 165, *supra*, n.10, at 89:2-91:20 (testimony of Authenticom expert witness, Dr. Hal Singer).

C.    **CDK and Reynolds Entered Into A *Per Se* Illegal Market Division Agreement And Colluded To Destroy Competition In The DIS Market**

(i)    **Dealership Data and the DIS Market**

73.    Dealership data is crucial to success in the retail automobile industry, and Dealers input that data into a database within their DMS. Dealerships utilize the DMS to generate data, including insurance, customer, vehicle financing, and titling and registration information. Dealers frequently engage Vendors to perform associated essential services for the Dealer. A single Dealership rooftop typically uses about 10-15 separate Vendors — and often more. For instance, a Dealer may engage a Vendor such as a software application provider to electronically register new automobiles upon sale. In providing their services to Dealers, Vendors necessarily access and utilize the DMS data, with the Dealers' authorization.

(ii)    **Dealers Own Their Data and Authorize Access to Vendors and Data Integrators**

74.    Dealers retain ownership of the data they create and store on their DMS's as CDK and Reynolds have both repeatedly and publicly acknowledged. For example, Reynolds spokesman, Tom Schwartz, stated that, "*[t]he data belongs to the dealers*. We all agree on that."[22] Similarly, Steve Annen, CDK's former CEO, stated, "I don't know how you can ever make the opinion that the data is yours to govern and to preclude others

---

[22]    David Barkholz, *Dealers Decry Reynolds Crackdown*, Automotive News, http://www.autonews.com/article/20111121/RETAIL07/311219997/dealers-decry-reynolds-crackdown (Nov. 21, 2011) (emphasis added) (last accessed May 29, 2018).

from having access to it, when in fact it's really the data belonging to the dealer. As long

as they grant permission, how would you ever go against that wish?"[23]

---

[23] Ralph Kisiel, *ADP Provides Dealers 3 Options on Data Access*, Automotive News, http://www.autonews.com/article/20070219/SUB/70215040/?template=print (Feb. 19, 2007) (emphasis added) (last accessed May 29, 2018). Indeed, senior executives of CDK (and its predecessor, ADP Dealer Services, Inc.) have repeatedly stated that Dealers own and control their data:

- Howard Gardner, CDK's Vice President of Data Strategy, has stated that CDK "has always understood that dealerships own their data and enjoy having choices on how best to share and utilize that data with others." *See* Press Release, ADP Dealer Services, Inc., *ADP announces new approved vendors for ADP's Third Party Access Program*, http://www.cdkglobal.ca/company/news/adp-announces-new-approved-vendors-adp%E2%80%99s-third-party-access-program-0 (Jan. 12, 2013) (last accessed May 31, 2018).

- Matt Parsons, CDK's Vice President of Sales and Marketing, has stated, "We're not going to limit the ability of a dealer to give an ID to someone else to, in essence, dial into their system. *That is the dealer's right.* We have no right to tell them they can't do that." *See* Ralph Kisiel, *NADA, AIADA weigh Reynolds data security debate*, Automotive News, http://www.autonews.com/article/20070204/SUB/70203019/nada-aiada-weigh-reynolds-data-security-debate (Feb. 4, 2007) (emphasis added) (last accessed May 31, 2018).

- Kevin Henahan, CDK's Senior Vice President of Product Marketing, has stated, "We don't tell the dealer, if someone wants access to their data, they have to come to [CDK] to gain access to the data. *It's ultimately the dealer's data.* If he wants to give that data to somebody, for us to try to charge a toll doesn't seem like the right thing to do. So we're not going to go down this path." *See* Ralph Kisiel, *Dealer security stirs insecurity: Vendors wary of Reynolds plan for computer systems* (lower case as amended), Automotive News, http://www.autonews.com/article/20061204/SUB/61201031/dealer-security-stirs-insecurity (Dec. 4, 2006) (emphasis added) (last accessed May 31, 2018).



75.     Although Vendors have the Dealer's authorization to access and utilize the Dealer's data on the DMS, they generally cannot obtain access to the data in a usable format directly from the Dealer. To access and utilize the Dealer's data, Vendors engage data integrators to extract, format, and organize the data. The data integrators access the data stored on the DMS and convert it into a form suitable for the specific service provided by the Vendor. For instance, for the registration of a new car sale, an electronic registration service provider will require access to the Dealer's DMS data concerning the vehicle and the customer. To extract the data in a usable format, the electronic registration service provider will engage a data integrator. However, data integrators currently can only access a DMS with the permission of the DMS provider. Dealers regularly provide data integrator access to their DMS's by either sharing existing login credentials or creating new ones for the data integrator.

76.     CDK and Reynolds also provide DIS, separate and apart from their DMS services through, respectively, their 3PA and RCI platforms. Although the 3PA and RCI DIS are limited to integrating data with respect to each Defendant's respective DMS, CDK also owns two independent integrators — Digital Motorworks ("DMI") and IntegraLink, which provide DIS with respect to data stored on others' DMS's (*e.g.*, Reynolds) as well.[24]

---

[24] In 2002, CDK acquired DMI, one of the largest dealer integrators in the market, which enabled CDK to "extract, transform and standardize data" from thousands of Dealerships. In 2010, CDK acquired IntegraLink, another data integrator that specialized in collecting data from Dealerships. *See* Authenticom Tr., ECF No. 164, *supra*, n.10, at 77:21-79:5 (Opening Statement by CDK Counsel) ("THE COURT: … Does CDK now kind of build data integration function into its DMS? MS. MILLER:   And I'd actually -- yeah. THE COURT: Because you used to have a third-party integrator -- MS. MILLER: And we still do. THE COURT: So tell me again what the continued role of DMI and -- what is it called, IntegraLink? MS. MILLER: IntegraLink. Both of

77.     CDK and Reynolds vigorously competed in the DIS market prior to 2015. In 2006, Reynolds began selectively and sporadically blocking data integrators from accessing Dealer data on the Reynolds DMS by disabling integrators' Dealer-created login credentials.[25] CDK differentiated itself and the CDK DMS from Reynolds by publicly touting the openness of its DMS. CDK repeatedly vowed (including in public statements by its CEO and top marketing officers) that it would not block independent data integrators from accessing Dealer data on its DMS.

78.     

[26] Historically, CDK was successful in marketing its "open" DMS to Dealers as a competitive advantage over the Reynolds DMS, and Dealers purchased DMS services from CDK based, in large part, on CDK's public representations about the openness of its DMS. As a result, CDK gained market share from Reynolds.[27]

---

those were acquisitions. DMI was in 2002. IntegraLink was in 2010. As Mr. Cohen told you, they used to be hostile integrators …").

[25] At one time, over a dozen integrators competed for Dealers' business. However, after Reynolds was privately acquired by Bob Brockman in 2006, Reynolds began blocking data integrators from accessing Dealer data on the Reynolds DMS by disabling the integrators' dealer-created login credentials. CDK had issues with Reynolds' actions. When asked by *Automotive News* whether Dealers should be permitted to hand out passwords or user IDs to a Vendor for data extraction, Steven Annen, now retired CEO of CDK replied, "We're not going to prohibit that or get in the way of that. I think we've stated pretty emphatically, we really believe the dealer owns the data. Obviously, they have to grant permission …." *See* Kisiel, *supra*, n.23.

[26] 

[27] *See* Authenticom Tr., ECF No. 164, *supra*, n.10, at 84:5-22 (Authenticom's expert, Dr. Singer, testifying that CDK's pre-2015 commitment to an open DMS gave CDK a huge advantage over

79.     In 2013, Reynolds began vigorously blocking data integrators. CDK, however, continued to allow open access to its DMS's and compete with Reynolds.

80.     Despite CDK's success in wresting market share away from Reynolds, its biggest competitor in the DMS market, competition between Reynolds and CDK suddenly ceased in 2015.

### (iii) Defendants Entered into a *Per Se* Illegal Horizontal Agreement to Allocate Market Share in the DIS Market

81.     In February 2015, CDK and Reynolds entered into an illegal market division agreement to divide the DIS market.[28] Specifically, CDK and Reynolds agreed to cooperate in closing their respective DMS's and, as part of that agreement, CDK closed its previously "open" system. ████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████[29]

---

Reynolds ("CDK was committed to open this [sic]. They used this in their marketing literature. They went to the market and they said, 'We're going to need to be superior because of openness. Because of openness, think about all the things that come: low-priced integration, low-priced apps, the proliferation of apps. This is just going to be a better platform than what our closed rival is doing,' and they won. We see a massive, a massive share shift going from R and R during this experiment to CDK on the order of 10 percentage points of share shift, 40% market share down to — even higher than 40 I understand, down to 30% over this period.").

[28] ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████

[29] ██████████████████████████████████████████████████████ ██████████████████████████████████████████████

82.     The unlawful market division agreement featured three separate written documents: (1) the Data Exchange Agreement or "Wind Down" Agreement; (2) the 3PA Agreement; and (3) the RCI Agreement (referred to previously as the "Agreements").[30]

(a)     **The Data Exchange or "Wind Down" Agreement**

83.     The Data Exchange Agreement or "Wind Down" agreement provides that CDK is to wind down its data integration business on Reynolds' DMS's; that is, CDK would stop providing services to Dealers relating to the integration of their data stored on Reynolds' DMS's. At the same time, Reynolds agreed not to block CDK's access to

---

[30] According to the U.S. District Court for the District of Wisconsin, the Agreements between CDK and Reynolds "suggest a horizontal conspiracy." *See* Authenticom Case, 2017 WL 3017048, *3, 6 (W.D. Wis. Jul. 14, 2017):

> CDK's transition to a closed system roughly coincided with CDK and Reynolds signing written agreements in February 2015…
>
> * * * * *
>
> The February 2015 agreements between CDK and Reynolds also suggest a horizontal conspiracy. Although the agreements do not explicitly state that defendants will work together to eliminate third-party data integrators, the agreements have that effect. The parties agree that they will not attempt to access, or help others access, the other's DMS without permission (although Reynolds gives CDK a long wind-down period to transition out of the Reynolds integration business). Both parties agree to cooperate in facilitating their dealers' access to each other's software applications. And their agreements with third-party vendors—like the 3PA Agreement and the RCI Agreement—are exclusive, in the sense that defendants agreed that in their capacity as app providers, their sole access to one another's DMSs would be through the in-house interfaces. In other words, by signing up for 3PA or RCI, defendants agreed not to use third-party integrators to access the CDK DMS or the Reynolds DMS, respectively. After the agreements, there is little room in the market for third-party integrators.

The Seventh Circuit overturned the District Court's grant of the preliminary injunction solely on the basis that the injunction was over-broad. The Seventh Circuit specifically noted that "[t]he merits of this lawsuit have yet to be tried, and so nothing we say should be taken as presaging the eventual outcome of the case. The only matter before us is the propriety of the preliminary injunction that the district court issued—a step it took out of concern for preserving Authenticom as a functioning company until the suit can be resolved one way or the other." *See Authenticom v. CDK Global, Inc.*, Nos. 17-2540 & 17-2541 (7th Cir . Nov. 6, 2017), 8.

Reynolds' DMS's during the wind down period, which lasts until 2020.[31] Defendants thus effectively agreed that CDK would stop competing with Reynolds in the DIS market.

84.    During that wind down period, Defendants agreed that CDK could continue to extract Dealer data from Reynolds' DMS's.[32] At the same time, the Data Exchange Agreement provided that CDK and Reynolds were to transition all of CDK's third party Vendor clients (*i.e.*, those vendors for whom CDK provided access to Dealer data on Reynolds DMS's) into the Reynolds' RCI program.  Specifically, under § 4.2 of the Agreement, CDK was to notify its Vendor clients of its intent to wind down its Reynolds DMS related integration, and under § 4.4, CDK was to assist and cooperate with Reynolds' efforts to communicate with CDK's Vendor clients and transition them to the RCI Program.[33]

---

[31] *See* CDK-0000001-13, Executed Data Exchange Agreement (Feb. 18, 2015), at CDK-0000001 ("WHEREAS, Reynolds has agreed to provide CDK an orderly Wind Down Period (the 'Wind Down Period') during which Reynolds will not attempt to prevent [CDK's Integralink and DMI affiliates] from polling data from Reynolds DMS."); *see also id.* at CDK-0000002-03, § 1.4 (Definition - "Wind Down Period"). A copy of the document is attached hereto as Exhibit 11.

[32] *See id.* at CDK-0000004, § 4.3 ("During the Wind Down Period, the parties intend that, consistent with the terms of this Agreement, CDK will continue providing its integration services through DMI in accordance with its contracts without interruption from Reynolds security enhancements …").

[33] *See id.* at CDK-0000003-04, § 4.2 ("CDK will communicate to the DMI Third Party Clients: (a) that CDK intends to wind down its Reynolds DMS related integration and does not intend to extend service for such integration beyond the current primary term of its agreement with such DMI Third Party Client ...."); *see also id.* at CDK-0000003,  § 4.4 ("During the Wind Down Period for each DMI Third Party Client, CDK agrees to reasonably assist and cooperate with Reynolds, with respect to: (1) communication with DMI Third Party Clients, their Reynolds Dealer customers and the automotive industry in general during the Wind Down Period; (2) Reynolds' development and testing of interfaces for DMI Third Party Clients who choose to join the Reynolds RCI Program; and (3) the transition of such customers to the Reynolds RCI program with respect to Reynolds Dealers.").

