**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817<br>Case No. 18 C 864 |
| | Hon. Robert M. Dow, Jr. |
| This Document Relates to:<br>*Loop, LLC, d/b/a AutoLoop v. CDK Global, LLC,* Case No. 18 C 2521 (N.D. Ill.) | Jury Trial Demanded |
| | **PUBLIC-REDACTED** |

**AMENDED COMPLAINT – CLASS ACTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

PARTIES ........................................................................................................... 13

JURISDICTION AND VENUE ......................................................................... 14

FACTUAL ALLEGATIONS ............................................................................. 16

    I.    The Relevant Product Markets .................................................. 16

        A.    The DMS Market .......................................................... 16

        B.    The Dealer Data Integration Market ............................ 20

        C.    Single-Brand Aftermarket for Dealer Data Integration on the CDK DMS .................................................................... 29

    II.    CDK's Anticompetitive Conduct ............................................... 30

        A.    CDK's and Reynolds' *Per Se* Unlawful Horizontal Agreement to Eliminate Competition in the Data Integration Market ................ 30

        B.    CDK's and Reynolds' Exclusive Dealing Provisions with Vendors and Dealers .................................................... 44

    III.    CDK's Actions Have Harmed Competition ................................ 49

        A.    Data Integration Prices Have Skyrocketed .................... 50

        B.    CDK's and Reynolds' Anticompetitive Conduct Has Tilted the Table in Favor of Their Applications to the Detriment of Competing Applications .................................................... 54

    IV.    CDK's Anticompetitive Conduct Has No Pro-Competitive Justification .. 57

COUNT I: HORIZONTAL CONSPIRACY IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE SHERMAN ACT CLASS) ....................................................... 65

COUNT II: UNLAWFUL RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE SHERMAN ACT CLASS) .................................... 66

COUNT III: UNLAWFUL MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE SHERMAN ACT CLASS) .................................... 68

COUNT IV: VIOLATION OF THE FLORIDA ANTITRUST ACT (ON BEHALF OF PLAINTIFF AND THE FLORIDA STATE-LAW SUBCLASS) ..................................................................................... 69

COUNT V:  UNFAIR PRACTICES IN VIOLATION OF THE FLORIDA
    DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (ON BEHALF
    OF PLAINTIFF AND THE FLORIDA STATE-LAW SUBCLASS) ............... 70

JURY DEMAND ...................................................................................................... 71

PRAYER FOR RELIEF ............................................................................................. 71

## INTRODUCTION

1.      Plaintiff Loop, LLC ("AutoLoop") brings this action on behalf of itself and other automotive software application vendors to remedy and enjoin ongoing antitrust and state law violations by CDK Global, LLC ("CDK").[1]

2.      As alleged herein, and supported by extensive evidence both from public sources and internal documents produced by CDK in limited discovery to date, CDK and its non-party co-conspirator The Reynolds and Reynolds Company ("Reynolds") have committed flagrant antitrust violations and inflicted widespread harm on automotive dealers, vendors of software products and services (like AutoLoop), and the automotive industry as a whole.  Specifically, CDK and Reynolds have conspired to eliminate competition for providing integration with dealer data – an extremely valuable asset that belongs to dealers, but over which CDK and Reynolds have seized control.  Where there was once a robust market for providing data integration services, CDK and Reynolds – through their coordinated conduct – have destroyed that competition.  Where CDK and Reynolds once themselves competed in that market, they have now entered into a written covenant not to compete.  Moreover, where CDK and Reynolds once offered data integration services on a level-playing field, they now place artificial and anticompetitive restrictions on dealer data in order to maintain their dominance over the Dealer Management Systems ("DMS") market,

---

[1] AutoLoop is authorized under Federal Rules of Civil Procedure 15(a)(1)(B) and/or 15(a)(2) to amend its Complaint without leave of court because, on May 14, 2018, CDK's counsel stated in writing that "[i]n the event Loop, LLC elects to amend its complaint pursuant to Rule 15(a)(1)(B), CDK has agreed to a 7 day-extension up to including June 6, 2018 for AutoLoop to make that filing."

favor their own products and services, and injure competing products and services such as those offered by AutoLoop and other vendors. The resulting harm to vendors and dealers has been immense.

3.     Vendors like AutoLoop are direct targets of CDK's and Reynolds' conspiracy for a simple reason:  CDK and Reynolds offer products and services that compete in the same markets.  That is, CDK and its co-conspirator Reynolds are seeking not only to destroy and impair competition for data integration services, but, even more directly, they are seeking to impair and destroy competition for the products and services that vendors offer, and upon which dealers rely.  By eliminating competition for data integration services, CDK and Reynolds have seized control over dealer data.  They have thwarted dealers' ability to control access to and the usage of the dealers' own data, with no lawful or legitimate purpose.  The only purposes are anticompetitive:   to eliminate competition for integration services and injure competing software solution providers like AutoLoop.   The result is that the competitive playing field is not only uneven, but, as CDK itself has described it in internal presentations to its executive team, "tilted" in the extreme in favor of CDK.

4.     CDK and Reynolds entered into their illegal conspiracy – a conspiracy that eliminated competition for data integration services and imposed myriad restrictions on vendor access to and use of dealer data – for multiple anticompetitive reasons.  First, the conspiracy is an effort to protect their duopoly in the market for DMSs and ensures that the DMS remains central to dealers, choking off the natural progression of dealer operations to more efficient and less expensive vendor software

solutions. Second, having eliminated competition for providing access to dealer data, CDK and Reynolds have imposed enormously inflated fees for access to and use of that data, reaping financial windfalls to the detriment of both dealers and vendors. These enormously "bloated" fees – as one court has described them – injure vendors like AutoLoop not only because they must pay them, but also because the fees make vendors' products and services less attractive to dealers because those dealers must ultimately bear much of the added costs. CDK's and Reynolds' own competing products and services, by contrast, do not have to pay integration fees, bloated or otherwise. Finally, as noted above, CDK and Reynolds conspired to control data integration so they could place artificial restrictions on vendors' access to and use of dealer data in order to "tilt the table" in favor of CDK's and Reynolds' own solutions, leaving competing products and services (like those offered by AutoLoop) at a disadvantage.

5.     The damage to the automotive industry has been immense, with the damage to AutoLoop alone from its antitrust claims in the millions of dollars even before the automatic trebling provided for by the nation's antitrust laws. AutoLoop brings this action on behalf of a class of software solution vendors to recover those damages, enjoin CDK's illegal conduct, and stave off further harm to vendors, dealers, and other participants in the automotive industry. The industry and market can no longer endure such abuses.

                    *              *              *

- 3 -

6. AutoLoop is an automotive software products and services company, providing integrated software solutions for car dealers. AutoLoop's products and services make sourcing, selling, and servicing cars easier and more efficient for dealers and consumers than ever before.

7. AutoLoop provides a fully integrated dealer software system to more than 2,000 dealers across the country. AutoLoop offers three suites of software: Sales, Service, and Marketing. Each suite includes multiple software applications that dealers can select à la carte to enhance their ability to sell cars and serve customers. For example, AutoLoop's Marketing Suite includes software products such as Conquest (data-driven direct mail and email), Loyalty (a personalized customer loyalty platform), and Essentials (automated, multichannel dealer marketing campaigns). AutoLoop's Service Suite includes products such as Book (online service appointment scheduling) and SmartLane (mobile check-in and service-lane management). AutoLoop's Sales Suite includes XRM (customer relationship management), Quote (data mining and quote generation), and Newsletter (individually targeted customer newsletter production). Because all of AutoLoop's software is fully integrated, AutoLoop's products are able to share data seamlessly across all aspects of a dealer's business.

8. For vendors' products and services to function, they need access to data from their dealer clients. This dealer data is the lifeblood of the automotive industry. It includes, but is not limited to, vehicle and parts inventory, customer name and contact information, customer leads, completed and pending sales information,

vehicle financing and insurance ("F&I") information, vehicle pricing information, and service and repair information.

9. Dealers have traditionally stored a significant portion of their data on a database within their DMS, which is software that dealers use to help manage their businesses (*e.g.*, accounting, sales, service, and human resources).

10. CDK and Reynolds are duopolists in the DMS market. Together, they control approximately 75% of the United States market by number of dealers and at least 90% when measured by vehicles sold. CDK controls approximately 45% of the DMS market, and Reynolds controls approximately 30%. On May 24, 2017, CDK announced that it was acquiring Auto/Mate, Inc., a company that has approximately eight percent of the DMS market, in a move that would further strengthen CDK's market power. The Federal Trade Commission voted to block that acquisition because it would have further "reduce[d] competition in an already concentrated market."[2]

11. In addition to their DMSs, CDK and Reynolds offer standalone software applications that compete directly with applications offered by AutoLoop and other third-party vendors. For example, CDK's Service Edge and customer relationship management applications compete directly with AutoLoop's SmartLane and XRM products.

---

[2] FTC Press Release, *FTC Challenges CDK Global, Inc.'s Proposed Acquisition of Competitor Auto/Mate, Inc.* (Mar. 20, 2018).

12.     Even though certain dealer data is stored on the DMS database, that data belongs to the dealers – as CDK and Reynolds have repeatedly admitted. Accordingly, DMS providers, including CDK, have historically allowed dealers to provide third parties (including vendors) with automated access to the dealer data stored on the DMS.  Data integration service providers are companies that collect and standardize data from a dealer's DMS and provide it to the dealer's chosen third-party vendors of software products and services.  Data integration services enable dealers to have their data integrated with vendor products and services.  Such integration involves providing access to certain data elements, in addition to bi-directional "read" and "write" capabilities.  Certain integrations offer near-real-time access to and use of dealer data, while other integrations enable periodic flow of dealer data.

13.     CDK and Reynolds each provide data integration services for their respective DMSs.  CDK's service is known as Third Party Access ("3PA"), while Reynolds' service is known as the Reynolds Certified Interface ("RCI").  Third parties have also provided competing data integration services.  CDK owns two third-party data integrators – Digital Motorworks, Inc. ("DMI") and IntegraLink.  Other third-party data integrators have included Authenticom, Inc. ("Authenticom") and Superior Integrated Solutions, Inc. ("SIS").

14.     At one time, both CDK and Reynolds had "open" DMSs, meaning that neither took steps to prevent dealer clients from authorizing third-party access to the dealers' own data or to place anticompetitive restrictions on rights with respect to

- 6 -

that data.  During this time, the competition between data integration services made access to dealer data cost effective – an application vendor would pay an integrator on the order of $50 per dealer per month.  With dealers in control of access to and use of their data, vendors created an array of innovative software products and services to help dealerships market, sell, lease, and service cars.  These solutions became pervasive.  Today, an average dealership uses 10 to 15 different software solutions.

15.     Over time, Reynolds began to "close" its DMS by selectively blocking third-party data integrators from accessing dealer data stored on the Reynolds DMS. As Reynolds reduced competition for data integration services through its blocking activities, Reynolds increased the fees it charged for data integration through RCI. CDK continued to differentiate itself as an "open" DMS.  As CDK's chief marketing officer publicly touted, "We don't tell the dealer, if someone wants access to their data, they have to come to [CDK] to gain access to the data.  It's ultimately the dealer's data.  If he wants to give that data to somebody, for us to try to charge a toll doesn't seem like the right thing to do.  So we're not going to go down this path."  And at the same time, CDK's own data integration businesses provided vendors with access to dealer data on the Reynolds DMS.  CDK's open-access policy allowed it to gain (very slowly) DMS customers at Reynolds' expense and sign those dealers to long-term contracts.

16.     That competition between CDK and Reynolds halted abruptly in early 2015 when CDK began blocking dealers from granting third-party access to dealer data and, at the same time, agreed to shut down its data integration business for

dealers using a Reynolds DMS. CDK's sudden about-face came as a complete surprise to the market. As it turned out, CDK's about-face was the result of a horizontal agreement with Reynolds.

