# Exhibit 1

MAYER·BROWN

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel +1 312 782 0600
Main Fax +1 312 701 7711
www.mayerbrown.com

May 24, 2018

**Britt M. Miller**
Direct Tel +1 312 701 8663
Direct Fax +1 312 706 8763
bmiller@mayerbrown.com

**By E-Mail**

Michael N. Nemelka
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 60036

Peggy J. Wedgworth
Milberg Tadler Phillips Grossman LLP
One Pennsylvania Plaza
New York, NY 10119

Re: *In re Dealer Management Systems Antitrust Litig.*,
    MDL No. 2817, Case No. 18-CV-864 (N.D. Ill.)

Dear Mike and Peggy:

I write to summarize our understanding of the parties' agreements / disagreements coming out of our meet-and-confer sessions on May 18, 21, and 22. To the extent that you disagree with our summary and/or we have misapprehended your position on any given issue, we would ask that you let us know no later than Tuesday, May 29.

**Authenticom's Discovery Requests to CDK**

As to the issues raised by your May 11, 2018 Letter, we provide the following information / summary of the parties' discussions:

**I.     CDK's FTC Production**

1. *CDK's FTC CID Custodians*—As stated during our meet-and-confer, although all of the information necessary to identify CDK's custodians for the FTC's Joint Conduct Investigation is already in plaintiffs' possession, as a courtesy we agreed to identify them by name. They are:

   a. Joe Bihner

   b. Leigh Ann Conver

   c. Kevin Distelhorst

   d. Josh Douglas

   e. Ronald Frey

Mayer Brown LLP operates in combination with other Mayer Brown entities, which have offices in North America, Europe and Asia and are associated with Tauil & Chequer Advogados, a Brazilian law partnership.

Michael N. Nemelka
Peggy J. Wedgworth
May 24, 2018
Page 2

      f.   Howard Gardner

      g.   Mark Imowitz

      h.   Robert Karp

      i.   Malcolm Thorne

      j.   Ron Workman

Please note that 9 of the 10 CID custodians are also in Authenticom's list of 17 custodians for whom CDK has already agreed to produce documents (the only exception being Josh Douglas).

2. *CDK FTC Search Terms.* Plaintiffs asked whether Defendants used search terms in producing documents in response to the FTC's CID. I reported during our Friday meet-and-confer that we were investigating this issue as Mayer Brown did not make that production to the FTC. We have since determined that the bulk of CDK's production to the FTC in connection with the Joint Conduct Investigation was done using TAR (Technology Assisted Review) and not search terms. We understand that a set of search terms may have been used to review a small subset of documents that could not be searched using TAR, but it is still unclear to what extent they were used and/or with what population they were used. We are following up and will update our response when we know more.

3. *CDK's CID.* Notwithstanding the fact that (a) there is no outstanding discovery request to CDK seeking the production of the Joint Conduct CID, and (b) Authenticom's prior informal request for its production was premised on a stated need to use it in order to challenge Reynolds's withholding non-relevant documents from its reproduction of its Joint Conduct Investigation production (an issue that is currently moot as Reynolds has re-produced the entirety of that production in the MDL), CDK has agreed to produce a copy of its Joint Conduct CID. Counsel for the Class Plaintiffs stated during our meet-and-confer that they would include a specific RFP asking for the production of the CID in their upcoming May 25 RFPs.

4. *FTC Interviews.* Authenticom's counsel clarified during our meet-and-confer that plaintiffs were unaware of the FTC having taken, scheduled, or otherwise indicated a desire to interview any of Defendants' employees as part of the Joint Conduct Investigation, but was merely basing plaintiffs' demand for "any transcript, recording, or other record from those interviews," on counsel's past experience in other, unrelated FTC proceedings. CDK agreed to consider this request if /when it actually became ripe.

II.    **Non-Custodial and Custodial Documents**

A.    *Non-Custodial.* Plaintiffs inquired whether Defendants would be producing documents besides those previously produced to the FTC. As has already been evidenced

Michael N. Nemelka
Peggy J. Wedgworth
May 24, 2018
Page 3

by CDK's production of non-FTC documents (*e.g.*, the 42,000+ records produced on January 11, 2018), the answer to that question is obviously "yes". As to the categories of documents identified in your May 11 Letter, we noted during the meet-and-confer that a number of these categories of documents are already in CDK's Joint Conduct production to the FTC including, for example, several large extracts of financial data responsive to Authenticom's request for pricing and expense information. Of course, while we reserve our rights to object to any burdensome and/or duplicative requests for additional documents (given our substantial production to date), CDK's production is ongoing and to the extent documents it has agreed to produce that are responsive to one of the identified categories has not been produced, we would expect them to be included in future productions.

B.    *Custodial Documents.* Again, Authenticom's counsel's repeated assertions during our meet-and-confer sessions that Defendants did "nothing" with regards to custodial documents during the pendency of the discovery stay are inaccurate. As I reported, CDK did begun its review of custodial documents (and, as noted above, has already produced approximately 42,000 custodial records), but has structured its review of such documents, consistent with Judge Peterson's order granting the stay, to minimize duplication of effort and a waste of resources. As Authenticom's counsel was quick to point out, on several occasions during our call (in relation to their other plaintiff clients), additional, non-duplicative discovery requests are due to be served this Friday,[1] after which the parties will, we are sure, work to ensure that their collective work on custodial productions will not be unnecessarily duplicative or unduly burdensome.

III.    **CDK's RFP Responses**. As previously noted, Authenticom identified all 15 of CDK's responses to Authenticom's Second Set of Requests for Production as deficient. As discussed during our meet-and-confer, that characterization was inaccurate, but the parties agreed to continue their efforts to reach agreement on the RFPs as follows:

1.  *RFP 93*: As we explained during our meet-and-confer, contrary to Authenticom's assertion that CDK's response was limited to previously agreed search terms, CDK has already produced documents within its possession, custody, and control responsive to this Request—including documents not identified through the use of the agreed-upon search terms. CDK further stated that its production in response to Authenticom's RFPs was ongoing and specifically committed to producing documents or data from which Authenticom should be able to calculate CDK's monthly spend on so-called "independent integrators" to the extent such documents/data exist.

---

[1] As stated during our meet-and-confer, we do not expect—and believe that it would be inconsistent with the Federal Rules—for any such discovery requests to seek large amounts of additional discovery from CDK given its production of almost 3 million pages of documents to date. We reserve the right to seek a protective order as to any and all duplicative or unduly burdensome discovery or any that are not proportional to the needs of this MDL.

Michael N. Nemelka
Peggy J. Wedgworth
May 24, 2018
Page 4

2. *RFP 94.* Although Authenticom's proffered justification for the documents called for by this RFP remains inadequate, CDK agreed to consider a reasonable list of search terms comprised of words that Authenticom considers "profane" which, if agreed upon, would be used to search Dan McCray's documents and for the period of time relevant to the instant litigation.

3. *RFP 95.* As discussed, CDK's search for documents responsive to this Request will, pursuant to its obligations under the Federal Rules, include any non-custodian-specific files where it reasonably believes responsive documents will be found. To the extent any such files are electronic, they will be searched using the agreed-upon search terms.

4. *RFP 96.* As stated, CDK believes that its prior commitments with respect to RFPs 64-71 encompass documents responsive to this Request. Authenticom disagrees. Counsel suggested that Authenticom would propound additional search terms related to this Request. CDK agreed to consider them upon receipt and then re-engage in a meet-and-confer as appropriate.

5. *RFP 97.* See our response as to RFP 96.

6. *RFP 98.* As discussed, CDK's search for documents responsive to this Request will, pursuant to its obligations under the Federal Rules, include any non-custodian-specific files where it reasonably believes responsive documents will be found. To the extent any such files are electronic, they will be searched using the agreed-upon search terms.

7. *RFP 99.* As discussed, CDK's search for documents responsive to this Request will, pursuant to its obligations under the Federal Rules, include any non-custodian-specific files where it reasonably believes responsive documents will be found. To the extent any such files are electronic, they will be searched using the agreed-upon search terms.

8. *RFP 100.* As discussed, CDK's search for documents responsive to this Request will, pursuant to its obligations under the Federal Rules, include any non-custodian-specific files where it reasonably believes responsive documents will be found. To the extent any such files are electronic, they will be searched using the agreed-upon search terms.

9. *RFP 101.* As discussed, CDK's search for documents responsive to this Request will, pursuant to its obligations under the Federal Rules, include any non-custodian-specific files where it reasonably believes responsive documents will be found. To the extent any such files are electronic, they will be searched using the agreed-upon search terms.

10. *RFP 102.* Notwithstanding its belief that it has complied with its obligations under the Federal Rules with respect to this Request, CDK committed to confirming whether the databases identified in response to this Request have the material information found the invoices called for by this Request as well as the date range of the data produced.

Mayer Brown LLP

Michael N. Nemelka
Peggy J. Wedgworth
May 24, 2018
Page 5

> Authenticom's counsel agreed to propose the parameters for their newly-proposed "representative sample" of the requested invoices, which CDK agreed to consider.

11. *RFP 103.*  See our response to RFP 102.

12. *RFP 104.*  Authenticom's counsel agreed to narrow this Request.

13. *RFP 105.*  Notwithstanding the unpersuasiveness of Authenticom's stated reason for the relevancy of this Request, CDK agreed to consider this Request and will revert.

14. *RFP 106.*  With respect to Plaintiffs' request for the unredacted version of the FTC's March 18, 2018 Complaint in connection with CDK's previously proposed acquisition of Automate, CDK agreed to consider this Request and will revert.  As to Plaintiffs' demand for the entirety of CDK's production of documents to the FTC in connection with the previously proposed AutoMate acquisition, CDK stands on its objection that Authenticom's repudiation of its agreement on this issue, specifically as it relates to Authenticom's RFP 56, is unjustified and inappropriate.  CDK stands by its commitment to respond to this Request consistent with the parties' prior agreements and based upon the parties' previously agreed-upon search terms, date limitations, and custodians.  To the extent Plaintiffs improperly persist in pursuing the production *in toto*, the parties are at impasse.

15. *RFP 107.*  As noted above, CDK believes that Authenticom's addition of 20 additional search terms is unwarranted under the circumstances, particularly given the breadth and scope of Authenticom's existing search terms.  Nonetheless, CDK agreed to consider these and any additional search terms Authenticom (or the other plaintiffs) may propose and respond accordingly.

## CDK's Discovery Requests to Authenticom

As discussed during the parties' meet-and-confer, the details of CDK's concerns regarding Authenticom's discovery responses are contained in my May 16, 2018 Letter.  The specific matters discussed/agreed upon during our meet-and-confer are as follows:

I.     **Authenticom's Interrogatory Responses**

A.     *Improper Objection:*  Authenticom confirmed that its inclusion of the phrase "Authenticom will construe this Request as concerning Authenticom's current practices" was intended as a limitation on its responses to Interrogatories 9, 10, 11, 12, 13, and 14, and that the limitation was the result of Authenticom's belief that, without such a limiter, the Interrogatories were unduly burdensome. The parties discussed each affected interrogatory as described, in turn, below.

Mayer Brown LLP

Michael N. Nemelka
Peggy J. Wedgworth
May 24, 2018
Page 6

B.    *Specific Interrogatories*

1.    <u>Interrogatory No. 4</u>.  We explained that Authenticom's response, which simply states it "asks its dealer clients to call Reynolds and/or CDK" when it notices profiles are being disabled" and "works with dealers to re-establish access to the dealers' data," is not sufficient under Fed. R. Civ. P. 33(b)(3) as it does not address the steps Authenticom takes to evade detection, but rather speaks only to the process it allegedly follows after detection has already occurred.  Further, "work[ing] with dealers" is not an adequate description of Authenticom's efforts, as required under the Federal Rules.  Authenticom declined to commit to supplementing its response (much less a date by which it would do so), but did agree to inform us by COB on May 25, 2018, whether it would supplement its response to address CDK's concern.  If we do not hear from Authenticom by that agreed deadline, we will assume that it does not intend to supplement and will consider the parties at impasse.

2.    <u>Interrogatory No. 5</u>.  Here again, we explained that although Authenticom's  response identifies a few methods that Authenticom purportedly uses to access "dealer data," CDK's question was not limited to "dealer data," but rather encompassed all data on non-CDK, non-Reynolds DMS systems.  We asked Authenticom to confirm the three methods expressly identified in its response—screen-scraping, data pushing, and API—are the only methods used by Authenticom to access any data—dealer or non-dealer—on a non-CDK, non-Reynolds DMS.  Alternatively, if Authenticom utilizes additional methods, we asked that it supplement its response accordingly.  Authenticom agreed to supplement, but noted that discovery does not close until February and inquired whether there was a reason CDK needed this information urgently.  Despite our concern that Authenticom believes that it might need nine months to supplement a relatively straightforward Interrogatory (and/or that it would wait that long to supplement its responses), we explained that given the motion to compel deadline and the basic information sought by this Interrogatory (which will guide certain of CDK's other discovery efforts), we asked that Authenticom promptly supplement.  Again, Authenticom declined to commit to a date by which it would supplement, merely indicating that it would supplement in the "short term" and certainly "before February."

3.    <u>Interrogatory 9</u>.  This is one of the Interrogatories subject to the improper "current practices" objection noted above.  As we explained during the meet-and-confer, CDK does not believe that this Interrogatory is properly limited solely to the steps Authenticom takes, if any, in May 2018 to "ensure that [it has] a Dealer's express authorization to obtain data from a CDK or Reynolds DMS on that Dealer's behalf," but rather that responsive information should be provided for the entire relevant period to the extent those steps have changed over time.

Michael N. Nemelka
Peggy J. Wedgworth
May 24, 2018
Page 7

Authenticom again declined to commit to supplementing its response (much less a date by which it would do so), but did agree to inform us by COB on May 25, 2018, whether it would supplement its response to address CDK's concern. If we do not hear from Authenticom by that agreed deadline, we will assume that it does not intend to supplement and will consider the parties at impasse.

4.     Interrogatory No. 10.  Here we explained that Authenticom's response merely states that to "access[] dealer data on a CDK or Reynolds DMS," it seeks "express permission of the dealers" who have "complete control" of the data through the DealerVault.  Stating that Authenticom seeks express authorization from the dealer, does not address the Interrogatory, as drafted, which seeks information about steps taken by Authenticom to ensure its access "does not exceed a Dealer's express authorization."   CDK stated that it interprets Authenticom's response as confirmation that Authenticom does not take additional steps to ensure its access stays within the bounds of the Dealer's express authorization.  Authenticom stated that it "didn't think that was fair" and that there was an automated process that the dealers controlled with respect to what data elements were scraped out of Defendants' DMSs.  We explained that such a response was non-responsive and that, as Authenticom is aware, depending on the level of password access it is given, Authenticom could have access to all data in the DMS relating to a given dealer—dealer and non-dealer data alike.  In light of this explanation, although Authenticom yet again declined to commit to supplementing its response (much less a date by which it would do so), it did agree to inform us by COB on May 25, 2018, whether it would supplement its response to address CDK's concern.  If we do not hear from Authenticom by that agreed deadline, we will assume that it does not intend to supplement and will consider the parties at impasse.

5.     Interrogatory No. 11.  Here again, we explained that Authenticom's response suffered from the same improper general objection issue described above.  We then explained that Authenticom also did not answer the question that is being asked in this Interrogatory.   Rather, it refers to its response to Interrogatory No. 10, which—as described above—generally indicated that Authenticom seeks "express permission of the dealers" to access dealer data on the DMS.  Given that dealers have the technical ability to grant access to all data on the DMS, including data that is "proprietary to the DMS provider, OEMs, or to any other third parties," we explained that we did not understand how seeking permission of the dealers to access *dealer-data*, ensures that Authenticom does not also access non-dealer proprietary data.   CDK explained that it read Authenticom's written response as confirmation that Authenticom does not take any steps to ensure it does not access data maintained on a CDK or Reynolds DMS that are proprietary to the DMS provider, OEMs, or to any other third parties.  Authenticom complained that we were reading Authenticom's response

Mayer Brown LLP

Michael N. Nemelka
Peggy J. Wedgworth
May 24, 2018
Page 8

in very "black and white" terms to which we responded that we could only read what Authenticom had written. As with a number of the other Interrogatories, Authenticom once again declined to commit to supplementing its response (much less a date by which it would do so), but did agree to inform us by COB on May 25, 2018, whether it would supplement its response to address CDK's concern. If we do not hear from Authenticom by that agreed deadline, we will assume that it does not intend to supplement and will consider the parties at impasse.

6.      Interrogatory No. 13 (mis-identified in our May 16 Letter as Interrogatory 12). Here again, we explained that Authenticom's response suffered from the same general objection issue described above. We then explained that Authenticom, again, did not answer the question that is being asked in this Interrogatory, which seeks information about the steps *Authenticom*—not the dealer—takes to guarantee that third-party access is within the bounds authorized by the Dealer. CDK explained that it read Authenticom's written response as confirmation that Authenticom does not take any steps to ensure third-parties who access or receive DMS data from it do so only as authorized by Dealers. Authenticom again complained that we were reading its responses too literally. Subsequently, although Authenticom again declined to commit to supplementing its response (much less a date by which it would do so), it did agree to inform us by COB on May 25, 2018, whether it would supplement its response to address CDK's concern. If we do not hear from Authenticom by that agreed deadline, we will assume that it does not intend to supplement and will consider the parties at impasse.

7.      Interrogatory No. 14 (mis-identified in our May 16 Letter as Interrogatory 13). We asked that Authenticom confirm that the four documents it identified in response to this Interrogatory were the only 4 that it was aware of in its production to date that were responsive to the Interrogatory. Authenticom noted that its production efforts were ongoing and that it could not say that these were the only four responsive documents. We explained that while we appreciated that Authenticom intended to produce additional documents, some of which may be responsive to this Interrogatory, and we were not taking issue with Authenticom not identifying documents that had not yet been produced, we needed definitive confirmation that the identified documents were the only responsive documents in Authenticom's document production as of May 7, 2018 (the date of its interrogatory responses) of which it was aware. Here, Authenticom agreed to either confirm the accuracy of its response or inform us whether it would be supplementing its response (but again declined to provide a date by which it would supplement) by COB on May 25, 2018. If we do not hear from Authenticom by that agreed deadline, we will assume that it does not intend to supplement and that it is standing on its existing response.

Mayer Brown LLP

Michael N. Nemelka
Peggy J. Wedgworth
May 24, 2018
Page 9

8.      Interrogatory No. 15.  As we stated in our May 16 letter and again during our meet-and-confer, in response to this Interrogatory, Authenticom merely stated that "it is willing to meet and confer with CDK to clarify the content and scope of this Interrogatory," without identifying what portion(s) of this interrogatory it specifically objects to.  During our discussion, we clarified that the information CDK is seeking is the file name (and common name, to the extent it is referred to by Authenticom as something other than its file name) of each script or executable program that Authenticom has used or provided to dealers during the relevant period to access data maintained on a CDK or Reynolds DMS, as well as a detailed description of that script's/executable program's intended purpose and function—*i.e.*, what it was created/designed to do.  As with Interrogatory No. 5, Authenticom declined to commit to a date by which it would supplement, merely indicating that it would be in the "short term."  We ask that you promptly provide us with a date by which Authenticom will supplement its response to this Interrogatory.

9.      Interrogatory Nos. 16, 17, 18, 19, and 20.  Authenticom stated that it stands in its objection to each of these Interrogatories as "contention interrogatories" and does not intend to supplement its response to any of the five at this time.  We appreciate Authenticom's clarification and note that the parties are now at impasse as to these Interrogatories.

10.     Interrogatory No. 21.  We explained that Authenticom's response is incomplete and unresponsive to the question posed in this interrogatory as Authenticom's Prayer For Relief in its Complaint does not "[i]dentify the terms of access that [it is] seeking with respect to CDK DMSs" or indicate "whether those same terms should apply to other third-party 'data integrators' or applications providers who may seek access."  Authenticom directed us to the form of injunction that it submitted to Judge Peterson (Dkt. 179) for additional details regarding the terms of access that it is seeking.  It then conceded that its response did not address the second part of the Interrogatory—namely whether those terms should apply to other third-party 'data integrators' or application providers who may seek access—and noted that it might be able to provide "a little more" on the terms of access it is seeking.  As with Interrogatory Nos. 5 and 15, Authenticom declined to commit to a date by which it would supplement, merely indicating that it would be in the "short term."  We ask that you promptly provide us with a date by which Authenticom will supplement its response to this Interrogatory.

11.     Interrogatory No. 25.  Authenticom made clear that it believes that current case law in this District supports its refusal to respond to this Interrogatory as violative of Fed. R. Civ. P. 33.  We appreciate that clarification.  It also indicated its willingness to consider authority to contrary.  We stated that we understood Authenticom's decision and would consider next steps.

Mayer Brown LLP

Michael N. Nemelka
Peggy J. Wedgworth
May 24, 2018
Page 10

II. **Authenticom's Responses to CDK's RFAs**

We explained that, as it had done in response to a number of Reynolds's RFAs, Authenticom changed the question that was posed in CDK's Request for Admission Nos. 3, 4, and 8, by adding the phrase "without authorization granted by a dealer." We further explained that CDK's RFAs, as written, are not limited to instances where Authenticom acted or acts without authorization granted by a dealer. Although Authenticom refused to commit to supplementing its response (much less a date by which it would do so), it did agree to inform us by COB on May 25, 2018, whether it would supplement its response to address CDK's concern or stand on its answers to these RFAs. We explained that if we do not hear from Authenticom by that agreed deadline, we will assume that it does not intend to supplement and will promptly moved to have all three RFAs admitted against Authenticom.

III. **Authenticom's Responses to CDK RFPs**

Here we reminded Authenticom that we previously wrote counsel on January 29, 2018 identifying several ongoing issues with respect to Authenticom's discovery responses, including deficiencies in Authenticom's responses and objections to CDK's Request For Production Nos. 1, 2, 8, 32, 33, 51, and 68. We then reminded counsel that during a meet-and-confer later that day, they committed to following-up with their client regarding the referenced Requests and the other issues discussed in CDK's January 29 letter, but that we had yet to hear from them on any of those issues, notwithstanding the termination of the stay of discovery. Again, would appreciate a prompt reply to our January 29 letter that addresses all of the outstanding issues outlined therein. At a minimum, we ask that you promptly provide us with a date by which Authenticom will provide its response.

\* \* \* \* \* \*

We are diligently working to provide plaintiffs with the information we committed to producing and trust that Authenticom is doing the same. If we have materially misstated any of Authenticom's (or the other plaintiffs') substantive positions (we are not interested in engaging in a war of words as to characterization), please promptly let us know.

Sincerely,

Britt M. Miller

cc:     Mark Ryan
        Andrew Marovitz
        Matt Provance

728713024

# Exhibit 2

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
———
(202) 326-7900
FACSIMILE:
(202) 326-7999

May 31, 2018

*Via Electronic Mail*

Brian Ross, Esq.                                    Britt M. Miller, Esq.
Gibbs & Bruns LLP                                  Mayer Brown
1100 Louisiana, Suite 5300                         71 South Wacker Drive
Houston, TX 77002                                  Chicago, IL 60606

Leo D. Caseria, Esq.
Sheppard, Mullin, Richter & Hampton LLP
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071

      Re:    *In re: Dealer Management Systems Antitrust Litigation*, MDL No. 2817

Dear Britt, Brian, and Leo:

      I write regarding the issues raised by Authenticom on our meet and confers on May 18, 21, 22, and in correspondence leading up to those discussions. We also raise issues regarding Defendants' inadequate responses to Authenticom's First Set of Interrogatories, and would like to discuss those on our next meet and confer, which we have requested take place on Tuesday, June 5 at 10:00 a.m. ET.

