# Exhibit 1

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
———
(202) 326-7900
FACSIMILE:
(202) 326-7999

May 25, 2018

*Via Electronic Mail*

Aundrea K. Gulley, Esq.
Brian T. Ross, Esq.                                    Britt M. Miller, Esq.
Gibbs & Bruns LLP                                    Mayer Brown LLP
1100 Louisiana                                          71 South Wacker Drive
Suite 5300                                                 Chicago, IL 60606
Houston, TX 77002

        Re: *In re: Dealer Management Systems Antitrust Litigation*, MDL No. 2817

Dear Counsel:

        We write on behalf of all MDL Plaintiffs regarding additional document custodians and search terms that we request Defendants include in their document collection and review. We request a response from Defendants as soon as possible – and no later than Friday, June 1st – as to Defendants' position on these requested custodians and search terms. We also request that we then have a meet and confer on Tuesday, June 5th, at either 10:00 a.m. ET or 2:00 p.m. ET, to discuss the custodians and search terms that may be in dispute. Given that Defendants are refusing to engage in full-scale custodial review until there is a unified set of custodians and search terms, it is necessary to reach agreement (or impasse) on these items as soon as possible.

        We note that the custodians and search terms that Defendants have already agreed to are identified in previous correspondence. *See*, *e.g.*, Letter from M. Nemelka to Defendants (March 14, 2018).

        Finally, we note that the below requested custodians and search terms are the result of close coordination by MDL Plaintiffs to avoid duplication. Each party did independent work to identify relevant custodians and search terms, and then worked together in compiling the final, non-duplicative lists.

## I.      CDK and CVR Custodians

        1.   <u>Brian MacDonald</u> (CEO, CDK). We previously explained at length why Mr. MacDonald should be a custodian. As the CEO of CDK, he has played an integral role in

1

implementing the conspiracy with Reynolds to block independent integrators. He has also had direct communications with Reynolds on topics relating to this litigation and, as CEO, very likely had high-level communications with outside parties (including CDK's investors and Elliott Management) concerning CDK's revenues, profitability, corporate strategy, data policies, etc. He also received direct communications from irate dealerships regarding CDK's blocking of dealer data. And, as CEO, Mr. MacDonald was briefed on the effect and implementation of the 2015 written agreements between CDK and Reynolds.

2. <u>Mark Roman</u> (Executive Sales Director, CDK). We previously explained at length as to why Mr. Roman should be a custodian. He is even more important as a custodian with respect to Motor Vehicle Software Corporation ("MVSC") given that he was one of the primary people with whom MVSC communicated when applying to become part of the 3PA program.

3. <u>Al Nietzel</u> (CFO, CDK). Mr. Nietzel is a longtime CDK financial executive and has been CDK's Chief Financial Officer from 2014 to present. As such, he is very likely to have relevant financial information, including information relating to CDK's sales, revenues, and profitability, as well as financial analysis of the implications of the SecurityFirst initiative and blocking of independent integrators. In Elliott Management's May 2016 letter to the CDK Board, Elliott Management singled out Mr. Nietzel as having "participated in an ongoing private dialogue" with the hedge fund from 2015 to 2016, the time period when CDK was working with Reynolds and driving revenue and profit increases through dramatic increases in data integration fees. Those communications – and documents, memoranda, and analyses related to those communications – are likely to be highly relevant and may not be in the files of any current custodian. Nietzel's documents should also speak authoritatively on the competitive relationship between CDK and Reynolds prior to and during the relevant period.

4. <u>Josh Douglas</u> (Senior Director of Operations, DMI). Other than Howard Gardner, Mr. Douglas is arguably the most consistent connection between CDK and Reynolds. He is featured on hundreds of direct communications with Reynolds, including many where he is the only CDK executive communicating. He appears to have been CDK's primary point of contact with Reynolds in implementing the 2015 written agreements, including moving DMI's customers to the Reynolds RCI program. He was also a member of the CDK-Reynolds "Joint Team" implementing the two companies' agreements on data integration and data access. He is also a custodian for CDK's response to the FTC's conduct investigation.

5. <u>Mike Joza</u> (Senior Director of Business Development, CDK). Mr. Joza communicated directly with Reynolds on matters at the heart of this case, including with respect to data integration and data access. He also directly communicated with vendors about the 3PA program, including communicating with vendors regarding CDK's 3PA price increases and the rollout of the SecurityFirst initiative. He was also centrally involved in internal strategy regarding 3PA budgeting, pricing, and functionality. *See*, *e.g.*, CDK-0248041 (attaching PowerPoint); CDK-0163664; CDK-0235171; CDK-0238589.

6. <u>Mike Certain</u> (Director of Strategic Accounts, CDK). Mr. Certain has been a front-line communicator with vendors and has been integrally involved in CDK's strategy to

drive Authenticom out of business. As one example, Mr. Certain communicated with Volkswagen regarding Volkswagen's desire, in early 2016, to switch from 3PA to Authenticom for data integration. CDK-0019193.

7.  David Wrobel (Director of Marketing, CDK). Mr. Wrobel is a key figure with responsibility for CDK's marketing strategy on SecurityFirst and the 3PA program. CDK-0015901; CDK-0036311. Mr. Wrobel was also involved in "DDX mass activation," which CDK implemented after it couldn't convince dealers to voluntarily use its data integration platform, and he has personal knowledge related to whether and to what extent vendors pass through 3PA data integration fees to dealers. CDK-0039511. Mr. Wrobel also communicated directly with Reynolds about the issues in this MDL, and with respect to the MVSC case, was involved in CDK's campaign to disrupt MVSC's operations in California in order to benefit CVR's competitive position. CDK-0049413.

8.  Linda Bartman (Global Chief Marketing Officer, CDK). Ms. Bartman was a high-ranking marketing and strategy official. She was a front-line communicator with dealers about CDK's blocking of Authenticom. She had significant responsibility for overseeing CDK's communications strategy with respect to SecurityFirst and 3PA data price increases. She also had significant involvement in CDK's communications about its price secrecy strategy. Ms. Bartman also communicated directly with Reynolds about the issues in this case.

9.  Michael Sailor (Senior Vice President of Sales for OEMs, CDK). Mr. Sailor was involved in CDK's efforts to eliminate Authenticom and other independent integrators. He was also involved in internal discussions regarding how much functionality CDK should provide vendors that participate in the 3PA program. Mr. Sailor also communicated directly with Reynolds.

10.  Trey Gerlich (Senior Director, Solutions Engineering, CDK). Mr. Gerlich was a "Team Member" in the CDK-Reynolds conspiracy. CDK-1424530. Mr. Gerlich was also integrally involved in anti-Authenticom strategy and messaging; CDK's 3PA pricing; CDK's vendor strategy and vendor communications; CDK's price secrecy and price secrecy enforcement; and the SIS wind-down, among other matters relevant to this MDL. *See, e.g.*, CDK-0018738 (anti-Authenticom strategy); CDK-0214377 (same); CDK-0855940 (same); CDK-0177623 (price secrecy); CDK-0264468 (vendor outreach). Mr. Gerlich also communicated directly with Reynolds.

11.  Jim Foote (Chief Security Officer, CDK, 2001-2016). Mr. Foote was the primary officer overseeing CDK security practices during the relevant period. He communicated about Authenticom; CDK's security practices with respect to data access and dealer control over data access; CDK's use of so-called "hostile integration"; and independent integrators more generally.

12.  Michael Guentzel (Account Director, DMI, CDK Data Strategy). Mr. Guentzel communicated directly with Reynolds. He played a key role in implementing the 2015 written agreements. At DMI, Mr. Guentzel communicated directly with vendors and dealers regarding Authenticom.

3

13.  <u>Jeff Barr</u> (Partner Ecosystem Product Strategy Director, CDK). Mr. Barr was the author of important PowerPoints regarding CDK's failed efforts to voluntarily convince dealers to install and use DDX, CDK's data integration platform. Mr. Barr also communicated directly with Reynolds.

14.  <u>John Lilly</u> (Chief Product Officer, CDK). As Chief Product Officer, Mr. Lilly played a key role in developing, implementing, and marketing CDK's products that compete directly with independent integrators and vendors. He also communicated directly with Reynolds.

15.  <u>Scott Herbers</u> (CVR GM and now VP at CDK). His central importance to the MVSC litigation is self-evident.

16.  <u>Jim Quinlan</u> (VP/GM of CVR, 2016 to present). Mr. Quinlan is CVR's top-ranking official with primary responsibility for CVR's business; he interacts with both CDK and Reynolds; and in particular he interacts frequently with and reports to Scott Herbers and Bob Karp at CDK. He is thus relevant to many aspects of the MVSC case, including CDK's control over CVR's day-to-day operations.

17.  <u>Janet Michaels</u> (GM of CVR, 2014 to 2016). As Jim Quinlan's predecessor as CVR's General Manager, Ms. Michaels is relevant to the MVSC litigation for the same reasons.

18.  <u>Scott Dudley</u> (VP of Operations, CVR). As Vice President of Operations, Mr. Dudley is likely to have responsive documents concerning CVR's product, customer relationships, market share and market presence, and more. Additionally, Mr. Dudley was also involved in CDK/CVR's efforts to ensure that Reynolds whitelisted AVRS's use of Authenticom for data integration on the Reynolds system. CDK-1726380.

19.  <u>Scott Bahr</u> (National Account Manager, CVR). As CVR's National Account Manager, Mr. Bahr is likely to have responsive documents concerning CVR's client base, customer relationships, and market share and market presence. Mr. Bahr was also involved in CDK/CVR's efforts to ensure that Reynolds whitelisted AVRS's use of Authenticom for data integration on the Reynolds system.

20.  <u>Jim Negrette</u> (Director of Software Engineering, CVR). Mr. Negrette had direct communications with Reynolds and was involved in CDK/CVR's efforts to ensure that Reynolds whitelisted AVRS's use of Authenticom for data integration on the Reynolds system. CDK-1726380.

21.  <u>Jason Bonifay</u> (VP of Development, CDK). Mr. Bonifay submitted a declaration in the Authenticom matter concerning AVRS's use of Authenticom. CDK-0008016. Mr. Bonifay also was involved in CDK/CVR's efforts to ensure that Reynolds whitelisted AVRS's use of Authenticom for data integration on the Reynolds system. CDK-0020449.

22.  <u>Bob Reiger</u> (co-founder and CEO, AVRS). Mr. Reiger was a key player in CDK's acquisition of AVRS in 2015. *See, e.g.*, CDK-1725993 (Project Ledson).

23.     Rick Francis (co-founder and CTO, AVRS). Mr. Francis was a key player in CDK's acquisition of AVRS in 2015. *See, e.g.*, CDK-1725993 (Project Ledson). Post-acquisition, Mr. Francis also was involved with AVRS's use of Authenticom for data integration on the Reynolds system. CDK-0235750.

24.     Chris Morris (Director of Sales, CDK). Mr. Morris was a primary point of contact between MVSC and CDK during MVSC's attempts to join the 3PA program. *See, e.g.*, CDK-0235232. Mr. Morris also participated in internal discussions regarding CDK's demand that EVR providers pay 25% of the top-line revenues in order to join the 3PA program. CDK-0210706 ("We need to be prepared that these vendors won't join 3PA at a 25% revenue share.").

25.     John Roeder (Senior Executive of Sales and Operations, CVR). Mr. Roeder is a high-ranking sales official within CVR, *see* CDK-0075814 (slide 2), and he has directly interacted with MVSC regarding MVSC's attempts to join the 3PA program.

26.     Richard Nichol (SVP, New Technology). Mr. Nichol was involved in CDK's policy of maintaining a "Closed Category" or "CVR Category" prohibiting CVR's competitors from joining the 3PA program, and Mr. Nichol has specifically stated that CDK cannot permit MVSC to join the 3PA program because of the competitive threat MVSC poses to CVR. CDK-0177998.

27.     Tony Limtiaco (California Operations and Inventory Manager, CVR). Mr. Limtiaco is likely to have responsive materials concerning CVR's operations, customer base, and market share and market presence in the California EVR market. Mr. Limtiaco was also involved in CDK/CVR's efforts to ensure that Reynolds whitelisted AVRS's use of Authenticom for data integration on the Reynolds system.

28.     Jose Ramirez (DMS administrator, AVRS). Mr. Ramirez is likely to have responsive information concerning CVR's acquisition of AVRS and CVR's product quality, customer relationships, competitors, market share and market presence, and more. Mr. Ramirez was also involved in CDK/CVR's efforts to ensure that Reynolds whitelisted AVRS's use of Authenticom for data integration on the Reynolds system.

29.     Nikki Nazaroff (Executive Director, AVRS). Ms. Nazaroff is likely to have responsive information concerning CVR's acquisition of AVRS and CVR's product quality, customer relationships, competitors, market share and market presence, and more. Ms. Nazaroff was also involved in CDK/CVR's efforts to ensure that Reynolds whitelisted AVRS's use of Authenticom for data integration on the Reynolds system.

30.     Jody Doublestein (Partner Program Director of Sales, CDK). Ms. Doublestein is likely to have responsive materials concerning the terms and implementation of CDK's contract with vendors such as AutoLoop, including the Statement of Work and CDK's decision to allow AutoLoop to continue using SIS as an integrator pending the approval of AutoLoop's applications in the 3PA program.

31. <u>DeAnne Hodum</u> (Solutions Engineer, CDK). Ms. Hodum is likely to have responsive information regarding CDK's contract and relationship with vendors in the 3PA program, including AutoLoop and Cox Automotive's solutions.

32. <u>Michael Postal</u> (Engineer, CDK). Mr. Postal is likely to have responsive information about the competitively sensitive nature of the information that CDK required vendors – such as AutoLoop and Cox Automotive's solutions – to provide as a condition of its certification in the 3PA program, the technical limitations imposed on the functionality of AutoLoop's applications, and the delays in approving AutoLoop's applications for the 3PA program.

33. <u>David LaGreca</u> (Divisional Vice President, Software Engineering, CDK). Mr. LaGreca was a "Team Member" in the CDK-Reynolds conspiracy. CDK-1424530.

34. <u>Mish Kumar</u> (Director, Strategic Planning and Initiatives, CDK). Ms. Kumar was a "Team Member" in the CDK-Reynolds conspiracy. CDK-1424530.

35. <u>Laura Stevens</u> (Marketing Communications Consultant, CDK). Ms. Stevens was a "Team Member" in the CDK-Reynolds conspiracy. CDK-1424530. She also had a role in marketing the Dealer Data Exchange program. CDK-0035951 (see metadata).

36. <u>Michael Kane</u> (Account Director, DMI). Mr. Kane is likely to have responsive information about breaches of customer data by CDK that were disclosed to AutoLoop. Michael Kane was also involved with the planning and implementation of SecurityFirst. CDK-0015052.

37. <u>JoAnn Billiter</u> (Account Specialist, CDK). Ms. Billiter is likely to have information related to CDK's billing practices with respect to vendors in the 3PA program, including AutoLoop and Cox Automotive's solutions.

38. <u>Joe Bihner</u> (Senior Operations Executive, CDK). Mr. Bihner has had a lead role in managing CDK's relationship with Cox Automotive and its various solutions.

39. <u>Byron McDuffee</u> (VP, Global Strategy, CDK). Mr. McDuffee has had a lead role in developing CDK's strategy with respect to dealer data, including managing CDK's relationships with key vendors such as Cox Automotive and its various solutions.

40. <u>Robert Marvin</u> (Vice President, Commercial Strategy and Pricing). Mr. Marvin has had a lead role in pricing strategy for CDK as well as CDK's strategy regarding the acquisition of competing entities. Mr. Marvin has also conduced analysis of CDK revenue attributed to the 3PA program.

## II. Reynolds Custodians

1. <u>Jon Strawsburg</u> (VP of Product Planning, Reynolds). Mr. Strawsburg communicated extensively with CDK on topics related to this litigation, including whitelisting (CDK-0071848). He was also a primary point of contact for vendors when applying to the RCI

program, including MVSC, and, within Reynolds, he had primary responsibility for interacting with and overseeing CVR.

2.  Michael Braun (Director, Data Services, Reynolds).  Mr. Braun was involved in implementing the 2015 agreement between CDK and Reynolds (CDK-1802135) and in blocking third-party access.

3.  Barbara L Wenclewicz (Technical Manager, Reynolds).  Ms. Wenclewicz was involved in implantation of the RCI (CDK-1802135).

4.  Eric Kaser (VP of Sales, Major Accounts Group, Reynolds). Mr. Kaser communicated on issues relating to customer/dealer complaints, data issues, and other topics relating to this litigation.

5.  Christopher Rulon (VP of Sales, Major Accounts Group, Reynolds).  Mr. Rulon communicated on issues relating to customer/dealer complaints, data issues, and other topics relating to this litigation.

6.  Dan Agan (Executive Vice President, Reynolds).  Mr. Agan was involved with negotiating the Reynolds Master Services agreements.  REYMDL00117393.

7.  Keith Hill (VP of Sales, Reynolds).  Mr. Hill communicated on issues relating to data security, security enhancements, customer/dealer complaints, and other topics relating to this litigation.

8.  Peter Sidwell (VP of Sales, Reynolds).  Mr. Sidwell communicated on issues relating to data security, security enhancements, dynamic reporting, dealer complaints, and other topics relating to this litigation.

9.  Kasi Edwards (VP of Marketing, Reynolds).  Ms. Edwards contains internal and external Reynolds corporate communications regarding security updates, security enhancements, CDK disruptions, the Authenticom lawsuit, and other topics relating to this litigation. REYMDL00103795.

10.  Ian Reilly (Manager, Sales Operations Canada, Reynolds).  Mr. Reilly communicated with dealers regarding integration fees (REYMDL00113712; REYMDL00113714) and other issues relating to this litigation.

11.  Jamie Martin (Marketing, Reynolds).  Mr. Martin was listed as part of the team implementing the 2015 agreement between CDK and Reynolds (CDK-1424530) and created marketing materials regarding data security (REYMDL00025832).

12.  Tim Rahill (Account Executive, Reynolds).  Mr. Rahill discussed data integration fees with dealers (REYMDL00059819) and other issues relating to this litigation.

13.    Donald Burlile (Manager OEM Relations, Reynolds).  Mr. Burlile communicated with OEMs and dealers regarding data integration fees.  REYMDL00080791.

14.    Andrew Knowles (Product Planning Manager, Reynolds).  Mr. Knowles was involved in communications with CDK regarding Reynolds' applications (REYMDL00067109; REYMDL00119304).

15.    Steven Mears (Director, OEM Solutions, Reynolds).  Mr. Mears was involved with communications concerning data integration fees (REYMDL00088767) and communicating with CDK regarding DMS access issues (REYMDL00067354).

16.    Kimberly Durnell (Account Executive, OEM Solutions Group, Reynolds).  Ms. Durnell sought extensions of the wind-down period for certain applications (REYMDL00067412); and was involved in communications with CDK regarding Reynolds' applications (REYMDL00067354).

17.    Will Farley (Business Development Manager, Reynolds).  Mr. Farley was a "Team Member" in the CDK-Reynolds conspiracy.  CDK-1424530.

18.    Tim Boughan (Account Manager/Business Development Supervisor, Reynolds).  Mr. Boughan was AutoLoop's account manager and is likely to have responsive information regarding RCI price increases, RCI certification requirements and procedures, and RCI contracts with AutoLoop.

19.    Brian Cumbow (Former Account Manager, Reynolds).  Mr. Cumbow was AutoLoop's former account manager and is likely to have responsive information regarding RCI price increases, RCI certification requirements and procedures, and RCI contracts with AutoLoop.

20.     Stewart Ross (Engineer, Reynolds).  Mr. Ross is likely to have information about the technical aspects of AutoLoop's integration with RCI and the process required for a vendor's application to integrate through RCI.

21.    Kevin Lawson (Engineer, Reynolds). Mr. Lawson is likely to have information about the technical aspects of AutoLoop's integration with RCI and the process required for a vendor's application to integrate through RCI.

22.    Stephanie Prier (Product Analyst, Reynolds).   Ms. Prier is likely to have information about the process by which AutoLoop was approved for RCI certification and the terms of the RCI contract with AutoLoop.

23.    Robert Burnett (SVP, Corporate Development, Reynolds).  Mr. Burnett is a long-time Reynolds executive who has played a lead role in managing all aspects of Reynolds' business, including formulating and implementing its data access policies; managing Reynolds' relationships with key vendors such as Cox Automotive and its various solutions; negotiating the

terms of RCI agreements; and advising Mr. Brockman regarding the key matters at issue in this MDL.

24. <u>Jerry Kirwan</u> (SVP and General Manager, Reynolds).  Mr. Kirwan has had a lead role in developing Reynolds' strategy with respect to dealer data, including managing Reynolds' relationships with key vendors such as Cox Automotive and its various solutions.

## III. Search Terms

Please find attached as Exhibit A (CDK) and Exhibit B (Reynolds) the additional search terms that the MDL Plaintiffs request that Defendants use in their ESI review.

* * * * *

We look forward to your prompt response by Friday, June 1st.  Please also let us know which time works on Tuesday, June 5th – either 10:00 a.m. ET or 2:00 p.m. ET, or some other time that day – to discuss any of the requested custodians and search terms that may be in dispute.

