PUBLIC REDACTED VERSION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This document relates to:* | Hon. Robert M. Dow, Jr. |
| *Authenticom, Inc. v. CDK Global, LLC et al.*, Case No. 1:18-cv-00868 (N.D. Ill.) | Magistrate Judge Jeffrey T. Gilbert |

## DEFENDANT CDK GLOBAL, LLC'S ANSWER AND AFFIRMATIVE AND ADDITIONAL DEFENSES AND COUNTERCLAIMS

Defendant CDK Global, LLC ("CDK"), by and through its attorneys, hereby submits its Answer and Affirmative and Additional Defenses in response to Plaintiff Authenticom, Inc.'s ("Plaintiff" or "Authenticom") Complaint (the "Complaint") and its Counterclaims in this matter as follows.

### CDK'S ANSWER AND AFFIRMATIVE AND ADDITIONAL DEFENSES

#### *Preliminary Statement*

Except as otherwise expressly stated below, CDK answers and responds only to those allegations contained in the Complaint that are directed toward it. CDK is without sufficient knowledge or information to form a belief concerning the truth of the allegations in the Complaint that are directed toward other defendants, Plaintiff, or third parties and on that basis denies them.

For the reader's convenience, CDK has organized its Answers to Plaintiff's allegations by employing the headings and subheadings used within the Complaint. In doing so, CDK does not admit that the headings or subheadings are accurate or appropriate for any purpose in this matter and, to the extent that any heading can be read to contain factual allegations, denies each and every one of them unless it has expressly indicated otherwise. In addition, Plaintiff's

1

Complaint contains 42 footnotes that are recited herein. To the extent the contents of those footnotes are not addressed in the text of the response to the Complaint paragraph to which the footnote relates and/or to the extent that the content of any footnote can be read to contain factual allegations, CDK denies each and every one of them.

## INTRODUCTION

1.      Plaintiff Authenticom, Inc. ("Authenticom") brings this action to remedy and put a stop to ongoing antitrust violations being committed by Defendants CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds"). As alleged herein, and supported by voluminous evidence even prior to any discovery, CDK and Reynolds entered into an express horizontal agreement to exclude competition in the market for dealer data integration services, which are critical to the proper functioning of the retail automotive industry. They also imposed unlawful exclusive dealing provisions to reinforce their unlawful horizontal agreement. Authenticom – Defendants' last remaining competitor in the dealer data integration market – has been crippled by Defendants' unlawful conduct and will soon be out of business if that conduct is not promptly enjoined. This case is thus critical not only to Authenticom – whose existence as an ongoing concern hangs in the balance – but also to automobile dealers and the suppliers of essential services to those dealers.

**ANSWER**:      CDK denies that Plaintiff or any other individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 1 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 1 of the Complaint. In addition, Plaintiff's claims and theories premised on CDK's contracts with its Dealer customers and Defendants' purported "market division" agreement were dismissed by the Court and have not been repled. Dkt. 176.

2.      Dealers' data is the lifeline of the automotive industry. In the course of their operations, automobile dealerships generate important data, including vehicle and parts inventory, customer name and contact information, completed and pending sales, vehicle financing and insurance information, and much more. Dealers authorize third-party application providers (commonly referred to in the industry as "vendors") to access their data so that the vendors can provide the dealers with essential services, such as inventory management, customer relationship management, and electronic vehicle registration and titling. Dealer data integration providers such as Authenticom transform the dealers' raw data into a usable form appropriate to

the particular services each vendor provides to the dealer. Vendors depend on and cannot provide their services without access to a dealer's data.

**ANSWER**:   CDK admits that a number of companies within the auto industry including automobile dealers ("Dealers"), dealer management system ("DMS") providers, original equipment manufacturers ("OEMs"), software application providers ("Vendors"), and others generate important data, including those identified in the second sentence of paragraph 2 of the Complaint.   CDK further admits that such data is used by various parties, including the foregoing, in the operation of their respective businesses.   CDK further admits that Dealers contract with various Vendors to provide software solutions, including those identified in the third sentence of paragraph 2 of the Complaint, to Dealers in connection with the operation of their dealerships. CDK admits that certain data services providers, like Authenticom, provide certain services to Dealers in connection with providing certain data to Vendors and that Vendors require certain data in order to provide their services to Dealers.   CDK denies that the allegations in paragraph 2 of the Complaint accurately describe the services that Authenticom or "[d]ealer data integration providers" perform.   CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 2 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them.   CDK denies the remaining allegations in paragraph 2 of the Complaint.

3.     Dealers enter their data into a database within their Dealer Management System ("DMS"). The DMS is the mission-critical enterprise software that manages nearly every function of a dealer's business. Defendants CDK and Reynolds are by far the two giants of the DMS market, controlling approximately 75 percent of the United States market by number of dealers, and approximately 90 percent when measured by vehicles sold. CDK and Reynolds have enormous leverage over dealers. Not only is it deeply disruptive and expensive for a dealer to switch DMS providers (switching takes up to a year of preparation and training), but CDK and Reynolds use their market power to compel dealers to submit to long-term contracts of between five and seven years in length. As a result, CDK and Reynolds have maintained their duopoly for over three decades. No competitor has been able to touch them – even Microsoft has failed.

**ANSWER**:     CDK admits that a number of Dealers use DMSs to assist in the operation of their

dealerships and that they, among other market participants, upload data to the DMS as part of

those operations.  CDK denies that its DMS is a "database."  CDK lacks sufficient knowledge or

information to form a belief as to the truth of the allegations in paragraph 3 of the Complaint that

relate to Defendants' purported collective share of the "DMS market" and on that basis denies

them.  CDK states that the allegations in paragraph 3 of the Complaint are so vague and

ambiguous as to the definition of the term "DMS market" that CDK cannot respond to those

allegations and on that basis denies them.  CDK lacks sufficient knowledge or information to

form a belief as to the truth of the allegations in paragraph 3 of the Complaint that relate to

individuals or entities other than CDK and/or are directed toward other defendants and on that

basis denies them.  CDK denies the remaining allegations in paragraph 3 of the Complaint.

4.     CDK and Reynolds also provide dealer data integration services – separate and
apart from their DMS services – in direct competition with Authenticom.

**ANSWER**:     CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 4 of the Complaint that are directed toward other defendants and on

that basis denies them.  CDK denies the remaining allegations in paragraph 4 of the Complaint.

5.     For over a decade, all DMS providers – including CDK and Reynolds –
recognized that dealers have the right to grant data access to the integrator of their choice.
Everyone agreed – and still agree to this day – that dealers own their data. Reynolds has publicly
declared: "The data belongs to the dealers. We all agree on that." CDK likewise states that it
"has always understood that dealerships own their data and enjoy having choices on how best to
share and utilize that data with others." When dealers and vendors had a choice of which
integrator to use, the integration market flourished. Over a dozen integrators provided secure,
reliable, and cost-effective access to dealer data. With that access, vendors innovated and created
numerous new software applications to help dealerships sell and service cars.

**ANSWER**:     CDK admits that the text quoted in the fourth sentence of paragraph 5 of the

Complaint is attributed to CDK employee Howard Gardner and appears in a July 13, 2013 press

release issued by ADP Dealer Services, Inc., CDK's predecessor, which also states that CDK's

3PA program is intended to "allow[ ] dealers to do business with the third-party vendors of their

choice without sacrificing security." CDK lacks sufficient knowledge or information to form a

belief as to the truth of the allegations in paragraph 5 of the Complaint that relate to individuals

or entities other than CDK and/or are directed toward other defendants and on that basis denies

them. CDK denies the remaining allegations in paragraph 5 of the Complaint.

6.     In 2007, after Reynolds was privately acquired by Bob Brockman, Reynolds
changed its position. Reynolds started to block data integrators – including Authenticom and
CDK – from accessing dealer data on the Reynolds DMS by disabling the integrator's dealer-
created login credentials. CDK, like the rest of the automobile industry, criticized Reynolds'
reversal. Steve Anenen, CDK's CEO, publicly reaffirmed that dealers using the CDK DMS had
the right to grant data integrators access to the dealers' own data. "We're not going to prohibit
that or get in the way of that," he told an industry publication. "I think we've stated pretty
emphatically, we really believe the dealer owns the data. I don't know how you can ever make
the opinion that the data is yours to govern and to preclude others from having access to it, when
in fact it's really the data belonging to the dealer. As long as they grant permission, how would
you ever go against that wish? I don't understand that."

**ANSWER**:     CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegation in the first sentence of paragraph 6 of the Complaint and on that basis denies them.

CDK admits that, as early as 2007, Reynolds took steps to block third-party access to its DMS

including by, for example, disabling certain login credentials. CDK admits that Steve Anenen,

CDK's former CEO, is identified as the source of the quotes that appear in paragraph 6 of the

Complaint in an article that appeared in *Automotive News* approximately 11 years ago. CDK

denies that these statements reflect CDK's policies or the state of the industry a decade later.

CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations

in paragraph 6 of the Complaint that are directed toward other defendants and on that basis

denies them. CDK denies the remaining allegations in paragraph 6 of the Complaint.

7.     Over the next eight years, CDK continued to take that position. In fact, CDK's
own data integration business extracted data for Reynolds dealers even though Reynolds tried to
block CDK from doing so. Mr. Brockman of Reynolds was asked about the fact that CDK "will
not prohibit dealers from providing their vendors with a user ID and password to extract data."
Mr. Brockman responded: "I don't understand [CDK's] position. Other than to be obstinate, than

to be opposite, I can't imagine from a business standpoint that that's truly their position. And frankly it would be my opinion that after awhile they probably change that position." In February 2015 – when CDK made an about face and entered into an illegal agreement with Reynolds to restrict access to dealer data – Mr. Brockman got his wish.

**ANSWER**:    CDK admits that certain of its former subsidiaries, specifically Digital Motorworks, Inc. ("DMI") and IntegraLink, did, during certain times during the relevant period, extract certain data from the Reynolds DMS in fulfillment of certain contracts the companies had with certain Vendors.  CDK further admits that, at certain times during the relevant period, Reynolds took steps to block DMI and IntegraLink's access to the Reynolds DMS.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 7 of the Complaint that are directed toward other defendants and on that basis denies them.  CDK denies the remaining allegations in paragraph 7 of the Complaint.

8.      Specifically, in February 2015, CDK and Reynolds entered into an agreement to eliminate competition in the dealer data integration market. First, they agreed not to compete with each other. Effective February 18, 2015, CDK and Reynolds entered into a formal written contract whereby Defendants agreed that CDK would stop providing integration services for dealers using the Reynolds DMS, ceding that ground exclusively to Reynolds. Moreover, the written agreement provided for coordination between the Defendants to transition vendors from CDK to Reynolds. On March 2, 2015, CDK sent a letter to its vendor clients – i.e., the ones for whom CDK had pulled data from the Reynolds DMS – announcing that the vendors "will be provided with a roadmap to transition" to the Reynolds integration product, which is what happened over the next months.

**ANSWER**:    CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds.  CDK denies Plaintiff's characterization of the agreements.  CDK states that the contracts speak for themselves.  CDK admits that on or about March 2, 2015, DMI sent a letter to certain of its vendor customers that contained the language cited in the fifth sentence of paragraph 8 of the Complaint.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 8 of the Complaint that are directed toward other defendants and on that basis denies them.  CDK denies the remaining allegations in paragraph 8 of the Complaint.   In addition, Plaintiff's claims and theories premised on

Defendants' purported "market division" agreement were dismissed by the Court and have not been repled. Dkt. 176.

9. Having agreed not to compete with each other in the integration market, CDK and Reynolds next took steps to eliminate their remaining competitors. CDK and Reynolds took numerous steps to obstruct dealer data integration providers such as Authenticom from obtaining access to dealers' data, including, for example, by disabling the login credentials to the DMS system created by dealers to provide authorized access to independent integrators. Defendants also bought several integrators off, sued others, and drove the rest from the market. Defendants have succeeded in eliminating all competition in the data integration market except Authenticom.

**ANSWER**: CDK admits that it has taken steps, consistent both with its contracts with its Dealer customers and with CDK's need to provide a stable and secure DMS product to its Dealer customers, to block hostile third-party access—like that of Authenticom—to its DMS. CDK further admits that one of the mechanisms it has used in its efforts to block the unlawful extraction of data from its systems includes disabling login credentials used by hostile data extractors like Authenticom. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 9 of the Complaint that are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 9 of the Complaint. In addition, Plaintiff's claims and theories premised on Defendants' purported "market division" agreement were dismissed by the Court and have not been repled. Dkt. 176.

10. Defendants have now turned their sights on driving out Authenticom, the last competitor remaining in the market. Senior CDK and Reynolds executives have admitted to entering into an agreement to destroy Authenticom. On April 3, 2016, at an industry convention, Dan McCray (CDK's Vice President of Product Management) approached Steve Cottrell (Authenticom's owner and CEO) and said that they should "take a walk." Mr. McCray led Mr. Cottrell off the convention floor and down a service ramp to a secluded area. Mr. McCray then confirmed the existence of the illegal agreement, stating that CDK and Reynolds had agreed to "lock you and the other third parties out." In reference to a prior offer by CDK to acquire Authenticom's business for $15 million, Mr. McCray confirmed the illegal agreement again, stating that the number was so low because Authenticom's "book of Reynolds business is worthless to us because of the agreement between CDK and Reynolds." Mr. McCray then said, "For god's sake, you have built a great little business, get something for it before it is destroyed otherwise *I will f\*\*\*ing destroy it*." Top Reynolds executives have delivered the same message.

**ANSWER**:  CDK admits that on or about April 3, 2016, Dan McCray, a former CDK employee, attended a National Automobile Dealers Association ("NADA") event.  CDK further admits, upon information and belief, that Mr. McCray spoke to Mr. Cottrell at the event.  CDK denies the denies the allegations in paragraph 10 of the Complaint as they relate to the content of Mr. McCray's discussion with Mr. Cottrell.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 10 of the Complaint that are directed toward other defendants and on that basis denies them.  CDK denies the remaining allegations in paragraph 10 of the Complaint.

11.    In furtherance of their agreement to eliminate competition in the data integration market, both CDK and Reynolds have also imposed a series of exclusive dealing provisions designed to foreclose competition by Authenticom. CDK and Reynolds have imposed terms in their DMS contracts with dealers providing that dealers cannot provide access to their data to anyone else, including Authenticom. Likewise, CDK and Reynolds have imposed terms in their vendor contracts that vendors that use CDK or Reynolds data integration services cannot obtain such services from any other provider, including Authenticom. These exclusive dealing provisions mean that any vendor that must do business with CDK or Reynolds cannot also contract with Authenticom to provide data integration services. Compounding this market foreclosure, these exclusive terms last for up to seven years in the case of the dealer contracts, and purportedly *forever* in the case of CDK's vendor contract. That is, even if the vendor were no longer to use CDK for data integration services, it would still be barred – forever – from obtaining data from any CDK dealer from any other source.

**ANSWER**:  Paragraph 11 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that a number of its licensing contracts with its Dealer customers lawfully prohibit a Dealer from providing third-party access to CDK's DMS.  CDK further admits that a number of its third-party access/managed interface agreements with its Vendor customers lawfully prohibit a Vendor from taking or accepting data from CDK's proprietary DMS obtained through unauthorized means, including by Authenticom.  CDK states that the contracts speak for themselves.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 11 of the Complaint that are directed toward other defendants and on that basis denies

8

them. CDK denies the remaining allegations in paragraph 11 of the Complaint. In addition, Plaintiff's claims and theories premised on CDK's contracts with its Dealer customers were dismissed by the Court and have not been repled. Dkt. 176.

12. On several occasions Defendants sought to persuade Authenticom to abandon competition in the dealer data integration market. But having failed to convince Authenticom to exit the data integration market on its own, CDK and Reynolds have waged an all-out assault on Authenticom by intensifying their blocking activities. Dealers have demanded that CDK and Reynolds stop blocking Authenticom, but to no avail. The plight of a Nebraska Ford dealer is typical. In December 2016, after CDK disabled Authenticom's login credentials, the dealer protested to CDK: "You do not have our authorization to disable user accounts. It is my data and I decide who has access to it." CDK responded that it in fact had the right to control access. Incensed, the dealer responded: "We own the data, CDK doesn't." But there was nothing the dealer could do.

**ANSWER**: CDK admits that it has taken steps, consistent both with its contracts with its Dealer customers and with CDK's need to provide a stable and secure DMS product to its Dealer customers, to block hostile third-party access—like that of Authenticom—to its DMS. CDK further admits that one of the mechanisms it has used in its efforts to block the unlawful extraction of data from its systems includes disabling login credentials used by hostile data extractors like Authenticom. CDK further admits that it has put Authenticom on notice that its unauthorized access to CDK's DMS is unlawful and prohibited, and directed it to cease such access. CDK further admits that some Dealers have complained. CDK admits that the text quoted in the fourth and fifth sentences of paragraph 12 of the Complaint appears in customer support notes associated with a Dealer. CDK further admits that those notes reflect statements by a CDK support representative informing that Dealer that CDK's licensing contracts with its Dealer customers lawfully prohibit a Dealer from providing third-party access to CDK's proprietary DMS. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 12 of the Complaint that relate to individuals or entities other than

CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 12 of the Complaint.

13.     Defendants' unlawful conduct has decimated Authenticom's business. Authenticom once provided integration services for more than 15,000 dealers (out of approximately 17,000 franchised dealers nationwide) and hundreds of vendors. In July 2, 2015, Authenticom had the honor of being singled out by President Barack Obama in a speech in La Crosse, Wisconsin. "In 2002, [Steve Cottrell] started a small business out of his house to help manage data for car companies and dealerships," the President recounted. He noted that Authenticom's business was booming and that its "business model was right." "So this business that began in Steve's son's old bedroom," the President explained, "is now one of America's fastest growing private companies based in a restored historic building right in downtown La Crosse." Now, almost two years later, as a result of Defendants' actions, Authenticom's business is cash flow insolvent and on the verge of collapse.

**ANSWER**:     CDK admits that the text quoted in paragraph 13 of the Complaint is attributed to a July 2, 2015 speech made by former President Barack Obama, which refers to Plaintiff. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 13 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 13 of the Complaint.

14.     Defendants' conduct has harmed not only Authenticom but the market as a whole. Despite the fact that dealers and vendors prefer Authenticom's better-priced and higher-quality integration services, vendors have had no choice but to leave Authenticom for Defendants' integration products. "It is with reluctance," one large vendor wrote to Authenticom, "that I write this email to confirm that we will be transitioning our CDK dealership clients from [Authenticom] to CDK." The vendor explained that "[t]his move was solely the result of CDK's aggressive and recurring disablement of our data access credentials.... Being forced to do business with CDK is distressing." Vendors could not sustain the business disruptions caused by Defendants' blocking, and Authenticom hemorrhaged customers.

**ANSWER**:     CDK denies that Plaintiff or any other individual or entity has suffered any injury as a result of any action or conduct of CDK or that its conduct has had any anticompetitive effect. CDK also states that the allegations in paragraph 14 of the Complaint are so vague and ambiguous as to the definition of the term "the market" that CDK cannot respond to those allegations and on that basis denies them. CDK admits that the text quoted in the third and

fourth sentences of paragraph 14 of the Complaint appears in a document produced by Authenticom. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 14 of the Complaint that related to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 14 of the Complaint.

15. The anticompetitive harm associated with Defendants' conduct is evidenced by the resulting increase in prices for dealer data integration services. Authenticom charges vendors approximately $50 per month per dealership connection. Other independent data integrators charged similar rates when they were still in business, as did CDK before it entered into its agreement with Reynolds. Since the unlawful 2015 agreement, CDK and Reynolds have charged vendors on average $300 per month for the same services, and other vendors as much as $800 per month.

**ANSWER**: Paragraph 15 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that Plaintiff or any other individual or entity has suffered any injury as a result of any action or conduct of CDK or that its conduct has had any anticompetitive effect. CDK admits that it has charged certain Vendors approximately $50 per month per dealership connection for certain data access and integration services. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 15 of the Complaint as they relate to pricing charged by Plaintiff, other defendants, or other third parties and on that basis denies them. CDK denies the remaining allegations in paragraph 15 of the Complaint.

16. Defendants' only justification for their elimination of competition in the integration market is "data security." But that justification is pretextual. Authenticom has never had a data breach; its security protections and protocols meet or exceed the highest federal standards; if there was ever a security incident (and there never has been one), Authenticom has agreed to indemnify dealers, backing up that promise with a $20 million dollar cyber liability insurance policy. At bottom, it is the dealer's choice to evaluate the security protections of data integrators, and select the one that meets their standards. "This is just a means of revenue generation for CDK," one Florida dealer wrote. "Let me, the client, worry about my data security by using a vendor such as [Authenticom]. It should be my choice on how I want to secure my data, not CDK's." The choice of which data integrator to use belongs to the dealer. As CDK's

CEO once stated, as "long as [dealers] grant permission, how would you ever go against that wish?"

**ANSWER**:     Paragraph 16 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that Plaintiff or any other individual or entity has suffered any injury as a result of any action or conduct of CDK or that its conduct has had any anticompetitive effect.  CDK also states that the allegations in paragraph 16 of the Complaint are so vague and ambiguous as to the definition of the term "the integration market" that CDK cannot respond to those allegations and on that basis denies them.  CDK denies that the justifications for the steps it has taken, consistent both with its contracts with its Dealer customers and with CDK's need to provide a stable and secure DMS product to its Dealer customers, to block hostile third-party access to its DMS are pretextual.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 16 of the Complaint as they relate to Authenticom's purported data security practices and its "cyber liability insurance policy" and on that basis denies them.  CDK admits that the text quoted in the fifth, sixth, and seventh sentences of paragraph 16 of the Complaint appears in an email attributed to a Dealer produced by Authenticom.  CDK admits that Steve Anenen, CDK's former CEO, is identified as the source of the quotes that appear in paragraph 16 of the Complaint in an article that appeared in *Automotive News* some 11 years ago.  CDK denies that these statements reflect CDK's policies or the state of the industry a decade later.  CDK denies the remaining allegations in paragraph 16 of the Complaint.

17.     Authenticom brings this action to restore competition in the market and choice to dealers and vendors. As described in detail herein, Defendants' horizontal conspiracy to eliminate competition is a per se violation of Section 1 of the Sherman Act, *see infra* Count I; their exclusive dealing arrangements with vendors and dealers are patently anticompetitive and unlawful under Section 1 of the Sherman Act, *see infra* Count II; the illegal tying of their integration service to their DMS service is unlawful under Section 1 of the Sherman Act, *see infra* Count III; their monopolization of their respective Dealer Data Integration aftermarkets is unlawful under Section 2 of the Sherman Act, *see infra* Count IV; and their tortious interference

with Authenticom's contracts with dealers and vendors violates Wisconsin state law, *see infra* Count V.

**ANSWER**:    Paragraph 17 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that Plaintiff asserts the Counts recited in paragraph 17 of the Complaint, except that Plaintiff's claims and theories premised on Defendants' purported "market division" agreement (Count I, in part), CDK's contracts with its Dealer customers (Count II, in part), and tying (Count III) were dismissed by the Court and have not been repled. Dkt. 176. CDK denies that Plaintiff or any other individual or entity has suffered any injury as the result of any action or conduct of CDK and therefore denies that Plaintiff is entitled to the relief it seeks. CDK denies the remaining allegations in paragraph 17 of the Complaint.

18.    Authenticom seeks to recover the damages it has suffered as a result of Defendants' violations of federal antitrust laws and Wisconsin tort law. In addition, Authenticom also seeks an injunction (1) enjoining Defendants from blocking independent data integrators from serving dealers and vendors; (2) enjoining the enforcement of Defendants' exclusive dealing provisions with dealers and vendors; and (3) releasing vendors from the multiyear terms in their contracts with Defendants so that vendors (and dealers) can select a data integrator of their choice.

**ANSWER**:    Paragraph 18 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that Plaintiff seeks to recover damages and seeks injunctive relief. CDK denies, however, that Plaintiff or any other individual or entity has suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiff is entitled to the relief it seeks. In addition, Plaintiff's claims and theories premised on CDK's contracts with its Dealer customers and Defendants' purported "market division" agreement were dismissed by the Court and have not been repled. Dkt. 176.

## PARTIES

19.     Formed in 2002, Plaintiff Authenticom is a privately-held Wisconsin corporation with its corporate headquarters and principal place of business at 400 Main Street, La Crosse, Wisconsin 54601.

**ANSWER**:   On information and belief, CDK admits that Plaintiff is a privately held

Wisconsin corporation with offices at the address listed in paragraph 19 of the Complaint. CDK

lacks sufficient knowledge or information to form a belief as to the truth of the remaining

allegations in paragraph 19 of the Complaint and on that basis denies them.

20.     Defendant CDK is a publicly traded Delaware corporation with its corporate headquarters and principal place of business at 1950 Hassell Road, Hoffman Estates, Illinois 60169. CDK provides Dealer Management System ("DMS") software and services to automobile dealerships throughout the United States, including in Wisconsin, and has more than $2 billion in annual revenues. CDK competes with Authenticom in providing data integration services. In 2014, CDK was spun off from ADP, LLC, and is now an independent, publicly traded company in which ADP retains no ownership interest. Prior to the spin-off, CDK was referred to as ADP Dealer Services (collectively, referred to herein as "CDK").

**ANSWER**:   CDK admits that it is a publicly traded company organized under the laws of

Delaware, and that its corporate headquarters is in Hoffman Estates, Illinois, at the address listed

in paragraph 20 of the Complaint. CDK further admits that it provides certain services to

Dealers, including within respect to DMS licensing, in the United States and in Wisconsin, and

that it reports its annual revenue in public filings with the Securities and Exchange Commission.

CDK further admits that it was spun off from Automatic Data Processing, Inc. ("ADP") in 2014.

CDK denies the remaining allegations in paragraph 20 of the Complaint.

21.     Defendant Reynolds is an Ohio corporation with its corporate headquarters and principal place of business at One Reynolds Way, Kettering, Ohio 45430. Like CDK, Reynolds provides DMS software and services to automobile dealerships throughout the United States, including in Wisconsin. Reynolds also competes with Authenticom in providing data integration services. Though formerly a publicly traded company, Reynolds was acquired by Bob Brockman in 2006.

**ANSWER**:   Upon information and belief, CDK admits that Reynolds is an Ohio corporation

with a business location at the address identified in the first sentence of paragraph 21 of the

Complaint.  CDK further admits, upon information and belief, that Reynolds offers a number of

products and services, including DMS services, to automobile dealerships in the United States.

Upon information and belief, CDK admits that Reynolds used to be a publicly traded company

and that in or about 2006, it was acquired by Bob Brockman.  CDK lacks sufficient knowledge

or information to form a belief as to the truth of the remaining allegations in paragraph 21 of the

Complaint on that basis denies them.

## JURISDICTION AND VENUE

22.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; and Wisconsin state law.

**ANSWER**:     Paragraph 22 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK admits that Plaintiff purports to

bring this action pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, Sections 4

and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26, and Wisconsin state law.  CDK denies,

however, that Plaintiff or any other individual or entity has suffered any injury as a result of any

action or conduct of CDK and therefore denies that Plaintiff is entitled to the relief it seeks.

CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations

in paragraph 22 of the Complaint that are directed toward other defendants and on that basis

denies them.  CDK denies the remaining allegations in paragraph 22 of the Complaint.

23.     This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367 because it is so closely related to the federal claims that they form part of the same case or controversy.

**ANSWER**:     CDK admits that this Court has jurisdiction over the claims asserted in Plaintiff's

Complaint.

24.     This Court has personal jurisdiction over Defendants because they have engaged in the unlawful acts described in this Complaint with the foreseeable or intended effect of causing substantial economic harm to Authenticom in Wisconsin. This lawsuit arises from and

relates to Defendants' Wisconsin activities – including their unlawful conspiracy and attempts to block Authenticom's access to the DMS platforms of hundreds Wisconsin automobile dealerships served by Authenticom. Moreover, Defendants purposefully availed themselves of the privilege of doing business in Wisconsin through the widespread promotion, sale, marketing, and distribution of their products and services in the state.

**ANSWER**:     CDK admits that it markets and sells certain products and services in Wisconsin.

CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations

in paragraph 24 of the Complaint that are directed toward other defendants and on that basis

denies them.  CDK denies the remaining allegations in paragraph 24 of the Complaint.

25.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d). Defendants are registered to do business, transacted business, were found, and had agents in the District; a substantial part of the events giving rise to Authenticom's claims arose in the District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in the District.

**ANSWER**:     CDK admits that it markets and sells certain products and services in Wisconsin.

CDK admits that it is registered to do business in Wisconsin and has a registered agent to accept

service of process in Wisconsin.  CDK further admits that venue is proper in the Western District

of Wisconsin pursuant to the statutes identified in paragraph 25 of the Complaint.  CDK lacks

sufficient knowledge or information to form a belief as to the truth of the allegations in

paragraph 25 of the Complaint that are directed toward other defendants and on that basis denies

them.  The remaining allegations in paragraph 25 of the Complaint state legal conclusions to

which no response is required.

26.     As described throughout the Complaint, Defendants' unlawful conduct has substantially affected interstate commerce by harming competition, increasing prices, reducing quality, and limiting output, to the detriment of Authenticom, dealers, and application providers throughout the nation. *See*, *e.g.*, *infra* Parts IV, V.

**ANSWER**:     Paragraph 26 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK admits that it sells certain products

and services in interstate commerce.  CDK denies, however, that Plaintiff or any other individual

or entity has suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiff is entitled to the relief it seeks. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 26 of the Complaint that are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 26 of the Complaint.

## FACTUAL ALLEGATIONS

### I.    The Relevant Product Markets

27.    The relevant product markets for Authenticom's claims are: (1) the DMS Market in the United States; and (2) the Dealer Data Integration Market in the United States, with the single-brand aftermarkets of (i) the CDK Dealer Data Integration Market and (ii) the Reynolds Dealer Data Integration Market.

**ANSWER**:    Paragraph 27 of the Complaint states legal conclusions to which no response is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 27 of the Complaint.

### A.    The DMS Market

28.    Dealer Management System software is enterprise software designed specifically for retail automotive dealerships. The software manages virtually every aspect of a dealer's business. The DMS has been analogized to the central nervous system of a car dealership. Specifically, DMS software handles and integrates the critical business functions of a car dealership, including sales, financing, inventory management (both vehicle and parts), repair and service, accounting, payroll, human resources, marketing, and more. In short, DMS software is the mission-critical software that enables dealerships to run their operations and function as a business. Industry publications describe the DMS as "the center of a dealer's entire retail management platform. It's impossible to operate without it."

**ANSWER**:    CDK admits that most new vehicle franchised Dealers and a number of used car Dealers use DMS enterprise software to manage and operate their dealerships, including with respect to sales, financing, inventory management, repair and service, accounting, payroll, human resources, and/or marketing. CDK denies that DMS software manages virtually every aspect of a Dealer's business. CDK further admits that a Dealer's DMS interface can include a

number of the functions identified in the fourth sentence of paragraph 28 of the Complaint. Plaintiff has not identified the source of the quotation that appears in the last sentence of paragraph 28 of the Complaint and thus CDK lacks sufficient knowledge or information to form a belief as to the accuracy of that quotation. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 28 of the Complaint and on that basis denies them.

29.     Critically, the DMS is also the place where a dealer's own data is stored, such as its inventory, customer, sales, and service information. In this way, the DMS also operates as a database. The physical storage of the data typically takes place either onsite at the dealership (on servers owned by the dealer or the DMS provider), offsite at private data centers operated by the DMS provider, or with cloud-based data storage companies.

**ANSWER**:     CDK admits that Dealers enter data into the DMS, including inventory, customer, sales, and service information, and that it and other data that does not belong to Dealers, including non-public personal and identifying information pertaining to end-use customers and proprietary data that belongs to CDK and to other third parties resides in the DMS. CDK further admits that data resides on its DMS on servers located in data centers maintained by CDK or, in a few instances (although this is being phased out), on servers that are maintained on a Dealer's premises. CDK denies that its DMS is merely a "database." CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 29 of the Complaint as they relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 29 of the Complaint.

30.     A dealer only has one DMS provider at a time. It would be functionally impossible for a dealership to operate with two separate DMS platforms – DMS providers have completely different and incompatible operating software for their respective systems.

**ANSWER**:     CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 30 of the Complaint and on that basis denies them.

31. DMS providers license and sell their software and services to automobile dealers pursuant to written contracts of between five and seven years in length.

**ANSWER**: CDK denies the allegations in paragraph 31 of the Complaint as they relate to CDK's licensing contracts with its Dealer customers. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 31 of the Complaint as they relate to other DMS providers and on that basis denies them. CDK denies the remaining allegations in paragraph 31 of the Complaint.

32. The DMS market is comprised of those providers that sell and market DMS services to automobile dealerships in the United States. The relevant geographical market is the DMS market is the United States. There is public and industry recognition of the DMS market. There are no reasonable substitutes for the enterprise software and services provided by DMS providers to retail automotive dealerships.

**ANSWER**: The allegations in paragraph 32 of the Complaint state legal conclusions to which no response is required. To the extent that an answer may be required, CDK states that the allegations in paragraph 32 of the Complaint are so vague and ambiguous as to the definition of the term "DMS market" that CDK cannot respond to those allegations and on that basis denies them. CDK denies the remaining allegations in paragraph 32 of the Complaint.

### 1. CDK and Reynolds Dominate the DMS Market

33. CDK and Reynolds together dominate the DMS market. Combined, CDK and Reynolds control approximately 75 percent of the DMS market in the United States when measured using dealership rooftops (i.e., franchised stores), with CDK controlling approximately 45 percent of the market and Reynolds controlling 30 percent. When measured using the number of vehicles sold from franchised dealers – which is more relevant for antitrust purposes – CDK's and Reynolds' market dominance is even more pronounced with a combined market share exceeding 90 percent.

**ANSWER**: CDK denies that it "dominates" any "DMS market" and denies that it has a 45 percent share of new car, franchised DMS customers (or of any other group of customers) in the United States. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 33 of the Complaint that relate to Defendants' purported collective

share of the "DMS market" and/or are directed toward other defendants, and on that basis denies

them. CDK further states that the allegations in paragraph 33 of the Complaint are so vague and

ambiguous as to the definition of the term "DMS market" that CDK cannot respond to those

allegations and on that basis denies them. CDK denies the remaining allegations in paragraph 33

of the Complaint.

34. CDK's and Reynolds' domination of the DMS market has been stable for decades. Because of the barriers to entry described below, other DMS providers and new entrants have not been able to break CDK's and Reynolds' stranglehold. *See infra* Part I.A.2.

**ANSWER**: CDK denies the allegations in paragraph 34 of the Complaint.

35. Aside from CDK and Reynolds, the DMS market is diffuse, with an array of providers dividing up the remaining market share. These providers are typically small, occupy a particular niche, and serve the country's smaller car dealerships.

**ANSWER**: CDK admits that there are an array of other DMS providers besides Defendants.

CDK further states that the allegations in paragraph 35 of the Complaint are so vague and

ambiguous as to the definition of the term "DMS market" that CDK cannot respond to those

allegations and on that basis denies them. CDK lacks sufficient knowledge or information to

form a belief as to the truth of the allegations in paragraph 35 of the Complaint as they relate to

other DMS providers and on that basis denies them. CDK denies the remaining allegations in

paragraph 35 of the Complaint.

36. Based on the foregoing, industry publications variously describe CDK and Reynolds as "the Big 2," "the Duopoly," "the two 400-pound gorillas," and "the two giants of the DMS market."

**ANSWER**: As Plaintiff has not identified the sources from which the purported quotations in

paragraph 36 of the Complaint are drawn, CDK lacks sufficient knowledge or information to

form a belief as to the truth of the allegations in paragraph 36 of the Complaint and on that basis

denies them.

37.     CDK and Reynolds have enormously lucrative DMS businesses. A single, small dealership will pay up to $150,000 per year for the DMS software license and services offered by CDK and Reynolds. Mid-size dealership groups (5 to 10 stores) can pay $1,500,000 or more per year, and large dealerships can easily pay over $5,000,000 per year. Given the thousands of dealerships that CDK and Reynolds serve, and with profit margins exceeding 40 percent, CDK and Reynolds are tremendously profitable. CDK's market capitalization is $9.2 billion.

**ANSWER**:     CDK admits that it serves thousands of Dealers and that certain Dealer franchises pay between up to $150,000 per year and, in some cases, over $5,000,000 per year for licensed DMSs and related services, depending on a variety of factors.  CDK denies that its market capitalization, which fluctuates, currently exceeds $9.2 billion, and denies that its profit margins exceed 40 percent.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 37 of the Complaint as they relate to other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 37 of the Complaint.

### 2.     CDK and Reynolds Maintain Their Market Dominance by Exercising Overwhelming Leverage over Dealerships

38.     CDK and Reynolds have powerful leverage over car dealerships, and they use that leverage to protect their dominant positions and constrain dealers' behavior.

