# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | ) ) ) ) | MDL No. 2817 Case No. 1:18-CV-00864 |
| *This Document Relates To:* | ) ) ) | Hon. Robert M. Dow, Jr. |
| The Dealership Class Action | ) ) | |

**DEFENDANT THE REYNOLDS AND REYNOLDS COMPANY'S MEMORANDUM IN SUPPORT OF ITS (1) MOTION TO DISMISS THE REYNOLDS DEALER PLAINTIFFS' CLAIMS IN FAVOR OF ARBITRATION PURSUANT TO RULE 12(B)(3) AND STAY REMAINING CDK DEALER CLAIMS; AND (2) MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT PURSUANT TO RULE 12(B)(6)**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................. 1

III.  THE REYNOLDS DEALERS' CLAIMS SHOULD BE DISMISSED IN FAVOR OF INDIVIDUAL ARBITRATIONS. THE REMAINING CDK DEALER CLAIMS SHOULD BE STAYED. ................................................................. 6

    A.  The Reynolds Dealers Signed Broad Arbitration Agreements ..................................... 7

    B.  The Proper Vehicle for Enforcing This Arbitration Agreement Is a Motion to Dismiss Under Rule 12(b)(3) ........................................................................... 8

    C.  Under the Arbitration Agreement, the Reynolds Dealers' Claims Must Be Dismissed in Favor of Individual Arbitration .............................................................. 8

        1.  The Reynolds Dealers' claims must be dismissed in favor of arbitration. ............. 8

            a.  The parties agreed that the arbitrator would decide whether the claims in suit fall within the scope of the arbitration agreement.................................. 8

            b.  Even if the parties had not delegated scope issues to the arbitrator, this broad-form agreement covers the Reynolds Dealers' allegations. ................. 10

        2.  The arbitration clause requires individual, not class, arbitration. ........................ 12

            a.  Even when the parties incorporate the AAA rules, this Court still decides class arbitrability. ............................................................................ 12

               i.  The parties contracted for the Sixth Circuit rule to control. ................... 12

               ii.  The Sixth Circuit rule is correct: class arbitrability is an issue for this Court.................................................................................................. 13

            b.  The arbitration clause prohibits class arbitration. ........................................... 17

    D.  The CDK Dealers' joint-and-several claims against Reynolds should be stayed pending arbitration of the Reynolds Dealers' direct-liability claims. ........................ 19

        1.  The FAA, properly construed, provides for a mandatory stay of this entire "action." The Seventh Circuit's decision adopting that rule is binding on this Court notwithstanding later decisions to the contrary.................................... 19

        2.  Even under the discretionary approach adopted by later panels, Reynolds is entitled to a stay of the CDK Dealers' joint-and-several claims. ........................ 20

IV.   ARGUMENT IN SUPPORT OF REYNOLDS' MOTION TO DISMISS
      PURSUANT TO RULE 12(B)(6).................................................................. 23

      A.  Plaintiffs Fail to Allege a Plausible Antitrust Injury With Respect to Their DMS
          Purchases........................................................................................... 25

      B.  Plaintiffs Fail To Plausibly Allege An Antitrust Violation With Respect To
          "Integration Services.".......................................................................... 29

          1.  Plaintiffs' Claims That Reynolds "Conspired" To Continue Its Preexisting,
              Unilateral Business Practices Do Not Make Economic Sense. ........................... 29

          2.  Plaintiffs' Inability to Grant Integrators Illegal Access to Reynolds's or
              CDK's DMS Is Not an Antitrust Injury................................................... 34

          3.  Plaintiffs Fail to Allege a Plausible "Market Division" Conspiracy. ................... 35

          4.  Plaintiffs Lack AGC Standing to Assert Claims Under Federal Law and
              Most of the Relevant State Laws. ...................................................... 36

      C.  Plaintiffs' Monopolization and Exclusive Dealing Claims Fail For Additional
          Reasons. ........................................................................................... 39

          1.  Plaintiffs Fail to Allege a Plausible "Single-Brand Aftermarket" for
              "Integration Services" on Reynolds's DMS. ............................................ 39

              a.  Reynolds's Dealer Customers Knew About Its "Aftermarket" Policy. .......... 41

              b.  Plaintiffs Cannot Allege They Are "Locked In" By Switching Costs............ 43

              c.  Plaintiffs Do Not Allege That "Information Costs" Prevented Them
                  From Learning The Total Cost Of the "Package" They Were Buying........... 45

          2.  Plaintiffs Cannot Allege That The Supposed "Exclusive Dealing"
              Provisions In Reynolds's Vendor Contracts Caused Their Alleged Injuries........ 46

          3.  Reynolds's Unilateral Refusal To Grant Access To Its Copyrighted DMS
              Cannot Be An Antitrust Violation. .................................................... 48

      D.  Plaintiffs' Damages Claims and Request For Injunctive Relief Are Overbroad........ 49

          1.  Plaintiffs' Contracts with Reynolds Require Dismissal of Their Claims
              Based On Purchases Made More Than One Year Prior to The Filing Of
              Their Respective Original Complaints................................................... 49

          2.  Plaintiffs' Request For Expansive Injunctive Relief Should Be Struck
              Under The Seventh Circuit's Decision In Authenticom. ................................ 51

V.    CONCLUSION.............................................................................................. 52

CERTIFICATE OF SERVICE ..................................................................................................... 53

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acquaire v. Canada Dry Bottling*,
   906 F. Supp. 819 (E.D.N.Y. 1995) ....................................................................................11

*Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*,
   141 F.3d 947 (9th Cir. 1998) ..........................................................................................30

*Ali v. Vehi-Ship, LLC*,
   17 CV 02688, 2017 WL 5890876 (N.D. Ill. Nov. 27, 2017)...........................................9

*AlixPartners, LLP v. Brewington*,
   836 F.3d 543 (6th Cir. 2016) ............................................................12, 16, 17, 18

*Allscripts Healthcare, LLC v. Etransmedia Tech., Inc.*,
   188 F. Supp. 3d 696 (N.D. Ill. 2016) ...............................................................................9

*Arista Records LLC v. Lime Group LLC*,
   532 F. Supp. 2d 556 (S.D.N.Y. 2007).............................................................................26

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).........................................................................................................27

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011).................................................................................................14, 16

*AT&T Techs., Inc. v. Communications Workers of Am.*,
   475 U.S. 643 (1986).........................................................................................................10

*Atl. Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990).........................................................................................................25

*Authenticom, Inc. v. CDK Global, LLC*,
   874 F.3d 1019 (7th Cir. 2017) ..........................................................26, 41, 51, 52

*Authenticom, Inc. v. CDK Global, LLC, et al.*,
   No. 17-cv-00318 (W.D. Wisc. July 28, 2018) ...........................................................44

*In re Automotive Parts Antitrust Litig.*,
   2017 WL 3579753 (E.D. Mich. Apr. 18, 2017)..............................................................22

*Avaya Inc., RP v. Telecom Labs, Inc.*,
   838 F.3d 354 (3d Cir. 2016)............................................................................................41

*Awuah v. Coverall N. Am., Inc.,*
  554 F.3d 7 (1st Cir. 2009) .................................................................................9

*B-S Steel of Kansas, Inc. v. Texas Indus., Inc.,*
  229 F. Supp. 2d 1209 (D. Kan. 2002) ..............................................................11

*Bailey Lumber & Supply Co. v. Georgia-Pac. Corp.,*
  No. 1:08CV1394 LG-JMR, 2009 WL 2872307, at *5 (S.D. Miss. Aug. 10,
  2009) .................................................................................................................28

*In re Beef Indus. Antitrust Litig.,*
  907 F.2d 510 (5th Cir. 1990) ............................................................................28

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007).........................................................................23, 27, 31

*Bischoff v. DirecTV, Inc.,*
  180 F. Supp. 2d 1097 (C.D. Cal. 2002) .......................................................11, 22

*Bogie v. Rosenberg,*
  705 F.3d 603 (7th Cir. 2013) ............................................................................52

*Brennan v. Opus Bank,*
  796 F.3d 1125 (9th Cir. 2015) ...........................................................................9

*Brokerage Concepts v. U.S. Healthcare,*
  140 F.3d 494 (3d Cir. 1998)..............................................................................43

*Brooks v. Walls,*
  279 F.3d 518 (7th Cir. 2002) ............................................................................20

*Brownmark Films, LLC v. Comedy Partners,*
  682 F.3d 687 (7th Cir. 2012) ............................................................................23

*Catamaran Corp. v. Towncrest Pharmacy,*
  864 F.3d 966 (8th Cir. 2017) ................................................................13, 16, 17

*In re: Cathode Ray Tube (CRT) Antitrust Litig.,*
  3:14-CV-02510, 2014 WL 7206620 (N.D. Cal. Dec. 18, 2014)........................10

*Cequent Performance Prod., Inc. v. Let's Go Aero, Inc.,*
  No. 14 C 8457, 2016 WL 4036754 (N.D. Ill. July 28, 2016) .............................9

*Champ v. Siegel Trading Co., Inc.,*
  55 F.3d 269 (7th Cir. 1995) ..............................................................................17

*Chesapeake Appalachia L.L.C v. Scout Petroleum, LLC,*
  17-2037, 2018 WL 1295736 (3d Cir. Mar. 13, 2018)........................................17

*Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*,
  809 F.3d 746 (3d Cir. 2016), *cert. denied*, 137 S. Ct. 40 (2016) ............................................16

*Commercial Data Servers, Inc. v. IBM*,
  262 F. Supp. 2d 50 (S.D.N.Y. 2003) .......................................................................................43

*Contec Corp. v. Remote Solution Co.*,
  398 F.3d 205 (2d Cir. 2005) ........................................................................................................9

*Cook v. John Hancock Life Ins. Co. (U.S.A.)*,
  7:12-CV-00455, 2013 WL 942384 (W.D. Va. Mar. 11, 2013) ................................................22

*In re Cotton Yarn Antitrust Litig.*,
  505 F.3d 274 (4th Cir. 2007) ....................................................................................................51

*In re Currency Conversion Fee Antitrust Litig.*,
  265 F. Supp. 2d 385 (S.D.N.Y. 2003) ......................................................................................11

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
  09 CV 3690, 2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) .....................................................37

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
  09 CV 3690, 2015 WL 3988488 (N.D. Ill. June 29, 2015) ......................................................37

*Data General Corp. v. Grumman Systems Support Corp.*,
  36 F.3d 1147 (1st Cir. 1994) ...............................................................................................48, 49

*Deb v. SIRVA, Inc.*,
  832 F.3d 800 (7th Cir. 2016) ......................................................................................................7

*Del Webb Communities, Inc. v. Carlson*,
  698 Fed. Appx. 761 (4th Cir. 2017) (per curiam) ....................................................................17

*Dell Webb Cmtys., Inc. v. Carlson*,
  817 F.3d 867 (4th Cir. 2016) ...............................................................................................13, 16

*Digital Equip. Corp. v. Uniq Digital Techs., Inc.*,
  73 F.3d 756 (7th Cir. 1996) ......................................................................................................41

*Doe v. Blue Cross & Blue Shield United of Wis.*,
  112 F.3d 869 (7th Cir. 1997) ....................................................................................................50

*Dominium Austin Partners, L.L.C. v. Emerson*,
  248 F.3d 720 (8th Cir. 2001) ....................................................................................................18

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  536 F. Supp. 2d 1129 (N.D. Cal. 2008) ...................................................................................37

vii

*Eastman Kodak Co. v. Image Tech. Services, Inc.*,
504 U.S. 451 (1992) ...........................................................................40, 46

*Empire State Ethanol & Energy, LLC v. BBI Int'l*, No. 1:08-CV-623 GLS/DRH,
2009 WL 790962 (N.D.N.Y. Mar. 20, 2009) .........................................11

*Epic Sys. Corp. v. Lewis*,
138 S. Ct. 1612 (2018) ........................................................................17

*Fallo v. High–Tech Inst.*,
559 F.3d 874 (8th Cir. 2009) ...............................................................9

*Faulkenberg v. CB Tax Franchise Sys., LP*,
637 F.3d 801 (7th Cir. 2011) ...............................................................8

*Ferenc v. Brenner*,
927 F. Supp. 2d 537 (N.D. Ill. 2013) ...................................................8

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995) ..........................................................................15

*Flynn v. FCA US LLC*,
15-CV-0855-MJR-DGW, 2016 WL 5341199 (S.D. Ill. Sept. 23, 2016).........................21, 22

*G&G Closed Circuit Events, LLC v. Castillo*,
14-CV-02073, 2017 WL 1079241 (N.D. Ill. Mar. 22, 2017) .................21

*GEA Group AG v. Flex-N-Gate Corp.*,
740 F.3d 411 (7th Cir. 2014) ...............................................................21

*Goss v. Mem'l Hosp. Sys.*,
789 F.2d 353 (5th Cir. 1986) ...............................................................28

*Gray v. Conseco, Inc.*,
SA CV 00-322DOC(EEX), 2000 WL 1480273 (C.D. Cal. Sept. 29, 2000).........................22

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
998 F.2d 391 (7th Cir. 1993) ...............................................................47, 48

*Hackman v. Dickerson Realtors*,
520 F. Supp. 2d 954 (N.D. Ill. 2007) ...................................................26, 33

*California ex rel. Harris v. Safeway, Inc.*,
651 F.3d 1118 (9th Cir. 2011) .............................................................36

*Henderson v. U.S Patent Comm'n, Ltd.*,
188 F. Supp. 3d 798 (N.D. Ill. 2016) ...................................................13, 17

*Howsam v. Dean Witter Reynolds, Inc.*,
537 U.S. 79 (2002) ........................................................................................................9

*Huffman v. Hilltop Companies, LLC*,
747 F.3d 391 (6th Cir. 2014) ......................................................................................12

*IDS Life Ins. Co. v. SunAmerica, Inc.*,
103 F.3d 524 (7th Cir. 1996) ......................................................................................20

*Imperial Crane Sales, Inc. v. Sany Am., Inc.*,
No. 15 C 859, 2015 WL 4325483 (N.D. Ill. July 15, 2015) .....................................9

*In re Independent Service Organizations Antitrust Litig.*,
203 F.3d 1322 (Fed. Cir. 2000) .............................................................................48, 49

*Int'l Bhd. of Elec. Workers Local 2150 v. NextEra Energy Point Beach, LLC*,
762 F.3d 592 (7th Cir. 2014) ......................................................................................10

*Int'l Constr. Prods. LLC v. Caterpillar Inc.*,
No. 15-108-RGA, 2016 WL 264909 (D. Del. Jan. 21, 2016) ....................................26

*JLM Indus., Inc. v. Stolt-Nielsen SA*,
387 F.3d 163 (2d Cir. 2004) ................................................................................10, 11

*KeyBank Natl. Assn. v. Sw. Greens of Ohio, L.L.C.*,
988 N.E.2d 32 (Ohio Ct. App. 2013) ...........................................................................7

*In re Late Fee & Over-Limit Litig.*,
528 F. Supp. 2d 953 (N.D. Cal. 2007) .......................................................................33

*Reed Elsevier, Inc. ex rel. LexisNexis Div. v. Crockett*,
734 F.3d 594 (6th Cir. 2013) .......................................................................... *passim*

*MacDermid Printing Solutions LLC v. Coltron Corp.*,
833 F.3d 172 (2d Cir. 2016) .......................................................................................26

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ....................................................................................................32

*Med. Mut. of Ohio v. k. Amalia Enters. Inc.*,
548 F.3d 383 (6th Cir. 2008) ......................................................................................50

*Meijer, Inc. v. Biovail Corp.*,
533 F.3d 857 (D.C. Cir. 2008) ....................................................................................36

*Mich. Division-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
458 F. Supp. 2d 474 (E.D. Mich. 2006) ......................................................................31

*Mid-Mich. Radiology Assocs., P.C. v. Cent. Mich. Cmty. Hosp.*,
  No. 94-CV-10057, 1995 WL 239360 (E.D. Mich. Feb. 14, 1995)..........................................47

*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*,
  473 U.S. 614 (1985).........................................................................................................11

*Morales v. Lexxiom, Inc.*,
  CV096549SVWDTBX, 2010 WL 11507515 (C.D. Cal. Jan. 29, 2010)................................23

*Morrie Mages & Shirlee Mages Found. v. Thrifty Corp.*,
  916 F.2d 402 (7th Cir. 1990) .......................................................................................19, 20

*Motor Vehicle Software Corp. v. CDK Global, Inc.*,
  No. 17-896 DSF, 2017 WL 5643163 (C.D. Cal. Oct. 2, 2017) ............................................33

*Nakamura Trading Co. v. Sankyo Corp.*,
  05 CV 7205, 2006 WL 1049608 (N.D. Ill. Apr. 19, 2006).....................................................21

*Newcal Indus., Inc. v. IKON Office Solution*,
  512 F.3d 1038 (9th Cir. 2008) ...........................................................................................40

