# EXHIBIT 6

1710156

# UNITED STATES OF AMERICA
# BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:     Maureen K. Ohlhausen, Acting Chairman
                                Terrell McSweeny

| | |
|---|---|
| **In the Matter of** | |
|     CDK Global, Inc.<br>        a corporation, | |
|     CDK Global, LLC<br>        a limited liability company, | |
|     Auto/Mate, Inc.<br>        a corporation, | |
|     Robert Eustace<br>        an individual, | **Docket No. 9382** |
|     Elsa Eustace<br>        an individual, | **REDACTED PUBLIC VERSION** |
|     G. Larry Colson, Jr.<br>        an individual, | |
|     Michael Esposito,<br>        an individual, | |
|         And | |
|     Glen Eustace<br>        a representative. | |

## COMPLAINT

Pursuant to the provisions of the Federal Trade Commission Act ("FTC Act"), and by virtue of the authority vested in it by the FTC Act, the Federal Trade Commission ("Commission"), having reason to believe that Respondents CDK Global, Inc. and CDK Global, LLC (collectively "CDK") and Auto/Mate, Inc. ("Auto/Mate"), Robert Eustace, Elsa Eustace, G. Larry Colson, Jr., Michael Esposito, and Glen Eustace have executed an acquisition agreement in

violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45, which if consummated would violate Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, and it appearing to the Commission that a proceeding by it in respect thereof would be in the public interest, hereby issues its complaint pursuant to Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), and Section 11(b) of the Clayton Act, 15 U.S.C. § 21(b), stating its charges as follows:

##### I.     NATURE OF THE CASE

1.     Respondents are providers of dealer management systems ("DMS") for franchise (new car) dealerships.  The DMS is mission-critical business software used by dealerships to manage nearly every aspect of their business, including accounting, payroll, parts and vehicle inventory, service repair scheduling, and vehicle financing.  Franchise DMS providers must also obtain car manufacturer ("OEM") certifications so that the DMS can share information between the franchise dealerships and OEMs, including information about new car sales, warranty services, parts, financial performance, and labor time.

2.     CDK and Reynolds & Reynolds ("Reynolds") are the two largest franchise DMS providers in the United States.  They are also the highest priced, and have similar business models, which include long-term contracts and significant initial and monthly fees for third-party applications (app) vendors to integrate with their respective DMS.

3.     Auto/Mate is an innovative, disruptive challenger to the two market leaders.  It offers franchise dealerships a distinct value proposition, including strong functionality, low pricing, an agnostic platform for third-party applications, extensive OEM certifications, short contracts, free software upgrades and training, and a reputation for high-quality customer service.  In recent years, Auto/Mate has grown as a competitive threat in the franchise DMS market, including by specifically targeting CDK customers.  Auto/Mate has consistently expanded its customer base and revenues through both aggressive pricing and adapting its differentiated product to match the preferences of many franchise dealers, placing pressure on CDK's pricing and margins.  It has also developed features attractive to larger franchise dealerships and as a result, became an increasing threat to take more customers from CDK.  CDK identified Auto/Mate as a current and emerging threat and responded aggressively by discounting and offering more flexible and better terms to customers.

4.     In the fall of 2016 when Auto/Mate placed itself up for sale, CDK concluded that it could eliminate a strong current competitor, which was threatening to become an even more disruptive rival, by simply purchasing the company.  However, CDK's plan to rid itself of a significant and growing competitive threat hit a roadblock: during the bidding process, CDK suspected that other well-financed, credible bidders recognized Auto/Mate's competitive strengths and were seriously interested in buying the company.  CDK recognized that if Auto/Mate fell into the hands of a well-financed buyer willing to invest additional resources, Auto/Mate would become an even more aggressive and effective competitor.  CDK was so concerned about this possibility that it ██████████████████████████████████████ ██████████████

5. After concluding that it could not allow Auto/Mate to fall into the hands of a larger, well-financed backer, CDK ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ CDK ultimately offered a price that was far in excess of its original standalone valuation of Auto/Mate ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Indeed, the most credible explanation for CDK's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6. CDK's post-merger plans for Auto/Mate provide substantial additional support for the conclusion that this Acquisition will reduce competition. Post-merger, CDK plans to substantially downgrade ▮▮▮▮▮▮ features and service, raise ▮▮▮▮▮▮ prices, and prevent CDK's larger customers from migrating ▮▮▮▮▮▮.

