# EXHIBIT 7

Page 1

```
 1   I L L I N O I S:
 2              IN THE UNITED STATES COURT OF APPEALS
 3                     FOR THE SEVENTH CIRCUIT
 4   -----------------------------------
                                              :
 5
     AUTHENTICOM, INC,                        :
 6
               Plaintiff-Appellee,            :
 7
          v.                                  : Case No.
 8
     CDK GLOBAL, LLC and REYNOLDS             : 3:17-cv-00318-jdp
 9
     AND REYNOLDS COMPANY,                    :
10
               Defendants-Appellants.         :
11
     -----------------------------------
12
                            ORAL ARGUMENTS
13
     DATE:           Tuesday, September 19, 2017
14
     BEFORE:         Honorable Diane P. Wood
15
                     Honorable Ilana Rovner
16
                     Honorable Frank Hoover Easterbrook
17
     LOCATION:
18                   Everett McKinley Dirksen US Courthouse
19                   219 S. Dearborn St., Rm. 2722
20                   Chicago, IL 60604
21                   Veritext Legal Solutions
22                   1250 Eye Street, NW, Suite 350
                     Washington, D.C.  20005
```

| Page 2 | Page 4 |
|---|---|
| 1         APPEARANCES | 1         PROCEEDINGS |
| 2 On behalf of Appellants: | 2     CIRCUIT JUDGE 1: Good afternoon, ladies and |
| 3    MICHAEL A. SCODRO, ESQUIRE | 3 gentlemen. We are here for arguments on Authenticom |
| 4    Mayer Brown LLP | 4 against CDK Global and Reynolds, Reynolds Company. So |
| 5    71 S. Wacker Dr. | 5 Mr. Scodro, you're the first up. |
| 6    Chicago, IL 60606 | 6     MR. SCODRO: Good afternoon, and may it |
| 7    (312) 701-8886 | 7 please the Court, Michael Scodro here on behalf of |
| 8 | 8 CDK. I'll be splitting time evenly with codefendant |
| 9    STEPHEN B. KINNAIRD, ESQUIRE | 9 counsel for Reynolds. |
| 10   Paul Hastings LLP | 10    Your Honors, this case asks the Court to |
| 11   875 15th St., NW | 11 decide whether §1 of the Sherman Act requires |
| 12   Washington, DC 20005 | 12 codefendants in this case to crack open their |
| 13   (202) 551-1700 | 13 proprietary computer networks in an unprecedented |
| 14 | 14 manner. And the premise for this extraordinary remedy |
| 15 On behalf of Appellee: | 15 is a presumed conspiracy that is utterly implausible |
| 16   AARON M. PANNER, ESQUIRE | 16 and in any event falls nowhere near the Matsushita |
| 17   Kellogg, Hansen, Todd, Figel & Frederick | 17 standard. Reynolds has -- |
| 18   1615 M. St., NW, #400 | 18     CIRCUIT JUDGE 1: Could you answer a question |
| 19   Washington, DC 20036 | 19 of fact for me? |
| 20   (202) 326-7900 | 20     MR. SCODRO: Of course. |
| 21 | 21     CIRCUIT JUDGE 1: Just a detail. I |
| 22 | 22 understood from the briefs that both of the dealer |

| Page 3 | Page 5 |
|---|---|
| 1        CONTENTS | 1 management systems from CDK and the one from Reynolds |
| 2 ORAL ARGUMENT       PAGE | 2 include not just data from the dealer, but also other |
| 3   By Mr. Scodro     4, 56 | 3 data as well; is that correct? |
| 4   By Mr. Kinnaird   14, 59 | 4     MR. SCODRO: That's correct, Your Honor. |
| 5   By Mr. Panner     25 | 5 There are two other components of data involved. One |
| 6 | 6 is proprietary data. That's data that is introduced |
| 7 | 7 by CDK and Reynolds itself. There's also original |
| 8 | 8 manufacturer data. That might be things like parts |
| 9 | 9 pricing provided by Honda. That information is also |
| 10 | 10 contained on the same DMS systems, Your Honor. |
| 11 | 11     CIRCUIT JUDGE 1: Okay. Thank you. |
| 12 | 12     MR. SCODRO: That's exactly right. And there |
| 13 | 13 was an exhibit introduced, Exhibit 186, which |
| 14 | 14 indicates that there, some of the information that, |
| 15 | 15 during the testing period, that was being accessed by |
| 16 | 16 Authenticom, some of those queries included |
| 17 | 17 information owned, that was proprietary, and some of |
| 18 | 18 that information also belonged to the original |
| 19 | 19 manufacturers. |
| 20 | 20     And I should add that CDK has contractual |
| 21 | 21 obligations with the original manufacturers to keep |
| 22 | 22 that, that data private. |

Page 6

1  CIRCUIT JUDGE 1: So that goes straight back
2  to the original manufacturer to get that component of
3  the system, not filtered through the dealer anyhow?
4  MR. SCODRO: It's my understanding that data
5  comes from the original manufacturer to us. Exactly,
6  Your Honor.
7  CIRCUIT JUDGE 2: You know, you assert that
8  Authenticom has the practical, has the practical
9  capability to extract the full universe of information
10 available to dealers through the, the DMS, but do you
11 have any concrete evidence that it actually accesses
12 sensitive information that does not belong to the
13 dealer?
14 MR. SCODRO: Sure. Two points, Your Honor.
15 First, yes. The exhibit that I just mentioned, which
16 was --
17 CIRCUIT JUDGE 2: That was one. That's why I
18 asked that.
19 MR. SCODRO: Yes, Your Honor. So that, that
20 exhibit indicates that some of the data that was being
21 accessed was, for example, OEM data. That's the
22 original manufacturer data.

Page 7

1  And the second point I would make, Your
2  Honor, as a follow-on, is that it's very clear, and as
3  our expert, Rosenbach, testified, what matters most
4  for purposes of data security is the ability to access
5  data. And the concern chiefly -- and, and this is
6  where, one of the points where the district court
7  frankly went awry.
8  The district court focused on whether
9  Authenticom itself was accessing, whether Authenticom
10 itself, its history looked like, but in reality, what
11 matters is the, is our expert used the term seam as a
12 metaphor. The seam's created by giving out the access
13 codes. Those create the possibility that cyber
14 thieves, that has another avenue to access this
15 information.
16 So even if they -- ultimately, they had not
17 been, Authenticom itself had not been drawing on
18 proprietary data, personal information, individual
19 personal information covered by Gramm-Leach-Bliley and
20 so forth. Even if that weren't the case, the point is
21 that these access codes are what is dangerous in
22 having them being passed on and creating another seam

Page 8

1  in the process.
2  CIRCUIT JUDGE 2: In the brief you claim that
3  the dealers are free to work with venders outside of
4  the CDK Partner Program by manually extracting data
5  and making it available directly to those venders.
6  And what I was wondering is have any dealers opted for
7  this approach? Because it seems that perhaps that
8  would pose many of the same security problems you
9  claim to be concerned about with Authenticom.
10 MR. SCODRO: Well, Your Honor, there was
11 testimony that the fact of mass automated access,
12 which is what we're talking about with a company like
13 Authenticom, creates additional concerns over and
14 above what exists in the, the so-called reporting
15 tools, which I think Your Honor is referring to.
16 Dynamic Reporting is the, the name of, of Reynolds'
17 version of that and, and we have a, CDK also has
18 reporting tools.
19 So there was testimony, Your Honor, that in
20 terms of data security, it is actually, there are far
21 increased risks when you're talking about a mass data
22 extraction like what we're talking about in the case

