**PUBLIC VERSION**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This filing relates to:* | Hon. Robert M. Dow, Jr. |
| *Loop, LLC, d/b/a AutoLoop v. CDK Global, LLC*, Case No. 18-cv-2521 (N.D. Ill.) | |

**DEFENDANT CDK GLOBAL, LLC'S MEMORANDUM
IN SUPPORT OF ITS MOTION TO DISMISS AUTOLOOP'S AMENDED COMPLAINT**

FILED UNDER SEAL

# TABLE OF CONTENTS

Table of Authorities .................................................................................................................... ii

Introduction ................................................................................................................................1

Background .................................................................................................................................2

    A.   The DMS "market" ...........................................................................................2

    B.   Hostile integration ...........................................................................................2

    C.   CDK's SecurityFirst initiative and 3PA program .............................................3

    D.   Reynolds provides an orderly wind-down of CDK subsidiaries' hostile access .............4

Argument ....................................................................................................................................5

I.    AutoLoop Must Arbitrate Its Claims Against CDK .................................................5

II.   AutoLoop Fails To State A Claim Under Section 1 (Count I) ...................................7

    A.   AutoLoop's horizontal conspiracy claims are inadequate as a matter of law...................7

        1.   Allegations of a market-division agreement are inadequate ....................9

        2.   CDK did not agree to a "group boycott" .................................................10

    B.   CDK has not engaged in exclusive dealing (Count II) ...................................12

    C.   CDK's conduct easily survives the Rule of Reason ........................................14

III.  AutoLoop Fails To State A Claim Under Section 2 (Count III) ............................16

    A.   There are no brand-specific aftermarkets for data integration services .........................17

    B.   CDK has no duty to ignore the plain terms of its service agreements ...........................18

IV.  AutoLoop's Florida-Law Claims Also Fail (Counts IV-V) ...................................20

Conclusion ...............................................................................................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*,
135 F.3d 740 (11th Cir. 1998) ..............................................................................20

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010) ...........................................................................16, 19

*Arthur Anderson LLP v. Carlisle*,
556 U.S. 624 (2009).................................................................................................6

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985)..........................................................................................14, 19

*Authenticom, Inc. v. CDK Glob., LLC*,
874 F.3d 1019 (7th Cir. 2017) ..................................................................... *passim*

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................5

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)..............................................................................................13

*Brownmark Films, LLC v. Comedy Partners*,
682 F.3d 687 (7th Cir. 2012) ................................................................................3

*Cal. Comput. Prods., Inc. v. IBM*,
613 F.2d 727 (9th Cir. 1979) ...........................................................................16, 19

*Cromeens, Holloman, Sibert, Inc. v. AB Volvo*,
349 F.3d 376 (7th Cir. 2003) .........................................................................17, 18

*Dig. Equip. Corp. v. Uniq Dig. Techs., Inc.*,
73 F.3d 756 (7th Cir. 1996) .................................................................................17

*DSM Desotech Inc. v. 3D Sys. Corp.*,
749 F.3d 1332 (Fed. Cir. 2014)............................................................................17

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992).............................................................................................14

*Fin-S Tech, LLC v. Surf Hardware Int'l-USA, Inc.*,
2014 WL 12461350 (S.D. Fla. Aug. 27, 2014)....................................................20

*Firestone Fin. Corp. v. Meyer*,
  796 F.3d 822 (7th Cir. 2015) ........................................................................................2

*Hoffman v. Deloitte & Touche, LLP*,
  143 F. Supp. 2d 995 (N.D. Ill. 2001) .........................................................................6, 7

*I Sports v. IMG Worldwide, Inc.*,
  157 Ohio App. 3d 593 (2004) .......................................................................................6

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ....................................................................................11

*In re Text Messaging Antitrust Litig.*,
  782 F.3d 867 (7th Cir. 2015) ........................................................................................8

*In re Titanium Dioxide Antitrust Litig.*,
  962 F. Supp. 2d 840 (D. Md. 2013) ..............................................................................7

*In re Universal Service Fund Tele. Billing Practices*,
  300 F. Supp. 2d 1107 (D. Kan. 2003) ...........................................................................7

*JLM Indus. v. Stolt-Nielsen SA*,
  387 F.3d 163 (2d Cir. 2004) ..........................................................................................7

*Khorrami v. Rolince*,
  539 F.3d 782 (7th Cir. 2008) ........................................................................................5

*Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*,
  174 F.3d 907 (7th Cir. 1999) ........................................................................................6

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .................................................................................................8, 11

*Minn. Mining & Mfg. Co. v. Pribyl*,
  259 F.3d 587 (7th Cir. 2001) ......................................................................................13

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
  797 F.2d 370 (7th Cir. 1986) ......................................................................................12

*Positive Software Sol'n, Inc. v. New Century Mortg. Corp.*,
  259 F. Supp. 2d 531 (N.D. Tex. 2003) ..........................................................................7

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
  104 F.3d 811 (6th Cir. 1997) ......................................................................................17

*QSGI, Inc. v. IBM Glob. Fin.*,
  2012 WL 1150402 (S.D. Fla. Mar. 14, 2012) ..............................................................20

*Sanchez v. CleanNet USA, Inc.*,
   78 F. Supp. 3d 747 (N.D. Ill. 2015) ..................................................6, 7

*Schor v. Abbott Labs.*,
   457 F.3d 608 (7th Cir. 2006) ...........................................................19

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961)........................................................................13

*Traeger v. Am. Express Bank FSB*,
   2014 WL 340421 (N.D. Ill. Jan. 30, 2014) .......................................6

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919).......................................................................19

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966).......................................................................16

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*,
   540 U.S. 398 (2004).......................................................................19

*Viamedia, Inc. v. Comcast Corp.*,
   218 F. Supp. 3d 674 (N.D. Ill. 2016) ...............................................20

