**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This document relates to:* | Hon. Robert M. Dow, Jr. |
| THE DEALERSHIP CLASS ACTION | Magistrate Judge Jeffrey T. Gilbert |

**DEFENDANT CDK GLOBAL, LLC'S MEMORANDUM IN SUPPORT OF
MOTION TO COMPEL ARBITRATION AND STAY CLAIMS
OR, IN THE ALTERNATIVE, TO DISMISS THE
DEALERSHIP CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

<div align="right">**Page**</div>

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 3

    A.    The Alleged DMS Market ................................................................................ 3

    B.    Hostile Integration ............................................................................................ 4

    C.    CDK's SecurityFirst Initiative and 3PA Program .................................. 4

    D.    The Orderly Wind-Down of CDK Subsidiaries' Hostile Access of Reynolds ....... 5

    E.    Alleged Pass-On Pricing and Effect on the DMS Market ...................... 6

    F.    The Complaint ................................................................................................. 7

ARGUMENT ............................................................................................................... 7

    I.    The Court Should Order The Reynolds Dealers To Arbitrate And Stay The Remaining Claims. ................................................................... 8

        A.    Reynolds Dealers Must Arbitrate Under Principles Of Equitable Estoppel. .................................................................... 8

        B.    The Court Should Stay The Remaining Claims Pending Arbitration. ..................................................................... 9

    II.    In The Alternative, The Court Should Dismiss The Complaint For Failure To State A Claim. .......................................................... 10

        A.    The Dealers Are Not Proper Federal Antitrust Plaintiffs (Counts I-V) .................................................................... 11

            1.    The Damages Claims Fail Under *Illinois Brick* (Counts I, III, V). .................................................. 11

            2.    The Dealers' Effort To Avoid *Illinois Brick* Is Meritless. ............ 12

            3.    The Dealers Are Not Proper Plaintiffs For Injunctive Relief (Counts II, IV) ............................................ 14

        B.    The Federal Counts Fail To State A Claim (Counts I-V). ......................... 16

            1.    The Horizontal Conspiracy Claims Fail (Counts I-II). ................. 17

            2.    The Exclusive Dealing Claims Fail (Counts III-IV).................... 21

            3.    CDK's Conduct Easily Survives The Rule Of Reason................. 23

            4.    The Monopolization Claim Fails (Count V). ............................... 24

        C.    The Complaint Fails To State A Claim Under State Law (Counts VI-L). ........................................................................ 26

            1.    The Dealers Allege No Operations or Purchases In Twenty-Six States. .......................................... 27

2.      The State Antitrust Claims, And Many Of The Consumer Protection Counts, Fail Because The Federal Antitrust Claims Fail. .......................................................................... 28

3.      The Dealers Are Too Remote To Be State-Law Antitrust Plaintiffs. ......................................................... 29

      a.      *Illinois Brick* Bars the South Carolina and Illinois Antitrust Claims. ..................................... 29

      b.      Thirteen Of The Remaining States Clearly Follow *AGC* ............................................................... 30

      c.      The Remaining States Presumptively Apply *AGC* Or Similar Remoteness Principles Barring The Dealers' Claims .................................................. 34

4.      Standing And Remoteness Principles Doom The Consumer Protection Claims As Well. ......................... 36

5.      Many State Antitrust And Consumer Protection Claims Fail For Additional Reasons. ....................................... 39

CONCLUSION................................................................................................... 44

<u>**Table of Authorities**</u>

**Page(s)**

**Cases**

*42nd Parallel North v. E Street Denim Co.*,
    286 F.3d 401 (7th Cir. 2002) ...............................................................13

*A & R Fugleberg Farms, Inc. v. Triangle Ag, LLC*,
    2010 WL 1418870 (D.N.D. Apr. 7, 2010)..........................................38

*Abbott Labs. v. Durrett*,
    746 So.2d 316 (Ala. 1999)...................................................................40

*In re Aftermarket Auto. Lighting Prod. Antitrust Litig.*,
    2009 WL 9502003 (C.D. Cal. July 6, 2009)........................................16

*In re Aftermarket Filters Antitrust Litig.*,
    2009 WL 3754041 (N.D. Ill. 2009) .....................................................41

*In re Aggrenox Antitrust Litig.*,
    2016 WL 4204478 (D. Conn. Aug. 9, 2016) ..................................29, 36

*Aikens v. Debow*,
    541 S.E.2d 576 (W.V. 2000)................................................................35

*Alaska Gasline Port Auth. v. ExxonMobil Corp.*,
    2006 WL 1718195 (D. Alaska June 19, 2006) ....................................29

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010) ...............................................................25

*Allied Van Lines, Inc. v. Orth Van & Storage, Inc.*,
    2005 WL 1563111 (N.D. Ill. June 3, 2005) ........................................10

*Am. Fed'n of Teachers-Oregon, AFT, AFL-CIO v. Or. Taxpayers United PAC*,
    145 P.3d 1111 (Or. Ct. App. 2006)......................................................36

*Apprentice Info. Sys., Inc. v. DataScout, LLC*,
    544 S.W.3d 536 (Ark. 2018)................................................................42

*Arthur Anderson LLP v. Carlisle*,
    556 U.S. 624 (2009).............................................................................8

*In re Asacol Antitrust Litig.*,
    2016 WL 4083333 (D. Mass. July 20, 2016).......................................42

*Ashley Furniture Indus., Inc. v. Packaging Corp. of Am.*,
  275 F. Supp. 3d 957 (W.D. Wis. 2017) ............................................................32, 45

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)........................................................................................24

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983)........................................................................... *passim*

*Atl. Coast Airlines Holdings, Inc. v. Mesa Air Grp., Inc.*,
  295 F. Supp. 2d 75 (D.D.C. 2003)......................................................................44

*Authenticom, Inc. v. CDK Glob., LLC*,
  874 F.3d 1019 (7th Cir. 2017) .............................................................5, 13, 18, 25

*In re Auto. Parts Antitrust Litig.*,
  2014 WL 3687035 (E.D. Mich. July 23, 2014) .........................................................43

*In re Beef Indus. Antitrust Litig.*,
  600 F.2d 1148 (5th Cir. 1979) .........................................................................12

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................................7

*Bennett v. Visa U.S.A., Inc.*,
  198 S.W.3d 747 (Tenn. Ct. App. 2006) ...............................................................41

*Blue Shield of Va. v. McCready*,
  457 U.S. 465 (1982)........................................................................................35

*In re Broiler Chicken Antitrust Litig.*,
  290 F. Supp. 3d 772 (N.D. Ill. 2017) ..................................................................29

*Byre v. City of Chamberlain*,
  362 N.W.2d 69 (S.D. 1985) ..............................................................................45

*Cal. Comput. Prods., Inc. v. IBM Corp.*,
  613 F.2d 727 (9th Cir. 1979) ...........................................................................25

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986)........................................................................................15

*Catlin v. Hanser*,
  2011 WL 1002736 (S.D. Ind. Mar. 17, 2011)........................................................28

*Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
  973 P.2d 527 (Cal. 1999) .................................................................................37

iv

*ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*,
    487 F. Supp. 2d 980 (N.D. Ill. 2007) .................................................................10

*In re Chocolate Confectionary Antitrust Litig.*,
    749 F. Supp. 2d 224 (M.D. Pa. 2010) ..............................................................42

*Consiglio–Tseffos v. Visa U.S.A. Inc.*,
    2004 WL 3030043 (Ariz. Super. Ct., Dec. 8, 2004) ..........................................35

*Contant v. Bank of America Corp.*,
    2018 WL 1353290 (S.D.N.Y. Mar. 15, 2018) ....................................................16

*Cornelison v. Visa U.S.A., Inc.*,
    No. CIV 03–1350 (S.D. Cir. Ct. 2004) .........................................................32, 33

*Cortellesso v. Zanni*,
    1997 WL 839911 (R.I. Super. Ct. Apr. 29, 1997) .............................................36

*Crain v. Debartolo*,
    2015 WL 73961 (E.D.N.C. Jan. 6, 2015) .........................................................45

*Cromeens, Holloman, Sibert, Inc. v. AB Volvo*,
    349 F.3d 376 (7th Cir. 2003) ...........................................................................26

*Cty. of Cook v. Philip Morris, Inc.*,
    817 N.E.2d 1039 (Ill. App. Ct. 2004) ..............................................................35

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
    2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) ..............................15, 16, 17, 28

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
    2015 WL 3988488 (N.D. Ill. June 29, 2015) .......................................... *passim*

*Davidson v. Apple, Inc.*,
    2018 WL 2325426 (D. Colo. May 8, 2018) ......................................................43

*Davric Maine Corp. v. Rancourt*,
    216 F.3d 143 (1st Cir. 2000) .......................................................................31, 44

*Dicesare v. Charlotte-Mecklenburg Hosp. Auth.*,
    2017 WL 1359599 (N.C. Super. Ct. Apr. 11, 2017) ........................................31

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ...........................................................................12

*Dig. Equip. Corp. v. Uniq Dig. Techs., Inc.*,
    73 F.3d 756 (7th Cir. 1996) .............................................................................26

*Donovan v. Digital Equip. Corp.*,
    883 F. Supp. 775 (D.N.H. 1994) ........................................................................36

*Drs. Steuer & Latham, P.A. v. Nat'l Med. Enters. Inc.*,
    672 F. Supp. 1489 (D.S.C. 1987) ..............................................................30, 45

*DSM Desotech Inc. v. 3D Sys. Corp.*,
    749 F.3d 1332 (Fed. Cir. 2014) ......................................................................26

*In re Ductile Iron Pipe Fittings Indirect Purchaser Antitrust Litig.*,
    2013 WL 5503308 (D.N.J. Oct. 2, 2013) .........................................................31

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    516 F. Supp. 2d 1072 (N.D. Cal. 2007) .....................................................37, 41

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    536 F. Supp. 2d 1129 (N.D. Cal. 2008) ..........................................................16

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) .........................................................................................24

*EEOC v. Concentra Health Servs., Inc.*,
    496 F.3d 773 (7th Cir. 2007) .............................................................................7

*ERI Max Enm't, Inc. v. Streisand*,
    690 A.2d 1351 (R.I. 1997) ..............................................................................45

*Evans v. State*,
    963 P.2d 177 (Utah 1998) ................................................................................45

*In re Flash Memory Antitrust Litig.*,
    643 F. Supp. 2d 1133 (N.D. Cal. 2009) .....................................................31, 42

*Fucile v. Visa U.S.A. Inc.*,
    2004 WL 3030037 (Vt. Super. Ct. Dec. 27, 2004) ..........................................32

*Futurevision Cable Sys., Inc. v. Multivision Cable TV Corp.*,
    789 F. Supp. 760 (D. Miss. 1992) ...................................................................44

*Geinosky v. City of Chicago*,
    675 F.3d 743 (7th Cir. 2012) .............................................................................3

*Glenn K. Jackson Inc. v. Roe*,
    273 F.3d 1192 (9th Cir. 2001) .........................................................................37

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..........................................................43

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
  998 F.2d 391 (7th Cir. 1993) ...................................................................14

*Gutnayer v. Cendant Corp.*,
  116 Fed. App'x 758 (7th Cir. 2004) .......................................................44

*Ho v. Visa USA, Inc.*,
  793 N.Y.S.2d 8 (App. Div. 2005) ......................................................31, 32

*Hoffman v. Deloitte & Touche, LLP*,
  143 F. Supp. 2d 995 (N.D. Ill. 2001) ....................................................8, 9

*Holt v. ARES Sec. Corp.*,
  2018 WL 2461992 (D.S.C. June 1, 2018)...............................................38

*Hyde v. Abbott Labs., Inc.*,
  473 S.E.2d 680 (N.C. 1996)....................................................................45

*I Sports v. IMG Worldwide, Inc.*,
  813 N.E.2d 4 (Ohio Ct. App. 2004) .........................................................9

*IDS Life Ins. Co. v. SunAmerica, Inc.*,
  103 F.3d 524 (7th Cir. 1996) ..................................................................11

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977).......................................................................*passim*

*In re Indus. Gas Antitrust Litig.*,
  681 F.2d 514 (7th Cir. 1982) ..................................................................16

*Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v.
   Philip Morris, Inc.*,
  196 F.3d 818 (7th Cir. 1999) ..................................................................15

*Int'l Healthcare Mgmt. v. Haw. Coalition for Health*,
  332 F.3d 600 (9th Cir. 2003) ..................................................................44

*In re Intel Corp. Microprocessor Antitrust Litig.*,
  496 F. Supp. 2d 404 (D. Del. 2007)........................................................43

*JLM Indus. v. Stolt-Nielsen SA*,
  387 F.3d 163 (2d Cir. 2004)......................................................................9

*Kanne v. Visa USA Inc.*,
  723 N.W.2d 293 (Neb. 2006)..................................................................32

*Kessel v. Monongalia Cnty. Gen. Hosp. Co.*,
  648 S.E.2d 366 (W. Va. 2007).................................................................45

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) ............................................... 31

*Knowles v. Visa U.S.A., Inc.*,
    2004 WL 2475284 (Me. Super. Ct. Oct. 20, 2004) ............................. 33

*Kochert v. Greater Lafeyette Health Servs.*,
    463 F.3d 710 (7th Cir. 2006) ............................................... 16

*LaBella Winnetka, Inc. v. Vill. of Winnetka*,
    628 F.3d 937 (7th Cir. 2010) ................................................ 4

*Lenhoff Enters., Inc. v. United Talent Agency, Inc.*,
    2018 WL 1548221 (9th Cir. Mar. 30, 2018) ........................... 28, 29, 44

*In re Lidoderm Antitrust Litig.*,
    103 F. Supp. 3d 1155 (N.D. Cal. 2015) ..................................... 37

*Little Caesar Enters., Inc. v. Smith*,
    895 F. Supp. 884 (E.D. Mich. 1995) ....................................... 44

*Loeb Indus., Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) ....................................... 12, 15, 16

*Loeb v. Champion Petfoods USA Inc.*,
    2018 WL 2745254 (E.D. Wis. June 7, 2018) ................................. 39

*Lorix v. Crompton Corp.*,
    736 N.W.2d 619 (Minn. 2007) ............................................. 35

*Maddock v. Greenville Retirement Cmty., L.P.*,
    1997 WL 89094 (Del. Ch. Feb. 26, 1997) ................................... 37

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ...................................................... 18

*McCauley v. City of Chicago*,
    671 F.3d 611 (7th Cir. 2011) ............................................... 8

*Merck & Co., Inc. v. Lyon*,
    941 F. Supp. 1443 (M.D.N.C. 1996) ....................................... 39

*In re Microsoft Corp. Antitrust Litig.*,
    401 F. Supp. 2d 461 (D. Md. 2005) .................................... 29, 30

*Midwestern Midget Football Club Inc. v. Riddell, Inc.*,
    2016 WL 3406129 (S.D. W.Va. June 17, 2016) .............................. 39

*Minuteman, LLC v. Microsoft Corp.*,
795 A.2d 833 (N.H. 2002) ...........................................................................45

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)..........................................................................................7

*Motorola Mobility LLC v. AU Optronics Corp.*,
775 F.3d 816 (7th Cir. 2015) .......................................................................11

*MS Dealer Serv. Corp. v. Franklin*,
177 F.3d 942 (11th Cir. 1999) ................................................................9, 22

*Mueller v. Wellmark, Inc.*,
861 N.W.2d 563 (Iowa 2015) ......................................................................44

*Mulford v. Altria Grp., Inc.*,
242 F.R.D. 615 (D.N.M. 2007)....................................................................38

*Murrin v. Fischer*,
2008 WL 540857 (D. Minn. Feb. 25, 2008) ...............................................38

*Nass-Romero v. Visa U.S.A. Inc.*,
279 P.3d 772 (N.M. Ct. App. 2012) ......................................................32, 33

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
350 F. Supp. 2d 160 (D. Me. 2004) .............................................................41

*Nootens v. Madison Gas & Elec. Co.*,
1998 WL 719611 (N.D. Ill. Oct. 8, 1998).................................................10

