**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817 Case No. 18 C 864 |
| This Document Relates to: *Authenticom, Inc. v. CDK Global, LLC, et al.,* Case No. 1:18-cv-00868 (N.D. Ill.) | Hon. Robert M. Dow, Jr. **PUBLIC-REDACTED** |

**AUTHENTICOM, INC.'S MEMORANDUM IN SUPPORT OF ITS
MOTION TO DISMISS THE COUNTERCLAIMS OF CDK GLOBAL, LLC**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ II

INTRODUCTION ................................................................................................... 1

BACKGROUND ...................................................................................................... 1

LEGAL STANDARD ................................................................................................ 4

ARGUMENT ........................................................................................................... 5

    I.   CDK FAILS TO PLEAD PLAUSIBLY THAT AUTHENTICOM IS NOT THE DEALERS' AUTHORIZED "AGENT" ............................................................. 5

        A.  CDK's DMS Contracts Unambiguously Authorized Access by "Agents" ................. 5

        B.  CDK's Counterclaims Fail To Plausibly Allege That Authenticom Was Not Acting As The Dealerships' Agent .................................................................. 6

        C.  CDK's Allegation That It Recently Changed the MSA Does Not Salvage Its Claims ............................................................................................................. 10

    II.  ALL OF CDK'S COUNTERCLAIMS FAIL TO STATE A CLAIM ............................ 11

        A.  CFAA and Parallel Wisconsin and California Laws (Counts 1, 4, 6) ...................... 11

        B.  DMCA (Count 2) ........................................................................................... 12

        C.  Defend Trade Secrets Act / Misappropriation of Trade Secrets (Counts 3, 5) .......... 15

        D.  Tortious Interference With the MSA (Count 8) .................................................... 17

        E.  Trespass To Chattels (Count 9) ........................................................................ 17

        F.  Conversion (Count 10) ................................................................................... 18

        G.  Unjust Enrichment (Count 11) ........................................................................ 19

        H.  Fraud (Count 12) .......................................................................................... 21

        I.  California Unfair Competition Law (Count 7) .................................................... 23

CONCLUSION ........................................................................................................ 23

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alliance Acceptance Co. v. Yale Ins. Agency, Inc.*, 648 N.E.2d 971 (1995) ................................ 19

*Am. Tel. & Tel. Co. v. Winback & Conserve Prog., Inc.*, 42 F.3d 1421 (3d Cir. 1994) ................ 9

*Amphenol Corp. v. Paul*, 993 F. Supp. 2d 100 (D. Conn. 2014) ................................................. 11

*Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817 (N.D. Ill. 2016) ............................ 6

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................... 4

*Assessment Techs. of Wis., LLC v. WIREdata, Inc.*, 350 F.3d 640 (7th Cir.2003) ...................... 13

*Authenticom, Inc. v. CDK Global, LLC*, 2017 WL 3017048 (W.D. Wis. July 14, 2017) .... 3, 7, 12

*Automation By Design, Inc. v. Raybestos Prods. Co.*, 463 F.3d 749 (7th Cir. 2006) ................. 6, 8

*Avenarius v. Eaton Corp.*, 898 F. Supp. 2d 729 (D. Del. 2012) ................................................. 20

*Bay Fasteners & Components, Inc. v. Factory Direct Logistics, LLC*, 2018 WL 1394033
  (N.D. Ill. Mar. 20, 2018) .......................................................................................................... 15

*Bruner v. Heritage Cos*, 593 N.W.2d 814 (Wis. Ct. App. 1999) ................................................ 18

*Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527 (Cal. 1999) ............. 23

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178 (Fed. Cir. 2004) .................. 12, 13

*Chatterplug, Inc. v. Digital Intent, LLC*, 2016 WL 6395409 (N.D. Ill. Oct. 28, 2016) ............... 16

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805
  (N.D. Ill. June 1, 2013) ......................................................................................................... 4, 5

*Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263 (7th Cir. 1992) .............. 16

*ConFold Pac., Inc. v. Polaris Indus., Inc.*, 433 F.3d 952 (7th Cir. 2006) .................................. 15

*Cummings ex rel. Techmeier v. Briggs & Stratton Ret. Plan*, 797 F.2d 383 (7th Cir. 1986) ....... 21

*Dairy Farmers of Am., Inc. Cheese Antitrust Litig., In re*, 2015 WL 3988488
  (N.D. Ill. June 29, 2015) .................................................................................................... 19, 20

*DIRECTV, Inc. v. Massey*, 2004 WL 1194744 (N.D. Ill. May 27, 2004) ..................................... 18

*Everett Labs., Inc. v. River's Edge Pharm., LLC*, 2010 WL 1424017
(D.N.J. Apr. 8, 2010) ................................................................................ 20

*Giacomazzi v. Urban Search Corp.*, 407 N.E.2d 621 (Ill. App. Ct. 1980) ................................... 21

*Haynish v. Bank of Am., N.A.*, 284 F. Supp. 3d 1037 (N.D. Cal. 2018) ........................................ 23

*Hernandez ex rel. Gonzalez v. Tapia*, 2010 WL 5232942 (N.D. Ill. Dec. 15, 2010) ............ 6, 9-10

*Hunt v. Enzo Biochem, Inc.*, 530 F. Supp. 2d 580 (S.D.N.Y. 2008) ............................................. 22

*I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.*, 307 F. Supp. 2d 521
(S.D.N.Y. 2004) ......................................................................................... 14

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009) ......................................................... 23

*Kuryakyn Holdings, LLC v. Ciro, LLC*, 242 F. Supp. 3d 789 (W.D. Wis. 2017) ......................... 15

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004) ............... 15

*Mack v. Plaza Dewitt Ltd. P'ship*, 484 N.E.2d 900 (Ill. App. Ct. 1985) ..................................... 21

*Mann v. Vogel*, 707 F.3d 872 (7th Cir. 2013) ................................................................................ 4

*McWane, Inc. v. Crow Chicago Indus., Inc.*, 224 F.3d 582 (7th Cir. 2000) .............................. 5, 9

*Midwestern Helicopter, LLC v. Coolbaugh*, 839 N.W.2d 167 (Wis. Ct. App. 2013) .................. 18

*Nat'l Am. Ins. Co. v. Ind. Lumbermens Mut. Ins. Co.*, 221 F.3d 1339 (7th Cir. 2000) ........... 20, 21

*Navistar, Inc. v. New Balt. Garage, Inc.*, 2012 WL 4338816
(N.D. Ill. Sept. 20, 2012) ...................................................................... 13, 14

*Océ N. Am., Inc. v. MCS Servs., Inc.*, 748 F. Supp. 2d 481 (D. Md. 2010) ................................. 11

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436
(7th Cir. 2011) ......................................................................................... 19

*Priority Int'l Animal Concepts, Inc. v. Bryk*, 2012 WL 1995113 (E.D. Wis. June 1, 2012) ...... 5, 8

