# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | ) | MDL NO. 2817 |
| | ) | Case No. 1:18-CV-00864 |
| | ) | |
| This document relates to: | ) | |
| | ) | Hon. Robert M. Dow, Jr. |
| ALL CASES | ) | Magistrate Judge Jeffrey T. Gilbert |

**RESPONSE OF NON-PARTY RESPONDENT DOMINION ENTERPRISES, INC.
TO REYNOLDS AND REYNOLDS COMPANY'S MOTION TO COMPEL
AND DOMINION'S MEMORANDUM OF LAW IN SUPPORT OF ITS
<u>MOTION TO MODIFY CONFIDENTIALITY ORDER</u>**

## I. INTRODUCTION

Dominion Enterprises, Inc. and its subsidiary Dominion Dealer Solutions (together, "Dominion")[1] are non-parties in this matter and are competitors and customers of Defendants, Reynolds and Reynolds Company ("R&R" or "Reynolds") and CDK Global, LLC ("CDK"). Permitting Defendants' attorneys who review Dominion's highly confidential materials also to advise the Defendants on their business relationships with Dominion will put Dominion at a severe competitive disadvantage and could even destroy its business.

The dispute arises because R&R (and presumably CDK) assert that trial counsel can review Dominion's highly confidential documents and then provide legal advice to their clients on their separate business dealings with Dominion *without using or disclosing* Dominion's information. Courts that have considered this issue do not believe such compartmentalization is possible. Dominion respectfully requests that, rather than allowing the risk that a non-party's sensitive information will be misused or disclosed, this Court make a reasonable and narrow modification to the Agreed Confidentiality Order ("Order").

There are five good-cause reasons for the Court to modify the Order. First, the Order prohibits trial counsel from using subpoenaed confidential information when providing legal advice on business dealings. This and other courts have concluded that it will be impossible for R&R's and CDK's trial counsel to *not* use Dominion's confidential information when providing such legal advice. Second, as a non-party, Dominion's confidential materials are entitled to stricter protection than the parties' materials. Third, while there is a presumption that the trial attorneys will meet the highest ethical standards in their treatment of highly confidential documents, trial counsel should have no entitlement to that presumption if they have made misrepresentations to

---

[1] R&R served its subpoena on Dominion Enterprises. Dominion Dealer Solutions is the competitor and customer of Defendants. The materials responsive to the subpoena are primarily from Dominion Dealer Solutions and it is Dominion Dealer Solutions that is the most vulnerable to harm.

this Court. Fourth, R&R's trial counsel are decision-makers, creating an unusually high risk of misuse or inadvertent disclosure of Dominion's information. And fifth, the harm to Dominion if trial counsel misuses or discloses Dominion's confidential information, intentionally or inadvertently, could be devastating, whereas the proposed modification to the Order represents a relative, mere inconvenience to Defendants.

## II.  RELEVANT FACTS

### A.  Because Dominion is a Customer and Competitor of Defendants, Its Business is Vulnerable to Defendants' Actions.

Dominion offers seven applications to franchised car dealers that require access to dealer data that resides in the Defendants' dealer management systems ("DMSs"). *See* Andreu Decl. ¶ 13 (submitted as Ex. 1). These applications provide value-added services to dealer customers. For example, Deal Activator creates customer outreach campaigns for targeted customer groups; Inventory manages dealer stocking and online vehicle marketing; and Sales Center, a customer relationship management ("CRM") application, serves as the hub for a dealership's customer interaction. *Id.*, ¶ 11(a), (c), (e).

The vast majority of Dominion's application customers use the R&R or CDK DMS. *Id.*, ¶ 8. Given each application's need for dealer data, the data housed in those DMSs is essential to the viability of Dominion's business. *Id.*, ¶ 13. Traditionally, with the dealer's authorization, Dominion's applications obtained dealer data through its own integration product, SelectQu, and through third-party integrators, such as Authenticom. *Id.*, ¶ 14. These integrations were low cost and very effective. *See id.*, ¶¶ 14, 16.

