***Jardin v. DATAllegro, Inc.,*** **2011 WL 3299395 (S.D. Cal. 2011)**

2011 WL 3299395
Only the Westlaw citation is currently available.
United States District Court,
S.D. California.

Cary A. JARDIN, Plaintiff,

v.

DATALLEGRO, INC. and Stuart Frost, Defendants.

No. 10–CV–2552–IEG (WVG).
|
July 29, 2011.

**Attorneys and Law Firms**

Cody R. Lejeune, Regis C. Worley, Jr., Robbins Geller
Rudman & Dowd LLP, San Diego, CA, John C. Herman,
Robbins Geller Rudman & Dowd LLP, Atlanta, GA, for
Plaintiff.

Jason W. Wolff, Juanita R. Brooks, Olga I. May, Seth M.
Sproul, Fish & Richardson P.C., San Diego, CA, Colin
C. Holley, George L. Hampton, IV, Hamptonholley LLP,
Corona Del Mar, CA, for Defendants.

## ORDER OVERRULING PLAINTIFF'S
## OBJECTION TO MAGISTRATE JUDGE
## GALLO'S JUNE 27, 2011 MINUTE ORDER

IRMA E. GONZALEZ, Chief Judge.

**\*1** Presently before the court is Plaintiff Cary A. Jardin's
objection to Magistrate Judge Gallo's June 27, 2011
minute order. [Doc. No. 58.] For the reasons stated below,
the Court **OVERRULES** Jardin's objections, and thus
upholds Judge Gallo's order.

### *BACKGROUND*

The factual background of this case is discussed in the
Court's April 12, 2011 Order and will not be repeated in
detail here. To briefly summarize, the central legal issue in
this action is the determination of the proper inventorship
of U.S. Patent Number 7,818,349 (the " #349 patent").
Jardin asserts Defendant Frost improperly listed himself
as the sole inventor of the # 349 patent, omitting to list
Jardin as either the proper sole inventor or a co-inventor.

The factual allegations supporting Jardin's legal claims,
however, implicate concerns related to trade secret law.
[*See* Pl.'s Opp'n to Defs.' Mot. to Dism. Claim III of the
FAC, Doc. No. 51, at 1 ("Jardin's allegations in this case
are clear: Frost took information from Jardin, and Frost
used that information to file his patent application.").]

This is the second case Jardin has filed against Defendants
DATAllegro, Inc. and Stuart Frost. Jardin filed a
related suit in 2008, alleging that Defendant DATAllegro
manufactured products that infringed upon U.S. Patent
Number 7,177,874 (the " #874 patent"), issued to Jardin.
*See Jardin v. DATAllegro, Inc.,* No. 08–CV–1462 IEG
(WVG) (S.D.Cal.2008) (the "2008 case").[1] Attorneys
from the law firm of Robbins Geller Rudman & Dowd
LLP ("Robbins Geller") have represented Jardin in both
the 2008 case and this action.

[1]     References to the "2010 case" refer to this action, 10–
        CV–2552.

During the course of discovery in the 2008 case,
Jardin's counsel gained access to confidential information
regarding DATAllegro's accused products. While those
products are not directly at issue in this action, the
factual allegations of the 2008 and 2010 cases substantially
overlap and the confidential information produced in the
2008 case is relevant to the 2010 case. [*Compare* 2008
Case Compl., ¶¶ 9–21 Doc. No. 1 (alleging that Frost
(1) "had a relationship with XPrime" (Jardin's company);
(2) had access to confidential information related to
Jardin's inventions, which were later claimed in the #874
patent; (3) left Jardin's company; (4) incorporated Jardin's
confidential information into DATAllegro's technology;
and (5) thus infringed on the #874 patent subsequently
issued to Jardin), *with* 2010 Case FAC, ¶¶ 8–94 (alleging
that Frost (1) was in some type of relationship with
XPrime"; (2) had access to confidential information
related to Jardin's inventions, which were later claimed
in the #874 patent; (3) left Jardin's company; (4)
incorporated Jardin's confidential information into the
application that eventually resulted in the #349 patent;
and (5) failed to list Jardin as an inventor of the #349
patent).]

A protective order on file in the 2008 case limits the
use of produced protected information to that case.
[*See* 2008 Case, Doc. No. 78 ¶ 6 [hereinafter the "2008
protective order"].] Because of the factual overlap in

Case: 1:18-cv-00864 Document #: 305-11 Filed: 08/06/18 Page 3 of 25 PageID #:8474
Jardin v. DATAllegro, Inc., Not Reported in F.Supp.2d (2011)
2011 WL 3299395

the 2008 and 2010 cases, the parties discussed revising the 2008 protective order to allow them to use in the 2010 case information produced in the 2008 case, with certain exceptions. Specifically, Defendants expressed concern that Jardin's attorneys and expert witnesses who had actual access to Defendants' confidential product-information in the 2008 case "are unlikely to divorce themselves from that knowledge," and, therefore, that knowledge might inform Jardin's claims and discovery requests related to his allegations of misappropriation of his confidential information in the 2010 case. Defendants thus sought to temporarily wall off the legal team that represented Jardin in the 2008 case, "only until Plaintiff sufficiently identifies ... what confidential information of his was allegedly taken." [*See* Defs.' Resp. to Pl.'s Objection, Doc. No. 62, at 2.] Jardin rejected that proposal, and when the parties could not reach an agreement on the issue, he brought the issue before Judge Gallo. Jardin also refused to participate in a Rule 26(f) conference until the issue is resolved. [*See* Pl.'s Objection, Doc. No. 58, at 3; Worley Decl., Exs. B & C (the parties' letter briefs to Judge Gallo).]

**\*2** On June 27, 2011, Judge Gallo held a telephonic discovery conference on the record. [*See* Transcript of June 27, 2011 Telephonic Discovery Hearing, Doc. No. 54 [hereinafter "June 27 Hr'g Tr."].] Finding Defendants' concern over Plaintiff's access to confidential material in the 2008 case was legitimate, Judge Gallo ordered Jardin to identify the specific information he alleges Defendants misappropriated in response to a special interrogatory from Defendants. Judge Gallo also ordered Jardin to preclude members of his 2008 legal team from participating in drafting Jardin's response to the special interrogatory. [*See* June 27, 2011 Minute Order, Doc. No. 50; June 27 Hr'g Tr., 37:24–40:16, 43:19–23.] As in Defendants' initial proposal, Judge Gallo only ordered this "ethical wall" to keep the specific lawyers who had actual access to Defendants' confidential information in the 2008 case from participating. He did not preclude other attorneys at Robbins Geller from participating in the response; nor did he disqualify Robbins Geller from continuing to represent Jardin in this case. Judge Gallo directed the parties to revise the 2008 protective order accordingly. [*See* Minute Order; June 27 Hr'g Tr., at 38:4–39:18, 40:13–43:23.] On July 11, 2011, Jardin filed this objection to Judge Gallo's order.

## LEGAL STANDARD

A party may object to a U.S. Magistrate Judge's non-dispositive pretrial order within fourteen days of service of that order. Fed.R.Civ.P. 72(a). The Court must uphold the magistrate judge's order unless it is "clearly erroneous or contrary to law." *Id.;* 28 U.S.C. § 636(b)(1)(A). "The 'clearly erroneous' standard applies to the magistrate judge's factual determinations and discretionary decisions...." *Computer Econ., Inc. v. Gartner Grp., Inc.,* 50 F.Supp.2d 980, 983 (S.D.Cal.1999) (citations omitted). "Under this standard, 'the district court can overturn the magistrate judge's ruling only if the district court is left with the definite and firm conviction that a mistake has been made.' " *Id.* (quoting *Weeks v. Samsung Heavy Indus. Co., Ltd.,* 126 F.3d 926, 943 (7th Cir.1997).

The "contrary to law" standard, however, "allows independent, plenary review of purely legal determinations by the Magistrate Judge." *Jadwin v. Cnty. of Kern,* 767 F.Supp.2d 1069, 1010 (E.D.Cal.2011) (citing *FDIC v. Fidelity & Deposit Co. of Md. ..,* 196 F.R.D. 375, 378 (S.D.Cal.2000)); *see also Computer Econ.,* 50 F.Supp.2d at 983 n. 4 ("It is not entirely clear whether the 'contrary to law' standard contemplates de novo review of a magistrate judge's legal determinations[,] ... [but, at] a minimum, it is less deferential than the 'clearly erroneous' standard applicable to the magistrate judge's factual determinations and acts of discretion."). A magistrate judge's order "is contrary to law when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Jadwin,* 767 F.Supp.2d at 1010–11 (quoting *DeFazio v. Wallis,* 459 F.Supp.2d 159, 163 (E.D.N.Y.2006) (internal quotation marks omitted).

## DISCUSSION

### I. Whether "Clearly Erroneous" or "Contrary to Law" is the Appropriate Standard of Review

**\*3** The parties dispute the nature of Judge Gallo's order, and thus disagree over which standard of review is appropriate. This dispute stems from discussions during the June 27, 2011 hearing and in the parties' letter-briefs to Judge Gallo regarding the possible application of California Code of Civil Procedure § 2019.210 to this case.

Jardin v. DATAllegro, Inc., Not Reported in F.Supp.2d (2011)
Case: 1:18-cv-00864 Document #: 305-11 Filed: 08/06/18 Page 4 of 25 PageID #:8475
2011 WL 3299395

Jardin argues that, whether Judge Gallo expressly applied § 2019.210 or merely fashioned a procedure under the Federal Rules to achieve the same ends, he improperly applied California Civil Procedure Code § 2019.210. Thus, Jardin argues, the order was based on a conclusion of law —namely, that § 2019.210 applies in federal court—and should be subject to the "contrary to law" standard on review.

Defendants argue that Judge Gallo's order was tantamount to a protective order under Federal Rule 26(c) and was firmly rooted in his discretion under the Federal Rules to manage discovery and his consideration of the particular facts of this case. Thus, Defendants argue, Judge Gallo's order is a factual determination, subject to the "clearly erroneous" standard.

Section 2019.210 (formerly § 2019(d)) was enacted as part of the California Uniform Trade Secrets Act ("CUTSA"). See Computer Econ., 50 F.Supp.2d at 983–84. Section 2019.210 prevents a plaintiff alleging misappropriation of trade secrets from taking discovery until it provides a statement identifying the allegedly misappropriated trade secrets "with reasonable particularity." Section 2019.210's mandatory pre-discovery trade secret statement serves four purposes:

> First, it promotes well-investigated claims and dissuades the filing of meritless trade secret complaints. Second, it prevents plaintiffs from using the discovery process as a means to obtain the defendant's trade secrets.... Third, the rule assists the court in framing the appropriate scope of discovery and in determining whether plaintiff's discovery requests fall within that scope.... Fourth, it enables defendants to form complete and well-reasoned defenses, ensuring that they need not wait until the eve of trial to effectively defend against charges of trade secret misappropriation.

