*ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC,*
2008 WL 5634214 (E.D. Tex. 2008)

ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC, Not Reported in F.Supp.2d...

2008 WL 5634214

KeyCite Yellow Flag - Negative Treatment
Distinguished by PACid Group, LLC v. Apple, Inc., E.D.Tex., February 19, 2010

2008 WL 5634214
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas,
Tyler Division.

ST SALES TECH HOLDINGS, LLC
v.
DAIMLER CHRYSLER CO., LLC, et al.

Civil Action No. 6:07–CV–346.
|
March 14, 2008.

**Attorneys and Law Firms**

Andrew Wesley Spangler of Spangler Law PC, Longview, TX, David Michael Pridham of Law Office of David pridham, Barrington, RI, John J. Edmonds of The Edmonds Law Firm, PC, Houston, TX, for Plaintiff.

Frank C Cimino, Jr of Dickstein Shapiro, LLP–DC, Washington, DC, J Thad Heartfield and M. Dru Montgomery of The Heartfield Law Firm, Beaumont, TX, for Defendant Daimler Chrysler Co LLC and Daimler Chrysler Corporation.

Frank A Angileri, John S Le Roy, and Marc Lorelli of Brooks & Kushman PC—Southfield, Southfield, MI, J Thad Heartfield of The Heartfield Law Firm, Beaumont, TX, Jennifer Parker Ainsworth of Wilson Sheehy Knowles Robertson & Cornelius PC, Tyler, TX, for Defendant Ford Motor Co, Land Rover of North America Inc, and Volvo Cars of North America Inc.

Andrew S Dallmann of Howrey LLP—Irvine CA, Irvine, CA, Andrew R Sommer and Matthew J Moore of Howrey LLP—Washington, Washington, DC, J Thad Heartfield of The Heartfield Law Firm, Beaumont, TX, for Defendant Mazda Motor of America Inc.

**MEMORANDUM OPINION AND ORDER**

JOHN D. LOVE, United States Magistrate Judge.

*1 Before the Court are Defendants' Motion For Entry of a Protective Order (Doc. No. 88), and a number of responses and replies. For the reasons that follow, Defendants' motion is **GRANTED**.

**BACKGROUND**

ST Sales Tech Holdings, LLC (hereinafter "Sales Tech") is a Texas limited liability company in the business of acquiring, licensing, and enforcing patents. Pridham Decl. ¶ 6. Sales Tech is the owner by assignment of U.S. Patent No. 6,941,305 (hereinafter "the '305 patent"), entitled "Customer management system for automobile sales industry," which it seeks to enforce through the present infringement proceedings. Compl. ¶ 15. Plaintiff Sales Tech is one of many patent holding entities owned and controlled by Erich Spangenberg and represented in some capacity by attorney David Pridham. Spangenberg's business entities, including Sales Tech, are in the business of holding intellectual property for litigation and pre-litigation activities. See Trial Transcript at 186:16–19 (May 23, 2007), Orion IP LLC v. Hyundai Motor Co., No. 6:05–cv–322 (E.D.Tex.2007). See also Def.'s Mot. For Entry of Protective Order (Doc. No. 88; Ex. 1). The parties' present dispute regards whether Pridham should be denied access to Defendants' confidential information under a protective order.

Although Sales Tech as an entity is relatively new, Spangenberg's many other patent holding entities have previously sued these same Defendants a number of times in just over three years.[1] The most recent lawsuits, including this one, involve similar patents and infringing conduct, specifically the operation of "build your own" tools on Defendants' websites and web-based methods for interacting with Defendants' auto dealerships. Def.'s Mot. For Entry of Protective Order at 3. A number of the lawsuits resulted in settlements, though Spangenberg's entities continue to acquire and attempt to enforce other similar patents against these same Defendants, including the '305 patent asserted herein.

[1]     Specifically, this is the third lawsuit brought by
        entities owned and controlled by Spangenberg against
        Defendants Hyundai, Ford, Volvo, and Mazda; the
        second against Land Rover; and the fourth lawsuit
        brought against Mercedes and Chrysler. See Orion
        IP, LLC v. Mercedes–Benz USA, LLC, No. 6:05–

Case: 1:18-cv-00864 Document #: 305-12 Filed: 08/06/18 Page 3 of 32 PageID #:8499

ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC, Not Reported in F.Supp.2d...

2008 WL 5634214

cv–322 (E.D.Tex.2005); *Orion IP, LLC v. Ford Motor Co. and DaimlerChrysler Corp.,* No. 2:04–cv–313 (E.D.Tex.2004); *Orion v. Chrysler Holding LLC,* No. 6:07–cv–370 (E.D.Tex.2006); *Orion IP, LLC v. Mercedes–Benz USA, LLC,* No. 6:07–cv–451 (E.D.Tex.2007); *Taurus IP, LLC v. Ford Motor Co.,* No. 2:04–cv–313 (W.D.Wis.2007); *Taurus IP, LLC v. DaimlerChrysler Corp. and Mercedes–Benz USA, LLC,* No. 07–C–0158 (W.D.Wis.2007); *ST Sales Tech Holdings, LLC v. DaimlerChrysler Co., LLC,* No. 6:07–cv–346 (E.D.Tex.2007).

Attorney David Pridham has been heavily involved in Spangenberg's activities since as early as 2003. Prior to working with Spangenberg, Pridham served as general counsel of Firepond, Inc., a Minnesota software company. Def.'s Mot. For Entry of Protective Order at 4. Spangenberg purchased Firepond's patent portfolio while Pridham served as general counsel, though Pridham himself was conflicted out of the negotiations.[2] *See* Trial Transcript at 193:1–14 (May 23, 2007), *Orion IP, LLC v. Hyundai Motor Co.,* 6:05–cv–322 (E.D.Tex.2007). *See also* Def.'s Mot. For Entry of Protective Order (Doc. No. 88; Ex. 1). Though the parties dispute small nuances of Pridham's exact role in Spangenberg's litigation-centered business entities since their acquisition of the Firepond patents, it is undisputed that Pridham has worked and continues to work extensively with Spangenberg entities in their business of acquiring, litigating, and licensing patents. Pl.'s Sur–Reply to Def.'s Mot. For Entry of Protective Order at 1.

[2]   Defendants speculate that "the existence of an actual conflict suggests that Spangenberg was either actively negotiating to hire Pridham as of January 2004 or had already hired him." Def.'s Mot. For Entry of Protective Order at 4 n. 8.

**\*2** Based on Pridham's role in the parties' litigation history, Defendants have moved for entry of a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure. The proposed protective order would prevent Pridham from viewing confidential information marked for "Attorney's Eyes Only."

### *ANALYSIS*

Under Rule 26 of the Federal Rules of Civil Procedure, "for good cause shown ... the court ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."[3] FED. R. CIV. P. 26(c). Included in Rule 26(c)(7) is the power for the Court to enter a protective order to restrict an individual attorney's access to a trade secret or other confidential information. *See* FED. R. CIV. P. 26(c)(7).

[3]   The "good cause" requirement of Rule 26(c) means the burden is on the movant to show the necessity for the issuance of a protective order. *In re Papst Licensing, GmbH, Patent Litigation,* 2000 WL 554219, at \*3 (E.D.La.2000).

In determining whether a protective order should bar one party's attorney access to information, the Court must focus on the risk of "inadvertent or accidental disclosure," and weigh that risk against the potential that the protective order may impair the other parties' ability to prosecute or defend its claims. *U.S. Steel Corp. v. United States,* 730 F.2d 1465, 1468 (Fed.Cir.1984); *In re Papst Licensing, GmbH, Patent Litigation,* 2000 WL 554219, at \*3 (E.D.La.2000). When conducting the balancing, courts look specifically at "the factual circumstances surrounding each individual counsel's activities, association, and relationship with a party." *U.S. Steel Corp.,* 730 F.2d at 1468 n. 3; *Infosint S .A. v. H. Lundbeck A.S.,* 2007 WL 1467784, at \*3 (S.D.N.Y.2007). Other factors to be considered in the balancing include: (1) whether the person receiving the confidential information is involved in competitive decision making or scientific research relating to the subject matter of the patent, (2) the level of risk of inadvertent disclosure of proprietary information, (3) the hardship imposed by the restriction, (4) the timing of the remedy, and (5) the scope of the remedy. *Infosint S.A.,* 2007 WL 1467784, at \*2. The ultimate goal of the balancing is to determine whether counsel's access to the confidential information creates "an unacceptable opportunity for inadvertent disclosure."[4] *U.S. Steel Corp.,* 730 F.2d at 1468; *In re Papst Licensing, GmbH, Patent Litigation,* 2000 WL 554219, at \*3.

[4]   The inquiry is not directed at the attorney's ethical standards, since "even if the competitor's counsel acted in the best of faith and in accordance with the highest ethical standards, the question remains whether access to the moving party's confidential information would create 'an unacceptable opportunity for inadvertent disclosure.'

ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC, Not Reported in F.Supp.2d...

Case: 1:18-cv-00864 Document #: 305-12 Filed: 08/06/18 Page 4 of 32 PageID #:8500

2008 WL 5634214

" *Mikohn Gaming Corp. v. Acres Gaming Inc.*, 50 U.S.P.Q.2d 1783, 1784 (D.Nev.1998).

### Balancing The Interests

Before proceeding to the balancing, the Court begins the analysis by crediting the assurance that Pridham would abide by any "Attorney's Eyes Only" protective order that might be entered. However, as previous courts have noted, accepting that an attorney will abide by a protective order is the starting point of the inquiry, not the end of the analysis. *Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.*, 237 F.R.D. 405, 408 (N.D.Ill.2006) (citing *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1471 (9th Cir.1992)). Under the relevant analysis, the focus of the inquiry is not the attorney's good faith, but the risk for *inadvertent* disclosure, and "[j]ust as '[i]nadvertence ... is no respecter of its victims,' neither is it a respecter of the integrity of those who fall prey to it." *Autotech Techs. Ltd. P'ship*, 237 F.R.D. at 408–09 (quoting in part *U.S. Steel Corp.*, 730 F.2d at 1468). *See also Andrx Pharm., LLC v. GlaxoSmithKline, PLC*, 236 F.R.D. 583, 585–86 (S.D.Fla.2006) ( "Even if the competitor's counsel acted in the best of faith and in accordance with the highest ethical standards, the question remains whether access to the moving party's confidential information would create 'an unacceptable opportunity for inadvertent disclosure.' "). The Court does not question Pridham's ethics or integrity. However, Pridham's and ST Sales' assurances of compliance with the protective order are not enough on their own to deny Defendants' motion.

### A. "Competitive Decisionmaker"

**\*3** Involvement in "competitive decisionmaking" is the oft-cited most critical factor weighing in favor of denial of access.[5] *U.S. Steel Corp.*, 730 F.2d at 1468 n. 3. The Federal Circuit has stated that "competitive decisionmaking" refers to "a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *Id.* Specifically, courts are concerned about the "untenable position" counsel would be in if, after viewing other litigants' technology, counsel would be forced to either refuse his client legal advice on competitive matters or violate the protective order's prohibition against revealing technical information. *In*

*re Papst Licensing, GmbH, Patent Litigation*, 2000 WL 554219, at \*3.

5    Determining whether counsel is a competitive decisionmaker is not the sole inquiry the Court must address in the balancing. *MGP Ingredients, Inc. v. Mars, Inc.*, 245 F.R.D. 497, 501 (D.Kan.2007). However, if counsel is a competitive decisionmaker, most all of the policy concerns underlying the rule allowing courts to deny attorneys' access to confidential information typically are present.

Plaintiff and Defendants argue a number of points regarding whether or not Pridham's activities and association with Erich Spangenberg qualify Pridham as a "competitive decisionmaker" in Spangenberg's business enterprise. Defendants argue that Pridham's continued close relationship with Spangenberg and expansive roles in Spangenberg's businesses qualifies Pridham as a competitive decisionmaker, and increases their risk of harm should he inadvertently disclose information. In response, Sales Tech argues Pridham is outside counsel, and that he is not involved in management of Sales Tech or other entities. Sales Tech also argues that Pridham has no role in patent prosecution, which is often a key factor in courts' decisions to grant a protective order to restrict certain counsel's access to confidential information. Since the burden is on the movant to prove the necessity of the protective order, the Court will address Defendants' arguments in favor of the protective order first.

Defendants have presented a bevy of information indicating that Pridham has served in many capacities throughout Spangenberg's many patent-holding entities since the two first met. In previous litigation, Spangenberg testified that (at that time) Pridham served as "both the general counsel at [IP Navigation Group, LLC] and then in a separate capacity he's outside counsel as well." *See* Trial Transcript at 193:15–22 (May 23, 2007), *Orion IP, LLC v. Hyundai Motor Co.*, 6:05–cv–322 (E.D.Tex.2007). IP Navigation Group, LLC (hereinafter "IP Nav") is one of the entities owned and operated by Spangenberg, and it provides consulting services to Spangenberg's other patent-holding entities. *Id.* at 184:15–24. Defendants also note that Pridham has appeared in pleadings as affiliated with Orion IP or other Spangenberg entities at least seven times between 2004 and 2006, but since 2006 Pridham has generally identified himself as affiliated with IP Nav. Def.'s Mot. For Entry Protective Order at 5. Perhaps emblematic of the confused mixing

ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC, Not Reported in F.Supp.2d...

Case: 1:18-cv-00864 Document #: 305-12 Filed: 08/06/18 Page 5 of 32 PageID #:8501

2008 WL 5634214

of roles within the various entities, during one patent infringement lawsuit, Pridham listed himself as Orion's in-house counsel, but with an @ipnav email address. *See* Complaint at 4, *Orion IP, LLC v. Staples, Inc.,* No. 2:04–cv–297 (E.D.Tex.2004). Aside from his role as in-house counsel and outside counsel to Spangenberg entities, Pridham has also served in at least one Spangenberg entity solely in a business capacity. Defendants cite reporting forms indicating Pridham served as a director on the board of In Store Media Systems, a company of which Spangenberg was director, CEO, treasurer, and secretary. Def.'s Mot. For Entry Protective Order at 4; (Doc. No. 88, Exs.8–9).

