**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817<br>Case No. 18 C 864 |
| This Document Relates to All Cases | Hon. Robert M. Dow, Jr.<br>Magistrate Judge Jeffery T. Gilbert<br><br>**PUBLIC REDACTED VERSION** |

**MDL PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
OMNIBUS MOTION TO COMPEL**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 1

LEGAL STANDARDS ....................................................................................................... 2

ARGUMENT ...................................................................................................................... 4

   1. Records of Telephone Communications Between Defendants' Document Custodians ..... 4

   2. Documents Relating to Defendants' Attendance at Industry Conferences ........................ 6

   3. Conspiratorial Conversations Between CDK and Reynolds ............................................... 8

   4. Defendants' DMS Customer Tenures ............................................................................... 10

   5. Reynolds and CDK Financial Information ....................................................................... 11

   6. Reynolds' Transactional Data and Invoices (Reynolds Only) ......................................... 15

   7. OEM Pricing Information ................................................................................................. 17

   8. Defendants' Weighted Cost of Capital and Related Metrics ............................................ 19

   9. Reynolds' Security Tools, Processes, and Training (Reynolds Only) .............................. 21

   10. How Whitelisting is Accomplished (Reynolds Only); Technological Implementation of "SecurityFirst" (CDK Only) ....................................................................................... 23

   11. Granular System Design Documents ................................................................................ 25

   12. CDK's Correspondence with Private Equity Firms .......................................................... 27

   13. CDK's Involvement in CVR ............................................................................................ 28

   14. Customer Information of CDK-Owned Subsidiaries Digital Motorworks and IntegraLink ........................................................................................................................ 30

   15. Reynolds' Customer Relationship Management Data (Reynolds Only) .......................... 32

   16. Search Terms for All Custodians ..................................................................................... 34

CONCLUSION .................................................................................................................. 38

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996 (3d Cir. 1994) ...................................... 23

*Baxter Int'l, Inc. v. AXA Versicherung*, 320 F.R.D. 158 (N.D. Ill. 2017) ...................................... 3

*Beltran v. Interexchange, Inc.*, 2017 WL 4418710 (D. Colo. July 24, 2017) ............................... 13

*Brand Name Prescription Drugs Antitrust Litig., In re,* 123 F.3d 599 (7th Cir. 1997) ............... 37

*Callahan v. A.E.V. Inc.*, 947 F. Supp. 175 (W.D. Pa. 1996) ......................................................... 3

*Catfish Antitrust Litig., In re*, 908 F. Supp. 400 (N.D. Miss. 1995) ............................................. 5

*Chocolate Confectionary Antitrust Litig., In re*, 289 F.R.D. 200 (M.D. Pa. 2012) ..................... 16

*City of New York v. Group Health, Inc.*, 2008 WL 4974578 (S.D.N.Y. Nov. 21, 2008) ............. 14

*Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., In re*,
    906 F. 2d 432 (9th Cir. 1990) ................................................................................................ 33

*Domestic Drywall Antitrust Litig., In re*, 2015 WL 5000954 (E.D. Pa. Aug. 20, 2015) .............. 16

*Duracell U.S. Operations, Inc. v. JRS Ventures, Inc.*, 2018 WL 704686
    (N.D. Ill. Feb. 5, 2018) .......................................................................................................... 23

*Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992) ................................................ 10

*Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*, 94 F.3d 1032 (6th Cir. 1996) ............................ 23

*Family Wireless #1, LLC v. Auto. Techs., Inc.*, 2016 WL 2930887 (D. Conn. May 19, 2016) .... 33

*Fellowes, Inc. v. Aurora Corp. of Am.*, 2009 WL 1097063 (N.D. Ill. Apr. 1, 2009) .................... 21

*Fine Paper Antitrust Litig., In re*, 685 F.2d 810 (3d Cir. 1982) ................................................... 37

*Fish v. Greatbanc Trust Co.*, 2016 WL 5923448 (N.D. Ill. Sept. 1, 2016) .................................. 20

*Folding Carton Antitrust Litig., In re*, 76 F.R.D. 420 (N.D. Ill. 1977) ....................................... 13

*Grasso Enters., LLC v. Express Scripts, Inc.*, 2017 WL 365434 (E.D. Mo. Jan. 25, 2017) .......... 7

*Hanley v. Como Inn, Inc.*, 2003 WL 1989607 (N.D. Ill. Apr. 28, 2003) ....................................... 9

*Jenkins v. White Castle Mgmt. Co.*, 2014 WL 3809763 (N.D. Ill. Aug. 4, 2014) ................... 3, 17

*Jones v. Nat'l Cart Co.*, 2014 WL 12735019 (C.D. Ill. Nov. 10, 2014) ....................................... 28

*Kleen Prods. LLC v. Packaging Corp. of Am.*,

    2013 WL 120240 (N.D. Ill. Jan. 9, 2013) .................................................. 14, 16

    2012 WL 4498465 (N.D. Ill. Sept. 28, 2012) ............................................ 3, 33

*Last Atlantis Capital, LLC v. AGS Specialist Partners*, 292 F.R.D. 568 (N.D. Ill. 2013)........... 32

*Linerboard Antitrust Litig., In re*, 296 F.Supp.2d 568 (E.D. Pa. 2003)........................................ 37

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1452 (2016) ...... 23

*Med Diversified, Inc., In re*, 346 B.R. 621 (Bankr. E.D.N.Y. 2006) ............................................ 20

*Nauman v. Abbott Labs.*, 2006 WL 1005959 (N.D. Ill. Apr. 12, 2006) ........................................... 9

*New England Carpenters Health & Welfare Fund v. Abbott Labs.*, 2013 WL 690613
    (N.D. Ill. Feb. 20, 2013).................................................................................. 29

*Nexium (Esomeprazole) Antitrust Litig., In re*, 968 F. Supp. 2d 367 (D. Mass. 2013) ............... 13

*Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986 (N.D. Ill. 2017) ......................... 19

*O'Conner v. Eden Mgmt. LLC*, 2014 WL 5761138 (N.D. Ill. Nov. 4, 2014).............................. 29

*Oneida Ltd., In re*, 351 B.R. 79 (Bankr. S.D.N.Y. 2006) ........................................................... 20

*Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312 (7th Cir. 2006) .............................................. 19

*Seah Chee Wei v. Rocky Point Int'l LLC*, 2017 WL 3911585 (E.D. Wis. Sept. 6, 2017) ...... 14, 19

*Static Random Access Memory (SRAM) Antitrust Litig., In re*,

    580 F. Supp. 2d 896 (N.D. Cal. 2008) ............................................................... 7

    2010 WL 5141861 (N.D. Cal. Dec. 13, 2010)............................................... 16

*Standard Iron Works v. ArcelorMittal*,

    639 F. Supp. 2d 877 (N.D. Ill. 2009) ................................................................. 7

    2011 WL 338435 (N.D. Ill. Feb. 3, 2011) ........................................................ 7

*Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 2010 WL 11474256 (M.D. Fla. Dec. 6, 2010) ........ 14

*Symons Int'l Grp., Inc. v. Cont'l Cas. Co.*, 2015 WL 1279839 (S.D. Ind. Mar. 20, 2015)............ 4

*Text Messaging Antitrust Litig., In re*, 630 F.3d 622 (7th Cir. 2010) ............................................ 7

*United States ex rel. Ceas v. Chrysler Grp. LLC*, 191 F. Supp. 3d 885 (N.D. Ill. 2016) ............... 3

*United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015) ................................................................ 4

*United States v. Maloof*, 205 F.3d 819 (5th Cir. 2000) .................................................................... 3

*United States v. Peake*, 874 F.3d 65 (1st Cir. 2017) ....................................................................... 6

*Urethane Antitrust Litig., In re*, 261 F.R.D. 570 (D. Kan. 2009) .................................................... 2

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ............... 3

*Weit v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chicago*, 641 F.2d 457 (7th Cir. 1981) ...................... 5

## INTRODUCTION

MDL Plaintiffs in this antitrust action file this brief in support of their omnibus motion to compel. Although the parties have substantially narrowed the issues in dispute through a lengthy meet-and-confer process, Defendants CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") are still improperly withholding certain categories of relevant information. MDL Plaintiffs therefore move the court for an order compelling disclosure of the documents and materials described below.

## BACKGROUND

This MDL involves a slew of antitrust actions – including two class actions and three individual suits – brought by customers and competitors of CDK and Reynolds. For an explanation of the claims and factual context for this MDL, we refer the Court to the opinions of Judge St. Eve denying in substantial part Defendants' motion to dismiss the complaint of Authenticom, Inc., *see* Memorandum Opinion and Order (May 14, 2018), Dkt. 176 (attached hereto as Exhibit A), and the order of Judge Peterson granting Authenticom's motion for a preliminary injunction (issued prior to the MDL transfer to this Court), *see* Opinion & Order *Authenticom, Inc., v. CDK Global, LLC* (July 14, 2017), Dkt. 172 (attached hereto as Exhibit B). Additionally, one plaintiff in this MDL – Motor Vehicle Software Corporation ("MVSC") – is somewhat differently situated than the other plaintiffs, because MVSC alleges a distinct conspiracy involving a market that is not at issue in any other case. For a description of MVSC's factual allegations and claims, we refer the Court to Judge Fischer's opinion (again prior to this MDL) denying in part Defendants' motion to dismiss the MVSC complaint. *See* Memorandum Opinion, *Motor Vehicle Software Corp. v. CDK Global, Inc.* (C.D. Cal. Oct. 2, 2017), Dkt. 73, at 1-5 (attached hereto as Exhibit C).

