# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: DEALER MANAGEMENT | ) | |
| SYSTEMS ANTITRUST LITIGATION | ) | |
| _____ ) | | Case No. 18 CV 864 |
| | ) | |
| This Document Applies to: | ) | Hon. Amy J. St. Eve |
| | ) | |
| *Authenticom, Inc. v. CDK Global, LLC* | ) | |
| Case No. 18 CV 868 | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Plaintiff Authenticom, Inc., a data-integration firm, sued Defendants CDK Global, LLC and The Reynolds and Reynolds Company, the premier purveyors of dealer management systems, for violating Sections 1 and 2 of the Sherman Act and committing tortious interference. Both Defendants filed respective motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (R. 53, R. 56.) For the reasons explained below, the Court grants in part and denies in part Defendants' motions.

### PROCEDURAL HISTORY

Authenticom filed this lawsuit on May 1, 2017, in the Western District of Wisconsin. With its Complaint, Authenticom filed an emergency motion for a preliminary injunction. The motion sought to enjoin Defendants' allegedly anticompetitive practices which, as explained below, allegedly prevented Authenticom from accessing Defendants' respective dealer management systems ("DMS"), a necessary part of Authenticom's data-integration business. Authenticom claimed that those practices effectively excluded it from the market and, as a result, were "on the verge of putting [it] out of business." (Case No. 18-cv-868, R. 5.) Over the next

three months, the parties submitted voluminous exhibits and declarations, and the district court held a two-and-a-half-day hearing in early July 2017.

On July 14, 2017, the district court granted Authenticom's motion for a preliminary injunction. It ruled that Authenticom had demonstrated a "moderate" likelihood of success on its Section 1 claims (it did not address the Section 2 claims), and that Authenticom had no adequate remedy at law as evidence suggested Defendants' conduct could force it to shutter its business. *See Authenticom, Inc. v. CDK Glob., LLC*, No. 17-CV-318-JDP, 2017 WL 3017048 (W.D. Wis. July 14, 2017), *vacated*, 874 F.3d 1019 (7th Cir. 2017). Weighing the harms, the court granted Authenticom's motion, and after some further briefing, entered a preliminary injunction against each Defendant on July 28, 2017. *See also Authenticom, Inc. v. CDK Glob., LLC*, No. 17-CV-318-JDP, 2017 WL 3206943 (W.D. Wis. July 28, 2017), *vacated,* 874 F.3d 1019 (7th Cir. 2017). Those preliminary injunctions forced, among other things, Defendants to allow Authenticom access to their DMSs.

Defendants appealed, and the Seventh Circuit vacated the preliminary injunctions and remanded the case. The Seventh Circuit held that whatever the merits of Authenticom's Section 1 claims, the injunctions' forced sharing of Defendants' DMSs ran afoul of the bedrock principle that firms generally have no duty to deal with competitors. *Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019, 1021 (7th Cir. 2017) (citing *Verizon Commc'ns Inc. v. Law Offices of Curtis v. Trinko*, 540 U.S. 398 (2004), *Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438 (2009)). It reasoned that "[t]he proper remedy for a section 1 violation based on an agreement to restrain trade is to set the offending agreement aside," not force the alleged violators to deal with the complainant. *Id.* at 1026. The Seventh Circuit, however, "urge[d]" the district court to do what it could to expedite resolution of the matter based on Authenticom's

representations of financial distress.  *Id.* at 1021.

By the time the Seventh Circuit issued its decision, software vendors and automobile dealers had filed a handful of potential tag-along lawsuits across the country against Defendants. The day after the Seventh Circuit's decision, Defendants filed a motion for transfer and consolidation of those cases (and ones later filed) with the Judicial Panel on Multidistrict Litigation ("JPML").  The JPML granted that motion and transferred the cases to this Court for consolidated pretrial proceedings.  (R. 1.)  Meanwhile, the district court presiding over *Authenticom* had granted Defendants' motion for a partial stay of discovery given the pending MDL.

In the midst of the preliminary-injunction and appellate proceedings, the parties briefed Defendants' Rule 12(b)(6) motions to dismiss.  Those motions are now before the Court.

## LEGAL STANDARDS

### I.     Rule 12(b)(6) and the Plausibility Standard

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted."  *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014); *see also Hill v. Serv. Emp. Int'l Union*, 850 F.3d 861, 863 (7th Cir. 2017).  Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To survive a Rule 12(b)(6) challenge, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007) ).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013). Courts, of course, accept all well-pleaded facts as true and draw reasonable inferences in the plaintiff's favor. *See, e.g.*, *Forgue v. City of Chicago*, 873 F.3d 962, 966 (7th Cir. 2017). After "excising the allegations not entitled to the presumption" of truth, courts "determine whether the remaining factual allegations plausibly suggest an entitlement to relief." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

## II.     The Materials Upon Which the Court Relies on a Rule 12(b)(6) Motion

In addition to well-pleaded facts, "a court ruling on a motion to dismiss can rely on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Olson v. Bemis Co.*, 800 F.3d 296, 305 (7th Cir. 2015); *see also, e.g.*, *Geinosky v. City of Chicago,* 675 F.3d 743, 745 n. 1 (7th Cir. 2012). Further, although a "complaint may not be amended by the briefs in opposition to a motion to dismiss," *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 348 (7th Cir. 2012), courts may "consider additional facts set forth in" a brief opposing dismissal "so long as those facts are consistent with the pleadings," *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013) (quoting *Geinosky*, 675 F.3d at 745 n. 1); *see also, e.g.*, *Jones v. Sparta Cmty. Hosp.*, 716 F. App'x 547 (7th Cir. 2018) ("because [plaintiff-appellant] now elaborates on the factual allegations in his amended complaint, and his elaborations are consistent with the pleadings, we consider that information in our review"); *Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017) ("Materials or elaborations in appellants' brief opposing dismissal may be considered, so long as those materials or elaborations are consistent with the pleadings."); *Martin v. Cook Cnty., Ill.*, No. 17 C 2330, 2018 WL 1942654, at *1 (N.D. Ill. Apr. 25, 2018) (a court may consider "additional facts

4

set forth in [plaintiff's] brief opposing dismissal, so long as those additional facts are consistent with the pleadings."). "To the extent that an exhibit attached to or referenced by the complaint contradicts the complaint's allegations, the exhibit takes precedence." *Phillips*, 714 F.3d at 1020.

## BACKGROUND

### I. DMSs, Data Integration, and Auto Dealers

This case concerns the data services and businesses upon which auto dealers rely in conducting their operations.[1] Two purported markets in that space are of principal relevance here: the DMS market and the data-integration market.

### A. The DMS Market

DMS software is the "central nervous system" of a dealership. (Compl. ¶ 28.) It is essentially enterprise software designed specifically for dealers, and a DMS manages "virtually every aspect of a dealer's business." (*Id.*) Specifically, DMS software handles information regarding sales, financing, part and vehicle inventory, repair and service, accounting, payroll, human resources, marketing, and still more. In addition to some management functionalities, a DMS is a database in which dealers effectively house this critical information and data. A dealer has only one DMS provider at a time; it would be "functionally impossible" for a dealer to try to use more than one. A DMS provider licenses its software to a dealer through a written contract

---

[1] In its opposition, Authenticom cites many facts adduced by the parties at the preliminary-injunction hearing. The Court generally finds that those facts do not add anything material to the Complaint, but credits them *only* to the extent that they are relevant and actually consistent with the Complaint's allegations. *See Phillips*, 714 F.3d at 1020; *see also, e.g.*, *Sorrentino v. Godinez*, No. 12 C 6757, 2013 WL 5497244, at *4 (N.D. Ill. Oct. 3, 2013), *aff'd as modified*, 777 F.3d 410 (7th Cir. 2015) (not crediting "new facts" that were inconsistent with pleadings); *Jones v. Chicago Bd. of Educ.*, No. 11 C 8326, 2013 WL 1499001, at *2 (N.D. Ill. Apr. 10, 2013) (not crediting "new allegations" that formed new bases for proposed relief). The Court also considers the CDK-Reynolds agreements at issue, as they are central to the Complaint. *See, e.g.*, *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012).

generally lasting between five to seven years.  The Complaint defines the DMS market as providers that sell DMS software to dealers in the United States.  (*Id.* ¶ 32.)

CDK and Reynolds "dominate" the DMS market.  (*Id.* ¶ 33.)  Viewed by dealer-customers, they together control approximately 75 percent of the market.  CDK has approximately 45 percent of it, and Reynolds has approximately 30 percent.  Viewed by the number of vehicles sold, their collective control increases to approximately 90 percent.

As alleged duopolists, CDK and Reynolds enjoy a profitable business.  They each, for example, earn approximately 40 percent profit margin.  Their customers, the dealers, are also unable to freely switch between DMS providers.  In addition to the contract lengths, "it is enormously difficult and disruptive for a dealer to switch DMS" given the costs of transferring data, retraining employees, and reconfiguring systems.  (*Id.* ¶ 40.)  Adding to those "logistical nightmares," the Complaint claims that CDK and Reynolds "punish" dealers that try to change DMS providers through lawsuits and by restricting third-party access to the dealers' DMS-stored data.  In part for those reasons, the average DMS-dealer relationship lasts more than 20 years. (*Id.* ¶ 44.)

### B.    The Data-Integration Market

Critical as it is, a dealer's DMS is not the only data service upon which it relies.  Many dealers use third-party application providers—or vendors—for service and management applications.  These applications help a dealership, for example, track vehicle inventory, customer information, service and repair appointments, and recalls.  Most dealerships have ten or more vendors.

To make their applications, vendors require access to dealerships' data—which is stored on DMSs.  A vendor that provides an application organizing vehicle registration and titling must

be able to obtain purchaser, vehicle, and financing information from a dealer's DMS. Some vendors, further, must be able to input data into a DMS. For example, an application that handles customer information must be able to "push" sales information into the DMS when a dealership sells a car from the lot. The Complaint does not estimate how many vendors exist, but it asserts that both CDK and Reynolds offer application services. CDK and Reynolds both, for example, offer relationship-management applications, and they jointly operate a provider of electronic-vehicle registration and titling.

Vendors, however, do not access the DMSs directly. Instead, data integrators—like Authenticom—provide this service to vendors. Data integrators "specialize in extracting dealers' data from DMS databases, aggregating that data and putting it into a standard format, and then delivering to vendors the specific data required for their applications." (*Id.* ¶ 54.) To pull the needed data from the DMS, data integrators generally receive authorization from dealerships. In many cases, including Authenticom's, dealers set up separate login credentials for the integrators so that they can access the DMSs. Once in, data integrators "data scrape" or "screen scrape" the DMS, an automatic process that pulls relevant data. Although dealers generally choose whether to authorize integrators' access to the DMSs, they do not directly pay integrators. Vendors, as the customers receiving the integrators' data output, make the payments.

