# Exhibit E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

AUTHENTICOM, INC.,

                            Plaintiff,                Case No. 17-cv-318

     vs.

CDK GLOBAL, LLC, and THE REYNOLDS
AND REYNOLDS COMPANY,

                            Defendants.

---

**AUTHENTICOM'S FIRST SET OF REQUESTS FOR THE PRODUCTION OF
DOCUMENTS FOR DEFENDANT THE REYNOLDS AND REYNOLDS COMPANY**

---

       Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff

Authenticom, Inc. ("Authenticom") hereby requests that Defendant The Reynolds and Reynolds

Company ("Reynolds") produce all documents in its actual or constructive possession, custody,

or control related directly or indirectly to any of the matters described below.  All documents and

tangible things responsive hereto should be produced for inspection as soon as practicable and in

no event later than thirty (30) days from the date after service of these requests for production.

Production shall be made at the offices of KELLOGG, HANSEN, TODD, FIGEL &

FREDERICK, P.L.L.C., 1615 M Street, N.W., Suite 400, Washington, D.C. 20036, or as

otherwise agreed to by the parties.

1

## DEFINITIONS

For purposes of these requests the following definitions shall apply:

1.      "Add-on application" means a software application that dealers use in addition to or separate from their Dealer Management System ("DMS") software in the course of operating their dealerships.

2.      "All" shall be construed as all and any, and the term "any" shall be construed as all and any.

3.      "API" shall mean Advanced Programming Interface.

4.      "Authenticom" shall mean the Plaintiff in this action and a provider of data integration services in the automotive industry based in La Crosse, Wisconsin.  "Authenticom" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

5.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the document request all responses that might otherwise be construed to be outside of its scope.

6.      "CDK" shall mean CDK Global, LLC, as described in Paragraph 4 of Defendants' Combined Statement of Additional Facts Requiring Denial of Preliminary Injunctive Relief (hereinafter, "SoAF"), Dkt. No. 87 (June 16, 2017).  "CDK" shall include the Dealer Services business of Automatic Data Processing, Inc. ("ADP") prior to September 30, 2014.  *See* SoAF ¶ 5.  "CDK" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

7.      "Communication" shall mean any exchange or transfer of information, whether electronic, written, oral, or in any other form. The phrase "communication between" is defined to

include instances where one party addresses the other party but the other party does not necessarily respond.

8.      "Data access policy" means Your policy with respect to the ability of dealers to authorize independent integrators to access data on the DMS or otherwise grant third parties access to their data on the DMS.

9.      "Data integrators" shall refer to service providers that provide access by any means to dealer data on the DMS database, whether by extracting the data, writing data back into the DMS, or both.  For the avoidance of doubt, "data integrators" includes CDK (through its 3PA program) and Reynolds (through its RCI program).

10.     "DealerVault" shall refer to the current data integration product offered by Authenticom, which providers a unified user interface that enables dealers to add, remove, or change the data sets that Authenticom sends to vendors on the dealers' behalf.

11.     "DMI" shall mean Digital Motorworks, Inc., as described in Paragraph 215 of the SoAF.  "DMI" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

12.     The "DMS Market" shall mean the market for the provision of DMS services to new car franchised automobile dealers, as described in Paragraphs 7-15 of the SoAF.

13.     "Document" and "Documents" are used in the broadest extent permitted by Federal Rule of Civil Procedure Rule 34(a).

14.     "IntegraLink" shall mean IntegraLink as described in Paragraph 215 of the SoAF. "IntegraLink" shall include its present or former predecessors, subsidiaries, divisions,

departments, operating units, directors, officers, managers, employees, attorneys, and accountants

15.     "Including" (in addition to its usual meanings) shall mean including but not limited to.

16.     "Meeting" shall mean, without limitation, any assembly, convocation, encounter, communication or contemporaneous presence (whether in person or via any electronic, computer-assisted, digital, analog, video, or telephonic method of communication) of two or more persons for any purpose, whether planned or arranged, scheduled or not.

17.     "Person" or "persons" shall mean, without limitation, any individual, corporation, partnership or any variation thereof (e.g., limited partnership, limited liability partnership), limited liability company, proprietorship, joint venture, association, government entity, group or other form of legal entity.

18.     "Preliminary Injunction Hearing" shall mean the hearing conducted in the United States District Court for the Western District of Wisconsin in this case, No. 3:17-CV-318-JDP, from June 26-28, 2017.

19.     "Price Secrecy Provision" means any contractual provision designed to prevent vendors from informing dealers or other third parties about the pricing charged under the 3PA or RCI programs.

20.     The terms "relating to," "related to," "referring to," "regarding," or "with respect to" shall mean, without limitation, the following concepts: concerning, discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part.

