# Exhibit G

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817 Case No. 18-cv-00864 |
| This Document Relates To:  ALL ACTIONS | Honorable Robert M. Dow, Jr. Magistrate Judge Jeffrey T. Gilbert |

**DEALERSHIP CLASS PLAINTIFFS' AMENDED FIRST SET OF REQUESTS FOR THE**
**PRODUCTION OF DOCUMENTS FOR**
**DEFENDANT THE REYNOLDS AND REYNOLDS COMPANY**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs Baystate Ford Inc.; Cliff Harris Ford, LLC d/b/a Warrensburg Ford; Hoover Automotive, LLC d/b/a Hoover Dodge Chrysler Jeep of Summerville; JCF Autos LLC d/b/a Stevens Jersey City Ford; Jericho Turnpike Sales LLC d/b/a Ford & Lincoln of Smithtown; Jim Marsh American Corporation d/b/a Jim Marsh Mitsubishi Suzuki Kia Mahindra; John O'Neil Johnson Toyota, LLC; Kenny Thomas Enterprises, Inc. d/b/a Olathe Toyota; Marshall Chrysler Jeep Dodge, LLC; Patchogue 112 Motors LLC d/b/a Stevens Ford; Pitre Imports, LLC d/b/a Pitre Kia; Pitre, Inc. d/b/a Pitre Buick GMC; Teterboro Automall, Inc. d/b/a Teterboro Chrysler Dodge Jeep Ram; Waconia Dodge, Inc. d/b/a Waconia Dodge Chrysler Jeep Ram; and Warrensburg Chrysler Dodge Jeep, L.L.C. ("Dealership Class Plaintiffs") request that The Reynolds and Reynolds Company ("Reynolds") produce all documents in its actual or constructive possession, custody, or control related directly or indirectly to any of the matters described below, subject to the Definitions and Instructions set forth herein. All documents and tangible things responsive hereto shall be produced to the undersigned counsel, or at such other location as is mutually acceptable to the parties, by the time prescribed, or at such other time and place as the parties mutually agree.

By this service, the Dealership Class Plaintiffs amend their First Set of Requests *nunc pro tunc* to include Request No. 45.

## I. DEFINITIONS

This section sets forth specific definitions applicable to certain words and terms used herein. Unless words or terms have been given a specific definition in this section or in a specific Request, each word or term shall be given its usual and customary dictionary definition, except where a word or term has a specific customary and usage definition in your trade and industry. In that case, the word or term shall be interpreted in accordance with the specific customary and usage definition.

1. "Add-on application" means a software application that dealers use in addition to or separate from their Dealer Management System ("DMS") software in the course of operating their dealerships.

2. "All" shall be construed as all and any, and the term "any" shall be construed as all and any.

3. "Authenticom" shall mean Authenticom, Inc. (Plaintiff in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-cv-318 (W.D. Wis.), now consolidated as a part of the above-captioned MDL), a provider of Data Integration Services in the automotive industry based in La Crosse, Wisconsin. "Authenticom" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

4. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the document request all responses that might otherwise be construed to be outside of its scope.

5.     "CDK" shall mean CDK Global, LLC, a publicly traded Delaware corporation with its corporate headquarters and principal place of business located at 1950 Hassell Road, Hoffman Estates, Illinois. "CDK" shall include the Dealer Services business of Automatic Data Processing, Inc. ("ADP"), or any other predecessor to CDK. "CDK" shall also include its present or former subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants, including those of ADP's Dealer Services business or any other predecessor to CDK.

6.     "Communication" shall mean any exchange or transfer of information, whether electronic, written, oral, or in any other form. The phrase "communication between" is defined to include instances where one party addresses the other party but the other party does not necessarily respond.

7.     "Data access policies" means Your policy with respect to the ability of dealers to authorize independent integrators to access data on the DMS or otherwise grant third parties access to their data on the DMS.

