# Exhibit T

**MAYER·BROWN**

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel +1 312 782 0600
Main Fax +1 312 701 7711
www.mayerbrown.com

Matthew D. Provance
Direct Tel +1 312 701 8598
Direct Fax +1 312 706 9397
mprovance@mayerbrown.com

July 30, 2018

**BY E-MAIL**

Michael N. Nemelka
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 60036

Re:   *In re Dealer Management Systems Antitrust Litig.*,
      MDL No. 2817, Case No. 18-CV-864 (N.D. Ill.)

Dear Mike:

I write in follow-up to our July 19, 2018, meet-and-confer regarding non-Dealer Plaintiffs' (Cox, AutoLoop, MVSC, and Authenticom) ("Plaintiffs") May 25, 2018, requests for production ("RFPs" or "Requests") to CDK Global, LLC's ("CDK").

**Responsive Time Period**

*Responsive Time Period for Certain Cox, AutoLoop, MVSC Discovery:*  As discussed during our meet-and-confer, CDK's responses to certain Requests (2, 3, 4-6, 8, 16, and 26) seeking documents related to negotiations with Plaintiffs Cox, AutoLoop, and MVSC related to their participation/possible participation in the 3PA program include date limitations of January 1, 2015 (for Cox and AutoLoop) and January 1, 2014 (for MVSC) based on the timing of when those negotiations began.  Plaintiffs challenge those limitations, seeking responsive documents from CDK back to 2013 and, in some cases, 2011.  But at the same time, these three Plaintiffs maintain that *their own* productions should be limited across-the-board—not just for certain document requests—to 2014 to the present (Cox and AutoLoop) and 2015 to the present (MVSC).[1]  There is no justification for Plaintiffs' inconsistent positions on what the relevant time period should be, and there is no basis for imposing a broader, more burdensome period on CDK for Cox, AutoLoop, and MVSC-related discovery than those Plaintiffs are willing to

---

[1]    *See* Cox Gen. Obj. No. 10; MVSC Gen. Obj. No. 11.  AutoLoop's written responses to CDK's requests for production state that "[u]nless otherwise stated, AutoLoop's response will relate to the time period January 1, 2013, to the present," AutoLoop Gen. Obj. No. 11, but this is illusory and misleading because AutoLoop apparently is only willing to run ESI search terms from January 1, 2014 to April 9, 2018.  *See* Attachment to 07/12/2018 Email from D. Guarnera to B. Miller and M. Provance.

Mayer Brown LLP

Michael N. Nemelka
July 30, 2018
Page 2

accept. If Plaintiffs will agree to the same for their own discovery responses, then CDK will agree to a general cut-off of January 1, 2013 for Requests 2, 3, 4-6, 8, 16, and 26.[2]

*Pre-2013 Discovery:* Plaintiffs (including Authenticom itself) are now seeking to reopen the general discovery cut-off of January 1, 2013 (with certain exceptions) that the parties agreed to following extensive meet-and-confer discussions in *Authenticom*. In particular, Plaintiffs seek documents and data back to 2011 for certain Requests (2, 3, 4, 43, 44, 46, 54) and discovery of CDK's pricing, cost, revenue, profit, and other categories of financial and other information well into the *2000s* or even earlier (*see* Requests 64, 81-93). We refer you to (and incorporate) our recent correspondence with the Dealership Class Plaintiffs on this issue, which reiterates why we believe 2013 is the appropriate cut-off for the vast majority of discovery in Plaintiffs' cases and the MDL overall, and why it would be inefficient and disproportionate for CDK to retread discovery issues that it has already covered (*e.g.*, sales transactional data) based on the agreed-upon time periods in *Authenticom* simply because Plaintiffs (including Authenticom) now seek substantially the same discovery from a broader time period. *See* 07/25/2018 Ltr. from M. Provance to R. Wallner at 1-3.[3] We would also point out that MDL Plaintiffs have all consistently taken the position that *their own* discovery obligations—including discovery related to their damages claims—should be limited according to cut-off dates of January 1, 2013 or later.

During our meet-and-confer, you argued that extra years of discovery, particularly for CDK's financial data (which CDK is already providing back to 2011 instead of 2013), are now necessary because claims have been asserted on behalf of Dealer and Vendor putative classes. As it relates to the appropriate relevant time period for discovery, we believe that is a distinction without a difference. The Vendor and Dealer putative classes' damages claims are similarly limited, at most, by the four-year limitations period (just like Authenticom). And, to the extent that the putative Vendor and Dealer putative classes will rely on CDK's financial data, CDK is already providing such data back to 2011—providing a "clean period" of at least three to four years before any alleged anticompetitive conduct by CDK.

