# Exhibit U

**MAYER•BROWN**

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel +1 312 782 0600
Main Fax +1 312 701 7711
www.mayerbrown.com

Matthew D. Provance
Direct Tel +1 312 701 8598
Direct Fax +1 312 706 9397
mprovance@mayerbrown.com

August 2, 2018

**BY E-MAIL**

Michael N. Nemelka
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 60036

Re: *In re Dealer Management Systems Antitrust Litig.*,
MDL No. 2817, Case No. 18-CV-864 (N.D. Ill.)

Dear Mike:

I write following up on our additional meet-and-confer discussions on Tuesday, July 31 regarding non-Dealer Plaintiffs' (Cox, AutoLoop, MVSC, and Authenticom) ("Plaintiffs") May 25, 2018, requests for production ("RFPs" or "Requests") as well as the issues raised in your July 31, 2018 letter concerning the discovery requests served by Authenticom, individually, and our meet-and-confer yesterday morning (August 1) on that topic.

**Plaintiffs' May 25, 2018 RFPs**

*Responsive Time Period:* Notwithstanding our objections to producing pre-2013 discovery in this litigation, which we maintain are fully justified, CDK has agreed (and will now further agree) to the following exceptions:

- As you are now demanding (see below), CDK will produce documents related to its internal or external statements regarding CDK's or other DMS providers' third-party access policies back to 2006 (notwithstanding that originally, you agreed to only seek such discovery back to 2007[1]), to the extent that such documents exist and are identified from a sub-set of agreed-upon custodians using a subset of agreed-upon search terms (from among those search terms already proposed).

- CDK will produce documents responsive to Plaintiffs' Requests 43 and 44 (subject to its objections and as described in our July 30 letter) back to 2011, to the extent that responsive information exists within CDK's possession, custody, or control and is

---

[1] *See* 11/24/2017 Ltr. from N. Nemelka to B. Miller and B. Ross, p. 2 ("Authenticom believes this documents responsive to this request going back to at least 2007 are appropriate, relevant, and proportional to the needs of the case."). As discussed in further detail below, this is one of several instances in which you are attempting, on behalf of Authenticom or one of the other parties that you represent in this MDL, to go back on express agreements you previously made in this litigation.

Mayer Brown LLP operates in combination with other Mayer Brown entities, which have offices in North America, Europe and Asia and are associated with Tauil & Chequer Advogados, a Brazilian law partnership.

Mayer Brown LLP

Michael N. Nemelka
August 2, 2018
Page 2

- identified in any centrally-maintained files where CDK reasonably believes such records may be kept.

- CDK will produce documents responsive to Requests 64 (subject to its objections and as described below) back to 2011, to the extent that responsive information exists and is identified in any centrally-maintained files where CDK reasonably believes such records may be kept.

- CDK will produce documents responsive to Requests 2, 3, and 4 back to January 1, 2011 in so far as these Requests pertain to Cox and AutoLoop, including through a custodian-based review using an agreed-upon subset of search terms (from among those search terms already proposed), provided that Plaintiffs will produce equivalent discovery back to 2011 on the same topics (*see* CDK RFPs 72-76 to Cox and CDK RFPs 35-39 to AutoLoop). Please let us know whether Plaintiffs will agree to reciprocity for the time period that applies to these Requests.

- As you previously agreed in *Authenticom*,[2] for the myriad financial and sales-related information that CDK has already produced and is producing (including in response to Authenticom RFPs 51, 52, 53, 54, 55, 57, 58, 59, 60, 61, 62, 63, 65, 66, 67, 69, and 70), CDK is using a January 1, 2011 cut-off.

- For the remaining Requests (including 5, 6, 8, 16, and 26), CDK will produce responsive documents according to the general January 1, 2013 cut-off.[3]

Thus, from our perspective, the only Requests where the parties remain at issue with respect to the appropriate responsive time period are Requests 73 and 81-93, which purport to go back to 2009 (73 and 83-93), 2006 (82), and 2000 (81).

*Request 1 (3PA Contracts):* As a further offer for compromise, and notwithstanding its burden and relevancy objections, CDK is prepared to produce the current 3PA/Managed Interface Agreement ("MIA") with 3PA program participants if it would resolve our dispute.[4] However, given the marginal relevance (if any) of producing every current 3PA/MIA agreement and the fact that the agreements are considered confidential and highly competitively sensitive by both CDK and the non-party vendors who enter into them, we would like to meet-and-confer further

---

[2] *See* 12/07/2017 Ltr. from M. Nemelka to B. Miller and B. Ross, p. 2, 3 ("We accept the January 1, 2011, date limitation for these requests.").

