# Exhibit V



Brian T. Ross
Partner
bross@gibbsbruns.com
713.751.5286

December 1, 2017

**VIA EMAIL**
Michael N. Nemelka
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Ste. 400
Washington, D.C. 20036-3215

   Re: *Authenticom, Inc. v. CDK Global, LLC and The Reynolds and Reynolds Company*, Case No. 17-cv-318 (W.D. Wis.)

Dear Mike:

  This letter is in response to your November 24, 2017 letter. Generally speaking, while we appreciate the continued dialogue, we are disappointed by Authenticom's failure to make a serious movement from its previous positions on many pending issues. Nevertheless, we will attempt to address the items raised in your letter here and will continue to work in good faith in an attempt to narrow the issues in dispute.

  **Search Terms.** As discussed last Friday, Authenticom's repeated accusations that Defendants were dilatory in providing proposed ESI search terms are neither constructive nor accurate. Despite Authenticom waiting until October to serve document requests, Defendants timely responded to those document requests (92 for CDK, 79 for Reynolds) in the normal time allotted by the Federal Rules, provided proposed custodians less than a week later, and informed Authenticom that they were ready to provide proposed search terms two weeks after that. The fact that Authenticom prematurely asked for search terms in October—before the ESI protocol was complete, and before responses to Authenticom's document requests were even due—is no evidence at all of any alleged delay. Moreover, shortly after the ESI protocol was finalized in late October, I encouraged you to make a proposal for Defendants' search terms (and custodians), and you declined to do so. As of the date of this letter, we still have not yet received Authenticom's proposed additional search terms for Reynolds, but whenever we do, we will diligently assess the appropriateness and burden of such proposed search terms, just as we would have done before.

  **Sources of ESI.** On page 1 of my November 16, 2017 letter to you, I stated Reynolds's intentions with respect to searching central or shared file locations. To the extent your paraphrasing of that letter is inconsistent with the plain terms of the November 16 letter, we would refer you back to the November 16 letter itself.

Michael N. Nemelka
December 1, 2017
Page 2 of 5

**Ron Lamb's ESI.** As I informed you last Friday, Mr. Lamb's ESI was preserved. As such, we will not address all of the inaccuracies on this subject in your letter, which are moot. With respect to your subsequent suggestion that Authenticom has received "differing accounts" on this subject, I will just state for the record that as of the date of my November 7, 2017 email to which you refer, I didn't yet know the status of Mr. Lamb's ESI. (As you know, Mr. Lamb left the company before we had notice of this suit.) Obviously, we could have just left Mr. Lamb off of our proposed custodian list while that issue was run to ground, but as a gesture of good faith, we included him on the list and simply flagged for full disclosure that there *may be* an issue as to whether his ESI was preserved. We subsequently determined that there was no such issue. In sum, I don't think you have received "differing accounts," and such unfounded accusations discourage open discourse regarding discovery matters. Regardless, Mr. Lamb's ESI was preserved when he left the company and will be searched for purposes of Reynolds's production.

I will now address specific RFPs to Reynolds set forth in your November 24, 2017 letter, including Reynolds's revised offers of compromise where applicable. Reynolds's offers of compromise herein in no way constitute a concession as to the relevance of the requested documents or the propriety of any RFP, but are made in good faith in an effort to resolve the parties' disputes. As before, Reynolds's proposals are contingent on resolving the parties' disputes as to the applicable request(s).

**Request No. 1 (Government Investigations).** Reynolds agrees with and incorporates the positions set forth in Britt Miller's December 1, 2017 letter.

**Request No. 4 (Defendants' Agreements).** Reynolds confirms that it will produce documents and communications discussing the subject agreements following a search and review of agreed upon custodians' files.

