# Exhibit W



Brian T. Ross<br>
Partner<br>
bross@gibbsbruns.com<br>
713.751.5286

August 1, 2018

<u>**Via Email**</u>
Michael N. Nemelka
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, N.W., Ste. 400
Washington, D.C. 20036-3215

Re: *In re: Dealer Management System Antitrust Litigation*, C.A. No. 18-C-864, MDL No. 2817 (N.D. Ill.)

Dear Mike,

This is in response to the letter you sent on the evening of July 30, 2018 regarding RFPs and interrogatories served by Authenticom.

Generally speaking, we are disappointed in the approach taken in your letter and more broadly, the failure of MDL Plaintiffs to coordinate in discovery. To review:

- Reynolds served its responses to Authenticom's RFPs on November 1, 2017.

- In November and December 2017, as your firm emphasized in its application for appointment as co-lead counsel, we "engaged in a series of lengthy meet and confers to resolve the vast majority of issues in dispute." (Dkt. 91 at 10).

- In March 2018, Authenticom represented to the Court that it could be ready for trial "with surprisingly little additional discovery over what we have now." (3/12/2018 Tr. at 35).

- On May 25, 2018, the "Individual Plaintiffs" (which includes Authenticom) and the Dealership Class Plaintiffs served 92 and 44 new RFPs, respectively, on Reynolds.

- Rather than negotiate those RFPs in a coordinated fashion, the Individual Plaintiffs and Dealership Class Plaintiffs insisted that each Defendant engage in separate meet-and-confers with each Plaintiff group, which Defendants accommodated.

- Many weeks into that process, and with less than a week remaining until the motion to compel deadline, we have now received your July 30 letter regarding a long list of

Michael N. Nemelka
August 1, 2018
Page 2 of 7

purported issues regarding Authenticom's discovery requests, many of which have been resolved or abandoned for several months. Some of the RFPs for which your July 30 letter demands "final positions" one day later have never even been the subject of any meet-and-confer request by your firm, at any time since Reynolds's RFP responses were served on November 1, 2017.

In sum, the "moving target" approach taken by MDL Plaintiffs has severely undermined the objectives of MDL discovery and prejudiced Reynolds's ability to reach and rely on constructive compromises.

All of that being said, and despite the fact that we are still to this day waiting on responses from your clients on numerous issues regarding their own discovery responses, we continue to try to work collaboratively in an effort to eliminate or narrow the issues requiring Court intervention. This morning we had a lengthy call with you going through the issues raised in your July 30 letter and are continuing to work diligently to address any open issues. On behalf of Reynolds, below is a summary of where we are. For convenience, we will use the same paragraph naming conventions from your July 30 letter.

**Demonstratives from Preliminary Injunction Hearing.** As noted on the call, your July 30 letter is the first time we are aware that this issue has been raised in the past year, since the preliminary injunction hearing took place. As discussed, we have no objection to providing a courtesy copy of any such demonstratives, but need guidance on what you believe you are missing. We agreed to send a copy of any slides used during opening or closing statements, and you agreed to point us to any specific demonstratives that you believe you are missing from witness testimony. Shortly, I am emailing you a copy of what we believe to be the final set of slides shown during Reynolds's opening statement and closing argument, respectively.

**General Objections.** As noted on the call, your July 30 letter is the first time this question has been posed to Reynolds. Nevertheless, we have now explained in good faith that while we are standing on our general objections for any requests on which Plaintiffs elect to move to compel, we are not withholding non-privileged documents based on general objections for any requests on which we have reached agreement (with the exception of time-frame objections). You stated that your clients are taking the same approach.

**CRM Software.** As noted on the call, your July 30 letter is the first time we recall your firm having posed this question to Reynolds. However, we also have explained that we are in the process of a similar discussion with the Dealership Class Plaintiffs and on the call summarized for you our findings to date, including those described in our recent letter to the Dealership Class Plaintiffs. As I understand it you are going to confer with the Dealership Class Plaintiffs and one of you will let us know of any follow-up.

**Authenticom RFP No. 4 (Agreements between CDK and Reynolds).** As noted on the call, we corresponded at length on this subject in November and December 2017, and believe that we reached an agreement memorialized by my December 1, 2017 letter to you.

For additional clarity, we gave examples of agreements that would not be relevant to this case, and confirmed that any agreements regarding the issues in the case (access to DMS platforms, data integration, data integrators, etc.) will be produced for the relevant time period, along with related communications.

