# Exhibit Y

**MAYER•BROWN**

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel +1 312 782 0600
Main Fax +1 312 701 7711
www.mayerbrown.com

**Britt M. Miller**
Direct Tel +1 312 701 8663
Direct Fax +1 312 706 8763
bmiller@mayerbrown.com

November 15, 2017

**BY E-MAIL**

Michael N. Nemelka
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036

Re:   <u>*Authenticom, Inc. v. CDK Global, LLC, et al.*,
      Case No. 17-CV-318 (W.D. Wisc.)</u>

Dear Mike:

We are in receipt of your November 13 Letter. We note at the outset that contrary to your representation during our lengthy meet-and-confer sessions last week that the only matters outstanding regarding CDK's written discovery responses were "nit" "clean-up" issues, you have now raised several issues with respect to which Authenticom is seeking yet another meet-and-confer. While we are happy to discuss these topics with you, we note that at least one (date range) is a threshold ESI collection issue that should have been raised at the outset of this process.

In any event, in the interest of attempting to resolve Authenticom's concerns related to CDK's responses and objections to Authenticom's First Set of Requests for the Production of Documents ("Requests"), further responses are provided below. Any offers to produce additional categories of documents are subject to and without waiver of CDK's general and specific objections set forth in its initial written responses dated November 1, 2017, and are contingent on resolving the parties' disputes as to the identified Requests.

**The November 13 Letter:**

*Production Timeline*. Authenticom's complaint that Defendants have yet to make a substantial production to date is not well taken.[1] As you are aware, the parties had their Rule 26(f) conference on August 17, 2017. Pursuant to Fed. R. Civ. P. 26(d)(1), Authenticom was then free to serve discovery requests on Defendants (indeed, it could have served them prior to August 17 and pursuant to Rule 26(d)(2)(B) they would have been deemed served as of that date). Similarly, it could have served its Requests on August 24, after the parties' telephonic pre-trial conference with Magistrate Judge Crocker during which he set the trial date and the "compressed timeframe and quickly approaching expert deadlines" you reference in your letter. Instead,

---

[1] It is not accurate to say that Defendants have not produced "any documents" as both CDK and Reynolds produced a significant number of documents, comprising over one thousand pages, in connection with the June 2017 preliminary injunction proceedings. *See* CDK-0000001-1435.

Michael N. Nemelka
November 15, 2017
Page 2

Authenticom elected to wait over *six weeks*, until October 2, 2017, to serve its first set of RFPs and when it did so, served CDK with nearly 100 such Requests. CDK served its responses and objections on November 1—within the time limit set by the Federal Rules—and agreed to meet-and-confer regarding those responses within two business days of receiving your request to do so. It has since been working in good faith to identify and collect any non-electronic documents and any centrally-stored collections of documents (*i.e.*, those that would not be dependent on search terms or custodians) responsive to those Requests that are not currently in dispute and hopes to begin producing documents next week. As you might expect, the vast majority of the Requests will be answered by custodial searches which CDK will promptly undertake once the parties have reached agreement and/or impasse on the appropriate custodians and search terms. In short, the compressed time frame in which the parties find themselves is due in no small part to Authenticom's delay in serving its initial Requests. Defendants are working with all due speed and are well aware of the upcoming deadlines.

*Search Terms*. You are correct that the parties' ESI stipulation, entered on October 25, requires the parties to meet-and-confer regarding search terms, document custodians, and relevant date limitations. Authenticom's demands notwithstanding, that meet-and-confer was premature until Defendants had responded to the Requests and the parties had met-and-conferred regarding those responses, as the ultimate scope of the Requests necessarily impacts search terms, document custodians, and date limitations (the latter of which are now at issue per your November 13 Letter). With our discussions last week and, hopefully, our discussions over the next few days, we will be able to resolve all or most of the custodian and date limitation issues and work toward proposing our initial list of proposed search terms next week.

