# Exhibit Z

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215

———

(202) 326-7900

FACSIMILE:
(202) 326-7999

July 30, 2018

*Via Electronic Mail*

Brian Ross, Esq.  
Gibbs & Bruns LLP  
1100 Louisiana  
Suite 5300  
Houston, TX 77002  

Britt M. Miller, Esq.  
Mayer Brown  
71 South Wacker Drive  
Chicago, IL 60606

Re:   *In re Dealer Management Systems Antitrust Litigation,* MDL No. 2817

Dear Britt and Brian:

I write regarding several discovery issues related to CDK's and Reynolds' responses to the Requests for Production ("RFPs") and Interrogatories propounded by Authenticom. These discovery issues have been outstanding for some time. We write to ensure that we have Defendants' final positions as we prepare motions to compel. We look forward to reaching finality on these issues on our next meet and confer, which is scheduled for tomorrow morning at 9:00 a.m. ET.

**Demonstratives from Preliminary Injunction Hearing.** We do not believe we have a complete set of the demonstratives used by Defendants during the Authenticom Preliminary Injunction proceedings, or shown to the Court during the hearing. Please provide a copy of each demonstrative used with any witness or during any summation or statement before Chief Judge Peterson. Thank you in advance for this courtesy. These are demonstratives we should have had, and in going through our case files, we do not believe you sent us a full set.

**General Objections.** As with Andy Marovitz's request in his letter on behalf of CDK regarding discovery from Cox Automotive and AutoLoop, *see* Letter from A. Marovitz to M. Nemelka (July 17, 2018), we too request that Defendants identify whether any of their General Objections to Plaintiffs' RFPs forms the basis for withholding non-privileged information or documents responsive to Plaintiffs' discovery requests.

**CRM Software.** A recurring topic has been our request that Defendants confirm that they have collected and are reviewing files from their customer relationship management ("CRM") software or similar communication tools. We know that Defendants communicated with vendors and dealers, and vice versa, through such software on core topics at issue in this case, such as dealer control over their own data. Please confirm that Defendants have collected and are reviewing their CRM communications for responsive information.

**Authenticom RFP No. 4 (Agreements between CDK and Reynolds).** This Request seeks "all documents and communications regarding any agreement (written or otherwise)

between CDK and Reynolds," but Defendants have only agreed to produce documents and communications regarding agreements between CDK and Reynolds "regarding access to their respective DMS platforms, independent data integrators, or that are otherwise relevant to any party's claims or defenses." *See*, *e.g.*, Letter from B. Miller to M. Nemelka (Nov. 15, 2017); Letter from B. Miller to M. Nemelka (Dec. 1, 2017).

In this regard, please confirm that all communications between CDK and Reynolds regarding the data integration offered to each other's add-on applications, and internal documents regarding the same, are being produced.

Apart from the categories of agreements that Defendants have agreed to produce, such as those touching on data integration, this Request seeks documents regarding *any* agreement between CDK and Reynolds. Defendants' response, however, is limited to the agreements they determine are "relevant to any party's claims or defenses." How are Defendants applying this standard? Which types of agreements are they not producing? We need this information so that we can determine if Defendants are using the proper standard for deciding whether to produce documents regarding their agreements. Otherwise we will have no choice but ensure Plaintiffs receive information regarding all agreements between Defendants.

**Authenticom RFP No. 5 (Waiver and Crime-Fraud Exception to the Attorney Client Privilege).** As you know, Authenticom has reserved its rights regarding Defendants' assertion of privilege over communications with counsel regarding their agreements, including the February 2015 "wind down" agreement. *See*, *e.g.*, Letter from M. Nemelka to Defendants (Nov. 13, 2017). I write to state that all Plaintiffs formally reserve the same rights. For the reasons previously stated, Defendants have waived any protection over such counsel communications regarding the agreements, and they are also subject to discovery based on the crime-fraud exception. *Id*. When Defendants produce their privilege logs, we will better be able to make further determinations on this topic. In the meantime, Plaintiffs continue to reserve all rights.

