# Exhibit C

**SheppardMullin**

Sheppard, Mullin, Richter & Hampton LLP
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
213.620.1780 main
213.620.1398 fax
www.sheppardmullin.com

213.617.4206 direct
lcaseria@sheppardmullin.com

File Number: 48KZ-266044

July 31, 2018

**VIA EMAIL**

Robert A. Wallner
John Hughes
Sarah Schindler
Milberg Tadler Phillips Grossman, LLP
One Pennsylvania Plaza
New York, NY 10119
rwallner@milberg.com
jhughes@milberg.com
sschindler@milberg.com

Re: *In re: Dealer Management System Antitrust Litigation*, C.A. No. 18-C-864; MDL No. 2817 (N.D. Ill.)

Dear Rob, John and Sarah:

I write this letter in response to your letter dated July 27, 2018 and to follow up on certain issues we discussed during our telephonic meet and confers on July 20 and 24 concerning the Dealership Class Plaintiffs' First Requests for the Production of Documents ("Requests" or "RFPs") to Reynolds.

Any statements or proposed compromises contained in this letter are subject to and without waiver of Reynolds's general or specific objections to Dealership Class Plaintiffs' RFPs. In particular, Reynolds has moved to compel arbitration of claims brought by Reynolds Dealers and believes that the proper place to conduct the vast majority of the discovery requested by Class Plaintiffs is in any future individual arbitration. Reynolds does not intend to waive any arbitration rights (including related to discovery) through any statement or position taken in this letter and expressly reserves such rights. In addition, given the lack of coordination between MDL Plaintiffs, we must insist that all compromises proposed herein be premised on the assumption that a different MDL Plaintiff will not then force Reynolds to litigate a motion to compel regarding the same subject matter.

1. **General Issues**

    a. **Temporal Scope of Dealership Class Plaintiffs' RFPs**

There does not appear to be a dispute that, as a general matter, Jan. 1, 2013 is the appropriate cut-off for document discovery. Page 11 of Dealership Class Plaintiffs' RFPs

Robert A. Wallner
July 31, 2018
Page 2

specifically identifies this as the generally applicable "Relevant Time Period," which you reiterated on our call.

As discussed, Reynolds is willing to consider certain one-off exceptions to this cut-off period for certain categories of documents or data, if there is a good reason for a longer date period that is proportional to the needs of the case and not unduly burdensome on Reynolds. However, for the vast majority of Requests, Reynolds believes January 1, 2013 is the appropriate cut-off.

There are good reasons for a January 1, 2013 cut-off. The Dealership Class Plaintiffs' claims and allegations center primarily around an alleged 2015 agreement between CDK and Reynolds. 2013 is a full two years before that alleged agreement and encompasses sufficient materials regarding the background and context for the alleged 2015 agreement. And to the extent that Dealership Class Plaintiffs are making claims based on other types of conduct or that require an understanding of other business practices, 5+ years of discovery is more than enough to understand those practices. Your repeated statements that Reynolds's position regarding the January 1, 2013 time frame relies entirely on the statute of limitations is not accurate.

That being said, it is true that January 1, 2013 encompasses the entire statute of limitations period (four years for federal antitrust claims), plus nine months. The first filed Dealership Class complaint was *Teterboro*, filed on October 19, 2017. Therefore, the limitations period for the Dealership Class extends, at most, to October 19, 2013. A cut-off of January 1, 2013 is therefore proportional to (and if anything, generous in light of) the needs of the case. *See, e.g., Greene v. Sears Prot. Co.*, 2017 U.S. Dist. LEXIS 43810, *13-14 (N.D. Ill. Mar. 27, 2017) (limiting discovery to the statute of limitations period, holding: "This Court agrees . . . that plaintiffs have provided no compelling argument that discovery going back earlier than [the applicable statute of limitations] is warranted."); *Wilson v. MRO Corp.*, 2017 U.S. Dist. LEXIS 18967, *4-5 (S.D.W.V. Feb. 10, 2017) (denying motion to compel production of documents pre-dating statute of limitations period); *Arenas v. Unified Sch. Dist. No. 223*, 2016 U.S. Dist. LEXIS 143338, *18 (D. Kan. Oct. 17, 2016) (limiting document discovery and testimony to statute of limitations period "to avoid unnecessary burden and expense.").

