# Exhibit J

**MAYER·BROWN**

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel +1 312 782 0600
Main Fax +1 312 701 7711
www.mayerbrown.com

July 25, 2018

**Matthew D. Provance**
Direct Tel +1 312 701 8598
Direct Fax +1 312 706 9397
mprovance@mayerbrown.com

<u>By E-Mail</u>

Robert A. Wallner
Milberg Tadler Phillips Grossman LLP
One Pennsylvania Plaza
New York, NY  10119

Re:  *In re Dealer Management Systems Antitrust Litig.*,
<u>MDL No. 2817, Case No. 18-CV-864 (N.D. Ill.)</u>

Dear Rob:

We write in response to your June 28, July 7, and July 13 letters concerning the Dealership Class Plaintiffs' First Requests for the Production of Documents ("Requests" or "RFPs") and in follow-up to the parties' July 6 and 9 meet-and-confers.

## I.     Global Issues Raised During The Meet-and-Confer

<u>Attorney-Client Privilege:</u>  We disagree with the Dealership Class Plaintiffs' premise that raising an "advice of counsel" defense as to any issues in this litigation would waive the attorney-client privilege as to any document or communication subject to discovery.  Regardless, CDK has not raised an "advice of counsel" defense. As I advised you during our July 6 meet-and-confer (and as reflected in our prior correspondence with Authenticom on this issue), CDK's passing references to the fact that the February 2015 agreements were prepared with the assistance of counsel during the *Authenticom* preliminary injunction hearing fall well short of CDK having asserted an "advice of counsel" defense.  Nor do we believe that CDK is required now, long before discovery is substantially complete and before any depositions take place, to further advise the Dealership Class Plaintiffs whether CDK ever might assert such a defense in the future (nor did I state during our meet-and-confer that CDK would advise the Plaintiffs in this regard).  If CDK does ever assert an "advice-of-counsel" defense, the parties can further meet-and-confer about purported waiver issues and any other pertinent matters; but those are discussions for another day, if that day ever comes.

<u>Pre-2013 Timeframe:</u>  We reiterate our position, fully aired during the discovery meet-and-confers that occurred in *Authenticom*, on why January 1, 2013 is the appropriate cut-off for the vast majority of discovery in this case:  Not only is that date several months *beyond* the applicable limitations period for the Dealership Class Plaintiffs' claims (in particular, the federal antitrust claims), but it is more than reasonable under the circumstances.  Many of the Dealership Class Plaintiffs' claims center on Defendants' February 2015 agreements and subsequent actions.  Thus, 2+ years of discovery prior to those agreements is more than reasonable for Plaintiffs to

Mayer Brown LLP operates in combination with other Mayer Brown entities, which have offices in North America,
Europe and Asia and are associated with Tauil & Chequer Advogados, a Brazilian law partnership.

Robert A. Wallner
July 25, 2018
Page 2

develop whatever evidence they think they can develop as to the relevant market, the market conditions at the time of the agreements, motive, and intent behind the agreements. Similarly, 5+ years of discovery regarding CDK's vertical contracting practices is similarly sufficient to establish whatever facts the Dealership Class Plaintiffs think they can establish with respect to the alleged anticompetitive nature of those contracts. Further, the Dealership Class Plaintiffs' arguments concerning the limitations period are not well-taken. Courts routinely recognize the applicable limitations period as an important factor when evaluating both the relevance and proportionality of requested discovery. *See, e.g.*, *Hollis v. Dep't of Mental Health & Addiction Servs.*, 2016 WL 1408077, *10 (D. Conn. Apr. 8, 2016) (denying motion to compel production of documents pre-dating statute of limitations period); *Wilson v. MRO Corp.*, 2017 U.S. Dist. LEXIS 18967, *4-5 (S.D.W.V. Feb. 10, 2017) (same). Moreover, as explained above, CDK's position is not based *solely* on the limitations period; it is also based on the timing of the underlying events (*e.g.*, the February 2015 agreements) that are at issue.[1]

True, the Dealership Class Plaintiffs may not be "bound" by what your co-counsel agreed to regarding the relevant discovery period in *Authenticom*. But the compromise we reached in *Authenticom* was the product of hard-fought negotiations that we are confident Judge Dow will not disregard; nor does it make any sense, as a matter of efficiency or otherwise, for there to be different sets of rules for the relevant discovery period for each case in this MDL.[2] It is also worth noting that no Plaintiff in this MDL has agreed to produce discovery from *their own* files that precedes the January 1, 2013 cut-off.

