PUBLIC REDACTED VERSION

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| | Hon. Robert M. Dow, Jr. |
| *This filing relates to:* | Magistrate Judge Jeffrey T. Gilbert |
| THE DEALERSHIP CLASS ACTION | |
| *Cox Automotive, Inc, et al. v. CDK Global, LLC*, Case No. 1:18-CV-1058 (N.D. Ill.) | |
| *Loop, LLC, d/b/a AutoLoop v. CDK Global, LLC*, Case No. 18-cv-2521 (N.D. Ill.) | |
| *Authenticom, Inc. v. CDK Global, LLC et al.*, Case No. 1:18-cv-00868 (N.D. Ill.) | |
| *Motor Vehicle Software Corp. v. CDK Global, Inc., et al.*, Case No. 1:18-cv-865 (N.D. Ill.) | |

# DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR OMNIBUS MOTION TO COMPEL CERTAIN PLAINTIFFS' COMPLIANCE WITH THEIR DISCOVERY OBLIGATIONS IN RESPONSE TO DEFENDANTS' WRITTEN DISCOVERY REQUESTS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION .............................................................................................................1

BACKGROUND ..............................................................................................................1

ARGUMENT ...................................................................................................................4

I. THE DEALERSHIP PLAINTIFFS REFUSE TO RESPOND TO RELEVANT REQUESTS FOR PRODUCTION, ANSWER INTERROGATORIES, AND PERFORM REASONABLE SEARCHES OF THEIR ESI ....................................................4

    A. The Dealers Refuse To Respond To Relevant RFPs And Interrogatories .......................6

        1. Data Security, Data Integrity, System Performance ....................................................6

        2. Alleged Markets And Competition ...........................................................................12

        3. DMS Contracts .......................................................................................................14

        4. Evidence of Liability or Damages ...........................................................................15

        5. Improperly Narrowed Responses .............................................................................16

        6. Publicly Available Documents ................................................................................17

    B. The Dealers Should Run The Search Terms That CDK Proposed. ...............................18

II. COX AND AUTOLOOP SHOULD BE COMPELLED TO COMPLY WITH CDK'S OUTSTANDING DISCOVERY REQUESTS REGARDING THEIR USE AND RE-SYNDICATION TO THIRD PARTIES OF DMS DATA ..........................21

III. AUTHENTICOM SHOULD BE COMPELLED TO PROVIDE COMPLETE RESPONSES TO THE TEN INTERROGATORIES FOR WHICH IT HAS SO FAR PROVIDED CDK ONLY VAGUE AND NON-RESPONSIVE ANSWERS. ITS RESPONSES TO TWO CONTESTED REQUESTS FOR ADMISSION ("RFAS") SHOULD ALSO BE DEEMED COMPLETE ADMISSIONS. ...................................................................................................23

    A. Authenticom Has Failed To Adequately Respond To Ten CDK Interrogatories. ...........24

    B. Authenticom's Responses To Two Disputed RFAs Should Be Deemed Admissions. .................................................................................................................29

IV. MVSC SHOULD BE COMPELLED TO PRODUCE RESPONSIVE DOCUMENTS FROM 2013, LIKE ALL OTHER PARTIES IN THE MDL.......................31

CONCLUSION ...............................................................................................................34

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
   683 F.3d 328 (7th Cir. 2012) ...........................................................12, 24

*Arenas v. Unified Sch. Dist. No. 223*,
   2016 WL 6071802 (D. Kan. Oct. 17, 2016) ...........................................35

*Authenticom, Inc. v. CDK Global, LLC*,
   2017 WL 3017048 (W.D. Wis. 2017)...................................................27

*Authenticom, Inc. v. CDK Global, LLC*,
   874 F.3d 1019 (7th Cir. 2017) .................................................... *passim*

*In re Broiler Chicken Antitrust Litig.*,
   2018 WL 3586183 (N.D. Ill. July 26, 2018)......................................35, 36

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   2018 WL 2193236 (N.D. Ill. May 14, 2018) ......................................7, 10

*In re eBay Seller Antitrust Litig.*,
   2009 WL 10694848 (N.D. Cal. July 13, 2009)...................................19, 24

*Fed. Deposit Ins. Corp. for Valley Bank v. Crowe Horwath LLP*,
   2018 WL 3105987 (N.D. Ill. June 25, 2018) ......................................4, 24

*In re Folding Carton Antitrust Litig.*,
   76 F.R.D. 420 (N.D. Ill. 1977)............................................................34

*Greene v. Sears Prot. Co.*,
   2017 WL 1134484 (N.D. Ill. Mar. 27, 2017)..........................................34

*Jackson v. Alton & S. Ry. Co.*,
   2008 WL 11383777 (S.D. Ill. July 14, 2008) .........................................30

*Johnstone v. Fox*,
   1986 WL 7978 (N.D. Ill. July 11, 1986)..................................................1

*Jones v. Syntex Labs., Inc.*,
   2001 WL 1338987 (N.D. Ill. Oct. 30, 2001)...........................................25

*Kodish v. Oakbrook Terrace Fire Prot. Dist.*,
   235 F.R.D. 447 (N.D. Ill. 2006) ............................................................4

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Leegin Creative Leather Prods., Inc. v. PVKS, Inc.*,
    551 U.S. 877 (2007).................................................................................................12, 24

*Meyer v. Southern Pacific Lines*,
    199 F.R.D. 610 (N.D. Ill. 2001)............................................................................18

*Old Reliable Wholesale, Inc. v. Cornell Corp.*,
    2008 WL 2323777 (N.D. Ohio June 4, 2008)........................................................25

*Resicom Custom Painting and Maintenance, Inc. v. Prof'l Retail Servs., Inc.*,
    2017 WL 3951603 (N.D. Ill. Sept. 8, 2017) ...........................................................4

*Rubin v. Islamic Republic of Iran*,
    349 F. Supp. 2d 1108 (N.D. Ill. 2004) ...................................................................4

*Vergara v. City of Waukegan*,
    2007 WL 3334501 (N.D. Ill. Nov. 6, 2007) .........................................................30

*Vukadinovich v. Griffith Pub. Sch.*,
    No. 2:02 CV 472, 2008 WL 5141388 (N.D. Ind. Dec. 5, 2008)............................18

*Wilson v. MRO Corp.*,
    2017 WL 561333 (S.D.W. Va. Feb. 10, 2017) .....................................................35

**Statutes, Rules and Regulations**

15 U.S.C. § 15b...............................................................................................................34

Fed. R. Civ. P. 26(a)(1)(A)(ii) ......................................................................................16

Fed. R. Civ. P. 26(b)(1)...............................................................................3, 6, 11, 34

Fed. R. Civ. P. 33 ..........................................................................................................25, 28

Fed. R. Civ. P. 33(a)(2)..................................................................................................25

Fed. R. Civ. P. 33(b)(3)..................................................................................................25

Fed. R. Civ. P. 36(a)(4)..................................................................................................25

Fed. R. Civ. P. 36(a)(6)..................................................................................................25

Rule 26............................................................................................................................24

Rule 26(a)..........................................................................................................................3

## TABLE OF AUTHORITIES
### (continued)

                                                                                    Page(s)

Rule 26(a)(1).................................................................................................................4, 5

Rule 26(b) ......................................................................................................................25

Rule 36......................................................................................................................25, 33

Rule 37(a)(3) ..................................................................................................................25

**Other Authorities**

Areeda & Hovencamp, Antitrust Law: An Analysis of Antitrust Principles &
  Their Application, ¶1504a (3rd & 4th Eds. 2018 Cum. Supp. 2010-2017).......................11, 12

Wright & Miller, *Federal Practice and Procedure*, § 2168.1 .......................................30

## INTRODUCTION

Despite Defendants' best efforts, the discovery process in this MDL has produced impasse with the various Plaintiffs on a range of issues. At bottom, the problem is simply stated: Plaintiffs believe that they are entitled to broader discovery of Defendants than Defendants are of them and therefore may withhold discoverable information—whether because they deem it burdensome for unspecified reasons, because they have unilaterally deemed it irrelevant, or because they simply don't want to produce the information. "Discovery, though, is a two way street." *Johnstone v. Fox*, 1986 WL 7978, at *1 (N.D. Ill. July 11, 1986). Defendants are entitled to their own discovery into the claims and defenses in this litigation—on reasonable terms, not Plaintiffs' preferred terms. Defendants thus respectfully move the Court to compel Plaintiffs to produce the information identified below.

## BACKGROUND

Defendants CDK Global, LLC ("CDK") and The Reynolds & Reynolds Company ("Reynolds")[1] separately license dealer management systems ("DMSs"), enterprise software that facilitates payroll, inventory, repair and service, HR, marketing, and other functions for automobile dealerships. Dealerships also enter into commercial relationships with third-party software vendors, who produce dealer-oriented computer applications. Some vendors seek data maintained on Defendants' DMSs for use in their applications through Defendants' authorized third-party access programs. Others attempt to use unaffiliated data extractors or so-called "integrators," including Plaintiff Authenticom, who gain access to Defendants' systems through various means—including dealer-issued login credentials—and use automated scripts and software tools to extract data and

---

[1] Reynolds joins the instant motion only as to Section IV related to the *MVSC* case as it is not a defendant in the *Cox Automotive* or *AutoLoop* actions, has resolved most discovery disputes with Authenticom (*but see* n.2, *infra*), and did not serve discovery on the Dealership Class Plaintiffs pending resolution of its Motion to Compel Arbitration (Dkt. 252).

syndicate it to vendors and other third parties. Reynolds has been blocking unauthorized third-party access to its DMS for more than a decade; CDK began enforcing third-party access restrictions and blocking unauthorized vendors and "integrators" several years later. This MDL followed.

MDL Plaintiffs include not only Authenticom but software vendors MVSC, Cox Automotive ("Cox") (also a competing DMS provider), and AutoLoop, which purports to represent a putative class of vendors who received "data integration services" from Defendants through their third-party access programs. In addition, some two dozen automobile dealers have now filed a Consolidated Class Action Complaint, putatively on behalf of all dealerships using Reynolds' and CDK's DMSs. *See* Dkt. 184 (public version). All MDL Plaintiffs allege the same basic conspiracy between CDK and Reynolds: an agreement between the two companies to prohibit third-party access to their respective systems outside their approved access programs and thereby eliminate competition in a purported "data integration" market. Plaintiffs also challenge supposed "exclusive dealing" provisions in Defendants' vendor and dealer contracts containing the same restrictions.

