**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE:  DEALER MANAGEMENT SYSTEMS** | MDL No. 2817 |
| **ANTITRUST LITIGATION** | Case No. 18-cv-00864 |
| | Hon. Robert M. Dow, Jr. |
| **This Document Relates To:  ALL ACTIONS** | Magistrate Judge Jeffrey T. Gilbert |

**MDL PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO CDK GLOBAL, LLC'S OMNIBUS MOTION TO COMPEL**

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ............................................................................. 1

II.    BACKGROUND ................................................................................................. 4

  A.   Brief Factual Background ............................................................................. 4

  B.   Brief Pertinent Procedural History................................................................. 6

  C.   Discovery Negotiations Between Dealership Plaintiffs and CDK .................... 7

III.   ARGUMENT – DEALERSHIP PLAINITFFS .................................................... 8

  A.   Legal Standard ............................................................................................. 8

  B.   Dealership Plaintiffs' Responses and Objections to CDK's Discovery Requests and
     Search Terms Are Reasonable and Appropriate ................................................ 9

    1.   CDK's RFPs and Interrogatories to Dealership Plaintiffs ............................. 9
      a.   CDK's Discovery Demands Concerning "Cybersecurity Concerns" and Similar
        Issues................................................................................................... 10
      b.   Requests Relating to the Alleged Markets and Competition .................... 14
      c.   CDK's Complaints About "Improperly Narrowed Responses" .............. 17
      d.   Requests Relating to DMS Contracts and Provisions.............................. 18
      e.   CDK's Improper Contention Requests .................................................. 19
      f.   CDK's Improper Demands for Publicly and/or Equally Available Materials and
        Information ............................................................................................ 20

    2.   Dealership Plaintiffs' Objections and Responses to CDK's Proposed ESI Search
      Terms................................................................................................... 21

IV.    ARGUMENT – INDIVIDUAL AND VENDOR CLASS PLAINTIFFS ...................... 24

  A.   CDK's Motion to Compel Cox Automotive and AutoLoop to Produce Documents
     Regarding Their "Use Of Data" Should Be Denied…………………………………..24

  B.   CDK's Motion to Compel Relating to Certain of Authenticom's Interrogatory and RFA
     Responses Should Be Denied…………………………………………………………26

    1.   Authenticom's Interrogatory Responses Are Sufficient…..........................................26
    2.   Authenticom's Responses to CDK RFA Nos. 3 and 4 Are Proper…………………31

  C.   CDK's Motion to Compel MVSC to Produce Documents Dating Back to 2013
     Is Moot………………………………………………………………………………..32

V.     CONCLUSION.................................................................................................. 33

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                    **Page(s)**

*Am. Roller Co. v. Foster-Adams Leasing, LLP*,
  2006 WL 1371441 (N.D. Ill. May 16, 2006) ..........................................................................26

*Assurance Co. of Am. v. Nat'l Fire & Marine Ins. Co.*,
  Case No. 09-cv-1162-JCM-PAL, 2012 WL 1970017 (D. Nev. June 1, 2012) ......................21

*Authenticom, Inc. v. CDK Global, LLC*,
  2017 WL 3017048 (W.D. Wis. July 14, 2017) ...........................................................6, 7, 28, 29

*In re Automotive Refinishing Paint Antitrust Litig.*,
  MDL No. 1426, 2006 WL 1479819 (E.D.Pa. May 26, 2006) .................................................15

*In re Broiler Chicken Antitrust Litig.*,
  Case No. 16-cv-08637, 2018 WL 999899 (N.D. Ill. Feb. 21, 2018) ........................................9

*C & C Jewelry Mfg., Inc. v. West*,
  2011 WL 2433817 (N.D. Cal. June 13, 2011) .......................................................................26

*Crom, LLC v. Preload, LLC*,
  16-cv-238-WTH-GRJ, 2017 WL 2408126 (N.D. Fla. June 2, 2017) .....................................19

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  Case No. 18-cv-864, 2018 WL 2193236 (N.D. Ill. May 14, 2018) ........................................12

*Diesel Power Source v. Crazy Carl's Turbos*,
  No. 2:14-CV-826 DN, 2017 WL 57791 (D. Utah Jan. 5, 2017) .............................................23

*Donelson v. Shearing*,
  Case No. 15-cv-95-SMY-RJD, 2017 WL 2895038 (S.D. Ill., May 9, 2017) ...........................9

*In re eBay Seller Antitrust Litig.*,
  Case No. 07-cv-1882-JF-RS, 2008 WL 5212170 ..............................................................18, 20

*Gross v. Town of Cicero*,
  Case No. 04-cv-0489, 2005 WL 2420372 (N.D. Ill., Sept. 28, 2005) ....................................21

*Hunt v. Northwest Community Hosp., Inc.*,
  No. 3 C 50250, 2007 WL 1512580 (N.D. Ill. May 22, 2007) .................................................32

*King v. Burlington Northern & Santa Fe Railway Co.*,
  538 F.3d 814 (7th Cir. 2008) ..................................................................................................21

*L&L Franchise, Inc. v. Tsai,*
  Case No. 06-cv-1155-JAH-POR, 2008 WL 11337594 (S.D. Cal. Mar. 7,
  2008) ....................................................................................................................21

*Lawrence E. Jaffee Pension Plan v. Household Int'l, Inc.,*
  Case No. 02-cv-5893, 2006 WL 3445742 (N.D. Ill. Nov. 22, 2006) ......................................8

*Makaeff v. Trump Univ., LLC,*
  2014 WL 3490356 (S.D. Cal. July 11, 2014) ........................................................30

*Merix Pharm. Corp. v. EMS Acquisition Corp.,*
  No. 09 CV 5871, 2010 WL 3781013 (N.D. Ill. Sept. 21, 2010)..............................................32

*Meyer v. S. Pacific Lines,*
  199 F.R.D. 610 (N.D. Ill. 2001).................................................................................20

*Moriarty v. American Life Ins. Co.,*
  17-cv-1709-BTM-WVG, 2018 WL 3832935 ....................................................................18, 20

*SEC v. Samuel H. Sloan & Co.,*
  369 F. Supp. 994 (S.D.N.Y. 1973) ................................................................................21, 22

*Sirazi v. Panda Express, Inc.,*
  Case No. 08-cv-2345, 2009 WL 4232693 (N.D. Ill. Nov. 24, 2009) ......................................11

*Ziemack v. Centel Corp.,*
  Case No. 92-cv-3551, 1995 WL 729295 (N.D.Ill. Dec. 7, 1995)............................................15

**Statutes**

Computer Fraud and Abuse Act ................................................................................6, 7

**Other Authorities**

Fed. R. Civ. P. 36(4) .............................................................................................32

Fed. R. Civ. Pro. 26(A)(1)(a)(ii).............................................................................19

Fed. R. Civ. Pro. 26(b)(1) ....................................................................................8, 9

Wright & Miller, 8B Fed. Prac. & Proc. Civ. § 2260 (3d ed.).......................................32

By and through their respective counsel, Plaintiffs in this Multi-District Litigation, consisting of (1) the twenty-five independent Dealership Plaintiffs[1], (2) Authenticom, Inc. ("Authenticom"), (3) Cox Automotive, Inc. ("Cox Automotive"), (4) Loop, LLC, d/b/a AutoLoop ("AutoLoop"), and (5) Motor Vehicle Software Corp. ("MVSC") (collectively, the "MDL Plaintiffs") respectfully submit this memorandum of law opposing Defendant CDK Global, LLC's ("CDK")[2] Omnibus Motion To Compel ("CDK's Motion").

## I.     PRELIMINARY STATEMENT

Both Plaintiffs and Defendants in this MDL have worked hard and in good faith to resolve their discovery disputes.  For example, Plaintiffs Authenticom and MVSC have acceded to all of Reynolds' discovery demands, and any discovery complaints that Reynolds once had are now moot.  With respect to CDK, MDL Plaintiffs have agreed to the vast majority of CDK's demands as well, but there remain a handful of outstanding issues – each addressed below – where CDK is simply pushing too far.

**Dealership Plaintiffs.**  CDK claims that the Dealership Plaintiffs are guilty of improperly thwarting CDK's full and fair pursuit of discovery relating to claims and defenses in this litigation.[3]  But this claim has no basis in fact.

The overwhelming majority of the discovery requests that CDK complains about vis-à-vis Dealership Plaintiffs relate, at most, to a purported "defense" – *i.e.*, the alleged violation of

---

[1] "Dealership Plaintiffs" are as identified and defined in the introductory paragraph on the first page of the June 4, 2018 Consolidated Class Action Complaint (Dkt. 184) ("Compl.").

[2] Defendant The Reynolds and Reynolds Company ("Reynolds") moved to compel only as to the date range applicable to MVSC's document production, but given that MVSC has now conceded on that point, the only issues in dispute relate to CDK's discovery demands.

