# EXHIBIT 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This document relates to:* | Hon. Amy J. St. Eve |
| *Cox Automotive, Inc, et al. v. CDK Global, LLC*, Case No. 1:18-CV-1058 (N.D. Ill.) | |

## DEFENDANT CDK GLOBAL, LLC'S FIRST REQUESTS FOR THE PRODUCTION OF DOCUMENTS TO COX AUTOMOTIVE, INC.

Pursuant to Rule 26 and 34 of the Federal Rules of Civil Procedure, Defendant CDK Global, LLC ("CDK") hereby requests that Plaintiff Cox Automotive, Inc., produce all documents described below for inspection and copying at the offices of Mayer Brown LLP, 71 South Wacker Drive, Chicago, Illinois 60606, on or before 30 days after service hereof.[1] These Requests are to be responded to in accordance with the following Definitions and Instructions.

### DEFINITIONS

1. "3PA" means CDK's Third-Party Access (3PA) Program.

2. "Application" shall mean any automotive software products or services, whether stand-alone, web-based, or otherwise and regardless of whether the application is capable of being or is integrated with any DMS—including, but not limited to, inventory management,

---

[1] CDK acknowledges that certain of the information sought by these requests were previously requested, in whole or in part, in a November 20, 2017 third-party subpoena issued to Cox in the matter captioned *Authenticom, Inc. v. CDK Global, LLC, et al.,* No. 18-cv-868 (N.D. Ill.) (formerly No. 17-cv-318 (W.D. Wis.)). Cox, however, has not responded to that subpoena or otherwise engaged in third-party discovery in the *Authenticom* matter since filing its action. These requests, therefore, are not intended to be duplicative of that third-party discovery. Rather, any overlapping requests are being served here to ensure that CDK receives full and complete information regarding the requested topics. To the extent Cox intends to comply with the *Authenticom* subpoena, CDK is willing to meet and confer with Cox and Reynolds (which issued the subpoena) to try to minimize duplication across Cox's discovery responses in this and the *Authenticom* matter.

customer relationship management, and electronic vehicle registration and titling applications—utilized by Dealers, manufacturers, lenders and other businesses in the automotive industry.

3.      "Authenticom" means Authenticom, Inc., as well as its officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors or predecessors, all persons acting on Authenticom's behalf, and any and all persons and entities affiliated with or controlled by Authenticom.

4.      "Autotrader" means Autotrader.com, Inc., as well as its officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors or predecessors, all persons acting on Autotrader's behalf, and any and all persons and entities affiliated with or controlled by Autotrader.

5.      "CDK" means CDK Global, LLC, as well as its officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors or predecessors, all persons acting on CDK's behalf, and any and all persons and entities affiliated with or controlled by CDK.

6.      "CDK DMS" means any DMS licensed to a Dealer by CDK.

7.      "CDK Proprietary Data" means data that are owned or created by CDK and licensed to DMS users, including, for example, service pricing guide information, operation codes and descriptions, and service labor hours and rates, regardless of whether those data have been re-keyed into another DMS field.

8.      "Complaint" means the complaint You filed against CDK Global, LLC, on December 11, 2017, in the United States District Court for the Western District of Wisconsin, in case number 17-cv-925.

9.     "Contracted Data Extractor" shall mean any Data Extractor with which You have contracted to provide Data Extraction Services.

10.     Unless otherwise specified, "Cox," "You," and "Your" means Cox Automotive, Inc., as well as its officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries (including, but not limited to, Autotrader, Dealer Dot Com, DealerTrack, HomeNet, Kelley Blue Book Co., vAuto, VinSolutions, and Xtime), parents, successors or predecessors, all persons acting on Cox's behalf, and any and all persons and entities affiliated with or controlled by Cox.

11.     "Data Extractor" shall mean a party who provides Data Extraction Services. For purposes of these Requests, this term is intended to include Data Integrators, as that term is used in the Complaint.

12.     "Data Extraction Services" means the provision of services for extracting, cleansing, formatting, integrating, standardizing or organizing the data housed on a DMS.

13.     "Dealer" means any new or used auto, truck, motorcycle, marine, recreational vehicle or heavy equipment dealer operating in the United States.

