**PUBLIC VERSION**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| | Hon. Robert M. Dow, Jr. |
| *This filing relates to:* | Magistrate Judge Jeffrey T. Gilbert |
| THE DEALERSHIP CLASS ACTION | **PUBLIC VERSION** |
| *Cox Automotive, Inc, et al. v. CDK Global, LLC*, Case No. 1:18-CV-1058 (N.D. Ill.) | |
| *Loop, LLC, d/b/a AutoLoop v. CDK Global, LLC*, Case No. 18-cv-2521 (N.D. Ill.) | |
| *Authenticom, Inc. v. CDK Global, LLC et al.*, Case No. 1:18-cv-00868 (N.D. Ill.) | |
| *Motor Vehicle Software Corp. v. CDK Global, Inc., et al.*, Case No. 1:18-cv-865 (N.D. Ill.) | |

# DEFENDANTS' OPPOSITION TO PLAINTIFFS' OMNIBUS MOTION TO COMPEL

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ....................................................................................................... 1

LEGAL STANDARD ................................................................................................. 1

ARGUMENT ............................................................................................................... 2

1. Telephone Records (Both Defendants) ................................................................. 2

2. Industry Conferences (Both Defendants) ............................................................. 4

3. Communications Between CDK and Reynolds (Both Defendants) ....................... 7

4. DMS Customer Tenures (Both Defendants) ......................................................... 9

5. Financial Data (Both Defendants) ...................................................................... 11

6. Reynolds Transactional Data and Invoices (Reynolds Only) .............................. 14

7. OEM Pricing Information (Both Defendants) ..................................................... 17

8. Cost of Capital (Both Defendants) ..................................................................... 18

9. Reynolds's Security Tools, Processes, and Training (Reynolds Only) ................. 22

10. "Whitelisting" and SecurityFirst (Both Defendants) .......................................... 24

    A. How "Whitelisting" is Accomplished (Reynolds) ....................................... 24

    B. Technological Implementation of SecurityFirst (CDK) ................................ 27

11. Granular System Design Documents (Both Defendants) ..................................... 28

12. CDK Correspondence with Private Equity Firms (CDK Only) ........................... 30

13. CDK's Involvement in CVR (CDK Only) ........................................................... 31

14. DMI and IntegraLink Customer Information (CDK Only) ................................... 34

15. Reynolds Customer Relationship Management Data (Reynolds Only) ................. 35

16. Search Terms (CDK Only) .................................................................................. 37

CONCLUSION .......................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abarca Health, LLC v. PharmPix Corp.*,
806 F.Supp.2d 483 (D.P.R. 2011).........................................................................26

*All. to End Repression v. Rochford*,
75 F.R.D. 430 (N.D. Ill. 1976)..............................................................................8

*Alvord-Polk, Inc. v. F. Shumacher & Co.*,
37 F.3d 996 (3d Cir. 1994)..................................................................................24

*Arenas v. Unified Sch. Dist. No. 223*,
2016 WL 6071802 (D. Kan. Oct. 17, 2016) ..........................................................6

*Asahi Glass Co. v. Pentech Pharm., Inc.*,
289 F. Supp. 2d 986 (N.D. Ill. 2003) ...................................................................33

*Authenticom, Inc. v. CDK Global, LLC*,
874 F.3d 1019 (7th Cir. 2017) .............................................................................21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................................................33

*Birnberg v. Milk Street Residential Assoc. LP*,
2002 WL 1162848 (N.D. Ill. May 24, 2002) .........................................................3

*CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*,
322 F.R.D. 350 (N.D. Iowa 2017) .......................................................................13

*Concord Boat Corp. v. Brunswick Corp.*,
No. 96 C 6026, 1996 WL 705260 (N.D. Ill. Dec. 4, 1996) ...................................31

*Congoo LLC v. Revcontent LLC*,
2017 WL 3584205 (D.N.J. Aug. 10, 2017) ..........................................................26

*Cook, Inc. v. Boston Scientific Corp.*,
2002 WL 406977 (N.D. Ill. Mar. 15, 2002)..........................................................17

*Disney Enter., Inc. v. Hotfile Corp.*,
2011 WL 13100240 (S.D. Fla. Aug. 26, 2011)......................................................26

*DSM Desotech Inc. v. 3D Sys. Corp.*,
2008 WL 4812440 (N.D. Ill. Oct. 28, 2008).........................................................33

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Duracell U.S. Operations, Inc. v. JRS Ventures, Inc.*,
2018 WL 704686 (N.D. Ill. Feb. 5, 2018) .................................................................24

*Ezzo's Inv., Inc. v. Royal Beauty Supply, Inc.*,
94 F.3d 1032 (6th Cir. 1996) .................................................................................24

*Fellowes, Inc. v. Aurora Corp. of Am.*,
2009 WL 1097063 (N.D. Ill. Apr. 1, 2009) ...........................................................20

*Fish v. Greatbanc Tr. Co.*,
2016 WL 5923448 (N.D. Ill. Sept. 1, 2016) ..........................................................19

*Greene v. Sears Prot. Co.*,
2017 WL 1134484 (N.D. Ill. Mar. 27, 2017) ...........................................................6

*Guy Chem. Co. v. Romaco AG*,
243 F.R.D. 310 (N.D. Ind. 2007) ...........................................................................22

*In re Brand Name Prescription Drugs Antitrust Litigation*,
123 F.3d 599 (7th Cir. 1997) .................................................................................39

*In re Catfish Antitrust Litig.*,
908 F. Supp. 400 (N.D. Miss. 1995) .........................................................................2

*In re Med Diversified, Inc.*,
346 B.R. 621 (Bankr. E.D.N.Y. 2006) ...................................................................19

*In re Oneida Ltd.*,
351 B.R. 79 (Bankr. S.D.N.Y. 2006) ....................................................................20

*In re Photochromic Lens Antitrust Litig.*,
279 F.R.D. 620 (M.D. Fla. 2012) ...........................................................................18

*In re Sulfuric Acid Antitrust Litig.*,
231 F.R.D. 331 (N.D. Ill. 2005) .......................................................................25, 27

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ...................................................................................5

*Kainz v. Anheuser-Busch, Inc.*,
15 F.R.D. 242 (N.D. Ill. 1954) .................................................................................8

*Kleen Prods.s LLC v. Int'l Paper*,
276 F. Supp. 3d 811 (N.D. Ill. 2017) .........................................................................3

*Kleen Prods. LLC v. Packaging Corp. of America*,
2013 WL 120240 (N.D. Ill. Jan. 9, 2013) ..............................................................14

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Lenihan v. Stewart Enters., Inc.*,
2002 WL 31427367 (E.D. La. Oct. 28, 2002) ........................................................31

*McWane, Inc. v. F.T.C.*,
783 F.3d 814 (11th Cir. 2015) ...........................................................................24

*Mfg. Research Corp. v. Greenlee Tool Co.*,
693 F.2d 1037 (11th Cir. 1982) .........................................................................18

*Miller UK Ltd. v. Caterpillar, Inc.*,
17 F.Supp.3d 711 (N.D. Ill. 2014) .......................................................................1

*Miniter v. City of L.A.*,
2011 WL 13134766 (C.D. Cal. Apr. 19, 2011) ....................................................31

*Motor Vehicle Software Corp. v. CDK Global, Inc.*,
2017 WL 5643163 (C.D. Cal. Oct. 2, 2017).................................................21, 32

*Scott Hutchinson Enter., Inc. v. Cranberry Pipeline Corp.*,
2016 WL 4203555 (S.D.W. Va. Aug. 9, 2016) ...................................................13

*Stamy v. Packer*,
138 F.R.D. 412 (D.N.J. 1990)............................................................................22

*Standard Iron Works v. ArcelorMittal*,
639 F. Supp. 2d 877 (N.D. Ill. 2009) ...............................................................5, 7

*Swanson v. Citibank*,
614 F.3d 400 (7th Cir. 2010) ...............................................................................1

*Telecomm Tech. Serv., Inc. v. Siemens Rolm Commc'n., Inc.*,
1997 WL 34639048 (N.D. Ga. Sept. 15, 1997) ....................................................4

*United States v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015)................................................................................2

*United States v. Lake Cty. Bd. of Comm'rs*,
2006 WL 1660598 (N.D. Ind. June 7, 2006) ......................................................18

*United States v. Maloof*,
205 F.3d 819 (5th Cir. 2000) ...............................................................................2

*Uppal v. Rosalind Franklin Univ. of Med. & Sci.*,
124 F. Supp. 3d 811 (N.D. Ill. 2015) .................................................................18

*Vaigasi v. Solow Mgmt. Corp.*,
2016 WL 616386 (S.D.N.Y. Feb. 16, 2016).........................................................2

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Viacom Int'l Inc. v. YouTube Inc.*,
253 F.R.D. 256 (S.D.N.Y. 2008) ..............................................................................26

*Weit v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*,
641 F.2d 457 (7th Cir. 1981) ...............................................................................2, 5

*Wilson v. MRO Corp.*,
2017 WL 561333 (S.D.W. Va. Feb. 10, 2017) ........................................................6

## STATUTES

28 U.S.C. § 1407(a) ..................................................................................................39

## OTHER AUTHORITIES

*CDK Global, Inc.*, *available at* https://finance.yahoo.com/quote/cdk?ltr=1
(Aug. 28, 2018) .....................................................................................................21

Fed. R. Civ. P. 26(b)(1)........................................................................................39, 40

Fed R. Civ. P. 26(b)(2)(C)(i) ....................................................................................24

Fed. R. Civ. P. 26(c)(1)(G) .......................................................................................26

## INTRODUCTION

Defendants are responding to scores of discovery requests from Plaintiffs in this MDL. Combined, Defendants have received 475 separate requests for production ("RFPs") and 25 interrogatories. They have already produced more than 850,000 documents, totaling 2.5 million pages, and agreed to 59 document custodians. Yet Plaintiffs' omnibus motion to compel tries to give the impression that Defendants have been stonewalling them in the discovery process, denying them access to basic information about their claims. That impression is inaccurate. Defendants have complied with the vast majority of Plaintiffs' discovery requests—some of them exceedingly burdensome—in an effort to avoid motions practice and conserve the Court's resources. The additional discovery subject to Plaintiffs' motion is either irrelevant to the claims or defenses in this litigation or, even if marginally relevant, excessive and unnecessary in light of the hundreds of discovery requests to which Defendants are already fully responding. For the reasons that follow, Plaintiffs' motion should be denied.[1]

## LEGAL STANDARD

Discovery has its limits, and district courts should exercise their broad discretion to restrict discovery where necessary, for "[f]ailure to exercise control results in enormous costs to the litigants and to the due administration of justice." *Miller UK Ltd. v. Caterpillar, Inc.,* 17 F.Supp.3d 711, 721-22 (N.D. Ill. 2014) (*citing, e.g.*, *Swanson v. Citibank*, 614 F.3d 400, 411-12 (7th Cir. 2010)). Discovery should be limited if it is unreasonably cumulative or duplicative; not proportional to the needs of the case; or if its burden or expense would outweigh the "marginal utility" of its likely benefit. Order on CDK's Mot. for Protective Order (Dkt. 330) at 3 (quoting

---

[1] Reynolds has filed a motion to dismiss the Dealership Class Plaintiffs' claims against Reynolds in favor of arbitration and stay the Dealership Class Plaintiffs' remaining claims. Dkt. 255. Reynolds believes that the Dealership Class Plaintiffs' claims should be resolved in arbitration and not in this Court. To the extent Reynolds is responding to Dealership Class Plaintiffs' motions to compel, it is only doing so to preserve its rights and not because it is electing a judicial forum over arbitration.

