**FILED UNDER SEAL**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION** | MDL No. 2817 |
| | Case No. 18-cv-00864 |
| **This Document Relates To:** | Hon. Robert M. Dow, Jr. |
| **THE DEALERSHIP CLASS ACTION** | Magistrate Judge Jeffrey T. Gilbert |

**DEALERSHIP PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO (1) DEFENDANTS' MOTIONS CONCERNING ARBITRATION AND TO STAY CLAIMS; AND (2) DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 9

   I.   REYNOLDS DEALERS' ANTITRUST CLAIMS SHOULD NOT BE DISMISSED IN
       FAVOR OF ARBITRATION, AND NO CLAIMS SHOULD BE STAYED ................... 9

     A.  Reynolds' Motion to Dismiss Reynolds Dealers' Antitrust Claims in Favor of
         Arbitration Should be Denied ................................................................................ 9

       1.  Dealership Plaintiffs' Antitrust Claims Are Outside the Scope of the Reynolds
          Arbitration Provision .................................................................................... 9

         a.  Plaintiffs' Antitrust Claims Do Not Arise From the Reynolds Agreement ........... 10

         b.  Ohio Law Establishes That Plaintiffs' Antitrust Claims Are Outside the Scope of
           the Arbitration Provision ........................................................................ 11

         c.  The Reynolds Agreement Does Not Require Arbitration of Statutory Claims ...... 17

       2.  The Court Should Reject Reynolds' Wholly Groundless Arguments In Favor of
          Arbitration .................................................................................................. 19

     B.  CDK Cannot Force Reynolds Dealers to Arbitrate Claims Against CDK .................... 22

       1.  CDK Has Waived Any Ability to Seek Arbitration ................................................... 22

       2.  CDK's Equitable Estoppel Argument Fails Under State Law .................................... 24

     C.  The Court Should Not Address the Availability of Class Arbitration .......................... 31

     D.  If the Court Dismisses Some Claims in Favor of Arbitration, the Remaining Claims
         Should Not Be Stayed ........................................................................................ 32

       1.  Defendants' Argument for a Mandatory Stay of the Entire Action Relies on a
          Misinterpretation of Abrogated Law ........................................................... 32

       2.  A Discretionary Stay Would Serve Neither Efficiency Nor Justice .......................... 33

         a.  Because CDK Dealers Cannot Be Bound By Any Arbitration Rulings, the Risk of
           Inconsistent Rulings Cannot be Avoided ................................................. 34

         b.  A Stay of Non-Arbitrable Claims Would Inevitably Result in Unnecessary and
           Duplicative Discovery Efforts and a Waste of Judicial Resources ...................... 36

       3.  The Cases Cited by Defendants Do Not Support a Stay ............................................ 37

II.  DEALERSHIP PLAINTIFFS HAVE STATED CLAIMS UNDER SECTIONS 1 AND 2 OF THE SHERMAN ACT (COUNTS I-V).................................................................. 39

   A.  Dealership Plaintiffs Are Proper Federal Antitrust Plaintiffs ......................................... 39

      1.  The Direct Purchaser Damages Claims Are Consistent with *Illinois Brick* (Counts I, III, V) ................................................................................................................. 40

      2.  *AGC* Does Not Bar Dealership Plaintiffs' Injunctive Relief Claims (Counts II, IV) . 42

   B.  Dealership Plaintiffs' Federal Counts Adequately State Claims on the Merits ............. 45

      1.  Dealership Plaintiffs' Section 1 Claims Alleging a Horizontal Conspiracy (Counts I-II) Should be Sustained ........................................................................................... 45

      2.  Dealership Plaintiffs' Section 1 Claims for Exclusive Dealing (Counts III and IV) Should be Sustained ........................................................................................... 50

      3.  CDK's Rule of Reason Argument is Unavailing ........................................................ 52

   C.  Dealership Plaintiffs Allege Antitrust Injury With Respect to Their DMS Purchases .. 54

   D.  Dealership Plaintiffs Plausibly Allege Antitrust Violations with Respect to DIS ......... 56

      1.  Dealership Plaintiffs' Conspiracy Claims Make "Economic Sense" ......................... 56

      2.  Defendants' Blockage of Access to Dealership Plaintiffs' DMS Data Constitutes Antitrust Injury ........................................................................................................... 59

      3.  Dealership Plaintiffs Have Alleged a Plausible Market Division Conspiracy ........... 60

      4.  *AGC* Standing Does Not Bar Dealership Plaintiffs' Claims...................................... 61

   E.  Dealership Plaintiffs' Monopolization and Exclusive Dealing Claims are Valid.......... 62

      1.  Dealership Plaintiffs Adequately Allege that Defendants Monopolized the Single-Brand Aftermarkets for Data Integration Services ("DIS") on Their DMS Platforms62

         a.  The Complaint Sufficiently Alleges Single-Brand Aftermarkets Under *Kodak* .... 62

         b.  Plaintiffs are Locked-In to Their Purchases of DMS............................................. 64

         c.  Reynolds Monopolized the DIS market for its DMS.............................................. 69

      2.  The Exclusive Dealing Provisions in Reynolds' Contracts with Vendors Injured Dealership Plaintiffs................................................................................................... 70

      3.  Copyright Law Provides No Cover for Reynolds' Illegal Behavior.......................... 73

F.   Dealership Plaintiffs' Damages Claims and Requests for Injunctive Relief are Not Overbroad ...................................................................................................... 74

1.   Reynolds Customers' Claims Based on Purchases Made More Than One Year Before Suit are Timely.................................................................................................. 74

2.   Dealership Plaintiffs' Requested Injunctive Relief is Appropriate............................ 75

III.  DEALERSHIP PLAINTIFFS' STATE LAW CLAIMS ARE VALID (VI-L)................. 77

A.   Dealership Plaintiffs Have Article III Standing .............................................. 77

B.   Dealership Plaintiffs Are Not Too Remote ..................................................... 80

1.   *Illinois Brick* Does Not Bar Illinois Antitrust Claims................................................. 80

2.   *AGC* Does Not Preclude Dealership Plaintiffs' State Antitrust Claims Because Dealership Plaintiffs Are In the Chain of Distribution of the Product Subject to Defendants' Anticompetitive Conduct ....................................................... 80

3.   There Is Also No Justification for Barring Dealership Plaintiffs' State Antitrust Claims Based on a Presumptive Application of *AGC* or Remoteness Principles....... 85

4.   Dealership Plaintiffs' State Antitrust Claims Satisfy All Factors of the *AGC* Analysis 87

a.   Overcharges Paid by IPPs Are the Type of Injury Congress Sought to Redress.... 87

b.   The Complaint Alleges a Causal Connection Between Defendants' Conduct and the Harm to Dealership Plaintiffs .......................................................... 88

c.   Dealership Plaintiffs' Recovery Under Repealer Statutes Would Not Be Duplicative of Recovery Under Federal Antitrust Laws ........................................ 89

C.   Consumer Protection Claims Are Not Barred On Other Grounds ................................ 90

CONCLUSION........................................................................................................... 100

## TABLE OF AUTHORITIES

**Cases**

*A.O.A. v. Doe Run Res. Corp.*, 2011 WL 6091724 (E.D. Mo. Dec. 7, 2011)............................... 35

*A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chem. Grp., Inc.*, 725 F.2d 1140, (7th Cir. 1984)............................................................................................................... 25

*Abbott Labs. v. Teva Pharm. USA, Inc.*, 432 F. Supp. 2d 408 (D. Del. 2006) ........................... 92

*Academy of Medicine of Cincinnati v. Aetna Health, Inc.*, 108 Ohio St. 3d 185 (Ohio 2006)12, 13

*Academy of Medicine*, 155 Ohio App. 3d 310 (Ohio Ct. App. 2003)............................... 12, 13, 14

*Aikens v. Debow*, 541 S.E.2d 576 (W. Va. 2000) ....................................................................... 86

*Alexander v. Phoenix Bond & Indem. Co.*, 149 F. Supp. 2d 989 (N.D. Ill. 2001)....................... 48

*Allen v. Wright*, 468 U.S. 737 (1984) ........................................................................................ 77

*Allied Van Lines, Inc. v. Orth Van & Storage, Inc.*, Case No. 04CV6004, 2005 WL 1563111 (N.D. Ill. June 3, 2005) ............................................................................................................ 38

*AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568 (7th Cir. 1999)....................................... 15

*Am. Fed'n of Teachers-Oregon, AFT, AFL-CIO v. Or. Taxpayers United PAC¸*145 P.3d 1111 (Or. Ct. App. 2006) ................................................................................................................. 86

*Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.*, 885 F.Supp.499 (S.D.N.Y. 1995) ...... 35

*Apprentice Info. Sys., Inc. v. DataScout, LLC*, 544 S.W.3d 536 (Ark. 2018) ............................. 97

*Arreola v. Godinez*, 546 F.3d 788 (7th Cir. 2008)...................................................................... 77

*Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185 (Cal. 2013)............................................ 83

*AT&T Tech., Inc. v. Comm. Workers of America*, 475 U.S. 643 (1986) ..................................... 31

*Authenticom v. CDK Global, Inc.,* 2017 WL 3017048 (W.D. Wis. Jul. 14, 2017) .......... 47, 49, 53

*Authenticom v. CDK Global, Inc.,* 874 F.3d 1019 (7th Cir. 2017). ....................................Passim

*Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354 (3d Cir. 2016) ........................................... 67

*Bailey v. ERG Enters., LP*, 705 F.3d 1311 (11th Cir. 2013)....................................................... 30

*Begay v. United States*, 553 U.S. 137 (2008).............................................................................. 19

*Belnap v. Iasis Healthcare*, 844 F.3d 1272 (10th Cir. 2017)...................................................... 20

*Bergstrom v. Noah*, 266 Kan. 829 (Kan. 1999) ......................................................................... 83

*Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097 (C.D. Cal. 2002)............................................. 17

*Blue Cross & Blue Shield v. AstraZeneca Pharm. LP* (*In re Pharm. Indus. Average Wholesale Price Litig.*), 582 F.3d 156 (1st Cir. 2009) ............................................................................. 91

*Brennan v Int'l Harvester Co.*, No. 73-C-3085, 1974 U.S. Dist. LEXIS 9279 (N.D. Ill. Mar. 27, 1974) ...................................................................................................................................... 76

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979).......................................... 73

*B-S Steel of Kansas, Inc. v. Texas Indus., Inc.*, 229 F. Supp. 2d 1209 (D. Kan. 2002) ............... 17

*Cabinetree of Wisc., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388 (7th Cir. 1995) ................. 22

*Cal. Computer Prods.., Inc. v. Int'l Bus. Machines Corp.*, 613 F.2d 727 (9th Cir. 1979)........... 53

*Cal. ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118 (9th Cir. 2011)............................................ 61

*Campbell v. City of Johnston City*, No. 05-cv-4072, 2005 WL 3440726 (S.D. Ill. Dec. 14, 2005) ....................................................................................................................... 75

*Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104 (1986) ....................................... 42

*Cast Iron Soil Pipe and Fittings Antitrust Litig.*, No. 1:14-md-2508, 2015 WL 5166014, at *32 (E.D. Tenn. June 24, 2015) ................................................................. 91

*Catlin v. Hanser*, 2011 WL 1002736 (S.D. Ind. Mar. 17, 2011) ................................ 77

*ChampionsWorld, LLC v. United States Soccer Fed'n, Inc.*, 487 F. Supp. 2d 980 (N.D. Ill. May 4, 2007) ........................................................................................................ 38

*Consiglio-Tseffos v. Visa U.S.A. Inc.*, No. CV 2003-020170, 2004 WL 3030043 (Ariz. Super. Ct., Dec. 8, 2004) ............................................................................................... 86

*Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511 (10th Cir. 1995) ................... 16

*Cortellesso v. Zanni*, No. P.C. 95-4571, 1997 WL 839911 (R.I. Super. Ct. Apr. 29, 1997) ........ 86

*Costco Wholesale Corp. v. AU Optronics Corp.*, Case Nos. M071827SI, C110058SI, 2011 WL 4017961 (N.D. Cal. Sept. 9, 2011) ............................................................. 29, 31

*Cty. of Cook v. Philip Morris, Inc.*, 817 N.E.2d 1039 (Ill. App. Ct. 2004) ................ 86

*D.R. Ward Const. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 496–98 (E.D. Pa. 2006) ...... 86

*Davidson v. Apple, Inc.*, No. 16-CV-04942-LHK, 2018 WL 2325426 (N.D. Cal. May 8, 2018) 99

*Dental Assocs., P.C. v. Am. Dental Partners of Mich., LLC*, 520 Fed. Appx. 349 (6th Cir. 2013) .......................................................................................................................... 10

*Dickson v. Microsoft Corp.*, 309 F3d 193 (4th Cir. 2002) ......................................... 40

*Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756 (7th Cir. 1996) ................... 62, 67

*Douglas v. Regions Bank*, 757 F.3d 460 (5th Cir. 2014) ................................. 19, 20, 21

*DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332 (Fed. Cir. 2014) ....................... 67

*Duncan v. Wheeler*, Case No. 09CA3296, 2010 WL 3852276 (Ohio Ct. App. Sept. 29, 2010). 11, 15

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ("*Kodak*")........... 62, 66, 67

*Empire State Ethanol and Energy, LLC v. BBI Int'l*, No. 1:08-CV-623, 2009 WL 790962 (N.D.N.Y. Mar. 20, 2009) ....................................................................................... 16

*Equal Emp. Opp. Comm. v. Waffle House*, 534 U.S. 279 (2002) ................................ 24

*Ervin v. Nokia, Inc.*, 349 Ill. App. 3d 508 (Ill. App. Ct. 2004) ................................. 26

*Evans v. Building Materials Corp. of Am.*, 858 F.3d 1377 (Fed. Cir. 2017) ............... 20

*Fields v. Herrnstein Chrysler, Inc.*, Case No. 12CA827, 2013 WL 772822 (Ohio Ct. App. Feb. 7, 2013) ................................................................................................................... 28, 29

*Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009) ..................... 84

*Flynn v. FCA US LLC*, Case No. 15CV0855MJRDGW, 2016 WL 5341749 (S.D. Ill. Sept. 23, 2016) .................................................................................................................... 35, 39

*Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, No. 09-CV-00852, 2012 WL 3841397 (E.D. Wis. Sep. 5, 2012) .......................................................................................... 92

*FTC v. Mylan Labs., Inc.*, 99 F. Supp. 2d 1 (D.D.C. 1999) ....................................... 95

*Fucile v. Visa U.S.A., Inc.*, No. S1560-03 CNC, 2004 WL 3030037 (Vt. Super. Ct. Dec. 27, 2004) ................................................................................................................... 84

*G&G Closed Circuit Events, LLC v. Castillo*, 14CV02073, 2017 WL 1079241 (N.D. Ill. Mar. 22, 2017) ................................................................................................................... 38

*GEA Group AG v. Flex-N-Gate Corp.*, 740 F.3d 411 (7th Cir. 2014) ................................... 38

*Glidden Co. v. Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109 (Ohio 2006) ........................... 27

*Global Pac., LLC v. Kirkpatrick*, 88 N.E.3d 431 (Ohio Ct. App. Apr. 10, 2017) ................... 27

*Gore v. Alltel Comm., LLC*, 666 F.3d 1027 (7th Cir. 2012) ................................................... 12

*Goree v. Northland Auto Enters.*, Case No. CV11758061, 2014 Ohio Misc. LEXIS 5 (Ohio Ct. Comm. Pl. Jan. 30, 2014) .............................................................................................. 28

*Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S 287 (2010) .......................................... 9

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391 (7th Cir. 1993) ...... 44, 71

*Greene v. Mizuho Bank, Ltd.*, 169 F. Supp. 3d 855 (N.D. Ill. 2016) ..................................... 80

*Guar. Trust Life Ins. Co. v. Platinum Supp. Life Ins., Inc.*, 68 N.E.3d 481 (Ill. Ct. App. Dec. 9, 2016) ................................................................................................................... 26

*Hackman v. Dickerson Realtors, Inc.*, 520 F. Supp. 2d 954 (N.D. Ill. 2007) ......................... 58

*Hartford Fire Ins., Co. v. Henry Bros. Const. Mgmt., Serv.*, No. 10CV4746, 2011 WL 3563138 (N.D. Ill. Aug. 10, 2011) .............................................................................................. 24

*Henry Schein, Inc. v. Archer and White Sales, Inc.*, Case No. 17CV1272, 2018 WL 1280843 (June 25, 2018) .............................................................................................................. 20

*Hoffman v. Deloitte & Touche, LLP*, 143 F. Supp. 2d 995 (N.D. Ill. 2001) ........................... 29

*Hollinger v. Keybank Nat'l Assn.*, C.A. No. 22147, 2004 WL 3017223 (Ohio Ct. App. Dec. 22, 2004) ................................................................................................................... 14

*Howsam v. Dean Witter Reynolds Inc.*, 537 U.S. 79 (2002) ................................................... 22

*HTG Capital Partners, LLC v. Doe*, Case No. 15CV02129, 2015 WL 5611333 (N.D. Ill. Feb. 16, 2016) ................................................................................................................... 22

*I Sports v. IMG Worldwide, Inc.*, 813 N.E.2d 4 (Ohio Ct. App. Jun. 7, 2004) ................. 27, 28, 29

*IBEW, Local #111 v. Public Serv. Co. of Colo.*, 773 F.3d 1100 (10th Cir. 2014) ................... 19

*IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524 (7th Cir. 1996) ............................. 32, 39

*In Aventis Envt'l Sci. USA L.P. v. Scotts Co.*, 383 F. Supp. 2d 488 (S.D.N.Y. 2005) ................. 46

*In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224 (D.Conn. 2015) ..................................... 96

*In re Aggrenox Antitrust Litig.*, No. 3:14-MD-2516, 2016 WL 4204478 (D. Conn. Aug. 9, 2016) ....................................................................................................................... 80

*In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2013 WL 2456612 (E.D. Mich. June 6, 2013) ............................................................................................................. 88, 97

*In re Automotive Parts Antitrust Litig.*, 29 F. Supp. 3d 982 (E.D. Mich. 2014) ..................... 87

*In re Automotive Parts Antitrust Litig.*, Master File No. 12MD02311, 2017 WL 3579753 (E.D. Mich. Apr. 18, 2017) ("*Auto Parts*") ....................................................................... 28, 37

*In re Blue Cross Blue Shield Antitrust Litig*, 308 F. Supp. 3d 1241 (N.D. Ala. 2018) ............... 52

*In re Brand Name Prescr. Drug Antitrust Litig.*, 123 F.3d 599 (7th Cir. 1997) ....................... 94

*In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781 (7th Cir. 1999) ................ 71
*In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772 (N.D. Ill. 2017) ....................... passim
*In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618 (E.D. Mich. 2000) ................. 66, 71, 72
*In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224 (M.D. Pa. 2010) .............. 94
*In re Cipro Cases I & II*, 61 Cal. 4th 116 (Cal. 2015) .................................................... 83
*In re Copper Antitrust Litig.*, 436 F.3d 782 (7th Cir. 2006) ........................................... 74
*In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385 (S.D.N.Y. 2003) ............. 16
*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880 (N.D. Ill. 2011). 66
*In re Dairy Farmers of Am. Inc. Cheese Antitrust Litig.*, No. 09-CV-3690, 2013 WL 4506000
    (N.D. Ill. Aug. 23, 2013) ("*DFA I*") .......................................................... 43, 44, 77
*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09-CV-3690, 2015 WL 3988488
    (N.D. Ill. June 29, 2015) ("*DFA II*")............................................... 82, 84, 86, 93
*In re Dairy Farmers of Am., Inc.*, Case No. 09-CV-3690, 2013 WL 212908 (N.D. Ill. Jan. 18,
    2013) (N.D. Ill. Jan. 18, 2013).............................................................. 75
*In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 221–22 (S.D.N.Y. 2012)
    .................................................................................................. 92, 94
*In re Disposable Contact Lens Litig.*, No. 3:00-94 MD 1030, 2001 WL 203964 (M.D. Fla. Jan. 5,
    2001) ........................................................................................... 70
*In re Domestic Drywall Antitrust Litig. Civil Action*, No. 13-2437, 2016 WL 3769680 (E.D. Pa.
    July 13, 2016)................................................................................... 98
*In re Ductile Iron Pipe Fittings Indirect Purchaser Antitrust Litig.*, No. 12-cv-169, 2013 WL
    5503308 (D.N.J. Oct. 2, 2013)................................................................. 83
*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072 (N.D.
    Cal. 2007)....................................................................................... 95
*In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1152 (N.D. Cal. 2009) .................. 86
*In re Flat Glass Antitrust Litig.*, 385 F.3d 350 (3d Cir. 2004) ....................................... 56
*In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524 (E.D. Pa. 2010)................................. 93
*In re Henson*, 869 F.3d 1052 (9th Cir. 2017).......................................................... 25
*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002) ................... 55, 56
*In re Humana Managed Care Litig.*, 285 F.3d 971 (11th Cir. 2002) .................................. 28, 30
*In re Hydroxycut Mktg. and Sales Practices Litig.*, 299 F.R.D. 648 (S.D. Cal. 2014)............... 99
*In re K-Dur Antitrust Litig.*, 338 F. Supp.2d 517 (D.N.J. 2004) .................................... 71
*In re Liquid Aluminum Sulfate Antitrust Litig.*, No. 16-md-2687 (JLL), 2017 WL 3131977
    (D.N.J. July 20, 2017)........................................................................ 92, 97
*In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160 (D. Me. 2004)
    ............................................................................................ 94, 95, 96, 98
*In re Opana ER Antitrust Litig.*, 162 F. Supp.3d 704 (N.D. Ill. 2016) .............................. 78
*In re Packaged Seafood Prods. Antitrust Litig.*, 277 F. Supp. 3d 1167 (S.D. Cal. 2017) ........... 91
*In re Pharm. Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229 (D. Mass. 2006).............. 95

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 2012 WL 39766 (N.D. Ill. Jan. 9, 2012) ....................................................................................................................... 77

*In re Pool Prods. Distrib. Market Antitrust Litig.*, 946 F. Supp. 2d 554, 567–68 (E.D. La. 2013) ................................................................................................................................ 86

*In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907 (N.D. Ill. 2009)......................................... 44, 83

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998) 78

*In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-md-02042, 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013)........................................................................................................ 86

*In re Samsung Galaxy Smartphone Mktg. & Sales Practices Litig.*, 298 F. Supp. 3d 1285 (N.D. Cal. Mar. 2018) .................................................................................................... 38

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503-DJC, 2015 WL 5458570 (D. Mass. Sep. 16, 2015)................................................................................. 92

*In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665 (E.D. Pa. 2014).......................................................................................................... 92

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 13-CV-3349 SI, 2014 WL 1395733 (N.D. Cal. Apr. 10, 2014) ....................................................................................................... 14

*In re Tobacco II Cases*, 207 P.3d 20 (Cal. 2009) ...................................................................... 99

*In re Trans Union Corp. Privacy Litig.*, 211 F.R.D. 328 (N.D. Ill. Sep. 10, 2002)...................... 25

*In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. 16-2765, 2017 WL 1902160 (D.N.J. May 8, 2017) ....................................................................................................................... 99

*In re Wireless Tel. 911 Calls Litig.*, Case No. 03CV2597, 2005 WL 2709286 (N.D. Ill. Oct. 20, 2005) ................................................................................................................................ 23

*In re Zappos.com, Inc.*, No. 3:12-cv-00325-RCJ-VPC, 2013 WL 4830497 (D. Nev. Sept. 9, 2013) ........................................................................................................................... 100

*Int'l Aerobatics Club Chapter 1 v. City of Morris*, 76 F. Supp.3d 767 (N.D. Ill. 2014).............. 66

*Int'l Broth. Of Elec. Workers Local 2150 v. NextEra Energy Pt. Beach, LLC*, 762 F.3d 592 (7th Cir. 2014) ....................................................................................................................... 20

*Int'l Broth. of Teamsters, Local 734 Health and Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818 (7th 1999)....................................................................................................... 42

*Int'l Outsourcing Servs., LLC v. Blistex, Inc.*, 420 F. Supp.2d 860 (N.D. Ill. 2006)................... 76

*James v. McDonald's Corp.*, 417 F.3d 672 (7th Cir. 2005) ...................................................... 12

*JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163 (2d Cir. 2004) ........................................... 16

*Johnson v. W. & S. Life Ins. Co.*, 598 Fed. Appx. 454 (7th Cir. 2015) ...................................... 22

*Jones v. Waffle House, Inc.*, 866 F.3d 1257 (11th Cir. 2017)..................................................... 20

*Judge v. Unigroup, Inc.*, Case No. 17CV201T23TGW, 2017 WL 3971457 (M.D. Fla. Sept. 8, 2017) ................................................................................................................................. 27

*Kawasaki Heavy Indus. v. Bombardier Rec. Prods.*, 660 F.3d 988 (7th Cir. 2011)................... 22

*Kay v. Penn. R. Co.*, 156 Ohio St. 503 (Ohio 1952) ................................................................ 18

*King Cole Foods, Inc. v. SuperValu, Inc. (In re Wholesale Grocery Prods. Antitrust Litig.)*, 707 F.3d 917 (8th Cir. 2013) .............................................................................................. 29, 30

*Klay v. All Defendants*, 389 F.3d 1191 (11th Cir. 2004) ................................................ 33

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959) ................................. 52

*Kochert v. Greater Lafayette Health Services, Inc.*, 463 F.3d 710, 718 (7th Cir. 2006) ............. 88

*KPMG LLP v. Cocchi*, 565 U.S. 18, 22 (2011) ............................................................. 10

*Kramer v. Toyota Motor Corp.*, 705 F.3d 1122 (9th Cir. 2013) ............................... 21, 30

*Kuhl v. Guitar Center Stores, Inc.*, No. 07 C 214, 2008 WL 656049 (N.D. Ill. Mar. 5, 2008).... 79

*Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88 (2d Cir. 2018) ...................... 78

*Lawrence v. Walzer & Gabrielson*, 207 Cal. App. 3d 1501 (Cal. Ct. App. 1989) ...................... 18

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 Fed. Appx. 704, (10th Cir. 2011). 28, 30

*Liebman v. Prudential Fin., Inc.*, Case No. CIVA022566, 2002 WL 31928443 (E.D. Pa. Dec. 30, 2002) ........................................................................................................................... 25

*Loeb Indus. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002)............................................ passim

*Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, No. 13-cv-01880, 2015 WL 4755335 (N.D. Cal. Aug. 11, 2015)................................................................................... 91

*Lupo, LLC v. Reynolds & Reynolds Co.*, 729 F. Supp.2d 350 (D. Me. 2010) ........................... 18

*Mace v. Van Ru Credit Corp.*, 109 F.3d 338 (7th Cir. 1997) ............................................. 96

*Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100 (Fla. Dist. Ct. App. 1996)......................... 91

*Maltz v. Union Carbide Chems. & Plastics Co., Inc.*, 992 F. Supp. 286 (S.D.N.Y. 1998) .......... 93

*Martinez v. Hooper*, 148 F.3d 856 (7th Cir. 1998) ........................................................... 100

*Matanuska Maid, Inc. v. State*, 620 P.2d 182 (Alaska 1980) ............................................ 92

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)................................ 47

*Morrie Mages and Shirlee Mages Found. v. Thrifty Corp.*, 916 F.2d 402 (7th Cir. 1990) ......... 32

*Motor Vehicle Software Corp. v. CDK Global, Inc.*, No. 17-896, 2017 WL 5643163 (C.D. Cal. Oct. 2, 2017) ................................................................................................................... 58

*Nat'l Oilwell Varco, L.P. v. Sadagopan*, Civil Action No. H-16-2261, 2018 WL 276364 (S.D. Tex. Jan. 3, 2018).............................................................................................................. 21

*Ne. Series of Lockton Cos., LLC v. Bachrach*, No. 12 C 1695, 2012 WL 3041639 (N.D. Ill. July 24, 2012) ......................................................................................................................... 72

*Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.*, 339 F.2d 440 (2d Cir. 1964) 33

*New York v. Feldman*, 210 F. Supp. 2d 294 (S.D.N.Y. 2002)............................................... 91

*Nootens v. Madison Gas & Elec. Co.*, Case No. 97CV4442, 1998 WL 719611 (N.D. Ill. Oct. 8, 1998) ................................................................................................................................ 39

*Noye v. Johnson & Johnson*, Case No. 15CV2382, 2018 WL 2199911 (M.D. Pa. May 11, 2018) ........................................................................................................................................... 25

*Ohio State Bd. of Pharmacy v. Frantz*, 555 N.E.2d 630 (Ohio 1990) ................................... 26

*Orr v. Beamon*, 77 F. Supp. 2d 1208 (D. Kan. 1999).......................................................... 83

*Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010).......... 53

*Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So.2d 331 (Miss. 2004).............................. 86

*Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 713 F. Supp. 2d 734 (N.D. Ill. 2010) . 38

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979)......................................................... 34

*Potts v. United Parcel Serv., Inc.*, No. 06 C 4766, 2007 WL 551555 (N.D. Ill. Feb. 15, 2007) .. 79

*Prima Paint Corp. v. Flood & Conkling Mfg. Co.*, 388 U.S. 395 (1967) .................................... 10

*Pryner v. Tractor Supply Co.*, 109 F.3d 354 (7th Cir. 1997) ...................................................... 32

*PSI Repair Servs., Inc. v. Honeywell, Inc.* 104 F.3d 811 (6th Cir. 1997) ............................. 67, 68

*Qbex Computadoras S.A. v. Intel Corp.*, No. 17-CV-03375-LHK, 2017 WL 5525939, at *7 (N.D. Cal. Nov. 17, 2017) ................................................................................................................. 94

*Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366 (Fed. Cir. 2006) ........................................... 19, 20

*Red Lion Medical Safety v. Ohmeda*, 63 F. Supp.2d 1218 (E.D. Cal. 1999) ............................... 68

*Riggs v. Patriot Energy Partners, LLC*, Case No. 11CA877, 2014 WL 605668 (Ohio Ct. App. Feb. 13, 2014) ......................................................................................................................... 28

*Robb v. Conn. Bd. of Veterinary Med.*, 157 F. Supp. 3d 130 (D. Conn. 2016) .......................... 58

*Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380 (7th Cir. 2004) .................................... 51

*Ross v. Am. Exp. Co.*, 547 F.3d 137 (2d Cir. 2008) .................................................................... 31

*Saltzman v. Pella Corp.*, 257 F.R.D. 471 (N.D. Ill. 2009) .......................................................... 79

*Sanchez v. CleanNet USA, Inc.*, 78 F. Supp. 3d 747 (N.D. Ill. 2015) .......................................... 29

*Sanders v. JGWPT Holdings, LLC*, Case No. 14CV9188, 2017 WL 4281123 (N.D. Ill. Sept. 27, 2017) ....................................................................................................................................... 23

*Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.*, No. C 93-20613, 1995 WL 853037 (N.D. Cal. Apr. 17, 1995) ........................................................................................................ 16

*Saulsberry v. Morinda, Inc.*, No. 1:07-CV-01542-WSD, 2008 WL 416933 (N.D. Ga. Feb. 13, 2008) ....................................................................................................................................... 97

*Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748 (7th Cir. 2017) ........................... 9, 10, 24

*See In re Toyota Motor Corp. Hybrid Brake Mktg., Sales, Prac. & Prods. Liab. Litig.*, 828 F.Supp.2d 1150 (C.D. Cal. Dec. 13, 2011) ............................................................................. 21

*Serfecz v. Jewel Food Stores*, 67 F.3d 591 (7th Cir. 1995) ........................................................ 42

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380 (E.D. Pa. 2010) ..................................................................................................... 90, 98

*Sherwood v. Microsoft Corp.*, No. M2000-01850-COA-R9-CV, 2003 WL 21780975 (Tenn. Ct. App. July 31, 2003) ............................................................................................................ 94, 95

*Short v. Res. Title Agency*, Case No. 95839, 2011 WL 1203906 (Ohio Ct. App. Mar. 31, 2011) 29

*Simply Wireless, Inc. v. T-Mobile US, Inc.*, 877 F.3d 522 (4th Cir. 2017) ................................. 19

*Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999) ......................................................... 16

*Skokie Gold Standard Liquors, Inc. v. Joeseph E. Seagram & Sons, Inc.*, 661 F.Supp.1311 (N.D. Ill. 1986) .................................................................................................................................. 48

*Smith v. Adams & Assocs.*, Case No. 14C5522, 2015 WL 5921098 (N.D. Ill. Oct. 9, 2015) ...... 24

*Somers v. Apple, Inc.,* 729 F3d 953 (9th Cir. 2013) ................................................................... 40

*Stark v. Visa U.S.A., Inc.*, No. 03-055030-CZ, 2004 WL 1879003 (Mich. Cir. Ct. July 23, 2004) ..................................................................................................................................... 83

*State v. Lead Indus. Ass'n, Inc.*, No. 99-5226, 2001 WL 345830 (R.I. Super. Ct. Apr. 2, 2001) 86

*Steamfitters Local Union NO. 614 v. Philip Morris, Inc.*, W1999-01061-COA-R9-CV, 2000 WL 1390171 (Tenn. Ct. App. Sept. 26, 2000) ................................................................... 86

*Super Pawn Jewelry & Loan, LLC v. Am. Environ. Ener., Inc.*, Case No. 11-cv-8894, 2013 WL 1337303 (N.D. Ill Mar. 29, 2013) ........................................................................ 23

*Supreme Auto Transp. LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032 (N.D. Ill. 2017) .... 78, 79, 86

*Taylor v. Ernst & Young, L.L.P.*, 130 Ohio St. 3d 411 (Ohio 2011) ......................................... 9

*Taylor v. Sturgell*, 553 U.S. 880 (2008) .............................................................................. 34

*Teague v. Bayer AG*, 671 S.E.2d 550 (N.C. Ct. App. 2009) .................................................. 84

*Thomas v. Am. Gen. Fin., Inc.*, No. 09 C 3009, 2009 WL 781078 (N.D. Ill. Mar. 23, 2009) ...... 17

*Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) ...................................................... 52

*Turi v. Main Street Adoption Servs., LLP*, 633 F.3d 496 (6th Cir. 2011) ............................... 19

*U.S. Bank N.A. v. Wilkens*, Case No. 96617, 2012 WL 892898 (Ohio Ct. App. Mar. 15, 2012) . 28

*U.S. v. Nat'l City Lines*, 134 F. Supp. 350 (N.D. Ill. 1955) ................................................. 76

*U.S. v. Sargent Elec. Co.*, 785 F.2d 1123 (3d Cir. 1986) ...................................................... 61

*United States Fire Ins. Co. v. Waterfront Assocs.*, Case No. 1:15-cv-46, 2016 WL 6600622 (S.D. Ohio Nov. 8, 2016) ............................................................................................. 10

*United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001) .................................................... 53

*Vance v. Bureau of Collection Recovery LLC*, No. 10-cv-06324, 2011 WL 881550 (N.D. Ill. March 11, 2011) ........................................................................................................ 100

*Vasic v. PatentHealth, L.L.C.*, 171 F. Supp.3d 1034 (S.D. Cal. 2016) ................................... 99

*Vinci v. Waste Mgmt, Inc.*, 36 Cal. App. 4th 1811 (Cal. Ct. App. 1995) ................................. 83

*VIS Sales, Inc. v. KeyBank, N.A.*, C.A. No. 25366, 2011 WL 1138889 (Ohio Ct. App. Mar. 30, 2011) ....................................................................................................................... 15

*Volkswagen of Am., Inc. v. Sud's of Peoria, Inc.*, 474 F.3d 966 (7th Cir. 2007) ...................... 33

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 117 (Del. 2006) ............................. 94

*Warciak v. Subway Restaurants, Inc.*, 880 F.3d 870 (7th Cir. 2018) ...................................... 25

*Washington Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260 (5th Cir. 2004) ................................ 30

*Whitlock v. Johnson*, 153 F.3d 380, 384 (7th Cir. 1998) ..................................................... 80

*Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 360 (7th Cir. 1990) ................................................. 68

*Williams-Bell v. Perry Johnson Registrars, Inc.*, Case No. 14C1002, 2015 WL 6741819 (N.D. Ill. Jan. 8, 2015) ......................................................................................................... 32

*Wilson v. Gen. Motors Corp.*, 921 A.2d 414 (N.J. 2007) ..................................................... 91

*Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 56 F.3d 663 (7th Cir. 2008) ....................................................................................................................... 91

*Wise v. Zwicker & Assocs., PC*, Case No. 12CV01653, 2013 WL 1195555 (N.D. Ohio Mar. 22, 2013) ....................................................................................................................... 30

*Zahn v. North Am. Power & Gas, LLC*, 815 F.3d 1082 (7th Cir. 2016) .................................. 65

*Zaycer v. Sturm Foods, Inc.*, 896 F. Supp. 2d 399 (D. Md. 2012) ........................................ 77

**Statutes**

6 Del. Code § 2512 ........................................................................................................... 93

ALA. CODE § 6-5-60 (2018) ........................................................................................... 77

Alaska Stat. Ann. § 45.50.531 ........................................................................................ 96

Cal. Bus. & Prof. Code § 16750 ..................................................................................... 99

Ga. Code Ann. § 10-1-399(b) .......................................................................................... 96

Haw. Rev. Stat. § 480–13.3(a)(1) ................................................................................... 96

Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/7.2 .................................................. 80

KAN. STAT. ANN. § 50-161(b) (West 2018) .................................................................... 83

S.C. CODE ANN. § 39-3-10 ............................................................................................ 77

**FILED UNDER SEAL**

## INTRODUCTION

Dealership Plaintiffs bring this antitrust action on behalf of a nationwide class of auto dealerships whose own data are being held hostage by Defendants CDK and Reynolds (the "Duopoly" or "Big 2", as they are known within the retail automobile industry). Defendants' illegal anticompetitive practices, unlawful collusion and conspiracy restrained and/or eliminated competition in markets for: (1) Dealer Management Systems ("DMS"); and (2) Data Integration Services ("DIS"). Dealership Plaintiffs rely on DMS in order to efficiently manage all aspects of their dealerships. As part of its scheme, the Duopoly has utilized its control of the DMS market (collectively, Defendants have at least 75% market share) and has furthered its collusion and conspiracy to control both the DMS and DIS markets by imposing exclusive dealing provisions in the vendor contracts that prevent dealerships from partnering with third parties (vendors) who may have the best solution to assist them in making more sales and profit, instead forcing the dealerships to use vendors that are owned or controlled by Defendants. Each dealership is now prevented from controlling its own data and prevented from using its choice of vendors that provide software and programs that use the dealer's own data to achieve operational efficiencies best for the dealer. Defendants' violations of both federal and state antitrust law, which began at least by January 2015, continue to harm dealerships nationwide.

Capitalizing on their DMS market dominance through implementation of *per se* illegal horizontal market division and decrease functionality agreements, CDK and Reynolds eliminated competition for the provision of crucial DIS to dealers nationwide, as well as to data integrators and vendors that require access to the dealers' own DMS data to provide a variety of vital services to dealers. Defendants furthered the conspiracy by implementing exclusive dealing provisions – purportedly infinite in duration – which forbid all vendors doing business with CDK or Reynolds from contracting with any other independent DIS provider. Accordingly, vendors

FILED UNDER SEAL

engaged by dealers to utilize the *dealers' own data* are also forced to utilize Defendants' affiliated DIS. Thus, if a vendor does business with CDK, pursuant to these exclusive dealing provisions, it can only use CDK's DIS, "Third Party Access" or "3PA" to utilize its dealer client's own data. Defendants have exploited these uncompetitive and unlawful exclusive dealing provisions in vendor contracts to impose exorbitant charges for data integration on vendors, and those charges are ultimately passed through to dealers.

Defendants' collusion has caused substantial price increases to dealerships, and has driven out any vestige of competition in both the DMS and DIS markets, and its conspiracy increased DMS and DIS prices to exorbitant levels. Defendants now charge vendors an average of $300 per month for DIS for one auto dealership (and some vendors are charged as much as $800 per month), whereas before the illegal conspiracy data integrators (including CDK subsidiaries) typically charged vendors about $50 per month per dealership for DIS. Vendors pass on these artificially inflated fees to dealers. Switching DMS by a dealership is enormously expensive and is described to be as painful as a heart or knee transplant.

It is in this context that both Defendants seek to avoid this Court's jurisdiction by moving this Court to send claims to arbitration. Reynolds asserts that its agreements with Reynolds Dealers are governed by four separate documents. Examples of those documents attached to the Reynolds Memorandum are ███████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

**FILED UNDER SEAL**

██████████ Reynolds' submission does not include any Exhibits, let alone signed versions thereof. In addition, this Court has stated that "[], as noted by Plaintiffs, the Master Agreement does not contain prices. Without any clear reference to the Master Agreement or any of its terms in the complaint, Reynolds has not identified any viable basis for concluding that the Master Agreement is central to Plaintiffs' allegations." Order, Dkt. 340 (Aug. 21, 2018), 2. Moreover, despite being given a third opportunity to properly identify and authenticate the documents comprising the contractual relationship between Reynolds and Dealers (in light of Reynolds' prior failures to do so), the declaration of Reynolds' General Counsel says nothing about Exhibits or about price terms in any of the documents comprising the Reynolds Agreement. *See* Decl. of Jeffrey Scott Cherry, Dkt. 335 (Aug. 20, 2018). Collectively, the Reynolds documents bring to mind an elaborate Rube Goldberg machine.

Though Reynolds' agreements contain an arbitration clause, the antitrust claims brought by six named Dealership Plaintiffs who contracted with Reynolds for the provision of DMS services ("Reynolds Dealers") are clearly outside the scope of that arbitration clause. CDK – who has **no** agreement to arbitrate with **any** Dealership Plaintiffs – waived any ability to seek arbitration, and cannot meet the standards for compelling arbitration under the equitable estoppel doctrine. Defendants' motions to stay this action pending arbitration should also be denied, as a stay of proceedings would have no beneficial effect, only negative consequences.

The arbitration provision in the Reynolds Agreement only requires ███████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ As this Court has recently noted, "references [to Reynolds' DMS contracts] are not central to the allegations in the complaint." Order, Aug. 21, 2018 (Dkt. No. 340) at 2. Dealership Plaintiffs' claims do not allege,

**FILED UNDER SEAL**

in any way, that Defendants violated the terms of the Reynolds Agreement. Thus, the Court will not be required to interpret any terms of that agreement in order to decide Plaintiffs' claims.

Instead, Dealership Plaintiffs' claims are focused on Defendants' own collusive and conspiratorial actions to restrain trade and eliminate competition in the DMS and DIS markets. It is Defendants' agreements *with each other* – not Dealership Plaintiffs – that are at the heart of Plaintiffs' claims. Reynolds acknowledges this in its motion papers (at 6), admitting that its February 2015 agreements with CDK are "the crux for all of [Dealership Plaintiffs'] claims in this litigation". Decisions from Ohio and federal courts, involving similar allegations, show that Dealership Plaintiffs' claims are outside the scope of arbitration.

Moreover, the arbitration clause in the Reynolds Agreement does not cover statutory claims like those brought by Plaintiffs. ██████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ As Reynolds' arguments for arbitration are wholly groundless, the Court has the authority to reject them without unnecessarily referring them to an arbitrator to make the same decision.

CDK's motion seeking arbitration is equally groundless. CDK has waived arbitration by remaining silent about its intent to seek arbitration, and by pursuing discovery from Reynolds Dealers. Further, under any relevant standards, CDK's equitable estoppel argument fails, because CDK cannot show that it detrimentally relied on Reynolds Dealers' contracts with Reynolds. Moreover, Reynolds Dealers' claims against CDK are completely unrelated to the Reynolds Agreement, and CDK lacks a corporate affiliation with Reynolds that might allow CDK to

"stand in Reynolds' shoes" and enforce the arbitration clause in the Reynolds Agreement. CDK's effort to leverage its own conspiratorial conduct to force arbitration here should be rejected.

If the Court finds some claims to be arbitrable, it should not impose a stay on the non-arbitrable claims. A stay would not reduce the risk of inconsistent judgments because CDK Dealers will not be bound by any arbitration rulings and will be able to fully litigate their claims in court; likewise, Defendants have not indicated that they would be bound by any negative rulings in arbitration. Further, despite a stay, the very issues that are central to Dealership Plaintiffs' claims will continue to be litigated in the parallel actions before the Court, and staying Plaintiffs' claims would only result in unnecessary and duplicative discovery and motion practice after the stay is lifted, to the detriment of Plaintiffs, non-parties and the Court.

Dealership Plaintiffs, as direct purchasers of Defendants' DMS, and indirect purchasers of DIS, have standing to pursue federal antitrust claims of horizontal conspiracy and exclusive dealing for damages and injunctive relief. Dealership Plaintiffs allege that, as a result of Defendants' arrangement to close their DMS to competing third party integrators, the DMS which Dealership Plaintiffs directly purchased from Defendants diminished in value. The illegal arrangement enabled Defendants (as horizontal competitors) to remove dealerships' pre-existing capability to freely access their DMS data and provide access to that data to authorized persons. As such, Defendants' conduct degraded DMS functionality thereby diminishing the value of the DMS -- a product purchased directly from Defendants. Compl. ¶¶ 149, 170-171. The injury also includes increased prices paid by Dealership Plaintiffs for DMS. *Id.* ¶ 16.

Defendants' unlawful horizontal agreements to restrain competition in the DMS market (which is illegal *per se* and not subject to a rule of reason analysis) by agreeing to reduce the functionality of CDK's DMS drove competition from the independent DIS market, and also

**FILED UNDER SEAL**

affected competition in the DMS market. In addition, given the costs of switching DMS, most dealerships have no viable alternatives. Compl. ¶¶ 4, 66–69. Dealership Plaintiffs allege that "[d]espite CDK's success in wresting market share away from Reynolds, its biggest competitor in the DMS market, competition between Reynolds and CDK suddenly ceased in 2015," and this wrongful conduct "had the effect of eliminating competition between CDK and Reynolds in the DMS market." *Id.* ¶ 80-81. Dealers allege that admissions from top executives who agreed to block integrators, reciprocal contractual terms with almost identical language, and Defendants' enormous combined market power all demonstrate a horizontal conspiracy between Defendants.

Dealership Plaintiffs also have standing to seek injunctive relief for violation of § 1 of the Sherman Act. As to the DMS market, Dealership Plaintiffs are the most directly-affected purchasers. Indeed, none of the other plaintiffs in this MDL can even be deemed direct or even indirect purchasers of DMS. With regard to the DIS market, Dealership Plaintiffs' injuries are directly attributable to Defendants' illegal conspiracy and are not "remote." Dealership Plaintiffs have alleged injuries that are directly attributable and traceable to Defendants' conspiracy (Compl. ¶¶ 70-152); indeed, vendors have passed overcharges onto dealers. Compl. ¶¶ 134-145. Moreover, the conspiracy took direct aim at the product (the DMS) that Dealership Plaintiffs purchased directly from Defendants; CDK agrees that its own integrator (3PA) is "a 'managed interface' that is *part of* CDK's DMS."

Dealership Plaintiffs have also properly alleged they were injured by a market division conspiracy where Defendants' agreement required CDK to cease providing DIS for Reynolds' DMS. Compl. ¶ 83. Dealership Plaintiffs are locked into their purchases of DMS and are otherwise unable to reasonably assess the lifecycle costs of their investment in DMS, and Defendants took advantage of these market imperfections, allowing them to "profitably…

FILED UNDER SEAL

maintain supracompetitive prices in the aftermarket" for data integration on their respective platforms. Defendants' ability to extract supracompetitive prices for DIS (Compl. ¶¶ 126-45), serves as direct evidence of Defendants' power in the DIS market in general, and the aftermarkets for DIS on their respective DMS in particular.

Reynolds cannot avoid antitrust liability by stating that it has always had a closed system when in fact Reynolds changed its policies by agreeing to help CDK, a competitor, close its DMS to third parties. Compl. ¶¶ 8-11, 77-86, 89, 91. While Reynolds' policies concerning third party access to its DMS may have been generally known prior to 2015, Reynolds' ability to effectuate this policy received a shot of adrenaline in 2015 from its anticompetitive agreement with CDK. As a part of Defendants' conspiracy, CDK agreed its subsidiaries (DMI and IntegraLink) would stop providing integration services for dealers with a Reynolds DMS. Reynolds monopolized, through anticompetitive means, the DIS market for its DMS, and also monopolized the single-brand aftermarket for DIS on its DMS by imposing exclusive dealing arrangements on vendors (Compl. ¶ 205), in violation of Section 2 of the Sherman Act.

Reynolds and CDK conspired to eliminate competition in the DIS and DMS markets by allocating the two markets between themselves, blocking third party integrators' access to their respective DMS, agreeing to reduce the functionality of CDK's DMS, and forcing vendors to utilize Defendants to access their respective DMS. Each has also leveraged and helped the other leverage its monopoly power in the aftermarket for DIS on their respective DMS platforms (Compl. ¶¶ 81-95, 122-25) causing substantial injury to Dealership Plaintiffs as their preferred data integrators and vendors have been denied access to Dealership Plaintiffs' data. Compl. ¶¶ 96-109, 125, 130-31, 42. Dealership Plaintiffs have also suffered from the increased fees

Reynolds and CDK are now able to extort for the use of their DMS and data integration services on their DMS and the reduced functionality of these services. Compl. ¶¶ 126-52.

Dealership Plaintiffs also have standing to pursue the state law claims herein which are equally well pled. The question of whether the named Plaintiffs are appropriate class representatives for dealers in other states is premature. At this point, Dealership Plaintiffs may pursue indirect purchaser claims under various state statutes as they are in the "distribution chain" and participated in the market for DIS, which are provided by Defendants, not any other entity. Federal antitrust standing precedent known as *AGC* does not bar Dealership Plaintiffs' claims here, where dealers have purchased the same product whose market Defendants allocated. To find otherwise would thwart the will of all repealer states. *Not one* state court has applied *AGC* to deny standing to indirect purchasers who participate in the market for the restrained product and purchase the same product that is subject to anticompetitive conduct.

Harmonization provisions and federal case law do not dictate a different result. *AGC* does not eviscerate the very right, *i.e.*, standing of indirect purchasers, for which the repealer statutes were enacted. Dealership Plaintiffs are participants in the DIS market and, by purchasing applications that incorporate DIS, they are indirect purchasers of DIS. In any event, Dealership Plaintiffs' claims satisfy each of the *AGC* factors. Plaintiffs allege that Defendants conspired to restrain competition for DIS with the intent of increasing DIS prices (Compl. ¶ 1) and as a result, the prices of DIS did artificially increase (Compl. ¶ 14), causing injury to Dealerships by paying more for DIS than they would have paid absent the conspiracy (Compl. ¶ 16). This injury is exactly the type the antitrust laws were intended to prevent. State consumer protection laws are broadly worded and are to be liberally construed, authorizing claims for collusive anticompetitive conduct, and Dealership Plaintiffs have adequately pled those claims as well.

For the foregoing reasons, as set forth more fully below, Defendants' motions should be denied in their entirety.

## ARGUMENT

## I. REYNOLDS DEALERS' ANTITRUST CLAIMS SHOULD NOT BE DISMISSED IN FAVOR OF ARBITRATION, AND NO CLAIMS SHOULD BE STAYED

### A. Reynolds' Motion to Dismiss Reynolds Dealers' Antitrust Claims in Favor of Arbitration Should be Denied

Reynolds' arguments that Reynolds Dealers' antitrust claims are within the scope of an arbitration provision are wholly groundless. Accordingly, the Court should reject those arguments without referring them to an arbitrator.

#### 1. Dealership Plaintiffs' Antitrust Claims Are Outside the Scope of the Reynolds Arbitration Provision

"Arbitration is strictly 'a matter of consent,' and thus 'is a way to resolve disputes – *but only those disputes* – that the parties have agreed to submit to arbitration.'" *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S 287, 299 (2010) (citations omitted) (emphasis in original). Because arbitration is a matter of contract, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017) (citing *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). "Accordingly, when deciding motions to compel arbitration, the proper focus is whether the parties actually agreed to arbitrate the issue, *i.e.*, the scope of the arbitration clause, not the general policies of the arbitration statutes." *Taylor v. Ernst & Young, L.L.P.*, 130 Ohio St. 3d 411, 417 (Ohio 2011) (citing *Equal Emp. Opp. Comm. v. Waffle House*, 534 U.S. 279, 294 (2002)).

The Federal Arbitration Act ("FAA") was intended "to make arbitration agreements as enforceable as other contracts, *but not more so*." *Prima Paint Corp. v. Flood & Conkling Mfg.*

FILED UNDER SEAL

*Co.*, 388 U.S. 395, 404 n.12 (1967) (emphasis added). "Substantive federal arbitration law does not 'alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them).'" *Scheurer*, 863 F.3d at 753 (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009)).

### a. Plaintiffs' Antitrust Claims Do Not Arise From the Reynolds Agreement

"[C]ourts must examine a complaint with care to assess whether any individual claim must be arbitrated." *KPMG LLP v. Cocchi*, 565 U.S. 18, 22 (2011) (per curiam). Reynolds Dealers' claims against Reynolds are not based on the terms of the Reynolds Agreement: they are claims under federal and state antitrust laws, not "disguised" claims for breach of contract; they do not allege that Reynolds' anti-competitive behavior violated any provisions of the Reynolds Agreement; and the essential elements of Plaintiffs' claims can be proved without establishing that Reynolds breached any provision of the Reynolds Agreement.

As this Court recently explained, "[a]lthough the complaint references Reynolds's DMS contracts, ***such references are not central to the allegations in the complaint***." Order, Dkt. 340 (Aug. 21, 2018) at 2 (emphasis added).[1]

Reynolds' own descriptions of Dealership Plaintiffs' claims show that they do not arise from, or relate to, the Reynolds Agreement. Reynolds itself asserts (at 6) that "[the] wind-down agreement between Reynolds and CDK is what Plaintiffs now use as the crux for all of their

---

[1] Dealership Plaintiffs' Complaint contains only one brief reference to Dealers' contracts with Reynolds, in the "Introduction" section. *See* Compl. ¶15. That does not provide a sufficient basis to find that Reynolds Dealers' claims are dependent on the Reynolds Agreement. *See Dental Assocs., P.C. v. Am. Dental Partners of Mich., LLC*, 520 Fed. Appx. 349, 353 (6th Cir. 2013) (reference to contract in "Background" section of complaint was insufficient to show that plaintiff's claims could not be maintained without reference to the contract); *United States Fire Ins. Co. v. Waterfront Assocs.*, Case No. 1:15-cv-46, 2016 WL 6600622, at *5 (S.D. Ohio Nov. 8, 2016) (denying motion to compel arbitration, as "a brief reference [in a complaint] to a contract containing an arbitration clause does not necessarily mean that the underlying dispute must be arbitrated.").

**FILED UNDER SEAL**

claims in this litigation regarding antitrust conspiracies and monopolization schemes." Reynolds

also recognizes: "There is no allegation that Reynolds made any changes to its contracts with

dealers or vendors" (at 30); "Plaintiffs do not challenge [the] contractual provision [relating to

providing system access to any third party]" (at 34); "Plaintiffs do not contend that the

provisions in their DMS licenses with Reynolds, which expressly prohibited Plaintiffs from

granting DMS access to integrators or any other third party, constituted 'exclusive dealing,' or

were unlawful in any way." (at 34); and "Plaintiffs' exclusive dealing claims are based solely on

Reynolds's contracts with its vendors" (at 47). Reynolds' own characterization of Dealership

Plaintiffs' claims, and its failure to identify a single provision of the Reynolds Agreement that is

purportedly central to Dealership Plaintiffs' claims, are fatal to its motion.[2]

The Complaint alleges a horizontal conspiracy between Reynolds and CDK to

monopolize trade in the DMS and DIS markets. The relevant facts of that conspiracy do not

relate to Reynolds' contracts with Reynolds Dealers, but with Defendants' improper and illegal

agreements ***with each other*** not to compete in the DIS market, to block access to their respective

DMS by competing independent data integrators, and to force vendors to only use Defendants

(or their affiliates) to access their respective DMS through exclusive dealing provisions in

Defendants' contracts ***with vendors***.

      **b.**    **Ohio Law Establishes That Plaintiffs' Antitrust Claims Are Outside the Scope of the Arbitration Provision**

"To determine whether a contract's arbitration clause applies to a given dispute, federal

courts apply state-law principles of contract formation." *Gore v. Alltel Comm., LLC*, 666 F.3d

---

[2] *See Duncan v. Wheeler*, Case No. 09CA3296, 2010 WL 3852276, at *3 (Ohio Ct. App. Sept. 29, 2010) (affirming denial of motion to compel arbitration of claims for breach of fiduciary duty, despite the presence of a broad arbitration clause covering "any controversy or claim arising out of" the parties' shareholder agreement, where the moving party did not cite any specific part of the agreement that was "implicated by the complaint").

FILED UNDER SEAL

1027, 1032 (7th Cir. 2012); *see also James v. McDonald's Corp.*, 417 F.3d 672, 677 (7th Cir. 2005) (in determining whether parties have agreed to arbitrate, courts apply state contract law). Here, the Court should apply Ohio state law principles, as the ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████[3]

Ohio courts have addressed the arbitrability of antitrust claims like those brought by Reynolds Dealers and found them to be outside the scope of broad arbitration provisions. In *Academy of Medicine of Cincinnati v. Aetna Health, Inc.*, 108 Ohio St. 3d 185 (Ohio 2006), the plaintiff physicians alleged that the defendant insurer conspired with other insurers to maintain artificially low reimbursement rates paid to physicians. The defendant argued that the antitrust claim was within the scope of the broad arbitration clause in the provider contract between the parties, which required arbitration of all disputes "about [the parties'] business relationship," and which did not expressly exclude statutory claims. *See id.* at 185. The trial court denied the motion to compel arbitration, finding that the price-fixing claim "[did] not arise out of or relate to the contracts between the Plaintiffs and Defendant[], nor [did] it involve disputes about the parties' business relationships." *See id.*

The Ohio Court of Appeals affirmed, applying the test from *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386 (6th Cir. 2003), that "if an action could be maintained without reference to the contract or relationship at issue… it is likely outside the scope of the arbitration agreement." *See Academy of Medicine*, 155 Ohio App. 3d 310, 312 (Ohio Ct. App. 2003) (citing *Fazio*, 340 F.3d at 395). The Court of Appeals concluded the plaintiffs' antitrust claims could be maintained

---

[3] Neither Reynolds nor CDK cites a single case applying Ohio law in which antitrust claims were found to be within the scope of an arbitration provision.

without reference to their individual contracts with the defendant, and therefore were outside the scope of the arbitration provision in those agreements:

> To maintain an antitrust claim…, the doctors will have to prove that two or more persons came together to illegally concentrate a particular business into the hands of a few for the purpose of controlling prices, and that injury resulted from that restraint of trade. The express elements of an antitrust claim do not depend, as a matter of law, on the provider agreements between the individual doctors and HMOs.

> The doctors' allegations in their complaint… neither relied on nor referred to a contract or provider agreement between the doctors and the HMOs. Instead, the antitrust claim was based upon a statutory remedy the legislature has provided to persons harmed by illegal price fixing.

*Id.* at 312-13. The Ohio Supreme Court affirmed, explaining that "[s]tatutory claims, including antitrust claims, are neither *per se* arbitrable or not arbitrable. Those claims must undergo the analysis that every other claim faces: whether the parties agreed to arbitrate the issue." *See Academy of Medicine*, 108 Ohio St. 3d at 190. The Ohio Supreme Court held that the *Fazio* test, as applied by the Court of Appeals, was consistent with Ohio law, implicitly rejecting the dissent's argument that the appropriate standard for determining arbitrability is whether allegations merely "touch matters" covered by the arbitration agreement. *See id.* at 191.

The claims in *Academy of Medicine* directly track to Plaintiffs' claims against Reynolds. As with the doctors' state law antitrust claims in *Academy of Medicine*, Reynolds Dealers' federal and state antitrust claims are based on statutory remedies provided by legislatures to prevent anticompetitive behavior, and the elements of those claims do not depend on a contract between Reynolds and dealers.

The court in *Academy of Medicine* concluded that the doctors' antitrust claim "could be maintained without reference to" their agreements with the defendant, despite the apparent fact that some of the doctors' damages flowed from artificially depressed reimbursement rates paid under those agreements. *Academy of Medicine*, 155 Ohio App. 3d at 312. Here, although a

**FILED UNDER SEAL**

portion of Reynolds Dealers' injuries were caused by artificially increased prices for DMS, the Reynolds Agreement is neither the genesis nor the linchpin of Dealers' damages; Reynolds' agreement with CDK to prevent Dealers from accessing their own data has caused those damages. Further, much of Reynolds Dealers' damages consist of amounts paid to vendors after those vendors passed on artificially increased data integration fees they incurred as a result of Defendants' manipulation of the DIS market. Compl. ¶¶ 134-145.[4] Moreover, as discussed in the Introduction, *supra*, incorporated herein by reference, the documents comprising the Reynolds Agreement, among other deficiencies, ███████████████████████ As in *Academy of Medicine*, this Court should find that Reynolds Dealers' antitrust claims can be maintained without reference to the Reynolds Agreement.

