# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | ) ) ) | MDL NO. 2817 Case No. 1:18-CV-00864 |
| This document relates to: | ) ) ) | Hon. Robert M. Dow, Jr. |
| ALL CASES | ) | Magistrate Judge Jeffrey T. Gilbert |

**NON-PARTY RESPONDENT DOMINION ENTERPRISES, INC.'S REPLY IN SUPPORT OF ITS MOTION TO MODIFY THE CONFIDENTIALITY ORDER**

Dominion, pursuant to this Court's order, D.E. 353, respectfully submits this Reply in support of its Motion to Modify the Confidentiality Order, D.E. 303.

## I.  INTRODUCTION

Reynolds asserts that its and CDK's (together, "Defendants") trial counsel can provide legal advice to their clients on their business dealings with Dominion without using or disclosing Dominion's confidential information. In offering this assurance, Reynolds ignores Dominion's leading argument that courts have concluded it is *impossible* for Defendants' trial counsel to *not* use Dominion's confidential information already in their heads when providing legal advice to their clients about business dealings. *See* D.E. 305 ("Dominion Response" or "Mem."); D.E. 343 ("Reynolds Opposition" or "Opp."). It also does not respond to Dominion's contention that, as a non-party, its confidential materials are entitled to stricter protection than the parties' materials. Nor does Reynolds dispute Dominion's showing that Defendants could easily drive Dominion out of business or cause it grievous harm.

Instead, Reynolds asserts that Dominion has not presented actual evidence of harm, either overlooking or dismissing Dominion's affidavit, facts, and hypotheticals that show the perils that

it faces. In this Reply, Dominion responds to this argument, further explaining how Dominion could be seriously harmed if the Court does not modify the Order.

Reynolds next argues that there can be no potential harm to Dominion because Defendants' trial counsel are outside counsel. Reynolds offers no explanation why this Court should rely on this arbitrary distinction when other courts have cautioned against it, finding that in each case, specific facts should govern. *See* Mem., p. 12.

Reynolds then submits another arbitrary distinction, arguing that Reynolds' trial counsel, Aundrea Gulley's, attempt to drive Dominion out of the integration *business* was only legal, not *business*, conduct, suggesting that she can continue her efforts, but now armed with Dominion's confidential information! As Dominion has explained, and will further explain, Ms. Gulley plays a business role at Reynolds, and as a part of that role, she attempts to eradicate Reynolds' integration competitors, like Dominion. Reynolds' contention that Ms. Gulley's conduct is permissible, whether that conduct amounts to business behavior, means that Reynolds takes a very narrow view of the *existing* Order. That Order prohibits trial counsel from *using* confidential information learned in the litigation outside of the litigation. Ms. Gulley surely will use that information, even if she does not divulge it. This makes it all the more important that the Court adopt Dominion's proposed modification ("Modification").

It is not just the Order that Reynolds treats in such a cavalier manner; it is also the facts. Reynolds repeats past misrepresentations and now fantasizes that Dominion accused Reynolds of a criminal conspiracy. All of this suggests the Court cannot presume Reynolds' trial attorneys would meet the highest ethical standards in their treatment of Dominion's confidential materials.

As Dominion previously argued, the Court ought to balance the existential threat to Dominion against the inconvenience to Defendants to determine whether the Modification is appropriate. Reynolds does not respond by providing its own perspective on this balance, but rather mischaracterizes the scope of the relief Dominion seeks, exaggerating the reach (and alleged burden) to Reynolds while ignoring the threat to Dominion. While Reynolds characterizes Dominion's proposal as unprecedented, in fact, it requests much less than what other courts have

imposed to protect vulnerable non-parties. In this Reply, Dominion continues to advocate the right balance, showing there is good cause to modify the Order.

