# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

AUTHENTICOM, INC.,

                  Plaintiff,               Case No. 17-cv-318

    vs.

CDK GLOBAL, LLC, and THE REYNOLDS
AND REYNOLDS COMPANY,

                  Defendants.

**AUTHENTICOM'S NOTICE OF DEPOSITION PURSUANT TO FEDERAL RULE OF**
**CIVIL PROCEDURE 30(b)(6) FOR DEFENDANT CDK GLOBAL, LLC**

PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 30(b)(6), Plaintiff Authenticom, Inc. ("Authenticom"), by and through their undersigned counsel, will take the deposition upon oral examination of Defendant CDK Global, LLC ("CDK"), commencing at 9:00 a.m. on February 16, 2018, at the offices of Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., 1615 M Street, NW, Suite 400, Washington, D.C. 20036, or at such other mutually agreeable time and location. The deposition will continue from day to day until completed. The deposition will be taken before an officer authorized to administer oaths. The deposition will be recorded by stenographic means and/or videotaped.

As required by Rule 30(b)(6), CDK shall designate one or more officers, directors, managing agents, employees, or other person(s) who are most qualified, knowledgeable, and competent to testify on behalf of CDK on the topics identified below. Please identify the person or persons who will testify pursuant to this notice and the matter or matters about which each

person will testify no later than 10 business days before the date on which the deposition will commence.

## **DEFINITIONS**

For purposes of the topics identified below the following definitions shall apply:

1.      "Add-on application" means a software application that dealers use in addition to or separate from their Dealer Management System ("DMS") software in the course of operating their dealerships.

2.      "All" shall be construed as all and any, and the term "any" shall be construed as all and any.

3.       "Authenticom" shall mean the Plaintiff in this action and a provider of data integration services in the automotive industry based in La Crosse, Wisconsin.  "Authenticom" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

4.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the deposition topic all responses that might otherwise be construed to be outside of its scope.

5.      "CDK" shall mean CDK Global, LLC, as described in Paragraph 4 of Defendants' Combined Statement of Additional Facts Requiring Denial of Preliminary Injunctive Relief (hereinafter, "SoAF"), Dkt. No. 87 (June 16, 2017).  "CDK" shall include the Dealer Services business of Automatic Data Processing, Inc. ("ADP") prior to September 30, 2014.  *See* SoAF ¶ 5.  "CDK" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

6.      "Communication" shall mean any exchange or transfer of information, whether electronic, written, oral, or in any other form. The phrase "communication between" is defined to include instances where one party addresses the other party but the other party does not necessarily respond.

7.      "Data access policy" means Your policy with respect to the ability of dealers to authorize independent data integrators to access data on the DMS or otherwise grant third parties access to their data on the DMS.

8.      "Data integrators" shall refer to service providers that provide access by any means to dealer data on the DMS database, whether by extracting the data, writing data back into the DMS, or both.  For the avoidance of doubt, "data integrators" includes CDK (through its 3PA program) and Reynolds (through its RCI program).

9.       "DMI" shall mean Digital Motorworks, Inc., as described in Paragraph 215 of the SoAF.  "DMI" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

10.      The "DMS Market" shall mean the market for the provision of DMS services to new car franchised automobile dealers in the United States.

11.      "Document" and "Documents" are used in the broadest extent permitted by Federal Rule of Civil Procedure 34(a).

12.      "IntegraLink" shall mean IntegraLink as described in Paragraph 215 of the SoAF. "IntegraLink" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

13.     "Including" (in addition to its usual meanings) shall mean including but not limited to.

14.      "Independent data integrators" shall mean data integrators that provide data integration services on a DMS platform and are unaffiliated with the DMS provider.

15.     "Meeting" shall mean, without limitation, any assembly, convocation, encounter, communication or contemporaneous presence (whether in person or via any electronic, computer-assisted, digital, analog, video, or telephonic method of communication) of two or more persons for any purpose, whether planned or arranged, scheduled or not.

16.     "Person" or "persons" shall mean, without limitation, any individual, corporation, partnership or any variation thereof (e.g., limited partnership, limited liability partnership), limited liability company, proprietorship, joint venture, association, government entity, group or other form of legal entity.

17.     "Preliminary Injunction Hearing" shall mean the hearing conducted in the United States District Court for the Western District of Wisconsin in this case, No. 3:17-CV-318-JDP, from June 26-28, 2017.

18.     "Price Secrecy Provision" means any contractual provision designed to prevent vendors from informing dealers or other third parties about the pricing charged under the 3PA or RCI programs.

19.     The terms "relating to," "related to," "referring to," "regarding," or "with respect to" shall mean, without limitation, the following concepts: concerning, discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part.

20.     "Reynolds" shall mean "The Reynolds & Reynolds Company" as described in Paragraphs 1-3 of the SoAF.  "Reynolds" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

21.     "SecurityFirst" shall mean the CDK initiative described in Paragraphs 133-148 of the SoAF.

22.     "SIS" means Superior Integrated Solutions and shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

23.     "Vendors" or "application providers" shall mean vendors who provide software applications that perform operations functions for dealerships, as described in Paragraph 20 of the SoAF.

24.     "You," "your" or "your company" mean the responding defendant, its predecessors, successors, parents, subsidiaries, departments, divisions, joint ventures, and affiliates, including without limitation any organization or entity that the responding defendant manages or controls, together with all present and former directors, officers, employees, agents, representatives or any persons acting or purporting to act on behalf of the responding defendant.

## TOPICS

### Agreements Between CDK and Reynolds

1.     The February 18, 2015 Data Exchange Agreement, 3PA Agreement, and Reynolds Interface Agreement, including the negotiation, drafting, purpose, implementation, and current status of those agreements.

