# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | ) ) ) |  MDL No. 2817<br>Case No. 1:18-CV-00864 |
| _____ | ) |  |
| *This Document Relates To:* | ) ) | Hon. Robert M. Dow, Jr. |
| The Dealership Class Action | ) ) |  |

**DEFENDANT THE REYNOLDS AND REYNOLDS COMPANY'S REPLY IN SUPPORT OF ITS (1) MOTION TO DISMISS THE REYNOLDS DEALER PLAINTIFFS' CLAIMS IN FAVOR OF ARBITRATION PURSUANT TO RULE 12(B)(3) AND STAY REMAINING CDK DEALER CLAIMS; AND (2) MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT PURSUANT TO RULE 12(B)(6)**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iv

I. THE COURT SHOULD DISMISS THE REYNOLDS DEALERS' CLAIMS IN
FAVOR OF ARBITRATION AND STAY THE REMAINING CLAIMS
AGAINST REYNOLDS............................................................................................ 1

    A. The Reynolds Dealers Agreed to Reynolds's Arbitration Provision. ................. 1

    B. The Parties Agreed to Arbitrate Arbitrability. ..................................................... 2

    C. The Dealers' Claims are Arbitrable. .................................................................... 4

        1. Plaintiffs' Argument that the DMS License Lacks a Price Term is
Wrong and Beside the Point. ....................................................................... 5

        2. The Dealers' Remaining Arguments are Likewise Unavailing. .............. 7

    D. The Court Should Stay the CDK Dealers' Joint-and-Several Claims
Against Reynolds. ............................................................................................... 11

II. IN THE ALTERNATIVE, THE COURT SHOULD DISMISS PLAINTIFFS'
CLAIMS AGAINST REYNOLDS UNDER RULE 12(b)(6) ..................................... 12

    A. Plaintiffs Fail to Allege a Plausible Antitrust Injury That Resulted In a
DMS Overcharge. ............................................................................................... 12

    B. Plaintiffs Fail To Plausibly Allege An Antitrust Violation With Respect
To "Integration Services." .................................................................................. 14

        1. Plaintiffs' Claims That Reynolds "Conspired" To Continue Its
Preexisting, Unilateral Business Practices Do Not Make Economic
Sense. ........................................................................................................ 15

        2. Plaintiffs' Inability to Grant Integrators Illegal Access to
Reynolds's or CDK's DMS Is Not an Antitrust Injury............................. 17

        3. Plaintiffs Fail to Allege a Plausible "Market Division" Conspiracy. .... 19

        4. Plaintiffs Lack *AGC* Standing to Assert Claims Under Federal Law
and Most of the Relevant State Laws. .................................................... 20

    C. Plaintiffs' Monopolization and Exclusive Dealing Claims Fail For
Additional Reasons. ........................................................................................... 20

        1. Plaintiffs Fail to Allege a Plausible "Single-Brand Aftermarket"

for "Integration Services" on Reynolds's DMS.................................... 20

      a.    Reynolds's Dealer Customers Knew About Its "Aftermarket" Policy, and That Is Dispositive Of Plaintiffs' Kodak Claim. ................................. 20

      b.    Plaintiffs Cannot Allege They Are "Locked In" By Switching Costs. ........................................... 21

      c.    Plaintiffs Do Not Allege That "Information Costs" Prevented Them From Learning The Total Cost Of the "Package" They Were Buying. ................................ 22

    2.    Plaintiffs Cannot Allege That The Supposed "Exclusive Dealing" Provisions In Reynolds's Vendor Contracts Caused Their Alleged Injuries. ............................................................... 23

    3.    Reynolds's Unilateral Refusal To Grant Access To Its Copyrighted DMS Cannot Be An Antitrust Violation................................. 24

  D.    Plaintiffs' Damages Claims and Request For Injunctive Relief Are Overbroad. ......................................................................... 25

    1.    Plaintiffs' Contracts with Reynolds Require Dismissal of Their Claims Based On Purchases Made More Than One Year Prior to The Filing Of Their Respective Original Complaints............................ 25

    2.    Plaintiffs' Request For Expansive Injunctive Relief Should Be Limited Under The Seventh Circuit's Decision In *Authenticom*. ........... 26

III.    CONCLUSION.................................................................... 27

CERTIFICATE OF SERVICE ................................................. 29

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.O.A. v. Doe Run Res. Corp.*,
    4:11CV44 CDP, 2011 WL 6091724 (E.D. Mo. Dec. 7, 2011).................................................12

*Acad. of Med. of Cincinnati v. Aetna Health, Inc.*,
    2006-Ohio-657, 108 Ohio St. 3d 185, 842 N.E.2d 488 ...........................................................7

*Ali v. Fed. Bureau of Prisons*,
    128 S. Ct. 831 (2008)................................................................................................................10

*AlliedSignal, Inc. v. B.F. Goodrich Co.*,
    183 F.3d 568 (7th Cir. 1999) .................................................................................................8, 9

*Altercare of Mayfield Village, Inc. v. Berner*,
    86 N.E.3d 649 (Ohio Ct. App., 2017).......................................................................................6

*Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.*,
    885 F. Supp. 499 (S.D.N.Y. 1995) .........................................................................................12

*AT&T Techs., Inc. v. Communications Workers of Am.*,
    475 U.S. 643 (1986)..................................................................................................................2

*Belnap v. Iasis Healthcare*,
    844 F.3d 1272 (10th Cir. 2017) ...............................................................................................2

*Bischoff v. DirecTV, Inc.*,
    180 F. Supp. 2d 1097 (C.D. Cal. 2002) ...................................................................................7

*Black v. JP Morgan Chase & Co.*,
    No. 10-CV-848, 2011 WL 4102802 (W.D. Penn. Aug. 10, 2011)..........................................16

*In re Cardizem CD Antitrust Litig.*,
    105 F. Supp. 2d 618 (E.D. Mich. 2000)..................................................................................24

*Clark v. U.S. Gypsum Co.*,
    No. 2:02-CV-500-JVB, 2009 WL 899706 (N.D. Ind. Mar. 30, 2009) ...................................18

*Coors Brewing Co. v. Molson Breweries*,
    51 F.3d 1511 (10th Cir. 1995) .................................................................................................9

*In re Currency Conversion Fee Antitrust Litig.*,
    265 F. Supp. 2d 385 (S.D.N.Y. 2003)............................................................................7, 9, 11

*Dillon v. BMO Harris Bank*,
    173 F.Supp.3d 258 (M.D.N.C. 2016) ............................................................1

*In re Disposable Contact Lens Litig.*,
    No. 3:00-94 MD 1030, 2001 WL 203964 (M.D. Fla. Jan. 5, 2001) ........................24

*Douglas v. Regions Bank*,
    757 F.3d 460 (5th Cir. 2014) ................................................................3

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018) ......................................................................2

*Evans v. Bldg. Materials Corp. of Am.*,
    858 F.3d 1377 (Fed. Cir. 2017) ..............................................................3

*In re Evanston Nw. Corp. Antitrust Litig.*,
    07-CV-04446, 2015 WL 13735423 (N.D. Ill. Sept. 4, 2015) ........................7, 9, 11

*Farag v. Health Care Serv. Corp.*,
    No. 17 C 2547, 2017 WL 2868999 (N.D. Ill. July 5, 2017) ................................13

*Flynn v. FCA US LLC*,
    15-CV-0855-MJR-DGW, 2016 WL 5341199 (S.D. Ill. Sept. 23, 2016) ...................12

*Garofoli v. Whiskey Island Partners, Ltd.*,
    2014-Ohio-5433, 25 N.E.3d 400 ..............................................................7

*Gilmer v. Interstate/Johnson Lane Corp.*,
    500 U.S. 20 (1991) ..........................................................................8

*Glaspell v. Ohio Edison Co.*,
    29 Ohio St. 3d 44, 505 N.E.2d 264 (1987) ..................................................10

*Global Network Communications, Inc. v. City of New York*,
    458 F.3d 150 (2d Cir. 2006) ................................................................26

*Gore v. Alltel Communications, LLC*,
    666 F.3d 1027 (7th Cir. 2012) ........................................................8, 9, 10, 11

*Graves v. BP Am., Inc.*,
    568 F.3d 221 (5th Cir. 2009) ................................................................8

*California ex rel. Harris v. Safeway, Inc.*,
    651 F.3d 1118 (9th Cir. 2011) ..............................................................19

*Harrison v. PPG Indus., Inc.*,
    446 U.S. 578 (1980) ........................................................................10

*Henry Schein, Inc. v. Archer and White Sales, Inc.*,
   138 S. Ct. 2678 (2018)............................................................................2

*In re Independent Service Organizations Antitrust Litig.*,
   203 F.3d 1322 (Fed. Cir. 2000)..............................................................25

