PUBLIC VERSION

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| | Hon. Robert M. Dow, Jr. |
| *This filing relates to:* | Magistrate Judge Jeffrey T. Gilbert |
| *Loop, LLC, d/b/a AutoLoop v. CDK Global, LLC*, Case No. 18-cv-2521 (N.D. Ill.) | |

## DEFENDANT CDK GLOBAL, LLC'S REPLY
## IN SUPPORT OF ITS MOTION TO DISMISS AUTOLOOP'S AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 1

I.      AUTOLOOP MUST ARBITRATE ITS CLAIMS AGAINST CDK ............................. 1

      A.      Ohio Law Applies ....................................................................................... 1

      B.      Ohio Law Does Not Require CDK To Show Reliance .................................... 3

      C.      Ohio Law Requires AutoLoop To Arbitrate ................................................... 6

      D.      The Claims In This Case Are Covered By Reynolds' Arbitration Clause ............ 6

      E.      CDK Did Not Waive Its Right To Arbitrate ................................................... 8

II.     AUTOLOOP FAILS TO STATE A CLAIM ON THE MERITS ................................. 11

      A.      AutoLoop's Section 1 claims fail (Counts I and II) ..................................... 11

      B.      AutoLoop fails to state a claim under Section 2 (Count III) ............................. 13

      C.      AutoLoop's Florida-law claims fail (Counts IV-V) ........................................ 15

CONCLUSION ........................................................................................................... 15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ABM Farms, Inc. v. Woods*,
　692 N.E.2d 574 (Ohio 1998)........................................................5

*Academy of Medicine of Cincinnati v. Aetna Health, Inc.*,
　842 N.E.2d 488 (Ohio 2006)........................................................7

*In re Actos (Pioglitazone) Prod. Liab. Litig.*,
　274 F. Supp. 3d 485 (W.D. La. 2017)..............................................10, 11

*American Express Co. v. Italian Colors Restaurant*,
　570 U.S. 228 (2013)........................................................6

*Authenticom, Inc. v. CDK Glob., LLC*,
　874 F.3d 1019 (7th Cir. 2017) ........................................................ *passim*

*Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*,
　748 F.3d 249 (5th Cir. 2014) ........................................................2

*In re Dairy Farmers of America, Inc. Cheese Antitrust Litig.*,
　2015 WL 3988488 (N.D. Ill. June 29, 2015) ........................................................5

*Dickinson v. Heinold Secs., Inc.*,
　661 F.2d 638 (7th Cir. 1981) ........................................................8, 10

*Doe v. Archdiocese of Cincinnati*,
　880 N.E.2d 892 (Ohio 2008)........................................................4

*Ervin v. Nokia, Inc.*,
　349 Ill. App 3d 508 (5th Dist. 2004)........................................................3, 4

*G&G Closed Circuit Events, LLC v. Castillo*,
　2018 WL 3046934 (N.D. Ill. June 20, 2018) ........................................................10

*Garcia v. Wayne Homes, LLC*,
　2002 WL 628619 (Ohio App. Apr. 19, 2002)........................................................5

*Genaw v. Lieb*,
　2005 WL 435211 (Ohio App. Feb. 25, 2005)........................................................4, 5

*Gilmer v. Interstate/Johnson Lane Corp.*,
　500 U.S. 20 (1991)........................................................6

*Global Pacific, LLC v. Kirkpatrick*,
    88 N.E.3d 431 (Ohio App. 2017)...........................................................................4

*Hartford Fire Ins. Co. v. Henry Bros. Constr. Mgmt. Servs.*,
    2011 WL 3563138 (N.D. Ill. Aug 10, 2011) .....................................................2, 3

*In re Henson*,
    869 F.3d 1052 (9th Cir. 2017) ...............................................................................2

*Hughes Masonry Co. v. Greater Clark County School Building Corp.*,
    659 F.2d 836 (7th Cir. 1981) ............................................................................4, 5

*Hunter v. Atchison, T. & S.F. Ry.*,
    188 F.2d 294 (7th Cir. 1951) ...............................................................................12

*I Sports v. IMG Worldwide, Inc.*,
    813 N.E.2d 4 (Ohio App. 2004)......................................................................3, 4, 5

*Johnston v. Electrum Partners LLC*,
    2018 WL 3094918 (S.D.N.Y. June 21, 2018) .......................................................2

*Judge v. Unigroup, Inc.*,
    2017 WL 3971457 (M.D. Fla. Sept. 8, 2017) ....................................................4, 5

*Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*,
    174 F.3d 907 (7th Cir. 1999) ................................................................................7

*Kline v. Oak Ridge Bldrs., Inc.*,
    656 N.E. 2d 992 (Ohio. App. 1995)......................................................................5

*Kowasaki Heavy Indus. v. Bombardier Rec. Prods.*,
    660 F.3d 988 (7th Cir. 2011) ................................................................................8

*Leff v. Deutsche Bank AG*,
    2009 WL 1380819 (N.D. Ill. May 14, 2009) ...............................................5, 8, 9, 11

*Levin v. NC12, Inc.*,
    2011 WL 2582138 (N.D. Ill. June 29, 2011) ........................................................5

*Maxum Founds. v. Salus Corp.*,
    779 F.2d 974 (4th Cir. 1985) ...........................................................................8, 10

