# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

*In re Dealer Management Systems Antitrust Litigation*, MDL 2817

_____

*This filing relates to:*

THE DEALERSHIP CLASS ACTION

_____

No. 1:18-CV-864

Hon. Robert M. Dow, Jr.

Magistrate Judge Jeffrey T. Gilbert

## DEFENDANT CDK GLOBAL, LLC'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION AND STAY CLAIMS OR, IN THE ALTERNATIVE, TO DISMISS THE DEALERSHIP CONSOLIDATED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................ 1

I.  THE REYNOLDS DEALERS MUST ARBITRATE THEIR CLAIMS
    AGAINST CDK AND THE COURT SHOULD STAY THE REMAINING
    CLAIMS ................................................................................................... 1

    A.  The Claims In This Case Are Covered By Reynolds's Arbitration Clause ........... 1

    B.  The Reynolds Dealers Are Estopped From Avoiding Arbitration With
        CDK ................................................................................................... 1

    C.  CDK Did Not Waive Its Right To Invoke Equitable Estoppel Or Compel
        Arbitration ........................................................................................ 3

    D.  The Court Should Stay All Remaining Dealer Claims ........................................ 6

II. ALTERNATIVELY, THE COURT SHOULD DISMISS FOR FAILURE TO
    STATE A CLAIM .................................................................................... 7

    A.  The Dealers Are Not Proper Federal Antitrust Plaintiffs (Counts I-V) ............... 7

    B.  The Federal Counts Fail To State A Claim (Counts I-V) .................................... 10

        1.  The Dealers' Horizontal Conspiracy Claims (Counts I-II) Fail .............. 11

        2.  The Dealers' Exclusive Dealing Claims (Counts III-IV) Fail ................. 13

        3.  The Dealers' Section 2 Claim (Count V) Fails ..................................... 14

    C.  The Complaint Fails To State A Claim Under State Law (Counts VI-L) ........... 15

        1.  The Dealers Allege No Operations or Purchases In Twenty-Six
            States .......................................................................................... 15

        2.  The State Antitrust Claims, And Several Of The Consumer
            Protection Counts, Fail Because The Federal Antitrust Claims Fail ....... 16

        3.  The Dealers Are Too Remote To Be State-Law Antitrust Or
            Consumer-Protection Plaintiffs ...................................................... 16

        4.  Many State Claims Fail For Additional Reasons ................................. 20

CONCLUSION ................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Actos (Pioglitazone) Prod. Liab. Litig.*,
    274 F. Supp. 3d 485 (W.D. La. 2017)...................................................................10

*In re Aftermarket Filters Antitrust Litig.*,
    2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) ..........................................................18

*In re Aggrenox Antitrust Litig.*,
    2015 WL 1311352 (D. Conn. Mar. 23, 2015) .......................................................16

*Apprentice Info. Sys., Inc. v. DataScout, LLC*,
    544 S.W.3d 536 (Ark. 2018)................................................................................22

*Arthur Anderson LLP v. Carlisle*,
    556 U.S. 624 (2009)...............................................................................................1

*In re Asacol Antitrust Litig.*,
    2016 WL 4083333 (D. Mass. July 20, 2016)........................................................22

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..........................................................................................9, 25

*In re Broiler Chicken Antitrust Litig.*,
    290 F. Supp. 3d 772 (N.D. Ill. 2017) ..............................................................10, 16

*Catlin v. Hanser*,
    2011 WL 1002736 (S.D. Ind. Mar. 17, 2011) ......................................................16

*ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*,
    487 F. Supp. 2d 980 (N.D. Ill. 2007) ....................................................................7

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
    2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) ......................................9, 10, 15, 16

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
    2015 WL 3988488 (N.D. Ill. June 25, 2015) ................................................ *passim*

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
    801 F.3d 758 (7th Cir. 2015) ...............................................................................13

*Davidson v. Apple, Inc.*,
    2018 WL 2325426 (D. Colo. May 8, 2018)..........................................................24

*Delgado v. Ocwen Loan Servicing, LLC*,
   2017 WL 5201079 (E.D.N.Y. Nov. 9, 2017)..........................................................................24

*Dickinson v. Heinold Secs., Inc.*,
   661 F.2d 638 (7th Cir. 1981) ...........................................................................................3, 5

*Fejzulai v. Sam's West, Inc.*,
   205 F. Supp. 3d 723 (D.S.C. 2016).......................................................................................24

*Gilmer v. Interstate/Johnson Lane Corp.*,
   500 U.S. 20 (1991)..................................................................................................................3

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) ................................................................................23

*Hartford Fire Ins. Co. v. Henry Bros. Constr. Mgmt. Servs.*,
   2011 WL 3563138 (N.D. Ill. Aug 10, 2011) ..........................................................................5

*Hunter v. Atchison, T. & S.F. Ry.*,
   188 F.2d 294 (7th Cir. 1951) ...............................................................................................11

*I Sports v. IMG Worldwide, Inc.*,
   813 N.E.2d 4 (Ohio Ct. App. 2004).....................................................................................1, 2

*Johnston v. Electrum Partners LLC*,
   2018 WL 3094918 (S.D.N.Y. June 21, 2018) .........................................................................2

*Kowasaki Heavy Indus. v. Bombardier Rec. Prods.*,
   660 F.3d 988 (7th Cir. 2011) ..........................................................................................3, 4, 5

*Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*,
   781 N.E.2d 787 (Mass. 2003) ..............................................................................................20

*Leff v. Deutsche Bank AG*,
   2009 WL 1380819 (N.D. Ill. May 14, 2009) ................................................................2, 3, 4, 5

*Maxum Foundations v. Salus Corp.*,
   779 F.2d 974 (4th Cir. 1985) ............................................................................................4, 5

*McGuire v. BMW of North Am., LLC*,
   2014 WL 2566132 (D.N.J. June 6, 2014) ..............................................................................16

*Mediterranean Enters., Inc. v. Ssangyon Corp.*,
   708 F.2d 1458 (9th Cir. 1983) ...............................................................................................6

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985)...............................................................................................................6

iii

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
    350 F. Supp. 2d 160 (D. Me. 2004) ...........................................................................21

*In re Niaspan Antitrust Litig.*,
    42 F. Supp. 3d 735 (E.D. Pa. 2014) ...........................................................................16

*Nissho Iwai Corp. v. M/V Joy Sea*,
    1999 WL 970335 (E.D. La. Oct. 22, 1999) ...................................................................4

*Nootens v. Madison Gas & Elec. Co.*,
    1998 WL 719611 (N.D. Ill. Oct. 8, 1998)......................................................................6

*Olstad v. Microsoft Corp.*,
    700 N.W.2d 139 (Wis. 2005)......................................................................................21

*In re Opana ER Antitrust Litig.*,
    162 F. Supp. 3d 704 (N.D. Ill. 2016) .........................................................................16

*Ortiz v. Fireboard Corp.*,
    527 U.S. 815 (1999)............................................................................................15, 16

*In re Packaged Seafood Prods. Antitrust Litig.*,
    242 F. Supp. 3d 1033 (S.D. Cal. 2017).......................................................................21

*In re Pharmaceutical Indus. Average Wholesale Price Litig.*,
    230 F.R.D. 61 (D. Mass. 2005)...................................................................................24

*In re Plasma-Derivative Protein Therapies Anitrust Litig.*,
    2012 WL 39766 (N.D. Ill. Jan. 9, 2012) ....................................................................16

