PUBLIC VERSION

# EXHIBIT 1

PUBLIC VERSION

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

---

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817<br>Case No. 18 C 864 |
| This Document Relates to All Cases | Hon. Amy J. St. Eve |

---

**INDIVIDUAL PLAINTIFFS' FIRST SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS FOR DEFENDANT CDK GLOBAL, LLC**

---

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs Motor Vehicle Software Corporation, Authenticom, Inc., Cox Automotive, Inc., Autotrader.com, Inc., Dealer Dot Com, Inc., Dealertrack, Inc., HomeNet, Inc., Kelley Blue Book Co., Inc., vAuto, Inc., VinSolutions, Inc., Xtime, and Loop, LLC ("Individual Plaintiffs") hereby request that Defendant CDK Global, LLC ("CDK") produce all documents in its actual or constructive possession, custody, or control related directly or indirectly to any of the matters described below. All documents and tangible things responsive hereto should be produced for inspection as soon as practicable and in no event later than the date provided for in the Case Management Order. Production shall be made at the offices of KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., 1615 M Street, N.W., Suite 400, Washington, D.C. 20036, or as otherwise agreed to by the parties.

## **DEFINITIONS**

For purposes of these requests the following definitions shall apply:

1.      "Add-on application" means a software application that dealers use in addition to or separate from their Dealer Management System ("DMS") software in the course of operating their dealerships.

2.      "All" shall be construed as all and any, and the term "any" shall be construed as all and any.

3.      "Authenticom" shall mean a Plaintiff in this MDL and a provider of data integration services in the automotive industry based in La Crosse, Wisconsin.  "Authenticom" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

4.      "AutoLoop" shall mean Loop, LLC and its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

5.      "Cox Automotive" shall mean Cox Automotive, Inc., Autotrader.com, Inc., Dealer Dot Com, Inc., Dealertrack, Inc., HomeNet, Inc., Kelley Blue Book Co., Inc., vAuto, Inc., VinSolutions, Inc., and Xtime, Inc. (collectively, "Cox Automotive") and their present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

6.      "MVSC" shall mean Motor Vehicle Software Corporation and its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

2

PUBLIC VERSION

7.      "RTS" shall mean Dealertrack's Registration and Titling Service and its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

8.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the document request all responses that might otherwise be construed to be outside of its scope.

9.      "CDK" shall mean CDK Global, LLC, as described in Paragraph 4 of Defendants' Combined Statement of Additional Facts Requiring Denial of Preliminary Injunctive Relief (hereinafter, "SoAF"), *Authenticom* Dkt. No. 87 (June 16, 2017).  "CDK" shall include the dealer services business of Automatic Data Processing, Inc. ("ADP") prior to September 30, 2014, as described in Paragraph 5 of the SoAF.  "CDK" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

10.     "Communication" or "Communications" shall mean any exchange or transfer of information, whether electronic, written, oral, or in any other form.  The phrase "communication between" is defined to include instances where one party addresses the other party but the other party does not necessarily respond.

11.     "CVR" shall mean Computerized Vehicle Registration and its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

12.     "Data integrators" shall refer to service providers that provide access by any means to dealer data on the DMS database, whether by extracting the data, writing data back into

3

the DMS, or both. For the avoidance of doubt, "data integrators" includes CDK (through its 3PA program) and Reynolds (through its RCI program).

13.     "DMI" shall mean Digital Motorworks, Inc., as described in Paragraph 215 of the SoAF. "DMI" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

14.     "Document" and "Documents" are used in the broadest extent permitted by Federal Rule of Civil Procedure 34(a).

15.     "IntegraLink" shall mean IntegraLink, as described in Paragraph 215 of the SoAF. "IntegraLink" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

16.     "Including" (in addition to its usual meanings) shall mean including but not limited to.

17.     The terms "relating to," "related to," "referring to," "regarding," or "with respect to" shall mean, without limitation, the following concepts: concerning, discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part.

18.     "Reynolds" shall mean "The Reynolds & Reynolds Company," as described in Paragraphs 1-3 of the SoAF. "Reynolds" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

19.     "Vendors" or "application providers" shall mean vendors who provide software applications that perform operations functions for dealerships, as described in Paragraph 20 of the SoAF.

20.     "You," "Your," or "Your company" shall mean the responding Defendant, its present or former predecessors, subsidiaries, departments, divisions, joint ventures, and affiliates, including without limitation, any organization or entity that the responding Defendant manages or controls, together with all present and former directors, officers, employees, agents, representatives, or any persons acting or purporting to act on behalf of the responding Defendant.

## INSTRUCTIONS

1.     In producing documents and other materials, You must furnish all documents in Your possession, custody, or control, regardless of whether such documents or materials are possessed directly by You, Your employees or former employees, agents or former agents, parents, subsidiaries, affiliates, investigators, or by Your attorneys or their employees, agents, vendors, or investigators.

2.     All documents shall be produced in the same order as they are kept or maintained by You in the ordinary course of Your business.  All documents shall be produced in the file folder, envelope, or other container in which the documents are kept or maintained.

3.     Documents attached to one another should not be separated.  If any portion of any document is responsive to any portion of the document requests below, then the entire document must be produced.

4.     Documents shall be produced in such fashion as to identify the natural person in whose possession they were found (i.e., the document custodian).

5. If any document responsive to any of these requests is privileged, and the document or any portion of the document requested is withheld based on a claim of privilege, provide a statement of the claim of privilege and all facts relied upon in support of that claim, including the following information:

    a. the exact basis for withholding the document;
    b. the date of such communication;
    c. the medium of such communication;
    d. the general subject matter of such communication (such description shall not be considered a waiver of Your claimed privilege);
    e. the identity of any document that was the subject of such communication and the present location of any such document;
    f. the identity of all persons involved in such communication; and
    g. the identity of any document which records, refers, or relates to such communication and the present location of any such document.

6. Each document requested herein should be produced in its entirety and without deletion, redaction, or excision, except as permitted by a recognized privilege, regardless of whether You consider the entire document or only part of it to be relevant or responsive to these document requests. If You have redacted any portion of a document on the ground of privilege, stamp the word "REDACTED" beside the redacted information on each page of the document You have redacted.

7. Each request for documents seeks production of all documents described along with any attachments, drafts, and non-identical copies in any language whatsoever, in the possession, custody, or control of You or Your respective agents or attorneys. You are specifically instructed to review any storage and archive facilities and the personal files, records, notes, correspondence, daily calendars, telephone logs, and records of all persons who would likely have responsive documents.

## REQUESTS FOR THE PRODUCTION OF DOCUMENTS

**REQUEST NO. 1.** The executed versions of every 3PA contract with a vendor.

**REQUEST NO. 2.** All documents and communications regarding CDK's Managed Interface Agreement with (a) Cox Automotive and (b) AutoLoop.

**REQUEST NO. 3.** All documents and communications regarding the 3PA fees to be charged to (a) Cox Automotive, (b) AutoLoop, and (c) MVSC.

**REQUEST NO. 4.** All documents and communications regarding access to dealer data on a CDK DMS through the 3PA program by (a) Cox Automotive, (b) AutoLoop, and (c) MVSC.

**REQUEST NO. 5.** All documents and communications regarding whether data received by a (a) Cox Automotive or (b) AutoLoop application from a CDK DMS may be shared with another application run by (a) Cox Automotive or (b) AutoLoop.

**REQUEST NO. 6.** All documents and communications regarding the Most Favored Nations clause – or anything like it – in the Managed Interface Agreement between Cox Automotive and CDK.

**REQUEST NO. 7.** All documents and communications regarding any instance in which a vendor received equal or better pricing than Cox Automotive for data integration under the 3PA program from 2015 to the present.

**REQUEST NO. 8.** All documents and communications regarding any representation made to Cox Automotive that it would pay the lowest rates for integration services.

**REQUEST NO. 9.** All documents regarding 3PA Governance. *See*, *e.g.*, CDK-0001039, at 46.

**REQUEST NO. 10.** All documents and communications regarding any DMS access restrictions, to which CDK add-on applications are not subject, that CDK places on third-party add-on applications.

**REQUEST NO. 11.**   All documents and communications regarding allowing applications to create or modify "repair orders."  *See*, *e.g.*, CDK-0000786, at 818.

**REQUEST NO. 12.**   All documents and communications regarding allowing applications to finalize purchasing and leasing transactions.  *See id.*

**REQUEST NO. 13.**   All documents and communications regarding any "category restrictions" in place at any time with respect to data integration.  *See*, *e.g.*, CDK-0001039, at 64.

**REQUEST NO. 14.**   All documents and communications relating to any "CVR Category" for data access by electronic vehicle registration and titling vendors.

**REQUEST NO. 15.**   All documents and communications relating to any "Closed Category" for data access by electronic vehicle registration and titling vendors.

**REQUEST NO. 16.**   All communications with Nissan Motor Acceptance Corporation, American Honda Finance Corporation, or their affiliates regarding Dealertrack's Sales and F&I solution.

**REQUEST NO. 17.**   All documents and communications concerning the process of transitioning dealers from CDK's DMS to Dealertrack's DMS.

**REQUEST NO. 18.**   All documents and communications regarding impeding, blocking, or in any way making it difficult for a dealer to switch from CDK's DMS to a competing DMS, including Dealertrack's DMS.  For the avoidance of doubt, this Request includes all communications and documents regarding a dealer's ability to transfer the dealer's data stored on the CDK DMS to a competing DMS.

**REQUEST NO. 19.**   All documents and communications regarding "push" notifications for 3PA or similar functionality provided to CDK's own add-on applications.

**REQUEST NO. 20.**   All documents regarding functionality, data access, or level of data integration provided to one vendor but not offered to a competing vendor or vendors.

**REQUEST NO. 21.**   All documents and communications regarding any purported burden placed on a CDK DMS by the applications of (a) Cox Automotive or (b) AutoLoop.

**REQUEST NO. 22.**   All documents and communications regarding the response time for 3PA interfaces from the time they are requested by a vendor until the time they are actually activated.

**REQUEST NO. 23.**   All documents and communications regarding "Project Peach."

**REQUEST NO. 24.**   All documents and communications regarding Dealertrack Registration & Titling's access to the CDK DMS.

**REQUEST NO. 25.**   All documents and communications regarding RTS participating in the 3PA program.

**REQUEST NO. 26.**   All documents and communications regarding AutoLoop's application to join the 3PA program.

**REQUEST NO. 27.**   All documents and communications regarding CDK's certification of AutoLoop's products for the 3PA program under the January 2016 Statement of Work between AutoLoop and CDK.

**REQUEST NO. 28.**   All documents and communications regarding CDK's decision to let AutoLoop use independent third-party integrators to provide data integration services to CDK dealers after AutoLoop's acceptance into the 3PA program.

**REQUEST NO. 29.**  All communications – and all documents regarding those communications – between CDK and dealers regarding (a) Cox Automotive, (b) AutoLoop, and (c) MVSC.

**REQUEST NO. 30.**  All documents and communications relating to any threat or perceived threat to Your DMS business posed by add-on applications, including but not limited to add-on applications provided by Cox Automotive.

**REQUEST NO. 31.**  All documents and communications between CDK and OEMs or car manufacturers regarding (a) Cox Automotive, (b) AutoLoop, and (c) MVSC.

**REQUEST NO. 32.**  All communications, and documents related to those communications, between CVR and CDK concerning MVSC, including but not limited to:  (1) MVSC's access to dealer data stored on the CDK DMS; (2) MVSC's presence and market share in California, Illinois, or any other state EVR market; (3) MVSC's expansion or potential expansion into states beyond California; and (4) any competitive threat or perceived competitive threat posed by MVSC to CVR.

**REQUEST NO. 33.**  All communications, and documents related to those communications, between CDK and Reynolds concerning or relating to MVSC.

**REQUEST NO. 34.**  All documents and communications related to MVSC's attempts or applications to join the Your data integration program, including but not limited to internal communications regarding whether to permit MVSC to participate in Your data integration program; internal communications regarding any competitive threat that permitting MVSC to join Your data integration program might pose to CVR; and the terms and pricing offered to MVSC.

**REQUEST NO. 35.**   All documents and communications related to any other application or attempt by any EVR provider, other than MVSC, to join Your data integration program, including the terms and pricing offered to any such EVR vendor.

**REQUEST NO. 36.**   All documents and communications regarding any EVR provider currently participating in Your data integration program, including when they started participating; the pricing they pay for participation; their applications to participate in the program; Your internal considerations regarding their applications; the data elements they receive and /or have access to; and the state EVR markets in which they participate.

**REQUEST NO. 37.**   All communications, and documents related to those communications, between You and Your dealer customers regarding MVSC, including but not limited to communications between You and Your dealer customers concerning (1) the way in which MVSC accesses dealer data; (2) MVSC's attempts to join the 3PA program and/or 3PA certification status; and (3) MVSC's security and data practices.

**REQUEST NO. 38.**   All communications and documents concerning or mentioning any MVSC executive, including but not limited to Don Armstrong, Kelly Kimball, Joseph Nemelka, and John Brueggeman.

**REQUEST NO. 39.**   All communications and documents concerning CDK's consideration or evaluation of whether to acquire or purchase MVSC.

**REQUEST NO. 40.**   All communications and documents concerning any efforts by You to block or impede MVSC's access to data for a dealer using Your DMS platform.

**REQUEST NO. 41.**   All communications and documents concerning MVSC's use of independent integrators, including but not limited to Authenticom, SIS, and ProQuotes, to access data for a dealer using Your DMS platform.

11

**REQUEST NO. 42.**   All communications and documents concerning the importance of having real time or bi-directional data integration in order to provide EVR services in Illinois, California, or any other state EVR market.

**REQUEST NO. 43.**   Documents sufficient to show CVR's market share and customer base in every state in which it operates, from 2011 to present.

**REQUEST NO. 44.**   All documents and communications concerning CVR's customer base and market share in California and Illinois, from 2011 to present.

**REQUEST NO. 45.**   All documents and communications concerning any market analysis or competitive analysis of the EVR markets in California and Illinois.

**REQUEST NO. 46.**   All documents and communications concerning CVR's operational costs, revenues, profitability, and financial projections and forecasts, from 2011 to present.

**REQUEST NO. 47.**   All documents and communications concerning deficiencies or perceived deficiencies in CVR's product and service level.  For the avoidance of doubt, this Request includes not only internal documents and communications but also communications with third parties (including CVR's dealer customers) regarding deficiencies or perceived deficiencies in CVR's product and service level.

**REQUEST NO. 48.**   All documents and communications concerning the product quality or perceived product quality of CVR's competitors, including but not limited to MVSC.

**REQUEST NO. 49.**   All documents and communications regarding any delays or backlogs by CVR in processing vehicle registrations and titles, including but not limited to any such delays or backlogs in California.

**REQUEST NO. 50.** All documents and communications concerning any advantage or perceived advantage CVR has over its competitors because of CVR's ability to access dealer data stored on the CDK and Reynolds DMSs.

**REQUEST NO. 51.** All documents and communications concerning the costs associated with entering a new EVR market, including costs associated with legal licensing and DMV requirements and capital and technological costs.

**REQUEST NO. 52.** Documents sufficient to show CVR's ownership structure, including documents sufficient to show how CVR's revenues and profits are divided between CDK and Reynolds.

**REQUEST NO. 53.** All documents and communications relating to Reynolds' ownership interest in CVR, including when that interest was acquired; why Reynolds acquired that interest; from whom Reynolds acquired that interest; how much Reynolds paid for that ownership interest; and what Reynolds' rights are with respect to its ownership interest.

**REQUEST NO. 54.** All documents and communications relating to the financial benefits received by Reynolds and CDK relating to their ownership interest in CVR, including any allocated profits or other financial benefit, from 2011 to the present.

**REQUEST NO. 55.** The operative CVR ownership agreement between CDK and Reynolds.

**REQUEST NO. 56.** All iterations of CVR's organizational chart from 2011 to the present.

**REQUEST NO. 57.** All documents concerning CDK's involvement in the operation of CVR, including but not limited to CDK's involvement in CVR's management, budget and

capital investments, hiring, firing, personnel decisions, salary and bonus allotments, strategic priorities, sales and marketing efforts, and other daily business activities.

**REQUEST NO. 58.** All documents and communications between anyone at CVR, on the one hand, and anyone at CDK, on the other, including regarding the operations, finances, and/or management of CVR.

**REQUEST NO. 59.** All communications between CDK and Reynolds regarding CVR.

**REQUEST NO. 60.** All documents and communications relating to CVR's acquisition of AVRS, including the strategic and financial considerations in CVR's acquisition of AVRS.

**REQUEST NO. 61.** All documents and communications regarding deficiencies or perceived deficiencies in AVRS's product and service levels after the acquisition. For the avoidance of doubt, this Request includes not only internal documents and communications but also communications with third parties (including AVRS's dealer customers) regarding deficiencies or perceived deficiencies in AVRS's product and service level.

**REQUEST NO. 62.** All documents and communications regarding instances in which CVR or AVRS uses or used independent integrators for access to dealer data on a DMS platform, whether CDK's, Reynolds', or any other DMS platform.

**REQUEST NO. 63.** All documents and communications regarding any instance in which an add-on application owned (or partly owned) by CDK or Reynolds uses or used independent integrators for access to dealer data on a DMS platform, whether CDK's, Reynolds', or any other DMS platform.

**REQUEST NO. 64.** All documents relating to CVR's Board of Directors or any equivalent governing body for CVR. This Request has no date limitation. This Request includes, but is not limited to:

      **a.**      All documents relating to the composition of CVR's Board of Directors;

      **b.**      Identification of every member of CVR's Board of Directors through time;

      **c.**      All materials presented to CVR's Board of Directors;

      **d.**      All materials considered by CVR's Board of Directors;

      **e.**      All minutes of meetings of CVR's Board of Directors; and

      **f.**      All communications between or among CVR's Board of Directors.

**REQUEST NO. 65.**   All communications between You and any customer or former customer of Authenticom regarding data integration services or data access, including Team Velocity, Automotive Masterminds, or any other vendor customer of Authenticom.

**REQUEST NO. 66.**   All communications between You and any dealer customer or former dealer customer of Authenticom regarding data integration services or data access.

**REQUEST NO. 67.**   All documents concerning Your evaluation of the market for data access / integration services, including what companies compete with You for provision of data access / data integration services.

**REQUEST NO. 68.**   All documents concerning Your cost of capital, cost of equity, cost of debt, and/or weighted average cost of capital, including any documents upon which any of the foregoing are based.

**REQUEST NO. 69.**   All documents concerning the economic value of data or data access to dealers, vendors, or DMS providers, including any economic value placed by You on Your ability to deny, restrict, or in any way control access to data on Your DMS platform.

**REQUEST NO. 70.**  All communications between CDK and any potential acquirer or acquirers, including The Carlyle Group, Silver Lake, Vista Equity Partners, Bain Capital, Thoma

Bravo, and Advent International (or any person acting on behalf of the foregoing), regarding the valuation of CDK, its subsidiaries, or any aspect of their business.

**REQUEST NO. 71.**  All documents regarding CDK's Fortellis Automotive Exchange, including all communications with dealers (including AutoNation, Lithia, Berkshire Automotive, Group One, and the Larry Miller Group) and vendors; historical data or projections regarding the costs of research and development, pricing, subscriptions, revenues, and profits.

**REQUEST NO. 72.**  All projections, forecasts, or other financial analyses regarding CDK's 3PA, OEM DCS, and/or DMI data services programs.

**REQUEST NO. 73.**  All documents concerning the following conferences and/or meetings from 2009 to the present:  the National Automobile Dealers Association Show; the Digital Dealer Conference & Expo; or any other industry conference.  For the avoidance of doubt, this Request includes all documents concerning:  the identity of any of Your employees that attended the conference and/or meeting; any booth or other exhibition space obtained by You; and the exhibitor list and/or floor plan for any such show.

**REQUEST NO. 74.**  All telephone records – whether landline or cell phone – reflecting calls made or received by any Reynolds employee and any employee of CDK from 2014 to the present.

**REQUEST NO. 75.**  All telephone records – whether landline or cell phone – for Your document custodians from 2014 to the present.

**REQUEST NO. 76.**  All documents concerning any training provided by You to Your employees regarding antitrust or competition laws.

**REQUEST NO. 77.**  All documents concerning CDK's Secure the DMS initiative.

**REQUEST NO. 78.**  All Secure the DMS Dashboard Reports (*see*, *e.g.*, CDK-0841086, at 87), including all data used to prepare such reports.

**REQUEST NO. 79.**  All documents regarding access by ReverseRisk to CDK's DMS platform.

**REQUEST NO. 80.**  All documents concerning "hostile integration" or use of non-authorized usernames or passwords to extract data from the CDK or Reynolds platforms.

**REQUEST NO. 81.**  Documents sufficient to show CDK's revenue, profit (including profit margins), and costs for providing data integration services, on a monthly basis, from January 1, 2000 to the present, with the revenues, profits, and costs of 3PA, DMI, and IntegraLink broken out separately.

**REQUEST NO. 82.**  Documents sufficient to show transactional sales data (including sales, profit, and cost data) on a per-customer and per-transaction basis for data integration services from January 1, 2006 to the present, with the data for 3PA, DMI, and IntegraLink broken out separately.  For the avoidance of doubt, this Request includes, without limitation, the following data linked to each data integration service transaction:

    **a.**  Date and location of transaction;

    **b.**  Data integration service customer;

    **c.**  Specific data integration service purchased;

    **d.**  Information tied to the specific data integration service purchased, including the unit price, unit cost, quantity, and applicable discounts;

    **e.**  CDK salesperson and applicable commission;

    **f.**  Order number and other identifying order information; and

PUBLIC VERSION

g.  Any documents necessary to interpret the contents of these data fields, including abbreviation keys and explanations.

**REQUEST NO. 83.**   All reports and analyses pertaining to CDK's marketing and sales of data integration services from January 1, 2009 to the present, with information for 3PA, DMI, and IntegraLink broken out separately.  For the avoidance of doubt, this Request includes, without limitation:

a.   Sales reports;

b.   Sales representative performance reports;

c.   Marketing plans;

d.   Marketing reports, including sales promotions and discounts;

e.   Strategic plans, including pricing strategy;

f.   Cost accounting reports;

g.   General ledger reports;

h.   Charts of accounts;

i.   Analyses of competitive position, including market share; and

j.   Profit and loss reports.

**REQUEST NO. 84.**   Documents sufficient to show CDK's projections with respect to revenue and profit for providing data integration services from January 1, 2009 to the present.

**REQUEST NO. 85.**   Documents sufficient to show CDK's projections with respect to costs for providing data integration services from January 1, 2009 to the present, with the projections for 3PA, DMI, and IntegraLink broken out separately.

**REQUEST NO. 86.**   All documents and communications concerning CDK's projections with respect to its data integration services from January 1, 2009 to the present.  For the

avoidance of doubt, this Request includes, without limitation, documents and communications relating to estimates, forecasts, and budgets for revenue, profit, and costs associated with CDK's provision of data integration services.

**REQUEST NO. 87.**   All documents and communications concerning CDK's internal valuations of its data integration service businesses, separate and apart from its DMS business, from January 1, 2009 to the present, including, without limitation, valuations of 3PA, DMI, and IntegraLink.

**REQUEST NO. 88.**   All documents and communications concerning CDK's internal valuations of its DMS business, separate and apart from its data integration services, from January 1, 2009 to the present.

**REQUEST NO. 89.**   All documents and communications from January 1, 2009 to the present concerning industry publications or industry reports with respect to data integration services.

**REQUEST NO. 90.**   All documents and communications from January 1, 2009 to the present concerning industry publications or industry reports with respect to DMS services.

**REQUEST NO. 91.**   All documents and communications CDK relied upon from January 1, 2009 to the present in creating projections, estimates, forecasts, and budgets for revenue, profit, and costs associated with CDK's provision of data integration services.

**REQUEST NO. 92.**   Documents sufficient to show the number of connections CDK has established between a vendor and a dealer's data for purposes of transmitting dealer data to the vendor, broken down by customer, specific service (3PA, DMI, or IntegraLink), and date, from January 1, 2009 to the present.

**REQUEST NO. 93.**  CDK's "win/loss" reports, communications, analyses, or any other documents sufficient to show the data integration customers (for 3PA, DMI, and IntegraLink, broken out separately) that CDK has lost every year since January 1, 2009, including the reasons the customer switched from a CDK data integration service to a non-CDK data integration service and the identity of the data integration service to whom the customer switched.

**REQUEST NO. 94.**  CDK's "win/loss" reports, communications, analyses, or any other documents sufficient to show the data integration customers (for 3PA, DMI, and IntegraLink, broken out separately) that CDK has won every year since January 1, 2009, including the reasons the customer switched to a CDK data integration service and the identity of the data integration service from whom the customer switched.

**REQUEST NO. 95.**  All documents and communications regarding the length of time to complete a request to receive data from or send data to a CDK DMS through the 3PA program.