85. The Data Exchange Agreement specifically required CDK to "cooperate with Reynolds" in the "transition of [CDK] customers to the Reynolds RCI program with respect to Reynolds Dealers."[34] In connection with that effort, CDK agreed to provide Reynolds with full information about the Vendors CDK served, including their names, DMS numbers, store numbers, branch numbers, user logins, specific data access provided by CDK, data interfaces, the frequency of the data provided, the deadlines for data delivery, and the format of the data.[35]

86. The Data Exchange Agreement also includes a "Prohibition on Knowledge Transfer and DMS Access" provision, whereby CDK and Reynolds each agreed not to provide DIS (*i.e.*, for Dealers or Vendors) with respect to data on the other's DMS.[36]

#### (b) The Data Integration Agreements

87. The two other written agreements made by Defendants in February 2015 were (1) the 3PA Agreement; and (2) the RCI Agreement. These two agreements, collectively referred to as the "Data Integration Agreements," provided CDK and

---

[34] *See id.*

[35] *See id.* at CDK-0000004, § 4.3 ("CDK understands and agrees that, in order for Reynolds to be able to provide such Interim Solution pursuant to this Section 4.3, CDK shall provide Reynolds with: (i) within 5 business days of the Effective Date, a list of Reynolds Dealers System Numbers and the OMS User Logins being used by CDK for each Dealer for whom such Interim Solution is needed; and (ii) provided CDK has secured any permission necessary to provide such information, within 60 days of the Effective Date, the information described in Exhibit DEA-2 hereto …").

[36] *See id.* at CDK-0000004-05, § 4.5 ("Each of Reynolds and CDK further covenants and agrees not to sell, transfer, or assign to any affiliate or third party any technology, business process, or other such knowledge regarding integration with the other party's DMS or take any other steps to assist any person that it reasonably believes to have plans to access or integrate with the other party's DMS without other party's written consent …").

Reynolds reciprocal access to each other's DIS — the 3PA and RCI programs, respectively. That is, CDK's applications could access data on Reynolds' DMS via RCI, and Reynolds' applications could access data on CDK DMS via 3PA.[37]

88.     In the agreements, Reynolds received five free years of 3PA access. Reynolds also agreed to access CDK DMS exclusively through 3PA, and further agreed that it would not "otherwise access, retrieve, license, or otherwise transfer any data from or to a CDK system (including, without limitation, pursuant to any 'hostile interface') for itself or any other entity" or contract with any third parties to access the system.[38]

89.     The Data Integration Agreements also provided that CDK and Reynolds would deny data integrators access to each other's DMS, effectively destroying any competition in the DIS market. The horizontal agreements are *per se* violations of the antitrust laws.

> **(iv)     CDK and Reynolds Illegally Colluded to Implement the *Per Se* Illegal Agreements**

90.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[37] *See* CDK-0000014-0000039, Executed 3PA Agreement (Feb. 18, 2015); *see also* CDK-0000040-0000106, Executed Reynolds Interface Agreement (a.k.a. the "RCI Agreement") (Feb. 18, 2015). The documents are attached hereto as, respectively, Exhibits 12 and 13.

[38] *See* CDK-0000014-0000039, *supra*, n.37 at CDK-0000017, § 1(e) (" [Reynolds] agrees that it will not, with respect to the Application(s) (i) otherwise access, retrieve, license, or otherwise transfer any data from or to a CDK System (including, without limitation, pursuant to any 'hostile interface') for itself or any other entity or (ii) contract with, or otherwise engage, any third party to access, retrieve, license or otherwise transfer any data from or to an CDK System.").





94.

95.    Reynolds viewed this divvying up of the market as crucial to its goal of being the only data integration source for Vendors who wanted to work with Dealers using a Reynolds' DMS's.



### (v) CDK and Reynolds Colluded to Restrain Competition in the DIS Market

96. Defendants' internal documents and the testimony of competitor data integrators demonstrate that Defendants' primary purpose of the *per se* illegal horizontal agreements was the destruction of any competition in the DIS market.

97. 

98. ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████[48] ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████[49] ██████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████[50]

99. I███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---



[48] ████████████████████████████████████████████
████████████████████████████████████

[49] *See id.*

[50] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████



100. ████████████████████████████████████

101.    Schaefer's counterpart at CDK, Dan McCray, then CDK's Vice President of Product Management, reiterated Schaefer's threat — and in no uncertain terms. During the April 2016 National Automobile Dealers Association Convention in Las Vegas, Nevada, McCray "grabbed [Cottrell's] arm" and said "let's take a walk," informing Cottrell that, "[y]ou may or not be aware we've entered into an agreement with Reynolds and Reynolds, okay? That agreement specifically says that we're going to support each

---

[51] ████████████████████████████████████████
████████████████████████████

[52] *See* Authenticom Tr., ECF No. 164, *supra*, n.10, at 139:8-13.

[53] ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████

other's third party interfaces, and we're working collaboratively to remove all hostile integrators from our DMS system."[54] McCray further stated, "'I have clocked you on 2,000 of our systems, and I can flip the switch at any time.'"[55] According to Cottrell, McCray "looked [him] in the eye and he said, 'I admire you. I admire your company …. I'd really like to see you get something for it before I fucking destroy it."[56] ██████████

███████████████████████████████████████████████████████████████

███████████[57]

102.     CDK actively sought to use its control of its DMS to block Authenticom's business. ████████████████████████████████████████████████████████

████████████████████████████████████████████████[58]

103.     ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

---

[54] *See* Authenticom Tr., ECF No. 164, *supra*, n.10, at 141:11-23.

[55] *Id.* at 141:25–142:1.

[56] *Id.* at 142:10-12.

[57] *Id.* at 143:2-8. ██████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████████████████

     ██████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

[58] ██████████████████████████████████████████████████████████
███████████████████████████████████████████████████████



104.



105.    Authenticom was not the only data integrator who fell victim to Defendants' anticompetitive conduct. Superior Integrated Solutions ("SIS") previously exited the DIS market as a result of Defendants' unlawful conduct.[63]

106.    ███████████████████████████████████████████

███████[64]███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████[65]

107.    CDK and Reynolds also colluded about jointly recruiting and sharing new customers. ██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████[66]

---

[63] Authenticom alleges SIS was forced out of the integration market. *See* Authenticom Complaint, *supra* ,n.7, at ¶107 ("CDK forced SIS to shut down its integration services for dealers using the CDK DMS. In short order, SIS went from one of the most successful data integration providers, with a long litany of clients, to a bygone participant in that market.").

[64] ████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

[65] ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████

[66] ████████████████████████████████████████
████████████████████████████

108. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██[67]███████████████████████████████████████████

███████████████████[68]

109. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████[69]

**D.** **CDK And Reynolds Forced Vendors Into Anticompetitive Exclusive Dealing Agreements Which Contained Price Secrecy Provisions**

    **(i)** **CDK and Reynolds Impose Contracts on Vendors Granting Defendants an Exclusive Right to Integrate Data**

110. After entering the February 2015 Agreements, to further their stronghold on the DIS market, Defendants imposed requirements that Vendors deal exclusively with them.

111. Shortly after entering the Data Exchange Agreement, CDK began canceling and renegotiating its 3PA Vendor contracts to impose exclusive dealing

---

[67] █████████████████████████████████████████████
████████████████████████████████████

[68] *Id.*

[69] █████████████████████████████████████████████
███████████████████████████████

53

provisions on Vendors. These new 3PA contracts (a.k.a. "Managed Interface Agreements") required Vendors to use 3PA if they wished to integrate CDK DMS data.

112. To ensure Vendors signed on to the new contracts,



113. Vendors, threatened by the prospect of losing access to data, reluctantly entered into new 3PA contracts, or Managed Interface Agreements, with CDK.[73]

114. CDK's new 3PA contracts contained provisions explicitly prohibiting Vendors from obtaining Dealer data from anyone other than CDK. Importantly, the contracts were entered on a Vendor-by-Vendor basis, not an application-by-application basis, so if a Vendor wanted to use CDK's integration services for one application, the

---



[73] *See*, *e.g. Cox Automotive, Inc. et. al. v. CDK Global, Inc.* No. 17-CV-00925, Complaint, ECF No. 1 ("Cox Complaint"), ¶¶ 123-129 ("Because of CDK's control over integrations to dealer data on its system and CDK's public threats to disconnect such integrations – and in direct reliance upon CDK's false representations that [redacted] - Cox Automotive agreed to CDK's terms, including, but not limited to, the exclusive dealing and price secrecy provisions.").

Vendor also had to use CDK's product for all of its other applications. The contracts stated, "Vendor agrees that it will, beginning on the date CDK certifies the use of the first Application with the CDK Interface System, access data on, and provide data to, CDK Systems exclusively through the Managed Interface System [a.k.a. 3PA] ... [and] will not (i) … transfer any data from or to a CDK System … or (ii) contract with … any third party … to … transfer any data from or to a CDK System."[74]

115.  ██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████[75]███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████[76]

116.    Thus, if a Vendor obtains Dealer data through the 3PA program (for CDK Dealers) or the Reynolds RCI program (for Reynolds Dealers), the Vendor is barred from obtaining Dealer data from any other integrator. ██████████████████████████

---

[74] *See*, *e.g.*, CDK-0001070-80, Executed Dealerlogix LLC Managed Interface Agreement (Apr. 15, 2016). A copy of the document is attached hereto as Exhibit 39, at CDK-0001072, § 1(e).

[75] ██████████████████████████████████████████████████
██████████████████████████████████████

[76] ████████████████████████████████

███████████████████████████████████████████████[77] Cox Automotive provides

various applications using Dealer DMS, with its brands including Autotrader (a leading

online destination for buying and selling new, certified and used cars and trucks),

Dealer.com (an integrated digital marketing platform that creates virtual showrooms),

Xtime (an all-in-one service and maintenance software solution), and roughly two dozen

others.[78] ███████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████[79] This exclusive dealing provision applies to all

of Cox Automotive's services. Furthermore, because Cox Automotive is prohibited from

sharing Dealer data between its own products and services, Cox Automotive must

separately pay CDK each time its services access the exact same data.[80]

117.    ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████[81] ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

─────────────────────

[77] ████████████████████████████████████████████████████
████████████████████████████████████

[78] *See* Cox Website – Company at a Glance, https://www.coxautoinc.com/home-page-2/future-cox-automotive/ (last accessed May 31, 2018).

[79] ███████████████████████████████████████

[80] *See* Cox Complaint, *supra*, n.73, at ¶ 134.

[81] ████████████████████████████████████████████████████
██████████████████████████████████

████████████████████████[82]███████████████████████

███████████████████████████████████████████████████

████████████████████[83]

   **(ii) The Exclusive Dealing Agreements Include Anticompetitive Price Secrecy Provisions**

118. The anticompetitive nature of the exclusive dealing provisions in the Vendor contracts is exacerbated by the imposition of price secrecy provisions. It was clear to Defendants, even before executing the illegal horizontal agreements that it would be important to keep Dealers in the dark about the resultant price increases to DIS. In a CDK PowerPoint presentation entitled, "Third Party Access Strategy — Strategy Refresh" dated December 3, 2014, under the heading "Contract Changes," CDK stated, "[t]he vendor is required not to disclose pricing in place February 2015."[84] In accordance with Defendants' strategy to destroy competition in the DIS market, Defendants' Managed Interface (or Third Party Access) and RCI Agreements imposed price secrecy provisions on Vendors.

119. ████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[82] █████████████████████████

[83] █████████████████████████

[84] CDK-0000786-905, PowerPoint, "Third Party Access Strategy – Strategy 'Refresh,'" slide 103, (Dec. 3, 2014). A copy of the document is attached hereto as Exhibit 43.



120. ██████████████████████████████████████████████████

121. These price secrecy provisions exacerbated the anticompetitive impact of

the exclusive dealing provisions. Vendors were unable to inform their customers, *i.e.*,

Dealers, that any Vendor price increase was a consequence of increased DIS costs imposed by Defendants.[89] Accordingly, Dealers were unaware of the true costs of their relationship with CDK or Reynolds.

> ### (iii)    The Vendor Exclusive Dealing Provisions are Anticompetitive and Prevent Competition in the Single-Brand Aftermarket for Data Integration

122.    The exclusive dealing provisions in the Vendor contracts are anticompetitive. Dealers are effectively "locked-in" to a DMS provider, at least partly because of the high-costs of switching DMS providers. Defendants' DIS on their respective systems are not interchangeable substitutes for one another. Among application providers, there is separate demand for integration services on the two systems. Application providers (Vendors) that want to sell their products to Dealerships that use the CDK DMS system functionally must purchase DIS from CDK. The same is true for Dealerships that use Reynolds' DMS's.

123.    When a Dealer purchases a DMS, the Dealer cannot factor in Defendants' higher data integration fees resulting from any policy changes because CDK and Reynolds impose price secrecy provisions on Vendors. Accordingly, a Dealer cannot accurately forecast the total cost of the DMS when they acquire it from either Reynolds or CDK.

124.    As such, each of Reynolds and CDK has a monopoly in the market for DIS for its respective DMS. If a Vendor is engaged to provide software application

---

[89] *See* Authenticom Tr., ECF No. 165, *supra*, n.10, at 45:4-10 (Alan Andreu, General Manager of Equity at Dominion Dealer Solutions, testifying as follows: "Q. Can we talk about your RCI agreement with Reynolds? What limitations, if any, does Reynolds place on Dominion's ability to tell dealers how much it pays for integration? A. It gags us completely. We can't tell them anything, so I'm expected to somehow pass through an $893 charge on an $1,152 product without telling them why."

services to a Dealer utilizing a CDK DMS, the Vendor must enter into CDK's Managed Interface Agreement. Pursuant to the exclusive dealing provision, if the Vendor participates in CDK's 3PA program for even a single Dealer, that Vendor may no longer access any CDK DMS through any means other than through the 3PA for *any* CDK dealer and for *any* product or service. Reynolds imposes similar exclusive dealing requirements.