17. Specifically, CDK and Reynolds colluded to block third-party access to their DMSs – eliminating competition to their respective 3PA and RCI data access programs – thereby forcing third-party solution providers (like AutoLoop) to use CDK and Reynolds for data integration services. Executives from both CDK and Reynolds have admitted that the companies agreed to block and thereby destroy third-party data integrators. CDK and Reynolds also agreed to no longer compete with each other for data integration services.

18. CDK and Reynolds memorialized one aspect of their agreement in writing, dated February 18, 2015, pursuant to which CDK agreed to "wind down" its data integration business for Reynolds dealers, and CDK and Reynolds both agreed not to access each other's DMSs. Damningly, just before the written agreement was signed, CDK's internal documents stressed the need to "gain reciprocal agreements with DMS providers" such as Reynolds in order to destroy competition for data integration. Dkt. No. 163, at 145:24-25.[3]

19. Apart from the written agreement, and as detailed below, CDK and Reynolds executives have admitted to a broader agreement to destroy independent data integrators and therefore eliminate all competition to their own data integration

---

[3]  Citations to the Transcripts of the Hearing held June 26-28, 2017 in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, are referred to by their respective docket numbers (Dkt. Nos. 162-166).

products. These horizontal conspiracies to destroy competition and divide the data integration market are *per se* violations of the antitrust laws.

20. CDK has also imposed unlawful exclusive dealing requirements on software solution vendors like AutoLoop. As a condition of participating in CDK's 3PA data integration service, vendors must generally agree to use 3PA exclusively for *all* of the vendors' products and services. Likewise, even though CDK's standard DMS contract expressly allows dealers to use "agents" to access data on the DMS, after entering into its horizontal agreements with Reynolds, CDK has asserted that its dealer clients are prohibited from using any third-party data integration service and has taken steps to block dealer-approved third-party access.

21. Internal CDK documents explain the motivations behind CDK's agreement with Reynolds to eliminate competition in the data integration market. First, the enormous success of third-party products and services like those offered by AutoLoop – made possible by integration with dealer data – began to threaten CDK's and Reynolds' DMS duopoly. As dealers increasingly used these third-party products and services, they began to rely less on CDK's and Reynolds' antiquated, monolithic DMS enterprise software. The third-party products and services began to perform tasks traditionally performed by the DMS, and to do so more efficiently and while offering greater features and functionality. Dealers also began entering data directly into the third-party solutions in the first instance, bypassing the DMS completely. CDK and Reynolds knew that this would eventually make it less difficult for dealers to switch DMS providers or even to forgo a DMS entirely. By seizing control over

dealer data, CDK and Reynolds have sought to forestall that threat to their legacy DMS duopoly.

22. Second, CDK wanted to eliminate competition for data integration so that it could limit access to dealer data, impose restrictions on usage rights contrary to the wishes of their dealer clients, limit bi-directional integration for competing products, raise the costs of those competing products (thereby giving its own offerings artificial advantages), and attempt to drive competing solutions out of the market. CDK's own documents state – and its employees have testified – that CDK wanted to leverage its duopoly control over the DMS market to "tilt the table" in favor of its own offerings.

23. For example, CDK prevents AutoLoop's SmartLane product from creating or modifying "repair orders" in the DMS. Yet CDK's Service Edge application has this capability, and CDK touts this fact to potential dealer clients: its marketing materials state that CDK's Service Edge has a "workflow [that] is written into the DMS," eliminating the "need to do the same work twice," while competitors like SmartLane are denied that capability. An application's ability to open repair orders and allow customers to sign for repairs in the service lane is a desirable feature, which CDK intentionally withholds to "tilt the table" in favor of its own competing applications.

24. CDK also abuses the 3PA "certification" process to the detriment of third-party vendors. For example, AutoLoop joined the 3PA program in January 2016, and was required to begin paying CDK's bloated integration fees six months

later. Two years into that contract, CDK still has not certified five of AutoLoop's seven products. AutoLoop thus has been double paying for integration – to CDK (for no service at all) and to an independent integrator (which CDK continues to allow). This shows CDK's only motive for the 3PA program is profit. As long as third-party vendors pay CDK, CDK does not care which data integrator third parties use. In addition, CDK has demanded that third-party vendors provide sensitive proprietary information about their products for no legitimate reason. For example, CDK has required AutoLoop to provide live demonstrations of its solutions to CDK employees, which AutoLoop would never provide for any other competitor.

25. Even where CDK and Reynolds grant competing applications access to data or provide a given integration, they still impose anticompetitive restrictions on the use of that data. For example, AutoLoop pays CDK a per dealer per month fee for data integration for each product and service, yet CDK contractually prohibits AutoLoop's various products and services from sharing that data with each other – despite having paid for it multiple times over. There is no legitimate basis for CDK or Reynolds to withhold those data sharing rights – especially where dealers want and authorize such rights – except to stifle innovation and make AutoLoop's and other vendors' products and services more expensive.

26. Such rights restrictions are especially nefarious because AutoLoop and other vendors have already secured the necessary rights to the data in question – whether from the dealers, consumers, or other third-party originators of the data. In

many instances, much of the data in the DMS originated in AutoLoop's and other vendors' own products and services.

27. Third, CDK saw an enormous financial opportunity to dramatically inflate its prices for data integration services – after it had eliminated the competition. AutoLoop's integration fees have skyrocketed from approximately $79 per month per rooftop with independent data integrators to more than █████ per month per rooftop with CDK. Other vendors have seen similar increases.

28. By charging monopoly prices for access to dealer data, CDK has also raised the input costs of rival solutions, including those offered by AutoLoop and other vendors. Having seen the costs of data access skyrocket – with no corresponding increase in functionality or service quality – AutoLoop and other vendors have had no choice but to pass through a portion of the additional costs to its dealer clients. Unable to afford the escalating pass-through data integration fees, many dealers have elected to reduce their use of third-party vendors' software solutions or forgo them altogether, often in favor of the competing CDK offering, even though AutoLoop's and other vendors' products and services are superior. Therefore, CDK's dramatic price increases after it entered into the conspiracy with Reynolds not only padded its bottom line, but also put competing solutions providers like AutoLoop at a severe competitive disadvantage in the marketplace.

29. AutoLoop brings this action on behalf of itself and other software solution vendors (as set forth in the Classes defined herein) to recover the damages they have suffered at the hands of CDK's and Reynolds' anticompetitive conduct – as

co-conspirators, CDK is equally liable for the damage caused by Reynolds – and to restore choice to dealers and vendors over data integration. As described in detail herein, CDK's and Reynolds' horizontal conspiracies to eliminate competition in the data integration market and their market division agreement (which is a covenant not to compete) are *per se* violations of Section 1 of the Sherman Act, *see infra* Count I; CDK's exclusive dealing arrangements with vendors are anticompetitive and unlawful under Section 1 of the Sherman Act, *see infra* Count II; CDK's monopolization of its Dealer Data Integration Aftermarket is unlawful under Section 2 of the Sherman Act, *see infra* Count III; the same conduct that violates the Sherman Act also violates state antitrust and unfair competition laws, *see infra* Count IV; and the anticompetitive conduct set forth herein independently violates state unfair competition laws, *see infra* Count V.

## PARTIES

30.  Plaintiff AutoLoop is a private Florida limited liability company with its headquarters and principal place of business at 33 N. Garden Avenue, Clearwater, Florida 33755. AutoLoop was founded by entrepreneur Steve Anderson in 2005. Today, AutoLoop employs 400 people, and its products are used by more than 2,100 dealers.

31.  Defendant CDK is a publicly traded Delaware corporation with its corporate headquarters and principal place of business at 1950 Hassell Road, Hoffman Estates, Illinois 60169. CDK provides DMS software and services to automobile dealerships throughout the United States and has more than $2 billion in annual revenue. In 2014, CDK was spun off from ADP, LLC, and is now an

independent, publicly traded company.  Prior to the spin-off, CDK was referred to as ADP Dealer Services (collectively, referred to herein as "CDK").  In addition to its DMS platform, CDK also provides data integration services, and offers products and services that compete directly with other vendors' solutions.  For example, CDK's Service Edge competes with AutoLoop's SmartLane product, and CDK's customer relationship management services compete with AutoLoop's XRM product.

32.    Non-party Reynolds is an Ohio corporation with its corporate headquarters and principal place of business at One Reynolds Way, Kettering, Ohio 45430.  Because Reynolds is CDK's co-conspirator, CDK is jointly and severally liable for all harm caused by Reynolds in furtherance of the conspiracy.  Like CDK, Reynolds provides DMS software and services to automobile dealerships throughout the United States.  Also like CDK, Reynolds provides data integration services, as well as products and services that compete directly with other vendors' solutions. Reynolds was acquired by Bob Brockman in 2006 in a leveraged buyout and taken private.

**JURISDICTION AND VENUE**

33.    This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; and state law.

34.    This Court has subject matter jurisdiction over the federal antitrust claims pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26.  This court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because they are so closely related

to the federal claims that they constitute part of the same constitutional case. Additionally, this Court has jurisdiction over AutoLoop's state law claims pursuant to 28 U.S.C. § 1332(d) because one or more of the plaintiffs is a citizen of a state different from CDK and the matter in controversy exceeds the sum of $5,000,000 exclusive of costs and interest.

35.     This Court has personal jurisdiction over Defendant CDK pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d), and the nationwide service provisions therein.   CDK has engaged in the unlawful acts described in this Complaint with the foreseeable or intended effects of causing substantial economic harm to AutoLoop in Wisconsin, and CDK has purposely availed itself of the privilege of doing business in Wisconsin through the widespread promotion, sale, and distribution of their products and services in the State.[4]   Many dealers in Wisconsin use CDK's DMS and/or its applications.

36.     Venue is proper in the Western District of Wisconsin pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d).   Defendant CDK is registered to do business, transacted business, was found, and had agents in Western District of Wisconsin; a substantial part of the events giving rise to the claims set forth herein occurred in the District; a

---

[4]     Pursuant to the Court's instructions at the April 6, 2018 status hearing in *In re Dealer Management Systems Antitrust Litigation*, No. 18 C 864 (MDL No. 2817), AutoLoop has filed this Complaint directly in the MDL court but requests that the Complaint be deemed filed in the Western District of Wisconsin and transferred to the Western District of Wisconsin for trial.

substantial portion of the affected interstate trade and commerce described herein has been carried out in the District. AutoLoop and other vendors' have also served dealers in Wisconsin that use a CDK or Reynolds DMS.

37.     CDK's unlawful conduct substantially affected interstate commerce by harming competition, increasing prices and quality, and limiting output, to the detriment of AutoLoop, dealers, and other vendors nationwide.

## FACTUAL ALLEGATIONS

### I.     The Relevant Product Markets

38.     The relevant product markets for AutoLoop's claims are: (1) the DMS market in the United States; (2) the Dealer Data Integration Market in the United States; and (3) the CDK Dealer Data Integration Single-Brand Aftermarket.

#### A.     The DMS Market

39.     The DMS is enterprise software used by retail automotive dealerships to manage their business, including sales, financing, inventory management, repairs and service, accounting, payroll, human resources, and marketing.

40.     The DMS also includes a database used to store certain dealer data, including vehicle and parts inventory, customer name and contact information, completed and pending sales, sales and F&I information, service and repair information, and more.

41.     Over time, the DMS became the center of a dealer's retail management platform. Virtually every franchised new car dealership in the United States now uses a DMS. And while dealers generate much of their data outside of the DMS in separate software solutions, as a practical matter, a substantial portion of dealer data

is stored on the DMS, even though there is no technical reason why that must be the case.

42.     The DMS market is comprised of those providers that market and sell DMS services to franchised new car dealers in the United States.  There is public and industry recognition of the DMS market.