## I.    FTC Productions

      **Auto/Mate Documents.** On our meet and confers, both Reynolds and CDK confirmed that they are refusing to provide a complete production of documents that they provided to the FTC in connection with the agency's review of CDK's proposed acquisition of Auto/Mate. At most, Defendants will produce documents they deem "relevant" to this MDL from their FTC Auto/Mate productions, with no insight into how Defendants will decide what is and what is not "relevant." As we have explained several times, including in prior correspondence, Defendants' position on this matter is unsupportable given the overlapping issues in this MDL and the FTC's review of – and most importantly, the agency's challenge to – CDK's thwarted acquisition of Auto/Mate. Defendants' position is all the more suspect given that Reynolds once took the same stance with respect to the FTC's joint conduct investigation – claiming a right to withhold certain "irrelevant" documents. Now that we have seen those documents, Reynolds had zero basis to claim irrelevancy. CDK's refusal to produce an unredacted copy of the FTC's complaint challenging the acquisition is even more baseless. The fact that, in the FTC's view, CDK's acquisition of Auto/Mate – which comprises only a small piece of the DMS market – was anticompetitive and challengeable under this nation's antitrust laws has direct relevance to whether CDK's and Reynolds' coordinated conduct is likewise anticompetitive and illegal, particularly given that Defendants' conduct affects over 75% of the DMS market, the entirety of

the data integration market, and every vendor. Having exhausted alternatives, we are at an impasse. If either CDK or Reynolds plan on taking a different position – and will instead produce all factual and non-factual material provided to the FTC in connection with the Auto/Mate review as well as the unredacted complaint – please let us know by our meet and confer on Tuesday.

**Recordings from FTC Interviews.** Reynolds has agreed to produce transcripts, recordings, or other records of FTC interviews in the FTC's joint conduct investigation so long as the Individual Plaintiffs commit to doing the same. Reynolds asked for such confirmation, and we can confirm that the Individual Plaintiffs commit to doing the same.

CDK has yet to take a position on this issue. We ask that CDK let us know by our meet and confer on Tuesday whether it will join Reynolds and the Individual Plaintiffs in producing records of FTC interviews. CDK states that this request is not yet "ripe," *see* Letter from B. Miller to M. Nemelka and P. Wedgworth (May 24, 2018), but we need to know whether this is an issue we need to raise with the Court. And it is certainly an issue that is "ripe" enough for both Reynolds and the Individual Plaintiffs to take a position on. CDK should too. If the interviews are "helpful" to CDK, then CDK should have no problem providing them in this MDL. If the interviews are "harmful" to CDK, then that is no basis for withholding them. Just as with the documents, the interviews are unquestionably relevant to this MDL.

Similarly, we need confirmation from both Defendants that they will produce transcripts, recordings, or other records of FTC interviews, if any, in connection with the FTC's review of CDK's acquisition of Auto/Mate. Please provide that confirmation by this Tuesday as well.

**Search Terms.** We understand that Reynolds did not use search terms to respond to the FTC's CID, but that CDK did for a subset of documents. Once CDK identifies those search terms, please provide them to us.

**CDK's Statement in FN 1 of Its Letter.** In CDK's May 24th letter, CDK wrote that "given its production of almost 3 million pages of documents to date," it "would be inconsistent with the Federal Rules . . . for any [additional] discovery requests to seek large amounts of additional discovery from CDK." *Id.* Let us state unequivocally: that statement is wrong and has no basis in the Rules or in fact with respect to the needs of this MDL. *CDK's document productions to the FTC do not satisfy its discovery obligations in this MDL.* The fact that CDK produced many pages to the FTC does not mean that it need not respond to the document requests in this MDL. As private plaintiffs, we may seek documents different from or in addition to what the FTC sought. In addition, the FTC may have made concessions as to document productions that the MDL Plaintiffs will not. The FTC may not have sought documents that we are seeking. The FTC may not be pursuing claims that we are pursuing. And so forth. It is simply a non-sequitur that because CDK has produced a certain volume of documents to the FTC that it need not produce an additional volume of documents in this MDL, no matter what that volume may be.

## II.    Custodial and Non-Custodial Documents

**Custodial.** In its correspondence, Reynolds stated that it "is not currently reviewing documents for responsiveness based on the custodians and search terms" that it has already

agreed to use. Letter from B. Ross to D. Ho and M. Nemelka (May 16, 2018). Reynolds again confirmed that fact on our meet and confers. For its part, CDK has stated that it has taken steps to begin its custodial document review, structuring it to minimize duplicative work, which we appreciate. That is what we have been requesting for many months that Defendants do.

To the extent Reynolds (and, apparently, to a lesser extent CDK) are not reviewing the documents they have already agreed to review, it is dilatory, unreasonable, and counter-productive for Defendants to take this position. Defendants' intentional inaction (in the case of Reynolds) and belated action (in the case of CDK) are recipes for delay. There is a deadline for document productions in the Case Management Order – a deadline for which Defendants advocated. No matter Defendants' delays today, they must meet that deadline that the Court ordered upon Defendants' insistence.

**Non-Custodial Documents.** In my May 11, 2018 letter, I highlighted several categories of non-custodial documents that Defendants should have already produced. With respect to Defendants' responses to those categories, we respond as follows:

1.  Full DMS and RCI/3PA Pricing and Financial Information. We are evaluating the documents Defendants have produced on this topic – including those documents that Defendants referenced by Bates number – and whether they contain the necessary information. But we note that other plaintiffs in this MDL have now requested more financial information beyond what Authenticom may have agreed to accept, and so this category of documents will continue to be a topic of discussion.

2.  DMS Switching Information. We are evaluating the documents Defendants have produced on this topic – including those documents that Defendants referenced by Bates number – and whether they contain the necessary information. But we note that other plaintiffs in this MDL have now requested more switching information beyond what Authenticom may have agreed to accept, and so this category of documents will continue to be a topic of discussion.

3.  Documents and Communications Regarding the February 2015 Agreements, including all drafts and correspondence regarding the Agreements. We appreciate Defendants' willingness to continue to produce the requested documents on this topic. It appears, based on Defendants' responses, that beyond those already produced, many of these documents will be forthcoming in custodial discovery, and we will continue to evaluate Defendants' productions in this regard.

4.  Dealer, Vendor, Integration, Wind-Down, and Other Agreements that Defendants Have Agreed to Produce. We are evaluating the documents Defendants have produced on these topics. Contrary to Defendants' statements, we do not believe that Defendants have already produced the agreed-upon documents in most instances. And moreover, Reynolds' letter only referred to the RCI contracts, and not to the other agreements. Nevertheless, we note that other plaintiffs in this MDL have now requested more documents beyond what Authenticom may have agreed to accept, and so these categories of documents will continue to be a topic of discussion.

5.  "Whitelisting". Even if Defendants do not use the term "'whitelisting' in the normal course" of their business, *see* Letter from B. Ross to D. Ho and M. Nemelka (May 16, 2018), let there be no doubt that Defendants are obligated to produce all documents relating to

the practice of what that term describes. Please confirm that neither CDK nor Reynolds are withholding documents – or failing to search for documents – merely because the term "whitelisting" is not used by them in the ordinary course. We await the complete production of all documents relating to any instance of this practice.

## III.     Reynolds' Preservation of Documents

We are troubled by many of the representations and statements in Reynolds' response to our questions regarding its preservation (or lack thereof) of discoverable and relevant documents. MDL Plaintiffs are coordinating a strategy for dealing with this issue, and will follow up.

At a minimum, Reynolds has represented that Bob Schaefer's emails and documents have been preserved since at least January 19, 2017 (which is when MVSC sent over its draft complaint with the litigation hold notice), and that those preserved documents include any on Mr. Schaefer's local devices, such as laptops, desktops, tablets, and phones used for work. If that is incorrect, please let us know immediately.

## IV.     CDK's Responses to Authenticom's RFPs

**RFP 93**. CDK confirmed that it will produce documents responsive to this Request; that centralized files will be searched; and that CDK will consider any additional search terms that may be necessary to capture the necessary information to calculate CDK's monthly spend on independent integrators from January 1, 2013 to the present.

**RFP 94.** CDK agreed to consider a list of search terms, which we have provided.

**RFP 95.** CDK's response as articulated in May 24th letter is acceptable except, as we stated on the call, to the extent centralized files may contain responsive documents, search terms may not be sufficient and the necessity of a targeted collection should be evaluated.

**RFP 96.** CDK's response as articulated in its May 24th letter is accurate.

**RFP 97.** CDK's response as articulated in its May 24th letter is accurate.

**RFP 98.** CDK's response as articulated in its May 24th letter is acceptable except, as we stated on the call, to the extent centralized files may contain responsive documents, search terms may not be sufficient and the necessity of a targeted collection should be evaluated.

**RFP 99.** CDK's response as articulated in May 24th letter is acceptable except, as we stated on the call, to the extent centralized files may contain responsive documents, search terms may not be sufficient and the necessity of a targeted collection should be evaluated.

**RFP 100.** CDK's response as articulated in its May 24th letter is acceptable except, as we stated on the call, to the extent centralized files may contain responsive documents, search terms may not be sufficient and the necessity of a targeted collection should be evaluated.

**RFP 101.** CDK's response as articulated in its May 24th letter is acceptable except, as we stated on the call, to the extent centralized files may contain responsive documents, search terms may not be sufficient and the necessity of a targeted collection should be evaluated.

**RFP 102.** In addition to what CDK is already producing in response to this Request, Authenticom would be willing to accept as a compromise – instead of having CDK produce every invoice from 2011 to the present for DMI, IntegraLink, and the 3PA program – the following: the full set of invoices for 40 vendor customers of DMI, 40 vendor customers of IntegraLink, and 40 vendor customers of the 3PA program from 2011 to the present. We can discuss the identification of these vendor customers.

**RFP 103.** In addition to what CDK is already producing in response to this Request, Authenticom would be willing to accept as a compromise – instead of having CDK produce every invoice from 2011 to the present for every dealer customer – the following: the full set of invoices for 100 dealer customers from 2011 to the present. We can discuss the identification of these dealer customers.

**RFP 104.** Authenticom agreed to narrow this Request, which we will. There is a larger discussion to be had with respect to security-related documents from Authenticom's prior requests, and we can include the discussion of this RFP with those.

**RFP 105.** Thank you for considering this Request. We await CDK's position.

**RFP 106.** *See supra* the discussion of Auto/Mate FTC documents.

**RFP 107.** These search terms – or variations of them – are included in MDL Plaintiffs' requested search terms.

## V.     Reynolds' Responses to Authenticom's RFPs

**RFP 80.** Reynolds confirmed that it will produce documents responsive to this Request; that centralized files will be searched; and that Reynolds will consider any additional search terms that may be necessary to capture the necessary documents.

**RFP 81.** Reynolds confirmed that it will produce documents responsive to this Request; that centralized files will be searched; and that Reynolds will consider any additional search terms that may be necessary to capture the necessary documents.

**RFP 82.** Reynolds confirmed that it will produce documents responsive to this Request; that centralized files will be searched; and that Reynolds will consider any additional search terms that may be necessary to capture the necessary documents.

**RFP 83.** Reynolds confirmed that it will produce documents responsive to this Request; that centralized files will be searched; and that Reynolds will consider any additional search terms that may be necessary to capture the necessary documents.

With respect to the production of documents or communications not containing passwords and only containing user ids, we agree that Reynolds need not produce such

documents *to the extent they are not otherwise responsive to other RFPs* – and in many if not most instances, those documents likely would be responsive to other RFPs.

**RFP 84.** We met and conferred regarding his Request, as Reynolds' response requested. Having met and conferred, please let us know if Reynolds will produce documents in response to this Request.

**RFP 85.** Reynolds refused to respond to this Request. We met and conferred, and in addition to what Reynolds is otherwise producing regarding RCI pricing information, Authenticom would be willing to accept as a compromise – instead of having Reynolds produce every invoice from 2011 to the present for the RCI program – the following: the full set of invoices for 40 vendor customers of the RCI program from 2011 to the present. We can discuss the identification of these vendor customers.

**RFP 86.** Reynolds refused to respond to this Request. We met and conferred, and in addition to what Reynolds is otherwise producing regarding DMS pricing information, Authenticom would be willing to accept as a compromise – instead of having Reynolds produce every invoice from 2011 to the present for its dealer customers – the following: the full set of invoices for 100 dealer customers from 2011 to the present. We can discuss the identification of these dealer customers.

**RFP 87.** Reynolds confirmed that it will produce documents responsive to this Request; that centralized files will be searched; and that Reynolds will consider any additional search terms that may be necessary to capture the necessary documents.

**RFP 88.** Authenticom agreed to narrow this Request, which we will. There is a larger discussion to be had with respect to security-related documents from Authenticom's prior requests, and we can include the discussion of this RFP with those.

**RFP 89.** These search terms – or variations of them – are included in MDL Plaintiffs' requested search terms.

## VI.    Defendants' Deficient Responses to Authenticom's First Set of Interrogatories

Defendants' responses to Authenticom's Interrogatories are deficient in many respects, and we request a meet and confer to discuss these deficiencies. To the extent the Interrogatories deal with integration pricing or DMS switching information, Defendants have pointed to documents in their productions. Therefore, for now, we will roll the sufficiency of Defendants' responses to those Interrogatories into our discussion of the completeness of Defendants' document productions. *See, e.g.*, CDK Responses to Interrogatory Nos. 1, 3, 4; Reynolds Responses to Interrogatory Nos. 1, 2, 3.

### A.    **CDK's Interrogatory Responses**

**No. 7.** CDK refused to respond to this Interrogatory, and we would like to discuss the basis for CDK's refusal. It is Authenticom's view that this Interrogatory is appropriate and CDK should provide a substantive response.

**No. 11.**  This Interrogatory asks for average tenure of CDK's DMS customers on an annual basis, from 2009 to the present. CDK's response is non-responsive and did not provide the requested information.

**No. 12.**  This Interrogatory asks for market share information for the DMS market.  CDK effectively refused to provide that information, instead listing the number of installed DMSs across various segments.  CDK also did not respond with respect to DMS market share with respect to "car sales."  Finally, this Interrogatory asked for market share over time since 2000, not just current numbers as of 2017.

**No. 14.**  CDK refused to respond to this Interrogatory, which asks for CDK to identify its communications with Reynolds regarding so-called "hostile integration" and/or any third party data integrator.  CDK's position is that it is impossible to respond to this interrogatory.  If that is so, then that is evidence itself of Defendants' liability.  Our position is that CDK should respond to this Interrogatory.

**B.**      **Reynolds' Interrogatory Responses**

**No. 4.**  Reynolds refused to respond to this Interrogatory, and we would like to discuss the basis for Reynolds' refusal.  It is Authenticom's view that this Interrogatory is appropriate and Reynolds should provide a substantive response.

**No. 7.**  This Interrogatory asks for average tenure of Reynolds' DMS customers on an annual basis, from 2009 to the present. Reynolds' response is non-responsive and did not provide the requested information.

**No. 8.**  This Interrogatory asks for market share information for the DMS market. Reynolds did not provide a substantive response.

**No. 10.**  This Interrogatory asks for the identification of all instances of "whitelisting" by Reynolds.  Reynolds refuted that it used that term in the ordinary course of business, or that any such concept exists.  We therefore believe that Reynolds is misinterpreting this Interrogatory, and its response is inadequate.

\* \* \* \* \*

Please let us know if you are available on Tuesday, June 5 at 10:00 a.m. ET to discuss Defendants' interrogatory responses.

Very truly yours,

*s/ Michael N. Nemelka*

Michael N. Nemelka

# Exhibit 3

MAYER·BROWN

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel +1 312 782 0600
Main Fax +1 312 701 7711
www.mayerbrown.com

November 15, 2017

**BY E-MAIL**

**Britt M. Miller**
Direct Tel +1 312 701 8663
Direct Fax +1 312 706 8763
bmiller@mayerbrown.com

Michael N. Nemelka
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036

Re: *Authenticom, Inc. v. CDK Global, LLC, et al.,*
    Case No. 17-CV-318 (W.D. Wisc.)

Dear Mike:

We are in receipt of your November 13 Letter. We note at the outset that contrary to your representation during our lengthy meet-and-confer sessions last week that the only matters outstanding regarding CDK's written discovery responses were "nit" "clean-up" issues, you have now raised several issues with respect to which Authenticom is seeking yet another meet-and-confer. While we are happy to discuss these topics with you, we note that at least one (date range) is a threshold ESI collection issue that should have been raised at the outset of this process.

In any event, in the interest of attempting to resolve Authenticom's concerns related to CDK's responses and objections to Authenticom's First Set of Requests for the Production of Documents ("Requests"), further responses are provided below. Any offers to produce additional categories of documents are subject to and without waiver of CDK's general and specific objections set forth in its initial written responses dated November 1, 2017, and are contingent on resolving the parties' disputes as to the identified Requests.

**The November 13 Letter:**

*Production Timeline*. Authenticom's complaint that Defendants have yet to make a substantial production to date is not well taken.[1] As you are aware, the parties had their Rule 26(f) conference on August 17, 2017. Pursuant to Fed. R. Civ. P. 26(d)(1), Authenticom was free to serve discovery requests on Defendants (indeed, it could have served them prior to August 17 and pursuant to Rule 26(d)(2)(B) they would have been deemed served as of that date). Similarly, it could have served its Requests on August 24, after the parties' telephonic pre-trial conference with Magistrate Judge Crocker during which he set the trial date and the "compressed timeframe and quickly approaching expert deadlines" you reference in your letter. Instead,

---

[1] It is not accurate to say that Defendants have not produced "any documents" as both CDK and Reynolds produced a significant number of documents, comprising over one thousand pages, in connection with the June 2017 preliminary injunction proceedings. *See* CDK-0000001-1435.

Michael N. Nemelka
November 15, 2017
Page 2

Authenticom elected to wait over **_six weeks_**, until October 2, 2017, to serve its first set of RFPs and when it did so, served CDK with nearly 100 such Requests. CDK served its responses and objections on November 1—within the time limit set by the Federal Rules—and agreed to meet-and-confer regarding those responses within two business days of receiving your request to do so. It has since been working in good faith to identify and collect any non-electronic documents and any centrally-stored collections of documents (*i.e.*, those that would not be dependent on search terms or custodians) responsive to those Requests that are not currently in dispute and hopes to begin producing documents next week. As you might expect, the vast majority of the Requests will be answered by custodial searches which CDK will promptly undertake once the parties have reached agreement and/or impasse on the appropriate custodians and search terms. In short, the compressed time frame in which the parties find themselves is due in no small part to Authenticom's delay in serving its initial Requests. Defendants are working with all due speed and are well aware of the upcoming deadlines.

*Search Terms*. You are correct that the parties' ESI stipulation, entered on October 25, requires the parties to meet-and-confer regarding search terms, document custodians, and relevant date limitations. Authenticom's demands notwithstanding, that meet-and-confer was premature until Defendants had responded to the Requests and the parties had met-and-conferred regarding those responses, as the ultimate scope of the Requests necessarily impacts search terms, document custodians, and date limitations (the latter of which are now at issue per your November 13 Letter). With our discussions last week and, hopefully, our discussions over the next few days, we will be able to resolve all or most of the custodian and date limitation issues and work toward proposing our initial list of proposed search terms next week.

*Date Range*. As noted above, you raised this issue for the first time in your November 13 Letter. Indeed, at no point during our meet-and-confer discussions last week did Authenticom object to Defendants' limitation of the relevant start date to January 1, 2013.[2] Not only is that date the outer bound of the applicable limitations period for all of Authenticom's stated claims (*i.e.*, those that it has actually pled in its Complaint), but Defendants believe that it is more than reasonable under the circumstances. As you note in your letter, many of Authenticom's claims center on Defendants' February 2015 agreements and subsequent actions. Thus, 2+ years of discovery prior to those agreements is more than reasonable for Authenticom to develop whatever evidence it thinks it can develop as to the relevant market, the market conditions at the time of the agreements, motive, and intent behind the agreements. Similarly, 4+ years of discovery regarding Defendants' vertical contracting practices is similarly sufficient to establish whatever facts Authenticom thinks it can establish with respect to the anticompetitive nature of those contracts. If there are particular Requests where Authenticom has a good faith basis for a modest extension of the January 1, 2013 date, Defendants are happy to consider it and to further meet-and-confer. Please let us know.

---

[2] We also note that in Authenticom's responses to Defendants' requests for production, Authenticom objects to those requests to the extent they are not "limited in time" and commits to producing documents as from January 1, 2013.

Michael N. Nemelka
November 15, 2017
Page 3

*Request No. 4.* Again, this is a Request that you raise for the first time in your November 13 Letter. While we are happy to meet-and-confer regarding the scope of this Request, we do not agree that Authenticom is permitted to root through every communication and every agreement CDK and Reynolds ever had to see whether it can gin up further allegations against the defendants. As you should be aware (despite your references to it in your responses to Defendants' RFPs), the discovery standard is no longer "reasonably calculated to lead to the discovery of admissible evidence". Rather, as you note elsewhere in your responses, the standard pursuant to Fed. R. Civ. P. 26(b)(1) is that the requested discovery must be relevant to a claim or defense in the litigation *and* proportional to the needs of the case. Consistent with that standard, Defendants will commit to producing non-privileged documents evidencing any agreements as and between CDK and Reynolds regarding access to their respective DMS platforms, independent data integrators, or that are otherwise relevant to any party's claims or defenses. Similarly, Defendants will commit to producing, through a search and review of agreed upon custodians' files, communications discussing any such agreements. Your request that Defendants simply produce it "all" and let Authenticom sort it out is not only unreasonable, it is inconsistent with the Federal Rules. If we need to further meet-and-confer on this issue, please let us know.

*Request No. 5.* Although you alluded to this issue during our meet-and-confer last week, this is the first articulation of Authenticom's position on both the waiver and the crime-fraud exception portions of this Request. We respectfully respond that both issues are without merit. Both Judge Peterson and the Seventh Circuit have held that the February 2015 Agreements were not in and of themselves anticompetitive. *See* Op. Vacating Prelim. Injunction (ECF No. 93) at 6; Dist. Ct. Prelim. Injunction Op. (Dkt. 172) at 14. At most, Judge Peterson opined that they could have an anticompetitive effect. *See* Dkt. 172 at 12. Even under that view of the agreements (which is now in serious doubt in light of the Seventh Circuit's analysis), Authenticom has no basis for seeking privileged communications regarding the agreements and Defendants will not agree to produce them. If there is something short of the production of that information that Authenticom is seeking with this Request then we are happy to meet-and-confer, but if not, then the parties are at an impasse.

### CDK Specific Responses

*Request No. 6.* To the extent that your letter suggests that Authenticom is requesting "integration pricing" that CDK pays for access to data on the Reynolds DMS, that information does not fall within the scope of this Request at all. However, the February 15, 2015 Reynolds Interface Agreement that CDK produced months ago (CDK-0000040) includes pricing information.

*Request No. 9.* The use of quotations around the terms "data integrators" and "solution" in CDK's response to this Request was not an indication that those were the only search terms that CDK intended to use to search for documents responsive to this Request. Rather it was intended to signify its disagreement with Authenticom's use of both terms as CDK believes neither is accurate or appropriate for use in this litigation. CDK nonetheless used both terms in its

Mayer Brown LLP

Michael N. Nemelka
November 15, 2017
Page 4

response as they were used in Authenticom's Request. CDK will search for documents responsive to this Request as it understands both of these terms.