Very truly yours,

      *s/ <u>Derek T. Ho</u>*           *s/ <u>Peggy J. Wedgworth</u>*
      Derek T. Ho               Peggy J. Wedgworth


CC:  MDL Counsel Email List

9

# Exhibit 2

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3
        IN RE:                          ) Docket No. 18 C 864
 4                                       )
          DEALER MANAGEMENT SYSTEMS     )
 5        ANTITRUST LITIGATION.          )
                                         ) Chicago, Illinois
 6                                       ) March 12, 2018
                                         ) 1:30 o'clock p.m.
 7

 8                    TRANSCRIPT OF PROCEEDINGS - STATUS
                      BEFORE THE HONORABLE AMY J. ST. EVE
 9

10      APPEARANCES:

11
        For Plaintiffs:           KELLOGG, HANSEN, TODD, FIGEL &
12                                   FREDERICK, PLLC
                                  BY:  MR. DEREK T. HO
13                                     MR. MICHAEL N. NEMELKA
                                  1615 M Street, N.W., Suite 400
14                                Washington, D.C.  20036

15                                GODFREY & KAHN, SC
                                  BY:  MS. JENNIFER L. GREGOR
16                                One East Main Street, Suite 500
                                  Madison, Wisconsin  53703
17
                                  MR. SAMUEL ISSACHAROFF
18                                40 Washington Square South
                                  New York, New York  10012
19
                                  MILBERG, LLP
20                                BY:  MS. PEGGY J. WEDGWORTH
                                  1 Penn Plaza, Suite 4800
21                                New York, New York  10119

22                                KAPLAN, KILSHEIMER & FOX, LLP
                                  BY:  MR. ROBERT N. KAPLAN
23                                805 Third Avenue
                                  New York, New York  10022
24

25
```

```
 1   APPEARANCES (Cont'd):

 2
     For Plaintiffs (Cont'd):   CUNEO, GILBERT & LADUCA, LLP
 3                              BY:  MR. JONATHAN W. CUNEO
                                     MS. VICTORIA ROMANENKO
 4                              4725 Wisconsin Avenue, N.W.
                                Suite 200
 5                              Washington, D.C.   20016

 6                              ROBERTS LAW FIRM, P.A.
                                BY:  MR. MIKE L. ROBERTS
 7                              20 Rahling Circle
                                Little Rock, Arkansas  72223
 8
                                BEASLEY, ALLEN, CROW, METHVIN,
 9                                PORTIS & MILES, P.C.
                                BY:  MR. ARCHIBALD I. GRUBB, II
10                              Post Office Box 4160
                                Montgomery, Alabama  36103
11
                                CLIFFORD LAW OFFICES, P.C.
12                              BY:  MR. ROBERT A. CLIFFORD
                                120 North LaSalle Street, 31st Fl.
13                              Chicago, Illinois  60602

14                              ROBBINS, GELLER, RUDMAN & DOWD, LLP
                                BY:  MS. ALEXANDRA S. BERNAY
15                              655 West Broadway, Suite 1900
                                San Diego, California  92101
16
                                ROBBINS, GELLER, RUDMAN & DOWD, LLP
17                              BY:  MR. JAMES E. BARZ
                                200 South Wacker Drive, Suite 3100
18                              Chicago, Illinois  60606

19                              MILLER LAW, LLC
                                BY:  MR. MARVIN A. MILLER
20                              115 S. LaSalle St., Suite 2910
                                Chicago, Illinois  60603
21
                                LABATON SUCHAROW, LLP
22                              BY:  MR. CHRISTOPHER J. McDONALD
                                     MR. GREGORY ASCIOLLA
23                                   MS. KARIN E. GARVEY
                                140 Broadway, 34th Floor
24                              New York, New York  10005

25
```

```
 1   APPEARANCES (Cont'd):

 2
     For Plaintiffs (Cont'd):   GIBBS LAW GROUP
 3                              BY:  MR. ERIC GIBBS
                                505 14th Street, Suite 110
 4                              Oakland, California  94612

 5                              GUSTAFSON GLUEK, PLLC
                                BY:  MR. DANIEL C. HEDLUND
 6                                   MS. MICHELLE J. LOOBY
                                     MR. DAVID A. GOODWIN
 7                              120 South 6th Street, Suite 2600
                                Minneapolis, Minnesota  55402
 8
                                WEXLER WALLACE, LLP
 9                              BY:  MR. KENNETH A. WEXLER
                                55 West Monroe Street, Suite 3300
10                              Chicago, Illinois  60603

11   For CDK and Computerized   MAYER BROWN, LLP
     Vehicle Registration:      BY:  MS. BRITT M. MILLER
12                              71 South Wacker Drive
                                Chicago, Illinois  60606
13
                                MAYER BROWN, LLP
14                              BY:  MR. MARK W. RYAN
                                1999 K Street, N.W.
15                              Washington, D.C.  20006

16   For The Reynolds and       GIBBS & BRUNS, LLP
     Reynolds Company:          BY:  MS. AUNDREA K. GULLEY
17                                   MR. BRIAN T. ROSS
                                     MS. KATHY D. PATRICK
18                              1100 Louisiana, Suite 5300
                                Houston, Texas  77002
19
                                SHEPPARD, MULLIN, RICHTER
20                                & HAMPTON, LLP
                                BY:  MR. LEO CASERIA
21                              333 South Hope Street, 43rd Floor
                                Los Angeles, California  90071
22

23   Also Present:             MR. STEVE COTTRELL, Authenticom
                               MR. MAYER GRASHIN, CDK
24                             MR. JONATHAN EMMANUAL,
                                 Reynolds and Reynolds
25
```

4

1    APPEARANCES (Cont'd):

2

     Court Reporter:              MR. JOSEPH RICKHOFF
3                                 Official Court Reporter
                                  219 S. Dearborn St., Suite 1232
4                                 Chicago, Illinois  60604
                                  (312) 435-5562
5

6                 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

7                        PROCEEDINGS RECORDED BY
                          MECHANICAL STENOGRAPHY
8                   TRANSCRIPT PRODUCED BY COMPUTER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE CLERK:  18 C 864, In Re: Dealer Management
 2   Systems Antitrust Litigation.
 3              THE COURT:  Good afternoon.
 4              MR. BARZ:  Good afternoon, your Honor, Jim Barz on
 5   behalf of the plaintiff Baystate Ford.  I'm going to introduce
 6   some of the folks in my group, if you will.
 7              You've got myself and Zan Bernay from Robbins,
 8   Geller.
 9              MS. BERNAY:  Good afternoon, your Honor.
10              THE COURT:  Good afternoon.
11              MR. BARZ:  You've got Bob Kaplan, the Kaplan law
12   firm.
13              THE COURT:  And if you would stand, please, just
14   because there are a lot of people in front of me to see.
15              MR. BARZ:  We have Vickie Romanenko from the Cuneo
16   firm, as well --
17              MS. ROMANENKO:  Good afternoon, your Honor.
18              THE COURT:  Good afternoon.
19              MR. BARZ:  -- as well as John Cuneo.
20              THE COURT:  Good afternoon.
21              MR. CUNEO:  Good afternoon, your Honor.
22              MR. BARZ:  We also have Marvin Miller.
23              MR. MILLER:  Good afternoon, your Honor.
24              THE COURT:  Good afternoon.
25              MR. BARZ:  And those will be the folks from our group
```

1    that you may hear from today.

2          THE COURT:  Okay.  Thank you.

3          When you say "our group," how are you defining "our

4    group"?

5          MR. BARZ:  I mean the group that expects to file a

6    motion for appointment as lead counsel on behalf of the

7    dealership cases.

8          THE COURT:  Okay.

9          And is that the 12-dealership or the 12 plus the four

10   from the other?

11         MR. BARZ:  That's the 12, yes.

12         THE COURT:  Okay.

13         And, then, do we have representatives from

14   Authenticom and --

15         MR. ISSACHAROFF:  Yes, your Honor.

16         THE COURT:  -- the other four dealerships, which is

17   how you --

18         MS. WEDGWORTH:  Your Honor, I'm also on behalf of the

19   12 dealerships, as well.  We don't have --

20         THE COURT:  And you are?

21         MS. WEDGWORTH:  Peggy Wedgworth on behalf of four

22   dealerships.  We filed two complaints.

23         I am also planning to make a motion for lead counsel

24   of the 12 dealerships.

25         THE COURT:  Okay.

7

```
1              MS. WEDGWORTH:  And with me today, I also have Eric
2    Gibbs.
3              THE COURT:  Good afternoon.
4              MR. GIBBS:  Good afternoon, your Honor, Eric Gibbs.
5              THE COURT:  And, so, you are on behalf of the 12
6    dealerships?
7              MS. WEDGWORTH:  Yes, your Honor.
8              THE COURT:  Okay.
9              And, then, is there someone here on behalf of
10   Authenticom --
11             MR. ISSACHAROFF:  Yes.
12             THE COURT:  -- and the other four dealerships?
13             MR. ISSACHAROFF:  Yes, your Honor, and MVSC and Cox
14   Automotive.
15             THE COURT:  Okay.
16             MR. ISSACHAROFF:  Samuel Issacharoff.  And with me
17   today is Derek Ho and Michael Nemelka from the Kellogg, Hansen
18   firm.
19             Also, we will be proposing to be lead counsel for the
20   MDL.
21             And we have also Jennifer Gregor -- I have to look up
22   the inform- -- Godfrey & Kahn firm in Wisconsin, who we will
23   suggest as liaison counsel for the MDL.
24             And, then, with us, we have representatives of some
25   of the dealership classes of the four in addition.  So, we
```

1   have Michael --

2           MR. ROBERTS:  Roberts.

3           MR. ISSACHAROFF:  -- Roberts.  I'm sorry.

4           MR. ROBERTS:  Mike Roberts, your Honor.

5           MR. ISSACHAROFF:  Michael Roberts of the Roberts Law

6   Firm, who represents one of those dealerships.

7           We have Greg Asciolla, Karin --

8           MR. ASCIOLLA:  Good afternoon, your Honor.

9           THE COURT:  Good afternoon.

10          MS. GARVEY:  Garvey.

11          MR. ISSACHAROFF:  -- Garvey and Chris McDonald --

12          MR. McDONALD:  Good afternoon.

13          MR. ISSACHAROFF:  -- from Labaton Sucharow, who

14  represent others.

15          And if I may, if the Court will indulge, I'd like to

16  introduce also Steve Cottrell, who is in the back, who is the

17  CEO of Authenticom.  I believe he's the only stakeholder in

18  the room.

19          And I think that's our whole team, if I'm not

20  mistaken.

21          MR. GRUBB:  I'll introduce myself.  I'm Archie Grubb

22  from the Beasley, Allen firm.

23          THE COURT:  Would you give me the last name again,

24  please.  Grubb?

25          MR. GRUBB:  Grubb, G-r-u-b-b.

9

1              THE COURT:  Thank you.

2              MR. GRUBB:  Thank you.

3              MR. ISSACHAROFF:  I think that's our whole group.

4              THE COURT:  Anybody else who wants to be introduced

5    on behalf of any plaintiffs?

6              MR. HEDLUND:  Good afternoon, your Honor, Dan Hedlund

7    with co-counsel Ken Wexler, Michelle Looby and Dave Goodwin,

8    here on behalf of Waconia Dodge.  We were listed in the status

9    report as a tag-along case.  We just filed late last week, and

10   I believe that the case has been assigned to you.

11             THE COURT:  Is that the case that was filed on March

12   8th?

13             MR. HEDLUND:  Yes.

14             THE COURT:  Yes.  I believe that has been transferred

15   over and is part of the MDL now.

16             MR. HEDLUND:  Okay.

17             THE COURT:  I think all the paperwork went through on

18   that.

19             MR. HEDLUND:  We've just sort of joined in and we're

20   going to sort of see what happens, and we'll decide where to

21   go from there.

22             THE COURT:  Okay.

23             MR. HEDLUND:  Thank you.

24             MR. BARZ:  And, your Honor, I guess I should also

25   point out Bob Clifford is here, as well.  He's on the

1    complaint with Mr. Cuneo, who is part of our group.

2              MR. CLIFFORD:  Good afternoon, your Honor.

3              THE COURT:  It is not like Mr. Clifford to be in the

4    back of the courtroom quiet.

5         (Laughter.)

6              MR. CLIFFORD:  I'm just watching around.

7         (Laughter.)

8              THE COURT:  Good afternoon, Mr. Clifford.

9              MR. CLIFFORD:  Thank you, your Honor.

10             THE COURT:  Anybody else?

11        (No response.)

12             THE COURT:  Okay.  Ms. Miller, it is your turn after

13   all of that.  Go ahead.

14             MS. MILLER:  Good afternoon, your Honor, Britt Miller

15   on behalf of the CDK defendants and Computerized Vehicle

16   Registration, and with me is my partner Mark Ryan.

17             THE COURT:  Good afternoon.

18             MR. RYAN:  Good afternoon, your Honor.

19             MS. MILLER:  That's it for us.

20             THE COURT:  Okay.

21             MS. GULLEY:  Good afternoon, your Honor, for The

22   Reynolds and Reynolds Company, Aundrea Gulley from Gibbs &

23   Bruns.  I'm here with my partners Kathy Patrick, Brian Ross,

24   as well as Leo Caseria from Sheppard, Mullin and Assistant

25   General Counsel for Reynolds, Jonathan Emmanual.

 1              THE COURT:  Good afternoon.

 2              MS. PATRICK:  Good afternoon, your Honor.

 3              MR. ROSS:  Good afternoon, your Honor.

 4              THE COURT:  Anybody else in the courtroom who wants

 5    to introduce him or herself?

 6              MR. GRASHIN:  Your Honor, Mayer Grashin with CDK.

 7              THE COURT REPORTER:  Can you say that again, please,

 8    sir.  I can't hear.

 9              MR. GRASHIN:  Mayer M-a-y-e-r, last name Grashin,

10    G-r-a-s-h-i-n, at CDK Corporation.

11              THE COURT:  All right.

12              Well, you are here for your initial status before

13    this Court to bring some organization to the recently assigned

14    MDL.

15              I did receive your joint status report.  Thank you

16    for submitting that.

17              I have some issues for you, some questions for you.

18    You probably have some for me, as well.

19              Ms. Miller, thank you.  I know you helped coordinate

20    some of these things.  So, thank you for doing that.

21              The first thing I need to tell you is that the

22    documents from these other MDL cases are not automatically

23    transferred to my docket.  So, you noted in the Authenticom

24    case that there is a motion to dismiss pending.  I do not have

25    any of that.

1      MS. MILLER:  We plan to refile it with your Honor.

2      THE COURT:  So, my question for you is -- and I am

3  not sure of the timing of when you filed that versus the

4  Seventh Circuit's opinion on the preliminary injunction -- if

5  you want to refile the exact same briefing or if you want to

6  update your motion at all.  I do not care.  I am just going to

7  give you some deadlines, depending on what you want to do.

8      MS. MILLER:  From our standpoint, your Honor,

9  briefing is closed and we're happy to refile.

10      THE COURT:  Okay.

11      MS. MILLER:  We think that on both Authenticom and

12  the MVSC, where actually oral argument was heard, that the

13  briefing record is closed on both and we can simply refile the

14  existing briefs with your Honor, and your Honor can rule.

15      THE COURT:  And are there two -- how many motions to

16  dismiss are there pending in other cases that have been sent

17  here?

18      MS. MILLER:  There are --

19      MS. GULLEY:  There's four.

20      MS. MILLER:  Well, we each -- there's motions --

21  there's two motions to dismiss in two cases.

22      THE COURT:  Okay.

23      MS. MILLER:  One in Authenticom.  There's a motion to

24  dismiss by CDK, and there's a motion to dismiss by Reynolds.

25      In the MVSC matter, there are motions to dismiss by

```
 1   CDK, by Reynolds, and by Computerized Vehicle Registration or
 2   CVR.
 3            THE COURT:  Okay.
 4            If you could please get the briefing -- and I assume
 5   there will not be any objection from the plaintiff if you just
 6   take all of the briefing and refile the motion, the response,
 7   the reply; and, the one where there was oral argument, if you
 8   would file the transcript.
 9            I know you identified it --
10            MS. MILLER:  Yeah.
11            THE COURT:  -- but, again, I cannot get into those.
12            MS. MILLER:  We'll refile.
13            THE COURT:  I always think with MDLs there should be
14   a better way to give us access --
15            MS. MILLER:  Sure.
16            THE COURT:  -- to the files, but that has not been
17   quite figured out yet.
18            So, if you would, please, by the end of the week --
19            MS. MILLER:  Yep.
20            THE COURT:  -- refile all of the briefing, including
21   any oral argument transcripts, on this docket.  I was not even
22   aware there were motions to dismiss.  So that I can turn to
23   those.
24            MS. MILLER:  We'll take care of it right away.
25            THE COURT:  Great.  Thank you.
```

```
 1              MS. MILLER:  Yep.

 2              THE COURT:  And, then, for the dealerships -- the 12

 3   dealerships -- it looks as if you want to file a consolidated

 4   amended complaint on behalf of the dealerships.  Defendants

 5   think it should be one.  There may be some dispute among the

 6   plaintiffs' attorneys.

 7              I think it should be one.  It is just much easier to

 8   deal with that way.  You can have multiple subparts, multiple

 9   classes, whatever you want; but, I prefer one motion.

10              Yes?  Did you want to jump in there?  You look like

11   you want to say something.

12              MR. KAPLAN:  Of course, your Honor, we'll --

13              THE COURT:  Identify, if you are speaking -- just

14   because we are not familiar with all of you yet, identify your

15   name, please.

16              MR. KAPLAN:  I'm Robert Kaplan, Kaplan, Fox &

17   Kilsheimer, LLP.  I'm -- Mr. Barz.

18              We will, of course, do what your Honor said.  Our

19   thought -- and it's still developing -- that because there is

20   an arbitration clause with Reynolds, we might possibly want to

21   do one complaint for the CDK dealers which would name Reynolds

22   and CDK, and a second complained for the Reynolds dealers

23   which would only name CDK.  We can put it all in one

24   complaint, but I think my worthy colleagues might argue that

25   the arbitration issues are more intertwined.
```

1          So, we haven't decided, but we would like possibly

2    the option to consider something like that.

3          THE COURT:  My inclination --

4          MR. KAPLAN:  But if your Honor wants one complaint,

5    of course that's what we'll do.

6          THE COURT:  My inclination would be to do one, and

7    then we can address if we need to sever it, or whatever we

8    need to do, based on arbitration clauses.  But it is always

9    easier and cleaner to work off of one where possible.  And

10   given the allegations here, one seems to make sense to me.

11         MR. KAPLAN:  That's fine, your Honor.

12         THE COURT:  So, that is my preference.  If I am

13   missing something or you --

14         MR. KAPLAN:  That's what we'll do.

15         THE COURT:  My preference is to do one.

16         MR. KAPLAN:  That's what we'll do.  Thank you.

17         THE COURT:  And I will give you some dates for

18   things --

19         MR. KAPLAN:  Thank you.

20         THE COURT:  -- before you leave here today.

21         The arbitration clauses, that was mentioned in the

22   joint status report, as well.  Can you shed any light for me

23   on those?  And have any of those issues been litigated in the

24   other courts out in California or Wisconsin yet?

25         MS. GULLEY:  No, your Honor.  They haven't been

1    litigated before.

2             The Reynolds arb- -- Reynolds' contracts with its

3    dealers and vendors have arbitration clauses negotiated with

4    the automotive dealerships.  And, so, we'll be moving to

5    compel arbitration.  But the dealership complaints have only

6    just been filed.  So, none of that's been litigated.

7             THE COURT:  Okay.

8             And is there a dispute about the arbitration clause?

9    Is that something that is going to be litigated or is there

10   agreement that the arbitration clause will control on the

11   Reynolds cases?

12            MR. KAPLAN:  I would like to reserve on that, your

13   Honor.

14            THE COURT:  Okay.

15            MR. KAPLAN:  There's some -- the language is somewhat

16   ambiguous.  But if we could just reserve on that for another

17   day.

18            THE COURT:  Yes, you may.

19            You may want to -- and I have not seen any of these,

20   but just given the scope of this case and the MDL nature of

21   it, you may want to have some preliminary discussions about

22   who to arbitrate it.  I do not know if that is covered in the

23   provision or not or if you have to agree on an arbitrator, but

24   you may not want to wait for those discussions, because I know

25   sometimes those can delay if it is going to go forward that

17

1    way.

2            MS. GULLEY:  Understood.  Thanks, your Honor.

3            THE COURT:  Do any of you anticipate any other

4    tag-along cases?

5            You are probably in a better position to know that.

6            MS. MILLER:  We're currently not aware of any.  But

7    we just found out about the one that was filed on the 8th when

8    it was filed.  So, we've not been put on notice of any, but

9    these -- all these guys might know better.

10           MS. WEDGWORTH:  Your Honor, I'm not aware of any

11   right now; but, given the fact that some have been trickling

12   in each week, it would not surprise us that more are filed in

13   the next couple weeks.

14           THE COURT:  Mr. Barz, are you --

15           MR. BARZ:  I think --

16           THE COURT:  -- aware of any out there?

17           MR. BARZ:  -- in terms of -- I'm not aware of any.

18   But in terms of leadership, I think you should choose from

19   those that are filed.  I don't think it --

20           THE COURT:  That is a separate issue.

21           MR. BARZ:  Sure.

22           THE COURT:  I am just trying to figure out for --

23           MR. BARZ:  Well, sometimes it's not, because people

24   get others to file to lend a hand.

25           THE COURT:  That is a separate issue for the purposes

```
 1    of what I am addressing now.  We will talk about --
 2              MR. BARZ:  Sure.
 3              THE COURT:  -- leadership in a bit.  But I am just
 4    trying to get my arms around what else might be coming in.
 5              MR. HO:  Your Honor --
 6              THE COURT:  Yes, Mr. Ho?
 7              MR. HO:  -- Derek Ho from Kellogg, Hansen.
 8              We do anticipate having another action by a vendor
 9    similar to the action that was brought by Cox Automotive.
10    It's obviously not on file yet, but we do anticipate that.
11              THE COURT:  Okay.
12              And you are just going to file that here as a
13    tag-along; is that correct?
14              MR. HO:  We are not quite sure.  We're still talking
15    with our client about that particular issue.
16              THE COURT:  In light of the MDL's order and the order
17    I have entered, it might make sense, rather than filing it in
18    some other state and going through the process of coming here,
19    that you can file directly here.
20              MR. HO:  That's certainly something we're
21    considering, your Honor.
22              MR. GIBBS:  Your Honor, it's Eric Gibbs.
23              I don't want to surprise the Court, but we have a
24    growing number of dealership clients.  So, I anticipate we'll
25    file at least one additional class case.  And, of course,
```

1  we'll procedurally set that so it's as simple as possible and

2  try to avoid the delay by the MDL.