**ANSWER**:     CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 38 of the Complaint as they relate to other defendants and on that basis denies them.  CDK denies the remaining allegations in paragraph 38 of the Complaint.

39.     First, CDK and Reynolds sell their DMS software and services pursuant to long-term contracts, typically between five and seven years in length, often with automatic extensions if new services are ordered in the middle of the contract. CDK and Reynolds therefore lock in their dealers with lengthy contracts.

**ANSWER**:     CDK denies that its DMS licensing contracts are typically between five and seven years in length, and denies that Dealers are "lock[ed] in" to such contracts.  CDK admits that a number of its licensing contracts have provisions pertaining to renewal and extension.  CDK states that the contracts speak for themselves.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 39 of the Complaint as they relate to

other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 39 of the Complaint.

40. Second, it is enormously difficult and disruptive for a dealer to switch DMS providers. One industry executive stated that changing DMS providers "is akin to a heart transplant." CDK's CEO recently acknowledged that "switching DMS providers can be very difficult. It [is] quite a process [to] change and takes time, which is part of the reason that many dealers are hesitant to switch."[1] One large dealer publicly referred to changing DMS providers as "mission impossible." Both Reynolds and CDK have publicly touted that their market positions are secure because of this very fact. Indeed, the *average* DMS client tenure is over 20 years.

**ANSWER**: CDK admits that the text quoted in the second and fifth sentences of paragraph 40 of the Complaint appeared in two issues of *Automotive News* published in 2010 (over eight years ago) and 2014 (over four years ago). CDK further admits that the text quoted in the third and fourth sentences of paragraph 40 of the Complaint is attributed to CDK's CEO in the source identified in footnote 1. CDK denies that the "average DMS client tenure" is over 20 years, and upon a reasonable investigation lacks sufficient knowledge or information to form a belief as to the truth of the allegation in paragraph 40 of the Complaint that CDK has ever publicly made such a statement—and on that basis denies such allegation. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 40 of the Complaint that related to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 40 of the Complaint.

41. Switching DMS providers is so difficult because it disrupts and changes nearly every process that a dealer uses to operate. For a typical dealership to change DMS providers, it takes at least a year of preparation, staff training, and testing before the new system is even put into operation. The financial costs – in terms of training and implementation – are enormous.

**ANSWER**: CDK admits that there are switching costs when changing DMS providers. CDK denies that switching "disrupts and changes nearly every process that a dealer uses to operate,"

---

[1] Thomson Reuters StreetEvents, *Edited Transcript: CDK – Q1 2017 CDK Global, Inc. Earnings Conference Call*, at 3 (Nov. 2, 2016) (statement by CDK Global CEO Brian MacDonald).

that it takes "at least a year," and that the financial costs of switching are "enormous." CDK

lacks sufficient knowledge or information to form a belief as to the truth of the allegations in

paragraph 41 of the Complaint that relate to individuals or entities other than CDK and/or are

directed toward other defendants and on that basis denies them. CDK denies the remaining

allegations in paragraph 41 of the Complaint.

42. The experience of Hendrick Automotive Group, the sixth largest dealership group
in the country, is illustrative. In May 2016, Hendrick announced that it had decided to switch
from Reynolds to CDK, with the goal of completing the transition by mid-2017. The fact that
such a large dealership group had decided to switch DMS providers was momentous news in the
automotive industry. However, just months later, CDK disclosed that Hendrick had decided
against the move. The switchover to CDK had already begun but was halted because of the
difficulty, cost, and disruption caused by the attempt. Hendrick remained with Reynolds.

**ANSWER**:    CDK admits that in or about May 2016, it was reported that the Dealer identified

in paragraph 42 of the Complaint announced plans to switch from Reynolds to CDK for DMS

services, but the Dealer ultimately stayed with Reynolds. CDK denies the remaining allegations

in paragraph 42 of the Complaint.

43. Third, the costs of switching DMS platforms are heightened because CDK and
Reynolds can paralyze a dealer's business by restricting critical third-party applications from
accessing a dealer's data. The DMS houses a dealer's data, and third-party applications must be
able to access that data in order to perform important services for the dealership. Although
dealers own the data stored on the DMS, CDK and Reynolds have seized control over access to
dealer data. CDK and Reynolds can severely disrupt a dealer's business simply by switching off
third-party access to essential dealer data, which is precisely what CDK and Reynolds have done
here by repeatedly blocking Authenticom and other data integrators. *See infra* Part III.C.

**ANSWER**:    CDK admits that there are switching costs when changing DMS providers. CDK

denies that those switching costs are "heightened" as a result of the fact that CDK does not

permit unauthorized third-party access to its proprietary DMS. CDK admits that Dealers input

certain data into the DMS, alongside other data hosted in the DMS that does not belong to

Dealers. CDK further admits that Vendors use such data in the course of providing services to

Dealers. CDK lacks sufficient knowledge or information to form a belief as to the truth of the

allegations in paragraph 43 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 43 of the Complaint.

44.     Indeed, Reynolds and CDK punish dealerships that try to switch DMS providers. For dealers, that makes switching DMS providers not only a logistical nightmare, but a risky and litigious proposition. There is a large collection of lawsuits brought by CDK and Reynolds against dealers that tried to switch DMS providers. The lawsuits tell the story of how deeply damaging an unsuccessful change in DMS providers can be. One publicized case involved a dealer that had been with Reynolds for over 20 years and tried to change providers. Reynolds and the dealer ended up in court, with Reynolds refusing to release the dealer's data stored on Reynolds' DMS until the dealer capitulated to an out-of-court settlement.

**ANSWER**:     CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 44 of the Complaint that related to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 44 of the Complaint.

45.     Finally, as a practical matter, it is impossible for a meaningful percentage of dealerships to switch DMS platforms in response to abusive conduct by CDK and Reynolds. Only a small percentage of dealers are up for grabs each year – because of the long-term contracts and insurmountable switching costs – which means there is little dealers can do to constrain Defendants' abusive practices by switching DMS providers. Moreover, it is all the more difficult to curb abusive conduct by Reynolds and CDK where, as here, they have coordinated their misconduct. For example, whether a dealer chooses CDK or Reynolds, dealers will be locked into the same anticompetitive exclusive dealing arrangements, as will the third-party application providers that serve them. *See infra* Part III.B.

**ANSWER**:     CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 45 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 45 of the Complaint.

46.     CDK and Reynolds have exercised such tight control over the DMS Market for so long, and the barriers to entry are so high, that even Microsoft Corp., the global software behemoth, could not compete with Defendants. Microsoft tried to enter the DMS market in 2006 but failed. In trying to take on CDK and Reynolds, a Microsoft executive publicly conceded,

"We kind of got ahead of ourselves."[2] As Mr. Brockman of Reynolds summarized, given the difficulty inherent in breaking into the DMS market, Microsoft and others "will not be an effective competitor in this marketplace."[3]

**ANSWER**:    CDK admits that Microsoft introduced a competing DMS software product in 2006 and that the text quoted in the third sentence of paragraph 46 of the Complaint appears in the 6-year old *Automotive News* article cited in footnote 2.  CDK denies that Microsoft's DMS offering "failed" or that Microsoft cannot compete with Defendants in so far as Microsoft recently formed a technology partnership with global DMS provider Incadea, a subsidiary of Cox Automotive, which serves more than 4,000 dealerships in 100 countries.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 46 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants, including those that appear in footnote 3, and on that basis denies them.  CDK denies the remaining allegations in paragraph 46 of the Complaint.

### B.    The Dealer Data Integration Market

47.    Not only is the DMS the enterprise software that enables dealers to operate, but it is also the location in which dealers input and store their own data. The dealer data stored on the DMS includes vehicle and parts inventory, customer name and contact information, completed and pending sales, vehicle service and repair history, manufacturer pricing and rebate details, vehicle financing and insurance information, and much more. Third-party application providers (commonly referred to as "vendors" in the industry) need access to this dealer data in order to perform essential services for the dealer. The Dealer Data Integration Market consists of those companies that provide service to dealers and application providers by pulling dealer data from the DMS, formatting and aggregating it, and then providing it to application providers.

**ANSWER**:    Paragraph 47 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that a number of Dealers use DMSs to assist in the operation of their dealerships and that they upload certain data to the DMS as part of those operations, including a number of the categories listed in the second

---

[2] David Barkholz, *Dealers Get New Management System Option*, Automotive News (Dec. 2, 2012).
[3] Mr. Brockman has made a habit of touting Microsoft's inability to break into the DMS market. For example, when asked whether Microsoft's efforts would "affect Reynolds' business," Mr. Brockman  responded, "there's not a chance." *See*, *e.g.*, *Automotive News* (Feb. 19, 2007) and (Jan. 25, 2009).

sentence of paragraph 47 of the Complaint. CDK further admits that Dealers contract with various Vendors for software solutions in connection with the operation of their dealerships. CDK further admits that certain data services providers, like Authenticom, provide certain services to Dealers in connection with providing data to Vendors and that Vendors require certain data in order to provide their services to Dealers. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 47 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 47 of the Complaint.

### 1. It Is Essential that Application Providers Be Able to Obtain Dealer Data Stored on the DMS

48.     Dealers use software "applications" to perform important sales and operational functions. These applications perform services in addition to (or, in some instances, in replacement of) functions provided by the DMS software. Such tasks include vehicle inventory management, customer relationship management, electronic vehicle registration and titling, and scheduling service and repair appointments. A single dealership rooftop typically uses about ten separate application providers (i.e., vendors) – and often more.

**ANSWER**:     CDK admits that Dealers contract with various Vendors for software solutions in connection with the operation of their dealerships, including with respect to sales and operational functions and a number of the tasks identified in paragraph 48 of the Complaint. CDK further admits that those solutions can be used in addition to or as a replacement for certain functionalities of a DMS. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 48 of the Complaint that relate to the number of third-party software solutions used by a "typical" Dealer and on that basis denies them. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 48 of the Complaint that relate to individuals or entities other than CDK and/or are

directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 48 of the Complaint.

49.     Vendors depend on and cannot provide their services without access to the data stored on the dealer's DMS. For example, vendors that provide electronic vehicle registration and titling – a critical service that dealers are legally mandated to provide in some states, including Wisconsin – must be able to retrieve purchaser, vehicle, and financing information about the sale of a car from the dealer's DMS. Without access to that data, vendors cannot register and title the car with the state.

**ANSWER**:     CDK admits that certain Vendors use data maintained in the DMS, including Vendors that provide electronic vehicle registration and titling ("EVR") services, in the course of providing software solutions to Dealers. CDK further admits that some Dealers are required to submit vehicle registrations electronically in certain states, including Wisconsin. CDK denies that Vendors need "access" to a DMS in order to obtain the required information. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 49 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 49 of the Complaint.

50.     Some applications not only require data that is "pulled" from a dealer's DMS, but they also need to "push" data back into the database. A prime example of this type of application is customer relationship management software, which helps dealers record and track potential customers. For example, when a car buyer walks into a showroom, the customer's information and vehicle preferences are first entered into the customer relationship management application, which then handles the relationship to the conclusion of the car sale. To do so, the application requires a dealer's car inventory, which is "pulled" from the DMS. At the conclusion of the process, the application must then be able to "push" the customer and sales information back into the DMS database.

**ANSWER**:     CDK admits that data can be copied from and written to DMSs, including CDK's DMS, and that customer relationship management ("CRM") information is one example of data maintained in the DMS for which some Vendors' software solutions utilize both functionalities. CDK further admits that the allegations in the third, fourth, and fifth sentences of paragraph 50

of the Complaint describe one type of software application that may both copy and write back CRM data to the DMS. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 50 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 50 of the Complaint.

51. Importantly, CDK and Reynolds also have their own applications for services that are separate from their DMS services. For example, CDK and Reynolds both have customer relationship management applications, and they have a wholly owned joint venture that provides electronic vehicle registration and titling. Therefore, many of CDK's and Reynolds' own applications compete with those offered by third-party application providers.

**ANSWER**: CDK admits that it, and upon information and belief Defendant Reynolds, offers software solutions to Dealers that are available separate from its DMS offering, including CRM solutions, and that Defendants have formed a joint venture that provides EVR services. CDK further admits that certain of these software solutions compete with solutions offered by other Vendors. CDK lacks sufficient knowledge or information to form a belief as to the truth of remaining allegations in paragraph 51 that are directed at other defendants and on that basis denies them. CDK denies the remaining allegations in Paragraph 51 of the Complaint.

52. Some of the largest application providers in need of data integration services are the car manufacturers themselves. Companies like Ford, General Motors, and Volkswagen need access to dealer data in order to help manage car and parts inventory, process warranty claims and recall notices, apply rebate and special promotions to car sales, and assist dealers with marketing and lead generation. These manufacturers rely on data integrators to access dealer data, which is essential to the functioning of the entire automobile industry.

**ANSWER**: CDK admits that certain car manufacturers—otherwise known as "original equipment manufacturers" or "OEMs"—obtain certain data from DMSs in connection with services they provide, including those manufacturers listed in paragraph 52 of the Complaint, and that some OEMs use third-party data service providers to obtain data from DMSs. CDK denies that the use of third-party "data integrators" is "essential" to OEMs' ability to offer such

PUBLIC REDACTED VERSION

services or that OEMs "rely" on such "data integrators."  CDK lacks sufficient knowledge or

information to form a belief as to the truth of the remaining allegations in paragraph 52 of the

Complaint that relate to individuals or entities other than CDK and/or are directed toward other

defendants and on that basis denies them.  CDK denies the remaining allegations in paragraph 52

of the Complaint.

53.     The only way for application providers to obtain the required dealer data is from
the dealer's DMS. The data is not stored anywhere else. Dealers do not store their data on any
other system or database. Dealers do not and would not enter the data into a separate, redundant
database. As CDK describes it, the data on a dealer's DMS is "irreplaceable."

**ANSWER**:     CDK denies the allegations in the first through fourth sentences of paragraph 53

of the Complaint.  As Plaintiff has not identified the source of the quoted material in paragraph

53 of the Complaint, CDK lacks sufficient knowledge or information to form a belief as to the

truth of the allegations in the fifth sentence of paragraph 53 of the Complaint and on that basis

denies them.

## 2.     Dealer Data Integrators Provide Dealer Data to Vendors

54.     Third-party application providers (i.e., vendors) do not obtain data directly from
dealers. Instead, there is a separate market comprised of companies that specialize in extracting
dealers' data from DMS databases, aggregating that data and putting it into a standardized
format, and then delivering to vendors the specific data required for their applications. (The
pulling of data by data integrators is sometimes referred to in the industry as "polling" data.)
Data integrators are able to pull and deliver data in an automated, seamless way without the need
for manual intervention by dealers.[4]

**ANSWER**:     Paragraph 54 of the Complaint states legal conclusions to which no answer is

required.  To the extent an answer may be required, CDK denies the allegations in the first

sentence of paragraph 54 of the Complaint.  CDK admits that the "pulling" or copying of data

from DMSs is sometimes referred to as "polling" data by certain members of the automotive

---

[4] While data access providers are commonly referred to as "integrators," there is no actual "integration" between
data integrators and the DMS database in the traditional sense of the two fusing or combining. Instead, in this
context, "integration" is simply a synonym for data access. An "integrator" serves as a bridge between the dealer
data and the vendor.

industry.  CDK further admits that certain data services providers, like Plaintiff, attempt to establish automated access to DMSs, including CDK's DMS.  CDK further admits that while Plaintiff refers to itself and other such data services providers as "integrators," Plaintiff offers "no actual 'integration'" with CDK's DMS "in the traditional sense," only data extraction.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 54 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them.  CDK denies the remaining allegations in paragraph 54 of the Complaint.

55.      Before a data integrator can pull data, it must get specific authorization from the dealer. For example, for integrators like Authenticom, dealers must set up separate login credentials for the integrators so that they can access the DMS database to pull the data. Once dealers set up those credentials, the data integrator can automate the pulling of data through user emulation. The user emulation software runs the data reports and captures the data, using the database software in the same way as a user at a dealership would. The only difference is that the integrator automates the process, whereas a user at the dealership would retrieve the data manually. This method for pulling data – sometimes referred to as "data scraping" or "screen scraping" – is standard not only in the dealer data integration market, but also in numerous other industries, such as banking and healthcare, where data must be pulled from databases for use in applications. *See infra* Part VI.

**ANSWER**:      CDK admits that Plaintiff uses Dealer-issued login credentials to attempt to establish automated access to DMSs, including CDK's DMS, in violation of CDK's contracts with its Dealer customers.  CDK further admits that Plaintiff uses software to automate data capture from DMSs, which is sometimes referred to as "data scraping" or "screen scraping."  CDK admits that Plaintiff and others may also refer to such software as "user emulation" software, but CDK denies that Authenticom's automated access actually emulates or uses CDK's DMS in the same way that an authorized Dealer employee uses the DMS.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 55 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other

30

defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 55 of the Complaint.

56. Data integrators pull data from the dealer's DMS database and then convert that data from a raw, unorganized state into a standardized format that is easy for vendors to use. Each DMS provider has its data in different formats, and dealers themselves enter data differently based on their own individual practices. Data integrators interpret, reformat, and translate the disparate data into a standardized format. They additionally correct data-entry errors or anomalies in the data set, such as missing numbers from vehicle identification numbers ("VINs") or incorrect customer contact information.

**ANSWER**: CDK admits that DMS providers have varying business rules for the formatting and processing of data maintained in their DMSs but denies that such data is maintained in CDK's DMS in "a raw, unorganized state." CDK further admits that certain data service providers offer data "cleansing" services similar to those described in paragraph 56 of the Complaint, and that Plaintiff purports to offer data "cleansing" services of some type. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 56 of the Complaint that relate to the details of such services as may be offered by Plaintiff or others and individual dealers' data practices and on that basis denies them. CDK further lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 56 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 56 of the Complaint.

57. The data integrator then delivers the data to vendors specifically selected by the dealer – i.e., those vendors whose applications the dealer has decided to use. The data provided to the vendor is limited to that which is specifically required by the application. For example, for electronic vehicle registration, the application receives vehicle sale and financing information, but nothing more.

**ANSWER**: CDK admits that so-called "data integrators" sell the data that they extract from DMSs to Vendors, including vendors specifically selected by the Dealer and whose applications the Dealer has decided to use. CDK lacks sufficient knowledge or information to form a belief

as to the truth of the remaining allegations in paragraph 57 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 57 of the Complaint.

58. At one time, there were numerous participants in the Dealer Data Integration Market. Today, there are only CDK, Reynolds, and Authenticom. As outlined below, Defendants have succeeded in driving every other competitor out of the market. CDK owns two of the largest dealer data integrators in the industry, Digital Motorworks and IntegraLink. Like Authenticom, Digital Motorworks and IntegraLink obtain login credentials from dealers to pull data and then provide that data to vendors.[5] CDK also has a data integration product for direct access to data on the CDK DMS – the "Third Party Access" program. Similarly, Reynolds has an integration product for direct access to data on the Reynolds DMS – the "Reynolds Certified Interface" program. Reynolds does not, however, have a product that pulls data from dealers that use non-Reynolds DMS systems.

**ANSWER**:    Paragraph 58 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that DMI and IntegraLink are now known as CDK Data Services, Inc., a subsidiary of CDK. CDK further admits that CDK Data Services interfaces with CDK's DMS in a number of ways, including through a VPN, and provides certain data services to Vendors, OEMs, and other participants in the automotive industry. CDK further admits that it has a "Third Party Access" program ("3PA"), n/k/a the CDK Global Partner program, but denies that the 3PA program offers "direct" access to CDK's DMS. CDK further admits, upon information and belief, that Reynolds has a "Reynolds Certified Interface" program. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 58 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 58 of the Complaint.

59. Dealers authorize but do not pay integrators to pull their data. Instead, vendors pay integrators for their data services. As detailed below, due to Defendants' market power and

---

[5] As wholly owned subsidiaries of CDK, Digital Motorworks and IntegraLink connect to the CDK DMS via a proprietary CDK VPN, and therefore dealers using the CDK DMS are not required to provide Digital Motorworks and IntegraLink with login credentials to pull data.

anticompetitive conduct, the prices charged by CDK and Reynolds are far higher than Authenticom's prices – by many multiples – even though there is no difference in the services provided. *See infra* Part IV.A.

**ANSWER**:     Paragraph 59 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that most Dealers do not pay data services providers or "data integrators" to pull data from a DMS and that Vendors typically pay for such services.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 59 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them.  CDK denies that Dealers can "authorize" third parties to pull data from CDK's DMS.  CDK denies the remaining allegations in paragraph 59 of the Complaint.

60.     Vendors enter into contracts with data integrators to pull the data. The length of the contract varies widely depending on the data integrator. While Authenticom's contracts are for one year, the vendor can cancel services at any time. CDK's and Reynolds' vendor contracts are typically three years in length.

**ANSWER**:     CDK admits that some Vendors enter into contracts with data services providers or "data integrators," and that many of CDK's contracts with Vendors are three years in length.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 60 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them.  CDK denies the remaining allegations in paragraph 60 of the Complaint.

61.     Below is an illustration depicting how the Dealer Data Integration Market works:



**ANSWER**: Paragraph 61 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required. CDK denies the allegations in paragraph 61 of the Complaint.

62. Protecting the security of the dealer data is critically important and the responsibility of all entities involved, including dealers, data integrators, vendors, and DMS providers. The most sensitive data pulled by data integrators are the names and contact information (such as home and email addresses) of the dealers' customers. Importantly, dealer data integrators like Authenticom do *not* have access to the more sensitive categories of data such as social security and credit card numbers. In selecting data integrators, a key criterion dealers and vendors evaluate is the integrator's security protections and protocols.

**ANSWER**: CDK admits that protecting the security of data that Dealers input into the CDK DMS is important to CDK and that CDK has, by contract and otherwise, a responsibility to maintain the security of such data as well as the other data maintained in the DMS. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 62 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 62 of the Complaint.

63. The Dealer Data Integration Market is comprised of providers of dealer data integration services in the United States. Geographically, the Dealer Data Integration Market is the United States. There is public and industry recognition of the Dealer Data Integration Market.

There are no reasonable substitutes for services provided by dealer data integrators, demonstrated more clearly by the fact that Defendants have been able to impose such massive price increases for their data integration services. Moreover, data integration in other markets – such as banking and healthcare – are not reasonable substitutes for data integration in the retail automobile business, where the data owners, vendor customers, and competitors are all different. Nor are DMS services substitutes for data integration, which CDK and Reynolds publicly recognize. Defendants have different businesses that provide data integration – with different pricing – than their DMS services. Moreover, the data integration market has its own supply and demand curves separate and apart from the DMS Market.

**ANSWER**:     Paragraph 63 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 63 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 63 of the Complaint.

### 3.    Dealers Own Their Data Stored on the DMS

64.    The data on a dealer's DMS is not owned by the DMS provider. Rather, the data is owned exclusively by the dealers. CDK and Reynolds have repeatedly admitted this fundamental fact in public statements by senior executives, on their websites, and in their DMS contracts.

**ANSWER**:     CDK denies the allegations in paragraph 64 of the Complaint.

65.    Tom Schwartz, Reynolds' chief spokesperson, publicly declared: "The data belongs to the dealers. We all agree on that."[6] On its website, Reynolds represents to dealers: "Your Data, Your Way. You own your data. Reynolds recognizes you need to share that data outside your dealership."

**ANSWER**:     CDK admits that the material quoted in the first sentence of paragraph 65 of the Complaint appears in the publication cited in footnote 6.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 65 of the Complaint and on that basis denies them.

---

[6] David Barkholz, *Dealers Decry Reynolds Crackdown*, Automotive News (Nov. 21, 2011).

66.    Howard Gardner, CDK vice president over data strategy, has stated that CDK "has always understood that dealerships own their data and enjoy having choices on how best to share and utilize that data with others."[7] CDK's website likewise states: "[D]ealerships own their data."

**ANSWER**:    CDK admits that the text quoted in the first sentence of paragraph 66 of the

Complaint is attributed to CDK employee Howard Gardner and appeared in the July 13, 2013

press release issued by ADP Dealer Services, Inc., CDK's predecessor, that is cited in footnote 7,

which also states that CDK's 3PA program is intended to "allow[ ] dealers to do business with

the third-party vendors of their choice without sacrificing security."   CDK states that the

document speaks for itself.   CDK further admits that the text quoted in the second sentence of

paragraph 66 appeared in material published on CDK's website in 2014, which in its entirety

reads: "CDK has always understood that dealerships own their data, so we offer an open yet

secure Dealer Management System (DMS) through the CDK Third Party Access Program.  We

give you the flexibility to provide DMS access to third parties without sacrificing security."

CDK states that the document speaks for itself.   CDK denies the remaining allegations in

paragraph 66 of the Complaint.

67.    The Reynolds and CDK DMS contracts also "spell out which party owns the data and there is generally little dispute: the data belongs to the dealer. This makes sense; after all, it's the dealership's customers, inventory, and transactional data that the dealership is putting into the DMS system."[8] *See* R&R Addenda Specific Terms and Conditions, at 3 ("Reynolds recognizes that your Business Data belongs to you, and we respect and support your right to protect your Business Data."); CDK Master Services Agreement § 7.A ("Any Client file or other information provided by Client to CDK for use with the Services. . . shall remain the exclusive and confidential property of Client.").

**ANSWER**:    CDK admits that the excerpted quoted text cited in paragraph 67 of the Complaint

as "CDK Master Services Agreement § 7.A" appears in a version of CDK's standard Master

---

[7] CDK Dealer Services, Inc. Press Release, [CDK] *Announces New Approved Vendors for [CDK] 's Third Party Access Program* (July 12, 2013).

[8] DrivingSalesNews, *The Hidden Data Tax That Dealers Don't Know They Are Paying,* Driving Sales (Oct. 17, 2013).

Services Agreement ("MSA") with Dealers in place during the relevant time period. CDK states that the contracts speak for themselves. CDK admits that the material quoted in the first sentence of paragraph 67 of the Complaint appears in the article identified in footnote 8. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 67 of the Complaint that are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 67 of the Complaint.

### 4. Dealers Have the Right to Control Who Has Access to Their Data

68. Until they began their anticompetitive conduct, CDK and Reynolds also publicly recognized that dealers, as owners of their data, have the right to control who has access to their data, including by sharing it with data integrators. Every other category of participant in the industry – including industry organizations, vendors, dealers, and car manufacturers – also recognizes this fundamental principle.

**ANSWER**: CDK admits that it has recognized that Dealers have certain rights as to their own data; but denies that dictating the terms of access to CDK's DMS, including third-party access, is one of them. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 68 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 68 of the Complaint.

69. Steve Anenen, CDK's longtime and recently retired CEO, publicly stated that dealers have the right to grant third parties, such as data integrators, access to their data. "We're not going to prohibit that or get in the way of that," he told the industry publication *Automotive News*.[9] "I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it, when in fact it's really the data belonging to the dealer. As long as they grant permission, how would you ever go against that wish?" *Id.*

**ANSWER**: CDK admits that Steve Anenen, CDK's former CEO, is identified as the source of the quotes that appear in paragraph 69 of the Complaint in an article that appeared in the *Automotive News* article cited in footnote 9 in 2007, some 11 years ago. CDK denies that these

---

[9] Ralph Kisiel, *ADP Provides Dealers 3 Options on Data Access*, Automotive News (Feb. 19, 2007).

statements reflect CDK's policies or the state of the industry a decade later. CDK denies the remaining allegations in paragraph 69 of the Complaint.

70. Matt Parsons, CDK's vice president of sales, similarly stated: "We're not going to limit the ability of a dealer to give an ID to someone else to, in essence, dial into their system. That is the dealer's right. We have no right to tell them they can't do that."[10] Kevin Henahan, CDK's senior vice president of marketing, delivered the same message to dealers and the industry: "We don't tell the dealer, if someone wants access to their data, they have to come to [CDK] to gain access to the data. It's ultimately the dealer's data. If he wants to give that data to somebody, for us to try to charge a toll doesn't seem like the right thing to do. So we're not going to go down this path."[11]

**ANSWER**: CDK admits that former CDK employees are identified as the sources of the quotes that appear in paragraph 70 of the Complaint in two articles cited in footnotes 10 and 11 that appeared in *Automotive News* some 11 and 12 years ago, in 2006 and 2007, respectively. CDK denies that these statements reflect CDK's policies or the state of the industry more than a decade later. CDK denies the remaining allegations in paragraph 70 of the Complaint.

71. In addition to these unequivocal statements, CDK benefits from these principles in practice. For more than a decade, CDK's subsidiaries – Digital Motorworks and IntegraLink – pulled dealer data from *Reynolds'* DMS using the standard industry method: using login credentials provided by dealers. It was not until CDK and Reynolds entered into their market division agreement in 2015 that CDK changed its policy position and it stopped pulling data from the Reynolds DMS. Even now, CDK still pulls data from dealers using other DMS systems, again using the same industry methods as before. *See infra* Parts I.B.5; VI.

**ANSWER**: Paragraph 71 of the Complaint states legal conclusion to which no answer is required. To the extent that an answer may be required, CDK admits that certain of its former subsidiaries, specifically DMI and IntegraLink, did, during certain times during the relevant period, extract certain data from the Reynolds DMS in fulfillment of certain contracts those companies had with certain Vendors, and that DMI and IntegraLink did so, at times, using dealer-issued login credentials. CDK further admits that CDK's policies for DMI and

---

[10] Ralph Kisiel, *NADA Weigh Reynolds Data Security Debate*, Automotive News (Feb. 4, 2007).
[11] Ralph Kisiel, *Dealer Security Stirs Insecurity: Vendors Wary of Reynolds Plan for Computer Systems*, Automotive News (Dec. 4, 2006).

IntegraLink have changed such that they have wound down their own practices of using dealer-issued login credentials to access other DMSs. Today, they only do so for a small number of DMSs where such access is specifically authorized through contractual agreements with the DMS provider or with the DMS provider's express permission. CDK denies that this change came as a result of any "market division agreement." CDK denies the remaining allegations in paragraph 71 of the Complaint. In addition, Plaintiff's claims and theories premised on Defendants' purported "market division" agreement were dismissed by the Court and have not been repled. Dkt. 176.

72.      Industry organizations have likewise confirmed that dealers have the right to grant data integrators access to dealer data. On February 2, 2007, the National Auto Dealers Association (NADA) and American International Automobile Dealers Association (AIADA), the two largest automobile dealer associations in the United States, issued a "Joint Policy Statement on Data Accessibility."[12] The purpose of the statement was to "guide the use and protection of data in dealer management systems." *Id*. The joint statement set forth the following three principles. First, "[d]ealers should control access to the data stored in their dealership management systems." *Id*. Second, "[d]ealers, not dealership management system vendors or other entities, should have the sole right and the practical means to authorize third parties to access and extract dealer data." *Id*. And third, "[d]ealers expect all parties involved in storing and using dealer data to . . . refrain from unreasonably impeding dealer-authorized access to dealer data." *Id*.

**ANSWER**:     CDK admits that the text quoted in paragraph 72 of the Complaint appears in a "Joint Policy Statement" cited in footnote 12 and issued by the National Auto Dealers Association ("NADA") and the American International Automobile Dealers Association ("AIADA") on or about February 2, 2007, more than 11 years ago. CDK further admits that NADA and AIADA are two of the largest automobile dealer associations in the U.S. CDK denies that the quoted text accurately reflects the policies of NADA and AIADA today. CDK denies the remaining allegations in paragraph 72 of the Complaint.

---

[12] NADA Press Release, *NADA, AIADA, Issue Joint Policy Statement on Data Accessibility* (Feb. 2, 2007); see also Ralph Kisiel, Automotive News (Feb. 4, 2007).

73.     Individual dealers themselves have made clear that they control who has access to their data. For example, a Lexus dealership in California wrote that "[a]s a dealership owner, I believe that [DMS providers have] no right to deny me access to my own data. By extension, I also retain my rights to distribute my data to chosen vendors who meet my strict criteria for data security." *See infra* Parts III.B.1; III.C.4; VI.

**ANSWER**:     CDK admits that the text quoted in paragraph 73 of the Complaint appears in an email produced by Plaintiff in this litigation and attributed to an employee of a Lexus Dealer in California.  CDK denies that it prohibits this Dealer (or any other Dealer customer) from accessing its own data and denies that any Dealer is prohibited from subsequently distributing its own data to Vendors (or anyone else).  CDK denies the remaining allegations in paragraph 73 of the Complaint.

74.     Auto manufacturers, which are some of the largest application providers (i.e., vendors) in the industry, have also defended the right of dealers to control access to their data. For example, after Reynolds changed its policy and began blocking data integrators from pulling dealer data, DaimlerChrysler AG issued a letter to its dealers stating: "A large DMS provider has announced their intent to discontinue the ability of third-party [integrators] to extract data via your DMS .... DaimlerChrysler has concern with this new policy, as it may have a significant impact to your business."[13] Referring to CDK's Digital Motorworks and IntegraLink, DaimlerChrysler noted that "[t]hese companies have been polling dealership data on our behalf for over 10 years and have yet to incur a single security breach in the extraction or delivery of our dealership data." *Id*.

**ANSWER**:     CDK admits that the text quoted in paragraph 74 of the Complaint appears in the 11-year old *Automotive News* article cited in footnote 13 and is attributed to DaimlerChrysler AG.  CDK denies that the quoted text accurately reflects the policies of Daimler or Chrysler or the state of the industry today, more than a decade later.  CDK denies the remaining allegations in paragraph 74 of the Complaint.

75.     Finally, a large coalition of dealers, application providers, data integrators, and DMS providers – including CDK – formed an industry group called Open Secure Access, Inc., which described itself as "a coalition of companies that believe dealers should control access to

---

[13] Ralph Kisiel, *DaimlerChrysler Fears Data Security Concerns Will Cost Dealers*, Automotive News (Feb. 5, 2007).

PUBLIC REDACTED VERSION

the data they own and determine how it is used."[14] CDK was one of the group's first members, as was Authenticom. The group published a set of basic principles to guide the industry, including that "dealers should control who accesses their data," "[t]hird parties that have dealer permission to utilize a dealer's data should be able to access the data through their own efforts or through the services of an independent company," and "DMS companies should facilitate interaction with all data available to a DMS user by providing technologically advanced means to interact with (read and write) that data, either through a robust set of APIs, system functionality, or direct access to the database."[15]

**ANSWER**:    CDK admits that the text quoted in paragraph 75 of the Complaint appears in the

sources cited in footnotes 14 and 15 that purport to be a press release and website printout from

2007 attributable to Open Secure Access, Inc.  CDK admits that its predecessor parent company,

ADP, and Plaintiff were members of Open Secure Access, Inc.  CDK denies that it was ever a

member of Open Secure Access, Inc., which formed in 2006 and is now defunct.  CDK denies

that the quoted text accurately reflects the state of the industry today, more than a decade later.

CDK denies the remaining allegations in paragraph 75 of the Complaint.

### 5.    Participants in the Dealer Data Integration Market

76.    At one time, there were over a dozen players in the Dealer Data Integration Market. Today, only three remain – CDK, Reynolds, and Authenticom. CDK and Reynolds drove out the rest from the market, and they have colluded to do the same to Authenticom.

**ANSWER**:    Paragraph 76 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

76 of the Complaint.

### a.    Authenticom

77.    Authenticom was founded in 2002 by Steve Cottrell, and he was the only employee for months as he worked to build the business. Authenticom introduced its data integration service in 2004, and it quickly grew to become a market leader. Authenticom pulled dealer data from all of the available DMS platforms – including Reynolds and CDK – using the industry standard (login credentials provided by dealers) and eventually grew to serve 15,000 dealerships and nearly 500 application providers. As Authenticom grew, CDK and Reynolds did

---

[14] Open Secure Access, Inc. Press Release, *Open Secure Access Releases Automotive Retail Data Security Guidelines* (June 28, 2007).
[15] https://web.archive.org/web/20070304104838/http://www.opensecureaccess.com/.

PUBLIC REDACTED VERSION

not interfere with Authenticom's pulling of dealer data from their DMS platforms. Instead, they affirmatively supported Authenticom and the burgeoning Dealer Data Integration Market. Vendors benefited from inexpensive, secure access to dealer data and there was an explosion of innovation in third-party applications that transformed how dealers conducted their business. Authenticom and other dealer data integrators played a critical role in this transformation. From a single employee and $0 in revenue in 2002, Authenticom grew to a business with 120 employees and over $20 million in revenue in 2014.

**ANSWER**:   Upon information and belief, CDK admits that Authenticom was founded in 2002 by Steve Cottrell and that in 2016 Authenticom claimed to serve 15,000 Dealers and 500 Vendors.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 77 of the Complaint that relate to Authenticom's introduction of products, financial results, and employee headcount and on that basis denies them.  CDK denies the remaining allegations in paragraph 77 of the Complaint.