*Niazi v. St. Jude Med. S.C., Inc.*,
  17-CV-183-JDP, 2017 WL 5159784 (W.D. Wis. Nov. 7, 2017) ...........................................20

*Nw. Univ. v. Insight Biomedical, Inc.*,
  No. 99 C 2354, 1999 WL 417397 (N.D. Ill. June 15, 1999) .................................................10

*Olson v. Bemis Co.*,
  800 F.3d 296 (7th Cir. 2015) ..............................................................................................23

*In re Online DVD Rental Antitrust Litig.*,
  No. M 09-2029 PJH, 2011 WL 5883772 (N.D. Cal. Nov. 22, 2011) ....................................35

*Opalinski v. Robert Half Int'l Inc*,
  677 Fed. Appx. 738 (3d Cir. 2017)......................................................................................17

*Opalinski v. Robert Half Int'l Inc.*,
  761 F.3d 326 (3d Cir. 2014).........................................................................................13, 14

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*,
  No. 5:16-cv-06370-EJD, 2017 WL 4310767 (N.D. Cal. Sept. 28, 2017)..............................31

*Petrofac, Inc. v. DynMcDermott Petrol. Ops. Co.*,
  687 F.3d 671 (5th Cir. 2012) ................................................................................................9

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
  No. 09 C 7666, 2012 WL 39766 (N.D. Ill. Jan. 9, 2012) .....................................................37

*In re Potash Antitrust Litig.*,
667 F. Supp. 2d 907 (N.D. Ill. 2009) ................................................... 37

*POURfect Prods. v. KitchenAid*,
2010 WL 1769413 (D. Ariz. May 3, 2010) ..................................... 40, 43

*Pryner v. Tractor Supply Co.*,
109 F.3d 354 (7th Cir. 1997) ........................................................... 20

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
104 F.3d 811 (6th Cir. 1997) ........................................................... 41

*Pugh v. Tribune Co.*,
521 F.3d 686 (7th Cir. 2008) ........................................................... 23

*Qualcomm Inc. v. Nokia Corp.*,
466 F.3d 1366 (Fed. Cir. 2006) ......................................................... 9

*Reed v. Florida Metro. Univ., Inc.*,
681 F.3d 630 (5th Cir. 2012) ...................................................... 16, 17

*In re Refrigerant Compressors Antitrust Litig.*,
No. 2:09-md-02042, 2013 WL 1431756 (E.D. Mich. April 9, 2013) .................... 37

*Rent-A-Ctr., W., Inc. v. Jackson*,
561 U.S. 63 (2010) ....................................................................... 9

*The Reynolds & Reynolds Co. v. Superior Integrated Solutions, Inc.*,
No. 1:12-cv-00848, 2013 WL 2456093 (S.D. Ohio June 6, 2013) .............. 5, 41, 42

*Robb v. Conn. Bd. of Veterinary Med.*,
157 F. Supp. 3d 130 (D. Conn. 2016) .................................................. 33

*Rossi v. Standard Roofing*,
156 F.3d 452 (3d Cir. 1998) ........................................................... 31

*In re Samsung Galaxy Smartphone Mktg. & Sales Practices Litig.*,
298 F. Supp. 3d 1285 (N.D. Cal. 2018) ................................................ 22

*Scan Top Enter. Co., Ltd. v. Winplus N. Am., Inc.*,
No. 14 C 7505, 2016 WL 910502 (N.D. Ill. Mar. 9, 2016) ............................. 10

*Schor v. Abbott Labs.*,
457 F.3d 608 (7th Cir. 2006) ..................................................... 31, 41, 52

*Shore v. Johnson & Bell*,
16-CV-4363, 2017 WL 714123 (N.D. Ill. Feb. 22, 2017) ............................... 17

*Simula, Inc. v. Autoliv, Inc.*,
 175 F.3d 716 (9th Cir. 1999) ........................................................................11

*Snyder v. Smith*,
 736 F.2d 409 (7th Cir. 1984) ........................................................................12

*Somers v. Apple, Inc.*,
 729 F.3d 953 (9th Cir. 2013) ........................................................................25

*Stephan v. Goldinger*,
 325 F.3d 874 (7th Cir. 2003) ........................................................................50

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
 559 U.S. 662 (2010) .............................................................................14, 15, 16, 17

*Sunbeam TV Corp. v. Nielsen Media Research, Inc.*,
 711 F.3d 1264 (11th Cir. 2013) ....................................................................36

*Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Intern., Ltd.*,
 1 F.3d 639 (7th Cir. 1993) ........................................................................7, 10

*Taylor v. W. & S. Life Ins. Co.*,
 966 F.2d 1188 (7th Cir. 1992) ......................................................................50

*Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*,
 432 F.3d 1327 (11th Cir. 2005) ......................................................................9

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
 No. C 10-5458 SI, 2011 WL 5325589 (N.D. Cal. Sept. 19, 2011) ................11

*United Magazine Co. v. Murdoch Magazines Distribution, Inc.*,
 146 F. Supp. 2d 385 (S.D.N.Y. 2001) ..........................................................32

*United States v. Romer*,
 148 F.3d 359 (4th Cir. 1999) ........................................................................36

*Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*,
 184 F. Supp. 2d 947 (D. Ariz. 2001) ........................................................40, 45

*Universal Grading Serv. v. Ebay, Inc.*,
 No. C-09-2755, 2012 WL 70644 (N.D. Cal. Jan. 9, 2012), *aff'd* 563 Fed.
 Appx. 571 (9th Cir. 2014) ............................................................................32

*Varela v. Lamps Plus, Inc.*,
 701 Fed. Appx. 670 (9th Cir. 2017), *cert. granted*, 138 S. Ct. 1697 (2018) ............18

*Volkswagen of Am., Inc. v. Sud's of Peoria, Inc.*,
 474 F.3d 966 (7th Cir. 2007) ...................................................................20, 21, 22

*Volt Info. Sci., Inc. v. Bd. of Trs. of Leland Stanford, Jr. Univ.*,
    489 U.S. 468 (1989) .................................................................................10

*Wal-Mart Stores, Inc. v. Helferich Patent Licensing, LLC*,
    51 F. Supp. 3d 713 (N.D. Ill. 2014) ..........................................................9

*Weisbuch v. County of Los Angeles*,
    119 F.3d 778 (9th Cir. 1997) ...................................................................24

*Wells Fargo Advisors, LLC v. Sappington*,
    884 F.3d 392 (2d Cir. 2018) ....................................................................16

*William O. Gilley Enters, Inc. v. Atl. Richfield Co.*,
    588 F.3d 659 (9th Cir. 2009) ...................................................................30

*WMS Gaming, Inc. v. IGT*,
    31 F. Supp. 3d 974 (N.D. Ill. 2014) ........................................................21

*Yellow Cab Affiliation, Inc. v. New Hampshire Ins. Co.*,
    No. 10-CV-6896, 2011 WL 307617 (N.D. Ill. Jan. 28, 2011) ...................9

**Statutes**

Federal Arbitration Act, 9 U.S.C. § 3 ...........................................................19

**Other Authorities**

Wright & Miller, § 4475.1 Arbitration Preclusion, 18B Fed. Prac. & Proc. Juris. §
    4475.1 (2d ed.) ........................................................................................21

Wright & Miller, § 3506 Courts of Appeals, 13 Fed. Prac. & Proc. Juris. (3d ed.) .....................20

Jonathan I. Gleklen et al., *Antitrust Law Developments*, 626 (7th ed. 2012) ...............................39

P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles
    & Their Application* ¶ 1411 (4th ed. 2017) ..............................................33

## I.      **INTRODUCTION**

As explained in **Section III** below, the Court should dismiss the Reynolds Dealers' claims against Reynolds in favor of contractually-required individual arbitrations and stay the remaining CDK Dealers' claims against Reynolds until those arbitrations are resolved.  Moreover, subject to that motion, for the reasons set forth and incorporated in **Section IV** below, all of the Dealership Plaintiffs' ("Plaintiffs") claims against Reynolds should be dismissed under Rule 12(b)(6).

The Court should resolve Reynolds's arbitration and stay arguments first.  If the Court grants both Reynolds's arbitration and stay requests, the Court should refrain from ruling on the issues set forth and incorporated in **Section IV** until all arbitrations are resolved.  If the Court grants only Reynolds' request for arbitration and denies its stay request, the Court should proceed to resolve all of the arguments set forth and incorporated in **Section IV**, with the exception of the argument set forth in **Section IV.D.1** below (which applies only to the Reynolds Dealer Plaintiffs).  Finally, if the Court denies both Reynolds's arbitration and stay requests, it should resolve all of the arguments set forth and incorporated in **Section IV**.

## II.     **BACKGROUND**

Since the late 1980s, Reynolds has spent billions of dollars building and maintaining a proprietary, high-end, closely-controlled enterprise software and computing platform for car dealerships, generally referred to in the industry as a Dealer Management System, or "DMS."  Dkt. No. 97, No. 17-cv-00318 (Declaration of Robert Schaefer) at ¶ 49.[1]  The DMS is Reynolds's intellectual property, and essential aspects of the system and source code are protected by copyright.  Ex. 1 (Copyright Registration Nos. TX 7-586-896; TX 7-586-863; TX 8-538-825; and

---

[1] Throughout their Complaint, Plaintiffs extensively refer to and rely on the factual record at the Authenticom preliminary injunction hearing.  *See, e.g.*, Complaint ¶¶ 64 n.9, 76 n.24, 78 n.27, 82 n.30, 100 n.52, 101 nn.54-57, 105 n.63, 121 n.89, 128 n.97, 131 n.104, 135 n.114, 140 n.119, 141 n.120, 144, 151 n.123, 152 n.124, 154 n.128, 162, 164 n.141.  As a result, the Court may properly consider this record in ruling upon this Motion.

TX 8-538-541). Reynolds's DMS is regarded as a premium product because it is more stable, secure, and effective than competing DMS products. Dkt. No. 98, No. 17-cv-00318 (Declaration of Ronald Lamb) at ¶ 22. Reynolds licenses its DMS primarily to larger car dealership groups that require a sophisticated, stable, and secure platform to manage their complex transactions and large cashflows. Dkt. No. 97, No. 17-cv-00318, ¶ 27.

Reynolds licenses its DMS to its dealership customers under a set of terms and conditions designed to ensure its system's performance and security, safeguard Reynolds's intellectual property rights, and meet Reynolds's contractual obligations to third parties. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ Dealers know and agree to this restriction (and others) when they choose to license a Reynolds DMS, and both Reynolds and the dealers negotiate the resulting licensing fees based on the expectation that ████████████████████████████████████████

████████████████████████████

Many of Reynolds's DMS competitors take a different approach and allow licensed dealers to provide third parties with access to their systems. *Id.* ¶ 10. This includes competitors Cox Automotive (the sister company of Cox Communications, the third largest DMS provider in the country, and a significantly larger company than either Reynolds or CDK), and many other competitors, including Auto/Mate, AutoSoft, and Dominion. *Id.*; *see also* Complaint ¶¶ 64, 67, 116. Dealers who prefer the ability to grant third-party access can, and often do, choose among these alternative products. Complaint ¶¶ 78, 80. The result is a competitive and dynamic DMS market with changes in market share and substantial rates of dealer switching among DMS

providers.  *See id.*; *see also id.* ¶ 66, nn.11-13; Dkt. No. 98, No. 17-cv-00318, ¶¶ 25, 30.

Reynolds's DMS processes and stores vast quantities of sensitive data originating from a variety of sources, including (a) consumer data such as consumer financial information, credit scores, driver's license numbers, and Social Security Numbers (Dkt. No. 97, No. 17-cv-00318, ¶¶ 14-27); (b) information licensed by Reynolds from automotive original equipment manufacturers ("OEMs") like GM, Ford, Honda, and Toyota, including codes and prices for parts and labor, rebates and incentive information, and warranty information (*id.* ¶ 23); and (c) Reynolds's own intellectual property.  Protecting the integrity and security of the Reynolds platform, and the data it contains, is a major concern for both Reynolds and its customers.  Dkt. No. 98, No. 17-cv-00318, ¶ 22.  Accordingly, Reynolds's system includes multiple protections designed to exclude hackers, prevent automated scripts from encumbering system resources, and ensure that only licensed dealership employees can access and use the system.  Dkt. No. 97, No. 17-cv-00318, ¶¶ 28-32.

Nevertheless, Reynolds does not prohibit dealers from accessing and exporting operational data from the DMS.  *Id.* ¶ 61.  On the contrary, Reynolds provides dealers with several tools for this purpose, which they are free to use, subject to their own independent legal, regulatory, and ethical obligations.  *Id.*  What Reynolds prohibits is not the dealers' use of data contained on the DMS, but access to Reynolds's system by unauthorized third parties.  *See, e.g.*, *id*. ¶ 105; *see also* Ex. 2 (Reynolds Master Agreement).

While Reynolds's DMS provides many tools for dealership functions like vehicle sales, financing, insurance, and inventory management, dealers can choose to use certain third-party software to supplement or replace these tools, referred to in the industry as "applications" sold by "vendors."  Complaint ¶¶ 3, 5, 61.  Accordingly, beginning in the early 2000s, Reynolds built specialized interfaces—today known as the Reynolds Certified Interface ("RCI") Program—that

enable third-party applications to function seamlessly with the Reynolds DMS.  Dkt. No. 97, No. 17-cv-00318, ¶ 30.  When an application vendor joins the RCI Program, Reynolds builds customized software interfaces that allow the DMS and the application to communicate and exchange data securely and efficiently.  *Id.* ¶ 50.  Dealers considering a Reynolds DMS can easily determine if a particular third-party vendor is an available RCI partner before making their DMS choice.  *See id.* ¶ 38.  Each certified vendor also signs a contract, known as a Reynolds Interface Agreement ("RIA") that, among other things, contains a robust set of security requirements, including ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████

Reynolds has heavily marketed its policy against unauthorized third-party access, and that policy is a core part of Reynolds's identity and reputation in the marketplace.  Dkt. No. 97, No. 17-cv-00318, ¶ 18.  Nevertheless, for years, various companies have attempted to obtain unauthorized access to Reynolds's DMS.  Complaint ¶ 106 n.65.  Among the most aggressive and successful of these have been third-party data brokers, which have primarily included five companies:  SIS, SelectQu, Authenticom (a plaintiff in an individual action in this MDL), and two subsidiaries of Defendant CDK, DMI and IntegraLink.  *See id.*  Reynolds has never, and is not alleged to have ever, owned or controlled any such company.

Though they are aware that Reynolds's system license prohibits it, these data brokers typically access Reynolds's DMS using the dealer's system log-in credentials, along with automated scripts that fool the DMS into thinking it is being accessed by an authorized human user, and then use a technology called "screen scraping" to automatically extract large amounts of data from the DMS, which they then supply to vendors for a fee.  *Id.* ¶¶ 75, 77.  While Plaintiffs

refer to these data brokers as "integrators," that term is a misnomer.[2]  In practice and effect, data brokers are hackers who break into proprietary computer systems, take others' data, and sell it.

The methods used by data brokers have caused major DMS performance issues for Reynolds's customers, with resulting harm to Reynolds's reputation and customer satisfaction. Dkt. No. 97, No. 17-cv-00318, ¶¶ 41-43.  In addition, major, irrevocable data breaches are increasingly common in the automotive sector, and the methods used by data brokers make such breaches more likely.  *See id.* ¶¶ 122-29.

Thus, for more than a decade, Reynolds has spent tens of millions of dollars to eliminate data brokers and other hackers from its DMS.  *Id.* ¶ 129.  In response, the data brokers have developed new methods to circumvent Reynolds's security measures.  *Id.* ¶ 96.  By 2013, however, Reynolds's self-developed security tools and other advancements in computer security allowed Reynolds to detect and prevent nearly all data broker attacks.  *See id.* ¶¶ 30, 105; *see also* Complaint ¶ 79.  The same year, Reynolds sued one of the data brokers, SIS, in federal court for illegally accessing Reynolds's DMS.[3]  That litigation resulted in a settlement allowing SIS to gradually "wind down" its unauthorized access, thereby minimizing disruption to dealers and vendors.  Complaint ¶ 131.

Reynolds viewed the SIS settlement as a successful blueprint for addressing unauthorized access by other data brokers.  Thus, beginning in 2014, Reynolds coupled its legal cease and desist demands and offers of settlement with offers of similar wind-downs to SelectQu, co-defendant CDK's DMI and IntegraLink subsidiaries, and Authenticom.  *See, e.g.*, Complaint ¶ 100 n.53.

---

[2] Authenticom admits it offers "no actual 'integration'" services "in the traditional sense"; "[i]nstead, in this context, 'integration' is simply a synonym for data access."  *Authenticom* Dkt. 4 ¶¶ 2, 54 n.4.

[3] *See generally The Reynolds & Reynolds Co. v. Superior Integrated Solutions, Inc.*, No. 1:12-cv-00848, 2013 WL 2456093, at *2 (S.D. Ohio June 6, 2013).