7. Today, competition from Auto/Mate yields a myriad of substantial benefits to franchise dealers. Auto/Mate's presence in this market means lower prices, greater innovation, more flexible contract terms, and better service. If consummated, the Acquisition would eliminate the considerable and growing competition between CDK and Auto/Mate. It would also eliminate competition between Auto/Mate and other DMS providers, and thereby cause significant and pervasive harm to franchise dealers.

8. The Acquisition would entrench CDK's ▮▮▮▮▮▮ share of the relevant market and would significantly increase market concentration. Post-Acquisition, CDK would control approximately 47% of the franchise DMS market. Reynolds would possess approximately ▮▮ of the relevant market. Under the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines"), a post-merger market-concentration level above 2500 points, as measured by the Herfindahl-Hirschman Index ("HHI"), and an increase in market concentration of more than 200 points renders a merger presumptively unlawful. Post-Acquisition market concentration would be more than 2500, and the Acquisition would increase HHIs in an already concentrated market by well over 200 points. Thus, the Acquisition is presumptively unlawful.

9. New entry or repositioning by existing producers would not be timely, likely, or sufficient to counteract the anticompetitive effects of the Acquisition. *De novo* entrants face considerable barriers including substantial and lengthy up-front investments in product development and OEM certification, with a high risk of failure. Similarly, existing DMS providers face substantial challenges in order to reposition to replace Auto/Mate's competitive significance, including but not limited to, a poor or non-existent reputation among customers, software with limited functionality, limited or non-existent OEM certifications, poor service levels, constrained capacity, and high prices. In brief, the remaining firms in this market are not likely to replace the unique, substantial, and growing competitive significance of Auto/Mate in a timely way, either collectively or individually.

10. Respondents cannot show cognizable efficiencies that would offset the likely and substantial competitive harm from the Acquisition.

## II. JURISDICTION

11. Respondents are, and at all relevant times have been, engaged in commerce or in activities affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

12. The Acquisition constitutes an acquisition subject to Section 7 of the Clayton Act, 15 U.S.C. § 18.

## III. RESPONDENTS

13. CDK is the largest provider of franchise DMS in the United States. CDK is a publicly traded company, headquartered in Hoffman Estates, Illinois. CDK had 2017 global revenues of over $2 billion. In the United States, CDK has DMS customers with more than ▉ franchise dealership locations (or "rooftops," the industry's preferred term).

14. Auto/Mate is one of the fastest-growing providers of franchise DMS in the United States. Auto/Mate is a privately held company based in Albany, New York, with 180 employees in the United States. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Auto/Mate had 2017 revenues of approximately ▉▉▉▉. In the United States, Auto/Mate has DMS customers with more than ▉ franchise dealership rooftops. Since 2012, Auto/Mate has grown rapidly, significantly increasing its customer base year-over-year. Auto/Mate is now the fifth largest franchise DMS provider in the United States with approximately ▉ market share.

## IV. THE ACQUISITION

15. Pursuant to a Stock Purchase Agreement, dated April 28, 2017, CDK proposes to acquire 100% of the shares of Auto/Mate for approximately ▉▉▉▉▉▉ in cash.

## V. MARKET PARTICIPANTS AND INDUSTRY DYNAMICS

16. The United States franchise DMS market is highly concentrated with CDK and Reynolds controlling approximately 70% of the market. Dealertrack, Auto/Mate, and Autosoft round out the top five franchise DMS providers in the United States. Each of the remaining franchise DMS providers accounts for a much smaller share of the market.

17. CDK and Reynolds have similar business models — both offer a broad set of features and OEM certifications, but both also charge relatively high prices, and both regularly require their customers to sign long-term contracts. In addition to these issues, both companies tend to charge relatively high fees for integrating third party applications, and CDK has a reputation for relatively poor customer service. Despite such business practices that frustrate

some of their customers, the two market leaders have maintained dominant positions in this market.

18. Customers frustrated with CDK's and Reynolds's business practices have faced significant challenges in switching DMS suppliers and, historically, a lack of good alternatives to the two market leaders. In order to change DMS suppliers, franchise dealers need to spend a significant number of hours training their staff, while dealing with losses in productivity that can lead to lower sales during the transition period. Because the DMS touches essentially every aspect of a dealer's business, there is considerable risk associated with switching to a DMS that does not perform adequately. This makes customers understandably wary of DMS suppliers without an established track record of success.