Page 9

1  of Authenticom.
2  And, and ultimately, Your Honor, we're, we're
3  talking about an alleged conspiracy here that's simply
4  implausible on its face. Reynolds had been doing what
5  it's been doing in terms of blocking hostile
6  integration for more than a decade now.
7  CIRCUIT JUDGE 3: And why exactly is the
8  conspiracy implausible? Reynolds has been doing it
9  and losing sales as a result. And therefore, it might
10 want to cooperate with CDK to do something that would
11 cause it to stop losing sales. And presumably as part
12 of the deal, CDK is compensated in some way.
13 Now we may not understand all the details by
14 which that happens, but it seems to me very difficult
15 to dismiss it all as implausible out of hand.
16 MR. SCODRO: Well, Your Honor, two points.
17 One, I would say certainly for purposes of the
18 Matsushita, you know, tending to excuse the
19 possibility of unilateral conduct here. So I'll, I'll
20 first say that.
21 But second, I would say that that's -- and
22 my, my colleague can speak more directly to this from

3 (Pages 6 - 9)

Page 10

1 the Reynolds perspective, but Reynolds had devoted
2 extraordinary resources and committed itself
3 publically and with its clients to a platform that
4 excluded all hostile integration. That was indeed
5 part of its sort of raison d'être the way that it
6 functioned, and, yes.
7     CIRCUIT JUDGE 3: And it found it was losing
8 sales and what better thing to do than to strike a
9 deal with its principal competitor in order to protect
10 itself? Now as I say, that would entail some
11 compensation to CDK, but the, what concerns me is just
12 waving your hand and dismissing it as implausible.
13 It's easy to talk, but it's harder to show that
14 something wouldn't have made economic sense.
15     MR. SCODRO: Well, Your Honor, a couple of
16 points there. There is still -- so, again, have they,
17 you know, have they shown that they -- have they
18 excluded the possibility of unilateral conduct here.
19 And, and the answer is no.
20     CIRCUIT JUDGE 3: No, no, no, no. I, I --
21 look, that's not the opening question to ask. There
22 is an actual agreement struck in 2015 between Reynolds

Page 11

1 and CDK.
2     MR. SCODRO: Yes.
3     CIRCUIT JUDGE 3: And I know it's your
4 contention that that agreement is lawful. But to say,
5 well, these people wouldn't be agreeing when in fact
6 they have an agreement that's in the record, is a
7 little tough.
8     MR. SCODRO: Well, Your Honor, maybe I should
9 address the terms of the three agreements entered into
10 in February of 2015 at the outset. And misperceptions
11 --
12     CIRCUIT JUDGE 2: And when you do, when you
13 do, would you be kind enough to let us know what the
14 current status is of those agreements?
15     MR. SCODRO: Sure. So let me begin with the
16 so-called data exchange agreement. This was the wind-
17 down agreement. And let me try to clarify a couple of
18 misperceptions. And I think the best thing I can do
19 is to explain what this agreement does not do.
20     It does not bind either party to forevermore,
21 or even during the term of the agreement, block
22 hostile integration. There's nothing -- there would

Page 12

1 be nothing inconsistent with that, with the agreement
2 for CDK to begin to permit Authenticom, for example --
3     CIRCUIT JUDGE 1: If they can go back to an
4 open system, in other words, you're saying --
5     MR. SCODRO: Right.
6     CIRCUIT JUDGE 1: -- what concerns me, I'll
7 let you fold into your answer as well, is that there
8 seems to be some evidence in this record that prices
9 skyrocketed for these integration providers from 30 to
10 800 dollars or so, 900 almost.
11     MR. SCODRO: So let me answer that directly
12 first, Your Honor. There is, as the district court
13 itself recognized, the record on pricing in this case
14 is sort of scant thus far and, and somewhat scattered.
15 There are some data points that have been introduced,
16 many of them anecdotal by particular customers.
17     What we know is this, and I would commend to
18 the Court the Conver (ph) Declaration, which is, is
19 Docket No. 90. Conver goes into some detail about the
20 pricing, and the pricing actually for some of the more
21 minimal, say, a more bare-bones services, more like
22 what Authenticom was offering, actually are much

Page 13

1 closer than the hundreds and hundreds of dollars that
2 are described in the record.
3     What we have is a tremendous amount -- and
4 this has been argued as apples and oranges comparisons
5 going on. Some of what, for example, CDK is offering
6 includes real time interface, for example, where
7 you're getting that real-time data as opposed to a
8 once a day or twice a day spray. So there is an
9 apples-to-oranges component to this.
10     I, I see that I'm entering rebuttal, but I
11 would like to -- I, I should conclude by saying at
12 least for the --
13     CIRCUIT JUDGE 3: I hope you'll answer Judge
14 Rovner's question.
15     MR. SCODRO: I will. So Judge Rovner, with
16 regard to the DEA agreement, that agreement is, the
17 testimony was that it is very close to being
18 completed. That's the wind-down agreement. The 3PA
19 and RCI agreements, you asked about the status of
20 those as well, and both of those are pro-competitive
21 in that they are permitting other apps now to, to
22 compete with their competing dealers, the dealers that

Page 14

1 don't own those applications. Those are in force
2 right now.
3     That is to say certain Authenticom -- excuse
4 me. Certain CDK apps are operating properly using the
5 RCI system as certified applications interfacing
6 directly, and vice versa for the apps covered by the
7 3PA agreement. Again, those are a set and discrete
8 limited number of applications that are listed in the
9 appendices to those contracts.
10     And in answer to Your Honor's question, those
11 are still in effect.
12     CIRCUIT JUDGE 1: All right. Thank you very
13 much. Mr. Kinnaird. Mr. Kinnaird, as you're
14 collecting your thoughts, I wondered if you could
15 address the district court's conclusions that although
16 there was a lot of talk about data security, there
17 really wasn't much of a record behind the concerns for
18 security. And that was one of the reasons the Court
19 didn't place greater weight on that factor.
20     MR. KINNAIRD: I think what, what has to be
21 distinguished are some of the factual testimony about
22 whether Authenticom has secure practices once it

Page 15

1 attracts, extracts the data. That's really irrelevant
2 to the question.
3     I think there is loads of testimony that in
4 terms of the decisions to close the system, both by
5 CDK and Reynolds, this data security is a huge, a huge
6 reason why you do that, as well as system performance
7 and reliability.
8     CIRCUIT JUDGE 1: Was there any -- there
9 wasn't much of a record, though, that during the
10 period that CDK was open it had security incidents. I
11 realize Reynolds has had a different business model
12 for a longer time, but one, one wonders when two
13 competitors get together and prices go way up for a
14 particular service and there doesn't seem to be much
15 of a there-there for the, for the stated reason,
16 what's going on?
17     MR. KINNAIRD: Well, I think what, you know,
18 part of the issue is risk. So if you're designing
19 your system and you're effectively blocking, then
20 you're to going to necessarily have incidents. But
21 the risks are real and they motivate the system
22 design. And I would point out in this --

Page 16

1     CIRCUIT JUDGE 2: Was any evidence presented
2 to the district court that the difficulties that
3 Reynolds experienced in the early 2000s with, you
4 know, DMS functionality were attributable directly?
5 And I really emphasize the word directly to
6 Authenticom.
7     MR. KINNAIRD: There's only one instance with
8 Authenticom, which Authenticom brought down a
9 particular DMS with a particular query. But again,
10 its, its -- the rule that they're seeking is access,
11 which would apply to all third-party access.
12     And this is a key feature of the Reynolds
13 system and why there's no causation of antitrust
14 injury here. The Reynolds system automatically blocks
15 any third-party machine access. Doesn't matter
16 whether it's a cyber thief or an agent, hostile
17 integrator, or other hacker. It does that
18 automatically if it's entering through the dealer
19 portal.
20     So the blocking is completely unrelated to
21 the alleged agreements. Blocking would happen
22 regardless of whether the agreements take place. So I