*VIP Sports Mktg., Inc. v. Buzil*,
   2004 WL 2608422 (N.D. Ill. Nov. 16, 2004) ....................................18

*Wigod v. Wells Fargo Bank, N.A.*,
   673 F.3d 547 (7th Cir. 2012) ..........................................................15

**STATUTES AND RULES**

Fla. Stat. Ann. § 501.204 ....................................................................20

Rule 12(b)(6)...................................................................................5, 7

15 U.S.C. § 1 ............................................................................ *passim*

15 U.S.C. § 2 ............................................................................ *passim*

**MISCELLANEOUS**

11 Williston on Contracts § 33:1 (4th ed. 2018)......................................12

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
Principles and Their Application* (May 2018)
   ¶ 772c2 ....................................................................................19
   ¶ 1800a ....................................................................................12

FILED UNDER SEAL

*Request for Information Regarding Consumer Access to Financial Records*,
   Bureau of Consumer Fin. Prot., Dkt. No. CFPB-2016-0048 (Nov. 14, 2016),
   perma.cc/F28M-5TZU ........................................................................................................15

## INTRODUCTION

Like other complaints in this MDL, AutoLoop's amended complaint largely piggybacks on the allegations in *Authenticom*—but AutoLoop is no Authenticom. Unlike Authenticom, whose hostile integration services face reduced demand, AutoLoop and other software vendors compete in a vibrant market that is continually expanding as more and more vendors offer new applications to dealers. Thus, whatever the plausibility of Authenticom's claims of foreclosed competition, those claims ring utterly hollow coming from AutoLoop. The complaint should accordingly be dismissed.

Indeed, AutoLoop should not be permitted to bring its claims in court to begin with; it has agreed to arbitrate such claims with Reynolds, CDK's alleged coconspirator, and cannot evade that commitment by choosing to sue only CDK. And in any event, AutoLoop's arguments are meritless, just as they are in the other MDL suits from which AutoLoop recycles them.[1] AutoLoop's Section 2 monopolization argument is already undermined by the Seventh Circuit's recognition that CDK is not a monopolist and has no duty to deal with rival firms—let alone on their preferred terms. AutoLoop's Section 1 allegations fail under the plain terms of the written agreements on which AutoLoop principally relies. Its remaining federal antitrust claims—group boycott and exclusive dealing—are conceptual mismatches for its allegations and therefore never get off the ground. Finally, because AutoLoop's state-law claims depend on its federal causes of action, the Amended Complaint should be dismissed in its entirety.

---

[1] AutoLoop alleges a conspiracy between CKD and Reynolds to eliminate independent data "integrators" (Count I); that CDK engaged in unlawful exclusive dealing (Count II) and monopolization of a purported single brand aftermarket for data integration on its DMS (Count III); and Florida-law claims derivative of these federal claims (Counts IV and V).

1

PUBLIC VERSION

# BACKGROUND[2]

## A.     The DMS "market"

DMSs are proprietary enterprise software systems that manage the core business functions of automobile dealerships. Am. Compl. ¶ 39. They manage, among other things, large volumes of data, including inventory, customer, sales, financing, and insurance information. *Id.* ¶ 40.

There are a number of various-sized firms that offer DMSs to new and used automobile, truck, motorcycle, marine, recreational vehicle and heavy equipment dealers throughout the world. Reynolds and CDK are two of the largest firms serving new vehicle franchised automobile dealers in the United States. Am. Compl. ¶ 43. AutoLoop alleges that, by number of franchised stores served, CDK has an approximate 45% share of DMS sales in the U.S. (*id.*); CDK, Reynolds, and a number of other DMS firms compete fiercely to attract dealers' business from one another. *See, e.g.*, *id.* ¶ 87 (describing CDK's gain in customers at Reynolds' expense).

## B.     Hostile integration

Dealers often contract with various third-party vendors, some of which offer software applications that leverage CDK's DMS (including the information it manages) to perform assorted dealership functions. Am. Compl. ¶¶ 52, 53. AutoLoop is one such vendor and provides several different "suites" of software to dealers. *Id.* ¶ 7. While many vendors seek only the ability to obtain or "extract" data, others also "push" or "write-back" altered data into the DMS to populate the DMS's various proprietary workflows, as when a vendor amends individual customer records. *Id.* ¶ 54.

Some vendors wishing to access CDK's DMS contract with independent data "integrators," who—acting as middlemen—access the DMS to extract data and transmit it to vendors through the

---

[2] We describe here the allegations in the complaint.  We assume the truth of the well-pled allegations solely for purposes of this motion. *See Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015).

integrator's own software interface. Am. Compl. ¶ 56. Dealers have facilitated data integrator access

to the DMS by providing them with user login credentials. With respect to CDK's DMS, this process

necessarily requires dealers to violate the terms of their master service contracts with CDK, which

forbid dealers from granting access to the DMS to third parties. *Id.* ¶ 123. For this reason, among

others, unauthorized access by third-party vendors and integrators is known as "hostile" access.

The Amended Complaint attempts to skirt these express restrictions by noting that CDK's

dealer contracts allow hostile integrators to access its DMS because they allow access by dealers'

"agents." Am. Compl. ¶ 125. But simply applying the label agents does not make them so under the

law.  AutoLoop has not alleged any well-pled facts to establish that hostile integrators, by virtue of

merely receiving login credentials to CDK's system, become dealers' "agents." Indeed, the only data

"integrator" that is a party in this MDL (and which shares counsel with AutoLoop), expressly

disclaims any agency relationship with dealers. *See* Dkt. 63-3 § 10.4 (Authenticom access agreement

stating that "[t]he Parties expressly agree that they are independent contractors and do not intend for

these Terms and Conditions to be interpreted as an employment agency, joint venture, or partnership

relationship").