*Novell v. Migliaccio*,
749 N.W.2d 544 (Wis. 2008).......................................................................39

*Nw. Pub. Serv., a Div. of Nw. Corp. v. Union Carbide Corp.*,
236 F. Supp. 2d 966 (D.S.D. 2002) .............................................................39

*Olstad v. Microsoft Corp.*,
700 N.W.2d 139 (Wis. 2005).......................................................................40

*In re Opana ER Antitrust Litig.*,
162 F. Supp. 3d 704 (N.D. Ill. 2016) ..........................................................30

*Or. Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.*,
185 F.3d 957 (9th Cir. 1999) .......................................................................45

*Orr v. Beamon*,
77 F. Supp. 2d 1208 (D. Kan. 1999).........................................................31

*Owens Corning v. R.J. Reynolds Tobacco Co.*,
  868 So.2d 331 (Miss. 2004) (en banc) ................................................................36

*In re Packaged Seafood Prod. Antitrust Litig.*,
  242 F. Supp. 3d 1033 (S.D. Cal. 2017) .............................................................37

*Peterson v. Visa U.S.A. Inc.*,
  2005 WL 1403761 (D.C. Super. Ct. Apr. 22, 2005) ...............................32, 33, 44

*Phillips v. Prudential Ins. Co. of Am.*,
  714 F.3d 1017 (7th Cir. 2013) ...........................................................................20

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
  2012 WL 39766 (N.D. Ill. Jan. 9, 2012) ........................................................16, 28

*Pomerantz v. Microsoft Corp.*,
  50 P.3d 929 (Colo. App. 2002) ..........................................................................37

*Positive Software Sols. Inc. v. New Century Mortg. Corp.*,
  259 F. Supp. 2d 531 (N.D. Tex. 2003) ................................................................9

*In re Potash Antitrust Litig.*,
  667 F. Supp. 2d 907 (N.D. Ill. 2009) ..............................................................16, 27

*Precourt v. Fairbank Reconstruction Corp.*,
  856 F. Supp. 2d 327 (D.N.H. 2012) ...................................................................40

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
  104 F.3d 811 (6th Cir. 1997) .............................................................................26

*Qbex Computadoras S.A. v. Intel Corp.*,
  2017 WL 5525939 (N.D. Cal. Nov. 17, 2017) ...................................................39

*QSGI, Inc. v. IBM Global Fin.*,
  2012 WL 1150402 (S.D. Fla. Mar. 14, 2012) ....................................................29

*In re Refrigerant Compressors Antitrust Litig.*,
  2013 WL 1431756 (E.D. Mich. April 9, 2013) .........................................16, 34, 39

*Romero v. Philip Morris Inc.*,
  242 P.3d 280 (N.M. 2010) .................................................................................45

*S. Peninsula Hosp. v. Xerox State Healthcare LLC*,
  223 F. Supp. 3d 929 (D. Alaska 2016) ..............................................................38

*S.C. Cotton Growers' Co–op. Ass'n v. English*,
  133 S.E. 542 (1926) ..........................................................................................30

*Sahagian v. Genera Corp.*,
    2009 WL 9504039 (C.D. Cal. July 6, 2009) ........................................................................31

*In re Samsung Galaxy Smartphone Mktg. & Sales Practices Litig.*,
    298 F. Supp. 3d 1285 (N.D. Cal. 2018) ..........................................................................10

*Sanchez v. CleanNet USA, Inc.*,
    78 F. Supp. 3d 747 (N.D. Ill. 2015) ...............................................................................8

*Saulsberry v. Morinda, Inc.*,
    2008 WL 416933 (N.D. Ga. Feb. 13, 2008) .................................................................42

*Serfecz v. Jewel Food Stores*,
    67 F.3d 591 (7th Cir. 1995) ..........................................................................................16

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
    737 F. Supp. 2d 380 (E.D. Pa. 2010) ...........................................................................40

*Sickles v. Cabot Corp.*,
    877 A.2d 267 (N.J. Super. Ct. App. Div. 2005)...........................................................36

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) ........................................................................................12

*In re South Dakota Microsoft Antitrust Litig.*,
    707 N.W.2d 85 (S.D. 2005) ..........................................................................................45

*Southard v. Visa U.S.A. Inc.*,
    734 N.W.2d 192 (Iowa 2007) ................................................................................32, 34

*Spahr v. Leegin Creative Leather Prods., Inc.*,
    2008 WL 3914461 (E.D. Tenn. Aug. 20, 2008) ..........................................................45

*Sperry v. Crompton Corp.*,
    863 N.E.2d 1012 (N.Y. 2007).......................................................................................45

*Star Discount Pharmacy, Inc. v. MedImpact Healthcare Sys., Inc.*,
    2014 WL 4470720 (N.D. Ala. Sept. 10, 2014) ...........................................................44

*Stark v. Visa U.S.A. Inc.*,
    2004 WL 1879003 (Mich. Cir. Ct. July 23, 2004).................................................31, 32

*State v. Alpine Air Prods.*,
    490 N.W.2d 888 (Minn. App. Ct. 1992).......................................................................44

*State v. Lead Indus. Ass'n, Inc.*,
    2001 WL 345830 (R.I. Super. Ct. Apr. 2, 2001) .........................................................36

*Steamfitters Local Union No. 614 v. Philip Morris, Inc.*,
  2000 WL 1390171 (Tenn. Ct. App. Sept. 26, 2000)......................................................36

*Strang v. Visa U.S.A., Inc.*,
  2005 WL 1403769 (Wis. Cir. Ct. Feb. 8, 2005) ..............................................32, 33

*Supreme Auto Transp. LLC v. Arcelor Mittal*,
  238 F. Supp. 3d 1032 (N.D. Ill. 2017) ..................................................................34

*Tackit v. Visa U.S.A., Inc.*,
  2004 WL 2475281 (Neb. Dist. Ct. Oct. 19, 2004)..........................................32, 33

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961)..............................................................................................23

*Teague v. Bayer AG*,
  671 S.E.2d 550 (N.C. Ct. App. 2009) ....................................................................31

*Tee Time Arrangers, Inc. v. Vistoso Gold Partners, LLC*,
  2008 WL 4149295 (Ariz. Ct. App. Feb. 28, 2008)................................................44

*In re Terazosin Hydrochloride Antitrust Litig.*,
  160 F. Supp. 2d 1365 (S.D. Fla. 2001) ...........................................................37, 40

*In re Text Messaging Antitrust Litig.*,
  782 F.3d 867 (7th Cir. 2015) ................................................................................18

*The "In" Porters, S.A. v. Hanes Printables, Inc.*,
  663 F. Supp. 494 (M.D.N.C. 1987) .......................................................................39

*In re Titanium Dioxide Antitrust Litig.*,
  962 F. Supp. 2d 840 (D. Md. 2013) .........................................................................9

*In re Tobacco II Cases*,
  207 P.3d 20 (Cal. 2009) ........................................................................................43

*Tuscaloosa v. Harcros Chemicals, Inc.*,
  158 F.3d 548 (11th Cir. 1998) ..............................................................................28

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966)...............................................................................................25

*In re Universal Service Fund Tele. Billing Practices*,
  300 F. Supp. 2d 1107 (D. Kan. 2003)......................................................................9

*Vandenberg v. Aramark Educational Servs., Inc.*,
  81 So.3d 326 (Ala. 2011)........................................................................................34

*Vinci v. Waste Mgmt., Inc.*,
    43 Cal. Rptr. 2d 337 (Cal. Ct. App. 1995) ............................................................31

*VIP Sports Mktg., Inc. v. Buzil*,
    2004 WL 2608422 (N.D. Ill. Nov. 16, 2004) ......................................................26

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*,
    901 A.2d 106 (Del. 2006) ....................................................................................39

*Walker v. U-Haul of Miss.*,
    734 F.2d 1068 (5th Cir. 1984) .............................................................................44

*Welchlin v. Tenet Healthcare Corp.*,
    366 F. Supp. 2d 338 (D.S.C. 2005) .....................................................................45

*In re Wellpoint, Inc., Out–of–Network UCR Rates Litig.*,
    903 F. Supp. 2d 880 (C.D. Cal. 2012) ................................................................29

*White v. Wyeth*,
    705 S.E.2d 828 (W.Va. 2010) ..............................................................................39

*In re Wiring Device Antitrust Litig.*,
    498 F. Supp. 79 (E.D.N.Y. 1980) ........................................................................30

*Wrobel v. Avery Dennison Corp.*,
    2006 WL 7130617 (Kan. Dist. Ct. Feb. 1, 2006) ...............................................31

*In re Zappos.com, Inc.*,
    2013 WL 4830497 (D. Nev. Sept. 9, 2013) ........................................................44

*Zaycer v. Sturm Foods, Inc.*,
    896 F. Supp. 2d 399 (D. Md. 2012) .....................................................................28

**Statutes**

9 U.S.C. § 2 ...................................................................................................................7

Alaska Stat. § 45.50.535(b)(1) ...................................................................................41

Ariz. Rev. Stat. Ann. § 44–1412 ...........................................................................34, 44

Ark. Code Ann. § 4–88–107(a)(10) ............................................................................43

Ark. Code Ann. § 4-88-113(f)(1)(B) ...........................................................................43

Colo. Rev. Stat. § 6–1–113(2) .....................................................................................43

D.C. Code § 28-4502 ...................................................................................................44

D.C. Code § 28-4515 ........................................................................................31, 44

Ga. Code Ann. § 10–1–392 ....................................................................................42

Ga. Code Ann. § 10–1–393 ....................................................................................42

Haw. Rev. Stat. § 480-3 ...................................................................................34, 44

Ill. Comp. Stat. 10/11 ............................................................................................44

Ill. Comp. Stat. 10/7(2) ..........................................................................................30

Iowa Code Ann. § 553.2 .........................................................................................31

Kan. Stat. § 50-163(b) ............................................................................................44

Mass. Gen. Laws Ch. 93A, § 11 ............................................................................39

N.H. Rev. Stat. Ann. § 356:14 ...............................................................................34

N.H. Rev. Stat. Ann. § 358–A:2 ............................................................................40

N.M. Stat. Ann. § 57–1–15 ....................................................................................32

Neb. Rev. Stat. § 59-829 ..................................................................................32, 45

Or. Rev. Stat. Ann. § 646.715(2) ...........................................................................34

R.I. Gen. Laws § 6–36–2(b) ...................................................................................45

S.C. Code Ann. § 39-5-140(a) ...............................................................................43

S.D. Codified Laws § 37-1-22 ...............................................................................32

Utah Code Ann. § 76-10-3118 ..........................................................................34, 45

Vt. Stat. Ann. tit. 9, § 2453(b) .........................................................................32, 45

W. Va. Code § 46A-6-106(c) .................................................................................41

W. Va. Code § 47–18–16 .......................................................................................34

W. Va. Code § 47–18–3(b) .....................................................................................45

**Other Authorities**

*Antitrust Law: An Analysis of Antitrust Principles & Their Application* ¶ 1800a
(May 2018)................................................................................................22, 23

Auto/Mate Dealership Systems, *Open/Mate Integration Program*,
https://www.automate.com/dms/openmate ...............................................................................3

Cox Automotive, *Dealer Management Systems*, https://www.coxautoinc.com/
solutions/dealer-management-systems-dms/ ............................................................................3

Vince Bond Jr., *CDK's 'fantastic win' is now lost* (Nov. 17, 2016),
https://bit.ly/2ihyYpW ...........................................................................................................6

11 Williston on Contracts § 33:1 (4th ed. 2018).......................................................................22

## INTRODUCTION

CDK Global, LLC ("CDK") provides technology solutions to automotive dealerships. Among the services that CDK offers is its dealer management systems ("DMS"), enterprise software that facilitates payroll, inventory, repair and service, HR, marketing, and other functions. Several additional providers also offer DMS, including co-defendant The Reynolds and Reynolds Company ("Reynolds"). Dealerships also enter into commercial relationships with third-party software vendors, who produce dealer-oriented computer applications. Vendors sometimes seek access to data maintained on CDK's DMS for use in their applications.

For more than a decade, Reynolds has prohibited third parties from accessing its DMS except through an approved third-party access program called "RCI." CDK has an approved third-party access program for its own DMS called "3PA." Notwithstanding the availability of the 3PA program, some vendors seek to access CDK's DMS on their own, including by using dealer-created DMS login credentials, installing their own code on CDK's computer systems, and engaging the services of so-called data "integrators" like individual plaintiff Authenticom, Inc. ("Authenticom")—all of which are known as "hostile" access methods. In 2014, CDK ultimately determined that—for business and operational reasons including an increasing focus on securing confidential and proprietary data—it would no longer tolerate hostile third-party access to its own DMS. In 2016, CDK began enforcing its third-party access restrictions and blocking unauthorized vendors and "integrators."

In 2017, Authenticom sued CDK and Reynolds alleging a conspiracy to violate the antitrust laws by agreeing to eliminate competition in a purported "data integration" market. *Authenticom, Inc. v. CDK Global, LLC*, No. 17-CV-318 (W.D. Wis. May 5, 2017). "Integrators" like Authenticom gain access to DMSs, extract data, and sell that data to vendors for use in the

1

vendors' applications. Because integrators essentially sell access to a system—CDK's DMS— that they neither built nor maintain, they often charge less than 3PA for their services. Several tag-along suits—by vendors and a competing DMS provider—followed *Authenticom*. The Judicial Panel on Multidistrict Litigation consolidated these suits into the present MDL.

Now, some two dozen additional dealers have jumped on the bandwagon. On June 4, 2018, these dealers filed a Consolidated Class Action Complaint ("Complaint"), putatively on behalf of all dealerships using Reynolds' and CDK's DMSs. *See* Dkt. 184 (public version). The dealers allege that CDK and Reynolds conspired to restrain competition in the supposed DMS and data integration "markets"; engaged in exclusive dealing by requiring vendors to access the DMS through authorized means; monopolized the supposed "data integration aftermarket" on their respective DMSs; and violated various state antitrust and unfair business practice laws.

As an initial matter, the court should stay this case because a substantial portion of the claims in this suit are subject to mandatory arbitration. But even if the Court were to let claims go forward at this point, this suit fails as a matter of law on multiple grounds. The dealers merely parrot factual and legal claims from the earlier-filed integrator and vendor complaints. In doing so, the dealers not only import the legal defects from those complaints,[1] but they add a new, insuperable obstacle—dealers cannot claim any direct injury, for the anti-competitive pricing they allege occurred in the so-called data integration market, in which dealers neither compete nor purchase services. As the Supreme Court has squarely held, antitrust claims by indirect and remote plaintiffs, like the dealers here, fail as a matter of law. Furthermore, the dealer's state-law claims fail on many independent grounds. The Court should therefore dismiss the Complaint.

---

[1] CDK has separately moved to dismiss the integrator and vendor complaints. *See Motor Vehicle Software Corp. v. GDK Global, Inc.*, No. 18-cv-865; *Cox Automotive, Inc. v. CDK Global, LLC*, No. 18-1058; *Loop LLC v. CDK Global, LLC*, No. 18-cv-2521. CDK's motion to dismiss the vendor complaint in the *Loop LLC* case is being filed concurrently with this brief.

## BACKGROUND

The Complaint alleges the following facts, which CDK takes as true solely for purposes of this motion, except to the extent contradicted by the materials attached to the Complaint, materials critical to the complaint and referred to in it, or materials subject to judicial notice. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

### A.     The Alleged DMS Market

DMS software is used to, among other things, maintain the dealership's alleged "central database," containing data from dealerships, customers, and third parties—including auto manufacturers—relating to certain aspects of a dealer's business. Compl. ¶¶ 3, 61. There are a number of various-sized firms that offer DMSs to new and used automobile, truck, motorcycle, marine, recreational vehicle, and heavy equipment dealers throughout the world. Reynolds and CDK are two of the largest firms serving new vehicle franchised automobile dealers. Allegedly, approximately 45% of such dealerships in the United States use a CDK DMS and approximately 30% use a Reynolds DMS. *Id.* ¶ 2. The Complaint asserts that this supposed "duopoly" enables CDK and Reynolds to "raise prices" in the DMS market to supracompetitive levels. *Id.* ¶ 69.