*Refrigerant Compressors Antitrust Litig., In re*, 2013 WL 1431756
(E.D. Mich. Apr. 9, 2013) ........................................................................ 20

*Romero v. West Bend Mut. Ins. Co.*, 885 N.W.2d 591 (Wis. Ct. App. 2016) ............................... 9

*Rubloff Dev. Grp., Inc. v. SuperValu, Inc.*, 863 F. Supp. 2d 732 (N.D. Ill. 2012) ...................... 23

*SCS Healthcare Mktg., LLC v Allergan USA, Inc.*, 2012 WL 6565713 (N.J. Super. Ch.
Dec. 7, 2012) ........................................................................................... 18

iii

*Song v. PIL, L.L.C.*, 640 F. Supp. 2d 1011 (N.D. Ill. 2009) .......................................................... 21

*Thermal Zone Prods. Corp. v. Echo Eng'g, Ltd.*, 1993 WL 358148
   (N.D. Ill. Sept. 14, 1993) ................................................................................................. 16, 17

*Ticketmaster L.L.C. v. Prestige Entm't, Inc.*, 306 F. Supp. 3d 1164 (C.D. Cal. 2018) .......... 12, 14

*Ticketmaster L.L.C. v. RMG Techs., Inc.,* 507 F. Supp. 2d 1096 (C.D. Cal. 2007)..................... 14

*Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824 (7th Cir. 2007)...... 21

*United States v. Springer*, 609 F.3d 885 (6th Cir. 2010) ................................................................ 6

*Universal Forest Prod. E. Div., Inc. v. Morris Forest Prod., LLC*, 558 F. Supp. 2d 893
   (E.D. Wis. 2008)..................................................................................................................... 21

*Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521 (N.D. Ill. 2008)............................................. 19

*Wis. Tel. Co. v. Reynolds*, 87 N.W.2d 285 (Wis. 1958).............................................................. 17

## STATUTES

17 U.S.C.:

  § 1201(a)(2) ......................................................................................................................... 12

  § 1201(a)(3)(A)............................................................................................................... 12, 13

  § 1201(b)(1) ........................................................................................................................ 13

  § 1201(b)(2)(A) .................................................................................................................. 13

  § 1201(f)(2) .................................................................................................................... 14, 15

18 U.S.C.:

  § 1030(a)(2)(C) .................................................................................................................. 11

  § 1030(c)............................................................................................................................. 12

  § 1839(3) ............................................................................................................................ 16

  § 1839(5) ............................................................................................................................ 15

  § 1839(6)............................................................................................................................. 15

Cal. Penal Code § 502 ................................................................................................................ 11

iv

Wis. Stat.:

   § 134.90(1) ........................................................................................................ 16, 17

   § 134.90(2) ............................................................................................................. 15

   § 943.70(2) ............................................................................................................. 11

## OTHER AUTHORITIES

Black's Law Dictionary (8th ed. 2004) ......................................................................... 6

Dan B. Dobbs, *Law of Remedies* (1993) ..................................................................... 21

Restatement (Second) of Torts (1965) ................................................................... 18, 19

Restatement (Third) of Agency (2006) ........................................................................ 6

Webster's Third New Int'l Dict. (1981) ....................................................................... 6

**INTRODUCTION**

CDK Global, LLC ("CDK") claims that Authenticom, Inc. ("Authenticom") has violated a variety of federal and state laws by gaining unauthorized access to CDK's Dealer Management System, or "DMS." CDK's claims suffer from a fatal flaw: CDK's standard DMS contract expressly authorized dealers and their agents to access a dealer's DMS, and CDK fails to plausibly allege that Authenticom was not acting as the dealers' agent when it accessed CDK's DMS on the dealers' behalf. Several of CDK's counterclaims also suffer from additional flaws that independently warrant dismissal. CDK's counterclaims should thus be dismissed in their entirety.

**BACKGROUND**

1.     In the course of operating its business, a car dealership generates numerous pieces of data – such as inventory, parts, customer, and repair information – and stores that information on a DMS. *See* Counterclaim Compl. ¶¶ 22, 26, Dkt. 229. Like many companies in the smartphone era, dealerships also rely on third-party software applications for their day-to-day operations. To create those applications, software companies (known as "vendors") need access to the dealer data stored on the dealer's DMS. And because car dealers and software vendors do not specialize in pulling data from the DMS, there is a separate market for "data integration services," in which "data integrators" extract dealers' data from the DMS, put it in a standardized format, and deliver it to vendors. *See generally* Memorandum Opinion and Order at 5-8, *Authenticom, Inc. v. CDK Global, LLC et al.*, No. 18 C 864 (N.D. Ill.) (May 14, 2018), Dkt. 176 ("*Authenticom* MTD Op."). CDK and Authenticom are competitors in the market for data integration services. *See id.*; Counterclaim Compl. ¶ 27 (describing CDK's 3PA data integration service).

2.     For many years, CDK touted that dealerships were free to permit third parties, including independent providers of data integration services, to access the CDK DMS on the dealer's behalf. High-ranking CDK representatives, "at least before 2015," long made "clear that

dealers can permit third-party access to their DMS-stored data." *Authenticom* MTD Op. at 7-8, Dkt. 176. "To take just one example," as Judge St. Eve explained in her Memorandum Opinion and Order on Defendants' motion to dismiss Authenticom's complaint, "Matt Parsons, CDK's vice president of sales, stated in 2007, 'We're not going to limit the ability of a dealer to give an ID to someone else to, in essence, dial into their system. That is the dealer's right. We have no right to tell them they can't do that.'" *Id.* at 8. As admitted in CDK's Answer to Authenticom's complaint, CDK made many other public statements affirming the dealers' right to designate agent access. *See*, *e.g.*, CDK Answer ¶ 69, Dkt. 229 (CDK CEO: "We're not going to prohibit that or get in the way of that. I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it, when in fact it's really the data belonging to the dealer. As long as they grant permission, how would you ever go against that wish?"); *see also id.* ¶¶ 65-66, 68, 70.

Consistent with its long-standing, publicly-stated commitment to dealer-controlled access, CDK's standard DMS contract, known as the "Master Services Agreement," or "MSA," has for more than a decade authorized dealerships to permit designated "employees and agents" to access the DMS on the dealers' behalf. *See* Counterclaim Compl. ¶ 75; August 2008 MSA, § 8(C) (*Authenticom* Dkt. 106-6) (Ex. A); July 2010 MSA, § 6(D) (*Authenticom* Dkt. 106-7); July 2011 MSA, § 6(D) (*Authenticom* Dkt. 106-8) (Ex. B); September 2014 MSA, § 6(D) (*Authenticom* Dkt. 106-9) (Ex. C); and July 2015 MSA, § 6(D) (*Authenticom* Dkt. 106-10) (Ex. D).

Specifically, § 6(D) of the CDK DMS contract states:



Ex. D. (emphasis added).