Because R&R has been aggressively blocking competing integrators, Dominion's access to dealer data in R&R's DMS now requires Dominion's applications to use R&R's integration product, "RCI," or an R&R permitted manual means of access. *See id.*, ¶ 16. CDK's threats to block competing integrators' access to dealer data in the CDK DMS forced Dominion to use CDK's integration product, "3PA," for accessing the data of all CDK DMS customers. *See id.*

One of Dominion's applications, Service Scheduler, exited the market because of the cost of R&R's integration service. *Id.*, ¶ 18. Today, Dominion's SelectQu is nearing a similar fate. It is losing money and things are expected to get worse. *Id.*, ¶¶ 19-20.

Dominion is not only dependent on R&R and CDK as a customer; most of its applications compete directly with R&R and CDK applications. *Id.*, ¶ 7. For example, their CRMs compete with Dominion's CRMs. *Id.*, ¶¶ 11-12. This puts Dominion in a very vulnerable position when negotiating with R&R or CDK. *Id.*, ¶ 25.

This is not just a theoretical concern. In the past, CDK forced Dominion to provide its competitively sensitive CRM roadmap by threatening to deny access to CDK's integration product, 3PA. *Id.*, ¶ 21. Only after CDK was satisfied Dominion's CRM development path was not a threat to CDK did CDK agree to move forward with 3PA certification. *See id.*

Given Dominion's reliance on R&R and CDK, in combination with their demonstrated willingness to use their leverage, Dominion is very concerned about the use or disclosure of any confidential Dominion information. *Id.*, ¶ 25. Dominion's viability is at stake. *See id.*

**B.     At Least One of R&R's Trial Attorneys Has Been Heavily Involved in R&R's Business Relationship with Dominion.**

Aundrea K. Gulley is on R&R's trial team and has been deeply involved in R&R's business strategy concerning Dominion. On May 4, 2015, she notified Dominion that SelectQu's access to dealer data in the R&R DMS is "unauthorized" and that "any knowing attempt by SelectQu to induce Reynolds dealers to allow such third-party access . . . gives rise to liability on the part of SelectQu for, among other things, tortious interference with contracts." Ex. 2. Ms. Gulley continued, "Reynolds is open to . . . an orderly wind down of the unauthorized DMS access" and asked Dominion *to call her* to discuss this further. *Id.*

**C.     Dominion is a Non-Party in This Litigation.**

On June 12, 2017, Authenticom served a subpoena on Dominion. Ex.3. In addition to Authenticom's required notice to R&R and CDK, on June 15, 2017, Dominion provided them with additional notice. Exs. 4, 5. On June 27, 2017, Alan Andreu, a Dominion employee testified at the

preliminary injunction hearing. Andreu Decl. ¶ 4. He did *not* testify that a conspiracy between CDK and R&R resulted in Dominion paying higher integration fees. *Id.*, ¶ 5; *see generally Authenticom, Inc. v. CDK Glob., LLC*, Case No. 3:17-cv-00318, D.E. 165 (W.D. Wisc.).

### D. Dominion Negotiated in Good Faith With Four Different Attorneys.

On December 7, 2017, R&R served on Dominion a Notice of Issuing a Subpoena to Produce Documents. Mem. in Support of Reynolds' Mot. to Compel ("Mem."), D.E. 283, Ex. A.

On December 21, Dominion responded with a letter to R&R's counsel, Perkins Coie, listing its objections and requesting a meet and confer. Mem., Ex. C. In the letter, Dominion stated, because it "continues to be a direct competitor of Reynolds . . . . Dominion needs assurances that the outside attorneys with access to Dominion's documents are not attorneys *that advise defendants on business issues*." *Id.*, p. 2 (emphasis added).[2]

By January 10, 2018, the parties were nearing an agreement on Dominion's document production. To address Dominion's concerns about confidentiality, Dominion understood Perkins Coie to represent that "[a]ll the defendant attorneys that will have access to Dominion documents are litigation attorneys, not business attorneys advising the defendants." Ex. 6. Before, the agreement could be finalized, the District Court of the Western District of Wisconsin stayed some aspects of discovery and ultimately, on February 2, 2018, the case was transferred to the Northern District of Illinois. *Authenticom*, Case No. 3:17-cv-00318, D.E. 245, 247.

Months later, on May 11, R&R counsel, Leo Caseria at Sheppard Mullin, emailed Dominion counsel asking whether Dominion planned to respond to the Subpoena. Mem., Ex. B, p. 8. On May 18, the parties conferred, and Caseria rejected the previous accommodations negotiated with Perkin Coie because "circumstances have changed." *See id.*, p. 3.