Computer Econ., 50 F.Supp.2d at 985 (internal citations omitted). In short, § 2019.210 aims to frame the dispute at an early stage of litigation and to prevent abuse of discovery in trade secret cases.

The Ninth Circuit has not decided whether § 2019.210 applies in federal court, and district courts in California have reached conflicting conclusions. Compare Computer Econ., 50 F.Supp.2d at 992 (concluding, after an extensive Erie analysis, that § 2019.210 (then § 2019(d)) applies in federal court); Neothermix Corp. v. Rubicor Med., Inc., 345 F.Supp.2d 1042, 1043–45 (C.D.Cal.2004) (applying § 2019.210 (then § 2019(d)) in a federal action for breach of a nondisclosure agreement, which included factual allegations of trade secret misappropriation), with Funcat Leisure Craft, Inc. v. Johnson Outdoors, Inc., No. S–06–0533 GEB GGH, 2007 WL 273949, at *2–3 (E.D.Cal. Jan.29, 2007) (concluding that § 2019.210 is a rule of procedure that conflicts with the Federal Rules, and thus it does not apply in federal court); Hilderman v. Enea Teksci, Inc., No. 05cv1049 BTM (AJB), 2010 WL 143440, at *2–3 (S.D.Cal. Jan. 8, 2010) (holding, on a motion in limine, that § 2019.210 does not apply in federal court, but noting that the plaintiff may be barred from presenting at trial trade secret claims of which the defendants have not received "fair notice"). But the cases rejecting the direct application of § 2019.210 in federal court do not suggest that a federal magistrate judge cannot consider issues related to the policy rationale for § 2019.210; nor do they suggest that a judge employing discovery procedures similar to those mandated by § 2019.210 necessarily applies state law.

**\*4** Indeed, in Hilderman, on which Jardin heavily relies, the plaintiff[2] filed a trade secret statement before initiating discovery as § 2019.210 would require in state court. Hearing motions in limine after discovery had concluded, the court held that, although § 2019.210 did not apply to federal actions, the plaintiff did not have "free reign to try trade secret claims that were not disclosed in its 'Trade Secret Disclosure.' " 2010 WL 143440, at *3. Thus, although the court found § 2019.210 inapplicable, it held that the plaintiff may be barred from presenting trade secret claims of which the opposing party had not received fair notice, "whether in the 'Trade Secret Disclosure' or other discovery responses." Id.; see also Applied Materials, Inc. v. Advanced Micro–Fabrication Equipment (Shanghai) Co., Ltd., No. C 07–5248 JW (PVT), 2008 WL 183520, at *1 & n. 2 (N.D.Cal. Jan.18, 2008) (expressly declining to take a position on the applicability of § 2019.210 in federal court, but using Federal Rule 26(c) "and the inherent discretion of a court to manage its own

Jardin v. DATAllegro, Inc., Not Reported in F.Supp.2d (2011)
Case: 1:18-cv-00864 Document #: 305-11 Filed: 08/06/18 Page 5 of 25 PageID #:8476

2011 WL 3299395

discovery" to order the plaintiff to disclose all trade secrets it alleged the defendants misappropriated).

2    To be precise, Enea Teksci, Inc., was initially named as a defendant, but filed a counterclaim alleging trade secret misappropriation. Because only the counterclaim is relevant here, for simplicity's sake, the Court will refer to Enea as a plaintiff.

Portions of the procedure Judge Gallo ordered mirror what § 2019.210 would mandate in state court. Specifically, Judge Gallo ordered Defendants to "propound to Plaintiff one (1) special interrogatory" that essentially asks Jardin to identify the confidential information he alleges Defendant Frost misappropriated and incorporated into the #349 patent. [*See* Minute Order, Doc. No. 50.] Jardin's response to this interrogatory will serve the same purpose as the trade secret statement mandated by § 2019.210. [*See* June 27 Hr'g Tr., at 41:22–42:5.] Addressing Jardin's concern that Defendants would be permitted to begin discovery before Jardin, Judge Gallo ordered that no discovery will take place until Jardin answers the special interrogatory. [3] [*See id.* at 38:16–39:15.]

3    Judge Gallo also ordered that members of Jardin's legal team who had actual access to Defendants' confidential information in the 2008 case not take part in responding to the special interrogatory. [*See* June 27 Hr'g Tr., 37:24–40:16, 43:19–23, 47:6–19.] Nothing in the text of § 2019.210, however, speaks to which attorneys may participate in drafting a trade secret statement.

In short, Judge Gallo considered the parties' concerns, which happened to coincide with some of the policy concerns underlying § 2019.210, and he ordered discovery procedures similar to those that would be required under § 2019.210. But this does not mean that Judge Gallo applied state law, and, in fact, a careful review the order and the hearing transcript makes abundantly clear that he did not. [June 27 Hr'g Tr., at 37:18–38:3 (agreeing "wholeheartedly" with Plaintiff's counsel that § 2019.210 should not be applied, but noting that the policy considerations underlying § 2019.210 are relevant to this case).] Rather, Judge Gallo considered the issues raised by the parties and ordered procedures under "[Federal] Rule 26 and our local rules ... to manage discovery in a way that ensures fairness across the board." [*Id.* at 38:5–7.]

Judge Gallo's order stemmed from his assessment of the particular facts before him and his responsibilities and discretion under the Federal Rules of Civil Procedure, not a legal determination that California Civil Procedure Code § 2019.210 should apply in federal court. Accordingly, the Court reviews Judge Gallo's order under the "clearly erroneous" standard.

**II. Whether the Order Was Clearly Erroneous**

*5 In ordering the procedures described above, Judge Gallo was guided by the Court's responsibility and discretion under Federal Rule 26 to "manage discovery in a way that ensures fairness across the board." [*Id.* at 38:4–15, 43:1–12; *see also id.* at 15:9–14 (Plaintiff's counsel agrees that Judge Gallo has "considerable latitude" in organizing, scheduling, and managing discovery under the Federal and Local Rules).] In deciding how to "ensure [ ] fairness across the board," Judge Gallo took into account the concerns outlined by the parties, some of which align with the policy considerations underlying California Civil Procedure Code § 2019.210. [*See id.* at 16:13–16 (Defendants' primary concern is "to make the Plaintiff identify [the allegedly misappropriated information] without the help or the assistance of having looked at all the information from the 2008 case); *id.* at 18:22–19:21, 30:1–8 (discussing possible prejudice caused to Plaintiff by requiring him to specify the misappropriated information before additional discovery takes place); *id.* at 17:22–18:20, 21:15–23:9 (noting the need to better define the allegations of misappropriation); *id.* at 24:13–19 (noting the significance of Jardin's allegations of misappropriation to all of his legal claims).]

Judge Gallo did not abuse his discretion by considering any of the issues raised by the parties or by ordering discovery procedures based on his assessment of the parties' concerns and the facts in this case. That he ordered procedures similar to those that § 2019.210 would mandate in state court is of no moment; the Federal Rules provide magistrate judges with broad discretion to manage discovery based on the particular facts of the cases before them. *See, e.g., Seattle Times,* 467 U.S. at 36 ("The trial court is in the best position to weigh fairly the competing needs and interests of parties affected by discovery. The unique character of the discovery process requires that the trial court have substantial latitude [under Federal Rule 26(c) ] to fashion protective orders.") (internal footnote omitted); *Little v. City of Seattle,* 863 F.2d 681, 685 (9th Cir.1988) ("The district court has wide

Case: 1:18-cv-00864 Document #: 305-11 Filed: 08/06/18 Page 6 of 25 PageID #:8477

discretion in controlling discovery."); *Applied Materials,* 2008 WL 183520, at *1 & n. 2 (ordering procedures nearly identical to those ordered by Judge Gallo in this case through a Rule 26(c) protective order).

Jardin takes particular issue with the requirement that members of his legal team who had access to Defendants' confidential information produced in the 2008 case not participate in responding to Defendants' special interrogatory. Jardin argues "disqualification" of his desired counsel is a drastic measure that will cause significant prejudice. In making this argument, however, Jardin apparently misconstrues Judge Gallo's order. Judge Gallo did not contemplate disqualifying Jardin's 2008 legal team from representing Jardin throughout this litigation. Rather, Judge Gallo ordered a limited and temporary ethical wall, and expressly permitted lawyers in Robbins Geller who did not have *actual access* to Defendants' confidential information in the 2008 case to respond to the special interrogatory. Judge Gallo made clear during the hearing that he ordered the ethical wall in response to Defendants' concern that Plaintiff's counsel could not divorce themselves from their knowledge of Defendants' confidential material when identifying the information Defendant Frost allegedly misappropriated from Jardin. [*See* June 27 Hr'g Tr., at 12:1–15, 17:22–1, 21:15–1, 40:3–19; *see also id.* at 16:13–16 (Defense counsel explaining the specific nature of Defendants' concern regarding the confidential information from the 2008

case).] In other words, Judge Gallo's order addressed the concern that Plaintiff's counsel in the 2008 case simply cannot unring the bell. This was not an abuse of discretion. *See, e.g., Brown Bag Software v. Symantec Corp.,* 960 F.2d 1465, 1470–72 (9th Cir.1992) (holding that a protective order that shielded the plaintiff's in-house counsel from personal knowledge of the defendant's trade secrets, but allowed plaintiff's counsel access to information through an independent consultant, was not abuse of discretion).

**\*6** Nothing in Judge Gallo's order is clearly erroneous. The procedures Judge Gallo ordered are consistent with his responsibilities and discretion under the Federal Rules of Civil Procedure. Accordingly, Plaintiff's objection is **OVERRULED.**

### *CONCLUSION*

For the reasons stated above, Plaintiff's objection to Magistrate Judge Gallo's June 27, 2011 minute order is **OVERRULED.**

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3299395

---

                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**PhishMe, Inc. v. Wombat Sec. Techs. Inc.,**
2017 WL 4138961 (D. Del. 2017)

Case: 1:18-cv-00864 Document #: 305-11 Filed: 08/06/18 Page 8 of 25 PageID #:8479
PhishMe, Inc. v. Wombat Security Technologies, Inc., Slip Copy (2017)

2017 WL 4138961

2017 WL 4138961
Only the Westlaw citation is currently available.
United States District Court,
D. Delaware.

PHISHME, INC., Plaintiff,

v.