**\*4** In his legal roles, Pridham provides many services to Spangenberg's entities. IP Nav, the entity Pridham most often associates himself with as either general counsel or outside counsel, "manages, acquires and monetizes a diverse group of patents," and involves its attorneys with "a variety of prosecution, licensing and litigation projects." Def.'s Mot. For Entry of Protective Order at 4 (citing IP Nav attorney job posting attached as exhibit); (Doc. No. 88, Ex. 2). Whether within IP Nav or serving as outside counsel, Pridham himself focuses his practice on patent litigation, licensing, and acquisition for Spangenberg's entities. Defendants attached a chart to their motion indicating that Pridham has appeared as counsel (affiliated with IP Nav) in at least 38 different lawsuits on behalf of at least six different Spangenberg entities: Sales Tech, Orion IP, Phoenix, Polaris, Triton, and Constellation. [6] *See* Def.'s Mot. For Entry Protective Order at 4 n. 7 (Doc. No. 88, Ex. 4). Sales Tech does not dispute Pridham's extensive role in its litigation ventures, and also admits to Pridham's role in the licensing of patents in settlement of litigation. Pl.'s Resp. To Def.'s Mot. For Entry of Protective Order at 2. Sales Tech specifically denies that Pridham provided any legal services related to the acquisition of the '305 patent, but it makes no denial or mention of Defendants' repeated accusations of his involvement in Spangenberg's acquisition of other patents. [7] Pridham Decl. ¶ 5. Also, despite Spangenberg's previous statements, Sales Tech now claims that Pridham is strictly outside general counsel for patent litigation and the related licensing of patents in settlement, and that he is not an employee or owner of IP Nav or involved in management of any kind. Though Sales Tech claims Pridham is not an employee, Pridham continues to use IP Nav's business mailing address and email address. Pridham claims the address is nothing more

than a "a convenient mail stop" in Texas while he works in Rhode Island. Pl.'s Resp. To Def.'s Mot. For Entry of Protective Order at 2.

[6]     Defendants also note, and Sales Tech does not dispute, that all of the entities listed the same business address that Pridham and IP Nav were using at the time of the previous lawsuits. Def.'s Mot. For Entry Protective Order at 4.

[7]     Sales Tech was assigned the '305 patent as part of a litigation settlement. Pridham represented the entity in that case, though the parties do not discuss the depth of his role in the settlement, and as noted and credited by the Court, Pridham denies any involvement in the acquisition of the '305 patent itself.

Aside from outlining Pridham's active role throughout Spangenberg's businesses, Defendants also argue the extent of the potential harm to them if Pridham were to inadvertently disclose confidential information to Spangenberg is apparent by the most recent litigation history among the parties. Defendants note that Pridham represented one of Spangenberg's entities (Orion) in litigation on two patents involving "build-your-own" websites. As a representative of Orion, Pridham took part in extensive discovery of the systems before most of the Defendants settled the *Orion* litigation. Reply in Supp. of Def.'s Mot. For Entry of Protective Order at 8–9. Shortly thereafter, Taurus, a different Spangenberg entity again represented by Pridham, sued many of these same Defendants in the Western District of Wisconsin for infringement of a different patent on the same accused systems at issue in the *Orion* litigation. *Id.* Finally, in May 2007, Spangenberg acquired the '305 patent in a settlement with Symeron Systems, a defendant in litigation with Spangenberg entity Triton (which was also represented by Pridham). *Id.* The '305 patent was assigned to Sales Tech, and Sales Tech, again represented by Pridham, promptly filed the present lawsuit, accusing the same systems as those accused in the *Orion* and *Taurus* litigation. *Id.* Defendants argue that Spangenberg's demonstrated willingness to acquire new patents and enforce them on the same systems presents a real danger of continuous litigation if Pridham were to inadvertently disclose confidential information.

**\*5** Based on the record before the Court, it appears that Pridham's active role in Spangenberg's business makes him a "competitive decisionmaker" as the term is defined by the Federal Circuit. Under the *U.S. Steel*

ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC, Not Reported in F.Supp.2d...

Case: 1:18-cv-00864 Document #: 305-12 Filed: 08/06/18 Page 6 of 32 PageID #:8502

2008 WL 5634214

*Corp.* definition, "competitive decisionmaking" refers to "a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *U.S. Steel Corp.,* 730 F.2d at 1468 n. 3. Pridham's involvement in Spangenberg's business enterprise is extensive, and goes well-beyond the typical role of outside counsel, even outside counsel who might work with an entity for years. By Spangenberg's characterization, Pridham is (or was) general counsel of Spangenberg's consulting entity that "manages, acquires, and monetizes" the patents for Spangenberg's many other patent-holding entities. Pridham has also appeared on behalf of Spangenberg's patent-holding entities as general counsel or affiliated counsel at least 38 times in the past couple years. Finally, all sides agree that Pridham is also extremely involved in the licensing of Spangenberg's patents after litigation. Active involvement in these factors have troubled courts in the past. Moreover, Spangenberg's entire business model with his patent-holding companies such as Sales Tech revolves around the acquisition, enforcement (through litigation), and licensing of patents. Under such a business model, it is difficult to argue that someone such as Pridham, who is so heavily involved in these aspects of the business, is somehow not a competitive decisionmaker.

Another important aspect to consider is that there appears to be no insulation between Spangenberg and Pridham in their business. When asked if Pridham worked for him during a trial less than a year ago, Spangenberg was careful to correct the questioner to reflect that Pridham "works with [Spangenberg]," not for him. *See* Trial Transcript at 193:15–18 (May 23, 2007), *Orion IP, LLC v. Hyundai Motor Co.,* 6:05–cv–322 (E.D.Tex.2007). To any extent Pridham does not make final decisions himself, he very clearly reports directly to Spangenberg himself, who is the owner and controller of the patent-holding enterprise discussed herein. Indeed, it appears as though there is nobody else but Spangenberg that Pridham even *could* report to, and Pridham's advice affects every aspect of Spangenberg's patent acquisition, litigation and licensing business. In short, Pridham's extremely close relationship with Spangenberg, when viewed in conjunction with his activity in all of the critical aspects of the patent-holding litigation and licensing business,

qualifies Pridham as a competitive decisionmaker under the *U.S. Steel Corp.* definition of the term.

The cases where courts have dealt with analogous situations provide ample support for the Court's determination. *See, e.g., Infosint S.A.,* 2007 WL 1467784, at *3–4; *Nike, Inc. v. Adidas America Inc.,* No. 9:06–cv–43 (E.D.Tex.2006) (Doc. No. 58); *Autotech Techs. Ltd. P'ship,* 237 F.R.D. at 410–11; *Intel Corp. v. VIA Techs., Inc.,* 198 F.R.D. 525, 529–31 (N.D.Cal.2000). In *Infosint,* a defendant manufacturing company moved to have two attorneys representing a patent-holding company screened from viewing highly confidential information under a protective order. *See Infosint S.A.,* 2007 WL 1467784, at *3–4. The Court ordered that one of the attorneys be denied access to the information in part because "[f]or nearly seven years, [counsel] has provided [plaintiff] with patent advice, based on his scientific and legal expertise." *Id.* The attorney's role in patent prosecution also played a large role in the *Infosint* court's determination. While Pridham himself is not involved in patent prosecution for Sales Tech, Pridham's role in IP Nav raises all the same concerns outlined by the *Infosint* court related to an attorney's involvement in patent prosecution after viewing certain confidential information. The concern in *Infosint* was that "[p]rosecuting patent applications 'involves decisions of scope and emphasis' that implicate competitive decision making, as claims may be drafted to 'read on new products and new directions where [a party projects] sales to be most critical.' " *Infosint S.A.,* 2007 WL 1467784, at *4. As Defendants point out in their motion, Pridham's involvement in IP Nav, which provides consulting on patent acquisition for Spangenberg's patent-holding entities, also puts Pridham in position to seek out and propose the purchase of patents that read on activities known from Pridham's involvement in confidential discovery during prior lawsuits, and then seek to enforce those patents against the same Defendants. Given Pridham's involvement from patent acquisition through litigation and claim construction, access to highly confidential information would also allow him to seek out certain patents and then propose claim constructions that read on Defendants' known use of the allegedly infringing systems. The risk of inadvertent disclosure would be high by the very nature of Pridham's duties and his connection to Spangenberg. If allowed to access the information, Pridham would be forced into what other courts have emphasized as the untenable position of having to

Case: 1:18-cv-00864 Document #: 305-12 Filed: 08/06/18 Page 7 of 32 PageID #:8503

ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC, Not Reported in F.Supp.2d...

2008 WL 5634214

compartmentalize his knowledge of the confidential information when asked about the acquisition or other use of patents whose claims could arguably be utilized against these Defendants. Courts have continuously determined that attempting to compartmentalize knowledge is an exercise in futility. *Autotech Techs. Ltd. P'ship,* 237 F.R.D. at 410–11. Moreover, Spangenberg and Pridham have demonstrated a willingness to sue these particular Defendants over and over as they acquire new patents, which puts Defendants at an even greater risk of suffering harm from any inadvertent disclosure.

**\*6** Pridham's active involvement in licensing and litigation, and the lack of any other persons to whom Pridham reports in the business, are also factors that other courts have considered critical to "competitive decisionmaker" analysis. One California court found that an attorney's active involvement "in licensing through litigation" constituted competitive decisionmaking in part because "advice and counsel necessarily affect licensing decisions," and licensing agreements affected the parties' strength in the marketplace. *See Intel Corp.* 198 F.R.D. at 530. The *Intel* court reiterated the overarching concern that counsel would be placed "in the untenable position of having either to refuse to offer crucial legal advice at times or risk disclosing protected information," and that counsel's close interaction with the immediate supervisors making the critical business decisions exacerbated the potential for inadvertent disclosure of the confidential information. *Id.* Yet another court denied counsel access primarily because counsel took his "ultimate instructions in the litigation from a single individual" who was "for all intents and purposes, the [client] corporation," and there were no "safeguards resulting from a layered managerial hierarchy." *Autotech Techs. Ltd. P'ship,* 237 F.R.D. at 410–11. Every aspect of Pridham's role in litigation has either been a foundation of other courts' decisions in screening attorneys such as Pridham from access to confidential information, or is highly analogous to certain aspects that have been critical to the decision, and thus, there is ample support to conclude that Pridham himself qualifies as a competitive decisionmaker.

In its response, Sales Tech argues that Pridham cannot be a competitive decisionmaker because Sales Tech does not manufacture products or design automobiles, and is therefore not a 'competitor' to Defendants. Sales Tech pulls this argument from the Federal Circuit's definition of "competitive decisionmaker," which covers counsel's

association with a client involving advice or participation in any decisions "made in light of similar or corresponding information about a *competitor." U.S. Steel Corp.,* 730 F.2d at 1468 n. 3 (emphasis added). However, since the *U.S. Steel Corp.* decision, courts have found that a person can still be a "competitive decisionmaker" under the Federal Circuit's definition even when not representing a competitor. [8] *See, e.g ., Infosint S.A. v. H. Lundbeck A.S.,* 2007 WL 1467784, at \*3–4 (S.D.N.Y.2007) (finding that outside counsel was a "competitive decisionmaker" even though he was "neither an officer nor employee of [plaintiff], and [was] not involved in 'business decisions regarding competitors of [his client].' "). *See also R.R. Donnelley & Sons Co. v. Quark, Inc.,* 2007 WL 61885, at \*2 n. 2 (D.Del.2007) (rejecting the argument that a person cannot be a competitive decisionmaker unless the party that person is a representative of a competitor of the other parties in the litigation since trade secrets and sensitive information could potentially be of value to the plaintiff). Moreover, it is somewhat disingenuous to argue Sales Tech is not Defendants' competitor simply because Sales Tech is in the business of acquiring and enforcing patents, while Defendants manufacture and design automobiles. Plaintiff and Defendants all seek to utilize, in one manner or another, intellectual property as part of a business model for pecuniary gain. The fact that Sales Tech is before the Court seeking to enforce its attained intellectual property, and has sued on similar patents against these same Defendants on the same systems many times before, indicates Sales Tech views Defendants as competitors for the rights to use the accused systems. To the extent Sales Tech and Defendants are not direct competitors in the traditional understanding of the term, competitor status is not the sole relevant inquiry, and it certainly is not determinative of the matter. *See MGP Ingredients, Inc. v. Mars, Inc.,* 245 F.R.D. 497, 500–01 (D.Kan.2007). There is little doubt Defendants' confidential information could be of value to an entity such as Sales Tech, whose business model hinges on the ability to acquire intellectual property and enforce it against other entities using the allegedly infringing technology. It is that ultimate potential for damaging use of the confidential information that underlies the concerns of Rule 26 and the *U.S. Steel Corp.* "competitive decisionmaker" analysis.

8    Sales Tech argues the present circumstance is "somewhat similar" to a case decided in the District of Kansas where the fact that the parties' were not competitors played a role in denying a motion

ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC, Not Reported in F.Supp.2d...

2008 WL 5634214

for protective order. *See MGP Ingredients, Inc. v. Mars, Inc.,* 245 F.R.D. 497, 500–01 (D.Kan.2007). However, in *MGP Ingredients* the Defendants grounded their motion on the fact that the parties were competitors, making it a more relevant issue in that case than it is here. *Id.* Here, Defendants have based their motion for the protective order on the notion that Pridham's extensive business relationship with Spangenberg and litigation history makes him a competitive decisionmaker, and a risk to inadvertently disclose confidential information that Spangenberg could use to harm Defendants. It is also important to note that even though the issue of whether the parties were competitors was placed squarely before the Court in the *MGP Ingredients* case, the court properly noted that "whether [plaintiff] and defendants are, in fact, competitors is not the sole legally relevant inquiry as to whether the [protective order] sought by defendants is warranted," and proceeded to analyze the case under all of the considerations outlined by the Federal Circuit in *U.S. Steel Corp. See MGP Ingredients, Inc.,* 245 F.R.D. at 501.