The parties in this MDL have served voluminous discovery, in light of the array of litigants involved and the complex nature of the antitrust and economic issues at stake. In particular, in October 2017, Authenticom served extensive discovery requests on CDK and Reynolds, which are attached hereto as Exhibit D (Authenticom RFPs to CDK) and Exhibit E (Authenticom RFPs to Reynolds). Then, after the cases were consolidated in this MDL proceeding, the parties served additional discovery requests. On May 25, 2018, the Dealership Class and the "Individual Plaintiffs" – Authenticom and the automotive vendors Cox Automotive, Inc., AutoLoop[1], and MVSC – each exchanged further discovery requests with CDK and Reynolds. *See* Ex. F (Dealership Class Amended RFPs to CDK); Ex. G (Dealership Class Amended RFPs to Reynolds); Ex. H (Individual Plaintiffs Amended RFPs to CDK); Ex. I (Individual Plaintiffs Amended RFPs to Reynolds).

After the exchange of written discovery requests, the parties engaged in a lengthy meet-and-confer process to reach compromise where possible and narrow the issues in dispute. Attached to this Motion are declarations from counsel for MDL Plaintiffs describing (and attaching as exhibits) the letters and correspondence relevant to MDL Plaintiffs' motion to compel.

## LEGAL STANDARDS

"[W]hen a party does not respond properly to a discovery request," Rule 37(a) permits "the party that issued the request [to] file a motion to compel a proper response." *Baxter Int'l, Inc. v. AXA Versicherung*, 320 F.R.D. 158, 161 (N.D. Ill. 2017). "Ultimately, the part[ies]

---

[1] On June 5, 2018, AutoLoop amended its Complaint to add class claims on behalf of vendors. *See* Dkt. 194.

objecting to discovery" – here, CDK and Reynolds – "bear[] the burden to show the requested discovery is improper." *Id.* (citing cases).

CDK and Reynolds have largely asserted relevance and burden objections to MDL Plaintiffs' discovery requests described below. As to relevance, the standard under Rule 26(b)(1) is "broad and liberal." *United States ex rel. Ceas v. Chrysler Grp. LLC*, 191 F. Supp. 3d 885, 888 (N.D. Ill. 2016) (Dow, J.). In antitrust cases in particular, "courts generally take an expansive view of relevance and permit broad discovery," *Kleen Prods. LLC v. Packaging Corp. of Am.*, 2012 WL 4498465, at *13 (N.D. Ill. Sept. 28, 2012) (citing cases), because antitrust cases "involve improper business conduct" that is often "covert and must be gleaned from records, conduct, and business relationships," *Callahan v. A.E.V. Inc.*, 947 F. Supp. 175, 179 (W.D. Pa. 1996). "[I]n antitrust cases involving allegations of conspiracy" – as here – "this liberal policy favoring discovery is particularly appropriate because broad discovery may be needed to uncover evidence of invidious design, pattern, or intent." *In re Urethane Antitrust Litig.*, 261 F.R.D. 570, 573 (D. Kan. 2009).

Where CDK and Reynolds have objected on the basis of burden, they "must 'specifically demonstrate the burden that the discovery would impose.'" *Baxter Int'l*, 320 F.R.D. at 166 (quoting *Symons Int'l Grp., Inc. v. Cont'l Cas. Co.*, 2015 WL 1279839, at *7 (S.D. Ind. Mar. 20, 2015)). Although undue burden is a "common refrain of parties" seeking to avoid discovery obligations, "[u]ndue burden or expense, actual or potential, must be shown by a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Jenkins v. White Castle Mgmt. Co.*, 2014 WL 3809763, at *2 (N.D. Ill. Aug. 4, 2014).

**ARGUMENT**

The Court should compel discovery of the documents and information described

below.

**1.      Records of Telephone Communications Between Defendants' Document Custodians**

Document Requests:  MDL Plaintiffs' RFPs sought "telephone records – whether

landline or cell phone – reflecting calls made or received" between CDK employees and

Reynolds employees from 2014 to present.[2]  During the meet-and-confer process, MDL

Plaintiffs narrowed their request to the telephone records of Defendants' document custodians

from 2014 to present.

Defendants' Response:  Both Defendants have refused to produce any telephone records

– and rejected MDL Plaintiffs' compromise offer – on relevance and burden grounds.

Reasons For Granting the Motion To Compel:  This is an antitrust conspiracy case, the

core allegation of which is that Defendants colluded to exclude independent data integrators

from the market and divide the market for themselves.  Collusion is the "supreme evil" of the

antitrust laws.  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398,

408 (2004).  Although MDL Plaintiffs already have extensive evidence of that conspiracy –

including documentary evidence and admissions made by CDK and Reynolds employees –

evidence that CDK and Reynolds employees communicated by telephone would also be highly

probative of the conspiracy.  *See*, *e.g.*, *United States v. Maloof*, 205 F.3d 819, 830 (5th Cir. 2000)

(highlighting relevance of "records of phone calls among . . . co-conspirators at crucial times");

*United States v. Apple, Inc.*, 791 F.3d 290, 315, 319 (2d Cir. 2015) (holding that a "high level of

---

[2] Nemelka Decl. Ex. I at 15 (Individual Plaintiffs RFPs #66 and #67 to Reynolds); *see* Nemelka Decl. Ex. H at 16 (Individual Plaintiffs RFPs #74 and #75 to CDK).

interfirm communications" can show the existence of a conspiracy and finding phone records formed part of the "overwhelming" conspiracy case against Apple).

Here, MDL Plaintiffs have reason to believe that CDK and Reynolds used telephonic communications in furtherance of their conspiracy, in the hope that they would never be discovered. Shortly after CDK and Reynolds formalized a part of their conspiracy in February 2015, a top-ranking Reynolds executive emailed a top-ranking CDK executive (both were key participants in the conspiracy) and warned: ███████████████████████████████

████████████████████ *See* Nemelka Decl. Ex. P (CDK-1796970) (emphasis added). The records of these communications are plainly relevant to one of the most important issues in this MDL. And preventing discovery of these materials would only reward Defendants for their admitted attempt (i.e., ███████████████) to shield their communications from discovery.

Defendants argue that telephone records are not relevant because the records will not reveal the content of the calls.[3] But that is unpersuasive, for two reasons. First, even if antitrust plaintiffs "cannot always provide specific details concerning the calls, the evidence of [the existence of] such communications can be nonetheless telling." *In re Catfish Antitrust Litig.*, 908 F. Supp. 400, 405 (N.D. Miss. 1995) (where there are a multitude of phone calls between conspirators, the "sheer number of contacts between [the] competitors . . . is circumstantial evidence of the existence of a conspiracy."). Second, armed with the relevant call logs, MDL Plaintiffs will have the information necessary to inquire, during depositions, about the subject

---

[3] In a July 30, 2018 letter, Reynolds claimed that, "[w]hether in narrowed form or as originally drafted, the request for phone records is irrelevant and out of proportion to the needs of the case," and that "[w]hat is important is not whether communications occurred," but "what the communications are about." Nemelka Decl. Ex. S at 7 (Letter from L. Caseria to M. Nemelka (July 30, 2018)). On a letter that same day, CDK took a similar position, noting that, "while [it] appreciate[d] Plaintiff's offer, it does not make the telephone records relevant." Nemelka Decl. Ex. T at 10 (Letter from M. Provance to M. Nemelka (July 30, 2018)).

matter of particular calls; compare the timing of the calls to other evidence of the conspiracy, such as emails, calendar entries, and first-hand witness testimony; and place the calls in context of other events of CDK's and Reynolds' close coordination to eliminate competition. Using telephone records in conjunction with other evidence is standard in antitrust cases. *See*, *e.g.*, *United States v. Peake*, 874 F.3d 65, 68 (1st Cir. 2017) (observing that an "'overwhelming amount' of evidence, including travel and telephone records, corroborated the [defendant's] leading role" in conspiracy).

Nor is the production of phone records unduly burdensome. As the cases cited above demonstrate, phone records are commonly produced in antitrust cases. Defendants have made no attempt to quantify why the purported burden would be any different in this case and, in any event, MDL Plaintiffs have agreed to limit the request to telephone records between the Defendants' agreed-upon document custodians, substantially lessening any burden.

**2.      Documents Relating to Defendants' Attendance at Industry Conferences**

Document Requests:  MDL Plaintiffs' RFPs sought documents concerning CDK's and Reynolds' attendance at industry conferences.[4] Based on compromises offered in the meet-and-confer process, Plaintiffs now seek six narrowly defined categories of documents relating to Defendants' attendance at industry conferences (from 2009 to present): (1) documents identifying industry conference attendees; (2) the schedules and calendars of those individuals; (3) conference agendas; (4) meeting notes; (5) preparatory materials; and (6) communications regarding any of the above.

---

[4] Nemelka Decl. Ex. H at 16 (Individual Plaintiffs RFPs #73 to CDK); *see* Nemelka Decl. Ex. I at 15 (Individual Plaintiffs RFPs #65 to Reynolds); Nemelka Decl. Ex. I at 22-23 (Dealership Class RFPs #37 and #38 to CDK); Nemelka Decl. Ex. G at 21-22 (Dealership Class RFPs #33 and #34 to Reynolds).