Dealers "own" their data in the DMSs. The Complaint quotes a Reynolds spokesperson as having stated, "The data belongs to the dealers. We all agree on that." (*Id.* ¶ 65.) CDK, likewise, has stated publicly that it "has always understood that dealerships own their data and enjoy having choices on how best to share and utilize the data with others." (*Id.* ¶ 66.) Both CDK's and Reynolds's websites make similar claims. Similarly, the Complaint cites a number of statements by CDK representatives (though not Reynolds representatives) making clear that

dealers can permit third-party access to their DMS-stored data, at least before 2015. To take just one example, Matt Parsons, CDK's vice president of sales, stated in 2007, "We're not going to limit the ability of a dealer to give an ID to someone else to, in essence, dial into their system. That is the dealer's right. We have no right to tell them they can't do that." (*Id.* ¶ 70.)

The Complaint defines the data-integration market as comprised of providers of integration services in the United States. According to the Complaint, there used to be "numerous" data integrators. Today, only CDK, Reynolds, and Authenticom remain.

Steve Cottrell founded Authenticom in 2002. Authenticom's feature product is DealerVault, which gives dealerships "state-of-the-art control over how their data is pulled and shared." (*Id.* ¶ 78.) In addition to pulling data from DMSs, Authenticom has begun, in limited fashion, "pushing" data as well, which benefits vendors and dealers in that it expands the services provided. Before accessing a dealer's DMS, Authenticom secures the dealer's—though not the DMS provider's—express authorization. The Complaint also highlights that Authenticom has never incurred a data breach and that its tools and practices are secure. As to pricing, Authenticom generally charges approximately $25 for a first data set, and $50 for two or more. The average price Authenticom charges a vendor is between $30 and 40 per month for one dealership.

CDK and Reynolds also offer integration services. CDK, for its part, owns the two largest data integrators in the market—Digital Motorworks and IntegraLink. It also offers a product that permits direct access to CDK DMSs, called the 3PA program. Digital Motorworks and IntegraLink function like Authenticom; they obtain login credentials for a DMS from the dealer, then extract and format the data. Indeed, Digital Motorworks and IntegraLink formerly pulled data from Reynolds DMS for vendors. Reynolds did not begin to block CDK "and

others" from doing so until 2009. (*See id.* ¶ 91.) After Reynolds began to block Digital Motorworks and IntegraLink—that is, prevent them from accessing Reynolds DMSs—CDK devised the "SMART-R" solution, which permitted its integrators to continue to access Reynolds DMSs. As a result, CDK (through Digital Motorworks and IntegraLink) continued to access Reynolds DMSs on behalf of its vendor clients, again at least until 2015.

Unlike Digital Motorworks and IntegraLink, 3PA, also known as "Third Party Access," allows access to CDK DMSs only. CDK's 3PA formerly offered three "levels": one supplied vendors with login credentials for the dealership's system, another allowed third parties "subscriber access" that the dealer controlled, and a third permitted real-time access to CDK DMSs. That, too, changed after the alleged anticompetitive agreements of 2015, when CDK revised 3PA to prohibit dealer control over third-party access to CDK DMSs. CDK represented that the change was the result of its "SecurityFirst" initiative, which ended up increasing charges to vendors to approximately $250 to $300 per connection—almost triple what it charged before the 2015 revision, and far more than the $25 to $50 per connection that Authenticom charges. Today, CDK has taken the position that 3PA is the "only approved method for accessing" CDK DMSs. (*Id.* ¶ 101.) CDK considers all other access "unauthorized," and it forbids vendors from obtaining data on a CDK DMS from any integrator other than 3PA.

Reynolds does not offer integration services to access other providers' DMS software, but it does offer the Reynolds Certified Interface Program ("RCI"). RCI is an "equivalent" to CDK's 3PA, and it is the only Reynolds-authorized method by which vendors can access Reynolds DMSs. (*Id.* ¶¶ 102–103.) Like with CDK and 3PA, Reynolds contractually restricts both dealers and vendors from using integrators other than RCI to access Reynolds DMSs. Reynolds's RCI pricing is not publicly available, but the Complaint represents that it is "even

steeper" than CDK's 3PA pricing. (*Id.* ¶ 104.)

The Complaint describes other integrators that, though once successful, have been forced

out of business as a result of Reynolds's prohibition and CDK's more-recent prohibition on

third-party access to their respective DMSs. Those prohibitions, while having the purported

effect of excluding data integrators from the data-integration market generally, also allow CDK

and Reynolds (through 3PA and RCI, respectively) to dominate their single-brand aftermarkets.

The Complaint alleges that such aftermarkets are cognizable in this case, because when dealers

purchase a DMS, they are "locked in" to that purchase through high switching and information

costs. (*Id.* ¶ 112.) A vendor who wants to work with both CDK and Reynolds dealers must

purchase both 3PA and RCI services. In turn, Defendants can, and do, charge supracompetitive

pricing for their respective integration services.

### C. CDK and Reynolds Pre-2015 Treatment of Data Integrators and Third-Party Access

Initially, and for over a decade, all DMS providers—CDK and Reynolds included—

permitted dealers the right to authorize third-party access to the DMSs. That industry-wide

agreement began to erode in 2007, when Reynolds announced that it would start blocking data

integrators from Reynolds DMSs. Since then, Reynolds has considered third-party, unauthorized

scraping of its DMSs as "hostile access." As a result of this policy change, Reynolds began

disabling Authenticom's credentials in 2009 by imposing "challenge questions" and "captcha"

(entry requests to enter random or blurred text), which identify non-human users. In 2013,

Reynolds began disabling Authenticom's credentials en masse.

CDK, on the other hand, countenanced third-party access for far longer. Indeed, CDK

touted its open architecture. Its CEO, for example, publicly stated, "We're not going to prohibit"

integrators' access "or get in the way of that. . . I think we've stated pretty emphatically, we

really believe the dealer owns the data. I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it." (*Id.* ¶ 6.) In 2015, however, CDK came to echo Reynolds's disapproval of third-party access.

## II.     CDK and Reynolds's Alleged Conspiracies

The Complaint alleges that in February 2015, CDK and Reynolds "entered into an agreement to eliminate competition in the Dealer Data-integration market and the single-brand after markets." (*Id.* ¶ 117.) Essentially, these agreements took two forms—written agreements, signed in early 2015, and a general understanding. The alleged purpose of Defendants' agreements was twofold: first, to protect vendors from siphoning any part of their DMS market duopoly by offering services that could compete with DMS software, and second, to protect CDK and Reynold's data-integration businesses and aftermarket single-brand monopolies.

### A.     The February 2015 Agreements

Effective February 18, 2015, CDK and Reynolds entered into a Data Exchange Agreement (the "DEA").[2] The DEA purportedly served as a wind-down arrangement, in which CDK agreed to eventually restrict (during a term that could last up to five years) its integrators—Digital Motorworks and IntegraLink—from accessing Reynolds DMSs. (*See* R. 54, Ex. 1 § 4.0.) As a part of that wind-down arrangement, CDK agreed to "cooperate" in efforts to have Digital Motorworks's and IntegraLink's vendor-clients join RCI. (*Id.* § 4.1.) The wind-down arrangement also featured Section 4.5, titled a "Prohibition on Knowledge Transfer and DMS Access," which stated:

> Each of Reynolds and CDK further covenants and agrees not to sell, transfer, or assign to any affiliate or third party any technology, business process, or other such knowledge regarding integration with the other party's DMS or take any other step

---

[2] The Complaint misattributes several quotes to and provisions of the DEA. The Court reviews and credits what the agreement actually says, *Phillips*, 714 F.3d at 1020, as do both parties in their briefs.

to assist any person that it reasonably believes to have plans to access or integrate with the other party's DMS without the other party's written consent. For the avoidance of doubt, this Section 4.5 is not intended as a "covenant not to compete," but rather as a contractual restriction of access and attempted access intended to protect the operational data security integrity of Reynolds DMS and CDK DMS and protection of intellectual property.

(*Id.* § 4.5.) According to Authenticom, this arrangement constituted an agreement to divide the market: Reynolds would not access, or aid the access of, CDK DMSs without CDK's permission,[3] and CDK would not access, or aid the access of, Reynolds DMSs without Reynolds's permission. Section 4.5's terms do not expire. (*Id*; *id.* § 6.1.)

The parties also entered into two, contemporaneously executed, reciprocal agreements. In the "3PA Agreement," Reynolds's vendor applications received five years' of free data integration using 3PA to access CDK DMSs. (*See* 54, Ex. 2; R. 54 at 8; 56 at 11.) In the "Reynolds Interface Agreement" (collectively, with the DEA and 3PA Agreement, the "2015 Agreements"), CDK agreed to enlist seven of its vendor applications in the RCI program to access Reynolds DMSs. (*See* 54, Ex. 3; R. 54 at 8; R. 56 at 11.) By way of both agreements, Defendants, in their capacity as application providers (though only for seven of CDK's applications[4]), agreed not to use other integrators when extracting data from the other's DMSs. Specifically, Reynolds agreed that it would not "otherwise access, retrieve, license, or otherwise transfer any data from or to a CDK System (including, without limitation, pursuant to any 'hostile interface') for itself or any other entity," nor contract with a third-party to access CDK DMSs. (R. 54, Ex. 2 § 1(e).) CDK likewise agreed to a provision titled "Non-Approved Access," which prohibited it from obtaining "[a]ny direct or indirect access of the Reynolds

---

[3] There are no allegations (or facts cited) that such access was possible at the time, however, as Reynolds was not engaged in integration of other providers' DMSs.

[4] CDK makes much of this point (*e.g.*, R. 54 at 8), but does not assert, nor provide judicially noticeable facts showing, what portion of CDK's application business these seven applications constituted.

System for the benefit" of the applications "by CDK or an agent acting on behalf of CDK other than with Reynolds' prior written consent."  (R. 54, Ex. 3 § 1.8.)

    **B.**      **The General Agreement to Oust Authenticom**

    In addition to a market-division agreement, the Complaint alleges that Defendants reached a broader agreement to expel Authenticom and other third parties from the data-integration market.  Defendants have allegedly conveyed this agreement to Authenticom.  On April 3, 2016, Dan McCray, CDK's Vice President of Product Management, approached Mr. Cottrell at an industry convention.  Mr. McCray led Mr. Cottrell off the convention floor and to a secluded area.  There, he told Mr. Cottrell that CDK and Reynolds had agreed to "lock you and the other third parties out."  (Compl. ¶ 180.)  Regarding an offer CDK had made to acquire Authenticom's business for approximately $15 million, Mr. McCray asserted that the offer was relatively low because Authenticom's "book of Reynolds business is worthless to us because of the agreement between CDK and Reynolds."  (*Id.*)  Mr. McCray then threatened: "I wanted to look you in the eye and let you know man to man, I have been mandated by our new CEO to seek you out and destroy your business on our systems."  (*Id.*)  Regarding CDK-dealer contracts prohibiting third-party access, Mr. McCray stated further, "we will enforce our contract with the dealers and sue them if needed to keep you out of our systems."  He concluded, "For god's sake . . . you have built a great little business, get something for it before it is destroyed otherwise I will f***ing destroy it."  (*Id.*)  Steve French, CDK's Senior Director of Client and Data Services and former Reynolds employee, delivered a similar (albeit more tempered) explanation of the supposed CDK-Reynolds agreement to a vendor.  In attempting to move a vendor over to the 3PA program, Mr. French stated that he was working with Reynolds to lock out third-party integrators like Authenticom.  (*Id.* ¶ 183.)