21.     "Reynolds" shall mean "The Reynolds & Reynolds Company" as described in Paragraphs 1-3 of the SoAF.  "Reynolds" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

22.     "SecurityFirst" shall mean the CDK initiative described in Paragraphs 133-148 of the SoAF.

23.     "SIS" means Superior Integrated Solutions and shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

24.     "SFTP" means secure file transfer protocol.

25.     "Third party integrators" shall mean data integrators that provide data integration services on a DMS platform and are unaffiliated with the DMS provider.

26.     "Vendors" or "application providers" shall mean vendors who provide software applications that perform operations functions for dealerships, as described in Paragraph 20 of the SoAF.

27.     "You," "your" or "your company" mean the responding defendant, its predecessors, successors, parents, subsidiaries, departments, divisions, joint ventures, and affiliates, including without limitation any organization or entity that the responding defendant manages or controls, together with all present and former directors, officers, employees, agents, representatives or any persons acting or purporting to act on behalf of the responding defendant.

## **INSTRUCTIONS**

1.     In producing documents and other materials, You must furnish all documents in Your possession, custody, or control, regardless of whether such documents or materials are

5

possessed directly by You or Your employees or former employees, agents or former agents, parents, subsidiaries, affiliates, investigators, or by Your attorneys or their employees, agents, vendors or investigators.

2.      All documents shall be produced in the same order as they are kept or maintained by You in the ordinary course of Your business.  All documents shall be produced in the file folder, envelope or other container in which the documents are kept or maintained.

3.      Documents attached to one another should not be separated.  If any portion of any document is responsive to any portion of the document requests below, then the entire document must be produced.

4.      Documents shall be produced in such fashion as to identify the natural person in whose possession they were found (i.e., the document custodian).

5.      If any document responsive to any of these requests is privileged, and the document or any portion of the document requested is withheld based on a claim of privilege, provide a statement of the claim of privilege and all facts relied upon in support of that claim, including the following information:

      a.  the exact basis for withholding the document;
      b.  the date of such communication;
      c.  the medium of such communication;
      d.  the general subject matter of such communication (such description shall not be considered a waiver of Your claimed privilege);
      e.  the identity of any document that was the subject of such communication and the present location of any such document;
      f.  the identity of all persons involved in such communication; and
      g.  the identity of any document which records, refers, or relates to such communication and the present location of any such document.

6.      Each document requested herein should be produced in its entirety and without deletion, redaction or excision, except as permitted by a recognized privilege, regardless of whether You consider the entire document or only part of it to be relevant or responsive to these

document requests.  If You have redacted any portion of a document on the ground of privilege, stamp the word "REDACTED" beside the redacted information on each page of the document You have redacted.

7.      Each request for documents seeks production of all documents described along with any attachments, drafts, and non-identical copies in any language whatsoever, in the possession, custody, or control of You or Your respective agents or attorneys.  You are specifically instructed to review any storage and archive facilities and the personal files, records, notes, correspondence, daily calendars, telephone logs, and records of all persons who would likely have responsive documents.

## REQUESTS FOR THE PRODUCTION OF DOCUMENTS

### *Regulatory Investigations*

**REQUEST NO. 1.**      All documents and correspondence relating to any inquiry or investigation by the Federal Trade Commission, Department of Justice, or any other federal or state regulatory authority regarding your DMS business, data integration business, add-on applications, data access policies, or any other related matter.  The date limitation for this request is January 1, 2007, to the present.  For the avoidance of doubt, this request includes, without limitation:

     a.      any documents produced by you (or any other party) to any such regulatory authority;

     b.      any correspondence with any such regulatory authority, including any Civil Investigative Demand ("CID") or subpoena received from any such regulatory authority;

     c.     any transcripts, recordings, or records of any interviews and/or testimony provided by any witness to any such regulatory authority; and

     d.     any CDK or Reynolds internal documents relating to any investigation by any such regulatory authority.

## *Agreements and Communications Between CDK and Reynolds*

**REQUEST NO. 2.**    All communications between CDK and Reynolds regarding their respective DMS business, data integration business, add-on applications, data access policies, or any other related matter – including all documents concerning such communications. There is no date limitation for this request.

**REQUEST NO. 3.**    All communications between CDK and Reynolds regarding access by independent data integrators to data on their respective DMS platforms. There is no date limitation for this request.

**REQUEST NO. 4.**    All documents and communications regarding any agreement (written or otherwise) between CDK and Reynolds. There is no date limitation for this request.