8.     "Data integrator(s)" shall refer to any service provider(s) that provide access by any means to dealer data on the DMS database, whether by extracting the data, writing data back into the DMS, or both. For the avoidance of doubt, "data integrator(s)" includes CDK (through its 3PA program) and Reynolds (through its RCI program).

9.     "Data Integration Services" or "DIS" shall refer to the extracting, transforming, integrating, and/or organizing of data house on dealer data management systems.

10.     "Dealers" or "Dealerships" shall refer to businesses engaged in retail automobile sales, including but not limited to the Dealership Class Plaintiffs in this litigation.

3

11. "DMI" shall mean Digital Motorworks, Inc., a data integrator and wholly owned subsidiary of CDK. "DMI" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

12. "DMS" shall mean Dealer Management System, the mission-critical enterprise software that manages nearly every function of a dealer's business. DMS software handles and integrates the critical business functions of a car dealership, including sales, financing, inventory management (both vehicle and parts), repair and service, accounting, payroll, human resources, marketing, and more. The DMS also operates as a database, housing dealer data related to inventory, customer, sales, and service information.

13. The "DMS Market" shall mean the market for the provision of DMS services to new car franchised automobile dealers.

14. "Document" and "documents" are used in the broadest extent permitted by Federal Rule of Civil Procedure Rule 34(a) and shall include, but not be limited to any original, reproduction or copy, and/or non-identical copy (i.e., copy with marginal notes, deletions, etc.) of any kind of writings, drawings, graphs, charts, photographs, videos or sound recordings, images, data or data compilations, and/or documentary material, including but not limited to emails, letters, text messages, press releases, postings, instructions, memoranda, notes, diaries, journals, calendars, contract documents, publications, advertisements, calculations, estimates, vouchers, minutes of meetings, invoices, reports, studies, computer tapes, computer disks, computer cards, computer files, photographs, negatives, slide decks or slides, dictation belts, voice tapes, and telegrams. This includes any materials documenting, reflecting, or relating to discussions, conversations, telephone calls, meetings, presentations, conferences, seminars, and/or other spoken or oral communications. Drafts or

non-identical copies of, and amendments or supplements to, any of the foregoing are separate documents within the meaning of this term.

15.     "FTC Complaint" means the Federal Trade Commission Administrative Complaint, *In the Matter of CDK Global, Inc. et al.*, Index No. 1710156, ECF No. 9382 (March 19, 2018) (Redacted Public Version).

16.     "IntegraLink" shall mean IntegraLink, a data integrator and wholly owned subsidiary of CDK. "IntegraLink" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

17.     "Including" (in addition to its usual meanings) shall mean including but not limited to.

18.     "Meeting" shall mean, without limitation, any assembly, convocation, encounter, communication or contemporaneous presence (whether in person or via any electronic, computer-assisted, digital, analog, video, or telephonic method of communication) of two or more persons for any purpose, whether planned or arranged, scheduled or not.

19.     "Person" or "persons" shall mean, without limitation, any individual, corporation, partnership or any variation thereof (*e.g.*, limited partnership, limited liability partnership), limited liability company, proprietorship, joint venture, association, government entity, group or other form of legal entity.

20.     "Price Secrecy Provision" means any contractual provision designed to prevent vendors from informing dealers or other third parties about the pricing charged under the 3PA or RCI programs.

21.     The terms "relating to," "related to," "referring to," "regarding," or "with respect to" shall mean, without limitation, the following concepts: concerning, discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part.

22.     "Reynolds" shall mean The Reynolds & Reynolds Company, an Ohio corporation with its corporate headquarters and principal place of business located at One Reynolds Way, Kettering, Ohio. "Reynolds" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

23.     "SecurityFirst" shall mean the CDK initiative to revamp its 3PA program publicly announced in June 2015.

24.     "SIS" means Superior Integrated Solutions, Inc. and shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

25.      "Third Party Integrators" shall mean data integrators that provide Data Integration Services on a DMS platform and are independent of or unaffiliated with the DMS provider.