Therefore, for the reasons noted above, among others, we are not inclined revisit the general 2013/2011 cut-offs that we negotiated with you in connection with the *Authenticom* discovery requests. However, as you know, CDK also has agreed to search for discovery from earlier periods on discrete issues (*e.g.*, documents, communications, or statements regarding third-party access to CDK's DMS and documents related to "SMART-R") through the use of limited search terms (from among those search terms already proposed) and custodians. If Plaintiffs have

---

[2] Moreover, for the reasons discussed below, there is no reason to expand the responsive time period back to 2011 for Requests 2, 3, or 4, as you demanded during our meet-and-confer.

[3] Among other things, January 1, 2013, is several months beyond the applicable limitations period for Plaintiffs' claims. Our July 25 letter to Mr. Wallner cites authority for the proposition that courts routinely recognize the applicable limitations period as a primary if not dispositive factor in defining the relevant time period for discovery in complex civil litigation. In addition to those cases, we also direct you to: *Greene v. Sears Protection Co.*, 2017 WL 1134484, at *5 (N.D. Ill. Mar. 27, 2017).

Mayer Brown LLP

Michael N. Nemelka
July 30, 2018
Page 3

proposals for other one-off categories of documents sought by their Requests, we are willing to consider making additional exceptions if warranted.

**Specific Requests for Production**

Below, we provide further responses to disputed Requests discussed during our July 19 meet-and-confer. Any offers to produce additional categories of documents are subject to and without waiver of CDK's general and specific objections set forth in its initial written responses dated June 22, 2018, and are contingent on resolving the parties' disputes as to the identified Requests.

*Request 1 (3PA Contracts):* CDK maintains that this Request (originally served as Authenticom RFP 43) is overbroad and unduly burdensome, and CDK's existing commitment to producing documents sufficient to show any material variation in its 3PA contracts, as well as the current version of its standard 3PA contract, is sufficient notwithstanding that Plaintiff AutoLoop now purports to represent a putative class of Vendors. Nevertheless, in the interest of finding a potential compromise for this Request, to the extent that any 3PA program participants have entered into 3PA/Managed Interface Agreements with CDK on or after January 1, 2013 that vary from CDK's standard contract with respect to any of the provisions that are being challenged by the AutoLoop putative class (*i.e.*, the alleged "exclusive dealing" and "price secrecy" provisions), CDK will separately produce those 3PA/Managed Interface Agreements. Please let us know if this would resolve our dispute.

*Request 7 ("Better" 3PA Pricing):* As you know, Cox's allegations that another 3PA member receives "better" pricing than Cox are based exclusively on the terms of CDK's February 2015 3PA agreement with Reynolds—which Cox already has (*see* CDK-0000014-39). CDK is also producing non-privileged documents related to the negotiation and drafting of the CDK-Reynolds 3PA agreement, including any "pricing" terms. Moreover, as we discussed during our meet-and-confer, CDK has already produced structured data (CDK-0701423-49) sufficient to show monthly prices paid by all 3PA members for data integration services. CDK disputes Cox's allegation that other 3PA members receive "better" pricing than Cox for comparable services, so the only way that CDK can reasonably respond to this Request is by producing the objective data on pricing that it has already produced.

*Requests 11-15 (3PA "Categories"):* You asked us to confirm whether documents that are responsive to these Requests would be produced from non-custodial sources. Of course, we have not determined where every document potentially responsive to Plaintiffs' requests may located. To the extent we identify non-custodial sources where responsive documents are reasonably likely to be found, they will be searched (just as CDK has done, and is doing, for all document requests in this litigation). That said, for the majority of Plaintiffs' Requests (including 11-15) we would expect that responsive documents, if any, will be located in the files of agreed-upon custodians through the use of agreed-upon search terms (from among those search terms already proposed). Therefore, where we state below that CDK is prepared produce certain categories of documents "to the extent they exist and can be identified through a reasonable search," that is generally what we mean.

Michael N. Nemelka
July 30, 2018
Page 4

*Requests 19 & 20 ("Push" Functionality; Levels of Integrations):* We explained the overbreadth of these Requests during our meet-and-confer. For example, as phrased, Request 19 literally seeks every piece of data that might be generated by any application that receives a "push" notification through its integration with CDK's DMS. You agreed, and suggested that these Requests could be narrowed. In the interest of finding a potential compromise for these Requests, CDK is prepared to produce non-privileged documents reflecting analyses or consideration by CDK regarding whether to provide "push" notifications for CDK applications only or whether to offer different categories of functionality, data access, or level of data integration through the 3PA program to Vendor applications based on whether those applications compete with CDK applications, to the extent such documents exist and can be identified through a reasonable search. Please let us know if this would resolve our dispute.