[3] It appears from your latest correspondence that Plaintiffs, including MVSC for example, think that the appropriate cut-off should be later than January 1, 2013 but only for their own productions. That position is unreasonable and likely will be the subject of a motion to compel.

[4] Any offers to produce additional documents reflected herein are subject to the same limitations noted in our July 30 letter. Non-privileged documents will be produced subject to CDK's general and specific objections and only to the extent they exist and are identified through a reasonable search.

Mayer Brown LLP

Michael N. Nemelka
August 2, 2018
Page 3

about a protocol for producing the agreements that will adequately protect them from disclosure and mitigate the burdens on CDK that arise from confidentiality provisions in the agreements. If CDK's offer of compromise is generally agreeable, we do not believe that it is necessary to resolve these remaining issues prior to the August 6 motions deadline.

*Request 7 ("Better" 3PA Pricing):* We will confirm, as you asked, that CDK is not aware of any Vendor in the 3PA program who receives "better" pricing than Cox for comparable services. Please let us know if this resolves our dispute.

*Requests 11-15 (3PA "Categories"):* We believe the parties are in agreement.

*Requests 19 & 20 ("Push" Functionality; Levels of Integrations):* During our follow-up meet-and-confer we clarified that as a further offer for compromise CDK is prepared to produce non-privileged documents reflecting analyses or consideration by CDK regarding whether to provide "push" notifications for CDK applications only or whether to offer different categories of functionality, data access, or level of data integration through the 3PA program to certain Vendor applications but not other others on the basis of whether those applications compete with each other or CDK, to the extent such documents exist and can be identified through a reasonable search. As this was the only clarification that you asked for, we assume that this resolves our dispute.

*Request 22 (Certification Time):* During our follow-up meet-and-confer we clarified that CDK's offer for compromise regarding this Request was not intended to be limited to initial certification of Vendors or applications, but also testing and deployment of 3PA interfaces. We assume that this resolves our dispute.

*Request 23 ("Project Peach"):* We are at issue.

*Requests 24 & 25 (RTS):* We believe the parties are in agreement.

*Requests 29, 31 & 37 (References to Cox, AutoLoop, MVSC):* As requested during our follow-up meet-and-confer, and as a further offer of compromise CDK will produce additional documents related to communications with Dealers or OEMs—which we believe would be located in custodial files, if at all—that purport to reflect direct competition with or marketing efforts that compare CDK against Cox, AutoLoop, or MVSC. We assume that this resolves our dispute.

*Requests 43 & 44 (CVR Customer Base and Market Share):* We believe the parties are in agreement.

*Request 46 (CVR Financial Information):* We believe the parties are in agreement.

*Requests 47 & 48 (CVR "Deficiencies" and EVR Provider Product Quality):* As requested during our follow-up meet-and-confer, we confirm that CDK will produce documents that are responsive to these Requests as informed by the example (CDK-0076911) that Plaintiffs

Michael N. Nemelka
August 2, 2018
Page 4

provided of a document that they consider responsive. We are not looking only for documents that are just like CDK-0076911. We assume that this resolves our dispute.

*Request 49 (EVR Delays and "Backlogs"):* We believe the parties are in agreement.

*Request 51 (EVR Costs of Entry):* We believe the parties are in agreement.

*Request 53 (Reynolds's Interest in CVR):* You asked whether CDK maintains, as Reynolds apparently does, a central "CVR" file that could be searched for documents that are responsive to this Request. After investigation, we are not aware of any general "CVR" file of that nature, nor any other file that would contain documents or correspondence from the 1990s that might be responsive to this Request. Thus, apart from the documents that CDK has already produced, we are not aware of any additional responsive documents in CDK's possession, custody, or control.

*Request 54 (CVR "Financial Benefits"):* To the extent that Plaintiffs are willing to narrow this Request to documents "sufficient to show" the "financial benefits" that CDK receives from its ownership interest in CVR, as was discussed during our follow-up meet-and-confer, CDK has produced and is producing such information, to the extent it exists within CDK's possession, custody, or control. Please let us know if this resolves our dispute.