**Request No. 5 (Authenticom's Contention of Privilege Waiver).** Reynolds agrees with and incorporates the positions set forth in Britt Miller's December 1, 2017 letter. In addition, Reynolds would note that the isolated reference to counsel that Authenticom has identified does not raise an "advice-of-counsel" defense because it does not disclose or describe the contents of any attorney-client communication about the February 2015 agreements (nor does it assert that Reynolds's reliance on such communication would bar liability in this antitrust suit). Reynolds is unaware of any authority holding that a bare reference to the existence of legal counsel in the context of a *Twombly* plausibility argument waives the attorney-client privilege, nor does the reasoning in the cases of which Reynolds is aware support such a conclusion.

**Request No. 15 ("Documents and communications regarding the VPN tunnel that CDK provided to Authenticom…").** It appears that we have reached a resolution on this request.

Michael N. Nemelka
December 1, 2017
Page 3 of 5

**Request No. 17 (CDK's "SMART-R" Program).** In the spirit of compromise, Reynolds will accept your proposed modifications to our previous offer, with the caveat that it is unclear what you mean by "analogous terms." For the avoidance of doubt, Reynolds is agreeable to including search terms for any internal code names for "SMART-R," if any, but as of now we are aware of none.

**Request Nos. 9, 19, 25, 62 (Reynolds's Agreements With Third-Party Integrators).** In the spirit of compromise, Reynolds will accept your proposed modifications to our previous offer. For the avoidance of doubt, documents other than the agreements themselves are still subject to an agreement on reasonable search terms and custodians.

**Request No. 36 (DMS "Tenure").** Notwithstanding what we believe are entirely valid relevance objections, Reynolds previously offered to compile and produce reasonable, summary-level statistics regarding the tenure of a representative sample of its DMS customers. Per your November 24 letter, Authenticom proposes that Reynolds also produce "all readily available documents [Reynolds] has in its position regarding DMS tenure." Respectfully, Reynolds believes that its previously proposed compromise is more than reasonable, and that Authenticom's proposal for "readily available" documents "regarding" DMS tenure is unworkably vague and likely to create more problems than it solves. That being said, in a good faith effort to bridge the gap and reach a resolution on this request, Reynolds would be willing to agree to produce any documents it relied upon in responding to Authenticom's Statement of Facts (Dkt # 51) ¶ 15.

**Request No. 42 (RCI Contracts).** In the spirit of compromise, Reynolds will accept your proposed modifications to our previous offer. To summarize, Reynolds understands the resolution to be that Reynolds will produce (i) a representative, current RCI Agreement, along with any other current version(s) or template(s) of the RCI Agreement that materially vary from Plaintiff's Preliminary Injunction Hearing Exhibit 53 with respect to any alleged exclusive dealing (i.e., "Non Approved Access") or price confidentiality provisions (each such version with vendor-specific identifying information redacted); (ii) any external modifications or waivers that Reynolds has agreed to with respect to the material terms; and (iii) a summary analysis showing the distribution of use (as a percentage of contracts) of each variant of the contracts identified.

**Request Nos. 45 and 48 (DMS Pricing).** Reynolds continues to disagree that Authenticom's request for DMS pricing data is relevant or proportional to the needs of the case, and disagrees that the information Authenticom has requested will be probative of any matter in dispute. Nevertheless, in the spirit of compromise, Reynolds is willing to amend its proposal as follows. In response to Authenticom's contention that the information previously offered by Reynolds would be useless without context, Reynolds is willing to agree to Authenticom's counter-proposal for "statistics that represent what dealers actually pay" (or, "to the extent Reynolds believes production of such statistics would be unduly onerous . . . documents

Michael N. Nemelka
December 1, 2017
Page 4 of 5

sufficient [for Authenticom] to undertake such analysis itself.") However, due to the lack of available data prior to 2014, Reynolds can only agree to produce such data for the time period of January 2014 to the present.

**Request No. 55 (former RCI vendors).** It appears that we have reached a resolution on this request, subject to our ongoing dialogue regarding search terms.