**Authenticom RFP No. 5 (Waiver and Crime-Fraud Exception to the Attorney Client Privilege).** We disagree that Plaintiffs have any rights to reserve with respect to this argument.

**Authenticom RFP 30 (Whitelisting).** As noted on the call, we responded to Authenticom's RFPs on November 1, 2017, and your July 30 letter is the first time that you have ever even asked for a meet-and-confer on this RFP. The portion of the request that appears to be at issue is "[d]ocuments sufficient to show how whitelisting is accomplished, including all technical, system architecture, workflow processes, or other mechanisms used to whitelist login credentials." Reynolds has produced extensive documentation regarding what you refer to as "whitelisting," but based on the arguments you have expressed to date, we must stand on our objections with respect to that portion of your request.

**Authenticom RFP Nos. 31-33 (DMS Switching).** As noted on the call, we responded to Authenticom's RFPs on November 1, 2017, and your July 30 letter is the first time that you have ever even asked for a meet-and-confer on this RFP. In addition, we would note that on November 24, 2017, Authenticom agreed to a January 1, 2013 date limitation with certain limited exceptions, and DMS switching was not one of those exceptions. Nevertheless, we confirmed that Reynolds has produced switching data back to 2008, not 2013. Our understanding is that we have given you what Reynolds has, and we have been unable to locate any hearing demonstrative relying on pre-2008 data.

**Authenticom RFP No. 73 (CDK) and RFP. No. 63 (Reynolds) (OEM Information).** We agree that we are at an impasse on Reynolds RFP No. 63. As for "related RFPs," we would need to know which ones you are referring to in order to specifically respond.

**DMS and RCI/3PA business plans, business presentations, marketing plans, strategic plans.** We agree with the characterization in your July 30 letter with the exception of "business presentations," which is too broad and nebulous. If there is a specific RFP for which you feel "business presentations" (as opposed to the other listed categories) is critical, please let us know.

**Security Audits.** Reynolds does not intend to withhold any security audits relating to the programs identified in your July 30 letter that are located pursuant to a reasonable search for the relevant time period.

Michael N. Nemelka
August 1, 2018
Page 4 of 7

**RFP No. 30(c) (how whitelisting is accomplished).** See above.

**DMS and RCI Financial Information (RFP Nos. 45-53).** As discussed on the call, it appears you may have missed some correspondence in terms of our agreements on DMS pricing, RCI pricing, DMS revenue, and RCI revenue. We ultimately were able to go back further for RCI pricing, DMS revenue, and RCI revenue, and not as far as we had hoped for DMS pricing. The cut-off dates are as follows:

- DMS pricing: August 2014
- RCI pricing: January 2010
- DMS revenue: January 2011
- RCI revenue: January 2012

With respect to profit, cost, expenses, projections, budgets, gross and net margins, and "the other requested financial information," both sides have explained their positions and there is no need to rehash them here. Based on our conversations with you over the last couple of days, including in the separate "Individual Plaintiffs" call, we are continuing to explore whether a compromise analogous to the compromise you reached with CDK may be possible for Reynolds.

**RFP No. 64 (DMS Technical Specifications).** As discussed on the call, our concerns regarding these requests are our objections to (1) gathering or producing granular system design documents, code, algorithms, and scripts and (2) any purported obligation to create documents. Thank you for clarifying on the call that your clients do not expect Reynolds to create documents, and would agree that granular system design documents, code, algorithms, and scripts need not be searched or produced. With those clarifications, assuming all MDL Plaintiffs agree, we will proceed with producing any non-privileged responsive documents from January 1, 2013 forward that are located using agreed upon custodians and search terms.

**RFP No. 69 (blocking of login credentials).** Same as RFP 64.

**RFP No. 78.** As discussed on the call, we confirmed that we will accept the compromise offered in your November 24, 2017 letter.

**RFP No. 80.** As discussed on the call, we confirmed that we are agreeable to producing data sufficient to show Reynolds's monthly data integration spend with independent integrators from January 1, 2013 forward based on data we have been able to locate from a central source, and will not withhold such information to the extent it comes up in the custodial review.

**RFP Nos. 81-83, 87.** As discussed on the call, with respect to RFP Nos. 81, 82, and 87, we are agreeable to producing any non-privileged responsive documents from January 1, 2013 forward that are located using agreed upon custodians and search terms. With respect to RFP 83,

I explained that we are agreeable to producing emails that contain usernames and passwords, and to the extent emails contain only usernames, they would be produced if responsive to another RFP.