*Date Range*. As noted above, you raised this issue for the first time in your November 13 Letter. Indeed, at no point during our meet-and-confer discussions last week did Authenticom object to Defendants' limitation of the relevant start date to January 1, 2013.[2] Not only is that date the outer bound of the applicable limitations period for all of Authenticom's stated claims (*i.e.*, those that it has actually pled in its Complaint), but Defendants believe that it is more than reasonable under the circumstances. As you note in your letter, many of Authenticom's claims center on Defendants' February 2015 agreements and subsequent actions. Thus, 2+ years of discovery prior to those agreements is more than reasonable for Authenticom to develop whatever evidence it thinks it can develop as to the relevant market, the market conditions at the time of the agreements, motive, and intent behind the agreements. Similarly, 4+ years of discovery regarding Defendants' vertical contracting practices is similarly sufficient to establish whatever facts Authenticom thinks it can establish with respect to the anticompetitive nature of those contracts. If there are particular Requests where Authenticom has a good faith basis for a modest extension of the January 1, 2013 date, Defendants are happy to consider it and to further meet-and-confer. Please let us know.

---

[2] We also note that in Authenticom's responses to Defendants' requests for production, Authenticom objects to those requests to the extent they are not "limited in time" and commits to producing documents as from January 1, 2013.

Mayer Brown LLP

Michael N. Nemelka
November 15, 2017
Page 3

*Request No. 4*.  Again, this is a Request that you raise for the first time in your November 13 Letter.  While we are happy to meet-and-confer regarding the scope of this Request, we do not agree that Authenticom is permitted to root through every communication and every agreement CDK and Reynolds ever had to see whether it can gin up further allegations against the defendants.  As you should be aware (despite your references to it in your responses to Defendants' RFPs), the discovery standard is no longer "reasonably calculated to lead to the discovery of admissible evidence".  Rather, as you note elsewhere in your responses, the standard pursuant to Fed. R. Civ. P. 26(b)(1) is that the requested discovery must be relevant to a claim or defense in the litigation *and* proportional to the needs of the case.  Consistent with that standard, Defendants will commit to producing non-privileged documents evidencing any agreements as and between CDK and Reynolds regarding access to their respective DMS platforms, independent data integrators, or that are otherwise relevant to any party's claims or defenses.  Similarly, Defendants will commit to producing, through a search and review of agreed upon custodians' files, communications discussing any such agreements.  Your request that Defendants simply produce it "all" and let Authenticom sort it out is not only unreasonable, it is inconsistent with the Federal Rules.  If we need to further meet-and-confer on this issue, please let us know.

*Request No. 5*.  Although you alluded to this issue during our meet-and-confer last week, this is the first articulation of Authenticom's position on both the waiver and the crime-fraud exception portions of this Request.  We respectfully respond that both issues are without merit.  Both Judge Peterson and the Seventh Circuit have held that the February 2015 Agreements were not in and of themselves anticompetitive.  *See* Op. Vacating Prelim. Injunction (ECF No. 93) at 6; Dist. Ct. Prelim. Injunction Op. (Dkt. 172) at 14.  At most, Judge Peterson opined that they could have an anticompetitive effect.  *See* Dkt. 172 at 12.  Even under that view of the agreements (which is now in serious doubt in light of the Seventh Circuit's analysis), Authenticom has no basis for seeking privileged communications regarding the agreements and Defendants will not agree to produce them.  If there is something short of the production of that information that Authenticom is seeking with this Request then we are happy to meet-and-confer, but if not, then the parties are at an impasse.

*CDK Specific Responses*

*Request No. 6*.  To the extent that your letter suggests that Authenticom is requesting "integration pricing" that CDK pays for access to data on the Reynolds DMS, that information does not fall within the scope of this Request at all.  However, the February 15, 2015 Reynolds Interface Agreement that CDK produced months ago (CDK-0000040) includes pricing information.

*Request No. 9*.  The use of quotations around the terms "data integrators" and "solution" in CDK's response to this Request was not an indication that those were the only search terms that CDK intended to use to search for documents responsive to this Request.  Rather it was intended to signify its disagreement with Authenticom's use of both terms as CDK believes neither is accurate or appropriate for use in this litigation.  CDK nonetheless used both terms in its

Michael N. Nemelka
November 15, 2017
Page 4

response as they were used in Authenticom's Request. CDK will search for documents responsive to this Request as it understands both of these terms.

*Request No. 12.* Setting aside that this Request is, like the bulk of Authenticom's Requests, redundant of a number of other Requests (to which CDK has committed to producing responsive information), in an effort to resolve this issue in the short term and subject to and without waiving its general or specific objections, CDK states that in addition to the documents it has already committed to produce in response to this Request, it will produce, to the extent they exist, are within CDK's possession, custody, and control and can be identified through a reasonable search and review of agreed upon custodians' files, non-privileged communications regarding "coordination, joint efforts, assistance, and exchanges of information between Reynolds and CDK aimed at blocking third party integrators."