**Authenticom RFP 30 (Whitelisting).** It appears that CDK and Reynolds – while agreeing to produce documents with respect to every other subsection of this request – are not agreeing to produce documents in response to subpart (c) of this request, which seeks "[d]ocuments sufficient to show how whitelisting is accomplished, including all technical, system architecture, workflow processes, or other mechanisms used to whitelist login credentials." This information is relevant to Defendants' security and DMS burden defenses, in addition to the relief that Authenticom seeks. It is also needed to test Defendants' representations to the courts (including to the Seventh Circuit) regarding the changes to their DMS systems that may be required to whitelist. Please confirm that CDK and Reynolds will produce such information; otherwise we will be at an impasse.

**Authenticom RFP Nos. 31-33 ((DMS Switching).** These RFPs seek information regarding the switching of DMS customers. CDK and Reynolds agreed to only provide such information going back to 2013. But like other Plaintiffs, Authenticom must insist that CDK and Reynolds provide this information going back to 2006, which is a compromise from the requested date range of the year 2000 to the present. We have previously explained on numerous occasions why that date is the proper one: it is when CDK and Reynolds began differentiating themselves based on their data access policies, and DMS customers began switching from

Reynolds to CDK as a result. Please confirm whether Defendants will produce the information in response to these requests going back to 2006, or whether we are at an impasse.

**Authenticom RFP No. 73 (CDK) and RFP. No. 63 (Reynolds) (OEM Information).** The parties are still at an impasse on this and related RFPs regarding data integration provided to OEMs. *See* Letter from M. Nemelka to Defendants (Jan. 19, 2018). If Defendants have reconsidered their positions, please let us know.

**DMS and RCI/3PA business plans, business presentations, marketing plans, strategic plans.** Please confirm that Defendants are producing their DMS and RCI/3PA business plans, business presentations, marketing plans, strategic plans, and any other similar document from January 1, 2013. Such materials are responsive to numerous different requests, and we wanted to ensure that CDK and Reynolds are not withholding any such documents.

**Security Audits.** Please confirm that Defendants are producing the records of any security audits relating to their DMS or data integration programs, services, or products, including with respect to the storage, retrieval, or handling of data. Such security audits are responsive to numerous RFPs, and we want to ensure that CDK and Reynolds are not withholding any such documents.

I.  **CDK's RFP Responses**

**Date Range for RFP Nos. 20, 21, 22, 23, and 34 (ability of dealers / vendors to use independent integrators to access data on CDK DMS).** With respect to RFP 20 – and it should likewise be for the related RFP Nos. 21, 22, 23, and 34 – it appears that CDK's position on the date range for requests regarding statements, communications, and internal analysis regarding the ability of dealers and vendors to use independent integrators to access data on a CDK DMS is the following: "CDK is willing to consider conducting targeted searches of a select subset of custodians, *e.g.*, Steve Anenen and any central marketing files – for the full 10 year period (going back to Jan. 1, 2007] using an agreed subset of search terms."

We believe that the date range should go back to Jan. 1, 2006 for the above identified requests given that CDK started differentiating itself from Reynolds with respect to data access policies in that year. Moreover, please confirm that all non-custodial files (such as marketing materials, public relation materials, business plans, presentations, and any other centrally maintained files) regarding these requests are also thoroughly searched. As for custodial files, we propose the following CDK custodians to be included in this "targeted search" for responsive documents: any custodian who was employed by CDK as of January 1, 2006.

As for the search terms for these requests, we must meet and confer to identify those.

**RFP No. 25 (Agreements with Other Providers of Data Integration Services).** The parties' remaining dispute centers on the production of documents relating to CDK's use of integrators (whether its own or others) to access non-CDK, non-Reynolds DMSs with open systems. *See* letter from B. Miller to M. Nemelka (Dec. 8, 2017). The parties have conferred extensively about this. Please confirm that the parties are at an impasse, or let us know if CDK has reconsidered and will produce the documents and communications regarding its agreements

with data integration providers, whether or not those providers provided CDK with access to "closed" or "open" DMS platforms.

**RFP 28 (Dealer Manual Exporting).** Apart from the other documents CDK agreed to produce in response to this Request, CDK stated: "To the extent we are able to expert data from our CRM systems and search that data, we will include those sources in our search for documents responsive to this Request." *See* Letter from B. Miller to M. Nemelka (Dec. 8, 2017). Please confirm that CDK is doing so.