During our calls, you explained that certain RFPs should have a cut-off earlier than Jan. 1, 2013 because various Reynolds pleadings refer to alleged events or conduct that occurred prior to 2013. As an example, you pointed to basic background information set forth in Reynolds's 7/18/18 motion to dismiss (Dkt. 256 at p. 1) and supporting declaration, including the statement that "Since the late 1980s, Reynolds has spent billions of dollars building and maintaining a proprietary, high-end, closely-controlled enterprise software and computing platform for car dealerships, generally referred to in the industry as a Dealer Management System, or 'DMS.'" Reynolds disagrees that a simple background statement such as this "opens the door" to decades of additional document discovery.

Robert A. Wallner
July 31, 2018
Page 3

### b. Advice of Counsel Defense

You asked whether Reynolds is asserting an advice of counsel defense. Reynolds has not asserted this defense to date and does not currently intend to assert such a defense. If Reynolds's position changes we will let you know.

### c. Searching Centralized Files

You asked whether Reynolds will be searching centralized files in response to the Dealership Class Plaintiffs' RFPs. Reynolds directs you to its General Objection No. 9 for its position on centralized files. To the extent that your July 27 letter is intended to impose a greater burden than General Objection No. 9, we disagree with it.[1]

Moreover, your purported list of examples of centralized files that would be searched overstates what Reynolds has committed to. We agreed to investigate the extent to which such data sources exist and are reasonably searchable, and if so, will utilize those sources consistent with General Objection No. 9. For the avoidance of doubt, Reynolds does not intend to engage in a manual review of large databases in hopes of locating the proverbial needle-in-a-haystack, nor would such an approach be remotely feasible under the discovery schedule in this case.

With respect to your question about whether Reynolds has a centralized CRM database, Reynolds does not have a CRM database per se. Reynolds does utilize a centralized tool for tracking certain sales calls and opportunities. The database for this tool is not searchable. It is capable of running certain manual reports, the burden of which we are still examining. At this time it appears that anything close to a comprehensive review or examination of this database would be patently unworkable under the current case schedule, but we may be able to agree to provide an agreed upon sample of information to you as a compromise.

Lastly, although your June 27 letter refers to "data dictionaries" for "each of the databases in question," the discussion on that point related only to the data dictionary for the transactional data that has been produced in this case. Per your request, the bates number is set forth in Section 3 below, along with all of the other bates numbers you asked us to locate for you.

### d. Pricing Committee Documents

You asked whether documents relating to Reynolds's pricing committee would be produced. Reynolds will perform a diligent search and produce any materials presented to or

---

[1] Also, numerous Reynolds responses to RFPs state that Reynolds is willing to meet and confer regarding search terms to be applied to custodial materials, and General Objection No. 9 applies to each of those responses with respect to centralized files. To the extent that your July 27 letter purports to memorialize statements by Reynolds that describe a different response or different commitment with respect to searches of custodial or centralized files, such as in response to RFPs 23-29, Reynolds disagrees.

Robert A. Wallner
July 31, 2018
Page 4

consider by an RCI pricing committee from January 1, 2013 to the present. Reynolds does not have a DMS pricing committee.

    2. <u>**Issues With Specific RFPs**</u>

        a. <u>**RFPs Seeking "Technological" Materials (RFPs 1, 4, 27)**</u>

Certain RFPs request documents relating to the "technological" aspects of Reynolds's business, particularly with respect to how DMS access is provided or blocked. *See, e.g.*, RFPs 1, 4, 27. As we explained, the phrase "technological" is vague and overbroad, and Reynolds does not believe that it is relevant or proportional to the needs of the case to force Reynolds to produce materials relating to Reynolds's source code or the technical details about how its systems are designed. What is potentially relevant is whether or why Reynolds engaged in certain conduct, not the technological details about how it granted or denied DMS access.

As a compromise, you proposed limiting the concept of "technological" in RFPs 1, 4, and 27 to discussions that occur in "layman's terms." Subject to this clarification, which Reynolds understands not to include materials such as granular system design documents, source code, algorithms, etc., Reynolds is willing to produce non-privileged, responsive documents from January 1, 2013 forward located using agreed upon search terms (the negotiation of which is ongoing).