---

[1] The cases cited in the Dealership Class Plaintiffs' June 28 letter are not to the contrary. In *Arvco Container*, the plaintiff filed suit in 2008 under the Robinson-Patman Act and sought certain discovery from the defendant, including pricing information, back to 2006—within the Robinson-Patman Act's four-year limitations period. Thus, *Arvco Container* is not on point. In *Kellam Energy*, which is more than 30 years old, the plaintiff sought discovery from a temporal period that stretched beyond the statute of limitations based on allegations of "a conspiracy to restrain trade and a scheme of monopolization that may have begun as early as 1975." 616 F. Supp. at 218. Plaintiffs here do not make similar allegations of any conspiracy or anticompetitive conduct by CDK that occurred prior to (or anywhere near) the January 1, 2013 cut-off. So *Kellam Energy*, even if it remains good authority, is also not on point. Finally, the Dealership Class Plaintiffs go all the way back to 1970—more than 48 years ago—for *Quonset Real Estate Corp.*, which noted that "courts have often permitted discovery of defendants' activities 'for a reasonable period' of time antedating the earliest possible date of the actionable wrong complained of in [antitrust lawsuits]." 50 F.R.D. at 241. Again, assuming that *Quonset* is still considered persuasive almost 50 years and many revisions to the Federal Rules of Civil Procedure later, all it says is that it may be appropriate to permit discovery in an antitrust lawsuit going back "for a reasonable period" of time predating the alleged *wrongful* conduct. Given what the Plaintiffs are alleging, January 1, 2013 would still be an appropriate cut-off under that framework.

[2] The allegations in the Dealership Class Plaintiffs' Consolidated Complaint regarding prior statements by CDK about third-party DMS access cited in your July 7 letter (*e.g.*, Consolidated Compl. ¶ 74 n. 23) provide no basis for a broader discovery period than the other actions. It appears that the Dealership Class Plaintiffs lifted those allegations directly from the *Authenticom* complaint, and they appear in the other complaints consolidated with this MDL as well.

Robert A. Wallner
July 25, 2018
Page 3

Additionally, as you know, two exceptions to the January 1, 2013 cut-off were established for discovery in *Authenticom*. First, for requests seeking CDK DMS and data integration pricing and financial information, the parties agreed to a January 1, 2011 cut-off. Second, for purposes of responding to discovery requests seeking documents, communications, or statements regarding third-party access to CDK's DMS, CDK is open to conducting reasonably targeted searches of a select subset of custodians (*e.g.*, Steve Anenen) and any central marketing files for an extended period going back to 2007, using an agreed subset of search terms, to the extent CDK has readily accessible ESI for those custodians within its possession, custody or control. While CDK maintains its objections to producing discovery from an unlimited timeframe for all of the Requests so designated by the Dealership Class Plaintiffs, CDK is certainly open to a similar compromise along the lines described above. Consistent with the foregoing, we await the Dealership Class Plaintiffs' proposal to the extent they would like to make one.

*Use of ESI Search Terms:* We honestly do not understand what the issue is here. No party in this MDL (including any Plaintiff) plans to manually inspect every single document in its possession, custody, or control for its possible responsiveness to the discovery requests to which that party is responding. Instead, for the majority of requests, the parties are using negotiated search terms and custodians (which the Dealer Class Plaintiffs proposed for CDK on May 25).[3] That is exactly what we understood the Dealership Class Plaintiffs to be saying in their General Objection No. 7 to CDK's RFPs: "Dealership Plaintiffs will produce responsive, non-privileged documents and information in accordance with the parties' agreements regarding date limitations and search terms to avoid the need to manually inspect every responsive document." To be sure, search terms will not be used for *all* discovery that is produced (*e.g.*, certain sales and financial data), but for many requests—including the Dealership Class Plaintiffs' RFPs 6-12 seeking "[a]ll documents" related to broad criteria—the use of search terms is both necessary and appropriate. If further discussion on this issue is needed, please let us know.