Several rounds of written discovery were exchanged in *Authenticom*, one of the earlier-filed cases, for which a handful of lingering disputes remain. Additional "coordinated" discovery was exchanged by all parties in the MDL on May 25, 2018, pursuant to § B.6 of the Case Management Order (Dkt. 166), along with proposals for document custodians and ESI search terms (which, for the parties in *Authenticom*, were in addition to the search terms and custodians that had been agreed to before MDL consolidation). After extensive meet-and-confer efforts, CDK was able to reach compromises with Cox and AutoLoop on most key issues, as was Reynolds with Authenticom, dramatically reducing the scope of motions practice at this time.[2] Several significant discovery issues

---

[2]  A few discrete issues remain unresolved where the parties have made significant progress over the last several days and plan to continue working, in good faith, beyond the August 6 motions deadline or where it is not feasible to bring motions at this time (*e.g.*, where the parties have agreed to amend certain of their interrogatory responses as a result of the meet-and-confer process but will not do so until after August 6). Per

remain unresolved between Defendants and MVSC, and between CDK and both Authenticom and the Dealership Class Plaintiffs ("Dealers" or "DP"). As described further below, Authenticom refuses to answer relevant and appropriately phrased interrogatories and requests for admission served by CDK, even after having an opportunity to amend its responses to cure their defects. MVSC refuses to produce discovery to Defendants from the entire baseline relevant time period that every other party in this MDL has accepted: January 1, 2013 to the present.

As for the Dealers, their intransigence is wide-ranging, especially compared to the relatively discrete and narrow issues remaining with the Individual Plaintiffs' discovery responses. After failing to provide any response to several of CDK's interrogatories until 7:00 p.m. on the last business day prior to the motion to compel deadline (over two months after they were served and without seeking an agreed extension of time), failing to provide any comment or otherwise engage on CDK's proposed search terms for over 65 days (and then only 3 business days before the motion to compel deadline), and refusing to include a number of individuals that *they themselves* identified in their Rule 26(a) disclosures as individuals with knowledge of this litigation until literally the night before the instant motion was filed, they still refuse to respond—at all—to a majority of CDK's discovery requests and wholesale refuse to run necessary and appropriate ESI search terms. Defendants' omnibus motion to compel should be granted in its entirety.

## ARGUMENT

Defendants are entitled to take discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and

---

the agreements of the parties (reflected in their various meet-and-confer correspondence), in the unfortunate event that these issues cannot be resolved, Defendants will bring them to the Court's attention promptly.

whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). "Requests for discovery are relevant if there is any possibility that the information sought may be relevant to the subject matter of the action." *Fed. Deposit Ins. Corp. for Valley Bank v. Crowe Horwath LLP*, 2018 WL 3105987, at *2 (N.D. Ill. June 25, 2018) (citing *Rubin v. Islamic Republic of Iran*, 349 F. Supp. 2d 1108, 1111 (N.D. Ill. 2004)). "[T]he 'burden rests upon the objecting party to show why a particular discovery request is improper.'" *Resicom Custom Painting and Maintenance, Inc. v. Prof'l Retail Servs., Inc.*, 2017 WL 3951603, at *1 (N.D. Ill. Sept. 8, 2017) (quoting *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447, 450 (N.D. Ill. 2006)).

## I. THE DEALERSHIP PLAINTIFFS REFUSE TO RESPOND TO RELEVANT REQUESTS FOR PRODUCTION, ANSWER INTERROGATORIES, AND PERFORM REASONABLE SEARCHES OF THEIR ESI

Consistent with the massive scope and breadth of the Dealers' 736-paragraph, 50-count Complaint, on May 25, 2018, CDK sent the Dealers 107 requests for production ("RFPs"), 14 interrogatories, and 135 proposed search terms to be applied to the Dealers' ESI. CDK also proposed two categories of document custodians for each Dealer: (1) the individuals who were disclosed by that Dealer as affirmative trial witnesses under Rule 26(a)(1); and (2) an additional set of custodians, as described by subject matter. The second category—including, for example, the "employee(s) responsible for negotiating contracts with DMS providers, Integrators, and Vendors"—was needed because the Dealers had yet to answer any of CDK's interrogatories (served on the same day). *See* Ex. 50, CDK's Proposed Search Term and Custodian List for Dealer Class Pls.

The Dealers responded with stonewalling and delay. They initially refused to produce *any* documents in response to 77 RFPs—more than 70% of what CDK served. *See* Ex. 8 7/5/18 Ltr. From M. Provance to P. Wedgworth, at 3-4; Ex. 53, Dealership Class Pls.' Resp. to CDK's First

RFPs.[3] Two Dealers also failed to respond at all to the majority of CDK's interrogatories, instead serving slip-sheets that stated, "Dealership Plaintiff's counsel are currently working to gather the information." *See* Ex. 52, Dealership Class Pls.' Resp. to CDK's First Interrogs., at Ex. O and W. Other Dealers purported to respond on the June 22 deadline (*see* Dkt. 166, § 6(a)), but they left many interrogatories unanswered, often responding with "Unknown at this time" or "TBD." *See* Ex. 52, at Exs. D, P, Q, and Y. The Dealers responded to CDK's May 25 proposal for document custodians on July 7—40 days later—offering only 13 custodians, which would not have given CDK even *one* document custodian from each Dealer, let alone the Rule 26(a)(1) witnesses that they identified. *See* Ex. 9, 7/13/2018 Ltr. From M. Provance to R. Wallner.[4] Finally, the Dealers waited until last Wednesday, August 1—a full ***65 days*** after CDK's proposal—to respond with boilerplate objections to the vast majority of CDK's proposed search terms. Ex. 26, Dealership Class Pls.' Modifications to CDK's Proposed Search Terms. It was clear from the Dealers' last-minute search term objections—

---

[3]  Among other groundless objections, the Dealers complain that CDK's discovery requests are "unnecessarily voluminous and place an undue burden on Dealership Plaintiffs." Ex. 20. But in fact, and as shown below, CDK's RFPs are narrowly targeted to specific and relevant categories of documents. And the Dealers can hardly claim that 107 RFPs is "unnecessarily voluminous" when CDK has received *258* separately-numbered RFPs (many with multiple subparts) and a total of 297 proposed ESI search terms. CDK also recently agreed to add 13 of its own document custodians, for a total of 30.

[4]  The Dealers' refusal to timely engage with CDK on their own document custodians stands in complete contrast to their demands for CDK's custodians. In their own May 25 proposal identifying 40 additional document custodians for *CDK*, the Dealers asked to meet-and-confer about document custodians "as soon as possible." Ex. 4, 5/25/2018 Ltr. From D. Ho and P. Wedgworth to A. Gulley, B. Ross, and B. Miller (regarding "additional document custodians and search terms). In a follow-up letter served a few days later, the Dealers reiterated that any delay in initiating bilateral negotiations regarding document custodians would be "unacceptable." Ex. 5, 6/1/2018 Ltr. From D. Ho and P. Wedgworth to B. Miller. They specifically said that any "refusal to discuss custodians" before answering even-pending discovery requests would be "inappropriate," and that the parties must "identify for each other—*now*—which custodians … the parties may agree to, and which they will not. … This procedure would be most efficient for all parties." *Id.* (emphasis added). But then, during June 8 and June 13 meet-and-confers on document custodians that promptly followed (at the Dealers' insistence), they suddenly took the opposite position. They advised that the Dealers would not even ***consider*** CDK's May 25 proposal until they had answered CDK's discovery requests (due June 22)—exactly what the Dealers called "unacceptable" and "inappropriate" in their June 1 letter. *See* Ex. 9. And then, once the Dealers had finally answered the discovery, it took another 15 days for CDK to actually receive a substantive offer from the Dealers regarding custodians—an offer that was plainly insufficient. *See id.*

## INTRODUCTION

Despite Defendants' best efforts, the discovery process in this MDL has produced impasse with the various Plaintiffs on a range of issues. At bottom, the problem is simply stated: Plaintiffs believe that they are entitled to broader discovery of Defendants than Defendants are of them and therefore may withhold discoverable information—whether because they deem it burdensome for unspecified reasons, because they have unilaterally deemed it irrelevant, or because they simply don't want to produce the information. "Discovery, though, is a two way street." *Johnstone v. Fox*, 1986 WL 7978, at *1 (N.D. Ill. July 11, 1986). Defendants are entitled to their own discovery into the claims and defenses in this litigation—on reasonable terms, not Plaintiffs' preferred terms. Defendants thus respectfully move the Court to compel Plaintiffs to produce the information identified below.

## BACKGROUND

Defendants CDK Global, LLC ("CDK") and The Reynolds & Reynolds Company ("Reynolds")[1] separately license dealer management systems ("DMSs"), enterprise software that facilitates payroll, inventory, repair and service, HR, marketing, and other functions for automobile dealerships. Dealerships also enter into commercial relationships with third-party software vendors, who produce dealer-oriented computer applications. Some vendors seek data maintained on Defendants' DMSs for use in their applications through Defendants' authorized third-party access programs. Others attempt to use unaffiliated data extractors or so-called "integrators," including Plaintiff Authenticom, who gain access to Defendants' systems through various means—including dealer-issued login credentials—and use automated scripts and software tools to extract data and

---

[1] Reynolds joins the instant motion only as to Section IV related to the *MVSC* case as it is not a defendant in the *Cox Automotive* or *AutoLoop* actions, has resolved most discovery disputes with Authenticom (*but see* n.2, *infra*), and did not serve discovery on the Dealership Class Plaintiffs pending resolution of its Motion to Compel Arbitration (Dkt. 252).

1

syndicate it to vendors and other third parties. Reynolds has been blocking unauthorized third-party access to its DMS for more than a decade; CDK began enforcing third-party access restrictions and blocking unauthorized vendors and "integrators" several years later. This MDL followed.

MDL Plaintiffs include not only Authenticom but software vendors MVSC, Cox Automotive ("Cox") (also a competing DMS provider), and AutoLoop, which purports to represent a putative class of vendors who received "data integration services" from Defendants through their third-party access programs. In addition, some two dozen automobile dealers have now filed a Consolidated Class Action Complaint, putatively on behalf of all dealerships using Reynolds' and CDK's DMSs. *See* Dkt. 184 (public version). All MDL Plaintiffs allege the same basic conspiracy between CDK and Reynolds: an agreement between the two companies to prohibit third-party access to their respective systems outside their approved access programs and thereby eliminate competition in a purported "data integration" market. Plaintiffs also challenge supposed "exclusive dealing" provisions in Defendants' vendor and dealer contracts containing the same restrictions.