[3] *See* Defendants' Memorandum In Support Of Their Omnibus Motion To Compel Certain Plaintiffs' Compliance With Their Discovery Obligations In Response To Defendants' Written Discovery Requests (Dkt. 317) ("Def. Mem.") at 1, 3, 6 and 7.

cybersecurity laws – that Judge St. Eve has already ruled is no defense at all to the antitrust violations at issue in this MDL.[4]  Therefore, many of CDK's complaints about Dealership Plaintiffs' refusal to produce documents are invalid *ab initio*, because most of them relate solely to this speculative and now legally irrelevant "cybersecurity" defense.  To the extent CDK claims that the Dealership Plaintiffs do not have sufficient cybersecurity policies and practices, Judge St. Eve also recognized that "[c]ourts have generally held that a plaintiff's wrongdoing is not a defense to an antitrust suit." *See also* Phillip E. Areeda, Herbert Hovenkamp, *Antitrust Law: An Analysis Of Antitrust Principles And Their Application* ¶ 361 (3rd and 4th eds. 2010–2017).  This case is about Defendants' wrongful and anticompetitive conduct, not baseless and conjectural claims regarding the Dealers' own cybersecurity policies and practices.[5]

CDK also relies heavily on the maxim that "discovery is a two-way street" to suggest that Dealership Plaintiffs have somehow improperly obstructed the discovery process in this case.  But CDK can do so only by cherry-picking favorable portions of the meet-and-confer record and mischaracterizing or ignoring the rest.  However, a full and balanced look at the record confirms that the Dealership Plaintiffs have made consistent and extensive efforts to reach a reasonable compromise on the parties' disputes, notwithstanding CDK's continued attempts to force an unrestrained fishing expedition based on irrelevant defenses and non-existent counterclaims.

Throughout the meet-and-confer process, with respect to their own Requests for Production propounded on CDK, Dealership Plaintiffs responded to CDK's objections by

---

[4] May 14, 2018 Opinion (Dkt. 176) at 18.

[5] CDK states that the cases joined in this MDL are antitrust in nature.  Def. Mem. at 2 ("All MDL Plaintiffs allege the same basic conspiracy between CDK and Reynolds: an agreement between the two companies to prohibit third-party access to their respective systems outside their approved access programs and thereby eliminate competition in a purported 'data integration' market. Plaintiffs also challenge supposed 'exclusive dealing' provisions in Defendants' vendor and dealer contracts containing the same restrictions.")

narrowing and clarifying their Requests. In contrast, CDK has by and large refused to narrow or clarify its Requests propounded on Dealership Plaintiffs. CDK instead chose to file its instant motion, which for the reasons below, should be denied in its entirety.

**Individual and Vendor Class Plaintiffs.** There are only a few remaining disputes with respect to the Individual and Vendor Class Plaintiffs' responses to CDK's discovery requests.

With respect to AutoLoop and Cox Automotive, CDK seeks documents about how they "use the data" they obtain from the DMS, including sharing of data with third parties. But the challenged conduct – blocking some methods of access to force application vendors like AutoLoop and Cox Automotive to pay exorbitant prices – has nothing to do with how AutoLoop and Cox Automotive "use the data." Indeed, CDK still allows Cox Automotive and AutoLoop to obtain data from the DMS, which it would not do if its conduct was motivated by how they "use the data." As CDK makes clear in its motion, CDK seeks this information in an attempt to develop breach of contract counterclaims against AutoLoop and Cox Automotive. But CDK is not entitled to engage in a fishing expedition for evidence to support non-existent counterclaims.

With respect to Authenticom, CDK asks the Court to compel Authenticom to provide more detail to already fulsome Interrogatory responses. As explained below, Authenticom's Interrogatory responses are more than sufficient, and in any event, CDK's request is premature: Authenticom has already agreed to provide additional information, as necessary, pursuant to Rule 33(d) once document discovery is complete. CDK also seeks the Court to deem admitted two Requests for Admission ("RFA") even though Authenticom responded to the RFAs in good faith and with concrete responses. There is therefore no basis for the Court to take the extraordinary step of deeming the RFAs admitted.

Finally, with respect to MVSC, CDK and Reynolds sought discovery of documents going back to 2013, even though MVSC's unique claims pertain to conduct after 2014. Nevertheless, in order to resolve this dispute, MVSC will agree to a start date of January 1, 2013 for its document collection and review, and there is therefore no longer a dispute.

## II.  BACKGROUND

### A.  Brief Factual Background

This antitrust action is about the illegal anticompetitive practices of Defendants CDK and Reynolds, frequently referred to in the retail automobile industry as the "Duopoly" or the "Big 2." These two ostensible competitors unlawfully colluded and conspired to restrain and/or eliminate competition in markets for: (1) Dealer Management Systems ("DMS"); and (2) Data Integration Services.

CDK and Reynolds are in the business of providing DMS software and services to dealerships, and together they dominate the DMS market. CDK and Reynolds together have total annual revenues of approximately $2.2 billion and $1.7 billion, respectively. They control at least 75% of the U.S. DMS market (measured by the number of franchised automobile dealership customers; their combined market share is even higher in terms of overall revenue and car sales).[6] Because of Defendants' dominant DMS market share and the significant barriers to entry into the DMS market, and the difficulty in switching DMS providers, the CDK/Reynolds duopoly has enormous leverage over automobile dealers.

Historically, the data integration market was highly competitive, with numerous providers (like Authenticom) competing with one another to provide affordable, secure, and

---

[6] CDK and Reynolds control approximately 45% and 30% of the DMS market, respectively. The remaining 25% is divided among various other, significantly smaller, DMS providers typically servicing smaller dealerships. Compl. at 2.

reliable access to dealer data for dealerships and vendors. Vendors, in turn, provide innovative software application products to help dealerships sell and service vehicles. Competition thrived in the data integration market, and prices were low.

That changed in early 2015 when CDK and Reynolds entered into an illegal conspiracy to eliminate competition from the data integration market and divide the market between the two of them. Defendants' agreement involved restricting and blocking independent data integrators' access to dealer data, thereby forcing independent integrators out of the market. CDK and Reynolds even memorialized portions of the conspiracy – including the market division agreement – in a series of written agreements dated February 2015, in which the erstwhile competitors agreed, *inter alia*, not to compete with one another in the provision of data integration on their respective DMS platforms.

By eliminating competition from the data integration market, CDK and Reynolds could (and did) drastically increase the prices they charged for data integration services, and indeed, prices skyrocketed. For example, after entering into the conspiracy with Reynolds, CDK immediately increased the prices that vendors paid by as much as 500%, without any improvement in service. Vendors pass on these artificially inflated fees to dealers, but Defendants prohibit vendors from informing dealerships that the reason for the increased vendor charges is Defendants' increased data integration fees. As a direct and proximate consequence of Defendants' anticompetitive and illegal conduct, independent integrators like Authenticom have been largely driven from the market; vendors (like Cox Automotive and AutoLoop) have directly paid inflated fees for data integration services to CDK and Reynolds; and Dealership Plaintiffs have directly paid Defendants supra-competitive prices for DMS services, and have indirectly paid the Defendants supra-competitive prices for the data integration services required by

vendors.  MDL Plaintiffs bring this antitrust action to recover damages to the maximum extent permitted by law, and for injunctive relief.

### B.     Brief Pertinent Procedural History

The first lawsuit in this MDL was filed on behalf of MVSC on February 3, 2017 in the Central District of California.[7]  Next, on May 1, 2017, Authenticom filed suit against Defendants in the Western District of Wisconsin.  Two weeks after filing the Complaint, Authenticom filed a motion for a preliminary injunction, and on June 26-28, 2017, Chief Judge Peterson conducted an evidentiary hearing on the motion.  The court granted Authenticom's motion for a preliminary injunction, finding that, on the merits of its antitrust claims, Authenticom met the requisite likelihood-of-success standard as to both its Section 1 horizontal conspiracy and exclusive dealing claims.  *See Authenticom, Inc. v. CDK Global, LLC*, 2017 WL 3017048 at *7-8 (W.D. Wis. July 14, 2017).  Afterwards, numerous additional parties filed suit against CDK and Reynolds based on similar facts and legal theories.

Prior to the formation of this MDL, CDK and Reynolds moved to dismiss Authenticom's complaint.  Before Judge Peterson could rule on the motions to dismiss, this MDL was created and Authenticom's case, as well as all related cases (including the Dealership Plaintiffs' litigation) were transferred to this Court.  In May 2018, Judge St. Eve issued an opinion largely denying Defendants' motion to dismiss the Authenticom case.  Dkt. 176.