14.     "DealerTrack" means Dealertrack, Inc., as well as its officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors or predecessors, all persons acting on DealerTrack's behalf, and any and all persons and entities affiliated with or controlled by DealerTrack.

15.     "Dealer Dot Com" means Dealer Dot Com, Inc., as well as its officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors or predecessors, all persons acting on Dealer Dot Com's behalf, and any and all persons and entities affiliated with or controlled by Dealer Dot Com.

16.     "DMS" means an enterprise system comprised of hardware, software, databases, and related data used by Dealers to manage and operate their dealerships, usually referred to as the DMS or Dealer Management System.

17.     "HomeNet" means HomeNet, Inc., as well as its officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors or predecessors, all persons acting on HomeNet's behalf, and any and all persons and entities affiliated with or controlled by HomeNet.

18.     "Kelley Blue Book" means Kelley Blue Book Co., Inc., as well as its officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors or predecessors, all persons acting on Kelley Blue Book's behalf, and any and all persons and entities affiliated with or controlled by Kelley Blue Book.

19.     "OEM" means any Original Equipment Manufacturer.

20.     "OEM Proprietary Data" means data that are owned or created by an OEM and licensed to DMS providers, including, for example, part numbers and descriptions, part costs, part return codes, part compensation values, part supersessions, operation codes and descriptions, and service labor hours and rates, regardless of whether those data have been re-keyed into another DMS field.

21.     "OpenTrack API" means DealerTrack's OpenTrack Application Programming Interface ("API").

22.     "Relevant Services" means the services that You provide as a Vendor to Dealers in the automotive industry and those services that You provide as a DMS provider.

23.     "Reynolds" means The Reynolds and Reynolds Company, as well as its officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries,

parents, successors or predecessors, all persons acting on Reynolds's behalf, and any and all persons and entities affiliated with or controlled by Reynolds.

24.     "Reynolds Proprietary Data" means data that are owned or created by Reynolds and licensed to DMS users, including, for example, service pricing guide information, operation codes and descriptions, and service labor hours and rates, regardless of whether those data have been re-keyed into another DMS field.

25.     "Third Party Proprietary Data" means data that are owned or created by any third-party and licensed to DMS providers, including for example, Motor labor times, third-party vehicle description data, and incentive data, regardless of whether those data have been re-keyed into another DMS field.

26.      "vAuto" means "vAuto, Inc., as well as its officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors or predecessors, all persons acting on vAuto's behalf, and any and all persons and entities affiliated with or controlled by vAuto.

27.     "Vendor" means any third-party applications provider that uses Dealer or DMS data to provide Dealers with services, including inventory management, customer relationship management, and electronic vehicle registration and titling.

28.     "VinSolutions" means VinSolutions, Inc., as well as its officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors or predecessors, all persons acting on VinSolution's behalf, and any and all persons and entities affiliated with or controlled by VinSolutions.

29.     "Xtime" means Xtime, Inc., as well as its officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors or predecessors,

all persons acting on Xtime's behalf, and any and all persons and entities affiliated with or controlled by Xtime.

## **INSTRUCTIONS**

1.      Unless otherwise indicated, each Request relates to the time period January 1, 2013 to the present (the "Relevant Time Period").

2.      You are instructed to produce all documents and communications identified by these Requests either as they are kept in the usual course of business or organized and labeled according to the record description to which they are deemed responsive.

3.      You are instructed to produce all documents and communications identified by these Requests that are in Your actual or constructive possession, custody, or control.

4.      Any noun used in the singular form shall be construed and applied so as to include the plural form also, and vice versa.

5.      Each Request shall be construed independently, and no Request shall be viewed as limiting the scope of any other Request, except that documents responsive to more than one Request need be produced only once.

6.      Each and every non-identical copy of a document, whether different from the original because of stamps, indications of the recipient(s), handwritten notes, marks, attachments, or any other reason, is a separate document that must be produced.

7.      If objecting to any Request, in whole or in part, the objection must state whether any responsive materials are being withheld on the basis of that objection in accordance with Fed. R. Civ. P. 34(b)(2)(c).