*Vaigasi v. Solow Mgmt. Corp.*, 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016)).

## ARGUMENT

### 1. Telephone Records (Both Defendants)

Plaintiffs first seek to compel Defendants to produce all telephone records—both landline and cell phone—of calls between Defendants' document custodians from 2014 to the present. Plaintiffs' Omnibus Mot. to Compel (Dkt. 318) ("Mot.") at 4. That request should be denied, because the requested records (to the extent Defendants even possess them) are irrelevant to the claims and defenses in this litigation and certainly not proportional to the needs of the case.[2]

To begin with, the telephone records are irrelevant. As Plaintiffs concede (Mot. 5-6), Defendants' telephone records would not demonstrate the *content* of any telephone conversations—only the fact that calls were placed. Whereas such evidence might be relevant in cases involving contemporaneous conduct by rival firms (such as price increases), where the timing or volume of the calls can be used to prove that the firms had the opportunity to conspire and were in contact at critical times—such as the cases Plaintiffs cite—that is not the case here. *See, e.g.*, *United States v. Apple, Inc.*, 791 F.3d 290, 318 (2d Cir. 2015) (price-fixing conspiracy); *United States v. Maloof*, 205 F.3d 819, 830 (5th Cir. 2000) (price-fixing conspiracy); *In re Catfish Antitrust Litig.*, 908 F. Supp. 400, 405 (N.D. Miss. 1995) (price-fixing conspiracy); *but see Weit v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*, 641 F.2d 457, 468-69 (7th Cir. 1981) (mere opportunity or ability to conspire is not relevant evidence of an actual conspiracy). Here, there is no dispute that CDK and Reynolds had communications with one another—as one would expect of two companies that were involved in joint ventures together and separately negotiating

---

[2] Individual Plaintiffs initially requested: (a) all telephone records reflecting calls "made or received by any Reynolds employee and any employee of CDK"; and (b) all telephone records for Reynolds's and CDK's document custodians from 2014 to the present. Plaintiffs have narrowed the requests and now seek only the telephone records of calls "between Defendants' agreed-upon document custodians." Memorandum in Support of Plaintiffs' Omnibus Motion to Compel ("Mot.") at 4, 6.

PUBLIC VERSION

a wind-down agreement relating to one company's access to the other's systems. *See Birnberg v. Milk Street Residential Assoc. LP*, 2002 WL 1162848, at *11 (N.D. Ill. May 24, 2002) (denying motion to compel production of phone records regarding facts already established in other responsive documents). And because CDK and Reynolds did not engage in contemporaneous conduct—their decisions to prohibit hostile integration came *years* apart—the timing of their communications is likewise irrelevant. Moreover, Defendants have already produced numerous documents—including contemporaneous email communications between them—that say far more about the nature of their interaction than phone records possibly could.

Plaintiffs claim to have "reason to believe" that the conspiracy they alleged was conducted by phone, ████████████████████████████████████████

████████████████████████████████████████████████████████[3]

████████████████████████████████████ hardly supports Plaintiffs' claim that Defendants carried out an elaborate campaign to conspire without leaving a paper trail.[4] And in any event, the fact remains that phone records cannot prove *anything* about the kind of conspiracy Plaintiffs allege. Records of calls between Reynolds and CDK will also involve communications on topics unrelated to this litigation. *See Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 835 (N.D. Ill. 2017) ("the mere fact that Defendants were in constant communication with one another does not, without more, suggest that Defendants agreed to fix prices….This is particularly so when the defendants have legitimate reasons to talk to one another – as Defendants in this case do being each other's customers and suppliers"); *see also*

---

[3] Mot. 5 (citing CDK-1796970).

[4] ████████████████████████████████████████████████████████

████████████████████████████████ *See* Declaration of M. Nemelka ISO MDL Plaintiffs' Omnibus Motion to Compel ("Nemelka Decl.") Ex. P (CDK-1796970).

*Telecomm Tech. Serv., Inc. v. Siemens Rolm Commc'n., Inc.*, 1997 WL 34639048, at *2 (N.D. Ga. Sept. 15, 1997) (denying motion to compel production of phone records sufficient to show calls between plaintiffs and defendant as overbroad). In sum, even if Plaintiffs had made a strong case here that the alleged conspiracy was carried out by phone (and they have not), there still would be no reason to compel discovery of the phone records.

Finally, as set forth in the Declarations of Robert Gibbs (Reynolds) and Christopher Tragasz (CDK), ████████████████████████████████████████████████

███████████████████████████████████████████████████[5] ███████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████[6] Thus, even if phone records were probative, there would be no point to ordering their production in this case because

████████████████████████████████████████████████████████████████████████

████████████████████████████████████

### 2. Industry Conferences (Both Defendants)

Plaintiffs next seek to compel production of the following documents relating to the attendance of *any* Defendant employee at *any* industry conference attended by *any* customer or potential customer, from January 1, 2009 to the present:

    (a)     documents identifying attendees;
    (b)     schedules and calendars of those individuals;
    (c)     conference agendas;
    (d)     meeting notes;
    (e)     preparatory materials; and
    (f)     communications regarding any of the five categories above.[7]

---

[5] Tragasz Decl. ¶ 3; Gibbs Decl. ¶¶ 2-3.

[6] *See* Tragasz Decl. ¶ 4; Gibbs Decl. ¶ 4.

[7] Mot. 6; *see also* Nemelka Decl. Ex. H at 16 (Individual Plaintiffs RFP 73 to CDK); Ex. I at 15 (Individual Plaintiffs RFP 65 to Reynolds); Ex. F at 22-23 (Dealership Class RFPs 37 and 38 to CDK); Ex. G at 21-22 (Dealership Class RFPs 33 and 34 to Reynolds).

These requests should be rejected on multiple grounds.

First, like the phone records that Plaintiffs seek, evidence that CDK or Reynolds personnel attended conferences at the same time, or even that such personnel met while there, would only demonstrate that the two firms had (or could have had) contact with one another. Again, that kind of evidence is sometimes relevant to proving opportunity to conspire (not the existence or purpose of an alleged agreement) in contemporaneous-conduct cases (which, once again, are the only kinds of cases Plaintiffs can muster). *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (price-fixing conspiracy); *Weit*, 641 F.2d at 477 (price-fixing conspiracy); *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 894 (N.D. Ill. 2009) (output restriction conspiracy). But it does not and cannot prove anything in *this* case, where CDK and Reynolds often had several reasons for legitimate contact (*see supra* p. 2-3).[8]

Moreover, to the extent documents were generated at industry conferences on subjects relevant to this litigation, Plaintiffs have propounded dozens of other document requests encompassing such documents (subject to the parties' negotiations over search terms and custodians). For example, Plaintiffs identify an alleged conversation between a CDK employee and Authenticom's CEO Steve Cottrell during an industry conference in April 2016. Mot. 8. But documents and communications regarding Authenticom, DealerVault, or Steve Cottrell are already the subject of other agreed-upon document requests.[9] Likewise, to the extent there were any conversations between Reynolds and CDK at industry conferences about blocking

---

[8] Plaintiffs cite the dissenting opinion in *Weit* for the proposition that evidence of the opportunity to conspire is probative of conspiracy. Mot. 7 (citing *Weit*, 641 F.2d at 477 (dissent)). But the majority in *Weit* specifically disagreed with this proposition, instead holding that "the mere opportunity to conspire, even in the context of parallel business conduct, is not necessarily probative evidence." *Id.* at 462.

[9] *E.g.*, Nemelka Decl. Ex. D at 11 (Authenticom RFP 10 to CDK)).

Authenticom or other data integrators from accessing either Defendant's DMS, there are already several agreed-upon document requests specifically aimed at such communications.[10]

Plaintiffs' request is also considerably overbroad. Plaintiffs have not limited their requests to conferences occurring during the limitations period for their antitrust claims, or to conventions relating to DMS or data integration.

Plaintiffs also fail to explain why they seek industry attendance and related documents back to *2009* instead of the January 1, 2013 cut-off applicable to most document discovery in this MDL. Plaintiffs' allegations focus almost exclusively on several written agreements between Reynolds and CDK, all from 2015. 2013 is already a full two years before these agreements, providing sufficient context and background to understand the 2015 agreements. Moreover, January 2013 more than covers the entire four-year limitations period applicable to Plaintiffs' federal antitrust claims.[11] *See, e.g., Greene v. Sears Prot. Co.*, 2017 WL 1134484, at *5 (N.D. Ill. Mar. 27, 2017) (agreeing that discovery encompassing limitations period was "reasonable and proportional to the needs of the…case"); *Wilson v. MRO Corp.*, 2017 WL 561333, at *2 (S.D.W. Va. Feb. 10, 2017) (limiting document discovery to applicable limitations period, "considering that the scope of discovery must be proportional to the needs of the case"); *Arenas v. Unified Sch. Dist. No. 223*, 2016 WL 6071802, at *6 (D. Kan. Oct. 17, 2016) (limiting document discovery and testimony to limitations period "to avoid unnecessary burden and expense"). It is unduly burdensome to force Defendants to attempt to identify every "conference" since 2009 that any one of their employees might have attended where a "customer or potential customer"

---

[10] Nemelka Decl. Ex. D at 11 (Authenticom RFPs 11-12 to CDK); Ex. E at 11 (Authenticom RFP 12 to Reynolds); Ex. F at 12 (Dealership Class RFP 6 to CDK); Ex. G at 13 (Dealership Class RFP 2 to Reynolds).

[11] The first case was filed in February 2017 by Plaintiff Motor Vehicle Software Corporation ("MVSC"). Thus, the limitations period for MVSC's federal antitrust claims extends, at most, back to February 2013.

might also have been present. Plaintiffs' reliance on *Standard Iron Works* on this issue is misplaced. The court there compelled production of "high-level executive documents" relating to the work of "specified individuals" from parties who had otherwise *not produced any documents* other than for class certification. 2011 WL 338435, at *1 (emphasis added). Nothing could be further from Plaintiffs' broad request here for industry conference materials.[12]

### 3. Communications Between CDK and Reynolds (Both Defendants)

Plaintiffs' next request—requiring CDK and Reynolds to identify "every oral and in-person communication" between the two companies regarding hostile integration and third-party integrators back to January 1, 2013—should be rejected.[13] The request is absurd and impossible on its face: to answer it, Defendants would need to canvass virtually every current *and* former employee who worked at either company during the relevant time period to see whether they could recall when they had conversations of this kind.