Tellingly, the court denied arbitration in *Academy of Medicine* even though the arbitration provision in that case was ***broader*** than the provision here. The provision in *Academy of Medicine* required arbitration of "any disputes arising out of or relating" to the "business relationship" between the doctors and the insurer, in addition to disputes over the provider contracts themselves. *See Academy of Medicine*, 155 Ohio App. 3d at 312. In contrast, the Reynolds arbitration provision ████████████████████████████████████ ███████[5]

In *Hollinger v. Keybank Nat'l Assn.*, C.A. No. 22147, 2004 WL 3017223 (Ohio Ct. App. Dec. 22, 2004), the court rejected arguments in favor of arbitration which "focus[ed] solely on [defendant's] business relationship with [the plaintiff]", and held that plaintiffs' fraud and

---

[4] *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 13-CV-3349 SI, 2014 WL 1395733, at *3 (N.D. Cal. Apr. 10, 2014) ("Gateway's claims during the period outlined above are arbitrable only to the extent they are based on purchases it made directly from NEC; to the extent Gateway's claims are based on indirect purchases or co-conspirator liability, such claims are not subject to arbitration.").

[5] ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████.

FILED UNDER SEAL

conspiracy claims were not arbitrable because they could "be asserted without reference to the contract" containing the arbitration provision. *See id.* at *7.[6] The court also noted that "at the time the parties entered this contract, they could not have contemplated that Appellant would conspire to commit fraud with a third party…, because such an agreement would violate public policy." *See id.* at *8. The same is true here: at the time Reynolds Dealers entered into their contracts with Reynolds, they could not have contemplated that Reynolds would enter into an illegal conspiracy with its principal competitor to monopolize trade in the DMS and DIS markets.

The Seventh and Tenth Circuits have also found antitrust claims like those asserted by Plaintiffs to be outside the scope of broad arbitration clauses. In *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568 (7th Cir. 1999), the Seventh Circuit held that a "Strategic Alliance Agreement" that required arbitration of "any claim or controversy arising out of or relating to [the] Agreement," did not cover the parties' antitrust dispute because the antitrust claims did not arise under the agreement. As the Court explained:

> The SAA, though it does provide for shared information and cooperation, does not regulate the price [defendant] may charge for its landing gear. Therefore, [defendant] could fully comply with the SAA and still cause AlliedSignal antitrust injury by charging uncompetitive prices. AlliedSignal's antitrust claims do not arise under the SAA and hence are not subject to arbitration.

*Id.* at 573. The Seventh Circuit's holding in *AlliedSignal* supports the denial of arbitration here because the Reynolds Agreement does not contain any provision barring Reynolds from charging

---

[6] *See also Duncan*, 2010 WL 3852276 at *3 ("There is a difference, however, between a broad clause and an all-encompassing clause," and "the parties did not simply agree to arbitrate all disputes relating to their business enterprise without limitations."); *VIS Sales, Inc. v. KeyBank, N.A.*, C.A. No. 25366, 2011 WL 1138889, at *6 (Ohio Ct. App. Mar. 30, 2011) ("[E]ven the presence of a broad arbitration clause does not make all claims subject to arbitration.").

prices artificially inflated by anticompetitive conduct; thus, Reynolds could "fully comply with" that agreement "and still cause Plaintiffs antitrust injury by charging anticompetitive prices."[7]

In *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511 (10th Cir. 1995), the Tenth Circuit held that Coors' antitrust claims alleging a combination (between Molson and Miller Brewing Company) in restraint of trade were not subject to arbitration because they were not related to the licensing agreement between Molson and Coors. *Id.* at 1517 ("We reiterate that Coors may litigate antitrust claims not related to the licensing agreement just as anyone else with standing may. Coors's claims regarding market concentration are not related to the licensing agreement and Coors may therefore litigate those claims.").[8]

---

[7] *See also, e.g., Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.*, No. C 93-20613, 1995 WL 853037, at *3 (N.D. Cal. Apr. 17, 1995) (denying motion to compel: "[plaintiffs'] claims are not arbitrable because no language in the contracts… needs to be interpreted in order to evaluate the merits of plaintiffs' antitrust claims").

[8] The decisions Reynolds cites are distinguishable, based on the nature of the claims in those cases and the terms of the relevant arbitration clauses. In *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999), the Court found the plaintiff's claims to be within the scope of the arbitration provision because the plaintiff ***itself alleged*** that the agreement containing the arbitration clause was "a primary reason why competition in the market… has been suppressed," and accused the defendant of "using [that agreement] to restrain trade"; thus, the Court held that resolution of the plaintiff's claims "will necessitate interpreting [that agreement] to determine its meaning and whether the contracts between [the parties] actually do suppress competition as alleged." *See id.* at 721-22. Here, Dealership Plaintiffs do not accuse Reynolds of using the Reynolds Agreement to effectuate its anticompetitive scheme with CDK, and the Court will not have to interpret that agreement in order to rule on the merits of Dealership Plaintiffs' claims. Similarly, in *Empire State Ethanol and Energy, LLC v. BBI Int'l*, No. 1:08-CV-623, 2009 WL 790962 (N.D.N.Y. Mar. 20, 2009), the plaintiff's antitrust claims "explicitly allege[d] that defendants' conspiracy to monopolize the New York ethanol market was realized through their access to [plaintiff's] confidential proprietary information under the [agreement containing the arbitration clause], and in clear violation of the [agreement's] confidentiality clause." *Id.* at *8. In contrast, Dealership Plaintiffs do not allege that Reynolds breached the Reynolds Agreement or used information obtained through such a breach to further its conspiracy with CDK. This Court has already explained that *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163 (2d Cir. 2004) is inapplicable here, because unlike the Reynolds Agreement, "the contracts at issue in *JLM* contained the price terms that plaintiffs claimed had been artificially inflated by defendant's anticompetitive conduct." Order, Dkt. 340 (Aug. 21, 2018) at 2 n.1.

Other cases involved arbitration clauses that were far broader than the relevant provision in the Reynolds Agreement. In *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385 (S.D.N.Y. 2003), the court found that the arbitration clauses were "quite broad in that they apply to any claim 'arising from or relating in any way to… your Account,' and 'arising out of or relating to… your Account.'" *Id.* at 410. Those clauses are much broader than the clause at issue here, ███████████████████████████

FILED UNDER SEAL

Accordingly, under Ohio law and numerous federal decisions, since Dealership Plaintiffs' claims can be maintained without reference to the Reynolds Agreement, they are outside the scope of the arbitration clause.

### c. The Reynolds Agreement Does Not Require Arbitration of Statutory Claims

Reynolds' motion also fails because the Reynolds Agreement does not contemplate the arbitration of Dealership Plaintiffs' statutory claims. *See generally Thomas v. Am. Gen. Fin., Inc.*, No. 09 C 3009, 2009 WL 781078, at *2 (N.D. Ill. Mar. 23, 2009) (courts "may not expand the application of an arbitration clause beyond its intended scope.") (citing *Am. United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 929 (7th Cir. 2003)).

According to Reynolds (at 7 n.7), the "Master Agreement" (Ex. 2 at ¶ 7(h)) states that



Indeed, the notion that Ohio's "internal laws" could govern Plaintiffs' federal statutory claims or non-Ohio statutory claims makes no sense. The Court should honor the intent of the parties as reflected in the Reynolds Agreement; to the extent there is any ambiguity, the

---

In *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097 (C.D. Cal. 2002), the arbitration clause was also much broader than the clause here, as it not only covered claims relating to the parties' written agreements, but also explicitly covered any claims relating to DirecTV's "Services." *Id.* at 1106. Similarly, in *B-S Steel of Kansas, Inc. v. Texas Indus., Inc.*, 229 F. Supp. 2d 1209 (D. Kan. 2002), unlike the clause in the Reynolds Agreement, the arbitration clause explicitly "cover[ed] not only claims or controversies tied to the parties' contract, but to any other transactions between the parties… even if they don't arise out of the contract." *Id.* at 1226.

FILED UNDER SEAL

agreement should be construed against Reynolds, the drafter. *See Lupo, LLC v. Reynolds & Reynolds Co.*, 729 F. Supp.2d 350, 353-354 (D. Me. 2010) (because the Reynolds Agreement is an "adhesion contract," "any doubt or ambiguity in the language of the contract is to be construed against the drafter.") (citing *Worldwide Asset Purchasing, LLC v. Easterling*, 928 N.E.2d 1148, 1150 (Ohio Ct. App. 2009) ("[S]ituations where the parties' agreement appears to be an adhesion contract will substantially weaken the presumption favoring arbitration.")).[9] The agreement's language, construed in Dealership Plaintiffs' favor, does not require arbitration of the federal and non-Ohio statutory law claims.

Consistent with the choice-of-law provision, the arbitration provision in the Reynolds Agreement



*See, e.g., Kay v. Penn. R. Co.*, 156 Ohio St. 503, 506 (Ohio 1952) ("The application of [the *ejusdem generis*] rule would require that where an enumeration of specific things is followed by some more general word or phrase, such general word or phrase should be held to include only things of the same general nature as those specified."). If the parties to the Reynolds Agreement

*See Lawrence v. Walzer & Gabrielson*, 207 Cal. App. 3d 1501, 1506 (Cal. Ct. App. 1989) (in applying the *ejusdem*

---

[9] In *Lupo*, the court granted Reynolds' motion to compel arbitration of the plaintiffs' "contract and tort claims -- legal theories ***explicitly denoted as arbitrable*** in the mandatory arbitration clause…" *Id*. at 355-56 (emphasis added).

*generis* rule to interpret the scope of an arbitration provision, the court explained that the rule "is based on the obvious reason that if the [writer] had intended the general words to be used in their unrestricted sense, [he or she] would not have mentioned the particular things or classes of things which would in that event become mere surplusage.").[10]

The Court should honor the intent of the parties to the Reynolds Agreement (as strictly construed against Reynolds, the drafter thereof) and hold that Reynolds Dealers' statutory claims are outside the scope of the arbitration provision.

### 2. The Court Should Reject Reynolds' Wholly Groundless Arguments In Favor of Arbitration

Reynolds argues that by incorporating a reference to the American Arbitration Association ("AAA") Rules in the arbitration provision, the parties to the Reynolds Agreement (but not CDK, as discussed below) implicitly agreed to delegate threshold issues of arbitrability to the arbitrator, not the Court. However, while the Seventh Circuit has not specifically addressed the issue, other circuit courts have held that even where the parties have agreed to delegate threshold questions of arbitrability to an arbitrator, the court may decide threshold questions of arbitrability where the arguments in favor of arbitration are "wholly groundless." *See Douglas v. Regions Bank*, 757 F.3d 460, 464 (5th Cir. 2014) (a court should refuse to enforce an agreement delegating questions of arbitrability to the arbitrator where the argument in support of arbitrability is "wholly groundless").[11]

---

[10] *See also Begay v. United States*, 553 U.S. 137, 142 (2008) (in applying the *ejusdem generis* principle, the Court stressed that if the disputed phrase was intended to have a broad meaning "it is hard to see why" the examples needed to be included at all); *IBEW, Local #111 v. Public Serv. Co. of Colo.*, 773 F.3d 1100, 1108 (10th Cir. 2014) (claims were outside the scope of the arbitration provision, as interpreted under the *ejusdem generis* rule).

[11] *See also Simply Wireless, Inc. v. T-Mobile US, Inc.*, 877 F.3d 522, 528-29 (4th Cir. 2017); *Turi v. Main Street Adoption Servs., LLP*, 633 F.3d 496, 511 (6th Cir. 2011); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1371 (Fed. Cir. 2006) (even where the parties delegate threshold issues of arbitrability to the

FILED UNDER SEAL

The "wholly groundless" test "most accurately reflects the law—that what must be arbitrated is a matter of the parties' intent," and where arguments for arbitration are wholly groundless, "surely [the parties] never intended that such arguments would see the light of day at an unnecessary and needlessly expensive gateway arbitration." *Douglas*, 757 F.3d at 464. Thus, "the 'wholly groundless' inquiry allows the district court to determine whether it is 'satisfied' pursuant to section 3 [of the FAA] while also preventing a party from asserting any claim at all, no matter how divorced from the parties' agreement, to force an arbitration." *Qualcomm*, 466 F.3d at 1373 n.5.[12]

"[I]n undertaking the 'wholly groundless' inquiry, the district court should look to the scope of the arbitration clause and the precise issues that the moving party asserts are subject to arbitration." *Qualcomm*, 466 F.3d at 1374. As set forth above, controlling Ohio case law, and other relevant law, show that Reynolds Dealers' claims against Reynolds are outside the scope of the arbitration provision in the Reynolds Agreement. Thus, "[t]hose counts are so plainly outside the arbitration provision that a contrary argument is wholly groundless." *Evans v. Building Materials Corp. of Am.*, 858 F.3d 1377, 1381 (Fed. Cir. 2017). Because there is no plausible argument that Reynolds Dealers' claims against Reynolds are covered by an arbitration

---

arbitrator, "the court should perform a second, more limited inquiry to determine whether the assertion of arbitrability is wholly groundless.") (internal quotation marks omitted).

Two circuit courts have rejected the "wholly groundless" doctrine. *See Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1269 (11th Cir. 2017); *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1286 (10th Cir. 2017). The Supreme Court recently granted a petition for writ of certiorari to hear an appeal on this doctrine. *See Henry Schein, Inc. v. Archer and White Sales, Inc.*, Case No. 17CV1272, 2018 WL 1280843 (June 25, 2018).

[12] The "wholly groundless" test is consistent with the Seventh Circuit's "positive assurance" standard for determining the arbitrability of particular claims. *See Int'l Broth. Of Elec. Workers Local 2150 v. NextEra Energy Pt. Beach, LLC*, 762 F.3d 592, 594 (7th Cir. 2014) ("Ultimately, we will compel arbitration 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.") (citation omitted). Where a court can determine with "positive assurance" that arguments in favor of arbitration are groundless, the court should reject those arguments without taking the unnecessary step of requiring an arbitrator to make the same determination.

**FILED UNDER SEAL**

agreement, the Court may deny Reynolds' motion without referring the issue to an arbitrator. *See Douglas*, 757 F.3d at 463.

CDK argues (at 7-8, 9 n.6) that, because it allegedly conspired with Reynolds, it should be permitted under equitable estoppel principles to invoke the arbitration provision in the Reynolds Agreement, even though *its* contracts with Plaintiffs contain no arbitration provision. That argument fails, as shown below. CDK is not a signatory to the Reynolds Agreement, and therefore did not agree to delegate questions of arbitrability under that agreement to an arbitrator; accordingly, this Court (not an arbitrator) must determine CDK's motion to compel arbitration. *See In re Toyota Motor Corp. Hybrid Brake Mktg., Sales, Prac. & Prods. Liab. Litig.*, 828 F.Supp.2d 1150, 1159 n.5 (C.D. Cal. Dec. 13, 2011) ("While parties may agree to explicit provisions enabling the arbitrator to decide issues of the applicability and scope of an arbitration agreement, these provisions are part of the agreement and only apply to signatories. Toyota cannot invoke the right to the benefits of the Purchase Agreement because it was not a party to the agreement; thus, the threshold issue of whether Toyota, as a nonsignatory, may compel Plaintiffs to submit to arbitration under the Purchase Agreements must be decided by this Court."), *aff'd, Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1127 (9th Cir. 2013) ("Given the absence of clear and unmistakable evidence that Plaintiffs agreed to arbitrate arbitrability with nonsignatories, the district court had the authority to decide whether the instant dispute is arbitrable.").[13] Indeed, CDK does not argue that its motion to force arbitration must be decided by an arbitrator.

---

[13] *See also Nat'l Oilwell Varco, L.P. v. Sadagopan*, Civil Action No. H-16-2261, 2018 WL 276364, at *2 (S.D. Tex. Jan. 3, 2018) ("The cases that do address using equitable estoppel to allow a nonsignatory to an arbitration agreement to enforce that agreement against a signatory treat this gateway issue as for the court to determine, except in circumstances not present here.").

**FILED UNDER SEAL**

B.       **CDK Cannot Force Reynolds Dealers to Arbitrate Claims Against CDK**

1.       **CDK Has Waived Any Ability to Seek Arbitration**

Through its inaction and affirmative acts in this litigation, CDK has waived any ability to force arbitration. "For waiver of the right to arbitrate to be inferred, [the court] must determine that, considering the totality of the circumstances, a party acted inconsistently with the right to arbitrate." *Kawasaki Heavy Indus. v. Bombardier Rec. Prods.*, 660 F.3d 988, 994 (7th Cir. 2011).[14] Courts, not arbitrators, decide whether a party has waived arbitration through litigation conduct. *See HTG Capital Partners, LLC v. Doe*, Case No. 15CV02129, 2015 WL 5611333, at *4 (N.D. Ill. Feb. 16, 2016).[15]

CDK did not assert its intent to arbitrate at the "earliest feasible" time. The first Dealership Plaintiff action was filed in October 2017. *See* n. 66, *infra*. While Reynolds reserved its rights to compel arbitration in its submissions to the Judicial Panel on Multidistrict Litigation ("JPML"), CDK did not.[16] *See Kawasaki*, 660 F.3d at 996 ("[W]hen a party chooses to proceed in a judicial forum, there is a rebuttable presumption that the party has waived its right to arbitrate."). Since then, during multiple hearings and conferences before the Court, CDK never

---

[14] "[D]iligence or the lack thereof should weigh heavily" in the waiver analysis, as well as "whether the allegedly defaulting party participated in litigation, substantially delayed its request for arbitration, or participated in discovery." *Id.* (citations omitted). In determining diligence, courts ask whether the party seeking to compel arbitration did "all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration." *Cabinetree of Wisc., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir. 1995). A showing of prejudice, while relevant, is not required in order to find waiver. *Kawasaki*, 660 F.3d at 995.

[15] Although the Supreme Court held in *Howsam v. Dean Witter Reynolds Inc.*, 537 U.S. 79 (2002), that waiver is presumptively a question for the arbitrator, the Seventh Circuit has further explained that the *Howsam* presumption is based the premise that "the parties intended arbitrators to decide whether a party has complied with time limits and other arbitrational prerequisites." *Johnson v. W. & S. Life Ins. Co.*, 598 Fed. Appx. 454, 456 (7th Cir. 2015). The *Howsam* presumption is overcome here, as CDK is not a party to any agreement to arbitrate with Reynolds Dealers.

[16] *See* Defendants' Memorandum in Support of Their Motion for Transfer and Consolidation of Related Actions Pursuant to 28 U.S.C. § 1407, MDL No. 2817, Dkt. No. 1-1 (Nov. 7, 2017), 1 n.1 ("Reynolds files this motion without waiver of, and reserving all rights with respect to, the controlling arbitration provisions in its dealer and vendor contracts.").

**FILED UNDER SEAL**

raised the prospect of arbitration with the Court, or with Dealership Plaintiffs' counsel, until it filed its motion to dismiss in July 2018.[17] Indeed, while Reynolds repeatedly told the Court and the parties that it intended to compel arbitration of Reynolds Dealers' claims, CDK remained ***completely silent*** with respect to arbitration. *Cf. Kawasaki*, 660 F.3d at 995-96 (finding no waiver when the defendant "mentioned its desire to arbitrate at every turn").[18]

Instead, CDK pursued discovery against Reynolds Dealers and other Dealership Plaintiffs, serving 107 requests for production of documents and thirteen interrogatories, negotiating search terms for Dealership Plaintiffs' productions and its own, engaging in extensive meet-and-confer discussions over the parties' discovery responses, and filing a motion to compel discovery responses from Dealership Plaintiffs. *See* Defendants' Omnibus Motion to Compel Certain Plaintiffs' Compliance with Their Discovery Obligations in Response to Defendants' Written Discovery Requests, Dkt. 312 (Aug. 6, 2018). While Reynolds has repeatedly asserted that its participation in discovery is not intended to serve as a waiver of the ability to arbitrate, CDK has made no such assertion.[19] Courts have found that such active participation in discovery strongly supports a finding of waiver. *See In re Wireless Tel. 911 Calls Litig.*, Case No. 03CV2597, 2005 WL 2709286, at *3 (N.D. Ill. Oct. 20, 2005) (finding waiver where, among other things, the defendant "propounded written discovery and participated in oral

---

[17] *See, e.g.*, Transcript of Proceedings Before the Hon. Amy J. St. Eve, Dkt. 146 (Apr. 25, 2018); Transcript of Proceedings Before the Hon. Robert M. Dow, Jr., Dkt. 211 (Jun. 18, 2018).
CDK's only mention of arbitration referred to "Defendants" generally and expressly limited any reservation of rights to the arbitration clauses in CDK's *own* contracts. *See* Parties' (Corrected) Joint Initial Status Report, Dkt. 64, at 2 ("Defendants reserve their right to move to compel arbitration of any claims subject to any arbitration clauses contained in their respective dealer and vendor contracts.").

[18] *See also Sanders v. JGWPT Holdings, LLC*, Case No. 14CV9188, 2017 WL 4281123, at *4 (N.D. Ill. Sept. 27, 2017) (no waiver where defendant "championed arbitration from the beginning [and] consistently told the court… that it wanted to preserve its right to arbitrate"); *Super Pawn Jewelry & Loan, LLC v. Am. Environ. Ener., Inc.*, Case No. 11-cv-8894, 2013 WL 1337303, at *16 (N.D. Ill Mar. 29, 2013) (no waiver where defendant "never concealed its intentions" to seek arbitration).

[19] *See* Memorandum of Law in Support of Defendants The Reynolds and Reynolds Company's Motion to Clarify its Discovery Rights and Obligations in Light of its Arbitration Rights and the Case Management, Dkt. 346 (Aug. 24, 2018) at 2-6.

**FILED UNDER SEAL**

argument concerning discovery matters."); *Smith v. Adams & Assocs.*, Case No. 14C5522, 2015 WL 5921098, at *3 (N.D. Ill. Oct. 9, 2015) (finding waiver where defendant "delayed in asserting the arbitration clause, acquiesced to the setting of a discovery cut-off, [and] prepared written discovery…"). In light of the foregoing, CDK has waived any ability to seek arbitration.

Further, CDK's contracts with CDK Dealers do not require arbitration. Indeed, CDK implicitly acknowledges (at 9 n.4) that its contracts with CDK Dealership Plaintiffs do not contain arbitration provisions. Having chosen not to require arbitration with its own dealers, CDK cannot enforce an arbitration provision in a dealer contract to which it is a stranger. *Cf. Hartford Fire Ins., Co. v. Henry Bros. Const. Mgmt., Serv.*, No. 10CV4746, 2011 WL 3563138, at *8 (N.D. Ill. Aug. 10, 2011) ("To allow Defendant to invoke an arbitration clause set forth in a contract to which it was not a party when the contract to which Defendant was a party specifically disclaims arbitration would lead to an unfair and unjust result.").

### 2. CDK's Equitable Estoppel Argument Fails Under State Law

"[N]othing in the [FAA] authorizes a court to compel arbitration … by any parties that are not … covered in the agreement." *Equal Emp. Opp. Comm. v. Waffle House*, 534 U.S. 279, 289 (2002). Nonetheless, CDK, relying on an equitable estoppel theory, asserts that Reynolds Dealers must arbitrate with it. CDK's argument is cursory argument, with good reason: a more thorough examination of the law reveals the weakness of its position.

The Seventh Circuit recognizes that "traditional principles of state law" govern whether a nonsignatory like CDK may enforce an arbitration provision in a contract to which it is not a party. *Scheurer*, 863 F.3d at 752 (citing *Arthur Andersen*, 556 U.S. at 631). Without any analysis or support, CDK asserts (at 8 n.4) that Ohio law applies because the Reynolds Agreement contains an Ohio choice-of-law provision. However, a nonsignatory to a contract generally cannot avail itself of a choice-of-law provision in that contract; in such situations, the court

**FILED UNDER SEAL**

should apply the choice-of-law principles of the forum state. *See In re Henson*, 869 F.3d 1052, 1059 (9th Cir. 2017); *Noye v. Johnson & Johnson*, Case No. 15CV2382, 2018 WL 2199911, at *8 (M.D. Pa. May 11, 2018) appeal docketed, No. 18-2197 (3d Cir. Jun. 4, 2018).

As equitable estoppel is a "tort doctrine," *A/S Apothekernes Laboratorium for Specialpreparater v. I.M.C. Chem. Grp., Inc.*, 725 F.2d 1140, 1142 (7th Cir. 1984), Illinois' choice-of-law principles for tort claims apply. "For tort claims, Illinois follows the most significant relationship test," which incorporates factors such as (1) where the injury occurred; (2) where the injury-causing conduct occurred; (3) the place of business of the parties; and (4) where the relationship of the parties is centered. *In re Trans Union Corp. Privacy Litig.*, 211 F.R.D. 328, 343 (N.D. Ill. Sep. 10, 2002); *see also Liebman v. Prudential Fin., Inc.*, Case No. CIVA022566, 2002 WL 31928443, at *2-4 (E.D. Pa. Dec. 30, 2002) (applying the same choice-of-law factors to an equitable estoppel claim). As between Illinois and Ohio, Illinois has the more significant relationship with CDK's motion, as CDK's principal place of business is in Illinois, and CDK's anticompetitive conduct was conceived of and directed from Illinois. Finally, CDK cannot complain about the application of Illinois law, because it has not shown that its own contracts with dealers contain a different state's choice-of-law provision.[20] In contrast, CDK has no strong relationship with Ohio.

Under Illinois law, a claim of equitable estoppel requires proof of detrimental reliance. *See Warciak v. Subway Restaurants, Inc.*, 880 F.3d 870, 872 (7th Cir. 2018) ("In Illinois, '[a] claim of equitable estoppel exists where a person, by his or her statements or conduct, induces a second person to rely, to his or her detriment, on the statements or conduct of the first person.'")

---

[20] Further, CDK argued before the JPML that the Northern District of Illinois is the most appropriate forum for this lawsuit, in part because it is subject to the appellate jurisdiction of the Seventh Circuit, which has already issued rulings in the *Authenticom* action. *See* Defendants' Memorandum in Support of Their Motion for Transfer and Consolidation of Related Actions Pursuant to 28 U.S.C. § 1407, MDL No. 2817, Dkt. No. 1-1 (Nov. 7, 2017). CDK did *not* identify Ohio as an appropriate forum for this litigation.

FILED UNDER SEAL

(citing *Ervin v. Nokia, Inc.*, 349 Ill. App. 3d 508, 541 (Ill. App. Ct. 2004)). Equitable estoppel "also requires a showing 'by clear, concise, and unequivocal evidence' of prejudicial reliance." *Ervin*, 349 Ill. App. 3d at 541 (citations omitted). Here, CDK has not attempted to make a showing of detrimental reliance, nor could it; CDK could not have reasonably relied on the arbitration provision in the Reynolds Agreement when it decided to enter into an illegal conspiracy with Reynolds. *Id.*; *see also Guar. Trust Life Ins. Co. v. Platinum Supp. Life Ins., Inc.*, 68 N.E.3d 481, 491 (Ill. Ct. App. Dec. 9, 2016) (nonsignatory defendant "makes no argument… that he has satisfied these elements of equitable estoppel [listed in *Ervin*], and accordingly, he has forfeited review thereof.").

CDK relies on an Ohio Court of Appeals case applying an equitable estoppel test that was adopted from federal court decisions. But Illinois state courts have expressly and repeatedly declined to "follow federal decisions that adopt this expanded interpretation of equitable estoppel" upon which CDK relies, "because they are inconsistent with the basic principle of arbitration that 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Ervin*, 349 Ill. App. 3d at 542 (citing *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)); *see also Guar. Trust Life Ins. Co.*, 68 N.E.3d at 491 (following *Ervin*). Because CDK cannot make the showing of detrimental reliance that Illinois law requires, CDK's motion should be denied.

Even under Ohio law, CDK's motion would fail. Like Illinois, the Ohio Supreme Court applies the traditional, black-letter test for equitable estoppel: "The party claiming the estoppel must have relied on conduct of an adversary in such a manner as to change his position for the worse and that reliance must have been reasonable." *Ohio State Bd. of Pharmacy v. Frantz*, 555 N.E.2d 630, 633 (Ohio 1990). "Equitable estoppel does not apply when there is no actual or

FILED UNDER SEAL

constructive fraud and no detrimental reliance," *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109, 119 (Ohio 2006), and CDK cannot show detrimental reliance. *See Judge v. Unigroup, Inc.*, Case No. 17CV201T23TGW, 2017 WL 3971457, at *5 (M.D. Fla. Sept. 8, 2017) (holding that "[t]he defendants cannot compel arbitration of the agreements [between plaintiffs and a nonparty] governed under Ohio law" because "[t]he defendants advance neither fact nor law establishing detrimental reliance").

The lone Ohio case cited by CDK – *I Sports v. IMG Worldwide, Inc.*, 813 N.E.2d 4 (Ohio Ct. App. Jun. 7, 2004) – relied on pre-*Arthur Andersen* federal common law cases. As a result, its continuing vitality is doubtful in light of *Arthur Andersen*. *See Judge*, 2017 WL 3971457 at *4 ("*I-Sports* applies pre-*Arthur Anderson* federal estoppel law; *Arthur Anderson* requires the application of state law."). Subsequent Ohio appellate court cases have affirmed that the rights of a nonsignatory to invoke an arbitration agreement are governed by traditional equitable estoppel principles, which (as explained above) include detrimental reliance. *Global Pac., LLC v. Kirkpatrick*, 88 N.E.3d 431, 435 (Ohio Ct. App. Apr. 10, 2017) ("Nonsignatories can be compelled to arbitrate if the party is bound to an arbitration agreement under ***ordinary contract and agency principles***.") (emphasis added).

Even under *I Sports* and other Ohio appellate court rulings which apply the federal standard, CDK's argument fails. "Arbitration agreements apply to nonsignatories only in rare circumstances." *I Sports*, 813 N.E.2d at 8. *I Sports* states that the doctrine of equitable estoppel is applied "(1) where a signatory must rely on the terms of the written agreement in asserting claims against a nonsignatory; and (2) where the signatory alleges substantially interdependent and concerted misconduct by both the nonsignatory and one or more signatories to the contract." *Id.* (citing *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)). The Eleventh

**FILED UNDER SEAL**

Circuit has clarified its ruling in *MS Dealer*, explaining that **both** of these circumstances must be present in order to apply the equitable estoppel doctrine.[21]

Equitable estoppel requires a "close relationship between the entities involved" in the lawsuit. *I Sports*, 813 N.E.2d at 8 (citing *Thompson-CSF, S.A. v. Am. Arbitration Assn.*, 64 F.3d 773, 776 (2d Cir. 1993)). Here, Reynolds Dealers had no relationship whatsoever with CDK, much less a "close" relationship, and as far as Reynolds Dealers knew when they contracted with Reynolds, CDK's only relationship with Reynolds was as a competitor. *See Goree v. Northland Auto Enters.*, Case No. CV11758061, 2014 Ohio Misc. LEXIS 5, at *20 (Ohio Ct. Comm. Pl. Jan. 30, 2014) (denying motion to compel arbitration by nonsignatory who had no dealings with the plaintiff). When they entered into their agreements with Reynolds, Reynolds Dealers could not have reasonably anticipated that they might be forced to arbitrate antitrust conspiracy claims against a completely unrelated company. In contrast, in the vast majority of Ohio cases where nonsignatories were permitted to enforce arbitration agreements, there was a close affiliation between the nonsignatory and signatory defendants.[22] The Northern District of Illinois decisions

---

[21] *See In re Humana Managed Care Litig.*, 285 F.3d 971, 975 (11th Cir. 2002) (requiring both "allegations of collusive behavior between the signatory and nonsignatory parties to the contract" and that the claims against the nonsignatory must be "intimately founded in and intertwined with the obligations imposed by the [contract]."), *rev'd on other grounds sub nom. PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401 (2003); *see also In re Automotive Parts Antitrust Litig.*, Master File No. 12MD02311, 2017 WL 3579753, at *6 (E.D. Mich. Apr. 18, 2017) ("*Auto Parts*") (concluding that "defendants must fulfill both prongs of the *MS Dealer* test"); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 Fed. Appx. 704, 710 (10th Cir. 2011) (applying the *MS Dealer* standard to deny nonsignatory's motion: "We conclude that even if [plaintiff's] antitrust claims either expressly or implicitly allege collusion between [signatory and nonsignatory defendants]…, they are not intimately founded in or intertwined with the obligations contained in the [agreement containing the arbitration clause].").