## II. ARGUMENT

### A. Dominion's Modification Is Reasonable.

Dominion's Modification is limited and discrete. Reynolds either misunderstood it or tried to inflate its scope, arguing "the modification Dominion now seeks would preclude [it] from advising [its] clients on any and all aspects of the lawsuit relating to Dominion." Opp., ¶ 5. But the Modification clearly states that trial counsel with access shall not "provide advice, legal or otherwise regarding *business* relationships with or *business* conduct affecting Dominion." Mem., p. 15 (emphasis added). It places no limitation on Defendants' ability to advise their clients regarding this litigation.[1] Thus, Reynolds' assertion that the Modification is "tantamount to disqualification" of Reynolds' counsel is a gross misrepresentation. Opp., ¶ 21.[2]

Second, Dominion does not seek to restrict Defendants' trial counsel from reviewing its highly confidential materials, as Reynolds wrongly suggests. *Id.*, p. 2 & ¶ 20 (stating Dominion has not "cited any case that precludes outside retained law firm trial counsel from the ability to review materials designated under a Protective Order" and "[n]one of Dominion's cited cases,

---

[1] Notably, plaintiffs' lawyers must have understood that the proposed modification would not restrict them from advising their clients in the underlying litigation or they certainly would have objected to Dominion's Modification. *See* Mem., Exs. 7-8 (no objection from attorneys representing plaintiffs); D.E. 348, Ex. 3 (no objection from the attorney representing the potential vendor class). Nevertheless, to clear up any misunderstanding, Dominion's counsel proposed to Reynolds' counsel adding the following language to assuage its concern: "This prohibition does not extend to the Receiving Party's advice to its client regarding litigating this Action." D.E. 348, Ex. 1. Reynolds rejected Dominion's proposal, *id.*, Ex. 2, but Dominion still intended to propose the additional sentence because Dominion's additional sentence was part of its broader request that Reynolds not object to Dominion submitting this Reply. Reynolds might have been solely objecting to the Reply and not the additional sentence. Thereafter, however, in Reynolds' Opposition to Dominion's Motion for Leave to File a Reply, D.E. 350, Reynolds mocked the proposed additional sentence, *id.*, ¶ 4 ("Dominion wishes to present yet a third variation of its proposed modification"), making it clear that Reynolds' assertion regarding the broad scope of Dominion's Modification was not sincere. Accordingly, Dominion is no longer proposing the additional sentence.

[2] This argument is reminiscent of Reynolds' earlier argument that the modification deprives Reynolds from using the attorney of its choosing. D.E. 283, ¶ 20. As Dominion has already explained, there is no unlimited right for companies to choose their counsel for all purposes. Mem., p. 14.

however, preclude outside retained law firm trial counsel from access to information produced by a party or witness"). As Dominion has made clear, it "is not seeking to prevent trial counsel from accessing Dominion's documents; it is simply asking them not to provide advice to their clients regarding their business dealings with Dominion after reviewing Dominion's sensitive documents." Mem., p. 11; *see also infra* n.3.

Third, Reynolds suggests "the proposed modification may force defense counsel to make an untenable choice between providing fulsome representation in this case, or being able to provide such representation in future cases." Opp., ¶ 10. The Modification does not limit Reynolds' ability to litigate any case, now or in the future; it is limited to advice relating to business relationships with or business conduct affecting Dominion. *See* Mem., p. 15; D.E. 348, Exs. 1, 3.[3]

Fourth, the Modification is *less restrictive* than the relief courts have ordered in other similar cases, where they ban counsel from reviewing highly confidential material altogether. Mem., p.11; *see, e.g.*, *Silversun Indus. v. PPG Indus.*, 296 F.Supp. 3d 936, 947 (N.D. Ill. 2017) (counsel "shall not have access" to highly confidential documents). Reynolds' contention that the Modification is "unprecedented," Opp., p. 2, when Dominion purposely made it less burdensome than what precedent dictates—to try to avoid a lengthy debate—is yet another example of Reynolds' unsupported hyperbole.