2.      The transition of CDK's vendor customers into the Reynolds RCI program following the February 18, 2015 Data Exchange Agreement.  This topic includes without limitation:

      a.  all information provided by CDK to Reynolds about its vendor customers, *see*, *e.g.*, §§ 4.3, 4.4, Exhibit DEA-2 of the Data Exchange Agreement;

      b.  communications between CDK and Reynolds about CDK's vendor customers;

      c.  communications between CDK and its vendor customers regarding the RCI program;

      d.  pricing information regarding what CDK vendor customers paid for access to data on the Reynolds DMS before the Data Exchange Agreement, and what those vendor customers (1) paid when they entered into the RCI program, and (2) what they pay now; and

      e.  communications related to any instance where CDK or Reynolds advised vendors awaiting RCI certification to move their data integration business to CDK, DMI, or IntegraLink in advance of RCI certification.

3.      Any and all communications between CDK and Reynolds regarding access by independent data integrators to data on their respective DMS platforms.

4.      Communications between CDK and Reynolds relating to Authenticom, DealerVault, or Steve Cottrell – including all documents concerning such communications.

5.      Any cooperation, coordination, joint effort, assistance, exchange of information or technical knowhow, or any other type of collaboration between CDK and Reynolds in blocking

an independent data integrator's access – including Authenticom's access – to dealer data on their respective DMS platforms. This topic includes without limitation:

      a.  Any communications with each other regarding the blocking of independent data integrators, including Authenticom;

      b.  Any communications regarding the technological means of blocking independent data integrators, including Authenticom;

      c.  Sharing of any information – whether technological or otherwise – with each other regarding the blocking of independent data integrators, including Authenticom; and

      d.  Any communications with each other regarding Authenticom's business working with Reynolds dealers to extract data using Dynamic Reporting, including blocking Authenticom's work in that regard.

**CDK's Add-On Applications**

6.      Financial information relating to CDK's add-on applications for each year from January 1, 2011, to the present, including (1) the prices CDK charges per month for the add-on applications; and (2) the actual and projected quarterly operational costs, revenues, and profits of CDK's add-on applications.

7.      CDK's effort to "tilt the table" or advantage its own add-on applications as compared to applications offered by third-party vendors. This topic includes without limitation:

      a.  any "closed categories" of application types that CDK would not permit into the 3PA program;

      b.   any functionality with respect to access to dealer data requested by vendors through the 3PA program that CDK refused, such as the ability to write repair orders back into the DMS; and

      c.   any effort to disrupt the workflow of applications offered by competing vendors.

8.     CDK's add-on applications.  This topic includes without limitation:

      a.   the services that CDK's add-on applications provide;

      b.   vendors that provide competing services and products to CDK's add-on applications;

      c.   CDK's market share in the respective markets for its add-on applications; and

      d.   how CDK's add-on applications obtain dealer data from the CDK DMS, and how much they pay for that data integration service, if anything; and

      e.   the data integration services used by CDK's add-on applications, including but not limited to RCI and Authenticom.

9.     CDK's use of Authenticom for data integration services from 2011 to present.

## CDK's "SecurityFirst" and/or "3PA Refresh" Initiatives

10.     CDK's "SecurityFirst" and/or "3PA Refresh" initiative.  This topic includes without limitation:

      a.   internal presentations regarding the "SecurityFirst" and/or "3PA Refresh" initiative;

      b.   the formulation, purpose, implementation, and current status of the "SecurityFirst" and/or "3PA Refresh" initiative;

    c.  the differences between the 3PA program before and after the "Security First" and/or "3PA Refresh" initiative;

    d.  security enhancements, if any, instituted as part of the "Security First" and/or "3PA Refresh" initiative;

    e.  internal presentations and communications regarding the "Security First" and/or "3PA Refresh" initiative;

    f.  financial analyses conducted relating to the "Security First" and/or "3PA Refresh" initiative; and

    g.  communications with dealers and vendors regarding the "Security First" and/or "3PA Refresh" initiative.

11.    CDK's pre-2015 position with respect to dealers being able to authorize independent data integrators to provide data integration services for dealers using a CDK DMS. This topic includes without limitation:

    a.  any and all CDK DMS contractual provisions on the topic, including the ability of dealers to authorize "agents" to access their data;

    b.  all public statements regarding the ability of dealers to authorize independent data integrators to access data on the CDK DMS;

    c.  all internal documents and communications regarding the ability of dealers to authorize independent data integrators to access data on the CDK DMS;

    d.  all communications with dealers or vendors regarding the ability of dealers to authorize independent data integrators to access data on the CDK DMS; and

    e.    Open Secure Access, Inc., including CDK's participation and membership in the group, the policies and purpose of the group, the stated principles espoused by the group, or any other documents relating to the group and your own data access policies.

12.    CDK's decision to start blocking independent data integrators – such as Authenticom – from being able to provide data integration services to dealers using a CDK DMS.

13.    The technological measures CDK has used to disable or block the ability of independent data integrators, including but not limited to Authenticom, to access the CDK DMS, from 2015 to present.

14.    CDK's whitelisting or authorization of independent data integration services for data stored in a CDK DMS – whether done at the request of dealerships, vendors, original equipment manufacturers, agreements or arrangements with independent data integrators (such as SIS) – from 2015 to present.

15.    Security and system performance concerns that CDK believes are associated with independent data integration services, including (1) specific instances, if any, where Authenticom degraded the performance of the CDK DMS; and (2) specific instances, if any, where independent data integration providers caused a data breach on a CDK DMS.

16.    Agreements between CDK and any provider of data integration services. This topic includes without limitation:

    a.    any "wind down," settlement, or other agreements entered into between CDK and any data integration provider; and

        b.   communications with other parties (whether vendors or dealers) regarding the agreements.

17.    The ability of dealers to extract their data from a CDK DMS manually.  This topic includes without limitation:

        a.   when that capability was instituted;

        b.   the means by which dealers extract the data manually;

        c.   how often dealers extract their own data for purposes of providing the data to third-party vendors; and

        d.   the means by which dealers send their manually-extracted data to vendors.