*JLM Indus., Inc. v. Stolt-Nielsen SA*,
   387 F.3d 163 (2d Cir. 2004).............................................................7, 11

*Jones v. Waffle House, Inc.*,
   866 F.3d 1257 (11th Cir. 2017) ..............................................................2

*In re K-Dur Antitrust Litig.*,
   338 F. Supp. 2d 517 (D.N.J. 2004) ........................................................24

*Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*,
   174 F.3d 907 (7th Cir. 1999) ............................................................3, 9

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997)...............................................................................26

*Kubala v. Supreme Prod. Services, Inc.*,
   830 F.3d 199 (5th Cir. 2016) ..................................................................3

*MacDermid Printing Solutions LLC v. Cortron Corp.*,
   833 F.3d 172 (2d Cir. 2016).....................................................................13

*Mason v. United States*,
   260 U.S. 545, 43 S. Ct. 200, 67 L. Ed. 396 (1923)...............................11

*Medcom Holding Co. v. Baxter Travenol Labs., Inc.*,
   984 F.2d 223 (7th Cir. 1993) ..................................................................7

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985).........................................................4, 7, 8, 11

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992)................................................................................4

*Morrie Mages & Shirlee Mages Found. v. Thrifty Corp.*,
   916 F.2d 402 (7th Cir. 1990) ................................................................11

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1, 103 S. Ct. 927, 74 L. Ed. 2d 765 (U.S. 1983)......................4

*New York Civ. Liberties Union v. New York City Transit Auth.*,
   684 F.3d 286 (2d. Cir. 2011)..................................................................27

*Oblix, Inc. v. Winiecki,*
  374 F.3d 488 (7th Cir. 2004) ...................................................................................10

*Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n,*
  713 F. Supp. 2d 734 (N.D. Ill. 2010) .......................................................................12

*POURfect Prods. v. KitchenAid,*
  No. CV-09-2660-PHX-GMS, 2010 WL 1769413 (D. Ariz. May 3, 2010) ..........................22

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.,*
  388 U.S. 395 (1967).......................................................................................7, 10

*PSI Repair Servs., Inc. v. Honeywell, Inc.,*
  104 F.3d 811 (6th Cir. 1997) ...................................................................................21

*Qualcomm Inc. v. Nokia Corp.,*
  466 F.3d 1366 (Fed. Cir. 2006)...................................................................................3

*Red Lion Medical Safety v. Ohmeda,*
  63 F. Supp.2d 1218 (E.D. Cal. 1999).......................................................................21

*Rent-A-Ctr., W., Inc. v. Jackson,*
  561 U.S. 63 (2010)...................................................................................................2

*United States ex rel. Reynolds v. Davis,*
  No. 10 C 3856, 2010 WL 4340260 (N.D. Ill. Oct. 22, 2010) ..................................27

*Simply Wireless, Inc v. T-Mobile US, Inc,*
  877 F.3d 522 (4th Cir. 2017) .....................................................................................3

*Susilo v. Wells Fargo Bank, N.A.,*
  796 F. Supp. 2d 1177 (C.D. Cal. 2011) ..................................................................27

*Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Intern., Ltd.,*
  1 F.3d 639 (7th Cir. 1993) ...................................................................................4, 9

*Tinder v. Pinkerton Sec.,*
  305 F.3d 728 (7th Cir. 2002) .....................................................................................1

*Training Inst., Inc. v. City of Chicago,*
  937 F. Supp. 743 (N.D. Ill. 1996) ...........................................................................26

*Turi v. Main St. Adoption Services, LLP,*
  633 F.3d 496 (6th Cir. 2011) ................................................................................2, 3

*Verizon Commc'ns Inc. v. Law Offices of Curtis v. Trinko, LLP,*
  540 U.S. 398 (2004)................................................................................................23

*Volkswagen Of Am., Inc. v. Sud's Of Peoria, Inc.*,
   474 F.3d 966 (7th Cir. 2007) ...................................................................12

*Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
   No. 16 CV 10324, 2018 WL 3313010 (N.D. Ill. July 5, 2018) ................................13

*White v. Marshall*,
   693 F. Supp. 2d 873 (E.D. Wis. 2009)...................................................................25

**Statutes**

15 U.S.C. § 77k (Securities Act § 11)...........................................................10

Ohio Rev. Code § 2307.74...........................................................................10

**Other Authorities**

ABA Section of Antitrust Law, *Antitrust Law Developments*, 735 (8th ed.) ..............................23

I. **THE COURT SHOULD DISMISS THE REYNOLDS DEALERS' CLAIMS IN FAVOR OF ARBITRATION AND STAY THE REMAINING CLAIMS AGAINST REYNOLDS.**

The Reynolds Dealers' claims are centered on their DMS license agreements. (Consolidated Complaint at ¶16 (Dealers "bring" this action to recover for "payment of artificially inflated prices for DMS…")). The license agreements that govern the challenged payments contain an unequivocal broad form arbitration provision that expressly applies to disputes brought under any legal theory and that disclaims the application of state law. More importantly, the Dealers agreed to arbitrate arbitrability. The Reynolds Dealers' claims belong in arbitration.

A. **The Reynolds Dealers Agreed to Reynolds's Arbitration Provision.**

The Reynolds Dealers—despite being sophisticated businesses—feign ignorance over how their DMS license agreements work. But they do not challenge that they each entered into DMS license agreements,[1] and they admit that these agreements expressly included broad form arbitration clauses under the rules of the American Arbitration Association and under the Federal Arbitration Act. Dkt. 358 (hereinafter "Opposition") at 2-4, 19. ▮▮▮▮▮▮▮▮



▮▮▮▮▮▮▮ The Dealers do not "unequivocally deny that there was an arbitration agreement," let alone produce any "evidence to substantiate the denial," and therefore should be compelled to arbitration. *Dillon v. BMO Harris Bank*, 173 F.Supp.3d 258, 264 (M.D.N.C. 2016); *see also Tinder v. Pinkerton Sec.*, 305 F.3d 728,

---

[1] The signed DMS Authorization Letters, Motion Ex. 8, demonstrate the essential elements of contract formation: offer, acceptance, and consideration. *See Complete Gen. Constr. Co. v. Kard Welding, Inc.*, 2009-Ohio-1861, ¶ 17, 911 N.E.2d 959, 963. The Dealers do not dispute any of these elements.

735–36 (7th Cir. 2002).

### B. The Parties Agreed to Arbitrate Arbitrability.

The Reynolds Dealers cannot avoid the broad arbitration provision. They do not deny that they contracted to arbitrate under the AAA rules and therefore agreed to have an arbitrator decide whether their claims fall within the scope of the parties' arbitration agreement. Opposition at 19; Motion at 8-10. The "wholly groundless" doctrine they attempt to invoke to avoid this result is both invalid and inapplicable. *See Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1284-93 (10th Cir. 2017); *Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1268-71 (11th Cir. 2017).[2]

It is invalid because the FAA "require[s] courts to respect and enforce agreements to arbitrate; it also specifically direct[s] them to respect and enforce the parties' chosen arbitration procedures." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018). "[I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 649 (1986). These principles apply with equal force to agreements to arbitrate arbitrability: "[a]n agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010). Application of any "wholly groundless" doctrine in this case would run

---

[2] In late June, the Supreme Court granted certiorari to resolve the circuit split on whether courts can legitimately apply a "wholly groundless" exception. *See Henry Schein, Inc. v. Archer and White Sales, Inc.*, 138 S. Ct. 2678 (2018). The Dealers' contention that there is a 4 to 2 circuit split in their favor is incorrect. As the Tenth and Eleventh Circuits emphasized, in most Circuits—including the First, Second, Eighth, Ninth, and DC Circuits—"a finding of clear and unmistakable intent" to delegate arbitrability issues to the arbitrator "ends the analysis" without consideration of a judicially invented "wholly groundless" test. *Jones*, 866 F.3d at 1268 (collecting and analyzing cases); *see also Belnap*, 844 F.3d at 1290-92 (same). Moreover, one of the cases that the Dealers count in their favor—*Turi v. Main St. Adoption Services, LLP*, 633 F.3d 496 (6th Cir. 2011)—applies by its terms only to *narrow* arbitration clauses that only permit arbitration of a limited subset of claims, unlike the broad arbitration clause at issue here.

afoul of this Supreme Court precedent by allowing the court to prejudge precisely the dispute that the parties agreed to arbitrate.

Even if there was a "narrow exception to the *Rent-A-Center* rule," it would not apply here. *Kubala v. Supreme Prod. Services, Inc.*, 830 F.3d 199, 202 & n.1 (5th Cir. 2016).[3] Even under that purported exception to the Supreme Court's guidance, "if there is a delegation clause, the motion to compel arbitration should be granted in almost all cases[,]" *id.* at 202, because so long as there is any "plausible" argument that arbitration is required, "a delegation clause is effective to divest the court of its ordinary power to decide arbitrability." *Id.* at 202 & n.1. Reynolds's arbitration agreement unequivocally incorporates the AAA's delegation clause. Motion Ex. 9 at 11; *see also* Motion at 8-10. Thus, arbitrability is for the arbitrator if Reynolds has "plausible" arguments.