*Mitsubishi Motors Corp. v. Soler Chysler-Plymouth, Inc.*,
    473 U.S. 614 (1985)............................................................................................11

*Murphy v. DirecTV, Inc.*,
    724 F.3d 1218 (9th Cir. 2013) ..............................................................................6

*Nissho Iwai Corp. v. M/V Joy Sea*,
    1999 WL 970335 (E.D. La. Oct. 22, 1999) .................................................................9

*Ohio State Bd. of Pharmacy v. Frantz*,
    555 N.E.2d 630 (Ohio 1990)...................................................................................4

*Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*,
    713 F. Supp. 2d 734 (N.D. Ill. 2010) ......................................................................5

*Pickett v. Prince*,
    207 F.3d 402 (7th Cir. 2000) ..................................................................................11

*Pine Top Receivables of Illinois, LLC v. Banco De Seguros Del Estado*,
    2013 WL 2574596 (N.D. Ill. June 11, 2013) ..........................................................3

*Ramasamy v. Essar Global Ltd.*,
    825 F. Supp. 2d 466 (S.D.N.Y. 2011)......................................................................2

*Republic of Ecuador v. ChevronTexaco Corp.*,
    376 F. Supp. 2d 334 (S.D.N.Y. 2005)......................................................................2

*Ross v. Am. Express Co.*,
    547 F.3d 137 (2d Cir. 2008)....................................................................................6

*Sanchez v. CleanNet USA, Inc.*,
    78 F. Supp. 3d 747 (N.D. Ill. 2015) ........................................................................5

*Scheurer v. Fromm Family Foods LLC*,
    863 F.3d 748 (7th Cir. 2017) ...............................................................................3, 4

*Sevinor v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    807 F.2d 16 (1st Cir. 1986).....................................................................................9

*Smith v. Adams & Assocs.*,
    2015 WL 5921098 (N.D. Ill Oct. 9, 2015).............................................................10

*St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co.*,
    969 F.2d 585 (7th Cir. 1992) ...................................................................................9

*Steele v. Harmon*,
    1985 WL 6594 (Ohio App. Apr. 10, 1985)..............................................................5

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    2011 WL 4017961 (N.D. Cal. Sept. 9, 2011) ..........................................................9

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    2011 WL 5325589 (N.D. Cal. Sept. 19, 2011) ........................................................9

*Tice v. Am. Airlines, Inc.*,
373 F.3d 851 (7th Cir. 2004) ...................................................................................11

*Tillman v. Indiana Energy Sav. Corp.*,
2010 WL 1729591 (N.D. Ill. Apr. 27, 2010) ...........................................................14

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981)...................................................................................................12

*Warciak v. Subway Restaurants, Inc.*,
880 F.3d 870 (7th Cir. 2018) ......................................................................................3

*In re Wireless Tel. 911 Calls Litig.*,
2005 WL 2709286 (N.D. Ill. Oct. 20, 2005)............................................................10

*Woidtke v. St. Clair Cnty.*,
335 F.3d 558 (7th Cir. 2003) .......................................................................................3

**Statutes**

Federal Arbitration Act ........................................................................................................8

**Other Authorities**

Rule 30(b)(6)........................................................................................................................9

## INTRODUCTION

In many of the other cases brought by AutoLoop's counsel against CDK, the complaint named both CDK and Reynolds as defendants, based on theories that are substantially similar to the ones AutoLoop advances in this litigation. Here, however, AutoLoop sued only CDK. As CDK pointed out in its opening brief (at 6), the reason for the difference is plain: AutoLoop knows it must arbitrate its claims against Reynolds under an arbitration provision in its contract with Reynolds, and it wanted to avoid that agreed-to obligation. Tellingly, AutoLoop's only response, buried in a footnote, is a non-denial that it "merely pursued its contractual right to sue CDK in court." Opp. 7 n.6. In short, AutoLoop is attempting to hold CDK jointly and severally liable for its and Reynolds' purported liability as a means of getting around a clear contractual commitment to arbitrate.

The doctrine of equitable estoppel is tailor-made to deter this kind of tactical behavior. Under established standards, AutoLoop cannot escape its obligation to arbitrate by suing CDK for what it alleges is concerted, interdependent misconduct. The Court accordingly should dismiss this case and require AutoLoop to arbitrate its claims. In the alternative, if the Court declines to send this case to arbitration, it should dismiss the case for failure to state a claim. AutoLoop gives these arguments short shrift other than to point to Judge St. Eve's decision on the motion to dismiss in *Authenticom*. But as we explain below, that is not sufficient to forestall dismissal.

## ARGUMENT

### I. AUTOLOOP MUST ARBITRATE ITS CLAIMS AGAINST CDK

#### A. Ohio Law Applies

AutoLoop argues as a threshold matter (at 8-9) that Illinois law supposedly applies to the parties' dispute. AutoLoop is incorrect. Ohio law governs because the contract containing the arbitration provision contains an express Ohio choice-of-law provision.

AutoLoop cites no Seventh Circuit case addressing whether a court should apply a choice-of-

law clause to an arbitration request by a nonsignatory, and CDK is not aware of one. As numerous courts outside the Seventh Circuit hold, however, when a party attempts to invoke an arbitration clause under a nonsignatory theory, a court should apply the choice-of-law clause that the signatory agreed to in the contract. *See*, *e.g.*, *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 257-59 (5th Cir. 2014); *Johnston v. Electrum Partners LLC*, 2018 WL 3094918, at *5–6 (S.D.N.Y. June 21, 2018); *Ramasamy v. Essar Global Ltd.*, 825 F. Supp. 2d 466, 469 (S.D.N.Y. 2011); *Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 355 (S.D.N.Y. 2005).