*In re Refrigerant Compressors Antitrust Litig.*,
    2013 WL 1431756 (E.D. Mich. Apr. 9, 2013)...............................................................9

*In re Samsung Galaxy Smartphone Mktg. & Sales Practices Litig.*,
    298 F. Supp. 3d 1285 (N.D. Cal. 2018) .......................................................................7

*Saulsberry v. Morinda, Inc.*,
    2008 WL 416933 (N.D. Ga. Feb. 13, 2008) ...............................................................23

*Sevinor v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    807 F.2d 16 (1st Cir. 1986)..........................................................................................4

*Siena v. Microsoft Corp.*,
    796 A.2d 461 (R.I. 2002)..............................................................................................8

*Smith v. Adams & Assocs.*,
    2015 WL 5921098 (N.D. Ill Oct. 9, 2015)..............................................................4, 5

*St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co.*,
    969 F.2d 585 (7th Cir. 1992) .....................................................................4

*Stulberg v. Intermedics Orthopedics*,
    997 F. Supp. 1060 (N.D. Ill.1998) .............................................................6

*Supreme Auto Transport, LLC v. Arcelor Mittal USA, Inc.*,
    2018 WL 4224426 (7th Cir. Sept. 6, 2018) ...............................18, 19, 20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    2011 WL 5325589 (N.D. Cal. Sept. 19, 2011) ..........................................4

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981)...................................................................................11

*In re Universal Service Fund Tel. Billing Practices Litig.*,
    300 F. Supp. 2d 1107 (D. Kan. 2003) .......................................................3

*In re Wholesale Grocery Prods. Antitrust Litig.*,
    707 F.3d 917 (8th Cir. 2013) .....................................................................2

*In re Wireless Tel. 911 Calls Litig.*,
    2005 WL 2709286 (N.D. Ill. Oct. 20, 2005)..............................................5

*In re Zappos.com, Inc.*,
    2013 WL 4830497 (D. Nev. Sept. 9, 2013) .............................................25

**Statutes**

Ark. Code Ann. § 4–88–107 ...........................................................................22

Del. Code § 2512 ............................................................................................20

Ga. Code Ann. § 10-1-392(6) .........................................................................23

Ga. Code Ann. § 10-1-392(10) .......................................................................23

Ga. Code Ann. § 10-1-393(a) .........................................................................23

N.J. Stat. Ann. § 56:8-20................................................................................22

Nev. Rev. Stat. § 598.0915 ............................................................................24

## INTRODUCTION

CDK's opening brief demonstrated that the dealers' claims cannot proceed for a variety of reasons. First, many of the dealers agreed to arbitrate their claims in their contracts with Reynolds, and they cannot avoid that obligation simply by suing CDK. Moreover, because all of the dealers' claims are inextricably intertwined with their arbitrable claims, the Court should stay the litigation while the arbitration proceeds. In any event, if the Court does reach the merits, the dealers' claims fail, for they are not proper antitrust plaintiffs, they fail to state a plausible claim, and many of their parallel state actions suffer from additional flaws. Nothing in the dealers' opposition changes these conclusions.

## I. The Reynolds Dealers Must Arbitrate Their Claims Against CDK And The Court Should Stay The Remaining Claims.

### A. The Claims In This Case Are Covered By Reynolds's Arbitration Clause.

The dealers argue that their antitrust claims are outside the scope of the arbitration provision in Reynolds's contract. Opp. 9-21. Reynolds's reply fully addresses that argument, and CDK incorporates that discussion by reference to avoid duplication.

### B. The Reynolds Dealers Are Estopped From Avoiding Arbitration With CDK.

The Reynolds dealers must arbitrate their claims against CDK. A nonsignatory may compel arbitration claims in two circumstances: (1) where the signatory's claims against the nonsignatory rely on the terms of the agreement, or (2) where the signatory alleges "substantially interdependent and concerted misconduct" by the nonsignatory and the signatory. *I Sports v. IMG Worldwide, Inc.*, 813 N.E.2d 4, 8 (Ohio Ct. App. 2004).[1] While the dealers contend (Opp.

---

[1] The dealers admit that their contract with Reynolds contains an Ohio choice-of-law clause (Opp. 12), but contend that Illinois law governs CDK's right to invoke arbitration because tort choice-of-law principles supposedly apply. Opp. 24-25. That is contrary to *Arthur Anderson LLP v. Carlisle*, which holds that a nonsignatory's right to compel arbitration is governed by "the relevant state *contract* law." 556 U.S. 624, 632 (2009) (emphasis added). As explained more fully in CDK's reply in support of its

27) that a nonsignatory must satisfy both prongs of this test, the plain language of *I Sports* makes clear that equitable estoppel applies in "two circumstances." 813 N.E.2d at 8. Indeed, applying the same test under Illinois law, this Court has held that estoppel applies in "two *distinct* circumstances" and a nonsignatory may arbitrate where—as here—"only the second prong of the test is at issue." *Leff v. Deutsche Bank AG*, 2009 WL 1380819, at *5 (N.D. Ill. May 14, 2009) (emphasis added).

CDK cited several cases in its opening brief (at 9 n.5) that compelled antitrust plaintiffs to arbitrate conspiracy allegations against a nonsignatory under the second prong of the equitable estoppel test. The dealers ignore these decisions. Instead, they cite (at 29) cases holding that "merely alleging that a non-signatory conspired with a signatory is insufficient to invoke equitable estoppel" if the signatory's claims do not have an "intimate[] … and intertwined" relationship with the underlying contract. *In re Wholesale Grocery Prods. Antitrust Litig.*, 707 F.3d 917, 923 (8th Cir. 2013). But here, the dealers' claims and their contracts with Reynolds are intimately intertwined. The dealers' claims are based on purported harms suffered directly "in the *DMS market*" (Opp. 40); they allege loss of "an important feature of the DMS and its functionality" (*id*. at 45-46, 54); they turn on "long-term DMS contracts with clauses providing for automatic renewals and extensions" (*id*. at 41, 64); and they accuse Defendants of "extort[ing]" fees "for the use of [the] DMS" (*id*. at 71). In the dealers' own words, the supposed conspiracy "took *direct aim* at the product (the DMS) that Dealership Plaintiffs purchased directly from Defendants." *Id*. at 43 (emphasis added). Having alleged as much, the dealers must

---

motion to dismiss in *Authenticom*, where (as here) a contract contains a choice-of-law clause, courts look to the chosen state's law to determine whether a nonsignatory is entitled to invoke the contract's arbitration provision. *E.g.*, *Johnston v. Electrum Partners LLC*, 2018 WL 3094918, at *5–6 (S.D.N.Y. June 21, 2018). Indeed, to allow the dealers to pick and choose between Ohio law and Illinois law when it suits them would countenance just the sort of gamesmanship that equitable estoppel doctrine exists to prohibit.

arbitrate their claims—they cannot "have it both ways." *In re Universal Service Fund Tel. Billing Practices Litig.*, 300 F. Supp. 2d 1107, 1139-40 (D. Kan. 2003) (compelling arbitration).

Finally, the dealers argue—and CDK does not dispute—that a nonsignatory cannot invoke an arbitration clause merely because a signatory's claims "touch matters concerning the agreement" or because the agreement is a "but for" cause of their injuries. Opp. 29-30. But again, the dealers' claims do much more than "touch" matters concerning their DMS contracts. Because the claims are intimately intertwined with the DMS contract, equitable estoppel applies.[2]

### C. CDK Did Not Waive Its Right To Invoke Equitable Estoppel Or Compel Arbitration.

Without a valid argument for avoiding arbitration on the merits, the dealers fall back on the claim that CDK waived its right to pursue arbitration. Opp. 22-24.