**REQUEST NO. 96.**  All documents and communications regarding making "push" functionality available for the 3PA program.

**REQUEST NO. 97.**  All documents and communications regarding how frequently vendors are allowed to pull, poll, or transfer data from the CDK DMS.

**REQUEST NO. 98.**  All documents and communications regarding how CDK determined what kinds of data, information, or technical specifications to require vendors to provide as part of the 3PA certification process, including "workflow" models, live demonstrations of the add-on applications, justifications for how add-on applications use each data element, and the add-on application's security features.

**REQUEST NO. 99.**  All documents and communications regarding any CDK policies or guidelines designed to prevent competitively sensitive information submitted by vendors seeking

3PA certification from being shared with CDK's sales teams, add-on application development teams, or any other components of CDK other than those with direct responsibility for engineering the integration of the vendors' add-on applications with the CDK DMS.

**REQUEST NO. 100.** All documents and communications regarding information, data, or technical specifications shared by vendors with CDK as part of the 3PA certification process used by CDK for any purpose other than engineering the integration of the vendors' add-on applications with the CDK DMS, including, for example, development of applications by CDK.

**REQUEST NO. 101.** All pictures of the cake from party for the one-year anniversary of the 2015 agreements between CDK and Reynolds.

Dated:  May 25, 2018                              Respectfully submitted,

                                                  */s/ Derek T. Ho*
                                                  Derek T. Ho
                                                  Michael N. Nemelka
                                                  Aaron M. Panner
                                                  Daniel V. Dorris
                                                  KELLOGG, HANSEN, TODD,
                                                    FIGEL & FREDERICK, P.L.L.C.
                                                  1615 M Street, N.W., Suite 400
                                                  Washington, D.C. 20036
                                                  Phone: (202) 326-7900
                                                  dho@kellogghansen.com
                                                  mnemelka@kellogghansen.com
                                                  apanner@kellogghansen.com
                                                  ddorris@kellogghansen.com

                                                  *Attorneys for Individual Plaintiffs*

**PUBLIC VERSION**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 25, 2018, I caused a true and correct copy of the foregoing

Individual Plaintiffs' First Set of Requests for the Production of Documents for Defendant CDK

Global, LLC to be served by email upon the following recipients:

CDK-MDL-Team@mayerbrown.com

reynoldsteam@gibbsbruns.com;

reynolds-smrh-pldg@sheppardmullin.com;

KStetsko@perkinscoie.com;

CTeichner@perkinscoie.com

*/s/ Derek T. Ho*
Derek T. Ho

PUBLIC VERSION

# EXHIBIT 2

MAYER·BROWN

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel +1 312 782 0600
Main Fax +1 312 701 7711
www.mayerbrown.com

June 1, 2018

**Britt M. Miller**
Direct Tel +1 312 701 8663
Direct Fax +1 312 706 8763
bmiller@mayerbrown.com

B**Y** E-M**AIL**

Derek T. Ho
K**ELLOGG**, H**ANSEN**, T**ODD**, F**IGEL** & F**REDERICK**, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 60036

Peggy J. Wedgworth
M**ILBERG** T**ADLER** P**HILLIPS** G**ROSSMAN** LLP
One Pennsylvania Plaza
New York, NY  10119

Re:     *In re Dealer Management Systems Antitrust Litig.,*
        MDL 2817, Case No. 18-CV-864 (N.D. Ill.)

Dear Counsel:

To say that we disagree with your June 1 Letter's characterizations of Defendants' positions is putting it mildly.  But rather than engaging on that level, we respond as follows.

Contrary to your repeated accusations, Defendants are not seeking to delay any portion of these proceedings, but the over-breadth of Plaintiffs' discovery requests, paired with the fact that the Class Plaintiffs have not even served an operative complaint, necessitates that Defendants be afforded sufficient time to review, analyze, and discuss those requests with their clients prior to substantively engaging with Plaintiffs.[1]   And contrary to your representation that Defendants "invited" the MDL Plaintiffs to provide us with the names of any additional custodians, Defendants made clear that *if* Plaintiffs proposed any additional custodians, Defendants would consider them.  That dialogue, of course, was in the context of discussing focused inquiries involving specific document requests.   Then Plaintiffs served Defendants with a list of *64 additional custodians*[2] that Plaintiffs want Defendants to search not only with the broad search terms already agreed to in the *Authenticom* litigation, but with an additional laundry list of new search terms. Defendants did not invite such dissemblance.

Some of the individuals that Plaintiffs have identified appear to be far afield of the actions and matters at the core of Plaintiffs' complaints.  Accordingly, Defendants need time to investigate and meaningfully determine whether there is any valid basis for their inclusion (which, for the

---

[1]  As you know, the requests were all served the day before a long holiday weekend.

[2]  Twenty-seven for CDK (which, if accepted, would bring its total to 44 custodians), 13 for CVR, and 24 for Reynolds (which, if accepted, would bring its total to 38 custodians).

Mayer Brown LLP
PUBLIC VERSION

Derek T. Ho
Peggy J. Wedgworth
June 1, 2018
Page 2

bulk of the identified individuals, we are skeptical).  As such, we will not be in a position to discuss custodians on June 5 as proposed, but will commit to discussing them on Friday, June 8, at 11:00 a.m. Central / 12:00 p.m. Eastern.

As for search terms, Defendants stand by their position that it is highly *inefficient* to discuss search terms before the parties have agreed on the scope of discovery as a whole (through discussion of their responses and objections to the other sides' requests) and on custodians. Negotiating search terms now neuters Defendants' (and Plaintiffs') objections and responses as, under Plaintiffs' construct, Defendants could be agreeing to search terms that will require them to review scores of documents responsive to RFPs that will be later limited by the parties' meet-and-confer efforts or subject to motion practice.  Given the likely size of the productions, that makes little sense here.

### Consolidated RFPs and Search Terms

Defendants accept your offer to meet-and-confer on June 5 regarding this issue.

As to your proffered thoughts, we respond as follows.

To be sure, this is an MDL, so discovery, like all proceedings in the mater, should be coordinated and non-duplicative.  Defendants have never said that there can be no overlap between the various Plaintiffs' discovery requests or search terms as there are certain claims and allegations common to all of the cases.  But the Individual Defendants (and various plaintiffs within that group) and the Class Plaintiffs have a number of unique claims and have chosen to sue only a few (or one) defendants.  They therefore cannot use the MDL as an excuse to propound discovery that they otherwise would not be entitled to were they not part of the MDL.

Your statement regarding search terms is inaccurate.  Defendants have always said that they wanted to run search terms once to avoid the need to potentially review documents multiple times and have therefore always insisted that Plaintiffs needed to ensure that their respective search term lists were not duplicative or redundant as to common issues.  And while (consistent with the Court's order) we will provide copies of all of our productions to the various Plaintiffs' groups, that does not mean that each is entitled to actively seek discovery that it would not be entitled to in its own, standalone action.

As to CVR, it is true that CDK will have a number of documents related to CVR.[3]  And CDK is prepared to undertake a reasonable search for documents relevant to the *MVSC* litigation that relate to CVR.  Currently, however, CVR has no written discovery to respond to and thus, no basis to engage in a discussion about custodians or search terms.  If MVSC wants to serve CVR

---

[3] We are not going to engage on your repeated assertion that CDK has control over CVR.  MVSC chose to name CVR as a defendant in its suit; it should seek discovery in CVR's possession, custody, and control from CVR itself.

Mayer Brown LLP

Derek T. Ho
Peggy J. Wedgworth
June 1, 2018
Page 3

with requests for production targeted to the allegations and claims asserted in *MVSC* (which it should have served on May 25), and propound a narrower set of search terms related to those claims, CVR is prepared to consider them with the understanding that—depending on when those requests are served (and their volume)—CVR may need additional time to respond.  Under the circumstances, we would expect Plaintiffs to agree to a modest extension.

* * * * *

Based on the foregoing and Mr. Nemelka's May 31 letters, Defendants are willing to meet-and-confer on June 5 regarding (1) my May 29 Letter (as to CVR and Reynolds), (2) the issues identified in Mr. Nemelka's letter regarding Authenticom's responses and objections to CDK's document requests (*i.e.*, the issues raised in our January 29, 2018 Letter), and (3) the alleged deficiencies in Defendants' responses to Authenticom's interrogatories.  We would ask that the call occur at 11:00 a.m. Central / 12:00 p.m. Eastern to accommodate all necessary defense counsel.  We will respond in writing to the other matters raised in Mr. Nemelka's May 31 letters and, as noted above, will be ready to discuss custodians on June 8 at 11:00 a.m. Central/12:00 p.m. Eastern.

Regards,

Britt M. Miller

cc:     Reynolds Counsel
        Mark Ryan
        Andrew Marovitz
        Matthew Provance

PUBLIC VERSION

# EXHIBIT 3

PUBLIC VERSION

# MAYER·BROWN

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel +1 312 782 0600
Main Fax +1 312 701 7711
www.mayerbrown.com

June 12, 2018

Matthew D. Provance
Direct Tel +1 312 701 8598
Direct Fax +1 312 706 9397
mprovance@mayerbrown.com

**By E-Mail**

Michael N. Nemelka
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 60036

Peggy J. Wedgworth
Milberg Tadler Phillips Grossman LLP
One Pennsylvania Plaza
New York, NY 10119

Re:     *In re Dealer Management Systems Antitrust Litig.*,
        MDL No. 2817, Case No. 18-CV-864 (N.D. Ill.)

Dear Mike and Peggy:

I write regarding the parties' May 25, 2018 proposals for document custodians and in follow-up to our June 8 meet-and-confer on the same subject.[1]

**Additional CDK Document Custodians**

CDK has already produced more than 820,000 documents (totaling more than 2.4 *million* pages) in the MDL. CDK also has already agreed to seventeen document custodians, from which tens of thousands of additional documents (if not hundreds of thousands) will be produced in response to Authenticom's and the remaining Plaintiffs' discovery requests. Notwithstanding the foregoing, Plaintiffs now seek *twenty-seven* additional document custodians from CDK—which, if accepted, would result in *forty-four* CDK custodians in the MDL. While we are willing to explore a possible compromise, Plaintiffs' proposal is excessive and contrary to the proportionality requirement of Rule 26.

To be clear, we believe that the seventeen custodians already agreed to by CDK are sufficient to meet any legitimate needs for additional discovery that Plaintiffs may have. Solely in the interest of reaching a compromise, however, CDK is prepared to agree to seven additional custodians to

---

[1]  Specifically, this letter addresses Plaintiffs' proposals for CDK and CVR document custodians, Defendants' proposal for MVSC document custodians, CDK's proposals for AutoLoop and Cox document custodians, and CDK's proposal for Dealership Class Plaintiff document custodians.

Mayer Brown LLP

PUBLIC VERSION

Michael N. Nemelka
Peggy J. Wedgworth
June 12, 2018
Page 2

be selected by Plaintiffs from the three categories provided below.[2]  Please note that our offer is contingent on reaching a global resolution regarding CDK document custodians in the MDL.

| Add'l CDK Management[3] (select three) | Add'l Sales, Mktg., Strategy (select two) | Add'l DMI & Data Services (select two) |
|---|---|---|
| 1. Brian MacDonald[4]<br>2. Jim Foote<br>3. Robert Marvin<br>4. Al Nietzel | 1. David Wrobel<br>2. Mike Joza<br>3. Jeff Barr<br>4. Byron McDuffee | 1. Josh Douglas<br>2. John Lilly<br>3. Trey Gerlich |

CDK has organized its offer of additional custodians into categories (from which Plaintiffs may select two or three custodians of their own choosing) in an attempt to mitigate the already substantial duplication of discovery being produced from current CDK document custodians who possess overlapping documents and communications.  It also ensures that each relevant category of information is adequately represented.

CDK objects to the remaining additional CDK document custodians proposed by Plaintiffs as not reasonably likely to possess relevant, non-duplicative discovery, and because the burden of adding further custodians at this point is disproportional to any possible benefit.  Our objections

---

[2] During our June 8 meet and confer, you asked whether CDK's document production includes organizational charts.  CDK has produced numerous organizational charts, including at CDK-2412042, CDK-0859456, CDK-1170819, CDK-0822648, and CDK-0121298.

[3] Plaintiffs' May 25 proposal also requests Joe Bihner as a CDK document custodian, but Mr. Bihner is already an *Authenticom* custodian.  *See, e.g.*, 12/08/2017 Ltr. from M. Nemelka to B. Ross and B. Miller.  CDK will not count him against its offer for Plaintiffs to select seven additional document custodians.

[4] As we have explained (*see* 11/15/2017 Ltr. from B. Miller to M. Nemelka and 12/15/2017 Ltr. from B. Miller to M. Nemelka), Steve Anenen was CDK's CEO until June 30, 2016—*i.e.*, during all of the events at the core of Plaintiffs' allegations.  Mr. MacDonald is not involved in the day-to-day operations of the aspects of the business at issue in this litigation, he was new to CDK when he joined in 2016, and he would not reasonably be expected to have documents responsive to Plaintiffs' discovery requests that are not otherwise contained in the files of other agreed upon custodians, most notably, Robert Karp, President of CDK North America throughout the relevant time period.  As discussed during our June 8 meet-and-confer, to the extent that Plaintiffs select Mr. MacDonald as an additional CDK document custodian as part of the proposed resolution, CDK expects that Plaintiffs will make their own CEOs (or equivalent positions) document custodians as well, including AutoLoop's Steve Anderson and Cox Automotive's Sandy Schwartz—both of whom, unlike Mr. MacDonald, were in charge of their respective businesses during the relevant events.  Regardless of whether Mr. MacDonald ultimately is made a document custodian, CDK reserves all rights to object to any deposition noticed for Mr. MacDonald under the "apex" doctrine and for the reasons set forth above.

Mayer Brown LLP

PUBLIC VERSION

Michael N. Nemelka
Peggy J. Wedgworth
June 12, 2018
Page 3

to Mark Roman, DeAnne Hodum, and Michael Kane are outlined in prior correspondence.[5] Several other proposed custodians report directly to CDK employees who are already document custodians or offered as additional custodians in this letter; and therefore, to the extent they have documents that are relevant and responsive to Plaintiffs' discovery requests, we would expect those documents to be included in what CDK has already produced or will produce. For example, proposed custodian Mike Certain reports directly to Beth Ayotte (a custodian), who, along with Steve French (a custodian), reports to Kevin Distelhorst (a custodian). Therefore, Mr. Certain would not reasonably be expected to have relevant documents responsive to plaintiffs' discovery requests that are not otherwise contained in the files of other custodians, most notably, Ms. Ayotte, Mr. French, and Mr. Distelhorst.

Other proposed custodians did not report to existing or offered custodians, but their involvement in relevant issues overlaps significantly with existing or offered custodians—so the same principle applies. For example, proposed custodian Linda Bartman (who is no longer with the company) oversaw CDK's marketing efforts company-wide, across all products and services, and including CDK's international operations. The "communications strategy" noted in your May 25 letter surrounding CDK's SecurityFirst initiative and 3PA program—only a part of CDK's North American retail business—was principally implemented by David Wrobel. Therefore, CDK's offer to produce documents from the files of Mr. Wrobel (see above) is sufficiently likely to capture any relevant documents from the files of Ms. Bartman that are responsive to plaintiffs' discovery requests. The remaining proposed custodians, for the most part, perform ground-level sales, implementation, technical, and accounting functions. Their roles at CDK are such that they would not reasonably be expected to have relevant documents; and to the extent that they may be copied on a handful of relevant communications, those documents should be available from the files of other existing or offered custodians.[6]

Additionally, three individuals—David LaGreca, Mish Kumar, and Laura Stevens—appear to be on Plaintiffs' list of proposed custodians primarily because they are referenced on an agenda (CDK-1424530) that purports to identify attendees at a meeting between CDK and Reynolds regarding the February 2015 DEA, RCI, and 3PA agreements. Plaintiffs label these individuals as "Team Members" in the "CDK-Reynolds conspiracy." Of course, this meeting is not evidence of any "CDK-Reynolds conspiracy." The agenda makes clear that the meeting was about implementing Defendants' written agreements, which are lawful, and it was appropriate for Defendants to communicate about implementing them. Moreover, Mr. LaGreca and Ms. Kumar are simply identified as attendees; not as actual members of the "CDK Team," nearly all

---

[5] *See* 11/15/2017 Ltr. from B. Miller to M. Nemelka (addressing Mr. Roman, Mr. Kane, and Ms. Hodum); 12/15/2017 Ltr. from B. Miller to M. Nemelka (further addressing Mr. Roman).

[6] For example, proposed custodian JoAnn Billiter is an accounting specialist who works with account receivables. Her name appears on a tiny fraction of the documents produced by CDK, most of which appear to have no bearing or relevance to any issue in the litigation. She appears to be copied on *one* email between Beth Ayotte (a custodian) and an AutoLoop employee discussing AutoLoop billing issues.

Mayer Brown LLP

PUBLIC VERSION

Michael N. Nemelka
Peggy J. Wedgworth
June 12, 2018
Page 4

of whom are already agreed-upon document custodians. *See id.* Their possible attendance at one meeting does not justify making them document custodians.[7]

## CVR Document Custodians

Thank you for confirming during our June 8 meet-and-confer that Plaintiffs intend to issue CVR-specific document requests and proposed search terms in the short term. Once we receive those materials, we will be prepared to discuss Plaintiffs' thirteen proposed CVR custodians. Preliminarily, we do not anticipate objecting to several of them, including Scott Herbers, Jim Quinlan, Janet Michaels, and Jason Bonifay. We have concerns that the remaining proposed custodians are somewhat far afield of Plaintiffs' allegations related to CVR and/or duplicative of the custodians listed above. However, we will reserve taking a firm position as to proposed CVR custodians pending our review of Plaintiffs' CVR-specific discovery requests.[8]

## MVSC Document Custodians

Thank you for your agreement to make Don Armstrong, Kelly Kimball, Joseph Nemelka, John Brueggeman, Napa Bulusu, and Matt Armstrong document custodians. During our June 8 meet-and-confer, Defendants requested organizational charts or equivalent documentation to substantiate MVSC's position that these same individuals are properly identified as Defendants' proposed custodians (g)-(k), who were described by subject matter. We have yet to receive this information and ask that MVSC provide it in advance of our next meet-and-confer. We reserve the right to identify additional custodians who may be appropriate based on this information.

## Cox Document Custodians

Thank you for your agreement to make Aaron Caw, Keith Jezek, Brian Green, John Kovac, Amy Mills, Lori Wittman, Paul Whitworth, and Dale Pollack document custodians. Here, too, CDK requested organizational charts or equivalent documentation to substantiate Cox's position that these same individuals are properly identified as CDK's proposed custodians No. 17-23, who were described by subject matter. And, here again, we have yet to receive this information and therefore ask that Cox provide it in advance of our next meet-and-confer. We again reserve the right to identify additional custodians who may be appropriate based on this information.

---

[7] Further, please be advised that Ms. Stevens was an outside consultant, and her documents were not retained when that engagement with CDK ended. As a result, no data is available for Ms. Stevens.

[8] In the interest of streamlining future discussions regarding proposed CVR custodians, please note that no documents or data are available for former AVRS employees Bob Reiger, Rick Francis, or Jose Ramirez. These individuals were either never employed by CVR or CDK (as is the case for Mr. Reiger), or they are former employees for whom no documents or data have been retained (as is the case for Mr. Francis and Mr. Ramirez, both of whom left in 2016).

Mayer Brown LLP                                                          **PUBLIC VERSION**

Michael N. Nemelka
Peggy J. Wedgworth
June 12, 2018
Page 5

Further, while we appreciate Cox's agreement to several of the named custodians CDK identified, we do not believe that its exclusion of certain other proposed custodians is appropriate. Per your request, we summarize below the relevance of each of proposed custodians currently in dispute. Although we do not have the benefit of reviewing a substantial document production from Cox to identify custodians, the information available to CDK indicates that these custodians possess relevant, non-duplicative discovery.

1. *Mike Barrington, Senior VP, Sales and Lender Solutions, Retail Solutions Group (Cox Automotive)*. We understand that Mr. Barrington has responsibility for sales and lender solutions offered by Cox, including through Plaintiffs HomeNet, vAuto, VinSolutions, and Xtime. Among other things, it is likely that Mr. Barrington has relevant documents related to Cox's customer relationships, pricing of Cox's sales and lender solutions, and its participation in CDK's 3PA program.

2. *Sandy Schwartz, President, Cox Automotive*. The point that Plaintiffs made during our June 8 meet-and-confer regarding Mr. Schwartz—that he joined Cox Automotive from the "newspaper business"—is irrelevant. Regardless of where he came from, Mr. Schwartz has been running Cox Automotive since 2014. Moreover, while Cox has yet to produce documents, it is already apparent that Mr. Schwartz was personally involved in matters at issue in this lawsuit. As one example, dealers communicated directly with Mr. Schwartz about Cox's access to data on CDK's DMS. *See, e.g.*, CDK-0069980.

3. *Mandi Fang, VP Product Management (vAuto).*[9] Ms. Fang is likely to have relevant documents regarding vAuto's contracts and relationships with dealer and OEM customers, as we understand that she plays a key role in working with vAuto's dealer and OEM customers regarding software solutions, and in particular new and used vehicle inventory management solutions. Ms. Fang is also involved in, and has directly communicated with CDK regarding, pricing for CDK's services, including data integration fees. *See, e.g.*, CDK-2378980; CDK-1407408.

4. *Jack Ternowchek, Senior Manager, Strategic Initiatives (Homenet)*. Mr. Ternowchek is likely to have relevant documents related to Homenet's access to CDK's DMS and possible data security issues attributable to Homenet. For example, Mr. Ternowchek is likely to have engaged in communications related to what appears to be a data security incident at one dealer, which the dealer attributed to Homenet's syndication of the dealer's vehicle inventory data to various vendors without the dealer's knowledge or authorization. Mr. Ternowchek was also centrally involved in Homenet's methods of accessing data stored on CDK's DMS. *See, e.g.*, CDK-2120245; CDK-0456761.

---

[9] In CDK's initial proposed search terms and custodian list for Cox, Ms. Fang was misidentified as the Vice President of Product Management for DealerTrack.

Mayer Brown LLP                                                    **PUBLIC VERSION**

Michael N. Nemelka
Peggy J. Wedgworth
June 12, 2018
Page 6

5. *Chase Abbott, VP Sales (VinSolutions & DealerTrack F&I).* We understand that Mr. Abbott leads and manages VinSolutions and DealerTrack F&I sales, and therefore is likely to have relevant documents related to customer relationships, pricing for software solutions, and third-party DMS access, certification, and fees.

6. *Sam Passer, Assistant VP Client Onboarding (VinSolutions).* Mr. Passer is likely to have relevant documents related to VinSolutions products and customer relationships. Mr. Passer also likely has relevant documents, including communications with dealers, related to VinSolutions's access to data maintained on CDK's DMS. *See* CDK-1824371.

7. *Corey Roberts, General Manager (xTime).* Mr. Roberts is likely to have relevant documents related to xTime's customer relationships, pricing, and the terms and conditions of xTime's 3PA certification. *See* CDK-0207785.

## AutoLoop Document Custodians

Thank you for your agreement to make Alex Eckelberry, Sara Loehwing, Tony Petruzelli, and Matthew Rodeghero document custodians. As with MVSC and Cox, CDK requested organizational charts or equivalent documentation to substantiate AutoLoop's position that these same individuals are properly identified as CDK's proposed custodians No. 10, 11, 14, and 15, who were described by subject matter. And, as with MVSC and Cox, we have yet to receive this information and would ask that it be produced in advance of our next meet-and-confer. We also await your identification of the AutoLoop employees who fit the descriptions of CDK's proposed custodians No. 12 and 13. Here again, we reserve the right to identify additional custodians who may be appropriate based on this information.

Further, while we appreciate AutoLoop's agreement to several of the named custodians CDK identified, we do not believe that its exclusion of certain other proposed custodians is appropriate. Per your request, we summarize below the relevance of each of proposed custodians currently in dispute. Once again, while we only have access to a small production of documents that AutoLoop previously made to the FTC, the information available to CDK indicates that these custodians possess relevant, non-duplicative discovery.

1. *Steve Anderson, Co-founder and Chief Executive Officer.* Mr. Anderson is likely to have relevant documents related to AutoLoop's products, data policies, market strategy, and financial information. We understand that Mr. Anderson also was involved in communications with government agencies regarding matters at issue in this litigation. In addition, Mr. Anderson played an integral role in AutoLoop's decision to join the 3PA program and has directly communicated with CDK about AutoLoop's enrollment in the program. *See, e.g.*, CDK-0015786; CDK-0045139.