125.    Defendants have exercised this monopoly power in the single-brand aftermarket by blocking third-party access to their respective DMS and by raising data access fees to supracompetitive levels.



E. **Defendants' Anticompetitive Conduct Has Resulted In Massive Increases To Data Integration Fees And Dealers Have Been Damaged By These Increased Fees**

(i) **Defendants' Anticompetitive Conduct has Massively Increased Data Integration Fees**

126. Defendants' *per se* horizontal agreements have given them exclusive control over data for Dealers using their DMS's. By seizing control over access to Dealer data, CDK and Reynolds have been able to impose massive price increases for their DIS and obtain monopoly profits.

127. Data integrators charge Vendors on a per site (per Dealer location) basis. As such, if a Dealership has ten locations (or "rooftops"), then the Vendor would need ten separate connections for that Dealer, thus incurring ten separate costs to access one Dealer's data. Prior to CDK and Reynold's anticompetitive conduct, the average connection cost was around $70. In July 2015, only six months after Defendants' horizontal agreements came into effect, industry publications reported on the massive price increase for data integration. Automotive News reported that, "CDK said it intends to charge each third-party vendor … between $250 and $300 a month per store for each software product. The current fees average about $70 per software product."[93] According to Automotive News, a "vendor executive said the new program would raise monthly data fees from about $50 per store per month today to as much as $600 for customer relationship management software."[94] This estimated increase in cost from $50 to $600

---

[93] David Barkholz, *Dealers Will Pay Up for Vendors' Data Access After CDK Switch*, Automotive News, http://www.autonews.com/article/20150720/RETAIL07/307209962/dealers-will-pay-up-for-vendors-data-access-after-cdk-switch (July 20, 2015) (last accessed May 31, 2018).

[94] *Id.*

per month reflects a Dealer's increased cost regarding one Vendor. As previously stated, a Dealer uses on average a minimum of 10-15 Vendors. Dealers with 20 rooftops can work with as many as 80 vendors.[95]

128. As for Reynolds, "[p]articipation costs one CRM vendor more than $700 a month per Reynolds store. The Vendor requested anonymity because Reynolds has strict nondisclosure provisions in its vendor contracts."[96] Since 2015, Reynolds has raised its monthly prices per connection from less than $100 to between $300 and $500.[97]

129. Specifically, in 2015, CDK forced massive price increases on Cox Automotive for DIS provided by CDK.[98] ████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████[99]██████
████████████████████████████████████████████████████████

---

[95] *See* Authenticom Tr., ECF No. 165, *supra*, n.10, at 81:3-13.

[96] *See*, Barkholz, *supra*, n.93.

[97] The same kind of massive increase came from CDK. Authenticom's expert witness, economist Dr. Hal Singer, testified that, "CDK prior to this agreement was charging, based on the best publicly available sources, $70 per rooftop per month, and after the agreement they were charging on the order of $250 to 300, and that's a very conservative estimate. We've heard a lot of testimony that suggests it was a lot higher than that. This is something on the order of a four times or five times increase — sorry, three times increase, going from 70 to 250." Authenticom Tr., ECF No. 165, *supra*, n.10, at 79:15-22.

[98] Reynolds has also raised its prices for DIS, by charging many Vendors a transaction charge for every data pull. CDK has instituted the same practice of charging some Vendors an additional per-transaction fee on top of the already large monthly fees.

[99] ████████████████████████████████████████████████████████
██████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████ [100]

130.　The experience of AutoLoop also exemplifies how Defendants' anticompetitive conduct victimized Vendors — and ultimately, Dealers.[101] AutoLoop offers three suites of software: Sales, Service, and Marketing.[102] Each suite includes multiple software applications that Dealers can select à la carte to enhance their ability to sell cars and serve customers.[103]

131.　Before 2015, AutoLoop purchased integration services from a competitor of Reynolds and CDK– Superior Integrated Solutions (SIS).[104] SIS charged AutoLoop $39 per rooftop per month for DIS.[105] In 2015, CDK and Reynolds began to shut off the access to DMS data that AutoLoop had historically enjoyed, thereby forcing AutoLoop to use CDK and Reynolds data integration tools, 3PA and RCI.[106] After being forced to sign an agreement with Reynolds, Autoloop was being charged over $700 for the same exact

---

[100] ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████

[101] On April 9, 2018, AutoLoop, an automotive software products and services company that provides integrated software solutions to more than 2000 car dealers, brought suit against CDK, alleging numerous causes of action, including violations of the antitrust laws and state consumer protection laws. *See AutoLoop, LLC v. CDK Global, LLC*, No. 18-CV-02521, Complaint, ECF No. 1 (N.D.Ill. Apr. 9, 2018) ("AutoLoop Complaint").

[102] *See* AutoLoop Home Page, https://www.autoloop.com/ (last accessed May 31, 2018).

[103] *See* AutoLoop Home Page, *Products,* https://www.autoloop.com/products/ (last accessed May 31, 2018).

[104] *See* Authenticom Tr., ECF No. 165, *supra*, n.10, at 57:6-9 (testimony of AutoLoop employee, Matthew Rodeghero).

[105] *See id.*

[106] *See id.* at 57:21-58:20 ("we got notice from SIS that they would no longer be continuing to support integration for RCI…").

services it once received from SIS.[107] AutoLoop did not fare any better under its agreements with CDK. AutoLoop was forced to pay roughly the same amount ($690) per rooftop per month for to integrate data from CDK DMS.[108] As a result of Defendants' anticompetitive conduct, AutoLoop's integration fees have skyrocketed from approximately $40 per month per rooftop with independent data integrators to almost $700 per month per rooftop with CDK and Reynolds.

132. [109]

133. Authenticom's expert witness, economist Dr. Hal Singer, testified that: "the[se] price increases speak to the anticompetitive harms in this case."[110]

### (ii) These Increased Data Integration Fees are Passed On to Dealers

134. As CDK and Reynolds have imposed massive price increases on Vendors, Vendors have passed those increased charges onto Dealers.[111] ███████████ ████████████████████████████████████████ ██████████████████████[112]

---

[107] *See id.* at 59:2-5.

[108] *See id.* at 61:13-15.

[109] ██████████████████████████████

[110] *See* Authenticom Tr., ECF No. 165, *supra*, n.10, at 78:6.

[111] Dealers themselves cannot easily determine the amount of the excessive fees passed onto them by Vendors because the standard RCI Vendor contract prohibits the Vendor from discussing RCI costs and, "[s]imilarly, CDK prevents vendors from putting a line item on their bills attributable to 3PA charges." *See* Authenticom Case, 2017 WL 3017048 at *5.

[112] ████████████████████████████████████████████DK ████████████████████████████████████████████

135. ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████ [113] Cox

Automotive passes on a portion of these integration fees as data integration surcharges, and such surcharges are a substantial percentage of the total monthly cost of Cox Automotive's DMS-integrated solutions. AutoLoop also confirmed it passes the increased data integration costs onto Dealers.[114]

136. Mitch Walters, president of the Friendship Family of Dealerships in Bristol, Tennessee, wrote a December 20, 2016 letter to Peter Welch, President of the National Automobile Dealers Association ("NADA"), stating that Dealers are "stuck in the middle of a war between DMS providers and third-party vendors as more companies decide to charge for access."[115]

137. Walters' December 20, 2016 letter stated in pertinent part:

I am writing to ask for the assistance of NADA in helping not only me, but other retail automobile dealers, resolve the issue of the integration

---

████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████

[113] ███████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████

[114] *See* Authenticom Tr., ECF No. 165, *supra*, n.10, at 62:22-23.

[115] Vince Bond Jr., *'Held hostage': Dealer's battle with software giants escalates*, Automotive News, http://www.autonews.com/article/20161226/RETAIL07/312269969/dealer-asks-nadas-help-in-dms-dispute (Dec. 26, 2016) (last accessed May 30, 2018).

surcharges that are being charged to dealerships as a result of a conflict between the DMS providers (e.g., CDK and Reynolds & Reynolds) and most every third party vendor that a retail automobile dealership maintains a partner relationship.

I struggle with the fact that dealerships provide data to a DMS provider and then the DMS provider charges a third party vendor an 'integration surcharge' to access the data, which actually belongs to the dealership. The third party vendor is then compelled to pass this unfair charge or assessment to the dealer who created the data in the first place.

It is like a dealership is "held hostage" with its own data. This is unfair and unreasonable. The DMS providers insist that the only way for a dealer not to experience this unfair surcharge is to utilize products that are exclusive to the DMS provider in lieu of a dealership choosing the vendor it desires. I believe that a dealership should be able to partner with the third party vendor that has the best solution to assist the dealership with making more sales and more gross profit, and not an internal vendor that is owned and controlled by a DMS provider.

Each dealership should have the right to control its own data and authorize partners (vendors) that provide software and programs that use the dealer's data to achieve operational efficiencies and the best ROI.[116]

138.    NADA released a response, stating that it "is aware of the concerns voiced by many dealers about the third-party certification requirements imposed by some of the DMS companies, and about limited options in the DMS marketplace generally. Transparency, choice and fairness are just as important to dealers running their businesses as they are to the customers those dealers serve …."[117]

139.    Walters stated that his eight stores had been using customer-relationship management tools from the Vendor, VinSolutions, owned by Cox Automotive. Based on the DIS charged imposed on VinSolutions by CDK, the monthly bills at Walter's

---

[116] *Id.*

[117] *Id.*

Dealership increased by approximately $2,400, leading Walters to conclude that "we've got $30,000 overhead now that we shouldn't have. It's our data."[118]

140.   Dealerships using the CDK DMS that have more than 20 rooftops (stores) are likely to work with more than 80 Vendors that need third-party access to CDK. Accordingly, if a Dealership works with 80 Vendors and has to pay $200 fees that are passed on from a Vendor, they could end up paying an extra $16,000 per month.[119]

141.   The Lexus of Westminster car dealership, located in Orange County, California — a medium-sized dealership — indirectly pays CDK between $200 and $500 a month to access its own data. According to its President, Chris Longpre, "[a]s a result of CDK's integration fees, DealerSocket [a Vendor] has informed me they are raising the prices it charges my dealership by $500 a month. In short, I am indirectly footing the bill for a large fee increase so that one of my key application providers can access my own data."[120]

142.   I █████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

[119] *See*, Authenticom Tr., ECF No. 165, *supra*, n.10, at 81:3-13 (Authenticom's expert, Dr. Hal Singer, testifying: "The immediate harm is it's higher prices paid by vendors who are seeking access to dealers' data on their respective defendant's systems, but we've also heard that those vendors in turn pass along those prices to their dealer clients. So it's not only the vendors who are harmed here but also dealers. And these numbers, it's hard to think about an abstract going from 70 to 250, but a very simple example is if you just use the before/after benchmark and say it's on the order of a $200 price increase, for a dealer that has ten applications and five rooftops, you're talking on the order of $10,000 extra per month that can be attributed to these price increases.").

[120] Authenticom Case, Declaration of Chris Longpre, President of Lexus of Westminster, ECF No. 55 (May 18, 2017) ¶¶ 5, 7, 8.

██████████████████████████████████████████████████

█████████████████████████████████████[121]

143.    The fees charged by Reynolds for Vendors to access their own data through Reynolds' Dealer DIS have also been passed onto Dealers, causing them injury.

144.    Even CDK's economic expert, Dr. Sumanth Addanki, recognized that increased data integration fees are passed onto Dealers. As he testified at the Authenticom preliminary injunction hearing, increased data integration costs to Vendors are "[a]bsolutely" passed on to Dealers.[122]

145.    Indeed, Defendants' price secrecy provisions, discussed above, implicitly recognize that Vendors will pass on data integration fees to Dealers; hence they tried to avoid alerting Dealers of the extent of those fees.

> **(iii)    Defendants' Dominance of the DMS Market and Their Illegal Agreements Enabled Them to Sharply Reduce the Functionality of the DMS and Charge Artificially Inflated Prices for DMS**

146.    In illegally reducing competition in the DIS market, Defendants have also reduced competition in the DMS market. A DMS supplier's services are useless if the data stored on the system cannot be utilized. The data on a DMS generally can only be

---

[121] ████████████████████████

██████████████████████████████████

[122] *See* Authenticom Tr., ECF No. 163, *supra*, n.9, at 215:2. Dr. Addanki further testified:

> If you are going to stick it to the vendors by raising the data fees in a competitive vendor environment, the economics is straightforward. They will be passed through. They're not going to be called passed through, they're going to pass through. They're either going to get out of business or raise the price.

> And the point is, Your Honor, it's system wide. It's to all vendors. So the whole price thing goes up, which means that the cost of doing business to the dealer has gone up; which means that the cost of using a CDK DMS has gone up.

*Id.* at 211:12-23.

utilized if it is integrated — that is, extracted and formatted into a usable format. However, as a consequence of Defendants' illegal agreements, each Defendant will only integrate its own, and independent data integrators are being driven out of the market. Accordingly, any potential competitor DMS supplier will have a limited pool of integrators available.

147. Moreover, before Defendants entered into their unlawful horizontal agreements, Dealers using CDK DMS's enjoyed unfettered access to their own data stored on the DMS's, and such data was freely available to third-parties (such as Authenticom, an independent data integrator) that were authorized by the Dealers to access the data.

148. The Dealers' ability to freely access their own data on their DMS's through third-parties was an important feature of the DMS and its functionality.