### 1.     CDK and Reynolds Dominate the DMS Market

43.     Defendant CDK and its co-conspirator Reynolds dominate the DMS market.  About 45% of dealer "rooftops" (i.e., franchised stores located at a physical location) use CDK's DMS, and about 30% use Reynolds' DMS.  When measured using the number of vehicles sold from franchised dealers, which is a more relevant metric, CDK and Reynolds control more than 90% of the DMS Market.  Industry publications have described CDK and Reynolds as "the Big 2," "the Duopoly," "the two 400-pound gorillas," and "the two giants of the DMS market."

44.     On May 24, 2017, CDK announced an agreement to buy the DMS provider Auto/Mate, Inc., which has an additional eight percent of the DMS market (as measured by dealer rooftops).  On March 20, 2018, the Federal Trade Commission voted to block that acquisition because it would have further "reduce[d] competition in an already concentrated market."[5]  CDK subsequently abandoned the attempted acquisition.

---

[5]     FTC Press Release, *FTC Challenges CDK Global, Inc.'s Proposed Acquisition of Competitor Auto/Mate, Inc.* (Mar. 20, 2018).

45.     Apart from CDK and Reynolds, the DMS market is diffuse, with an array of providers dividing up the remaining market share.  The remaining DMS providers are generally small, occupy a particular niche, or serve the country's smaller car dealerships.

46.     CDK's and Reynolds' DMS businesses are very lucrative.  A single, small dealership pays up to $150,000 per year for the DMS software license and services.  Mid-size dealership groups (5 to 10 stores) pay $1,500,000 or more per year, and large dealership groups can easily pay more than $5,000,000 per year.   CDK's and Reynolds' profit margins on their DMSs are estimated to exceed 40%.

### 2.     The CDK and Reynolds Duopoly Has Proven Durable

47.     Significant barriers to entry protect CDK's and Reynolds' dominant positions in the DMS market.  First, CDK and Reynolds have locked in dealers to lengthy contracts.  CDK and Reynolds sell their respective DMS software and services pursuant to long-term contracts that are typically between five and seven years in length.   These contracts often include automatic extensions if new services are ordered in the middle of the contract.

48.     Second, switching costs are high.  Switching DMS providers presents significant logistical challenges and is highly disruptive to business operations.  It can take a dealership over a year of preparation, staff training, and testing before a new DMS can be put into operation, all while the dealership is trying to sell and service cars.   The financial costs in terms of training and implementation are significant.

49.    One industry executive stated that changing DMS providers "is akin to a heart transplant."  David Barkholz, *DMS Dilemma:  Why It's So Hard to Switch – Upstarts Battle Big 2, But Dealers Weigh Cost vs. Comfort Zone*, Automotive News (May 10, 2010).  CDK's CEO recently acknowledged that "switching DMS providers can be very difficult.  It [is quite a] process [to] change and takes time, which is part of the reason that many dealers are hesitant to switch."  Thomson Reuters StreetEvents, *Edited Transcript:  CDK – Q1 2017 CDK Global Inc. Earnings Call*, at 3 (Nov. 2, 2016) (statement by CDK Global CEO Brian MacDonald).  One large dealer publicly referred to changing DMS providers as "mission impossible."  David Barkholz, *Inside 'Mission Impossible':  A DMS Change – How Store Succeeded in Sign-or-Switch Situation*, Automotive News (January 13, 2014).  Both Reynolds and CDK have publicly touted that their market positions are secure because of how difficult it is to switch DMS providers.  As a result of the high-switching costs, the *average* DMS tenure is over twenty years.

50.    CDK has recently forced many of its dealers to extend their contracts by years by threatening to terminate their DMS service.  Many of these dealers were on month-to-month contracts, and had been for a long time.  CDK abruptly – and without prior notice – informed these dealers that their DMS services would terminate in less than 60 days unless the dealers entered into years-long contracts.  Dealers generally had no choice but to sign the lengthy extensions given the impossibility of switching DMS providers in such a short amount of time.

51.     The barriers to entry are so high that even Microsoft could not compete in this market.  When Microsoft tried to enter the DMS market in 2006, Reynolds' CEO Bob Brockman was not concerned, saying "there's not a chance" that Microsoft could succeed.   David Barkholz, *Data System is Brockman's Latest Surprise,* Automotive News (Jan. 25, 2009).  Indeed, Microsoft failed, prompting a company executive to publicly concede, "We kind of got ahead of ourselves" in trying to take on CDK and Reynolds.  David Barkholz, *Dealers Get New Management System Option – Dominion-Microsoft Product Battles Giants ADP, Reynolds*, Automotive News (Dec. 2, 2012).

**B.     The Dealer Data Integration Market**

52.     Dealers use software products and services from AutoLoop (and many other vendors) to perform important sales, servicing, marketing, and operational functions.  These solutions supplement and oftentimes replace functions provided by the DMS.   AutoLoop's products and services are used for, among other things, customer relationship management, service lane management, lead generation, data mining, and multiplatform marketing.   Other vendors offer similar products and services.  A dealer may use 10 to 15 standalone products and services, and some use many more.

53.     To function, these solutions need integration with dealer data stored on the DMS.  For example, XRM is a customer relationship management tool that requires access to, among other things, customer information, vehicle information and history, and inventory data.

54. While the precise data needs of vendor solutions can vary, it has become increasingly common for vendor solutions to need or at least desire real-time bi-directional access to dealer data on the DMS – i.e., they need to read data from the DMS in near-real-time, as well as push data back into the DMS near-real-time in the many instances where that data is first generated within the vendor solution (i.e., outside of the DMS).

55. As described in more detail below, even though certain dealer data is stored on the DMS, that data belongs to the dealers, and dealers have the right to provide that data to third parties and to establish use and sharing rights for the data.

56. The Dealer Data Integration Market consists of services that provide access to dealer data on the DMS, including CDK's and Reynolds' own in-house data integration services. Data integrators may also provide value-enhancing services, such as putting data from different DMS in a uniform format, data hygiene (i.e., error correction), and granular control by dealers over which vendors receive which data.

57. Before a data integrator can access dealer data on the DMS, the data integrator must receive specific authorization from the dealer. To grant such access, dealers enter into contracts with data integrators that authorize the data integrator to access the dealer's data.

58. There is public and industry recognition of the existence of a Dealer Data Integration Market distinct from the DMS market. CDK and Reynolds have separate business units that provide data integration and DMS services. In its 2015 10-K, CDK described its data integration services as "a stand-alone product" separate

from "the core Dealer Management System." CDK, Annual Report (Form 10-K) (Aug. 13, 2015), at 4. The Dealer Data Integration Market also has its own supply and demand curves. The usage of integrated vendor solutions – and hence the amount of data integration services – has fallen relative to what it would be in a competitive market in response to supra-competitive prices charged for data integration services by CDK and Reynolds because a significant portion of those costs are passed through to dealers. There are also no reasonable substitutes for services provided by data integrators, demonstrated most clearly by the fact that CDK and Reynolds, after closing their systems, have been able to impose massive price increases for their data integration services.

59.     Geographically, the Dealer Data Integration Market covers the United States.

### 1.     The Dealer Data in the DMS Belongs to the Dealers

60.     Even though certain dealer data is stored on the DMS, that data still belongs to the dealers. The dealers therefore should decide who to authorize to access their data. CDK and Reynolds have repeatedly admitted this fundamental fact in public statements, on their websites, and in their DMS contracts with dealers.

61.     Tom Schwartz, Reynolds' chief spokesperson, publicly declared: "The data belongs to the dealers. We all agree on that." David Barkholz, *Dealers Decry Reynolds Crackdown*, Automotive News (Nov. 21, 2011). On its website, Reynolds represents to dealers: "Your Data, Your Way. You own your data. Reynolds recognizes you need to share that data outside your dealership."

62.     Howard Gardner, now CDK's Vice President for Data Strategy, has stated that CDK "has always understood that dealerships own their data and enjoy having choices on how best to share and utilize that data with others."  CDK's website likewise states:  "[D]ealerships own their data."

63.     The Reynolds and CDK DMS contracts "spell out which party owns the data and there is generally little dispute:  the data belongs to the dealer.  This makes sense; after all, it's the dealership's customers, inventory, and transactional data that the dealership is putting into the DMS system."  DrivingSales News, *The Hidden Data Tax That Dealers Don't Know They Are Paying,* Driving Sales (Oct. 17, 2013); *see* Reynolds Addenda Specific Terms and Conditions, at 3 ███████████████
████████████████████████████████████████████████████████
████████████████████████ ; CDK Master Services Agreement § 7.A ███████████████
████████████████████████████████████████████████████████
███████████████████████████ .

### 2.     CDK Has Long Recognized That Dealers Have the Right To Control Access to, and Use of, Their Data

64.     For many years, CDK publicly recognized the fundamental principle that dealers, as owners of their data, have the right to control access to and use of that data.

65.     CDK's standard DMS contract states a dealer's "employees and agents" may "have access" to the DMS.  This language has existed since at least the 1990s.  CDK's standard DMS contract therefore specifically permits dealers to grant their

agents, including data integrators, access rights to the dealer's data stored on the DMS.

66.    Consistent with this contractual language, CDK's top executives have repeatedly made public statements that dealers may grant data integrators rights to access their DMS.  For example, Steve Anenen, CDK's longtime CEO, publicly stated that dealers have the right to grant third parties access to, and use of, their data.  He told the industry publication *Automotive News*, "We're not going to prohibit that or get in the way of that."  Ralph Kisiel, *ADP Provides Dealers 3 Options on Data Access*, Automotive News (Feb. 19, 2007).  "I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it, when in fact it's really the data belonging to the dealer.  As long as they grant permission, how would you ever go against that wish?"  *Id*.

67.    Matt Parsons, CDK's vice president of sales and marketing, similarly stated: "We're not going to limit the ability of a dealer to give an ID to someone else to, in essence, dial into their system.  That is the dealer's right.  We have no right to tell them they can't do that."  Ralph Kisiel, *NADA, AIADA Weigh Reynolds Data Security Debate*, Automotive News (Feb. 4, 2007).  Kevin Henahan, CDK's senior vice president of product marketing, delivered the same message:  "We don't tell the dealer, if someone wants access to their data, they have to come to [CDK] to gain access to the data.  It's ultimately the dealer's data.  If he wants to give that data to somebody, for us to try to charge a toll doesn't seem like the right thing to do.  So we're not going to go down this path."  Ralph Kisiel, *Dealer Security Stirs Insecurity:*

*Vendors Wary of Reynolds Plan for Computer Systems*, Automotive News (Dec. 4, 2006). Even as recently as April 2017, CDK executives have continued to say that dealers are permitted to authorize independent integrators to access their data if they wish. *See* Ex. 1 (CDK-0032559, at 562) ████████████████████████ ██████████████████████████████████████████████████████ .

68. CDK was also one of the first members of Open Secure Access, Inc., which described itself as "a coalition of companies that believe dealers should control access to the data they own and determine how it is used." Open Secure Access, Inc. Press Release, *Open Secure Access Releases Automotive Retail Data Security Guidelines* (June 28, 2007). The group published a set of basic principles to guide the industry, including that "dealers should control who accesses their data," "[t]hird parties that have dealer permission to utilize a dealer's data should be able to access the data through their own efforts or through the services of an independent company," and "DMS companies should facilitate interaction with all data available to a DMS user by providing technologically advanced means to interact with (read and write) that data, either through a robust set of APIs, system functionality, or direct access to the database."

### 3. Participants in the Data Integration Market

69. At one time, there were approximately a dozen competitors in the Dealer Data Integration market, such as SIS and SelectQu. CDK's and Reynolds' anticompetitive behavior has driven most of them out of the market. Today, there are only three remaining commercial data integrators serving CDK's and Reynolds' dealers: Reynolds through RCI, CDK through 3PA, and Authenticom. Every

independent data integration provider other than Authenticom has been driven from the market by CDK's and Reynolds' anticompetitive conduct.  Subject to its own litigation against CDK and Reynolds, Authenticom's ability to remain in business is in doubt.  And CDK and Reynolds continue to take steps to block Authenticom from accessing their DMSs.  Therefore, vendors effectively only have one integration option with respect to dealer data on a CDK DMS – CDK itself.  It is the same with Reynolds.