*Request No. 12.* Setting aside that this Request is, like the bulk of Authenticom's Requests, redundant of a number of other Requests (to which CDK has committed to producing responsive information), in an effort to resolve this issue in the short term and subject to and without waiving its general or specific objections, CDK states that in addition to the documents it has already committed to produce in response to this Request, it will produce, to the extent they exist, are within CDK's possession, custody, and control and can be identified through a reasonable search and review of agreed upon custodians' files, non-privileged communications regarding "coordination, joint efforts, assistance, and exchanges of information between Reynolds and CDK aimed at blocking third party integrators."

*Request No. 28.* CDK has clearly stated the basis for its objection to this Request—namely that it is grossly overbroad and unduly burdensome as written in that it literally seeks "all documents and communications" regarding manual extraction of data from CDK's DMS for a 10+ year period. Setting aside the time period issue (addressed above), CDK is at a loss as to why documents sufficient to show the various subcategories of documents sought by this Request are not sufficient. Under CDK's formulation, Authenticom will receive documents sufficient to show when dealers gained the capability to manually extract data from the DMS. Under Authenticom's formulation, CDK would be required to produce every single document and communication that mentions a dealer receiving the capability to manually extract data from the DMS. As the relevant question is limited to "when" dealers gained that capability, documents "sufficient to show" that information should be sufficient; "all documents" relating to that question would be punitive and unduly burdensome. The same is true of the other sub-categories. If the concern is "communications" regarding manual extraction (which is the only thing that CDK can conceptualize is not squarely addressed by its offer of documents sufficient to show the requested information), then to the extent they exist, are within CDK's possession, custody, and control and can be identified through a search and review of agreed upon custodians' files, CDK will produce non-privileged communications regarding dealers' ability to manually extract data from the CDK DMS for the period January 1, 2013 to the date of CDK's collections of documents for purposes of responding to the Requests.

*Request No. 41.* Subject to the other limitations set forth in its response (*e.g.*, time period, a search and review of reasonable sources, etc.), CDK intends to produce documents and communications relating to the contract term identified in the Request (or any other similar provision).

*Request No. 72.* As with Request No. 9, the use of quotations around the term "data integration services" in CDK's response to this Request was not an indication that that was the only search terms that CDK intended to use to search for documents responsive to this Request. Rather it was intended to signify its disagreement with Authenticom's use of the term as CDK does not believe that it is accurate or appropriate as used by Authenticom in connection with the services it provides. CDK nonetheless used the term in its response as it was used in Authenticom's

Michael N. Nemelka
November 15, 2017
Page 5

Request.  CDK will search for documents responsive to this Request as it understands the term.
As for the "data integrators" CDK has agreed to search for, if Authenticom has specific entities
in mind, CDK is happy to consider them, otherwise CDK will search for documents related to
non-CDK "data integrators" as it understand the term.

### **Follow-Up from the November 8 and 9 Meet-and-Confer Sessions:**

With respect to the issues you raised during our meet-and-confer session on November 8 and 9,
CDK responds as follows.  As above, any offers to produce additional categories of documents
are subject to and without waiver of CDK's general and specific objections set forth in its initial
written responses dated November 1, 2017 (including as to time period, and to the sources of
documents to be searched), and are contingent on resolving the parties' disputes as to the
identified Requests.

*Request No. 1 (Documents Produced in Response to Government Investigations).*  In addition to
pre-existing business records that are responsive to this Request, which CDK has already
committed to produce, Authenticom requested that CDK produce narrative responses,
correspondence, and "white papers" provided to the government in response to CIDs and
subpoenas.  As we stated during our meet-and-confer, however, correspondence and white
papers prepared by counsel are not evidence, nor is it appropriate for Authenticom to simply rely
on the government's discovery efforts in other proceedings in lieu of conducting its own
discovery in this litigation.

Notwithstanding these objections or those set forth in its responses, in addition to pre-existing
business records, CDK is willing to produce any factual summaries, data compilations, or
presentations created and provided to the government for purposes of responding to government
CIDs and subpoenas, to the extent that they are relevant to the claims and defenses in this
litigation and not otherwise privileged.  CDK continues to object to producing documents created
specifically to present legal argument or advocacy to the government, whether in the form of
white papers, correspondence, analyses, or other.

*Request No. 17 ("SMART-R").* As we explained during our meet-and-confer, "SMART-R" is a
version of a long-defunct program developed by IntegraLink a decade ago, before it was
acquired by CDK. Moreover, no claim or defense in this litigation depends on the former
business practices of IntegraLink or the technical manner in which it previously accessed
Reynolds's DMS.

Notwithstanding these objections or those set forth in its responses, CDK will produce non-
privileged documents and communications discussing the use of the SMART-R program to
access Reynolds's DMS, its effectiveness (or ineffectiveness), and its discontinuation, as
identified through a search and review of agreed upon custodians' files.

*Request No. 19 (DMI and IntegraLink Access to Non-CDK, Non-Reynolds DMSs).*  This Request
is even farther afield than Request No. 17 in terms of its possible relevance to any claim or

Michael N. Nemelka
November 15, 2017
Page 6

defense in this litigation. How DMI and IntegraLink might access *other* DMS providers' platforms, much less the "technological means" by which they do (or did) so, has no bearing on whether CDK and Reynolds entered into some unlawful agreement concerning their own respective DMS access policies.

Notwithstanding these objections or those set forth in its responses, CDK is willing to produce documents, to the extent that they are available and maintained by CDK in the ordinary course of business, sufficient to show (a) which non-CDK, non-Reynolds DMSs DMI and IntegraLink access, (b) what type of access they have (*e.g.*, if they have access to data that is "pushed" by the DMS provider), and (c) how they generally store and transfer data.

*Request No. 25 (Agreements with Other Providers of "Data Integration Services")*.  During the parties' meet-and-confer discussions, Authenticom conceded the vast overbreadth of this Request, which if read literally, would encompass any agreement of any type between CDK and any provider of "data integration services," on any subject matter, whenever created. Moreover, any agreements between CDK and third-party providers of "data integration services" as to non-CDK, non-Reynolds DMSs have no relevance to whether CDK had valid and legitimate business reasons to begin restricting unauthorized third-party access to its own DMS, much less whether it formed an unlawful agreement with Reynolds to do so.

Notwithstanding these objections or those set forth in its responses, CDK is willing to produce agreements with third-party providers of "data integration services" with respect to access to data maintained on CDK or Reynolds's DMSs, and for any other DMS providers with policies restricting unauthorized third-party access.  CDK is also willing produce non-privileged documents and communications discussing such agreements, as identified through a search and review of agreed upon custodians' files.

*Request Nos. 35 & 36 (DMS Customer Switching)*.   During the parties' meet-and-confer discussions, Authenticom argued that documents responsive to these Requests would show whether CDK possesses "market power" as to DMS customers.  If that issue is relevant at all, it is to Authenticom's tying claim, which is subject to a pending motion to dismiss and which the Seventh Circuit recently characterized as "dubious in the extreme."  *See* ECF No. 93 at 13. Further, as CDK explained, it does not maintain data in the ordinary course of its business that would allow it to create a report sufficient to show the "tenure" of all current DMS customers. The average customer "tenure" statistics that appear in certain public reports filed by CDK are based on annual customer switching data (*e.g.*, as a hypothetical, if there were 20% customer turnover in a given year, then the average customer tenure would be approximated at five years). To the extent that Authenticom wants to investigate further, CDK has already agreed to produce documents sufficient to show win/loss statistics for its DMS customers in response to Request Nos. 31, 32, and 33, among others.

Notwithstanding these objections or those set forth in its responses, and in addition to the categories of documents noted above, CDK is willing to produce non-privileged documents and communications created after January 1, 2015 that discuss any loss or potential loss of DMS

Michael N. Nemelka
November 15, 2017
Page 7

customers in connection with SecurityFirst, as well as summary-level statistics on DMS customer tenure or switching, as identified through a search and review of agreed upon custodians' files.

*Request Nos. 46, 47, 48, 49, 62, 63 & 68 (DMI and IntegraLink Contracts and Pricing)*.  In addition to the categories of documents that CDK has offered to produce in response to Request No. 17, and notwithstanding its objections set forth in its responses, CDK is willing to produce non-privileged documents sufficient to show a representative sample of managed data services contracts between DMI and IntegraLink (on the one side) and vendors and/or dealers (on the other), as well as the current versions of DMI and IntegraLink's standard managed data services contract terms and conditions, if any.  CDK is also willing to produce non-privileged documents and communications, if any, comparing prices charged by DMI and IntegraLink for access to data on CDK's DMS against prices charged by CDK through the 3PA program, as identified through a search and review of agreed upon custodians' files.

*Request Nos. 51, 52, 53, 54 & 55 (DMS Pricing)*.  Here again, Authenticom argues that this information will show whether Defendants possess "market power" or the ability to raise prices for DMS customers—issues that would be relevant, if at all, to Authenticom's "dubious in the extreme" tying claim.  Moreover, even if prices for DMS service were relevant, "projections" for revenue and profit (as sought in Request No. 55) have no bearing on whether the prices charged by Defendants for DMS services were at, above, or below competitive levels.

Notwithstanding these objections or those set forth in its responses, CDK is willing to produce documents or information sufficient to show its monthly basic DMS pricing and revenue for DMS services, from January 1, 2015 to the date of CDK's collections, to the extent such data are maintained by CDK in the ordinary course of its business and can be provided in a reasonably usable format without causing CDK to incur unreasonable burden and expense.

*Request No. 56 (Auto/Mate Acquisition)*.   Notwithstanding its objections set forth in its responses, CDK is willing to produce any pre-existing business documents produced by CDK to the Federal Trade Commission ("FTC") in connection with the FTC's Second Request regarding CDK's planned acquisition of Auto/Mate, as well as any factual summaries, data compilations, or presentations created and provided to the government for purposes of responding to the Second Request, to the extent such documents are relevant to the claims and defenses in this litigation, and are not protected from disclosure by an applicable privilege.

*Request Nos. 57, 58, 59, 60, 61, 65, 66, 67, 69 & 70 (3PA Pricing)*.  During the parties' meet-and-confer discussions, Authenticom stated that it is seeking data and summary-level business records (*e.g.*, reports and memoranda) through these Requests that would allow for comparison between CDK's prices for 3PA services before and after it began "blocking" Authenticom and other unauthorized third-party data extractors in mid-2016.  Of course, to the extent that CDK believed (or data supports) that excluding unauthorized third parties—whose business model is based on free-riding on CDK's systems, investments, and intellectual property—would support raising prices, that is both unsurprising and a strong *unilateral* incentive for CDK to have acted

Michael N. Nemelka
November 15, 2017
Page 8

in the manner it did. Further, CDK's own costs and profits (and projections as to the same) have no bearing on whether the prices charged for 3PA services before and after SecurityFirst were at, above, or below competitive levels.

Notwithstanding these objections or those set forth in its responses, CDK is willing to produce documents or information sufficient to show its monthly pricing and revenue for services offered through the 3PA program, from January 1, 2015 to the date of CDK's collections, to the extent such data are maintained by CDK in the ordinary course of its business and can be provided in a reasonably usable format without causing CDK to incur unreasonable burden and expense.

*Request No. 71 (Vendor "Pass-Through")*. Notwithstanding its objections set forth in its responses, CDK is willing to produce non-privileged documents and communications that discuss vendor "pass through" of 3PA fees (or which use similar terms), as identified through a search and review of agreed upon custodians' files.

*Request No. 73 (OEM Pricing)*. During the parties' meet-and-confer discussions, Authenticom argued that OEMs are "just another vendor." That is incorrect. The managed data services that CDK offers to OEMs are subject to highly individualized contract negotiations. These services are not offered through CDK's 3PA program, nor do the pricing terms of CDK's agreements with OEMs have any bearing on the prices that CDK charges vendors for data access and integration services through the 3PA program. Accordingly, CDK intends to stand on its objections to this Request.

*Request No. 74 (DMS Technical Specifications)*. During the meet-and-confer, Authenticom attempted to justify its requests for broad and unbounded discovery into the technical workings of CDK's DMS—including all underlying code, scripts, and algorithms—as necessary for its experts to "test" whether CDK's concerns about data security, data integrity and system performance issues caused by unauthorized third-party access are genuinely held. Yet, CDK is already producing documents and communications regarding SecurityFirst and its justifications (including in response to Request Nos. 26 and 27, which seek, among other things, "[a]ll documents and communications relating to the reasons CDK introduced the 'Security First' and/or '3PA Refresh' initiative"). In short, producing the technical details of its entire DMS is unnecessary, overly burdensome, and unduly prejudicial given the highly sensitive nature of the requested information—particularly in the hands of Authenticom, whose business model remains premised on gaining unauthorized access to CDK's DMS and evading detection by CDK's network and computer systems. To date, Authenticom has not articulated a reasoned basis for requesting this information and CDK does not believe one exists. Accordingly, CDK intends to stand on its objections to this Request.

*Request No. 79 ("Blocking" Methods)*. Authenticom clarified during the parties' meet-and-confer discussions that it is principally seeking communications and other writings (as opposed to "all documents") that discuss or describe the methods that CDK has used to "block" or otherwise restrict or disable Authenticom's unauthorized DMS access.

Mayer Brown LLP

Michael N. Nemelka
November 15, 2017
Page 9

Subject to this clarification, and notwithstanding its objections set forth in its responses, CDK is willing to produce non-privileged documents and communications describing the methods it has used to block, restrict, or disable Authenticom's unauthorized DMS access, as identified through a search and review of agreed upon custodians' files. However, none of the foregoing should be read to suggest that CDK agrees or intends to produce documents or communications reflecting the technical details of its "blocking" methods or of its DMS platform generally.

_Request Nos. 86 & 87 (Elliott Management)_. During the parties' meet-and-confer discussions, it became clear that these Requests are based on speculation—and nothing more—that institutional investor Elliott Management could have in some way influenced CDK's decisions to exclude third-party integrators from its DMS. However, based on our investigation to date, which remains ongoing, the handful of communications between CDK and Elliott Management of which we are aware do not touch on this issue, much less reference SecurityFirst, the 3PA "refresh," or even the 3PA program generally. Indeed, Elliott Management did not even become an investor in CDK until after the February 2015 agreements that Authenticom claims is the root of the alleged conspiracy. Communications with or otherwise related to Elliott Management that pertain to other, unrelated aspects of CDK's business operations are irrelevant.

Notwithstanding these objections or those set forth in its responses, to the extent that CDK subsequently identifies any non-privileged communications with or otherwise related to Elliott Management in its search and review of agreed upon custodian documents that refer to CDK's "SecurityFirst" or 3PA "refresh" strategies, it is willing to produce such documents.

_Request No. 91 ("Tilt the Table")_. The significance of this issue continues to escape us. To be clear, it is in no way anticompetitive for CDK to leverage _its own_ resources and facilities—which it has developed at considerable investment and expense—to advantage its own products and service offerings (or those of its corporate affiliates) over products and services offered by third parties and competitors. Far from indicating an unlawful agreement with Reynolds, such evidence would tend to show that there were strong _unilateral_ incentives for CDK to have acted in the manner it did.

Notwithstanding these objections or those set forth in its responses, CDK is willing to produce documents and communications referencing the adoption (or not) of any "tilt the table" (or similarly-worded) strategy, or otherwise related to the establishment (or not) of "closed" application categories in connection with SecurityFirst and/or the 3PA strategy "refresh," as identified through a search and review of agreed upon custodians' files.

### Custodians

In your November 8, 2017 email, Authenticom asks that CDK add 15 additional custodians to the list of 13 custodians whose documents CDK has already agreed to search in response to Authenticom's RFPs—for a total of 28 custodians. Although two of the identified individuals—Steven Anenen and Brian MacDonald (CDK's former and current CEO)—were identified in Authenticom's August 31, 2017 Rule 26(a) disclosures as individuals Authenticom believed

Michael N. Nemelka
November 15, 2017
Page 10

might have knowledge relevant to the claims and defenses in this litigation, Authenticom has provided no explanation for its inclusion of the other 13. Moreover, given Authenticom's professed concern regarding the "compressed time schedule" the parties face in this matter, its identification, some 60+ days later, of 15 additional potentially relevant individuals rings hollow.

Nonetheless, in an effort to resolve this matter and promptly move to the discovery process forward, CDK is willing to add three of the requested custodians—Steven Anenen, Beth Ayotte, and Jeff Nosick—to its list of agreed custodians. For the reasons briefly identified below, CDK believes the other 12 are inappropriate additions but is willing to meet-and-confer with Authenticom if Authenticom believes that it has some legitimate basis for their inclusion.

1. *Brian MacDonald, current CEO*. As Authenticom is aware, Steve Anenen was CDK's CEO until June 30, 2016—*i.e.*, during all of the events at the core of Authenticom's allegations. Mr. McDonald, whose tenure at the company post-dates the relevant period, has no involvement in the day-to-day operations of the aspects of the business at issue and would not reasonably be expected to have documents responsive to Authenticom's RFPs that are not otherwise contained in the files of other agreed upon custodians, most notably, Robert Karp, the President of CDK North America.

2. *Matt Parsons, former Vice-President of Sales*. Mr. Parsons is no longer with CDK and was not on any legal hold at the time of his departure (prior to the filing of the instant litigation). As a result, none of his documents were preserved and no data is available.

3. *Kevin Henahan, former Senior Vice-President of Marketing*. Mr. Henahan left CDK well before the events at issue in Authenticom's complaint and thus, to the extent CDK has any materials still within its possession, custody, or control from his files, it would not reasonably expect them to contain information relevant to the claims and defenses in this litigation.

4. *Mark Roman, former Director of Sales, DMI*. Mr. Roman is no longer with CDK. Moreover, CDK does not expect that his files would contain documents relevant to the claims and defenses in the litigation that would not otherwise be contained in the files of other agreed upon custodians, most notably, Jeff Nosick, Mr. Roman's supervisor and the Vice-President of Sales for CDK's Partner Program.

5. *Mike Matlock, Account Director, Data Services*. Mr. Matlock works with a subset of individual customers regarding individual customer integrations and would not reasonably be expected to have relevant documents responsive to Authenticom's RFPs that are not otherwise contained in the files of other agreed upon custodians, most notably, Beth Ayotte, Mr. Matlock's supervisor.

6. *Terry Blosie, Integration Analyst*. Mr. Blosie performs integration certifications and develops integration points. In short, his role at CDK is purely a technical one such that he would not reasonably be expected to have documents relevant to the claims or

Mayer Brown LLP

Michael N. Nemelka
November 15, 2017
Page 11

defenses in this litigation. Moreover, CDK would expect that any relevant documents he might have would be redundant of those in other agreed upon custodians' files, most notably those of Mike Noser.

7. *Vicki Litke, Integration Analyst*. Like Mr. Blosie, Ms. Litke performs integration certifications and develops integration points. In short, her role at CDK is purely a technical one such that she would not reasonably be expected to have documents relevant to the claims or defenses in this litigation. Moreover, CDK would expect that any relevant documents she might have would be redundant of those in other agreed upon custodians' files, most notably Mike Noser's files.

8. *DeAnne Hodum, Solutions Engineer*. Ms. Hodum performs a largely administrative role in CDK's organization, focusing on the preparation of SOWs and other contract documents for review and refinement by others within the company. In short, she would not reasonably be expected to have relevant documents responsive to Authenticom's RFPs.

9. *Daniel Flynn, President, CDK North America (as of December 1, 2017)*. As has been publicly announced, Mr. Flynn will succeed Mr. Karp as President of CDK North America on December 1, 2017. In his current role and in the minimal amount of time he has been with the company (less than 2 years) he has played no management or directive role in the business currently at issue. As such, he would not reasonably be expected to have documents relevant to the claims or defenses in this litigation.

10. *Michael Kane, Account Director*. Mr. Kane, like Mr. Bloskie and Ms. Litke, ultimately reports to Mr. Noser (a custodian) and occupies a technical role in connection with the certification of partner integration. In short, his role at CDK is purely a technical one such that he would not reasonably be expected to have documents relevant to the claims or defenses in this litigation. Moreover, CDK would expect that any relevant documents he might have would be redundant of those in other agreed upon custodians' files, most notably Mike Noser's files.

11. *Jesse Traucht, Account Operations Manager*. Like Mr. Matlock, Mr. Traucht is an account director who focuses on a subset of individual managed data services customers and would not reasonably be expected to have relevant documents responsive to Authenticom's RFPs that are not otherwise contained in the files of other agreed upon custodians, most notably, Kevins Distelhorst, the head of Mr. Traucht's division.

12. *Kevin Kelley, former Product Manager*. Mr. Kelley is no longer with CDK and was not on any legal hold at the time of his departure (prior to the filing of the instant litigation). As a result, none of his documents were preserved and no data available.

Michael N. Nemelka
November 15, 2017
Page 12

* * * * * *

We remain hopeful that the foregoing resolves most, if not all, of the parties' outstanding disputes.  As always, we stand ready to meet-and-confer in good faith in the event Authenticom is willing to do the same and that further discussion of any of these issues would be productive.

Sincerely,

Britt M. Miller

cc:     Mark Ryan
        Matt Provance
        Aundrea Gulley
        Brian Ross

# Exhibit 4

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
_____
(202) 326-7900
FACSIMILE:
(202) 326-7999

November 24, 2017

*Via Electronic Mail*

Brian T. Ross                                    Britt M. Miller, Esq.
Gibbs & Bruns LLP                                Mayer Brown
1100 Louisiana                                   71 South Wacker Drive
Suite 5300                                       Chicago, IL 60606
Houston, TX 77002

      Re:    *Authenticom, Inc. v. CDK Global, LLC and The Reynolds and Reynolds Company*, Case No. 17-cv-318 (W.D. Wis.)

Dear Britt and Brian,

      I write in response to your letters dated November 15 (CDK) and November 16 (Reynolds), which were in response to our letter of November 13, 2017, and the meet and confer we had regarding Defendants' responses to Authenticom's document requests.

      While we appreciate the concessions you have each offered with regard to some of our requests, we believe other responses remain deficient. Despite the remaining distance between our positions, we are hopeful compromise is still available on most if not all of the requests. We will address each topic in turn.

      **Search Terms.** Your attempt to tie issues of date limitations and custodians to the issue of proposed search terms is inappropriate – neither the custodians to be searched nor the date range to be reviewed reasonably impacts the formulation of appropriate search terms. Similarly, although there are disputes as to the scope of Defendants' compliance with certain requests, many others are not and have not been in dispute. Thus none of these disputes in any way prevented Defendants from formulating proposed search terms and exchanging those initial proposals to Authenticom. It has been nearly two months since we first asked Defendants to exchange search terms. The delay in Defendants exchanging search terms – which they just did today – has caused substantial prejudice and delay. By delaying, Defendants are in noncompliance with the court-ordered (and agreed to) ESI protocol that required the exchange and discussion of search terms as soon as possible.

      Today, we received your search terms. They are woefully inadequate. Why did it take Reynolds two months to come up with a handful of search terms that consist mainly of the names

of custodians and the parties? We will send you proposed – and necessary – additions to Defendants' search terms.

**Date Range.** Without waiving or otherwise limiting Authenticom's previously asserted positions, in the interest of compromise, Authenticom is willing to accept Defendant's proposed start date of January 1, 2013 as the primary collection start date, subject to limited exceptions for the following specific requests:

- Reynolds Requests No. 45-50, 56-59 (seeking RCI and DMS pricing and financial information): Authenticom believes DMS and RCI pricing back to at least 2007 is necessary for Authenticom to properly show the impact and anticompetitive effects on the Data Integration Market generally, and the single product aftermarket of Reynolds DMS Data Integration in particular (under Authenticom's Section 2 claims).