3         THE COURT:  Mr. Gibbs or Mr. Ho, do you have any

4  sense of timing on these additional complaints?  Do you expect

5  it this month?

6         MR. GIBBS:  Yes, by the end of this month.  I think

7  that's fair.

8         MR. HO:  Same here, your Honor.

9         THE COURT:  Okay.

10         Anybody else aware of any tag-alongs?

11     (No response.)

12         THE COURT:  All right.

13         So, a consolidated amended complaint, when do you

14  think you will be ready to file that?

15         MR. KAPLAN:  Robert Kaplan.

16         We propose 60 days after appointment of lead counsel.

17         THE COURT:  Okay.

18         Was there any dispute on that timing?

19         MS. MILLER:  We didn't have any objection to the 60

20  days, your Honor.

21         THE COURT:  And, then, I know you proposed 45 days

22  after to answer or otherwise plead.

23         MS. MILLER:  Yes, your Honor.

24         THE COURT:  Which is fine.

25         MS. MILLER:  The only thing the parties were not able

1    to agree on was, in the event we move to dismiss, a briefing

2    schedule.

3            THE COURT:  And I can wait and see what the motion

4    looks like --

5            MS. MILLER:  That's great.

6            THE COURT:  -- before setting a briefing schedule.

7            And, then, answers, it looks like you were in

8    agreement:  28 days after the Court rules on the motion to

9    dismiss.

10           MS. WEDGWORTH:  Yes, your Honor.

11           THE COURT:  Which I will put that in place, as well.

12           MS. MILLER:  And, your Honor, we just want to make it

13   clear that to the extent your Honor allows it to -- you know,

14   them to replead, it would be -- we'd obviously wait to answer

15   until the whole thing was decided.

16           THE COURT:  Absolutely.

17           MS. MILLER:  Great.

18           THE COURT:  And I would give further direction on

19   that in any ruling.

20           MS. MILLER:  Perfect.  Thank you.

21           THE COURT:  When do you anticipate, Ms. Gulley, on

22   behalf of Reynolds, filing motions to compel arbitration?

23           MS. GULLEY:  We anticipate, your Honor, filing them

24   at the same time on the same schedule as the motions to

25   dismiss --

```
 1              THE COURT:  Okay.  That is what I thought.

 2              MS. GULLEY:  -- if that's all right with your Honor.

 3              THE COURT:  That is fine.

 4         And we are talking about the 12-dealership now.  I do

 5    not know if you have motions -- if the arbitration provision

 6    is going to be raised with respect to the other set of class

 7    plaintiffs at all.

 8              MS. GULLEY:  So, any dealers that are Reynolds

 9    customers, it would apply to those, as well.

10         There are currently no vendors suing Reynolds.  The

11    Cox complaint is not filed against Reynolds.  And not all of

12    the dealers have --

13              THE COURT:  Right.

14              MS. GULLEY:  -- filed all the claims against

15    Reynolds.  However, if the new one we just heard about from

16    Mr. Ho involves Reynolds, that would also be subject to the

17    same issue.

18              THE COURT:  Okay.

19         So, I will give you some specific deadlines.  I am

20    fine with the 60 days after appointment.  I will give you some

21    specific deadlines when we talk at the end this morning -- or

22    this afternoon -- about appointment of lead counsel.  Before I

23    get into that, though, let's talk about the protective order.

24         So, there is already a protective order in place in

25    the Authenticom cases up in Wisconsin, correct?
```

1      MS. MILLER:  Yes, your Honor.  There was a protective

2  order entered by -- an agreed protective order entered by --

3  the parties in that case and entered by the Court, and the

4  parties have produced documents pursuant to that protective

5  order.

6      THE COURT:  And have both defendants produced -- are

7  you a party and --

8      MS. GULLEY:  Yes, your Honor, both --

9      THE COURT:  -- subject to that protective order?

10     MS. GULLEY:  Both defendants, yes, your Honor.

11     THE COURT:  Does that protective order cover ESI --

12     MS. MILLER:  Yes.

13     THE COURT:  -- production and protocol, as well?

14     MS. GULLEY:  It's a separate --

15     MS. MILLER:  We have -- we had a separate ESI

16  protocol that was entered by Judge Peterson, also agreed, that

17  sets out all of the various metadata and characteristics; and,

18  we have produced documents in accordance with that

19  stipulation.

20     MS. GULLEY:  Well, although most of our production so

21  far have been just reproduction --

22     MS. MILLER:  Correct.

23     MS. GULLEY:  -- of prior government productions.

24     THE COURT:  Right.  That is what you represented.

25     And you are working on a protective order for the

1    MDL?

2              MS. MILLER:  We've --

3              MS. WEDGWORTH:  Yes, your Honor.

4              MS. MILLER:  -- been told by some of the plaintiffs

5    that they have some objections -- we do not know what they are

6    -- to the Authenticom order, and that they are going to

7    propose some changes to that.  We've agreed to hear them

8    out --

9              THE COURT:  Okay.

10             MS. MILLER:  -- and see if there are any -- if we

11   agree any modifications need to be made.  If not, we'll bring

12   those issues to your Honor.

13             MS. WEDGWORTH:  Your Honor, Peggy Wedgworth.

14             We have looked at it.  We've edited it among

15   ourselves.  And as you can see, it's a large group.  So, it's

16   hard to get all the comments in.

17             The simple question from defendants was:  Are the

18   edits bigger than a bread box?  And I think the answer is yes.

19             So, we have something in the works, both on ESI and

20   protective order.  And given we didn't participate there, we

21   do plan to get them comments as soon as possible, because if

22   there's still disagreement by March 30th, we'll bring it to

23   the Court.

24             MS. MILLER:  And, your Honor, I mean, our biggest

25   concern is that what we've already produced is protected by

```
 1    the orders that are currently in place and we won't have to --

 2             THE COURT:  And it will be.  It will be.

 3             Any documents that the defendants have already

 4    produced subject to the protective order in the Authenticom

 5    case will remain subject to that protective order.  And out of

 6    fairness -- you have relied on that -- that is only

 7    appropriate.

 8             The protective order here -- I do not know what your

 9    issues are.  There is a form protective order in the Northern

10    District of Illinois forms.  But if there is one in place, I

11    do not know if Wisconsin has a form protective order --

12             MS. MILLER:  We took the Northern District of

13    Illinois form into account as we were negotiating the one in

14    the Western District simply because it was one of the few --

15    this district is one of the few that has a form.  So, we used

16    it as a basis in the negotiations.  It's certainly not

17    identical, but there are elements of it.  And I think all of

18    the things that are addressed in the form are addressed in

19    this order.

20             THE COURT:  Okay.  I was going to direct you to look

21    at that in your discussions.

22             MS. WEDGWORTH:  And we have.  We've taken that into

23    account.  But as she said, some of the changes made affect new

24    thoughts, as well, and new procedure and permutations.  And

25    we're addressing that from our standpoint.  Since we're
```

1    dealerships, it's a little bit of a different dynamic.

2          MR. BARZ:  So --

3          THE COURT:  One second.

4          Is there a protective order in the California case,

5    as well?

6          MS. GULLEY:  Yes, your Honor.  The Authenticom one

7    was the --

8          MS. MILLER:  It wasn't entered.

9          MS. GULLEY:  Oh, it wasn't entered?

10          MS. MILLER:  No.

11          MS. GULLEY:  It didn't get there.

12          THE COURT:  And there is no protective --

13          MS. WEDGWORTH:  And we took that one, too.  We've

14    looked at the one in California, which actually, for instance,

15    has definitions, whereas the Northern District of Illinois did

16    not and the Wisconsin does not.  So, we've -- those are the

17    kinds of things we're inserting to incorporate all of these

18    issues.

19          THE COURT:  And I will let you work on that and see

20    if you can reach agreement.

21          So, the one in California was not entered, correct?

22          MS. MILLER:  I don't believe so.  It was --

23          THE COURT:  Have you produced any documents?

24          MS. MILLER:  It was entered.  I'm told it was

25    entered.

```
 1              THE COURT:  My bigger question is:  Have you produced
 2   any documents pursuant --
 3              MS. MILLER:  No.
 4              THE COURT:  -- to that protective order?
 5              MS. MILLER:  No.
 6              THE COURT:  All right.  So, it is only the
 7   Authenticom protective --
 8              MS. MILLER:  Correct.
 9              THE COURT:  -- order that you produced documents.
10              So, anything that you produced pursuant to that
11   protective order will be covered by that protective order.
12   And I will wait and see -- I am going to give you until March
13   30th to hopefully file an agreed protective order with the
14   Court; and, if you cannot agree, you can file a motion and I
15   will resolve it.  But I am hoping that -- you are all
16   professional and experienced in --
17              MR. BARZ:  Your Honor --
18              THE COURT:  -- these complex cases -- that you can
19   agree.
20              Yes, Mr. Barz?
21              MR. BARZ:  To put a small point on that, because the
22   discussions about the protective order and ESI are not
23   vis-a-vis the Northern District of Illinois standard terms.
24   It's more because that was negotiated between competitors with
25   Authenticom suing them as a competitor, but we are now the
```

```
1    dealers.  So, there's some nuances and things that we think
2    are not applicable to us, like attorneys' eyes -- certain
3    provisions that you would negotiate with a competitor that
4    wouldn't necessarily be applicable to the dealers, as well as
5    certain protections we need for our data that weren't
6    anticipated by the competitor.
7            So, those are the things --
8            MS. MILLER:  We're certainly happy to entertain if
9    there's certain protections they need for their clients.  We
10   would certainly believe that there is absolutely a necessary
11   for an outside "attorneys' eyes only."
12           MS. GULLEY:  Our clients are --
13           MS. MILLER:  Are competitors.
14           MS. GULLEY:  -- competitors.
15           MS. MILLER:  And, so --
16           THE COURT:  I am not saying that you should agree on
17   the Authenticom protective order, because I do not know what
18   it looks like.  So, I am just saying I hope that whatever your
19   final product looks like, that you can agree on it, file it
20   with the Court by March 30th; and, if not, you can file a
21   motion and I will address it then and see what your
22   differences are.  But not having seen the protective order, I
23   cannot even give you any general thoughts on it.
24           But, again, you are all professionals and this is not
25   your first time doing this.  So, hopefully you can reach
```

1    agreement on it so that we can move things along.

2              On an ESI order --

3              Was this about the protective order or something

4    else?

5              MS. ROMANENKO:  Protective order.

6              THE COURT:  Sure.  Go ahead.  And tell me your name

7    again, please.

8              MS. ROMANENKO:  Victoria Romanenko from Cuneo,

9    Gilbert & LaDuca.

10             So, your Honor, we're not seeking to take away any

11   protections that the defendants' documents are already

12   receiving under the Authenticom protective order.  And even

13   the new version that we will negotiate will include the two

14   tiers of protection on the "attorneys' eyes only" designation.

15             What our concern is, is that we're going to have one

16   dealership action and some documents in it will be subject to

17   one order, some will be subject to another's.  Every time we

18   have a filing and attach exhibits, we have to think, is this

19   exhibit subject to this order?  Is this exhibit subject to

20   that order?  Which provisions do we follow?  And we think

21   that's going to be very confusing.

22             So, our concern is just that once the protective

23   order is entered that we've all had a chance to negotiate,

24   that all the documents that are produced in our action are

25   subject to that order, including those ones that the

1   defendants are reproducing from the other actions or the FTC

2   investigation.

3          THE COURT:  Well, I anticipate that that will be

4   something that you discuss when you have your discussions

5   about the new protective order here.  And maybe you agree and

6   put something in place with respect to your prior productions.

7          I am just saying for purposes of now -- you can

8   certainly agree otherwise, but for purposes of now -- anything

9   that has been produced pursuant to that other protective order

10  will stay pursuant to that.

11         I share what you are saying.  That makes sense.  But

12  see if you could reach agreement on that.

13         MS. ROMANENKO:  Okay.

14         And if we won't, we can just submit it as part of the

15  briefing on the protective order issue, whether it's

16  prospective or not.

17         THE COURT:  That would be helpful to have in any

18  event, regardless of what your disputes are, just to see what

19  the other one looks like.

20         MS. ROMANENKO:  Thank you.

21         THE COURT:  Does the current protective order -- you

22  said it does cover ESI but not protocol?

23         MS. MILLER:  No, there's two separate orders, your

24  Honor.  There's a confidentiality order that was entered, and

25  then there is an ESI stipulation and protocol that covers all

1    of the ESI protocols, including metadata fields and all of the

2    stuff that the ESI protocols here in the Northern District

3    contemplate.

4              THE COURT:  Okay.

5              And have you had discussions about an ESI protocol in

6    this case?

7              MS. MILLER:  It's the same story.  We've been told

8    that the dealer --

9              MS. WEDGWORTH:  Second chapter.

10             MS. MILLER:  -- the dealer plaintiffs have some

11   proposed changes.  We do not know what those are.  But there

12   again, we don't want to be in a situation where we're having

13   to, you know, redo anything, and that what we have done stays

14   for the documents we have produced.

15             THE COURT:  Will you --

16             MR. BARZ:  Part --

17             THE COURT:  -- be in a position by March 30th to file

18   something --

19             MS. WEDGWORTH:  Yes.

20             THE COURT:  -- with respect to ESI, as well?

21             MS. WEDGWORTH:  Yes.

22             MR. BARZ:  I think either set of the proposed leads

23   would be in that position.  The question, of course, is when

24   half of us, one side or the other, drops out of this, then it

25   will be easier for the defendants get one set of edits.  It's

1   a little bit cumbersome with all the folks in the room having

2   thoughts.

3          THE COURT:  Well, one quality in lead counsel is

4   somebody who can work together with everybody.  So --

5          MR. BARZ:  And we've all tried that terrifically so

6   far in terms of the --

7          THE COURT:  That is important.

8          MS. MILLER:  From our standpoint, we're happy -- as

9   we said, we're happy to meet and confer with them, but we

10  obviously need it more than the 29th in order to meaningfully

11  respond and prepare a paper.  So, if your Honor would like to

12  set an interim date by when we need to exchange; but, if not,

13  we'll simply go forward and if we have any disputes, we'll

14  bring them to you.

15         THE COURT:  When will you be in a position to turn

16  over proposals?

17         MR. McDONALD:  Your Honor, this is Chris McDonald

18  from Labaton Sucharow on behalf of Bob Baker.

19         Part of the issue that we have here is there are

20  separate groups within the plaintiffs' dealers on it.  So, the

21  sooner that issue is decided, I think the sooner we'll be able

22  to move forward on all these issues.

23         THE COURT:  We will talk about it, then, at the end.

24         MS. WEDGWORTH:  We've edited it.  We -- at least some

25  and waiting on comments.  So, if today is the 12th --

```
 1                 THE COURT:  Yes.

 2                 MS. WEDGWORTH:  So --

 3                 THE COURT:  Can you send it by Friday?

 4                 MS. WEDGWORTH:  -- a week from today, next Monday, we

 5      can get it by 5:00 o'clock to defense counsel.

 6                 THE COURT:  Great.  So, send over your draft with

 7      your proposals, joint by the plaintiffs, by March 19th at 5:00

 8      o'clock Central Time.

 9                 MS. WEDGWORTH:  Done.

10                 MS. MILLER:  Thank you, your Honor.

11                 MS. GULLEY:  Thank you, your Honor.

12                 THE COURT:  And same with the ESI, please.

13                 MS. WEDGWORTH:  Yes.

14                 THE COURT:  Send that over, as well.

15                 There is a question now in terms of discovery and

16      going forward and the Authenticom case wanting -- some

17      discovery has already been done -- and wanting to move faster

18      in light of the circumstances.  And I have your proposals --

19                 MR. KAPLAN:  May I speak to this?

20                 MR. ISSACHAROFF:  I represent Authenticom; you don't,

21      Bob.

22                 MR. KAPLAN:  Oh.

23                 MR. ISSACHAROFF:  If I may?

24                 MR. KAPLAN:  Oh, sure.  Please.

25                 MR. ISSACHAROFF:  Thank you.
```

```
 1              MR. KAPLAN:  Excuse me.
 2              THE COURT:  What I do not know from your joint status
 3  report is --
 4              MR. KAPLAN:  I'm trying to support you.
 5              THE COURT:  Just hold on.
 6              What I do not know from your joint status report is
 7  what discovery has already been exchanged in Authenticom, how
 8  far along you are.  If it is just -- it sounded like maybe it
 9  was just some written, not all written, and no ESI and nothing
10  oral yet.
11              MS. GULLEY:  That's right, your Honor.
12              MR. ISSACHAROFF:  That is --
13              MS. MILLER:  Your Honor, what we've exchanged is --
14  since we're the ones that have produced the most, I can say we
15  have exchanged -- each exchanged -- one set of document
16  discovery.  There have been some supplemental requests to
17  that.  I think there have been a handful of interrogatories
18  that have been served by one party.
19              But as Ms. Gulley noted before, all of the document
20  productions that have been done thus far are reproductions of
21  existing government productions, all but a handful.  So,
22  there's been no depositions, no expert discovery, anything of
23  that sort.
24              THE COURT:  Have --
25              MR. ISSACHAROFF:  Your Honor, I don't think --
```

```
1              THE COURT:  -- interrogatories been --

2              MR. ISSACHAROFF:  -- from my perspective --

3              THE COURT:  Have interrogatories been issued?

4              MS. MILLER:  One set of interrogatories was issued by

5    us --

6              THE COURT:  Did plaintiffs issue any?

7              MS. MILLER:  -- to plaintiff.

8              THE COURT:  Did plaintiffs issue any to you?

9              MS. MILLER:  No.

10             THE COURT:  Okay.

11             Yes, go ahead.

12             MR. ISSACHAROFF:  We disagree on the percentage of

13   the documents that are overlap, but that's not really

14   important right now.

15             The -- what we have is requests for production of

16   documents.  There's several hundred thousand -- 300,000 and

17   change -- and over a million.  That's been gone through.  We

18   were at the point of noticing depositions, and we were ready

19   to go forward with that when we got the stay order in the MDL

20   order.

21             So, we are at the point, speaking for Authenticom,

22   that we are prepared to immediately commence discovery, and we

23   think we should be able to immediately commence discovery, and

24   with the anticipation that we could hold to as close to our

25   trial date -- original trial date -- as possible.
```

1          THE COURT:  Do you not expect to issue

2    interrogatories?

3          MR. ISSACHAROFF:  We will issue interrogatories.

4          But, your Honor, we are in a position where we are

5    more eager to go to trial than we are to engage in extensive

6    discovery.  We could be ready for trial with surprisingly

7    little additional discovery over what we have now.  We have --

8          THE COURT:  Defendants may disagree with that, but --

9          MR. ISSACHAROFF:  They might disagree with that, but

10   not on the liability phase.  I don't think that anything that

11   we have done goes to the question of whether they conspired,

12   whether they tried to shut us out of the market.  I don't

13   think that there's any claim here that we are a joint tort

14   feasor of some kind in this process.

15         So, with regard to liability, we are prepared to move

16   very quickly, even if that costs us some of the normal range

17   of discovery that we would have.

18         As the Seventh Circuit noted, we're representing a

19   client in Authenticom that is at grave risk of going out of

20   business through the normal processes of delay when a business

21   is failing.

22         THE COURT:  I am certainly sympathetic to that, but I

23   also know that the Seventh Circuit noted, without addressing

24   any of the merits, that there may be viable defenses here.

25         So --

1          MS. GULLEY:  Right, your Honor.

2          THE COURT:  -- I appreciate both sides, and we will

3    try to accommodate that.  But before putting any deadlines in

4    place, I am trying to get a sense of what has been done --

5          MR. ISSACHAROFF:  That's all that's been done.

6          THE COURT:  -- and what remains to be done.

7          MS. MILLER:  And --

8          THE COURT:  Have you produced any documents on behalf

9    of plaintiffs?

10         MR. HO:  Yes, we have, your Honor.  We've produced

11   documents to the plaintiffs.  Obviously, our document

12   discovery is not going to be nearly as voluminous as the

13   defendants'.  But, yes, we've produced documents.

14         We have received more than three -- about 350,000

15   documents.  I'm a little bit surprised to hear that those

16   consist almost solely of reproductions of the productions to

17   the government because that's quite the opposite of what the

18   defendants have been representing to us as they've been sort

19   of resisting additional discovery.

20         But the bottom line is that there has been extensive

21   document production going both ways; we've reviewed a lot of

22   those documents; and, we feel like we've identified the ones

23   that are critical to the case, which is why we had 12

24   depositions scheduled on January 12th, when Judge Peterson put

25   the stay in place.  So, we were on the cusp of going from the

1  document discovery phase to the oral discovery phase.

2         THE COURT:  Did you have discovery in connection with

3  the preliminary injunction hearing?  Was there expedited

4  discovery?

5         MS. MILLER:  No.

6         MS. GULLEY:  No, your Honor.

7         MR. HO:  There was no discovery as such under Rule

8  26; but, in support of the defendants' preliminary injunction

9  papers, there were voluminous attachments.  And, so, much of

10  the record in the preliminary injunction proceeding -- which

11  consisted of about 350 exhibits -- were documents that the

12  parties attached to their paper.  So, there was discovery in

13  that regard.

14         THE COURT:  Okay.

15         MS. GULLEY:  Your Honor, just real briefly in

16  response, because the motions to dismiss in Authenticom have

17  been fully briefed and pending since October, Reynolds has not

18  yet filed its counterclaims against Authenticom.

19         But just to take issue with counsel's statement,

20  there are certainly are questions -- and you'll hear it in the

21  oral argument in the Seventh Circuit -- regarding

22  Authenticom's violations of the Computer Fraud and Abuse Act

23  by accessing their system.  Those counterclaims have not been

24  filed.  No discovery has been served on that yet.