78.    The current version of Authenticom's data integration service is called DealerVault, which gives dealers state-of-the-art control over how their data is pulled and shared. It provides a unified user interface where dealers, with the click of a button, are able to add, remove, or change the data sets that Authenticom pulls from the DMS. Authenticom pulls only those data sets that a dealer has specifically authorized. DealerVault also gives dealers the ability to control, with the click of a button, the data that is sent to each of their vendors. The service further provides reports detailing the data Authenticom collected and to whom it was sent, all down to the granularity of a specific data field. Dealers have embraced the product enthusiastically, with over 5,600 dealers signing up.

**ANSWER**:   CDK admits that Authenticom offers a product or service called DealerVault. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 78 of the Complaint that relate to how many Dealers have subscribed to DealerVault and on that basis denies them.  CDK denies the remaining allegations in paragraph 78 of the Complaint.

79.    In response to dealer and vendor demand, Authenticom has also developed the capability to "push" dealer data back into the dealer's DMS. That capability is beneficial to vendors and dealers because it expands the types of services that vendors can provide to dealers. However, Authenticom has only deployed this service to a limited number of vendors and dealers because CDK and Reynolds can too easily obstruct the push of data back into the dealer's database. Absent Defendants' anticompetitive conduct, Authenticom would make this functionality more widely available to vendors and dealers.

**ANSWER**:    Paragraph 79 of the Complaint states legal conclusions to which no answer is required. To the extent an answer may be required, CDK admits that Authenticom seeks not only to "pull," "extract" and "scrape" data from CDK's DMS, but also to "push data back into the database" in altered form.  CDK admits that it attempts to block such attempts by Authenticom and other hostile "data integrators" when it has detected such unauthorized activity.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 79 of the Complaint that relate to how often Authenticom has engaged in such activity purportedly on behalf of Dealers or Vendors and on that basis denies them.  CDK denies the remaining allegations in paragraph 79 of the Complaint.

80.    In Authenticom's agreements with dealers, the Terms and Conditions make clear that (1) Authenticom extracts only that data that the dealer has specifically authorized Authenticom to pull, *see* Authenticom T&C § 3.4; (2) Authenticom sends data only to those vendors selected by the dealership, *see id.* § 5.3; (3) that Authenticom will not use the dealer data for any other purpose, and (4) that dealers maintain ownership over their data, *see id.* In turn, dealers represent and agree that they have the right to grant Authenticom access to pull data from their DMS databases. *Id.* § 7.1.

**ANSWER**:    CDK admits that Plaintiff has produced in discovery a purported copy of its Terms and Conditions with respect to DealerVault, which state that "DealerVault shall only extract the Dealership Data that the Dealership permits DealerVault to extract," that "DealerVault may only disclose Dealership Data to third parties as authorized by Dealership or as required by law," and that "Dealership will retain all ownership of Dealership Data that Dealership submits to DealerVault."  CDK lacks sufficient knowledge or information to form a belief as to allegations in paragraph 80 of the Complaint that these terms are in any specific Dealer contract or all Dealer contracts, and on that basis denies them.  CDK denies, regardless of what Plaintiff's contracts say, that Dealers are permitted under their agreements with CDK to grant or otherwise authorize Plaintiff access to CDK's DMS.  CDK lacks sufficient knowledge

43

or information to form a belief as to the truth of the remaining allegations in paragraph 80 of the Complaint and on that basis denies them.

81.     Authenticom's contracts with vendors dictate that the vendors can use the data only for the services outlined in the contract between the vendor and dealer.

**ANSWER**:     CDK admits that Plaintiff has produced in discovery a purported copy of its Vendor Agreement, which includes a provision stating that "Vendor is granted a … limited license to the Data only to the extent to perform the services or provide the products to Dealership as those are specifically set forth and defined in the written contract between Dealership and Vendor."  CDK lacks sufficient knowledge or information to form a belief as to allegations in paragraph 81 of the Complaint that such term is in any specific Vendor contract or all Vendor contracts, and on that basis denies them.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 81 of the Complaint and on that basis denies them.

82.     Like all data integrators, Authenticom is compensated by the vendors for providing data integration services; with the exceptions noted below, Authenticom generally does not receive payment for its services directly from dealers. Authenticom's standard pricing to pull data is $25 for the first data set, and then $50 for two or more (Authenticom can supply up to seven different data sets). The average price per vendor to pull data is between $30 and $40 per dealership rooftop per month. For bi-directional access – i.e., for data "pulled" from the dealer's DMS database as well as "pushed" back in – Authenticom has charged at most $75 per month for that bundled service, and that price included additional services such as data hygiene. Authenticom has a setup fee of $2,500 for its services, but that works as a down payment credited against the vendor's first invoices.

**ANSWER**:     CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 82 of the Complaint and on that basis denies them.

83.     Tellingly, while Authenticom generally does not charge dealers for data integration services, there are a handful of large dealership groups that choose to pay for DealerVault because of their preference for Authenticom's data integration product – even though the dealers' vendors already are paying CDK and Reynolds for data integration services.

**ANSWER**:    CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 83 of the Complaint and on that basis denies them.

84.    Authenticom's security practices are state of the art. Authenticom has never had a data breach and its firewall has never been compromised. Authenticom transfers all data using secured and encrypted protocols that meet or exceed federal standards for federally insured banking transactions. Authenticom partners with Microsoft Azure cloud services – and has achieved Microsoft's top-level gold security certification three years in a row – to provide dealers with a secure place to syndicate and distribute their data.

**ANSWER**:    CDK denies the allegations in the first and fourth sentences of paragraph 84 of the

Complaint, including because Plaintiff has not achieved "Microsoft's top-level gold security

certification three years in a row," as such certification does not exist.  CDK lacks sufficient

knowledge or information to form a belief as to the truth of the remaining allegations in

paragraph 84 of the Complaint and on that basis denies them.

85.    Authenticom's information security system exceeds applicable consumer privacy and protection restrictions, including the Gramm-Leach-Bliley Act of 1999 and the Federal Trade Commission's Implementing Rules. Indeed, Authenticom's contracts with dealers guarantee compliance with those regulatory requirements. Finally, Authenticom agrees to indemnify dealers in the event there is any data security event and backs up that promise with a $20 million cyber liability insurance policy.

**ANSWER**:    CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 85 of the Complaint and on that basis denies them.

86.    Authenticom is very proud of the business it has built and the employment opportunities it provides to the people in and around La Crosse, Wisconsin. Authenticom and Steve Cottrell had the honor of being singled out by President Barack Obama in a speech in La Crosse on July 2, 2015, where the President praised the company for its admirable business and the positive impact it has had on the community. The President noted that during the recession of 2007-09, "Steve invested in new people, new technology; decided to double down, was absolutely confident his business model was right." When "the auto industry came roaring back, things began booming," the President continued. He explained: "Steve's revenue is up 1000 percent. His company, Authenticom, has gone from 18 employees to more than 120. So this business that began in Steve's son's old bedroom is now one of America's fastest growing private companies based in a restored historic building right in downtown La Crosse." The President commented how fortunate Authenticom was "to be part of a community like La Crosse: to be part of an industry that got back to basics, determined to do things better and

PUBLIC REDACTED VERSION

smarter. He pays his employees fair wages. He guarantees paid sick days. He helps pay for the tuition of those folks when they decide to go back to school."[16]

**ANSWER**:   CDK admits that the text quoted in paragraph 86 of the Complaint is attributed to

a July 2, 2015 speech made by former President Barack Obama, which referred to Plaintiff.

CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining

allegations in paragraph 86 of the Complaint and on that basis denies them.

87.   President Obama gave his speech on July 2, 2015, just after CDK and Reynolds had secretly entered into an illegal agreement to divide the data access market and destroy independent data integrators like Authenticom. As detailed below, less than nine months later, a senior CDK executive told Mr. Cottrell that CDK and Reynolds had agreed to "lock you and the other third parties out" and that Mr. Cottrell should "get something for [his business] before it is destroyed otherwise I will f***ing destroy it." This lawsuit is about CDK and Reynolds making good on that threat.

**ANSWER**:   Paragraph 87 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK admits that the speech by former

President Obama referenced in paragraph 87 of the Complaint occurred on July 2, 2015.  CDK

denies the remaining allegations in paragraph 87 of the Complaint.

### b.   CDK

88.   CDK owns two of the largest dealer data integrators in the industry, Digital Motorworks and IntegraLink. It also has an integration product for direct access to dealer data on the CDK DMS – the 3PA program.

**ANSWER**:   CDK admits that DMI and IntegraLink are now known as CDK Data Services,

Inc., a subsidiary of CDK, and DMI and IntegraLink provide certain data services.  CDK further

admits that it has a 3PA program.  CDK denies that the 3PA program offers "direct" access to

CDK's DMS. CDK denies the remaining allegations in paragraph 88 of the Complaint.

### i.   Digital Motorworks and IntegraLink

89.   Like Authenticom, Digital Motorworks and IntegraLink obtain authorization from dealers to pull data (using login credentials and data scraping) and provide that data to vendors.

---

[16] For the President's full remarks on Authenticom, *see* www.youtube.com/watch?v=Bfzu9kd5HU8.

At the time CDK acquired Digital Motorworks in 2002, CDK stated: "As a result of its acquisition of Digital Motorworks, [CDK] now has the ability to extract, transform and standardize data from varied sources to client specifications." Digital Motorworks claims to work with over 100 vendors and pull data from thousands of dealerships.

**ANSWER**:     CDK admits that ADP acquired DMI in 2002 and that the text quoted in

paragraph 89 of the Complaint appeared in ADP's 2002 Form 10-K.  CDK denies the remaining

allegations in paragraph 89 of the Complaint in so far as DMI and IntegraLink have wound down

their former practices of using dealer-issued login credentials to access other DMSs.  Today, they

only do so for a handful of DMSs where such access is specifically authorized through

contractual agreements with the DMS provider or with the DMS provider's express permission.

CDK denies the remaining allegations in paragraph 89 of the Complaint.

90.     CDK acquired IntegraLink in 2010. IntegraLink – like Digital Motorworks and Authenticom – "specialize[s] in the collection of data from automotive retailers' dealership management systems" using the same standard process. IntegraLink was founded in 1998 by Kevin Distelhorst to "fill the need for a professional data collection firm focused entirely on the needs of the automotive retailing industry."[17] Prior to founding IntegraLink, Mr. Distelhorst was Reynolds' director of online services. Today, Mr. Distelhorst is a vice president at CDK.

**ANSWER**:     CDK admits that ADP acquired IntegraLink in 2010.  CDK further admits that

IntegraLink was founded by current CDK employee Kevin Distelhorst in 1998, who currently is

a Vice President.  CDK admits that Mr. Distelhorst previously worked for Reynolds in the 1990s,

approximately 20 years ago.  CDK admits that the language quoted in paragraph 90 of the

Complaint appears in the source cited in footnote 17.  CDK lacks sufficient knowledge or

information to form a belief as to the truth of the remaining allegations in paragraph 90 of the

Complaint and on that basis denies them.

91.     For over a decade – before CDK and Reynolds entered into their market division agreement – Digital Motorworks and IntegraLink pulled data from Reynolds dealers using login credentials, instructing dealers to provide them with a "dedicated account" and password. *See*, *e.g.*, https://www.integralink.com/hyundai/acct_check.html ("Reynolds [DMS] dealers should

---

[17] IntegraLink, *About Us: Kevin Distelhorst*, www.integralink.com/about_management_kd.html.

provide user ID, password, and store number with access to program 2213 & 6910 (report generator).").

**ANSWER**:    Paragraph 91 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that DMI and IntegraLink, did, during certain times during the relevant period, extract certain data from the Reynolds DMS in fulfillment of certain contracts the companies had with certain Vendors, and that DMI and IntegraLink did so, at times, using dealer-issued login credentials.  CDK further admits that CDK's policies for DMI and IntegraLink have changed such that they have wound down their former practices of using dealer-issued login credentials to access other DMSs.  Today, they only do so for a handful of DMSs where such access is specifically authorized through contractual agreements with the DMS provider or with the DMS provider's express permission.  CDK further admits that the website URL attributed to DMI alleged in paragraph 91 of the Complaint appears on the legacy DMI website and appears to be dated from 2009.  CDK denies the remaining allegations in paragraph 91 of the Complaint.  In addition, Plaintiff's claims and theories premised on Defendants' purported "market division" agreement were dismissed by the Court and have not been repled.  Dkt. 176.

92.    During much of that time period, Reynolds did not block CDK's access to dealer data – just as it did not block Authenticom and other dealer data integrators. Reynolds did not start blocking CDK and others in earnest until 2011. Thereafter, Reynolds blocked and disabled CDK's usernames, disrupting Digital Motorworks' and IntegraLink's pulling of data. As described by CDK to dealers at the time, "Reynolds has instituted policies designed to prevent automated processes such as those used by IntegraLink, [Digital Motorworks,] and other third-party data-collection services from collecting data for programs you have enrolled in."[18] "In short," CDK explained, "when Reynolds blocks our access to your data on your dealership management system, we cannot perform the tasks you have asked us to perform." *Id*.

**ANSWER**:    CDK admits that, at certain times during the relevant period, Reynolds took steps to block DMI and IntegraLink's access to the Reynolds DMS.  CDK further admits that the text

---

[18]  IntegraLink, *Smart-R for Reynolds ERA Dealers*, https://il.dmotorworks.com/downloads/ smartr/SMART-R_FAQ.pdf.

quoted in paragraph 92 of the Complaint appears in the source cited in footnote 18, purporting to be from the IntegraLink legacy website. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 92 of the Complaint that are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 92 of the Complaint.

93. To circumvent Reynolds' blocking, CDK rolled out a new solution called "SMART-R." As described by CDK, the application "automates the process of running [Reynolds DMS data] reports (7601/7602), captures and encrypts the output, and then securely transfers the data to IntegraLink" or Digital Motorworks. *Id.*

**ANSWER**: CDK admits that the text quoted in paragraph 93 of the Complaint appears in the source cited in footnote 18, purporting to be from the IntegraLink legacy website. CDK denies that it "rolled out" SMART-R, as SMART-R was developed and "rolled out" by IntegraLink in 2007, before IntegraLink was acquired by ADP. CDK denies the remaining allegations in paragraph 93 of the Complaint.

94. In short, with the help of its workaround, CDK continued to pull data of dealers using the Reynolds DMS. That state of affairs abruptly changed in February 2015, when CDK and Reynolds entered into an agreement to divide the data integration market. Pursuant to this agreement, CDK agreed that it would no longer compete with Reynolds in providing integration services for dealers using the Reynolds DMS. *See infra* Part III.A. After the agreement, Digital Motorworks and IntegraLink discontinued their data pulling business for dealers using the Reynolds DMS, ceding that ground exclusively to Reynolds.

**ANSWER**: Paragraph 94 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that certain of its subsidiaries, specifically DMI and IntegraLink, did, during certain times during the relevant period, extract certain data from the Reynolds DMS in fulfillment of certain contracts the companies had with certain Vendors. CDK further admits that today, DMI and IntegraLink no longer use dealer-issued login credentials to extract data from the Reynolds DMS, but denies that this change came as a result of any "market division agreement." CDK denies the remaining

allegations in paragraph 94 of the Complaint. In addition, Plaintiff's claims and theories premised on Defendants' purported "market division" agreement were dismissed by the Court and have not been repled. Dkt. 176.

95.     Significantly, CDK – through Digital Motorworks and IntegraLink – continues to pull data from dealerships using non-Reynolds DMS systems precisely as before. For most DMS systems, dealers provide CDK with login credentials. The other DMS providers provide CDK with an API for direct access to pull dealer data. No matter how it obtains the data, CDK charges vendors only $25 to $50 per connection – pricing that is similar to Authenticom's – for data pulled from dealers using non-Reynolds DMS systems.

**ANSWER**:     CDK denies that DMI and IntegraLink continue to pull data from dealerships using non-Reynolds DMS systems precisely as before: CDK's policies for DMI and IntegraLink have changed such that they have wound down their former practices of using dealer-issued login credentials to access other DMSs. Today, they only do so for a handful of DMSs where such access is specifically authorized through contractual agreements with the DMS provider or with the DMS provider's express permission. CDK denies the remaining allegations in paragraph 95 of the Complaint.

### ii.     CDK Third Party Access Program

96.     CDK provides access to dealer data on the CDK DMS through an official data integration product called the Third Party Access, or 3PA program.

**ANSWER**:     CDK admits the allegations in paragraph 96 of the Complaint except that it states that CDK's 3PA program is now known as the CDK Global Partner program.

97.     Before February 2015 – when CDK and Reynolds entered into their illegal agreement – the 3PA program had three levels. The first level was "basic access" by which a dealer "supplie[d] third-party vendor[s] a user ID and password to access the dealership's system."[19] This level of access was a recognition that dealers have a right to grant access to their data to whomever they wish, and CDK imposed no charges for this. The second level was "subscriber access" in which CDK "provide[d] secure, high-speed Internet access" to the DMS, with the "[d]ealer maintain[ing] responsibility for data access."[20] CDK charged a small amount for the Internet service. The final level was "Third-Party Integration," which was data access

---

[19] Ralph Kisiel, *ADP Provides Dealers 3 Options on Data Access*, Automotive News (Feb. 19, 2007).
[20] *Id*.; Automatic Data Processing, Inc., *ADP's Third Party Access Program*.

obtained directly from CDK and included "real-time access" and a "bi-directional interface," allowing for both pulling data from and pushing data into the DMS. *Id.* CDK's prices for this increased level of data access were higher than the prices charged by Authenticom, averaging approximately $70 per month per dealership rooftop. Importantly, dealers could choose access levels on a vendor-by-vendor basis, giving dealers flexibility in managing how their vendors obtained data.

**ANSWER**:     Paragraph 97 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK admits that the language quoted in

paragraph 97 of the Complaint appears in the sources cited in footnotes 19 and 20.  CDK denies

the remaining allegations in paragraph 97 of the Complaint.  In addition, Plaintiff's claims and

theories premised on Defendants' purported "market division" agreement were dismissed by the

Court and have not been repled.  Dkt. 176.

98.     This changed after CDK and Reynolds entered into their market division agreement in February 2015. CDK scrapped the old version of the 3PA program in exchange for one that matched Reynolds'. CDK now blocks dealers from granting third-party data integrators (like Authenticom) access to dealer data. The revised 3PA program requires all vendors to obtain data directly from CDK – and at much higher prices. On average, CDK now charges vendors on average between $250 and $300 per connection, almost triple the $70 that it charged before for the exact same services. When compared to the $25 to $50 per connection that CDK (through Digital Motorworks and IntegraLink) charges for integration services on non-CDK platforms, the price increase is even more stark. Moreover, for "bi-directional" access – that is, for both "pulling" data from the DMS and "pushing" data back into the database – CDK charges vendors up to $700 per connection.

**ANSWER**:     Paragraph 98 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK admits that it has taken steps,

consistent both with its contracts with its Dealer customers and with CDK's need to provide a

stable and secure DMS product to its Dealer customers, to block hostile third-party access—like

that of Authenticom—to its DMS.  CDK denies the remaining allegations in paragraph 98 of the

Complaint.  In addition, Plaintiff's claims and theories premised on Defendants' purported

"market division" agreement were dismissed by the Court and have not been repled.  Dkt. 176.

99.     CDK announced the revamped 3PA program on June 22, 2015, as part of its "SecurityFirst" initiative. This initiative used data security as the excuse for stripping dealers of control over access to their own data and imposing massive price increases on vendors. The industry saw this for what it was. "CDK is rolling out a new cybersecurity initiative," *Automotive News* reported, "that will raise monthly integration fees for most of the third-party software vendors that dealerships use in addition to CDK software. It is patterned after a program at Reynolds and Reynolds."[21] Vendors and dealers received little, if anything, in return for the dramatically higher prices. "Vendors briefed on CDK's new data-security program said nothing will change in the way they get data from CDK-served DMS dealerships under SecurityFirst except for a higher price."[22] Indeed, vendors "in the CDK program. . . say the costs being charged far exceed the value of any increased data security." *Id*. One "vendor executive who asked not to be named called the data-access cost a surcharge under the guise of data security." *Id*.

**ANSWER**:     CDK admits that it issued a press release concerning SecurityFirst on June 22, 2015, and that the quoted text in paragraph 99 of the Complaint appears in the two *Automotive News* articles cited in footnotes 21 and 22.  CDK denies the remaining allegations in paragraph 99 of the Complaint.

100.     CDK has also engaged in deceptive advertising with respect to the new higher pricing. As part of the revamped 3PA program, CDK posted a pricing guide on its website that CDK represents is the standardized pricing for all vendors. "Our 3PA pricing philosophy is simple," CDK states in its program guide, "standardized pricing for all customers." But that is false. As many vendors can attest, CDK imposes much higher prices than what it advertises. For example, CDK told one vendor providing electronic vehicle registration and titling that the vendor would have to pay 25 percent of its top-line revenues to participate in the 3PA program, which is many times more than the posted "standard" pricing.

**ANSWER**:     Paragraph 100 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that it has sought to standardize its pricing for certain products and services.  CDK denies the remaining allegations in paragraph 100 of the Complaint.

101.     Today, CDK declares that the 3PA program is the "only approved method for accessing" data on a dealer's DMS. It labels any other method for accessing data – including through data integrators such as Authenticom – as "unauthorized." According to CDK, a dealer

---

[21] David Barkholz, *CDK Global Sees Earnings Boost from Cost-Cutting, Improved Efficiency*, Automotive News (Nov. 3, 2015).
[22] David Barkholz, *Dealers Will Pay Up for Vendors' Data Access After CDK Switch*, Automotive News (July 20, 2015).

breaches its contract when it provides so-called "unauthorized" access to data integrators. Moreover, unlike before, CDK now contractually forbids vendors from obtaining data from anyone but CDK. In this way, CDK has perfected its power grab, making the 3PA program the only means by which vendors can obtain the necessary data for dealers using the CDK DMS.[23]

**ANSWER**:    CDK admits that the 3PA program, generally, is the only approved method for

Vendors to access and integrate with CDK's DMS.  CDK further admits that it provides certain

data integration services to certain car manufacturers, and that car manufacturers (in their

capacity as such) are not participants in the 3PA program.  CDK denies that the 3PA program is

the only means by which Vendors can obtain data necessary to provide software solutions to

Dealers.  CDK denies the remaining allegations in paragraph 101 of the Complaint.

### c.    Reynolds Certified Interface Program

102.    Reynolds provides access to dealer data on the Reynolds DMS through the Reynolds Certified Interface, or RCI, program, which is Reynolds' equivalent to CDK's 3PA data integration product.[24] Before Mr. Brockman acquired Reynolds, Reynolds operated like all others in the industry. Dealers were free to have data integrators pull their data in automated ways by using login credentials and user emulation software. But Mr. Brockman put a stop to that in the name of "security" and transformed the RCI program into the exclusive method for automated access to data on the Reynolds DMS, imposing large price hikes in the process. Prior to 2015, CDK even used Reynolds' blocking of data access as a marketing tool to convince dealers to switch DMS platforms, and some dealers did switch from Reynolds to CDK on reliance that CDK would not take the same position. But now that CDK blocks independent integrators just like Reynolds, there is no difference between them.

**ANSWER**:    Upon information and belief, CDK admits that Reynolds offers a product/service

known as the "Reynolds Certified Interface" or "RCI" program.  CDK further admits that it

works to block hostile, unauthorized "integrators" like Authenticom from unlawfully accessing

its DMS.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the

remaining allegations in paragraph 102 of the Complaint and on that basis denies them.

---

[23] As discussed above, car manufacturers are some of the largest and most important vendors in need of data integration services, for purposes of recalls, rebates, inventory, and many others. While not formally participants of the RCI or 3PA programs, CDK and Reynolds provide data integration services to car manufacturers just as they do to other vendors, and charge similarly high rates.

[24] Reynolds does not have an independent data integration business that pulls data from other DMS platforms. Therefore, unlike CDK with its Digital Motorworks and IntegraLink businesses, Reynolds does not compete in the Dealer Data Integration Market outside of the Reynolds DMS.

PUBLIC REDACTED VERSION

103.    The RCI program operates in nearly identical ways to CDK's 3PA program. Like the 3PA program, the Reynolds RCI program is the only means by which vendors are allowed to obtain automated access to dealer data on the Reynolds DMS. Like CDK, Reynolds blocks third-party access to dealer data, disabling credentials created by dealers for other data integrators. Like CDK, Reynolds contractually restricts both dealers and vendors from using competing integrators. And like CDK, Reynolds charges exorbitant rates for access to the data.

**ANSWER**:    CDK denies the allegations in the first sentence of paragraph 103 of the Complaint.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 103 of the Complaint and on that basis denies them.

104.    Reynolds does not publicize its data integration pricing. According to current and former Reynolds executives, Reynolds has a pricing committee (chaired by the company's owner, Mr. Brockman) that determines the rates on a vendor-by-vendor basis. Based on information from several sources, the data integration fees under the RCI program are even steeper than CDK's under the 3PA program. *See infra* Part IV.A.

**ANSWER**:    CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 104 of the Complaint and on that basis denies them.

105.    Finally, Reynolds has a tool called "Dynamic Reporting," which is a non-automated function for dealers to manually generate a data report. Dealers must manually generate the report (or reports), and then send the necessary data to a vendor every time the vendor requires the data for its application. Authenticom has tried to help dealers cut down on the manual steps for using Dynamic Reporting, but the tool still requires a dealer's daily manual intervention. The tool is useless for applications requiring regular data feeds or bi-directional access to dealer data, and dealers do not have the personnel available to initiate the process multiple times per day. Given these shortcomings, dealers and vendors generally refuse to use the Dynamic Reporting tool for their integration needs except in limited, one-off cases.[25]

**ANSWER**:    Upon information and belief, CDK admits that Reynolds offers a tool known as "Dynamic Reporting."  CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 105 of the Complaint and on that basis denies them.

---

[25] And even with these shortcomings, Reynolds has still made it difficult for dealers. At one time, the tool had a bulk export functionality so that dealers could export multiple data reports at once. But when Authenticom helped dealers automate that functionality, Reynolds disabled it, only turning it back on after dealer complaints.

### d. The Remaining Data Integration Providers Have Been Driven from the Market by CDK and Reynolds

106. The Dealer Data Integration Market once had numerous participants. But CDK and Reynolds have systematically destroyed or driven them all out of the market (other than, as yet, Authenticom). To achieve that result, CDK and Reynolds have blocked access and disabled usernames, filed lawsuits, and required data integrators to leave the market as a condition of allowing certain third-party applications to participate in the 3PA and RCI programs (where the company that owned the data integration business also had third-party applications that required access to dealer data). A few examples follow.

**ANSWER**:    Paragraph 106 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that there have been (and continue to be) entities besides Plaintiff that offer certain data services that are premised on access to data maintained in DMSs.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 106 that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them.  CDK denies the remaining allegations in paragraph 106 of the Complaint.

107. Superior Integrated Solutions, Inc. ("SIS") was a leading data integration provider, servicing thousands of car dealerships. CDK and Reynolds excluded SIS from the market through blocking and litigation tactics. Reynolds first sued SIS for tortious interference, claiming that by having dealers grant SIS access to their data, the dealers were in breach of their DMS contracts. After years of bruising litigation, SIS settled and left the integration market for dealers using the Reynolds DMS. Then, in August 2016, under the threat of blocking and password-disabling, CDK forced SIS to shut down its integration services for dealers using the CDK DMS. In short order, SIS went from one of the most successful data integration providers, with a long litany of clients, to a bygone participant in that market.

**ANSWER**:    CDK admits that Superior Integrated Solutions ("SIS") is a data services provider that offers certain services, among others, premised on access to data maintained in DMSs.  CDK denies the allegations in paragraph 107 of the Complaint that SIS no longer does so or that SIS is otherwise a "bygone participant."  CDK further admits, upon information and belief, that SIS and Reynolds have been engaged, at certain times, in litigation.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 107 of the

Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 107 of the Complaint.

108. SelectQu, which is owned by Dominion Enterprises, is another dealer data integrator that was forced out of the market. SelectQu's parent company (Dominion) provides a large number of software services in the automobile market and owns several popular applications that provide inventory, reputation management, and customer relationship management services for dealers. In order to obtain approval for participation in the 3PA and RCI programs for these applications, CDK and Reynolds forced Dominion to agree that SelectQu would no longer pull data from their DMSs. As a result, SelectQu exited the market, forced out not only by the usual blocking and disabling of usernames, but also by the leverage Defendants hold over applications needing dealer data from their customers.

**ANSWER**: CDK admits, upon information and belief, that SelectQu is owned by Dominion Enterprises ("Dominion") and that Dominion offers, among other things, software solutions to Dealers that provide inventory, reputation management, and customer relationship management services. CDK further admits that Dominion is a participant in the 3PA program. CDK denies that Dominion was "forced" to join the 3PA program or "forced" to agree to the standard terms or conditions of participation in the 3PA program, including that 3PA participants access CDK's DMS through an approved third-party interface. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 108 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 108 of the Complaint.

109. The list goes on. New Freedom Data Resources – founded in 1991 and a pioneer in the market – was forced to shut down its data integration business in 2014 as a result of Reynolds' blocking actions. The StoneEagle Group recently ended its data integration business in exchange for CDK and Reynolds allowing its data analytics application into the 3PA and RCI programs. ProQuotes, Inc. was cut off from accessing data on CDK DMSs in the fall of 2016, and as a result exited the data integration market. There are still others, all victims of CDK's and Reynolds' strong-arm tactics.

**ANSWER**: CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 109 of the Complaint that relate to the history and background of

"New Freedom Data Resources," and on that basis denies them. CDK denies the remaining allegations in paragraph 109 of the Complaint.

110. In short, CDK and Reynolds have succeeded in eliminating virtually all competition in the data integration market for dealers using the CDK and Reynolds DMS platforms, and have now targeted Authenticom, their only remaining competitor.

**ANSWER**: CDK denies the allegations in paragraph 110 of the Complaint.

### C. The Single-Brand Aftermarkets for Dealer Data Integration Services

111. The markets for dealer data integration for dealers using Defendants' DMS systems are cognizable, brand-specific antitrust aftermarkets.

**ANSWER**: Paragraph 111 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 111 of the Complaint.

112. The aftermarket for dealer data integration is derivative of the primary DMS Market. If there were no DMS systems in the first place, there would be no demand for integration services for dealer data on those systems.

**ANSWER**: Paragraph 112 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 112 of the Complaint.

113. When dealers purchase a DMS system, they are "locked in" to that purchase through high switching and information costs. As explained above, CDK and Reynolds lock their DMS customers into long-term contracts. Even aside from the long duration of the contracts, switching DMS providers is expensive and difficult – which is why the average car dealer stays with a single DMS provider for an average of 20 years.

**ANSWER**: CDK denies the allegations in paragraph 113 of the Complaint.

114. Information costs prevent dealers from accurately factoring in Defendants' higher data integration fees when they choose their DMS provider. Among other things, CDK and Reynolds are not transparent with dealers about their data integration fees. On the contrary, and as explained *infra* Part III.B.2.c, Defendants impose price secrecy provisions on application providers, which frustrates the flow of information and prevents dealers from engaging in accurate lifecycle pricing. Similarly, dealers had no reason to believe Defendants would switch positions with respect to data access after CDK and Reynolds had already locked them into long-term DMS contracts. For example, given CDK's unequivocal public statements, dealers could

not have known that CDK would make an abrupt change and seize control over access to dealer data.

**ANSWER**:    CDK admits that a version of its standard 3PA contract with Vendors in place during the relevant time period contains a provision addressing Vendors' communication of 3PA fees to their Dealer customers.  CDK states that the document speaks for itself.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 114 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them.  CDK denies the remaining allegations in paragraph 114 of the Complaint.

115.    Because of these market imperfections, Defendants can profitably charge – and have charged – supracompetitive prices in the aftermarkets for dealer data integration on their respective systems. That Defendants have been able to impose such large price increases for integration services in their respective aftermarkets demonstrates that there are no reasonable substitutes for services provided by CDK and Reynolds in those aftermarkets. Similarly, Defendants' integration services on their respective systems are not interchangeable substitutes for one another. Among application providers, there is separate demand for integration services on the two systems. Application providers that want to sell their products to dealerships that use the CDK DMS system functionally must purchase data integration services from CDK. The same is true for Reynolds dealerships. If CDK's and Reynolds' integration products were reasonable substitutes, application providers would choose between them. But instead, application providers buy *both* CDK and Reynolds dealer data integration services – which would make no sense if the services were interchangeable.

**ANSWER**:    Paragraph 115 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 115 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them.  CDK denies the remaining allegations in paragraph 115 of the Complaint.

116.    As a result of Defendants' actions – including their agreement not to compete, their dealer and vendor exclusive dealing provisions, and their blocking of competing independent data integrators (driving nearly all of them out of business) – CDK and Reynolds have monopolized their respective dealer data integration aftermarkets. Specifically, CDK has a

nearly 100 percent market share for dealer data integration services for dealers using the CDK DMS, and Reynolds has the same for dealers using the Reynolds DMS.

**ANSWER**:     Paragraph 116 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

116 of the Complaint.

## II.     CDK and Reynolds Have Illegally Agreed To Eliminate Competition in the Dealer Data Integration Market and the Single-Brand Aftermarkets

### A.     The Facts of the Agreement Are Straightforward

117.     No later than February 2015, CDK and Reynolds entered into an agreement to eliminate competition in the Dealer Data Integration Market and the single-brand aftermarkets. The agreement has given CDK exclusive control over data for dealers using the CDK DMS, and Reynolds the same for dealers using the Reynolds DMS. By seizing control over access to dealer data, CDK and Reynolds have been able to impose massive price increases for their data integration services and obtain monopoly profits.

**ANSWER**:     Paragraph 117 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK admits that on or about February

18, 2015, it entered into three written agreements with Reynolds.  CDK denies Plaintiff's

characterization of the agreements.  CDK states that the contracts speak for themselves.  CDK

denies the remaining allegations in paragraph 117 of the Complaint.  In addition, Plaintiff's

claims and theories premised on Defendants' purported "market division" agreement were

dismissed by the Court and have not been repled.  Dkt. 176.

118.     As described in more detail below, Authenticom has already uncovered substantial evidence demonstrating Defendants' agreement to eliminate competition in the Dealer Data Integration Market and the single-brand aftermarkets, including the following: (1) In February 2015, CDK and Reynolds entered into a written market division agreement in which they agreed not to compete in the markets, *see infra* Part III.A; (2) Senior executives at both CDK and Reynolds have admitted to Authenticom's President, Steven Cottrell, that Defendants were engaged in a coordinated effort to block independent data integrators like Authenticom and drive them from the market, *see infra* Part III.C.1; (3) CDK and Reynolds have employees working together to effectuate the blocking of independent data integrators, *see infra* Part III.C.2; (4) CDK and Reynolds have jointly included patently anticompetitive exclusive dealing provisions in their agreements with dealers and vendors, securing for themselves the exclusive right to pull dealer data and then provide it to vendors, *see infra* Part III.B.

**ANSWER**:     Paragraph 118 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds.  CDK denies Plaintiff's characterization of the agreements.  CDK states that the contracts speak for themselves.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 118 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them.  CDK denies the remaining allegations in paragraph 118 of the Complaint.

119.    CDK's and Reynolds' decision to divide the market, block other data integrators, and seize control over access to dealer data was the function of an agreement between them, not unilateral decision-making. CDK and Reynolds – horizontal competitors in the DMS Market and, before their market division agreement, one-time competitors in the Dealer Data Integration Market – coordinated their actions and have actively worked together to achieve their aim. Their conspiracy is a per se violation of the Sherman Act.

**ANSWER**:     Paragraph 119 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 119 of the Complaint.  In addition, Plaintiff's claims and theories premised on Defendants' purported "market division" agreement were dismissed by the Court and have not been repled. Dkt. 176.

120.    CDK's and Reynolds' conspiracy was formed and implemented by top-level executives at each company. For CDK, the leading actors in the conspiracy include Robert N. Karp, the President of CDK North America and the person with oversight of CDK's 3PA program; Howard Gardner, CDK's Vice President and Manager of Data Strategy and the person who took the lead on the market division agreement; Dan McCray, CDK's recently retired Vice President of Product Management and the person who told Mr. Cottrell that CDK and Reynolds had agreed to destroy Authenticom's business; and Kevin Distelhorst, CDK's Chief Customer Officer, the founder of IntegraLink, and a former executive at Reynolds. Upon information and belief, other senior CDK executives were also involved in planning, executing, and implementing Defendants' unlawful agreement.

**ANSWER**:    Paragraph 120 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 120 of the Complaint.

121.    For Reynolds, the leading actors in the conspiracy are Bob Brockman, Reynolds' Owner, Chairman, and CEO, and the person who approved the market division agreement and formulated the policy to eliminate competition through blocking; and Robert Schaefer, Reynolds Director of Data Services and the person in charge of the RCI program. Upon information and belief, other senior Reynolds executives were also involved in planning, executing, and implementing Defendants' unlawful agreement.