Authenticom ignored Reynolds's wind-down offer,[4] but CDK accepted.  *Id.* ¶ 82, Ex. 11. ██

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████

     This wind-down agreement between Reynolds and CDK is what Plaintiffs now use as the crux for all of their claims in this litigation regarding antitrust conspiracies and monopolization schemes.  But, boilerplate aside, the factual allegations against Reynolds simply describe conduct that Reynolds has been engaging in, lawfully and unilaterally, for more than a decade—well before the 2015 agreement with CDK.  Indeed, there is no allegation that the 2015 agreement resulted in any material change to Reynolds's business practices:  there has been no change to Reynolds's policy of blocking data brokers and other unauthorized third parties from its DMS, and there has been no change to the terms of Reynolds's contracts with dealers or vendors.  Similarly, Reynolds has never agreed to refrain from acting as a data broker on CDK's DMS, because it has never acted as a data broker in the first place, on CDK's DMS or anywhere else.  *See* Complaint ¶ 81 n.28, Ex. 9.  Plaintiffs cannot explain how an unremarkable wind-down agreement transforms any of Reynolds's undisputedly lawful, unilateral pre-agreement conduct into an antitrust violation.

### III.    THE REYNOLDS DEALERS' CLAIMS SHOULD BE DISMISSED IN FAVOR OF INDIVIDUAL ARBITRATIONS.  THE REMAINING CDK DEALER CLAIMS SHOULD BE STAYED.

     Six named Plaintiffs (collectively the "Reynolds Dealers") signed agreements that oblige them to resolve the claims in this suit in individual arbitration in Dayton, Ohio, not class-action

---

[4] Authenticom, despite being blocked from Reynolds's DMS since 2013, if not earlier, waited another four years before bringing suit in the Western District of Wisconsin, where it represented that it needed a preliminary injunction or it would imminently go out of business.  On a limited evidentiary record without the benefit of discovery, the district court granted a preliminary injunction.  The Seventh Circuit reversed and vacated the injunction.  These cases followed.  Authenticom did not go out of business.

litigation in Chicago, Illinois.[5]  Therefore, their claims should be dismissed in favor of individual arbitration.  Further, to avoid prejudicing Reynolds's arbitration rights, the CDK Dealers' claims against Reynolds should be stayed pending resolution of the Reynolds Dealers' arbitrations.

### A.  The Reynolds Dealers Signed Broad Arbitration Agreements

The Reynolds DMS licensing contract consists of several documents and is executed by signature of an Authorization Letter.[6]  The Authorization Letter incorporates by reference the Master Agreement and the Defined Terms.  The Master Agreement, in turn, incorporates by reference the Customer Guide.  Reynolds's automotive dealership customers are thus bound to the terms of these integrated contracts.[7]  The binding arbitration provision included in every named Reynolds Dealers' contract states, in relevant part:



[9]

---

[5]  The complaint alleges that five of the named plaintiffs—John O'Neill Johnson Toyota, Gregoris Motors, Inc., Hoover Automotive, LLC (d/b/a Hoover Dodge Jeep of Summerville); Jim Marsh American Corporation (d/b/a Jim Marsh Mitsubishi Suzuki Kia Mahindra); and Teterboro Automall, Inc. (d/b/a Teterboro Chrysler Dodge Jeep Ram) are current Reynolds DMS customers.  Named plaintiff Pitre, Inc. (d/b/a Pitre Buick GMC) is a former Reynolds DMS customer whose contractual relationship with Reynolds continued until March of 2015, after the alleged antitrust claims accrued. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  That exhibit is properly considered in this Motion.  *Deb v. SIRVA, Inc.*, 832 F.3d 800, 809 (7th Cir. 2016).

[6]  *See* ▮▮▮

[7]  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Under Ohio law, parties can incorporate other documents into a contract by reference, and those other documents are as binding as any other part of the contract.  *E.g.*, *KeyBank Natl. Assn. v. Sw. Greens of Ohio, L.L.C.*, 988 N.E.2d 32, 39 (Ohio Ct. App. 2013).

[8]  ▮▮▮▮▮▮▮▮▮

[9]  Although Pitre, Inc.'s DMS contract terminated in March 2015, *see* Ex. 8 at 7, the arbitration agreement in that contract survives the termination of the contract itself.  *See Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Intern., Ltd.*, 1 F.3d 639, 643 (7th Cir. 1993); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Critically, Pitre's claim allegedly accrued in February 2015, before the contract expired.

**B. The Proper Vehicle for Enforcing This Arbitration Agreement Is a Motion to Dismiss Under Rule 12(b)(3)**

The parties contracted to arbitrate their disputes in Dayton, Ohio—outside of this District. Therefore, the proper mechanism to enforce the arbitration agreement is dismissal under Rule 12(b)(3). *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 808 (7th Cir. 2011). This does not change the legal analysis; the question is still "did the plaintiffs agree to arbitrate the claims asserted in their complaint?" *Ferenc v. Brenner*, 927 F. Supp. 2d 537, 542 (N.D. Ill. 2013).

**C. Under the Arbitration Agreement, the Reynolds Dealers' Claims Must Be Dismissed in Favor of Individual Arbitration**

This Court's first task is to determine whether the parties' arbitration agreement requires dismissal of the Reynolds Dealers' claims. It does. The parties' arbitration agreement incorporates the American Arbitration Association's ("AAA") Rules. Therefore, the arbitrator is the proper decisionmaker on most arbitrability issues, including whether the plaintiff's claims are within the scope of the agreement.[10] (But even if this Court was the proper decisionmaker, the arbitration provision covers these claims.)

This Court's second task is to determine whether the arbitration agreement permits class arbitration. It does not. While incorporation of the AAA rules delegates *most* arbitrability issues to the arbitrator, class arbitrability remains an issue for the Court. This arbitration clause does not permit class arbitration. Therefore, any arbitration must be on an individual basis.

    1. <u>The Reynolds Dealers' claims must be dismissed in favor of arbitration.</u>

        *a. The parties agreed that the arbitrator would decide whether the claims in suit fall within the scope of the arbitration agreement.*

Parties can agree that "gateway" arbitrability determinations should be decided by the

---

[10] The only exception, as explained later in this brief, is the issue of class arbitrability. Even when the parties agree to arbitrate under the AAA rules, class arbitrability is a gateway issue for the Court.

arbitrator rather than the Court.[11]  However, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so."[12]

The parties' agreement to the AAA rules is clear and unmistakable evidence that most arbitrability issues are delegated to the arbitrator.[13]  *Wal-Mart Stores, Inc. v. Helferich Patent Licensing, LLC*, 51 F. Supp. 3d 713, 719-720 (N.D. Ill. 2014).  Every circuit that has considered the question—including the First, Second, Fifth, Eighth, Ninth, Eleventh, and Federal Circuits[14]—has reached the same result.  While the Seventh Circuit has not reached the question, courts in the Northern District follow the Circuits that have passed on the issue in holding that incorporation of the AAA rules means the arbitrator decides most gateway arbitrability issues.[15]

This Court's analysis is narrowly cabined: after confirming that the parties agreed to arbitrate *any* set of claims under the AAA rules, all subsequent arbitrability issues as to what

---

[11] *See, e.g.*, *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-70 (2010); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002).

[12] *Howsam*, 537 U.S. at 83 (quoting *AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 649 (1986)).

[13] As explained later, incorporation of the AAA rules delegates most **but not all** arbitrability issues to the arbitrator. Specifically, the issue of whether the agreement allows for class arbitration remains for the Court to decide even when the parties agree to arbitrate under the AAA rules.

[14] *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) ("Now that the question regarding incorporation of the AAA rules is squarely before us, we hold that incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability."); *Petrofac, Inc. v. DynMcDermott Petrol. Ops. Co.*, 687 F.3d 671, 675 (5th Cir. 2012); *Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 11 (1st Cir. 2009) (Boudin, J.) (describing incorporation of the AAA rules as "about as 'clear and unmistakable' as language can get"); *Fallo v. High–Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1373 (Fed. Cir. 2006); *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 211 (2d Cir. 2005) ("[W]hen, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."); *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332 (11th Cir. 2005).

[15] *E.g.*, *Ali v. Vehi-Ship, LLC*, 17 CV 02688, 2017 WL 5890876, at *3 (N.D. Ill. Nov. 27, 2017) (adopting the "consensus view"); *Cequent Performance Prod., Inc. v. Let's Go Aero, Inc.*, No. 14 C 8457, 2016 WL 4036754, at *6 (N.D. Ill. July 28, 2016) ("Given this AAA requirement that the arbitrator decide 'the arbitrability of any claim,' district courts in this circuit (and courts of appeals in other circuits, including the 1st, 2d, 5th, 8th, 9th, 11th, and Federal Circuits) have consistently held that a clause requiring arbitration according to AAA Rules requires the arbitrator to resolve arbitrability disputes."); *Allscripts Healthcare, LLC v. Etransmedia Tech., Inc.*, 188 F. Supp. 3d 696, 701 (N.D. Ill. 2016) ("The court adopts the consensus view. By incorporating the AAA's Rules, the Partnership Agreement's arbitration clause clearly and unmistakably delegates authority to the arbitrators to decide whether Allscripts's claims are arbitrable."); *Imperial Crane Sales, Inc. v. Sany Am., Inc.*, No. 15 C 859, 2015 WL 4325483, at *4 (N.D. Ill. July 15, 2015) (describing same rule as representing an "overwhelming majority");  *Yellow Cab Affiliation, Inc. v. New Hampshire Ins. Co.*, No. 10-CV-6896, 2011 WL 307617, at *5 (N.D. Ill. Jan. 28, 2011).

*specific* claims are arbitrable are left for the arbitrator,[16] and the claims must be dismissed.[17]

> **b. Even if the parties had not delegated scope issues to the arbitrator, this broad-form agreement covers the Reynolds Dealers' allegations.**

Regardless of who makes the arbitrability determination, the parties' arbitration agreement covers this dispute. Under the arbitration agreement, the Reynolds Dealers agreed ███████

███████████████████████████████████████████████████████████

███████████████████████████ ██ ██████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████ The arbitration agreement expressly requires arbitration of any dispute directly or indirectly related to that commercial relationship.

When the parties have agreed to a broad arbitration clause like this one, the court must presume that the dispute is arbitrable. *AT&T Techs.*, 475 U.S. at 649.[19] Broad "related to" language means that the parties must arbitrate whenever the factual allegations underlying a claim touch on the contract that contains the arbitration agreement.[20] Antitrust allegations that a

---

[16] Except class arbitrability, as discussed below.

[17] *See* cases cited in notes 14-15, *supra*; *see also In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 3:14-CV-02510, 2014 WL 7206620, at *3 (N.D. Cal. Dec. 18, 2014) (AAA incorporation delegated determination as to whether plaintiff's antitrust claims were covered by the arbitration agreement to the arbitrator, requiring dismissal).

[18] ████████████████████████████████████████████████████████

[19] *See also Volt Info. Sci., Inc. v. Bd. of Trs. of Leland Stanford, Jr. Univ.*, 489 U.S. 468, 475–76 (1989) (ambiguities must be resolved in favor of arbitration); *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 642 (7th Cir. 1993) (holding that if the arbitration clause would even "arguably cover" the dispute at hand, that "is all that is needed to trigger arbitration"); *Int'l Bhd. of Elec. Workers Local 2150 v. NextEra Energy Point Beach, LLC*, 762 F.3d 592, 594 (7th Cir. 2014) (requiring arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute") (quoting *United Steelworkers of America v. Warrior & Gulf*, 363 U.S. 574, 582–83 (1960)).

[20] *See Scan Top Enter. Co., Ltd. v. Winplus N. Am., Inc.*, No. 14 C 7505, 2016 WL 910502, at *4 (N.D. Ill. Mar. 9, 2016); *Nw. Univ. v. Insight Biomedical, Inc.*, No. 99 C 2354, 1999 WL 417397, at *5 (N.D. Ill. June 15, 1999) (quoting *Kerr–McGee Refining Corp. v. M/T Triumph*, 924 F.2d 467, 470 (2d Cir.1991)); *see also JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 172–75 (2d Cir. 2004). *Sweet Dreams*, 1 F.3d at 642.

"conspiracy . . . undermined legitimate contractual relations between the parties" are related to the underlying purchase contract. *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 175 (2d Cir. 2004) (collecting cases).[21]  Indeed, all of the Reynolds Dealers' claims are squarely "related to" the business relationship.

The Reynolds Dealers plead that they have suffered two basic forms of injury—direct payment of allegedly supracompetitive prices for the Reynolds DMS and indirect payment of allegedly supracompetitive prices for "Data Integration Services."  The DMS contract is the asserted but-for cause of both alleged injuries.  If the Dealers did not contract with Reynolds to license the DMS, they would not have made *any* payments to Reynolds.  And if they did not use the DMS, they would have no occasion to hire vendors that incur integration charges to interface with the Reynolds DMS (or the associated, allegedly passed-through charges).  The allegations in the complaint easily fall within the broad sweep of the arbitration provision.

The only exception to arbitration in the agreement proves the rule.



---

[21] *See also Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 624 n.13 (1985);  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721–22 (9th Cir. 1999); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 10-5458 SI, 2011 WL 5325589, at *3 (N.D. Cal. Sept. 19, 2011); *Empire State Ethanol & Energy, LLC v. BBI Int'l*, No. 1:08-CV-623 GLS/DRH, 2009 WL 790962, at *6-7 (N.D.N.Y. Mar. 20, 2009); *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 405 (S.D.N.Y. 2003); *B-S Steel of Kansas, Inc. v. Texas Indus., Inc.*, 229 F. Supp. 2d 1209, 1226 (D. Kan. 2002); *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1106 (C.D. Cal. 2002); *Acquaire v. Canada Dry Bottling*, 906 F. Supp. 819, 835-38 (E.D.N.Y. 1995).

██████████████████████████████████████████████████████████████

████ The agreement is unambiguous: it applies broadly, and without exception, to the claims at issue.[22]

    2. <u>The arbitration clause requires individual, not class, arbitration.</u>

Although incorporation of the AAA rules delegates *most* arbitrability issues to the arbitrator, class arbitration remains an issue for this Court. As the language of the agreement makes clear, the parties contracted for individual arbitration, not class arbitration.

    a. *Even when the parties incorporate the AAA rules, this Court still decides class arbitrability.*

    i. The parties contracted for the Sixth Circuit rule to control.

The arbitration agreement requires arbitration in Dayton, Ohio—within the jurisdiction of the Sixth Circuit—████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████. The Sixth Circuit follows the nationwide majority rule: the court decides class arbitrability as a gateway matter, even when the parties incorporate the AAA rules into their arbitration agreement.[24] This Court should honor the parties' contract and apply the Sixth Circuit rule. The Reynolds Dealers' violation of their obligation to bring arbitrations in Dayton, rather than a class-action lawsuit in Chicago, should not inure to their benefit by enabling them to deny to Reynolds its contracted-for judicial, not arbitral, determination

---

[22] Even if the exception generated ambiguity as to whether the claims are covered, that ambiguity must be resolved in favor of arbitration. *See* cases cited at notes 19-20, *supra*, and accompanying text.

[23] *See Snyder v. Smith*, 736 F.2d 409, 419 (7th Cir. 1984) (a party to an arbitration agreement cannot "avoid the effect of the agreed-to forum merely by filing suit in a different district"), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873, 877 (7th Cir. 1998).

[24] *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 553 (6th Cir. 2016) (Sentelle, J., by designation), *Huffman v. Hilltop Companies, LLC*, 747 F.3d 391, 398–99 (6th Cir. 2014), and *Reed Elsevier, Inc. ex rel. LexisNexis Div. v. Crockett*, 734 F.3d 594, 599-600 (6th Cir. 2013) (Kethledge, J.).

as to class arbitrability.[25]

        ii.  The Sixth Circuit rule is correct: class arbitrability is an issue for this Court.

Even if the Court determines that the parties did not contract for the Sixth Circuit rule to apply, that rule is correct and this Court should follow it. "[T]he availability of class arbitration is a question of arbitrability presumptively for the court, not for the arbitrator." *Henderson v. U.S Patent Comm'n, Ltd.*, 188 F. Supp. 3d 798, 801-06 (N.D. Ill. 2016) (Feinerman, J.).[26] While the Seventh Circuit has not addressed whether incorporation of the AAA rules is "clear and unmistakable" evidence that the parties intended to delegate the class arbitrability determination to the arbitrator, *see id.*, the majority (and most sensible) rule holds that class arbitrability remains an issue for the Court notwithstanding incorporation of the AAA rules. To be sure, the AAA has a set of Supplementary Rules for Class Arbitrations, and those rules call for the arbitrator to "determine . . . whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class . . . ." AAA Supplementary Rule 3.[27] But AAA Supplementary Rule 3 does not resolve the issue.