19. Auto/Mate is a low price, innovative company that has posted consistent, double-digit growth in recent years. A significant portion of Auto/Mate's wins in recent years have come at CDK's expense. Auto/Mate's value proposition includes but is not limited to, low prices, an ample and growing set of features, month-to-month contracts, the choice of on-site or cloud server deployment, a full roster of major OEM certifications, a low-cost agnostic platform for third-party applications, a strong reputation, and excellent customer service.

20. Today, no other DMS offers Auto/Mate's combination of low prices, high functionality, and strong customer service. These attributes position Auto/Mate well to effectively challenge the market leadership of CDK and Reynolds. According to its internal business documents, Auto/Mate plans to grow its market share both by continuing to aggressively court and win small franchise dealership customers as well as by continuing to expand on its recent successes in winning larger franchise dealership customers. In 2016, Auto/Mate stated it could grow ███████████████████████████████

21. Compared to Auto/Mate, each remaining DMS provider, including Dealertrack and Autosoft, lacks important features or value, including but not limited to, low pricing, important software functionalities, important OEM certifications, month-to-month contracts, or a strong reputation. Many of these DMS providers have failed to show significant growth or have stagnated or contracted in the last several years. Many of the remaining DMS providers have significant limitations on their capacity to add and support new customers.

## VI. RELEVANT MARKET

22. The relevant market is the sale of DMS for franchise dealers in the United States ("Relevant Market" or "U.S. Franchise DMS Market"). A hypothetical monopolist of the sale of all franchise DMS in the United States would find it profit-maximizing to impose at least a small but significant and non-transitory increase in price ("SSNIP").

## A. Relevant Product Market

23. The relevant product market in which to assess the effects of the proposed Acquisition is DMS for franchise dealers.

24. The DMS is a mission-critical business software that serves as the backbone of the dealer's information technology systems. Within a dealership, the DMS is used to manage nearly every aspect of the business, including accounting, payroll, parts and vehicle inventory, service repair scheduling, and vehicle financing. Much of the technology needed to run a dealership, including internet connectivity, telephones, website management, inventory, service scheduling, finance and insurance, and accounting is run or connected through the DMS. The DMS is also necessary for sharing information between the dealerships and OEMs like Ford, Audi, or Honda. This enables the dealer and OEMs to share real-time information on sales, inventory, parts, service, and warranties.

25. There are no reasonably interchangeable substitutes for franchise DMS, and franchise dealerships could not realistically switch to other products in the face of a SSNIP for DMS for franchise dealers.

26. DMS for franchise dealers has distinct qualities that other DMS products, including independent (used car) DMS does not have. A DMS for franchise dealers must have OEM certifications for the dealer to communicate with OEMs to share new car sales and parts information, and perform warranty services. Independent DMS providers and general business software do not have OEM certifications.

27. In addition to OEM certification, franchise dealers generally require software features tailored to franchise car dealership business operations, which are lacking in other DMS. In particular, franchise dealers demand complex automobile repair and parts software modules that independent DMS providers do not offer. In addition, independent DMS providers often lack other software modules important to the franchise dealer, including accounting and payroll modules.

28. Franchise dealers do not use independent DMS providers as a competitive restraint in negotiations with franchise DMS providers. General business software programs are also not a constraint on franchise DMS providers, and franchise dealers do not use general business software as a competitive restraint in negotiations with franchise DMS providers.

29. Thus, DMS for franchise dealers is the relevant product market in which to analyze the Acquisition's likely effects.

6

### B. Relevant Geographic Market

30. The relevant geographic market is the United States. Auto/Mate does not compete outside of the United States. OEM certifications are frequently limited to specific countries and many OEMs require a United States-specific certification. Because franchise DMS customers demand OEM certifications that work within their country, and those certifications are frequently nation-specific, the relevant geographic market is the United States.

### VII. MARKET STRUCTURE AND THE MERGER'S PRESUMPTIVE ILLEGALITY

31. The U.S. Franchise DMS Market is highly concentrated, with CDK and Reynolds controlling roughly 70% of the market. CDK has approximately ▮ market share and Auto/Mate has approximately ▮ market share. Post-Acquisition, the Relevant Market would be even more highly concentrated; CDK would control nearly half the market.