Page 17

1 think there's no antitrust injury and that's why the
2 mandatory relief.
3     CIRCUIT JUDGE 2: To shut third parties,
4 instead of constantly trying to shut out third parties
5 from your DMS, why don't, why not pursue the dealers
6 who share login credentials directly?
7     MR. KINNAIRD: Your Honor, I think it's
8 accepted as very strong and universally accepted
9 practices that, that you implement technological
10 barriers to third party access, particularly machine
11 access. This is a very dangerous type of access.
12     And so these kind of security protocols, and
13 there was ample testimony in the record, but these are
14 top of the draw security practices. You wouldn't try
15 to rely just on contractual measures. I would also
16 like to point --
17     CIRCUIT JUDGE 2: How did the open system DMS
18 providers handle the security risks that, you know,
19 your, your being inherent?
20     MR. KINNAIRD: Well, I mean they can --
21     CIRCUIT JUDGE 2: -- access to the DMS?
22     MR. KINNAIRD: Right. They, they tolerate it

Page 18

1  and, and they have various measures, but in -- and
2  then this is, I think, part of the product innovation
3  and product design. Well before any of these
4  agreements, Reynolds decided that a closed system
5  given the evolution of the market was the way to
6  having long term success. And that's been its market
7  niche.
8      CIRCUIT JUDGE 1: Now if that's all Reynolds
9  had ever done, we certainly wouldn't be here. You
10 know, Reynolds can choose an open system or a closed
11 system. But it's when Reynolds sits down in February
12 of 2015 and enters into an agreement with its major
13 competitor that you begin to be uncomfortable from an
14 antitrust point of view.
15     Why did you have to agree with CDK about how
16 you were going to divide this market up between
17 yourselves?
18     MR. KINNAIRD: There was no market division,
19 Your Honor. Reynolds never agreed not to access CDK's
20 system. Of course, it didn't have to. It does, it's
21 not in that business. It's not a hostile integrator,
22 but there's no agreement to that fact. And, and Mr.

Page 19

1  Schaefer clarified that in his testimony.
2      CIRCUIT JUDGE 1: But CDK had these two
3  subsidiaries or whatever they were that were more or
4  less in the same business as Authenticom, and that all
5  gets sorted out in this agreement.
6      MR. KINNAIRD: Yes, they, they've been
7  blocked by our system. We also, you know, maintaining
8  that their access was illegal. They testified that
9  their hostile integration was dwindling. So in order
10 to preserve a soft landing for their customers and
11 also to bring their applications onto our system, they
12 agreed to do an RCI interface.
13     And they also agreed to this wind-down
14 agreement for hostile integration, which is illegal.
15 Which is also another key point that, and it goes to
16 antitrust standing that Authenticom --
17     CIRCUIT JUDGE 3: There's no such thing.
18     MR. KINNAIRD: I'm sorry?
19     CIRCUIT JUDGE 3: There's no such thing.
20     MR. KINNAIRD: As?
21     CIRCUIT JUDGE 3: In the Lexmark case a
22 couple of years ago, the Supreme Court said there's no

Page 20

1  such thing as your subject matter name here standing.
2  There is standing or there isn't. There's no question
3  of standing here.
4      MR. KINNAIRD: I, I think Your Honor --
5      CIRCUIT JUDGE 3: There is antitrust injury.
6      MR. KINNAIRD: Well, but it's not, it's
7  illegal trade. I think that's that Maltz case. Maltz
8  says that --
9      CIRCUIT JUDGE 3: Are you acquainted with
10 Lexmark?
11     MR. KINNAIRD: No, Your Honor.
12     CIRCUIT JUDGE 3: Yeah. That's what I was
13 afraid of.
14     MR. KINNAIRD: Your Honor --
15     CIRCUIT JUDGE 1: What the court says is you
16 have to think in terms of whether the conduct falls
17 within the scope of the statute, which is not a
18 standing inquiry. It's a scope of claim inquiry. But
19 what's, what's troublesome here is what your opponents
20 -- they started a different point, not surprisingly,
21 in the story.
22     And they're saying there's all this data that

Page 21

1  the dealers have allowed you to put in this format in
2  the dealer management system. It's their data for the
3  most part. So why shouldn't they be entitled to take
4  advantage of third party application companies, turn
5  the data over to them without having to reinvent the
6  wheel, and have the whole thing put in some computer-
7  readable form a second time?
8      Why isn't this like our case with the real
9  estate business? You know, why isn't it completely
10 suitable for them to control their own data?
11     MR. KINNAIRD: Because they do not have the
12 rights under the license to authorize Authenticom to
13 do that.
14     CIRCUIT JUDGE 1: How can, how can Reynolds
15 tell somebody it was your data yesterday, but it's our
16 data now? Sounds like what Facebook was doing with
17 pictures years ago.
18     MR. KINNAIRD: We're, we're not saying that
19 the data that they put in and only partial, some of
20 the data is theirs. It's theirs and they can take it
21 out, but they have to follow the terms of the license
22 for the use of the system. And the system prevents

Page 22

1  any sort of automated access through the dealer portal
2  which is not designed in order to do that. And so
3  that's -- and I, the district court did not find our
4  dealer agreements to violate §1.
5      I'd also like to address on the question
6  about concrete evidence in addition to what Mr. Scodro
7  mentioned, that ECF 16:12, Mr. Schaefer testified as
8  to the scraping of OEM data. Then the, in Exhibit
9  P99, if you look at the fields there, many of those,
10 and the Court would not be able to tell that, OEM or
11 Reynolds, but there is VIN Explosion Chrome ID.
12 Chrome is a third-party provider.
13     So it's not -- it is OEM data which is
14 subject to contractual restrictions in which the, it,
15 Reynolds has an obligation to protect.
16     But the main thing, they are just not
17 authorized under the license to allow it and, and that
18 is a, you know, software licensors have the ability to
19 set license terms.
20     I'd also like to address in terms of the
21 unwritten conspiracy, Your Honor. It may be that one
22 can say there's a possibility that a firm would have

Page 23

1  motivation to stem loss of share; although, I would
2  point out loss of share is not necessarily equivalent
3  to loss of, of profit. But there's, it has to be more
4  --
5      CIRCUIT JUDGE 1: I'm not sure you want to
6  make that point. But --
7      MR. KENNARD: Well, I mean there's, there's
8  no evidence of that, that there was a financial
9  calamity as if, if CDK were to go to it to, were to
10 stay open, which was Dr. Singers, theory, which is
11 completely unsupported. And so there also has to be,
12 there has to be some reason for the terms of the
13 agreement. Dr. Singer and the district court seemed
14 to credit it. Said there would be reassurances from
15 one to the other.
16     The problem with that is that there's no
17 evidence at all, first of all, that they actually
18 informed us that they were going to a closed system in
19 February 2015. But also, there's no evidence at all
20 that CDK would worry that Reynolds would abandon its
21 system design which has put millions of dollars, its
22 market position or its current customers and, in order

Page 24

1  to do that. Or that CDK would need Reynolds to do
2  that because either one could block automatically.
3      And the fact that its system blocking and not
4  intervention blocking on the Reynolds DMS makes the
5  agreement completely implausible under Matsushita.
6      CIRCUIT JUDGE 1: By, by -- I mean this is a
7  complex market. Obviously, you've got the dealer
8  system. You've got the integration function going on.
9  You've got apps that are being written. You've got
10 cross licensing almost it seems.
11     It's, the results of this agreement, or at
12 least there's evidence that the district court
13 credited, was to increase prices in the market. Isn't
14 that what we are concerned about with the antitrust
15 laws?
16     MR. KINNAIRD: I don't think so, Your Honor.
17 There was -- Reynolds increased the number -- well,
18 Reynolds, when, when some companies went to RCI
19 because of the automated blocking, their prices went
20 up over what Authenticom charges. Remember,
21 Authenticom doesn't bear any of the costs of
22 maintaining the system.