## C.    CDK's SecurityFirst initiative and 3PA program

Cybersecurity and system performance are essential to the proper functioning of any

enterprise system. In part to ensure the security and stability of its systems, CDK's contracts with

dealers have long expressly prohibited dealers from granting any unauthorized third-party access to

the DMS.[3] Beginning in June 2015, CDK announced that it was further improving DMS security by

enhancing its 3PA program, which relies on a managed data interface for transporting data to and

---

[3] Dkt. 176 at 35. See also the sample CDK dealer contract attached as Exhibit A. The court may consider the
contract because AutoLoop cites and relies on it in its complaint. *See, e.g.*, *Brownmark Films, LLC v. Comedy
Partners*, 682 F.3d 687, 690 (7th Cir. 2012).

from CDK's DMS. Am. Compl. ¶ 72. CDK made this change as part of its SecurityFirst initiative. *See id*. ¶ 133. Under the refreshed 3PA program and SecurityFirst, vendors may no longer use hostile third parties to access data on CDK's DMS; instead, vendors must access this data through 3PA or other approved means. *Id.* ¶ 72.

### D. Reynolds provides an orderly wind-down of CDK subsidiaries' hostile access

AutoLoop concedes that Reynolds has blocked unauthorized third-party access to its DMS for years. Am. Compl. ¶ 86. By 2013, Reynolds's blocking activities had improved to the point where hostile integrators were being substantially disrupted. *See Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019, 1023 (7th Cir. 2017). At the time, ADP (from which CDK was spun off in 2014) owned two subsidiaries—Digital Motorworks ("DMI") and IntegraLink—that offered various data services, including unauthorized access of Reynolds's systems. Am. Compl. ¶¶ 73, 76. Reynolds—as it had with other hostile integrators—demanded that DMI and IntegraLink cease this activity, and both eventually did so. *Id.* To that end, and to ensure that vendors using DMI and IntegraLink and the Reynolds dealers they serviced were not adversely affected, Reynolds and CDK negotiated an agreement for a voluntary wind-down of DMI and IntegraLink's hostile access to Reynolds's system. *Id.* ¶ 96. The agreement, entered into in February 2015, was the "Data Exchange Agreement" ("DEA").

AutoLoop describes the DEA as a market division agreement, but that is a characterization, not a well-pled allegation. The DEA says nothing about Reynolds's access to CDK's DMS (AutoLoop does not allege that Reynolds *ever* hostilely integrated on CDK's DMS or any other), nor does it address CDK's access policies with respect to its own DMS. *See* Data Exchange Agreement, attached as Ex. B. Indeed, the only restriction with respect to third-party integration appears in § 4.5, which simply prohibits CDK and Reynolds from sharing information they learned about integration with the other party's DMS during the course of the agreement, including by helping another party

integrate with the other's DMS. The contract does *not* obligate CDK or Reynolds to block hostile integrators or "close" their DMSs.

Concurrent with the DEA, the parties signed two additional contracts. First, as consideration for the orderly wind-down of DMI's and IntegraLink's unauthorized access, CDK agreed to provide integration through the 3PA program for several applications that Reynolds offered to CDK dealers, without charge (and with certain limitations) for up to five years. *See* 3PA Agreement, attached as Ex. C. This provision increased competition in the market for vendor applications by allowing a competing DMS provider's applications into the 3PA program (thereby giving CDK dealers access to those applications). Second, consistent with its decision to end its subsidiaries' hostile integration to Reynolds's DMS, CDK enrolled seven of its vendor applications in the RCI program at Reynolds's standard pricing and consistent with Reynolds's standard RCI policies (thus increasing application competition by giving Reynolds dealers access to those applications). *See* RCI Agreement, attached as Ex. D.

**ARGUMENT**

In determining whether a complaint fails to state a claim under Rule 12(b)(6), a court must assess whether the complaint "include[s] 'enough facts to state a claim to relief that is plausible on its face.'" *Khorrami v. Rolince*, 539 F.3d 782, 788 (7th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). AutoLoop's complaint fails that test.

**I.     AUTOLOOP MUST ARBITRATE ITS CLAIMS AGAINST CDK**

Without even reaching the merits of AutoLoop's allegations, the Court should dismiss the complaint in favor of arbitration. AutoLoop agreed to arbitrate any and all claims against Reynolds when it signed up for Reynolds's RCI program. AutoLoop's allegations require extending that agreement to AutoLoop's claims against CDK.

AutoLoop agreed to arbitrate ███████████████████████████████

████████ its Reynolds Interface Agreement ("RIA"). *See* Dkt. 198-40, § 6.12. AutoLoop's antitrust conspiracy claim plainly ████████ the RIA. AutoLoop alleges, after all, is that it has been compelled to pay supracompetitive prices (under the RIA and CDK's 3PA agreement) for access to Reynolds's and CDK's DMSs, all by virtue of CDK and Reynolds's alleged conspiracy to eliminate independent "integrators." That allegation easily fits within the broad language of the RIA's arbitration clause. *See Traeger v. Am. Express Bank FSB*, 2014 WL 340421, at *8 (N.D. Ill. Jan. 30, 2014) ("[T]he phrase 'arising from or relating to' is common in arbitration clauses; the Seventh Circuit has held that arbitration clauses that contain this language are 'broad' and 'necessarily create a presumption of arbitrability.'") (quoting *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 910 (7th Cir. 1999)).