There are many other competing DMS providers, however, including Cox Automotive, a plaintiff in another action in this MDL, and Auto/Mate Dealership Systems, which the dealers characterize as a "strong competitor." *Id.* ¶ 64 n.10. Both Cox and Automate trumpet their "open" DMS platforms to customers. Cox Automotive, *Dealer Management Systems*, https://www.coxautoinc.com/solutions/dealer-management-systems-dms/ ("Open integration without the costly data fees."); Auto/Mate Dealership Systems, *Open/Mate Integration Program*, https://www.automate.com/dms/openmate ("We have long been an advocate for open standards in the automotive industry") (both websites last accessed July 3, 2018); *see also LaBella*

3

*Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 944 n.3 (7th Cir. 2010) (taking judicial notice of undisputed material posted on website).

**B.      Hostile Integration**

Dealers often contract with third-party vendors, some of which offer software applications that access data housed and organized in the DMS to perform assorted dealership functions. Comp. ¶¶ 5, 73. While many application vendors seek only to obtain or "extract" data, others also need to "push" or "write-back" altered data into the DMS to populate the various proprietary workflows, as when a vendor amends individual customer records. *Id.*

Some vendors wishing to access a DMS contract with independent data "integrators," who—acting as middlemen—access the DMS to transmit data to vendors through the integrator's own software interface. Compl. ¶ 56. Dealers have facilitated data-integrator access to CDK's DMS by either sharing existing login credentials or creating new ones for the integrators. This process violates the terms of the dealers' contracts with CDK, which forbid dealers from giving unauthorized third parties access to the DMS. Dkt. 176 at 35. For this reason, among others, unauthorized access by third-party vendors and integrators is a form of "hostile" access to the DMS.

**C.      CDK's SecurityFirst Initiative and 3PA Program**

Cybersecurity and system performance are essential to the proper functioning of any enterprise system provider. In part to ensure the security and stability of its systems, CDK's contracts with dealers have long expressly prohibited dealers from granting any unauthorized third-party access to the DMS. Dkt. 176 at 35. Beginning in 2015, CDK announced that it was further improving DMS security by enhancing its 3PA program, which relies on a managed data interface for transporting data to and from CDK's DMS. Compl. ¶ 111. CDK made this change as part of its SecurityFirst initiative. *See id.* ¶ 155. Under the refreshed 3PA program and

SecurityFirst, vendors may no longer use hostile third parties to access data on CDK's DMS; instead, vendors must access the data on CDK's DMS through approved means. *Id.* ¶¶ 110-111.

### D.     The Orderly Wind-Down of CDK Subsidiaries' Hostile Access of Reynolds

The dealers concede that Reynolds has blocked unauthorized third-party access to its DMS for years. Compl. ¶ 79. By 2013, Reynolds's blocking activity was substantially disrupting hostile integrators. *See Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019, 1023 (7th Cir. 2017). At the time, ADP (from which CDK spun off in 2014) owned two subsidiaries—Digital Motorworks ("DMI") and IntegraLink—that offered various data integration services, including unauthorized access to Reynolds's systems. Compl. ¶ 76. As it had with other similarly-situated hostile integrators, Reynolds threatened litigation and demanded that DMI and IntegraLink cease their hostile integration, which both eventually did. To that end, and to ensure that vendors using DMI and IntegraLink to service Reynolds dealers were not adversely affected, in February 2015 Reynolds and CDK negotiated a Data Exchange Agreement ("DEA") to voluntarily wind-down DMI and IntegraLink's hostile access of Reynolds's system. *Id.* ¶¶ 83-85; *id.*, Ex. 11.

The parties signed two additional contracts at the same time. First, as consideration for the orderly wind-down of DMI's and IntegraLink's unauthorized access, CDK agreed to provide integration through the 3PA program for several Reynolds applications without charge (and with certain limitations) for up to five years. *Id.* ¶¶ 87-88. This was the "3PA Agreement," *id.*, Ex. 12, which also increased competition in the application market by allowing Reynolds' applications into the 3PA program, thereby giving CDK's dealers access to those applications. Second, consistent with CDK's decision to end its subsidiaries' hostile integration of Reynolds's DMS, a separate "RCI Agreement" enrolled seven of CDK's applications in the RCI program at Reynolds's standard pricing and terms (giving Reynolds dealers access to those applications). *Id.* ¶¶ 87-88; *id.*, Ex. 13.

The Dealers describe the DEA, 3PA Agreement, and RCI Agreement collectively as a "market division agreement." *Id.* ¶ 81. But the three agreements say nothing about Reynolds's ability to hostilely integrate with CDK's DMS, or about CDK's ability to return to hostilely integrating Reynolds's DMS when the agreements expire no later than 2020. Nor do the agreements purport to require either party to "close" their respective DMS from hostile third-party integration or keep them closed. The only restriction on third-party integration appears in § 4.5 of the DEA, and that section merely prohibits CDK and Reynolds from sharing classified information about integrating with the other's DMS *if that information was acquired during the course of the agreement*, or from helping *another party* integrate with the other's DMS.

### E.  Alleged Pass-On Pricing and Effect on the DMS Market

The dealers allege that CDK and Reynolds have reduced competition from hostile third-party integrators in the supposed "data integration services" (or "DIS") market and that fees in this market have increased since CDK stopped hostile integration on its DMS. Compl. ¶ 126.[2] The dealers claim they have paid these price increases "indirectly" because vendors have passed them along. *Id.* ¶ 134.

The Complaint also makes conclusory allegations that CDK and Reynolds have "reduced competition in the DMS market." *Id.* ¶ 146. The dealers do not explain how competition in this market has been reduced, however, or allege that CDK and Reynolds have ceased competing for DMS customers. In fact, CDK and Reynolds continue to compete aggressively in this market.[3]

---

[2] As we explain below in Part II.B.4, CDK disputes that a separate DIS market exists as a matter of law.

[3] *See, e.g.*, Vince Bond Jr., *CDK's 'fantastic win' is now lost* (Nov. 17, 2016), https://bit.ly/2ihyYpW (cited at Compl. ¶ 65 n.11) (reporting that 102-store automotive group decided not to move from Reynolds' to CDK's DMS and quoting statement by CDK's CEO that "[t]here is no easy win and everybody is fighting for that share").

### F.    The Complaint

The Complaint includes fifty counts, raising claims under federal and thirty-six states' laws. These claims can be broken down into three basic categories, however. *First*, the dealers allege violations of federal antitrust laws—specifically, that CDK and Reynolds agreed to limit competition in the alleged DMS and DIS markets (Count I (damages) & Count II (injunctive relief)); entered into contracts with unlawful exclusive dealing provisions (Count III (damages) & Count IV (injunctive relief)); and monopolized the aftermarkets for data integration on their respective DMS platforms (Count V (damages)). *Second*, based on the same purported conspiracy underlying Counts I and II, the Complaint raises claims under twenty-six state antitrust laws (Count VI–Count XXXI). *Third*, again based on the purported conspiracy underlying Counts I and II, the dealers advance claims under nineteen state consumer fraud or unfair or deceptive practices laws (Count XXXII–Count L).

## ARGUMENT

The Federal Arbitration Act ("FAA") ensures that an arbitration clause in a contract involving commerce "shall be valid, irrevocable, and enforceable save upon such grounds as exist in law or in equity for the revocation of any contract." 9 U.S.C. § 2. Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

In determining whether a complaint fails to state a claim under Rule 12(b)(6), a court must assess whether the complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). The Court must accept all "well-pleaded

facts" as true, but need not accept "legal conclusions and conclusory allegations" that merely recite the elements of a claim. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

## I.   The Court Should Order The Reynolds Dealers To Arbitrate And Stay The Remaining Claims.

In its concurrently filed motion (Dkt. 252), Reynolds explains that the Reynolds dealers are required to submit their claims against Reynolds to binding arbitration. CDK adopts this argument by Reynolds in full. CDK writes separately to make the additional point that the Reynolds dealers must arbitrate their claims against CDK as well. Accordingly, the Court should order the Reynolds dealers to arbitrate their claims against both Defendants in this case. In addition, the Court should stay remaining non-arbitrable claims in the interests of efficiency and wise administration of its docket.

### A.   Reynolds Dealers Must Arbitrate Under Principles Of Equitable Estoppel.

The "mere fact" that parties are not "signatories to [an] agreement does not defeat their right to compel arbitration." *Hoffman v. Deloitte & Touche, LLP*, 143 F. Supp. 2d 995, 1004 (N.D. Ill. 2001). Here, Reynolds dealers are bound to arbitrate their claims against CDK under the doctrine of equitable estoppel, by which courts "regularly allow non-signatory entities [like CDK] to enforce an arbitration agreement against a signatory [like the Reynolds dealers]." *Sanchez v. CleanNet USA, Inc.*, 78 F. Supp. 3d 747, 758 (N.D. Ill. 2015) (collecting cases).[4]

From virtually the first paragraph of the Complaint to the last, the dealers purport to allege interdependent and concerted misconduct by Reynolds and CDK. Compl. ¶ 1 (alleging

---

[4] State law ultimately controls whether a non-signatory like CDK can enforce an arbitration agreement. *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 632 (2009). While Reynolds' contract provides for the application of Ohio law, Ohio courts and courts in this District agree that signatories can use equitable estoppel to compel arbitration where a signatory must rely on the terms of the written agreement to assert claims against a non-signatory or (as here) where the signatory alleges substantially interdependent and concerted misconduct by both the non-signatory and one or more signatories. *I Sports v. IMG Worldwide, Inc.*, 813 N.E.2d 4, 8 (Ohio Ct. App. 2004); *Hoffman*, 143 F. Supp. 2d at 1005 (same).

that Defendants "colluded and conspired to restrain and/or eliminate competition" in the DMS and DIS markets), ¶ 720 (alleging that Defendants "knowingly conspir[ed], contract[ed], and/or agree[d]" to restrain trade in the DMS and DIS markets). It is well-settled that a signatory to an arbitration agreement must arbitrate claims against a non-signatory if "the signatory raises allegations of ... substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Hoffman*, 143 F. Supp. 2d at 1005 (citing *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)). Indeed, courts regularly hold that allegations of a conspiracy or joint venture between signatory and non-signatory defendants, including in the antitrust context, are sufficient to equitably estop the signatory plaintiff to arbitrate claims against the non-signatory defendant.[5] That is especially so here, where the alleged conspiracy the dealers are challenging supposedly manifested in Reynolds' and CDK's contracts, including the agreements with vendors and dealers, and where the contract containing the arbitration clause pertains to the alleged markets from which CDK and Reynolds purportedly "leverage[d] their market power." Compl. ¶ 70.[6]

**B.     The Court Should Stay The Remaining Claims Pending Arbitration.**

The Court should stay whatever claims are not subject to arbitration. Specifically, if the Court does not compel the Reynolds dealers to arbitrate their claims against CDK, at a minimum, the Court should stay the Reynolds dealers' claims against CDK pending the outcome of the arbitration. And the Court should stay the CDK dealers' claims as well.

---

[5] *See, e.g., JLM Indus. v. Stolt-Nielsen SA*, 387 F.3d 163, 178 (2d Cir. 2004) (price-fixing conspiracy); *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 851 (D. Md. 2013) (same); *In re Universal Service Fund Tele. Billing Practices,* 300 F. Supp. 2d 1107, 1139-40 (D. Kan. 2003) (same); *Positive Software Sols. Inc. v. New Century Mortg. Corp.*, 259 F. Supp. 2d 531, 540 (N.D. Tex. 2003) (conspiracy to violate IP rights in software).

[6] Certain of CDK's contracts with putative class members contain arbitration provisions that would cover the claims raised in this case. In the event plaintiffs move to certify a class and a class actually is certified, CDK reserves the right to move to compel arbitration as to any such class members.

A stay is warranted because "issues involved" in the instant case "may be determined" in the arbitration. *Allied Van Lines, Inc. v. Orth Van & Storage, Inc.*, 2005 WL 1563111, at *2–3 (N.D. Ill. June 3, 2005); *see also In re Samsung Galaxy Smartphone Mktg. & Sales Practices Litig.*, 298 F. Supp. 3d 1285, 1304 (N.D. Cal. 2018) ("This Court and other courts have stayed all claims in an action even if only some of the claims will be arbitrated."); *ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*, 487 F. Supp. 2d 980, 991-92 (N.D. Ill. 2007) (staying entire case where claims against signatories were "obviously intertwined" with those against non-signatory parties); *Nootens v. Madison Gas & Elec. Co.*, 1998 WL 719611, at *3 (N.D. Ill. Oct. 8, 1998) (staying case where "each count of plaintiffs' federal complaint (save one) involves, or will be clearly influenced by, the pending arbitration"). A stay of non-arbitrable claims would serve important interests of judicial economy and would prevent the litigation of identical claims and issues in multiple forums.

Further, as the Seventh Circuit has held, a party to an arbitration agreement should not be allowed to "get around it" by suing "not only the other party to the agreement but some related party with which it has no arbitration agreement, in the hope that the claim against the other party will be adjudicated first and have preclusive effect in the arbitration." *IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 530 (7th Cir. 1996). In such a case, a court is "require[d] . . . to stay the proceedings before it and let the arbitration go forward unimpeded." *Id*.

## II.      In The Alternative, The Court Should Dismiss The Complaint For Failure To State A Claim.

If the Court determines that any dealer claims are not arbitrable and should not be stayed, the Court should dismiss those claims under Rule 12(b)(6).

### A.    The Dealers Are Not Proper Federal Antitrust Plaintiffs (Counts I-V)

As a threshold matter, the dealers' federal claims must be dismissed because the dealers are not proper plaintiffs under federal antitrust law.

### 1.    The Damages Claims Fail Under *Illinois Brick* (Counts I, III, V).

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), holds that a federal antitrust plaintiff may not seek damages based on alleged supra-competitive prices passed through by a purchaser earlier in the distribution chain. As recently summarized, *Illinois Brick* "forbids a customer of the purchaser who paid a cartel price to sue the cartelist, even if his seller—the direct purchaser from the cartelist—passed on to him some or even all of the cartel's elevated price." *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 821 (7th Cir. 2015); *see also In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at *4 (N.D. Ill. June 29, 2015) ("*DFA II*").[7] This is because when defendants "sell to a third party who . . . could recover for any injury" it suffers as a direct purchaser, there is no need for separate and duplicative suits for "implicit overcharges" claimed further downstream. *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 482 (7th Cir. 2002).

The dealers' federal claims allege a conspiracy to limit competition in the purported market for data integration services on CDK's and Reynolds' respective DMSs. But dealers do not purchase data integration services, which are "programs used to extract data from DMS's [sic] for the benefit of *application Vendors*." Compl. at p. iii (emphasis added). The dealers acknowledge this. Each dealer alleges that it "paid supracompetitive prices for its *indirect purchases* of" data integration services "because the Vendors from which [the Dealer] purchased

---

[7] Although *Illinois Brick* was a price-fixing case under Section 1, its holding applies to tying claims and to claims under Section 2 as well. *E.g.*, *Somers v. Apple, Inc.*, 729 F.3d 953, 961-62 (9th Cir. 2013); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002); *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1157 (5th Cir. 1979).

11

software applications *passed on* Defendants' artificially inflated data integration fees." Compl. ¶¶ 26-50 (emphasis added); *see also id.* ¶ 165(d) (referring to dealers as "[i]ndirect purchasers of DIS"). Indeed, direct-purchaser vendors *already* have filed several suits—including a putative class action—in this MDL. Because only "the direct purchaser from the alleged antitrust violator(s) is the one with the right of action," *Loeb*, 306 F.3d at 481, Counts I, III, and V of the Complaint must be dismissed.