During the *Authenticom* preliminary injunction proceedings before Chief Judge James D. Peterson in the Western District of Wisconsin, CDK represented to the court that "[w]hile the MSA has been revised and updated over the years, its terms have stayed largely the same," including the provision quoted above which remained "virtually unchanged." *See* CDK and The Reynolds and Reynolds Company's Combined Statement of Facts ¶ 50 (June 16, 2017), *Authenticom* Dkt. 87.

Other provisions of CDK's standard DMS contract likewise provide that dealerships have a limited right to provide access to the DMS by third parties, including to "employees and agents" as expressly permitted in § 6(D) of the MSA. *See* Counterclaim Compl. ¶ 71 (describing MSA § 4(D), which provides that "Client shall not allow access to [the CDK DMS] by any third parties *except as otherwise permitted by this agreement*," and § 4(B), which prohibits dealerships from permitting "ANY THIRD PARTY SOFTWARE TO ACCESS THE [CDK DMS] EXCEPT AS OTHERWISE PERMITTED BY THIS AGREEMENT") (emphasis added)).

3.    When Authenticom accesses the CDK DMS to obtain dealer data, it does so only with the dealers' express authorization and on the dealers' behalf. *See Authenticom, Inc. v. CDK Global, LLC*, 2017 WL 3017048, at *2, slip op. at 3 (W.D. Wis. July 14, 2017) ("With the dealer's consent, Authenticom accesses the dealer's data on its DMS.").[1]  CDK's counterclaims contain no allegation to the contrary.  In fact, CDK's counterclaims repeatedly acknowledge that Authenticom

███████████████████████████████████████████████████████████

████████████████  Counterclaim Compl. ¶ 44 (emphases added); *see also id.* ¶ 63.  CDK does not allege – nor could it – that Authenticom obtains dealers' login credentials without the dealers'

---

[1] For the Court's convenience, attached hereto as Exhibit E is Chief Judge James D. Peterson's Slip Opinion, Dkt. 172.

permission.  On the contrary:  Authenticom "acquir[es] login credentials from CDK dealers," *id.* ¶ 41, and subsequently accesses the DMS "with the consent or 'authorization' of dealers" in order to provide the dealers' data to software vendors of the dealers' choosing, *id.* ¶ 42.  In short, as the counterclaims recognize, Authenticom accesses the CDK DMS only at the direction and with the express authorization of dealers.

4.      On June 29, 2018, after Judge St. Eve denied in large part CDK's motion to dismiss Authenticom's complaint, *see* Dkt. 176, CDK answered Authenticom's complaint and filed a variety of counterclaims.  The counterclaims do not dispute that dealers authorize Authenticom to access the CDK DMS on their behalf.  Rather, the gravamen of all of the claims is that Authenticom was not authorized to access the CDK DMS, even when designated by dealers as their agent.  *See* Counterclaim Compl. ¶¶ 7-8 (alleging that dealers lack the authority to grant Authenticom or any other third parties any rights to access the DMS).

## LEGAL STANDARD

To survive a Rule 12(b)(6) challenge, CDK's Counterclaim Complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Authenticom* MTD Op. at 3 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 3-4 (quoting *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013)).  In considering a motion to dismiss, this Court may consider not only the allegations in the counterclaims but also "documents that are critical to the complaint and referred to in it."  *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *10 (N.D. Ill. Feb. 13, 2013).

**ARGUMENT**

I.    **CDK FAILS TO PLEAD PLAUSIBLY THAT AUTHENTICOM IS NOT THE DEALERS' AUTHORIZED "AGENT"**

A.    **CDK's DMS Contracts Unambiguously Authorized Access by "Agents"**

CDK's counterclaims should be dismissed because they fail to plausibly allege that Authenticom lacked authorization to access CDK's DMS, a necessary factual predicate for all of CDK's claims.  As set forth above, CDK's standard DMS contract with dealers expressly provides that dealers may permit "employees *and agents*" to access the DMS on the dealers' behalf.  *See supra* pp. 2-3; Ex. D, § 6(D).[2]  That provision's meaning is plain:  Authenticom was authorized to access the CDK DMS as long as it was acting as the dealers' agent.  Indeed, until 2015, CDK made repeated public declarations that dealers were authorized to allow access by third-party agents.  *See*, *e.g.*, *supra* pp. 1-2 ("*That is the dealer's right.  We have no right to tell them they can't do that.*").  As Judge Peterson observed during the Authenticom preliminary injunction proceedings, "It does seem that CDK allows the dealer to designate agents."  Prelim. Inj. Hr'g Tr., *Authenticom* Dkt. 166, at 100:5-6.

Because CDK's DMS contract is unambiguous, the Court "may determine its meaning as a matter of law" on a Rule 12(b)(6) motion to dismiss, and "[t]he unambiguous contract controls over contrary allegations in the plaintiff's complaint."  *McWane, Inc. v. Crow Chicago Indus., Inc.*, 224 F.3d 582, 584 (7th Cir. 2000); *see also Priority Int'l Animal Concepts, Inc. v. Bryk*, 2012 WL 1995113, at *5 (E.D. Wis. June 1, 2012) ("Agency status is a question of law" and the "assertion of a legal conclusion—that [the defendant] was not [an] agent—is not entitled to an

---

[2]  Because CDK referenced and quoted from its DMS contract in the Counterclaim Complaint, *see* Counterclaim Compl. ¶¶ 71-73, 75, this Court can consider that contract in deciding Authenticom's Rule 12(b)(6) motion.  *See City of Sterling Heights Gen. Emps.' Ret. Sys.*, 2013 WL 566805, at *10.

assumption of truth.").  Indeed, when construing a contractual provision indistinguishable from § 6(D) of CDK's MSA, this Court held that "[t]he phrase 'agents and employees' is not ambiguous" and hence applied "the plain meaning of these terms" on a motion to dismiss.  *Hernandez ex rel. Gonzalez v. Tapia*, 2010 WL 5232942, at *7 (N.D. Ill. Dec. 15, 2010) (disregarding contrary allegations, which are "immaterial for the purpose of discerning the plain meaning" of agent).  The Court should do the same here.

**B.     CDK's Counterclaims Fail To Plausibly Allege That Authenticom Was Not Acting As The Dealerships' Agent**

To support its claim of unauthorized access in the face of the plain terms of CDK's MSA, CDK must allege facts that plausibly show that Authenticom was not acting as the dealers' agent when it accessed the CDK DMS.  An agent is "[o]ne who is authorized to act for or in place of another; a representative."  *Automation By Design, Inc. v. Raybestos Prods. Co.*, 463 F.3d 749, 757 (7th Cir. 2006) (alteration in original) (quoting Black's Law Dictionary (8th ed. 2004)); *accord Hernandez*, 2010 WL 5232942, at *7 ("An agent is commonly understood as [o]ne who is authorized to act for or in place of another.") (alteration in original); *United States v. Springer*, 609 F.3d 885, 890 (6th Cir. 2010) (agent is "one that acts for . . . another by authority from him") (alteration in original) (quoting Webster's Third New Int'l Dict. (1981)); Restatement (Third) of Agency § 1.01 (2006).  "An agent has express actual authority" – the strongest form of agency – "when the principal expressly grants the agent the authority to perform a particular act."  *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 831 (N.D. Ill. 2016).