On May 22, Dominion sent an email to Caseria, expressing its displeasure at having to renegotiate its response. *Id.*, p. 6. But, in an effort to find common ground, Dominion agreed to turn over its responses to the Federal Trade Commission Civil Investigative Demands ("CIDs") in

---

[2] Dominion reserves all objections in this letter.

4

two investigations of Defendants *if* Caseria would "reconfirm[] that the lawyers that will review Dominion's highly confidential response to the subpoena do not participate in or provide legal or other advice regarding CDK's and Reynolds' business dealings." *Id.*, p. 7. Dominion further agreed that R&R could request additional documents if it believed that was necessary after fully reviewing the initial production. *Id.* Had R&R and Dominion come to an agreement, Dominion would have produced approximately 42,000 documents.

On May 25, rather than reconfirming Dominion's understanding, Caseria wrote, "outside counsel for Reynolds . . . . are not making competitive business decisions for Reynolds . . . . However, as attorneys, they obviously provide legal advice to Reynolds . . . and that legal advice may relate to business dealings." *Id.*, p. 4. Caseria was otherwise "amenable to moving forward as [Dominion] proposed." *Id.*, p. 5.

Dominion responded on May 31, stating it was not comfortable with Caseria's assertion that "the litigating attorneys may provide legal advice that relates to business dealings." *Id.*, p. 3. Not wanting to drag out the process, Dominion suggested the Defendants set up firewalls to protect Dominion's Highly Confidential documents and information contained therein. *Id.*

On June 1, Caseria rejected the firewall proposal, stating, "defendants are unable to limit access to highly confidential materials only to outside counsel who do not provide legal advice on defendants' business dealings, *because many of the key outside attorneys involved in this case are the same attorneys who provide legal advice on defendants' business dealings.*" *Id.*, p. 2. (emphasis added).

In response, on June 7, Dominion again indicated it would turn over a "large body of materials," if R&R would attempt to accommodate Dominion's confidentiality concerns. *Id.*, p. 1. On June 26, R&R responded, this time, through a different lawyer, Michael Cohen, who "confirm[ed]" that "outside counsel are consulted to provide legal advice regarding matters unrelated to this litigation, like the antitrust implications of proposed merger transactions." Mem., Ex. D.

5

On June 28, Dominion explained, again, that it may be harmed if R&R trial attorneys provide "legal advice regarding Dominion's contracts or other business dealings with Reynolds." Mem., Ex. H.

On July 19, yet another attorney, James McGinnis, called Dominion's counsel, stating the Defendants' trial attorneys will not limit their advice regarding business decision-making beyond what is required in the Order, and R&R would be filing a motion to compel. After some more back and forth, this time with Michael Cohen, R&R filed its motion on July 23.

## III.     ARGUMENT

A court has "broad discretion" to modify a protective order if the movant shows good cause. *Trading Techs. Int'l, Inc. v. GL Consultants, Inc.*, 2011 WL 148252, at *2 (N.D. Ill. 2011); *see also Fed. Trade Comm'n v. Advocate Health Care Network*, 162 F. Supp. 3d 666, 673 (N.D. Ill. 2016). "Courts in this circuit and other circuits recognize that the burden to show good cause is less demanding on non-parties." *In re Northshore Univ. Healthsystem*, 254 F.R.D. 338, 342 (N.D. Ill. 2008). There are five reasons that demonstrate good cause to modify the Order here.

### A.     Trial Counsel Cannot Provide Legal Advice and Abide by the Order.

Defendants' trial counsel, with knowledge of Dominion's documents, intend to provide legal advice to their clients on business dealings with Dominion. R&R asserts this will not harm Dominion because the Order, which prohibits Receiving Parties from using Discovery Materials outside the Litigation, "resolves" Dominion's concerns. Mem., ¶ 7. But, it does not, because it is "manifestly impossible" for counsel to adhere to the Order while providing such legal advice, requiring them to engage in an unattainable level of "mental gymnastic[s]." *See, e.g., Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.*, 237 F.R.D. 405, 410 (N.D. Ill. 2006).