WOMBAT SECURITY
TECHNOLOGIES, INC., Defendant.

Civil Action No. 16–403–LPS–CJB

|

Signed 09/08/2017

**Attorneys and Law Firms**

Anne Shea Gaza, Samantha G. Wilson, Young, Conaway,
Stargatt & Taylor LLP, Wilmington, DE, Fahd H. Patel,
Pro Hac Vice, Hector G. Gallegos, Pro Hac Vice, Joshua
A. Hartman, Pro Hac Vice, Mehran Arjomand, Pro Hac
Vice, Richard S.J. Hung, Pro Hac Vice, for Plaintiff.

Steven L. Caponi, K & Gates LLP, Wilmington, DE,
Anna Shabalov, Pro Hac Vice, Christopher M. Verdini,
Pro Hac Vice, Mark G. Knedeisen, Pro Hac Vice, Patrick
J. McElhinny, Pro Hac Vice, for Defendant.

## MEMORANDUM ORDER

Christopher J. Burke, UNITED STATES
MAGISTRATE JUDGE

**\*1** Pending before the Court in this patent infringement
action is Plaintiff PhishMe, Inc.'s ("Plaintiff" or
"PhishMe") letter motion seeking to modify the Protective
Order entered in this case ("Motion"). (D.I. 93, 96)
The Motion is opposed by Defendant Wombat Security
Technologies, Inc. ("Defendant" or "Wombat"). For the
reasons discussed below, the Court DENIES Plaintiff's
Motion.

## I. BACKGROUND

On June 1, 2016, Plaintiff commenced Civil Action
Number 16–403–LPS–CJB [1] against Defendant; the
operative complaint in that case now alleges that
Defendant infringes United States Patent No. 9,398,038.
(D.I. 1; D.I. 16) Defendant has, *inter alia*, asserted

Lanham Act and state law counterclaims in that
case related to another PhishMe patent, U.S. Patent
No. 9,356,948 (the " '948 patent"). (D.I. 18) [2] In
its counterclaims, Defendant has alleged (and for our
purposes, there really is no dispute) that it and Plaintiff
are direct competitors in the market for, *inter alia*,
cyber security awareness and training software for
organizations. (*Id.* at 8 at ¶ 1; *id.* at 10–11 at ¶¶ 11–19;
*id.* at 12 at ¶ 29; *id.* at 29 at ¶ 155; *see also* D.I. 99 at
1; D.I. 103, ex. 2 ("Tr.") at 25 (Wombat's counsel noting
that the parties are "vigorous competitors")) On June 28,
2017, Chief Judge Leonard P. Stark referred the case to
the Court to hear and resolve all pre–trial matters, up to
and including the resolution of case-dispositive motions.
(D.I. 85)

[1]    Citations herein are to the docket in this Civil Action
       Number, unless otherwise noted.

[2]    PhishMe had originally asserted the '948 patent
       against Defendant, and later removed its claims as to
       that patent without prejudice. (D.I. 16; D.I. 108) The
       Court recently issued a Report and Recommendation
       recommending that the District Court grant-in-part
       and deny-in-part PhishMe's motion seeking dismissal
       of the Lanham Act and state law counterclaims, (D.I.
       111), to which objections have been filed, (D.I. 114;
       D.I. 115).

A jointly-proposed Protective Order was entered by the
Court in Civil Action Number 16–403–LPS–CJB on
November 1, 2016. (D.I. 24) That Protective Order,
at issue here, requires that, *inter alia*, there be three
levels of protection for confidential information: (1)
"CONFIDENTIAL Material," which up to three of
each party's employees, officers or directors can access;
(2) "ATTORNEY'S EYES ONLY ['AEO'] Material,"
with access restricted to a smaller group of persons,
including outside counsel (but not including any party
employees, officers or directors); and (3) "Prosecution Bar
Material," with access restricted to outside counsel and
further conditioned on forbearance from certain patent
prosecution activities. (D.I. 24 at 2–4, 9–13; D.I. 96 at
1) [3] To date, Wombat has produced a significant amount
of AEO Material to PhishMe, including documents
reflecting Wombat's business and products, financial
position, strategic planning, competitive intelligence, and
customer contract negotiations. (D.I. 99 at 2–3; D.I. 105
at 2 & ex. 1; Tr. at 25) Indeed, it appears that a significant
amount of the documents that each side has produced

to the other in this case have been designated as AEO Material. (D.I. 96, ex. 4 at ¶ 6; Tr. at 15, 25)[4]

3    Pursuant to the Protective Order, AEO Material is material that the designating party "believes in good faith is not generally known to others and has significant competitive value such that unrestricted disclosure to others would create a substantial risk of serious injury, and which the [d]esignating [p]arty (i) would not normally reveal to third parties except in confidence or has undertaken with others to maintain in confidence; (ii) believes in good faith is protected by a right to privacy under federal or state law or any other applicable privilege or right related to confidentiality or privacy; or (iii) believes in good faith constitutes proprietary financial, technical or commercially sensitive competitive information that the [p]roducing [p]arty maintains as highly confidential in its business." (D.I. 24 at 2–3) Prosecution Bar Material is "[s]ource code designated by the [p]roducing [p]arty ... and any [CONFIDENTIAL Material or AEO Material] that bears a label 'Subject to Prosecution Bar[.]' " (Id. at 4)

4    Wombat's counsel estimated that of the approximately 200,000 pages of documents it has produced, the "majority" of them are designated as AEO Material. (Tr. at 35)

*2 On June 16, 2017, Plaintiff commenced a second case against Defendant, alleging infringement of U.S. Patent Nos. 9,591,017 and 9,674,221. That action—Civil Action No. 17–769–LPS–CJB—was also referred to the Court to hear and resolve all pre-trial matters, up to and including the resolution of case-dispositive motions. (Civil Action No. 17–769–LPS–CJB, D.I. 9) Thereafter, Civil Action No. 17–769–LPS–CJB was consolidated with Civil Action No. 16–403–LPS–CJB by joint stipulation and by order of the Court. (D.I. 86) The Protective Order at issue here thus applies to both of the consolidated cases.

On July 19, 2017, the parties notified the Court of the instant Motion. (D.I. 93) With the Motion, Plaintiff asks the Court to modify the Protective Order to permit one in-house counsel of Plaintiff to access AEO Material: Plaintiff's General Counsel, Secretary and Chief Privacy Officer Shane McGee, who joined Plaintiff (and took on each of those roles) on October 31, 2016. (D.I. 96 at 1; see also id., ex. 2 at 10; id., ex. 4 at ¶ 3; D.I. 103, ex. 1 at ¶ 1) The parties thereafter filed letter briefs in support of their positions. (D.I. 96; D.I. 99) The Court held a

teleconference to address the Motion on August 10, 2017. Following the teleconference, the Court ordered that the parties may file one additional submission apiece that addressed certain issues raised during the teleconference. Each side then submitted supplemental materials, and the briefing was closed on August 18, 2017. (D.I. 103; D.I. 105)

## II. DISCUSSION

### A. Legal Standards

Federal Rule of Civil Procedure 26(b)(1) permits, with certain limits, "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense[.]" Fed. R. Civ. P. 26(b)(1). A producing party may ask the Court to minimize its burden to turn over discoverable information by ordering that a protective order be issued, to protect it from "annoyance, embarrassment, oppression, or undue burden or expense[.]" Fed. R. Civ. P. 26(c)(1). One such order can allow that "a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way[,]" id., to, inter alia, an attorney for one of the parties, see Blackbird Tech LLC v. Serv. Lighting & Elec. Supplies, Inc., Civil Action No. 15–53 RGA, 2016 WL 2904592, at *1 (D. Del. May 18, 2016). A party seeking a modification to a protective order (here, Plaintiff) regarding an attorney's access to otherwise protected information carries the burden of demonstrating "good cause" for the modification. Cf. In re Deutsche Bank Trust Co. Ams., 605 F.3d 1373, 1378 (Fed. Cir. 2010); Pansy v. Borough of Stroudsburg, 23 F.3d 772, 790 (3d Cir. 1994); Apeldyn Corp. v. AU Optronics Corp., Civil Action No. 08–568–SLR, 2012 WL 2368796, at *2 (D. Del. June 13, 2012); Phillips Petroleum Co. v. Rexene Prods. Co., 158 F.R.D. 43, 46 (D. Del. 1994); Cytosport, Inc. v. Vital Pharm., Inc., No. CIV. S–08–2632 FCD/GGH, 2010 WL 728454, at *1 & n.3 (E.D. Cal. Mar. 2, 2010); see also (Tr. at 18).

The United States Court of Appeals for the Federal Circuit[5] has stated that in determining whether good cause has been shown to support modification to a protective order of the type at issue here, a court must first consider whether the modification would bring with it an "unacceptable risk of inadvertent disclosure" or competitive misuse of confidential information. In re Deutsche Bank, 605 F.3d at 1378–79 (citation omitted).[6]

The Court must then "balance" that risk against the potential harm to the moving party, were the modification not to be adopted, and were it to thus face restrictions on its right to have the benefit of counsel of its choice. *Id.* at 1380.

5    The parties do not directly address the issue of whether regional circuit law or Federal Circuit law governs the determination of whether, and under what circumstances, a modification to a protective order, of the type at issue here, is appropriate. Even assuming that regional circuit law applies, *see Baystate Techs., Inc. v. Bowers*, 283 Fed.Appx. 808, 810 (Fed. Cir. 2008) (applying First Circuit law in resolving a protective order dispute), the Court will still—as have our Court and other courts in cases involving patent disputes—look to the Federal Circuit's case law for helpful guidance as to these issues. *See, e.g., Blackbird Tech LLC*, 2016 WL 2904592, at *1; *R.R. Donnelley & Sons Co. v. Quark, Inc.*, No. CIV A 06–032 JJF, 2007 WL 61885, at *1 (D. Del. Jan. 4, 2007); *Boehringer Ingelheim Pharm., Inc. v. Hercon Labs. Corp.*, Civ. A. No. 89–484–CMW, 1990 WL 160666, at *1–2 (D. Del. Oct. 12, 1990); *see also Intel Corp. v. VIA Techs., Inc.*, 198 F.R.D. 525, 528 (N.D. Cal. 2000).

6    As numerous courts have remarked, the inquiry here is not directed to an attorney's ethical standards, because it mainly focuses on the likelihood of inadvertent disclosure or misuse. *Blackbird Tech LLC*, 2016 WL 2904592, at * 1 n.2. The Court stresses that in its discussion below, it is in no way presuming or suggesting that Mr. McGee would intentionally disclose or misuse confidential information. The primary concern, as it is in all such cases, is the extent to which the human mind is such that it becomes very difficult—once one learns of a competitor's confidential information—to completely insulate that information from the thought process involved in providing one's client advice on competition-related issues.