**\*7** Sales Tech also argues extensively that Pridham cannot be a competitive decisionmaker because his title is now strictly outside counsel to Sales Tech, and he is not an owner or employee of Sales Tech, IP Nav, or other Spangenberg entities. *See* Pridham Decl. ¶¶ 2–3. However, Pridham's actual title is irrelevant to the pertinent analysis, as courts have found attorneys to be competitive decisionmakers regardless of whether they are in-house and outside counsel. *See U.S. Steel Corp.,* 730 F.2d at 1467–68 (rejecting notion that in-house counsel are more of a risk to inadvertently disclose confidential information, since many outside counsel maintain long-standing relationships with clients). *See also, e.g .., Infosint S.A.,* 2007 WL 1467784, at \*4 (finding outside counsel to be competitive decisionmaker); *Nike, Inc. v. Adidas America Inc. .,* No. 9:03–cv–43 (E.D.Tex.2006) (Doc. No. 58) (refusing to modify protective order to grant in-house counsel access because of risk for inadvertent disclosure of trade secrets). The risk of inadvertent or accidental disclosure is the focus of the issue, and that must be weighed against the potential harm to all parties, not Pridham's actual title. In *U.S. Steel Corp.,* the Federal Circuit specifically articulated that the "factual circumstances surrounding each individual counsel's activities, association, and relationship with a party, *whether counsel be in-house or retained,* must govern any concern for inadvertent or accidental disclosure." *U.S. Steel Corp.,* 730 F.2d at 1468 (emphasis added).

In looking at the totality of the facts surrounding Pridham's role in Spangenberg's businesses, from patent acquisition to active involvement in litigation and licensing, all of the concerns prior courts have found critical in denying certain attorneys access to confidential information are present. The Court finds that Pridham is a competitive decisionmaker, and that his close relationship with Spangenberg presents a high risk for inadvertent disclosure that bears great potential to significantly harm Defendants through continued litigation. While determining whether counsel is a "competitive decisionmaker" is a critical factor for the Court to consider, in itself the factor is not determinative. The Court must also examine and balance the potential for harm on both sides before determining whether a protective order is ultimately necessary.

### B. Balancing The Potential Harms and Risks of Disclosure

If counsel is determined to be involved in competitive decisionmaking, the issue then becomes whether there is a demonstrated need for access to the documents sufficient to outweigh the concerns such access gives rise to. *Infosint S.A.,* 2007 WL 1467784, at \*5. In their motion and replies, Defendants argue that Spangenberg's well-documented willingness to seek out similar patents and assert them against these Defendants on similar technology puts them at risk of continuous litigation if Pridham is allowed continued access to their confidential information. In response, Sales Tech argues that the infringement claims in this lawsuit are based on publicly available information, and that it would already be apparent if they had misused "Attorneys' Eyes Only" information Pridham had accessed in previous cases as the bases of its claims against Defendants herein. Pl.'s Resp. To Def.'s Mot. For Entry of Protective Order at 9. Sales Tech also argues that Defendants have not sufficiently demonstrated facts showing the competitive harm that would befall them by any inadvertent disclosure of confidential information by Pridham to Spangenberg, and that Sales Tech would in fact be severely harmed if denied Pridham's services during the present proceeding. Finally, Sales Tech notes that it has agreed to include terms in the protective order that would limit the use of any confidential information gained during discovery to use in the present proceeding, and therefore any inadvertent disclosure Pridham makes would subject him to violating the protective order.

ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC, Not Reported in F.Supp.2d...

2008 WL 5634214

**\*8** As discussed in the competitive decisionmaker subsection above, the Court agrees with Defendants that the risk that Pridham might inadvertently disclose confidential information to Spangenberg is very high under the circumstances. Pridham and Spangenberg share a close business relationship, and it appears there are no levels of managerial hierarchy to insulate the interaction of the two. Moreover, Pridham's involvement in patent acquisition, litigation and licensing, which is the very core of Spangenberg's business, underscores his importance to Spangenberg's businesses. If Pridham were to gain continued access to confidential material, he would be in a difficult position when advising Spangenberg on everything from patent acquisition to claim construction to licensing. Defendants would ultimately be at a high risk of continued litigation, as Spangenberg has demonstrated a willingness to acquire and enforce patents on the same systems against these same Defendants when he has the capability of doing so.

In comparison, the harm to Sales Tech is relatively minor. Sales Tech has other highly competent counsel that has been involved in the case since the beginning of the present litigation (and even in previous cases). Courts have found time and again that requiring a party to rely on its competent outside counsel does not create an undue or unnecessary burden. *Brown Bag Software,* 960 F.2d at 1471; *Autotech Techs. Ltd. P'ship,* 237 F.R.D. at 413; *Intel Corp.,* 198 F.R.D. at 529. Sales Tech has presented no credible argument for why Pridham absolutely needs access to Defendants' confidential information, or that he is critical to the prosecution of its case.

Sales Tech's other arguments are also unavailing. Sales Tech's argument that it would already be obvious if it had misused information Pridham had accessed in the prior litigation involving these Defendants misses the point of the inquiry. The question is whether the potential for inadvertent disclosure exists on a going-forward basis, and whether the potential harm from such a disclosure outweighs the potential harm to Sales Tech. Likewise, Sales Tech's agreement in its proposed protective order to limit the use of the information to use in the present litigation only also ignores the underlying law, which is the risk of *inadvertent* disclosure going forward. No amount of guarantees to limit the use of the information can ensure against such an inadvertent disclosure. *See U.S. Steel Corp.,* 730 F.2d at 1468.

On the whole, the Court finds that Pridham's relationship with Spangenberg and his role in Spangenberg's business enterprise presents un unacceptable risk of inadvertent disclosure that could significantly harm Defendants. While the Court notes that Plaintiff will be harmed by having one of its counsel screened from accessing certain information in the case, that harm is minor compared to the risk of continued harm to Defendants since Sales Tech has other highly competent attorneys that have been involved since the beginning of the case.

### CONCLUSION

**\*9** For the stated reasons, Defendants' Motion For Entry of a Protective Order (Doc. No. 88) is **GRANTED.**

**So ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 5634214

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.



***Trading Techs. Int'l, Inc. v. GL Consultants, Inc.***, **2011 WL 148252
(N.D. Ill. 2011)**

Case: 1:18-cv-00864 Document #: 305-12 Filed: 08/06/18 Page 11 of 32 PageID #:8507

Trading Technologies Intern., Inc. v. GL Consultants, Inc., Not Reported in F.Supp.2d...

2011 WL 148252

2011 WL 148252
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

TRADING TECHNOLOGIES
INTERNATIONAL, INC., Plaintiff,

v.

GL CONSULTANTS, INC., et al., Defendants.
Trading Technologies, International, Inc., Plaintiff,

v.

Futurepath Trading, LLC, Defendant.

Nos. 05 C 4120, 05 C 5164.
|
Jan. 18, 2011.

**Attorneys and Law Firms**

Paul H. Berghoff, Alan Wayne Krantz, Christopher
Michael Cavan, George I. Lee, Jennifer M. Kurcz, Jeremy
E. Noe, Kirsten L. Thomson, Leif R. Sigmond, Jr.,
Marcus Jay Thymian, Matthew J. Sampson, Michael
David Gannon, Michelle Lynn Mcmullen–Tack, Paul A.
Kafadar, Paul S. Tully, S. Richard Carden, Sarah Emily
Fendrick, Mcdonnell, Boehnen, Hulbert & Berghoff, Ltd.
Steven F. Borsand, Trading Technologies International,
Inc., Chicago, IL, for Plaintiff.

Anthony B. Ullman, Adele R. Frankel, Alison G.
Naidech, Lora A. Moffatt, Salans LLP, Christopher
Louis Mcardle, David John Eklund, Natalic C. Clayton,
Alston & Bird LLP, New York, NY, Brian W. Norkett,
Law Offices of Brian W. Norkett, Scott R. Sinson,
Bullaro & Carton, P.C., James Frank Cirincione, Foley &
Lardner, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

SIDNEY I. SCHENKIER, United States Magistrate
Judge.

**\*1** Beginning in 2004, Plaintiff Trading Technologies
International, Inc. ("TT") brought a number of separate
patent infringement suits against various defendants
alleging infringement of U.S. Patent Nos. 6,766,304 (#304
Patent) and 6,882,132 (#132 Patent), which relate to

certain computer software used for electronic trading
in the futures industry.[1] Defendants in the above
consolidated actions have moved for a modification of the
protective order signed by Judge James Moran on August
7, 2006 ("2006 Order") (doc. # 284: Mot. to Modify).
Judge Moran signed the 2006 Order after the parties spent
"an inordinate amount of time" and "massive briefing" on
the protective order issues (doc. # 120, 7/13/2006 Mem.
Op. and Order at 1), and the parties in this case have now
spent a massive amount of time and briefing on issues
related to modifying the protective order.

[1]     This general background information has been
        gleaned from various opinions written in these cases,
        including, for example, *Rosenthal Collins Group, LLC
        v. Trading Technologies Int'l Inc.,* No. 05 C 4088, 2009
        WL 3055383 (N.D.Ill. Sept. 18, 2009); and *Trading
        Technologies Int'l, Inc. v. CQG, Inc.,* No. 05 C 4811,
        2009 WL 398152 (N.D.Ill. Feb.17, 2009).

Defendants propose to modify the 2006 Order in the
following ways: (1) to preclude TT's in-house counsel
and Executive Vice President of Intellectual Property,
Steven Borsand, from having access to any information
defendants designate "Highly Confidential"; (2) to
broaden the definition of "Primary Responsibility for
the Preparation and Prosecution of Patent Applications";
(3) to broaden the definition of "Related to the
Subject Matter of the Patents–In–Suit"; and (4) to
create a fourth tier of confidentiality (in addition to
"Confidential," "Highly Confidential–Attorneys' Eyes
Only," and "Highly Confidential–Patent Prosecution")
for source code, "Highly Confidential–Attorneys' Eyes
Only–Source Code," which would establish numerous
additional restrictions on a party's ability to review source
code information. TT contends that the 2006 Order should
remain in effect as it is, without any modification.

After careful review of all of the parties' submissions, we
deny defendants' motion to modify the protective order.

## I.

Under Federal Rule of Civil Procedure 26(c)(1), "[t]he
court may, for good cause, issue an order to protect a party
or person from annoyance, embarrassment, oppression,
or undue burden or expense." Fed.R.Civ.P. 26(c)(1).
Although the Federal Circuit generally defers to regional
circuit law when the issue involves an interpretation of

Case: 1:18-cv-00864 Document #: 305-12 Filed: 08/06/18 Page 12 of 32 PageID #:8508

Trading Technologies Intern., Inc. v. GL Consultants, Inc., Not Reported in F.Supp.2d...

2011 WL 148252

the Federal Rules of Civil Procedure, Federal Circuit law applies to discovery matters "if the determination implicates an issue of substantive patent law." *In re Deutsche Bank Trust Co. Americas,* 605 F.3d 1373, 1377 (Fed.Cir.2010). In deciding which law to apply, the Federal Circuit considers "the uniformity in regional circuit law, the need to promote uniformity in the outcome of patent litigation, and the nature of the legal issue involved." *Id.* at 1377. In *Deutsche Bank,* the Federal Circuit held that a "determination of whether a trial lawyer should be denied access to information under a protective order because of his additional role in patent prosecution, or alternatively be barred from representing clients in certain matters before the U.S. Patent and Trademark Office ("PTO"), is an issue unique to patent law." *Id.* As defendants' motion to amend implicates this very issue, under *Deutsche Bank* we apply Federal Circuit law in deciding the motion. *Id.* at 1377–78.

**\*2** Defendants, the moving party, carry the burden of showing good cause for modification of the protective order. *Deutsche Bank,* 605 F.3d at 1378, The district court has broad discretion to decide when a protective order is appropriate and what degree of protection is required. *County Materials Corp. v. Allan Block Corp.,* 502 F.3d 730, 739 (7th Cir.2007) (citing *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 36, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984)).

"Good cause 'is difficult to define in absolute terms, it generally signifies a sound basis or legitimate need to take judicial action.' " *Wiggins v. Burge,* 173 F.R.D. 226, 229 (N.D.Ill.1997) (quoting *In re Alexander Grant & Co., Litig.,* 820 F.2d 352, 356 (11th Cir.1987)). "Good cause is established by showing that the disclosure will cause a clearly defined and serious injury," *Hobley v. Chicago Police Commander Burge,* 225 F.R.D. 221, 224 (N.D.Ill.2004). To establish good case under Rule 26(c), the moving party must present a "particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 102 n. 16, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981); *see also Baxter Int'l, Inc. v. Abbott Labs.,* 297 F.3d 544, 548 (7th Cir.2002) (motion to maintain documents under seal must be made with specificity, analyzing in detail, document by document, the propriety of secrecy, providing reasons and legal citations).