<u>Defendants' Response</u>:  Reynolds and CDK have refused to produce these categories of documents.[5]

<u>Reasons For Granting the Motion To Compel</u>:  Like telephone records, evidence of meetings and discussions among competitors at industry conferences is standard proof in antitrust cases.  "[D]irect, in-person communications at trade meetings between executives at least supply a plus factor in support of the plausible inference that Defendants reached a meeting of the minds . . . ."  *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 894 (N.D. Ill. 2009); *see also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (practice of exchanging pricing information at trade association meetings "facilitates price fixing"); *Weit v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*, 641 F.2d 457, 477 (7th Cir. 1981) ("Evidence of meetings between defendants, presenting an opportunity to conspire," can be "plus factors in finding a price-fixing agreement," "even though there was no evidence of what was discussed.").  These documents are plainly relevant and discoverable.  *See Standard Iron Works v. ArcelorMittal*, 2011 WL 338435, at *1 (N.D. Ill. Feb. 3, 2011) (granting motion to compel production of executive-level trade association and trade meeting documents).

Reynolds asserts that "[m]ere participation or attendance by Reynolds at conferences or conventions has nothing to do with the issues or defenses in the case," and CDK similarly argues

---

[5] Dealership Class Plaintiffs proposed a separate compromise offer to Defendants, asking that they produce (a) documents reflecting meetings between CDK and Reynolds at industry conferences; (b) marketing and promotional materials used or distributed at conferences, and (c) written training and instructions provided to their employees at conferences.  Wallner Decl. Ex. B & I.  Reynolds refused to produce even this narrow set of documents.  Wallner Decl. Exs. B & I.  For its part, CDK agreed to the Dealership Class proposal, Wallner Decl. Ex. C, but the Individual Plaintiffs and the Vendor Class (represented by Kellogg Hansen) continue to believe that the broader six categories of conference-related documents described in this Motion are likely to contain highly relevant materials that should be discoverable.

that conference materials are "neither relevant nor proportional to the needs of the case."[6] But those boilerplate objections are contrary to the host of cases finding that interactions at industry conferences are a prime source of evidence of collusion.[7] The schedules and calendars of conference participants, and their meeting notes, will demonstrate whether additional collusion occurred. Indeed, this very case has already proved the importance of industry conferences: one of the central pieces of evidence in this MDL – a CDK executive's admission to the conspiracy at the heart of these cases – took place during a conversation with Authenticom's CEO at an industry conference in April 2016. Ex. A (Dkt. 176), at 13.

3.      **Conspiratorial Conversations Between CDK and Reynolds**

Interrogatories: MDL Plaintiffs propounded the following Interrogatory on both CDK and Reynolds: "Identify every oral and in-person communication" between the two Defendants "concerning what you now call 'hostile integration' and/or any third party data integrator (including but not limited to Authenticom, SIS, DMI, and Integralink) from January 1, 2011 to the present."[8]

During the meet-and-confer process, Authenticom proposed a compromise to reduce the burden on Defendants by narrowing the date range from January 1, 2011 to present to January 1, 2013 to present.

---

[6] Nemelka Decl. Ex. S at 6 (Letter from L. Caseria to M. Nemelka (July 30, 2018)); Nemelka Decl. Ex. U at 6 (Letter from M. Provance to M. Nemelka (August 2, 2018)).

[7] *See also*, *e.g.*, *Grasso Enters., LLC v. Express Scripts, Inc.*, 2017 WL 365434, at *4 (E.D. Mo. Jan. 25, 2017) ("Membership and participation in a trade group facilitates collusion and provides opportunities to conspire."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (similar).

[8] Nemelka Decl. Ex. K at 8 (Authenticom Interrogatory #14 to CDK); Nemelka Decl. Ex. L at 8 (Authenticom Interrogatory #11 to Reynolds).

Defendants' Responses:  Both CDK and Reynolds refused to answer the Interrogatories regarding their conspiratorial conversations, primarily on burden grounds.[9]  CDK specifically rejected MDL Plaintiff's compromise proposal to narrow the date range.[10]

Reasons For Granting the Motion To Compel:  As described above, the central issue in this MDL is collusion between CDK and Reynolds to block independent integrators from the market and divide it among themselves.  Interrogatories #14 (for CDK) and #11 (for Reynolds) are narrowly tailored to identify Defendants' communications on that issue.

CDK argues the Interrogatory is "literally impossible for CDK" to answer.[11]  But under Rule 33, CDK is required to make reasonable efforts to respond to the Interrogatory, including by interviewing CDK employees about their interactions with Reynolds regarding third-party data integration.  *See, e.g., Hanley v. Como Inn, Inc.*, 2003 WL 1989607, at *4 (N.D. Ill. Apr. 28, 2003).  Just because it may not be possible to exhaust with 100% certainty *every* such communication does not excuse CDK from responding to the Interrogatory *at all*, including by identifying those communications it knows about or that it could discover through reasonable investigation.  *Nauman v. Abbott Labs.*, 2006 WL 1005959, at *4 (N.D. Ill. Apr. 12, 2006) (compelling defendant to answer Interrogatories regarding meeting attendees where the defendant had "access to individuals who participated in the meetings.  Although no single one of those individuals may have a 'precise or comprehensive recollection,' that does not excuse [the defendant's] responsibility to disclose what information they do have, even if it is limited.").

---

[9] Nemelka Decl. Ex. M at 19-20 (CDK's Reponses to Authenticom's First Set of Interrogatories); Nemelka Decl. Ex. N at 19-20 (Reynolds' Response to Authenticom's First Set of Interrogatories) (failing to address Interrogatory #11 at all).

[10] Nemelka Decl. Ex. U at 12 (Letter from M. Provance to M. Nemelka (Aug. 2, 2018)).

[11] *Id.*

4.     **Defendants' DMS Customer Tenures**

Interrogatory:  MDL Plaintiffs propounded the following Interrogatory on both CDK and Reynolds: "Identify the average tenure of CDK's DMS customers on an annual basis, from 2009 to the present."[12]

Defendants' Response:



MDL Plaintiffs repeatedly asked both Defendants to answer the Interrogatory as written, but they both refused.

Reasons For Granting the Motion To Compel:  Switching DMS providers is a "logistical nightmare[]."  Ex. A (Dkt. 176), at 6.  It is "enormously difficult and disruptive for a dealer to switch DMS given the costs of transferring data, retraining employees, and reconfiguring systems."  *Id.*  For these and other reasons – including long-term contracts – "the average DMS-dealer relationship lasts more than 20 years."  *Id.*

The high switching costs are legally relevant to Plaintiffs' monopolization claims, which are based on the Supreme Court's decision in *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992), holding that where customers face "significant information and switching

---

[12] Nemelka Decl. Ex. K at 7 (Authenticom Interrogatory #11 to CDK); Nemelka Decl. Ex. L at 7 (Authenticom Interrogatory #7 to Reynolds).

[13] Nemelka Decl. Ex. M at 16-17 (CDK Response to Authenticom Interrogatory #11).

[14] Nemelka Decl. Ex. N at 16 (Reynolds Response to Authenticom Interrogatory #7); Nemelka Decl. Ex. V at 3 (Letter from B. Ross to M. Nemelka (Dec. 1, 2017)).

costs," single-brand aftermarkets can be a cognizable market for antitrust purposes.  *See generally* Ex. A (Dkt. 176), at 43-49.  Here, Judge St. Eve already upheld Plaintiffs' claims on this theory.  *Id*. at 47 ("The Complaint alleges facts suggesting that consumers are 'locked in' after purchasing CDK DMSs, given the initial investments required, the contract length, and the resources required to change DMSs.").  The average tenure of CDK's and Reynolds' DMS customers is therefore relevant to the claims at issue, and Defendants cannot argue otherwise unless they intend to waive any argument against single-brand aftermarkets.

Nor can Defendants claim that it is impossible for them to calculate the average tenure of their DMS customers.  In fact, they already made that calculation once, as of 2017, in this very case.  During the preliminary injunction proceedings in the Western District of Wisconsin, the parties were required to submit verified responses to each other's statements of facts.  Authenticom submitted the following statement of fact: "The average DMS client tenure is over 20 years."[15]  In response, CDK informed the court: "Undisputed by CDK."[16]  Reynolds wrote: "Based on information available to Reynolds, average DMS client tenures are currently less than 20 years."[17]  Defendants have thus calculated their DMS client tenure before, and they should do so again for the full time period of 2009 to the present.  They are the only parties with this information, which is central to the legal claims in this MDL.  Defendants have offered no basis – whether of relevance or burden – for why they cannot or should not answer the Interrogatory as written.  The Court should compel them to respond.

5.      **Reynolds and CDK Financial Information**

---

[15] Defs.' Resps. to Authenticom Statement of Facts ¶ 15 (June 17, 2017), *Authenticom* Dkt. 115.

[16] *Id.*

[17] *Id.*

Document Requests.  MDL Plaintiffs' RFPs requested that Reynolds and CDK produce the following categories of financial data:

- Financial statements reflecting the financial performance of its DMS and data integration businesses, from 2009 to the present.[18]

- DMS and data integration profit and loss information, including gross and net profit margins, from 2009 to the present.[19]

- Costs and expenses related to providing DMS and data integration services, from 2009 to the present.[20]

- Projections and budgets for DMS and data integration revenues, profits, and costs, from 2009 to present.[21]

Defendants' Response:  CDK has agreed to produce financial information for all of the categories described above.[22]  The only dispute with CDK pertains to time period.  CDK has agreed to produce the information back to 2011, but MDL Plaintiffs seek the information back to

---

[18] Nemelka Decl. Ex. G at 23 (Dealership Class Amended RFP #38 to Reynolds); Nemelka Decl. Ex. F at 23-24 (Dealership Class Amended RFP #42 to CDK); Nemelka Decl. Ex. E at 22, 23 (Authenticom RFPs #46 and #51 to Reynolds); Nemelka Decl. Ex. D at 24, 25 (Authenticom RFPs #52 and #58 to CDK).