Reynolds's executives have delivered the same message to Authenticom. In May 2015, Robert Schaefer, Reynolds's Director of Data Services and the person in charge of the RCI program, told Mr. Cottrell during a phone conversation that CDK and Reynolds had an agreement to support each other's 3PA and RCI programs, and therefore block integration competitors like Authenticom. Mr. Schaefer shared with Mr. Cottrell that Bob Brockman, Reynolds's Owner, Chairman, and CEO, was "adamant" about blocking independent data integrators. (*Id.* ¶ 181.)

The Complaint cites examples of Defendants carrying out these shared threats. Reynolds unsuccessfully proposed a wind-down agreement with Authenticom, and CDK began blocking Authenticom from their DMSs. In August 2016, for example, CDK disabled Authenticom's credentials at thousands of dealerships. After doing so, CDK sent a letter to all dealers whose vendors use Authenticom. The message said that the dealers must join the 3PA program to avoid business "disruption." (*Id.* ¶ 201.) Reynolds has delivered similar messages. (*Id.* ¶ 202.)

## III.    CDK and Reynolds's Alleged Vertical Restraints

In addition to those agreements between competitors, the Complaint claims that Defendants have entered into anticompetitive agreements with their vendors and dealers.[5]

### A.    Vendor Agreements

CDK requires that any vendor using 3PA for any of its dealer-customers on a CDK DMS must agree to use 3PA exclusively for all of its of its dealer-customers on CDK DMSs. The penalty for failing to comply with this exclusive arrangement is termination of the agreement

---

[5] The Complaint is unclear as to whether these agreements were horizontal as well as vertical; that is, it is unclear whether Defendants allegedly agreed with one another to have exclusive-dealing and tying arrangements with their respective vendors and dealers. Authenticom's opposition brief clarifies that it pursues these theories as vertical in nature. (*See* R. 59 at 14–15, 26–34.)

(and thus access to dealer data stored on CDK DMSs). The terms of these exclusivity clauses purportedly "last forever," according to the Complaint. Reynolds has similar terms in its vendor contracts. Likewise, in its RCI contracts, Reynolds requires that the vendor agree not to use any "Non-Approved Access" to Reynolds DMSs. These terms last as long as the agreement is in effect, which generally constitutes three years plus any one-year renewals.

CDK and Reynolds also both include "price secrecy" provisions in their vendor contracts. These provisions prevent vendors from sharing with dealers information about how much Defendants charge for data access. The CDK 3PA contract, for example, states that vendors "shall not include any interface fee, DMS access fee or any other similar fee related to the use of the CDK Interface System in any of its invoices to its customers or otherwise include any direct or indirect indication to its customer (in its invoices or otherwise) of the fees charged by CDK hereunder." (*Id.* ¶ 167.) Reynolds's RCI contracts contain a similar provision binding the vendors from sharing pricing information with their customers, the dealers.

### B. Dealer Agreements

As for the contracts with dealers, both Defendants purportedly require that dealers agree that they will not provide access to the DMS to anyone other than the DMS provider for data-integration purposes. CDK's standard DMS contract, for example, contains a clause stating: "Client is not authorized to cause or permit any third party software to access the CDK Dealer Management System," and "Client shall not allow access to [the CDK DMS] by any third parties except parties otherwise permitted," which includes the dealer's "employees and agents." (*Id.* ¶ 151.) According to the Complaint, CDK used to take the position that its contracts permitted integrators to access CDK DMSs—as demonstrated by its self-touted open architecture—but it now takes the opposite stance. CDK's contract provisions last for the contract's five-year

duration.  Reynolds has similar provisions in its standard DMS contracts.  Those contracts bar

dealers from "provid[ing] access to the [Reynolds DMS] . . . to any third party."  (*Id.* ¶ 152.)

Reynolds's restriction clauses, too, last for the contract's duration, which is generally five to

seven years.

 CDK and Reynolds, respectively, enforce these contract provisions by disabling third-

party user credentials (like those upon which Authenticom relies) to access their DMSs.  When

one dealer complained to CDK, CDK cited in response the authorization provisions of its

standard contract.  Reynolds, further, has filed lawsuits against data integrators for tortiously

interfering with their dealer contracts by accessing (presumably with dealer authorization)

Reynolds DMSs.

## IV. Alleged Competitive Harm

 The Complaint claims that Defendants' conduct has harmed the markets in essentially

two ways: one, it has allowed Defendants to increase the prices they charge for their integration

services, and two, it has reduced consumer choice and output.

### A. Price Increase

 As noted, Authenticom generally charges $25 for one data feed and $50 for two to seven.

As such, Authenticom customers generally pay between $30 to $40 dollars for services per

month.  Authenticom also charges $75 dollars for "bi-directional access" to dealer data.  These

prices are comparable to those charged by most other data integrators.  One, for example,

charges $40 per connection and $70 per connection for bi-directional access.  CDK and

Reynolds, on the other hand, charge much higher prices for integration.  One vendor used to pay

an integrator a rate of $45 to $55 per month; it now pays Reynolds and CDK between $300 to

$866 per month.  CDK used to charge $70 per connection, for example, but since 2015, now

charges upwards of $300.  Likewise, post-2015, Reynolds continues to raise prices for

integration services.  Defendants, moreover, charge substantial upfront fees.  It costs "at least"

$30,000 to join the 3PA and RCI programs, and the setup fees for such services are

approximately $300.

### B.    Reduced Consumer Choice and Output

Defendants' conduct has also reduced output in the data-integration market and

downstream markets, the Complaint claims.  Dealerships and vendors prefer Authenticom

because of its higher-quality services and better prices, but Defendants' contracts with dealers

and vendors—and the general exclusion of Authenticom and other integrators from the market—

effectively require both to use (indirectly and directly) Defendants' integration products.

Defendants' higher prices also hinder the third-party application market.  One vendor, for

example, closed one of its application products because of Reynolds's high integration fees.

Another expressed concerns about going out of business because it could not afford Defendants'

integration costs.

### ANALYSIS[6]

Authenticom brings five counts—four based on alleged violations of the Sherman Act,

one based on state tort law.  Defendants have moved to dismiss all counts.  The Court addresses

them in turn.

### I.    Antitrust Claims (Counts One Through Four)

Counts One through Four of the Complaint entail claims under both Sections 1 and 2 of

---

[6] The Court is presently ruling only on the motions to dismiss the as-filed, as-briefed *Authenticom* Complaint.  To the extent later-filed complaints entail varying allegations and theories, later decisions will account for them.  Further, the Court notes that the preliminary injunction opinion does not dictate the conclusions of this motion to dismiss ruling, as the *Authenticom* district court indicated.  (*See* Case No. 18-cv-868, R. 209.)

the Sherman Act, based on several anticompetition theories.  Defendants challenge each of those claims as insufficiently pleaded, but also argue that Authenticom's claims fail for threshold reasons concerning antitrust defenses and injury.

### A.    The Computer Fraud and Abuse Act and Other Cyber-Security Laws

Defendants argue that Authenticom's Sherman Act claims fail at the start because they seek to vindicate an illegal trade through an antitrust lawsuit.  Defendants contend, specifically, that the Complaint affirmatively pleads Authenticom's violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.*, the Wisconsin Cyber Crimes Act ("WCCA"), Wis. Stat. § 943.70, and other cyber-security laws.  The CFAA, for example, imposes criminal liability on anyone who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer."  18 U.S.C. § 1030(a)(2)(c).  Defendants argue that the Complaint makes clear that Authenticom did just that by accessing DMSs (protected computers) and pulling data without authorization (from Defendants).  Having admitted as much, Defendants submit, Authenticom cannot now seek refuge under the Sherman Act.  The Court disagrees.

Courts have generally held that a plaintiff's wrongdoing is not a defense to an antitrust suit.  The Supreme Court decided in *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 140 (1968) (plurality), that the in pari delicto doctrine—a common-law defense that curbs or bars recovery where the claimant is also at fault for her injury—"is not to be recognized as a defense to an antitrust action."  As the Seventh Circuit later put it, "[p]roof of the plaintiff's unrelated unlawful conduct is not a valid in pari delicto defense to an antitrust charge."  *Pinto Trucking Serv., Inc. v. Motor Dispatch, Inc.*, 649 F.2d 530, 534 n. 5 (7th Cir. 1981); *see also Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 830 F.2d 716, 720 (7th Cir. 1987) ("Strictly

18

speaking, the common-law form of the [in pari delicto] defense is not available to defendants in antitrust lawsuits."); *see also* Phillip E. Areeda, Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 361 (3rd and 4th eds. 2010– 2017). *Memorex Corp. v. Int'l Bus. Machs. Corp.*, 555 F.2d 1379 (9th Cir. 1977), is also illustrative. In that case, the Ninth Circuit held that a plaintiff's alleged theft of a defendant's trade secrets did not prevent that plaintiff from bringing an antitrust suit. The plaintiff, Memorex Corporation, had sued the defendant, IBM, for violating the antitrust laws. *Memorex*, 555 F.2d at 1380. IBM responded by asserting that the only reason Memorex even existed in the relevant market was because it had stolen IBM's trade secrets. *Id.* The district court struck that defense, and the Ninth Circuit affirmed. It held: "A wrongful act committed against one who violates the antitrust laws must not become a shield in the violator's hands against operation of the antitrust laws. This is particularly true when the defendant has other remedies available to him." *Id.* at 1382.

Under that law, Authenticom's purported wrongdoing is of no matter at this stage. Defendants may have claims against Authenticom under the CFAA and related state laws— indeed, *Authenticom*'s docket and defense counsel's representations in court suggest that they may bring such claims—but those claims do not foreclose Authenticom's Sherman Act claims. *See id.* Both things can be true: Defendants may be able to state valid cyber-security claims against Authenticom *and* Authenticom may be able to state valid antitrust claims against Defendants.

Defendants, however, contend that Authenticom's purported wrongdoing does not provide a defense for Defendants inasmuch as it deprives Authenticom of a claim, and more specifically, of antitrust injury. That overstates the law. Defendants rely heavily on, for

example, *Maltz v. Sax*, 134 F.2d 2, 5 (7th Cir. 1943). In that case, Seventh Circuit held that the manufacturer of gambling "punchboards" could not bring an antitrust suit because gambling was illegal under federal law. *Maltz*, 134 F.2d at 5. As the court summarized: "He had no legal rights to protect. Therefore defendants could not invade them." *Id.* Likewise, in *In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006), the Eighth Circuit held that consumers could not bring an antitrust claim based on drug manufacturers' restrictions on importing prescription drugs from Canada because doing so would violate federal law. "The absence of competition from Canadian sources in the domestic prescription drug market . . . is caused by the federal statutory and regulatory scheme adopted by the United States government, not by the conduct of the defendants," the court reasoned in holding that consumers lacked antitrust injury. *Canadian Imp.*, 470 F.3d at 791. Defendants' other cases stand for the same proposition—that a plaintiff whose desired trade is illegal independent of the defendants' complained-of conduct lacks antitrust injury. *See Bubis v. Blanton*, 885 F.2d 317, 320 (6th Cir. 1989) (plaintiff lacked standing to challenge alleged collusion in denial of a liquor license because the plaintiff's "interest in [the store] at the time of the attempted transfer of the liquor license was unlawful"); *Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, No. C 08-4548 MHP, 2010 WL 145098, at *6 (N.D. Cal. Jan. 8, 2010) (plaintiff lacked antitrust injury because its product manufacturing had "almost certainly" violated the law); *Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*, 309 F. Supp. 2d 1156, 1170 (N.D. Cal. 2004) (plaintiff lacked antitrust injury because its conduct was "unlawful by its own terms"); *Pearl Music Co. v. Recording Indus. Ass'n of Am., Inc.*, 460 F. Supp. 1060, 1068 (C.D. Cal. 1978) (because plaintiff's business was "totally illegal" in 49 states, it lacked "standing or capacity" to bring antitrust suit).