**REQUEST NO. 5.**    All documents and communications relating to the February 18, 2015 "Data Exchange Agreement," "3PA Agreement," and "Reynolds Interface Agreement" (collectively, the "Agreements"). There is no date limitation for this request. For the avoidance of doubt, this request includes, without limitation:

     a.     all communications between CDK and Reynolds regarding the Agreements;

     b.     all communications with other parties (whether vendors or dealers) regarding the Agreements;

     c.     all drafts of the Agreements;

     d.     all documents describing, construing, or interpreting the Agreements;

      e.      all internal documents and communications regarding the Agreements;

      f.      because CDK and Reynolds have waived their attorney-client privilege with respect to the Agreements – and any such communications are subject to the crime-fraud exception in any event – all communications with counsel for CDK and/or Reynolds regarding the Agreements; and

      g.      any other document relating in any way to the Agreements.

**REQUEST NO. 6.**    All documents and communications regarding the transition of vendor customers of CDK into the RCI program.  For the avoidance of doubt, this request includes, without limitation:

      a.      all information provided by CDK to Reynolds about its vendor customers, *see, e.g.*, §§ 4.3, 4.4, Exhibit DEA-2 of the Data Exchange Agreement;

      b.      all communications between CDK and Reynolds about CDK's vendor customers;

      c.      all communications between CDK and its vendor customers regarding the RCI program;

      d.      all communications between Reynolds and CDK's vendor customers regarding the RCI program;

      e.      all communications with Reynolds DMS customers regarding the transition of CDK's vendor customers into the RCI program;

      f.      all pricing information regarding what CDK vendor customers paid for access to data on the Reynolds DMS before the Data Exchange Agreement, and what those vendor customers (1) paid when they entered into the RCI program, and (2) what they pay now; and

       g.     all communications related to any instance where Reynolds advised vendors awaiting RCI certification to move their data integration business to CDK, DMI, or IntegraLink in advance of RCI certification.

**REQUEST NO. 7.**    All documents and communications regarding data security and/or DMS system performance with respect to CDK's access to the Reynolds DMS.  There is no date limitation for this request.  For the avoidance of doubt, this request includes, without limitation:

       a.     all documents and communications relating to the effect of CDK's access to the Reynolds DMS on the performance of the Reynolds DMS;

       b.     all documents and communications relating to any data security incidents caused by CDK's access to the Reynolds DMS; and

       c.     all documents and communications relating to any specific system performance issue that was or is directly attributable to CDK's access to the Reynolds DMS.

**REQUEST NO. 8.**    All documents and communications regarding the impact on CDK's business (including the business of its subsidiaries, DMI and IntegraLink) – whether on CDK's finances, its dealer and vendor relationships, or otherwise – caused by Reynolds' blocking of CDK's access to dealer data on the Reynolds DMS.

**REQUEST NO. 9.**    All documents regarding working with other data integrators – such as Authenticom, SIS, SelectQu, or others – and all communications with those entities regarding finding solutions (technological or otherwise) to Reynolds' blocking.

***Authenticom***

**REQUEST NO. 10.**   All documents and communications referencing, relating to, or concerning Authenticom, DealerVault, or Steve Cottrell.  There is no date limitation for this request.

**REQUEST NO. 11.**   All documents and/or communications between CDK and Reynolds relating to Authenticom, DealerVault, or Steve Cottrell – including all documents concerning such communications.  There is no date limitation for this request.

**REQUEST NO. 12.**   All documents and/or communications regarding any cooperation, coordination, joint effort, assistance, exchange of information or technical knowhow, or any other type of collaboration between CDK and Reynolds in blocking Authenticom's access to dealer data on their respective DMS platforms.  There is no date limitation for this request.

**REQUEST NO. 13.**   All communications with vendors and/or dealers regarding Authenticom, DealerVault, or Steve Cottrell.  There is no date limitation for this request.

**REQUEST NO. 14.**   All documents and communications to or from Bob Brockman, Robert Schaefer, Ron Lamb, Chris Hellyer, or Kelly Hall relating to the following: Authenticom, Steve Cottrell, DealerVault, "hostile" or "unauthorized" integration, dealers using independent integrators to access their data, Dan McCray, Steve French, Howard Gardner, Malcolm Thorne, Robert Karp, Ron Workman, Steve Anenen, or Brian MacDonald.  There is no date limitation for this request.

**REQUEST NO. 15.**   All documents and communications regarding the VPN tunnel that CDK provided to Authenticom for accessing dealer data on the CDK DMS, and the reasons why CDK stopped providing Authenticom with that access.