26.     "Vendors" or "application providers" shall mean Vendors who provide software applications that perform operations functions for dealerships, such as inventory management, customer relationship management, and electronic vehicle registration and titling, among other functions.

27.     "You," "Your" or "Your Company" mean the responding defendant, its predecessors, successors, parents, subsidiaries, departments, divisions, joint ventures, and

affiliates, including without limitation any organization or entity that the responding defendant manages or controls, together with all present and former directors, officers, employees, agents, representatives or any persons acting or purporting to act on behalf of the responding defendant.

28.     Any term stated in the singular includes the plural and vice versa.

29.     The use of any tense of any word includes all other tenses.

## II.    INSTRUCTIONS

1.     All documents shall be produced as they are maintained in the ordinary course of business, and shall be produced in their original folders, binders, covers or containers, or facsimile thereof, *i.e.*, documents maintained electronically shall be produced in the manner in which such documents are stored and retrieved.

2.     In responding to these Requests, you shall produce all responsive documents (including those stored electronically), which are in your possession, custody or control, or in the possession, custody or control of your predecessors, successors, parents, subsidiaries, divisions or affiliates, or any of your respective directors, officers, managing agents, agents, employees, attorneys, accountants or other representatives. A document shall be deemed to be within your control if you have the right to secure the document or a copy of the document from another person having possession or custody of the document.

3.     Each Request for documents seeks production of all documents described along with any attachments, drafts, and non-identical copies in any language whatsoever and created or used for any purpose, including, without limitation, the making of notes thereon. You are specifically instructed to review any storage and archive facilities and the personal files, records, notes, correspondence, daily calendars, telephone logs, and records of all persons who would likely have responsive documents.

7

4.      To the extent that there are documents containing information relevant to these Requests that are currently in electronic format, the documents are to be produced in their native format.

5.      Privilege logs shall be promptly provided and must be sufficiently detailed and informative to justify the privilege. No generalized claims of privilege or work-product protection shall be permitted. With respect to each document or communication for which a claim of privilege or work product is made, the asserting party must at the time of assertion identify:

(a)      The exact basis for withholding or redacting the document or communication;

(b)      The medium of such document or communication;

(c)      The general subject matter of such document or communication (such description shall not be considered a waiver of Your claimed privilege);

(d)      Any document that was the subject of such document or communication and the present location of any such document;

(e)      All persons making or receiving the privileged or protected document or communication; and

(f)      Any document which records, refers, or relates to such document or communication and the present location of any such document; and

(g)      The steps taken to ensure the confidentiality of the documents or communication, including affirmation that no unauthorized persons have received the document or communication.

6.      If a portion of any document responsive to these Requests is withheld under claim of privilege pursuant to Instruction No. 5, any non-privileged portion of such document must be produced with the portion claimed to be privileged redacted.

7.      The log should also indicate, as stated above, the location where the document was found.

8.      You are to produce each document requested herein in its entirety, without deletion or excision (except as qualified by Instructions Nos. 5 and 6 above), regardless of whether you consider the entire document to be relevant or responsive to the Requests.

9.      Documents attached to one another should not be separated. If any portion of any document is responsive to any portion of the document Requests below, then the entire document, including any attachments to the document, must be produced.

10.     Whenever a document is not produced in full or is produced in redacted form, so indicate on the document and state with particularity the reason or reasons it is not being produced in full, and describe to the best of your knowledge, information and belief, and with as much particularity as possible, those portions of the document which are not being produced.

11.     If a document responsive to these Requests was at any time in your possession, custody or control but is no longer available for production, as to each such document state the following information:

(a)      Whether the document is missing or lost;

(b)      Whether it has been destroyed;

(c)      Whether the document has been transferred or delivered to another person, and, if so, at whose request;

(d)      Whether the document has been otherwise disposed of; and

9

(e)     A precise statement of the circumstances surrounding the disposition of the document and the date of its disposition.