*Request 22 (Certification Time):* You explained that this Request seeks documents that discuss how long it takes to certify and deploy integrations requested by Vendors under the 3PA program. You asserted that such documents were relevant because some Vendors believe that CDK "drags its feet." We disagree that the amount of time it takes to certify and deploy 3PA integrations is relevant to any claim or defense in this litigation, and moreover, the amount of time it takes can be different for every Vendor depending on myriad factors, including factors that are outside of CDK's control. Nevertheless, in the interest of finding a potential compromise for this Request, CDK is prepared to produce documents related to any complaints by Vendors that the 3PA certification process is taking too long, to the extent such documents exist and can be identified through a reasonable search. Please let us know if this would resolve our dispute.

*Request 23 ("Project Peach"):* We still fail to see the relevance of "Project Peach," a proposed venture between ODE (a joint venture between CDK and Reynolds) and Cox, which related to credit and contract processing but was never consummated. Your explanation that any and all documents related to Project Peach will purportedly reflect CDK and Reynolds's "views on data access" was not persuasive. Project Peach appears to have had nothing to do with CDK's alleged third-party DMS access restrictions, the use of so-called "independent integrators," or any other core issue that is relevant to the claims and defenses in this litigation.

*Request 24 & 25 (RTS):* Following our discussion of these Requests during the meet-and-confer, in the interest of finding a potential compromise, CDK is prepared to produce documents related to (a) RTS's eligibility or possible participation in the 3PA program, and/or (b) RTS's access to CDK's DMS outside the 3PA program, to the extent such documents exist and can be identified through a reasonable search. Please let us know if this would resolve our dispute.

*Request 29, 31 & 37 (References to Cox, AutoLoop, MVSC):* These Requests seek all communications—and all documents about those communications—between CDK and Dealers and OEMs that in any way mention Cox, AutoLoop, or MVSC, in any context. As we explained, these Requests are overbroad, as not every mention of Plaintiffs, in any context, is relevant to the claims and defenses in this litigation. Cox, AutoLoop, and MVSC seem to understand this concept when communications are requested from *them* that mention or refer to CDK—they

Mayer Brown LLP

Michael N. Nemelka
July 30, 2018
Page 5

objected to producing *any* such documents on the purported ground that the Requests are "overbroad." *See, e.g.*, CDK's RFPs 10 & 32 to Cox; CDK's RFP 8 to AutoLoop. CDK has already agreed to produce documents responsive to these Requests that relate to access to CDK's DMS by Cox, AutoLoop, and MVSC. That limitation should be sufficient to capture the vast majority of relevant communications. However, in the interest of finding a potential compromise for this Request, CDK is also prepared to produce additional documents that relate to (a) the way in which the above-referenced Plaintiffs access or use DMS data; (b) their possible participation in the 3PA program and/or 3PA certification status; and (c) their security and data practices, to the extent such documents exist and can be identified through a reasonable search. If there are additional, relevant topics that you would like us to consider, please let us know.

*Requests 35 & 36 (EVR Provider 3PA Certification):* As drafted, these Requests are overbroad. Nevertheless, in addition to documents sufficient to show the EVR providers who are enrolled in CDK's 3PA program and the contractual terms and conditions of their enrollment, which CDK has already agreed to produce, in the interest of finding a potential compromise CDK is prepared to produce documents related to negotiations with EVR providers for their participation in the 3PA program, including pricing terms, to the extent such documents exist and can be identified through a reasonable search. Please let us know if this would resolve our dispute.

*Request 38 (MVSC Executives):* We are formulating an appropriate search term for this Request and likely will make a proposal tomorrow, or Wednesday.

*Request 39 (Acquisition of MVSC):* Notwithstanding our objections to this Request, and that we fail to see the relevance of any contemplated acquisition of MVSC to the claims and defenses at issue, we are still confirming whether any non-privileged documents that are responsive to this Request exist, and expect to follow up shortly in that regard.