*Requests 57 & 58 (CDK's "Involvement" in CVR):* We understand that Plaintiffs reject CDK's offer for compromise and are seeking compliance with these Requests as written.

*Request 59 (CDK/Reynolds Communications re CVR):* Upon further investigation of the incremental burden associated with this Request, in a further offer of compromise CDK will produce documents that are responsive to this Request, not just those that fall within the categories identified in our July 30 letter. We assume that this resolves our dispute.

*Requests 60 & 61 (AVRS Acquisition):* In addition to the documents that CDK has already offered to produce (which are: (a) documents related to the acquisition of AVRS that discuss the impact of the acquisition on CVR's ability to compete with other EVR providers, and (b) documents related any complaints received from Dealers (in other words, "communications regarding deficiencies or perceived deficiencies in AVRS's product and service levels") following the AVRS acquisition), during our follow-up meet-and-confer Plaintiffs asked CDK to consider producing documents related to "whether to acquire AVRS and why" CDK acquired AVRS. That additional category proposed by Plaintiffs likely covers all or substantially all documents related to the acquisition—which is not at issue—and puts us essentially back to where we started with these Requests. CDK believes that its July 30 offer for compromise is more than sufficient will capture any documents related to "whether to acquire AVRS and why" that may be even marginally relevant in this litigation.

*Requests 62 & 63 (CVR, AVRS & Applications' Use of "Independent Integrators"):* The parties agree that the only dispute as to these Requests is whether CDK will agree to produce responsive documents related to the use (if any) of so-called "independent integrators" to access non-CDK,

Mayer Brown LLP

Michael N. Nemelka
August 2, 2018
Page 5

non-Reynolds DMSs. We maintain that such documents have no bearing on any party's claims or defenses in this litigation. However, continuing to fight over these Requests (and the similar dispute we have concerning Authenticom RFP 25) is worth neither the time, expense, or effort of burdening the Court with motions practice. Therefore, CDK will produce any non-privileged documents on this issue to the extent they exist and are identified within the files of agreed-upon custodians using agreed-upon search terms (from among those search terms already proposed). We assume that this resolves our dispute.

*Request 64 (CVR Board Materials):* In addition to the categories of documents identified in CDK's written response (and summarized in our July 30 letter), as a further offer of compromise, to the extent they are located within the files of agreed-upon custodians using agreed-upon search terms (from among those search terms already proposed), CDK also will produce communications between members of CVR's Board of Directors that discuss CVR's business. As that was the additional category of documents that you requested during our follow-up meet-and-confer, we assume that this resolves our dispute.

*Requests 65 & 66 (Communications with Authenticom Customers):* As discussed during our follow-up meet-and-confer, CDK is prepared to amend its July 30 offer for compromise to the following: to the extent that such documents exist and can be identified through a reasonable search, CDK will produce communications with Dealers and Vendors that refer to Authenticom. We assume that this resolves our dispute.

*Request 68 (CDK Cost of Capital):* We understand that Plaintiffs now are *not* withdrawing this Request and instead are making an argument—which they were unable to articulate during our initial meet-and-confer—that this Request is relevant because "[c]ost of capital serves as a measurement that would allow plaintiffs to more fully understand [CDK]'s financial health," which "in turn, will shed light on any overcharges imposed by [CDK], as enabled by [CDK]'s anticompetitive conduct." We disagree. Moreover, we believe that information sufficient to calculate CDK's "cost of capital," as you have articulated the concept, will be available from the myriad financial information that CDK has already produced and is producing, if not the financial reporting that is readily available for CDK as a publicly-traded company.

*Request 69 ("Economic Value of Data"):* We believe the parties are in agreement.

*Request 70 (CDK "Valuations"):* We are at issue.

*Request 71 (Fortellis):* Once again, we have yet to hear a clear or convincing explanation for why all documents related to Fortellis are relevant to this litigation or should be produced. During our follow-up meet-and-confer, you suggested that Plaintiffs were willing to limit CDK's response to this Request to documents within the files of agreed-upon custodians that are identified using agreed-upon search terms (from among those search terms already proposed). With that in mind, CDK will make a further offer for compromise concerning Fortellis: to the extent that documents discuss or contemplate how third parties might one day access CDK's

Michael N. Nemelka
August 2, 2018
Page 6

DMS or the data maintained on CDK's DMS through Fortellis (as we explained, that is not happening today), they will be produced. Please let us know if this resolves our dispute.