**Request Nos. 56-59 (RCI Pricing).** As you are aware, Reynolds previously agreed to produce (i) documents sufficient to show the prices paid by its RCI vendors for each of the full years 2015, 2016, and 2017; and (ii) to undertake a reasonable, custodian-based search and produce any non-privileged internal powerpoints or other presentations discussing RCI pricing strategy. In your November 24 letter, you proposed the following modifications to Reynolds's proposal: (1) expand the time period to 2009-2017; (2) produce communications discussing RCI pricing strategy or deliberations relating to any change in RCI pricing; and (3) produce any materials presented to or considered by an RCI pricing committee (from January 1, 2013 to the present).

While we cannot accept the full extent of your counter-proposal, and without conceding the relevance of such a time period, Reynolds would agree to what we believe is a generous compromise of producing documents sufficient to show the prices paid by its RCI vendors for the years 2011-2017, with the caveat that Reynolds may lack information sufficient to respond for the year 2011.

**Request No. 63 (OEM Pricing).** As we stated previously, Reynolds's OEM relationships are not part of the RCI program and do not have any bearing on the prices that Reynolds charges vendors under the RCI program. Moreover, Reynolds notes that Authenticom still has not identified—in its Complaint or otherwise—a single OEM relationship that it alleges it lost due to the conduct alleged in this case. Respectfully, the general statement in your letter that "the proper scope of any relevant geographic product markets is a question of fact" is not sufficient to make Reynolds's OEM relationships relevant to any claims or defenses currently in this case—let alone in the overly broad manner attempted by Request No. 63. If you have additional, affirmative arguments supporting the relevance and proportionality of this request, we are willing to consider them. At this time, however, Reynolds is unable to justify withdrawing its objections.

**Request Nos. 46, 47, 49-53 (DMS and RCI Financial Information).** As you are aware, notwithstanding our dispute as to the relevance of these requests, Reynolds previously offered to produce documents sufficient to show the total monthly revenues for ERA sales, POWER sales, and the RCI program for each of the years 2015, 2016, and 2017. In the spirit of compromise, Reynolds is willing to accept Authenticom's counterproposal to expand its production of aggregate monthly ERA, POWER, and RCI revenue information to also include the years 2013 and 2014.

Michael N. Nemelka
December 1, 2017
Page 5 of 5

With respect to Requests 47, 49, 50, 52, and 53, respectfully, Reynolds remains unconvinced by Authenticom's arguments at to the relevance of DMS or RCI profit or cost information. In any event, such information is something that Reynolds does not have the practical ability to accurately provide. Reynolds does not fully allocate costs or produce actual profitability reports on a product line basis. In other words, responding to these requests would require Reynolds to create documents that do not currently exist and are not used in the normal course of business.

**Request No. 61 (Vendor "Pass-Through").** It appears that we have reached a resolution on this request.

**Request No. 78 (Reynolds Effort to "Advantage" its own add-on Applications).** As you know, notwithstanding its objections, Reynolds previously offered to conduct a reasonable ESI search for the agreed upon custodians and time frame, and produce (a) documents sufficient to show "closed categories," if any, of application types that Reynolds would not permit into the RCI program; (b) documents sufficient to describe any data polling or write-back capability that Reynolds does not, as a rule, allow with respect to third-party applications; (c) documents discussing any effort to disrupt the workflow of applications offered by competing vendors.

Reynolds appreciates that Authenticom is making its own proposal for a compromise, but we are having genuine difficulty understanding the nature of that counter-proposal. Please review your proposal and let me know if you can offer additional clarity. If it is simply a matter of coming together on search terms, then we are of course willing to have that dialogue, as noted above.

\* \* \* \*

In conclusion, we hope that the responses and proposals above bring our clients to a resolution (or at least substantially close to a resolution) on most of Authenticom's requests. We are of course willing to meet and confer further on any remaining open items that you would like to discuss further, and we look forward to Authenticom's follow-up from the November 21st and November 27th meet-and confer sessions regarding Authenticom's responses and objections to Defendants' requests for production.

Very truly yours,

Brian T. Ross

cc: Michelle Umberger
Jennifer Gregor
Britt Miller