**RFP No. 85.** Without rehashing our arguments as to why discovery of RCI invoices is unnecessary and unduly burdensome, we are carefully considering your proposal of invoices for 30 RCI vendor customers. We understand that proposal would be inclusive of all plaintiffs, and we will respond or counter no later than tomorrow. Please note that, as discussed in prior correspondence, RCI invoices are not reasonably accessible from any centralized source prior to April 2014.

**RFP No. 86.** Without rehashing our arguments as to why discovery of DMS invoices is unnecessary and unduly burdensome, we are carefully considering your proposal of invoices for 75 DMS customers. We understand that proposal would be inclusive of all plaintiffs, and we will respond or counter no later than tomorrow. Please note that DMS invoices may not be reasonably accessible from any centralized source prior to April 2014.

**RFP No. 88.** As described in your July 30 letter, this request seeks all "communications and documents concerning your security tools, processes, and training for your software developers." Your July 30 letter offers to modify the request as follows:

> (1) with respect to "security tools," document and communications regarding the software used to test / analyze the security of your DMS and data integration programs; (2) with respect to "processes," your security planning documents, specifications for security and reliability, threat modeling, and risk analysis; and (3) with respect to "training," documents and communications regarding the training given to software developers working on your DMS and data integration programs. Also encompassed would be all design, technical, or functional specifications or similar development planning documents for your DMS or integration program.

While we appreciate your offer to modify this RFP, we are unable to accept your proposal and will let you know if we have ideas for a counter-proposal. I apologize that I am not in a position to do so here but in fairness to Reynolds, the correspondence reflects that you promised to make a proposal in May, and we have just now received your proposal.

**Interrogatory No. 4.** Reynolds stands on its objections.

**Interrogatory No. 7.** Reynolds stands on its objections.

**Interrogatory No. 8.** Thank you for your offer to reduce the time frame of this Interrogatory from 2000-present to 2007-present. We are conferring with our client to determine

Michael N. Nemelka
August 1, 2018
Page 6 of 7

whether and to what extent we can offer to supplement this interrogatory answer, but at this time must stand on our objections.

**Interrogatory No. 10.** This interrogatory asks Reynolds to "[i]dentify each dealership, vendor, OEM, and/or third-party integrator that has been whitelisted by Reynolds at any point since January 1, 2013. For each such entity, state the dates of the whitelisting and the number and identity of any dealership(s) and vendor(s) covered by the whitelisting." Reynolds has already undertaken significant effort to produce a detailed report including all of the requested information except for dealer names. *See* REYMDL00134886-134889. To be clear, the information produced includes (i) the number of exemptions; (ii) by month beginning in 2013; (iii) organized by respective vendors or OEMs for whom the exemptions were granted. The identity of the dealers serviced by those vendors / OEMs are irrelevant in this context and not proportional to the needs of the case.

\* \* \*

Finally, I have a few follow-up items regarding our separate, July 31, 2018 meet-and-confer call (which was focused on our July 30, 2018 letter regarding the Individual Plaintiffs' RFPs to Reynolds).

**Individual Plaintiffs' RFP 19.** You asked if, in addition to the information described in our July 30 letter, Reynolds would agree to produce documents reflecting complaints by vendors or dealers regarding such delays. If it will resolve the Request, we are agreeable to including such documents located using agreed upon search terms and custodians.

**Individual Plaintiffs' RFP 83.** As we have explained, Reynolds does not track "DMS connections." On our call, you clarified that you would accept the number of dealers serviced by Reynolds' RCI customers for the relevant time period. It appears that we may be able to provide that information back to 2014, although it entails a manual burden. By way of compromise, if it will resolve the Request, we are willing to provide this information once per year from 2014 to the present. Please let us know if that will resolve the request.

**Individual Plaintiffs' RFP 84.** While both sides engaged in a spirited debate regarding this RFP on our call, I do not believe "in the light of day" that there is a real dispute. For the avoidance of doubt, in addition to all other materials that Reynolds has agreed to produce per our July 30 letter, if Reynolds's custodial document review reveals emails discussing groups of wins or losses (as opposed to emails regarding single accounts won or lost), such documents will be produced (regardless of whether styled as "reports").

I hope that our efforts to quickly provide good faith feedback on the above issues is appreciated. We will follow up as soon as possible on the handful of remaining open issues.

Michael N. Nemelka
August 1, 2018
Page 7 of 7

                    Sincerely,

                    Brian T. Ross


Cc: MDL Service List