*Request No. 28.* CDK has clearly stated the basis for its objection to this Request—namely that it is grossly overbroad and unduly burdensome as written in that it literally seeks "all documents and communications" regarding manual extraction of data from CDK's DMS for a 10+ year period. Setting aside the time period issue (addressed above), CDK is at a loss as to why documents sufficient to show the various subcategories of documents sought by this Request are not sufficient. Under CDK's formulation, Authenticom will receive documents sufficient to show when dealers gained the capability to manually extract data from the DMS. Under Authenticom's formulation, CDK would be required to produce every single document and communication that mentions a dealer receiving the capability to manually extract data from the DMS. As the relevant question is limited to "when" dealers gained that capability, documents "sufficient to show" that information should be sufficient; "all documents" relating to that question would be punitive and unduly burdensome. The same is true of the other sub-categories. If the concern is "communications" regarding manual extraction (which is the only thing that CDK can conceptualize is not squarely addressed by its offer of documents sufficient to show the requested information), then to the extent they exist, are within CDK's possession, custody, and control and can be identified through a search and review of agreed upon custodians' files, CDK will produce non-privileged communications regarding dealers' ability to manually extract data from the CDK DMS for the period January 1, 2013 to the date of CDK's collections of documents for purposes of responding to the Requests.

*Request No. 41.* Subject to the other limitations set forth in its response (*e.g.*, time period, a search and review of reasonable sources, etc.), CDK intends to produce documents and communications relating to the contract term identified in the Request (or any other similar provision).

*Request No. 72.* As with Request No. 9, the use of quotations around the term "data integration services" in CDK's response to this Request was not an indication that that was the only search terms that CDK intended to use to search for documents responsive to this Request. Rather it was intended to signify its disagreement with Authenticom's use of the term as CDK does not believe that it is accurate or appropriate as used by Authenticom in connection with the services it provides. CDK nonetheless used the term in its response as it was used in Authenticom's

Michael N. Nemelka
November 15, 2017
Page 5

Request.  CDK will search for documents responsive to this Request as it understands the term. As for the "data integrators" CDK has agreed to search for, if Authenticom has specific entities in mind, CDK is happy to consider them, otherwise CDK will search for documents related to non-CDK "data integrators" as it understand the term.

**Follow-Up from the November 8 and 9 Meet-and-Confer Sessions:**

With respect to the issues you raised during our meet-and-confer session on November 8 and 9, CDK responds as follows.  As above, any offers to produce additional categories of documents are subject to and without waiver of CDK's general and specific objections set forth in its initial written responses dated November 1, 2017 (including as to time period, and to the sources of documents to be searched), and are contingent on resolving the parties' disputes as to the identified Requests.

*Request No. 1 (Documents Produced in Response to Government Investigations).*  In addition to pre-existing business records that are responsive to this Request, which CDK has already committed to produce, Authenticom requested that CDK produce narrative responses, correspondence, and "white papers" provided to the government in response to CIDs and subpoenas.  As we stated during our meet-and-confer, however, correspondence and white papers prepared by counsel are not evidence, nor is it appropriate for Authenticom to simply rely on the government's discovery efforts in other proceedings in lieu of conducting its own discovery in this litigation.

Notwithstanding these objections or those set forth in its responses, in addition to pre-existing business records, CDK is willing to produce any factual summaries, data compilations, or presentations created and provided to the government for purposes of responding to government CIDs and subpoenas, to the extent that they are relevant to the claims and defenses in this litigation and not otherwise privileged.  CDK continues to object to producing documents created specifically to present legal argument or advocacy to the government, whether in the form of white papers, correspondence, analyses, or other.

*Request No. 17 ("SMART-R").*  As we explained during our meet-and-confer, "SMART-R" is a version of a long-defunct program developed by IntegraLink a decade ago, before it was acquired by CDK. Moreover, no claim or defense in this litigation depends on the former business practices of IntegraLink or the technical manner in which it previously accessed Reynolds's DMS.