**RFP No. 27(f) (security implementation of Security Frist and/or 3PA Refresh).** Please confirm that CDK is producing all documents and communications with respect to the technological implementation of the "Security First" and/or "3PA Refresh" initiative. Otherwise we will be at an impasse.

**RFP No. 30(c) (how whitelisting is accomplished).** Please confirm that CDK is producing documents sufficient to show how whitelisting is accomplished, including all technical, system architecture, workflow processes, or other mechanisms used to whitelist login credentials.

**RFP Nos. 62-63 (DMI and IntegraLink).** Based on our correspondence, it does not appear that CDK has agreed to identify the vendors that have used IntegraLink and DMI and for which DMS platforms, as requested by the RFPs. Is CDK withholding such information for IntegraLink and DMI?

**RFP No. 68 (communications regarding prices charged by DMI and IntegraLink).** We believe that CDK has agreed to produce all documents and communications relating to the prices charged by IntegraLink and DMI for access to data on the CDK DMS, but we are writing to confirm. CDK did agree to produce documents sufficient to show the prices charged by IntegraLink and DMI, but we would like to confirm that CDK is agreeing to produce the *communications* regarding those prices as well.

**RFP No. 74 (DMS Technical Specifications).** Is CDK agreeing to provide the following in response to this request?

**a.** Documents sufficient to show how you block automated access to data on the DMS?

**b.** Documents sufficient to show how data is retrieved from the DMS database?

**c.** Documents sufficient to show how data is entered, stored, and organized on the DMS database?

**d.** Documents sufficient to show the technological aspects for how data extraction occurs from the DMS database when using the RCI and/or 3PA programs?

**e.** Documents sufficient to show the technological aspects for how data extraction occurs from the DMS database when using independent integrators such as DMI, IntegraLink, or otherwise?

**f.** All documents and communications reviewed by any testifying and/or consulting experts on data security and system performance engaged by you for this case, whether for the Authenticom preliminary injunction hearing or otherwise?

If CDK agrees to produce the foregoing, we will agree to forego – for now – the request for code, scripts, and algorithms relating to subparts a, b, and c.

**RFP No. 79 (blocking of login credentials).** Please confirm that CDK is producing all documents and communications relating to the technological methods used by CDK to block or disable dealer-provided login credentials.

**RFP No. 82 (security infrastructure of CDK DMS).** Please confirm that CDK will produce documents sufficient to show the security infrastructure of the CDK DMS and how it has changed over time.

**RFP No. 93 (monthly spend on independent data integrators).** Based on our review of CDK's discovery response and correspondence, *see* Letter from B. Miller to M. Nemelka (May 24, 2018), CDK has agreed to produce documents and communications regarding how much CDK spends on a monthly basis with independent integrators. If that is wrong, please let us know immediately.

**RFP No. 94 (McCray curse words).** CDK has agreed to consider our proposed list of curse words that may have been used by Mr. McCray in his correspondence. Those discussions are ongoing.

**RFP Nos. 96-101.** CDK agreed to negotiate in good faith additional search terms for these RFPs, which process is underway.

**RFP No. 102.** This RFP asks for every DMI, IntegraLink, and 3PA invoice from 2011 to the present. As a compromise, we offered to agree to limit this RFP to "the full set of invoices for 40 vendor customers of DMI, 40 vendor customers of IntegraLink, and 40 vendor customers of the 3PA program from 2011 to the present." *See* Letter from M. Nemelka to Defendants (May 31, 2018). We offered discuss the identification of these vendor customers. CDK rejected this compromise. *See* Letter from B. Miller to Plaintiffs (June 5, 2018).

In one final effort to find a compromise, we would agree to limit this request to the top 30 vendor customers of DMI, Integralink, and the 3PA program. Please let us know if you accept this compromise or if we are at an impasse.