To the extent your July 27 letter purports to state a different agreement with respect to these requests, it is inaccurate.

        b. <u>**Dealer Agreements (RFPs 13, 14, 15)**</u>

Certain RFPs request all agreements between Reynolds and dealers and all documents and communications related to those agreements and certain types of provisions in those agreements. *See, e.g.,* RFPs 13, 14, 15. As we explained, these RFPs are overbroad and would subject Reynolds to the undue burden of locating, collecting, reviewing and producing an unworkably large body of documents, much of which is irrelevant to the claims and defenses in the case, and much of which is not centrally located.

We discussed possible compromise solutions. You asked Reynolds to investigate whether it has or could generate a chart summarizing key contract terms applicable to various dealers.

As an initial matter, we have confirmed that the current form Master Agreement and Customer Guide, which have been produced, have remained unchanged since early 2009. In addition, if it will resolve these requests, Reynolds is willing to produce the following:

- A chart or data sufficient to show the DMS contract term length (and renewal term length) for each of Reynolds's current DMS customers;

Robert A. Wallner
July 31, 2018
Page 5

- With respect to RFP 15, Reynolds is willing to produce non-privileged documents from January 1, 2013 forward located using agreed upon search terms (the negotiation of which is ongoing) discussing changes or proposed changes to the following standard terms (i) contract renewal and/or extension; (ii) the ability of individuals or entities other than Reynolds and the Dealership customer to access the DMS and/or use data stored on the DMS; (iii) any time or limitations period for bringing claims; and/or (iv) Reynolds' ability to change the prices charged to Dealership customers for DMS software and services. Please note that this proposal covers all of the terms requested in your July 27 letter except for "contract duration," for which there is no standard term for which a search for changes or proposed changes would make sense;

- Finally, if it is necessary to resolve these requests, Reynolds may be able to produce a chart or data sufficient to show any agreed upon exceptions or alterations to the Master Agreement or Customer Guide that have been agreed upon between Reynolds and any of its current DMS customers (however, we are still working with the client to confirm this).

Please let us know if the above compromise would resolve these requests. All of the projects above involve a serious burden, and thus will only be undertaken if these requests can be considered resolved.

### c. RCI Agreements (RFP 24)

Certain RFPs request all documents concerning restrictions on vendors' use of data brokers to scrape data from a Reynolds DMS, including relevant contracts or contract provisions. See, e.g., RFP 24. Reynolds's response states that it is willing to meet and confer regarding search terms, but with respect to RCI agreements themselves, Reynolds believes it is not proportional to the needs of the case and would subject Reynolds to an undue burden to collect every variation of every RCI agreement, much of which is irrelevant to the claims and defenses in the case.

Your July 27 letter does not accurately describe our conversation on this request. During our call, Dealership Class Plaintiffs committed to revert with a proposed sample of RCI agreements that it would find acceptable, which you have not done.

Nevertheless, as a compromise, Reynolds would produce (i) a representative, current RCI Agreement, along with any other current version(s) or template(s) of the RCI Agreement that materially vary from Plaintiff's Preliminary Injunction Hearing Exhibit 53 with respect to any alleged exclusive dealing (i.e., "Non Approved Access") or price confidentiality provisions (each such version with vendor-specific identifying information redacted); and (ii) a summary analysis showing the distribution of use (as a percentage of contracts) of each variant of the contracts identified. In addition, to the extent RCI agreements are attached to otherwise responsive custodial emails, they will not be withheld.

Please let us know if the above compromise will resolve this request.

Robert A. Wallner
July 31, 2018
Page 6

### d. Additional RFPs For Which Reynolds Is Willing To Meet And Confer Regarding Search Terms (RFPs 18, 21, 22, 25)

Following our meet and confer discussions, Reynolds states that it is willing to produce non-privileged, responsive documents from January 1, 2013 forward located using agreed upon search terms (the negotiation of which is ongoing) for the following requests:

- RFP 18 (changes in Reynolds DMS pricing)
- RFP 21 (reasons why dealers switched from Reynolds's DMS to another DMS)
- RFP 22 (reasons for Reynolds DMS fees)
- RFP 25 (payments for integration services to IntegraLink and/or DMI)

As we explained on our calls, Reynolds does not expect to have any responsive materials for RFP 25. Nevertheless, we are amenable to proceeding as outlined above using reasonable search terms.