## II. Issues With Specific Requests

In the interest of attempting to potentially resolve the issues raised by the Dealership Class Plaintiffs' concerning specific RFPs, further responses are provided below. Any offers to produce additional categories of documents are subject to and without waiver of CDK's general and specific objections set forth in its initial written responses dated June 22, 2018, and are contingent on resolving the parties' disputes as to the identified Requests.

*Requests No. 1-5:* That is consistent with our understanding of the parties' discussions.

*Request No. 7:* We confirm that no other "Third Party Integrator" besides Authenticom was provided with VPN services by CDK. Further, to clarify, CDK does not consider the VPN services that Authenticom received to have been "direct access" to CDK's DMS. As such, we

---

[3] To the extent we use the term "reasonable search" below in our discussion of specific Requests, generally we mean the use of negotiated search terms and custodians.

Mayer Brown LLP

Robert A. Wallner
July 25, 2018
Page 4

believe that CDK has already agreed to produce documents that are responsive to this Request through its response to Authenticom RFP 15.

*Request No. 11:* Subject to its objections, and in the interest of reaching a compromise as to this Request, CDK is prepared to produce documents that are responsive to subparts (e) and (f) of this Request (in addition to subparts (a)-(d) and (h)), to the extent they exist and can be identified through a reasonable search. Thus, it appears that the only remaining issue for this Request is subpart (g), which seeks "all documents with respect to the technological implementation of the 'SecurityFirst' and/or '3PA Refresh' initiative." Please clarify what the Dealership Class Plaintiffs are looking for with subpart (g). Some aspects of the 3PA "refresh," for example, relate to third-party contracting and pricing standardization and thus do not have a "technological implementation." Further, as discussed during our July 6 meet-and-confer, CDK objects to producing granular system design documents, source code, algorithms, etc. in response to this Request. If something else is being sought, depending on what it is, we would be willing to consider a compromise to resolve our remaining dispute over this Request.

*Request No. 14:* As discussed during our July 6 meet-and-confer, this Request is grossly overbroad in that it seeks literally "[a]ll documents concerning any other DMS provider." It seems beyond legitimate dispute that not every document that mentions another DMS provider in any context—for example, a document that references another "DMS provider" in a completely different capacity, *e.g.*, as to unrelated services that it provides—would be relevant. Therefore, the Dealership Class Plaintiffs' proposal that CDK run search terms based on the names of other DMS providers against its document collection and produce the results will not work. To the extent there are relevant subparts to this Request not subsumed by other discovery requests (including the Dealership Class Plaintiffs' RFPs 13, 15, 26, 46, and 47; Authenticom's RFPs 19, 31, 32, 72, 89 and 90; and the remaining Plaintiffs' RFPs 19, 31, 32, 72, 89 and 90), we believe that the burden is properly on the Dealership Class Plaintiffs to identify them for us.

*Request No. 15:* Subject to its objections, and in the interest of reaching a compromise as to this Request, CDK is prepared to produce documents that are responsive to subparts (a) (other than for non-payment of amounts owed) and (b) of this Request to the extent they exist and can be identified through a reasonable search. We appreciate the Dealership Class Plaintiffs' offer to slightly narrow subparts (c) and (d), but it does not address our concerns. We still do not understand why the DMS customer switching data that CDK has already produced and the additional switching data that that it is producing does not satisfy any legitimate need for the discovery identified in subpart (c) of this Request. With regard to subpart (d), which now seeks "all documents concerning CDK's month-to-month contracts with DMS customers," that would potentially implicate hundreds or perhaps even thousands of DMS customers whose contracts automatically reverted to month-to-month upon the expiration of their initial terms, at any point from 2014 and the present. Further, we do not understand the relevance of some dealers being on month-to-month DMS contracts, which if anything seems to undercut the Dealership Class Plaintiffs' assertion that dealers are "locked in" to multiyear agreements for DMS services that they cannot get out of. If the Dealership Class Plaintiffs can clarify the relevance of subparts (c)

Mayer Brown LLP

Robert A. Wallner
July 25, 2018
Page 5

and (d) and propose something for them that is less than "all documents," CDK is open to considering their proposal.