Several rounds of written discovery were exchanged in *Authenticom*, one of the earlier-filed cases, for which a handful of lingering disputes remain. Additional "coordinated" discovery was exchanged by all parties in the MDL on May 25, 2018, pursuant to § B.6 of the Case Management Order (Dkt. 166), along with proposals for document custodians and ESI search terms (which, for the parties in *Authenticom*, were in addition to the search terms and custodians that had been agreed to before MDL consolidation). After extensive meet-and-confer efforts, CDK was able to reach compromises with Cox and AutoLoop on most key issues, as was Reynolds with Authenticom, dramatically reducing the scope of motions practice at this time.[2] Several significant discovery issues

---

[2] A few discrete issues remain unresolved where the parties have made significant progress over the last several days and plan to continue working, in good faith, beyond the August 6 motions deadline or where it is not feasible to bring motions at this time (*e.g.*, where the parties have agreed to amend certain of their interrogatory responses as a result of the meet-and-confer process but will not do so until after August 6). Per

remain unresolved between Defendants and MVSC, and between CDK and both Authenticom and

the Dealership Class Plaintiffs ("Dealers" or "DP"). As described further below, Authenticom

refuses to answer relevant and appropriately phrased interrogatories and requests for admission

served by CDK, even after having an opportunity to amend its responses to cure their defects.

MVSC refuses to produce discovery to Defendants from the entire baseline relevant time period that

every other party in this MDL has accepted: January 1, 2013 to the present.

As for the Dealers, their intransigence is wide-ranging, especially compared to the relatively

discrete and narrow issues remaining with the Individual Plaintiffs' discovery responses. After

failing to provide any response to several of CDK's interrogatories until 7:00 p.m. on the last

business day prior to the motion to compel deadline (over two months after they were served and

without seeking an agreed extension of time), failing to provide any comment or otherwise engage

on CDK's proposed search terms for over 65 days (and then only 3 business days before the motion

to compel deadline), and refusing to include a number of individuals that *they themselves* identified

in their Rule 26(a) disclosures as individuals with knowledge of this litigation until literally the night

before the instant motion was filed, they still refuse to respond—at all—to a majority of CDK's

discovery requests and wholesale refuse to run necessary and appropriate ESI search terms.

Defendants' omnibus motion to compel should be granted in its entirety.

## ARGUMENT

Defendants are entitled to take discovery "regarding any nonprivileged matter that is relevant

to any party's claim or defense and proportional to the needs of the case, considering the importance

of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant

information, the parties' resources, the importance of the discovery in resolving the issues, and

---

the agreements of the parties (reflected in their various meet-and-confer correspondence), in the unfortunate
event that these issues cannot be resolved, Defendants will bring them to the Court's attention promptly.

whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). "Requests for discovery are relevant if there is any possibility that the information sought may be relevant to the subject matter of the action." *Fed. Deposit Ins. Corp. for Valley Bank v. Crowe Horwath LLP*, 2018 WL 3105987, at *2 (N.D. Ill. June 25, 2018) (citing *Rubin v. Islamic Republic of Iran*, 349 F. Supp. 2d 1108, 1111 (N.D. Ill. 2004)). "[T]he 'burden rests upon the objecting party to show why a particular discovery request is improper.'" *Resicom Custom Painting and Maintenance, Inc. v. Prof'l Retail Servs., Inc.*, 2017 WL 3951603, at *1 (N.D. Ill. Sept. 8, 2017) (quoting *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447, 450 (N.D. Ill. 2006)).

## I.     THE DEALERSHIP PLAINTIFFS REFUSE TO RESPOND TO RELEVANT REQUESTS FOR PRODUCTION, ANSWER INTERROGATORIES, AND PERFORM REASONABLE SEARCHES OF THEIR ESI

Consistent with the massive scope and breadth of the Dealers' 736-paragraph, 50-count Complaint, on May 25, 2018, CDK sent the Dealers 107 requests for production ("RFPs"), 14 interrogatories, and 135 proposed search terms to be applied to the Dealers' ESI. CDK also proposed two categories of document custodians for each Dealer: (1) the individuals who were disclosed by that Dealer as affirmative trial witnesses under Rule 26(a)(1); and (2) an additional set of custodians, as described by subject matter. The second category—including, for example, the "employee(s) responsible for negotiating contracts with DMS providers, Integrators, and Vendors"—was needed because the Dealers had yet to answer any of CDK's interrogatories (served on the same day). *See* Ex. 50, CDK's Proposed Search Term and Custodian List for Dealer Class Pls.

The Dealers responded with stonewalling and delay. They initially refused to produce *any* documents in response to 77 RFPs—more than 70% of what CDK served. *See* Ex. 8 7/5/18 Ltr. From M. Provance to P. Wedgworth, at 3-4; Ex. 53, Dealership Class Pls.' Resp. to CDK's First

RFPs.[3] Two Dealers also failed to respond at all to the majority of CDK's interrogatories, instead serving slip-sheets that stated, "Dealership Plaintiff's counsel are currently working to gather the information." *See* Ex. 52, Dealership Class Pls.' Resp. to CDK's First Interrogs., at Ex. O and W. Other Dealers purported to respond on the June 22 deadline (*see* Dkt. 166, § 6(a)), but they left many interrogatories unanswered, often responding with "Unknown at this time" or "TBD." *See* Ex. 52, at Exs. D, P, Q, and Y. The Dealers responded to CDK's May 25 proposal for document custodians on July 7—40 days later—offering only 13 custodians, which would not have given CDK even *one* document custodian from each Dealer, let alone the Rule 26(a)(1) witnesses that they identified. *See* Ex. 9, 7/13/2018 Ltr. From M. Provance to R. Wallner.[4] Finally, the Dealers waited until last Wednesday, August 1—a full ***65 days*** after CDK's proposal—to respond with boilerplate objections to the vast majority of CDK's proposed search terms. Ex. 26, Dealership Class Pls.' Modifications to CDK's Proposed Search Terms. It was clear from the Dealers' last-minute search term objections—

---

[3]    Among other groundless objections, the Dealers complain that CDK's discovery requests are "unnecessarily voluminous and place an undue burden on Dealership Plaintiffs." Ex. 20. But in fact, and as shown below, CDK's RFPs are narrowly targeted to specific and relevant categories of documents. And the Dealers can hardly claim that 107 RFPs is "unnecessarily voluminous" when CDK has received *258* separately-numbered RFPs (many with multiple subparts) and a total of 297 proposed ESI search terms. CDK also recently agreed to add 13 of its own document custodians, for a total of 30.

[4]    The Dealers' refusal to timely engage with CDK on their own document custodians stands in complete contrast to their demands for CDK's custodians. In their own May 25 proposal identifying 40 additional document custodians for *CDK*, the Dealers asked to meet-and-confer about document custodians "as soon as possible." Ex. 4, 5/25/2018 Ltr. From D. Ho and P. Wedgworth to A. Gulley, B. Ross, and B. Miller (regarding "additional document custodians and search terms). In a follow-up letter served a few days later, the Dealers reiterated that any delay in initiating bilateral negotiations regarding document custodians would be "unacceptable." Ex. 5, 6/1/2018 Ltr. From D. Ho and P. Wedgworth to B. Miller. They specifically said that any "refusal to discuss custodians" before answering then-pending discovery requests would be "inappropriate," and that the parties must "identify for each other—*now*—which custodians … the parties may agree to, and which they will not. … This procedure would be most efficient for all parties." *Id.* (emphasis added). But then, during June 8 and June 13 meet-and-confers on document custodians that promptly followed (at the Dealers' insistence), they suddenly took the opposite position. They advised that the Dealers would not even ***consider*** CDK's May 25 proposal until they had answered CDK's discovery requests (due June 22)—exactly what the Dealers called "unacceptable" and "inappropriate" in their June 1 letter. *See* Ex. 9. And then, once the Dealers had finally answered the discovery, it took another 15 days for CDK to actually receive a substantive offer from the Dealers regarding custodians—an offer that was plainly insufficient. *See id.*

and quickly confirmed by CDK—that the Dealers have not run any of the proposed search terms on any custodians' ESI and therefore have no basis whatsoever to assert that any of CDK's proposed search terms is "overly broad" or "burdensome." Ex. 27, 8/3/2018 Ltr. From J. Michaels to J. Hughes. CDK learned today that the Dealers expect to have data for one, maybe two of their named plaintiffs tomorrow.

Although the meet-and-confer process has resolved a few of these issues,[5] the Dealers are still withholding plainly relevant discovery. They refuse to adequately respond to at least 50 RFPs and two interrogatories, and they have refused to apply reasonable search terms designed to capture relevant and responsive documents.

### A. The Dealers Refuse To Respond To Relevant RFPs And Interrogatories

On each of the RFPs and interrogatories described below, the Dealers either flatly refuse to produce *any* responsive documents or information, or insufficiently offer to respond *in part* to a handful of requests. CDK is entitled to "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The documents and responses CDK seeks easily satisfy that standard.

### 1. Data Security, Data Integrity, System Performance

Like the other Plaintiffs in this MDL, the Dealers' antitrust and accompanying state-law claims largely challenge Defendants' respective decisions to bar unauthorized, third-party data extractors (whom the Dealers call "independent integrators") from accessing their DMSs using

---

[5]    Plaintiff Teterboro Automall provided its initial responses to CDK's interrogatories on July 10. Plaintiff John O'Neil Johnson Toyota provided its initial responses last Friday, August 3, along with the other four Dealers who initially answered several interrogatories with placeholder responses "TBD" and "Unknown at this time." Ex. 35, 8/3/2018 Ltr. From M. Provance to R. Wallner. CDK has not had an opportunity to review or raise any deficiencies concerning these late-served responses between Friday and today, and reserves its right to raise issues with these responses, to the extent necessary, after the August 6 motions deadline. Last night, the parties reached agreement on the identities of Dealers' document custodians, avoiding the need for motions practice there.

dealer-issued login credentials and running automated software scripts that repeatedly query and extract data from—and sometimes "write-back" altered data to—the DMS. *See, e.g.*, Complt. ¶¶ 7-11. As recognized by the Seventh Circuit, the core factual dispute is whether unmonitored and unauthorized third-party access by data extractors jeopardizes Defendants' massive investments in their respective DMSs by undermining data security, system integrity, and functionality. *See Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1022, 1025 (7th Cir. 2017). Similarly, Judge St. Eve recognized that proving up the security and system integrity threats posed by unauthorized third-party access to Defendants' DMSs would establish "procompetitive upsides" to their challenged conduct, critical to whether that conduct will "prevail on the ultimate rule-of-reason balancing." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2018 WL 2193236, at *19 (N.D. Ill. May 14, 2018).