Of particular relevance to the discovery dispute between CDK and Dealership Plaintiffs, Judge St. Eve expressly rejected Defendants' argument that the purported violation by Authenticom of the federal Computer Fraud and Abuse Act ("CFAA") and "other cyber-security

---

[7] On October 2, 2017, Judge Dale Fischer denied Defendants' motion to dismiss MVSC's conspiracy claims under Section 1 of the Sherman Act. *See* Memorandum Order, *MVSC* Dkt. 73.

laws" served as a defense to Defendants' alleged antitrust violations. *See* Dkt. 176 at 18. Judge St. Eve recognized that "Courts have generally held that a plaintiff's wrongdoing is not a defense to an antitrust suit" and "[a]s the Seventh Circuit later put it, '[p]roof of the plaintiff's unrelated unlawful conduct is not a valid *in pari delicto* defense to an antitrust charge.'" *Id.* (quoting Pinto *Trucking Serv., Inc. v. Motor Dispatch, Inc.*, 649 F.2d 530, 534 n. 5 (7th Cir. 1981)). Thus, the Court ruled, "Defendants may have claims against Authenticom under the CFAA and related state laws — indeed, ***Authenticom's*** docket and defense counsel's representations in court suggest that they may bring such claims — but those claims do not foreclose Authenticom's Sherman Act claims."[8] CDK did indeed subsequently bring counterclaims against Authenticom,[9] but CDK and Reynolds have no such counterclaims against the Dealership Plaintiffs, nor have they indicated the intent to file any. Moreover, even if they had, a discovery fishing expedition with respect to such unalleged counterclaims at this juncture would still be premature, speculative, and entirely improper. *See, e.g.*, *infra* at 26. Finally, Authenticom has moved to dismiss CDK's counterclaims, and the briefing will soon be complete. *See* Dkt. 276.

### C.    Discovery Negotiations Between Dealership Plaintiffs and CDK

Dealership Plaintiffs have been engaging in discussions with CDK (and Reynolds) concerning discovery, as part of coordinated discovery efforts in the MDL, since May 25, 2018, pursuant to the MDL Case Management Order (Dkt. 166). As part of those discussions, CDK and Dealership Plaintiffs exchanged document requests, interrogatories, and lists of proposed document custodians and search terms to be used for the search and production of ESI.

---

[8] *Id* at 19 (emphasis added). The District Court added: "Defendants . . . contend that Authenticom's purported wrongdoing does not provide a defense for Defendants inasmuch as it deprives Authenticom of a claim, and more specifically, of antitrust injury. ***That overstates the law***." *Id* at 19-20 (emphasis added).

[9] Authenticom has moved to dismiss those counterclaims, and briefing on those motions is under way. *See* Dkt. 276, 278.

Dealership Plaintiffs and CDK also conducted subsequent meet and confers (both written and telephonic) in an attempt to reach compromise, and were able to do so on several issues. Nevertheless, CDK makes much of the issues that remain unresolved, complaining that Dealership Plaintiffs have supposedly: (1) unreasonably refused to respond to two of CDK's fourteen interrogatories; (2) unreasonably refused to respond to a number of CDK's document requests; and (3) unreasonably refused to agree to run every single one of CDK's 135 proposed ESI search terms, as originally written and proposed by CDK instead (as is typical in such negotiations), disagreeing with some and proposing modifications to certain of terms, as CDK has also done with respect to the Dealership Plaintiffs' list of proposed ESI search terms. Def. Mem. at 18. As explained in detail herein, none of CDK's claims has merit, and its requests to compel vis-à-vis Dealership Plaintiffs should be denied entirely.

## III. ARGUMENT – DEALERSHIP PLAINITFFS

### A. Legal Standard

Federal Rule of Civil Procedure 26(b)(1) prohibits discovery that is not relevant to a party's "claim or defense" in the litigation or is not "proportional to the needs of the case," in order to, among other things, protect against discovery requests where the costs of review and production outweigh the potential benefits. Fed. R. Civ. P. 26(b)(1). *Lawrence E. Jaffee Pension Plan v. Household Int'l, Inc.*, Case No. 02-cv-5893, 2006 WL 3445742 at *4 (N.D. Ill. Nov. 22, 2006) (affirming magistrate judge's denial of motion to compel because "the burden on [defendant] in having to produce the documents sought is immense" and information was only "marginally probative").

The determination of whether discovery is proportional generally depends on: (1) "the importance of the issues at stake in the action," (2) "the amount in controversy," (3) "the parties' relative access to relevant information," (4) "the parties' resources," (5) "the importance of the

discovery in resolving the issues," and (6) "whether the burden or expense of the proposed discovery outweighs its likely benefit." *See* Fed. R. Civ. Pro. 26(b)(1). As this Court has recently observed, in the context of antitrust litigation, the potential value of discovery sought from putative class representatives must be weighed against "the potential chilling effect on private antitrust enforcement" that could follow from requiring the discovery. *See In re Broiler Chicken Antitrust Litig.*, Case No. 16-cv-08637, 2018 WL 999899 (N.D. Ill. Feb. 21, 2018). Finally, "[t]he burden in a motion to compel rests with the party seeking discovery to explain why the opposing party's responses are inadequate." *Donelson v. Shearing*, Case No. 15-cv-95-SMY-RJD, 2017 WL 2895038, *1 (S.D. Ill., May 9, 2017) (citing *MSTG, Inc. v. AT&T Mobility LLC*, Case No. 08-cv-7411, 2011 WL 221771, *6 (N.D. Ill. Jan. 20, 2011).

B.  **Dealership Plaintiffs' Responses and Objections to CDK's Discovery Requests and Search Terms Are Reasonable and Appropriate**

1.  **CDK's RFPs and Interrogatories to Dealership Plaintiffs**

CDK represents that Dealership Plaintiffs "initially refused to produce *any* documents in response to 77 RFPs . . .," but CDK's very first source contradicts this claim. *Compare* Def. Mem. at 4 (emphasis in original) and Def. Mem. Ex. 8 (Provance 7/5/18 Letter) at 4 ("The Dealership Class Plaintiffs' responses state that they are refusing, *in whole or in part*, to produce documents that are responsive to many of CDK's requests," listing 63 specific requests) (emphasis added). In addition, a review of Dealership Plaintiffs' Responses to CDK's RFP's shows that for a number of the specific RFP's where CDK complains that Dealership Plaintiffs "refused to produce *any* documents," Dealership Plaintiffs actually have agreed to produce at least some responsive documents and information, including those in response to CDK RFP Nos.

1, 5, 28, 30, 45.[10]  CDK also improperly presents stale negotiating proposals as if they are the current state of the parties' talks.[11]  Accurately presented, the Dealership Plaintiffs' positions show that the dealers have gone the extra mile in trying to compromise.

### a.  CDK's Discovery Demands Concerning "Cybersecurity Concerns" and Similar Issues

The vast majority of CDK's discovery requests in dispute (as well as its ESI search terms) are geared toward cybersecurity and related issues that are no defense to Defendants' anticompetitive conduct.  *See, e.g.*, Def. Mem. at 7-8; Def. RFP Nos. 49-63 and Interrogatory Nos. 8 and 9.  CDK cannot seriously dispute otherwise.  Instead, CDK claims that it is entitled to this discovery in any event because certain allegations in Dealership Plaintiffs' Consolidated Complaint purportedly implicate these rejected defenses.  CDK is wrong on all counts.

Judge St. Eve's ruling is clear. The Court ruled that a defense based upon a plaintiff's supposed violation of federal or state cybersecurity laws is irrelevant as a matter of law to issues of CDK's antitrust liability.  *See supra* at 6-7; Dkt. 176.

CDK's arguments in opposition to a motion to compel in this Court just a few months ago are also instructive here.  In May 2018, CDK sought a protective order against the production of certain materials it had already produced to the Federal Trade Commission,

---

[10] CDK takes issue with the Dealership Plaintiffs' response to its RFP No. 45, but ignores the fact that one of the Dealership Plaintiff's main objections here is that RFP No. 45 is "duplicative and/or cumulative" of CDK's other Requests, including, *inter alia*, CDK Request Nos. 2, 3, and 38 and Interrogatory No. 2," in response to all of which Plaintiff has agreed to produce at least some materials or information.