8.    If You become aware of any documents or communications requested in these Requests that have been destroyed, lost, misplaced, or are otherwise incapable of production, You are instructed to respond by providing the following information:

(a)    The type of document (*e.g.* e-mail, notes, letters, memorandum, etc.);

(b)    A description of the document and its contents;

(c)    The identity of the author of the document;

(d)    The circumstances under which the document was destroyed, lost, misplaced, or rendered otherwise incapable of production; and

(e)    The identity of all persons having knowledge of the documents or the circumstances under which the document was destroyed, lost misplaced or otherwise rendered incapable of production.

9.    In the event You assert any form of objection or privilege as a ground for not producing any documents or communications requested in these Requests, You must identify the legal grounds and facts supporting the objection or privilege in accordance with Fed. R. Civ. P. 26(b)(5) and any applicable local rules and orders issued in the above-captioned proceeding. With respect to each responsive document that is withheld on the basis of an applicable privilege or other protection against disclosure, You are instructed to:

(a)    Identify the author(s), sender(s), and recipient(s) of the document;

(b)    Identify the date(s) the document was created and distributed;

(c)    Identify the applicable privilege(s) or protection(s) against disclosure; and

(d)    Describe the nature of the document in a manner that will enable CDK to assess the applicability of the privilege(s) or protection(s) against disclosure that You rely on.

10.     This set of Requests shall be deemed continuing in accordance with Fed. R. Civ. P. 26(e). If You obtain or become aware of any further documents responsive to this set of Requests, You are required to produce such additional documents.

## DOCUMENT REQUESTS

### *Acquisition and Development of DealerTrack*[2]

1.      All documents related to any public statements about the acquisition of DealerTrack, including, but not limited to, Alex Taylor's presentation on the acquisition as reported in *Automotive News* (July 25, 2016) and Cliff Bank's remarks at the October 7, 2015 BWG Strategy conference.

2.      All documents related to any statements made to DealerTrack investors regarding Your acquisition of DealerTrack.

3.      All documents related to any endorsement of You by the California New Car Dealers Association.

4.      All documents You submitted to the United States Federal Trade Commission or any other regulatory authority as part of Your Hart-Scott-Rodino Act ("HSR") filing related to Your acquisition of DealerTrack, including all documents which are responsive or otherwise submitted pursuant to Item 4(c) of Your HSR Form.

5.      All documents related to the divestiture of assets and other conduct required of You pursuant to the Final Judgment (Dkt. No. 11) entered on January 21, 2016, in *United States v. Cox Enter., Inc., et al.,* Civ. Action No. 15-01583 (D.D.C.).

6.      All documents related to Your decision for DealerTrack to offer (and continue to offer) an "open" DMS, as that term is used in the Complaint.

---

[2] The headers used in this document are for the convenience of the reader and should not be read to limit, in any way, the requests that appear beneath each.

7.    Documents sufficient to show Your investments in or financing related to DealerTrack, including, specifically, any investments in or financing related to data security.

8.    All written business plans or presentations related to DealerTrack.

9.    All versions of Your standard agreements and/or terms and conditions with Dealers for DMS services offered by DealerTrack, including, but not limited to, contract initiation and expiration dates, all required payments, and provisions regarding sharing Dealers' log-in credentials with third-party Data Extractors.

10.   All marketing materials that refer to DealerTrack, Your Applications, the OpenTrack program or API, CDK, Reynolds, and/or any CDK or Reynolds product, including, but not limited to, materials created after learning about CDK's decision to block third-party Data Extractors.

11.   All documents comparing the DMS systems (including their functionality, service quality, pricing, and/or price changes) offered by DealerTrack and other DMS providers or otherwise assessing competition for DMS customers.

12.   Documents sufficient to show the number and identity of (a) new automobile franchised Dealers, (b) new automobile independent (non-franchised) Dealers, (c) used automobile Dealers, and (d) non-automobile Dealers who were DealerTrack DMS customers for each month during the Relevant Time Period, and DealerTrack's share of each Dealer category for each month during the Relevant Time Period.