Requiring Defendants to perform extensive internal investigations, including interviewing every employee who might have had a conversation, no matter how trivial, with an

---

[12] Further, during the meet-and-confer process the Dealership Class made an offer for compromise that significantly narrowed these requests, which one Defendant—CDK—accepted. That offer was for three categories of documents specific to Defendants' industry conference attendance, subject to the ordinary January 1, 2013 cut-off for document discovery: (a) documents evidencing or otherwise reflecting meetings between CDK and Reynolds, if any, at such conferences, (b) marketing and promotional materials used or distributed at such conferences, and (c) written training and instructions provided to employees concerning the marketing of certain products and services at such conferences. *See* Nemelka Decl. Ex. U (08/02/2018 Ltr. from M. Provance). Plaintiffs' refusal to honor that compromise (Mot. 7 n.5) goes against the Court's directive that Plaintiffs conduct "*coordinated* discovery" in this MDL. Case Mgmt. Order (Dkt. 166) § B.6 (emphasis added). In any event, this narrowed version of discovery into Defendants' industry conference attendance proposed during the meet-and-confer process is the most that Plaintiffs should now be permitted to seek.

[13] Originally, Plaintiffs demanded an itemization of oral and in-personal communications back to January 1, 2011. *See* Mot. 8. During the meet-and-confer process, Plaintiffs offered to "narrow" their interrogatory to address Defendants' objections. *See* Ex. 8 at 3 (6/14/2018 Ltr. from M. Provance). But the proposed "compromise" that Plaintiffs offered was for Defendants to answer the interrogatory as originally phrased, from January 1, 2013 to the present. Mot. 8. Trimming the time period was a meaningless concession on Plaintiffs' part, for they made no effort to narrow the *substantive* scope of the information they sought in response to Defendants' objections.

employee of the other Defendant, in response to this interrogatory would be completely improper. Interrogatories are intended to require an opposing party to answer a question based on the information available to it or obtainable through reasonable efforts; they are *not* to be "used as a device for compelling the interrogated party to prepare the interrogator's case for him" by conducting a substantial investigation. *Kainz v. Anheuser-Busch, Inc.*, 15 F.R.D. 242, 251 (N.D. Ill. 1954); *see also, e.g.*, *All. to End Repression v. Rochford*, 75 F.R.D. 430, 431 (N.D. Ill. 1976) (interrogatory was unduly burdensome to the extent it would require an audit).

Moreover, Defendants have already agreed to produce voluminous discovery regarding their communications with each other, including email communications between the two firms and many thousands of internal documents from each company. Plaintiffs will thus have access during the discovery process to all the information they need to determine whether and to what extent CDK and Reynolds personnel communicated regarding hostile integration. They will have numerous documents from nearly 60 custodians reflecting any evidence that Defendants communicated in writing, over the phone, or in person—including any scheduling documents, meeting reminders, and the like. They also will have the opportunity to depose a number of Defendant employees and can inquire on the topic directly. Requiring Defendants to supplement this comprehensive production with an additional investigation into every oral communication between the two companies would serve little purpose, other than to impose substantial burdens—both time and discovery costs—on Defendants.

### 4. DMS Customer Tenures (Both Defendants)

The Court should not compel Defendants to answer the next interrogatory—seeking the "average tenure" of their DMS customers on an annual basis over a 10-year period from 2009 to the present (*see* Mot. 10-11)—because (1) neither Defendant maintains the requested information and (2) Plaintiffs do not need the requested information.

As CDK has explained in its discovery responses and during the meet-and-confer process

████████████████████████████████████████████████████

███████████████████████[14] ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████[15] ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████[16]

Likewise, ████████████████████████████████████████

██████████████[17] ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[14] Coleman Decl. ¶ 3.

[15] *Id.* ¶ 4.

[16] *Id.*

[17] Robinson Decl. ¶¶ 2-4.



████████████████████████████████████████.[18] Performing this task for thousands of

dealerships, ████████████████████████████ is unduly burdensome and not proportional

to the needs of the case.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████, Plaintiffs' purported need for this discovery—

to assess DMS switching costs—is amply satisfied by other agreed-upon discovery. Whatever

value there may be in knowing "average dealer tenure," the switching data already provided to

Plaintiffs are much better evidence of the difficulty (or lack thereof) of switching. For example,

CDK is already producing information on DMS customer switching rates, to the extent such data

exist in CDK's possession, custody, or control.[19] And to the extent CDK maintains data that

could potentially indicate how long a customer has used CDK's DMS in its customer

relationship management ("CRM") system, that information is also being produced.[20] Reynolds

likewise has produced detailed switching data showing, among other things, how many dealers

actually switched to or from Reynolds on a monthly and annual basis from 2008-2017.[21]

Requiring Defendants to generate "tenure" statistics that do not currently exist adds nothing of

consequence to this substantial production of switching data and is simply excessive.[22]

---

[18] *Id.* ¶ 4.

[19] *See, e.g.*, Nemelka Decl. Ex. M at 17 (CDK's Resp. to Authenticom Interrogatory 11).

[20] Nemelka Decl. Ex. U at 11 (8/2/2018 Ltr. from M. Provance).

[21] Nemelka Decl. Ex. W (8/1/2018 Ltr. from B. Ross). Reynolds also offered to use agreed-upon search terms and custodians to search for documents regarding switching or attempted switching.

[22] Plaintiffs' assertion that Defendants "calculated their DMS client tenure before" when they responded to Authenticom's statements of facts in the preliminary injunction proceeding, Mot. 11, is incorrect. CDK simply did not dispute *Authenticom*'s claim about the average DMS tenure. CDK offered no calculation of its own. *Id.* And while Reynolds disputed Authenticom's allegation that "the average DMS client tenure is over 20 years" based on the best information available to it—e.g., the frequency with which dealers switch DMS providers—Reynolds likewise did not purport to perform its own calculation.

### 5. Financial Data (Both Defendants)

Plaintiffs move to compel several categories of financial data relating to Defendants'

DMS and data integration services, from 2009 to the present:

- Financial statements reflecting financial performance of Defendants' DMS and data integration businesses.[23]

- DMS and data integration profit and loss information, including gross and net profit margins.[24]

- Costs and expenses related to providing DMS and data integration services.[25]

- Projections and budgets for DMS and data integration revenues, profits, and costs.[26]

The motion to compel should be denied on this issue. CDK reached a compromise with

Plaintiffs—and Reynolds recently offered to compromise on the same basis—to resolve all

aspects of these requests except the time frame. (Defendants are willing to produce information

back to 2011, and Plaintiffs are seeking information back to 2009). There is no basis for

compelling production of such old data.

***Existing agreements and negotiations.*** Prior to filing their motion to compel, Plaintiffs

reached a compromise with CDK regarding these requests (except as to the date range), under

which CDK would produce "documents sufficient to show the requested financial information . .

---

[23] Nemelka Decl. Ex. G at 23 (Dealership Class RFP 38 to Reynolds); Ex. F. at 23-24 (Dealership Class RFP 42 to CDK); Ex. E at 22, 23 (Authenticom RFPs 46 and 51 to Reynolds); Ex. D at 24, 25 (Authenticom RFPs 52 and 58 to CDK).

[24] Nemelka Decl. Ex. G at 23 (Dealership Class RFP 38 to Reynolds); Ex. F. at 23-24 (Dealership Class RFP 42 to CDK); Ex. E at 22, 23 (Authenticom RFPs 47 and 52 to Reynolds); Ex. I at 16 (Individual Plaintiffs RFP 73 to Reynolds); Ex. H at 17 (Individual Plaintiffs RFP 81 to CDK).

[25] Nemelka Decl. Ex. G at 23 (Dealership Class RFP 38 to Reynolds); Ex. F. at 23-24 (Dealership Class RFP 42 to CDK); Ex. E at 23 (Authenticom RFP 50 to Reynolds); Ex. I at 17 (Individual Plaintiffs RFP 76 to Reynolds).

[26] Nemelka Decl. Ex. G at 23 (Dealership Class RFP 38 to Reynolds); Ex. F. at 23-24 (Dealership Class RFP 42 to CDK); Ex. E at 22 (Authenticom RFP 49 to Reynolds); Ex. I at 17 (Individual Plaintiffs RFP 77 to Reynolds); Ex. H at 18-19 (Individual Plaintiffs RFPs 84, 85 and 86 to CDK).

PUBLIC VERSION

. for its DMS and data integration businesses at the product line, divisional, and management level, to the extent such documents/information exists."[27] Shortly before filing their Motion, Plaintiffs invited Reynolds to agree to a similar compromise. *Id.* On August 23, 2018, Reynolds did just that.[28]

Specifically, Reynolds offered to produce "documents sufficient to show Reynolds's DMS and RCI revenue, profit, projections, margin, and cost information to the extent maintained in the ordinary course of Reynolds's business from the years 2011 to the present." Reynolds also explained in the same letter that this production would include ███████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████. In other words, Reynolds has agreed to a compromise virtually identical to the one that Plaintiffs reached with CDK, for materials relating to the specific Reynolds services at issue in this case—DMS and RCI. Despite this being exactly what Plaintiffs asked for, Plaintiffs have not yet formally accepted Reynolds's offer. Based on correspondence received from Plaintiffs today,[29] Reynolds believes that a resolution is likely (and will promptly inform the Court of same), though there is some concern that Plaintiffs may now be trying to expand the agreement to include additional, irrelevant business lines.

***Relevant product lines.*** Plaintiffs' motion sought financial information only for Defendants' DMS and data integration businesses. There is no basis to go further. To the extent that Plaintiffs are now seeking financial information beyond what has already been produced and what Reynolds has offered to produce in its August 23 letter, Plaintiffs are seeking materials that

---

[27] Nemelka Decl. Ex. AA at 7 (8/3/2018 Ltr. from M. Nemelka).

[28] Ex. 16 (8/23/2018 Ltr. from B. Ross).