[22] *See Riggs v. Patriot Energy Partners, LLC*, Case No. 11CA877, 2014 WL 605668, at *8 (Ohio Ct. App. Feb. 13, 2014) (nonsignatories were assignees of the signatory defendant, and the contract at issue expressly applied to assignees); *Fields v. Herrnstein Chrysler, Inc.*, Case No. 12CA827, 2013 WL 772822, at *5-6 (Ohio Ct. App. Feb. 7, 2013) (nonsignatories were employees, agents and/or assignees of the signatory defendant, and plaintiff dealt directly with the nonsignatories in connection with the transaction at issue); *U.S. Bank N.A. v. Wilkens*, Case No. 96617, 2012 WL 892898, at *5 (Ohio Ct. App. Mar. 15, 2012) (nonsignatory was the "attorney-in-fact" to the signatory's assignee and the "servicer of

**FILED UNDER SEAL**

cited by CDK also involved close relationships between the signatory and nonsignatory defendants -- which is **not** present here.[23]

Many federal courts have similarly rejected motions to compel by non-signatories who lacked this "close relationship." *See King Cole Foods, Inc. v. SuperValu, Inc. (In re Wholesale Grocery Prods. Antitrust Litig.)*, 707 F.3d 917, 924 (8th Cir. 2013) (denying nonsignatory's motion to compel arbitration where there was no evidence "that the contracts explicitly anticipated a signatory would enter into the type of relationship with a non-signatory—here, the relationship being that of antitrust co-conspirators—that ultimately gave rise to the claims."); *Costco Wholesale Corp. v. AU Optronics Corp.*, Case Nos. M071827SI, C110058SI, 2011 WL 4017961, at *5 (N.D. Cal. Sept. 9, 2011) (given nonsignatory defendant's lack of corporate affiliation with signatory, there was "no showing that [plaintiff] intended to arbitrate disputes with all defendants at the time it signed its vendor agreements").

Moreover, "[i]t is not sufficient that the plaintiff's claims [against the nonsignatory] 'touch matters concerning the agreement' or that the claims are 'dependent upon' the agreement" containing the arbitration provision. *I Sports*, 813 N.E.2d at 9; *see also Fields*, 2013 WL 772822 at *5-6(citing *I Sports*). Even where a plaintiff's claims against a nonsignatory are "dependent upon the business relationship created by the agreement," equitable estoppel will not be applied where the plaintiff "does not need to rely on the terms within the agreement to assert its claims"

---

the loan at issue"); *Short v. Res. Title Agency*, Case No. 95839, 2011 WL 1203906, at *2 (Ohio Ct. App. Mar. 31, 2011) (nonsignatories were officers and agents of the signatory defendant).
[23] *See Sanchez v. CleanNet USA, Inc.*, 78 F. Supp. 3d 747, 758 (N.D. Ill. 2015) (nonsignatory was the corporate affiliate of the signatory, and the plaintiff's claims treated the two corporations as "a single concerted entity"); *Hoffman v. Deloitte & Touche, LLP*, 143 F. Supp. 2d 995, 1005 (N.D. Ill. 2001) (nonsignatory acted as the agent of the signatory defendant and was an intended third-party beneficiary of the agreement at issue).

**FILED UNDER SEAL**

against the nonsignatory. *I Sports*, 813 N.E.2d at 9.[24] While Reynolds asserts (at 11) that the Reynolds Agreement "is the asserted but-for cause" of Reynolds Dealers' alleged injuries, a "but-for" relationship provides an insufficient basis for CDK to compel arbitration. *See id.* at 9.[25]

Equitable estoppel is, as its name suggests, an equitable doctrine whose purpose is to "preclude[] a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes as well." *Washington Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 267 (5th Cir. 2004). Here, the Complaint does not in any way "claim the benefits" of the Reynolds Agreement; Plaintiffs have not asserted any breach of contract, and the Complaint barely mentions that contract, much less relies on it. The Reynolds Agreement is at most incidental to Plaintiffs' claims, and no question is raised as to its performance.

Ignoring both the purpose and basic requirements of the equitable estoppel doctrine, CDK seeks to invoke the doctrine merely because Reynolds Dealers allege that CDK conspired with Reynolds. But it cannot be that any time a plaintiff alleges an antitrust conspiracy that includes a signatory it must arbitrate with all the co-conspirators. Such a rule would fly in the face of the Supreme Court's consistent holding that "arbitration is a matter of contract and a

---

[24] *See also Kramer*, 705 F.3d at 1131-32 ("In order for Toyota's equitable estoppel argument to succeed, Plaintiffs' claims themselves must intimately rely on the existence of the Purchase Agreements, not merely reference them."); *King Cole Foods, Inc.*, 707 F.3d at 923 (nonsignatory defendant could not compel arbitration of antitrust conspiracy claims, as the claims against the nonsignatory defendant "exist[ed] independent of the [] agreements" containing the arbitration clause)*; In re Humana Managed Care Litig.*, 285 F.3d at 976 ("The plaintiff's actual dependence on the underlying contract in making out the claims against the nonsignatory defendant is… always the *sine qua non* of an appropriate situation for applying equitable estoppel.").

[25] *See also Bailey v. ERG Enters., LP*, 705 F.3d 1311, 1321-22 (11th Cir. 2013) ("A simple but-for relationship does not constitute the actual dependence on the underlying contract that equitable estoppel requires.")*; Lenox MacLaren Surgical Corp.*, 449 Fed. Appx. at 710 (assessing whether a plaintiff's claims against nonsignatory "rely on" the contract containing the arbitration provision, "the contract must form the legal basis of those claims; it is not enough that the contract is factually significant to the plaintiff's claims or has a 'but-for' relationship with them"); *Wise v. Zwicker & Assocs., PC*, Case No. 12CV01653, 2013 WL 1195555, at *8 (N.D. Ohio Mar. 22, 2013) (denying nonsignatory's motion to compel arbitration under equitable estoppel theory where "[t]he claims assert that defendants are liable pursuant to federal and state law, not pursuant to any duties imposed by the Agreement") (applying Utah law derived from *MS Dealer*).

party cannot be required to submit to arbitration any dispute which he has not agreed so to submit" – no matter how "efficient" such joint arbitration might be. *AT&T Tech., Inc. v. Comm. Workers of America*, 475 U.S. 643, 648 (1986).

Ultimately, requiring Reynolds Dealers to arbitrate their claims against CDK "would allow defendants to bootstrap their way into arbitration based on nothing more than the very conduct which constituted a violation of the antitrust laws in the first place." *Costco*, 2011 WL 4017961 at *5; *see also Ross v. Am. Exp. Co.*, 547 F.3d 137, 146-48 (2d Cir. 2008) (nonsignatory could not avail itself of arbitration agreement where its only connection to the signatory defendants was as an antitrust co-conspirator "allegedly attempting to subvert the integrity of the cardholder agreements"). The Court should not allow CDK to use an equitable doctrine to reward its illegal and inequitable behavior.

### C.    The Court Should Not Address the Availability of Class Arbitration

Dealership Plaintiffs and Reynolds agree (at 13 n. 25) that, given the procedural posture of this action, the Court should not address issues of class arbitration.

The relevant arbitration provision here requires any arbitration to take place in Dayton, Ohio. Accordingly, any arbitration will take place outside of this Court's jurisdiction. For this reason, as Reynolds acknowledges (at 8), the Court cannot compel arbitration but instead can only dismiss arbitrable claims for improper venue under Rule 12(b)(3).

If the Court decides that some claims must be dismissed in favor of arbitration, it should decline to wade into procedural questions about ***how*** a subsequent arbitration in another district should be conducted. Instead, any questions about the availability of class arbitration should be reserved for the court which has jurisdiction over that arbitration proceeding (or the arbitrator). *See Williams-Bell v. Perry Johnson Registrars, Inc.*, Case No. 14C1002, 2015 WL 6741819, at

**FILED UNDER SEAL**

*6 (N.D. Ill. Jan. 8, 2015) (agreeing with the majority of courts in this District that the availability of class arbitration is a procedural question for an arbitrator to decide).

    **D.**       **If the Court Dismisses Some Claims in Favor of Arbitration, the Remaining Claims Should Not Be Stayed**

If the Court determines that some or all of Reynolds Dealers' claims should be dismissed in favor of arbitration, the remaining non-arbitrable claims should not be stayed, as a stay would not result in judicial economy but would instead prejudice Plaintiffs and unduly burden non-parties and the Court.

        **1.**       **Defendants' Argument for a Mandatory Stay of the Entire Action Relies on a Misinterpretation of Abrogated Law**

Reynolds contends that, under Section 3 of the FAA, all non-arbitrable claims must be stayed. Reynolds relies on *Morrie Mages and Shirlee Mages Found. v. Thrifty Corp.*, 916 F.2d 402 (7th Cir. 1990), interpreting Section 3, which was abrogated by later Seventh Circuit opinions. Reynolds makes a technical argument (at 20 n. 40) that -- even though these Seventh Circuit decisions "ostensibly overruled *Morrie Mages*" -- the *Morrie Mages* case should be treated as good law because its holding was not undone through the appropriate appellate procedure. Crucially though, Defendants gloss over the decisions that directly repudiate the *Morrie Mages* decision and the logic behind the proposition for which Defendants cite that case.

As Reynolds acknowledges in its alternative argument (at 20-23), *IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524 (7th Cir. 1996) and *Pryner v. Tractor Supply Co.*, 109 F.3d 354 (7th Cir. 1997), are controlling. In *IDS Life*, 103 F.3d 524, the Court made clear: "[S]ection 3 assumes and the case law holds that the movant for a stay, in order to be entitled to a stay under the arbitration act, must be a party to the agreement to arbitrate." *See id.* at 529 (citing 2d, 5th, 8th, and 9th Circuit opinions). And in *Pryner*, 109 F.3d 354, the Court noted, "the cases, perhaps concerned lest the tail wag the dog, treat the question whether to stay the entire case as

**FILED UNDER SEAL**

discretionary in cases involving both arbitrable and nonarbitrable issues." *Id.* at 361 (collecting cases). Reynolds acknowledges (at 20 n.40) that subsequent cases follow these later decisions. Because Section 3 does not mandate a stay of non-arbitrable claims, such as claims brought by CDK Dealers who never agreed to arbitrate with either Defendant, "at the district court's discretion, litigation may proceed against parties who were not subject to the arbitration agreement, even though claims against the arbitrating parties have been stayed." *Volkswagen of Am., Inc. v. Sud's of Peoria, Inc.*, 474 F.3d 966, 972 (7th Cir. 2007).

### 2. A Discretionary Stay Would Serve Neither Efficiency Nor Justice

The factors considered on whether to stay non-arbitrable claims include "the risk of inconsistent rulings, the extent to which parties will be bound by the arbitrators' decision, and the prejudice that may result from delays." *See id.*

In cases involving arbitrable and non-arbitrable claims, the presumption is that non-arbitrable claims should go forward in court. *See Klay v. All Defendants*, 389 F.3d 1191, 1204 (11th Cir. 2004) ("courts generally refuse to stay proceedings of non-arbitrable claims when it is feasible to proceed with the litigation"); *Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.*, 339 F.2d 440, 441-42 (2d Cir. 1964) (for discretionary stay of non-arbitrable claims, the party seeking a stay "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else") (citation omitted).

Reynolds contends (at 21) that the presumption is overcome by the need to "safeguard arbitration rights." This is wrong for several reasons. First, because CDK Dealers (who make up a majority of Dealership Plaintiffs and class members) cannot be bound by any findings in arbitration, their claims will proceed in this Court. Moreover, the other cases within this MDL proceeding, which involve issues that overlap with Dealership Plaintiffs' claims, will also be

33

**FILED UNDER SEAL**

litigated in Court. And, any rulings by an arbitrator would bind no one except the actual parties to the particular arbitration. Thus, the risk of inconsistent rulings between an arbitrator and this Court is virtually inevitable; staying the non-arbitrable claims in this action will do nothing do mitigate that risk. (As Reynolds notes (at 23), "The scheduling order in this MDL already contemplates that the Authenticom case (not subject to arbitration) will proceed to trial ahead of this one reaching the threshold class certification stage.") Finally, staying the Dealers' non-arbitrable claims would not result in any judicial economy; to the contrary, it would delay the inevitable litigation of those claims, and result in duplicative discovery and motion practice, to the detriment of all parties, non-parties, and the Court.

###### a. Because CDK Dealers Cannot Be Bound By Any Arbitration Rulings, the Risk of Inconsistent Rulings Cannot be Avoided

CDK argues (at 10) that "[a] stay of non-arbitrable claims would serve important interests of judicial economy and would prevent the litigation of identical claims and issues in multiple forums." That is wrong. CDK Dealers cannot be forced to arbitrate their claims against either Defendant, and do not consent to any arbitration of their claims; thus, CDK Dealers (as non-parties to any arbitration) would not be bound by an arbitration ruling in favor of Reynolds or CDK. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979) (permitting offensive nonmutual collateral estoppel only against a party who was a party to the previous action); *Taylor v. Sturgell*, 553 U.S. 880, 904 (2008) (there is no "virtual representation" exception to the general rule against nonparty issue preclusion).

Moreover, CDK has not represented that it would agree to be bound by any rulings by an arbitrator in favor of CDK Dealers. Reynolds has also refused (at 21 n.46) to commit to any preclusive effect of arbitration, stating that it "takes no stance on whether any specific future opinion in the litigation or arbitration will have a preclusive effect on the other proceeding." In

**FILED UNDER SEAL**

light of the foregoing, regardless of the outcome of any arbitration of Reynolds Dealers' claims, CDK's claims against Defendants will almost certainly be litigated in court. Staying CDK Dealers' claims would only unnecessarily delay those proceedings to CDK Dealers' detriment. In short, a stay of CDK Dealers' claims would not serve the interests of judicial economy – it would do the exact opposite. See *Flynn v. FCA US LLC*, Case No. 15CV0855MJRDGW, 2016 WL 5341749, at *9 (S.D. Ill. Sept. 23, 2016) (declining to stay certain non-arbitrable claims brought by nonsignatories to the arbitration agreement; because the nonsignatories would not be bound by any rulings by the arbitrator, a stay would not result in judicial economy, as the nonsignatories' claims would be litigated in court regardless of the outcome of the arbitration).[26]

Reynolds argues (at 21) that, absent a stay, "[t]his Court's factual and legal determinations in the CDK Dealer litigation may improperly influence the arbitrations, either through collateral estoppel or simply undue pressure on the arbitrators to conform their opinions to this Court's rulings." But any such influence is wholly speculative, as Reynolds acknowledges. Reynolds contends (at 21) that arbitrators may feel "undue pressure...to conform their opinions to this Court's rulings," but this is pure speculation. There is no reason to preclude Dealership Plaintiffs from developing their case in parallel with the other pending matters. Given CDK Dealers have the right to pursue their claims in court without being bound by rulings of an arbitrator, the risk of inconsistent rulings cannot be avoided.

---

[26] *See also A.O.A. v. Doe Run Res. Corp.*, 2011 WL 6091724 (E.D. Mo. Dec. 7, 2011) (declining to stay non-arbitrable claims where plaintiffs would not be bound by the arbitration); *Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.*, 885 F.Supp.499, 502 (S.D.N.Y. 1995) ("The moving parties have indicated that they will not be bound by the arbitration, rendering it inappropriate to grant a stay of the proceedings involving the moving defendants. It makes no sense to stay proceedings pending the end of the arbitration when any outcomes of the arbitration with which the moving defendants disagree will have to be relitigated in the federal courts anyway.").

**FILED UNDER SEAL**

> **b.** **A Stay of Non-Arbitrable Claims Would Inevitably Result in Unnecessary and Duplicative Discovery Efforts and a Waste of Judicial Resources**

A stay of this action would prejudice Dealership Plaintiffs, unduly burden non-parties to this action, and result in a waste of the Court's resources. This MDL proceeding involves coordinated discovery, not only in Dealership Class action, but in the other actions in this MDL (*e.g.*, *Authenticom*, *Cox Automotive*, *AutoLoop*, *MVSC*, and the Vendor Class Action). Discovery is ongoing and will continue no matter how the Court rules on Defendants' request for a stay of Dealership Plaintiffs' claims. Several discovery motions (and other substantive motions) have already been filed by other parties in this MDL, which could well affect the scope of discovery in the overall MDL going forward. Those motions will be decided regardless of whether Dealership Plaintiffs' claims are stayed. Further, the parties in the pending parallel cases will soon seek depositions of many of the same executives of Reynolds and CDK, and non-parties, who Dealership Plaintiffs would seek to depose.

Excluding the Dealership Plaintiffs from this ongoing discovery process, and forcing them to separately seek documents at some point down the road, makes no sense. A stay of Dealership Plaintiffs' non-arbitrable claims would shut Dealers out of the ongoing discovery negotiations, leaving Dealership Plaintiffs' interests unprotected in those negotiations, and once a stay is lifted, Dealership Plaintiffs would have to undertake additional negotiations about the scope of document discovery, including a second round of negotiations with non-parties. Similarly, if any depositions go forward while Dealership Plaintiffs' claims are stayed, Dealership Plaintiffs may be forced to seek a second round of depositions of the ***same*** witnesses after the stay is lifted. Thus, staying Dealership Plaintiffs' claims would not only prejudice the Dealers, but non-party witnesses who would be required to sit for a second round of depositions.

FILED UNDER SEAL

Even assuming that Defendants are willing to waste *their* time renegotiating the scope of discovery and sitting for additional depositions by Dealership Plaintiffs at some point in the future, it is unreasonable to ask the Court to twice preside over the disputes that inevitably accompany the discovery process.

Defendants do not attempt to argue that a stay would serve the "just, speedy, and inexpensive determination" of this action because they cannot. Fed. R. Civ. P. 1. Instead, after prolonged negotiations on coordinating the scope and scheduling of discovery, both Reynolds and CDK now seek to leverage an arbitration clause in Reynolds' agreements with six Reynolds Dealers in order to stay all claims by all Plaintiffs against all Defendants. A stay, particularly where no arbitration proceeding has even begun, would greatly prejudice Dealership Plaintiffs, who already negotiated a schedule with Defendants that provides for the completion of fact and expert discovery in February 2019 and summary judgment submissions in May 2019. Any delay would carry especially large consequences in this case, where Defendants' ongoing anticompetitive conduct continues to damage Dealership Plaintiffs.

Because a stay of Dealership Plaintiffs' non-arbitrable claims would force Dealership Plaintiffs and non-parties to go through unduly burdensome and duplicative document discovery and depositions, would prejudice Dealership Plaintiffs' ability to protect their interests in the ongoing litigation, and would require the Court to waste its resources in deciding multiple motions on the same issues, a stay of Plaintiffs' claims is unwarranted.

### 3. The Cases Cited by Defendants Do Not Support a Stay

The decision in *Auto Parts*, 2017 WL 3579753, cited by Reynolds, does not support a stay of CDK Dealers' claims, which are clearly non-arbitrable. In *Auto Parts*, five of the six

Direct Purchase Plaintiffs ("DPPs")[27] had entered into agreements to arbitrate with one or more defendants, and the court dismissed those DPP's claims in favor arbitration. Only one DPP had not entered into any agreement to arbitrate and was thus not subject to arbitration; the court stayed that single DPP's claims while the other five DPP's claims were arbitrated. *Id.* at *11. Here, in contrast, Defendants claim that only six of the twenty-five named Dealership Plaintiffs (the Reynolds Dealers) have arbitration agreements with Reynolds -- leaving the remaining Plaintiffs (the CDK Dealers) with *no* arbitration agreement. Moreover, CDK dealers represent the majority of class members. *See* Compl. ¶ 2 n.1. The Court should not stay the non-arbitrable claims of the majority of Dealership Plaintiffs and class members, leaving those claims in limbo, in favor of arbitration by a minority. *See Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 713 F. Supp. 2d 734, 746 (N.D. Ill. 2010) ("The Court declines to exercise its discretion to stay the entire case based on its determination that the claims of a small number of individual plaintiffs are arbitrable.").[28]

---

[27] The decision in *Auto Parts* does not identify the specific number of DPPs, but the parties' briefs in *Auto Parts* identify six DPPs.

[28] The other cases cited by Defendants do not support a stay here. *G&G Closed Circuit Events, LLC v. Castillo*, 14CV02073, 2017 WL 1079241 (N.D. Ill. Mar. 22, 2017), did not involve the situation here, where parallel proceedings will inevitably go forward in court, such that a stay would impair Dealership Plaintiffs' ability to participate in the ongoing discovery, and would do nothing to avoid the risk of inconsistent rulings. Reynolds surprisingly cites *GEA Group AG v. Flex-N-Gate Corp.*, 740 F.3d 411 (7th Cir. 2014), which supports Plaintiffs. There, the Seventh Circuit found the district court's decision to allow certain court proceedings to go forward where a related arbitration was already pending was "not only reasonable but eminently sensible". *Id.* at 416. In rejecting the stay motion, the Seventh Circuit found unavailing the concern that a party may use the court proceeding to gather evidence in order to "do-over [the] arbitration proceeding." *Id.* at 418.

In *Allied Van Lines, Inc. v. Orth Van & Storage, Inc.*, Case No. 04CV6004, 2005 WL 1563111 (N.D. Ill. June 3, 2005), cited by CDK, the court sent a case to arbitration and granted a stay where the plaintiff did not argue that any harm would arise from the stay. Here, Dealership Plaintiffs have made plain that they would be harmed should their non-arbitrable claims be stayed, particularly where there is active litigation regarding CDK's anticompetitive conduct that is not subject to a stay. This is also in contrast to the other cases Defendants cite. *See In re Samsung Galaxy Smartphone Mktg. & Sales Practices Litig.*, 298 F. Supp. 3d 1285, 1304 (N.D. Cal. Mar. 2018) (stay granted where plaintiffs did not dispute that a stay would be proper); *ChampionsWorld, LLC v. United States Soccer Fed'n, Inc.*, 487 F. Supp. 2d 980 (N.D. Ill. May 4, 2007) (stay granted where arbitration was to occur outside the United States and where there

FILED UNDER SEAL

Finally, contrary to CDK's assertion (at 10), Dealership Plaintiffs are not seeking to "get around" any supposed arbitration agreements with Reynolds by suing CDK for a favorable, preclusive ruling to use against Reynolds. *See IDS Life Ins. Co.*, 103 F.3d at 530 (discussing "evasion" cases and declining to determine the stay issue). CDK is a properly named defendant in this case, and ***its*** liability as a co-conspirator -- indeed, the larger of the two co-conspirators -- is amply supported by the admissions of its own executives. *See* Compl. ¶ 101.

Accordingly, since a stay of Dealership Plaintiffs' non-arbitrable claims would not result in any judicial economy, would do nothing to avoid the risk of inconsistent rulings, and would prejudice Plaintiffs and non-parties, the Court should impose no stay.[29]

## II. DEALERSHIP PLAINTIFFS HAVE STATED CLAIMS UNDER SECTIONS 1 AND 2 OF THE SHERMAN ACT (COUNTS I-V)

"[F]or purposes of a motion to dismiss, the Court accepts as true all of Plaintiff's well-pleaded factual allegations and draws all reasonable inferences in Plaintiff's favor." Order, Dkt. 340 (Aug. 21, 2018), at 3 n.2 (citing *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614 (7th Cir. 2007)).

### A. Dealership Plaintiffs Are Proper Federal Antitrust Plaintiffs

Contrary to Defendants' assertions, Dealership Plaintiffs, as direct purchasers of Defendants' DMS, and indirect purchasers of DIS, have standing to pursue federal antitrust claims for damages and injunctive relief, as alleged in Counts I-V of the Complaint.

---

was no indication that any party objected to a stay); *Nootens v. Madison Gas & Elec. Co.,* Case No. 97CV4442, 1998 WL 719611, at *4 (N.D. Ill. Oct. 8, 1998) (stay granted where plaintiffs "acquiesce to the stay of the federal proceedings, as long as defendants' counterclaims are also stayed").

[29] If the Court is inclined to stay some or all of Plaintiffs' non-arbitrable claims, any such stay should be limited in duration, to minimize the prejudice resulting from a stay. *See Flynn*, 2016 WL 5341749 at *19 (ordering a 60 day stay of certain non-arbitrable claims because plaintiffs "have a right to continue to press their non-arbitrable claims to a swift resolution").

**FILED UNDER SEAL**

1.    **The Direct Purchaser Damages Claims Are Consistent with _Illinois Brick_ (Counts I, III, V)[30]**

Attempting to cast Dealership Plaintiffs as improper federal antitrust plaintiffs for Counts I, III, and V, CDK (at 11-12) erroneously conflates Dealership Plaintiffs' status as indirect purchasers of DIS with their status as direct purchasers of DMS. In those Counts, Dealership Plaintiffs allege direct damages based on their purchases of DMS. Indeed, in Counts I, III, and V, Dealership Plaintiffs specifically allege decreased competition in the _DMS market_ (_see_ Compl. ¶¶ 167-208), _i.e._, the market in which they were direct purchasers.[31]

CDK misconstrues an important facet of Dealership Plaintiffs' Count I claim. In Count I, Dealership Plaintiffs allege that, as a result of Defendants' arrangement to close their DMS to competing third party integrators, the DMS which Dealership Plaintiffs directly purchased from Defendants diminished in value.[32] The illegal arrangement enabled Defendants to remove dealerships' pre-existing capability to freely access their DMS data and provide access to that data to authorized persons. As such, Defendants' conduct degraded DMS functionality, thereby diminishing the value of the DMS -- a product purchased directly from Defendants. _See_ Compl. ¶¶ 149, 171. This is hardly the "implicit overcharge[] claimed further downstream" that CDK describes (at 11).

---

[30]This Section responds to CDK Mem., Section II.A.1-2 at 11-13.

[31] CDK notes (at 12) that the other plaintiffs in this MDL have not alleged a conspiracy pertaining to the DMS market. That observation, however, is hardly remarkable, given that Dealership Plaintiffs are the _only_ plaintiffs who purchase DMS services _directly_ from CDK and Reynolds.

[32] The cases cited by CDK (at 11-12) are inapposite: this is not, as CDK implies, merely the case of "Party A, the antitrust violator, sell[ing] to Party B, and then Party C, a down-stream purchaser from B, seek[ing] to recover the implicit overcharges that B passed on to C." _Loeb Indus. v. Sumitomo Corp._, 306 F.3d 469, 482 (7th Cir. 2002); _see also Dickson v. Microsoft Corp._, 309 F.3d 193, 213 (4th Cir. 2002) (dismissing tying claims under _Illinois Brick_ where plaintiff had **not** purchased an operating system directly from Microsoft) (emphasis added). Nor are Dealership Plaintiffs the _indirect_ purchasers of the DMS product for which value is reduced. _See Somers v. Apple, Inc._, 729 F.3d 953 (9th Cir. 2013) (dismissing claims for diminution of value of iPods where consumers were _indirect_ purchasers). In relation to the subject Counts, Dealership Plaintiffs are direct purchasers.

Furthermore, despite CDK's assertions to the contrary (at 12-13), the combination of Defendants' market power, the long lock-in periods of DMS contracts, the difficulty of switching DMS providers,[33] and Defendants' success in driving competition from the independent DIS market, has also affected competition in the DMS market.[34] Indeed, despite Defendants' argument that Cox and Auto/Mate market competing products which allow "hostile integration," these are not viable options for most dealerships, given the costs of switching DMS. *See* Compl. ¶¶ 4, 66–69. Moreover, Defendants' price-secrecy provisions ensure that dealerships cannot accurately calculate the lifecycle cost of the DMS products purchased directly from Defendants. *See* Memorandum Opinion and Order, 18-CV-0864, Dkt. 176 (May 14, 2018) ("Authenticom Opinion"), at 48-49 (dealers may be "unable to undertake lifecycle-cost analyses… before purchasing the primary product").

Finally, CDK's suggestion (at 13) that Dealership Plaintiffs do not "allege that CDK and Reynolds conspired to divide the DMS market or fix prices for DMS systems" ignores allegations in the Complaint.[35] Dealership Plaintiffs allege, *inter alia*, that "[d]espite CDK's success in wresting market share away from Reynolds, its biggest competitor in the DMS market, competition between Reynolds and CDK suddenly ceased in 2015." Compl. ¶ 80. Dealership Plaintiffs also allege that Defendants' wrongful conduct "had the effect of eliminating competition between CDK and Reynolds in the DMS market." *Id.* ¶ 81.

---

[33] Compl. ¶¶ 66-68.

[34] CDK's argument (at 13) that "the 2015 agreements do not prohibit either party from allowing hostile integration at any time" is misguided. As Judge Peterson in the Western District of Wisconsin observed: "The February 2015 agreements between CDK and Reynolds also suggest a horizontal conspiracy. Although the agreements do not explicitly state that the defendants will work together to eliminate third-party data integrators, the agreements have that effect." *Authenticom v. CDK Global, Inc.,* 2017 WL 3017048, at *6 (W.D. Wis. Jul. 14, 2017), *vacated on other grounds*, 874 F.3d 1019 (7th Cir. 2017).

[35] *See* Compl. ¶¶ 146-152.

**FILED UNDER SEAL**

### 2. *AGC* Does Not Bar Dealership Plaintiffs' Injunctive Relief Claims (Counts II, IV)[36]

Dealership Plaintiffs have standing to seek injunctive relief against Defendants for violation of § 1 of the Sherman Act, as alleged in Counts II and IV of the Complaint. CDK (at 14) cites *Assoc. Gen. Contractors of Cal., Inc. v. Cal, State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), to argue that Dealership Plaintiffs lack antitrust standing to pursue injunctive relief claims because "more directly-affected purchasers seek the same injunctive relief." The argument, however, is without merit.