### B. Dominion Has Shown Good Cause to Modify the Protective Order.

#### 1. There Is Substantial Evidence of Potential Harm to Dominion.

Reynolds argues that Dominion has not shown with "particular and specific demonstration of fact," that it will harm Dominion without the Modification. Opp., ¶¶ 6-8. Significantly, in so

---

[3] It is worth noting that the Order (unmodified) prohibits counsel from using any confidential information outside of this litigation "for any purpose whatsoever," D.E. 104, ¶ 5(a), and so prohibits trial counsel from using the confidential information in future litigation. Because there is no way for trial counsel to bifurcate their brains, *see* Mem., pp. 6-10, they would be using the confidential knowledge gained in this litigation in such future litigation. Thus, the unmodified Order, not the Modification, prevents trial counsel from "providing [fulsome] representation in future cases." This is but one example of how Reynolds misinterprets the Order, showing that vigilance is necessary and the Modification is essential.

arguing, Reynolds does not dispute that Defendants can drive Dominion out of business[4] or that the potential harm to Dominion is greater than in any of the cases Dominion cited in support of its proposed Modification. Rather, Reynolds contends that Dominion has not provided "actual evidence." *Id.*, ¶¶ 4, 7-10, 14. In so arguing, Reynolds appears to create a new evidentiary standard, not found in any of the cases Reynolds cites.

Dominion has more than amply demonstrated this harm, including why Dominion is at risk, (Mem., Ex. 1, ¶¶ 7, 12, 25), Dominion's dependency on Defendants (*id.*, ¶¶ 16-17, 22-25), how Defendants' actions have already affected Dominion's business (*id.*, ¶ 18-20), CDK's use of its negotiating leverage over Dominion to obtain competitive intelligence (*id.*, ¶ 21), Defendants' incentives to harm Dominion because it is a competitor (*id.*, ¶ 12), why Dominion is particularly susceptible to that harm as a customer that Defendants can easily put out of business (*id.*, ¶ 24; *supra* n.4), how Dominion has already had to pull one of its applications from the market, (Mem., ¶ 18), and how Defendants have driven other competitors from the market (*id.*, ¶ 22). Reynolds turns a blind eye to all of this evidence.

Reynolds also objects to Dominion's hypotheticals, which are directly responsive to Reynolds' demand for categories of documents and legal advice that would result in harm to Dominion. Reynolds does not argue that the hypotheticals are inapposite; it just argues they are "not evidence." Opp., ¶¶ 9-10. It provides no precedent supporting its conclusion. Hypotheticals are a traditional way to help courts reason their way through legal problems, particularly when something has not happened yet. *See* Marla E. Mansfield, *Standing and Ripeness Revisited: The Supreme Court's Hypothetical Barriers*, 68 N.D. L. Rev. 1, 2 (1992) ("when courts discuss 'hypotheticals' the dicta created can influence the legal process"); Paul Gewirtz, *The Jurisprudence of Hypotheticals*, 67 A.B.A. J. 864, 866 (1981) ("Hypotheticals press us to think about future cases and to formulate general principles that look beyond achieving a favored result

---

[4] Defendants can do so in many ways, by, for example, simply raising the price of integration beyond what Dominion is able to pay or denying certification to Dominion applications while blocking Dominion's access to car dealer data through its own integration product.

in a single case."). Notably, Reynolds did not argue that the hypotheticals were improbable or fanciful; they simply hope the Court ignores them.

Hypotheticals also can demonstrate "potential harm" that is sufficient as a matter of law to show good cause to modify a protective order. *PhishMe, Inc. v. Wombat Sec. Techs., Inc.*, 2017 WL 4138961, at *8 (D. Del. 2017) ("there are too many future scenarios in which—if [counsel] is given unfettered access to [defendant's] AEO Material—he may later find himself providing crucial legal advice to [plaintiff's] decision makers as to whether [plaintiff] should take action that might harm [defendant's] competitive position"); *see also Corcel Corp. v. Ferguson Enters., Inc.*, 291 F.R.D. 680, 681-82 (S.D. Fla. 2013) (good cause for protective order where party demonstrated, "it would likely suffer economic harm," if confidentiality order was not issued); *Star Sci., Inc. v. Carter*, 204 F.R.D. 410, 416 (S.D. Ind. 2001) (good cause existed where "potential dangers" outweighed legitimate interest and "may lead to a competitive disadvantage").