**CDK's Data Integration Services**

18.    CDK's standard 3PA contract before June 2015 or the "3PA Refresh."

19.    CDK's standard 3PA contract after June 2015 or the "3PA Refresh."

20.    DMI and IntegraLink's standard contract with dealers regarding data integration services before June 2015 or the "3PA Refresh."

21.    DMI and IntegraLink's standard contract with vendors regarding data integration services after June 2015 or the "3PA Refresh."

22.    CDK's enforcement, threat of enforcement, and interpretation of contractual provisions in vendors' current 3PA contracts.  This topic includes without limitation:

        a.   communications with vendors relating to whether they can (or cannot) use independent data integrators to access data on the CDK DMS, including any communications that cite provisions in a particular 3PA contract to that effect;

b. the enforcement or threat of enforcement of CDK's 3PA contract against vendors with respect to accessing data on the CDK DMS by means other than through the 3PA program;

c. the enforcement or threat of enforcement of the price secrecy provisions in the 3PA contract;

d. documents and communications relating to what vendors can tell dealers (whether on invoices, in general communications, or otherwise) with respect to what vendors pay CDK under the 3PA program for data integration; and

e. documents describing, construing, or interpreting the 3PA agreements.

23. The 3PA program's pricing (both up-front and recurring pricing) and actual and projected costs, revenues, and profitability, from 2011 to present.

24. The operation of the 3PA program, including the services offered to vendors that participate in the 3PA program and the manner and form in which data is delivered to vendors that participate in the 3PA program.

25. DMI and IntegraLink's past and present provision of data integration services on the CDK DMS. This topic includes without limitation:

a. the prices charged to vendors for those services;

b. the technological methods used to access dealer data stored on a CDK DMS;

c. the customers of those services; and

d. for each year from 2011 to the present, the actual and projected revenues and profits for those services.

26.     CDK's data integration services (whether provided by DMI, IntegraLink, or otherwise) for data on a Reynolds DMS. This topic includes without limitation:

    a. the vendor customers that purchased data integration services from CDK for data on a Reynolds DMS;

    b. the prices CDK charged for those services;

    c. the data integration services CDK provided to those vendors, including any bi-directional integration services;

    d. the data elements CDK accessed on the Reynolds DMS;

    e. the technological methods CDK used to access dealer data stored on a Reynolds DMS;

    f. CDK's "SMART-R" program;

    g. CDK's efforts to work around Reynolds' blocking of CDK's access to dealer data on a Reynolds DMS, including the technological means CDK used to work around Reynolds' blocking;

    h. any data breaches caused by CDK's access to the Reynolds DMS;

    i. the revenue and profits CDK derived from its data integration business on the Reynolds DMS; and

    j. CDK's current provision of data integration services for data on a Reynolds DMS, including the customers, pricing, and methods of access for those services.

27.     Data security and/or DMS system performance with respect to CDK's access to the Reynolds DMS. This topic includes without limitation:

    a.   the effect of CDK's access to the Reynolds DMS on the performance of the Reynolds DMS;

    b.   any data security incidents caused by CDK's access to the Reynolds DMS; and

    c.   any specific system performance issue that was or is directly attributable to CDK's access to the Reynolds DMS.

28.    CDK's data integration services – including as provided by DMI and IntegraLink – on non-CDK and non-Reynolds DMSs.  This topic includes without limitation:

    a.   the DMS systems for which CDK provides data integration services;

    b.   the agreements CDK has with DMS providers and dealerships relating to its provision of data integration services;

    c.   the data elements CDK accesses;

    d.   the instances in which CDK provides bi-directional data integration services, and for which DMSs;

    e.   CDK's data integration customers;

    f.   the technological methods CDK uses to access dealer data stored on other DMSs;

    g.   the pricing of CDK's data integration services offered by DMI, IntegraLink, or any other business for non-CDK DMSs; and

    h.   the actual and projected costs, revenues, and profitability of CDK's data integration services offered by DMI, IntegraLink, or any other business for non-CDK DMSs.

14

**CDK DMS Products and Services**

29.     The competitive threat posed by add-on applications – such as customer relationship management, inventory management, service lane management, deal desking, and F&I applications – to the services provided by the CDK DMS.  This topic includes without limitation:

a.   the features of add-on applications that compete with features offered by the CDK DMS;

b.   any and all documents and communications regarding the competitive threat posed by add-on applications to the primacy of the DMS to dealer operations; and

c.   controlling access to dealer data as a way to maintain the primacy of the DMS to a dealer's operations.

30.     The services and key features of a CDK DMS.

31.     CDK's DMS contracts.  This topic includes without limitation:

a.   The standard term length of CDK's DMS contracts; and

b.   CDK's DMS contracts (and/or any addendum, exhibit, or part thereof) that authorize or acknowledge that dealers may provide independent data integrators access to data on the CDK DMS.

32.     Section 6.D of CDK's standard DMS contract or any other similar provision relating to the fact that a dealer's "employees and agents" may "have access" to the DMS.  This topic includes without limitation:

15

     a.   communications with other parties (whether vendors or dealers) regarding the provision or the ability for dealers to grant access to data on a CDK DMS; and

     b.   documents describing, construing, or interpreting the provision.

33.     Your communications to dealers (whether existing or prospective DMS customers) regarding the differences or similarities between CDK and Reynolds with respect to data access policies, including without limitation where CDK marketed its open access policy as a point of differentiation with the Reynolds DMS.

34.     The tenure (i.e., how long they have been using a CDK DMS) of CDK's DMS customers.

35.     The market shares of competitors in the United States DMS market, including your market share and the market shares of your competitors, from 2008 to the present.

36.     Dealership customers switching to and from the CDK DMS, including dealership customers switching to CDK from Reynolds or from CDK to Reynolds, from 20011 to present.