*Douglas*, *Turi*, and *Evans* are inapposite.[4] In *Douglas*, there was *no* connection between the claims and the arbitration agreement. There, the claims related to funds misappropriated via an *attorney's* escrow account. The bank attempted to invoke an arbitration clause related to a totally different, long-closed consumer banking account of the attorney's client. *Douglas*, 757 F.3d at 461. By contrast, the Reynolds Dealers' allegations are intimately related to the contract through which they licensed the Reynolds DMS.

The other two turn on the narrow language of the arbitration agreements under review.[5] Reynolds's arbitration clause, by contrast, is sweeping in scope. *See Kiefer Specialty Flooring,*

---

[3] Notably, *Kubala* was written by Judge Smith, who also wrote *Douglas v. Regions Bank*, 757 F.3d 460 (5th Cir. 2014), the Dealers' leading case in *favor* of the "wholly groundless" doctrine.

[4] The Dealers' other cases did not refuse enforcement. *Qualcomm* simply set out the wholly groundless rule and remanded. *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1374 (Fed. Cir. 2006). *Simply Wireless* enforced the agreement to arbitrate arbitrability. *Simply Wireless, Inc v. T-Mobile US, Inc*, 877 F.3d 522, 529 (4th Cir. 2017).

[5] *See Turi*, 633 F.3d at 506-511 (RICO case where arbitration agreement was "deliberately limited to disputes 'regarding fees.'"); *Evans v. Bldg. Materials Corp. of Am.*, 858 F.3d 1377, 1381 (Fed. Cir. 2017) (arbitration clause with narrow "arising under" contract language rather than broad "relating to" language did not reach patent infringement, trade-dress infringement, and unfair competition claims)).

*Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999) (clause covering claims "arising out of or relating to" a contract was "extremely broad and capable of an expansive reach"). Arbitrability in this case easily surpasses the minimal threshold necessary to defeat any "wholly groundless" exception.

### C.    The Dealers' Claims are Arbitrable.

Arbitrability is a question for the arbitrator(s). But it is easily resolved in Reynolds's favor: the language of the arbitration provision mandates arbitration here. In considering the language, arbitration is required where there is any permissible interpretation of the agreement that covers the Dealers' claims. *See Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Intern., Ltd.*, 1 F.3d 639, 641 (7th Cir. 1993) (arbitration required unless it can be said with "positive assurance that the agreement is not susceptible of an interpretation that covers the asserted dispute."); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S. Ct. 927, 941, 74 L. Ed. 2d 765 (U.S. 1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.").

Courts routinely emphasize that the ordinary meaning of the phrase "relate to" or "relating to" is sweeping. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). When that phase is used in an arbitration provision, the Supreme Court has held that courts properly compel arbitration whenever "the allegations underlying the [Sherman Act] claims touch matters covered by" the contract. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n.13 (1985). The agreement here makes that already expansive sweep broader by requiring arbitration of disputes ████████████████████████████████████████████ ████████████████████████████████████████ The agreement further clarifies that ████████████████████████████████████████████████ ████████ The parties agreed to arbitrate any dispute, of any kind, that has anything at all to do

with a dealer's Reynolds DMS license.

      **1.**     **Plaintiffs' Argument that the DMS License Lacks a Price Term is Wrong and Beside the Point.**

Every Reynolds Dealer signed a license agreement for DMS services that included the same arbitration provision.

While the foregoing contract documents are more than sufficient to memorialize "price terms," Reynolds submits—for the avoidance of any possible doubt— ███████████████████

███████████████████████ The Reynolds Dealers are well aware that their license agreements require them ███████████████████████

████████████ as they have made those payments, and are now suing to recover alleged overcharges. Complaint ¶16. The Dealers' feigned ignorance of the pricing terms (Opposition at 2-3, 14) is neither credible nor legally relevant. *See Altercare of Mayfield Village, Inc. v. Berner*, 86 N.E.3d 649, 658 (Ohio Ct. App., 2017) (contracting parties charged with knowledge of the contracts they signed and are held to their terms).

In any event, Plaintiffs' argument is beside the point because their claims are, at the very least, "indirectly" related to[7] the DMS license: that agreement is a but-for cause of every harm they allege. As explained above, the license agreement creates the obligation to pay Reynolds's DMS fees, as explained above. But even if the DMS license agreement itself did not contain price terms (which it does), the very existence of the agreement is the foundation of Plaintiffs' claims. Absent the license agreement, █████████████████████████

████████████████████████████████████

██████████████████████████████ But they

[6] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[7] Dealers' suggestion that the contract uses "arise from" language is false. Opposition at 10-11.

*did* license the DMS.  The Master Agreement and Customer Guide are the written instruments that obligate the Reynolds Dealers ███████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████    The Dealers acknowledge that their claims rely on use of the DMS pursuant to the license agreement.  *See* CDK Reply at 2 (citing Opposition at 41, 43, 45-46, 54, 64, 71).  Courts have repeatedly compelled arbitration in these circumstances.[8]

### 2.    The Dealers' Remaining Arguments are Likewise Unavailing.

The Dealers' reliance on Ohio case law (particularly *Acad. of Med. of Cincinnati v. Aetna Health, Inc.*, 2006-Ohio-657, 108 Ohio St. 3d 185, 842 N.E.2d 488) is unavailing.  First, the Dealers ignore the ███████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████[9]  Second, the Dealers' Ohio cases are prime examples of the "longstanding judicial hostility to arbitration" under state law that the FAA was enacted to reverse, *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991), and are entirely inconsistent with the pro-arbitration federal case law applying that

---

[8] *See, e.g.*, *Mitsubishi*, 473 U.S. at 624-25 n.13; *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 173-78 (2d Cir. 2004) (collecting cases); *In re Evanston Nw. Corp. Antitrust Litig.*, 07-CV-04446, 2015 WL 13735423, at *7 (N.D. Ill. Sept. 4, 2015) ("The agreements both concern the MCOs paying NorthShore for hospital services. And the antitrust claims also concern those payments."); *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 410 (S.D.N.Y. 2003) ("Plaintiffs allege a conspiracy to fix currency conversion fee prices . . . . The terms of plaintiffs' use of those credit card accounts are governed by the cardholder agreements containing the arbitration clause. Thus, the antitrust claims are related to the cardholder agreements and the plaintiffs' credit card accounts such that the claims 'touch matters' covered by the cardholder agreement."); *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1106 (C.D. Cal. 2002).  The Dealers' only response to *JLM*'s all-fours holding in favor of arbitrability is to cite this Court's order on the Dealers' Motion to Convert, Dkt. 340.  But an order holding that a document is not "central" to the claims within the meaning of federal civil procedure is not the same as a determination that the claims are not even indirectly related to a contract within the meaning of federal arbitration law.  Moreover, the Exhibits in which prices are set out are incorporated by reference into the contracts.

[9] *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 984 F.2d 223, 227 (7th Cir. 1993) ("[W]here a contract contains both general and specific provisions relating to the same subject, the specific provision controls."); *Garofoli v. Whiskey Island Partners, Ltd.*, 2014-Ohio-5433, ¶ 29, 25 N.E.3d 400, 406 (same); *see also generally Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402–04 (1967) (arbitration agreement is separable from and analyzed distinct from contract in which it appears).

statute.  Third, the Dealers misstate the choice-of-law rules generally applicable to arbitrability analysis.  The Dealers are correct that contract *formation* is an issue of state law, but "[o]nce it is clear . . . that the parties have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration ***as a matter of federal law***."  *Gore v. Alltel Communications, LLC*, 666 F.3d 1027, 1032–33 (7th Cir. 2012) (emphasis added).[10] The Dealers' Ohio cases are thus irrelevant.

The Dealers cite two federal appellate cases refusing to compel arbitration of antitrust claims on the grounds that they do not relate to a contract containing an arbitration agreement. The Seventh Circuit's decision in *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568 (7th Cir. 1999), is distinguishable because, unlike here, the arbitration agreement was not contained in the plaintiff's contract to purchase the allegedly affected product.  As Judge Chang explained in rejecting an identical attempt by antitrust class plaintiffs to misuse *AlliedSignal*:

> The contract had nothing to do with either the plaintiff or that defendant buying or selling anything from each other—it was just about seeking business opportunities together. This was key: the cooperation agreement just did not have anything to do with the antitrust claim. *AlliedSignal*, 183 F.3d at 573. The same is not true here. The contracts here are about the MCOs paying NorthShore for care that NorthShore provides to the MCOs members. The antitrust claim alleges that the MCOs paid too much *under those contracts.* Unlike in *Allied*, the contract and the antitrust claim here are related.