AutoLoop cites one decision that concludes that a nonsignatory may not invoke a choice-of-law clause, but the rationale the case offers is not persuasive. Opp. 9 n.7 (citing *In re Henson*, 869 F.3d 1052 (9th Cir. 2017)). *Henson* reasons that a "choice-of-law clause, like an arbitration clause, is a contractual right and *generally* may not be invoked by one who is not a party to the contract in which it appears." 869 F.3d at 1059 (emphasis). But in some cases, like this one, the "general" rule gives way to the exception. Just as the rule against nonparties invoking an arbitration clause does not apply where the signatory seeks to unfairly avoid its contractual obligations, so too should the general rule against nonparties invoking a choice-of-law clause give way where to do otherwise would give the signatory an unfair benefit.

In short, the better rule is the one followed in the Second and Fifth Circuits: Where a contract contains a choice-of-law clause, courts look to the chosen state's law to determine whether a nonsignatory can invoke the contract's arbitration provision.[1] This makes good sense. Equitable

---

[1] It makes no difference that CDK and AutoLoop selected Illinois law to govern their *own* contract. Opp. 8. The Reynolds Interface Agreement is the source of AutoLoop's obligation to arbitrate. Moreover, the clause in CDK's contract states that "[*t*]*his Agreement* shall be governed by the laws of the State of Illinois." Nemelka Decl., Ex. N § 11(f). By contrast, Reynolds's contract with AutoLoop requires arbitration of a whole host of disputes beyond mere contract claims. AutoLoop's reliance (at 9-10) on *Hartford Fire Ins. Co. v. Henry Bros. Constr. Mgmt. Servs.*, 2011 WL 3563138 (N.D. Ill. Aug 10, 2011), thus is misplaced. In that case, the Court held that when a defendant "specifically disclaims arbitration" by agreeing to *delete* an arbitration provision from a contract with the plaintiff, the defendant "waive[s] any equitable estoppel-based

estoppel focuses on the relationship between the prior contractual commitments and current legal claims of the *signatory*, not the nonsignatory. Its application therefore must turn on whether the law the signatory agreed to apply would permit a nonsignatory to invoke arbitration. Because AutoLoop agreed that Ohio law would govern its contract, Ohio law applies.[2]

### B. Ohio Law Does Not Require CDK To Show Reliance

Under Ohio law, a nonsignatory may compel arbitration in two circumstances: (1) where the signatory's claims against the nonsignatory rely on the terms of the agreement, or (2) where the signatory alleges "substantially interdependent and concerted misconduct" by the nonsignatory and the signatory. *I Sports v. IMG Worldwide, Inc.*, 813 N.E.2d 4, 8 (Ohio App. 2004). The second criterion is satisfied here.

AutoLoop argues that CDK must demonstrate not only that it satisfies one of the two *I Sports* criteria but also that CDK detrimentally relied on the arbitration agreement in AutoLoop's contract with Reynolds. Opp. 10-11. AutoLoop points to no controlling state authority that imposes a reliance requirement in this context, however. Absent a controlling decision from the state's highest court, this Court's job is to "ascertain" what answer the Ohio Supreme Court would likely give "if the present case were before it now." *Woidtke v. St. Clair Cnty.*, 335 F.3d 558, 562 (7th Cir. 2003). And on that question, existing precedent strongly suggests that Ohio would *not* require a showing of detrimental reliance before a nonsignatory could invoke an arbitration agreement.[3]

---

argument" arising from an arbitration provision in another of plaintiff's contracts to which the defendant is a nonsignatory. *Id.* at \*8. CDK's contract does not expressly disclaim an existing right to arbitration.

[2] There is no need to address Illinois choice-of-law principles because AutoLoop agreed to apply Ohio law in the contract; as AutoLoop agrees, "Illinois respects a choice of law clause if the contract is valid and the law does not contradict Illinois's fundamental public policy." Opp. 8.

[3] Because Ohio law applies, AutoLoop's reliance on *Warciak v. Subway Restaurants, Inc.*, 880 F.3d 870 (7th Cir. 2018), and *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748 (7th Cir. 2017), is unavailing. *Warciak* addressed the Seventh Circuit's prediction of Illinois law; it assumed that Illinois courts would follow a line of intermediate appellate decisions requiring detrimental reliance. 880 F.3d at 872 (citing *Ervin v. Nokia, Inc.*, 349 Ill. App 3d 508 (5th Dist. 2004)); *cf. Pine Top Receivables of Illinois, LLC v. Banco De Seguros Del*

AutoLoop cites five cases (at 11 n.9 & 13 n.11) to show that Ohio purportedly would require a nonsignatory to show reliance. But a glance at these authorities shows otherwise. Two of the cases AutoLoop cites do not mention arbitration. *See Doe v. Archdiocese of Cincinnati*, 880 N.E.2d 892 (Ohio 2008); *Ohio State Bd. of Pharmacy v. Frantz*, 555 N.E.2d 630 (Ohio 1990). Another discusses arbitration but does not mention either reliance or the estoppel theory that is the basis for CDK's motion; in fact, the court there *upheld* the application of an arbitration clause to a nonsignatory on an agency theory because "a plaintiff cannot avoid an arbitration agreement" through artful pleading. *Genaw v. Lieb*, 2005 WL 435211, at *3-4 (Ohio App. Feb. 25, 2005). And a fourth case discusses a different branch of equitable estoppel, under which a signatory can compel a *non*signatory to arbitrate rather than vice versa. *Global Pacific, LLC v. Kirkpatrick*, 88 N.E.3d 431, 435 (Ohio App. 2017). Indeed, *I Sports* discussed this theory separate from the estoppel theory at issue here, which the court noted "has been limited to situations where a nonsignatory tries to bind a signatory to arbitration, not the reverse." 813 N.E.2d at 8, 10.