This Court has recognized, however, that the "strong federal policy favoring enforcement of arbitration agreements" "impresses upon a party asserting waiver a heavy burden." *Leff*, 2009 WL 1380819, at *3. Accordingly, "a waiver of arbitration is not lightly to be inferred." *Id.* (quoting *Dickinson v. Heinold Secs., Inc.*, 661 F.2d 638, 641 (7th Cir. 1981)). A court will find waiver only when, "considering the totality of the circumstance," a party acts "inconsistently with the right to arbitrate." *Kowasaki Heavy Indus. v. Bombardier Rec. Prods.*, 660 F.3d 988, 994 (7th Cir. 2011). Nothing CDK has done satisfies that standard.

*First*, CDK did not wait too long to "rais[e] the prospect of arbitration." Opp. 22. *Kowasaki* holds that a party may move for arbitration even after filing a motion to dismiss, and that there is an "important difference between a mere motion to dismiss and a motion for

---

[2] The dealers' suggestion (at 31) that arbitration would "reward" CDK's supposedly unlawful conduct is meritless. Requiring the dealers to arbitrate does not "reward" CDK; as the Supreme Court has said, "generalized attacks on arbitration [that] rest on suspicion of arbitration" as a fair means of dispute resolution are "far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30 (1991).

summary judgment." 660 F.3d at 995. Yet CDK moved to compel arbitration at the earliest possible opportunity, when it filed its opening motion to dismiss.

*Second*, the parties' parallel discovery efforts are not inconsistent with a desire to proceed in arbitration. CDK served discovery as required by the Court's Case Scheduling Order. It makes no sense to impose a rule "that would require a party seeking arbitration to avoid a finding of default by ignoring court-ordered discovery deadlines and assuming the risk that its motion under the Federal Arbitration Act will be unsuccessful." *Maxum Foundations v. Salus Corp.*, 779 F.2d 974, 982-83 (4th Cir. 1985). Indeed, the Seventh Circuit has acknowledged that it can be "necessary" in "complex cases involving multi-count complaints containing claims that were arguably non-arbitrable," for a defendant to invoke judicial machinery "both to sort out the claims before it can intelligently decide whether to arbitrate and to protect its rights in court if the arguably non-arbitrable claims do turn out to be non-arbitrable." *St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co.*, 969 F.2d 585, 589 (7th Cir. 1992).

As this Court has recognized, "[e]ngaging in discovery will not necessarily result in waiver of arbitration rights." *Leff*, 2009 WL 1380819, at *3. In *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 5325589 (N.D. Cal. Sept. 19, 2011), for instance, the court found no waiver despite the moving party's serving dozens of document requests, receiving over 47,000 pages of documents, taking a one-day Rule 30(b)(6) deposition of opposing party's corporate representative, and serving deposition notices on four of their opponent's employees. *Id.* at *8.[3]

---

[3] *See also, e.g.*, *Sevinor v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 807 F.2d 16, 19 (1st Cir. 1986) (no waiver where movant served 300 interrogatories, 12 "comprehensive" requests for production, and numerous continuances of discovery deadlines); *Nissho Iwai Corp. v. M/V Joy Sea*, 1999 WL 970335, at *4 (E.D. La. Oct. 22, 1999) (no waiver where defendants' activities "were consistent with orderly participation in the lawsuit" and where acting otherwise might have "prejudiced [defendants'] position in this case had the Court found the arbitration clause not enforceable").

The cases cited by the dealers (at 23-24) are distinguishable. In *Smith v. Adams & Assocs.*, 2015 WL 5921098 (N.D. Ill Oct. 9, 2015), for example, the "critica[l]" fact was that the movant "tried twice to

*Finally*, although prejudice is "a relevant consideration" (*Kawasaki*, 660 F.3d at 998), the dealers do not purport to have suffered any prejudice as a result of CDK's actions. There is good reason for this. As this Court observed in August, despite the pending arbitration claims, it is hard to "envision[] any scenario in which grinding discovery to a complete halt would make sense" given the complexity of this litigation and the need for coordinated proceedings across all of the cases. Ex. A (8/16/18 Tr.) at 40:21-25. Here, especially, halting discovery would have made no sense. Only some named dealer plaintiffs must arbitrate their claims, and as the dealers concede (at 33-36), discovery from the dealers is relevant to many claims and issues raised in other MDL cases. *Cf. Dickinson v. Heinold Sec.*, 661 F.2d 638, 642 (7th Cir. 1981) (no waiver where discovery sought was relevant to both arbitrable and non-arbitrable claims).

The dealers did not contest Reynolds's Motion for Clarification (Dkt. 344), which sought to clarify that Reynolds's participation in discovery would not be a waiver of Reynolds's arbitration rights. That is a frank acknowledgement that CDK's participation in discovery is not inconsistent with arbitration either. The Reynolds dealers also did not seek a protective order or other relief despite knowing since at least July 2018 of CDK's intent to pursue arbitration. "Absent a protective order," a party "seeking arbitration does not lose its contractual right by prudently pursuing discovery in the face of a court-ordered deadline." *Maxum*, 779 F.2d at 983.

The dealers accordingly have failed to carry their "heavy burden" to show waiver. *Leff*,

---

convince the court to jettison [the plaintiff's] recruited counsel." *Id.* at *5. And in *In re Wireless Tel. 911 Calls Litig.*, 2005 WL 2709286 (N.D. Ill. Oct. 20, 2005), the movant filed multiple motions, including a partial summary judgment motion and a motion to dismiss, and filed a motion to compel months *later*. CDK engaged in no such conduct here. *Hartford Fire Ins. Co. v. Henry Bros. Constr. Mgmt. Servs.*, 2011 WL 3563138 (N.D. Ill. Aug 10, 2011), also is inapposite. There, this Court held that when a defendant "specifically disclaims arbitration" by agreeing to delete an existing arbitration provision from a contract with the plaintiff, the defendant "waive[s] a motion equitable estoppel-based argument" based on an arbitration provision in another of plaintiff's contracts to which the defendant is a nonsignatory. *Id.* at *8. But CDK's contracts with its own dealers do not expressly disclaim an existing right to arbitration; and CDK does not seek to require its own dealers to arbitrate.

2009 WL 1380819, at *3. Indeed, even if the question were close (and it is not) the dealers' arguments still would fail. Under federal law, "any doubts concerning the scope of arbitrable issues"—*including* "allegation[s] of waiver"—"should be resolved in favor of arbitration." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

### D. The Court Should Stay All Remaining Dealer Claims.

Whatever claims the Court does not order into arbitration should be stayed for the reasons set forth in CDK's opening brief. *See* Mem. 9-10. There is no reason for this Court and the parties to expend time and resources litigating overlapping claims and issues in multiple forums when "each count of plaintiffs' federal complaint . . . involves, or will be clearly influenced by, the pending arbitration." *Nootens v. Madison Gas & Elec. Co.*, 1998 WL 719611, at *3 (N.D. Ill. Oct. 8, 1998); *see also Mediterranean Enters., Inc. v. Ssangyon Corp.*, 708 F.2d 1458, 1465 (9th Cir. 1983) (in "deciding those issues necessary to resolve" arbitrable claims, arbitrator "might well decide issues which bear in some way on the court's ultimate disposition of" other counts).