2. *Doug Denham, National Sales Director.* Mr. Denham is likely to have relevant documents related to AutoLoop's customer relationships, the pricing of AutoLoop's applications (including any data integration "surcharges"), and direct communications

Mayer Brown LLP

Michael N. Nemelka
Peggy J. Wedgworth
June 12, 2018
Page 7

with customers regarding such charges. Mr. Denham is also likely to have relevant documents related to competition with other application providers, AutoLoop's claims that CDK has an "unfair advantage," and AutoLoop's claims regarding CDK's integration fees. *See, e.g.*, AUTOLOOP_FTC_0003972; AUTOLOOP_FTC_0003980.

3. *Jim Thompson, former Senior Director of Operations.* Mr. Thompson is likely to have relevant documents related to AutoLoop's admission into CDK's 3PA program, negotiations with CDK, and the effect of 3PA certification on AutoLoop's revenues and profitability. Dealers also directly communicated with Mr. Thompson about relevant issues, including switching DMS providers and their purported ownership of DMS data.

4. *Graham Annett, VP of Marketing.* Mr. Annett is likely to have relevant documents related to AutoLoop's marketing of competing products. It is also likely that Mr. Annett was involved in the creation of marketing materials related to the 3PA program and AutoLoop's 3PA certification, and related communications with AutoLoop's customers.

5. *Patrick Kelly, VP of Client Retention.* Mr. Kelly is likely to have relevant documents related to customer wins and losses (including the reasons for such wins and losses) and any effect that 3PA certification has had on AutoLoop's ability to retain customers. Mr. Kelly also is likely to have relevant documents related to AutoLoop's use of third-party data extractors for access to data maintained on CDK's DMS.

**<u>Dealership Class Plaintiff Document Custodians</u>**

CDK proposed the following Dealership Class Plaintiff document custodians: (1) the witnesses at each Dealership who are identified in the Dealership Plaintiffs' own Rule 26 disclosures; and (2) an additional set of custodians at each Dealership, identified by specific categories that CDK provided (*e.g.*, the "employee(s) responsible for negotiating contracts with DMS providers, Integrators, and Vendors").[10] During our June 8 meet-and-confer, the Dealership Plaintiffs suggested that they likely would only agree to the first category of proposed document custodians—their own Rule 26 witnesses. That is plainly insufficient. First, several parties who are named in the Consolidated Complaint are not included in the Dealership Plaintiffs' Rule 26 disclosures.[11] Second, the Dealership Plaintiffs have clearly taken the position that *Defendants*

---

[10] In accordance with the current Case Management Order, Defendants made their initial proposal for document custodians on May 25, without the benefit of any discovery from the Dealership Plaintiffs or the Consolidated Class Action Complaint (Dkt. 184), which was later filed on June 4. As stated in our May 25 proposal, Defendants reserve the right to propose additional Dealership Plaintiff document custodians—and serve other discovery—based on the new Consolidated Complaint.

[11] This despite the fact that the Court's May 7, 2018 Case Management Order (Dkt. 166) specifically required the Dealership Plaintiffs' disclosures to "include a statement as to the individual named plaintiffs **who will** prosecute this matter on behalf of the putative class…" (emphasis added). Accordingly,

(cont'd)

Mayer Brown LLP                                                    **PUBLIC VERSION**

Michael N. Nemelka
Peggy J. Wedgworth
June 12, 2018
Page 8

are obligated to designate additional document custodians beyond the witnesses that each
Defendant has disclosed under Rule 26. Third, many of the Dealership Plaintiffs' Rule 26
disclosures only identify their general manager (or an equivalent position). Other employees
within a dealership besides the general manager will possess non-duplicative, relevant discovery.
For example, as you are aware, one dealership's IT director offered testimony at Authenticom's
preliminary injunction hearing last year. Those are some of the types of employees at each
Dealership Plaintiff—in addition to the general manager—who should be included as document
custodians.

At a minimum, at our June 8 meet-and-confer we asked each Dealership Plaintiff to identify the
individuals within their respective organizations who meet the subject-matter descriptions set
forth in Defendants' May 25 proposal. We have not received this information and asked that it
be provided promptly, and, in any event, prior to our next meet-and-confer.

Sincerely,


*/s/ Matthew D. Provance*
Matthew D. Provance

cc:     Lead MDL Plaintiff Counsel of Record
        Reynolds Counsel of Record
        Mark Ryan
        Britt Miller
        Andrew Marovitz

---

(… cont'd)

Defendants request that the Dealership Plaintiffs amend their Rule 26 disclosures immediately to account
for all entities who are named plaintiffs in the Consolidated Complaint.

PUBLIC VERSION

# EXHIBIT "6"

PUBLIC VERSION

# MAYER·BROWN

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel +1 312 782 0600
Main Fax +1 312 701 7711
www.mayerbrown.com

July 30, 2018

Matthew D. Provance
Direct Tel +1 312 701 8598
Direct Fax +1 312 706 9397
mprovance@mayerbrown.com

**B**Y **E-M**AIL

Michael N. Nemelka
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 60036

Re:     *In re Dealer Management Systems Antitrust Litig.*,
         MDL No. 2817, Case No. 18-CV-864 (N.D. Ill.)

Dear Mike:

I write in follow-up to our July 19, 2018, meet-and-confer regarding non-Dealer Plaintiffs' (Cox, AutoLoop, MVSC, and Authenticom) ("Plaintiffs") May 25, 2018, requests for production ("RFPs" or "Requests") to CDK Global, LLC's ("CDK").

**Responsive Time Period**

*Responsive Time Period for Certain Cox, AutoLoop, MVSC Discovery:*  As discussed during our meet-and-confer, CDK's responses to certain Requests (2, 3, 4-6, 8, 16, and 26) seeking documents related to negotiations with Plaintiffs Cox, AutoLoop, and MVSC related to their participation/possible participation in the 3PA program include date limitations of January 1, 2015 (for Cox and AutoLoop) and January 1, 2014 (for MVSC) based on the timing of when those negotiations began.  Plaintiffs challenge those limitations, seeking responsive documents from CDK back to 2013 and, in some cases, 2011.  But at the same time, these three Plaintiffs maintain that *their own* productions should be limited across-the-board—not just for certain document requests—to 2014 to the present (Cox and AutoLoop) and 2015 to the present (MVSC).[1]  There is no justification for Plaintiffs' inconsistent positions on what the relevant time period should be, and there is no basis for imposing a broader, more burdensome period on CDK for Cox, AutoLoop, and MVSC-related discovery than those Plaintiffs are willing to

---

[1]     *See* Cox Gen. Obj. No. 10; MVSC Gen. Obj. No. 11.  AutoLoop's written responses to CDK's requests for production state that "[u]nless otherwise stated, AutoLoop's response will relate to the time period January 1, 2013, to the present," AutoLoop Gen. Obj. No. 11, but this is illusory and misleading because AutoLoop apparently is only willing to run ESI search terms from January 1, 2014 to April 9, 2018.  *See* Attachment to  07/12/2018 Email from D. Guarnera to B. Miller and M. Provance.

Mayer Brown LLP

PUBLIC VERSION

Michael N. Nemelka
July 30, 2018
Page 2

accept. If Plaintiffs will agree to the same for their own discovery responses, then CDK will agree to a general cut-off of January 1, 2013 for Requests 2, 3, 4-6, 8, 16, and 26.[2]

_Pre-2013 Discovery:_  Plaintiffs (including Authenticom itself) are now seeking to reopen the general discovery cut-off of January 1, 2013 (with certain exceptions) that the parties agreed to following extensive meet-and-confer discussions in _Authenticom_.  In particular, Plaintiffs seek documents and data back to 2011 for certain Requests (2, 3, 4, 43, 44, 46, 54) and discovery of CDK's pricing, cost, revenue, profit, and other categories of financial and other information well into the _2000s_ or even earlier (_see_ Requests 64, 81-93).  We refer you to (and incorporate) our recent correspondence with the Dealership Class Plaintiffs on this issue, which reiterates why we believe 2013 is the appropriate cut-off for the vast majority of discovery in Plaintiffs' cases and the MDL overall, and why it would be inefficient and disproportionate for CDK to retread discovery issues that it has already covered (_e.g._, sales transactional data) based on the agreed-upon time periods in _Authenticom_ simply because Plaintiffs (including Authenticom) now seek substantially the same discovery from a broader time period.  _See_ 07/25/2018 Ltr. from M. Provance to R. Wallner at 1-3.[3]  We would also point out that MDL Plaintiffs have all consistently taken the position that _their own_ discovery obligations—including discovery related to their damages claims—should be limited according to cut-off dates of January 1, 2013 or later.

During our meet-and-confer, you argued that extra years of discovery, particularly for CDK's financial data (which CDK is already providing back to 2011 instead of 2013), are now necessary because claims have been asserted on behalf of Dealer and Vendor putative classes. As it relates to the appropriate relevant time period for discovery, we believe that is a distinction without a difference.  The Vendor and Dealer putative classes' damages claims are similarly limited, at most, by the four-year limitations period (just like Authenticom).  And, to the extent that the putative Vendor and Dealer putative classes will rely on CDK's financial data, CDK is already providing such data back to 2011—providing a "clean period" of at least three to four years before any alleged anticompetitive conduct by CDK.

Therefore, for the reasons noted above, among others, we are not inclined revisit the general 2013/2011 cut-offs that we negotiated with you in connection with the _Authenticom_ discovery requests.  However, as you know, CDK also has agreed to search for discovery from earlier periods on discrete issues (_e.g._, documents, communications, or statements regarding third-party access to CDK's DMS and documents related to "SMART-R") through the use of limited search terms (from among those search terms already proposed) and custodians.  If Plaintiffs have

---

[2]      Moreover, for the reasons discussed below, there is no reason to expand the responsive time period back to 2011 for Requests 2, 3, or 4, as you demanded during our meet-and-confer.

[3]      Among other things, January 1, 2013, is several months beyond the applicable limitations period for Plaintiffs' claims.  Our July 25 letter to Mr. Wallner cites authority for the proposition that courts routinely recognize the applicable limitations period as a primary if not dispositive factor in defining the relevant time period for discovery in complex civil litigation.  In addition to those cases, we also direct you to: _Greene v. Sears Protection Co._, 2017 WL 1134484, at *5 (N.D. Ill. Mar. 27, 2017).

Mayer Brown LLP                                                                    **PUBLIC VERSION**

Michael N. Nemelka
July 30, 2018
Page 3

proposals for other one-off categories of documents sought by their Requests, we are willing to consider making additional exceptions if warranted.

## Specific Requests for Production

Below, we provide further responses to disputed Requests discussed during our July 19 meet-and-confer. Any offers to produce additional categories of documents are subject to and without waiver of CDK's general and specific objections set forth in its initial written responses dated June 22, 2018, and are contingent on resolving the parties' disputes as to the identified Requests.

*Request 1 (3PA Contracts):* CDK maintains that this Request (originally served as Authenticom RFP 43) is overbroad and unduly burdensome, and CDK's existing commitment to producing documents sufficient to show any material variation in its 3PA contracts, as well as the current version of its standard 3PA contract, is sufficient notwithstanding that Plaintiff AutoLoop now purports to represent a putative class of Vendors. Nevertheless, in the interest of finding a potential compromise for this Request, to the extent that any 3PA program participants have entered into 3PA/Managed Interface Agreements with CDK on or after January 1, 2013 that vary from CDK's standard contract with respect to any of the provisions that are being challenged by the AutoLoop putative class (*i.e.*, the alleged "exclusive dealing" and "price secrecy" provisions), CDK will separately produce those 3PA/Managed Interface Agreements. Please let us know if this would resolve our dispute.

*Request 7 ("Better" 3PA Pricing):* As you know, Cox's allegations that another 3PA member receives "better" pricing than Cox are based exclusively on the terms of CDK's February 2015 3PA agreement with Reynolds—which Cox already has (*see* CDK-0000014-39). CDK is also producing non-privileged documents related to the negotiation and drafting of the CDK-Reynolds 3PA agreement, including any "pricing" terms. Moreover, as we discussed during our meet-and-confer, CDK has already produced structured data (CDK-0701423-49) sufficient to show monthly prices paid by all 3PA members for data integration services. CDK disputes Cox's allegation that other 3PA members receive "better" pricing than Cox for comparable services, so the only way that CDK can reasonably respond to this Request is by producing the objective data on pricing that it has already produced.

*Requests 11-15 (3PA "Categories"):* You asked us to confirm whether documents that are responsive to these Requests would be produced from non-custodial sources. Of course, we have not determined where every document potentially responsive to Plaintiffs' requests may located. To the extent we identify non-custodial sources where responsive documents are reasonably likely to be found, they will be searched (just as CDK has done, and is doing, for all document requests in this litigation). That said, for the majority of Plaintiffs' Requests (including 11-15) we would expect that responsive documents, if any, will be located in the files of agreed-upon custodians through the use of agreed-upon search terms (from among those search terms already proposed). Therefore, where we state below that CDK is prepared produce certain categories of documents "to the extent they exist and can be identified through a reasonable search," that is generally what we mean.

Mayer Brown LLP

PUBLIC VERSION

Michael N. Nemelka
July 30, 2018
Page 4

_Requests 19 & 20 ("Push" Functionality; Levels of Integrations):_  We explained the overbreadth of these Requests during our meet-and-confer.  For example, as phrased, Request 19 literally seeks every piece of data that might be generated by any application that receives a "push" notification through its integration with CDK's DMS.  You agreed, and suggested that these Requests could be narrowed.  In the interest of finding a potential compromise for these Requests, CDK is prepared to produce non-privileged documents reflecting analyses or consideration by CDK regarding whether to provide "push" notifications for CDK applications only or whether to offer different categories of functionality, data access, or level of data integration through the 3PA program to Vendor applications based on whether those applications compete with CDK applications, to the extent such documents exist and can be identified through a reasonable search.  Please let us know if this would resolve our dispute.

_Request 22 (Certification Time):_  You explained that this Request seeks documents that discuss how long it takes to certify and deploy integrations requested by Vendors under the 3PA program.  You asserted that such documents were relevant because some Vendors believe that CDK "drags its feet."  We disagree that the amount of time it takes to certify and deploy 3PA integrations is relevant to any claim or defense in this litigation, and moreover, the amount of time it takes can be different for every Vendor depending on myriad factors, including factors that are outside of CDK's control.  Nevertheless, in the interest of finding a potential compromise for this Request, CDK is prepared to produce documents related to any complaints by Vendors that the 3PA certification process is taking too long, to the extent such documents exist and can be identified through a reasonable search.  Please let us know if this would resolve our dispute.

_Request 23 ("Project Peach"):_  We still fail to see the relevance of "Project Peach," a proposed venture between ODE (a joint venture between CDK and Reynolds) and Cox, which related to credit and contract processing but was never consummated.  Your explanation that any and all documents related to Project Peach will purportedly reflect CDK and Reynolds's "views on data access" was not persuasive. Project Peach appears to have had nothing to do with CDK's alleged third-party DMS access restrictions, the use of so-called "independent integrators," or any other core issue that is relevant to the claims and defenses in this litigation.

_Request 24 & 25 (RTS):_  Following our discussion of these Requests during the meet-and-confer, in the interest of finding a potential compromise, CDK is prepared to produce documents related to (a) RTS's eligibility or possible participation in the 3PA program, and/or (b) RTS's access to CDK's DMS outside the 3PA program, to the extent such documents exist and can be identified through a reasonable search.  Please let us know if this would resolve our dispute.

_Request 29, 31 & 37 (References to Cox, AutoLoop, MVSC):_  These Requests seek all communications—and all documents about those communications—between CDK and Dealers and OEMs that in any way mention Cox, AutoLoop, or MVSC, in any context.  As we explained, these Requests are overbroad, as not every mention of Plaintiffs, in any context, is relevant to the claims and defenses in this litigation.  Cox, AutoLoop, and MVSC seem to understand this concept when communications are requested from _them_ that mention or refer to CDK—they

Mayer Brown LLP                                                                    PUBLIC VERSION

Michael N. Nemelka
July 30, 2018
Page 5

objected to producing *any* such documents on the purported ground that the Requests are
"overbroad."  *See, e.g.*, CDK's RFPs 10 & 32 to Cox; CDK's RFP 8 to AutoLoop.  CDK has
already agreed to produce documents responsive to these Requests that relate to access to CDK's
DMS by Cox, AutoLoop, and MVSC.  That limitation should be sufficient to capture the vast
majority of relevant communications.  However, in the interest of finding a potential
compromise for this Request, CDK is also prepared to produce additional documents that relate
to (a) the way in which the above-referenced Plaintiffs access or use DMS data; (b) their possible
participation in the 3PA program and/or 3PA certification status; and (c) their security and data
practices, to the extent such documents exist and can be identified through a reasonable search.
If there are additional, relevant topics that you would like us to consider, please let us know.

<u>Requests 35 & 36 (EVR Provider 3PA Certification):</u>  As drafted, these Requests are overbroad.
Nevertheless, in addition to documents sufficient to show the EVR providers who are enrolled in
CDK's 3PA program and the contractual terms and conditions of their enrollment, which CDK
has already agreed to produce, in the interest of finding a potential compromise CDK is prepared
to produce documents related to negotiations with EVR providers for their participation in the
3PA program, including pricing terms, to the extent such documents exist and can be identified
through a reasonable search.  Please let us know if this would resolve our dispute.

<u>Request 38 (MVSC Executives):</u>  We are formulating an appropriate search term for this Request
and likely will make a proposal tomorrow, or Wednesday.

<u>Request 39 (Acquisition of MVSC):</u>  Notwithstanding our objections to this Request, and that we
fail to see the relevance of any contemplated acquisition of MVSC to the claims and defenses at
issue, we are still confirming whether any non-privileged documents that are responsive to this
Request exist, and expect to follow up shortly in that regard.

<u>Requests 43 & 44 (CVR Customer Base and Market Share):</u>  We reiterate that this Request is
better directed to CVR, not CDK.[4]  However, in the interest of finding a potential compromise
for these Requests, CDK is prepared to produce documents sufficient to show the number of
CVR's customers for EVR services, on an annual basis, from 2013 to 2017, to the extent those
statistics are maintained by CDK.  Further, to the extent that a state-by-state breakdown of those
statistics exists, it will be included in CDK's production.  As we explained,  CDK may not be
able to conclusively determine, much less produce documents that are "sufficient to show,"
CVR's "share" of EVR customers.  Any estimates of "share" would be based on CVR's own

---

[4]      This Request is among many seeking information most likely to be found in CVR's corporate
records and in the files of its custodians.  You again confirmed during our meet-and-confer that Plaintiffs
intend to serve separate discovery requests upon CVR.  Per your prior conversation with Britt Miller, we
understand that Plaintiffs are "holding off" until the Court rules on CVR's pending motion to dismiss so
as not to expend unnecessary resources in the event CVR's motion is granted.  As Ms. Miller informed
you during that same conversation, while CVR appreciates that plaintiffs are trying not to unnecessarily
burden CVR, CVR will not be prejudiced by Plaintiffs' delay and it reserves all rights to seek relief from
such discovery, including but not limited to an extension of the discovery schedule, based on, among
other things, Plaintiffs' delay.

Mayer Brown LLP

PUBLIC VERSION

Michael N. Nemelka
July 30, 2018
Page 6

EVR customer count and varying estimates of the total number of available EVR users obtained from available data, including public data and third-party data. However, to the extent that such estimates exist and can be identified through a reasonable search—mostly, we would expect, through a review of custodians' files—CDK is prepared to produce them from 2013 to the present if it would resolve the parties' dispute. Please let us know.

*Request 46 (CVR Financial Information):* This is another Request that is better directed to CVR. To the extent CDK maintains CVR-related financial information, it is largely—as you pointed out—for purposes of consolidating CVR's financials into CDK's aggregated financial returns. As you know, CDK has already committed to producing documents sufficient to show its profit, projections, margin, and cost information at the individual product line level (*e.g.*, DMS), at the divisional level (e.g., Data Services), and at the management level (*e.g.*, the Retail Sales corporate level), or some combination thereof, to the extent such documents/information exist, back to 2011. We confirm that to the extent that CDK's profit, projection, margin, and cost information is broken out separately for CVR, it will be produced that way.

*Requests 47 & 48 (CVR "Deficiencies" and EVR Provider Product Quality):* Once again, these Requests are better directed to CVR. But, thank you for the example, CDK-0076911, of a document that Plaintiffs consider to be responsive to these Requests (and we note that the document also would be considered responsive according to the parameters of CDK's written responses to these Requests). We confirm that documents like CDK-0076911 will be produced to the extent that they exist within CDK's possession, custody, or control and can be identified through a reasonable search.

*Request 49 (EVR Delays and "Backlogs"):* As above, this Request is better directed to CVR. However, in the interest of finding a potential compromise for this Request, CDK is prepared to produce—in addition to "backlogs"—documents related to any complaints or concerns regarding delays by EVR providers in processing electronic vehicles registrations and titles, to the extent such documents exist, are within CDK's possession, custody, or control, and can be identified through a reasonable search. Please let us know if this would resolve our dispute.

*Request 51 (EVR Costs of Entry):* Thank you for clarifying that this Request seeks documents discussing or analyzing the licensing requirements, DMV requirements, or "entry" costs associated with providing EVR services (in states where private EVR providers are licensed to offer such services). As clarified, CDK will produce non-privileged documents reflecting CDK's analysis of these issues (EVR licensing requirements, DMV requirements, or "entry" costs), to the extent they exist, are within CDK's possession, custody, or control, and can be identified through a reasonable search. Please let us know if further discussion is needed.

*Request 53 (Reynolds's Interest in CVR):* As we explained, CDK has already produced the operative agreement between CDK and Reynolds concerning the formation and ownership structure of CVR (CDK-0001931), and a number of ancillary agreements pertaining to CVR (*e.g.*, CDK-0002076, CDK-0001964, CDK-0002137, CDK-0002143, CDK-0002010, CDK-0002126, CDK-0002145, CDK-0002130, CDK-0002110, CDK-0002041). Further, in response

Mayer Brown LLP

PUBLIC VERSION

Michael N. Nemelka
July 30, 2018
Page 7

to Plaintiffs' Request 52, CDK is producing documents sufficient to show CVR's ownership structure, including documents sufficient to show how CVR's revenues and profits are divided between CDK and Reynolds. We are not aware of any other documents in CDK's possession, custody, or control that relate to Reynolds's ownership interest in CVR, which it acquired in the early 1990s. But even if such documents exist, we do not believe they are relevant—the agreements speak for themselves and supersede any collateral documents or communications that might exist from the 1990s discussing Reynolds's ownership interest. Finally, if anyone should have to go looking for documents discussing how and why Reynolds acquired an ownership interest in CVR (which we do not agree is relevant or remotely proportional to the needs of the case) respectfully it should be Reynolds conducting a search of its own files for documents that speak to these issues, not CDK.

*Request 54 (CVR "Financial Benefits")*: As discussed above, CDK is producing documents sufficient to show how CVR is structured and how CVR's profits are allocated. As further discussed above, CDK is also producing documents sufficient to show profit, projections, margin, and cost information, to the extent such information exists and is broken out for CVR, back to 2011. To the extent that this Request seeks documents about other types of "financial benefits" related to CVR, it is not clear what that even means. To the extent that Plaintiffs continue to seek "[a]ll documents and communications" that are in any way related to the CVR-related information that CDK is producing, CDK maintains that the Request is grossly overbroad and unduly burdensome.

*Request 55 (CVR Ownership Agreement)*: We are fairly certain that CDK-0001931 is the "operative CVR ownership agreement between CDK and Reynolds," but will confirm this in the short term following additional investigation, which is still ongoing at this time.

*Requests 57 & 58 (CDK's "Involvement" in CVR)*: The discovery sought through these Requests relates to MVSC's new allegations that CDK "controls" CVR, which (a) are pled in service of a Section 2 claim that has been dismissed once already and is subject to another pending motion to dismiss, and (b) contradict allegations in MVSC's prior complaints that CDK *and* Reynolds jointly "control" CVR. However, in the interest of finding a potential compromise for this Request, CDK is prepared to search for and produce documents that are responsive to these Requests—to the extent such documents exist and can be identified through a reasonable search—in the event that MVSC's Section 2 claim against CDK is not dismissed. Please let us know if this would resolve our dispute.

*Request 59 (CDK/Reynolds Communications re CVR)*: This Request seeks all communications between CDK and Reynolds related to their joint venture, CVR, regardless of their relevance. CDK has already offered to produce such communications if they pertain CVR's operations (*i.e.*, what CVR does), its finances, and/or CVR's participation in CDK and Reynolds's respective 3PA and RCI programs. We are at a loss as to what other topics could remotely be relevant to the claims and defenses in this litigation. If there are additional, relevant topics that you would like us to consider short of "all" communications, we are willing to consider them.