149. Through their unlawful conduct, however, Defendants eliminated this feature of the DMS and its functionality, thereby restraining competition and increasing prices paid by the Dealers for DMS.

150. Moreover, as other Vendors' software applications began to provide many of the same features as a DMS, CDK and Reynolds felt their lucrative DMS businesses were under attack, and acted to preserve their DMS duopoly by preventing the natural progression of Dealers away from Defendants' DMS's to lower cost and more efficient solutions being offered by Vendors.

151. Defendants' unlawful conduct restrained competition in both the DMS and DIS markets, and resulted in the Dealers paying supracompetitive prices for Defendants' DMS's, and for DIS.[123]

152. Defendants viewed the DMS and DIS markets, collectively, as an "ecosystem," to be controlled by them, free of competitive pressures from other actors.[124]

### F. Defendants' "Security" Claim is a Pretext

153. 

154. CDK formally announced a "refreshed" 3PA program on June 22, 2015 as part of its so-called "Security First" initiative. "CDK is rolling out a new cybersecurity

---

[123] Authenticom Tr., ECF No. 165, *supra*, n.10, at 81:25 (according to Authenticom's expert Dr. Singer, DMS prices have "gone up over this period [since the unlawful agreement came into effect].").

[124] *See* Authenticom Tr., ECF No. 164, *supra*, n.10, at 62:3-9 (At the *Authenticom* preliminary injunction hearing, a CDK attorney described (albeit self-servingly) the "ecosystem," stating: "We are trying to grow a value-add ecosystem for our dealers. That's the whole point. But the point is in order to provide that option for our dealers, we have to build, we have to maintain, and we have to secure that DMS and all of the data that resides therein, and we have to have the ability to control what plugs in and what interacts with all of those moving parts."); *see also* Authenticom Tr., ECF No. 163, *supra*, n.9, at 100:19-21 (Additionally, CDK's former Global Chief Strategy Officer, Malcolm Thorne, testified that "the number of vendors that are connected to our DMS ecosystem is growing rapidly[.]").



initiative," Automotive News reported, "that will raise monthly integration fees for most of the third-party software vendors that dealerships use in addition to CDK software. It is patterned after a program at Reynolds and Reynolds."[127] This initiative used data security as the pretext for "closing" the DMS and imposing massive price increases on Vendors.[128]

155.    Vendors recognized that the purportedly enhanced data security was a mere a pretext for increased data integration charges: Automotive News reported that "[a] vendor executive who asked not to be named called the data-access cost a surcharge under the guise of data security." Industry publications similarly reported that "Vendors briefed on CDK's new data-security program said nothing will change in the way they get data from CDK-served DMS dealerships under SecurityFirst except for a higher price."[129] Automotive News reported that Vendors in the CDK program "lament that they

---

[127] David Barkholz, *CDK Global Sees Earnings Boost from Cost-Cutting, Improved Efficiency*, Automotive News, http://www.autonews.com/article/20151103/RETAIL/151109957/cdk-global-sees-earnings-boost-from-cost-cutting-improved-efficiency (Nov. 3, 2015) (last accessed May 30, 2018).

[128] Dealers using CDK's "open" DMS system before 2015 had the clear choice to opt for Reynold's closed system but chose not to. Accordingly, CDK's SecurityFirst initiative could not be said to be a DMS product enhancement. Additionally, at the Authenticom hearings, Authenticom's expert economist, Dr. Singer, testified:

> If you believe the defendants' claim that closed is superior from a quality perspective, what you should see is that customers walking with their feet, dealer customers, ought to be migrating over to the closed system. In fact, we see the opposite, Your Honor. We see massive substitution away from R and R's closed system towards the CDK system over this period [before CDK closed its DMS pursuant to the horizontal agreement] . . . . [CDK] went to the market and they said . . . '[The open platform] is just going to be a better platform than what our closed rival is doing,' and they won. We see a massive, a massive share shift going from R and R during this experiment to CDK on the order of 10 percentage points of share shift, 40% market share down to — even higher than 40 I understand, down to 30% over this period.

Authenticom Tr., ECF No. 165, *supra*, n.10, at 83:16-22; 84:8-17.

[129] *See* Barkholz, *supra*, n.93.

plan to pass those extra costs on to their dealer customers," asserting that the costs charged by CDK far exceeded any alleged value of increased data security.[130]



156.

157.

158.



159.

160.

---

[134] *See id.*

[135]

[136]

161. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████[137]

███████████████████████████████████

162.    Tellingly, at the Authenticom preliminary injunction hearing, CDK was unable to offer a single example of a data security incident involving any data integrator, and Reynolds could only cite to one incident — which actually involved a query being stalled, not a data security issue — that was quickly and easily resolved.[138]

163.    As noted above, the price increases for data integration imposed by Defendants have been massive. In October 2015, The Banks Report reported that "[a]ccording to numerous vendors I've talked with, … prices to access data in CDK's

---

[137] ████████████████████████████████████████████████
███████████████████████████████

[138] *See* Authenticom Case, 2017 WL 3017048 at * 5 n.2.

systems under the new initiative could increase anywhere from 300% to 800%."[139]
However, these price increases do not correlate with any data security costs.[140]

164.    Finally, Authenticom's cybersecurity and privacy regulation expert,
Professor Swire testified that it is consumers who give their data to Dealers and therefore
the Dealer has the principal control over the individual consumer's data — accordingly, it
is the Dealer who is the focus of privacy regulation.[141] Thus it is the Dealer, and not the
DMS provider, who is responsible for the data security of the data and the security
provided by any third parties. "[I]f the dealer is the one in control of the data, which is the
idea in the first party, then the dealer would be the one deciding where the data goes after
that and would need decisions about which third parties might get the data."[142]

## ANTITRUST INJURY

165.    Defendants' unlawful conduct, as challenged herein, had the following
effects, among others:

---

[139]    Cliff Banks, *Data Access Battle Goes Nuclear*, The Banks Report,
https://dealervault.files.wordpress.com/2015/12/tbr_data_access_15.pdf (Oct. 12, 2015) (last
accessed May 30, 2018).

[140] In the Authenticom Case, Defendants attempted to justify the increased costs of their data
integration services based on "the burden of maintaining the DMS and preserving its security."
*See* Authenticom case, 2017 WL 3017048 at *7. However, the District Court was not persuaded
because "defendants did not present evidence of the cost of data integration [and] the dealers
already pay a lot for the DMS, and defendants did not put in any evidence to quantify the
additional expense of providing data integration." *Id.* Furthermore, "defendants did not show that
properly managed third-party access, even using dealer credentials and screen scraping, really
poses additional security risks." *Id.* The Court also noted that, "Reynolds allows significant
exceptions by 'whitelisting' certain third parties that it allows to access its system, most notably
DMI, CDK's third-party integrator." *Id.*

[141] *See* Transcript of First Day of Evidentiary Hearing, Afternoon Session (Jun. 26, 2017), ECF
No. 162 ("Authenticom Tr., ECF No. 162"), 64:16 - 65:25. Excerpts of Authenticom Tr., ECF
No. 162 are attached hereto as Exhibit 61.

[142] *See id.* at 65:21-25.

(a)  Competition in the DMS and DIS markets, including price competition, has been unlawfully restrained and suppressed;

(b)  Prices paid by Dealers for DMS and DIS have been unlawfully fixed, raised, maintained and/or stabilized at supracompetitive levels;

(c)  Direct purchasers of DMS, including Dealership Plaintiffs and Class members, were deprived of the benefit of free and open competition; and

(d)  Indirect purchasers of DIS, including Dealership Plaintiffs and Class members, were deprived of the benefit of free and open competition.

166.  As a result of the Defendants' anticompetitive conduct, Dealership Plaintiffs and Class members paid more for DMS and DIS than they would have paid in the absence of such conduct, and has sustained, and will continue to sustain, injury in their business and substantial damages.

## CLAIMS FOR RELIEF

### COUNT I

### CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR A HORIZONTAL CONSPIRACY
### (ON BEHALF OF THE NATIONWIDECLASS)

167.  Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

168.  Defendants CDK and Reynolds entered into and engaged in an agreement, combination or conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

169.    CDK and Reynolds are horizontal competitors in the DMS and DIS markets.

170.    CDK and Reynolds possess dominant positions in the DMS and DIS markets.

171.    Defendants have entered into a continuing agreement, combination or conspiracy to restrain competition in the DMS and DIS markets. In furtherance thereof, in February 2015, Defendants entered into agreements not to compete with each other by blocking access to their respective DMS by independent data integrators. In addition, Defendants agreed to reduce the functionality of CDK's DMS (including Dealers' ability to freely access their DMS data through authorized persons). Moreover, Defendants colluded to force Vendors to use the Defendants (or their affiliates) to access their respective DMS. Defendants' actions constitute *per se* violations of the Sherman Act and, in any event, are unreasonable and unlawful restraints of trade. There is no procompetitive justification for Defendants' conduct.

172.    Defendants' challenged conduct was intended to and did reduce competition in the DMS market and cause actual injury to Dealership Plaintiffs and the Class.

173.    Dealership Plaintiffs and the Nationwide Class members, as direct purchasers of Defendants' DMS, are entitled to treble damages for the violations of the Sherman Act alleged herein.

## COUNT II

## CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR A HORIZONTAL CONSPIRACY
## (ON BEHALF OF THE NATIONWIDE CLASS FOR INJUNCTIVE RELIEF)

174.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

175.    Defendants CDK and Reynolds entered into and engaged in an agreement, combination or conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

176.    CDK and Reynolds are horizontal competitors in the DMS and DIS markets.

177.    CDK and Reynolds possess dominant positions in the DMS and DIS markets.

178.    Defendants have entered into a continuing agreement, combination or conspiracy to restrain competition. In furtherance thereof, in February 2015, Defendants entered into formal written agreements not to compete with each other in the DIS market and to block access to their respective DMS by independent data integrators. Moreover, Defendants colluded to force Vendors to use the Defendants (or their affiliates) to access their respective DMS. Defendants' actions constitute *per se* violations of the Sherman Act and, in any event, are unreasonable and unlawful restraints of trade.  There is no procompetitive justification for Defendants' conduct.

179.    Dealership Plaintiffs and the Nationwide Class have no adequate remedy at law and will suffer irreparable injury unless Defendants are enjoined from continuing their unlawful conduct. Accordingly, Dealership Plaintiffs and Nationwide Class members are entitled to injunctive relief against Defendants.

## COUNT III

## CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR THE IMPOSITION OF EXCLUSIVE DEALING PROVISIONS (ON BEHALF OF THE NATIONWIDE CLASS)

180.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

181.    CDK and Reynolds entered into contracts with Vendors that contain exclusive dealing provisions that unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

182.    Pursuant to their conspiracy to eliminate competition, CDK and Reynolds inserted exclusive dealing provisions in their contracts with Vendors. Those contracts provide that Vendors cannot obtain data for Dealers using the CDK or Reynolds DMS from any data integrator except CDK or Reynolds, respectively.

183.    CDK and Reynolds were able to impose these exclusive dealing provisions on Vendors as a result of their market power.

184.    Because CDK and Reynolds imposed these exclusive dealing provisions pursuant to their conspiracy to eliminate competition in the DMS and DIS markets, they are *per se* illegal.

185.    These exclusive dealing provisions are an unlawful and unreasonable restraint of trade and have led to increased prices, and reduced competition in the DMS and DIS markets.

186.    These exclusive dealing provisions have caused actual injury to competition in the DMS and DIS markets.

187.    There is no procompetitive business justification for Defendants' exclusive dealing agreements, and the exclusive dealing arrangements do not enhance

efficiency or competition in the DMS or DIS markets. On the contrary, the agreements have produced only anticompetitive effects in both markets.

188.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Nationwide Class have suffered injury to their business or property.

189.    Dealership Plaintiffs and the Nationwide Class are entitled to treble damages for the violations of the Sherman Act alleged herein.

## COUNT IV

### CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR THE IMPOSITION OF EXCLUSIVE DEALING PROVISIONS (ON BEHALF OF THE NATIONWIDE CLASS FOR INJUNCTIVE RELIEF ONLY)

190.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

191.    CDK and Reynolds entered into contracts with Vendors that contain exclusive dealing provisions that unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

192.    Pursuant to their conspiracy to eliminate competition in the DIS market, CDK and Reynolds inserted exclusive dealing provisions in their contracts with Vendors. The contracts with Vendors provide that Vendors cannot obtain data for Dealers using the CDK or Reynolds DMS from any data integrator except CDK or Reynolds, respectively.

193.    CDK and Reynolds were able to impose these exclusive dealing provisions on Vendors as a result of their market power in the DMS and DIS markets

194.    Because CDK and Reynolds imposed these exclusive dealing provisions pursuant to their conspiracy to eliminate competition in the DIS market, they are *per se* illegal.

195.    These exclusive dealing provisions are an unlawful and unreasonable restraint of trade and have led to increased prices, and have reduced competition in both the DIS markets.

196.    These exclusive dealing provisions have caused actual injury to competition in the DIS markets.

197.    There is no procompetitive business justification for Defendants' exclusive dealing agreements, and the exclusive dealing arrangements do not enhance efficiency or competition in the DMS or DIS markets. On the contrary, the agreements have produced only anticompetitive effects.

198.    As a direct and proximate result of Defendants' unlawful conduct, Dealership Plaintiffs and the Class have suffered injury to their business or property.