**a.    CDK**

70.    CDK provides integration with dealer data on the CDK DMS through an interface offered by CDK under its Third Party Access ("3PA") program.  The 3PA program's managed interface is used exclusively for data integration with the CDK DMS.

71.    Prior to early 2015 – when CDK colluded with Reynolds to "close" its DMS – CDK offered several ways by which dealers could share their data.  For example, CDK offered a "basic access" package where dealers supplied vendors with a user ID and password by which the vendors – or their data integrators – could access dealer data on CDK's DMS.  Before 2015, CDK also allowed dealers to use other data integrators that competed with 3PA.

72.    CDK revamped the 3PA program in June 2015.  Under the "refreshed" 3PA program, CDK declares that the 3PA program's managed interface is the only CDK-approved method of integrating with a CDK DMS.  It now labels any other method for accessing data "unauthorized," and it disables login credentials that any dealer provides to a third party.  Today, CDK disables login credentials used by third-party data integrators even though its own dealer contracts specifically permit access

by "agents" of the dealers. The "refreshed" 3PA program is a direct market substitute for the services previously provided by independent integrators like Authenticom. *See, e.g.*, Ex. 2 (CDK-0105062) (Slide 9) ███████████████████████████████ ███████████████████████████████████████████████; Ex. 3 (CDK-0215041) ████████████████████████████████████████████████████████████ ██████████████████.

73. CDK also owns two third-party data integrators, DMI and IntegraLink. DMI and IntegraLink obtain authorization from dealers to pull data from the dealer's DMS in the same way as other data integrators and provide that data to vendors.

74. At the time CDK acquired DMI in 2002, CDK stated: "As a result of its acquisition of Digital Motorworks, [CDK] now has the ability to extract, transform and standardize data from varied sources to client specifications." DMI claims to work with over 100 vendors and pull data from thousands of dealerships.

75. CDK acquired IntegraLink in 2010. IntegraLink "specialize[s] in the collection of data from automotive retailers' dealership management systems." IntegraLink was founded in 1998 by Kevin Distelhorst, Reynolds' former director of online services and currently a vice president at CDK.

76. For over a decade, DMI and IntegraLink provided data integration services for CDK itself and a variety of other DMS platforms, including Reynolds. ██ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████ Ex. 4 (CDK-0602338). Even after Reynolds began to block Digital

Motorworks and IntegraLink – that is, prevent them from accessing Reynolds DMSs – CDK devised the "SMART-R" solution, which permitted its integrators to continue to access Reynolds DMSs. As a result, CDK (through Digital Motorworks and IntegraLink) continued to access Reynolds DMSs on behalf of its vendor clients, again at least until 2015. AutoLoop and other vendors had used these data integration services for some of its products and services. CDK, however, largely discontinued these services once CDK and Reynolds entered into their February 2015 agreement not to compete, which is described below. Now, DMI and IntegraLink primarily provide data integration services for non-Reynolds and non-CDK DMSs. For these non-dominant DMSs, dealers provide CDK with login credentials or a secure connection for direct data transfers, such as an API. DMI and IntegraLink charge vendors only $25 to $50 per dealer per month.

### b. Reynolds

77. Reynolds provides integration with dealer data on the Reynolds DMS through its RCI service, which is Reynolds' equivalent to 3PA. Like the 3PA program, RCI is now the only means by which vendors are allowed to integrate with dealer data on Reynolds' DMS. Reynolds does not have a data integration service that works with other DMS platforms.

### c. Authenticom and Other Independent Integrators

78. Authenticom was founded in 2002, introduced its data integration service in 2004, and has served more than 15,000 dealers.

79. Authenticom provides data integration services for all available DMS platforms – including Reynolds and CDK. Authenticom is the last significant independent data integration provider in the market.

80. Authenticom's standard pricing to pull data is $25 per dealer per month for the first data set, and then $50 per dealer per month for two or more. According to Authenticom, the average price a vendor pays to pull data is between $30 and $40 per dealer per month. For bi-directional integration, Authenticom has charged at most $75 per dealer per month, and that price included additional services like data hygiene.

81. Apart from Authenticom, there were once many other independent integrators in the market – such as SIS, SelectQu, and others – before CDK and Reynolds drove them from the market.

**C.  Single-Brand Aftermarket for Dealer Data Integration on the CDK DMS**

82. The Dealer Data Integration Market for dealers using CDK's DMS is a brand-specific aftermarket. This market is derivative of the primary DMS market.

83. When dealers purchase the CDK DMS platform, they are locked in to that purchase because of high switching costs as described above.

84. Dealers also lack information necessary to assess accurately the true cost of using CDK's DMS. CDK had historically been an "open" DMS where there were multiple competing data integration providers. Dealers could not know in advance that CDK would collude with Reynolds to "close" its DMS, thereby causing data integration prices to skyrocket, a portion of which is passed through to dealers.

85. Because of these market imperfections, CDK is profitably charging supra-competitive prices for dealer data integration on its DMS. That CDK has been able to impose such large price increases for integration services on its DMS demonstrates that there are no reasonable substitutes for that service.

## II. CDK's Anticompetitive Conduct

### A. CDK's and Reynolds' *Per Se* Unlawful Horizontal Agreement to Eliminate Competition in the Data Integration Market

#### 1. CDK's DMS Was "Open" Prior to 2015

86. Third-party access was a key point of competition between CDK and Reynolds. Prior to 2015, CDK publicly touted its open system as one of the competitive advantages of its DMS. As noted above, CDK repeatedly vowed (including in public statements by its CEO and top marketing officers) that it would not block third parties, including data integrators, from accessing dealer data on its DMS. CDK issued press releases stressing that it "believes in the fair competitive environment and does not use its leverage through supply of the dealer management system to reduce competition through the restriction of data access." By contrast, in 2009, Reynolds began selectively blocking third-party access, and increased its blocking efforts in 2013.

87. CDK was successful in marketing its "open" DMS as a competitive advantage over the Reynolds DMS, and dealers purchased DMS services from CDK based, in part, on CDK's public representations and unchanged contractual language allowing for such access. As a result, CDK very slowly gained market share from

Reynolds.  Over a decade, Reynolds' DMS market share declined from about 40 to 30 percent, with most dealers leaving Reynolds for CDK.

88.     That competition between CDK and Reynolds abruptly halted in 2015, when CDK suddenly "closed" its system.  Given CDK's unequivocal public statements (and the unchanged DMS contractual language allowing for "agent" access), CDK's abrupt about-face came as a complete surprise.  Before 2015, AutoLoop used SIS to access data for dealers using the CDK DMS.  But after CDK elected to close its system, CDK made every effort to ensure that AutoLoop and other vendors could only integrate with dealer data through CDK's 3PA program.  CDK's about-face was the result of a horizontal agreement with Reynolds.

> **2.     CDK "Closed" Its DMS in 2015 After Entering into an Agreement with Reynolds To Eliminate Competition in the Data Integration Market**
>
>> **a.     CDK's Internal Documents Reveal Its Motivations for Colluding with Reynolds**

89.     In 2014, CDK decided that it wanted to capture more value for itself by charging dramatically increased rates for integration with dealer data.  Prior to entering into its unlawful agreements with Reynolds, CDK charged on average $70 per dealer per month for integration.  Dealers could choose methods of access on a vendor-by-vendor basis, giving dealers flexibility in managing how their vendors obtained data and the costs that would be passed through to the dealers.  But by closing its DMS, CDK saw an opportunity to impose huge price increases on its data integration services – increasing CDK's profits while also advantaging its competing products and services by raising the input costs and decreasing the integration

available to its rivals. Internal CDK presentations specifically recognized the "risk of vendors willing to move" to competing data integrators "instead of accept[ing] increase price" if those competing integrators were allowed to continue to provide their services. Dkt. No. 163, at 134:11-15.

90. In addition, CDK believed that destroying competition for data integration and subsequently raising prices for data integration would help address the threat posed by standalone products and services to the primacy of the DMS to a dealer's operations. The growth of standalone solutions – especially sales and service customer relationship management applications – have threatened to reduce the importance of the DMS as dealers increasingly manage their operations through the standalone solutions outside of the DMS. Moreover, many of those solutions are where dealers generate much of their data in the first instance – for example, customer relationship management software products are often where dealers first capture and store information about their customers and sales transactions – and, as those products are able to host and manage a dealer's data, the DMS again loses its importance. By "closing" its DMS and raising the input costs for standalone solutions, CDK has sought to forestall the growth of those solutions, which is what would naturally occur absent the anticompetitive restraints.

91. Finally, CDK sought to advantage its own offerings that compete with products and services provided by other vendors like AutoLoop. Destroying competition for data integration gave CDK control over competing service providers' access to, and ability to use and update, dealer data. CDK recognized that it could

"tilt the table" in favor of its own applications by withholding needed data access, imposing use restrictions, and limiting write permissions for certain data elements. CDK's actions have disrupted the workflow of competing solutions, and denied data access completely for some competing offerings. Internal CDK strategy documents reveal the specific purposes of CDK's conspiracy with Reynolds. According to CDK, "One of the 3PA Program's principles was to protect CDK products through a tilt-the-table approach." Dkt. No. 163, at 140:13-15. By "tilt the table," CDK meant it would advantage its products and services over those of third-party vendors by providing itself greater access and use rights to dealer data. CDK intended to keep an "advantage to CDK-layered applications" as compared to third-party solutions, providing additional "margin" that could be achieved through a "closed" system. *Id.* at 139:2-7.

92. CDK's own documents show that it sought to "disrupt the workflow" of competing applications and services, and of those that compete with CDK's own "service workflow application[s]" in particular. For example, although CDK's Service Lane is able to create and modify repair orders, CDK does not permit AutoLoop's SmartLane application to do so. There is no bona fide justification for that limitation other than to disadvantage competing applications, and thereby to allow CDK to gain market share that it could not obtain on the merits of its products. Other software solution vendors have seen the functionality of their products artificially diminished in similar ways.

93. 

. *See* Ex. 5 (CDK-2182930). Mr. Gardner wrote, *Id*.

*Id*.

94.     In order to achieve these aims, as CDK's internal documents acknowledged, CDK needed Reynolds' cooperation. In an October 2014 presentation, CDK stated that it needed to enter into "***reciprocal agreements with DMS providers***," including specifically Reynolds, in order to eliminate competing data integrators. And Reynolds needed CDK to close CDK's system to reduce the number of dealers leaving Reynolds for CDK on the basis of CDK's previously "open" system. Moreover, with the two dominant DMS providers agreeing to block independent integrators, it would be impossible for competing data integrators to survive. CDK thus contemplated reaching an agreement with Reynolds to reduce, and ultimately eliminate, competition for integration to dealer data.

**b.     CDK and Reynolds Agreed To Divide the Market and Block Independent Integrators**

95.     A few months later, in early 2015, CDK and Reynolds entered into agreements designed to eliminate competition in the provision of dealer data integration services. First, in February 2015, CDK and Reynolds entered into three

written agreements in which they promised not to compete in providing data integration services and, in their capacity as providers of proprietary applications and services, not to use the services of independent integration service providers to obtain data from the other's DMS. Second, CDK and Reynolds further agreed that each would block independent integrators' access to their DMS customers' data, in an effort to drive independent integrators from the market entirely.