- Reynolds Requests No. 64, 66, 67,68,69, 71, 72 (seeking documents concerning the implementation and development of Reynolds security measures over time and the motives therefor): Reynolds has put forward a security rationale as a supposed procompetitive justification for all of the activities at issue in this case, including the allegations of anticompetitive conduct targeted at both the Data Integration market as a whole, and the single product aftermarket of Reynolds DMS data integration in particular. Because Reynolds first began implementing these actions in earnest in 2009, Authenticom believes documents in these categories back to 2009 go to the core of one of Reynolds' main defenses in the case, and are thus reasonable and proportional to the needs of the case.

- CDK Requests No. 46, 47, 48, 49, 51, 52, 53, 54, 55, 57, 58, 59, 60, 61, 62, 63, 65, 66, 67, 68, 69 & 70 (seeking CDK DMS and Data Integration pricing and financial information): Authenticom believes DMS and Data Integration pricing back to at least 2009 is necessary to show the impact and anticompetitive effects on the Data Integration Market generally, and the single product aftermarket of CDK DMS Data Integration in particular (under Authenticom's Section 2 claims).

- CDK Requests No. 20 (documents, communications, and statements … with respect to third-party access to dealer data): Given the length of many CDK DMS contracts, documents and communications either touting CDK's open data access policy, or internally discussing any competitive advantage or disadvantage presented by CDK's open platform compared to Reynolds, Authenticom believes this documents responsive to this request going back to at least 2007 are appropriate, relevant, and proportional to the needs of the case. As you know, some of the key representations made by CDK's former CEO, chief marketing officer, and others were made in 2007.

**Request No. 1 (Government Investigations).** Reynolds has agreed that, in addition to the previously agreed scope of production pursuant to this request, it will also produce relevant documents that are and were generated specifically for purposes of government investigations to

- 2 -

the extent such documents are purely factual in nature. Similarly, CDK has agreed that, in addition to pre-existing business records produced in response to government investigations, it "will produce any factual summaries, data compilations, or presentations created and provided to the government for purposes of responding to government CIDs and subpoenas, to the extent that they are relevant to the claims and defenses in this litigation and not otherwise privileged."

We appreciate Defendants' movement on this request, but it is not sufficient. Defendants should produce all documents that they have (or will) provide to the FTC on issues that relate to this case, including if those documents contain legal argument, expert analysis, or take the form of white papers, powerpoint presentations, or otherwise. And given that the FTC investigation is directly on point to the issues in this case, there is no basis for Defendants to withhold such documents on grounds of relevance. The black-letter rule is that if you turn over work product to an adversary – and the FTC in this context is an adversary – a party waives any work product protections. There are scores of cases compelling disclosure of such materials. *See, e.g.*, *Clark v. Experian Info. Sols., Inc.*, 2006 WL 626820, at *5 (N.D. Ill. Jan. 6, 2006) (nothing protects "documents prepared by Defendants especially in response to requests by the FTC for information… [because] … voluntary disclosure to an investigating governmental agency has been held to waive even attorney work product protection"); *In re Qwest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1192 (10th Cir. 2006) ("[W]e conclude the record in this case is not sufficient to justify adoption of a selective waiver doctrine as an exception to the general rules of waiver upon disclosure of protected material. Qwest advocates a rule that would preserve the protection of materials disclosed to federal agencies under agreements which purport to maintain the attorney-client privilege and work-product protection but do little to limit further disclosure by the government. The record does not establish a need for a rule of selective waiver to assure cooperation with law enforcement, to further the purposes of the attorney-client privilege or work-product doctrine, or to avoid unfairness to the disclosing party"); *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1128 (9th Cir. 2012) ("Given that Congress has declined broadly to adopt a new privilege to protect disclosures of attorney-client privileged materials to the government, we will not do so here."); *id.* at 1127 ("'selective waiver' initially accepted by the Eight Circuit, *Diversified Industries, Inc. v. Meredith,* 572 F.2d 596 (8th Cir.1978) (en banc), but rejected by every other circuit to consider the issue since, *see In re Qwest Commc'ns Int'l,* 450 F.3d 1179, 1197 (10th Cir. 2006)"); *see also In re Steinhardt Partners, L.P.,* 9 F.3d 230, 235, 236 (2d Cir.1993) (work product protection waived with respect to a document which the defendant had produced to the SEC in the hope of preventing a formal investigation); *In re Bank One Securities Litigation,* 209 F.R.D. 418, 423-24 (N.D.Ill.2002) (work product protection waived as to submissions made by Bank One to the Office of the Comptroller of the Currency during the Office's investigation of Bank One).

Since the documents provided by Defendants to the FTC are relevant – whether or not they were "pre-existing," contain legal or factual summaries and representations, are in the form of white papers, expert reports, or presentations – Defendants have no grounds to withhold those documents absent privilege. And since Defendants have waived privilege by providing such documents to the FTC, *see id.*, Defendants have no grounds to withhold the production of such documents. Please confirm that Defendants will immediately produce such documents, or if the parties are at an impasse.

**Request No. 4 (Defendants' Agreements).**  Thank you for agreeing to produce – in addition to "non-privileged documents evidencing any agreements as and between CDK and Reynolds regarding access to their respective DMS platforms, independent data integrators, or that are otherwise relevant to any party's claims or defenses," – "communications discussing" any such agreements.  Please also confirm that Defendants will also produce any documents – not just communications – relating to those agreements.

**Request No. 5 (Communications regarding Agreements).**  Although CDK's November 15 letter responds to Authenticom's position concerning the crime-fraud exception, it is silent on Authenticom's contention that Defendants have waived the attorney client privilege with regard to the February 2015 agreements by specifically relying on the fact of counsel's advice to support their defenses.  At the preliminary injunction proceeding and in their briefing, both Defendants specifically relied on the fact that they were represented by sophisticated counsel as a basis for concluding that the written agreements were not illegal.  *See, e.g.*, ECF No. 105 at 26 ("[I]t is simply implausible… sophisticated business entities *represented by experienced in-house and outside counsel . . .* would commit a *per se* violation of the Sherman Act by reducing it to a lengthy written agreement.") (emphasis added).   By relying on the advice-of-counsel defense to defend the legitimacy of the agreements, Defendants have put the advice of their attorneys concerning those agreements at issue in the case and thus waived the privilege against production of those communications.  *See Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1175 (7th Cir. 1995) ("the attorney-client privilege is generally waived when the client asserts claims or defenses that put his attorney's advice at issue in the litigation"); *accord Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1163 (9th Cir.1992) ("When a party puts at issue legal advice it received, *e.g.*, by way of an advice of counsel defense, it waives the attorney-client privilege with respect to those communications.").  To the extent Defendants believe that they have a good-faith basis for asserting that they have *not* placed at issue the advice of counsel concerning the agreements, Authenticom remains willing to consider Defendants' argument.  But if Defendants do not have a valid argument – and they have not provided one to date – then it appears we are at an impasse on this issue.

**Sources of ESI.**  Thank you for confirming that, for those requests where Reynolds and CDK have agreed to produce documents pursuant to a diligent ESI search, they will also perform a good faith search of central or shared file locations where documents that are responsive to the particular Requests may be found.  If this understanding is incorrect, please let us know.

**Communications with Vendors and/or Dealers.**  Given that many of Defendants' responses are limited to agreed-upon custodians and search terms, we are concerned that many relevant documents will be excluded from those parameters.  For example, we believe that CDK and Reynolds have communicated with its vendor and dealer customers through customer relationship management software or other similar means.  How are those sources going to be searched?

Similarly, many relevant communications will be general marketing materials that may not be associated with specific custodians.  That is why it is important that Defendants search centrally maintained marketing materials for responsive documents.  Please confirm that Defendants are doing so.

**Timing of Productions.** We thank Reynolds for their initial production. We are still waiting on an initial production from CDK. When can we expect CDK's initial production, and subsequent productions from Reynolds?

<u>Reynolds</u>

**ESI of of former Reynolds President Ron Lamb.** Brian, in your e-mail of November 7, 2017, you indicated that while Reynolds was willing to search former President Ron Lamb as a document custodian for electronic searches, "Mr. Lamb's employment ended prior to Reynolds receiving notice of this lawsuit, so the volume of available ESI for this custodian may be very limited." During our prior meet and confer, we raised our concern that, given that Reynolds had already been sued months earlier in a litigation (MVSC) that Reynolds itself has described as "unquestionably overlap[ping]" in factual questions with Authenticom – and given that MVSC specifically sent Reynolds a litigation hold demand months before Mr. Lamb's employment ended, including listing specific categories of documents that should be preserved (with many of those categories being equally applicable to Authenticom) – Reynolds would clearly have a reasonable expectation that the documents of its president during the relevant time period would be relevant to anticipated litigation. *Jones v. Bremen High Sch. Dist. 228*, No. 08 C 3548, 2010 WL 2106640, at *6 (N.D. Ill. May 25, 2010) ("A defendant has a duty to preserve evidence that it has control over and which it reasonably knows or can foresee would be material (and thus relevant) to a potential legal action"); *see also Larson v. Bank One Corp.*, No. 00 C 2100, 2005 WL 4652509, at *11 (N.D. Ill. Aug. 18, 2005) (defendant "could have reasonably foreseen these documents' relevance as a result of" related lawsuits filed months before present suit); *accord Zubulake v. UBS Warburg*, LLC, 220 F.R.D. 212, 216 (S.D.N.Y.2003) ("the obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation"); *Henkel Corp. v. Polyglass USA, Inc.*, 194 F.R.D. 454, 456 (E.D.N.Y.2000) (a party's obligation to preserve evidence arises when it has notice of the evidence's relevance to litigation "likely to be commenced").

The destruction of Mr. Lamb's documents for purposes of the MVSC lawsuit is a serious issue, and will need to be addressed in that case; but it is no less serious with respect to the Authenticom matter, given Defendants' own representations to the JPML panel of the overlapping factual issues and the MSVC litigation demand (which included many issues relevant to the Authenticom matter) that necessitated preservation of Mr. Lamb's documents. And Mr. Lamb was no ordinary employee – he was Reynolds' president.

For starters, please provide information regarding (1) when Mr. Lamb's employment with Reynolds terminated; (2) whether he had (or has) any continuing relationship with Reynolds post-employment; (3) when Reynolds destroyed his documents; (4) which categories of documents of Mr. Lamb were not preserved; and (5) whether there are any documents of Mr. Lamb that were preserved, and which documents those are.

Given the fact that Reynolds did not preserve the documents of its own president, it calls into question whether Reynolds did not preserve other relevant documents. In this regard, when

did Reynolds institute a litigation hold? Is Reynolds still destroying documents? What other relevant document custodians have left Reynolds' employment this year, and were their documents preserved?

Also, with respect to the ESI protocol, Reynolds represented that only duplicative information was contained on "back-up tapes" and so those backup tapes would not be preserved. With this information about the non-preservation of Mr. Lamb's documents, those back-up tapes now have a renewed importance.

**Reynolds Request No. 15 ("Documents and communications regarding the VPN tunnel that CDK provided to Authenticom").** Authenticom accepts your offer that, based on a reasonable inquiry, Reynolds has no documents responsive to this request.

**Reynolds Request No. 17 (CDK's "SMART-R" Program).** Thank you for agreeing to include "SMART-R" in "its ESI search criteria for the agreed upon time frame and custodians." In the spirit of compromise, Authenticom will accept Reynolds proposal for this request if Reynolds agrees to the following two modifications: 1) that, in addition to its search of custodians, Reynolds will also apply that search term to relevant non-custodial sources, and 2) that Reynolds will include search terms of analogous terms or internal code-names for "SMART-R", if any.

**Reynolds Request Nos. 9, 19, 25, 62 (Reynolds' Agreements with Third-Party Integrators).** Thank you for your proposed compromise of producing, in addition to your previously agreed scope of production, "any agreements between Reynolds and third-party integrators with respect to data maintained on CDK or Reynolds's DMS, and for any other DMS providers that prohibit such third party access, along with a reasonable custodian-based search for other documents relating to those agreements." In the interest of compromise, Authenticom is largely willing to accept Reynolds' proposal, with the following proposed modification: "any agreements between Reynolds and third-party integrators with respect to data maintained on CDK or Reynolds's DMS, and for any other DMS providers, along with a reasonable custodian-based search for other documents relating to those agreements." Authenticom believes this proposed compromise properly strikes the balance between the necessary discovery concerning market definition, scope, and the claims and defenses presented, while balancing the burden on Reynolds.

Please also confirm that Reynolds will also produce documents and communications related to those agreements.

**Reynolds Request No. 36 (DMS "Tenure").** Thank you for your proposal of producing "reasonable, summary-level statistics regarding the tenure of a representative sample of [Reynolds'] DMS customers." While we appreciates this offer, we believe that, to the extent Reynolds has readily-available documents relating to DMS tenure, Authenticom is entitled to those documents. During the preliminary injunction proceeding, Reynolds conceded that DMS tenure is around 20 years. *See* Response to Authenticom's SOF. Reynolds had documents and information in its possession in order to provided that response. Again, Authenticom is entitled

to that information.  In short, in lieu of full compliance with the request, Reynolds should produce all readily available documents it has in its possession regarding DMS tenure.

**Reynolds Request No. 42 (RCI Contracts)**.  Thank you for your proposal of producing "a representative, current RCI Agreement with vendor-specific identifying information redacted" as well as any other versions or templates that "materially vary from the Plaintiff's Preliminary Injunction Hearing Exhibit 53 with respect to any alleged exclusive dealing … or price confidentiality provisions."  In the spirit of compromise, Authenticom will accept Reynolds' proposal for this request if Reynolds agrees to the following two modifications: 1) to the extent any external modifications or waivers of the material terms of the contract at issue have been agreed to by Reynolds, Reynolds will produce such external modifications or waivers of the material terms, and 2) Reynolds will also produce an analysis of the distribution of use (as a percentage of contracts) of each variant of the contracts identified.

**Reynolds Request Nos. 45 and 48 (DMS Pricing)**.  Thank you for your proposed compliance with the requests.  We do not believe, however, that your proposed limitations are reasonable within the scope of Authenticom's claims and defenses.  For instance, despite agreeing generally to a scope of discovery beginning in January 2013, your proposal only provides pricing from 2015 onwards – and, as noted above, Authenticom believes the appropriate range of production is from January 1, 2009.  Additionally, your proposal limits production only to "standard prices of [Reynolds] base DMS package." Such information would be useless without context: it would not provide any information on how many customers actually pay those prices, how many dealers use the "base DMS package" as opposed to some other package, and generally gives no practical information concerning the actual prices paid by dealers to Reynolds.  To the extent Reynolds wishes to produce summary information rather than comply with the scope of these requests, Authenticom would require statistics that represent what dealers actually pay, such as average per-rooftop, monthly pricing broken into quartiles or other similarly detailed compilations, as well as the methodology underlying such calculations. To the extent Reynolds believes production of such statistics would be unduly onerous, Authenticom requests only documents sufficient to undertake such analysis itself.

**Reynolds Request No. 55.**  Authenticom accepts your offer that Reynolds will produce non-privileged documents that are responsive to this request and located pursuant to agreed upon ESI searches.  Given the inadequacy of Reynolds' proposed search terms, however, this request may remain subject to a dispute.

**Reynolds Request Nos. 56-59 (RCI Pricing)**.  Thank you for your offer to produce "documents sufficient to show the prices paid by [Reynolds] RCI vendors for each of the full years 2015, 2016, and 2017" as well as "any non-privileged internal PowerPoints or other presentations discussing RCI pricing strategy" from "a reasonable, custodian-based search and produce."  In the interest of compromise, we are willing to accept Reynolds' proposal for this request if Reynolds agrees to the following modifications: 1) Reynolds will produce such document sufficient to show for the full years 2009 through 2017, rather than only those years starting 2015; 2) Reynolds also produces communications discussing RCI pricing strategy or deliberations relating to any change in RCI pricing – i.e., producing only presentations is not acceptable; communications are also necessary; and 3) we understand that Reynolds has an RCI

- 7 -

pricing committee – Reynolds should produce any materials presented to or considered by such pricing committee. For the pricing committee materials, we would agree to a January 1, 2013, start date.

**Reynolds Request No. 63 (OEM Pricing).** Reynolds' protestation that "Reynolds' OEM relationships are not part of the RCI program" and "do not have any bearing on the prices that Reynolds charges vendors under the RCI program" are not well-taken. Authenticom alleges a conspiracy between Reynolds and CDK to restrict access to data on DMS systems to gain the ability to charge supracompetitive prices for that data. The proper scope of any relevant geographic product markets is a question of fact; to the extent Reynolds contends OEMs are not purchasers in the relevant markets, Reynolds is free to seek to prove that at a proper stage of litigation. Reynolds may not, however, withhold documents that are reasonably relevant to that question based on its own contentions as to ultimate questions of fact. Please let us know if we are at an impasse on this issue, or if you will reconsider.

**Reynolds Request Nos. 46, 47, 49, 50, 51, 52, 53 ("DMS and RCI Financial Information Requests").** Reynolds has offered to produce documents sufficient to show the total monthly revenues for ERA sales, Power sales, and the RCI program for each of the years 2015, 2016, and 2017. While Authenticom appreciates that these offers are made in good faith, we do not believe the offered compromise is sufficient. For instance, for all of the identified requests, despite agreeing generally to a scope of discovery beginning in January 2013, your proposal only provides pricing from 2015 onwards. Authenticom believes the response each of these requests should likewise go back at least as far as January 1, 2013.

With respect to Requests 46 (seeking information concerning DMS revenues), Request 47 (seeking information concerning DMS profits), Defendants themselves have put at issue the cost of maintaining and profiting from the DMS system for the allegedly necessary security measures. *See* ECF No. 172 at 15 ("Defendants explain that the costs are justified because they undertake the burden of maintaining the DMS and preserving its security. I am not persuaded for two primary reasons. First, defendants did not present evidence of the cost of data integration."). Authenticom is entitled to test such contentions by relevant evidence.

The same considerations apply with respect to Requests 50 (seeking information concerning costs of Data Integration offering), 51 (seeking information concerning revenues from Data Integration), and 52 (seeking information concerning profits for Data Integration). Defendants contend that Authenticom is able to offer lower prices only because Authenticom "free rides" on the investment of Defendants. Authenticom is entitled to test such contentions by relevant evidence, particularly where these issues were mentioned in Judge Peterson's opinion on the preliminary injunction.

With respect to Requests 49 (seeking information concerning DMS revenue and profit projections) and 53 (seeking information concerning data integration revenue and profit projections), financial projections showing expected profits and revenue both before and after entry into the conspiracy are relevant to both motive for the conspiracy and anticompetitive effects.

- 8 -

Authenticom remains willing to meet and confer on these requests.

**Reynolds Request No. 61 (Vendor "Pass-Through").** Thank you for your agreement to produce non-privileged documents and communications that are located pursuant to a reasonable ESI search for the agreed upon custodians and time frame that discuss the practice of vendors passing through of RCI fees.

**Reynolds Request No. 78 (Reynolds Effort to Advantage its own add-on Applications).** While Authenticom appreciates Reynolds efforts to compromise, Authenticom does not believe the proposed alternatives to its own request are proper limitations on a valid and reasonable discovery request. While Reynolds has objected that this request is "beyond the scope of permissible discovery" because there are no specific allegations of any effort by Reynolds to advantage its own add-on applications," this request is clearly relevant, as the ability to advantage its own applications over competitors through limitations on access to dealership data goes to show both motive and effect of Reynolds' unlawful conduct. In the spirit of compromise, however, and in light of the proposed scope of Reynolds' compliance, Authenticom would be willing to accept non-privileged documents identified pursuant to a diligent search of ESI for the agreed upon custodians and time frame regarding Reynolds efforts, if any, to advantage its own add-on applications as compared to applications offered by third-party vendors. The limited scope of this search would be properly informed by the three illustrative categories provided by Authenticom in its original request, rather than the alternative wording provided by Reynolds in its proposal.

<u>**CDK Requests**</u>

**CDK Request No. 6** The portion of the request in dispute is subsection (f), which requests "all pricing information regarding what CDK vendor customers paid for access to data on the Reynolds DMS before the Data Exchange Agreement, and what those vendor customers (1) paid when they entered into the RCI program, and (2) what they pay now."). Authenticom maintains that CDK's refusal to comply with this request is unreasonable for substantially the reasons given herein in relation to requests 46-49, 62, 63, 65-70.

**CDK Request No. 9** Thank you for confirming that CDK's use of quotation marks was not intended to indicate that the terms inside of quotation marks were the only search terms that CDK intended to use. However, given the inadequacy of CDK's proposed search terms, this request may remain subject to a dispute.

**CDK Request No. 12** Authenticom accepts your offer that, in addition to the documents CDK has already committed to produce in response to this Request, CDK will produce non-privileged "communications regarding coordination, joint efforts, assistance, and exchanges of information between Reynolds and CDK aimed at blocking third party integrators" identified through a reasonable search and review of agreed upon custodial files.

**CDK Request No. 17 ("SMART-R").** Thank you for your offer to produce "non-privileged documents and communications discussing the use of the SMART-R program to access Reynold's DMS, its effectiveness (or ineffectiveness), and its discontinuation, as

identified through a search and review of agreed upon custodians' files." In the interest of compromise, we are willing to accept CDK's proposal if CDK also produces external communications with vendors or dealers regarding the SMART-R program. That means CDK will have to include a custodian or custodians that would have such documents, including searching any customer relationship management software where such messages may be located.

**CDK Request No. 19 (DMI and IntegraLink Access to Non-CDK, Non-Reynolds DMSs)**. Thank you for your offer to produce documents sufficient to show "(a) which non-CDK, non-Reynolds DMSs DMI and IntegraLink access, (b) what type of access they have (*e.g.*, if they have access to data that is 'pushed' by the DMS provider), and (c) how they generally store and transfer data." In the interest of compromise, we are willing to accept CDK's proposal for this request if CDK agrees to the following modification: CDK will provide the agreed upon information not only for the present time, but also historically going back to January 1, 2013.

**CDK Request No. 25 (Agreements with Other Providers of Data Integration Services).** Thank you for your offer to produce "agreements with third-party providers of 'data integration services' with respect to access to data maintained on CDK or Reynold's DMS, and for any other DMS providers with policies restricting unauthorized third-party access" as well as "non-privileged documents and communications discussing such agreements, as identified through a search and review of agreed upon custodians' files." In the interest of compromise, we are willing to accept CDK's proposal for this request if CDK agrees to the following modification: "agreements with third-party providers of 'data integration services' with respect to access to data maintained on CDK or Reynold's DMS, and for any other DMS providers" as well as "non-privileged documents and communications discussing such agreements, as identified through a search and review of agreed upon custodians' files."

**CDK Request No. 28** Authenticom accepts your offer that, in addition to the documents CDK has already agreed to produce subject to this request, CDK will product non-privileged communications in CDK's possession, custody, or control identified pursuant to a reasonable search of agreed upon custodians "regarding dealers' ability to manually extract data from the CDK DMS for the period January 1, 2013 to the date of CDK's collection of documents for purposes of responding to the requests." We note that CDK specifically represented to Judge Peterson that CDK dealers have this ability similar to Reynolds' Dynamic Reporting. Therefore, as with all ESI searches, to the extent there are centrally maintained documents responsive to this request (which we presume there are given CDK's representations), then please confirm CDK will produce them.

**CDK Request Nos. 35 & 36** Thank you for your offer to produce "non-privileged documents and communications created after January 1, 2015 that discuss any loss or potential loss of customers in connection with SecurityFirst, as well as summary-level statistics on DMS customer tenure or switching, as identified through a search and review of agreed upon custodians' files." In the interest of compromise, we are willing to accept CDK's proposal for this request if CDK agrees to the following modification: "non-privileged documents and communications created after January 1, 2014 that discuss any loss or potential loss of customers in connection with SecurityFirst, as well as summary-level statistics on DMS customer tenure or switching, as identified through a search and review of agreed upon custodians' files."