25         MS. MILLER:  And just to briefly respond to some of

1   the assertions, if you look at the production, since the

2   majority of the production has been made by my client, they're

3   clearly marked as having been produced in the prior government

4   proceedings.

5           We -- on the expedited schedule that we had where

6   Authenticom had noticed 12 depositions, we had -- we were on

7   an expedited schedule at that point, which was one of the

8   reasons that we asked for the stay.  We had produced documents

9   related to one of the custodians that was coming up for

10  deposition because we had agreed to produce them as

11  depositions were coming up.  So -- but with the exception of

12  that one custodian, all of the other documents that we had

13  produced -- which is the majority of that 300,000 -- were

14  documents that had been previously produced in the government

15  proceedings.

16          So, I'm not saying that's not a comprehensive set of

17  documents, and I have no doubt that they will have all sorts

18  of documents available to them and -- but discovery certainly

19  is not done insofar as Reynolds hasn't filed its

20  counterclaims, CDK hasn't filed its; and, we haven't had a

21  chance to do any of this in terms of -- vis-a-vis the other

22  dealer plaintiffs.  And we obviously need to be in a position

23  where we're doing this once.

24          THE COURT:  Has any discovery been exchanged with the

25  other 12 dealers?

```
 1            MS. WEDGWORTH:  No.

 2            MS. MILLER:  No.

 3            MR. HO:  No, your Honor.

 4            THE COURT:  Have you issued any?

 5            MS. WEDGWORTH:  No, your Honor.

 6            MR. BARZ:  No.

 7            MR. HO:  And, your Honor, if I may just add one thing

 8  -- it may be clear from the status report -- is that when

 9  discovery was stayed on January 12th of 2018, the case was on

10  track for trial in October, 2018.

11            THE COURT:  Right.

12            MR. HO:  And Chief Judge Peterson had made very clear

13  that that trial date was not going to move.  So, wherever we

14  were in discovery, I think it's fair to say that both sides

15  anticipated that we would be able to complete the discovery

16  process in the nine months or so between January and October.

17            MS. GULLEY:  We just disagree.

18            MS. MILLER:  I don't think that's a fair statement.

19  We had talked to the other side in terms of potentially seek-

20  -- we reserved the right to seek an extension of that

21  schedule, given the amount of discovery that we were being

22  told was going to be asked of us.  And we got 30(b)(6)

23  depositions -- deposition notices -- that had 156 subparts.

24  So, the chances of that being resolved and done and expert

25  reports out, from our standpoint, were slim.
```

1          But we understand that Authenticom was pushing

2    towards its trial date; but, ultimately, when these other

3    cases got filed, Judge Peterson entered the stay order that he

4    did and said, look, these cases have to be -- have to take

5    into account the MDL process.

6          THE COURT:  Is the Authenticom case a class case,

7    too?

8          MR. HO:  No, your Honor.

9          THE COURT:  It is not a class.

10          MR. HO:  It's an individual competitor case.

11          THE COURT:  Okay.

12          MR. HO:  Yes, there's no class component.

13          MR. ISSACHAROFF:  Authenticom has a unique role in

14    this hierarchy of proceedings.  So, there wouldn't be a class

15    there.

16          THE COURT:  Okay.

17          MR. HO:  But I would say the claim of Authenticom

18    having been excluded from the market is the linchpin of all

19    the other cases, including the class cases.

20          MR. ISSACHAROFF:  It's how the vendors got out shut

21    out --

22          THE COURT:  Right.

23          MR. ISSACHAROFF:  -- is how all this happens.

24          THE COURT:  I have read your complaint.

25          Okay.  Before I give you some discovery guidance,

1    let's talk about lead counsel and lead counsel structure.

2              MR. ISSACHAROFF:  If I may, your Honor?

3              THE COURT:  Yes.

4              MR. ISSACHAROFF:  We have a proposal on this, and I

5    think that there may be some confusion in the documents

6    between lead counsel for purposes of the MDL and the

7    subsequent appointment of interim lead or co-lead class

8    counsel pursuant to 23(g).

9              We have proposed that the class part of this be

10   pushed back a week, and that everybody be able to file papers

11   and make their requests to be appointed pursuant to 23(g).  We

12   have our proposal of how that should be; others have theirs.

13             But for the moment, I think the most important thing

14   is to start the MDL process rolling.  And for that, we think

15   that there should be the appointment of lead counsel and

16   liaison counsel.

17             Lead counsel, at this point it's impossible to see

18   how it can be other than Mr. Ho on behalf -- who has

19   represented the critical cases that have gone forward thus

20   far, MVSC and the Authenticom cases.  Those are the cases that

21   precipitated all this litigation.  Nobody would be in this

22   courtroom without those cases and, particularly, without the

23   injunction in Authenticom.

24             That's where the documents have gone.  I've seen some

25   of these documents because I'm co-counsel with them.  It moves

1    the ball tremendously in these cases.  My view, it

2    substantiates much of what we've alleged; but, obviously,

3    there will be disagreement on that.  But the critical part of

4    it is that it is already a repository of over a million pages

5    of documents, that we believe are the heart and soul of what

6    we are alleging here and form the foundation for everybody

7    else.

8          So, our proposal is that Mr. Ho be lead counsel for

9    the MDL; that he be able, as is normally the case with MDL

10   lead counsel, to assign responsibility for sub-working groups.

11   If there need to be groups doing particularly discovery on

12   class issues, if there need to be questions about dealership

13   structures and dealership agreements, all those can be set up

14   as subsets from the authority of the leadership of the MDL.

15         And we also propose that Jennifer Gregor be appointed

16   liaison counsel.  Ms. Gregor was the person who was

17   responsible for the coordination with Judge Peterson's court

18   as Authenticom was getting ready to go to trial.  She

19   participated heavily in the preliminary injunction hearing,

20   put on several of the key witnesses, including Brian Maas,

21   whose declaration you admitted into evidence today, from the

22   California Dealer Association.

23         We believe that that's a team that has already

24   performed this function in what has been the only part of this

25   litigation that has taken shape thus far.  It is the engine

1    that drives this entire train.  Nobody is here but for the

2    efforts of these counsel.

3          And, then, we would suggest that this Court have a

4    hearing at some point, when reasonably feasible, on the

5    question of the class components.  We have views that the

6    suggestion of the 12 group -- the group of 12 -- if I can call

7    -- group of 12 versus the group of four for just -- for ease

8    of reference -- that there be a two-year delay process in this

9    is just too long.  It's too long not just for Authenticom --

10    which obviously needs, as the Seventh Circuit recognized, to

11    go to trial more quickly -- but it's too long even for the

12    dealers, as Mr. Maas -- Mrs. Maas's declaration goes forward.

13          So, we have views -- strong views -- on who should be

14    the interim co-leads on the class counsel, but we recommend to

15    the Court that that be handled as a separate -- as a second

16    proceeding, so that we can get the MDL leadership assigned and

17    get this case moving forward as expeditiously as possible.

18          THE COURT:  I did not understand Ms. Wedgworth and

19    Mr. Barz to be saying -- correct me if I am wrong -- that they

20    were here to seek lead class counsel only.

21          MR. BARZ:  Correct.

22          THE COURT:  I understood you to be --

23          MS. WEDGWORTH:  That is correct.

24          THE COURT:  -- saying that you are -- you want to

25    seek as lead counsel in the MDL.

44

```
 1              MS. WEDGWORTH:  Correct.

 2              MR. BARZ:  Correct.

 3              THE COURT:  Okay.

 4         Then we are going to have to have a procedure to go

 5    about doing that.  And I will take your motions on that and,

 6    then, have you come back in short order to address that.

 7         Have you talked about -- and just so you know,

 8    whoever is selected as lead counsel and liaison counsel, I am

 9    going to want to see your proposed committees and approve your

10    proposed committees.  It is not -- you were suggesting that if

11    Mr. Ho is selected, that he get to do all this.

12              MR. ISSACHAROFF:  No, no, your Honor.

13              THE COURT:  That is not going to work that way.

14              MR. ISSACHAROFF:  No, no, I was not suggesting that

15    the Court --

16              THE COURT:  That is how I --

17              MR. ISSACHAROFF:  -- create a dictatorship.

18              THE COURT:  -- understood you.  Yes.

19              MR. ISSACHAROFF:  I misspoke.  That that be obviously

20    a recommendation to the Court to facilitate this.

21         But there's a sense, once you have a leadership

22    structure, of what the organizational form is that best

23    responds to the needs of this particular case.

24         This is not the typical MDL case.  There's not just

25    an overwhelming number of cases that are --
```

```
 1              THE COURT:  I am not sure there is --
 2              MR. ISSACHAROFF:  Well, there is no --
 3              THE COURT:  -- a typical MDL case.
 4              MR. ISSACHAROFF:  Yes, I realized as soon as I said
 5    that.
 6              THE COURT:  All of mine have been different.
 7              MR. ISSACHAROFF:  Yes.
 8              But this is not a huge --
 9              THE COURT:  I understand.
10              MR. ISSACHAROFF:  -- number of individual filings.
11    This is something that is -- really takes some thought as to,
12    given the experience with the discovery thus far, how best to
13    organize the case and, also, how to coordinate the class side
14    of the dealerships with the need of Authenticom to get to
15    trial as quickly as possible.
16              THE COURT:  Have you had discussions among
17    yourselves -- the plaintiffs' counsel -- about how to proceed
18    in terms of seeking lead counsel?
19              MR. BARZ:  We've had some discussions, your Honor.
20    We've had a lot of discussions about various, you know,
21    thoughts people had about leadership.  And as of now, we've
22    got a proposal to come in here and ask for some briefing.  I'm
23    not even sure that we've solidified whether we want just one
24    brief -- which would be my preference -- or whether you want
25    to go through the entire process of brief, response and reply.
```

 1              THE COURT:  I will not need that much.

 2              MR. BARZ:  Yeah.

 3              THE COURT:  But I may want input on --

 4              MR. BARZ:  So, I think in one brief -- because if you

 5    do two, then everybody tells you how great they are in theirs

 6    and, then, they wait to respond to everybody else's.  I think

 7    we can put them both up front because I think we've now seen

 8    where the groups have sorted out.

 9              If I could just briefly respond to some of the points

10    that Mr. Issacharoff made.

11              Your Honor's exactly correct.  There's no dispute as

12    to who should lead the individual actions.  That's Kellogg.

13    Those are their clients.  But there is dispute amongst now

14    three sets of candidates and their various team components as

15    to who should lead the dealership cases.

16              We believe that it should not be the Kellogg group

17    and the group they've sort of assembled to represent the

18    dealer side because of a conflict.  And that is, where will

19    these damages ultimately lie?  Will they have lied with the

20    vendors or were they passed on to the dealers?

21              And you heard Mr. Issacharoff mention, for example,

22    that Authenticom is in a unique situation where they're

23    pressing to get to this trial right away.  I think he said --

24    and this is close; I don't expect to be verbatim but -- even

25    if it would cost us some of the normal discovery.

1          Well, that's not a representation I would make as

2   class counsel for the dealership group.  We want to get all

3   the discovery we need.  We haven't been part of that.  We

4   think the issues are similar but different, as well.

5          And Judge Durkin just dealt with this in what's

6   called the chicken broiler case, where there was a conflict

7   amongst, you know --

8          THE COURT:  I am aware of what he -- he and I spoke

9   about that.

10          MR. BARZ:  Okay.  Great.

11          And originally he said, well, I don't think it will

12   be that big of an issue, and then a couple months later, he

13   said, actually, it is, and appointed separate counsel.

14          So, I think the two competing groups on the

15   dealership side, Ms. Wedgworth and what I'll call my group,

16   agree that Kellogg and its group should just handle

17   Authenticom.

18          THE COURT:  So, are you proposing --

19          MR. McDONALD:  I'm sorry, your Honor, this is Chris

20   McDonald again --

21          THE COURT:  Wait, wait, wait.  Please do not

22   interrupt me.  We have got all afternoon.  So, I will give you

23   time to talk.

24          Are you proposing, then, Mr. Barz, that there be two

25   lead counsel, counsel for Authenticom and then counsel to

1   cover all the dealerships?

2           MR. BARZ:  Yes.

3           THE COURT:  Okay.

4           MR. BARZ:  Yes.

5           And we believe --

6           THE COURT:  Ms. Wedgworth, are you in agreement with

7   that?

8           MS. WEDGWORTH:  I'm certainly in agreement with it.

9   I --

10          THE COURT:  Two lead counsel, Ms. Wedgworth?

11          MS. WEDGWORTH:  Well, lead counsel for Authenticom --

12          THE COURT:  Yes.

13          MS. WEDGWORTH:  -- as a vendor.

14          THE COURT:  Individuals, yes.

15          MS. WEDGWORTH:  Yes.

16          THE COURT:  And to the extent other vendors come in.

17  I do not know if they will.

18          MS. WEDGWORTH:  It sounds like one is going to be

19  filed by Mr. Ho anyway.  So, it sounds like that makes sense

20  to have Mr. Ho as -- in charge of -- or your firm, however you

21  want to say it -- in charge, and then lead counsel for the

22  other; and, we can coordinate, as we've done so far.

23          MR. KAPLAN:  Your Honor, we have this a lot where we

24  have opt-out actions, individual actions and class actions.

25  The opt-out actions counsel represent their clients.  They

 1    have retainer agreements with their clients, just like Mr. Ho

 2    has --

 3              THE COURT:  This is a little different than opt-out.

 4              MS. WEDGWORTH:  Yes.

 5              THE COURT:  I am talking about up front, not opt-out.

 6              MS. WEDGWORTH:  They're not a class member.

 7              MR. KAPLAN:  They're not a class member.

 8              THE COURT:  Right.

 9              MS. WEDGWORTH:  So, that's not a typical opt-out.

10              MR. KAPLAN:  It's a business that brings its own

11    action, just like Authenticom is represented by their counsel.

12    The class counsel has no say in that representation.  They

13    represent them.

14              MR. ISSACHAROFF:  Your Honor, in most cases, you

15    don't find that a group copies --

16              THE COURT:  Somebody is -- I did not hear you, Mr.

17    Issacharoff.

18              MR. ISSACHAROFF:  You do not find that the complaints

19    of the dealers virtually track verbatim the complaints of

20    Authenticom and MVSC.

21              THE COURT:  No, I understand.

22              MR. ISSACHAROFF:  So --

23              THE COURT:  I am just trying to figure out what

24    you --

25              MR. ISSACHAROFF:  Yes.

```
 1              THE COURT:  -- are agreement on or if there is
 2    disagreement on that.
 3              You wanted to say something, counsel?
 4              MR. ROBERTS:  Your Honor, if I might.
 5              Mike Roberts.  I represent Hoover Automotive, a
 6    dealer in this case.  And we also will be vying for a
 7    leadership position, along with Labaton -- the Labaton firm --
 8    and their dealership client.
 9              We, too, agree that the class of dealers should have
10    its own set of lead or co-lead counsel and, of course, the
11    Kellogg firm being the MDL coordinating counsel or MDL lead
12    counsel, if you will, to help coordinate the common interests
13    of both the dealers -- the dealer class -- there's common
14    evidence -- as well as the individual plaintiffs in the case.
15              THE COURT:  And are you -- Mr. Roberts and
16    Ms. Wedgworth and Mr. Barz, are you in agreement as to
17    Ms. Gregor serving as liaison counsel --
18              MR. BARZ:  No.
19              MS. WEDGWORTH:  No, your Honor.
20              THE COURT:  -- or are you going to propose something?
21    Okay.
22              MS. WEDGWORTH:  And, in fact, I'm not sure a liaison
23    counsel is needed if we can coordinate, which we've done
24    before.  At least this way we've --
25              MR. ROBERTS:  Your Honor --
```

```
 1              MS. WEDGWORTH:  -- coordinated.
 2              MR. ROBERTS:  Sorry.
 3              THE COURT:  It is often helpful to the Court --
 4              MR. BARZ:  Your Honor, our proposal --
 5              THE COURT:  -- to have liaison --
 6              Mr. Barz, you know better than that.
 7              MR. BARZ:  When you're ready.
 8              THE COURT:  You have been in here enough.
 9              It is often better for the Court to have a liaison
10    counsel, but we will see.
11              Yes, Mr. Roberts?
12              MR. ROBERTS:  Your Honor, if I may.
13              To answer your original question, some -- have we --
14              THE COURT:  Which one?
15        (Laughter.)
16              MR. ROBERTS:  That is, have we tried to confer
17    together to try to come up with some consensus or civility
18    with regard to working with each other as a structure for the
19    dealer class.
20              I can tell you that I have, and I know that others
21    have.  We are trying to work together.  I had dinner with
22    Mr. Kaplan and Mr. Cuneo last night.  There was no
23    breakthrough, but we are still trying, your Honor.
24              MR. BARZ:  Your Honor, if I may.
25              I might be part of the reason there's no breakthrough
```

1    on this.  It's just we've tried to put together a group that

2    we believe accomplishes the goals of the Manual for Complex

3    Litigation.  One of those goals is to make sure you have a

4    team that has the resources and the talent to do the best for

5    the class but isn't so big.  So, unfortunately, we're not

6    going to be able to make everybody happy by including 15 firms

7    in our proposed leadership.

8           We've tried to be as lean as we can.  We've got three

9    co-leads -- myself, Mr. Kaplan, Mr. Cuneo -- with a chair of

10   that lead, which would be myself.  So, the defendants and the

11   Court have one-stop shopping to get answers.  If anything's

12   been proven over this last couple weeks, as you saw by our

13   filing that came in -- I think Ms. Miller was stuck filing

14   about six minutes after midnight -- there's just too many

15   cooks in the kitchen.  So, we want one-stop shopping.

16          THE COURT:  I noticed it did not come in on time.

17          MR. BARZ:  It's wasn't her fault at all.

18          THE COURT:  I know it is not Ms. Miller's fault.

19          MR. BARZ:  The coordination of all the different

20   competing groups -- which will eventually be resolved -- we

21   think it's important to have a liaison.  We have Mr. Clifford,

22   as well, with liaison.  And we have just two folks on our

23   executive committee.  And we think that's the right team.

24   It's lean, but it's also got everything that it needs.

25          And it doesn't have the conflicts that, I think, some

1    of the groups that are aligned with Kellogg, that are

2    representing the dealers but are aligning themselves with

3    these notions that we're prepared to streamline discovery even

4    if it costs us.  We don't think that's something the dealers

5    can take on.

6              THE COURT:  So, I would like submissions from each

7    group, individual -- whoever -- who wants to propose being

8    lead counsel, addressing what structure you would propose, why

9    you think you should be lead counsel.  I certainly want your

10   résumés and any other either MDL or complex experience you

11   have had, including the judges who you have appeared before.

12             I want to give you a little bit of reasonable time.

13   I know this needs to get resolved quickly; and, if you have

14   done your due diligence, you know I will not sit on things.

15   But I also want to give you time to see if there are any

16   pieces of it that you can work out.

17             So, Mr. Roberts, I will start with you.  What do you

18   think is reasonable in terms of filing submissions before the

19   Court to consider for lead counsel?

20             MR. ROBERTS:  Your Honor, thank you very much.

21             In my opinion, I think that if you gave us two or

22   three weeks to work through this, I think that that's

23   reasonable enough time.  I think filing a proposal or -- with

24   this amount of people, it's been very, very difficult to get

25   people to even go have a cup of coffee or to get on the phone

1    with each other.  And I think that even John Cuneo would agree

2    with that.  I mean, he's talked to me about it's difficult to

3    reach people.  And, so -- not to put blame on anyone.

4         But I believe that if we had, say, two weeks to make

5    a proposal, that would give us the chance to talk to each

6    other and see if we could come to a consensus to present to

7    the Court.

8         THE COURT:  So, if I give you until March 26th, does

9    that work?

10         MR. BARZ:  It's fine, your Honor.

11         MS. WEDGWORTH:  That's acceptable, your Honor.

12         THE COURT:  Okay.

13         MR. HO:  That's fine, your Honor.

14         THE COURT:  And I do look to the guideposts in the

15    Manual for Complex Litigation.  And it is very important for

16    me to have somebody who not just has the experience, but can

17    work well with others.  That is important to me.  So, whatever

18    examples you give, I will take, and --

19         MS. MILLER:  Your Honor --

20         THE COURT:  -- talk to other judges who you have

21    worked with, as well.

22         Yes --

23         MS. MILLER:  Sorry.

24         THE COURT:  -- Ms. Miller?

25         MS. MILLER:  We're not going to get in the middle of

1   this.

2          THE COURT:  I noticed you moving over as they were

3   talking.

4          MS. MILLER:  Yeah.

5      (Laughter.)

6          MS. MILLER:  I only wanted to raise one issue because

7   it was mentioned earlier by Authenticom's counsel.  I know

8   your Honor granted their motion for leave to file Mr. Maas's

9   declaration.  We obviously didn't get a chance to respond to

10  that.  We may have something to file to give your Honor some

11  context.

12         THE COURT:  And I read the Seventh Circuit opinion,

13  which, I think, gives me a chunk of context.  And I took that

14  for purposes of today to the extent it was anything I needed

15  to consider.

16         MS. MILLER:  Fair enough.

17         THE COURT:  I do not know --

18         MS. WEDGWORTH:  And, your Honor --

19         THE COURT:  I think I probably have enough for

20  context, but --

21         MS. WEDGWORTH:  On that point --

22         THE COURT:  -- if you feel the need to, you can.  But

23  I do not think you need to.

24         MS. WEDGWORTH:  We actually were contemplating

25  responding, as well, perhaps --

1        THE COURT:  There is no need to.  I understand where

2   you may be coming from.  I granted the motion and took it for

3   purposes of today for this status and setting the tone and

4   talking about any kind of discovery deadlines.

5        So, March 26th, by 5:00 o'clock -- since you seem to

6   like 12:05, the next day.

7        MR. KAPLAN:  5:00 o'clock Central Time.

8        THE COURT:  March 26th, Central Time, by 5:00

9   o'clock, please file any motions, anybody who is seeking a

10  lead counsel position, along with the indications that I gave

11  you.  And I would also like you to, please, drop off courtesy

12  copies of them.