**ANSWER**:    Paragraph 121 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 121 of the Complaint.

### B.    The Purpose of the Agreement Is to Capture Monopoly Profits

122.    The purpose of the agreement between CDK and Reynolds is twofold: (1) to protect their duopoly and market power in the DMS Market, and (2) to obtain and maintain respective monopolies over the CDK and Reynolds aftermarkets in the Dealer Data Integration Market.

**ANSWER**:    Paragraph 122 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 122 of the Complaint.

### 1.    CDK and Reynolds Are Protecting Their DMS Duopoly

123.    Defendants' DMS businesses are money machines. CDK and Reynolds have market power to ratchet up pricing every year. *See infra* Part IV.4. Despite the ever-increasing costs, CDK and Reynolds have maintained their duopoly in the DMS Market for over three decades, and likely much longer. No competitor has been able to touch them. CDK and Reynolds have enduring competitive advantages given their lengthy DMS contracts, high switching costs, and leverage over dealers. *See supra* Part I.A.2.

**ANSWER**:    CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 123 of the Complaint that relate to individuals or entities other than

CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 123 of the Complaint.

124. Application providers, however, pose a threat to the CDK / Reynolds duopoly. There are many applications that increasingly perform functions that were once exclusively provided by DMS software, especially those involving inventory and customer relationship management. Such applications – and many others – increasingly have the potential to supplant portions of the DMS software. But such applications cannot be provided without access to dealer data. For this reason, the ability of dealers to provide application providers with inexpensive access to the dealers' own data is the number one threat to Defendants' DMS duopoly. That is a reason why CDK and Reynolds have taken such extreme measures to seize control over access to the data. When dealers are allowed to grant access to their data to whomever they wish, Defendants' duopoly is threatened. Unwilling to take that risk – which is the risk of losing the enormous DMS profits they extract through market power in the DMS Market – CDK and Reynolds have locked down access to dealer data, seizing for themselves the exclusive right to access and distribute it.

**ANSWER**: Paragraph 124 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 124 of the Complaint.

### 2. CDK and Reynolds Are Protecting Their Dealer Data Integration Monopolies

125. CDK's and Reynolds' incentive to block dealers from providing their data to third parties is not limited to concern over the threat to their DMS duopoly. With respect to the Dealer Data Integration aftermarkets, the 3PA and RCI programs have been rapidly growing cash cows. By 2019, the RCI and 3PA programs will bring in over $1 billion in combined revenue. The profit margins for their data integration businesses are staggering, exceeding at least 50 percent. By eliminating all competition – especially where other data integrators provided the same services at much lower rates – CDK and Reynolds have been able to impose massive price increases for data integration services and thereby reap monopoly profits from vendors, above and beyond the profits they can charge dealers in the DMS Market. The purpose of Defendants' agreement to block and eliminate the ability of other competitors, like Authenticom, to compete in the Dealer Data Integration Market is to protect the flow of these monopoly profits.

**ANSWER**: Paragraph 125 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 125 of the Complaint that relate to Defendants' combined, projected revenue associated with their 3PA and RCI

programs, and on that basis denies them. CDK denies the remaining allegations in paragraph 125 of the Complaint.

126. After CDK rolled out its revamped 3PA program, CDK's CEO (Mr. Anenen) remarked – in a case of severe understatement – that the third-party data security program would provide "a lift" in revenue.[26] Indeed, CDK announced massive projected profit growth almost immediately after implementing "SecurityFirst" and entering into the market division agreement with Reynolds. On July 29, 2015, Mr. Anenen told analysts during a year-end earnings call that, on the strength of cost-cutting and better bundling of software products, CDK expected adjusted earnings to rise "at least 25 percent" in 2016.[27] CDK outperformed Mr. Anenen's own projections, and adjusted earnings rose 28 percent in 2016.

**ANSWER**:    CDK admits that the text quoted in the first sentence of paragraph 126 of the Complaint is attributed to CDK's former CEO Steven Anenen in the *Automotive News* article cited in footnote 26, which in its entirety states:  "Anenen said its third-party data security program would provide 'a lift' in revenue but its central goal is to protect data housed in its systems at dealerships."  CDK further admits that it expected improved earnings in 2016 on the strength of cost-cutting and better bundling of software products, and that the text quoted in the third sentence of paragraph 126 of the Complaint is attributed to Mr. Anenen in the *Automotive News* article cited in footnote 27.  CDK further admits that it reported a 28% increase in adjusted earning before income taxes in its SEC Form 10-K for the fiscal year ending June 30, 2016. CDK denies the remaining allegations in paragraph 126 of the Complaint.

127. The widely read Banks Report – the industry's leading newsletter – commented on Defendants' motives: "It's clear, part of that playbook involves charging third-party vendors significantly more for access to the data. It's one area that can provide an almost immediate bump to the bottom line. And as [CDK's] activist investors reportedly are looking for a quick exit, any increase to the bottom line will make for a better sales price."[28] Another widely read industry publication said, "We see the direction that the DMS companies are moving for adding access fees through the guise of certification and security measures. The incremental costs being added are exorbitant (200, 300 and up to 500% increases in [data integration] fees) to [vendors],

---

[26] Barkholz, *CDK Global Sees Earnings Boost from Cost-Cutting, Improved Efficiency*, Automotive News (Nov. 3, 2015).
[27] David Barkholz, *CDK Sees 25 Percent Profit Growth in 2016*, Automotive News (July 29, 2015).
[28] Cliff Banks, *Data Access Battle Goes Nuclear*, The Banks Report (Oct. 12, 2015).

and end up coming back to the dealer in the form of higher monthly service fees for all applications using the dealer's data."[29]

**ANSWER**:  CDK admits that the excerpted text quoted in the first, second, and third sentences of paragraph 127 of the Complaint appears in the article published by *The Banks Report* cited in footnote 28.  CDK further admits that the text quoted in the fourth, fifth, and sixth sentences of paragraph 127 of the Complaint appears in the blog post published on DrivingSales cited in footnote 29.  CDK denies the remaining allegations in paragraph 127 of the Complaint.

128.    The fact that CDK and Reynolds – rather than the dealers themselves – profit from charging vendors for access to the dealers' own data is a prime example of the imbalance of power between the dealers and the DMS providers. Indeed, in nearly every case, the vendors pass the cost of access to dealer data on to the dealers themselves in the form of higher service fees – in effect, dealers have to pay CDK and Reynolds for access to their own data.

**ANSWER**:  CDK denies the allegations in paragraph 128 of the Complaint.

129.    In an article entitled "The Hidden Data Tax That Dealers Don't Know They Are Paying," a leading industry publication explained that "[b]ehind dealership DMS systems, there is a big fight taking place worth hundreds of millions of dollars that few dealers know about, despite its potential to take huge profits from the bottom line."[30] As the publication reported, the "elephant in the room is how much money third parties must pay to access the DMS data on behalf of a dealership, and how those charges are hidden as they are passed on down to the dealers. It's as if there is a massive 'data tax' being paid by most dealerships that few know they are paying, let alone how much they are paying. Because it's an unknown, it is currently near impossible to manage, and such a tax has large effects on dealership profits and technology innovation." *Id.* This article was written in 2013, before CDK and Reynolds entered into their agreement and when there was still somewhat robust competition in the Dealer Data Integration Market. Today, the situation is much worse, with the "data tax" imposed by CDK and Reynolds having become a monopoly rent.

**ANSWER**:  CDK admits that the text quoted in paragraph 129 of the Complaint appears in the October 2013 article cited in footnote 30.  CDK denies the remaining allegations in paragraph 129 of the Complaint.

130.    Furthermore, CDK and Reynolds have imposed these increased fees on vendors – most of which are passed on to dealers through the price they pay to vendors for software

---

[29] Brad Korner, *Dealers Taking Control of DMS Data*, Driving Sales (July 31, 2015).
[30] DrivingSalesNews, *The Hidden Data Tax That Dealers Don't Know They Are Paying*, Driving Sales (Oct. 17, 2013).

applications – without providing any offsetting price break to the dealers themselves on DMS service. On the contrary, as explained below, the prices that the duopolists charge for DMS service rises each year – at a rate much higher than inflation – without any cost justification. This unchecked ability to raise prices both directly and indirectly is evidence of Defendants' market power.

**ANSWER**:     Paragraph 130 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK lacks sufficient knowledge or

information to form a belief as to the truth of the allegations in paragraph 130 of the Complaint

that relate to the prices charged by Vendors to their Dealer customers and on that basis denies

them.  CDK denies the remaining allegations in paragraph 130 of the Complaint.

### III.     The Evidence of Defendants' Agreement to Eliminate Competition in the Dealer Data Integration Market and the Single-Brand Aftermarkets Is Overwhelming

131.    Described in more detail below are Defendants' (1) February 2015 market division agreement pursuant to which they agreed not to compete in the Dealer Data Integration Market and single-brand aftermarkets; (2) exclusive dealing provisions they have jointly imposed on dealers and vendors; and (3) coordinated campaign to block independent data integrators like Authenticom.

**ANSWER**:     Paragraph 131 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

131 of the Complaint.  In addition, Plaintiff's claims and theories premised on Defendants'

purported "market division" agreement were dismissed by the Court and have not been repled.

Dkt. 176.

### A.     CDK and Reynolds Entered into a Per Se Illegal Written Agreement Dividing the Dealer Data Integration Market and Single-Brand Aftermarkets

132.    As described above, for over a decade, CDK had provided data integration services for dealers using the Reynolds DMS, competing directly with Reynolds' own RCI integration product. Effective February 18, 2015, however, CDK and Reynolds entered into a written agreement categorized as a "Wind Down Access Agreement" whereby Defendants agreed that they would no longer compete in the Dealer Data Integration Market. It is a classic case of illegal market division: CDK agreed that it would no longer compete in providing access to dealer data on the Reynolds DMS, ceding that ground exclusively to Reynolds. Moreover, because Reynolds already did not compete with CDK in providing access to data for dealers

using the CDK DMS, the agreement ensured that CDK and Reynolds would be the exclusive providers of data integration services for dealer data on their respective DMS platforms.

**ANSWER**:    Paragraph 132 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds.  CDK denies Plaintiff's characterization of the agreements.  CDK states that the contracts speak for themselves.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 132 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them.  CDK denies the remaining allegations in paragraph 132 of the Complaint.  In addition, Plaintiff's claims and theories premised on Defendants' purported "market division" agreement were dismissed by the Court and have not been repled.  Dkt. 176.

133.    More than that, the agreement mandated coordination between the erstwhile competitors in transitioning all of CDK's vendor clients (i.e., those vendors for whom CDK provided access to dealer data on the Reynolds DMS) into the Reynolds RCI program. In short, the written agreement is direct evidence of CDK's and Reynolds' collusion in furtherance of their conspiracy to eliminate competition in the Dealer Data Integration Market, and therefore be the sole providers of data integration services for dealers using their respective DMS platforms. With this agreement, Defendants took a key step in eliminating competition from the market.

**ANSWER**:    Paragraph 133 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds.  CDK denies Plaintiff's characterization of the agreements.  CDK states that the contracts speak for themselves.  CDK denies the remaining allegations in paragraph 133 of the Complaint.  In addition, Plaintiff's claims and theories premised on Defendants' purported "market division" agreement were dismissed by the Court and have not been repled.  Dkt. 176.

### 1. The Agreement Contains Specific Provisions Dividing the Dealer Data Integration Market

134.    The agreement's key provision states that CDK "covenants and agrees not to integrate with, access, or attempt to integrate with or access, any Reynolds-brand DMS – either CDK itself or through any current or future affiliated subsidiary," which includes CDK subsidiaries Digital Motorworks and IntegraLink. *See* § 4.1. In short, CDK agreed to no longer provide any "data service that involves the polling of data from Reynolds DMS for use by" any vendor or other third party, thereby cementing the conspiracy to divide the data integration market between CDK and Reynolds. *Id.*; Recitals ¶ 2.

**ANSWER**:    Paragraph 134 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds.  CDK denies Plaintiff's characterization of the agreements and denies that the quoted text appears in the agreements.  CDK states that the contracts speak for themselves.  CDK denies the remaining allegations in paragraph 134 of the Complaint.

135.    The agreement granted CDK a "Wind Down Period" of one year to stop pulling dealer data stored on the Reynolds DMS. During that period, Reynolds agreed that CDK could continue to pull dealer data just as it had before, using a username provided by the dealer.[31] But during that wind-down period, CDK agreed that it would not "add any additional data requirements, data feeds, or other services. . . without Reynolds prior written permission." *Id.*

**ANSWER**:    Paragraph 135 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds.  CDK denies Plaintiff's characterization of the agreements and denies that the quoted text appears in the agreements.  CDK states that the contracts speak for themselves.  CDK denies the remaining allegations in paragraph 135 of the Complaint.

---

[31] *See* § 3.3 ("During the Wind Down Period, the parties intend that. . . CDK will continue providing its integration services in accordance with its [vendor] contracts," although Reynolds could require the "re-naming of existing user IDs on the Reynolds DMS to a Reynolds-specified naming convention and adhering to a single user ID per [vendor].").

### 2. The Agreement Required Coordination in Transitioning Vendor Clients from CDK to Reynolds

136. Because CDK agreed that it would no longer provide vendors with data from dealers using the Reynolds DMS, CDK and Reynolds agreed that they would work together to transition those vendors into the Reynolds RCI program. Specifically, the agreement mandated that CDK "cooperate with Reynolds' efforts" to have vendors "execute agreements to become part of the Reynolds RCI Program." *Id.* § 3.1. The agreement went even further and required CDK to "assist and cooperate with Reynolds with respect to: (1) communication with [vendors, car manufacturers], their Reynolds Dealer customers and the automotive industry in general during the Wind Down Period; (2) Reynolds' development and testing of interfaces for [vendors] who choose to join the Reynolds RCI program; and (3) the transition of such customers to the Reynolds RCI Program or Reynolds OEM Solution with respect to Reynolds Dealers." *Id.* § 3.4.

**ANSWER**: Paragraph 136 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds. CDK denies Plaintiff's characterization of the agreements and denies that the quoted text in the third sentence of paragraph 136 appears in the agreements. CDK states that the contracts speak for themselves. CDK denies the remaining allegations in paragraph 136 of the Complaint.

137. The fact that CDK and Reynolds agreed to coordinate in transitioning CDK vendor customers to Reynolds lays bare a primary purpose behind the agreement: preventing vendors from using competing data integrators and forcing them to become members of the RCI and 3PA programs.

**ANSWER**: CDK denies the allegations in paragraph 137 of the Complaint.

138. In connection with coordinating the transition of vendors from CDK's data pulling services into the RCI program, the wind down agreement required CDK to give Reynolds full information about the vendors CDK served, including their name, contact information, contract terms, data pulling requirements, usernames used to pull the data, and more.[32] Absent an

---

[32] The customer information CDK gave to Reynolds included the following: (1) the name of every vendor for whom CDK pulled dealer data from a Reynolds DMS; (2) the primary and secondary points of contact at the vendor; (3) the vendor's product name; (4) the date when CDK's data pulling contract with the vendor would end; (5) the specific Reynolds dealers served by the vendors; (6) the username used by CDK to access the data at each Reynolds dealership; (7) the data reports being run by CDK; (8) the specific data access details, including the technology, tools, transmission protocols, and emulation software technology used; (9) the specific data being provided to the vendor; (10) the frequency of the data provided by CDK to the vendor "(i.e., once per night, every 90 minutes, etc.)"; (11) any deadlines for data delivery to the vendor "e.g., must be there by 3am, etc)"; and (12) the format of the data provided "(e.g., comma/pipe delimited, XML, etc.)." See Agreement § 3.3 and Exhibit A.

agreement not to compete for each other's customers, CDK would treat such highly confidential customer information as a trade secret; it would not share it with Reynolds.

**ANSWER**:   CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds.  CDK states that the contracts speak for themselves.  CDK denies the remaining allegations in paragraph 138 of the Complaint.

### 3.   CDK and Reynolds Implemented the Agreement

139.   Consistent with their agreement, CDK stopped providing dealer data integration services with respect to Reynolds DMS dealers after the wind-down period.

**ANSWER**:   Paragraph 139 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that its former subsidiaries DMI and IntegraLink no longer access the Reynolds DMS without Reynolds's authorization.  CDK the remaining allegations in paragraph 139 of the Complaint.

140.   Also consistent with their agreement, CDK and Reynolds coordinated the transition of vendors from CDK to Reynolds. On March 2, 2015, CDK sent a letter to its vendor clients – i.e., the ones for whom CDK had pulled data from the Reynolds DMS – announcing that the vendors "will be provided with a roadmap to transition to the Reynolds Certified Interface (RCI) program without any further risk of interruption to existing services." CDK explained that "we are in a transition period to allow time for [Digital Motorworks] clients to enroll in the RCI program in support of your R&R dealers," and that "we will assist you to facilitate a smooth transition." The letter noted that Reynolds had "agreed to protect the current [Digital Motorworks] process for collecting data from R&R dealers during this transition" and promised "a more detailed letter within the next couple of weeks that outlines the transition process."

**ANSWER**:   CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds.  CDK states that the contracts speak for themselves.  CDK admits that on or about March 2, 2015, DMI sent a letter to certain of its vendor customers that contained the language quoted in paragraph 140 of the Complaint.  CDK states that the document speaks for itself.  CDK denies the remaining allegations in paragraph 140 of the Complaint.

141.   On April 1, 2015, CDK sent that promised follow-up letter to its vendor customers. The letter begins: "As announced earlier this month, the recent business agreement between CDK Global and The Reynolds and Reynolds Company (R&R) provides for the clients

of Digital Motorworks, Inc. (DMI) a streamlined process to enroll in the Reynolds Certified Interface (RCI) program for their R&R dealers. We are now in the transition period to allow sufficient time for this enrollment, and R&R has agreed to provide a grace period for the existing DMI process for R&R data collection during this time."

**ANSWER**:      CDK admits that on or about April 1, 2015, DMI sent a letter to certain of its

vendor customers that contained the language quoted in paragraph 141 of the Complaint.  CDK

denies the remaining allegations in paragraph 141 of the Complaint.

142.    The letter gave a deadline by when the vendors needed to enroll in the RCI program: "Your deadline for RCI Certification, listed above, refers to when you need to be RCI Certified and the R&R grace period is schedule to end. R&R is ready to assist you with your transition to the RCI process." Not only would Reynolds assist them, but so would CDK: "If you would prefer assistance, just let me know, and I will be happy to schedule and participate in an introductory conference call on your behalf."

**ANSWER**:      CDK admits that on or about April 1, 2015, DMI sent a letter to certain of its

vendor customers that contained the language quoted in paragraph 142 of the Complaint.  CDK

denies the remaining allegations in paragraph 142 of the Complaint.

143.    CDK's letter then made the sales pitch for RCI participation: "We are pleased to be working with R&R to bring you this streamlined, supported process for handling dealership data for your R&R dealers." In relation to CDK's agreement not to compete, the letter stated that if the vendor was "not RCI Certified, it will be more difficult to reliably receive dealership data since DMI is no longer extracting data directly from Reynolds systems."

**ANSWER**:      CDK admits that on or about April 1, 2015, DMI sent a letter to certain of its

vendor customers that contained the language quoted in paragraph 143 of the Complaint.  CDK

denies the remaining allegations in paragraph 143 of the Complaint.

144.    Remarkably – and putting the lie to "security" concerns with the use of third-party data integrators – the market division agreement still allowed Digital Motorworks to pull data from the Reynolds DMS *so long as* the vendors paid Reynolds first by enrolling in the RCI program. Referring to Digital Motorworks as a "technical agent" in this scenario, the letter explained that "DMI will be able to receive data directly from R&R on your behalf through the RCI program. You will continue to receive the benefits of our data cleansing, standardization, integration and related support services." This demonstrates that the RCI program (like the 3PA program) reflects no legitimate security concern: so long as vendors pay Reynolds' exorbitant price for the data, vendors can still use other data integrators for the same services.

**ANSWER**:    Paragraph 144 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that on or about April 1, 2015, DMI sent a letter to certain of its vendor customers that contained the language quoted in paragraph 144 of the Complaint, except for the quoted text in the third sentence, which actually reads:  "You will continue to receive the benefits of our data cleansing, standardization, aggregation and related support services."  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 144 of the Complaint that are directed toward other defendants and on that basis denies them.  CDK denies the remaining allegations in paragraph 141 of the Complaint.

145.    CDK ended the letter by noting that it had successfully "transitioned clients to the RCI program in the past, and it has proven to be a successful approach to consistent, reliable data extraction." With respect to how "this new approach differ[ed] from the previous one," the letter stated: "Prior to this agreement, DMI would extract data directly from its R&R dealers, however there was no guarantee that the data wouldn't be interrupted during the data extraction process . . . . With the RCI program, the data is pushed from the DMS through a certified interface," which CDK claimed made "the process more reliable and consistent."

**ANSWER**:    CDK admits that on or about April 1, 2015, DMI sent a letter to certain of its vendor customers that contained the excerpted language quoted in paragraph 145 of the Complaint, which referred to DMI, not CDK.  CDK denies the remaining allegations in paragraph 145 of the Complaint.

146.    Reynolds followed up with its own letters to CDK's vendor clients as the erstwhile competitors transitioned customers from CDK to Reynolds.

**ANSWER**:    CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 146 of the Complaint and on that basis denies them.

147.    The agreement had its intended effect: vendors were forced from Digital Motorworks' and IntegraLink's data integration services into the Reynolds RCI program. With the switch, vendors now pay far higher prices for the same services.

**ANSWER**:    CDK denies the allegations in paragraph 147 of the Complaint.

148.     The market division agreement had a direct impact on Authenticom. Not only is the agreement part of Defendants' overarching aim to eliminate competition, but during the "wind-down" period, Authenticom lost many customers to Digital Motorworks (i.e., CDK). Many vendors decided to leave Authenticom (which was being blocked) and to join CDK (which was not being blocked) on an interim basis, even if those vendors knew they would ultimately be forced into the RCI program. In fact, this was one of Defendants' purposes for entering into the non-compete agreement: to cooperate in driving vendors away from Authenticom.

**ANSWER**:     Paragraph 148 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that Plaintiff or any other entity has suffered any injury as a result of any action or conduct of CDK.  CDK denies the remaining allegations in paragraph 148 of the Complaint.

### B.     CDK and Reynolds Require Dealers and Vendors to Enter into Exclusive Dealing Arrangements That Are Patently Anticompetitive

149.     In their market division agreement, CDK and Reynolds agreed not to compete in the Dealer Data Integration Market. But to remove the rest of the competition, further measures were required. Accordingly, CDK and Reynolds imposed exclusive dealing provisions in dealer contracts (dealers cannot provide access to their data to anyone else) and vendor contracts (vendors cannot obtain dealer data from anyone else). For independent data integrators like Authenticom, these exclusive dealing provisions have foreclosed the entire data integration market for dealers using the CDK and Reynolds DMS platforms.

**ANSWER**:     Paragraph 149 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 149 of the Complaint.

### 1.     Defendants' DMS Contracts with Dealers Grant Defendants an Exclusive Right to Access the Dealers' Data

#### a.     The Dealer Exclusive Dealing Terms

150.     In their DMS contracts with dealers, both CDK and Reynolds require dealers to agree that they will not provide anyone other than the DMS provider access to their data for purposes of data integration and syndication to vendors. The contractual terms thus prohibit dealers from granting access to their data to anyone else, including data integrators such as Authenticom.

**ANSWER**:     Paragraph 150 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that a number of its

PUBLIC REDACTED VERSION

licensing contracts with its Dealer customers lawfully prohibit a Dealer from providing third-party access to CDK's proprietary DMS. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 150 of the Complaint relating to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 150 of the Complaint. In addition, Plaintiff's claims and theories premised on CDK's contracts with its Dealer customers were dismissed by the Court and have not been repled. Dkt. 176.

151. CDK's current standard DMS contract contains an explicit exclusive dealing provision that forecloses dealers from using other integration providers, including Authenticom: "Client shall not allow access to [the CDK DMS] by any third parties." Master Services Agreement § 6.D. It also states: "Client is not authorized to cause or permit any third party software to access the CDK Dealer Management System." *Id.* at § 6.B. While the agreement bars dealers from granting data access to third parties, the agreement expressly provides that CDK is able to access the data for purposes of data integration and syndication. These provisions last the life of the DMS contract, which is a minimum of five years. Together, these provisions give CDK an exclusive right to access dealer data on the CDK DMS for purposes of data integration and syndication. And because data integration providers depend on dealer authorization to access the dealers' data, these provisions effectively foreclose any competitor from competing with CDK in the provision of data integration services for dealers whose data is stored on CDK's DMS database.

**ANSWER**: CDK admits that the excerpted quoted text in paragraph 151 of the Complaint appears in a version of its standard MSA in place during the relevant time period. CDK states that the contracts speak for themselves. CDK denies that its licensing contracts with Dealers last a minimum of five years. CDK denies the remaining allegations in paragraph 151 of the Complaint. In addition, Plaintiff's claims and theories premised on CDK's contracts with its Dealer customers were dismissed by the Court and have not been repled. Dkt. 176.

152. Reynolds also has the same provisions in its current standard DMS contract. It prohibits dealers from "provid[ing] access to [the DMS] . . . to any third party." Master Agreement § 1. The Reynolds DMS Customer Guide, which is incorporated into the contract, similarly states that the dealer is barred from "permit[ting] any person, firm or entity access to" the DMS. *See* Customer Guide at p. 21. Reynolds has interpreted these provisions to mean that dealers cannot grant access to their own data on the DMS database. Like the CDK dealer contract, the Reynolds contract explicitly gives Reynolds the right "to use and distribute [the

dealer's] Business Data" and the "right at all times. . . to access, copy, or use [the dealer's] business data." *Id.* at pp. 8-9. These rights and restrictions last as long as the DMS contract, typically five to seven years. As with the CDK contract, together these provisions give Reynolds an exclusive right to access dealer data on the Reynolds DMS for purposes of data integration and syndication, to the exclusion of all others.

**ANSWER**:    CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 152 of the Complaint and on that basis denies them.

> **b.    CDK and Reynolds Vigorously Enforce the Dealer Exclusive Dealing Provisions**

153.    CDK and Reynolds vigilantly enforce the restrictive terms in their DMS contracts. As detailed throughout this complaint, CDK and Reynolds block other data integrators from accessing dealer data. *See infra* Part III.C.4.

ANSWER:    CDK admits that it endeavors to enforce the terms of its contracts with Dealers.

CDK further admits that it takes steps to block hostile, unauthorized access to its DMS.  CDK

lacks sufficient knowledge or information to form a belief as to the truth of the allegations in

paragraph 153 of the Complaint that are directed toward other defendants and on that basis

denies them.  CDK denies the remaining allegations in paragraph 153 of the Complaint.  In

addition, Plaintiff's claims and theories premised on CDK's contracts with its Dealer customers

were dismissed by the Court and have not been repled.  Dkt. 176.

154.    These provisions are harmful to dealers, yet CDK and Reynolds are able to force dealers to agree to them because of their market power in the DMS Market. Many dealers do not even realize that CDK and Reynolds have inserted the exclusive dealing provisions into the DMS contracts. Dealers complain often, but to no avail. For example, after CDK disabled Authenticom's login credentials, one dealer protested to CDK: "You do not have our authorization to disable user accounts. It is my data and I decide who has access to it." CDK responded that it in fact had the right to control access. The dealer asked for "documentation validating CDK is allowed to disable OUR accounts to OUR data without OUR permission." CDK responded that the DMS Agreement "contains language stating that unauthorized access to the DMS is prohibited," citing the provisions quoted above.

**ANSWER**:    CDK admits that the text quoted in paragraph 154 of the Complaint appears in

customer support notes associated with a Dealer.  CDK denies the remaining allegations in

paragraph 154 of the Complaint.  In addition, Plaintiff's claims and theories premised on CDK's

contracts with its Dealer customers were dismissed by the Court and have not been repled. Dkt.

176.

155.    More recently, CDK added the following warning shot to dealers on its dealer login page: "Please be advised that the creation of User IDs for use by unauthorized third parties violates the terms of your CDK [DMS] Agreement."

**ANSWER**:    CDK admits that a screen Dealers interface with when creating new user IDs for

use by their employees to access CDK's DMS includes the quoted language in paragraph 155 of

the Complaint. CDK denies the remaining allegations in paragraph 155 of the Complaint. In

addition, Plaintiff's claims and theories premised on CDK's contracts with its Dealer customers

were dismissed by the Court and have not been repled. Dkt. 176.

156.    Reynolds has taken the extra step of not only disabling login credentials, but actually filing lawsuits against competing data integrators for tortious interference with the DMS contracts. *See supra* Part I.A.2. Reynolds regularly hangs this same threat over Authenticom. For example, on April 6, 2015 – shortly after Reynolds and CDK entered into their market division agreement – Mr. Schaefer (one of Reynolds' senior executives involved in forging the agreement) sent a letter to Authenticom threatening that "any knowing attempt by Authenticom to induce Reynolds dealers to allow such third party access. . . gives rise to liability on the part of Authenticom for, among other things, tortious interference with contracts."

**ANSWER**:    CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 156 of the Complaint and on that basis denies them.

### 2.    Defendants' Contracts with Vendors Grant Defendants an Exclusive Right to Provide Data to Vendors

157.    In addition to inserting exclusive dealing provisions in their dealer contracts, CDK and Reynolds have also inserted exclusive dealing provision provisions in their data integration contracts with vendors. As a result, a vendor using CDK or Reynolds for data integration services must agree *only* to use CDK or Reynolds, and forgo using anyone else.

**ANSWER**:    Paragraph 157 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK lacks sufficient knowledge or

information to form a belief as to the truth of the allegations in paragraph 157 of the Complaint

relating to individuals or entities other than CDK and/or are directed toward other defendants and

PUBLIC REDACTED VERSION

on that basis denies them. CDK denies the remaining allegations in paragraph 157 of the Complaint.

158. Specifically, the CDK 3PA and the Reynolds RCI contracts contain exclusive dealing provisions that prohibit vendors from obtaining dealer data from anyone other than CDK (through the 3PA program) or Reynolds (through the RCI program). Thus, if a vendor obtains dealer data through the 3PA program (for CDK dealers) or the Reynolds RCI program (for Reynolds dealers), the vendor is barred from obtaining the dealer data from any other integrator. These exclusive dealing provisions foreclose Authenticom from its entire customer base.

**ANSWER**: Paragraph 157 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 157 of the Complaint relating to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 157 of the Complaint.

### a. The Vendor Exclusive Dealing Terms

159. **CDK.** The current CDK 3PA contract states: "Vendor agrees that it will, beginning on the date CDK certifies the use of the first Application with the CDK Interface System, access data on, and provide data to, CDK Systems exclusively through the [3PA program]." *See* CDK 3PA Contract § 2(e); § 1(a)(l). The contract goes on to state that the vendor cannot "contract with, or otherwise engage, any third party (including any [dealer]) to access, retrieve, license or otherwise transfer any data from or to a CDK System." *Id*. That specifically prohibits vendors from having Authenticom (or any other data access provider or even the dealer itself) provide the data to the vendor.[33] Moreover, the exclusivity provision applies to every software application a vendor has. Thus, if a vendor uses CDK's integration product for one application, the vendor must then use CDK for every other application too.

**ANSWER**: CDK admits that the excerpted text quoted in paragraph 159 and footnote 33 of the Complaint appears in a version of its standard contract with Vendors in place during the relevant time period. CDK states that the contract speaks for itself. CDK denies the remaining allegations in paragraph 159 of the Complaint.

---

[33] If a vendor should breach the contract and obtain data from a source other than CDK, the vendor will not only be liable for breach of contract, but the vendor must "nonetheless pay CDK under this Agreement as if such CDK Client [i.e., the dealer] was using the CDK Interface System with respect to such Application." *See* CDK 3PA Contract § 2(e).

160.    The penalty for accessing dealer data other than through CDK is termination. "CDK may terminate this Agreement at any time in the event that the Vendor. . . accesses any data or places any data on a CDK System other than through CDK." *Id*. § 6(g).

**ANSWER**:    CDK admits that the excerpted text quoted in paragraph 160 of the Complaint appears in a version of its standard contract with Vendors in place during the relevant time period.  CDK states that the contract speaks for itself.  CDK denies the remaining allegations in paragraph 160 of the Complaint.

161.    These exclusive terms purportedly *last forever*. The contract states: "All restrictions set forth in Section 2 and 3 of this Agreement *shall survive the termination of this Agreement for any reason*." *Id*. § 6(j) (emphasis added). By extending the life of the prohibitions into perpetuity, the contract ties the vendor to the 3PA program indefinitely. Even if the vendor were no longer to participate in the 3PA program, it would still be barred – forever – from obtaining data from any CDK dealer from any other source. That gives CDK carte blanche to abuse vendors and raise prices once they enter the 3PA program, because few, if any, vendors could survive without access to nearly half the franchised dealerships in the United States (i.e., those that use the CDK DMS).

**ANSWER**:    CDK admits that the excerpted text quoted in paragraph 161 of the Complaint appears in a version of its standard contract with Vendors in place during the relevant time period.  CDK states that the contract speaks for itself.  CDK denies the remaining allegations in paragraph 161 of the Complaint.

162.    In order to police these exclusive dealing terms, the contract grants CDK audit rights to determine if the vendor has received dealer data from any other entity besides CDK. *See id*. § 5(d).

**ANSWER**:    CDK admits that a term in a version of CDK's standard contract with Vendors in place during the relevant time period grants CDK certain "audit" rights "for the sole purpose of verifying the amounts due" under the contract.  CDK states that the contract speaks for itself. CDK denies the remaining allegations in paragraph 162 of the Complaint.

163.    **Reynolds.** Just like the CDK 3PA contract, the Reynolds RCI contract contains exclusive dealing provisions that prohibit vendors from obtaining dealer data from any source except Reynolds. The RCI Agreement states that "any Non-Approved Access and/or Non-Approved Use is strictly prohibited and is considered a violation of this Agreement and any other data movement agreements between [the vendor] and Reynolds." RCI Agreement § 2.5.3. The

Agreement defines "Non-Approved Use" as the "utilization" of dealership data obtained in any way other than through the RCI program. *Id*. § 1.10. And "Non-Approved Access" is defined as "[a]ny direct or indirect use or access of the Reynolds System by [the vendor] or an agent acting on behalf of [the vendor]." *Id*. § 1.9.

**ANSWER:**    CDK lacks sufficient knowledge or information to form a belief as to allegations

in paragraph 163 of the Complaint and on that basis denies them.

164.    These exclusivity provisions in the Reynolds RCI contract for vendors last "for as long as this Agreement is in effect," *id*. § 2.5.3., which is "three (3) years" plus automatic renewals "for additional one (1) year terms," *id*. § 5.1.

**ANSWER**:    CDK lacks sufficient knowledge or information to form a belief as to allegations

in paragraph 164 of the Complaint and on that basis denies them.

165.    In order to police these exclusive dealing terms, the contract grants Reynolds audit rights to determine if the vendor has received dealer data from any other entity besides Reynolds. *See id*. § 6.2.

**ANSWER**:    CDK lacks sufficient knowledge or information to form a belief as to allegations

in paragraph 165 of the Complaint and on that basis denies them.

> **b.    Defendants' Vendor Contracts Contain Price Secrecy Provisions That Prohibit Vendors from Informing Dealers About the Data Fees**

166.    Making matters worse, CDK and Reynolds impose "Price Secrecy Provisions" in their 3PA and RCI contracts. These provisions prohibit vendors from informing dealers about the data access fees in any way, whether directly or indirectly, even though the data access fees are often passed down to dealers in the form of higher vendor prices.

**ANSWER**:    CDK admits that a version of its standard 3PA contract with Vendors in place

during the relevant time period contains a provision addressing Vendors' communication of 3PA

fees to their Dealer customers.  CDK states that the document speaks for itself.  CDK lacks

sufficient knowledge or information to form a belief as to the truth of the allegations in

paragraph 166 of the Complaint relating to individuals or entities other than CDK and/or are

directed toward other defendants and on that basis denies them.  CDK denies the remaining

allegations in paragraph 166 of the Complaint.

167.    The CDK 3PA contract states that vendors "shall not include any 'interface' fee, DMS access fee or any other similar fee related to the use of the CDK Interface System in any of its invoices to its customers or otherwise include any direct or indirect indication to its customers [i.e., the dealers] (in its invoices or otherwise) of the fees charged by CDK hereunder." CDK 3PA Contract § 10.

**ANSWER**:    CDK admits that the excerpted text quoted in paragraph 167 of the Complaint appears in a version of its standard contract with Vendors in place during the relevant time period.  CDK states that the contract speaks for itself.  CDK denies the remaining allegations in paragraph 167 of the Complaint.