The Supreme Court has established a stringent clear-statement rule prohibiting courts from ordering class arbitration unless the agreement reflects an affirmative intent to arbitrate on a class

---

[25] To the extent that this Court believes the class arbitrability issues—both (1) "who decides" and (2) whether the clause permits class arbitration—are more properly addressed to courts in Ohio, Reynolds has no objection to this Court dismissing the Reynolds Dealers' claims from this litigation under Rule 12(b)(3) without reaching the class arbitrability issues. Reynolds would simply request that any such order explicitly and emphatically state that this Court did not reach or pass on either class arbitrability issue, to avoid inadvertent preclusive effects.

[26] *See also Catamaran Corp. v. Towncrest Pharmacy*, 864 F.3d 966, 972 (8th Cir. 2017) (concluding that the availability of class arbitration is a "substantive question of arbitrability" to be determined by the courts, unless the parties "clearly and unmistakably delegate the question to an arbitrator"); *Dell Webb Cmtys., Inc. v. Carlson*, 817 F.3d 867, 873 (4th Cir. 2016) (holding that "whether an arbitration clause permits class arbitration is a gateway question of arbitrability"), *cert. denied sub nom. Carlson v. Del Webb Communities, Inc.*, 137 S. Ct. 567, (2016); *Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326, 329 (3d Cir. 2014) ("[T]he availability of classwide arbitration is a substantive 'question of arbitrability' to be decided by a court absent clear agreement otherwise."); *Crockett*, 734 F.3d at 599.

[27] The Supplementary Rules are available at https://perma.cc/2SSR-DZMD.

basis.[28]  And it explicitly linked that rule to its decisions on delegation of arbitrability issues.  As a majority of the Circuits to have considered the issue have concluded, the logic of the Supreme Court's opinions dictates a very similar rule for the class arbitrability determination: it is an issue for the court absent extremely clear and specific contractual language to the contrary.  Just as a court cannot infer an agreement to arbitrate on a class basis from a general agreement to arbitrate, a court cannot infer an agreement to arbitrate class arbitrability from a general agreement to arbitrate arbitrability issues.  Following this straightforward analysis, the majority-rule Circuits hold that, even when the parties *generally* agree to arbitrate arbitrability issues by incorporating the AAA rules, the class arbitrability decision is properly reserved for the court.

Class arbitration is an extraordinary procedure that is extraordinarily disfavored.  As the Supreme Court has made clear, class arbitration "is not arbitration as envisioned by the FAA" and "lacks its benefits."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351 (2011).  The shift from individual to class arbitration is "fundamental":

> [ (1) a]n arbitrator . . . no longer resolves a single dispute between the parties to a single agreement, but instead resolves many disputes between hundreds or perhaps even thousands of parties . . . [; (2) ] the presumption of privacy and confidentiality that applies in many bilateral arbitrations [does] not apply in class arbitrations[,] thus potentially frustrating the parties' assumptions when they agreed to arbitrate[; (3) t]he arbitrator's award no longer purports to bind just the parties to a single arbitration agreement, but adjudicates the rights of absent parties as well[; and (4) ] the commercial stakes of class-action arbitration are comparable to those of class-action litigation, even though the scope of judicial review is much more limited.

*Opalinski v. Robert Half Intern. Inc.*, 761 F.3d 326, 333 (3d Cir. 2014) (quoting *Stolt-Nielsen*, 559 U.S. at 685).  While bilateral arbitration provides parties with "lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes, . . . the relative

---

[28] *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010) (holding that "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so.").

benefits of class-action arbitration are much less assured, ***giving reason to doubt the parties' mutual consent to resolve disputes through class-wide arbitration***." *Stolt-Nielsen*, 559 U.S. at 685 (emphasis added). Critically, the Court justified its holding that the manifest inadequacies of class arbitration give "reason to doubt the parties' mutual consent" to arbitrate on a class basis by relying on the clear-statement rule for delegation of arbitrability determinations. The *Stolt-Nielsen* Court cited *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 945 (1995), quoting the Court's statement that "one can understand why courts might hesitate to interpret silence or ambiguity on the 'who should decide arbitrability' point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate." *Id.* (citing *First Options*, 514 U.S. at 945).

In other words, the Court linked the *First Options* clear-statement rule for delegation of arbitrability to the *Stolt-Nielsen* clear-statement rule for class arbitration, and linked *both* rules to its judgment that reasonable contracting parties would not intend to subject themselves to the indignities and inefficiencies of class arbitration. That analysis strongly supports a symmetrical rule for the class arbitrability determination. Just as reasonable contracting parties are very unlikely to intend to arbitrate on a class basis, reasonable contracting parties are very unlikely to intend to arbitrate the question of class arbitrability. Delegation of class arbitrability presents a dual risk of unreviewable and catastrophic error: an erroneous decision on class arbitrability irreversibly and unreviewably commits both the defendant and the absent classmembers to a procedure that exposes defendants to massive liability and purports to bind absent classmembers despite a near-total absence of the due process protections that undergird and justify court-litigated class actions.[29] Following that Supreme Court guidance, the Third, Fourth, Sixth, and Eighth Circuits have held that, even when the parties incorporate the AAA rules into their agreement,

---

[29] Indeed, delegation of the class arbitrability determination creates more danger for the defendant and absent parties than a court's holding that a clause permits class arbitration (which is at least subject to substantive appellate review).

class arbitrability remains a gateway issue for the district court notwithstanding Supplementary Rule 3.[30]  The Second and Fifth Circuits are in the minority.[31]  The majority-rule cases are correct.

Just as the Supreme Court holds that the stakes are too high to infer consent to *class arbitration* from the parties' general agreement to arbitrate, *Stolt-Nielsen*, 559 U.S. at 685, the majority rule correctly holds that courts cannot infer consent to arbitrate *class arbitrability* from a general agreement to arbitrate arbitrability issues.  A party arguing delegation of class arbitrability to the arbitrator bears an especially "onerous burden," significantly higher than for bilateral gateway issues.  *Chesapeake Appalachia*, 809 F.3d at 761; *Catamaran Corp.*, 864 F.3d at 973.  Thus, only "express contractual language unambiguously delegating the question" is sufficient— and AAA-rule incorporation does not meet that standard.  *Chesapeake Appalachia*, 809 F.3d at 761.[32]  "The risks incurred by defendants in class arbitration (bet-the-company stakes without effective judicial review, loss of confidentiality) and the difficulties presented by class arbitration (due process rights of absent class members, loss of speed and efficiency, increase in costs) all demand a ***more particular delegation of the issue than we may otherwise deem sufficient in bilateral disputes***."  *Catamaran Corp.*, 864 F.3d at 973 (emphasis added).[33]

The Second and Fifth Circuits' decisions to the contrary fail to account for class

---

[30] *Catamaran Corp.*, 864 F.3d at 973 ("Incorporation of AAA Rules by reference is insufficient evidence that the parties intended for an arbitrator to decide the substantive question of class arbitration."); *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 765–66 (3d Cir. 2016), *cert. denied*, 137 S. Ct. 40 (2016); *Dell Webb*, 817 F.3d at 877; *AlixPartners, LLP*, 836 F.3d at 553 (citing *Crockett*, 734 F.3d at 599-600).

[31] *Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392 (2d Cir. 2018); *Reed v. Florida Metro. Univ., Inc.*, 681 F.3d 630 (5th Cir. 2012), *abrogated on other grounds by Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 133 S. Ct. 2064 (2013).

[32] Deciding whether the parties agreed to arbitrate on a class basis is "vastly more consequential than even the gateway question of whether they agreed to arbitrate bilaterally," *Crockett*, 734 F.3d at 599, and so cases addressing the effect of AAA-rule incorporation in *bilateral* arbitrability disputes are "entitled to relatively little weight in the class arbitrability context." *Chesapeake Appalachia*, 809 F.3d at 764; *Catamaran Corp.*, 864 F.3d at 973.

[33] Moreover, class arbitrability implicates *with whom* the parties agreed to arbitrate, *see Concepcion*, 563 U.S. at 344; *Stolt-Nielsen*, 559 U.S. at 684-85, and courts are properly reluctant to conclude that a contract between A and B requires B to allow an arbitrator to force B to arbitration against an entire class of persons who are strangers to the contract.

arbitration's extraordinary status as is required by the logic of *Stolt-Nielsen* and related decisions. Both the Second and Fifth Circuit decisions treat class arbitrability as just one more ordinary arbitrability issue delegated to the arbitrator under the AAA rules. But class arbitrability is unique: it fundamentally and irreversibly changes the nature of the dispute. Because the class arbitrability determination is "vastly more consequential" than any bilateral arbitrability determination, *Crockett*, 734 F.3d at 599, the evidentiary standard necessary to find a "clear and unmistakable" delegation to the arbitrator is necessarily more stringent than for other arbitrability issues. *Catamaran Corp.*, 864 F.3d at 973. Therefore, class arbitrability is a gateway issue for this Court.

### b. The arbitration clause prohibits class arbitration.

The arbitration clause in this case does not authorize class arbitration, and its terms make clear that it calls for bilateral arbitration. "[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen*, 559 U.S. at 684.[34] And a court cannot infer "[a]n implicit agreement to authorize class-action arbitration . . . solely from the fact of the parties' agreement to arbitrate." *Id.* at 685. Thus, when an arbitration clause lacks language evincing an affirmative intent to authorize class arbitration, the court is "prohibited from reading such a procedure" into the agreement. *Champ v. Siegel Trading Co., Inc.*, 55 F.3d 269, 277 (7th Cir. 1995).[35] The Third, Fourth, Fifth, Sixth, and Eighth Circuits have reached the same result,[36] leaving the Ninth on the

---

[34] *See also Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621–23 (2018).

[35] *See also Epic Sys.*, 138 S. Ct. at 1621-23; *Henderson*, 188 F.Supp.3d at 808-810; *Shore v. Johnson & Bell*, 16-CV-4363, 2017 WL 714123, at *3 (N.D. Ill. Feb. 22, 2017).

[36] *Chesapeake Appalachia L.L.C v. Scout Petroleum, LLC*, 17-2037, 2018 WL 1295736, at *2–3 (3d Cir. Mar. 13, 2018) (affirming district court's decision on remand that arbitration provision did not permit class arbitration); *Opalinski v. Robert Half Int'l Inc*, 677 Fed. Appx. 738, 741-43 (3d Cir. 2017) (affirming district court's decision on remand that arbitration provision did not permit class arbitration), *cert. denied sub nom. Opalinski v. Robert Half Inter., Inc.*, 138 S. Ct. 378, 199 L. Ed. 2d 306 (2017); *Del Webb Communities, Inc. v. Carlson*, 698 Fed. Appx. 761 (4th Cir. 2017) (per curiam) (affirming district court's decision on remand that arbitration provision did not permit class arbitration); *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 553 (6th Cir. 2016) ("An agreement must expressly include the possibility of classwide arbitration for us to conclude that the parties agreed to it."); *Crockett*, 734 F.3d at 599 ("The principal reason to conclude that this arbitration clause does not authorize classwide arbitration is that the

short end of a long split and headed for Supreme Court review.[37]  The terms of the agreement in

the instant case plainly contemplate bilateral arbitration, and there is absolutely nothing to suggest

that the parties intended to arbitrate on a class basis.  Instead, like the arbitration provisions in

*Stolt-Nielson*, *Champ*, *Chesapeake Appalachia*, *Opalinski*, *Del Webb*, *AlixPartners*, *Reed*, and

*Dominium*,[38] class arbitration is not mentioned.  Thus, under the rule in these cases—two of which,

*Stolt-Nielsen* and *Champ*, are binding on this Court—the agreement at issue does not permit class

arbitration.

Moreover, the agreement repeatedly uses bilateral language wholly inconsistent with class

arbitration.[39]



---

clause nowhere mentions it."); *Reed v. Florida Metro. Univ., Inc.*, 681 F.3d 630, 644 (5th Cir. 2012) ("We conclude, therefore, that the arbitrator lacked a contractual basis upon which to conclude that the parties agreed to authorize class arbitration. At most, the agreement in this case could support a finding that the parties did not preclude class arbitration, but under *Stolt–Nielsen* this is not enough."), *abrogated on other grounds by Oxford Health Plans LLC v. Sutter*, 569 U.S. 564 (2013); *Dominium Austin Partners, L.L.C. v. Emerson*, 248 F.3d 720, 728–29 (8th Cir. 2001) ("[B]ecause the partnership agreements make no provision for arbitration as a class, the district court did not err by compelling appellants to submit their claims to arbitration as individuals.").

[37] *Varela v. Lamps Plus, Inc.*, 701 Fed. Appx. 670 (9th Cir. 2017), *cert. granted*, 138 S. Ct. 1697 (2018). The reasoning in the Ninth Circuit's unsigned memorandum disposition—issued over a two-sentence dissent aptly describing the opinion as a "palpable evasion of *Stolt-Nielsen*"—would transform every ordinary broad-form arbitration agreement that calls for arbitration of "all disputes" (or similar) into an affirmative authorization of class arbitration in contravention of the Supreme Court's clear directives.

[38] *See* cases cited *supra* note 36.

[39] *See AlixPartners*, 836 F.3d at 553 (bilateral language militated against finding that parties agreed to class arbitration); *Crockett*, 734 F.3d at 599-600 (bilateral language including specification that clause covered disputes "arising from or in connection with this Order" militated against finding that parties agreed to class arbitration).

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████ As a result, this Court should hold that

the agreement prohibits class arbitration.

### D. The CDK Dealers' joint-and-several claims against Reynolds should be stayed pending arbitration of the Reynolds Dealers' direct-liability claims.

If the Court grants this Motion and dismisses the Reynolds Dealers' claims against Reynolds in favor of arbitration, then the CDK Dealers' joint-and-several claims against Reynolds should be stayed.

1. The FAA, properly construed, provides for a mandatory stay of this entire "action." The Seventh Circuit's decision adopting that rule is binding on this Court notwithstanding later decisions to the contrary.

Section 3 of the FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration . . . , the court . . . ***shall on application of one of the parties stay the trial of the action*** until such arbitration has been had in accordance with the terms of the agreement . . . .

9 U.S.C. § 3 (emphasis added). The statute requires a stay of the entire "***action***" upon determination that "any ***issue***" within the action is "referable to arbitration." Here, all "issues" arising out of the Reynolds Dealers' antitrust allegations are subject to a written agreement to arbitrate, and so the statute requires this Court to stay "the action"—*ACA Motors, Inc., et al. v. CDK Global, LLC et al.*, No. 18-cv-864—"until such arbitration has been had in accordance with the terms of the agreement." The Seventh Circuit adopted precisely this construction in *Morrie Mages*, 916 F.2d at 406-08, holding that a nonsignatory to an arbitration agreement was entitled to a *mandatory* stay pending resolution of the signatory parties' arbitration, because "Section 3 of

the FAA plainly requires that a district court stay litigation where *issues* presented in the litigation are the subject of an arbitration agreement." *Id.* Under that rule, this action must be stayed, because the Reynolds Dealers' claims against Reynolds are subject to arbitration.

In a pair of later opinions, other panels purported to overrule *Morrie Mages* insofar as that decision requires a mandatory stay (as opposed to a discretionary stay).[40] But *Morrie Mages*, not these later decisions, is the controlling precedent that binds this Court. A later panel cannot overrule an earlier panel absent an intervening Supreme Court decision or *en banc* reconsideration (or by consent under Circuit Rule 40(e)).[41] None of these later decisions was issued through an *en banc* proceeding or under Rule 40(e), and none purports to rely on an intervening Supreme Court decision that undercuts *Morrie Mages*. Thus, the FAA and controlling Seventh Circuit precedent require this Court to stay the entire action pending the resolution of the Reynolds Dealers' arbitrations.

>    2. <u>Even under the discretionary approach adopted by later panels, Reynolds is entitled to a stay of the CDK Dealers' joint-and-several claims.</u>

Even if this Court follows the discretionary approach, a stay of the CDK Dealers' claims

---

[40] In *IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 529–30 (7th Cir. 1996), the panel purported to reject the holding in *Morrie Mages*, finding Section 3 has no application to stay requests involving nonsignatories to an arbitration agreement and applying the discretionary doctrine of parallel proceeding abstention. And in *Pryner v. Tractor Supply Co.*, 109 F.3d 354, 361 (7th Cir. 1997), despite observing that the FAA "says in fact that the court shall stay the suit, not just a piece of the suit, if the suit is 'brought upon' an arbitrable issue," the panel relied on out-of-circuit cases to conclude that the proper approach was to "treat the question whether to stay the entire case as discretionary in cases involving both arbitrable and nonarbitrable issues." More recent cases appear to follow these later opinions, holding that the "decision to stay the litigation of non-arbitrable claims or issues is a matter largely within the district court's discretion to control its docket." *Volkswagen of Am., Inc. v. Sud's of Peoria, Inc.*, 474 F.3d 966, 971 (7th Cir. 2007). Even though these decisions ostensibly overruled *Morrie Mages* as to the mandatory character of a stay on these facts, they all approve its end result: when there is a serious risk of impairing issues before the arbitrator, the court should issue a stay.