32. The Merger Guidelines and courts often measure concentration using HHIs. HHIs are calculated by totaling the squares of the market shares of every firm in the relevant market. Under the Merger Guidelines, a merger is presumed likely to create or enhance market power and is presumptively illegal when the post-merger HHI exceeds 2,500 and the merger increases the HHI by more than 200 points.

33. Post-Acquisition, the Relevant Market would be substantially more highly concentrated than it is today. Post-Acquisition, CDK would control approximately 47% of this Relevant Market. Reynolds, the next largest competitor, would possess approximately ▮ of the Relevant Market. The Acquisition would result in a post-Acquisition HHI of over 2,500, and would increase concentration by well over 200 points. Therefore, the Acquisition establishes a presumption of competitive harm.

34. In this matter, the HHIs based on current market shares materially understate Auto/Mate's competitive significance in the Relevant Market because they do not take into consideration Auto/Mate's likely growth trajectory. Prior to the merger announcement, Auto/Mate posted significant growth year-over-year, adding new functionalities to its DMS and gaining large dealership customers. Moreover, Auto/Mate's reputation was growing in the industry and it was poised for continuing and significant growth.

35. The Acquisition is, therefore, presumptively unlawful under relevant case law and the Merger Guidelines.

### VIII. ANTICOMPETITIVE EFFECTS: THE ACQUISITION WOULD ELIMINATE VITAL COMPETITION BETWEEN AUTO/MATE AND OTHER DMS PROVIDERS

36. The Acquisition is likely to substantially lessen competition in the Relevant Market. Auto/Mate competes aggressively against CDK today and would compete even more aggressively against CDK in the future but for the Acquisition. The merger would extinguish

7

this competition, as well as competition between Auto/Mate and other DMS providers. The result would be higher prices, inferior service, and reduced quality and innovation.

### A. Auto/Mate Competes Aggressively Against CDK Today

37. To successfully challenge the large incumbent DMS providers, Auto/Mate deploys aggressive sales and marketing efforts. In attempts to win CDK customers, Auto/Mate has repeatedly emphasized CDK's price increases for both its core DMS and third-party integration, CDK's restrictive contracts, and CDK's business practices in marketing blasts it sent directly to CDK customers:

- "Pressure to increase margins has already caused prices to increase on third-party integration fees. This pressure will also cause increased prices on products for dealers directly if they have not seen it already."

- "CDK is letting go of a substantial amount of account managers in addition to other employees" and "[t]his will surely result in decreased communications between CDK and its dealers."

- "We believe that CDK dealers using an older web platform are being forced to migrate to a newer version and are required to pay for the cost of implementation."

- "[I]f you are currently using an in-house server, you may be alarmed to find out that you will be forced to migrate to a cloud-based solution by January 1st, 2018."

- "We are aware that these changes could drastically impact your bottom line. If you're tired of being locked down in an unsatisfactory contract and forced to pay for unnecessary updates, please feel free to contact me personally."

38. Auto/Mate also focuses on the overall price difference between Auto/Mate and CDK and Reynolds, using its website to assure prospective customers that "dealers often find their Auto/Mate monthly support bills to be 65-75 percent less than what they're paying with Reynolds and Reynolds or CDK." Auto/Mate is successful in its attempts to target CDK and Reynolds customers. Auto/Mate touted that "[o]ver 82% of our customers are converted from CDK Global and Reynolds & Reynolds DMS systems."

39. Auto/Mate also continually improves its product in response to customer demand for feature innovations. ███████████████████████████████████████████████ ███████████████████████████████████████████████ Auto/Mate almost always provides these enhancements to its entire customer base, and in most cases, does so free of charge.

8

40. Auto/Mate's aggressive competition drew considerable attention at CDK. In 2016, CDK recognized that Auto/Mate was winning an increasing share of opportunities and that CDK was "losing more clients to Automate (sic) in the ▬▬▬▬ than we've ever lost before," that Auto/Mate had "shrunken the gap in functionality to our core DMS," that Auto/Mate was "moving up toward Tier 1," and that Auto/Mate was now successfully acquiring large dealership customers. Internally, CDK discussed that Auto/Mate was getting "more and more aggressive with pricing" and that Auto/Mate was "making too much headway" relative to other franchise DMS competitors.

41. To respond to competition from Auto/Mate, CDK regularly offers ▬▬▬ concessions. Reynolds also provides ▬▬▬ and other benefits in response to competition from Auto/Mate.