Page 25

1      CIRCUIT JUDGE 1: Oh, I know, but free riders
2  are -- that's your argument, but the price increase
3  seemed way beyond whatever any free riding explanation
4  --
5      MR. KENNARD: But the price increases after
6  the agreement were, were much more modest in the 5 to
7  10% range. So there's no, there's no skyrocketing
8  post agreement rise in prices from Reynolds for the
9  RCI. I'll reserve the remainder of my time.
10     CIRCUIT JUDGE 1: Okay. That's fine. Mr.
11 Panner?
12     MR. PANNER: Thank you, Chief Judge Wood.
13 And may it please the Court, the district court's
14 preliminary injunction order rests on two
15 determinations that are really not subject to serious
16 challenge at this stage of the proceedings in this
17 court.
18     First, the district court found direct
19 evidence to support the claim that Reynolds and CDK
20 had conspired to drive Authenticom out of the market.
21     CIRCUIT JUDGE 1: But I -- you have to answer
22 right away I think a -- maybe there's an answer to

Page 26

1 this -- an important question which is, under what
2 circumstances, particularly post Trinko, does a
3 company have the obligation to sell its work product
4 to someone else in the market? And I phrase it as
5 work product because the, the programs that create the
6 DMS are, you know, complicated software programs.
7   That's why I asked Mr. Scodro what goes into
8 the system and it's not just your data. It's not just
9 that you turned over your own data, they played around
10 with it, formatted, and now they won't give it back to
11 you. It's a much more complicated product.
12   And I'm concerned about your premise which,
13 and actually the premise of the injunction, which is
14 that there's some duty that either of these companies
15 has to sell its work product or make its work product
16 available for scraping for free to others.
17   MR. PANNER: Right. I, I think actually for
18 two reasons that question does not necessarily present
19 itself and I'll try to do my best to answer it after I
20 give those two reasons.
21   And the first reason is that notwithstanding
22 whatever unilateral obligation either defendant might

Page 27

1 have, it's clear, and indeed its been uncontested at
2 every stage, that they are not permitted to agree with
3 regard to how that they will block an independent
4 integrator. It is --
5   CIRCUIT JUDGE 1: But if it's not illegal for
6 the one company to do it, what, what turn, what
7 alchemy makes it become illegal when two companies
8 say, you know, neither one of us is going to sell.
9 You know, we both have the same policy here. We don't
10 want to sell our work product.
11   MR. PANNER: Well, there's nothing, there's
12 nothing at all unusual about that under the antitrust
13 laws, Your Honor, because it's very common that a
14 unilateral, a, an actor might engage in a unilateral
15 refusal to deal with either a potential customer or a
16 potential rival, but yet if that actor reaches an
17 agreement with the competitor not to do so, that
18 becomes per se unlawful under the antitrust laws. And
19 as I say, that was the evidence --
20   CIRCUIT JUDGE 1: I wouldn't rush too fast,
21 per se.
22   CIRCUIT JUDGE 3: Then why isn't the

Page 28

1 appropriate remedy, if it's proper to have an interim
2 remedy at all, why isn't the appropriate remedy to
3 disestablish the 2015 agreements and restore
4 unilateral conduct in the market? What, the actual
5 injunction the district court entered required for
6 example, it required Peterson to change a policy that
7 it had in place long before the 2015 agreements.
8   And I would think if the district court says
9 the probable violation on which I'm acting is a
10 violation of §1 from the 2015 agreements, that the
11 remedy is to get rid of them, not to do something else
12 altogether. But what happened is something else
13 altogether.
14   MR. PANNER: Well, Your Honor, because what
15 the Court found was that there, that the blocking in
16 which CDK engaged was part of the conspiracy with
17 Reynolds. And Reynolds --
18   CIRCUIT JUDGE 3: Yes. Well, you have to end
19 the conspiracy with Reynolds. But that's not what the
20 injunction does.
21   MR. PANNER: But, Your Honor, I think --
22   CIRCUIT JUDGE 3: The injunction not only

Page 29

1 leaves the agreements in place as, as Mr. Scodro said,
2 they're still in place. It left the supposedly
3 illegal agreements in place and then did something
4 that so far as I could see isn't related to the
5 agreements. This is a problem.
6   MR. PANNER: Your Honor, I, I don't think so
7 because I think that the agreement was to block
8 Authenticom from obtaining dealer data on an automated
9 basis. And I should have really started --
10   CIRCUIT JUDGE 1: But, but you've -- haven't
11 you conceded, though, that during the period when
12 Reynolds, let's say, was the only company that had a
13 closed system, Reynolds if it wanted to, and
14 apparently it did want to for reasons sufficient to
15 itself, was entitled to install whatever blocking
16 software it wanted to to keep Authenticom out of its
17 systems? Just answer that simple question. Never
18 mind what happens later.
19   MR. PANNER: Right. And the answer to that,
20 Your Honor, is that we have not conceded that. It is
21 not the basis upon which the, upon --
22   CIRCUIT JUDGE 3: Given, given Trinko, how

Page 30

1 can you avoid conceding that?
2     MR. PANNER: Because, Your Honor --
3     CIRCUIT JUDGE 3: For that matter given 18
4 USC 1030, how can you avoid conceding that?
5     MR. PANNER: Well, because, Your Honor, what
6 -- and this -- I, I, as I say, I should have begun by,
7 by forcefully pushing back on the assumption that
8 what's going on here is a sharing of OEM data or other
9 proprietary data.
10     The data that Authenticom is obtaining and
11 delivering to venders is dealer data. That was the,
12 that was the finding of the district court and it's
13 based on the evidence in the record.
14     CIRCUIT JUDGE 3: Let us, let --
15     CIRCUIT JUDGE 2: It's the dealer --
16     CIRCUIT JUDGE 1: Wait a minute, Ilana. I
17 think Frank was about to ask a question.
18     CIRCUIT JUDGE 3: If, if the conduct is
19 unilateral, let's look at the world before 2015, is
20 there any problem given Trinko and linkLine with
21 Reynolds' decision that no one can get access to its
22 system without its consent? Any antitrust problem

Page 31

1 with that?
2     MR. PANNER: Yes, I think there is an
3 antitrust problem because it's not simply unilateral.
4 It's, it, the, it is based on --
5     CIRCUIT JUDGE 3: My hypothesis is that it's
6 unilateral.
7     MR. PANNER: But it's based on an agreement
8 with the dealers, at least.
9     CIRCUIT JUDGE 3: That's a kind of vertical
10 agreement and it won't distinguish this case from
11 Trinko. Both Judge Wood and I have been asking
12 questions about Trinko and linkLine --
13     MR. PANNER: Yes, yes, Your Honor.
14     CIRCUIT JUDGE 3: -- and you have not really
15 engaged.
16     MR. PANNER: Well, it's because I don't -- I
17 will certainly try. And with respect to Trinko and
18 linkLine, those cases establish the general
19 proposition that except in unusual circumstances, a
20 monopolist has no duty to deal with a potential rival
21 and --
22     CIRCUIT JUDGE 1: And if a monopolist doesn't