The question here, therefore, is whether AutoLoop can evade its commitment to arbitrate claims ████████ the RIA by suing only CDK and strategically declining to name Reynolds as a defendant. It cannot. Although CDK is not party to the agreements between Reynolds and its dealers, it is well-settled that the "mere fact" that parties are not "signatories to [an] agreement does not defeat their right to compel arbitration." *Hoffman v. Deloitte & Touche, LLP*, 143 F. Supp. 2d 995, 1004 (N.D. Ill. 2001). Under the doctrine of equitable estoppel, courts "regularly allow non-signatory entities to enforce an arbitration agreement against a signatory" in cases alleging "interdependent and concerted misconduct" with signatories. *Sanchez v. CleanNet USA, Inc.*, 78 F. Supp. 3d 747, 758 (N.D. Ill. 2015) (collecting cases); *accord Hoffman*, 143 F. Supp. 2d at 1004 (a signatory to an arbitration agreement must arbitrate claims, even against a non-signatory, if "the signatory raises allegations of . . . substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.").[4]

---

[4] State law controls whether a non-signatory can enforce an arbitration agreement. *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 632 (2009). But it does not matter which state's law applies here. Reynolds is an Ohio company. Ohio courts recognize that non-signatories can use equitable estoppel to compel arbitration where the signatory alleges substantially interdependent and concerted misconduct by both the non-signatory and

That is this case exactly. The Complaint's theory of relief, from the first paragraph to the last, is one of interdependent and concerted misconduct by Reynolds and CDK (although, as discussed *infra*, AutoLoop's factual allegations do not substantiate that theory). Am. Compl. ¶ 1 (alleging that CDK and Reynolds "conspired to eliminate competition for providing integration with dealer data), Prayer for Relief (b) (praying for a "decree that CDK entered into an unlawful horizontal conspiracy with Reynolds"). This District has regularly compelled arbitration in circumstances like these (*Sanchez*, 78 F. Supp. 3d at 758; *Hoffman*, 143 F. Supp. 2d at 1004). That outcome is especially warranted here, where the antitrust violations that AutoLoop alleges purportedly arose out of Reynolds' and CDK's contracts, including the agreements with vendors and dealers, and where the contract containing the arbitration clause (the RIA) directly pertains to the "data integration" market that CDK allegedly sought to divide with Reynolds and control.[5]

## II. AUTOLOOP FAILS TO STATE A CLAIM UNDER SECTION 1 (COUNT I)

If the Court determines that one or more of AutoLoop's claims are not arbitrable, the Court should dismiss the claim or claims under Rule 12(b)(6).

### A. AutoLoop's horizontal conspiracy claims are inadequate as a matter of law

AutoLoop centers its horizontal conspiracy claim on the allegation that CDK and Reynolds entered into written "agreements designed to eliminate competition in the provision of dealer data integration services." Am. Compl. ¶ 95. That is not the case. The agreements effect only a wind-down of CDK's hostile access to Reynolds's DMS; they do not divide any market, restrain any competition, or say anything about CDK's or Reynolds's third-party access policies. On their faces,

---

one or more signatories. *I Sports v. IMG Worldwide, Inc.*, 157 Ohio App. 3d 593, 599 (2004). This is the same standard applied in *Hoffman* and other cases in this District and by courts in virtually all other states.

[5] *See, e.g., In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 851 (D. Md. 2013) (price-fixing conspiracy); *JLM Indus. v. Stolt-Nielsen SA*, 387 F.3d 163, 178 (2d Cir. 2004) (same); *In re Universal Service Fund Tele. Billing Practices*, 300 F. Supp. 2d 1107, 1139-40 (D. Kan. 2003) (same); *Positive Software Sol'n, Inc. v. New Century Mortg. Corp.*, 259 F. Supp. 2d 531, 540 (N.D. Tex. 2003) (conspiracy to violate IP rights in software).

these agreements do not eliminate competition—as a matter of either intent or effect.

Nor can AutoLoop state a Section 1 claim based on CDK's and Reynolds's independent decisions, made many years apart, to block unauthorized third-party access to their respective DMSs. Reynolds began blocking hostile integration no later than 2013 (Am. Compl. ¶ 86), and CDK announced SecurityFirst in 2015 (*id.* ¶ 72). Section 1 does not prohibit this kind of follow-the-leader conduct, particularly when (as here) the defendants' decisions are separated by years. *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015) ("[C]onscious parallelism[] does not violate section 1 of the Sherman Act.").

It is commonplace for firms to copy each other, and substantive antitrust law thus forbids inferences of collusion from allegations that firms in the same industry employ similar business strategies, absent evidence that "tends to exclude the possibility" of independent conduct. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). AutoLoop's conspiracy claim accordingly fails as a matter of law, because AutoLoop does not allege anything other than permissible, parallel conduct. The complaint concedes, explicitly or by omission, that (1) Reynolds's decision preceded CDK's by several years; (2) Reynolds did not need CDK's assistance or agreement to close its DMS to hostile integration or to keep it closed; (3) CDK likewise did not need Reynolds's assistance or agreement to close its own DMS to hostile integration; (4) Reynolds accomplished the legitimate business objective of increasing its system stability by building its system to prevent unauthorized access; (5) CDK also sought to increase its system security and vendor revenue by closing its system to unauthorized access; and (6) the contractual provisions in CDK's dealer agreements prohibiting dealers from sharing login credentials with hostile integrators have nothing to do with Reynolds and were not the product of any conspiracy with Reynolds.

In ruling on the motion to dismiss the *Authenticom* complaint, Judge St. Eve held that

8

PUBLIC VERSION

Authenticom—whose allegations AutoLoop copies—had "raise[d] a reasonable inference of [CDK and Reynolds's] motive to conspire" by alleging that that the two firms were motivated to be able to close their systems to hostile integration "without fearing that their customers would respond by, for example, turning to another provider." Dkt. 176 at 30. But such a motive is not at all plausible. Reynolds *already* had unilaterally closed its system to hostile integration prior to the supposed conspiracy. And CDK had no rational reason to risk treble-damages liability in exchange for Reynolds's mere agreement to continue doing what it already had done for years. Absent a plausible motive for CDK to conspire, AutoLoop's complaint shows, at most, one firm's decision to copy a competitor's long-standing practice where that practice was in the independent interests of each firm.