### 2. The Dealers' Effort To Avoid *Illinois Brick* Is Meritless.

The dealers seek to salvage Counts I and III by theorizing, for the first time by any plaintiff in this MDL, that defendants' alleged conspiracy and exclusive dealing also had anti-competitive effects in the *DMS* market. *See, e.g.*, Compl. ¶ 173. This is a transparent effort to plead around the *Illinois Brick* rule by invoking the one market in which *dealers* participate directly. But the Complaint alleges anti-competitive effects in the DMS market only in passing and with conclusory language that comes nowhere close to satisfying federal pleading standards. Indeed, CDK lacks monopoly power in the DMS market, *see* Compl. ¶¶ 65, 150; *Authenticom*, 874 F.3d at 1025, and if CDK tried to raise prices in that market to supracompetitive levels, Reynolds and other competitors would undercut those prices and gain customers at CDK's expense.[8] It is clear that defendants continue to compete fiercely as "everybody is fighting for" a "share" of the market. *See supra* n. 3.

The Complaint resorts to a series of unexplained, conclusory references to diminished competition in the DMS market, none of which survives scrutiny.

---

[8] The Complaint makes a passing reference to an observation at the *Authenticom* preliminary injunction hearing that some DMS prices have "gone up" by unidentified amounts since CDK moved to a "closed" system. Compl. ¶ 151 n.123. But Authenticom's expert did not testify that prices had gone up *because of* CDK's decision to exclude hostile integration, and as explained such a claim would be incompatible with allegations in the Complaint. Plus, "[j]ust because a retailer raises prices doesn't mean competition has been harmed." *42nd Parallel North v. E Street Denim Co.*, 286 F.3d 401, 405 (7th Cir. 2002).

*First*, the dealers claim that the parties' alleged conspiracy deprived the DMS market of a "primary point of differentiation" between CDK and Reynolds because now neither permits hostile integration. *Id*. ¶ 9. But this theory fails for the simple reason that the 2015 Agreements do not prohibit either party from allowing hostile integration at any time. *See Authenticom*, 874 F.3d at 1025 ("[N]othing in the 2015 agreements forbade CDK itself from allowing access to its own data integration system."). In any event, other DMS providers like Cox and Auto/Mate can and do market themselves as allowing hostile integration, *see supra* p. 2, and CDK competes with Reynolds in many other dimensions besides third-party access.

*Second*, the dealers contend that defendants' purported conspiracy has driven "independent data integrators" from the market, limiting the pool of integrators available for "potential competitor DMS suppliers." *Id*. ¶ 9. There is no dispute, however, that hostile integration services remain available for those DMS providers who choose to allow them, and it is not CDK's duty to ensure that the alleged market for these services remains robust. More fundamentally, DMS providers have multiple ways to make their systems accessible to vendors, including using integrators, third-party access systems, or other data transfer methods.

*Finally*, Counts II and IV remove all doubt that the dealers' claims are not based on anti-competitive behavior in the DMS market. Those counts are the equitable counterparts to the damages claims in Counts I and III. But they seek injunctive relief for alleged misconduct *solely* in the alleged data-integration market. *See* Compl. ¶¶ 178, 192, 194, 196, 199. Nowhere in the 700+ paragraph Complaint do the dealers allege that CDK and Reynolds conspired to divide the DMS market or fix prices for DMS systems.

### 3. The Dealers Are Not Proper Plaintiffs For Injunctive Relief (Counts II, IV).

The dealers are no more successful in asserting claims for injunctive relief in Counts II and IV. *Illinois Brick* may not bar these claims, but the dealers lack antitrust standing to pursue them because a plaintiff lacks antitrust standing where, as here, more directly-affected purchasers seek the *same* injunctive relief that the more-remote plaintiff demands.

Antitrust standing "examines the connection between the asserted wrongdoing and the claimed injury to limit the class of potential plaintiffs to those who are in the best position to vindicate the antitrust infraction." *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993). Though they both address proximity to anti-competitive harm, the "direct-purchaser doctrine of *Illinois Brick* and the direct-injury doctrine of *Associated General Contractors* are analytically distinct" and constitute "independent obstacle[s] to recovery." *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris, Inc.*, 196 F.3d 818, 823, 828 (7th Cir. 1999); *see also DFA II*, 2015 WL 3988488, at *6 (same). Indeed, failure to satisfy antitrust standing is reason to dismiss the federal damages claims as well.

In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), the Supreme Court held that regardless of whether an antitrust plaintiff has "constitutional standing," at the pleadings stage a district court "must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Id.* at 535 & n.31. The Court announced six factors to consider in assessing whether an antitrust plaintiff is the proper party to proceed under the antitrust laws: "(1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the

14

speculative nature of the damages; and (6) the risk of duplicate recovery or complex damage apportionment." *DFA II*, 2015 WL 3988488, at *6 (citing *AGC*, 459 U.S. at 537-45).[9]

The dealers fail the *AGC* test. The "broad proposition" of *AGC* is that "a party cannot recover when others more directly injured are better able to state a claim." *Loeb*, 306 F.3d at 490; *see also DFA II*, 2015 WL 3988488, at *6. "An appropriate balance is achieved by granting standing only to those who, as consumers or competitors, suffer *immediate* injuries with respect to their business or property, while excluding persons whose injuries were more indirectly caused by the antitrust conduct." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 598 (7th Cir. 1995) (emphasis added) (citing *In re Indus. Gas Antitrust Litig.*, 681 F.2d 514, 520 (7th Cir. 1982)).

Here, there is no question that "others more directly injured" are better able to state a claim for injunctive relief. *Loeb*, 306 F.3d at 489. As Judge St. Eve previously explained, *vendors*—not dealers—are the "effective and actual purchasers" of alleged data integration services. Dkt. 176 at 42-43 ("[n]o alleged facts plausibly suggest that—despite vendors engaging, paying, and receiving directly integrators' services—dealers are the effective and actual purchasers of those services"). And those vendors—along with data integrators like Authenticom—have already filed suit seeking the same injunctive relief that the dealers seek in Counts II and IV. *See, e.g.*, *Loop, LLC, d/b/a AutoLoop v. CDK Global LLC*, No. 18-cv-2521, Am. Compl. at p. 71-72; *Cox Automotive, Inc. v. CDK Global, LLC*, No. 18-cv-864, Compl. at p. 80; *Authenticom, Inc. v. CDK Global, LLC*, No. 18-cv-878, Compl. at p. 90. Consequently, "the existence of a less remote party to vindicate the public interest is no hypothetical proposition." *In*

---

[9] For injunctive relief, the "speculative nature of the damages" and "risk of duplicate recoveries" factors drop out of the analysis, *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2013 WL 4506000, at *9 (N.D. Ill. Aug. 23, 2013) ("*DFA I*"), but the need to establish antitrust standing remains. *See Cargill, Inc. v. Monfort of Colo., Inc*., 479 U.S. 104, 110-11 (1986) (requiring party seeking injunctive relief to show antitrust standing).

*re Dairty Farmers of Am., Inc. Cheese Antitrust Litig.*, 2013 WL 4506000, at *14 (N.D. Ill. Aug. 23, 2013) ("*DFA I*").[10]

Antitrust standing is even more questionable here for the additional reason that the service at the heart of the alleged conspiracy (data integration) is not a component of the product purchased by dealers (third-party vendor software). *See id.* at *14 n.13. Instead, vendors use such integration services in the course of creating entirely different products: software applications. Compl. ¶ 75. The allegedly anticompetitive market here thus concerns a service—"data integration"—that the dealers do not consume or purchase, even indirectly. Because the dealers do not satisfy *AGC*'s antitrust standing test, their remote and duplicative claims for injunctive relief (Counts II and IV) must be dismissed. *DFA I*, 2013 WL 4506000, at *9-11.

**B.     The Federal Counts Fail To State A Claim (Counts I-V).**

Even if the dealers were proper plaintiffs for seeking relief under federal law for their alleged indirect injuries, Counts I through V fail to state a claim on the merits.

Counts I and II raise Section 1 claims seeking to recover for a purported conspiracy between CDK and Reynolds to "restrain competition in the … DIS markets." Compl. ¶ 171.[11]

---

[10] Besides this Court's *DFA* decisions, there are many examples of courts applying *AGC* or analogous remoteness doctrines to bar claims by indirect purchasers who did not participate in an allegedly restrained market and where a more directly injured purchaser is in a better position to state a claim. *See, e.g.*, *Kochert v. Greater Lafayette Health Servs.*, 463 F.3d 710, 719 (7th Cir. 2006) ("If Anesthesia Associates and GLHS are truly manipulating the anesthesia services market in order to raise prices and drive down quality of care, these effects will not be missed by patient-consumers or insurers."); *Contant v. Bank of America Corp.*, 2018 WL 1353290, at *6 (S.D.N.Y. Mar. 15, 2018) (dismissing claims under *AGC* where there were "more direct victims of the alleged conspiracy to manipulate prices in that market than Plaintiffs in this case"); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 2012 WL 39766, at *9 (N.D. Ill. Jan. 9, 2012) ("the existence of a less remote party to vindicate the public interest is no hypothetical proposition: the direct purchasers are actively pursuing their claims"); *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 924 (N.D. Ill. 2009), *rev'd on other grounds sub nom. Minn-Chem, Inc. v. Agrium Inc.*, 657 F.3d 650 (7th Cir. 2011); *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756 (E.D. Mich. April 9, 2013); *In re Aftermarket Auto. Lighting Prod. Antitrust Litig.*, 2009 WL 9502003, at *6 (C.D. Cal. July 6, 2009); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1136-41 (N.D. Cal. 2008).

Counts III and IV purport to state claims for exclusive dealing in violation of Section 1; these counts are based solely on the requirement in CDK's contracts with its vendors that vendors obtain data from the CDK DMS only through authorized means. *Id*. ¶¶ 181-82, 191-92. Finally, Count V alleges monopolization of the alleged DIS "aftermarket" under Section 2. *Id*. ¶ 201. As we explain below, none of these counts states a viable claim.

### 1. The Horizontal Conspiracy Claims Fail (Counts I-II).

The horizontal conspiracy claims allege that the DEA, 3PA Agreement, and RCI Agreement reached in February 2015 constitute an illegal arrangement. Compl. ¶¶ 81-82, 178. The dealers cast these contracts as a collusive effort to monopolize the data integration markets for defendants' respective DMSs, but they are nothing of the sort. The three agreements merely wind down CDK's hostile access to Reynolds's DMS. They do not divide any market, restrain any competition, or say anything about CDK's or Reynolds's third-party access policies (which either company could change tomorrow). See *Authenticom*, 874 F.3d at 1025 ("nothing in the 2015 agreements forbade CDK itself from allowing access to its own data integration system").

Nor can the dealers state a Section 1 claim based on CDK's and Reynolds's independent decisions—made many years apart—to bar hostile integration. Even if the Complaint alleged that CDK and Reynolds adopted substantially similar third-party access restrictions at the same time (and it does not), Section 1 does not prohibit parallel or follow-the-leader conduct. *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015) ("[C]onscious parallelism[] does not violate section 1 of the Sherman Act."). Firms commonly copy each other, and antitrust law therefore forbids inferring collusion from allegations that firms in the same

---

[11] The dealers assert that the "challenged conduct" was "intended to and did reduce competition in the DMS market" as well (*id*. ¶ 172), but CDK has already explained why this claim fails as a matter of law. *See supra* Section II.A.2.

industry employ similar business strategies, absent evidence that "tends to exclude the possibility" of independent conduct. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). The dealer's conspiracy claims accordingly fail as a matter of law, for they do not allege facts suggesting anything other than permissible, parallel conduct. Rather, the Complaint concedes, explicitly or by omission, that (1) Reynolds's decision to block integrators preceded CDK's by several years (Compl. ¶ 77 n.25 & ¶ 79); (2) Reynolds did not need CDK's assistance or agreement to close its DMS to hostile integration or to keep it closed; (3) CDK likewise did not need Reynolds' assistance or agreement to close the CDK DMS to hostile integration; (4) CDK sought to increase its vendor revenue by closing its system to unauthorized access; and (5) provisions in CDK's dealer agreements prohibiting dealers from sharing login credentials with hostile integrators were not the product of any conspiracy with Reynolds.

In ruling on the motion to dismiss the *Authenticom* complaint, Judge St. Eve held that Authenticom—whose allegations the dealers copy—"raise[d] a reasonable inference of [CDK and Reynolds's] motive to conspire" by alleging that the two firms wanted to close their systems to hostile integration "without fearing that their customers would respond by, for example, turning to another provider." Dkt. 176 at 30. But such a motive is not at all plausible. Reynolds *already* had unilaterally closed its system to hostile integration prior to the supposed conspiracy. And CDK had no rational reason to risk antagonizing customers, not to mention treble-damages liability. in exchange for Reynolds's mere agreement to continue doing what it already had done for many years. Reynolds had prohibited unauthorized third-party access to its system for years preceding the alleged conspiracy, without ever indicating any intent to reconsider its decision. CDK had already allegedly succeeded in "wresting market share away from Reynolds" prior to the supposed agreement. Compl. ¶ 80. Absent a plausible motive to conspire, the Complaint

18

shows, at most, one firm's decision to copy a competitor's long-standing practice where that practice was in the independent interests of each firm.

The dealers also allege that the 2015 Agreements constituted a "market division agreement" that "effectively destroy[ed] any competition in the DIS market" by committing defendants to "no longer access data on each other's DMS." Compl. ¶¶ 11, 89. But the February 2015 agreements do not prohibit hostile access to a counterparty's DMS; they only prohibit sharing certain proprietary information gleaned during the wind-down process. Regardless, Reynolds has aggressively enforced its licensing agreements to prevent unauthorized access to its DMS for many years (*see id.* ¶ 79), and it needed no agreement with CDK to continue doing so. The same goes for CDK, which independently introduced SecurityFirst in 2015 and subsequently began enforcing its own restrictions on unauthorized third-party access. *Id*. ¶ 160. Neither company agreed or needed to agree with the other to enforce its policies.

Nor do the 2015 Agreements amount to a market-division scheme as a logical matter. To the extent that CDK was agreeing that DMI and IntegraLink would permanently stop hostilely accessing Reynolds's DMS (and CDK was not), this would have *helped* other hostile integrators by eliminating two of their competitors. And Reynolds has never provided hostile integration on CDK's (or any other DMS provider's) system, so any agreement on its part would not support a market division theory in any event.

The Complaint also depicts supposed efforts to "implement" the above-mentioned conspiracy, all taken out of context and mischaracterized. Compl. ¶¶ 90-109. This comes as no surprise, for the purported "agreement" these efforts supposedly were undertaken to implement did not exist. Importantly, allegations that contradict or misrepresent the exhibits attached to the



Complaint are not "well-pleaded facts" that the Court must credit on a motion to dismiss. *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013).

Many of the exhibits the dealers cite, for example, simply establish [redacted]. *See, e.g.*, Compl., Ex. 14-19, Ex. 34. Others do not support the proposition for which they are ostensibly offered. [redacted] *Id.* ¶ 97. [redacted]. Meanwhile, other supposedly inculpatory documents cited by the dealers have nothing to do with any purported conspiracy at all. For example, the dealers cite [redacted] *Id.* ¶ 103. [redacted] *Id.*, Ex. 29.