CDK's counterclaims do not plausibly allege that Authenticom is not the dealers' agent under this well-accepted standard.  On the contrary, CDK's own allegations confirm that Authenticom *is* acting as the dealers' agent, because it obtains data on the dealers' behalf pursuant to the dealers' express authorization.  *See supra* pp. 3-4.  Dealers authorize Authenticom to access

6

the DMS on their behalf, in writing, in their contracts with Authenticom.  *See* DealerVault Terms and Conditions (*Authenticom* Dkt. 65-3) (Ex. F) (setting forth terms and conditions relating to the "agreement between the Dealership . . . and Authenticom" regarding "DealerVault's access to Dealership Data")[3]; *see also Authenticom* MTD Op. at 7 ("data integrators generally receive authorization from dealerships").  CDK's Counterclaim Complaint (at ¶ 41) also acknowledges that Authenticom first "acquir[es] login credentials from CDK dealers."  *See also Authenticom* MTD Op. at 7 ("dealers set up separate login credentials for the integrators so that they can access the DMSs").  It is thus undisputed that the dealer (the principal) authorizes Authenticom (the agent) to act on the dealers' behalf to provide data integration services.

CDK also has failed to plausibly allege that Authenticom acts outside of the dealerships' control.  As just discussed, dealerships authorize Authenticom to access the DMS on their behalf, and they are free to revoke Authenticom's authorization.  And because Authenticom ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ Counterclaim Compl. ¶ 44 (emphasis added), CDK has not plausibly alleged that dealerships lack the practical ability to control Authenticom's access.[4]  In short, Authenticom provides data integration services pursuant to the dealers' authorization and control – a quintessential agency relationship.

The few relevant factual allegations, taken as true, fail to state a plausible claim.

---

[3] Because CDK referenced and quoted from Authenticom's contract with dealers in the Counterclaim Complaint, *see* Counterclaim Compl. ¶¶ 71-73, 75, this Court can also consider that contract in deciding Authenticom's Rule 12(b)(6) motion.

[4] In addition, as Chief Judge Peterson noted, Authenticom's DealerVault product "provides an interface that allows dealers to monitor and control the data provided from its DMS to the vendors it uses," such that "the data to which Authenticom has access is controlled by the dealer." *Authenticom*, 2017 WL 3017048, at *2, slip op. at 3.

*First*, CDK claims (at ¶ 75) that Authenticom's interpretation of the agency provision of the MSA is "directly contradicted" by Authenticom's allegation – supporting its antitrust claims – that CDK engaged in exclusive dealing by requiring dealers that use the CDK DMS to use CDK exclusively for data integration services. That is legal argument, not proper factual pleading. But in any event, there is no contradiction. After 2015, CDK changed its interpretation of the MSA (even though it did not change the language, *see supra* pp. 2-3) to justify its insistence that dealers stop providing access to independent data integrators, including by threatening dealers with breach of contract. CDK Answer ¶¶ 153, 155 (admitting contract enforcement). Authenticom need not agree with or endorse CDK's post-conspiracy interpretation (and application) of its DMS contract to challenge its conduct as anti-competitive. The fact that CDK invoked its MSA when it forced its dealers to deal exclusively with CDK for integration services does not change the unambiguous contract language.

*Second*, CDK (at ¶ 75) alleges – or, more accurately, argues – that Authenticom is not an authorized agent because its contracts with dealers, the DealerVault Terms and Conditions, provide that Authenticom is an independent contractor. This Court can quickly dispose of that argument, just as the Seventh Circuit did in *Automation By Design*: "Regardless of how the two parties chose to define their relationship for remuneration, tax, employment law, or tort liability purposes," Authenticom is the dealers' agent because it is retained "'to act for or in place of' [the dealers], as a representative" and "in [their] stead." 463 F.3d at 757 (rejecting argument that a party "could not have been [an] agent because the two parties signed an agreement which specifically defined their relationship as that of independent contractors and not agents"); *accord Animal Concepts*, 2012 WL 1995113, at *5 (rejecting argument that independent contractor was not an agent on a motion to dismiss).

Indeed, CDK's reading of the Terms and Conditions is wrong as a matter of law.  Being an independent contractor is not mutually exclusive with being an agent.  Independent contractors can be – and frequently are – agents.  *See*, *e.g.*, *Romero v. West Bend Mut. Ins. Co.*, 885 N.W.2d 591, 601 (Wis. Ct. App. 2016) ("Agents may be either servants or independent contractors."); *Am. Tel. & Tel. Co. v. Winback & Conserve Prog., Inc.*, 42 F.3d 1421, 1435 (3d Cir. 1994) ("There are [] agent independent contractors and non-agent independent contractors.").  Section 10.4's further statement that Authenticom and dealers are not entering into an "employment agency" relationship likewise does not mean that Authenticom is not the dealers' agent – only that Authenticom is not the dealers' *employee*.

CDK's argument (at ¶ 75) that the DealerVault Terms and Conditions refer only to *other* parties as agents is even less tenable.  While certain provisions do set forth the rights of the dealers' agents to use DealerVault, those provisions cannot plausibly be read as suggesting by implication that Authenticom does not act as the dealers' agent.  For example, § 1.12 defines "Users" of Authenticom's DealerVault service to include the dealers' agents.  *See* Ex. F.  But that provision says nothing about whether Authenticom is acting as the dealers' agent when it pulls the dealers' data.

*Third*, CDK references (at ¶ 87) an April 2016 conversation between CDK executive Dan McCray and Authenticom CEO Steve Cottrell, in which Mr. McCray told Mr. Cottrell that CDK's "contracts with dealers prohibited them from providing DMS login credentials to third parties." But regardless of Mr. McCray's description of the CDK MSA – which he made post-conspiracy with Reynolds and after CDK changed its interpretation of the unchanged contractual language – § 6(D) plainly says otherwise.  *See supra* pp. 5-7; *McWane*, 224 F.3d at 584 ("The unambiguous contract controls over contrary allegations in the plaintiff's complaint."); *Hernandez*, 2010 WL

9

5232942, at *7 (factual allegations are "immaterial for the purpose of discerning the plain meaning" of agent).