R&R does not address this issue, simply suggesting Dominion should trust Defendants' attorneys will abide by the Order and maintain the "highest duties and ethical standards." Mem., ¶ 7 (citation omitted). R&R misses the point: even attorneys maintaining ethical standards cannot accomplish the impossible. The "test is not that lawyers involved in such activities will intentionally misuse confidential information; rather, it is the risk that such information will be

6

used or disclosed inadvertently because of the lawyer's role in the client's business decisions." *Fed. Trade Comm'n v. Sysco Corp.*, 83 F. Supp. 3d 1, 3-4 (D.D.C. 2015). Counsel does not have to disclose the confidential information to violate the Order; it may be implicitly imbedded in its business advice. *See, e.g.*, *Autotech Techs.*, 237 F.R.D. at 411 (stating the nature of the case meant "competitive decision-making" and "litigation decision-making" would "blend imperceptibly together").

In similar disputes, this Court has observed, "[c]ounsel would not be able to separate the highly confidential information in their minds and use it solely for purposes of this litigation, as '[c]ompartmentalization would be exceedingly difficult'" and "a feat beyond the compass of ordinary minds." *Id.* at 408, 410 (citation omitted). It is "beyond debate" that "once the Highly Confidential [I]nformation in this case is disclosed, 'the bell cannot be unrung.'" *Silversun Indus., Inc. v. PPG Indus., Inc.*, 296 F. Supp. 3d 936, 947 (N.D. Ill. 2017) (citation omitted); *see also Brown Bag Software v. Symantec Corp.*, 960 F. 2d. 1465, 1471 (9th Cir. 1992) (court must consider whether counsel can "lock-up trade secrets in his mind").

In fact, Dominion is more vulnerable than those seeking relief in these cited opinions because Defendants have the means to destroy Dominion's relevant businesses, *supra* Section II(A), *especially* if their attorneys give them business advice based on their knowledge of Dominion's highly confidential information.

Some hypotheticals illustrate this: CDK's and Dominion's CRMs compete. Suppose CDK asks its trial counsel whether refusing to renew its integration contract with Dominion and blocking third-party integration with Dominion's CRM will allow it to gain an unlawful monopoly in the relevant CRM market. CDK's trial counsel, having reviewed Dominion's documents, knows that Dominion has no expectation of capturing enough market share to affect materially CDK's share. CDK's counsel can then advise CDK that it can drive Dominion out of the CRM market, as its conduct would not generate unlawful monopoly power. Even though counsel did not *disclose* any confidential information, it *used* the confidential information to inform its legal advice.

7

As a second example, suppose R&R's trial counsel has advised R&R that it can legally block third-party integrators, such as Dominion's SelectQu, from obtaining dealer data, and can require the use of its own integration product, RCI, if it has a strong justification for its exclusionary conduct. Suppose further that R&R asks its counsel if the security benefits of its integration product, RCI, may outweigh the anticompetitive effects of its exclusionary practices. This justification might carry the day, according to trial counsel's thinking, if SelectQu's security protocols are not as secure as RCI's protocols. Trial counsel knows the documents that Dominion produced do not address SelectQu's security protocols at all. Trial counsel may reason that they learned nothing in discovery and can therefore advise its client that if R&R believes that SelectQu has inferior security, it can put SelectQu out of business.

Continuing the second example, suppose at a later date, R&R subpoenas StoneEagle, another integrator, and asks its attorneys whether it can put StoneEagle out of business by blocking its access to dealer data. After reviewing StoneEagle's documents, trial counsel has reason to believe that StoneEagle has better security than RCI. Trial counsel cannot provide the same advice it provided regarding SelectQu, as that would result in legal jeopardy for R&R. Perhaps trial counsel will just inform the client that, given what it knows, it cannot provide any legal advice. However, the difference in trial counsel's responses regarding Dominion versus StoneEagle may very well lead R&R to believe that it can drive SelectQu out of business, but not StoneEagle. Trial counsel did its very best not to use any confidential information, but nevertheless, its advice was informed by Dominion and StoneEagle's documents and that advice might result in R&R blocking SelectQu more aggressively than StoneEagle, driving the final nail in SelectQu's coffin.

Moving away from antitrust to contract negotiations, frequently negotiators bluff. Suppose that R&R's trial counsel has deposed Dominion's negotiator, and being under oath, Dominion's negotiator cannot bluff. Then, R&R's trial counsel attends business negotiations between R&R and Dominion. Counsel says nothing, but her mere presence intimidates Dominion's negotiator, as R&R's trial counsel would know when Dominion is bluffing.