**B. Discussion**

### 1. Unacceptable Risk of Inadvertent Disclosure or Competitive Misuse

**\*3** In assessing whether a proposed modification of a Protective Order would present an unacceptable risk of inadvertent disclosure or competitive misuse of confidential information, it would be error

to deny access solely because of an in-house counsel's "general position"; instead, "the factual circumstances surrounding each individual counsel's activities, association, and relationship with a party ... must govern any concern for inadvertent or accidental disclosure." *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1467–68 (Fed. Cir. 1984); *see also Boehringer Ingelheim Pharm., Inc. v. Hercon Labs. Corp.*, Civ. A. No. 89–484–CMW, 1990 WL 160666, at *1 (D. Del. Oct. 12, 1990). This decision will turn, then, on a fact-intensive inquiry into whether affected counsel (here, Mr. McGee) participates in "competitive decisionmaking" at PhishMe. *U.S. Steel Corp.*, 730 F.2d at 1467–68; *In re Deutsche Bank*, 605 F.3d at 1378. The Federal Circuit has defined "competitive decisionmaking" as "counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *U.S. Steel Corp.*, 730 F.2d at 1468 n.3; *see also In re Deutsche Bank*, 605 F.3d at 1378–79.

Here, the parties focus much of their briefing on whether Mr. McGee, in fact, participates in competitive decisionmaking. The Court will similarly reserve much of its focus for this issue. In addressing that question, it makes sense to first assess what we know about Mr. McGee's responsibilities at PhishMe (drawn from two declarations that Mr. McGee has submitted and a few other materials of record):

• Mr. McGee states that, in his role as General Counsel, he is "responsible for all of PhishMe's legal affairs and provide[s] advice and counsel to the company on legal, compliance, and privacy matters." (D.I. 96, ex. 4 at ¶ 3) He reports directly to Rohyt Belani, PhishMe's Chief Executive Officer ("CEO"). (*Id.*)

• Mr. McGee avers that while he "participate[s] in evaluating whether other companies are infringing PhishMe's intellectual property rights and in formulating enforcement strategies[,]" he is "not authorized, however, to make the ultimate decisions on whether and on what terms to license PhishMe's intellectual property, including the patents PhishMe has asserted against Wombat, or on whether to enforce PhishMe's patents against entities it believes infringe[,]" or as to whether initiate or settle litigation. (*Id.* at ¶¶ 4–5) PhishMe's CEO and its

Board of Directors ("Board") make those "ultimate decisions[.]" (*Id.* at ¶ 4)

- Mr. McGee also manages PhishMe's "outside patent prosecution counsel in the prosecution of patent applications and in post-issuance proceedings related to PhishMe's patents." (*Id.* at ¶ 5)

- Additionally, Mr. McGee supervises two other in-house attorneys and a barrister-in-training. (*Id.* at ¶ 3) One of those two attorneys, *inter alia*, reviews and drafts contracts, developing contractual language based on terms negotiated by PhishMe's business teams. (D.I. 103, ex. 1 at ¶ 4).

- Mr. McGee states that he plays no part in "PhishMe's sales, marketing, or product development efforts, including [1] designing or developing PhishMe's products; [2] identifying prospective customers, investors, or other business partners; [3] identifying potential strategic transactions or business opportunities; and [4] determining product pricing." (D.I. 96, ex. 4 at ¶ 7) Any participation he has in the company's competitive decisions flows from his provision of advice to PhishMe's business personnel on the legal or privacy-related implications of the various competitive paths those business persons are considering or have tentatively chosen. (*Id.; see also* Tr. at 9–10)

- In a November 2016 press release touting Mr. McGee's hire, PhishMe described his role to include "acting as a strategic business partner"; it also noted how, in his prior role as General Counsel for another company, Mandiant Corporation ("Mandiant"), Mr. McGee "negotiated and finalized" the over $1 billion dollar sale of Mandiant to another entity. (D.I. 99, ex. 1 at 1) Despite the language to this effect in the PhishMe press release, Mr. McGee now states that, in fact, he "did not negotiate the business terms in connection with the sale of Mandiant" and that, in any event, his responsibilities at PhishMe "do not include negotiating the business terms of strategic transactions, customer contracts, or other business agreements." (D.I. 103, ex. 1 at ¶ 5)

**\*4** • PhishMe has a management team of 15 executives, of which Mr. McGee is one. (*Id.* at ¶ 2) Other members of this management team are responsible for departments that serve a business or competitive function (such as business development,

sales, product development, marketing, and the like). (*Id.*) Mr. McGee does not engage in "any work for these departments related to competitive decision-making or otherwise fill any gaps in such departments." (*Id.*) Mr. McGee's role, instead, is to "provide legal advice to ... other [Wombat] departments who are responsible for the competitive operations that PhishMe undertakes." (Tr. at 8–9)

- As a member of the management team, Mr. McGee attends management team meetings that also include the company's Board. In those meetings, he states that he participates "solely to identify legal issues and provide legal and compliance advice" and does not participate in any of the "competitive decisions[.]" (D.I. 103, ex. 1 at ¶ 3) Mr. McGee further explains that he is often the only attorney who advises the Board on the status of the company's legal matters and on the development and enforcement of its intellectual property portfolio; the company has rarely used outside counsel to play this role. (D.I. 96, ex. 4 at ¶¶ 3–4)

With these statements about Mr. McGee's responsibilities firmly in mind, the Court has next attempted to distill down a number of the factors that our Court and other courts have examined when assessing the risk of inadvertent disclosure or competitive misuse (most of which have to do with determining whether an attorney participates in "competitive decisionmaking").

First, courts have looked at the extent to which the in-house counsel plays an active, first-person role in strategic and competitive decisionmaking (e.g., by making certain decisions himself that directly affect relevant competition with other entities). Obviously, to the extent that the affected counsel is the final decisionmaker in this regard, this would (almost by definition) dictate that he or she is a "competitive decisionmaker." [7]

[7]    *see Blackbird Tech LLC,* 2016 WL 2904592, at \*4 (finding that the fact that two in-house attorneys served as "essentially the officers and principals of [plaintiff,]" and had the "final say" in matters of company management and case resolution, all augured in favor of a finding that they were competitive decisionmakers); *R.R. Donnelley,* 2007 WL 61885, at \*2 (denying a party's President of Corporate Strategic Initiatives access to AEO Material where he served in a supervisory role

Case: 1:18-cv-00864 Document #: 305-11 Filed: 08/06/18 Page 12 of 25 PageID #:8483
PhishMe, Inc. v. Wombat Security Technologies, Inc., Slip Copy (2017)

2017 WL 4138961

in research and development and other strategic initiatives of the company); *Sullivan Mktg., Inc. v. Valassis Commc'ns, Inc.*, No. 93 CIV. 6350 (PKL), 1994 WL 177795, at *3 (S.D.N.Y. May 5, 1994) (finding that the defendant's General Counsel was involved in competitive decisionmaking to such a degree that he should be denied access to competitively sensitive data, where, *inter alia*, he not only provided legal advice, but also managed specific departments, and where his compensation was linked to business profitability).

Here, Mr. McGee has repeatedly stated that he does not himself make final decisions on issues affecting competition (e.g., with regard to pricing, product development, business acquisitions or the like); others, particularly PhishMe's CEO and its Board, make those decisions instead. The Court credits these statements, *see Matsushita Elec. Indus. Co., Ltd. v. United States*, 929 F.2d 1577, 1579–80 (Fed. Cir. 1991), and thus, this factor supports PhishMe's Motion.

Second, courts have assessed the extent to which counsel —even if he or she does not make competitive decisions —nevertheless directly advises other high level executives at the company, who are themselves competitive decisionmakers in the subject matter areas relating to the suit in question. *see Intel Corp. v. VIA Techs., Inc.*, 198 F.R.D. 525, 530–31 (N.D. Cal. 2000) (finding that concerns about the risk of harm from competitive decisionmaking were exacerbated where a Senior Counsel for plaintiff regularly advised the general managers of the plaintiffs business unit that were most affected by potential licensing agreements, and advised a Vice-President involved in competitive decisionmaking who had been denied access to confidential information by other courts in similar cases, and finding that it would be difficult for the Senior Counsel to give advice to these other persons without drawing on protected information). Of course, the proper inquiry here is not simply about whether the counsel has *regular contact* with a competitive decisionmaker. Instead, it is on whether the nature of this contact or advice suggests that the counsel will be a *meaningful participant* in a process that leads to the making of decisions affecting competition. *Matsushita Elec. Indus. Co.*, 929 F.2d at 1580 (noting that the focus should be on counsel's " 'advice and participation' in 'competitive decisionmaking' ").

**\*5** It is worth noting that, even when an attorney states that their role is simply to provide "legal advice" on "legal

issues" to competitive decisionmakers, or when counsel asserts that they are simply an "advisor" with regard to these questions, this is not dispositive. Instead, the (1) greater the extent that an in-house attorney viewing confidential material like that at issue here is one of few people advising the ultimate decisionmaker, and (2) the greater the role counsel plays in that advice-giving process, then (3) the greater the chance that, inadvertently, access to the confidential material may cloud the types of advice counsel provides, and may ultimately play an important role in the decisionmaking process. [8]

[8] *Compare Cytosport, Inc.*, 2010 WL 728454, at *3 ("If the CEO is not a lawyer, query who will advise him on such issues. Questions such as the extent that in-house counsel will be advising the employer on such legal issues as input on contract formation, marketing, and employment are important [in this inquiry.]"); *and Sullivan Mktg.*, 1994 WL 177795, at *3 (finding that although defendant's General Counsel stated that his input was limited to "legal issues [,]" his attendance at company strategy meetings where pricing tactics were discussed and where knowledge of a competitor's marketing plans would be particularly crucial indicated that the risk of inadvertent disclosure was high, as it "is often difficult to draw the line between legal and business advice" in such contexts), *with Koninklijke Philips N.V. v. Amerlux, LLC*, 167 F. Supp. 3d 270, 272–73 (D. Mass. 2016) (finding that plaintiffs' in-house counsel did not participate in competitive decisionmaking in a manner that was problematic, in part because the patents-in-suit involved LED lighting technology, and counsel did not interact with plaintiff's lighting unit in any way implicating competitive decisionmaking), *and R.R. Donnelley*, 2007 WL 61885, at *1 (permitting a party's Chief Patent Counsel access to AEO Material, in significant part because he did *not* report directly to any business person with direct responsibility for competitive decisionmaking).