"In considering whether good cause exists for a protective order, the federal courts have generally adopted a balancing process ." *Grove Fresh Distributors, Inc. v. John Labatt Ltd.,* 888 F.Supp. 1427, 1443–44 (N.D.Ill., 1995). This test balances the privacy interests and potential harm to the party seeking the protective order with the importance of disclosure to the public. *Wiggins,* 173 F.R.D. at 229; *see also Bond v. Utreras,* 585 F.3d 1061, 1074 (7th Cir.2009). In considering motions to modify confidentiality orders, the Third Circuit has suggested adding to the balancing test the consideration of the extent the parties relied on the original confidentiality order. *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 789–91 (3d Cir.1994). While the Seventh Circuit has not set forth a specific test to follow in considering whether to grant a motion to vacate or modify a protective order, at least some judges in this district have adopted such a test. In *Murata Mfg. Co., Ltd. v. Bel Fuse, Inc.,* 234 F.R.D. 175, 179 (N.D.Ill.2006), the court adopted the following four factors to consider: "(1) the nature of the protective order; (2) the foreseeability, at the time of issuance of the order, of the modification requested; (3) the parties' reliance on the order; and most significantly (4) whether good cause exists for the modification." *Id.* (citing *Bayer AG and Miles, Inc. v. Ban Labs., Inc.* 162 F.R.D. 456, 462–63 (S.D.N.Y.1995)). " 'Good cause' in this context implies changed circumstances or new situations; a continuing objection to the terms of a protective order does not constitute good cause to modify or withdraw it." *Kyles v. J.K. Guardian Sec. Servs.,* 2006 WL 2349238, at *4 (N.D.Ill. Aug.15, 2006).

**\*3** In patent cases, the test for modification of a protective order asks "whether there is an unacceptable risk of or opportunity for 'inadvertent disclosure' of confidential information." *Pfizer Inc. v. Apotex Inc.,* No. 08–7231, 2010 WL 3937916, at *2 (N.D.Ill. Sept.29, 2010) (*citing Autotech Techs. Ltd. Psp. v. Automationdirect.com, Inc.,* 237 F.R.D. 405, 407 (N.D.Ill.2006) (quoting *Matsushita Elec. Indus. Co., Ltd. v. United States,* 929 F.2d 1577, 1579 (Fed.Cir.1991)). If such a risk exists, the balancing test then involves weighing that risk against the burden that would be placed on the party seeking the information if it were denied material necessary to its defenses or claims. *Pfizer,* 2010 WL 3937916, at *2. In making this determination, the court must "examine all relevant facts surrounding counsel's actual preparation and prosecution activities, on a counsel-by-counsel basis." *Deutsche Bank,* 605 F.3d at 1380.

Case: 1:18-cv-00864 Document #: 305-12 Filed: 08/06/18 Page 13 of 32 PageID #:8509
Trading Technologies Intern., Inc. v. GL Consultants, Inc., Not Reported in F.Supp.2d...

2011 WL 148252

## II.

Defendants' first proposed modification to the protective order seeks to exclude Mr. Borsand from viewing all documents defendants designate as "Highly Confidential–Attorneys' Eyes Only," "Highly Confidential–Patent Prosecution," or "Highly Confidential—Attorneys' Eyes Only—Source Code" (a new category proposed by defendants). The 2006 Order allows "confidential" and "Highly Confidential–Attorneys' Eyes Only" information to be disclosed to TT's in-house attorney, Mr. Borsand, and to in-house attorneys for the defendants (doc. # 286: Defs.' Mem. in Supp. of Mot. to Amend, Ex. 1: 2006 Order at ¶ 6). In addition, the 2006 Order stated that a party receiving "Highly Confidential–Patent Prosecution" information may disclose it to Mr. Borsand and other designated in-house attorneys "provided that they agree not to have primary responsibility for preparation and prosecution of patent applications ... related to the subject matter of the patents-insuit" (*Id.* at ¶ 8).

Defendants argue that Mr. Borsand is intimately involved in TT's patent prosecution, is responsible for managing TT's intellectual property assets and litigation, and is an "active inventor" in connection with the type of technology at issue in this litigation (Defs.' Mem. at 5–7). Defendants contend that Mr. Borsand's involvement in these activities creates an unacceptable risk that if he were allowed access to the various species of Highly Confidential information, Mr. Borsand—despite his best efforts to avoid doing so—would inadvertently use the information to defendants' competitive detriment (*Id.* at 12–13). As a result, defendants contend that the 2006 Order should be modified to bar Mr. Borsand from viewing all "Highly Confidential" information (Defs.' Mem., Ex. 3: Proposed Order at ¶¶ 6(b), 7, 8).

The Federal Circuit recently explained that the risk of inadvertent disclosure turns on "the extent to which counsel is involved in competitive decisionmaking with its client" *Deutsche Bank,* 605 F.3d at 1378. The Federal Circuit defines "competitive decisionmaking" as "shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions ... made in light of similar or corresponding information about a competitor." *Id.*

These decisions include decisions on pricing, product design, and other unspecified areas. *Id.* at 1378–79 (citing *US. Steel Corp. v. United States,* 730 F.2d 1465 (Fed.Cir.1984)).

*\*4 The Federal Circuit observed that the concern over inadvertent disclosure manifests itself in patent infringement cases when trial counsel represents the same client in patent prosecution matters. *Deutsche Bank,* 605 F.3d at 1379, Nevertheless, the court held that because patent prosecution can encompass a range of activities, not every patent prosecution attorney is necessarily involved in competitive decisionmaking, and conversely, not every attorney involved in competitive decisionmaking does patent prosecution. "The facts, not the category must inform the result." *Id.*

Therefore, in determining the proper scope of a protective order, a court must consider, on a counsel-by-counsel basis, "whether an unacceptable opportunity for inadvertent disclosure" by the opposing party's attorney to his or her client-the competitor corporation-exists. *Deutsche Bank,* 605 F.3d at 1378. If it is determined that a risk of inadvertent disclosure exists, the court then "must balance the risk against the potential harm to the opposing party from restrictions imposed on that party's right to have the benefit of counsel of its choice." *Id.* at 1380. We apply that two-step approach in considering defendants' proposal to bar Mr. Borsand from access to information that defendants designate as Highly Confidential.

### A.

We begin by considering Mr. Borsand's role at TT. As the Executive Vice President of Intellectual Property for TT, Mr. Borsand manages and actively participates in all of TT's litigation matters that relate to intellectual property, including TT's enforcement of the patents-insuit (doc. # 302: TT Opp'n Br., Ex. C: Borsand Decl. at ¶¶ 1, 4). Mr. Borsand is "extensively involved in determining TT's legal strategy with respect to all substantive issues in the litigations," and is one of few attorneys "with an overarching understanding of TT's broad legal strategy across the various patents and defendants" (*Id.* at ¶ 4). He "provide[s] legal advice to the decision makers within TT regarding issues in the litigations" and is TT's lead litigation counsel in this case and in all of TT's pending patent litigation (*Id.* at ¶¶ 4–5). Further, Mr. Borsand is

Case: 1:18-cv-00864 Document #: 305-12 Filed: 08/06/18 Page 14 of 32 PageID #:8510

Trading Technologies Intern., Inc. v. GL Consultants, Inc., Not Reported in F.Supp.2d...

2011 WL 148252

the "only attorney who represents TT in settlement and license negotiations" (*Id.* at ¶ 6).

However, Mr. Borsand does not make decisions "related to product pricing, sales, marketing design, or development" (Borsand Decl. at ¶ 13). According to Mr. Borsand, since mid–2004 (prior to the commencement of these lawsuits), his role in patent prosecution has been "minimal and only at a high level" (*Id.* at ¶ 7). Indeed, Mr. Borsand says his current involvement in patent prosecution is even less than it was in 2005, when the protective order originally was entered in these cases (*Id.* at ¶ 9). He does not draft patent applications, office action responses, or amendments, and he has not reviewed a single TT patent application since the third quarter of 2004 (*Id.*). Mark Triplett, TT's Vice President of Patents who reports to Mr. Borsand, heads a group of five patent attorneys and a paralegal responsible for managing all of TT's patent prosecution matters (*Id.* at ¶¶ 8–9).

**\*5** With respect to defendants' characterization of him as an inventor, Mr. Borsand acknowledges that since 2003 his name has appeared as an inventor on three continuation-in-part applications (Borsand Decl. at ¶ 11). However, Mr. Borsand states that all of those applications were spawned from applications filed in 2003 and added no new material (*Id.*). Mr. Borsand states that he has not had any involvement with inventing products since 2003, and since that time has not made any inventive contribution to the patents involved in the 2003 applications (*Id.* at ¶¶ 11–12).

Mr. Borsand states that he has viewed Highly Confidential —Attorneys' Eyes Only material in this case, and that at all times he has abided by the terms of the protective order (Borsand Decl. at ¶ 10). Defendants have not offered any evidence to the contrary. So far, in this and prior litigation, Mr. Borsand has elected not to view information designated Highly Confidential Patent Prosecution (*Id.*). Nevertheless, Mr. Borsand maintains that if he chose to review that category of material, he would fully abide by the terms of the protective order and would not have "Primary Responsibility for the Preparation and Prosecution of Patent Application(s) Related to the Subject Matter of the Patents–in–Suit," and thus would not be in a position to use the information to defendants' competitive disadvantage (*Id.*).

The Federal Circuit has stated that there is little risk that attorneys involved "solely" in the following prosecution activities will inadvertently rely on or be influenced by information they may learn as trial counsel during the course of litigation; "reporting office actions or filing ancillary paperwork, such as sequence listings, formal drawings, or information disclosure statements;" "highaltitude oversight of patent prosecution, such as staffing projects or coordinating client meetings." *Deutsche Bank,* 605 F.3d at 1379–80. The Federal Circuit reasoned that in these functions, attorneys "have no significant role in crafting the content of patent applications or advising clients on the direction to take their portfolios." *Id.* at 1380. By contrast, the Federal Circuit has warned of a high risk of inadvertent disclosure for attorneys who were "more substantially engaged with prosecution," including: "obtaining disclosure materials for new inventions and inventions under development, investigating prior art relating to those inventions, making strategic decisions on the type and scope of patent protection that might be available or worth pursuing for such inventions, writing, reviewing, or approving new applications or continuations-in-part of applications to cover those inventions, or strategically amending or surrendering claim scope during prosecution." *Id.* The Federal Circuit has remarked that the level of risk of disclosure is a "closer question" in the case of a "senior level supervisor" who primarily serves as a liaison between prosecuting attorneys and clients. *Id.*

**\*6** Based on this record, we conclude that Mr. Borsand's work while not involving current inventive activity or direct involvement in patent prosecution activity does present some level of risk of inadvertent disclosure, because Mr. Borsand "mak[es] strategic decisions on the type and scope of patent protection that might be available or worth pursuing" for TT's inventions, as defined in *Deutsche Bank,* 605 F.3d at 1380. Mr. Borsand has oversight responsibility over the department responsible for patent prosecution activity, he is one of the most senior executives of TT, and he is the primary architect of TT's legal strategy to protect its intellectual property to prevent competitors from copying TT's innovations, including enforcement of the patents-in-suit (Borsand Decl. at ¶¶ 1,3–4). The evidence persuades us that there is enough risk to warrant proceeding to the second step of the analysis.

Case: 1:18-cv-00864 Document #: 305-12 Filed: 08/06/18 Page 15 of 32 PageID #:8511

Trading Technologies Intern., Inc. v. GL Consultants, Inc., Not Reported in F.Supp.2d...

2011 WL 148252

## B.

When there is a risk of inadvertent disclosure, the court "must balance the risk against the potential harm to the opposing party from restrictions imposed on that party's right to have the benefit of counsel of its choice." *Deutsche Bank,* 605 F.3d at 1380. The subject matter covered by the bar must "reasonably reflect the risk presented by the disclosure of proprietary competitive information." *Id.* at 1381. Further, the court must determine, on a counsel-by-counsel basis, whether the potential injury to the nonmoving party from restrictions imposed on its choice of litigation and prosecution counsel outweighs the potential injury to the moving party caused by the inadvertent use of confidential information learned in litigation. *Id.*

A district court has broad discretion to balance these conflicting interests and decide what degree of protection is required. *Deutsche Bank,* 605 F.3d at 1380. In making this determination, the court should consider such things as the extent of the counsel's past history representing the client in patent prosecution matters, the client's reliance and dependence on that past history, and the potential difficulty the client might face if forced to rely on other counsel for the pending litigation or engage other counsel in patent prosecution matters. *Id.* at 1381. In addition, the court looks to factors such as the type and scope of the activities prohibited by the protective order bar, the duration of the bar, and the definition of the subject matter covered by the bar. *Id.* As the Federal Circuit points out, however, "[t]his is no easy balancing act, ... since the factors that make an attorney so valuable to a party's prosecution interests are often the very factors that subject him to the risk of inadvertent use or disclosure of proprietary competitive information acquired during litigation." *Id.*

In addition, courts in this district give weight to the expectation that the parties' attorneys will abide by the highest duties and ethical standards that are required of them in general and according to the protective order. See *JAB Distributors, LLC v. London Luxury, LLC,* No. 09–5831,2010 WL 4008193, at *4 (N.D. Ill. Oct 13, 2010) (citing *Truswal Sys. Corp. v. Hydro–Air Eng'g, Inc.,* 813 F.2d 1207, 1211 (Fed.Cir.1987)). In *JAB,* the court held that the movant's claims that a more restrictive protective order was necessary because

its competitor "will spare no effort or expense to usurp the [movant's] business" indicated nothing more than normal competition between the two companies. *JAB,* 2010 WL 4008193, at *2. The court considered the central issue to be whether the protective order "adequately" protected the highly confidential information. *Id.* at *3. The court held that the protective order in place was adequate to ensure the secure production of competitively sensitive information, because the plaintiffs attorneys could view confidential documents and "use them to inform their larger recommendation to their client as to the desirability of a proposed course, without communicating private information contained in those documents (to the clients)." *Id.* at *4

*7 Similarly, in *Motorola, Inc. v. Lemko Corp.,* No. 08 C 5427, 2010 WL 2179170, at *3 (N.D.Ill. June 1, 2010), a party sought to loosen the protective order's provision that certain "attorneys' eyes only" information would be accessible only to outside counsel of record and to independent expert witnesses and consultants, so that a portion of the protected information would also be available to some of Motorola's in-house attorneys and business or security personnel. *Motorola,* 2010 WL 2179170, at *3. As in *JAB,* the *Motorola* court acknowledged the competition, or potential competition, between the parties, and the parties' concern that disclosure of development, design, and implementation of cutting-edge communications technology "would put the company at risk that a competitor or potential competitor would learn of and use the technology." *Id.* at *4. The court held, however, that the defendants failed to show that disclosure of the materials to a small number of Motorola personnel—the responsibilities of most of whom were legal and security-related— would put the defendants "at any appreciable risk" of "disclosure (including inadvertently or accidentally) of sensitive competitive information," especially in light of the fact that the persons would be subject to the court's protective order and its non-disclosure/non-use restrictions. *Id.*

In this case, the factors in the balancing test weigh against imposing the restriction on Mr. Borsand (and on TT) that defendants seek. Mr. Borsand is TT's lead trial counsel and is intimately involved in TT's overall litigation strategy. As such, TT would face serious difficulty if forced to rely on outside counsel rather than Mr. Borsand to the extent that defendants propose.