[19] Nemelka Decl. Ex. G at 23 (Dealership Class Amended RFP #38 to Reynolds); Nemelka Decl. Ex. F at 23-24 (Dealership Class Amended RFP #42 to CDK); Nemelka Decl. Ex. E at 22, 23 (Authenticom RFPs #47 and #52 to Reynolds); Nemelka Decl. Ex. I at 16 (Individual Plaintiffs RFP #73 to Reynolds); Nemelka Decl. Ex. H at 17 (Individual Plaintiffs RFP #81 to CDK).

[20] Nemelka Decl. Ex. G at 23 (Dealership Class Amended RFP #38 to Reynolds); Nemelka Decl. Ex. F at 23-24 (Dealership Class Amended RFP #42 to CDK); Nemelka Decl. Ex. E at 23 (Authenticom RFP to #50 to Reynolds); Nemelka Decl. Ex. I at 17 (Individual Plaintiffs RFP #76 to Reynolds).

[21] Nemelka Decl. Ex. G at 23 (Dealership Class RFP #38 to Reynolds); Nemelka Decl. Ex. F at 23-24 (Dealership Class RFP #42 to CDK); Nemelka Decl. Ex. E at 22 (Authenticom RFP to #49 to Reynolds); Nemelka Decl. Ex. I at 17 (Individual Plaintiffs RFP #77 to Reynolds); Nemelka Decl. Ex. H at 18-19 (Individual Plaintiffs RFPs #84, #85, and #86 to CDK).

[22] Wallner Decl. Ex. J (Letter from M. Provance to R. Wallner (July 25, 2018)).

2009.[23]  In contrast, Reynolds has refused to provide the requested financials – agreeing to produce only (certain) pricing and revenues for its DMS and data integration businesses.[24]

Reasons For Granting the Motion To Compel:  As Judge St. Eve explained in her *Authenticom* Motion to Dismiss Memorandum Opinion, this antitrust case revolves around two related but distinct markets:  (1) the DMS market and (2) the market for data integration services. Ex. A (Dkt. 176), at 5-9.  The competitive conditions in those markets – Defendants' market power, and the imposition of supra-competitive prices – is thus central to this case.  The financial information sought by MDL Plaintiffs is the most basic grist necessary to analyze those core antitrust issues.  Defendants' revenues, costs, and profits in the DMS and data integration markets are highly relevant to the economic analysis of Defendants' market power.  *See, e.g.*, IIB Areeda & Hovenkamp, Antitrust Law ¶ 502, at 112 (defendant's "market power is commonly defined by the excess of its profit-maximizing price above its marginal cost"); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 389 (D. Mass. 2013) (prices "well in excess of marginal costs" were supra-competitive).

Like evidence of direct communications, this type of financial information is standard fare in antitrust cases, and routinely required.  *E.g.*, *In re Folding Carton Antitrust Litig.*, 76 F.R.D. 420, 427 (N.D. Ill. 1977) (compelling disclosure of financial information that may antitrust plaintiff "determine whether or not defendants enjoyed unreasonably high or excessive profits" and noting "courts have often required defendants to produce the type of basic financial information sought here"); *Beltran v. Interexchange, Inc.*, 2017 WL 4418710, at *5 (D. Colo. July 24, 2017) ("no credible dispute that financial statements, which show profits and losses, are

---

[23] Nemelka Decl. Ex. S at 5 (Letter from L. Caseria to M. Nemelka (July 30, 2018)).

[24] *See id.*

relevant to Plaintiffs' antitrust claim"), *vacated in part on recon. on other grounds*, 2018 WL 936012 (D. Colo. Feb. 16, 2018).[25]

CDK's refusal to produce this information earlier than 2011 is unjustified, and CDK has not even attempted to demonstrate how the production of two additional years of financial information creates any undue burden. This Court has noted that, in light of the "expansive view of discovery in antitrust cases," it is appropriate to allow antitrust plaintiffs to seek a "larger window of economic data (as opposed to conduct documents)" to "provide an accurate economic picture." *Kleen Prods. LLC v. Packaging Corp. of Am.*, 2013 WL 120240, at *9 (N.D. Ill. Jan. 9, 2013) (granting motion to compel transactional data for 12-year window) (collecting cases providing for discovery window of up to 25 years in antitrust cases). MDL Plaintiffs are thus entitled to a sufficient breadth of data to analyze Defendants' revenues, prices, and profitability over time. CDK's financial performance from 2009 to 2011 is a relevant benchmark against which to judge its financial performance following its conspiracy with Reynolds and imposition of other anti-competitive restraints.

Reynolds's wholesale refusal to provide this information is even more egregious. Reynolds claims that it "does not fully allocate costs or produce actual profitability reports on a product line basis."[26] But it is commonplace for economic experts to disaggregate financial data to isolate the information needed to analyze a particular product or market. Reynolds certainly is

---

[25] *See also, e.g.*, *Seah Chee Wei v. Rocky Point Int'l LLC*, 2017 WL 3911585, at *2 (E.D. Wis. Sept. 6, 2017) (granting motion to compel defendant to produce financial information in antitrust action); *City of New York v. Group Health, Inc.*, 2008 WL 4974578, at *2-3 (S.D.N.Y. Nov. 21, 2008) (granting motion to compel information necessary for antitrust expert); *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 2010 WL 11474256, at *7 (M.D. Fla. Dec. 6, 2010) (financial information discoverable in antitrust case).

[26] Nemelka Decl. Ex. V at 5 (Letter from B. Ross to M. Nemelka (Dec. 1, 2017)); Nemelka Decl. Ex. W at 4 (Letter from B. Ross to M. Nemelka (Aug. 1, 2018)) (stated Reynolds has explained its refusal to produce financial records and "there is no need to rehash them here").

not entitled to prevent MDL Plaintiffs' experts from analyzing the data for themselves to determine how best to dissect it. However Reynolds keeps its financial performance data – whether on a product line, business line, division, or company level – Reynolds should be required to produce it, from 2009 to present, for the intervals that Reynolds tracks it (monthly, quarterly, and yearly).

**6. Reynolds' Transactional Data and Invoices (Reynolds Only)**

Document Request. MDL Plaintiffs have requested Reynolds' transactional data reflecting all amounts Reynolds invoiced to (and received from) its dealer and data integration customers, from January 1, 2009 to present.[27]

Reynolds' Response: For DMS customers (i.e., dealers), Reynolds has said it cannot produce *any* transaction-level data prior to August 2014 and, in the period since 2014, has agreed to produce invoice amounts – but refused to produce amounts actually paid.[28] For vendor customers, Reynolds has agreed to produce certain transactional data but refused to produce the underlying invoices.[29]

By contrast, CDK has agreed to produce transactional data for both its dealer and vendor customers from 2011 to present.[30] In light of CDK's agreement to provide that transactional data – showing the amounts paid by its dealer and vendor customers – MDL Plaintiffs have accepted a compromise in which CDK has agreed produce a sample of invoices for its largest dealer and

---

[27] Nemelka Decl. Ex. G at 17, 22, 24 (Dealership Class RFPs #17, #36, and #44 to Reynolds); Nemelka Decl. Ex. I at 16 (Individual Plaintiffs RFP #74 to Reynolds).

[28] Wallner Decl. Ex. C at 10-11 (Letter from L. Caseria to R. Wallner (July 31, 2018)).

[29] Wallner Decl. Ex. D (Letter from B. Ross to R. Wallner (Aug. 3, 2018)).

[30] Wallner Decl. Ex. G (Email from M. Provance to S. Schindler (Aug. 3, 2018, 9:49 PM)).

vendor customers from 2011 to present.[31]   Because Reynolds has not agreed to produce transactional data like CDK, however, MDL Plaintiff are moving to compel the production of whatever transactional data and invoices Reynolds has in its possession, from 2011 to present, in order to ensure Plaintiffs' experts have sufficient data to perform an adequate economic analysis.

<u>Reasons For Granting the Motion To Compel</u>:   Reynolds should be required to produce all transactional data and invoices for its dealer and data integration customers.  Transactional data is a standard subject of discovery in antitrust cases and commonly analyzed by experts to show both liability and damages.   This MDL concerns whether Defendants Reynolds and CDK restrained competition and raised prices above competitive levels in the DMS and data integration markets.  Reynolds' transactional data and invoices are the basic data MDL Plaintiff need to prove those claims and analyze Reynolds' pricing over time.  *In re Domestic Drywall Antitrust Litig.*, 2015 WL 5000954, at *3 (E.D. Pa. Aug. 20, 2015) (common for antitrust experts to review "voluminous pricing data, as well as actual invoices"); *see also In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200 (M.D. Pa. 2012); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5141861, at *2 (N.D. Cal.  Dec. 13, 2010).   Indeed, this Court recently compelled an antitrust defendant to produce 12 years of transactional data – less than MDL Plaintiffs seek here from Reynolds.  *See Kleen Prods.*, 2013 WL 120240, at *9.

Reynolds claims that producing invoices for its vendors "is prohibitively burdensome and time-consuming (and for several of the years in this range impossible)."[32]  But that is belied by the fact that Reynolds' co-defendant CDK has agreed to produce its transactional data, for both dealers and vendors, since 2011.  Reynolds should be required to do the same.  Moreover, Reynolds has

---

[31] Nemelka Decl. Ex. X (Email from M. Provance to M. Nemelka (Aug. 5, 2018, 3:51 PM)).