     In this case, unlike in those cases, Authenticom's as-alleged practices are not illegal

independent of Defendants' challenged conduct. *Accord Linea Internacional de Credito, S.A. v. W. Union Fin. Servs., Inc.*, No. 03 C 6736, 2004 WL 1336302, at *3 (N.D. Ill. June 14, 2004) (distinguishing *Maltz*, stating "[i]t is not clear from the complaint that plaintiff's business is inseparably connected with gambling or that its services could only be used in furtherance of gambling"); *Monarch Marking Sys., Inc. v. Duncan Parking Meter Maint. Co.*, No. 82 C 2599, 1988 WL 23830, at *1 (N.D. Ill. Mar. 8, 1988) (granting reconsideration of dismissal of antitrust claim because there was some "*possibility*" that part of claimant's business was legal and therefore it could establish cognizable injury) (emphasis in original). The Complaint alleges that Defendants' anticompetitive conduct blocked or foreclosed Authenticom from the data-integration market. That is, the Complaint claims that Authenticom lacks authorization or access to Defendants' DMSs (which is necessary to compete in the data-integration market, given Defendants' upstream duopoly) *because of* Defendants' anticompetitive conduct—and it is that conduct which Authenticom challenges as illegal.[7]

Defendants argue that simply because user authorization—or rather the lack thereof—is what makes Authenticom's conduct a potential crime does not distinguish this from cases like *Maltz* and *Canadian Import*. They submit that many property crimes turn on owner approval. While that may be true, it is beside the point. Even assuming, without deciding, that the CFAA prohibits Authenticom from accessing DMSs without Defendants' authorization, Defendants are not free to withhold such approval pursuant to illegal arrangements. *See, e.g.*, *Primetime 24 Joint Venture v. Nat'l Broad., Co.*, 219 F.3d 92, 99, 103 (2d Cir. 2000) (although a law permitted

---

[7] None of this comes close to saying that CDK and Reynolds, respectively, have independent antitrust duties to allow Authenticom and other integrators authorization and access. Rather, the question of this case is whether Defendants' refusal to grant such authorization and access, and more specifically their attendant blocking, was the result not of a unilateral refusal to deal, but of illegal conspiracies and anticompetitive arrangements (like tying or exclusive dealing) recognized by the antitrust laws.

networks and stations to withhold their licenses, plaintiff adequately stated a Section 1 claim by alleging that they had colluded to do so); *see also Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19 (1979) ("the copyright laws confer no rights on copyright owners to fix prices among themselves or otherwise to violate the antitrust laws"); *accord Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608 n. 38 (1985) ("In considering the competitive effect of [a firm's] refusal to deal or cooperate . . . it is not irrelevant to note that similar conduct carried out by the concerted action of three independent rivals with a similar share of the market would constitute a *per se* violation of § 1 of the Sherman Act.").

In any event, Defendants also overstate the extent to which the Complaint demonstrates Authenticom's lack of "authorization." According to the Complaint, CDK had long permitted, indeed encouraged, third-party integration on its DMS. *See Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1069 (9th Cir. 2016), *cert. denied,* 138 S. Ct. 313 (2017) ("Because Power had *implied* authorization to access Facebook's computers, it did not, at first, violate the statute.") (emphasis added). In light of that well-pleaded history, the Court cannot determine as a matter of law that Authenticom lacked authorization to access CDK DMSs before 2015. Although Reynolds presents a different case, "authorization" here is "a factual matter" and "not properly before the Court based on the pleadings alone, and thus a precise delineation of whether the events in question may or may not be covered under the statute is premature." *Weingand v. Harland Fin. Sols., Inc.*, No. C-11-3109 EMC, 2012 WL 3763640, at *2 (N.D. Cal. Aug. 29, 2012). Authenticom has therefore not pleaded itself out of antitrust injury at this stage.

### B.    Authenticom's Section 1 Claims

Turning to Authenticom's Section 1 claims, the Complaint alleges both horizontal agreements (between Defendants) and vertical agreements (between each Defendant and its

dealers and vendors). Section 1 of the Sherman Act declares illegal "[e]very contract,

combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce

among the several States . . ." 15 U.S.C. § 1. To state a Section 1 claim, a plaintiff must plead

facts plausibly suggesting: (1) a contract, combination, or conspiracy (meaning, an agreement);

(2) a resulting unreasonable restraint of trade in a relevant market; and (3) an accompanying

injury. *Agnew*, 683 F.3d at 335.

Plausibly pleading the first element, an agreement, requires "enough factual matter (taken

as true) to suggest that an agreement was made"—that is, "enough fact to raise a reasonable

expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.

Plaintiffs can do this in one of two ways, by pleading either direct or circumstantial evidence of

an illegal agreement. *E.g.*, *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir.

2010). Direct evidence of an agreement "is explicit and requires no inferences to establish the

proposition or conclusion being asserted." *In re Dairy Farmers of Am., Inc., Cheese Antitrust*

*Litig.*, 60 F. Supp. 3d 914, 950 (N.D. Ill. 2014) (quoting *In re Baby Food Antitrust Litig.,* 166

F.3d 112, 118 (3d Cir. 1999)). Simply, direct evidence constitutes a "smoking gun." *Omnicare,*

*Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011); *accord In re High Fructose*

*Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002) ("an admission by the defendants

that they agreed to fix their prices is all the proof a plaintiff needs"). Circumstantial evidence, in

contrast, is facts "from which the existence of such an agreement can be inferred." *High*

*Fructose Corn Syrup*, 295 F.3d at 654. Mere allegations of "parallel conduct," without more, do

not "tend[ ] to exclude the possibility of independent action," and are therefore insufficient.

*Twombly*, 550 U.S. at 554.

The second element, an unreasonable restraint, hinges on whether the alleged violation is per se unreasonable or is, instead, subject to the rule of reason.[8]  *See In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 864 (N.D. Ill. 2010) (citing *Denny's Marina v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993)).  Per se violations—those with which courts have "considerable experience" and "inevitably result[ ] in a finding of anticompetitive effect"—are presumed to be unreasonable restraints on trade.  *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Adver. Ass'n. Inc.*, 672 F.2d 1280, 1284 (7th Cir. 1982); *see also, e.g.*, *Omnicare*, 629 F.3d at 706 (an unreasonable restrain is "conclusively presumed once the first [element] is proved" in per se cases).  Rule-of-reason violations, however, require that a plaintiff plead "anticompetitive effects," and "that the injury complained of be of a type that the antitrust laws were designed to guard against, and further that the antitrust violation be the direct cause of plaintiff's injury."  *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 556 (7th Cir. 1980); *see also Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (rule of reason ultimately requires "the factfinder [to] weigh[ ] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition"); *see also, e.g.*, *Watkins v. Smith*, No. 12 CIV. 4635 DLC, 2012 WL 5868395, at *7 (S.D.N.Y. Nov. 19, 2012) ("The rule-of-reason inquiry requires, at the motion to dismiss stage, that the plaintiff identify the relevant market affected by the challenged conduct and allege an actual adverse effect on competition in the identified market.").

Alleging the third element, antitrust injury, requires pleading an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful."  *Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830

---

[8] Neither party suggests that the quick-look analysis is applicable to any of Authenticom's claims at this stage.

F.2d 1374, 1377 (7th Cir. 1987); *accord United States ex rel. Blaum v. Triad Isotopes, Inc.*, 104 F. Supp. 3d 901, 924 (N.D. Ill. 2015).

### 1. Horizontal Conspiracy Between Defendants (Count One)

Count One of the Complaint claims a conspiracy between CDK and Reynolds, competitors in both the DMS market and the data-integration market. Two related agreements, essentially, comprise the alleged conspiracy: first, the Complaint alleges that Defendants agreed to drive Authenticom and other third-party integrators out of the data-integration market by blocking access to the dealers' DMS-stored data, and second, the Complaint claims that Defendants agreed to allocate their respective DMS single-brand aftermarkets through the 2015 Agreements.

### a. The Alleged Agreement to Block Authenticom's Access to Dealer Data

The Complaint adequately alleges an agreement to drive Authenticom out of the market. It claims that in May 2015, just three months after CDK and Reynolds executed the 2015 Agreements, a Reynolds executive referenced those agreements on a phone call with Mr. Cottrell. He told Mr. Cottrell that CDK and Reynolds had agreed to "support each other's" integration programs and "therefore block competitors" like Authenticom from "pulling dealer data." (Compl. ¶ 181.) The Reynolds executive also told Mr. Cottrell that he was "in communications" with other DMS providers to join "in the agreement to block independent data integrators," like Authenticom. (*Id.*) A CDK executive allegedly repeated that message to Mr. Cottrell a year later, in April 2016. At an industry convention that month, CDK's Vice President of Product Management told Mr. Cottrell that CDK and Reynolds had agreed to "lock you and

the other parties out." (*Id.* ¶ 180.)  In the same conversation, he then told Mr. Cottrell that he planned to "destroy" Authenticom's "great little business," according to the Complaint.[9]

These allegations straightforwardly suffice.  They are, for one, direct-evidence allegations of the agreement:  Taken as true, the fact that two of Defendants' executives admitted an agreement to block Authenticom and other integrators from accessing dealer data shows directly the existence of such an agreement.  No further inference is required.  *See, e.g.*, *Baby Food*, 166 F.3d at 118.  Indeed, such "admission[s] by [ ] employee[s] . . . of the conspirators" are textbook examples of adequate direct-evidence allegations.  *Text Messaging*, 630 F.3d at 628; *see also W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010) (defendant's alleged admission of an "agreement" to do harm to plaintiff constituted direct-evidence allegations); *cf. In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 998 (N.D. Ill. 2011) ("an admission by an insider" constitutes "direct evidence of agreement").  Even if it were otherwise, and as Defendants assert, there was some ambiguity in the admissions, they are at a minimum "highly suggestive of the existence" agreement to block Authenticom from accessing dealer data and thus out of the market.  *High Fructose Corn Syrup*, 295 F.3d at 662.

The potential impact of the 2015 Agreements, and Section 4.5 of the DEA specifically, further support the existence of the alleged agreement.  Defendants correctly point out that the 2015 Agreements do not require them to preclude third-party integration on their own DMSs. They do, however, effectively require that CDK stop hostile access of Reynolds DMSs (for a period, at least) and, more importantly, expressly prohibit Defendants from assisting in the hostile access of one another's DMSs.  Such a partial ceasefire and mutual forbearance between

---

[9] Authenticom also cites Mr. Cottrell's preliminary-injunction testimony, which is consistent with these factual allegations.

two rivals would make sense if—as the executives allegedly admitted—Defendants sought to "support" one another's integration services to the exclusion of third-party integrators from the competition. Defendants also contend that there are legitimate explanations for the 2015 Agreements, such as resolving CDK's hostile access and addressing security concerns. But at this stage, it is reasonably inferable that such agreements were a part of the broader and admitted agreement to block third-party integrators.