***CDK's Access to Other DMSs***

**REQUEST NO. 16.**   All documents and communications relating to CDK's (including through its subsidiaries, Digital Motorworks and Integralink) access to data on the Reynolds DMS.  There is no date limitation for this request.  For the avoidance of doubt, this request includes, without limitation:

      a.      all communications between CDK and Reynolds regarding CDK's access to the Reynolds DMS;

      b.      the technological means by which CDK accesses or accessed the Reynolds DMS;

      c.      the technological means by which Reynolds has either blocked or permitted CDK's access to the Reynolds DMS;

      d.      any internal documents and communications regarding CDK's access to the Reynolds DMS;

      e.      any communications with vendors or dealers regarding CDK's access to the Reynolds DMS;

      f.      documents sufficient to show the revenues CDK received from vendors for providing access to data on the Reynolds DMS;

      g.      documents sufficient to show the vendors for whom CDK provided access to data on the Reynolds DMS, including the time period during which CDK provided or has provided that access; and

      h.      all documents and communications relating to CDK's wind down of its access to data on the Reynolds DMS.

**REQUEST NO. 17.**  All documents and communications relating to CDK's "SMART-R" program.

**REQUEST NO. 18.**  All documents and communications relating to Reynolds blocking or disabling of the dealer-provided login credentials that Digital Motorworks and/or IntegraLink used to access the Reynolds DMS.

**REQUEST NO. 19.**  All documents and communications concerning CDK's (including through its subsidiaries, Digital Motorworks and IntegraLink) access to data on non-CDK, non-Reynolds DMS platforms.  The date limitation for this request is January 1, 2014, to the present.  For the avoidance of doubt, this request includes, without limitation:

  a. all communications between CDK and any other DMS provider regarding CDK's access to that provider's DMS;

  b. the technological means by which CDK accesses or accessed data on any other DMS provider's DMS, including the use of login credentials, APIs, SFTPs, other file transfer protocols, cloud sharing technology (such as Dropbox), direct integration, or otherwise;

  c. the technological means by which any DMS provider has either blocked or permitted CDK's access to that provider's DMS;

  d. all agreements between Digital Motorworks or IntegraLink, on the one hand, and a DMS provider, on the other hand, regarding access to data on the provider's DMS;

  e. any internal documents and communications regarding CDK's access to data on non-CDK DMSs; and

f.      any communications with vendors or dealers regarding CDK's access to data

on non-CDK DMSs.

***Reynolds' Data Access Policies***

**REQUEST NO. 20.**   All documents, communications, and statements (whether internal

or public) regarding Reynolds' policies (or the policies of any other DMS provider) with respect

to third-party access to data on the Reynolds DMS.  There is no date limitation for this request.

For the avoidance of doubt, this request includes, without limitation:

a.      all documents and communications relating to your public statements

regarding the data access policies of any other DMS provider, including CDK;

and

b.      all documents and communications regarding your marketing of your open or

closed data access policies as contrasted with the data access policies of other

DMS providers.

**REQUEST NO. 21.**   All documents and communications relating to Open Secure

Access, Inc., including your attempted participation or membership in the group, the policies and

purpose of the group, the stated principles espoused by the group, or any other documents

relating to the group and your own data access policies.  The date limitation for this request is

January 1, 2006, to the present.

**REQUEST NO. 22.**   All documents, communications, and statements (whether internal

or public) regarding the ability of dealers to authorize independent data integrators to access data

on the Reynolds DMS.  There is no date limitation for this request.  For the avoidance of doubt,

this request includes, without limitation:

14

      a.     all communications with dealers or vendors, representations to dealers or vendors, or statements relating to dealers or vendors (whether internal to Reynolds or public) regarding the ability of dealers to authorize independent data integrators to access data on the Reynolds DMS;

      b.     all public statements regarding the ability of dealers to authorize independent integrators to access data on the Reynolds DMS; and

      c.     all internal documents and communications regarding the ability of dealers to authorize independent integrators to access data on the Reynolds DMS.

**REQUEST NO. 23.** All documents, communications, and statements (whether internal or public) regarding the ability of vendors to use independent integrators to access data on the Reynolds DMS. There is no date limitation for this request. For the avoidance of doubt, this request includes, without limitation:

      a.     all communications with dealers or vendors, representations to dealers or vendors, or statements relating to dealers or vendors (whether internal to Reynolds or public) regarding the ability of vendors to use independent integrators to access data on the Reynolds DMS;

      b.     all public statements regarding the ability of vendors to use independent integrators to access data on the Reynolds DMS; and

      c.     all internal documents and communications regarding the ability of vendors to use independent integrators to access data on the Reynolds DMS.

**REQUEST NO. 24.** All communications between Reynolds and any provider of data integration services – such as SIS, Authenticom, or otherwise – including all documents

concerning such communications.  There is no date limitation for this request.  For the avoidance of doubt, this request includes, without limitation:

    a.    any communications regarding the integration provider's access to dealer data on the Reynolds DMS;

    b.    any internal documents regarding the integration provider's access to dealer data on the Reynolds DMS; and

    c.    any cease and desist letters or similar complaints regarding the integration provider's access to dealer data on the Reynolds DMS.