12.     References to specific portions of your contracts with Dealers, Vendors, and others are provided solely as a convenience – to assist you in understanding the relevance or the types of documents sought – and are not intended to, and do not, narrow or otherwise limit the scope of the Request.

13.     A Request to produce "all documents" means you must produce every non-identical document responsive to the subject matter of the Request. A Request to produce "documents sufficient to" identify or describe certain facts means you may select which documents to produce in response to the Request so long as you reasonably believe they include all of the information relating to the subject matter of the Request that would be reflected in all of the documents responsive to the Request. In lieu of producing "documents sufficient to" identify or describe certain facts, you may produce "all documents" relating to the subject matter of the Request. In that event, you should state that you have produced "all documents" relating to the Request in your written response to these Requests.

14.     Provide a source list that clearly identifies who maintained the document and the location from where it was collected.

15.     Each Request herein shall be construed independently. No Request shall be construed by reference to any other Request for the purpose of limiting the scope of the answers to such Request.

16.     If no document responsive to a Request exists, or if the only documents responsive to a Request are not within your possession, custody or control, please so state in your written response to the Request.

17.     These Requests shall be deemed continuing Requests so as to require supplemental responses if You obtain or discover additional documents between the time of initial production and the time of the trial. Such supplemental documents must be produced promptly upon discovery. Plaintiffs specifically reserve the right to seek supplementary responses and the additional supplementary production of documents before trial.

18.     These Requests incorporate by reference all Requests for the production of documents previously served on defendant Reynolds by Authenticom in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-cv-318 (W.D. Wis.), now consolidated as a part of the above-captioned MDL.

## III.    RELEVANT TIME PERIOD

Except as otherwise specified, each document Request concerns the time period from January 1, 2013 through the present (the "Relevant Time Period"). In responding to the Requests, you must produce all documents created, dated, prepared, drafted, generated, modified, sent, provided, obtained, used, or received during the Relevant Time Period, or the time period otherwise specified by the Request, that are responsive, in whole or in part, to the subject matter of the Request, and all responsive documents created before or after the Relevant Time Period, or the time period otherwise specified by the Request, that relate, in whole or in part, to facts, transactions, events, or occurrence taking place, or anticipated to take place, during the Relevant Time Period or the time period otherwise specified by the Request.

## REQUESTS FOR THE PRODUCTION OF DOCUMENTS

**REQUEST NO. 1:**

All documents relating to Third Party Integrators' (including DMI's and IntegraLink's) access to data on the Reynolds DMS. There is no date limitation for this Request. For the avoidance of doubt, this Request includes, without limitation:

(a)     all documents and communications between Third Party Integrators and Reynolds regarding third party access to the Reynolds DMS;

(b)     the technological means by which Third Party Integrators access or accessed the Reynolds DMS;

(c)     the technological means by which Reynolds has either blocked (or attempted to block) or permitted Third Party Integrators' access to the Reynolds DMS;

(d)     all documents regarding Third Party Integrators' access to the Reynolds DMS;

(e)     all documents and communications with Vendors or Dealers regarding Third Party Integrators' access to the Reynolds DMS;

(f)     all documents sufficient to show which of Reynolds' Dealer customers utilized Third Party Integrators (as opposed to the RCI program) to provide access to their Reynolds DMS data, including the time period during which each Dealer utilized a Third Party Integrator; and

(g)     all documents relating to any Third Party Integrator's wind down of its access to data on the Reynolds DMS.

**REQUEST NO. 2:**

All documents regarding any cooperation, coordination, joint effort, assistance, exchange of information or technical knowhow, or any other type of collaboration between Reynolds and CDK in blocking any Third Party Integrators' access to Dealer data on their respective DMS platforms. There is no date limitation for this Request.

**REQUEST NO. 3:**

All documents regarding any VPN tunnel (or other direct access, *i.e.*, access that does not require the use of login credentials) that Reynolds provided to Third Party Integrators for accessing Dealer data on the Reynolds DMS, including any decision to rescind such access to a Third Party Integrator. There is no date limitation for this request.