*Requests 43 & 44 (CVR Customer Base and Market Share):* We reiterate that this Request is better directed to CVR, not CDK.[4] However, in the interest of finding a potential compromise for these Requests, CDK is prepared to produce documents sufficient to show the number of CVR's customers for EVR services, on an annual basis, from 2013 to 2017, to the extent those statistics are maintained by CDK. Further, to the extent that a state-by-state breakdown of those statistics exists, it will be included in CDK's production. As we explained, CDK may not be able to conclusively determine, much less produce documents that are "sufficient to show," CVR's "share" of EVR customers. Any estimates of "share" would be based on CVR's own

---

[4] This Request is among many seeking information most likely to be found in CVR's corporate records and in the files of its custodians. You again confirmed during our meet-and-confer that Plaintiffs intend to serve separate discovery requests upon CVR. Per your prior conversation with Britt Miller, we understand that Plaintiffs are "holding off" until the Court rules on CVR's pending motion to dismiss so as not to expend unnecessary resources in the event CVR's motion is granted. As Ms. Miller informed you during that same conversation, while CVR appreciates that plaintiffs are trying not to unnecessarily burden CVR, CVR will not be prejudiced by Plaintiffs' delay and it reserves all rights to seek relief from such discovery, including but not limited to an extension of the discovery schedule, based on, among other things, Plaintiffs' delay.

Mayer Brown LLP

Michael N. Nemelka
July 30, 2018
Page 6

EVR customer count and varying estimates of the total number of available EVR users obtained from available data, including public data and third-party data. However, to the extent that such estimates exist and can be identified through a reasonable search—mostly, we would expect, through a review of custodians' files—CDK is prepared to produce them from 2013 to the present if it would resolve the parties' dispute. Please let us know.

*Request 46 (CVR Financial Information):* This is another Request that is better directed to CVR. To the extent CDK maintains CVR-related financial information, it is largely—as you pointed out—for purposes of consolidating CVR's financials into CDK's aggregated financial returns. As you know, CDK has already committed to producing documents sufficient to show its profit, projections, margin, and cost information at the individual product line level (*e.g.*, DMS), at the divisional level (e.g., Data Services), and at the management level (*e.g.*, the Retail Sales corporate level), or some combination thereof, to the extent such documents/information exist, back to 2011. We confirm that to the extent that CDK's profit, projection, margin, and cost information is broken out separately for CVR, it will be produced that way.

*Requests 47 & 48 (CVR "Deficiencies" and EVR Provider Product Quality):* Once again, these Requests are better directed to CVR. But, thank you for the example, CDK-0076911, of a document that Plaintiffs consider to be responsive to these Requests (and we note that the document also would be considered responsive according to the parameters of CDK's written responses to these Requests). We confirm that documents like CDK-0076911 will be produced to the extent that they exist within CDK's possession, custody, or control and can be identified through a reasonable search.

*Request 49 (EVR Delays and "Backlogs"):* As above, this Request is better directed to CVR. However, in the interest of finding a potential compromise for this Request, CDK is prepared to produce—in addition to "backlogs"—documents related to any complaints or concerns regarding delays by EVR providers in processing electronic vehicles registrations and titles, to the extent such documents exist, are within CDK's possession, custody, or control, and can be identified through a reasonable search. Please let us know if this would resolve our dispute.

*Request 51 (EVR Costs of Entry):* Thank you for clarifying that this Request seeks documents discussing or analyzing the licensing requirements, DMV requirements, or "entry" costs associated with providing EVR services (in states where private EVR providers are licensed to offer such services). As clarified, CDK will produce non-privileged documents reflecting CDK's analysis of these issues (EVR licensing requirements, DMV requirements, or "entry" costs), to the extent they exist, are within CDK's possession, custody, or control, and can be identified through a reasonable search. Please let us know if further discussion is needed.

*Request 53 (Reynolds's Interest in CVR):* As we explained, CDK has already produced the operative agreement between CDK and Reynolds concerning the formation and ownership structure of CVR (CDK-0001931), and a number of ancillary agreements pertaining to CVR (*e.g.*, CDK-0002076, CDK-0001964, CDK-0002137, CDK-0002143, CDK-0002010, CDK-0002126, CDK-0002145, CDK-0002130, CDK-0002110, CDK-0002041). Further, in response

Mayer Brown LLP

Michael N. Nemelka
July 30, 2018
Page 7

to Plaintiffs' Request 52, CDK is producing documents sufficient to show CVR's ownership structure, including documents sufficient to show how CVR's revenues and profits are divided between CDK and Reynolds. We are not aware of any other documents in CDK's possession, custody, or control that relate to Reynolds's ownership interest in CVR, which it acquired in the early 1990s. But even if such documents exist, we do not believe they are relevant—the agreements speak for themselves and supersede any collateral documents or communications that might exist from the 1990s discussing Reynolds's ownership interest. Finally, if anyone should have to go looking for documents discussing how and why Reynolds acquired an ownership interest in CVR (which we do not agree is relevant or remotely proportional to the needs of the case) respectfully it should be Reynolds conducting a search of its own files for documents that speak to these issues, not CDK.