*Requests 72, 81-82, 84-86 (Additional Financial Information):* As we explained, we believe that the myriad financial information that CDK has already negotiated with you and committed to producing—including documents sufficient to show profit, projections, margin, and cost information—in response to Authenticom RFPs 51, 52, 53, 54, 55, 57, 58, 59, 60, 61, 62, 63, 65, 66, 67, 69, and 70, among others, is more than sufficient. We understand from our meet-and-confer that you are now disavowing what was previously negotiated with CDK vis-à-vis its production of financial information in this case and are seeking compliance with these Requests as written, back to 2009, or earlier for some Requests. While CDK is not inclined to re-do its collection and production of financial data, we note that as a practical matter the vast majority of what Plaintiffs are seeking through this Request is already captured by CDK's production commitments in *Authenticom*, which we will continue to honor.

*Request 73 (Industry Conferences):* While we maintain that this Request is neither relevant nor proportional to the needs of the case, CDK is prepared to accept the offer for compromise made by the Dealership Class Plaintiffs concerning their RFPs 37 and 38 related to industry conferences, which are substantially similar to this Request. Specifically, CDK is prepared to produce (a) documents evidencing or otherwise reflecting meetings between CDK and Reynolds, if any, at such conferences, (b) marketing and promotional materials used or distributed by CDK at such conferences, and (c) written training and instructions provided to CDK employees concerning the marketing of CDK's DMS services, applications, or Data Services at such conferences, to the extent that such documents exist and are identified through a reasonable search. Since you have repeatedly stated that you are negotiating discovery requests in a coordinated manner with the Dealership Class Plaintiffs, we assume that our acceptance of the Dealers' offer for compromise also resolves our dispute over this Request.

*Requests 74 & 75 (Telephone Records):* We are at issue.

*Request 78 ("Secure the DMS" Dashboard Reports):* We believe the parties are in agreement.

*Request 79 (ReverseRisk):* We are still waiting for you to advise us whether the parties are in agreement based on CDK's July 30 offer for compromise concerning this Request.

*Request 83 (Sales and Marketing Plans):* CDK has already offered to produce responsive documents from 2013 to the present to the extent they are identified in custodial files through the use of agreed-upon search terms (from among those search terms already proposed). In a further offer of compromise, CDK states that to the extent that CDK identifies centrally-maintained files that it reasonably believes are likely to contain documents responsive to subparts (a)-(j) of this Request, responsive documents from such files will be produced. Please let us know if this resolves our dispute.

*Requests 87 & 88 (DMS, 3PA, DMI & IntegraLink "Valuations"):* We are at issue.

Mayer Brown LLP

Michael N. Nemelka
August 2, 2018
Page 7

*Requests 89 & 90 (Industry Publications):* Following our follow-up meet-and-confer and in a further offer of compromise, CDK is prepared to produce documents that are responsive to this Request from 2013 to the present to the extent they are identified in custodial files through the use of agreed-upon search terms (from among those search terms already proposed). Please let us know if this resolves our dispute.

*Request 91 (Projections – Reliance Material):* We believe the parties are in agreement.

*Request 92 (3PA, DMI & IntegraLink Connections):* The only outstanding issue related to this Request appears to be whether CDK will agree to produce documents sufficient to show the number of CDK DMS customers served by each application certified through its 3PA program (what you referred to as DMS "connections," notwithstanding that this term as it applies to the 3PA program is neither accurate nor appropriate for this litigation). Upon further investigation into the availability of this information in an aggregated format, we believe that it is available, and thus, it will be produced. We assume that this resolves our dispute.

*Requests 93 & 94 (Data Integration "Win/Loss" Reports):* We believe that CDK's July 30 offer for compromise as to this Request was more than reasonable, and we have not heard any more from you about this Request. Therefore, let us know if there is anything else to discuss.

*Request 95 (3PA Request/Response):* See above regarding Requests 93 and 94.

*Requests 98-100 (3PA Certification Requirements):* Same.

**Authenticom's Document Requests**

Like Reynolds, we are disappointed by Authenticom's July 30 letter and the fact that Authenticom apparently views this MDL as an opportunity to dishonor the compromises and agreements that we reached with you concerning Authenticom's document requests. The record on this—summarized in Reynolds's August 1 letter—does and will continue to speak for itself. Nevertheless, as to the specific issues raised in Authenticom's letter, we respond as follows.