Notwithstanding these objections or those set forth in its responses, CDK will produce non-privileged documents and communications discussing the use of the SMART-R program to access Reynolds's DMS, its effectiveness (or ineffectiveness), and its discontinuation, as identified through a search and review of agreed upon custodians' files.

*Request No. 19 (DMI and IntegraLink Access to Non-CDK, Non-Reynolds DMSs).*  This Request is even farther afield than Request No. 17 in terms of its possible relevance to any claim or

Mayer Brown LLP

Michael N. Nemelka
November 15, 2017
Page 6

defense in this litigation. How DMI and IntegraLink might access *other* DMS providers' platforms, much less the "technological means" by which they do (or did) so, has no bearing on whether CDK and Reynolds entered into some unlawful agreement concerning their own respective DMS access policies.

Notwithstanding these objections or those set forth in its responses, CDK is willing to produce documents, to the extent that they are available and maintained by CDK in the ordinary course of business, sufficient to show (a) which non-CDK, non-Reynolds DMSs DMI and IntegraLink access, (b) what type of access they have (*e.g.*, if they have access to data that is "pushed" by the DMS provider), and (c) how they generally store and transfer data.

*Request No. 25 (Agreements with Other Providers of "Data Integration Services")*. During the parties' meet-and-confer discussions, Authenticom conceded the vast overbreadth of this Request, which if read literally, would encompass any agreement of any type between CDK and any provider of "data integration services," on any subject matter, whenever created. Moreover, any agreements between CDK and third-party providers of "data integration services" as to non-CDK, non-Reynolds DMSs have no relevance to whether CDK had valid and legitimate business reasons to begin restricting unauthorized third-party access to its own DMS, much less whether it formed an unlawful agreement with Reynolds to do so.

Notwithstanding these objections or those set forth in its responses, CDK is willing to produce agreements with third-party providers of "data integration services" with respect to access to data maintained on CDK or Reynolds's DMSs, and for any other DMS providers with policies restricting unauthorized third-party access. CDK is also willing produce non-privileged documents and communications discussing such agreements, as identified through a search and review of agreed upon custodians' files.

*Request Nos. 35 & 36 (DMS Customer Switching)*. During the parties' meet-and-confer discussions, Authenticom argued that documents responsive to these Requests would show whether CDK possesses "market power" as to DMS customers. If that issue is relevant at all, it is to Authenticom's tying claim, which is subject to a pending motion to dismiss and which the Seventh Circuit recently characterized as "dubious in the extreme." *See* ECF No. 93 at 13. Further, as CDK explained, it does not maintain data in the ordinary course of its business that would allow it to create a report sufficient to show the "tenure" of all current DMS customers. The average customer "tenure" statistics that appear in certain public reports filed by CDK are based on annual customer switching data (*e.g.*, as a hypothetical, if there were 20% customer turnover in a given year, then the average customer tenure would be approximated at five years). To the extent that Authenticom wants to investigate further, CDK has already agreed to produce documents sufficient to show win/loss statistics for its DMS customers in response to Request Nos. 31, 32, and 33, among others.

Notwithstanding these objections or those set forth in its responses, and in addition to the categories of documents noted above, CDK is willing to produce non-privileged documents and communications created after January 1, 2015 that discuss any loss or potential loss of DMS

customers in connection with SecurityFirst, as well as summary-level statistics on DMS customer tenure or switching, as identified through a search and review of agreed upon custodians' files.

*Request Nos. 46, 47, 48, 49, 62, 63 & 68 (DMI and IntegraLink Contracts and Pricing)*.  In addition to the categories of documents that CDK has offered to produce in response to Request No. 17, and notwithstanding its objections set forth in its responses, CDK is willing to produce non-privileged documents sufficient to show a representative sample of managed data services contracts between DMI and IntegraLink (on the one side) and vendors and/or dealers (on the other), as well as the current versions of DMI and IntegraLink's standard managed data services contract terms and conditions, if any.  CDK is also willing to produce non-privileged documents and communications, if any, comparing prices charged by DMI and IntegraLink for access to data on CDK's DMS against prices charged by CDK through the 3PA program, as identified through a search and review of agreed upon custodians' files.