**RFP No. 103.** This RFP asks for every CDK DMS invoice from 2011 to the present. As a compromise, we offered to accept "the full set of invoices for 100 dealer customers from 2011 to the present," and an offer to discuss the identification of those dealers. *See* Letter from M. Nemelka to Defendants (May 31, 2018). CDK rejected that offer. *See* Letter from B. Miller to Plaintiffs (June 5, 2018).

In one final effort to find a compromise, we would agree to limit this request to the top 75 DMS customers of CDK. Please let us know if you accept this compromise or if we are at an impasse.

**RFP No. 104.** This request seeks all "communications and documents concerning your security tools, processes, and training for your software developers." As a narrowing compromise, we offer the following: (1) with respect to "security tools," document and communications regarding the software used to test / analyze the security of your DMS and data integration programs; (2) with respect to "processes," your security planning documents, specifications for security and reliability, threat modeling, and risk analysis; and (3) with respect to "training," documents and communications regarding the training given to software developers working on your DMS and data integration programs. Also encompassed would be all design, technical, or functional specifications or similar development planning documents for your DMS or integration program.

Please let us know if this compromise is acceptable.

**RFP No. 106.** We understand that CDK has continued to refuse to produce the unredacted version of the FTC Auto/Mate complaint. Regardless of the parties' dispute with respect to the larger Auto/Mate FTC production, please let us know if CDK has reconsidered its position. Otherwise, we are at an impasse on the production of the unredacted Auto/Mate complaint.

## II.     CDK's Interrogatory Responses

**No. 7.** This Interrogatory asks CDK to state "whether you contend, and the basis for any contention, that there is a competitive market for data integration services on DMSs other than the CDK DMS and the Reynolds DMS." CDK has refused to respond to this Interrogatory based on specious grounds. Letter from M. Provance to Plaintiffs (June 14, 2018). CDK's own divisions – DMI and Integralink – provided and provide data integration services for non-CDK and non-Reynolds DMSs. It knows whether there is a competitive market in providing data integration on such DMS platforms. CDK also states that it does not know what the term "competitive" means, which is another specious statement. *Id.* "Competitive" means competition between two or more providers of a service or product to set of customers.

Please let us know if CDK will amend its Interrogatory response and provide the requested information, or if we are at an impasse.

**No. 11.** This Interrogatory asks for average tenure of CDK's DMS customers on an annual basis, from 2009 to the present. As we discussed on the meet and confer, CDK's response is non-responsive and did not provide the requested information. CDK was able to provide such information for the present at the preliminary injunction hearing, and yet it is refusing to do so in response to an Interrogatory. *Id.*

Please let us know if CDK will amend its Interrogatory response, or if we are at an impasse.

**No. 12.** This Interrogatory asks for market share information for the DMS market. CDK effectively refused to provide that information, instead listing the number of installed DMSs across various segments. CDK also did not respond with respect to DMS market share with

respect to "car sales." Finally, this Interrogatory asked for market share over time since 2000, not just current numbers as of 2017.

On the meet and confer, we explained that CDK is obligated to provide a substantive response with its actual market share information. CDK can provide such information, as indicated by its witness declarations in the preliminary injunction proceedings. CDK, however, has refused to amend its response. *Id.*

Before we file a motion to compel, we ask one last time whether will CDK supplement its Interrogatory response and provide its actual market share information requested? As a compromise, we will agree to have the requested information start from 2007, instead of 2000.

**No. 14.** CDK refused to respond to this Interrogatory, which asks for CDK to identify its communications with Reynolds regarding so-called "hostile integration" and/or any third party data integrator. In your letter, you represented that we offered to provide some sort of narrowing of this basic interrogatory. *Id.* We offer to reduce the date range to January 1, 2013 to the present, from the current date range of January 1, 2011 to the present.

Please let us know if CDK will amend its Interrogatory response, or if we are at an impasse.

### III. Reynolds' RFP Responses

**RFP No. 30(c) (how whitelisting is accomplished).** It appears that Reynolds is still refusing to produce documents sufficient to show how whitelisting is accomplished, including all technical, system architecture, workflow processes, or other mechanisms used to whitelist login credentials. Is that so? If so, we are at an impasse.