### e. Dealership Count (RFP 19)

Your July 27 letter states that you asked on our July 24 call whether Reynolds is agreeable to producing responsive data for 2011 to the present. We do not recall, and our notes don't reflect, that question being asked.

But in any event, Reynolds has already produced responsive data dating back to 2008. *See* Store Base Reports referenced in Reynolds's RFP responses.

### f. Cost Information (RFP 20)

You asked us to confirm whether Reynolds does or does not have materials responsive to RFP 20. We hereby confirm that as stated in RFP 20, Reynolds does not fully allocate its costs and therefore does not have documents sufficient to show the requested information.

### g. How Dealer Data Is Stored On The Reynolds DMS (RFP 30)

RFP 30 requests documents sufficient to show how dealer data is stored on the Reynolds DMS. Reynolds stated that it was willing to provide a response in the form of an interrogatory. This proposed interrogatory will address issues (a) through (d) in RFP 30 (whether one dealer's data is stored separate from the data of other dealers; whether one dealer's data is commingled with data that does not belong to the dealer; where dealer data is stored; how the storage of dealer data has changed over time).

You asked for confirmation that Reynolds's proposed interrogatory response will cover the period from January 1, 2013 to the present. We can confirm that it will.

### h. Time Period Applicable To RFP Regarding Reynolds's Security Measures (RFP 31)

RFP 31 requests "documents sufficient to show the specific changes to security measures instituted by Reynolds to protect security of Dealer data." Reynolds responded that it was willing to discuss search terms to be applied to agreed upon custodian files in a good faith effort to capture responsive and relevant documents from January 1, 2013 to the present.

You asked that we consider expanding the scope of the response to this RFP to capture materials going back to January 1, 2011. For all of the reasons set forth in Section 1.a above, Reynolds believes that the date cut-off of January 1, 2013 is reasonable for this Request.

### i. Industry Conferences (RFPs 33-34)

RFP 33 requests all documents "demonstrating the attendance or participation of a Reynolds representative at any conference or convention where customers or potential customers attended" and RFP 34 requests all "documents produced, used or distributed at any conference or convention where customers or potential customers attended." These RFPs are vague, overbroad and request materials that would be irrelevant to the claims and defenses in this case.

Mere participation or attendance by Reynolds at conferences or conventions has nothing to do with the issues or defenses in this case. To the extent that documents were created in connection with conferences or conventions that actually relate to issues in the case, they will already be captured by dozens of other RFPs that have been served on Reynolds and CDK. To take just one example, any materials regarding collaboration or exchange of information between Reynolds and CDK about blocking data brokers from accessing DMS would be captured by RFP 2, even if the materials are created or used or exchanged at a conference. The same is true for dozens of additional RFPs that have been served on Reynolds by multiple parties in this case. It is not clear what additional relevant materials would be captured by RFPs 33 and 34 that would not be captured by these other RFPs.

In addition, these RFPs do not identify the specific conferences or conventions that the Dealership Class Plaintiffs are actually interested in. The RFPs are not even limited to conventions that relate to DMS or integration. Reynolds has no reasonable way to determine every single possible conference that every single Reynolds employee since 2013 may have attended where a customer or potential customer also attended. During our call, we asked that Dealership Class Plaintiffs at least identify the specific conferences or conventions they are interested in but you declined to do so.

The burden of responding to RFPs 33 and 34 is not proportional to the needs of the case. If Dealership Class Plaintiffs can provide additional specificity and narrow the RFPs to potentially relevant materials, Reynolds is willing to consider a proposed compromise.

### j. Invoices (RFPs 36 and 44)

RFPs 36 and 44 request "sales data and information" relating to RCI, including invoices. In response to both RFPs, Reynolds directed Dealership Class Plaintiffs to REYMDL0037507, which shows the prices paid by vendors participating in Reynolds's RCI program from 2010 to 2017. Reynolds objected to producing all invoices because the relevant information is already contained in REYMDL0037507 and therefore the burden of collecting and producing invoices is not proportional to the needs of the case.

Your July 27 letter asks (i) whether, during the Relevant Time Period, Reynolds has maintained a database containing invoices for Vendors that used DMI, Integralink, or the RCI Program; and (ii) whether Reynolds is agreeable to producing a sampling of such invoices.