*Request No. 16:* Subject to its objections, and in the interest of reaching a compromise as to this Request, CDK is prepared to produce the current signed Master Services Agreement ("MSA") and schedules and addenda thereto for DMS services, to the extent they exist for any named Plaintiff joined in the Consolidated Complaint. Please confirm that this will resolve our dispute over this Request. Further, in response to your question, there is a central repository used to store executed DMS contracts. We have not investigated whether that repository purports to be comprehensive of all the documents implicated by this Request as phrased.

*Request No. 17:* We appreciate the Dealership Class Plaintiffs' willingness to narrow this Request. Subject to its objections, and in the interest of reaching a compromise as to this Request, CDK is prepared to produce the following documents, to the extent they exist and can be identified through a reasonable search of agreed-upon custodians' files: (a) non-privileged documents discussing the drafting, implementation, or anticipated impact of "automatic extension and/or renewal" provisions in CDK's MSA; and (b) communications with Dealers that reflect contract negotiations about those provisions. Please let us know whether this would resolve our dispute.

*Request No. 18:* Subject to its objections, and in the interest of reaching a compromise as to this Request, CDK is prepared to produce non-privileged documents, to the extent they exist and can be identified through a reasonable search of agreed-upon custodians' files, discussing the drafting, implementation, or anticipated impact of the following provisions in CDK's MSA: (a) initial contract term length; (b) any "automatic extension and/or renewal" provisions (see above); (c) third-party DMS access restrictions; and (d) price adjustment mechanisms. Please let us know whether this would resolve our dispute.

*Request No. 19:* There appears to be some confusion about CDK's response to this Request that we should clear up. During the meet-and-confer, we stated our understanding that CDK's production of certain sales transactional data, likely among other documents and information produced by CDK, will be sufficient to show "which Dealers use or used a CDK DMS" (subpart (1) of this Request), and that CDK's production of customer switching data will be sufficient to show "if any Dealer no longer uses a CDK DMS, when [the] Dealer ceased using [CDK]" (subpart (4) of this Request). As we also explained, we have not identified any dataset maintained by CDK that purports to systematically track "when each Dealer customer first used a CDK DMS" or "how long each Dealer's customer tenure as a client of CDK has lasted" (subparts (2) and (3) of this Request). However, to the extent that CDK may have this sort of information for certain of its DMS customers on a one-off basis or otherwise in a customer relationship management ("CRM") database that it maintains, CDK has made a production of structured data from its CRM database (*see* CDK-0701450-65).

*Request Nos. 20, 21, 25, and 28:* To be clear, the structured data produced at CDK-0701423-49 comes from an enterprise-level system that CDK uses in the regular course of its business to

Robert A. Wallner
July 25, 2018
Page 6

record sales transactions. While this system, of course, was not created specifically to respond to the Dealership Class Plaintiffs' Requests, to the best of our understanding CDK's production is reasonably comprehensive of the information sought by these Requests, to the extent the information exists and is maintained by CDK.

*Request No. 22:* Regarding your request for an additional explanation regarding CDK-0701423-49, please see above (also, the characterization of the data as "spreadsheet-type files" is yours, not ours). As this dataset shows DMS customers' invoiced payments on a monthly basis, it should be sufficient to show changes in those payments (up or down) over time. Regarding the Dealership Class Plaintiffs' additional request for "documents reflecting correspondence and/or communications between CDK and Dealer customers participating in this litigation regarding changes in pricing for DMS services," CDK would consider producing this additional category of documents (subject to its objections and to the extent they exist and can be identified through a reasonable search) if the Dealership Class Plaintiffs will reconsider their refusal to produce documents responsive to CDK's RFPs 33, 34, 35, 36, 48. Please let us know your position.