Still, the Dealers dispute that unauthorized DMS system access "'really poses any cybersecurity risks'" and contend that "the costs charged by CDK far exceeded any alleged value of increased data security" and that CDK is therefore using cybersecurity merely as a pretext to exclude third-party extractors and raise prices for DMS integration. *E.g.*, Compl. ¶¶153, 155, 163 n.140. To test the validity of these claims and to support its defenses that there are economically rational and pro-competitive justifications for its conduct, CDK seeks targeted discovery from the Dealers on five key topics related to their use of third-party extractors and the resulting impacts on data security, system integrity, and DMS performance:

| Dealers' Use of Third-Party Data Extractors | **RFP 1** (Use of Data Extractors, means of access, and data accessed) |
| --- | --- |
| | **RFP 7** (Dealer, Vendor, and Data Extractor policies and procedures re: DMS access and login credentials) |
| | **RFP 29** (communications with Vendors, Dealers, or Data Extractors re: third-party DMS access) |
| | **RFP 61** (Data Extractor protocols for data extraction and writeback) |
| | **RFP 71** (Dissatisfaction or problems with Authenticom or |

| | |
|---|---|
| | DealerVault) |
| | **RFP 72** (Products and services offered by Data Extractors) |
| **Data Security Issues** | **RFP 9, 10** (DMS access by Vendors or Data Extractors without Dealers' knowledge or permission) |
| | **RFP 8, 19, 57** (Sharing DMS login credentials) |
| | **RFP 11, 22** (Data Extractor access to non-Dealer data, including NPI, PII, Defendants' proprietary data, or other third-party proprietary data maintained in the DMS) |
| | **RFP 17** (Evasion of efforts by Defendants to detect and block unauthorized DMS access) |
| | **RFP 24** (administrator-level ("UUP") third-party DMS access) |
| | **RFP 58, 63** (Investments in data security and cyber liability insurance) |
| | **RFP 49, 50, 52, 56** (DMS data security policies, security audits, communications re: data security) |
| | **RFP 53, 55, 59, 60, 62** (DMS and non-DMS data security breaches, data misappropriation, misuse) |
| **System Integrity and Performance Impacts** | **RFP 13, 23** (Frequency and content of third-party data extractions) |
| | **RFP 14** (Problems with data corruption, system integrity, and system performance caused by unauthorized third-party access) |
| | **RFP 25** (DMS user "emulation" software used created or used by Vendors, Data Extractors) |
| | **RFP 31** (Use of hostile third-party code ("code-on-the-box") to permit Data Extractor access to DMS) |
| **Contract Prohibitions and Legality** | **RFP 12** (Legality of Vendor or Data Extractor practices re: DMS access) |
| | **RFP 30** (Vendor or Data Extractor "agent" exception) |
| **Alternatives to Third-Party Access** | **RFP 27** (Manual reporting tools) |

The relevancy of this discovery is straightforward and appropriately sought from the Dealers. The RFPs at issue go straight to the documents and communications in the Dealers' files that will shed light on their own data security policies and procedures; the Dealers' interactions with third-party data extractors; the automated scripts, "hostile" third-party code ("code-on-the-box"), and user

"emulation" software that extractors install on Dealer networks or the DMS itself in order to gain access to Defendants' DMSs; the level of DMS access (including administrator-level access) that extractors obtain and the types of data they can access; and whether any of the foregoing has resulted in a data security breaches, data corruption issues, or otherwise degraded the performance the Dealers' DMS services. The limited discovery that Defendants have obtained from Authenticom already shows that ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████. CDK is entitled to discover evidence of these kind of interactions from the Dealers' files to ascertain the broad scope of their complicity in various third parties' to evade CDK's security systems, not just in coordination with Authenticom but with other third party extractors who are not before the Court in this proceeding, or via other means.

Likewise, CDK Interrogatories No. 8 and 9 asked Dealers to identify their "policies and procedures designed to protect the security of" customer information, including "sensitive data such as social security numbers," and to "[d]escribe any instance . . . where a Data Extractor or Vendor . . . received your DMS data without [y]our express consent." Ex. 52 at 12-13. Discovery on this latter issue (also embodied in RFPs 9 and 10) responds directly to Plaintiffs' repeated assertions that Defendants' blocking activities are unjustified because third-party data extractors only access data that "belongs" to the Dealers and only with the Dealers' express authorization and consent.[6]

---

[6] Other RFPs are similarly targeted to discrete, relevant issues. For example, RFPs 12 and 30 seek documents that reflect the extent to which Dealers understand that their DMS contracts prohibit sharing login credentials with third parties, which is relevant both to whether third-party access violates CDK's contract rights vis-à-vis the Dealers as well as whether the Dealers were aware of those restrictions when they signed up— undermining the alleged existence of any "single brand aftermarket" for "data integration" services. *See* CDK's Mot. to Dismiss (Dkt. 265) at 25. RFP 27 seeks documents to show the extent to which Dealers avail themselves of "manual reporting" tools, which allow Dealers *themselves* to compile and export data requested by third-party vendor applications—which both Defendants allow. This discovery is necessary to address a key factual dispute about whether manual reporting is a feasible alternative to unauthorized third-party access. *Compare, e.g.*, 06/27/2017 Hrg. Tr. (Fitkin) (*Authenticom* Dkt. 165) at 2-A-9-10 (manual reporting "doesn't

The Dealers categorically refuse to respond to *any* of these plainly relevant RFPs and interrogatories. *See* Ex. 35, 8/3/2018 Ltr. From M. Provance to R. Wallner. They insist, first, that "Judge St. Eve's motion to dismiss ruling in *Authenticom* shows that the documents sought by these Requests are irrelevant as a matter of law." Ex. 20, 7/28/18 Ltr. From R. Wallner to M. Provance, at 1. Second, "[i]nsofar as CDK contends that its challenged conduct can be explained by any purported security-related concerns," the Dealers contend that "CDK would have to demonstrate, based on its own, internal documents, that those concerns drove its decisions." Ex. 26 , at 1 n.1.

Both of these objections fail. The Dealers overstate Judge St. Eve's *motion to dismiss* ruling, which of course assumes the truth of well-pled facts. At the same time, Judge St. Eve made clear that "[d]iscovery may reveal otherwise," 2018 WL 2193236, at *16—and now the Dealers hope to prevent CDK from obtaining that discovery. As counsel for CDK explained to the Dealers, the discovery CDK seeks "is relevant, among other things, to whether CDK's third-party access policies . . . serve its legitimate interests in protecting and maintaining the security and integrity of its DMS," and "to the Dealership Class Plaintiffs' allegations that security-related concerns are a 'pretext' for CDK's third-party access policies . . . ." Ex. 10, 7/16/2018 Ltr. From M. Provance to R. Wallner. The discovery also responds directly to factual assertions about the adverse effects (or lack thereof) of "hostile" third-party access to Defendants' DMSs that the Plaintiffs have continuously made, including the often-cited testimony offered in support of Authenticom during the *Authenticom* preliminary injunction hearing. *See, e.g.*, Cottrell Reply Decl. (*Authenticom* Dkt. 143) ¶¶ 13, 34, 36; Fitkin Decl. (*Authenticom* Dkt. 53) ¶¶ 6, 8, 10-11.

---

work") *with* Wood Decl. (*Authenticom* Dkt. 99) (manual reporting is "practical and useful, and the modest amount of manual effort that it requires from me is more than justified"). Documents responsive to RFPs 11, 22, and 24 all will show whether the user login credentials that Dealers provide to third-party extractors give them access to sensitive consumer data (including NPI and PII), proprietary data that belongs to Defendants or third parties, or administrator-level (including "update user profile" or "UUP") access privileges—which dealers admit should never be granted to third parties from a data security standpoint because it gives them the "keys to the kingdom." 06/27/2017 Hrg. Tr. (Fitkin) (*Authenticom* Dkt. 165) at 2-A-8-9.

In short, CDK is citing risks to data security and system functionality among the pro-competitive benefits of barring unauthorized data extraction. The Dealers seek to rebut this argument by trivializing these risks. *See, e.g.*, Complt. ¶¶154-55. Whether and to what extent third-party extraction affected data security and system operations is therefore central to the merits of the rule-of-reason analysis at the heart of this litigation, and the material CDK seeks therefore is plainly relevant. *See* Fed. R. Civ. P. 26(b)(1).

The Dealers' second objection is just as meritless. As noted above, the Dealers complain loudly in their Complaint (as do other plaintiffs) that CDK is using cybersecurity as a "pretext" to exclude third-party extractors and raise prices for DMS integration. Compl. ¶¶153, 155, 163 n.140. Nonetheless, they refuse to produce any of this material on the theory that CDK must "demonstrate, based" solely "on its own, internal documents, that data-security concerns drove its decisions." Ex. 26, at 1 n.1. Put differently, Dealers claim that CDK must produce evidence exclusively from its own files to prove them wrong. The Dealers, in short, presume that actual procompetitive effects are immaterial under the rule of reason—that the only relevant question is what defendants *subjectively* predicted these benefits would be, regardless of any *actual* impact on consumers.

Of course, CDK will rely on documents concerning its decisionmaking process leading up to the conduct at issue, but that is not the only point. Under rule-of-reason analysis, "the defendants' state of mind is less important . . . than the objective consequences of their behavior." Areeda & Hovencamp, Antitrust Law: An Analysis of Antitrust Principles & Their Application, ¶1504a (3d & 4th Eds. 2018 Cum. Supp. 2010-2017). At best, a defendant's "knowledge of its own situation" may be relevant in identifying "the possible justifications for its conduct," but "belief and state of mind should be left behind when we have more reliable indications of whether the alleged [competitive] benefits are present." *Id.* (emphasis added); *see also id.* ¶1506. That's because the rule of reason

11

exists to "distinguish[] between restraints with *anticompetitive effect* that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Leegin Creative Leather Prods., Inc. v. PVKS, Inc.*, 551 U.S. 877, 886-87 (2007) (emphasis added); *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) ("Under a Rule of Reason analysis, the plaintiff carries the burden of showing that an agreement or contract has an *anticompetitive effect* on a given market within a given geographic area.") (emphasis added). So even if the Dealers could claim that subjective intent bears some relevance to the rule-of-reason inquiry, they could not possibly contend that actual market effects are *irrelevant*, as they must to withhold the requested discovery material.

In sum, while the Dealers certainly might argue that CDK has overblown the data-security and system-integrity risks of unauthorized third-party integration, the Federal Rules do not permit them to withhold evidence that would demonstrate the falsity of that claim.