[11] For instance, CDK complains that Dealership Plaintiffs offered "only 13 custodians, which would not have given CDK even *one* document custodian from each Dealer, . . ." Def. Mem. at 5.  However, in a July 19, 2018 letter from Dealership Plaintiffs' counsel (which is not attached to the Omnibus Motion papers), Dealership Plaintiffs offered exactly that (a proposal that CDK again rejected). *See, e.g.*, Ex.15 (July 25, 2018 Letter to Rob Wallner, Esq. from CDK counsel, stating "[w]hile we appreciate your offer to provide 'one ESI custodian for each Dealership Class Plaintiff named in the Consolidated Complaint,'. . .").  With respect to CDK's interrogatories, only two of the 25 independent Dealership Plaintiffs (Teterboro Automall, Inc. D/B/A Teterboro Chrysler Dodge Jeep Ram and O'Neil Johnson Toyota, LLC) have had difficulty responding, and provided statements indicating as much. *See* Ex. 52.

arguing: "to the extent plaintiffs are hoping to find material they can use to support *new* claims in this litigation, courts 'are unanimous in prohibiting discovery from being used as a "fishing expedition"' in this way"[12] and "the discovery rules are not an excursion ticket to an unlimited, never-ending exploration of every conceivable matter that captures an attorney's interest."[13] The same principles are applicable here and bar CDK's request for a "fishing expedition" "hoping to find material [it] can use to support *new* claims in this litigation." Dkt. 197 at 10. CDKs attempts to defend its speculative, overbroad, and unduly burdensome requests for discovery from the Dealership Plaintiffs are neither relevant nor proportional to this litigation, and general fishing expeditions into areas unrelated to a plaintiff's claims are simply not permitted under Rule 26(b). As noted in *Sirazi v. Panda Express, Inc.*, Case No. 08-cv-2345, 2009 WL 4232693 at *3 (N.D. Ill. Nov. 24, 2009):

> [s]peculation is not evidence, and hypothesis is not proof. The trouble with absence of evidence is that it is consistent with *any* hypothesis. This is not to say that a request for information that seeks to probe the facts underlying an opponent's case is impermissible because it constitutes, to use the timeworn phrase, a "fishing expedition." But, without some reason to conclude that the pond might be stocked, one cannot demand to "fish."

CDK not only suggests that Dealership Plaintiffs have "overstat[ed]" the District Court's ruling, but argues that the ruling opened the doors wide for CDK to conduct open-ended discovery from all 25 Dealership Plaintiffs regarding the dealers' cybersecurity policies, practices, and other related issues. CDK's argument is based on an out-of-context quote from the District Court's opinion. CDK claims that "Judge St. Eve made clear that '[d]iscovery may

---

[12] Dkt. 197 at p. 10 ¶ 4 (quoting *BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, Case No. 15-cv-10340, 2018 WL 946396, at *4 (N.D. Ill. Feb. 20, 2018) (collecting cases).

[13] Dkt. 197 at p. 10 ¶ 4 (quoting *O'Toole v. Sears Roebuck & Co.*, Case No. 11-cv-4611, 2014 WL 1388660 at *3 (N.D. Ill. Apr. 10, 2014) (internal quotations omitted).

reveal otherwise,' — and now the Dealer [Plaintiffs] hope to prevent CDK from obtaining that discovery." Def. Mem. at 10 (citing *In re Dealer Mgmt. Sys.*, 2018 WL 2193236 at *16). However, Judge St. Eve did not make this statement in the context of any counterclaims, defenses, or arguments related to data security or breaches, or any such issues, but vis-à-vis upholding Authenticom's antitrust claims to begin with:

> The driving animus behind many of Defendants' Section 1 arguments is that Authenticom essentially challenges Defendants' refusals to deal. . . . *The Complaint provides well-pleaded allegations regarding the purported markets and, to some extent, Defendants' conduct. Taken as true—as the Court must — those allegations plausibly suggest at least one Section 1 violation (and a Section 2 violation, as discussed in that section below).* <u>*Discovery may reveal otherwise, and show that Authenticom's gripe is confined to Defendants' unilateral refusals to deal.*</u> But at this stage, the Court's only role is to determine whether the Complaint states a claim for the causes of actions it advances.

Dkt. 176 at 35 (emphasis added).[14]

CDK's alternative argument likewise fails. CDK argues that it should be allowed broadranging discovery on legally irrelevant defenses because Dealership Plaintiffs have pointed to widespread industry consensus that CDK's purported "cybersecurity" arguments are meritless. Def. Mem. at 10. CDK claims that the discovery it seeks is relevant

> to whether CDK's third-party access policies . . . serve its legitimate interests in protecting and maintaining the security and integrity of its DMS," and "to the Dealership Class Plaintiffs' allegations that security-related concerns are a 'pretext' for CDK's third-party access policies . . . ."

---

[14] CDK makes the same type of misleading assertion that the Seventh Circuit "recognized" "*the* core factual dispute" in this litigation as involving third parties supposedly "jeopardiz[ing] Defendants' massive investments in their respective DMSs by undermining data security, system integrity, and functionality," and similarly overreaches when it claims that "Judge St. Eve recognized that proving up the security and system integrity threats posed by unauthorized third-party access would establish 'procompetitive upsides' . . . .'" Def. Mem at 7 (citing *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1022, 1025 (7th Cir. 2017) and *In re Dealer Mgmt. Sys. Antitrust Litig.*, Case No. 18-cv-864, 2018 WL 2193236 at *19 (N.D. Ill. May 14, 2018). But the citations provided by CDK for these assertions do not support them.

and that these issues are somehow "central" to the antitrust analysis "at the heart of this litigation." Def. Mem. at 11. CDK first cherry-picks two paragraphs from Dealership Plaintiffs' Complaint, which simply describe public media and industry reports recognizing that CDK's "purportedly enhanced data security was a mere pretext for increased data integration charges."[15] CDK improperly tries to leverage this fact into an argument that the sweeping discovery it seeks from Dealership Plaintiffs is material and necessary to this particular case.

CDK (along with Reynolds) has repeatedly offered up these "increased security" concerns as justification for their competition-suppressing actions, but have provided little if anything to substantiate these concerns. To the contrary, Dealership Plaintiffs' operative Complaint contains a brief section, titled "Defendants' 'Security' Claim is a Pretext," which is based only on Defendants' internal documents and publicly available information and establishes that CDK's "cybersecurity" and related arguments and purported concerns are nothing but a smokescreen. Compl. ¶¶153-64.

Having failed to muster support for its unfounded "cybersecurity" cover story, CDK now wants to embark on an indiscriminate and speculative fishing expedition in the hope of dredging up *something* useful from Dealership Plaintiffs. But federal courts do not allow free-range discovery based on purely "Hail Mary" litigation theories. *See supra* at 10-11.

CDK also overstates the significance of the categories of discovery materials it seeks in the context of antitrust law. CDK tries to paint a picture in which its own intent (and its internal documents exhibiting that intent) are essentially irrelevant to the analysis and need not be probed, and the only factors needing consideration are whether Defendants' conspiracy had some accidental and/or marginally beneficial effects. CDK argues that "[u]nder rule-of-reason

---

[15] Compl. ¶¶154-55

analysis, 'the defendants' state of mind is less important . . . than the objective consequences of their behavior.'" Def. Mem. at 11 (citing Areeda & Hovencamp, *Antitrust Law*, ¶1504a). CDK takes this statement out of context and turns it on its head; this treatise actually states that

> . . . the defendants' state of mind is less important for antitrust policy than the objective consequences of their behavior. ***The defendants' mistaken belief, no matter how sincere, that their collaboration improves competition should be immaterial to the tribunal's decision whether to enjoin it as an unreasonable trade restraint. Nevertheless, we often speak of the defendant's purpose, because we look to the defendant, with its knowledge of its own situation, to identify the possible justifications for its conduct.***

*Id* (emphasis added). There are already compelling indications that CDK had no basis at all to believe that its anticompetitive conduct had, or might have had, even a mild ancillary procompetitive impact upon the market. As noted in the Complaint, at the Authenticom preliminary injunction hearing last summer, CDK could not offer a single example of a data security incident involving any data integrator. Compl. ¶ 162 (citing Authenticom, Case No. 17-cv-318-JDP, 2017 WL 3017048 at *5 n.2). CDK's grossly overreaching discovery requests to the Dealership Plaintiffs are nothing more than improper fishing expeditions.

### b. Requests Relating to the Alleged Markets and Competition

CDK Requests Nos. 39 and 40 – seeking documents and communications "related to" the "existence and or bounds" of the DMS and data integration markets, and competition among participants in those markets – are amorphous, overbroad, premature, and aimed at getting inside the heads of Dealership Plaintiffs' experts. As Dealership Plaintiffs stated in their Objections and Responses and reiterated during telephonic meet and confers, "the existence and bounds of the 'DMS Market' and 'Dealer Data Integration Market' will be subject to expert opinion and analysis," based largely on data and information provided by Defendants. *See* Responses to RFP's 39 and 40. CDK's demands for "all documents" that form the basis of such expert

14

opinions, well before expert disclosures are due, are premature and misdirected.  *See*, *e.g.*, *Ziemack v. Centel Corp.*, Case No. 92-cv-3551, 1995 WL 729295 at *2 (N.D.Ill. Dec. 7, 1995).[16] To be sure, Dealership Plaintiffs, whose day-to-day activities focus on auto sales, should not be subject to CDK's sweeping and speculative discovery requests aimed at uncovering information about the DMS and Data Integration markets. *See In re Automotive Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2006 WL 1479819 at *8 (E.D.Pa. May 26, 2006).[17] Importantly, CDK responded to Dealership Plaintiffs' requests for clarification of these Requests by stating that "documents responsive to these Requests will include" (but not be limited to) at least seven broadly stated categories of materials. *See* Def. Mem., Ex. 10 (Provance 7/16/18 Letter) at 5. CDK's veritable laundry list of what could be captured by these Requests only speaks further to their overbreadth.