13.   Documents, including, but not limited to, "win/loss" reports, sufficient to identify all Dealers who have switched to or from a DealerTrack DMS during the Relevant Time Period, and: (a) the DMS that the Dealer switched to (or from); (b) the effective date of the switch; (c)

the number of Dealer stores that switched; and (d) the length of time the Dealer used the DMS that it switched from.

14. All documents regarding Dealers switching DMS providers, including, but not limited to, Your strategies for switching Dealers to DealerTrack and/or any discussions with Dealers, industry groups, press, or other third parties regarding switching DMS providers.

15. All documents analyzing the ability of Dealers to switch DMS providers, including, but not limited to, studies, reports, engagement letters, surveys, focus group results, and communications. This request includes, but is not limited to, all documents underlying, evidencing, discussing and describing the studies that Cox has publicly described as follows: "Cox Automotive partnered with two independent research firms to conduct studies with hundreds of dealer respondents. This included surveys, focus groups, a national online panel, and one-on-one discussions . . . Respondents with a variety of current DMS providers, including CDK, Reynolds & Reynolds, Dealertrack DMS, and others participated in the research."

16. Any studies or surveys (including, but not limited to, all data and documentary input and output) conducted by or for You reporting on any automotive Dealers' DMS and/or Application use.

17. Documents sufficient to show DealerTrack's DMS market share in the United States DMS market, both by dealership rooftop and any other metric commonly used by Cox to track DMS market share (*e.g.*, percentage of car sales). For the avoidance of doubt, this Request is not limited solely to new car franchised dealerships, but applies to all automobile dealerships that use a DMS.

*Data Security*

18.     All documents related to Your or any Contracted Data Extractor's data security policies (as they pertain to any Relevant Service), including, but not limited to, Your or any Contracted Data Extractor's protocols for inputting, pushing, or otherwise transferring data into or out of DMSs.

19.     All documents and communications, whether internal or involving a third-party, that discuss or refer to security threats to any DMS, including but not limited to concerns regarding the security of data stored on a DMS.

20.     All documents related to any analysis of data security, data integrity, or system performance risks caused by third-party access to any DealerTrack DMS or the data maintained thereon, including, but not limited to, data tracking access to Cox's DMS by Data Extractors, whether hostile or non-hostile extractors.

21.     All documents related to actual or suspected unauthorized third-party access to, misuse, or misappropriation of data maintained on any DealerTrack DMS or any other provider's DMS.

22.     All documents related to any Application, Data Extraction Service, or DMS, and which refer to: (a) the 2013 data breach against Target; (b) North Korea's June 2014 cyber attack against Sony Pictures Enterprise; (c) the August 2014 hack into Community Health System's patient information; (d) the 2017 Equifax data breach; (e) Cambridge Analytica's alleged data scraping of Facebook user's information; (f) the 2016 data security incident at DealerBuilt; or (g) any other attempted or successful cyber attacks or data security breaches.

23.     All documents related to Your cyber liability insurance.

*Applications*

24.     All advertising plans, business plans, strategic plans, estimates, revenue forecasts, sales or marketing plans or efforts, product launch plans, promotional programs, third party market research reports, or strategies, concerning Your Applications.

25.     All documents that discuss the ability of Your Applications to compete with and/or replace traditional DMSs, including, but not limited to, the ability of Dealers to enter data directly into Your Applications in the first instance, bypassing the DMS completely.

26.     Documents sufficient to identify and describe the functionality of each Application that You have offered during the Relevant Time Period, and the number of Dealers who used each Application during each year of the Relevant Time Period.

27.     Documents sufficient to identify (1) all Dealers who used each of Your Applications and (2) the DMS providers they used, including non-Cox DMS providers, for each month of the Relevant Time Period.

28.     All documents related to the fees You charge Your Vendor customers for 3PA and RCI integration.  For the avoidance of doubt, this request includes, by way of example only, Application order forms and invoices on which You indicate a charge or fee for 3PA and RCI integration.

29.     Market studies, survey data, or any other source of market share information on all Applications used by Your Dealer customers.

30.     Documents sufficient to identify Your share of Application sales for each month of the Relevant Time Period, in every way that You keep track of it.

31.     Documents sufficient to identify all competing Application providers and their overall shares and shares by Applications segments for each month of the Relevant Time Period.