[29] Ex. 17 (8/29/2018 Email from P. Wedgworth).

are irrelevant and not proportional to the needs of the case because they extend beyond DMS and RCI and into aspects of Reynolds's business having nothing to do with this case or Plaintiffs' allegations. Plaintiffs cite no authority establishing that Reynolds must be compelled—in addition to the substantial data already produced and already offered—to produce competitively-sensitive price, revenue, cost and profit data, including businesses and product lines unrelated to any issue in this case.[30] Courts have rejected similar requests for unrelated financials, finding them overbroad and not proportional. *See, e.g.*, *CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*, 322 F.R.D. 350, 357 (N.D. Iowa 2017) (denying motion to compel sales, cost and other financial documents pertaining to product lines not at issue); *Scott Hutchinson Enter., Inc. v. Cranberry Pipeline Corp.*, 2016 WL 4203555, at *3 (S.D.W. Va. Aug. 9, 2016) (rejecting request for expenses, profitability or financial records relating to other types of business operations not at issue). None of the cases cited in Plaintiffs' motion (Mot. 13-14) provides any support for compelling a party to produce competitively-sensitive financial data for business divisions or product lines not relevant to the case, and again, Plaintiffs did not ask for this information.

**Time period.** The Court also should not compel Defendants to produce agreed-upon financial data prior to January 1, 2011. Data from earlier periods are not necessary or even helpful for Plaintiffs' stated purpose—to provide a "benchmark" for judging Defendants' financial performance before and after the alleged "conspiracy." Mot. 14. Plaintiffs allege that that "conspiracy" began in 2015. *Id.* at 37. A period of four years *before* the conspiracy (*i.e.*, 2011-2014) already provides an ample baseline for comparing Defendants' financial performance before and after the events at issue. Plaintiffs offer no reason why data from 2011 onward are not a "sufficient breadth of data to analyze Defendants'" performance over time. *Id.*

---

[30] For example, Reynolds has a business unit that sells standard document forms, and other unrelated business units that are not at issue in this MDL.

And in their cited case, *Kleen Products LLC v. Packaging Corp. of America*, 2013 WL 120240, at *9 (N.D. Ill. Jan. 9, 2013), the court granted discovery where the "'before' period" was "equal in time … to the conspiracy period." Defendants' agreement to produce financial information back to 2011 includes a "before" period of at least four years (2011-2014/15) against a "conspiracy" period of three years—exceeding the standard used in *Kleen Products*.

Moreover, Plaintiffs decline to mention that, prior to MDL consolidation, one of the Individual Plaintiffs, through counsel, previously agreed to a 2011 start date for the production of financial data.[31] In reliance on that agreement, productions from CDK's sales and financial-reporting databases were tailored to include responsive information back to 2011, to the extent it exists. Supplementing those productions would involve more than just pushing a button; each production involved substantial work that would need to be redone if the relevant time period were now changed—a wasteful duplication of resources and effort for no reason. Plaintiffs' request to extend the "before" period another two years after the fact should be denied.[32]

### 6. Reynolds Transactional Data and Invoices (Reynolds Only)

Plaintiffs' next request seeks all of Reynolds's transactional data and invoices for dealer and data integration customers from 2009 to the present. Mot. 15. Plaintiffs conflate their requests for transactional data and invoices into a single topic, but these were treated separately throughout the meet-and-confer process. In fact, the parties reached a written agreement with respect to invoices (by which Reynolds would produce full invoices for 75 dealer customers, and 30 RCI vendor customers, dating back to April 2014).[33] The night before motions to compel

---

[31] *See* Ex. 3 at 2-3 (12/7/2017 Ltr. from M. Nemelka) ("[w]e accept the January 1, 2011, date limitation").

[32] As noted in the August 23, 2018 letter, after a diligent inquiry, Reynolds has only located potentially responsive financial reports dating back to the fourth quarter of 2011. *See* Ex. 16.

[33] Nemelka Decl. Ex. W (8/1/2018 Ltr. from B. Ross); Ex. AA (8/3/2018 Ltr. from M. Nemelka).

PUBLIC VERSION

were filed, Plaintiffs backed out of that agreement.[34] The Court should hold the parties to their written agreement on invoices, but regardless, Plaintiffs' Motion on this point should be denied.

**Invoices.** As Reynolds explained during the meet-and-confer process, producing DMS and RCI invoices is extremely burdensome and time-consuming. As detailed in the Declaration of Sheri Robinson:



In light of the above, the parties' compromise, whereby Reynolds would produce invoices for 75 dealer customers and 30 RCI vendor customers for the entire time period that they were accessible, was more than reasonable. As shown above, ███████████████ ████████████████████████████████████████████████████████████ ████████████████████████

---

[34] Ex. 15 (8/5/2018 Email from M. Nemelka).

[35] Robinson Decl. ¶¶ 5-7.

**Transactional Data.** Reynolds' compromise on invoices was particularly generous given the transactional invoice data already produced or agreed to be produced in this matter. The pricing information in the transactional data is the same as what appears in the invoices, and there is no need to put Reynolds to the burden of pulling *any* invoices for time periods for which there are transactional data.

Reynolds has already produced all transactional invoice data for all dealership customers from August 2014 to October 2017. Reynolds does not perform a mass export of this data in the normal course of its business. The exports had to be run one month of data at a time, overnight, due to the strain on Reynolds's accounting system. In many cases, the export process would crash and have to be redone the following evening. This task took approximately 4 months for the transactional invoice data. Reynolds does not have transactional data prior to August 2014.[36]

Exporting transactional *payment* data for the same time frame and population of dealers would involve ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████[37] ██████████████████████████████████████████████

████████████████████████████

With respect to RCI vendor customers, Reynolds has already produced data sufficient to show every price for every package for every RCI vendor customer dating back to 2010.[38] Reynolds has also agreed to provide data sufficient to show the number of units (*i.e.*, dealer interface packages) for which each RCI vendor customer has been invoiced back to 2010.[39]

---

[36] Robinson Decl. ¶ 9.

[37] Robinson Decl. ¶ 10.

[38] Wallner Decl. Ex. C (7/31/2018 Ltr. from L. Caseria).

[39] Nemelka Decl. Ex. AA (8/3/2018 Ltr. from M. Nemelka).

Reynolds has undertaken enormous efforts to make all of this production despite the fact that it has not been sued by any vendor or putative vendor class. Plaintiffs are not entitled to more.

### 7.   OEM Pricing Information (Both Defendants)

Plaintiffs' next request is for "[d]ocuments and communications relating to prices charged to OEMs for access to data" on the CDK and Reynolds DMSs.[40] But OEMs (*i.e.*, car manufacturers, such as GM or Ford) are neither parties to the case nor members of any putative class. Accordingly, information on the prices Defendants charge OEMs is irrelevant. The alleged conspiracy is purportedly between CDK and Reynolds to exclude competition in the alleged market for dealer data integration services provided to *software application providers* (*i.e.*, vendors)—*not* OEMs. The supposed purpose of the conspiracy is to block hostile data integrators such as Authenticom so that vendors will be forced to use CDK and Reynolds's own data integration services—3PA and RCI, respectively.[41] As Authenticom states in its Complaint, OEMs do *not* use the 3PA or RCI programs.[42] There is no basis for a fishing expedition into Defendants' dealings with OEMs, let alone discovery into all documents and communications relating to OEM pricing.

Courts routinely reject attempts by antitrust plaintiffs to obtain discovery on products separate from those subject to the alleged antitrust violation. For example, in *Cook, Inc. v. Boston Scientific Corp.*, 2002 WL 406977 (N.D. Ill. Mar. 15, 2002), plaintiff moved to compel production of defendant's licensing and distribution agreements with third parties and third-party clinical studies. Defendant objected on multiple grounds, including the fact that plaintiff sought information related to *all* of defendant's products, not just those at issue in the litigation. *Id.* at

---

[40] Nemelka Decl. Ex. D at 28 (Authenticom RFP 73 to CDK); Ex. E at 24 (RFP 63 to Reynolds).

[41] Authenticom Compl. (*Authenticom* Dkt. 1) ¶ 1.

[42] *Id.* ¶ 101 n.23 ("car manufacturers are … not formally participants in the RCI or 3PA programs").

*1-2. The Court agreed, explaining that the plaintiff had not explained how documents involving unrelated products were relevant. *Id.* at *3-4. *See also Mfg. Research Corp. v. Greenlee Tool Co.*, 693 F.2d 1037, 1042-43 (11th Cir. 1982) (defendant's market share in product other than the one at issue was irrelevant); *In re Photochromic Lens Antitrust Litig.*, 279 F.R.D. 620, 621, 625-26 (M.D. Fla. 2012) (denying motion to compel as to products unrelated to relevant market).

Plaintiffs claim they should be able to take discovery to determine "whether OEMs are part of the data integration market[.]" Mot. 18. But there is not a single OEM plaintiff in this MDL, and neither Authenticom (nor any other plaintiff) alleges harm as a result of what OEMs paid for interface products. Authenticom is not entitled to a fishing expedition to develop new claims or theories not alleged in its complaint. *See Uppal v. Rosalind Franklin Univ. of Med. & Sci.*, 124 F. Supp. 3d 811, 814 (N.D. Ill. 2015) (parties "have no entitlement to discovery to develop new claims or defenses that are not identified in the pleadings"); *United States v. Lake Cty. Bd. of Comm'rs*, 2006 WL 1660598, at *1 (N.D. Ind. June 7, 2006), *aff'd*, 2006 WL 2051729 (N.D. Ind. July 20, 2006) ("The relevancy requirement 'should not be misapplied so as to allow fishing expeditions in discovery.'").

### 8. Cost of Capital (Both Defendants)

Individual Plaintiffs request that CDK and Reynolds produce "[a]ll documents concerning [their] cost of capital, cost equity, cost of debt, and/or weighted average cost of capital ["WACC"], including any documents upon which any of the foregoing are based."[43] However, Defendants' WACC is not relevant to any claim or defense.

Individual Plaintiffs' reasons for seeking Defendants' WACC have changed over time and their current explanation makes no sense. During the parties' meet and confers, Individual

---

[43] Nemelka Decl. Ex. H at 15 (Individual Plaintiffs RFP 68 to CDK); Ex. I at 14 (Individual Plaintiffs RFP 60 to Reynolds).

PUBLIC VERSION

Plaintiffs initially were unable to articulate any relevance to the request that is now the subject of their motion.[44] Plaintiffs later suggested that the information was relevant because:

> Cost of capital serves as a measurement that would allow plaintiffs to more fully understand Reynolds's financial health, particularly long run profitability as compared to cost of investment and development. This, in turn, will shed light on any overcharges imposed by Reynolds, as enabled by Reynolds's anticompetitive conduct. Such metrics are thus directly probative of both liability and damages.[45]

However, this rationale made no sense, as Defendants' "financial health" has no bearing on whether they violated the antitrust laws, whether that conduct caused any harm to Plaintiffs, or what if any damages Plaintiffs suffered.[46]

Plaintiffs' motion now posits a new theory that "[b]ecause Defendants are competitors in the relevant markets," their WACC is "relevant for computing *Plaintiffs*' WACC," which in turn purportedly would assist Plaintiffs in calculating their "own damages." Mot. 20 (emphasis added). Plaintiffs' explanation still makes no sense, for several reasons.