As an initial matter, with respect to Defendants' conspiracy directed towards the DMS market, Dealership Plaintiffs, as direct purchasers of DMS, are the most "directly-affected purchasers." Indeed, none of the other plaintiffs in this MDL litigation can even be deemed direct or even indirect purchasers of DMS. As such, CDK's argument fails insofar as Dealership Plaintiffs seek injunctive relief relating to the DMS market.

CDK's argument with respect to the DIS market also fails. *AGC* and the majority of the Seventh Circuit cases cited by CDK focus on claims for *damages, not equitable relief*.[37] The *AGC* analyses of "the potential for duplicative recovery, the complexity of apportioning damages, and the existence of other parties that have been more directly harmed" only apply where the plaintiff seeks *damages. See generally Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986).

As the district court in *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772 (N.D. Ill. 2017) recently explained:

---

[36] This Section responds to CDK Mem., Section II.A.3 at 14-16.

[37] *See Kochert v. Greater Lafayette Health Services, Inc.*, 463 F.3d 710, 718 (7th Cir. 2006); *Loeb Indus.*, 306 F.3d at 489; *Int'l Broth. of Teamsters, Local 734 Health and Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 823 (7th 1999); *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 598 (7th Cir. 1995).

FILED UNDER SEAL

> [Where] Indirect Plaintiffs do not seek damages for their Sherman Act claim, it is inconsequential that there are more 'immediate victims' of the scheme. When damages are at issue, the most direct victims are the proper plaintiffs for the reasons stated in *Illinois Brick*. ***When damages are not at issue, as long as the plaintiffs' alleged injury is not "remote" like the union's injury in* AGC*, but is directly attributable to the conspiracy, the injury satisfies* AGC.**

*Id.* at 814 (emphasis added). Here, Dealership Plaintiffs' injuries are directly attributable to Defendants' illegal conspiracy and are not "remote." *See id.* (holding that indirect purchaser plaintiffs, who could trace their purchases from the defendants through wholesalers and retailers, had standing to seek injunctive relief). Like the indirect purchaser plaintiffs in *Broiler Chicken*, Dealership Plaintiffs have alleged injuries that are directly attributable and traceable to Defendants' conspiracy. *See* Compl. ¶¶ 70-152.

*In re Dairy Farmers of Am. Inc. Cheese Antitrust Litig.*, No. 09-CV-3690, 2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) ("*DFA I*"), cited by CDK (at 15 n.9), does not suggest a contrary result. There, the plaintiffs failed to establish that their injuries constituted an "integral part" of the alleged conspiracy; the link to the injuries was too attenuated. *See id.* at *11. Here, the opposite is the case. Dealership Plaintiffs' injuries are an integral part of the alleged conspiracy; indeed, vendors have passed on overcharges to dealers. *See* Compl. ¶¶ 134-145. And, without dealers' purchases from vendors, there would have been no damages for vendors to allege in the first place. Moreover, the conspiracy took direct aim at the product (the DMS) that Dealership Plaintiffs purchased directly from Defendants. CDK agrees (at 22) 3PA is "a 'managed interface' that is ***part of*** CDK's DMS." (emphasis in original). This is distinguishable from *DFA I*, where: (1) the indirect purchaser plaintiffs were "downstream participants in a retail market (finished dairy products), which [wa]s separate from the allegedly restrained markets (spot cheese and milk futures bought and sold on a commodities exchange)," and (2) "the

FILED UNDER SEAL

allegedly price-fixed products (commodities/futures contracts) [we]re not even components of the products that Plaintiffs purchased." *See DFA I*, 2013 WL 4506000, at *12-13.

The other cases cited by CDK that address claims for injunctive relief under the Sherman Act are inapplicable. In *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391 (7th Cir. 1993), the Court *at summary judgment* found the plaintiffs "failed to show with a fair degree of certainty that 'but for' the alleged antitrust violation, [they] would not have suffered the injuries of which they complain[ed]." *Id.* at 404. The defendants identified "numerous intervening economic and market factors" that may have been the actual cause of the plaintiffs' injuries. *See id.* at 402-04. Here, Dealership Plaintiffs have more than plausibly alleged that, "but for" Defendants' antitrust violations, Dealership Plaintiffs would not have paid artificially inflated prices for DMS and DIS. There is no suggestion of any "intervening economic and market factors" that caused Dealership Plaintiffs' injuries.

In *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907 (N.D. Ill. 2009), the court held the indirect purchaser plaintiffs "fail[ed] to allege… a chain of causation between the alleged restraint in the market -- an illicit agreement to fix the price of potash -- and their injury -- paying higher prices for potash-containing products." *See id.* at 940. Here, the chain of causation is alleged (Compl. ¶¶ 134-145), and ██████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ *see also Authenticom*, 874 F.3d at 1023

("There is evidence that prices have increased considerably since the 2015 agreements took effect… App vendors pass along these bloated fees to dealers, who are already paying large fees for their data management system.").

FILED UNDER SEAL

Finally, as among all Plaintiffs in this MDL, Dealership Plaintiffs are well-suited to seek injunctive relief against Defendants. Authenticom is facing counterclaims (Dkt. 225, 229) and has raised the prospect it may go out of business. Vendor Plaintiffs are facing a motion to dismiss. If Authenticom ceases business, or the claims of Authenticom or Vendor Plaintiffs are dismissed or settled, those parties may be unable (or unmotivated) to seek an injunction.

**B.      Dealership Plaintiffs' Federal Counts Adequately State Claims on the Merits**

       **1.      Dealership Plaintiffs' Section 1 Claims Alleging a Horizontal Conspiracy (Counts I-II) Should be Sustained[38]**

CDK seeks (at 17-21) dismissal of Dealership Plaintiffs' horizontal conspiracy claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, based on arguments that ignore or misconstrue the Complaint's allegations. Dealership Plaintiffs allege in Counts I and II of the Complaint that Defendants engaged in *per se* antitrust violations by, *inter alia*, agreeing to restrain competition in the DMS and DIS markets. *See, e.g.*, Compl., ¶¶ 171, 178. Dealership Plaintiffs' pleadings are more than adequate to state a claim under Section 1.

As an initial matter, CDK ignores the allegations that Defendants conspired with respect to *the DMS market*.[39] As Dealership Plaintiffs allege, Defendants -- "horizontal competitors" and possessors of "dominant positions" in the DMS market -- unlawfully agreed to restrain competition in *that* market by, *inter alia*, agreeing to "reduce the functionality of CDK's DMS (including dealerships' ability to freely access their DMS data through authorized persons)." *Id.* ¶¶ 170-171; *see also* ¶¶ 148-49 (Dealerships' ability to access their data on DMS through third parties "was an important feature of the DMS and its functionality," and Defendants unlawfully "eliminated this feature of the DMS and its functionality."). Thus, for example, whereas

---

[38] This Section responds to CDK Mem., Section II.B1-2 at 16-21.

[39] In a footnote (at 17 n.11), CDK mentions the DMS market by referencing Section II.A.2 of its brief. That section, however, concerns *standing* under the *Illinois Brick* doctrine. Dealership Plaintiffs address that argument at Section II.A.1, *supra*.

FILED UNDER SEAL

Dealership Plaintiffs using CDK DMS, prior to Defendants' horizontal agreements, enjoyed "unfettered access" to data on their DMS -- including through persons (*e.g.*, integrators) who they authorized to access such data (*id.* ¶ 147), their ability to do so was restrained by Defendants' unlawful conduct. Defendants' conduct "reduce[d] competition in the DMS market," causing injury to Dealership Plaintiffs. *Id.* ¶ 172. *See In Aventis Envt'l Sci. USA L.P. v. Scotts Co.*, 383 F. Supp. 2d 488, 504 (S.D.N.Y. 2005) (holding that evidence of "retardation of innovation and subsequent decrease in the quality of [alternative products]," *i.e.*, defendant Monsanto not introducing its improved version of RoundUp, "could qualify as a harm to competition and consumers"). As CDK fails to address these allegations, Counts I and II, insofar as they allege a horizontal conspiracy with respect to the DMS market, should be sustained.

CDK's arguments concerning the alleged horizontal conspiracy involving the DIS market fare no better. Judge St. Eve's decision denying, in pertinent part, Defendants' motion to dismiss the *Authenticom* complaint is dispositive. *See* Authenticom Opinion at 25-33. Like the Complaint here, the *Authenticom* complaint alleged Defendants entered into a horizontal conspiracy to block third-party integrators from accessing data stored on Defendants' DMS. *See id*. ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████ *See* Compl. ¶ 100. Similarly, in April 2016, CDK's Vice President of Product Management, Dan McCray, told Cottrell:

> [W]e've entered into an agreement with Reynolds and Reynolds, okay? That agreement specifically says that we're going to support each other's third party interfaces, and we're working collaboratively to remove all hostile integrators from our DMS system.

**FILED UNDER SEAL**

*see id*. at ¶ 101 ████████████████████████████████████████████

████████████████████████████████████

These admissions by CDK and Reynolds' executives constitute classic "smoking gun" evidence. *See* Authenticom Opinion at 23 (quoting *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011)); *see also* Transcript of Proceedings, Dkt. 211 (Jun. 18, 2018), 31:4 (Judge St. Eve's ruling is "law of the case"). Dealership Plaintiffs' allegations of those admissions are thus "direct-evidence allegations" of Defendants' horizontal agreement. *See* Authenticom Opinion at 26 (Defendants' admissions are "textbook examples" of adequate allegations) (citing *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010)). Indeed, "[t]aken as true, the fact that two of Defendants' executives admitted an agreement to block Authenticom and other integrators from accessing dealer data shows directly the existence of such an agreement. No further inference is required." *See id.* (citing authorities).[40] *See also Authenticom,* 2017 WL 3017048 at *18 (explaining that Cottrell's testimony regarding Schaefer and McCray's statements "could establish the existence of a per se illegal horizontal conspiracy," and "was detailed and thus more persuasive" than Defendants' "conclusory" denials.).

CDK offers an assortment of arguments to challenge the allegations, but none works here. For example, CDK argues (at 17-18) that persons may engage in parallel, independent conduct without violating the antitrust laws.[41] Dealership Plaintiffs' allegations, however, describe an unlawful agreement, not independent conduct. *See* Authenticom Opinion at 29-31.

---

[40] Having accused Dealership Plaintiffs of "copy[ing]" Authenticom's allegations CDK cannot properly argue (at 18) that those allegations -- which warranted a denial of Defendants' motion to dismiss horizontal conspiracy claims in *Authenticom* -- should produce a different result here.

[41] CDK cites *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), to support its argument. *Matsushita* addresses the standard for summary judgment or a directed verdict, not a motion to dismiss. *See id.* at 588 ("To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently.") (citation omitted); *see also* Authenticom Opinion at 30

FILED UNDER SEAL

Defendants' illegal conduct, moreover, was highly motivated, as it enabled them to, *inter alia*, charge artificially inflated prices for DIS -- which prices were passed on to Dealership Plaintiffs. Compl. ¶¶ 134-145. *See* Authenticom Opinion at 30 (finding Authenticom's allegations "raise[d] a reasonable inference of Defendants' motive to conspire" including allegations that "several dealers loudly complained" when CDK began blocking access); *see also Authenticom*, 874 F.3d at 1023.

CDK argues (at 18) that "Reynolds *already* had unilaterally closed its system to hostile integration prior to the supposed conspiracy." (emphasis in original). Judge St. Eve, however, properly rejected that argument, given that Defendants allegedly "admittedly '*agreed*' to block third parties." *See* Authenticom Opinion at 28 (emphasis in original).

Further, seeking to compartmentalize Dealership Plaintiffs' allegations, CDK argues (at 19) that the February 2015 written agreements between CDK and Reynolds,[42] standing alone, do

---

("the bars described in *Matsushita* are not set at the pleading stage") (citations omitted). Nonetheless, Dealership Plaintiffs easily satisfy the *Matsushita* standard because the Complaint "raises a reasonable inference of Defendants' motive to conspire." *See id*. Moreover, "[w]hen a defendant puts forward denials of a conspiracy based on a defense of conscious parallelism, Courts have allowed plaintiffs to proceed by presenting evidence that there is some 'plus factor' which reduces the probability of independent action." *Alexander v. Phoenix Bond & Indem. Co.*, 149 F. Supp. 2d 989, 1000 (N.D. Ill. 2001). Essentially "something more" than conscious parallelism must be *proven* for antitrust liability to attach. *Skokie Gold Standard Liquors, Inc. v. Joeseph E. Seagram & Sons, Inc.*, 661 F.Supp.1311, 1319 (N.D. Ill. 1986). Dealership Plaintiffs have alleged far more than is necessary and more than mere parallel conduct. Not only have Dealership Plaintiffs put forward direct evidence in the form of written agreements, but they have also supplied evidence in the form of admissions from top executives of both Defendants that an unlawful conspiracy existed. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002) ("[A]n admission by the defendants that they agreed to fix their prices is all the proof a plaintiff needs.").

[42] Those agreements include the "Data Exchange Agreement" (Compl. ¶ 83, Ex. 11) ("DEA"); the "3PA Agreement" (*id.* ¶ 43, Ex. 12), and the "RCI Agreement" (*id.* ¶ 83, Ex. 13). Challenging Judge St. Eve's conclusion that the DEA "lent credence to allegations of a horizontal conspiracy" CDK relies (at 21, n.12) on language from section 4.5 of the DEA, which states that that section "is not intended as a 'covenant not to compete." (emphasis omitted, citing Authenticom Opinion at 26; Compl., Ex. 11, § 4.5). Defendants, however, cannot cavalierly avoid liability by strategically inserting self-serving language in their written agreements, no more than can they escape liability by simply denying any wrongdoing. Moreover, CDK cites no authority to support its novel argument that multiple written agreements between would-be competitors that "control the DMS market" (Authenticom Opinion at 30) can *negate* the

**FILED UNDER SEAL**

not support Dealership Plaintiffs' claims. The argument, however, is a red herring. Dealership Plaintiffs' "direct-evidence allegations," namely, admissions by CDK's McCray ███████ ████████ suffice to show a horizontal conspiracy. *See* Authenticom Opinion at 26. In any event, the written agreements themselves provide evidence of a horizontal conspiracy. *See Authenticom*, 2017 WL 3017048 at *6 ("The February 2015 agreements between CDK and Reynolds also suggest a horizontal conspiracy. Although the agreements do not explicitly state that defendants will work together to eliminate third-party data integrators, the agreements have that effect… After the agreements, there is little room in the market for third-party integrators."); *see also* Authenticom Opinion at 26-27 (finding the written terms "further support the existence of the alleged agreement," and "it is reasonably inferable that [the] agreements were a part of the broader and ***admitted agreement*** to block third-party integrators.") (emphasis added).[43]

Finally, CDK takes issue (at 20) with Dealership Plaintiffs' interpretations of various exhibits to the Complaint. But even without those exhibits, Dealership Plaintiffs' allegations -- including stunning admissions by Defendants' executives -- suffice to allege a horizontal conspiracy. And while CDK posits (at 20) that ███████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████

---

inference of conspiracy on a motion to dismiss. CDK's reliance on the parol evidence rule (at 32 n.13) (citing 11 Williston on Contracts § 33.1 (4th ed. 2018)), is misplaced for numerous reasons, including that Dealership Plaintiffs -- non-parties to those written agreements -- are not asserting contract rights thereunder. More importantly, the argument that the alleged confessions by Defendants' executives refer only to the written agreement is, as Judge St. Eve found, a "bad argument." *See* Authenticom Opinion at 29. It also "backfires" because it "suggests that Defendants (or at least their executives) thought that the [written agreements] aimed to 'block' third-party integrators -- precisely as the Complaint claims." *Id.*

[43] CDK suggests (at 19) that the agreements actually increased competition, insofar as other hostile integrators benefitted from CDK's DMI and Integralink products no longer being able to access Reynolds' DMS. But this ignores that Reynolds treated CDK's DIS providers wholly differently than other integrators (such as Authenticom). Defendants agreed to a blanket policy of "blocking" integrators, which extended even to CDK's integrators.

FILED UNDER SEAL

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

In sum, with the weight of admissions from top executives, reciprocal contractual terms with almost identical language indicating an agreement, and the enormous combined market power of the Defendants, Dealership Plaintiffs' Counts I and II, alleging a horizontal conspiracy between Defendants, should be sustained.

### 2. Dealership Plaintiffs' Section 1 Claims for Exclusive Dealing (Counts III and IV) Should be Sustained[44]

Dealership Plaintiffs have sufficiently pled that Defendants violated Section 1 through their exclusive dealing arrangements. Counts III and IV allege that, pursuant to their conspiracy to eliminate competition, Defendants entered into contracts with vendors that featured exclusive dealing provisions dictating that vendors "cannot obtain data for Dealers using the CDK or Reynolds DMS from any data integrator except CDK or Reynolds, respectively." Compl. ¶ 182.

Judge St. Eve sustained Authenticom's Section 1 claims based on these very provisions. *See* Authenticom Opinion at 35-39. That ruling should be followed here. The contracts contain classic "exclusive dealing" provisions because "they require the vendor to obtain its integration services exclusively from Defendants when obtaining data from their DMSs." *See id.* at 37 (citing *Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 46 (7th Cir. 1996)).

Those provisions, moreover, create "a reasonable inference of substantial foreclosure." *See* Authenticom Opinion at 39. Among other things, (i) they were imposed by the two firms that "controlled the market" (*id*. at 30; *see* Compl. ¶ 64, n.10); (ii) they blocked "at least one significant competitor…" (*Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 393 (7th Cir.

---

[44] This Section responds to CDK Mem., Section II.B.2 at 21-23.

FILED UNDER SEAL

2004) (quoted in Authenticom Opinion at 36); *see id.* at 37; Compl. ¶ 100 ( 

and (iii) they resulted in increased integration costs borne by Dealership Plaintiffs. (Compl. ¶¶ 144, 185).

CDK's contention (at 22) that similar provisions are "commonplace throughout the economy" and "essential to companies' cybersecurity practices," is neither supported by the record nor relevant. *See* Authenticom Opinion at 27 (despite Defendants' suggestion that the written agreements were designed, *inter alia*, to "address[] security concerns[,] … at this stage, it is reasonably inferable that such agreements were a part of the broader and admitted agreement to block third-party integrators.").[45] What matters here is that the provisions were unlawfully implemented pursuant to a conspiracy between the two largest would-be competitors, foreclosed substantial competition, and damaged Dealership Plaintiffs.

To the extent that CDK argues (at 23) Dealership Plaintiffs lack standing to challenge these provisions, CDK ignores a basic precept of economics in this case. Although Dealership Plaintiffs are not parties to the contract provisions, they still have standing based on the provisions' ultimate effects. The provisions force vendors to use a product offered by Defendants rather than a competing product. This restrains trade and stifles competition. Over time, this results in a higher price paid by vendors, and as alleged in the Complaint, those costs are passed through the vendor and borne by Dealership Plaintiffs. *See, e.g.*, Compl. ¶¶ 134-145, 180-199.

---

[45] Defendants' so-called "security" defense is entirely pretextual, as shown by their internal documents. Compl. ¶¶ 153-64. In any event, at the pleading stage, any purported "procompetitive upsides of exclusive dealing" are of no consequence. *See* Authenticom Opinion at 39.

FILED UNDER SEAL

### 3. CDK's Rule of Reason Argument is Unavailing[46]

CDK's argument (at 23-24) that Defendants' conduct survives the "Rule of Reason" fails on both a legal and factual basis.

First, because Defendants engaged in *horizontal* conduct in violation of Section 1, that conduct is illegal *per se* and not subject to a rule of reason analysis. *See, e.g.*, *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000) ("joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle" are *per se* illegal) (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985)); *In re Blue Cross Blue Shield Antitrust Litig*, 308 F. Supp. 3d 1241, 1258-73 (N.D. Ala. 2018) (ruling, on summary judgment, that defendants' agreement to divide the geographic market among themselves and not compete with one another through a series of trademark licensing agreements and other arrangements that restricted access to health care providers and subscribers was a *per se* violation of Section 1, which could not be offset with evidence of the purported benefits of the collaboration), *petition for permission to appeal docketed*, No. 18-90020 (11th Cir. June 22, 2018).[47] Accordingly, Defendants cannot escape liability *even if* their conduct was otherwise deemed reasonable. *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959).

Second, Defendants' conduct does not pass muster under a "rule of reason" analysis. As alleged in the Complaint, Defendants' conduct, among other things, reduced the functionality of Dealership Plaintiffs' DMS, restrained competition, and increased prices paid by Dealership Plaintiffs. *See, e.g.*, Compl. ¶¶ 148-49, 151, 165-66, 171-72. Defendants' purported justifications

---

[46] This Section responds to CDK Mem., Section II.B3 at 23-24.

[47] CDK improperly relies (at 23) on *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992) ("*Kodak*"), addressing elements of a Section 2 monopolization claim. Counts I-IV allege Section 1 violations.

FILED UNDER SEAL

(at 23), including a concern for "cybersecurity," are pretextual and belied by CDK's own documents. *See* Compl. ¶¶ 153-175. *Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010), cited by CDK (at 24), does not help Defendants. As the Ninth Circuit noted, "changes in product design are not immune from antitrust scrutiny…" *Id.* at 998. And, while the Court affirmed summary judgment as to a Section 2 claim, the plaintiffs had presented "no evidence" to refute the defendant's showing that the product change reflected a "genuine improvement." *Id.* at 1002; *see also Cal. Computer Prods.., Inc. v. Int'l Bus. Machines Corp.*, 613 F.2d 727, 744 (9th Cir. 1979) (there was "uncontroverted evidence that IBM's changes allowed it to reduce manufacturing costs and prices to the consumer and also improved performance of the product"); *United States v. Microsoft*, 253 F.3d 34, 66-67 (D.C. Cir. 2001) (affirming, in part, post-trial judgment that Microsoft violated Section 2 by modifying Windows operating system, where "Microsoft failed to meet its burden of showing that its conduct serves a purpose other than protecting its operating system monopoly"). Here, Defendants' challenged conduct resulted in no conceivable product "improvement."

Here, the Complaint's allegations -- and the documents cited therein -- suffice to show that Defendants' conduct was unreasonable. *See generally Authenticom*, 2017 WL 3017048 at *7 (the district court "not persuaded" by Defendants' purported justifications, including supposed security concerns); *see also* Authenticom Opinion at 27 ("Defendants… contend that there are legitimate explanations for the 2015 Agreements, such as… addressing security concerns. But at this stage, it is reasonably inferable that such agreements were a part of the broader and admitted agreement to block third-party integrators.").

**FILED UNDER SEAL**

### C. Dealership Plaintiffs Allege Antitrust Injury With Respect to Their DMS Purchases[48]

Reynolds argues (at 25) that Dealership Plaintiffs have failed to allege antitrust injury with respect to their DMS purchases. Reynolds, however, ignores Dealership Plaintiffs' allegations of antitrust injury caused by Defendants' misconduct. The injury includes increased prices paid by Dealership Plaintiffs for DMS, *i.e.*, a classic form of antitrust injury. *See, e.g.*, Compl. ¶ 16 (Dealership Plaintiffs paid supracompetitive prices for DMS), ¶ 151 n.123 (citing Authenticom expert's testimony: DMS prices have "gone up"), ¶¶ 165-66.

Dealership Plaintiffs also allege that Defendants degraded DMS functionality. *See, e.g.*, *id.* ¶¶ 147-49, 171. Specifically, the Complaint alleges "Defendants agreed to reduce the functionality of CDK's DMS (including Dealers' ability to freely access their DMS data through authorized persons)." *See id.* ¶ 171. That itself constitutes injury because "Dealers' ability to freely access their own data on their DMS  through third-parties was an important feature of the DMS and its functionality." *See id.* ¶ 148.

Reynolds emphasizes (at 25) that Dealership Plaintiffs have alleged misconduct concerning DIS, including misconduct in the aftermarket for data integration. Those allegations, however, are *in addition to* the alleged misconduct that was directed at, and caused injury to Dealership Plaintiffs as purchasers of DMS. Indeed, it is hardly surprising that Dealership Plaintiffs sustained multiple types of antitrust injury, given that they purchased DMS from the Defendants *and* products from vendors.

Ironically, Reynolds cites (at 26) Dealership Plaintiffs' allegations of Defendants' "duopoly." *See* Compl. ¶ 150 ("CDK and Reynolds felt their lucrative DMS businesses were under attack, and acted to preserve their DMS duopoly…"); *see also id.* ¶ 152 ("Defendants

---

[48] This Section responds to Reynolds Mem., Section IV.A at 25-29.

**FILED UNDER SEAL**

viewed the DMS and DIS markets collectively, as an 'ecosystem' to be controlled by them, free of competitive pressures from other actors."), n.124. Those allegations support Dealership Plaintiffs' contention that Defendants controlled the DMS market. *See* Authenticom Opinion at 30 ("Defendants… together control the DMS market"); *id.* at 6 ("CDK and Reynolds 'dominate' the DMS market… As alleged duopolists, CDK and Reynolds enjoy a profitable business… Their customers, the dealers, are also unable to freely switch between DMS providers.") (citing *Authenticom* complaint). Indeed, Defendants' market control paved the way for their *joint* anticompetitive conduct. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627-628 (7th Cir. 2010) ("an industry structure that facilitates collusion constitutes supporting evidence of collusion"); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (market had a "structure that is auspicious for price fixing").

Reynolds proffers other "straw man" arguments that likewise fail. Reynolds argues (at 27) that data integrators could service Dealership Plaintiffs on "competing systems" including, possibly, DMS systems of "potential competitors who had not yet entered the market." But even assuming, hypothetically, that new DMS suppliers emerged, the argument still ignores the enormous costs that would befall dealers switching to another DMS. *See infra* Section II.D.1. The existence of niche competitors does not change the calculus. Finally, Reynolds' argument improperly relies on material outside the record (*i.e.*, at 27 n.52, relying on a newspaper article), highlighting that the issue, at best, is one is for the jury.

**FILED UNDER SEAL**

### D. Dealership Plaintiffs Plausibly Allege Antitrust Violations with Respect to DIS

#### 1. Dealership Plaintiffs' Conspiracy Claims Make "Economic Sense"[49]

Reynolds argues (at 29) Dealership Plaintiffs' conspiracy allegations make "no economic sense" because Reynolds had no motive to conspire with CDK. To the contrary, the allegations make perfect economic sense and, indeed, Reynolds has admitted its conspiratorial conduct.

Citing paragraph 7 of the Complaint, Reynolds states (at 29) it has blocked integrators since 2006. As alleged in that paragraph, however, Reynolds' conduct caused it to lose market share to CDK. *See also* Compl. ¶ 78, n.27. By conspiring with CDK, Reynolds sought, *inter alia*, to stanch its market share loss and impose higher prices on customers. Compl. ¶ 10 n.3; *see also id.* ¶¶ 1, 16. Protection of market share represents a classic motive for conspiratorial conduct. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 659 (reversing summary judgment for defendants).[50] So too is the imposition of supracompetitive prices. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 358 (3d Cir. 2004).

Disputing its motive, Reynolds suggests (at 32) that reduced competition between itself and CDK, *i.e.*, the two dominant firms that controlled the DMS market (*see* Compl. ¶¶ 1-2, 170) would have driven its DMS customers to smaller DMS providers, namely DealerTrack and Auto/Mate. That argument ignores: (1) the enormous switching costs confronting dealers (*see id.* ¶ 66 (citing CDK CEO's acknowledgment, in November 2016, that "switching DMS providers can be very difficult" and "many dealers are hesitant to switch")), and (2) the fact that other providers are "significantly smaller" and "typically service smaller Dealerships in niche

---

[49] This Section responds to Reynolds Mem., Section IV.B. at 29-34.

[50] Thus, even if Reynolds' conduct *in 2006* was unilateral, its horizontal agreement with its principal, would-be competitor, CDK, most certainly was not.

FILED UNDER SEAL

submarkets." *Id.* ¶ 1 n.1.[51] Additionally, this argument was rejected by Judge St. Eve. *See* Authenticom Opinion at 30 ("it is inferable that... Defendants (which together control the DMS market) desired the luxury of taking an action profitable for them but disadvantageous to their customers (by excluding a cheaper rival in the downstream data-integration market) without fearing that their customers would respond by, for example, **turning to another provider.**") (emphasis added); *id.* at 30 n.11 ("Authenticom has asserted and submitted evidence that Reynolds's DMS market share began to decline after it implemented closed architecture. As the Seventh Circuit recognized during oral argument on the preliminary injunction, such a fact makes Defendants' repeated declarations of facial 'implausibility' dubious.").

Reynolds argues (at 31) that because it allegedly "has" monopoly power with respect to "integration services" on its DMS, it did not "need[] to conspire" with CDK. This argument is a non-sequitur, given the Complaint's allegations that Defendants acquired and maintained their monopoly position by, *inter alia*, "entering into a market division agreement pursuant to which they agreed not to compete." Compl. ¶ 205. Moreover, even if Reynolds historically faced no competition for *integration services on its DMS*, it historically competed against CDK in the *DMS market* and had lost market share to CDK. *Id.* ¶ 7. In any event, even with respect to DIS, Dealership Plaintiffs allege that, after 2015, Reynolds substantially increased its prices. *See, e.g.*, *id.* ¶¶ 128-129 n.98.

Finally, as alleged in the Complaint, Defendants' executives ███████████████████

███████████████████████████████████████████████████████████████

---

[51] Reynolds cites non-record material (at 32, 43-45, Ex. 4-5) to argue that switching is commonplace. Reynolds's reliance on that material is plainly improper on a motion to dismiss. *See* Dkt 340, n.2 ("…for purposes of a motion to dismiss, the Court accepts as true all of Plaintiff's well-pleaded factual allegations and draws all reasonable inferences in Plaintiff's favor. *Killingsworth*, 507 F.3d at 618. Reynolds will have the opportunity to present all of its evidence in opposition to Plaintiffs' claims at the appropriate time (*e.g.* summary judgment, trial).")

FILED UNDER SEAL

████████████████████ *Id.* ¶¶ 100-101. As Judge St. Eve explained: "Defendants also insist that the alleged confessions do not refer to a broader agreement to block integrators but only the 2015 [written] Agreements, which are facially legitimate. That is a poor argument. For one, it requires an inference in Defendants' favor and Authenticom's disfavor. It also backfires. The executives allegedly confessed to an agreement to 'block' third-party integrators…" *See* Authenticom Opinion at 29; *see also* Section II.B.1, *supra.* Given those admissions, Reynolds' suggestion that Dealership Plaintiffs have not alleged motive -- even if true -- is of no moment. *See Matsushita*, 475 U.S. at 595-97.