Reynolds also argues that Dominion has not provided evidence of the category of documents or types of legal advice that could result in harm to Dominion. Opp., ¶ 8. None of the confidentiality cases cited by either party require this. *See* Mem., pp. 2-3, 6-9, 12. Such a standard would require foreknowledge of a fluid, vast set of future possibilities. *See PhishMe*, 2017 WL 4138961, at *8 ("[T]here are too many future scenarios . . . .").

Nevertheless, in response to Reynolds' contention, Dominion proffers a Supplemental Declaration (submitted as Ex. 1). That declaration sets forth several ways that the documents discovered and the advice given can result in grievous harm to Dominion. For example, Dominion documents could describe new application features that Dominion is planning. Trial counsel might inadvertently divulge such features when asked for an opinion regarding whether Dominion is complying with its various agreements. Defendants could then get a head start trying to match or surpass Dominion's new feature for an existing application.[5] *See* Andreu Suppl. Decl., ¶ 2.

---

[5] The Federal Trade Commission's ("FTC's") Civil Investigative Demands ("CIDs") and subpoena and Reynolds' subpoena are filled with requests for documents regarding Dominion's competitive efforts, including its efforts to compete with products Defendants provide. *See, e.g.*, Ex. 2, Nos. 19, 21; Ex. 3, Nos. 2, 5, and 6; Ex. 4, Nos. 1-5; D.E. 283, Ex. A, Nos. 2-7. Further, the government sought Dominion's

6

Defendants could also ask trial counsel for legal advice concerning whether Dominion is adhering to the terms of its certification agreement, which is required for access to dealer documents stored in their DMSs. Trial counsel might inadvertently convey information found in a Dominion confidential document that might be (wrongly) interpreted as a Dominion deviation from its certification agreement. This could result in a substantial fine. *Id.*, ¶ 4.

Reynolds might also ask trial counsel whether Dominion's use of SelectQu breaches its certification agreement with Reynolds. In response, trial counsel might inadvertently disclose confidential information found in a document regarding Dominion's competitive use of SelectQu. That could result in Reynolds acting to counter SelectQu. *Id.*, ¶ 5.

Notably, although in the best position to do so, Reynolds has submitted no evidence of its own as to why the harm Dominion describes is a product of "imagination," rather than a plausible scenario. Opp., ¶ 9. Indeed, in response to one hypothetical, Reynolds claims Dominion has provided "zero evidence that lawyers from Gibbs & Bruns, Sheppard Mullin or Mayer Brown have ever attended business (as apart from legal settlement) negotiations for their respective clients. None." *Id.* But Reynolds does not say trial counsel *has not* attended or even led business negotiations, nor does it say trial counsel *will not* attend or lead business negotiations in the future. It would have been easy to say, if true.

### 2. Aundrea Gulley Can Cause Substantial Harm to Dominion.

Reynolds relies on an arbitrary distinction to discount the risk Reynolds' trial counsel Aundrea Gulley poses to Dominion. As previously explained, Ms. Gulley sought an agreement that would end Dominion's integration competition with Reynolds. Mem., pp. 3, 12, Ex. 2 ("Gulley Letter"). According to Reynolds, the Gulley Letter, whose purpose was to terminate Dominion's integration **business**, *see id.*, is not a "business communication" or "business negotiation," but rather a legal demand. Opp., ¶ 12. Consider what Reynolds is saying: Ms. Gulley can continue to

---

valuations of harm from Defendants' conduct, which would show where Dominion is most vulnerable, and sought materials regarding third party integration, which could provide easy targets for Defendants' efforts to drive competing integrators from the market. *See, e.g.*, Ex. 2, Nos. 13 and 21.

negotiate the demise of Dominion's integration business, but next time, armed to the teeth with Dominion's confidential information about Dominion's use of its integration application, SelectQu.[6] Despite the existing Order's prohibition against use of confidential information outside of the litigation and despite the uniform conclusion of the courts that Ms. Gulley will use the information (because "the bell cannot be unrung," Mem., pp. 7, 12), Ms. Gulley can keep trying to drive Dominion from the market because, according to Reynolds, she is performing a legal function. This leaves Dominion in a very precarious position.