37.     The rate of switching of Reynolds dealers to the CDK DMS before and after the February 2015 Data Exchange Agreement.

38.     Financial information relating to CDK's DMS business for each year from January 1, 2011, to the present, including (1) the prices CDK charges for DMS services (both basic and bundled); and (2) the actual and projected quarterly operational costs, revenues, and profits of CDK's DMS business.

39.     CDK's proposed acquisition of Auto/Mate, include CDK's plans with respect to the ability of Auto/Mate dealers to authorize the use of independent data integrators after the acquisition closes.

**Security and System Performance**

40.    The system architecture of your DMS, technological aspects for retrieving data from the DMS database, and the blocking automated access to data on your DMS.  This topic includes without limitation:

    a.   how CDK blocks automated access to data on the DMS;

    b.   how data is retrieved from a DMS database;

    c.   how data is entered, stored, and organized on a DMS database;

    d.   how data read and writeback of dealer data occurs from a DMS database when using the RCI and/or 3PA programs; and

    e.   how data extraction occurs from the DMS database when using independent integrators such as DMI and IntegraLink.

41.    Any specific security incident directly caused by Authenticom's (or any other independent integrator's) automated access to data on the CDK or Reynolds DMSs.

42.    The effects on DMS system performance of Authenticom's (or any other independent integrator's) automated access to data on the CDK or Reynolds DMSs, including any specific system performance issue directly caused by Authenticom or any other independent integrator.

43.    The technological methods used by CDK to block or disable dealer-provided login credentials.  The date limitation for this topic is January 1, 2014, to the present.

44.    The specific security measures CDK has instituted to protect the security of dealer data.  The date limitation for this topic is January 1, 2014, to the present.

45.    The security infrastructure of the CDK DMS and how it has changed over time. The date limitation for this topic is January 1, 2014, to the present.

46.     CDK's involvement with the August 28, 2013 memo of the National Automobile Dealers Association, which was introduced as Defendants' Exhibit 15 at the Preliminary Injunction Hearing.

47.     The "GSO Threat and Security Assessment" report prepared by PwC, dated May 6, 2015 and introduced as Defendants' Exhibit 25 at the Preliminary Injunction Hearing.  This topic includes without limitation:

       a.   when PwC was engaged;

       b.   what PwC's assignment was; and

       c.   communications with PwC regarding its work relating to the report.

48.     Any instance in which CDK has made dealer data available to an OEM from a dealership that sells a different brand of automobile.  For the avoidance of doubt, this topic would include any instance where CDK made available to an OEM (e.g., Honda) the DMS data from a dealership family that included a Honda dealer as well as other non-Honda dealerships.

49.     How dealer data is stored on the CDK DMS.  This topic includes without limitation:

       a.   whether a dealer's data is stored separate from the data of other dealers;

       b.   whether a dealer's data is commingled with data that does not belong to the dealer; and

       c.   where dealer data is stored (whether on servers at the dealership; at CDK-managed server farms; at third-party managed server farms; or somewhere else).

**<u>Other Topics</u>**

50.     Investigations by the Federal Trade Commission, Department of Justice, or any other federal or state regulatory authority regarding your DMS business, data integration business, add-on applications, data access policies, or any other related matter from 2007 to the present.

51.     Elliott Management's investment in CDK.  This topic includes without limitation:

   a.  CDK's communications with Elliott Management regarding (1) the "3PA Refresh," (2) increasing revenue through the 3PA program, (3) blocking independent data integrators, (4) competitive threats to CDK's DMS business, (5) the February 2015 agreements with Reynolds, (6) governmental investigations of CDK's business, and (7) antitrust litigation against CDK;

   b.  Elliott Management's letters and emails to CDK; and

   c.  Elliott Management's meetings with CDK, including attendees, time and place, and topics of discussion.

52.     The replacement of Steve Anenen with Brian MacDonald as CEO of CDK, including the reasons for it and communications with Elliott Management regarding the replacement.

53.     Your document retention and destruction policy and any modification of CDK's document retention or email retention policies (a) since 2013, and (b) in connection with this litigation.

54.     The identity of information and documents relied on, or reviewed by, the corporate representative(s) in preparation for this deposition, including the identity of all persons consulted by the corporate representative(s) with respect to each topic set forth in this notice.

55.     The identity and location of persons most knowledgeable about each of the foregoing topics.

56.     CDK's efforts to collect and produce documents in this case.  This topic includes without limitation:

>    a.   the process used to identify and review pertinent documents;
>
>    b.   the identification of any pertinent documents that have not been collected;
>
>    c.   the identity of all location(s) from which documents were collected for production; and
>
>    d.   a description of all documents that were, or that may have been, destroyed (including, but not limited to, documents relating to any topic in this notice of deposition).

Dated: January 10, 2018

Respectfully submitted,

*s/ Michael N. Nemelka*

Michael N. Nemelka *(pro hac vice)*
Aaron M. Panner *(pro hac vice)*
David L. Schwarz *(pro hac vice)*
Kevin J. Miller *(pro hac vice)*
Derek T. Ho *(pro hac vice)*
Daniel V. Dorris *(pro hac vice)*
Joshua Hafenbrack *(pro hac vice)*
Joanna T. Zhang *(pro hac vice)*
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax:    (202) 326-7999
Email: mnemelka@kellogghansen.com
        apanner@kellogghansen.com
        dschwarz@kellogghansen.com
        kmiller@kellogghansen.com
        dho@kellogghansen.com
        ddorris@kellogghansen.com
        jhafenbrack@kellogghansen.com
        jzhang@kellogghansen.com

Jennifer L. Gregor
Allison W. Reimann
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI 53703
Phone: 608-257-3911
Fax:    608-257-0609
Email: jgregor@gklaw.com
        areimann@gklaw.com