*In re Evanston Nw. Corp. Antitrust Litig.*, 07-CV-04446, 2015 WL 13735423, at *7 (N.D. Ill. Sept. 4, 2015).[11]  As a result, "*AlliedSignal* must be confined to its facts" and has no bearing in cases

---

[10] *See also, e.g.*, *Mitsubishi*, 473 U.S. at 626 (1985) (interpretation of scope is matter of "federal substantive law of arbitrability"); *Graves v. BP Am., Inc.*, 568 F.3d 221, 222–23 (5th Cir. 2009) (same).

[11] Moreover, the "relatedness" analysis in *AlliedSignal* that the Dealers block-quote, Opposition at 15, is contrary to the Seventh Circuit's consistent rule for analyzing broad-form "arising out of or relating to" arbitration clauses.  The *AlliedSignal* panel refused to compel arbitration in part because the plaintiff could prove an antitrust violation without demonstrating a breach of the agreement containing the arbitration clause.  *AlliedSignal*, 183 F.3d at 573 ("B.F. Goodrich–Coltec could fully comply with the SAA and still cause AlliedSignal antitrust injury").  But Seventh Circuit cases before, contemporaneous with, and after *AlliedSignal* hold that broad-form arbitration clauses cover claims related to the contract regardless of whether they implicate the parties' performance or breach of their duties or

where (as here) a broad arbitration agreement is contained in the purchase contract for the allegedly affected product.[12]

The Tenth Circuit's opinion in *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511 (10th Cir. 1995), similarly involved an arbitration provision unconnected to the specific antitrust allegation at issue. There, a monopolization claim was not arbitrable under an arbitration clause in an agreement unrelated to the purchase of the affected product: every beer producer and consumer was identically situated. By contrast, the court compelled arbitration of a separate claim for which—as here—the injury alleged flowed through the agreement containing the arbitration provision. *Id.* at 1512-17. *Coors* is authority in Reynolds's favor, not the Dealers': but for the DMS license, they would not have suffered the alleged injury. *See Currency Conversion*, 265 F.Supp.2d at 409-10 (distinguishing *Coors*).

Finally, the Dealers' suggestion that the arbitration agreement does not cover statutory claims (despite the agreement's specific provision that ███████████████████████ ████████████████████████████████████████████████████████████████████ is baseless. All of the Dealers' ambiguity arguments flow from the mistaken premise that there is a conflict between the Ohio choice-of-law clause and arbitration of non-Ohio-law claims. Opposition at 17-18. That asserted ambiguity is nonexistent. As already noted, *supra* at 7, ████ ██████████████████████████████████████████████████████████████████

---

interpretation of the contract's terms. *E.g.*, *Gore*, 666 F.3d at 1033; *Kiefer*, 174 F.3d at 910; *Sweet Dreams*, 1 F.3d at 641-43. It appears that the *AlliedSignal* panel mistakenly applied the test for narrower "arising *under*" arbitration clauses, as evidenced by its performance-and-breach based analysis and its conclusion that "AlliedSignal's antitrust claims do not arise under the SAA . . . ." *AlliedSignal*, 183 F.3d at 573. *See also Sweet Dreams*, 1 F.3d at 642 ("arising under" provisions are materially narrower than "arising out of" or "relating to" provisions).

[12] *Currency Conversion*, 265 F.Supp.2d at 410 n.6 (quoting *LCA, Inc. v. Sharp Elec. Corp.*, No. 00–3283, 2000 WL 1222044, at *3 (N.D.Ill. Aug. 22, 2000)).

████████████████████████████ [13] *See Gore*, 666 F.3d at 1032–33; *Prima Paint*, 388 U.S at

402–04 (arbitration clause construed and enforced independent of larger contract).

Even if the phrase in question was ambiguous (it is not), the Dealers' arguments applying

interpretive canons to assign it a narrow meaning are foreclosed by the overriding federal rule that

ambiguity in an arbitration agreement is construed in *favor* of arbitration, not against. *See supra*

at 4. The Dealers' canon-based arguments also fail on their own terms. The "against-the-drafter"

canon does not apply in favor of sophisticated commercial contractors like the Dealers.[14] *Ejusdem*

*generis* does not suggest that ████████████████ means "common-law claims," as the Dealers

argue. ████████████ is *not* a species of "common law claim": it is a standard, one routinely

found in statutory claims,[15] so the argument fails on its own terms. Further, *ejusdem generis*

applies only when a literal reading of an unrestricted term is in tension with the context and

structure of the text in which it appears.[16] ████████████████████████████████████

████████████████████████████████████████████████████████

To credit the Dealers' argument, one would have to believe that the parties inserted the

---

[13] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

[14] *E.g.*, *Glaspell v. Ohio Edison Co.*, 29 Ohio St. 3d 44, 47, 505 N.E.2d 264, 266–67 (1987); *see also Oblix, Inc. v. Winiecki*, 374 F.3d 488, 491 (7th Cir. 2004) ("Standard-form agreements are a fact of life, and given § 2 of the Federal Arbitration Act, 9 U.S.C. § 2, arbitration provisions in these contracts must be enforced unless states would refuse to enforce all off-the-shelf package deals.").

[15] *E.g.*, Ohio Rev. Code § 2307.74 (in products suits, manufacturer liable despite exercise of "all possible care"); 15 U.S.C. § 77k (Securities Act § 11).

[16] *Ali v. Fed. Bureau of Prisons*, 128 S. Ct. 831, 833 (2008) (rejecting "attempt to create ambiguity where the statute's text and structure suggest none" and emphasizing that "we do not woodenly apply limiting principles every time Congress includes a specific example along with a general phrase" when context suggests the general phrase is intended in its unrestricted sense); *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980) ("The rule of *ejusdem generis*, while firmly established, is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty."); *Mason v. United States*, 260 U.S. 545, 554, 43 S. Ct. 200, 202, 67 L. Ed. 396 (1923) (*ejusdem generis* is "a rule of *construction*, to be resorted to only as an aid to the ascertainment of the meaning of doubtful words and phrases, and not to control or limit their meaning contrary to the true intent. It cannot be employed to render general words meaningless, since that would be to disregard the primary rules, that effect should be given to every part of a statute, if legitimately possible, and that the words of a statute or other document are to be taken according to their natural meaning.").

phrase ███████████████████████████████████████████████

██████████████████ in an effort to *narrow* the scope of arbitration. That does not square with common sense or the long line of authority noting that broad-form, "related to" arbitration agreements cover claims with any connection to the contract regardless of the legal theory on which the claims are premised.[17] In sum, in the unlikely event that the Court—as opposed to an arbitration panel—were to decide arbitrability, the Reynolds Dealers' claims are unquestionably arbitrable.

### D. The Court Should Stay the CDK Dealers' Joint-and-Several Claims Against Reynolds.

If this Court dismisses the Reynolds Dealers' claims in favor of arbitration, the unambiguous language of the FAA ***requires*** this Court to stay the remainder of this "action." *See* Motion at 19-20 (quoting 9 U.S.C. § 3). The Seventh Circuit adopted that construction in *Morrie Mages & Shirlee Mages Found. v. Thrifty Corp.*, 916 F.2d 402, 406-08 (7th Cir. 1990). Later panel opinions cannot overrule that holding absent *en banc* or Rule 40(e) review.

Even if a mandatory stay is denied, the discretionary analysis from the later cases strongly favors a stay. *See* Motion at 20-23. Every single count of the Dealers' Complaint includes an explicit allegation of a "conspiracy" between Reynolds and CDK. *See, e.g.*, Complaint ¶¶ 182, 192, 210, 378. There is an overwhelming risk that this Court's rulings could prejudice Reynolds's arbitration rights through preclusion or undue influence on the arbitrator.[18] The cases that the Dealers cite do not hold to the contrary: those decisions either explicitly conclude that the issues

---

[17] *E.g.*, *Mitsubishi*, 473 U.S. at 617, 624 n.13 (antitrust); *Gore*, 666 F.3d at 1036 (Illinois consumer protection statute); *JLM*, 387 F.3d at 173-78 (antitrust and, in collected cases, RICO); *In re Evanston Nw. Corp. Antitrust Litig.*, 2015 WL 13735423, at *7 (applying Seventh Circuit law to antitrust claims); *Currency Conversion*, 265 F.Supp.2d at 410 (antitrust).