The only apposite decision AutoLoop cites is *Judge v. Unigroup, Inc.*, 2017 WL 3971457 (M.D. Fla. Sept. 8, 2017). But that case is not binding on this court and does not represent a persuasive prediction of how the Ohio Supreme Court would rule if presented with this case. In *Judge*, the court cited two Ohio cases—*Frantz* and an intermediate appellate opinion—for its conclusion that Ohio would require detrimental reliance. *Id*. at *5. Neither of these mentioned arbitration. The *Judge* court also dismissed *I Sports* in a footnote, claiming that it applied "pre-*Arthur Anderson* federal estoppel law." *Id*. at 4 n.4. But the fact that the *I Sports* decision *cited*

---

*Estado*, 2013 WL 2574596, at *6-7 (N.D. Ill. June 11, 2013) (noting that many federal courts had declined to follow *Ervin* in light of *Hughes Masonry Co. v. Greater Clark County School Building Corp.*, 659 F.2d 836 (7th Cir. 1981)). *Scheuer* involved the Seventh Circuit's prediction about Wisconsin law. 863 F.3d at 754. Notably, moreover, *Scheuer* did not foreclose the possibility that *Hughes Masonry* might continue to apply where, as here, the plaintiff's claims were intertwined with the underlying contracts. *Id*.

4

federal cases in no way suggests that the case was not a bona fide interpretation of state law. Ohio courts frequently treat federal law as a persuasive guide when interpreting Ohio's arbitration statutes.[4] Indeed, the *Genaw* decision on which AutoLoop (incorrectly) relies is full of citations to federal arbitration law.

In *In re Dairy Farmers of America, Inc. Cheese Antitrust Litig.*, 2015 WL 3988488 (N.D. Ill. June 29, 2015), this Court explained that "[i]n the absence of guiding decisions by the state's highest court, [federal courts] consult and follow the decisions of intermediate [state] appellate courts unless there is a convincing reason to predict [that] the state's highest court would disagree." *Id.* at *3. *I Sports* is the only Ohio state court decision that either party has cited that discusses when a nonsignatory can invoke an arbitration agreement where, as here, the signatory attempts to avoid its arbitration obligation and alleges substantially interdependent and concerted misconduct by a signatory and nonsignatory. The decision is consistent with a large body of preexisting federal common law, including decisions by the Seventh Circuit and this Court.[5] And the only decision reaching an opposite conclusion—the Florida district court's nonbinding opinion in *Judge*—is thinly reasoned and not persuasive on its own terms.

AutoLoop points to nothing in Ohio law, "convincing" or otherwise, to suggest that the Ohio Supreme Court would depart from the course the appellate court set in *I Sports*. Therefore, the Court should follow the Ohio intermediate appellate court's decision in *I Sports* as the best prediction of the law the state supreme court would apply.

---

[4] *See, e.g.*, *ABM Farms, Inc. v. Woods*, 692 N.E.2d 574, 577 (Ohio 1998); *Garcia v. Wayne Homes, LLC*, 2002 WL 628619, at *8 (Ohio App. Apr. 19, 2002); *Kline v. Oak Ridge Bldrs., Inc.*, 656 N.E. 2d 992, 994 (Ohio. App. 1995); *Steele v. Harmon*, 1985 WL 6594, at *4 (Ohio App. Apr. 10, 1985).

[5] *See, e.g.*, *Hughes Masonry Co.*, 659 F.2d at 838; *Sanchez v. CleanNet USA, Inc.*, 78 F. Supp. 3d 747, 758 (N.D. Ill. 2015); *Levin v. NC12, Inc.*, 2011 WL 2582138, at *5 (N.D. Ill. June 29, 2011); *Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 713 F. Supp. 2d 734, 745 (N.D. Ill. 2010); *Leff v. Deutsche Bank AG*, 2009 WL 1380819, at *5 (N.D. Ill. May 14, 2009).