The dealers argue against a stay on the grounds that CDK has not represented that it will be bound by the proceedings in arbitration. However, representations about the preclusive effect of an arbitration, if any, would be premature. No award has yet issued, much less been confirmed, and whether to apply preclusion principles to an unconfirmed award is a fact-bound inquiry. *Stulberg v. Intermedics Orthopedics*, 997 F. Supp. 1060, 1066 (N.D. Ill.1998) ("courts are not required to afford previous unconfirmed arbitration awards preclusive effect on later federal proceedings; however, courts may impose such preclusion in appropriate cases").

More importantly, the grounds for a stay do not depend on the arbitration's conclusive resolution of claims or issues. As Reynolds notes, allowing the dealers' claims against CDK to proceed would impinge upon Reynolds's rights to arbitration—especially though not exclusively if the Court permits the Reynolds dealers' intertwined claims against CDK to go forward. *See*

*ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*, 487 F. Supp. 2d 980, 991-92 (N.D. Ill. 2007) (staying all claims where arbitrable claims are "obviously intertwined" with claims against nonsignatories). Indeed, "[a] stay of all claims is particularly warranted in the class-action context because the complaint admits that common questions of fact and law predominate." *In re Samsung Galaxy Smartphone Mktg. & Sales Practices Litig.*, 298 F. Supp. 3d 1285, 1304 (N.D. Cal. 2018); *see also* Compl. ¶¶ 20-21 (alleging that common questions predominate).

The dealers also argue that a stay would result in duplicative discovery, but their own arguments show that those concerns are overblown. As the dealers note, the other cases in the MDL "involve issues that overlap with Dealership Plaintiffs' claims" (Opp. 33) and discovery in those cases "is ongoing and will continue no matter how the Court rules" in the present motion (*id*. at 36). This discovery and the Court's rulings on associated motions to dismiss would frame subsequent discovery once the stay is lifted, including regarding supposed dealer-specific issues. The dealers' failure to give any concrete examples of such issues or of the prejudice they would suffer from a stay is further proof that the dealers' efficiency concerns lack merit.

## II. Alternatively, The Court Should Dismiss For Failure To State A Claim.

### A. The Dealers Are Not Proper Federal Antitrust Plaintiffs (Counts I-V).

*Illinois Brick*. The Supreme Court's *Illinois Brick* decision precludes the dealers from bringing federal claims for antitrust violations in a market in which the dealers were not direct purchasers. The dealers are not direct purchasers of data integration services. To plead around this problem, they attempt to allege a substantively identical antitrust conspiracy that just so happens to take place in the DMS market. But as CDK explained in its opening brief (at 12-13), the Complaint's allegations of a DMS conspiracy are, charitably described, paper-thin.

The dealers' response confirms as much. Their brief offers no answer to the dealers' clear failure to plead a DMS-market conspiracy in support of the federal equitable claims. Mem. 13.

Nor does it deny that the dealers' evidence shows that CDK and Reynolds, to this day, compete aggressively for DMS market share. Mem 6. n.3.

Instead, the dealers attempt to transmute the alleged injury they suffered in the so-called DIS market into an identical injury suffered directly in the DMS market (Opp. 39-45), arguing that they have stated a direct-purchaser claim because the DMSs they purchased from Reynolds and CDK have "diminished in value" and "degraded" in functionality. Opp. 40. But this alleged diminution is just the flip side of the purported inability to access data integration in the so-called DIS market, and thus cannot satisfy *Illinois Brick* as a matter of law.

After all, in a world where the vendors did not pass on the allegedly improper price increases resulting from their use of the RCI or 3PA programs, the dealers' only alleged injury would not exist. Without vendor pass-through of integration costs, dealers could "freely access their DMS data and provide that data to authorized persons" (Opp. 41) at no higher cost than when vendors and data integrators were able to free-ride off Reynolds's and CDK's substantial investment in their respective DMS platforms. And forcing the Court to separate the vendors' alleged damages from the integrators' alleged damages in these purportedly distinct markets would implicate the very concerns that motivated the *Illinois Brick* rule. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at *6 (N.D. Ill. June 25, 2015) ("*DFA II*"); *cf. Siena v. Microsoft Corp.*, 796 A.2d 461, 465 (R.I. 2002) (plaintiffs could not plead around *Illinois Brick* by alleging that, by virtue of end-user licensing agreements, they "contracted directly with Microsoft and are subject to Microsoft's direct control").

In any event, the dealers have not alleged any *facts* to support a conspiracy in the DMS market. Conclusory allegations that "competition between Reynolds and CDK suddenly ceased in 2015" or that wrongful conduct "had the effect of eliminating competition between CDK and

Reynolds in the DMS market" (Opp. 41) fall well short of what an antitrust plaintiff must plead to survive a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The dealers cannot adopt virtually all of the other MDL Plaintiffs' allegations concerning a conspiracy in the so-called DIS market, add a conclusory label transforming that conspiracy to one in the DMS market, and thereby circumvent both *Twombly* and *Illinois Brick*.

*AGC*. The dealers' federal claims for injunctive relief are likewise barred by *AGC*. Mem. 14-16. As this Court has explained, *AGC* bars injunctive relief suits where the plaintiffs were "downstream participants in a retail market . . . separate from the allegedly restrained market" and "the allegedly price-fixed products . . . [we]re not even components of the products that Plaintiffs purchased." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2013 WL 4506000, at*12-13 (N.D. Ill. Aug. 23, 2013) ("*DFA I*").

The dealers try to resist this conclusion by claiming that, because Defendants allegedly knew that price increases would be passed on to the dealers, the dealers' injuries were an "integral part" of the alleged conspiracy. But as this Court explained in *DFA I*, it is not enough to allege a "general causal relationship" between a plaintiff's injury and the "alleged anticompetitive activity." *Id*. at *11. The alleged increase in fees paid to vendors is, "at best, a result of—rather than a means to or a cause of"—the supposed injury sustained in the purported DIS market. *Id*. (quoting *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *12 (E.D. Mich. Apr. 9, 2013)). Moreover, the dealers do not dispute that third-party integration is not a "component" of any product or service purchased by dealers. Third-party integration allegedly allows vendors "to extract, organize and integrate the Dealers' own data" into a "usable format," but the vendor services that dealers purchase are distinct from the data being integrated. Compl. ¶ 5.

The dealers' last-ditch attempt to portray themselves as "well-suited" to seek injunctive relief vis-a-vis the other MDL plaintiffs is unavailing. Opp. 45. It boils down to the assertion that if other, more directly injured plaintiffs disappear from the case, then the dealers are the best-suited plaintiffs to seek injunctive relief by default. That may be so, but it is true of every case in which plaintiffs at multiple levels of the market and chain of distribution seek to bring claims. Authenticom and the vendor plaintiffs are "actively pursu[ing] their claims" in the MDL (*DFA I*, 2013 WL 1431756, at *14), which is grounds for dismissal of the dealers' more remote but substantively identical claims in this case.[4]

### B.    The Federal Counts Fail To State A Claim (Counts I-V).

Even if the Dealership Plaintiffs were proper federal antitrust plaintiffs, their federal claims could not go forward, because none states a plausible claim for relief.

In defense of these claims, the Dealership Plaintiffs rely chiefly on Judge St. Eve's decision on the motion to dismiss in *Authenticom*—which they call "dispositive" (Opp. 46)—and on Judge Peterson's decision at the preliminary injunction stage. But this reliance is misplaced. This action is separate from *Authenticom*, and the dealers' complaint must rise or fall based on whether *it* states a plausible claim for relief. *See In re Actos (Pioglitazone) Prod. Liab. Litig.*, 274 F. Supp. 3d 485, 519 (W.D. La. 2017) (MDLs "are not one case" but rather "a loose collective of separate cases temporarily brought together . . . for a limited purpose.").