Mayer Brown LLP                                                    PUBLIC VERSION

Michael N. Nemelka
July 30, 2018
Page 8

_Requests 60 & 61 (AVRS Acquisition):_   Again, documents pertaining to CVR's acquisition of
AVRS are better requested from CVR.  Moreover, the CVR-AVRS transaction is not at issue in
this litigation and so these Requests for every document in any way related to the acquisition are
substantially overbroad.   However, in the interest of finding a potential compromise for this
Request, CDK is prepared to produce (a) documents related to the acquisition of AVRS that
discuss the impact of the acquisition on CVR's ability to compete with other EVR providers, and
(b) documents related any complaints received from Dealers (in other words, "communications
regarding deficiencies or perceived deficiencies in AVRS's product and service levels")
following the AVRS acquisition, to the extent such documents exist, are within CDK's
possession, custody, or control, and can be identified through a reasonable search.  Please let us
know if this would resolve our dispute.

_Requests 62 & 63 (CVR, AVRS & Applications' Use of "Independent Integrators"):_   As we
discussed, CDK's response to these Requests—in which it agrees to produce non-privileged
documents related to any agreements with "independent integrators" with respect to CVR,
AVRS (after its acquisition by CVR), or CDK applications' access to data maintained on CDK
or Reynolds's DMS, or any other DMS providers with policies restricting third-party access—
tracks the offer that CDK made in response to Authenticom RFP 25, which is substantially
similar except that it relates to _CDK_'s use of so-called "independent integrators."  To the extent
that you believe, as you stated during our meet-and-confer, that there are unresolved issues
surrounding Authenticom RFP 25, we suggest that these Requests (Authenticom RFP 25 and
Plaintiffs' RFP 62) be discussed together during our next meet-and-confer.[5]

_Request 64 (CVR Board Materials):_   During our meet-and-confer we explained the overbreadth
problems with this Request, including that it seeks "[a]ll documents related to CVR's Board of
Directors" (In what respects? Are you seeking their personnel files?) from literally the beginning
of time and "[a]ll communications between or among CVR's Board of Directors" on any topic or
subject matter—_e.g._, whether they are going to the annual Christmas party, etc.   You
acknowledged during our meet-and-confer that the Request was overbroad.  CDK's written
response already commits to producing non-privileged documents sufficient to show the
composition of CVR's Board of Directors, CVR Board of Directors meeting minutes, and
materials distributed to CVR Board members in advance of Board meetings, to the extent those
documents exist within CDK's possession, custody, or control.  If there are specific, additional
relevant topics that are subsumed within this Request, we believe that it is Plaintiffs'
responsibility to identify them for us.

_Requests 65 & 66 (Communications with Authenticom Customers):_   Thank you for identifying
the  documents  produced  by  Authenticom  at  AUTH_00045915,  AUTH_00045922,
AUTH_00009614, and PHX-97.   They appear to identify hundreds of purported Vendor

---

[5]        On our July 19 call, you also accused me of mischaracterizing the record of meet-and-confer
discussions and correspondence regarding Authenticom RFP 25.  If that is still your position, please
explain how you think I have mischaracterized the record or correspondence.  We have looked into it
following our call and believe our representations were accurate.

Mayer Brown LLP                                                          **PUBLIC VERSION**

Michael N. Nemelka
July 30, 2018
Page 9

customers and thousands of purported Dealer customers. CDK maintains that producing all communications with hundreds of individual Vendors and thousands of individual Dealers that in any way relate to "data integration services" or "data access," in any context, is overbroad and unduly burdensome. Moreover, it appears to us that this Request seeks additional document discovery on behalf of Authenticom well after the March 23, 2018, deadline established by Judge St. Eve during the MDL consolidation proceedings (Dkt. 43). Can you explain to us why this Request was not served previously? Provided that we receive a satisfactory response, in the interest of finding a potential compromise for these Requests, CDK would be prepared to produce responsive documents with the following limitation: To the extent that such documents exist and can be identified through a reasonable search, CDK will produce communications with the above-identified Dealers and Vendors related to their use (or potential or former use) of Authenticom for data integration services or data access. Please let us know if this would resolve our dispute.

*Request 68 (CDK Cost of Capital):* It appears that Plaintiffs are withdrawing this Request, as you were unable to explain the basis for its relevance during our July 19 meet-and-confer and did not provide one in your July 26 follow-up letter.

*Request 69 ("Economic Value of Data"):* In light of the clarifications that Plaintiffs provided regarding this Request during our meet-and-confer, we believe that documents responsive to this Request are subsumed within other discovery requests to which CDK is producing responsive documents. In other words, to the extent CDK reasonably can identify discussions of the vague and amorphous terms used in this Request like "the economic value of data" in business records reviewed in connection with this litigation, they are being produced.

*Request 70 (CDK "Valuations"):* During our meet-and-confer, we explained why we do not believe that any "valuations" of CDK in connection with potential acquisitions are relevant to any claim or defense in this litigation. No issue has been raised about whether CDK could pay a judgment rendered in this litigation, nor does any party's alleged damages depend on CDK's market value. If there is a clear basis for the relevance of this Request, we have yet to hear it.

*Request 71 (Fortellis):* The Fortellis Automotive Commerce Exchange is a new cloud-based technology platform created by CDK that allows Dealers, Vendors, third-party developers and OEMs to share data and software solutions through the platform using DMS-agnostic API specifications. Currently, CDK has not provided access to its DMS through these APIs. Thus, it is unclear what Fortellis has to do with the claims and defenses in this litigation or how requiring CDK to gather and produce "[a]ll documents" related to Fortellis, including all financial information, could be proportional to the needs of the case. We also note that Fortellis launched in March 2018, which is after the dates that we understand several Plaintiffs have proposed cutting off their own productions of responsive discovery (based on the dates of their complaints), and well after any alleged anticompetitive conduct as and between Reynolds. This appears to be a rank fishing expedition and we have yet to hear a plausible explanation for why all documents related to Fortellis should be produced.

Mayer Brown LLP                                                                    PUBLIC VERSION

Michael N. Nemelka
July 30, 2018
Page 10

_Request 72 (Projections & Forecasts):_   As discussed during our meet-and-confer, we believe
that the myriad financial information that CDK is already producing—including documents
sufficient to show third-party profit, projections, margin, and cost information—in response to
Authenticom RFPs 52, 53, 55, 57, 58, 59, and 60, among others, is sufficient to meet any
legitimate need for the discovery sought by this Request.

_Request 73 (Industry Conferences):_   Plaintiffs confirmed that this Request is substantially
duplicative—despite the Court's direction to the contrary—of the Dealership Class Plaintiffs'
RFPs 37 and 38, which collectively seek all documents concerning any "industry conference."
One difference may be that this Request is even broader than the Dealership Class Plaintiffs'
RFPs in so far as it simply seeks "[a]ll documents" concerning any "industry conference,"
apparently regardless of whether CDK attended or considered attending the conference.  Beyond
the grossly overbroad nature of this Request, as we explained during our meet-and-confers with
the Dealers, to the extent that relevant events occurred at industry conferences (_e.g._, the April
2016 discussion between Mr. McCray and Mr. Cottrell mis-described in several Plaintiffs'
complaints) or relevant documents were created or disseminated by CDK in connection with
industry conferences, those documents likely will be produced in response any number of
discovery requests that CDK has received that track the issues in this litigation and not the
conferences themselves.   For example, non-privileged documents (if any) related to Mr.
McCray's conversation with Mr. Cottrell—the alleged content of which, to be clear, we
dispute—are being produced in response to Authenticom's RFP 10 ("[a]ll documents and
communications referencing, relating to, or concerning Authenticom, DealerVault, or Steve
Cottrell"), if not many others. The same is true for other potentially relevant documents, _e.g._,
communications about SecurityFirst or the 3PA "refresh," such that the significant additional
burden of responding to these Requests are not proportional to the needs of the case.

_Requests 74 & 75 (Telephone Records):_   During our meet-and-confer, Plaintiffs offered to limit
these Requests.  As we understood the offer, Plaintiffs are willing to accept telephone records (to
the extent they exist within CDK's possession, custody, or control) showing calls made between
CDK and Reynolds documents custodians, going back to 2014.  While we appreciate Plaintiffs'
offer, it does not make the telephone records relevant.  This is not a case (unlike, for example,
_Urethanes_ or _Containerboard_) in which Defendants are accused of fixing prices or engaging in
coordinated output restrictions such that it would make sense to examine how frequently
Defendants communicated or whether they communicated during or in proximity to allegedly
parallel price announcements, plant closures, etc.  Thus, we appear to be at an impasse regarding
these Requests, and CDK does not intend to respond to them.[6]

---

[6]     In addition, please be advised that the information CDK has in its possession, custody, or control
that may be responsive to these Requests is extremely limited.  CDK maintains access to telephone
records for employee landline telephone numbers going back, at most, two years.  For CDK employees
who are on a CDK-sponsored plan with their mobile carrier (AT&T, Verizon, and until 2016, Sprint),
CDK's access to telephone records is much more limited.  Of course, additional records may be
maintained by the carrier—but CDK does not know what records are maintained by each carrier nor can it
represent that such records exist.

Mayer Brown LLP

Michael N. Nemelka
July 30, 2018
Page 11

*Request 78 ("Secure the DMS" Dashboard Reports):*  As we explained, the "Secure the DMS" Dashboard Reports subject to this Request were generated by CDK employees periodically from information primarily maintained in CDK's Dealer Data Exchange ("DDX") database, which was included in CDK's production of structured data at the Bates numbers listed in CDK's written response to this Request.  To the extent that Dashboard Reports are identified in the custodial files that CDK is searching and reviewing to respond to Plaintiffs' discovery requests, we confirm that the Reports will be produced.  We have not located any central file or repository that purports to contain all "Secure the DMS" Dashboard Reports, but to the extent such file or repository exists we will consider producing its contents to the extent not duplicative of documents that CDK has already produced or is producing.

*Request 79 (ReverseRisk):*  This Request seeks "[a]ll documents regarding access by ReverseRisk to CDK's DMS platform," so every single document, email, data transmission, etc. that relates to ReverseRisk accessing CDK's DMS is requested, without any limitation.  While that is grossly overbroad, CDK has already agreed to produce the Managed Interface Agreement and Statement of Work between CDK and ReverseRisk.  Your July 26 letter asserts that additional documents and communications regarding ReverseRisk's access to CDK's DMS are relevant because CDK purportedly "whitelisted" ReverseRisk and allowed it to use Authenticom to access data.  We disagree with your characterizations, but in the interest of finding a potential compromise for this Request CDK is prepared to produce additional documents related to this issue—the purported "whitelisting" of ReverseRisk in connection with its use of Authenticom to access CDK's DMS, to the extent such documents exist and can be identified through a reasonable search.  Please let us know if this would resolve our dispute.

*Requests 81-82, 84-86 (Additional Financial Information):*  As discussed during our meet-and-confer, we believe that the myriad financial information that CDK is already producing in response to Authenticom RFPs 52, 53, 55, 57, 58, 59, and 60, among others, is sufficient to meet any legitimate need for the discovery sought by these Requests.

*Request 83 (Sales and Marketing Plans):*  Despite the grossly overbroad nature of this Request, and notwithstanding that it is duplicative of several Authenticom RFPs seeking largely the same categories of sales, marketing, and financial information, in the interest of finding a potential compromise for this Request CDK is prepared to produce responsive documents from 2013 to the present to the extent they are identified in custodial files through the use of agreed-upon search terms (from among those search terms already proposed).  Please let us know if this would resolve our dispute.

*Requests 87 & 88 (DMS, 3PA, DMI & IntegraLink "Valuations"):*  This Request seeking "valuations" of CDK's DMS, 3PA, DMI, and IntegraLink business lines appears to be no more relevant than Plaintiffs' RFP 70, discussed above, which seeks "valuations" of CDK as a whole. CDK objects for largely the same reasons.  Further, during our meet-and-confer, you asserted that valuations of CDK's data services businesses were relevant to showing a motive to conspire. What potential motive would any "valuations" of those business lines reveal that would not be

PUBLIC VERSION

Michael N. Nemelka
July 30, 2018
Page 12

reflected in the financial results—*i.e.*, revenue, profits, costs, projections—that CDK has already committed to producing?

*Requests 89 & 90 (Industry Publications):* CDK maintains that these Requests—which seek all documents and communications relating in any way to industry publications or reports that touch on "data integration" or DMS services—are overbroad. However, in the interest of finding a potential compromise for these Requests, CDK is prepared to produce responsive documents from 2013 to the present that reflect CDK's analysis, commentary, or discussion of data integration of DMS services apart from the publications themselves, to the extent such documents exist and can be identified through a reasonable search. (For example, under CDK's offer, an otherwise blank email attaching an industry publication would be non-responsive, but an email attaching the publication with additional commentary about it would be responsive.) Please let us know if this would resolve our dispute.

*Request 91 (Projections – Reliance Material):* As discussed above, CDK is already producing financial projections, including to the extent that projections are located in custodial files and identified through the use of agreed-upon search terms. In the interest of finding a potential compromise for this Request, CDK is prepared to produce additional documents identified within those custodial files that reflect documents or information relied upon to create those projections. Please let us know if this would resolve our dispute.

*Request 92 (3PA, DMI & IntegraLink Connections):* Following our meet-and-confer discussion and in the interest of finding a potential compromise for this Request, CDK is prepared to produce documents sufficient to show the total number of Vendors and applications that have enrolled in the 3PA program, to the extent available, from 2013 to the present. CDK will also produce documents sufficient to show the total number of DMS connections maintained in connection with data extraction services offered through CDK's former DMI and IntegraLink subsidiaries, to the extent available, from 2013 to the present. Please let us know if this would resolve our dispute.

*Requests 93 & 94 (Data Integration "Win/Loss" Reports):* As we explained, unlike for its DMS business, CDK does not maintain "win/loss" reports (or their equivalent) for its data integration business. To the extent that there have been one-off reports—although we currently are not aware of any—analyzing the number of Vendors who join or leave the 3PA program during a given period, or gains or losses of DMI and IntegraLink customers, we would expect that such documents would be found in the files of agreed-upon custodians. To the extent such documents exist and are identified using agreed-upon search terms (from among those search terms already proposed), in the interest of finding a potential compromise for this Request, CDK is prepared to produce them from 2013 to the present. Please let us know if this would resolve our dispute.

*Request 95 (3PA Request/Response):* As clarified in their July 26 letter, Plaintiffs are seeking documents through this Request related to the "latency" of data integration through the 3PA program, *i.e.*, how long it takes for the 3PA interface to complete a requested data transaction once it is initiated by a Vendor application. That is what we thought Plaintiffs were seeking,

Michael N. Nemelka
July 30, 2018
Page 13

although there was some confusion about this during our meet-and-confer. CDK maintains that this Request is overbroad and implicates, if read literally, transactional-level detail from millions of data transactions that occur through the 3PA program interface. To the extent that this Request is instead seeking analyses of 3PA "latency" periods (as this Request is using the term), in the interest of finding a potential compromise CDK is prepared to produce such analyses, if any, if it would resolve the parties' dispute over this Request. Please let us know.

*Request 96 ("Push" Functionality):* Based on your July 26 letter, we understand that Plaintiffs are withdrawing this Request as duplicative of Request 19.

*Requests 98-100 (3PA Certification Requirements):* Following our meet-and-confer discussion and in the interest of finding a potential compromise for these Requests, CDK is prepared to produce (a) its operative policies, guides, and certification standards for the 3PA program, (b) additional documents, if any, related to creation and purpose of policies, guides, and certification standards for Vendor technical data submissions, and (c) additional documents, if any, that relate to the use of such technical data for competitive purposes or limitations on the use of such technical data for competitive purposes. Please let us know if this would resolve our dispute.

Sincerely,

*/s/ Matthew D. Provance*
Matthew D. Provance

cc:     Lead MDL Plaintiff Counsel of Record
        Reynolds Counsel of Record
        Mark Ryan
        Britt Miller
        Andrew Marovitz

PUBLIC VERSION

# EXHIBIT 5

PUBLIC VERSION

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817<br>Case No. 18 C 864 |
| This Document Relates to All Cases | Hon. Robert M. Dow, Jr.<br>Magistrate Judge Jeffery T. Gilbert |

**INDIVIDUAL PLAINTIFFS' FIRST SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS FOR DEFENDANT COMPUTERIZED VEHICLE REGISTRATION**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs Motor Vehicle Software Corporation, Authenticom, Inc., Cox Automotive, Inc., Autotrader.com, Inc., Dealer Dot Com, Inc., Dealertrack, Inc., HomeNet, Inc., Kelley Blue Book Co., Inc., vAuto, Inc., VinSolutions, Inc., Xtime, and Loop, LLC ("Individual Plaintiffs") hereby request that Defendant Computerized Vehicle Registration ("CVR") produce all documents in its actual or constructive possession, custody, or control related directly or indirectly to any of the matters described below. All documents and tangible things responsive hereto should be produced for inspection as soon as practicable. Production shall be made at the offices of KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., 1615 M Street, N.W., Suite 400, Washington, D.C. 20036, or as otherwise agreed to by the parties.

PUBLIC VERSION

## **DEFINITIONS**

For purposes of these requests the following definitions shall apply:

1.      "All" shall be construed as all and any, and the term "any" shall be construed as all and any.

2.      "Authenticom" shall mean Authenticom, Inc., a Plaintiff in this MDL and a provider of data integration services in the automotive industry based in La Crosse, Wisconsin. "Authenticom" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

3.      "AutoLoop" shall mean Loop, LLC and its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

4.      "Cox Automotive" shall mean Cox Automotive, Inc., Autotrader.com, Inc., Dealer Dot Com, Inc., Dealertrack, Inc., HomeNet, Inc., Kelley Blue Book Co., Inc., vAuto, Inc., VinSolutions, Inc., and Xtime, Inc. (collectively, "Cox Automotive") and their present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

5.      "MVSC" shall mean Motor Vehicle Software Corporation and its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

6.      "RTS" shall mean Dealertrack's Registration and Titling Service and its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

2

7.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the document request all responses that might otherwise be construed to be outside of its scope.

8.      "CDK" shall mean CDK Global, LLC, as described in Paragraph 4 of Defendants' Combined Statement of Additional Facts Requiring Denial of Preliminary Injunctive Relief (hereinafter, "SoAF"), *Authenticom* Dkt. No. 87 (June 16, 2017).  "CDK" shall include the dealer services business of Automatic Data Processing, Inc. ("ADP") prior to September 30, 2014, as described in Paragraph 5 of the SoAF.  "CDK" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

9.      "Communication" or "Communications" shall mean any exchange or transfer of information, whether electronic, written, oral, or in any other form.  The phrase "communication between" is defined to include instances where one party addresses the other party but the other party does not necessarily respond.

10.     "CVR" shall mean Computerized Vehicle Registration and its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.  ***For the avoidance of doubt, included within the definition of CVR shall be "AVRS."***

11.     "Data integrators" shall refer to service providers that provide access by any means to dealer data on the DMS database, whether by extracting the data, writing data back into the DMS, or both.  For the avoidance of doubt, "data integrators" includes CDK (through its 3PA program) and Reynolds (through its RCI program).

3

PUBLIC VERSION

12.     "Document" and "Documents" are used in the broadest extent permitted by Federal Rule of Civil Procedure 34(a).

13.     "EVR" shall mean electronic vehicle registration and titling.

14.     "Including" (in addition to its usual meanings) shall mean including but not limited to.

15.     The terms "relating to," "related to," "referring to," "regarding," or "with respect to" shall mean, without limitation, the following concepts: concerning, discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part.

16.     "Reynolds" shall mean "The Reynolds & Reynolds Company," as described in Paragraphs 1-3 of the SoAF.  "Reynolds" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

17.     "Vendors" or "application providers" shall mean vendors who provide software applications that perform operations functions for dealerships, as described in Paragraph 20 of the SoAF.

18.     "You," "Your," or "Your company" shall mean the responding Defendant, its present or former predecessors, subsidiaries, departments, divisions, joint ventures, and affiliates, including without limitation, any organization or entity that the responding Defendant manages or controls, together with all present and former directors, officers, employees, agents, representatives, or any persons acting or purporting to act on behalf of the responding Defendant.

4

*For the avoidance of doubt, included within the definition of "You," "Your," or "Your Company" shall be "AVRS."*

## INSTRUCTIONS

1.      In producing documents and other materials, You must furnish all documents in Your possession, custody, or control, regardless of whether such documents or materials are possessed directly by You, Your employees or former employees, agents or former agents, parents, subsidiaries, affiliates, investigators, or by Your attorneys or their employees, agents, vendors, or investigators.

2.      All documents shall be produced in the same order as they are kept or maintained by You in the ordinary course of Your business.  All documents shall be produced in the file folder, envelope, or other container in which the documents are kept or maintained.

3.      Documents attached to one another should not be separated.  If any portion of any document is responsive to any portion of the document requests below, then the entire document must be produced.

4.      Documents shall be produced in such fashion as to identify the natural person in whose possession they were found (i.e., the document custodian).

5.      If any document responsive to any of these requests is privileged, and the document or any portion of the document requested is withheld based on a claim of privilege, provide a statement of the claim of privilege and all facts relied upon in support of that claim, including the following information:

      a.      the exact basis for withholding the document;
      b.      the date of such communication;
      c.      the medium of such communication;
      d.      the general subject matter of such communication (such description shall not be considered a waiver of Your claimed privilege);

   e.  the identity of any document that was the subject of such communication and the present location of any such document;

   f.  the identity of all persons involved in such communication; and

   g.  the identity of any document which records, refers, or relates to such communication and the present location of any such document.

  6.  Each document requested herein should be produced in its entirety and without deletion, redaction, or excision, except as permitted by a recognized privilege, regardless of whether You consider the entire document or only part of it to be relevant or responsive to these document requests. If You have redacted any portion of a document on the ground of privilege, stamp the word "REDACTED" beside the redacted information on each page of the document You have redacted.

  7.  Each request for documents seeks production of all documents described along with any attachments, drafts, and non-identical copies in any language whatsoever, in the possession, custody, or control of You or Your respective agents or attorneys. You are specifically instructed to review any storage and archive facilities and the personal files, records, notes, correspondence, daily calendars, telephone logs, and records of all persons who would likely have responsive documents.

  8.  Unless otherwise stated, the date range for these Requests shall be 2011 to the present.

**REQUESTS FOR THE PRODUCTION OF DOCUMENTS**

**Communications between CVR and CDK/Reynolds**

  **REQUEST NO. 1.**  All communications between CVR document custodians and CDK.

  **REQUEST NO. 2.**  All communications between CVR document custodians and Reynolds.

**PUBLIC VERSION**

**REQUEST NO. 3.**    All communications between CVR and CDK and/or Reynolds concerning or relating to MVSC, RTS, TitleTech, or any other EVR provider, including but not limited to:  (1) their access to dealer data stored on a CDK or Reynolds DMS; (2) their presence and market share in California, Illinois, or any other state EVR market; (3) their expansion or potential expansion into states beyond California; and (4) any competitive threat or perceived competitive threat posed by them to CVR.

**REQUEST NO. 4.**    All communications between CVR and CDK and/or Reynolds regarding data access by EVR providers.

**REQUEST NO. 5.**    All communications between CVR and CDK and/or Reynolds regarding data access fees to be charged to EVR providers.

**Data Access and Fees**

**REQUEST NO. 6.**    All documents and communications regarding how CVR obtains data from the DMSs of Reynolds and CDK dealers.

**REQUEST NO. 7.**    All documents and communications regarding any data integration agreement between CVR and any entity, including CDK, Reynolds, any non-CDK, non-Reynolds DMS provider, and/or any independent data integrator.

**REQUEST NO. 8.**    All documents and communications regarding the prices paid by and/or charged to CVR for data integration, including but not limited to 3PA fees, RCI fees, fees charged by independent integrators such as Authenticom, and fees charged by non-CDK, non-Reynolds DMS providers.

**REQUEST NO. 9.**    All documents and communications regarding the 3PA and RCI fees charged to and/or paid by CVR.

**REQUEST NO. 10.** All documents and communications regarding access by CVR to dealer data on a CDK DMS through the 3PA program.

**REQUEST NO. 11.** All documents and communications regarding access by CVR to dealer data on a Reynolds DMS through the RCI program.

**REQUEST NO. 12.** All documents and communications regarding any data access restrictions, to which CVR is not subject, that CDK or Reynolds places on other EVR providers.

**REQUEST NO. 13.** All documents and communications regarding CVR's access to a dealer's general ledger, and whether that access is provided to other EVR providers.

**REQUEST NO. 14.** All documents and communications regarding any "category restrictions" in place at any time with respect to data integration. *See*, *e.g.*, CDK-0001039, at 64.

**REQUEST NO. 15.** All documents and communications relating to any "CVR Category" for data access by EVR providers.

**REQUEST NO. 16.** All documents and communications relating to any "Closed Category" for data access by EVR providers.

**REQUEST NO. 17.** All documents and communications regarding access by any EVR provider – whether MVSC, RTS, TitleTech, specifically, generally, or otherwise – to data on a CDK or Reynolds DMS.