199.    As indirect purchasers of DIS, Dealership Plaintiffs and the Nationwide Class have no adequate remedy at law and will suffer irreparable injury unless Defendants are enjoined from continuing their unlawful conduct. Accordingly, Dealership Plaintiffs and the Nationwide Class members are entitled to injunctive relief against Defendants.

## COUNT V

### UNLAWFUL MONOPOLIZATION IN VIOLATION OF SECTION 2
### OF THE SHERMAN ACT
### (ON BEHALF OF THE NATIONWIDE CLASS )

200.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

201.    Defendants have unlawfully monopolized the aftermarket for DIS on Defendants' respective DMS in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

202. In the primary DMS product market, Defendants have a longstanding duopoly. When Dealers purchase Defendants' DMS, they are "locked in" to that DMS because, at least in part, of the significant financial costs, burdens and time associated with implementing an alternative system.

203. When a Dealer purchases a DMS, Dealers cannot factor in Defendants' higher data integration fees resulting from any policy changes because CDK and Reynolds impose price secrecy provisions on Vendors. Accordingly, Dealers cannot accurately forecast the total cost of the DMS when they acquire it from either Reynolds and CDK.

204. Wrongfully exploiting customer lock-in in the primary DMS market, CDK and Reynolds have monopolized the markets for DIS on their respective DMS platforms. Defendants have wrongfully excluded competition by blocking third-party integrators from accessing Dealer data stored on its DMS system and has raised integration fees to supracompetitive levels.

205. Defendants used anticompetitive means to acquire and maintain their monopoly position in the aftermarket for DIS on their respective DMS, including, *inter alia*, by blocking and disabling third-party integrators from accessing Dealer data, entering into a market division agreement pursuant to which they agreed not to compete in the aftermarkets, and imposing anticompetitive exclusive dealing arrangements on Vendors.

206. Defendants' ability to exclude competition and impose massive price increases demonstrates its power in the market. And such conduct has no procompetitive business justification.

207. As a direct and proximate result of Defendants' unlawful use of their duopoly power in the DMS market and monopoly power in the aftermarket for DIS on their respective DMS, the Dealer Plaintiffs and the Nationwide Class have suffered injury to their business or property.

208. Plaintiffs and the Nationwide Class are entitled to treble damages.

## COUNT VI

### VIOLATION OF ALABAMA ANTITRUST LAWS, ALA. CODE §§ 6–5–60, *ET SEQ.*, AND §§ 8–10–1, *ET SEQ.* (ON BEHALF OF THE ALABAMA CLASS)

209. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

210. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in flagrant violation of Alabama antitrust laws, Ala. Code. §§ 6–5–60 and 8–10–1, *et seq.*

211. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

212. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

213. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

214. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing

independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

215.    Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

(a)    to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b)    to eliminate or significantly curtail competition in the DIS market in the State on their respective DMSs, and thereby monopolize the DIS market in the State and reap monopoly profits.

216.    These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and caused actual injury to Dealership Plaintiffs and the Alabama Class.

217.    Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Alabama.

218.    Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Alabama Class.

219.     Defendants' conduct has a significant nexus with Alabama because the Alabama Class members are located in Alabama, owned DMS in Alabama, and engaged Vendors who utilized DIS in Alabama.

220.     Defendants' conduct substantially affected Alabama commerce.

221.     Accordingly, Plaintiffs and the Alabama Class seek all forms of relief available under Alabama antitrust laws, Ala. Code. §§ 6–5–60 and 8–10–1, *et seq.*

**COUNT VII**

**VIOLATION OF ARIZONA'S UNIFORM STATE
ANTITRUST ACT, ARIZ. REV. STAT., § 44-1401, *ET SEQ.*
(ON BEHALF OF THE ARIZONA CLASS)**

222.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

223.     As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in flagrant violation of Arizona's Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, *et seq.*

224.     CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

225.     CDK and Reynolds possess dominant positions in the DMS and DIS markets.

226.     CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

227.     The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market.

85

CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

228. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

> (a) to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

> (b) to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

229. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Arizona Class.

230. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Arizona

231. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Arizona Class.

232.     Defendants' conduct has a significant nexus with Arizona because the Arizona Class members are located in Arizona, owned DMS in Arizona, and engaged Vendors who utilized DIS in Arizona.

233.     Defendants' conduct substantially affected Arizona commerce.

234.     Accordingly, Plaintiffs and the Class seek all forms of relief available under Arizona's Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, *et seq.*

### COUNT VIII

### VIOLATION OF CALIFORNIA ANTITRUST LAWS, CAL. BUS. & PROF. CODE §§ 16700 AND §17200, *ET SEQ.* (ON BEHALF OF THE CALIFORNIA CLASS)

235.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

236.     As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of Cal. Bus. & Prof. Code §§ 16700 and 17200, *et seq.*, and Defendants entered into and engaged in a continuing unlawful trust as defined by Cal. Bus. & Prof. Code § 16720, and unlawful competition as defined in Cal. Bus. & Prof. Code § 17200.

237.     CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

238.     CDK and Reynolds possess dominant positions in the DMS and DIS markets.

239.     CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

240.     The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and

87

DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

241. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

(a) to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b) to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

242. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the California Class.

243. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust and unfair competition laws of California.

244. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the California Class.

245. Defendants' conduct has a significant nexus with California because the California Class members are located in California, owned DMS in California, and engaged Vendors who utilized DIS in California.

246. Defendants' conduct substantially affected California commerce.

247. Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Cal. Bus. & Prof. Code §§ 16700 and 17200, *et seq.*

## COUNT IX

### VIOLATION OF THE DISTRICT OF COLUMBIA CODE, § 28-4501, *ET SEQ.* (ON BEHALF OF THE DISTRICT OF COLUMBIA CLASS)

248. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

249. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of the District of Columbia Code § 28-4501, *et seq.*

250. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

251. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

252. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

253. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

254. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

(a) to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b) to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

255. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the District of Columbia Class.

256. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in

the DMS and DIS markets, and constitute violations of the state antitrust laws of the District of Columbia.

257.    Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the District of Columbia Class.

258.    Defendants' conduct has a significant nexus with the District of Columbia because the District of Columbia members are located in California, owned DMS in the District of Columbia, and engaged Vendors who utilized DIS in the District of Columbia.

259.    Defendants' conduct substantially affected District of Columbia commerce.

260.    Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq.*

## COUNT X

### VIOLATION OF HAWAII REVISED STATUTES ANNOTATED, § 480-1, *ET SEQ.* (ON BEHALF OF THE HAWAII CLASS)

261.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

262.    As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq.*

263.    CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

264.    CDK and Reynolds possess dominant positions in the DMS and DIS markets.

265. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

266. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition and are unreasonable and unlawful restraints of trade.

267. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

      (a)     to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

      (b)     to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

268. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Hawaii Class.

269.    Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, constituting violations of the state antitrust laws of Hawaii.

270.    Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Hawaii Class.

271.    Defendants' conduct has a significant nexus with Hawaii because the Hawaii Class members are located in Hawaii, owned DMS in Hawaii, and engaged Vendors who utilized DIS in Hawaii.

272.    Defendants' conduct substantially affected Hawaii commerce.

273.    Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Hawaii Revised Statutes Annotated § 480-1, *et seq.*

## COUNT XI

## VIOLATION OF THE ILLINOIS ANTITRUST ACT, 740 ILCS 10/1, *ET SEQ.* (ON BEHALF OF THE ILLINOIS CLASS)

274.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

275.    As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of the Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*

276.    CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

277.    CDK and Reynolds possess dominant positions in the DMS and DIS markets.

93

278.    CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

279.    The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

280.    Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

(a)     to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b)     to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

281.    These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Illinois Class.

282. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Illinois.

283. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Illinois Class.

284. Defendants' conduct has a significant nexus with Illinois because the Illinois Class members are located in Illinois, owned DMS in Illinois, and engaged Vendors who utilized DIS in Illinois.

285. Defendants' conduct substantially affected Illinois commerce.

286. Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*

## COUNT XII

## VIOLATION OF THE IOWA COMPETITION LAW, IA ST § 553.4, *ET SEQ.* (ON BEHALF OF THE IOWA CLASS)

287. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

288. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of the Iowa Competition Law, IA ST § 553.4, *et seq.*

289. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

290. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

291.     CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

292.     The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

293.     Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

(a)     to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b)     to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

294.     These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Iowa Class.

295.    Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Iowa.

296.    Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Iowa Class.

297.    Defendants' conduct has a significant nexus with Iowa because the Iowa Class members are located in Iowa, owned DMS in Iowa, and engaged Vendors who utilized DIS in Iowa.

298.    Defendants' conduct substantially affected Iowa commerce.

299.    Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Iowa Competition Law, IA ST § 553.4, *et seq.*

### COUNT XIII

**VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT,
K.S.A. 50–101, *ET SEQ.*
(ON BEHALF OF THE KANSAS CLASS)**

300.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

301.    As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of the Kansas Restraint of Trade Act, K.S.A. 50–101, *et seq.*

302.    CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

303.    CDK and Reynolds possess dominant positions in the DMS and DIS markets.

304.     CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

305.     The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

306.     Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

(a)     to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b)     to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

307.     These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Kansas Class.

308. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Kansas.

309. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Kansas Class.

310. Defendants' conduct has a significant nexus with Kansas because the Kansas Class members are located in Kansas, owned DMS in Kansas, and engaged Vendors who utilized DIS in Kansas.

311. Defendants' conduct substantially affected Kansas commerce.

312. Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under the Kansas Restraint of Trade Act, K.S.A. 50–101, *et seq.*

## COUNT XIV

## VIOLATION OF MAINE ANTITRUST LAW, 10 M.R.S. § 1101, *ET SEQ.* (ON BEHALF OF THE MAINE CLASS)

313. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

314. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of Maine antitrust law, 10 M.R.S. § 1101, *et seq.*

315. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

316. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

317.    CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

318.    The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

319.    Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

(a)    to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b)    to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

320.    These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Maine Class.

321. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Maine.

322. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Maine Class.

323. Defendants' conduct has a significant nexus with Maine because the Maine Class members are located in Maine, owned DMS in Maine, and engaged Vendors who utilized DIS in Maine.

324. Defendants' conduct substantially affected Maine commerce.

325. Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Maine antitrust law, 10 M.R.S. M.C.L.A. 445.7721101, *et seq.*

## COUNT XV

### VIOLATION OF MICHIGAN ANTITRUST REFORM ACT, M.C.L. § 445.771, *ET SEQ.* (ON BEHALF OF THE MICHIGAN CLASS)

326. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

327. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of the Michigan Antitrust Reform Act, M.C.L. § 445.771, *et seq.*

328. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

329. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

330.     CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

331.     The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

332.     Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

> (a)     to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and
>
> (b)     to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

333.     These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Michigan Class.

334.   Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Michigan.

335.   Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Michigan Class.

336.   Defendants' conduct has a significant nexus with Michigan because the Michigan Class members are located in Michigan, owned DMS in Michigan, and engaged Vendors who utilized DIS in Michigan.

337.   Defendants' conduct substantially affected Michigan commerce.

338.   Accordingly, Dealership Plaintiffs and the Indirect Purchaser Class seek all forms of relief available under the Michigan Antitrust Reform Act, M.C.L. § 445.771, *et seq.*

## COUNT XVI

### VIOLATION OF THE MINNESOTA ANTITRUST LAW OF 1971, MINN. STAT. § 325D.49, *ET SEQ.* (ON BEHALF OF THE MINNESOTA CLASS)

339.   Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

340.   As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of the Minnesota Antitrust Law of 1971, Minn. Stat. § 325D.49, *et seq.*

341.     CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

342.     CDK and Reynolds possess dominant positions in the DMS and DIS markets.

343.     CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

344.     The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

345.     Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

      (a)     to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

      (b)     to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

346. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Minnesota Class.

347. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Minnesota.

348. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Minnesota Class.

349. Defendants' conduct has a significant nexus with Minnesota because the Minnesota Class members are located in Minnesota, owned DMS in Minnesota, and engaged Vendors who utilized DIS in Minnesota.

350. Defendants' conduct substantially affected Minnesota commerce.

351. Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under the Minnesota Antitrust Law of 1971, Minn. Stat. § 325D.49, *et seq.*

## COUNT XVII

### VIOLATION OF MISSISSIPPI ANTITRUST LAW, MISS. CODE ANN. § 75-21-1, *ET SEQ.* (ON BEHALF OF THE MISSISSIPPI CLASS)

352. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

353.     As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of Mississippi antitrust law, Miss. Code Ann. § 75-21-1, *et seq.*

354.     CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

355.     CDK and Reynolds possess dominant positions in the DMS and DIS markets.

356.     CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

357.     The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

358.     Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

> (a)     to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b)     to eliminate or significantly curtail competition in the DIS market

in the State on their respective DMS's, and thereby monopolize the

DIS market in the State and reap monopoly profits.

359.    These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Mississippi Class.

360.    Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Mississippi.

361.    Defendants' conduct has a significant nexus with Mississippi because the Mississippi Class members are located in Mississippi, owned DMS in Mississippi, and engaged Vendors who utilized DIS in Mississippi.

362.    Defendants' conduct substantially affected Mississippi commerce.

363.    Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Mississippi antitrust law, Miss. Code Ann. § 75-21-1, *et seq.*

## COUNT XVIII

### VIOLATION OF NEBRASKA'S JUNKIN ACT, NEB. REV. STAT. § 59-801, *ET SEQ.* (ON BEHALF OF THE NEBRASKA CLASS)

364.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

365. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of the Junkin Act, Neb. Rev. Stat. § 59-801, *et seq.*

366. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

367. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

368. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

369. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

370. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

      (a)    to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b)     to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

371.    These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Nebraska Class.

372.    Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Nebraska.