### i. The Market Division Agreement and Data Integration Agreements

96. **Market Division Agreement.** Effective February 18, 2015, CDK and Reynolds entered into three written agreements. The centerpiece was a so-called "Data Exchange Agreement" – also referred to as a "wind-down" agreement – pursuant to which CDK agreed to wind down its data integration business on the Reynolds DMS, with Reynolds promising not to block CDK's access to the Reynolds system during the wind-down period, which might last as long as five years – until the year 2020. *See* Data Exchange Agreement § 1.4. During that period, Reynolds agreed that CDK could continue to extract dealer data just as it had before, using login credentials provided by the dealer. *See id.* § 4.3. As for other independent integrators, CDK and Reynolds agreed that they would not "take any steps to assist any person that it reasonably believes to have plans to access or integrate with the other party's DMS." *Id.* § 4.5.

97. CDK and Reynolds also agreed that they themselves would no longer access data on each other's DMS. *Id.* (agreeing to "[p]rohibition on . . . DMS Access"). Specifically, the agreement states: "For the avoidance of doubt, this Section 4.5 is not

intended as a 'covenant not to compete,' but rather as a contractual restriction of access and attempted access." *Id*. This restriction lasts forever. *See id*. § 6.1. Reynolds' own top executive confirmed that Section 4.5 prohibits CDK and Reynolds from accessing each other's DMS. Robert Schaefer, Reynolds' Vice President of Data Services, has testified under oath to the following: "Q: In this contract by its plain term Section 4.5, Reynolds agreed not to access the CDK DMS; isn't that right? A: That would be correct." Dkt. No. 163, at 76:6-9. Mr. Schaefer offered similar sworn testimony with respect to CDK's prohibition on access of Reynolds' DMS. *Id*. at 73:11-16; 75:16-76:1. Internal emails between CDK and Reynolds confirm the same agreement: Mr. Schaefer promised CDK ███████████████████████████ ████████████████████████████████████████████████████████. Ex. 6 (CDK-0222945, at 946); *see also* Ex. 7 (CDK-0189652) ██████████████████████ ████████████████████████████████████████████.

98. Further, the agreement also mandated coordination between the competitors in transitioning all of CDK's vendor clients (*i.e.*, those vendors for which CDK provided access to dealer data on the Reynolds DMS) into the Reynolds RCI program. *See* Data Exchange Agreement § 4.4. The agreement specifically required CDK to "cooperate with Reynolds" in the "transition of [CDK] customers to the Reynolds RCI program with respect to Reynolds Dealers." *Id*. In connection with that effort, CDK agreed to give Reynolds full information about the vendors CDK served, including their name, DMS number, store number, branch number, user login, specific data access provided by CDK, data interfaces, the frequency of the data

provided, the deadlines for data delivery, the format of the data, and more.  *See  id.*
§ 4.3, Exhibit DEA-2.  Absent an agreement not to compete, CDK would treat this
information as a highly confidential customer trade secret and would not share it
with rivals.  Indeed, Mr. Schaefer of Reynolds admitted under oath that Reynolds
would never share such highly sensitive information with a competitor absent an
agreement with that competitor.  ████████████████████████████████

████████████████████████████████████, *see* Ex. 8 (CDK-0774207); ████

████████████████████████, *see id.*; █████████████████████████████████,

*see* Ex. 9 (CDK-0061228) (Slide 1).  Minutes from meetings between these erstwhile

competitors state: ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ Ex. 10 (CDK-1424529, at 532).  ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ *Id.* at CDK-1424531.

99.     Consistent with the agreement to cooperate in transitioning customers
from CDK to Reynolds, CDK sent letters to its vendor customers with a "roadmap"
and "deadline" for joining Reynolds' integration program.  On March 2, 2015, CDK
sent a letter to its vendor clients announcing that the vendors "will be provided with
a roadmap to transition to the [RCI] program without any further risk of interruption
to existing services."  CDK explained that "we are in a transition period to allow time
for [DMI] clients to enroll in the RCI program in support of your [Reynolds] dealers,"

and that "we will assist you to facilitate a smooth transition." The letter noted that Reynolds had "agreed to protect the current DMI process for collecting data from [Reynolds] dealers during this transition" and promised "a more detailed letter within the next couple of weeks that outlines the transition process."

100. On April 1, 2015, CDK sent a follow-up letter to its vendor customers. The letter began: "As announced earlier this month, the recent business agreement between CDK Global and The Reynolds and Reynolds Company (R&R) provides for the clients of Digital Motorworks, Inc. (DMI) a streamlined process to enroll in the Reynolds Certified Interface (RCI) program for their R&R dealers. We are now in the transition period to allow sufficient time for this enrollment, and R&R has agreed to provide a grace period for the existing DMI process for R&R data collection during this time."

101. Reynolds followed up CDK's letters with its own communications. Reynolds has also pushed vendors to use DMI and IntegraLink during the wind down, and away from other third-party providers, in order to drive competing data integration providers completely out of the market. ██████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ██████████████████████ Ex. 10 (CDK-1424529, at 532).

102. **Integration Agreements.** Two additional written agreements between CDK and Reynolds "granted reciprocal access" to each other's data

integration products – via the 3PA and RCI programs, respectively. Under the agreements, CDK's proprietary products and services could integrate with data on Reynolds DMSs via RCI, and vice versa. Reynolds received five free years of 3PA integration from CDK, while CDK pays for the data integration services from Reynolds. Moreover, by signing up for 3PA, Reynolds agreed that it would integrate with data on CDK's DMSs exclusively through 3PA, and not obtain data for its products and services from anywhere else. CDK agreed to the same in its integration contract with Reynolds for the RCI program.

### ii. Top Executives at CDK and Reynolds Have Admitted That They Agreed To Block Third-Party Access

103. In addition to the written agreements, senior CDK and Reynolds executives also have admitted that they have agreed to restrict access to dealer data and destroy data integrators like Authenticom, SIS, and others. During a phone conversation with Steve Cottrell – Authenticom's founder and CEO – in May 2015, Mr. Schaefer of Reynolds said that Reynolds had "made agreements with the other major DMS providers" – there is only CDK – "to support each other's third-party access agreements *and* to block independent integrators such as Authenticom." Dkt. No. 164, at 139:6-13. Mr. Schaefer said that Reynolds' owner, Bob Brockman, was "adamant" that all third-party data integrators must be cut off. *Id*. As a result, Mr. Schaefer said that Authenticom should wind down its operations and leave the market. *Id*. at 138:3-139:19.

104. A top executive at CDK delivered the same message to Mr. Cottrell. *Id*. at 140:1-143:1. On April 3, 2016, at an industry convention in Las Vegas, Dan

McCray (CDK's former Vice President of Product Management) stopped by Authenticom's booth to talk with Mr. Cottrell, who was occupied with a customer. *Id*. After Mr. Cottrell finished with the customer, he walked to CDK's booth, where he saw Mr. McCray "standing off to the side" with "three other individuals." *Id*. After cordial greetings, Mr. McCray took Mr. Cottrell by the arm and said, "Let's take a walk." *Id*. Mr. McCray led Mr. Cottrell off the convention floor and down a service ramp to a secluded area. *See id*. Mr. McCray then confirmed the existence of the illegal agreement, stating that CDK and Reynolds had agreed to "[l]ock you and the other third parties out," and that they were "working collaboratively to remove all hostile integrators from our DMS system." *Id*. at 140:1-143:1. Mr. McCray then grew threatening: "I wanted to look you in the eye and let you know man to man, I have been mandated by our new CEO to seek you out and destroy your business on our systems." "For god's sake," he concluded, "you have built a great little business, get something for it before it is destroyed otherwise I will f***ing destroy it." Mr. Cottrell rejected Mr. McCray's threats, and insisted that Authenticom would continue to serve its dealer and vendor customers.

105. CDK and Reynolds even have employees actively working together to coordinate the technical aspects of blocking third-party access. In December 2016, during one particular vendor's discussions with CDK about joining the 3PA program and leaving Authenticom, Steve French – CDK's senior director of client and data services – told the vendor that a large portion of his job was to work with Reynolds to ensure third-party data integrators like Authenticom remain locked out. Mr. French

suggested that resistance to getting dealer data from CDK and Reynolds was futile as they were working together to lock out third-party access.

106.    Documents produced by CDK to date reinforce the conclusion that CDK and Reynolds agreed to block independent integrators like Authenticom. ████



Ex. 11 (CDK-1974207). ██████████████████

. Ex. 12 (CDK-0048430). ████████████████

*Id.*

107.    CDK's internal documents show its callous infliction of harm on Authenticom and the dealers and vendors who relied on independent integrators. ████

Ex. 13 (CDK-0855506).

Ex. 14 (CDK-0018738).

108.    CDK's and Reynolds' conspiracy was formed and implemented by top-level executives at each company.  For CDK, the leading actors in the conspiracy include Robert N. Karp, the President of CDK North America and the person with oversight of CDK's 3PA program; Howard Gardner, CDK's Vice President and Manager of Data Strategy and the person who took the lead on the February 2015 agreement; Dan McCray, CDK's recently retired Vice President of Product Management; Ron Workman, CDK's Senior Vice President of Global Corporate Development, who signed the February 2015 agreement; Kevin Distelhorst, CDK's Chief Customer Officer, the founder of IntegraLink, and a former executive at Reynolds; and Malcolm Thorne, CDK's former Chief Global Strategy Officer and the person who took the lead on spearheading the changes to 3PA in 2014 and 2015.

109.    For Reynolds, the leading actors in the conspiracy include Bob Brockman, Reynolds' Owner, Chairman, and CEO and the person who approved and executed the February 2015 agreement and formulated the policy to eliminate competitive data integrators through blocking; and Robert Schaefer, Reynolds' Vice President of OEM Relations, Data Services, and Security, the person in charge of the RCI program.

### iii.    CDK and Reynolds Implemented the Agreement with Aggressive Blocking

110.    In the wake of their agreements, CDK and Reynolds have aggressively blocked data integrators and other third parties from accessing their DMS.  By eliminating the use of other data integrators, CDK has required dealers who use CDK's DMS also to use CDK's 3PA service.

- 42 -

111.    Dealers have repeatedly demanded that CDK and Reynolds stop blocking data integrators.  Dealers have made clear that they own the data, that they control access to it, and that disrupting their preferred access methods has impaired their business operations and caused financial harm.  But CDK and Reynolds have rejected or ignored the dealers' objections.

112.    The dealer complaints are too numerous to fully recount here, but a few examples make the point.  In November 2016, one Mercedes dealership in California wrote to CDK:  "When will you stop the blocking of our user profiles?  This must stop." The dealer decried CDK's "attempt to stop all other data access routes thereby forcing us to use [CDK's] data monetizing scheme if we want to access our data."  As the dealer recognized, the blocking actions were intended to obtain the economic benefits of the dealers' data.  "When will CDK stop trying to monetize data owned by [us] at our expense?  All being orchestrated under the guise of 'protecting our data.'  Frankly most can see right through this propaganda smoke screen.  The data could be protected by using available technology that doesn't cut off the dealers' access to their data using fully automated routines."

113.    One Virginia dealer asked his employees "to raise holy hell with CDK. This is really affecting our business."  And a Lexus dealership in California wrote that "[a]s a dealership owner, I believe that CDK has no right to deny me access to my own data.  By extension, I also retain my rights to distribute my data to chosen vendors who meet my strict criteria for data security."

**B.** **CDK's and Reynolds' Exclusive Dealing Provisions with Vendors and Dealers**

114. Shortly after entering into the Data Exchange Agreement, CDK began forcing vendors to enter into new contracts for the 3PA program. Consistent with its decision to close its DMS, CDK imposed exclusive dealing provisions that required vendors to use 3PA alone to integrate with data on CDK DMSs for all of their products and services. CDK also took the new position that, notwithstanding their plain language, its existing contracts with dealers prohibited allowing data integrators to access CDK DMSs.