**CDK Request No. 41.** Thank you for confirming CDK intends to "produce documents and communications relating to the contract term identified in the Request (or any other similar provision)."

**CDK Request Nos. 46, 47, 48, 49, 62, 63 & 68 (DMI and IntegraLink Contracts and Pricing)** Thank you for your offer to produce "non-privileged documents sufficient to show a representative sample of managed data services contracts between DMI and IntegraLink (on the one side) and vendors and/or dealers (on the other), as well as the current versions of DMI and IntegraLink's standard managed data services contract terms and conditions, if any." While this offer responds to Authenticom's Request 46 (current contracts between IntegraLink and vendors, dealers, or OEMs), Request 47 (pre-June 2015 IntegraLink contracts), Request 48 (current contracts between DMI and vendors, dealers, or OEMs), Request 49 (pre-June 2015 DMI contracts), it is insufficient, at least, to the extent it would exclude contracts with OEMs, for the reasons discussed with respect to request 73. It is also insufficient in that it fails to provide information directly relevant to the scope and market conditions (including prevailing pricing) of the data integration market (Requests 62 and 63), and to test Defendants' contentions that Authenticom is able to offer lower prices only because of "free riding." It also would prevent Authenticom from proving the impact of CDK's conspiracy on that market as reflected by modifications, if any, of contract terms.

In short, CDK has no basis to withhold documents showing what DMI and IntegraLink charge or have charged for data integration services, whether for access to data on the CDK DMS, Reynolds DMS, or other DMSs, and to do so going back at least to January 1, 2013.

Authenticom remains willing to meet and confer with regard to the other requests at issue here in order to seek an appropriate compromise.

**CDK Request Nos. 51, 52, 53, 54 & 55 (DMS Pricing)**

CDK agrees to produce documents sufficient to show the total monthly basic DMS pricing and revenue for DMS services, from January 1, 2015 to the data of CDK's collections, to the extent such data are maintained by CDK in the ordinary course of its business and can be provided in a reasonably useable format without causing CDK to incur unreasonable burden or expense." We do not believe, however, that your proposed limitations are reasonable within the scope of Authenticom's claims and defenses. For instance, despite agreeing generally to a scope of discovery beginning in January 2013, your proposal only provides pricing from 2015 onwards. Authenticom believes the response each of these requests should likewise go back at least as far as January 1, 2013.

Additionally, your proposal limits production only to the "total monthly basic DMS pricing and revenue for DMS services." Such information would be useless without context: it would not provide any information on how many customers actually pay such "basic" prices, how many dealers use the "basic DMS" as opposed to some other package of DMS, and generally gives no practical information concerning how much dealers actually pay CDK on a per rooftop basis. To the extent CDK wishes to produce summary information rather than

comply with the scope of these requests, Authenticom would require statistics that represent what dealers actually pay, such as average per-rooftop, monthly pricing broken into quartiles or other similarly detailed compilations, as well as the methodology underlying such calculations. To the extent CDK believes production of such statistics would be unduly onerous, Authenticom requests only documents sufficient to undertake such analysis itself.

With respect to Requests 52 (seeking information concerning DMS revenues), Request 53 (seeking information concerning DMS profits), and Request 54 (seeking information concerning price increases for DMS services), Defendants themselves have put at issue the cost of maintaining and profiting from the DMS system for the allegedly necessary security measures. *See* ECF No. 172 at 15 ("Defendants explain that the costs are justified because they undertake the burden of maintaining the DMS and preserving its security. I am not persuaded for two primary reasons. First, defendants did not present evidence of the cost of data integration."). Authenticom is entitled to test such contentions by relevant evidence.

With respect to Request 55 (seeking information concerning DMS revenue and profit projections), financial projections showing expected profits and revenue both before and after entry into the conspiracy are relevant to both motive for the conspiracy and anticompetitive effects.

Authenticom remains willing to meet and confer on these requests.

**CDK Request No. 56 (Auto/Mate Acquisition).** Authenticom accepts your offer that you will produce any pre-existing business documents produced by CDK to the Federal Trade Commission as well as "any factual summaries, data compilations, or presentations created and provided to the government for purposes of responding to the Second Request, to the extent such documents are relevant to the claims and defenses in this litigation, and are not protected from disclosure by an applicable privilege."

**CDK Requests No. 57, 58, 59, 60, 61, 65, 66, 67, 69 & 70 (3PA Pricing).** Thank you for your offer to produce "documents or information sufficient to show CDK's monthly pricing and revenue for services offered through the 3PA program, from January 1, 2015 to the date of CDK's collections, to the extent such data are maintained by CDK in the ordinary course of its business and can be provided in a reasonably useable format without causing CDK to incur unreasonable burden and expense." We do not believe, however, that your proposed limitations are reasonable within the scope of Authenticom's claims and defenses. For instance, for all of the identified requests, despite agreeing generally to a scope of discovery beginning in January 2013, your proposal only provides pricing from 2015 onwards. Authenticom believes the response each of these requests should likewise go back at least as far as January 1, 2013.

With respect to Requests 57 (seeking information concerning costs of 3PA offering), 58 (seeking information concerning revenues of 3PA offering), and 59 (seeking information concerning profits of 3PA offering), Defendants contend that Authenticom is able to offer lower prices only because Authenticom "free rides" on the investment of Defendants. Authenticom is entitled to test such contentions by relevant evidence.

With respect to Requests 60 (seeking information concerning 3PA revenue and profit projections), financial projections showing expected profits and revenue both before and after entry into the conspiracy are relevant to both motive for the conspiracy and anticompetitive effects.

In the interest of compromise, with respect to Requests 65 (seeking documents sufficient to show CDK's 3PA pricing) and 66 (seeking documents and communications relating to changes in pricing), 67 (seeking internal documents and presentations with respect to changes in pricing), 69 (seeking information concerning up-front fees), and 70 (seeking documents sufficient to show per-transaction fees), we are willing to accept the following proposal: documents sufficient to show the prices paid by 3PA vendors from 2013 to 2017, as well as any non-privileged internal PowerPoints or other presentations discussing 3PA pricing strategy, and communications discussing 3PA pricing strategy or the reasons underlying any change in 3PA pricing, from a reasonable, custodian-based search and produce. Finally, we understand that CDK has extensive communications with vendors regarding changes to its pricing after January 1, 2015. CDK should also produce any such external communications, and any internal communications regarding the same.

Authenticom remains willing to meet and confer on these requests.

**CDK Request No. 71 (Vendor "Pass-Through").** Authenticom accepts your offer that CDK will produce "non-privileged documents and communications that discuss vendor "pass through" of 3PA fees (or which use similar terms) as identified through a search and review of agreed upon custodians' files.

**CDK Request No. 72.** Thank you for confirming that CDK's use of quotation marks was not intended to indicate that the terms inside of quotation marks were the only search terms that CDK intended to use. Other relevant independent integrators would be ones identified in this litigation, such as ProQuotes.

**CDK Request No. 73 (OEM Pricing).** CDK's objections that "managed data services that CDK offers to OEMs are subject to highly individualized contract negotiations" and that they "are not offered through CDK's 3PA program" and "do not have any bearing on the prices that CDK charges vendors under the 3PA program program" are not well-taken. Authenticom alleges a conspiracy between Reynolds and CDK to restrict access to data on DMS systems to gain the ability to charge supracompetitive prices for that data. The proper scope of any relevant geographic product markets is a question of fact; to the extent CDK contends OEMs are not purchasers in the relevant markets, CDK is free to seek to prove that at a proper stage of litigation. CDK may not, however, withhold documents that are reasonably relevant to that question based on its own contentions as to ultimate questions of fact. Please let us know if we are at an impasse on this issue, or if you will reconsider.

**CDK Request No. 74 (DMS Technical Specifications).** Both Defendants have put forward a security rationale as a supposed procompetitive justification for all of the activities at issue in this case. CDK in particular alleged that third-party integrators' access to the system caused performance issues and data corruption. *See, e.g.,* Hearing Transcript Day 2-P-104

("basically every single DMS system that we had had some level of data corruption on it, and we believed that was largely caused by third-party integrators"). In addition, in correspondence with dealers and vendors – including in letters from Bob Karp throughout the fall of 2016 – CDK has put forward a security rationale as a reason for blocking Authenticom and other independent integrators. Authenticom is entitled to test those contentions. To that end, this request and other related requests concerning the technical aspects of CDK's system design are intended to see documents showing whether security or performance issues were the actual motivation for the design choices CDK made, including both documents commenting on such choices and the design choices with a reasonable level of particularity such that experts (such as CDK's own expert from the preliminary injunction hearing) could opine on the purposes of various design decisions. Such documents would include internal presentations discussing system design and security choices and planning documents used by the developers who actually implemented mechanisms to block Authenticom.

As for subparts (a) through (c) (seeking portions of source code relevant to this case), such code portions will show whether defendants' supposed security and performance concerns actually motivated the changes or they were merely pretextual based on insufficient or unrelated implementations. To the extent CDK's objections are based on the highly sensitive nature of source code or specifics of *implementation* of security (as opposed to the *types* of security), Authenticom would be willing to stipulate to an Outside Attorneys' Eyes Only designation for such documents. Moreover, to the extent CDK makes sufficient detail available from non-code sources, Authenticom would be willing to consider technical documents that go short of the specific implementations or source code sufficiently responsive.

**CDK Request No. 79 ("Blocking Methods").** Thank you for confirming CDK will produce "non-privileged documents and communications describing the methods it has used to block, restrict, or disable Authenticom's unauthorized DMS access, as identified through a search and review of agreed upon custodians' files."

**CDK Request Nos. 86 & 87 (Elliott Management).** Thank you for confirming that, based on your investigation to date, no responsive, relevant documents are in CDK's possession, custody, or control, and that CDK will not withhold non-privileged communications with or otherwise related to Elliott Management that refer to CDK's "SecurityFirst" or "3PA 'refresh'" strategies. Please confirm, however, that you are not limiting your response to documents that only reference "SecurityFirst" or "3PA 'refresh'" but will produce any communications with Elliott Management that relate to increased integration fees.

**CDK Request No. 91 ("Tilt the Table").** Thank you for your offer to produce "documents and communications referencing the adoption (or not) of any 'tilt the table' (or similarly-worded) strategy, or otherwise related to the establishment (or not) of "closed" application categories in connection with SecurityFirst and/or the 3PA strategy 'refresh,' as identified through a search and review of agreed upon custodians' files." While Authenticom appreciates CDK's efforts to compromise, Authenticom does not believe the proposed alternatives are proper limitations for a valid and reasonable discovery request.

The few presentations that CDK provided during the preliminary injunction proceedings included highly relevant slides regarding CDK's efforts to advantage its own applications with respect to data access and fees, including specific references to service applications (e.g., writing repair orders), F&I applications (disrupting their workflow), categorical restrictions (competitors to CVR), and others.  In addition, we are aware that CDK provides marketing materials to dealers listing the advantages that its own applications have because of CDK's data access policies.  For example, CDK's ServiceEdge application has been using such marketing materials.

All such documents need to be produced, whether internal presentations and communications, or external marketing materials and communications.  CDK has not offered any justified basis for withholding such documents, and its own carefully worded "compromise" does not come close to sufficing.

**Custodians.**  We are evaluating your positions on the custodians Authenticom has requested that CDK and Reynolds add.  We are also evaluating your proposed additions to Authenticom's list of custodians.  We will respond on this topic early next week.

\* \* \* \* \*

So that we can bring all issues to a head and determine which need to be resolved by the Court, could we please have a meet and confer on issues raised in this letter this coming Monday?

Very truly yours,

Michael N. Nemelka

# Exhibit 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-cv-864 |
| This document relates to: *Authenticom, Inc. v. CDK Global, LLC and The Reynolds and Reynolds Company*, Case No. 18-CV-868 (N.D. Ill.) | Hon. Amy J. St. Eve |

**CDK GLOBAL, LLC'S RESPONSES AND OBJECTIONS TO AUTHENTICOM'S
SECOND SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS**

Defendant CDK Global, LLC ("CDK"), by and through its attorneys, and pursuant to

Fed. R. Civ. P. 26 and 34, hereby submits its written objections and responses Plaintiff

Authenticom, Inc.'s Second Set of Requests for the Production of Documents for Defendant

CDK Global, LLC, dated March 23, 2018 (the "Requests").

**GENERAL OBJECTIONS**

1.     CDK asserts each of the following objections to the Requests.  In addition to

these General Objections, CDK may also state specific objections to a Request where

appropriate.  By setting forth such additional specific objections, CDK does not in any way

intend to limit or restrict its General Objections.  Moreover, to the extent CDK provides a

response to any of the Requests to which CDK objects, such response shall not constitute a

waiver of any General Objection or specific objection.

2.     Nothing herein shall be construed as an admission by CDK regarding the

competence, admissibility, or relevance of any fact sought by the Requests.  CDK reserves its

right to challenge the competency, relevance, materiality, and admissibility of any information or

documents that it produces in response to any discovery request at trial, of this or any other

action, or at any subsequent proceeding, of this action or of any other action. Further, CDK intends no incidental or implied admissions by its answers to the Requests. Whether CDK answers or objects to any particular Request should not be interpreted as an admission that CDK accepts or admits the existence of any fact(s) set out or assumed by such Requests, that the Requests are proper, that CDK's answers or objections constitute admissible evidence, that the documents or information sought are relevant, material, or otherwise within the proper bounds of discovery, that such documents or information are properly discoverable, or that other such discovery requests will be treated in a similar fashion in this or any other proceeding. Furthermore, whether CDK answers part or all of any particular Request is not intended and should not be construed as a waiver by CDK of any or all objections to such Request or any other Request.

3.      CDK objects to any request, instruction, definition, or directive contained in the Requests to the extent that it purports to impose any obligations on CDK beyond those set forth in the Federal Rules of Civil Procedure and the Local Rules of the Northern District of Illinois.

4.      CDK objects to the Requests to the extent they are unlimited in time or not limited to the time relevant to this litigation, on the ground that such Requests seek information which is neither relevant to any claim or defense in this action and is overly broad and unduly burdensome. The limitations period applicable to Authenticom's claims is, at most, four years from the date it filed suit—May 1, 2013. Further, Authenticom's Complaint does not allege any potentially actionable conduct by CDK until much later than that. Therefore, unless otherwise specified in its response to a specific Request, CDK production of documents will be limited to the time period beginning on or after January 1, 2013.

5.     CDK objects to making multiple collections of documents for purposes of responding to these and Authenticom's First Set of Requests for the Production of Documents, dated October 2, 2017, on the ground that such collections are unnecessarily burdensome and disproportional to the needs of the case.

6.     CDK objects to the Requests, and each and every definition, instruction, and request therein, to the extent they seek information and/or documents that: (a) contain privileged attorney-client communications; (b) constitute work product; (c) were prepared in anticipation of or in connection with litigation or trial; (d) disclose the mental impressions, conclusions, opinions or legal theories of any attorney for or other representative of CDK; (e) are subject to the common-interest or joint-defense privileges; or (f) are otherwise privileged or exempt from discovery.  To the extent that the Requests, or any one of them, seek such information, CDK hereby claims such privilege and invokes such protection.  The fact that CDK does not specifically object to an individual request on the grounds that it seeks privileged or protected material shall not be deemed a waiver of the protection afforded by any applicable privilege. Similarly, to the extent any information or documents subject to a privilege or otherwise protected from discovery are produced in response to these Requests, such production is inadvertent and not intended as a waiver.

7.     CDK objects to the Requests to the extent that they seek information and/or documents that are confidential or otherwise proprietary in nature.  The represented parties in this litigation have agreed upon an Agreed Confidentiality Order ("Confidentiality Order"), which was approved and entered by the Court on April 4, 2018 (Dkt. 104).  Thus, to the extent that a request calls for production of confidential or competitively sensitive material, as defined by the Confidentiality Order, CDK will only produce such material subject to that Order.

8.      CDK objects to the Requests to the extent that they violate any constitutional, statutory, or common law rights of privacy and confidentiality, including those provided under U.S. state or federal law or any other country's law, of CDK's employees and other persons, including individuals who are not parties to this litigation.  CDK reserves the right to protect the privacy and confidentiality interests of non-parties to this litigation, including by allowing such parties to seek a protective order from the Court prior to the production of material that implicates their confidential or private information, or by redacting such information from documents or ESI that CDK may produce.

9.      CDK objects to the Requests to the extent they purport to require the production of documents or information that are not maintained by CDK in the form or manner requested.

10.     CDK objects to the Requests to the extent that they seek the production of documents or information beyond the possession, custody, or control of CDK or its current officers, directors, or employees and/or that cannot be located with a reasonably diligent search, thus making the Requests unduly burdensome.

11.     CDK objects to the Requests on the ground of undue burden to the extent that they seek the production of documents or information currently in plaintiff's possession, custody, or control, that is publicly available, or that can be obtained more easily from third parties.

12.     No statement that CDK will produce requested documents or information in response to any given Request shall be deemed a representation that such documents or information exist, but rather is a statement that CDK will undertake to produce responsive, non-privileged documents or information to the extent that they exist, are within its possession, custody, or control and can be located with a reasonably diligent search.

13.    To the extent CDK has agreed to search for documents responsive to these Requests, its searches will be limited to the files of those document custodians agreed upon by the parties and to central or shared file locations (if any) where documents that are responsive to particular Requests are likely to be found.  Similarly, in accordance with the Stipulated Order Re: Discovery Of Electronically Stored Information ("ESI") ("ESI Stipulation"), which was approved and entered by the Court on April 6, 2018 (Dkt. No. 105), CDK will produce responsive, non-privileged documents and information in accordance with the parties' agreements regarding date limitations and search terms, to avoid the need to manually inspect every potentially responsive document.  To the extent that responsive documents can be identified and produced without the use of search terms, custodian, or date limitations, CDK will make good-faith, diligent efforts to produce those responsive documents concurrent with resolving any disagreements over search criteria.

14.    CDK's responses to the Requests are based on its present knowledge, upon a reasonable inquiry.  Discovery is ongoing, and CDK's investigation continues.  CDK reserves the right to supplement, amend, and correct these responses and objections, if necessary, based on information later obtained through investigation, discovery, or otherwise.

15.    To the extent CDK has objected to or refused to produce documents or information in response to any given Request, and to the extent that Authenticom takes issue with any such objection or refusal, CDK is willing to meet-and-confer with Authenticom to see if a reasonable, mutually-acceptable compromise might be reached.

16.    CDK incorporates each of the foregoing General Objections as though fully set forth in each response and objection below.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      CDK objects to each and every "Definition" set forth in the Requests, including "communication," "relating to," "related to," "referring to," "regarding," and "with respect to" to the extent that such definitions purport to broaden these terms beyond their ordinary meaning or impose obligations on CDK broader than or inconsistent with the obligations created by Fed. R. Civ. P. 26 and 34 and/or any applicable Local Rule or other Court Order.  CDK will interpret and respond to Requests using these terms consistent with their ordinary meaning.

2.      CDK objects to Authenticom's definition of "add-on application" in Definition No. 1 as overly broad and unduly burdensome, to the extent it purports to include "software applications" that are not relevant to any party's claims or defenses, *e.g.*, software applications used by car dealerships that do not require direct or indirect access to data maintained by the dealership's licensed DMS.

3.      CDK objects to Authenticom's definitions of "CDK" and "you," "your" and "your company" in Definition Nos. 5 and 15 as overly broad and unduly burdensome to the extent they purport to require CDK to produce information and/or documents beyond CDK's possession, custody, or control.  In addition, CDK objects to Definition Nos. 5 and 15 to the extent they purport to require CDK to produce information and/or documents within the possession, custody, or control of any person or entity other than its current officers, directors, employees, agents, or any person acting on CDK's behalf.

4.      CDK objects to Authenticom's definition of "data integrators" in Definition No. 7, in so far as an entity that does not own or provide its own DMS but which "provide[s] access by any means to dealer data" on another provider's "DMS database, whether by extracting the data, writing data back into the DMS, or both," is not providing "integration" services as CDK uses and understands the term.  CDK further objects to Definition No. 7 as inaccurate.  CDK is

not a "data integrator" "through its 3PA program" despite Authenticom's repeated attempts to label it as such. CDK's subsidiaries DMI and IntegraLink have served in that role (as CDK understands the term) at various times during the relevant period. To the extent that CDK responds to Requests that reference "data integrators," it does not mean that CDK agrees with or accepts Authenticom's definitions.

5.      CDK objects to Authenticom's definitions of "DMI" and "IntegraLink" in Definition Nos. 8 and 9 as overly broad, unduly burdensome, and seeking documents and information that are irrelevant and not within CDK's possession, custody, or control, to the extent that these definitions purport to include any documents or information pertaining to Digital Motorworks, Inc. or IntegraLink before those entities were acquired by and incorporated into the business operations of CDK.

6.      CDK objects to Authenticom's definitions of "Vendors" and "application providers" in Definition No. 14 as overly broad and unduly burdensome, to the extent it purports to include "Vendors" or "application providers" of "software applications" that are not relevant to any party's claims or defenses, *e.g.*, software applications used by car dealerships that do not require direct or indirect access to data maintained by the dealership's licensed DMS.

7.      CDK objects to Authenticom's "Instructions," including Instruction Nos. 1, 2, 3, 4, 5, 6, and 7, to the extent that they purport to conflict with, or impose any obligations that are greater than or otherwise inconsistent with, the ESI Stipulation. CDK will collect, review, and produce ESI responsive to these Requests in accordance with that Stipulation. CDK further objects to Instruction No. 1 to the extent it purports to require the production of privileged documents, including but not those limited those in the possession of CDK's "attorneys or their employees, agents, vendors, or investigators."

## CDK'S SPECIFIC RESPONSES TO
## REQUESTS FOR THE PRODUCTION OF DOCUMENTS

**REQUEST NO. 93.**  Communications and documents relating to how much CDK spends on a monthly basis with independent data integrators, including with Authenticom, SIS, and/or others, from January 1, 2013 to present. *See* CDK-0053241.

**RESPONSE:**  CDK objects to this Request as overbroad, unduly burdensome, not proportional to the needs of the case, and to the extent that it seeks information that is not relevant to any party's claims or defenses and thus is beyond the scope of permissible discovery. Specifically, this Request is overly broad and unduly burdensome to the extent it seeks all "communications and documents" (broadly defined by Authenticom's definitions) relating, in any way, to how much CDK "spends" on so-called "data integrators".  CDK further objects to this Request as duplicative and/or cumulative of prior discovery requests by Authenticom, including but not limited to RFP Nos. 9, 25, and 72, and to the extent Authenticom seeks to void or evade the specific agreements the parties reached with respect to Authenticom's prior RFPs.

Subject to and without waiving these or its General Objections, CDK states that it has already produced documents within its possession, custody, or control responsive to this Request.  CDK's production in response to Authenticom's prior RFPs, however, is ongoing, and CDK states that it will produce additional non-privileged documents responsive to this Request consistent with the parties' prior agreements and based upon the parties previously agreed-upon search terms, date limitations, and custodians.

**REQUEST NO. 94.**  Communications and documents in which Dan McCray used any term of profanity. This request has no date limitation.

**RESPONSE**:  CDK objects to this Request as grossly overbroad, unduly burdensome, not proportional to the needs of the case, and to the extent that it seeks information that is not relevant to any party's claims or defenses and thus is beyond the scope of permissible discovery. Specifically, this Request is grossly overly broad, and unduly burdensome in that it seeks all

8

communications and documents, for an unlimited period of time, concerning any instance in which Dan McCray, a former CDK employee, used "any term of profanity". Notably, Authenticom does not identify those words it considers "profane" for purposes of this Request. As written, this Request would require a search of every email sent by Dan McCray for every type of swear word or other "profane" expression, regardless of topic or relevance to the claims or defenses in this case, since the beginning of time. Whether Mr. McCray used loose language in any of his communications or documents has no bearing on whether or not Defendants allegedly entered into an unlawful agreement to eliminate Authenticom from the marketplace or whether the terms of CDK's dealer or vendor contracts of which plaintiff complains are anticompetitive. Moreover, the limitations period applicable to Authenticom's claims is, at most, four years from the date it filed suit—May 1, 2013.