13       Then I am going to have you come back the following

14  week.

15       MR. ROBERTS:  Is that April 2nd, your Honor?

16       THE COURT:  No, no, it will not be that soon.  We

17  have got to find a chunk of time.

18       The morning of April 6th -- Friday, April 6th -- at

19  10:00 a.m.  And anybody who is seeking to be lead counsel

20  should be present because I may have questions for you, and we

21  can talk about the issues further.

22       As to discovery -- and I know there are disputing

23  issues here and different interests -- I do want you to go

24  ahead and issue in the Authenticom case -- and I appreciate

25  you want to be on the same schedule, but at least I want to

1    get some things moving on there that have not been.

2              I am going to lift the stay.  I am going to keep a

3    stay on oral discovery until further order of the Court and I

4    get a better sense of what still needs to be done and if there

5    is any way to bifurcate or segregate the Authenticom from the

6    other cases.  I am not sure there is, but there certainly may

7    be a way on some witnesses to do that.

8              Any interrogatories that you want to issue or any

9    other document requests, to the extent you have not issued

10   those, should be issued by March 23rd.

11             MR. KAPLAN:  And that is just in the Authenticom

12   case?

13             THE COURT:  Just in the Authenticom case for now,

14   because that is the one -- I am not hearing anybody else

15   telling me the same things that Authenticom is telling me, and

16   they already have some discovery underway.

17             When you come back here on April 6th, one of the

18   other things I would like you to do is to have some additional

19   discussions among yourselves about a discovery structure, now

20   that you can focus just on that, and see if you can reach any

21   agreement or have any creative proposal that might address the

22   Authenticom concerns, as well as yours.  Because I know the

23   defendants do not want to have to do this twice, and that is

24   not efficient at all.  I am aware of that.  But is there any

25   way that you can come up with to balance both of your needs?

58

1          So, you have your dates going forward.  Again, March
2      26th by 5:00 o'clock Central Time.  Please drop off courtesy
3      copies.
4          And, then, is there anything else this afternoon that
5      we have to take up?
6          Yes?
7          MR. HEDLUND:  Good afternoon, your Honor, Dan
8      Hedlund.  I introduced myself earlier.  We filed the case on
9      March 8th for --
10          THE COURT:  Yes.
11          MR. HEDLUND:  Waconia Dodge.
12          So, it's a class dealership case.  I've worked with
13      many of the counsel involved in the dealership cases and will
14      certainly engage in discussions with them about leadership,
15      but I just wanted to indicate that it's possible we could also
16      file something.
17          THE COURT:  Okay.
18          And nobody is precluded from filing.  If you did not
19      speak up today, I will not hold that against you.  But if you
20      do want to, you need to file something by the 26th.
21          MR. HEDLUND:  Thank you.
22          MR. BARZ:  Do you want to set a page limit for those?
23      15?
24          THE COURT:  No, I do not.  If you give me a hundred
25      pages, I am not going to be happy.

1          (Laughter.)

2              MR. KAPLAN:  You wouldn't read it.

3              THE COURT:  I like efficiency.  So, if you give me a

4      hundred pages, that is going to tell me something about how

5      efficient you are.

6              MS. MILLER:  Your Honor, there's only one other

7      issue, and it only affects a couple of parties; but, that's

8      the motion to dismiss in the Cox individual action.  We have

9      submitted a proposed briefing schedule for that because it's

10     just between the individual Cox plaintiff and CDK.

11             THE COURT:  And I will -- what was your proposed

12     briefing schedule for that?

13             MS. MILLER:  I had it and now I don't.  Give me a

14     second.

15         (Brief pause.)

16             MS. MILLER:  It's on Page 4 of the status report.

17             Subject to approval by the Court, of course, we would

18     file our motion to dismiss by March 16th; Cox to file its

19     response by April 16th --

20             THE COURT:  Oh, yes.

21             MS. MILLER:  -- and our reply by April 30th.

22             THE COURT:  That is fine.  I will put that in place

23     as to Cox Automotive.

24             And that only impacts your client, correct --

25             MS. MILLER:  Correct.

60

```
 1              THE COURT:  -- Ms. Miller?

 2              That does not impact --

 3              MS. MILLER:  Correct.

 4              THE COURT:  -- Reynolds?

 5              MS. GULLEY:  That's right.

 6              THE COURT:  Okay.

 7              So, that is fine.  March 16th, April 16th, and April

 8  30th.

 9              Again, please drop off courtesy copies for me.  It is

10  easier.  And you will get the other motions on file and drop

11  off courtesy copies.

12              MS. MILLER:  We will file everything just as a refile

13  so you don't have to get multiple filings from different

14  people.

15              THE COURT:  Okay.

16              MS. MILLER:  We'll just file everything for you and

17  bring over one set.

18              THE COURT:  Thank you.

19              MS. MILLER:  Yep.

20              THE COURT:  That would be helpful.

21              MR. HO:  Your Honor, just one question for clarity.

22  Was it your Honor's decision that there would be no responses

23  to the leadership applications?

24              THE COURT:  Not unless I ask for them.

25              MR. HO:  Thank you.
```

1          MS. WEDGWORTH:  And, then, as to the confidentiality

2    order -- protective order -- and ESI, do you anticipate any

3    additional briefing or information needed after March 30th if

4    there is a dispute?

5          THE COURT:  I am very hopeful that you are going to

6    give me an agreed one.

7          MS. WEDGWORTH:  Working on it.

8          THE COURT:  So, at the moment, I do not anticipate

9    anything because I am hopeful that it would be agreed.  But if

10   not, you will get further direction from me.

11         MS. WEDGWORTH:  Thank you, your Honor.

12         MR. ISSACHAROFF:  Your Honor, I apologize, I will not

13   be here April 6th.  I teach at that time.  I can't.  But I am

14   working with Mr. Ho's group.

15         THE COURT:  Okay.  There are enough of you.

16         Do you teach that morning?

17         MR. ISSACHAROFF:  Yes.

18         THE COURT:  I was going to give you the call-in

19   option, but if you teach that morning, that will not work.

20         MR. ISSACHAROFF:  10:00 to 12:00.  I've got a hundred

21   students.  I'm sorry, your Honor.

22         THE COURT:  That is okay.  I understand.

23         Is there anything else for the Court this afternoon?

24         Yes?

25         MS. ROMANENKO:  Yes, your Honor, one more issue.

1          THE COURT:  Can you just move a little closer to the

2     microphone, please --

3          MS. ROMANENKO:  Sure.

4          THE COURT:  -- so I can hear you.

5          MS. ROMANENKO:  Sure.

6          Victoria Romanenko again from Cuneo, Gilbert &

7     LaDuca.

8          So, with respect to a stay of discovery during the

9     pendency of motion-to-dismiss briefing in the dealership

10     actions, we understand that maybe oral discovery will not go

11     forward, but we're hopeful that other discovery can go

12     forward.  Your Honor's rules say that the parties are reminded

13     that the pendency of a motion, such as a motion to dismiss,

14     does not stay discovery.  So, we just wanted to clarify that

15     issue.

16          MS. MILLER:  If we could briefly -- your Honor, as

17     the Seventh Circuit opinion and other opinions have given

18     indication, we think some of the issues may be dropped out by

19     some of the motions.  We're hopeful.  We'll await your Honor's

20     decision on those.  But we think that waiting on the motions

21     to dismiss -- and your Honor is usually quite expeditious in

22     issuing such orders -- that, you know, we should wait until

23     those motions are decided because that may narrow the scope of

24     discovery.

25          THE COURT:  I am going to take that back up on the

1    6th.

2              MS. MILLER:  Okay.

3              THE COURT:  That is one of the things that I have

4    asked you to talk about.  And maybe you will agree to turn

5    over the documents you have given to the government

6    investigators or maybe there is some subset.

7              But before I put anything firm in place, I want to

8    see what I get -- what the protective order looks like, what

9    the lead counsel applications look like -- and, then,

10   hopefully you will be able to reach some agreement on it.

11             Yes?

12             MS. GULLEY:  Just going back for a second to the

13   issue of the Authenticom discovery -- written discovery --

14   that should be issued by March 23rd, just --

15             THE COURT:  If it has not been already.

16             MS. GULLEY:  Well, I just mentioned earlier that

17   Reynolds has not filed their counterclaim -- its counterclaims

18   -- yet; and, therefore, there's obviously -- I mean, you're

19   not suggesting that the not-yet-filed counterclaims discovery

20   needs to be served by --

21             THE COURT:  No.  If it is not on file yet, no.  But I

22   will get to the motion to dismiss, so that we can figure out

23   where that is going.

24             MS. GULLEY:  Great.  Thank you.

25             MR. KAPLAN:  Thank you, your Honor.

64

1          THE COURT:  Any other issues?

2      (No response.)

3          THE COURT:  Anybody in the audience want to say

4  anything?

5      (No response.)

6          THE COURT:  Okay.

7          I will see you April 6th.  Thank you.

8                    *    *    *    *    *

9

10  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.
11

12
    /s/ Joseph Rickhoff                     March 14, 2018
13  Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 3

MAYER·BROWN

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel +1 312 782 0600
Main Fax +1 312 701 7711
www.mayerbrown.com

June 5, 2018

**Britt M. Miller**
Direct Tel +1 312 701 8663
Direct Fax +1 312 706 8763
bmiller@mayerbrown.com

**BY E-MAIL**

Michael N. Nemelka
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 60036

Peggy J. Wedgworth
MILBERG TADLER PHILLIPS GROSSMAN LLP
One Pennsylvania Plaza
New York, NY 10119

Re:     *In re Dealer Management Systems Antitrust Litig.*,
        MDL No. 2817, Case No. 18-CV-864 (N.D. Ill.)

Dear Mike and Peggy:

I write regarding the CDK-specific issues raised in Plaintiffs' May 25 and May 31 letters.[1]

**Plaintiffs' May 25, 2018 Letter:**

*Interrogatories:* We appreciate your agreement to supplement Authenticom's responses to CDK Interrogatory Nos. 4, 5, 9, 10, 11, 13, 14, 15, and 21. We note, however, that you did not provide a date by which you would supplement. We ask that you identify a date certain by which Authenticom will supplement no later that COB Friday, June 8.

With respect to Interrogatory No. 25, while courts have disagreed on the issue, the Northern District of Illinois has held that an interrogatory asking a party "to explain the factual and legal basis of any denial of a request to admit" constitutes a single interrogatory for purposes of the cap. *Scandaglia v. Transunion Interactive, Inc.*, 2010 WL 317518, at *5 (N.D. Ill. Jan. 21, 2010). There the court squarely rejected the opposing party's claim—indistinguishable from Plaintiffs' here—that the interrogatory was "compound" and "would exceed the allowable number of interrogatories." *Id.* "Having denied so many . . . Requests to Admit," the court explained, the objecting party "placed these issues in dispute." *Id.* The party who propounded the interrogatory was "entitled to discovery regarding the basis for [the other side's] denials, and conducting this discovery through interrogatory rather than through deposition" was "less costly

---

[1] Plaintiffs' sent two letters on May 31, 2018. One in response to CDK's January 29, 2018 Letter, and the other purporting to memorialize certain aspects of the parties May 18, 21, and 22 meet-and-confers. Per my letter of June 1, 2018, this letter is intended to address the latter May 31 letter.

Mayer Brown LLP

Michael N. Nemelka
Peggy J. Wedgworth
June 5, 2018
Page 2

and time consuming for all parties involved." *Id.* This holding and rationale apply equally here. Please let us know if Authenticom will withdraw its objection and respond to this Interrogatory.

*RFAs:* We appreciate your agreement to amend Authenticom's responses to CDK RFA Nos. 3, 4, and 8. Here, again, we note that you did not provide a date by which you would amend. We ask that you identify a date certain by which Authenticom will amend no later that COB Friday, June 8.

*RFPs:* We appreciate your May 31, 2018 response. We will follow-up, as appropriate, on the issues discussed on today's meet-and-confer.

## Plaintiffs' May 31, 2018 Letter:

I.      **FTC Productions**

     A.      *AutoMate Documents:* As we have thoroughly documented through our meet-and-confer correspondence, we disagree with your repeated argument regarding the relevance of *all* of the documents CDK produced to the FTC in connection with the AutoMate transaction—based solely on the fact that they were produced to the FTC in regards to that transaction—and, as clearly stated in my May 24 letter (and during our May 22 meet-and-confer), the parties are at impasse. Your May 31 letter confirms as much. As this issue has festered for some time and given the discovery deadlines currently in place, we will shortly be seeking clarification from the Court on this issue. And while the logistics of how CDK proposes to determine what of the AutoMate production it will produce in the civil litigation is irrelevant to the core issue in dispute, the answer is simple: CDK intends to run the full set of agreed-upon search terms against the document collections of all of the agreed-upon (or court-ordered) custodians and review the resulting documents for responsiveness to Plaintiffs' document requests (as limited by any party agreements or Court orders). In other words, CDK intends to treat the AutoMate collection the same as it will treat non-AutoMate/non-CID documents— *i.e.*, limited to agreed-upon (or court-ordered) custodians and search terms.

     B.      *Recordings of FTC Interviews.* Like Plaintiffs and Reynolds, CDK will agree to produce any transcripts, recordings, or other memorializations of FTC interviews in connection with the agency's joint conduct investigation. As previously noted, however, we are unaware of any interviews and thus unaware of any such documents.

     C.      *Search Terms.* As previously reported, the bulk of CDK's production to the FTC in connection with the joint conduct investigation was done using TAR and not search terms. We have confirmed that search terms were used in connection with certain non-TAR documents. CDK will produce those search terms.

     D.      *Footnote 1 of my May 24 Letter:* Plaintiffs are over-reading the footnote in question and the rant in your letter does not warrant a response. CDK will respond to

Mayer Brown LLP

Michael N. Nemelka
Peggy J. Wedgworth
June 5, 2018
Page 3

discovery requests properly served upon it and produce documents in accordance with
any agreements reached and any orders of the Court.

## II.     Custodial and Non-Custodial Documents

A.      *Custodial*.  As this section of your letter is largely directed at Reynolds, we will
allow its counsel to speak on its behalf.  As to CDK, I will repeat, again, that CDK has
already begun its review of custodial documents (and, again, has already produced
approximately 42,000 custodial records).   So Plaintiffs aspersions of misconduct
(appearing in some off-hand parentheticals in your letter) on the part of CDK are
misplaced.

B.      *Non-Custodial*.  We already addressed this in our May 24 letter and have nothing
more to add.

## III.    Reynolds' Preservation of Documents.

As this issue is not directed at CDK, no response is required of it.

## IV.    CDK's Responses to Authenticom's RFPs

Your attempts to recast the parties' meet-and-confer discussion on this topic
notwithstanding, CDK offers the following as to the outstanding RFPs.

1.  *RFP 102:*  Per my May 24 letter, we have confirmed that the databases we identified
contain the material information regarding invoiced amounts to vendors for the period
2011-2017 to the extent data exists.  In that letter, CDK also agreed to consider any
parameters Authenticom might propose with respect to a "representative sample" of the
actual invoices sent to vendors.  Your letter proposes a full set of invoices for 40 vendor
customers each of DMI, IntegraLink, and 3PA—a total of 120 customers—for a 7+ year
period.  That is not a "representative" sample and CDK is not inclined to undertake the
burdensome task of putting together the requested collection, particularly given CDK's
substantial data production on this topic.  If Authenticom is willing to consider a
substantially smaller, truly "representative" sample, CDK remains willing to consider it.

2.  *RFP 103:*  Here again, we have confirmed that the databases we identified contain the
material information regarding invoiced amounts to dealers for the period 2011-2017 to
the extent data exists.  But, here again, your letter does not propose a "representative"
sample of dealer invoices, but instead suggests a full set of such invoices for 100 dealers
for a 7+ year period.  That is not a "representative" sample and CDK is not inclined to
undertake the burdensome task of putting together the requested collection, particularly
given CDK's substantial data production on this topic.  If Authenticom is willing to
consider a substantially smaller, truly "representative" sample, CDK remains willing to
consider it.

Mayer Brown LLP

Michael N. Nemelka
Peggy J. Wedgworth
June 5, 2018
Page 4

3. *RFP 105:* Given the tenuous relevance argument Plaintiffs have advanced in connection with this Request, CDK is not inclined to undertake the substantial burden required to assemble the requested information. CDK has undergone at least three significant corporate reorganizations over the last 3+ years, starting with its spin-off from ADP in 2014, and a number of smaller, departmental reorganizations. Attempting to track down whether a given position was eliminated or simply renamed, whether it was "off-shored" or moved to accommodate a specific candidate, would require CDK to attempt to piece together information from hundreds (and potentially thousands) of HR records, with no guarantee that it would ultimately be able to successfully determine the answer as to any given title or position. To the extent Authenticom can conceive of a more targeted way by which CDK could satisfy this Request, we remain willing to consider it.

4. *RFP 106: See supra* the discussion of the AutoMate FTC production.

As to the remainder of the RFPs enumerated in your letter, CDK will produce documents in accordance with the parties' agreements as to each, as memorialized in my May 24, 2018 letter.

## V. Reynolds' Responses to Authenticom's RFPs

As this issue is not directed at CDK, no response is required of it.

## VI. Defendants' "Deficient" Responses to Authenticom's First Set of Interrogatories

We appreciate your May 31, 2018 response. We will follow-up, as appropriate, on the issues discussed on today's meet-and-confer with respect to CDK.

Sincerely,

Britt M. Miller

cc: Reynolds Counsel of Record
    Mark Ryan
    Andrew Marovitz
    Matt Provance

# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: DEALER MANAGEMENT | ) | MDL No. 2817 |
| SYSTEMS ANTITRUST LITIGATION | ) | Case No. 18 C 864 |

This Document Relates to All Cases

**AUTHENTICOM'S SECOND SET OF REQUESTS FOR THE PRODUCTION
OF DOCUMENTS FOR DEFENDANT CDK GLOBAL, LLC**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff

Authenticom, Inc. ("Authenticom") hereby requests that Defendant CDK Global, LLC

("CDK") produce all documents in its actual or constructive possession, custody, or

control related directly or indirectly to any of the matters described below.  All

documents and tangible things responsive hereto should be produced for inspection as

soon as practicable and in no event later than thirty (30) days from the date after service

of these requests for production.  Production shall be made at the offices of KELLOGG,

HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., 1615 M Street, N.W., Suite 400,

Washington, D.C. 20036, or as otherwise agreed to by the parties.

**DEFINITIONS**

For purposes of these requests the following definitions shall apply:

1.      "Add-on application" means a software application that dealers use in addition to or separate from their Dealer Management System ("DMS") software in the course of operating their dealerships.

2.      "All" shall be construed as all and any, and the term "any" shall be construed as all and any.

3.      "Authenticom" shall mean the Plaintiff in this action and a provider of data integration services in the automotive industry based in La Crosse, Wisconsin.  "Authenticom" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

4.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the document request all responses that might otherwise be construed to be outside of its scope.

5.      "CDK" shall mean CDK Global, LLC, as described in Paragraph 4 of Defendants' Combined Statement of Additional Facts Requiring Denial of Preliminary Injunctive Relief (hereinafter, "SoAF"), Dkt. No. 87 (June 16, 2017).  "CDK" shall include the dealer services business of Automatic Data Processing, Inc. ("ADP") prior to September 30, 2014, as described in Paragraph 5 of the SoAF.  "CDK" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

6.      "Communication" shall mean any exchange or transfer of information, whether electronic, written, oral, or in any other form.  The phrase "communication between" is defined

to include instances where one party addresses the other party but the other party does not necessarily respond.

7.    "Data integrators" shall refer to service providers that provide access by any means to dealer data on the DMS database, whether by extracting the data, writing data back into the DMS, or both.  For the avoidance of doubt, "data integrators" includes CDK (through its 3PA program) and Reynolds (through its RCI program).

8.    "DMI" shall mean Digital Motorworks, Inc., as described in Paragraph 215 of the SoAF.  "DMI" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

9.    "Document" and "Documents" are used in the broadest extent permitted by Federal Rule of Civil Procedure 34(a).

10.    "IntegraLink" shall mean IntegraLink, as described in Paragraph 215 of the SoAF.  "IntegraLink" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

11.    "Including" (in addition to its usual meanings) shall mean including but not limited to.

12.    The terms "relating to," "related to," "referring to," "regarding," or "with respect to" shall mean, without limitation, the following concepts: concerning, discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part.

13.     "Reynolds" shall mean "The Reynolds & Reynolds Company," as described in Paragraphs 1-3 of the SoAF.  "Reynolds" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

14.     "Vendors" or "application providers" shall mean vendors who provide software applications that perform operations functions for dealerships, as described in Paragraph 20 of the SoAF.

15.     "You," "Your," or "Your company" shall mean the responding Defendant, its present or former predecessors, subsidiaries, departments, divisions, joint ventures, and affiliates, including without limitation, any organization or entity that the responding Defendant manages or controls, together with all present and former directors, officers, employees, agents, representatives, or any persons acting or purporting to act on behalf of the responding Defendant.

## INSTRUCTIONS

1.     In producing documents and other materials, You must furnish all documents in Your possession, custody, or control, regardless of whether such documents or materials are possessed directly by You, Your employees or former employees, agents or former agents, parents, subsidiaries, affiliates, investigators, or by Your attorneys or their employees, agents, vendors, or investigators.

2.     All documents shall be produced in the same order as they are kept or maintained by You in the ordinary course of Your business.  All documents shall be produced in the file folder, envelope or other container in which the documents are kept or maintained.

3.      Documents attached to one another should not be separated.  If any portion of any document is responsive to any portion of the document requests below, then the entire document must be produced.

4.      Documents shall be produced in such fashion as to identify the natural person in whose possession they were found (i.e., the document custodian).