168.    The CDK contract also bars vendors from indicating "in any way" that an increase in the price of their own services is related to an increase in the data access fees charged by CDK. The language is sweeping: "Vendor shall never indicate in any way to any CDK Vendor Client that any increase in any price charged by Vendor to any CDK Vendor Client is in reaction to, or in any other way associated with, any modification in the price charged by CDK hereunder with respect to Vendor's use of the CDK Interface System." *Id*.

**ANSWER**:    CDK admits that the excerpted text quoted in paragraph 168 of the Complaint appears in a version of its standard contract with Vendors in place during the relevant time period.  CDK states that the contract speaks for itself.  CDK denies the remaining allegations in paragraph 168 of the Complaint.

169.    Similarly, the Reynolds RCI contract prohibits vendors from disclosing any terms or conditions of the contract – including the pricing paid for the data integration services – to any party, including dealers. *See* RCI Contract § 2.7.

**ANSWER**:    CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 169 of the Complaint and on that basis denies them.

170.    Through these provisions, CDK and Reynolds make it exceedingly difficult, if not impossible, for dealers to understand the true cost of DMS services (given that dealers ultimately bear the cost of the data access fees imposed by CDK and Reynolds). By shrouding in secrecy the source of data-related price increases, CDK and Reynolds thwart competition and transparency in the DMS Market.

**ANSWER**:    CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 170 of the Complaint that relate to individuals or entities other than

CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 170 of the Complaint.

**c.    CDK and Reynolds Vigorously Enforce the Vendor Exclusive Dealing and Price Secrecy Provisions**

171.    Like the exclusive dealing provisions in the dealer contracts, CDK and Reynolds aggressively enforce the exclusive dealing provisions against vendors. They punish vendors that obtain dealer data from any other integrator, impose large fines, threaten to cancel the vendor's contract, and initiate audits.

**ANSWER**:    CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 171 of the Complaint that are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 171 of the Complaint.

172.    A prime example involves a large vendor of customer relationship management software. In August 2016, Reynolds sent a letter to the vendor stating that it had "come to Reynolds' attention that [the vendor] has materially breached the Agreement by violating, without limitation, the Agreement's prohibition against Non-Approved Access and/or Non-Approved Use" by obtaining dealer data from Authenticom. "More specifically," the letter explained, "Reynolds recently received documentary evidence from one of our mutual dealership customers showing that [the vendor] is flagrantly violating the above provisions by using an unauthorized, third-party data broker to extract data" for one of the vendor's applications. Reynolds threatened to terminate the RCI agreement with the vendor unless the vendor agreed to "immediately cease and desist" from using dealer data extracted "using a non-RCI method (e.g., using Authenticom/DealerVault software)." Reynolds demanded that the vendor "submit to a third-party audit (at [the vendor's] expense). . . to verify that all instances of the use of non-RCI data extraction have been reported and addressed." Reynolds also demanded "a one-time payment to Reynolds of $100,000" under the agreement's liquidated damages clause. Reynolds threatened that the $100,000 figure was "offered in the spirit of compromise" and if the vendor did not accede to the demands in the letter, "Reynolds intends to establish that [the vendor's] conduct constitutes multiple breaches for purposes of the Agreement and that Reynolds is entitled to far greater amount in damages." Significantly, nothing in the letter was about security – Reynolds just wanted its fees and the vendor to stop using Authenticom.

**ANSWER**:    CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 172 of the Complaint and on that basis denies them.

173.    Such strong-arm tactics are typical of Reynolds and CDK, and they have succeeded in intimidating vendors. Indeed, the vendor in the above example not only terminated its relationship with Authenticom, but it was so worried about running afoul of Reynolds again

80

that it asked Authenticom, as a preventative measure, to disregard any future request to provide data in case the vendor inadvertently tried to rely on Authenticom's services again.

**ANSWER**: CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 173 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 173 of the Complaint.

174. CDK and Reynolds also strictly enforce the Price Secrecy Provisions with an iron fist. They have threatened numerous vendors with claims of material breach and liquidated damages for so much as mentioning that they pay large data access fees.

**ANSWER**: CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 174 of the Complaint that are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 174 of the Complaint.

### 3. The Dealer and Vendor Exclusive Dealing and Price Secrecy Provisions Are Anticompetitive

175. The exclusive dealing provisions in Defendants' dealer and vendor contracts are anticompetitive. They are per se illegal because they are part of Defendants' agreement to eliminate competition in the primary Dealer Data Integration Market and secondary aftermarkets. They are also anticompetitive and invalid under the rule of reason. They foreclose a substantial percentage of the integration market – given CDK's and Reynolds' market share in the DMS Market, at least 75 percent of the nation's dealers are prohibited from using Authenticom for automated integration services. When considered in light of the aftermarkets, 100 percent of dealers using the CDK or Reynolds DMS systems are prohibited for using Authenticom. From the perspective of vendors, the foreclosure is even more extreme. If a vendor uses CDK as an integrator for even a single CDK dealer, that vendor may no longer use Authenticom as an integrator for *any* CDK dealer, and the same is true for Reynolds. There are few, if any, vendors that could survive without serving CDK and Reynolds dealers, and therefore the vast majority of vendors are foreclosed from using Authenticom.

**ANSWER**: Paragraph 175 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 175 of the Complaint.

176. The serious anticompetitive effects of Defendants' conduct on the Dealer Data Integration Market and respective aftermarkets – and the widespread harm to dealers and vendors – is established by the massive price increases Defendants have successfully imposed, *see infra* Part IV.A. Similarly, the price secrecy provisions make it difficult, if not impossible, for dealers to understand the true cost of using either CDK or Reynolds for DMS services. Defendants have also demonstrated an ability to exclude their rivals, having eliminated all competition in the integration market except for Authenticom, which has suffered serious financial injury. Given Defendants' market power and leverage, dealers and vendors had no choice but to enter into the exclusive dealing terms, *see supra* Parts I.B; III.B.1. The presence of coercion is also demonstrated by Defendants' blocking of all other competitors.

**ANSWER**:    Paragraph 176 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

176 of the Complaint.

177. The impact of the exclusive dealing provisions is amplified by their lengthy duration. Defendants' DMS contracts with dealers typically last five to seven years. Reynolds' contracts with vendors are typically 3 years with automatic renewals. And CDK's exclusive dealing terms with vendors purport to be indefinite and non-terminable.

**ANSWER**:    CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 177 of the Complaint relating to individuals or entities other than

CDK and/or are directed toward other defendants and on that basis denies them.  CDK denies the

remaining allegations in paragraph 177 of the Complaint.

### C.    Defendants Are Engaged in a Coordinated Campaign to Block Authenticom's Access to Dealer Data and Thereby Destroy Its Business

178. Having succeeded in eliminating the rest of the competition, CDK and Reynolds have now stepped up their coordinated attacks on Authenticom by blocking its access to dealer data (despite dealer authorization). Through this group boycott, Defendants are intent on destroying Authenticom's business.

**ANSWER**:    Paragraph 178 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

178 of the Complaint.

### 1. Defendants Have Admitted That They Have Agreed to Restrict Access and Block Authenticom

179. Senior CDK and Reynolds executives – including those who formed and implemented the agreement – have admitted that CDK and Reynolds have entered into an agreement to restrict access to dealer data on their systems and to destroy data integrators like Authenticom.

**ANSWER**: CDK denies the allegations in paragraph 179 of the Complaint.

180. Specifically, on April 3, 2016, at an industry convention, Dan McCray (CDK's Vice President of Product Management) approached Mr. Cottrell and said that they should "take a walk." Mr. McCray led Mr. Cottrell off the convention floor and down a service ramp to a secluded area. Mr. McCray then confirmed the existence of the illegal agreement, stating that CDK and Reynolds had agreed to "lock you and the other third parties out." In reference to a prior offer by CDK to acquire Authenticom's business for $15 million, Mr. McCray confirmed the illegal agreement again, stating that the number was so low because Authenticom's "book of Reynolds business is worthless to us because of the agreement between CDK and Reynolds." Mr. McCray then grew threatening: "I wanted to look you in the eye and let you know man to man, I have been mandated by our new CEO to seek you out and destroy your business on our systems." Referring to the exclusive dealing provisions in the dealer DMS contracts, he stated that "we will enforce our contract with dealers and sue them if needed to keep you out of our systems." "For god's sake," he concluded, "you have built a great little business, get something for it before it is destroyed otherwise *I will f\*\*\*ing destroy it*." Mr. Cottrell rejected Mr. McCray's threats, refused to sell his company for a fraction of its value, and insisted Authenticom would continue to serve its dealer and vendor customers.

**ANSWER**: CDK admits that on or about April 3, 2016, Dan McCray, a former CDK employee, attended a National Automobile Dealers Association ("NADA") event. CDK further admits, upon information and belief, that Mr. McCray spoke to Mr. Cottrell at the event. CDK denies the remaining allegations in paragraph 180 of the Complaint.

181. Top Reynolds executives have delivered the same message. In May 2015, Mr. Schaefer – Reynolds' head of data services and one of the architects of the conspiracy – told Mr. Cottrell during a phone conversation that CDK and Reynolds had an agreement to support each other's 3PA and RCI programs and therefore block competitors like Authenticom from pulling dealer data. Mr. Brockman was adamant, Mr. Schaefer said, that all third-party data integrators must be cut off. Mr. Schaefer also said that he was in communications with other DMS companies to try to convince them to join CDK and Reynolds in the agreement to block independent data integrators. To date, he has not had success – every other DMS company recognizes a dealer's right to have Authenticom (and others like CDK-owned Digital Motorworks and IntegraLink) provide data integration services.

**ANSWER**:     CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 181 of the Complaint and on that basis denies them.

### 2.      Defendants' Employees Are Working In Concert to Coordinate the Blocking of Authenticom

182.     CDK and Reynolds have not only agreed to block Authenticom, but they have employees actively working together to coordinate the technical aspects of that blocking.

**ANSWER**:     CDK denies the allegations in paragraph 182 of the Complaint.

183.     In December 2016, during one particular vendor's discussions with CDK about joining the 3PA program and leaving Authenticom, Steve French – CDK's senior director of client and data services – told the vendor that a large portion of his job was to work with Reynolds to ensure third-party data integrators like Authenticom remain locked out. Mr. French suggested that resistance to getting dealer data from CDK and Reynolds was futile as they were working together to lock out third party data integrators like Authenticom.  Mr. French's background makes him an ideal liaison between CDK and Reynolds: he previously worked for Reynolds as its data collection manager.

**ANSWER**:     CDK denies the allegations in paragraph 183 of the Complaint.

### 3.      Defendants Tried to Coerce Authenticom to Exit the Dealer Data Integration Market

184.     CDK and Reynolds have tried multiple times to coerce Authenticom to exit the Dealer Data Integration Market and cede the field completely to them. As already recounted above, CDK told Mr. Cottrell that he should sell his business to CDK for $15 million because otherwise CDK and Reynolds were going to destroy it.

**ANSWER**:     CDK denies the allegations in paragraph 184 of the Complaint.

185.     Reynolds has also given Authenticom an ultimatum to exit the data integration market or face escalating attacks on its business. As noted above, in April 2015, Reynolds threatened to sue Authenticom for tortious interference. Authenticom rejected the threat, and in response noted that "a significant percentage of R&R's [dealer] customers also are Authenticom's customers" and, like Reynolds, Authenticom and the dealers "have contractual agreements." In response, on May 7, 2015, Reynolds' lawyer sent Mr. Cottrell a proposed "Wind Down" agreement. Authenticom would shut down its data integration business and, in exchange, Reynolds would stop blocking Authenticom's access to dealer data during the one-year wind down period. During that so-called "grace" period, Authenticom would be required to transition Authenticom's vendor clients into the RCI program, where they would pay Reynolds' vastly higher integration fees. Mr. Schaefer told Mr. Cottrell that the draft agreement Reynolds provided was word-for-word what Reynolds and CDK had agreed to just months earlier. In fact, the attorney that sent the Wind Down agreement is the same Reynolds lawyer who had negotiated Reynolds' market division agreement with CDK.

**ANSWER**:    CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 185 of the Complaint and on that basis denies them.

186.    Mr. Cottrell rejected Reynolds' threats. As he wrote to Mr. Schaefer, instead of leaving the market, Authenticom was intent on providing "a safe and secure data movement option in a fair and competitive marketplace."

**ANSWER**:    CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 186 of the Complaint and on that basis denies them.

### 4.    Defendants Are Blocking Authenticom's Ability to Provide Dealer Data Integration Services

187.    Having failed to convince Authenticom to exit the data integration market on its own, CDK and Reynolds have waged an all-out assault on Authenticom by intensifying their blocking activities. Vendors – with no choice given the interruptions to their services – have left Authenticom and joined the 3PA and RCI programs, putting Authenticom's business into a downward spiral.

**ANSWER**:    CDK denies the allegations in paragraph 187 of the Complaint.

### a.    CDK and Reynolds Have Disabled Authenticom's Usernames En Masse

188.    On August 1, 2016, Authenticom's employees walked into work and confronted a business catastrophe. Overnight, CDK had disabled Authenticom's login credentials at thousands of dealerships. A throng of dealers and vendors called Authenticom, frantically trying to find a way to re-establish Authenticom's connection and resume the flow of data. Vendors and dealers alike had their business operations interrupted. Over the ensuing weeks and months, CDK unleashed wave after wave of blocking actions that disabled Authenticom's login credentials for thousands of dealerships. In terms of timing, CDK has informed dealers that "[o]ur goal is to complete the removal" of "unauthorized third-party access methods by December 31, 2016." CDK then promised that in 2017 it would "further increase our security actions to prevent the use of unapproved data access methods."

**ANSWER**:    CDK admits that on or about August 1, 2016, it took steps, consistent both with its contracts with its Dealer customers and with CDK's need to provide a stable and secure DMS product to its Dealer customers, to block hostile third-party access—including that of Authenticom—to its DMS. CDK further admits one of the mechanisms it used in its efforts to block the unlawful extraction of data from its systems included disabling login credentials used

by hostile data extractors like Authenticom. CDK further admits that the quoted text in paragraph 188 of the Complaint appears in an August 2016 letter that CDK sent to certain of its Dealer customers. CDK denies the remaining allegation in paragraph 188 of the Complaint.

189. Reynolds' blocking tactics started earlier and have been more sustained than CDK's, as CDK did not start blocking independent data integrators until it entered into the agreement with Reynolds in 2015. Reynolds first started disabling Authenticom's usernames in 2009 when it introduced gimmicks such as "challenge questions" and "captcha" (where the user has to enter random blurred text) to make it more difficult to automate the pulling of data. Reynolds also targeted Authenticom's usernames for specific vendors, disrupting the data flow for those vendors and thereby forcing them to join the RCI program. In June 2013, Reynolds intensified its tactics by disabling Authenticom's usernames en masse. "Effective immediately," Reynolds announced to its dealers, "Reynolds will begin the rollout of prohibiting automated access into" its DMS. "This will impact any process that is set up to directly access [the DMS] without any manual intervention." Over a three-month period in the summer of 2013, Reynolds disabled 27,000 profiles used by Authenticom at over 3,600 dealers. Reynolds' actions resulted in an almost complete collapse of Authenticom's integration business for dealer data for dealers using the Reynolds DMS.

**ANSWER**: CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 189 of the Complaint and on that basis denies them.

### b. Dealers Have Protested to CDK and Reynolds and Demanded That They Stop Blocking Authenticom

190. Dealers have demanded that CDK and Reynolds stop blocking Authenticom. The dealers have made clear that the data is theirs, that they control access to it, and that the disabling of Authenticom has interrupted their operations and caused economic harm. But CDK and Reynolds have rejected the dealers' objections.

**ANSWER**: Paragraph 190 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that certain of its Dealer customers have asked CDK to stop "blocking" Authenticom. Several have ceased such inquiry when CDK points out to the Dealer that its contract with CDK prohibits the Dealer from allowing unauthorized third-party access to CDK's DMS. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 190 of the Complaint relating to individuals or entities other than CDK and/or are directed toward other defendants and

on that basis denies them. CDK denies the remaining allegations in paragraph 190 of the Complaint.

191. The dealer complaints are too numerous to fully recount here. But a few examples make the point. In November 2016, one Mercedes dealership in California wrote to CDK: "When will you stop the blocking of our user profiles? This must stop." The dealer decried CDK's "attempt to stop all other data access routes thereby forcing us to use [CDK's] data monetizing scheme if we want to access our data." As the dealer recognized, the blocking of Authenticom was an effort to obtain the economic benefits of the dealers' data. "When will CDK stop trying to monetize data owned by [us] at our expense? All being orchestrated under the guise of 'protecting our data.' Frankly most can see right through this propaganda smoke screen. The data could be protected by using available technology that doesn't cut off the dealers' access to their own data using fully automated routines." The dealer explained that because of CDK's exorbitant data access fees, it could not use the applications it wanted: "We would like to purchase the XTime application. The CDK data access charges make that option prohibitively expensive. Did CDK actually think that these exorbitant data access charges levied against our third party solution providers would not get passed directly back to us?"

**ANSWER**: CDK admits that the quoted excerpted text in paragraph 191 of the Complaint appears in a November 2016 email that an employee of a Dealer customer sent to CDK. CDK denies the remaining allegations in paragraph 191 of the Complaint.

192. One Virginia dealer asked his employees "to raise holy hell with CDK. This is really affecting our business." A Wisconsin dealer explained that it had even created a login for the owner of the dealership "to see if CDK had the nerve to deactivate it. They did! I have very strongly voiced by phone to my CDK rep to STOP IT." A Lexus dealer in Ohio related that it had "lit into [CDK] about how CDK is making it more difficult for me now with this agenda of theirs (I even mentioned Authenticom's name and how I felt they were being unfairly singled out to frighten dealers regarding their DMS security)."

**ANSWER**: CDK admits that the quoted text in the first, second, third, and fourth sentences of paragraph 192 of the Complaint appears in a document produced by Authenticom. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the fifth sentence of paragraph 192 of the Complaint and on that basis denies them. CDK denies the remaining allegations in paragraph 192 of the Complaint.

193. Dealers explained that they preferred the superior product and service they received from Authenticom. For example, a Lexus dealership in California wrote that "[a]s a dealership owner, I believe that CDK has no right to deny me access to my own data. By extension, I also retain my rights to distribute my data to chosen vendors who meet my strict

criteria for data security." Praising Authenticom's product, the dealer wrote that "with each vendor requiring different kinds of data extraction, I feel it would be far more effective to support Authenticom and DealerVault, to build a great single point of extracted data, and plug my vendors into their ecosystem."

**ANSWER**:     CDK admits that the quoted text in paragraph 193 of the Complaint appears in a

document produced by Authenticom.  CDK denies the remaining allegations in paragraph 193 of

the Complaint.

194.     One final example comes from a Ford dealership in Wisconsin: "I have been very vocal to my CDK rep in terms of who owns the data and how their disruption of our business is costing us money in potential lost sales with our vehicle inventory not being up to date." Like most dealerships, however, it felt trapped between CDK and Reynolds, given the DMS needs of their business. "The only [DMS providers] we are comfortable handling this business, unfortunately for us, is CDK and R&R." And that, in a nutshell, is the dilemma dealers face: no matter which DMS provider the dealer selects, both CDK and Reynolds have agreed to block independent data integrators and have seized control over access to the dealer's own data.

**ANSWER**:     CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 194 of the Complaint and on that basis denies them.

### c.     Dealers Have Set Up New Usernames for Authenticom, but Those Have Been Quickly Blocked by CDK and Reynolds Too

195.     After CDK and Reynolds disabled the dealer-created Authenticom credentials, dealers worked cooperatively with Authenticom to set up new credentials and reestablish access. Given the sheer scale of the mass blocking, Authenticom was forced to redirect a majority of its 120-person workforce to the effort – including at one point hiring 50 temporary employees solely to help dealers navigate around the shutdowns. But as soon as dealers set up new login credentials, CDK and Reynolds disabled them. Dealers understandably grew weary of devoting time and energy to setting up new usernames day after day, particularly given the interruptions to their operations that the blocking of data was already causing.

**ANSWER**:     CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 195 of the Complaint and on that basis denies them.

196.     Among the many examples, one Nissan dealership from Indiana reported that it had "updated a few profiles and within 24 hours they are locked out again." A Delaware dealer called "CDK and yelled at them for about 2 hours telling them to let me handle security and to stop touching my user list in every single situation. They refused to stop."

**ANSWER**:   CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 196 of the Complaint and on that basis denies them.

197.   Amid the constant attack on dealer logins, dealerships threw up their hands. "I cannot continue to create new profiles nor does my schedule allow for time to reset this log on daily," a large California dealership stated. With respect to Reynolds, a large dealership group explained that the "process to recreate a user ID in Reynolds is not as simple as it used to be and now takes approximately 30 min. to remake [Authenticom's] account with the proper access[;] that is time I don't have." The dealer lamented that although it did "like what [Authenticom's] product does and the ease and control we have," it could not continue to deal with Reynolds' repeated disabling. Underscoring the leverage that DMS providers wield, a Massachusetts Ford dealer explained that "[w]e cannot play the nightly cat and mouse game of us enabling the [Authenticom] account – only to have them shut it down. We cannot put our company at risk by having CDK declare us – not secure – and shutting us out of our own server and making it impossible to do business."

**ANSWER**:   CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 197 of the Complaint and on that basis denies them.

> **d.     CDK and Reynolds Have Refused To Give Credence to the Dealers' Objections**

198.   Even though dealers forcefully objected to CDK's and Reynolds' blocking of Authenticom, CDK and Reynolds did not listen. Instead, they insisted that, by re-establishing a username for Authenticom, dealers would breach their DMS contracts. For dealers, this is the "nuclear option" – because they simply cannot operate without a functioning DMS.

**ANSWER**:   CDK admits that providing user names and passwords to unauthorized third

parties like Authenticom is generally prohibited by CDK's dealer contracts.   CDK lacks

sufficient knowledge or information to form a belief as to the truth of the allegations in

paragraph 198 of the Complaint that relate to individuals or entities other than CDK and/or are

directed toward other defendants and on that basis denies them.   CDK denies the remaining

allegations in paragraph 198 of the Complaint.

199.   A vendor reported to Authenticom that dealers "are so worried to go against the grain with CDK thanks to very threatening language being used. CDK is telling my dealerships that they risk litigation if they cooperate with enabling profiles." CDK "told another dealership that enabling profiles violates their agreement with CDK and it could result in aggressive action." A Toyota Reynolds dealership in California said "it does not matter what ID is used it will trigger the Suspicious Activity triggers according to [Reynolds] and shut down any account

used to access Data," with the takeaway that "this issue will NEVER GO AWAY!" As one Dodge dealer in Texas reported, its CDK "rep said that setting up a new profile would work for a day or two but our account is now being monitored. Basically he told me that they have control and that is the way it's going to be."

**ANSWER**:     CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 199 of the Complaint and on that basis denies them.

> **e.    CDK and Reynolds Are Proactively Contacting Dealers Served by Authenticom to Pressure Them to Have Their Vendors Switch to the RCI and 3PA Programs**

200.    In conjunction with disabling Authenticom's profiles, CDK and Reynolds have contacted dealers to convince them to have their vendors switch to the 3PA and RCI programs. The pattern is familiar: block Authenticom, and then push vendors to switch.

**ANSWER**:     CDK admits that it has communicated with certain Dealers regarding

unauthorized third-party DMS access.  CDK lacks sufficient knowledge or information to form a

belief as to the truth of the allegations in paragraph 200 of the Complaint relating to individuals

or entities other than CDK and/or are directed toward other defendants and on that basis denies

them.  CDK denies the remaining allegations in paragraph 200 of the Complaint.

201.    On August 22, 2016, Mr. Karp sent a letter to all of CDK's dealers served by Authenticom with the following message: "We are contacting you because your dealership has been identified as a client of a third party that is accessing your data through CDK systems by unauthorized means." He stated that CDK would no longer allow independent data integrators to access dealer data, and that vendors therefore needed to "begin the Third Party Access program application process immediately to avoid disruption." Mr. Karp followed up this letter with repeated communications to dealers throughout the fall of 2016. In letter from September 23, 2016, he told dealers to "[s]hare your list of vendors with us so that our Third Party Access program team can invite vendors who are not already part of the program to join." CDK's goal is plain: ensure that Authenticom has no way to access dealer data and then take Authenticom's customers.

**ANSWER**:     CDK admits that the excerpted quoted text appears in two letters from former

CDK employee Robert Karp to certain Dealers dated August 22, 2016 and September 23, 2016,

respectively.  CDK denies the remaining allegations in paragraph 201 of the Complaint.

202.    Reynolds has delivered the same message with the same goal, repeatedly notifying dealers that it was "prohibiting automated access" to data integrators and following that

PUBLIC REDACTED VERSION

up with a marketing push: "[I]f a third party vendor you do business with is impacted by this, please refer them to the Reynolds Certified Interface hotline."

**ANSWER**:    CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 202 of the Complaint and on that basis denies them.

### f.    CDK and Reynolds Have Spread False Information About Authenticom's Security as Part of Their Marketing Push

203.    As part of their effort to discredit Authenticom and force vendors to join the 3PA and RCI programs, CDK and Reynolds have spread falsehoods about Authenticom's data security.

**ANSWER**:    CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 203 of the Complaint that are directed toward other defendants and

on that basis denies them.    CDK denies the remaining allegations in paragraph 203 of the

Complaint.

204.    For example, in multiple letters to dealers, Mr. Karp falsely stated that, with Authenticom, "there are no limits on data elements that can be accessed, increasing the risk of misuse. There is also an inability for you to track and monitor where your data is going." These statements are demonstrably false. Authenticom pulls only the data dealers specify, and with DealerVault, dealers have complete control and visibility over the flow of their data. Mr. Karp also warned of "unauthorized software" being "installed on your CDK DMS system," which is also false. Authenticom does not install any software on the DMS system, but simply runs data reports just as the dealer can. CDK and Reynolds have also raised the fake concern that "sharing data through intermediaries such as Authenticom increases data handling risks." CDK does *the exact same thing* (through its Digital Motorworks and IntegraLink subsidiaries) in pulling data as a "data-handling intermediary" and has for years.

**ANSWER**:    CDK admits that the excerpted quoted statements appear in certain letters from

former CDK employee Robert Karp to certain Dealers, denies that the statements were—as

Plaintiff misleadingly suggests—in specific reference to Authenticom as opposed to the data

security risks posed by unauthorized third-party access generally.    CDK denies the remaining

allegations in paragraph 204 of the Complaint.

205.    Defendants' criticisms of Authenticom's security ring especially hollow given that they *both use Authenticom for data integration services for their own applications*. For example, Reynolds uses Authenticom to pull data from a handful of *Reynolds' own dealerships*

for use in *Reynolds' own applications*. Reynolds has turned to Authenticom to pull data for those dealerships – using the standard procedure of login credentials and data scraping – and Authenticom then provides that data to Reynolds for use in its applications. If Defendants succeed in putting Authenticom out of business, then Reynolds will have to start pulling data itself from these Reynolds dealerships.

**ANSWER**:    CDK admits that AVRS, Inc. ("AVRS"), a subsidiary of Computerized Vehicle

Registration ("CVR") which, in turn, is a joint venture between CDK and Reynolds that provides

EVR services in California, used Authenticom for certain data access services at the time of

CVR's acquisition of AVRS in 2015.  As AVRS's operations are incorporated into CVR, its use

of Authenticom is being discontinued and it currently uses Authenticom for a small number of

CDK and Reynolds dealers with legacy DMS software.  CDK lacks sufficient knowledge or

information to form a belief as to the truth of the allegations in paragraph 205 of the Complaint

relating to individuals or entities other than CDK and/or are directed toward other defendants and

on that basis denies them.  CDK denies the remaining allegations in paragraph 205 of the

Complaint.

205.    Another example involves AVRS, Inc., a wholly owned joint venture of CDK and Reynolds. AVRS provides electronic registration and titling services for dealers in California, and it uses Authenticom for data integration services. Thus, on behalf of Defendants' own joint venture, Authenticom pulls data from *CDK dealers* and *Reynolds dealers*. The data AVRS requires is the car buyer's identification information, including name, address, and date of birth. The state of California mandates security protections for this data; Authenticom complies. AVRS – and thus CDK and Reynolds – would not use Authenticom otherwise.

**ANSWER**:    CDK admits that AVRS, a subsidiary of CVR which, in turn, is a joint venture

between CDK and Reynolds that provides EVR services in California, used Authenticom for

certain data access services at the time of CVR's acquisition of AVRS in 2015.  As AVRS's

operations are incorporated into CVR, its use of Authenticom is being discontinued and it

currently uses Authenticom for a small number of CDK and Reynolds dealers with legacy DMS

software.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the

allegations in paragraph 206 of the complaint relating to individuals or entities other than CDK

and on that basis denies them. CDK denies the remaining allegations in paragraph 206 of the

Complaint.

207.    In another example, before it entered into the conspiracy with CDK, Reynolds used Authenticom to pull data from CDK dealers. (Now, post-agreement, Reynolds can no longer use Authenticom for CDK dealers.) But even today, Reynolds still uses Authenticom to pull data from non-CDK and non-Reynolds dealers for use in Reynolds' applications. Reynolds is actually one of Authenticom's larger vendor clients. Again, if Defendants' succeed in driving Authenticom out of business, then Reynolds will have to use CDK (i.e., Digital Motorworks) for integration services for these dealers.

**ANSWER**:    CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 207 of the Complaint and on that basis denies them.

### g.    Authenticom Is Losing Its Customers – and Therefore Its Business – Because of Defendants' Actions

208.    CDK's and Reynolds' goal is simple: to put Authenticom out of business, which will cement their monopoly over integration services for dealer data on their systems. It is working. Despite the fact that dealers and vendors prefer Authenticom's better-priced and higher-quality product and services, vendors have had no choice but to leave Authenticom and join the 3PA and RCI programs.

**ANSWER**:    CDK denies the allegations in paragraph 208 of the Complaint.

209.    "After being a loyal client for over six years," one longtime vendor client of Authenticom wrote, "we are compelled to make a business decision to pursue Third Party Access from CDK Data Services." The vendor could not sustain the business disruptions caused by the blocking. "Over the past 60 days, we have averaged 100 of our dealer clients blocked from DealerVault/Authenticom polling the dealer's data. The effect of these disruptions has taken a serious toll on our dealer business clients causing them to terminate or suspend marketing services with us." Many vendors made the same point about the detrimental effects of Defendants' blocking tactics. "I know this [blocking by CDK and Reynolds] is causing you a great deal of angst and lost sleep I am sure. I support your battle but I need to try and save myself at some point." "Between the Reynolds lockouts and the subsequent CDK lock-outs," another vendor explained, "our business has contracted due to dealer cancellations." Another wrote: "We have (reluctantly) fallen victim to CDK and have already moved several (nearly all) [accounts] to CDK." The data interruptions cost that vendor "the loss of tens of thousands of dollars that we cannot make up. Ensuring data is complete and flowing properly is essential to our business." As a result, the vendor saw "no choice but to bite the proverbial bullet and go back to CDK." Dealerships often delivered the bad news themselves. "Due to major issues with DealerVault's Reynolds login getting disabled over and over again[,] [w]e need to cancel the account," a Reynolds dealership in Texas explained. "We now have [the vendor] pulling directly from Reynolds."

**ANSWER**:    CDK admits that the quoted text in the first, third, fourth, and eighth sentences of paragraph 209 of the Complaint appears in documents produced by Authenticom.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 209 of the Complaint that relate to whether other quoted text is attributed to Dealers or accurately stated and on that basis denies them.  CDK denies the remaining allegations in paragraph 209 of the Complaint.

210.    Leaving Authenticom was especially frustrating for vendors because they much preferred Authenticom's superior data integration services to CDK's and Reynolds'. As one vendor summarized, the "process to onboard data via [Authenticom] is streamlined and much easier for both our company and the individual dealership. Plus, the data accuracy and formatting is very consistent when it is secured (this is not the case when data is pulled directly from CDK)." In the end, the vendor lamented, "the only party that truly suffers here is the actual dealer. It takes us longer to provide them the services they are requesting and have paid for. The data is not as clean, therefore requiring additional processes and data scrubbing and appending tools to be applied on our side. And the costs are greatly increased – literally double – due to the egregious fees that CDK charges."

**ANSWER**:    CDK admits that the text quoted in paragraph 210 of the Complaint appears in a document produced by Authenticom.  CDK denies the remaining allegations in paragraph 210 of the Complaint.

## IV.    Defendants' Actions Have Harmed Competition

211.    Defendants' anticompetitive conduct has not just harmed Authenticom, it has harmed competition itself– first and foremost through dramatic price increases, but also through reduced output, degraded product quality, and diminished customer choice. CDK's and Reynolds' anticompetitive conduct has harmed dealers, vendors, and the industry as a whole.

**ANSWER**:    Paragraph 211 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that Plaintiff or any other individual or entity has suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiff is entitled to the relief it seeks.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 211 of the Complaint

that are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 211 of the Complaint.

### A. Defendants' Anticompetitive Conduct Has Resulted in Massive Price Increases in the Dealer Data Integration Market

212. Having eliminated their competitors, CDK and Reynolds have exercised their market power and imposed enormous price increases on data integration services. Neither vendors nor dealers have been able to stop or resist these increases.

**ANSWER**: Paragraph 212 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that Plaintiff or any other individual or entity has suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiff is entitled to the relief it seeks. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 212 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 212 of the Complaint.

213. There are two ways to look at the price increases: (1) the price difference between what Authenticom (and other independent data integrators) charged and what CDK and Reynolds now charge the same vendors for the same services; and (2) the price difference between what CDK and Reynolds charged before they entered their illegal agreement and enhanced their market power, and what they charge now. Under both measurements, the price increases have been immense.

**ANSWER**: Paragraph 213 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that Plaintiff or any other individual or entity has suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiff is entitled to the relief it seeks. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 213 of the Complaint that are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 213 of the Complaint.

### 1. CDK and Reynolds Have Imposed Massive Price Increases As Compared to What Authenticom Charged

214. Data integrators charge vendors per dealership rooftop, sometimes referred to as a "connection." Thus, if a dealer has ten rooftops (i.e., ten individual franchises), then the vendor would need ten separate connections for that dealer. To pull data, Authenticom has consistently charged vendors $25 for one data feed and $50 for two or more (up to seven). On average, Authenticom charges vendors between $30 and $40 a month per connection. For bi-directional access to dealer data, Authenticom has generally charged $75 per connection. Other independent data integrators charged similar rates. For example, between 2008 and 2016, SIS charged around $40 per connection for pulling data and $70 per connection for bi-directional access (until it was forced out of the data integration market).

**ANSWER**: Upon information and belief, CDK admits that certain so-called "data integrators," like Authenticom, charge Vendors on a per dealership rooftop basis. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 214 that relate to Authenticom or other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 214 of the Complaint.

215. CDK and Reynolds now charge far higher rates than those charged by Authenticom and former data integrators. One prominent vendor paid Authenticom $35 per month to pull data; when it was forced to join the RCI program for data integration services, the monthly rate charged by Reynolds was $210, a 500 percent increase. Another large vendor purchased data integration services from SIS for years, at a rate of $45 to $50 per month. That vendor now pays Reynolds and CDK monthly charges of between $300 and $866 (Reynolds) and between $300 and $700 (CDK).

**ANSWER**: CDK admits that certain of its rates—including those for bi-directional access, real-time data updates, and more complex data packages—are higher than the $35 Authenticom is alleged to charge on a monthly basis to "pull data" but denies that all of its "rates" are higher than those allegedly charged by Authenticom and other so-called "data integrators." CDK further denies that its pricing (or "rates") is properly compared to Authenticom's pricing. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 215 of the Complaint relating to individuals or entities other than CDK and/or are

directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 215 of the Complaint.

216. In addition to these monthly fees, CDK and Reynolds also charge vendors enormous upfront fees to initiate services. CDK and Reynolds charge at least $30,000 to join the 3PA and RCI programs, with "setup" fees of around $300 (or more) per connection. These initiation fees are much more than anything charged by Authenticom and other independent data integrators. For example, Authenticom collects an upfront fee of $2,500, but that fee is credited against the first invoices. Moreover, Authenticom does not charge an additional per-connection setup fee as CDK and Reynolds do.

**ANSWER**: CDK admits that it charges vendors fees for certification and installation services. CDK denies that those fees are "enormous" but states that they reflect the value of the products at issue. CDK denies that it charges "at least" $30,000 to join the 3PA program. CDK admits that it charges for set-up fees varied, depending on the complexity of the interface needed by each vendor. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 216 of the Complaint relating to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 216 of the Complaint.

### 2. CDK and Reynolds Have Dramatically Increased the Prices for Their Own Data Integration Services

217. CDK and Reynolds dramatically raised their data integration fees upon entering into their conspiracy in February 2015 to divide the market and coordinate their efforts to block Authenticom and other independent data integrators.

**ANSWER**: Paragraph 217 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 217 that are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 217 of the Complaint.