[41] *Brooks v. Walls*, 279 F.3d 518, 522 (7th Cir. 2002) ("One panel of this court cannot overrule another implicitly. Overruling requires recognition of the decision to be undone and circulation to the full court under Circuit Rule 40(e)."); *accord* Wright & Miller, § 3506 The Courts of Appeals, 13 Fed. Prac. & Proc. Juris. (3d ed.); *Niazi v. St. Jude Med. S.C., Inc.*, 17-CV-183-JDP, 2017 WL 5159784, at *2 (W.D. Wis. Nov. 7, 2017) (noting that "the general rule is that '[o]ne panel of a circuit court cannot overrule another panel,' at least in the absence of an intervening statute or Supreme Court decision") (citing 18 James Wm. Moore, Moore's Federal Practice § 134.02[1][c] (3d ed. 2016)).

against Reynolds (that survive the Rule 12(b)(6) motions to dismiss) is proper. Allowing the CDK Dealers' claims to proceed during the pendency of Reynolds's arbitrations with its dealer clients would prejudice Reynolds's arbitration rights and waste party and judicial resources.

A district court abuses its discretion when it refuses to grant a stay when one is needed to safeguard a party's arbitration rights.[42] Courts must consider and balance factors including "the risk of inconsistent rulings, the extent to which parties will be bound by the arbitrators' decision, and the prejudice that may result from delays."[43] As part of that analysis, courts consider the risk that judicial determinations will have a preclusive effect in the arbitration.[44]

Taken together, these factors require a stay. The risk that this Court's determinations on the CDK Dealers' joint-and-several claims will have a preclusive effect on the arbitration, thus "subverting the arbitration agreement,"[45] is overwhelming. Reynolds's liability to the CDK Dealers turns entirely on whether it entered into an illegal conspiracy with CDK—precisely the issue that will drive the arbitrations. This Court's factual and legal determinations in the CDK Dealer litigation may improperly influence the arbitrations, either through collateral estoppel[46] or simply undue pressure on the arbitrators to conform their opinions to this Court's rulings. Either

---

[42] *G&G Closed Circuit Events, LLC v. Castillo*, 14-CV-02073, 2017 WL 1079241, at *9 (N.D. Ill. Mar. 22, 2017) ("The breadth of that discretion reaches its limits . . . when 'allowing nonarbitrable issues to proceed in the district court risks inconsistent rulings because the pending arbitration is likely to resolve issues material to [the] lawsuit.'") (quoting *Volkswagen*, 474 F.3d at 972) (internal quotation marks omitted); *see also GEA Group AG v. Flex-N-Gate Corp.*, 740 F.3d 411, 418 (7th Cir. 2014) ("[A] district court should stay an entire suit pending arbitration if there is a serious danger (should it fail to do so) of inconsistent rulings or needless duplication of effort.").

[43] *Volkswagen*, 474 F.3d at 972 (quoting *AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 242 F.3d 777, 783 (8th Cir. 2001)).

[44] *Id.* (citing *Morrie Mages*, 916 F.2d at 407) (emphasizing risk that court's rulings would have preclusive effect on issues presented in arbitration); *Flynn v. FCA US LLC*, 15-CV-0855-MJR-DGW, 2016 WL 5341199, at *6 (S.D. Ill. Sept. 23, 2016) ("At the least, the Court's rulings . . . could affect the arbitrator's decisions . . . and the arbitrator should have an opportunity to rule . . . without the Court pressing his hand."); *WMS Gaming, Inc. v. IGT*, 31 F. Supp. 3d 974, 978 (N.D. Ill. 2014) ("[S]taying the entire litigation is appropriate where the suit would decide an arbitrable issue and thereby impair the issues before the arbitrator.").

[45] *Nakamura Trading Co. v. Sankyo Corp.*, 05 CV 7205, 2006 WL 1049608, at *5 (N.D. Ill. Apr. 19, 2006).

[46] Reynolds takes no stance on whether any *specific* future opinion in the litigation or arbitration will have a preclusive effect on the other proceeding. However, when the relevant factors are met, court decisions can have preclusive effect in arbitration and vice versa. *See generally* Wright & Miller, § 4475.1 Arbitration Preclusion, 18B Fed. Prac. & Proc. Juris. (2d ed.)

possibility requires a stay. *Volkswagen*, 474 F.3d at 972;[47] *Flynn*, 2016 WL 5341199, at *6.

It does not matter that the CDK Dealers did not sign an arbitration agreement with Reynolds: courts routinely stay nonsignatory plaintiffs' claims against signatory defendants.[48] For example, in *In re Automotive Parts Antitrust Litig.*, 2017 WL 3579753 (E.D. Mich. Apr. 18, 2017), the court granted a stay of claims that were structurally and procedurally identical to the CDK Dealers' claims against Reynolds. There, the plaintiffs' claims against defendant DENSO were based solely on joint-and-several liability for alleged participation in a price-fixing scheme with the plaintiffs' suppliers. DENSO successfully invoked equitable estoppel to force the plaintiffs to arbitrate their joint-and-several claims based on their purchases from **one** of its codefendants, but that defense failed as to the other. Nonetheless, the court stayed those joint-and-several claims pending arbitration:

> Given the basis of the claims . . . a decision regarding purchases made from one alleged co-conspirator will necessarily implicate the merits of claims relating to purchases made from another alleged co-conspirator. That is, an arbitrator determining DENSO's joint and several liability for [plaintiffs'] purchases made from Bosch would be forced to confront the merits of the alleged price-fixing conspiracy amongst DENSO, Bosch, and NGK. This issue is clearly central to a determination of DENSO's liability for purchases made from NGK. All claims depend on a common core of facts and are inherently inseparable. Accordingly, a stay of the non-arbitrable proceedings against DENSO relating to [plaintiffs'] purchases from NGK is appropriate.

*In re Auto. Parts Antitrust Litig.*, 12-MD-02311, 2017 WL 3579753, at *9 (E.D. Mich. Apr. 18,

---

[47] *Volkswagen*'s gloss of *Morrie Mages* is instructive. Although the *Volkswagen* panel hewed to the later line of cases that reject *Morrie Mages*'s core holding—that Section 3 of the FAA *required* a stay—it still relied on *Morrie Mages* to support the proposition that a district court should issue a stay when core issues overlap and the litigation could have a preclusive effect on the arbitration. *Volkswagen*, 474 F.3d at 972.

[48] *See In re Samsung Galaxy Smartphone Mktg. & Sales Practices Litig.*, 298 F. Supp. 3d 1285, 1304 (N.D. Cal. 2018) (staying nonsignatory plaintiffs' claims pending arbitration of signatory plaintiffs' claims); *Cook v. John Hancock Life Ins. Co. (U.S.A.)*, 7:12-CV-00455, 2013 WL 942384, at *3-4 (W.D. Va. Mar. 11, 2013), as corrected (Mar. 13, 2013) (citing *Home Assurance Co. v. Vecco Concrete Constr. Co., Inc. of Va.*, 629 F.2d 961, 964 (4th Cir.1980))*; Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1114-5 (C.D. Cal. 2002) (staying nonsignatory antitrust plaintiffs' claims against arbitrating and non-arbitrating defendants; *Gray v. Conseco, Inc.*, SA CV 00-322DOC(EEX), 2000 WL 1480273, at *8 (C.D. Cal. Sept. 29, 2000) ("The district court's power is the same whether the non-arbitrable claims arise between parties with other arbitrable claims or instead are brought by parties with no arbitrable claims.").

2017). That logic applies with undiminished force here.[49]

In addition, any delay resulting from the stay will be marginal. This is an antitrust class action that is part of a multidistrict litigation. The scheduling order in this MDL already contemplates that the *Authenticom* case (not subject to arbitration) will proceed to trial ahead of this one reaching the threshold class certification stage. *See* Dkt. 166 at 3. The marginal delay caused by a stay pending arbitration of the Reynolds Dealers' claims will not unduly prejudice the CDK Dealers.

## IV. ARGUMENT IN SUPPORT OF REYNOLDS' MOTION TO DISMISS PURSUANT TO RULE 12(B)(6)[50]

In deciding whether Plaintiffs state viable, plausible claims for relief, the Court may consider (1) the factual allegations in the Complaint, disregarding all conclusory allegations, "naked assertions," and boilerplate, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007); (2) all documents that are attached to the Complaint; (3) all documents that are critical to the Complaint and referred to in it; and (4) all documents and information subject to judicial notice, including "documents in the public record." *See, e.g.*, *Olson v. Bemis Co.*, 800 F.3d 296, 305 (7th Cir. 2015); *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012); *Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008).

Judge St. Eve previously issued an order in this MDL partially dismissing Authenticom's complaint. Dkt. No. 176. As identified below, that order addressed certain of the issues discussed in this memorandum, but on far more limited allegations. While the Authenticom complaint relied on vague and misleading allegations made in early 2017, which Judge St. Eve felt compelled to

---

[49] *See also Morales v. Lexxiom, Inc.*, CV096549SVWDTBX, 2010 WL 11507515, at *10 (C.D. Cal. Jan. 29, 2010) (staying joint-and-several claims against RICO defendants pending arbitration of direct-liability claims).

[50] In the interest of avoiding duplicative briefing, to the extent not expressly addressed below, Reynolds hereby incorporates by reference and asserts each of the arguments set forth in (1) CDK's concurrently-filed motion to dismiss the Complaint; and (2) each of the arguments set forth by Reynolds and CDK in their motions to dismiss Authenticom's Complaint in this litigation. *See* Dkt Nos. 54 (CDK opening brief) and 57 (Reynolds opening brief).

credit and interpret in Authenticom's favor at the pleadings stage, Plaintiffs' Complaint goes much further: its 736 paragraphs, 142 evidentiary footnotes, 60 exhibits, and 918 total pages incorporate large amounts of evidence about the underlying markets and economic relationships between the relevant market participants. These additional incorporated facts are properly considered on this Motion to Dismiss, and, as explained below, they confirm the implausibility of Plaintiffs' claims against Reynolds. *See Weisbuch v. County of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) ("A plaintiff may plead herself out of court. If the pleadings establish facts compelling a decision one way, that is as good as if depositions and other expensively obtained evidence on summary judgment establishes the identical facts.") (internal punctuation omitted) (quoting *Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir. 1995)).

With respect to each of their claims, Plaintiffs assert two forms of injury: supposed overpayments for DMS, and supposed overpayments for "integration services." Complaint ¶ 165. As explained in **Section A** below, Plaintiffs fail to allege a plausible antitrust injury with respect to their DMS purchases, and therefore all of their claims based on such purchases must be dismissed. **Sections B and C** discuss grounds for dismissing Plaintiffs' three species of claim against Reynolds involving "integration services,"[51] *i.e.*, (1) horizontal conspiracy with CDK to "divide" the market for "integration services" and/or "block" integrators; (2) a claim that Reynolds used "exclusive dealing" provisions in its contracts with vendors (not dealers); and (3) a claim that Reynolds unlawfully monopolized an "aftermarket" for integration services on its own DMS. Finally, **Section D** discusses threshold limitations on Plaintiffs' ability to recover damages and injunctive relief.

---

[51] As noted above, the phrase "integration services" is a misnomer that was created by Plaintiffs for purposes of this litigation. Nevertheless, for the sake of clarity Reynolds will use Plaintiffs' phrase throughout.

### A. Plaintiffs Fail to Allege a Plausible Antitrust Injury With Respect to Their DMS Purchases.

To recover supposed overpayments for DMS (as opposed to overpayments for "integration services"), Plaintiffs must plausibly allege an antitrust violation that affected their DMS purchases. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 344 (1990) (under the "antitrust injury" standing requirement, an antitrust plaintiff may only recover for injuries that flow "from a competition-reducing aspect or effect of the defendant's behavior"); *Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013) (*Twombly*'s plausibility standard applies equally to the "antitrust injury" requirement). But as explained below, Plaintiffs (1) do not plausibly allege any antitrust violation *directed at* DMS; and (2) do not plausibly allege that their asserted antitrust violations regarding *integration services* had the *effect* of raising DMS prices. As a result, all of Plaintiffs' claims must be dismissed to the extent they are based on DMS purchases.

As noted above, Plaintiffs effectively assert three antitrust violations by Reynolds, none of which is alleged to have been directed at DMS. Instead, Plaintiffs expressly allege that each of these violations was directed exclusively at markets for "integration services." *First*, Plaintiffs assert that Reynolds engaged in a horizontal conspiracy with CDK to "divide" the market for *integration services*, and/or to "destroy competition" in that market by "blocking" *integrators* from their systems. Complaint ¶¶ 74-109 (alleging that Reynolds and CDK conspired to restrain trade in the integration services market). *Second*, Plaintiffs assert that Reynolds used "exclusive dealing" provisions in its contracts with vendors by prohibiting those vendors from giving *integrators* access to Reynolds's system. *Id.* ¶¶ 110-125 (alleging that Reynolds and CDK imposed "exclusive dealing provisions" with respect to integration services). And *third*, Plaintiffs assert that Reynolds unlawfully monopolized an aftermarket for *integration services* on Reynolds's system. *Id.* ¶¶ 200-208. According to Plaintiffs' own allegations, these supposed

25

antitrust violations were directed at markets for integration services, not the DMS market.

Plaintiffs do make scattered (and unsupported) references to CDK and Reynolds having a "duopoly in the DMS market," but that is not an antitrust violation. *See, e.g.*, *id.* ¶¶ 1, 150, 267(a), 280(a). Courts have consistently held that there is no such thing as an antitrust "duopoly" claim. *See, e.g.*, *MacDermid Printing Solutions LLC v. Coltron Corp.*, 833 F.3d 172, 186 (2d Cir. 2016) ("[T]he mere fact that a market has few competitors does not transform every action by one of them into an antitrust violation"); *Int'l Constr. Prods. LLC v. Caterpillar Inc.*, No. 15-108-RGA, 2016 WL 264909, at *9 (D. Del. Jan. 21, 2016) ("§ 2 applies to the conduct of single firms only, rather than to the conduct of a small number of firms engaged in tacit collusion, as in cases involving oligopoly, shared monopoly, or . . . duopoly.") (internal quotations and citation omitted); *Arista Records LLC v. Lime Group LLC*, 532 F. Supp. 2d 556, 580 (S.D.N.Y. 2007) (district courts "have uniformly held or approved the view that allegations of a 'shared monopoly' do not state a claim under section 2 of the Sherman Act."); *see also Authenticom*, 874 F.3d at 1026 ("Authenticom has not argued that either Reynolds or CDK has sufficient market power on its own to trigger either a monopolization or an attempt-to-monopolize claim under section 2").

Thus, to the extent Plaintiffs allege any viable antitrust violations at all, those violations are exclusively directed at "integration services," not DMS. Unsurprisingly, moreover, Plaintiffs fail to plausibly allege that those violations *had the effect* of raising DMS prices. Indeed, Plaintiffs' only attempted explanation in their 736-paragraph Complaint for how Defendants' conduct supposedly affected DMS prices is limited to a handful of conclusory, implausible paragraphs and boilerplate references to "supracompetitive prices" for DMS, or harm to "competition in the DMS market.". Complaint ¶¶ 16, 72, 146-152, 172. These passages are precisely the "naked assertions" and boilerplate that district courts must disregard. *See, e.g.*, *Hackman v. Dickerson Realtors*, 520

F. Supp. 2d 954, 968 (N.D. Ill. 2007) (conclusory allegations of antitrust violations do not satisfy *Twombly*); *Twombly*, 550 U.S. at 556-57 ("naked assertions," "labels" and "conclusions" are irrelevant); *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (the "conclusory nature" of plaintiff's allegations "disentitles them to the presumption of truth.").

It is not enough for Plaintiffs to simply assert that DMS prices went up; to recover under the antitrust laws Plaintiffs must plausibly allege that these price increases resulted from a well-pled antitrust violation. Plaintiffs do not even seriously attempt to satisfy this requirement.

*First*, Plaintiffs theorize that the alleged agreements might have impacted the DMS market by limiting the "pool" of "independent data integrators" available to a "potential" competing DMS supplier. *Id.* ¶ 146. But that makes no sense: even according to Plaintiffs' allegations, the agreements between Reynolds and CDK could only have barred "integrators" from accessing Reynolds's and CDK's systems. *Id.* ¶ 9. And there is no allegation that any of the many *existing participants* in the DMS market have lacked for "integrators" that they desired. Further, there is no allegation that Reynolds and CDK did anything to prevent integrators from accessing the DMS systems *of each other*, let alone the systems of Reynolds's and CDK's competitors, or of potential competitors who had not yet entered the market. Nor is there any allegation that CDK's decision to "close" its DMS has driven any integrator out of business.