42. In 2016, CDK implemented a plan specifically designed to reduce the risk that some of its customers would switch to Auto/Mate. ▬▬▬ all of which were beneficial to customers.

43. Competition between CDK and Auto/Mate has substantially lowered prices for customers. The following are examples of this direct price competition:

- In a competition between CDK, Auto/Mate and Dealertrack, a franchise dealer's consultant produced a cost comparison showing that Auto/Mate's total price over 60 months was ▬▬▬ less than Dealertrack and ▬▬▬ less than CDK's DMS. In explaining his decision to leave CDK, the franchise dealer cited the price difference as "significant" and added that the decision to leave "wasn't a very hard call."

- A franchise dealer told CDK it was switching to Auto/Mate because "The price difference between R&R / CDK and a smaller DMS like Auto/Mate is a savings of ▬▬▬ over 60 months. That is substantial and the main reason our owners wish to go this route."

- In competition with Auto/Mate, CDK was forced to provide a roughly ▬▬▬ discount on monthly charges (an equivalent of approximately ▬▬▬ over 60 months).

44. CDK also regularly responds to competition from Auto/Mate on non-price terms, including but not limited to, ▬▬▬ For example, CDK typically offers a 60-month term contract, whereas Auto/Mate's contracts are month-to-month. Before the Acquisition's announcement, in response to Auto/Mate competition, ▬▬▬ In another example, seeing Auto/Mate as the "real risk" to win one of its existing customers who expressed frustration with CDK's service, ▬▬▬

9

### B. Auto/Mate Is Positioned to Compete Even More Aggressively in the Future Against CDK, Especially for Larger Dealership Customers

45. This Acquisition would lead to a real and significant loss of current competition. However, Auto/Mate's effect on the market is more significant than its current market share suggests, in part because of its compelling value proposition and history of continuous software innovations. These issues strongly indicate that, prior to the Acquisition, Auto/Mate was poised to become an even more aggressive and effective competitor in the Relevant Market.

46. For the past five years, Auto/Mate has been experiencing significant year-over-year rooftop growth. To drive this growth, Auto/Mate recently introduced several important functionality upgrades, including centralized accounting, which is a feature that dealerships with multiple rooftops value, and often strongly prefer. By adding centralized accounting to an already solid feature set at aggressive prices, Auto/Mate has attracted the attention of multi-rooftop dealers with very sophisticated DMS needs. Auto/Mate's introduction of centralized accounting was a ▮▮▮▮▮▮▮▮ and amplified its competitive threat to CDK.

47. Prior to the Acquisition's announcement, Auto/Mate was on a clear growth path and believed it was well positioned to win larger DMS franchise customers. In 2016, Auto/Mate's Chairman made its growth plans clear: "We expect that as we continue to take larger groups from CDK/R&R, that we will eventually wake the sleeping giants. Right now, we're an annoyance, and they truly think that we are not a serious competitor at dealerships of a certain size. However, they are not really aware of some of the recent changes we have made to the software, and in the coming months we will begin installing a pilot store at a very large dealer group[] that, assuming we are successful, ought to shake up the industry, at least those who are paying attention."

48. As predicted, Auto/Mate had its best year yet in 2016, the last full year prior to the Acquisition's announcement, when it won several larger dealerships and successfully started ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Auto/Mate believed its momentum would lead to further success: "Our success with these Groups is already generating interest from other large groups…. The large groups we installed in 2015 and 2016 are singing our praises."

49. In 2016, Auto/Mate won ▮ customers with ▮ rooftops from CDK in competitive situations. Auto/Mate also had significant success against Reynolds in 2016, winning ▮ customers with ▮ rooftops in competitive situations. Auto/Mate also won ▮ customers with ▮ rooftops from other DMS providers in competitive situations.

50. Auto/Mate knew its aggressive competition and strong reputation were working: "It seems that our reputation as tops in customer service, our successes at multi-store group installations, our more recent larger customer wins and some help from our competitors jacking up 3rd party integration fees has combined to create one of those 'perfect storm' moments, and we're perfectly positioned to take advantage of it."

10

51. At the end of 2016, Mike Esposito, the President and CEO of Auto/Mate highlighted to his team "We have worked very hard to get to the 'top of the hill'…we are almost on the other side. Our efforts are paying off! People don't ask anymore 'Who are you guys?' They now know who Auto/Mate is!" Mr. Esposito expected 2017 to "be the best year we have ever had."