Page 32

1 under Colgate, then surely a firm with less than
2 monopoly power wherever you want to peg Reynolds in
3 the pre-2015 period has no such duty.
4     MR. PANNER: That is true, but I think it's
5 wrong to -- I think it is incorrect to conceptualize
6 what's going on here as a refusal to deal because
7 what's going on -- again, this is dealer data.
8     CIRCUIT JUDGE 1: You just called it a
9 refusal to deal a little while ago.
10     MR. PANNER: I, I don't, I hope I didn't
11 refer to this as a refusal for dealer, Your Honor, but
12 --
13     CIRCUIT JUDGE 3: Reynolds says in the world
14 before this agreement the only way to get access to
15 our system is with our consent and using our portal.
16 It is not sufficient to have the dealer's consent
17 because the dealers are not us. Our consent is
18 required.
19     Now that's a unilateral declaration and it
20 really doesn't make any difference. I, I don't want
21 you to say, well, Trinko is distinguishable because
22 that's unilateral and this isn't because in Trinko,

Page 33

1 Verizon was dealing with some firms and not dealing
2 with others. It was exercising choice and that's what
3 Reynolds was doing.
4     MR. PANNER: I understand that, Your Honor,
5 and you're, you're right. I think that the Reynolds
6 decision to deal with, to provide automated access, I
7 -- perhaps I shouldn't make the aside, but I do want
8 to make the aside that the statement that it's not
9 providing automated access is incorrect as the
10 district court found.
11     But with regard to what's going on here, I
12 think that the, the, the Wiredata case that this Court
13 decided is a significant one for purposes of
14 conceptualizing what's going on here. What, what's at
15 issue here as the district court found is the dealers
16 data and the question is whether the owner, a database
17 provider can use a license agreement or other
18 mechanisms to prevent the dealer from providing
19 automated access to its own data.
20     CIRCUIT JUDGE 1: That's, I think that's not
21 a quite what this is though, because first of all
22 we're told in the record that the integrated program,

Page 34

1 I'll just call it, the assemblage of data that's the
2 dealer management system, includes a lot of dealer
3 data, yes, but it's not limited to that. And they're
4 concerned that you either can't or won't scrape only
5 the dealer data, that there will be risks to other
6 things.
7      But more fundamentally, they're saying if you
8 want us to provide the software program for dealer
9 management, there's a price that comes along with it,
10 which is that you are going to give us the final say.
11 And I can think of reputational reasons why they would
12 do that. The final say over who else is going to get
13 this data.
14      If there is a breach, they know that the
15 first person you'll point to is them. If there isn't,
16 then maybe we don't have a problem. But anyway,
17 that's the price of admission it sounds to me. It's a
18 little bit like resale price maintenance. Maybe you
19 don't like it, but it's a vertical term.
20      MR. PANNER: But, but Your Honor, the, at
21 least with regard to CDK, it was quite clear that that
22 was not their policy at the time that these were --

Page 35

1      CIRCUIT JUDGE 1: Which we understand. We
2 understand that. And, and maybe they had a good
3 policy because they gained quite a bit of market
4 share.
5      MR. PANNER: A lot.
6      CIRCUIT JUDGE 1: Vis-à-vis Reynolds.
7      CIRCUIT JUDGE 3: And that brings us back to
8 the §1 problem. Maybe Judge Wood and I want to make
9 sure that Judge Rovner can get in because we've, we've
10 been taking our physical proximity to advantage.
11 Judge Rovner?
12      CIRCUIT JUDGE 2: Yeah. Well, it was a long
13 time ago, but if -- look. If the dealers are so
14 unhappy, they're so unhappy with, you know, the
15 respective nature and the expense of Reynolds, and now
16 CDK's closed DMS system, what is stopping them from
17 moving en masse to the open DMS providers or exerting
18 their own bargaining power to seek better contract
19 terms that would allow them to share their login
20 credentials with third parties like Authenticom?
21      MR. PANNER: Your Honor, there was extensive
22 evidence in the record about that very question. And

Page 36

1 there are several reasons that it's not possible for,
2 that the market power that both Reynolds and CDK have
3 has been extremely durable.
4      One is that the contracts in which, into
5 which they enter are both long term and staggered.
6 They are set up in a way that makes it very difficult
7 for the dealers to get out from under them.
8      CIRCUIT JUDGE 1: Five years?
9      CIRCUIT JUDGE 3: Reynolds lost market share
10 very quickly according to this record.
11      MR. PANNER: There's no, the evidence is not
12 that they lost it very quickly, Your Honor; it's that
13 over the course of a decade or more they lost --
14      CIRCUIT JUDGE 3: Well, over the course of
15 five years under these contracts they could go from
16 whatever they have to zero?
17      MR. PANNER: Well, Your Honor --
18      CIRCUIT JUDGE 3: They lost less, but they
19 lost.
20      MR. PANNER: But that goes to the additional
21 evidence that once a, once a dealer is, has trained
22 personnel and has established a system on one of these

Page 37

1 systems --
2      CIRCUIT JUDGE 3: Yeah, I know. This is a
3 version of lock-in arguments and then of course then
4 it leads to the dealers will demand compensation for
5 being locked in. There are all sorts of things that
6 one can say, but we're not going to remake the world
7 physically.
8      MR. PANNER: Well, Your Honor, I, I -- there
9 there was evidence about this and --
10      CIRCUIT JUDGE 3: The lock-in -- hold on.
11 I'm afraid I'm still treading on Judge Rovner's toes
12 and I don't want to.
13      CIRCUIT JUDGE 2: No, that's okay.
14      CIRCUIT JUDGE 3: Let me, let me back off,
15 off. I'm sorry, Judge Rovner.
16      CIRCUIT JUDGE 2: I, I'm, I'm, I'm worrying
17 about all sorts of things and one of them is that I've
18 really been thinking about is if Authenticom, let's
19 say you did suffer a security branch. Who would be
20 the beneficiary of the cyber liability insurance
21 policy? In other words, would you be able to repay
22 CDK or Reynolds' losses from such a breach?

Page 38

1  MR. PANNER: Well, Your Honor, if, if there
2  were any evidence of -- if there were a claim, that
3  would be what the insurance policy would cover. There
4  wasn't extensive evidence about the nature of the
5  policy that was raised at the hearing other than its
6  amount and the fact that it would cover a potential
7  breach.
8      But I think, what I think the district court
9  looked at with regard to the preliminary relief and
10 why the fact that there, that both there was evidence
11 that Authenticom's operations were extremely secure,
12 and that both CDK and Reynolds granted access when it
13 suited their business interests, was so significant to
14 the finding a balance of harms was that there's
15 nothing inherent --
16     The idea that there's something inherently
17 dangerous about granting this sort of access is belied
18 by the fact that they do it when they feel like it or
19 when indeed there's a dealer with sufficient
20 bargaining power to, to insist about it.
21     CIRCUIT JUDGE 2: So, so I get that, which
22 doesn't -- I'm not sure how far that gets you because

Page 39

1  I have the same question Judge Easterbrook raised a
2  few minutes ago, which is that the real problem is
3  agreement between these two major suppliers of, of
4  services in this area.
5      Why enjoining the agreement isn't the
6  appropriate step is unclear to me except that it, it
7  would be my guess, and you can tell me if I'm wrong,
8  that that would leave you entirely unsatisfied because
9  of the likelihood that both Reynolds and CDK would
10 continue on unilaterally with closed systems and you'd
11 be just as bad off as you were before?
12     MR. PANNER: Well, having established the
13 current pattern though, through agreement, then
14 that's, that's quite likely the case and --
15     CIRCUIT JUDGE 2: So you can enforce a duty
16 to deal on them that we don't have precedent for?
17     MR. PANNER: Well, Your Honor, again, I
18 would, I do not except the rubric of duty to deal
19 because I think what's going on here --
20     CIRCUIT JUDGE 2: But that's what the judge's
21 injunction -- if you read the thing, that's what it
22 does.