### 1.  *Allegations of a market-division agreement are inadequate*

The alleged "2015 agreement" between Reynolds and CDK comprises three separate contracts: (1) a DEA between Reynolds and CDK related to winding down DMI's and IntegraLink's unauthorized access to the Reynolds system; (2) a 3PA Agreement providing a subset of Reynolds's third-party applications with hosted integration to the CDK DMS; and (3) an RCI agreement governing integration between Reynolds's DMS and seven of CDK's applications. There is no agreement by either party with respect to its own DMS system access policies or anything else regarding interactions with data integrators. *See* Exs. 2-4.

AutoLoop alleges that the agreement "eliminate[d] competition in the provision of dealer data integration services" (Am. Compl. ¶ 95), in that CDK and Reynolds "agreed that they themselves would no longer access data on each other's DMS" (*id.* ¶ 97). But the language of the agreements, and the facts that AutoLoop alleges, are to the contrary. Reynolds has aggressively enforced its service contracts to prevent unauthorized access to its DMS for many years (*see id.* ¶ 86); it needed no agreement with CDK to continue doing so. The same goes for CDK, which independently introduced SecurityFirst in 2015 and subsequently began enforcing its own

restrictions on unauthorized third-party access. *Id*. ¶ 72. Neither company needed to agree with the other to enforce its policies.

Nor does the 2015 agreement amount to a market-division scheme as a logical matter. Even if CDK was agreeing that DMI and IntegraLink would permanently stop hostilely accessing Reynolds's DMS (and according to the contract's terms, it was not), this would have *helped* other hostile integrators by eliminating two of their competitors with respect to the Reynolds DMS. And Reynolds, which has never provided hostile integration on CDK's (or any other DMS provider's) system, had no reason to agree to anything regarding hostile integration on other DMSs.

The documents that AutoLoop relies on for its market-division claim do little to advance its cause. Exhibit 8, read as a whole, confirms what the written agreements themselves spell out—that DMI's role in transitioning its vendor clients to the RCI program was limited to sending an initial, informative communication as contemplated by § 4.4 of the DEA. It was preferable, from both sides' perspective, that vendors be given advance warning of the transition, rather than learning about it when their unauthorized access to a DMS through an integrator was cut off. And Exhibits 9 and 10 simply establish that the two firms wanted to have consistent communications in order to avoid confusing customers.[6] AutoLoop has therefore failed to state a claim of "market division."

### 2. CDK did not agree to a "group boycott"

AutoLoop also alleges that CDK and Reynolds engaged in a "group boycott" in violation of Section 1 of the Sherman Act. CDK and Reynolds allegedly sought to "block all third-party access to their respective DMSs." Am. Compl. ¶ 175. But this theory fails for the same reasons that the

---

[6] Further, the statement in Exhibit 10 about Reynolds "mov[ing] vendors from Authenticom polling to DMI" (*see* Am. Compl. ¶ 101) refers to the fact that at the time of the DEA, a handful of vendors were in transition to the RCI program but still using both DMI and Authenticom for data polling during their transition. The document indicates that those vendors would need to move from Authenticom to DMI if they wished to have continued, uninterrupted access during their transition, given that Authenticom's access to Reynolds's DMS was prohibited while DMI's would be permitted during the wind-down period.

PUBLIC VERSION

"market division" theory fails. To prove that CDK and Reynolds entered into an unlawful horizontal conspiracy, AutoLoop must plausibly allege that they engaged in parallel conduct and that other facts "tend[] to exclude the possibility" that they acted out of lawful motives. *Matsushita*, 475 U.S. at 597 (internal quotation marks omitted). There are two problems for AutoLoop. First (and again), Reynolds unilaterally forbade access to its DMS by hostile integrators *years* before CDK's SecurityFirst initiative. "[S]uch slow adoption of similar policies does not raise the specter of collusion." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015). Second, AutoLoop has not plausibly alleged facts tending to exclude the possibility that CDK and Reynolds acted independently. Once again, there was nothing for CDK to gain from any supposed collusion, because it could block unauthorized third-party access to its DMS unilaterally, with or without Reynolds's decision to do the same. AutoLoop has not identified any plausible reason why CDK would have "agreed" to do with Reynolds what it could do just as well on its own.

In an attempt to bolster its conspiracy theory, AutoLoop offers the copy-cat allegation that representatives of CDK and Reynolds openly confessed to a conspiracy. But those self-serving, hearsay allegations are inconsistent with documents incorporated in the complaint. For example, AutoLoop alleges that Robert Schaefer from Reynolds told Authenticom's Steve Cottrell in a May 2015 phone conversation that CDK and Reynolds had an agreement "to support each other's third-party access agreements *and* to block independent integrators such as Authenticom." Am. Compl. ¶ 103. But as shown above, the 3PA and RCI agreements do not block Authenticom or any other hostile integrator from anything. Indeed, the agreements do not mention hostile integrators *at all*.

AutoLoop also alleges that, nearly a year after the alleged Schaefer-Cottrell conversation, Dan McCray, a CDK employee, told Cottrell that "CDK and Reynolds had agreed to '[l]ock [Authenticom] and the other third parties out.'" Am. Compl. ¶ 104. But this alleged statement does not tend to exclude independent conduct—CDK admittedly *had* made the decision to block

11

unauthorized access, and it needed no agreement to do it. Again, the best evidence of CDK's and Reynolds's agreement is the actual written contracts that the companies signed.[7]

The documents AutoLoop proffers in support of its conspiracy allegations do nothing to bolster its claims. The communication in Exhibit 11 concerned a vendor that was temporarily getting by with data pulled by Authenticom; the communication had nothing to do with "do[ing] a better job of jointly blocking Authenticom" (Am. Compl. ¶ 106). That the two companies celebrated the agreement (*id.*; Am. Compl. Ex. 12) is unsurprising; the fact that two DMS competitors had permitted each other's software applications on their systems for the first time, thereby increasing competition in the application space, and benefited from doing so, was worth celebrating. And AutoLoop's reliance on communications making sarcastic comments about Authenticom (Am. Compl. ¶ 107 (citing Am. Compl. Exs. 13-14)) is meritless. It is no surprise and no secret that CDK and its personnel disliked Authenticom, a company that makes money by parasitically free-riding on proprietary technology that took CDK years of substantial investment to develop. But dislike for another firm is not an antitrust violation. "[I]f conduct is not objectively anticompetitive, the fact that it was motivated by hostility to [other firms] is irrelevant." *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986).