In another attempt to bolster their conspiracy theory, the dealers rely on allegations from *Authenticom* that representatives of CDK and Reynolds openly confessed to a conspiracy to Authenticom's owner. But those self-serving allegations are inconsistent with documents incorporated in the Complaint. For example, the dealers allege that [redacted]

*Id.* ¶ 100. But as shown above, the 3PA and RCI agreements do not "block" Authenticom or any other hostile integrator from anything. Indeed, the agreements do not mention hostile integrators *at all*.[12]

The dealers also allege that, nearly a year after the alleged Schaefer-Cottrell conversation, Dan McCray, a CDK employee, told Cottrell that ███████████████████████████████ *Id.* ¶ 101. But this alleged statement does not tend to exclude independent conduct, as it must to state a claim—CDK *had* made the decision to block unauthorized access, and it needed no agreement to do it. Again, the best evidence of CDK's and Reynolds's agreement is their written contracts.[13]

### 2. The Exclusive Dealing Claims Fail (Counts III-IV).

The dealers argue that CDK violated Section 1 by including "exclusive dealing provisions" in its vendor contracts, requiring vendors to obtain data from the CDK DMS only through the 3PA interface. Compl. ¶¶ 182, 192. Judge St. Eve already found that exclusive

---

[12] In her ruling on the *Authenticom* motion to dismiss, Judge St. Eve concluded that Section 4.5 of the DEA, which prohibits "[k]nowledge [t]ransfer and DMS [a]ccess," lent credence to allegations of a horizontal conspiracy. Dkt. 176 at 11, 26. In fact, however, Section 4.5 "*is not intended as a 'covenant not to compete*,' but rather as a contractual restriction of access and attempted access intended to protect the operational data security integrity of Reynolds DMS and CDK DMS and protection of intellectual property." Compl., Ex. 11, § 4.5 (emphasis added). Transferring the DMI Third Party Customers from CDK to Reynolds required CDK and Reynolds to share sensitive and proprietary technical information. It is perfectly appropriate for both entities to limit the disclosure of that intellectual property.

[13] In *Authenticom*, Judge St. Eve thought this argument "backfire[d]" because it "suggests that [CDK and Reynolds] (or at least their executives) thought that the 2015 Agreements aimed to 'block' third-party integrators." Dkt. 176 at 29. But that analysis—which uses allegations of oral statements to inform the meaning of a written agreement—would upend established contract canons. The ordinary rule is that oral evidence may not supplement a fully integrated, written agreement. *See, e.g.*, 11 Williston on Contracts § 33:1 (4th ed. 2018).

dealing claims based on access terms in the *dealer* contracts were completely implausible. Dkt. 176 at 36. And the dealers' attempt to bring the same claim on behalf of the vendors fails as well.

An exclusive dealing agreement is one where a buyer and seller agree to deal with each other exclusively for a particular good or service, foreclosing a portion of the market to other sellers. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles & Their Application* ¶ 1800a (May 2018) (explaining that exclusive-dealing agreement "forbids the buyer from purchasing the contracted good from any other seller" or "requires the buyer to take all of its needs in the contracted good from that [seller]"). But 3PA is not a competing data integrator; it is a "managed interface" that is *part of* CDK's DMS, allowing vendors to obtain data directly from CDK. *See id.* ¶ 70.

Moreover, the dealers' restrictive-dealing claim is deficient on its face, for the licensing terms the dealers challenge are commonplace throughout the economy and essential to countless companies' cybersecurity practices. Indeed, such terms appear in CDK's dealer contracts, *see* Dkt. 176 at 35, but the dealers raise no antitrust challenge to that practice. If these terms are not anticompetitive in dealer contracts, then the dealers cannot seriously argue that the same restrictions are anticompetitive in vendor contracts.

And in any event, it is fundamental that "even though a contract is found to be an exclusive-dealing arrangement, it does not violate the [antitrust laws] unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (Clayton Act case). There is no suggestion in the complaint that CDK's vendor contracts foreclosed any vendors from a substantial share of any market. To the extent the dealers complain that hostile integrators are "excluded" by the contracts, it is doubtful that the dealers

(twice removed from the so-called data integration market) have standing to make that argument[14]—and even if they did, it would fail because hostile integrators still may deal with DMS providers covering a sizable portion of the market for car dealership DMS services.

### 3. CDK's Conduct Easily Survives The Rule Of Reason.

Even if all of the foregoing were wrong, CDK's conduct would be a basis for antitrust liability only if "valid business reasons" could not explain it. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985)). And as the dealers' allegations make clear, CDK's conduct rested on legitimate business justifications: the need to protect its system and the data on that system from cybersecurity threats, and CDK's desire to capitalize on its investment in the DMS infrastructure instead of letting third parties capture that value for themselves. Compl. ¶ 154.

The Complaint does not deny that cybersecurity is a concern for DMS providers (and for all modern business, for that matter). Nor does it allege that any company permits unfettered access to its systems on users' preferred terms. Rather, the Complaint alleges that unauthorized third-party system access creates no cybersecurity risk and that CDK is using cybersecurity as a pretext. Compl. ¶ 153. But that allegation fails for several reasons.

As an initial matter, the dealers do not plausibly allege that hostile integration poses no cybersecurity risk to CDK's systems. To be sure, they argue that CDK has not presented examples of data breaches involving hostile integrators. Compl. ¶ 162. But that neither

---

[14] For this reason, Judge St. Eve's conclusion that Authenticom stated a claim that the vendor contracts are exclusive deals (Dkt. 176 at 37-38) does not apply here. Judge St. Eve found that the *Authenticom* complaint alleged that Authenticom was foreclosed from a substantial portion of the "data-integration market," because enforcement of the vendor contracts would preclude it from offering its extraction services to most potential buyers. *Id.* at 37. The dealers do not argue that they have been foreclosed from any such market. They do not even participate in the supposed market that is the subject of their claim.

guarantees that one will not occur nor indicates that concern for such risk is invalid. CDK is not required to leave itself defenseless against cyber risks until *after* a breach is identified.

The dealers' other "pretext" arguments are likewise unpersuasive. Citing CDK documents, the dealers contend that ████████████████████████████████████ ██████████████████████████████████████. *Id.* ¶¶ 156-61. ███████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████.[15]

In short, CDK "had the right to [design or] redesign its products to make them more attractive to buyers" through "improved performance," including improved cybersecurity. *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999 (9th Cir. 2010) (quoting *Cal. Comput. Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 744 (9th Cir. 1979)). That principle requires dismissal of the dealers' Section 1 claims.

### 4. The Monopolization Claim Fails (Count V).

The dealers' final federal claim is for monopolization under Section 2 of the Sherman Act, and this claim likewise fails as a matter of law. The dealers allege that CDK has monopolized the alleged "aftermarket" for data integration on its own, brand-specific DMS. Compl. ¶ 201. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or

---

[15] The dealers' selective excerpts also misconstrue the documents on which they rely. For example, ████ Compl. ¶ 160. █████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ *Id.*, Ex. 59 at 7.

maintenance of that power." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Given the Seventh Circuit's recognition that "neither Reynolds nor CDK is a monopolist," *Authenticom*, 874 F.3d at 1025, the dealers' attempt to state a Section 2 claim based on the same facts is doomed to fail.

To prevail on a Section 2 theory, the dealers must demonstrate that CDK has monopoly power in a relevant market. They allege that CDK has monopolized a "single-brand aftermarket" for data integration for dealers using the CDK DMS. Compl. ¶ 60. But this alleged market does not exist as a matter of law. CDK has included terms in its service contracts prohibiting dealers from permitting third-party access to the DMS by disseminating login credentials. *See supra* p. 4. Dealers therefore had the opportunity, when contracting for DMS service, to choose whether to use a DMS that permitted hostile data extraction, and to weigh the potential lifecycle costs of each approach. And as the Seventh Circuit has held, if a seller "informed customers about its policies before they bought," "purchasers could have shopped around" and thus cannot have been unfairly locked in. *Dig. Equip. Corp. v. Uniq Dig. Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996); *see, e.g.*, *DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1346 (Fed. Cir. 2014); *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 819 (6th Cir. 1997).[16]

The fact that prior to 2015 CDK may not have consistently enforced its contractual bars on third-party DMS access does not save the dealers' claim. Even if dealers believed there was a chance that CDK might not enforce the express prohibition on hostile, third-party data extraction, they would have been aware of the provision and the possibility that it *could* be

---

[16] The Dealers' lock-in argument is further undermined by the undisputed facts that dealerships can and do switch DMS providers and CDK's contracts with dealers are only in effect for a limited period of time. Compl. ¶ 15. As the Seventh Circuit recognized, even a defendant with monopoly power in a single-brand aftermarket has very limited ability to extract additional money by raising prices, for "once the new policy was known, consumers could shop with full information." *Dig. Equip. Corp. v. Uniq Dig. Techs., Inc.*, 73 F.3d 756, 762 (7th Cir. 1996). Indeed, the Seventh Circuit expressed doubt that "fooling consumers in this way" was even "an antitrust rather than a deception problem." *Id.*

enforced. "A party is not justified in relying on representations outside of or contrary to the written terms of a contract he or she signs when the signer is aware of the nature of the contract and had a full opportunity to read it." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003).[17]

Judge St. Eve held that Authenticom had alleged that dealers were unable to shop for DMS services by claiming that CDK "prohibits . . . vendors from informing dealers of how much CDK's integration services cost." Dkt. 176 at 48. But the dealers' Complaint alleges that dealers *know* that vendors are passing on integration pricing and that some vendors have informed dealers that they are raising prices in response to higher integration fees. Compl. ¶¶ 135-42. The dealers should not be permitted to claim that dealerships are aware of the pass-through and then offer the wholly inconsistent allegation that dealers are unable to evaluate the price difference between DMSs that permit hostile integration and those that do not. *See, e.g.*, *VIP Sports Mktg., Inc. v. Buzil*, 2004 WL 2608422, at *3 (N.D. Ill. Nov. 16, 2004) (affirming grant of motion to dismiss because plaintiff's "contradictory allegations" negated its claim).

### C.    The Complaint Fails To State A Claim Under State Law (Counts VI-L).

The Complaint raises forty-five counts under the antitrust and consumer protection laws of thirty-six states. Each of these counts fails as a matter of law. The dealers' claims as to twenty-six states fail wholesale because no dealer operates in or otherwise alleges a sufficient connection to those jurisdictions. Meanwhile, fatal defects in the dealers' federal antitrust claims require dismissal of most, if not all, of the state-law antitrust claims, as well as several state-law consumer protection claims. The dealers also lack antitrust standing for their state antitrust

---

[17] For that reason, Judge St. Eve's conclusion that Authenticom plausibly alleged that CDK customers did not know they were agreeing to restrictions on hostile integration (Dkt. 176 at 47-48) was incorrect. Judge St. Eve's opinion did not consider the principle that contracting parties are charged with knowing the terms of their contracts.

claims under *Illinois Brick*, *AGC*, and similar remoteness inquiries that other state courts have adopted for their antitrust laws. And that lack of antitrust standing requires dismissal of the dealers' consumer protection claims as well, for the same principle that defeats antitrust standing also reveals the dealers' failure to plausibly allege that CDK and Reynolds' conduct caused their alleged harms. Finally, many of the state antitrust and consumer protection claims fail on a range of additional, state-specific grounds.

Given the number of state-law claims and numerous bases for dismissing them, CDK attaches as Exhibit A a chart cataloguing the grounds for dismissing each state-law count.

### 1. The Dealers Allege No Operations or Purchases In Twenty-Six States.

The dealers cannot state a claim under the laws of states that are unrelated to any dealer's place of business or commercial operations. Among the counts raised in the Complaint, the dealers seek to advance claims under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Iowa, Maine, Michigan, Nebraska, New Hampshire, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. But no dealer alleges that it has its principal place of business in, or has suffered any alleged injury in, any of those states. Compl. ¶¶ 26-50.[18]

As this Court has recognized, claims "brought under the laws of the states in which no named [plaintiff] purchased goods" must be dismissed for lack of standing. *DFA I*, 2013 WL 4506000, at *7-8 (citing *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 922 (N.D. Ill. 2009); *see also In re Plasma–Derivative Protein Therapies Antitrust Litig.*, 2012 WL 39766, at *6

---

[18] The named dealers in the Complaint are twenty-five car dealerships doing business in eleven states: Illinois, Kansas, Massachusetts, Minnesota, Mississippi, Missouri, New Jersey, New Mexico, New York, Nevada, and South Carolina.

(N.D. Ill. Jan. 9, 2012); *Zaycer v. Sturm Foods, Inc.*, 896 F. Supp. 2d 399, 409 (D. Md. 2012); *Catlin v. Hanser*, 2011 WL 1002736, at *8 (S.D. Ind. Mar. 17, 2011);. Accordingly, Counts VI–X, XII, XIV–XV, XVIII–XIX, XXII–XXIV, XXVI–XXXVIII, XLI, XLIII, XLVI, and XLVIII–L should be dismissed.

### 2. The State Antitrust Claims, And Several Of The Consumer Protection Counts, Fail Because The Federal Antitrust Claims Fail.

The state antitrust claims should be dismissed because these claims rise and fall with their federal counterparts. Several states apply that same principle to their consumer protection claims, which likewise succeed or fail in lockstep with federal antitrust causes of action.

*Antitrust Claims*. All of the state antitrust laws raised in the Complaint are interpreted in a manner consistent with federal law.[19*] For many states, this requirement appears in statutory harmonization language providing that "a state's antitrust laws should be read in harmony with federal antitrust laws." *DFA II*, 2015 WL 3988488, at *3. Elsewhere, courts have so held. *E.g.*, *Lenhoff Enters., Inc. v. United Talent Agency, Inc.*, 2018 WL 1548221, at *2 (9th Cir. Mar. 30, 2018) ("the determination that the alleged conduct is not an unreasonable restraint of trade under the Sherman Act necessarily implies that the conduct is not unlawful under the Cartwright Act"); *Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 555 n.8 (11th Cir. 1998) (federal law "control[ed]" court's "disposition of the plaintiffs' state-law antitrust claims as well as their federal antitrust claims").

Because the dealers plead no plausible violation of federal antitrust law, *see* Section II.B, *supra*, they may not proceed on those same failed claims under state antitrust law, either. Accordingly, the state antitrust claims asserted in Counts VI–XXXI fail in lockstep with the federal claims in Counts I through V.

---

[19] For readability, the citations supporting this proposition appear in an endnote at the end of the brief.

*Consumer Protection Claims*. At least four of the consumer protection claims fail for the same reason. Courts applying Alaska, California, Florida, and South Carolina law have held that consumer protection claims based on the same factual allegations as a failed antitrust claim must likewise be dismissed. Such courts do not permit their consumer protection statutes to "operate as . . . surrogate[s] for antitrust law." *In re Aggrenox Antitrust Litig.*, 2016 WL 4204478, at *9 (D. Conn. Aug. 9, 2016) (applying South Carolina law).[20] Counts XXXII, XXXIV, XXXVII, and XLVII therefore fail.

### 3. The Dealers Are Too Remote To Be State-Law Antitrust Plaintiffs.

As explained above, the dealers' federal claims fail under *Illinois Brick* and *AGC* because the dealers are indirect buyers purchasing in a different market than the purported one that is the focus of the alleged antitrust conspiracy. *See supra* Section II.A. The same principles doom the state-law antitrust claims.

### a. *Illinois Brick* Bars the South Carolina and Illinois Antitrust Claims.

The South Carolina claim is the simplest to eliminate on these grounds, for that state has not repealed *Illinois Brick*—as some states have—and has otherwise long "follow[ed] federal law in antitrust matters." *In re Microsoft Corp. Antitrust Litig.*, 401 F. Supp. 2d 461, 463 (D. Md. 2005) ("South Carolina has long adhered to a policy of following federal precedents in matters

---

[20] **Alaska**—*Alaska Gasline Port Auth. v. ExxonMobil Corp.*, 2006 WL 1718195, at *3 n.24 (D. Alaska June 19, 2006) ("Under Alaska law, a plaintiff who bases a UTPA claim on purported [anti-competitive] conduct is required to demonstrate that it has standing to sue under the antitrust laws."); **California**— *Lenhoff Enters.*, 2018 WL 1548221, at *2; *In re Wellpoint, Inc., Out–of–Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 927–28 (C.D. Cal. 2012) (dismissing California UCL claims because plaintiffs lacked antitrust standing for Sherman Act claims); **Florida**—*In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 819 (N.D. Ill. 2017) ("[F]ederal courts applying Florida law have dismissed [Florida Deceptive Trade Practices Act] claims on the basis of a failure to state a claim under Florida's antitrust statute" in cases that "addressed the substantive elements of the antitrust claim."); *QSGI, Inc. v. IBM Global Fin.*, 2012 WL 1150402, at *4 (S.D. Fla. Mar. 14, 2012) ("When . . . a plaintiff's FDUTPA claim is based on the same allegations as its antitrust claim, failure to establish a violation of the antitrust law is sufficient to conclude that the plaintiff has also failed to state a FDUTPA claim."); **South Carolina**—*In re Aggrenox Antitrust Litig.*, 2016 WL 4204478, at *9 (D. Conn. Aug. 9, 2016).

relating to state trade regulation enforcement.") (quoting *Drs. Steuer & Latham, P.A. v. Nat'l Med. Enters.*, 672 F. Supp. 1489, 1521 (D.S.C. 1987), *aff'd*, 846 F.2d 70 (4th Cir. 1988)); *In re Wiring Device Antitrust Litig.*, 498 F. Supp. 79, 87 (E.D.N.Y. 1980) (recognizing "South Carolina policy that state antitrust laws be interpreted consistently with federal antitrust precedent"); *S.C. Cotton Growers' Co–op. Ass'n v. English*, 133 S.E. 542, 543 (1926) (looking to federal case law to construe South Carolina's antitrust statute). As a result, courts have rejected efforts by indirect purchasers to recover under South Carolina's antitrust law. *See In re Microsoft Corp. Antitrust Litig.*, 401 F. Supp. 2d at 463; *In re Wiring Device Antitrust Litig.*, 498 F. Supp. at 87 (noting that "[f]ailure to apply *Illinois Brick* in this action would create the same problems the Supreme Court sought to avoid when it rendered that decision"). The South Carolina antitrust claim (Count XXV) therefore fails because the dealers are not proper plaintiffs under *Illinois Brick*.