### C. CDK's Allegation That It Recently Changed the MSA Does Not Salvage Its Claims

The allegation that CDK modified its MSA at some point in 2017 to eliminate § 6(D)'s language authorizing access by dealers' agents does not save CDK's counterclaims. *See* Counterclaim Compl. ¶ 75; *see also id.* ¶ 73 & n.52 (alleging that CDK modified its MSA in "2017"). As part of the June 2017 preliminary injunction proceedings in the Western District of Wisconsin, CDK submitted a statement of facts representing that the agent language in MSA § 6(D), as quoted in this motion to dismiss, *see supra* pp. 2-3, was part of its then-current MSA, and had been since no later than 2008. *See* CDK and The Reynolds and Reynolds Company's Combined Statement of Facts ¶¶ 49-51, *Authenticom* Dkt. 87. CDK now alleges that the dealers' right to appoint an agent – which was standard in its contracts as of June 2017 – was contained in a "prior version" of its MSA. *See* Counterclaim Compl. ¶ 75. But CDK does not allege that the more recent version of its MSA changed the scope of access authorized by the prior version. Nor does CDK allege that Authenticom has provided data integration services to any dealerships operating under the new MSA or that Authenticom had any knowledge of any potentially relevant change in the contractual language prior to the filing of CDK's counterclaim.[5] In sum, CDK has not plausibly pleaded that Authenticom acted without authorization when it accessed CDK's DMS at any time.

---

[5] 

## II. ALL OF CDK'S COUNTERCLAIMS FAIL TO STATE A CLAIM

All of CDK's claims depend on the allegation that Authenticom accessed CDK's DMS *without authorization*. Because CDK has not plausibly alleged that Authenticom lacked such authorization, those claims should be dismissed under Rule 12(b)(6). Several of CDK's claims fail for additional reasons as well.

### A. CFAA and Parallel Wisconsin and California Laws (Counts 1, 4, 6)

CDK's claims that Authenticom violated the Computer Fraud and Abuse Act ("CFAA") (Count One) and the parallel Wisconsin Computer Crimes Act (Count Four) and the California Comprehensive Computer Data Access and Fraud Act (Count Six) hinge on the contention that Authenticom obtains "unauthorized" access to CDK's DMS. *See* 18 U.S.C. § 1030(a)(2)(C) (CFAA providing criminal and civil penalties for anyone who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer"); Wis. Stat. § 943.70(2) (likewise prohibiting unauthorized access); Cal. Penal Code § 502 (same). But because all three statutes prohibit only *unauthorized* access, a defendant cannot violate them if it has authorization to access the computer in question. *See*, *e.g.*, *Amphenol Corp. v. Paul*, 993 F. Supp. 2d 100, 110 (D. Conn. 2014) (defendant who was "authorized to access" the computer in question "did not violate the CFAA"); *Océ N. Am., Inc. v. MCS Servs., Inc.*, 748 F. Supp. 2d 481, 486 (D. Md. 2010) (where defendant "was authorized to access the website and information located there she was not in violation of the CFAA"). Because CDK's contract with dealers gives dealers the right to grant access to agents like Authenticom, and there is no plausible allegation that Authenticom lacked authorization from the dealerships to access the DMS on their behalf, CDK's CFAA claim fails as a matter of law.

It bears noting that, for many years prior to its 2015 conspiracy with The Reynolds and Reynolds Company ("Reynolds"), CDK offered data integration services using dealer-provided

login credentials, including on the Reynolds DMS. *Authenticom*, 2017 WL 3017048, at *3, slip. op. at 6 ("In fact, CDK itself owned and operated third-party integrators"). Nonetheless, CDK claims that Authenticom's business model – which is no different from its own – amounts to criminal "cyber piracy," *see* Counterclaim Compl. ¶ 10, that should be punishable by at least five years in federal prison, *see* 18 U.S.C. § 1030(c).[6] That claim is implausible, at least in the case of Authenticom, because Authenticom *had* authorization pursuant to CDK's own MSA to access the DMS on behalf of willing dealerships.

**B.    DMCA (Count 2)**

**1.**    The DMCA prohibits circumvention of a "technological measure" "*without the authority of the copyright owner*." 17 U.S.C. § 1201(a)(3)(A) (emphasis added). Here, however, Authenticom is an authorized user of the CDK DMS because Authenticom acts as the dealers' agent and accesses the DMS with dealer authorization, which CDK – the alleged copyright owner – gave dealers the right to grant. *See supra* pp. 2-3, 5-7. As the Federal Circuit – applying Seventh Circuit law – has held, authorized users like Authenticom are "immune from § 1201(a)(1) circumvention liability." *Chamberlain Grp., Inc. v. Skylink Techs., Inc.* 381 F.3d 1178, 1204 (Fed. Cir. 2004) (holding DMCA "circumvention" ban does not apply to those with licenses or sublicenses); *cf. Ticketmaster L.L.C. v. Prestige Entm't, Inc.*, 306 F. Supp. 3d 1164, 1174 (C.D. Cal. 2018) ("legitimate users" that complete a CAPTCHA screen "do not violate the DMCA").[7]

---

[6] On appeal of the Authenticom preliminary injunction order, Judge Rovner pointed out this contradiction at oral argument. *See* Oral Arg. at 57:35, *Authenticom, Inc. v. CDK Global, LLC,* Nos. 17-2540 & 17-2541 (7th Cir. Sept. 19, 2017), http://media.ca7.uscourts.gov/sound/2017/ab.17-2540.17-2540_09_19_2017.mp3 (Judge Rovner: "Given your position that Authenticom's data integration amounts to illegal activity, would you concede that CDK's own subsidiaries, DMI and IntegraLink, were engaged in illegal activity at least until the 2015 agreement?").

[7] To the extent that CDK claims that its CAPTCHA screen is intended to block machine access in particular, that assertion does nothing to bolster its claim under the DMCA because CDK

CDK's interpretation would lead to the absurd result that a copyright owner can use the DMCA as a tool unilaterally to thwart access by those who are contractually authorized to access copyrighted material. That turns the DMCA on its head: using the copyright laws to prevent lawful access constitutes copyright abuse. *See Chamberlain,* 381 F.3d at 1201 (noting that an interpretation of DMCA that granted new substantive rights to control "access" to copyrighted works would improperly interfere with doctrine of copyright misuse); (citing *Assessment Techs. of Wis., LLC v. WIREdata, Inc.,* 350 F.3d 640, 647 (7th Cir. 2003)).

> **2.** CDK's DMCA claim fails for two additional reasons.

*First*, CDK has not plausibly alleged that Authenticom "circumvent[ed] a technological measure" that "effectively controls access to a [copyrighted] work." 17 U.S.C. § 1201(a)(2), (b)(1). The DMCA defines "circumvent a technological measure" to mean "descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." *Id.* § 1201(a)(3)(A). The DMCA further defines "circumvent[ion]" to mean "avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure." *Id.* § 1201(b)(2)(A). What Authenticom is alleged to have done – obtaining access by using dealer-provided "login credentials" – is not circumvention by the DMCA's definition. In *Navistar, Inc. v. New Balt. Garage, Inc.*, for example, this Court held that "using a password to access a copyrighted work, even without authorization, does not constitute 'circumvention' under the DMCA because it does not involve descrambling, decrypting, or otherwise avoiding, bypassing, removing, deactivating, or impairing a 'technological measure.'" 2012 WL 4338816, at *5 (N.D. Ill. Sept. 20, 2012) (Dow,

---

points to nothing in its MSA that would restrict a dealer's ability either to employ automated access methods itself or to authorize agents to do so on its behalf.