These are situations where counsel's "assurances" that they will comply with the confidentiality order "are not enough." *ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC*, 2008 WL 5634214, at *2 (E.D. Tex. 2008). The risk that Defendants' trial counsel cannot "selectively suppress information once learned" provides good cause to modify the Order. *See Silversun*, 296 F. Supp. 3d at 946.

### B. Non-Parties Are Entitled to More Protection than Parties.

The misuse of discovery materials is particularly concerning when a non-party's information is at issue, especially when the non-party is a vulnerable competitor. This Court's guidance in *In re Northshore* is instructive. There, non-parties, in response to a motion to compel documents submitted to the FTC, objected that the protective order in the underlying litigation did not protect their interests and the "unbridled disclosure would be costly in future negotiations and would destroy their competitive advantage." 254 F.R.D. at 341. The court agreed these concerns were "legitimate," and in modifying the order, wrote, "[t]he inability of non-parties to maintain continuing control over their confidential commercial documents . . . enables non-parties to show good cause for a protective order." *Id.* The court provided the following analogy, "[w]hen non-parties are forced to produce commercial documents pursuant to a discovery request, they are in effect handing over the keys to their corporate automobiles to parties who may, at best, be considered ambivalent towards their interests." *Id.* at 343. This Court's guidance in *Advocate Health* is also illustrative. There, the court observed:

> The inescapable reality is that once an expert—or a lawyer for that matter—learns the confidential information that is being sought, that individual cannot rid himself of the knowledge he has gained; he cannot perform a prefrontal lobotomy on himself, as courts in various contexts have recognized. That risk is one that a party must, of necessity, endure. *But it is not one that a nonparty ought to be forced to take where the party seeking the information is its foremost competitor* and there appear to be alternative sources of information.

*Advocate Health*, 162 F. Supp. 3d at 670 (emphasis added) (citations omitted); *see also Steuben Foods, Inc. v. Shibuya Hoppmann Corp.*, 2017 WL 1483548, at *2 (W.D.N.Y. 2017) ("[I]t is

9

appropriate to provide additional protections for non-parties."). Dominion's status as a non-party alone is good cause to modify the Order.

### C. Misrepresentations by R&R Creates an Additional Risk that Dominion's Confidential Information Will Be Used or Disclosed.

R&R misrepresented Dominion's testimony that it claims is the basis of its subpoena. *See* Mem., ¶ 2. With no pin cite, R&R tells the Court that Dominion's employee testified that the "conspiracy between CDK and Reynolds . . . caused price increases for Dominion's integration fee." *Id.* In fact, the Dominion employee never testified about this alleged conspiracy. Andreu Decl., ¶ 5; *see also Authenticom*, Case No. 3:17-cv-00318, D.E. 165. R&R also claims Dominion "injected itself into the litigation," "volunteer[ing] important, hotly contested testimony." Mem., ¶¶ 16, 21. But R&R does not tell the Court that Authenticom subpoenaed Dominion's testimony, and R&R received notice of that subpoena from Authenticom *and* Dominion. Exs. 3, 4, 5.

The distortion of fact shows Dominion cannot, as R&R suggests, "give weight to the expectation that the parties' attorneys will abide by the highest duties and ethical standards that are required of them in general and according to the protective order." Mem., ¶ 7 (citation omitted). Indeed, more so here than in other cases, the risk "cannot be ignored [only] because counsel in the case says it does not pose a meaningful problem." *Silversun*, 296 F. Supp. 3d at 946. Simply, if we cannot trust R&R's brief, how can we trust its representations regarding its future compliance with the Order? Will it not, at bare minimum, resolve any ambiguity or interpretation of language in its favor? Under these circumstances, the Court should no longer presume that R&R (and CDK if it approved R&R's memorandum) would meet the highest ethical standards, thus establishing good cause to modify the Order.

### D. Defendants' Trial Counsel Are Competitive Decision-Makers.

R&R's main argument is that its trial counsel are not competitive decision-makers. *See* Mem., ¶¶ 10-18. But more important issues are at play. *See, e.g.*, *Autotech Techs.*, 237 F.R.D. at 408, 411 (stating competitive decision-making is "*one* basis" for limiting access, but not the

10

"exclusive" one, and finding that even where counsel were not competitive decision-makers, "litigation decision-making and competitive decision-making blend[ed] imperceptibly together").