Here, it is clear that while Mr. McGee may not be the "final decisionmaker" as to issues regarding pricing, product design or those otherwise made in light of similar information about a competitor (like Wombat), he plays a very important role in the process that leads to those decisions. He provides legal advice to the final decisionmakers (including the company's CEO and its Board) on these issues. (Tr. at 8–9) Moreover, Mr. McGee is not only the sole in-house attorney who provides that

kind of advice, but in most instances, he is really the *only* attorney who ever does so (since outside counsel has not traditionally played any role in that process). This all militates in favor of denial of the Motion. [9]

[9]    The Court also notes the apparent disconnect between the way PhishMe described Mr. McGee's role in the November 2016 press release that was issued just after he was hired, and the way it has described Mr. McGee's role since this legal issue arose. In the press release, Mr. McGee is referred to as a "strategic business partner[,]" (D.I. 99, ex. 1 at 1), but now, PhishMe seems to shy away from that kind of description, (Tr. at 10). In the press release, PhishMe also describes Mr. McGee's prior work at Mandiant as including "negotiat[ion] and finali[zation]" of Mandiant's sale, (D.I. 99, ex. 1 at 1); but now, PhishMe states that this description is incorrect (or perhaps, at least a bit misleading), (D.I. 103, ex. 1 at ¶ 5 (Mr. McGee averring that "I did not negotiate the business terms in connection with the sale of Mandiant")). At a minimum, it seems like PhishMe wanted the reader of that press release to conclude that Mr. McGee had real experience with the kinds of issues and decisions that play an important role in setting a company's future "strategic" course.

**\*6** A third factor, one particular to the patent context, is whether the in-house counsel plays a significant role in the enforcement of a company's intellectual property (including the extent to which that counsel makes determinations about whether to pursue patent litigation against competitors or to license those competitors). *Blackbird Tech LLC*, 2016 WL 2904592, at \*1 (citing cases). Here, as noted above, Mr. McGee states that he does not make the "ultimate decisions" on "whether and on what terms to license PhishMe's intellectual property ... or on whether to enforce PhishMe's patents against entities it believes infringe." (D.I. 96, ex. 4 at ¶ 5) Those "ultimate decisions" are made by PhishMe's CEO, Mr. Belani, and by the company's Board. This is because the company is at a place "in its life cycle [where] these decisions are sufficiently important that the[se types of high-level] ultimate decision-makers are required for something as important as whether to initiate a lawsuit, whether to license its intellectual property and on what terms." (Tr. at 6; *see also* D.I. 105, ex. 2 (article noting that Mr. Belani: (1) described 2018 as a " 'pivotal year' " for the company, (2) explained how the company is currently "focused on ... potential

acquisitions" that would "accelerate its product or technology roadmap[,]" (3) noted that the company is releasing new products in 2018, and (4) cited Wombat as a competitor of PhishMe))

However, even Plaintiff has acknowledged that "Mr. McGee's role is still *significant* with respect to th[e]se issues [because h]e is involved in advising PhishMe's CEO and its Board on whether to enforce and who to enforce against and whether to license[,]" and that Mr. McGee's "informed counsel [is] *essential* in how PhishMe makes those decisions." (Tr. at 6–7 (emphasis added)) Mr. McGee's knowledge of Wombat's products, its marketing information and other aspects of its AEO Material would, *inter alia*, "be directly relevant to [his] evaluation of licensing agreements" in subject matter areas in which the company competes with Wombat. *Intel*, 198 F.R.D. at 530. And the fact that he reports to the final decisionmakers directly—and that his legal advice is crucial to shaping those decisions—suggests that it would be difficult for him to "lock[ ] up trade secrets in [his] mind" while providing the advice. *Id.* (internal quotation marks and citation omitted); (D.I. 105 at 2 (Wombat asserting that "it is unrealistic to believe that Mr. McGee could advise PhishMe on whether or when to sue Wombat on a new patent or to license a patent to a competitor while 'compartmentaliz[ing] and selectively suppress[ing]' all of Wombat's AEO information."))

Unsurprisingly, courts have found that this type of significant, active role in the direction of patent litigation and licensing—particularly for a company at PhishMe's stage of life—weighs in favor of a conclusion that Mr. McGee participates in competitive decisionmaking. To be sure, PhishMe is not a patent licensing entity, and so it is not that (as with such entities) its *entire business model* is built on the concept of bringing patent litigation and/or entering into patent licensing agreements. *Blackbird Tech LLC*, 2016 WL 2904592, at \*2, \*4 (noting that, where an " 'essential' " part of a plaintiff company's business was "acquiring patents and asserting them in litigation [,]" in-house counsel were competitive decisionmakers where they, *inter alia*, "essentially have the final say on what patents [plaintiff] will acquire and assert in subsequent litigations"). But undisputedly, PhishMe is at a point in its corporate history where deciding whom to sue for patent infringement (or license) still amounts to a particularly "important" part of its business strategy. And at PhishMe, working with a "small group of inhouse attorneys [,]"

Case: 1:18-cv-00864 Document #: 305-11 Filed: 08/06/18 Page 14 of 25 PageID #:8485
PhishMe, Inc. v. Wombat Security Technologies, Inc., Slip Copy (2017)

2017 WL 4138961

Mr. McGee is the "only one of those ... attorneys with a significant role in managing litigation and enforcing PhishMe's patents." (Tr. at 8) Taking all of this into account, there is a real risk that to give Mr. McGee "access to [Wombat's] confidential technical and financial information would raise the specter of prosecuting or acquiring patents that read on [Wombat's] products." *Blackbird Tech LLC*, 2016 WL 2904592, at *5 (citing *ST Sales Tech Holdings, LLC v. Daimler Chrysler Co.*, LLC, Civil Action No. 6:07–CV–346, 2008 WL 5634214, at *5 (E.D. Tex. Mar. 14, 2008)). [10] This too supports denial of the Motion.

[10]     see also *Pinterest, Inc. v. Pintrips, Inc.*, Case No. 13–CV–04608–RS (KAW), 2014 WL 5364263, at *2–3 (N.D. Cal. Oct. 21, 2014) (finding that a company's Deputy General Counsel was engaged in competitive decisionmaking, even though the counsel's stated role was not to advise on business strategy or on what new products to develop or how to price those products, because of counsel's "substantial role on the [company's] legal team, his control over Plaintiff's intellectual property, his influence over whether Plaintiff will pursue litigation against another business entity, and his advisory work with product teams"); *Affymetrix, Inc. v. Illumina, Inc.*, No. Civ.A 04–901–JJF, 2005 WL 1801683, at *2 (D. Del. July 28, 2005) (finding that one in-house counsel could not be included as a party to the protective order, in that her role was linked to competitive decisionmaking, since she "is part of [defendant's] management team and is involved with settling patent litigation and licensing"); *Intel*, 198 F.R.D. at 530 (finding that plaintiff's Senior Counsel was engaged in competitive decisionmaking, where counsel was "actively involved in negotiating the terms of licensing agreements as part of settling lawsuits" and where her "knowledge of technical aspects of [defendant's] products, [defendant's] licensing agreements, and marketing information would be directly relevant to her evaluation of licensing agreements of related products" such that this might give plaintiff a "competitive advantage" in negotiating related licenses in the future).

**\*7** Fourth, courts have looked at the degree to which the in-house counsel at issue plays a role in patent prosecution. That process  in which an attorney might inadvertently utilize a competitor's confidential information in determining how to craft new patent claims that could read on the competitor's products—carries with it a particularly significant risk of competitive misuse.

*In re Deutsche Bank*, 605 F.3d at 1380; *Commissariat A L'Energie Atomique v. Dell Comp. Corp.*, No. Civ.A 03–484–KAJ, 2004 WL 1196965, at *2 (D. Del. May 25, 2004); *Cf. Koninklijke Philips N.V. v. Amerlux, LLC*, 167 F. Supp. 3d 270, 272–73 (D. Mass. 2016) (finding that plaintiffs' in-house counsel did not participate in competitive decisionmaking, in part because they did not prosecute or oversee prosecution of the company's patents). Here, Mr. McGee (and nobody else) directly oversees and "manage[s]" PhishMe's patent prosecution efforts. (D.I. 96, ex. 4 at ¶ 5; *see also* Tr. at 20) PhishMe is very aware (having cited to it) of some authority suggesting that if in-house counsel provides only " 'high-altitude oversight' " of patent prosecution, and "is not directly involved in the drafting or prosecution of patent applications [,]" then this might mitigate any risk of competitive misuse in the patent prosecution arena. *see ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 274 F.R.D. 576, 582 (E.D. Va. 2010) (cited in D.I. 96 at 3 n.19 and D.I. 103 at 1 n.4). But, despite having filed two declarations, Mr. McGee has provided no indication that his "manage[ment]" of patent prosecution is only the kind of high-level, not-so-deep-into-the-details role that is referenced by this caselaw.

The Court does note that the Protective Order allows for certain, highly-sensitive material to be marked "Prosecution Bar Material" (material that Mr. McGee would not be permitted to access, no matter the outcome of the instant Motion). (D.I. 96 at 4) But that does not entirely eliminate the risk at issue in the patent prosecution space. It is clear that even the AEO Material that is not further designated as Prosecution Bar Material still involves the kind of very sensitive information that could well be inadvertently misused to Wombat's detriment in PhishMe's future patent prosecution efforts. (D.I. 99 at 4) [11] And *a lot* of AEO Material has been produced in this case—the parties agree that the lion's share of their productions so far have consisted of that kind of material. In the end, Mr. McGee's apparently substantive role in overseeing patent prosecution efforts provides another reason to consider him a participant in competitive decisionmaking.