Defendants' suggestion that Mr. Borsand "would not be precluded from representing [TT] in the litigation (Defs.' Mem. at 14), is disingenuous at best. Defendants do not explain how Mr. Borsand could competently discharge his responsibilities as TT's lead counsel while at the same time being kept wholly in the dark as to significant categories of evidence.

Defendants' alternative suggestion that TT would not be prejudiced if Mr. Borsand could not continue to act as lead counsel (*Id.*) is likewise a non-starter. Mr. Borsand has been TT's lead counsel in litigation involving the patents-in-suit since 2003, and he is now its lead counsel in thirteen suits in this court involving these patents. He has also tried one case involving the patents-in-suit to a successful jury verdict in 2007. The idea that TT would be unscathed if it lost Mr. Borsand's involvement as lead counsel blinks reality, and ignores the weight to be given to a party's choice of what counsel will represent it in major litigation. *See Deutsche Bank,* 605 F.3d at 1380 (court must balance competing interests between potential harm from risk of inadvertent disclosure of confidential information against potential harm from restrictions imposed on patentees' right to have counsel of choice).

**\*8** On the flip side, we find that the risk of inadvertent disclosure of Highly Confidential information Mr. Borsand receives in the litigation is not great. Mr. Borsand does not himself now engage in patent prosecution or inventive activity and does not make decisions related to product pricing, sales, marketing, design, or development. In his declaration, Mr. Borsand stated that he has abided by the terms of the 2006 Order, and indeed, there is no evidence that he has improperly disclosed the Highly Confidential—Attorneys' Eyes Only material to which he has had access. We agree with the analysis of the courts in *JAB* and *Motorola,* and expect that Mr. Borsand will abide by the protective order as he has in the past .[2] Moreover, while to date Mr. Borsand has elected not to view any materials with the designation Highly Confidential–Patent Prosecution, he warrants that if he did view such materials, he would fully abide by the terms of the protective order (Borsand Decl. at ¶ 10). Specifically, Mr. Borsand warrants that he would not have "Primary Responsibility for the Preparation and Prosecution of Patent Applications" as defined in the Protective Order (*Id.* at ¶ 10). That is a credible representation, since the evidence submitted with TT's response to defendants' motion shows that Mr. Borsand

does not currently exercise primary responsibility for that activity.

[2]  We are mindful of defendants' argument that conduct by Mr. Borsand that defendants cite in a separate motion to disqualify Mr. Borsand as trial counsel (doc. # 293) also supports barring Mr. Borsand from access to Highly Confidential information. In that motion, defendants contend that one of the defendants retained EIP, a European patent firm, in December 2005 as a consultant to help defendants' outside trial counsel defend against TT's 2005 infringement suit. In July 2010, TT hired EIP to represent TT in prosecuting some of TT's European patent applications. Defendants contend that EIP was privy to "defense strategy related to TT's patents" and other related work product (doc. # 295: Mem. in Supp. of Mot. to Disqualify at 4). In his declaration, Mr. Borsand attests that he did not violate the 2006 Order through his contacts with EIP, and TT has maintained its relationship with EIP (Borsand Decl. at ¶¶ 14–22). The district judge presiding in this case will decide the factual issues in the motion to disqualify, and we will not limit Mr. Borsand's access to materials based on contested allegations that will be adjudicated by another judge. We will revisit the issue of restrictions on Mr. Borsand if the ruling by the district judge provides good cause to do so.

Defendants argue that whether or not Mr. Borsand has "Primary Responsibility for the Preparation and Prosecution of Patent Applications," there is a risk of inadvertent disclosure that should bar Mr. Borsand from having access to Highly Confidential information. This misunderstands the nature of a patent prosecution bar in a protective order. The patent prosecution bar reflects a court's determination of "the degree of protection required" to balance the risk of inadvertent disclosure against the harm to the opposing party from limitations imposed on that party's right to have the counsel of its choice. *Deutsche Bank,* 605 F.3d at 1380. Defendants have not pointed out any case, nor have we found one, where an absolute bar against an attorney's access to a wide range of confidential information in a protective order was held to "reasonably reflect the risk presented by the disclosure of proprietary competitive information." *Id.* at 1381. Rather, a patent prosecution bar in a protective order reflects a balance wherein an attorney agrees to give up a specific scope of activities for the specific duration of the bar in exchange for access to certain confidential information.

*Id.* As Judge Moran aptly put it: "It's a choice.... [A] party ... has a choice to say, okay, I am going to use this attorney as part of my litigation team. Or I am going to use this attorney as part of my patent application team. But you can't do both." (TT's Opp'n Br., Ex. B: 3/7/06 Tr. at 6).

Finally, we are not persuaded that the activity that defendants say should bar Mr. Borsand from access to confidential material is activity that was not substantially before Judge Moran when he entered the protective order in 2006. We recognize that Judge Moran entered the order over defendants' strenuous objection. But, neither continuing dissatisfaction with the protective order nor the reassignment of the case to a new judge is good cause to change a protective order provision that has adequately governed the case for four years.

**\*9** Based on this analysis, we find that it is too great a burden to preclude TT's lead litigator and trial counsel from access to defendants' Highly Confidential material. Accordingly, defendants have not presented "good cause"—in fact, they have not presented any changed evidence or circumstances since the 2006 Order issued—that the protective order should be modified as they have requested.

### III.

The next two modifications sought by defendants seek to broaden the patent prosecution bar in the 2006 Protective Order, which prevents people who gain access in the litigation to documents marked "Highly Confidential–Patent Prosecution" from primary responsibility for prosecuting any patent related to the subject matter of the patents in suit. The 2006 Order stated that in order for the designated in-house attorney to view "Highly Confidential–Patent Prosecution" information, he or she "must, prior to disclosure, elect in writing to forego Primary Responsibility for Preparation and Prosecution of Patent Applications Related to the Subject Matter of the Patents–in–Suit until 1 year after conclusion of the proceedings" (2006 Order at ¶ 8). Defendants seek to expand both the definition of "Primary Responsibility for Preparation and Prosecution of Patent Applications" as well as the definition of "Related to the Subject Matter of the Patents–in–Suit." TT contends that defendants' proposed expansion of both the type and scope of

activities to be prohibited by the bar exceeds any risk of disclosure of confidential information.

### A.

The 2006 Order defines "Primary Responsibility for Preparation and Prosecution of Patent Applications" as drafting patent specifications, drawings, claims, or amended patent claims (2006 Order at ¶ 8). The 2006 Order specified that "Primary Responsibility" does not include general advice over patent strategy, patent office interviews, or opposition proceedings in a foreign country (*Id.*). Defendants contend that this definition does not adequately limit the inadvertent risk of disclosure. They seek to expand the definition to include these formerly excluded categories: "the preparation and filing of responses to objections of the patent examiner, interviews at the patent office or by telephone, participating in opposition, reexamination, reissue, appeal or similar proceedings in the U.S. or in a foreign country and generally advising other attorneys of overall patent strategy, and supervising, directing or instructing others engaged in any of the foregoing activities" (Proposed Order at ¶ 8).

The Federal Circuit, however, has held that there is little risk of inadvertent disclosure involved in the activities to which defendants seek to expand the bar: "reporting office actions or filing ancillary paperwork, such as sequence listings, formal drawings, or information disclosure statements;" and "high-altitude oversight of patent prosecution, such as staffing projects or coordinating client meetings." *Deutsche Bank,* 605 F.3d at 1379–80. Without any evidence to justify expanding the patent prosecution bar to situations which the Federal Circuit has stated present a low risk of inadvertent disclosure, or evidence as to why the present definition has proven insufficient, we deny defendants' motion to expand the definition of "Primary Responsibility for Preparation and Prosecution of Patent Applications."

### B.

**\*10** We likewise deny defendants' proposed expansion of the definition of "Related to Subject Matter of Patents–In–Suit." The 2006 Order defines "Related to Subject Matter of Patents–In–Suit" as "patent applications

Case: 1:18-cv-00864 Document #: 305-12 Filed: 08/06/18 Page 18 of 32 PageID #:8514

Trading Technologies Intern., Inc. v. GL Consultants, Inc., Not Reported in F.Supp.2d...

2011 WL 148252

seeking to claim a graphical user interface for manual order entry" (2006 Order at ¶ 8). Defendants contend that this definition does not adequately limit the inadvertent risk of disclosure because the technology embodied in their products "clearly has relevance and application beyond merely a 'graphical user interface for manual order entry' " (Defs.' Mem. at 8). Defendants propose that "Related to the Subject Matter of the Patents–In–Suit" should mean "patent applications seeking to claim subject matter related to the electronic trading of commodities" (Proposed Order at ¶ 8). In support, they argue that TT has propounded discovery requests seeking confidential technical information going far beyond the confines of a "graphical user interface for manual order entry" (doc. # 307: Defs.' Reply at 10–11). In addition, defendants note that the #132 and #304 Patents state that the invention "is directed to the electronic trading of commodities" (*Id.* at 11).

By contrast, TT argues that the same considerations apply now as applied when Judge Moran considered and rejected defendants' arguments to broaden the subject matter of the bar in 2005 (TT's Opp'n Br. at 15). TT contends that "graphical user interfaces for manual order entry" "accurately describes the subject matter of the patents-in-suit" (*Id.*). TT argues that defining the subject matter broadly as "directed to electronic trading of commodities" would "mean that any attorney who accessed information in the third tier [3] would be barred from electronic trading fields wholly unrelated to the pending litigation, such as algorithmic trading, back end architecture, matching engines, etc. essentially TT's entire patent application portfolio" (*Id.* at 15–16). As such, TT argues that defendants' proposed definition does not "reasonably reflect the risk presented by the disclosure of proprietary competitive information" (*Id.* at 16 (quoting *Deutsche Bank,* 605 F.3d at 1381)).

[3]   The "third tier" as used by TT appears to refer to information designated "Highly Confidential–Patent Prosecution" under the protective order.

We find that TT has the better of this debate. While defendants point to some language describing the #304 and #132 Patents in broad terms, a closer examination of those patents reveals that almost every section of the patents-in-suit specify that the patents read on a specific tool for executing trades more quickly and efficiently, not on the electronic trading field as a whole (*see* doc. # 1: Compl., Ex. A: #304 Patent; Compl., Ex. B: #132 Patent).

Moreover, defendants' argument that the breadth of TT's discovery requests warrants a broadened definition of the subject matter of the patents-in-suit is a recycled argument that Judge Moran previously considered and rejected.

During the proceedings in 2006, as here, defendants argued for a broad definition of the scope of the patent bar, in part, based on discovery requests by TT that seek confidential technical information that was broader than a "graphical user interface for manual order entry" (Defs.' Reply at 10–11). At a March 10, 2006, hearing before Judge Moran, Mr. Borsand argued for a narrow definition of the subject matter—patents seeking to claim a graphical user interface for electronic order entry—while defendants' counsel argued that the discovery propounded was "exceedingly broad" and went beyond graphical interface to all electronic trading tools and even banking as a whole (doc. # 299: 3/10/06 Tr. at 34–37). Judge Moran reiterated that the protective order "applies only to the technology involved in this lawsuit," and "that we go back to the general obligation ... [that] highly confidential information ... cannot be used except for the purposes of this lawsuit" (*Id.* at 35–36).

**\*11** On July 6, 2006, Judge Moran ordered the parties to file a "blueprint of the current disputes regarding the protective order with the Court" (doc. # 117: 7/6/06 Order). Defendants' "blueprint," filed in the eSpeed case, indicated that they sought a protective order which defined "Related to the Subject Matter of the Patents–in–Suit" as "related to the electronic trading of commodities" (eSpeed doc. # 365: Defs.' Blueprint, Ex. B at 7). By contrast, TT sought to define the phrase as meaning "patent applications seeking to claim a graphical user interface for manual order entry" (*Id.* at 6). These are the same definitions the parties seek now, almost five years later. In addition, defendants' arguments in support of a broader definition of "related to the subject matter of the patents-in-suit" were largely the same before Judge Moran as they are today. In their blueprint, defendants summarized their argument in favor of an expansive definition as follows:

> TT's ever expanding patent application filings cover subject matter that extends to data processing systems for use in electronic trading, managing data displays, graphic user interfaces, as well as systems and methods

Case: 1:18-cv-00864 Document #: 305-12 Filed: 08/06/18 Page 19 of 32 PageID #:8515
Trading Technologies Intern., Inc. v. GL Consultants, Inc., Not Reported in F.Supp.2d...

2011 WL 148252

for executing electronic trades. Additionally, it is possible that their currently unpublished pending applications cover even more areas of electronic trading. All of TTI's applications and patents clearly include more than graphic user interfaces and additionally all of the pending applications could be influenced by Highly Confidential–Patent Prosecution material that is disclosed during litigation, which by no means is limited to graphic user interfaces. Thus, it is illogical to restrict the subject matter of the patents-in-suit to graphic user interfaces; instead, the related subject matter is electronic trading of commodities.

(eSpeed doc. # 365: Defs.' Blueprint, Ex. C at 6).