[32] Wallner Decl. Ex. D (Letter from B. Ross to R. Wallner (Aug. 3, 2018)).

16

not made anything close to the "particular and specific demonstration of fact" required to deny discovery on fundamental pricing data that goes to the core economic issues in this antitrust MDL. *See, e.g., Jenkins*, 2014 WL 3809763, at *2 ("undue burden" is "a common refrain of parties to litigation who would prefer, understandably, not to comply with discovery requests that involve anything other than the slightest effort. But modern litigation often requires efforts that might have been regarded as difficult and thus avoidable years ago.").

**7.     OEM Pricing Information**

Document Request:  MDL Plaintiffs requested that CDK and Reynolds provide financial information regarding Defendants' sales of data integration services to Original Equipment Manufacturers (or "OEMs").  Specifically, Authenticom requested "[d]ocuments and communications relating to prices charged to OEMs for access to data" on the CDK and Reynolds DMSs.[33]  In this industry, automobile manufacturers – such as General Motors, Ford, Toyota, and Volkswagen – are OEMs.

Defendants' Response:  Both Defendants have refused to produce any OEM pricing information.[34]

Reasons For Granting the Motion To Compel:  The data integration purchases of OEMs are directly relevant to a host of issues in this case.  Just like automotive vendors, OEMs need access to dealer data to run their day-to-day operations (such as automobile warranties or recall efforts) and thus purchase data integration services.  OEMs are therefore a direct purchaser in one of the two antitrust markets relevant to this MDL.  Ex. A (Dkt. 176), at 7-8 (discussing data integration market).

---

[33] Nemelka Decl. Ex. D at 28 (Authenticom RFP #73 to CDK); Nemelka Decl. Ex. E at 24 (Authenticom RFP #63 to Reynolds).

[34] Nemelka Decl. Ex. Y (Letter from B. Miller to M. Nemelka (Nov. 15, 2017)).

The requested pricing information will show the supra-competitive prices that Defendants charged OEMs for data integration, which is a core issue that goes to competitive harm and market power in the data integration market. Moreover, the OEM pricing information is highly relevant to Authenticom's damages. Initial discovery has already revealed that, absent Defendants' anti-competitive conduct, several large OEMs would have preferred to use independent integrators, including Authenticom, for data integration. To take one such example,

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

OEM pricing is thus relevant to show the business and profits Authenticom would have won, but for Defendants' anti-competitive conduct.

Defendants argue that the OEM pricing information is irrelevant because (according to Defendants) OEMs are different from other automotive vendors and not part of the data integration market.[35] CDK argues, for example, that the data integration services it sells to OEMs "are subject to highly individualized contract negotiations" and that CDK sells OEMs data integration through a different corporate program than it does other automotive vendors.[36] But CDK's argument puts the cart before the horse: whether OEMs are part of the data integration market is a disputed issue – and can only properly be resolved after relevant discovery is exchanged. CDK cannot properly withhold discovery relevant to market definition based on its own self-serving characterization.

---

[35] Notably, neither CDK nor Reynolds has ever suggested that producing their data integration pricing for OEMs would be unduly burdensome.

[36] Nemelka Decl. Ex. Y (Letter from B. Miller to M. Nemelka (Nov. 15, 2017)).

Indeed, there is ample evidence in the record already that Defendants' market definition is unduly narrow. Whether OEMs are a customer in the market for data integration services is a fact-intensive question that hinges on whether, from the perspective of the OEMs (the customer), Defendants' data integration services are reasonably interchangeable with those sold by independent integrators. *See*, *e.g.*, *Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986, 1012 (N.D. Ill. 2017). As shown above, Volkswagen clearly thought Authenticom and CDK's 3PA program were interchangeable. Moreover, two other OEMs – Ford Direct and GM Canada – actually did use Authenticom rather than CDK for data integration. ████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████ █████████████████████████████████████████ It is therefore clear that – absent anti-competitive restraints – many OEMs view third-party integrators as "good substitutes" for CDK, and Reynolds' data integration services. *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 318 (7th Cir. 2006). To the extent Defendants contend that OEMs should nevertheless be excluded from the market for data integration, they are "free to make that argument at trial. It is not a reason to deny discovery." *Seah Chee Wei*, 2017 WL 3911585, at *2 (granting motion to compel defendant to produce financial information in antitrust action).

**8.      Defendants' Weighted Cost of Capital and Related Metrics**

Document Request:  Individual Plaintiffs requested that CDK and Reynolds each produce "[a]ll documents concerning [their] cost of capital, cost of equity, cost of debt, and/or weighted average cost of capital, including any documents upon which any of the foregoing are based."[37]

---

[37] Nemelka Decl. Ex. H at 15 (Individual Plaintiffs RFP #68 to CDK); Nemelka Decl. Ex. I at 14 (Individual Plaintiffs RFP #60 to Reynolds).

Defendants' Response:  Both CDK and Reynolds have refused to produce any documents in response to these requests.[38]

Reasons For Granting the Motion To Compel:  In antitrust (and other) cases, damages are often estimated using a discounted cash flow ("DCF") method, where future (lost) revenues are discounted to present value based on a discount rate.  The most frequently used discount rate is the weighted average cost of capital ("WACC").  *See*, *e.g.*, *Fish v. Greatbanc Trust Co.*, 2016 WL 5923448, at *28 (N.D. Ill. Sept. 1, 2016) (describing DCF model and role of WACC).  The WACC, in turn, is computed based on the cost of equity and cost of debt.  *See*, *e.g.*, *In re Med Diversified, Inc.*, 346 B.R. 621, 635 n.27 (Bankr. E.D.N.Y. 2006); *In re Oneida Ltd.*, 351 B.R. 79, 88 (Bankr. S.D.N.Y. 2006) (identifying WACC as "projected costs of debt and equity and the split between the two").

Because Defendants are competitors in the relevant markets, their WACC is also relevant for computing Plaintiffs' WACC.  Indeed, it is customary for economic experts to use comparable companies as a benchmark in computing a plaintiff's own damages.  *See*, *e.g.*, *Fish*, 2016 WL 5923448, at *28-29 (discussing expert's "comparable companies" analysis).  Documents pertaining to Defendants' cost of capital and other related metrics are thus directly relevant to Plaintiffs' damages and should be produced as part of Defendants' production of other relevant financial data.  *See, e.g.*, *Fellowes, Inc. v. Aurora Corp. of Am.*, 2009 WL 1097063, at *5 (N.D. Ill. Apr. 1, 2009) ("Plaintiff is entitled to the underlying financial data," including "profit and loss statements; accounts showing overhead; fixed and variable expenses;

---

[38] Nemelka Decl. Ex. S (Letter from L. Caseria to M. Nemelka (July 30, 2018)); Nemelka Decl. Ex. U (Letter from M. Provance to M. Nemelka (Aug. 2, 2018)).

assets; capital expenditures; cost of capital and hurdle rates; engineering costs; sales records; unit sales; and manufacturing capacity utilization").

CDK does not dispute the relevance of this information, but has suggested that MDL Plaintiffs could attempt to cobble together, on their own, CDK's cost of capital from public filings and other financial documents it has produced. But CDK is not entitled under the Federal Rules to put Plaintiffs to financial detective work. If CDK has the data, it should produce it. For its part, Reynolds argues that its "financial health" is not relevant to this MDL.[39] But that misses the point: WACC and its component parts (cost of equity and cost of debt) are relevant to damages. Unless CDK and Reynolds intend to waive their ability to question the discount rate used by Plaintiffs' damages experts, they should be required to produce this information.

## 9. Reynolds' Security Tools, Processes, and Training (Reynolds Only)

Document Requests: MDL Plaintiffs seek "communications and documents concerning [Reynolds'] security tools, processes, and training for [Reynolds'] software developers."[40] In the meet and confer process, after Defendants asked for further clarification and a narrowing of the scope of this request, Plaintiffs narrowed it to the following:

- with respect to "security tools," documents and communications regarding the software used to test or analyze the security of Defendants DMS and data integration programs;

- with respect to "processes," Defendants' security planning documents, specifications for security and reliability, threat modeling, and risk analyses; and

- with respect to "training," documents and communications regarding the training given to software developers working on Defendants' DMS and data integration programs.[41]

---

[39] Nemelka Decl. Ex. S at 3 (Letter from L. Caseria to M. Nemelka (July 30, 2018)).

[40] Nemelka Decl. Ex. E at 7 (Authenticom RFP #88 to Reynolds).

[41] Nemelka Decl. Ex. Z at 6 (Letter from M. Nemelka to Defendants (July 30, 2018)).

Encompassed within these categories "would be all design, technical, or functional specifications or similar development planning documents for Defendants' DMS or integration programs."[42]

Defendants' Response:  CDK accepted Plaintiffs' narrowing and clarifications, and agreed to produce the requested documents.  Reynolds, on the other hand, did not.  "While we appreciate your offer to modify this RFP," Reynolds explained, "we are unable to accept your proposal and will let you know if we have ideas for a counter-proposal."[43]  Reynolds never provided an explanation for its refusal, nor did it provide a counter-proposal.

Reasons for Granting the Motion to Compel:  Defendants' security tools, processes, and training are all relevant to test the security justifications for Defendants' conduct.  Reynolds has not disputed the relevance of such information, nor has Reynolds stated that it would be a burden to produce.  CDK has agreed to produce the requested information, and Reynolds should be compelled to produce it as well.