That broader agreement is, moreover, anticompetitive. Under established law, "joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle" merit per se treatment. *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 936 (7th Cir. 2000) (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985)); *see also Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959). In this case, the Complaint in essence claims that Defendants conspired to block integrators from accessing necessary data from the dealers—meaning, "relationships" integrators "need"—by (among other things) withholding authorization and disabling third-party credentials, so that Defendants, ultimately, could charge more for their integration services.

Defendants do not contest that an agreement to block integrators from the market is plausibly anticompetitive.[10] They do, however, argue that the Court should disregard the

---

[10] Defendants do argue that an alleged "group boycott" is a "factual mismatch" to this case because they do not deal with Authenticom directly and because both Defendants could have unilaterally blocked Authenticom based on their service contracts. As Authenticom correctly responds, the first argument misunderstands a group boycott under *Klor's*, and the second fails at this stage because it ignores an inferable reason Defendants would conspire—to prevent unhappy dealers from, for example, turning to another DMS provider, as discussed further below. None of this, however, is to say that the per se test will ultimately apply to Authenticom's Section 1 conspiracy claim. *See, e.g.*, *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012) (determining that that plaintiff had alleged "a *per se* violation of the Sherman Act for purposes of surviving a 12(b)(6) motion" but that the ultimate decision of which test applies "is more appropriate on a motion for summary judgment").

Complaint's direct-evidence (or at a minimum, highly probative) allegations of the agreement's existence. CDK, for example, contends that the alleged confessions are "nonsensical" because Reynolds had decided long before 2015 to block Authenticom's access. Accepting that argument, though, requires the Court to ignore well-pleaded allegations of fact (that the executives admitted the agreement), and then credit an inference in Defendants' favor (that the agreement did not exist because Reynolds had already engaged in integrator blocking) over a contrary one in Authenticom's favor (that Reynolds agreed, for example, to escalate or enhance its blocking, or agreed not to go after CDK for its hostile access, in exchange for CDK's commitment to begin blocking). The Court cannot do that at this stage. *Accord Forgue*, 873 F.3d at 966. CDK further submits that the executive's comment to Mr. Cottrell—that "Reynolds and CDK had agreed to 'lock [Authenticom] and the other third parties out'"—does not "tend to exclude independent conduct." (R. 54 at 14.) Again, the allegation is that Defendants admittedly "*agreed*" to block third parties.

Reynolds's similar arguments are equally misplaced. It identifies innocent explanations for and interpretations of the executives' comments, and then attempts to persuade the Court that those exculpatory explanations are "more plausible" than Authenticom's inculpatory ones. That is not the inquiry at this stage. "A court ruling on [ ] a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 267 (5th Cir. 2009) ("we are not authorized or required to determine whether the plaintiff's plausible inference . . . is equally or more plausible than other competing inferences"); *Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, No. 09C5619, 2010 WL 1979569, at *6 (N.D. Ill. May 17, 2010)

(rejecting the argument that courts should assess under *Twombly* which parties' version is the "more plausible" one); *see also Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013) ("At these early stages in the litigation, the court has no substantiated basis in the record to credit a defendant's counterallegations."). Instead, under *Twombly*, the Court abdicates probability weighing, assumes that all the well-pleaded "allegations in the complaint are true (even if doubtful in fact)," and decides whether the totality of those allegations "suggest that an agreement was made." *Twombly*, 550 U.S. at 556. Reynolds may ultimately have it right—the agreement identified by Defendants' executives may have referred to legitimate business arrangements, or it may not have even happened as alleged—but the Court cannot credit those alternatives at this stage.

Defendants also insist that the alleged confessions do not refer to a broader agreement to block integrators but only the 2015 Agreements, which are facially legitimate. That is a bad argument. For one, it requires an inference in Defendants' favor and Authenticom's disfavor. It also backfires. The executives allegedly confessed to an agreement to "block" third-party integrators; Defendants' position that the agreement referenced was in fact the 2015 Agreements suggests that Defendants (or at least their executives) thought that the 2015 Agreements aimed to "block" third-party integrators—precisely as the Complaint claims.

Defendants' other argument, that there is no plausibly pleaded agreement to block integrator access to dealer data because Defendants could have done so independently, fails for similar reasons. In making that argument, both Defendants rely on the Supreme Court's decision in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596 (1986), that a plaintiff must present evidence showing that defendants had a "rational economic motive to conspire" and evidence "that tends to exclude the possibility" of independent conduct to survive summary

judgment. Courts, however, have correctly held that the bars described in *Matsushita* are not set

at the pleading stage. *See, e.g.*, *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 425 (4th

Cir. 2015) (considering *Twombly* and *Matsushita*, and noting "courts must be careful not to

import the summary-judgment standard into the motion-to-dismiss stage"); *Evergreen*

*Partnering*, 720 F.3d at 46 (post-*Twombly* "[p]leading requirements are thus starkly

distinguished from what would be required at later litigation stages under *Matsushita*"); *Erie*

*Cty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 869 (6th Cir. 2012) ("there is no authority cited . . .

for extending the [*Matsushita*] standard to the pleading stage"); *Jung v. Ass'n of Am. Med.*

*Colleges*, 300 F. Supp. 2d 119, 159 (D.D.C. 2004) ("The Court concludes that application of

the *Matsushita* rule simply is not appropriate in the context of a motion to dismiss."); *see also In*

*re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010) ("Although *Twombly's*

articulation of the pleading standard for § 1 cases draws from summary judgment jurisprudence,

the standards applicable to Rule 12(b)(6) and Rule 56 motions remain distinct.").

Even applying *Matsushita*, however, the Complaint raises a reasonable inference of

Defendants' motive to conspire. Specifically, the Complaint alleges facts showing that many

dealers preferred open architecture; when CDK began blocking, for example, several dealers

loudly complained. In light of those claims, it is inferable that—as is true of most antitrust

conspiracies—Defendants (which together control the DMS market) desired the luxury of taking

an action profitable for them but disadvantageous to their customers (by excluding a cheaper

rival in the downstream data-integration market) without fearing that their customers would

respond by, for example, turning to another provider.[11] Making that inference, as the Court

---

[11] Indeed, consistent with the Complaint, Authenticom has asserted and submitted evidence that
Reynolds's DMS market share began to decline after it implemented closed architecture. As the Seventh

must, Defendants' argument fails. Reynolds or CDK could indeed have continued or began to block integrator access independently, like any oligopolist could, say, continue or decide to raise prices independently. But the former fact does not mean Defendants' lacked a motive to conspire to do so, like the latter fact does not mean that oligopolists lack motive to fix prices.

The Complaint plausibly pleads an anticompetitive conspiracy to block third-party integrators' access to DMSs and dealer data.[12] The Court, accordingly, denies Defendants' motions to dismiss with respect to this part of Count One.

### b. The Alleged Market-Allocation Agreement

The Complaint also claims that Defendants agreed to divide the data-integration market, in which Authenticom, CDK, and Reynolds allegedly compete for vendors' business. Authenticom bases this theory on the 2015 Agreements' terms. (R. 59 at 23.) Specifically, it alleges that the DEA plainly evidences an agreement in which CDK would forebear from providing integration services on Reynolds DMSs, in exchange for Reynolds's forbearance from providing integration services on CDK DMSs. The point of Defendants' alleged conspiracy, according to Authenticom, is to reap monopoly rents for Defendants' data-integration services. (*E.g.*, Compl. ¶¶ 217.)

Whether or not the market-division agreement is plausible, and insofar as it is distinct from the alleged agreement to block third-party integrators, Authenticom lacks the antitrust injury (if not injury-in-fact) required to challenge that agreement. It is well-established that a competitor "cannot recover for a conspiracy to impose nonprice restraints that have the effect of

---

Circuit recognized during oral argument on the preliminary injunction, such a fact makes Defendants' repeated declarations of facial "implausibility" dubious.

[12] Defendants, correctly, do not argue that Authenticom lacks antitrust injury stemming from this agreement.

either raising market price or limiting output. Such restrictions, though harmful to competition, actually *benefit* competitors by making supracompetitive pricing more attractive." *Matsushita*, 475 U.S. at 583 (emphasis in original); *see also, e.g.*, *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 778 (7th Cir. 1999) (holding that there was no injury and stating, "You *want* your competitors to charge high prices."); *O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*, 36 F.3d 565, 572 (7th Cir. 1994) ("to the extent that [claimant] was also a seller in the market, increased prices caused it no injury, let alone antitrust injury."); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1418 (7th Cir. 1989) (competitor lacked injury based on *Matsushita*'s principle). Put differently, as Professors Areeda and Hovenkamp have: "When a horizontal merger, price fixing, market division, or similar collaboration among competitors substantially reduces competition, consumers suffer while existing rivals benefit." Areeda & Hovenkamp, Antitrust Law ¶ 348b. That is the case here. As CDK puts it, the alleged market allocation Authenticom complains of "would have *helped* Authenticom" by eliminating its alleged competitors and, after they raised prices, allowing it to undercut them. (R. 54 at 11.) As such, the Complaint fails to plead plausibly injury caused by the alleged market allocation. *See, e.g.*, *GSI Tech. v. United Memories, Inc.*, No. 5:13-CV-01081-PSG, 2014 WL 1572358, at *4 (N.D. Cal. Apr. 18, 2014) ("to the extent that [a firm] claims an antitrust injury from an alleged market allocation agreement between [its competitors], [the firm] does not have standing because it is a competitor in the marketplace, rather than a consumer."); *Banxcorp v. Bankrate Inc.*, No. CIV.A. 07-3398 ES, 2012 WL 3988182, at *2 (D.N.J. Sept. 11, 2012) (same).

The Complaint alleges that it has suffered injury in that "Defendants' written market division agreement caused many vendors to leave Authenticom for Digital Motorworks (i.e., CDK) during the 'wind-down period' because those vendors knew they would not be blocked

32

[from CDK] during that period." (Compl. ¶ 232.) That injury, however, stems from the alleged agreement (discussed earlier) to block Authenticom and other third-party integrators from accessing dealer data, not from the alleged agreement to divide the market and raise prices. In other words, the Complaint alleges that Authenticom's customers headed for the exits in 2015 and 2016 because Authenticom began to lose large-scale access to dealer data, not because competing integrators had divided the market and raised prices. The Court therefore grants Defendants' motions to dismiss with respect to the Complaint's market-division claims without prejudice.

### 2. Vertical Agreements with Vendors and Dealers

Counts Two and Three also assert Section 1 violations. Count Two claims that Defendants engage in anticompetitive exclusive dealing, and Count Three claims that Defendants practice illegal tying arrangements. These claims, in essence, take issue with how Defendants have operated their DMSs, and specifically which companies they have permitted—and more importantly restricted—to use and access their DMSs. Defendants challenge both of Authenticom's vertical Section 1 theories and argue that the Complaint's allegations do not meet the legal requirements for such claims. Before addressing those arguments, the Court addresses another threshold concern: the effect of *Trinko* and *Linkline* on the Complaint's claims.