**REQUEST NO. 25.**  All documents relating to any agreements between Reynolds and any provider of data integration services.  There is no date limitation for this request.  For the avoidance of doubt, this request includes, without limitation:

    a.    any "wind down," settlement, or other agreements entered into between Reynolds and any data integration provider;

    b.    all communications between Reynolds and the integration provider regarding the agreements;

    c.    all communications with other parties (whether vendors or dealers) regarding the agreements;

    d.    all drafts of the agreements;

    e.    all documents describing, construing, or interpreting the agreements;

    f.    all internal documents and communications regarding the agreements;

    g.    all communications with counsel for Reynolds regarding the agreements; and

    h.    any other document relating in any way to the agreements.

16

***Reynolds' RCI Program and Dynamic Reporting***

**REQUEST NO. 26.**   Documents and communications sufficient to describe the characteristics of the RCI Program before Reynolds was acquired by Bob Brockman.  The date limitation for this request is January 1, 2006, to January 1, 2016.

**REQUEST NO. 27.**   Documents and communications regarding the ability of dealers to extract their data from the DMS manually (whether using the Dynamic Reporting tool or otherwise), including when that capability was instituted; the means by which dealers extract the data manually; how often dealers extract their own data for purposes of providing the data to third-party vendors; and the means by which dealers send their manually-extracted data to vendors.  The date limitation for this request is January 1, 2007, to the present.

**REQUEST NO. 28.**   All documents and communications regarding the functionality of Dynamic Reporting, including the ability of dealers to extract data using bulk queries, individual queries only, and any other subject affecting the ease of use of Dynamic Reporting for dealers. The date limitation for this request is January 1, 2009, to the present.

**REQUEST NO. 29.**   Documents and communications regarding whether vendors that participate in the RCI program are able to obtain data directly from dealers consistent with the terms of the RCI contract.  The date limitation for this request is January 1, 2010, to the present.

***Whitelisting***

**REQUEST NO. 30.**   All documents and communications relating to "whitelisting" – or Reynolds otherwise declining to disable or block – the login credentials created by dealers for certain vendors or data integrators.  The date limitation for this request is January 1, 2015, to the present.  For the avoidance of doubt, this request includes, without limitation:

a.      All communications with data integrators, vendors, and/or dealers regarding the whitelisting of login credentials;

b.      Documents sufficient to show for which data integrators, vendors, or other third parties Reynolds whitelisted login credentials;

c.      Documents sufficient to show how whitelisting is accomplished, including all technical, system architecture, workflow processes, or other mechanisms used to whitelist login credentials;

d.      All internal documents and communications regarding whitelisting of login credentials, including whether to whitelist, how to whitelist, the benefits and drawbacks of whitelisting, or any other such materials regarding the protection of login credentials used by third parties; and

e.      Documents sufficient to show the number of dealers with a Reynolds DMS for which SIS continued to provide any data integration services after the litigation between Reynolds and SIS terminated, and the specific services that SIS provided and/or provides to each such dealer.

### *DMS Business*

**REQUEST NO. 31.**  Reynolds' "win/loss" reports, communications, analysis, or any other documents sufficient to show the DMS customers (including by dealership group and by rooftop) that Reynolds has lost every year since 2000, including the reasons the DMS customer switched DMS providers and the identity of the DMS provider to whom the dealer switched.

**REQUEST NO. 32.**  Reynolds' "win/loss" reports, communications, analysis, or any other documents sufficient to show the DMS customers (including by dealership group and by

rooftop) that Reynolds has won every year since 2000, including the reasons the DMS customer switched to Reynolds and the identity of the DMS provider from whom the dealer switched.

**REQUEST NO. 33.**   Documents sufficient to show or list the DMS customers that Reynolds has lost to CDK or won from CDK for every year since 2000.

**REQUEST NO. 34.**   All communications from Reynolds to dealers (whether existing or prospective DMS customers) regarding the differences or similarities between Reynolds and CDK with respect to data access policies.  The date limitation for this request is January 1, 2006, to the present.  For the avoidance of doubt, this request includes, without limitation, any documents or communications in which Reynolds marketed its closed access policy as a point of differentiation with the CDK DMS.

**REQUEST NO. 35.**   All documents and communications from January 1, 2006, to the present regarding any loss or potential loss of DMS customers in connection with Reynolds' decision to restrict dealers from using independent integrators.

**REQUEST NO. 36.**   Documents sufficient to show the tenure (i.e., how long they have been using a Reynolds DMS) of Reynolds' current DMS customers.