**REQUEST NO. 4:**

All documents relating to Reynolds blocking or disabling any Third Party Integrators' access to the Reynolds DMS, including without limitation all documents relating to the technological methods used by Reynolds to block or disable Dealer-provided login credentials, or otherwise block or disable Third Party Integrators' access to the Reynolds DMS.

**REQUEST NO. 5:**

All documents, communications, and statements regarding Reynolds' policies concerning any changes to Reynolds' or other DMS providers' data access policies. There is no date limitation for this Request.

**REQUEST NO. 6:**

All documents regarding the ability of Dealers to authorize, or Vendors to use, Third Party Integrators to access data on non-Reynolds DMS, including the CDK DMS. There is no date limitation for this Request. For the avoidance of doubt, this Request includes, without limitation:

(a)      all communications with Dealers or Vendors, representations to Dealers or Vendors, or statements relating to Dealers or Vendors regarding the ability of Dealers to authorize, or Vendors to use, Third Party Integrators to access data on non-Reynolds DMS, including CDK DMS;

(b)      all statements regarding the ability of Dealers to authorize, or Vendors to use, Third Party Integrators to access data on non-Reynolds DMS, including CDK DMS; and

(c)      all documents regarding the ability of Dealers to authorize, or Vendors to use, Third Party Integrators to access data on non-Reynolds DMS, including CDK DMS.

## REQUEST NO. 7:

All documents and communications from Reynolds to former Dealer customers regarding the differences or similarities between Reynolds and CDK with respect to data access policies. For the avoidance of doubt, this Request includes, without limitation, any documents or communications in which Reynolds marketed its closed access policy as a point of differentiation with the CDK DMS or with other DMS providers.

## REQUEST NO. 8:

All documents regarding the ability of Dealers to extract their data from the Reynolds DMS manually (whether using the Dynamic Reporting tool or otherwise), including when that capability was instituted; the means by which data is extracted; how the means to extract data manually changed, if they changed at all, over the Relevant Time Period; how often Dealers extract their own data for purposes of providing the data to Vendors; how the use of this functionality (*i.e.*, the incidence of its use) has changed over the Relevant Time Period, if at all; and the means by which Dealers send their manually-extracted data to Vendors.

**REQUEST NO. 9:**

All documents concerning any other DMS provider. For the avoidance of doubt, this Request includes:

      (a)    all documents concerning any other DMS provider's DMS and/or DMS services;

      (b)    all documents concerning the system architecture of any other DMS or DMS provider, including but not limited to the technological aspects for retrieving data from any other DMS, blocking of third party access to other DMS, or any other relevant technological matter to the claims and defenses in this case; and

      (c)    all documents concerning competition within the DMS or Data Integration Services market.

**REQUEST NO. 10:**

All documents concerning any of Reynolds' DMS customers switching or attempting to switch to a different DMS provider, including the time and expense associated with changing or switching DMS providers, as well as all documents concerning any of Reynolds' DMS customers who have discontinued use of Reynolds' services since January 1, 2014. For avoidance of doubt, this Request includes, without limitation:

      (a)    all documents concerning any litigation or threatened litigation resulting from such a switch or attempted switch;

      (b)    all documents concerning restricting access to a former customer's Reynolds DMS data or threatening to restrict access to a customer's Reynolds DMS data if it switched to a new DMS provider;

       (c)    all documents concerning customers who have had a contract with Reynolds for DMS and/or DMS services and that contract was not renewed from January 1, 2014 to the present; and

       (d)    all documents concerning customers who have had a month to month contract with Reynolds at any time from January 1, 2014 to present, regardless of whether that customer is a current Reynolds customer.

**REQUEST NO. 11:**

All documents regarding any gain or potential gain of DMS customers in connection with the "SecurityFirst" initiative, "3PA Refresh," and/or CDK's decision to restrict dealers from using third party integrators or otherwise restrict access to Dealer's DMS data.