*Request 54 (CVR "Financial Benefits"):* As discussed above, CDK is producing documents sufficient to show how CVR is structured and how CVR's profits are allocated. As further discussed above, CDK is also producing documents sufficient to show profit, projections, margin, and cost information, to the extent such information exists and is broken out for CVR, back to 2011. To the extent that this Request seeks documents about other types of "financial benefits" related to CVR, it is not clear what that even means. To the extent that Plaintiffs continue to seek "[a]ll documents and communications" that are in any way related to the CVR-related information that CDK is producing, CDK maintains that the Request is grossly overbroad and unduly burdensome.

*Request 55 (CVR Ownership Agreement):* We are fairly certain that CDK-0001931 is the "operative CVR ownership agreement between CDK and Reynolds," but will confirm this in the short term following additional investigation, which is still ongoing at this time.

*Requests 57 & 58 (CDK's "Involvement" in CVR):* The discovery sought through these Requests relates to MVSC's new allegations that CDK "controls" CVR, which (a) are pled in service of a Section 2 claim that has been dismissed once already and is subject to another pending motion to dismiss, and (b) contradict allegations in MVSC's prior complaints that CDK *and* Reynolds jointly "control" CVR. However, in the interest of finding a potential compromise for this Request, CDK is prepared to search for and produce documents that are responsive to these Requests—to the extent such documents exist and can be identified through a reasonable search—in the event that MVSC's Section 2 claim against CDK is not dismissed. Please let us know if this would resolve our dispute.

*Request 59 (CDK/Reynolds Communications re CVR):* This Request seeks all communications between CDK and Reynolds related to their joint venture, CVR, regardless of their relevance. CDK has already offered to produce such communications if they pertain CVR's operations (*i.e.*, what CVR does), its finances, and/or CVR's participation in CDK and Reynolds's respective 3PA and RCI programs. We are at a loss as to what other topics could remotely be relevant to the claims and defenses in this litigation. If there are additional, relevant topics that you would like us to consider short of "all" communications, we are willing to consider them.

Mayer Brown LLP

Michael N. Nemelka
July 30, 2018
Page 8

*Requests 60 & 61 (AVRS Acquisition):*  Again, documents pertaining to CVR's acquisition of AVRS are better requested from CVR.  Moreover, the CVR-AVRS transaction is not at issue in this litigation and so these Requests for every document in any way related to the acquisition are substantially overbroad.  However, in the interest of finding a potential compromise for this Request, CDK is prepared to produce (a) documents related to the acquisition of AVRS that discuss the impact of the acquisition on CVR's ability to compete with other EVR providers, and (b) documents related any complaints received from Dealers (in other words, "communications regarding deficiencies or perceived deficiencies in AVRS's product and service levels") following the AVRS acquisition, to the extent such documents exist, are within CDK's possession, custody, or control, and can be identified through a reasonable search.  Please let us know if this would resolve our dispute.

*Requests 62 & 63 (CVR, AVRS & Applications' Use of "Independent Integrators"):*  As we discussed, CDK's response to these Requests—in which it agrees to produce non-privileged documents related to any agreements with "independent integrators" with respect to CVR, AVRS (after its acquisition by CVR), or CDK applications' access to data maintained on CDK or Reynolds's DMS, or any other DMS providers with policies restricting third-party access—tracks the offer that CDK made in response to Authenticom RFP 25, which is substantially similar except that it relates to *CDK*'s use of so-called "independent integrators."  To the extent that you believe, as you stated during our meet-and-confer, that there are unresolved issues surrounding Authenticom RFP 25, we suggest that these Requests (Authenticom RFP 25 and Plaintiffs' RFP 62) be discussed together during our next meet-and-confer.[5]

*Request 64 (CVR Board Materials):*  During our meet-and-confer we explained the overbreadth problems with this Request, including that it seeks "[a]ll documents related to CVR's Board of Directors" (In what respects? Are you seeking their personnel files?) from literally the beginning of time and "[a]ll communications between or among CVR's Board of Directors" on any topic or subject matter—*e.g.*, whether they are going to the annual Christmas party, etc.  You acknowledged during our meet-and-confer that the Request was overbroad.  CDK's written response already commits to producing non-privileged documents sufficient to show the composition of CVR's Board of Directors, CVR Board of Directors meeting minutes, and materials distributed to CVR Board members in advance of Board meetings, to the extent those documents exist within CDK's possession, custody, or control.  If there are specific, additional relevant topics that are subsumed within this Request, we believe that it is Plaintiffs' responsibility to identify them for us.