*Demonstratives from Preliminary Injunction Hearing:* Regarding CDK's closing argument slides, we refer you to Britt Miller's June 28, 2017 email (8:45 p.m. Central) attaching it. This was the only "demonstrative" that you identified as missing from CDK.

*General Objections:* This "issue" was resolved during our call. Other than its general objection to producing documents outside the responsive time period (*see* above), CDK is not withholding any documents that it has otherwise agreed to produce in response to specific Requests on the basis of its general objections.

*CRM Software:* As we explained, CDK already has made a production of structured data from its CRM database of record, Salesforce (*see* CDK-0701450-65). We understand that to the

Michael N. Nemelka
August 2, 2018
Page 8

extent that the produced fields include a field that would capture information entered into the system by CDK's sales representatives regarding conversations/contacts with dealers.

*Request 4 (CDK-Reynolds Agreements):* As explained in our November 15, 2017 letter on this Request that is quoted in your correspondence, CDK is producing documents (including communications) related to agreements between CDK and Reynolds "regarding access to their respective DMS platforms, independent data integrators, or that are otherwise relevant to any party's claims or defenses." The first two categories of agreements—any that are related to CDK or Reynolds's respective DMSs, or independent data integrators—are what would be relevant to this litigation. The final category—any agreements that are otherwise relevant to any party's claims or defenses—was a catch-all that we included to make clear that although we are presently unaware of any other types of agreements between CDK or Reynolds that have any bearing on the claims or defenses in this litigation, to the extent that any such agreements are identified they will be included. You accepted this formulation of CDK's response.[5] We explained all this during yesterday's meet-and-confer and confirmed, again, that any agreements between CDK and Reynolds that relate to access to DMSs, data integration, or data integrators would be considered responsive.

*Request 5 (Waiver and Crime-Fraud Exception):* Like Reynolds, we disagree that Authenticom or any other Plaintiff in this MDL has any rights to reserve on this issue.

*Request 30 (Whitelisting):* CDK's objection to producing documents responsive to subparagraph (c) of this Request was clear from its November 1, 2017 written responses, but you failed to this issue until nine months later, on July 30, 2018. As we explained during our call, to the extent that documents sufficient to show how so-called "whitelisting" is accomplished, including all technical, system architecture, workflow processes, or other mechanisms used to "whitelist" login credentials are found within the document sources that CDK has agreed to search, CDK will produce such documents. However, CDK objects to producing granular system design documents, source code, algorithms, etc. in response to this Request or searching through centrally-maintained files that may contain such materials for purposes of responding to this Request.

*Requests 31-33 (DMS Switching):* CDK's objection to producing documents responsive to these Requests from prior to 2013 was clear from its November 1, 2017 written responses, but, again, you failed to raise this issue until July 30, 2018. Moreover, CDK has no reason to believe that there even was an issue as to these RFPs given Authenticom's agreement "to accept Defendant's proposed start date of January 1, 2013 as the primary collection start date, subject to limited

---

[5] *See* 11/24/2017 Ltr. from M. Nemelka to B. Miller and B. Ross, p. 4 ("Thank you for agreeing to produce – in addition to 'non-privileged documents evidencing any agreements as and between CDK and Reynolds regarding access to their respective DMS platforms, independent data integrators, or that are otherwise relevant to any party's claims or defenses,' – 'communications discussing' any such agreements. Please also confirm that Defendants will also produce any documents – not just communications – relating to those agreements.").

Michael N. Nemelka
August 2, 2018
Page 9

exceptions for … specific requests," none of which were Requests 31-33.  11/24/2017 Ltr. from M. Nemelka to B. Miller, p. 2.  In any event, it should be noted that the switching data CDK has already produced goes back to July 2011 (*see* CDK-0001297), which we strongly suspect to be as far back as the data exists, although we have not been able to definitively confirm that since receiving your letter purporting to make this an issue, for the first time, on Monday night.

*Request 73 (OEM Pricing Information):*  We remain at issue as to this Request.  Like Reynolds, we don't know what you mean by "and related RFPs."

*DMS and 3PA Business Plans, Business Presentations, Marketing Plans, Strategic Plans:*  We confirm that all of the foregoing, other than "business presentations", addressing CDK's DMS or data integration businesses are being produced.  We are sure that myriad "business presentations" (whatever that term means) are being produced, but we cannot represent that every "business presentation" of any kind related to the identified issues is being produced, as we do not believe all such documents have been requested nor are they necessarily relevant.