*Request Nos. 51, 52, 53, 54 & 55 (DMS Pricing)*.  Here again, Authenticom argues that this information will show whether Defendants possess "market power" or the ability to raise prices for DMS customers—issues that would be relevant, if at all, to Authenticom's "dubious in the extreme" tying claim.  Moreover, even if prices for DMS service were relevant, "projections" for revenue and profit (as sought in Request No. 55) have no bearing on whether the prices charged by Defendants for DMS services were at, above, or below competitive levels.

Notwithstanding these objections or those set forth in its responses, CDK is willing to produce documents or information sufficient to show its monthly basic DMS pricing and revenue for DMS services, from January 1, 2015 to the date of CDK's collections, to the extent such data are maintained by CDK in the ordinary course of its business and can be provided in a reasonably usable format without causing CDK to incur unreasonable burden and expense.

*Request No. 56 (Auto/Mate Acquisition)*.  Notwithstanding its objections set forth in its responses, CDK is willing to produce any pre-existing business documents produced by CDK to the Federal Trade Commission ("FTC") in connection with the FTC's Second Request regarding CDK's planned acquisition of Auto/Mate, as well as any factual summaries, data compilations, or presentations created and provided to the government for purposes of responding to the Second Request, to the extent such documents are relevant to the claims and defenses in this litigation, and are not protected from disclosure by an applicable privilege.

*Request Nos. 57, 58, 59, 60, 61, 65, 66, 67, 69 & 70 (3PA Pricing)*.  During the parties' meet-and-confer discussions, Authenticom stated that it is seeking data and summary-level business records (*e.g.*, reports and memoranda) through these Requests that would allow for comparison between CDK's prices for 3PA services before and after it began "blocking" Authenticom and other unauthorized third-party data extractors in mid-2016.  Of course, to the extent that CDK believed (or data supports) that excluding unauthorized third parties—whose business model is based on free-riding on CDK's systems, investments, and intellectual property—would support raising prices, that is both unsurprising and a strong *unilateral* incentive for CDK to have acted

Michael N. Nemelka
November 15, 2017
Page 8

in the manner it did. Further, CDK's own costs and profits (and projections as to the same) have no bearing on whether the prices charged for 3PA services before and after SecurityFirst were at, above, or below competitive levels.

Notwithstanding these objections or those set forth in its responses, CDK is willing to produce documents or information sufficient to show its monthly pricing and revenue for services offered through the 3PA program, from January 1, 2015 to the date of CDK's collections, to the extent such data are maintained by CDK in the ordinary course of its business and can be provided in a reasonably usable format without causing CDK to incur unreasonable burden and expense.

*Request No. 71 (Vendor "Pass-Through")*. Notwithstanding its objections set forth in its responses, CDK is willing to produce non-privileged documents and communications that discuss vendor "pass through" of 3PA fees (or which use similar terms), as identified through a search and review of agreed upon custodians' files.

*Request No. 73 (OEM Pricing)*. During the parties' meet-and-confer discussions, Authenticom argued that OEMs are "just another vendor." That is incorrect. The managed data services that CDK offers to OEMs are subject to highly individualized contract negotiations. These services are not offered through CDK's 3PA program, nor do the pricing terms of CDK's agreements with OEMs have any bearing on the prices that CDK charges vendors for data access and integration services through the 3PA program. Accordingly, CDK intends to stand on its objections to this Request.

*Request No. 74 (DMS Technical Specifications)*. During the meet-and-confer, Authenticom attempted to justify its requests for broad and unbounded discovery into the technical workings of CDK's DMS—including all underlying code, scripts, and algorithms—as necessary for its experts to "test" whether CDK's concerns about data security, data integrity and system performance issues caused by unauthorized third-party access are genuinely held. Yet, CDK is already producing documents and communications regarding SecurityFirst and its justifications (including in response to Request Nos. 26 and 27, which seek, among other things, "[a]ll documents and communications relating to the reasons CDK introduced the 'Security First' and/or '3PA Refresh' initiative"). In short, producing the technical details of its entire DMS is unnecessary, overly burdensome, and unduly prejudicial given the highly sensitive nature of the requested information—particularly in the hands of Authenticom, whose business model remains premised on gaining unauthorized access to CDK's DMS and evading detection by CDK's network and computer systems. To date, Authenticom has not articulated a reasoned basis for requesting this information and CDK does not believe one exists. Accordingly, CDK intends to stand on its objections to this Request.