**DMS and RCI Financial Information (RFP Nos. 45-53).** It appears, at least based on its correspondence, that Reynolds is only agreeing to produce the following:

- DMS pricing – January 2014 to the present.
- RCI pricing – January 2011 to the present.
- DMS revenue – January 2013 to the present.
- RCI revenue – January 2013 to the present.

With respect to information on profit, cost, expenses, projections, budgets, gross and net margins, and the other requested financial information, Reynolds is refusing to produce that information. *See* Letters from B. Ross to M. Nemelka (Dec. 1, 2017) and (May 16, 2018). If any of this is incorrect, please let us know immediately.

To be clear, Reynolds' responses are insufficient and unacceptable, as we have stated many times. *See, e.g.*, Letter from M. Nemelka to Defendants (Jan. 19, 2018). Consistent with other Plaintiffs, Authenticom is seeking full financial information – with respect to pricing, revenue, profit, cost, expenses, projections, margins, budgets, and so forth – for Reynolds' DMS and RCI businesses from January 1, 2009, to the present. Reynolds has asserted that it "does not fully allocate costs or produce actual profitability reports on a product line basis." *See* Letter from B. Ross to M. Nemelka (Dec. 1, 2017). For purposes of discovery, however, Reynolds is

obligated to produce what it does have with respect to its financial performance, whether or not Reynolds produces financial reports along precise business lines.

**RFP No. 64 (DMS Technical Specifications).** Is Reynolds agreeing to provide the following in response to this request?

**a.** Documents sufficient to show how you block automated access to data on the DMS?

**b.** Documents sufficient to show how data is retrieved from the DMS database?

**c.** Documents sufficient to show how data is entered, stored, and organized on the DMS database?

**d.** Documents sufficient to show the technological aspects for how data extraction occurs from the DMS database when using the RCI and/or 3PA programs?

**e.** Documents sufficient to show the technological aspects for how data extraction occurs from the DMS database when using independent integrators such as DMI, IntegraLink, or otherwise?

**f.** All documents and communications reviewed by any testifying and/or consulting experts on data security and system performance engaged by you for this case, whether for the Authenticom preliminary injunction hearing or otherwise?

If Reynolds agrees to produce the foregoing, we will agree to forego – for now – the request for code, scripts, and algorithms relating to subparts a, b, and c.

**RFP No. 69 (blocking of login credentials).** Please confirm that Reynolds is producing all documents and communications relating to the technological methods used by CDK to block or disable dealer-provided login credentials.

**RFP No. 78.** This request seeks documents relating to Reynolds' effort to advantage its own applications. Apologies if we may have missed it, but is Reynolds producing documents in response to this RFP? We cannot see Reynolds' final position in our correspondence, though we admit we may have missed it.

**RFP No. 80.** Last we heard, Reynolds was "in the process" of considering whether to provide full information regarding its monthly data integration spend with independent integrators, from Jan. 1, 2013 to the present. In its responses, Reynolds has already agreed to produce such information as found in custodial documents. But centralized files must also be searched. Reynolds has this information – both as to the numbers and communications relating thereto – and please confirm Reynolds will produce it. If not, we are at an impasse.

**RFP Nos. 81-83, 87.** Reynolds stated in a letter that the parties do not have agreement on these RFPs. *See* Letter from L. Casaria to M. Nemelka (June 5, 2018). Will Reynolds produce documents in response to these RFPs? If not, we are at an impasse. And with respect to RFP No. 83, we reject Reynolds' refusal to search for and produce documents with usernames but not

passwords. Reynolds has sought such information from Authenticom, and it goes to Reynolds' security rationale and (baseless) criticisms of Authenticom's security practices.

**RFP No. 84.** We agree to your compromise proposal of limiting this RFP to "vendors" only. *See* Letter from L. Casaria to M. Nemelka (June 5, 2018).

**RFP No. 85.** This RFP asks for every RCI invoice from 2011 to the present. As a compromise, we offered to agree to limit this RFP to the full set of invoices for 40" RCI customers from 2011 to the present. *See* Letter from M. Nemelka to Defendants (May 31, 2018). We offered discuss the identification of these vendor customers. Reynolds rejected this compromise. *See* Letter from L. Casaria to M. Nemelka (June 5, 2018).