DMI and Integralink, of course, are not Reynolds companies, and Reynolds has not maintained a database containing DMI or Integralink invoices. We understand that Reynolds does have a data source from which it can pull historical RCI invoices (or the data that would have been included in the invoices) back to April 2014.[2] The burden of doing so is material, and we do not believe is justified for the reasons that we have explained.

Nevertheless, if it will resolve these requests, Reynolds is willing as a compromise to produce invoices (or the data that would have been included in the invoices) from April 2014 to the present for the following vendors specified in RFP 36: TrueCar, Carfax, Autotrader, Cars.com, vAuto, Dealer.com, DealerSocket, RouteOne, and DealerRater.[3] If you would prefer to substitute another RCI vendor for one or more of those entities, we would likely be agreeable in the event the overall number remains the same.

Lastly, to the extent RCI invoices are located in the course of Reynolds' custodial email review, they will not be withheld.

Please let us know if the above compromise will resolve these requests.

### k. Antitrust Compliance Documents (RFP 39)

Your July 27 letter asks that we confirm whether Reynolds has any non-privileged documents responsive to this request. After a diligent inquiry, we understand that Reynolds does not.

---

[2] Prior to April 2014, such data is not reasonably accessible from any centralized source.

[3] Please note that this includes all of the entities specified in your RFP 36 with the exception of NakedLime which, as we have informed you previously, is a d/b/a of Reynolds.

Robert A. Wallner
July 31, 2018
Page 9

## I. Late-served RFP (RFPs 45)

RFP 45 purports to incorporate by reference the 92 RFPs that the Individual Plaintiffs served on Reynolds. RFP 45 is improper for several reasons.

Pursuant to the 5/7/18 Case Management Order (Dkt. 166), May 25, 2018 was the "[d]eadline to serve any additional, non-duplicative, coordinated discovery requests, search terms, and custodians." Dealership Class Plaintiffs' RFP 45 was served nearly three weeks after May 25 and is therefore untimely.

RFP 45 is also improper because it is duplicative and not coordinated. The 92 Individual Plaintiffs RFPs purportedly incorporated into RFP 45 are not complementary to the 44 remaining Dealership Class Plaintiffs' RFPs. Instead, a review of the 92 Individual Plaintiffs' Requests and the 44 Dealer Class Plaintiffs' Requests and the 89 Authenticom Requests that have been served on Reynolds thus far (225 Requests to Reynolds in total) exhibit an enormous degree of overlap, duplication and repetition. Numerous specific RFPs from the Dealership Class Plaintiffs cover substantially the same type of material as RFPs from the Individual Plaintiffs. Certain Dealership Class Plaintiff RFPs are nearly word-for-word identical to RFPs previously served on Reynolds by Authenticom.

Regardless, Reynolds has stated in response to RFP 45 that to the extent that Reynolds produces materials in response to the Individual Plaintiffs' RFPs, it will also produce those materials to the Dealership Class Plaintiffs.

Dealership Class Plaintiffs expressed concern that some relevant documents might not be produced to the Dealership Class Plaintiffs without RFP 45. Given the high degree of overlap between the various sets of comprehensive RFPs that have been served on Reynolds, and the fact that the Individual Plaintiffs and Dealership Class Plaintiffs have proposed a joint set of search terms to be run on the same set of agreed custodians for Reynolds, this appears to be a theoretical concern rather than an actual problem. If Dealership Class Plaintiffs can identify a specific type of document that it believes will not be produced unless Reynolds responds to RFP 45, Reynolds is happy to discuss it with the Dealership Class Plaintiffs.

### 3. Information Requested By Dealership Class Plaintiffs Regarding Certain Reynolds Documents Or RFP Responses

#### a. Bates Numbers

During our meet and confers, you requested REYMDL bates numbers for various documents that Reynolds referenced in its RFP responses. Reynolds notes that your requests for these bates numbers makes clear that you had not even reviewed the specific documents Reynolds referenced in its RFP responses, even though you had sent us a meet and confer letter about those RFP responses and we were on a call with you to discuss those RFP responses, which is disappointing.