*Request No. 23:* During the meet-and-confer we did not "confirm[ ] that CDK is producing documents sufficient to show the cost of CDK providing DMS services separate and apart from Data Integration Services." As stated in our written objections, CDK's costs of providing data integration services with respect to its own DMS generally are not separable from its costs of providing DMS services, as data integration is part of the design and functionality of the DMS itself. That is not just our position in this litigation; it is how DMS cost data is recorded and maintained by CDK in the normal course of its business. To reiterate, and as stated in the correspondence we exchanged with Authenticom concerning similar discovery requests, CDK is producing documents sufficient to show its cost information at the individual product line level (*e.g.*, DMS), at the divisional level (*e.g.*, Data Services), at the management level (*e.g.*, the Retail Services corporate level), or some combination thereof, to the extent such documents/information exists. To the extent that investments in data security surrounding its DMS are recorded as "costs," CDK will include that information in its response to this Request.

*Request No. 24:* For DMS customers who switched from CDK during the relevant time period, this Request seeks documents "sufficient to show" the reasons why those customers switched. We explained that the DMS customer switching data that CDK is producing in this litigation, which CDK maintains in the ordinary course of its business, includes a data point that provides CDK's understanding—if it has one—of why each customer switched. The Dealership Class Plaintiffs' demand for "the original sources of this information," including "all other documents reflecting Dealer customers' statements about their reasons for stopping the use of CDK's DMS services (such as emails, letters, or call notes)," is foreclosed by, and would defeat the purpose of, the "sufficient to show" nature of this Request. Besides contradicting the "sufficient to show" limitation that is embedded within this Request, the additional categories of documents requested are overly broad and unduly burdensome and not proportional to the needs of the case, particularly in light of the switching data CDK has already committed to producing.

Mayer Brown LLP

Robert A. Wallner
July 25, 2018
Page 7

*Request No. 26:* We appreciate the Dealership Class Plaintiffs' clarifications regarding this Request. Subject to its objections, and in the interest of reaching a compromise as to this Request, CDK is prepared to produce documents that reflect comparisons of pricing for DMS services offered by CDK and other DMS providers, to the extent they exist and can be identified through a reasonable search of appropriate custodians' files. Please let us know whether this would resolve our dispute.

*Request No. 30:* If the Dealership Class Plaintiffs confirm that they are not seeking CDK's granular system design documents, source code, algorithms, etc. through this Request, then subject to its objections, and in the interest of reaching a compromise as to this Request, CDK is prepared to produce documents that reflect differences between approved and unapproved third-party DMS access as they relate to data security, system integrity, data corruption, and system burden and performance issues, to the extent such documents exist and can be identified through a reasonable search. Please let us know whether this would resolve our dispute.

*Request No. 31:* We confirm that the phrase "[s]ubject to and without waiving these or its General Objections" in CDK's written response to this Request is not intended to specifically limit what CDK subsequently states that it will produce. Please confirm the same for those CDK RFPs where the Dealership Class Plaintiffs have similarly indicated that they will produce responsive documents "[s]ubject to and without waiving" their objections.

*Request No. 34:* Regarding subpart (d) of this Request, we confirm that to the extent there have been changes during the relevant time period regarding how data input into CDK's DMS by Dealers (which is our best understanding of what you mean by "dealer data") is stored, documents sufficient to show such changes will be included in CDK's response to this Request, to the extent such documents exist and can be identified through a reasonable search.

*Request No. 35:* To the extent there is any daylight between this Request and Authenticom RFP 81 owing to the fact that the Dealership Class Plaintiffs' request seeks documents going back to January 1, 2013, while Authenticom RFP 81 had a cut-off of January 1, 2014, CDK will produce responsive documents from 2013 subject to its normal reservations (*i.e.*, to the extent such documents exist and can be identified through a reasonable search).

*Request No. 36:* Subject to its objections, and in the interest of reaching a compromise as to this Request, CDK is prepared to produce documents related to both the 2013 and 2014 NADA memos, to the extent they exist and can be identified through a reasonable search. Please confirm that this will resolve our dispute over this Request.