## 2. Alleged Markets And Competition

**RFP 39**: "All documents and communications related to the existence or bounds of the alleged 'DMS Market' and the 'Dealer Data Integration Market' as those terms are used by the Dealer Class Plaintiffs in the Complaints."

**RFP 43**: "All documents and communications related to competition with or among any participants in the alleged 'DMS Market' or 'Data Integration Market,' as those terms are used by the Dealer Class Plaintiffs in the Complaints, including all documents related to switching between DMS providers."

These two requests are directed at the core of this antitrust case. The Dealers complain that the requests are "overbroad" and refuse to respond to them at all. *See* Ex. 53, at 45-46, 48-49. But CDK provided specific clarification on their meaning. Ex. 10, at 5.[7] More importantly, it is the

---

[7] Specifically, CDK explained that this RFP seeks the following discrete categories of documents related to: (i) actual or potential switching between DMS providers, or switching costs; (ii) Dealers' awareness of the fees charged by CDK and Reynolds through their respective third-party access programs; (iii) Dealers' awareness of the provisions in CDK and Reynolds's DMS contracts that limit or restrict the ability of Dealers to facilitate automated access to their licensed DMS platforms by unauthorized third parties; (iv) other DMS

Dealers who allege these markets, and they must establish their existence and contours, as well as the state of competition within them. Nor do these requests ask the Dealers "to create" new documents or "premature[ly] disclos[e]" expert opinion, as the Dealers complain. Ex. 53, at 45-46, 48. CDK seeks existing material directly relevant to the markets alleged in the Complaint.

**RFP 40**: "All documents and communications related to the use of standalone Applications as an alternative to traditional DMS, including but not limited to, the ability [of] Dealers to enter data directly into an Application in the first instance, bypassing the DMS completely."

**RFP 42**: "All documents and communications related to Your decision(s) to acquire or not to acquire any DMS or Application, including Your consideration of any alternative items or products considered."

**RFP 44**: "Agreements, quotes, terms sheets, analyses, and communications (both internal and external) related to any actual or contemplated decision by You to change DMS providers, including but not limited to any documents and communications related to the costs associated with such a change and any reasons for changing or not changing DMS providers."

These three requests target the Dealer's choices as consumers, including their ability to use applications as a substitute for DMS functions and factors considered in choosing and switching between DMS providers, all central issues in the Complaint. The Dealers refuse to produce anything in response to these RFPs other than "a request for a quote or request for proposal from a competing DMS provider issued by a named dealership." Ex. 20, 7/28/2018 Ltr. from R. Wallner to M. Provance, at 5. That comes nowhere close to covering these issues. Nor have the Dealers agreed, as CDK proposed, to confirm that "all documents responsive to [these requests] will be produced" in response to other requests. Ex. 10, at 5.

**RFP 46**: "Market studies, survey data, or any other source of the market share information on all Applications and DMSs used by Dealers."

---

providers offering platforms that are "open" or otherwise permissive of access by "independent" Data Extractors; (v) comparisons between providers of data integration or extraction services on the basis of price, service offerings, or any other criteria; (vi) comparative marketing materials prepared by DMS providers; and (vii) comparison of pricing or price changes for DMS services." Ex. 10.

This request seeks information on DMS market share, which is critical to the Dealers' antitrust allegations, *see, e.g.*, Complaint at ¶¶2, 7, 64, 78-89, 154, yet the Dealers insist they are willing to produce only "documents wherein Dealership Plaintiffs refer to CDK and/or Reynolds' market share in the DMS market," and even then only "to the extent the agreed-upon custodians and search terms" otherwise "yield" such documents. Ex. 20, at 2. This omits information on *other* DMS providers' market share (the category of responsive material that CDK is *least* likely to possess in its own files), as well as any material on the application market, all of which is relevant to the Dealers' claims.

**RFP 47**: "All documents related to any analyses comparing Applications (including their functionality, service quality, features, technology, capabilities, pricing, and/or price changes) offered by CDK, Reynolds or other Vendors or otherwise assessing Application competition."

This request seeks information pertinent to a number of Dealer claims, including their allegation that defendants coerce Dealers into using defendants' applications over preferred third-party products. *See, e.g.*, Complaint at ¶125. The Dealers complain that this request is overbroad and includes even mere "promotional materials." Ex. 20, at 2-3. But CDK had informed the Dealers that "this Request specifically seeks documents related to 'analyses' of the foregoing topics" and "does not necessarily encompass every advertisement or other piece of information concerning an application." Ex. 10, at 3. Nevertheless, the Dealers still refuse to produce these obviously relevant documents.

### 3. DMS Contracts and Relevant Provisions

**RFP 33**: "All documents and communications related to drafting, negotiation, interpretation, or enforcement of contracts or agreements for the provision of DMS services."

**RFP 35**: "All documents and communications related to the terms or conditions in Your DMS contracts and agreements that require 'dealers to cede control of their own data' as alleged in the Complaints."

**RFP 36**: "All documents and communications related to any terms and conditions of any acquisition by You of any DMS, including without limitation any rebates, discounts, promotional monies, or other financial benefits received in connection with the acquisition."

**RFP 48**: "All documents and communications related to the length of the contractual term in any agreement between You and CDK or Reynolds."

These four requests home in on specific elements of the Dealers' contractual relationships with their DMS providers that are put at issue by the Dealers' allegations that they are "locked-in" to their agreements (*e.g.*, ¶¶ 15, 122), and the Dealers have served similar requests on CDK. *See* Ex. 51, Dealership Class Pls.' First RFPs, RFPs 17, 18, and 22. The Dealers' answer—that they furnished some responsive documents pursuant to other requests, and that they cannot understand what "relevant" documents these targeted requests seek, *see* July 28, 2018 Ltr. at 4—is neither sufficient nor credible.[8]

### 4. Evidence of Liability or Damages

**RFP 84**: "All documents and communications related to Your suspicion, belief, or claims that any Defendant was engaged in any anticompetitive activity or that competition in any market has been harmed."

This request appropriately seeks documents supporting the Dealers' allegation that Defendants have violated the antitrust laws. Nothing could be more central to the litigation. Yet the Dealers have agreed to produce only those responsive documents "wherein Dealership Plaintiffs refer to Defendants' conduct as 'anticompetitive' or 'harmful to competition' in the DMS market or the DIS market . . . ." Ex. 20, at 3. In other words, Dealers are only willing to run those two incredibly specific terms—neither of which Dealers can credibly claim is used in everyday email communications among individuals who don't practice antitrust law for a living—through their custodians' documents. On its face, such a search would be drastically under-inclusive.

---

[8] The Dealers "refuse to produce anything beyond what we are already producing for Request Nos. 2-4" (requests for copies of the Dealers' DMS contracts and related pricing information), which only confirms that they are withholding additional responsive documents. *See* Ex. 20 at 4.

**RFP 85**: "All documents and communications that You contend to be evidence of an illegal agreement between CDK and Reynolds."

**RFP 96**: "All documents that reflect coordinated conduct by CDK and Reynolds with respect to third-party DMS access programs, policies, business practices, strategy, or pricing, or that otherwise relate to Your claims that CDK has engaged in any illegal or anticompetitive activity or that competition in any market has been harmed."

These two requests target the factual basis for the Dealers' claim that defendants have engaged in an anticompetitive conspiracy or that CDK has acted anticompetitively. The Dealers refuse to produce these obviously-relevant documents, *see* Ex. 20, at 3, which, under the Federal Rules' disclosure requirements, the Dealers should have produced even without a request from CDK. *See* Fed. R. Civ. P. 26(a)(1)(A)(ii) (requiring production of "of all documents . . . that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses").

**RFP 91**: "All documents and communications related to Your alleged injuries or damages."

Weeks ago, CDK asked the Dealers to confirm that they were not withholding documents responsive to this request. Ex. 10, at 6. The Dealers offer no such confirmation. Ex. 20, at 5. CDK is entitled to this material.

### 5. Improperly Narrowed Responses

**RFP 5**: "All documents and communications related to 'exclusive dealing provisions' in any agreement or contract between You or any Vendor or Contracted Data Extractor and Reynolds or CDK, as alleged in the Complaints."

This RFP seeks documents and communications in the Dealers' files that discuss certain provisions in Defendants' vendor and dealer contracts that the *Dealers* collectively refer to as "excusive dealing provisions." *E.g.*, Compl. ¶ 13. Here again the Dealers have agreed only to produce responsive documents containing the literal term "exclusive dealing provisions." Ex. 20, at 2. Yet the Dealers allege exclusive dealing in their Complaint (at ¶¶110-125), and the material this request seeks goes directly to those core allegations. It is absurd for the Dealers to limit their request

16

to documents containing this phrase verbatim, which is certain to omit substantial responsive material.

**RFP 51**: "All documents and communications that relate to automotive industry standards or guidance regarding DMS access, data distribution, data scraping, data security, or data privacy, including as provided by the National Automobile Dealers Association or the American International Automobile Dealers Association."

This request targets industry standards on the conduct at the core of this case. Claiming that this request is "overbroad," the Dealers insist they will only produce responsive material "[t]o the extent that agreed-upon custodians and search terms yield non-privileged documents wherein Dealership Plaintiffs have discussed NADA or AIADA guidelines on 'data security' . . . ." Ex. 53 at 54. But what they have offered is far too narrow, excluding all subject matter other than data security and all industry groups other than the two they mention. And their overbreadth objection is nonsensical, for as CDK has explained, "[t]he Request is specific to industry standards or guidance regarding DMS access, data distribution, data scraping, data security, or data privacy" Ex. 35, 8/3/2018 Ltr. From M. Provance to R. Wallner, at 2.

### 6. Publicly Available Documents

Unlike any other party to the MDL, the Dealers also refuse to produce documents that are publicly available because, the Dealers insist, CDK can "access" this material "on its own." Ex. 20, at 2. The Dealers state that they will produce "public" documents only for a handful of document requests, and even as to those the Dealers hedge that they may decide merely to "direct CDK to their locations." *Id.* This is an insufficient response even as to these few requests, and the implication is that the Dealers will not produce any publicly available documents responsive to CDK's other RFPs. This is a legally invalid objection, for "[t]he mere fact that information may be available to the public does not relieve a party from producing the sought information." *Vukadinovich v. Griffith*

*Pub. Sch.*, 2008 WL 5141388, at *6 (N.D. Ind. Dec. 5, 2008) (citing *Meyer v. S. Pacific Lines,* 199

F.R.D. 610, 615 (N.D. Ill. 2001)).