With respect to Request No. 40, seeking documents related to the use of standalone applications as an alternative to traditional DMS, Dealership Plaintiffs have already agreed to produce responsive documents.  *See* Def. Mem., Ex. 20 at 4-5.  As previously noted by Dealership Plaintiffs, this Request is subsumed by Request No. 38 (seeking documents comparing or contrasting DMS products or analyzing alternatives to DMS), for which Dealership Plaintiffs have agreed to produce responsive documents.  *Id.*  Moreover, in the interest of narrowing the disputes, for Request No. 44, Dealership Plaintiffs state that to the extent such

---

[16] In a securities action, the analysis of how defendants' actions impacted market price was within the domain of an expert, and "theory" discovery requests on that issue were premature where experts had not yet been retained or deposed. *See id.*

[17] "Defendants advance three theories to support their position that this discovery should be permitted: (1) that the requested information will demonstrate the highly competitive nature of the paint industry and, in turn, prove the nonexistence of a price-fixing scheme. […] Plaintiffs' activities are almost wholly irrelevant in proving or disproving the underlying charge. ***This claim must be substantiated by evidence of Defendants' activities, not Plaintiffs'***." *Id.* (emphasis added).

materials can be identified through a reasonable search of appropriate sources, they will produce non-privileged responsive documents.

CDK's Request Nos. 42, 46, and 47, are so vague and disproportionately broad and burdensome that Dealership Plaintiffs cannot and should not be required to respond to them. Specifically, No. 42 seeks every document "related to" *any time* Dealership Plaintiffs ever considered – or declined to consider – using *any* DMS or application, including, among others, documents like promotional materials from vendors. As set forth in Dealership Plaintiffs' Complaint, "[a] single Dealership rooftop typically uses about 10-15 separate vendors — and often more." Compl. at ¶ 73. Accordingly, dealerships frequently receive documents and materials from various vendors. Also, Dealership Plaintiffs have already provided CDK with lists of the DMS and applications they used from 2013 to present. *See* Def. Mem., Ex. 52 and 55 (Responses and Supplemental Responses to Interrogatories) at No. 2. And Dealership Plaintiffs have agreed to produce contracts and documents related to vendors they have used. *See* Def. Mem., Ex. 53 (Responses to RFP's) at Nos. 2-4. Requiring Dealership Plaintiffs to additionally produce every document "related to" any application they chose to use, or not use, would obviously be unduly burdensome and unnecessary. Nevertheless, CDK has refused to narrow this Request. *See* Def. Memo Ex. 10 (Provance 7/16/18 Letter), Ex. 35 (Provance 8/3/18 Letter).

Similarly, Request No. 46 seeks any documents that reference the market shares of any applications or DMS used by Dealers. However, this would require the collection and review of a large volume of documents such as industry publications and promotional materials received by Dealership Plaintiffs, which are likely to contain at least some reference to vendors' market shares (*e.g.*, references to a vendor being the market leader, the most popular among dealers, etc.). Dealership Plaintiffs offered as a compromise to produce documents in which Dealership

Plaintiffs refer to CDK and/or Reynolds' market share in the DMS market. *See* Def. Mem. Ex. 20 at 2. CDK inexplicably rejected this proposal and refused to narrow its Request in any way. *See* Def. Mem. Ex. 35 at 2. Particularly considering the parties' relative access to information (a Rule 26(b) proportionality factor), Dealership Plaintiffs should not be compelled to engage in an unduly and unnecessarily burdensome search for even the vaguest and most ambiguous of market share information when CDK is actually a competitor in the relevant markets, and can and should properly, and much more easily and efficiently, obtain such information from other sources, including itself.

Request No. 47 is also improperly broad. CDK claims that the discovery sought is relevant to showing that Dealership Plaintiffs were not coerced into using Defendants' Applications. *See* Def. Mem. at 14. But in the course of the parties' meet and confers, CDK made clear that beyond simply seeking Dealership Plaintiffs' internal analyses of what Applications to use, this Request seeks *all* internal or external analyses, from any source, comparing any vendors' Applications. *See* Def. Mem. Ex. 10 at 3. As such, this Request would require Dealership Plaintiffs and their counsel to review every document from any vendor and any industry publication for any references to a competing product. *See* Def. Mem. Ex. 20 at 2-3. There is no proportional need for Dealership Plaintiffs to respond to such an overly broad, extremely and unduly burdensome Request.

### c. CDK's Complaints About "Improperly Narrowed Responses"

Dealership Plaintiffs properly objected to Request Nos. 5 and 51 as, among other things, overbroad, vague, and unduly burdensome. Nevertheless, in the interests of compromise, Dealership Plaintiffs made offers to produce documents responsive to these Requests. *See* Def. Mem. Ex. 53 at 13-14 (Response to RFP No. 5); Def. Mem. Ex. 20 at 3 (discussing Request No. 51). CDK rejected Dealership Plaintiffs' proposals, without offering any counterproposals

whatsoever, instead simply declaring an "impasse." *See* Def. Mem. Ex. 10 (Provance 7/16/18 letter) at 2, 4. Dealership Plaintiffs stand by their responses and objections to RFP Nos. 5 and 51.

Request No. 5, like the Requests discussed in Section III.B.1. herein, is an improper contention request and is overly broad and burdensome. Requiring Dealership Plaintiffs to produce "all documents and communications related to" their exclusive dealing claims, before Dealership Plaintiffs have had the opportunity to adduce discovery on this issue from Defendants, "would be of questionable value to the goal of efficiently advancing the litigation." *See Moriarty v. American Life Ins. Co.,* , 17-cv-1709-BTM-WVG, 2018 WL 3832935 at *1; *In re eBay Seller Antitrust Litig.,* Case No. 07-cv-1882-JF-RS, 2008 WL 5212170 at *2. At most, Dealership Plaintiffs should not be compelled to produce anything beyond documents referencing the term "exclusive dealing provision(s)," which Dealership Plaintiffs have already offered to do.

Request No. 51 is improper in that it purports to require Dealership Plaintiffs to produce industry standards, and related documents, related to DMS security and similar issues. Dealership Plaintiffs agreed to produce documents located through the application of agreed-upon search terms to custodial files wherein Dealership Plaintiffs discuss NADA or AIADA guidelines on "data security." *See Def. Mem.* Ex. 20 at 3. Requiring Dealership Plaintiffs to search for anything further would be disproportional to the needs of the case. Dealership Plaintiffs' compliance with such industry standards is not relevant to any claims or defense in this case. Further, to the extent CDK wishes to obtain information about such industry standards, CDK can do so through alternative sources, including itself.

### d.      Requests Relating to DMS Contracts and Provisions

Request Nos. 33, 35, 36, and 48 are amorphous, demanding production of all documents

"related to" terms of DMS contracts. CDK attempts to analogize these Requests to Dealership Plaintiffs' Requests which, as originally worded, sought documents relating to: CDK DMS contract provisions for automatic renewals and extensions (Request No. 17), changes or proposed changes to material terms in CDK DMS contracts (Request No. 18), and changes in the pricing for DMS services paid by Dealer customers (Request No. 22). Def. Mem. at 14-15. Importantly, however, CDK initially objected to these Requests and overly broad, unduly burdensome, and duplicative of other Requests, as a result of which Dealership Plaintiffs agreed to narrow the Requests. *See* Def. Mem. Ex. 20 at 1, 2, 2-3.

By contrast, CDK has refused to narrow or clarify its own Requests on the same topics. These Requests are improper, especially given that Dealership Plaintiffs have already identified the DMS providers they used during the relevant time period, and have agreed to produce copies of all contracts and agreements they had in place with those DMS providers, as well as documents sufficient to show all up-front, initial (non-recurring), and monthly fees they paid for DMS services during that period. *See* Def. Mem. Ex. 52 and 55 (Responses and Supplemental Responses to Interrogatory No. 2-3); Def. Mem. Ex. 53, Response to RFP No. 2; Def. Mem. Ex. 20 at 4.

### e.     CDK's Improper Contention Requests

Contrary to CDK's suggestion, Dealership Plaintiffs are not avoiding their obligations under Fed. R. Civ. Pro. 26(A)(1)(a)(ii). Rather, Dealership Plaintiffs have taken issue with CDK's overly broad requests. Request Nos. 84, 85, and 96 are contention requests, insofar as they "simply refer to claims and various allegations and seek production of documents related to those claims and allegations." *See Crom, LLC v. Preload, LLC*, 16-cv-238-WTH-GRJ, 2017 WL 2408126 at *2–3 (N.D. Fla. June 2, 2017). Such Requests, which require [Dealership Plaintiffs] to provide "in essence, a running narrative or description of the entire case or claim," are overly

broad and improper. *See id.* They are also premature because pretrial discovery is not substantially complete. *Moriarty v. American General Life Ins. Co.*, Case No. 17-cv-1709-BTM-WVG, 2018 WL 3832935 at *1 (S.D. Cal. Aug. 13, 2018) (Since "[t]he purpose of contention requests is not to obtain facts, but rather to narrow the issues that will be addressed at trial," such requests "need not be answered until the substantial completion of pretrial discovery."). At this stage, any responses that Dealership Plaintiffs could give to these Requests "would be of questionable value to the goal of efficiently advancing the litigation." *See In re eBay Seller Antitrust Litig.,* Case No. 7-cv-1882, 2008 WL 5212170 at *2 (N.D. Cal. Dec. 11, 2008). Accordingly, Dealership Plaintiffs should not be compelled to respond to these Requests.