32.     All documents related to any analyses comparing Your Applications (including their functionality, service quality, features, technology, capabilities, pricing, and/or price changes) to the Applications offered by CDK or other Vendors or otherwise assessing competition for Application customers.

33.     All documents related to Your allegation in Paragraph 28 of the Complaint that Your "products and services are superior" to those of CDK.

34.     Documents sufficient to identify all Dealers who have switched to or from one of Your Applications during the Relevant Time Period, and: (a) the Application that the Dealer switched to (or from); (b) the effective date of the switch; (b) the number of Dealer stores that switched; and (c) the Dealer's tenure using the prior Application.

35.     All "win/loss" reports and documents that reflect Application customer switching.

36.     All documents reflecting communications with Dealers regarding complaints, shortcomings or disadvantages with respect to the functionality or capabilities of Your products and services.

### *DealerTrack's Third-Party Access Policies*

37.     All documents related to Your policies and practices regarding third-party access to any DealerTrack DMS or data maintained thereon, including, but not limited to, any restrictions or limitations You have placed or considered placing on any DealerTrack DMS, such as: (a) locking access to dealers' user IDs/logins; (b) disabling dealers' userIDs/logins; (c) sunsetting dealer's userIDs/logins and passwords; and/or (d) otherwise preventing Vendors or Data Extractors from accessing dealers' DealerTrack DMSs.

38.     All documents related to agreements with Data Extractors for access to DealerTrack DMSs or data maintained thereon, including, but not limited to, the drafting, negotiation, interpretation, or enforcement of any such agreements.

39.     All documents related to agreements with other DMS providers for access by Applications to a DMS or data maintained thereon, including, but not limited to, the drafting, negotiation, interpretation, or enforcement of any such agreements.

40.     All documents related to any restrictions or limitations You have placed or considered placing on Vendors or Data Extractors who use Dealer login credentials to access DealerTrack DMSs or the data maintained thereon.

41.     All versions of standard agreements and/or terms and conditions for the OpenTrack program in effect since January 1, 2013, as well as, by means of a representative sample, all OpenTrack agreements with any named party in this MDL.

42.     All documents related to any restrictions placed on participants in the OpenTrack program from accessing DealerTrack DMSs or the data maintained thereon through other means.

43.     All documents related to the admission or request for admission into the OpenTrack program by any DMS provider, Data Extractor, or competing Application provider.

44.     All documents related to any differences between how Your Applications access, extract, "writeback" and/or otherwise provide protected integration of data maintained on the DealerTrack DMS compared to the way that competing Applications do so as participants in the OpenTrack program.

45.     All documents related to whether any Contracted Data Extractor's methods of DMS access, data syndication, writeback, or data extraction: (a) are prohibited by any applicable laws, regulations, or contractual agreements; (b) comply with data security, data privacy, or

automotive industry standards or guidance; (c) cause data security, data integrity, or system burden issues; or (d) are otherwise objectionable.

46.     All documents related to any contemplation of charging fees for access to any DealerTrack DMSs or the data maintained thereon, either through the OpenTrack program, the OpenTrack API, or any other means.

47.     All documents related to instances of diminished DMS functionality caused by third party access to a DealerTrack DMS, whether such third party access was through the OpenTrack program, the OpenTrack API, or any other means.

### *Access to the CDK or Reynolds DMS*

48.     All documents related to any CDK or Reynolds Data Authorization forms that You or any Contracted Data Extractor sent to Dealers, and any response(s) that You received.

49.     Documents sufficient to show all agreements with Dealers and/or Contracted Data Extractors regarding access to any CDK or Reynolds DMS or the data maintained thereon.

50.     Documents sufficient to show Your or any Contracted Data Extractor's methods of accessing, requesting, receiving, storing, securing, encrypting, or using data maintained on any CDK or Reynolds DMS or any CDK or Reynolds DMS username and password credentials through means other than approved 3PA or RCI integration, and any written policies, guidance, standards, procedures, or similar documentation that apply to Your or the Contracted Data Extractor's access methods.