First, Plaintiffs cite no antitrust case ordering discovery of WACC information, much less one that tracks Plaintiffs' convoluted damages theory, which presumably would involve (1) taking the cost of equity and debt of an unrelated *defendant* company to (2) calculate its weighted average cost of capital, then (3) determining a discount rate to apply in a discounted cash flow ("DCF") analysis to (4) project a *plaintiff*'s future lost revenue. The cases cited by Plaintiffs are easily distinguishable. *See* Mot. 5 (citing *Fish v. Greatbanc Tr. Co.*, 2016 WL 5923448, at *28-29 (N.D. Ill. Sept. 1, 2016) (in ERISA action, expert determined company's fair market value (not its lost profits or lost revenues); comparable companies were selected based on "business model, size, markets served and related product lines, and risk profile"); *In re Med*

---

[44] Nemelka Decl. Ex. S at 3 (7/30/2018 Ltr. from L. Caseria); *see also* Nemelka Decl. Ex. U at 5 (8/2/2018 Ltr. from M. Provance).

[45] Ex. 13 at 2 (7/26/2018 Ltr. from M. Nemelka).

[46] Nemelka Decl. Ex. S at 3 (7/30/2018 Ltr. from L. Caseria).

*Diversified, Inc.*, 346 B.R. 621, 642 (Bankr. E.D.N.Y. 2006) (holding that expert report applying DCF analysis to value company was unreliable and inadmissible); *In re Oneida Ltd.*, 351 B.R. 79, 89 (Bankr. S.D.N.Y. 2006) (disregarding DCF analysis used to estimate company value where "comparable companies" used to establish valuation were "problematic at best"); *Fellowes, Inc. v. Aurora Corp. of Am.*, 2009 WL 1097063, at *3 (N.D. Ill. Apr. 1, 2009) (court in patent infringement case denied motion to compel broad swath of financial documents; no substantive discussion of DCF or WACC)).

Second, while WACC is used to discount the value of a company to present value, the enterprise value of Plaintiffs' businesses will not be at issue here. To seek damages based on enterprise value (as opposed to damages for alleged overcharges), Plaintiffs would need to allege that the purported antitrust violations here caused them to go out of business. Of all the Plaintiffs, only Authenticom has even alleged that it is likely to go out of business as a result of Defendants' conduct—███████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

████████████████████████████████ None of the Plaintiffs, therefore, has any plausible need for information regarding Defendants' WACC.

Third, even if one or more Plaintiffs actually had a potentially viable claim for damages based on lost enterprise value, discovery into Defendants' WACC—as some proxy for Plaintiffs' own WACC—still would make no sense. Notably, Plaintiffs are not seeking WACC-related discovery from any data brokers, standalone vendors, car dealers, or EVR providers—all of which would be far more comparable companies than Defendants.[47] Indeed, even a cursory

---

[47] Defendants are not aware of any document requests to any entities other than Reynolds and CDK seeking the materials requested in Plaintiffs' motion. Authenticom served a lengthy subpoena on Superior

examination of Defendants' businesses, including from Plaintiffs' own statements, shows that they are not reasonable benchmarks:

a. Defendants offer a wide range of products and services, including their DMS and 3PA/RCI offerings, add-on applications for dealers, and forms for dealers, among other things. Authenticom, a data broker, does not offer anything like the full range of products and services that Defendants provide.[48] Neither do MVSC, an EVR vendor, AutoLoop, another vendor, or the members of the putative vendor class.[49]

b. To the extent that *some* CDK offerings overlap with Authenticom's, they are a relatively small component of CDK's business. CDK is a public company with a market capitalization (as of this filing) of approximately $8 billion.[50] Revenue from data "integration" accounts for about 4% of CDK's total revenue.[51] Reynolds, for its part, has never offered third-party data scraping services like Authenticom's.[52]

---

Integrated Solutions ("SIS"), a data broker, that did not request such information. To the extent Plaintiffs' authorities all require an analysis of *comparable companies* to perform a company valuation using WACC and DCF, Plaintiffs' failure to seek such information from plainly more comparable companies casts doubt on their proffered justification for this discovery.

[48] Ex. 9 at 6 (Authenticom's Amended Resp. to Reynolds's RFAs 4, 9) (admitting that Authenticom "[for non-franchised dealerships] provides data extraction, which is a type of data integration service, for vendors primarily needing access to inventory data" and is "not a competitor or customer in the DMS market")

[49] Ex. 12 at 6 (MVSC's Resp. to Reynolds's RFAs 5-6) (admitting that MVSC is not a competitor in any DMS market and that it provides EVR services to automobile dealers other than new car franchised automobile dealerships); *Motor Vehicle Software Corp. v. CDK Global, Inc.*, 2017 WL 5643163, at *5 (C.D. Cal. Oct. 2, 2017) (finding MVSC had not alleged that CDK or Reynolds competed in any EVR markets); MVSC Compl. (*MVSC* Dkt. 76) ¶¶ 2, 4, 19-21 (MVSC is a vendor, whereas CDK and Reynolds are DMS providers); AutoLoop Compl. (Dkt. 194) ¶¶ 6, 11 (████████████████████████████████████████████████████████).

[50] *CDK Global, Inc.* (CDK), *available at* https://finance.yahoo.com/quote/cdk?ltr=1 (Aug. 28, 2018).

[51] 6/27/2017 Hrg. Tr. (*Authenticom* Dkt. 163) at 2-P-207:16-18.

[52] *See, e.g.*, *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1021-22 (7th Cir. 2017); *Authenticom* Compl. ¶¶ 3, 4; *id.* ¶ 102 n.24 (differentiating Reynolds from Authenticom: "Reynolds does not have an independent data integration business that pulls data from other DMS platforms. Therefore, ... Reynolds does not compete in the Dealer Data Integration Market outside of the Reynolds DMS.").

c. Of course, Reynolds and CDK are not car dealers, so there is no basis for arguing that the Dealership Class Plaintiffs are comparable businesses to Reynolds and CDK.[53] Nor is it plausible that the Dealership Class might claim damages in this case based on lost enterprise value such that their own WACC is potentially relevant in the first place.

d. Cox, which is both a DMS provider (DealerTrack) and an application provider, does not allege that either its DMS business or any of its applications are being forced out of business as a result of any alleged anticompetitive conduct by Defendants. It, too, cannot plausibly seek damages based on lost enterprise value.

Finally, it bears repeating that Reynolds is not a defendant in either *AutoLoop* or *Cox*. A propounding party must make a stronger showing of relevance when seeking discovery from a nonparty. *Guy Chem. Co. v. Romaco AG*, 243 F.R.D. 310, 313 (N.D. Ind. 2007) ("Non-party status is a significant factor to be considered in determining whether the burden imposed by a subpoena is undue."); *Stamy v. Packer*, 138 F.R.D. 412, 419 (D.N.J. 1990) (collecting cases) ("[I]t should be noted that the standards for nonparty discovery require a stronger showing of relevance than for simple party discovery."). Plaintiffs' request for discovery into Reynolds's WACC should be denied for this reason as well.

### 9. Reynolds's Security Tools, Processes, and Training (Reynolds Only)

Plaintiffs move to compel Reynolds to produce documents in response to Authenticom RFP 88, which, as ostensibly narrowed by Authenticom, requests: (1) documents regarding software used to test or analyze the security of Reynolds's DMS or integration programs; (2) Reynolds's "security planning documents, specifications for security and reliability, threat modeling, and risk analyses"; and (3) documents regarding training for software developers

---

[53] Dealership Class Compl. ¶¶ 17, 26-50.

working on Reynolds's DMS or integration programs. Plaintiffs assert that this material is relevant to "evaluate and challenge Reynolds' purported security rationale for its restraints on competition."[54] Mot. 23. To do so, however, Plaintiffs do not need to know: (1) *how* Reynolds tests and analyzes its products' security; (2) *what* Reynolds's security plans and specifications are; or (3) *how* Reynolds trains its software developers.[55] Indeed, given Reynolds's counterclaims against Authenticom for its unauthorized access to Reynolds's system, it is troubling that Authenticom would request detailed information about Reynolds's security measures and security strategy that could be used to circumvent such efforts.

At most, Plaintiffs need to know *why* Reynolds thought security was important and *whether* legitimate security concerns supported Reynolds's conduct. These materials are already requested through numerous other security-related RFPs, which Defendants have agreed to search for, and which are not at issue in Plaintiffs' Motion.[56] For example, Authenticom has separately propounded requests for actually relevant information regarding Reynolds's "security rationale" such as communications regarding data security and system performance problems caused by Authenticom and security incidents caused by data brokers.[57]

Further, even assuming Plaintiffs are entitled to documents showing *how* Reynolds's security tools and processes work, several of Plaintiffs' other requests already seek this

---

[54] Authenticom's original RFP sought all communications and documents concerning Reynolds's security tools, processes, and training for Reynolds's software developers. Ex. 7 at 7 (Authenticom RFP 88 to Reynolds). As Authenticom has narrowed its request during the meet-and-confer process (Mot. 21), it has waived any right to its original, broader request.

[55] The topic of training is not even limited to security training, and is therefore even more disproportionate, overbroad, and irrelevant.

[56] *See* Nemelka Decl. Ex. E at 10, 25, 26-27 (Authenticom RFPs 7, 64, 66, 67, 71, and 72 to Reynolds); Ex. G at 16, 20, 21 (Dealership Class RFPs 11, 29, 31, and 32 to Reynolds); Ex. I at 10, 19 (Individual Plaintiffs RFPs 32 and 89 to Reynolds).

[57] Nemelka Decl. Ex. E at 26 (Authenticom RFPs 66 and 67 to Reynolds).

information.[58] RFP 88 however, goes beyond any of the above requests to seek not only irrelevant information, but details about Reynolds's security practices that could be used to develop ways to further evade Reynolds's security measures under the guise of discovery.[59]

Plaintiffs have not explained why Reynolds's responses to Plaintiffs' other requests relating to security issues will be insufficient, and they are not entitled to unreasonably cumulative and duplicative discovery. *See* Fed. R. Civ. P. 26(b)(2)(C)(i). Nor are they entitled to materials that are neither relevant nor proportional to the needs of the case. The Court should thus deny the motion to compel as to RFP 88.

### 10. "Whitelisting" and SecurityFirst (Both Defendants)

### A. How "Whitelisting" is Accomplished (Reynolds)

Authenticom's request to compel Reynolds to produce confidential, hypertechnical, and competitively-sensitive documents showing "*how* whitelisting is accomplished, including all technical, system architecture, workflow processes, or other mechanisms used to whitelist login credentials" (Mot. 23-24; emphasis added) should be denied on several grounds.[60]

---

[58] *E.g.*, Nemelka Decl. Ex. E at 27 (Authenticom RFPs 71 and 72 to Reynolds) ("Documents and communications sufficient to show the specific security measures Reynolds has instituted to protect the security of dealer data" from 2009 to the present; "Documents sufficient to show the security infrastructure of the Reynolds DMS and how it has changed over time" from 2009 to the present).