Reynolds' legal authority does not suggest otherwise. For example, in *Hackman v. Dickerson Realtors, Inc.*, 520 F. Supp. 2d 954 (N.D. Ill. 2007), the court held the complaint lacked "enough" factual allegations to suggest an agreement. *See id.* at 958. Similarly, in *Robb v. Conn. Bd. of Veterinary Med.*, 157 F. Supp. 3d 130 (D. Conn. 2016), the plaintiff "failed to plead a single factual allegation affirmatively evincing the existence of an agreement." *See id.* at 147. Just the opposite is true here. The admissions by Reynolds and CDK executives -- *standing alone* -- substantiate Defendants' unlawful agreement. *See* Authenticom Opinion at 26 ("Taken as true, the fact that two of Defendants' executives admitted an agreement to block Authenticom and other integrators from accessing dealer data shows directly the existence of such an agreement. *No further inference is required*.") (emphasis added, citing authorities).[52]

---

[52] Surprisingly, Reynolds cites (at 33) *Motor Vehicle Software Corp. v. CDK Global, Inc.*, No. 17-896, 2017 WL 5643163 (C.D. Cal. Oct. 2, 2017). There, the court *sustained* a vendor's Section 1 claim against Reynolds and CDK, explaining that the complaint "pleaded sufficient factual matter to 'nudge' its allegations of a horizontal agreement between CDK and Reynolds 'across the line from conceivable to plausible.'" *See id.* at *5 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). Although the court dismissed a Section 2 claim with respect to monopolization of the markets for electronic vehicle registration and titling services, it noted that "the few factual allegations related to CVR do not identify conspiratorial conversations between CVR and CDK or Reynolds." *See id.* at *7. Here, the allegations against Reynolds -- including Reynolds's and CDK's admissions of conspiratorial conduct -- are both factual and compelling.

FILED UNDER SEAL

Accordingly, Dealership Plaintiffs' allegations concerning Reynolds' conspiratorial conduct make perfect economic sense. Even if Reynolds' conduct *in 2006* was unilateral, its more recent horizontal agreement with CDK most certainly was not. Allegations concerning the agreement are supported not simply by Reynolds' economic motives, but by the admissions of Reynolds and CDK executives.

### 2. Defendants' Blockage of Access to Dealership Plaintiffs' DMS Data Constitutes Antitrust Injury[53]

Reynolds argues that Defendants' blockage of integrators' access to Dealership Plaintiffs' DMS data does not constitute antitrust injury. The argument fails on multiple grounds.

First, Reynolds claims *its* (not CDK's) form dealer contract states dealers will not provide access to third parties, thus its conduct is "independent" of any antitrust violation. As alleged in the Complaint, however, ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████ Compl. ¶ 100. *See also* Authenticom Opinion at 28 (rejecting CDK's contention that Defendants' executives admissions of an agreement are "nonsensical because Reynolds decided long before 2015 to block Authenticom's access").

Also meritless is Reynolds' contention that Dealership Plaintiffs' antitrust injury is precluded by Authenticom's purported violation of the Computer Fraud and Abuse Act ("CFAA"). That argument ignores the law of the case. Judge St. Eve held that, even if Authenticom violated the CFAA, that would not negate Authenticom's antitrust injury or otherwise preclude its Sherman Act claims. *See* Authenticom Opinion at 18-22. *A fortiori*, Authenticom's CFAA violation, *if any*, does not immunize Dealership Plaintiffs from obtaining

---

[53] This Section responds to Reynolds Mem., Section IV.B. at 34-35.

**FILED UNDER SEAL**

recovery for *their* antitrust injuries. Relatedly, the premise of Reynolds' argument -- *i.e.*, that Authenticom violated the CFAA -- is alleged without any basis or case citation.

Finally, Reynolds argues (at 34) that a purported "contractual provision" in its Master Agreement ██████████████████████████████████████ and that Dealership Plaintiffs "***do not challenge this contractual provision***." (emphasis added). That argument is a red herring. As this Court has ruled, arguments "dependent on the Master Agreement" are properly disregarded. *See* Order, Dkt. 340 (Aug. 21, 2018) at 2. Even assuming, *arguendo*, that such a contractual provision existed (and was otherwise valid), Defendants' horizontal agreement, if nothing else, resulted in CDK's decision to close its DMS, and the elimination of competition between Defendants, the result of which was to increase prices paid by *Reynolds Dealers*. Compl. ¶ 151; *see also id.,* ¶ 7 ("Leading up to 2015, CDK had succeeded in wresting market share away from Reynolds in the DMS space."). Accordingly, insofar as Reynolds relies on the Master Agreement to dispute Dealership Plaintiffs' antitrust injury, the argument fails.

> **3.      Dealership Plaintiffs Have Alleged a Plausible Market Division Conspiracy[54]**

Relying on Judge St. Eve's *Authenticom* ruling, Reynolds argues Dealership Plaintiffs have not alleged a market division conspiracy. The argument fails. Judge St. Eve ruled that Authenticom, a data integrator, lacked antitrust injury because the challenged conduct "'would have ***helped*** Authenticom' by eliminating its alleged competitors." *See* Authenticom Opinion at 32 (emphasis in original, citation omitted). By contrast, Dealership Plaintiffs were not competitors of Authenticom or Defendants; rather, they were purchasers of DMS and DIS, whose prices were inflated due to Defendants' conduct. As such, Dealership Plaintiffs sustained antitrust injury. Reynolds' contention that Dealership Plaintiffs failed to plead a "quid pro quo"

---

[54] This Section responds to Reynolds Mem., Section IV.B. at 35-36.

FILED UNDER SEAL

with CDK also lacks meritless. As alleged in the Complaint, Defendants' conspiracy, *inter alia*, required CDK to cease providing DIS for Reynolds' DMS. Compl. ¶ 83 (the "Wind Down Agreement" required CDK to "stop providing services to Dealers relating to the integration of their data stored on Reynolds' DMS's"). As such, this case is distinguishable from *Cal. ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1137 (9th Cir. 2011), cited by Reynolds (at 36), since Defendants' conspiracy *did* "prevent" a defendant "from actually making sales."

Reynolds's final argument, that Dealership Plaintiffs do not allege Defendants were actual or "potential" competitors with respect to DIS, likewise fails. Defendants' conspiracy, if nothing else, "eliminate[d] competition between CDK and Reynolds in the DMS market." Compl. ¶ 81. Their written agreements, moreover, "expressly prohibit Defendants from assisting in the hostile access of one another's DMSs" and represent "a partial ceasefire and mutual forbearance between two rivals". Authenticom Opinion at 26-27.

Those agreements support an inference that Defendants were, at the very least, potential competitors. *See U.S. v. Sargent Elec. Co.*, 785 F.2d 1123, 1127 (3d Cir. 1986) ("If they were not, there would be no point to such an agreement.").

### 4. *AGC* Standing Does Not Bar Dealership Plaintiffs' Claims[55]

Reynolds' *AGC* arguments fail for the same reasons as CDK's, as discussed in sections II.A.2 and II.G.3.b–d, below.

---

[55] This Section responds to Reynolds Mem., Section IV.B.4 at 36-39.

**FILED UNDER SEAL**

E.    **Dealership Plaintiffs' Monopolization and Exclusive Dealing Claims are Valid**

    1.    **Dealership Plaintiffs Adequately Allege that Defendants Monopolized the Single-Brand Aftermarkets for Data Integration Services ("DIS") on Their DMS Platforms[56]**

Judge St. Eve previously found that Authenticom adequately pled a Section 2 claim for monopolization of the single-brand aftermarkets for DIS. *See* Authenticom Opinion at 44-50. That decision warrants the rejection of Reynolds's and CDK's virtually identical arguments for dismissal of Dealership Plaintiffs' Section 2 claims here.[57]

    a.    **The Complaint Sufficiently Alleges Single-Brand Aftermarkets Under *Kodak***

As Judge St. Eve explained, the Supreme Court in *Kodak*, 504 U.S. 451, "expressed [] general concerns about customers that unknowingly and involuntarily sign on for the defendant's aftermarket power." *See* Authenticom Opinion at 23 (citing *Kodak*, 504 U.S. at 473-75). "Included in that group, according to the Supreme Court, are those unable to undertake lifecycle-cost analyses (at least at some, reasonable level) before purchasing the primary product because the requisite 'information is difficult -- some of it impossible -- to acquire at the time of purchase.'" *Id.* (quoting *Kodak*, 504 U.S. at 473-74). The Seventh Circuit has acknowledged that a customer being unable to accurately assess lifecycle costs is important to the determination of whether a single-brand aftermarket claim is viable under *Kodak*. *See id.* (citing *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 762 (7th Cir. 1996)).

---

[56] This Section responds to Reynolds Mem., Section IV.C.1 at 39-46. CDK (at 24-26) makes many of the same arguments as Reynolds regarding Dealership Plaintiffs' Section 2 claims, so those arguments are addressed herein as well.

[57] Reynolds seeks little more than a reconsideration of Judge St. Eve's prior decision in *Authenticom*, which Defendants had an opportunity to challenge through a request for reconsideration or an interlocutory appeal or both, but they chose not to do so. Reynolds' attempt to use the instant motion to challenge Judge St. Eve's prior ruling is inappropriate.

Moreover, this MDL was specifically created to avoid inconsistent rulings in the related actions to this proceeding. *See* Transfer Order establishing MDL 2817, Dkt. 1 (Feb. 1, 2018) ("Centralization would … avoid the potential for inconsistent pretrial rulings.").

FILED UNDER SEAL

Dealership Plaintiffs are precisely this type of customer. They are subject to informational asymmetries in the DMS and DIS markets that disable them from reasonably estimating lifecycle costs. Judge St. Eve concluded as much, explaining:

> [T]he [*Authenticom*] Complaint pleads that Reynolds employs contracts that prohibit vendors from sharing with dealers Reynolds's integration fees, which are allegedly subject to varying, significant, and frequent increases. Taken as true, those alleged 'market imperfections' suggest that dealers may be unable to assess lifecycle costs like the *Eastman Kodak* owners.

Authenticom Opinion at 49 (citations omitted).

Dealership Plaintiffs' Complaint specifically alleges that Defendants' price secrecy provisions conceal the lifecycle costs of Dealership Plaintiffs' DMS (¶¶ Compl. 118-21, 123), as vendors were subject to varying, significant, and frequent increases as a result of Defendants' conspiracy (*id.* ¶¶ 126-31). The Court should reach the same conclusion as Judge St. Eve – that Plaintiffs are unable to sufficiently assess the lifecycle costs of their DMS under *Kodak*.

Reynolds argues (at 45-46), and CDK similarly suggests (at 26), that Dealership Plaintiffs in fact knew the total cost of Reynolds' DMS, including the cost of any integration fees. This is simply not true. Reynolds cites allegations from the Complaint (at 45-46 (citing Compl. ¶¶ 63, 114) that have nothing to do with integration costs to vendors, let alone whether the existence or quantum of such costs were known to dealers. Reynolds also highlights Dealership Plaintiffs' allegations (at 45-46 (citing Compl. ¶ 127)) that Defendants planned to increase integration fees to vendors as a result of their 2015 agreement -- but again, this says little about dealerships' ability to account for and value the ultimate costs to them. Similarly, CDK argues (at 26) that because Dealership Plaintiffs allege some vendors informed some dealers they were raising prices in response to higher fees, this somehow negates the allegations that Dealership Plaintiffs were unable to price DMS due to CDK "prohibit[ing]… vendors from informing dealers of how much CDK's integration services cost." *See* Authenticom Opinion at 48. Dealership Plaintiffs'

awareness of higher prices being passed on to them by some vendors does not equate to perfect knowledge of the price of DIS. As Judge St. Eve explained, the "counter argument -- that the Complaint pleads that some dealers complained about the costs, and thus the allegations about price secrecy are not well-pleaded [*cf.* Reynolds Mem. at 46] -- is a stretch. A contract can prohibit vendors from sharing pricing information and a few vendors can do so anyway." *See* Authenticom Opinion at 23.

Dealership Plaintiffs certainly were not able to accurately assess the lifecycle costs of their DMS platforms in the wake of Defendants' 2015 agreement, which resulted in Defendants charging exorbitant and ever-increasing integration fees to vendors (and ultimately to Dealership Plaintiffs). *See* Compl. ¶¶ 128-31. And despite Reynolds' argument to the contrary, the 2015 agreement affected vendors (and in turn Dealership Plaintiffs) that had previously accessed Reynolds' DMS through third-party integrators. *See, e.g.*, *id.* ¶¶ 130-31 (after Defendants' 2015 agreement, vendor AutoLoop, which previously accessed dealers' data on Defendants' DMS via third party integrator SIS, was forced to access Defendants' DMS via the 3PA and RCI programs). Dealership Plaintiffs could not have predicted such changes, or the effect of such changes on the all-in costs of their DMS. The same holds true as to CDK, who acknowledges (at 25) that prior to 2015 it "may not have consistently enforced its contractual bars."

b.      **Plaintiffs are Locked-In to Their Purchases of DMS**

As in *Authenticom*, Dealership Plaintiffs here adequately allege that "consumers are 'locked in' after purchasing []DMSs, given the initial investments required, the contract length, and the resources required to change DMSs." *See* Authenticom Opinion at 23. Indeed, dealers are locked-in by, *inter alia*, long-term DMS contracts with clauses providing for automatic renewals and extensions. *See* Compl. ¶15. Switching costs are also prohibitive. *See id.* ¶¶ 4, 63 (DMS-specific investments cost dealers tens of thousands of dollars up-front, with a single, small

**FILED UNDER SEAL**

dealer paying up to $150,000 in yearly fees thereafter and larger dealers paying anywhere from $1.5 to 5 million or more yearly.); *see also id.* ¶ 66 ("In November 2016, CDK's CEO acknowledged that 'switching DMS providers can be very difficult. It [is] quite a process [to] change and takes time, which is part of the reason that many dealers are hesitant to switch.'").[58] Moreover, the investment in one DMS is for the most part not transferable to another DMS -- for example, training for one system is generally not applicable to another and time to complete transfer and training for a new system is long -- a year or more. *Id.* ¶¶ 4, 66. Finally, the lock-in is illustrated by the fact that the average length of dealers' engagement with their DMS provider is 20 years. *Id.* ¶ 68. These allegations are sufficient at this stage to plead a lock-in under *Kodak*.

Faced with these well-pled facts, Reynolds' bald statement (at 43) that "the Complaint does not come close to alleging a 'lock-in' within the meaning of *Kodak*" should be rejected, as should Reynolds' attempts to (i) offer an alternative interpretation that misconstrues and mischaracterizes Dealership Plaintiffs' well-pled facts (at 44), and (ii) cut out of whole cloth new, alternative narratives that suit its needs (at 44-45). Any argument that paints Dealership Plaintiffs' well-pled facts in a different light should be rejected at this stage of the litigation. *See Zahn v. North Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016); *see also* Order, Dkt. 340 (Aug. 21, 2018), at 3 n.2 ("Reynolds's response implies that it is unfair to allow Plaintiffs to cite to factual support in their complaint without permitting Reynolds to counter that evidence. However, for purposes of a motion to dismiss, the Court accepts as true all of Plaintiff's well-pleaded factual allegations and draws all reasonable inferences in Plaintiff's favor.") (citing *Killingsworth*, 507 F.3d at 618).

---

[58] Interestingly, CDK now argues (at 25, n.16) that switching DMS providers is no big deal, and "contracts with dealers are only in effect for a limited period of time." But, much to the contrary, Dealership Plaintiffs have described the process in even more onerous terms. Compl. ¶¶ 4, 66.

FILED UNDER SEAL

The Court likewise should give short shrift to any argument that relies on new facts which find no basis in the complaint. *See In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 649 (E.D. Mich. 2000) ("Dismissal under Rule 12(b)(6) is not permitted simply because Defendants can come up with a different set of facts that support an alternative… that does not offend antitrust law.") At most, Reynolds' counter-allegations prove that this issue is best resolved at a later stage of the litigation. *See Int'l Aerobatics Club Chapter 1 v. City of Morris*, 76 F. Supp.3d 767, 774 (N.D. Ill. 2014).("The defendants cannot use extrinsic evidence to contradict the facts in the complaint for purposes of obtaining a Rule 12(b)(6) dismissal[.]"); *see also* Authenticom Opinion at 23 ("[A]s was true in *Eastman Kodak*, '[t]he proper market definition in this case can be determined only after a factual inquiry into the commercial realities faced by consumers.'") (citing *Kodak*, 504 U.S. at 482).[59]

Nevertheless, even if taken as true, Reynolds' alternative interpretations and facts do not require dismissal of Dealership Plaintiffs' single-brand aftermarket claim as they are not inconsistent with the fact that dealerships are locked in to their choice of DMS and functionally unable to switch to another DMS.[60]

CDK's arguments regarding a supposed lack of lock-in are equally unpersuasive. CDK argues (at 25) that alleged terms in CDK dealership contracts as to third-party access provided enough information to buyers to quash any later claims of lock-in. CDK relies on *Digital Equip.*

---

[59] More generally, market definition and market power are fact-intensive inquiries best left for later stages of litigation. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 901 (N.D. Ill. 2011) ("[B]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.") (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) (Sotomayor, J.)); *see also Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 360 (7th Cir. 1990) ("Whether market power exists in an appropriately defined market is a fact-bound question…").

[60] DMS providers' marketing about "how to switch DMS providers" and that they have "perfected the DMS conversion process" says little about the actual number of dealers that are locked-in. *See* Reynolds Mem. at 44-45. Moreover, dealerships' effective ability to switch has been curtailed by Reynolds and CDK's anticompetitive agreement closing 75% or more of the DMS market. *See* Compl. ¶¶ 78-80.

FILED UNDER SEAL

*Corp.*, 73 F.3d at 763, but that case is inapposite. There, following a summary judgment decision, the Seventh Circuit held there was no record evidence that the defendant was able to raise prices or otherwise exploit any customers. *Id.* at 763. CDK's reliance (at 25) on *DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1346 (Fed. Cir. 2014), which was appealed after summary judgment, is off-base. There, the court held, based on record evidence, that only a handful of customers could have even been subject to lock out, thus the plaintiffs' alternative market for a specific type of resin did not lock in a substantial number of customers. *PSI Repair Servs., Inc. v. Honeywell, Inc.* 104 F.3d 811 (6th Cir. 1997) is also unpersuasive. In that case, following summary judgment, the appellate court held that lock in cannot succeed where, unlike here, the defendant has been "otherwise forthcoming about its pricing structure and service policies." *Id.* at 820. Here, where Dealership Plaintiffs allege multiple grounds supporting lock-in including price secrecy provisions, allegations regarding lock-in are well-founded.

Dealership Plaintiffs' allegations are more than adequate at this stage to establish a claim under *Kodak*: Dealership Plaintiffs are locked-in to their purchases of DMS and are otherwise unable to reasonably assess the lifecycle costs of their investment in DMS, and Defendants took advantage of these market imperfections, allowing them, among other things, to "profitably… maintain supracompetitive prices in the aftermarket" for data integration on their respective platforms. *See Kodak*, 504 U.S. at 476.

Further, Dealership Plaintiffs explain Defendants' ability to extract supracompetitive prices for DIS. *See, e.g.*, Compl. ¶¶ 126-45. These supracompetitive prices serve as direct evidence of Defendants' power in the DIS market in general, and the aftermarkets for DIS on their respective DMS in particular, and further support the plausibility of Dealership Plaintiffs' aftermarket claims. *See Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 402 (3d Cir. 2016)

**FILED UNDER SEAL**

("Other factors to consider [in evaluating a *Kodak*-style lock-in claim] include 'evidence of (1) supracompetitive pricing…'") (citation omitted); *see generally Wilk*, 895 F.2d 352 at 360 ("'[P]roof of actual detrimental effects, such as reduction of output,' [or supracompetitive price] can obviate the need for an inquiry into market power, which is 'but a surrogate for detrimental effects.'" (quoting *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986)).

Contrary to Reynolds' argument (at 40-41), Dealership Plaintiffs need not plead a change in aftermarket policy, or that they were generally unaware of Reynolds' aftermarket policy, in order to establish a claim under *Kodak*. As Judge St. Eve noted, "a change in aftermarket practices is not the sole worry of *Eastman Kodak* and its progeny." Authenticom Opinion at 23 (citing *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 384 (3d Cir. 2005). Similarly, Reynolds incorrectly states (at 41) that "[c]ourts have unanimously held that the exception identified in *Kodak* is 'limited to situations in which the seller's [aftermarket] policy was not generally known.'" (citations omitted). While some courts have limited *Kodak*-style lock-in claims to situations where the seller's aftermarket policy was not generally known, others have not. *See Red Lion Medical Safety v. Ohmeda*, 63 F. Supp.2d 1218, 1230-31 (E.D. Cal. 1999). Indeed, even the court in *PSI Repair Servs.*, 104 F.3d 811, relied upon heavily by Reynolds, acknowledged: "The Court in *Kodak* did not explicitly state the extent to which Kodak's change in policy affected the Court's analysis." 104 F.3d at 819. Therefore, Dealership Plaintiffs need not plead that there was a change or switch in aftermarket policy, or that they were otherwise generally unaware of Reynolds' aftermarket policy, to establish a claim under *Kodak*.

In any event, Reynolds did adopt a change in policy or practice beginning in 2015, as evidenced by a series of written, anticompetitive agreements with CDK. Among other things, Reynolds changed its policies by agreeing to help CDK, a competitor, close its DMS to third

**FILED UNDER SEAL**

parties. *See* Compl. ¶¶ 8-11, 77-86, 89, 91. While Reynolds' policies concerning third party access to its DMS may have been generally known prior to 2015, Reynolds' ability to effectuate this policy received a rocket boost in 2015 as a result of its anticompetitive agreement with CDK. As Reynolds admits (at 4), "the most aggressive and successful... third-party data brokers [] have primarily included five companies: SIS, SelectQu, Authenticom (a plaintiff in an individual action in this MDL), and two subsidiaries of Defendant CDK, DMI and IntegraLink." As part of Defendants' conspiracy, CDK agreed its subsidiaries, DMI and IntegraLink, would stop providing integration services for dealers with Reynolds DMS. *See* Compl. ¶¶ 81-86, 91, 93, 95; *see also id.* ¶ 89 (general, reciprocal agreement "that CDK and Reynolds would deny data integrators access to each other's DMS"). And Dealership Plaintiffs allege SIS has been driven from the market for integration services altogether as a result of Defendants' anticompetitive agreement. *See id.* ¶ 105. Other third party integrators that previously accessed Reynolds DMS were blocked following the 2015 agreement as well. *See id.* ¶¶ 130-31. This does constitute a change in Reynolds' policies and, at the very least, it speaks to "the more general concerns about customers that unknowingly and involuntarily sign on for the defendant's aftermarket power" that the Supreme Court was concerned with in *Kodak*. *See* Authenticom Opinion at 23.

### c.   Reynolds Monopolized the DIS market for its DMS

Dealership Plaintiffs adequately allege that Reynolds monopolized, through anticompetitive means, the DIS market for its DMS. "Where defendant has engaged in unlawful restraint of trade that would independently violate Section 1 of the Sherman Antitrust Act, it is well established that it also violates Section 2 if it acquires or maintains a monopoly by means of that restraint of trade." Authenticom Opinion at 24 (quoting *Gumwood HP*, 2013 WL 3214983, at *7). As alleged by Dealership Plaintiffs, Reynolds monopolized the single-brand aftermarket for DIS on its DMS through anticompetitive means, including by imposing exclusive dealing

69

**FILED UNDER SEAL**

arrangements on vendors. *See* Compl. ¶ 205. Reynolds "do[es] not argue that such conduct is insufficiently anticompetitive for Section 2's purposes." Authenticom Opinion at 24. Accordingly, Dealership Plaintiffs adequately plead their Section 2 claim against Reynolds.

**2.    The Exclusive Dealing Provisions in Reynolds' Contracts with Vendors Injured Dealership Plaintiffs[61]**

Reynolds incorrectly argues (at 46-48) that the exclusive dealing provisions in its vendor contracts did not harm Dealership Plaintiffs. As the Seventh Circuit noted in *Authenticom*, "There is evidence that prices have increased considerably since the 2015 agreements took effect… App vendors *pass along these bloated fees to dealers, who are already paying large fees for their data management system*." *Authenticom*, 874 F.3d at 1023; *see also* Compl. ¶¶ 134-145, 185-56 (alleging injury from Reynolds' exclusive dealing provisions in vendor contracts).

Reynolds places too high a burden on Dealership Plaintiffs at this (or at any) stage of the litigation to establish that Defendants' anticompetitive behavior caused Dealership Plaintiffs' harm and rule out other possible alternative explanations. "Plaintiff's burden regarding proof of causation is not onerous." *See In re Disposable Contact Lens Litig.*, No. 3:00-94 MD 1030, 2001 WL 203964, at *6 (M.D. Fla. Jan. 5, 2001). Dealership Plaintiffs easily meet their burden as to causation at this stage. Dealership Plaintiffs' well-pled allegations illustrate Reynolds has conspired with CDK to eliminate competition in the DIS and DMS markets. Defendants effectuated their conspiracy by, among other things, allocating the DIS and DMS markets between themselves, blocking third party integrators' access to their respective DMS, agreeing to reduce the functionality of CDK's DMS, and forcing vendors to utilize Defendants to access their respective DMS. *See supra* Section II.C, II.D. Each has also leveraged, and helped the other leverage, monopoly power in the aftermarket for DIS on their respective DMS platforms. *See*

---

[61] This Section responds to Reynolds Mem., Section IV.C.2 at 46-48.

FILED UNDER SEAL

Compl. ¶¶ 81-95, 122-25; *see supra* Section II.E. These actions have caused substantial injury to Dealership Plaintiffs, as their preferred data integrators and vendors have been denied access to their data, interrupting (or in some cases, causing the cessation) of long-standing services to Dealership Plaintiffs. *See id.* ¶¶ 96-109, 125, 130-31, 42. Furthermore, Dealership Plaintiffs have suffered from the increased fees Reynolds (and CDK) are now able to extort for the use of their DMS and data integration services on their DMS and the reduced functionality of these services. *See id.* ¶¶ 126-52.

Reynolds argues (at 48) that its DMS contracts with Dealership Plaintiffs contain provisions that would produce the same injury that Dealership Plaintiffs allege because of Reynolds' exclusive dealing provision in its vendor contracts, thus breaking the causation chain. The argument fails, as Reynolds cannot prove that the supracompetitive price increases complained of occurred *before* Defendants engaged in their unlawful conduct. Reynolds has not done so here. In any event, Dealership Plaintiffs "need not exhaust all possible alternative sources of injury" in establishing causation. *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d at 649 (quoting *Zenith Radio Corp.*, 395 U.S. at 114 n.9); *see also In re K-Dur Antitrust Litig.*, 338 F. Supp.2d 517, 535 (D.N.J. 2004) ("Defendants have attempted to argue that Plaintiffs must allege (or dispose of) all alternative theories of causation to survive a motion to dismiss. This is not true at the pleading stage.").[62]

Reynolds' reliance on *Greater Rockford Energy*, 998 F.2d 391 is misplaced. As discussed in Section II.A, *supra*, the Court there noted there were multiple, alternative explanations for the

---

[62] Reynolds' argument "would imply that the plaintiff in an antitrust case must prove a violation of the antitrust laws not by a preponderance of the evidence, not even by proof beyond a reasonable doubt (as indeed is required in criminal antitrust cases), but to a 100 percent certainty, since any lesser degree of certitude would leave a possibility that the defendant was innocent." *See In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 787 (7th Cir. 1999). Dealership Plaintiffs do not have to make such a showing at this or any other stage of the litigation. *See id.*[63] This responds to Reynolds Mem., Section IV.C.3 at 48-49.

**FILED UNDER SEAL**

plaintiffs' damages. "Standing alone one of these alternative causes of the plaintiffs' injuries might be insufficient to put causation-in-fact in question." *See id.* at 404. Here, Reynolds asks the Court to dismiss Dealership Plaintiffs' claims based on a single, hypothetical alternative cause. At this early stage, with a factual record nowhere close to that developed in *Greater Rockford* (dealing with summary judgment), the Court should reject Reynolds' argument.

Moreover, Dealership Plaintiffs do not mention, let alone discuss in any detail, any exclusivity provisions in their contracts with Defendants for DMS. Accordingly, any argument that these provisions (to the extent that they exist and say what Reynolds says they say) work to break the chain of causation between Reynolds' exclusive dealing with vendors and Dealership Plaintiffs' injury is not properly considered at this stage of the litigation. *See In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d at 649 ("This Court is required to accept [plaintiffs'] allegations as true. Dismissal under Rule 12(b)(6) is not permitted simply because Defendants can come up with a different set of facts that support an alternative… that does not offend antitrust law."); *see also Ne. Series of Lockton Cos., LLC v. Bachrach*, No. 12 C 1695, 2012 WL 3041639, at *2 (N.D. Ill. July 24, 2012) ("Rule 12(b)(6) motion must be denied when it presents an issue of fact that is outside the face of the complaint and contradicts the allegations of the complaint.") (internal quotations and citation omitted). As Reynolds itself acknowledges, "Plaintiffs' exclusive dealing claims are based ***solely*** on Reynolds's contracts with its vendors." Reynolds Mem. at 47. Dealership Plaintiffs have otherwise established that Defendants' anticompetitive conduct, including Defendants' exclusive dealing provisions in their contracts with vendors, caused Dealership Plaintiffs' harm -- all points which Reynolds does not dispute. Accordingly, Dealership Plaintiffs have adequately alleged exclusive dealing claims against Reynolds (and CDK) under Sections 1 and 2.

FILED UNDER SEAL

### 3. Copyright Law Provides No Cover for Reynolds' Illegal Behavior[63]

Reynolds' reliance on its copyright (at 48) is unavailing. As the Supreme Court has held, "the copyright laws confer no rights on copyright owners to fix prices among themselves or otherwise to violate the antitrust laws." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19 (1979) (quoted in Authenticom Opinion at 22).

Moreover, in addressing a very similar argument made by Defendants in *Authenticom*, Judge St. Eve held that "[e]ven assuming, without deciding,… that accessing DMSs without Defendants' authorization [is prohibited], ***Defendants are not free to withhold such approval pursuant to illegal arrangements***." Authenticom Opinion at 11. This fact is no less true if accessing Reynolds' DMS without authorization is prohibited by copyright law (instead of the federal Computer Fraud and Abuse Act, as previously argued by Defendants). *See id.* Indeed, Judge St. Eve previously noted, "the copyright laws confer no rights on copyright owners to fix prices among themselves or otherwise to violate the antitrust laws." *See id.* (quoting *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19, (1979)). This is especially true since Reynolds DMS houses data that Reynolds concedes Dealership Plaintiffs own. Compl. ¶ 74.[64]

In any event, similar to Judge St. Eve's previous decision regarding Authenticom's authorization to access the Defendants' DMS, whether and to what extent Reynolds' DMS is

---

[63] This responds to Reynolds Mem., Section IV.C.3 at 48-49.