Not that it should matter, but Ms. Gulley's activities go beyond a legal function. If Ms. Gulley attained her objective, it would change the *business* environment. Moreover, Ms. Gulley was offering a *quid pro quo*—Reynolds would cease blocking SelectQu's access to data for some time if Dominion would agree to exit the market eventually. The details, such as the amount of time and the scope of Dominion's business during that time, would be the result of business negotiations with Ms. Gulley. If such negotiations are not business negotiations, there is little Ms. Gulley cannot do. Ms. Gulley's next threat letter could offer a discount on Reynolds' integration fees if Dominion exits the market. Alternatively, the letter could threaten to terminate Dominion's certification of its applications if Dominion does not exit the integration market. Indeed, Reynolds appears to believe that Ms. Gulley could be the tip of the spear in all negotiations with Dominion so long as the letter leads with a "legal demand." *See* Opp., ¶ 12. Importantly, however, "even when an attorney states that their role is simply to provide 'legal advice' on 'legal issues'" this "may cloud the types of advice counsel provides." *PhishMe*, 2017 WL 4138961, at *5.

It is also suspicious that Reynolds provided no evidence with respect to Ms. Gulley's activities on behalf of Reynolds. We do not know how many competitors Ms. Gulley has driven from the market. We do not know whether Ms. Gulley has extended her efforts to run out competitors beyond the integration market. We do not know the extent of Ms. Gulley's business

---

[6] This was but one example of a "specific demonstration" that Reynolds ignored concerning how Dominion could be harmed. Documents regarding Dominion's use of SelectQu would be detrimental in the hands of Ms. Gulley who has already tried to extinguish SelectQu. *See* Andreu Suppl. Decl., ¶ 5.

8

advice with respect to Dominion. We do not know the share of her billings attributed to Reynolds. Instead of such pertinent information, Reynolds tells us about her pro bono work. *See* Opp., ¶ 11.

### 3. Dominion is a Non-Party Entitled to Extra Protection.

Dominion is a non-party in this dispute, thereby establishing good cause to modify the Order. Mem., pp. 3-4, 9-10. Reynolds' only response is to suggest Dominion is only "technical[ly]" a non-party because it "is a member of the putative plaintiff vendor class action against defendant CDK." Opp., ¶ 5. This is disingenuous; no class has been certified and Dominion did not ask to be a part of any class. Not only is Dominion a non-party, it is a competitor, thus warranting further protection. Mem., p. 9; *PhishMe*, 2017 WL 4138961, at *8 ("[T]he risk of harm is heightened where the non-moving company is a direct competitor of the movant in particular business areas . . . .").

### 4. Dominion has Shown the Harm is Foreseeable.

Not only has Dominion sufficiently shown the harm it faces, it also has explained the harm is foreseeable because Defendants' trial counsel cannot perform the "mental gymnastic[s]" necessary to adhere to the Order's limitation on the use of Dominion's confidential information while providing legal advice to their clients regarding their business relationships with Dominion. Mem., pp. 6-9. Reynolds provided no explanation as to how its trial lawyers can perform impossible "feat[s] beyond the compass of ordinary minds." *Id.*, p. 7. Indeed, as Dominion explained in one of its hypotheticals, even if Dominion does its best to follow the Order, Dominion can still be grievously harmed. *Id.*, p. 8.