*Attorneys for Plaintiff Authenticom, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2018, I caused a true and correct copy of the foregoing Authenticom, Inc.'s Notice of Rule 30(b)(6) Deposition for Defendant CDK Global, LLC to be served by email upon the following individuals:

Mark W. Ryan (mryan@mayerbrown.com)
Britt M. Miller (bmiller@mayerbrown.com)
Matthew D. Provance (mprovance@mayerbrown.com)
Jeffrey A. Simmons (jsimmons@foley.com)
Joseph S. Harper (jharper@foley.com)
Aundrea K. Gulley (agulley@gibbsbruns.com)
Brian T. Ross (bross@gibbsbruns.com)
Brice A. Wilkinson (bwilkinson@gibbsbruns.com)
Ross M. MacDonald (rmacdonald@gibbsbruns.com)
Justin D. Patrick (jpatrick@gibbsbruns.com)
Kathy D. Patrick (kpatrick@gibbsbruns.com)
Michael P. A. Cohen (mcohen@sheppardmullin.com)
Amar S. Naik (anaik@sheppardmullin.com)
James L. McGinnis (jmcginnis@sheppardmullin.com)
John S. Skilton (jskilton@perkinscoie.com)
Charles G. Curtis, Jr. (ccurtis@perkinscoie.com)
Michelle M. Umberger (mumberger@perkinscoie.com)
Brandon M. Lewis (blewis@perkinscoie.com)
Jesse J. Bair (jbair@perkinscoie.com)
Kathleen A. Stetsko (kstetsko@perkinscoie.com)

*s/ Michael N. Nemelka*
Michael N. Nemelka

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

AUTHENTICOM, INC.,

                          Plaintiff,               Case No. 17-cv-318

      vs.

CDK GLOBAL, LLC, and THE REYNOLDS
AND REYNOLDS COMPANY,

                          Defendants.

## AUTHENTICOM'S NOTICE OF DEPOSITION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6) FOR DEFENDANT REYNOLDS

PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 30(b)(6), Plaintiff Authenticom, Inc. ("Authenticom"), by and through their undersigned counsel, will take the deposition upon oral examination of Defendant The Reynolds and Reynolds Company ("Reynolds"), commencing at 9:00 a.m. on February 12, 2018, at the offices of Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., 1615 M Street, NW, Suite 400, Washington, D.C. 20036, or at such other mutually agreeable time and location. The deposition will continue from day to day until completed. The deposition will be taken before an officer authorized to administer oaths. The deposition will be recorded by stenographic means and/or videotaped.

As required by Rule 30(b)(6), Reynolds shall designate one or more officers, directors, managing agents, employees, or other person(s) who are most qualified, knowledgeable, and competent to testify on behalf of Reynolds on the topics identified below. Please identify the person or persons who will testify pursuant to this notice and the matter or matters about which

1

each person will testify no later than 10 business days before the date on which the deposition will commence.

## **DEFINITIONS**

For purposes of the topics identified below the following definitions shall apply:

1. "Add-on application" means a software application that dealers use in addition to or separate from their Dealer Management System ("DMS") software in the course of operating their dealerships.

2. "All" shall be construed as all and any, and the term "any" shall be construed as all and any.

3. "Authenticom" shall mean the Plaintiff in this action and a provider of data integration services in the automotive industry based in La Crosse, Wisconsin. "Authenticom" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

4. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the deposition topic all responses that might otherwise be construed to be outside of its scope.

5. "CDK" shall mean CDK Global, LLC, as described in Paragraph 4 of Defendants' Combined Statement of Additional Facts Requiring Denial of Preliminary Injunctive Relief (hereinafter, "SoAF"), Dkt. No. 87 (June 16, 2017). "CDK" shall include the Dealer Services business of Automatic Data Processing, Inc. ("ADP") prior to September 30, 2014. *See* SoAF ¶ 5. "CDK" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

6. "Communication" shall mean any exchange or transfer of information, whether electronic, written, oral, or in any other form. The phrase "communication between" is defined to include instances where one party addresses the other party but the other party does not necessarily respond.

7. "Data access policy" means Your policy with respect to the ability of dealers to authorize independent data integrators to access data on the DMS or otherwise grant third parties access to their data on the DMS.

8. "Data integrators" shall refer to service providers that provide access by any means to dealer data on the DMS database, whether by extracting the data, writing data back into the DMS, or both. For the avoidance of doubt, "data integrators" includes CDK (through its 3PA program) and Reynolds (through its RCI program).

9. "DMI" shall mean Digital Motorworks, Inc., as described in Paragraph 215 of the SoAF. "DMI" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

10. The "DMS Market" shall mean the market for the provision of DMS services to new car franchised automobile dealers in the United States.

11. "Document" and "Documents" are used in the broadest extent permitted by Federal Rule of Civil Procedure 34(a).

12. "IntegraLink" shall mean IntegraLink as described in Paragraph 215 of the SoAF. "IntegraLink" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

3

13.     "Including" (in addition to its usual meanings) shall mean including but not limited to.

14.     "Independent data integrators" shall mean data integrators that provide data integration services on a DMS platform and are unaffiliated with the DMS provider.

15.     "Meeting" shall mean, without limitation, any assembly, convocation, encounter, communication or contemporaneous presence (whether in person or via any electronic, computer-assisted, digital, analog, video, or telephonic method of communication) of two or more persons for any purpose, whether planned or arranged, scheduled or not.

16.     "Person" or "persons" shall mean, without limitation, any individual, corporation, partnership or any variation thereof (e.g., limited partnership, limited liability partnership), limited liability company, proprietorship, joint venture, association, government entity, group or other form of legal entity.

17.     "Preliminary Injunction Hearing" shall mean the hearing conducted in the United States District Court for the Western District of Wisconsin in this case, No. 3:17-CV-318-JDP, from June 26-28, 2017.

18.     "Price Secrecy Provision" means any contractual provision designed to prevent vendors from informing dealers or other third parties about the pricing charged under the 3PA or RCI programs.