[18] *See Volkswagen Of Am., Inc. v. Sud's Of Peoria, Inc.*, 474 F.3d 966, 972 (7th Cir. 2007). Plaintiffs' attempt to distinguish the decision in the *Auto Parts* case fails. The Court's reasoning in that case had nothing to do with the percentage of class representatives who had an arbitration agreement with the defendant in question.

in the arbitration and litigation are so different that there is no such risk, or fail to address that centrally important factor.[19]

## II.     IN THE ALTERNATIVE, THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS AGAINST REYNOLDS UNDER RULE 12(b)(6)[20]

### A.     Plaintiffs Fail to Allege a Plausible Antitrust Injury That Resulted In a DMS Overcharge.

Plaintiffs' opposition confirms that they are unable to explain how any of the conduct asserted in their Complaint—all of which concerns so-called DMS "integration services"—caused Plaintiffs to suffer an antitrust injury with respect to any DMS overcharge.[21]  *See* Complaint, ¶ 5 (alleging that DMS and "integration services" are "separate" products); *id.* at ¶16 (claiming both DMS and integration related overcharges).

Accordingly, Plaintiffs offer only cursory attempts to support their assertions of DMS injury.  First, they assert that DMS prices "have gone up."  (Opp. at 54).  But, even if that were true, there is no explanation for how this supposed increase in prices resulted from any antitrust violation alleged in the Complaint, and merely asserting higher prices is not sufficient to allege antitrust injury as a matter of law.  *See Farag v. Health Care Serv. Corp.*, No. 17 C 2547, 2017 WL 2868999, at *5 (N.D. Ill. July 5, 2017) (allegations of "higher prices" were not sufficient to

---

[19] In *Flynn v. FCA US LLC*, 15-CV-0855-MJR-DGW, 2016 WL 5341199, at *6 (S.D. Ill. Sept. 23, 2016), the court denied a stay of some nonarbitrating plaintiffs' claims because those claims were based on different state-law theories than the arbitrating plaintiffs' claims, so there was "little chance that the Court's rulings . . . would press the arbitrator's hand . . . ."  In *A.O.A. v. Doe Run Res. Corp.*, 4:11CV44 CDP, 2011 WL 6091724, at *5 (E.D. Mo. Dec. 7, 2011), the court held that "the issues to be resolved by the arbitration and in this litigation are separate and distinct" and that "the facts involved in this case needed to prove defendants' liability to plaintiffs are different from those needed for defendants to be entitled to indemnification" from an unrelated third party.  The courts in *Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.*, 885 F. Supp. 499, 502 (S.D.N.Y. 1995), and *Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 713 F. Supp. 2d 734, 745 (N.D. Ill. 2010) simply did not consider this important factor.

[20] In the interest of avoiding duplicative briefing, Reynolds incorporates by reference and asserts each of the 12(b)(6) arguments set forth in CDK's concurrently-filed reply papers, including without limitation CDK's *Illinois Brick* and *AGC* arguments.

[21] The fact that Plaintiffs' claims based on supposed DMS overcharges are implausible and must be dismissed does not undermine Reynolds's arguments concerning the arbitrability of those claims.  As explained above, the merit of the underlying claims (or lack thereof) has nothing to do with their arbitrability.

"clear the *Twombly* hurdle" with respect to antitrust injury).

Plaintiffs next say the alleged antitrust violations affected their DMS prices because Reynolds and CDK agreed to "degrade[] DMS functionality."[22]  (Opp. at 54).  But that is just wordplay: as their supporting citations make clear, Plaintiffs are merely repackaging their assertions that Reynolds and CDK conspired to prevent third-party "integrators" from accessing their respective systems.  (*Id.*) (citing Complaint, ¶¶ 148, 171).  Thus, the "functionality" to which Plaintiffs refer is Plaintiffs' ability to indirectly purchase *integration services from third parties*.  That is not an antitrust injury that results in a DMS overcharge.

Plaintiffs apparently concede that "duopoly" is not an antitrust violation, but seem to say that the supposed existence of a duopoly "paved the way" to an antitrust violation.  (Opp. at 54-55).  That is wrong.  *See MacDermid Printing Solutions LLC v. Cortron Corp.*, 833 F.3d 172, 186 (2d Cir. 2016) ("[T]he mere fact that a market has few competitors does not transform every action by one of them into an antitrust violation").  Moreover, merely asserting that a market is conducive to an antitrust violation is not remotely sufficient to allege an actual violation.  *See Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, No. 16 CV 10324, 2018 WL 3313010, at *11 (N.D. Ill. July 5, 2018) ("[I]ndustry structure alone cannot get the complaint across the finish line.").  And even more importantly, Plaintiffs' frequent assertions of "duopoly" have nothing to do with the issue at hand:  whether Plaintiffs can allege an antitrust injury concerning their DMS purchases.  They cannot.

Finally, Plaintiffs appear to stand behind their theory that the alleged conduct, by "closing" CDK's DMS, prevented existing Reynolds dealers who wanted an "open" system from switching

---

[22] Of course, Plaintiffs do not, and cannot, allege that there was any agreement to "degrade the functionality" of Reynolds's DMS, because it undisputed that Reynolds blocked integrators from its DMS for almost a full decade before the 2015 agreements.

to CDK.  As explained in Reynolds's opening brief, however, there is no allegation that the Defendants did—or had the power to do—anything to prevent such dealers from switching to another, non-conspiring DMS provider.  Plaintiffs' response is that competing DMS providers are not a feasible option because switching is too costly.[23]  (Opp. at 55).  But Plaintiffs ignore their own allegations of "massive" switching between Reynolds and CDK, which directly contradict that assertion.  Complaint, ¶¶ 78 n.27, 154 n.128.  Even more importantly, Plaintiffs completely ignore the larger point that, even if Reynolds dealers were prevented from switching to an "open" CDK system *and* could not practically switch to any other "open" DMS provider, that antitrust injury relates to vendor and integration issues – it does not result in a *DMS* overcharge directly to dealers.  According to Plaintiffs, the practical difference for dealers between an "open" and a "closed" DMS is their ability to use vendors that use independent integrators, and, presumably, thereby save money on the cost of vendor services.  *See* Complaint, ¶¶ 13, 77-80, 131.  Once again, then, Plaintiffs are taking an asserted injury with respect to "integration services" and attempting to repackage it as a DMS injury.

Plaintiffs have now had ample opportunity to articulate an intelligible theory for how their asserted antitrust violations relate in any way to their alleged DMS overcharge.  Instead, in their Complaint and again in their opposition papers, Plaintiffs offer vague assertions and boilerplate.  Whatever the merit of Plaintiffs' antitrust theories with respect to integration services (discussed below), Plaintiffs' claims for recovery for DMS overcharges have no substance and should be dismissed.

**B.**      **Plaintiffs Fail To Plausibly Allege An Antitrust Violation With Respect To**

---

[23] Plaintiffs appear to assert that the reality of rampant switching in the DMS industry is "outside the record."  (Opp. at 55).  But Plaintiffs affirmatively allege a "massive [market] share shift" in the industry, which they say was directly motivated by dealer preferences for "open" DMS systems. Complaint, ¶ 154 n.28.  This directly contradicts Plaintiffs' latest assertion that such switching is infeasible.

"Integration Services."

1.     **Plaintiffs' Claims That Reynolds "Conspired" To Continue Its Preexisting, Unilateral Business Practices Do Not Make Economic Sense.**

Plaintiffs concede that the alleged 2015 conspiracy to "block integrators" did not alter Reynolds's business practices in any material way:  Reynolds continued blocking integrators just as it had been doing—openly, lawfully, and unilaterally—for nearly a decade prior.  Plaintiffs concede, in other words, that they effectively accuse Reynolds of "conspiring" to do nothing.  Plaintiffs do not challenge, or even address, any of the authorities cited in Reynolds's opening papers holding that an asserted antitrust conspiracy is economically implausible as a matter of law where, as here, it is undisputed that the defendant could have achieved the same effects unilaterally.  (Motion at 30-31) (collecting authorities).

As explained in Reynolds's opening brief, this conclusion is independently mandated by Plaintiffs' own allegations that Reynolds has "monopoly power" with respect to integration services on its own DMS, and therefore has the power to raise prices unilaterally.  (*Id.* at 31-33) (collecting authorities holding that the possession of monopoly power makes a conspiracy unnecessary and implausible).  Plaintiffs appear to half-heartedly assert that Reynolds only acquired such monopoly power on its own DMS as a result of the 2015 agreements, but Plaintiffs' own allegations say otherwise:  Reynolds has unilaterally blocked independent integrators from accessing its DMS since 2006—almost a full decade before the 2015 agreements—and therefore, according to Plaintiffs, had monopoly power with respect to integration services on its own DMS well before any supposed agreement with CDK.  *See* Compl., ¶¶ 7, 77, 124-126, 205.  Under Plaintiffs' theory, Reynolds did not need to conspire with anyone to raise prices for the integration services it provided on its own DMS.