## C.    Ohio Law Requires AutoLoop To Arbitrate

CDK cited several cases in its opening brief (at 7 n.5) that compelled antitrust plaintiffs to arbitrate conspiracy allegations against a nonsignatory under the second prong of the equitable estoppel test. AutoLoop once again ignores these decisions and cites other cases that are distinguishable. *See* Opp. 13-15. The cases AutoLoop cites deny motions to compel arbitration by nonsignatories because "it would be wrong to suggest that a claim against a co-conspirator of a party alleged to have engaged in antitrust violations will always be intertwined to a degree sufficient to work an estoppel." *Ross v. Am. Express Co.*, 547 F.3d 137, 148 (2d Cir. 2008). But AutoLoop's claims do not merely allege a conspiracy between a signatory and a nonsignatory. AutoLoop's claims rest directly on provisions of CDK's and Reynolds's contracts with vendors. And AutoLoop conspicuously sued CDK without naming Reynolds to avoid its obligation to arbitrate its claims. Thus, this case is not like *Murphy v. DirecTV, Inc.*, 724 F.3d 1218 (9th Cir. 2013), which involved "[m]ere allegations of collusion" between a signatory and a nonsignatory. *Id.* at 1232. AutoLoop's claims are intimately founded in and intertwined with the obligations imposed by the contract containing the arbitration clause, and AutoLoop deliberately seeks to avoid the impact of that clause by not naming Reynolds and suing CDK individually.[6]

## D.    The Claims In This Case Are Covered By Reynolds' Arbitration Clause

AutoLoop argues in the alternative that its antitrust claims are outside the scope of the arbitration provision in Reynolds's contract. Opp. 15. But that contention is belied by AutoLoop's failure to offer even a remotely convincing explanation for its decision not to sue Reynolds.  It also

---

[6] AutoLoop's suggestion (at 13) that CDK is seeking a "windfall" through arbitration is meritless. Holding AutoLoop to its agreement to arbitrate is no "windfall" to CDK; as the Supreme Court has made clear, "generalized attacks on arbitration [that] rest on suspicion of arbitration" as a means of dispute resolution are "far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30 (1991). Similarly, the Court has squarely foreclosed AutoLoop's suggestion (at 15) that arbitration would somehow "impede the enforceability of the antitrust laws." *See American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013).

is wrong for the reasons addressed in Reynolds' reply in support of its motion to dismiss the dealer complaint, which CDK incorporates by reference. Finally, *Academy of Medicine of Cincinnati v. Aetna Health, Inc.*, 842 N.E.2d 488 (Ohio 2006), does not support AutoLoop's position. The arbitration clause at issue here covers any disagreements "arising from or related to" the Agreement (Nemelka Decl., Ex. M § 6.12), language that is "extremely broad and capable of extensive reach." *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999). Indeed, such a clause is considered "the paradigm of a broad clause." *Aetna Health*, 842 N.E.2d at 492. The arbitration clause "does not remove statutory claims from the scope of the arbitration provision"; to the contrary it "purports to cover any disputes about the parties' business relationship." *Id.*

AutoLoop argues that its claims against CDK are not arbitrable because they arise from or relate to AutoLoop's contract with *CDK*, not its contract with Reynolds. Opp. 15-16. But the allegations in the Amended Complaint draw no distinction between the CDK contract and the Reynolds contract. Nor could they—both contracts govern AutoLoop's use of Reynolds' and CDK's respective managed data interfaces and therefore are inextricably intertwined with AutoLoop's claims that CDK and Reynolds supposedly sought "to impair and destroy competition for the products and services that vendors offer." Am. Compl. ¶ 3; *see also id.* ¶ 17 (alleging that CDK and Reynolds both "forc[ed] third-party solution providers (like AutoLoop) to use CDK and Reynolds for data integration services"); *id.* ¶ 25 (alleging that both CDK and Reynolds "impose anticompetitive restrictions" on data in their contracts and that "[t]here is no legitimate basis for CDK *or Reynolds* to withhold those data sharing rights").

This case is therefore a far cry from *Aetna Health*, where the anticompetitive conduct supposedly pre-dated the relevant contracts and the plaintiff's allegations "did not even presume the existence of the underlying . . . agreement." 842 N.E.2d at 491. By contrast, here AutoLoop alleges

7

anticompetitive conduct contemporaneous with and reflected in specific provisions of the applicable agreements; and the only reason AutoLoop maintains that its claims do not turn on its contract with Reynolds is that AutoLoop did not sue Reynolds, in a deliberate attempt to avoid arbitration. Again, these are precisely the circumstances in which the doctrine of equitable estoppel is most appropriate.

### E.     CDK Did Not Waive Its Right To Arbitrate

Without a valid argument for avoiding arbitration on the merits, AutoLoop falls back on the claim that CDK waived its right to pursue arbitration. Opp. 4-7. As this Court has recognized, however, there is a "strong federal policy favoring enforcement of arbitration agreements," and this policy "impresses upon a party asserting waiver a heavy burden." *Leff*, 2009 WL 1380819, at *3. Accordingly, "a waiver of arbitration is not lightly to be inferred." *Id*. (quoting *Dickinson v. Heinold Secs., Inc.*, 661 F.2d 638, 641 (7th Cir. 1981)). A party waives its right to compel arbitration only when, "considering the totality of the circumstances," it acts "inconsistently with the right to arbitrate." *Kowasaki Heavy Indus. v. Bombardier Rec. Prods.*, 660 F.3d 988, 994 (7th Cir. 2011). CDK has done nothing inconsistent with its assertion of that right.

*First*, CDK did not wait too long to "rais[e] the prospect of arbitration." Opp. 22. By raising the arbitration issue in the motion to dismiss the amended complaint, which was in effect CDK's first request for substantive relief, CDK did not act inconsistently with its right to arbitrate. A party may move for arbitration even after filing a motion to dismiss, and there is an "important difference between a mere motion to dismiss and a motion for summary judgment." *Kawasaki*, 660 F.3d at 995.