As is clear from Judge St. Eve's opinion (and as argued in CDK's *Authenticom* motion to dismiss), Judge Peterson's since-reversed opinion on the preliminary injunction has even less

---

[4] To the extent *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772 (N.D. Ill. 2017), holds that the existence of other, more direct victims is irrelevant to the *AGC* analysis for equitable claims, it is inconsistent with *DFA I*, in which the Court dismissed claims for both damages and injunctive relief on the grounds that "the existence of a less remote party to vindicate the public interest is no hypothetical proposition" (2013 WL 4506000, at *14), and with the many other cases cited in CDK's opening brief that apply *AGC* to equitable claims (*see* Mem. 16 n.10).

relevance than Judge St. Eve's opinion. "[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding" on the Court at later stages of the litigation. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). A decision "granting or denying [a] temporary injunction does not constitute the law of the case," in other words, "and will not estop the parties nor the court as to the merits of the case." *Hunter v. Atchison, T. & S.F. Ry.*, 188 F.2d 294, 299 (7th Cir. 1951). That is especially true here, where Judge Peterson explicitly did not "set out all the facts established by the parties' evidence or . . . review comprehensively that evidence" in his preliminary injunction decision. *Authenticom* Dkt. 172 at 2.

### 1. The Dealers' Horizontal Conspiracy Claims (Counts I-II) Fail.

The Dealership Plaintiffs' horizontal conspiracy claims cannot withstand a motion to dismiss because, as CDK has shown (Mem. 17-21), the alleged "conspiracy" is implausible and the agreement purportedly at its center was entirely lawful.

The dealers' first move in response is to claim that they allege a conspiracy directed not only at the data integration market, but also at the DMS market, and that CDK has not responded to the allegations regarding the DMS market. Opp. 45-46. But that is not so, for two reasons. First, as explained above (at Part II.A), the dealers' attempt to repackage their claim about the integration market into one about the DMS market to avoid *Illinois Brick* is unavailing. And second, even if the dealers could be reasonably understood as making a claim about a conspiracy in the DMS market, as well as the integration market, they could not avoid dismissal on that basis, because with respect to both putative markets, the conspiracy consists of the same alleged conduct undertaken for the same alleged reasons. CDK's arguments are fully responsive to any claim about a conspiracy in the DMS market.

The dealers' responses to those arguments lack merit. To begin with, their reliance on the so-called "'smoking gun' evidence" mentioned in Judge St. Eve's opinion (Opp. 47) is

unavailing, because the best evidence of what the parties agreed to is the written agreements they signed. The dealers dutifully recite that this argument "backfires" because it implies that CDK and Reynolds personnel believed that the effect of the written agreements was to block independent integrators (Opp. 48 n.42), but CDK has already explained why that conclusion was mistaken: it ignores the well-established principle that oral statements should not be used to supplement the meaning of a written, integrated agreement (Mem. 21 n.13). The dealers argue that this Court should not apply the "parol evidence rule" because they are "not asserting contract rights" under CDK and Reynolds's written agreements (Opp. 48 n.42), but CDK is not relying on that doctrine; what matters here is the principle behind it, which Dealership Plaintiffs do not dispute. The Court should thus give no weight to the dealers' much-ballyhooed allegations about "admissions" by CDK or Reynolds employees. Opp. 49.

Nor do the dealers offer any persuasive response to CDK's showing (Mem. 18-19) that the conspiracy they allege is implausible because defendants had no motive to conspire. They argue at length why *Reynolds* might have had a motive to conspire (Opp. 56-57), but say virtually nothing about why *CDK* would have conspired.[5] Their argument about Reynolds's motives is wrong, for the reasons Reynolds explains—but what matters here is that, to state a plausible claim of conspiracy, the dealers must allege that *both* alleged conspirators had a plausible motive to conspire. They conspicuously fail to do so.

Finally, the dealers fail to rehabilitate the exhibits they attached to their complaint, which CDK showed reflected nothing more than CDK and Reynolds harmonizing their communications about the 2015 wind-down agreement. The dealers try to argue that "efforts by the two market-dominating firms to 'harmonize' communications . . . strongly support[] an

---

[5] The dealers argue that CDK had a motive to conspire because CDK could charge "artificially inflated prices" (Opp. 48)—but that is not a plausible motive for a *conspiracy*, given that CDK could have (and did) change its policies and prices unilaterally.

inference of unlawful horizontal conduct" (Opp. 49-50), but that is wrong. If communications between competitors can be "understood as a part of a legitimate business relationship as readily as they could be understood as a part of a conspiracy," the communications do not support a Section 1 claim. *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 763 (7th Cir. 2015). That is clearly the case here: given the ongoing wind-down agreement and the potential impact on their respective customers' daily operations, CDK and Reynolds had "a number of legitimate reasons to communicate with each other," notwithstanding the Dealership Plaintiffs' scattershot insinuations that these communications were improper. *Id.*

### 2.     The Dealers' Exclusive Dealing Claims (Counts III-IV) Fail.

In defense of their exclusive dealing allegations, the dealers rely on Judge St. Eve's conclusion that Authenticom—a data integrator—has stated an exclusive-dealing claim based on its allegations that CDK and Reynolds's respective decisions to prohibit hostile integration had foreclosed Authenticom and other integrators from the market. Dkt. 176 at 37. But *dealers* do not participate in the alleged data integration market. Accusing CDK of "ignor[ing] a basic precept of economics," the dealers insist that they have standing to make a similar exclusive dealing claim because the costs of the purported exclusive dealing "are passed through the vendor and borne by" dealers. Opp. 51. But it is the dealers who are ignoring settled principles: that kind of pass-through argument is exactly what *Illinois Brick* prohibits.

In any event, the exclusive-dealing allegations here fail on their own terms. Dealers cannot plausibly argue that CDK's decision to restrict access to its DMS—the same kind of access restriction imposed by firms throughout the economy as a sound security measure—is an unlawful exclusive deal. Mem. 22. The dealers do not dispute the ubiquity of access restrictions like CDK's, but they argue that this is "irrelevant" because the restrictions here "were unlawfully implemented pursuant to a conspiracy." Opp. 51. That dodge improperly blurs the distinction

between their conspiracy claim and their exclusive dealing claim. Tellingly, the dealers support this point by citing the portion of Judge St. Eve's opinion discussing Authenticom's conspiracy claim, not the exclusive dealing claim. *See* Opp. 51 (citing Dkt. 176 at 27).[6]

### 3. The Dealers' Section 2 Claim (Count V) Fails.

The dealers' final federal claim—for monopolization under Section 2—fails as well, because the single-brand aftermarket that CDK purportedly monopolized does not exist. To plausibly allege such an aftermarket, the dealers had to plausibly allege that they were locked in *after* purchasing DMS services. They fail to do so as a matter of law, because CDK's dealer contracts disclosed that third-party access to the DMS was not permitted. Mem. 25-26.