**REQUEST NO. 18.** All documents and communications regarding the prices to be charged to any EVR provider – whether MVSC, RTS, TitleTech, specifically, generally or otherwise – for access to data on a CDK or Reynolds DMS.

**REQUEST NO. 19.** All documents and communications regarding MVSC's, RTS's, TitleTech's, or any other EVR provider's participation in the 3PA program.

**REQUEST NO. 20.** All documents and communications regarding MVSC's, RTS's, TitleTech's, or any other EVR provider's participation in the RCI program.

**REQUEST NO. 21.** All documents and communications related to MVSC's attempts or applications to join the 3PA or RCI program, including but not limited to communications regarding whether to permit MVSC to participate in the 3PA or RCI program; internal communications regarding any competitive threat that permitting MVSC to join the 3PA or RCI program might pose to CVR; and the terms and pricing offered to MVSC.

**REQUEST NO. 22.** All documents and communications related to any application or attempt by any EVR provider, other than MVSC, to join the 3PA or RCI program, including the terms and pricing offered to any such EVR vendor.

**REQUEST NO. 23.** All documents and communications regarding any EVR provider currently participating in the 3PA or RCI program, including the pricing they pay for participation; their applications to participate in the program; communications regarding their applications; the data elements they receive and /or have access to; and the state EVR markets in which they participate.

**REQUEST NO. 24.** Documents sufficient to show the actual amounts paid by CVR to CDK and/or Reynolds for data integration services.

**REQUEST NO. 25.** The actual checks, wires, or other money transfers from CVR to CDK and/or Reynolds for data integration services. For the avoidance of doubt, this Request seeks documents and information sufficient to show how CVR paid CDK and Reynolds for data integration services.

**Communications with Dealers**

**REQUEST NO. 26.**   All communications – and all documents regarding those communications – between CVR and any dealer regarding (a) MVSC, (b) RTS, (c) TitleTech, or (d) any other EVR provider, including but not limited to communications concerning (1) the way in which they access dealer data; (2) their attempts to join the 3PA or RCI program and/or obtain 3PA or RCI certification status; and (3) their security and data practices.

**REQUEST NO. 27.**   All communications – and all documents regarding those communications – between CVR and any dealer regarding data access, including but not limited to communications regarding CVR's participation in the 3PA and RCI programs.

**REQUEST NO. 28.**   All communications – and all documents regarding those communications – between CVR and any dealer regarding data access fees.

**REQUEST NO. 29.**   All documents and communications between CVR and OEMs or car manufacturers regarding (a) MVSC, RTS, TitleTech, or any other EVR provider, or (b) data access.

**REQUEST NO. 30.**   All documents and communications, including but not limited to agreements or memoranda, concerning the prices and fees CVR charges to dealerships for the provision of EVR services for each geographical region in which CVR operates from January 1, 2009 to the present.

**REQUEST NO. 31.**   All documents and communications, including but not limited to agreements or memoranda, concerning any fees CVR remits to state regulators for each geographical region in which CVR operates from January 1, 2009 to the present.

**REQUEST NO. 32.**   All documents and communications concerning regulatory or statutory limits on fees that CVR may charge for EVR services, broken down by each applicable geographical jurisdiction, from January 1, 2009 to the present.

10

**REQUEST NO. 33.**  All documents and communications between CVR and state regulators from January 1, 2009 to the present.  This Request includes, without limitation, documents that discuss CVR's capital, pricing, and liquidity, as well as documents discussing the quality and nature of CVR's services.

**EVR Markets**

**REQUEST NO. 34.**  All documents regarding – including documents sufficient to show – CVR's market share and customer base in every state in which it operates from 2006 to the present.  For the avoidance of doubt, this Request includes all communications regarding CVR's market share.

**REQUEST NO. 35.**  All internal documents and communications discussing CVR's presence and market share in any state EVR market, including CVR's expansion or potential expansion into or withdrawal or potential withdrawal from any states.

**REQUEST NO. 36.**  All documents sufficient to show the EVR products and services offered by CVR, and the associated prices and costs for those products and services.

**REQUEST NO. 37.**  All documents sufficient to show CVR's EVR customers, the EVR products and services they purchased from CVR, and the associated prices, costs and other terms and conditions for those products and services.

**REQUEST NO. 38.**  All documents referring to CVR's EVR competitors, or competition between or among EVR providers, including any type of competitive intelligence report or assessment.

**REQUEST NO. 39.**  All documents referring to products or services offered by other EVR providers, including any type of competitive intelligence report or assessment.

**REQUEST NO. 40.**   All documents identifying the participants in the California, Illinois, and Virginia EVR markets.

**REQUEST NO. 41.**   All documents relating to the EVR market share for CVR and its competitors, in each state where CVR provides EVR services, including changes over time.

**REQUEST NO. 42.**   All documents sufficient to show when CVR entered or exited any EVR market in any state.

**REQUEST NO. 43.**   All documents relating to any analysis, evaluation, assessment, communication or discussion of whether to enter or exit, or to not enter or not exit, any EVR market, and the reasons therefor.

**REQUEST NO. 44.**   All documents and communications discussing a competitive threat or perceived competitive threat posed to CVR by any EVR provider, including MVSC.

**REQUEST NO. 45.**   All documents and communications concerning any market analysis or competitive analysis of any state EVR markets or the EVR industry generally.

**REQUEST NO. 46.**   All communications and documents concerning or mentioning any MVSC executive, including but not limited to Don Armstrong, Kelly Kimball, Joseph Nemelka, and John Brueggeman.

**REQUEST NO. 47.**   All communications and documents concerning CDK's or CVR's consideration or evaluation of whether to acquire or purchase MVSC or any other EVR provider.

**REQUEST NO. 48.**   All communications and documents concerning any efforts by to impede MVSC's – or any other EVR provider's – access to data for a dealer using the CDK or Reynolds DMS platform.

**REQUEST NO. 49.**  All communications and documents concerning MVSC's – or any other EVR provider's – use of independent integrators, including but not limited to Authenticom, SIS, and ProQuotes, to access data for a dealer using the CDK or Reynolds DMS platform.

**REQUEST NO. 50.**  All documents and communications regarding instances in which CVR or AVRS uses or used independent integrators for access to dealer data on a DMS platform, whether CDK's, Reynolds', or any other DMS platform.

**REQUEST NO. 51.**  All communications regarding Authenticom or Steve Cottrell or DealerVault or SIS.

**REQUEST NO. 52.**  All communications and documents concerning having real time or bi-directional data integration in order to provide EVR services, including in Illinois, California, or any other state EVR market.

**REQUEST NO. 53.**  All documents and communications regarding California Assembly Bill No. 516.

**REQUEST NO. 54.**  All documents and communications concerning deficiencies or perceived deficiencies in CVR's product and service level.  For the avoidance of doubt, this Request includes not only internal documents and communications but also communications with CDK, Reynolds, and third parties (including CVR's dealer customers) regarding deficiencies or perceived deficiencies in CVR's product and service level.

**REQUEST NO. 55.**  All documents and communications concerning the product quality or perceived product quality of CVR's competitors, including but not limited to MVSC.

**REQUEST NO. 56.**  All documents and communications regarding any delays or backlogs by CVR in processing vehicle registrations and titles, including but not limited to any such delays or backlogs in California.

**REQUEST NO. 57.**   All documents and communications concerning any advantage or perceived advantage CVR has over its competitors because of CVR's ability to access dealer data stored on the CDK and Reynolds DMSs, whether through the 3PA and RCI programs or otherwise.

**REQUEST NO. 58.**   All documents and communications concerning the costs associated with entering a new EVR market, including costs associated with legal licensing and DMV requirements and capital and technological costs.

**CVR Ownership**

**REQUEST NO. 59.**   Documents sufficient to show CVR's ownership structure, including documents sufficient to show how CVR's revenues and profits are divided between CDK and Reynolds.

**REQUEST NO. 60.**   All documents and communications relating to Reynolds' ownership interest in CVR, including when that interest was acquired; why Reynolds acquired that interest; from whom Reynolds acquired that interest; how much Reynolds paid for that ownership interest; and what Reynolds' rights are with respect to its ownership interest.

**REQUEST NO. 61.**   All documents and communications relating to the financial benefits received by Reynolds and CDK relating to their ownership interest in CVR, including any allocated profits or other financial benefit, from 2011 to the present.

**REQUEST NO. 62.**   All iterations of CVR's organizational chart from 2011 to the present.

**REQUEST NO. 63.**   All documents concerning CDK's involvement in the operation of CVR, including but not limited to CDK's involvement in CVR's management, budget and

14

capital investments, hiring, firing, personnel decisions, salary and bonus allotments, strategic priorities, sales and marketing efforts, and other daily business activities.

**REQUEST NO. 64.**   All documents and communications between anyone at CVR, on the one hand, and anyone at CDK, on the other, including regarding the operations, finances, and/or management of CVR.

**REQUEST NO. 65.**   All documents concerning Reynolds' involvement in the operation of CVR, including but not limited to Reynolds' involvement in CVR's management, budget and capital investments, hiring, firing, personnel decisions, salary and bonus allotments, strategic priorities, sales and marketing efforts, and other daily business activities.

**REQUEST NO. 66.**   All documents and communications between anyone at CVR, on one hand, and anyone at Reynolds, on the other, including regarding the operations, finances, and/or management of CVR.

**REQUEST NO. 67.**   All communications between CDK and Reynolds regarding CVR.

**REQUEST NO. 68.**   All documents and communications relating to CVR's acquisition of AVRS.  This Request includes, without limitation, the terms of the agreement, documents discussing strategic and financial considerations pertaining to the acquisition, all financial statements and projections provided by AVRS to CVR in connection with the acquisition, all internal and external valuation analyses of AVRS, and all accounting documents that reflect the manner in which the acquisition price was allocated.

**REQUEST NO. 69.**   All documents and communications regarding deficiencies or perceived deficiencies in AVRS's product and service levels after the acquisition.  For the avoidance of doubt, this Request includes not only internal documents and communications but

also communications with third parties (including AVRS's dealer customers) regarding deficiencies or perceived deficiencies in AVRS's product and service level.

**REQUEST NO. 70.**  All documents relating to CVR's Board of Directors or any equivalent governing body for CVR.  This Request has no date limitation.  This Request includes, but is not limited to:

   a.   All documents relating to the composition of CVR's Board of Directors;

   b.   Identification of every member of CVR's Board of Directors through time;

   c.   All materials presented to CVR's Board of Directors;

   d.   All materials considered by CVR's Board of Directors;

   e.   All minutes of meetings of CVR's Board of Directors; and

   f.   All communications between or among CVR's Board of Directors.

**REQUEST NO. 71.**  All communications with any potential acquirer or acquirers of CVR, including any private equity firm.

**Financial Information**

**REQUEST NO. 72.**  All communications between CVR and CDK and/or Reynolds regarding CVR's financial information.

**REQUEST NO. 73.**  All of CVR's financial statements, on a monthly, quarterly, and yearly basis, from 2006 to the present, both cumulative and broken out by state EVR market. This Request includes, without limitation, income statements, balance sheets, and statements of cash flows.

**REQUEST NO. 74.**  Documents regarding CVR's revenues on a monthly, quarterly, and yearly basis, from 2006 to the present, both cumulative and broken out by state EVR market.

PUBLIC VERSION

**REQUEST NO. 75.**  Documents regarding the prices charged by CVR for its EVR services in each state in which it operates.

**REQUEST NO. 76.**  Documents sufficient to show CVR's profit (including profit margins), and costs for providing EVR services, on a monthly basis, from January 1, 2006 to the present, both cumulative and broken out by state EVR market.

**REQUEST NO. 77.**  Documents regarding CVR's financial projections from January 1, 2006 to the present.  For the avoidance of doubt, this Request includes, without limitation, documents and communications relating to estimates, forecasts, and budgets for revenue, profit, and costs associated with CVR's provision of EVR services.

**REQUEST NO. 78.**  All documents and communications You relied upon from January 1, 2006 to the present in creating projections, estimates, forecasts, and budgets for revenue, profit, and costs associated with Your provision of EVR services.

**REQUEST NO. 79.**  All documents and communications concerning CVR's operational costs, revenues, profitability, and financial projections and forecasts, from 2006 to present.

**REQUEST NO. 80.**  All documents concerning Your cost of capital, cost of equity, cost of debt, and/or weighted average cost of capital, including any documents upon which any of the foregoing are based.

**REQUEST NO. 81.**  All documents concerning the economic value of data or data access to dealers, vendors, or DMS providers, including any economic value placed by You on Your ability to access dealer data through the 3PA and RCI programs.

**REQUEST NO. 82.**  Documents sufficient to show transactional sales data (including sales, profit, and cost data) on a per-customer and per-transaction basis for EVR services from

January 1, 2006 to the present. For the avoidance of doubt, this Request includes, without limitation, the following data linked to each EVR transaction:

    a. Date and location of transaction;

    b. EVR dealer customer;

    c. Specific EVR service purchased;

    d. Information tied to the specific EVR service purchased, including the unit price, unit cost, quantity, and applicable discounts;

    e. Order number and other identifying order information; and

    f. Any documents necessary to interpret the contents of these data fields, including abbreviation keys and explanations.

**REQUEST NO. 83.** All reports and analyses pertaining to CVR's marketing and sales of EVR services from January 1, 2009 to the present. For the avoidance of doubt, this Request includes, without limitation:

    a. Sales reports;

    b. Sales representative performance reports;

    c. Marketing plans;

    d. Marketing reports, including sales promotions and discounts;

    e. Strategic plans, including pricing strategy;

    f. Cost accounting reports;

    g. General ledger reports;

    h. Charts of accounts;

    i. Analyses of competitive position, including market share; and

    j. Profit and loss reports.

PUBLIC VERSION

**REQUEST NO. 84.**  All documents and communications concerning any valuations – whether internal or external – of CVR, from January 1, 2009 to the present.  These valuations include, without limitation, those prepared by outside auditors, independent valuation consultants, or representatives from CDK or Reynolds.  This Request includes, without limitation, formal valuation studies and impairment tests of value.

**REQUEST NO. 85.**  All documents and communications concerning internal and external valuations of Reynolds' and/or CDK's ownership interests in CVR from January 1, 2009 to the present.

**Miscellaneous**

**REQUEST NO. 86.**  All documents concerning any training provided by You to Your employees regarding antitrust or competition laws.

**REQUEST NO. 87.**  All documents concerning "hostile integration" or use of non-authorized usernames or passwords to extract data from the CDK or Reynolds platforms.

**REQUEST NO. 88.**  All documents and communications from January 1, 2009 to the present concerning industry publications or industry reports with respect to EVR services.

**REQUEST NO. 89.**  All documents sufficient to identify all dealers that that have switched from using CVR to using MVSC for EVR, or vice versa (by dealer name, the effective date of the switch, and the number of stores switched), and documents relating to reasons for the switch.

**REQUEST NO. 90.**  All documents relating to the reasons why any customer or potential customer selects one EVR provider over another.

**REQUEST NO. 91.**   All documents referring to complaints about any EVR provider, including but not limited to complaints by your dealer customers regarding the functionality or capabilities of your products and services.

**REQUEST NO. 92.**   All contracts or agreements with dealers relating to your EVR services or products.

**REQUEST NO. 93.**   All communications and documents exchanged between you and any other EVR provider.

**REQUEST NO. 94.**   All documents relating or referring to the RCI or 3PA program, including pricing, security protocols, and any terms of access.

**REQUEST NO. 95.**   All documents and communications referring or relating to your applications or requests to participate in RCI or 3PA.

**REQUEST NO. 96.**   All documents relating any analysis, evaluation, assessment, communication or discussion of access to dealership data through RCI or 3PA as compared to any other method, such as access through an independent data integrator or directly from a dealership.

**REQUEST NO. 97.**   All documents referring or relating to complaints about Reynolds, RCI, CVR, CDK or 3PA, including but not limited to complaints by your dealer customers.

**REQUEST NO. 98.**   All documents referring or relating to efforts by CVR to acquire MVSC's EVR customers in any state.

**REQUEST NO. 99.**   All documents referring to CDK's and/or Reynolds' efforts to prevent any independent data integrator from accessing a Reynolds DMS or CDK DMS.

**REQUEST NO. 100.** All documents sufficient to show payments made by You to any independent data integrator.

PUBLIC VERSION

**REQUEST NO. 101.** All documents sufficient to show when You started or stopped using any independent data integrator, and the reasons therefor.

**REQUEST NO. 102.** Your contracts or agreements with any independent data integrator.

**REQUEST NO. 103.** All documents and communications relating to CVR's data security or cybersecurity policies, guidelines, and practices.

**REQUEST NO. 104.** All documents or communications relating to CVR's internal or external security audits.

**REQUEST NO. 105.** All documents and communications relating to any data breach, system breach, or hack suffered by or thwarted by CVR.

**REQUEST NO. 106.** All documents and communications relating to any data security or cybersecurity training provided to CVR employees.

**REQUEST NO. 107.** All documents identifying the type of data or information CVR needs from a Reynolds DMS or CDK DMS in order to provide EVR services.

**REQUEST NO. 108.** All documents identifying the type of data or information CVR actually obtains from a Reynolds DMS or CDK DMS.

**REQUEST NO. 109.** All documents and communications exchanged between CVR and dealers describing how CVR accessed or planned to access the DMS system for that dealer in order to provide services.

**REQUEST NO. 110.** All of CVR's competitive analyses, strategic plans, long-range plans, business plans, marketing plans, and forecasts, and any documents referring or relating to these materials.

**REQUEST NO. 111.** Without limitation as to time, all communications or documents that you sent to or received from the Federal Trade Commission or U.S. Department of Justice

relating to CDK, Reynolds, Authenticom, the EVR market, the DMS market, or the data

integration market.


Dated:  August 30, 2018                    Respectfully submitted,

*/s/ Derek T. Ho*

Derek T. Ho
Michael N. Nemelka
Aaron M. Panner
Daniel V. Dorris
Christine Bonomo
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
dho@kellogghansen.com
mnemelka@kellogghansen.com
apanner@kellogghansen.com
ddorris@kellogghansen.com
cbonomo@kellogghansen.com

*Attorneys for Individual Plaintiffs*

**PUBLIC VERSION**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 30, 2018, I caused a true and correct copy of the foregoing

Individual Plaintiffs' First Set of Requests for the Production of Documents for Defendant

Computerized Vehicle Registration to be served by email upon the following recipients:

SERVICE-EXTERNAL-DMS-MDL@lists.kellogghansen.com

*/s/ Derek T. Ho*
Derek T. Ho

PUBLIC VERSION

# EXHIBIT 6

**PUBLIC VERSION**

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
———
(202) 326-7900
FACSIMILE:
(202) 326-7999

September 10, 2018

*Via Electronic Mail*
Britt M. Miller, Esq.
Mayer Brown
71 South Wacker Drive
Chicago, IL 60606

　　　　　Re:  CVR Custodians

Dear Britt:

　　　　I write to follow up on the document requests issued to Computerized Vehicle Registration.  Consistent with our prior discussions and correspondence on this issue, we would like to discuss our previously requested CVR document custodians.

　　　　On May 25, 2018, we requested the following document custodians for CVR (including custodians associated with AVRS, which CVR acquired):

1. Jim Quinlan
2. Janet Michaels
3. Scott Dudley
4. Scott Bahr

5. Jim Negrette
6. Bob Reiger
7. Rick Francis
8. John Roeder

9. Tony Limtiaco
10. Jose Ramirez
11. Nikki Nazaroff

　　　　For descriptions of each requested custodian, and an explanation for why they should be included as custodians in this case, please see our May 25, 2018 letter.  Please let us know by this Wednesday which of these CVR custodians you will agree to so that we know whether we have a dispute with respect to any.

　　　　　　　　　Very truly yours,

　　　　　　　　　*s/ Michael N. Nemelka*

　　　　　　　　　Michael N. Nemelka

PUBLIC VERSION

# GZJ KDKV'9

| Term # | Plaintiffs' Proposed Search Term(s) |
|---|---|
| 1. | *@cdk.com OR *@adp.com |
| 2. | *@reyrey.com |
| 3. | (*@cdk.com OR *@adp.com OR *@reyrey.com) AND (MVSC OR Vitu OR RTS OR triVIN OR TitleTech OR ADD123 OR AIB OR DDI OR "Decision Dynamics" OR DLRdmv) |
| 4. | (*@cdk.com OR *@adp.com OR *@reyrey.com) AND (MVSC OR Vitu OR RTS OR triVIN OR TitleTech OR ADD123 OR AIB OR DDI OR "Decision Dynamics" OR DLRdmv) AND (access* OR poll* OR extract* OR integrat* OR data) |
| 5. | (*@cdk.com OR *@adp.com OR *@reyrey.com) AND (MVSC OR Vitu OR RTS OR triVIN OR TitleTech OR ADD123 OR AIB OR DDI OR "Decision Dynamics" OR DLRdmv) AND (pric* OR fee OR rate OR cost) |
| 6. | 3PA OR "Third Party Access" OR RCI OR "Reynolds Certified Interface" OR access OR poll* OR extract* OR integrat* OR data |
| 7. | 3PA OR "Third Party Access" OR RCI OR "Reynolds Certified Interface" OR access OR poll* OR extract* OR integrat* OR data OR Authenticom OR DealerVault OR SIS OR SelectQu OR SelectQ OR "Superior Integrated Solutions" OR StoneEagle OR ProQuotes OR DMI OR IntegraLink |
| 8. | (hostile OR scrap* OR emulat* OR poll* OR pull* OR integrat* OR extract* OR Authenticom OR DealerVault OR SIS OR SelectQu OR SelectQ OR "Superior Integrated Solutions" OR StoneEagle OR ProQuotes OR DMI OR IntegraLink OR 3PA OR "Third Party Access" OR RCI OR "Reynolds Certified Interface") AND (pric* OR fee OR rate OR cost) |
| 9. | (3PA OR "Third Party Access" OR RCI OR "Reynolds Certified Interface") AND (pric* OR fee OR rate OR cost) |
| 10. | 3PA OR "Third Party Access" |
| 11. | RCI OR "Reynolds Certified Interface" |
| 12. | (Tilt* AND field) OR "natural advantage" OR "tilt the table" or (tilt w/3 table) ((DMS OR data) W/5 (block* OR restrict* OR disable* OR "cut off")) (access* OR scrap* OR emulat* OR poll* OR pull* OR integrat* OR extract*) W/5 (block* OR restrict* OR disable* OR stop* OR "cut off") AND (third party OR compet* OR non-Reynolds OR non-CDK) |
| 13. | "general ledger" AND access* |
| 14. | "category restriction*" |
| 15. | "CVR Category" |
| 16. | (open* w/5 categ*) OR (close* w/5 categ*) |
| 17. | (3PA OR "Third Party Access" OR RCI OR "Reynolds Certified Interface" OR access OR poll* OR extract* OR integrat* OR data) AND (MVSC OR Vitu OR RTS OR TitleTech OR ADD123 OR AIB OR DDI OR "Decision Dynamics" OR DLRdmv) |
| 18. | (3PA OR "Third Party Access" OR RCI OR "Reynolds Certified Interface" OR access OR poll* OR extract* OR integrat* OR data) AND (MVSC OR Vitu OR RTS OR triVIN OR TitleTech OR ADD123 OR AIB OR DDI OR "Decision Dynamics" OR DLRdmv) AND (pric* OR fee OR rate OR cost) |