373.    Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Nebraska Class.

374.    Defendants' conduct has a significant nexus with Nebraska because the Nebraska Class members are located in Nebraska, owned DMS in Nebraska, and engaged Vendors who utilized DIS in Nebraska.

375.    Defendants' conduct substantially affected Nebraska commerce.

376.    Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under the Junkin Act, Neb. Rev. Stat. § 59-801, *et seq.*

## COUNT XIX

## VIOLATION OF NEW HAMPSHIRE ANTITRUST LAW, N.H. REV. STAT. ANN. § 356:1, *ET SEQ.* (ON BEHALF OF THE NEW HAMPSHIRE CLASS)

377.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

378.    As described hereinabove, Defendants willfully engaged in a conspiracy and entered into unlawful agreements to restrain trade, in flagrant violation of New Hampshire antitrust laws, N.H. Rev. Stat. Ann. § 356:1, *et seq.*

379.    CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

380.    CDK and Reynolds possess dominant positions in the DMS and DIS markets.

381.    CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

382.    The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

383. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

(a)  to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b)  to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

384. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the New Hampshire Class.

385. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of New Hampshire.

386. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the New Hampshire Class.

387. Defendants' conduct has a significant nexus with New Hampshire because the New Hampshire Class members are located in New Hampshire, owned DMS in New Hampshire, and engaged Vendors who utilized DIS in New Hampshire.

388. Defendants' conduct substantially affected New Hampshire commerce.

389. Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under New Hampshire antitrust law, N.H. Rev. Stat. Ann. § 356:1, *et seq.*

## COUNT XX

### VIOLATION OF THE NEW MEXICO ANTITRUST ACT, N. M.S.A. § 57-1-1, *ET SEQ.* (ON BEHALF OF THE NEW MEXICO CLASS)

390. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

391. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of the New Mexico Antitrust Act, N.M.S.A. § 57-1-1, *et seq.*

392. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

393. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

394. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

395. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their

conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

396.    Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

        (a)     to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

        (b)     to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

397.    These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the New Mexico Class.

398.    Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of New Mexico.

399.    Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the New Mexico Class.

400.    Defendants' conduct has a significant nexus with New Mexico because the New Mexico Class members are located in New Mexico, owned DMS in New Mexico, and engaged Vendors who utilized DIS in New Mexico.

401.    Defendants' conduct substantially affected New Mexico commerce.

402.    Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under the New Mexico Antitrust Act, N.M.S.A. § 57-1-1, *et seq.*

### COUNT XXI

### VIOLATION OF NEW YORK'S DONNELLY ACT, N. Y. GEN.BUS. LAWS § 340, *ET SEQ.* (ON BEHALF OF THE NEW YORK CLASS)

403.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

404.    As described hereinabove, Defendants engaged in a conspiracy and entered unlawful agreements to restrain trade, in violation of the New York's Donnelly Act, New York Gen. Bus. Law § 340, *et seq.*

405.    CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

406.    CDK and Reynolds possess dominant positions in the DMS and DIS markets.

407.    CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

408.    The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The

114

agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

409.    Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

(a)    to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b)    to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

410.    These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the New York Class.

411.    Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of New York.

412.    Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the New York Class.

413.     Defendants' conduct has a significant nexus with New York because the New York Class members are located in New York, owned DMS in New York, and engaged Vendors who utilized DIS in New York.

414.     Defendants' conduct substantially affected New York commerce.

415.     Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under New York's Donnelly Act, New York Gen. Bus. Law § 340, *et seq.*

## COUNT XXII

### VIOLATION OF NORTH CAROLINA ANTITRUST LAWS, N.C.G.S.A. § 75-1, *ET SEQ.* (ON BEHALF OF THE NORTH CAROLINA CLASS)

416.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

417.     As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of North Carolina antitrust laws, N.C.G.S.A. § 75-1, *et seq.*

418.     CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

419.     CDK and Reynolds possess dominant positions in the DMS and DIS markets.

420.     CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

421.     The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market.

116

CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

422.    Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

(a)    to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b)    to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

423.    These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the North Carolina Class.

424.    Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of North Carolina.

425.     Defendants' conduct has a significant nexus with North Carolina because the North Carolina Class members are located in North Carolina, owned DMS in North Carolina, and engaged Vendors who utilized DIS in North Carolina.

426.     Defendants' conduct substantially affected North Carolina commerce.

427.     Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under North Carolina antitrust laws, N.C.G.S.A. § 75-1, *et seq.*

## COUNT XXIII

## VIOLATION OF OREGON REVISED STATUTES § 646.705, *ET SEQ.*
## (ON BEHALF OF THE OREGON CLASS)

428.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

429.     As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of Oregon Revised Statutes § 646.705, *et seq.*

430.     CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

431.     CDK and Reynolds possess dominant positions in the DMS and DIS markets.

432.     CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

433.     The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market.

CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

434.    Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

(a)    to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b)    to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

435.    These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Oregon Class.

436.    Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Oregon.

437.    Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Oregon Class.

438. Defendants' conduct has a significant nexus with Oregon because the Oregon Class members are located in Oregon, owned DMS in Oregon, and engaged Vendors who utilized DIS in Oregon.

439. Defendants' conduct substantially affected Oregon commerce.

440. Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Oregon Revised Statutes § 646.705, *et seq.*

## COUNT XXIV

### VIOLATION OF THE RHODE ISLAND ANTITRUST ACT, R.I. GEN. LAWS § 6-36-1, *ET SEQ.* (ON BEHALF OF THE RHODE ISLAND CLASS)

441. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

442. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq.*

443. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

444. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

445. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

446. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market.

CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

447.    Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

> (a)    to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and
>
> (b)    to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

448.    These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Rhode Island Class.

449.    Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Rhode Island.

450. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Rhode Island Class.

451. Defendants' conduct has a significant nexus with Rhode Island because the Rhode Island Class members are located in Rhode Island, owned DMS in Rhode Island, and engaged Vendors who utilized DIS in Rhode Island.

452. Defendants' conduct substantially affected Rhode Island commerce.

453. Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq.*

## COUNT XXV

### VIOLATION OF SOUTH CAROLINA CODE ANNOTATED § 39-3-10, *ET SEQ.* (ON BEHALF OF THE SOUTH CAROLINA CLASS)

454. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

455. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of South Carolina Code Annotated § 39–3–10, *et seq.*

456. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

457. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

458. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

122

459.    The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

460.    Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

> (a)    to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

> (b)    to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

461.    These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the South Carolina Class.

462.    Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in

123

the DMS and DIS markets, and constitute violations of the state antitrust laws of South Carolina.

463.     Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the South Carolina Class.

464.     Defendants' conduct has a significant nexus with South Carolina because the South Carolina Class members are located in South Carolina, owned DMS in South Carolina, and engaged Vendors who utilized DIS in South Carolina.

465.     Defendants' conduct substantially affected South Carolina commerce.

466.     Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under South Carolina Code Annotated § 39–3–10, *et seq.*

## COUNT XXVI

## VIOLATION OF SOUTH DAKOTA CODIFIED LAWS § 37–1–33, *ET SEQ.* (ON BEHALF OF THE SOUTH DAKOTA CLASS)

467.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

468.     As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of South Dakota Codified Laws § 37–1–33, *et seq.*

469.     CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

470.     CDK and Reynolds possess dominant positions in the DMS and DIS markets.

471. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

472. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

473. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

(a) to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b) to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

474. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the South Dakota Class.

475.     Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of South Dakota.

476.     Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the South Dakota Class.

477.     Defendants' conduct has a significant nexus with South Dakota because the South Dakota Class members are located in South Dakota, owned DMS in South Dakota, and engaged Vendors who utilized DIS in South Dakota.

478.     Defendants' conduct substantially affected South Dakota commerce.

479.     Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under South Dakota Codified Laws § 37–1–33, *et seq.*

## COUNT XXVII

### VIOLATION OF THE TENNESSEE CODE § 47-25-101, *ET SEQ.*<br>(ON BEHALF OF THE TENNESSEE CLASS)

480.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

481.     As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of Tennessee Code § 47-25-101, *et seq.*

482.     CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

483.     CDK and Reynolds possess dominant positions in the DMS and DIS markets.

484.     CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

485.     The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

486.     Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

> (a)     to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and
>
> (b)     to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

487.     These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and

DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Tennessee Class.

488.    Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Tennessee.

489.    Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Tennessee Class.

490.    Defendants' conduct has a significant nexus with Tennessee because the Tennessee Class members are located in Tennessee, owned DMS in Tennessee, and engaged Vendors who utilized DIS in Tennessee.

491.    Defendants' conduct substantially affected Tennessee commerce.

492.    Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Tennessee Code § 47-25-101, *et seq.*

## COUNT XXVIII

### VIOLATION OF THE UTAH CODE § 76-10-3101, *ET SEQ.*
### (ON BEHALF OF THE UTAH CLASS)

493.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

494.    As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of Utah Code § 76-10-3101, *et seq.*

495. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

496. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

497. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

498. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

499. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

      (a)      to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

      (b)      to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

500.     These   horizontal   market-share   agreements   and   collusive   and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Utah Class.

501.     Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Utah.

502.     Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Utah Purchaser Class.

503.     Defendants' conduct has a significant nexus with Utah because the Utah Class members are located in Utah, owned DMS in Utah, and engaged Vendors who utilized DIS in Utah.

504.     Defendants' conduct substantially affected Utah commerce.

505.     Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Utah Code § 76-10-3101, *et seq.*

## COUNT XXIX

## VIOLATION OF VERMONT STATUTES, TITLE 9, § 2453(a), *ET SEQ.* (ON BEHALF OF THE VERMONT CLASS)

506.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

507.    As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of Vermont Statutes, Title 9, § 2453(a), *et seq.*

508.    CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

509.    CDK and Reynolds possess dominant positions in the DMS and DIS markets.

510.    CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

511.    The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

512.    Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

(a)     to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b)     to eliminate or significantly curtail competition in the DIS market

in the State on their respective DMS's, and thereby monopolize the

DIS market in the State and reap monopoly profits.

513.    These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Vermont Class.

514.    Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Vermont.

515.    Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Vermont Class.

516.    Defendants' conduct has a significant nexus with Vermont because the Vermont Class members are located in Vermont, owned DMS in Vermont, and engaged Vendors who utilized DIS in Vermont.

517.    Defendants' conduct substantially affected Vermont commerce.

518.    Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Vermont Statutes, Title 9, § 2453(a), *et seq.*

## COUNT XXX

### VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT, W. VA. CODE § 47-18-1, *ET SEQ.* (ON BEHALF OF THE WEST VIRGINIA CLASS)

519.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

520.     As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of the West Virginia Antitrust Act, W. Va. Code, § 47-18-1, *et seq.*

521.     CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

522.     CDK and Reynolds possess dominant positions in the DMS and DIS markets.

523.     CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

524.     The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

525. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

    (a)      to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

    (b)      to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

526. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the West Virginia Class.

527. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of West Virginia.

528. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the West Virginia Class.

529. Defendants' conduct has a significant nexus with West Virginia because the West Virginia Class members are located in West Virginia, owned DMS in West Virginia, and engaged Vendors who utilized DIS in West Virginia.

530. Defendants' conduct substantially affected West Virginia commerce.

531.     Accordingly, Plaintiffs and the Class seek all forms of relief available under West Virginia Antitrust Act, W. Va. Code, § 47-18-1, *et seq.*

## COUNT XXXI

**VIOLATION OF WISCONSIN ANTITRUST LAWS, WIS. STAT. § 133.01, *ET SEQ.* (ON BEHALF OF THE WISCONSIN CLASS)**

532.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

533.     As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of Wisconsin antitrust laws, Wis. Stat. § 133.01, *et seq.*

534.     CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

535.     CDK and Reynolds possess dominant positions in the DMS and DIS markets.

536.     CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

537.     The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their

conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

538.    Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

        (a)    to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

        (b)    to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

539.    These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Wisconsin Class.

540.    Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Wisconsin.

541.    Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Wisconsin Class.

542.    Defendants' conduct has a significant nexus with Wisconsin because the Wisconsin Class members are located in Wisconsin, owned DMS in Wisconsin, and engaged Vendors who utilized DIS in Wisconsin.

543.     Defendants' conduct substantially affected Wisconsin commerce.

544.     Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Wisconsin antitrust laws, Wis. Stat. § 133.01, *et seq.*

## COUNT XXXII

### VIOLATION OF ALASKA STATUTES, § 45.50.471, *ET SEQ.* (ON BEHALF OF THE ALASKA CLASS)

545.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

546.     Defendants have engaged in unfair competition or unfair, unconscionable, deceptive and/or fraudulent acts or practices in violation of the Alaska Statute § 45.50.471, *et seq.*

547.     During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Alaska Class to pay supracompetitive prices.

548.     Defendants' practices, even if not considered unlawful, offend public policy and the common law and are categorically within the penumbra of unfairness. These actions were immoral, unethical, oppressive, and/or unscrupulous and each had the tendency to deceive purchasers.

549.     Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual and substantial injury to Dealership Plaintiffs and members of the Alaska Class.

550. Defendants' conduct substantially affected commerce in Alaska throughout the Class Period.

551. In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Alaska Class.

552. Therefore, Dealership Plaintiffs and members of the Alaska Class seek any and all relief, to the fullest extent allowable, under Alaska Statute § 45.50.471, *et seq.*

## COUNT XXXIII

### VIOLATION OF ARKANSAS CODE ANNOTATED, §4-88-101, *ET SEQ.* (ON BEHALF OF THE ARKANSAS CLASS)

553. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

554. Defendants have violated Arkansas Code Annotated, §4-88-101, *et seq.*, through their unfair and/or deceptive practices.