**1.** **CDK Imposes Exclusive Dealing and Price-Secrecy Provisions on Vendors**

115. CDK requires that any vendor using 3PA for any of its dealer-customers on a CDK DMS must agree to use 3PA exclusively for all of its of its dealer-customers on CDK DMSs. For example, AutoLoop's Managed Interface Agreement ("MIA") and accompanying Statement of Work, dated January 12, 2016, states in Section 1(f):

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████ MIA § 1(f).

116. The exclusive dealing provision purports to apply to nearly every AutoLoop product and service, so that the use of 3PA for any one of AutoLoop's current offerings essentially binds AutoLoop to use 3PA for all existing, and future, offerings. If AutoLoop breaches this provision by using another data integrator, CDK

may terminate the entire agreement. *See id.* § 4(g) ████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████ .

117.    These exclusive dealing provisions even prohibit AutoLoop from sharing dealer data between its own products and services because AutoLoop's solutions cannot receive dealer data from any source other than 3PA, even where each such AutoLoop product or service is separately paying CDK to access the exact same data. Because AutoLoop cannot share data between its solutions, it must pay for a new 3PA integration interface for each of its solutions. That is a very inefficient and highly anticompetitive process. It also means that CDK can charge repeatedly for access to the same data, in addition to thwarting AutoLoop's ability to integrate its solutions.

118.    The new 3PA contract also includes a price-secrecy provision in Section 8: █████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████ Internal CDK documents state the purpose of these provisions is "to create minimal awareness to dealer" regarding CDK's exorbitant pricing for data integration.

119.    CDK also imposes the same or substantially similar exclusive dealing and price-secrecy provisions in its standard 3PA contract with other vendors. The

current CDK 3PA contract template imposes an exclusive dealing condition on

vendors, stating: ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *See* CDK 3PA

Contract §§ 1(a)(*l*), 2(e).  The contract goes on to state that the vendor cannot

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *Id.*

120.   The penalty for accessing dealer data other than through CDK's 3PA

interface is termination of the entire agreement: ███████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* § 6(g).

121.   The exclusive dealing terms in CDK's standard form contract

purportedly last forever.  The contract template states: ███████████████████

████████████████████████████████████████████████████████████████

████████████████ *Id.* § 6(j).  This provision seeks to tie the vendor to the 3PA program

indefinitely.  Even if a vendor were to stop participating in the 3PA program, it would

still be barred from obtaining data from any CDK dealer from any other source.  That

gives CDK carte blanche to raise integration prices once they enter the 3PA program

because vendors need integration with data on the CDK DMS.

122.   ████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *See id.* § 5(d).

123.   The standard vendor contract also has a price-secrecy provision.   It
states that vendors ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████ *Id.*
§ 10.

124.   The CDK standard contract bars vendors from indicating ████████████

that an increase in the price of products or services is related to an increase in the

integration fees charged by CDK: ██████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████   *Id.*  CDK's price-secrecy provisions prevent dealers from

evaluating the true life-cycle cost – including integration fees that will ultimately be

passed on to dealers – of CDK's DMS when deciding which DMS platform to buy.

### 2.   CDK's DMS Contracts with Dealers

125.   CDK has changed its position on the meaning of its existing contracts

with dealers.  Those contracts allow "agents" of the dealer – such as data integrators

– to access the DMS on the dealer's behalf.  Consistent with that provision, CDK had

long marketed its DMS as an "open system" that data integrators could access on the

dealer's behalf, and dealers relied upon those representations in agreeing to purchase

the CDK DMS.  But in 2015, CDK began insisting (contrary to the language in the

standard contract itself) that its dealer contracts prohibited data integrators other

than 3PA, and it began disabling the logins that dealers had provided to third-party data integrators to access the DMS. This has required dealers who are using CDK's DMS to use CDK's 3PA exclusively.

### 3. The Vendor and Dealer Exclusive Dealing Provisions Are Anticompetitive

126. The exclusive dealing provisions are independently anticompetitive. The provisions in CDK's contracts with dealers foreclose all competition in the Dealer Data Integration Market for approximately 40% of dealers who use CDK DMSs (and an even greater percentage when considered in terms of the number of new cars sold). And they foreclose all competition in the Single-Brand Aftermarket for Dealer Data Integration on CDK DMS. The foreclosure effects of the exclusive dealing provisions imposed directly on vendors are even more extreme. If a vendor participates in CDK's 3PA program for even a single CDK dealer, that vendor may no longer access any CDK DMS through any means other than through 3PA for *any* CDK dealer and for *any* product or service. Reynolds also imposes similar exclusive dealing requirements. Defendants' exclusive-dealing provisions with vendors could foreclose a substantial portion of the data-integration market. The effect of CDK's provisions is to exclude third-party data integrators from the market, force vendors to pay supracompetitive data integration prices, and reduce output. Indeed, there are few, if any, vendors that could survive without serving CDK dealers, much less CDK *and* Reynolds dealers.

## III.   CDK's Actions Have Harmed Competition

127.   CDK's illegal horizontal agreement with Reynolds and its anticompetitive exclusive dealing provisions have severely harmed competition in the Dealer Data Integration Market to the detriment of solutions that rely on data integration services.   CDK and Reynolds currently have a monopoly on data integration for their respective DMSs.   This monopoly has had predictable effects: prices for data integration services have skyrocketed and quality has stagnated or even decreased.   CDK's internal documents candidly explain that this was precisely CDK's goal.   It needed to "close" its DMS because otherwise the dramatically increased prices would cause vendors "to move to [other data integrators] instead of accept increase price."

128.   Even though AutoLoop and other vendors pass through a portion of CDK's and Reynolds' inflated data integration costs to dealers, many vendors (including AutoLoop) have no choice but to absorb some of the increased data integration fees because dealers are unable or unwilling to pay such excessive fees. This results in slashed development budgets, support, and other investments in their products and services.   These cost-cutting measures ultimately reduce the quality of such products and services.

129.   The increased data integration prices and reduced quality of data integration services have also "tilted the table" in favor of CDK's own software application offerings.   CDK's products and services do not have to pay excessive data integration fees, and those solutions have near real-time, read and write integration to all necessary dealer data on the DMS.

130.   Dealers are on record stating that they do not use some of their preferred vendors because of the huge pass-through data integration surcharges.

131.   Additionally, vendors have had to scale back the functionality of their products and services or pull them off the market entirely.   For example, at the Authenticom hearing, Alan Andreu of Dominion – a vendor – testified that Dominion had to shutter one application because the cost of integration fees exceeded the cost of the product itself.   Likewise, Michael Korp, owner of the vendor Open Recalls, testified that he could not afford CDK's and Reynolds' high integration prices.   He had therefore been forced to rely on Authenticom for integration, but CDK's blocking has forced the vendor to lay off employees and halt plans for growth.

## A.   Data Integration Prices Have Skyrocketed

132.   CDK and Reynolds have drastically increased the prices they charge for their data integration services (3PA and RCI) since 2015.   These prices are now far higher than the prices that would exist in a competitive Dealer Data Integration Market.

133.   CDK formally announced a "refreshed" 3PA program on June 22, 2015 – just a few months after its collusive agreement with Reynolds – as part of its "SecurityFirst" initiative.   This initiative used data security as the pretext for "closing" the DMS and imposing massive price increases on vendors.   "CDK is rolling out a new cybersecurity initiative," *Automotive News* reported, "that will raise monthly integration fees for most of the third-party software vendors that dealerships use in addition to CDK software.   It is patterned after a program at Reynolds and

Reynolds." David Barkholz, *CDK Global Sees Earnings Boost from Cost-Cutting, Improved Efficiency*, Automotive News (Nov. 3, 2015).

134. CDK's own internal documents reveal that the reason for the 3PA "refresh" was revenue, not security:  Ex. 15 (CDK-0843493) (emphasis added). According to plan, CDK's revenues and profit margin for data integration increased substantially in 2017 compared to 2016.

135. Vendors received little, if anything, in return for the dramatically higher prices. Industry publications reported that, "Vendors briefed on CDK's new data-security program said nothing will change in the way they get data from CDK-served DMS dealerships under SecurityFirst except for a higher price." David Barkholz, *Dealers Will Pay Up for Vendors' Data Access After CDK Switch*, Automotive News (July 20, 2015).

136. The price increases faced by AutoLoop are illustrative. CDK and AutoLoop began negotiating a 3PA agreement shortly after the launch of CDK's SecurityFirst initiative. They ultimately entered into a Managed Interface Agreement and accompanying Statement of Work on January 12, 2016.

137. When AutoLoop joined 3PA in January 2016, CDK charged $672 per rooftop per month for a dealer buying the entire AutoLoop suite. CDK increased the price to $694 per rooftop per month in July 2016. Today, CDK charges upwards of $730 per rooftop per month for the full suite of AutoLoop products.

138. After entering into the unlawful 2015 agreement with CDK, Reynolds has also increased its RCI prices far higher than it could if there were any competition. Every year, RCI prices increase by approximately four to five percent. Furthermore, the year after the CDK and Reynolds agreement, Reynolds began charging AutoLoop a fee for each "transaction" between AutoLoop's applications and the Reynolds DMS. In other words, Reynolds now charges AutoLoop an additional fee every time certain of its applications accesses the DMS. As of mid-2017, these fees were ███████ per transaction. For applications that require frequent communication with the DMS – such as scheduling software – transaction fees *alone* can cost AutoLoop hundreds of dollars per dealer per month. Given the combination of Reynolds' exorbitantly high standard integration fees and its transaction fees, many dealers pay more in fees than AutoLoop charges for its products. Other vendors have seen the cost of integration fees charged by Reynolds increase by similar margins, and have been forced to pay transaction fees.

139. As an example of the fee increases imposed on other vendors, at the Authenticom hearing, a witness for vendor Dominion Enterprises testified that his company paid $30 per dealer per month for data integration with Authenticom, but now is paying CDK ███████████████████ for the same service. ████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████ *See* Ex. 16 (CDK-0248042) (Slide 5).

140.   CDK has also engaged in deceptive advertising to the market.  As part of the revamped 3PA program, CDK posted a pricing guide on its website that CDK represents as "standardized" pricing for all vendors.  "Our 3PA pricing philosophy is simple," CDK states in its program guide, "standardized pricing for all customers." But that is false and misleading.  CDK's internal documents show that, for certain vendors like AutoLoop, the actual 3PA fees charged by CDK are far in excess of its published "standard" pricing packages.  CDK told another vendor providing electronic vehicle registration and titling that the vendor would have to pay 25% of its top-line revenues to participate in the 3PA program, which is many times more than the posted "standard" pricing.

141.   More egregious still, CDK has refused to provide integration for data elements if the data will be used in an application that competes against one of CDK's applications.  For example, AutoLoop has requested to be able to modify an open repair order in the service lane for one of its solutions, and CDK has refused that request.

142.   In addition to these monthly fees, CDK also charges vendors enormous upfront fees to initiate services.  CDK charged AutoLoop ███████ to join the 3PA program, with "setup" fees of around ████ (or more) per dealership rooftop.  These initiation fees are much more than anything correspondingly charged by independent data integrators.  CDK charges other vendors similar setup fees.

143.   The current 3PA and RCI prices are much higher than the prices that were charged by competing data integrators prior to CDK's and Reynolds' illegal

agreement in 2015. For example, between 2008 and 2016, SIS charged around $40 per dealer per month for pulling data and $70 per dealer per month for bi-directional, read-write integration, which included the ability to share data between AutoLoop's solutions. Similarly, Authenticom charged vendors $25 per dealer per month for one data feed and $50 per dealer per month for two or more (up to seven). On average, Authenticom charged vendors between $30 and $40 per dealer per month, and $75 per dealer per month for bi-directional, read-write integration.

144. CDK's prices for the 3PA program stand in stark contrast to the prices CDK charges for data integration services for non-CDK and non-Reynolds DMSs. DMI and IntegraLink charge between $25 and $50 per dealer per month for non-CDK and non-Reynolds DMSs.