**REQUEST NO. 95.** Communications and documents concerning DMI's syndication or "comingling" of Reynolds' data following the February 18, 2015 Data Exchange Agreement, including but not limited to internal communications and documents concerning any competitive advantage DMI gained through the ability to syndicate or "comingle" Reynolds' data and communications with third parties concerning DMI's ability to syndicate or "comingle" Reynolds' data.

**RESPONSE**: CDK objects to this Request as vague, ambiguous, overbroad, unduly burdensome, not proportional to the needs of the case, and to the extent it seeks information that is not relevant to any party's claims or defenses in this matter and thus is beyond the scope of permissible discovery. Specifically, CDK objects to the terms "syndication," "Reynolds' data" and "comingle," all of which are undefined, as vague and ambiguous. CDK further objects to this Request as duplicative and/or cumulative of prior discovery requests by Authenticom, including but not limited to RFP Nos. 2, 4, and 5, and to the extent Authenticom seeks to void or evade the specific agreements the parties reached with respect to Authenticom's prior RFPs.

Subject to and without waiving these or its General Objections, CDK states that, to the extent they have not already been produced, CDK will produce additional non-privileged documents responsive to this Request based upon the parties previously agreed-upon search terms, date limitations, and custodians. To the extent Authenticom believes additional search terms are necessary to specifically target documents discussing "syndication" or "comingling" of data, CDK is willing to meet and confer with Authenticom to determine whether a reasonable number of search terms can be agreed upon in connection with this Request.

**REQUEST NO. 96.** Communications and documents concerning the potential or expressed inability of vendors to afford the up front, minimum, and/or monthly fees CDK charges through the 3PA program, including but not limited to any communications with third party vendors in which the third party indicated it could not afford CDK's 3PA up front, minimum, and/or monthly fees.

**RESPONSE**: CDK objects to this Request as vague, overbroad, unduly burdensome, not proportional to the needs of the case, and to the extent that it seeks information that is not relevant to any party's claims or defenses and thus is beyond the scope of permissible discovery. Specifically, this Request is vague, overly broad, and unduly burdensome to the extent it seeks all communications and documents, for an unlimited period of time, concerning "the potential or expressed inability of vendors" to afford CDK's 3PA program fees. Whether vendors had a potential or actual inability to afford participation in CDK's 3PA program has no bearing on whether or not Defendants allegedly entered into an unlawful agreement to eliminate Authenticom from the marketplace or whether the terms of CDK's dealer or vendor contracts of which plaintiff complains are anticompetitive. The limitations period applicable to Authenticom's claims is, at most, four years from the date it filed suit—May 1, 2013. CDK further objects to this Request as duplicative and/or cumulative of prior discovery requests by Authenticom, including but not limited to RFP Nos. 64-71, and to the extent Authenticom seeks

to void or evade the specific agreements the parties reached with respect to Authenticom's prior RFPs.

Subject to and without waiving these or its General Objections, CDK states that it has already produced documents within its possession, custody, or control responsive to this Request. CDK's production in response to Authenticom's prior RFPs, however, is ongoing, and CDK states that it will produce additional non-privileged documents responsive to this Request consistent with the parties' prior agreements and based upon the parties previously agreed-upon search terms, date limitations, and custodians.

**REQUEST NO. 97.** Communications and documents concerning any vendor reducing the services obtained through the 3PA program in connection with (or as a result of) any price increases for those services.

 **RESPONSE**: CDK objects to this Request as vague, overbroad, unduly burdensome, not proportional to the needs of the case, and to the extent that it seeks information that is not relevant to any party's claims or defenses and thus is beyond the scope of permissible discovery. Specifically, this Request is vague, overly broad, and unduly burdensome to the extent it seeks all communications and documents, for an unlimited period of time, concerning any vendor's decision to reduce its participation in CDK's 3PA program that is connected, in any way, to any price increase in that program. As CDK is free to unilaterally set the prices it charges for its services. Whether a vendor negatively reacted to any price increases and ultimately elected to reduce or eliminate its participation in the 3PA program has no bearing on whether or not Defendants allegedly entered into an unlawful agreement to eliminate Authenticom from the marketplace or whether the terms of CDK's dealer or vendor contracts of which plaintiff complains are anticompetitive. Moreover, the limitations period applicable to Authenticom's claims is, at most, four years from the date it filed suit—May 1, 2013. Finally, CDK objects to this Request as duplicative and/or cumulative of prior discovery requests by Authenticom,

including but not limited to RFP Nos. 64-71, and to the extent Authenticom seeks to void or

evade the specific agreements the parties reached with respect to Authenticom's prior RFPs.

Subject to and without waiving these or its General Objections, CDK states that it has

already produced documents within its possession, custody, or control responsive to this

Request. CDK's production in response to Authenticom's prior RFPs, however, is ongoing, and

CDK states that it will produce additional non-privileged documents responsive to this Request

consistent with the parties' prior agreements and based upon the parties previously agreed-upon

search terms, date limitations, and custodians.

**REQUEST NO. 98.** Communications and documents regarding whether CDK should or
would pass through, or has passed through, RCI data integration fees to dealership customers of
CDK add-on applications.

**RESPONSE**: CDK objects to this Request as grossly overbroad, unduly burdensome,

not proportional to the needs of the case, and to the extent that it seeks information that is not

relevant to any party's claims or defenses and thus is beyond the scope of permissible discovery.

Specifically, this Request is grossly overly broad, and unduly burdensome in that it seeks all

communications and documents, for an unlimited period of time, regarding whether CDK

"should, would, ... or has passed through" RCI fees to those dealership DMS customers that also

subscribe to CDK proprietary applications. Whether CDK discussed, contemplated, or engaged

in the pricing behavior described in this Request has no bearing on whether or not Defendants

allegedly entered into an unlawful agreement to eliminate Authenticom from the marketplace or

whether the terms of CDK's dealer or vendor contracts of which plaintiff complains are

anticompetitive. Moreover, the limitations period applicable to Authenticom's claims is, at most,

four years from the date it filed suit—May 1, 2013. Finally, CDK objects to this Request to the

extent it is duplicative and/or cumulative of prior discovery requests by Authenticom and to the

extent Authenticom seeks to void or evade the specific agreements the parties reached with respect to Authenticom's prior RFPs.

Subject to and without waiving these or its General Objections, CDK states that, to the extent they have not already been produced, CDK will produce additional non-privileged documents responsive to this Request based upon the parties' previously agreed-upon search terms, date limitations, and custodians. To the extent Authenticom believes additional search terms are necessary to specifically target emails containing passwords, CDK is willing to meet and confer with Authenticom to determine whether a reasonable number of search terms can be agreed upon in connection with this Request.

**REQUEST NO. 99.** Communications and documents concerning the limitations of manual extraction of dealer data, including but not limited to communications and documents concerning Reynolds' Dynamic Reporting program.

**RESPONSE**: CDK objects to this Request as vague, ambiguous, overbroad, unduly burdensome, not proportional to the needs of the case, and to the extent that it seeks information that is not relevant to any party's claims or defenses and thus is beyond the scope of permissible discovery. Specifically, this Request is overly broad and unduly burdensome in that it seeks all communications and documents, for an unlimited period of time, concerning, in any way, any "limitations" (a term that is undefined) on "manual extraction" (also undefined) of certain data from the CDK's DMS as well as any such communications and documents CDK may have "concerning" a specific Reynolds' manual reporting tool. Whether there any "limitations" on "manual extraction" (which CDK is interpreting to be equivalent to manual reporting) of data from the DMS has no bearing on whether or not Defendants allegedly entered into an unlawful agreement to eliminate Authenticom from the marketplace or whether the terms of CDK's dealer or vendor contracts of which plaintiff complains are anticompetitive. Moreover, the limitations period applicable to Authenticom's claims is, at most, four years from the date it filed suit—May

13

1, 2013.  CDK further objects to this Request as duplicative and/or cumulative of prior discovery requests by Authenticom, including but not limited to RFP Nos. 28 and 29, and to the extent Authenticom seeks to void or evade the specific agreements the parties reached with respect to Authenticom's prior RFPs.

Subject to and without waiving these or its General Objections, CDK states that it has already produced documents within its possession, custody, or control responsive to this Request.  CDK's production in response to Authenticom's prior RFPs, however, is ongoing, and CDK states that it will produce additional non-privileged documents responsive to this Request consistent with the parties' prior agreements and based upon the parties previously agreed-upon search terms, date limitations, and custodians.

**REQUEST NO. 100.** Communications and documents concerning any instance in which a CDK, DMI, and/or Integralink employee, agent, or independent contractor sent a dealership user-id and/or password in an unencrypted format through email.

**RESPONSE**:  CDK objects to this Request as grossly overbroad, unduly burdensome, not proportional to the needs of the case, and to the extent that it seeks information that is not relevant to any party's claims or defenses and thus is beyond the scope of permissible discovery. Specifically, this Request is grossly overly broad, and unduly burdensome in that it seeks all communications and documents, for an unlimited period of time, concerning any instance in which CDK and two of its subsidiaries, as well as any "independent contractor," sent certain information via email.  As written, this Request would require a search of every email sent by every CDK, DMI, and IntegraLink employee, agent, or independent contractor since the beginning of time.  Whether any of the identified individuals sent an email of the type described in this Request has no bearing on whether or not Defendants allegedly entered into an unlawful agreement to eliminate Authenticom from the marketplace or whether the terms of CDK's dealer or vendor contracts of which plaintiff complains are anticompetitive.  Moreover, the limitations

14

period applicable to Authenticom's claims is, at most, four years from the date it filed suit—May 1, 2013. CDK also objects to this Request as overly broad and unduly burdensome to the extent that it seeks emails sent by CDK or any of its subsidiaries or independent contractors that contain merely a user-id and no password. Finally, CDK objects to this Request to the extent it is duplicative and/or cumulative of prior discovery requests by Authenticom and to the extent Authenticom seeks to void or evade the specific agreements the parties reached with respect to Authenticom's prior RFPs.

Subject to and without waiving these or its General Objections, CDK states that, to the extent they have not already been produced, CDK will produce additional non-privileged documents responsive to this Request based upon the parties previously agreed-upon search terms, date limitations, and custodians. To the extent Authenticom believes additional search terms are necessary to specifically target emails containing passwords, CDK is willing to meet and confer with Authenticom to determine whether a reasonable number of search terms can be agreed upon in connection with this Request.

**REQUEST NO. 101.** Documents sufficient to show the identity of any vendor and/or dealer that used DMI and/or Integralink for data integration services on the Reynolds DMS during the "wind down period," as described in the February 18, 2015 Data Exchange Agreement. For each such vendor and/or dealer, please produce documents sufficient to show the date (if any) on which each vendor and/or dealer exited the "wind down period" and no longer used DMI and/or Integralink for data integration services on the Reynolds DMS.

**RESPONSE**: CDK objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. CDK further objects to this Request as duplicative and/or cumulative of prior discovery requests by Authenticom, including but not limited to RFP Nos. 6 and 16, and to the extent Authenticom seeks to void or evade the specific agreements the parties reached with respect to Authenticom's prior RFPs.

Subject to and without waiving these or its General Objections, CDK states that it has already produced documents within its possession, custody, or control responsive to this Request. CDK's production in response to Authenticom's prior RFPs, however, is ongoing, and CDK states that it will produce additional non-privileged documents responsive to this Request consistent with the parties' prior agreements and based upon the parties previously agreed-upon search terms, date limitations, and custodians.

**REQUEST NO. 102.** For the avoidance of doubt, all invoices for all vendors that used (1) DMI, (2) Integralink, and/or (3) the 3PA program for data integration services, from 2011 to the present.

**RESPONSE**: CDK objects to this Request as grossly overbroad, unduly burdensome, not proportional to the needs of the case, and to the extent that it seeks information that is not relevant to any party's claims or defenses and thus is beyond the scope of permissible discovery. As written, this Request would literally seek the production of every individual invoice issued by CDK and two of its subsidiaries for so-called "data integration services" and participation in the 3PA program for a 7 year period. CDK further objects to this Request as duplicative and/or cumulative of prior discovery requests by Authenticom, including but not limited to RFP Nos. 6, 64-66, 68-70, and 73, and to the extent Authenticom seeks to void or evade the specific agreements the parties reached with respect to Authenticom's prior RFPs.

Subject to and without waiving these or its General Objections, CDK states that it has already produced data that captures the information sought by this Request to the extent that they exist and are within CDK's possession, custody, and control. *See* CDK-0701423; CDK-0701424; CDK-0701425; CDK-0701426; CDK-0701427; CDK-0701428; CDK-0701429; CDK-0701430; CDK-0701431; CDK-0701432; CDK-0701433; CDK-0701434; CDK-0701435; CDK-0701436; CDK-0701437; CDK-0701438; CDK-0701439; CDK-0701440; CDK-0701441; CDK-

16

0701442; CDK-0701443; CDK-0701444; CDK-0701445; CDK-0701446; CDK-0701447; CDK-0701448; CDK-0701449.

**REQUEST NO. 103.** For the avoidance of doubt, all invoices for all dealerships that used a CDK DMS, from 2011 to the present.

**RESPONSE**: CDK objects to this Request as grossly overbroad, unduly burdensome, not proportional to the needs of the case, and to the extent that it seeks information that is not relevant to any party's claims or defenses and thus is beyond the scope of permissible discovery. As written, this Request would literally seek the production of every individual invoice issued by CDK to the thousands of dealers that used its DMS services for a 7 year period. CDK further objects to this Request as duplicative and/or cumulative of prior discovery requests by Authenticom, including but not limited to RFP Nos. 51 and 54, and to the extent Authenticom seeks to void or evade the specific agreements the parties reached with respect to Authenticom's prior RFPs.

Subject to and without waiving these or its General Objections, CDK states that it has already produced data that captures the information sought by this Request to the extent that they exist and are within CDK's possession, custody, and control. *See* CDK-0701423; CDK-0701424; CDK-0701425; CDK-0701426; CDK-0701427; CDK-0701428; CDK-0701429; CDK-0701430; CDK-0701431; CDK-0701432; CDK-0701433; CDK-0701434; CDK-0701435; CDK-0701436; CDK-0701437; CDK-0701438; CDK-0701439; CDK-0701440; CDK-0701441; CDK-0701442; CDK-0701443; CDK-0701444; CDK-0701445; CDK-0701446; CDK-0701447; CDK-0701448; CDK-0701449.

**REQUEST NO. 104.** All communications and documents concerning your security tools, processes, and training for your software developers.

**RESPONSE**: CDK objects to this Request as grossly overbroad, unduly burdensome, not proportional to the needs of the case, and to the extent that it seeks information that is not

17

relevant to any party's claims or defenses and thus is beyond the scope of permissible discovery. As written, this Request would literally seek the production of "all communications and documents" (broadly defined by Authenticom's definitions) relating, in any way, to CDK's "security tools, processes, and training for [] software developers." CDK further objects to this Request as duplicative and/or cumulative of prior discovery requests by Authenticom, including but not limited to RFP Nos. 74 and 79- 82, and to the extent Authenticom seeks to void or evade the specific agreements the parties reached with respect to Authenticom's prior RFPs.

**REQUEST NO. 105.** Documents sufficient to show the jobs CDK eliminated and/or moved offshore from 2015 to the present, including documents sufficient to show the extent of the jobs eliminated and/or moved offshore, the dates on which the jobs were eliminated and/or moved offshore, and the categories or types of jobs that were eliminated and/or moved offshore. *See, e.g.*, CDK-1181024.

**RESPONSE**: CDK objects to this Request as overbroad, unduly burdensome, not proportional to the needs of the case, and to the extent that it seeks information that is not relevant to any party's claims or defenses and thus is beyond the scope of permissible discovery. Whether CDK has eliminated or off-shored any jobs over the past 3 years has no bearing on whether or not Defendants allegedly entered into an unlawful agreement to eliminate Authenticom from the marketplace or whether the terms of CDK's dealer or vendor contracts of which plaintiff complains are anticompetitive.

**REQUEST NO. 106.** An unredacted version of the FTC's March 18, 2018 Complaint concerning CDK's proposed acquisition of Auto/Mate (Docket No. 9382), as well as, for the avoidance of doubt, all documents provided to the FTC in connection with the FTC's review of the Auto/Mate acquisition.

**RESPONSE**: CDK objects to this Request as not proportional to the needs of the case and to the extent that it seeks information that is not relevant to any party's claims or defenses and thus is beyond the scope of permissible discovery. CDK further objects to this Request as duplicative and/or cumulative of prior discovery requests by Authenticom, including but not

18

limited to RFP No. 56 and to the extent Authenticom seeks to void or evade the specific agreements the parties reached with respect to Authenticom's prior RFPs.

Subject to and without waiving these or its General Objections, CDK states that its production in response to Authenticom's prior RFPs is ongoing and that it will produce additional non-privileged documents responsive to this Request consistent with the parties' prior agreements and based upon the parties previously agreed-upon search terms, date limitations, and custodians.

**REQUEST NO. 107.** Communications and documents not previously produced to Authenticom which contain any of the following terms:

- "Vendor X"
- "Joint team"
- "Combined team"
- "No disruption" /50 "security level"
- "Iron dome"
- "Secure DMS Strategy"
- "Lock out*"
- "Security Advisory Council"
- "Project Scarlett"
- "Project Ledson"
- Unhook & Rey! or RR or R&R
- "Data breach" & OneEighty or "One Eighty"
- "Evil empire"
- "DDX mass activation"
- Trust* /50 Rey! or RR or R&R or Schaefer or Brockman
- Threat* /50 Rey! or RR or R&R
- Exorbitant /50 Rey! or RR or R&R
- DMI & "one stop shop"
- Leak or leakage /50 Authen! or SIS
- Drain* /s swamp

**RESPONSE**: CDK objects to this Request as overbroad, unduly burdensome, not proportional to the needs of the case, and to the extent it seeks information that is not relevant to the claims or defenses in this case and thus is beyond the scope of permissible discovery. On their face, several of the terms seem wholly unrelated to the claims and defenses in this litigation

as it is simply a list of term, without explanation or context. CDK further objects to this Request as grossly overbroad and unduly burdensome in that it asks CDK to run the identified search terms on any and all documents "not previously produced" and regardless of custodian, that have been created since the beginning of time. CDK further objects to this Request as duplicative and/or cumulative of prior discovery requests by Authenticom and to the extent Authenticom seeks to void or evade the specific agreements the parties reached with respect to Authenticom's prior RFPs. As Authenticom has repeatedly told the Court, the parties have an agreed set of search terms (*see, e.g.,* MDL Dkt. 91 at 15 (Authenticom's counsel "successfully negotiated … search terms") and yet Authenticom is now trying to add to that extensive set of terms under the guise of a new RFP.

Dated: April 23, 2018                                      Respectfully submitted,

                                                          /s/ *Matt D. Provance*
                                                          Britt M. Miller
                                                          Matthew D. Provance
                                                          MAYER BROWN LLP
                                                          71 South Wacker Drive
                                                          Chicago, IL 60606
                                                          (312) 782-0600
                                                          bmiller@mayerbrown.com
                                                          mprovance@mayerbrown.com

                                                          Mark W. Ryan
                                                          MAYER BROWN LLP
                                                          1999 K Street NW
                                                          Washington, DC 20006
                                                          (202) 263-3000
                                                          mryan@mayerbrown.com

                                                          *Counsel for Defendant CDK Global, LLC*

## CERTIFICATE OF SERVICE

     I, Matthew D. Provance, an attorney, certify that I caused a copy of the foregoing **CDK GLOBAL, LLC'S RESPONSES AND OBJECTIONS TO AUTHENTICOM'S SECOND SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS** to be served on counsel of record in the above-captioned proceeding via email in accordance the parties' written stipulation to receive service by electronic means pursuant to Fed. R. Civ. P. 5(b)(2)(E).


                                                                           */s/ Matthew D. Provance*

# Exhibit 6

1710156

## UNITED STATES OF AMERICA
## BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:      **Maureen K. Ohlhausen, Acting Chairman**
                                 **Terrell McSweeny**

| | |
|---|---|
| In the Matter of | |
| **CDK Global, Inc.** <br>     **a corporation,** | |
| **CDK Global, LLC** <br>     **a limited liability company,** | |
| **Auto/Mate, Inc.** <br>     **a corporation,** | |
| **Robert Eustace** <br>     **an individual,** | **Docket No. 9382** |
| **Elsa Eustace** <br>     **an individual,** | **REDACTED PUBLIC VERSION** |
| **G. Larry Colson, Jr.** <br>     **an individual,** | |
| **Michael Esposito** <br>     **an individual,** | |
|       **And** | |
| **Glen Eustace** <br>     **a representative.** | |

## COMPLAINT

Pursuant to the provisions of the Federal Trade Commission Act ("FTC Act"), and by virtue of the authority vested in it by the FTC Act, the Federal Trade Commission ("Commission"), having reason to believe that Respondents CDK Global, Inc. and CDK Global, LLC (collectively "CDK") and Auto/Mate, Inc. ("Auto/Mate"), Robert Eustace, Elsa Eustace, G. Larry Colson, Jr., Michael Esposito, and Glen Eustace have executed an acquisition agreement in

violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45, which if consummated would violate Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, and it appearing to the Commission that a proceeding by it in respect thereof would be in the public interest, hereby issues its complaint pursuant to Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), and Section 11(b) of the Clayton Act, 15 U.S.C. § 21(b), stating its charges as follows:

## I.      NATURE OF THE CASE

1.      Respondents are providers of dealer management systems ("DMS") for franchise (new car) dealerships.  The DMS is mission-critical business software used by dealerships to manage nearly every aspect of their business, including accounting, payroll, parts and vehicle inventory, service repair scheduling, and vehicle financing.  Franchise DMS providers must also obtain car manufacturer ("OEM") certifications so that the DMS can share information between the franchise dealerships and OEMs, including information about new car sales, warranty services, parts, financial performance, and labor time.

2.      CDK and Reynolds & Reynolds ("Reynolds") are the two largest franchise DMS providers in the United States.  They are also the highest priced, and have similar business models, which include long-term contracts and significant initial and monthly fees for third-party applications (app) vendors to integrate with their respective DMS.

3.      Auto/Mate is an innovative, disruptive challenger to the two market leaders.  It offers franchise dealerships a distinct value proposition, including strong functionality, low pricing, an agnostic platform for third-party applications, extensive OEM certifications, short contracts, free software upgrades and training, and a reputation for high-quality customer service.  In recent years, Auto/Mate has grown as a competitive threat in the franchise DMS market, including by specifically targeting CDK customers.  Auto/Mate has consistently expanded its customer base and revenues through both aggressive pricing and adapting its differentiated product to match the preferences of many franchise dealers, placing pressure on CDK's pricing and margins.  It has also developed features attractive to larger franchise dealerships and as a result, became an increasing threat to take more customers from CDK. CDK identified Auto/Mate as a current and emerging threat and responded aggressively by discounting and offering more flexible and better terms to customers.