5.      If any document responsive to any of these requests is privileged, and the document or any portion of the document requested is withheld based on a claim of privilege, provide a statement of the claim of privilege and all facts relied upon in support of that claim, including the following information:

    a.  the exact basis for withholding the document;
    b.  the date of such communication;
    c.  the medium of such communication;
    d.  the general subject matter of such communication (such description shall not be considered a waiver of Your claimed privilege);
    e.  the identity of any document that was the subject of such communication and the present location of any such document;
    f.  the identity of all persons involved in such communication; and
    g.  the identity of any document which records, refers, or relates to such communication and the present location of any such document.

6.      Each document requested herein should be produced in its entirety and without deletion, redaction, or excision, except as permitted by a recognized privilege, regardless of whether You consider the entire document or only part of it to be relevant or responsive to these document requests.  If You have redacted any portion of a document on the ground of privilege, stamp the word "REDACTED" beside the redacted information on each page of the document You have redacted.

7.      Each request for documents seeks production of all documents described along with any attachments, drafts, and non-identical copies in any language whatsoever, in the possession, custody, or control of You or Your respective agents or attorneys.  You are

specifically instructed to review any storage and archive facilities and the personal files, records, notes, correspondence, daily calendars, telephone logs, and records of all persons who would likely have responsive documents.

## REQUESTS FOR THE PRODUCTION OF DOCUMENTS

**REQUEST NO. 93.**   Communications and documents relating to how much CDK spends on a monthly basis with independent data integrators, including with Authenticom, SIS, and/or others,  from January 1, 2013 to present.  *See* CDK-0053241.

**REQUEST NO. 94.**   Communications and documents in which Dan McCray used any term of profanity.  This request has no date limitation.

**REQUEST NO. 95.**   Communications and documents concerning DMI's syndication or "comingling" of Reynolds' data following the February 18, 2015 Data Exchange Agreement, including but not limited to internal communications and documents concerning any competitive advantage DMI gained through the ability to syndicate or "comingle" Reynolds' data and communications with third parties concerning DMI's ability to syndicate or "comingle" Reynolds' data.

**REQUEST NO. 96.**   Communications and documents concerning the potential or expressed inability of vendors to afford the up front, minimum, and/or monthly fees CDK charges through the 3PA program, including but not limited to any communications with third party vendors in which the third party indicated it could not afford CDK's 3PA up front, minimum, and/or monthly fees.

**REQUEST NO. 97.**   Communications and documents concerning any vendor reducing the services obtained through the 3PA program in connection with (or as a result of) any price increases for those services.

**REQUEST NO. 98.**  Communications and documents regarding whether CDK should or would pass through, or has passed through, RCI data integration fees to dealership customers of CDK add-on applications.

**REQUEST NO. 99.**  Communications and documents concerning the limitations of manual extraction of dealer data, including but not limited to communications and documents concerning Reynolds' Dynamic Reporting program.

**REQUEST NO. 100.**  Communications and documents concerning any instance in which a CDK, DMI, and/or Integralink employee, agent, or independent contractor sent a dealership user-id and/or password in an unencrypted format through email.

**REQUEST NO. 101.**  Documents sufficient to show the identity of any vendor and/or dealer that used DMI and/or Integralink for data integration services on the Reynolds DMS during the "wind down period," as described in the February 18, 2015 Data Exchange Agreement.  For each such vendor and/or dealer, please produce documents sufficient to show the date (if any) on which each vendor and/or dealer exited the "wind down period" and no longer used DMI and/or Integralink for data integration services on the Reynolds DMS.

**REQUEST NO. 102.**  For the avoidance of doubt, all invoices for all vendors that used (1) DMI, (2) Integralink, and/or (3) the 3PA program for data integration services, from 2011 to the present.

**REQUEST NO. 103.**  For the avoidance of doubt, all invoices for all dealerships that used a CDK DMS, from 2011 to the present.

**REQUEST NO. 104.**  All communications and documents concerning your security tools, processes, and training for your software developers.

7

**REQUEST NO. 105.**  Documents sufficient to show the jobs CDK eliminated and/or moved offshore from 2015 to the present, including documents sufficient to show the extent of the jobs eliminated and/or moved offshore, the dates on which the jobs were eliminated and/or moved offshore, and the categories or types of jobs that were eliminated and/or moved offshore. *See, e.g.*, CDK-1181024.

**REQUEST NO. 106.**  An unredacted version of the FTC's March 18, 2018 Complaint concerning CDK's proposed acquisition of Auto/Mate (Docket No. 9382), as well as, for the avoidance of doubt, all documents provided to the FTC in connection with the FTC's review of the Auto/Mate acquisition.

**REQUEST NO. 107.**  Communications and documents not previously produced to Authenticom which contain any of the following terms:

- "Vendor X"
- "Joint team"
- "Combined team"
- "No disruption" /50 "security level"
- "Iron dome"
- "Secure DMS Strategy"
-  "Lock out*"
- "Security Advisory Council"
- "Project Scarlett"
- "Project Ledson"
-  Unhook & Rey! or RR or R&R
- "Data breach" & OneEighty or "One Eighty"
- "Evil empire"
- "DDX mass activation"
- Trust* /50 Rey! or RR or R&R or Schaefer or Brockman
- Threat* /50 Rey! or RR or R&R
- Exorbitant /50 Rey! or RR or R&R
- DMI & "one stop shop"
- Leak or leakage /50 Authen! or SIS
- Drain* /s swamp

8

Dated:  March 23, 2018

Respectfully submitted,

*/s/ Michael N. Nemelka*

Michael N. Nemelka *(pro hac vice)*
Aaron M. Panner *(pro hac vice)*
David L. Schwarz *(pro hac vice)*
Kevin J. Miller *(pro hac vice)*
Derek T. Ho *(pro hac vice)*
Joshua Hafenbrack *(pro hac vice)*
Joanna T. Zhang *(pro hac vice)*
KELLOGG, HANSEN, TODD,
    FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax:    (202) 326-7999
Email: mnemelka@kellogghansen.com
        apanner@kellogghansen.com
        dschwarz@kellogghansen.com
        kmiller@kellogghansen.com
        dho@kellogghansen.com
        jhafenbrack@kellogghansen.com
        jzhang@kellogghansen.com


Jennifer L. Gregor
Allison W. Reimann
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI 53703
Phone: 608-257-3911
Fax:    608-257-0609
Email: jgregor@gklaw.com
        areimann@gklaw.com


*Attorneys for Plaintiff Authenticom, Inc.*

9

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 23, 2018, I caused a true and correct copy of the foregoing

Authenticom, Inc.'s Second Set of Requests for the Production of Documents for Defendant

CDK Global, LLC to be served by email upon the following individuals:

Mark W. Ryan (mryan@mayerbrown.com)
Britt M. Miller (bmiller@mayerbrown.com)
Matthew D. Provance (mprovance@mayerbrown.com)
Jeffrey A. Simmons (jsimmons@foley.com)
Joseph S. Harper (jharper@foley.com)
Aundrea K. Gulley (agulley@gibbsbruns.com)
Brian T. Ross (bross@gibbsbruns.com)
Brice A. Wilkinson (bwilkinson@gibbsbruns.com)
Ross M. MacDonald (rmacdonald@gibbsbruns.com)
Justin D. Patrick (jpatrick@gibbsbruns.com)
Kathy D. Patrick (kpatrick@gibbsbruns.com)
Michael P. A. Cohen (mcohen@sheppardmullin.com)
Amar S. Naik (anaik@sheppardmullin.com)
James L. McGinnis (jmcginnis@sheppardmullin.com)
John S. Skilton (jskilton@perkinscoie.com)
Charles G. Curtis, Jr. (ccurtis@perkinscoie.com)
Michelle M. Umberger (mumberger@perkinscoie.com)
Brandon M. Lewis (blewis@perkinscoie.com)
Jesse J. Bair (jbair@perkinscoie.com)
Kathleen A. Stetsko (kstetsko@perkinscoie.com)

*/s/ Michael N. Nemelka*
Michael N. Nemelka

# Exhibit 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817 Case No. 18 C 864 |
| This Document Relates to All Cases | Hon. Amy J. St. Eve |

**INDIVIDUAL PLAINTIFFS' FIRST SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS FOR DEFENDANT CDK GLOBAL, LLC**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs Motor Vehicle Software Corporation, Authenticom, Inc., Cox Automotive, Inc., Autotrader.com, Inc., Dealer Dot Com, Inc., Dealertrack, Inc., HomeNet, Inc., Kelley Blue Book Co., Inc., vAuto, Inc., VinSolutions, Inc., Xtime, and Loop, LLC ("Individual Plaintiffs") hereby request that Defendant CDK Global, LLC ("CDK") produce all documents in its actual or constructive possession, custody, or control related directly or indirectly to any of the matters described below. All documents and tangible things responsive hereto should be produced for inspection as soon as practicable and in no event later than the date provided for in the Case Management Order. Production shall be made at the offices of KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., 1615 M Street, N.W., Suite 400, Washington, D.C. 20036, or as otherwise agreed to by the parties.

## **DEFINITIONS**

For purposes of these requests the following definitions shall apply:

1.     "Add-on application" means a software application that dealers use in addition to or separate from their Dealer Management System ("DMS") software in the course of operating their dealerships.

2.     "All" shall be construed as all and any, and the term "any" shall be construed as all and any.

3.     "Authenticom" shall mean a Plaintiff in this MDL and a provider of data integration services in the automotive industry based in La Crosse, Wisconsin. "Authenticom" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

4.     "AutoLoop" shall mean Loop, LLC and its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

5.     "Cox Automotive" shall mean Cox Automotive, Inc., Autotrader.com, Inc., Dealer Dot Com, Inc., Dealertrack, Inc., HomeNet, Inc., Kelley Blue Book Co., Inc., vAuto, Inc., VinSolutions, Inc., and Xtime, Inc. (collectively, "Cox Automotive") and their present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

6.     "MVSC" shall mean Motor Vehicle Software Corporation and its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

7.      "RTS" shall mean Dealertrack's Registration and Titling Service and its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

8.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the document request all responses that might otherwise be construed to be outside of its scope.

9.      "CDK" shall mean CDK Global, LLC, as described in Paragraph 4 of Defendants' Combined Statement of Additional Facts Requiring Denial of Preliminary Injunctive Relief (hereinafter, "SoAF"), *Authenticom* Dkt. No. 87 (June 16, 2017). "CDK" shall include the dealer services business of Automatic Data Processing, Inc. ("ADP") prior to September 30, 2014, as described in Paragraph 5 of the SoAF. "CDK" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

10.      "Communication" or "Communications" shall mean any exchange or transfer of information, whether electronic, written, oral, or in any other form. The phrase "communication between" is defined to include instances where one party addresses the other party but the other party does not necessarily respond.

11.      "CVR" shall mean Computerized Vehicle Registration and its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

12.      "Data integrators" shall refer to service providers that provide access by any means to dealer data on the DMS database, whether by extracting the data, writing data back into

3

the DMS, or both. For the avoidance of doubt, "data integrators" includes CDK (through its 3PA program) and Reynolds (through its RCI program).

13. "DMI" shall mean Digital Motorworks, Inc., as described in Paragraph 215 of the SoAF. "DMI" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

14. "Document" and "Documents" are used in the broadest extent permitted by Federal Rule of Civil Procedure 34(a).

15. "IntegraLink" shall mean IntegraLink, as described in Paragraph 215 of the SoAF. "IntegraLink" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

16. "Including" (in addition to its usual meanings) shall mean including but not limited to.

17. The terms "relating to," "related to," "referring to," "regarding," or "with respect to" shall mean, without limitation, the following concepts: concerning, discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part.

18. "Reynolds" shall mean "The Reynolds & Reynolds Company," as described in Paragraphs 1-3 of the SoAF. "Reynolds" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

4

19.     "Vendors" or "application providers" shall mean vendors who provide software applications that perform operations functions for dealerships, as described in Paragraph 20 of the SoAF.

20.     "You," "Your," or "Your company" shall mean the responding Defendant, its present or former predecessors, subsidiaries, departments, divisions, joint ventures, and affiliates, including without limitation, any organization or entity that the responding Defendant manages or controls, together with all present and former directors, officers, employees, agents, representatives, or any persons acting or purporting to act on behalf of the responding Defendant.

## INSTRUCTIONS

1.     In producing documents and other materials, You must furnish all documents in Your possession, custody, or control, regardless of whether such documents or materials are possessed directly by You, Your employees or former employees, agents or former agents, parents, subsidiaries, affiliates, investigators, or by Your attorneys or their employees, agents, vendors, or investigators.

2.     All documents shall be produced in the same order as they are kept or maintained by You in the ordinary course of Your business.  All documents shall be produced in the file folder, envelope, or other container in which the documents are kept or maintained.

3.     Documents attached to one another should not be separated.  If any portion of any document is responsive to any portion of the document requests below, then the entire document must be produced.

4.     Documents shall be produced in such fashion as to identify the natural person in whose possession they were found (i.e., the document custodian).

5.      If any document responsive to any of these requests is privileged, and the document or any portion of the document requested is withheld based on a claim of privilege, provide a statement of the claim of privilege and all facts relied upon in support of that claim, including the following information:

a.      the exact basis for withholding the document;
b.      the date of such communication;
c.      the medium of such communication;
d.      the general subject matter of such communication (such description shall not be considered a waiver of Your claimed privilege);
e.      the identity of any document that was the subject of such communication and the present location of any such document;
f.      the identity of all persons involved in such communication; and
g.      the identity of any document which records, refers, or relates to such communication and the present location of any such document.

6.      Each document requested herein should be produced in its entirety and without deletion, redaction, or excision, except as permitted by a recognized privilege, regardless of whether You consider the entire document or only part of it to be relevant or responsive to these document requests.  If You have redacted any portion of a document on the ground of privilege, stamp the word "REDACTED" beside the redacted information on each page of the document You have redacted.

7.      Each request for documents seeks production of all documents described along with any attachments, drafts, and non-identical copies in any language whatsoever, in the possession, custody, or control of You or Your respective agents or attorneys.  You are specifically instructed to review any storage and archive facilities and the personal files, records, notes, correspondence, daily calendars, telephone logs, and records of all persons who would likely have responsive documents.

## REQUESTS FOR THE PRODUCTION OF DOCUMENTS

**REQUEST NO. 1.**    The executed versions of every 3PA contract with a vendor.

**REQUEST NO. 2.**    All documents and communications regarding CDK's Managed Interface Agreement with (a) Cox Automotive and (b) AutoLoop.

**REQUEST NO. 3.**    All documents and communications regarding the 3PA fees to be charged to (a) Cox Automotive, (b) AutoLoop, and (c) MVSC.

**REQUEST NO. 4.**    All documents and communications regarding access to dealer data on a CDK DMS through the 3PA program by (a) Cox Automotive, (b) AutoLoop, and (c) MVSC.

**REQUEST NO. 5.**    All documents and communications regarding whether data received by a (a) Cox Automotive or (b) AutoLoop application from a CDK DMS may be shared with another application run by (a) Cox Automotive or (b) AutoLoop.

**REQUEST NO. 6.**    All documents and communications regarding the Most Favored Nations clause – or anything like it – in the Managed Interface Agreement between Cox Automotive and CDK.

**REQUEST NO. 7.**    All documents and communications regarding any instance in which a vendor received equal or better pricing than Cox Automotive for data integration under the 3PA program from 2015 to the present.

**REQUEST NO. 8.**    All documents and communications regarding any representation made to Cox Automotive that it would pay the lowest rates for integration services.

**REQUEST NO. 9.**    All documents regarding 3PA Governance.  *See*, *e.g.*, CDK-0001039, at 46.

**REQUEST NO. 10.**   All documents and communications regarding any DMS access restrictions, to which CDK add-on applications are not subject, that CDK places on third-party add-on applications.

7

**REQUEST NO. 11.** All documents and communications regarding allowing applications to create or modify "repair orders." *See*, *e.g.*, CDK-0000786, at 818.

**REQUEST NO. 12.** All documents and communications regarding allowing applications to finalize purchasing and leasing transactions. *See id.*

**REQUEST NO. 13.** All documents and communications regarding any "category restrictions" in place at any time with respect to data integration. *See*, *e.g.*, CDK-0001039, at 64.

**REQUEST NO. 14.** All documents and communications relating to any "CVR Category" for data access by electronic vehicle registration and titling vendors.

**REQUEST NO. 15.** All documents and communications relating to any "Closed Category" for data access by electronic vehicle registration and titling vendors.

**REQUEST NO. 16.** All communications with Nissan Motor Acceptance Corporation, American Honda Finance Corporation, or their affiliates regarding Dealertrack's Sales and F&I solution.

**REQUEST NO. 17.** All documents and communications concerning the process of transitioning dealers from CDK's DMS to Dealertrack's DMS.

**REQUEST NO. 18.** All documents and communications regarding impeding, blocking, or in any way making it difficult for a dealer to switch from CDK's DMS to a competing DMS, including Dealertrack's DMS. For the avoidance of doubt, this Request includes all communications and documents regarding a dealer's ability to transfer the dealer's data stored on the CDK DMS to a competing DMS.

**REQUEST NO. 19.** All documents and communications regarding "push" notifications for 3PA or similar functionality provided to CDK's own add-on applications.

**REQUEST NO. 20.**  All documents regarding functionality, data access, or level of data integration provided to one vendor but not offered to a competing vendor or vendors.

**REQUEST NO. 21.**  All documents and communications regarding any purported burden placed on a CDK DMS by the applications of (a) Cox Automotive or (b) AutoLoop.

**REQUEST NO. 22.**  All documents and communications regarding the response time for 3PA interfaces from the time they are requested by a vendor until the time they are actually activated.

**REQUEST NO. 23.**  All documents and communications regarding "Project Peach."

**REQUEST NO. 24.**  All documents and communications regarding Dealertrack Registration & Titling's access to the CDK DMS.

**REQUEST NO. 25.**  All documents and communications regarding RTS participating in the 3PA program.

**REQUEST NO. 26.**  All documents and communications regarding AutoLoop's application to join the 3PA program.

**REQUEST NO. 27.**  All documents and communications regarding CDK's certification of AutoLoop's products for the 3PA program under the January 2016 Statement of Work between AutoLoop and CDK.

**REQUEST NO. 28.**  All documents and communications regarding CDK's decision to let AutoLoop use independent third-party integrators to provide data integration services to CDK dealers after AutoLoop's acceptance into the 3PA program.

9

**REQUEST NO. 29.**   All communications – and all documents regarding those communications – between CDK and dealers regarding (a) Cox Automotive, (b) AutoLoop, and (c) MVSC.

**REQUEST NO. 30.**   All documents and communications relating to any threat or perceived threat to Your DMS business posed by add-on applications, including but not limited to add-on applications provided by Cox Automotive.

**REQUEST NO. 31.**   All documents and communications between CDK and OEMs or car manufacturers regarding (a) Cox Automotive, (b) AutoLoop, and (c) MVSC.

**REQUEST NO. 32.**   All communications, and documents related to those communications, between CVR and CDK concerning MVSC, including but not limited to:  (1) MVSC's access to dealer data stored on the CDK DMS; (2) MVSC's presence and market share in California, Illinois, or any other state EVR market; (3) MVSC's expansion or potential expansion into states beyond California; and (4) any competitive threat or perceived competitive threat posed by MVSC to CVR.

**REQUEST NO. 33.**   All communications, and documents related to those communications, between CDK and Reynolds concerning or relating to MVSC.

**REQUEST NO. 34.**   All documents and communications related to MVSC's attempts or applications to join the Your data integration program, including but not limited to internal communications regarding whether to permit MVSC to participate in Your data integration program; internal communications regarding any competitive threat that permitting MVSC to join Your data integration program might pose to CVR; and the terms and pricing offered to MVSC.

**REQUEST NO. 35.**   All documents and communications related to any other application or attempt by any EVR provider, other than MVSC, to join Your data integration program, including the terms and pricing offered to any such EVR vendor.

**REQUEST NO. 36.**   All documents and communications regarding any EVR provider currently participating in Your data integration program, including when they started participating; the pricing they pay for participation; their applications to participate in the program; Your internal considerations regarding their applications; the data elements they receive and /or have access to; and the state EVR markets in which they participate.

**REQUEST NO. 37.**   All communications, and documents related to those communications, between You and Your dealer customers regarding MVSC, including but not limited to communications between You and Your dealer customers concerning (1) the way in which MVSC accesses dealer data; (2) MVSC's attempts to join the 3PA program and/or 3PA certification status; and (3) MVSC's security and data practices.

**REQUEST NO. 38.**   All communications and documents concerning or mentioning any MVSC executive, including but not limited to Don Armstrong, Kelly Kimball, Joseph Nemelka, and John Brueggeman.

**REQUEST NO. 39.**   All communications and documents concerning CDK's consideration or evaluation of whether to acquire or purchase MVSC.

**REQUEST NO. 40.**   All communications and documents concerning any efforts by You to block or impede MVSC's access to data for a dealer using Your DMS platform.

**REQUEST NO. 41.**   All communications and documents concerning MVSC's use of independent integrators, including but not limited to Authenticom, SIS, and ProQuotes, to access data for a dealer using Your DMS platform.

**REQUEST NO. 42.**   All communications and documents concerning the importance of having real time or bi-directional data integration in order to provide EVR services in Illinois, California, or any other state EVR market.

**REQUEST NO. 43.**   Documents sufficient to show CVR's market share and customer base in every state in which it operates, from 2011 to present.

**REQUEST NO. 44.**   All documents and communications concerning CVR's customer base and market share in California and Illinois, from 2011 to present.

**REQUEST NO. 45.**   All documents and communications concerning any market analysis or competitive analysis of the EVR markets in California and Illinois.

**REQUEST NO. 46.**   All documents and communications concerning CVR's operational costs, revenues, profitability, and financial projections and forecasts, from 2011 to present.

**REQUEST NO. 47.**   All documents and communications concerning deficiencies or perceived deficiencies in CVR's product and service level.  For the avoidance of doubt, this Request includes not only internal documents and communications but also communications with third parties (including CVR's dealer customers) regarding deficiencies or perceived deficiencies in CVR's product and service level.