218. Before entering the agreement with Reynolds in February 2015, CDK charged an average of $70 per connection. Since 2015, the average cost per connection has risen to at least

$250 to $300 (and often much more). This constitutes, at the conservative end, an increase in the range of 250 to 325 percent in the price of data integration services.

**ANSWER**:    CDK admits that beginning in 2015, CDK sought to standardize its integration

pricing and that, as a result, some Vendors' prices increased.    CDK denies the remaining

allegations in paragraph 218 of the Complaint.

219.    CDK's prices for the 3PA program stand in stark contrast to the prices CDK charges for data access to non-CDK dealers. Today, CDK (through Digital Motorworks and IntegraLink) charges between $25 and $50 per connection to non-CDK dealers, while it charges on average between $250 and $300 for the same services to CDK dealers.

**ANSWER**:    CDK denies the allegations in paragraph 219 of the Complaint.

220.    As for Reynolds, before 2010, Reynolds generally charged vendors less than $100 per month per connection. By 2013 – after it had begun to block independent data integrators and impose (and enforce) exclusivity provisions in its contracts with dealers and vendors – Reynolds raised its monthly prices per connection from less than $100 to between $300 and $500. This constitutes a price increase in the range of 200 to 400 percent in the price of data integration services. And since Defendants entered the agreement in 2015, Reynolds has been raising its prices for data integration services even more, including by charging many vendors a transaction charge for every data pull. CDK has instituted the same practice of charging some vendors an additional per-transaction fee on top of their already large monthly fees.

**ANSWER**:    CDK admits that it charges certain Vendors a per-transaction fees for more

complex data transactions.    CDK lacks sufficient knowledge or information to form a belief as to

the truth of the allegations in paragraph 220 of the Complaint that are directed toward other

defendants and on that basis denies them.    CDK denies the remaining allegations in paragraph

220 of the Complaint.

### 3.    The Evidence of CDK's and Reynolds' Price Increases Is Overwhelming

221.    Leading industry publications have reported widely on the price increases imposed by CDK and Reynolds on data integration services.

**ANSWER**:    CDK admits that certain publications purport to have reported on prices charged

by CDK and Reynolds in connection with their respective managed interface programs.    CDK

lacks sufficient knowledge or information to form a belief as to the truth of the allegations in

paragraph 221 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 221 of the Complaint.

222. In July 2015, shortly after CDK and Reynolds entered their agreement, *Automotive News* reported that "CDK said it intends to charge each third-party vendor... between $250 and $300 a month per store for each software product. The current fees average about $70 per software product."[34] Another "vendor executive said the new program would raise monthly data fees from about $50 per store per month today to as much as $600 for customer relationship management software." *Id*. As for Reynolds, "[p]articipation costs one CRM vendor more than $700 a month per Reynolds store. The vendor requested anonymity because Reynolds has strict nondisclosure provisions in its vendor contracts." *Id*.

**ANSWER**: CDK admits that paragraph 222 of the Complaint accurately quotes selected parts of the publication cited in footnote 34. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 222 of the Complaint that relate to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 222 of the Complaint.

223. Other publications reported similarly. "According to numerous vendors I've talked with," The Banks Report wrote in October 2015, "prices to access data in CDK's systems under the new initiative could increase anywhere from 300% to 800%."[35] In the face of such massive price increases, "[d]ealers are caught in the middle – either they'll end up seeing increased charges from their vendors or, they'll see a sudden drop off in service from their vendors." *Id*. In February 2017, The Banks Report provided an update, noting that "vendors complain the pricing is creating an untenable situation in the industry. Two separate vendors shared with TBR during the recent NADA convention that they each pay a combined $30 million to CDK and Reynolds for access rights."[36] One dealer – Friendship Enterprises from Bristol, Tennessee – told *Automotive News* in December 2016 that, as a result of "CDK's data surcharge," it has large "'overhead [expenses] now that we shouldn't have. It's our data.'"[37]

**ANSWER**: CDK admits that paragraph 223 of the Complaint accurately quotes the publications cited in footnotes 35-37. CDK lacks sufficient knowledge or information to form a

---

[34] David Barkholz, *Dealers Will Pay Up for Vendors' Data Access After CDK Switch*, Automotive News (July 20, 2015).
[35] Cliff Banks, *Data Access Battle Goes Nuclear*, The Banks Report (Oct. 12, 2015).
[36] Cliff Banks, *CDK, Reynolds and Reynolds Sued for Alleged Antitrust Practices*, The Banks Report (Feb. 4, 2017).
[37] Vince Bond Jr., *"Held Hostage": Dealer's Battle with Software Giants Escalates*, Automotive News (Dec. 26, 2016).

PUBLIC REDACTED VERSION

belief as to the truth of the allegations in paragraph 223 of the Complaint relating to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 223 of the Complaint.

### 4. CDK and Reynolds Continue to Charge Dealers Escalating Fees for DMS Services

224. As described above, because vendors cannot absorb the massive price increases imposed by CDK and Reynolds, vendors pass most if not all the increased data integration fees down to dealers. At the same time, and despite this new source of revenue, CDK and Reynolds have done nothing to reduce fees for DMS services. On the contrary, CDK and Reynolds ratchet up the DMS fees year after year, with no price break to dealers to make up for the pass-through costs for data integration.

**ANSWER**: Paragraph 224 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 224 of the Complaint relating to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 224 of the Complaint.

225. Both CDK and Reynolds have fee escalation clauses in their DMS contracts with dealers. The standard Reynolds contract provides that DMS fees go up every year on March 1. The price increase is therefore automatic, and is measured by the Customer Price Index plus 2%. The standard CDK contract gives dealers price protection for the first year of the DMS contract, but imposes a 6% automatic yearly price increase thereafter. As a result, dealers are hit from both sides: rapidly escalating data integration fees and contractually mandated, annual DMS price hikes.

**ANSWER**: CDK admits that annual price changes are dictated by contract with each of its Dealer customers. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 225 of the Complaint relating to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 225 of the Complaint.

PUBLIC REDACTED VERSION

### B.    Defendants' Anticompetitive Conduct Has Harmed Competition in Many Other Ways

226.    Besides the massive, supracompetitive price increases for data integration services, Defendants have harmed competition in many other ways as well.

**ANSWER**:    CDK denies the allegations in paragraph 226 of the Complaint.

227.    First, Defendants' conduct reduces dealership and vendor choice in the data integration market. Many dealerships and vendors prefer using Authenticom because of its superior product and service (and cheaper price), but Defendants are preventing dealerships and vendors from making that choice. Defendants require dealers and vendors – i.e., the customers on both sides of the Dealer Data Integration Market – to use Defendants' integration services regardless of the customers' preferences. And dealers and vendors have no choice given the elimination of competitors, the blocking of Authenticom, and the exclusive dealing provisions.

**ANSWER**:    Paragraph 227 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 227 of the complaint relating to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them.  CDK denies the remaining allegations in paragraph 227 of the Complaint.  In addition, Plaintiff's claims and theories premised on CDK's contracts with its Dealer customers were dismissed by the Court and have not been repled.  Dkt. 176.

228.    Second, Defendants' conduct is also reducing output in the data integration market, as well as the downstream market for third-party applications. Dealers are on record stating that they do not use some of their preferred vendors because of the huge pass-through data integration fees. Instead, the dealers either go without a vendor for that particular service, or they use a less preferable alternative (usually the one offered by CDK and Reynolds). There has also been reduced output in terms of fewer overall connections. And because Defendants now charge some vendors an additional per-transaction fee, those vendors are economizing by reducing the output of data they receive.

**ANSWER**:    Paragraph 228 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 228 of the Complaint relating to individuals or entities other than CDK and/or are directed toward other defendants and

on that basis denies them. CDK denies that it charges Vendors a per-transaction fee for standard integration services. CDK denies the remaining allegations in paragraph 228 of the Complaint.

229. Third, Defendants' actions are thwarting innovation and reducing product quality in the third-party application market. The market for third party applications exploded due to the reliable and inexpensive access to dealer data provided by Authenticom and other independent data integrators. But now, dramatically more expensive data access means fewer new vendors and less opportunity for vendors to innovate. Moreover, many vendors have made the hard realization that their businesses are no longer sustainable with the higher data access costs and have exited the market. Dealers are therefore left with fewer products and services from which to choose. Even though vendors generally pass on a substantial percentage of the increased data costs to dealers, many vendors have no choice but to absorb some of the increased data fees – resulting in slashed budgets for research and development, support, and other investments in their products. These cost-cutting measures will ultimately reduce the quality of the products and diminish the support that the dealers receive.

**ANSWER**: Paragraph 229 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 229 of the complaint relating to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 229 of the Complaint.

230. Fourth, Defendants' actions have reduced the quality of data integration itself. By propping up their inferior data integration products, and trying to eliminate a superior one (Authenticom's DealerVault product, for example, with its dealer control and visibility over data extraction and syndication), Defendants are reducing the quality of the products in the market. As one Mercedes dealership in California wrote, "I am as sick of [CDK] . . . trying to force us into using their inferior offerings."

**ANSWER**: Paragraph 230 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the third sentence of paragraph 230 of the Complaint that relate to whether other quoted text is attributed to a Mercedes Dealer in California or accurately stated and on that basis denies them. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 230 of the complaint

relating to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 230 of the Complaint

231. Finally, in concentrated markets, injury to a competitor harms not just that competitor, but competition generally. CDK and Reynolds have already driven out all of their competitors except for one – Authenticom. By driving Authenticom out of business, Defendants are by definition harming competition in the concentrated (indeed, monopolized) CDK and Reynolds Dealer Data Integration aftermarkets.

**ANSWER**: Paragraph 231 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 231 of the Complaint.

## V. Authenticom Has Suffered Antitrust Injury

232. The same anticompetitive conduct that has injured competition has also directly and significantly damaged Authenticom. Defendants' written market division agreement caused many vendors to leave Authenticom for Digital Motorworks (i.e., CDK) during the "wind-down period" because those vendors knew they would not be blocked during that period, even if the vendors eventually would be forced to join the RCI program. The written agreement also was a key component of Defendants' overarching agreement to eliminate competition – including Authenticom – in the primary data integration market and the secondary aftermarkets. Defendants' exclusive dealing provisions prohibit dealers and vendors from using Authenticom's data integration services. And in carrying out their campaign to drive out competitors, Defendants have continuously disrupted Authenticom's ability to access dealer data by, among other tactics, disabling Authenticom's dealer-created log-in credentials.

**ANSWER**: Paragraph 232 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that it has taken steps to disrupt Authenticom's hostile, unauthorized access to its DMS including by disabling certain dealer-created log-in credentials. CDK denies the remaining allegations in paragraph 232 of the Complaint.

233. Because Authenticom's business and revenues depend on its ability to access dealer data and provide data integration services to dealers and vendors, Defendants' anticompetitive conduct has nearly destroyed the entirety of Authenticom's business. As a result of Defendants' actions, the number of data feeds that Authenticom has established for vendors has sharply declined. Authenticom's profits, as measured by EBITDA, dropped by 77.22 percent

PUBLIC REDACTED VERSION

from the third quarter of 2015, when Defendants intensified their blocking efforts, to the first quarter of 2017. Defendants' actions have left Authenticom cash flow insolvent, with insufficient earnings and resources to satisfy its outstanding debt obligations. Authenticom was unable to pay an $11 million principal payment on a loan from BMO Harris Bank due April 16, 2017, and has received a limited 90-day forbearance from the Bank pending the outcome of the forthcoming preliminary injunction motion. Authenticom was also unable to pay an approximately $1.17 million tax-related obligation due April 18, 2017. Authenticom has sought additional financing from, among others, BMO Harris Bank and Citizens State Bank, but they have declined to provide this financing, citing doubts about Authenticom's continued viability because of Defendants' actions.

**ANSWER**:    Upon information and belief, CDK denies that Authenticom is "cash flow insolvent" or otherwise on the brink of demise.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 233 of the complaint relating to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them.  CDK denies the remaining allegations in paragraph 233 of the Complaint.

## VI.    Defendants' Anticompetitive Conduct Has No Pro-Competitive Justification

234.    There are no pro-competitive justifications that excuse Defendants' misconduct. Defendants' conduct has not reduced price, increased output, or improved quality. On the contrary, as outlined above, Defendants' anticompetitive conduct has dramatically increased prices, reduced output, restricted customer choice, suppressed innovation, and diminished product quality.

**ANSWER**:    Paragraph 234 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 234 of the Complaint.

235.    Defendants' argument for their anticompetitive conduct is that it is necessary to protect "data security." By extension, Defendants have claimed that Authenticom (and all other independent data integrators) are "unsecure" and pose a threat to the security of dealer data. In other words, CDK and Reynolds argue that, in order to protect dealer data, it is necessary for them to (1) agree to divide the data integration market; (2) impose exclusive dealing provisions in vendor and dealer contracts; (3) agree to block independent data integrators from pulling data; and (4) drive out all competitors from the data integration market, including Authenticom. Instead of protecting dealer data, the only fruits of that anticompetitive conduct are monopoly profits and the protection of Defendants' DMS duopoly.

**ANSWER**:    Paragraph 235 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK admits that one of the reasons it

has taken steps, consistent both with its contracts with its Dealer customers and with CDK's need

to provide a stable and secure DMS product to its Dealer customers, to block hostile third-party

to its DMS is that Authenticom and other hostile data extractors are "unsecure" and pose threats

to security.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the

allegations in paragraph 235 of the Complaint relating to individuals or entities other than CDK

and/or are directed toward other defendants and on that basis denies them.  CDK denies the

remaining allegations in paragraph 235 of the Complaint.  In addition, Plaintiff's claims and

theories premised on CDK's contracts with its Dealer customers and Defendants' purported

"market division" agreement were dismissed by the Court and have not been repled.  Dkt. 176.

236.    As evidenced by many facts, Defendants' "security" rationale is a pretext.

**ANSWER**:    CDK denies the allegations in paragraph 236 of the Complaint.

237.    First, there is nothing unusual or unsecure about independent data integrators like
Authenticom. CDK owns two data integrators – Digital Motorworks and IntegraLink – that pull
and syndicate data in the same way as Authenticom: using login credentials provided by the
dealer and then transferring the data to vendors. Malcolm Thorne – CDK's then chief strategy
officer – told *Automotive News* in March 2015 that "the pull process of extracting data is as safe
as pushing out." Indeed, until they entered their agreement in February 2015, CDK pulled data
using login credentials from Reynolds dealers, and CDK continues to pull data in this way from
dealers using other DMS systems. And Reynolds for over a decade allowed independent data
integrators to provide services for Reynolds dealers. It was only after Mr. Brockman acquired the
company that it changed positions. A top-level CDK executive admitted in private conversation
with a vendor that the rhetoric around "security" has "little credibility" and is primarily designed
to force vendors to use CDK for data integration.

**ANSWER**:    CDK admits that the quoted text in paragraph 237 of the Complaint attributable to

former CDK employee Malcolm Thorne appears in a March 2015 *Automotive News* article.

CDK further admits that certain of its subsidiaries, specifically DMI and IntegraLink, did, during

certain times during the relevant period, extract certain data from the Reynolds DMS in

fulfillment of certain contracts the companies had with certain Vendors. CDK denies that DMI and IntegraLink pull and syndicate data in the same way as Authenticom: among other differences, DMI and IntegraLink have wound down their former practices of using dealer-issued login credentials to access other DMSs. Today, they only do so for a handful of DMSs where such access is specifically authorized through contractual agreements with the DMS provider or with the DMS provider's express permission. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 237 of the Complaint relating to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 237 of the Complaint.

238. Using login credentials to pull data is standard across industries, including in banking and healthcare, where the data is much more sensitive than anything accessible from dealers. Taking the banking industry as an example, thousands of third party applications – from well-established ones like PayPal, Mint, Square, and Quicken to new startups like Even – require access to a customer's banking data. There are large data integrators like Intuit and Yodlee that pull data from the consumers' bank accounts using login credentials and provide that data to the third party applications. As the Consumer Financial Protection Bureau recently summarized, "Typically, consumers provide their account credentials for a particular company or financial institution where they hold an account. Those credentials are then used to obtain their account data through either: (1) A structured data feed or an application program interface (API) hosted by the company or financial institution, or (2) the company or financial institution's consumer-facing website in a process known as screen-scraping."[38] Indeed, "screen scraping is the only technology that enables all of the thousands of small financial institutions to participate in the data-sharing ecosystem."[39] And that ecosystem – just as in the automobile industry – has been critical for the development of many innovations in the banking industry. As the Consumer Financial Protection Bureau stated, "the availability of consumer financial account data. . . has made possible a range of benefits to consumers."[40]

**ANSWER**:    CDK admits that the quoted text in paragraph 238 of the Complaint appears in the

sources referenced in footnotes 38, 39, and 40. CDK denies that any of those sources support

---

[38] Consumer Access to Financial Records, Request for Information, Bureau of Consumer Financial Protection, Docket No.: CFPB-2016-0048, at 9 (Nov. 17, 2016).
[39] Jennifer Tescher and Beth Brockland, *One-off Data-Sharing Deals Aren't Enough*, American Banker (Jan. 27, 2017).
[40] *Consumer Access to Financial Records*, Request for Information, Bureau of Consumer Financial Protection, Docket No.: CFPB-2016-0048, at 7 (Nov. 17, 2016).

Authenticom's unauthorized access and data extraction methods. CDK denies the remaining allegations in paragraph 238 of the Complaint.

239. Mr. Brockman has justified Reynolds' blocking of independent data integrators by arguing that there is "within the dealership system as much personal information as there would be inside banks. Can you imagine a bank that would have a dial-in modem attached to its system where, if the bank felt like it, it could give out the password and let third parties access it? The suggestion is ludicrous."[41] In fact, contrary to Mr. Brockman's suggestion, that is exactly what happens in the banking industry. Mr. Brockman got his analogy wrong in another way: it is the actual customer, the owner of the data, that provides the login credentials, not the bank or the DMS provider.

**ANSWER**: CDK admits that the language quoted in paragraph 239 of the Complaint appears in the article cited in footnote 41. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 239 of the Complaint and on that basis denies them.

240. Second, as a substantive matter, CDK and Reynolds have no basis to claim that Authenticom is unsecure. Authenticom has never had a data breach and its firewall has never been compromised. Authenticom pulls data using standard industry protocols. To transfer data, Authenticom uses encryption protocols that meet or exceed federal standards for banking transactions. Microsoft has certified Authenticom with its top-level gold security certification three years in a row. If there was a security incident (and there never has been one), Authenticom has agreed to indemnify dealers for any resulting harm. Authenticom is also insured with a $20 million dollar cyber liability insurance policy. Authenticom has an information security system that is in full accordance with applicable consumer privacy and protection restrictions, including the Gramm-Leach-Bliley Act of 1999 and the Federal Trade Commission's Implementing Rules. Indeed, dealers require that Authenticom comply with data privacy regulatory requirements. In short, CDK and Reynolds have no basis to use "data security" as a reason to destroy Authenticom's business.

**ANSWER**: CDK admits that that Authenticom purports to have a $20 million liability insurance policy (or policies). CDK denies that the allegations in paragraph 240 of the Complaint accurately characterize the policies, which speak for themselves. CDK denies that the terms of such policy are sufficient to indemnify Authenticom or others from the potential loss resulting

---

[41] Ralph Kisiel, *Question & ANSWER: Deal Puts Brockman in the Spotlight*, Automotive News (Feb. 19, 2007).

from a breach of Authenticom's servers. CDK denies the remaining allegations in paragraph 240 of the Complaint.

241. Third, as detailed above, Reynolds and CDK actually use Authenticom as a data integrator for certain of their third party applications. CDK and Reynolds pay Authenticom to pull data from dealerships using their DMS systems and distribute that data to their applications. Furthermore, one Defendant has agreed to stop disabling Authenticom's login credentials for one of the Defendant's largest dealer customers in response to that dealer's demands. Only a select few dealership groups has this customer's size and clout. But the fact that Authenticom pulls data from this large dealership group with the Defendant's blessing – in addition to the fact that Reynolds and CDK actually use Authenticom for integration services – proves there is nothing "unsecure" about Authenticom's process or security protocol.[42]

**ANSWER**: CDK admits that AVRS, a subsidiary of CVR which, in turn, is a joint venture between CDK and Reynolds that provides EVR services in California, used Authenticom for certain data access services at the time of CVR's acquisition of AVRS in 2015. As AVRS's operations are incorporated into CVR, its use of Authenticom is being discontinued and it currently uses Authenticom for a small number of CDK and Reynolds dealers with legacy DMS software. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 241 of the Complaint and footnote 42 relating to individuals or entities other than CDK and/or are directed toward other defendants and on that basis denies them. CDK denies the remaining allegations in paragraph 241 and footnote 42 of the Complaint.

**FIRST CAUSE OF ACTION:**
**HORIZONTAL CONSPIRACY IN VIOLATION OF**
**SECTION 1 OF THE SHERMAN ACT**

242. Authenticom incorporates by reference the preceding allegations.

---

[42] If CDK and Reynolds were concerned about data security instead of monopoly profits, then there are a number of less restrictive means to protect dealer data. Most obviously, they could establish "application program interfaces" – called APIs – with independent data integrators. Before entering the agreement with Reynolds, CDK even advocated that DMS providers should establish APIs for data integrators. Indeed, some of the smaller DMS providers do provide APIs for Authenticom, Digital Motorworks, and IntegraLink. Other DMS providers send regularly scheduled data reports to Authenticom, which is another less restrictive means. There are many others. Moreover, Authenticom has repeatedly offered to discuss its security protocols with CDK and Reynolds. Not once have Defendants taken Authenticom up on its offer.

PUBLIC REDACTED VERSION

**ANSWER**:   CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

243.   CDK and Reynolds entered into and engaged in an agreement in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

**ANSWER**:   Paragraph 243 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 243 of the Complaint.

244.   CDK and Reynolds are horizontal competitors of one another in the DMS Market and the Dealer Data Integration Market.

**ANSWER**:   Paragraph 245 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that CDK are horizontal competitors in the licensing of DMSs.  CDK denies the remaining allegations in paragraph 244 of the Complaint.

245.   The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding, or concerted action to eliminate competition in the Dealer Data Integration Market and their respective aftermarkets. In furtherance of that conspiracy, in February 2015, they entered into a written market division agreement pursuant to which they agreed to no longer compete in the Dealer Data Integration Market. CDK and Reynolds also engaged in a group boycott to block all other third-party data integrators (such as Authenticom) from accessing data of dealers using Defendants' respective DMS systems. Defendants' conspiracy is a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

**ANSWER**:   Paragraph 245 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 245 of the Complaint.

246.   The purpose of Defendants' conspiracy is twofold: (1) to protect their DMS duopoly and (2) to drive competing data integrators out of the Dealer Data Integration Market and their respective aftermarkets, thereby protecting and increasing the flow of monopoly profits to CDK and Reynolds.

**ANSWER**:     Paragraph 246 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 246 of the Complaint.

247.     Defendants' conspiracy was intended to harm interstate commerce, and it has had an actual, substantial effect on interstate commerce.

**ANSWER**:     Paragraph 247 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 247 of the Complaint.

248.     Through their conspiracy, Defendants have caused actual injury to competition in the Dealer Data Integration Market and their respective aftermarkets.

**ANSWER**:     Paragraph 248 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 248 of the Complaint.

249.     The CDK and Reynolds agreement has cut off Authenticom's access to dealer data that Authenticom needs in order to compete with CDK and Reynolds in the Dealer Data Integration Market.

**ANSWER**:     Paragraph 249 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 249 of the Complaint.

250.     CDK and Reynolds possess dominant positions in the DMS Market, which they have utilized to further the conspiracy.

**ANSWER**:     Paragraph 250 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 250 of the Complaint.

251.     Defendants' conspiracy and anticompetitive conduct in furtherance thereof do not enhance efficiency or competition in the Dealer Data Integration Market. On the contrary, Defendants' conduct has produced only anticompetitive effects in that market.

**ANSWER**:    Paragraph 251 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 251 of the Complaint.

252.    As a direct and proximate result of Defendants' unlawful conduct, Authenticom has suffered injury to its business or property. Authenticom is entitled to treble damages for the violations of the Sherman Act alleged herein.

**ANSWER**:    Paragraph 252 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that Plaintiff or any other individual or entity has suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiff is entitled to the relief it seeks.  CDK denies the remaining allegations in paragraph 252 of the Complaint.

**SECOND CAUSE OF ACTION:**
**EXCLUSIVE DEALING PROVISIONS IN VIOLATION OF**
**SECTION 1 OF THE SHERMAN ACT**

253.    Authenticom incorporates by reference the preceding allegations.

**ANSWER**:    CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.  This claim, to the extent based upon CDK's Dealer contracts, has been dismissed and has not been repled by Plaintiff.  Dkt. 176.

254.    CDK and Reynolds entered into contracts with dealers and vendors that contain exclusive dealing provisions that unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

**ANSWER**:    Paragraph 254 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 254 of the Complaint.

255.    Pursuant to their conspiracy to eliminate competition in the Dealer Data Integration Market and respective aftermarkets, CDK and Reynolds inserted exclusive dealing provisions in their contracts with dealers and vendors. The contracts with dealers provide that dealers cannot provide access to their data to any data integrator except CDK or Reynolds, respectively. Likewise, the contracts with vendors provide that vendors cannot obtain data for

PUBLIC REDACTED VERSION

dealers using the CDK or Reynolds DMS systems from any data integrator except CDK or Reynolds, respectively. These provisions are standard throughout Defendants' contracts with dealers and vendors.

**ANSWER**:     Paragraph 255 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

255 of the Complaint.

256.    CDK and Reynolds were able to impose these exclusive dealing provisions on dealers and vendors as a result of their market power in the DMS Market (dealers) and the Data Integration Market (vendors).

**ANSWER**:     Paragraph 256 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

256 of the Complaint.

257.    Because CDK and Reynolds imposed these exclusive dealing provisions pursuant to their conspiracy to eliminate competition in the Dealer Data Integration Market and respective aftermarkets, they are per se illegal. Nevertheless, whether entered into pursuant to an agreement between Defendants or independently, because these agreements, individually and collectively, unreasonably foreclose competition in a substantial portion of the Dealer Data Integration Market and are likely to, and in fact have, led to increased prices in that market beyond competitive levels, these agreements constitute an unreasonable and unlawful restraint of trade under the rule of reason.

**ANSWER**:     Paragraph 257 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

257 of the Complaint.

258.    Through these exclusive dealing provisions, Defendants have caused actual injury to competition in the Dealer Data Integration Market.

**ANSWER**:     Paragraph 258 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies that Plaintiff or any other

individual or entity has suffered any injury as a result of any action or conduct of CDK.  CDK

denies the remaining allegations in paragraph 258 of the Complaint.

259. The exclusive dealing agreements have, individually and collectively, substantially foreclosed Authenticom's access to dealer data that Authenticom needs in order to compete with CDK and Reynolds in the Dealer Data Integration Market.

**ANSWER**: Paragraph 259 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 259 of the Complaint.

260. Defendants' exclusive dealing agreements do not enhance efficiency or competition in the Dealer Data Integration Market. On the contrary, the agreements have produced only anticompetitive effects in that market.

**ANSWER**: Paragraph 260 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 260 of the Complaint.

261. As a direct and proximate result of Defendants' unlawful conduct, Authenticom has suffered injury to its business or property. Authenticom is entitled to treble damages for the violations of the Sherman Act alleged herein.

**ANSWER**: Paragraph 261 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that Plaintiff or any other individual or entity has suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiff is entitled to the relief it seeks. CDK denies the remaining allegations in paragraph 261 of the Complaint.

## THIRD CAUSE OF ACTION:
## ILLEGAL TYING IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

262. Authenticom incorporates by reference the preceding allegations.

**ANSWER**: CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint. This claim has been dismissed in its entirety and has not been repled by Plaintiff. Dkt. 176.

263. CDK and Reynolds have imposed tying arrangements on dealers that unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

**ANSWER**: Paragraph 263 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 263 of the Complaint.

264. CDK and Reynolds have tied dealers' use of Defendants' integration services to their DMS services. That is, as a condition of dealers using Defendants' DMS services, Defendants also require dealers to use Defendants' own integration services and not use their competitors' integration services. Thus, Defendants coerce customers of their DMS systems – i.e., the dealers – into using Defendants' dealer data integration services.

**ANSWER**: Paragraph 264 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 264 of the Complaint.

265. DMS systems are a separate and distinct product from dealer data integration services.

**ANSWER**: CDK denies the allegations in paragraph 265 of the Complaint.

266. Defendants have sufficient market power in the tying market (the market for DMS services, where they have had a longstanding duopoly) to appreciably restrain free competition in the market for the tied product (dealer data integration services). Defendants have demonstrated their ability to leverage their market power in the tying market (DMS services) to control prices and exclude competition in the tied market (integration services).

**ANSWER**: Paragraph 266 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 266 of the Complaint.

267. Defendants' tying arrangements have affected a substantial amount of interstate commerce.

**ANSWER**: Paragraph 267 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 267 of the Complaint.

PUBLIC REDACTED VERSION

268.    Defendants' tying arrangements are a per se violation of the federal antitrust laws and are, in any event, unreasonable and unlawful restraints of trade and commerce.

**ANSWER**:    Paragraph 268 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 268 of the Complaint.

269.    As a direct and proximate result of Defendants' unlawful tying arrangement, Authenticom has suffered injury to its business or property. Authenticom is entitled to treble damages for the violations of the Sherman Act alleged herein.

**ANSWER**:    Paragraph 269 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that Plaintiff or any other individual or entity has suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiff is entitled to the relief it seeks.  CDK denies the remaining allegations in paragraph 269 of the Complaint.

## FOURTH CAUSE OF ACTION:
## MONOPOLIZATION OF THE DEALER DATA INTEGRATION AFTERMARKETS IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

270.    Authenticom incorporates by reference the preceding allegations.

**ANSWER**:    CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

271.    Defendants CDK and Reynolds have unlawfully monopolized their respective Dealer Data Integration aftermarkets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER**:    Paragraph 271 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 271 of the Complaint.

272.    In the primary DMS product market, Defendants have a longstanding duopoly. When dealers purchase Defendants' brand of DMS, they are "locked in" to that brand through long-term contractual relationship and high switching and information costs.

**ANSWER**:     Paragraph 272 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 272 of the Complaint.

273.     Because of customer lock-in in the primary DMS market, Defendants have monopolized the aftermarkets for dealer data integration services on their respective DMS platforms.  CDK and Reynolds have demonstrated their ability to control prices and exclude competition by blocking third-party integrators from accessing dealer data stored on their systems and by profitably raising integration fees to supracompetitive levels.

**ANSWER**:     Paragraph 273 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 273 of the Complaint.

274.     CDK and Reynolds used anti-competitive means to acquire and maintain their monopolies in the aftermarkets for dealer data integration services, including, *inter alia*, by blocking and disabling third-party integrators from accessing dealer data, entering into a market division agreement pursuant to which they agreed not to compete in the aftermarkets, and imposing anticompetitive exclusive dealing arrangements on vendors and dealers.

**ANSWER**:     Paragraph 274 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 274 of the Complaint.

275.     Defendants' ability to exclude competition and impose massive price increases demonstrate their market power in the aftermarkets.  And such conduct has no procompetitive business justification.

**ANSWER**:     Paragraph 275 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 275 of the Complaint.

276.     As a direct and proximate result of Defendants' unlawful conduct, Authenticom has suffered injury to its business or property. Authenticom is entitled to treble damages for the violations of the Sherman Act alleged herein.

**ANSWER**:     Paragraph 276 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that Plaintiff or any other

individual or entity has suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiff is entitled to the relief it seeks. CDK denies the remaining allegations in paragraph 276 of the Complaint.

## FIFTH CAUSE OF ACTION: TORTIOUS INTERFERENCE

277. Authenticom incorporates by reference the preceding allegations.

**ANSWER**: CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

278. Defendants have tortiously interfered with Authenticom's existing contracts with dealers and vendors, in violation of Wisconsin state law.

**ANSWER**: Paragraph 275 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 275 of the Complaint.

279. Authenticom has contracts with thousands of dealers. In those contracts, dealers contract with Authenticom to extracts dealer data for purposes of providing data integration services. Authenticom also has contracts with hundreds of vendors. In those contracts, vendors contract with Authenticom to provide them with standardized dealer data for use in the vendors' applications.

**ANSWER**: CDK denies that Dealers that have licensed CDK's DMS can authorize or otherwise permit Authenticom to access or use CDK's DMS. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 279 of the Complaint and on that basis denies them.

280. Both CDK and Reynolds tortiously interfered with Authenticom's contracts with dealers and vendors when they blocked Authenticom from providing dealer data integration services, including by disabling Authenticom's dealer-created login credentials. CDK and Reynolds likewise interfered with Authenticom's dealer and vendor contracts by spreading false and disparaging information about Authenticom's security practices and protocol.

**ANSWER**:    Paragraph 280 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 280 of the Complaint.

281.    Both CDK and Reynolds knew about Authenticom's contracts with dealers and vendors when they interfered with those contracts. In fact, many of Authenticom's contracts with dealers and vendors predated any contract that Defendants may have with those third parties.

**ANSWER**:    Paragraph 281 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 281 of the Complaint.

282.    As a result of Defendants' interference, many dealers and vendors terminated their contracts with Authenticom. Defendants' interference was intentional and designed to produce this result.

**ANSWER**:    Paragraph 282 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 282 of the Complaint.

283.    Defendants' interference damaged Authenticom by causing its vendor and dealer customers to terminate their contracts with Authenticom, and leave Authenticom's data integration business and go to Defendants' integration businesses.

**ANSWER**:    Paragraph 283 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 283 of the Complaint.

284.    It was foreseeable to Defendants that their interference would cause these damages. In fact, Defendants specifically intended to cause these damages by blocking Authenticom and preventing it from being able to provide data integration services.

**ANSWER**:    Paragraph 284 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 284 of the Complaint.

285.    Defendants were not justified or privileged to interfere with Authenticom's contracts. Indeed, Defendants' interference was and is illegal under federal antitrust laws.

**ANSWER**:    Paragraph 285 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 285 of the Complaint.

286.    At trial, Authenticom will prove the precise amount of damages suffered.

**ANSWER**:    Paragraph 286 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that Plaintiff or any other individual or entity has suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiff is entitled to the relief it seeks.  CDK denies the remaining allegations in paragraph 286 of the Complaint.

## JURY DEMAND

In accordance with Federal Rule of Civil Procedure 38(b), Authenticom demands a trial by jury on all issues so triable.

**ANSWER:**    To the extent that an answer may be required to the Jury Demand at the end of Plaintiff's Complaint, CDK denies each and every allegation therein.

## PRAYER FOR RELIEF

WHEREFORE, Authenticom requests that the Court:

(a)    decree that the conduct alleged herein is an illegal restraint of trade in violation of Section 1 of the Sherman Act;

(b)    decree that the conduct alleged herein is an illegal monopoly, attempted monopolization, and conspiracy to monopolize in violation of Section 2 of the Sherman Act;

(c)    decree that the exclusive dealing provisions in Defendants' contracts with vendors and dealers are anticompetitive and illegal restraints of trade under Section 1 of the Sherman Act;

(d)    preliminarily and permanently enjoin the enforcement of the exclusive dealing provisions in the CDK and Reynolds contracts with dealers and vendors;

119

(e)      preliminarily and permanently release vendors from the term commitments (i.e., the multi-year terms) in their contracts with CDK and Reynolds;

(f)      preliminarily and permanently enjoin CDK and Reynolds from blocking or disabling Authenticom's access to dealer data for purposes of providing dealer data integration services;

(g)      award Authenticom damages, as provided under the Sherman Act, and that a joint and several judgment in favor of Authenticom be entered against Defendants in an amount to be trebled in accordance with such laws;

(h)      award Authenticom its reasonable costs and expenses incurred in this action, including expert fees and attorney's fees;

(i)      award Authenticom prejudgment interest; and

(j)      award Authenticom any such further relief that the Court may deem just and proper.

**ANSWER:**      To the extent that an answer may be required to the Prayer for relief at the end of the Complaint, CDK denies each and every allegation contained therein and denies that Plaintiff is entitled to the relief it seeks.

\* \* \* \* \* \*

## DENIAL

CDK denies each and every allegation of the Complaint not specifically admitted above.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

Without assuming any burden of proof that it would not otherwise bear, CDK also asserts the following affirmative and additional defenses:

## First Defense

The Complaint fails to state a claim upon which relief may be granted.

PUBLIC REDACTED VERSION

### Second Defense

As detailed in CDK's counterclaims, Plaintiff's actions are illegal independent of any conduct or action by CDK. As such, all of Plaintiff's claims are barred as a matter of law. Restraint of illegal trade is not redressable under the antitrust laws, and because Plaintiff's claims are based on Plaintiff's illegal business activities, Plaintiff lacks antitrust injury.