On the contrary, "integrators" like Authenticom and CDK's DMI and IntegraLink remain available on those competing systems today. Authenticom's own CEO, in late 2017 (after the Seventh Circuit ruled that Authenticom was not entitled to an injunction or forced sharing), told the marketplace that he believed it would be "well-positioned and viable" for years to come.[52] Tellingly in this regard, there is not a single allegation in the Complaint that any vendor has been

---

[52] *See* Mike Tighe, *Anguished Steve Cottrell Sets Layoffs of 55 Authenticom Employees for Feb. 2*, LaCrosse Tribune, Nov. 9, 2017, *available at* https://perma.cc/246J-34VF.

unable to obtain integration services on a competing open DMS system, much less that there have been such serious market-wide difficulties in obtaining integration services that other DMS providers have been unable to compete with Reynolds and CDK.[53]  And even if Plaintiffs could allege that Reynolds and CDK excluded integrators from the entire market, the only conceivable effect of that conduct would be higher prices for *integration services*, not higher prices for DMS.

*Finally*, Plaintiffs appear to suggest that the alleged agreements concerning integration services affected the DMS market by eliminating the "openness" of CDK's DMS, and therefore preventing dealers who might have preferred that feature from switching from Reynolds's "closed" DMS to CDK's previously "open" DMS.  Complaint ¶¶ 147-149.  But even if that were true, there is no allegation that Reynolds and CDK did anything to prevent dealers who desired an "open" DMS from purchasing one from another DMS provider, like DealerTrack or Auto/Mate.  *See, e.g.*, *Goss v. Mem'l Hosp. Sys.*, 789 F.2d 353, 355 (5th Cir. 1986) (alleged group boycott not "likely to have anticompetitive effect" where only some hospitals in area allegedly participated); *In re Beef Indus. Antitrust Litig.*, 907 F.2d 510, 516 (5th Cir. 1990) (conspiracy between some beef packers "economically unfeasible" because other packers could simply steal the conspirators' market share); *Bailey Lumber & Supply Co. v. Georgia-Pac. Corp.*, No. 1:08CV1394 LG-JMR, 2009 WL 2872307, at *5 (S.D. Miss. Aug. 10, 2009) (dismissing conspiracy claims as implausible where non-conspiring manufacturers "could choose to increase their output and steal the abandoned market share").  And again, even if Plaintiffs *could* plausibly allege that dealers were forced to pay higher *integration fees* because they were unable to switch to an "open" DMS, that still would not explain how the alleged conduct supposedly forced dealers to pay higher prices *for DMS*.

Thus, Plaintiffs do not plausibly allege an antitrust injury with respect to DMS purchases,

---

[53] Indeed, the fact that dealers frequently switch from Reynolds and CDK to competing DMS suppliers confirms that competition in the DMS market is alive and well.  *See* discussion below, pp. 47-49.

and the Court should dismiss all of Plaintiffs' claims to the extent they are based on such purchases.

**B. Plaintiffs Fail To Plausibly Allege An Antitrust Violation With Respect To "Integration Services."**

As explained above, boilerplate references to "DMS prices" and "competition in the DMS market" aside, all of Plaintiffs' asserted antitrust violations concern so-called "integration services." In this regard, Plaintiffs assert three types of antitrust violation by Reynolds: (1) "horizontal conspiracy"; (2) "exclusive dealing"; and (3) "unlawful monopolization." This **Section B** discusses pleading deficiencies common to all of these claims. **Section C** below discusses additional deficiencies specific to the exclusive dealing and monopolization claims.

1. <u>Plaintiffs' Claims That Reynolds "Conspired" To Continue Its Preexisting, Unilateral Business Practices Do Not Make Economic Sense.</u>

Plaintiffs attempt (with no supporting factual allegations) to tie all of their asserted antitrust violations back to a supposed "conspiracy" between Reynolds and CDK. *See, e.g.*, Complaint ¶ 13 (exclusive dealing provisions part of conspiracy); *id.* ¶ 205 (Reynolds and CDK used conspiracy to monopolize "aftermarkets"). Because it is implausible—indeed, nonsensical—that Reynolds participated in a conspiracy, all of Plaintiffs' claims against Reynolds fail.

In effect, Plaintiffs allege that Reynolds conspired to do nothing. While Plaintiffs rely entirely on an alleged 2015 conspiracy between Reynolds and CDK to block integrators, the Complaint affirmatively alleges that Reynolds has enforced a unilateral policy of blocking integrators since 2006. *Id.* ¶ 7. The Complaint acknowledges that Reynolds made public statements in support of its policy long before the alleged 2015 agreements, *see id.* ¶ 74 n.22 (quoting 2011 news article regarding Reynolds's policy of blocking unauthorized access to its DMS), and there is no factual allegation that these public statements were a mere "pretext." *See id.* ¶¶ 153-164 (relying entirely on CDK documents for argument that data security is a "pretext").

Similarly, despite allegations that CDK and Reynolds used exclusive dealing provisions to

effect their 2015 conspiracy, *id.* ¶ 110, the Complaint concedes that the asserted "exclusive dealing provisions" in Reynolds's vendor contracts have been unchanged since at least 2013, well before the alleged 2015 agreements. *Id.* ¶ 115. The Complaint further admits that the prohibitions against third-party access have been unchanged in Reynolds's DMS licensing agreements since at least 2006. *Id.* ¶¶ 7, 52, 77 n.25; *see also id.*, Ex. 1 at 12:6-7 ("Reynolds is closed. That has been a historical fact for decades.").

Nor did the 2015 agreements alter Reynolds's preexisting business practices with respect to "integration services." Plaintiffs claim that, as part of the 2015 agreements, "Reynolds agreed not to provide [data integration services] for Dealers, Vendors, or data integrators using a CDK DMS." *Id.* ¶ 11. But the 2015 agreements say no such thing. *See id.*, Exs. 11, 12, 13. And indeed, such a provision would serve no purpose, because Reynolds has *never* provided "integration services" on CDK's DMS, or anywhere else. *See id.*, Ex. 2 at 21, ¶ 81 n.28, Ex. 9.

Simply put, there is no allegation that the 2015 agreements resulted in *any* material change to Reynolds's pre-2015 business practices. There is no allegation that Reynolds made any changes to its policies prohibiting unauthorized access of its DMS. There is no allegation that Reynolds made any changes to its contracts with dealers or vendors. Nor is there any allegation that, but for the 2015 agreements, Reynolds might have changed these practices in the future—for example by "opening" its DMS. There is no allegation that Reynolds changed its business practices with respect to integration services. Crucially, moreover, there is no allegation that any of Reynolds's pre-2015 conduct was anything other than lawful, unilateral activity.

To be plausible, an allegation of antitrust conspiracy must "make economic sense." *Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998); *see also William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009) (in

applying *Twombly* to antitrust claim, court must consider "basic economic principles."). It does not make economic sense for an antitrust defendant to conspire to do something it can do unilaterally. *See, e.g.*, *Rossi v. Standard Roofing*, 156 F.3d 452, 481 (3d Cir. 1998) ("it would be unreasonable to infer that Servistar would conspire with GAF to do what GAF could do unilaterally"); *Twombly*, 550 U.S. at 557 ("parallel conduct that could just as well be independent action" is not sufficient to allege antitrust conspiracy); *Mich. Division-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 458 F. Supp. 2d 474, 486 (E.D. Mich. 2006) (conspiracy claims were "economically implausible" were defendants could have achieved asserted goal of conspiracy—to "force out independent sellers of monuments"—through "unilateral decision"). That principle should apply with extra force in situations where a defendant, like Reynolds, is accused of conspiring to do something *it was already doing* unilaterally and lawfully. *See Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006) (firms have no antitrust obligation "to cooperate with rivals by selling them products that would help the rivals to compete.") (citing *Verizon Commc'ns Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 408 (2004)).

Indeed, Plaintiffs affirmatively allege that Reynolds has *monopoly power* over so-called "integration services" on its DMS—*i.e.*, the power to *unilaterally* raise prices. Complaint ¶¶ 124-125, 200-208 (alleging that Reynolds exercised monopoly power). These allegations are fatal to Plaintiffs' Section 1 claims against Reynolds, rendering implausible the suggestion that Reynolds needed to conspire for the result it had allegedly obtained nearly a decade before. *See, e.g.*, *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, No. 5:16-cv-06370-EJD, 2017 WL 4310767, at *7 (N.D. Cal. Sept. 28, 2017) ("Plaintiff's theory that [defendants] are involved in a conspiracy to restrain trade makes no economic sense in the face of allegations that Ningbo Sunny is already a monopolist .... If Ningbo Sunny wanted to increase prices or set price terms, it would be far

easier for Ningbo Sunny to do just that than to collude with another company, given its purported level of control over the relevant market."); *Universal Grading Serv. v. Ebay, Inc.*, No. C-09-2755, 2012 WL 70644, at *5 (N.D. Cal. Jan. 9, 2012), *aff'd* 563 Fed. Appx. 571 (9th Cir. 2014); *United Magazine Co. v. Murdoch Magazines Distribution, Inc.*, 146 F. Supp. 2d 385, 401-02 (S.D.N.Y. 2001).[54]

Nevertheless, Plaintiffs assert that Reynolds had a motive to "agree" that CDK would close its own DMS, because that change would stop dealers from switching from Reynolds's closed DMS to CDK's open DMS. Complaint ¶ 10 n.3. *First*, nowhere in the 2015 wind-down agreements did CDK agree to "close" its system, and there is no factual allegation suggesting Reynolds even knew that was CDK's plan, much less "agreed" that CDK would do so.

*Second*, why would Reynolds do that? For those dealers that prefer more controlled, secure DMS architecture, CDK's decision only heightened the competition with Reynolds, and threatened to diminish one of Reynolds's primary *market differentiators:* its controlled, secure DMS. For dealers looking for an "open" DMS, the easily foreseeable effect of an "agreement" to close CDK's DMS was not that those dealers would stay with Reynolds, but that they would depart for competing providers of open DMS, like DealerTrack and Auto/Mate, instead of CDK. Indeed, such switching to competing open DMS providers was commonplace before the 2015 agreements between Reynolds and CDK, and has continued to the present. *See* discussion below, pp. 43-45. Tellingly, there is no allegation in the Complaint that any dealer was precluded from switching to an open DMS as a result of the 2015 agreements. In light of these basic market facts, it is not

---

[54] Judge St. Eve did not address this antitrust pleading doctrine in her order on Defendants' motions to dismiss the complaint in *Authenticom*. Dkt. No. 176. Instead, Judge St. Eve addressed the Supreme Court's decision in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596 (1986) regarding the standards for establishing a "rational economic motive to conspire," which Judge St. Eve concluded applied only at the summary judgment stage. *Id.* at 29-31. Reynolds raises a distinct argument here: *i.e.*, even if Plaintiffs manage to allege that Reynolds had a "motive" to conspire, a bare motive is not enough where, as here, the plaintiff concedes that the defendant could—indeed, already was—achieving the alleged goals of the conspiracy unilaterally and lawfully.

plausible that Reynolds would have viewed a bilateral (and otherwise unnecessary) conspiracy with CDK as an effective means of preserving customers who wanted an "open" DMS.

*Third*, even if Plaintiffs' asserted "motive" for Reynolds could be credited, it is implausible that Reynolds and CDK would have needed a conspiracy to close CDK's DMS, when CDK could just as easily make such a change unilaterally (just as Reynolds did years before).

*Fourth*, this naked assertion of a hypothetical motive is insufficient as a matter of law to plausibly allege that Reynolds participated in an antitrust conspiracy. *See, e.g.*, *Hackman*, 520 F. Supp. 2d at 968 (assertions that defendant could have had a certain motive to conspire not sufficient); *Motor Vehicle Software Corp. v. CDK Global, Inc.*, No. 17-896 DSF (AFMx), 2017 WL 5643163, at *7 (C.D. Cal. Oct. 2, 2017) ("Alleging only that [defendant] had motive and opportunity to conspire is insufficient to suggest an illegal agreement.") (citing *Twombly*); *Robb v. Conn. Bd. of Veterinary Med.*, 157 F. Supp. 3d 130, 146 (D. Conn. 2016) ("a theoretical 'common motive to conspire' . . . is insufficient to establish an antitrust conspiracy when there exists an 'obvious alternative explanation'") (quoting *Twombly*, 550 U.S. at 567); *In re Late Fee & Over-Limit Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007); P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles & Their Application* ¶ 1411 at 68 (4th ed. 2017) ("Motivation to enter a conspiracy is never enough").

Indeed, Plaintiffs imply that Reynolds must have conspired because it had a motive to retain its existing customers. But if that were sufficient to allege an antitrust conspiracy, "every company in every industry could be accused of conspiracy, because they all would have such a 'motive.'" *In re Late Fee & Over-Limit Litig.*, 528 F. Supp. 2d at 964 (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 133 (3d Cir. 1999)).

Plaintiffs' conspiracy claims against Reynolds do not make economic sense and should be

dismissed under *Twombly* and its progeny.

> 2. <u>Plaintiffs' Inability to Grant Integrators Illegal Access to Reynolds's or CDK's DMS Is Not an Antitrust Injury.</u>

All of Plaintiffs' claims (whether cast as horizontal conspiracy, exclusive dealing, or unlawful monopolization) are ultimately based on their inability to grant "integrators" access to Reynolds's or CDK's DMS. But Reynolds's dealers █████████████████████████████████ ██████████████████████████████████████████████████████████████ and Plaintiffs *do not challenge this contractual provision.* Thus, Plaintiffs' ████████████████████ ██████ is *independent* of any asserted antitrust violation, and this ends the inquiry.

Under cyber-security laws, including the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.*, it is illegal—indeed, criminal—to intentionally access a computer system without authorization and obtain information. Authenticom and other "integrators" violated these laws every time they accessed Reynolds's DMS with bootlegged dealer credentials. And as recognized by Judge St. Eve in *Authenticom*, "a plaintiff whose desired trade is illegal independent of the defendants' complained-of conduct lacks antitrust injury." Dkt. No. 176 at 19-20.

Judge St. Eve reasoned that Authenticom's conduct was not illegal "independent of" Reynolds' alleged antitrust violations, based on Authenticom's assertions that its lack of authorization and DMS access was the *sole result* of the alleged anticompetitive conduct. *Id.* at 21. But Plaintiffs' allegations here confirm that Authenticom's lack of authorization and access was indeed independent of any antitrust violation. Unlike Authenticom, Plaintiffs do not contend that the ████████████████████████████████████████████████████████████ ██████████████████████████████████████████ constituted "exclusive dealing," or were unlawful in any way. These undisputedly lawful provisions, and not any asserted antitrust violation, are what made Authenticom's access of Reynolds' DMS unauthorized, and therefore

illegal under the CFAA. As a result, Plaintiffs' alleged inability to use integrators is not an antitrust injury, and Plaintiffs' counts should be dismissed.[55]

### 3. Plaintiffs Fail to Allege a Plausible "Market Division" Conspiracy.

In addition to the overall implausibility of Plaintiffs' conspiracy allegations, Plaintiffs do not adequately plead their "market division" theory. At its core, this theory asserts that Reynolds and CDK unlawfully agreed to divide the market for "integration services" by agreeing that CDK would wind down its data broker subsidiaries' unauthorized access of Reynolds's DMS. *See* Complaint ¶¶ 83-85 (alleging that "CDK would stop providing services to Dealers relating to the integration of their data stored on Reynolds's DMS"). Judge St. Eve persuasively dismissed a substantially identical claim in *Authenticom*. *See* Dkt. No. 176 at 32-33 (any market division conspiracy could not have caused antitrust injury because it was not the cause of vendors leaving Authenticom and doing business with CDK instead). Moreover, Plaintiffs' market division claim fails as a matter of law for at least two additional reasons.

*First*, Plaintiffs fail to allege a plausible market division conspiracy because they cannot allege that Reynolds agreed to refrain from making any sales. While the 2015 agreements were consistent with Reynolds's general approach of winding down all unauthorized access of its system, there is no well-pled factual allegation that Reynolds made any agreement to refrain from acting as a data broker on CDK's DMS or to alter its (non-existent) business practices with respect to "integration" in any way. Thus, the "quid pro quo" essential to a market division claim is entirely absent. *See, e.g.*, *In re Online DVD Rental Antitrust Litig.*, No. M 09-2029 PJH, 2011 WL 5883772, at *10 (N.D. Cal. Nov. 22, 2011) (agreement did not constitute market division because

---

[55] In the interest of minimizing duplication, Reynolds incorporates by reference the parties' briefing on CFAA issues in Authenticom. *See, e.g.*, Dkt. No. 54 at 22-23 (CDK opening brief), Dkt. No. 57 at 6-21 (Reynolds opening brief), and Dkt. No. 63 at 4-12 (Reynolds reply brief).

it did not impose a "quid pro quo" obligation on one of the parties to refrain from making any sales); *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1137 (9th Cir. 2011) (revenue sharing agreement among grocers did not constitute market division agreement because it did not "prevent any [d]efendant from actually making sales" to consumers).