52. As Auto/Mate won more and more customers, CDK executives knew they needed to respond to this competition, acknowledging that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and that CDK needed a ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇." CDK determined that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

### C. The Acquisition Will Eliminate the Consumer Benefits of Head-to-Head Competition Between Auto/Mate and other DMS providers

53. The Acquisition would eliminate the intense head-to-head price and quality competition between CDK and Auto/Mate occurring today. Consequently, CDK would not need to compete as aggressively on price to win franchise dealer customers, and would have the incentive and ability to raise prices and lower service quality. The Acquisition would also eliminate the competition between Auto/Mate and other DMS providers, reducing the need for those providers to compete as aggressively on price, service, and innovation.

54. After the Acquisition, CDK and other DMS providers would face less competition to retain and gain new customers and would have less incentive to offer shorter contracts, faster software enhancements, more third-party and less expensive app integration, additional training, and better customer service. CDK was aware that it would face less competition after acquiring Auto/Mate, internally touting: "We are so serious about acquiring new customers that we bought the DMS [Auto/Mate] that has been kicking our butts."

55. Indeed, CDK was willing to pay top dollar to keep Auto/Mate out of the hands of an acquirer that would increase Auto/Mate's already impressive growth trajectory. CDK predicted that, in the hands of a motivated and well-capitalized buyer, Auto/Mate would ▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ To prevent this, CDK ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ over the next highest bidder to acquire Auto/Mate, and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ CDK's original valuation of Auto/Mate. The gap between CDK's winning bid and its initial valuation substantially represents the defensive value to CDK of removing Auto/Mate as a competitor and preventing a well-financed alternative buyer from accelerating Auto/Mate's growth further.

56. Post-Acquisition, CDK plans to severely handicap the ▇▇▇▇▇▇ DMS platform and remove it as a competitive alternative to CDK's other DMS products for large swaths of customers. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ These are two Auto/Mate features its customers highly value. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Prior to the

11

Acquisition announcement, Auto/Mate was successfully adding customers with three or more rooftops, often at the expense of CDK. ▬▬▬▬ customers therefore would face degraded functionality and higher prices following the Acquisition, and ▬▬▬▬ strong competitive attributes would be significantly dampened or withdrawn from the market. To the extent that Auto/Mate customers seek another franchise DMS provider, that provider would not be a close substitute to the unique value proposition they chose with Auto/Mate. Moreover, such alternatives may not be available given the significant installation and support capacity limitations of many other DMS providers.

## IX.   LACK OF COUNTERVAILING FACTORS

### A.  Barriers to Entry and Expansion

57. Respondents cannot demonstrate that new entry or expansion by existing firms would be timely, likely, or sufficient to offset the anticompetitive effects of the Acquisition.

58. New entry or repositioning by existing producers would not be timely, likely, or sufficient to counteract the anticompetitive effects of the Acquisition. *De novo* entrants into this market would face considerable barriers in replicating the competition that will be eliminated by the Acquisition. Effective entry into this market would require substantial, costly up-front investments in product development and OEM certification, and the risk of failure would be high given the substantial product development and reputational barriers to commercial success in this market. Collectively, these challenges would take many years to overcome. Auto/Mate's current success has taken many years of slow, careful growth to achieve, and new entrants would face a similarly protracted, high-risk path to success.

59. Similarly, existing DMS providers are unlikely to replace the competition that will be lost as a result of the Acquisition, because all of them lack important offerings Auto/Mate provides and that they are unlikely to develop in a timely manner if Auto/Mate is absorbed by CDK. While each firm's shortcomings are distinct, each faces real and significant challenges in becoming the next Auto/Mate. These challenges include, but are not limited to, a poor or non-existent reputation among customers, software with limited functionality, limited or non-existent OEM certifications, poor service levels, and constrained capacity. Moreover, other DMS providers are significantly higher priced than Auto/Mate and would not sufficiently replace Auto/Mate's aggressive pricing. The remaining firms in this market are not likely to replace the unique, substantial, and growing competitive significance of Auto/Mate in a timely way, either collectively or individually.

### B.  Efficiencies

60. Respondents have not identified and cannot demonstrate cognizable efficiencies that would be sufficient to rebut the strong presumption and evidence that Acquisition likely would substantially lessen completion in the relevant market.