Page 40

1  MR. PANNER: That's because to a large extent
2  what was --
3      CIRCUIT JUDGE 2: You have to create logins.
4      MR. PANNER: That was done, that was done at
5  defendant's request. There's no -- we do not need to
6  deal with CDK or Reynolds. We need to deal with the
7  dealers. The dealers are the ones who provide access
8  to their data.
9      CIRCUIT JUDGE 2: But you don't want to just
10 deal with the dealers. You want the packaged data set
11 because what we're told in this record is you can deal
12 with the dealers if you can persuade them to reinvent
13 the wheel.
14     MR. PANNER: Your Honor, that, what the, what
15 is happening here is we are pulling precisely the data
16 that the dealer looks at when they do a query on the
17 system. We're not asking the system to do anything
18 that it doesn't already do for the dealers.
19     The objection here is simply that Authenticom
20 is doing for the dealers on an automated, automated
21 way what the dealers effectively cannot do because of
22 obstacles of cost and personnel.

Page 41

1  CIRCUIT JUDGE 3: And contract because the
2  dealers have promised not to do it.
3      MR. PANNER: That's not true, Your Honor.
4  The, indeed they, they insist that the, the dealers
5  are permitted to pull this data and send it to
6  vendors, but --
7      CIRCUIT JUDGE 3: The dealers are permitted
8  to pull the data themselves, but not to put
9  Authenticom in their place to do something in their
10 stay.
11     MR. PANNER: Well, under CDK's contract, they
12 are permitted to allow an agent to pull the data, but
13 more to the point --
14     CIRCUIT JUDGE 1: But who's an agent? I mean
15 there's been a lot of discussion about this. The
16 understanding that CDK has of that is an agent isn't
17 some third-party company that's coming in, you know,
18 with a scraped business model.
19     MR. PANNER: But, Your Honor, I think that --
20 at the trial, at the hearing before the district judge
21 there was a demonstration of the Authenticom's dealer
22 vault system. And it's really, it's obviously

11 (Pages 38 - 41)

Page 42

1  impossible to see it on the cold record, but what's so
2  important to understand about the way that that works
3  is it's the dealer is in utter, is in complete control
4  over the data that is pulled off of the system and
5  where it goes.
6       The dealer in, in, in effect, in substance,
7  the dealer is pulling the dealer's own data and
8  sending that data to the vender of the dealer's
9  choice. It is using an automated tool to do so. But
10 there is absolutely no regard in which there is any
11 sort of theft of anyone's data that the dealer does
12 not have access to.
13      And the district judge's injunction makes
14 that absolutely clear. What the district judge says,
15 and there's ample evidence in the record, that there
16 is absolutely nothing that Authenticom pulls off the
17 system to which the dealer does not have access.
18      And so what is going on here is they're, they
19 are attempting to disable, interfere with a voluntary
20 course of dealing between the dealer and a provider of
21 effectively an automated tool that allows the dealer
22 to provide data to a vender of its choice in an

Page 43

1  efficient way. And they're doing that solely, I would
2  submit, because it allows them to exploit an
3  extraordinary, an extraordinary opportunity to sell
4  dealer data.
5       And the evidence of price increases was truly
6  eye-opening. Remember, before 2015 there is a
7  competitive market for integration services.
8  Reynolds' closing of its system drove one competitor
9  from the market. There's evidence of that. But
10 nevertheless, there was still competitive access.
11      After the system is closed, the price
12 increases are absolutely unexplainable except --
13      CIRCUIT JUDGE 3: How many dealers have
14 complained?
15      MR. PANNER: The, the dealers are up in arms
16 and indeed there were dealers who testified --
17      CIRCUIT JUDGE 3: How many dealers have
18 complained? Have dealers filed a lawsuit?
19      MR. PANNER: The dealers have not yet filed a
20 lawsuit.
21      CIRCUIT JUDGE 3: Isn't that a puzzle to you?
22 Your claim is that the dealers are paying too much,

Page 44

1  and therefore, you would expect the dealers to be
2  suing. Class act, the class action plaintiffs' bar
3  rarely leaves a mark at opportunity on the table, and
4  as you have described it, there's an enormous market
5  opportunity here that's being bypassed.
6       MR. PANNER: Your Honor, I, I, I, I hesitate
7  to be -- I really am, in all seriousness there is a
8  great deal of attention being paid to what happens in
9  this, in this case. And, but what's very significant
10 -- remember, the dealers are subject to tremendous --
11 the, the power of Authenticom -- of, excuse me,
12 Reynolds and CDK and these markets, because of their
13 relationship --
14      CIRCUIT JUDGE 3: You're, you're about to
15 make the argument that they have monopoly power and so
16 they can take the same profit twice. No, they can't,
17 right? If they've got the power to extract $5,000 a
18 year from a dealer, it's completely irrelevant whether
19 it's 4,000 for the system and a 1,000 for add-ons, or
20 just 5,000 for the system and anybody can have add-
21 ons.
22      MR. PANNER: Your, Your Honor, I, I'm no more

Page 45

1  an economist than I am a, than I am an astronomer, but
2  I'm told that the earth goes around the sun and I
3  believe it. And I'm told that when goods are not sold
4  in fixed proportions, the single monopoly profit
5  theory doesn't hold and I believe that too.
6       But, and the point is that this is very much
7  a case where the demand for the data does, is not one-
8  to-one. There's a vender demand out there and there's
9  -- you know, the evidence that they have been able to
10 -- now whether it is durable, Your Honor, is something
11 that --
12      CIRCUIT JUDGE 1: But what you're, you're
13 essentially arguing is that there's a two-sided market
14 here where, you know, CDK and Reynolds are both
15 selling to the dealers a program that gives them a
16 dealer management system and they're selling to the
17 outside world the venders of the various apps, the
18 packaged data that they've created from the beginning,
19 which is what does take you back into what Judge
20 Easterbrook was talking about.
21      CIRCUIT JUDGE 3: Kind of like what Facebook
22 sells.

Page 46

1  CIRCUIT JUDGE 1: Yes.
2  MR. PANNER: Your Honor, I don't disagree
3  about the two side, the potential, you know, the
4  analysis --
5  CIRCUIT JUDGE 1: And so you have to decide
6  you know, at what point, whether its AMEX with the
7  merchants and the customers and, or wherever it is,
8  any company in that sense of being in the middle of
9  the two sides has to decide where they're going to
10 take their profits, how are they going to do it.
11 MR. PANNER: Well, except that, Your Honor,
12 here it was very significant that the, was, and it
13 really goes to this point in a way that's quite
14 striking. Both CDK and Reynolds affirmatively
15 testified that they do not provide any benefit to the
16 dealer, any reduction in price to the dealer as a
17 result of this data.
18 Look, there are different ways in which the -
19 - there, there are procompetitive ways in which CDK
20 and Reynolds could decide to say to a dealer, look,
21 you should really give me your data, you know.
22 CIRCUIT JUDGE 1: Haven't they said that when