### B.    CDK has not engaged in exclusive dealing (Count II)

AutoLoop's final Section 1 theory is that CDK's agreements with vendors are "exclusive deals" that foreclose competition. This theory also fails as a conceptual matter.

An exclusive dealing agreement is one where a buyer and seller agree to deal with each other exclusively with respect to a particular good or service, foreclosing a portion of the market to other

---

[7] In *Authenticom*, Judge St. Eve thought this argument "backfire[d]" because it "suggests that [CDK and Reynolds] (or at least their executives) thought that the 2015 Agreements aimed to 'block' third-party integrators." Dkt. 176 at 29. But that analysis—which uses allegations of oral statements to inform the analysis of a written agreement—disregarded the ordinary rule that a fully integrated, written agreement should not be supplemented with oral evidence. *See, e.g.*, 11 Williston on Contracts § 33:1 (4th ed. 2018).

12

sellers. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1800a (May 2018) (explaining that an exclusive deal "forbids the buyer from purchasing the contracted good from any other seller" or "requires the buyer to take all of its needs in the contracted good from that [seller]"). As AutoLoop sees it, the agreements require vendors exclusively to "use 3PA alone to integrate with data on [the] CDK DMS[]." Am. Compl. ¶ 114. But 3PA is not a competing data integrator; it is a "managed interface" that is a feature of CDK's DMS offering, requiring vendors to obtain data directly from the DMS. *See id.* ¶ 70.[8]

What is more, AutoLoop's allegation that CDK's contract terms with vendors forbidding unauthorized access are violations of the antitrust laws is deficient on its face, given that the restrictions on vendors are simply the other side of the coin from the prohibition in *dealers*' DMS contracts prohibiting them from allowing third parties to access the DMS. That kind of licensing term is commonplace throughout the economy and essential to companies' cybersecurity practices.

And in any event, it is fundamental that "even though a contract is found to be an exclusive-dealing arrangement, it does not violate the [antitrust laws] unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (Clayton Act case). There is no suggestion in the complaint that CDK's dealer or vendor contracts foreclosed AutoLoop from any market; AutoLoop has not been excluded from dealing with CDK or any dealer.

For this reason, Judge St. Eve's conclusion that Authenticom stated a claim that the vendor contracts are exclusive deals (Dkt. 176 at 37-38) is inapplicable here. Judge St. Eve found that the

---

[8] AutoLoop alleges that 3PA is a "direct market substitute" for the services of independent integrators—citing two documents referring to CDK's "competing" with Authenticom. Am. Compl. ¶ 72. But neither document establishes that 3PA and independent integrators' services are in the same market—an issue that depends on "'the reasonable interchangeability of use or the cross-elasticity of demand between'" 3PA and other services. *Minn. Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 603 (7th Cir. 2001) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). They show, at most, that CDK considered Authenticom to be a firm with interests rivalrous to its own.

*Authenticom* complaint alleged that Authenticom was foreclosed from a substantial portion of the "data-integration market," because enforcement of the vendor contracts would preclude it from offering its extraction services to most potential buyers. *Id.* at 37. AutoLoop is not similarly foreclosed in its own market (the app market); on the contrary, it currently does business with "more than 2,000 dealers across the country" (Am. Compl. ¶ 7) and does not allege that there are any dealers with whom it is unable to deal.

### C.    CDK's conduct easily survives the Rule of Reason

In any event, CDK's conduct would be a basis for antitrust liability only if it could not be explained by "'valid business reasons.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985)). Here, as AutoLoop's allegations make clear, CDK's conduct rested on at least two important business justifications: the need to protect its system from cybersecurity threats and CDK's desire to capitalize on its investment in its DMS infrastructure instead of letting third parties capture that value for themselves. Am. Compl. ¶ 134, 151.

AutoLoop's complaint does not deny that cybersecurity is a concern for DMS providers (and for all modern business, for that matter). Nor does it allege that any company permits unfettered access to its systems on users' preferred terms. Rather, AutoLoop alleges that CDK is using cybersecurity as a pretext. Am. Compl. ¶ 152. That allegation fails for several reasons.

As an initial matter, AutoLoop does not allege that hostile integration is innocuous to the DMS, posing no cybersecurity risk to CDK's systems. To be sure, AutoLoop asserts that CDK has not presented examples of data breaches involving hostile integrators. Am. Compl. ¶ 155. But that is neither a guarantee that one will not occur nor an indicator that concern for such risk is invalid. CDK is not required to leave itself defenseless against cyber risks until after a breach is identified; to conclude otherwise would put companies like CDK in a no-win bind, rendering them helpless to

14

prevent cyber breaches *before* they occur and yet vilified for not doing enough *after* they occur.

AutoLoop's other "pretext" arguments are likewise unpersuasive. It first alleges that CDK is not genuinely concerned about cybersecurity because it has engaged in hostile integration on *other* companies' DMSs through its subsidiaries, DMI and IntegraLink. Am. Compl. ¶ 152. That is a red herring. The fact is, some DMS providers do not actively block unauthorized access (*id.* ¶ 160), creating a market for DMI and IntegraLink. That says nothing about CDK's DMS; it means only that other DMS providers weigh the costs and benefits of a managed interface differently than CDK does. That DMS providers differentiate themselves in this way is the essence of competition. In any event, AutoLoop does not allege that DMI or IntegraLink has engaged in hostile integration since 2015, when CDK strengthened its own access and security policies.