Similarly, the Illinois Antitrust Act provides that only the Illinois Attorney General may bring a class action asserting indirect purchaser claims. *See* 740 Ill. Comp. Stat. 10/7(2). This post-*Illinois Brick* restriction on indirect purchaser class claims requires the dismissal of the Illinois Antitrust Act claim (Count XI). *See In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 723 (N.D. Ill. 2016) (dismissing indirect purchasers' Illinois antitrust claims on this basis).

### b. Thirteen Of The Remaining States Clearly Follow *AGC*.

As with the federal antitrust claims, *see supra* Section II.A.3, *AGC* bars standing under the antitrust laws of another thirteen states. This Court recently analyzed whether to apply the *AGC* factors to state-law antitrust claims in another large MDL. *See DFA II*, 2015 WL 3988488, at *7–16. In that case, the Court considered the relevant antitrust harmonization provisions, *Illinois Brick* repealer laws, and state and federal case law to decide whether *AGC* would apply

to the state-law claims. In particular, the Court concluded that harmonization provisions, without any countervailing statutory or state appellate authority, are "sufficient to permit a district court to apply federal antitrust-standing law—including *AGC*—to claims brought under that state's antitrust laws." *Id.* at *4.

As the Court held in *DFA II*, the highest courts in California, Kansas, Michigan, New York,[21] and North Carolina[22] would apply *AGC* to questions of indirect purchaser antitrust standing. *Id.* at *15. In addition, *AGC* applies to the dealers' antitrust claims under the laws of the District of Columbia, Iowa, Maine, Nebraska, New Mexico, South Dakota, Vermont, and Wisconsin. All of these states, save one, harmonize their law with federal antitrust law, which absent countervailing authority is "sufficient" to apply *AGC*. *Id.* at *4. And courts in all of these states—whether at the trial, appellate, or highest levels—have specifically applied *AGC*.[23]

---

[21] As the Court held in *DFA II*, state courts in California, Kansas, Michigan, and New York apply the *AGC* analysis to evaluate antitrust standing under the laws of those states. *See, e.g.*, *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1151–52 (N.D. Cal. 2009) (citing *Vinci v. Waste Mgmt., Inc.*, 43 Cal. Rptr. 2d 337, 338–39 (Cal. Ct. App. 1995)); *Wrobel v. Avery Dennison Corp.*, 2006 WL 7130617 , at *2–4 (Kan. Dist. Ct. Feb. 1, 2006); *Stark v. Visa U.S.A. Inc.*, 2004 WL 1879003, at *4 (Mich. Cir. Ct. July 23, 2004); *Ho v. Visa USA, Inc.*, 793 N.Y.S.2d 8, 8-9 (App. Div. 2005), *aff'g*, 787 N.Y.S.2d 677 (Sup. Ct. 2004). Likewise, federal courts have applied *AGC* when considering antitrust standing issues under the laws of these same states. *See, e.g.*, *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987–91 (9th Cir. 2000); *Orr v. Beamon*, 77 F. Supp. 2d 1208, 1212 (D. Kan. 1999); *In re Ductile Iron Pipe Fittings Indirect Purchaser Antitrust Litig.*, 2013 WL 5503308, at *15 (D.N.J. Oct. 2, 2013) (applying *AGC* to Michigan antitrust standing); *Sahagian v. Genera Corp.*, 2009 WL 9504039, at *6 (C.D. Cal. July 6, 2009) (applying *AGC* under New York law).

[22] Regarding North Carolina, this Court distinguished the facts of *DFA II* from those of *Teague v. Bayer AG*, 671 S.E.2d 550 (N.C. Ct. App. 2009), where the North Carolina appellate court declined to apply *AGC*. This Court found that *Teague* could not be read as "a wholesale rejection of *AGC*," and noted that *Teague* was not "a mixed-market case where the price-fixed thing is not a component of end-user product and the Indirect Purchaser Plaintiffs are not—at least under the *Teague* standard—indirect purchasers." *DFA II*, 2015 WL 3988488, at *15. Instead, this Court concluded that "the North Carolina Supreme Court would adopt and apply the *AGC* factors, at least in modified form." *Id.* The decision in *Dicesare v. Charlotte-Mecklenburg Hosp. Auth.*, 2017 WL 1359599 (N.C. Super. Ct. Apr. 11, 2017), *cert. denied*, 804 S.E.2d 541 (N.C. Sept. 28, 2017), does not alter this conclusion. *Dicesare* declined to apply a modified form of the *AGC* factors but expressly noted that the North Carolina Supreme Court "has not spoken on the . . . issue" (*id.* at *12) and in any event is an unpublished, non-precedential decision.

[23] *See* D.C. CODE § 28-4515; IOWA CODE ANN. § 553.2; *Davric Maine Corp. v. Rancourt*, 216 F.3d 143, 149 (1st Cir. 2000) (The First Circuit has "noted that the 'Maine antitrust statutes parallel the Sherman

Many of the *AGC* decisions in these states arose in the course of consumer litigation against Visa and Mastercard, who allegedly required merchants using their credit cards to accept their debit cards as well, a purported tying arrangement that allowed the defendants to charge merchants higher debit-card-processing fees.[24] *See Nass-Romero*, 279 P.3d at 775-76. The consumer plaintiffs could not allege that they had purchased any service or product directly from the credit card companies. Rather, these plaintiffs claimed they were injured because merchants passed the inflated service fees through to them in the form of higher retail prices. *See id.*

But time and again, courts applied *AGC* to deny the plaintiffs standing. Courts recognized that the alleged misconduct affected the market for Visa and Mastercard's "debit processing service," *id.* at 778 (citing *Kanne v. Visa USA Inc.*, 723 N.W.2d 293, 298 (Neb. 2006); *Southard v. Visa USA Inc.*, 734 N.W.2d 192, 199 (Iowa 2007)), and that the retail consumer was "neither a consumer nor a competitor in [that] market"—these plaintiffs did "not appear in that chain of distribution" and therefore could not "be identified as a consumer of the service provided by Visa and MasterCard." *Id.* Courts thus concluded that the plaintiffs' alleged harms were "too remote to be compensable" (*Southard*, 734 N.W.2d at 199) because plaintiffs were not "directly

---

Act,' and thus [has] analyzed claims thereunder according to the doctrines developed in relation to federal law."); NEB. REV. STAT. § 59-829; N.M. STAT. ANN. § 57–1–15; S.D. CODIFIED LAWS § 37-1-22; *Ashley Furniture Indus., Inc. v. Packaging Corp. of Am.*, 275 F. Supp. 3d 957, 968–69 (W.D. Wis. 2017) (noting that "Wisconsin courts traditionally look to federal law to interpret substantive violations of the Wisconsin antitrust statutes"). Vermont's harmonization provision tracks the Federal Trade Commission Act rather than the Sherman Act, s*ee* Vt. Stat. Ann. tit. 9, § 2453(b), but Vermont courts apply *AGC*'s analysis nonetheless. *See Fucile v. Visa U.S.A. Inc.*, 2004 WL 3030037, at *2-4 (Vt. Super. Ct. Dec. 27, 2004).

[24] *See Peterson v. Visa U.S.A. Inc.*, 2005 WL 1403761, at *4-6 (D.C. Super. Ct. Apr. 22, 2005); *Southard v. Visa U.S.A. Inc.*, 734 N.W.2d 192, 198–200 (Iowa 2007); *Knowles v. Visa U.S.A., Inc.*, 2004 WL 2475284, at *5–9 (Me. Super. Ct. Oct. 20, 2004); *Tackit v. Visa U.S.A., Inc.*, 2004 WL 2475281, at *2–3 (Neb. Dist. Ct. Oct. 19, 2004); *Nass-Romero v. Visa U.S.A. Inc.*, 279 P.3d 772, 778–81 (N.M. Ct. App. 2012); *Cornelison v. Visa U.S.A., Inc.*, No. CIV 03–1350 (S.D. Cir. Ct. 2004) (hearing transcript attached as Exhibit B in accordance with the Court's rules for motion practice); *Fucile v. Visa U.S.A., Inc.*, 2004 WL 3030037, at *2–5 (Vt. Super. Ct. Dec. 27, 2004); *Strang v. Visa U.S.A., Inc.*, 2005 WL 1403769, at *3–5 (Wis. Cir. Ct. Feb. 8, 2005); *see also Stark v. Visa U.S.A. Inc.*, 2004 WL 1879003, at *4 (Mich. Cir. Ct. July 23, 2004); *Ho*, 793 N.Y.S.2d at 8.

harmed by the actions of Visa and MasterCard" or even "indirectly harmed through the chain of distribution of the debit card services." *Nass-Romero*, 279 P.3d at 778-79.[25] And there was "indisputably a more immediate class of potential plaintiffs"—the merchants that *were* participants in the relevant market and had already settled their antitrust claims. *Knowles*, 2004 WL 2475284, at *6. Indeed, the very existence of that more immediate plaintiff group increased the risks of duplicative recovery and complex damages apportionment. *See Nass-Romero*, 279 P.3d at 779–80; *Knowles*, 2004 WL 2475284, at *6.

The dealers' antitrust claims are analogous to the consumers' failed claims in the Visa/Mastercard litigation and must be dismissed for the same reason. As in those cases, the allegedly anticompetitive market here is for a service—"data integration"—that the dealers do not consume or purchase. (Again, dealers are free to give or sell their own *data* to whomever they wish. Their claim is that CDK and Reynolds bar vendors from using a particular *service*— hostile third-party access to each defendant's DMS.) Application vendors pay for that service, just as retailers paid Visa and Mastercard's debt-servicing fees, while the dealers operate outside the service's "chain of distribution." The dealers, like the failed consumer plaintiffs in Visa/Mastercard, contend merely that they have "indirectly" "paid for" the allegedly inflated service fees that vendors paid directly. *See* Compl. ¶ 134. Also like the failed consumer plaintiffs in Visa/Mastercard, more immediate potential vendor plaintiffs exist and have already filed suit.

---

[25] *See Peterson*, 2005 WL 1403761, at *5–6 (consumer's claims were "remote and speculative" where he was a "non-purchaser" of the debit card services); *Nass-Romero*, 279 P.3d at 779 ("Plaintiff's injury is better characterized as remote or derivative."); *Tackit*, 2004 WL 2475281, at *3 (plaintiff was not an "indirect purchaser" under Nebraska's *Illinois Brick* repealer statute); *Strang*, 2005 WL 1403769, at *5 (alleged injuries were "derivative, remote, and highly speculative"); *Cornelison*, No. CIV 03–1350, Hr'g Tr. at 54:11–13 (Sept. 28, 2004) ("The Court finds that the Plaintiffs lack standing as they are not alleging injury as consumers in the relevant market."). The *Knowles* court disregarded any "remoteness" inquiry based on its reading of Maine's *Illinois Brick* repealer statute, but nonetheless found that the alleged damages and causal chain were speculative and that the existence of a more immediate class of plaintiffs and concerns over duplicative recovery and complex apportionment all supported dismissal under *AGC*. *See Knowles*, 2004 WL 2475284, at *6–7.

*See Loop, LLC, d/b/a AutoLoop v. CDK Global, LLC*, Case No. 18-cv-2521 (N.D. Ill.); *Cox Automotive, Inc. v. CDK Global, Inc.*, 18-cv-864. Accordingly, under AGC, the dealers' injuries are simply "too remote to be compensable" under state antitrust laws. *Southard*, 734 N.W.2d at 199; *see also id.* ("Clearly, the injuries alleged by the plaintiffs are not even indirect, as the plaintiffs are not in the chain of distribution. Their injuries are better described as derivative.").

Because the dealers lack standing under *AGC*, the state antitrust claims in Counts VIII–IX, XII–XV, XIV, XVIII, XX, XXI, XXII, XXVI, XXIX, and XXXI should be dismissed.

### c. The Remaining States Presumptively Apply *AGC* Or Similar Remoteness Principles Barring The Dealers' Claims.

A handful of the Complaint's state antitrust claims are from states where there is no state court authority expressly adopting *AGC*. Applying *AGC* as to many of those states is nonetheless appropriate based on harmonization provisions and case law, as well as federal case law applying *AGC* to those states' laws.[26] Regardless, even to the extent any state antitrust claims would not be subject to *AGC* specifically, all of these states still require plaintiffs to plead and prove sufficient causation. And the dealers cannot plausibly plead causation for the same reasons their claims fail under *AGC*—they allege only indirect harm and make their purchases in a different market than the one affected by the supposed anti-competitive conduct. *See DFA II*, 2015 WL 3988488, at *17 ("[T]he directness inquiry in antitrust-standing law is predicated on the well-

---

[26] **Alabama**—*Vandenberg v. Aramark Educational Servs., Inc.*, 81 So.3d 326, 335 (Ala. 2011) (recognizing "long-standing caselaw applying federal antitrust principles to state-law antitrust claims"); **Arizona**—ARIZ. REV. STAT. ANN. § 44-1412; *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *10 (E.D. Mich. Apr. 9, 2013); **Hawaii**—HAW. REV. STAT. § 480-3 (Hawaii's antitrust law "shall be construed in accordance with judicial interpretations of similar federal antitrust statutes"); **Mississippi**—*Supreme Auto Transp. LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032, 1039 & n. 5 (N.D. Ill. 2017); **New Hampshire**—N.H. REV. STAT. ANN. § 356:14; *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *10; **Oregon**—OR. REV. STAT. ANN. § 646.715(2): **Rhode Island**—R.I. GEN. LAWS ANN. § 6-36-2(b); **Tennessee**—*Supreme Auto Transp. LLC*, 238 F. Supp. 3d at 1039; **Utah**—UTAH CODE ANN. § 76–10–3118; *Supreme Auto Transp. LLC*, 238 F. Supp. 3d at 1039; **West Virginia**—W. VA. CODE § 47–18–16; *Supreme Auto Transp. LLC*, 238 F. Supp. 3d at 1039.

known concept of proximate causation."); *see also id.* ("In the absence of direct guidance from Congress, and faced with the claim that a particular injury is too remote from the alleged violation to warrant § 4 standing, the courts are thus forced to resort to an analysis no less elusive than that employed traditionally by courts at common law with respect to the matter of 'proximate cause.'" (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 477 (1982)).