J.); *accord I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.*, 307 F. Supp. 2d 521, 532-33 (S.D.N.Y. 2004) ("Defendant did not surmount or puncture or evade any technological measure to do so; instead, it used a password intentionally issued by plaintiff to another entity . . . [T]he DMCA and the anti-circumvention provision at issue do not target this sort of activity.").

CDK's allegations concerning "challenge prompts" fail to state a DMCA claim for the same reasons. Counterclaim Compl. ¶ 108. CDK has not plausibly alleged that Authenticom "circumvents" CDK's prompts or CAPTCHAs; rather, it alleges that Authenticom passed through them exactly as any other authorized user would: by responding. *See* Counterclaim Compl. ¶ 85 ("Authenticom modified its scripts to . . . enter "YES" in response to the log-in"); ¶ 92 ("CDK does not yet know exactly how Authenticom is circumventing the CAPTCHA"). But passing a CAPTCHA "does not involve descrambling, decrypting, or otherwise avoiding, bypassing, removing, deactivating, or impairing a 'technological measure.'" *Navistar,* 2012 WL 4338816, at *5.[8] CDK thus has failed to plead circumvention within the meaning of the DMCA.

*Second*, CDK has failed to plausibly allege that Authenticom's conduct falls outside the DMCA's exemption for those who "develop and employ technological means to circumvent a technological measure . . . for the purpose of enabling interoperability of an independently created computer program with other programs, if such means are necessary to achieve such interoperability, to the extent that doing so does not constitute infringement under this title." 17

---

[8] Though some district courts have held that circumventing CAPTCHA can, in some circumstances, violate the DMCA, *see Ticketmaster,* 306 F. Supp. 3d at 1174, none of those cases involved users such as Authenticom that were authorized (and provided login credentials) by the system licensee. In any event, as addressed above, the statutory definition of "circumvention" is clear: simply doing what any ordinary user does to pass through a technological measure does not "descramble, . . . decrypt . . . , or otherwise to avoid, bypass, remove, deactivate, or impair" the CAPTCHAs. 17 U.S.C. § 1201(a)(3)(A). *See also Ticketmaster L.L.C. v. RMG Techs., Inc.,* 507 F. Supp. 2d 1096, 1112 (C.D. Cal. 2007).

U.S.C. § 1201(f)(2). Both Authenticom's software and the software of its vendor customers are "independently created computer programs" which can interoperate with CDK's DMS only with access to the data contained within the system, and CDK has not alleged that Authenticom otherwise violates CDK's copyrights. To the extent CDK has alleged Authenticom circumvents any technological barriers, it has alleged Authenticom has done so only to enable interoperability with those independently created computer programs, as noted, with the permission of dealers. *See supra* pp. 3-4, 6-7. As such, Authenticom is subject to § 1201(f)(2)'s exemption. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 550-51 (6th Cir. 2004) (reversing grant of preliminary injunction because plaintiff unlikely to prevail on merits of DMCA claim where circumvention was necessary to enable interoperability).

### C. Defend Trade Secrets Act / Misappropriation of Trade Secrets (Counts 3, 5)

CDK's claim for misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA") and the Wisconsin Uniform Trade Secrets Act ("WUTSA") fail for two independent reasons. *See Bay Fasteners & Components, Inc. v. Factory Direct Logistics, LLC*, 2018 WL 1394033, at *3 (N.D. Ill. Mar. 20, 2018) (recognizing that the DTSA and WUTSA are interpreted identically); *Kuryakyn Holdings, LLC v. Ciro, LLC*, 242 F. Supp. 3d 789, 797-98 (W.D. Wis. 2017) (same).

*First*, CDK's allegations fail to adequately plead that Authenticom engaged in actionable misappropriation. "[M]isappropriation of a trade secret normally is not actionable without either a tort or a breach of contract." *ConFold Pac., Inc. v. Polaris Indus., Inc.*, 433 F.3d 952, 959 (7th Cir. 2006). Both statutes specifically provide that misappropriation requires "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5). Importantly, "improper means" "does not include . . . any . . . lawful means of acquisition." *Id. at* § 1839(6); *accord* Wis. Stat. § 134.90(2) (same).

15

CDK has not plausibly alleged that Authenticom either used "improper means" or had knowledge of any alleged impropriety. On the contrary, as explained above, *see supra* pp. 2-3, 5-7, Authenticom only accessed CDK's DMS as the dealers' agent. Absent a plausible allegation that Authenticom's access was unauthorized, CDK cannot plausibly allege knowing misappropriation by unlawful means.

*Second*, even assuming CDK has plausibly alleged Authenticom's unauthorized access to the CDK DMS, CDK has not plausibly alleged the existence of legally cognizable trade secrets.[9] "The Seventh Circuit has required a degree of specificity when defining certain pieces of information as trade secrets." *Thermal Zone Prods. Corp. v. Echo Eng'g, Ltd.*, 1993 WL 358148, at *5 (N.D. Ill. Sept. 14, 1993). "It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) (per curiam). Here, CDK nowhere identifies with any particularity which aspects of the DMS it alleges are trade secrets. Beyond a vague reference to "forms, accounting rules, tax tables, and proprietary tools and data compilations," CDK fails to specify what part of the DMS it claims is secret. Counterclaim Compl. ¶¶ 23, 115, 127. CDK generally adverts to "proprietary tools and data," but that is the sort of "broad" pleading the Seventh Circuit rejected in *Composite Marine*. 962 F.2d at 1266; *see Chatterplug, Inc. v. Digital Intent, LLC*, 2016 WL 6395409, at *3 (N.D. Ill. Oct. 28, 2016) (dismissing trade secret claim for insufficient pleading, noting "the law requires the

---

[9] Both the DTSA and WUTSA statutes define "Trade Secret" in substantially the same manner, as "information, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply: (1) The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. (2) The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances." Wis. Stat. § 134.90(1); *see also* 18 U.S.C. § 1839(3).

trade secret claimant to describe the secret with sufficient specificity that its protectability can be assessed").

CDK's lone particularized alleged trade secret does not support its claim. CDK alleges that its "proprietary programs . . . calculate the expected monthly payment for a financed car deal based on inputs like the sale price, the customer's down payment, and the term." Counterclaim Compl. ¶ 48. CDK thus appears to claim that a car payment calculation is "CDK's proprietary dataset," *id.*, but such a basic math calculation – readily available on the Internet – cannot plausibly be considered a trade secret. *See* Wis. Stat. § 134.90(1)(c) (information must be meaningfully non-public); 18 U.S.C. § 1839(3) (same); *Thermal Zone,* 1993 WL 358148, at *5.

### D. Tortious Interference With the MSA (Count 8)

CDK's claim that Authenticom tortiously interfered with the MSAs that CDK enters into with dealers fails to state a claim, because it is premised on the assertion that the MSAs prohibit Authenticom from accessing the CDK DMS without CDK's consent. As discussed above, the plain language of MSA § 6(D) says otherwise. Authenticom cannot plausibly have "intentionally interfered" with these agreements by acting as the dealers' agent, pursuant to authority that the MSA specifically permits dealerships to provide access to Authenticom.