First, even if R&R's trial counsel were not competitive decision-makers, the Court would not hesitate to act if counsel confessed they would violate the Order. R&R has offered no such confession, but the result is much the same because it will be "manifestly impossible" for trial counsel to *not* misuse discovery material if they provide legal advice on Dominion's business dealings. *Supra* Section III(A). Second, the issue of competitive decision-making typically arises when the movant is asking the court to limit counsel's access to highly confidential documents. Dominion is not seeking to prevent trial counsel from reviewing Dominion's documents; it is simply asking them not to provide advice to their clients regarding their business dealings with Dominion after reviewing Dominion's sensitive documents.

In any event, R&R's trial counsel are competitive decision-makers, as their "activities, association, and relationship with a client" involve counsel's "advice and participation in any or all of the client's decisions . . . made in light of similar or corresponding information about a competitor." *Silversun*, 296 F. Supp. 3d at 940-41; *Pinterest, Inc. v. Pintrips, Inc.*, 2014 WL 5364263, at *1 (N.D. Cal. 2014). R&R admits as much, acknowledging, "many of the key outside attorneys involved in this case are the same attorneys who provide legal advice on defendants' business dealings," Mem., Ex. B, p. 2, but then avers those "many" attorneys do not "have authority to make competitive business decisions." *Id.*; *see also* Mem., ¶ 11. "Authority," however, is not a critical distinction. An attorney may be a competitive decision-maker when *advising* on competitive decisions. *See Sysco Corp.*, 83 F. Supp. 3d at 3-4 (in-house counsel who did not have final decision-making authority was a competitive decision-maker where he was "chiefly responsible" for mergers and acquisitions involving "evaluation of market competitors as potential acquisition targets"); *PhishMe, Inc. v. Wombat Sec. Techs. Inc.*, 2017 WL 4138961, at *5 (D. Del. 2017) ("even when an attorney states that their role is simply to provide 'legal advice' on 'legal issues' to competitive decisionmakers," this "may cloud the types of advice counsel provides");

11

*see also Advocate Health*, 162 F. Supp. 3d at 669 ("[M]erely insisting that one is not 'involved in competitive decision making' cannot pretermit inquiry . . . .").[3]

In fact, R&R's trial counsel, Aundrea Gulley, appears to do more than advise. Ms. Gulley, not only threatened Dominion, she tried to force Dominion to negotiate its own demise with her, which she called a "wind down." Ex. 2; *supra* Section II(B). Arguably, Ms. Gulley was proposing to negotiate a conspiracy to eliminate the competition between two integration competitors. In the absence of an Order modification, if Ms. Gulley picks up where she left off, she may have much more information about the product she has already tried to extinguish.

R&R acknowledges that whether counsel is in-house or outside is "not dispositive," yet hangs its hat on this arbitrary distinction. *See* Mem., ¶¶ 10, 17-18. Courts have cautioned against this approach. *See, e.g.*, *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 (Fed. Cir. 1984) ("Denial or grant of access, however, cannot rest on a general assumption that one group of lawyers are more likely or less likely inadvertently to breach their duty under a protective order . . . . The problem and importance of avoiding inadvertent disclosure is the same for both [in-house and retained counsel]"); *ST Sales Tech Holdings*, 2008 WL 5634214, at *7 ("[C]ourts have found attorneys to be competitive decisionmakers regardless of whether they are in-house and outside counsel."); *Brown Bag*, 960 F.2d at 1470 ("[P]roper review of protective orders in cases such as this requires the district court to examine factually all the risks and safeguards surrounding inadvertent disclosure by *any* counsel, whether in-house or retained.").