[11]     According to Wombat, "PhishMe has additional pending patent applications that are related to the asserted patents in this case and that could be amended based on Wombat's AEO information,

Phishme, inc. v. Wombat Security Technologies, Inc., Slip Copy (2017)
Case: 1:18-cv-00864 Document #: 305-11 Filed: 08/06/18 Page 15 of 25 PageID #:8486

2017 WL 4138961

exacerbating the risk of inadvertent disclosure by Mr.
McGee." (D.I. 99 at 4)

Fifth, courts have inquired about the size of the company
(and its in-house legal department) in which the affected
counsel works. To the extent that the company is relatively
small (and that, as a result, this increases the likelihood
that the in-house counsel would undoubtedly need to
work closely with other competitive decisionmakers), that
could "exacerbate the potential for inadvertent misuse
or disclosure[.]" *Blackbird Tech LLC*, 2016 WL 2904592,
at *4; *see also Cytosport, Inc.*, 2010 WL 728454, at *4.
As for the size of the in-house legal department, where
the department is of sufficiently large size that, if a
"future project [of the counsel-at-issue] were to present
a conflict because of information that has been learned
from discovery in this lawsuit, the conflicting assignment
could be rerouted to another individual not possessing
the conflicting information[,]" that might help lessen
concerns about future misuse. *Boehringer Ingelheim*, 1990
WL 160666, at *2; *see also* (Tr. at 30). But if the legal
department is very small, that would tend to enhance such
concerns, since the affected counsel might, by necessity,
have to play a role in such future projects. *Cytosport, Inc.*,
2010 WL 728454, at *4 ("The risk and potential danger
of disclosure is compounded here in that [the defendant]
has only two attorneys on its in-house counsel team, and
it is a relatively small company.... This is not a situation ...
similar to Microsoft which has 50 in-house attorneys, any
one of which could take over in such a case and be walled
off from the other attorneys and management.").

**\*8** Here, it appears that while PhishMe is "a
tiny company[,]" (Tr. at 8), it is relatively small (with
approximately 200 employees), (*Id.*). And it is clear that its
legal department is very small. (*Id.*) Mr. McGee is but one
of three licensed attorneys in the department, and appears
to be the only one who provides key legal advice directly
to most or all of the corporate decisionmakers. This too
augers in favor of denial of the Motion.

Sixth, courts have inquired about the gravity of the
consequences of inadvertent disclosure or misuse. In that
regard, courts have acknowledged that the risk of harm
is heightened where the non-moving company is a direct
competitor of the movant in particular business areas
(e.g., the parties sell competing products or services). *Cf.
Blackbird Tech LLC*, 2016 WL 2904592, at *4–5; *see also
Pinterest, Inc. v. Pintrips, Inc.*, Case No. 13–cv–04608–
RS (KAW), 2014 WL 5364263, at *2–3 (N.D. Cal. Oct.

21, 2014); *St. Alphonsus Med. Ctr. v. St. Luke's Health
Sys.*, No. 1:12–cv–00560–BLW–RE, 2013 WL 139324, at
*4 (D. Id. Jan. 10, 2013); *Cytosport, Inc.*, 2010 WL 728454,
at *5; *Intel*, 198 F.R.D. at 531. In such a scenario, were
its confidential information later utilized to its detriment,
the non-movant might not only be harmed in the instant
litigation or in other litigation matters, but it might also
see its competitive position in the market damaged in
ways that are hard to quantify. Here, as noted above, it
is undisputed that PhishMe and Wombat are fierce, direct
competitors, and so this factor also weighs against the
movant.

Seventh, courts have asked whether the affected counsel
proposes to use strict safeguards in handling confidential
information. *Affymetrix*, 2005 WL 1801683, at *2. Here,
Mr. McGee states that he will not store any AEO Material
in computer systems accessible to business personnel at
PhishMe, and that he will ensure that any such electronic
material is password-protected, or encrypted. (D.I. 96,
ex. 4 at ¶ 8) This would help provide some comfort that
the AEO Material at issue would be safeguarded from
unauthorized access (though it necessarily cannot address
the risk that *insights* from such material may inadvertently
seep into the legal advice that Mr. McGee provides to
others). (Tr. at 37) And so it works a bit in PhishMe's
favor.

In the end though, most of the above-referenced factors
indicate that the risk of inadvertent disclosure or
competitive misuse is high here, and that Mr. McGee
participates in competitive decisionmaking. Based on
what is known, there are too many future scenarios
in which—if Mr. McGee is given unfettered access to
Wombat's AEO Material—he may later find himself
providing crucial legal advice to PhishMe decision makers
as to whether PhishMe should take action that might harm
Wombat's competitive position.

### 2. Harm to the Movant From Restriction on
### Having the Benefit of Counsel of its Choice

The Court next investigates the harm to PhishMe were it
not able to have Mr. McGee access AEO Material.

PhishMe's best arguments as to why Mr. McGee's needs
that access are that, since so much of the produced
discovery in the case is designated as AEO Material, Mr.

Case: 1:18-cv-00864 Document #: 305-11 Filed: 08/06/18 Page 16 of 25 PageID #:8487
PhishMe, Inc. v. Wombat Security Technologies, Inc., Slip Copy (2017)

2017 WL 4138961

McGee has to see that material so he can: (1) evaluate the merits of the parties' contentions; (2) help form and approve PhishMe's litigation strategy in the case; and (3) advise PhishMe's CEO and Board of the strengths and weaknesses of each party's case, and assess possibilities for settlement. (D.I. 96, ex. 4 at ¶ 6); *see also Boehringer Ingelheim*, 1990 WL 160666, at *2. [12] The fact that Mr. McGee (and none of the other PhishMe attorneys) is the in-house counsel who oversees this case, and who is responsible for facilitating major decisions regarding the lawsuit, demonstrates that there will be some prejudice to PhishMe if the Motion is denied. It is no doubt difficult for Mr. McGee to fully convey to his internal clients PhishMe's potential exposure here, or to provide them with a detailed assessment of the merits, without having exposure to AEO Material. (Tr. at 12) And it is not as if, were Mr. McGee precluded from accessing AEO Material, some other in-house attorney who has already been provided access to the material could play this role (since no other in-house employee can review AEO Material, pursuant to the Protective Order). *see Boehringer Ingelheim*, 1990 WL 160666, at *2 (finding that the fact that certain in-house counsel were the people responsible for major decisions concerning the lawsuit favored allowing access). While this factor might auger even more strongly in favor of access were Mr. McGee a member of the trial team (he is not), *see Intervet, Inc. v. Merial Ltd.*, 241 F.R.D. 55, 55-56 (D.D.C. 2007), or were he shown to have highly specialized knowledge about the subject matter of this case that no one else (even outside counsel) could replicate, *see Cytosport, Inc.*, 2010 WL 728454, at *4, it still is favorable to PhishMe's request.

[12]   Mr. McGee also states that he needs access to AEO Material in order to forecast and monitor PhishMe's legal fees and costs, and to prepare and maintain a budget for the litigation. (D.I. 96, ex. 4 at ¶ 6) But the immediacy of those needs, and their relationship to Mr. McGee's access to AEO Material, are not well set out in PhishMe's papers. (*see* D.I. 99 at 3; Tr. at 27) The Court will thus not take them into account in its resolution of the Motion.

**\*9** However, our Court has also noted that the "risk of inadvertent disclosure cannot be overcome by the mere contention that access to confidential information is necessary for case management"; instead, the focus should be on whether "in-house counsel's lack of access would impede a party's ability to litigate through outside counsel[.]" *R.R. Donnelley*, 2007 WL 61885, at *1; *see also*

*Intel*, 198 F.R.D. at 529. Here, PhishMe has competent and capable outside counsel. It is represented by Morrison & Foerster LLP and Young Conaway Stargatt & Taylor, LLP—two firms with extensive intellectual property litigation experience. (D.I. 99 at 2 & ex. 2); *see also Intel*, 198 F.R.D. at 529 ("The quality of the counsel representing Intel and the lack of any evidence indicating Intel will be prejudiced in prosecuting its case undermines Intel's contention that they have good cause to modify the Protective Order."). [13] Our Court has noted that where parties are represented from the outset by capable outside counsel, "courts have little trouble balancing the harms in protective order disputes, often readily concluding that the outside counsel of a party's choice can adequately represent its interests even if in-house counsel is precluded from viewing confidential information." *Blackbird Tech LLC*, 2016 WL 2904592, at *5; *see also Pinterest, Inc.*, 2014 WL 5364263, at *3; *ST Sales Tech*, 2008 WL 5634214, at *5.

[13]   Thus, this is not a situation where the in-house counsel at issue is the sole litigator in the case (as can occur in cases where a party has elected to have in-house counsel represent them, to the exclusion of engaging outside counsel). *see Blackbird Tech LLC*, 2016 WL 2904592, at *2–3; *Affymetrix*, 2005 WL 1801683, at *2 n.3.

Additionally, the Court takes note of the fact that the current Protective Order has been in place for over 10 months, and that (in light of the parties' competitive relationship) it was the product of significant negotiation. (D.I. 99 at 1) To be sure, Mr. McGee did not begin his work with PhishMe until October 31, 2016—the very day that the Protective Order was submitted. And so it might be argued (as PhishMe does) that his hiring was a changed circumstance, one that (especially as PhishMe saw how the case progressed) warranted a later re-assessment of whom should access AEO Material. (D.I. 103, ex. 1 at ¶ 1; Tr. at 14–15)

Yet PhishMe had to know at some point during the period leading up to the submission of the Protective Order that it planned to bring Mr. McGee on as its General Counsel. Despite this, it agreed to the limitations on sharing confidential information that are in the current Order. And it (and Wombat, who has no in-house attorneys) were fully prepared then to manage the litigation without allowing any in-house attorney the ability to access AEO Material. The parties have done just that in the many

Case: 1:18-cv-00864 Document #: 305-11 Filed: 08/06/18 Page 17 of 25 PageID #:8488
PhishMe, Inc. v. Wombat Security Technologies, Inc., Slip Copy (2017)

2017 WL 4138961

months since the Protective Order was issued. (Tr. at 28–29) Even if less than ideal, then, it seems very possible, based on the history of this case, that the parties can sufficiently navigate the litigation without an in-house attorney having access to AEO Material. (D.I. 99 at 2–3) [14] To "change the rules" well into this case, after so much AEO Material has been provided and so much effort went into negotiating the Protective Order, seems a bit unfair to Wombat.

[14]     This decision does not affect the parties' ability, for example, to jointly agree that in the context of Court-involved alternative dispute resolution efforts, certain company employees who are otherwise prohibited from accessing AEO Material may see particular documents. Nor does it affect the parties' ability to challenge certain AEO Material designations, to the extent permitted by the Protective Order. (D.I. 96, ex. 1 at § 5)

All of this indicates to the Court that while PhishMe would suffer real harm were it not able to have Mr. McGee

access AEO Material, that harm is not so outsized that it overcomes the serious risk of inadvertent disclosure or competitive misuse of Wombat's confidential information.

### 3. Conclusion

In the end, the Court determines that PhishMe has not met its burden to show good cause to modify the Protective Order at issue.