Judge Moran rejected defendants' arguments. In his memorandum opinion accompanying the 2006 Order, Judge Moran stated that he had considered defendants' "blueprint," and determined that "the obligations should be confined to patent applications seeking to claim a graphical user interface for manual order entry" (doc. # 120: 7/13/06 Mem. Op. and Order at 3–4). Judge Moran reasoned that "[t]he likelihood of inadvertent use of restricted information by a litigator, when the information relates to patents that are largely irrelevant to the litigation, is small, indeed" (*Id.* at 4). Judge Moran held that the protective order would apply to all of the related TT cases (*Id.* at 5).

Defendants have not demonstrated good cause to diverge from Judge Moran's reasoning, which we find persuasive. We reiterate: dissatisfaction with a prior ruling or assignment of the case to a new judge do not constitute good cause to rewrite a protective order. Accordingly, we reject defendants' request to modify the 2006 Order to expand the definition of "Related to Subject Matter of Patents-in-Suit."

IV.

\*12 Lastly, defendants seek to expand the protections afforded to "source code" material in the protective order. Defendants propose a fourth category of confidentiality, entitled "Highly Confidential–Attorneys' Eyes Only–Source Code" for Highly Confidential–Attorneys' Eyes Only material that consists of source code (Proposed Order at ¶ 4). In addition to the heightened confidentiality to which the Attorneys' Eyes Only material would be subject, source code material would be subject to additional, extensive procedures involving the establishment of a secure facility in which source code can be deposited by the producing party and reviewed by the requesting party under elaborate restrictions (Proposed Order at ¶ 9; Defs.' Mem. at 15).

Defendants contend that when the 2006 Order was entered, TT had requested production of source code from older products that defendants were relying on as prior art but not actively marketing, while now, by contrast, TT is requesting source code from defendants' currently accused infringing products (Defs.' Mem. at 9). In addition, defendants contend that since the 2006 Order was entered, the marketplace has become more competitive, and TT's activity in it has increased (Defs.' Reply at 12).

TT counters that defendants knew of their intention to seek discovery of current source code and that TT had requested production of source code and object code for operative and current versions of the allegedly infringing products before entry of the 2006 Order (TT's Opp'n Br. at 17–18). Furthermore, TT claims that it has already produced source code under the 2006 Order, and that defendants' addition of a five-page procedure on how to deal with source code is "unnecessarily burdensome and would just serve to multiply costs for all parties" (*Id.* at 18). Finally, TT contends that defendants' source code is already adequately protected by the 2006 Order (*Id.*). TT notes that parties in related cases have already produced source code under the 2006 Order without problems (*Id.* at 19).

In a recent case in this district, the court denied a party's request to enhance confidentiality restrictions for source code material. In *Bergstrom, Inc. v. Glacier Bay, Inc.,* No. 08 C 50078, 2010 WL 257253 (N.D.Ill. Jan.22, 2010), the court found that the enhanced procedures requested, including requiring the party to view the material on a computer in a specific location, was

Case: 1:18-cv-00864 Document #: 305-12 Filed: 08/06/18 Page 20 of 32 PageID #:8516
Trading Technologies Intern., Inc. v. GL Consultants, Inc., Not Reported in F.Supp.2d...

2011 WL 148252

extremely time consuming and "overly burdensome," and that the movant had not made a sufficient showing that the circumstances regarding the source code—including its highly sensitive nature—justified such a restrictive viewing. *Id.* at *2. Although in *Bergstrom,* the court barred an attorney from viewing the source code who was involved in the litigation and in prosecuting related patents, *id.,* in the instant case, as has been established above, Mr. Borsand is not involved in prosecuting related patents, and the risk of inadvertent disclosure by Mr. Borsand is low.

*13 Defendants have failed to show that the kind of labyrinthian procedures they propose for handling source code are needed here. Accordingly, we deny defendants' motion to amend the source code provisions in the 2006 Order.

## CONCLUSION

For the foregoing reasons, we deny defendants' motion to modify the protective order (doc. # 284).

## All Citations

Not Reported in F.Supp.2d, 2011 WL 148252

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

*United States v. Aetna Inc.,* 2016 WL 8738422 (D.D.C. 2016)

Case: 1:18-cv-00864 Document #: 305-12 Filed: 08/06/18 Page 22 of 32 PageID #:8518
United States v. Aetna Inc., Slip Copy (2016)

2016 WL 8738422

2016 WL 8738422
Only the Westlaw citation is currently available.
United States District Court,
District of Columbia.

UNITED STATES of America, et al., Plaintiffs,

v.

AETNA INC. and Humana Inc., Defendants.

Case No. 1:16-cv-1494 (JDB)
|
Signed 09/22/2016

**Attorneys and Law Firms**

Craig William Conrath, Dylan Matthew Carson, Eric J. Mahr, Eyitayo Oritsematosan St. Matthew-Daniel, Miriam Rose Vishio, Peter Joseph Mucchetti, Ryan M. Kantor, Barry James Joyce, Bennett Jorg Matelson, Eric Damian Welsh, Justin T. Heipp, Matthew David Siegel, Patricia Leigh Sindel, Samer Makram Musallam, Sanford Marshall Adler, Yvette F. Tarlov, U.S. Department of Justice, Catherine Anne Jackson, Elizabeth Sarah Gere, Office of the Attorney General for the District of Columbia, Washington, DC, Michael Andrew Undorf, Department of Justice, Wilmington, DE, Christopher R. Hunt, Rachel Michelle Steinman, Timothy Michael Fraser, Lizabeth A. Brady, Office of the Attorney General, Tallahassee, FL, Daniel Stephen Walsh, Monica Anne Sullivan, Office of Attorney General, Atlanta, GA, Robert W. Pratt, Elizabeth Louise Maxeiner, Office of the Attorney General, Chicago, IL, Layne M. Lindebak, Attorney General's Office for the State of Iowa, Des Moines, IA, Beth Ann Finnerty, Brian Francesco Jordan, Thomas Nathaniel Anger, Office of the Attorney General, Columbus, OH, Aaron L. Schwartz, James A. Donahue, III, Tracy Wright Wertz, Commonwealth of Pennsylvania Office of Attorney General, Jennifer Ann Thomson, Office of Attorney General/PA Litigation Section, Harrisburg, PA, Sarah Oxenham Allen, Tyler Timothy Henry, Office of the Attorney General, Richmond, VA, for Plaintiffs.

Christopher Nathan Thatch, John M. Majoras, Michael S. Fried, Geoffrey S. Irwin, Michael R. Shumaker, Jones Day, Arthur Norman Lerner, Astor Henry Lloyd Heaven, III, Kent Alan Gardiner, Shari Ross Lahlou, Shawn R. Johnson, Christie L. Stahlke, David Martin Schnorrenberg, Joseph M. Miller, Crowell & Moring

LLP, Edward D. Hassi, Katrina M. Robson, Richard G. Parker, O'Melveny & Myers LLP, Washington, DC, Aaron M. Healey, Jones Day, Columbus, OH, Alex P. Middleton, Paula W. Render, Jeremy J. Gray, Jones Day, Chicago, IL, Erin L. Shencopp, Frederick P. Santarelli, Thomas B. Helbig, Elliot Greenleaf, P.C., Blue Bell, PA, Thomas Demitrack, Jones Day, Cleveland, OH, Connor T. Lynch, Cynthia A. Merrill, Jeffrey J. Fowler, Kenneth R. O'Rourke, O'Melveny & Myers LLP, Los Angeles, CA, for Defendants.

## SPECIAL MASTER REPORT AND RECOMMENDATION NO. 4

Hon. Richard A. Levie (Ret.), Special Master

**\*1** Currently before the Special Master are two Motions to Modify the Protective Order, filed by non-parties UPMC and UMPC Health Plan, Inc. (collectively, "UPMC" or "UPMC Health Plan") (Dkt. No. 106) and non-parties Baylor Scott & White Holdings ("BSWH"), Duke University Health System, Inc. ("Duke" or "DUHS"), and Iowa Health System d/b/a UnityPoint Health ("UnityPoint" or "UnityPoint Health").[1] The Special Master recommends that the Court grant in part and deny in part these Motions.

[1]    Non-party Tufts Associated Health Plans ("TAHP") also submitted an Unopposed Motion to Modify the Protective Order in *United States et al. v. Anthem Inc. and Cigna Corp.*, Case No. 1:16-cv-1493(ABJ) (Dkt. No. 110). That Motion seeks to amend subsection H of the Protective Order to include the following language: "Upon the filing of a proposed order governing the disclosure of Confidential Information at trial, the Parties shall provide notice of such order to any Protected Person whose Confidential Information is expected to be used at trial." (TAHP Mot. at 1). While the Tufts Motion was not filed in this case, all parties to this case have indicated that they do not oppose the Tufts Motion. (*See* TAHP Mot. at 1; Def. Opp. at 12). The Special Master finds this to be an appropriate modification to the Protective Order in this case. The Special Master therefore recommends that the Court adopt the TAHP proposal in its entirety.

**I. Background**

Case: 1:18-cv-00864 Document #: 305-12 Filed: 08/06/18 Page 23 of 32 PageID #:8519
United States v. Aetna Inc., Slip Copy (2016)

2016 WL 8738422

The Court originally issued the underlying Protective Order in this case on August 12 after considering the arguments of the parties. (*See* Dkt. No. 54). In late August, the parties informed the Special Master that various non-parties objected to provisions of that Order. The Special Master subsequently issued Special Master Order No. 1 (Dkt. No. 74) and Special Master Order No. 2. (Dkt. No. 92). In relevant part, these Orders directed non-party Protected Persons[2] with objections to the Protective Order to meet and confer with the parties and, should the meet-and-confer process not resolve these concerns, to file Motions with the Special Master.[3] The parties reached agreement with numerous non-parties regarding proposed changes to the Protective Order, and the parties submitted a proposed amended Protective Order which the Court adopted. (*See* Dkt. No. 108).

[2]     The Amended Protective Order defines a "Protected Person" as "any Person.... that, either voluntarily or under compulsory process, has provided or provides (i) Investigation Materials in connection with the Investigation, or (ii) Litigation Materials in connection with this Action." [Protective Order at ¶ A(o) ].

[3]     The Order Appointing the Special Master to this case grants the Special Master authority over, *inter alia*, scheduling matters and motions for protective order. (Dkt. No. 53 at ¶ 2).

The parties were not able to reach complete agreement with UPMC or BSWH/Duke/UnityPoint, and UPMC and BSWH/Duke/UnityPoint timely submitted Motions to Amend the Protective Order. The Special Master has reviewed these Motions, as well as Oppositions filed separately by Plaintiffs and Defendant Humana on behalf of itself and Defendant Aetna, and Reply briefs submitted by UPMC and BSWH/Duke/UnityPoint, and considered all of the arguments made therein. These recommendations follow.

**II. Legal Standard**

**\*2** Although "protective orders are not permanent or immutable and may be modified to serve important efficiency or fairness goals," the party or, in this case, non-party, which seeks to modify a protective order bears the burden of showing that good cause exists to justify the desired change. [*U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, 2004 WL 2009414 at \*2 (D.D.C. May 17, 2004)( citations omitted); *Infineon Tech. A.G. v. Green*

*Power Tech Ltd.*, 247 F.R.D. 1, 2 (D.D.C. 2005)(Bates, J.)(citations omitted) ]. " 'Good cause' implies changed circumstances or new situations; a continuing objection to the terms of an order does not constitute good cause to modify or withdraw a protective order." [*Infineon Tech.*, 247 F.R.D. at 2 (citing *Bayer AG & Miles, Inc. v. Barr Labs., Inc.*, 162 F.R.D. 456, 464 (S.D.N.Y. 1995)) ].

To show good cause, the party seeking to modify the protective order must provide specific facts showing the particular harm that is likely to occur in the absence of such an order and that this harm outweighs the opposing side's interests in preparing for trial. As one court has stated,

> Good cause exists under Rule 26(c) when justice requires the protection of a party or a person from any annoyance, embarrassment, oppression, or undue burden or expense, but the party requesting a protective order must make a specific demonstration of facts in support of the request as opposed to conclusory or speculative statements about the need for a protective order and the harm which will be suffered without one. Accordingly, courts apply a balancing test, weighing the movant's proffer of harm against the adversary's 'significant interest' in preparing for trial.

[*Huthnance v. District of Columbia*, 255 F.R.D. 285, 296 (D.D.C. 2008) (quoting *Fonville v. District of Columbia*, 230 F.R.D. 38, 40 (D.D.C. 2005) and *Doe v. District of Columbia*, 230 F.R.D. 47, 50 (D.D.C. 2005)) ].

In determining whether good cause exists to justify a proposed modification, a court may consider a four-factor test. [*Infineon Tech.*, 247 F.R.D. at 2 (citing *Diabetes Treatment Ctrs.*, 2004 WL 2009414 at \*2-4) ].[4] The first factor is whether "good cause was shown for the original protective order." [*Bayer AG & Miles, Inc. v. Barr Labs., Inc.*, 162 F.R.D. 456, 462-63 (S.D.N.Y. 1995) ]. If so, "the burden is on the party seeking modification to show good cause for modification...." (*Id.*) Both the original Protective Order (Dkt. No. 53) and the Amended Protective Order (Dkt. No. 108) state that they each were

Case: 1:18-cv-00864 Document #: 305-12 Filed: 08/06/18 Page 24 of 32 PageID #:8520
United States v. Aetna Inc., Slip Copy (2016)

2016 WL 8738422

entered "upon good cause shown." Thus, the burden is on the movants here to establish good cause.