Reynolds has made the security of data on its DMS a central theme of its defense. Throughout this litigation, Reynolds has claimed that it blocks independent integrators for security reasons and charges large fees to application vendors to cover the costs of those security efforts.  It stated in briefing to the Seventh Circuit that "performance, reliability, and security . . . [are] at the heart of Reynolds's strategy" and that it has "expended tens of millions of dollars in both capital investment and operational expenses to create a DMS that tightly controls third-party access . . . so it could maximize system performance, reliability, and security."  Reynolds Br. at 6-7, *Authenticom, Inc. v. CDK Global, LLC, et al.*, No. 17-2540 (7th Cir. Aug. 22, 2017), Dkt. 46 ("Reynolds 7th Cir. Br.").  Reynolds has even touted the very security tools and

---

[42] *Id*.

[43] Nemelka Decl. Ex.W at 5 (Letter from B. Ross to M. Nemelka (Aug. 1, 2018)).

processes about which it refuses to produce documents, claiming that it "has implemented extensive cybersecurity measures . . . including the use of virtual local area networks, encryption, threat detection, and other technologies," as well as "special rules and protections regarding certain sensitive data elements." Reynolds 7th Cir. Br. at 14-15.

Because Reynolds has "inject[ed]" these issues into the litigation, "there can be no legitimate objection to [plaintiffs] being able to take appropriate discovery to ascertain the truth of" Reynolds' assertions. *Duracell U.S. Operations, Inc. v. JRS Ventures, Inc.*, 2018 WL 704686, at *4 (N.D. Ill. Feb. 5, 2018). The plaintiffs in this litigation thus are entitled to contemporaneous documentation about Reynolds' security practices – including the tools it used, the processes it established, and the training of its employees. These documents are necessary for MDL Plaintiffs to evaluate and challenge Reynolds' purported security rationale for its restraints on competition. *See McWane, Inc. v. FTC*, 783 F.3d 814, 841-42 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1452 (2016) (relying on "damning internal documents [as] powerful evidence that [the defendant's] procompetitive justifications are 'merely pretextual'"); *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1012 (3d Cir. 1994) (recognizing that evidence an antitrust defendant "advanced reasons for its actions which were pretextual . . . would tend to support an inference that it acted as part of a conspiracy"); *Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*, 94 F.3d 1032, 1036 (6th Cir. 1996) (similar).

**10. How Whitelisting is Accomplished (Reynolds Only); Technological Implementation of "SecurityFirst" (CDK Only)**

Document Requests: MDL Plaintiffs seek from both Defendants documents "sufficient to show how whitelisting is accomplished, including all technical, system architecture, workflow

processes, or other mechanisms used to whitelist login credentials."[44]  And from CDK, Plaintiffs seek "[a]ll documents and communications with respect to the technological implementation of the 'Security First' and/or '3PA Refresh' initiative."[45]

Defendants' Response:  With respect to the whitelisting request, CDK has agreed to produce the requested documents.  By contrast, Reynolds has taken the position that, while it will not withhold responsive documents that are part of its custodial review, Reynolds will not affirmatively look for them (including in centralized files).[46]

With respect to the "Security First" request, CDK has stated that it will not withhold responsive documents that are part of its custodial review, but CDK will not affirmatively look for them (including in centralized files).[47]  Given the similar positions taken by Defendants, Plaintiffs address these requests together.

Reasons for Granting the Motion to Compel:  "Whitelisting" refers to Reynolds' practice of protecting third-party login credentials so that they can be used to access dealer data.  This evidence is critical because it undermines Reynolds' purported security rationale for blocking independent data integrators.  As Judge Peterson explained after the preliminary injunction hearing, "defendants did not show that properly managed third-party access, even using dealer credentials and screen scraping, really poses additional security risks.  Reynolds allows significant exceptions by 'whitelisting' certain third parties that it allows to access its system, most notably DMI, CDK's third-party integrator."  Ex. A (Dkt. 176), at 15-16; *see also id.* at 19. Reynolds, however, has argued that "whitelisting" does not undermine its security rationale

---

[44] Nemelka Decl. Ex. E at 18 (Authenticom RFP #30(c) to Reynolds).

[45] Nemelka Decl. Ex. D at 17 (Authenticom RFP #27(f) to CDK.).

[46] Nemelka Decl. Ex. AA (Letter from M. Nemelka to Defendants (Aug. 3, 2018)).

[47] *Id.*

because it was a temporary measure that was not feasible to maintain long term. *See* Reynolds 7th Cir. Br. at 20-21; *see also Authenticom* Dkt. 181-1 (declaration from Reynolds' employee responsible for system security attesting to purported burden of whitelisting).

Evidence regarding how Reynolds accomplished "whitelisting" is thus relevant to Reynolds' argument that whitelisting was burdensome and needed to be discontinued. Reynolds does not – and cannot – contend otherwise and should be compelled to conduct a full search for documents related to whitelisting.

CDK's refusal to search specifically for documents concerning the technical implementation of its "Security First" initiative raises similar issues. "Security First" is CDK's shorthand for its decision in 2015 to begin blocking independent integrators from accessing dealer data. Prior to 2015, CDK publicly touted its position that dealers were permitted to use third-party integrator access. Ex. A (Dkt. 176), at 8-11. But under the guise of "security," CDK changed that policy in 2015. *Id.* Plaintiffs are entitled to evaluate how CDK technically implemented that policy to evaluate whether it was truly motivated by "security." Again, CDK does not dispute the relevance of such documents; it just will not affirmatively search for them. Just as with Reynolds' approach, that half-measure is insufficient on such an important topic.

**11.     Granular System Design Documents**

Document Requests:  MDL Plaintiffs have propounded several document requests regarding the security of Defendants' DMS and data integration systems, and many of these ask for Defendants' system design documents.[48]

---

[48] Nemelka Decl. Ex. D at 18, 28-29, 30 (Authenticom RFPs #30(c), #74, #79, and #82); Nemelka Decl. Ex. J at 7 (Authenticom Second Set of RFPs #104 to CDK); Nemelka Decl. Ex. E at 25-26 (Authenticom RFPs #64 and #69 to Reynolds).

<u>Defendants' Response</u>:  Even where CDK and Reynolds have agreed to produce security-related documents, they have refused to produce what they call "granular system design documents."[49]

<u>Reasons for Granting the Motion to Compel</u>.  As discussed above, Reynolds and CDK have placed security at the center of this case.  Reynolds and CDK have already engaged two computer security experts to bolster those claims.  Those experts state they have "review[ed] the architecture of CDK and Reynolds' DMS systems . . . in pretty great detail . . . to understand exactly how [they are] architected."  Tr. of Prelim. Inj. Hr'g at 123, *Authenticom* Dkt. 162.[50] And one of those experts has already testified (at the preliminary injunction hearing) – and, if allowed, would likely testify later – that he considers CDK's and Reynolds' "approaches to cybersecurity" to be "very impress[ive]," Tr. of Prelim. Inj. Hr'g at 125-126, *Authenticom* Dkt. 162, and that their respective system designs "address. . . legitimate security concern[s]," *id.* at 128.

Plaintiffs need CDK's and Reynolds' system design documents to fairly respond to the expert evidence that CDK and Reynolds have already presented.  Defendants have not contested the relevance of this evidence.  Rather, they concede that *some* system design documents should be produced, just not "granular" ones.  That makes no sense:  greater "granularity" makes the

---

[49] Nemelka Decl. Ex. U (Letter from M. Provance to M. Nemelka (Aug. 2, 2018)); Nemelka Decl. Ex. W (Letter from B. Ross to M. Nemelka (Aug. 1, 2018)).

[50] 

documents *more* relevant, not less, and there is no greater burden to producing "granular" documents. Defendants' proposed limitation also would leave Plaintiffs susceptible to a vague and subjective standard: Defendants have never articulated a workable standard for differentiating between "general" design documents and "granular" design documents. Accordingly, Defendants should be compelled to produce system design documents without withholding of "granular" documents.[51]

## 12. CDK's Correspondence with Private Equity Firms

Request: MDL Plaintiffs have sought CDK's communications with "any potential acquirer or acquirers," including a number of private equity firms that, according to published reports, have considered buying CDK within the last year.[52]

CDK's Response: CDK has refused to produce any documents in response to this request.[53]

Reasons For Granting the Motion To Compel: CDK does not deny that, when it made presentations to (and otherwise communicated with) private equity firms that were interested in acquiring it, it provided substantial information about the DMS and data integration markets, CDK's business and profitability (including the profitability of its DMS and data integration business segments), its customer base, and other issues directly relevant to this litigation. Because they do not have the documents, MDL Plaintiffs do not know the exact content of these

---

[51] These documents may be designated highly confidential – similar to attorneys' eyes only – to protect defendants' proprietary information. Moreover, Plaintiffs have agreed that Defendants do not need to produce the underlying source code, algorithms, or scripts for their systems.

[52] Nemelka Decl. Ex. H at 15-16 (Individual Plaintiffs RFP #70 to CDK).

[53] Nemelka Decl. Ex. T at 9 (Letter from M. Provance to M. Nemelka (July 30, 2018)); Nemelka Decl. Ex. U at 5 (Letter from M. Provance to M. Nemelka (Aug. 2, 2018)) ("We are at [impasse].")).

presentations, but it is not hard to imagine that, in trying to attract private equity investment, CDK might have touted its market power, its supra-competitive profits, its ability to maintain high profit margins, or the stability of its customer base. Any statements by CDK on those subjects would be directly relevant.