#### a. *Trinko* **and** *Linkline*

The driving animus behind many of Defendants' Section 1 arguments is that Authenticom essentially challenges Defendants' refusals to deal. The law, as Defendants note, generally permits unilateral refusals to deal by monopolists under Section 2, and so certainly permits such unilateral refusals by non-monopolists under Section 1.[13] Defendants specifically,

---

[13] Defendants' related Section 2 arguments are addressed further below.

and naturally, point to *Trinko* and *Linkline*. In *Trinko*, the Supreme Court held that a monopolist exchange carrier, Verizon, had no duty to share access to system services it owned and competitors needed to operate their business effectively. *Trinko*, 540 U.S. at 410. The Supreme Court explained that "[c]ompelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." *Id.* at 407–08. A few years later, in *Linkline*, the Court repeated the principle. It held that another telecommunications monopolist, AT&T, had no antitrust duty to deal—let alone a duty to deal on favorable terms—in selling services to its competitors in the retail market. *Linkline*, 555 U.S. at 450. The Supreme Court said, as was true in *Trinko*, a monopolist can generally wield its upstream power "to prevent rival firms from competing effectively" in a downstream market. *Id.*

In this case, Defendants submit that Authenticom's Section 1 claims are "end-run[s]" to *Trinko* and *Linkline*—brought against companies that are not even monopolists. Indeed, the Seventh Circuit, in hearing Defendants' preliminary-injunction appeal, expressed somewhat similar concerns both at oral argument and in its opinion. *See Authenticom*, 874 F.3d at 1026 ("We are dubious in the extreme that [Authenticom's claims] amount to tying, rather than simply participation at two levels of the market, as in *Linkline*.").

Defendants may ultimately have it right, but the Court cannot adjudicate that issue at this stage. *Trinko* and *Linkline* did not involve exclusive-dealing or tying claims, nor did they abrogate long-standing jurisprudence in those areas. *Accord Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (distinguishing unilateral refusals to deal from other recognized forms of anticompetitive conduct, like exclusive dealing and tying); *Z-Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.*, 331 F. Supp. 2d 513, 547 (E.D. Tex. 2004) ("The Court declines to

read *Trinko* so as to lessen antitrust liability in contexts," like tying, which were not "addressed

in that opinion").  The Complaint provides well-pleaded allegations regarding the purported

markets and, to some extent, Defendants' conduct.  Taken as true—as the Court must—those

allegations plausibly suggest at least one Section 1 violation (and a Section 2 violation, as

discussed in that section below).  Discovery may reveal otherwise, and show that Authenticom's

gripe is confined to Defendants' unilateral refusals to deal.  But at this stage, the Court's only

role is to determine whether the Complaint states a claim for the causes of actions it advances.

### b.    Exclusive Dealing (Count Two)

The Complaint claims that Defendants engaged in exclusive dealing with both dealers

and vendors via their respective contractual arrangements.  Defendants' DMS licenses require a

dealer to agree that it will not provide anyone other than Defendants access to the dealer's data

on the DMS.  Likewise, Defendants' integration-services contracts require a vendor to agree that

it will exclusively use Defendants' respective integration services (3PA and RCI) to access data

on Defendants' respective DMSs.

"An exclusive dealing contract obliges a firm to obtain its inputs from a single source."

*Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 46 (7th Cir. 1996); *see also* Areeda

& Hovenkap, ANTITRUST LAW ¶ 1800a.  "The objection to exclusive-dealing agreements is that

they deny outlets to a competitor during the term of the agreement."  *Roland Mach. Co. v.

Dresser Indus., Inc.*, 749 F.2d 380, 393 (7th Cir. 1984).  Courts, however, "'often approve'

of exclusive dealing because of its 'procompetitive benefits.'"  *Viamedia, Inc. v. Comcast Corp.*,

218 F. Supp. 3d 674, 696 (N.D. Ill. 2016) (quoting *Republic Tobacco Co. v. N. Atl. Trading Co.*,

381 F.3d 717, 736 (7th Cir. 2004)).  These benefits include "increasing allocative efficiency,

reducing adverse selection and moral hazard barriers to deals, and preventing free-riding."  *VBR*

*Tours, LLC v. Nat'l R.R. Passenger Corp.*, No. 14-CV-00804, 2015 WL 5693735, at *12 (N.D.

Ill. Sept. 28, 2015) (citing *Republic Tobacco*, 381 F.3d at 736); *see also Methodist Health Servs.*

*Corp. v. OSF Healthcare Sys.*, 859 F.3d 408, 410 (7th Cir. 2017). Because of those recognized

procompetitive effects, exclusive dealing "must be analyzed under the Rule of Reason." *Dos*

*Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346, 1352 (7th Cir. 1982) (citing

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961)).[14] Under that standard,

"[e]xclusive dealing arrangements violate antitrust laws only when they foreclose competition in

a substantial share of the line of commerce at issue." *Republic Tobacco*, 381 F.3d at 736; *cf.*

*Roland Mach.*, 749 F.2d at 394 (plaintiff "must prove that [the arrangement] is likely to keep at

least one significant competitor of the defendant from doing business in a relevant market . . .

[and] he must prove that the probable (not certain) effect of the exclusion will be to raise prices

above (and therefore reduce output below)").[15]

      Defendants' DMS licenses with dealers are not plausible exclusive dealing. The only

thing the Complaint alleges that Defendants sell to dealers through those licenses are DMSs, and

there is no allegation (or argument) that Defendants require dealers to purchase and use their

respective DMSs exclusively. There is therefore "no exclusivity." *VBR Tours*, 2015 WL

5693735, at *12; *see also Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, No.

3:11-CV-268 JD, 2013 WL 3214983, at *8 (N.D. Ind. Mar. 13, 2013) ("when a purchaser

. . . requires only a single product, it makes no sense to label as an exclusive dealing agreement

the decision to purchase that product from one supplier rather than another"). Despite

---

[14] Courts "routinely rely" on Section 3 of the Clayton Act cases in assessing exclusive dealing under
Section 1 of the Sherman Act. *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 478 n. 4 (7th Cir.
1988).

[15] Defendants do not contend that the alleged exclusive dealings do not constitute agreements, or that
injury is lacking.

Defendants raising this very point, Authenticom offers no defense of its theory. *See Cnty. of McHenry v. Ins. Co. of the West*, 438 F.3d 813, 819 (7th Cir. 2006) ("When presented with a motion to dismiss, the non-moving party must proffer some legal basis to support his cause of action."); *Fonza v. Chicago Pub. Sch. Dist. #299*, No. 17-CV-3571, 2018 WL 337811, at *6 (N.D. Ill. Jan. 9, 2018) ("it is not the court's role to make the parties' arguments for them") (citing *United States v. McLee*, 436 F.3d 751, 760 (7th Cir. 2006)).

The allegations regarding Defendants' integration-services contracts with vendors are a different story. The Complaint alleges that these contracts require a vendor that uses the 3PA or RCI programs for one dealer to use those programs to obtain data for any and all of its dealer-customers that use CDK or Reynolds DMSs, respectively. In other words, they require the vendor to obtain its integration-services exclusively from Defendants when obtaining data from their DMSs. *See Paddock*, 103 F.3d at 46.

The Complaint also has pleaded sufficient facts indicating that these exclusive-dealing contracts could foreclose a substantial portion of the data-integration market. It pleads that each Defendant accounts for at least 30 percent of the DMS market, or a collective 90 percent if judged by cars sold. CDK is right that Defendants' respective share of the *DMS* market is not the operative measure, but the Complaint further alleges that vendors rely on data integrators to access customer-dealers' data on the DMSs that Defendants' dominate. As a result, "[t]here are few, if any, [vendors] that could survive without serving CDK and Reynolds dealers." (Compl. ¶ 175). The Complaint also plausibly suggests that the enforcement of the exclusive-dealing arrangements—which again preclude vendors from working with other integrators on Defendants' DMSs—has likely forced integrators (including Authenticom to an extent) from the market, and that Defendants have been effective at hiking integration costs. *See Roland Mach.*,

749 F.2d at 394. CDK's exclusive-dealing provisions, moreover, purport to last forever, while Reynolds's last the length of the contract (three years). *Cf. Paddock*, 103 F.3d at 47. These allegations raise a reasonable inference that, if enforced, Defendants' exclusive-dealing provisions with vendors could foreclose a substantial portion of the data-integration market and reduce output. *Accord, e.g.*, *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2017 WL 6524839, at *10 (D. Kan. Dec. 21, 2017) ("recognizing that *Tampa Electric* provides a number of other factors which may be relevant to a rule of reason analysis in an exclusive dealing claim . . . [we] refuse[ ] to decide at the pleading stage that plaintiff had failed to plead adequate foreclosure levels to state an exclusive dealing claim"); *In re Ductile Iron Pipe Fitting Direct Purchaser Antitrust Litig.*, No. 12-711, 2013 WL 812143, at *19 (D.N.J. Mar. 5, 2013) ("The question of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line of commerce is a merits question not proper for the pleading stage.").

Defendants' contrary arguments are, again, ill-timed for this stage of the case. CDK primarily argues that 3PA (like, presumably, RCI) is not a data integrator that competes with Authenticom; it is instead interface software that permits vendors direct access to the DMS. The Court appreciates the distinction, but the Complaint plausibly suggests that it matters little to vendors which rely on either for the primary purpose of obtaining dealers' data. *See Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1070 (N.D. Ill. 2016) ("Courts should dismiss antitrust claims based on a market argument only when it is certain that the alleged relevant market clearly does not encompass all interchangeable substitute products"); *accord Avnet, Inc. v. Motio, Inc.*, No. 12 C 2100, 2015 WL 5307515, at *4 (N.D. Ill. Sept. 9, 2015) ("because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions

to dismiss for failure to plead a relevant product market") (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001)).

Reynolds argues that the Complaint does not allege substantial foreclosure with respect to Reynolds's conduct, as Authenticom can still work with vendors that service non-Reynolds dealers. But based on Reynolds's allegedly correlated power in the DMS market, and in light of the other foreclosure allegations discussed earlier, the Complaint raises a reasonable inference that Reynolds's exclusive dealing caused substantial foreclosure.[16] Reynolds, like CDK, also cites the procompetitive upsides of exclusive dealing. Those may exist, and they may prevail on the ultimate rule-of-reason balancing, but at this stage Authenticom need only plead facts creating a reasonable inference of substantial foreclosure. *See, e.g.*, *Viamedia*, 218 F. Supp. 3d at 696–97; *accord Pecover v. Elecs. Arts Inc.*, 633 F. Supp. 2d 976, 983 (N.D. Cal. 2009) ("The rule of reason analysis requires a factual analysis of the line of commerce, the market area and the affected share of the relevant market. Such a factual inquiry is improper at this stage in the proceedings.").

The Court, accordingly, grants Defendants' motions to dismiss as to Count Two's exclusive-dealing claim based on Defendants' DMS licenses with dealers without prejudice, but denies them as to Count Two's exclusive-dealing claim based on Defendants' contracts with vendors.