### Contracts with Dealers, Vendors, or OEMs

    *a.*    ***DMS Contracts***

**REQUEST NO. 37.**   One (1) representative Master Services Agreement signed each year from 1990 to the present between Reynolds and its dealer customers for DMS services. Each representative agreement should include all documents that comprise a DMS contract between Reynolds and its dealer customers, including any user guides, addendums, exhibits, and other documents that form the agreement between Reynolds and its dealer customers.

**REQUEST NO. 38.**   One (1) representative example of each version of Reynolds' standard DMS contract with its dealer customers as it has materially changed over time from 1990 to the present.  Each representative version should include all documents that comprise a DMS contract between Reynolds and its dealer customers, including any user guides, addendums, exhibits, and other documents that form the agreement between Reynolds and its dealer customers.

**REQUEST NO. 39.**   Twenty (20) representative, current signed Master Services Agreements between Reynolds and its dealer customers.  Each agreement should include all documents that comprise the DMS contract between Reynolds and the dealer, including any user guides, addendums, exhibits, and other documents that form the agreement between Reynolds and its dealer customers.

**REQUEST NO. 40.**   All DMS contracts (and/or any addendum, exhibit, or part thereof) that authorize or acknowledge that dealers may provide independent integrators access to data on the Reynolds DMS.

**REQUEST NO. 41.**   All documents and communications relating to Reynolds no longer allowing dealers to authorize independent integrators to access data on the Reynolds DMS.  The date limitation for this request is January 1, 2006, to the present.  For the avoidance of doubt, this request includes, without limitation:

a.   All communications with dealers relating to whether they can (or cannot) authorize independent integrators to access data on the Reynolds DMS, including any communications that cite provisions in a particular DMS contract to that effect;

20

b.      All documents and communications relating to the enforcement or threat of

enforcement of Reynolds' DMS contract against dealers with respect to third-

party access to data on the Reynolds DMS; and

c.       Any internal documents relating to the dealer rights under their DMS contract

to authorize third parties to access data on the Reynolds DMS.

**b.      *RCI Contracts and Other Data Integration Contracts***

**REQUEST NO. 42.**   All current RCI contracts between Reynolds and vendors.

**REQUEST NO. 43.**   All documents and communications (internal or external) with

respect to any changes to material terms in the RCI contract, including with respect to the use of

other data integrators; price secrecy provisions; and the duration of any terms, including those

that survive the termination of the RCI contract.  The date limitation for this request is January 1,

2009, to the present.

**REQUEST NO. 44.**   All documents and communications relating to Reynolds'

enforcement, threat of enforcement, or Reynolds' interpretation of contractual provisions in

vendors' current RCI contracts.  The date limitation for this request is January 1, 2015, to the

present.  For the avoidance of doubt, this request includes, without limitation:

a.      All communications with vendors relating to whether they can (or cannot) use

independent integrators to access data on the Reynolds DMS, including any

communications that cite provisions in a particular RCI contract to that effect;

b.      All documents and communications relating to the enforcement or threat of

enforcement of Reynolds' RCI contract against vendors with respect to

accessing data on the Reynolds DMS by means other than through the RCI

program;

     c.     All documents and communications relating to the enforcement or threat of enforcement of the price secrecy provisions in the RCI contract;

     d.     All documents and communications relating to what vendors can tell dealers (whether on invoices, in general communications, or otherwise) with respect to what vendors pay Reynolds under the RCI program for data integration;

     e.     All documents and communications with vendors and/or dealers with respect to any other contractual provision in the vendor's current RCI contract; and

     f.     all documents describing, construing, or interpreting the RCI agreements.

***Pricing and Financial Documents***

     *a.*     ***DMS***

**REQUEST NO. 45.**  Documents sufficient to show the monthly price for DMS services paid by Reynolds' dealer customers, from 2000 to the present.

**REQUEST NO. 46.**  Documents sufficient to show Reynolds' revenue for DMS services, on a quarterly basis, from 2000 to the present.

**REQUEST NO. 47.**  Documents sufficient to show Reynolds' profit (including profit margins) for DMS services, on a yearly basis, from 2000 to the present.

**REQUEST NO. 48.**  Documents and communications sufficient to show the price increases for DMS services paid by Reynolds' dealer customers, from 2000 to the present, including whether those price increases were mandated by contract.

**REQUEST NO. 49.**  Documents and communications sufficient to show Reynolds' projections with respect to revenue and profit for its DMS services.  The date limitation for this request is January 1, 2015, to the present.

     *b.*     ***Data Integration***

**REQUEST NO. 50.**   Documents sufficient to show the cost of providing data integration services separate and apart from providing DMS services.

**REQUEST NO. 51.**   Documents sufficient to show Reynolds' revenue for data integration services, on a quarterly basis, from 2000 to the present.