**REQUEST NO. 12:**

All documents concerning any provision in Reynolds' RCI contracts (or any other Vendor contracts) that provide for automatic renewal or extension of such contracts.

**REQUEST NO. 13:**

All current signed Master Services Agreements and/or contracts, agreements, and/or written understandings between Reynolds and its Dealer customers. Each agreement should include all documents that comprise the DMS contract between Reynolds and the Dealer, including any user guides, addendums, exhibits, and other documents that form the agreement between Reynolds and its Dealer customers.

**REQUEST NO. 14:**

All documents concerning any provision in Reynolds' DMS contracts that provide for automatic renewal or extension of Reynolds' DMS contracts.

**REQUEST NO. 15:**

All documents with respect to any changes or proposed changes to material terms in the Reynolds DMS contract, including with respect to the use of Third Party Integrators; and automatic renewal and/or extension of the contract.

**REQUEST NO. 16:**

All documents sufficient to show (1) which Dealers use or used a Reynolds DMS; (2) when each Dealer customer first used a Reynolds DMS; (3) how long each Dealer customer's tenure as a client of Reynolds has lasted; and (4) if any Dealer no longer uses a Reynolds DMS, when Dealer ceased using the DMS provider. For the avoidance of doubt, Reynolds shall provide the above information for any Dealer that was a customer of Reynolds at any time during the Relevant Time Period.

**REQUEST NO. 17:**

All documents sufficient to show the monthly pricing for DMS services paid by each Dealer customer identified in Request No. 16.

**REQUEST NO. 18:**

All documents relating to any change in the pricing for DMS services paid by Reynolds' Dealer customers.

**REQUEST NO. 19:**

All documents sufficient to show the total number of Dealers (both by Dealership group and by rooftop) that used a Reynolds DMS, broken down on a month-by-month basis.

**REQUEST NO. 20:**

All documents sufficient to show the cost of Reynolds providing DMS services separate and apart from providing Data Integration Services.

17

**REQUEST NO. 21:**

All documents relating to any Dealer that once obtained DMS services from Reynolds, but no longer does, including documents sufficient to show the reasons why those Dealers no longer obtain DMS services from Reynolds.

**REQUEST NO. 22:**

Documents sufficient to show any up-front initiation fees, per-dealership setup or installation fees, per-transaction fees, or other one-time charges that Reynolds has charged to its Dealer customers for DMS services, broken down on a Dealer-by-Dealer basis. This Request includes documents sufficient to show when these fees or charges were instituted; why they were instituted; their amounts; and by how much they increase a Dealer's monthly DMS fees.

**REQUEST NO. 23:**

All documents relating to the pricing charged by other DMS providers, including but not limited to CDK.

**REQUEST NO. 24:**

All documents concerning restrictions on Vendors' use of Third Party Integrators to access DMS data on Reynolds systems. For the avoidance of doubt, this Request includes, without limitation, all documents concerning any provision in Reynolds' RCI or Vendor contracts that limit the ability of Vendors to use Third Party Integrators to access data on Reynolds DMS systems or otherwise require that Vendors use RCI to access data on Reynolds DMS.

**REQUEST NO. 25:**

All documents sufficient to show what each Vendor paid for Data Integration Services on a month-by-month basis until they stopped using IntegraLink and/or DMI for each month of the Relevant Time Period. For the avoidance of doubt, if any Vendor so identified no longer obtains

Data Integration Services from IntegraLink or DMI, provide documents and documents sufficient to show when they stopped and what they paid when they stopped.