*Requests 65 & 66 (Communications with Authenticom Customers):*  Thank you for identifying the documents produced by Authenticom at AUTH_00045915, AUTH_00045922, AUTH_00009614, and PHX-97.  They appear to identify hundreds of purported Vendor

---

[5]    On our July 19 call, you also accused me of mischaracterizing the record of meet-and-confer discussions and correspondence regarding Authenticom RFP 25.  If that is still your position, please explain how you think I have mischaracterized the record or correspondence.  We have looked into it following our call and believe our representations were accurate.

Mayer Brown LLP

Michael N. Nemelka
July 30, 2018
Page 9

customers and thousands of purported Dealer customers. CDK maintains that producing all communications with hundreds of individual Vendors and thousands of individual Dealers that in any way relate to "data integration services" or "data access," in any context, is overbroad and unduly burdensome. Moreover, it appears to us that this Request seeks additional document discovery on behalf of Authenticom well after the March 23, 2018, deadline established by Judge St. Eve during the MDL consolidation proceedings (Dkt. 43). Can you explain to us why this Request was not served previously? Provided that we receive a satisfactory response, in the interest of finding a potential compromise for these Requests, CDK would be prepared to produce responsive documents with the following limitation: To the extent that such documents exist and can be identified through a reasonable search, CDK will produce communications with the above-identified Dealers and Vendors related to their use (or potential or former use) of Authenticom for data integration services or data access. Please let us know if this would resolve our dispute.

*Request 68 (CDK Cost of Capital):* It appears that Plaintiffs are withdrawing this Request, as you were unable to explain the basis for its relevance during our July 19 meet-and-confer and did not provide one in your July 26 follow-up letter.

*Request 69 ("Economic Value of Data"):* In light of the clarifications that Plaintiffs provided regarding this Request during our meet-and-confer, we believe that documents responsive to this Request are subsumed within other discovery requests to which CDK is producing responsive documents. In other words, to the extent CDK reasonably can identify discussions of the vague and amorphous terms used in this Request like "the economic value of data" in business records reviewed in connection with this litigation, they are being produced.

*Request 70 (CDK "Valuations"):* During our meet-and-confer, we explained why we do not believe that any "valuations" of CDK in connection with potential acquisitions are relevant to any claim or defense in this litigation. No issue has been raised about whether CDK could pay a judgment rendered in this litigation, nor does any party's alleged damages depend on CDK's market value. If there is a clear basis for the relevance of this Request, we have yet to hear it.

*Request 71 (Fortellis):* The Fortellis Automotive Commerce Exchange is a new cloud-based technology platform created by CDK that allows Dealers, Vendors, third-party developers and OEMs to share data and software solutions through the platform using DMS-agnostic API specifications. Currently, CDK has not provided access to its DMS through these APIs. Thus, it is unclear what Fortellis has to do with the claims and defenses in this litigation or how requiring CDK to gather and produce "[a]ll documents" related to Fortellis, including all financial information, could be proportional to the needs of the case. We also note that Fortellis launched in March 2018, which is after the dates that we understand several Plaintiffs have proposed cutting off their own productions of responsive discovery (based on the dates of their complaints), and well after any alleged anticompetitive conduct as and between Reynolds. This appears to be a rank fishing expedition and we have yet to hear a plausible explanation for why all documents related to Fortellis should be produced.

Michael N. Nemelka
July 30, 2018
Page 10

*Request 72 (Projections & Forecasts):* As discussed during our meet-and-confer, we believe that the myriad financial information that CDK is already producing—including documents sufficient to show third-party profit, projections, margin, and cost information—in response to Authenticom RFPs 52, 53, 55, 57, 58, 59, and 60, among others, is sufficient to meet any legitimate need for the discovery sought by this Request.