*Security Audits:*  We have no reason to believe "security audits" are being withheld in response to Authenticom's Requests, although the May 2015 PwC report ("GSO Threat and Security Assessment") is the only "security audit" that was specifically requested.

*Requests 20, 21, 22, 23 & 34 (Pre-2013 Statements re: "Independent Integrators"):*  Of these, only Request 20 was subject to the extended responsiveness period, for a limited subset of custodians and search terms agreement, that we previously negotiated (*see* above).  Moreover, you asked for a period going back to January, 1 2007 for Request 20—not 2006.  11/24/2017 Ltr. from N. Nemelka to B. Miller and B. Ross, p. 2.  Nevertheless, we are willing to discuss *limited* search terms and custodians for these Requests.

*Request 25 (Use of "Independent Integrators"):*  As discussed above, although we maintain that the requested documents have no bearing on any party's claim or defense in this litigation, as with Plaintiffs' Requests 62 and 63 CDK will agree to produce responsive documents related to the use (if any) of so-called "independent integrators" to access non-CDK, non-Reynolds DMSs.  We assume that this resolves our dispute.

*Request 28 (Manual Reporting):*  We agreed during our call that there is no dispute about this Request as CDK already has made a production of structured data from its CRM database.

*Request 27(f) (Technological Implementation of SecurityFirst and 3PA "Refresh"):*  CDK's objection to producing documents responsive to subparagraph (f) of this Request was clear from its November 1, 2017 written responses, but, as with several other request already discussed, you failed to raise this issue until July 30, 2018.  Moreover, the Dealership Class Plaintiffs have offered to compromise on an identical RFP that they served (RFP 11(g)) by accepting the following:  "documents explaining the implementation of the 'SecurityFirst' and/or '3PA Refresh' initiative in layman's terms (*i.e.*, communications to customers)," which CDK accepts.  Here again, given your repeated representations that that you are negotiating discovery requests

Mayer Brown LLP

Michael N. Nemelka
August 2, 2018
Page 10

in a coordinated manner with the Dealership Class Plaintiffs, we assume that our acceptance of the Dealers' offer for compromise also resolves our dispute over this Request.

*Requests 62 & 63 (DMI and IntegraLink):* As we explained on our call, CDK agreed to produce documents sufficient to show DMI and IntegraLink's prices for data integration services for data on both CDK and non-CDK DMSs. You agreed that this was sufficient to respond to the Request and we confirmed that "[t]his issue is resolved."[6] You now claim that CDK's response to Requests 62 and 63 must include information that will "identify the vendors that have used IntegraLink and DMI and for which DMS platforms." As we explained during our call, the structured sales data that CDK has produced for DMI and IntegraLink will identify their customers and the prices that they paid. That structured data may well also identify "for which DMS platforms" those customers used DMI and IntegraLink, although this does not appear to be an element of Request 62 or 63 as originally phrased or as articulated in CDK's negotiated response. Nevertheless, the bottom line is that CDK has produced DMI and IntegraLink pricing data as the data is maintained in the normal course of CDK's business.

*Request 74 (DMS Technical Specifications):* As Authenticom has offered to amend this Request, to the extent that responsive documents are found within the document sources that CDK has agreed to search, including custodial email files, CDK will produce them. However, CDK continues to object to producing granular system design documents, source code, algorithms, etc. in response to this Request or searching through centrally-maintained files that may contain such materials for purposes of responding to this Request.

*Request 79 (Blocking of Login Credentials):* CDK has agreed to produce non-privileged documents and communications describing the methods it has used to block, restrict, or disable Authenticom's unauthorized DMS access, as identified through a search and review of agreed upon custodians' files. You previously agreed that this was sufficient to respond to the Request and we confirmed that "[i]t appears that the parties are agreed on this Request."[7] Nevertheless, our answer is the same as it is for Request 74: to the extent that responsive documents are found within the document sources that CDK has agreed to search, CDK will produce them. However, CDK continues to object to producing granular system design documents, source code, algorithms, etc. in response to this Request or searching through centrally-maintained files that may contain such materials for purposes of responding to this Request.