*Request No. 79 ("Blocking" Methods)*. Authenticom clarified during the parties' meet-and-confer discussions that it is principally seeking communications and other writings (as opposed to "all documents") that discuss or describe the methods that CDK has used to "block" or otherwise restrict or disable Authenticom's unauthorized DMS access.

Mayer Brown LLP

Michael N. Nemelka
November 15, 2017
Page 9

Subject to this clarification, and notwithstanding its objections set forth in its responses, CDK is willing to produce non-privileged documents and communications describing the methods it has used to block, restrict, or disable Authenticom's unauthorized DMS access, as identified through a search and review of agreed upon custodians' files. However, none of the foregoing should be read to suggest that CDK agrees or intends to produce documents or communications reflecting the technical details of its "blocking" methods or of its DMS platform generally.

*Request Nos. 86 & 87 (Elliott Management).* During the parties' meet-and-confer discussions, it became clear that these Requests are based on speculation—and nothing more—that institutional investor Elliott Management could have in some way influenced CDK's decisions to exclude third-party integrators from its DMS. However, based on our investigation to date, which remains ongoing, the handful of communications between CDK and Elliott Management of which we are aware do not touch on this issue, much less reference SecurityFirst, the 3PA "refresh," or even the 3PA program generally. Indeed, Elliott Management did not even become an investor in CDK until after the February 2015 agreements that Authenticom claims is the root of the alleged conspiracy. Communications with or otherwise related to Elliott Management that pertain to other, unrelated aspects of CDK's business operations are irrelevant.

Notwithstanding these objections or those set forth in its responses, to the extent that CDK subsequently identifies any non-privileged communications with or otherwise related to Elliott Management in its search and review of agreed upon custodian documents that refer to CDK's "SecurityFirst" or 3PA "refresh" strategies, it is willing to produce such documents.

*Request No. 91 ("Tilt the Table").* The significance of this issue continues to escape us. To be clear, it is in no way anticompetitive for CDK to leverage *its own* resources and facilities—which it has developed at considerable investment and expense—to advantage its own products and service offerings (or those of its corporate affiliates) over products and services offered by third parties and competitors. Far from indicating an unlawful agreement with Reynolds, such evidence would tend to show that there were strong *unilateral* incentives for CDK to have acted in the manner it did.

Notwithstanding these objections or those set forth in its responses, CDK is willing to produce documents and communications referencing the adoption (or not) of any "tilt the table" (or similarly-worded) strategy, or otherwise related to the establishment (or not) of "closed" application categories in connection with SecurityFirst and/or the 3PA strategy "refresh," as identified through a search and review of agreed upon custodians' files.

*Custodians*

In your November 8, 2017 email, Authenticom asks that CDK add 15 additional custodians to the list of 13 custodians whose documents CDK has already agreed to search in response to Authenticom's RFPs—for a total of 28 custodians. Although two of the identified individuals—Steven Anenen and Brian MacDonald (CDK's former and current CEO)—were identified in Authenticom's August 31, 2017 Rule 26(a) disclosures as individuals Authenticom believed

Mayer Brown LLP

Michael N. Nemelka
November 15, 2017
Page 10

might have knowledge relevant to the claims and defenses in this litigation, Authenticom has provided no explanation for its inclusion of the other 13. Moreover, given Authenticom's professed concern regarding the "compressed time schedule" the parties face in this matter, its identification, some 60+ days later, of 15 additional potentially relevant individuals rings hollow.

Nonetheless, in an effort to resolve this matter and promptly move to the discovery process forward, CDK is willing to add three of the requested custodians—Steven Anenen, Beth Ayotte, and Jeff Nosick—to its list of agreed custodians. For the reasons briefly identified below, CDK believes the other 12 are inappropriate additions but is willing to meet-and-confer with Authenticom if Authenticom believes that it has some legitimate basis for their inclusion.

1. *Brian MacDonald, current CEO*. As Authenticom is aware, Steve Anenen was CDK's CEO until June 30, 2016—*i.e.*, during all of the events at the core of Authenticom's allegations. Mr. McDonald, whose tenure at the company post-dates the relevant period, has no involvement in the day-to-day operations of the aspects of the business at issue and would not reasonably be expected to have documents responsive to Authenticom's RFPs that are not otherwise contained in the files of other agreed upon custodians, most notably, Robert Karp, the President of CDK North America.