In one final effort to find a compromise, we would agree to limit this request to the top 30 RCI vendor customers. Please let us know if you accept this compromise or if we are at an impasse.

**RFP No. 86.** This RFP asks for every Reynolds DMS invoice from 2011 to the present. As a compromise, we offered to accept "the full set of invoices for 100 dealer customers from 2011 to the present," and an offer to discuss the identification of those dealers. *See* Letter from M. Nemelka to Defendants (May 31, 2018). Reynolds rejected that offer. *See* Letter from L. Casaria to Plaintiffs (June 5, 2018).

In one final effort to find a compromise, we would agree to limit this request to the top 75 DMS customers of Reynolds. Please let us know if you accept this compromise or if we are at an impasse.

**RFP No. 88.** This request seeks all "communications and documents concerning your security tools, processes, and training for your software developers." As a narrowing compromise, we offer the following: (1) with respect to "security tools," document and communications regarding the software used to test / analyze the security of your DMS and data integration programs; (2) with respect to "processes," your security planning documents, specifications for security and reliability, threat modeling, and risk analysis; and (3) with respect to "training," documents and communications regarding the training given to software developers working on your DMS and data integration programs. Also encompassed would be all design, technical, or functional specifications or similar development planning documents for your DMS or integration program.

Please let us know if this compromise is acceptable.

## IV.  Reynolds' Interrogatory Responses

On June 5, the parties held a meet and confer regarding issues with Reynolds' responses to the following Interrogatories propounded by Authenticom. Reynolds has still not responded to the issues discussed on that call and whether Reynolds will supplement their deficient interrogatory responses. Reynolds has now had almost two months to consider these. Please let us know on our meet and confer whether Reynolds will supplement its responses and by when.

**No. 4.** This Interrogatory asked Reynolds to identify every instance "where a vendor exaggerated or inflated the RCI data integration fee on a bill, invoice, or communication with a Reynolds dealer, from January 1, 2015 to present. In each example, please state what Reynolds contends was the actual RCI fee versus the RCI fee that the vendor invoiced to the dealer."

On our meet and confer, Reynolds stated that it believed there were instances of vendors doing so. Reynolds must therefore identify those instances in its Interrogatory response.

**No. 7.** This Interrogatory asks for average tenure of Reynolds' DMS customers on an annual basis, from 2009 to the present. Reynolds' response is non-responsive and did not provide the requested information. Will Reynolds amend its response and provide the requested information?

**No. 8.** This Interrogatory asks for market share information for the DMS market from 2000 to the present. Reynolds did not provide a substantive response, and instead pointed to its rooftop numbers. On the meet and confer, we explained that Reynolds is obligated to provide a substantive response with its actual market share information. Reynolds can provide such information, as indicated by Robert Schaefer's declaration specifying Reynolds' market share for this year. Will Reynolds supplement its Interrogatory response and provide its actual market share information? As a compromise, we will agree to have the requested information start from 2007, instead of 2000.

**No. 10.** This Interrogatory asks for the identification of all instances of "whitelisting" by Reynolds. In its response, Reynolds refuted that it used that term in the ordinary course of business, or that any such concept exists. On the meet and confer, Reynolds confirmed that it is not limiting its response on that basis, and understands the topic that the Interrogatory addresses. In its response, Reynolds pointed to its narrative response to FTC CID specifications 17 and 19 and corresponding data. Such information, however, is not fully responsive to this Interrogatory.

This Interrogatory asks Reynolds to "[i]dentify each dealership, vendor, OEM, and/or third-party integrator that has been whitelisted by Reynolds at any point since January 1, 2013. For each such entity, state the dates of the whitelisting and the number and identity of any dealership(s) and vendor(s) covered by the whitelisting." Will Reynolds provide the full information requested by this Interrogatory? If not, which of the requested information is Reynolds not providing?

******

As stated at the start of this letter, the issues addressed herein have been outstanding for some time. We look forward to reaching finality on these issues on our next meet and confer, which is scheduled for tomorrow morning at 9:00 a.m. ET.

Very truly yours,

*s/ Michael N. Nemelka*

Michael N. Nemelka

- 10 -