The requested bates numbers are provided below:

Robert A. Wallner
July 31, 2018
Page 10

- Bill Stop Report (original): REYMDL00017997

- Bill Stop Report (update): REYMDL00133969

- Store Base Report: REYMDL00133958-67

- Transaction-level data from Aug. 2014 – Oct. 2017 for products purchased by dealer customers: REYMDL00133970-REYMDL00134009

- Data dictionary: REYMDL00134009

- CID for FTC's Joint Conduct Investigation: REYMDL00037470-506

- Reynolds's document retention policies: REYMDL00134861-75

### b. Marketing Files (RFP 7)

You asked whether Reynolds has a centralized file of marketing materials that would be searched in response to this RFP. We confirm that there is a centralized marketing file or files that will be searched for the Relevant Time Frame.

### c. Information Regarding Bill Stop Report, Store Base Report, and Dealer Transactional Data (RFP 16)

In connection with RFPs 16 and 19, you have asked for more information about the databases underlying Reynolds's Bill Stop Report, Store Base report, and its dealer transactional data. The dealer transactional data is generated from a database, and the data fields are defined in the data dictionary. The Bill Stop Report and the Store Base Report are not generated from a database. Both of these reports are manually created and updated.

Your July 27 letter inquires for the first time whether the data set forth in the previous paragraph are "sufficient to identify the Dealerships that used a Reynolds DMS during the Relevant Time Period, plus the dates those Dealers started and (if applicable) stopped using a Reynolds DMS." Breaking that question down, our understanding is that that information is sufficient to identify the dealerships that used a Reynolds DMS during the period covered by the transactional data, but not necessarily prior to that period. That information is sufficient to reflect whether and when a dealership stopped using a Reynolds DMS during the Relevant Period. For some dealers (specifically those that became Reynolds customers during the period covered by the transactional data), it will be sufficient to reflect when the dealers became Reynolds DMS customers. Based on our investigation, there is no reasonably accessible way to determine the start date for all Reynolds dealer customers during the Relevant Period. However, if it will resolve these Requests, Reynolds is willing to produce a chart reflecting the inception date for the current contract term of current Dealership customers.

In connection with RFP 17, you have asked whether the transactional data reflects amounts paid by dealers rather than just amounts invoiced. The dealer transactional data only

Robert A. Wallner
July 31, 2018
Page 11

reflects invoiced amounts, not final amounts actually paid. Based on our investigation, any attempt to pull payment history information for the same period would take approximately 3 to 4 months of effort, and thus is not proportional to the needs of the case.

### 4. Requests that Dealership Class Plaintiffs Have Attempted to Narrow

#### a. "All documents concerning any other DMS provider" (RFP 9)

RFP 9 was plainly overbroad as originally formulated. We appreciate the effort to narrow the request, as set forth in your July 27 letter and believe that your suggested revisions could form the basis of an acceptable compromise. However, the statement that "we reserve our right to seek supplemental discovery responsive to this Request as originally worded" undermines any incentive to reach a compromise here. Please let us know if Dealership Class Plaintiffs are interested in reaching an actual resolution of this RFP.

#### b. Switching-related documents (RFP 10)

RFP 10 was plainly overbroad as originally formulated. We appreciate the effort to narrow the request, as set forth in your July 27 letter, but the request as purportedly narrowed is still overbroad.

In the interest of compromise, if it will resolve the request, Reynolds is willing to produce non-privileged, responsive documents from January 1, 2013 forward located using agreed upon search terms (the negotiation of which is ongoing) for subsections (a) and (b) as originally formulated, and subsection (c) as revised in your July 27 letter.

For the avoidance of doubt, to the extent your July 27 letter's statement that Reynolds agreed to produce "all documents in its possession, custody, or control that are responsive to parts (a) and (b) of this Request" purports to impose a burden that is unbound by the stated time frame and reasonable custodians, it is inaccurate.

#### c. "All documents concerning" automatic renewal provisions (RFP 12)

RFP 12 was plainly overbroad as originally formulated. We appreciate the effort to narrow the request, as set forth in your July 27 letter and believe that your suggested revisions could form the basis of an acceptable compromise. However, the statement that "we reserve our right to seek supplemental discovery responsive to this Request as originally worded" undermines any incentive to reach a compromise here. Please let us know if Dealership Class Plaintiffs are interested in reaching an actual resolution of this RFP.

Robert A. Wallner
July 31, 2018
Page 12

Sincerely,

*Leo Caseria*

Leo D. Caseria
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


SMRH:227863437.3