*Requests No.37 and 38:* Between them, these Requests seek (a) "[a]ll documents" demonstrating CDK's attendance at any industry conference or convention where customers or potential customers may have attended (including "memos, diary entries, and travel, accommodation, and restaurants receipts, or any other documentation"), and (b) "[a]ll documents produced, used or distributed" at such conferences. During our meet-and-confer, we reiterated CDK's burden and overbreadth objections. Based upon the their July 13 correspondence, we understand that the Dealership Class Plaintiffs are unwilling to substantively narrow either Request. To the extent

Robert A. Wallner
July 25, 2018
Page 8

that relevant events occurred at industry conferences (*e.g.*, the April 2016 discussion between Mr. McCray and Mr. Cottrell noted in your July 13 letter) or relevant documents were created or disseminated by CDK in connection with industry conferences, those documents likely will be produced in response any number of Requests served by the MDL Plaintiffs that track the issues in this litigation and not the conferences themselves. For example, non-privileged documents (if any) related to Mr. McCray's conversation with Mr. Cottrell—the alleged content of which, to be clear, we dispute—are being produced in response to Authenticom's RFP 10 ("[a]ll documents and communications referencing, relating to, or concerning Authenticom, DealerVault, or Steve Cottrell."), if not many others. The same is true for other potentially relevant documents, *e.g.*, communications with Dealers about SecurityFirst or the 3PA "refresh," such that the significant additional burden of responding to these Requests are not proportional to the needs of the case.[4]

*Request No. 40:* Regarding your questions about the status of CDK's discussions with Authenticom concerning their requests for invoices and invoice data (Authenticom RFPs 102 and 103), we refer you to the relevant correspondence. *See* 05/11/2018 Ltr. from M. Nemelka to B. Ross and B. Miller; 05/24/2018 Ltr. from B. Miller to M. Nemelka and P. Wedgworth; 05/31/2018 Ltr. from M. Nemelka to B. Miller; 06/05/2018 Ltr. from B. Miller to M. Nemelka and P. Wedgworth. Moreover, no attempts have been made (nor will they be made, by us at least) to exclude the Dealership Class Plaintiffs from appearing for and observing future meet-and-confer negotiations with Authenticom regarding these (and any other) RFPs that Authenticom has served. Indeed, such a position is antithetical to the fundamental principle of an MDL—namely that discovery be coordinated among all the parties to the MDL. Thus, the best way for the Dealership Class Plaintiffs to stay abreast of the status of negotiations concerning Authenticom RFPs 102 and 103 would be to observe any future meet-and-confers.

*Request No. 41:* As we clarified (to the extent any clarification was needed), CDK is not standing on its objections to this Request. We refer you to CDK's written response to this Request, which we believe is sufficiently clear about what CDK intends to produce.

*Request No. 42:* During our discussions about this Request, we told you that CDK already has produced and is producing myriad financial information, including:

- In response to Authenticom RFPs 52, 53, and 55, CDK already has produced and is producing documents sufficient to show its DMS profit, projections, margin, and cost information at the individual product line level (*e.g.*, DMS), at the divisional level (e.g., Data Services), and at the management level (*e.g.*, the Retail Sales corporate level), or some combination thereof, to the extent such documents/information exist. Further, to the extent that DMS "projections" are not maintained in central financial reporting

---

[4] Your July 13 letter also proposes that CDK respond to RFP 38 by "produc[ing] additional documents responsive to this Request that are identified through the use of search terms and custodians." We are skeptical that this proposal would address the problem. However, so that we may fully evaluate the Dealership Class Plaintiffs' proposal, please identify the search terms from Plaintiffs' May 25 list and the custodians that you would propose CDK use for purposes of responding to RFP 38.

Mayer Brown LLP

Robert A. Wallner
July 25, 2018
Page 9

- repositories but may exist in custodial files like email, CDK is amenable to running targeted searches for such documents through appropriate custodians' files.