**B.      The Dealers Should Run The Search Terms That CDK Proposed**

In full compliance with § B.6 of the Case Management Order, CDK sent 135 proposed

electronic search terms to the Dealers on May 25, 2018. Plaintiffs proposed 164 search terms for

CDK's ESI on the same day and pushed to expedite discussions about them, anxious to "reach

agreement (or impasse) on these items as soon as possible." Ex. 4. Once the parties had served

responses to each other's May 25 document requests and engaged in multiple meet-and-confers

(which helped elucidate the necessity and relevance of the search terms), CDK responded to

Plaintiffs' search term proposal on July 19, accepting many of Plaintiffs' proposed terms as written

and proposing modifications where necessary to curb the return of voluminous, non-relevant results.

Ex. 14, 07/19/2018 Email from J. Michaels. CDK's response (and each of its subsequent counter-

offers for search terms) are annotated with hit counts for each proposed search term that CDK

contends is overbroad, critical information that has allowed Plaintiffs to evaluate CDK's objections.

All other Plaintiffs in this MDL (Cox, AutoLoop, Authenticom, and MVSC) have provided the same

information when discussing search terms to be applied to their ESI.

But not the Dealers. Sixty-one days after making its proposal, on July 25, CDK reminded the

Dealers that "the Dealership Class Plaintiffs" still had "not substantively responded to CDK's

proposed search terms," and that the "August 6 motions deadline" was drawing near. Ex. 14, at 1

n.1. Another seven days passed—for a total of 68 days since CDK proposed the terms—before the

Dealers responded in an August 1 email. Ex. 26. Only then, with a mere three work days remaining

for the parties to negotiate before the motions deadline, did CDK learn that the Dealers were

objecting in whole or in part to ***122 of CDK's 135 proposed search terms*** (75 terms are rejected out of

18

hand, and significant limitations are proposed for the other 47). Ex. 26. To make matters worse, the

Dealers' objections are boilerplate. They merely repeat that search terms are "irrelevant"[9] or "overly

broad and burdensome," but provide no data—including, most importantly, hit counts—to support

the Dealers' objections. *Id.* That is because, as CDK quickly confirmed, the Dealers have yet collect

ESI from any of their custodians, much less test CDK's proposed search terms. Ex. 36.

      This conduct is unacceptable. Moreover, the search terms, as drafted, are reasonably crafted

to seek relevant and responsive documents. *See, e.g.*, *In re eBay Seller Antitrust Litig.*, 2009 WL

10694848, at *2 (N.D. Cal. July 13, 2009) (rejecting party's refusal to run search terms that "address

the issues at play in this action"). By way of example, the following are search terms proposed by

CDK rejected (with boilerplate objections) by the Dealers:

| No. | Search Term | Relevance |
|---|---|---|
| 2 | (CDK OR Reynolds OR DMS OR or system) AND (script* OR program OR executable OR bypass OR avoid OR (work w/5 around) OR (break w/5 (through OR down)) OR evade) | Search results will show efforts by Dealers to assist third-party data extractors from bypassing DMS access restrictions. |
| 20 | "secure web form" | Search results will show Authenticom's alleged use of a "secure web form" to solicit and collect DMS login credentials from Dealers. *See* Cottrell Reply Decl. (*Authenticom* Dkt. 143 ¶ 20). |
| 24 | ((CDK OR Reynolds) w/20 DMS) AND data AND available AND (poll* OR pulled* OR scrape* OR extract* OR integrat*) AND (field* OR element*) | Search results will show what data fields are extracted from Defendants' DMS by vendors and third-party data extractors. |
| 32 | ((security OR Data) AND (standard* OR rule* OR guid* OR memo* OR report)) AND (NADA OR AIADA OR "National Automobile Dealers Association" OR "American International Automobile Dealers Association") | Search results will show industry guidance provided to dealers on data security and DMS access policies. |

---

[9] The Dealers also object that many of the search terms seek material discussed in Part I.A, above. *See* Ex. 26 at 1 n.1 ("[I]nsofar as CDK contends that its challenged conduct can be explained by security-related concerns, CDK should have to demonstrate, based on its own, internal documents, that those concerns drove its decisions."). This objection is meritless for the reasons discussed in that section.

| No. | Search Term | Relevance |
|-----|-------------|-----------|
| 44 | (Authoriz* OR access OR stor* OR Secur*) AND (DMS OR "Dealer Management System" OR Password OR login OR credential* OR username OR pwd OR (user w/5 ID) OR data) AND (Polic* OR practice) | Search results will show the Dealers' policies and practices for sharing DMS login credentials with third parties. |
| 61 | (data OR system OR DMS) w/20 (breach OR attack OR steal OR stolen OR hack* OR corrupt* OR cybersec* OR (cyber w/5 secur*)) | Search results will show DMS data security issues, including data breaches. |
| 66 | ((declin* OR refus* OR ((will OR would) /3 not) OR won't) w/10 (authoriz* OR grant OR give OR allow OR share)) AND (login OR credential OR password OR pwd OR access) AND (Cox OR DealerTrack OR DMS OR Reynolds OR R&R OR RR OR CDK OR integrat* OR Authenticom OR DealerVault OR vendor*) | Search results will show whether the Dealers purport to "authorize" third-party extractors to access Defendants' DMS using Dealer login credentials. |
| 104 | "SOC" OR SSAE OR cybersec* OR hack* OR (breach* AND (data OR system)) | Search results will show the Dealers' cyber security assessments. |
| 126 | manual w/10 (report* OR tool* OR extract*) | Search results will show the use and availability of manual reporting tools. |
| 130 | operational report* OR ERPG OR "Enhanced Report Generator" OR "dynamic report*" | See above. |

The Dealers should be required to run these and the other terms that they object to as "irrelevant as drafted." *See* Ex. 26. Moreover, for the 47 additional search terms that the Dealers seek to limit, they have provided zero basis to substantiate their burden and overbreadth objections and, therefore, those objections are waived.[10] Accordingly, both sets of refused terms should be run as-is, without further modifications.

---

[10] Earlier this afternoon, counsel for the Dealers informed CDK that "hit results" from testing CDK's proposed search terms on *one* or possibly two of the 25 named Dealer Plaintiffs would be forthcoming tomorrow, after the August 6 motions deadline. The Dealers then proposed to "postpone" this aspect of CDK's motion until Wednesday, August 8 "in order for us to negotiate a global solution regarding dealership custodians' search terms." Ex. 40. While CDK appreciates that the Dealers are now willing to begin substantively engaging on search terms, they are far too late in

## II.  COX AND AUTOLOOP SHOULD BE COMPELLED TO COMPLY WITH CDK'S OUTSTANDING DISCOVERY REQUESTS REGARDING THEIR USE AND RE-SYNDICATION TO THIRD PARTIES OF DMS DATA

Cox and AutoLoop sued CDK in their capacity as providers of software applications to dealers, alleging that CDK and Reynolds's conduct has harmed application vendors by restricting their access to hostile data integration. Thus, for Cox and AutoLoop, CDK targeted its discovery at specific documents that would go to the core issues raised by these claims and defenses thereto, including the effects of hostile integration on DMS security and data integrity.

Cox and AutoLoop initially objected to almost all of CDK's RFPs for every reason under the sun, including relevance, ambiguity, and burden, generally without stating why or whether they actually intended to produce or withhold responsive documents.[11] Still, the parties met-and-conferred, and Cox and AutoLoop committed to follow-up in writing to clarify what information they were willing to produce. Cox and AutoLoop did so on July 26, informing CDK that they were willing to produce documents responsive to approximately half of the RFPs so long as those documents fell into certain subject-matter categories that they deemed "relevant." Ex. 16, 7/26/18 D. Dorris Ltr. to A. Marovitz & M. Provance. This approach, which hinged entirely on Cox and AutoLoop's subjective approach to what they deemed "relevant," further muddied the waters.

Notwithstanding Cox and AutoLoop's replacement of CDK's as-written RFPs with categories of their own choosing, CDK continued to seek a compromise with Cox and AutoLoop by proposing alternative formulations of "relevance" categories that would give CDK assurance that it would obtain the information it needed. *See* Ex. 21, 7/30/18 A. Marovitz Ltr. to M. Nemelka. Indeed,

---

starting that process to avoid motions practice, nor is realistically possible that the parties might resolve these issues by Wednesday on the basis of data from one or two Dealers. Of course, CDK is willing to continue the meet-and-confer process with the Dealers on this issue, and if the parties are able to resolve their differences, they will notify the Court promptly.

[11] Instead, Cox and AutoLoop repeatedly responded that they were "willing to meet and confer" about each request, which gave CDK no real indication of their position. *See* Ex. 48, 49.

in the end, the parties were able to reach agreement on most discovery scope issues, but one critical request remains unresolved:[12] Cox and AutoLoop's use of data obtained from Defendants' DMSs, including their re-syndication of any such data to third parties. Despite the fact that this information is highly relevant to the claims and defenses of the case—or perhaps *because* it is so highly relevant—Cox and AutoLoop refuse to produce it. Accordingly, CDK requests that this Court compel Cox and AutoLoop to produce documents, in full and without limitation, responsive to Cox RFP Nos. 45, 69-71, 85-86 & AutoLoop RFP Nos. 27, 55-56.

CDK is entitled to discovery into Cox and AutoLoop's use of data obtained from Defendants' DMSs, including their re-syndication of any such data to third-parties, because such information is directly relevant to CDK's defenses, and in particular, why CDK "secured" its DMS in the first place. Indeed, CDK is entitled to probe whether and/or the extent to which Cox and AutoLoop shared data they obtained from DMSs with third-parties. Indeed, Cox and AutoLoop's steadfast refusal to disclose this information only heightens our concern that they have shared the data. Such conduct clearly raises security concerns with respect to the data maintained on CDK's DMSs, not to mention that it will show whether Cox and/or AutoLoop observed proper data security protocols, and/or were in compliance with provisions in their contracts with CDK regarding re-syndication of data obtained from CDK's DMS. And while Cox and AutoLoop may wish to avoid disclosing this conduct, if it indeed occurred, any such refusal would plainly compromise CDK's ability to demonstrate the need for the very security measures at issue in this litigation. Moreover, neither Cox nor AutoLoop can refuse discovery into these issues with a blanket statement that

---

[12] As noted above, there are several smaller issues that CDK continues to attempt to resolve with Cox and AutoLoop. CDK has reserved its right to file a later, targeted motion to compel, in the unfortunate event that these efforts are not successful.

"competitively sensitive information" might be included in the resulting discovery (*see* Ex. 30 at 3), especially in light of the Protective Order entered in the case.[13]

In sum, Rule 26 does not permit a plaintiff like Cox or AutoLoop unilaterally to determine that information outside its own theory of the case is irrelevant and then refuse discovery on that basis. They should be compelled to produce all documents, in full and without limitation, responsive to Cox RFP Nos. 45, 69-71, 85-86 & AutoLoop RFP Nos. 27, 55-56.