### f.   CDK's Improper Demands for Publicly and/or Equally Available Materials and Information

CDK offers an odd and internally contradictory complaint about Dealership Plaintiffs' objections to overbroad and sweeping requests for documents that are public and as equally available to CDK as they are to Dealership Plaintiffs. Def. Mem. at 17.[18] CDK objects that "[u]nlike any other party to the MDL, the Dealers also refuse to produce documents that are publicly available." *Id.* In the very next sentence CDK concedes that "[t]he Dealers state that ***they will*** produce 'public' documents" in response to certain RFPs. *Id.* In fact, the correspondence cited by CDK states that Dealership Plaintiffs have agreed to produce (or make available by providing locations of) copies of publicly available documents in response to five out of the seven RFPs at issue. Def. Mem. Ex. 20 at 2.

The case law cited by CDK on this point is inapposite. CDK makes this specific complaint about Dealership Plaintiffs' responses to certain RFPs, but CDK cites cases relating

---

[18] Citing Def. Mem. Ex. 20, at 2.

only to interrogatories and requests to admit. Def. Mem. at 17-18; *Meyer v. S. Pacific Lines,* 199 F.R.D. 610, 615 (N.D. Ill. 2001) (citing *United States v. 58.16 Acres of Land*, 66 F.R.D. 570, 573 (E.D. Ill. 1975), which held that "[g]enerally an interrogatory is proper although the information sought is equally available to both parties."). In fact, it is black letter law that public information need not be re-disclosed in discovery. *See, e.g.*, *King v. Burlington Northern & Santa Fe Railway Co.*, 538 F.3d 814, 819 (7th Cir. 2008) (recognizing that "publicly available" information can be obtained by a party "without depositions or other discovery"); *Gross v. Town of Cicero*, Case No. 04-cv-0489, 2005 WL 2420372 at *3 (N.D. Ill. Sept. 28, 2005) (Darrah, J.) (rejecting motion to strike certain documents not produced in discovery because "some of the documents were public record documents"); *L&L Franchise, Inc. v. Tsai,* Case No. 06-cv-1155-JAH-POR, 2008 WL 11337594 at *3 (S.D. Cal. Mar. 7, 2008) ("[B]ecause either party could have conducted the simple search and discovered these same web pages, these documents need not be subject to discovery."). *Assurance Co. of Am. v. Nat'l Fire & Marine Ins. Co.,* Case No. 09-cv-1162-JCM-PAL, 2012 WL 1970017 at *4 (D. Nev. June 1, 2012) ("[B]ecause the documents were readily and equally available to all parties, there was no duty to disclose them during discovery.") (citations and footnotes omitted); *SEC v. Samuel H. Sloan & Co.*, 369 F. Supp. 994, 995 (S.D.N.Y. 1973) ("[D]iscovery need not be required of documents of public record which are equally accessible to all parties").[19]

### 2. Dealership Plaintiffs' Objections and Responses to CDK's Proposed ESI Search Terms.

CDK complains about Dealership Plaintiffs' reluctance to offer blanket acceptance to

---

[19] The specific Requests with which CDK takes issue on this subject – Nos. 75 and 79 – call for "[e]very document referred to, quoted, paraphrased, or excerpted in the Complaints or the Consolidated Amended Complaint, or otherwise relied upon as the basis for any allegation in either the Complaints or the Consolidated Amended Complaint" and "[e]very document referred to, quoted, paraphrased, or excerpted in Your responses to any interrogatories in this litigation."

CDK's 135 search terms, the many of which are unrelated to any of the issues in this antitrust litigation. These search terms are, by and large, targeted toward defenses already ruled irrelevant or some speculative and unalleged counterclaims. *See supra* at 1-2, 6-7. As discussed above, this is entirely improper, and Dealership Plaintiffs stand by their objections on this basis. A review of CDK's proposed search terms illustrates the validity of Dealership Plaintiffs' responses and objections thereto, as well as their refusal to conduct such searches as written and/or insistence on reasonable modifications. For instance, CDK previously insisted that all 25 Dealership Plaintiffs search their electronic materials for such plainly overbroad terms as:

- (No. 21) "sensitive personal information"[20]

- (No. 105) agen*

- (No. 119) Disable[21]

- (No. 129) (OEM and data)

- (No. 39) (*settle* OR assign*) AND (Lawsuit OR litigat* OR complaint OR alleg* OR claim* OR (legal w/3 (action OR proceeding)) OR MDL OR "multi district")

- (No. 46) (BOD OR "Board of Directors" OR shareholder OR investor) AND (minutes OR notes OR present*)

- (No. 47) (breach OR hack OR attack OR data) AND (target OR "north korea" OR Sony OR "Community Health" OR Equifax OR Facebook OR DealerBuilt OR "New Hampshire"))

- (No. 88) (Login OR username OR "user name" OR password OR credential* OR

---

[20] This proposed term by CDK, as with many others, is also objectionable because it appears exclusively and improperly geared toward "cyber-security" or related issues. *See supra* at 1-2, 6-7; *see also* for example CDK proposed Terms 47, 88, 95, 96, 100, 104, and 132.

[21] CDK withdrew proposed search terms 105 and 119 (and 17, 59 and 121) via email on August 7, 2018, the day after filing its motion but with no mention of the withdrawal therein. This is understandable since nearly a week prior, Dealership Plaintiffs objected to the inclusion of terms such as 119 and others, based on only reasoned argument rather than the hit counts and data CDK claims as necessary for its negotiations. *See* Def. Mem. at 19.

pwd OR (user w/5 ID)) AND (recei* OR stor* OR compil* OR encrypt* OR transmi* OR request OR shar* OR obtain OR gather OR acquir* OR protect OR utilize* OR use OR maintain* OR email OR send OR stor* OR access)[22]

Defendants original search terms also improperly included a single term, No. 135, featuring the names of many of the dealership plaintiffs separated only by the connector "OR", essentially comprising 49 separate terms, each of which likely to hit on every document in the respective dealership's productions.[23] *See Diesel Power Source v. Crazy Carl's Turbos*, No. 2:14-CV-826 DN, 2017 WL 57791 at *2 (D. Utah Jan. 5, 2017) (finding undue burden because "a search term using a part of [a] business name is not acceptable").[24] Accordingly CDK's motion should not be granted with respect its search terms.[25]

---

[22] As explained above, CDK's requested discovery should be entirely denied where it concerns "cyber-security," "data integrity," or related issues vis-à-vis the Dealership Plaintiffs. However, should the Court grant any such discovery, Dealership Plaintiff respectfully request that the Court also direct that the parties promptly meet and confer concerning CDK's proposed terms on these subjects, many of which are extremely overbroad as written, and negotiate an agreed-upon list to be submitted within ten days.

[23] CDK withdrew this term as drafted on August 7, 2018, reflecting lack of consideration of Dealership Plaintiffs' reason-based arguments a week prior. *See* Def. Ex. 33 (J. Hughes Letter to J. Michaels dated Aug. 2, 2018 at 2, fn 4.); Ex. 1 hereto (M. Provance email to P. Wedgworth dated Aug. 7, 2018).

[24] A look at CDK's treatment of MDL Plaintiffs' proposed search terms is also instructive. CDK complains that Dealership Plaintiffs have been unduly dismissive of its proposed terms, yet CDK initially rejected or insisted on modifying about one-half of MDL Plaintiffs' proposed search terms, in many instances with little or no explanation or support than a perfunctory "Overbroad" or "Not relevant." Def. Ex. 14 at 103 (CDK's responses/objections to MDL Plaintiffs' proposed terms Nos. 38, 50, 60, 74, 76B, 77, 81, 82, 95, 101, 102, 104, 107, 124, 146, 147, 149, 150).

[25] In the face of CDK's accusations of stonewalling, Dealership Plaintiffs have accepted versions of many of CDK's proposed search terms, both as reasonably modified and as originally drafted where possible. In the weeks before and since CDK filed its motion to compel, Dealership Plaintiffs have worked hard in good faith to reach compromise on remaining issues, efforts continuing to the present. *See, e.g.*, Ex. 2 hereto (J. Hughes Corresp. to J. Michaels dated Aug. 28, 2018.). *See also* Def. Ex. 26 and Ex. 3 hereto (Dealership Plaintiffs' counter proposals dated Aug. 28, 2018). CDK abruptly broke off from these negotiations following Dealership Plaintiffs' Aug. 28, 2018 proposal. *See* Ex. 3 hereto (J. Michaels email to J. Hughes dated Aug. 29, 2018).