51.     Documents sufficient to show all requests for, receipts of, or attempts by You or any Contracted Data Extractor to obtain username and password credentials for any CDK or Reynolds DMS, including, but not limited to, any requests for system administrator-level or "UUP user" access to a CDK DMS.

52.     All documents related to any circumstances in which You or any Contracted Data Extractor have accessed a CDK or Reynolds DMS or the data maintained thereon without first obtaining express, written consent or authorization from a Dealer purporting to permit such access.

53.     All documents related to any Dealer's declination to authorize or request to stop Your or any Contracted Data Extractor's access or extraction of data maintained on any CDK or Reynolds DMS.

54.     All documents that purport to establish You or any Contracted Data Extractor as a Dealer's "agent" for purposes of accessing any CDK DMS or the data maintained thereon.

55.     All documents discussing access privileges associated with Dealer DMS login credentials, including any documents or communications that show whether You or any Contracted Data Extractor have access to any non-Dealer owned data maintained in any CDK or Reynolds DMS, including, but not limited to, any OEM, Third Party, CDK or Reynolds Proprietary Data.

56.     All documents related to Your or any Contracted Data Extractor's development or installation of any "code-on-the-box" used to access any CDK DMS or the data maintained thereon.  For the avoidance of doubt, this includes code-on-the-box installed by or for any of Your Applications.

57.     Documents sufficient to identify for each year of the Relevant Time Period: (a) all CDK DMSs (by Dealer) that You or any Contracted Data Extractor have accessed (directly or indirectly) through any means other than approved 3PA integration; (b) Your or any Contracted Data Extractor's means of accessing the CDK DMS or the data maintained thereon (*e.g.*, code-on-the box, Dealer username and password and screen-scraping); (c) all usernames and

passwords that You or any Contracted Data Extractor have used to access the CDK DMS; and (d) all DMS directories and files that that You or any Contracted Data Extractor accessed.

58.     Documents sufficient to show all English statement queries that You or any Contracted Data Extractor have performed on a CDK DMS.

59.     Documents sufficient to show the date, time, content, volume, frequency, and duration of all queries that You or any Contracted Data Extractor have performed on any CDK DMS or the data maintained thereon through means other than approved 3PA integrations.

60.     All documents related to any data corruption, data integrity, or system performance-related issues experienced by any CDK or Reynolds Dealer, which were attributable to or otherwise related to a Vendor's access to the Dealer's licensed CDK or Reynolds DMS.

61.     All documents that refer or otherwise relate to: (a) CDK's or Reynolds's third-party access policies; (b) CDK's SecurityFirst program; and/or (c) CDK's "refreshed" 3PA program.

62.     All documents related to any efforts or "threats" made by CDK to detect, block, disable, or otherwise restrict Your or any Contracted Data Extractor's access to a CDK DMS or the data maintained thereon, and/or Your or any Contracted Data Extractor's efforts to evade CDK's blocking and detection efforts, including any attempts to bypass security features implemented by CDK and documents sufficient to identify and describe all scripts, programs, or executable files that You or any Contracted Data Extractor have created, used, or provided to Dealers for any of these purposes.

63.     All documents related to Your allegation in Paragraph 171 of the Complaint that a CDK employee "admitted in private conversation with a vendor that the rhetoric around 'security' has 'little credibility.'"

64.     All documents related to Your allegation in Paragraph 177 of the Complaint that "CDK allows other third-parties that it does not fear as competitive threats . . . the right to create and modify repair orders."

*Data Extraction Services*

65.     Documents sufficient to identify for each year of the Relevant Time Period: (a) each Data Extractor that You have used to access any CDK or Reynolds DMS or the data maintained thereon; (b) the Dealers on whose behalf you engaged each Data Extractor; and (c) all DMS directories and files that were accessed by the Data Extractor.

66.     All documents related to any agreements between You and Data Extractors for access to any CDK or Reynolds DMS or the data maintained thereon, including, but not limited to, the drafting, negotiation, interpretation, or enforcement of any such agreements.

67.     All documents related to pricing and/or services offered by any Data Extractor for access to CDK or Reynolds DMSs or the data maintained thereon.

68.     All documents related to any Data Extraction Services that You offer or which You have offered during the Relevant Time Period.