[59] None of Plaintiffs' citations (Mot. 23) supports their request for detailed documents relating to how Reynolds's security practices work, but not why they exist. *See Duracell U.S. Operations, Inc. v. JRS Ventures, Inc.*, 2018 WL 704686, at *4 (N.D. Ill. Feb. 5, 2018) (unremarkable holding that plaintiff was entitled to depose a witness who provided certification in support of motion to dismiss); *Alvord-Polk, Inc. v. F. Shumacher & Co.*, 37 F.3d 996, 1012 (3d Cir. 1994) (relying on defendants' high level "*management committee['s] minutes*," not detailed technical information, to conclude that defendant's conduct could be pretextual) (emphasis added); *Ezzo's Inv., Inc. v. Royal Beauty Supply, Inc.*, 94 F.3d 1032, 1036 (6th Cir. 1996) (finding that a factfinder could credit plaintiff's arguments and find justification was pretextual); *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 841 (11th Cir. 2015) (finding justification to be pretextual based on *executive-level* internal communications that program was implemented to prevent a competitor's pricing aggression, not detailed technical information).

[60] ████████████████████████████████████████████████████████████████████████████

First, Authenticom has failed to properly meet and confer on this topic and effectively waived its arguments by waiting over eight months to raise the issue for the first time on the night before filing their Motion. Reynolds served its responses and objections to Authenticom's First Request for Production (which included RFP 30(c)) nearly a year ago, on November 1, 2017.[61] At that time, Reynolds objected to RFP 30(c) as unreasonably broad and burdensome given that the subject of the RFP was irrelevant to the case. In the months that followed, the parties engaged in lengthy meet and confers to resolve numerous outstanding discovery disputes. But Authenticom did not raise the issue of "whitelisting" until one week before filing this Motion.[62] *See In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 331, 338 (N.D. Ill. 2005) ("[P]urposeful inactivity is compelling evidence that the discovery now claimed to be essential ... is in fact unnecessary.").

Second, Reynolds has already agreed to search for and produce extensive documents concerning "whitelisting," including: (a) documents indicating which third parties Reynolds whitelisted; (b) communications with third parties regarding whitelisting; (c) internal documents and communications concerning whitelisting; and (d) documents showing the number of dealers with a Reynolds DMS for which SIS continued to provide data integration services after the litigation between Reynolds and SIS was terminated.[63]

The only category of documents Reynolds has not agreed to produce is technical, system architecture data sufficient to show exactly how "whitelisting" works. But Plaintiffs need not

███████████████████████████████████████
███████████████████████████████████

[61] Ex. 2 (Reynolds's Resp. to Authenticom's RFP 30).

[62] Nemelka Ex. W at 3 (B. Ross Letter to M. Nemelka (Aug. 1, 2018)). Although all Plaintiffs now purport to move to compel, the RFP in question was only propounded by Authenticom, and the last-minute meet and confer was pursuant to a letter sent only on behalf of Authenticom.

[63] Ex. 2 at 28-29 (Reynolds's Resp. to Authenticom's RFP 30).

understand *how* whitelisting works to evaluate Reynolds's security justifications. The whitelisting documents Reynolds has already agreed to search for are more than sufficient and proportional to Plaintiffs' needs. Producing extremely sensitive, proprietary system architecture specifications—on top of the extensive whitelisting documents Reynolds has already agreed to produce—is particularly overbroad and disproportional given their competitively-sensitive nature. *Viacom Int'l Inc. v. YouTube Inc.*, 253 F.R.D. 256, 259-61 (S.D.N.Y. 2008) (denying motion to compel disclosure of certain source codes that were "critical trade secret[s]" for defendants); *Abarca Health, LLC v. PharmPix Corp.*, 806 F.Supp.2d 483 (D.P.R. 2011) (denying motion to compel where benefits of disclosure did not outweigh burden to competitor from disclosing its commercially valuable source code); Fed. R. Civ. P. 26(c)(1)(G) (court may restrict disclosure of "trade secret or other confidential … information").

Plaintiffs claim that "technical, system architecture, workflow processes, or other mechanisms" showing how whitelisting works are relevant to Reynolds's position that whitelisting is burdensome and temporary. Mot. 25. But in rejecting plaintiff's claim that source code was needed to evaluate what defendants *could have been doing* to better protect against infringement of plaintiff's copyrighted work, *Viacom* explained:

> If there is a way to write a program that can identify and thus control infringing videos, plaintiffs are free to demonstrate it, with or without reference to the way [defendants'] program works . . . . The notion that examination of the source code might suggest how to make a better method of infringement detection is speculative. Considered against its value and secrecy, plaintiffs have not made a sufficient showing of need for its disclosure.

*Viacom*, 253 F.R.D. at 260-61; *see also Disney Enter., Inc. v. Hotfile Corp.*, 2011 WL 13100240, at *2 (S.D. Fla. Aug. 26, 2011) (denying motion to compel source code because while the movant may have shown that the source code is *relevant*, it has not shown that it is *necessary*); *Congoo LLC v. Revcontent LLC*, 2017 WL 3584205, at *3 (D.N.J. Aug. 10, 2017) (disclosure of

source code not justified where alternatives are available).

## B. Technological Implementation of SecurityFirst (CDK)

From CDK, Plaintiffs request all documents "with respect to the technological implementation of the 'SecurityFirst' … initiative" (Mot. 24)—which, among other things, revamped CDK's Third Party Access ("3PA") program to require vendors to access CDK's DMS through the 3PA managed interface. *E.g.*, Dkt. 261 at 3-4. But the Dealership Plaintiffs have already agreed to a reasonable compromise that satisfies any legitimate purpose for this request. The other Plaintiffs should be required to accept it.

Plaintiffs cite this request as Authenticom's RFP 27(f), but omit the fact that this request is identical in substance to the Dealership Class Plaintiffs' RFP 11(g) (*see* Nemelka Decl. Ex. F at 15)—and that, as to that request, the Dealership Plaintiffs proposed a compromise, which CDK accepted, to produce documents "explaining the implementation of the 'SecurityFirst' … initiative in layman's terms."[64] That compromise agreement—along with the additional categories of documents related to SecurityFirst that are described below—is more than sufficient to give Plaintiffs the information they claim to need about how SecurityFirst was implemented. Allowing Plaintiffs to circumvent their agreement and impose a new discovery obligation on CDK would be improper and violate the MDL objective of requiring Plaintiffs to engage in "coordinated" discovery efforts. Case Mgmt. Order (Dkt. 166) § B.6. Plaintiffs cannot reach an agreement through the meet-and-confer process on one RFP from one plaintiff and then turn around and move to compel based on a duplicative RFP from another plaintiff. *See In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. at 341 ("The heads I win, tails you lose approach ... is no more acceptable in a court than in a casino").

---

[64] *See* Wallner Decl. Ex. I (7/31/2018 Ltr. from R. Wallner); Ex. K (8/2/2018 Ltr. from M. Provance).

Moreover, the productions CDK has made or agreed to make from custodian-based and agreed-upon non-custodial sources already include all conceivably relevant information on CDK's SecurityFirst initiative. These include, among other things:

(1) Internal presentations and communications regarding SecurityFirst;
(2) Financial analyses conducted relating to SecurityFirst;
(3) Documents bearing on CDK's reasons for introducing SecurityFirst;
(4) Communications with dealers and vendors regarding SecurityFirst;
(5) Security enhancements instituted as part of SecurityFirst; and
(6) Explanations of how SecurityFirst is actually implemented.[65]

To date, although its productions are ongoing, CDK has produced more than *18,000* custodial documents referring to or discussing SecurityFirst. Beyond that, CDK has also produced (and is producing) reports from non-custodial sources tracking unauthorized third-party access to its DMS and security measures created from a database established by CDK in connection with SecurityFirst, as well as "Secure the DMS" reports.[66] Virtually the only documents related to the "technological" implementation of SecurityFirst that CDK is *not* producing in accordance with these parameters are the granular system design documents discussed *infra*, which are highly sensitive and irrelevant to the key issue of *why* SecurityFirst was "implemented." As such, CDK is already producing all conceivably relevant discovery related to SecurityFirst. Plaintiffs' motion to compel more on the subject should be denied.

### 11. Granular System Design Documents (Both Defendants)

Plaintiffs next seek to compel Defendants to produce all system design documents for their respective DMSs. Mot. 25-27. As Plaintiffs acknowledge, Defendants have agreed to produce certain system design documents covered by this request; they simply object to

---

[65] *See* Ex. 1 (CDK Resp. to Authenticom RFP 27), Ex. 10 (CDK Resp. to Dealership Class RFP 11); Wallner Decl. Ex. I (7/31/2018 Ltr. from R. Wallner); Ex. K (8/2/2018 Ltr. from M. Provance).

[66] *See, e.g.*, Ex. 11 (CDK Resp. to Individual Plaintiff RFPs 77-78); Nemelka Decl. Ex. T (7/30/2018 Ltr. from M. Provance).

producing granular-level documents. *Id.* at 26. Plaintiffs plead ignorance about what "granular" means in this context, arguing that Defendants have not articulated a "workable standard" for determining what they will produce and what they will not. *Id.* at 27.

Plaintiffs' purported confusion is disingenuous. They conveniently forget that this issue was already discussed during the meet-and-confer process and that Plaintiffs did not have any difficulty understanding the meaning of "granular system design documents" at that time. Indeed, the Dealership Class Plaintiffs have previously explicitly confirmed to Reynolds that "granular system design documents" (including source code, algorithms and the like) need not be produced.[67] The clarity that Plaintiffs now claim to seek through their motion to compel was already provided by *Plaintiffs themselves*, when they suggested that the type of system design document that would not constitute a "granular system design document," and would therefore need to be produced, would be a document using "*layman's terms*."[68] An explicit agreement was reached between Reynolds and Dealership Class Plaintiffs on this precise point.[69] Similarly, the Dealership Class Plaintiffs expressly confirmed that they were not seeking "granular system design documents" from CDK in discovery.[70] Again, Plaintiffs cannot play games and end-run this agreement by moving to compel based on a duplicative Authenticom document request.[71]

To be clear, this dispute is only about what sources of documents Defendants must

---

[67] Wallner Decl. Ex. C at 4 (7/31/2018 Ltr. from L. Caseria).

[68] *Id.*

[69] *Id.*

[70] Wallner Decl. Ex. J at 7 (7/25/2018 Ltr. from M. Provance) (requesting confirmation that "the Dealership Class Plaintiffs … are not seeking CDK's granular system design documents, source code, algorithms, etc."); Wallner Decl. Ex. I at 4 (7/31/2018 Ltr. from R. Wallner) ("We are agreeable to your proposal.").