[64] Reynolds' argument here -- that its "unilateral refusal to grant access to its copyrighted DMS cannot be an antitrust violation" -- echoes another one of its arguments in *Authenticom* – trying to characterize plaintiff's exclusive-dealing provisions in its contracts with vendors as nothing more than "unilateral refusals to deal." Judge St. Eve correctly determined that this characterization (and Defendants' argument) should not carry the day (at least for the time being), and this Court should come to a similar conclusion here. *See* Authenticom Opinion at 16. Moreover, even if this Court were to find that Dealership Plaintiffs cannot sustain any claims against Reynolds related to its exclusive dealing provisions in its contracts with vendors, Dealership Plaintiffs Section 2 monopolization claim against Reynolds should still proceed as it is not premised solely on Reynolds' exclusive dealing. *See* Compl. ¶ 205 (anticompetitive means utilized by Reynolds to monopolize the aftermarket for DIS on its DMS not limited to exclusive dealing provisions in its contracts with vendors); *see also supra* Section II. D[65] This responds to Reynolds Mem., Section IV.D.1 at 49-51.

protected by copyright law and Reynolds is able to use any such protection to prohibit access to some or all of its DMS are issues best left for another day. *See* Authenticom Opinion at 11.

### F. Dealership Plaintiffs' Damages Claims and Requests for Injunctive Relief are Not Overbroad

#### 1. Reynolds Customers' Claims Based on Purchases Made More Than One Year Before Suit are Timely[65]

Reynolds argues (at 49-50) that its customers may not sue for damages for purchases made more than one year prior to the filing of their complaints, citing ██████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ Reynolds Ex. 2, ██████. Reynolds' argument is both procedurally improper and substantively flawed.

As an initial matter, the argument is "dependent on the Master Agreement," -- *i.e.*, a document extraneous to the Complaint -- and for that reason alone, must be disregarded. *See* Order, Dkt. 340 (Aug. 21, 2018) at 2 ("[T]he Court will disregard the Master Agreement"); *see also id.* at 3 n.2 ("Reynolds will have the opportunity to present all of its evidence in opposition to Plaintiffs' claims at the appropriate time (*e.g.*, summary judgment, trial).").

Moreover, for purposes of determining *when* Dealership Plaintiffs' claims arose, reference must be made to the date on which Dealership Plaintiffs actually (or reasonably should have) discovered their claim against Reynolds -- not the date on which any particular purchase occurred. Thus, in *In re Copper Antitrust Litig.*, 436 F.3d 782 (7th Cir. 2006), the Seventh Circuit reversed the grant of summary judgment in favor of a defendant on statute of limitations grounds, holding that the four-year statute of limitations for antitrust claims (15 U.S.C. § 15b) starts running when the plaintiff discovers that it has been injured by the defendant's conduct. *Id.* at 789. The discovery rule "'postpones the beginning of the limitations period from the date

---

[65] This responds to Reynolds Mem., Section IV.D.1 at 49-51.

**FILED UNDER SEAL**

when the plaintiff is wronged to the date when he discovers he has been injured.'" *Id.* (citations omitted); *see id.* at 790 ("if the soonest that the plaintiffs were put even on inquiry notice about Morgan's role was late 1999, that was when the four-year period began to run"). *See also In re Dairy Farmers of Am., Inc.*, Case No. 09-CV-3690, 2013 WL 212908, at *7 (N.D. Ill. Jan. 18, 2013) (N.D. Ill. Jan. 18, 2013) (citing *Copper Antitrust*). Necessarily, then, if the suit is timely commenced, the plaintiff may sue on transactions that occurred even prior to the date when it actually discovered (or should have discovered) the claim.

Tellingly, Reynolds does not contend that Plaintiffs waited too long to file suit.[66] As such, Reynolds's argument fails, and Dealership Plaintiffs may challenge *all* tainted transactions, including those that occurred more than one year prior to suit.

### 2. Dealership Plaintiffs' Requested Injunctive Relief is Appropriate[67]

Reynolds seeks (at 51) to *partially* strike Dealership Plaintiffs' request for injunctive relief, reasoning that any injunctive relief should be directed only at Defendants' 2015 written agreements or their alleged agreement "to bar Authenticom" from their DMS. (citing *Authenticom*, 874 F.3d at 1026). Reynolds' argument is flawed.

A motion to strike a prayer for relief is governed by Fed. R. Civ. 12(f). *See Campbell v. City of Johnston City*, No. 05-cv-4072, 2005 WL 3440726, at *3 n.4 (S.D. Ill. Dec. 14, 2005). Reynolds filed no Rule 12(f) motion.

Moreover, Dealership Plaintiffs allege, *inter alia*, that Defendants agreed not simply to bar Authenticom, but ███████████████████████████████████████████Compl. ¶ 100 ██████████████████████████████████ Because an appropriate injunction includes

---

[66] Nor could it. Under the discovery rule, Dealership Plaintiffs' time to file suit was triggered no earlier than July 14, 2017, *i.e.*, the date of the *Authenticom* preliminary injunction ruling. The first dealership class action, *Teterboro Automall, Inc. v. CDK Global, LLC*, No. 2:17-cv-08714 (D.N.J.), was filed on October 19, 2017, well less than one year following issuance of the ruling.
[67] This Section responds to Reynolds Mem., Section IV.D.2 at 51-52.

FILED UNDER SEAL

"set[ting] the offending agreement aside," *Authenticom*, 874 F.3d at 1026, an injunction in this case should at least enjoin Defendants from blocking *all* data integrators, not just Authenticom. *See Int'l Outsourcing Servs., LLC v. Blistex, Inc.*, 420 F. Supp.2d 860, 862 (N.D. Ill. 2006) (denying motion to dismiss where plaintiff sought to enjoin defendant "from engaging in all activity related to the fixing of shipping costs"); *U.S. v. Nat'l City Lines*, 134 F. Supp. 350, 355 (N.D. Ill. 1955) (while a court should not "embark upon a general program of comprehensive control of the defendants' business," "[a]n injunction must be broad enough to prevent a repetition of the wrong, and a mere deviation in the method by which the same evil is accomplished cannot be permitted to evade the prohibition."). Dealership Plaintiffs' complaint challenges Defendants' conduct well beyond that at issue in *Authenticom*, including their actions to reduce the functionality of dealers' DMS. *See* Compl. ¶¶ 149, 171. As such, this case warrants an injunction broader than that available in *Authenticom*.

In any event, the precise contours of an injunction can be set by the Court based on a full trial record. *See Authenticom*, 874 F.3d at 1026 ("After trial, the court will be better able to assess the competitive significance of CDK and Reynolds' business models, of the 2015 agreements, and of any other agreement Authenticom is able to prove.").[68] *See also Brennan v Int'l Harvester Co.*, No. 73-C-3085, 1974 U.S. Dist. LEXIS 9279, at *1 (N.D. Ill. Mar. 27, 1974) ("The Court finds that plaintiff's prayer for injunctive relief is not overly broad. Proof at trial may actually show a corporate practice or policy of discrimination on basis of age mandating injunctive relief."). At this juncture, there is no reason to strike any part of the Prayer for Relief.

---

[68] *Authenticom* concerned a preliminary injunction. As the Circuit explained: "The only matter before us is the propriety of the preliminary injunction that the district court issued -- a step it took out of concern for preserving Authenticom as a functioning company until the suit can be resolved one way or the other." *Id.* at 1024.

**FILED UNDER SEAL**

## III.    DEALERSHIP PLAINTIFFS' STATE LAW CLAIMS ARE VALID (VI-L)[69]

As a threshold matter, contrary to CDK's assertions (at 28-29), to the extent Dealership Plaintiffs' state law claims are dependent on their federal claims, the state law claims are valid. *See* Section II, *supra*. The Court should reject Defendants' other arguments as to Dealership Plaintiffs' state law antitrust claims and consumer protection claims, for the following reasons.

### A.    Dealership Plaintiffs Have Article III Standing[70]

CDK does not explicitly state what type of standing it claims is lacking for states where the named Dealership Plaintiffs do not operate, but the cases cited all deal with Article III standing. *See DFA I*, 2013 WL 4506000, at *6–8; *Zaycer v. Sturm Foods, Inc.*, 896 F. Supp. 2d 399, 407-09 (D. Md. 2012); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 2012 WL 39766, at *3-9 (N.D. Ill. Jan. 9, 2012); *Catlin v. Hanser*, 2011 WL 1002736, at *6-8 (S.D. Ind. Mar. 17, 2011). Dealership Plaintiffs have Article III standing because they "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be addressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984).

CDK does not contest that Dealership Plaintiffs have individual standing under Article III. Rather, CDK conflates the individual standing requirement of Article III with the question of whether a plaintiff can represent consumers in other states for purposes of class certification under Rule 23 of the Federal Rules of Civil Procedure. According to the Seventh Circuit, the question of whether a plaintiff may advance claims of absent class members is determined solely by Rule 23. *See Arreola v. Godinez*, 546 F.3d 788, 795 (7th Cir. 2008) (once a plaintiff establishes standing to pursue his own claims, "[w]hether he is entitled to relief on any or all of those claims and whether he may serve as an adequate class representative for others asserting

---

[69] Dealership Plaintiffs withdraw their claims under ALA. CODE § 6-5-60 (2018), et seq. (Count VI) and S.C. CODE ANN. § 39-3-10 (2018), et seq. (Count XXV).
[70] This Section responds to CDK Mem., Section II.C.1 at 27-28.

**FILED UNDER SEAL**

such claims are separate questions."); *see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 306–07 (3d Cir. 1998) ("'[o]nce threshold individual standing by the class representatives is met, a proper party to raise a particular issue is before the court, and there remains no further separate class standing requirement in the constitutional sense.'") (citation omitted).

The Second Circuit recently rejected a similar Article III standing argument, concluding that "whether a plaintiff can bring a class action under the state laws of multiple states is a question of predominance under Rule 23(b)(3), not a question of standing under Article III." *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 96 (2d Cir. 2018). Thus, the question of whether the named plaintiffs are appropriate class representatives is premature until Dealership Plaintiffs' motion for class certification.

Courts in this district have recently held the same. In *In re Opana ER Antitrust Litig.*, 162 F. Supp.3d 704 (N.D. Ill. 2016), Judge Leinenweber explained, "[a]s long as one member of the class has a plausible claim to have suffered an injury that is fairly traceable to the challenged conduct and likely to be redressed by a favorable decision, the requirements of Article III standing are satisfied." *See id.* at 722 (citing *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 676 (7th Cir. 2009)). In *Supreme Auto Transp. LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032 (N.D. Ill. 2017), Judge Shah reconciled *Opana ER* with *Arreola*:

> In *Arreola v. Godinez*, the court addressed the question of standing before it addressed class certification; however, in that case it was the standing of the individual named plaintiff that was being addressed—no inquiry was being made into the name plaintiff's ability to serve as a class representative at that time. [citing *Arreola*, 546 F.3d at 794–95] For now, whether named plaintiffs can bring claims under the laws of other states and whether plaintiffs are adequate class representatives do not pose Article III barriers to subject-matter jurisdiction. *See Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011).

FILED UNDER SEAL

*Arcelor Mittal*, 238 F. Supp. 3d 1032 at 1038; *see also Saltzman v. Pella Corp.*, 257 F.R.D. 471, 480 (N.D. Ill. 2009) ("[t]he Seventh Circuit has followed the Supreme Court's direction in [*Ortiz*] and held that class certification should normally precede Article III standing challenges"); *In re Aftermarket Filters Antitrust Litig.*, No. 08 C 4883, 2009 WL 3754041, at *5 (N.D. Ill. Nov. 5 2009) ("*Filters*") (same); *Kuhl v. Guitar Center Stores, Inc.*, No. 07 C 214, 2008 WL 656049, at *3 (N.D. Ill. Mar. 5, 2008) (same); *Potts v. United Parcel Serv., Inc.*, No. 06 C 4766, 2007 WL 551555, at *1 (N.D. Ill. Feb. 15, 2007) (same).

More recently, Judge Durkin explained:

[In] *Plasma-Derivative* and *Dairy Farmers*… the courts did not address the reasoning from *Lewis* and *Payton* the court relies on here. Those courts focused on the principle that "named plaintiffs who represent a class must allege and show that they have personally been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Plasma-Derivative*, 2012 WL 39766, at *6 (quoting *Lewis*, 518 U.S. at 357, 116 S. Ct. 2174); *see also Dairy Farmers*, 2013 WL 4506000, at *8 ("[I]t bears repeating that a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action." (quoting *Payton*, 308 F.3d at 682)). But *Plasma-Derivative* and *Dairy Farmers* failed to account for the fact that in *Payton* the named plaintiffs—like the named plaintiffs here—*were* able to establish their own standing apart from that of the class. 308 F. 3d at 682 ("This is not a case where the named plaintiff is trying to piggy-back on the injuries of the unnamed class members."). As the Supreme Court put it in *Lewis*, "the standing issue focuses on whether the plaintiff is properly before the court, not whether represented parties or absent class members are properly before the court." 518 U.S. at 395, 116 S. Ct. 2174. For these reasons, the Court finds the holdings of *Plasma-Derivative* and *Dairy Farmers* unpersuasive on this issue. The Indirect Plaintiffs have plausibly alleged Article III standing for all their claims.

*Broiler Chicken*, 290 F. Supp. 3d at 810.

In the event the Court addresses class representation under Article III, Dealership Plaintiffs request leave to file an amended complaint with additional plaintiffs for those states

**FILED UNDER SEAL**

without representation,[71] at which time they can also address any substantive amendments required based on the Court's decision on the motion to dismiss.

### B. Dealership Plaintiffs Are Not Too Remote[72]

#### 1. *Illinois Brick* Does Not Bar Illinois Antitrust Claims[73]

Dealership Plaintiffs may pursue an indirect purchaser class action under the Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/7.2, in federal court. To be sure, a state statutory class action bar does not preclude class action claims in federal court, which are governed by Rule 23 of the Federal Rules of Civil Procedure. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398-415 (2010) (holding that Rule 23, not New York's statutory class action bar, applies in federal court). Courts have specifically held that the Illinois indirect purchaser class action bar does not apply to class actions brought in federal court. *See Broiler Chicken*, 290 F. Supp. 3d at 817–18; *In re Aggrenox Antitrust Litig.*, No. 3:14-MD-2516, 2016 WL 4204478, at *6 (D. Conn. Aug. 9, 2016); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420, 2014 WL 4955377, at *20–21 (N.D. Cal. Oct. 2, 2014).

#### 2. *AGC* Does Not Preclude Dealership Plaintiffs' State Antitrust Claims Because Dealership Plaintiffs Are In the Chain of Distribution of the Product Subject to Defendants' Anticompetitive Conduct[74]

CDK wrongly contends (at 30-34) that a vast majority of *Illinois Brick* repealer states would find indirect purchasers lack state antitrust standing under the standing analysis established in *AGC*. To the contrary, *AGC* does not apply to state law claims of indirect purchasers who participate in the market that was restrained. *See, e.g., Filters*, 2009 WL

---

[71] *See Whitlock v. Johnson*, 153 F.3d 380, 384 (7th Cir. 1998) (finding the district court acted properly in allowing the class claims to continue with the substitution of appropriate class representatives despite the failure of the named plaintiff's individual claim on the merits); *Greene v. Mizuho Bank, Ltd.*, 169 F. Supp. 3d 855, 867 (N.D. Ill. 2016) (noting Seventh Circuit's policy of allowing counsel to designate new named plaintiffs) (citing *Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1080–81 (7th Cir. 2013)).

[72] This Section responds to CDK Mem., Section II.C.3 at 29-36.

[73] This Section responds to CDK Mem., Section II.C.3(a) at 29-30.

[74] This Section responds to CDK Mem., Section II.C.3(b) at 30-34.

FILED UNDER SEAL

3754041 at *7. CDK would have the Court find that *AGC* bars *all* indirect purchaser claims, even if the plaintiffs purchased the very good or service subject to the conspiratorial conduct.

In *Filters*, Judge Gettleman addressed a price-fixing conspiracy in the market for filters, alleged by two types of indirect purchasers: (1) "Do-It For Yourself" plaintiffs, who purchased filters to install in their own cars and (2) "Do-It For Me" plaintiffs, who purchased filters as part of an auto service package. *See id.* The defendants challenged the "Do-It For Me" plaintiffs' standing under *AGC*, arguing they were participants in a separate automotive services market. *See id.* The court rejected this argument, finding the "Do-It For Me" plaintiffs also purchased the filters that were subject to price-fixing. *Id.* at *7–8. Judge Gettleman distinguished *AGC*, which did not involve horizontal price-fixing or downstream purchasers (but rather, the defendants' attempts to coerce third parties to do business with non-union contractors, thereby restraining the union's business activities): "*AGC* was obviously never intended to apply to the instant situation involving claims of price-fixing down a chain of distribution, because in the federal context such claims were already barred by *Illinois Brick*." *Id.* at *7 (citations and quotations omitted). Thus, the court rejected *AGC*'s application, because the plaintiffs were "end users of defendants' products, and all are in the chain of distribution." *Id.* at *8.

Exactly like the indirect purchaser plaintiffs in *Filters*, Dealership Plaintiffs here purchased Defendants' data integration services and participated in the same "physical market" restrained by Defendants. Like in *Filters*, Dealership Plaintiffs' claims here are "precisely the kind of case the repealer states envisioned when they enacted the state antitrust laws." *See id.*

While some federal courts have applied *AGC* to preclude standing for indirect purchasers who buy products in a separate market, these holdings are inapplicable where indirect purchasers are participants in the same market that was restrained. *See, e.g., AGC*, 459 U.S. at 539 ("[T]he

[plaintiff] was neither a consumer nor a competitor in the market in which trade was restrained."); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09-CV-3690, 2015 WL 3988488, at *16 (N.D. Ill. June 29, 2015) ("*DFA II*") ("this is a mixed-market case, where damages inflicted on the physical commodity market are not derivative of injuries in the futures market").

Here, Dealership Plaintiffs are in the "distribution chain" and participated in the market for DIS. The relevant DIS are provided by Defendants, not any other entity. If CDK was correct that *AGC* bars Plaintiffs' claims, no indirect purchaser claim under repealer state law could ever be sustained in federal court, even for the garden-variety indirect purchaser who buys the same product whose market Defendants allocated. This would thwart the will of all repealer states.

*Not one* state court has applied the *AGC* analysis to deny standing to indirect purchasers who participate in the market for the restrained product and purchase the same product that is subject to anticompetitive conduct. Consistent with the Supreme Court's recognition in *ARC*, six years after *AGC*, states can "allow indirect purchasers to recover under their own antitrust laws." *See California v. ARC America Corp.*, 490 U.S. 93, 103 (1989).

CDK's attempt to have this Court be the *very first* to reject indirect purchaser standing under *Illinois Brick*-repealer statutes, where the IPPs are downstream purchasers of the same product that was subject to a market allocation agreement, should be rejected.

CDK relies heavily (at 31) on *DFA II*, where this Court opined "California, Kansas, Michigan, New York, and North Carolina would apply *AGC* to questions of indirect purchaser antitrust standing" -- but noted those states' highest courts had not made definitive rulings and other courts were split as to whether *AGC* applied. *See DFA II*, 2015 WL 3988488, at *7–10, 12–15. Recently, another court in this district observed that only five of the states at issue there

**FILED UNDER SEAL**

(Minnesota, Iowa, Nebraska, New Mexico, New York) had squarely addressed the question, and all five had held that "considering *AGC*'s express borrowing of reasoning from *Illinois Brick*, *Illinois Brick* repealers work to save indirect purchaser damages suits, even from application of the *AGC* factors." *See Broiler Chicken*, 290 F. Supp.3d at 815–16. "[I]t is inappropriate to broadly apply the *AGC* test to plaintiffs' claims under the repealer states' laws in the absence of a clear directive from those states' legislatures or highest courts." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008) ("*LCD*"). In light of these principles, and relevant case law, there is scant support for the proposition that *AGC* applies to California,[75] Kansas,[76] Michigan,[77] New York,[78] and North Carolina[79] in cases such as this.

---

[75] In *Vinci v. Waste Mgmt, Inc.*, 36 Cal. App. 4th 1811, 1814–15 (Cal. Ct. App. 1995), a California appeals court applied *AGC* to claims of a plaintiff who was not an indirect purchaser, but rather was suing his former employer for loss of his job and loss of business. Since *Vinci*, the Supreme Court of California has spoken on the issue twice and ruled both times that federal antitrust law does *not* control interpretation of California's antitrust law. *See In re Cipro Cases I & II*, 61 Cal. 4th 116, 142 (Cal. 2015); *Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1195 (Cal. 2013). Recent federal court opinions are in accord. *See Broiler Chicken*, 290 F. Supp. 3d at 816 n.15; *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1072–74 (N.D. Cal. 2015); *Lithium Ion Batteries*, 2014 WL 4955377, at *10–11; *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, No. 13-cv-01880, 2015 WL 4755335, at *19 (N.D. Cal. Aug. 11, 2015).

[76] In *Orr v. Beamon*, 77 F. Supp. 2d 1208, 1209–12 (D. Kan. 1999), *aff'd*, 246 F.3d 682 (10th Cir. 2001), the plaintiff was not an indirect purchaser, but rather was suing his former employer for his firing and for failing to get competitive bids. In *Potash,* the court found *Orr* "unpersuasive as it does not engage in the proper examination of relevant state law authorities in determining whether Kansas has adopted *AGC*." 667 F. Supp. 2d at 944. The text of the Kansas statute itself authorizes an antitrust action "regardless of whether such injured person dealt directly or indirectly with the defendant." KAN. STAT. ANN. § 50-161(b) (West 2018). Moreover, the Kansas Supreme Court has found that federal "authority is not binding upon any court in Kansas interpreting Kansas antitrust laws." *Bergstrom v. Noah*, 266 Kan. 829, 845 (Kan. 1999); *see Los Gatos Mercantile*, 2015 WL 4755335, at *19 (declining to apply *AGC* to Kansas antitrust claims because neither the state supreme court nor the state appellate courts have adopted *AGC*).

[77] In *Stark v. Visa U.S.A., Inc.*, No. 03-055030-CZ, 2004 WL 1879003, at *4 (Mich. Cir. Ct. July 23, 2004), a Michigan court found the plaintiff lacked standing because they were not an indirect purchaser of the products or services that were the subject of the conspiracy. In *Potash,* the court refused to apply the federal *AGC* antitrust standing test to indirect purchaser plaintiffs' Michigan antitrust claims because neither the state supreme court nor the state's appellate courts have adopted *AGC*. 667 F. Supp. 2d at 944; *see Los Gatos Mercantile*, 2015 WL 4755335, at *19 (same).

[78] New York's highest court has not weighed in on the application of *AGC* to New York's antitrust law. In the absence of authority, some federal courts have declined to apply *AGC*. *See, e.g., Broiler Chicken*, 290 F. Supp. 3d at 815–16; *In re Ductile Iron Pipe Fittings Indirect Purchaser Antitrust Litig.*, No. 12-cv-169, 2013 WL 5503308, at *16 (D.N.J. Oct. 2, 2013).

FILED UNDER SEAL

CDK also relies (at 31) on this Court's ruling in *DFA II*, 2015 WL 3988488, at \*4, to argue that the harmonization provisions in the laws of the District of Columbia, Iowa, Maine, Nebraska, New Mexico, South Dakota, Vermont, and Wisconsin require application of *AGC*. However, as explained above, the *DFA II* plaintiffs were not actual indirect purchasers of the product subject to the conspiratorial conduct. This was a key consideration of the court in *Broiler Chicken* when it concluded "that any state with an *Illinois Brick* repealer would reject application of *AGC* to this case…" *Broiler Chicken*, 290 F. Supp. 3d at 816. Of the cases CDK cites (at 31–32 n.23) for the premise that "courts in all of these states… have specifically applied *AGC*," only one case even cites *AGC*, and actually holds "the Vermont Supreme Court would also draw upon the standing factors in [*AGC*] for guidance, at least to the extent that these factors are consistent with allowing 'indirect purchaser' standing." *Fucile v. Visa U.S.A., Inc.*, No. S1560-03 CNC, 2004 WL 3030037, at \*3 (Vt. Super. Ct. Dec. 27, 2004).[80] It is also not settled that the presence of a harmonization provision is sufficient to require application of *AGC*.[81]

The Visa and Mastercard cases upon which CDK relies heavily (at 32–34) are easily distinguishable from the present case. Those cases involved claims where the plaintiffs were in the chain of distribution and were neither consumers nor competitors in the market in which the misconduct occurred. Dealership Plaintiffs, by contrast, are the ultimate consumers in the DIS market, and are the very next, and final, step in the chain of distribution after vendors. Therefore,

---

[79] As CDK recognizes (at 31 n. 22), in *Teague v. Bayer AG*, 671 S.E.2d 550 (N.C. Ct. App. 2009), the North Carolina appellate court declined to apply *AGC* where the product at issue was a component of the product purchased by indirect purchasers. As discussed above, Dealership Plaintiffs are indirect purchasers of DIS, so *Teague* therefore indicates that *AGC* does not apply in this indirect purchaser case.

[80] Additionally, D.C. courts appear skeptical of the applicability of *AGC* to D.C.'s antitrust law. *See Holder v. Archer Daniels Midland Co.*, No. 96-2975, 1998 WL 1469620, at \*2 (D.C. Ct. Super. Nov. 4, 1998) (upholding standing for indirect purchasers without applying *AGC*, instead relying on the "plain language" of the D.C. Antitrust Act.).

[81] *See In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1151–53 (N.D. Cal. 2009) (declining to apply *AGC* to Kansas, Maine, Michigan, Mississippi, North Carolina, South Dakota, and Wisconsin antitrust laws for lack of a clear state-court directive).

**FILED UNDER SEAL**

the cases cited by CDK, wherein courts applied *AGC* to indirect purchaser claims lacking those features, are inapposite. Moreover, courts that have addressed this question concerning claims that are similarly situated to Dealership Plaintiffs' have found the *AGC* factors to not apply.[82]

Accordingly, the Court should reject CDK's arguments and sustain the state antitrust claims in Counts VIII–IX, XII–XV, XIV, XVIII, XX, XXI, XXII, XXVI, XXIX, and XXXI.

### 3. There Is Also No Justification for Barring Dealership Plaintiffs' State Antitrust Claims Based on a Presumptive Application of *AGC* or Remoteness Principles[83]

The Court should reject CDK's argument that, based on harmonization provisions and federal case law, *AGC* applies to bar state antitrust claims for Arizona, Hawaii, Illinois, Minnesota, Mississippi, New Hampshire, Oregon, Rhode Island, Tennessee, Utah, and West Virginia. These states have enacted *Illinois Brick* repealer statutes. As discussed above, *AGC* does not eviscerate the very right, *i.e.*, standing of indirect purchasers, for which the repealer statutes were enacted. *See ARC*, 490 U.S. at 103; *Broiler Chicken*, 290 F. Supp. 3d at 816 n.17 (finding that harmonization provisions do "not prevent the courts in those states from recognizing that *Illinois Brick* repealers work to save the claims of true indirect *purchasers*").

CDK and Reynolds argue (at 34 and 36–39, respectively) that Dealership Plaintiffs' claims fail because "they allege only indirect harm" for "purchases in a different market than the one affected" by the alleged conduct. However, as explained above, Dealership Plaintiffs are participants in the DIS market and, by purchasing applications that incorporate DIS, they are indirect purchasers of DIS. The cases CDK cites for the premise that *AGC* should be applied

---

[82] *See, e.g., Broiler Chicken¸* 290 F. Supp. 3d at 814–16; *Filters*, 2009 WL 3754041 at *7; *Holder*, 1998 WL 1469620, at *2.

[83] This Section responds to CDK Mem., Section II.C.3(c) at 34-36.

**FILED UNDER SEAL**

presumptively are distinguishable or inapposite.[84] CDK cites no case law for the premise that *AGC* should be applied to claims under the relevant Hawaii, Oregon, and Rhode Island statutes. CDK nonsensically acknowledges (at 35) that the "Minnesota Supreme Court rejected *AGC*," but argues that *AGC* should still apply to bar Dealer Plaintiffs' claims under Minnesota law.[85] CDK also admits (at 35–36 n.27) it is unaware of any decisions applying these principles to the laws of Hawaii or Utah. Importantly, a number of courts have found *AGC* inapplicable to claims under several of the relevant states' antitrust laws.[86] And many courts have allowed indirect purchaser claims under these state antitrust statutes without finding *AGC* or other vague "remoteness principles" prohibitive.[87]

---

[84] *In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-md-02042, 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) (plaintiffs did not allege they were consumers of products in the relevant market); *Arcelor Mittal*, 238 F. Supp. 3d at 1032 (plaintiffs did not establish they could trace the product they ultimately purchased to a defendant); *Consiglio-Tseffos v. Visa U.S.A. Inc.*, No. CV 2003-020170, 2004 WL 3030043 (Ariz. Super. Ct., Dec. 8, 2004) (plaintiffs not indirect purchasers of defendants' services); *Aikens v. Debow*, 541 S.E.2d 576 (W. Va. 2000) (dealing with common law tort rather than statutory claims); *Cty. of Cook v. Philip Morris, Inc.*, 817 N.E.2d 1039 (Ill. App. Ct. 2004) (dealing with claims under the Illinois Consumer Fraud and Deceptive Business Practices Acts, not the Illinois Antitrust Act, as CDK suggests); *Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So.2d 331 (Miss. 2004) (company attempting to recover for "past and future asbestos claims"); *Steamfitters Local Union NO. 614 v. Philip Morris, Inc.*, W1999-01061-COA-R9-CV, 2000 WL 1390171 (Tenn. Ct. App. Sept. 26, 2000) (also dealing with asbestos claims); *Am. Fed'n of Teachers-Oregon, AFT, AFL-CIO v. Or. Taxpayers United PAC*¸145 P.3d 1111 (Or. Ct. App. 2006) (dealing with RICO claims); *State v. Lead Indus. Ass'n, Inc.*, No. 99-5226, 2001 WL 345830 (R.I. Super. Ct. Apr. 2, 2001) (claims dealing with unlawfully concealing hazards of lead); *Cortellesso v. Zanni*, No. P.C. 95-4571, 1997 WL 839911 (R.I. Super. Ct. Apr. 29, 1997) (dealing with RICO claims); *Donovan v. Digital Equip. Corp.*, 883 F.Supp. 775, 783–85 (D.N.H. 1994) (dealing with a claim stemming from employment termination).

[85] This Court previously found that "the Minnesota Supreme Court has already made clear that the *AGC* factors conflict with Minnesota antitrust law." *DFA II*, 2015 WL 3988488, at *10.

[86] *See In re Pool Prods. Distrib. Market Antitrust Litig.*, 946 F. Supp. 2d 554, 567–68 (E.D. La. 2013) (finding *AGC* does not apply to Arizona claims, *inter alia*); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1152 (N.D. Cal. 2009) (finding insufficient support to apply *AGC* to laws of Arizona and West Virginia, *inter alia*); *D.R. Ward Const. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 496–98 (E.D. Pa. 2006) (declining to apply *AGC* to Arizona and Tennessee); *Los Gatos Mercantile*, 2015 WL 4755335, at *19 (*AGC* does not apply to Arizona, Minnesota, Mississippi, New Hampshire, Oregon, and Tennessee).