As this Court has stated, the risk cannot simply be ignored "because counsel . . . says it does not pose a meaningful problem . . . . If the rule were otherwise, there could never be a restriction . . . since the conclusion of the . . . declarant would be accorded the weight of an encyclical. Of course, it's not." *Silversun*, 296 F.Supp. 3d at 946. Reynolds spends not one drop of ink rebutting the courts' holdings on this issue.

9

### C. Courts Disfavor Distinctions between Inside and Outside Counsel.

Reynolds recognizes distinctions between in-house and outside counsel are "not dispositive," when assessing the risk of harm from the misuse or disclosure of sensitive information, yet makes that distinction the heart of its argument. *See* D.E. 283, ¶¶ 10, 17-18. As Dominion has explained, courts have cautioned against, and disfavor, arbitrary distinctions between inside and outside counsel when assessing any risk of disclosure or misuse. Mem., p. 12. That is because the facts of every dispute are different and critical in determining whether risk is present. *Id.* (citing *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992) ("[P]roper review of protective orders in cases such as this requires the district court to examine factually all the risks and safeguards surrounding inadvertent disclosure by *any* counsel, whether in-house or retained.")).

Moreover, contrary to Reynolds' assertions, where warranted, courts do not hesitate to place restrictions on outside counsel. Mem., pp. 12, 14-15 (citing *Jardin v DATAllegro, Inc.*, 2011 WL 3299395, at *2 (S.D. Cal. 2011); *ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC*, 2008 WL 5634214, at *2 (E.D. Tex. 2008)). For example, as Dominion explained, in *Jardin*, the court ordered plaintiffs' counsel to erect an ethical wall to "keep the specific lawyers who had actual access to Defendants' confidential information in [a] 2008 case from participating" in a 2011 case. *Id.*, p. 14 (citing *Jardin*, 2011 WL 3299395, at *2). The ethical wall addressed the concern that "counsel could not divorce themselves from their knowledge of Defendants' confidential material" from the previous proceeding. *Id.* (citing *Jardin*, 2011 WL 3299395, at *5).[7]

---

[7] In addition, as Dominion explained and Reynolds ignored, Reynolds' categorical dismissal of courts' reasoning in patent cases is contrary to this Court's conclusion that "the facts, not the category must inform the result." Mem., p. 13 (citing *Trading Techs. Int'l, Inc. v. GL Consultants, Inc.*, 2011 WL 148252, at *4 (N.D. Ill. 2011)). Indeed, the consideration in patent cases, like here, is whether a party's counsel, when accessing confidential information of a competitor in a litigation, can "prevent inadvertent compromise" of that information when counseling its client on other matters. *See id.* (citing *In re Deutsche Bank Tr. Co., Americas*, 605 F.3d 1373, 1378 (Fed. Cir. 2010)).

### D. Reynolds Is Not Entitled to the Presumption that Its Trial Attorneys Will Meet the Highest Ethical Standards.

Reynolds misrepresented Alan Andreu's testimony in its opening brief, claiming, "Dominion testified that the alleged conspiracy between CDK and Reynolds—which is the subject matter of this multidistrict litigation—caused price increases for Dominion's integration fees." D.E. 283, ¶ 2. There is no such testimony; Andreu did not testify about the conspiracy, let alone the connection between such a conspiracy and the integration fees Defendants are charging Dominion. Mem., p. 10; *id.*, Ex. 1, ¶ 5. Dominion practically dared Reynolds to provide a pin citation to Andreu's testimony about the conspiracy. *See id.*, p. 10. Reynolds did not accept the challenge and misdirected the Court to Andreu's testimony about price increases from 2011 forward that Andreu never connected to a conspiracy. Opp. ¶ 23.