19.     The terms "relating to," "related to," "referring to," "regarding," or "with respect to" shall mean, without limitation, the following concepts: concerning, discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part.

4

20.     "Reynolds" shall mean "The Reynolds & Reynolds Company" as described in Paragraphs 1-3 of the SoAF.  "Reynolds" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

21.     "SecurityFirst" shall mean the CDK initiative described in Paragraphs 133-148 of the SoAF.

22.     "SIS" means Superior Integrated Solutions and shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

23.     "Vendors" or "application providers" shall mean vendors who provide software applications that perform operations functions for dealerships, as described in Paragraph 20 of the SoAF.

24.     "You," "your" or "your company" mean the responding defendant, its predecessors, successors, parents, subsidiaries, departments, divisions, joint ventures, and affiliates, including without limitation any organization or entity that the responding defendant manages or controls, together with all present and former directors, officers, employees, agents, representatives or any persons acting or purporting to act on behalf of the responding defendant.

## TOPICS

### Agreements Between CDK and Reynolds

1.     The February 18, 2015 Data Exchange Agreement, 3PA Agreement, and Reynolds Interface Agreement, including the negotiation, drafting, purpose, implementation, and current status of those agreements.

2.      The transition of CDK's vendor customers into the Reynolds RCI program following the February 18, 2015 Data Exchange Agreement.  This topic includes without limitation:

      a.   all information provided by CDK to Reynolds about its vendor customers, *see*, *e.g.*, §§ 4.3, 4.4, Exhibit DEA-2 of the Data Exchange Agreement;

      b.   communications between CDK and Reynolds about CDK's vendor customers;

      c.   communications between CDK and its vendor customers regarding the RCI program;

      d.   pricing information regarding what CDK vendor customers paid for access to data on the Reynolds DMS before the Data Exchange Agreement, and what those vendor customers (1) paid when they entered into the RCI program, and (2) what they pay now; and

      e.   communications related to any instance where CDK or Reynolds advised vendors awaiting RCI certification to move their data integration business to CDK, DMI, or IntegraLink in advance of RCI certification.

3.      Any and all communications between CDK and Reynolds regarding access by independent data integrators to data on their respective DMS platforms.

4.      Communications between CDK and Reynolds relating to Authenticom, DealerVault, or Steve Cottrell – including all documents concerning such communications.

5.      Any cooperation, coordination, joint effort, assistance, exchange of information or technical knowhow, or any other type of collaboration between CDK and Reynolds in blocking

an independent data integrator's access – including Authenticom's access – to dealer data on their respective DMS platforms.  This topic includes without limitation:

  a.  Any communications with each other regarding the blocking of independent data integrators, including Authenticom;

  b.  Any communications regarding the technological means of blocking independent data integrators, including Authenticom;

  c.  Sharing of any information – whether technological or otherwise – with each other regarding the blocking of independent data integrators, including Authenticom; and

  d.  Any communications with each other regarding Authenticom's business working with Reynolds dealers to extract data using Dynamic Reporting, including blocking Authenticom's work in that regard.

**Reynolds' Add-On Applications**

6.  Financial information relating to Reynolds' add-on applications for each year from January 1, 2011, to the present, including (1) the prices Reynolds charges per month for the add-on applications; and (2) the actual and projected quarterly operational costs, revenues, and profits of Reynolds' add-on applications.

7.  Reynolds' effort to advantage its own add-on applications as compared to applications offered by third-party vendors.  This topic includes without limitation:

  a.  any functionality with respect to access to dealer data requested by vendors through the RCI program that Reynolds refused; and

  b.  any effort to disrupt the workflow of applications offered by competing vendors.

8.     Reynolds' add-on applications. This topic includes without limitation:

    a.   the services that Reynolds' add-on applications provide;

    b.   vendors that provide competing services and products to Reynolds' add-on applications;

    c.   Reynolds' market share in the respective markets for its add-on applications; and

    d.   how Reynolds' add-on applications obtain dealer data from the Reynolds DMS, and how much they pay for that data integration service, if anything; and

    e.   the data integration services used by Reynolds' add-on applications, including but not limited to 3PA and Authenticom.

9.     Reynolds' use of Authenticom for data integration services from 2011 to present. This topic includes any instance in which a Reynolds-owned (wholly, jointly, or partially) add-on application used Authenticom for data integration services with respect to any DMS platform, including Reynolds' own.

**CDK Access to Reynolds DMS**

10.     CDK's (including through its subsidiaries, Digital Motorworks and Integralink) access to data on the Reynolds DMS. This topic includes without limitation:

    a.   communications between CDK and Reynolds regarding CDK's access to the Reynolds DMS;

    b.   the technological means by which CDK accesses or accessed the Reynolds DMS;

    c.   the technological means by which Reynolds has either blocked or permitted CDK's access to the Reynolds DMS;

    d.   communications with vendors or dealers regarding CDK's access to the Reynolds DMS;

    e.   the vendors for whom CDK provided access to data on the Reynolds DMS, including the time period during which CDK provided or has provided that access; and

    f.   CDK's wind down of its access to data on the Reynolds DMS.

11.    Your blocking or disabling of the dealer-provided login credentials that Digital Motorworks and/or IntegraLink used to access the Reynolds DMS.

12.    CDK's current data integration services for Reynolds dealers.

**Reynolds' Data Access Policies**

13.    Reynolds history of allowing dealers using a Reynolds DMS to authorize independent integrators to provide data integration services for data on that DMS.

14.    Communications and statements (whether internal or public) regarding the ability of dealers to authorize independent data integrators to access data on the Reynolds DMS. This topic includes without limitation:

    a.   communications with dealers or vendors, representations to dealers or vendors, or statements relating to dealers or vendors (whether internal to Reynolds or public) regarding the ability of dealers to authorize independent data integrators to access data on the Reynolds DMS;

    b.   public statements regarding the ability of dealers to authorize independent integrators to access data on the Reynolds DMS; and

      c.   internal documents and communications regarding the ability of dealers to authorize independent integrators to access data on the Reynolds DMS.