Contrary to Plaintiffs' assertion, Judge St. Eve did not address these arguments in

*Authenticom*, much less resolve them for purposes of this action. The referenced portions of Judge St. Eve's opinion expressly addressed only the summary judgment standard for establishing a "motive to conspire." (Dkt. 176 at pp. 30-31). That is not the issue presented here because, under *Twombly*, merely asserting the existence of a hypothetical motive to conspire is insufficient as a matter of law to plausibly allege an antitrust conspiracy.[24] (*See* Motion at 33-34) (collecting authorities). Instead, the issue presented here is that Plaintiffs' antitrust conspiracy claim against Reynolds makes no economic sense because it is undisputed that Reynolds could have (and was) achieving the same goal unilaterally and is *expressly alleged* to be a monopolist. Nowhere did Judge St. Eve purport to address the authorities establishing these pleading principles. (*See id.* at 32 n.54) (collecting authorities).

Plaintiffs' only meaningful attempt to contend that Reynolds's participation in a conspiracy makes economic sense is their assertion that Reynolds needed a conspiracy to deter Reynolds's existing customers from switching to CDK's previously "open" DMS. (Opp. at 56). But Reynolds did *not* need a conspiracy to achieve this result. It is far more plausible that Reynolds would have simply sat back while CDK "closed" its DMS unilaterally,[25] thereby avoiding the massive (and entirely unnecessary) risks associated with participating in an antitrust conspiracy. *See Black v. JP Morgan Chase & Co.*, No. 10-CV-848, 2011 WL 4102802, at *30-31 (W.D. Penn. Aug. 10, 2011) ("The Court agrees…that it is highly unlikely [defendants] would enter into a conspiracy in which they would needlessly risk antitrust penalties and from which they would not benefit."). CDK did not need Reynolds's agreement to close its own DMS, and Reynolds had nothing to gain from "agreeing" to the change. Plaintiffs do not even acknowledge this point.

---

[24] Plaintiffs do not even acknowledge this point.
[25] Again, there is no factual allegation anywhere that Reynolds even knew CDK intended to "close" its DMS, and such a term appears nowhere in the supposedly conspiratorial 2015 agreements between Reynolds and CDK.

Plaintiffs again say that Reynolds was at no risk of losing customers to other providers of "open" DMS systems because switching is too costly and the competing DMS providers are too small. But as noted above, Plaintiffs' own allegations show that switching is not only feasible but abundant in this industry. Not surprisingly, then, the Federal Trade Commission has stated that other competitors are increasingly taking customers and market share from Reynolds and CDK. (*See* discussion in Motion, at 44-45).[26]

Finally, Plaintiffs attempt to sidestep the pleading requirement that the alleged conspiracy makes economic sense by pointing to their assertions that Defendants' executives supposedly admitted to the conduct Plaintiffs allege. But Plaintiffs have it backwards: the asserted confessions do nothing to show that the alleged underlying conspiracy makes economic sense; rather, the fact that the alleged conspiracy makes no sense confirms that the supposed confessions are facially implausible. Antitrust plaintiffs should not be permitted to nullify *Twombly* and ignore basic economic principles by baldly asserting that "Defendants admitted to everything."

### 2. Plaintiffs' Inability to Grant Integrators Illegal Access to Reynolds's or CDK's DMS Is Not an Antitrust Injury.

Plaintiffs do not dispute that the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.* makes it illegal to intentionally access a computer system without authorization and obtain information. Plaintiffs' own allegations show that integrators intentionally access DMS systems and obtain information. Complaint, ¶ 5. And Plaintiffs allege that such access has long

---

[26] Nor do Plaintiffs acknowledge that the supposed conspiracy would have been at least as likely to harm Reynolds's market share as help it. Plaintiffs do not dispute that Reynolds's "closed" DMS had long been a major point of market differentiation between Reynolds and other DMS providers, including its largest competitor CDK. Plaintiffs do not even try to explain why it would have made sense for Reynolds to "agree" that its most serious competitor would now begin offering its own "closed" DMS, bringing it into even more direct competition with Reynolds's system and depriving Reynolds of its primary calling card in the market. Thus, even if one were to credit Plaintiffs' assertion that the supposed conspiracy would have deterred some Reynolds customers from switching to CDK, it is at least as likely that the conspiracy also would have *incentivized* some Reynolds customers to switch to CDK (*e.g.*, those that desired a "closed" system and preferred CDK).

been unauthorized by Reynolds (including well before the alleged "conspiracy") and more recently is unauthorized by CDK as well. *Id.*, ¶¶ 7, 10, 77, 78-79 & n.25. Plaintiffs' opposition brief does not contend otherwise.

Instead, Plaintiffs rely (Opp. at 59) entirely on Judge St. Eve's ruling in *Authenticom* that, "Authenticom's as-alleged practices are not illegal independent of Defendants' challenged conduct." Dkt. 176 at 20-21.[27] But as explained in Reynolds's opening brief, that is not what these Plaintiffs allege. Indeed, Plaintiffs emphasize in their opposition papers that they, unlike Authenticom, do not challenge any term or condition in their licensing agreements with Defendants, including the provision in Reynolds's Master Agreement ████████████████████████ ████████████████████████████████████████████ (Opp. at 11, 60, 76). And Plaintiffs do not dispute that, even if the supposed conspiracy never existed, this express, lawful provision would have still ████████████████████████████████████████, and therefore illegal under the CFAA *independent* of any alleged misconduct. Thus, the premise of Judge St. Eve's ruling in *Authenticom* is negated by Plaintiffs' differing allegations in this case.

Rather than address this argument on substance, Plaintiffs attempt to play another procedural game, contending that the Court is precluded even from considering the fact that Reynolds's contracts with Plaintiffs ████████████████████████████. Not so. Judge St. Eve relied on this provision in *Authenticom*, and there are no procedural machinations necessary for this Court to make use, in its discretion, of rulings made by its predecessor in this MDL. *See Clark v. U.S. Gypsum Co.*, No. 2:02-CV-500-JVB, 2009 WL 899706, at *1 (N.D. Ind. Mar. 30, 2009) ("The court may consider previous orders of another federal court when deciding

---

[27] Judge St. Eve also noted that "Defendants may have claims against Authenticom under the CFAA and related state laws—indeed, Authenticom's docket and defense counsel's representations in court suggest that they may bring such claims…" *Id.*

a motion to dismiss.").

### 3.    Plaintiffs Fail to Allege a Plausible "Market Division" Conspiracy.

Plaintiffs concede that their market division conspiracy claim requires them to plausibly allege a "*quid pro quo*" agreement, such that each conspirator agrees to refrain from making certain sales. Plaintiffs' response is that there is a *quid* here, because CDK agreed to stop providing integration services on Reynolds's DMS. But Plaintiffs do not, and cannot, identify any *quo*— they cannot allege that, in exchange, *Reynolds* agreed to refrain from making any sales at all. Not surprisingly, Plaintiffs offer no authority supporting this single-company conspiracy theory—in a market division context or any other.[28]

Plaintiffs also concede that they must plausibly allege that Reynolds and CDK were actual or potential competitors with respect to their supposed market division conspiracy, but they make no serious attempt to satisfy this standard. Plaintiffs say only that Reynolds and CDK are competitors in the DMS market, (Opp. at 61), but that is not the market Plaintiffs accuse the Defendants of "dividing." Complaint, ¶ 81 (alleging that Reynolds and CDK conspired to divide the market for "integration services"); *id.* ¶¶ 7, 80. Plaintiffs do not even try to suggest that Reynolds was a competitor with respect to "integration services,"—i.e., the practice of extracting data from another's computer system, formatting it, and selling it to third parties for a fee—nor could they, because Reynolds has never provided such services.[29] As Plaintiffs themselves observe, this fact demonstrates that "there would be no point" for Reynolds and CDK to enter into

---

[28] *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1137 (9th Cir. 2011) provides Plaintiffs no support: it holds that a market division agreement must restrict the sales of "*competitors* at the same level [of the market]…." (emphasis added; internal quotations omitted).

[29] Plaintiffs appear to suggest that Judge St. Eve's *Authenticom* opinion somehow supports their market division claim. On the contrary, Judge St. Eve dismissed Authenticom's substantially identical market division claims for lack of antitrust injury. Dkt. 176 at pp. 31-33. Nor did Judge St. Eve find that the 2015 agreements between Reynolds and CDK required Reynolds to refrain in any way from selling integration services. That is because the 2015 agreements say no such thing. Plaintiffs do not seriously contend otherwise.

a market division conspiracy. (Opp. at 61) (quoting *U.S. v. Sargent Elec. Co.*, 785 F.2d 1123, 1127 (3d Cir. 1986)).

### 4. Plaintiffs Lack *AGC* Standing to Assert Claims Under Federal Law and Most of the Relevant State Laws.

Just as with the other arguments set forth in CDK's Reply, *see* note 20, *supra*, Reynolds incorporates CDK's arguments demonstrating that Plaintiffs' arguments with respect to *AGC* standing are baseless.