*Second*, the parties' parallel discovery efforts are not inconsistent with a desire to proceed in arbitration. CDK served discovery as required by the Court's Case Scheduling Order. It would make no sense to "require a party seeking arbitration to avoid a finding of default by ignoring court-ordered discovery deadlines and assuming the risk that its motion under the Federal Arbitration Act will be unsuccessful." *Maxum Founds. v. Salus Corp.*, 779 F.2d 974, 982-83 (4th Cir. 1985). Indeed,

the Seventh Circuit has said that in "complex cases involving multi-count complaints containing claims that were arguably non-arbitrable," it may be necessary to invoke judicial machinery "both to sort out the claims before it can intelligently decide whether to arbitrate and to protect its rights in court if the arguably non-arbitrable claims do turn out to be non-arbitrable." *St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co.*, 969 F.2d 585, 589 (7th Cir. 1992).

As this Court has recognized, "[e]ngaging in discovery will not necessarily result in waiver of arbitration rights." *Leff*, 2009 WL 1380819, at *3. In *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 5325589 (N.D. Cal. Sept. 19, 2011), for instance, the court found no waiver despite the moving party's serving dozens of document requests, receiving over 47,000 pages of documents, taking a Rule 30(b)(6) deposition of opposing party's corporate representative, and serving deposition notices on four employees of the opposing party. *Id*. at *8. The same is true of another decision in the *TFT-LCD* litigation. 2011 WL 4017961, at *5 (N.D. Cal. Sept. 9, 2011) (no waiver despite defendant's waiting eight months to move to arbitrate, after filing a motion to dismiss and seeking "extensive discovery"). AutoLoop cites this decision repeatedly in its brief. *See* Opp. 14-15.

*Third*, *TFT-LCD* also disposes of AutoLoop's claim that it has supposedly been prejudiced by expending "hundreds of hours of in-house and outside attorney time responding to CDK's discovery requests." Opp. 5. In *TFT-LCD*, the court rejected the plaintiff's complaints that it had invested "hundreds of hours and hundreds of thousands of dollars" in discovery efforts, and it found that the plaintiff "would have incurred expenses in connection with the prosecution of its case" regardless. 2011 WL 4017961, at *5.[7] As this Court similarly observed in August, despite the

---

[7] *See also, e.g.*, *Sevinor v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 807 F.2d 16, 19 (1st Cir. 1986) (no waiver where movant served 300 interrogatories, 12 "comprehensive" requests for production, and numerous continuances of discovery deadlines); *Nissho Iwai Corp. v. M/V Joy Sea*, 1999 WL 970335, at *4 (E.D. La. Oct. 22, 1999) (no waiver where defendants' activities "were consistent with orderly participation in the lawsuit" and where acting otherwise might have "prejudiced [defendants'] position in this case had the Court found the arbitration clause not enforceable").

9

pending arbitration claims, it is hard to "envision[] any scenario in which grinding discovery to a complete halt would make sense" given the complexity of this MDL and the need to coordinate proceedings across all of the cases. Ex. A (8/16/18 Tr.) at 40:21-25. *Cf. Dickinson v. Heinold Sec.*, 661 F.2d 638, 642 (7th Cir. 1981) (no waiver where discovery was relevant to both arbitrable and non-arbitrable claims). Even if CDK had reserved its right to move for arbitration months before, therefore, AutoLoop does not and cannot contend that it somehow could have avoided these costs.

AutoLoop's inability to show prejudice is confirmed by its decision not to seek a protective order or other relief despite knowing since July 2018 of CDK's intent to pursue arbitration. "Absent a protective order," a party "seeking arbitration does not lose its contractual right by prudently pursuing discovery in the face of a court-ordered deadline." *Maxum*, 779 F.2d at 983. Indeed, AutoLoop's declaration that it spent "hundreds" of hours responding to discovery rings hollow, given that many of these hours were incurred after CDK served its motion.

*Finally*, AutoLoop's suggestion (at 6-7) that CDK's motion to compel arbitration "constitutes improper forum shopping" is dead wrong. CDK filed its motion because it determined that it had plausible grounds for compelling arbitration under a nonsignatory estoppel theory. The Court had not even ruled on CDK's first motion when AutoLoop amended its complaint, and a party that amends its complaint takes its "chances that the opposing party will come up with new and better arguments in favor of dismissal." *G&G Closed Circuit Events, LLC v. Castillo*, 2018 WL 3046934, at *9 n.15 (N.D. Ill. June 20, 2018). That in the meantime Judge St. Eve issued a motion to dismiss in a different case should not deprive CDK of the right to compel arbitration. To state the obvious, this action is separate from *Authenticom. See, e.g.*, *In re Actos (Pioglitazone) Prod. Liab. Litig.*, 274

---

Cases cited by AutoLoop (at 5) are distinguishable. In *Smith v. Adams & Assocs.*, 2015 WL 5921098 (N.D. Ill Oct. 9, 2015), for example, the "critica[l]"fact was that the movant "tried twice to convince the court to jettison [the plaintiff's] recruited counsel." *Id.* at *5. And in *In re Wireless Tel. 911 Calls Litig.*, 2005 WL 2709286 (N.D. Ill. Oct. 20, 2005), the movant filed multiple motions, including motions to dismiss and for partial summary judgment, then moved to compel arbitration months later. CDK engaged in no such conduct.