The dealers do not dispute that their contracts disclosed that hostile integration was prohibited, or that they are properly charged with knowing about the existence of those contract terms. Instead, they harp on purported factual distinctions between this case and certain of CDK's authorities. Opp. 66-67. But that misses the point. CDK did not suggest that this case is exactly like other aftermarket cases. Rather, those cases stand for the proposition—undisputed by the dealers—that customers who know about a seller's policies before they buy cannot, as a matter of law, be "locked in" for purposes of Section 2. That is clearly the case here, given that dealers' contracts expressly forbid them from giving DMS access to hostile integrators.

The dealers seek to shore up their Section 2 claims by pointing to their allegations that dealers are unable to calculate the lifecycle costs for DMS service from CDK and Reynolds due to "informational asymmetries" and alleged price secrecy provisions in vendor contracts. Opp. 63. But those allegations are implausible, because many other allegations by the dealers

---

[6] The dealers misunderstand CDK's point when they argue that CDK's "so-called 'security' defense is pretextual." Opp. 51 n.45. The point here is not that CDK made the decision at issue for security reasons—although that is what CDK did—but rather that it is utterly commonplace for firms to restrict access to their computer systems in this way, and thus implausible to claim that all of these restrictions constitute exclusive deals. The dealers have no response to this point.

contradict them. The dealers allege, for example, that CDK's price increases were publicized in industry publications. *See* Dkt. 184 ¶ 127. And the complaint discusses by name several dealers that have been able to *pinpoint* the amount by which 3PA and RCI pass through allegedly increased prices they paid for vendor services. *See id.* ¶¶ 139, 141. The Dealership Plaintiffs dismiss the inconsistency, saying that their "awareness of higher prices being passed on to them by some vendors does not equate to perfect knowledge of the price of" integration services (Opp. 64), but the Complaint's allegations regarding price increases reflect specific knowledge about the pass-through of alleged overcharges, not a general "awareness." And in any event, the Dealership Plaintiffs do not cite any authority for their dubious assertion that only "perfect knowledge" of integration costs can defeat a lock-in claim. It is more than enough for CDK to show, as it has, that if the dealers were right that CDK's price increases were "massive" (Dkt. 184 ¶ 134), overt (*id.* ¶ 127), and obviously in excess of "any . . . value of increased data security" (*id.* ¶ 155), dealers could have anticipated them and avoided them by doing business with a different DMS provider. The dealers' Section 2 claim should therefore be dismissed.

### C.    The Complaint Fails To State A Claim Under State Law (Counts VI-L).

#### 1.    The Dealers Allege No Operations or Purchases In Twenty-Six States.

The dealers impermissibly raise claims under the laws of states where no plaintiff has a principal place of business or has suffered any alleged injury. In response, the dealers assert that it is enough to allege that the named dealers have "individual" Article III standing. Opp. 77. But this Court has correctly rejected that argument. When plaintiffs bring claims "for states in which they do not reside and/or did not purchase the products at issue," they "fail to satisfy their burden of showing Article III standing." *DFA I*, 2013 WL 4506000, at *8. As this Court reasoned, the U.S. Supreme Court in *Ortiz v. Fireboard Corp.*, 527 U.S. 815 (1999), "did *not* intend for district courts to delay determining whether an actual case or controversy is before them" by reserving

the standing inquiry for class certification. *Id.*[7]

> ### 2. The State Antitrust Claims, And Several Of The Consumer Protection Counts, Fail Because The Federal Antitrust Claims Fail.

The dealers do not dispute that their state antitrust and some consumer protection claims fail if the federal antitrust claims fail. On the contrary, the dealers merely cross-reference their federal arguments in defending these state-law claims. *See* Opp. 77. Accordingly, the point in CDK's opening brief is uncontested. *See* Mem. 28–29.

> ### 3. The Dealers Are Too Remote To Be State-Law Antitrust Or Consumer-Protection Plaintiffs.

The dealers do not purchase or consume the data integration services at the center of their antitrust conspiracy allegations, notwithstanding their conclusory arguments to the contrary.

> #### a. *Illinois Brick* Bars The South Carolina And Illinois Antitrust Claims.

The dealers offer no response to CDK's argument that the South Carolina antitrust claim fails because that state has not repealed *Illinois Brick*. *See* Mem. 29. Nor do they dispute that the Illinois Antitrust Act bars indirect purchaser class actions. Instead, the dealers respond (at 80) that this bar has no effect in federal court. But the argument that "Illinois cannot limit Rule 23's class action procedure . . . has been repeatedly rejected by the courts." *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 723 (N.D. Ill. 2016).

> #### b. The Dealers' State-Law Claims Fail Under *AGC* And Similar Principles.

As CDK explained in its opening brief, all of the states identified in the Complaint would

---

[7] Many courts agree that plaintiffs lack standing to bring claims under the laws of states in which they do not reside or do business. *See*, *e.g.*, *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 2012 WL 39766, at *6 (N.D. Ill. Jan. 9, 2012); *In re Aggrenox Antitrust Litig.*, 2015 WL 1311352, at *20 (D. Conn. Mar. 23, 2015); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 758–59 (E.D. Pa. 2014); *McGuire v. BMW of North Am., LLC*, 2014 WL 2566132, at *6 (D.N.J. June 6, 2014); *Catlin v. Hanser*, 2011 WL 1002736, at *8 (S.D. Ind. Mar. 17, 2011). In contrast, the dealers lean heavily on the rejection of a similar standing argument in *In re Broiler Chicken Antitrust Litig.*, where the court said that *DFA I* was "unpersuasive." 290 F. Supp. 3d 772, 810 (N.D. Ill. 2017).

apply *AGC* or similar principles to reject the antitrust and consumer protection claims at issue here. Mem. 30–38. To escape this conclusion, the dealers cast themselves as indirect participants "in the same 'physical market' restrained by the Defendants." Opp. 80–81. But as discussed above, the dealers allege no facts to support this argument. They simply repeat the same mantra: that they are "in the 'distribution chain'" and "participated in the market" for data integration services. Opp. 82. These conclusory statements prove too much. By the dealers' logic, a plaintiff alleging anticompetitive conduct in the labor market would be a participant in *that* market so long as the plaintiff purchased products whose prices were affected by increased labor costs.

The Visa/Mastercard cases illustrate the point and show why the dealers' argument violates *AGC*. *See* Mem. 32–34. As in this case, those cases involved an alleged conspiracy in an ancillary market in which the plaintiffs did not participate. Here, it is the supposed market for data integration, which facilitates the exchange of data between third-party applications and the DMS; in Visa/Mastercard, it was the market for debit card processing, which facilitated the exchange of payments between consumers and merchants. And in both cases, the plaintiffs allegedly suffered pass-through harms because the participants in the allegedly price-fixed market passed along price increases to consumers of the primary service.

It is therefore significant that in the Visa/Mastercard cases, courts across the country held that despite the alleged pass-through, a retail consumer was "neither a consumer nor a competitor in [the alleged anticompetitive] market"—retail consumers did "not appear in that chain of distribution," could not "be identified as a consumer of the [supposedly price-fixed] service," and thus were "too remote" to have suffered "compensable" harms. Mem. 32.[8] The same result

---

[8] *See, e.g.*, *Nass-Romero v. Visa U.S.A. Inc.*, 279 P.3d 772, 779 (N.M. Ct. App. 2012) ("The alleged harm caused by Defendants' tying scheme takes an abrupt left turn after reaching the merchants and branches off into supposed higher prices for all goods throughout New Mexico, mutating into a different form of harm to consumers. Plaintiff's injury is better characterized as remote or derivative.").

applies here. The dealers' only response to this point is to repeat their mantra: that they are "the ultimate consumers in the DIS market" such that the Visa/Mastercard cases are "easily distinguishable." Opp. 84.[9]

*Supreme Auto Transport, LLC v. Arcelor Mittal USA, Inc.*, 2018 WL 4224426 (7th Cir. Sept. 6, 2018), also provides powerful support for CDK's position. There, indirect purchasers of steel brought state-law antitrust, consumer protection, and unfair competition claims against eight U.S. steel producers. In upholding the dismissal of these claims, the Seventh Circuit made clear that the "purpose of the proximate causation requirement—in both antitrust and tort law— is to avoid speculative recovery by requiring a *direct relation* between the plaintiff's injury and the defendant's behavior." *Id.* at *5 (emphasis added).