| | |
|---|---|
| 19. | (RTS OR triVIN OR TitleTech OR ADD123 OR AIB OR DDI OR "Decision Dynamics" OR DLRdmv) AND (3PA or "Third Party Access" or RCI OR "Reynolds Certified Interface") |
| 20. | MVSC OR Vitu OR RTS OR triVIN OR TitleTech OR ADD123 OR AIB OR DDI OR "Decision Dynamics" OR DLRdmv |
| 21. | (hostile OR scrap* OR emulat* OR ((poll* OR pull*) w/10 DMS) OR integrat* OR extract* OR Authenticom OR DealerVault OR SIS OR SelectQu OR SelectQ OR "Superior Integrated Solutions" OR StoneEagle OR ProQuotes OR DMI OR IntegraLink OR 3PA OR "Third Party Access" OR RCI OR "Reynolds Certified Interface") |
| 22. | "data access fee*" OR ((3PA OR "Third Party Access" or RCI or "Reynolds Certified Interface" OR hostile OR scrap* OR emulat* OR poll* OR pull* OR integrat*) w/10 (pric* OR fee OR rate OR cost)) |
| 23. | (MVSC OR Vitu OR RTS OR triVIN OR TitleTech OR ADD123 OR AIB OR DDI OR "Decision Dynamics" OR DLRdmv) |
| 24. | (pric* OR fee OR rate OR cost) w/10 (EVR or "electronic vehicle registration" or service*) |
| 25. | (government OR govt OR "gov" OR state) w/25 fee* |
| 26. | (government OR govt OR "gov" OR state) w/25 (cap OR max*) |
| 27. | To/from: *.gov |
| 28. | (market w/5 share) OR (new w/3 state) OR (new w/3 territory) OR (enter w/3 market) OR (enter w/3 state) OR (expand w/5 territory) OR (expand w/5 state) |
| 29. | MVSC OR Vitu OR RTS OR triVIN OR TitleTech OR ADD123 OR AIB OR DDI OR "Decision Dynamics" OR DLRdmv OR "competitive intelligence" |
| 30. | ((California OR CA) w/5 (EVR or "electronic vehicle registration")) OR ((Illinois OR IL) w/5 (EVR or "electronic vehicle registration")) OR ((Virginia or VA) w/5 (EVR or "electronic vehicle registration")) |
| 31. | (new w/3 state) OR (new w/3 territory) OR (enter w/3 market) OR (enter w/3 state) OR (expand w/5 territory) OR (expand w/5 state) OR (exit w/3 market) OR (exit w/3 state) OR (exit w/3 territory) OR (leave w/3 market) OR (leave w/3 state) OR (leave w/3 territory) |
| 32. | (threat* OR compet* OR presence OR grow* OR pressur*) w/20 (market* OR share OR enter* OR penetrat* OR danger*) |
| 33. | (market w/3 anal*) OR (comp* /3 anal*) |
| 34. | Armstrong OR Kimball OR Nemelka OR Brueggeman OR Bulusu |
| 35. | (MVSC OR "motor vehicle software" OR Vitu OR DMVDesk OR "DMV Desk" OR *@vitu.com OR *@dmvdesk.com OR *@mvscusa.com) AND (exec* OR officer OR CEO OR president OR chairman OR COO OR chief) |
| 36. | (Don OR Kelly OR Joseph OR Joe OR John OR Napa) AND (MVSC OR "motor vehicle software" OR Vitu OR DMVDesk OR "DMV Desk" OR *@vitu.com OR *@dmvdesk.com OR *@mvscusa.com) |
| 37. | (acqui* OR purchas* OR invest* OR buy* OR bought OR obtain* OR merg* OR consolidat*) AND (RTS OR triVIN OR TitleTech OR ADD123 OR AIB OR DDI OR "Decision Dynamics" OR DLRdmv) |

| | |
|---|---|
| 38. | (Armstrong OR Kimball OR Nemelka OR Brueggeman OR Bulusu OR MVSC OR "motor vehicle software" OR Vitu OR DMVDesk OR "DMV Desk" OR *@vitu.com OR *@dmvdesk.com OR @mvscusa.com) AND (acquir* OR purchas* OR invest* OR buy* OR bough* OR merg* OR consolidat*) |
| 39. | (block* OR disable* OR remove* OR exclude OR clos* OR lock OR disrupt* OR restrict OR shut OR suspend OR "cut" OR stop* OR secur* OR interrupt* OR hostile OR *authoriz*) AND (Authenticom OR Dealervault OR "Dealer Vault" OR SIS OR "Superior Integrat* Solutions" OR ProQuotes OR StoneEagle OR SelectQ* OR integrat* OR poll* OR extract* OR access* OR pull* OR emulate* OR scrape OR retrieve OR gather* OR produc* OR report* OR enter) AND (MVSC OR Vitu OR RTS OR triVIN OR TitleTech OR ADD123 OR AIB OR DDI OR "Decision Dynamics" OR DLRdmv) |
| 40. | (MVSC OR Vitu OR RTS OR triVIN OR TitleTech OR ADD123 OR AIB OR DDI OR "Decision Dynamics" OR DLRdmv) AND (Authenticom OR Dealervault OR "Dealer Vault" OR SIS OR "Superior Integrat* Solutions" OR ProQuotes OR StoneEagle OR SelectQ* OR integrat* OR poll* OR extract* OR access* OR pull* OR emulate* OR scrape OR retrieve OR gather* OR produc* OR report* OR enter) |
| 41. | Authenticom OR Dealervault OR "Dealer Vault" OR SIS OR "Superior Integrat* Solutions" OR ProQuotes OR StoneEagle OR SelectQ* OR DMI OR IntegraLink OR integrat* OR poll* OR extract* OR access* OR pull* OR emulate* OR scrape OR retrieve OR gather* OR produc* OR report* OR enter |
| 42. | Authenticom OR DealerVault OR DV OR Acom OR Cottrell OR SIS OR Batiste |
| 43. | ("realtime" OR "real time" OR "bi-directional" OR bidirectional OR "two-way" OR twoway OR instant OR push) w/5 (integrat* OR DMS) |
| 44. | "Assembly Bill No. 516" OR ("assembly bill" w/3 516) OR (bill w/3 516) OR ("AB 516") |
| 45. | CVR w/10 (inferior OR compar* OR deficient OR quality OR perform* OR worse OR delay* OR prefer*) |
| 46. | (MVSC OR Vitu OR RTS OR triVIN OR TitleTech OR ADD123 OR AIB OR DDI OR "Decision Dynamics" OR DLRdmv) AND (quality OR perform* OR review OR prefer* OR satisf*) |
| 47. | ((backlog* OR delay* OR (too w/5 time) OR (too w/5 long) OR unacceptable OR unsustain* OR sustain*)) AND (((vehicle OR car) w/10 regist*) OR ((vehicle OR car) w/10 titl*)) |
| 48. | CVR AND (3PA or "Third Party Access" or RCI or "Reynolds Certified Interface" or certif* or (data w/3 access) or (DMS w/3 access)) AND (MVSC OR Vitu OR RTS OR triVIN OR TitleTech OR ADD123 OR AIB OR DDI OR "Decision Dynamics" OR DLRdmv) |
| 49. | (cost* OR expense*) AND ((new w/5 market) OR (new w/5 state)) |
| 50. | ("Reynolds and Reynolds" OR "Reynolds & Reynolds" OR Reynolds OR R&R OR ReyRey) w/20 (interest OR own* OR share OR alloc* OR acqui*) |
| 51. | ((dividend OR shareholder) w/5 payout) OR (profit w/5 (alloc* OR payout)) |

| 52. | (manag* OR budget* OR capital* OR invest* OR hir* OR fir* OR personnel OR salary OR bonus OR strategy* OR priorit* OR sales OR market* OR operat* OR headcount OR staff* OR employ*) AND (ADP OR CDK OR *@cdk.com OR *@adp.com OR Herbers or Karp OR "Reynolds and Reynolds" OR "Reynolds & Reynolds" OR Reynolds OR R&R OR ReyRey OR *@reyrey.com OR Schaefer) |
| --- | --- |
| 53. | (manag* OR budget* OR capital* OR invest* OR hir* OR fir* OR personnel OR salary OR bonus OR strategy* OR priorit* OR sales OR market* OR operat* OR headcount OR staff* OR employ*) AND (*@cdk.com or *@adp.com) |
| 54. | (*@adp.com OR *@cdk.com) AND *@reyrey.com |
| 55. | "Project Ledson" OR Ledson OR (AVRS AND (acqui* OR purchas* OR invest* OR buy* OR bought OR obtain* OR merg* OR consolidat*)) |
| 56. | AVRS AND (complain* OR inferior OR deficien* OR declin* OR service OR comparison* OR "go* down" OR poor OR disappoint*) |
| 57. | "board of directors" OR (CVR w/5 board) |
| 58. | (merge* OR acqui* OR buyer OR buyout OR "buy out" OR purchase* OR PE OR "private equity") w/20 (CVR OR us) |
| 59. | (pric* or fee* or charg*) w/10 (CVR OR EVR OR "electronic vehicle registration" OR service*) |
| 60. | (forecast* OR projection OR revenue* OR profit* OR cost* OR income OR sale* OR turnover OR "bottom line" OR "top line" OR EBITA OR "P and L" OR "P&L" OR liabilit* OR debt OR credit OR budget OR overhead OR COGs OR "cost of services" or COS "cost of sales" OR margin* OR balance OR "cash flow*") |
| 61. | (capital w/3 cost) OR (equity w/3 cost) OR (debt w/3 cost) OR ((average or avg) w/3 capital) |
| 62. | ((Data w/5 valu*) w/20 (DMS or access)) OR ((Access AND restrict) w/15 valu*) |
| 63. | (P&L OR Budget OR Margin OR Revenue OR Marketing) w/5 (projection OR Analy* OR plan OR "financial statement") |
| 64. | valuation |
| 65. | (antitrust OR competition) AND (training OR class OR education OR seminar) |
| 66. | (DealerVault or Authenticom or SelectQu or SelectQ or "Superior Integrated Solutions" or SIS or StoneEagle or "Stone Eagle" or ProQuotes) w/25 (login or "log in" or credential* or password* or pwd or psk or username or user) |
| 67. | (EVR or "Electronic Vehicle Registration") AND (automotive news OR banks report OR autotrader OR (industry W/3 news) OR WardsAuto OR "Driving Sales" OR DealerRefresh OR "Digital Dealer" OR "Dealers Association" OR "Automotive Digest" OR "Woods and Seaton") |
| 68. | ((dealer* OR Dealership* OR dlr* OR "auto group" OR "automotive group") w/10 (CVR OR MVSC OR Vitu OR RTS or triVIN OR TitleTech OR ADD123 OR AIB OR DDI OR "Decision Dynamics" OR DLRdmv)) AND (switch OR chang* OR trap* OR "down time" OR downtime OR transition* OR stuck) |
| 69. | (dealer* OR Dealership* OR dlr* OR "auto group" OR "automotive group" OR "auto sales" OR "Motor sales" OR customer OR vendor*) w/5 (lost or loss or lose or win* or gain* or churn* or defect* or turnover or "turn over" or switch or chang* or mov*) |
| 70. | "win loss report" OR "W/L report" |

| 71. | (complain* OR inferior OR deficien* OR declin* OR service OR comparison* OR "go* down" OR poor OR disappoint*) AND (EVR OR ((vehicle OR title* OR electronic) w/10 (titling* OR regist*))) |
|---|---|
| 72. | *@dmvdesk.com OR *@vitu.com OR *@avrs.com OR *@dditechnology.com OR *@aibtexas.com OR *@add123.com OR *@autopoint.com OR *@titletec.com OR *@dealertrack.com OR *@trivin.com OR *@dlrdmv.com |
| 73. | 3PA OR "Third Party Access" OR RCI or "Reynolds Certified Interface" |
| 74. | (3PA OR "Third Party Access" OR RCI or "Reynolds Certified Interface") AND appli* |
| 75. | (ADP OR CDK OR "Reynolds and Reynolds" OR "Reynolds & Reynolds" OR R&R OR ReyRey OR 3PA OR "Third Party Access" OR RCI OR "Reynolds Certified Interface" OR CVR) AND (complain* OR inferior OR deficien* OR declin* OR service OR comparison* OR "go* down" OR poor OR disappoint*) |
| 76. | (acqui* OR flip) AND (MVSC or Vitu) |
| 77. | ((DMS OR "dealer management system") w/8 (block* OR restrict* OR disable*OR stop* OR "cut off")) OR AND ((third party OR 3d party OR non-Reynolds or competit*) OR ((Lever* OR edge OR favor* OR advantage*) w/5 (DMS OR "dealer management system"))) AND app* |
|  | ((access* OR scrap* OR emulat* OR poll* OR pull* OR integrat* OR extract*) w/5 (block* OR restrict* OR disable* OR stop* OR "cutoff")) AND ((third party OR 3d party OR non-Reynolds or competit*) OR ((Lever* OR edge OR favor* OR advantage*) w/5 (DMS OR "dealer management system"))) AND app* |
| 78. | ((secur* or cyber* or infosec) w/3 (protocol* or manual* or polic* or strateg*)) OR "Open Secure Access" or OSA or "Automotive Retail Data Security Guidelines or "STAR" or "Standards for Technology in Automotive Retail" |
| 79. | secur* AND audit |
| 80. | (data OR secur* OR cyber* OR system OR network OR comput*) w/3 breach* |
| 81. | (train OR seminar OR class OR education) AND (secur* or cyber* or infosec) |
| 82. | (3PA OR "Third Party Access" OR RCI or "Reynolds Certified Interface" OR Authenticom OR Dealervault OR "Dealer Vault" OR SIS OR "Superior Integrat* Solutions" OR ProQuotes OR StoneEagle OR SelectQ* OR DMI OR IntegraLink OR integrat* OR poll* OR extract* OR access* OR pull* OR emulate* OR scrape OR retrieve OR gather* OR produc* OR report* OR enter) AND DMS |
| 83. | CID |
| 84. | CFAA or "computer fraud and abuse" |
| 85. | (*@cdk.com OR *@adp.com) AND (*@avrs.com OR AVRS OR "CDK Vehicle Registration" OR "Reynolds Vehicle Registration" OR Ledson OR EVR OR (vehicle OR title* OR electronic) w/10 (titling* OR regist*)) |
| 86. | compet* w/10 (Dealer or franchis* or DMS or Drive or Dash or ODE or "Open Dealer Exchange" or CVR or "computerized vehicle registration" or AVRS or DMI or "Digital Motorworks" or "Digital Motor Works" or Integralink or RCI or "certified interface" or 3PA or "Partner Program" or "access program" or integrat* or app* or solution*) |
| 87. | (SelectQu OR "Superior Integrated Solutions" OR SIS OR "Stone Eagle" OR ProQuotes OR AutoLoop OR "Phil B" OR "Phillip B" OR Battista) w/8 (compet* OR stand* OR pause* OR target* or "hands off") |

| 88. | (Armstrong OR Kimball OR Nemelka OR Brueggeman OR Bulusu OR MVSC OR "motor vehicle software" OR Vitu OR DMVDesk OR "DMV Desk" OR *@vitu.com OR *@dmvdesk.com OR *@mvscusa.com) |
|---|---|
| 89. | (Armstrong OR Kimball OR Nemelka OR Brueggeman OR Bulusu OR MVSC OR "motor vehicle software" OR Vitu OR DMVDesk OR "DMV Desk" OR *@vitu.com OR *@dmvdesk.com OR *@mvscusa.com) AND (California OR Calif. OR CA OR IL OR Ill. OR Virginia OR VA OR Va OR Oregon OR Ore OR expan* OR threat* OR compet* OR presence OR grow* OR pressur*) |
| 90. | (Armstrong OR Kimball OR Nemelka OR Brueggeman OR Bulusu OR MVSC OR "motor vehicle software" OR Vitu OR DMVDesk OR "DMV Desk" OR *@vitu.com OR *@dmvdesk.com OR *@mvscusa.com) AND (*@cdk.com OR *@adp.com OR *@digitalmotorworks.com OR *@integralink.com OR *@reyrey.com) |
| 91. | (Armstrong OR Kimball OR Nemelka OR Brueggeman OR Bulusu OR MVSC OR "motor vehicle software" OR Vitu OR DMVDesk OR "DMV Desk" OR *@vitu.com OR *@dmvdesk.com OR *@mvscusa.com) w/25 (3PA OR RCI OR "third party" OR "3rd party" OR "third-party" OR (Reynolds w/10 (hub OR interface OR agreement)) OR integrat* OR access) |
| 92. | (Armstrong OR Kimball OR Nemelka OR Brueggeman OR Bulusu OR MVSC OR "motorvehicle software" OR Vitu OR DMVDesk OR "DMV Desk" OR *@vitu.com OR *@dmvdesk.com OR @mvscusa.com) w/25 ((DMS w/10 (data OR access)) OR "managed interface" OR appl* OR certif* OR approv* OR pric* OR term* OR top-line OR "top line" OR danger* OR compet* OR participat* OR permit* OR integrat*) |
| 93. | (Armstrong OR Kimball OR Nemelka OR Brueggeman OR Bulusu OR MVSC OR "motor vehicle software" OR Vitu OR DMVDesk OR "DMV Desk" OR *@vitu.com OR *@dmvdesk.com OR *@mvscusa.com) AND (block* OR disable* OR remove* OR exclude OR clos* OR lock OR disrupt* OR restrict OR shut OR suspend OR "cut" OR stop* OR secur* OR interrupt* OR hostile OR *authoriz*) |
| 94. | ("CDK Vehicle Registration" OR"Reynolds Vehicle Registration") AND (California OR Illinois OR CA OR IL OR Calif. OR Ill.) AND (expan* OR new OR threat* OR compet* OR presence OR grow* OR pressur* OR (number* w/10 dealer*) OR market* OR *share OR analy* OR assess* OR consult* OR examin* OR customer* OR forecast* OR project* OR revenue*) |

PUBLIC VERSION

# EXHIBIT 8

PUBLIC VERSION

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
———
(202) 326-7900
FACSIMILE:
(202) 326-7999

September 18, 2018

*Via Electronic Mail*

Matthew D. Provance
Mayer Brown
71 South Wacker Drive
Chicago, IL 60606

      Re:    CVR Custodians and Search Terms

Dear Matt:

I write in response to your September 14 letter regarding proposed document custodians for Computerized Vehicle Registration ("CVR"), as well as regarding search terms for CVR's document custodians.

For the reasons we have previously explained during our past discussions, as well as for the explanations provided in our May 25 letter, we do not believe that our initial proposal of 11 document custodians for CVR is unreasonable. But in the spirit of compromise, we are willing to limit the proposed CVR document custodians to the following individuals:

1. Jim Quinlan
2. Janet Michaels
3. Jason Bonifay
4. Scott Dudley
5. Jim Negrette
6. Rick Francis
7. John Roeder
8. Mark Kithcart

With respect to Scott Herbers, he already is a document custodian for CDK search terms; we assumed, given his position at CVR, that CVR search terms would also be run for him. Please confirm that is the case. Finally, with respect to Mark Kithcart, his role and importance at CVR more recently came to our attention, and so we respectfully ask that he be included as a custodian as well.

Please find attached proposed search terms for CVR's custodians.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

Matthew D. Provance
September 18, 2018
Page 2

      We look forward to meeting and conferring with you and discussing these proposed custodians and search terms.  You had proposed talking today or tomorrow at 4:00 p.m. CT.  Given our substantive response to your letter contained herein, you may need more time to consider our proposal than today or tomorrow provides.  Nevertheless, we are available at both times, or on Thursday at 9:30 a.m. CT.  Please let us know what works best for you.

                        Very truly yours,

                        *s/ Michael N. Nemelka*

                        Michael N. Nemelka

cc:   MDL External Service List

PUBLIC VERSION

# EXHIBIT 7

# FILED UNDER SEAL

PUBLIC VERSION

# EXHIBIT 10

PUBLIC VERSION

MAYER·BROWN

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel +1 312 782 0600
Main Fax +1 312 701 7711
www.mayerbrown.com

September 14, 2018

Matthew D. Provance
Direct Tel +1 312 701 8598
Direct Fax +1 312 706 9397
mprovance@mayerbrown.com

BY E-MAIL

Michael N. Nemelka
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 60036

Re:     *In re Dealer Management Systems Antitrust Litig.*,
        MDL No. 2817, Case No. 18-CV-864 (N.D. Ill.)

Dear Mike:

I write regarding Individual Plaintiffs' September 10 letter regarding proposed document custodians for Computerized Vehicle Registration ("CVR"). Reserving all rights, we would like to meet-and-confer, and are available on Tuesday or Wednesday afternoon (September 17 or 18), after 4:00 p.m. (Central). Please let us know if either time works for you.

Despite your letter, Individual Plaintiffs' request for 11 additional CVR document custodians is not "[c]onsistent with our prior discussions and correspondence on this issue." As you know, Individual Plaintiffs originally proposed 13 custodians for CVR. Our last correspondence on the matter—which was exchanged more than three months ago—indicated that we were likely to agree to four of those proposed custodians: Jim Quinlan, Janet Michaels, Jason Bonifay, and Scott Herbers. *See* 06/12/18 Ltr. from M. Provance to M. Nemelka at 4. Nonetheless, it appears that Plaintiffs' original proposal for CVR custodians remains unchanged, with the exception of Scott Herbers (who has since been made a custodian by CDK) and Jason Bonifay.

CVR is a relatively small organization. It is named as a Defendant in a single case, where there are only a handful of allegations directed towards its purported conduct.[1] As you know, we do not believe that the claims asserted against CVR should proceed and that MVSC's allegations will again not survive CVR's motion to dismiss. Further, we do not agree that 11 CVR document custodians—on top of the 59 document custodians that Defendants have already agreed to—is reasonable or proportional to the needs of the case. That is almost twice the number of custodians designated for MVSC (which has agreed to 6 custodians), more than twice the number of custodians designated for AutoLoop (which has agreed to only 5 custodians), and even more than the 10 custodians collectively designated for Cox Automotive, Autotrader.com, Inc., Dealer Dot Com, Inc., Dealertrack, Inc., HomeNet, Inc., Kelley Blue Book Co., Inc., vAuto,

---

[1] Indeed, plaintiff Authenticom, AutoLoop, and Cox Automotive's attempt to serve 111 *party* document requests on CVR is improper as CVR is not a defendant in any of those actions, an issue that we will address in connection with those RFPs.

Mayer Brown LLP                                                        PUBLIC VERSION

Michael N. Nemelka
September 14, 2018
Page 2

Inc., VinSolutions, Inc., and Xtime combined, despite the fact that the Cox Automotive family of
companies is easily orders of magnitude larger than CVR.