555. During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Arkansas Class to pay these supracompetitive prices.

556. Defendants knowingly made false representations about the characteristics, uses, and benefits of their products and related services.

557. Defendants engaged in the aforesaid conduct which is unconscionable, false, or deceptive. Defendants' acts affront the sense of justice, decency, and/or reasonableness and violate public policy.

558.    Due to Defendants' concerted actions, Dealership Plaintiffs and members of the Arkansas Class, have suffered actual injury to their businesses and properties and are threatened with further actual injury. Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the Arkansas Class.

559.    Defendants' conduct substantially affected commerce and consumers in Arkansas throughout the Class Period.

560.    In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Arkansas Class.

561.    Therefore, Dealership Plaintiffs and members of the Arkansas Class seek any and all relief, to the fullest extent allowable, under Arkansas Code Annotated, §4-88-101, *et seq.*, and as equity so requires.

## COUNT XXXIV

### VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONAL CODE § 17200, *ET SEQ.* <br> (ON BEHALF OF THE CALIFORNIA CLASS)

562.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

563.    Defendants have violated California Business and Professional Code § 17200, *et seq.*, through their unfair and/or deceptive practices.

564.    During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets;

and (4) causing Dealership Plaintiffs and members of the California Class to pay these supracompetitive prices.

565.    These business acts or practices were unlawful, unfair, and/or fraudulent. Defendants' acts constitute a common, continuous, and continuing illegal and unlawful course of conduct, which Defendants will continue into the future.

566.    Dealership Plaintiffs and members of the California Class have suffered injury in fact and lost money or property as a result of Defendants' concerted actions.

567.    Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the California Class. Defendants' conduct substantially affected commerce and consumers in California throughout the Class Period.

568.    In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the California Class.

569.    Therefore, Dealership Plaintiffs, and members of the California Class seek any and all relief, to the fullest extent allowable, under California Business and Professional Code § 17200, *et seq.*, and as equity so requires, including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants.

## COUNT XXXV

## VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT, COLO. REV. STAT., § §6-1-101, *ET SEQ.* (ON BEHALF OF THE COLORADO CLASS)

570.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

571.    Defendants have violated the Colorado Consumer Protection Act, Colorado Rev. Stat. §6-1-101, *et seq.*, through their unfair and/or deceptive practices. During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Colorado Class to pay these supracompetitive prices.

572.    Defendants engaged in an unfair or deceptive trade practice during the course of their regular business that significantly impacted Dealership Plaintiffs and members of the Colorado Class, as well as other actual or potential consumers of Defendants' goods/services. Dealership Plaintiffs and members of the Colorado Class have suffered injury in fact to a legally protected interest and lost money or property as a result of Defendants' concerted actions.

573.    Defendants' actions have already severely impacted consumers in the state and have the potential to further negatively impact Colorado consumers in the future.

574.    Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the Colorado Class. Defendants' conduct substantially affected commerce and consumers in Colorado throughout the Class Period.

575.    In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Colorado Class.

576. Therefore, Dealership Plaintiffs and members of the Colorado Class seek any and all relief, to the fullest extent allowable, under the Colorado Consumer Protection Act, Colorado Rev. Stat. §6-1-101, *et seq.*, and as equity so requires.

## COUNT XXXVI

### VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT, 6 DEL. CODE § 2511, *ET SEQ.* (ON BEHALF OF THE DELAWARE CLASS)

577. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

578. Defendants have violated the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq.*, through their unfair and/or deceptive practices. During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Delaware Class to pay these supracompetitive prices.

579. Defendant engaged in an unlawful practice which caused an ascertainable loss to Dealership Plaintiffs and members of the Delaware Class. Included among those actions are deliberate failures to disclose material facts to Dealership Plaintiffs and members of the Delaware Class. Defendants also misrepresented that the prices of their DMS and DIS were competitive and were set by a free and fair market.

580. As a result, Defendants misled Dealership Plaintiffs and members of the Delaware Class as purchasers and/or consumers of those products.

142

581. Dealership Plaintiffs and members of the Delaware Class are entitled to the benefit-of-the-bargain in that they should be made whole and restored to a position that they would have been in, if the representations of Defendants were true.

582. This includes damages to equal the difference between the price paid and the actual value of the product and/or service received.

583. Due to Defendants' concerted actions there now exists a gross disparity between the price of DMS and DIS and the value of DMS and DIS. Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the Delaware Class.

584. Defendants' conduct substantially affected commerce and consumers in Delaware throughout the Class Period. In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Delaware Class.

585. Therefore, Dealership Plaintiffs and members of the Delaware Class seek any and all relief, to the fullest extent allowable, under the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq.*, and as equity so requires.

## COUNT XXXVII

### VIOLATION OF DISTRICT OF FLORIDA DECEPTIVE TRADE PRACTICES ACT, FLA. STAT. § 501.201, *ET SEQ.* (ON BEHALF OF THE FLORIDA CLASS)

586. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

587. Defendants have violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*, through their unfair and/or deceptive practices. During the Class Period, Defendants have acted unlawfully by: (1) knowingly

conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Florida Class to pay these supracompetitive prices.

588.    To be sure, Dealership Plaintiffs and members of the Florida Class suffered an ascertainable loss that is both concrete and actual, not conjectural or hypothetical.

589.    Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the Florida Class. Defendants' conduct substantially affected commerce and consumers in Florida throughout the Class Period.

590.    In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Florida Class.

591.    Therefore, Dealership Plaintiffs and members of the Florida Class seek any and all relief, to the fullest extent allowable, under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*, and as equity so requires.

## COUNT XXXVIII

### VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT, GEORGIA CODE § 10-1-390, *ET SEQ.* (ON BEHALF OF THE GEORGIA CLASS)

592.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

593.    Defendants have violated the Georgia Fair Business Practices Act, Georgia Code § 10-1-390, et seq., through their unfair and/or deceptive practices.

594. During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Georgia Class to pay these supracompetitive prices.

595. All of Defendants' illegal, unfair, and deceptive actions were perpetuated in the consumer marketplace.

596. Included among these actions are Defendants' deliberate failure to disclose material facts to Dealership Plaintiffs and members of the Georgia Class.

597. Defendants misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market and in turn Defendants misled Dealership Plaintiffs and members of the Georgia Class as purchasers and/or consumers of those products.

598. Dealership Plaintiffs and members of the Georgia Class were unaware that they were being unfairly and illegally overcharged for the DMS and DIS provided by Defendants.

599. Therefore, Dealership Plaintiffs and members of the Georgia Class, could not exercise diligence to ascertain the falsity of Defendants' statements, misrepresentations, and material omissions.

600. Dealership Plaintiffs and members of the Georgia Class reasonably relied upon these misrepresentations and material omissions.

601.    Dealership Plaintiffs and members of the Georgia Class have also suffered an ascertainable loss of money and/or property as a result of Defendants' concerted actions.

602.    Holding defendant accountable for the aforesaid actions will serve the public interest and aid in ending unfair and/or deceptive acts which have the potential for great harm to the general consuming public in Georgia. Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the Georgia Class. Defendants' conduct substantially affected commerce and consumers in Georgia throughout the Class Period.

603.    In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Georgia Class.

604.    Therefore, Dealership Plaintiffs and members of the Georgia Class seek any and all relief, to the fullest extent allowable, under the Georgia Fair Business Practices Act, Georgia Code § 10-1-390, et seq. and as equity so requires.

## COUNT XXXIX

### VIOLATION OF MASSACHUSSETS GENERAL LAWS CH. 93A, § 1, *ET SEQ.* (ON BEHALF OF THE MASSACHUSSETS CLASS)

605.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

606.    Defendants have violated the Massachusetts Gen. Laws, Ch. 93A, § 1, *et seq.*, through their unfair and/or deceptive practices.

607.    During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3)

increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Massachusetts Class to pay these supracompetitive prices.

608.　Defendants knowingly and willfully engaged in actions that constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," as outlined in M.G.L.A. 93A, §§ 2, 11.

609.　Defendants' unfair and unlawful acts directly and/or indirectly affected not only Dealership Plaintiffs and members of the Massachusetts Class, but also the people of the commonwealth of Massachusetts.

610.　Defendants deliberately failed to disclose material facts to Dealership Plaintiffs and members of the Massachusetts Class.

611.　Defendants misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market.

612.　In turn, Defendants misled Dealership Plaintiffs and members of the Massachusetts Class as purchasers and/or consumers of those products.

613.　These statements and material omissions created an over-all misleading impression of Defendants' product and services.

614.　Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of an actual and distinct injury to Dealership Plaintiffs and members of the Massachusetts Class.

615.　Defendants' conduct substantially affected commerce and consumers in Massachusetts throughout the Class Period.

616. In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Massachusetts Class.

617. Therefore, Dealership Plaintiffs and members of the Massachusetts Class, seek any and all relief, to the fullest extent allowable, under Massachusetts Gen. Laws, Ch. 93A, § 1, *et seq.*, and as equity so requires.

## COUNT XL

### VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT, MINN. STAT. § 325F.68, *ET SEQ.* (ON BEHALF OF THE MINNESOTA CLASS)

618. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

619. Defendants have violated the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq.*, through their unfair and/or deceptive practices.

620. During the Class Period, Defendants have willfully acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Minnesota Class to pay these supracompetitive prices.

621. Included among these actions are Defendants' deliberate failures to disclose material facts to Dealership Plaintiffs and members of the Minnesota Class.

622. Defendants misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market. In turn, Defendants misled Dealership Plaintiffs and members of the Minnesota as purchasers of those products.

148

623. Defendants' actions have already severely impacted consumers and have the potential to further negatively impact consumers in the future.

624. Defendants' unlawfulconduct was a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the Minnesota Class. Defendants' conduct substantially affected commerce and consumers in Minnesota throughout the Class Period.

625. In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Minnesota Class.

626. Therefore, Dealership Plaintiffs and members of the Minnesota Class seek any and all relief, to the fullest extent allowable, under the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq.*, and as equity so requires.

627. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

628. Defendants have violated the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325D.43, *et seq.*, through their unfair and/or deceptive practices.

629. During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Minnesota Class to pay these supracompetitive prices.

630. Included among these actions are Defendants' deliberate failures to disclose material facts to Dealership Plaintiffs and members of the Minnesota Class.

631.    Defendants misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market. In turn, Defendants misled Dealership Plaintiffs and members of the Minnesota as purchasers of those products.

632.    These statements created the likelihood of confusion or misunderstanding. Dealership Plaintiffs and members of the Minnesota Class were the actual and/or potential consumers of Defendants' goods/services. In addition, Defendants' actions have already severely impacted consumers and have the potential to further negatively impact consumers in the future.

633.    Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the Minnesota Class. Defendants' conduct substantially affected commerce and consumers in Minnesota throughout the Class Period.

634.    In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Minnesota Class.

635.    Therefore, Dealership Plaintiffs and members of the Minnesota Class seek any and all relief, to the fullest extent allowable, under the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*, and as equity so requires.

## COUNT XLI

### VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT, NEB. REV. STAT, § 59-1601, *ET SEQ.* (ON BEHALF OF THE NEBRASKA CLASS)

636.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

637.    Defendants have violated the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.*, through their unfair and/or deceptive practices.

638.     During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Nebraska Class to pay these supracompetitive prices.

639.     Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the Nebraska Class.

640.     Defendants' conduct substantially affected commerce and consumers in Nebraska throughout the Class Period.

641.     In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Consumer Protection Class.

642.     Therefore, Dealership Plaintiffs and members of the Nebraska Class seek any and all relief, to the fullest extent allowable, under the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.*, and as equity so requires.

## COUNT XLII

### VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT, NEV. REV. STAT. § 598.0903, *ET SEQ.* (ON BEHALF OF THE NEVADA CLASS)

643.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

644.     Defendants have violated the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*, through their unfair and/or deceptive practices.

645.    During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Nevada Class to pay these supracompetitive prices.

646.    Defendants knowingly and willfully engaged in these actions.

647.    Dealership Plaintiffs and the Nevada Class are victims of the consumer fraud perpetuated by Defendants.

648.    Defendants affirmatively misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market.

649.    These affirmative misrepresentations misled Dealership Plaintiffs and members of the Nevada Class as purchasers of those products.

650.    In addition, Dealership Plaintiffs and members of the Nevada Class have suffered an ascertainable loss of money and/or property as a result of Defendants' concerted actions.

651.    That loss was caused by Defendants' willful and deceptive conduct. Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the Nevada Class.

652.    Defendants' conduct substantially affected commerce and consumers in Nevada throughout the Class Period.

653.    In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Nevada Class.

654.    Therefore, Dealership Plaintiffs and members of the Nevada Class seek any and all relief, to the fullest extent allowable, under the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*, and as equity so requires.

## COUNT XLIII

## VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT, N.H. REV. STAT. § 358-A:1, *ET SEQ.* (ON BEHALF OF THE NEW HAMPSHIRE CLASS)

655.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

656.    Defendants have violated New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*, through their unfair and/or deceptive practices.

657.    During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the New Hampshire Class to pay these supracompetitive prices.

658.    Defendants' concerted actions, as outlined above, rise to a level of rascality which far surpasses the normal level found in everyday commerce and/or business.

659.    Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and

members of the New Hampshire Class. Defendants' conduct substantially affected commerce and consumers in New Hampshire throughout the Class Period.

660.    In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the New Hampshire Class.

661.    Therefore, Dealership Plaintiffs and members of the New Hampshire Class seek any and all relief, to the fullest extent allowable, under the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*, and as equity so requires.