**B. CDK's and Reynolds' Anticompetitive Conduct Has Tilted the Table in Favor of Their Applications to the Detriment of Competing Applications**

145. As of 2015, third-party applications, like those offered by AutoLoop, had been growing steadily due, in part, to reliable third-party integration to dealer data. CDK's and Reynolds' conduct has had anticompetitive effects in the software application market because it has provided their own products and services with preferential data access and ubiquitous read-write permissions. In addition to raising prices for data integration services to supracompetitive levels, CDK now provides inferior services to third-party vendors to "tilt the table" in favor of its own applications. Malcolm Thorne, CDK's former chief strategy officer, has admitted under oath that 3PA "protect[ed] CDK products through a tilt-the-table approach." Dkt. No. 163, at 140:11-25. And CDK's internal documents state that one of the "3PA

Program Principles" is to "[p]rotect CDK Products through a 'tilt-the-table' approach" and to "[k]eep value add advantage to CDK-layered applications." *Id.* at 139:2-140:25.

146. CDK restricts AutoLoop's and other vendors' access to and rights regarding dealer data on the DMS for no reason other than to make their offerings more difficult to use or to reduce the features and functionality of those products, thereby harming AutoLoop and other vendors, and providing an artificial advantage to CDK's own competing products and services.

147. For example, CDK withholds from AutoLoop the ability to create and modify repair orders using its SmartLane program, even though CDK has enabled this capability for its own competing program, Service Edge. There is no justification for doing so other than to give CDK's Service Edge a leg up in its competition against AutoLoop and other vendors. Similarly, CDK does not allow customers to sign repair orders in the dealer's service lane, even though that capability is available in Service Edge. These artificial capability restrictions insulate CDK's applications from having to compete on their merits against AutoLoop's products and those offered by other vendors.

148. CDK actively markets Service Edge by pointing to the artificial functionality limitations imposed by CDK on Service Edge's competitors. For example, one marketing presentation depicts the following:

**Missing Features Compared to CDK Service Edge**

| Feature | Impact |
|---------|--------|

| 2 | Bi-directional integration to DMS. Read and Write-back data | | CDK Service Edge workflow is written into DMS. No need to do the same work twice. |
|---|---|---|---|
| | *Repair Order Creation* | | Service Edge is the only solution that can open a Repair Order outside of the DMS |
| | *Electronic payments posted directly to accounting G/L (competitor requires additional manual processing to DMS)* | | Non-CDK solutions require additional manual step |
| 5 | Digital Signature capture on RO's and Vehicle Walkaround | | Customers electronically sign RO's, Invoices and Inspection forms. Immediately available in DMS. |
| 9 | Cost | | CDK bundles appointments, lane inspection, electronic MPI and electronic payments into one affordable payment. Also eliminates any 3rd party ingtegration charges. Nissan Newport News bundle is much less than 3rd party pricing. |

149.    As another example of "tilting the table," CDK limits how frequently its applications can send data to, or receive data from, the DMS. Whereas independent integrators like SIS were able to exchange data with the DMS in less than 30 seconds, AutoLoop's contract with CDK limits data exchanges to once every 15 minutes. Other vendors experience similar restrictions on their ability to access data in the DMS. CDK's own applications, however, are able to communicate with the DMS in near-real-time.

150.    CDK also forces AutoLoop to go through onerous 3PA "certification" exercises that serve no purpose other than to provide CDK with valuable and confidential proprietary information about AutoLoop's products. CDK has demanded that AutoLoop:    (a) provide proprietary information about the functionality of AutoLoop's products; (b) conduct live demonstrations of its products during which CDK employees ask detailed questions about AutoLoop's technology; (c) provide a

"workflow" model showing how each AutoLoop product uses data; and (d) justify how the AutoLoop product will use each data element. CDK has refused to confirm that it will not use AutoLoop's proprietary information to gain a competitive advantage against AutoLoop. On information and belief, CDK imposes similarly invasive 3PA certification requirements on other vendors.

## IV.    CDK's Anticompetitive Conduct Has No Pro-Competitive Justification

151.    There are no pro-competitive justifications for CDK's anticompetitive behavior. CDK has claimed that "closing" the DMS is necessary to protect "data security" because, it asserts, other data integrators are "unsecure." But that is simply not true.

152.    First, there is nothing unusual or unsecure about third parties integrating with the DMS on the dealer's behalf. CDK itself owns two data integrators (DMI and IntegraLink) that interact with and syndicate data in the same way as other data integrators. Malcolm Thorne – CDK's then chief strategy officer – told *Automotive News* in March 2015 that "the pull process of extracting data is as safe as pushing out." David Barkholz, *Dealerships Work To Safeguard Data as Security Breaches Loom*, Automotive News (Mar. 9, 2015). Indeed, until they entered their agreement in February 2015, CDK pulled data using login credentials from Reynolds dealers (and still does today pursuant to the "wind down" agreement). And Reynolds for over a decade consistently allowed third-party access to its DMS. It was only after Mr. Brockman acquired Reynolds in 2006 that it changed its position with respect to competitors' access. Similarly, a top-level CDK executive admitted in private conversation with a vendor that the rhetoric around "security" has "little

credibility" and is primarily designed to force vendors to use CDK for data integration.

153.   Significantly, while CDK's own SecurityFirst initiative itself recommended improving third-party integration practices and retiring "certain integration that risks data security," it did not recommend terminating all third-party integration.

154.   Second, using independent integrators to enable data flow between parties is standard across industries, including in banking and healthcare, where the data is much more sensitive than anything accessible from dealers.   Taking the banking industry as an example, thousands of third party products and services – from well-established companies like PayPal, Mint, Square, and Quicken to new startups like Even – require access to a customer's banking data.   There are large data integrators like Intuit and Yodlee that pull data from the consumers' bank accounts and provide that data to the third-party applications.   As the Consumer Financial Protection Bureau stated, "the availability of consumer financial account data . . . has made possible a range of benefits to consumers."   *Consumer Access to Financial Records*, Request for Information, Bureau of Consumer Financial Protection, Docket No. CFPB-2016-0048, at 7 (Nov. 17, 2016).

155.   Third, at the Authenticom hearing, CDK was unable to offer a single example of a data-security incident involving any independent data integrator.   *See* Op. & Order, *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, 2017 WL 3017048, at *2 n.2 (July 14, 2017).   Reynolds could cite only a single incident (not involving

data security) in which a query became stalled, but the problem was quickly and easily resolved. This is not surprising given that the methods used by third parties to integrate with the DMS are standard methods employed by integrators in multiple industries. CDK has never explained why the standard methods that work in other industries do not work here.

156. Fourth, CDK has allowed AutoLoop to use another independent integrator (SIS) as long as AutoLoop pays the 3PA integration fees. CDK "whitelists" SIS from its usual blocking practices. These examples show that profit – not security – is the sole motivation for the 3PA program.

157. Fifth, based on AutoLoop's experience with CDK's onerous 3PA certification process, CDK does not ask any questions actually related to vendors' security practices, such as how it secures data it retrieves from the DMS during transit and storage. Rather, CDK seeks proprietary information about the functionality of software applications provided by vendors such as AutoLoop – the type of information one would want to know about a competitor's products in order to gain a competitive advantage against third-party vendors.

158. Sixth, CDK also uses third-party integration to non-CDK DMS to pull data for *their own standalone products and services*. For example, CDK and Reynolds pay Authenticom to pull data from dealerships using their DMSs and to distribute that data to their applications. And DMI continues to screen scrape data from the Reynolds DMS during the five-year wind-down period pursuant to the February 2015

agreement. The fact that Reynolds and CDK actually use third-party access themselves proves there is nothing inherently "unsecure" about it.

159. In fact, CDK's insistence that vendors integrate with dealer data only through the 3PA program actually imposes unnecessary burdens on the underlying systems. Instead of querying the DMS once, and syndicating any data that is pulled to all vendors that need it, CDK requires every product and service to impose upon the network for the exact same data. That serves no purpose other than to allow CDK to reap a financial windfall by charging each vendor for integration with the same underlying data. For these reasons, the district court in the Authenticom matter concluded that CDK had failed to present evidence of a procompetitive justification for its anticompetitive acts.

160. Finally, CDK has failed to implement less-restrictive means of protecting dealer data. For example, CDK could establish application programming interfaces ("APIs") for independent integrators. Indeed, before entering the agreement with Reynolds, CDK even advocated that DMS providers should offer APIs for third-party integrators. Other DMS providers regularly provide API access for third-party integrators. Alternatively, other DMS providers also allow for dealers and vendors to utilize APIs between them directly, which is another less-restrictive means.

## CLASS ALLEGATIONS

161.   AutoLoop brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking damages and equitable and injunctive relief on behalf of the following class:

**Nationwide Sherman Act Class:**   All automotive software vendors (i.e., persons or entities engaged in the sale of software solutions to car dealers) located in the United States that, at any time since April 9, 2014, purchased data integration services from CDK or Reynolds.

162.   AutoLoop also brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking damages and equitable and injunctive relief pursuant to state antitrust and consumer protection statutes on behalf of the following class:

**Florida State-Law Subclass:**   All automotive software vendors (i.e., persons or entities engaged in the sale of software solutions to car dealers) located in the United States that, at any time since April 9, 2014, purchased data integration services from CDK or Reynolds to serve car dealerships located in Florida.

163.   Excluded from the foregoing Classes are CDK, Reynolds, and any of their officers, directors, management, employees, subsidiaries, and affiliates.

164.   Also excluded from the foregoing Classes are any vendor that has filed an individual complaint, as of the date of this Amended Complaint, against CDK or Reynolds regarding the provision of data integration services.

165.    This action may properly be brought as a class action because it satisfies the requirements of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

166.    The members of the Classes are so numerous that individual joinder of all Class Members is impracticable. There are at least dozens of automotive software solution vendors in the United States. On information and belief, nearly all of those vendors serve dealers using CDK's or Reynolds' DMS, including over 860 car dealers located in Florida. The precise number of Class Members, as well as their names and addresses, are currently unknown to Plaintiff but may be ascertained through CDK's and Reynolds' books and records.

167.    Common questions of law and fact exist as to the Classes, as required by Rule 23(a)(2), and those questions predominate over any questions that may affect only individual Class Members, as required by Rule 23(b)(3). The common questions of law and fact include, but are not limited to:

   a.    whether CDK and Reynolds unlawfully conspired to exclude third-party data integrators from the market;

   b.    whether CDK's and Reynolds' February 2015 agreements constitute an unlawful conspiracy in restraint of trade or commerce;

   c.    whether CDK's contractual exclusive dealing provisions violate the antitrust laws;

   d.    CDK's and Reynolds' historical and current policies and practices with respect to dealer ownership of data on their DMSs, dealer

authorization of third-party access to data on their DMSs, and security of data on their DMSs;

e.     CDK's and Reynolds' historical and current policies and practices with respect to their own third-party access to dealer data on other DMSs;

f.     whether vendors have paid inflated integration prices and received inferior quality data integration services as a result of the unlawful conspiracy between CDK and Reynolds;

g.     the anticompetitive effects of the unlawful conspiracy between CDK and Reynolds;

h.     whether, through the acts complained of herein, Defendants have violated federal and state antitrust laws;

i.     whether the acts complained of herein constitute unlawful, deceptive, and/or unfair business acts or practices; and

j.     whether the acts complained of herein constitute unconscionable and/or unfair trade or business practices or unfair competition.

168.     Alternatively, this action may be certified under Rule 23(b)(1) or Rule 23(b)(2) because: (a) the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendants; (b) the prosecution of separate actions by individual Class Members

would create a risk of adjudicative rulings as to them that would, as a practical matter, be dispositive of the interests of the other Class Members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds that apply generally to the Class Members, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

169.    AutoLoop's claims are typical of the claims of the Classes it seeks to represent, as required by Rule 23(a)(3), because AutoLoop and the Class Members have been subject to the same wrongful practices and have been injured in the same manner thereby.