4.      In the fall of 2016 when Auto/Mate placed itself up for sale, CDK concluded that it could eliminate a strong current competitor, which was threatening to become an even more disruptive rival, by simply purchasing the company.  However, CDK's plan to rid itself of a significant and growing competitive threat hit a roadblock: during the bidding process, CDK suspected that other well-financed, credible bidders recognized Auto/Mate's competitive strengths and were seriously interested in buying the company.  CDK recognized that if Auto/Mate fell into the hands of a well-financed buyer willing to invest additional resources, Auto/Mate would become an even more aggressive and effective competitor.  CDK was so concerned about this possibility that it █████████████████████████████████████████ ███████████████████

5.      After concluding that it could not allow Auto/Mate to fall into the hands of a larger, well-financed backer, CDK ██████████████████████████████ ███████████████████ CDK ultimately offered a price that was far in excess of its original standalone valuation of Auto/Mate ██████████████████████ Indeed, the most credible explanation for CDK's ████████████████████████████████████████ ███████████████████████████████████████████████

6.      CDK's post-merger plans for Auto/Mate provide substantial additional support for the conclusion that this Acquisition will reduce competition.  Post-merger, CDK plans to substantially downgrade ███████████ features and service, raise ██████████ prices, and prevent CDK's larger customers from migrating ██████████████.

7.      Today, competition from Auto/Mate yields a myriad of substantial benefits to franchise dealers.  Auto/Mate's presence in this market means lower prices, greater innovation, more flexible contract terms, and better service.  If consummated, the Acquisition would eliminate the considerable and growing competition between CDK and Auto/Mate.  It would also eliminate competition between Auto/Mate and other DMS providers, and thereby cause significant and pervasive harm to franchise dealers.

8.      The Acquisition would entrench CDK's ████████████ share of the relevant market and would significantly increase market concentration.  Post-Acquisition, CDK would control approximately 47% of the franchise DMS market.  Reynolds would possess approximately ████ of the relevant market.  Under the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines"), a post-merger market-concentration level above 2500 points, as measured by the Herfindahl-Hirschman Index ("HHI"), and an increase in market concentration of more than 200 points renders a merger presumptively unlawful.  Post-Acquisition market concentration would be more than 2500, and the Acquisition would increase HHIs in an already concentrated market by well over 200 points.  Thus, the Acquisition is presumptively unlawful.

9.      New entry or repositioning by existing producers would not be timely, likely, or sufficient to counteract the anticompetitive effects of the Acquisition.  *De novo* entrants face considerable barriers including substantial and lengthy up-front investments in product development and OEM certification, with a high risk of failure.  Similarly, existing DMS providers face substantial challenges in order to reposition to replace Auto/Mate's competitive significance, including but not limited to, a poor or non-existent reputation among customers, software with limited functionality, limited or non-existent OEM certifications, poor service levels, constrained capacity, and high prices.  In brief, the remaining firms in this market are not likely to replace the unique, substantial, and growing competitive significance of Auto/Mate in a timely way, either collectively or individually.

10.      Respondents cannot show cognizable efficiencies that would offset the likely and substantial competitive harm from the Acquisition.

## II. JURISDICTION

11.     Respondents are, and at all relevant times have been, engaged in commerce or in activities affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

12.     The Acquisition constitutes an acquisition subject to Section 7 of the Clayton Act, 15 U.S.C. § 18.

## III. RESPONDENTS

13.     CDK is the largest provider of franchise DMS in the United States.  CDK is a publicly traded company, headquartered in Hoffman Estates, Illinois.  CDK had 2017 global revenues of over $2 billion.  In the United States, CDK has DMS customers with more than ███ franchise dealership locations (or "rooftops," the industry's preferred term).

14.     Auto/Mate is one of the fastest-growing providers of franchise DMS in the United States.  Auto/Mate is a privately held company based in Albany, New York, with 180 employees in the United States. ████████████████████████████████████████████████████████ ██████████████████████████████ Auto/Mate had 2017 revenues of approximately █████████.  In the United States, Auto/Mate has DMS customers with more than ███ franchise dealership rooftops.  Since 2012, Auto/Mate has grown rapidly, significantly increasing its customer base year-over-year.  Auto/Mate is now the fifth largest franchise DMS provider in the United States with approximately ██ market share.

## IV. THE ACQUISITION

15.     Pursuant to a Stock Purchase Agreement, dated April 28, 2017, CDK proposes to acquire 100% of the shares of Auto/Mate for approximately ██████████ in cash.

## V. MARKET PARTICIPANTS AND INDUSTRY DYNAMICS

16.     The United States franchise DMS market is highly concentrated with CDK and Reynolds controlling approximately 70% of the market.  Dealertrack, Auto/Mate, and Autosoft round out the top five franchise DMS providers in the United States.  Each of the remaining franchise DMS providers accounts for a much smaller share of the market.

17.     CDK and Reynolds have similar business models — both offer a broad set of features and OEM certifications, but both also charge relatively high prices, and both regularly require their customers to sign long-term contracts.  In addition to these issues, both companies tend to charge relatively high fees for integrating third party applications, and CDK has a reputation for relatively poor customer service.  Despite such business practices that frustrate

4

some of their customers, the two market leaders have maintained dominant positions in this market.

18.     Customers frustrated with CDK's and Reynolds's business practices have faced significant challenges in switching DMS suppliers and, historically, a lack of good alternatives to the two market leaders. In order to change DMS suppliers, franchise dealers need to spend a significant number of hours training their staff, while dealing with losses in productivity that can lead to lower sales during the transition period. Because the DMS touches essentially every aspect of a dealer's business, there is considerable risk associated with switching to a DMS that does not perform adequately. This makes customers understandably wary of DMS suppliers without an established track record of success.

19.     Auto/Mate is a low price, innovative company that has posted consistent, double-digit growth in recent years. A significant portion of Auto/Mate's wins in recent years have come at CDK's expense. Auto/Mate's value proposition includes but is not limited to, low prices, an ample and growing set of features, month-to-month contracts, the choice of on-site or cloud server deployment, a full roster of major OEM certifications, a low-cost agnostic platform for third-party applications, a strong reputation, and excellent customer service.

20.     Today, no other DMS offers Auto/Mate's combination of low prices, high functionality, and strong customer service. These attributes position Auto/Mate well to effectively challenge the market leadership of CDK and Reynolds. According to its internal business documents, Auto/Mate plans to grow its market share both by continuing to aggressively court and win small franchise dealership customers as well as by continuing to expand on its recent successes in winning larger franchise dealership customers. In 2016, Auto/Mate stated it could grow ███████████████████████████████████

21.     Compared to Auto/Mate, each remaining DMS provider, including Dealertrack and Autosoft, lacks important features or value, including but not limited to, low pricing, important software functionalities, important OEM certifications, month-to-month contracts, or a strong reputation. Many of these DMS providers have failed to show significant growth or have stagnated or contracted in the last several years. Many of the remaining DMS providers have significant limitations on their capacity to add and support new customers.

## VI.     RELEVANT MARKET

22.     The relevant market is the sale of DMS for franchise dealers in the United States ("Relevant Market" or "U.S. Franchise DMS Market"). A hypothetical monopolist of the sale of all franchise DMS in the United States would find it profit-maximizing to impose at least a small but significant and non-transitory increase in price ("SSNIP").

## A. Relevant Product Market

23.     The relevant product market in which to assess the effects of the proposed Acquisition is DMS for franchise dealers.

24.     The DMS is a mission-critical business software that serves as the backbone of the dealer's information technology systems.  Within a dealership, the DMS is used to manage nearly every aspect of the business, including accounting, payroll, parts and vehicle inventory, service repair scheduling, and vehicle financing.  Much of the technology needed to run a dealership, including internet connectivity, telephones, website management, inventory, service scheduling, finance and insurance, and accounting is run or connected through the DMS.  The DMS is also necessary for sharing information between the dealerships and OEMs like Ford, Audi, or Honda.  This enables the dealer and OEMs to share real-time information on sales, inventory, parts, service, and warranties.

25.     There are no reasonably interchangeable substitutes for franchise DMS, and franchise dealerships could not realistically switch to other products in the face of a SSNIP for DMS for franchise dealers.

26.     DMS for franchise dealers has distinct qualities that other DMS products, including independent (used car) DMS does not have.  A DMS for franchise dealers must have OEM certifications for the dealer to communicate with OEMs to share new car sales and parts information, and perform warranty services.  Independent DMS providers and general business software do not have OEM certifications.

27.     In addition to OEM certification, franchise dealers generally require software features tailored to franchise car dealership business operations, which are lacking in other DMS.  In particular, franchise dealers demand complex automobile repair and parts software modules that independent DMS providers do not offer.  In addition, independent DMS providers often lack other software modules important to the franchise dealer, including accounting and payroll modules.

28.     Franchise dealers do not use independent DMS providers as a competitive restraint in negotiations with franchise DMS providers.  General business software programs are also not a constraint on franchise DMS providers, and franchise dealers do not use general business software as a competitive restraint in negotiations with franchise DMS providers.

29.     Thus, DMS for franchise dealers is the relevant product market in which to analyze the Acquisition's likely effects.

## B. Relevant Geographic Market

30.     The relevant geographic market is the United States.  Auto/Mate does not compete outside of the United States.  OEM certifications are frequently limited to specific countries and many OEMs require a United States-specific certification.  Because franchise DMS customers demand OEM certifications that work within their country, and those certifications are frequently nation-specific, the relevant geographic market is the United States.

## VII.    MARKET STRUCTURE AND THE MERGER'S PRESUMPTIVE ILLEGALITY

31.     The U.S. Franchise DMS Market is highly concentrated, with CDK and Reynolds controlling roughly 70% of the market.  CDK has approximately ██ market share and Auto/Mate has approximately ██ market share.  Post-Acquisition, the Relevant Market would be even more highly concentrated; CDK would control nearly half the market.

32.     The Merger Guidelines and courts often measure concentration using HHIs.  HHIs are calculated by totaling the squares of the market shares of every firm in the relevant market.  Under the Merger Guidelines, a merger is presumed likely to create or enhance market power and is presumptively illegal when the post-merger HHI exceeds 2,500 and the merger increases the HHI by more than 200 points.

33.     Post-Acquisition, the Relevant Market would be substantially more highly concentrated than it is today.  Post-Acquisition, CDK would control approximately 47% of this Relevant Market.  Reynolds, the next largest competitor, would possess approximately ██ of the Relevant Market.  The Acquisition would result in a post-Acquisition HHI of over 2,500, and would increase concentration by well over 200 points.  Therefore, the Acquisition establishes a presumption of competitive harm.

34.     In this matter, the HHIs based on current market shares materially understate Auto/Mate's competitive significance in the Relevant Market because they do not take into consideration Auto/Mate's likely growth trajectory.  Prior to the merger announcement, Auto/Mate posted significant growth year-over-year, adding new functionalities to its DMS and gaining large dealership customers.  Moreover, Auto/Mate's reputation was growing in the industry and it was poised for continuing and significant growth.

35.     The Acquisition is, therefore, presumptively unlawful under relevant case law and the Merger Guidelines.

## VIII.    ANTICOMPETITIVE EFFECTS: THE ACQUISITION WOULD ELIMINATE VITAL COMPETITION BETWEEN AUTO/MATE AND OTHER DMS PROVIDERS

36.     The Acquisition is likely to substantially lessen competition in the Relevant Market.  Auto/Mate competes aggressively against CDK today and would compete even more aggressively against CDK in the future but for the Acquisition.  The merger would extinguish

this competition, as well as competition between Auto/Mate and other DMS providers. The result would be higher prices, inferior service, and reduced quality and innovation.

## A. Auto/Mate Competes Aggressively Against CDK Today

37. To successfully challenge the large incumbent DMS providers, Auto/Mate deploys aggressive sales and marketing efforts. In attempts to win CDK customers, Auto/Mate has repeatedly emphasized CDK's price increases for both its core DMS and third-party integration, CDK's restrictive contracts, and CDK's business practices in marketing blasts it sent directly to CDK customers:

- "Pressure to increase margins has already caused prices to increase on third-party integration fees. This pressure will also cause increased prices on products for dealers directly if they have not seen it already."

- "CDK is letting go of a substantial amount of account managers in addition to other employees" and "[t]his will surely result in decreased communications between CDK and its dealers."

- "We believe that CDK dealers using an older web platform are being forced to migrate to a newer version and are required to pay for the cost of implementation."

- "[I]f you are currently using an in-house server, you may be alarmed to find out that you will be forced to migrate to a cloud-based solution by January 1st, 2018."

- "We are aware that these changes could drastically impact your bottom line. If you're tired of being locked down in an unsatisfactory contract and forced to pay for unnecessary updates, please feel free to contact me personally."

38. Auto/Mate also focuses on the overall price difference between Auto/Mate and CDK and Reynolds, using its website to assure prospective customers that "dealers often find their Auto/Mate monthly support bills to be 65-75 percent less than what they're paying with Reynolds and Reynolds or CDK." Auto/Mate is successful in its attempts to target CDK and Reynolds customers. Auto/Mate touted that "[o]ver 82% of our customers are converted from CDK Global and Reynolds & Reynolds DMS systems."

39. Auto/Mate also continually improves its product in response to customer demand for feature innovations. ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ Auto/Mate almost always provides these enhancements to its entire customer base, and in most cases, does so free of charge.

8

40.     Auto/Mate's aggressive competition drew considerable attention at CDK. In 2016, CDK recognized that Auto/Mate was winning an increasing share of opportunities and that CDK was "losing more clients to Automate (sic) in the ███████████ than we've ever lost before," that Auto/Mate had "shrunken the gap in functionality to our core DMS," that Auto/Mate was "moving up toward Tier 1," and that Auto/Mate was now successfully acquiring large dealership customers.  Internally, CDK discussed that Auto/Mate was getting "more and more aggressive with pricing" and that Auto/Mate was "making too much headway" relative to other franchise DMS competitors.

41.     To respond to competition from Auto/Mate, CDK regularly offers ████████ ████ concessions.  Reynolds also provides █████████████ and other benefits in response to competition from Auto/Mate.

42.     In 2016, CDK implemented a plan specifically designed to reduce the risk that some of its customers would switch to Auto/Mate. ███████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ all of which were beneficial to customers.

43.     Competition between CDK and Auto/Mate has substantially lowered prices for customers.  The following are examples of this direct price competition:

- In a competition between CDK, Auto/Mate and Dealertrack, a franchise dealer's consultant produced a cost comparison showing that Auto/Mate's total price over 60 months was ██████ less than Dealertrack and ██████ less than CDK's DMS.  In explaining his decision to leave CDK, the franchise dealer cited the price difference as "significant" and added that the decision to leave "wasn't a very hard call."

- A franchise dealer told CDK it was switching to Auto/Mate because "The price difference between R&R / CDK and a smaller DMS like Auto/Mate is a savings of ██████ over 60 months.  That is substantial and the main reason our owners wish to go this route."

- In competition with Auto/Mate, CDK was forced to provide a roughly ████ discount on monthly charges (an equivalent of approximately ████████ over 60 months).

44.     CDK also regularly responds to competition from Auto/Mate on non-price terms, including but not limited to, ██████████████████████████████████████ ████  For example, CDK typically offers a 60-month term contract, whereas Auto/Mate's contracts are month-to-month.  Before the Acquisition's announcement, in response to Auto/Mate competition, ██████████████████████████  In another example, seeing Auto/Mate as the "real risk" to win one of its existing customers who expressed frustration with CDK's service, ████████████████████████████████████████ ██████████████████████████

**B. Auto/Mate Is Positioned to Compete Even More Aggressively in the Future Against CDK, Especially for Larger Dealership Customers**

45.     This Acquisition would lead to a real and significant loss of current competition. However, Auto/Mate's effect on the market is more significant than its current market share suggests, in part because of its compelling value proposition and history of continuous software innovations. These issues strongly indicate that, prior to the Acquisition, Auto/Mate was poised to become an even more aggressive and effective competitor in the Relevant Market.

46.     For the past five years, Auto/Mate has been experiencing significant year-over-year rooftop growth. To drive this growth, Auto/Mate recently introduced several important functionality upgrades, including centralized accounting, which is a feature that dealerships with multiple rooftops value, and often strongly prefer. By adding centralized accounting to an already solid feature set at aggressive prices, Auto/Mate has attracted the attention of multi-rooftop dealers with very sophisticated DMS needs. Auto/Mate's introduction of centralized accounting was a ██████████████ and amplified its competitive threat to CDK.

47.     Prior to the Acquisition's announcement, Auto/Mate was on a clear growth path and believed it was well positioned to win larger DMS franchise customers. In 2016, Auto/Mate's Chairman made its growth plans clear: "We expect that as we continue to take larger groups from CDK/R&R, that we will eventually wake the sleeping giants. Right now, we're an annoyance, and they truly think that we are not a serious competitor at dealerships of a certain size. However, they are not really aware of some of the recent changes we have made to the software, and in the coming months we will begin installing a pilot store at a very large dealer group[] that, assuming we are successful, ought to shake up the industry, at least those who are paying attention."

48.     As predicted, Auto/Mate had its best year yet in 2016, the last full year prior to the Acquisition's announcement, when it won several larger dealerships and successfully started ████████████████████████████████████████████████████████ Auto/Mate believed its momentum would lead to further success: "Our success with these Groups is already generating interest from other large groups…. The large groups we installed in 2015 and 2016 are singing our praises."

49.     In 2016, Auto/Mate won ██ customers with ██ rooftops from CDK in competitive situations. Auto/Mate also had significant success against Reynolds in 2016, winning ██ customers with ██ rooftops in competitive situations. Auto/Mate also won ██ customers with ██ rooftops from other DMS providers in competitive situations.

50.     Auto/Mate knew its aggressive competition and strong reputation were working: "It seems that our reputation as tops in customer service, our successes at multi-store group installations, our more recent larger customer wins and some help from our competitors jacking up 3rd party integration fees has combined to create one of those 'perfect storm' moments, and we're perfectly positioned to take advantage of it."

51.     At the end of 2016, Mike Esposito, the President and CEO of Auto/Mate highlighted to his team "We have worked very hard to get to the 'top of the hill'…we are almost on the other side. Our efforts are paying off! People don't ask anymore 'Who are you guys?' They now know who Auto/Mate is!"  Mr. Esposito expected 2017 to "be the best year we have ever had."

52.     As Auto/Mate won more and more customers, CDK executives knew they needed to respond to this competition, acknowledging that ███████████████████████ and that CDK needed a ████████████████████████████████████████████."  CDK determined that ████████
████████████████████████████████████████████████████████

### C.  The Acquisition Will Eliminate the Consumer Benefits of Head-to-Head Competition Between Auto/Mate and other DMS providers

53.     The Acquisition would eliminate the intense head-to-head price and quality competition between CDK and Auto/Mate occurring today.  Consequently, CDK would not need to compete as aggressively on price to win franchise dealer customers, and would have the incentive and ability to raise prices and lower service quality.  The Acquisition would also eliminate the competition between Auto/Mate and other DMS providers, reducing the need for those providers to compete as aggressively on price, service, and innovation.

54.     After the Acquisition, CDK and other DMS providers would face less competition to retain and gain new customers and would have less incentive to offer shorter contracts, faster software enhancements, more third-party and less expensive app integration, additional training, and better customer service.  CDK was aware that it would face less competition after acquiring Auto/Mate, internally touting: "We are so serious about acquiring new customers that we bought the DMS [Auto/Mate] that has been kicking our butts."

55.     Indeed, CDK was willing to pay top dollar to keep Auto/Mate out of the hands of an acquirer that would increase Auto/Mate's already impressive growth trajectory.  CDK predicted that, in the hands of a motivated and well-capitalized buyer, Auto/Mate would ████
████████  To prevent this, CDK ████████████████ over the next highest bidder to acquire Auto/Mate, and ████████████████ CDK's original valuation of Auto/Mate.  The gap between CDK's winning bid and its initial valuation substantially represents the defensive value to CDK of removing Auto/Mate as a competitor and preventing a well-financed alternative buyer from accelerating Auto/Mate's growth further.

56.     Post-Acquisition, CDK plans to severely handicap the ████████ DMS platform and remove it as a competitive alternative to CDK's other DMS products for large swaths of customers. ████████████████████████████████████████
████████████████████████  These are two Auto/Mate features its customers highly value. ████████████████████████████████████████
████████████████████████████████████████  Prior to the



Acquisition announcement, Auto/Mate was successfully adding customers with three or more rooftops, often at the expense of CDK. ████████ customers therefore would face degraded functionality and higher prices following the Acquisition, and ████████ strong competitive attributes would be significantly dampened or withdrawn from the market. To the extent that Auto/Mate customers seek another franchise DMS provider, that provider would not be a close substitute to the unique value proposition they chose with Auto/Mate. Moreover, such alternatives may not be available given the significant installation and support capacity limitations of many other DMS providers.

## IX. LACK OF COUNTERVAILING FACTORS

### A. Barriers to Entry and Expansion

57. Respondents cannot demonstrate that new entry or expansion by existing firms would be timely, likely, or sufficient to offset the anticompetitive effects of the Acquisition.

58. New entry or repositioning by existing producers would not be timely, likely, or sufficient to counteract the anticompetitive effects of the Acquisition. *De novo* entrants into this market would face considerable barriers in replicating the competition that will be eliminated by the Acquisition. Effective entry into this market would require substantial, costly up-front investments in product development and OEM certification, and the risk of failure would be high given the substantial product development and reputational barriers to commercial success in this market. Collectively, these challenges would take many years to overcome. Auto/Mate's current success has taken many years of slow, careful growth to achieve, and new entrants would face a similarly protracted, high-risk path to success.

59. Similarly, existing DMS providers are unlikely to replace the competition that will be lost as a result of the Acquisition, because all of them lack important offerings Auto/Mate provides and that they are unlikely to develop in a timely manner if Auto/Mate is absorbed by CDK. While each firm's shortcomings are distinct, each faces real and significant challenges in becoming the next Auto/Mate. These challenges include, but are not limited to, a poor or non-existent reputation among customers, software with limited functionality, limited or non-existent OEM certifications, poor service levels, and constrained capacity. Moreover, other DMS providers are significantly higher priced than Auto/Mate and would not sufficiently replace Auto/Mate's aggressive pricing. The remaining firms in this market are not likely to replace the unique, substantial, and growing competitive significance of Auto/Mate in a timely way, either collectively or individually.

### B. Efficiencies

60. Respondents have not identified and cannot demonstrate cognizable efficiencies that would be sufficient to rebut the strong presumption and evidence that Acquisition likely would substantially lessen completion in the relevant market.

## X. VIOLATION

### Count I – Illegal Agreement

61.     The allegations of Paragraphs 1 through 60 above are incorporated by reference as though fully set forth herein.

62.     The Acquisition Agreement constitutes an unfair method of competition in violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

### Count II—Illegal Acquisition

63.     The allegations of Paragraphs 1 through 60 above are incorporated by reference as though fully set forth herein.

64.     The Acquisition, if consummated, may substantially lessen competition in the relevant market in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and is an unfair method of competition in violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

### NOTICE

Notice is hereby given to the Respondents that the twenty-first day of August, 2018, at 10 a.m., is hereby fixed as the time, and the Federal Trade Commission offices at 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580, as the place, when and where an evidentiary hearing will be had before an Administrative Law Judge of the Federal Trade Commission, on the charges set forth in this complaint, at which time and place you will have the right under the Federal Trade Commission Act and the Clayton Act to appear and show cause why an order should not be entered requiring you to cease and desist from the violations of law charged in the complaint.