**REQUEST NO. 48.**   All documents and communications concerning the product quality or perceived product quality of CVR's competitors, including but not limited to MVSC.

**REQUEST NO. 49.**   All documents and communications regarding any delays or backlogs by CVR in processing vehicle registrations and titles, including but not limited to any such delays or backlogs in California.

**REQUEST NO. 50.**  All documents and communications concerning any advantage or perceived advantage CVR has over its competitors because of CVR's ability to access dealer data stored on the CDK and Reynolds DMSs.

**REQUEST NO. 51.**  All documents and communications concerning the costs associated with entering a new EVR market, including costs associated with legal licensing and DMV requirements and capital and technological costs.

**REQUEST NO. 52.**  Documents sufficient to show CVR's ownership structure, including documents sufficient to show how CVR's revenues and profits are divided between CDK and Reynolds.

**REQUEST NO. 53.**  All documents and communications relating to Reynolds' ownership interest in CVR, including when that interest was acquired; why Reynolds acquired that interest; from whom Reynolds acquired that interest; how much Reynolds paid for that ownership interest; and what Reynolds' rights are with respect to its ownership interest.

**REQUEST NO. 54.**  All documents and communications relating to the financial benefits received by Reynolds and CDK relating to their ownership interest in CVR, including any allocated profits or other financial benefit, from 2011 to the present.

**REQUEST NO. 55.**  The operative CVR ownership agreement between CDK and Reynolds.

**REQUEST NO. 56.**  All iterations of CVR's organizational chart from 2011 to the present.

**REQUEST NO. 57.**  All documents concerning CDK's involvement in the operation of CVR, including but not limited to CDK's involvement in CVR's management, budget and

capital investments, hiring, firing, personnel decisions, salary and bonus allotments, strategic

priorities, sales and marketing efforts, and other daily business activities.

**REQUEST NO. 58.**   All documents and communications between anyone at CVR, on

the one hand, and anyone at CDK, on the other, including regarding the operations, finances,

and/or management of CVR.

**REQUEST NO. 59.**   All communications between CDK and Reynolds regarding CVR.

**REQUEST NO. 60.**   All documents and communications relating to CVR's acquisition

of AVRS, including the strategic and financial considerations in CVR's acquisition of AVRS.

**REQUEST NO. 61.**   All documents and communications regarding deficiencies or

perceived deficiencies in AVRS's product and service levels after the acquisition.  For the

avoidance of doubt, this Request includes not only internal documents and communications but

also communications with third parties (including AVRS's dealer customers) regarding

deficiencies or perceived deficiencies in AVRS's product and service level.

**REQUEST NO. 62.**   All documents and communications regarding instances in which

CVR or AVRS uses or used independent integrators for access to dealer data on a DMS

platform, whether CDK's, Reynolds', or any other DMS platform.

**REQUEST NO. 63.**   All documents and communications regarding any instance in

which an add-on application owned (or partly owned) by CDK or Reynolds uses or used

independent integrators for access to dealer data on a DMS platform, whether CDK's, Reynolds',

or any other DMS platform.

**REQUEST NO. 64.**   All documents relating to CVR's Board of Directors or any

equivalent governing body for CVR.  This Request has no date limitation.  This Request

includes, but is not limited to:

**a.**     All documents relating to the composition of CVR's Board of Directors;

**b.**     Identification of every member of CVR's Board of Directors through time;

**c.**     All materials presented to CVR's Board of Directors;

**d.**     All materials considered by CVR's Board of Directors;

**e.**     All minutes of meetings of CVR's Board of Directors; and

**f.**     All communications between or among CVR's Board of Directors.

**REQUEST NO. 65.**   All communications between You and any customer or former customer of Authenticom regarding data integration services or data access, including Team Velocity, Automotive Masterminds, or any other vendor customer of Authenticom.

**REQUEST NO. 66.**   All communications between You and any dealer customer or former dealer customer of Authenticom regarding data integration services or data access.

**REQUEST NO. 67.**   All documents concerning Your evaluation of the market for data access / integration services, including what companies compete with You for provision of data access / data integration services.

**REQUEST NO. 68.**   All documents concerning Your cost of capital, cost of equity, cost of debt, and/or weighted average cost of capital, including any documents upon which any of the foregoing are based.

**REQUEST NO. 69.**   All documents concerning the economic value of data or data access to dealers, vendors, or DMS providers, including any economic value placed by You on Your ability to deny, restrict, or in any way control access to data on Your DMS platform.

**REQUEST NO. 70.**   All communications between CDK and any potential acquirer or acquirers, including The Carlyle Group, Silver Lake, Vista Equity Partners, Bain Capital, Thoma

Bravo, and Advent International (or any person acting on behalf of the foregoing), regarding the valuation of CDK, its subsidiaries, or any aspect of their business.

**REQUEST NO. 71.** All documents regarding CDK's Fortellis Automotive Exchange, including all communications with dealers (including AutoNation, Lithia, Berkshire Automotive, Group One, and the Larry Miller Group) and vendors; historical data or projections regarding the costs of research and development, pricing, subscriptions, revenues, and profits.

**REQUEST NO. 72.** All projections, forecasts, or other financial analyses regarding CDK's 3PA, OEM DCS, and/or DMI data services programs.

**REQUEST NO. 73.** All documents concerning the following conferences and/or meetings from 2009 to the present: the National Automobile Dealers Association Show; the Digital Dealer Conference & Expo; or any other industry conference. For the avoidance of doubt, this Request includes all documents concerning: the identity of any of Your employees that attended the conference and/or meeting; any booth or other exhibition space obtained by You; and the exhibitor list and/or floor plan for any such show.

**REQUEST NO. 74.** All telephone records – whether landline or cell phone – reflecting calls made or received by any Reynolds employee and any employee of CDK from 2014 to the present.

**REQUEST NO. 75.** All telephone records – whether landline or cell phone – for Your document custodians from 2014 to the present.

**REQUEST NO. 76.** All documents concerning any training provided by You to Your employees regarding antitrust or competition laws.

**REQUEST NO. 77.** All documents concerning CDK's Secure the DMS initiative.

**REQUEST NO. 78.**  All Secure the DMS Dashboard Reports (*see*, *e.g*., CDK-0841086, at 87), including all data used to prepare such reports.

**REQUEST NO. 79.**  All documents regarding access by ReverseRisk to CDK's DMS platform.

**REQUEST NO. 80.**  All documents concerning "hostile integration" or use of non-authorized usernames or passwords to extract data from the CDK or Reynolds platforms.

**REQUEST NO. 81.**  Documents sufficient to show CDK's revenue, profit (including profit margins), and costs for providing data integration services, on a monthly basis, from January 1, 2000 to the present, with the revenues, profits, and costs of 3PA, DMI, and IntegraLink broken out separately.

**REQUEST NO. 82.**  Documents sufficient to show transactional sales data (including sales, profit, and cost data) on a per-customer and per-transaction basis for data integration services from January 1, 2006 to the present, with the data for 3PA, DMI, and IntegraLink broken out separately.  For the avoidance of doubt, this Request includes, without limitation, the following data linked to each data integration service transaction:

    **a.**  Date and location of transaction;

    **b.**  Data integration service customer;

    **c.**  Specific data integration service purchased;

    **d.**  Information tied to the specific data integration service purchased, including the unit price, unit cost, quantity, and applicable discounts;

    **e.**  CDK salesperson and applicable commission;

    **f.**  Order number and other identifying order information; and

17

    **g.**  Any documents necessary to interpret the contents of these data fields, including abbreviation keys and explanations.

**REQUEST NO. 83.**  All reports and analyses pertaining to CDK's marketing and sales of data integration services from January 1, 2009 to the present, with information for 3PA, DMI, and IntegraLink broken out separately.  For the avoidance of doubt, this Request includes, without limitation:

    **a.**    Sales reports;

    **b.**    Sales representative performance reports;

    **c.**    Marketing plans;

    **d.**    Marketing reports, including sales promotions and discounts;

    **e.**    Strategic plans, including pricing strategy;

    **f.**    Cost accounting reports;

    **g.**    General ledger reports;

    **h.**    Charts of accounts;

    **i.**    Analyses of competitive position, including market share; and

    **j.**    Profit and loss reports.

**REQUEST NO. 84.**  Documents sufficient to show CDK's projections with respect to revenue and profit for providing data integration services from January 1, 2009 to the present.

**REQUEST NO. 85.**  Documents sufficient to show CDK's projections with respect to costs for providing data integration services from January 1, 2009 to the present, with the projections for 3PA, DMI, and IntegraLink broken out separately.

**REQUEST NO. 86.**  All documents and communications concerning CDK's projections with respect to its data integration services from January 1, 2009 to the present.  For the

avoidance of doubt, this Request includes, without limitation, documents and communications relating to estimates, forecasts, and budgets for revenue, profit, and costs associated with CDK's provision of data integration services.

**REQUEST NO. 87.**  All documents and communications concerning CDK's internal valuations of its data integration service businesses, separate and apart from its DMS business, from January 1, 2009 to the present, including, without limitation, valuations of 3PA, DMI, and IntegraLink.

**REQUEST NO. 88.**  All documents and communications concerning CDK's internal valuations of its DMS business, separate and apart from its data integration services, from January 1, 2009 to the present.

**REQUEST NO. 89.**  All documents and communications from January 1, 2009 to the present concerning industry publications or industry reports with respect to data integration services.

**REQUEST NO. 90.**  All documents and communications from January 1, 2009 to the present concerning industry publications or industry reports with respect to DMS services.

**REQUEST NO. 91.**  All documents and communications CDK relied upon from January 1, 2009 to the present in creating projections, estimates, forecasts, and budgets for revenue, profit, and costs associated with CDK's provision of data integration services.

**REQUEST NO. 92.**  Documents sufficient to show the number of connections CDK has established between a vendor and a dealer's data for purposes of transmitting dealer data to the vendor, broken down by customer, specific service (3PA, DMI, or IntegraLink), and date, from January 1, 2009 to the present.

19

**REQUEST NO. 93.** CDK's "win/loss" reports, communications, analyses, or any other documents sufficient to show the data integration customers (for 3PA, DMI, and IntegraLink, broken out separately) that CDK has lost every year since January 1, 2009, including the reasons the customer switched from a CDK data integration service to a non-CDK data integration service and the identity of the data integration service to whom the customer switched.

**REQUEST NO. 94.** CDK's "win/loss" reports, communications, analyses, or any other documents sufficient to show the data integration customers (for 3PA, DMI, and IntegraLink, broken out separately) that CDK has won every year since January 1, 2009, including the reasons the customer switched to a CDK data integration service and the identity of the data integration service from whom the customer switched.

**REQUEST NO. 95.** All documents and communications regarding the length of time to complete a request to receive data from or send data to a CDK DMS through the 3PA program.

**REQUEST NO. 96.** All documents and communications regarding making "push" functionality available for the 3PA program.

**REQUEST NO. 97.** All documents and communications regarding how frequently vendors are allowed to pull, poll, or transfer data from the CDK DMS.

**REQUEST NO. 98.** All documents and communications regarding how CDK determined what kinds of data, information, or technical specifications to require vendors to provide as part of the 3PA certification process, including "workflow" models, live demonstrations of the add-on applications, justifications for how add-on applications use each data element, and the add-on application's security features.

**REQUEST NO. 99.** All documents and communications regarding any CDK policies or guidelines designed to prevent competitively sensitive information submitted by vendors seeking

20

3PA certification from being shared with CDK's sales teams, add-on application development teams, or any other components of CDK other than those with direct responsibility for engineering the integration of the vendors' add-on applications with the CDK DMS.

**REQUEST NO. 100.** All documents and communications regarding information, data, or technical specifications shared by vendors with CDK as part of the 3PA certification process used by CDK for any purpose other than engineering the integration of the vendors' add-on applications with the CDK DMS, including, for example, development of applications by CDK.

**REQUEST NO. 101.** All pictures of the cake from party for the one-year anniversary of the 2015 agreements between CDK and Reynolds.

Dated:  May 25, 2018                          Respectfully submitted,

                                              */s/ Derek T. Ho*
                                              Derek T. Ho
                                              Michael N. Nemelka
                                              Aaron M. Panner
                                              Daniel V. Dorris
                                              KELLOGG, HANSEN, TODD,
                                                FIGEL & FREDERICK, P.L.L.C.
                                              1615 M Street, N.W., Suite 400
                                              Washington, D.C. 20036
                                              Phone: (202) 326-7900
                                              dho@kellogghansen.com
                                              mnemelka@kellogghansen.com
                                              apanner@kellogghansen.com
                                              ddorris@kellogghansen.com

                                              *Attorneys for Individual Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 25, 2018, I caused a true and correct copy of the foregoing

Individual Plaintiffs' First Set of Requests for the Production of Documents for Defendant CDK

Global, LLC to be served by email upon the following recipients:

CDK-MDL-Team@mayerbrown.com

reynoldsteam@gibbsbruns.com;

reynolds-smrh-pldg@sheppardmullin.com;

KStetsko@perkinscoie.com;

CTeichner@perkinscoie.com

*/s/ Derek T. Ho*
Derek T. Ho

# Exhibit 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

IN RE: DEALER MANAGEMENT
SYSTEMS ANTITRUST LITIGATION

This Document Relates To: ALL ACTIONS

MDL No. 2817
Case No. 18-cv-00864
Hon. Amy J. St. Eve

**DEALERSHIP CLASS PLAINTIFFS' FIRST SET OF REQUESTS FOR THE
PRODUCTION OF DOCUMENTS FOR DEFENDANT CDK GLOBAL, LLC**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs Baystate
Ford Inc.; Cliff Harris Ford, LLC d/b/a Warrensburg Ford; Hoover Automotive, LLC d/b/a Hoover
Dodge Chrysler Jeep of Summerville; JCF Autos LLC d/b/a Stevens Jersey City Ford; Jericho
Turnpike Sales LLC d/b/a Ford & Lincoln of Smithtown; Jim Marsh American Corporation d/b/a
Jim Marsh Mitsubishi Suzuki Kia Mahindra; John O'Neil Johnson Toyota, LLC; Kenny Thomas
Enterprises, Inc. d/b/a Olathe Toyota; Marshall Chrysler Jeep Dodge, LLC; Patchogue 112 Motors
LLC d/b/a Stevens Ford; Pitre Imports, LLC d/b/a Pitre Kia; Pitre, Inc. d/b/a Pitre Buick GMC;
Teterboro Automall, Inc. d/b/a Teterboro Chrysler Dodge Jeep Ram; Waconia Dodge, Inc. d/b/a
Waconia Dodge Chrysler Jeep Ram; and Warrensburg Chrysler Dodge Jeep, L.L.C. ("Dealership
Class Plaintiffs") request that CDK Global, LLC ("CDK") produce all documents in its actual or
constructive possession, custody, or control related directly or indirectly to any of the matters
described below, subject to the Definitions and Instructions set forth herein. All documents and
tangible things responsive hereto shall be produced to the undersigned counsel, or at such other
location as is mutually acceptable to the parties, by the time prescribed, or at such other time and
place as the parties mutually agree.

## I.    DEFINITIONS

This section sets forth specific definitions applicable to certain words and terms used herein. Unless words or terms have been given a specific definition in this section or in a specific Request, each word or term shall be given its usual and customary dictionary definition, except where a word or term has a specific customary and usage definition in your trade and industry. In that case, the word or term shall be interpreted in accordance with the specific customary and usage definition.

1.    "Add-on application" means a software application that dealers use in addition to or separate from their Dealer Management System ("DMS") software in the course of operating their dealerships.

2.    "All" shall be construed as all and any, and the term "any" shall be construed as all and any.

3.    "Authenticom" shall mean Authenticom, Inc. (Plaintiff in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-cv-318 (W.D. Wis.), now consolidated as a part of the above-captioned MDL), a provider of Data Integration Services in the automotive industry based in La Crosse, Wisconsin. "Authenticom" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

4.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the document request all responses that might otherwise be construed to be outside of its scope.

5.    "CDK" shall mean CDK Global, LLC, a publicly traded Delaware corporation with its corporate headquarters and principal place of business located at 1950 Hassell Road, Hoffman Estates, Illinois. "CDK" shall include the Dealer Services business of Automatic Data Processing,

Inc. ("ADP"), or any other predecessor to CDK. "CDK" shall also include its present or former subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants, including those of ADP's Dealer Services business or any other predecessor to CDK.

6.      "Communication" shall mean any exchange or transfer of information, whether electronic, written, oral, or in any other form. The phrase "communication between" is defined to include instances where one party addresses the other party but the other party does not necessarily respond.

7.      "Data access policies" means Your policies with respect to the ability of dealers to authorize independent integrators to access data on the DMS or otherwise grant third parties access to their data on the DMS.

8.      "Data integrator(s)" shall refer to any service provider(s) that provide access by any means to dealer data on the DMS database, whether by extracting the data, writing data back into the DMS, or both. For the avoidance of doubt, "data integrator(s)" includes CDK (through its 3PA program) and Reynolds (through its RCI program).

9.      "Data Integration Services" or "DIS" shall refer to the extracting, transforming, integrating, and/or organizing of data housed on dealer data management systems.

10.     "Dealers" or "Dealerships" shall refer to businesses engaged in retail automobile sales, including but not limited to the Dealership Class Plaintiffs in this litigation.

11.      "DMI" shall mean Digital Motorworks, Inc., a data integrator and wholly owned subsidiary of CDK. "DMI" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

12. "DMS" shall mean Dealer Management System, the mission-critical enterprise software that manages nearly every function of a dealer's business. DMS software handles and integrates the critical business functions of a car dealership, including sales, financing, inventory management (both vehicle and parts), repair and service, accounting, payroll, human resources, marketing, and more. The DMS also operates as a database, housing dealer data related to inventory, customer, sales, and service information.

13. The "DMS Market" shall mean the market for the provision of DMS services to new car franchised automobile dealers.

14. "Document" and "documents" are used in the broadest extent permitted by Federal Rule of Civil Procedure Rule 34(a) and shall include, but not be limited to any original, reproduction or copy, and/or non-identical copy (i.e., copy with marginal notes, deletions, etc.) of any kind of writings, drawings, graphs, charts, photographs, videos or sound recordings, images, data or data compilations, and/or documentary material, including but not limited to emails, letters, text messages, press releases, postings, instructions, memoranda, notes, diaries, journals, calendars, contract documents, publications, advertisements, calculations, estimates, vouchers, minutes of meetings, invoices, reports, studies, computer tapes, computer disks, computer cards, computer files, photographs, negatives, slide decks or slides, dictation belts, voice tapes, and telegrams. This includes any materials documenting, reflecting, or relating to discussions, conversations, telephone calls, meetings, presentations, conferences, seminars, and/or other spoken or oral communications. Drafts or non-identical copies of, and amendments or supplements to, any of the foregoing are separate documents within the meaning of this term.

15. "FTC Complaint" means the Federal Trade Commission Administrative Complaint, *In the Matter of CDK Global, Inc. et al.*, Index No. 1710156, ECF No. 9382 (March 19, 2018) (Redacted Public Version).

16. "IntegraLink" shall mean IntegraLink, a data integrator and wholly owned subsidiary of CDK. "IntegraLink" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

17. "Including" (in addition to its usual meanings) shall mean including but not limited to.

18. "Meeting" shall mean, without limitation, any assembly, convocation, encounter, communication or contemporaneous presence (whether in person or via any electronic, computer-assisted, digital, analog, video, or telephonic method of communication) of two or more persons for any purpose, whether planned or arranged, scheduled or not.

19. "Person" or "persons" shall mean, without limitation, any individual, corporation, partnership or any variation thereof (*e.g.*, limited partnership, limited liability partnership), limited liability company, proprietorship, joint venture, association, government entity, group or other form of legal entity.

20. The terms "relating to," "related to," "referring to," "regarding," or "with respect to" shall mean, without limitation, the following concepts: concerning, discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part.

5

21.     "Reynolds" shall mean The Reynolds & Reynolds Company, an Ohio corporation with its corporate headquarters and principal place of business located at One Reynolds Way, Kettering, Ohio. "Reynolds" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

22.     "SecurityFirst" shall mean the CDK initiative to revamp its 3PA program publicly announced in June 2015.

23.     "SIS" means Superior Integrated Solutions, Inc. and shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

24.      "Third Party Integrators" shall mean data integrators that provide Data Integration Services on a DMS platform and are independent of or unaffiliated with the DMS provider.

25.     "Vendors" or "application providers" shall mean Vendors who provide software applications that perform operations functions for dealerships, such as inventory management, customer relationship management, and electronic vehicle registration and titling, among other functions.

26.     "You," "Your" or "Your Company" mean the responding defendant, its predecessors, successors, parents, subsidiaries, departments, divisions, joint ventures, and affiliates, including without limitation any organization or entity that the responding defendant manages or controls, together with all present and former directors, officers, employees, agents, representatives or any persons acting or purporting to act on behalf of the responding defendant.

27.     Any term stated in the singular includes the plural and vice versa.

28.     The use of any tense of any word includes all other tenses.

6

## II.    INSTRUCTIONS

1.    All documents shall be produced as they are maintained in the ordinary course of business, and shall be produced in their original folders, binders, covers or containers, or facsimile thereof, *i.e.*, documents maintained electronically shall be produced in the manner in which such documents are stored and retrieved.

2.    In responding to these Requests, you shall produce all responsive documents (including those stored electronically), which are in your possession, custody or control, or in the possession, custody or control of your predecessors, successors, parents, subsidiaries, divisions or affiliates, or any of your respective directors, officers, managing agents, agents, employees, attorneys, accountants or other representatives. A document shall be deemed to be within your control if you have the right to secure the document or a copy of the document from another person having possession or custody of the document.

3.    Each Request for documents seeks production of all documents described along with any attachments, drafts, and non-identical copies in any language whatsoever and created or used for any purpose, including, without limitation, the making of notes thereon. You are specifically instructed to review any storage and archive facilities and the personal files, records, notes, correspondence, daily calendars, telephone logs, and records of all persons who would likely have responsive documents.