### Third Defense

Plaintiff's claim is barred, in whole or in part, by the applicable statute of limitations. Plaintiff filed this action on May 1, 2017. Plaintiff has not pled any event that would toll any applicable limitations period. As such, the statutory time limitation applicable to some or all of each of Plaintiff's claims has passed and thus are time-barred.

### Fourth Defense

If and to the extent that Plaintiff has been damaged, which CDK denies, the amount of damages that Plaintiff alleges to have suffered is too remote or speculative to allow recovery, and it is impossible to ascertain and allocate such alleged damages with reasonable certainty.

### Fifth Defense

If and to the extent Plaintiff has been damaged, which CDK denies, Plaintiff, by the exercise of reasonable diligence, could have mitigated its damages but did not, and Plaintiff is therefore barred from recovery. Alternatively, any damages sustained by Plaintiff, which CDK denies, must be reduced by the amount that such damages would have been reduced had Plaintiff exercised reasonable diligence in mitigating its damages.

### Sixth Defense

Plaintiff's claims for equitable relief are barred for the reasons set forth in the Seventh Circuit's opinion in this matter (*Authenticom, Inc. v. CDK Glob.*, LLC, 874 F.3d 1019 (7th Cir.

2017)), including *Verizon Communications Inc. v. Law Offices of Curtis v. Trinko*, 540 U.S. 398 (2004), and *Pacific Bell Telephone Co. v. Linkline Communications, Inc.*, 555 U.S. 438, (2009). In addition, Plaintiff has suffered no irreparable harm and otherwise fails to satisfy the criteria necessary for injunctive relief.

### Seventh Defense

Plaintiff's claims are barred, in whole or in part, based on the doctrines of estoppel, laches, and waiver as Plaintiff's claims are based, in part, on actions and events spanning more than 10 years. Plaintiff has pled no facts to explain or justify why this lawsuit was filed when it was filed. To the extent that Plaintiff could have brought essentially the same suit years earlier, Plaintiff is barred from pursuing all or part of its claims by the doctrines of estoppel and laches.

### Eighth Defense

Plaintiff's claims are barred, in whole or in part, because CDK's conduct was pro-competitive, reasonable and permissible, and was based on independent, legitimate and self-interested business and economic justifications.

### Ninth Defense

Plaintiff's claims are barred, in whole or in part, because Plaintiff has not suffered any legally cognizable injury, including because Plaintiff has not suffered an injury-in-fact and their alleged injuries are too speculative, indirect and remote from the alleged conduct, and cannot be ascertained and apportioned.

### Tenth Defense

Plaintiff's claims are barred, in whole or in part, because none of CDK's alleged actions or omissions substantially lessened competition within any properly defined market.

### Eleventh Defense

Plaintiff's claims are barred, in whole or in part, because to the extent Plaintiff suffered any injury or incurred any damages as alleged in the Complaint, which CDK denies, CDK's alleged conduct was not the actual or proximate cause of any injury or damage to Plaintiff.

### Twelfth Defense

Plaintiff's claims are barred, in whole or in part, because to the extent Plaintiff suffered any injury or incurred any damages as alleged in the Complaint, which CDK denies, any such injury or damage was caused and brought about by the acts, conduct or omissions of individuals or entities other than CDK and, as such, any recovery herein should be precluded or diminished in proportion to the amount of fault attributable to such other individuals or entities.

### Thirteenth Defense

Plaintiff's claims are barred, in whole or in part, because to the extent Plaintiff suffered any injury or incurred any damages as alleged in the Complaint, which CDK denies, any such injury or damage was caused and brought about by intervening or superseding events, factors, occurrences, conditions or acts of others, including forces in the marketplace, and not by the alleged wrongful conduct on the part of CDK.

### Fourteenth Defense

Plaintiff's claims are barred, in whole or in part, because any recovery would result in unjust enrichment to Plaintiff.

### Fifteenth Defense

Plaintiff's claims are barred, in whole or in part, because its alleged damages, if any, are too speculative, uncertain and not of the nature or to the extent alleged.

**Sixteenth Defense**

Plaintiff's claims are barred, in whole or in part, because the Complaint has insufficiently alleged a relevant product market and geographic market and is so vague and ambiguous as to deny CDK notice of the markets alleged by Plaintiff.

* * * * * *

CDK adopts by reference any applicable defense pled by any other defendant not expressly set forth herein. In addition, CDK has insufficient knowledge or information upon which to form a basis as to whether it may have additional, as yet unstated, separate defenses available. CDK reserves the right to amend this Answer to add, supplement or modify defenses based upon legal theories that may be or will be divulged through clarification of the Complaint, through the Court's decision on CDK's concurrently filed motion to dismiss, through discovery, or through further factual or legal analysis of Plaintiff's allegations, contentions and positions in this litigation.

**JURY DEMAND**

Pursuant to Federal Rules of Civil Procedure, Rule 38(b), CDK hereby demands trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, CDK requests that Plaintiff's Complaint be dismissed with prejudice as to CDK, that the Court find that Plaintiff is not entitled to any judgment or relief, that the Court enter judgment in favor of CDK, and that the Court award CDK its attorneys' fees, costs and expenses, pre-judgment interest, and such other and further relief as the Court deems just and proper.

## COUNTER-PLAINTIFF CDK GLOBAL, LLC'S COUNTERCLAIMS

CDK Global, LLC ("CDK" or "Counter-Plaintiff") brings these Counterclaims against counter-defendant Authenticom, Inc. and its related subsidiaries and affiliates ("Authenticom") for damages, declaratory, injunctive, and other relief pursuant to the Computer Fraud and Abuse Act ("CFAA"), the Digital Millennium Copyright Act ("DMCA"), the Defend Trade Secrets Act ("DTSA"), the Wisconsin Computer Crimes Act, the California Comprehensive Computer Data Access and Fraud Act, the Wisconsin Uniform Trade Secrets Act, and state common law, consumer protection, and related laws.

CDK alleges the following based upon information and belief, except as to those allegations set forth below that are based on CDK's knowledge.

## INTRODUCTION

1. CDK, Global LLC is one of the country's leading firms offering state-of-the art enterprise software known as dealer management systems ("DMS") and related services to Auto, Truck, Motorcycle, Marine, Recreational Vehicle, and Heavy Equipment dealerships. CDK's DMS offering  (referred to herein as "CDK's DMS" or "the CDK DMS") primarily consists of two software products—Drive and DASH—that provide dealers with proprietary software tools and resources necessary to manage core aspects of their business.  CDK's DMS currently is licensed to more than 27,000 dealerships across the world and more than 8,000 new and used car dealerships in North America.

2. CDK's DMS also operates as an element of a larger automotive data "ecosystem" inhabited by dealers and other industry participants, including original equipment manufacturers ("OEMs") like General Motors, Ford, Toyota, Subaru, Porsche, and Jaguar; third-party software vendors that offer applications and solutions to dealers and OEMs; and CDK itself.  Central to

PUBLIC REDACTED VERSION

this automotive data ecosystem is CDK's DMS, which provides the infrastructure and intellectual property necessary for the ecosystem to securely and efficiently function.

3.      One of the ways that CDK maintains the stability and security of its DMS is by requiring that third parties—for example, software application providers that wish to interact with the DMS—access the CDK DMS primarily through an approved interface known as "3PA."[43]   The 3PA interface ensures that third parties only access the data they are properly authorized to access, and in a manner that is centrally managed by CDK in order to optimize data and system security and to prevent degradation of system performance and data corruption.  As a means of enforcing this requirement, CDK dealers are contractually prohibited from giving unauthorized third parties access to the CDK DMS, including by giving those third parties login credentials meant for use solely by dealership employees.

4.      This limitation on third-party access is a feature of the CDK DMS that CDK believes is necessary to create and maintain a superior, better-functioning product.   CDK dealerships, through their access to CDK's DMS, have access to myriad, highly-sensitive, commercially valuable data belonging to end-use customers (*e.g.*, the car-buying public), OEMs, and CDK itself.  As data privacy and data misuse issues have markedly increased over the last several years (*e.g.*, Target and Sony, to name just a few), CDK has increased the number of security measures and system protections in place to protect all of this data and ensure that its customers have a stable, secure, and multi-functional system to use in the efficient operation of their dealerships.

5.      One entity who *does not* benefit from CDK's exercise of control over its own proprietary software is counter-defendant Authenticom, whose business model is built around

---

[43]   More recently, the 3PA or "Third Party Access" program became known as the CDK Global Partner Program.  For convenience, CDK will continue to refer to it as the 3PA program herein.

unrestricted (and uncompensated) access to CDK's DMS on behalf of software vendors and other third parties. Authenticom gains access to the CDK DMS by soliciting log-in credentials from dealers and essentially impersonating them. Authenticom then extracts data—not limited to data input by the dealers themselves—through a process known as "screen-scraping" and then *sells* that data to the vendors in exchange for a fee, often first copying the data into its own mirrored database called "DealerVault." To make matters worse, for some vendors Authenticom also attempts, sometimes successfully, to "write back" *altered* data into the CDK DMS.

6.      All of this occurs outside of CDK's managed 3PA interface, meaning that so long as Authenticom has access to CDK's system, CDK has no way to control Authenticom's screen-scraping methods or prevent it from causing a data breach, degrading system performance, or corrupting files in the CDK DMS.

7.      Authenticom knows full well that its business model and conduct constitutes a flagrant breach of CDK's contracts with its dealers and an improper circumvention of CDK's DMS access restrictions, but Authenticom has refused for years to change its conduct, claiming that its activities are justified because dealers have "authorized" its unlawful conduct.

8.      That position is mistaken. CDK's contracts with dealers (known as a Master Services Agreement or "MSA") are clear that dealers are licensees of CDK's DMS and cannot "authorize" or otherwise grant Authenticom or any other third parties any rights to access the DMS—certainly not over CDK's express objections, which are presented to Authenticom each and every time it logs into the DMS. And even if dealers *could* give Authenticom access to just their own data in the CDK DMS, Authenticom accesses not only dealer data but also a significant amount of data (including OEM data and customers' personal data and information)

that does *not* belong to dealers. Such misappropriation of highly sensitive information that CDK is contractually bound to protect is not privileged by any reasonable measure.

9. Authenticom also attempts to justify its conduct by claiming that dealers' only means of accessing data in CDK's DMS is by allowing Authenticom to hack into the DMS and scrape it out for them. That is false. There are several other ways that dealers can access and share data with third parties, including through the use of reporting tools that CDK makes available to dealers. In fact, some CDK dealerships elect to gather data themselves using these tools so that vendors and other third-parties have no need to access the DMS at all.

10. Although Authenticom paints itself as the victim—claiming the antitrust laws *require* CDK to allow it to pursue its parasitic practices—it is Authenticom's conduct that is unlawful under a host of federal and state laws prohibiting unauthorized access to computers and unauthorized access to trade secrets and it is Authenticom's cyber piracy that must be stopped. The Court should award CDK statutory and common law damages to compensate it for the costs of preventing Authenticom's access to its DMS as well as equitable relief requiring Authenticom to permanently cease and desist its unauthorized DMS access and to disgorge the ill-gotten gains it has reaped from free-riding on CDK's intellectual property and investments.

## PARTIES

11. Counter-Plaintiff CDK Global, LLC is a Delaware limited liability company with its corporate headquarters and principal place of business at 1950 Hassell Road, Hoffman Estates, Illinois 60169. CDK is the largest global provider of integrated information technology and digital marketing solutions to the automotive retail industry, with more than 40 years of experience. CDK currently provides integrated technology solutions to over 27,000 Auto, Truck,

Motorcycle, Marine, Recreational Vehicle and Heavy Equipment dealers throughout the world, including more than 8,000 new and used car auto dealers in the United States.

12.    The automotive data ecosystem that CDK supports is massive, with tens of thousands of installations of approved vendor applications and millions of transactions every day, supporting billions of dollars in commerce each year.   CDK has made tremendous investments to build out and support its network of products and service offerings.  Over the last three years alone, CDK has spent more than $480 million researching, developing, and deploying new and enhanced product solutions for its customers.

13.    In light of its network's size, scope, and importance to the American economy, CDK has been designated by the Department of Homeland Security as a Critical National Infrastructure "so vital to the United States that [its] incapacitation would have a debilitating effect on security [and] national economic security."[44]

14.    Counter-defendant Authenticom, Inc., is a privately held Wisconsin corporation with its corporate headquarters and principal place of business at 400 Main Street, La Crosse, Wisconsin 54601.  *Authenticom* Complaint (*Authenticom* Dkt. 4) ("Compl.") ¶ 19.

## NATURE OF THE COUNTERCLAIMS

15.    These counterclaims arise under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201; the Defend Trade Secrets Act, 18 U.S.C. § 1836; the Wisconsin Computer Crimes Act ("WCCA"), Wis. Stat. § 943.70(2)(a); the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502; the California Unfair Competition Law, Cal. Bus. and Prof. Code §

---

[44] *See* Dep't of Homeland Security, What is Critical Infrastructure?, *available at* perma.cc/N8JR-YQ6Y.

17200; the Wisconsin Uniform Trade Secrets Act, Wis. Stat. § 134.90; and common-law theories of tortious interference, trespass to chattels, conversion, unjust enrichment, and fraud.

16.     This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1331, 1332(a)(1), and 1367(a).   There is diversity jurisdiction under 28 U.S.C. § 1332(a)(1) because CDK is a citizen of Illinois, Authenticom is a citizen of Wisconsin, and the amount in controversy with respect to these counterclaims exceeds the sum or value of $75,000, exclusive of interest and costs.   In addition, there is federal question jurisdiction under 28 U.S.C. § 1331 because CDK alleges violations of the CFAA, the DMCA, and the Defend Trade Secrets Act.   There is supplemental jurisdiction over the state law counterclaims pursuant to 28 U.S.C. § 1367(a) because they are so related to CDK's federal-law counterclaims that they form part of the same case or controversy.

17.     This Court has personal jurisdiction over Authenticom because it is located and does business in the District in which this action was filed; because many of the actions giving rise to these counterclaims occurred in, and/or were directed from, that District; and because Authenticom filed its complaint against CDK in that District.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c).

## FACTUAL ALLEGATIONS

### A.     CDK's DMS

19.     CDK has invested hundreds of millions of dollars to develop the hardware and software components of its DMS.   CDK's DMS also includes, and is largely comprised of, valuable pieces of intellectual property, including patented technologies and proprietary software elements and programs created by CDK, each of which are accessed each time a user logs into and uses the DMS.   At all relevant times, and as CDK's contracts with dealers and third parties

make clear, the DMS has remained the sole and exclusive property of CDK. Dealers who purchase DMS services from CDK are granted a personal, non-transferable, license to *use* CDK's DMS in accordance with the terms and conditions of their agreement with CDK. Authenticom does not have such a license.

20.     CDK's DMS offering consists of software and hardware components residing at both the dealership ("dealership network") and at CDK's data centers ("CDK network").[45]  CDK uses state-of-the-art technology to secure the connections between the dealerships and the CDK network, including through specialized hardware at each dealership site. That hardware creates a "virtual private network" ("VPN") or "Leased-Line Multiprotocol Label Switching network" ("MPLS") between the dealership and the CDK network, which accepts direct communications only from computers on the corresponding dealership's network.

21.     CDK's terminal program that runs on dealer computers is an original and independent work created and licensed by CDK. It consists of original and distinct elements including its source and object code; distinctive screen layouts; graphical content; text; arrangement, organization, and display of information; and dynamic user experience.

22.     In addition to its core functionalities, the CDK DMS stores voluminous amounts of financial and accounting information and highly sensitive data, including financial statements, accounting data, payroll information, sales figures, inventory, parts data, warranty information, appointment records, service and repair records, vehicle information, customer personal identifiable information, intellectual property, and other third-party data. CDK encrypts sensitive data in the DMS and appropriately expunges data regularly.

---

[45] In a few instances, the server side of the DMS system is located on a dealership's premises rather than offsite at a CDK data center.

23.     Not all of this data "belongs" to the dealers who use CDK's DMS.  Some data is proprietary to OEMs, such as prices and part numbers for replacement parts, labor rates, and rebate, incentive and warranty information.  Other data in CDK's DMS is proprietary to third-party service providers, such as credit reporting bureaus like Equifax, Experian, and TransUnion.  Still other data in the DMS is CDK's own proprietary data, including forms, accounting rules, tax tables, and proprietary tools and data compilations.  While access to third-party proprietary information in the DMS is permitted for licensed DMS customers, CDK is prohibited from sharing much of this information with unlicensed third parties.  And CDK generally does not share its own proprietary information in the DMS with any third parties in the absence of a valid license.  Authenticom does not have such a license.

24.     CDK's DMS is password-protected. To access the DMS, each dealership employee must authenticate using his or her individual login credentials.

25.     Typically, at least one employee at each dealership using CDK's DMS has "administrator" level access privileges.  An employee of a dealership who has submitted testimony in this case compared administrator-level access to CDK's DMS to possessing "the keys to the kingdom."  06/27/2017 Tr. (*Authenticom* Dkt. 165) 2-A-9:10-11. Users with administrator-level privileges have the authority to create new accounts (and corresponding login credentials) for other dealership employees.  They also have the ability to define the data and functions each employee may access within CDK's DMS by creating and assigning the employees different "roles."   In other words, each user has access to the DMS that is commensurate with the access privileges assigned to his or her user ID.

26.     Data maintained in CDK's DMS are used in four primary application areas: Accounting, F&I Sales, Parts, and Service.  The user IDs that dealerships create for their

employees can be configured to have general access to all four functions or just certain of them. User IDs can also be configured to run reports, data queries, and writeback commands using what is known as an English Statement processor ("ENG"). ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

## B. CDK's 3PA Program

27.     Introduced by CDK in 2000, the 3PA program is a managed interface created for software application providers and other third parties to access and integrate with CDK's DMS. For example, several third-party marketing websites generate sales leads on behalf of dealerships.  Those websites interface with CDK's DMS through the 3PA program to access sales transaction data, which they uses to validate vehicle sales based on their sales leads.  This is but one example of hundreds of third-party applications that integrate with CDK's DMS.

28.     CDK's 3PA program has grown considerably in terms of both its sophistication and its number of participants, and its membership continues to grow today.  Currently, the 3PA program provides more than 300 participants offering more than 400 applications with DMS integration through predefined integration points ("PIPs") that allow each  application to extract and/or write data to CDK's DMS in a defined and controlled manner.  Each PIP is a custom configuration based on the specific needs of the application it serves through a collaborative process between CDK and the respective 3PA program participant.

29.     Importantly, PIPs also prevent third-party applications from accessing the DMS directly.  Instead, PIPs create an interface *between* third-party applications and the DMS, relaying each application's request for data extraction or writeback to the DMS itself, which

fulfills the request, and communicating the response back to the application. This is essential to facilitating safe and secure third-party access to CDK's DMS.

30.     Further, the use of PIPs ensures that a third party's software can only access data maintained in the CDK DMS in a reliable, secure, and supportable manner that will safeguard the integrity of the data and of CDK's system as a whole. Among other things, PIPs limit the third party's access to precisely the data and permissions it needs (and as approved by CDK). They also allow CDK to audit all aspects of third-party access, including which precise data elements in the DMS are being accessed and how frequently they are being accessed.

31.     In addition, a managed 3PA interface allows CDK to place limits on the number of simultaneous transactions between third parties and the DMS, which prevents outside queries from overwhelming the system. CDK is able to pool system resources to serve each party's request sequentially and in the most efficient manner. And CDK has the ability to communicate with third parties using 3PA to alert them to system performance issues and manage troubleshooting. The managed 3PA interface also allows CDK to take steps to ensure that updates to CDK's DMS software and scheduled system maintenance do not disrupt third-party integrations and the risk of data corruption is minimized.

### a. 3PA Certification Requirements

32.     The 3PA certification process consists of four phases: Orientation and Planning; Development; Certification; and finally, Deployment. During the Orientation and Planning stage, CDK works with third-party application vendors to determine their integration requirements, including the scope, workflows, frequency of access, and required data elements. CDK then proposes (and the parties agree to) an integration plan, which includes specifications for PIPs and other details of the integration. In the Development stage, the vendor builds the

components of its application that will interface with CDK's DMS. The vendor's requested integrations are then configured and rigorously tested in a special staging environment using a "test" dealer linked to a set of accounts on a server that contain sample DMS data. Vendors are expected to implement logging into their integration framework, including the complete request and response for each data extraction, writeback command, etc. Logging is used to both troubleshoot any issues created by the interface and validate the precise data elements that are being copied from and/or written back to the CDK DMS. At the Certification stage, these results are verified and a final version of the software that the vendor plans to deploy is tested once again. Only after these steps are successfully completed does the application enter Deployment, when the application's interface is actually released into production. Each step is designed by CDK to protect the security, integrity, and performance of its DMS.

33.     Each third party certified under 3PA enters into a written agreement with CDK, including a Statement of Work that describes the integration (including PIPs) called for by the integration plan. In addition, among other things, the agreement obligates the vendor to access CDK's system only through its approved interface. The vendor also agrees to work with CDK on an ongoing basis to ensure that the integration remains healthy as both CDK's and the third party's software evolves. The agreement also imposes liability on the vendor for misuse of the system or the data and requires the vendor to obtain written consent from the dealer before accessing its DMS and to refrain from re-syndicating the data to unapproved third parties. Further, the agreement indemnifies CDK for the vendor's failure to comply with data collection, privacy, and other applicable laws and regulations.

34.     CDK also charges third-party participants in the 3PA program fees for the integration services it provides. These fees allow CDK to recoup its investment in both the 3PA

program and the DMS itself and compensate CDK for the value of its services and the intellectual property that makes data integration possible.

35. Authenticom is not a member of the 3PA program. CDK has no plans to admit Authenticom to the 3PA program, as Authenticom's entire business model is premised on free and unrestricted access to CDK's DMS. As a general matter, Authenticom does not have CDK's permission or its authorization to access or use CDK's DMS, including on behalf of or for the purported benefit of dealers or vendors.[46]

**b. Alternatives To 3PA**

36. While many dealers and vendors exchange data through the 3PA program, it is not the only way that data residing on CDK's DMS can be exchanged. CDK's flagship DMS product, Drive, includes several reporting tools that dealers can use to compile and export their operational data, which they can use or distribute to third parties—including third-party application providers and entities like Authenticom. Some of these are the same reporting tools that Authenticom uses when it accesses the DMS using dealer-issued user IDs—the difference being that an actual dealership employee does not call them up hundreds or thousands of times throughout the day and night to constantly query data. Additional, more sophisticated reporting tools are also available to Drive users on an add-on basis.

37. CDK dealers can and do use these reporting tools to share data with third-party vendors, often instead of having those vendors access CDK's DMS through the 3PA program. This approach is not only viable; it is specifically approved by the National Auto Dealers Association ("NADA"), which published a set of data security guidelines for dealers in 2014

---

[46] There are a few one-off circumstances where CDK tolerates Authenticom's access to its DMS with respect to specific dealerships as a result of legacy contractual arrangements entered into by certain CDK affiliates, which CDK is working to eliminate as its contractual restrictions permit. Authenticom's continued access to the DMS in these few, specific instances is not at issue here.

suggesting that dealers should "consider implementing a strict data 'push' system for sharing data." Defs. P.I. Ex. 16 (*Authenticom* Dkt. 106-16).

38. Upon information and belief, several CDK dealers elect to "push" data to Authenticom that they obtain themselves from the CDK DMS using the reporting tools described above. Authenticom accepts data from dealers in this manner.

39. In addition, other DMS providers permit third-party access to their systems (including by Authenticom) outside of a certification program and/or without requiring those third parties to pay integration fees. If some dealers prefer that system, they are free to switch DMS providers. Some dealers have switched; many others have stayed or switched *to* CDK since it began taking steps to prevent unauthorized third-party access to its DMS.

**C.      Authenticom's Illegal Business Model**

40. Authenticom refers to itself as a "dealer data integration provider," Compl. ¶ 2, but that is a fiction. Authenticom admits that it offers "no *actual* 'integration'" with CDK's DMS "in the traditional sense," only "data access." Compl. ¶ 54 n.4.

41. Authenticom is a free rider. Its business model revolves around gaining free access to DMSs (including CDK's DMS), extracting and exporting the data from those DMSs, often copying it into its own system, and then selling the data to third parties—principally vendors that provide software applications to support the dealers' operations. Authenticom is able to do this by acquiring login credentials from CDK dealers—often through unsecured means—and then using those credentials to access and query CDK's DMS thousands of times per day via automated software "scripts" often installed on dealer-owned computers, bypassing software controls that CDK has put in place to prevent such access along the way.

42.     Once Authenticom has collected data from CDK's DMS by its unauthorized and unlawful methods, it often exports the data to its own mirrored database known as "DealerVault."  From there, Authenticom sells access to the data—precisely what it takes from CDK for free—to other third-party vendors, purportedly with the consent or "authorization" of dealers.  Ironically, Authenticom requires vendors who access the data through DealerVault to enter into agreements that strictly prohibit them, among other things, from "furnish[ing] to any third party any Data provided to Vendor by DealerVault without written authorization from DealerVault or the Dealership" and obligating the vendors to "protect all Data provided by DealerVault so as to preclude access by any third party."  Pl. P.I. Ex. 76 (*Authenticom* Dkt. 151-4) §§ 1.2 & 1.4.  Authenticom provides no such commitments to CDK, via contract or otherwise, before accessing CDK's proprietary DMS and extracting data.

43.     Of course, Authenticom does not permit automated third-party access and screen-scraping from *its own* system, and it strictly prohibits dealers from sharing *DealerVault* user IDs and passwords with anyone other than "the unique authorized User to whom such password is assigned."  Pl. P.I. Ex. 28 (*Authenticom* Dkt. 71-3) § 6.7.  Authenticom thus prohibits the same sort of third-party access and data syndication for DealerVault that it employs to siphon, and profit from, data residing on CDK's DMS.

44.     When Authenticom accesses CDK's DMS using dealer-issued login credentials from a computer running on the dealer's network, Authenticom's CEO Steve Cottrell admits that the intent is to "emulate" an ordinary dealership employee (whose access would be permitted under the dealer's MSA).  06/26/2017 Tr. (*Authenticom* Dkt. 164) 1-A-108:15-19.   However, despite these and other efforts to evade detection, ███████████████████████████████████

███████████████████████████████████████████████████████████████████████████

t ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

### a. Misappropriation Of Proprietary Information

45.     Each and every time that Authenticom accesses CDK's DMS from a dealer computer, it uses valuable pieces of intellectual property, including patented technologies and original software elements and programs.  Each and every time that Authenticom accesses the CDK DMS, it creates a copy of portions of the DMS program code in the computer's Random Access Memory, as well as copies of the original and distinctive page layouts; graphical content; text; arrangement, organization, and display of information; and dynamic user experience.

46.     In addition, Authenticom's screen-scraping queries regularly access files containing proprietary information that belongs to neither it nor the dealers it purports to serve.



47.     Authenticom's unauthorized access to these files is rampant.  For example, an investigation performed by CDK in June 2017 showed that in just the preceding 30 days,

████████████████████████████████████████████████████████

███████████████████████████████████████████

48.     Even when Authenticom does not access proprietary data directly, often it accesses and copies data that were created using CDK and third-party proprietary forms and

functions within the DMS. For example, dealers use CDK's proprietary programs to calculate the expected monthly payment for a financed car deal based on inputs like the sale price, the customer's down payment, and the term. All four data elements in this example—including the monthly payment calculated using CDK's proprietary dataset—are stored in the DMS files that Authenticom can access, scrape, and copy into its mirrored DealerVault database.

### b. Burdens On System Performance

49.     Authenticom's methods of accessing and extracting data place considerably more strain on CDK's DMS than approved third-party access through the 3PA interface or the ordinary dealership employees for whom user ID/password access was designed, degrading system performance and consuming valuable computing resources.

50.     Third-party application providers often seek to replicate a narrow subset of data in the CDK DMS in their own databases. For example, a vendor offering a service appointment scheduling application may need to maintain up-to-date sets of service and repair order data from the DMS of each dealer it serves. This normally requires priming the vendor's database with a full dataset once, when the vendor begins providing services, and then updating the vendor's dataset with changes on an ongoing basis. In the 3PA program, vendors work with CDK to develop efficient data queries that retrieve only new data, cutting down on extraction of duplicative records and conserving computing resources. Nearly half of the third-party data extractions that occur through the 3PA interface are minimized in this manner.

51.     Authenticom, however, does not update its vendors' datasets with only the new data that they need to stay current. Instead, it often pulls a complete set of data *every* time it accesses the CDK DMS, and runs its queries constantly in order to mimic the *bona fide* integration available to vendors through the 3PA program. Authenticom repeats this process

throughout the day for hundreds of dealers, adding to the cost of the computing services that CDK must provide to each of them. ███████████████████████████████

███████████████████████████████████

52.     Among the many guidelines and requirements of the 3PA program, vendors are restricted in most cases from performing bulk extraction queries between 5:00 a.m. and 10:00 p.m.  The purpose of this restriction is to minimize system burden and performance degradation caused by third-party access during dealership business hours. ████████████████████

████████████████████████████████

53.     Investigations of Authenticom's data extraction methods show that Authenticom burdens CDK's systems with poorly-constructed, inefficient and repetitive queries that extract too much data, too frequently, and during peak dealer business hours. █████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

54.     Because Authenticom hacks into the CDK DMS outside the 3PA interface and uses automated methods to extract data through decentralized interfaces that were designed for manual use by dealership employees, CDK effectively has no control over the queries that Authenticom runs or how frequently it runs them.  CDK cannot manage the strain on system resources created by Authenticom or mitigate any performance issues that result.

55.     The burdens on CDK's DMS that result from Authenticom's constant access and querying are real and measurable. ███████████████████████████████

56.    Authenticom has no incentive to minimize these burdens that it places on the CDK DMS: it didn't build the DMS, it doesn't pay for its operation or maintenance, and it doesn't deal with any issues that arise in its operation (and it doesn't have direct liability if the system fails).  Instead, dealers who experience problems with the DMS call CDK—not Authenticom—and expect CDK to resolve the problem.

### c.    Data Integrity Risks

57.    An internal report prepared in 2013 by CDK's former parent company Automatic Data Processing, Inc. ("ADP") found that *all* of more than 2,900 CDK DMS servers examined had some level of data corruption issues, many of which were attributable to "hostile," unauthorized access to the DMS similar to Authenticom's methods of access.

58.    Moreover, in addition to extracting data from CDK's DMS, Authenticom also attempts to write back altered data to the DMS on behalf of at least some dealerships for whom it offers "data-cleansing" services.  Cottrell Reply Decl. (*Authenticom* Dkt. 143) ¶ 46; *see also* Compl. ¶¶ 50, 54-55 & n.4, 77-80 (Authenticom seeks not only to "pull," "extract" and "scrape" data from CDK's DMS; but also to "push data back into the database" in altered form).

59.    Authenticom's unauthorized "writeback" activity creates a high risk of introducing data errors and undermining the integrity of CDK's DMS.  CDK has formatting requirements called "business rules" for data fields in the DMS's various databases, which

govern precisely how applications should input data. When unauthorized third-parties attempt writeback functions, they often apply business rules incorrectly (or not at all) and cause data entry errors—which CDK is then responsible for fixing. While a manual error by a dealership employee can be a minor annoyance, a series of errors by automated systems—such as the scripts that Authenticom runs on CDK's DMS—can rapidly propagate across an entire dataset, causing major disruption or denial of service. CDK can effectively address these risks for third-party application providers who access writeback functionality through the 3PA program through technical evaluations of the provider's applications and extensive testing during the certification process. Pre-certification testing and evaluation also ensures that the application is not adversely affecting performance of the DMS. These sort of protections do not exist for Authenticom's unauthorized, automated access using dealer-issued login credentials.

### d. Data Security Risks

60. Authenticom's methods of accessing CDK's DMS are significantly less secure than the 3PA managed interface that CDK requires approved third parties to use.

61. As described above, 3PA participants access the CDK DMS through PIPs, which act as an intermediary between the participant's application and the actual DMS. Before allowing any data to be transferred in or out of the DMS, the application must pass rigorous authentication protocols initiated by the PIP. The authentication token that each application uses is transmitted through a secured communication channel. By contrast, Authenticom uses dealer-issued login credentials that it often obtains through unsecured channels, including plain-text email. This exposes the credentials—and by extension, CDK's DMS—to the risk of interception or compromise and violates widely accepted cybersecurity practices.

PUBLIC REDACTED VERSION

62. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████

63.     Authenticom's use of dealer-issued login credentials is particularly concerning to the extent that Authenticom implemented a software tool, as it bragged to one CDK dealer, that automatically re-enables any disabled user IDs "every hour."   Defs. P.I. Ex. 41 (*Authenticom* Dkt. 106-48).   This software was run by an administrator-level account at the dealership—the highest level of user access permitted for CDK's DMS, usually limited to one or two trusted employees at each dealership. ██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

64.     Authenticom's methods also violate the tenet of data minimization, *i.e.*, that each user of a secured system should receive no greater access or privileges than necessary.  The 3PA interface abides by this principle and strictly controls each participant's access at a granular level, to only those specific data needed for that party's approved purposes.   By contrast, Authenticom claims that "[a]s a matter of practice," it accesses and scrapes data from all primary

144

directories in the CDK DMS for every dealer: sales, service, inventory, customers, and parts. Cottrell Reply Decl. ¶¶ 3, 13. What this means, and what CDK's investigation indicates, is that Authenticom's user IDs regularly have access to (and often, are constantly querying) all application areas in CDK's DMS, regardless of whether the purported end users—the application providers—actually need or have even asked for such access.

65.     Against this backdrop, Authenticom argues that CDK should simply trust that Authenticom is an honest data broker and that its data security practices are adequate. However, even if CDK could bear the risk of taking Authenticom at its word on these points (and it cannot), evidence directly contradicting these assurances have already emerged.

66.     For example, in August 2016, CDK implemented a security measure to disable numerous user IDs that Authenticom was using to perpetrate its unauthorized data scraping. In response,



67. █████████████████████████████████████████████████████████

███████ Contrary to Mr. Cottrell's sworn testimony that "[i]t has been—and continues to be—Authenticom's policy that … if a dealer prefers to send login credentials via email, that the username and password be sent to Authenticom in separate emails," Cottrell Reply Decl. ¶ 23, ████████████████████████████████████████████████████

68. Authenticom's CEO Mr. Cottrell also falsely represented in both this litigation and to the marketplace that Authenticom had for three years received a Microsoft "gold security certification" with respect to its data extraction methods—a certification that does not, in fact, exist. *Compare* Cottrell Decl. (*Authenticom* Dkt. 62) ¶ 31 *with* 06/26/2017 Tr. (*Authenticom* Dkt. 162) at 1-P-25:15-26:10. In any event, Microsoft itself is clear that simply being a customer of its Azure storage platform does not ensure Authenticom is secure or obviate Authenticom's many security obligations.[47] Indeed, a highly publicized recent data breach at Deloitte occurred on the same Microsoft Azure platform that Authenticom uses.[48]

69. Mr. Cottrell further testified that DMSs are "not a high value target" for hackers. 06/26/2017 Tr. at 1-P-23:2-5. That statement is patently illogical, given the reams of sensitive personal and financial data that are maintained in DMSs, including CDK's DMS. Moreover, at least one DMS solution—offered by competitor DealerBuilt—has *already* suffered a serious data security breach resulting in millions of customers' confidential information being compromised. Defs. P.I. Ex. 151.[49] Although the DealerBuilt data breach was widely reported, Mr. Cottrell

---

[47] *See* Frank Simorjay, *Shared Responsibilities for Cloud Computing* at 5 (Microsoft White Paper, April 2017), *available at* https://perma.cc/3D2Q-TCPH.

[48] *See, e.g.*, Nick Hopkins, *Deloitte hit by cyber-attack revealing clients' secret emails*, The Guardian (Sep. 25, 2017), *available at* https://perma.cc/7PVL-3FS3.

[49] *See also* Zack Whittaker, *Bought a Car Recently? Millions of dealership customer details found online*, ZDNet (Nov. 8, 2016), *available at* https://perma.cc/4K85-8GQN.

146

testified that he remained unaware that the breach had even occurred for nearly ten months. 06/26/2017 Tr. at 1-P-22:1-6

70. Authenticom also touts a purported $20 million cybersecurity insurance policy, but that policy by its terms provides no coverage to CDK in the event of a data breach. Moreover, as just some examples, to settle their respective data breaches Home Depot reportedly paid out more than $150 million[50] and Target more than $200 million.[51] It is unrealistic to think that a $20 million insurance policy could remedy the potential harm that would result from a breach of Authenticom's DealerVault data warehouse.