*Second*, to allege a market division conspiracy with respect to "integration services," Plaintiffs must plausibly allege that CDK and Reynolds were actual or potential competitors with respect to those services. *See United States v. Romer*, 148 F.3d 359, 368 (4th Cir. 1999) ("An agreement among persons who are not actual or potential competitors in a relevant market is for Sherman Act purposes an act without consequence.") (internal punctuation omitted). But Plaintiffs do not allege that Reynolds was an actual competitor of CDK's data broker subsidiaries: there is no allegation that Reynolds, directly or indirectly, acted as a data broker at any time on any computer system, much less on CDK's DMS. Nor do Plaintiffs plausibly allege that Reynolds was a "potential competitor" of CDK's subsidiaries with respect to integration services. To plead the existence of a "potential competitor" under the antitrust laws, Plaintiffs must allege that Reynolds "intended and was prepared" to become a data broker, and had "taken some affirmative steps to enter the business." *Sunbeam TV Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1272-73 (11th Cir. 2013) (internal quotations omitted); *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 862 (D.C. Cir. 2008). Plaintiffs do not, and cannot, allege any of these things.

Thus, for these reasons, in addition to the reasons set forth in **Section III.B.1** above and **Sections III.B.2** and **III.B.3** below, the Court should dismiss Plaintiffs' federal claims (Counts I and II) and state law claims (Counts VI-L) alleging a horizontal "market division" conspiracy.

    4.   <u>Plaintiffs Lack *AGC* Standing to Assert Claims Under Federal Law and Most of the Relevant State Laws.</u>

Numerous courts—including this one—have applied *AGC* or analogous remoteness

doctrines to bar claims by indirect purchasers who did not participate in an allegedly restrained market, where a more directly injured purchaser is in a better position to state a claim.[56] *See*, *e.g.*, *Dairy Farmers I*, 2013 WL 4506000, \*14 (indirect purchasers of finished dairy products lacked standing under *AGC* and remoteness principles because the plaintiffs did not participate in the "allegedly restrained markets," the allegedly restrained products were not components of the products the plaintiffs purchased, and more direct purchasers were "in a better position to advance an action"); *Dairy Farmers II*, 2015 WL 3988488, at \*3-5 (adopting same *AGC* analysis and applying it to both plaintiffs' federal and state law claims); *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 924 (N.D. Ill. 2009), *rev'd on other grounds sub nom., Minn-Chem, Inc. v. Agrium Inc.,* 657 F.3d 650 (7th Cir. 2011) (indirect purchasers of potash lacked standing under *AGC* because direct purchasers of potash had already filed a putative class action); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, No. 09 C 7666, 2012 WL 39766, at \*9 (N.D. Ill. Jan. 9, 2012) (indirect purchasers lacked *AGC* standing where "direct purchasers are actively pursuing their claims"); *see also In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-md-02042, 2013 WL 1431756 (E.D. Mich. April 9, 2013); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1136-41 (N.D. Cal. 2008).

Here, as in the above cases, Plaintiffs do not and cannot allege that they participated as consumers or competitors in the allegedly restrained "data integration services" (or "DIS") markets. The Complaint is clear that vendors, not dealers, are the direct purchasers of integration services on CDK's and Reynolds's DMS. Complaint ¶¶ 5, 75. Indeed, Judge St. Eve drew the same conclusion in assessing Authenticom's complaint. *See* Dkt. No. 176 at 42-43 ("No alleged facts plausibly suggest that—despite vendors engaging, paying, and receiving directly integrators'

---

[56] Reynolds incorporates CDK's analysis regarding the applicability of *AGC* to Plaintiffs' federal and state law claims.

services—dealers are the effective and actual purchasers of those services.")[57]

Moreover, unlike the relatively simple physical goods at issue in the above cases, the service that vendors (not dealers) purchase from sellers in the alleged DIS markets—extraction and formatting of data—is not indirectly purchased by Plaintiffs in the alleged DMS market. Instead, vendors use such integration services in the course of creating entirely different products: software applications. Complaint ¶ 75. There are hundreds of such applications created and sold by hundreds of vendors. *See, e.g.*, Cox Automotive Complaint, Dkt. No. 3, No. 17-cv-00925, ¶ 27; MVSC Second Amended Complaint, Dkt. No. 76, No. 17-cv-00896, ¶¶ 50-52, 75 (alleging distinct state-specific relevant markets for applications relating to vehicle registration).

To the extent Plaintiffs claim to have suffered an injury in connection with indirect purchases of integration services, those injuries could have only occurred through independent transactions with vendors in these distinct markets for software applications—markets that Plaintiffs do not even clearly acknowledge, much less plausibly define and causally link to their alleged DMS and "DIS" markets.

Further, Plaintiffs not only allege that the market in which they participate (the "DMS Market") is distinct from the markets in which the alleged restraint of trade occurred (the "DIS Markets"), they also allege that the latter are "aftermarkets" of the former. Complaint ¶ 60. As observed by Judge St. Eve in addressing similar allegations in *Authenticom*, this allegation necessarily implies that competition in the alleged DMS Market is "dissociated" from competition in the DIS markets. *See* Dkt. No. 176 at 49 (quoting *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 402 (3d Cir. 2016)). Such competitive "dissociation" underscores the remoteness of Plaintiffs' alleged injuries under *AGC*.

---

[57] Plaintiffs refer to and rely upon Authenticom's complaint in their own Complaint. *See* Complaint ¶ 64 n.9.

Finally, again like the above cases applying *AGC*, other plaintiffs who *did* participate as consumers and competitors in the allegedly restrained DIS markets are not only capable of pursuing antitrust claims, they are doing so. This includes (1) a putative class action filed on behalf of all vendors who purchased DIS from CDK or Reynolds (*i.e.*, the alleged direct purchasers of integration services), (Dkt. No. 1, No. 18-cv-02521), (2) an individual action filed by Authenticom (the primary "independent integrator" in the alleged DIS markets) (Dkt. No. 1, No. 17-cv-00318), and (3) individual complaints filed by large vendors and purchasers of integration services MVSC, Cox Automotive, Autotrader.com, Kelley Blue Book, and others (Dkt. No. 76, No. 17-cv-00896; Dkt. No. 3, No. 17-cv-00925). These other plaintiffs allege more direct injuries for purposes of *AGC* and are in a better position to pursue these antitrust claims than are Plaintiffs here.

For all of these reasons, Plaintiffs' federal claims (Counts I-V) and above-identified state law claims (Counts VI-XXXII, XXXIV- XXXVII, XXXIX-L) should be dismissed for lack of *AGC* standing.

### C. Plaintiffs' Monopolization and Exclusive Dealing Claims Fail For Additional Reasons.

#### 1. Plaintiffs Fail to Allege a Plausible "Single-Brand Aftermarket" for "Integration Services" on Reynolds's DMS.

To maintain both their federal claim for "unlawful monopolization" under Section 2 and their federal and state law claims based on alleged "exclusive dealing," Plaintiffs must allege a plausible, legally viable relevant market. *See, e.g.*, Jonathan I. Gleklen et al., *Antitrust Law Developments*, 626 (7th ed. 2012) (collecting authorities). Plaintiffs attempt to meet this pleading requirement with respect to Reynolds by relying entirely on a rare type of alleged market known as a "single-brand aftermarket"—*i.e.*, a supposed market for integration services only on Reynolds's DMS. *See* Complaint ¶¶ 60, 122-25. Courts have almost always rejected such single-brand aftermarkets, based on an "economic presumption" that any market power that may exist in

such an aftermarket is constrained by competition in the primary market, because "consumers make a knowing choice to restrict their aftermarket options when they decide in the initial (competitive) market" to make a purchase that restricts later choices. *Newcal Indus., Inc. v. IKON Office Solution*, 512 F.3d 1038, 1050 (9th Cir. 2008).

In *Kodak*, the U.S. Supreme Court carved out a sole, narrow exception to this presumption against aftermarket claims. *Eastman Kodak Co. v. Image Tech. Services, Inc.*, 504 U.S. 451 (1992). There, after achieving significant sales and effectively "locking" many customers into using its printers and copiers through "sunk costs," Kodak *changed* its policies to require its customers to exclusively use Kodak's repair service. The Court found the ordinary presumption— that market power in an aftermarket will be checked by competition in the primary market— potentially rebutted by evidence that: (1) Kodak's customers did not know at the time they contracted with Kodak that they would be giving Kodak the exclusive right to provide parts and services for the equipment they were purchasing; (2) Kodak's customers were effectively "locked in" to using Kodak equipment by "very high" "switching costs" that prevented them from switching to competing products; and (3) high "information costs" made it "impossible" for customers to reasonably predict before entering into a contract the total cost they were agreeing to (*i.e.*, the combined cost for equipment, parts, and service). *Id.* at 473-74.

In the wake of *Kodak*, "[a] plaintiff faces a *substantial* burden to overcome the presumption under the antitrust laws that 'normal' market forces are at work." *Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*, 184 F. Supp. 2d 947, 955 (D. Ariz. 2001) (emphasis in original). To meet this burden at the pleadings stage, a plaintiff must plausibly allege *each* of *Kodak*'s prerequisites for a single-brand aftermarket claim. *POURfect Prods. v. KitchenAid*, 2010 WL 1769413, at *4 (D. Ariz. May 3, 2010) (citing Areeda, ¶ 1740 at 138). Here, however, Plaintiffs do not, and

cannot, allege *any* of *Kodak*'s prerequisites.

> a.  *Reynolds's Dealer Customers Knew About Its "Aftermarket" Policy.*

Courts have unanimously held that the exception identified in *Kodak* is "limited to situations in which the seller's [aftermarket] policy was not generally known." *See, e.g.*, *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 819 (6th Cir. 1997); *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996) ("The Court did not doubt in *Kodak* that if spare parts had been bundled with Kodak's copiers from the outset, or Kodak had informed customers about its policies before they bought its machines, purchasers could have shopped around for competitive life-cycle prices."); *Schor*, 457 F.3d at 614 (rejecting single-brand aftermarket because, unlike in *Kodak*, "Schor does not accuse Abbott of any similar [aftermarket policy] switch that would exploit customers' sunk costs"); *Avaya*, 838 F.3d at 405.

Here this essential element of a *Kodak* claim cannot be met.  For more than a decade, Reynolds's controlled system access has been the defining and highly marketed feature of Reynolds's DMS.  The contracts made clear, and the automotive press underscored, that Reynolds's DMS was limited to human access by dealer employees, and it required vendors to integrate data stored on a Reynolds DMS through a "Reynolds Certified Interface," a built-in component of Reynolds's DMS.  Complaint ¶ 71.  For at least 26 years, the "aftermarket" policy about which Plaintiffs now complain—Reynolds's prohibition of third parties from accessing its DMS—has been ███████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████ *see also Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1021-22 (7th Cir. 2017) ("Reynolds . . . has always forbidden [Authenticom's practice of screen-scraping] in its system licenses."); *Reynolds & Reynolds Co. v. Superior Integrated Sols., Inc.*, 2013 WL 2456093, at *2 (Reynolds's dealer customers expressly agree that third parties, including

integrators, may not access the DMS).

Reynolds's contracts make no allowance for DMS access by dealer "agents" or any other third party. *See id.* Nor is there any allegation in the Complaint that Reynolds has contradicted the express language of its dealer contracts, through public statements or otherwise. On the contrary, the Complaint alleges that Reynolds has long touted its "closed" DMS, including through public statements made well before the alleged 2015 agreements. Complaint ¶ 77 nn.25-26, Ex. 8. The news articles cited in the Complaint demonstrate that Reynolds's policy prohibiting third-party integration was widely known and discussed in the automotive industry as early as 2006-2007. *See* Complaint ¶ 74 n.23.[58] And these provisions are legally valid. Following the dismissal of similar claims by Judge St. Eve, the dealers have dropped their claim that the licensing restrictions on third party access in the dealer contracts were unlawful.

Every dealer who purchased a Reynolds DMS during the relevant period was on full notice that, by so doing, it was agreeing to restrictive system access controls, including vis-à-vis third-party vendors and integrators. The unilateral policy has not changed at any point after the agreement was entered with the dealers. In short, Reynolds dealers (sophisticated businesses in and of themselves) agree in advance that providing system credentials to third parties like Authenticom is unauthorized—and the dealers do not challenge those unilateral restrictions. Under *Kodak* and its progeny, on these undisputed facts, Plaintiffs' aftermarket claims against Reynolds must be dismissed.

Indeed, in assessing Authenticom's aftermarket allegations, Judge St. Eve confirmed that "Reynolds's closed architecture was generally known to customers before they purchased the

---

[58] *See, e.g.*, Ralph Kisiel, *Dealer security stirs insecurity: Vendors wary of Reynolds plan for computer systems*, Automotive News, https://perma.cc/B4A6-NER3; Ralph Kisiel, *NADA, AIADA weigh Reynolds data security debate*, Automotive News, https://perma.cc/25LB-LZEL.

product," and therefore Reynolds did not engage in the "change in aftermarket practices" at issue in *Kodak*. Dkt. No. 176 at 48. Under the above case law, that ruling should have been dispositive of Authenticom's monopolization and exclusive dealing claims, just as it is dispositive of Plaintiffs' claims here. Instead, however, Judge St. Eve interpreted *Kodak* as authorizing single-brand aftermarket claims even where the seller's aftermarket policy is clearly disclosed at the time of purchase, provided that there are "information costs" and "switching costs" in the primary market. *Id.* at 49. Reynolds respectfully disagrees that such an interpretation is permissible under the black letter law identified above. But in any event, Judge St. Eve's reliance on switching and information costs does not help Plaintiffs here, because Plaintiffs' broader allegations and incorporated facts show that such costs do not exist in the alleged "primary" DMS market within the meaning of *Kodak*.

### b. *Plaintiffs Cannot Allege They Are "Locked In" By Switching Costs.*

To adequately plead the "very high" switching costs at issue in *Kodak*, a plaintiff must "face switching costs significant enough to constitute a lock in[,]" *see Brokerage Concepts v. U.S. Healthcare*, 140 F.3d 494, 515 (3d Cir. 1998) (plaintiffs failed to establish sufficiently high switching costs), and plausibly demonstrate that the lock-in affected a "substantial number of customers" by preventing them from switching to another product, *POURfect Prods.*, 2010 WL 1769413, at *4. The mere allegation that switching would cost money "does not establish lock in." *Commercial Data Servers, Inc. v. IBM*, 262 F. Supp. 2d 50, 69 (S.D.N.Y. 2003).

Here, the Complaint does not come close to alleging a "lock in" within the meaning of *Kodak*, much less that such a lock in affected a substantial portion of the DMS market. Instead, the Complaint alleges that switching DMS providers is "disruptive," "takes time," and requires

43

dealers to train their staff, making some dealers "hesitant to switch."[59] Complaint ¶¶ 66-69. Glaringly absent, however, are any factual allegations plausibly suggesting that substantial numbers of dealers are *locked in* to using Reynolds's DMS, such that they could not switch to another DMS even if they wanted to.

The Complaint does not allege lock-in because there is none. Indeed, Plaintiffs affirmatively allege that there has been a "massive [market] share shift" from Reynolds to CDK in recent years, decreasing Reynolds's market share from above 40% to around 30%.[60] Complaint ¶ 154 n.28 (internal quotations omitted). Major shifts in market share are incompatible with the notion that dealers cannot switch from Reynolds to other DMS providers: not only are dealers *able* to switch, the Complaint alleges they actually do, and in large numbers.

This switching in the DMS market continues to the present day. For example, Cox Automotive, another plaintiff in this MDL and the provider of the third largest DMS in the nation, an "open" product called DealerTrack, has recently published brochures explaining to dealers how to switch DMS providers, and reporting that independent research shows that around 45% of small dealers, 31% of medium-sized dealers, and 21% of large dealers switched DMS providers at the end of their last contract.[61] Ex. 4 (DealerTrack eBook) at 5.

Similarly, another competing provider of an "open" DMS product, Auto/Mate, publicly

---

[59] The Complaint also hypothesizes that Reynolds and CDK might try to "cripple" the business of a dealer who switches to another DMS, in an attempt at "retribution." Complaint ¶ 67. Plaintiffs' failure to allege a single instance where such "retribution" has actually occurred makes it impossible to take this naked assertion seriously.

[60] On appeal from a preliminary injunction ruling in the Authenticom case, *Authenticom, Inc. v. CDK Global, LLC, et al.*, No. 17-cv-00318 (W.D. Wisc. July 28, 2017) the Seventh Circuit emphasized the importance of this evidence at oral argument. Ex. 7 (Oral Argument Tr. 9/19/17) at 35:12-35:20 (Judge Rovner: "If the dealers are so unhappy…what is stopping them from moving en masse to the open DMS providers….?"); 36:9-10 (Judge Easterbrook: "Reynolds lost market share very quickly according to this record.").