## X. VIOLATION

### Count I – Illegal Agreement

61. The allegations of Paragraphs 1 through 60 above are incorporated by reference as though fully set forth herein.

62. The Acquisition Agreement constitutes an unfair method of competition in violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

### Count II—Illegal Acquisition

63. The allegations of Paragraphs 1 through 60 above are incorporated by reference as though fully set forth herein.

64. The Acquisition, if consummated, may substantially lessen competition in the relevant market in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and is an unfair method of competition in violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

### NOTICE

Notice is hereby given to the Respondents that the twenty-first day of August, 2018, at 10 a.m., is hereby fixed as the time, and the Federal Trade Commission offices at 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580, as the place, when and where an evidentiary hearing will be had before an Administrative Law Judge of the Federal Trade Commission, on the charges set forth in this complaint, at which time and place you will have the right under the Federal Trade Commission Act and the Clayton Act to appear and show cause why an order should not be entered requiring you to cease and desist from the violations of law charged in the complaint.

You are notified that the opportunity is afforded you to file with the Commission an answer to this complaint on or before the fourteenth (14th) day after service of it upon you. An answer in which the allegations of the complaint are contested shall contain a concise statement of the facts constituting each ground of defense; and specific admission, denial, or explanation of each fact alleged in the complaint or, if you are without knowledge thereof, a statement to that effect. Allegations of the complaint not thus answered shall be deemed to have been admitted. If you elect not to contest the allegations of fact set forth in the complaint, the answer shall consist of a statement that you admit all of the material facts to be true. Such an answer shall constitute a waiver of hearings as to the facts alleged in the complaint and, together with the complaint, will provide a record basis on which the Commission shall issue a final decision containing appropriate findings and conclusions and a final order disposing of the proceeding. In such answer, you may, however, reserve the right to submit proposed findings and conclusions under Rule 3.46 of the Commission's Rules of Practice for Adjudicative Proceedings.

Failure to file an answer within the time above provided shall be deemed to constitute a waiver of your right to appear and to contest the allegations of the complaint and shall authorize the Commission, without further notice to you, to find the facts to be as alleged in the complaint and to enter a final decision containing appropriate findings and conclusions, and a final order disposing of the proceeding.

The Administrative Law Judge shall hold a prehearing scheduling conference not later than ten (10) days after the Respondents file their answers. Unless otherwise directed by the Administrative Law Judge, the scheduling conference and further proceedings will take place at the Federal Trade Commission, 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580. Rule 3.21(a) requires a meeting of the parties' counsel as early as practicable before the pre-hearing scheduling conference (but in any event no later than five (5) days after the Respondents file their answers). Rule 3.31(b) obligates counsel for each party, within five (5) days of receiving the Respondents' answers, to make certain initial disclosures without awaiting a discovery request.

### Notice of Contemplated Relief

Should the Commission conclude from the record developed in any adjudicative proceedings in this matter that the Merger challenged in this proceeding violates Section 5 of the Federal Trade Commission Act, as amended, and/or Section 7 of the Clayton Act, as amended, the Commission may order such relief against Respondents as is supported by the record and is necessary and appropriate, including, but not limited to:

1. If the Acquisition is consummated, divestiture or reconstitution of all associated and necessary assets, in a manner that restores two or more distinct and separate, viable and independent businesses in the relevant market, with the ability to offer such products and services as CDK and Auto/Mate were offering and planning to offer prior to the Acquisition.

2. A prohibition against any transaction between CDK and Auto/Mate that combines their businesses in the relevant market, except as may be approved by the Commission.

3. A requirement that, for a period of time, CDK and Auto/Mate provide prior notice to the Commission of acquisitions, mergers, consolidations, or any other combinations of their businesses in the relevant market with any other company operating in the relevant markets.

4. A requirement to file periodic compliance reports with the Commission.

5. Any other relief appropriate to correct or remedy the anticompetitive effects of the transaction or to restore Auto/Mate as a viable, independent competitor in the relevant market.

**IN WITNESS WHEREOF**, the Federal Trade Commission has caused this complaint to be signed by its Secretary and its official seal to be hereto affixed, at Washington, D.C., this nineteenth day of March, 2018.

By the Commission.

Donald S. Clark
Secretary

SEAL:

15