Page 47

1  they've said we, you can't give it to anybody else
2  without my permission?
3  MR. PANNER: But, and, Your Honor, I, I don't
4  think they've said you can't give it to anybody else
5  with my, without my permission. Indeed, they admit
6  that it is the dealer's data and that the dealer can
7  provide the data to who it pleases. What they object
8  to --
9  CIRCUIT JUDGE 1: Well, that's -- I mean we
10 do get to this question, you know. I could walk you
11 into an old fashioned, you know, room full of
12 documents, actual pieces of paper, or I could give you
13 a thumb drive, you know. And giving you the thumb
14 drive is probably what you'd rather have these days
15 'cause it would take you an enormous amount of time
16 and resources.
17 There's a transformation. It reminds me a
18 little bit of BMI/ASCAP. There's, there's really in a
19 sense a different product because of the integration
20 of the data.
21 MR. PANNER: Well, Your Honor, I'm, I think I
22 probably agree with that and indeed it, you know, I'm

Page 48

1  sure a district judge, if I came into a district court
2  and I said, you know, I don't understand what they're
3  complaining about. I gave them, you know, banker's
4  boxes. The district judge would sanction me.
5  And, and, so that's, that's exactly what's
6  going on here, right? That, what's going on is the
7  dealers own the data, okay, and that's a very
8  significant concession on the part of the defendants.
9  The dealers own their data. That is the data that --
10 CIRCUIT JUDGE 1: Before it's been churned
11 through these programs.
12 MR. PANNER: There's no claim, there's no
13 claim that the -- because, that the data that the
14 venders are receiving is data that is OEM data that
15 the dealers can't provide or that Authenticom is
16 breaching --
17 CIRCUIT JUDGE 1: Yeah, I understand that.
18 I'll, I'll --
19 MR. PANNER: And so what's so important about
20 this, okay, is that what, what -- so for example what
21 Reynolds says is we're perfectly fine if you want to
22 use Dynamic Reporting and get these reports and then

Page 49

1  put it in an e-mail and, and shoot it off to whoever,
2  you know, we're fine with that. But what you can't do
3  is allow Authenticom to use Dynamic Reporting to pull
4  the same reports and provide it to the vender. Now --
5  CIRCUIT JUDGE 1: And why do you equate those
6  two things? It seems to me each dealer's going to
7  have its usage patterns, but when you let somebody
8  else come in who's running an entirely independent
9  business, different demands on the system will be
10 there, different exposure.
11 MR. PANNER: Your Honor, we're not writing on
12 a blank slate on appeal. There was a record about
13 this. This was litigated before the district court
14 and that's what's so critical. That, there was an
15 argument made, oh, this puts a burden on the, on the
16 system. Well, the district court found they had
17 failed to show that.
18 There was an argument that it would, but it
19 didn't show that. There was an argument that there
20 was a security problem, but the evidence --
21 CIRCUIT JUDGE 3: So if I understand 18 USC
22 1030, you know, and all the sub things correctly, it

13 (Pages 46 - 49)

Page 50

1 just says that there's no access to a protected system
2 without the consent of the system's proprietor. It
3 doesn't say if and only if the system proprietor first
4 satisfied a district judge that he's making a good
5 decision.
6     It just says no access without consent. So
7 why does it matter that the people who want to
8 restrict access haven't shown the, to the district
9 judges satisfaction why they're doing that?
10     MR. PANNER: Well, they're really, there are
11 really two reasons, Your Honor. First, with regard to
12 the meaning of lack of authorization, it doesn't
13 simply says access to the system. It says access to
14 the system to obtain information. And so the
15 construction of authorization has to take --
16     CIRCUIT JUDGE 3: Information from any
17 protected computer.
18     MR. PANNER: Correct. And so --
19     CIRCUIT JUDGE 3: If I understand the way
20 this works, Authenticom wants to get information from
21 protected competitors within the meaning of that
22 statute.

Page 51

1     MR. PANNER: And the authorization is being
2 granted by the owner of the data.
3     CIRCUIT JUDGE 3: No, it's being, it is, but
4 it is not being granted by the person who runs the
5 system, that is by CDK or Reynolds.
6     MR. PANNER: But it's not --
7     CIRCUIT JUDGE 3: This doesn't say permission
8 by anyone. If I have an account with AOL, to take a
9 computer giant of the past, right, to get access to
10 AOL's system, you need AOL's permission, not my
11 permission. The fact that I have an account with AOL
12 doesn't mean I can authorize anybody else to use AOL.
13     MR. PANNER: But, but Your Honor, the issue
14 is -- I think that -- it doesn't say --
15     CIRCUIT JUDGE 3: Don't say the issue is.
16 Give me the language of the statute that you're
17 relying on.
18     MR. PANNER: Thank you. And the language of
19 the statute is without authorization to obtain
20 information. And so it makes perfect sense to
21 construe authorization in light of the fact, with
22 regard to the provision upon which they relied

Page 52

1 primarily.
2     CIRCUIT JUDGE 3: And so you're reading that
3 as authorization by anyone.
4     MR. PANNER: No. Authorization by the --
5     CIRCUIT JUDGE 3: By a person --
6     MR. PANNER: -- system owner or the data
7 owner.
8     CIRCUIT JUDGE 3: -- who has legal authority
9 to give authorization.
10     CIRCUIT JUDGE 1: That's right.
11     CIRCUIT JUDGE 3: Surely.
12     CIRCUIT JUDGE 1: You see it as two possible
13 places. The person who's created the system, who's
14 created the database that we're talking about, and you
15 think also anyone who's provided inputs to that
16 database such as the dealer who's providing inputs
17 from the dealer or the manufacturer. If, if the
18 person, if the input provider gives permission, you
19 think that should be enough as well?
20     MR. PANNER: I think that if the data owner
21 who has --
22     CIRCUIT JUDGE 1: Well, they're an input

Page 53

1 provider for the whole dealer management system.
2     MR. PANNER: Well, but --
3     CIRCUIT JUDGE 1: The system as a whole is
4 not just the sum of the dealer's data.
5     MR. PANNER: That's true. And so it does
6 matter the type of access that's that, you know, what
7 access is being obtained. But, and, but so with
8 regard to the question of statutory construction, the
9 without authorization to obtain information needs to
10 be construed in such a way that if the data owner, the
11 one who owns the information, has authorized the
12 access in a manner that the data owner itself could,
13 could have access to the system, that it does not make
14 sense to make that conduct criminal.
15     CIRCUIT JUDGE 3: That's a different
16 question. That sounds like an argument about what
17 Congress should have enacted.
18     MR. PANNER: No, it's an, it's an argument
19 about how those words should be construed, Your Honor,
20 in light of the fact that it is not simply --
21     CIRCUIT JUDGE 3: What, what is your best --
22 I mean presumably you're making either a definitional

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 54

1 clause or some kind of structural argument about why
2 the word authorization refers to anyone with authority
3 to deal with the system in any way rather than the
4 system proprietor.
5     MR. PANNER: Well, I'm talking about that --
6 I'm talking about --
7     CIRCUIT JUDGE 3: Let's suppose NSA has
8 information on a government system and it's secure,
9 and they authorize one person to deal with that
10 system.
11     MR. PANNER: That's a different --
12     CIRCUIT JUDGE 3: Can that person grant,
13 subcontract that authorization?
14     MR. PANNER: But Your Honor, that's a
15 different provision of the statute and it also, you
16 need, one needs to look at the full provision. They
17 have relied on two provisions of the statute.
18     CIRCUIT JUDGE 3: The words accesses without
19 authorization precedes a) financial record, b)
20 information from a department or agency of the United
21 States, and c) information from any protected
22 computer. The word authorization has to mean the same