AutoLoop also argues that hostile integrators in the DMS industry are comparable to "integrators" that extract data for banking or healthcare applications (Am. Compl. ¶ 154), but it offers no support for that assertion—or for its claim that the data in banking and healthcare systems is "much more sensitive than anything accessible from dealers" (*id.*). (Nor could it, given that dealers engage in leasing, financing and insurance transactions). Neither does AutoLoop provide any facts supporting its insinuation that banks condone the practice. Indeed, the Consumer Financial Protection Bureau regulation that AutoLoop cites (*id.*) also notes that "consumer financial account providers have raised concerns about whether account aggregators or permissioned parties [*i.e.*, data 'integrators'] employ adequate security and privacy procedures with respect to consumers' online account credentials and consumer account data obtained through aggregation."[9]

AutoLoop next alleges that it is permitted to use an independent integrator, SIS, as long as it

---

[9] *Request for Information Regarding Consumer Access to Financial Records*, Bureau of Consumer Fin. Prot., Dkt. No. CFPB-2016-0048, at 12-13 (Nov. 14, 2016), perma.cc/F28M-5TZU. As a public document prepared by a government agency and quoted in the complaint, this document is subject to judicial notice on a motion to dismiss. *See, e.g.*, *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556 (7th Cir. 2012).

PUBLIC VERSION

pays the 3PA integration fees necessary for doing so, which purportedly "show[s] that profit—not security—is the sole motivation for the 3PA program." Am. Compl. ¶ 156. But as the Managed Interface Agreement between CDK and AutoLoop indicates (Ex. E, § 1(f)),[10] ████████████

██████████████████████████████████████████

██████████████████████████████████████████

Nothing about this temporary accommodation suggests that CDK's long-term security concerns are invalid or pretextual. This allegation more plausibly suggests that CDK was sensitive to the business needs of a customer during its transition to 3PA.

Lastly, AutoLoop alleges that in certifying AutoLoop's applications for 3PA, "CDK does not ask any questions actually related to [AutoLoop's] security practices." Am. Compl. ¶ 157. But that allegation has no relation to CDK's stated security concerns, which involve how third parties access CDK's *own* system. If AutoLoop or other vendors access data through 3PA, there is no risk to CDK's systems, which obviates the need to ask questions about AutoLoop's own internal security.

In short, CDK "had the right to [design or] redesign its products to make them more attractive to buyers" through "improved performance," including improved cybersecurity. *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999 (9th Cir. 2010) (quoting *Cal. Comput. Prods., Inc. v. IBM*, 613 F.2d 727, 744 (9th Cir. 1979)). The facts alleged in the complaint are at minimum consistent with that lawful, pro-competitive objective.

## III.    AUTOLOOP FAILS TO STATE A CLAIM UNDER SECTION 2 (COUNT III)

"The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Given the Seventh Circuit's recognition that "neither Reynolds nor CDK is a monopolist," *Authenticom*, 874 F.3d at 1025,

---

[10] This document is incorporated by reference into AutoLoop's complaint. *See, e.g.*, Am. Compl. ¶ 115-16.

AutoLoop's attempt to make out a Section 2 claim here based on the same facts is doomed to fail.

### A.    There are no brand-specific aftermarkets for data integration services

To prevail on a Section 2 theory, AutoLoop must demonstrate that CDK has monopoly power in a relevant market. AutoLoop alleges that CDK has monopolized a "brand-specific after-market" for data integration for dealers using the CDK DMS. Am. Compl. ¶ 82. But this alleged market does not exist as a matter of law because CDK has included terms in its service contracts prohibiting dealers from permitting third-party access to the DMS by disseminating login credentials. *See* p.3, *supra*. Dealers therefore had the opportunity, when contracting for DMS service, to choose whether to use a DMS that permitted third-party data extraction, and to weigh the potential lifecycle costs of each approach. And as the Seventh Circuit has held, if a seller "informed customers about its policies before they bought," "purchasers could have shopped around" and thus cannot have been unfairly locked in. *Dig. Equip. Corp. v. Uniq Dig. Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996). The law is clear on this point: If a secondary product or service is "bundled" with a primary service or product "from the outset," it follows that purchasers are not unfairly locked in. *Id.*; *see also, e.g.*, *DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1346 (Fed. Cir. 2014); *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 819 (6th Cir. 1997).

AutoLoop alleges that prior to 2015, CDK failed to consistently enforce its contractual bars on third-party DMS access—but that does not save its claim. Even if dealers believed there was a factual possibility that CDK might not enforce the express prohibition on third-party data extraction, they would have been aware of the provision and the possibility that it *could* be enforced. "A party is not justified in relying on representations outside of or contrary to the written terms of a contract he or she signs when the signer is aware of the nature of the contract and had a full opportunity to read it." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003). Thus, Judge St. Eve's conclusion that Authenticom had plausibly alleged that CDK customers did not know that

they were agreeing to restrictions on hostile integration (Dkt. 176 at 47-48) is not pertinent. Judge St. Eve did not consider the principle that contracting parties—particularly sophisticated businesses like AutoLoop—are charged with knowing the terms of their contracts. *Cromeens*, 349 F.3d at 394.