Thus, courts in many of the remaining states have expressly recognized concrete limits akin to *AGC* under their antitrust laws, even if these states have not applied *AGC*'s structured approach to antitrust standing explicitly. For example, in a Visa/Mastercard case, an Arizona court rejected the consumers' claims because these plaintiffs were not even indirect purchasers of defendants' services. *See Consiglio–Tseffos v. Visa U.S.A. Inc.*, 2004 WL 3030043, at *1 (Ariz. Super. Ct., Dec. 8, 2004) ("The injury suffered by Plaintiffs is not that of an indirect purchaser of the services sold by Defendants."). Likewise, although the Minnesota Supreme Court has declined to apply *AGC*, it has recognized that remote and speculative injuries will not support antitrust standing. *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 632 (Minn. 2007) (*AGC* factors do not apply, but an earlier Visa/Mastercard case "does provide an example of an injury that is most likely too remote and speculative to afford standing"); *see also DFA II*, 2015 WL 3988488, at *15 (determining that although Minnesota Supreme Court rejected *AGC*, it still "recognizes prudential limits to antitrust standing such that it would likely find Indirect Plaintiffs' injuries too remote and speculative to award standing"). Other courts embrace analogous remoteness limits in antitrust and related settings.[27]

---

[27] *See Aikens v. Debow*, 541 S.E.2d 576, 582 (W.V. 2000) (in tort context, noting that *AGC* "reasoned that the doctrine of remoteness is a component of proximate cause, which in turn embraces the concept that the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing" (quotations omitted)); *Cty. of Cook v. Philip Morris, Inc.*, 817 N.E.2d 1039, 1045 1047–48 (Ill. App. Ct. 2004) (citing *AGC* and concluding that "given the derivative nature of the injuries alleged," plaintiffs' state-law antitrust and other claims were "correctly dismissed on the basis of the remoteness doctrine");

Based on these remoteness principles, the antitrust claims in Counts VI, VII, X, XI, XVI, XVII, XIX, XXIII, XXIV, XXV, XXVII, XXVIII, and XXX should be dismissed.

### 4. Standing And Remoteness Principles Doom The Consumer Protection Claims As Well.

The Complaint's consumer protection claims suffer from the same *Illinois Brick*/*AGC* defects that the federal and state antitrust claims do. *See supra* Sections II.2, III.B.3. At least four states expressly follow the *Illinois Brick* rule for consumer protection claims, allowing only direct purchasers to pursue claims under those statutes.[28]

Moreover, the dealers cannot seek to avoid the *Illinois Brick* bar under state antitrust law merely by casting the claim as one under a state consumer protection statute. "State legislatures

---

*Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So.2d 331, 339, 343 (Miss. 2004) (en banc) (citing *AGC* and finding plaintiffs' fraud claims failed "based on remoteness of injury"); *Steamfitters Local Union No. 614 v. Philip Morris, Inc.*, 2000 WL 1390171, at *1 (Tenn. Ct. App. Sept. 26, 2000) (finding "the plaintiffs' alleged injuries are too remote, as a matter of law, to permit recovery" and that their antitrust and other claims therefore failed); *Am. Fed'n of Teachers-Oregon, AFT, AFL-CIO v. Or. Taxpayers United PAC*, 145 P.3d 1111, 1135 (Or. Ct. App. 2006) (finding plaintiffs' state-law RICO claims failed partly because of "the remoteness of defendants' [] violations to plaintiffs' injuries"); *State v. Lead Indus. Ass'n, Inc.*, 2001 WL 345830, at *14 (R.I. Super. Ct. Apr. 2, 2001) (state's alleged injuries were "inescapably contingent on direct or speculative harm to [consumers] and accordingly [were] too derivative, remote, or contingent to support a cognizable tort claim"); *cf. Cortellesso v. Zanni*, 1997 WL 839911, at *7–8 (R.I. Super. Ct. Apr. 29, 1997) (in RICO context, acknowledging connection between proximate causation and remoteness); *Donovan v. Digital Equip. Corp.*, 883 F. Supp. 775, 783–85 (D.N.H. 1994) (applying *AGC* to find lack of federal antitrust standing partly because "plaintiff's injury is neither causally related to, nor the direct result of, the defendant's alleged market restraint," and applying federal antitrust standing requirements to state antitrust claim as well). We are unaware of any decisions discussing these principles under Alabama, Hawaii, South Carolina, or Utah law, but we have no reason to believe these states would reach a contrary conclusion, especially as those states harmonize their law with federal antitrust law.

[28] *See* **New Jersey**—*Sickles v. Cabot Corp.*, 877 A.2d 267, 277 (N.J. Super. Ct. App. Div. 2005) ("[T]o permit an indirect purchaser, such as plaintiff, to recast his antitrust claim as a consumer fraud violation would undermine the standing requirements of the [New Jersey Antitrust Act] and would essentially permit an end run around the policies allowing only direct purchasers to recover under the Antitrust Act." (quotations omitted)); **Massachusetts**—*In re Aggrenox Antitrust Litig.*, 2016 WL 4204478, at *8-9 (D. Conn. Aug. 9, 2016) (*Illinois Brick* applies to claims under Section 11 of Massachusetts Consumer Protection Act); **South Carolina**—*Id.* (*Illinois Brick* applies to claims under South Carolina Unfair Trade Practices Act); **Florida**—*DFA II*, 2015 WL 3988488, at *19 ("The contours of Florida's antitrust laws would be rendered moot were the Court to allow Indirect Plaintiffs to repackage their dead-on-arrival antitrust claims as FDUTPA claims," in part because Florida still follows *Illinois Brick*).

and courts that adopted the *Illinois Brick* rule against indirect purchaser antitrust suits did not intend to allow an end run around the policies allowing only direct purchasers to recover." *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1380 (S.D. Fla. 2001) (quotations omitted). Accordingly, the dealers' consumer protection claims under the laws of four additional states must be dismissed.[29]

The dealers' inability to satisfy *AGC*, and the related remoteness of their alleged injuries from the conduct they challenge, also means they cannot satisfy the causation requirements of any of their consumer protection claims. This Court has previously recognized that "the directness inquiry in antitrust-standing law is predicated on the well-known concept of proximate causation." *DFA II*, 2015 WL 3988488, at *17. As in *DFA II*, "the same causation issue that plague[s]" the dealers' state-law antitrust claims here "also provides grounds for dismissal for [their] state-law consumer-protection claims." *Id.* at *20; *see also*, *e.g.*, *Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192, 1203 (9th Cir. 2001) ("the breadth of [Cal. Bus. Code] § 17200 does not give a plaintiff license to 'plead around' the absolute bars to relief contained in other possible causes of action by recasting those causes of action as ones for unfair competition" (quoting *Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 541 (Cal. 1999)). Indeed, given that the dealers' claims are remote and in a different market, they cannot state a claim under any

---

[29] **Alaska**— *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1163 (N.D. Cal. 2015) (dismissing Alaska consumer protection claim in light of "the clear intent of the Alaska antitrust statute reserving to the Alaska Attorney General the ability to seek damages on behalf of indirect purchasers" and the absence of any persuasive contrary authority); *see also In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1108 (N.D. Cal. 2007) (declining to read Alaska consumer protection statute to permit indirect purchaser standing, and dismissing claim accordingly); **Arkansas**—*See In re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1069-70 (S.D. Cal. 2017) (finding only state attorney general may bring indirect purchaser claims under Arkansas antitrust law); **Colorado**—*See Pomerantz v. Microsoft Corp.*, 50 P.3d 929, 933 (Colo. App. 2002) (finding that indirect purchasers lack standing under Colorado antitrust law); **Delaware**—*See Maddock v. Greenville Retirement Cmty., L.P.*, 1997 WL 89094, at *6 (Del. Ch. Feb. 26, 1997) (Delaware antitrust statute provides no private right of action, instead granting only the state attorney general "the right to bring remedial actions").

of the consumer protection laws on which they rely; causation is essential to each of those

claims.[30] Accordingly, the consumer protection claims in Counts XXXII–L should be dismissed.

_____

[30] **Alaska**—*S. Peninsula Hosp. v. Xerox State Healthcare LLC*, 223 F. Supp. 3d 929, 941 (D. Alaska 2016) (whether "an act or practice is unfair" depends in part on "whether it causes substantial injury to consumers (or competitors or other businessmen)") (quoting *ASRC Energy Servs. Power & Commc'ns, LLC v. Golden Valley Elec. Ass'n, Inc.*, 267 P.3d 1151, 1159 (Alaska 2011)); **Arkansas**—*Forever Green Athletic Fields, Inc. v. Lasiter Constr., Inc.*, 384 S.W.3d 540, 552 (Ark. Ct. App. 2011) (to state claim, "there must be a causal connection between the violation of the [Act] and the injury"); *see also DFA II*, 2015 WL 3988488, at *17 ("[i]n light of the importance of causation under Arkansas law, Indirect Plaintiffs' remoteness problems in the antitrust context also preclude their rebranded antitrust claims brought under the Arkansas Deceptive Trade Practices Act"); **California**—*DFA II*, 2015 WL 3988488, at *17 ("The causation element makes its way into the UCL through the standing requirement, whereby '[a] private person * * * has standing to assert a UCL claim only if he or she (1) "has suffered injury in fact," and (2) "has lost money or property as a result of the unfair competition."' The second prong of the standing test 'imposes a causation requirement.'" (citation omitted)); **Colorado**—*Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998) (en banc) (to state a claim, plaintiff must show "that the challenged practice caused the plaintiff's injury"); **Delaware**—*Teamsters Local 237 Welfare Fund v. AstraZeneca Pharm. LP*, 136 A.3d 688, 693 (Del. 2016) (required elements include that "a causal relationship exists between the defendant's unlawful conduct and the plaintiff's ascertainable loss"); **Florida**—*Soper v. Tire Kingdom, Inc.*, 124 So.3d 804, 806 (Fla. 2013) (causation is required element of damages claim); *2P Commercial Agency S.R.O. v. SRT USA, Inc.*, 2013 WL 246650, at *4 (M.D. Fla. Jan. 23, 2013) (causation "must be direct, rather than remote or speculative"); **Georgia**—*Jenkins v. BAC Home Loan Servicing, LP*, 822 F. Supp. 2d 1369, 1375 (M.D. Ga. 2011) (causation is required element, and courts "have implied a reliance component into the causation element of the prima facie case under" the statute (citing *Zeeman v. Black*, 273 S.E.2d 910, 916 (Ga. Ct. App. 1980))); **Massachusetts**—*Walsh v. TelTech Sys., Inc.*, 821 F.3d 155, 160 (1st Cir. 2016) ("The Massachusetts Supreme Judicial Court ('SJC') has held that 'causation is a required element of a successful [Chapter] 93A claim.'" (quoting *Aspinall v. Philip Morris Cos., Inc.*, 813 N.E.2d 476, 491 (Mass. 2004))); **Minnesota**—*Nelson v. Am. Family Mut. Ins. Co.*, 262 F. Supp. 3d 835, 862 (D. Minn. 2017) ("When a plaintiff seeks monetary damages, it must demonstrate a causal nexus between the improper conduct and the monetary losses alleged." (quotations omitted)); **Nebraska**—*WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1042 (8th Cir. 2011) (plaintiff must show it "'was *injured* in its business or property *by* [defendant]'s unfair method of competition or deceptive trade practice'"(emphases added)); **Nevada**—*Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009) (private claim for damages requires "a victim of consumer fraud to prove that (1) an act of consumer fraud by the defendant (2) *caused* (3) damage to the plaintiff" (emphasis added)); **New Hampshire**—*Mulligan v. Choice Mortg. Corp. USA*, 1998 WL 544431, at *11 (D.N.H. Aug. 11, 1998) (a plaintiff must "establish a causal link between the conduct at issue and his or her injury" to state a claim)); **New Jersey**—*Gonzalez v. Wilshire Credit Corp.*, 25 A.3d 1103, 1115 (N.J. 2011) (elements of claim include showing of "a causal relationship between the unlawful conduct and the ascertainable loss")); **New Mexico**—*Mulford v. Altria Grp., Inc.*, 242 F.R.D. 615, 622 (D.N.M. 2007) (plaintiff "must prove that she suffered a loss of money or property *as a result* of the deceptive conduct" (emphasis added)); **North Dakota**—*Murrin v. Fischer*, 2008 WL 540857, at *18 (D. Minn. Feb. 25, 2008) ("causation is a necessary element in a damages claim under the misrepresentation in sales statutes"); *see also A & R Fugleberg Farms, Inc. v. Triangle Ag, LLC*, 2010 WL 1418870, at *6 (D.N.D. Apr. 7, 2010) (plaintiffs must allege "that they were *aggrieved by* a person 'who has acquired any moneys or property by means of any practice declared to be unlawful' under the Act" (emphasis added)); **South Carolina**—*Holt v. ARES Sec. Corp.*, 2018 WL 2461992, at *1 (D.S.C. June 1, 2018) (elements of claim

**5. Many State Antitrust And Consumer Protection Claims Fail For Additional Reasons.**

Additional bases for dismissal apply to many of the state-law claims.

*Lack of territorial conduct/effect.* Several laws invoked by the dealers require a territorial connection separate and apart from the requirement (discussed in Section II.C.1 *supra*) that there be significant in-state conduct or injury. For instance, the Delaware Consumer Fraud Act, *see* 6 Del. § 2512, requires "relevant conduct" to occur in Delaware. *Qbex Computadoras S.A. v. Intel Corp.*, 2017 WL 5525939, at *7 (N.D. Cal. Nov. 17, 2017) (applying Delaware law); *see also Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 117 (Del. 2006). Likewise, for a plaintiff to proceed under Massachusetts' consumer protection statute, the "actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice" must have "occurred *primarily* and *substantially*" in Massachusetts. Mass. Gen. Laws Ch. 93A, § 11 (emphasis added). In the same way, courts read North Carolina's Unfair Trade Practices Act to reach only conduct causing a "'substantial' in-state injury," not "merely an 'incidental'" one. *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *18–19 (E.D. Mich. Apr. 9, 2013) (citing *The "In" Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494, 502 (M.D.N.C. 1987); *Merck & Co., Inc. v. Lyon*, 941 F. Supp. 1443, 1463 (M.D.N.C. 1996)). And the Wisconsin high court holds that the state's antitrust law only reaches interstate commerce if the plaintiff alleges "actionable conduct" occurring within the state, or if

---

include "actual, ascertainable damages as a result of the defendant's use of the unlawful trade practice"); **South Dakota**—*Nw. Pub. Serv., a Div. of Nw. Corp. v. Union Carbide Corp.*, 236 F. Supp. 2d 966, 973–74 (D.S.D. 2002) (requiring "proof of an intentional misrepresentation or concealment of a fact . . . that *caused* an injury to plaintiff" (emphasis added)); **West Virginia**—*Midwestern Midget Football Club Inc. v. Riddell, Inc.*, 2016 WL 3406129, at *4 (S.D. W.Va. June 17, 2016) (plaintiff must allege "proof of a causal connection between the alleged unlawful conduct and the consumer's ascertainable loss" (quoting *White v. Wyeth*, 705 S.E.2d 828, 837 (W.Va. 2010)); **Wisconsin**—*Loeb v. Champion Petfoods USA Inc.*, 2018 WL 2745254, at *6 (E.D. Wis. June 7, 2018) (plaintiff must allege that "the representation materially induced (caused) a pecuniary loss to the plaintiff'" (quoting *Novell v. Migliaccio*, 749 N.W.2d 544, 553 (Wis. 2008)).

the alleged conduct "substantially affects the people of Wisconsin and has impacts in" that state. *Olstad v. Microsoft Corp.*, 700 N.W.2d 139, 158 (Wis. 2005) (quotations omitted). Finally, while no dealer alleges *any* connection to New Hampshire, its consumer protection act applies only to "the conduct of any trade or commerce within" that state. *See* N.H. Rev. Stat. Ann. § 358–A:2; *see Precourt v. Fairbank Reconstruction Corp.*, 856 F. Supp. 2d 327, 343 (D.N.H. 2012) ("determinative question" is whether plaintiff alleged any conduct by defendant "within New Hampshire").

The dealers fail to plausibly allege relevant conduct by defendants within these—or any—particular states. This is yet another reason to dismiss Counts XXII, XXXI, XXXVI, XXXIX, and XLIII.