### E. Trespass To Chattels (Count 9)

CDK's trespass to chattels claim is just another variant on its claim of unauthorized access to the DMS. Because trespass to chattels occurs only when "[o]ne who *without a consensual or other privilege to do so*" uses or interferes with chattel in the possession of another, CDK's failure to plead plausibly that Authenticom accessed the DMS without authorization dooms CDK's trespass to chattels claim as well. *E.g.*, *Wis. Tel. Co. v. Reynolds*, 87 N.W.2d 285, 288 (Wis. 1958) (quoting Restatement (First) of Torts, § 218) (emphasis added).

17

### F.        Conversion (Count 10)

Likewise, CDK's conversion claim fails as a matter of law.  Authorization is incompatible with conversion.  *See*, *e.g.*, *Midwestern Helicopter, LLC v. Coolbaugh*, 839 N.W.2d 167, 170 (Wis. Ct. App. 2013) ("Conversion is the intentional, *unauthorized* control of another's chattel so as to interfere with the owner's possessory rights.") (emphasis added); *accord* Restatement (Second) of Torts § 228 (1965) (conversion can be based on exceeding authorized use).  Thus, conversion is not a viable claim because CDK authorized Authenticom to access the DMS.

Moreover, CDK's counterclaims do not plausibly assert that Authenticom exercised sufficient control of CDK's DMS to support a conversion claim as a matter of law.  *See Bruner v. Heritage Cos.*, 593 N.W.2d 814, 818 (Wis. Ct. App. 1999) (elements of conversion are "intentionally controlling/taking property belonging to another" without the owner's consent, "resulting in serious interference with the rights of the owner to possess the property").  Generally, "unpermitted use is not a conversion unless it amounts to such a serious violation of the other's right of control as to justify requiring the user to pay the full value of the chattel."  Restatement (Second) of Torts § 228 cmt. d; *id.* § 222A cmt. d (stating that the question of whether defendant's action was a sufficiently serious interference turns on the "justice of requiring the forced purchase at full value").  Here, CDK cannot plausibly allege that Authenticom so "seriously interfered" with "CDK's possessory rights in its server systems" that Authenticom converted – and should be awarded the full value of – the entire DMS.  *DIRECTV, Inc. v. Massey,* 2004 WL 1194744, at *4 (N.D. Ill. May 27, 2004) (dismissing conversion claims for alleged interference with satellite broadcasts because "there are no allegations that [Defendants] exercised such dominion and control over the signals as to deprive DIRECTV, the rightful owner of the signals, the use of them."); *see also SCS Healthcare Mktg., LLC v Allergan USA, Inc.*, 2012 WL 6565713 (N.J. Super. Ch. Dec. 7, 2012) (granting motion to dismiss conversion claim and noting that in the "context of

unauthorized computer access" claims, courts have "been reluctant to find conversion where there is no tangible [personal] property taken.").

The sole factual allegation in support of the element of control is that Authenticom submits search queries to the DMS, which runs them and then "return[s] the data requested." *See* Counterclaim Compl. ¶ 164. But allegedly running search queries on the DMS does not plausibly constitute exercise of "dominion and control" over the entire DMS or database. Likewise, CDK's allegation (at ¶ 164) that Authenticom's access to the DMS "reduc[ed] the efficiency and efficacy of the server systems" does not support a finding that Authenticom converted the entire DMS. *See* Restatement (Second) of Torts § 222A, cmt. c (explaining that conversion requires deprivation of the entirety of the chattel).

### G. Unjust Enrichment (Count 11)

CDK has alleged a cause of action for unjust enrichment, but it fails to indicate under which state's law the claim arises. Given the significant variability in the elements of unjust enrichment from state to state, *see Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521, 532 (N.D. Ill. 2008) (collecting cases), Authenticom cannot fairly evaluate whether CDK has pleaded a claim. For example, CDK has brought several counterclaims under California law, but its unjust enrichment claim would fail under California law because "California law does not recognize a cause of action for unjust enrichment." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at *36 (N.D. Ill. June 29, 2015) (Dow, J.). As another example, in CDK's home state of Illinois, "unjust enrichment is not a separate cause of action. 'Rather, it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence, and may be redressed by a cause of action based upon that improper conduct.'" *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 447 (7th Cir. 2011) (quoting *Alliance Acceptance Co. v. Yale Ins. Agency, Inc.,* 648 N.E.2d 971, 977 (Ill. App. Ct.

1995)).  Given the variance in states' unjust enrichment doctrine, CDK has failed to plead facts sufficient to show that it is "entitled to relief" under Federal Rule of Civil Procedure 8(a)(2), and its claim should be dismissed on that basis alone.  *See In re Dairy Farmers*, 2015 WL 3988488, at *36 ("Plaintiffs fail to specify which states' laws, if any, give rise to their unjust enrichment claims, which presents [a] viable ground for dismissal."); *see also In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *24 (E.D. Mich. Apr. 9, 2013) (same); *Avenarius v. Eaton Corp.*, 898 F. Supp. 2d 729, 740 (D. Del. 2012) (same); *Everett Labs., Inc. v. River's Edge Pharm., LLC*, 2010 WL 1424017, at *6 (D.N.J. Apr. 8, 2010) (same).

Even if this defect were overlooked, CDK's claim cannot succeed in light of the terms of the MSA.  CDK pleads that Authenticom has unjustly benefitted from (1) "provid[ing] data extraction and writeback services to vendors and [being] paid by vendors" and (2) "enjoy[ing] free access to the CDK DMS."  Counterclaim Compl. ¶¶ 169-170.  In cases where a third party (such as the dealers) transferred a benefit to the defendant, "to show that the retention of the benefit constitutes unjust enrichment the plaintiffs must initially show that: (1) the benefit should have been given to the plaintiffs but the third party mistakenly gave it to the defendants; (2) the defendants procured it from the third party by some type of wrongful conduct; or (3) the plaintiffs for some reason have a better claim to the benefit than the defendants."  *Nat'l Am. Ins. Co. v. Ind. Lumbermens Mut. Ins. Co.*, 221 F.3d 1339 (7th Cir. 2000) (applying Indiana law).  But as described *supra* pp. 2-3, 5-7, dealers engaged Authenticom as their agent pursuant to the express terms of their MSAs, as CDK stated repeatedly and publicly they were allowed to do.  Therefore, any benefit Authenticom received was required by contract.  "[W]here the enrichment was innocently conferred by a third party according to a contractual . . . obligation" – here, dealers acting pursuant to their MSAs –"the enrichment cannot be unjust."  221 F.3d 1339; *see also id.* ("one who is

enriched by what he is entitled to under a contract or otherwise is not unjustly enriched") (quoting Dan B. Dobbs, *Law of Remedies* § 4.1(2) (1993)); *Cummings ex rel. Techmeier v. Briggs & Stratton Ret. Plan*, 797 F.2d 383, 390 (7th Cir. 1986) ("Enrichment is not 'unjust' where it is allowed by the express terms of the pension plan."). CDK's unjust enrichment claim seeks to evade the terms of its MSAs. But "[w]here a valid contract exists, a plaintiff cannot use theories like unjust enrichment . . . to shift the risk that plaintiff knowingly assumed." *Song v. PIL, L.L.C.*, 640 F. Supp. 2d 1011, 1017 (N.D. Ill. 2009). Therefore, CDK's unjust enrichment claim should be dismissed. *See Universal Forest Prods. E. Div., Inc. v. Morris Forest Prods., LLC*, 558 F. Supp. 2d 893, 908 (E.D. Wis. 2008) (rejecting unjust enrichment claim premised on a contract between the plaintiff and a third party because the only benefit to the defendant resulted from performance of the contract).