---

[3] *United States v. Aetna Inc.*, 2016 WL 8738422 (D.D.C. 2016) and *Pfizer Inc. v. Apotex Inc.*, 744 F. Supp. 2d 758 (N.D. Ill. 2010)) are inapposite. In *Aetna*, the court denied plaintiffs' request to modify a protective order because they had "not presented any evidence suggesting that any outside counsel in this case is or might be involved in Defendants' competitive decision-making beyond their duties in this particular case." 2016 WL 8738422, at *8. Here, in contrast, R&R admits its outside counsel provides advice to R&R on unrelated matters, including "business dealings" with Dominion. Mem., Ex. B, p. 2. Further, Dominion does not seek to prohibit R&R's outside counsel from seeing its confidential documents, but rather, requests that once counsel has access to those documents, it not provide advice to R&R on *separate matters* related to Dominion. In *Pfizer*, the court opined "rigid rules related to competitive decisionmaking must give way to a review of each case's facts" and found plaintiffs had "provide[d] no explanation" and no "affidavit, declaration, or other form of evidence." 744 F. Supp. 2d at 765-66. Here, Dominion has provided facts and a declaration in support of its position. Plus, the *Pfizer* decision revolved around the risk of inadvertent disclosure, rather than misuse, and was a dispute between parties, rather than a party and non-party. *See id.* at 761, 763-66. The need for protection is higher for a non-party. *Supra* Section III(B).

R&R tries to distinguish Dominion's precedents by asserting they arise in the "unique patent context," where the "same counsel may participate in patent prosecution activities relating to the litigated patent." Mem. ¶¶ 10, 17. This is not "unique," and is, in fact, quite similar to here, where R&R's trial counsel, with access to Dominion's documents, will advise R&R on activities related to Dominion. Indeed, the consideration in patent cases, like here, is whether a party's counsel, when accessing confidential information of a competitor in a litigation, can "prevent inadvertent compromise" of that information when counseling its client on other matters. *See, e.g.*, *In re Deutsche Bank Tr. Co., Americas*, 605 F.3d 1373, 1378 (Fed. Cir. 2010). A categorical dismissal of courts' reasoning in patent cases is contrary to this Court's conclusion that "the facts, not the category must inform the result." *Trading Techs.*, 2011 WL 148252, at *4 (citation omitted).

### E. The Potential Harm to Dominion Outweighs Defendants' Preference for Legal Advice from Attorneys Who Have Reviewed Confidential Information.

To determine the proper level of protection in a protective order, the harm to Dominion must be balanced against the benefit to R&R. *See Autotech Techs.*, 237 F.R.D. at 408. Yet, the harm to Dominion appears to be irrelevant to R&R; and as to the benefit to R&R, all it offers is its cursory representation that R&R's trial attorneys are "uniquely qualified" to provide legal advice on business dealings. Mem., ¶ 19. Thousands of antitrust attorneys attend the ABA Antitrust Spring meeting in Washington DC every year, but if we are to believe R&R, none of the attendees are fully qualified to counsel R&R.[4] The Plaintiffs, represented by Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. and Milberg Tadler Phillips Grossman LLP, have concluded otherwise, asserting they are not opposed to Dominion's proposed modification to the Order. Exs. 7, 8.

R&R argues Dominion's proposal will hinder its defense because counsel who have "led defendants' defense since the Authenticom preliminary injunction proceeding" will be restricted

---

[4] R&R does not explain why other lawyers at their trial counsels' law firms or other law firms advising R&R could not provide the relevant legal advice. Nor do they explain why the full trial team must review Dominion's documents. "There is only the *ipse dixit* of the defendants . . . . [a]nd that is not enough." *See, e.g.*, *Advocate Health*, 162 F. Supp. 3d at 674.

13

from accessing documents related to the litigation. Mem., ¶ 20. Dominion does not suggest that the Order prohibit trial counsel from reviewing Dominion's confidential documents. It only proposes prohibiting trial attorneys from advising their clients on business dealings with Dominion once they have had access to Dominion's highly confidential documents.

R&R next claims that these "proposed restrictions on outside trial counsel's access necessarily implicate a 'party's right to have the benefit of counsel of its choice,'" *id.*, ¶ 20 (citing *Deutsche Bank*, 605 F.3d at 1380), but there is no automatic right. Indeed, the case R&R relies on for this proposition merely found that a court must balance the risk of disclosure "against the *potential* harm to the opposing party from restrictions imposed on that party's right to have the benefit of counsel of its choice." *Deutsche Bank*, 605 F.3d at 1380 (emphasis added). Further, *Deutsche* deals exclusively with inadvertent disclosure, *see id.*, only one of Dominion's concerns.