## III. CONCLUSION

**\*10** For the reasons outlined above, Plaintiff's Motion is DENIED.

### All Citations

Slip Copy, 2017 WL 4138961

---

End of Document      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

***Pinterest, Inc. v. Pintrips, Inc.,***
**2014 WL 5364263 (N.D. Cal. 2014)**

Case: 1:18-cv-00864 Document #: 305-11 Filed: 08/06/18 Page 19 of 25 PageID #:8490
Pinterest, Inc. v. Pintrips, Inc., Not Reported in F.Supp.3d (2014)

2014 WL 5364263

2014 WL 5364263
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Pinterest, Inc., Plaintiff,

v.

Pintrips, Inc., Defendant.

Case No. 13–cv–04608–RS (KAW)

|

Signed October 21, 2014

**Attorneys and Law Firms**

Lawrence J. Siskind, Lawrence Jay Siskind, Jane Ann Levich, Donald A Thompson, Harvey Siskind LLP, San Francisco, CA, for Plaintiff.

Edward T. Colbert, Kenyon And Kenyon LLP, Washington, DC, Frank L. Bernstein, Kenyon & Kenyon LLP, Palo Alto, CA, for Defendant

## ORDER REGARDING DISCOVERY LETTER BRIEFS

Re: Dkt. No. 72, 91

KANDIS A. WESTMORE, United States Magistrate Judge

### I. INTRODUCTION

*1 Pinterest, Inc. ("Plaintiff") and Pintrips, Inc. ("Defendant") dispute whether Plaintiff's Deputy General Counsel, Anthony Falzone, may be properly nominated as "Designated House Counsel" under the stipulated protective order entered in this case. [1] The Court held a hearing on the matter on September 4, 2014. Following the hearing, the Court ordered Mr. Falzone to prepare a declaration that details his duties and responsibilities. On September 26, 2014, the parties filed Mr. Falzone's declaration, along with a brief updated joint letter. After reviewing the declaration, the Court issued an order stating that Mr. Falzone appeared to be engaged in competitive decision-making and giving the parties the option of an evidentiary hearing on the issue, which the parties elected not to pursue. As the matter is now ripe

for ruling, the Court concludes that Plaintiff may not nominate Mr. Falzone as "Designated House Counsel" under the stipulated protective order entered in this case. The Court's reasons are set forth below.

[1] That order defines "Designated House Counsel" as "House Counsel who seek access to 'HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY' information in this matter." Aug. 19, 2014 Joint Ltr., Ex. A, Stipulated Protective Order ¶ 2.4, Dkt. No. 72. It limits disclosure of attorneys' eyes only information to Designated House Counsel who, among other things "has no involvement in competitive decision-making" and "to whom disclosure is reasonably necessary for this litigation." *Id.* ¶ 7.4(a).

### II. LEGAL STANDARD

Federal Rule of Civil Procedure 26(b)(1) permits "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." The information sought "need not be admissible at the trial" so long as it "appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* A producing party may ask the Court to minimize its burden to turn over discoverable information by ordering "that a trade secret or other confidential research, development, or commercial information need not be revealed or revealed only in a specified way." Fed.R.Civ.P. 26(c). In that instance, the producing party bears the burden of showing that such protection is warranted. *City of Oakland v. SSA Terminals, LLC,* No. C 11–1446 YGR (MEJ), 2012 WL 1414075, at *2 (N.D. Cal. April 23, 2012). The Court must balance the risk of inadvertent disclosure of trade secrets to competitors against the risk that the protection of such information will impair a plaintiff's ability to prosecute its case. *Brown Bag Software v. Symantec Corp.,* 960 F.2d 1465, 1470 (9th Cir.1992) (no abuse of discretion where magistrate judge held an evidentiary hearing, during which in-house counsel testified, prior to issuing a protective order limiting access to attorneys' eyes only information).

In *U.S. Steel Corp. v. United States,* 730 F.2d 1465, 1467 (Fed.Cir.1984), the Federal Circuit rejected the view that access to confidential information "may be denied solely because of counsel's in-house status." It noted the concern that "there is a greater likelihood of inadvertent disclosure by lawyers who are employees committed to

Case: 1:18-cv-00864 Document #: 305-11 Filed: 08/06/18 Page 20 of 25 PageID #:8491
Pinterest, Inc. v. Pintrips, Inc., Not Reported in F.Supp.3d (2014)

2014 WL 5364263

remain in the environment of a single company," but reasoned that "[d]enial or grant of access, however, cannot rest on a general assumption that one group of lawyers are more likely or less likely inadvertently to [*sic* ] breach their duty under a protective order." *Id.* at 1467–68. The Federal Circuit thus concluded that "the factual circumstances surrounding each individual counsel's activities, association, and relationship with a party, whether counsel be in-house or retained, must govern any concern for inadvertent or accidental disclosure." *Id.* In the context of in-house counsel who is engaged in competitive decision-making, the Federal Circuit cautioned that it "may well be that a party seeking access should be forced to retain outside counsel or be denied the access recognized as needed." *Id.* at 1468. The Federal Circuit defined "competitive decision-making" as "shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decision (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *Id.*

**\*2** In resolving this type of dispute, the Court must determine whether knowledge of the trade secrets at issue would place counsel in the "untenable position" of either refusing legal advice or revealing the sensitive information. *Intel Corp. v. VIA Tech, Inc.,* 198 F.R.D. 525, 530–31 (N.D.Cal.2000) (citing *Brown Bag,* 960 F.2d at 1472). "The concern for inadvertent disclosure is particularly acute where the party seeking access to the information is a direct competitor." *Adobe Systems, Inc. v. Davachi,* No. C 10–03575 SC (LB), 2011 WL 2610170, at \*5 (N.D.Cal. July 1, 2011) (citing *U.S. Steel Corp.,* 730 F.2d at 1468 n.3).

### III. DISCUSSION

According to Plaintiff, "Mr. Falzone is not involved in deciding how to compete with business rivals on pricing, design, or other business issues." (Aug. 19, 2014 Joint Ltr. at 3.) Plaintiff asserts that Mr. Falzone reports to the General Counsel, not to any business or operations manager, and that his role is to assess and advise on legal risks, not on business strategy. *(Id.)* Based on these descriptions of Mr. Falzone's position, Plaintiff contends that Mr. Falzone is not engaged in competitive-decision making. *(Id.)* As Defendant argues, Mr. Falzone's

declaration implies that this is simply not the case. [2] (Sept. 26, 2014 Joint Ltr. at 3.)

[2] The Court, however, rejects Defendant's argument that because Mr. Falzone possesses unlimited authority to settle this case, which involves a competitor, he is necessarily a competitive decisionmaker. Aug. 19, 2014 Joint Ltr. at 6, 7. Defendant has not cited any legal authority in support of this position, and the Court is unconvinced that, as Defendant puts it, the "simple syllogism" demonstrates Mr. Falzone a competitive decision-maker as a matter of law. This would make any attorney who attends a settlement conference with unlimited authority to settle a case involving a competitor a competitive decision-maker. This is unworkable. An in-house lawyer who, for example, strictly manages a company's litigation could possess unlimited authority to settle a case involving a competitor, attend a settlement conference intending to exercise such authority, but nonetheless fail to meet the definition of a competitive decision-maker.

In his declaration, Mr. Falzone describes his role as follows. He reports to Michael Yang, Plaintiff's General Counsel. (Sept. 26, 2014 Joint Ltr., Ex. A, Falzone Decl. ¶ 2, Dkt. No. 91.) He explains that "[t]he small size of [the Company's] legal team and the dynamic nature of the industry [they] work in require each one of [them] to cover a lot of ground." (*Id.* ¶ 5.) Among other things, he is "responsible for setting and executing the Company's worldwide strategy on all aspects of intellectual property, including copyright, trademark and trade secret matters. This includes protecting the Company's intellectual property and advising it on its intellectual property rights, as well as on the intellectual property rights of others." (*Id.* ¶ 5.a.) He also "provide[s] legal counseling to product teams to help them identify, assess and minimize legal risk in the products they're developing, and to ensure [the Company's] products comply with applicable legal requirements (e.g., privacy rules, COPA requirements relating to age restrictions, CAN–SPAM issues, etc.)." (*Id.* ¶ 5.e.)

Mr. Falzone also denies that he engages in competitive decision-making. He states that in the area of intellectual property, he "may advise the Company on whether a new product qualifies for copyright or patent protection, or what [they] need to do to comply with specific statutory requirements. But [he is] not involved in deciding what new products to develop, or how to market or price

Case: 1:18-cv-00864 Document #: 305-11 Filed: 08/06/18 Page 21 of 25 PageID #:8492
Pinterest, Inc. v. Pintrips, Inc., Not Reported in F.Supp.3d (2014)
2014 WL 5364263

them." (*Id.* ¶ 7.) In the area of litigation, he "will advise the Company on whether it has viable claims against another business entity and whether to pursue them. But [he is] not involved in identifying competitors or in devising business strategies for dealing with them." *(Id.)* With respect to the subject of this litigation, Mr. Falzone also declares that he "advised business and product teams on legal issues relating to 'Place Pins' (including for example copyright, trademark, contract and privacy issues), but [he] was not involved in the Company's decision to develop 'Place Pins,' and [he] was not involved in designing or testing the product or deciding how to market it." (*Id.* ¶ 8.)

**\*3** Here, it is undisputed that Plaintiff and Defendant are competitors in the travel sector. In light of this, Mr. Falzone's substantial role on the legal team, his control over Plaintiff's intellectual property, his influence over whether Plaintiff will pursue litigation against another business entity, and his advisory work with product teams presents a real risk that he will find himself in the " 'untenable position' of either refusing his employer legal advice or revealing [Defendant's] sensitive information." *See Adobe Systems, Inc.,* 2011 WL 2610170, at \*5 ("The concern for inadvertent disclosure is particularly acute where the party seeking access to the information is a direct competitor."); *Intel,* 198 F.R.D. at 531 ("The potential injury from inadvertent disclosure of [Defendant's] trade secrets in this case would be great, because the information could be used to duplicate [Defendant's] products, compete for its customers, or interfere with its business plan and thereby gain a competitive advantage in the marketplace."). Put another way, there is a risk that Mr. Falzone will have in interest in the protected information beyond the current litigation. This is especially so given that his client has recently entered the market in which Defendant operates.