4    This four-factor test is intended to aid the court's determination. The factors are neither mandatory nor do they represent the only test employed by courts in assessing whether a protective order should be modified. [*see U.S. v. Microsoft Corp.*, 165 F. 3d 952, 959 (D.C. Cir. 1999); *U.S. v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 312 F.R.D. 16, 19 n.3 (D.D.C. 2015) ]. As another court in this district has explained, "[c]ourts have used various formulae in determining whether to modify a protective order. In balancing competing interests, courts have weighed, *inter alia*, efficiency concerns, reliance interests upon the continued integrity of the protective order, and the public interest in open access to records and documents. A significant factor for many courts is whether the discovery sought will obviate the need for that party to engage in duplicative discovery." [*In re Vitamins Antitrust Litig.*, 2001 WL 34088808 at *6 (D.D.C. Mar. 19, 2001)(citations omitted) ].

*3 The second factor is the nature of the protective order, meaning whether the order was court imposed or entered upon stipulation of the parties and whether the order is a "blanket" order applicable to all discovery in a case or is a specific order applicable only to a particular document. (*Bayer*, 162 F.R.D. at 463; *Diabetes Treatment Ctrs.*, 2004 WL 2009414 at *3). For purposes of these Motions, the Special Master notes that, while the original Protective Order was stipulated because parties agreed to the terms of the Order prior to its entry, the parties were sensitive to and thoroughly considered the needs and issues of non-parties in drafting the terms of the Order. [*See* Pl. Mem. re: Protective Order (Dkt. No. 64) at 2-3]. In addition, the Order is "blanket" in that it is applicable to all discovery in this case. A blanket order is appropriate here as it encourages "just, prompt and efficient resolution of [ ] complex actions." (*Diabetes Treatment Ctrs.*, 2004 WL 2009414 at *3).

The third and fourth factors are "the foreseeability [of the proposed modification] at the time of the original protective order of the modification now requested" and "the parties' reliance on the protective order." (*Bayer*, 162 F.R.D. at 463). The foreseeability of each proposed modification must be considered individually. As to reliance, the parties have engaged in discovery to date based upon the terms of the present Protective Order. To the extent that non-parties have produced evidence to

date, such productions have also been made in the context of the current Order.

## III. UPMC Health Plan Motion

UPMC seeks four modifications to the protective order: (1) a limitation on the disclosure of confidential information to current employees of a producing party; (2) the addition of a requirement that would provide notice to non-parties who produced discovery when their productions will be submitted in a filing with the Court; (3) the addition of language designed to protect confidential information used during hearings or trial; and (4) the addition of a notice requirement that would inform non-parties of any attempts to modify the Protective Order.

### A. Disclosure of Information to Employees of the Producing Party

Section E of the Amended Protective Order, concerning permitted disclosure of confidential information, currently provides that "[n]othing in this [Protective] Order ... prevents disclosure of Confidential Information by any party to any current employee of the Protected Person that designated the Confidential Information." [Amended Protective Order ¶ E(6)(b) ].

UPMC takes issue with this provision, noting that UPMC "does not allow most of its own current employees access to all of its Confidential Information." Rather, UPMC shields confidential information "from its own employees who have no need for that information" in order to "protect[ ] the confidentiality of its proprietary information." (UPMC Mot. at 4).

UPMC has proposed two alternative clauses to replace section E(6)(b). Initially, UPMC proposed that the language be amended to read:

> Nothing in this Order ... (5) (b) [sic] prevents disclosure of Confidential Information by any party to any current employee of the Protected Person that designated the Confidential Information *where it is apparent from the face of the document that the current employee of the Protected Person has already seen the document.*

[UPMC Mot. at 4 (new proposed language emphasized) ].

In the alternative, UPMC asks that the clause be changed to:

> Nothing in this Order ... (5) (b) [sic] prevents disclosure of Confidential Information by any party to any current employee of the Protected Person that designated the Confidential Information *where (1) the Protected Person is a party; or (2) for nonparty Protected Persons where (a) it is apparent from the face of the document that the current employee of the Protected Person has already seen the document; (b) where the current employee holds an executive level position with the Protected Person; or (c) where the Information relates to a topic for which the current employee is appearing at a deposition as the designated representative of the Protected Person.*

 **\*4** [UPMC Mot. at 5 (new proposed language emphasized) ].

Plaintiffs oppose these proposed modifications, and argues that UPMC has not shown "good cause" for the proposed modifications. (*See* Pl. Opp. at 3). Plaintiffs additionally argue that the UPMC's first proposal is "unworkably ambiguous;" is not easily applicable to "smaller companies and partnerships that constitute a substantial number of protected Persons in these cases;" creates unnecessary complexity with respect to Anthem Inc. and Cigna Corp., who are non-parties to this case, but parties in *United States et al. v. Anthem Inc. and Cigna Corp.*, Case No. 1:16-cv-1493(ABJ).; and conflicts with other sections of the Amended Protective Order. (Pl. Opp. at 3). [5]

[5]    Defendants Aetna and Humana do not oppose the proposed modification.

The Special Master finds that UPMC has not shown good cause for this proposed modification, particularly as it would apply to all depositions in this case. This is an extraordinarily large case, involving the depositions of likely more than 50 non-parties. Requiring the parties to question a non-party's representative using only documents "where it is apparent from the face of the document that the current employee ... has already seen the document" [6] would unduly complicate the use by the deposing party of documents during the deposition with a result of limiting the usefulness of any given deposition. In the alternative, UPMC's proposed modification would require the parties to contact each non-party prior to a deposition to confirm that the deponent has seen each document that may be used. This would inject unnecessary and unworkable delay into the discovery process.

[6]    The phrase "from the face of the document" also is ambiguous and may lead to further, unnecessary litigation regarding when it is sufficiently clear that a current employee has in fact seen the document at issue.

As weighed against this concern, UPMC has not provided evidence of the harm that it believes that it would stem from disclosure of its own information to its own employees. Notably, none of the other 50-plus non-parties slated for deposition in this case have raised any similar concerns to the Special Master. While UPMC broadly states that limiting its' own employees access to confidential information is "[o]ne of the ways in which [it] protects the confidentiality of its proprietary information," UPMC's use of the phrase "one of the ways" suggests that it has additional methods of protecting this confidentiality and that shielding its own employees is not the sole means of guarding its information. Regardless, UPMC has presented no declaration or other evidence describing the actual harm that may stem from the type of disclosure that might occur in a deposition setting in this particular case.

Accordingly, while the Special Master recognizes UPMC's interest in protecting the confidentiality of its information, the parties also have a valid interest in litigating this case, and efficient and productive depositions are an essential element of this litigation. UPMC has not provided specific examples of the information at risk or the harm that it fears would stem from providing UPMC-produced information to its own employees. UPMC has not shown good cause justifying the proposed modification, and the showing that it has made does not outweigh the parties' interest in maintaining provision E(6)(b) as it currently stands.

## B. Submissions of Confidential Information to the Court

**\*5** UPMC asks to amend section F of the Protective Order, regarding use of information designated as confidential,

> Upon receipt of an objection or challenge to the filing of a Protected Person's Confidential Information under seal, *or upon the denial of a motion to file such Information under seal or a motion to unseal such Information*, the Party that filed *or attempted to file* the Confidential Information under seal shall notify the Protected Person within three business days of the receipt of such *denial, motion,* objection or challenge, *so that the Protected Person has a reasonable opportunity to be heard prior to any ruling.*

[UPMC Mot. at 6 (new proposed language emphasized) ]. None of the parties object to this change and the Special Master recommends that the Court adopt this language in its entirety.

## C. Parties' Use of Confidential Information at Trial or during Hearings

Section H of the Amended Protective Order currently states that "[t]he disclosure of Confidential Information at trial will be governed by a separate Court order." UPMC proposes that this section be replaced with the following language:

> In the event that a Party wishes to use any third party Confidential Information at any hearing or at trial, the Party seeking to use such Information shall notify counsel for the third party at least seven (7) days in advance of the hearing or trial so that the Parties and the third party may meet and confer regarding the handling of the information so designated. In particular, the third party may require the exclusion from the proceedings of any person who is not authorized to have access

to the Confidential Information. In the event an agreement cannot be reached, the aggrieved entity may petition the Court for relief.

(UPMC Mot. at 7).

In the alternative, UPMC proposes that section H be rewritten to provide that:

> This Court order will ensure that non-party Protected Persons who produce information designated as Confidential in this Action will be notified by the Parties in advance if their Confidential Information will be used *at trial or hearing* so that Protected Persons may determine whether *their* Confidential Information may be revealed *at trial or hearing.* Non-party Protected Persons who determine that their Confidential Information will be revealed *at trial or a hearing* may participate in considering and establishing adequate protections of their Confidential Information.

(UPMC Mot. at 8).

UPMC argues that without the inclusion of such a provision, "the Parties effectively are asking third parties to trust that they will provide adequate protections at trial." (UPMC Mot. at 7).

Plaintiffs object to UPMC's request as premature. (*See* Pl. Opp. at 4). Plaintiffs also argue that the unopposed modification proposed by Tufts Associated Health Plans ("TAHP"), which provides that "[u]pon the filing of a proposed order governing the disclosure of Confidential Information at trial, the Parties shall provide notice of such order to any Protected Person whose Confidential Information is expected to be used at trial" (*see* FN. 1, *supra*) is sufficient to protect the interests of non-parties. (*See* Pl. Opp. at 4) [7].

[7]     Defendants Aetna and Humana do not oppose this request.

**\*6** UPMC replies that the TAHP modification is not sufficient because it would not permit non-parties to be heard before the Court enters a trial-related protective order. (UPMC Reply at 5-6). UPMC also notes that the TAHP proposal "provides no protection where information may be disclosed or used during pre-trial hearings." (*Id.* at 6).

The Court specifically chose *not* to address in the original or Amended Protective Order the treatment of confidential information at trial. The Protective Order ensures that a separate order will be entered before the start of trial, and the TAHP modification ensures that non-parties will be informed when that order is entered. UPMC has presented no reasons—and certainly none rising to the level of "good cause"—that warrant second-guessing the Court's judgment on this matter. [8]

8      The Special Master is also troubled by the portion of UPMC's proposed modification which requires the parties to provide notice to non-parties prior to use of confidential information "so that Protected Persons may determine whether their Confidential Information may be revealed at trial or hearing." Such language arguably can be read as granting non-parties the unilateral right to determine what evidence a party may or may not present when litigating this case.

With respect to UPMC's concerns about the disclosure of information during pre-trial hearings, the current Protective Order governs the pre-trial use of confidential information, including specific limitations on the permitted disclosure of such information. [*See* Amended Protective Order, ¶¶ E(1)(a-i) ]. The Order likewise requires that anyone who views confidential information must execute an Agreement Concerning Confidentiality in which that person declares that he or she has read the Protective Order, agrees to be bound by its terms, and understands that failure to abide by its terms may result in civil and criminal penalties for contempt of court. [*See* Protective Order ¶ E(2) and Appendix (A) ]. UPMC has noted a specific concern that its information may be disclosed at a pre-trial *Daubert* hearing. Counsel to the parties have each executed the Agreement Concerning Confidentiality. If the parties elect to use confidential information in such a setting, their Counsel will do so under the strictures of Section E of the Protective Order. UPMC has not presented any specific facts showing why these protections are not adequate.

For these reasons, the Special Master recommends that the Court deny UPMC's Motion as to this request.

### d. Notice to Non-parties of Attempts to Modify the Protective Order

Finally, UPMC asks that the Protective Order be amended to expressly inform non-parties when any party moves to amend the Protective Order. UPMC proposes the following language:

> The Parties acknowledge that third parties are producing documents in reliance on the protections afforded in this Protective Order. To the extent that any party or other entity seeks to modify the Protective Order in a way that would impact the rights of third parties who have produced documents with confidentiality designations, those third parties will be given reasonable notice and a meaningful opportunity to be heard on the proposed modification.

(UPMC Mot. at 9). UPMC argues that this language is necessary because "if the Parties have the right to seek modification of the Protective Order in ways that may impact third parties ... then due process and basic rules of fairness require notice to those third parties and an opportunity to be heard." (*Id.* at 10).

**\*7** Plaintiffs oppose this proposed modification, noting that any motion to amend the Protective Order will be publicly noted on the docket. (*See* Pl. Opp. at 4). Plaintiffs further argue that providing such notice would be "unduly burdensome on any party given the large number of the non-parties in these matters." (Pl. Opp. at 4).

Defendants also oppose UPMC's proposal as to this modification, stating that while they "will endeavor to provide the notice requested by UPMC," they oppose formally incorporating this requirement into the Protective Order "due to the large number of Protected Persons and the accelerated pace of the litigation." (Def. Opp. at 11).

Case: 1:18-cv-00864 Document #: 305-12 Filed: 08/06/18 Page 28 of 32 PageID #:8524
United States v. Aetna Inc., Slip Copy (2016)

2016 WL 8738422

UPMC has not shown any "specific reasons" justifying this request. If any party moves to amend the Protective Order to, as UPMC suggests, "[seek] to include several other categories of persons who would have access to the information" (UPMC Mot. at 10), that party's motion will be publicly filed and listed on the Court's public docket for this case.

UPMC contends that expecting non-parties to monitor the docket in this case is "an incredibly unfair and undue burden to impose on non-parties." (UPMC Reply at 7). As previously noted, trial is scheduled to begin in this case on November 21. UPMC has not demonstrated, in any way, that monitoring a public docket for a period of just over two months places an undue burden on any non-party, and in particular a sophisticated entity such as UPMC. At any rate, UPMC has not offered any showing to support its burdensomeness argument and, in this District, "[t]he court entertains the burdensome objection only when the responding party demonstrates how the document is 'overly broad, burdensome, or oppressive, by submitting affidavits or offering evidence which reveals the nature of the burden.' " [*U.S. ex rel. Fisher v. Network Software Assoc.*, 217 F.R.D. 240, 246 (D.D.C. 2003) ].

Accordingly, the Special Master recommends that the Court deny this requested modification.