In disputing relevance, CDK contends that "[n]o issue has been raised about whether CDK could pay a judgment rendered in this litigation, nor does any party's alleged damages depend on CDK's market value."[54] But that simply misunderstands the request, which is not geared toward discovering whether CDK could "pay a judgment." Rather, CDK's communications with private equity firms are relevant because they are likely to contain documents where CDK offered opinions and insights about its business and industry. That is more than sufficient to clear the "very low bar for what is discoverable." *Jones v. Nat'l Cart Co.*, 2014 WL 12735019, at *2 (C.D. Ill. Nov. 10, 2014).

## 13. CDK's Involvement in CVR

Document Request: The Individual Plaintiffs requested that CDK produce documents concerning CDK's involvement in the day-to-day operations of Computerized Vehicle Registrations ("CVR"), a subsidiary that is jointly owned by CDK and Reynolds.[55]

CDK's Response: Although it has not objected to this Request on substantive grounds, CDK has unilaterally refused to respond to it while its motion to dismiss the MVSC Complaint is pending.[56]

---

[54] Nemelka Decl. Ex. T at 9 (Letter from M. Provance to M. Nemelka (July 30, 2018)).

[55] Nemelka Decl. Ex. H at 13-14 (Individual Plaintiffs RFP #57 to CDK).

[56] Nemelka Decl. Ex. T at 7 (Letter from M. Provance to M. Nemelka (July 30, 2018)).

Reasons For Granting the Motion To Compel:   CDK's involvement in the daily business activities of CVR is directly relevant to MVSC's Section 2 monopolization claim against CDK. MVSC's case is unique in this MDL, because it is the only action that concerns the market for electronic vehicle registrations.  MVSC and CDK's subsidiary CVR are head-to-head competitors in that market.

To prove its monopolization claim against CDK, MVSC must show that CDK substantially controls CVR's day-to-day business activities.  If MVSC makes that showing, CDK can be considered a "competitor" in the market for electronic vehicle registrations (where its subsidiary CVR operates) and subject to liability for unlawful monopolization.  *See* MVSC Consol. Opp'n, Dkt. 47, at 2-5 (explaining "substantial control" doctrine).  Request #57 will allow MVSC to obtain the documents necessary to prove CDK's substantial control over CVR.

CDK's sole basis for refusing to produce the undisputedly relevant documents described above is its pending motion to dismiss the MVSC case.  But as this Court has noted, the "pendency of a motion – even a dispositive motion – does not operate as an automatic stay of discovery."  Discovery Proc. Hon. J. Dow.  Accordingly, "normally a defendant with a pending motion to dismiss is not excused from responding to discovery."  *O'Conner v. Eden Mgmt. LLC*, 2014 WL 5761138, at *1 (N.D. Ill. Nov. 4, 2014) (Gilbert, J.); *see also New England Carpenters Health & Welfare Fund v. Abbott Labs.*, 2013 WL 690613, at *2 (N.D. Ill. Feb. 20, 2013).[57]

That rule is particularly important in the context of this MDL.  At the behest of Defendants, which moved for MDL consolidation and transfer, the Court has adopted a coordinated discovery schedule for all cases.  Substantial document production is to be

---

[57] Notably, CDK has agreed to produce a variety of other documents relevant to the MVSC case despite its pending motion to dismiss.  It has only objected to RFP #57.

completed under that schedule by October 12, 2018.  CDK's refusal to produce documents until the motions to dismiss are resolved thus threatens the very coordination they have insisted on so adamantly.  The Court should thus compel CDK to produce documents about its involvement in CVR, notwithstanding its pending motion to dismiss.[58]

**14.    Customer Information of CDK-Owned Subsidiaries Digital Motorworks and IntegraLink**

Document Request:  MDL Plaintiffs requested that CDK produce documents showing the customer lists of Digital Motorworks, Inc. ("Digital Motorworks" or "DMI") and IntegraLink, CDK's third-party data integration subsidiaries.[59]  Critically, these requests seek not only documents relating to the customers of DMI/IntegraLink, but documents concerning the DMS platform each of those customers used.

CDK's Response:  CDK has refused to fully comply with this request.  It has only agreed to review the *billing records* of Digital Motorworks and IntegraLink for responsive information, not other types of documents.[60]  MDL Plaintiffs thus move to compel CDK's full compliance with Authenticom RFP #63.

Reasons For Granting the Motion To Compel:   Information showing the DMS platform of Digital Motorworks and IntegraLink's customers is relevant to key issues in this case.  CDK's subsidiaries "Digital Motorworks and IntegraLink function like Authenticom; they obtain login credentials for a DMS from the dealer, then extract and format the data."  Ex. A (Dkt. 176), at 8-

---

[58] It is noteworthy that CDK has *not* suggested that Authenticom can refuse discovery relevant to any of the CDK counter-claims that Authenticom has moved to dismiss.  Rather, CDK has unilaterally purported to grant itself -- and itself alone – a special stay of discovery.

[59] Nemelka Decl. Ex. D at 24 (Authenticom RFP #63 to CDK); Nemelka Decl. Ex. AA at 3 (Letter from M. Nemelka to Defendants (Aug. 3, 2018)).

[60] Nemelka Decl. Ex. U at 4-5 (Letter from M. Provance to M. Nemelka (Aug. 2, 2018)).

9. Indeed, for over a decade, Digital Motorworks and IntegraLink pulled data from Reynolds dealers using dealer-provided login credentials, competing head-to-head with Authenticom and Reynolds' in-house data integration service (RCI). *Id.*

The requested information – the DMS provider used by customers of Digital Motorworks and IntegraLink – is thus relevant evidence that CDK (through its subsidiaries) competed with Authenticom and Reynolds for data integration business on the Reynolds platform. The existence and extent of that competition helps to rebut Defendants' claim that there is no market for data integration service. The identity of the underlying DMS provider is also important in demonstrating the anticompetitive impact of the CDK-Reynolds conspiracy, as the requested documents will likely show that, after 2015, Digital Motorworks and IntegraLink stopped servicing vendors that needed to access dealer data stored on the Reynolds DMS – thereby eliminating a competitive alternative formerly available to vendors. Moreover, Digital Motorworks and IntegraLink's customers on other DMS systems (not just Reynolds) are relevant. The scope of CDK's third-party data integration business on other DMSs will show the state of competition for data integration on so-called "open" DMSs – allowing MDL Plaintiffs to (for example) compare the data integration prices and options available to vendors on DMS systems where competition exists versus what they are forced to pay CDK and Reynolds, post-conspiracy, for the same services.

Accordingly, CDK must produce *all* documents and communications – not just billing records – that identify the DMS platform information of Digital Motorworks and IntegraLink's dealer customers. *Last Atlantis Capital, LLC v. AGS Specialist Partners*, 292 F.R.D. 568, 574 (N.D. Ill. 2013) (granting motion to compel the production of "plainly relevant" information, noting that, "indeed, that evidence is at the crux of the claims at issue in this lawsuit").

15.    **Reynolds' Customer Relationship Management Data (Reynolds Only)**

Document Requests:   MDL Plaintiffs seek production of documents from Reynolds concerning its Customer Relationship Management ("CRM") database.[61] These requests seek several categories of documents from Reynolds' CRM database: (1) information about Reynolds' DMS customers switching or attempting to switch to a different DMS provider, including the time and expense associated with changing or switching DMS providers; (2) documents concerning any of Reynolds' DMS customers who have discontinued use of Reynolds' services since January 1, 2014; (3) documents relating to any change in the pricing for DMS services paid by Reynolds' Dealer customers; and (4) sales call notes reflecting interactions with Reynolds' dealership customers.

Reynolds' Response:   Reynolds refused to produce any documents from its CRM, largely on burden grounds, even though Reynolds confirmed it uses a CRM database and has the ability to produce data from that CRM from 2015 to present.[62]   Reynolds was only willing to "try to export" CRM documents for the six Reynolds dealership customers who are named plaintiffs in the dealership class action.[63]   That offer is insufficient, and the Court should compel Reynolds to produce CRM documents from the above categories.

CDK – unlike Reynolds – has agreed to produce its CRM documents, including comments from sales personnel who interacted with dealerships.[64]

---

[61] Nemelka Decl. Ex. G at 15-16, 17 (Dealership Class RFPs #10 and #18 to Reynolds).

[62] Nemelka Decl. Ex. O (Reynold's Resps. & Objs. to Dealership Class RFPs).

[63] Wallner Decl. Ex. E (Letter from B. Ross to R. Wallner (Aug. 3, 2018)).

[64] CDK's database is on a platform maintained by a third party called Salesforce. Therefore, the production has been extracted from a Salesforce platform and transported into what appears to be other platforms.

<u>Reasons for Granting the Motion to Compel</u>:  Reynolds' communications with dealers are fundamentally important because they reflect unfiltered and contemporaneous interactions between Reynolds and its customers.  In antitrust cases, sales calls and interactions with consumers are plainly relevant.  *Kleen Prods.*, 2012 WL 4498465, at *15 (noting that "even if the conspiracy is among higher-level executives, lower-level employees may *possess* important information which could reasonably lead to admissible evidence.") (citing cases).  Although Reynolds' top brass may have hatched the conspiracy with CDK, lower-level employees are the ones who implement it on the ground and may describe company policies more candidly than C-suite executives.  *See*, *e.g.*, *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 453 (9th Cir. 1990) (although defendants argued rank-and-file employees were "too low-level . . . to be of significance" the court disagreed and found their documents relevant and important); *Family Wireless #1, LLC v. Auto. Techs., Inc.*, 2016 WL 2930887, at *3 (D. Conn. May 19, 2016) ("[W]hile not issuing directives, lower-level employees may discuss execution of policies amongst themselves and with third parties other than their superiors. These communications may be particularly revealing.").