---

[16] Reynolds cites no law for the implied proposition that courts should not examine foreclosure in the aggregate among defendants. *See, e.g.*, *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped legal arguments are waived, as are arguments unsupported by legal authority."). In any event, the Court need not address the proposition for the reasons just explained. *But see Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, No. 93 C 7493, 1995 WL 632031, at *5 (N.D. Ill. Oct. 25, 1995), *aff'd*, 103 F.3d 42 (7th Cir. 1996) (addressing when aggregation of exclusive deal's anticompetitive effects is appropriate).

### c.    Tying (Count Three)

Regarding the tying claim, the Complaint alleges Defendants' respective DMS licenses with dealers prohibit the dealers from using integrations services other than Defendants' respective ones.  As Authenticom puts it, the "contracts with dealers condition the purchase of DMS software (the tying product) on the dealers' agreement to use only Defendants' integration services (the tied product)."  (R. 59 at 35.)

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'"  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461–62 (1992) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958)).  "Such an arrangement [also] violates § 1 of the Sherman Act if the seller has appreciable economic power in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market."  *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 832 (7th Cir. 2014) (quoting *Eastman Kodak*, 504 U.S. at 462); *see also Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 594 (7th Cir. 2008) (tying can violate Section 1 when "the seller has 'market power' in the market for the tying product").  The Supreme Court has emphasized that the "essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."  *Jefferson Parish*, 466 U.S. at 12.

The Complaint attempts to allege an untraditional tying claim.  Authenticom's depiction notwithstanding, the Complaint does not actually plead that Defendants condition the purchase of DMSs on the purchase of integration services.  Rather, it claims that Defendants effectively

condition the purchase of a DMS on an agreement not to use another company's integration services.

This arrangement is called a "negative tie." *See Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1178 (1st Cir. 1994) ("Section 1 also forbids 'negative' ties"), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010). Although "courts rarely encounter" such claims, a "negative tie occurs when the customer promises not to take the tied product from the defendant's competitor." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016) (citation, quotations, and modifications omitted); *see also Grumman Sys.*, 36 F.3d at 1178 (negative ties are "arrangements conditioning the sale of one product on an agreement *not* to purchase a second product from competing suppliers"); Areeda & Hokenkamp, ANTITRUST LAW ¶ 1752c (although "rarely encountered," a tying arrangement "is fully satisfied when the defendant's customer promises not to take the tied product from the defendant's rival"). The Supreme Court recognized the arrangement (though not in name) in *Eastman Kodak* when it held that there was an issue of fact regarding whether a firm's sale of its parts premised on an agreement that the purchaser would not use a competitor's servicers was an illegal tie. 504 U.S. at 463; *see also id.* at 462 (defining tying as "at least [an] agree[ment] that [a purchaser] *will not purchase that product* from any other supplier'") (emphasis added); *accord RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1223 (C.D. Cal. 2012) (holding that in light of *Eastman Kodak*, plaintiff had pleaded a negative tying claim); *In2 Networks, Inc. v. Honeywell Int'l*, No. 2:11-CV-6-TC, 2011 WL 4842557, at *8 (D. Utah Oct. 12, 2011) ("[Plaintiff] alleges that [defendant] conditioned the sale of its products on the third-party *not buying* [plaintiff's] products. This type of 'negative tie' can be the basis of a tying claim") (citing *Eastman Kodak*, 504 U.S. at 461). That is the sort of sales

conditioning that the Complaint attempts to allege.

Defendants, however, take issue with a second atypical feature of the alleged tie—dealers buy the tying product (DMS) but not the tied product (integration services). *See, e.g.*, *Jefferson Parish*, 466 U.S. at 12; *see also, e.g.*, *Live Nation*, 746 F.3d at 832. Authenticom does not contend that a cognizable tying arrangement can include two (or more) levels of purchasers, but they do claim that dealers are the "relevant targets" of the arrangement.

The Supreme Court has emphasized that the Sherman Act "is aimed at substance rather than form." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 760 (1984); *see also Eastman Kodak*, 504 U.S. at 466–67 ("[F]ormalistic distinctions rather than actual market realities are generally disfavored in antitrust law. This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the particular facts disclosed by the record.") (internal quotations and citation omitted); *In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 550 (1st Cir. 2016) (antitrust law "consistently prioritize[s] substance over form"). When it comes to tying, antitrust law's substantive and "core concern" is that the practice "prevents goods from competing directly for consumer choice on their merits." *United States v. Microsoft Corp.*, 253 F.3d 34, 87 (D.C. Cir. 2001) (citing *Jefferson Parish*, 466 U.S. at 13). In other words, tying presents a risk of anticompetitive "leverage"—the "special ability" of a supplier with market power "to force a purchaser to do something that he would not do in a competitive market." *Jefferson Parish*, 466 U.S. at 13–14 & n.20; *see also* Areeda & Hovenkamp, ANTITRUST LAW ¶ 1700d; *accord Sheridan*, 530 F.3d at 592.

In this case, the Complaint does not plausibly plead that dealers are the purchasers whose "consumer choice" is improperly constrained by the alleged tie. *See Microsoft*, 253 F.3d at 87. To the contrary, the Complaint asserts that vendors engage and pay integrators for their services.

42

The Complaint does claim that dealers have historically "had the right to grant data access to the integrator of their choice" and that "it is the dealer's choice to evaluate the security protections of data, and select one that meets their standards." (Compl. ¶¶ 5, 16.) Those allegations, however, are conclusory, and they are inconsistent with the other claims that vendors select integrators. (*Id.* ¶ 115 ("If CDK and Reynolds' integration products were reasonable substitutes, *application providers* would choose between them") (emphasis added), ¶ 18 (bringing suit "so that vendors (and dealers) can select a data integrator of their choice"), ¶ 5 ("When dealers and vendors had a choice of which integrator to use, the integration market flourished").) The Complaint also alleges that vendors "pass most if not all" of Defendants' increased data-integration fees on to dealers. (Compl. ¶ 224.) That generalized allegation, however, does not plausibly suggest that dealers, not vendors, make the economic choice about which integrator to use and suffer the consequences of those decisions. *Cf. Dos Santos*, 684 F.2d at 1354 (in dicta, stating that a hospital, rather than a patient, may be the "real purchaser" for antitrust purposes because the patient does not make the "significant economic decision[s]" about which anesthesia services to use); *see also Aerotec*, 836 F.3d at 1179 (holding that there was no "de facto" or "implied" tie because there was no evidence of conditioning on the consumer).

No alleged facts plausibly suggest that—despite vendors engaging, paying, and receiving directly integrators' services—dealers are the effective and actual purchasers of those services. The Complaint therefore does not state a tying claim, and the Court grants Defendants' motions to dismiss with respect to Count Three without prejudice.

### C. Authenticom's Section 2 Claim (Count Four)

The Complaint also includes a claim under Section 2 of the Sherman Act for monopolization. To plead such a claim, a plaintiff must allege (1) that the defendant "possessed

monopoly power" in an antitrust market, and (2) that the defendant "willfully acquired or maintained that power by means other than the quality of its product, its business acumen, or historical accident." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 43 (2013). The Complaint, however, does not plead that either CDK or Reynolds are monopolists in the DMS or data-integration markets. It claims instead that Defendants have monopolized the purported data-integration aftermarkets for their respective DMSs. Defendants, in response, argue that the Complaint fails to plead the narrow sort of aftermarket claim the Supreme Court blessed in *Eastman Kodak* and that it fails to allege the acquisition of power through unlawful conduct. The Court disagrees.

### 1.  The Single-Brand Aftermarket

"In rare circumstances, a single brand of a product or service can constitute a relevant market for antitrust purposes." *PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010). *Eastman Kodak* is the principal authority describing such circumstances. In that case, independent-service operators of photocopiers and micrographic equipment sued Kodak for, among other things, monopolizing the sale of services for Kodak machines. 504 U.S. at 459. After doing well selling equipment, Kodak moved to control the repairs of its equipment. It specifically implemented a new policy of selling replacement parts only to owners that used Kodak's services or repair their own machines. As part of the same policy, manufacturers agreed not to sell replacement parts to anyone but Kodak, and Kodak "pressured" owners and distributors not to sell replacement parts to independent service providers. *Id.*

Kodak first argued that it could not exercise power in the markets for its parts and services because there was bona fide competition in the upstream market for equipment, and therefore customers could check supracompetitive pricing for parts and services by turning to

Kodak's manufacturer-competitors. The Supreme Court disagreed. It held that in a "market for complex durable goods," like the one at issue, customers may face "significant information and switching costs" in attempting to change equipment manufacturers, and "[l]ifecycle pricing" is difficult for consumers to calculate when initially purchasing equipment. *Id.* at 473. The Supreme Court, moreover, found it important that Kodak had "locked in" many customers before changing its policy to dominate the parts and services aftermarkets. *Id.* at 475. The Supreme Court thus held that a factual question existed as to "whether information costs and switching costs foil the simple assumption that the equipment and service markets act as pure complements to one another." *Id.* at 477. Kodak later argued "that, as a matter of law, a single brand of a product or service can never be a relevant market under the Sherman Act." *Id.* at 481. The Supreme Court again disagreed. It reasoned that the relevant antitrust market was "determined by the choices available for Kodak equipment owners." *Id.* at 482 (citing *Jefferson Parish*, 466 U.S. at 19). Because Kodak's parts are not interchangeable with other manufacturers', the Supreme Court concluded that the relevant market from the "owner's perspective is composed of only those companies that service Kodak machines." *Id.* at 482.

The Seventh Circuit has since elucidated *Eastman Kodak*'s holding. In *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 762 (7th Cir. 1996), the court explained that the *Eastman Kodak* Court "conceded that customers who had anticipated the change of policy could not be exploited." Indeed, "[c]ompetition among manufacturers fully protects buyers who accurately calculate life-cycle costs"—but for customers who did or could not have that anticipation, "Kodak had some ability to extract additional money by raising prices." *Digital Equip.*, 73 F.3d at 762. It went on:

> The Court did not doubt in *Kodak* that if spare parts had been bundled with
> Kodak's copiers from the outset, or Kodak had informed customers about its

> policies before they bought its machines, purchasers could have shopped around
> for competitive life-cycle prices. The material dispute that called for a trial was
> whether the change in policy enabled Kodak to extract supra-competitive prices
> from customers who had already purchased its machines.

*Id.* at 763. In *Schor v. Abbott Labs.*, 457 F.3d 608, 614 (7th Cir. 2006), the court explained

further: "What the Supreme Court held in [*Eastman Kodak*] is not that firms with market power

are forbidden to deal in complimentary products, but that they can't do this in ways that take

advantage of customers' sunken costs" by, in *Kodak*'s case, "mov[ing] to claim all of the repair

work for itself." *See also PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 819 (6th Cir.

1997) ("Both the First and the Seventh Circuits have interpreted Kodak to be limited to situations

in which the seller's policy was not generally known.") (citing *Digital Equip.*, 73 F.3d at 763,

*Lee v. Life Ins. Co. of North America*, 23 F.3d 14, 20 (1st Cir. 1994), *cert. denied*, 513 U.S. 964

(1994)).