**REQUEST NO. 52.**   Documents sufficient to show Reynolds' profit (including profit margins) for data integration services, on a yearly basis, from 2000 to the present.

**REQUEST NO. 53.**   Documents and communications sufficient to show Reynolds' projections with respect to revenue and profit for its data integration services.  The date limitation for this request is January 1, 2009, to the present.

**REQUEST NO. 54.**   Documents sufficient to show (1) which vendor applications are or were participants in the RCI program; (2) when they became participants in the program; (3) what they paid for integration services when they joined the program; (4) what they paid in January 1, 2015; (5) what they pay now; and (6) if they are no longer participants in the RCI program, when they stopped and what they paid when they left.

**REQUEST NO. 55.**   All documents and communications with respect to any vendor application that once obtained data integration services from Reynolds for data on the Reynolds DMS, but no longer, including documents sufficient to show the reasons why those vendor applications no longer obtain data integration from Reynolds.

**REQUEST NO. 56.**   Documents sufficient to show the change in Reynolds' pricing for RCI participants from January 1, 2007, to the present.

**REQUEST NO. 57.**   Documents and communications relating to the change in any pricing for RCI participants after January 1, 2015.

**REQUEST NO. 58.**  All internal documents and presentations with respect to changes in pricing for participants in the RCI program.  The date limitation for this request is January 1, 2014, to the present.

**REQUEST NO. 59.**  Documents sufficient to show any up-front initiation or certification fees, per-dealership setup fees, or other one-time charges that Reynolds has charged to participants in the RCI program from January 1, 2007, to the present.

**REQUEST NO. 60.**  Documents sufficient to show any per-transaction fees charged to participants in the RCI program, including when those per-transaction fees were instituted; why they were instituted; their amounts; and by how much they increase a vendor's monthly integration fees.  The date limitation for this request is January 1, 2009, to the present.

**REQUEST NO. 61.**  All documents and communications relating to the practice of vendors passing through RCI integration fees to dealers.  This request includes not only internal documents and correspondence but also, without limitation, any correspondence between Reynolds and dealers or vendors regarding pass-through integration fees.  The date limitation for this request is January 1, 2014, to the present.

**REQUEST NO. 62.**  All documents and communications relating to the pricing charged by other data integrators for data integration services, including but not limited to CDK (through its 3PA program or subsidiaries DMI and IntegraLink), Authenticom, SelectQu, and SIS, from January 1, 2007 to the present.

**REQUEST NO. 63.**  Documents and communications relating to prices charged to OEMs for access to data on the Reynoldds DMS.

*DMS Architecture, Data Security and System Performance*

**REQUEST NO. 64.**  Documents, communications, codes, scripts, and algorithms sufficient to show the system architecture of your DMS, technological aspects for retrieving data from the DMS database, blocking automated access to data on your DMS, or any other relevant technological matter to the claims and defenses in this case.  The date limitation for this request is January 1, 2016, to the present.  For the avoidance of doubt, this request includes, without limitation:

    a.    Codes, scripts, and/or algorithms sufficient to show how you block automated access to data on the DMS;

    b.    Codes, scripts, and/or algorithms sufficient to show how data is retrieved from the DMS database;

    c.    Codes, scripts, and/or algorithms sufficient to show how data is entered, stored, and organized on the DMS database;

    d.    Documents sufficient to show the technological aspects for how data extraction occurs from the DMS database when using the RCI and/or 3PA programs;

    e.    Documents sufficient to show the technological aspects for how data extraction occurs from the DMS database when using independent integrators such as DMI, IntegraLink, or otherwise; and

    f.     All documents and communications reviewed by any testifying and/or consulting experts on data security and system performance engaged by you for this case, whether for the Authenticom preliminary injunction hearing or otherwise.

**REQUEST NO. 65.**  All documents and communications regarding Reynolds' use of Authenticom for data integration services.  The date limitation for this request is January 1, 2007, to the present.  For the avoidance of doubt, this request includes any instance in which a Reynolds-owned (wholly, jointly, or partially) add-on application used Authenticom for data integration services with respect to any DMS platform.

**REQUEST NO. 66.**  All documents and communications regarding data security and/or DMS system performance with respect to Authenticom's access to the Reynolds or CDK DMSs.  There is no date limitation for this request.

**REQUEST NO. 67.**  All documents, communications, or analyses regarding any specific security incident directly caused by Authenticom's (or any other independent integrator's) automated access to data on the CDK or Reynolds DMSs.  There is no date limitation for this request.

**REQUEST NO. 68.**  All documents, communications, or analyses with respect to the effects on DMS system performance of Authenticom's (or any other independent integrator's) automated access to data on the CDK or Reynolds DMSs, including any specific system performance issue directly caused by Authenticom or any other independent integrator.  There is no date limitation for this request.