**REQUEST NO. 26:**

All documents concerning restrictions on Dealers' ability to allow third parties to access data on the Reynolds DMS systems. For the avoidance of doubt, this Request includes, without limitation:

(a)     all documents concerning any restrictions on Dealers' use of Third Party Integrators to access DMS data on Reynolds systems;

(b)     all documents concerning any provision in Reynolds' DMS contracts that limit the ability of Dealers to use Third Party Integrators to access data on Reynolds DMS systems;

(c)     all documents and communications with Dealers relating to whether they can (or cannot) authorize Third Party Integrators to access data on the Reynolds DMS, including any communications that cite provisions in a particular DMS contract to that effect;

(d)     all documents relating to the enforcement or threat of enforcement of Reynolds' DMS contract against Dealers with respect to third-party access to data on the Reynolds DMS; and

(e)     all documents relating to Dealer rights under DMS contracts to authorize third parties to access data on the Reynolds DMS.

**REQUEST NO. 27:**

All documents sufficient to show the technological aspects of:

19

(a)     how data extraction occurs from the DMS database when using Third Party Integrators;

(b)     extracting data for Third Party Integrators differs from those for (i) DMI or IntegraLink or (ii) participants of the 3PA program;

(c)     how manual extraction of data occurs from the DMS database; and

(d)     how the technological aspects of manually extracting data from the DMS database differs from the technological aspects of extracting data for (i) DMI or IntegraLink or (ii) participants of the 3PA program.

**REQUEST NO. 28:**

All documents regarding Reynolds' use of any Third Party Integrator, including but not limited to Authenticom, for Data Integration Services. For the avoidance of doubt, this Request includes any instance in which a Reynolds-owned (wholly, jointly, or partially) add-on application used a Third Party Integrator for Data Integration Services with respect to any DMS platform.

**REQUEST NO. 29:**

All documents regarding data security and/or DMS system performance with respect to any Third Party Integrator's access to the Reynolds or CDK DMSs. There is no date limitation for this Request. For the avoidance of doubt, this Request includes, without limitation:

(a)     all documents relating to the effect of Third Party Integrators' access to the Reynolds DMS on the performance of the Reynolds DMS;

(b)     all documents relating to any data security incidents caused by Third Party Integrators' access to the Reynolds DMS; and

(c)     all documents relating to any specific system performance issue that was or is directly attributable to third parties' access to the Reynolds DMS.

**REQUEST NO. 30:**

All documents sufficient to show how Dealer data is stored on the Reynolds DMS. For the avoidance of doubt, this Request includes, without limitation:

        (a)     all documents sufficient to show whether a Dealer's data is stored separate from the data of other Dealers;

        (b)     all documents sufficient to show whether a Dealer's data is commingled with data that does not belong to the Dealer;

        (c)     all documents sufficient to show where Dealer data is stored (whether on servers at the Dealership, at Reynolds-managed server farms, at third-party managed server farms, or at some other location, or in some other manner); and

        (d)     all documents sufficient to show how the storage of Dealer data may have changed over the Relevant Time Period.

**REQUEST NO. 31:**

All documents sufficient to show the specific changes to security measures instituted by Reynolds to protect security of Dealer data.

**REQUEST NO. 32:**

All documents referencing, relating to, or concerning the National Automobile Dealers Association in connection with Dealer data or data security, including, but not limited to, an August 28, 2013 memo of the National Automobile Dealers Association sent to members concerning Dealer data guidance and a 2014 memo entitled, "10 Steps Dealers Need To Take To Protect 'Dealer Data.'"

**REQUEST NO. 33:**

All documents demonstrating the attendance or participation of a Reynolds representative at any conference or convention where customers or potential customers attended, including but not limited to any Digital Dealer Conference or any National Auto Dealers Association conference or convention. This Request includes any memos, diary entries, and travel, accommodation, and restaurants receipts, or any other documentation evidencing reimbursement for attendance at the conference or convention.

**REQUEST NO. 34:**

All documents produced, used or distributed at any conference or convention where customers or potential customers attended, including but not limited to any Digital Dealer Conference or any National Auto Dealers Association conference or convention. This Request includes any memos, videos, emails and any other materials used to inform, instruct and/or train Reynolds representatives to market any of Reynolds' services to Dealers at any convention, meeting, gathering or informational events that would at any time include current or potential CDK customers.