*Request 73 (Industry Conferences):* Plaintiffs confirmed that this Request is substantially duplicative—despite the Court's direction to the contrary—of the Dealership Class Plaintiffs' RFPs 37 and 38, which collectively seek all documents concerning any "industry conference." One difference may be that this Request is even broader than the Dealership Class Plaintiffs' RFPs in so far as it simply seeks "[a]ll documents" concerning any "industry conference," apparently regardless of whether CDK attended or considered attending the conference. Beyond the grossly overbroad nature of this Request, as we explained during our meet-and-confers with the Dealers, to the extent that relevant events occurred at industry conferences (*e.g.*, the April 2016 discussion between Mr. McCray and Mr. Cottrell mis-described in several Plaintiffs' complaints) or relevant documents were created or disseminated by CDK in connection with industry conferences, those documents likely will be produced in response any number of discovery requests that CDK has received that track the issues in this litigation and not the conferences themselves. For example, non-privileged documents (if any) related to Mr. McCray's conversation with Mr. Cottrell—the alleged content of which, to be clear, we dispute—are being produced in response to Authenticom's RFP 10 ("[a]ll documents and communications referencing, relating to, or concerning Authenticom, DealerVault, or Steve Cottrell"), if not many others. The same is true for other potentially relevant documents, *e.g.*, communications about SecurityFirst or the 3PA "refresh," such that the significant additional burden of responding to these Requests are not proportional to the needs of the case.

*Requests 74 & 75 (Telephone Records):* During our meet-and-confer, Plaintiffs offered to limit these Requests. As we understood the offer, Plaintiffs are willing to accept telephone records (to the extent they exist within CDK's possession, custody, or control) showing calls made between CDK and Reynolds documents custodians, going back to 2014. While we appreciate Plaintiffs' offer, it does not make the telephone records relevant. This is not a case (unlike, for example, *Urethanes* or *Containerboard*) in which Defendants are accused of fixing prices or engaging in coordinated output restrictions such that it would make sense to examine how frequently Defendants communicated or whether they communicated during or in proximity to allegedly parallel price announcements, plant closures, etc. Thus, we appear to be at an impasse regarding these Requests, and CDK does not intend to respond to them.[6]

---

[6] In addition, please be advised that the information CDK has in its possession, custody, or control that may be responsive to these Requests is extremely limited. CDK maintains access to telephone records for employee landline telephone numbers going back, at most, two years. For CDK employees who are on a CDK-sponsored plan with their mobile carrier (AT&T, Verizon, and until 2016, Sprint), CDK's access to telephone records is much more limited. Of course, additional records may be maintained by the carrier—but CDK does not know what records are maintained by each carrier nor can it represent that such records exist.

Mayer Brown LLP

Michael N. Nemelka
July 30, 2018
Page 11

*Request 78 ("Secure the DMS" Dashboard Reports):* As we explained, the "Secure the DMS" Dashboard Reports subject to this Request were generated by CDK employees periodically from information primarily maintained in CDK's Dealer Data Exchange ("DDX") database, which was included in CDK's production of structured data at the Bates numbers listed in CDK's written response to this Request. To the extent that Dashboard Reports are identified in the custodial files that CDK is searching and reviewing to respond to Plaintiffs' discovery requests, we confirm that the Reports will be produced. We have not located any central file or repository that purports to contain all "Secure the DMS" Dashboard Reports, but to the extent such file or repository exists we will consider producing its contents to the extent not duplicative of documents that CDK has already produced or is producing.

*Request 79 (ReverseRisk):* This Request seeks "[a]ll documents regarding access by ReverseRisk to CDK's DMS platform," so every single document, email, data transmission, etc. that relates to ReverseRisk accessing CDK's DMS is requested, without any limitation. While that is grossly overbroad, CDK has already agreed to produce the Managed Interface Agreement and Statement of Work between CDK and ReverseRisk. Your July 26 letter asserts that additional documents and communications regarding ReverseRisk's access to CDK's DMS are relevant because CDK purportedly "whitelisted" ReverseRisk and allowed it to use Authenticom to access data. We disagree with your characterizations, but in the interest of finding a potential compromise for this Request CDK is prepared to produce additional documents related to this issue—the purported "whitelisting" of ReverseRisk in connection with its use of Authenticom to access CDK's DMS, to the extent such documents exist and can be identified through a reasonable search. Please let us know if this would resolve our dispute.

*Requests 81-82, 84-86 (Additional Financial Information):* As discussed during our meet-and-confer, we believe that the myriad financial information that CDK is already producing in response to Authenticom RFPs 52, 53, 55, 57, 58, 59, and 60, among others, is sufficient to meet any legitimate need for the discovery sought by these Requests.

*Request 83 (Sales and Marketing Plans):* Despite the grossly overbroad nature of this Request, and notwithstanding that it is duplicative of several Authenticom RFPs seeking largely the same categories of sales, marketing, and financial information, in the interest of finding a potential compromise for this Request CDK is prepared to produce responsive documents from 2013 to the present to the extent they are identified in custodial files through the use of agreed-upon search terms (from among those search terms already proposed). Please let us know if this would resolve our dispute.