*Request 82 (Security Infrastructure of CDK DMS):* CDK's objected to producing documents responsive to this Requests in its November 1, 2017 written responses, but, once again, you failed to raise this issue until July 30, 2018. Notwithstanding that we believe Authenticom's attempt to raise the issue now is improper, to the extent that responsive documents are found within the document sources that CDK has agreed to search, CDK will produce them. However,

---

[6] *See* 01/19/2018 Ltr. from M. Nemelka to B. Miller and B. Ross, p. 4; 01/29/2018 Ltr. from B. Miller to M. Nemelka, p. 3 ("This issue is resolved.").

[7] *See* 11/24/2018 Ltr. from M. Nemelka to B. Miller and B. Ross, p. 14; 12/01/2017 Ltr. from B. Miller to M. Nemelka, p. 8 ("It appears that the parties are agreed on this Request.").

Mayer Brown LLP

Michael N. Nemelka
August 2, 2018
Page 11

CDK continues to object to producing granular system design documents, source code, algorithms, etc. in response to this Request or searching through centrally-maintained files that may contain such materials for purposes of responding to this Request.

*Request 93 (Monthly Spend on "Independent Integrators"):* As explained on our call, we believe that the parties are in agreement.

*Request 94 (McCray – Curse Words):* CDK has agreed to run search terms that Authenticom designed to capture any use of profanity by Mr. McCray. CDK will review those documents and produce them if they are responsive to other Requests. CDK did not agree to produce every document reflecting any use of profanity by Mr. McCray in any context, as certainly not all such documents would be relevant to the claims and defenses in this litigation.

*Requests 96-101 (Various):* Correct: We are currently negotiating Plaintiffs' May 25, 2018 proposal for ESI search terms to be run on CDK's ESI.

*Requests 102 and 103 (Invoices):* We are still considering your proposals and expect to respond later today or, at the latest, tomorrow morning.

*Request 104 (Security Tools):* As Authenticom has offered to amend this Request, to the extent that responsive documents are found within the document sources that CDK has agreed to search, including custodial email files, CDK will produce them. However, CDK continues to object to producing granular system design documents, source code, algorithms, etc. in response to this Request or searching through centrally-maintained files that may contain such materials for purposes of responding to this Request.

*Request 106 (Unredacted AutoMate Complaint):* As we explained during the call, the unredacted AutoMate complaint is already at issue on CDK's pending motion for a protective order concerning the AutoMate documents (*see* Dkt. 197 at 4 n.2).

**Authenticom's Interrogatories**

*Interrogatory No. 7 ("Competitive Market"):* We maintain that this Interrogatory is improper for a number of reasons, among them that the information requested will necessarily be included in the expert phase of this litigation.

*Interrogatory No. 11 (Average Tenure of DMS Customers):* We have explained why CDK has already answered this Interrogatory to the extent CDK is reasonably able to provide a response. Moreover, in response to the Dealership Class Plaintiffs' RFP 19 seeking documents sufficient to show, among other things, "how long each Dealer customer's tenure as a client of CDK has lasted," to the extent it has such documents CDK is producing them, including from its CRM database. Thus, to the extent that CDK possesses additional information that is responsive to this Interrogatory, it is being produced pursuant to Rule 33(d).

Mayer Brown LLP

Michael N. Nemelka
August 2, 2018
Page 12

*Interrogatory No. 12 (DMS "Market Share"):* We have explained why CDK has already answered this Interrogatory to the extent CDK is reasonably able to provide a response. Moreover, to the extent that CDK's documents reflect estimates of its DMS "market share" (based on different assumptions and varying definitions of the "market"), it identified those documents pursuant to Rule 33(d). Further, to the extent that additional documents are identified during the course of CDK's review, it will produce them pursuant to Rule 33(d).

*Interrogatory No. 14 (CDK-Reynolds Communications):* We maintain that this Interrogatory is improper. However, following meet-and-confer discussions in May and June, Authenticom offered to narrow this Interrogatory in an attempt to address CDK's objections. Your offer to reduce the date range from January 1, 2011 to the present to January 1, 2013 to the present does not, however, accomplish that goal. As previously discussed, it is literally impossible for CDK to comply with Interrogatory as phrased, regardless of whether it is subject to a 2013 cut-off or a 2011 cut-off. If Authenticom is interested in narrowing this Interrogatory in a meaningful way, CDK is still willing to consider a reasonable proposal.

Sincerely,

*/s/ Matthew D. Provance*
Matthew D. Provance

cc: Lead MDL Plaintiff Counsel of Record
     Reynolds Counsel of Record
     Mark Ryan
     Britt Miller
     Andrew Marovitz