2. *Matt Parsons, former Vice-President of Sales*. Mr. Parsons is no longer with CDK and was not on any legal hold at the time of his departure (prior to the filing of the instant litigation). As a result, none of his documents were preserved and no data is available.

3. *Kevin Henahan, former Senior Vice-President of Marketing*. Mr. Henahan left CDK well before the events at issue in Authenticom's complaint and thus, to the extent CDK has any materials still within its possession, custody, or control from his files, it would not reasonably expect them to contain information relevant to the claims and defenses in this litigation.

4. *Mark Roman, former Director of Sales, DMI*. Mr. Roman is no longer with CDK. Moreover, CDK does not expect that his files would contain documents relevant to the claims and defenses in the litigation that would not otherwise be contained in the files of other agreed upon custodians, most notably, Jeff Nosick, Mr. Roman's supervisor and the Vice-President of Sales for CDK's Partner Program.

5. *Mike Matlock, Account Director, Data Services*. Mr. Matlock works with a subset of individual customers regarding individual customer integrations and would not reasonably be expected to have relevant documents responsive to Authenticom's RFPs that are not otherwise contained in the files of other agreed upon custodians, most notably, Beth Ayotte, Mr. Matlock's supervisor.

6. *Terry Blosie, Integration Analyst*. Mr. Blosie performs integration certifications and develops integration points. In short, his role at CDK is purely a technical one such that he would not reasonably be expected to have documents relevant to the claims or

Mayer Brown LLP

Michael N. Nemelka
November 15, 2017
Page 11

> defenses in this litigation. Moreover, CDK would expect that any relevant documents he might have would be redundant of those in other agreed upon custodians' files, most notably those of Mike Noser.

7. *Vicki Litke, Integration Analyst.* Like Mr. Blosie, Ms. Litke performs integration certifications and develops integration points. In short, her role at CDK is purely a technical one such that she would not reasonably be expected to have documents relevant to the claims or defenses in this litigation. Moreover, CDK would expect that any relevant documents she might have would be redundant of those in other agreed upon custodians' files, most notably Mike Noser's files.

8. *DeAnne Hodum, Solutions Engineer.* Ms. Hodum performs a largely administrative role in CDK's organization, focusing on the preparation of SOWs and other contract documents for review and refinement by others within the company. In short, she would not reasonably be expected to have relevant documents responsive to Authenticom's RFPs.

9. *Daniel Flynn, President, CDK North America (as of December 1, 2017).* As has been publicly announced, Mr. Flynn will succeed Mr. Karp as President of CDK North America on December 1, 2017. In his current role and in the minimal amount of time he has been with the company (less than 2 years) he has played no management or directive role in the business currently at issue. As such, he would not reasonably be expected to have documents relevant to the claims or defenses in this litigation.

10. *Michael Kane, Account Director.* Mr. Kane, like Mr. Bloskie and Ms. Litke, ultimately reports to Mr. Noser (a custodian) and occupies a technical role in connection with the certification of partner integration. In short, his role at CDK is purely a technical one such that he would not reasonably be expected to have documents relevant to the claims or defenses in this litigation. Moreover, CDK would expect that any relevant documents he might have would be redundant of those in other agreed upon custodians' files, most notably Mike Noser's files.

11. *Jesse Traucht, Account Operations Manager.* Like Mr. Matlock, Mr. Traucht is an account director who focuses on a subset of individual managed data services customers and would not reasonably be expected to have relevant documents responsive to Authenticom's RFPs that are not otherwise contained in the files of other agreed upon custodians, most notably, Kevins Distelhorst, the head of Mr. Traucht's division.

12. *Kevin Kelley, former Product Manager.* Mr. Kelley is no longer with CDK and was not on any legal hold at the time of his departure (prior to the filing of the instant litigation). As a result, none of his documents were preserved and no data available.

Mayer Brown LLP

Michael N. Nemelka
November 15, 2017
Page 12

\* \* \* \* \* \*

We remain hopeful that the foregoing resolves most, if not all, of the parties' outstanding disputes. As always, we stand ready to meet-and-confer in good faith in the event Authenticom is willing to do the same and that further discussion of any of these issues would be productive.

Sincerely,

*/s/ Britt M. Miller*

Britt M. Miller

cc: Mark Ryan
    Matt Provance
    Aundrea Gulley
    Brian Ross

725938260