- In response to Authenticom RFPs 57, 58, 59, and 60, CDK already has produced and is producing documents sufficient to show third-party integration (3PA) profit, projections, margin, and cost information at the individual product line level, at the divisional level, and at the management level, or some combination thereof, to the extent such documents/information exist. Further, as with DMS "projections," to the extent that 3PA "projections" are not maintained in central financial reporting repositories but may exist in custodial files like email, CDK is amenable to running targeted searches for such documents through appropriate custodians' files.

We believe that the above is more than sufficient to respond to this Request, and to the extent this Request seeks additional financial information and/or all financial information in CDK's possession, custody, or control, CDK maintains its objections to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.

*Request No. 43:* In its written response to this Request, CDK stated "that to the extent they exist, are within CDK's possession, custody, and control, and can be identified through a reasonable search of appropriate sources, CDK will produce non-privileged written antitrust compliance policies and training materials distributed to employees in the normal course of business." The section in your July 13 letter related to this Request only states that it is the Dealership Class Plaintiffs' "position that this Request is not duplicative of previous requests and that the documents sought is relevant and discoverable." Is there a dispute over this Request? If so, we are unsure as to the nature of any such dispute.

*Request No. 45:* We confirm that the General Retention Schedule produced at CDK-0701400 is dated October 1, 2014, and is the only such version of the General Retention Schedule in place since CDK was spun off from its former corporate parent (ADP, Inc.) in 2014.

*Requests No. 46 and 47:* As we discussed during our meet-and-confer, our principal issue with these Requests is that that, as phrased, they do not describe the documents sought with reasonable particularity. To the extent that your July 13 letter indicates that the Dealership Class Plaintiffs are seeking documents referring to "competition" (or similar terms/concepts) for the sale of DMS or data "integration" products and services, and factors that may prevent entities from offering them, that may be something that CDK could agree to. Please confirm whether the Dealership Class Plaintiffs are amenable to clarifying the Requests in this manner.

*Request No. 48:* We refer you back to our discussion of CDK-0701423-49 in regard to RFPs 20, 21, 25, and 28, and confirm that it covers as a general matter both the 3PA program and sales generated through CDK's former DMI and IntegraLink subsidiaries. A data dictionary for the documents produced at CDK-0701423-49 is available at CDK-0701478.

*Request No. 49:* As stated in CDK's June 22 written responses, we believe that the Dealership Class Plaintiffs' attempt via this Request to "incorporate[ ]" all 102 additional requests for

Mayer Brown LLP

Robert A. Wallner
July 25, 2018
Page 10

production served upon CDK jointly by Plaintiffs MVSC, Authenticom, Cox Automotive, and AutoLoop ("non-Dealer RFPs") is both untimely and improper. However, to the extent that CDK produces documents in response to the non-Dealer RFPs, those documents will in the normal course be provided to all other parties in the MDL, including the Dealership Class Plaintiffs. Your June 28 letter indicates that this is unacceptable because CDK's objections to certain non-Dealer RFPs may be valid against the parties who actually served them but not the Dealership Class Plaintiffs. Dealer Plaintiffs cannot have it both ways by vaguely purporting to incorporate all of the non-Dealer Plaintiffs' RFPs by reference through the use of a single RFP, regardless of their relevance, or lack thereof, to the Dealer Plaintiffs' allegations, but then attempt to take CDK to task for not addressing each of those incorporated RFPs individually in response. In any event, we disagree with the Dealer Plaintiffs' assertions on this point, but in an attempt to reach some resolution, we suggest that the Dealer Plaintiffs identify which non-Dealer RFPs they claim are irrelevant, overly burdensome, not proportional, etc. as to the non-Dealer Plaintiffs (MVSC, Authenticom, Cox, and AutoLoop) but not the Dealership Class Plaintiffs. Otherwise, this seems to us like a theoretical rather than a real issue that the Dealership Class Plaintiffs are raising.

Sincerely,

*/s/ Matthew D. Provance*
Matthew D. Provance

cc: Lead MDL Plaintiff Counsel of Record
Reynolds Counsel of Record
Mark Ryan
Britt Miller
Andrew Marovitz