## III. AUTHENTICOM SHOULD BE REQUIRED TO RESPOND IN FULL TO TEN INTERROGATORIES, AND ITS IMPROPER RESPONSES TO TWO REQUESTS FOR ADMISSION SHOULD BE DEEMED ADMISSIONS

Authenticom should be compelled to provide complete responses to ten interrogatories for which it has so far provided CDK only vague and non-responsive answers. Its responses to two contested requests for admission ("RFAs") should also be deemed complete admissions.

Under Federal Rule of Civil Procedure 33, a party may serve interrogatories related to "any matter that may be inquired into under Rule 26(b)," and the responding party must answer each interrogatory "separately and fully in writing." Fed. R. Civ. P. 33(a)(2), (b)(3). Answers that are vague and non-responsive "should be treated as a failure to answer" under Rule 37(a)(3). *See Jones v. Syntex Labs., Inc.*, 2001 WL 1338987, at *2 (N.D. Ill. Oct. 30, 2001).

Requests for admission are governed by Rule 36, which provides that "[i]f a matter is not admitted, the answer must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it." Fed. R. Civ. P. 36(a)(4). Responding parties may not avoid RFAs by

---

[13] More generally, like the Dealers, Cox and AutoLoop have also suggested that records in their possession cannot be relevant because CDK must base its showing of procompetitive justifications for its conduct on its *own* internal documents and communications. As discussed above, that position is incorrect. *See* Areeda & Hovenkamp ¶1504a; *Leegin Creative Leather Prods., Inc. v. PVKS, Inc.*, 551 U.S. 877, 886-87 (2007); *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). Cox and AutoLoop cannot possibly contend that there is no possibility that evidence in their possession going to the actual effects of their behavior on CDK, and on the DMS market as a whole, will be relevant to these actions. *See Valley Bank*, 2018 WL 3105987, at *2.

admitting or denying different questions from those posed in the Requests; "[a]dmitting what was not requested in an effort to dodge the request creates confusion and frustration during the discovery process, and leads to needless Court intervention." *Old Reliable Wholesale, Inc. v. Cornell Corp.*, 2008 WL 2323777, at *2 (N.D. Ohio June 4, 2008). The requesting party "may move to determine the sufficiency of an answer or objection," and the court may order "that the matter is admitted or that an amended answer be served." Fed. R. Civ. P. 36(a)(6).

### A.  Authenticom Has Failed To Adequately Respond To Ten Interrogatories.

CDK served its First Set of Interrogatories on Authenticom on January 3, 2018, and its Second Set of Interrogatories on March 23, 2018. *See* Ex. 42; Ex. 44. Authenticom served its original objections and responses to those interrogatories, *see* Ex. 42; Ex. 44—and then served amended objections and responses on June 22, 2018, after CDK pointed out that Authenticom's original responses were inadequate. *See* Ex. 1; Ex. 45; Ex. 42. But even Authenticom's amended responses to Interrogatories Nos. 4, 5, 10, 11, 13, 21, and 25 still fall well short of its obligations under the Federal Rules, and Authenticom should be compelled to instead provide complete, responsive answers to these questions. The following chart reflects Authenticom's current responses to those requests, with Authenticom's amended language—a throwaway sentence at the end of each answer that fails to cure its non-responsive nature[14]—underlined.

| CDK's Interrogatory | Authenticom's Original and Amended Response |
|---|---|
| Interrogatory No. 4:<br>Please describe the steps taken by Authenticom from January 1, 2013 to the present to prevent either Reynolds or CDK from (i) detecting Authenticom's access to data on Reynolds or CDK DMS platforms, or (ii) blocking Authenticom's access. | |

---

[14] Authenticom's objections are largely omitted from this chart, except for CDK Interrogatory No. 25, as Authenticom has refused to provide any other response to that interrogatory.

PUBLIC REDACTED VERSION

| | |
|---|---|
| | |
| **Interrogatory No. 5:**<br>Please identify the means (*e.g.*, screen-scraping, data "push," API, or other) by which Authenticom accesses data on non-Reynolds, non-CDK DMS platforms. | |
| **Interrogatory No. 10:**<br>Describe all steps that You take to ensure that Your access to data maintained on a CDK or Reynolds DMS does not exceed a Dealer's express authorization. | |
| **Interrogatory No. 11:**<br>Describe all steps that You take to ensure that You do not access data maintained on a CDK or Reynolds DMS that are proprietary to the DMS provider, OEMs, or to any other third parties. | |
| **Interrogatory No. 13:**<br>Describe all steps that You take to ensure that third-parties who access or receive DMS data from You do so only as authorized by Dealers. | |



| | |
|---|---|
| Interrogatory No. 21: Identify the terms of access that You are seeking with respect to CDK DMSs, and state whether those same terms should apply to other third-party "data integrators" or applications providers who may seek access (including, specifically, each "data integration service provider" identified in Your response to CDK Interrogatory No. 3). | |
| Interrogatory No. 25: If any of Your responses to CDK's First Requests for Admission ("RFAs") 1-19 is anything other than a complete and unqualified admission: identify the RFA; identify the factual basis for Your response; identify all documents and information—including, by Bates number, each document produced by any party or non-party in this litigation—supporting Your response; and identify all persons who have knowledge of the facts supporting Your response. | |

Authenticom's "responses" to these Interrogatories, even as amended, are inadequate. Each is written to evade the question being asked and provide selective information that suits Authenticom's own preferences instead of the information that is actually called for.

In response to Interrogatory No. 4, for example, Authenticom has failed to address the steps that it takes to evade detection of its access to data on the Defendants' DMS platforms—instead ██████████████████████████████████████. Moreover, Authenticom's statement that ██████████████ is vague and incomplete. Authenticom should

26

PUBLIC REDACTED VERSION

be ordered to identify and fully explain each of the steps it takes to evade detection and prevent blocking of its access to Defendants' DMSs.

Similarly, Authenticom has failed to provide a complete answer to Interrogatory No. 5. That interrogatory is not limited to "dealer data," but instead encompasses *all data* on "non-Reynolds, non-CDK DMS platforms." Authenticom has failed to confirm—despite CDK's explicit request that it do so, *see* Ex. 1 at 3—that ████████████████████████████████████████████

████████████████████████████████████████████████████████████████[15]

In response to Interrogatory No. 10, Authenticom states that ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ This response is vague, and fails to actually identify, much less describe, "all the steps" Authenticom takes to ensure that its access to data on a CDK or Reynolds DMS does not exceed the dealer's express authorization.

The same is true of Authenticom's response to Interrogatory No. 11, in which it ████████████

██████████████████████ Interrogatory No. 11 concerns data on CDK or Reynolds DMSs that are "proprietary to the DMS provider, OEMs, or to any other third parties"; moreover, Authenticom's inadequate response to No. 10 ████████████████████████ simply cannot address No. 11's question regarding access to *non-dealer* proprietary data. Authenticom's response to Interrogatory No. 13 similarly falls short, as it fails to address the question actually posed regarding the steps that Authenticom (as opposed to the dealer) takes to ensure that third-party access does not exceed the

---

[15] As the Seventh Circuit has explained, Authenticom—as a third-party integrator—"collects data from dealerships, organizes the data for various purposes, and sells this service to third-party app vendors, who use Authenticom's integration services to ensure that their apps are compatible with a dealer's management system." *Authenticom*, 874 F.3d at 1021. However, "Authenticom does not obtain its data directly from raw dealership records," but instead "'scrapes' (or collects) data from the management system that the dealer uses." *Id.* The parties dispute "the extent to which the data scraped by data integrators is limited to dealer information versus additional content added by Reynolds" or CDK. *Id.* at 1025.

scope authorized by the dealer. The one-sentence amendment—which mirrors language in the response to No. 10—does not remedy this problem. Its vagueness aside, █████████████████ ████████████████████████████████████████████████████████████ have nothing to do with this Interrogatory, which is about what Authenticom does to protect the data from unauthorized third parties once it is imported.

Authenticom's response to Interrogatory No. 21 is yet another dodge. Authenticom ████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████. Authenticom's amended answer does not remedy this problem; █████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████ does not clarify what *terms of access* Authenticom is seeking, and further fails to clarify what terms should apply to it and other third-party "data integrators."



Authenticom has refused to respond at all to Interrogatory No. 25, instead objecting that the interrogatory is compound and causes CDK to exceed the number of interrogatories permitted under the Federal Rules. But Authenticom is mistaken. Courts have held that interrogatory subparts "'directed at eliciting details concerning a common theme'" "should be counted together as one interrogatory." *See Jackson v. Alton & S. Ry. Co.*, 2008 WL 11383777, at *1 (S.D. Ill. July 14, 2008) (quoting Wright & Miller, *Federal Practice and Procedure*, § 2168.1).[16] Under that principle, CDK's interrogatory—which aimed at eliciting details about Authenticom's inability to answer

---

[16] The district court in *Jackson* found that the challenged interrogatory's subparts were all aimed at a common theme and so should be counted as a single interrogatory. *See* 2008 WL 11383777, at *2. The court went on to note that "[i]n any event, in view of the breadth of the allegations of the complaint, the court would have granted defendant leave to propound more than 25 interrogatories had defendant so moved." *Id.*

CDK's RFAs—counts as one interrogatory, irrespective of whether it has conceptual subparts. Authenticom should thus be compelled to provide a complete response to Interrogatory No. 25.

Authenticom also makes a burden objection to Interrogatory Nos. 9, 10, 11, 12, 13, and 14 to the extent they are not limited to Authenticom's "current practices"—but that objection is not well taken. Authenticom has offered no substantiation for its assertion that answering these interrogatories as written is unduly burdensome. Authenticom therefore cannot be permitted to "construe[]" those requests "as concerning [only] Authenticom's current practices." Ex. 47. To the extent Authenticom's "practices" have changed during the time period relevant to his litigation, Authenticom should be ordered to amend its responses to explain how.

### B. Authenticom's Responses To Two RFAs Should Be Deemed Admissions

Authenticom's responses to two of CDK's requests for admission ("RFAs") are similarly insufficient, and should be construed as admissions. These RFAs and Authenticom's original and amended responses—with objections omitted—are as follows:

**RFA No. 3:** Admit that You have accessed data maintained on CDK DMSs without a license from CDK.

**Authenticom's Original Response:** Authenticom will construe this Request as concerning Authenticom's current practices. . . . Authenticom will interpret "license from CDK" to include authority granted by a dealer that possesses a license from CDK and authorizes Authenticom to access the dealer's data as agent for the dealer. Subject to and without waiving the foregoing objections, denied.