## IV.    ARGUMENT – INDIVIDUAL AND VENDOR CLASS PLAINTIFFS

CDK moves to compel the Individual and Vendor Class Plaintiffs on the following issues: (1) AutoLoop and Cox Automotive documents related to the "use of data"; (2) Authenticom with respect to certain Interrogatory and RFA responses; and (3) MVSC with respect to documents dating back to 2013.  For the reasons stated below, CDK's complaints are either moot or should be rejected.

### A.    CDK's Motion to Compel Cox Automotive and AutoLoop to Produce Documents Regarding Their "Use of Data" Should Be Denied

CDK served 183 broad requests for production on AutoLoop and Cox Automotive. Many of these requests were part of an overbroad search for competitively sensitive information that CDK could have used to give its own applications an upper hand against Cox Automotive's and AutoLoop's competing applications.  Among other things, CDK sought "[a]ll . . . strategic plans . . . or strategies[] concerning Your Applications" and defined "Applications" to include all of AutoLoop's and Cox Automotive's "products or services" regardless of whether those "products or services" are even at issue in the litigation.  *See* Ex. 4 at Definition #2, RFP #24; *id.*, Ex. 5 at Definition #3, RFP #1.  Nonetheless, the parties were able to resolve all disagreements but one, principally because AutoLoop and Cox Automotive acceded to CDK's requests for irrelevant information.

The only issue in dispute is whether AutoLoop and Cox Automotive must produce documents relating to their "use of data obtained from Defendants' DMSs," including "re-syndication of any such data."  *See* Dkt. 323 at 22.  As an initial matter, none of CDK's requests for production seek documents relating to AutoLoop's and Cox Automotive's "use of data," and so that request should be rejected out of hand.  And any such request would have been hopelessly overbroad, as it would cover every document about the workings of AutoLoop's and Cox

Automotive's applications given that no application can work without dealer data, which is the lifeblood of the entire industry. Accordingly, CDK's request for documents about AutoLoop's and Cox Automotive's "use of data" should be denied.

So too should CDK's narrower request for documents concerning the "re-syndication" of data. "Re-syndication" refers to the provision of data to a third-party. For example, AutoLoop and Cox Automotive offer consumer-facing applications that advertise a dealer's car inventory online and allow consumers to schedule service appointments. In CDK's lingo, those applications "re-syndicate" data whenever they display data obtained from the DMS – such as cars available for sale or the time of an upcoming service appointment – to consumers.

However, as CDK notes (at 2), this litigation concerns CDK's and Reynolds' practice of "prohibit[ing] third-party access to their respective [DMS] outside their approved access programs." Notably, AutoLoop and Cox Automotive may obtain data from CDK's DMS using CDK's "approved access program," albeit at sky-high prices. Because CDK still allows AutoLoop and Cox Automotive to obtain data from CDK's DMS through approved channels, CDK's decision to close off other channels of access could not be motivated by how AutoLoop's and Cox Automotive's applications use the data to perform their services for dealers.

Nonetheless, CDK insists there are three reasons why information about "re-syndication" is relevant. None has merit. *First*, CDK contends (at 22) that this information is relevant to "why CDK 'secured' its DMS." That could be true only if CDK had "secured" its DMS to prevent AutoLoop and Cox Automotive from obtaining data, but it is indisputable that CDK still allows them to obtain data from the DMS. *Second*, CDK argues that this information will show whether AutoLoop and Cox Automotive "observed proper data security protocols." But AutoLoop's and Cox Automotive's data security protocols have had no effect on CDK's actions

25

because CDK still allows them to obtain the data from the DMS. In any case, CDK will already receive documents on this issue, as AutoLoop and Cox Automotive have explained that they will not withhold documents relating to the effect that their applications have on the data security of any DMS. *See* Dkt. 317-01, Ex. 16 at 2. *Third*, CDK claims that documents about "re-syndication" will show whether AutoLoop and Cox Automotive have breached their contracts with CDK. But CDK has asserted no breach of contract claims against AutoLoop and Cox Automotive, and has no basis to assert one. CDK's "attempt to discover evidence . . . for unasserted claims is improper," and thus, should be denied. *Am. Roller Co. v. Foster-Adams Leasing, LLP*, 2006 WL 1371441, at *3 (N.D. Ill. May 16, 2006); *see C & C Jewelry Mfg., Inc. v. West*, 2011 WL 2433817, at *2 (N.D. Cal. June 13, 2011) (rejecting attempt to "fish for evidence of potential claims").

### B. CDK's Motion to Compel Relating to Certain of Authenticom's Interrogatory and RFA Responses Should Be Denied

#### 1. Authenticom's Interrogatory Responses Are Sufficient

In its motion to compel, CDK states (at 24) that "Authenticom has failed to adequately respond to ten interrogatories," but then CDK proceeds to only discuss seven – Nos. 4, 5, 10, 11, 13, 21, and 25. Authenticom thus addresses the seven that are actually at issue in CDK's motion to compel.

The gravamen of CDK's argument is that Authenticom's interrogatory responses provide "inadequate" answers to the propounded questions, and therefore CDK wants Authenticom to provide additional details. But Authenticom's responses directly answer the questions asked with sufficient particularity. Moreover, Authenticom has already informed CDK that it will supplement its responses, as necessary, with citations to produced business records pursuant to Rule 33(d). *See* F.R.C.P. 33(d) (permitting party, in responding to an interrogatory, to "produce

business records" and cite those documents in its interrogatory response). CDK's complaint is therefore premature. The deadline for completing document productions is October 12, 2018, and Authenticom has agreed to supplement, as appropriate, its interrogatory responses with additional information after its document production is complete.

Even without further supplementation, however, Authenticom's interrogatory responses are more than sufficient. The ones at issue are addressed in turn.

**Interrogatory No. 4.** This Interrogatory asks for information regarding steps Authenticom has taken to prevent CDK or Reynolds from (1) detecting its access to data or (2) blocking such access. Authenticom has provided a full response. With respect to the first, Authenticom responded that it "works with dealers to randomize" the login credentials "that dealers create and provide to Authenticom." Beyond that, Authenticom does not try to "prevent" Defendants from "detecting" its working relationships with dealers. And with respect to blocking access, Authenticom works with dealers to re-establish access once blocked, as Authenticom described in its response. CDK claims (at 26) that Authenticom's statement is "vague and incomplete," but Authenticom explained (at 24-25) that "it asks its dealer clients to call Reynolds and/or CDK and request that these profiles be reactivated. Authenticom researches what is causing the lockouts, including by speaking to dealers, and works with dealers to re-establish access to the dealers' data." CDK has no basis to request more, especially where Authenticom has agreed to cite to business records showing how this process works.

**Interrogatory No. 5.** This Interrogatory asks for "the means" by which Authenticom accesses data for dealers not using a Reynolds or CDK DMS. Authenticom provided a full response, explaining that it does so through (1) Application Programming Interfaces ("APIs"), (2) data pushing, and (3) screen-scraping. "On rare occasions," Authenticom explained (at 25)

that "some dealers have provided Authenticom with encrypted hard drives or storage media devices containing the dealers' data." Just as importantly, Authenticom added that "no other DMS provider, aside from CDK and Reynolds, has ever disabled or interrupted Authenticom's dealer-authorized access to dealer data." CDK complains (at 27) that this response is insufficient because the interrogatory asks not just about "dealer data," but "all data." Authenticom does not access non-dealer data, and its response is therefore complete.

**Interrogatory Nos. 10 and 11.** These Interrogatories ask for the steps Authenticom takes to ensure that its access to data "does not exceed a Dealer's express authorization" (No. 10) nor access data that does not belong to the dealers (No. 11). Authenticom provided a full response. For example, Authenticom explained (at 25-26) that it cannot and does not access data without the express authorization of dealers; that it only accesses the data dealers themselves have authorization to access; that dealers control – through Authenticom's DealerVault interface – exactly which data Authenticom can access; and that Authenticom designed its database and import system to reject the import of data that exceeds the scope of the dealer's authorization. CDK complains (at 27) that this response is "vague," but it is nothing of the sort.