69.     All documents related to Your actual or contemplated syndication of data maintained on any CDK or Reynolds DMS to third parties, including any related agreements.

70.     All documents reflecting communications, agreements, or transactions with 10 Foot Wave, LLC related to any CDK or Reynolds DMS or the data maintained thereon.

71.    Documents sufficient to show each third party (including other Vendors) to whom You have syndicated data maintained on a CDK or Reynolds DMS, and all DMS directories and files that were syndicated to each third party.

*January 8, 2016 3PA Agreement*

72.    All documents related to Your 3PA Agreement with CDK dated January 8, 2016, including, but not limited to: (a) the decision to enter into the Agreement; (b) any analysis of the financial impact of entering into the Agreement and the pricing terms therein; (c) all negotiations surrounding the Agreement; (d) any amendments to the Agreement; and/or (e) any analysis or communication concerning the legality or illegality of the Agreement.

73.    All documents that reflect Your awareness of Reynolds's admission into the 3PA program and/or the 3PA fees paid by Reynolds during the Relevant Time Period.

74.    All documents related to Your pass-through of 3PA fees to Dealers.

75.    All documents related to Your allegation in Paragraph 129 of the Complaint that CDK made certain "threats" to discontinue Cox's integrations with data maintained on CDK's DMSs.

76.    All documents related to the 3PA certification, decertification, or lack of certification, of Your Applications, including, but not limited to, any related negotiations and/or amendments, any applications to join, or any discussions regarding pricing, security protocols or terms of access.

*Pricing and Financial Information*

a.      *Applications*

77.     For each of Your Applications, documents sufficient to show all initial, one-time, and monthly recurring prices from January 1, 2011 to the present.  Data should indicate the month each monthly recurring charge is covering.

78.     Documents sufficient to show all initial, one-time, and monthly recurring prices that Dealers paid for non-Cox Applications from January 1, 2011 to the present. Data should indicate the month each monthly recurring charge is covering.

79.     For each of Your Applications, documents sufficient to show monthly revenue, costs (including variable costs and/or COGS), and profit (including profit margin) from January 1, 2011 to the present.

80.     Documents sufficient to show quarterly revenue and profit (including profit margin) for all Applications from January 1, 2011 to the present.

81.     Documents sufficient to show all integration and/or extraction fees paid by You for each of Your Applications on a monthly basis from January 1, 2011 to the present, and the entity to whom such fees were paid for each of Your Applications.

82.     Documents sufficient to show all integration and/or extraction fees or costs charged to Dealers for each of Your Applications on a monthly basis from January 1, 2011 to the present.  To the extent that these fees and costs differ depending on the DMS used by a Dealer, identify the fees by DMS (*e.g.*, AutoMate, CDK, Cox, Reynolds).

83.     Documents sufficient to show Your projections with respect to revenue and profit for each of Your Applications from January 1, 2015 to the present.

b.  *Data Extraction Services*

84.  Documents sufficient to show all initial, one-time, and monthly recurring fees that You paid to Data Extractors for each of Your Applications from January 1, 2011 to the present. Data should indicate the month each monthly charge is covering.

85.  Documents sufficient to show Your monthly revenue, costs, and profit (including profit margin) derived from any syndication of data maintained on a CDK or Reynolds DMS.

86.  Documents sufficient to show Your monthly revenue, costs, and profit (including profit margin) derived from any syndication of data maintained on each non-CDK DMS.

87.  Documents sufficient to show how data from each DMS was integrated into Your Applications.

c.  *DealerTrack*

88.  Documents sufficient to show all initial, one-time, and monthly recurring prices that each Dealer paid for DealerTrack from January 1, 2011 to the present. Data should indicate the month each monthly charge is covering.

89.  Documents sufficient to show all initial, one-time, and monthly recurring prices that non-Cox Dealers paid (on average) for non-Cox DMS from January 1, 2011 to the present. Data should indicate the month each monthly charge is covering.

90.  Documents sufficient to show monthly revenue, costs (including variable costs and/or COGS), and profit (including profit margin) attributed to DearlerTrack customers from January 1, 2011 to the present.

91.  Documents sufficient to show quarterly revenue and profit (including profit margin) attributed to DealerTrack from January 1, 2011 to the present.