[71] Plaintiffs cite only certain Authenticom RFPs in connection with this motion. *See* Mot. 25 n. 48. They do not mention the duplicative Dealership Class Plaintiffs' requests. *See* Nemelka Decl. Ex. G (Dealership Class RFPs 1, 4, and 27 to Reynolds).

search. They are already producing responsive documents from custodial files. But Defendants should not be put to the burden of searching through and producing documents from the files of engineers, programmers, or other technical personnel. The technical materials in those files are not relevant to any issues in this case, and are highly sensitive.[72] As explained in Section 10, *supra*, Plaintiffs do not need to know the details of *how* Defendants' DMS systems work to pursue their claims or evaluate Defendants' security justifications.[73]

Requiring Defendants to disclose granular-level details about the design and functionality of their respective DMSs would shed no additional light on any relevant issues in this litigation, while at the same time exposing Defendants' DMSs to great risk, including the possible circumvention of their DMS security measures, by disclosing sensitive information to Defendants' competitor (Cox) and to a data integrator (Authenticom) that actively seeks unauthorized access to Defendants' systems.[74]

### 12. CDK Correspondence with Private Equity Firms (CDK Only)

Plaintiffs next seek to compel CDK to produce all communications ▮▮▮▮▮▮▮▮



▮▮▮▮▮ Mot. 27. But any such communications are irrelevant. This case has nothing to do with CDK's interactions with private equity firms ▮▮▮▮▮▮▮▮▮▮▮▮.

Plaintiffs do not suggest that these communications are relevant in and of themselves;

---

[72] *See* Crutchfield Decl. ¶¶ 5-10.

[73] Plaintiffs' suggestion that Defendants' security experts at the preliminary injunction stage in *Authenticom* relied on these granular documents (Mot. 26 n.50) is wrong. Mr. Rosenbach reviewed ▮▮▮▮▮▮▮▮▮▮▮▮ (*Authenticom* Dkt. 129, ¶ 2) and ▮▮▮▮▮▮▮▮▮▮ (*e.g., id.* ¶ 86). Mr. Rosenbach also ▮▮▮▮▮▮▮▮▮▮▮▮ *See id.*, Ex. A. Similarly, Mr. Schneck ▮▮▮▮▮▮▮▮ *Authenticom* Dkt. 126, ¶ 2. Neither attempted to describe Defendants' systems at a granular, technical level, and Defendants do not plan to include granular, technical information in future expert testimony, either.

[74] *See* Crutchfield Decl. ¶ 10.

rather, they *speculate* that, in these communications, CDK "might have" discussed its market power, profitability, and customer base. Mot. 28. But even if that assumption were plausible, CDK has explained to Plaintiffs—and Plaintiffs do not contest—that those subjects are likely encompassed in any number of the other RFPs that Plaintiffs have served and to which CDK will respond. The only unique information captured by this request is likely to be highly sensitive financial information regarding CDK's business, which—as explained above—is much broader than the particular lines of DMS and data services that are at issue in this case. CDK should not be compelled to provide this highly confidential, competitively sensitive, and overbroad universe of information given Plaintiffs' existing access to information on the subjects they purport to be investigating. *See, e.g.*, *Miniter v. City of L.A.*, 2011 WL 13134766, at *5 (C.D. Cal. Apr. 19, 2011) (denying motion to compel as to RFPs because plaintiff was "unable to narrow these requests beyond what is already called for under other requests"); *Lenihan v. Stewart Enters., Inc.*, 2002 WL 31427367, at *2 (E.D. La. Oct. 28, 2002) (denying motion to compel response to RFP because discoverable portion of information covered by RFP had "already been requested in other requests"); *cf. Concord Boat Corp. v. Brunswick Corp.*, No. 96 C 6026, 1996 WL 705260, at *3 (N.D. Ill. Dec. 4, 1996) (denying plaintiff's motion to compel compliance with subpoena because "[i]t is not clear that [plaintiff] cannot glean the necessary information from the documents which it received from its other requests").

### 13. CDK's Involvement in CVR (CDK Only)

Plaintiffs' next request seeks documents concerning CDK's "involvement" in the day-to-day operations of Computerized Vehicle Registration ("CVR"), a joint venture owned by CDK and Reynolds. The Court should not compel CDK to respond to this request at this time. The request is a fishing expedition aimed at finding some factual basis for a claim asserted by Plaintiff MVSC that has *already* been dismissed once and is subject to another pending motion

to dismiss. CDK has no objection to responding to this request if and when MVSC's Section 2 claim against CDK survives a motion to dismiss, but it should not be forced to engage in improper and wasteful discovery unless and until that occurs.

MVSC claims that CDK sought to monopolize the market for electronic vehicle registration ("EVR") services, which are provided by (among others) MVSC and CVR. CDK does not directly compete in the EVR market, so to state a monopolization claim against CDK, MVSC must plausibly allege either that CDK is liable as an owner of CVR for CVR's alleged acts of monopolization or that CDK itself competes in the EVR market through CVR. *Motor Vehicle Software Corp.*, 2017 WL 5643163, at *5.

In its First Amended Complaint, MVSC took the former tack, alleging that CDK and Reynolds were "jointly and severally liable" for any monopolization by CVR. *Id.* at *6. But the Court dismissed MVSC's claims against CDK and Reynolds, holding that MVSC had not stated a claim that CVR's conduct amounted to monopolization and that, as a result, MVSC's claim of joint and several liability against CDK and Reynolds also failed. MVSC now does an about-face in its Second Amended Complaint, alleging that CDK alone "wields complete control over CVR's direction and management" (*MVSC* Dkt. 76, ¶ 56) and "CVR's day-to-day activities" (*id.* ¶ 57) and that CDK itself is therefore "properly considered to compete in the relevant EVR markets" (*id.* ¶ 59). CDK's motion to dismiss these allegations is pending.

As the foregoing makes clear, the problem with this RFP is not merely that CDK's motion to dismiss the claim to which it relates is pending, as Plaintiffs suggest. Mot. 29. Rather, the problem is that the request is a long-shot effort to find some factual basis for a claim that completely contradicts the one that MVSC initially pled. MVSC's first two complaints sought to hold both CDK and Reynolds liable for monopolization by alleging that they were vicariously

liable as owners of CVR for CVR's alleged monopolizing conduct. After Judge Fischer held that none of CVR's alleged conduct amounted to monopolization, MVSC decided to allege a different theory entirely: that CDK was so involved in CVR's operations that CDK itself is a competitor in the EVR market. MVSC is digging for any evidence it can find to support this new theory and keep its Section 2 claim in the case.

In any event, Plaintiffs' claim that discovery must continue despite CDK's motion to dismiss is wrong. Although a motion to dismiss does not *automatically* stay discovery, "[n]evertheless, stays are granted with some frequency," and stays are "often deemed appropriate where"—as here—"discovery may be especially burdensome and costly to the parties." *DSM Desotech Inc. v. 3D Sys. Corp.*, 2008 WL 4812440, at *2 (N.D. Ill. Oct. 28, 2008). This practice of granting stays is rooted in the well-accepted understanding that "discovery in *any* antitrust case can quickly become enormously expensive and burdensome to defendants." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *see also, e.g.*, *Asahi Glass Co. v. Pentech Pharm., Inc.*, 289 F. Supp. 2d 986, 995 (N.D. Ill. 2003) (Posner, J., sitting by designation) ("[S]ome threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase"). That concern is particularly pronounced here, where (1) the operative complaint represents MVSC's *third* attempt to state a claim against CDK and makes use of a legal theory that is wholly out of step with MVSC's earlier allegations, and (2) the discovery sought—all documents that are in any way related to CDK's "involvement" in the day-to-day operations of CVR—is extremely broad and expansive. Granting Plaintiffs' motion to compel on this issue would unfairly reward MVSC for its scattershot pleading.

Plaintiffs argue that denying discovery based on the pending motion to dismiss

"threatens" the coordinated discovery schedule that CDK "insisted on so adamantly" when it moved for MDL consolidation. Mot. 30. But whether CDK controls CVR's day-to-day operations is relevant to MVSC's case only. Denying the motion to compel and leaving this single RFP to be revisited if the Court allows MVSC's Section 2 claim against CDK to go forward will not materially impact the discovery schedule or impede the other pending cases.

### 14. DMI and IntegraLink Customer Information (CDK Only)

Plaintiffs next request the Court to compel CDK to produce all "documents relating to the customers of DMI/IntegraLink," CDK's subsidiaries, and "documents concerning the DMS platform each of those customers used." Mot. 30. This request should be denied.

To begin with, the documents Plaintiffs now demand are not even encompassed in the RFP at issue, Authenticom's RFP No. 63. That RFP, which Plaintiffs do not quote, sought:

> Documents sufficient to show (1) which vendor applications obtain or obtained data integration services from Integralink and/or Digital Motorworks for data on non-CDK DMSs; (2) when those applications started to obtain such data integration services, and when they ended, as applicable; (3) what they paid for integration services when they started to obtain such integration services; (4) what they paid in January 1, 2015; (5) what they paid after the "3PA refresh"; and (6) what they pay now, if they still obtain such data integration services from Integralink and/or Digital Motorworks for data on non-CDK DMSs.[75]

The RFP does not include information about *which* "non-CDK DMS[]" a particular customer uses. In addition, the parties narrowed the scope of this RFP by agreement. CDK agreed to produce documents sufficient to show DMI and IntegraLink's prices for data integration services for data on non-CDK DMSs. Authenticom *agreed* that this was sufficient,[76] and CDK confirmed that the issue was "resolved."[77] Regardless of whether DMS platform information fell within RFP No. 63 as written, therefore, Plaintiffs confirmed that CDK did not need to produce it.

---

[75] Nemelka Decl. Ex. D at 24 (emphasis omitted).

[76] Ex. 5 at 4 (1/19/18 Ltr. from M. Nemelka).

[77] Ex. 6 at 3 (1/29/18 Ltr. from B. Miller).

Plaintiffs' disregard for that agreement (as well as RFP 63 itself) should not be rewarded, and the MDL consolidation is no ground for Plaintiffs to reopen this issue, given that no Plaintiff other than Authenticom has sought this information. Plaintiffs' request should be denied.

### 15. Reynolds Customer Relationship Management Data (Reynolds Only)

Plaintiffs' motion to compel information from Reynolds's "Customer Relationship Management" (*i.e.*, CRM) database asserts that (i) Reynolds confirmed it uses a CRM database; and (ii) Reynolds refused to produce any documents from it. Both assertions are inaccurate.

First, ███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████ █ █████████████████████████

█████████████████████████████████████████████████████████████.