[87] *See, e.g., Lithium Ion Batteries*, 2014 WL 4955377 (allowing indirect purchaser claims under relevant laws of Arizona, Illinois, Minnesota, Mississippi, New Hampshire, Oregon, Tennessee, Utah, and West Virginia).

FILED UNDER SEAL

Thus, the Court should reject CDK's arguments and sustain the state antitrust claims at Counts VII, X, XI, XVI, XVII, XIX, XXIII, XXIV, XXV, XXVII, XXVIII, and XXX.

### 4. Dealership Plaintiffs' State Antitrust Claims Satisfy All Factors of the *AGC* Analysis

Under *AGC's* standing analysis, courts consider:

(1) The causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was on Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex damage apportionment.

*Loeb Indus.*, 306 F.3d at 484 (citing *AGC*, 459 U.S. at 535–46). Dealership Plaintiffs' claims satisfy each of these factors.[88]

### a. Overcharges Paid by IPPs Are the Type of Injury Congress Sought to Redress

The most important *AGC* factor focuses on the "nature of the plaintiff's alleged injury," as the primary purpose of the Sherman Act is to "assure customers the benefit of price competition." *See AGC*, 459 U.S. at 538. Claims of injury by customers in markets where competition is allegedly restrained fall "squarely within the area of congressional concern." *Id.* at 538–39 (finding no antitrust standing where plaintiff was neither a consumer nor a competitor in the market in which trade was restrained). *See also LCD*, 586 F. Supp. 2d at 1118 (noting that the Supreme Court identified "nature of the plaintiffs' alleged injury" as the most important factor).

---

[88] Numerous courts have found indirect purchasers to have standing when applying the *AGC* factors to state law claims. *See Lithium Ion Batteries*, 2014 WL 4955377, at *11–16 (addressing laws of Arizona, California, the District of Columbia, Kansas, Maine, Michigan, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Dakota, Oregon, Tennessee, Vermont, West Virginia, and Wisconsin); *In re Automotive Parts Antitrust Litig*, 29 F. Supp. 3d 982, 1001–03 (E.D. Mich. 2014) (finding *AGC* factors satisfied for indirect purchasers under laws of Arizona, California, the District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin); *LCD*, 586 F. Supp. 2d at 1121–24 (finding *AGC* requirements satisfied for indirect purchaser claims under laws of Arizona, California, Iowa, Kansas, Maine, Michigan, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, West Virginia, and Wisconsin).

FILED UNDER SEAL

Here, Dealership Plaintiffs allege that Defendants conspired to restrain competition for DIS with the intent of increasing DIS prices (Compl. ¶ 1), and that, as a result, the prices of DIS did artificially increase (Compl. ¶ 14), and Dealership Plaintiffs were injured by paying more for DIS than they would have paid absent the conspiracy (Compl. ¶ 16). This injury is exactly the type the antitrust laws were intended to prevent. *Kochert*, 463 F.3d at 715 ("[T]he principal purpose of the antitrust laws is to prevent overcharges to consumers."). Thus, Dealership Plaintiffs satisfy this *AGC* factor.[89]

### b. The Complaint Alleges a Causal Connection Between Defendants' Conduct and the Harm to Dealership Plaintiffs

The "causal connection" factor of the *AGC* analysis is satisfied. Dealership Plaintiffs allege a clear link between Defendants' conspiracy to restrain competition and raise prices for DIS (Compl. ¶¶ 81, 96, 126) and the harm to Dealership Plaintiffs -- supracompetitive DIS prices passed through the distribution chain (*id*. ¶¶ 134–45).

Dealership Plaintiffs allege a short and simple chain of distribution and causation: Defendants sold DIS to direct purchaser vendors who in turn sold DIS to Dealership Plaintiffs along with software applications. Compl. ¶¶ 73, 75, 127. Those overcharges to Vendors were passed along and absorbed by Dealership Plaintiffs. Compl. ¶¶ 134–35. The overcharges are traceable because there is an extremely short distribution chain. *See In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2013 WL 2456612, at *17 (E.D. Mich. June 6, 2013) ("Because IPPs have alleged that they can trace overcharges through the distribution chain, they have satisfied this *AGC* factor."); *see also LCD*, 586 F. Supp. 2d at 1123–24 (allegations that the distribution chain for the relevant products is short, in that the products are sold either directly to end users

---

[89] The second *AGC* factor is not at issue. Dealership Plaintiffs have sufficiently alleged Defendants' improper motives. *See* Compl. ¶¶ 57, 215. Defendants do not dispute this.

by direct purchasers or through intermediary resellers, are sufficient to satisfy the *AGC* "directness of the alleged injury" factor).

CDK's argument (at 33) that Dealership Plaintiffs lack standing because vendors are a "more immediate plaintiff group" for the alleged conspiracy, and Reynolds' similar argument (at 39) that vendors "allege more direct injuries," would deny standing in every indirect purchaser case. This is the exact argument that was rejected by the legislatures in the various repealer states and by the Court in *ARC*, 490 U.S. at 103.

Concerns that Dealership Plaintiffs' injuries are too "remote" or "speculative" will be resolved at trial, when Dealership Plaintiffs will prove the overcharges were indeed passed on to them. At the pleading stage, it is sufficient for Dealership Plaintiffs to plead facts concerning the economic evidence of pass-on, which they have done. Compl. ¶¶ 134–35. It is not appropriate to decide "[d]isputed claims of causation and injury" on a motion to dismiss. *Knevelbaard Diaries v. Kraft Foods, Inc.*, 232 F.3d 979, 989 (9th Cir. 2000); *see also LCD*, 586 F. Supp. at 1118 (finding indirect plaintiffs sufficiently alleged that overcharges are passed on to consumers).

> ### c. Dealership Plaintiffs' Recovery Under Repealer Statutes Would Not Be Duplicative of Recovery Under Federal Antitrust Laws

The Seventh Circuit has held that indirect purchaser claims under repealer statutes do ***not*** "duplicate" claims brought under federal antitrust laws:

> [T]he supposed "duplication here comes from different bodies in our federal system seeking to remedy separate harms. It presents no risk of duplicate recovery for the same injury under the same law and is thus no bar to the plaintiffs' recovery. *California v. ARC Am. Corp.*, 490 U.S. 93 (1989) (permitting state to require offenders to pay both state damages to indirect purchasers and federal treble damages to direct purchasers).

*Loeb Indus.*, 306 F.3d at 492; *see also In re Optical Disk Drive Antitrust Litig.*, No. 3:10-MD-2143 RS, 2011 WL 3894376, at *11 (N.D. Cal. Aug. 3, 2011) ("The application of the *AGC* test

[defendants] advocate would appear, in effect, to 'repeal' the *Illinois Brick* 'repealers,' as it is difficult to imagine an indirect purchaser ever having antitrust standing under defendants' formulation.").

Moreover, Dealership Plaintiffs will demonstrate the amount of damages they sustained. Difficulties in allocating damages among antitrust plaintiffs is not a basis to deny a claim. In *Loeb*, the Seventh Circuit observed:

> It is certainly acceptable through expert economic testimony to make a reasonable estimation of actual damages through probability inferences... The main complication will come from attempting to discern how much of the [price] at a given time represented an overcharge due to the defendants' manipulation and how much stemmed from normal economic forces. This difficulty, however, occurs in every price-fixing case… Through discovery, economic experts can evaluate the impact of the defendants' illegal actions on the [] market and come to reasoned conclusions.

*Loeb Indus.*, 306 F.3d at 490–93 (evaluating claims at the summary judgment stage).

In sum, Dealership Plaintiffs allege facts to support standing and, to the extent applicable, satisfy the *AGC* factors. Therefore, even if the *AGC* factors are applied, Counts VII, VIII, IX, X, XI, XII XIII, XIV, XV, XVI, XVII, XIX, XX, XXI, XXII, XXIII, XXIV, XXVI, XXVII, XXVIII, XXIX, XXX, and XXXI should be sustained.[90]

### C. Consumer Protection Claims Are Not Barred On Other Grounds

State consumer protection laws are broadly worded and are to be liberally construed, typically authorizing claims for collusive anticompetitive conduct. *See, e.g., Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 405 (E.D. Pa. 2010). They are modeled after the Federal Trade Commission Act, 15 U.S.C. § 41, et seq. (the "FTC Act"), which provides guidance for interpreting state consumer protection statutes. *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 56 F.3d 663,

---

[90] Additionally, as explained in Section II.A.2, *supra*, the Court should sustain Dealership Plaintiffs' claims as direct purchasers of DMS.

669 (7th Cir. 2008). Since "[i]t is well-established that the government may use the FTC Act to enforce antitrust laws," "[antitrust violations] constitute the kind of deceptive acts and practices contemplated by [consumer protection statutes]." *New York v. Feldman*, 210 F. Supp. 2d 294, 302 (S.D.N.Y. 2002).

CDK mistakenly argues (at 36) that the consumer protection statutes of New Jersey, Massachusetts, South Carolina, and Florida allow only direct purchasers to pursue claims. New Jersey's Consumer Fraud Act (CFA) precludes claims that "assert an anticompetitive scheme… without any allegation of a direct or indirect statement or communication with any plaintiff"; here, Dealership Plaintiffs allege direct and indirect misrepresentations made to them by Defendants. *See Wilson v. Gen. Motors Corp.*, 921 A.2d 414, 417 (N.J. 2007); Compl. ¶¶ 665–68. Indirect purchasers can state claims under the Massachusetts consumer protection statute by alleging defendants misrepresented and concealed information about price increases. *See Blue Cross & Blue Shield v. AstraZeneca Pharm. LP* (*In re Pharm. Indus. Average Wholesale Price Litig.*), 582 F.3d 156, 193 (1st Cir. 2009) (sustaining claims of indirect purchasers "who believed the [prices] reflected actual acquisition costs, lacked information about the extent of the deceptive practices, were unable to adapt, and were among the obvious and foreseeable victims."); *See* Compl. ¶¶ 605-617. Federal courts have upheld indirect purchaser claims under South Carolina's SCUTPA as well. *See, e.g., In re Packaged Seafood Prods. Antitrust Litig.*, 277 F. Supp. 3d 1167, 1177 (S.D. Cal. 2017).[91] Indirect purchasers can pursue FDUTPA claims based on conduct that violates antitrust laws, such as Defendants' conduct here. *See Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 104–05 (Fla. Dist. Ct. App. 1996) ("fair reading of

---

[91] *See also Broiler Chicken*, 290 F. Supp. 3d at 821; *Cast Iron Soil Pipe and Fittings Antitrust Litig.*, No. 1:14-md-2508, 2015 WL 5166014 (E.D. Tenn. June 24, 2015); *Los Gatos Mercantile*, 2015 WL 4755335, at *21; *Lithium Ion Batteries*, 2014 WL 4955377, at *21.

FILED UNDER SEAL

[FDUTPA] reveals no intention by the legislature to limit suits for price-fixing to direct purchasers only."); *see also In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503-DJC, 2015 WL 5458570, at \*16 (D. Mass. Sep. 16, 2015); *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, No. 09-CV-00852, 2012 WL 3841397, at \*7 (E.D. Wis. Sep. 5, 2012).

CDK's similar arguments for Alaska, Arkansas, Colorado, and Delaware also fail. When interpreting the Alaska Unfair Trade Practices and Consumer Protection Act ("AUTPCPA"), "due consideration and great weight should be given the interpretations of" the FTC Act, which weighs in favor of permitting claims based on anticompetitive conduct. *See* Alaska Stat. § 45.50.545 (2018); *see also Matanuska Maid, Inc. v. State*, 620 P.2d 182, 185 (Alaska 1980) (same conduct can violate Alaska antitrust and consumer protection statutes); *see also In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 704 (E.D. Pa. 2014) (allowing an Alaska indirect purchaser unjust enrichment claim to proceed). Turning to Arkansas, in the case cited by CDK, the court sustained the plaintiffs' claims under the Arkansas Deceptive Trade Practices Act ("ADTPA"). *See In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1072 (S.D. Cal. 2017). Additionally, courts have permitted indirect purchasers to proceed under Colorado's consumer protection statute. *See, e.g., In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 221–22 (S.D.N.Y. 2012); *In re Liquid Aluminum Sulfate Antitrust Litig.*, No. 16-md-2687 (JLL), 2017 WL 3131977, at \*25 (D.N.J. July 20, 2017). Courts have likewise allowed indirect purchaser claims under Delaware's consumer fraud act. *See, e.g., Abbott Labs. v. Teva Pharm. USA, Inc.*, 432 F. Supp. 2d 408, 434 (D. Del. 2006).

FILED UNDER SEAL

CDK argues that Dealership Plaintiffs' consumer protection claims all fail on proximate cause. Even assuming CDK is correct that the proximate causation standard for state consumer protection claims is similar to the *AGC* analysis, CDK's "remoteness" argument fails because Dealership Plaintiffs satisfy *AGC. See, supra*, II.B.2, III.B.4. As this Court noted in *DFA II*, indirect purchaser plaintiffs have standing under California's UCL where "plaintiffs—one step removed from the alleged price-fixers—actually used defendants' products and had indirect dealings with defendants." *See DFA II*, 2015 WL 3988488, at *18 (describing *Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1087 (Cal. 2010)). Here, Dealership Plaintiffs are similarly situated to the plaintiffs in *Clayworth*: Dealership Plaintiffs are one step removed from the alleged conspirators, actually paid for DIS, and had direct and indirect dealings with Defendants. Dealership Plaintiffs' claims under consumer protection laws are not too remote.

*Territorial conduct/effect.* Dealership Plaintiffs have alleged sufficient territorial connections under the laws of Delaware, Massachusetts, North Carolina, Wisconsin, and New Hampshire. The Delaware Consumer Fraud Act is aimed at "unfair or deceptive merchandising practices in the conduct of any trade or commerce *in part or wholly within [Delaware]*." *See* 6 Del. Code § 2512. Under the Massachusetts CPA, the defendant has the burden of proving the conduct complained of did not occur "primarily and substantially" in Massachusetts. *See* MASS. GEN. LAWS ch. 93A, § 11; *see also Maltz v. Union Carbide Chems. & Plastics Co., Inc.*, 992 F. Supp. 286, 319 (S.D.N.Y. 1998). Under North Carolina's UTPA, a sufficient nexus between defendants' conduct and intrastate commerce is established by allegations that indirect purchasers in North Carolina paid supracompetitive, artificially inflated prices. *See Auto Parts*, 50 F. Supp. 3d at 860–61; *see also In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 540–41 (E.D. Pa. 2010). The Wisconsin case cited by CDK rejects the view that the antitrust statute

applies only to intrastate conduct. *See Olstad v. Microsoft Corp.*, 700 N.W.2d 139, 263 (Wis. 2005). Courts have sustained claims under New Hampshire's CPA based on allegations that citizens of the state were affected by the defendants' conduct. *See In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 760–61 (E.D. Pa. 2014); *In re DDAVP*, 903 F. Supp. 2d 198 at 231; *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 235 (M.D. Pa. 2010).

Dealership Plaintiffs' claims meet these standards. The Complaint alleges CDK is a Delaware corporation, and Defendants sold DIS at supracompetitive prices in Delaware. Compl. ¶¶ 27, 41, 578, 584.[92] The Complaint alleges a nexus with North Carolina due to the supracompetitive prices paid there and the "substantial effect" of Defendants' conduct on North Carolina commerce. Compl. ¶¶ 423–26. The Complaint contains similar allegations for Massachusetts (Compl. ¶¶ 605-615), Wisconsin (Compl. ¶¶ 539, 542–43), and New Hampshire (Compl. ¶ 659).

***Intrastate conduct***. Tennessee law does not require allegations of purely intrastate conduct, as CDK contends (at 40-41). Analyzing the Tennessee antitrust statute "in great depth," the Tennessee Court of Appeals "rejected any requirement that the illegal conduct 'predominately' affect intrastate commerce." *See In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160, 172–73 (D. Me. 2004) (interpreting *Sherwood v. Microsoft Corp.*, No. M2000-01850-COA-R9-CV, 2003 WL 21780975, at *17, 21 (Tenn. Ct. App. July 31, 2003)). The alleged conduct need not occur entirely or even predominately within a single state to be "intrastate" -- any such requirement would render the state statute a "dead letter." *In re Brand Name Prescr. Drug Antitrust Litig.*, 123 F.3d 599, 613 (7th Cir. 1997) (noting that there

---

[92] The cases cited by CDK are distinguishable. *See Qbex Computadoras S.A. v. Intel Corp.*, No. 17-CV-03375-LHK, 2017 WL 5525939 (N.D. Cal. Nov. 17, 2017) (complaint alleged no conduct occurring in or affecting Delaware); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 117 (Del. 2006) (complaint did "not allege that any of the conduct at issue took place in Delaware.").

"are virtually no sales" anywhere in the United States that are "wholly intrastate"). Dealership Plaintiffs' allegations of nationwide conduct that increased prices paid by Dealership Plaintiffs in Tennessee are sufficient to state a claim.

*"Intangible" Services*. The Tennessee Trade Practices Act ("TTPA") applies only to tangible goods, not services, but that does not warrant dismissal of Dealership Plaintiffs' claims. Dealership Plaintiffs allege anticompetitive conduct with respect to the DMS and the DIS sold by Defendants. Compl. ¶¶ 487–89. The sale of software has been found by Tennessee courts to fall within the ambit of the TTPA. *See Sherwood*, 2003 WL 21780975, at *29–30 (allowing indirect purchaser claim for software to proceed).

*Antitrust Conduct.* Courts have allowed claims based on conduct violating antitrust law under Arkansas and West Virginia's consumer protection statutes. *See FTC v. Mylan Labs., Inc.*, 99 F. Supp. 2d 1, 5, 10 (D.D.C. 1999); *In re Pharm. Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230–31 (D. Mass. 2006); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160, 178–79 (D. Me. 2004). In addition, contrary to CDK's claim, the court in *DRAM* actually found the plaintiffs' claim under the ADTPA was viable. *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1108–09 (N.D. Cal. 2007). While the court in *DRAM* found the antitrust claims not covered by the West Virginia Consumer Credit and Protection Act ("WVCCPA"), another court recently observed that the courts reaching such conclusions did not have "the benefit of the West Virginia Legislature's 2015 amendment to the WVCCPA intending that 'in construing this article, the courts be guided by the policies of the [FTC] and interpretations given by the [FTC] and the federal courts to Section 5(a)(1) of the [FTC] Act…'" *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d at 1087 (quoting W. Va. Code § 46A-6-101 (West 2018)). The court went on to

**FILED UNDER SEAL**

conclude that "Supreme Court precedent regarding FTC unfairness analysis" supplied "a plausible theory of West Virginia-based recover." *Id.* at 1088.

***Pre-Filing Notice Provisions.*** The Court should reject CDK's arguments (at 41) as to Dealership Plaintiffs' purported non-compliance with notice provisions for their Hawaii antitrust claim and their Alaska, Georgia, New Jersey, and West Virginia consumer protection claims.

As a threshold matter, CDK has not identified any relevant notice provisions for Alaska or New Jersey. The cited Alaska provision imposes a requirement on *the clerk of the court* where the action is filed. *See* Alaska Stat. Ann. § 45.50.531. CDK does not provide any authority related to New Jersey. Additionally, Georgia's 30-day notice provision does not apply because Defendants have not asserted they maintain places of business or keep assets within Georgia. *See* Ga. Code Ann. § 10-1-399(b) (provision "shall not apply if the prospective respondent does not maintain a place of business or does not keep assets within the state.").

The notice provisions cited by CDK are state procedural rules and are inapplicable in this federal action. *See Shady Grove*, 559 U.S. 393; *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 346 (7th Cir. 1997) (30-day notice provision, intended to encourage settlements and prevent suits from being filed, was procedural rather than substantive);[93] *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 253–54 (D.Conn. 2015) (a "plain reading" of Haw. Rev. Stat. § 480–13.3(a)(1) reflects the notice requirement is procedural). Lack of compliance with pre-suit notice requirements is not a basis for dismissal. *See, e.g., Filters*, 2009 WL 3754041 at *6 (denying motion to dismiss for failure to comply with Hawaii's pre-suit notice requirement because "dismissal is inconsistent with the remedial purpose of the statute;… nothing in the statutory

---

[93] Georgia's 30-day notice requirement "presumably is designed to encourage settlement and to avoid unnecessary lawsuits." *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160, 183 (D. Me. 2004). CDK cites this case because the court nevertheless found the Georgia notice requirement applied. But *Mace* and *Shady Grove* dictate the opposite.

scheme suggests that defendants may use the statute as a shield to avoid answering for alleged anticompetitive behavior.").[94]

*"Consumer" Ties.* The sole case cited by CDK for the premise that Dealership Plaintiffs are not consumers under Arkansas law is easily distinguishable. By CDK's own admission, in *Apprentice Info. Sys., Inc. v. DataScout, LLC*, 544 S.W.3d 536, 539 (Ark. 2018), the parties were competitors. Here, Dealership Plaintiffs are indisputably Defendants' customers and are consumers of Defendants' goods and services. The only case CDK cites to support its argument that Dealership Plaintiffs are not "consumers" for the purposes of Georgia's consumer protection law (the "GFBPA"), *Saulsberry v. Morinda, Inc.*, No. 1:07-CV-01542-WSD, 2008 WL 416933, at *3 (N.D. Ga. Feb. 13, 2008), notes that a primary factor is whether the relationship between the parties is a "contractual business relationship." Dealership Plaintiffs do not have a contractual business relationship with Defendants with regard to DIS, are the ultimate consumers of Defendants' DIS, and are therefore consumers for the purposes of the GFBPA.

*"Unfairness" Allegations.* Arkansas' ADTPA "is to be construed liberally inasmuch as it was enacted 'to protect the interest of both the consumer public and legitimate business community.'" *Auto. Parts,* 29 F. Supp. 3d at 1008. Although courts are split,[95] in light of the intention for the ADTPA to be construed liberally, Dealership Plaintiffs' ADTPA claim should be allowed. *See In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d at 1072 (allowing claim due to Arkansas Supreme Court's adoption of a broad definition of the term "unconscionable" and liberal construction of the law); *see also Liquid Aluminum,* 2017 WL 3131977, at *25 (allowing a claim for price-fixing); *In re New Motor Vehicles Canadian Export*

---

[94] CDK cites non-controlling authority that disagrees with the conclusion of *Aftermarket Filters*, but disagreement among courts is not dispositive.

[95] *See, e.g., In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1166–67 (N.D. Cal. 2015) (noting disagreement in courts and lack of authority from Arkansas courts).

*Antitrust Litig.*, 350 F. Supp. 2d 160, 178–79 (D. Me. 2004); *Sheet Metal Workers*, 737 F. Supp. 2d at 404–05; *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 583 (M.D. Pa. 2009); *Lithium Ion Batteries*, 2014 WL 4955377, at *22–23. The Court should sustain Dealership Plaintiffs' ADTPA claims.

> > **Grossly Unequal Bargaining Power.** "[T]he New Mexico statute does not require a plaintiff to plead grossly unequal bargaining power." *In re Domestic Drywall Antitrust Litig. Civil Action*, No. 13-2437, 2016 WL 3769680, at *10 (E.D. Pa. July 13, 2016). "[The] conclusion that the New Mexico statute did not contemplate price fixing allegations rests on a misunderstanding of the statute itself." *Id.*; *see also In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp.2d 538, 585–86 n.60 (M.D. Pa. 2009) (allowing New Mexico claim, noting the "compelling trend favorable to consumer protection claims in price-fixing actions").

> > **Class Actions Not Barred.** The Alaska, Arkansas, Georgia, and South Carolina claims are proper. CDK's reliance on *In re Intel Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 417 (D. Del. 2007) is unfounded as it predates *Shady Grove* by three years. The AUTPCPA does not include a class action bar. Alaska Stat. Ann. § 45.50.531. The premise that there is such a bar appears rooted in the mistaken, and pre-*Shady Grove*, impression that a statute's silence on the subject of class actions constitutes a bar. *See In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp.2d 404, 417 (D. Del. 2007) (citing *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 84 (D. Mass. 2005) (interpreting the absence of a provision allowing class actions as a class action bar)). Another court in this district has found the South Carolina bar procedural rather than substantive. *Broiler Chicken*, 290 F. Supp.3d at 821. Similarly, application of Rule 23 in lieu of Georgia's class action bar does not "abridge, enlarge or modify any substantial right." *In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. 16-2765, 2017 WL

FILED UNDER SEAL

1902160, at *24 (D.N.J. May 8, 2017); *see also In re Hydroxycut Mktg. and Sales Practices Litig.*, 299 F.R.D. 648, 652–54 (S.D. Cal. 2014).

      ***Claims for Monetary Compensation.*** While damages are not available under California's UCL, plaintiffs are allowed to seek an injunction and restitution. *In re Tobacco II Cases*, 207 P.3d 20, 29 (Cal. 2009) ("[P]laintiffs are generally limited to injunctive relief and restitution."); *see also Vasic v. PatentHealth, L.L.C.*, 171 F. Supp.3d 1034, 1041 (S.D. Cal. 2016) ("An order for restitution is one compelling a UCL defendant to return the money obtained through the unfair business practice."). CDK offers no authority for its assertion that Cartwright Act plaintiffs cannot collect damages; the statutory language plainly allows for damages. Cal. Bus. & Prof. Code § 16750 ("Any person who is injured… may sue… and recover three times the damages sustained…"). CDK cites *Davidson v. Apple, Inc.*, No. 16-CV-04942-LHK, 2018 WL 2325426, at *11 (N.D. Cal. May 8, 2018), *appeal docketed*, No 18-80060 (9th Cir. May 23, 2018) for the premise that class action plaintiffs are not permitted to recover damages under the Colorado Consumer Protection Act ("CCPA"). However, the *Davidson* court reached its conclusion while explicitly ignoring the fact that "(1) some Colorado courts have adjudicated motions for class certification without referring to the CCPA bar, and (2) at least one district court has found that the CCPA bar does not apply." *Id.* (citing *Andren v. Alere, Inc.*, No. 16cv1255-GPC (AGS), 2017 WL 6509550, at *21–22 (S.D. Cal. Dec. 20, 2017). Therefore, there are no grounds to dismiss Counts VIII, XXXIV, and XXXV to the extent Dealership Plaintiffs seek monetary compensation. If the Court finds claims for monetary compensation are barred, Dealership Plaintiffs should be permitted to seek injunctive relief.

      ***Specific Violation Alleged.*** The single case CDK cites for the premise that plaintiffs are obligated to specify the section of the Nevada Deceptive Trade Practices Act ("NDTPA") under

FILED UNDER SEAL

which they are bringing claims contains virtually no analysis and cites to no authority that such a specification is required by law. *See In re Zappos.com, Inc.*, No. 3:12-cv-00325-RCJ-VPC, 2013 WL 4830497, at *6 (D. Nev. Sept. 9, 2013). Dealership Plaintiffs have asserted that Defendants made affirmative misrepresentations to Dealership Plaintiffs in the sale of DMS and DIS, Compl. ¶ 648, and it is therefore apparent that Dealership Plaintiffs are asserting a violation of Nev. Rev. Stat. § 598.0915. Count XLII should not be dismissed. *Martinez v. Hooper*, 148 F.3d 856, 858 (7th Cir. 1998) (noting that "a plaintiff is not required to use magic words" in pleading); *see also Vance v. Bureau of Collection Recovery LLC*, No. 10-cv-06324, 2011 WL 881550, at *2 (N.D. Ill. March 11, 2011) ("Plaintiff's complaint does not fail to state a claim merely because it uses terminology that differs slightly from the terminology of the statute."). If the Court disagrees, Dealership Plaintiffs request leave to amend. *See In re Zappos.com*, 2013 WL 4830497.

## CONCLUSION

For the foregoing reasons, Defendants' motions should be denied. Alternatively, in the event the Court is inclined to dismiss any claims, Dealership Plaintiffs respectfully request an opportunity to replead.

Dated:    August 31, 2018

*/s/ Peggy J. Wedgworth*

Peggy J. Wedgworth (*pro hac vice*)
***Dealership Interim Lead Class Counsel***
Elizabeth McKenna (*pro hac vice*)
**MILBERG TADLER PHILLIPS**
**GROSSMAN LLP**
One Pennsylvania Plaza
19th Floor
New York, NY 10119
Tel:  (212) 594-5300
Fax: (212) 868-1229
pwedgworth@milberg.com
emckenna@milberg.com

**FILED UNDER SEAL**

Leonard A. Bellavia (*pro hac vice*)
***Plaintiffs' Steering Committee***
Steven Blatt
**BELLAVIA BLATT, PC**
200 Old Country Road, Suite 400
Mineola, New York 11501
Tel:  (516) 873-3000
Fax: (516) 873-9032
lbellavia@dealerlaw.com
sblatt@dealerlaw.com

Daniel C. Hedlund
***Plaintiffs' Steering Committee***
Michelle J. Looby (*pro hac vice*)
***Plaintiffs' Steering Committee***
Daniel E. Gustafson
David A. Goodwin
Daniel J. Nordin
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel:  (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dgoodwin@gustafsongluek.com
mlooby@gustafsongluek.com
dnordin@gustafsongluek.com

James E. Barz
***Plaintiffs' Steering Committee***
Frank Richter
***Plaintiffs' Steering Committee***
**ROBBINS GELLER RUDMAN & DOWD LLP**
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Tel:  (312) 674-4674
Fax: (312) 674-4676
jbarz@rgrdlaw.com
frichter@rgrdlaw.com

Robert A. Clifford
***Liaison Counsel***
Shannon M. McNulty
Kristofer S. Riddle
**CLIFFORD LAW OFFICES, P.C.**
120 N. LaSalle Street, 31st Floor
Chicago, Illinois 60602
Tel:  (312) 899-9090
Fax: (312) 251-1160
RAC4cliffordlaw.com
SN4M@cliffordlaw.com
KSR@cliffordlaw.com

David W. Mitchell (*pro hac vice*)
Alexandra S. Bernay
Carmen A. Medici
**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel: (619) 231-1058
Fax (619) 231-7423
davidm@rgrdlaw.com
xanb@rgrdlaw.com
cmedici@rgrdlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I, Peggy J. Wedgworth, an attorney, hereby certify that on August 31, 2018, I caused to be served a true and correct copy of **DEALERSHIP PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO (1) DEFENDANTS' MOTIONS CONCERNING ARBITRATION AND TO STAY CLAIMS; AND (2) DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT** to be filed and served electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filings as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

/s/ Peggy J. Wedgworth
Peggy J. Wedgworth
MILBERG TADLER
PHILLIPS GROSSMAN LLP
One Pennsylvania Plaza, 19th Floor
New York, NY 10119
(212) 594-5300
pwedgworth@milberg.com