Then Reynolds shifts to the observations of Authenticom's attorney, who, in oral argument, addresses the record of price increases, and, at least in the quoted language, does *not* address the alleged conspiracy. *Id.*, ¶ 24. Next, Reynolds quotes the district court opinion. *Id.*, ¶ 26. But again, the quote does not connect the price increase to the conspiracy. Finally, Reynolds quotes the Court of Appeals, which does suggest that prices went up after the 2015 agreement, but which does not appear to conclude that the agreement caused the price increase. *Id*. Yet, even if the Court of Appeals had drawn a closer connection, that would not support the conclusion that Andreu made that connection. Reynolds concludes it "accurately represented the trial proceedings." *Id.* That statement, of course, means nothing, because Reynolds' original statement ("Dominion testified that the alleged conspiracy . . . caused price increases") was not about the "trial proceedings" but about Mr. Andreu's "hotly contested" testimony. D.E. 283, ¶ 2, 21. In fact, Reynolds argued, it was this *testimony* that justified its rejection of any restrictions on its trial counsel. *Id.*[8]

Reynolds now contends that Dominion accused Reynolds or Ms. Gulley of a "criminal conspiracy." Opp. ¶ 12. Dominion never asserted there was a conspiracy, only stating, "[a]rguably, Ms. Gulley was proposing to negotiate a conspiracy to eliminate the competition between two

---

[8] Reynolds finally concedes that Dominion was subpoenaed to testify in the litigation, Opp., p. 10, n. 5, but it never retracts its statements that Dominion "volunteer[ed]." D.E. 283, ¶ 21.

11

integration competitors." Mem., p.12. There was no conspiracy because Dominion rejected Gulley's offer. Reynolds, all by itself, made up the characterization that the conspiracy would have been "criminal."

There is more. As noted above, Reynolds takes an improperly narrow view of the existing Order, for example, suggesting that trial counsel can represent Reynolds in later litigation without the leave of this Court (*supra* n.3), and apparently believing that Ms. Gulley can continue to negotiate Dominion's exit from the market after being armed with Dominion's confidential information (*supra*, p. 8). For all these reasons, Reynolds is not entitled to the presumption that its trial attorneys will meet the highest ethical standards in their treatment of Dominion's confidential materials.

### III. CONCLUSION

Dominion faces an existential threat. We are unaware of any case where a non-party was more vulnerable, where there has been a demonstrated effort by Defendants to remove the non-party as a competitor, and where Defendant's trial counsel was already a critical player in such efforts. To be sure, there is no evidence that the harm has happened *yet*. That, however, will always be the case for petitioners seeking preventative relief. Requiring more would go against logic, as petitioner will never have access to more until it is too late. The Court should balance the potential risk, not the certainty, of harm, to Dominion, against the inconvenience to the Defendants.[9] When doing so it becomes very clear that the court should adopt the Modification.

WHEREFORE, for the reasons stated above and in its Response, non-party Dominion urges the Court to modify the Order as set forth in its Response.

---

[9] It cannot be very inconvenient, as plaintiffs' counsel do not object to the Modification. *Supra*, n.1.

Dated: September 12, 2018

Respectfully submitted,

/s/ *Jeff Norberg*
Jeff Norberg, Ill. Bar No. 6315012
Neal & McDevitt, LLC
1776 Ash Street
Northfield, Il 60093
(847) 441-9100
jnorberg@nealmcdevitt.com

Marc Schildkraut
Deepti Bansal
Cooley LLP
1299 Pennsylvania Ave, NW,
Suite 700
Washington, DC 20004
(202) 728-7000
(202) 728-7027
mschildkraut@cooley.com
dbansal@cooley.com

*Counsel for Non-Party Respondent
Dominion Enterprises, Inc.*

**CERTIFICATE OF SERVICE**

    I, Jeff Norberg, an attorney, hereby certify that on September 12, 2018, I caused true and correct copies of the foregoing Non-Party Respondent Dominion Enterprises, Inc. Reply in Support of its Motion to Modify the Confidentiality Order to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

By: /s/ *Jeff Norberg*
Jeff Norberg, Ill. Bar No. 631
Neal & McDevitt, LLC
1776 Ash Street
Northfield, IL 60093
(847) 441-9100
jnorberg@nealmcdevitt.com

*Counsel for Non-Party Respondent Dominion Enterprises, Inc.*