15.     Open Secure Access, Inc., including Reynolds' attempted participation and membership in the group, the policies and purpose of the group, the stated principles espoused by the group, or any other documents relating to the group and your own data access policies.

16.     Reynolds' decision to start blocking independent data integrators – such as Authenticom – from being able to provide data integration services to dealers using a Reynolds DMS.

17.     The technological measures Reynolds has used to disable or block the ability of independent data integrators, including but not limited to Authenticom, to access a Reynolds DMS, from 2008 to present.

18.     Reynolds' whitelisting or authorization of independent data integration services for data stored in a Reynolds DMS – whether done at the request of dealerships (such as Penske), vendors, original equipment manufacturers (such as Jaguar or BMW), agreements or arrangements with independent data integrators (such as CDK, Authenticom, or SIS).  This topic includes without limitation:

      a.   communications with data integrators, vendors, and/or dealers regarding the whitelisting of login credentials;

      b.   for which data integrators, vendors, or other third parties Reynolds whitelisted login credentials;

      c.   how whitelisting is accomplished, including all technical, system architecture, workflow processes, or other mechanisms used to whitelist login credentials;

     d.   internal documents and communications regarding whitelisting of login credentials, including whether to whitelist, how to whitelist, the benefits and drawbacks of whitelisting, or any other such materials regarding the protection of login credentials used by third parties; and

     e.   the number of dealers with a Reynolds DMS for which SIS continued to provide any data integration services after the litigation between Reynolds and SIS terminated, and the specific services that SIS provided and/or provides to each such dealer.

19.    Security and system performance concerns that Reynolds believes are associated with independent data integration services, including (1) specific instances, if any, where Authenticom degraded the performance of the Reynolds DMS; and (2) specific instances, if any, where independent data integration providers caused a data breach on a Reynolds DMS.

20.    Agreements between Reynolds and any provider of data integration services. This topic includes without limitation:

     a.   any "wind down," settlement, or other agreements entered into between Reynolds and any data integration provider; and

     b.   communications with other parties (whether vendors or dealers) regarding the agreements.

21.    The Dynamic Reporting program. This topic includes without limitation:

     a.   The ability of dealers to extract their data from a Reynolds DMS manually, including by using Dynamic Reporting.

     b.   when that capability was instituted;

     c.   the means by which dealers extract the data manually;

11

    d.  how often dealers extract their own data for purposes of providing the data to third-party vendors;

    e.  the means by which dealers send their manually-extracted data to vendors; and

    f.  the functionality of Dynamic Reporting, including the ability of dealers to extract data using bulk queries, individual queries only, and any other subject affecting the ease of use of Dynamic Reporting for dealers.

**Reynolds' Data Integration Services**

22.    Reynolds' standard RCI contract, and any material changes over time.

23.    Reynolds' enforcement, threat of enforcement, and interpretation of contractual provisions in vendors' current RCI contracts.  This topic includes without limitation:

    a.  communications with vendors relating to whether they can (or cannot) use independent data integrators to access data on the Reynolds DMS, including any communications that cite provisions in a particular RCI contract to that effect;

    b.  the enforcement or threat of enforcement of Reynolds' RCI contract against vendors with respect to accessing data on the Reynolds DMS by means other than through the RCI program;

    c.  the enforcement or threat of enforcement of the price secrecy provisions in the RCI contract;

    d.  documents and communications relating to what vendors can tell dealers (whether on invoices, in general communications, or otherwise) with

respect to what vendors pay Reynolds under the RCI program for data

integration; and

e.   documents describing, construing, or interpreting the RCI agreements.

24.   The RCI program's pricing (both up-front and recurring pricing) and actual and projected costs, revenues, and profitability, from 2011 to present.

25.   The operation of the RCI program, including the services offered to vendors that participate in the RCI program and the manner and form in which data is delivered to vendors that participate in the RCI program.

26.   Data security and/or DMS system performance with respect to CDK's access to the Reynolds DMS.  This topic includes without limitation:

a.   the effect of CDK's access to the Reynolds DMS on the performance of

the Reynolds DMS;

b.   any data security incidents caused by CDK's access to the Reynolds DMS;

and

c.   any specific system performance issue that was or is directly attributable

to CDK's access to the Reynolds DMS.

**Reynolds DMS Products and Services**

27.   The competitive threat posed by add-on applications – such as customer relationship management, inventory management, service lane management, deal desking, and F&I applications – to the services provided by a Reynolds DMS.  This topic includes without limitation:

a.   the features of add-on applications that compete with features offered by

the Reynolds DMS;

13

b.  any and all documents and communications regarding the competitive threat posed by add-on applications to the primacy of the DMS to dealer operations; and

c.  controlling access to dealer data as a way to maintain the primacy of the DMS to a dealer's operations.

28.     The services and key features of a Reynolds DMS.

29.     Reynolds' DMS contracts.  This topic includes without limitation:

a.  The standard term length of Reynolds' DMS contracts; and

b.  Reynolds' DMS contracts (and/or any addendum, exhibit, or part thereof) that authorize or acknowledge that dealers may provide independent data integrators access to data on a Reynolds DMS.

30.     Your communications to dealers (whether existing or prospective DMS customers) regarding the differences or similarities between CDK and Reynolds with respect to data access policies.

31.     The tenure (i.e., how long they have been using a Reynolds DMS) of Reynolds' DMS customers.

32.     The market shares of competitors in the United States DMS market, including your market share and the market shares of your competitors, from 2008 to the present.

33.     Dealership customers switching to and from the Reynolds DMS, including dealership customers switching to CDK from Reynolds or from CDK to Reynolds, from 20011 to present.