### C. Plaintiffs' Monopolization and Exclusive Dealing Claims Fail For Additional Reasons.

#### 1. Plaintiffs Fail to Allege a Plausible "Single-Brand Aftermarket" for "Integration Services" on Reynolds's DMS.

There is nothing "improper" about Reynolds's request that the Court revisit what Reynolds respectfully submits is an error of law in the only prior *Kodak* ruling in this MDL. Far more important than avoiding "inconsistent rulings," particularly at this relatively early stage of the litigation, is ensuring that this MDL is litigated under the correct legal standard. Plaintiffs' opposition confirms that they are unable to allege any of the factual prerequisites to a *Kodak* claim.

##### a. Reynolds's Dealer Customers Knew About Its "Aftermarket" Policy, and That Is Dispositive Of Plaintiffs' Kodak Claim.

As set forth in Reynolds's opening brief, there is an extensive line of authority, including Seventh Circuit decisions binding on this Court, holding that the first essential element of a *Kodak* claim—that the plaintiff lacked knowledge of the defendant's "aftermarket" policy—is independently dispositive. (Motion at 41-43) (collecting authorities). Plaintiffs only half-heartedly dispute this point. They rely on a single out-of-Circuit district court opinion, which is in the clear minority on this issue, and which expressly acknowledges that its holding has been rejected by the Seventh Circuit. *See Red Lion Medical Safety v. Ohmeda*, 63 F. Supp.2d 1218, 1230-31 (E.D. Cal. 1999). Plaintiffs do not even acknowledge the Seventh Circuit's holdings in

*Digital Equipment Corp.* and *Schor* that there is no *Kodak* claim, full stop, where the plaintiff knew about the defendant's aftermarket policy in advance. (Motion at 41).

This is crucial, because Plaintiffs effectively *concede* in their opposition papers, as they must, that Reynolds's aftermarket policy concerning third-party access to its DMS was "generally known prior to 2015." (Opp. at 69). That is a dispositive concession, and the end of the *Kodak* analysis. It does not matter that Plaintiffs now seek to manufacture a supposed conspiracy between Reynolds and CDK to close *CDK's* DMS. (Opp. at 69). Plaintiffs' *Kodak* claim against Reynolds, as a Section 2 claim, can only be based on Reynolds's supposed unilateral monopolization of a distinct aftermarket on *its own* DMS. Complaint, ¶¶ 76, 124. And in that Reynolds-specific aftermarket, it is undisputed that the complained-of aftermarket policy—Reynolds's policy prohibiting third-party access—was generally known. That is dispositive. No further analysis is required. Plaintiffs' *Kodak* claim against Reynolds fails.

> ### b. Plaintiffs Cannot Allege They Are "Locked In" By Switching Costs.

Plaintiffs misconstrue the meaning of a "lock-in" as the concept is used in *Kodak*. Plaintiffs repeat the assertions in their Complaint that it is "quite a process" to change DMS providers, involving expenditures of time and money, and that dealers can only change providers after their existing contracts expire. (Opp. at 64-65). Under *Kodak*, "lock-in" does not merely mean "hard to switch"; a lock-in is a trick, in which a defendant lures its customers into economic relationships and then, after they are stuck, changes its aftermarket policy to their detriment. *See PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 818 (6th Cir. 1997) (switching costs were "particularly high" in *Kodak* because Kodak's change to its aftermarket policy came "after numerous customers had already purchased Kodak copiers, thus creating a 'lock-in' effect."). Plaintiffs do not, and cannot, allege such a "lock in" by Reynolds.

And even if the mere alleged difficulty of switching was the relevant consideration under *Kodak*, Plaintiffs are wrong that the extensive facts showing frequent switching in the DMS industry are based on improper "extrinsic evidence."[30] Plaintiffs ignore *their own allegations* of major market share shifts in the DMS industry, as well as the Complaint's reliance on a single dealer's *successful* effort to switch DMS providers. Complaint, ¶¶ 66 & n.13, 154 & n.28. These allegations are not compatible with the "very high" switching costs required by *Kodak*.

### c. Plaintiffs Do Not Allege That "Information Costs" Prevented Them From Learning The Total Cost Of the "Package" They Were Buying.

While Plaintiffs seemingly acknowledge that only the total price of the "package" is relevant under *Kodak*'s "information costs" element, they appear to take the position that Reynolds has the burden of establishing that Plaintiffs in fact knew the total price. On the contrary, to place themselves within the narrow *Kodak* exception, Plaintiffs need to *affirmatively allege* that they were prevented from knowing the total price (not merely a component of the total price) by high information costs. *See, e.g.*, *POURfect Prods. v. KitchenAid*, No. CV-09-2660-PHX-GMS, 2010 WL 1769413, at *3-4 (D. Ariz. May 3, 2010) (plaintiff has burden to plausibly allege every element of *Kodak*). The Complaint contains no such allegations, and Plaintiffs do not purport to identify any. The required allegations are absent because Plaintiffs know they are not true.

Plaintiffs' only other response on this point is their assertion that before the supposed conspiracy, some Reynolds dealers were ███████████████████████████████ ████████████████████████████████████████████████████████████████████████████████

(Opp. at 64). These breaching dealers, Plaintiffs seem to say, did not foresee that Reynolds would

---

[30] Plaintiffs attempt to identify the issue here as whether Defendants have "market power," which Plaintiffs say is a "fact-intensive" question. (Opp. at 66, n.59). That is not the issue here. The issue is whether Plaintiffs have plausibly alleged each of the facts necessary to invoke the narrow *Kodak* exception. That is a pleadings question.

discover and then block the integrators' access and thereby prevent Plaintiffs from using the integrators. The idea that these Plaintiffs did not know they could not ███████████ ██████████████ and that this lack of knowledge is somehow a valid "information costs" argument under *Kodak*, is absurd and unsupported by any authority.

> **2. Plaintiffs Cannot Allege That The Supposed "Exclusive Dealing" Provisions In Reynolds's Vendor Contracts Caused Their Alleged Injuries.**

Plaintiffs do not and cannot contravene their own allegations showing that the supposed "exclusive dealing" provisions in Reynolds's vendor contracts were unilaterally in place at least as early as 2013—well before the supposed 2015 antitrust violations. *See* Complaint, ¶ 115, Ex. 40. Because the point is uncontested, Plaintiffs' exclusive dealing claim against Reynolds should be dismissed for this reason alone. *See Verizon Commc'ns Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 408 (2004) (there is no general antitrust duty to cooperate with rivals).

On the issue of causation, Plaintiffs complain that they should not be required to rule out "all possible alternative sources of injury." (Opp. at 70-71). But that is a straw man. Plaintiffs are being asked to do something far more fundamental: plausibly allege that the "exclusive dealing" provisions in Reynolds's vendor contracts caused Plaintiffs *any injury at all*. *See* ABA Section of Antitrust Law, *Antitrust Law Developments*, 735 (8th ed.) ("The antitrust violation need not be the sole cause of the injury, *but it must be a material and a substantial cause*.") (emphasis added) (collecting authorities). Not surprisingly, each of Plaintiffs' own authorities—none of which involved a situation in which, as here, the alleged antitrust violation was simply *not a cause* of the alleged injury—recognize this essential pleading requirement. *See, e.g.*, *In re Disposable Contact Lens Litig.*, No. 3:00-94 MD 1030, 2001 WL 203964, at *6 (M.D. Fla. Jan. 5, 2001) ("the illegality [must be] shown to be a material cause of the injury"); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 649 (E.D. Mich. 2000) (same); *In re K-Dur Antitrust Litig.*, 338 F.

Supp. 2d 517, 535 (D.N.J. 2004) (plaintiffs plausibly alleged "that their injury flows from the Defendants' anti-competitive conduct.").

For Reynolds's vendor contracts to be a "but for" cause of Plaintiffs' inability to use integrators on Reynolds's DMS, it would have to be the case that, *but for* those vendor contracts, Plaintiffs could use independent integrators. But that is not the case, because Plaintiffs would still be bound by ███████████████████████████████████████████████████████████

████████████ The vendor contracts make no difference—not because they are one among many causes of Plaintiffs' supposed injury, but because they are not a cause at all. Plaintiffs do not provide any intelligible response to this dispositive point.[31]

### 3. Reynolds's Unilateral Refusal To Grant Access To Its Copyrighted DMS Cannot Be An Antitrust Violation.

Plaintiffs have no substantive response to Reynolds's argument that it cannot be held liable under the antitrust laws for a unilateral refusal to grant integrators access to its copyrighted DMS. Plaintiffs correctly point out that an antitrust defendant *can* be held liable for *conspiring* to deny access to a copyrighted work, (Opp. at 73), but Reynolds's argument is not targeted at Plaintiffs' conspiracy claims, it is targeted at Plaintiffs' claims (under theories of monopolization and exclusive dealing), that Reynolds *unilaterally* denied integrators access to its DMS. Plaintiffs apparently do not dispute that the copyright laws preclude antitrust liability for such unilateral conduct.