F. Supp. 3d 485, 519 (W.D. La. 2017) (MDLs "are not one case" but rather "a loose collective of separate cases temporarily brought together . . . for a limited purpose.").

AutoLoop accordingly fails to carry its "heavy burden" to show waiver. *Leff*, 2009 WL 1380819, at *3. Indeed, even if the question were close (and it is not) AutoLoop's arguments still would fail. Under federal law, "any doubts concerning the scope of arbitrable issues"—*including* "allegation[s] of waiver"—"should be resolved in favor of arbitration." *Mitsubishi Motors Corp. v. Soler Chysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

## II.     AutoLoop Fails To State A Claim On The Merits

AutoLoop has little to say about the merits of its antitrust allegations—and it quickly reveals why: in AutoLoop's view, Judge St. Eve's opinion on the motion to dismiss in *Authenticom* "forecloses CDK's arguments for dismissal." But that is not so.

As just mentioned, "MDLs . . . are not one case." *Pioglitazone*, 274 F. Supp. 3d at 519. AutoLoop's complaint accordingly must rise or fall based on whether it states a plausible claim for relief. To be sure, this Court should respectfully consider the *Authenticom* ruling, but this Court is free to disagree with that opinion as it sees fit. Doing so would not constitute "re-litigat[ion]" of the issues or conflict with the MDL consolidation (*contra* Opp. 17), and it is perfectly consistent with the law of the case doctrine, which is "highly flexible" (*Pickett v. Prince*, 207 F.3d 402, 407 (7th Cir. 2000)) and allows courts to reconsider issues where "a good reason is shown to depart from" an earlier ruling (*Tice v. Am. Airlines, Inc.*, 373 F.3d 851, 853 (7th Cir. 2004)).

In short, this Court should evaluate AutoLoop's amended complaint for itself, on the amended complaint's own merit (or lack thereof), and conclude that none of AutoLoop's allegations states a plausible claim for relief.

### A.     AutoLoop's Section 1 claims fail (Counts I and II)

AutoLoop does not respond to most of CDK's arguments regarding its Section 1 claims,

other than by cross-referencing Cox Automotive's arguments in *Cox*.[8] To the extent necessary to respond to this reference, CDK refers the Court to its *Cox* reply brief. *See* Dkt. 161 at 1-11.

AutoLoop does join issue on the subject of "market division," but it offers no persuasive rebuttal to CDK's showing that the wind-down agreement between CDK and Reynolds did not "divide" any market because it simply required the two not to "assist" hostile integrators seeking to access the other's DMS, without saying anything about either company's DMS access policies or the data integration activities of CDK's subsidiaries. AutoLoop cites Judge St. Eve's conclusion that the 2015 written agreements between CDK and Reynolds brought about a "'partial ceasefire'" between the two companies (Opp. 17 (citing Dkt. 176 at 26-27)), but Judge St. Eve's opinion found (incorrectly, in CDK's view) that the written agreements lent credence to Authenticom's allegations of a *group boycott*—not to its "market division" claim.

Likewise unavailing is AutoLoop's claim that CDK's argument "'requires an inference in [CDK's] favor.'" Opp. 18 (quoting Dkt. 176 at 29). This argument once again relies on a portion of Judge St. Eve's opinion discussing a completely different subject (*i.e.*, the question whether Authenticom had alleged an oral "group boycott" agreement in addition to alleging that the written agreements constituted a boycott). And in any event, the argument is wrong. The written agreements, which are properly before the Court on this motion to dismiss, refute AutoLoop's "market division"

---

[8] AutoLoop also characterizes CDK's arguments as ones that have "lost . . . multiple times before multiple judges," by which it apparently refers to Judge St. Eve's ruling on the *Authenticom* motion to dismiss and Judge Peterson's ruling on the preliminary injunction in the same case. Opp. 17. But Judge St. Eve's ruling is not controlling for the reasons stated above, and AutoLoop's reliance on Judge Peterson's preliminary injunction decision is even more ill-founded. "[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding" on the Court at later stages of the litigation. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). A decision "granting or denying [a] temporary injunction does not constitute the law of the case," in other words, "and will not estop the parties nor the court as to the merits of the case." *Hunter v. Atchison, T. & S.F. Ry.*, 188 F.2d 294, 299 (7th Cir. 1951). That is especially true here, where Judge Peterson concededly did not "set out all the facts established by the parties' evidence or . . . review comprehensively that evidence" in his preliminary injunction decision. *Authenticom* Dkt. 172 at 2. In short, AutoLoop is clearly wrong to suggest that Judge Peterson's tentative conclusions at the preliminary injunction stage of another case somehow bear on this motion.

claim on their face, without any need for inferences in either party's favor.

AutoLoop lastly alludes to certain exhibits attached to Cox's opposition to CDK's motion to dismiss in *Cox* (in violation of the *Authenticom* confidentiality order, as CDK explained in its *Cox* reply (Dkt. 161 at 1 n.1)). But these exhibits do not evidence of "market division." ████████████ ███████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████ or an assurance that Reynolds would never get into the hostile-integration business. Opp. 18. Rather, █████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████. Exhibit 5 reflects nothing more than the (unsurprising) fact that Reynolds wanted to prevent Authenticom from accessing its systems—as Reynolds had been trying to do for years. AutoLoop's quotation of the word "key" is misleading; the exhibit does not say that the agreements were a means to enable Reynolds to block Authenticom, let alone that the agreements were "key" to that objective. Am. Compl. Ex. 5. The unsubstantiated "market division" allegations should therefore be dismissed.