The Seventh Circuit then rejected the dealers' repeated contention that "any state with an *Illinois Brick* repealer would reject application of *AGC* to this case." Opp. 84. As the court explained, states with *Illinois Brick*-repealer statutes have not "replaced one *per se* rule with another," so that all indirect-purchaser suits can proceed "no matter how far removed the purchasers are from the production process and no matter how speculative the damages award would be." 2018 WL 4224426, at *6. "It is one thing to say that a state is willing to allow someone other than a direct purchaser to have the opportunity to shoulder the burden of showing proximate causation; it is quite another thing to say that the state has thrown both the direct-

---

[9] The dealers' efforts (at 80-81) to analogize themselves to the "Do-It For Me" plaintiffs in *In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041 (N.D. Ill. Nov. 5, 2009), are unavailing. The "Do-It For Me" plaintiffs were actual, indirect purchasers of car filters because they purchased car maintenance services that included changing the filters. *See id.* at *6. Although a "Do-It For Me" plaintiff bought a filter as part of the service package, each filter was "separately itemized and taxed," meaning the alleged injury to that plaintiff was the same as the injury to the "Do-It Yourself" plaintiffs who bought and installed the filters themselves. *Id.* at *8. Plaintiffs in both groups were "end users of the defendants' products" and "in the chain of distribution." *Id.* at *7–8. By contrast, here the dealers are not end users of the integration services; those services are not a component of any product the dealers purchase, and the dealers are not participants in the relevant chain of distribution.

18

purchaser rule *and* proximate causation out the window." *Id.*

In their supplemental brief, the dealers try to cast *Supreme Auto* as favoring their position. It plainly does not. *Supreme Auto* distinguished the failed allegations in that case from a more traditional indirect-purchaser suit—where plaintiffs purchase defendants' products through a distributor. The dealers thus try to portray themselves as traditional, indirect purchasers. *See* Mot. for Leave to Submit Supplemental Authority, Dkt. 366, at 2. But again, the dealers did not buy integration services, even indirectly. Like the plaintiffs in Visa/Mastercard, they purchased an entirely different product, in an entirely different market, whose price happened to depend in part on prices charged in the former (allegedly anticompetitive) market.

### c. State-Specific Considerations Demonstrate That *AGC* And Related Remoteness Principles Apply.

The dealers fare no better when they descend from general principles to particular state laws. In *DFA II*, this Court comprehensively examined the laws of many of the states at issue in this case, and concluded that even in those states that lacked binding precedent or where intermediate appellate and other precedent was unclear, the best prediction was that the states' highest courts would apply *AGC* or *AGC*-like factors if faced with the question. *See DFA II*, 2015 WL 3988488, at *7–16. The dealers' state-specific arguments largely fly in the teeth of that assessment. Crucially, the dealers cannot identify any binding authority from those states' highest courts to support their contention that *AGC* does not apply.

Nor do the dealers raise a convincing argument against *AGC*'s applicability to the laws of the District of Columbia, Iowa, Maine, Nebraska, New Mexico, South Dakota, Vermont, or Wisconsin. Although the Court did not consider these state's laws in *DFA II*, applying the Court's rationale in that case to these states compels the same conclusion. *See* Mem. 31. All of these states, save one, harmonize their law with federal antitrust law, which is alone "sufficient"

to apply *AGC* in the absence of countervailing authority. *DFA II*, 2015 WL 3988488, at *4. The dealers insist this conclusion is not "settled" (Opp. 84), but they offer no reason for this Court to reconsider its well-reasoned approach. In addition, courts in all of these states, at various levels, have already adopted or substantially incorporated *AGC*. Mem. 31.[10]

Finally, CDK showed in its opening brief (at 34–36) that the remaining states presumptively apply *AGC*—based on state harmonization provisions and federal case law—or, at the least, would apply similar principles of remoteness and causation to bar the dealers' claims. Mem. 34–36. The dealers argue that these states have enacted *Illinois Brick*-repealer statutes, and that *AGC* therefore should not apply. Opp. 85. In addition to being squarely foreclosed by the Seventh Circuit's *Supreme Auto* decision (2018 WL 4224426, at *6), however, this Court has already rejected that argument. *See DFA II*, 2015 WL 3988488, at *5-6.

### 4. Many State Claims Fail For Additional Reasons.

***Lack of territorial conduct/effect.*** The dealers do not dispute that the Delaware Consumer Fraud Act requires "relevant conduct" to occur in Delaware; they agree relevant conduct must occur "in part or wholly within" the state. Opp. 93 (quoting 6 Del. Code § 2512). Because the dealers do not allege any such conduct in Delaware, the Delaware claim fails.

The Massachusetts, North Carolina, Wisconsin, and New Hampshire claims suffer from the same flaw. The dealers do not dispute that a claim under Massachusetts' consumer protection statute requires conduct that "occurred primarily and substantially" in Massachusetts, *see* Opp. 93, and the alleged antitrust conspiracy could not possibly have had its "center of gravity" there. *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787, 799 (Mass. 2003). Nor

---

[10] The dealers state (at 84) that only one of the cases in footnote 23 cites *AGC*, but that footnote is intended to support the previous sentence of the opening brief. The cases demonstrating that various courts in the referenced states apply *AGC* can be found in footnote 24 of CDK's opening brief.

does the complaint allege any nexus with North Carolina, where no named dealer does business. Likewise, the dealers allege no "actionable conduct" in Wisconsin or contend that any alleged conduct "substantially affects the people of Wisconsin and has impacts" there. *Olstad v. Microsoft Corp.*, 700 N.W.2d 139, 158 (Wis. 2005) (quotations omitted). And even if a New Hampshire consumer protection claim can survive if a citizen of the state was merely "affected" by the alleged conduct (Opp. 94), no dealer alleges *any* connection to New Hampshire. Mem. 40.

*Intrastate conduct.* The dealers have no response to CDK's argument that Alabama's antitrust laws are limited to purely intrastate conduct. As to Tennessee, the dealers rest on a nonbinding decision concluding that conduct must "substantially" affect commerce in the state. *See In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160, 173 (D. Me. 2004). The dealers allege no substantial effects on commerce in Tennessee, however, as no named plaintiff does business or alleges an injury there.

*Intangible Services.* The dealers admit that the Tennessee Trade Practices Act does not apply to intangible services, but argue that the statute covers the sale of software. Opp. 95. The only case they cite did not address whether software was a tangible good, however, and since the dealers do not use data integration software, they cannot bring a "software" claim in any event.