Sincerely,


/s/ Matthew D. Provance
Matthew D. Provance

cc:     Lead MDL Plaintiff Counsel of Record
        Reynolds Counsel of Record
        Mark Ryan
        Britt Miller
        Andrew Marovitz

PUBLIC VERSION

# EXHIBIT 11

```
1                IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
2                          EASTERN DIVISION

3     IN RE                        )   Docket No. 18 C 864
                                   )
4     DEALER MANAGEMENT SYSTEMS    )   Chicago, Illinois
      ANTIRUST LITIGATION          )   August 16, 2018
5                                  )   9:21 a.m.
                                   )
6
                        TRANSCRIPT OF PROCEEDINGS
7          BEFORE THE HONORABLE ROBERT M. DOW, JR.

8
      APPEARANCES:
9
      For the Plaintiffs,
10    Authenticom, et al.:   KELLOGG, HANSEN, TODD, FIGEL &
                               FREDERICK, PLLC, by
11                             MR. DEREK TAM HO
                               MR. JOSHUA HAFENBRACK
12                             1615 M Street, N.W.
                               Suite 400
13                             Washington, District of Columbia  20036
                               (202) 236-7931
14                             Dho@kellogghansen.com
                               Jhafenbrack@kellogghansen.com
15
      For the Dealer
16    Plaintiffs:             MILBERG LLP, by
                               MS. PEGGY J. WEDGWORTH
17                             1 Penn Plaza
                               Suite 4800
18                             New York, New York  10119
                               (212) 631-8622
19                             pwedgworth@milberg.com

20

21    Court Reporter          KRISTIN M. ASHENHURST, CSR, RDR, CRR
                               Official Court Reporter
22                             United States District Court
                               219 S. Dearborn Street, Suite 2303-A
23                             Chicago, IL 60604
                               (312) 818-6549
24                             kristin_ashenhurst@ilnd.uscourts.gov

25
```

```
 1    APPEARANCES: (CONTINUED)

 2    For the Dealer
      Plaintiffs:              ROBBINS GELLER RUDMAN & DOWD, by
 3                             MR. JAMES E. BARZ
                               200 South Wacker Drive
 4                             Suite 3100
                               Chicago, Illinois  60606
 5                             (312) 674-4674
                               jbarz@rgrdlaw.com
 6

 7    For Defendants CDK
      Global, LLC, and
 8    Computerized Vehicle
      Registration:            MAYER BROWN LLP, by
 9                             MS. BRITT M. MILLER
                               MR. MATTHEW D. PROVANCE
10                             71 South Wacker Drive
                               Chicago, Illinois  60606
11                             (312) 782-0600
                               bmiller@mayerbrown.com
12                             mprovance@mayerbrown.com

13    For Defendant
      The Reynolds and
14    Reynolds Company:        GIBBS & BRUNS, LLP, by
                               MS. AUNDREA K. GULLEY
15                             MR. BRIAN ROSS
                               1100 Louisiana
16                             Suite 5300
                               Houston, Texas  77002
17                             (713) 650-8805
                               agulley@gibbsbruns.com
18                             bross@gibbsbruns.com

19
                               SHEPPARD MULLIN RICHTER
20                             & HAMPTON, LLP, by
                               MR. DYLAN I. BALLARD
21                             Four Embarcadero Center
                               17th Floor
22                             San Francisco, California  94111
                               (415) 434-9100
23                             dballard@sheppardmullin.com

24

25
```

```
 1    APPEARANCES: (Continued)

 2
                                SHEPPARD MULLIN RICHTER
 3                              & HAMPTON, LLP, by
                                MR. LEO CASERIA
 4                              333 South Hope Sreet
                                43rd Floor
 5                              Los Angeles, California 90071
                                (213) 620-1780
 6                              lcaseria@sheppardmullin.com

 7
      ALSO PRESENT:             MR. SCOTT CHERRY,
 8                              General Counsel Reynolds & Reynolds

 9                              MR. JOHN EMMANUAL
                                Assistant General Counsel
10                              Reynolds & Reynolds

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      (The following proceedings were had in open court.)

2          THE CLERK:  18 CV 0864, In Re Dealer Management

3  Systems.

4          MS. MILLER:  Good morning, your Honor.

5          THE COURT:  I've been hearing so many fun cases

6  lately, I just want a local rule passed that all cases must die

7  with the judge, when the judge retires, or takes senior status

8  or whatever, because there's a lot of mysteries I'm resolving

9  these days.

10         Okay.  Good morning, all of you folks.  Nice to see

11  you.

12         MS. GULLEY:  Good morning.

13         THE COURT:  So let's see.  Let me take attendance

14  here.  So for the plaintiffs I see -- I see your counsel here.

15  Okay.  So go ahead and say your names, if you would.

16         MS. WEDGWORTH:  Your Honor, Peggy Wedgworth, on behalf

17  of the class-dealership plaintiffs; along with me is Jim Barz.

18         THE COURT:  And there he is.

19         MR. BARZ:  Good morning, your Honor.

20         THE COURT:  Good morning.

21         MR. HO:  Derek Ho from Kellogg Hansen, also on behalf

22  of the plaintiffs; with me is Joshua Hafenbrack.

23         THE COURT:  Defendants.

24         MS. GULLEY:  Good morning, your Honor.  Andrea Gulley

25  on behalf of the Reynolds and Reynolds Company.  In the back,

1    general counsel Scott Cherry, and assistant general counsel

2    John Emmanual are here.  I've also got Leo Caseria, Dylan

3    Ballard, and Brian Ross.

4        THE COURT:  All right.  You passed the test.  Good

5    morning.

6        MS. GULLEY:  Thanks.

7        MS. MILLER:  Good morning, your Honor.  Britt Miller

8    on behalf of CDK Global, and with me is my partner Matt

9    Provance.

10        THE COURT:  Okay.  What's happened since I last saw

11    you guys a month ago.  So I know I've got, it looks like about

12    a dozen motions to dismiss that are -- some of them from March,

13    and some of them from much more recently.  And there's a

14    briefing schedule on that.  There's the one that's being put

15    off to the side for the moment, which you guys gave me a reply

16    brief on yesterday, and it's your motion to dismiss, right?

17        MS. WEDGWORTH:  Actually, the motion yesterday is a

18    motion to convert Reynolds' motion to dismiss.

19        THE COURT:  It's Reynolds' motion to dismiss, and it's

20    the plaintiff's motion to convert that from 12(b) to 56.

21        MS. WEDGWORTH:  Correct, your Honor.

22        THE COURT:  And from your perspective, you would

23    rather have me decide the 12(b)(3) motion, anyway.

24        MS. GULLEY:  (3), right.  Which is not the subject of

25    that --

1        THE COURT:  And you guys probably would like me to

2   deny the 12(b)(6) and make it a 56.

3        MS. WEDGWORTH:  Correct, your Honor.

4        THE COURT:  Nobody really is put out at the moment,

5   because until I decide the arbitration issue, you're not in a

6   hurry to get your 12(b)(6) resolved.  You want that resolved in

7   the alternative if you don't get arbitration.

8        MS. GULLEY:  That's right, your Honor.  Anyway, most

9   of the arguments to dismiss under 12(b)(6) are shared by CDK,

10  who is not subject to the same motion.  So that will eventually

11  be decided in their motion anyway.

12       THE COURT:  All right.  Let me talk about that motion

13  anyway, the motion to convert.

14       So you guys have cited some of my past cases in there.

15  I just took a quick glance last night.  I have another issue

16  that's a little more pressing than you guys this week and

17  you'll be able to read about it in the papers if you are in

18  Chicago pretty soon.  This is the second biggest case I have.

19  The biggest case I have is the Chicago Police Department

20  consent decree case.  And that's the case I have been working

21  on this week.

22       But you guys are next in line for major attention from

23  me.

24       I will just tell you in the past, though, what I have

25  done in those situations, usually it's -- it's never been an

 1    MDL antitrust case, and usually it's a pro se litigant that

 2    comes in and puts a bunch of stuff in a response to a motion to

 3    dismiss.  And then I'm like, well, you obviously don't know

 4    about Wright vs. whatever it is -- the case that you guys cite.

 5    29 F 3d.  That's the case for what's in and what's out in a

 6    12(b)(6).  What I've often done in this case is to stay

 7    whatever's out, I don't consider, and I still consider it a

 8    12(b)(6).  I know that's not what the plaintiffs want me to do.

 9    What you guys want me to do is look at this and decide that if

10    they have gone over the edge of what's acceptable under

11    12(b)(6), then I just convert it to 56.

12            MS. WEDGWORTH:  Yes, your Honor.

13            THE COURT:  I can't decide what I should do yet

14    because I haven't looked at it carefully enough.  I think I've

15    done that in the past too, where I've just thrown up my hands

16    and said, "It's too far gone, I have to consider this as 56.

17    Or I can just disregard the offending materials and do it as

18    12(b)(6).  I guess I'm going to have to think about that in the

19    context of their briefs, too, --

20            MS. GULLEY:  Right.

21            THE COURT:  -- because if I'm going to resolve the

22    issue, anyway -- I could do whatever I want with you.  I'm

23    going to resolve the issue, and I'm not going to apply it

24    differently when you come around.  But that's all pretty

25    complicated, and it's going to take some focused energy on my

1    part.  And until I get this ruling out in the consent decree

2    case that I have to get out this week, I'm not going to be able

3    to really focus on it.  But I will soon thereafter.  And I will

4    give you whatever guidance I can give you as fast as I can.

5            MS. WEDGWORTH:  Your Honor, my one issue is we are

6    filing a brief on Monday to the motion to dismiss as you're

7    aware.  And as you might recall, it's 100 pages, so it's not a

8    short endeavor.

9            THE COURT:  Mm-hmm.

10           MS. WEDGWORTH:  Some of the issues that are in the

11   motion to convert, and, more importantly, some of the documents

12   that are attached to the motion to dismiss affect how we

13   respond as well.

14           THE COURT:  Mm-hmm.

15           MS. WEDGWORTH:  So the guidance would greatly benefit

16   not only what documents are in or out, but the actual briefing

17   itself for the 12(b)(6) motion.  And to some extent, I do

18   certainly see how one ties into the other.  But these

19   documents, in and of themselves, have so much meat in them that

20   if we need to respond to them in this opposition on Monday,

21   that that changes substantially what we should do.

22           THE COURT:  I understand.  And that's actually one

23   reason why, generally, I just kick the can on this.  But I

24   can't do that for you.  So I think -- I think what I would have

25   to do is give you, like, give you time after I give you

1    guidance to file the briefs.  I know that's going to screw up

2    the whole idea of keeping all of this together, but the fact

3    is, you know, I'm going to push all of these motions to dismiss

4    up the hill at the same time, and it's not going to be a week

5    after the reply brief comes in.  So if your deadlines get

6    pushed back a week, it's not the end of the world.

7           What I can't figure out is how complicated this is

8    going to be just based on what I read last night, which wasn't

9    a lot.  I mean, you guys gave me one brief last Thursday, and

10   the other one last night.  I haven't read either of them

11   carefully enough.  I read them enough to realize that you're

12   citing my own cases back to me, and that some of those cases I

13   remember what I did was just strike the offending documents and

14   the 12(b)(6) with the documents I can consider.

15          But that doesn't help you because you want to file a

16   response brief, and you only want to respond to what you have

17   to respond.  And until I tell you what's in and what's out you

18   can't do it.  I get it.

19          MS. GULLEY:  Your Honor, if I can only address Ms.

20   Wedgworth's argument this way.  The vast majority of these 100

21   pages are going to be legal arguments related to things like

22   "Is this a single-brand aftermarket?"  And, you know, the

23   Section One claims and so forth that are briefed in different

24   ways, but, certainly, the legal issues are the same in both

25   briefs.  One of which is subject to her motion and one is not.

1    And so I really do not think that this -- I mean, I think it's

2    a bit of a red herring that there's a huge influence on the

3    motion.

4              On the other hand, what typically happens, and we said

5    this in our brief, is that this is sort of more pages -- this

6    brief that we're talking about here, the motion to convert, is

7    just more pages that would normally be included in the 100

8    pages that we have.  Right?  Well, you know, to the extent this

9    argument, you know, consider this legal argument, you should

10   not consider these documents.  That's how I've always briefed

11   it before; that's typical in some of your past cases as well.

12   And, therefore, I don't think it changes anything about the way

13   that they brief their brief.  If they want you to not consider

14   the documents, then they can say so within the 100 pages.

15             THE COURT:  They have to argue in the alternative,

16   basically.  What they'd have to say is if you consider these

17   things, here is our argument.  If you strike all of the stuff

18   you shouldn't consider, here's our argument.

19             MS. GULLEY:  I guess another way to handle that would

20   just be if they don't want to argue the documents in the

21   alternative and you rule in some way later, then there could be

22   a supplement on that issue.  They do have 100 pages, so...

23             THE COURT:  No, I know.  I know.

24             MS. WEDGWORTH:  Which we're responding to 100 pages.

25             But, your Honor, just to respond.  Two of the

1    affidavits alone infect the briefing itself.  There are two

2    factual affidavits the defendants have attached.  That infects

3    their entire argument.

4            THE COURT:  Yeah.  Your argument basically is that I

5    should throw my hands up and say, "This is too -- it's too much

6    out of bounds to actually consider this a 12(b)(6).  You have

7    to go to Rule 56."

8            MS. WEDGWORTH:  Yes.  It's not only declarations.

9    There's the Seventh Circuit argument.  There are numerous

10   things included in there that are so far out of bounds this is

11   a -- it goes to 56 at some point.  And we would just ask for a

12   stay of that --

13           THE COURT:  The Seventh Circuit argument, what's that?

14           MS. WEDGWORTH:  With regard to the Authenticom

15   litigation that created our filing of the complaint.  That

16   argument is attached as one of the exhibits to their motion to

17   dismiss.

18           THE COURT:  What is the attachment?

19           MS. GULLEY:  It's the transcript of the hearing in

20   front of Judge Easterbrook and Judge Wood.

21           THE COURT:  Oh, it's the transcript of the oral

22   argument.

23           MS. GULLEY:  Correct.

24           THE COURT:  That's something I can take judicial

25   notice of.  I don't know that that's --

1        MS. GULLEY:  Right.

2        MS. WEDGWORTH:  Well, actually, your Honor, the

3   underlying statements in the argument you couldn't take

4   judicial notice of.  Certainly, you can take judicial notice

5   of --

6        THE COURT:  If it wasn't an argument.

7        MS. WEDGWORTH:  Correct.  Et cetera.  As you pointed

8   out, it does get complicated because they're relying on the

9   facts of these declarations or the hearing transcript.  It gets

10  complicated, and we have to address those in our motion to

11  dismiss to the extent they affect all of the Sherman Act

12  claims, all of the state repealer claims, et cetera.

13       MS. GULLEY:  Your Honor, I just don't agree that this

14  is very complicated.  They haven't identified in any way in

15  which these documents affect the legal argument.  And I believe

16  that you will see, if you do what you normally do, which is

17  say, "Look, for the things I'm not taking judicial notice of,

18  like the copyright filings," which you can take judicial notice

19  of, but for something else that they think you should not take

20  judicial notice of, that's only referenced in the background

21  section, does not appear anywhere else, you know, we argue that

22  it is raised in their complaint, obviously, but say you

23  disagree that their antitrust claims somehow don't -- their

24  reliance on the history of the PI somehow is not raised in

25  their, you know, massive complaint with 60 exhibits, and you

1    just reject it, our arguments are still the same, and we still

2    win.

3            THE COURT:  And they're all arguments mostly that

4    Ms. Miller has made, too.

5            MS. GULLEY:  Precisely.  With the exception of our

6    copyright-related defense, which that document relied on is a

7    public copyright document, which you can take judicial notice,

8    that's one of the exceptions, but by and large,

9    99 percent -- I'm making up that number -- but it -- I can

10   think of very little else that would be relevant.

11           THE COURT:  Do you guys have a 12(b)(3) argument, too?

12           MS. MILLER:  We've raised the question that if, in

13   fact, your Honor refers us to arbitration, then the matter

14   against us should be stayed, pending the outcome of the

15   arbitration.  But we have not separately raised an arbitration

16   provision, and ask that it be referred to arbitration.

17           But on your point, your Honor, we, obviously, were not

18   a party to this motion, but we have -- we are concerned about

19   the outcome.  Obviously, we didn't attach any affidavits or

20   anything to our motion to dismiss.  So this is a

21   Reynolds-specific issue.  But how your Honor rules, as you

22   noted, could have material impact on CDK.  So to the extent --

23   so as simply not to prejudice my client, we, obviously, would

24   be in favor of your Honor ruling to the extent that you think

25   it should not be considered, that you just not consider it and

1    move on and address the issues, the legal issues, in the brief

2    so that we are not adversely prejudiced by another's filing.

3            MR. BARZ:  In the alternative, is a phrase you will

4    hear a lot from both sides.

5            MS. GULLEY:  Well, I think ultimately the problem is

6    we are, obviously, barreling forward with discovery, as your

7    recent order makes clear you are aware of.

8            THE COURT:  Judge Gilbert will have plenty of things

9    for you, too.

10           MS. GULLEY:  Yes, exactly.  We'll be talking to him

11   about those things later.  But I do think that the defendants

12   are very interested in their own issues.  We think there are

13   some very straightforward issues.  The arbitration issue we

14   think is very straightforward.  On 12(b)(6) we think there are

15   straightforward issues about, you know, the pass-through claims

16   in *Illinois Brick* and things that do not require anything

17   beyond what's in the complaint in the legal argument, and

18   narrowing those issues now as we go into discovery.

19           I mean, obviously, our clients are massive computer

20   system providers who have massive amounts of data, and if the

21   pass-through issue is out of the case, that's very relevant to

22   extremely expensive discovery that we're facing right now, and

23   so that's a big issue.

24           THE COURT:  But if you go to arbitration, everything

25   waits -- at least as to you, right?  That's what your position

1      is.

2              MS. GULLEY:  That's right, your Honor.

3              THE COURT:  And that's why they take the position that

4      if you go to arbitration, everything should wait as to

5      everybody.  And these guys take the position that "Wait is bad

6      for us."

7              Mr. Ho:  Just to be clear.  There are plaintiffs as to

8      which Reynolds has not moved to compel arbitration.

9              THE COURT:  And you guys will go anyway.

10             MR. HO:  Right.  Exactly.

11             MS. WEDGWORTH.  And, your Honor, just on the point of

12     straightforward.  In fact, the arbitration issue is not

13     straightforward.  The very first issue we draft in our motion

14     to convert deals with the document they attached to their

15     opposition called Master Agreement.  They had to file a

16     corrected Master Agreement, after we notified them that they

17     referred in their brief to a one-year statute of limitation,

18     and a document they called Master Agreement that they attached

19     had a two-year statute of limitation in it.  And, by the way,

20     the Bates number indicated JA, which to me is a joint appendix

21     from perhaps the Seventh Circuit opinion.  Once we notified

22     them that what they argued did not match up to the statute of

23     limitations in their exhibit, they filed a corrected exhibit

24     that had a one-year statute of limitations in it.  They

25     attached a declaration to it -- and you will read this in our

1    reply -- that is not a sworn declaration.  Therefore, these

2    issues aren't straightforward, and they are complicated.

3              THE COURT:  Why is the declaration not sworn?

4              MS. GULLEY:  Can I please correct that, your Honor?

5              MS. WEDGWORTH:  Your Honor, they've been given two

6    times, no less, to have a sworn declaration to authenticate one

7    document, and it's two swings and two misses.

8              MS. GULLEY:  Your Honor --

9              THE COURT:  Is there any dispute that the document is

10   what the document --

11             MS. GULLEY:  -- authentic.

12             THE COURT:  Every time I get this -- every time I get

13   a contract attached, which is the most frequent thing that's

14   attached in a 12(b)(6), the most frequent thing that's attached

15   to a response is the contract, that's referred to in the --

16   that is the subject of the dispute usually.  This isn't a

17   breach of contract case, I understand that.  But the most

18   typical situation where you get a document outside a 12(b)(6)

19   is the contract.

20             MS. GULLEY:  Right.

21             THE COURT:  And very seldom do I have people come in

22   and say, "Oh, that's not the contract."  It either is or it

23   isn't.  Can you please tell me whether it is or it isn't.  Do

24   you know?

25             MS. WEDGWORTH:  Your Honor, there are four documents

1    here that they say all relate to form one contract.  And if the

2    master agreement didn't have three versions, and we've now seen

3    two attached, one of them went up to, apparently, the Seventh

4    Circuit, which is not the one that they're attaching here.

5    There is a question as to what the contract is that relates to

6    our plaintiffs.  They're different versions.  They've

7    been -- they're trying to authenticate something that they

8    don't even have a sworn declaration for.

9              MS. GULLEY:  Your Honor --

10             THE COURT:  The sworn declaration piece, though, I

11   just addressed this in a case and I basically said to somebody

12   I can't consider it if it's not a sworn declaration.  The rule

13   is the rule.  It's 28 -- Title 28, I forgot the section number,

14   but it is what it is.

15             MS. GULLEY:  Well, let me back up a minute.  On the

16   arbitration point, which is not the subject of their motion.

17   Their motion relates to 12(b)(6), not 12(b)(3).  There is no

18   question that the arbitration agreement is the arbitration

19   agreement, and the side issue is not relevant to whether the

20   arbitration agreement is the arbitration agreement.

21             With respect to the master agreement that was filed

22   under seal, and some talking in generalities here in open

23   court, the only issue they've raised is the one-year statute of

24   limitations versus the others, which, incidentally, we're fine

25   with if you decide that very narrow issue ruling that it should

1    be dismissed you under the Rule 56 rules would be fine.  What

2    else do you need to know?  Does the contract say one-year

3    statute of limitations or not, and what are the legal

4    principles around can you contract for a shorter period?

5              That said, carving out that only narrow issue, the

6    contract that was filed inadvertently was one that Authenticom

7    had had in Authenticom's record in the Seventh Circuit.

8    Counsel unintentionally filed that one.  It ended in 2009.  The

9    contract that was replaced has been in place since 2009.  There

10   is no suggestion that it's a forgery or inauthentic.  The only

11   suggestion -- and there can't be -- these plaintiffs, it's

12   their contract with us.  They've never come forward and say,

13   "It's not."  They have a portal.  They login.  Here's my

14   contract.

15             THE COURT:  This was puzzling to me.  Every other time

16   I have had someone attach a contract in a 12(b)(6), I don't

17   remember anybody ever coming in to say, "Well, that's not

18   authenticated it or I didn't get a -- it either is or it isn't.

19             MS. GULLEY:  Right.  This is a total --

20             THE COURT:  It's a contract between two parties,

21   right?

22             MS. GULLEY:  Exactly.  It's a total attempt at a

23   gotcha.  It's not something we possess individually and they

24   don't have.  The dealers each have a portal they can login and

25   get their contract documents.  They know what their contracts

1    are, and more importantly, several of the plaintiffs, before

2    the class was consolidated, including Mr. Ho's client, a

3    different dealer, did not sue Reynolds.  Presumably, for the

4    same reason the vendors haven't, because of our arbitration

5    provision and whatever other considerations there were.

6         Ms. Wedgworth, when designing the consolidated

7    complaint when she was appointed lead counsel, obviously went

8    back to the contracts, evaluated the arbitration provision, and

9    understands that this is a real issue.  We've been raising the

10   issue of the arbitration clause forever.  And I just do not

11   want the two things, the 12(b)(6) motion and the arbitration

12   motion, to be confused in any way.  The motion to compel

13   arbitration, there's no question, suggestion, or otherwise,

14   that the arbitration provision that we discussed is the

15   arbitration.

16        THE COURT:  I don't care about that one at the moment.

17   But if 12(b)(6) gets too messy, it's probably more likely I

18   will jump to 12(b)(3) and try to resolve it.

19        MS. GULLEY:  But the question that you guys --

20   whatever it is -- four documents, one document, whatever it is,

21   that you guys attached to your motion, the issue that I think I

22   read last night was that it's not properly authenticated under

23   1746, or whatever the statute is that you have to ring the bell

24   in federal court.

25        I have people come and say, "Well, we did it under

1    state law." And I'm, like, "No, this is federal court. You

2    have to do it under federal law."

3         Apart from that argument, Ms. Wedgworth, is there a

4    contention that that's not the right contract?

5         MS. WEDGWORTH: Well, your Honor, if they -- am I to

6    assume that they authenticate it, that they say that is the

7    one?

8         THE COURT: Yeah. If I were to allow them to correct

9    the oversight of not complying with the federal statute by

10   having the right person write the right thing at the bottom,

11   sworn to under oath, or whatever.

12        MS. WEDGWORTH: That's the point of the master

13   agreement. But according to Reynolds, it takes three other

14   documents plus the master agreement to equal one contract.

15        THE COURT: Okay.

16        MS. GULLEY: And that's normal.

17        MS. WEDGWORTH: And -- and I had no representation

18   that this was what all dealers had, any one dealer had, that

19   they saw, that they represented, that they reviewed, that they

20   currently have. There is no policy and procedure in the

21   ordinary course of business, none of that.

22        So, certainly, if it was corrected and how you have

23   two tries to submit authentication, and you don't know how to

24   swear under penalty of perjury.

25        THE COURT: Yeah. That's unfortunate. But I don't --

1    I think it's a side show compared to -- what I have to get to

2    at the end is what is the contract.

3            MS. WEDGWORTH:  Understood.

4            THE COURT:  And if they can come in and say, "All

5    right.  Now I swear that this is what -- my representations are

6    sworn under oath and consistent with the statute," then I can

7    actually get to the merits.

8            MS. WEDGWORTH:  Right.  Which is why we would like

9    discovery your Honor, and thus converting the motion to dismiss

10   into one of summary judgment and postponing that until summary

11   judgment, or that we've had discovery, which --

12           THE COURT:  And that's the big question to figure out.

13   So here's my suggestion.  Correct your affidavit and get it so

14   that it complies with federal law, so I can actually consider

15   whatever it is.

16           MS. GULLEY:  Thank you.

17           THE COURT:  Then what I will do is figure out this

18   motion.  I'll resolve this motion.  Until I resolve this

19   motion, even if it only affects five pages of the brief, it's

20   still going to -- I'd rather have the brief -- I would rather

21   have the brief actually address everything, than ask you for a

22   supplemental brief three months from now when I figure this

23   out.

24           MS. WEDGWORTH:  I am with you on that, your Honor.

25           THE COURT:  And I think you guys would rather reply to

1    the real deal than something you are going to have to

2    supplement on months from now whenever I figure all of this

3    out.  So I think that means that once I give you a ruling on

4    this motion, how much time would you need to get your 100 pages

5    ready?

6         MS. WEDGWORTH:  I would say ten days, your Honor.

7         THE COURT:  All right.  I will reset the briefing

8    schedule, and it will give you 10 days from when I rule on this

9    motion.  And then I'll give you guys whatever you had before in

10   replies.  I know that's going to push the briefs back probably

11   toward closer to October.  But the fact of the matter is, until

12   I get to October, I'm probably not going to be able to push

13   this ball up the hill anyway because I've got lots of other

14   problems, too.

15        So all right.  Well, that was a long-winded way of

16   resolving what I hope won't be as complicated as it sounds.

17   And that just covers -- 290 is your motion.

18        MS. GULLEY:  That's right.

19        THE COURT:  And you guys have 328 and 331 of the

20   briefs that have been filed on that.  I'll give you a ruling on

21   that as fast as I can.  I can't tell you exactly what the day

22   is.  And then from that ruling, all of the briefs and these

23   motions to dismiss will be due this side, ten days thereafter;

24   this side -- what did I give you guys, like, three weeks or

25   something like that?

1      MS. MILLER:  I think it was 21 days.

2      THE COURT:  21 days.  Perfect.  10 and 21.  Okay.

3  Because I would rather not have a lot of supplemental briefs on

4  this later, too.

5      And I can't figure out which of the various courses I

6  have taken in the past I will have to take in this case.  But

7  you guys have very helpfully found my old cases, so thank you.

8      Okay.  What else do I have for today?  You have

9  several motions in front of Judge Gilbert, and discovery

10 issues.  And I think he's resolved some of them.  You have had

11 several discovery motions, some of which he's already resolved.

12 and some of which are still out there; is that right?

13     MS. MILLER:  He has issued some preliminary rulings on

14 a few motions.

15     THE COURT:  Mm-hmm.

16     MS. MILLER:  He's asked for briefing schedules on some

17 of the other ones that have been submitted.  I suspect we're

18 going to be submitting something to him and he'll schedule

19 whatever he's going to schedule.

20     THE COURT:  Yes.

21     MS. MILLER:  On your prior point, your Honor, I did

22 some bad math.  We had four weeks to respond in our reply

23 brief.  Their original response is due August 20th.  Our reply,

24 I believe, is due September 10th.  So I think that's four

25 weeks.