### COUNT XLIV

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT, N.J. STAT. ANN. 56:8-1, *ET SEQ.* (ON BEHALF OF THE NEW JERSEY CLASS)

662.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

663.    Defendants have violated the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*, through their unfair and/or deceptive practices.

664.    During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the New Jersey Class to pay these supracompetitive prices.

665.    Defendants used and/or employed unconscionable commercial practices, deception, fraud, false pretenses, false promises, and misrepresentations with intent for Dealership Plaintiffs and members of the New Jersey Class to rely on those statements and actions.

666. These actions constituted "deception" as it is understood from the perception of a reasonable consumer in New Jersey.

667. Included among these actions are Defendants' deliberate failures to disclose material facts to Dealership Plaintiffs and members of the New Jersey Class.

668. Defendants misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market.

669. In turn, Defendants misled and victimized Dealership Plaintiffs and members of the New Jersey Class as purchasers and/or consumers of those products.

670. These products were sold in the consumer marketplace.

671. Defendants knowingly and willfully engaged in these actions. Dealership Plaintiffs and members of the New Jersey Class have suffered an ascertainable loss of money and/or property as a result of Defendants' concerted actions.

672. Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the New Jersey Class. Defendants' conduct substantially affected commerce and consumers in New Jersey throughout the Class Period.

673. In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the New Jersey Class.

674. Therefore, Dealership Plaintiffs and members of the New Jersey Class seek any and all relief, to the fullest extent allowable, under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*, and as equity so requires.

## COUNT XLV

## VIOLATION OF NEW MEXICO STAT. ANN. § 57-12-1, *ET SEQ.* (ON BEHALF OF THE NEW MEXICO CLASS)

675.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

676.    Defendants have violated New Mexico Stat. Ann. § 57-12-1, *et seq.*, through their unfair and/or deceptive practices.

677.    During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the New Mexico Class to pay these supracompetitive prices.

678.    These actions constitute "unconscionable trade practices," in violation of N.M. Stat. Ann. § 57-12-3. Dealership Plaintiffs and members of the New Mexico Class were unaware that they were being unfairly and illegally overcharged for the DMS and DIS provided by Defendants.

679.    Defendants' conduct, with regard to the sale of DMS and DIS, was substantively unconscionable.

680.    Defendant took grossly unfair advantage of Dealership Plaintiffs and members of the New Mexico Class.

681.    Due to Defendants' concerted actions, there now exists a gross disparity between the price of DMS and DIS and the value of DMS and DIS.

682.    Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the New Mexico Class. Defendants' conduct substantially affected commerce and consumers in New Mexico throughout the Class Period.

683.    In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the New Mexico Class.

684.    Therefore, Dealership Plaintiffs and members of the New Mexico Class seek any and all relief, to the fullest extent allowable, under New Mexico Stat. Ann. § 57-12-1, *et seq.*, and as equity so requires.

## COUNT XLVI

**VIOLATION OF THE NORTH DAKOTA UNLAWFUL SALES OR ADVERTISING PRACTICES STATUTE, N.D. CENT. CODE. § 51-15-01, *ET SEQ.* (ON BEHALF OF THE NORTH DAKOTA CLASS)**

685.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

686.    Defendants have violated the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Cent. Code § 51-15-01, *et seq.*, through their unfair and/or deceptive practices.

687.    During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the North Dakota Class to pay these supracompetitive prices.

688.     Defendants misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market. In turn Defendants misled Dealership Plaintiffs and members of the North Dakota Class as purchasers and/or consumers of those products.

689.     Defendant made these misrepresentations with the intent that Dealership Plaintiffs and members of the Consumer Protection Class would rely on them. In addition, Dealership Plaintiffs and members of the North Dakota Class have suffered an ascertainable loss of money and/or property as a result of Defendants' concerted actions.

690.     That loss was caused by Defendants' knowing and willfully deceptive conduct. Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the North Dakota Class.

691.     Defendants' conduct substantially affected commerce and consumers in North Dakota throughout the Class Period.

692.     In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the North Dakota Class.

693.     Therefore, Dealership Plaintiffs and members of the North Dakota Class seek any and all relief, to the fullest extent allowable, under the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Cent. Code § 51-15-01, *et seq.*, and as equity so requires.

## COUNT XLVII

### VIOLATION OF THE SOUTH CAROLINA'S UNFAIR TRADE PRACTICES ACT, S.C. CODE ANN. §§ 39-5-10, *ET SEQ*. <u>(On Behalf of the South Carolina Class)</u>

694.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

695.    Defendants have violated the South Carolina U n f a i r Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*, through their unfair and/or deceptive practices.

696.    During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the South Carolina Class to pay these supracompetitive prices.

697.    The injury of Dealership Plaintiffs and members of the South Carolina Class resulted from these actions.

698.    Included among the actions of Defendants are their deliberate failures to disclose material facts to Dealership Plaintiffs and members of the South Carolina Class.

699.    Defendants misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market.

700.    In turn, Defendants misled Dealership Plaintiffs and members of the South Carolina Class as purchasers and/or consumers of those products. These affirmative misrepresentations and omissions were regarding information important to Dealership Plaintiffs and members of the South Carolina Class.

701.    In addition, Dealership Plaintiffs and members of the South Carolina Class have suffered an ascertainable loss of money and/or property as a result of Defendants' concerted actions.

702.    As purchasers of DMS and DIS, Dealership Plaintiffs and South Carolina Class were adversely affected by the actions of Defendants, and overall these actions were injurious to the public interest.

703.    Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the South Carolina Class. Defendants' conduct substantially affected commerce and consumers in South Carolina throughout the Class Period.

704.    In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the South Carolina Class.

705.    Therefore, Dealership Plaintiffs and members of the South Carolina Class seek any and all relief, to the fullest extent allowable, under South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.,* as equity so requires.


## COUNT XLVIII

**VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES
AND CONSUMER PROTECTION STATUTE,
S.D. CODIFIED LAWS, § 37-24-1, *ET SEQ.*
(ON BEHALF OF THE SOUTH DAKOTA CLASS)**

706.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

707.    Defendants have violated the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq.*, through their unfair and/or deceptive practices.

708.    During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS

markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the South Dakota Class to pay these supracompetitive prices.

709.    The injury of Dealership Plaintiffs and members of the South Dakota Class resulted from these actions.

710.    Included among the actions of Defendants are their deliberate failures to disclose material facts to Dealership Plaintiffs and members of the South Dakota Class.

711.    Defendants misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market.

712.    In turn, Defendants misled Dealership Plaintiffs and members of the South Dakota Class as purchasers and/or consumers of those products. These affirmative misrepresentations and omissions were regarding information important to Dealership Plaintiffs and members of the South Dakota Class.

713.    In addition, Dealership Plaintiffs and members of the South Dakota Class have suffered an ascertainable loss of money and/or property as a result of Defendants' concerted actions.

714.    As purchasers of DMS and DIS, Dealership Plaintiffs and South Dakota Class were adversely affected by the actions of Defendants.

715.    Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the South Dakota Class. Defendants' conduct substantially affected commerce and consumers in South Dakota throughout the Class Period.

716. In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the South Dakota Class.

717. Therefore, Dealership Plaintiffs and members of the South Dakota Class seek any and all relief, to the fullest extent allowable, under South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq.*, as equity so requires.

## COUNT XLIX

## VIOLATION OF THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT, W. VA. CODE, § 46A-6-101, *ET SEQ.* (<u>ON BEHALF OF THE WEST VIRGINIA CLASS</u>)

718. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

719. Defendants have violated the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A-6-101, *et seq.*, through their unfair and/or deceptive practices.

720. During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the West Virginia Class to pay these supracompetitive prices.

721. Defendants misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market.

722. In turn, Defendants misled Dealership Plaintiffs and members of the West Virginia Class as purchasers and/or consumers of those products.

723.     Dealership Plaintiffs and members of the West Virginia Class have suffered an ascertainable loss of money and/or property as a result of Defendants' concerted actions.

724.     Defendants' actions were not fair and honest competition, but rather were unreasonable in relation to the development and preservation of business and overall these actions were injurious to the public interest.

725.     Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the West Virginia Class. Defendants' conduct substantially affected commerce and consumers in West Virginia throughout the Class Period.

726.     In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the West Virginia Class.

727.     Therefore, Dealership Plaintiffs and members of the West Virginia Class seek any and all relief, to the fullest extent allowable, under the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A-6-101, *et seq.*, and as equity so requires.

## COUNT L

### VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT, WIS. STAT. § 100.18, *ET SEQ.* (ON BEHALF OF THE WISCONSIN CLASS)

728.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

729.     Defendants have violated the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, *et seq.*, through their unfair and/or deceptive practices.

730.     During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS

markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and causing Dealership Plaintiffs and members of the Wisconsin Class to pay these supracompetitive prices.

731.    Defendants misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market.

732.    In turn, Defendants misled Dealership Plaintiffs and members of the Wisconsin Class as purchasers and/or consumers of those products.

733.    These statements came in the form of affirmative misrepresentations and material omissions of information important to Dealership Plaintiffs and members of the Wisconsin Class.

734.    Dealership Plaintiffs and members of the Consumer Protection Class have suffered an ascertainable loss of money and/or property as a result of Defendants' concerted actions. Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the Wisconsin Class.

735.    Defendants' conduct substantially affected commerce and consumers in Wisconsin throughout the Class Period. In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Wisconsin Class.

736.    Therefore, Dealership Plaintiffs and members of the Wisconsin Class seek any and all relief, to the fullest extent allowable, under the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, *et seq.*, and as equity so requires.

## PRAYER FOR RELIEF

WHEREFORE, Dealership Plaintiffs requests that the Court enter judgment in their favor, and against Defendants and order the following relief:

(a) Certification of the action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Dealership Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

(b) Declaring that the unlawful horizontal agreement alleged in Counts I and II be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(c) Declaring that the exclusive dealing provisions alleged in Counts III and IV be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(d) Declaring that the monopolization of the after-market for DIS on CDK DMS alleged in Count V be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(e) Declaring that the monopolization of the after-market for DIS on Reynolds DMS alleged in Count VI be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(f)    Declaring that the conduct alleged herein constitutes unconscionable and/or unfair business acts or practices in violation of the various state laws alleged herein in Counts VI-L;

(g)    Permanent injunctive relief which enjoins Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claims to act on their behalf, from, in any manner, continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and from otherwise violating the antitrust laws by entering into and carrying out their illegal agreements, and requires them to take affirmative steps to dissipate the effects of the violation;

(h)    Awarding damages for all damages arising from Defendants' unlawful conspiracy in restraint of trade as alleged herein, as provided under the Sherman Act, State Antitrust Acts, and the State Consumer Protection Acts, and holding Defendants jointly and severally liable for all damages;

(i)    Declaring that Dealership Plaintiffs and the Class recover treble their damages as caused by the conspiracy alleged herein, as provided by law, and that judgment in favor of Dealership

Plaintiffs and the Class be entered against Defendants in that amount;

(j)     By awarding Dealership Plaintiffs and Class members pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the complaint in this action;

(k)     Ordering that Dealership Plaintiffs and Class members recover their costs of this suit, including reasonable attorneys' fees and costs, as provided by law; and

(l)     Such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

737.    Trial by jury is demanded on all issues so triable.


Dated:    June 4, 2018

*/s/ Peggy J. Wedgworth*_____
Peggy J. Wedgworth (pro hac vice)
***Dealership Interim Lead Class Counsel***
Elizabeth McKenna (pro hac vice)
**MILBERG TADLER PHILLIPS GROSSMAN LLP**
One Pennsylvania Plaza, 19th Floor
New York, New York 10119
Tel:  (212) 594-5300
Fax: (212) 868-1229
pwedgworth@milberg.com
emckenna@milberg.com

Leonard A. Bellavia (pro hac vice)
***Plaintiffs' Steering Committee***
Steven Blatt
**BELLAVIA BLATT, PC**
200 Old Country Road, Suite 400
Mineola, New York 11501
Tel:  (516) 873-3000

Daniel C. Hedlund (pro hac vice)
***Plaintiffs' Steering Committee***
Michelle J. Looby (pro hac vice)
***Plaintiffs' Steering Committee***
Daniel E. Gustafson
David A. Goodwin
Daniel J. Nordin

Fax: (516) 873-9032
lbellavia@dealerlaw.com
sblatt@dealerlaw.com

**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dgoodwin@gustafsongluek.com
mlooby@gustafsongluek.com
dnordin@gustafsongluek.com

James E. Barz
*Plaintiffs' Steering Committee*
Frank Richter
*Plaintiffs' Steering Committee*
**ROBBINS GELLER RUDMAN
& DOWD LLP**
200 South Wacker Drive, 31st
Floor
Chicago, IL 60606
Tel: (312) 674-4674
Fax: (312) 674-4676
jbarz@rgrdlaw.com
frichter@rgrdlaw.com

David W. Mitchell (pro hac vice)
Alexandra S. Bernay
Carmen A. Medici
**ROBBINS GELLER RUDMAN &
DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel: (619) 231-1058
Fax (619) 231-7423
davidm@rgrdlaw.com
xanb@rgrdlaw.com
cmedici@rgrdlaw.com

Robert A. Clifford
*Liaison Counsel*
Shannon M. McNulty
Kristofer S. Riddle
**CLIFFORD LAW OFFICES, P.C.**
120 N. LaSalle Street, 31 Floor
Chicago, Illinois 60602
Tel: (312) 899-9090
Fax: (312) 251-1160
RAC@cliffordlaw.com
SMM@cliffordlaw.com