170.    AutoLoop will adequately represent the interests of Class Members as required by Rule 23(a)(4). AutoLoop has no interests adverse to any Class Members. AutoLoop is committed to the prosecution of this action and has retained competent and experienced counsel.

171.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial harms suffered by AutoLoop and each Class Member are relatively small compared to the burden and expense that would be required to individually litigate their claims against CDK, so it would be impracticable for each Class Member to individually seek redress for CDK's wrongful conduct. Even if Class Members could afford individual litigation, individualized litigation creates a potential for inconsistent or

contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, a class action presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**COUNT I:**
**HORIZONTAL CONSPIRACY IN VIOLATION OF**
**SECTION 1 OF THE SHERMAN ACT**
**(ON BEHALF OF PLAINTIFF AND THE NATIONWIDE**
**SHERMAN ACT CLASS)**

172. Plaintiff incorporates by reference the preceding allegations.

173. CDK and Reynolds entered into and engaged in an agreement in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

174. CDK and Reynolds are horizontal competitors of one another in the DMS market and the Dealer Data Integration Market.

175. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding, or concerted action to eliminate competition in the Dealer Data Integration Market and their respective brand-specific aftermarkets. In furtherance of that conspiracy, in February 2015, CDK and Reynolds entered into a written market division agreement pursuant to which they agreed to "close" their DMSs and not to compete in the Dealer Data Integration Market. CDK and Reynolds also engaged in a group boycott to block all third-party access to their respective DMSs. The agreement not to compete between CDK and Reynolds is a *per se* violation of the Sherman Act and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

- 65 -

176.    The purposes of the conspiracy between CDK and Reynolds include: (1) to protect their DMS duopoly (thereby protecting their monopoly profits); (2) to protect their standalone applications; and (3) to monopolize the Dealer Data Integration Market so that they can reap monopoly profits.

177.    Through their conspiracy, CDK and Reynolds have caused actual injury to competition for applications and in the Dealer Data Integration Market and respective aftermarkets.

178.    The CDK and Reynolds agreement has cut off access to dealer data that solution providers need in order to compete with CDK and Reynolds.

179.    CDK and Reynolds possess dominant positions in the DMS market, which they have utilized to further the conspiracy.

180.    CDK's and Reynolds' conspiracy and anticompetitive conduct in furtherance thereof do not enhance efficiency or competition in any market. On the contrary, their conduct has produced only anticompetitive effects.

181.    As a proximate result of CDK's and Reynolds' unlawful conduct, for which CDK is jointly and severally liable, AutoLoop and the Nationwide Sherman Act Class have suffered injury to their business or property in an amount to be proven at trial and automatically trebled.

## COUNT II:
## UNLAWFUL RESTRAINT OF TRADE IN VIOLATION OF
## SECTION 1 OF THE SHERMAN ACT
## (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE
## SHERMAN ACT CLASS)

182.    Plaintiff incorporates by reference the preceding allegations.

183.    CDK entered into contracts with vendors that contain exclusive dealing provisions that unreasonably restrict trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

184.    CDK's contracts with vendors provide that vendors cannot access the DMS except through 3PA.   These provisions are standard throughout CDK's contracts with vendors.

185.    CDK was able to impose these exclusive dealing provisions on vendors as a result of its market power in the DMS market and the respective dealer data integration aftermarket.

186.    Because CDK imposed these exclusive dealing provisions pursuant to its conspiracy with Reynolds to eliminate competition, they are *per se* illegal.  Moreover, whether entered into pursuant to CDK's agreement with Reynolds or independently, CDK's vertical restraints are unlawful because they have led to increased prices and reduced output.

187.    Through its exclusive dealing provisions, CDK has injured competition in the DMS and Dealer Data Integration markets.

188.    CDK's exclusive dealing agreements do not enhance efficiency or competition in any market.  On the contrary, the agreements have produced only anticompetitive effects.

189.    As a proximate result of CDK's unlawful conduct, AutoLoop and the Nationwide Sherman Act Class have suffered injury to their business or property in an amount to be proven at trial and automatically trebled.

## COUNT III:
## UNLAWFUL MONOPOLIZATION IN VIOLATION OF
## SECTION 2 OF THE SHERMAN ACT
## (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE
## SHERMAN ACT CLASS)

190.    Plaintiff incorporates by reference the preceding allegations.

191.    CDK has unlawfully monopolized the aftermarket for dealer data integration services with respect to dealer data stored on the CDK DMS, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

192.    When dealers purchase DMS services from CDK, they are "locked in" to that purchase through a long-term contractual relationship and high switching and information costs.

193.    Because of customer lock-in in the primary DMS market, CDK has monopoly power – and in fact has monopolized – the Single-Brand Dealer Data Integration Aftermarket on its DMS platform.  CDK has demonstrated its ability to control prices and exclude competition by blocking third-party access to their DMS by raising data access fees to supracompetitive levels.

194.    CDK used anticompetitive means to acquire and maintain its monopoly, including, *inter alia*, by blocking third-party access to the DMS, entering into a market division agreement pursuant to which it agreed with Reynolds that neither DMS provider would provide third-party access to the other's DMS, and imposing anticompetitive exclusive dealing arrangements on vendors and dealers.

195.    As a direct and proximate result of CDK's monopolization, AutoLoop and the Nationwide Sherman Act Class have suffered damage to their business or property in an amount to be proven at trial and automatically trebled.

**COUNT IV:**
**VIOLATION OF THE FLORIDA ANTITRUST ACT**
**(ON BEHALF OF PLAINTIFF AND THE FLORIDA STATE-LAW**
**SUBCLASS)**

196. Plaintiff incorporates by reference the preceding allegations.

197. CDK and non-defendant co-conspirator Reynolds engaged in a conspiracy in unreasonable restraint of trade in violation of the Florida Antitrust Act, Fla. Stat. Ann. § 542.15 *et seq.*, for the reasons set forth in the preceding allegations. This conspiracy is a *per se* violation of the Florida Antitrust Act and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

198. CDK's exclusive dealing requirements and monopolization of the aftermarket for dealer data integration services are also unlawful under the Florida Antitrust Act.

199. The violations of the Florida Antitrust Act alleged herein had a significant effect on commerce in Florida, where at least 860 car dealers – and AutoLoop – are located. AutoLoop and the Florida State-Law Subclass – as well as Florida-based car dealers and car buyers – suffered adverse effects in Florida resulting from CDK's violations of the Florida Antitrust Act.

200. As a direct and proximate result of CDK's unlawful conduct, AutoLoop and the Florida State-Law Subclass have suffered injury to their business or property. AutoLoop and the Florida State-Law Subclass are entitled to treble damages for the violations of the Florida Antitrust Act alleged herein.

## COUNT V:
## UNFAIR PRACTICES IN VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
## (ON BEHALF OF PLAINTIFF AND THE FLORIDA STATE-LAW SUBCLASS)

201.    Plaintiff incorporates by reference the preceding allegations.

202.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") defines "unfair competition" to include, among other things, any "unfair methods of competition" and "unfair or deceptive acts or practices."  Fla. Stat. Ann. § 501.204.

203.    CDK's acts and practices as alleged herein have been "unfair" and "deceptive" under the FDUTPA.  CDK's conduct – for instance, its "tilt-the-table approach" in placing anticompetitive restrictions on competing services and products that it does not place on its own corresponding products, its conspiratorial agreement with Reynolds, and its concealment from dealers of the reasons for integration price increases and diminished functionality in non-CDK applications – offends established public policy (including federal and state antitrust statutes) and significantly threatened and harmed consumers of both data integration services and the products and services that rely on those services, including car dealers and car buyers.  Furthermore, any utility from CDK's conduct does not outweigh the harm it causes to competitors, car dealers, and car buyers.

204.    A substantial portion of the unfair acts and practices alleged herein occurred in Florida, and harm to application vendors, car dealers, and car buyers was inflicted in Florida for all the reasons set forth in the preceding allegations.

205. As a direct and proximate result of CDK's unfair conduct, AutoLoop and the Florida State-Law Subclass have suffered injury to their business or property. AutoLoop and the Florida State-Law Subclass are entitled to restitution in an amount to be proven at trial and automatically trebled.

## JURY DEMAND

206. In accordance with Federal Rule of Civil Procedure 38(b), AutoLoop demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, AutoLoop requests that the Court:

(a) certify this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the Classes defined above;

(b) decree that CDK entered into an unlawful horizontal conspiracy with Reynolds in violation of Section 1 of the Sherman Act;

(c) decree that the exclusive dealing provisions in CDK's contracts with AutoLoop, other vendors, and dealers are anticompetitive and illegal restrictions of trade under Section 1 of the Sherman Act;

(d) decree that CDK has illegally monopolized the market for integration services for dealer data stored on its DMS platform under Section 2 of the Sherman Act;

(e) enjoin the enforcement of the exclusive dealing provisions in the CDK contracts with dealers and vendors;

(f) enjoin CDK from privileging its own products and services – as compared to AutoLoop's and other vendors' products and services – with

respect to integration with data elements stored on mutual dealer clients' DMSs, including with respect to data access and usage rights, and bi-directional integration;

(g)     award damages, as provided under the Sherman Act and Florida law, and hold CDK jointly and severally liable for all damages resulting from CDK's unlawful conspiracy in restraint of trade with Reynolds, to be entered against CDK in an amount to be trebled in accordance with the Sherman Act and Florida law;

(h)     award appropriate actual and punitive damages for CDK's state law violations;

(i)     award its reasonable costs and expenses incurred in this action, including expert fees and attorneys' fees;

(j)     award prejudgment interest; and

(k)     award any such further relief that the Court may deem just and proper.

June 5, 2018                                    Respectfully submitted,

                                                 */s/ Derek T. Ho*

Richard J. Prendergast                          Derek T. Ho
Michael T. Layden                               Michael N. Nemelka
Collin M. Bruck                                 Aaron M. Panner
RICHARD J. PRENDERGAST, LTD.                    David L. Schwarz
111 W. Washington Street, Suite 1100            Kevin J. Miller
Chicago, Illinois 60602                         Daniel V. Dorris
Telephone:  (312) 641-0881                      Joanna T. Zhang
rprendergast@rjpltd.com                         Joshua Hafenbrack
mlayden@rjpltd.com                              Daniel S. Guarnera
cbruck@rjpltd.com                               KELLOGG, HANSEN, TODD,
                                                   FIGEL & FREDERICK, P.L.L.C.
                                                1615 M Street, N.W., Suite 400
Jennifer L. Gregor                              Washington, D.C. 20036
Kendall W. Harrison                             Telephone:  (202) 326-7900
Allison W. Reimann                              Fax:  (202) 326-7999
GODFREY & KAHN S.C.                             dho@kellogghansen.com
One East Main Street                            mnemelka@kellogghansen.com
Suite 500                                       apanner@kellogghansen.com
Madison, Wisconsin 53703                        dschwarz@kellogghansen.com
Telephone:  (608) 284-2629                      kmiller@kellogghansen.com
Fax:  (608) 257-0609                            ddorris@kellogghansen.com
jgregor@gklaw.com                               jzhang@kellogghansen.com
kharrison@gklaw.com                             jhafenbrack@kellogghansen.com
areimann@gklaw.com                              dguarnera@kellogghansen.com

                                                *Counsel for Plaintiff Loop, LLC,*
                                                *d/b/a AutoLoop*

## <u>CERTIFICATE OF SERVICE</u>

I, Derek T. Ho, an attorney, hereby certify that on June 5, 2018, I caused a true and correct copy of the foregoing **AMENDED COMPLAINT – CLASS ACTION** to be filed and served electronically via the court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by email to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

*/s/ Derek T. Ho*

Derek T. Ho
**KELLOGG, HANSEN, TODD,**
 **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com