You are notified that the opportunity is afforded you to file with the Commission an answer to this complaint on or before the fourteenth (14th) day after service of it upon you. An answer in which the allegations of the complaint are contested shall contain a concise statement of the facts constituting each ground of defense; and specific admission, denial, or explanation of each fact alleged in the complaint or, if you are without knowledge thereof, a statement to that effect. Allegations of the complaint not thus answered shall be deemed to have been admitted. If you elect not to contest the allegations of fact set forth in the complaint, the answer shall consist of a statement that you admit all of the material facts to be true. Such an answer shall constitute a waiver of hearings as to the facts alleged in the complaint and, together with the complaint, will provide a record basis on which the Commission shall issue a final decision containing appropriate findings and conclusions and a final order disposing of the proceeding. In such answer, you may, however, reserve the right to submit proposed findings and conclusions under Rule 3.46 of the Commission's Rules of Practice for Adjudicative Proceedings.

Failure to file an answer within the time above provided shall be deemed to constitute a waiver of your right to appear and to contest the allegations of the complaint and shall authorize the Commission, without further notice to you, to find the facts to be as alleged in the complaint and to enter a final decision containing appropriate findings and conclusions, and a final order disposing of the proceeding.

The Administrative Law Judge shall hold a prehearing scheduling conference not later than ten (10) days after the Respondents file their answers. Unless otherwise directed by the Administrative Law Judge, the scheduling conference and further proceedings will take place at the Federal Trade Commission, 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580. Rule 3.21(a) requires a meeting of the parties' counsel as early as practicable before the pre-hearing scheduling conference (but in any event no later than five (5) days after the Respondents file their answers). Rule 3.31(b) obligates counsel for each party, within five (5) days of receiving the Respondents' answers, to make certain initial disclosures without awaiting a discovery request.

### Notice of Contemplated Relief

Should the Commission conclude from the record developed in any adjudicative proceedings in this matter that the Merger challenged in this proceeding violates Section 5 of the Federal Trade Commission Act, as amended, and/or Section 7 of the Clayton Act, as amended, the Commission may order such relief against Respondents as is supported by the record and is necessary and appropriate, including, but not limited to:

1.  If the Acquisition is consummated, divestiture or reconstitution of all associated and necessary assets, in a manner that restores two or more distinct and separate, viable and independent businesses in the relevant market, with the ability to offer such products and services as CDK and Auto/Mate were offering and planning to offer prior to the Acquisition.

2.  A prohibition against any transaction between CDK and Auto/Mate that combines their businesses in the relevant market, except as may be approved by the Commission.

3.  A requirement that, for a period of time, CDK and Auto/Mate provide prior notice to the Commission of acquisitions, mergers, consolidations, or any other combinations of their businesses in the relevant market with any other company operating in the relevant markets.

4.  A requirement to file periodic compliance reports with the Commission.

5.      Any other relief appropriate to correct or remedy the anticompetitive effects of the transaction or to restore Auto/Mate as a viable, independent competitor in the relevant market.

**IN WITNESS WHEREOF**, the Federal Trade Commission has caused this complaint to be signed by its Secretary and its official seal to be hereto affixed, at Washington, D.C., this nineteenth day of March, 2018.

By the Commission.


Donald S. Clark
Secretary

SEAL:

15

# Exhibit 7

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
———
(202) 326-7900
FACSIMILE:
(202) 326-7999

May 2, 2018

*Via Electronic Mail*

Aundrea K. Gulley, Esq.                     Britt M. Miller, Esq.
Gibbs & Bruns LLP                            Mayer Brown
1100 Louisiana                               71 South Wacker Drive
Suite 5300                                   Chicago, IL 60606
Houston, TX 77002

      Re:  *In re: Dealer Management System Antitrust Litigation*, MDL No. 2817 (N.D. Ill.)

Dear Andi and Britt:

      I write regarding the production of documents that the parties have produced to the Federal Trade Commission ("FTC"). In particular, at the April 25, 2018 hearing, counsel for Reynolds made two material misstatements to the Court on this topic. We also write regarding the status of document productions made to the FTC in connection with the agency's review of CDK's acquisition of Auto/Mate.

      ***First***, at the hearing, the Court asked Defendants: "Have you given a ***complete*** production of what you turned over to the FTC?" Tr. 25:13-25 (emphasis added). Counsel for Reynolds responded: "So far." *Id*. (A. Gulley). And just prior to the Court's question, counsel for Reynolds made the same point: "[W]e've already done it." *Id*. (A. Gulley). Those representations were incorrect, as you know. Reynolds has specifically refused to give Authenticom a complete production of what it has turned over to the FTC. Instead, Reynolds has withheld an unspecified number of documents, unilaterally claiming – without explanation – that the withheld documents are not "relevant" to the *Authenticom* matter. *See* Email from B. Ross and A. Gulley to M. Nemelka (Jan. 29, 2018) ("With respect to production to the FTC, Reynolds' position on producing irrelevant factual documents has not changed."). The most Reynolds has said is that the withheld documents include, but are not limited to, "commercial agreements between Reynolds and CDK." *Id*. We have repeatedly explained that those documents – and any other withheld documents – are plainly relevant and discoverable and that Reynolds' refusal is improper. *See*, *e.g.*, Letter from M. Nemelka to Defendants (Jan. 19, 2018) ("Our position remains that any factual material produced to the FTC is relevant: the FTC's investigation overlaps with the issues in this case."). We have extensive correspondence on Reynolds' refusal to produce all FTC documents, and we had several telephonic meet and confers regarding the same. *See generally* Correspondence between M. Nemelka and

1

Defendants (December 2017 – January 2018). We cannot think of a plausible explanation for Reynolds' contrary representations to the Court. We reserve all rights.

The Court has now ordered that all parties produce all documents that they have provided to the FTC. *See* Tr. 27:14-16 ("So, all parties should produce whatever has been produced to the FTC, and continue doing so to the extent you have continued productions and identify what it is."); *id.* Tr. 27:24-28:1 ("Produce – and all sides should produce – to the extent you have not already, by May 9th any productions that your clients have made to the FTC."). Reynolds no longer has any basis to withhold any documents it has produced to the FTC, especially given its misrepresentations to the Court on the matter. We request that Reynolds produce the missing documents forthwith.

We remind Defendants that they have agreed to produce advocacy pieces, white papers, or other such non-factual documents produced to or presented to the FTC. *See* Letters from B. Miller and B. Ross to M. Nemelka (Dec. 15, 2017). Please confirm that Defendants have produced all of those non-factual documents as well.

***Second***, counsel for Reynolds made an additional misrepresentation to the Court, though less serious. Counsel for Reynolds stated: "Authenticom has not identified for us what of its production was produced to the FTC." Tr. 26:14-15 (A. Gulley). That too is incorrect. We have explained to Defendants – on two separate occasions during two separate meet and confers – that Authenticom's FTC production consists of every document it is producing in this litigation. In fact, we explained that Authenticom first produces its documents to Defendants, and then replicates that production for the FTC. And so we have in fact identified what of Authenticom's production is also being produced to the FTC – all of it.

***Third***, the category of documents produced to the FTC includes those documents provided pursuant to the FTC's investigation of CDK's proposed acquisition of Auto/Mate, which the FTC recently blocked on grounds that the acquisition would be anticompetitive. *See In re CDK Global, Inc., et al.,* F.T.C. Docket No. 9382 (March 19, 2018). In light of Defendants' representations to the Court, please confirm that Defendants have also produced all of those documents in this MDL as well. And if they have not, please confirm that they will do so by the May 9, 2018 deadline.

\* \* \* \* \*

Please let us know if you would like to discuss any of the foregoing, and we look forward to your prompt response.

Very truly yours,

*s/ Michael N. Nemelka*

Michael N. Nemelka

CC:    MDL Counsel Email List

# Exhibit 8

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
_____
(202) 326-7900
FACSIMILE:
(202) 326-7999

May 8, 2018

*Via Electronic Mail*

Aundrea K. Gulley, Esq.                           Britt M. Miller, Esq.
Gibbs & Bruns LLP                                 Mayer Brown
1100 Louisiana                                    71 South Wacker Drive
Suite 5300                                        Chicago, IL 60606
Houston, TX 77002

      Re:  *In re: Dealer Management System Antitrust Litigation*, MDL No. 2817 (N.D. Ill.)

Dear Andi and Britt:

      I write regarding the productions of documents that the parties have produced to the Federal Trade Commission ("FTC"), and in response to your letters of May 4.

      **Completeness of Reynolds' Reproductions of FTC Documents.**  Thank you for reconsidering your position on the withheld documents, which you were withholding on an unfounded "relevancy" objection.  We look forward to receiving the documents tomorrow. Reynolds mentions in its letter that it may withhold documents in the future on the same ground; we continue to object to the withholding of any document – whether factual or otherwise – that Reynolds or CDK has produced to the FTC.  Please let us know immediately if Reynolds (or CDK) withholds any such documents.

      As for your statements to the Court, we acknowledge and accept that there was no intention to mislead.  But when the Court asks a direct question, care should be given to answer accurately.  And contrary to your suggestion, the statement did not deal with "minutiae."  If it had, we would certainly understand not delving into insignificant details of our meet-and-confers.  The question, however, was on the specific point: "Have you given a ***complete*** production of what you turned over to the FTC?"  Tr. 25:13-25 (emphasis added).  There was only one correct answer to that question, and it was: "No."  And the issue was material.  In fact, as you point out, the parties had a "notorious disagreement" on the Court's very question: Reynolds *was* refusing to provide a "complete production of what you turned over to the FTC." We also disagree with your suggestion that the onus was on us to correct your statements.  In this instance, we alerted you to them after getting the hearing transcript, and we have now worked through them in this correspondence.

1

**Authenticom's FTC Production.**  With respect to your follow-up questions, you are correct that Authenticom has not provided any documents to the FTC in connection with the CDK/Reynolds investigation that were not previously produced in this civil matter.  And you are also correct that Authenticom has not provided any white papers or advocacy pieces to the FTC.  As I wrote in my prior letter, Authenticom will produce to Defendants any document that Authenticom has or will provide to the FTC.

**Documents Produced by CDK and Reynolds to the FTC in Connection with the FTC's Review of CDK's Proposed Acquisition of Auto/Mate.**  Based on your letters, we understand that both CDK and Reynolds are refusing to produce by tomorrow's deadline the documents that either of you produced to the FTC in connection with the agency's review of CDK's proposed acquisition of Auto/Mate.  Reynolds for now is refusing to produce any documents on that score; and CDK is only agreeing to produce those documents that are "relevant" at some future date.  We disagree with Defendants' positions.  The FTC blocked CDK's acquisition of Auto/Mate because of its anti-competitive effects in the DMS, data integration, and application markets.  *See In re CDK Global, Inc.*, *et al.,* F.T.C. Docket No. 9382 (March 19, 2018).  Defendants have no basis to withhold such documents in this MDL where the very same issues are at stake.  Moreover, the FTC only recently blocked the acquisition – on March 19, 2018 – and articulated its reasons for doing so in a complaint.  The relevance of these documents have therefore only been heightened and all MDL Plaintiffs request that CDK and Reynolds produce them as soon as possible.

Given that Defendants are refusing to produce the documents from the FTC Auto/Mate investigation, we must take the same position on behalf of the MDL Plaintiffs for the time being.  As soon as Defendants agree to produce the FTC Auto/Mate documents, we will agree to do the same on behalf of any MDL Plaintiff that we represent.

Very truly yours,

*s/  Michael N. Nemelka*

Michael N. Nemelka

CC:     MDL Counsel Email List

# Exhibit 9

| | |
|---|---|
| **From:** | Miller, Britt M. |
| **Sent:** | Tuesday, January 09, 2018 11:24 PM |
| **To:** | Nemelka, Michael N. |
| **Cc:** | Ryan, Mark; Provance, Matthew D.; Brian Ross; Aundrea K. Gulley; Michael Cohen; Hafenbrack, Joshua; 'Gregor, Jennifer' |
| **Subject:** | RE: CDK confidentiality designations |

Mike –

To be sure, as a general rule, we agree that the parties must comply with the terms of the Protective Order. It is not our intention to designate every single document we produce in this case as "Highly Confidential," but, as we explained (and as you acknowledge), the documents in our December 15 production were subject to a separate agreement of the parties. And contrary to the version of the facts set forth in your email, there was nothing "provisional" about the parties' agreement. As detailed in my January 4 email and as I made clear during our December 12 meet-and-confer, the offer of an expedited production of those documents was conditional on the understanding that we were not going to go back and re-review that production (as we had other pressing document review obligations ahead of us) but that we would be reasonable in entertaining any request by Authenticom that we downgrade the confidentiality of specific documents/targeted document ranges in that collection. Again, we stand by that offer.

And while we appreciate your identification of those documents from CDK's initial production that "relate to" each of the six CDK custodians that Authenticom has identified for deposition in the short term (although we're not sure what you mean by "relate to"), we cannot commit to re-reviewing all 42,919 of them and having them re-designated (as applicable) within 7 days of each deposition—at least not with respect to the first several depositions (the first of which is scheduled to take place in 9 days). Application of Authenticom's search terms already has us reviewing literally hundreds of thousands of documents for a number of the early deponents and we are working diligently to ensure that each deponent's documents are produced seven days in advance of his/her deposition consistent with the parties' agreement. Moreover, Authenticom has had CDK's December 15 production for over 3 weeks and its proposed deposition dates for over 2 weeks—to raise this now and state an intent to "treat" all 42,919 documents as "CONFIDENTIAL" unless CDK meets Authenticom's chosen deadline is completely unreasonable. It is particularly unreasonable with respect to the 3,030 Ayotte documents that Authenticom now purports to require us to re-review in the next two days.

In any event and regardless of the parties' different recollections of the relevant facts, this would appear to be an academic dispute in the short term. As Authenticom rightly points out, there is a Protective Order in place in this case. Pursuant to paragraph 5(c)(6) of that Order:

> "During their depositions, witnesses in this action who are employees of the Designating Party or who were employees of the Designating Party at the time that the exhibit designated as 'HIGHLY CONFIDENTIAL' was created" … are "allowed to review Confidential Information designated as 'HIGHLY CONFIDENTIAL'".

As 5 of the current 6 CDK deponents are current employees of CDK (Ayotte, Noser, Distelhorst, Frey, Conver), all five of them can be shown HIGHLY CONFIDENTIAL documents during their depositions, so the possible over-designation of documents in CDK's December 15 production is not prejudicing Authenticom in any way vis-à-vis the upcoming CDK depositions. As to Steve Anenen, he was a CDK employee for the vast majority of the relevant period and thus can be shown most (if not all) of the HIGHLY CONFIDENTIAL documents you may want to show him at his deposition (although we believe that we should be able to re-review the identified 1,300 documents before his deposition, assuming the date we offered stands). In short, there is absolutely no reason for Authenticom to "treat" any documents from the December 15 production as "CONFIDENTIAL" in connection with the upcoming CDK depositions.

1

To the extent you intend to follow through on your ultimatum, however, we would be remiss if we did not also point out that the Protective Order contains a provision that governs disputes regarding confidentiality designations. Notwithstanding our offer to re-review the production (albeit not on Authenticom's ridiculously truncated schedule) and our offer to consider the prompt downgrade of any specifically-identified documents, if Authenticom doesn't want to wait for us to complete that work (in addition to all of the other document review obligations we currently have) then its remedy is **not** self-help (i.e., unilaterally electing to "treat" them as CONFIDENTIAL), but rather to file a motion with the Court which, under the circumstances and with this factual record we will be more than happy to respond to.  Until the Court rules on that motion, however, "**all parties shall continue to treat the materials as Confidential Information ["CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" as designated] under the terms of [the] Order**."  To the extent Authenticom purposefully and knowingly violates the Protective Order and shows documents designated as "HIGHLY CONFIDENTIAL" to persons not permitted to see them under the terms of that Order, CDK will have no choice but to seek redress from the Court.

With respect to future productions related specifically to the civil litigation, we are working diligently to address confidentiality designations as part of our initial review and production efforts.  As detailed in my January 4 email, however, with respect to our future re-productions of CDK's FTC CID productions (which we did not handle in the first instance), we will have to review them all prior to their production to Authenticom as they currently do not bear any confidentiality labels (as the FTC has agreed to accord them all the highest confidentiality treatment).  As such, there will be a modest delay in their production (as I previously noted, we had been prepared to make another large re-production this week, but given your about-face on the December 15 production, pulled that production back and are only going to be producing, in the short term, those portions that relate to the upcoming deponents as they are the only ones that have been reviewed for confidentiality and designated, as appropriate).

With respect to Authenticom's production, we can debate whether Authenticom's over-designation applies to only a handful of "extreme outlier" documents, but as we do not think such a discussion would be productive, we will not engage in it here.  To the extent that we determine that Authenticom has over-designated any particular document/documents and we believe we need to share it with someone not otherwise permitted to see it under the terms of the Protective Order, we will notify you in accordance in paragraph 9 of the Order and, if necessary, file a motion with the Court.

Regards – Britt

**Britt M. Miller**
**MAYER BROWN LLP**
**71 South Wacker Drive**
**Chicago, Illinois 60606-4637**
**Direct Dial: (312) 701-8663**
**Direct Fax: (312) 706-8763**
**e-mail:** bmiller@mayerbrown.com

**From:** Nemelka, Michael N. [mailto:mnemelka@kellogghansen.com]
**Sent:** Tuesday, January 09, 2018 5:23 PM
**To:** Miller, Britt M.
**Cc:** Ryan, Mark; Provance, Matthew D.; Brian Ross; Aundrea K. Gulley; Michael Cohen; Hafenbrack, Joshua; 'Gregor, Jennifer'
**Subject:** RE: CDK confidentiality designations

Dear Britt,

Your production of documents in this case must comply with the obligations of the protective order, and designating every single document as "Highly Confidential" does not comply with those obligations.  We only agreed to your

producing the first production as Highly Confidential – on a *provisional* basis – because CDK had not produced a single document and it was (and is) necessary to move the production of documents along. It has now been nearly a month since we made that provisional agreement, and per my email below, we again ask CDK to apply the proper designations to those documents.

To help you prioritize, please apply the proper designations to the documents relating to the following upcoming deponents. Specific Bates-numbered documents for each deponent are in the attached spreadsheets. Unless we hear from you otherwise seven days before the depositions of the below witnesses, we will consider the documents in the attached to be "Confidential."

1. Ayotte - 3,030 records
2. Noser - 7,671 records
3. Distelhorst – 7,183 records
4. Frey – 1,689 records
5. Conver – 21,957 records
6. Anenen – 1,389 records

As for future productions, we appreciate your efforts to get those to us as quickly as possible, and we recognize those efforts. But we think it would be more efficient to apply the proper designations in the first instance. Applying the proper designations should not be a reason that document productions are delayed, however.

Finally, we agree that with the amount of work the parties are doing that some over-designation may unfortunately occur. We would just note that in Authenticom's production, the descriptions your provided apply only to a handful of documents and are the extreme outliers.

Thanks and, again, we appreciate your efforts.

Mike

---

**From:** Miller, Britt M. [mailto:BMiller@mayerbrown.com]
**Sent:** Thursday, January 04, 2018 10:23 PM
**To:** Nemelka, Michael N.
**Cc:** Ryan, Mark; Provance, Matthew D.; Brian Ross; Aundrea K. Gulley; Michael Cohen; Hafenbrack, Joshua; 'Gregor, Jennifer'
**Subject:** RE: CDK confidentiality designations

Mike –

The production that we made on December 15, 2017, you will recall, was the first installment of CDK's FTC production in response to the CID. As I explained in my December 8, 2017 letter (at p. 2) in response to your complaint that we had not yet produced any "factual" FTC documents as of that date, CDK had just begun producing custodial documents to the FTC and in order to comply with the Protective Order in this case, we would have to review those 86,569 documents and assign them appropriate confidentiality designations prior to production—an effort that would take some time. In an attempt to get Authenticom documents sooner rather than later, however, we then offered that if Authenticom was willing to treat the documents as "HIGHLY CONFIDENTIAL" under the Protective Order (and we would label them as such), we would have a copy of the production delivered within 3 business days. During our meet-and-confer on December 12, 2017, you accepted that offer and we made the production within the 3 promised days. So the designation of the entire collection as "HIGHLY CONFIDENTIAL" was done with Authenticom's knowledge and consent. Moreover, we also made clear during that meet-and-confer—in response to your specific question about this very subject—that we did not intend to go back and re-review those documents for confidentiality purposes but that we would be reasonable in entertaining any request by Authenticom that we downgrade the confidentiality of specific documents/targeted document ranges in that collection. We stand by that offer. And although it is no doubt true that all of the documents in that collection do not warrant "HIGHLY CONFIDENTIAL" status, we're sure that there are many

that do.  Thus, your request that we "*en masse*" designate them as "CONFIDENTIAL" is not a reasonable request.  If you have specific documents/document ranges you would like us to consider downgrading, we are happy to do so and will do so promptly.  If you are asking us to undertake a re-review of the entire collection for confidentiality purposes, we can do so, but that will take some time as we are working diligently to get documents out for the upcoming depositions (as I described during our call earlier today).

On this same point, however, we had understood that Authenticom was willing to handle CDK's future FTC productions in the same manner as our December 15 production and thus had been preparing to make another substantial production early next week.  But, I gather from your email that Authenticom is not willing to treat such collections as "HIGHLY CONFIDENTIAL" in their entirety (subject to appropriate downgrades upon reasonable request) and thus, we will not make that production in the short term.  Instead we will focus on producing those documents in the collection that belong to the upcoming deponents and assigning appropriate confidentiality designations to those documents so as to avoid this issue going forward.  If that is not Authenticom's position, please let us know promptly.

Finally, it is worth noting that in a case of this magnitude and with the speed with which all of the parties are working to try to get documents produced, some over-designation is bound to happen.  Indeed, a quick review of Authenticom's production to date shows that approximately 90% has been designated as "HIGHLY CONFIDENTIAL", including a number of organizational charts and other routine business documents that likely don't warrant the designation.  Consistent with the Protective Order, however, Defendants will reach out to Authenticom about downgrading the confidentiality of various documents when necessary/appropriate.

Regards – Britt

_____

**Britt M. Miller**
**MAYER BROWN LLP**
**71 South Wacker Drive**
**Chicago, Illinois 60606-4637**
**Direct Dial: (312) 701-8663**
**Direct Fax: (312) 706-8763**
**e-mail:** bmiller@mayerbrown.com

---

**From:** Nemelka, Michael N. [mailto:mnemelka@kellogghansen.com]
**Sent:** Thursday, January 04, 2018 5:09 PM
**To:** Miller, Britt M.
**Cc:** Ryan, Mark; Provance, Matthew D.; Brian Ross; Aundrea K. Gulley; Michael Cohen; Hafenbrack, Joshua; 'Gregor, Jennifer'
**Subject:** CDK confidentiality designations

Dear Britt,

CDK has made one production to date – on December 15, 2017 – totaling 86,569 records.  CDK designated every document Highly Confidential, even though these documents do not merit that designation.  We hereby request that CDK de-designate these documents, and apply  the "CONFIDENTIAL" designation to them.  It is improper for CDK to maintain the highest confidentiality designation for its entire document production, meaning we cannot show any of the documents to our client or use them at depositions without undertaking arduous procedures.  Treating the entire document production as Highly Confidential is inconsistent with the Protective Order.  If CDK wishes to maintain any of them as Highly Confidential, then it should have identified those documents by now.  But it is inappropriate for CDK to maintain the highest level of confidentiality *en masse*.  Can we please confer about this matter tomorrow?  We are generally available, and will work around your schedule.

Thanks,

Mike


Michael N. Nemelka
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
1615 M. St. N.W., Suite 400
Washington, DC  20036
Direct:  (202) 326-7932
mnemelka@kellogghansen.com

NOTICE:  This transmission is intended only for the use of the addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify the sender immediately via reply e-mail, and then destroy all instances of this communication.  Thank you.


_____


This email and any files transmitted with it are intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. If you are not the named addressee you should not disseminate, distribute or copy this e-mail.