4.    To the extent that there are documents containing information relevant to these Requests that are currently in electronic format, the documents are to be produced in their native format.

5.    Privilege logs shall be promptly provided and must be sufficiently detailed and informative to justify the privilege. No generalized claims of privilege or work-product protection

shall be permitted. With respect to each document or communication for which a claim of privilege or work product is made, the asserting party must at the time of assertion identify:

(a)     The exact basis for withholding or redacting the document or communication;

(b)     The medium of such document or communication;

(c)     The general subject matter of such document or communication (such description shall not be considered a waiver of Your claimed privilege);

(d)     Any document that was the subject of such document or communication and the present location of any such document;

(e)     All persons making or receiving the privileged or protected document or communication; and

(f)     Any document which records, refers, or relates to such document or communication and the present location of any such document.

(g)     The steps taken to ensure the confidentiality of the documents or communication, including affirmation that no unauthorized persons have received the document or communication;

6.     If a portion of any document responsive to these Requests is withheld under claim of privilege pursuant to Instruction No. 5, any non-privileged portion of such document must be produced with the portion claimed to be privileged redacted.

7.     The log should also indicate, as stated above, the location where the document was found.

8

8.      You are to produce each document requested herein in its entirety, without deletion or excision (except as qualified by Instructions Nos. 5 and 6 above), regardless of whether you consider the entire document to be relevant or responsive to the Requests.

9.      Documents attached to one another should not be separated. If any portion of any document is responsive to any portion of the document Requests below, then the entire document, including any attachments to the document, must be produced.

10.     Whenever a document is not produced in full or is produced in redacted form, so indicate on the document and state with particularity the reason or reasons it is not being produced in full, and describe to the best of your knowledge, information and belief, and with as much particularity as possible, those portions of the document which are not being produced.

11.     If a document responsive to these Requests was at any time in your possession, custody or control but is no longer available for production, as to each such document state the following information:

        (a)     Whether the document is missing or lost;

        (b)     Whether it has been destroyed;

        (c)     Whether the document has been transferred or delivered to another person, and, if so, at whose request;

        (d)     Whether the document has been otherwise disposed of; and

        (e)     A precise statement of the circumstances surrounding the disposition of the document and the date of its disposition.

12.     References to specific portions of your contracts with Dealers, Vendors, and others are provided solely as a convenience – to assist you in understanding the relevance or the types of

documents sought – and are not intended to, and do not, narrow or otherwise limit the scope of the Request.

13.     A Request to produce "all documents" means you must produce every non-identical document responsive to the subject matter of the Request. A Request to produce "documents sufficient to" identify or describe certain facts means you may select which documents to produce in response to the Request so long as you reasonably believe they include all of the information relating to the subject matter of the Request that would be reflected in all of the documents responsive to the Request. In lieu of producing "documents sufficient to" identify or describe certain facts, you may produce "all documents" relating to the subject matter of the Request. In that event, you should state that you have produced "all documents" relating to the Request in your written response to these Requests.

14.     Provide a source list that clearly identifies who maintained the document and the location from where it was collected.

15.     Each Request herein shall be construed independently. No Request shall be construed by reference to any other Request for the purpose of limiting the scope of the answers to such Request.

16.     If no document responsive to a Request exists, or if the only documents responsive to a Request are not within your possession, custody or control, please so state in your written response to the Request.

17.     These Requests shall be deemed continuing Requests so as to require supplemental responses if You obtain or discover additional documents between the time of initial production and the time of the trial. Such supplemental documents must be produced promptly upon

discovery. Dealership Class Plaintiffs specifically reserve the right to seek supplementary responses and the additional supplementary production of documents before trial.

18.     These Requests incorporate by reference all Requests for the production of documents previously served on defendant CDK by Authenticom in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-cv-318 (W.D. Wis.), now consolidated as a part of the above-captioned MDL.

## III.     RELEVANT TIME PERIOD

Except as otherwise specified, each document Request concerns the time period from January 1, 2013 through the present (the "Relevant Time Period"). In responding to the Requests, you must produce all documents created, dated, prepared, drafted, generated, modified, sent, provided, obtained, used, or received during the Relevant Time Period, or the time period otherwise specified by the Request, that are responsive, in whole or in part, to the subject matter of the Request, and all responsive documents created before or after the Relevant Time Period, or the time period otherwise specified by the Request, that relate, in whole or in part, to facts, transactions, events, or occurrence taking place, or anticipated to take place, during the Relevant Time Period or the time period otherwise specified by the Request.

## REQUESTS FOR THE PRODUCTION OF DOCUMENTS

**REQUEST NO. 1:**

All documents concerning CDK's post-merger plans for Auto/Mate, including the planned downgrading of features and service as well as the prevention of CDK's larger customers from migrating from CDK as detailed in Paragraph 6 of the March 19, 2018 FTC Complaint.

**REQUEST NO. 2:**

All documents concerning any analysis by CDK regarding the effect of the acquisition of Auto/Mate on franchise Dealers.

**REQUEST NO. 3:**

All documents concerning any analysis by CDK regarding Auto/Mate's "aggressive competition," "winning an increasing share of opportunities," and Auto/Mate "successfully acquiring large dealership customers" as detailed in Paragraph 40 of the FTC Complaint.

**REQUEST NO. 4:**

All documents regarding CDK's 2016 plan designed to reduce the risk that some of its customers would switch to Auto/Mate as detailed in Paragraph 42 of the FTC Complaint.

**REQUEST NO. 5:**

All documents concerning the plans outlined in Paragraph 56 of the FTC Complaint regarding CDK's post-acquisition plan that would remove a DMS platform as a competitive alternative to CDK's other DMS products for many customers, which Dealer customers "highly value."

**REQUEST NO. 6:**

All documents regarding any cooperation, coordination, joint effort, assistance, exchange of information or technical knowhow, or any other type of collaboration between CDK and Reynolds in blocking any Third Party Integrators' access to Dealer data on their respective DMS platforms. There is no date limitation for this Request.

**REQUEST NO. 7:**

All documents regarding any VPN tunnel (or other direct access, *i.e.*, one that doesn't require use of login credentials) that CDK provided to any Third Party Integrators for accessing Dealer data on the CDK DMS, including any decision to rescind such access to Third Party Integrators.

**REQUEST NO. 8:**

All documents regarding CDK's policies concerning any changes to CDK's or other DMS providers' data access policies. There is no date limitation for this Request.

**REQUEST NO. 9:**

All documents regarding the ability of Dealers to authorize, or Vendors to use, Third Party Integrators to access data on non-CDK DMS, including the Reynolds DMS. There is no date limitation for this Request. For the avoidance of doubt, this Request includes, without limitation:

    (a)    all communications with Dealers or Vendors, representations to Dealers or Vendors, or statements relating to Dealers or Vendors regarding the ability of Dealers to authorize, or Vendors to use, Third Party Integrators to access data on non-CDK DMS, including Reynolds DMS;

13

(b)     all statements regarding the ability of Dealers to authorize, or Vendors to use, Third Party Integrators to access data on non-CDK DMS, including Reynolds DMS; and

(c)     all documents regarding the ability of Dealers to authorize, or Vendors to use, Third Party Integrators to access data on non-CDK DMS, including Reynolds DMS.

**REQUEST NO. 10:**

All documents and communications from CDK to former Dealer customers regarding the differences or similarities between CDK and Reynolds with respect to data access policies. For the avoidance of doubt, this Request includes, without limitation, any documents or communications in which CDK marketed its open access policy as a point of differentiation with the Reynolds DMS.

**REQUEST NO. 11:**

All documents relating to CDK's "SecurityFirst" and/or "3PA Refresh" initiative. There is no date limitation for this Request. For the avoidance of doubt, this Request includes, without limitation:

(a)     all presentations regarding the "SecurityFirst" and/or "3PA Refresh" initiative;

(b)     all financial analyses conducted relating to the "SecurityFirst" and/or "3PA Refresh" initiative;

(c)     all documents relating to the reasons CDK introduced the "SecurityFirst" and/or "3PA Refresh" initiative;

(d)     all documents and communications with Dealers and Vendors regarding the "SecurityFirst" and/or "3PA Refresh" initiative, including communications concerning

14

blocking or threatening to block Dealers and/or Vendors that did not meet the requirements of the initiative from the CDK DMS;

(e)     all documents concerning any certification requirements under the "SecurityFirst" and/or "3PA Refresh," including any termination or threat of termination of a Dealer and/or Vendor for failure to meet the certification requirements;

(f)     all documents and regarding any differences between the 3PA program before and after the "SecurityFirst" and/or "3PA Refresh" initiative;

(g)     all documents with respect to the technological implementation of the "SecurityFirst" and/or "3PA Refresh" initiative; and

(h)     all documents relating to any security or other technological enhancements instituted as part of the "Security First" and/or "3PA Refresh" initiative.

**REQUEST NO. 12:**

All documents regarding the ability of Dealers to extract their data from the CDK DMS manually, including when that capability was instituted; the means by which data is extracted; how the means to extract data manually changed, if they changed at all, over the Relevant Time Period; how often Dealers extract their own data for purposes of providing the data to Vendors; how the use of this functionality (*i.e.*, the incidence of use) has changed over the Relevant Time Period, if at all; and the means by which Dealers send their manually-extracted data to Vendors.

**REQUEST NO. 13:**

All documents and communications from CDK to Dealers (whether existing, former, or prospective DMS customers) regarding the differences or similarities between CDK and any other DMS provider with respect to data access policies. For the avoidance of doubt, this Request

includes, without limitation, any documents or communications in which CDK marketed its open access policy as a point of differentiation with the Reynolds DMS.

**REQUEST NO. 14:**

All documents concerning any other DMS provider. For the avoidance of doubt, this Request includes:

(a)     all documents concerning any other DMS provider's DMS and/or DMS services;

(b)     all documents concerning the system architecture of any other DMS or DMS provider, including but not limited to the technological aspects for retrieving data from any other DMS, blocking of third party access to other DMS, or any other relevant technological matter to the claims and defenses in this case; and

(c)     all documents concerning competition within the DMS or Data Integration Services market.

**REQUEST NO. 15:**

All documents concerning any of CDK's DMS customers switching or attempting to switch to a different DMS provider, including the time and expense associated with changing or switching DMS providers, as well as all documents concerning any of CDK's DMS customers who have discontinued use of CDK's services since January 1, 2014. For avoidance of doubt, this Request includes, without limitation:

(a)     all documents concerning any litigation or threatened litigation resulting from such a switch or attempted switch;

(b)    all documents concerning restricting access to a former customer's CDK DMS data or threatening to restrict access to a customer's CDK DMS data if it switched to a new DMS provider;

(c)    all documents concerning customers who have had a contract with CDK for DMS and/or DMS services and that contract was not renewed from January 1, 2014 to the present; and

(d)    all documents concerning customers who have had a month to month contract with CDK at any time from January 1, 2014 to present, regardless of whether that customer is a current CDK customer.

**REQUEST NO. 16:**

All current signed Master Services Agreements and/or other contracts, agreements, and/or written understandings between CDK and its Dealer customers. Each agreement should include all documents that comprise the DMS contract between CDK and the Dealer, including any user guides, addendums, exhibits, and other documents that form the agreement between CDK and its Dealer customers.

**REQUEST NO. 17:**

All documents concerning any provision in CDK's DMS contracts that provide for automatic renewal or extension of CDK's DMS contracts.

**REQUEST NO. 18:**

All documents relating to any changes or proposed changes to material terms in the CDK DMS contract, including with respect to the use of Third Party Integrators; and automatic renewal and/or extension of the contract.

**REQUEST NO. 19:**

All documents sufficient to show (1) which Dealers use or used a CDK DMS; (2) when each Dealer customer first used a CDK DMS; (3) how long each Dealer customer's tenure as a client of CDK has lasted; and (4) if any Dealer no longer uses a CDK DMS, when Dealer ceased using the DMS provider. For the avoidance of doubt, CDK shall provide the above information for any Dealer that was a customer of CDK at any time during the Relevant Time Period.

**REQUEST NO. 20:**

All documents sufficient to show the monthly pricing for DMS services paid by each Dealer customer identified in Request No. 19.

**REQUEST NO. 21:**

All documents sufficient to show the total number of Dealers (both by Dealership group and by rooftop) that used a CDK DMS, broken down on a month-by-month basis.

**REQUEST NO. 22:**

All documents relating to any change in the pricing for DMS services paid by CDK's Dealer customers.

**REQUEST NO. 23:**

All documents sufficient to show the cost of CDK providing DMS services separate and apart from providing Data Integration Services.

**REQUEST NO. 24:**

All documents relating to any Dealer that once obtained DMS services from CDK, but no longer does, including documents sufficient to show the reasons why those Dealers no longer obtain DMS services from CDK.

18

**REQUEST NO. 25:**

Documents sufficient to show any up-front initiation fees, per-dealership setup or installation fees, per-transaction fees, or other one-time charges that CDK has charged to its Dealer customers for DMS services, broken down on a Dealer-by-Dealer basis. This Request includes documents sufficient to show when these fees or charges were instituted; why they were instituted; their amounts; and by how much they increase a Dealer's monthly DMS fees.

**REQUEST NO. 26:**

All documents relating to the pricing charged by other DMS providers, including but not limited to Reynolds.

**REQUEST NO. 27:**

All documents concerning restrictions on Vendors' use of Third Party Integrators to access DMS data on CDK systems or otherwise require that Vendors use the 3PA program to access data on CDK DMS systems. For the avoidance of doubt, this Request includes, without limitation, all documents concerning any provision in CDK's Vendor contracts that limit the ability of Vendors to use Third Party Integrators to access data on CDK DMS systems.

**REQUEST NO. 28:**

All documents sufficient to show what each Vendor paid for Data Integration Services on a month-by-month basis until they stopped using IntegraLink and/or DMI for each month of the Relevant Time Period. For the avoidance of doubt, if any Vendor so identified no longer obtains Data Integration Services from IntegraLink or DMI, provide documents and documents sufficient to show when they stopped and what they paid when they stopped.

**REQUEST NO. 29:**

All documents concerning restrictions on Dealers' use of third parties to access DMS data on the CDK systems. For the avoidance of doubt, this Request includes, without limitation:

(a)     all documents concerning any restrictions on Dealers' use of Third Party Integrators to access DMS data on CDK systems;

(b)     all documents concerning any provision in CDK's DMS contracts that limit the ability of Dealers to use Third Party Integrators to access data on CDK DMS systems;

(c)     all documents and communications with Dealers relating to whether they can (or cannot) authorize Third Party Integrators to access data on the CDK DMS, including any communications that cite provisions in a particular DMS contract to that effect;

(d)     all documents relating to the enforcement or threat of enforcement of CDK's DMS contract against Dealers with respect to third-party access to data on the CDK DMS; and

(e)     all documents relating to Dealer rights under DMS contracts to authorize third parties to access data on the CDK DMS.

**REQUEST NO. 30:**

All documents sufficient to show the technological aspects of:

(a)     how data extraction occurs from the DMS database when using Third Party Integrators;

(b)     extracting data for Third Party Integrators differs from those for (i) DMI or IntegraLink or (ii) participants of the 3PA program;

(c)     how manual extraction of data occurs from the DMS database; and

20

(d)     how the technological aspects of manually extracting data from the DMS database differs from the technological aspects of extracting data for (i) DMI or IntegraLink or (ii) participants of the 3PA program.

**REQUEST NO. 31:**

All documents regarding CDK's use of any Third Party Integrator, including but not limited to Authenticom, for Data Integration Services. For the avoidance of doubt, this Request includes any instance in which a CDK-owned (wholly, jointly, or partially) add-on application used a Third Party Integrator for Data Integration Services with respect to any DMS platform.

**REQUEST NO. 32:**

All documents regarding data security and/or DMS system performance with respect to any Third Party Integrator's access to the Reynolds or CDK DMSs. There is no date limitation for this Request. For the avoidance of doubt, this Request includes, without limitation:

(a)     all documents relating to the effect of Third Party Integrators' access to the CDK DMS on the performance of the CDK DMS;

(b)     all documents relating to any data security incidents caused by Third Party Integrators' access to the CDK DMS; and

(c)     all documents relating to any specific system performance issue that was or is directly attributable to third parties' access to the CDK DMS.

**REQUEST NO. 33:**

All documents regarding any decision to block the access of a Third Party Integrator to the CDK DMS prior to the implementation of the "Security First initiative."

**REQUEST NO. 34:**

All documents sufficient to show how Dealer data is stored on the CDK DMS. For the avoidance of doubt, this Request includes, without limitation:

  (a)    all documents sufficient to show whether a Dealer's data is stored separate from the data of other Dealers;

  (b)    all documents sufficient to show whether a Dealer's data is commingled with data that does not belong to the Dealer;

  (c)    all documents sufficient to show where Dealer data is stored (whether on servers at the Dealership, at CDK-managed server farms, at third-party managed server farms, or at some other location, or in some other manner); and

  (d)    all documents sufficient to show how the storage of Dealer data may have changed over the Relevant Time Period.

**REQUEST NO. 35:**

All documents sufficient to show the specific changes to security measures instituted by CDK to protect security of Dealer data.

**REQUEST NO. 36:**

All documents referencing, relating to, or concerning the National Automobile Dealers Association in connection with Dealer data or data security, including, but not limited to, an August 28, 2013 memo of the National Automobile Dealers Association sent to members concerning Dealer data guidance and a 2014 memo entitled, "10 Steps Dealers Need To Take To Protect 'Dealer Data.'"

**REQUEST NO. 37:**

All documents demonstrating the attendance or participation of a CDK representative at any conference or convention where customers or potential customers attended, including but not limited to any Digital Dealer Conference or any National Auto Dealers Association conference or convention. This Request includes any memos, diary entries, and travel, accommodation, and restaurants receipts, or any other documentation evidencing reimbursement for attendance at the conference or convention.

**REQUEST NO. 38:**

All documents produced, used or distributed at any conference or convention where customers or potential customers attended, including but not limited to any Digital Dealer Conference or any National Auto Dealers Association conference or convention. This Request includes any memos, videos, emails and any other materials used to inform, instruct and/or train CDK representatives to market any of CDK's services to Dealers at any convention, meeting, gathering or informational events that would at any time include current or potential CDK customers.

**REQUEST NO. 39:**

Any Civil Investigative Demand served on CDK pertaining to alleged anticompetitive conduct and/or acquisitions or potential acquisitions by CDK and/or Reynolds. For avoidance of doubt, this request is for the Civil Investigative Demand itself and any attachments.

**REQUEST NO. 40:**

All documents concerning CDK sales data and information, including but not limited to invoices, relating to any data integrators or the following Vendors: TrueCar, Carfax, Autotrader, Cars.com, vAuto, Dealer.com, DealerSocket, RouteOne, NakedLime and DealerRater, and/or any of their subsidiaries, affiliates or related entities.

**REQUEST NO. 41:**

All documents exchanged between CDK and Reynolds and any Vendor relating to changes in data integration fees impacting (or potentially impacting) Vendors' prices and fees to Dealerships. This includes but is not limited to any documents or communications that relate in any way to Vendors increasing their prices and fees to Dealerships as a result of increases in data integration fees charged by CDK and/or Reynolds.

**REQUEST NO. 42:**

All documents concerning CDK's actual and projected financial results on a weekly, monthly, quarterly and/or yearly basis during the Relevant Time Period, including but not limited to:

        (a)      internal projections;

        (b)      profit and loss statements, analyses or projections;

        (c)      cost analyses or projections;

        (d)      analyses or projections of gross margins;

        (e)      budgets;

        (f)      marketing plans;

        (g)      business plans or other planning documents; and

        (h)      financial statements, including any filings with governmental agencies or presentations to banks or other financial institutions.

**REQUEST NO. 43:**

All documents concerning CDK's policies and/or practices directed at compliance with the United States antitrust laws.

**REQUEST NO. 44:**

All documents concerning any insurance policies, indemnification agreements or hold harmless agreements that may provide coverage for any of the claims or causes of action asserted in this action, or that may provide reimbursement for payments made or costs incurred in defense of this action.

**REQUEST NO. 45:**

All documents concerning CDK's policies and/or practices regarding the retention, destruction, disposal, and/or preservation of documents.

**REQUEST NO. 46:**

All documents concerning the potential for entities to enter into the market for the supply of DMS, including the potential for such entry and the barriers or obstacles for such entry.

**REQUEST NO. 47:**

All documents concerning the potential for entities to enter into the market for the supply of DIS, including the potential for such entry and the barriers or obstacles for such entry.

**REQUEST NO. 48:**

All documents concerning CDK sales data and information, including but not limited to invoices and all underlying data used to generate invoices for Vendors that used (1) DMI, (2) Integralink, and/or (3) the 3PA program for data integration services, from 2011 to the present, as well as all underlying data used to generate invoices for dealers that used a CDK DMS, from January 1, 2011 to the present. This request includes but is not limited transactional data which shows the payor, date, price, discount, net payable, the category of data polled, as well as records that show the amounts paid to CDK in response to invoices.

Dated: May 25, 2018                    Respectfully submitted,

                                       */s/ Peggy J. Wedgworth*
                                       Peggy J. Wedgworth
                                       Elizabeth McKenna
                                       **MILBERG TADLER PHILLIPS GROSSMAN LLP**
                                       One Pennsylvania Plaza, 19th Floor
                                       New York, NY 10119
                                       (212) 594-5300
                                       pwedgworth@milberg.com
                                       emckenna@milberg.com

                                       *Dealership Interim Lead Class Counsel*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 25, 2018, I caused a true and correct copy of the foregoing

Dealership Class Plaintiffs' First Set of Requests for the Production of Documents for Defendant

CDK Global, LLC to be served by email upon the individuals at the following email address:

CDK-MDL-Team@mayerbrown.com

*/s/ Elizabeth McKenna*
Elizabeth McKenna