### D. CDK Prohibits Authenticom's Unauthorized Access

#### a. Contractual Prohibitions

71. In order to protect against unauthorized access to the sensitive and proprietary data maintained in CDK's DMS, the MSA between CDK and its dealer customers expressly prohibits dealers from supplying login credentials to third parties or otherwise granting third parties access to the DMS: "Client shall not allow access to [the CDK DMS] by any third parties except as otherwise permitted by this agreement." MSA § 4(D). Dealers are also prohibited from causing or permitting "ANY THIRD PARTY SOFTWARE TO ACCESS THE [CDK DMS] EXCEPT AS OTHERWISE PERMITTED BY THIS AGREEMENT." *Id.* § 4(B). Nowhere does the MSA permit access by Authenticom.

72. Pursuant to the MSA, the dealer expressly agrees, among other things, that it will only use CDK's software "for its own internal business purposes and will not sell or otherwise provide, directly or indirectly, any Products or Services, or any portion thereof to any third

---

[50] Jeff John Roberts, *Home Depot to Pay Banks $25 Million in Data Breach Settlement*, Fortune Magazine (March 9, 2017), *available at* https://perma.cc/H5A8-XAP6.

[51] Reuters, *Target Pays Millions to Settle State Data Breach Lawsuits*, Fortune Magazine (May 23, 2017), *available at* https://perma.cc/PP9R-HQVA.

party" (*id.* § 4(B)); and that it will "treat as confidential and will not disclose or otherwise make available any of the Products or Services (including, without limitation, screen displays or user documentation) or any … proprietary data, information, or documentation related thereto … in any form, to any person other than employees of [the dealer]…" (*id.* § 4(D)). The dealer also acknowledges that notwithstanding its license to use the CDK DMS, the DMS remains at all times "the exclusive and confidential property of [CDK]." *Id.* § 4(A).

73. Every version of CDK's standard MSA since at least 1994 has expressly stated that dealers are prohibited from permitting unauthorized third parties to access their licensed DMS. Further, the language quoted above has remained substantially the same in every version of the MSA since approximately 2010.[52]

74. Authenticom is well aware that its business model and method of accessing CDK's DMS violates the express terms of the MSA between CDK and its dealer customers. Upon information and belief, Authenticom has been aware of this fact for *years*.

75. A prior version of CDK's MSA prohibited dealers from making the DMS available "to any person other than employees and agents of [the dealer] with a need-to-know." Authenticom has recently begun asserting—once this litigation began—that its access to CDK's DMS was permitted under this language because Authenticom supposedly is the dealer's "agent." That assertion is directly contradicted by Authenticom's own Complaint, in which it attempted to assert an antitrust claim—which was dismissed by the Court—premised on a theory that the express restrictions on unauthorized third-party access in CDK's MSA constitute "exclusive dealing." *See* Compl. ¶¶ 150-56. Moreover, Authenticom's own contract with dealers makes clear that Authenticom is <u>not</u> the dealer's "agent," and in fact refers to "agents" of

---

[52] Prior to 2017, the provisions quoted above appeared in Section 6 of the MSA; they now appear in Section 4.

the dealer repeatedly as third parties to the agreement.  Pl. P.I. Ex. 28 (*Authenticom* Dkt. 65-3) §§ 1.12, 3.2, 8.1, 104.  Finally, even if an "agent" exception existed (and it does not), the MSA independently prohibits "ANY THIRD PARTY SOFTWARE TO ACCESS THE CDK DEALER MANAGEMENT SYSTEM."  MSA § 6(B).

### b.  CDK's Enforcement Of Its Third-Party Access Restrictions

76.     At one time, notwithstanding the MSA's prohibition on unauthorized third-party access, CDK did not actively enforce these contract rights; it did not seek to prevent dealers from providing login credentials to third parties and did not actively take steps to block third parties from accessing the CDK DMS with these credentials.  Events over the last decade, however, caused CDK to fundamentally change its approach to data security and third-party access.  By March 2013, CDK was warning dealers to "[n]ever allow third parties to use your user ID or 'screen scrape' your data."  Defs. P.I. Ex. 21 (*Authenticom* Dkt. 106-23).

77.     Moreover, beginning later that year and in 2014, a number of high-profile data security breaches across multiple industries cost US companies millions of dollars and put sensitive customer information for millions of people at risk:

   a)  In November and December 2013, online thieves successfully hacked into the computer network at against Target, one of the largest retail companies in the United States.  The hackers stole credit card or personal information from up to 70 million customers.  Both personal data and credit card information may have been stolen from about 40 million people.

   b)  In June 2014, North Korea conducted the first-ever destructive cyber attack against the United States when it launched destructive malware attacks against Sony Pictures Enterprise ("Sony"). In addition to destroying Sony data and systems, the attackers stole approximately 100 terabytes of sensitive company and employee data.  The cyber attack led to the firing of Sony's CEO.

   c)  In August 2014, Community Health Systems, the largest provider of general hospital healthcare services in the United States, informed the Securities and Exchange Commission that hackers "originating from China" had stolen sensitive information on 4.5 million patients.

d) In 2016, a security breach at competing DMS provider DealerBuilt exposed millions of customer records of personal and financial data, making them vulnerable to cybercrime and fraud.

78. These well publicized data breaches brought new focus to the risks that CDK was taking by continuing to tolerate unchecked third-party access to its DMS.

79. On September 30, 2014, CDK was officially spun off from ADP and began to operate as an independent, publicly-traded company. CDK's executive leadership quickly realized that a lack of stringent security surrounding its DMS created an unacceptable liability risk for any publicly-traded company. The lack of such security was also allowing free-riders like Authenticom to profit off hundreds of millions of dollars in capital investments and intellectual property to which Authenticom had not contributed a dime.

80. In January 2015, CDK engaged PwC to conduct an assessment of its security program. PwC's report concluded that CDK faced an "[i]ncreased risk exposure from not knowing or assessing all vendors that have access to CDK facilities, assets and data." In consultations with CDK that followed, PwC specifically recommended that CDK secure its DMS to eliminate the security risks presented by unauthorized third-party access.

81. In June 2015, CDK announced a multipart strategy called "SecurityFirst," one aspect of which was an initiative by the company to remove third-party code installed on its DMS and eliminate unauthorized third-party access, including through the use of dealer-issued login credentials. When SecurityFirst was announced, over 52% of CDK's DMS servers were infected with "hostile" code and 27,000 user IDs were being used by unauthorized third parties. A large number of those user IDs were attributable to Authenticom.

82. CDK's SecurityFirst announcement was well publicized within the industry. Upon information and belief, Authenticom became aware that CDK objected to its unauthorized access to the CDK DMS no later than June 2015, and in all likelihood, much earlier.

150

### c. Authenticom's Attempts To Evade CDK's Security Measures

83.     In 2016, CDK began actively implementing security measures to prevent unauthorized access to its DMS by Authenticom and a number of other "hostile" third-party vendors and data extractors.   At each step, Authenticom has constantly attempted—often successfully—to circumvent CDK's security measures, including by falsely certifying to CDK that it is an authorized DMS user.

84.     For example, CDK created a log-in prompt, shown below, to address suspected unauthorized third-party access to its DMS.  The prompt notified users that "[t]he CDK Global DMS is for authorized Dealer personnel only.  Use or access by unauthorized third parties is prohibited. … Enter 'YES' to confirm you are an authorized dealer employee in order to continue.  Enter 'NO' to exit this program."  In other words, users had to represent to CDK that they were "an authorized dealer employee" before they could access the CDK DMS:

```
login: heidi
Password:
Last login: Thu Mar 24 09:10:10 from 139.126.150.113
A RAID EVENT has been reported in the raid event directory.
It is important to notify your CRR of this RAID EVENT as soon as possible.
The CDK Global DMS is for authorized Dealer personnel only.
Use or access by unauthorized third parties is prohibited.
Those using this system without authorization will be denied
access and may have their services revoked.
Enter "YES" to confirm you are an authorized dealer employee
in order to continue,  enter "NO" to exit this program.
yes
```

85.     Between approximately March and July, 2016, this log-in prompt was deployed to more than ▮▮▮ user IDs that Authenticom was using to access CDK's DMS.  Each time, Authenticom modified its scripts to automatically enter "YES" in response to the log-in, thereby representing to CDK that the script was "an authorized dealer employee."

86.     Authenticom made these representations to CDK knowing that they were false, and for the purpose of tricking CDK's DMS into allowing Authenticom's scripts to access the

system and scrape data. By altering its scripts to falsely certify that they were authorized dealer employees, Authenticom was able to regain access to CDK's DMS.

87.    In April 2016, former CDK employee Dan McCray spoke with Authenticom's CEO Steve Cottrell in person while both happened to be attending the same industry conference and informed him (a) that CDK's contracts with dealers prohibited them from providing DMS login credentials to third parties (including Authenticom) and (b) that CDK intended to prevent non-authorized access to its DMS, including Authenticom's unlawful user ID and password access. Mr. Cottrell responded to the effect that Authenticom refused to cease its unauthorized access or otherwise change its business practices.

88.    In approximately June 2016, CDK began requiring password changes for user IDs associated with unauthorized automated third-party access, including several hundred accounts being used by Authenticom. This was a security measure implemented by CDK to effectively disable any accounts that were not being used by authorized dealership employees (who would be capable of easily changing their password). Temporarily, this worked to block Authenticom's scripts from accessing the system. But within a matter of days, Authenticom modified its scripts once again to automatically change the passwords for each of the affected user IDs. By doing so, Authenticom was able to regain access to CDK's DMS.

89.    The following month, CDK began permanently disabling certain user IDs that Authenticom was using to access the CDK's DMS. Authenticom claims that this effectively blocked its use of "thousands" of user IDs, at least temporarily. *See* Cottrell Decl. (*Authenticom* Dkt. 62) ¶ 39 ("CDK disabled Authenticom's login credentials, affecting thousands of dealership connections."); Compl. ¶ 189. However, as described in further detail above, Authenticom soon responded by soliciting dealers to create new user IDs and by offering to install software on the

dealer's network that uses an administrator-level account to access the CDK's DMS and automatically re-enable all other disabled accounts "every hour."

90.     More recently, in November 2017, CDK also introduced a CAPTCHA control designed to stop Authenticom's automated access:



91.     The CAPTCHA could not be more clear that "[o]nly dealer personnel are authorized to use the CDK Global DMS. Use or access by unauthorized third parties is strictly prohibited and is in violation of the terms on which CDK licenses its software and services. Machine/automated access … or issuing of user names and passwords for third party use is considered non-authorized access."  The CAPTCHA then requires the user to identify a word or

series of letters and numbers, as shown above, to "confirm you are an authorized dealer employee" before successfully logging into the CDK DMS.

92.     Humans can easily pass CAPTCHA tests, but automated scripts—like the ones that Authenticom uses—often encounter difficulty.  Accordingly, CDK deployed a CAPTCHA test to hundreds of specific user IDs associated with, among others, Authenticom in order to prevent its automated access to the CDK DMS.  It worked, for a moment.  However, Authenticom was able to crack the CAPTCHA almost immediately and regain access.  CDK does not yet know exactly how Authenticom is circumventing the CAPTCHA.  But in doing so, Authenticom once again falsely certifies to CDK that it is "an authorized dealer employee" in order to bypass a security measure specifically designed to keep it out of the system.

93.     Authenticom has been unmistakably clear that unless it is stopped once and for all, it will continue circumventing CDK's security measures by any means available.  ██████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████         A few months later, in November 2016, Mr. Cottrell issued another letter touting that Authenticom had found "a technology solution" to CDK's security measures—the profile re-enabling program described above—and was working to "deploy the solution across thousands of dealerships."  Defs. P.I. Ex. 44 (*Authenticom* Dkt. 106-51).  Authenticom has further admitted during the course of discovery that it continues to use dealer-issued login credentials to access CDK's DMS—in direct violation of CDK's agreements with those dealers—and that it "works with affected dealers to reestablish … connections" whenever CDK disables them, a statement that Authenticom echoes in its complaint.  *See* Compl. ¶ 195 (Authenticom "work[s] cooperatively" with dealers to "set up new credentials and reestablish access").

94.     Even today, more than two years after CDK began taking steps to eradicate illegal, hostile access to its DMS, Authenticom still accesses CDK DMS hundreds of times every day using new user IDs and passwords that it obtains.  Even when CDK permanently disables those user IDs, new ones spring up just as quickly and resume querying and extracting data.

95.     Unless Authenticom is permanently enjoined from raiding CDK's DMS through the unlawful and unauthorized practices set forth above, it will continue to do so in perpetuity. With every security measure that CDK implements, Authenticom will look for what Mr. Cottrell euphemistically calls a "technology solution."  Authenticom's business model for so-called "data integration" services depends on it.  Absent an injunction, CDK will be forced into endless litigation to enforce its fundamental right to exclude unwanted incursions into its DMS.

### FIRST COUNTERCLAIM FOR RELIEF
### (Violations of the Computer Fraud and Abuse Act)

96.     Paragraphs 1-95 above are incorporated herein by reference.

97.     The Computer Fraud and Abuse Act ("CFAA") provides that "[w]hoever … intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains … information from any protected computer," is subject both to criminal and civil liability. 18 U.S.C. § 1030(a)(2)(C); *see also id.* § 1030(c) (criminal penalties); *id.* § 1030(g) (civil damages and injunctive relief).  The CFAA provides for a private cause of action for "compensatory damages and injunctive relief or other equitable relief" to anyone who suffers at least $5,000 in damage or loss in any one-year period "by reason of a violation" of its terms. *Id.* § 1030(g); *see id.* § 1030(c)(4)(A)(i)(I).

98.     CDK's DMS is a "computer" within the meaning of the CFAA, which defines that term to include "any data storage facility or communications facility directly related to or operating in conjunction with [a computing] device."  *Id.* § 1030(e)(1).  CDK's DMS also relies

on the operation of one or more computing devices in its operations. The DMS itself, and the computing devices by which it operates, are "protected computers" within the meaning of the CFAA because they are connected to the internet and thus are used in and affect interstate and foreign commerce and communications. *See id.* § 1030(e)(2)(B).

99. Authenticom has repeatedly and intentionally accessed the CDK DMS without CDK's authorization. CDK's dealer contracts prohibit dealers from granting Authenticom and other third parties access to the CDK DMS without CDK's consent. At all relevant times, Authenticom was aware of this access restriction and chose to ignore it.

100. CDK has informed Authenticom that its access to CDK's DMS is unauthorized and demanded that it cease its hostile access, but Authenticom has refused to do so.

101. Authenticom accesses CDK's DMS every day and obtains information, including but not limited to the information that Authenticom provides to vendors as part of the "data integration" services it sells them.

102. Authenticom's violations of the CFAA have caused substantial damages to CDK. These damages and losses include the costs of investigating and responding to Authenticom's unlawful actions; the costs of restoring the DMS and the data it contains to their condition prior to Authenticom's unlawful actions; and all revenue lost, costs incurred, and other consequential damages incurred because of disruption of service caused by Authenticom's unauthorized access.

103. Authenticom will continue to violate the CFAA if not enjoined by this Court. Moreover, Authenticom's unauthorized access to the CDK DMS dramatically increases the risk that CDK will suffer a security breach and widespread data corruption issues and degrades the performance of its DMS, all of which constitute an irreparable harm.

104.    CDK is also entitled to equitable relief in the form of restitution for the benefits that Authenticom accrued and/or disgorgement of its profits.

### SECOND COUNTERCLAIM FOR RELIEF
### (Violations of the Digital Millennium Copyright Act)

105.    Paragraphs 1-104 above are incorporated herein by reference.

106.    The Digital Millennium Copyright Act, 17 U.S.C. § 1201 ("DMCA"), prohibits three types of conduct:

a)  "[C]ircumvent[ing] a technological measure that effectively controls access to a work protected under this title" (*Id.* § 1201(a)(1)(A));

b)  "[M]anufactur[ing], import[ing], offer[ing] to the public, provid[ing], or otherwise traffic[king] in any technology, product, service, device, component, or part thereof, that—(A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title; (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title" (*Id.* § 1201(a)(2)); and

c)  "[M]anufactur[ing], import[ing], offer[ing] to the public, provid[ing], or otherwise traffic[king] in any technology, product, service, device, component, or part thereof, that—(A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; (B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof." *Id.* § 1201(b)(1).

107.    CDK uses several technological measures to control access to and prevent copying of the CDK DMS software program. These technological measures include: requiring dealer employees to log on with passwords; text prompts asking a user to certify that he or she is

an authorized dealer employee; and disabling of dealer credentials that CDK finds have been used for automated access by Authenticom or other third parties. These measures effectively control access to the DMS software program, in that the program cannot be run, and its original, expressive elements cannot be displayed or copied, unless these measures have been navigated. These access control measures were effective in preventing Authenticom from accessing the CDK DMS before Authenticom circumvented them.

108. Authenticom has repeatedly circumvented CDK's access control measures in order to access the CDK DMS, extract data from it, and push data back into it. Authenticom has wrongfully obtained login credentials, in violation of contractual requirements that such credentials be given to authorized dealer employees only. It has circumvented, or given outright false answers to, multiple challenge prompts. And after CDK disabled login credentials that had been improperly used for automated DMS access by third parties, Authenticom worked to evade this form of blocking by having new credentials created on its behalf and/or by restoring disabled credentials—including by automated means. This conduct constitutes circumvention of technological measures that effectively controlled access to CDK's DMS, in violation of Section 1201(a)(1)(A).

109. Authenticom has also violated Section 1201(a)(2) and 1201(b)(1) by offering its data extraction services to the public. Aspects of Authenticom's technology and service offerings are primarily designed or produced for use in circumventing the access controls on CDK's DMS, because portions of the product are designed and produced primarily for the purpose of bypassing CDK's password controls, text prompts, and credential disabling. Authenticom has therefore violated Sections 1201(a)(2) and 1201(b)(1).

110.     Authenticom has also violated Section 1201(a)(2) and 1201(b)(1) by offering a service to the public, a part of which has limited commercially significant purpose or use other than circumventing the access and anticopying controls on the CDK DMS.

111.     Authenticom has also violated Section 1201(a)(2) and 1201(b)(1) by offering to a service to the public, a part of which Authenticom markets for use in circumventing the access controls on the CDK DMS terminal.

112.     Under 17 U.S.C. § 1203, CDK is entitled to either actual damages and any additional profits from Authenticom's violations of the DMCA or statutory damages, at CDK's election.  CDK is also entitled to injunctive relief under 17 U.S.C. § 1203(b)(1).  Authenticom will continue to violate the DMCA if not enjoined by this Court.  Moreover, Authenticom's unauthorized access to the CDK DMS dramatically increases the risk that CDK will suffer a security breach and widespread data corruption issues and degrades the performance of its DMS, all of which constitute an irreparable harm.

## THIRD COUNTERCLAIM FOR RELIEF
### (Violations of the Defend Trade Secrets Act)

113.     Paragraphs 1-112 above are incorporated herein by reference.

114.     The Defend Trade Secrets Act provides the owner of a trade secret that is related to a product or service used in, or intended for use in, interstate or foreign commerce a cause of action against a party that has misappropriated that trade secret.  18 U.S.C. § 1836(b).

115.     CDK's DMS contains numerous CDK-proprietary trade secrets, including CDK-created forms, accounting rules, tax tables, and proprietary tools and data compilations.  These trade secrets relate to CDK's DMS services, which are licensed and/or sold in interstate and foreign commerce.  Authenticom misappropriated these trade secrets by repeatedly gaining access to CDK's DMS through improper means, including by using login credentials it was not

authorized to use, evading or bypassing technological measures intended to prevent automated third party access, and wrongful creation of login credentials or reinstatement of disabled credentials. Authenticom knew or had reason to know that its unauthorized access to and copying of information from the CDK DMS was improper.

116. Authenticom has been unjustly enriched by its misappropriation of CDK's trade secrets, and CDK is entitled to disgorgement of those profits. In the alternative, CDK is entitled to payment of a reasonable royalty for Authenticom's acquisition, use, and possession of CDK's trade secrets.

117. Authenticom's misappropriation of CDK's trade secrets will continue unless enjoined by this Court, causing CDK irreparable harm.

### FOURTH COUNTERCLAIM FOR RELIEF
### (Violations of the Wisconsin Computer Crimes Act)

118. Paragraphs 1-117 above are incorporated herein by reference.

119. The Wisconsin Computer Crimes Act ("WCCA") prohibits "willfully, knowingly and without authorization" accessing, taking possession of, or copying "computer programs or supporting documentation." Wis. Stat. § 943.70(2)(a).

120. The WCCA provides that "[a]ny aggrieved party may sue for injunctive relief … to compel compliance with this section." *Id.* § 943.70(5).

121. CDK's DMS is a "computer program" within the meaning of the WCCA, which defines that term to include not just computing devices themselves, but also "all input, output, processing, storage, computer software and communication facilities that are connected or related to a computer in a computer system or computer network." *Id.* § 943.70(1)(am).

122. Authenticom has willfully and repeatedly accessed, taken possession of, and/or copied CDK's DMS and programs within the DMS. At all relevant times, Authenticom knew

that dealers are forbidden by their contracts with CDK from giving Authenticom or other data integrators access to the DMS without CDK's consent.

123. CDK is an "aggrieved party" within the meaning of the WCCA because it is the owner and operator of the CDK DMS that Authenticom has illegally accessed; because Authenticom has intentionally induced and caused CDK's dealer customers to violate the terms of their contracts with CDK; because Authenticom has unjustly enriched itself at CDK's expense; and because Authenticom has caused CDK various other damages and losses as set forth in these Counterclaims.

124. Authenticom will continue to violate the WCCA unless enjoined by this Court. Moreover, Authenticom's unauthorized access to the CDK DMS dramatically increases the risk that CDK will suffer a security breach and widespread data corruption issues and degrades the performance of its DMS, all of which constitute an irreparable harm.

## FIFTH COUNTERCLAIM FOR RELIEF
### (Misappropriation of Trade Secrets)

125. Paragraphs 1-124 above are incorporated herein by reference.

126. The Wisconsin Uniform Trade Secrets Act, Wis. Stat. § 134.90, prohibits misappropriation of trade secrets.

127. CDK's DMS contains numerous proprietary CDK trade secrets, including forms, accounting rules, tax tables, and proprietary tools and data compilations.

128. The CDK trade secrets stored on the CDK DMS derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, such as other DMS providers, application providers, or third-party data extractors like Authenticom.

129.    CDK makes efforts to maintain the secrecy of these trade secrets that are reasonable under the circumstances.  CDK secures its DMS with password control and places strict contractual limitations on who may be granted password access to the DMS.  CDK also uses automated prompts and other measures to prevent DMS access by automated screen-scraping systems such as Authenticom's. CDK does not generally share these trade secrets except in narrow circumstances and subject to strict constraints on further disclosure.

130.    Authenticom misappropriated these trade secrets by improperly acquiring login credentials from CDK's dealer customers, using those credentials to access the CDK DMS without authorization, circumventing multiple access controls, and copying data. The means by which Authenticom acquired these trade secrets was clearly improper, in that it violated both federal and state laws and the terms of CDK's dealer contract. Authenticom thus knew or had reason to know that these means were improper.

131.    Authenticom has been unjustly enriched by its misappropriation of CDK's trade secrets, and CDK is entitled to disgorgement of those profits.

132.    In the alternative, CDK is entitled to payment of a reasonable royalty for Authenticom's acquisition, use, and possession of CDK's trade secrets.

133.    Authenticom's misappropriation of CDK's trade secrets will continue unless enjoined by this Court, causing CDK irreparable harm.

**SIXTH COUNTERCLAIM FOR RELIEF**
**(Violations of the California Comprehensive Computer Data Access and Fraud Act)**

134.    Paragraphs 1-133 above are incorporated herein by reference.

135.    The California Comprehensive Computer Data Access and Fraud Act ("CCCDAFA") provides for criminal and civil liability against "any person" who, among other specified misconduct:

162

a) "[k]nowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data";

b) "[k]nowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network";

c) "[k]nowingly and without permission uses or causes to be used computer services";

d) "[k]nowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network";

e) "[k]nowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section"; and

f) "[k]nowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network."  Cal. Penal Code § 502(c)(1)-(4), (6)-(7).

136.    The CCCDAFA further provides that, "[i]n addition to any other civil remedy available, the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of" any of these violations "may bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief."  *Id.* § 502(e)(1).

137.    CDK's DMS constitutes and/or comprises a "computer network[]," "computer system[]," and "computer program[] or software," and CDK provides "computer services" to its dealer customers and authorized vendors, including in California, within the meaning of the CCCDAFA.  A substantial portion of CDK's networks and systems are located in California.

138.    As set forth above, Authenticom has repeatedly and knowingly accessed the CDK DMS without CDK's permission, including in California, and has knowingly and without

163

PUBLIC REDACTED VERSION

permission engaged in numerous other actions prohibited by the CCCDAFA. Authenticom has knowingly and without permission accessed and used CDK's DMS to wrongfully obtain data within the DMS and provide it to third-party vendors; knowingly and without permission attempted to deceive and defraud CDK by tricking the DMS into believing that Authenticom was an authorized dealer employee logging into his or her own account, for the purpose of taking data from the DMS and providing it to third-party vendors; knowingly and without permission used a variety of computer services provided by the CDK DMS; and knowingly and without permission accessing, causing to be accessed, and assisting others in accessing the CDK DMS.

139.    A substantial portion of these illegal activities either took place in California or were targeted at computers, computer systems, and computer networks located there; were undertaken at the behest of and in coordination with dealers and vendors located in California; and involved confidential data of California residents.

140.    The CCCDAFA violations identified above have caused damages to CDK, including the costs of investigating and responding to Authenticom's unlawful actions; the costs of restoring the CDK DMS and the data it contains to their condition prior to Authenticom's unlawful actions; and all revenue lost, costs incurred, and other consequential damages incurred because of disruption of service caused by Authenticom's unauthorized access.

141.    Authenticom's violations of the CCCDAFA will continue if not enjoined by this Court.  Moreover, Authenticom's unauthorized access to the CDK DMS dramatically increases the risk that CDK will suffer a security breach and widespread data corruption issues and degrades the performance of its DMS, all of which constitute an irreparable harm.

142.    CDK is also entitled to equitable restitution for the benefits that Authenticom accrued and/or disgorgement of its profits.

PUBLIC REDACTED VERSION

## SEVENTH COUNTERCLAIM FOR RELIEF
### (California Unfair Competition Law)

143.     Paragraphs 1-142 above are incorporated herein by reference.

144.     The California Unfair Competition Law prohibits "any unlawful, unfair or fraudulent business act or practice …." Cal. Bus. & Prof. Code § 17200.

145.     Authenticom's business acts and practices, including but not limited to its misappropriation and unauthorized use of DMS login credentials; circumvention of access and anticopying controls; and provision to the public of a service that facilitates circumvention of access and anticopying controls are unlawful under, *inter alia*, the CFAA; the WCCA; the CCCDFA; and the DMCA.

146.     Authenticom's business acts and practices, including but not limited to its misappropriation and unauthorized use of DMS login credentials and inducement of CDK's dealer customers to breach their contracts with CDK are also unfair practices under the UCL. It is unfair and inequitable for Authenticom to violate CDK's legitimate restrictions on DMS access in order to free-ride on CDK's proprietary system and technology for its own profit.

147.     A substantial portion of Authenticom's unlawful and unfair activities occurred in California, where many CDK dealer customers are located.

148.     CDK has suffered economic injury as a result of Authenticom's unlawful and unfair business practices. CDK has had to devote substantial resources to monitoring and remediating any harmful effects of Authenticom's unauthorized DMS access and to preventing such unauthorized access in the future.  CDK has also been denied any compensation for Authenticom's access to the CDK DMS.

149.     CDK is entitled to restitution for the benefits that Authenticom accrued and/or disgorgement of its profits.

150.    Authenticom's unlawful business practices will continue if not enjoined by this Court.  Moreover, Authenticom's unauthorized access to the CDK DMS dramatically increases the risk that CDK will suffer a security breach and widespread data corruption issues and degrades the performance of its DMS, all of which constitute an irreparable harm.

### EIGHTH COUNTERCLAIM FOR RELIEF
### (Tortious Interference With Contract)

151.    Paragraphs 1-150 above are incorporated herein by reference.

152.    CDK enters into a valid and binding written contract with each of its dealer customers, referred to as the Master Services Agreement.

153.    CDK's Master Services Agreement prohibits dealers from allowing third-party data extractors like Authenticom to access the CDK DMS without CDK's consent. Authenticom was aware of these contractual restrictions and has encouraged dealers to violate them.

154.    At all relevant times, Authenticom knew that dealers who provided it with login credentials for the CDK DMS for purposes of accessing the DMS and its constituent programs, extracting data, providing the data to vendors, and writing data back into the DMS were breaching their contracts with CDK.  Authenticom intentionally interfered with those contractual relationships by selling data integration services to dealers.

155.    Authenticom's interference with CDK's dealer contracts was the direct and proximate cause of damages to CDK.  As a result of Authenticom's interference and the breaches of the dealer contracts, CDK has had to devote substantial resources to monitoring and remediating any harmful effects of Authenticom's unauthorized DMS access and to preventing such unauthorized access in the future.  CDK has also been denied any compensation for Authenticom's access to the CDK DMS. CDK was also damaged in that Authenticom enjoyed free access to the CDK DMS for which it otherwise would have had to pay.

156.     Authenticom was neither justified nor privileged to interfere with CDK's contractual relationships with its dealers in this way.  Authenticom knew that the terms of CDK's dealer contracts forbade it from accessing the CDK DMS without CDK's authorization but deliberately pursued a business model that violated and undermined that restriction on access in order to profit off of CDK's substantial investments in its DMS technology.

157.     Authenticom's tortious interference with CDK's dealer contracts will continue into the future if not enjoined by this Court.  Moreover, Authenticom's unauthorized access to the CDK DMS dramatically increases the risk that CDK will suffer a security breach and widespread data corruption issues and degrades the performance of its DMS, all of which constitute an irreparable harm.

## NINTH COUNTERCLAIM FOR RELIEF
### (Trespass to Chattels)

158.     Paragraphs 1-157 above are incorporated herein by reference.

159.     Authenticom's repeated circumvention of the access controls on the CDK DMS, and its repeated access thereto, constitute trespass to chattels.

160.     At all relevant times, Authenticom knew that its access to the CDK DMS was not authorized, but it intentionally and repeatedly accessed the DMS despite CDK's opposition.

161.     Authenticom's access to, extraction of data from, and writing data back into the CDK DMS impaired the condition, quality, and value of the DMS by slowing its performance, impeding its operations, subjecting it to data corruption and system integrity issues, and exposing it to heightened security threats.

162.     Authenticom's trespasses have directly and proximately harmed CDK by diminishing the functionality, efficiency, and usefulness of its DMS.

PUBLIC REDACTED VERSION

## TENTH COUNTERCLAIM FOR RELIEF
### (Conversion)

163.    Paragraphs 1-162 above are incorporated herein by reference.

164.    Every time Authenticom accesses the CDK DMS and the DMS database software program, it intentionally controls servers owned by CDK, which execute the search queries submitted by Authenticom and return the data requested.

165.    CDK does not consent and has never consented to Authenticom's exercise of control over its server systems.

166.    Authenticom's repeated access to the CDK DMS seriously interfered with CDK's possessory rights in its server systems by reducing the efficiency and efficacy of the server systems.  This interference has been a direct and proximate cause of harm and damages to CDK.

## ELEVENTH COUNTERCLAIM FOR RELIEF
### (Unjust Enrichment)

167.    Paragraphs 1-166 above are incorporated herein by reference.

168.    Every time Authenticom accesses the CDK DMS without authorization, the DMS automatically confers several benefits upon Authenticom.

169.    First, Authenticom is able to extract data from the CDK DMS and write data back into it, which enables it to provide data extraction and writeback services to vendors and to be paid by vendors for those services.

170.    Second, Authenticom enjoys free access to the CDK DMS, which is a benefit for which it would otherwise have to pay (through CDK's 3PA program).

171.    Authenticom knows and appreciates that CDK is conferring benefits upon Authenticom when Authenticom accesses CDK's DMS.  Authenticom recognizes such benefits

when, among other things, it makes representations that, if CDK is permitted to block it from accessing the CDK DMS, it will go out of business. *See, e.g.*, Compl. ¶ 233.

172.    Authenticom has accepted and retained these ill-gotten benefits under such circumstances that it would be inequitable to allow it to retain the benefits without paying for the value thereof.  Authenticom's unauthorized access is unlawful and violates the terms of CDK's dealer contracts. Authenticom also knows that CDK does not want Authenticom to access the CDK DMS but has persisted in doing so for its own purposes and its own profit.  It would be inequitable in these circumstances to allow Authenticom to retain the benefits of its unauthorized access without paying compensation to CDK.

**TWELFTH COUNTERCLAIM FOR RELIEF**
**(Fraud)**

173.    Paragraphs 1-172 above are incorporated herein by reference.

174.    In the course of accessing the CDK DMS without authorization, Authenticom has frequently and repeatedly represented to CDK that it is a human employee of a CDK dealer customer who is authorized to access the DMS.  That representation occurs whenever Authenticom uses login credentials provided by dealers, which are only intended permitted to be used by authorized dealership employees.  Authenticom has also responded "YES" to text prompts during the DMS login process expressly asking whether it is an authorized dealership employee, and has entered CAPTCHA responses when prompted to "[e]nter the following text to confirm you are an authorized dealer employee."

175.    Those representations are false.  Authenticom is not a dealer employee and is forbidden under CDK's dealer contracts from accessing the CDK DMS.  Authenticom knows these facts and thus knows that its representations to CDK are untrue.

176.     CDK frequently believes Authenticom's false misrepresentations to be true and relies on them by allowing Authenticom to access the CDK DMS.  CDK's technological measures have not always been effective to detect Authenticom's unauthorized access; even today, they are sometimes unable to determine that Authenticom is not an authorized employee of a CDK dealer customer.  If CDK always knew when Authenticom was attempting to access its system without authorization, it would prevent Authenticom from ever doing so.

177.     Authenticom's fraudulent misrepresentations are the direct and proximate cause of harm and damages to CDK.  As a result of Authenticom's interference and the breaches of the dealer contracts, CDK has had to devote substantial resources to monitoring and remediating any harmful effects of Authenticom's unauthorized DMS access and to preventing such unauthorized access in the future.  CDK has also been denied any compensation for Authenticom's access to the CDK DMS.  CDK was also damaged in that Authenticom enjoyed free access to the CDK DMS for which it otherwise would have had to pay.

178.     Authenticom's fraud will continue if not enjoined by this Court.  Among other things, Authenticom's unauthorized access to the CDK DMS dramatically increases the risk that CDK will suffer a security breach and widespread data corruption issues and degrades the performance of its DMS, all of which would constitute an irreparable harm because money damages would not compensate for the reputational injury that CDK would experience from such a breach.

## PRAYER FOR RELIEF

WHEREFORE, CDK respectfully requests that this Court enter judgment:

A.     Declaring that Authenticom's actions:

(1) violate the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

(2) violate the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201(a)(1)(A), 1201(a)(2), and 1201(b)(1);

(3) violate the Defend Trade Secrets Act, 18 U.S.C. § 1836;

(4) violate the Wisconsin Computer Crimes Act, Wis. Stat. § 943.70(2)(a);

(5) violate the Wisconsin Uniform Trade Secrets Act, Wis. Stat. § 134.90;

(6) violate the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502;

(7) violate the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200; and

(8) constitute tortious interference with contract, trespass to chattels, conversion, unjust enrichment, and fraud in violation of the common law.

B.    Permanently enjoining Authenticom from engaging in the actions that violate these laws including accessing, using, and copying any portion or part of CDK's DMS without CDK's authorization;

C.    Awarding CDK its full losses, expenses, and other damages caused by Authenticom's illegal actions;

D.    Requiring Authenticom to pay for the benefits it has unjustly obtained through its unauthorized access to CDK's DMS and the data in it, including a reasonable royalty together with the profits it has earned from vendors or dealers from accessing the DMS without CDK's authorization;

E.    Awarding CDK its costs and litigation expenses, including attorneys' fees and costs; and

PUBLIC REDACTED VERSION

G.  Awarding CDK such other and further relief that this Court deems just, proper, and equitable.

## JURY DEMAND

CDK hereby demands a trial by jury for all claims so triable.

Dated: June 29, 2018                                  Respectfully submitted,

_/s/ Britt M. Miller_
Britt M. Miller
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

_Counsel for Defendant CDK Global, LLC_

## CERTIFICATE OF SERVICE

I, Britt M. Miller, an attorney, hereby certify that on June 29, 2018, I caused a true and correct copy of the foregoing **DEFENDANT CDK GLOBAL, LLC'S ANSWER AND AFFIRMATIVE AND ADDITIONAL DEFENSES AND COUNTERCLAIMS** to be filed electronically via the court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Copies were served on counsel of record via e-mail.

>  */s/ Britt M. Miller*_____
>  Britt M. Miller
>  MAYER BROWN LLP
>  71 South Wacker Drive
>  Chicago, IL  60606
>  Phone:  (312) 782-0600
>  Fax:  (312) 701-7711
>  E-mail:  bmiller@mayerbrown.com