[61] The Court may consider this document on this Motion to Dismiss because the document is publicly available and because, throughout their Complaint, Plaintiffs refer to and rely upon Cox's allegations, contracts, and public statements (including statements from Cox's website). *See, e.g.*, Complaint ¶ 113 & n.73; *id.* ¶ 116 & nn.77-80; *id.* ¶ 129 & n.99.

states that it "converts over 82% of its customers from the industry's two largest DMS providers [CDK and Reynolds]" and claims to have "perfected the DMS conversion process." *See* Ex. 5 (Auto/Mate Website Marketing Materials).[62] Indeed, when Auto/Mate and CDK sought to merge earlier this year, the FTC filed suit to stop the merger on the grounds that "Auto/Mate is successful in its attempts to target CDK and Reynolds customers" and therefore represents an important source of competition in the DMS market. Ex. 6 (FTC Complaint ¶ 38). Tellingly in this regard, while Plaintiffs rely on one dealer's colorful description of changing DMS providers as akin to a "heart transplant or a knee replacement," that dealer in fact *switched DMS providers*. Complaint ¶ 66 & n.13. Thus, even if switching costs alone were a sufficient basis to maintain a single-brand aftermarket claim, abundant switching dispels any inference that substantial numbers of dealers are locked into using Reynolds's DMS.

> c. *Plaintiffs Do Not Allege That "Information Costs" Prevented Them From Learning The Total Cost Of the "Package" They Were Buying.*

"In assessing the issue of information deficits between the foremarket and the aftermarket, perfect information about the aftermarket is not required." *Universal Avionics*, 184 F. Supp. 2d at 956. "In fact, very imperfect knowledge suffices to defeat the assertion of a *Kodak* lock-in market." *Id.* (quoting *SMS Systems Maintenance Services, Inc. v. Digital Equipment Corp.*, 188 F.3d 11, 19 & n.3 (1st Cir. 1999)).

In *Authenticom*, Judge St. Eve based her *Kodak* analysis with respect to Reynolds entirely on this issue of "information costs," reading Authenticom's allegation that Reynolds prohibits vendors from itemizing integration fees in their invoices to dealers to "suggest that dealers may be unable to assess lifecycle costs" like the plaintiffs in *Kodak*. Dkt. No. 176 at 49. Even if

---

[62] Auto/Mate, *Why We're Different*, https://perma.cc/JK9E-F729. The Court may consider the FTC's Complaint because Plaintiffs refer to and rely upon it in their Complaint. *See* Complaint ¶ 64 & n.10.

Reynolds's notorious policy was not fatal to the *Kodak* claim (it is), the far more extensive facts incorporated by Plaintiffs' Complaint refute any inference that dealers face "information costs."

In *Kodak*, the purchasers found it "difficult" or "impossible" to "inform themselves of the *total cost of the 'package'*—equipment, service, and parts—at the time of purchase . . . ." 504 U.S. at 473 (emphasis added). Here, however, the *total cost of the package* to dealers is easily discoverable—and no one contends otherwise. A dealer licensing integrated third party application software pays two fees: (1) the DMS license fee to the DMS provider, and (2) the Application fee (including any passthrough integration fees), to the vendor. Complaint ¶¶ 63, 127. Each of these costs is knowable—a dealer considering switching to Reynolds can discover both what Reynolds will charge that dealer for its DMS and what a vendor would charge that dealer for its application. *Id.* ¶ 135, Ex. 51, n.113; *id.* ¶ 114.

The only allegation here is that Reynolds prohibits vendors from specifically itemizing the integration fee that the vendors allegedly pass on to dealers. But even if that were true, knowledge of this specific *component* of cost is irrelevant under *Kodak*, because a dealer is undisputedly capable of determining the *total* cost. Indeed, vendors routinely inform dealers of the total price they will pay for applications, including integration fees, if they elect to purchase a Reynolds DMS as compared to competing DMS products. *See* Complaint ¶ 135 n.113, Ex. 51.

Thus, Plaintiffs cannot allege any of the elements of *Kodak*'s narrow exception to the presumption against single-brand aftermarkets. For this additional reason Plaintiffs' monopolization and exclusive dealing claims against Reynolds (Counts III-V) must be dismissed.

    2.   <u>Plaintiffs Cannot Allege That The Supposed "Exclusive Dealing" Provisions In Reynolds's Vendor Contracts Caused Their Alleged Injuries.</u>

Plaintiffs assert that Reynolds engaged in unlawful "exclusive dealing" by entering into contracts with vendors that prohibit the vendors from giving third parties unauthorized access of

Reynolds's DMS. As an initial matter, though Plaintiffs *assert* that these provisions were "imposed" in furtherance of a supposed 2015 conspiracy between Reynolds and CDK, Complaint ¶ 118, Plaintiffs' *factual allegations* show that is not true, because the provisions at issue were in Reynolds's vendor contracts at least as early as 2013. *Id.* ¶ 115, Ex. 40. In any event, Plaintiffs' exclusive dealing claims fail for yet another reason: Plaintiffs cannot allege that Reynolds's vendor contracts caused them any injury.

As with any Section 1 claim, Plaintiffs are required to plausibly allege that the asserted "exclusive dealing" was a "but for" cause of their claimed injuries. *See, e.g.*, *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 404 (7th Cir. 1993) (antitrust plaintiff must establish "that 'but for' the alleged antitrust violation, the plaintiffs would not have suffered the injuries of which they complain."); *Mid-Mich. Radiology Assocs., P.C. v. Cent. Mich. Cmty. Hosp.*, No. 94-CV-10057, 1995 WL 239360, at *5 (E.D. Mich. Feb. 14, 1995) (dismissing Section 1 claims for failure to plausibly allege "but for" causation") (citing *O.K. Sand & Gravel v. Martin Marietta Technologies*, 36 F.3d 565, 573-74 (7th Cir. 1994)).

Plaintiffs' exclusive dealing claims are based solely on Reynolds's contracts with its vendors. Complaint ¶¶ 180-199. Plaintiffs say that if these contracts did not prohibit vendors from allowing unauthorized data integrators to access Reynolds's DMS, dealers would have the ability to authorize their vendors to use such data integrators. *Id.* ¶¶ 115-116, 182. The flaw in this argument, however, is that Reynolds's contracts *with Plaintiffs—i.e.*, Reynolds's DMS license agreements—independently prohibit *dealers* from allowing unauthorized data integrators to access Reynolds's DMS, and Plaintiffs do *not* assert that these standalone dealer provisions constitute "exclusive dealing," or indeed, that they are unlawful in any way. That is because, as observed by Judge St. Eve in dismissing such claims in *Authenticom*, such claims are not viable. Dkt. No. 176

47

at 36-37 ("Defendants' DMS licenses with dealers are not plausible exclusive dealing.").

Thus, even if the challenged provisions in Reynolds's *vendor contracts* were voided, Plaintiffs would still be ███████████████████████████████████ ███████████████████████████████—contracts they do not challenge. Put another way, the challenged vendor provisions are not a "but for" cause of Plaintiffs' alleged injuries, and therefore Plaintiffs' exclusive dealing claims against Reynolds (Counts III-IV) must be dismissed. *See Greater Rockford*, 998 F.2d at 402 ("but for" causation not satisfied where factors independent of alleged antitrust violation were sufficient to cause alleged injury).

3. <u>Reynolds's Unilateral Refusal To Grant Access To Its Copyrighted DMS Cannot Be An Antitrust Violation.</u>

Plaintiffs' monopolization and exclusive dealing claims against Reynolds boil down to the assertion that Reynolds prevented others from accessing its DMS. But as noted above, an essential aspect of Reynolds's DMS, the DMS PC software that runs on dealer computers, is an original copyrighted work. And it is well-established that copyright holders are presumptively safeguarded from antitrust liability for their unilateral refusal to permit use or access of their work:

> [T]he limited copyright monopoly is based on Congress' empirical assumption that the right to exclude others from using their works creates a system of incentives that promotes consumer welfare in the long term….. We cannot require antitrust defendants to prove and reprove the merits of this legislative assumption in every case where a refusal to license a copyrighted work comes under attack.

*In re Independent Service Organizations Antitrust Litig.*, 203 F.3d 1322, 1328-29 (Fed. Cir. 2000) (internal punctuation and quotations omitted) (quoting *Data General Corp. v. Grumman Systems Support Corp.*, 36 F.3d 1147, 1186-87 (1st Cir. 1994)).

The copyright holder's "subjective motivation" in refusing to grant access to its work is irrelevant. *Id.* at 1329; *Data General Corp.*, 36 F.3d at 1188-89, *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 160 & n.2 (2010). Instead, to rebut the presumption

against antitrust liability, Plaintiffs have the burden of pleading and proving either that Reynolds's copyright was "obtained by unlawful means" or was "used to gain monopoly power beyond the statutory copyright granted by Congress." *Id.* But there is no allegation that Reynolds did either of these things. On the contrary, the Complaint merely alleges that Reynolds has monopoly power with respect to *its own DMS* (*i.e.*, the copyrighted work at issue) and that it has achieved this monopoly power by refusing to grant universal access to its copyrighted work. *See* Complaint ¶¶ 124-125. This is exactly the kind of conduct Congress authorized by creating the "copyright monopoly." *See In re Independent Service Organization Antitrust Litig.*, 203 F.3d at 1329 ("Xerox's refusal to sell or license its copyrighted works was squarely within the rights granted by Congress to the copyright holder and did not constitute a violation of the antitrust laws."). Thus, for this additional reason, the Court should dismiss Plaintiffs' monopolization and exclusive dealing claims against Reynolds (Counts III-V).

### D. Plaintiffs' Damages Claims and Request For Injunctive Relief Are Overbroad.

1. <u>Plaintiffs' Contracts with Reynolds Require Dismissal of Their Claims Based On Purchases Made More Than One Year Prior to The Filing Of Their Respective Original Complaints.</u>

The Complaint alleges that five named Plaintiffs[63] are current Reynolds DMS customers. In addition, as evidenced by DMS contracts referenced and relied upon in the Complaint, an additional named Plaintiff, Pitre, Inc. (d/b/a Pitre Buick GMC), was a Reynolds DMS customer during a portion of the alleged relevant period. ███████████████████████

Each of these Reynolds Dealers agreed to be bound by a ████████████████████

████████████████████████████████████████████

---

[63] These five Plaintiffs are John O'Neill Johnson Toyota, LLC; Gregoris Motors, Inc.; Hoover Automotive, LLC (d/b/a Hoover Dodge Jeep of Summerville); Jim Marsh American Corporation (d/b/a Jim Marsh Mitsubishi Suzuki Kia Mahindra); and Teterboro Automall, Inc. (d/b/a Teterboro Chrysler Dodge Jeep Ram). Complaint ¶¶ 35, 36 , 39, 40, 48.



With the exception of Plaintiff Pitre, Inc., this provision was in effect for each of the Reynolds Plaintiffs throughout the alleged relevant period.

This provision applies to all disputes between these Plaintiffs and Reynolds.

Courts have consistently held that "contractual limitations periods shorter than the statute of limitations are permissible, provided they are reasonable."[64] *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 874 (7th Cir. 1997) (noting that rule "is consistent with the principle of party autonomy that underlies the law of contracts"); *see also Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1206 (7th Cir. 1992); *Stephan v. Goldinger*, 325 F.3d 874, 876-77 (7th Cir. 2003) (concluding that statutory limitations period established by the Commodity Exchange Act could be contractually shortened). In this regard, "[c]ourts have frequently found contractual limitations

---

[64] ███████████████████████████████ Ohio courts apply the same standard here as federal courts. *See, e.g.*, *Med. Mut. of Ohio v. k. Amalia Enters. Inc.*, 548 F.3d 383, 393 (6th Cir. 2008).

periods of one year (or less) to be reasonable," including as applied to antitrust claims. *See In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 288 (4th Cir. 2007) (collecting additional authorities).

Here, the Reynolds Dealers (like the other named plaintiffs) assert claims based on purchases dating back to January 1, 2015, *see* Complaint ¶ 17, which is more than one year prior to the date on which each Reynolds Dealer filed its respective original complaint in this litigation. Therefore, the Court should dismiss the Reynolds Dealers' claims based on purchases that fall outside these Plaintiffs' contractual one-year limitations period for initiating legal action.[65]

    2.   Plaintiffs' Request For Expansive Injunctive Relief Should Be Struck Under The Seventh Circuit's Decision In *Authenticom.*

The Seventh Circuit has already held that the only appropriate injunctive relief for Plaintiffs' asserted antitrust violations would be "ordering Reynolds and CDK not to implement their 2015 agreements or any alleged agreement collectively to bar Authenticom from their data management systems." *Authenticom Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1026 (7th Cir. 2017). But Plaintiffs' prayer for relief goes much further, seeking to enjoin not only these supposedly illegal agreements, but also "any other contract" and even any unilateral "practice" or "plan . . . having a similar purpose or effect" as those agreements. Prayer for Relief, ¶ (g).

Plaintiffs' requested injunction is therefore overbroad in the same ways as the injunction rejected and vacated by the Seventh Circuit in *Authenticom* and, like that injunction, would effectively require Reynolds to do business with others against its will, in violation of the core principle that Reynolds has no antitrust duty "to cooperate with rivals by selling them products

---

[65] Specifically, the Court should dismiss the Reynolds Plaintiffs' claims as follows: Plaintiffs Gregoris Motors, Inc., Jim Marsh American Corporation, and Pitre, Inc. filed their original complaint (the Complaint at issue) on June 4, 2018; therefore, they may not seek damages based on purchases before **June 4, 2017**. Plaintiff John O'Neill Johnson Toyota, LLC filed its original complaint on November 3, 2017; therefore, it may not seek damages for purchases before **November 3, 2016**. Plaintiff Hoover Automotive, LLC filed its original complaint on November 14, 2017; therefore it may not seek damages for purchases before **November 14, 2016**. Plaintiff Teterboro Automall, Inc. filed its original complaint on October 19, 2017; therefore, it may not seek damages for purchases before **October 19, 2016.**

that would help the rivals to compete." *Schor*, 457 F.3d at 610 (citing *Verizon Commc'ns Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 408 (2004)); *Authenticom*, 874 F.3d at 1026 (enjoining Reynolds and CDK "to do business with Authenticom on terms to which they did not agree . . . is inconsistent with *Trinko*").  Accordingly, Plaintiffs' request for injunctive relief should be stricken from the pleadings to the extent it seeks to enjoin anything beyond the allegedly unlawful agreements between Reynolds and CDK.

## V.    CONCLUSION

For the foregoing reasons, Reynolds respectfully requests that the Court (1) dismiss the Reynolds Dealers' claims in favor of individual arbitrations and stay all remaining claims against Reynolds in this action; or (2) if the Court does not grant *both* Reynolds' arbitration and stay requests, that the Court dismiss all of Plaintiffs' Counts against Reynolds in their entirety and with prejudice.  *See Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013).

Dated:  July 18, 2018                         Respectfully submitted,

                                             */s/ Aundrea K. Gulley*
                                             Aundrea K. Gulley
                                             Kathy D. Patrick
                                             Brian T. Ross
                                             Brice A. Wilkinson
                                             Ross A. MacDonald
                                             Justin D. Patrick
                                             GIBBS & BRUNS LLP
                                             1100 Louisiana Street, Suite 5300
                                             Houston, TX 77002
                                             (713) 751-5258
                                             agulley@gibbsbruns.com
                                             kpatrick@gibbsbruns.com
                                             bross@gibbsbruns.com
                                             bwilkinson@gibbsbruns.com
                                             rmacdonald@gibbsbruns.com
                                             jpatrick@gibbsbruns.com

                                             Michael P.A. Cohen
                                             SHEPPARD MULLIN RICHTER
                                             & HAMPTON, LLP

2099 Pennsylvania Ave., NW, Suite 100
Washington, DC 20006
(202) 747-1900
mcohen@sheppardmullin.com

Leo D. Caseria
SHEPPARD MULLIN RICHTER
& HAMPTON, LLP
333 S. Hope St., 43rd Floor
Los Angeles, CA 90071
(213) 617-4206
lcaseria@sheppardmullin.com

Dylan I. Ballard
SHEPPARD MULLIN RICHTER
& HAMPTON, LLP
Four Embarcadero Center., 17th Floor
San Francisco, CA 94111
(415) 434-9100
dballard@sheppardmullin.com

*Counsel for Defendant The Reynolds &
Reynolds Company*

## CERTIFICATE OF SERVICE

I, Aundrea K. Gulley, an attorney, hereby certify that on this 18th day of July, 2018, I caused a true and correct copy of the foregoing Memorandum in Support of Reynolds's (1) Motion to Dismiss the Reynolds Dealer Plaintiffs' Claims in Favor of Arbitration Pursuant to Rule 12(b)(3) and Stay Remaining CDK Dealer Claims; and (2) Motion to Dismiss the Consolidated Class Action Complaint Pursuant to Rule 12(b)(6) to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

*/s/ Aundrea K. Gulley*
Aundrea K. Gulley
**GIBBS & BRUNS LLP**
1100 Louisiana Street, Suite 5300
Houston, TX 77002
(713) 650-8805
agulley@gibbsbruns.com