Page 55

1 thing for data in an NSA computer as it does in a data
2 in a Reynolds' computer.
3     MR. PANNER: Correct. And the, but the thing
4 that connects authorization to those additional
5 clauses is the thereby. So you need to look at the
6 question of authorization for purposes of the
7 provision that's relied on.
8     And then, you know, they cited another,
9 another provision of the statute as well, A5C, in
10 their reply brief, A5C, but that talks about
11 intentionally accessing a protected computer and
12 thereby causes damages and, damage and loss.
13     So the, the provision on which they're
14 relying needs to be looked at as a whole. I should
15 emphasize, though, that this really does come back to
16 the question whether they have lawfully prevented
17 access in the first place. Because if they have, if
18 they have reached an unlawful agreement to deny access
19 to independent integrators, to block the relationship
20 that existed, the existing, voluntary, did not involve
21 them relationship between the dealers and Authenticom
22 unlawfully, then they do not get immunity for that

Page 56

1 unlawful agreement by virtue of 18 USC 1030.
2     CIRCUIT JUDGE 1: Okay. I think maybe you'll
3 have to stop there. It seems like a symmetrical place
4 to stop. So thank you very much. Mr. Scodro, do you
5 have anything further?
6     MR. SCODRO: Very briefly, Your Honor. If I
7 could just clarify a couple of points that arose in
8 the last segment. We certainly agree that the
9 injunction goes well beyond simply invalidating an
10 agreement in this case. We obviously disagree that
11 there is any unlawful agreement here and even the
12 district court did not find that the written
13 agreements here were themselves unlawful. But to the
14 Court's earlier point, we would certainly agree with
15 that.
16     The, the information that's required to be
17 exchanged, by the way, just to clarify, by the court's
18 injunction is, in, includes data reasonably necessary.
19 It goes beyond just data fields that the dealer
20 authorizes. It also says that are reasonably
21 necessary for Authenticom to provide the data
22 integration services.

Page 57

1     CIRCUIT JUDGE 1: And there's some write-
2 back, isn't there?
3     MR. SCODRO: There is. There is some write-
4 back on the CDK side, Your Honor, with regard to data
5 cleansing. That's exactly, that's exactly right. And
6 the, the notion that this, that their service does not
7 depend on our system is simply false.
8     The way this works is the system is set up to
9 allow queries. On ours it's called an ENG for English
10 query. That's the name of the system that's used and
11 the search system. And they're using that search
12 system, that proprietary system in order to call up
13 the data that is then scraped.
14     So the notion that this is simply taking data
15 and we're not involved in this, indeed the dealers
16 license the system from CDK and from Reynolds.
17     The notion that the CDK contract considers
18 them an agent, I would just commend to the Court ECF
19 65-3, and that document, this is actually a contract,
20 an Authenticom contract in which they indicate that
21 they are not an agent of the vender or the dealer.
22 And we certainly do not see them as our agent within

15 (Pages 54 - 57)

Page 58

1 the meaning of that term in our contract.
2     CIRCUIT JUDGE 2: I, I'd like to ask a
3 question that I hope you don't think is off the wall.
4 But given your position that Authenticom's data
5 integration amounts to illegal activity, would you
6 concede that CDK's own subsidiaries, BMI and
7 IntegraLink, were engaged in illegal activity at least
8 until the 2015 agreement?
9     MR. SCODRO: Your Honor, no. In light of
10 several elements of, of the crime and some information
11 that is not in the record, I have to say, we're, we're
12 not conceding that CDK or its subsidiaries were in
13 violation. Probably not --
14     CIRCUIT JUDGE 1: But it's an interesting
15 question.
16     MR. SCODRO: I'm sorry, Judge?
17     CIRCUIT JUDGE 2: I said if it's not in the
18 record, how can I check on that?
19     MR. SCODRO: I, I would also --
20     CIRCUIT JUDGE 3: I think the answer has to
21 be you can access CDK's systems remotely with some
22 dealer's consent and we'll track it down.

Page 59

1     CIRCUIT JUDGE 1: You're reaching a
2 (inaudible) that's going to be doing that.
3     MR. SCODRO: Your Honor, I would just like to
4 make final point that I didn't address on the opening.
5 And that is as we point out in our briefs and I won't
6 belabor it here, there were many, many reasons why CDK
7 made the conclusion to go to a system that was closed
8 to hostile integration and they include dealer concern
9 about data integrity.
10     There is evidence in the record about that.
11 There's substantial evidence in the record. We had
12 just spun off as our own freestanding public company
13 at this time and that was a decision made in
14 connection with that.
15     CIRCUIT JUDGE 1: All right. Thank you. Mr.
16 Kinnaird.
17     MR. KINNAIRD: Your Honors, the system
18 security measures were instituted beginning in 2009.
19 They are, they are unilateral. They're complementary
20 measures to the dealer contract. They are not
21 dependent upon it. If all the agreements were
22 enjoined - and I would point out the dealer agreement

Page 60

1 was not found to violate §1 - then you would still
2 have blocking and that's why there is forced sharing
3 here.
4     If they simply had the credentials the dealer
5 gave them, they would be blocked. So the district
6 court completely separate from any relief for the
7 agreements ordered us to just go in, program the
8 system, to disable the security protocols for each of
9 them. That's forced sharing.
10     CIRCUIT JUDGE 1: You're moving papers for
11 this appeal. You asserted, if I remember correctly,
12 that, that the district court's injunction was
13 requiring you to create new code; is that correct?
14     MR. KINNAIRD: You have to go in there and
15 actually reprogram and disable the, the protocol. And
16 I would point out it is, even if it's not a question
17 of standing, this, the injunction can't be used to
18 promote criminal activity. I think Mr. Panner's
19 construction of 10-30 does not work.
20     The term without authorization in that same
21 section applies to many different offences, some of
22 which have nothing to do with information. So it has

Page 61

1 to be information given by the system proprietor.
2 It's conceded that Reynolds is the, is the computer
3 proprietor.
4     So I think the, for all those reasons -- and
5 I would point out, also out, this is not a question of
6 denying the district, the dealers their data. They
7 simply cannot authorize the use, automated use of our
8 system, which does tax the system and for which --
9     CIRCUIT JUDGE 1: So once the data's been
10 dumped into your system, your position, though, is
11 that they can't pull it back out again and give it to
12 Authenticom.
13     MR. KINNAIRD: Through, no, through a utility
14 called Dynamic Reporting the dealer can do that and
15 send it to Authenticom. Now what they can't do is
16 they can't authorize --
17     CIRCUIT JUDGE 1: A machine generated --
18     MR. KINNAIRD: -- third party machine to go
19 in there constantly ping our system, which degrades
20 system performance. And there was testimony to that
21 effect.
22     CIRCUIT JUDGE 1: But the district court

16 (Pages 58 - 61)

Page 62

1  didn't think that was a big problem.
2      MR. KINNAIRD: I think the district court
3  didn't give it enough credence, but he also didn't --
4  I mean he didn't even address the criminality issue
5  and I don't think he addressed the Trinko issue.
6      CIRCUIT JUDGE 1: No.
7      MR. KINNAIRD: So I don't think the relief
8  can stand if they were questioning under §1.
9      CIRCUIT JUDGE 1: All right. Thank you very
10 much. Thanks to all counsel. We will take the case
11 under advisement and the Court will be in recess.
12     (Whereupon, the proceeding was concluded.)

Page 63

1          CERTIFICATE OF TRANSCRIBER
2      I, Penny Knight, do hereby certify that this
3  transcript was prepared from audio to the best of my
4  ability.
5
6      I am neither counsel for, related to, nor
7  employed by any of the parties to this action, nor
8  financially or otherwise interested in the outcome of
9  this action.
10
11                *Penny Knight*
12 May 4, 2018
13 DATE        Penny Knight

17 (Pages 62 - 63)