Judge St. Eve also concluded that Authenticom had alleged that dealers were unable to shop for DMS services by alleging that a provision in CDK's vendor agreements "prohibits . . . vendors from informing dealers of how much CDK's integration services cost." Dkt. 176 at 48. Perhaps. But *AutoLoop's* allegations here make clear that, notwithstanding any such provisions, dealers are very well aware of the differences in price between integration through 3PA and integration through hostile integrators. First, AutoLoop does not allege that dealers do not know the price of vendor applications, which obviously reflect integration fees. Second, the Amended Complaint alleges that vendors absorb some of the price difference because dealers are "unwilling" to pay it (Am. Compl. ¶ 128), and one cannot be "unwilling" to pay for something that one is unaware of. Third, it alleges that some dealers openly and proactively avoid certain vendors "because of the huge pass-through data integration surcharges" (*id.*¶ 130). These allegations, moreover, do not concern one or two odd dealers, as they may have in *Authenticom* (Dkt. 176 at 48); rather, they tell a story that dealers, industry-wide, are concerned about increased prices for vendor applications on so-called "closed" DMSs. Needless to say, CDK disputes AutoLoop's slanted account, but that is not the point for present purposes. The point, instead, is that AutoLoop cannot tell one story (dealers are aware of increased access costs) and then offer a wholly inconsistent allegation (that dealers are getting blindsided by the alleged lifetime cost difference between so-called "open" and "closed" DMSs). *See, e.g.*, *VIP Sports Mktg., Inc. v. Buzil*, 2004 WL 2608422, at *3 (N.D. Ill. Nov. 16, 2004) (affirming dismissal because plaintiff's "contradictory allegations" negated its claim).

### B. CDK has no duty to ignore the plain terms of its service agreements

AutoLoop also fails to establish predatory conduct of any kind. AutoLoop asserts that it was

"exclusionary" for CDK to refuse to allow hostile data integrators to access its secure, proprietary

DMS platform for free. But that argument runs headlong into the well-established principle that "the

Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an

entirely private business, freely to exercise his own independent discretion as to parties with whom

he will deal.'" *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004)

(quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). This unassailable maxim of

antitrust law reflects that "[c]ooperation is a *problem* in antitrust, not one of its obligations." *Schor v.

Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006). The Seventh Circuit held that *Trinko* "leave[s] no

doubt" that a duty-to-deal theory "cannot support relief" here (*Authenticom*, 874 F.3d at 1026), and

this Court should do the same.[11]

To be sure, the right to refrain from aiding other businesses is not "unqualified." *Aspen

Skiing*, 472 U.S. at 601. But courts have been "very cautious in recognizing" exceptions to this right

"because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying

anticompetitive conduct by a single firm." *Trinko*, 540 U.S. at 408. In general, where a refusal to

deal has any rational business justification, the courts will not find a violation of the antitrust laws.

*See* Areeda & Hovenkamp ¶ 772c2 ("*Aspen* leaves monopolists free to refuse to deal or cooperate

with rivals for legitimate business reasons."). That principle disposes of AutoLoop's Section 2 claim.

Judge St. Eve did not disagree with CDK's contention in *Authenticom* that *Trinko* forecloses

any finding of an improper duty to deal here. Instead, she held that Authenticom could maintain a

Section 2 claim based on its allegations of conspiracy and exclusive dealing under Section 1. Dkt.

176 at 50. Here, because AutoLoop's claims under those Section 1 theories fail, its Section 2 claim

---

[11] Moreover, as explained, blocking hostile third-party data integrators is a necessary element of CDK's procompetitive SecurityFirst program. The antitrust laws do not impose a duty to limit "product development so as to facilitate sales of [hostile integrators'] products." *Allied Orthopedic*, 592 F.3d at 999 (quoting *Cal. Comput. Prods., Inc.*, 613 F.2d at 744).

should likewise be dismissed in its entirety. And if the Court declines to dismiss the Section 1 claims, it should at minimum dismiss the Section 2 claim insofar as it relies on an alleged refusal to deal. *See, e.g.*, *Viamedia, Inc. v. Comcast Corp.*, 218 F. Supp. 3d 674, 699 (N.D. Ill. 2016) (denying motion to dismiss Section 2 claim based on exclusive dealing and tying but dismissing the claim to the extent it was based on a refusal to deal).

## IV.   AUTOLOOP'S FLORIDA-LAW CLAIMS ALSO FAIL (COUNTS IV-V)

The dismissal of AutoLoop's Sherman Act claims would be fatal to its parallel claim under the Florida Antitrust Act. "Federal and Florida antitrust laws are analyzed under the same rules and case law." *See, e.g.*, *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 n.11 (11th Cir. 1998). It follows that, just as AutoLoop's Sherman Act claims must be dismissed, its Florida Antitrust Act claim must be as well. *See, e.g.*, *Fin-S Tech, LLC v. Surf Hardware Int'l-USA, Inc.*, 2014 WL 12461350, at *2 (S.D. Fla. Aug. 27, 2014).

AutoLoop also alleges that CDK violated the Florida Deceptive and Unfair Trade Practices Act, which prohibits "[u]nfair methods of competition" and "unfair or deceptive acts or practices." Fla. Stat. Ann. § 501.204. But when "a plaintiff's FDUTPA claim is based on the same allegations as its antitrust claim, failure to establish a violation of antitrust law is sufficient to conclude that the plaintiff has also failed to state a FDUTPA claim." *QSGI, Inc. v. IBM Glob. Fin.*, 2012 WL 1150402, at *4 (S.D. Fla. Mar. 14, 2012). And as we have shown, the conduct that AutoLoop alleges is not a violation of the antitrust laws.

## CONCLUSION

The complaint should be dismissed in its entirety.

Dated: July 18, 2018

Respectfully submitted,

/s/ *Britt M. Miller*
Britt M. Miller
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant*
*CDK Global, LLC*

**PUBLIC VERSION**

## CERTIFICATE OF SERVICE

I, Britt M. Miller, an attorney, hereby certify that on July 18, 2018, I caused a true and correct copy of the foregoing **DEFENDANT CDK GLOBAL, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS AUTOLOOP'S AMENDED COMPLAINT**, to be filed **UNDER SEAL** and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/ Britt M. Miller*_____
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Phone: (312) 782-0600
Fax: (312) 701-7711
E-mail: bmiller@mayerbrown.com