***Intrastate conduct.*** The Complaint does not state a claim under the Alabama or Tennessee statutes for the additional reason that these statutes are limited to purely or at least predominantly intrastate conduct, but the Complaint alleges anticompetitive acts "nationwide." Compl. ¶ 12; *see Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 429 (E.D. Pa. 2010) (Alabama antitrust law does not apply where alleged anticompetitive behavior "involve[d] interstate, and *not purely intrastate*, conduct" (emphasis added)); *see also Abbott Labs. v. Durrett*, 746 So.2d 316, 339 (Ala. 1999) (Alabama antitrust laws "regulate monopolistic activities that occur 'within this state'—within the geographic boundaries of [the] state."); *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1378 (S.D. Fla. 2001) (dismissing Tennessee antitrust claim where alleged conspiracy was "not predominantly intrastate in nature," noting that courts have "repeatedly dismissed" such claims based on "conspiracies implemented across state lines even where there

are concrete allegations regarding the defendants' conduct in Tennessee"). Counts VI and XXVII should be dismissed on this ground.

*Intangible Services.* The dealers' claim under Tennessee's antitrust law fails because that statute does not apply to services. *See Bennett v. Visa U.S.A. Inc.*, 198 S.W.3d 747, 751–53 (Tenn. Ct. App. 2006) (Visa customers' claims are not actionable under Tennessee Trade Practices Act because that statute "applies only to tangible goods, not intangible services"). The dealers allege anticompetitive conduct in the data-integration market, a services industry to which Tennessee antitrust law does not apply. Count XXVII therefore should be dismissed.

*Alleged Antitrust Conduct Not Covered.* Arkansas and West Virginia's consumer protection statutes do not apply to "traditional antitrust conduct," as alleged here. *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1118 (N.D. Cal. 2007). Counts XXXIII and XLIX should be dismissed on this basis.

*Notice Requirements Unsatisfied.* The claims under the statutes of Alaska, Georgia, Hawaii, and New Jersey, as well as the West Virginia consumer protection claim, all fail because those statutes carry notice requirements—as to either the defendants or the state attorney general—that the dealers here do not allege they satisfy. *See* Alaska Stat. § 45.50.535(b)(1); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 183 (D. Me. 2004) (dismissing Georgia claim for failure to satisfy pre-suit demand requirement in Ga. Code Ann. § 10-1-399(b)); *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 232–33 (M.D. Pa. 2010) (dismissing Hawaii claim for failure to satisfy attorney general service requirement in Haw. Rev. Stat. § 480–13.3(a)(1)); W. Va. Code § 46A-6-106(c). Counts X, XXXII, XXXVIII, XLIV, and XLIX must therefore be dismissed.[31]

---

[31] In *In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, at *6 (N.D. Ill. 2009), the court declined to dismiss a consumer protection claim under the Hawaii statute for failure to satisfy the notice

*Insufficient Tie to Consumers.* The Arkansas and Georgia consumer protection claims fail because the dealers cannot plead a sufficient connection to consumers or consumer-related conduct. To state a claim under the Arkansas Deceptive Trade Practices Act, Ark. Code. Ann. § 4-88-101 *et seq.*, a plaintiff must plead a "consumer-oriented act." *Apprentice Info. Sys., Inc. v. DataScout, LLC*, 544 S.W.3d 536, 539 (Ark. 2018) (quotations omitted). Earlier this year, the Arkansas Supreme Court held that there was no such act where the parties "were competitors in the market of selling counties' public data" and where the plaintiff "sued over its thwarted business model, not a specific harm to consumers." *Id.* at 539–40. Likewise here, the dealers allege harm only to their business models, not to consumers. Similarly, the Georgia Fair Business Practices Act makes unlawful "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" but limits the definition of "consumer" to "a natural person" and "consumer transactions" to those that are "primarily for personal, family, or household purposes." Ga. Code Ann. §§ 10–1–393(a), 10-1-392(6), (10). Georgia courts "have often held that contractual business relationships, such as those between manufacturers and suppliers or distributors and retailers, are not subject to" the Georgia statute. *See Saulsberry v. Morinda, Inc.*, 2008 WL 416933, at *3 (N.D. Ga. Feb. 13, 2008). Counts XXXIII and XXXVIII fail on this basis.

*No "Unfairness" Claim.* The Arkansas consumer protection claim fails because the dealers have not alleged the type of extreme conduct covered by that statute. The Arkansas Deceptive Trade Practices Act prohibits "'unconscionable, false, or deceptive' business practices without reference to 'unfair' business practices." *See DFA II*, 2015 WL 3988488, at *35 (citing

---

requirement. But the court cited no case law to support this position, and substantial authority supports dismissal on this basis. *See In re Chocolate Confectionary*, 749 F. Supp. 2d at 232–33 (citing *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d at 1158); *In re Asacol Antitrust Litig.*, 2016 WL 4083333, at *14-15 (D. Mass. July 20, 2016)).

Ark. Code Ann. § 4–88–107(a)(10)). As a result, stating a claim under this statute requires allegations of fraudulent or unconscionable acts. *Id.* The dealers fail to allege any conduct by defendants that "affront[s] the sense of justice, decency, or reasonableness" as required under Arkansas law. *See id.* Count XXXIII should be dismissed on this ground.

*Grossly Unequal Bargaining Power Not Alleged.* The New Mexico consumer protection statute similarly requires plaintiffs to plead a level of "grossly unequal bargaining power" that the dealers have not alleged here. *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1029–30 (N.D. Cal. 2007). Count XLV fails on this basis.

*Class Actions Not Authorized.* The dealers are precluded from pursuing a class action under the consumer protection statutes of Alaska, Arkansas, Georgia, and South Carolina. *See, e.g.*, *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 417 (D. Del. 2007) (dismissing Alaska and Georgia consumer protection claims based on class action bans); Ark. Code Ann. § 4-88-113(f)(1)(B); S.C. Code Ann. § 39-5-140(a); *In re Auto. Parts Antitrust Litig.*, 2014 WL 3687035, at *2-3 (E.D. Mich. July 23, 2014) (dismissing South Carolina claim). Counts XXXII, XXXIII, XXXVIII, and XLVII should thus be dismissed.

*No Damages Claim.* Any attempt by the dealers to recover damages under California's Unfair Competition Law fails, as a "UCL action is equitable in nature" and therefore "damages cannot be recovered." *See In re Tobacco II Cases*, 207 P.3d 20, 29 (Cal. 2009). Similarly, the Colorado Consumer Protection Act prohibits the recovery of class action damages, and a federal court recently concluded that this bar applies in federal suits as well as state court actions. *See Davidson v. Apple, Inc.*, 2018 WL 2325426, at *11 (D. Colo. May 8, 2018); Colo. Rev. Stat. § 6–1–113(2). This ground provides additional support for dismissal of Counts VIII, XXXIV, and XXXV to the extent the dealers seek damages on these claims.

*Failure To Allege Specific Violation.* Many of the asserted state consumer protection statutes embrace multiple varieties of conduct or include long lists of specific violations, but the dealers make no attempt to identify which aspects of those statutes CDK and Reynolds have allegedly violated. That failure warrants dismissal of their Nevada Deceptive Trade Practices Act claim. Courts have recognized that such a claim should be dismissed where a plaintiff fails to identify "which kinds of violations are alleged" under the statute. *In re Zappos.com, Inc.*, 2013 WL 4830497, at *6 (D. Nev. Sept. 9, 2013). Count XLII should therefore be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should compel arbitration and stay the remaining claims. In the alternative, all of the claims in the Complaint should be dismissed.

---

* **Alabama**—*Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 555 n.8 (11th Cir. 1998); *see also Star Discount Pharmacy, Inc. v. MedImpact Healthcare Sys., Inc.*, 2014 WL 4470720, at *7 (N.D. Ala. Sept. 10, 2014)); **Arizona**—*Tee Time Arrangers, Inc. v. Vistoso Gold Partners, LLC*, 2008 WL 4149295, at *5 (Ariz. Ct. App. Feb. 28, 2008) ("Because much of the case law in the antitrust arena has been developed in the federal courts," Arizona courts "may rely on opinions from those courts" when evaluating state antitrust claims.); *see also* Ariz. Rev. Stat. Ann. § 44–1412; **California**—*Lenhoff Enters., Inc. v. United Talent Agency, Inc.*, 2018 WL 1548221, at *2 (9th Cir Mar. 30, 2018); the **District of Columbia**—*Atl. Coast Airlines Holdings, Inc. v. Mesa Air Grp., Inc.*, 295 F. Supp. 2d 75, 87 (D.D.C. 2003) (D.C. Code § 28-4502 "parallels § 1 of the Sherman Act"); *Peterson*, 2005 WL 1403761, at *2 (D.C. Antitrust Act "allows 'a court of competent jurisdiction . . . [to] use as a guide interpretations given by federal courts to comparable antitrust statutes.'") (quoting D.C. Code § 28-4515); **Hawaii**—*Int'l Healthcare Mgmt. v. Haw. Coalition for Health*, 332 F.3d 600, 609 (9th Cir. 2003) ("[Plaintiff's] state antitrust claims fail for the same reasons as their federal claims because Hawaii antitrust statutes are interpreted 'in accordance with judicial interpretations of similar federal antitrust statutes.'"); Haw. Rev. Stat. § 480-3; **Illinois**—*Gutnayer v. Cendant Corp.*, 116 Fed. App'x 758, 761 (7th Cir. 2004) ("The Illinois Antitrust Act is modeled on the Sherman Act, and Illinois courts interpret the state antitrust act in accordance with federal law."); 740 Ill. Comp. Stat. 10/11; **Iowa**—*Mueller v. Wellmark, Inc.*, 861 N.W.2d 563, 567 (Iowa 2015) ("when interpreting the Iowa Competition Law, we have generally adhered to federal interpretations of federal antitrust law"); **Kansas**—Kan. Stat. § 50-163(b); **Maine**—*Davric Maine Corp. v. Rancourt*, 216 F.3d 143, 149 (1st Cir. 2000); **Michigan**—*Little Caesar Enters., Inc. v. Smith*, 895 F. Supp. 884, 898 (E.D. Mich. 1995) ("Michigan antitrust law is identical to federal law and follows the federal precedents."); **Minnesota**—*State v. Alpine Air Prods.*, 490 N.W.2d 888, 894 (Minn. App. Ct. 1992), *aff'd* 500 N.W.2d 788 (Minn. 1993) ("Minnesota antitrust law is to be interpreted consistently with the federal courts' construction of federal antitrust law."); **Mississippi**—*Futurevision Cable Sys., Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 780 (D. Miss. 1992) (state-law claims "must be dismissed" where federal antitrust claims failed) (citing *Walker v. U-Haul of Miss.*, 734 F.2d 1068, 1070

---

n.5 (5th Cir. 1984) (treating Mississippi and federal antitrust claims as "analytically identical")), *aff'd*, 986 F.2d 1418 (5th Cir. 1993); **Nebraska**—Neb. Rev. Stat. § 59-829; **New Hampshire**—*Minuteman, LLC v. Microsoft Corp.*, 795 A.2d 833, 836 (N.H. 2002) (state legislature "expressly encouraged a uniform construction with federal antitrust law") (citing N.H. Rev. Stat. Ann. § 356.14); **New Mexico**—*Romero v. Philip Morris Inc.*, 242 P.3d 280, 291 (N.M. 2010) (citing harmonization provision and explaining that "[i]t is therefore the duty of the courts to ensure that New Mexico antitrust law does not deviate substantially from federal interpretations of antitrust law."); **New York**—*Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007) (court "generally construe[s] the Donnelly Act in light of federal antitrust case law" and it will "interpret our statute differently" only "where State policy, differences in the statutory language or the legislative history justify such a result" (quotations omitted)); **North Carolina**— *Crain v. Debartolo*, 2015 WL 73961, at *8 n.3 (E.D.N.C. Jan. 6, 2015) ("Federal case law interpretations of the federal antitrust laws are persuasive authority in construing [North Carolina] antitrust statutes." (quoting *Hyde v. Abbott Labs., Inc.*, 473 S.E.2d 680, 684 (N.C. 1996)); **Oregon**—*Or. Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 n.4 (9th Cir. 1999) ("Oregon antitrust statutes are almost identical to the federal antitrust statutes" and "Oregon courts look to federal antitrust decisions for 'persuasive' guidance in interpreting the state antitrust laws"); **Rhode Island**—*ERI Max Entertainment, Inc. v. Streisand*, 690 A.2d 1351, 1353 n.1 (R.I. 1997) ("federal cases interpreting parallel federal provisions are appropriately consulted in interpreting state antitrust laws"); R.I. Gen. Laws § 6–36–2(b)); **South Carolina**—*Welchlin v. Tenet Healthcare Corp.*, 366 F. Supp. 2d 338, 342 n.5 (D.S.C. 2005) ("the court's finding with respect to liability on Plaintiff's federal antitrust claims will be dispositive of the state-law antitrust claim."); *Drs. Steuer & Latham, P.A. v. Nat'l Med. Enters. Inc.*, 672 F. Supp. 1489, 1521 (D.S.C. 1987) ("South Carolina has long adhered to a policy of following federal precedents in matters relating to state trade regulation enforcement" (quotations omitted)); **South Dakota**—*Byre v. City of Chamberlain*, 362 N.W.2d 69, 74 (S.D. 1985) ("[B]ecause of the similarity of language between the federal and state antitrust statutes and because of the legislative suggestion for interpretation found in SDCL 37–1–22, great weight should be given to the federal cases interpreting the federal statute."); *see also In re South Dakota Microsoft Antitrust Litig.*, 707 N.W.2d 85, 99 (S.D. 2005) (quoting same); **Tennessee**—*Spahr v. Leegin Creative Leather Prods., Inc.*, 2008 WL 3914461, at *14 (E.D. Tenn. Aug. 20, 2008) (plaintiffs "asserted no good reason why the Tennessee courts would not follow" U.S. Supreme Court's antitrust precedent); **Utah**—*Evans v. State*, 963 P.2d 177, 180–82 (Utah 1998) (applying federal and state antitrust precedent interchangeably); Utah Code Ann. § 76-10-3118; **West Virginia**—*Kessel v. Monongalia Cnty. Gen. Hosp. Co.*, 648 S.E.2d 366, 379–81 (W. Va. 2007) (finding W. Va. Code § 47–18–3(b) "comparable to Section 1 of the Sherman Act" and seeing "no reason to depart from federal precedent" when analyzing state antitrust claims); W. Va. Code § 47-18-16; **Wisconsin**—*Ashley Furniture Indus., Inc. v. Packaging Corp. of Am.*, 275 F. Supp. 3d 957, 968–69 (W.D. Wis. 2017); **Vermont**—Vermont's statute includes a harmonization provision referencing the Federal Trade Commission Act rather than federal antitrust law generally. *See* Vt. Stat. Ann. tit. 9, § 2453(b). However, we are aware of no authority that would support sustaining a Vermont antitrust claim that fails on substantive grounds under federal law.

Dated: July 18, 2018     Respectfully submitted,

          /s/ *Britt M. Miller*
          Britt M. Miller
          Michael A. Scodro
          Matthew D. Provance
          Mayer Brown LLP
          71 South Wacker Drive
          Chicago, IL 60606
          (312) 782-0600
          bmiller@mayerbrown.com
          mprovance@mayerbrown.com

          Mark W. Ryan
          Mayer Brown LLP
          1999 K Street NW
          Washington, DC 20006
          (202) 263-3000
          mryan@mayerbrown.com

          *Counsel for Defendant CDK Global, LLC*

## CERTIFICATE OF SERVICE

I, Britt M. Miller, an attorney, hereby certify that on July 18, 2018, I caused a true and correct copy of the foregoing **DEFENDANT CDK GLOBAL, LLC'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND STAY CLAIMS OR, IN THE ALTERNATIVE, TO DISMISS THE DEALERSHIP CONSOLIDATED CLASS ACTION COMPLAINT**, to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/ Britt M. Miller*
Britt M. Miller
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
Phone: (312) 782-0600
Fax: (312) 701-7711
Email: bmiller@mayerbrown.com