### H. Fraud (Count 12)

CDK alleges (at ¶¶ 173-78) that Authenticom committed fraud by answering "YES" to the CAPTCHA screen prompts that CDK implemented following its 2015 conspiracy with Reynolds. A claim for fraud requires CDK to plead with particularity under Federal Rule of Civil Procedure 9(b), among other things, "a false statement of material fact" and "damages resulting from reliance on [that] statement." *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007). CDK fails to plausibly plead either element.

**1.** For an alleged false statement to be material, "the misrepresented condition must be an essential element to the transaction between the parties." *Mack v. Plaza Dewitt Ltd. P'ship*, 484 N.E.2d 900, 906 (Ill. App. Ct. 1985); *Giacomazzi v. Urban Search Corp.*, 407 N.E.2d 621, 624 (Ill. App. Ct. 1980) ("[t]o be material, the condition must be essential to one of the parties").

CDK fails to allege a material misstatement of fact. CDK's CAPTCHA screen required Authenticom to enter "YES" to "confirm you are an authorized dealer employee." Counterclaim

Compl. ¶ 84. The gravamen of CDK's fraud claim, therefore, turns on the distinction that Authenticom was not an authorized dealer *employee*, as it answered in the CAPTCHA screen, but instead was an authorized dealer *agent*. Even if that could constitute a misstatement, it is not material. CDK's contract with dealers draws no distinction between the dealers' employees and its agents; they are equally entitled to access the DMS on the dealers' behalf. *See supra* pp. 2-3, 5-7. Because the difference between employee and agent makes no legal difference under the MSA, it cannot be considered essential.

Moreover, the CAPTCHA prompt as a whole demonstrates that its purpose was to prohibit unauthorized access. Indeed, the prompt states: "Use or access by *unauthorized third parties* is prohibited." *See* Counterclaim Compl. ¶ 84 (emphasis added); *see also id.* ¶ 91 ("Use or access by unauthorized third parties is strictly prohibited"). Here again, the difference between an authorized dealer employee and an authorized dealer agent is immaterial to the goal of preventing *unauthorized* access. For all the reasons described earlier, Authenticom was an authorized third party and therefore was entitled to access the DMS with dealer authorization on the dealers' behalf.

**2.** Even if the distinction between an authorized dealership employee and an authorized dealership agent were material (and it is not), CDK cannot plead cognizable damage resulting from justifiable reliance on any alleged misstatement in that regard. *See Hunt v. Enzo Biochem, Inc.*, 530 F. Supp. 2d 580, 593 (S.D.N.Y. 2008) ("Rule 9(b) also requires that the detrimental reliance element of a fraud claim be pleaded with particularity."). Rather, given that Authenticom was authorized to access the DMS pursuant to the MSA and its contracts with dealers, CDK could not justifiably impose technological access barriers, such as the CAPTCHA screen, to impede Authenticom's lawful access to the DMS. Nor would it be justified in relying on Authenticom's responses to the prompts it set up in order to impede Authenticom's access. *See*

*Rubloff Dev. Grp., Inc. v. SuperValu, Inc.*, 863 F. Supp. 2d 732, 748 (N.D. Ill. 2012) (dismissing complaint despite sufficient allegations of false statements, where the allegations that the plaintiff's reliance on those statements "caused the injury here is shaky at best").

## I. California Unfair Competition Law (Count 7)

California's Unfair Competition Law ("UCL") makes actionable "unfair" and "unlawful" business practices. "Each prong of the UCL is a separate and distinct theory of liability" and must be analyzed separately. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009).

With respect to the UCL's "unfair" practices prong, CDK identifies two allegedly unfair practices: Authenticom's "unauthorized use of DMS login credentials," and its "inducement of CDK's dealer customers to breach their contracts with CDK." *See* Counterclaim Compl. ¶ 146. But neither theory is plausible, because, as discussed above, Authenticom's access to the DMS was authorized under the plain terms of CDK's contract with dealers.

Likewise, CDK's allegations of "unlawful" conduct fail to state a claim under the UCL. "The unlawful category of the UCL 'borrows violations of other laws,'" and thus "to the extent the Court dismissed the underlying claims, [CDK] cannot plead UCL violations based on those claims." *Haynish v. Bank of Am., N.A.*, 284 F. Supp. 3d 1037, 1051-52 (N.D. Cal. 2018) (quoting *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999)). Therefore, because none of CDK's other counterclaims satisfy Rule 12(b)(6), CDK's UCL claim based on "unlawful" conduct necessarily fails as well.

## CONCLUSION

The Court should dismiss CDK's counterclaims.

Dated:  July 20, 2018

Respectfully submitted,

 _/s/ Derek T. Ho_____
Derek T. Ho

Jennifer L. Gregor
Kendall W. Harrison
**Godfrey & Kahn S.C.**
One East Main Street, Suite 500
Madison, WI 53703
(608) 257-0609
jgregor@gklaw.com
kharrison@gklaw.com

*Attorneys for Authenticom, Inc.*

Michael N. Nemelka
Aaron M. Panner
David L. Schwarz
Kevin J. Miller
Daniel V. Dorris
Joanna T. Zhang
Joshua Hafenbrack
**Kellogg, Hansen, Todd,**
  **Figel & Frederick, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com
mnemelka@kellogghansen.com
apanner@kellogghansen.com
dschwarz@kellogghansen.com
kmiller@kellogghansen.com
ddorris@kellogghansen.com
jzhang@kellogghansen.com
jhafenbrack@kellogghansen.com

*Attorneys for Authenticom, Inc.*

24

<u>**CERTIFICATE OF SERVICE**</u>

I, Derek T. Ho, an attorney, hereby certify that on July 20, 2018, I caused a true and correct copy of the foregoing **AUTHENTICOM INC.'S MOTION TO DISMISS THE COUNTERCLAIMS OF CDK GLOBAL, LLC** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by email to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/ Derek T. Ho*
Derek T. Ho
**Kellogg, Hansen, Todd,**
 **Figel & Frederick, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com