Clients do not have the absolute right to any attorney where there are countervailing factors. Indeed, law firms often create ethical walls to bar attorneys from viewing confidential documents where those attorneys have a conflict. *See In re Ampal-Am. Israel Corp.*, 534 B.R. 569, 577 (Bankr. S.D.N.Y. 2015) (ethical wall was created to prevent attorneys from sharing confidential information where a conflict of interest existed), *aff'd*, 554 B.R. 604 (S.D.N.Y. 2016), *aff'd*, 691 F. App'x 12 (2d Cir. 2017). *Jardin v. DATAllegro, Inc.* is instructive. In *Jardin*, the court ordered plaintiffs' counsel to erect an ethical wall to "keep the specific lawyers who had actual access to defendants' confidential information in [a] 2008 case from participating" in a 2011 case. 2011 WL 3299395, at *2 (S.D. Cal. 2011). The court found no "significant prejudice" with this ethical wall because other lawyers in the firm "who did not have *actual access* to Defendants' confidential information in the 2008 case" were permitted to work on a 2011 case. *Id.* at *5. The ethical wall addressed the concern that "counsel could not divorce themselves from their knowledge of Defendants' confidential material" from the previous proceeding. *Id.*

Indeed, as this Court has said, in dealing with a similar dispute, "[A] party . . . has a choice to say, okay, I am going to use this attorney as part of my litigation team. Or I am going to use this attorney as part of my patent application team. But you can't do both." *Trading Tech.*, 2011 WL

148252, at *8 (citation omitted) (protective order "reflect[ed] a balance" where "an attorney agrees to give up a specific scope of activities . . . in exchange for access to certain confidential information"). Here, R&R wants to do both: let its trial counsel both review Dominion's highly confidential documents and advise R&R on issues involving Dominion.

Finally, it is worth repeating: Defendants can drive Dominion out of business. *Supra* Section II(A). Indeed, Dominion's unique posture as a customer and a competitor increases the "gravity of the consequences of inadvertent disclosure or misuse." *PhishMe, Inc.*, 2017 WL 4138961, at *8. If Dominion's "confidential information [is] later utilized to its detriment, [it] might not only be harmed in the instant litigation or in other litigation matters, but it might also see its competitive position in the market damaged." *Id.* To protect itself, Dominion seeks only a modest modification to the Order.

## IV. **CONCLUSION**

For the foregoing reasons, Dominion respectfully requests this Court deny R&R's Motion to Compel Production of Documents Pursuant to Subpoena and modify the Order to add the following:

> No Receiving Party with access to Confidential Information or Items of Dominion Enterprises, Inc., its affiliates, and subsidiaries ("Dominion") shall provide advice, legal or otherwise, regarding business relationships with or business conduct affecting Dominion until one year after the conclusion of this Action. This prohibition does not extend to general advice, legal or otherwise, that the Receiving Party has concluded affects Dominion no differently than its competitors after undertaking reasonable due diligence to investigate the potential effect.

Once the Court modifies the Order, Dominion will submit the agreed upon materials. Hence, no order compelling the submission of such materials would be necessary.

Dated: August 6, 2018                                      Respectfully submitted,

                                                             /s/ *Marc Schildkraut*
                                                             Marc Schildkraut
                                                             Deepti Bansal
                                                             Cooley LLP
                                                             1299 Pennsylvania Ave, NW,
                                                             Suite 700
                                                             Washington, DC 20004

(202) 728-7000
(202) 728-7027
mschildkraut@cooley.com
dbansal@cooley.com

Jeff Norberg, Ill. Bar No. 6315012
Neal & McDevitt, LLC
1776 Ash Street
Northfield, Il 60093
(847) 441-9100
jnorberg@nealmcdevitt.com

*Counsel for Non-Party Respondent*
*Dominion Enterprises, Inc.*

## **CERTIFICATE OF SERVICE**

I, Marc Schildkraut, an attorney, hereby certify that on August 6, 2018, I caused true and correct copies of the foregoing **Response of Non-Party Respondent Dominion Enterprises, Inc. to Reynolds and Reynolds Company's Motion to Compel and Dominion's Memorandum of Law in Support of Its to Modify Confidentiality Order** to be filed and served electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

By: /s/ *Marc Schildkraut*
Marc Schildkraut
Cooley LLP
1299 Pennsylvania Ave, NW,
Suite 700
Washington, DC 20004
(202) 728-7000
mschildkraut@cooley.com

*Counsel for Non-Party Respondent Dominion Enterprises, Inc.*