Any harm to Plaintiff, however, is non-existent. It has competent outside counsel that has been involved in this case from the outset. "Requiring a party to rely on its competent outside counsel does not create an undue or unnecessary burden." *Intel Corp.,* 198 F.R.D. at 529 (internal quotations omitted); *see Brown Bag Software,* 960 F.2d at 1471 (no prejudice where outside counsel had sufficient time and resources to review

confidential information and was presumably competent to evaluate the information). Plaintiff has not advanced a persuasive argument why Mr. Falzone must have access to Defendant's attorneys' eyes only information, or why he is otherwise critical to the prosecution of its case. That Plaintiff prefers to closely supervise its outside counsel, *see* Joint Ltr. at 4 n.1 ("Plaintiff has a strong need for the supervision of fully informed in-house counsel."), *see* Falzone Decl. ¶ 9 ("I consider it especially important that I be in a position to supervise [Harvey Siskind LLP] closely."), is insufficient to justify risking the inadvertent disclosure of Defendant's attorneys' eyes only information. The argument that Plaintiff's ability to prosecute its case would be impaired because Mr. Falzone would not have access to important information that would help him understand the strengths of Plaintiff's claims and could inform his decision to settle is also unavailing. Competent counsel routinely facilitate the settlement of cases, even when it is only a company principal, who, without access to attorneys' eyes only information, possesses the authority to resolve litigation.

Here, then, it is appropriate to deny Mr. Falzone access to Defendant's attorneys' eyes only information. The risk of inadvertent disclosure outweighs any possible prejudice to Plaintiff's ability to prosecute its case. *See Adobe Systems, Inc.,* 2011 WL 2610170, at \*3 ("Where a counsel is involved in 'competitive decision-making,' and denial of the information would not prejudice the ability of that party to litigate its case, courts generally deny that counsel access to the information.") (citation omitted).

## IV. CONCLUSION

For the reasons set forth above, Mr. Falzone may not be nominated as "Designated House Counsel" under the stipulated protective order entered in this case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5364263

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

***Steuben Foods, Inc. v. Shibuya Hoppmann Corp.,***
**2017 WL 1483548 (W.D.N.Y. 2017)**

Steuben Foods, Inc. v. Shibuya Hoppmann Corporation, Slip Copy (2017)

2017 WL 1483548

2017 WL 1483548
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

STEUBEN FOODS, INC., Plaintiff,

v.

SHIBUYA HOPPMANN CORPORATION, Shibuya
Kogyo Co., Ltd., and HP Hood LLC, Defendants.

1:10-CV-00781 EAW
|
Signed 04/25/2017

**Attorneys and Law Firms**

Thomas J. Fisher, Oblon McClelland Maier & Neustadt, LLP, Alexandria, VA, Joseph L. Stanganelli, Barclay Damon, LLP, Boston, MA, Mark Eric Galvez, Barclay Damon, LLP, Syracuse, NY, Olivia E. Marbutt, Kent & Risley LLC, Alpharetta, GA, Thomas B. Cronmiller, Barclay Damon, LLP, Rochester, NY, for Plaintiff.

William D. Christ, Scott T. Peloza, Phillips Lytle LLP, Buffalo, NY, Benjamin L. Rudofsky, Christopher C. Funk, Jean Paul Y. Nagashima, Nicholas O. Hunter, Kellogg Hansen Todd Figel & Frederick PLLC, John Christopher Rozendaal, Michael E. Joffre, Sterne, Kessler, Goldstein & Fox P.L.L.C., Washington, DC, for Defendants.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, United States District Judge

## INTRODUCTION

**\*1** Plaintiff Steuben Foods, Inc. ("Plaintiff") has sued Defendants Shibuya Hoppmann Corp., Shibuya Kogyo Co. Ltd., and HP Hood LLC (collectively "Defendants") for patent infringement under 35 U.S.C. §§ 100 *et seq.* (Dkt. 1). On April 15, 2013, this matter was referred to Magistrate Judge Jeremiah J. McCarthy for hearing and disposition of all non-dispositive motions or applications, supervision of discovery, and to hear and report upon dispositive motions for consideration by the district judge. (Dkt. 112). Judge McCarthy

subsequently entered a protective order dated April 16, 2014, which permits a party producing material to designate such material as either "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL." (Dkt. 148) (hereinafter the "Protective Order"). Material designated "HIGHLY CONFIDENTIAL" may be disclosed only to certain enumerated persons, including up to three in-house counsel. (*Id.*). Defendants had requested that the Protective Order provide that "HIGHLY CONFIDENTIAL" materials be disclosed only to outside counsel and experts, but Judge McCarthy denied that request, holding that Defendants had failed to articulate any reason to justify this heightened level of protection. (*See* Dkt. 140 at 2; Dkt. 144 at 16).

On May 27, 2016, Defendants filed a motion seeking to amend the Protective Order, again asking Judge McCarthy to allow designation of documents for "outside attorneys' eyes only" (hereinafter "OAEO"). (Dkt. 227). Specifically, Defendants stated that Plaintiff had refused to produce certain material on the basis that it had a contractual obligation to a third party to maintain such material as confidential, and argued that inclusion of an OAEO designation in the Protective Order would resolve this discovery dispute. (*See* Dkt. 227-1 at 5). In the alternative, Defendants asked that the Court compel Plaintiff to produce the withheld material without an OAEO designation. (*Id.*). Plaintiff opposed the motion (Dkt. 236), and on September 23, 2016, Judge McCarthy entered a Text Order holding that while a party could not utilize an OAEO designation for its own materials, third parties would be permitted to intervene and request that their materials be designated OAEO. (Dkt. 255). Defendants appealed Judge McCarthy's determination to the undersigned on October 7, 2016. (Dkt. 260). For the reasons set forth below, Defendants' appeal is denied.

## DISCUSSION

### I. Standard of Review

A district court will reverse a magistrate judge's ruling on a non-dispositive issue only where it was "clearly erroneous or contrary to law." *See Thurmond v. Bowman*, 199 F. Supp. 3d 686, 689 (W.D.N.Y. 2016). "The clearly erroneous/contrary to law standard of review is 'highly deferential' and 'a district court may reverse the order only if on the entire evidence, the district court is left with the definite and firm conviction that a mistake has

Case: 1:18-cv-00864 Document #: 305-11 Filed: 08/06/18 Page 24 of 25 PageID #:8495
Steuben Foods, Inc. v. Shibuya Hoppmann Corporation, Slip Copy (2017)

2017 WL 1483548

been committed.' " *Id.* (quoting *Rodríguez v. Pie of Port Jefferson Corp.*, 48 F. Supp. 3d 424, 425 (E.D.N.Y. 2014)).

Here, Defendants rely on two unpublished, out-of-circuit decisions to argue that the Court should afford no deference to Judge McCarthy's ruling because he did not issue a written opinion or detailed explanation for his order. (*See* Dkt. 260-1 at 5-6). The Court disagrees. Judge McCarthy had already explained, on the record, his reasons for not including an OAEO designation in the Protective Order. (*See* Dkt. 144 at 16). He was not required to repeat that ruling in response to Defendants' most recent request. Instead, he entered a Text Order dealing with the specific issue raised by Defendants' motion—namely, how to protect the interests of third parties with confidentiality interests in material relevant to this litigation. Under these circumstances, the Court has no trouble discerning the rationale behind Judge McCarthy's ruling and, accordingly, reviews it under the deferential clear error/contrary to law standard.

## II. Judge McCarthy's Ruling was Free from Error

*2 "Whether to lift or modify a protective order is a decision committed to the sound discretion of the trial court." *In re Agent Orange Prod. Liab. Lit.*, 821 F.2d 139, 147 (2d Cir. 1987). The Court weighs four factors when considering a request to modify a protective order: "(1) whether good cause exists for the modification, (2) the nature of the protective order, (3) the foreseeability, at the time of issuance of the order, of the modification requested, and (4) the parties' reliance on the order." *Lee Shuknecht & Sons, Inc. v. P. Vigneri & Sons, Inc.*, 927 F. Supp. 610, 614 (W.D.N.Y. 1996).

Here, Judge McCarthy properly concluded that modification of the Protective Order to provide for an OAEO designation was not warranted. The Protective Order at issue has been in place for more than four years, and the parties have conducted extensive discovery under its provisions. The foreseeability of Defendants' request is amply illustrated by the fact that they previously requested an OAEO designation at the time the Protective Order was initially entered. Defendants had the opportunity at that time to present a full case for why such a designation was needed, and could have asked for district judge review of the Protective Order at that time, but chose not to do so. Additionally, Defendants have failed to show good cause for creation of a general OAEO designation, because the procedure established by Judge McCarthy

(namely, allowing third parties to seek protection of their confidential materials) addresses the precise issue raised by Defendants in their motion.

Defendants claim that Judge McCarthy's order was somehow "unfair," because it "affords non-parties greater protection for their highly sensitive materials than parties." (Dkt. 260-1 at 11). This argument is without merit. As other courts have noted, "the risk of harm to non-parties from disclosure is significant due to their inability to be present at day-to-day proceedings...." *In re Northshore Univ. Healthsystem*, 254 F.R.D. 338, 342 (N.D. Ill. 2008); *see also Equal Emp't Opportunity Comm'n v. Kronos Inc.*, 694 F.3d 351, 368 (3d Cir. 2012) (finding no error in providing additional protection to business interests of a third party); *Crane Plastics Co. v. Louisiana-Pac. Corp.*, 119 F. Supp. 2d 749, 751 (S.D. Ohio 2000) ("[T]he Court assigns greater weight to the confidentiality interests asserted by a non-party to the litigation...."). In other words, it is appropriate to provide additional protections for non-parties who are uninvolved in the day-to-day litigation of this matter and, therefore, are disadvantaged with respect to their ability to protect their business interests. This is precisely what Judge McCarthy did in this matter.

Based on the foregoing, the Court concludes that Judge McCarthy's resolution of Defendants' motion to modify the Protective Order was free from error. Moreover, and for the same reasons, the Court would reach the same conclusion Judge McCarthy reached were it to consider the issue *de novo*.

## III. Defendants' Alternative Request is Denied

Defendants have made an alternative request that the Court, in essence, reverse Judge McCarthy's Text Order and not permit third parties the opportunity to seek additional protection for their confidential material. (*See* Dkt. 260-1 at 20-21). This request is denied. As set forth above, additional protections for third parties are often appropriate, and the Court finds no error in Judge McCarthy's decision to allow them in this matter. Indeed, third party JBT ICS Solutions U.S., Inc. has already gone to the time and expense of filing a motion for a protective order covering its confidential material (*see* Dkt. 267), which Judge McCarthy granted on February 1, 2017. (*See* Dkt. 305; Dkt. 306). Defendants have failed to establish any grounds for upending this procedure.

Steuben Foods, Inc. v. Shibuya Hoppmann Corporation, Slip Copy (2017)

2017 WL 1483548

## CONCLUSION

**\*3** For the reasons set forth above, the Court denies Defendants' appeal (Dkt. 260) of Judge McCarthy's resolution of their motion to modify the Protective Order.

SO ORDERED.

**All Citations**

Slip Copy, 2017 WL 1483548

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.