## IV. Baylor Scott & White Holdings, Duke University Health System, Inc., and owa Health System Motion

Baylor Scott & White Holdings, Duke University Health System, and UnityPoint Health submit one motion which seeks five modifications to the Protective Order, all premised on these non-parties' belief that Defendants' outside counsel should not have access to confidential information if those outside counsel are involved in Defendants' competitive decision-making. (*See* BSWH et al. Mot. at 4-8).

### A. Outside counsel access to protected information

BSWH, Duke, and UnityPoint first ask that the Protective Order be modified to expressly prevent outside counsel who are engaged in competitive decision making on behalf of defendants or any competitor from having access to confidential information. (BSWH et al. Mot. at 4-6). The proposal would also prevent outside counsel from participating in competitive decision making for a period of three years after conclusion of this litigation. (*Id.*)

The three non-parties here argue that this provision is warranted because "anyone involved in competitive decision-making is at risk for inadvertently disclosing or using the confidential information when advising on the client's business decisions." (*Id.* at 5). Defendants oppose the proposed modification as "overbroad and plainly unworkable." (Def. Opp. at 2). [9]

[9]     Plaintiffs do not oppose the modifications because the modifications would not impact them in any way. (Pl. Opp. at 2).

**\*8** The non-parties have not shown good cause for their proposed limitations because they have not provided "specific facts" showing that they are likely to suffer harm if these provisions are not included. Notably, the risk of inadvertent disclosure is much lower with respect to outside counsel than it is with respect to inside counsel. As noted in Special Master Report and Recommendation No. 2,

> Concerns relevant to in-house counsel are not applicable to those of outside counsel. ... A company's in-house counsel, and in particular [in-house counsel who advise healthcare insurance companies] have many duties and obligations to their clients, including providing advice regarding competitively sensitive matters such as litigation with healthcare providers and/ or contract negotiations regarding reimbursement rates. ... By contrast, the outside counsel and outside professionals who Defendants have retained for purposes of this case have one primary obligation: to represent Defendants during the pendency of this litigation and, possibly, throughout the merger process.

[*See* Report & Recommendation No. 2 (Dkt. No. 112) at 10].

BSWH, Duke, and UnityPoint have not presented any evidence suggesting that any outside counsel in this case is or might be involved in Defendants' competitive decision-making beyond their duties in this particular case. To the

Case: 1:18-cv-00864 Document #: 305-12 Filed: 08/06/18 Page 29 of 32 PageID #:8525
United States v. Aetna Inc., Slip Copy (2016)

2016 WL 8738422

contrary, it appears that the entire scope of Defendants' outside counsels' duties relate to this case.

Moreover, the current Protective Order expressly prevents any individual who obtains confidential information under the terms of the Order from using that information in any context other than the instant litigation. Any outside counsel who receives such information is likewise required to execute an agreement verifying that he or she agrees to be bound by the terms of the Order and may be held in contempt of court for any violations of the Order. (*See* Protective Order at Appx. A). BSWH, Duke, and UnityPoint have not provided any specific facts suggesting that these safeguards are insufficient to prevent against inadvertent disclosure of information.

As weighted against this showing, Defendants have presented persuasive reasons that recommend against the proposed modification. Notably, the Special Master agrees that it would be inappropriate to "require each defense attorney to determine, prior to accessing a Protected Person's confidential information, whether she or he currently provides representation arguably involving competitive decision-making to *any* competitor or potential competitor of the Protected Person—even on topics unrelated to the confidential information." [Def. Opp. at 2 (emphasis in original) ]. Indeed, the language proposed by these non-parties is significantly overbroad, particularly because the non-parties have not shown any real need to restrict Defendants' counsel in this manner. [10]

[10] Oddly, the proposal is at once too broad in the limits it would place on Defendants' counsel, and too narrow in that it does not apply to Plaintiffs' counsel. Indeed, while the non-parties express concerns that Defendants' counsel may one day represent a non-party competitor, the non-parties apparently have no concerns about any hypothetical harm that may occur if a counsel to Plaintiffs elects to enter the private sector and represent a non-party competitor.

Likewise, the non-parties' speculations regarding potential future harms are not sufficient to justify imposing a three-year ban which would potentially prevent any current defense counsel who views confidential information from representing any competitor of any non-party who provided information in this case. Indeed, because it is not always possible to anticipate who may be considered a business competitor in particular situations, the proposed modification may

force defense counsel to make an untenable choice between providing fulsome representation in this case, or being able to provide such representation in future cases. [*See Gen-Probe Inc. v. Becton, Dickinson and Co.*, 267 F.R.D. 679, 687 (S.D. Cal. 2010) ].

**\*9** For all of these reasons, the Special Master recommends that the non-parties' Motion be denied with respect to this request.

### B. Disclosure of Identities of Outside Counsel who Access Information

BSWH, Duke and UnityPoint next ask that the Protective Order be modified to require the parties to provide non-parties with a list of each outside counsel who received confidential information in this matter. (BSWH et al. Mot. at 6-7). In support of this request, the non-parties state that "[t]here presumably will be attorneys who work on this matter who do not enter an appearance in court," and argue that non-parties have a right to know whether insurance companies with whom they engage in contract negotiations are represented by outside counsel who viewed the non-party's confidential information. (*Id.*) Defendants oppose this request as "unduly burdensome and unnecessary." [11]

[11] Plaintiffs do not oppose this modification because it would not impact them.

The non-parties have not shown good cause for this request. As noted, the Protective Order expressly prevents counsel from using any confidential information learned through this litigation from using that information in any other proceeding. The non-parties have not presented any evidence indicating that this provision does not adequately protect against misuse of their confidential information. To the contrary, their described harms are speculative at best.

By contrast, Defendants present a detailed explanation of the burden that the provision would entail:

> The proposed provision would require each of the three defense law firms involved in this litigation to maintain a list of attorneys, paralegals, assistants, and other support staff that *actually* accessed the confidential information of each

of roe than fifty third parties. Plainly, not *all* timekeepers will access information produced by *all* third parties; some will not access confidential information at all. Others may ski a filing in which a third party's information was aggregated into charts or a snippet of confidential information was paraphrased. Given the pace of this litigation it is unreasonable to assume that each attorney or staff person, no matter her or his role, will necessarily recall each third party whose information the individual encountered in documents, expert reports, drafts, briefing, explanatory charts, testimony, or otherwise. The three law firms would additionally need to share this information to compile over 75 master lists of the individuals who accessed each third party's information.

(Def. Opp. at 5).

In their Reply, the non-parties suggest that Defendants can reduce this burden by contemporaneously "running a list of timekeepers and confirming whether they accessed any Confidential Information during the litigation." (BSWH et al. Reply at 3). Given the pace of this litigation, however, requiring Defendants to track contemporaneously which individuals view what material and at what time risks compromising the efficiency with which this case is being litigated or, worse, compromising Defendants' counsels' ability to litigate using the full range of appropriately available discovery. Indeed, it seems that it would be far less burdensome for BSWH, Duke, and UnityPoint to simply ask opposing counsel in any future litigation whether that opposing counsel has viewed their confidential information at any time. Regardless, "weighing the movant's proffer of harm against the adversary's 'significant interest' in preparing for trial," the non-parties' proposal is not warranted here. (*Huthnance*, 255 F.R.D. at 296).

### C. Definition of Competitive Decision-Making

**\*10** BSWH, Duke and UnityPoint ask that the phrase "competitive decision-making" be expressly defined in the Protective Order as follows:

> "Competitive Decision-Making" means advising clients on business decisions involving contracts, marketing, employment, pricing, product design, purchasing, mergers and acquisitions, and other decisions vis-à -vis a competitor, made in the light of similar information regarding the competitor."

(BSWH et al. Mot. at 7).

Alternatively, the non-parties propose amending the definition of "Outside Counsel of Record" to mean:

> The firms or attorneys representing a Defendant in this Action (i) who do not participate in Competitive Decision Making for any Defendant or any competitor of any Protected Person whose Confidential Information is produced in this Action on any subjects related to the Confidential Information at issue; (ii) who will not participate in any Competitive Decision-Making for any Defendant or any competitor of any Protected Person whose Confidential Information is produced in this Action on any subjects related to the Confidential Information at issue for a period of three (3) years after the conclusion of this Action, and (iii) who will abide by the provisions of this Protective Order.

(BSWH et al. Reply at 3-4).

Both Plaintiffs and Defendants oppose this proposed modification as unnecessary and not properly targeted to this litigation. (*See* Pl. Opp. at 3-4; Def. Opp. at 6).

The non-parties have not shown good cause for including this specific definition in the Protective Order. First, for the reasons noted in section IV(a) of this Report and Recommendation, *supra*, there is no good cause to amend the Order to expressly limit disclosure to counsel who verify that they are not and will not be involved in competitive decision-making. As such, there is no reason to provide a definition of this phrase.

Additionally, assuming *arguendo* that there were reason to include a definition of "competitive decision-making," the non-parties have not shown that the proffered definition is tailored to limit the risk of any particular harm to their interests. The non-parties are all healthcare providers, and this case involves the merger of health insurers, yet the non-parties ask to include such topics as "employment" and "marketing" advice under the umbrella of prohibited competitive decision-making. Putting aside the safeguards designed to prevent counsel from using confidential information learned through this litigation in any other context, it is not clear from the proposed definition what possible risk of harm justifies this broad definition. [12]

[12]   The non-parties suggest that their proffered definition "is based on factors discussed in case law and additional factors important to the protection of Confidential information," citing cases without explanation. Each case cited, however, concerned the dissemination of information to *in-house*, rather than outside, counsel, and therefore is inapplicable here. [*See FTC v. Sysco Corp.*, 83 F. Supp. 32 1, 4 (D.D.C. 2015); *FTC v. Whole Foods Mkt., Inc.*, 2007 WL 2059741 at *1 (D.D.C. July 6, 2007); *Intervet, Inc. v. Merial, Ltd.*, 241 F.R.D. 55, 55-56 (D.D.C. 2007); *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 (Fed. Cl. 1984)].

*11 The non-parties' alternative proposal, to amend the definition of "Outside Counsel of Record," is not acceptable. It proposes to dictate who Defendants may hire to represent themselves in this matter. BSWH, Duke, and UnityPoint have not provided any argument which justifies such an extraordinary measure.

### D. Certification of Destruction of Confidential Information

BSWH, Duke and UnityPoint ask that if, at the conclusion of litigation, the parties elect to delete or destroy non-party confidential information rather than returning it, the Protective Order require the parties to certify formally that the material has been deleted or destroyed. (BSWH et al. Mot. at 7-8). Plaintiffs object to this request as overly burdensome. Defendants do not object to this request.

The non-parties contend that this proposed modification is appropriate because "the Non-parties are concerned that the Plaintiffs will not be able to account for and destroy all copies of any Confidential Information they produce in this Action." (Reply at 4). The non-parties' justification rests on mere speculation, however. They have provided no specific facts showing that Plaintiffs will actually be unable to comply with the Protective Order's provisions in this regard. The Special Master assumes that Plaintiffs will comply with the terms of the Protective Order, particularly as Plaintiffs' counsel have executed a signed agreements pledging to do so. The non-parties have not shown good cause for this modification.

### E. Penalty Provision

BSWH, Duke and UnityPoint's initial Motion asked that a penalty provision be added to the Protective Order. (BSWH et al. Mot. at 8). Plaintiffs and Defendants both opposed such a provision as unnecessary. (Pl. Opp. at 5; Def. Opp. at 8). In their Reply brief, BSWH, Duke and UnityPoint agreed not to further pursue this request. The request is therefore moot.

### F. Time Period in which Protected Persons must move for relief if there is a dispute regarding any confidentiality designation.

Finally, BSWH, Duke and UnityPoint note that section D(2) of the Protective Order "does not specify a time period in which Protected Persons must move for relief if there is a dispute regarding any confidentiality designation" and ask that protected persons be required to make such a motion within 2 days of the conclusion of a meet-and-confer session. (BSWH et al. Mot. at 9; Reply at 5). The Parties have agreed to this provision, and the Special Master recommends that it be included in full.

### V. Conclusion

For the foregoing reasons, the Special Master recommends that the Court:

(1) Amend Section H of the Protective Order to incorporate the language provided by Tufts

Case: 1:18-cv-00864 Document #: 305-12 Filed: 08/06/18 Page 32 of 32 PageID #:8528

Associated Health Plan's Unopposed Motion to Amend the Protective Order, filed in *United States et al. v. Anthem Inc. and Cigna Corp.*, Case No. 1:16-cv-1493(ABJ) (Dkt. No. 110); and

(2) Grant UPMC Health Plan's Motion to the extent that it seeks to amend section F of the Amended Protective Order; and

(3) Deny UPMC Health Plan's Motion to the extent that it seeks to amend the remainder of the Amended Protective Order; and

(4) Grant the Motion of Baylor Scott & White Holdings, Duke University Health System Inc. and Iowa Health System d/b/a UnityPoint Health to the extent that it seeks modification of Section D(2) of the Amended Protective Order; and

**\*12** (5) Deny the remainder of the Motion submitted by Baylor Scott & White Holdings, Duke University Health System Inc. and Iowa Health System d/b/a UnityPoint Health.

A proposed Second Amended Protective Order which incorporates the recommended modifications is attached to this Report and Recommendation.

**VI. Certification**

Because this recommendation involves the interests of non-parties to this case, the Special Master, pursuant to paragraph 5 of the appointment order (Dkt. 53) certifies this Report and Recommendation for appeal to the Court. Pursuant to paragraph 5, UPMC Health Plan and Baylor Scott & White Holdings, Duke University Health System Inc. and Iowa Health System d/b/a UnityPoint Health have 48 hours from the entry of this Report and Recommendation to file a brief noting an appeal. If UPMC or Baylor Scott & White Holdings, Duke University Health System Inc. and Iowa Health System d/b/a UnityPoint Health elect not to appeal to the Court, they are requested to notify the Court and the parties as soon as possible.

**All Citations**

Slip Copy, 2016 WL 8738422

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.