The remaining categories of requested CRM materials are relevant to Reynolds' market power and harm to competition.  The first two categories (interactions with customers attempting to switch DMS providers, including those that actually left Reynolds) are likely to provide contemporaneous evidence of the difficulty of switching DMS providers, which goes directly to the "stickiness" of the DMS relationship.  *See supra* pp. 10-11.  The third category (changes in pricing) will likewise provide evidence of Reynolds' market power – *i.e.*, its ability to inflict price increases on customers – and is also relevant to damages.

Reynolds cites technical difficulties as the basis for its refusal to produce any CRM information. But Reynolds' burden argument is belied by the fact that its co-defendant CDK has agreed to produce the exact same information. Moreover, Reynolds created the CRM database – which it hosts internally – and Reynolds has confirmed it has the ability to produce information from the database from 2015 to present. It should be ordered either to produce that information (via export), or to permit its inspection for as long as reasonably necessary to review it.

**16.    Search Terms for All Custodians**

While this topic is last, it is also among the most important. Last Monday, July 30, 2018, CDK informed MDL Plaintiffs – for the first time – that it was refusing to run the full set of agreed terms across many of its agreed-upon document custodians.[65] CDK's about-face would deprive MDL Plaintiffs of relevant information for critical witnesses. The Court should compel CDK to honor its prior commitment to run the agreed-upon search terms against all of the agreed-upon custodians.

Background. In December 2017, in the *Authenticom* case, CDK and Authenticom agreed to 68 search terms and 17 document custodians (the "Original Search Terms" and the "Original Custodians"). The parties' agreement was the product of extensive negotiation and compromise between the parties. Shortly thereafter, discovery in *Authenticom* was stayed pending Defendants' MDL transfer motion.

After the MDL was created, and discovery in *Authenticom* was coordinated with discovery in the other MDL cases, this Court instructed the parties to use the Original Search Terms and Custodians as a starting point, and to propose additional search terms and custodians to be added on top of that baseline. *See* Case Management Order, Dkt. 166, at 2 (May 7, 2018)

---

[65] Nemelka Decl. Ex. BB (Letter from M. Nemelka to B. Miller (July 30, 2018)).

(setting a deadline for the parties to serve "additional, non-duplicative, coordinated discovery requests, search terms, and custodians").  In the negotiations that commenced in May 2018, CDK specifically demanded that any additional search terms should be non-duplicative of the Original Search Terms.  To satisfy that demand, MDL Plaintiffs formulated new search terms to be used in addition to the Original Search Terms, omitting areas that were sufficiently covered by the already agreed Original Search Terms.

Over a period of more than two months, the parties negotiated the addition of new search terms and new custodians.  On July 6, 2018, CDK and the MDL Plaintiffs agreed to 13 additional custodians (the "Additional Custodians"), and on August 4, 2018, CDK and the MDL Plaintiffs agreed to 185 additional search terms (the "Additional Search Terms").  During these hard-fought negotiations, MDL Plaintiffs traded away many custodians and search terms that they had requested in order to receive others.  At all times during those negotiations, MDL Plaintiffs acted in reliance on CDK's prior agreement to the Original Search Terms and the Original Custodians, and, specifically, with the understanding that the Original Search Terms would be run across *all* agreed-upon custodians, including the 17 Original Custodians and the 13 Additional Custodians.  Indeed, the other similarly situated parties – Authenticom and Reynolds – are applying both their original and additional search terms against both their original and additional custodians.  Accordingly, MDL Plaintiffs had the (correct) belief that they did not need to ensure the Additional Search Terms that were being negotiated covered the same topics as the Original Search Terms.

One week prior to this motion to compel deadline (Monday, July 30, 2018), CDK informed MDL Plaintiffs for the very first time that it would not agree to run the Original Search Terms on the Additional Custodians unless the Original Search Terms were narrowed.

Although CDK's new position was a fundamental departure from its prior commitments, MDL Plaintiffs continued to negotiate in good faith toward a compromise, including by proposing substantial revisions to several of the Original Search Terms to reduce CDK's burden. Ultimately, however, the parties reached an impasse. MDL Plaintiffs' final proposal returns roughly 1.411 million documents total, across both sets of search terms and custodians; Defendants' final proposal would return 1.046 million documents – a difference of approximately 365,000 documents.

Reasons for Granting the Motion To Compel. CDK should be required to search for and review documents in accordance with Plaintiffs' final set of proposed search terms and custodians. MDL Plaintiffs have made their best effort to narrow the search terms to reduce the number of documents CDK has to review. But CDK's proposed revisions are a bridge too far, because they unduly narrow some of the most important search terms in this case. For instance, CDK has substantially modified a term which seeks documents from CDK regarding CDK's whitelisting practices,[66] imposing a narrowing limitation that materially alters its scope. Similarly, CDK has materially altered a term seeking core conspiratorial communications with Reynolds.[67] CDK's last-minute modifications jeopardize Plaintiffs' ability to obtain critical documents and evidence in this MDL.

---

[66] *Compare* Original Term (""whitelist* or "white listing" or (white w/3 list*) or (permit* w/10 access) or ((safe or allow* or known) w/3 list)"), *with* CDK Modification (whitelist* or "white listing" or (white w/3 list*) or (permit* w/10 access) or ((safe or allow* or known) w/3 list)) w/10 (app* or integrat* or Rey* or Authenticom* or "third party" or thirdparty or DealerVault or SIS or SelectQu or SelectQ or "Superior Integrated Solutions" or StoneEagle or ProQuotes)").

[67] *Compare* Original Term (DMI or "Digital Motorworks" or "Digital Motor Works" or Integralink or 3PA or "Partner Program" or integrat* or extract* or poll* or pull* or 3PA or "Access Program" or "wind down" or data or access) w/35 (agree* or contract)), *with* CDK's Proposal ((3PA or "Partner Program" or integrat* or 3PA or "Access Program" or "wind down") w/5 (agree* or contrac)).

That is especially true because the Additional Custodians are critical to this case. Just to name a few examples, Brian MacDonald is CDK's CEO; Josh Douglas was *the* point person in implementing CDK's 2015 conspiracy with Reynolds; and Scott Herbers is probably the most important custodian for MVSC's entire case. They will be key witnesses at trial. CDK should not be allowed to narrow the scope of its review of documents for these key witnesses – especially in violation of its own prior agreement that the Original Search Terms would be run across the Additional Custodians, no different from the Original Custodians.

Defendants' central argument – burden – is not persuasive. Reviewing 1.4 million documents is not an undue burden in a major MDL such as this. Courts have imposed discovery obligations on antitrust defendants that are far more onerous than what MDL Plaintiffs seek here. *See, e.g., In re Brand Name Prescription Drugs Antitrust Litig.,* 123 F.3d 599, 614 (7th Cir. 1997) (discovery involved more than 1,000 depositions and over 50 million pages of documents).[68] Moreover, any burden argument CDK may attempt to assert should be considered in light of its central role, as the defendant in five separate antitrust actions (two of which are class actions), and the "importance of the issues at stake" in this MDL. Fed. R. Civ. P. 26(b)(1). As discussed, multiple courts have found the collusion case against CDK and Reynolds to be a viable one – including one federal judge (Judge Peterson) who heard substantial evidence at a three-day hearing and found that MDL plaintiffs have a likelihood of success of proving an unlawful conspiracy. The FTC has since launched a parallel investigation. Fulsome discovery is warranted.

---

[68] *See also*, *e.g.*, *In re Linerboard Antitrust Litig.,* 296 F.Supp.2d 568, 577 (E.D. Pa. 2003) (discovery required production of millions of pages of documents); *In re Fine Paper Antitrust Litig.,* 685 F.2d 810, 818 (3d Cir. 1982) (court permitted taking of 270 depositions and production of nearly two million documents in complex, nationwide antitrust claim).

In all events, CDK's claim of "burden" comes far too late in the day. As explained above, the bedrock of the parties' negotiations over search terms and custodians has been an understanding that the parties would run all agreed-upon search terms against the agreed-upon custodians. Up until a few days ago, CDK never questioned that fundamental premise. It is fundamentally unfair for CDK unilaterally to revoke its assent to these terms after inducing MDL Plaintiffs to rely on them to their detriment.

## CONCLUSION

The Court should grant MDL Plaintiffs' motion to compel.

Dated: August 6, 2018       Respectfully submitted,

*/s/ Peggy J. Wedgworth*       */s/ Derek T. Ho*
Peggy J. Wedgworth        Derek T. Ho
**MILBERG TADLER PHILLIPS**   **KELLOGG, HANSEN, TODD,**
**GROSSMAN LLP**       **FIGEL & FREDERICK, P.L.L.C.**
One Pennsylvania Plaza, 19th Floor  1615 M Street, NW, Suite 400
New York, NY 10119      Washington, D.C. 20036
(212) 594-5300        (202) 326-7932
pwedgworth@milberg.com    dho@kellogghansen.com

*MDL Co-Lead Counsel*

## **CERTIFICATE OF SERVICE**

I, Derek T. Ho, an attorney, hereby certify that on August 6, 2018, I caused a true and correct copy of the foregoing **MDL PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR OMNIBUS MOTION TO COMPEL** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by email to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/ Derek T. Ho*
Derek T. Ho
**KELLOGG, HANSEN, TODD,**
 **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com

39