Other circuits have echoed that an *Eastman Kodak* claim depends on the consumer's

unawareness of the supplier's aftermarket power and its terms when it purchased the

primary-market product. *See, e.g.*, *id.* at 820 ("the change in policy in Kodak was the crucial

factor in the Court's decision"); *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 405 (3d Cir.

2016) ("no antitrust liability for a *Kodak*-style attempted monopolization claim could lie after

May 2008 when customers were put on clear notice that purchasing [defendant's] precluded use

of [third-party] maintenance"); *DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1346 (Fed.

Cir. 2014) (stating, "[c]rucial to the *Kodak* decision . . . was the fact that customers had already

purchased their equipment before learning about Kodak's policies on aftermarket parts and

services[,]" and holding, "[c]ustomers who learn about the RFID lock before buying the

equipment cannot be exploited in the same way as the 'locked-in' customers because they can

shop around for competitive life-cycle prices."); *see also, e.g.*, *Collins Inkjet Corp. v. Eastman*

*Kodak Co.*, 781 F.3d 264, 278 (6th Cir. 2015) (holding that plaintiff sufficiently stated an *Eastman Kodak* claim in large part because "there is no indication that . . . customers had any reason to expect sharp variations in aftermarket prices" although they were sophisticated purchasers). The Ninth Circuit aptly summarized the post-*Eastman Kodak* world this way: "[T]he law permits an antitrust claimant to restrict the relevant market to a single brand of the product at issue (as in *Eastman Kodak* )," but "the law prohibits an antitrust claimant from resting on market *power* that arises solely from contractual rights that consumers *knowingly and voluntarily* gave to the defendant." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1048 (9th Cir. 2008) (second emphases added).[17]

Taking the aftermarket case against CDK first, the Complaint plausibly pleads a claim. The Complaint alleges facts suggesting that consumers are "locked in" after purchasing CDK DMSs, given the initial investments required, the contract length, and the resources required to change DMSs. It also alleges that CDK changed from open architecture to closed architecture as a matter of policy in 2015, which resulted in hefty integration-service fees. CDK contends that because its DMS licenses with dealers expressly prohibit DMS access to anyone other than the dealers' "employees and agents," dealers knew what they were signing up for. The Complaint is replete with detailed allegations, however, showing that, before 2015, CDK publicly and loudly took the position that it permitted third-party integrator access. It is thus inferable that dealers did not in fact "knowingly and voluntarily" agree to third-party blocking when they purchased DMSs. *See id.* That the licenses permit "agents" to access the DMS adds to the conclusion that CDK may have duped dealers by closing its architecture post-sale, even if CDK is correct that

---

[17] Defendants do not challenge whether the alleged aftermarkets are insufficient for failing to exclude reasonable alternatives (*see* R. 54 at 20–23, R. 57 at 29–38)—a question best left for summary judgment anyway.

integrators do not actually constitute agents under state law.

In addition to the 2015 switch in policy, the Complaint alleges that CDK's contracts with vendors prohibit the vendors from informing dealers of how much CDK's integration services cost, or even telling dealers any part of its charges from vendors are "in any [ ] way associated with" CDK's costs. From that, it is reasonably inferable that dealers cannot price shop for "lifecycle"—a fact that the *Eastman Kodak* court found critical. 504 U.S. at 473–75. CDK's counter argument—that the Complaint pleads that some dealers complained about the costs, and thus the allegations about price-secrecy are not well-pleaded—is a stretch. A contract can prohibit vendors from sharing pricing information and a few vendors can do so anyway. Altogether, as was true in *Eastman Kodak*, "[t]he proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers." 504 U.S. at 482.

The aftermarket case against Reynolds is thinner, but nevertheless sufficient at this stage. Reynolds points out that the Complaint affirmatively pleads its long-standing opposition to third-party integration, which started in 2009 at the latest. It pleads further that Reynolds's has made this stance publicly known, and that its contracts expressly ban "provid[ing] access to . . . any third party." The Complaint, therefore, affirmatively pleads that Reynolds's closed architecture was generally known to customers before they purchased the product (during whatever can be considered the relevant period, at least).[18]

But a change in aftermarket practices is not the sole worry of *Eastman Kodak* and its progeny. *See Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 384 (3d Cir. 2005) ("an 'aftermarket policy change' is not the *sine qua non* of a *Kodak* claim"). Rather, as explained, the

---

[18] Authenticom's attempt to walk back that pleading by calling Reynolds's initial blocking as "tepid" is unpersuasive.

Supreme Court expressed more general concerns about customers that unknowingly and involuntarily sign on for the defendant's aftermarket power. *See Eastman Kodak*, 504 U.S. at 473–75. Included in that group, according to the Supreme Court, are those unable to undertake lifecycle-cost analyses (at least at some, reasonable level) before purchasing the primary product because the requisite "information is difficult—some of it impossible—to acquire at the time of purchase." *Id.* at 473–74. Indeed, the Seventh Circuit recognized as much in explaining that "[c]ompetition among manufacturers fully protects buyers who *accurately* calculate life-cycle costs," but where customers cannot do so, a supplier-defendant (*i.e.*, Kodak, in the court's description) can charge supracompetitive prices in the aftermarket. *Digital Equip.*, 73 F.3d at 762 (emphasis added). Like CDK, the Complaint pleads that Reynolds employs contracts that prohibit vendors from sharing with dealers Reynolds's integration fees, which are allegedly subject to varying, significant, and frequent increases. Taken as true, those alleged "market imperfections" suggest that dealers may be unable to assess lifecycle costs like the *Eastman Kodak* owners. *Newcal*, 513 F.3d at 1050; *Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 617 (9th Cir. 1990), *aff'd sub nom. Eastman Kodak*, 504 U.S. 451 ("market imperfections can keep economic theories about how consumers will act from mirroring reality") (citing *Jefferson Parish*, 466 U.S. at 15 n. 24)); *see also* Areeda & Hovenkamp, ANTITRUST LAW ¶¶ 1740, 1740a. Despite Authenticom making this point, Reynolds ignores it altogether.

Ultimately, Authenticom "must produce hard evidence dissociating the competitive situation in the aftermarket from activities occurring in the primary market." *Avaya*, 838 F.3d at 402. At this stage, however, the Complaint adequately pleads an aftermarket claim against Reynolds.

### 2.  Acquisition of Power by Anticompetitive Means

That leaves the question of whether the Complaint has adequately alleged that

Defendants have monopolized their respective aftermarkets through anticompetitive means.

"Where defendant has engaged in unlawful restraint of trade that would independently violate

Section 1 of the Sherman Antitrust Act, it is well established that it also violates Section 2 if it

acquires or maintains a monopoly by means of that restraint of trade."  *Gumwood HP*, 2013 WL

3214983, at *7 (citing *United States v. Griffith*, 334 U.S. 100, 106 (1948)).  As already

determined, the Complaint adequately pleads that Defendants have engaged in a conspiracy to

block Authenticom and exclusive dealing.  Defendants do not argue that such conduct is

insufficiently anticompetitive for Section 2's purposes.

Defendants do, however, fall back on *Trinko* and the CFAA.  Those positions are

unpersuasive mostly for reasons already explained.  *Accord Viamedia*, 218 F. Supp. 3d 674

(denying a motion to dismiss with respect to Section 2 tying and exclusive dealing claims, but

granting it with respect to Section 2 refusal-to-deal claim).  Defendants emphasize, for example,

that Authenticom has no right to access the DMSs, and that its Section 2 claim is really an

attempt to "enforce[ ] sharing" of Defendants' DMSs.  That concern is both premature and

misplaced.  As the Seventh Circuit has made clear, in no event will there be an enforced duty to

deal.  *Authenticom*, 874 F.3d at 1025–26.  If the alleged agreement violates the Sherman Act, the

proper remedy is to "set the offending agreement aside." *Id.* at 1026.  If the alleged ties (if later

pleaded plausibly) do the same, "the proper remedy would be to enjoin the tie." *Id.*  As for the

cyber-security laws, Defendants argue that their right to deny third parties access to their

computers is not "override[n]" by the Sherman Act.  True, but so is the inverse—cyber-security

laws do not give Defendants an antitrust defense.

The Court therefore denies Defendants' motions to dismiss with respect to Count Four.

## II.    Tortious Interference (Count Five)

Finally, the Complaint alleges that Defendants tortuously interfered with Authenticom's business by engaging in the conduct that forms the bases of the antitrust claims as well as by spreading "falsehoods" about Authenticom's security. "In an MDL, a court must apply the choice-of-law rules of the transferor forum." *Chang v. Baxter Healthcare Corp.*, 499 F.3d 728, 732 (7th Cir. 2010); *see also Dairy Farmers*, 2015 WL 3988488, at *22. Under Wisconsin law, tortious interference with contractual relations has five elements: "(1) the plaintiff had a contract or prospective contractual relationship with a third party; (2) the defendant interfered with the relationship; (3) the interference was intentional; (4) a causal connection exists between the interference and the damages; and (5) the defendant was not justified or privileged to interfere." *Comsys Inc. v. City of Kenosha*, 2017 WL 1906750, at *22 (E.D. Wis. May 9, 2017) (quoting *Burbank Grease Servs., LLC v. Sokolowski*, 717 N.W.2d 781, 796 (Wis. 2006)). Wisconsin courts also appear to follow the Restatement (Second) of Torts' approach to tortious interference. *See Magnum Radio, Inc. v. Brieske*, 577 N.W.2d 377, 379 (Wis. Ct. App. 1998).

Defendants argue that the Complaint fails to plead the first and fifth elements. They contend that Authenticom's vendor contracts are invalid and unenforceable in that they are illegal under the cyber-security laws. The Complaint, however, does not plead that assertion. Further, as already noted, the question of "authorization" is fact-intensive and its resolution on these pleadings is inappropriate. *See, e.g.*, *Weingand*, 2012 WL 3763640, at *2. Defendants point to no case in which a court has dismissed claims based on the notion that the Complaint affirmatively pleaded a violation of cyber-security laws. Defendants also contend that Section 773 of the Restatement (Second) of Torts, which says that a party may be "justified or privileged

to interfere" if it is asserting "in good faith a legally protected interest," protects their conduct. As Authenticom correctly notes, however, that exception does not extend to otherwise illegal acts. *See* Restatement (Second) of Torts § 767 cmt. c (1979) ("Conduct specifically in violation of statutory provisions or contrary to established public policy may for that reason make an inference [that the defendant acted without inappropriate motive] improper. This may be true, for example, of conduct that is in violation of antitrust provisions or is in restraint of trade"). Moreover, courts recognize that the issue is a factual one inappropriate for resolution on a motion to dismiss. *See Metso Minerals Indus., Inc. v. FLSmidth-Excel LLC*, No. 07-CV-926, 2010 WL 55845, at *3 (E.D. Wis. Jan. 5, 2010). The Court, accordingly, denies Defendants' motions to dismiss Count Five.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motions to dismiss. If Authenticom wishes to replead any claims that the Court has dismissed without prejudice, it has until June 4, 2018, to do so.

Dated: May 14, 2018
                                      **ENTERED**

                                      _____
                                      **AMY J. ST. EVE**
                                      **United States District Court Judge**