**REQUEST NO. 69.**  Documents and communications relating to the technological methods used by Reynolds to block or disable dealer-provided login credentials.  The date limitation for this request is January 1, 2009, to the present.

**REQUEST NO. 70.**  Documents sufficient to show how dealer data is stored on the Reynolds DMS.  The date limitation for this request is January 1, 2014, to the present.  For the avoidance of doubt, this request includes, without limitation:

26

a.      Documents sufficient to show whether a dealer's data is stored separate from the data of other dealers;

b.      Documents sufficient to show whether a dealer's data is commingled with data that does not belong to the dealer; and

c.      Documents sufficient to show where dealer data is stored (whether on servers at the dealership; at Reynolds-managed server farms; at third-party managed server farms; or somewhere else).

**REQUEST NO. 71.**  Documents and communications sufficient to show the specific security measures Reynolds has instituted to protect the security of dealer data.  The date limitation of this request is January 1, 2009, to the present.

**REQUEST NO. 72.**  Documents sufficient to show the security infrastructure of the Reynolds DMS and how it has changed over time.  The date limitation for this request is January 1, 2009, to the present.

**REQUEST NO. 73.**  All documents and communications referencing, relating to, or concerning the August 28, 2013 memo of the National Automobile Dealers Association, which was introduced as Defendants' Exhibit 15 at the Preliminary Injunction Hearing.

**REQUEST NO. 74.**  All documents and communications referencing, relating to, or concerning the Gramm-Leach-Bliley Act in connection with data integration services.

**REQUEST NO. 75.**  All documents and communications relating to any prospective sale of Reynolds, whether to a private equity firm, another corporation, or to public investors. The date limitation for this request is January 1, 2014, to the present.

### *Miscellaneous*

**REQUEST NO. 76.**  All documents and communications relating to any competitive threat or challenge posed by independent data integrators to Reynolds' business, including without limitation, to Reynolds' core DMS business and Reynolds' add-on applications.  The date limitation for this request is January 1, 2014, to the present.

**REQUEST NO. 77.**  All documents and communications relating to any competitive threat or challenged posed by application providers to Reynolds' DMS business, including without limitation, any threat of disintermediation.

**REQUEST NO. 78.**  All documents and communications regarding Reynolds effort to advantage its own add-on applications as compared to applications offered by third-party vendors.  The date limitation for this request is January 1, 2009, to the present.  For the avoidance of doubt, this request includes, without limitation:

> a.  All documents and communications regarding any "closed categories" of application types that Reynolds would not permit into the RCI program;

> b.  All documents and communications regarding any functionality with respect to access to dealer data requested by vendors through the RCI program that Reynolds refused, such as the ability to write repair orders back into the DMS; and

> c.  All documents and communications regarding any effort to disrupt the workflow of applications offered by competing vendors.

**REQUEST NO. 79.**  Documents sufficient to show Reynolds' organizational structure, including leadership positions over Reynolds' DMS and data integration businesses, from January 1, 2007, to the present.

Dated:  October 2, 2017                    Respectfully submitted,

*s/ Jennifer L. Gregor*

Jennifer L. Gregor
Allison W. Reimann
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI 53703
Phone: 608-257-3911
Fax:    608-257-0609
Email: jgregor@gklaw.com
areimann@gklaw.com

Michael N. Nemelka *(pro hac vice)*
Aaron M. Panner *(pro hac vice)*
David L. Schwarz *(pro hac vice)*
Kevin J. Miller *(pro hac vice)*
Derek T. Ho *(pro hac vice)*
Joshua Hafenbrack *(pro hac vice)*
Joanna T. Zhang *(pro hac vice)*
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax:    (202) 326-7999
Email: mnemelka@kellogghansen.com
apanner@kellogghansen.com
dschwarz@kellogghansen.com
kmiller@kellogghansen.com
dho@kellogghansen.com
jhafenbrack@kellogghansen.com
jzhang@kellogghansen.com

*Attorneys for Plaintiff Authenticom, Inc.*

29

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 2, 2017, I caused a true and correct copy of the foregoing Authenticom, Inc.'s First Set of Requests for the Production of Documents for Defendant The Reynolds and Reynolds Company to be served by email upon the following individuals:

Mark W. Ryan (mryan@mayerbrown.com)
Britt M. Miller (bmiller@mayerbrown.com)
Jeffrey A. Simmons (jsimmons@foley.com)
Aundrea K. Gulley (agulley@gibbsbruns.com)
Michael P. A. Cohen (mcohen@sheppardmullin.com)
John S. Skilton (jskilton@perkinscoie.com)

*s/ Michael N. Nemelka*
Michael N. Nemelka