**REQUEST NO. 35:**

Any Civil Investigative Demand served on Reynolds pertaining to alleged anticompetitive conduct and/or acquisitions by CDK and/or Reynolds. For avoidance of doubt, this request is for the Civil Investigative Demand itself and any attachments.

**REQUEST NO. 36:**

All documents concerning Reynolds sales data and information, including but not limited to invoices, relating to any data integrators or the following Vendors: TrueCar, Carfax, Autotrader, Cars.com, vAuto, Dealer.com, DealerSocket, RouteOne, NakedLime and DealerRater, and/or any of their subsidiaries, affiliates or related entities.

**REQUEST NO. 37:**

All documents exchanged between Reynolds and CDK and any Vendor relating to changes in data integration fees impacting (or potentially impacting) Vendors' prices and fees to Dealerships. This includes but is not limited to any documents or communications that relate in any way to Vendors increasing their prices and fees to Dealerships as a result of increases in data integration fees charged by Reynolds and/or CDK.

**REQUEST NO. 38:**

All documents concerning Reynolds's actual and projected financial results on a weekly, monthly, quarterly and/or yearly basis during the Relevant Time Period, including but not limited to:

      (a)      internal projections;

      (b)      profit and loss statements, analyses or projections;

      (c)      cost analyses or projections;

      (d)      analyses or projections of gross margins;

      (e)      budgets;

      (f)      marketing plans;

      (g)      business plans or other planning documents; and

      (h)      financial statements, including any filings with governmental agencies or presentations to banks or other financial institutions.

**REQUEST NO. 39:**

All documents concerning Reynolds's policies and/or practices directed at compliance with the United States antitrust laws.

**REQUEST NO. 40:**

All documents concerning any insurance policies, indemnification agreements or hold harmless agreements that may provide coverage for any of the claims or causes of action asserted in this action, or that may provide reimbursement for payments made or costs incurred in defense of this action.

**REQUEST NO. 41:**

All documents concerning CDK's policies and/or practices regarding the retention, destruction, disposal, and/or preservation of documents.

**REQUEST NO. 42:**

All documents concerning the potential for entities to enter into the market for the supply of DMS, including the potential for such entry and the barriers or obstacles for such entry.

**REQUEST NO. 43:**

All documents concerning the potential for entities to enter into the market for the supply of DIS, including the potential for such entry and the barriers or obstacles for such entry.

**REQUEST NO. 44:**

All documents concerning Reynolds sales data and information, including but not limited to invoices and all underlying data used to generate invoices for Vendors that used (1) DMI, (2) Integralink, and/or (3) the RCI program for data integration services, from 2011 to the present, as well as all underlying data used to generate invoices for dealers that used a Reynolds DMS, from January 1, 2011 to the present. This request includes but is not limited transactional data which shows the payor, date, price, discount, net payable, the category of data polled, as well as records that show the amounts paid to CDK in response to invoices.

**REQUEST NO. 45:**

This RFP incorporates all RFPs propounded by the Individual Plaintiffs and formally requests all documents sought by those RFPs.


Dated: June 13, 2018                    Respectfully submitted,

                                        */s/ Peggy J. Wedgworth*_____
                                        Peggy J. Wedgworth
                                        Elizabeth McKenna
                                        **MILBERG TADLER PHILLIPS GROSSMAN LLP**
                                        One Pennsylvania Plaza, 19th Floor
                                        New York, NY 10119
                                        (212) 594-5300
                                        pwedgworth@milberg.com
                                        emckenna@milberg.com

                                        *Dealership Interim Lead Class Counsel*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 13, 2018, I caused a true and correct copy of the foregoing

Dealership Class Plaintiffs' Amended First Set of Requests for the Production of Documents for

Defendant The Reynolds and Reynolds Company to be served by email upon the following

recipients:

SERVICE-EXTERNAL-DMS-MDL@lists.kellogghansen.com


*/s/ Elizabeth McKenna*

Elizabeth McKenna