*Requests 87 & 88 (DMS, 3PA, DMI & IntegraLink "Valuations"):* This Request seeking "valuations" of CDK's DMS, 3PA, DMI, and IntegraLink business lines appears to be no more relevant than Plaintiffs' RFP 70, discussed above, which seeks "valuations" of CDK as a whole. CDK objects for largely the same reasons. Further, during our meet-and-confer, you asserted that valuations of CDK's data services businesses were relevant to showing a motive to conspire. What potential motive would any "valuations" of those business lines reveal that would not be

Mayer Brown LLP

Michael N. Nemelka
July 30, 2018
Page 12

reflected in the financial results—*i.e.*, revenue, profits, costs, projections—that CDK has already committed to producing?

*Requests 89 & 90 (Industry Publications):* CDK maintains that these Requests—which seek all documents and communications relating in any way to industry publications or reports that touch on "data integration" or DMS services—are overbroad. However, in the interest of finding a potential compromise for these Requests, CDK is prepared to produce responsive documents from 2013 to the present that reflect CDK's analysis, commentary, or discussion of data integration of DMS services apart from the publications themselves, to the extent such documents exist and can be identified through a reasonable search. (For example, under CDK's offer, an otherwise blank email attaching an industry publication would be non-responsive, but an email attaching the publication with additional commentary about it would be responsive.) Please let us know if this would resolve our dispute.

*Request 91 (Projections – Reliance Material):* As discussed above, CDK is already producing financial projections, including to the extent that projections are located in custodial files and identified through the use of agreed-upon search terms. In the interest of finding a potential compromise for this Request, CDK is prepared to produce additional documents identified within those custodial files that reflect documents or information relied upon to create those projections. Please let us know if this would resolve our dispute.

*Request 92 (3PA, DMI & IntegraLink Connections):* Following our meet-and-confer discussion and in the interest of finding a potential compromise for this Request, CDK is prepared to produce documents sufficient to show the total number of Vendors and applications that have enrolled in the 3PA program, to the extent available, from 2013 to the present. CDK will also produce documents sufficient to show the total number of DMS connections maintained in connection with data extraction services offered through CDK's former DMI and IntegraLink subsidiaries, to the extent available, from 2013 to the present. Please let us know if this would resolve our dispute.

*Requests 93 & 94 (Data Integration "Win/Loss" Reports):* As we explained, unlike for its DMS business, CDK does not maintain "win/loss" reports (or their equivalent) for its data integration business. To the extent that there have been one-off reports—although we currently are not aware of any—analyzing the number of Vendors who join or leave the 3PA program during a given period, or gains or losses of DMI and IntegraLink customers, we would expect that such documents would be found in the files of agreed-upon custodians. To the extent such documents exist and are identified using agreed-upon search terms (from among those search terms already proposed), in the interest of finding a potential compromise for this Request, CDK is prepared to produce them from 2013 to the present. Please let us know if this would resolve our dispute.

*Request 95 (3PA Request/Response):* As clarified in their July 26 letter, Plaintiffs are seeking documents through this Request related to the "latency" of data integration through the 3PA program, *i.e.*, how long it takes for the 3PA interface to complete a requested data transaction once it is initiated by a Vendor application. That is what we thought Plaintiffs were seeking,

Mayer Brown LLP

Michael N. Nemelka
July 30, 2018
Page 13

although there was some confusion about this during our meet-and-confer. CDK maintains that this Request is overbroad and implicates, if read literally, transactional-level detail from millions of data transactions that occur through the 3PA program interface. To the extent that this Request is instead seeking analyses of 3PA "latency" periods (as this Request is using the term), in the interest of finding a potential compromise CDK is prepared to produce such analyses, if any, if it would resolve the parties' dispute over this Request. Please let us know.

*Request 96 ("Push" Functionality):* Based on your July 26 letter, we understand that Plaintiffs are withdrawing this Request as duplicative of Request 19.

*Requests 98-100 (3PA Certification Requirements):* Following our meet-and-confer discussion and in the interest of finding a potential compromise for these Requests, CDK is prepared to produce (a) its operative policies, guides, and certification standards for the 3PA program, (b) additional documents, if any, related to creation and purpose of policies, guides, and certification standards for Vendor technical data submissions, and (c) additional documents, if any, that relate to the use of such technical data for competitive purposes or limitations on the use of such technical data for competitive purposes. Please let us know if this would resolve our dispute.

Sincerely,

*/s/ Matthew D. Provance*
Matthew D. Provance

cc: Lead MDL Plaintiff Counsel of Record
Reynolds Counsel of Record
Mark Ryan
Britt Miller
Andrew Marovitz

729553811