**Authenticom's Amended Response:** Authenticom will construe this Request as concerning Authenticom's current practices. . . . Authenticom accesses dealer data with the express authorization of dealers, who are licensed to access their data on the CDK DMS and entitled, by contract and otherwise, to designate Authenticom to access the dealers' data.

**RFA No. 4:** Admit that You developed scripts to access data maintained on CDK DMSs by responding "YES" to the log-in prompt shown below.

**Authenticom's Original Response:** Authenticom will interpret "You developed scripts to access data maintained on CDK DMSs" to mean "Authenticom used scripts to obtain access to data on CDK DMSs without authorization granted by a dealer that possesses a license from CDK and authorizes Authenticom to access the dealer's data." Subject to and without waiving the foregoing objections, denied.

**Authenticom's Amended Response:** Authenticom accesses dealer data with the express authorization of dealers, who are licensed to access the CDK DMS and entitled, by contract and otherwise, to designate Authenticom to access the dealers' data as the dealers' agent. Subject to and without waiving the foregoing objections, Authenticom admits that dealers authorize Authenticom to access dealer data for purposes of providing data integration services, including by using login credentials in connection with the log-in prompt above. Authenticom otherwise denies this Request.

In another variation on its consistent theme, Authenticom's original "responses" to RFA Nos. 3 and 4 effectively changed the question being asked, by adding the phrase "without authorization granted by a dealer." CDK informed Authenticom that this was unacceptable and requested that Authenticom answer the RFAs as they were written, without limiting the response to instances where Authenticom acted or acts without a dealer's authorization. *See* Ex. 1 at 5. Yet Authenticom's amended "responses" to RFA Nos. 3 and 4 once again refused to answer the actual question posed, by "admitting" to facts distinct from those specifically referenced in these Requests. As a result, the RFAs should be deemed admitted—as drafted—as and against Authenticom.

PUBLIC REDACTED VERSION

## IV.   MVSC SHOULD BE COMPELLED TO PRODUCE RESPONSIVE DOCUMENTS FROM 2013, LIKE ALL OTHER PARTIES IN THE MDL

Plaintiff MVSC is a provider of electronic vehicle registration and titling ("EVR") services. It alleges that CDK, Reynolds, and Computer Vehicle Registration ("CVR") (a joint venture of CDK and Reynolds that is also in the EVR business)[17] unlawfully conspired to restrain trade in ways that harmed MVSC and benefited CVR. MVSC also alleges that CDK engaged in unilateral anticompetitive conduct that harmed MVSC.

Defendants served a comprehensive set of RFPs on MVSC aimed at discovering evidence related to its claims—including, among other things, documents relating to liability, causation and alleged damages. The meet-and-confer process largely resolved the issues relating to these RFPs, but throughout the process, MVSC continued to insist on a cut-off date for document discovery of January 1, 2014. *See* Exs. 31, 34 MVSC is the only party in any case in this MDL seeking a date cut-off for document discovery that is later than January 1, *2013*.[18] The Court should compel it to accept that date, as all other parties in the MDL have. The latter date is not only what all other parties have agreed to; it is a sensible date that ensures the capture of relevant documents while keeping discovery proportional to the "needs of the case." Fed. R. Civ. P. 26(b)(1).

MVSC has never disputed that its documents from January 1, 2013, to January 1, 2014, are relevant to its claims and the defenses thereto. Ex. 31 (MVSC letter challenging cut-off based on proportionality, not relevance). Nor could it: its Second Amended Complaint alleges that "it is

---

[17] CVR is not joining in the present motion to compel because the MDL plaintiffs thus far have not elected to proceed with discovery against it. Counsel for CVR understand (and have reached an informal agreement with plaintiffs' counsel) that plaintiffs are holding off on issuing any discovery to CVR pending the Court's ruling on CVR's motion to dismiss (Dkt. 46). In the event plaintiffs elect to proceed with discovery against it, CVR reserves its rights to bring appropriate motions with respect to such discovery at a suitable time after said discovery is served.

[18] Authenticom, Dealership Class Plaintiffs, Reynolds and CDK all agreed to the January 1, 2013, cut-off date in their initial discovery responses. Cox and AutoLoop agreed to the 2013 cut-off during the meet-and-confer process. *See* Ex. 30.

likely" that Defendants' purported conspiracy existed prior to 2014. *See* No. 17-cv-896, Dkt. 76 ("SAC") ¶¶ 11, 100. The 2013-2014 time period is also the time period in which MVSC was preparing to apply, and applying, to join the Third Party Access ("3PA") and Reynolds Certified Interface ("RCI") program. *See* Ex. 34. The SAC relies heavily on these applications, in alleging that CDK and Reynolds unlawfully blocked MVSC from joining Reynolds's RCI program and CDK's 3PA program (*see* SAC ¶¶ 115-128) by demanding prices that were "absurd" or "exorbitant" and amounted to an "effective refusal to deal" (*see* SAC ¶¶ 122, 123, 126, 127, 128). Given the centrality of these allegations to its case, MVSC cannot credibly claim that the circumstances surrounding its applications to 3PA and RCI in 2013-2014 are not relevant to its claims. Nor can it deny that Defendants need discovery into MVSC's documents from the 2013-2014 time period in order to prepare a full defense. *See, e.g., In re Folding Carton Antitrust Litig.,* 76 F.R.D. 420, 427-28 (N.D. Ill. 1977) (ordering plaintiff in antitrust case to produce relevant documents, including documents that defendants asserted were essential to the preparation of their case).

A cut-off of January 1, 2013, is also proportional to the needs of the case. MVSC filed its original complaint in February 2017; accordingly, the four-year limitations period applicable to MVSC's federal antitrust claims extends to February 1, 2013. 15 U.S.C. § 15b. As numerous courts have held in like circumstances, a discovery period roughly aligning with the applicable limitations period is manifestly proportional to the needs of the case. *See, e.g., Greene v. Sears Prot. Co.,* 2017 WL 1134484, at *5 (N.D. Ill. Mar. 27, 2017) (agreeing that discovery encompassing the statute of limitations period was "reasonable and proportional to the needs of the . . . case"); *Wilson v. MRO Corp.,* 2017 WL 561333, at *2 (S.D.W. Va. Feb. 10, 2017) (limiting document discovery to the applicable limitations period, "considering that the scope of discovery must be proportional to the needs of the case."); *Arenas v. Unified Sch. Dist. No. 223,* 2016 WL 6071802, at *6 (D. Kan. Oct.

32

17, 2016) (limiting document discovery and testimony to limitations period "to avoid unnecessary burden and expense."). It is also warranted as a matter of simple fairness: it would be untoward, to say the least, to allow MVSC to seek treble damages based on alleged antitrust violations purportedly spanning back to 2013 and at the same time insist that Defendants cannot obtain document discovery from MVSC that predates 2014.

During the parties' meet-and-confers, MVSC was unable provide any details to substantiate the notion that it would be unduly burdensome for MVSC to have to produce documents from 2013. That failure alone should doom its attempt to resist discovery into the 2013 time period—particularly given that all the other parties in this MDL have agreed to discovery starting on January 1, 2013. *See, e.g., In re Broiler Chicken Antitrust Litig.*, 2018 WL 3586183, at *2-3 (N.D. Ill. July 26, 2018) (Gilbert, J.) (denying a single antitrust defendant's request for a special relevant time period for discovery because the defendant "should not be exempted from producing documents and ESI for the discovery time frame applicable to all other Defendants in this case," and rejecting defendant's arguments regarding undue burden, which were stated in "broad generalities" and did not do "a good job of identifying or quantifying the burden in either time or cost of doing what [the requesting parties] want it to do.").

Furthermore, any burden on MVSC of producing documents going back to January 1, 2013, has already been eliminated or significantly reduced through the parties' negotiations regarding search terms. MVSC and Defendants have been separately negotiating, and reached agreement on, search terms that will be used to identify documents potentially responsive to Defendants' RFPs. Through those negotiations, Defendants have compromised and reduced the scope of, or eliminated, search strings in direct response to MVSC's complaints about high hit counts associated with specific search strings when tested on documents going back to January 1, 2013. Given this

33

PUBLIC REDACTED VERSION

refinement of Defendants' search terms (at MVSC's request), any claim that it remains unduly burdensome for MVSC to produce documents from 2013 is not credible. *See Broiler Chicken*, 2018 WL 3586183, at *4 (noting that defendant's arguments in favor of a special document discovery time period ignored the parties' discussions regarding proposed revisions to search terms).

## CONCLUSION

For the foregoing reasons, Defendants' motion to compel discovery responses from the various plaintiffs should be granted.

Dated: August 6, 2018

*/s/ Aundrea K. Gulley*
Aundrea K. Gulley
Kathy D. Patrick
Brian T. Ross
Brice A. Wilkinson
Ross A. MacDonald
GIBBS & BRUNS LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
(713) 751-5258
agulley@gibbsbruns.com
kpatrick@gibbsbruns.com
bross@gibbsbruns.com
bwilkinson@gibbsbruns.com
rmacdonald@gibbsbruns.com

Michael P.A. Cohen
SHEPPARD MULLIN RICHTER & HAMPTON, LLP
2099 Pennsylvania Ave., NW, Suite 100
Washington, DC 20006
(202) 747-1900
mcohen@sheppardmullin.com

Leo D. Caseria
SHEPPARD MULLIN RICHTER & HAMPTON, LLP
333 S. Hope St., 43rd Floor
Los Angeles, CA 90071
(213) 617-4206
lcaseria@sheppardmullin.com

*Counsel for Defendant The Reynolds and Reynolds Company*

Respectfully submitted,

*/s/ Britt M. Miller*
Britt M. Miller
Michael A. Scodro
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant CDK Global, LLC*

PUBLIC REDACTED VERSION

## CERTIFICATE OF SERVICE

I, Britt M. Miller, an attorney, hereby certify that on August 6, 2018, I caused a true and correct copy of the foregoing **MEMORANDUM IN SUPPORT OF THEIR OMNIBUS MOTION TO COMPEL CERTAIN PLAINTIFFS' COMPLIANCE WITH THEIR DISCOVERY OBLIGATIONS IN RESPONSE TO DEFENDANTS' WRITTEN DISCOVERY REQUESTS**, to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/ Britt M. Miller_____
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Phone: (312) 782-0600
Fax: (312) 701-7711
E-mail: bmiller@mayerbrown.com