**Interrogatory No. 13.** This Interrogatory asks for the steps Authenticom takes to ensure that the vendors to whom Authenticom sends the data are in fact authorized by dealers to receive the data. Again, Authenticom's response (at 25-26) is more than sufficient. Authenticom cited to the preliminary injunction hearing proceedings where its product and services were demonstrated and described in detail under oath. In fact, Judge Peterson specifically cited the control that Authenticom gives dealers over the data transmission to vendors as a reason for Authenticom's success prior to Defendants' conspiracy to drive it from the market. *See Authenticom, Inc. v. CDK Global, LLC*, 2017 WL 3017048, at *2 (W.D. Wis. 2017)

28

("DealerVault provides an interface that allows dealers to monitor and control the data provided from its DMS to the vendors it uses. DealerVault is popular with dealers, who generally feel strongly that because they own their data, they should be able to control and monitor its use."). Therefore, the "steps" that Authenticom takes to ensure that only the dealers' chosen vendors receive the dealers' data is that Authenticom gives dealers total control over the process. Authenticom's software runs pursuant to that direction. It is not clear what further explanation CDK expects.

**Interrogatory No. 21.** This interrogatory seeks "the terms of access" Authenticom is seeking, and whether those terms of access should apply to others as well. Authenticom pointed CDK to its complaint, where it describes the relief it seeks for itself and none other. For present purposes, that is sufficient. Asking for anything else is premature as the precise terms of the injunctive relief Authenticom may seek will rely in large part on the conclusions of its antitrust economic expert. As the Seventh Circuit explained in its opinion, "After trial" – acknowledging that this case should go to trial – "the court will be better able to assess the competitive significance of CDK and Reynolds's business models, of the 2015 agreements, and of any other agreement Authenticom is able to prove," and then decide what injunctive relief may be appropriate. *Authenticom* Dkt. No. 226-02, at 14. That is exactly what Authenticom's antitrust expert is doing. To ask Authenticom to provide further details now is premature.

**Interrogatory No. 25.** This Interrogatory asks Authenticom to explain the basis, cite documents, and identify knowledgeable persons for every denial to one of CDK's nineteen different RFAs. In other words, for each denial, CDK has asked Authenticom to provide all information explaining that denial. Courts throughout the country have held that such requests transform RFAs into Interrogatories, and that such tactics cannot be used to circumvent the

numerical limit for Interrogatories imposed by Rule 33(a). As explained by one court, "Allowing service of an interrogatory which requests disclosure of all of the information on which the denials of each of 50 requests for admissions were based … essentially transforms each request for admission into an interrogatory." *Makaeff v. Trump Univ., LLC*, 2014 WL 3490356, at *5 (S.D. Cal. July 11, 2014) (citation and quotation marks omitted). "This is not the purpose requests for admissions were intended to serve," the court explained, "and because Rule 36 imposes no numerical limit on the number of requests for admissions that may be served, condoning such a practice would circumvent the numerical limit contained in Rule 33(a)" for interrogatories. *Id*.; *see also* 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, § 2252, at 524–525 (same). Therefore, courts routinely hold that an interrogatory "that asked for a response regarding every RFA in which the plaintiff responded with anything other than an unqualified admission" – just as CDK does here – "effectively constituted separate interrogatories." *Makaeff*, 2014 WL 3490356, at *6 (collecting cases).

That reasoning is precisely on point here. CDK's nineteen RFAs are not on the same subject, but run the gamut from Authenticom's various services and products to the types of data residing on a DMS to the terms of CDK's DMS contracts. CDK's Interrogatory No. 25 therefore constitutes nineteen different interrogatories and puts CDK well above the numerical limit provided by Rule 33(a). Authenticom's objection that "CDK has vastly exceeded the number of Interrogatories permitted under the Federal Rules of Civil Procedure" is therefore well-founded and CDK's motion to compel should be denied.

**Current Practices versus Past Practices.** Several of CDK's Interrogatories – namely, Nos. 9, 10, 11, 12, 13, and 14 – asked about Authenticom's current (as opposed to past) practices, and so Authenticom's responses related to its current practices. Now CDK also wants

information on Authenticom's past practices to determine if Authenticom's practices have changed. Authenticom maintains that CDK should have propounded interrogatories that asked for such information. Nevertheless, in order to resolve this dispute, Authenticom will amend its responses to the Interrogatories at issue to explain how its practices may have changed, if at all.

### 2.     Authenticom's Responses to CDK RFA Nos. 3 and 4 Are Proper

CDK seeks the extraordinary relief of having two RFAs – Nos. 3 and 4 – deemed admitted, even though Authenticom provided full and good faith responses to the propounded requests. RFA No. 3 asks Authenticom to admit that it has "accessed data maintained on CDK DMSs without a license from CDK," and RFA No. 4 relatedly asks for an admission that Authenticom "developed scripts to access data maintained on CDK DMSs by responding 'YES' to the log-in prompt." CDK may not agree with Authenticom's responses to these RFAs, but that does not mean it can compel admissions in response to them.

As fully explained in Authenticom's motion to dismiss CDK's counterclaims, "CDK's standard DMS contract expressly authorized dealers and their agents to access a dealer's DMS," and CDK cannot plausibly show "that Authenticom was not acting as the dealers' agent when it accessed CDK's DMS on the dealers' behalf." *See generally* MDL Dkt. No. 276. Therefore, for RFA No. 3, Authenticom responded (at 29) that it "accesses dealer data with the express authorization of dealers, who are licensed to access their data on the CDK DMS and entitled, by contract and otherwise, to designate Authenticom to access the dealers' data." Similarly, for RFA No. 4, Authenticom responded (at 30) that dealers are entitled "to designate Authenticom to access the dealers' data as the dealers' agent," and that Authenticom therefore admitted that "dealers authorize Authenticom to access dealer data for purposes of providing data integration services, including by using login credentials in connection with the log-in prompt above."

31

Otherwise, Authenticom denied the RFA. Authenticom therefore responded in good faith to the RFAs, explaining that dealers have the right to designate Authenticom as agents under the dealers' license agreements with CDK.

Where a party has complied with Rule 36 in this way, a court has no basis to deem the matter admitted. *See* Fed. R. Civ. P. 36; Wright & Miller, 8B Fed. Prac. & Proc. Civ. § 2260 (3d ed.). The Rule expressly allows parties to deny part of a particular request for admission, provided they fairly respond to the substance of the matter and do so in good faith. Fed. R. Civ. P. 36(4) ("If a matter is not admitted, the answer must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it. A denial must fairly respond to the substance of the matter; and *when good faith requires that a party qualify an answer or deny only a part of a matter, the answer must specify the part admitted and qualify or deny the rest*.") (emphasis added); *see also Merix Pharm. Corp. v. EMS Acquisition Corp.*, No. 09 CV 5871, 2010 WL 3781013, at *5 (N.D. Ill. Sept. 21, 2010) (denying motion to deem responses admissions because responding party satisfied Rule 36(a)(4) with its qualified responses); *Hunt v. Northwest Community Hosp., Inc.*, No. 3 C 50250, at 2007 WL 1512580, at *4 (N.D. Ill. May 22, 2007) (same). CDK's request to have the RFAs deemed admitted should therefore be denied.

### C. CDK's Motion to Compel MVSC to Produce Documents Dating Back to 2013 Is Moot

For MVSC, CDK and Reynolds have sought discovery of documents going back to 2013, even though MVSC's unique claims pertain to conduct after 2014. However, the issue is now moot. In order to resolve the only outstanding issue with respect to its discovery responses, and despite the additional burden (which is substantial), MVSC has agreed to a date range starting at January 1, 2013.

## V.     CONCLUSION

MDL Plaintiffs have engaged in extensive good faith efforts to try to resolve any continuing discovery disputes with CDK in hopes of reaching a negotiated resolution on the outstanding issues.  MDL Plaintiffs expect to continue to do so.  Nevertheless, for the reasons stated above, CDK's Motion to Compel should be denied on the handful of remaining issues for which the parties have not found agreement.


Dated: August 29, 2018                                   Respectfully submitted,

*/s/ Derek T. Ho*                                        */s/ Peggy J. Wedgworth*
Derek T. Ho                                             Peggy J. Wedgworth (pro hac vice)
**KELLOGG, HANSEN, TODD, FIGEL &**                      **MILBERG TADLER PHILLIPS**
**FREDERICK P.L.L.C.**                                  **GROSSMAN LLP**
1615 M Street, NW, Suite 400                            One Pennsylvania Plaza, 19th Floor
Washington, D.C. 20036                                  New York, New York 10119
(202) 326-7932                                          (212) 594-5300
dho@kellogghansen.com                                   pwedgworth@milberg.com


                                                        *MDL Co-Lead Counsel*

<u>**CERTIFICATE OF SERVICE**</u>

I, Peggy J. Wedgworth, an attorney, hereby certify that on August 29, 2018, I caused to be served a true and correct copy of the foregoing **MDL PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO CDK GLOBAL, LLC'S OMNIBUS MOTION TO COMPEL** to be filed and served electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filings as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

/s/ Peggy J. Wedgworth
Peggy J. Wedgworth
**MILBERG TADLER
PHILLIPS GROSSMAN LLP**
One Pennsylvania Plaza, 19th Floor
New York, NY 10119
(212) 594-5300
pwedgworth@milberg.com