*Miscellaneous*

92.     All documents related to the February 18, 2015 agreements between CDK and Reynolds described in Paragraph 106 of the Complaint, including all documents that reflect Your awareness of the agreements or of any term of the agreements.

93.     All documents related to any "wind down" agreement between You and any DMS provider, including, but not limited to, Reynolds.

94.     All documents that reflect coordinated conduct by CDK and Reynolds with respect to third-party DMS access programs, policies, business practices, strategy, or pricing, or that otherwise relate to Your claims that CDK has engaged in any illegal or anticompetitive activity or that competition in any market has been harmed.

95.     All documents related to Your allegation in Paragraph 29 of the Complaint that CDK made certain statements that Cox "is the cause of ongoing deficiencies in data integrations between DealerTrack Sales and F&I solutions and CDK's DMS."

96.     All documents related to Your offer and marketing of bundled products and Relevant Services and compensation for solution gaps.

97.     All documents related to any complaints that You failed to adequately focus on Dealers' needs.

98.     All documents related to Your allegation in Paragraph 5 of the Complaint that "the damage to Cox Automotive alone from its antirust claims exceed[s] $200 million," including all computations of claimed damages and all documents on which you rely to substantiate Your alleged damages.

99.     Every document referred to, quoted, paraphrased, or excerpted in the Complaint, or otherwise relied upon as the basis for any allegation in the Complaint.

100.    All documents You received from any non-parties in response to subpoenas, informal discovery requests, or other means in preparation for or connection with this litigation.

101.    All documents and communications related to Your alleged injuries or damages.

102.    All communications with Authenticom or its counsel regarding the subject matter of this litigation or the action that Authenticom filed against CDK and Reynolds in the United States District Court for the Western District of Wisconsin, Case No. 17-cv-318-jdp, including, but not limited to, Your draft or final declarations in connection with the preliminary injunction hearing in the above-referenced case.

103.    All documents provided by You to the United States Federal Trade Commission in connection with its investigation regarding CDK and Reynolds.

104.    All documents related to any presentations that You have prepared or given, or meetings of Your board of directors, shareholders, or investors, that refer or relate to CDK, Your claims and allegations, or this litigation.

105.    Documents sufficient to show Your policies and practices concerning the preservation, retention, storage, or destruction of any documents or ESI.

106.    Documents sufficient to show Your organizational structure during the Relevant Time Period, including the identity of all officers, employees, investors, partners, owners, shareholders, or principals with management-level responsibility for any Relevant Services.

107.    Any industry data (including survey data, market studies, or any other sources) that You have access to that provide information about DMS providers to Dealers (including non-Cox Dealers).

108.    Any industry data (including survey data, market studies, or any other sources) that You have access to that provide information about Applications used by Dealers (including non-Cox Applications and non-Cox Dealers).

Dated:  May 25, 2018                         Respectfully submitted,

                                             */s/ Britt M. Miller*
                                             Britt M. Miller
                                             Andrew S. Marovitz
                                             Matthew D. Provance
                                             MAYER BROWN LLP
                                             71 South Wacker Drive
                                             Chicago, IL 60606
                                             Tel: (312) 782-0600
                                             bmiller@mayerbrown.com
                                             amarovitz@mayerbrown.com
                                             mprovance@mayerbrown.com

                                             Mark W. Ryan
                                             MAYER BROWN LLP
                                             1999 K Street NW
                                             Washington, DC 20006
                                             (202) 263-3000
                                             mryan@mayerbrown.com

                                             *Counsel for CDK Global, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, Britt M. Miller, an attorney, certify that I caused a copy of the foregoing **DEFENDANT CDK GLOBAL, LLC'S FIRST SET OF REQUESTS FOR PRODUCTION TO COX AUTOMOTIVE, INC.** to be served on MDL Co-Lead Counsel, Plaintiffs' Liaison Counsel, and Plaintiffs' Coordinating Counsel, as well as Defendants' counsel of record in the above-captioned proceeding via email in accordance with Fed. R. Civ. P. 5(b)(2)(E).

_/s/ *Britt M. Miller*_____

727223862