Second, in any event, Reynolds never "refused to produce any documents" ████████

████. Reynolds explained from the outset that ████████████████████████████

███████████████████████████████████[79] ███████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████[80] Later that day, Plaintiffs reported that they were conferring and "will let you know what a fair compromise may be for you to

---

[78] Wallner Decl. Ex. C at 3 (7/31/2018 Ltr. from L. Caseria).

[79] *Id*. at 3.

[80] Wallner Decl. Ex. E at 1 (8/3/2018 Ltr. from B. Ross).

search and produce responsive information from Reynolds' CRM (sic)."[81] But Plaintiffs never made a proposal—they just filed their motion, essentially seeking the entire SMT.

Nevertheless, Reynolds has continued its good faith efforts to work through this issue, devoting internal programming manpower to attempt to ███████████████████████████ ████████████████. While those efforts are ongoing, Reynolds recently sent Plaintiffs a positive update, along with a formal offer to reopen the meet-and-confer process ███████ ████████████████[82]

All of that being said, the categories of documents Plaintiffs seek in their motion are overbroad, not proportional, and/or already satisfied by other agreements. One all-encompassing category ("sales call notes reflecting interactions with Reynolds' dealership customers") is not even tied to any actual RFP.

| Category of CRM info Sought By Plaintiffs | Resolution / Primary Objection |
|---|---|
| (1) "information about Reynolds' DMS customers switching or attempting to switch to a different DMS provider, including the time and expense associated with changing or switching DMS providers." | • Reynolds has already produced data sufficient to identify every customer that switched to another DMS provider since 2008 including the reason, if known.<br><br>• Reynolds also offered to use agreed upon search terms and custodians to search for documents regarding switching or attempted switching. |
| (2) "documents concerning any of Reynolds' DMS customers who have discontinued use of Reynolds' services since January 1, 2014" | • Overbroad and disproportionate. This would encompass "all documents" "concerning" hundreds of DMS customers that have switched from Reynolds. |
| (3) "documents relating to any change in the pricing for DMS services paid by Reynolds' Dealer customers" | • Reynolds has already produced ███████ ████████████████████████████████ ████████████████████████████████ |

81 Nemelka Decl. Ex. AA at 1 (8/3/2018 Ltr. from M. Nemelka). Plaintiffs' letter also suggested that the parties continue to explore potential compromises past the motion to compel deadline.

82 Ex. 18 (8/29/2018 Ltr. from B. Ross).

36

| | |
|---|---|
| | • Reynolds also offered to use agreed-upon search terms and custodians to search for documents regarding changes in DMS pricing. |
| (4) "sales call notes reflecting interactions with Reynolds' dealership customers." | • This category is not included in any RFP cited by Plaintiffs, and in any event would be overbroad and disproportionate. |

In sum, Reynolds respectfully requests that the motion be denied, or at least deferred so that the parties can attempt to agree on a path forward based on reasonable search terms.

### 16. Search Terms (CDK Only)

Plaintiffs' last request—that the Court compel CDK to run 133 ESI search terms originally proposed in *Authenticom* ("Original Search Terms") for CDK's 17 *Authenticom* custodians ("Original Custodians") [83] over ESI from 14 additional CDK custodians identified for the MDL ("Additional Custodians")—should be denied. CDK never agreed to run the Original Search Terms on later-identified custodians, and doing so with the Original Search Terms as they currently stand would be extraordinarily burdensome, particularly in light of the copious documents CDK has already produced. As in their recent failed bid to obtain all 1.5 million documents produced by CDK to the FTC in connection with its previously proposed acquisition of DMS provider AutoMate (*see* Dkt. 330), Plaintiffs once again do not know when to stop.

In December 2017, before the pending cases were consolidated in this MDL, CDK and Authenticom reached agreement on a set of 133 Original Search Terms to be run on ESI from 17 agreed-upon Original Custodians in the *Authenticom* case. CDK—and Authenticom, too—was consistently clear that all agreements to run the Original Search Terms "remain[ed] subject to testing and validation with the full set of finally agreed custodians," and could require

---

[83] For ease of reference, and without in any way endorsing Plaintiffs' narrative of events, we refer to these search terms and custodians using Plaintiffs' labels: "Original Search Terms," "Original Custodians," "Additional Search Terms," and "Additional Custodians."

"adjustment" to the extent that certain terms proved "unduly burdensome … against the final corpus of documents to be reviewed."[84] Applying the Original Search Terms to the 17 Original Custodians identified 1.048 million documents for review.[85]

Following consolidation, all MDL Plaintiffs (including Authenticom) proposed 164 new Additional Search Terms to be applied to both the 17 Original Custodians and 14 Additional Custodians agreed to for the MDL. Plaintiffs' assertion (Mot. 35) that they narrowed their initial proposal for the Additional Search Terms based on an assumption or "understanding" that CDK would *also* be applying the Original Search Terms as-is to all 31 MDL custodians rings hollow. The Additional Search Terms as initially proposed by Plaintiffs returned 95% of the custodian documents tested, totaling 5.4 million documents—virtually every document in their files.[86] Thus, contrary to Plaintiffs' assertions, there is little doubt that "the Additional Search Terms that were being negotiated covered the same topics as the Original Search Terms." Mot. 35.

Eventually, the parties agreed on revisions to the Additional Search Terms (including foregoing some, and holding others in abeyance). However, during a July 30 meet-and-confer (memorialized in a July 31 follow-up letter), CDK identified a specific problem: running the Original Search Terms on the *Additional* Custodians' ESI was returning approximately 1.5 million more documents from those custodians alone.[87] CDK proposed certain revisions to the Original Search Terms (only as applied to the Additional Custodians) as a possible solution, but it became clear that Plaintiffs were not interested in reaching a reasonable compromise. CDK's final offer was to run a narrowed version of the Original Search Terms on the Additional

---

[84] *E.g.*, Ex. 4 (12/19/2017 Email from M. Provance).

[85] *See* Hastert Decl. ¶ 4. Approximately 678,000 of these documents are "unique" in the sense that they are not otherwise identified by running the Additional Search Terms over the same dataset. *Id.* ¶¶ 5.

[86] Ex. 14 (7/31/2018 Ltr. from B. Miller).

[87] *Id.*

38

Custodians that would still have entailed a total review of 1.046 million *additional* documents not responsive to the original review of those terms with respect to the Original Custodians—a colossal burden, but one that CDK was willing to take on to resolve the issue. By contrast, Plaintiffs' best and final offer was for CDK to run a slightly modified version of the Original Search Terms resulting in 1.411 million total documents. Mot. 36.[88]

The burden of evaluating almost half a million *additional* documents, on top of the million new documents that CDK's best and final compromise would entail reviewing, and the 800,000+ documents that CDK has *already* produced—would be considerable, and not "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Indeed, Plaintiffs offer no meaningful, good-faith argument that the burden of this search-term demand is proportionate: they simply point to the Rule 26(b)(1) standard, without any explanation why the issues in this case justify the compelled review of these additional documents—particularly in light of Judge Dow's recent observation that Plaintiffs' demands for discovery must at some point be "curbed by the law of diminishing marginal returns." Order (Dkt. 330) at 3. And their observation that this is an MDL proceeding is neither here nor there. MDL consolidation is a procedural device meant to achieve the "just and efficient conduct" of the cases involved (28 U.S.C. § 1407(a)), not a certification that a case warrants any discovery plaintiffs can devise.

Nor does *In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599 (7th

---

[88] On August 21, 2018, Plaintiffs made a subsequent counter-proposal for CDK to apply the Original Search Terms as-is to 8 of the Additional Custodians, and a modified version of the Original Search Terms to the other 6 Additional Custodians. This proposal was *more* burdensome than Plaintiffs' last proposal, resulting in an additional review burden of 1.740 million documents—over 300,000 more documents than Plaintiffs' prior August 3 proposal. Ex. 19 (8/26/2018 Email from M. Provance). After CDK informed Plaintiffs of this fact, they made another proposal on August 27 that similarly exceeded their pre-motion offer, this time resulting in a review burden of 1.643 million additional documents. *Id.* It is not clear to CDK whether Plaintiffs are reverting back to their August 3 proposal of 1.411 million documents or now want CDK to review even more documents as contemplated by their subsequent August 21 or August 27 proposals.

Cir. 1997), support Plaintiffs' onerous demands. The court of appeals' observation that the parties there had produced 50 million pages of documents is inapposite here for many reasons: (1) the MDL in that case involved "hundreds of separate cases," not the relative handful consolidated in this MDL (*id.* at 602), and it entailed "the taking of a thousand depositions"— more, by orders of magnitude, than will be taken in this case; (2) the figure mentioned by the court refers to *all* parties' productions, not one side's or one party's; (3) the court's figure refers to *pages*, not documents; and (4) in any event, Rule 26(b)(1) requires the Court to determine whether Plaintiffs' request is proportional to the needs of *this* case, not how Plaintiffs' discovery compares to discovery in other cases. Plaintiffs have not shown why compelling CDK to go above and beyond its best and final offer—to review more than a million additional documents, on top of the significant burdens it has already undertaken in pre-MDL discovery—is proportional to the needs of *this* case. The motion to compel should therefore be denied as to this issue.

## CONCLUSION

Plaintiffs' omnibus motion to compel should be denied in its entirety.

**PUBLIC VERSION**

Dated: August 29, 2018

*/s/ Aundrea K. Gulley*
Aundrea K. Gulley
Kathy D. Patrick
Brian T. Ross
Brice A. Wilkinson
Ross A. MacDonald
GIBBS & BRUNS LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
(713) 751-5258
agulley@gibbsbruns.com
kpatrick@gibbsbruns.com
bross@gibbsbruns.com
bwilkinson@gibbsbruns.com
rmacdonald@gibbsbruns.com

Michael P.A. Cohen
SHEPPARD MULLIN RICHTER & HAMPTON, LLP
2099 Pennsylvania Ave., NW, Suite 100
Washington, DC 20006
(202) 747-1900
mcohen@sheppardmullin.com

Leo D. Caseria
SHEPPARD MULLIN RICHTER & HAMPTON, LLP
333 S. Hope St., 43rd Floor
Los Angeles, CA 90071
(213) 617-4206
lcaseria@sheppardmullin.com

*Counsel for Defendant The Reynolds and
Reynolds Company*

Respectfully submitted,

*/s/ Britt M. Miller*
Britt M. Miller
Michael A. Scodro
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant
CDK Global, LLC*

41

PUBLIC VERSION

## CERTIFICATE OF SERVICE

I, Britt M. Miller, an attorney, hereby certify that on August 30, 2018, I caused a true and correct copy of the foregoing **DEFENDANTS' OPPOSITION TO PLAINTIFFS' OMNIBUS MOTION TO COMPEL** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/ Britt M. Miller*_____
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Phone: (312) 782-0600
Fax: (312) 701-7711
E-mail: bmiller@mayerbrown.com