34.     The rate of switching of Reynolds dealers to the CDK DMS before and after the February 2015 Data Exchange Agreement.

14

35.     Financial information relating to Reynolds' DMS business for each year from January 1, 2011, to the present, including (1) the prices Reynolds charges for DMS services (both basic and bundled); and (2) the actual and projected quarterly operational costs, revenues, and profits of Reynolds' DMS business.

**<u>Security and System Performance</u>**

36.     The system architecture of your DMS, technological aspects for retrieving data from the DMS database, and the blocking automated access to data on your DMS.  This topic includes without limitation:

    a.   how Reynolds blocks automated access to data on the DMS;

    b.   how data is retrieved from a DMS database;

    c.   how data is entered, stored, and organized on a DMS database;

    d.   how data read and writeback of dealer data occurs from a DMS database when using the RCI and/or 3PA programs; and

37.     Any specific security incident directly caused by Authenticom's (or any other independent integrator's) automated access to data on the CDK or Reynolds DMSs.

38.     The effects on DMS system performance of Authenticom's (or any other independent integrator's) automated access to data on the CDK or Reynolds DMSs, including any specific system performance issue directly caused by Authenticom or any other independent integrator.

39.     The technological methods used by Reynolds to block or disable dealer-provided login credentials.  The date limitation for this topic is January 1, 2011, to the present.

40.     The specific security measures Reynolds has instituted to protect the security of dealer data.  The date limitation for this topic is January 1, 2014, to the present.

41.     The security infrastructure of the Reynolds DMS and how it has changed over time.  The date limitation for this topic is January 1, 2008, to the present.

42.     Reynolds' involvement with the August 28, 2013 memo of the National Automobile Dealers Association, which was introduced as Defendants' Exhibit 15 at the Preliminary Injunction Hearing.

43.     How dealer data is stored on the Reynolds DMS.  This topic includes without limitation:

      a.   whether a dealer's data is stored separate from the data of other dealers;

      b.   whether a dealer's data is commingled with data that does not belong to the dealer; and

      c.   where dealer data is stored (whether on servers at the dealership; at Reynolds-managed server farms; at third-party managed server farms; or somewhere else).

**<u>Other Topics</u>**

44.     Investigations by the Federal Trade Commission, Department of Justice, or any other federal or state regulatory authority regarding your DMS business, data integration business, add-on applications, data access policies, or any other related matter from 2007 to the present.

45.     Your document retention and destruction policy and any modification of Reynolds' document retention or email retention policies (a) since 2013, and (b) in connection with this litigation.

46.     The identity of information and documents relied on, or reviewed by, the corporate representative(s) in preparation for this deposition, including the identity of all persons consulted by the corporate representative(s) with respect to each topic set forth in this notice.

47.     The identity and location of persons most knowledgeable about each of the foregoing topics.

48.     Reynolds' efforts to collect and produce documents in this case.  This topic includes without limitation:

      a.   the process used to identify and review pertinent documents;

      b.   the identification of any pertinent documents that have not been collected;

      c.   the identity of all location(s) from which documents were collected for production; and

      d.   a description of all documents that were, or that may have been, destroyed (including, but not limited to, documents relating to any topic in this notice of deposition).

Dated: January 10, 2018        Respectfully submitted,

*s/ Michael N. Nemelka*

Michael N. Nemelka *(pro hac vice)*
Aaron M. Panner *(pro hac vice)*
David L. Schwarz *(pro hac vice)*
Kevin J. Miller *(pro hac vice)*
Derek T. Ho *(pro hac vice)*
Daniel V. Dorris *(pro hac vice)*
Joshua Hafenbrack *(pro hac vice)*
Joanna T. Zhang *(pro hac vice)*
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax:    (202) 326-7999
Email: mnemelka@kellogghansen.com
       apanner@kellogghansen.com
       dschwarz@kellogghansen.com
       kmiller@kellogghansen.com
       dho@kellogghansen.com
       ddorris@kellogghansen.com
       jhafenbrack@kellogghansen.com
       jzhang@kellogghansen.com

Jennifer L. Gregor
Allison W. Reimann
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI 53703
Phone: 608-257-3911
Fax:    608-257-0609
Email: jgregor@gklaw.com
       areimann@gklaw.com

*Attorneys for Plaintiff Authenticom, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 10, 2018, I caused a true and correct copy of the foregoing Authenticom, Inc.'s Notice of Rule 30(b)(6) Deposition for Defendant The Reynolds and Reynolds Company to be served by email upon the following individuals:

Mark W. Ryan (mryan@mayerbrown.com)
Britt M. Miller (bmiller@mayerbrown.com)
Matthew D. Provance (mprovance@mayerbrown.com)
Jeffrey A. Simmons (jsimmons@foley.com)
Joseph S. Harper (jharper@foley.com)
Aundrea K. Gulley (agulley@gibbsbruns.com)
Brian T. Ross (bross@gibbsbruns.com)
Brice A. Wilkinson (bwilkinson@gibbsbruns.com)
Ross M. MacDonald (rmacdonald@gibbsbruns.com)
Justin D. Patrick (jpatrick@gibbsbruns.com)
Kathy D. Patrick (kpatrick@gibbsbruns.com)
Michael P. A. Cohen (mcohen@sheppardmullin.com)
Amar S. Naik (anaik@sheppardmullin.com)
James L. McGinnis (jmcginnis@sheppardmullin.com)
John S. Skilton (jskilton@perkinscoie.com)
Charles G. Curtis, Jr. (ccurtis@perkinscoie.com)
Michelle M. Umberger (mumberger@perkinscoie.com)
Brandon M. Lewis (blewis@perkinscoie.com)
Jesse J. Bair (jbair@perkinscoie.com)
Kathleen A. Stetsko (kstetsko@perkinscoie.com)

*s/ Michael N. Nemelka*
Michael N. Nemelka