Plaintiffs appear to contend that this argument is somehow analogous or related to an argument decided by Judge St. Eve in *Authenticom*. (Opp. at 73, n.64). It is not. Nowhere in the *Authenticom* opinion did Judge St. Eve address the impact of Reynolds's status as a copyright

---

[31] Instead, Plaintiffs once again pretend to have no idea whether their own contracts with Reynolds prohibit the use of integrators. As explained above, however, Judge St. Eve has already observed that Reynolds's contracts contain the provision in question, and it is entirely proper for this Court to consider that finding in connection with this Motion.

holder on the scope of its antitrust liability. Nor does this issue overlap with the *Trinko* line of cases concerning general antitrust liability for unilateral refusals to deal. (Presumably, Plaintiffs make this connection because both lines of cases make use of the word "unilateral"). The lawful "copyright monopoly" is a specific and independent immunity from antitrust liability for unilateral conduct. *In re Independent Service Organizations Antitrust Litig.*, 203 F.3d 1322, 1328-29 (Fed. Cir. 2000).

Plaintiffs' only other response is their suggestion that this issue be "left for another day." They offer no reason why the issue should be deferred. The Court may properly take judicial notice of Reynolds's copyright registration certificates (*see* Dkt. No. 256-1) on a motion to dismiss, and indeed Plaintiffs do not object to their consideration. *See White v. Marshall*, 693 F. Supp. 2d 873, 884 (E.D. Wis. 2009) ("Certificates of Registration from the U.S. Copyright Office are public records that the court may take judicial notice of without converting a Rule 12(b)(6) motion to a motion for summary judgment."). Plaintiffs effectively concede, as they must, that their Complaint contains none of the allegations required to overcome the presumption against antitrust liability at the pleadings stage—*i.e.*, that Reynolds obtained its copyrights by unlawful means or used them to gain improper monopoly power. (Motion at 48-49). Nor is any discovery warranted on this issue because, as explained in Reynolds's opening brief, a copyright holder's motivations for denying access are entirely irrelevant. *In re Independent Service Organizations Antitrust Litig.*, 203 F.3d at 1329. This pleading deficiency is ripe for resolution now, and therefore all of Plaintiffs' claims against Reynolds based on alleged unilateral conduct (*i.e.*, Counts III-V, alleging monopolization and exclusive dealing) should be dismissed.

**D.    Plaintiffs' Damages Claims and Request For Injunctive Relief Are Overbroad.**

**1.    Plaintiffs' Contracts with Reynolds Require Dismissal of Their Claims Based On Purchases Made More Than One Year Prior to The Filing Of Their Respective Original Complaints.**

Reynolds respectfully requests that the Court revisit its decision not to consider the Master Agreement between Plaintiffs and Reynolds for purposes of Reynolds's one-year limitations argument.[32] Dkt. No. 340. Whether a document is "central" to a plaintiff's complaint cannot turn simply on how frequently the complaint mentions the document; otherwise, a plaintiff would be free to side-step a clearly dispositive pleadings argument "simply by clever drafting," just as Plaintiffs seek to do here. *See Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 156-157 (2d Cir. 2006). As explained above, the Master Agreement is the document that expressly creates the economic relationship between the parties and obligates Plaintiffs to pay for the products and services at issue in this litigation.

Plaintiffs cannot rely on the "discovery rule" to extend the limitations period, because that rule does not apply to antitrust claims. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188 (1997) ("[I]n private antitrust treble damages actions…a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.") (collecting authorities). And even if it did, Plaintiffs' Complaint is devoid of the required factual allegations establishing its supposed delayed discovery. *Training Inst., Inc. v. City of Chicago*, 937 F. Supp. 743, 750-51 (N.D. Ill. 1996) ("The Seventh Circuit noted over 40 years ago that such a complaint cannot survive a motion to dismiss."). Plaintiffs' claims based on alleged injuries occurring more than one year prior to the filing of their respective original complaints are facially time-barred.

### 2. Plaintiffs' Request For Expansive Injunctive Relief Should Be Limited Under The Seventh Circuit's Decision In *Authenticom*.

Plaintiffs fail to cite any authority for their assertion that Reynolds was required to file a distinct "Rule 12(f) motion" challenging Plaintiffs' improper prayer for injunctive relief. On the

---

[32] In the alternative, Reynolds requests summary judgment on the narrow issue of the one-year statute of limitation contained in the agreements of every named Reynolds dealer. Dkt. 270; Dkt. 335.

contrary, Rule 12(g) expressly requires all available Rule 12 defenses to be combined in a single motion, as Reynolds has done here. *See United States ex rel. Reynolds v. Davis*, No. 10 C 3856, 2010 WL 4340260, at *1 n.1 (N.D. Ill. Oct. 22, 2010) ("it is the substance of a motion, not its label, that controls how courts treat the request.") (citing *United States v. Boyd*, 591 F.3d 953, 956 (7th Cir. 2010)); *Susilo v. Wells Fargo Bank, N.A.*, 796 F. Supp. 2d 1177, 1196 (C.D. Cal. 2011) (court may strike prayer for relief that is not available as a matter of law).

Plaintiffs say they are entitled to a broader injunction than the one authorized by the Seventh Circuit in *Authenticom*, because they allege that Defendants "reduce[d] the functionality of dealers' DMS." (Opp. at 76). But as explained above, that is just the same injury alleged in Authenticom with a different name: the "functionality" that was supposedly "reduced" was Plaintiffs' ability to use third-party "integrators" (like Authenticom) on Reynolds's and CDK's DMS. Thus, the only appropriate injunctive remedy for that asserted injury is the one identified by the Seventh Circuit—setting aside the 2015 agreements.[33] The Court does not need a "full trial record"—or any factual record at all—to limit Plaintiffs' prayer for injunctive relief to its appropriate scope as a matter of law.

## III. CONCLUSION

For all of the reasons set forth and incorporated above and in Reynolds's opening papers, the Court should (1) dismiss the Reynolds Dealers' claims against Reynolds pursuant to Rule 12(b)(3) in favor of individual arbitrations and stay all remaining claims against Reynolds; or (2) if the Court does not grant both Reynolds's arbitration and stay requests, the Court should dismiss all of Plaintiffs' claims against Reynolds with prejudice under Rule 12(b)(6).

---

[33] Plaintiffs point out that the Seventh Circuit's ruling in *Authenticom* concerned a preliminary injunction, but that makes no difference. *New York Civ. Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 294 (2d. Cir. 2011) ("The requirements for a permanent injunction are essentially the same as for a preliminary injunction….").

Dated:  September 21, 2018

Respectfully submitted,

*/s/ Aundrea K. Gulley*
Aundrea K. Gulley
Kathy D. Patrick
Brian T. Ross
Brice A. Wilkinson
Ross A. MacDonald
Justin D. Patrick
GIBBS & BRUNS LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
(713) 751-5258
agulley@gibbsbruns.com
kpatrick@gibbsbruns.com
bross@gibbsbruns.com
bwilkinson@gibbsbruns.com
rmacdonald@gibbsbruns.com
jpatrick@gibbsbruns.com

Michael P.A. Cohen
SHEPPARD MULLIN RICHTER
& HAMPTON, LLP
2099 Pennsylvania Ave., NW, Suite 100
Washington, DC 20006
(202) 747-1900
mcohen@sheppardmullin.com

Leo D. Caseria
SHEPPARD MULLIN RICHTER
& HAMPTON, LLP
333 S. Hope St., 43rd Floor
Los Angeles, CA 90071
(213) 617-4206
lcaseria@sheppardmullin.com

Dylan I. Ballard
SHEPPARD MULLIN RICHTER
& HAMPTON, LLP
Four Embarcadero Center., 17th Floor
San Francisco, CA 94111
(415) 434-9100
dballard@sheppardmullin.com

*Counsel for Defendant The Reynolds &
Reynolds Company*

## CERTIFICATE OF SERVICE

I, Aundrea K. Gulley, an attorney, hereby certify that on this 21st day of September, 2018, I caused a true and correct copy of the foregoing Reply in Support of Reynolds's (1) Motion to Dismiss the Reynolds Dealer Plaintiffs' Claims in Favor of Arbitration Pursuant to Rule 12(b)(3) and Stay Remaining CDK Dealer Claims; and (2) Motion to Dismiss the Consolidated Class Action Complaint Pursuant to Rule 12(b)(6) to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

/s/ Aundrea K. Gulley
Aundrea K. Gulley
**GIBBS & BRUNS LLP**
1100 Louisiana Street, Suite 5300
Houston, TX 77002
(713) 650-8805
agulley@gibbsbruns.com