## B. AutoLoop fails to state a claim under Section 2 (Count III)

AutoLoop's defense of its Section 2 claim relies largely on Judge St. Eve's opinion—which is nonbinding and, as CDK's motion to dismiss explained (Mem. 16-20), is no basis for allowing AutoLoop's claim to go forward. AutoLoop makes a few additional points, but none is persuasive.

AutoLoop first claims that the Court must ignore the plain language of CDK's dealer agreements prohibiting third-party access to the DMS, because the notion that dealers knew about that provision is a "factual assertion [that] cannot be credited at this stage." Opp. 19. That is wrong; the text of CDK's dealer contracts is proof positive that dealers knew about CDK's system access policies, unless the Court is willing to disregard the well-established principle that parties are charged with knowledge of the contents of contracts they sign. Mem. 17-18. AutoLoop dismisses

13

CDK's authority on this point as "a non-antitrust case," but AutoLoop does not dispute the well-established rule that parties are charged with knowing the terms of their contracts, or offer any reason why that principle should not apply here. AutoLoop suggests that dealers are not required to know the terms of their contracts because they "have a broad range of sophistication" (Opp. 19), but that throwaway line is unavailing; AutoLoop offers not a word to substantiate the notion that auto dealers lack reasonable sophistication, and in any event, the principle applies even to ordinary consumers. *See, e.g.*, *Tillman v. Indiana Energy Sav. Corp.*, 2010 WL 1729591, at *2 (N.D. Ill. Apr. 27, 2010) (noting that in light of this principle, a consumer would have an "uphill battle" in arguing that she was misled about the terms of her written contract with a natural gas company).

AutoLoop next argues that there is no inconsistency between (1) its allegation that dealers know about and are unwilling to accept data access-related price increases from vendors and (2) its allegation that dealers are locked in because they do not know the costs of data access on CDK's DMS. It points to Judge St. Eve's observation that "'[a] contract can prohibit vendors from sharing pricing information and a few vendors can do it anyway.'" Opp. 20 (quoting Dkt. 176 at 48). But whatever the force of Judge St. Eve's observation in the context of *Authenticom*, it has no force here. AutoLoop does not allege that "a few vendors" told certain dealers about the price of data integration under the 3PA program; rather, it alleges widespread knowledge of the facts among dealers. *See, e.g.*, Am. Compl. ¶ 112 (alleging that dealers "too numerous to fully recount here" complained about CDK's policies). CDK pointed this out in the opening brief (at 18), but AutoLoop has no response. And in any event, AutoLoop's allegation that dealers have refused to bear the alleged price increases under the 3PA program is not the only allegation that contradicts its claim of lock-in. AutoLoop also alleges that dealers preferred CDK to Reynolds when CDK still permitted hostile integration (presumably because they thought their costs would be lower) (*id.* ¶ 87); that dealers actively avoid

14

certain vendors "because of the huge pass-through data integration surcharges" (*id.* ¶ 130); and that CDK's purported price increases were publicized in multiple industry publications (*id.* ¶¶ 133, 135). In light of this array of allegations, AutoLoop's claim that dealers could not anticipate that a so-called "closed" DMS would have different costs from an "open" DMS is not plausible.

AutoLoop lastly argues that it has plausibly alleged exclusionary conduct by CDK. It takes no issue with CDK's point that Section 2 permitted it unilaterally to close its DMS (*see* Mem. 19). Nor could it, given that the Seventh Circuit reached that very conclusion in *Authenticom*. *See Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019, 1026 (7th Cir. 2017) ("*Trinko* and *Linkline* leave no doubt that such a theory cannot support relief."). Rather, AutoLoop argues that its Section 2 claim is based on CDK's purported "horizontal conspiracy with Reynolds and exclusive dealing." Opp. 20. At a minimum, therefore, the Court should dismiss AutoLoop's Section 2 claim to the extent it relies on an alleged refusal to deal. *See* Mem. 20. And given that AutoLoop has failed to state a claim under Section 1, the Section 2 claim should be dismissed in its entirety.

### C. AutoLoop's Florida-law claims fail (Counts IV-V)

AutoLoop does not dispute CDK's showing in the motion to dismiss (Mem. 20) that its Florida-law antitrust claims rise and fall with its federal claims. *See* Opp. 20. Thus, AutoLoop's Florida-law claims should be dismissed along with the rest of the complaint.

## CONCLUSION

For the foregoing reasons, the Court should require AutoLoop to arbitrate its claims against CDK under a nonsignatory equitable estoppel theory. In the alternative, the amended complaint should be dismissed in its entirety.

Dated: September 21, 2018

Respectfully submitted,

/s/ *Britt M. Miller*
Britt M. Miller
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant*
*CDK Global, LLC*

## CERTIFICATE OF SERVICE

I, Britt M. Miller, an attorney, hereby certify that on September 21, 2018, I caused a true and correct copy of the foregoing **DEFENDANT CDK GLOBAL, LLC'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS AUTOLOOP'S AMENDED COMPLAINT**, to be filed **UNDER SEAL** and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/ Britt M. Miller*_____
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Phone: (312) 782-0600
Fax: (312) 701-7711
E-mail: bmiller@mayerbrown.com