*Alleged Antitrust Conduct Not Covered.* In arguing that the West Virginia consumer protection law covers antitrust conduct, the dealers cite a case recognizing that "multiple district courts have concluded that price fixing is *not* within the ambit of" the statute. *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1087 (S.D. Cal. 2017) (emphasis added). The court declined to dismiss the suit because an amendment indicated that courts should look to the Federal Trade Commission Act and policies in interpreting the statute. *See id.* But that amendment should not be read to so drastically expand the scope of the statute, especially where

21

the dealers identify no West Virginia authority saying it does. Meanwhile, the Arkansas Deceptive Trade Practices Act ("ADTPA") does not explicitly prohibit "unfair competition" at all. S*ee* Ark. Code Ann. § 4–88–107. And even if that statute does reach antitrust conduct, this claim fails for other reasons, including that "'Arkansas law recognizes the remoteness doctrine' as applied to claims under the ADTPA, favoring suits by those directly injured over more-indirect victims." *DFA II*, 2015 WL 3988488, at *17.

**Notice Requirements Unsatisfied.** As CDK acknowledged in its opening brief, courts are split over the applicability of state statutory notice requirements to federal court proceedings. *See* Mem. 41 n.31. But the better side of this issue holds that specific notice requirements for state antitrust lawsuits do apply in federal court because they are intertwined with the substantive remedy and because Rule 23 does not purport to address similar considerations. *In re Asacol Antitrust Litig.*, 2016 WL 4083333, at *14–15 (D. Mass. July 20, 2016). Indeed, to decline to apply the notice requirements "would encourage forum shopping and the inequitable administration of laws." *Id.*[11]

**Insufficient Tie to Consumers.** The dealers fail to plead a "consumer-oriented act" to support their claim under the Arkansas Deceptive Trade Practices Act. And while the dealers make much of the fact that they are competitors with CDK, they cannot argue around the fact that, like the plaintiff in *Apprentice Information Systems, Inc. v. DataScout, LLC*, 544 S.W.3d 536 (Ark. 2018), they are suing over a "thwarted business model, not a specific harm to consumers." *Id.* at 539. As to the Georgia Fair Business Practices Act claim, the dealers' cited case was brought by an individual who fell outside the statute because she had a contractual

---

[11] The dealers argue (at 96) that CDK has not identified any applicable notice requirement under Alaska, Georgia, or New Jersey law. The New Jersey Consumer Fraud Act requires notice at N.J. Stat. Ann. § 56:8-20. And as to Georgia law, the dealers' *Shady Grove* argument has been rejected by *Asacol*. However, CDK withdraws its notice argument as to Alaska.

relationship with the defendant and alleged no "ordinary consumer relationship." *See Saulsberry v. Morinda, Inc.*, 2008 WL 416933, at *3 (N.D. Ga. Feb. 13, 2008). The dealers fall outside the statute's scope on an even simpler ground: auto dealerships are not "natural persons," and there is no transaction alleged "primarily for personal, family, or household purposes." *See* Ga. Code Ann. §§ 10–1–393(a), 10-1-392(6), (10).

**No "Unfairness" Claim.** The dealers again directly challenge this Court's analysis in *DFA II* when they argue that their Arkansas Deceptive Trade Practices Act claim should survive. *See* Opp. 42-43; Mem. 97-98. In *DFA II*, this Court reasoned that because the statute prohibits "'unconscionable, false, or deceptive' business practices without reference to 'unfair' business practices," a plaintiff must allege fraudulent or unconscionable acts to state a claim. 2015 WL 3988488, at *35. Though the dealers note that courts "are split" on the scope of this statute, Opp. 97, the reasoning in *DFA II* is correct and compels a dismissal here.

**Grossly Unequal Bargaining Power Not Alleged.** Though the dealers point to two non-binding cases for their argument that the New Mexico consumer protection statute does not require allegations of grossly unequal bargaining power, the case on which CDK relies has the better reasoning. There, a court determined that the New Mexico statute "prohibits deceptive and unconscionable conduct in consumer transactions," and that pleading unconscionability in that state "requires something more than merely alleging that the price of a product was unfairly high." *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1029–30 (N.D. Cal. 2007). The court dismissed the claim not because the price-fixing allegations were not serious, but because the plaintiffs failed to plead "the kind of grossly unequal bargaining power" the statute prohibits. *Id.* at 1030.

**Class Actions Not Authorized.** The dealers argue that class action bars in the consumer

protection laws of Alaska, Arkansas, Georgia, and South Carolina should not apply under *Shady Grove*, but they are mistaken: these statutory restrictions are substantive and therefore properly apply in federal court.[12] The dealers also miss the mark with their assertion that Alaska does not bar class actions under its statute. Courts have interpreted the state's repeal of the provision that had allowed class actions to mean that the statute bars them. *See In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 84 (D. Mass. 2005).

**No Damages Claim.** The dealers admit that damages are unavailable under California's Unfair Competition Law. *See* Opp. 99. Nor do the dealers contest that a federal court recently held that class action plaintiffs could not recover damages under the Colorado Consumer Protection Act ("CCPA"). *See Davidson v. Apple, Inc.*, 2018 WL 2325426, at *11 (D. Colo. May 8, 2018). And contrary to the dealers' argument, *Davidson* did not "ignore" cases that did not refer to or apply the statute's restriction, but instead explained that those cases were unpersuasive where the plaintiffs had not identified any Colorado decision "actually holding that the CCPA bar is inapplicable or explaining why the CCPA bar can be ignored." *Id.* Without any such authority, the *Davidson* court declined to "overlook the statute's plain language." *Id.* The statute's plain language similarly controls here. To the extent the dealers seek damages under these two statutes in Counts VIII, XXXIV, and XXX, those theories should be rejected.

**Failure To Allege Specific Violation.** The Dealership Plaintiffs do not dispute that they failed to identify which aspect of the Nevada Deceptive Trade Practices Act CDK and Reynolds allegedly violated, instead asserting that it is somehow "apparent" that the provision at issue is Nev. Rev. Stat. § 598.0915. *See* Opp. 100. But that is not "apparent" from the face of the dealers'

---

[12] *See also* Part II.C.3.a *supra*; *Fejzulai v. Sam's West, Inc.*, 205 F. Supp. 3d 723, 729 (D.S.C. 2016) (holding that South Carolina statute's class action bar applies in federal court); *Delgado v. Ocwen Loan Servicing, LLC*, 2017 WL 5201079, at *10 (E.D.N.Y. Nov. 9, 2017) (same for Georgia Fair Business Practices Act).

complaint, which fails to provide "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quotation marks omitted). Sections 598.0915 through 598.0925 of the Nevada act "list various kinds of deceptive trade practices cognizable under the statute," and the dealers' failure to identify what kind of violation they are alleging warrants dismissal. *In re Zappos.com, Inc.*, 2013 WL 4830497, at *13 (D. Nev. Sept. 9, 2013).

## CONCLUSION

For the foregoing reasons, the Court should compel arbitration and stay the remaining claims, or in the alternative dismiss the claims for failure to state a claim.

Dated: September 21, 2018

Respectfully submitted,

/s/ *Britt M. Miller*
Britt M. Miller
Michael A. Scodro
Matthew D. Provance
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
Mayer Brown LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant CDK Global, LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I, Britt M. Miller, an attorney, hereby certify that on September 21, 2018, I caused a true and correct copy of the foregoing **DEFENDANT CDK GLOBAL, LLC'S REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND STAY CLAIMS OR, IN THE ALTERNATIVE, TO DISMISS THE DEALERSHIP CONSOLIDATED CLASS ACTION COMPLAINT**, to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/ Britt M. Miller*
Britt M. Miller
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
Phone: (312) 782-0600
Fax: (312) 701-7711
Email: bmiller@mayerbrown.com