```
 1            THE COURT:  August 20th to September 10th?
 2            MS. MILLER:  Is it three weeks?
 3            THE COURT:  It can't be four.
 4            MR. BARZ:  It's 21 exactly.
 5            MS. MILLER:  Is it 21?
 6            THE COURT:  Okay.  All right.
 7            MS. MILLER:  There you go.  So I did do good math.  I
 8    did bad math the second time.
 9            MR. BARZ:  There isn't a CPA in the room.
10            MS. MILLER:  There you go.
11            THE COURT:  It can't be four.
12            MS. MILLER:  This is why I did not become a
13    mathematician.
14            THE COURT:  We cover all contingencies on our counsel
15    appointments, too --
16            MS. MILLER:  Fair enough.
17            THE COURT:  So --
18            MR. BARZ:  -- better at math, Judge, St. Eve might not
19    have appointed me at all.
20         (Laughter.)
21            THE COURT:  And then there's this interim lead counsel
22    issue that is still out there.  And that one, I think, I spent
23    three days last week with lots of very experienced MDL
24    transferee judges, and Judge Fallon and Judge Barbier both told
25    me that all counsel in their cases are temporary and they're
```

1    one-year appointments.  I'm not going to do that to you guys.

2    But the point is that we revisit these issues all of the time,

3    which is what the defendants sensibly said in their response,

4    not really objecting to me appointing you, Mr. Ho, as interim

5    lead for the vendor class, so I'm going to go ahead and do

6    that.  If these conflicts ever arise, I know that Professor

7    Issacharoff's one of the world's experts on those things.  I'm

8    sure he will identify it before anyone else does.  But at the

9    moment I don't see it, and so everything I said before still

10   stands, but I will now appoint you interim-lead counsel for the

11   vendor class.

12           MR. HO:  Thank you, your Honor.

13           THE COURT:  And we will close out 200, Carolyn.

14   That's 200 that closes out.  You guys are up to, like, in the

15   330s, already.

16           MS. MILLER:  Mm-hmm.

17           THE COURT:  So, let's see.  So there was a stray

18   motion out there.  Someone is leaving, some -- one of you guys.

19   It's -- 249 is a motion for some counsel wanted leave to

20   withdraw.  I didn't print the whole thing.  But look at 249,

21   Carolyn, and see which one of you guys lost a lawyer.

22           MS. MILLER:  Oh, we believe it's one of the dealer's

23   counsel.

24           MS. WEDGWORTH:  Oh, your Honor, in one of the original

25   filed cases I do believe -- she wasn't in on the consolidated

1    complaint, but one of the original complaints that were --

2          THE COURT:  We will just let her go.  Whoever she is,

3    we'll let her go.  I was just trying to do some docket-policing

4    last night when I was going over what I would cover with you

5    guys.  Because the one thing in MDL cases that I have learned,

6    this is my third one now.  My second one we did some clean-up

7    this last week of things that got away from us.  It had a

8    desired effect.  I got two stipulations of dismissal in the

9    last two days, but I wanted to sweep the docket.

10          Because the last time you were here, I swept the

11   docket, and realized there were things that were filed in front

12   of Judge St. Eve that I never internalized.  And those are

13   these motions to dismiss that are still out here from March.

14   So I think my homework is to decide 290, and the briefs

15   attached.  And that will take me back into all kinds of my old

16   cases, so thank you. I will give you a ruling as fast as I can

17   on that.

18          Do you have other things you want to raise with me?

19          MS. GULLEY:  I have a random housekeeping issue about

20   the motions that file under seal, as you correctly guessed --

21          THE COURT:  Well, I have a question, on that, too,

22   actually.  If I could just interrupt you for one second.  290

23   is the document that has -- that's your original motion on this

24   conversion from 12(b)(6) to 56.  Where is the unredacted brief

25   on the docket?

1      MS. WEDGWORTH:  I am not sure it's --

2      THE COURT:  Because I gave you leave to file under

3  seal, but I never saw --

4      MS. WEDGWORTH:  We didn't file after that.

5      THE COURT:  Maybe you didn't, because I couldn't find

6  it.  And last night -- I'm not sure all of the black really

7  affected my understanding, as rudimentary as it may be, this

8  morning because as a -- I really didn't look at it until last

9  night.  I'll be honest, I have got a big thing that's coming

10  out soon.

11      MS. WEDGWORTH:  I will check on that.

12      THE COURT:  If you don't find it, if you could just

13  file it, the redacted version under seal.  Because I know we

14  gave you leave to do that.  I just couldn't find it.  And I'm

15  not -- if you find it, you can just email Carolyn and say,

16  "Please tell the Judge it's, you know, 340," or whatever it is.

17  But I didn't find it.  And without, I'm not sure what I'm

18  missing because some of it is blacked out.  So if you could

19  correct that, that would be great.  And then I'll have all of

20  the briefs I need.  I don't believe the response or the reply

21  had anything redacted in it; is that right?

22      MS. GULLEY:  That's correct.

23      MS. WEDGWORTH:  Correct.

24      MS. GULLEY:  Your exhibits were under seal.

25      MS. WEDGWORTH:  Oh, not yesterday.

1    THE COURT:  Okay.  All four exhibits that are on 290

2    are also redacted, so I can't read those either.  So if you

3    give me an unredacted -- an unredacted version under seal that

4    would be perfect.  And then I'll start pushing this one toward

5    a ruling.  I'll give you guys a ruling.  I'm sorry it's going

6    to hold up the briefing, but I do think it's going to be better

7    than getting supplemental briefing later.

8         So -- go ahead.

9         MS. GULLEY:  So the question is, you know, I think

10   we're following all of the local procedures and everything we

11   have to do in filing the redacted and unredacted versions.  But

12   the Pacer, or whatever it is when you file it, requires you to

13   set it for a hearing.  And, you know, Ms. Wedgworth lives in

14   Alabama, and my co-counsel live in D.C., and California, and

15   I'm in Texas, and we'll find that -- especially if you're in

16   trial or something like that, and difficult to reach because of

17   that, you know, we're like, "Well, do we need to fly to

18   Chicago?"

19        THE COURT:  I have got an idea for that.  So you guys

20   are going to be filing -- probably half of the documents you

21   file in this case will -- at least -- will be pursuant to this

22   protocol.  So let's invent a protocol.  So my proposal would

23   be -- and I say this because our circuit is the most

24   restrictive of all the circuits in terms of what you can file

25   under seal and keep under seal.  So we have to be a little bit

1   careful about that, although half of the duo that created that

2   rule are gone.  Because it's -- they are all Posner and

3   Easterbrook opinions, all of those opinions, but I

4   don't -- it's circuit law, so we have to be respectful of that.

5         But I think what you guys can do is I will give you

6   leave to file under seal whatever documents you believe should

7   be filed under seal, with the caveat that anybody can come in

8   within, let's say, four weeks from that, to move to lift the

9   seal, if they think it's improperly sealed.  Do I think

10  anyone's going to do that?  No.  But at least it's a nod in the

11  direction of our circuit law.  Does that sound okay to

12  everybody?

13        MS. WEDGWORTH:  Yes, your Honor.

14        MR. HO:  Yes, your Honor.

15        MS. MILLER:  Yes.

16        MS. GULLEY:  Yes.

17        THE COURT:  Because almost every time you have another

18  motion, there's another two or three that come with it that say

19  "Motion for leave to file under seal," all of which have been

20  granted, and I anticipate will be granted.  And your case

21  certainly falls under the permissible things to seal in the

22  Seventh Circuit -- even in the Seventh Circuit, I should say.

23  Because, you know, I studied this on the appellate rules

24  committee many years ago when I was on the subcommittee that

25  studied this, and what we came up with is that in the Seventh

1   Circuit it's really hard to get anything sealed.  In the Ninth

2   Circuit, you can seal pretty much anything you want.  And the

3   other circuits were in between.  And we said, "Oh, a national

4   rule on that, no."  It would just be too complicated, and there

5   would be too much resistance from the circuits who like their

6   own practices.  So let's do it that way.

7           MS. GULLEY:  Thank you.

8           THE COURT:  So from now on, I'll just put an order in

9   today that will say for housekeeping purposes, to deal with the

10  vast number of motions to seal documents in this case, here's

11  the protocol.

12          MS. MILLER:  And, your Honor, can we assume that

13  applies to both you and Judge Gilbert.

14          THE COURT:  Yeah.  I'll take the hit for that one.

15          MS. MILLER:  Fair enough.

16          THE COURT:  And then that will save you guys lots of

17  notices of motion and worrying about whether you're on trial

18  somewhere else, or you've got to show up here for a sealing

19  motion.  Let's pray that never happens.

20          MS. GULLEY:  It never happens again.

21          THE COURT:  So that was a good idea because I noticed

22  that probably 20 or 30 of the docket entries here are that.

23          MS. GULLEY:  We have a related question.  Believe it

24  or not, this was the first federal court I was licensed, but

25  now I'm down in Houston and it's different.  And one of the

1    things that I think we have all come to realize in this MDL is

2    that when there's filed a notice of motion, there's a motion

3    day and we come in, and, typically, rather than arguing the

4    motion like you would if it was in the Northern District of

5    California, you come in and get a schedule --

6              THE COURT:  Get a briefing schedule, yes.

7              MS GULLEY:  Which is also a long way to go to do the

8    briefing schedules.  And so I don't have a suggestion on that.

9    I mean, obviously, the Court can do telephone and so on and so

10   forth, but nobody wants to be the one that can't --

11             THE COURT:  Well, you guys have been on top of that,

12   actually.  And I'll say, "Okay.  You're right.  That's an

13   unusual practice."  I didn't know how unusual our district was

14   until I went to one of these FJC things.  And I'll just give

15   you an example.  Northern Indiana, which touches our border --

16   30 minutes you can be in the Northern District of Indiana --

17   they were horrified at what we do, and we were horrified at

18   what they did.  They don't see lawyers like we see lawyers.

19   But they would say, "Well, it's not -- a lot of times you see

20   lawyers it's not all that efficient.  And especially in a case

21   like this, where most of you are not walking down the street.

22   A few of you are, but most of you are not.

23             What can we do about that?  Well, here's the thing.

24   So our rule is a three-day presentment.  A lot of times three

25   days wouldn't be enough time to take a position, which is why

1    the default is you don't orally argue your motion on the date

2    of presentment.  What you guys have done, and I think it's been

3    really helpful, is get ahead of that, and in a day or two --

4    and that may not be possible all of the time because I know you

5    guys, this isn't your only case.  Unfortunately, it's not my

6    only case either, but my best suggestion is to do what you've

7    been doing, which is to coordinate on these and then send

8    Carolyn a briefing schedule.  I think I've entered every

9    briefing schedule that you guys have given me because they have

10   been sensible.  And, you know, that's maybe the best I can

11   suggest because that is our local rule.

12         MS. MILLER:  Your Honor, we tried to motion most of

13   them to comply with the 14-day rule, so we don't necessarily

14   always put them up on the third day.  We put them out.

15         THE COURT:  Oh, yeah, yeah.  The 14-day rule I'm not

16   too worried about.  If you actually want to put something out

17   there to get a briefing schedule so it's ready for the next

18   general status, that would be the reason that you would notice

19   something up for 21 days or 28 days into the future.  Even

20   though that's contrary to our local rule, I'm willing to waive

21   that because sometimes it makes sense to do that.  What you're

22   doing is you're noticing up a motion.  You're telling the other

23   side, "I would like to get this briefed before we see the judge

24   the next time."  In an MDL case -- that's what you guys just

25   did with this motion.

1          MS. WEDGWORTH:  You're right, your Honor.

2          THE COURT:  And it worked perfectly because at least I

3     have a clue.  I'm not on top of it, but I have a clue.  And if

4     you did this 28 days in advance, and I had the briefs 14 days

5     before the hearing date, then we could do some serious business

6     on this.  But that's another problem with our local rules that

7     you don't experience in most other jurisdictions.  But my

8     solution to that is do what you're doing, because that's

9     made -- that's actually been really good.

10          I don't want you guys to come in from Washington and

11    Alabama to talk.  Even how many pages, we could have done that

12    one by telephone.

13          MS. WEDGWORTH:  That was fun, though, Judge.

14          THE COURT:  Fun?  Sometimes you just want to roll them

15    down the stairs and see if they'll resolve themselves.  But

16    that's a good suggestion, too.  Because I want this to be as

17    efficient as possible, and I know you guys -- you guys have

18    been doing this, many of you probably have more MDLs than I

19    have.  So, you know, whatever you can come up with from best

20    past practice that has worked very well, I'm all for it.  I am

21    not going to appoint you at one year at a time, though.

22          MS. GULLEY:  I think we all want to thank Carolyn for

23    her assistance.

24          THE COURT:  Well, Carolyn is the hostess with the

25    mostest.  And I know Kris has gotten you some transcripts, too,

1    which I have just reread this morning, too.  And we will try to

2    keep this running as efficient as we can, too, and be receptive

3    to your phone calls and your emails because that is a way to

4    keep this efficient.  You shouldn't be afraid to reach out to

5    Carolyn and she'll get to me right away because I want to make

6    this work as smoothly as possible.

7          Anything else?

8          MS. GULLEY:  Yes, I'm sorry.  One other issue has come

9    up.  Hopefully it's not a discovery issue, because I know we're

10   taking those to the magistrate.  But the -- Judge St. Eve

11   entered the current scheduling order that, you know, required

12   discovery to proceed before you decided the 12(b)(3) motion.

13   As a result, the record you'll see going way back to early

14   times is replete with Reynolds saying, you know, "We reserve

15   our right to compel arbitration.  We believe this belongs in

16   arbitration."

17         As discovery continues to grow -- and we did not serve

18   discovery on the class -- CDK served discovery on the class.

19   Just to belt and suspenders, we were in the middle of changing

20   judges, but now that we have a new MDL judge, I did want to

21   re-raise that issue.  Obviously, restate that Reynolds reserves

22   the right to move to compel arbitration.  We believe the class

23   case belongs in arbitration, for the record.  But, at the same

24   time, there are court-ordered discovery deadlines.  There is a

25   suggestion by the class plaintiffs that if we participate in

1    discovery that we may be waiving our right to continue to

2    pursue arbitration, so there's a conflict between the schedule

3    and any rules related to waiver.  So I just wanted to raise

4    that issue, whether we may participate or should not

5    participate in discovery with the class while the motion to

6    arbitrate is pending.

7              THE COURT:  Okay.  Now are you guys taking the

8    position that they -- by going forward, they may be waiving

9    their right?

10             MS. WEDGWORTH:  Well, your Honor, we're addressing all

11   of that in our motion papers.

12             THE COURT:  Mm-hmm.  But what is -- I haven't read it

13   yet, so what does it say?

14             MS. WEDGWORTH:  In our opposition?

15             THE COURT:  Yes.  Oh, I haven't read it yet because

16   you haven't filed it yet.

17             MS. WEDGWORTH:  Correct.  Correct.

18             THE COURT:  I guess, I suppose that -- I mean, maybe

19   what she's doing is raising an issue that you will address, but

20   to the extent that there's a tension there, I'm either going to

21   have to rule on the motion to arbitrate right away, or I'm

22   going to have to slow-boat the discovery, unless you guys can

23   agree that it won't be prejudicial to them.  That's your point,

24   right?

25             MS. GULLEY:  Exactly.  One way or the other.

1          MS. WEDGWORTH:  So at this point -- I guess if she is

2     making a motion to stay discovery, I would at least want to

3     consider and respond to it.

4          THE COURT:  Yeah.  No, I assume you would respond to

5     it in your brief, which is fine, because it's not going to be

6     that long from now that you're going to file that response.

7     She is making an oral motion to lay down a marker that she's

8     worried about this issue.  That's what I heard today.  I didn't

9     hear a formal motion.

10         MS. GULLEY:  Well, I'm not sure how you would want me

11    to phrase a motion, your Honor.  Please tell us which way.  I

12    mean, either way is fine, you know what I'm saying?

13         THE COURT:  So the motion you would file would

14    probably be a motion to reset or extend the discovery schedule

15    pending a ruling in the arbitration, if you think you're going

16    to be prejudiced by that.  And I suppose they could obviate the

17    need for that motion by agreeing that by your participation in

18    discovery, pursuant to Judge St. Eve's scheduling order, which

19    I haven't messed with yet, it will not be prejudicial to your

20    position that you're entitled to arbitration.

21         MS. GULLEY:  Okay.  And frankly, we feel like Judge

22    St. Eve addressed this in addressing the schedules and the

23    caveats in the joint status back in the day.  But I think

24    raising it now as the new lead -- appointed lead plaintiff has

25    phrased it in a different way than the prior group of

1    plaintiffs, makes us -- we'll file a motion.

2          THE COURT:  Yeah, if you need to file a motion you

3    can.  And, obviously, Ms. Wedgworth and Mr. Ho can address that

4    in their brief, too, in a way that might satisfy you.  I don't

5    know.  And, obviously, what I'll try to do is make sure that no

6    one is prejudiced by what's happening in my chambers, by how

7    long it takes us to decide things.  But we all have, you know,

8    between 3 and 400 civil cases, plus whatever criminal cases we

9    have here.  That is what it is, and I can't only work on your

10   case or the other big case I have right now.

11         MR. HO:  And, again, just to make the same point I

12   raised earlier in the hearing, there are cases against Reynolds

13   as to which there is no motion for arbitration.

14         THE COURT:  Yes.

15         MR. HO:  And discovery in this case is obviously

16   coordinated from all plaintiffs.  So, you know, I'm not exactly

17   sure what the delta is between not proceeding on discovery,

18   vis-a-vis one of the cases, but only as to the rest.  And just

19   proceeding with discovery as I think Judge St. Eve envisioned

20   it, which is in a coordinated fashion.  So I think that the

21   practical implications of this are more modest than it would

22   first appear.

23         MS. GULLEY:  Right.  I think Mr. Ho and Ms. Wedgworth

24   probably have different positions on this.  Mr. Ho is happy to

25   coordinate discovery with us and has been doing so, and is

1 happy to work with -- there's no arbitration motion with

2 Mr. Ho's clients.  It's Ms. Wedgworth's clients that have

3 refused to allow us to join calls that involved cross-issues,

4 so we have been completely unable to coordinate discovery

5 between her case and all of the other cases.

6        THE COURT:  And that's because of the arbitration

7 issues.

8        MS. WEDGWORTH:  Actually, your Honor, the only time

9 that has come up is with regard to CDK serving discovery on us.

10 The petition there is CDK served discovery on us.  So in our

11 meet and confers on that we had meet and confers with CDK

12 counsel.  I don't understand why Reynolds should be involved

13 with those meet and confers.

14        MS. GULLEY:  Mr. Ross.

15        MR. ROSS:  Just to clarify.  I think the disconnects

16 here in terms of coordinated discovery, discovery is to be

17 coordinated in theory.  But, in fact, the individual plaintiffs

18 and dealer-class plaintiffs have served separate document

19 requests, have insisted on separate meet and confer sessions.

20 This is not facts to coordinate -- it has caused, frankly,

21 quite a bit of difficulty.

22        THE COURT:  Right.  Now, in terms of coordinating

23 discovery, that's something you should take up with Judge

24 Gilbert because he is going to be the one who pushes people's

25 heads together; it won't be me.

1          But on the issue of how discovery relates to the

2     arbitration motion, that's something that I need to figure out

3     because I am the one who has to rule on the arbitration motion.

4     But I assume that Ms. Gulley having raised this, that you will

5     address this in your -- somewhere in those 100 pages.

6          MS. WEDGWORTH:  The arbitration?

7          THE COURT:  Yes.  And, also, if there's any issues

8     regarding whether discovery should be proceeding or waiver -- I

9     guess waiver is the thing you're worried about.

10          MS. WEDGWORTH:  We will, your Honor, yes.

11          THE COURT:  Okay.  Perfect.  And if you need relief

12     before then, you can let me know with a motion.

13          MS. GULLEY:  Sounds like we do, so we will.

14          THE COURT:  Yes.  Then you guys can call each other

15     and agree on a schedule for briefing that motion.  And because

16     that motion relates to the arbitration motion, you should

17     notice that with me instead of Judge Gilbert.

18          MS GULLEY:  Thank you.

19          MS. MILLER:  And, your Honor, just for clarity's sake.

20     We don't think it's necessarily an administrative issue.  And

21     if discovery is being stayed pending a ruling on the

22     arbitration motion, --

23          THE COURT:  Mm-hmm.

24          MS. MILLER:  -- then all discovery should be stayed on

25     the basis of this is supposed to be a coordinated MDL.  So we

1    would be opposed and would like to be heard if there's some

2    consideration or some thought that discovery should go forward

3    on the individual cases and not on the dealer cases because

4    they've adopted each other's discovery, and we obviously don't

5    want our folks deposed twice or anything like that.

6         So we would have a problem to the extent that there

7    was some sort of argument that some should go forward and

8    others should not.  So from our perspective it's an all or

9    nothing.

10        MS. WEDGWORTH:  Your Honor, this has been a step too

11   far there.  We've agreed from the start, depositions we don't

12   plan to duplicate.  All of that is to be coordinated.  To the

13   extent we can coordinate, we are.  To the extent we can't, we

14   each have to represent our own classes and we do so vigorously,

15   understanding that the benefit to all to coordinate will give

16   us efficiency.  We are 100 percent behind efficiency, do not

17   want to duplicate.  If there's a way to coordinate, we can.

18   But we're not going to risk our own clients' rights for certain

19   requests or certain dealings or certain arguments just in the

20   sake to coordinate.

21        THE COURT:  Well, the whole reason you're here is

22   coordinated pretrial proceedings, that's why the MDL put this

23   thing together.  But I also -- I'm having a hard time

24   envisioning any scenario in which grinding discovery to a

25   complete halt would make sense.  There has got to be something

1   you can move forward on, no matter what's still suspended in

2   air.  But that's all abstract.  If you want something concrete

3   that's anything different than what Judge St. Eve said, that so

4   far I have blessed, you have got to tee it up and explain it

5   out.  And I will move as quickly as I can on all of these

6   motions to keep you guys moving.

7          MS. GULLEY:  Appreciate it.

8          THE COURT:  Anything else on your list for today?

9   Anybody?  Anybody?

10         Okay.  So when to come back.  So you're going to be

11  seeing Judge Gilbert periodically I assume, because I saw

12  something entitled omnibus motion to compel or something like

13  that.  Those are the kinds of things that I say "Oh, thank God

14  we have a magistrate judge on this case."

15         (Laughter.)

16         THE COURT:  Because the pile of motions to dismiss

17  you've given me, and these 100-page briefs are going to be

18  quite a lot for me to digest, too.  As long as you're

19  proceeding with him for discovery, I wonder if it makes sene

20  for me to hold off on setting a status date until I've at least

21  reviewed the briefs on the motion to dismiss.  What may well

22  happen is I will review the briefs and decide there are a few

23  issues that would benefit from a hearing, an oral hearing, as

24  opposed to just me deciding them on the paper.  If I do that, I

25  would give you guys the questions in advance so you would know

1    what's bothering me, because that works a lot better.

2          If I set it for an oral argument, you're just going to

3    repeat your briefs, unless you know what I'm talking about.

4    But if I'm actually concerned about three particular issues and

5    I give you the questions in advance, it's a much better

6    hearing.  So my guess is that's what will happen.  So I will

7    not give you another date until I've read the briefs.

8          Now, I will give you another briefing schedule as soon

9    as I resolve No. 290, okay?  Sound good?

10         MS. WEDGWORTH:  Yes, your Honor.

11         MR. HO:  Yes, your Honor.

12         THE COURT:  Fantastic.  Good to see you all.  Happy

13   travels back to wherever you're going.  And I will get on 290

14   as fast as I can.

15         MS. WEDGWORTH:  Great.  Thank you, your honor.

16         MS. GULLEY:  Thank you, your Honor.

17         THE COURT:  Thanks, everybody.  Good to see you all.

18      (Proceedings concluded.)

19                    * * * * * * * * *

20                  C E R T I F I C A T E

21      I certify that the foregoing is a correct transcript from

22   the record of proceedings in the above-entitled matter.

23

24
     /s/Kristin M. Ashenhurst, CSR, RDR, CRR   SEPTEMBER 13, 2018
25   Kristin M. Ashenhurst, CSR, RDR, CRR      Date
     Federal Official Court Reporter