1    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF ILLINOIS
2    EASTERN DIVISION

3    IN RE:                          ) No. 18 C 864
                                     )
4    DEALER MANAGEMENT SYSTEMS       ) Chicago, Illinois
     ANTITRUST LITIGATION            ) October 5, 2018
5                                    ) 9:23 a.m.

6                    TRANSCRIPT OF PROCEEDINGS
7    BEFORE THE HONORABLE JEFFREY T. GILBERT

8
     APPEARANCES:
9
     For Plaintiffs              KELLOGG, HANSEN, TODD, FIGEL &
10   Authenticom, et al.:              FREDERICK, P.L.L.C.
                                  BY:  MR. DEREK TAM HO
11                                     MR. MICHAEL N. NEMELKA
                                  1615 M Street, NW, Suite 400
12                                Washington, D.C.  20036
                                  (202) 236-7931
13                                dho@kellogghansen.com
                                  mnemelka@kellogghansen.com
14

15   For the Dealer             MILBERG LLP
     Plaintiffs:                BY:  MS. PEGGY J. WEDGWORTH
16                              1 Penn Plaza, Suite 4800
                                New York, New York  10119
17                              (212) 631-8622
                                pwedgworth@milberg.com
18

19   Plaintiffs' Liaison        CLIFFORD LAW OFFICES
     Counsel:                   BY:  MS. SHANNON M. McNULTY
20                              120 North LaSalle Street, Suite 3100
                                Chicago, Illinois  60602
21                              (312) 899-9090
                                smm@cliffordlaw.com
22

23   Official Court Reporter:   NANCY L. BISTANY, CSR, RPR, FCRR
                                 219 South Dearborn Street, Room 1706
24                              Chicago, Illinois  60604
                                 (312) 435-7626
25                              nancy_bistany@ilnd.uscourts.gov

```
 1    APPEARANCES:   (Continued)

 2    For Defendants CDK         MAYER BROWN LLP
      Global, LLC, and          BY:  MS. BRITT M. MILLER
 3    Computerized Vehicle           MR. MATTHEW D. PROVANCE
      Registration:             71 South Wacker Drive
 4                              Chicago, Illinois  60606
                                (312) 782-0600
 5                              bmiller@mayerbrown.com
                                mprovance@mayerbrown.com
 6

 7    For Defendant             GIBBS & BRUNS, L.L.P.
      The Reynolds and          BY:  MS. AUNDREA K. GULLEY
 8    Reynolds Company:              MR. BRIAN T. ROSS
                                     MR. ROSS MacDONALD
 9                              1100 Louisiana Street, Suite 5300
                                Houston, Texas  77002
10                              (713) 650-8805
                                agulley@gibbsbruns.com
11                              bross@gibbsbruns.com
                                rmacdonald@gibbsbruns.com
12

13    For Defendant             SHEPPARD MULLIN RICHTER & HAMPTON LLP
      The Reynolds and          BY:  MR. LEO CASERIA
14    Reynolds Company:         333 South Hope Street
                                Forty-third Floor
15                              Los Angeles, California  90071
                                (213) 620-1780
16                              lcaseria@sheppardmullin.com

17

18

19

20

21

22

23

24

25
```

1      (Proceedings heard in open court:)

2           THE COURT:  Good morning, everybody.

3      (Chorus of "Good morning, Your Honor.")

4           THE COURT:  Move this a little bit so the people in

5      Kansas can see.

6           Okay.  Do you want to call the case?

7           THE CLERK:  Case No. 18 CV 00864, In Re:  Dealer

8      Management Systems Antitrust Litigation.

9           THE COURT:  Okay.  Good morning, everybody.

10          The way I would like to do this is anybody who

11     anticipates you're going to be speaking, please identify

12     yourself for the record.  And then also when you get up to

13     speak, say your name again just so our court reporter can

14     associate your name with your face.

15          Anybody who wants to be recorded in any transcript as

16     having been in attendance here but doesn't necessarily intend

17     to speak, you can send your name and who you represent to --

18     are they sending it directly to you?

19          THE COURT REPORTER:  I had them sign in, Judge.

20          THE COURT:  You had them sign in?  Okay.  Because

21     there's less people here than the other times.  Okay.  Never

22     mind.

23      (Laughter.)

24          THE COURT:  But I still think if you're going to --

25     if you want to announce your appearance of record, that's good.

```
 1   And then just for me and for our court reporter, state your
 2   name when you speak.
 3              I'm all ears.
 4              MR. HO:  Good morning, Your Honor.
 5              Your Honor, Derek Ho from Kellogg Hansen.  I'm one of
 6   the two co-lead counsels with this MDL on behalf of the
 7   plaintiffs.
 8              THE COURT:  Right.
 9              MS. WEDGWORTH:  Good morning, Your Honor.
10              I'm the other half.  Peggy Wedgworth on behalf of
11   class dealership plaintiffs in the MDL.
12              THE COURT:  Okay.  Got it.
13              MR. NEMELKA:  Mike Nemelka of Kellogg Hansen as well
14   on behalf of the individual and vendor class plaintiffs.
15              THE COURT:  And tell -- how do you spell your last
16   name?
17              MR. NEMELKA:  N-e-m-e-l-k-a.
18              THE COURT:  And when you say you're "vendor class,"
19   you're also here for Authen -- how do you pronounce it again?
20   Authenticom?
21              MR. NEMELKA:  Authenticom.
22              THE COURT:  Authenticom, right --
23              MR. NEMELKA:  Yes.
24              THE COURT:  -- as well?
25              And everybody else who Ms. Wedgworth doesn't
```

1    represent?

2              MR. NEMELKA:  That's correct, Your Honor.

3              THE COURT:  Okay.  Okay.

4              MS. McNULTY:  Good morning, Your Honor.

5              Shannon McNulty from Clifford Law Offices, liaison

6    counsel for the plaintiffs.

7              THE COURT:  Okay.  Thanks.

8              And are you liaison for all plaintiffs?

9              MS. McNULTY:  That's true, Your Honor.

10             THE COURT:  Okay.  Yeah, I saw the case management

11   order.

12             Yes.

13             MS. GULLEY:  Good morning, Your Honor.

14             Andy Gulley for The Reynolds and Reynolds Company.

15             THE COURT:  Okay.  Give me -- I didn't hear you

16   completely.

17             MS. GULLEY:  I'm sorry.  I lost my voice.

18             It's Andy Gulley, G-u-l-l-e-y, for The Reynolds and

19   Reynolds Company.

20             THE COURT:  Got it.

21             MR. CASERIA:  Leo Caseria also for Reynolds.

22             MR. ROSS:  Good morning, Your Honor.

23             Brian Ross also for Reynolds.

24             MS. MILLER:  Good morning, Your Honor.

25             Britt Miller on behalf of CDK Global, LLC, and

1    Computerized Vehicle Registration.

2              MR. PROVANCE:  Good morning, Your Honor.

3              Matt Provance also for CDK Global, LLC, and

4    Computerized Vehicle Registration.

5              THE COURT:  Okay.  Great.  All right.  And please be

6    seated.

7              Welcome.  I know you're glad to be seeing me, and I'm

8    glad to be seeing you as well.  Okay?  You are on a crowded

9    calendar.  You're also the third MDL case that I've gotten down

10   the pike, and so you're the third in birth order.  All right?

11        (Laughter.)

12             THE COURT:  And just like I love all my three kids

13   equally, there's some times that birth order matters.  So --

14   but I do love all these equally, and I'm hoping to give them

15   the equal amount of attention that they deserve.

16             I know that I have under advisement a number of

17   pending discovery motions.  We're working on them.  I talked

18   with some people about the privilege issue.  We're working on

19   the other ones.  I know what's there.

20             I'm planning either ruling -- calling a hearing,

21   ruling on the record, issuing some written rulings.  If I need

22   clarification, I'll get that.

23             I saw you filed just recently your notice of

24   resolving the search terms for custodians, so that's good.  We

25   don't have to deny neglect work on that one maybe a little bit,

1    but I -- that's more of a -- I'm saying that facetiously.  It

2    wasn't intentional.

3              So anyway, I want you to know that I have that stuff

4    under advisement.

5              Today I want to talk about the deposition protocol

6    and some things related to that.

7              I have some questions -- discovery-related questions

8    really first to kind of frame some of the issues here.  So if

9    you'll indulge me a little bit.

10             So you just filed something that said you resolved

11   the search terms for the custodians.  So I take it -- and I

12   don't know who is going to want to respond to it -- but search

13   terms have not yet been run.

14             Now you've resolved this, and now you're going to run

15   the search terms, right?  Or is --

16             MS. MILLER:  That is partially true, Your Honor.

17   Britt Miller on behalf of CDK Global.

18             THE COURT:  Okay.

19             MS. MILLER:  The dispute was only between the

20   plaintiffs and CDK with respect to the issue that we resolved.

21   We have begun running them, and we are reviewing documents

22   contemporaneously.

23             THE COURT:  Okay.  So does that mean that Reynolds is

24   on track to having run your search terms and completing the

25   substantial production of documents by October 12th, with

1    privilege logs on November 2nd?  Does that mean the class

2    plaintiffs have all run search terms electronically?  Does that

3    mean that the vendor plaintiffs have?

4         Give me a sense of where you are on that, because

5    that informs, in part, what we're doing on depositions.

6         MS. WEDGWORTH:  Your Honor, Peggy Wedgworth for the

7    class dealership plaintiffs.

8         We are running search terms on roughly 68 search

9    terms.  We are not running searches on the security issue,

10   which is before Your Honor on the motion to compel.

11        We've made two productions, September 21st and

12   September 28th, for about 5,300 on the first production, 3,300

13   on the second production.  We're about at 8,700 currently

14   produced for the individual dealership plaintiffs class reps.

15   We have approximately 25 class reps.

16        We are still producing and planning on making an

17   equally substantial production either maybe Monday or Tuesday,

18   one of those.

19        We anticipate being substantially completed by

20   October 12th.

21        MR. NEMELKA:  And on behalf of the vendor class and

22   Authenticom and VSC and Cox Automotive, yes, we've run the

23   search terms.  And, yes, we -- barring any unforeseen

24   circumstances, we will be complete -- substantially complete on

25   October 12th with our document production.

1          And on CDK, just one clarification.  The dispute only

2    related to a certain subset of custodians and a certain subset

3    of search terms.  There's a -- there's a larger set of

4    custodians and search terms that we're already agreed to that

5    they should have and could have been running.

6          THE COURT:  Right.  I know.

7          MS. MILLER:  Your Honor, if I could respond to that

8    briefly.  Mr. Nemelka is --

9          THE COURT:  State your name.  Ms. Miller.

10          MS. MILLER:  Britt Miller on behalf of CDK.

11          THE COURT:  Okay.

12          MS. MILLER:  -- is leaving the impression that we

13    haven't been reviewing.  We have been, and we expect that we

14    will meet the substantial completion deadline for CDK despite

15    the fact that we just recently resolved the search term

16    dispute.  We are working diligently to meet that October 12th

17    deadline.

18          With respect to the search terms, I appreciate Your

19    Honor's working through the motions to compel.  But with

20    respect to the dealer class plaintiffs, there are still quite a

21    number of search terms that we are at issue on and that we have

22    moved on.  And so resolution of those will impact what is going

23    on with respect to search terms.

24          And also it's a -- as we said in our motion papers,

25    although I appreciate that folks have indicated that they will

1    meet the substantial completion deadline, plaintiffs just began

2    producing documents a week or so ago when we were filing our

3    motions.  For some plaintiffs, we -- I don't believe we still

4    even have some documents.

5              THE COURT:  Right.  And you said that in the dep

6    protocol --

7              MS. MILLER:  Yes, Your Honor.

8              THE COURT:  -- briefing.

9              And when you say that part of the motion to compel --

10   the defendants' motion to compel is search terms vis-a-vis the

11   class plaintiffs, does that mean, Ms. Wedgworth, that depending

12   upon how I resolve it, you may have to go back and rerun some

13   search terms and certain document populations?

14             MS. WEDGWORTH:  Yes, Your Honor.  It will be limited

15   to the security issue.

16             We are -- you know, we are running searches and again

17   produced already on September 21st and 28th, so --

18             MS. MILLER:  And to be clear, Your Honor, the search

19   terms that are at issue, with all due respect, are not just

20   security related.  They relate to a number of things spelled

21   out in our motions.  Your Honor can certainly look at them.

22             THE COURT:  Okay.  But all I'm just asking, just in

23   time-wise, is that depending upon how I resolve that motion, it

24   may require another run of search terms and another production

25   of documents.

1          MS. WEDGWORTH:  That is correct, Your Honor.

2          THE COURT:  And I know that there's a lot of issues

3  under advisement with the -- with the -- on the motions to

4  compel.  I mean, you know, the first one, the telephone

5  communications between custodians, I know I have that.  If I

6  grant -- if I grant that or if I go one way on that, there's

7  more electronic stuff that needs to be produced, potentially

8  also, you know, other searches that need to be produced.

9          I know that from all these things, there's

10  potentially more documents to come in.  But I -- what I was

11  inquiring about, since this is the first time I'm seeing you,

12  is what's going on in discovery -- I'm trying to get a feel for

13  what's going on in discovery now, what will have to be in

14  addition after motions are decided.  So this is helpful.

15          MR. ROSS:  Your Honor, to --

16          THE COURT:  And what about like Authenticom and, you

17  know --

18          MR. ROSS:  Your Honor, Brian Ross.

19          Just to answer the Court's question with respect to

20  Reynolds, Reynolds has completed its search terms, has been

21  working very diligently to get document productions out.  We've

22  made several large document productions on a rolling basis over

23  the last several weeks.

24          We do believe we're on track to meet the substantial

25  completion deadline, again, subject to the point the Court's

1     already made, which is --

2                THE COURT:  Okay.

3                MR. ROSS:  -- if there are additional documents to

4     compel, that deadline goes --

5                THE COURT:  Right.  Yeah, there's some stuff out

6     there.

7                And Authenticom?

8                MR. NEMELKA:  Authenticom, MVSC, Cox Automotive, and

9     the vendor class, we are all on track to complete --

10    substantial completion October 12th.

11               THE COURT:  Okay.  Great.

12               MS. GULLEY:  Your Honor --

13               THE COURT:  Let me just say one thing.  My clerks

14    know.  I'm having trouble with Authenticom for some reason.  I

15    have a -- I'm mispronouncing it a lot.  So I apologize to

16    Authenticom as we go forward, but I may call it Automiton

17    (phonetic) --

18         (Laughter.)

19               THE COURT:  -- or Authentimecon (phonetic).

20    So something --

21               MR. NEMELKA:  We'll know what you mean.

22               THE COURT:  So I'll just say the "A" plaintiff.

23               Okay.  Somebody was going to say something?  Ms.

24    Miller?

25               MS. GULLEY:  Yes, Your Honor.  Andy Gulley for The

1  Reynolds and Reynolds Company.

2  One issue that is not before Your Honor is that --
3  and you're kind of getting the lay of the land on discovery --
4  is counterclaim discovery.  Counterclaims have not been on file
5  very long, and counterclaim discovery has just gone out in the
6  only case in which the defendants have had to answer, which is
7  the Authenticom case.

8  And so the other cases, we haven't even answered or
9  filed counterclaims yet.  But I just wanted to kind of flag
10 that for the future.

11 THE COURT:  Okay.  I got it.

12 MS. GULLEY:  That is coming.

13 THE COURT:  Yeah, I read Judge St. Eve's opinion, so
14 I got that.  And I know subsequent to that, counterclaims were
15 filed, and I've been looking at the docket to see what's going
16 on there.  So okay.

17 And we've got -- you know, right now we've got an
18 October 12th substantial completion date and then privileged
19 logs November 2nd, right?

20 (Chorus of "Yes, Your Honor.")

21 THE COURT:  Okay.  And the only motion that I have
22 not addressed in terms of a briefing schedule or something like
23 that is the new one.  The motion to compel defendant, The
24 Reynolds and Reynolds Company, to produce unredacted documents
25 for *in camera* review, right?  That's been filed, but I haven't

1    said anything about that, right?

2              MR. HO:  That's correct, Your Honor.

3              THE COURT:  And do we need a briefing --

4              THE COURT REPORTER:  I'm sorry, your name again?

5              THE COURT:  Jeff Gilbert.  No.

6              MR. HO:  No, I'm sorry.  That was Mr. Ho.  I'm sorry.

7              MR. ROSS:  Fair enough.  I will say something.  Brian

8    Ross.

9              The movants on that motion and Reynolds have a number

10   of disagreements in terms of how that motion was teed up.  I

11   don't believe there was a failure to meet and confer,

12   et cetera, et cetera.

13             That being said, we think we can save the Court's

14   time.  We don't have any objection, as we said in our response

15   on Monday, but Reynolds does not have any objection to

16   tendering that -- those documents to the Court *in camera*.

17             I have copies with me today and am prepared to do so

18   if the Court would like us to.

19             THE COURT:  How many are there?

20             MR. ROSS:  Two.

21             THE COURT:  I'll take them.

22        (Laughter.)

23             THE COURT:  Because I got -- I got CDK's delivery, I

24   think, yesterday, right?

25             Thank you for not only doing the flash drive but

1    giving me some hard copies, because that's fine.  That's great.

2    And it didn't -- it could choke a horse, but it won't fill a

3    room, so --

4                MS. MILLER:  Fair enough.

5                MR. ROSS:  The way that this has been prepared, Your

6    Honor, is there is a cover declaration from one of the

7    correspondents in the emails.  Just to make absolutely sure

8    that there's no doubt about the context, there are two emails

9    that are exhibits to the declaration.  Both the unredacted and

10   the redacted versions are in there, those two copies of the

11   declaration.  It's just an extra copy in case the clerk needs

12   one.

13               THE COURT:  Okay.  And will you serve -- did you

14   serve the other side with these yet or you're going to?

15               MR. ROSS:  We were not planning to.

16               THE COURT:  Oh, that's right.  It's *in camera*.  Never

17   mind.  Bye.  Yeah.  Thanks.  I got it.

18               MR. HO:  Your Honor, just to --

19               THE COURT:  And the declaration is also *in camera*,

20   too, at this point, right?  Yes, because that's explaining

21   what's going on.

22               I'll have to make a decision as to that, but okay.  I

23   got it.

24               MR. HO:  Your Honor, if I could just --

25               THE COURT:  Any objection from you guys to my seeing

1    it *in camera*?

2            MR. HO:  No.  In fact, that was our request.  And as

3    Mr. Ross indicated, the parties have now agreed that that's the

4    appropriate course.

5            THE COURT:  Okay.

6            MR. HO:  There are two documents that have now been

7    handed to you for *in camera* review.

8            As we pointed out in our motion, there are still a

9    host of additional documents that have been redacted that on

10    their face do not seem to entail attorney-client privilege

11    communications or be otherwise protected.

12            As we point out in our motion, the defendants are

13    still taking under advisement whether they will withdraw any of

14    those redactions.  So I just want to make clear that although

15    there are only two documents as to which this privilege issue

16    is ripe and they've now been handed to Your Honor for *in camera*

17    review, this is part of a larger set as to which the parties

18    have had meet-and-confer discussions.

19            THE COURT:  Okay.  But that goes a little bit to

20    Reynolds' objection that you didn't meet and confer before

21    doing this.

22            So what am I supposed to do with the motion now?

23    Should I set a date by which you're going to fish or cut bait

24    on these things?  I mean --

25            MR. HO:  Well, Your Honor, just --

 1          THE COURT:  -- do you want to file a supplement at

 2   this point or do you want to just let me --

 3          (Discussion off the record.)

 4          THE COURT:  Yeah.  I mean --

 5          MR. HO:  Your Honor, to be clear about the -- there

 6   are, I think, two issues.  One is there are other documents as

 7   to which we have not even yet moved.

 8          THE COURT:  Got it.  Oh, got it.

 9          MR. HO:  The defendants are still considering whether

10   to withdraw the objections.

11          THE COURT:  Okay.

12          MR. HO:  Now, the defendants did take issue with the

13   meet-and-confer with respect to the two documents that Your

14   Honor has now received.

15          The short of it is that there was a letter that we

16   sent to the defendants or we thought we had sent to the

17   defendants that inadvertently was sent only to our internal

18   team as opposed to the external team.  And so we thought that

19   we had met and conferred fully with the defendants when, in

20   fact, by our own mistake, admittedly, we hadn't actually sent

21   them the letter.

22          We then, when we realized that, met and conferred

23   with the defendants, and it became clear that there was not

24   going to be agreement as to whether or not these redactions

25   ought to be withdrawn.

1          THE COURT:  Okay.

2          MR. HO:  So I think the meet-and-confer issue is now

3   essentially water under the bridge.  The parties have agreed

4   that Your Honor should review those documents *in camera* to

5   determine whether the redacted portions are, in fact, protected

6   by the attorney-client privilege.

7          THE COURT:  Okay.  Got it.

8          You wanted to say something, Mr. Ross?

9          MR. ROSS:  Just -- and I agree that there's no need

10  to rehash all the issues of the correspondence and the

11  meet-and-confer.

12         I don't -- I don't necessarily agree it's accurate

13  with what Mr. Ho has said, but I agree it is water under the

14  bridge.

15         The one just additional piece of context, both of

16  these two documents and all of the other documents that have

17  been mentioned in the motion, although not moved on, all those

18  are documents that were produced originally to the FTC and then

19  reproduced in the MDL exactly as they were produced to the FTC.

20         So, in other words, there weren't redactions that

21  were made in the course of discovery responses here.  They

22  were -- those documents were as redacted as produced to the

23  FTC.  And so it's -- it's not really as if we were considering

24  unredacting them.  It's just we're reviewing the same documents

25  in the course of production in this case.  And if they are not

1    appropriate to be redacted and -- under the federal rules, we

2    won't redact them.  And that will -- we'll cross that bridge

3    when we come to it.

4          THE COURT:  Right.  But the relevant thing is -- the

5    relevant consideration is plaintiffs object to that right now.

6    And so you're talking about it.  And if I have to deal with

7    that, I'll deal with it, but -- right?

8          MR. ROSS:  Precisely.

9          THE COURT:  Right.  And I don't want to argue the

10   motion that hasn't been filed yet.

11         But I am going to grant plaintiffs' motion to compel

12   the production of these unredacted documents, which is on the

13   docket No. 397, I think, just so the docket gets cleared up on

14   that.  And then I'll look at your -- what you sent -- what you

15   submitted to me and rule.  So that's good.

16         Okay.  I'd like to now move to the main subject that

17   we're here today, which is the deposition protocol.  Okay?  I'd

18   like to say a couple of things at the outset and then work

19   through this, if I can.  And some of it I have questions about.

20         But to me the defendants' most significant objection

21   to plaintiffs' deposition protocol proposal is that plaintiffs

22   propose too many depositions for discovery to close on February

23   15th, 2019, which is our current discovery close date, right?

24   I mean, that's a -- you got other objections, but underlie -- a

25   big objection is that that controls the number of depositions

1  and how many a week and everything else.  Right, Ms. Miller --

2  Ms. Gulley?

3          MS. GULLEY:  Yes, sir, that's correct.

4          THE COURT:  And I agree.  I think defendants are

5  probably right, that there are -- that the plaintiffs are

6  proposing to take too many depositions for a discovery to close

7  on February 12th.

8          I mean, can it be done by February 12th?  Yeah.  It

9  can only be done with double- and maybe triple-tracking

10 depositions when you consider Thanksgiving, Christmas, and the

11 fact that some documents -- you know, you're not going to hit

12 the ground -- on October 15th, you're not going to be doing 25

13 depositions.  You know, you're not -- I mean, some stuff is

14 sill happening.

15         I still have motions under advisement that are going

16 to affect this.  People are going to have to move forward.  You

17 know, the perfect is the enemy of the good here in terms of how

18 we're going to get that stuff.  You may take depositions and

19 later get documents.  But as long as -- in order to move this

20 case forward, that's what we're going to have to do.

21         But that's a lot of pain.  That would be a lot of

22 pain in this case.  I've been in these cases.  You know, I'm

23 sitting here now trying to direct traffic, but the defendants,

24 I think, cite *In Re:  CFS Securities Litigation*.  You probably

25 figured this out.  I was lead counsel in that case.  I know

1    what 200 depositions looks like, and I know what double- and

2    triple-tracking depositions looks like.  And if it has to be

3    done, it has to be done.  I'm just not sure it has to be done

4    in this case right now.

5            One of the prime movers of the fast track that we're

6    on was Authenticom and the notion in Wisconsin that -- and in

7    the Seventh Circuit that Authenticom was going to go out of

8    business unless it can -- unless we can get this done

9    lickety-split.  And I get that.  I get the economic imperative

10   there.

11           But I talked to Judge Dow about this, and he said

12   when he's had you in front of him that that imperative has

13   somehow been reduced.  And defendants say it was reduced in

14   their deposition protocol motion and -- or, you know, it's not

15   as, quote/unquote, serious.  I think it's serious for

16   Authenticom.  But the defendants said in their brief and

17   explained to me kind of what had happened and what's the

18   history on it.

19           And the plaintiffs didn't jump on that in the reply

20   that they filed, which was without leave, but I'm cool with

21   that.  I mean, it was helpful.

22           So, you know, to me, if we're going to get this done

23   by February 15th, plaintiffs either have to cut down

24   dramatically on the number of depositions they want to take or

25   the discovery close date would have to be extended or both.

1    You're playing chicken a little bit with each other

2    here, and I recognize that, too.  I mean, I've been there as

3    well.  But to me I think discovery is going to have to be

4    extended here modestly.  But I don't think you can do all that

5    you're talking about doing by February 15th, do it well, do

6    your clients justice with it, and not drive yourselves and your

7    staff and even your clients nuts on this.  Okay?

8    I mean, that's my overall view.  Discovery would have

9    to be extended to get all the depositions done in a timely

10   manner without killing yourselves, because I have some pending

11   discovery disputes under advisement, which happens, and because

12   we're still producing documents.

13   And I know everybody intends to get this done by

14   October 12th and intends to get everything done by November

15   2nd, but stuff happens.  And, you know, I -- you know, I

16   just -- I just feel we're going to have to relieve the schedule

17   a little bit to get this done even if I cut down on the number

18   of depositions that are going to be taken, which I'm going to

19   do.  Okay?

20   Maybe I should address numbers first and then hear

21   from you on this.  Maybe plaintiffs are going to say, "Judge,

22   we can't -- we can't bear extending discovery."  And I'll have

23   to understand why that's the case better than I do now.

24   Let me talk about numbers, and then I'm going to

25   pause and interact with you a little bit.  And then after we

1  talk about that, we'll talk about the other issues you've got

2  on the plate; scheduling issues, the deposition protocol order,

3  Rule 30(b)(6) depositions, all this kind of stuff.

4         Let me ask a question before I talk numbers.  In

5  their dep protocol, defendants propose that within three

6  business days of me ruling on the dep protocol, you then would

7  tell plaintiffs which witnesses you want to depose in October.

8  But then what I understood you to be saying is then we want to

9  pause before we tell them any other depositions to be taken

10  after October.

11         Was that -- Ms. Gulley, it looks like you're on point

12  for this, so --

13         MS. GULLEY:  Thank you, Your Honor.

14         So in terms of October because of just the timing of

15  this hearing, we went ahead and already provided that to them.

16  So that --

17         THE COURT:  Okay.

18         MS. GULLEY:  -- that piece is done.  It's subject to

19  some disputes and letters and whatever.  But we've done that.

20         In terms of taking a pause and moving forward, you've

21  heard plaintiffs describe that they're trying to meet the

22  substantial completion deadline.

23         The defendants produced, you know, millions of

24  documents in the spring because these were reproductions of the

25  FTC documents, at least more than a million.

1      MS. MILLER:  Predominantly.

2      MS. GULLEY:  Collectively.  And the plaintiffs, on

3  the other hand, we're just now getting it.  And there are five

4  plaintiff families.  There's 37 named plaintiffs.  And these

5  are not, you know, like individual consumers.  These are major

6  corporations, all 37 of them, one of which's magnitude is

7  larger than either defendant.

8          And we're just now starting to see the information.

9  So we're just not able to say, "Here's the list of everyone

10  we're going to depose, number one."  Number two, we're here

11  today to talk about how many, so we didn't know what -- you

12  know, we didn't know the answer.

13          And so instead we proposed -- really we're flexible

14  on how the scheduling works.  We've proposed month by month,

15  you know, sometime before the beginning of the month, but I'm

16  happy to talk to plaintiffs more about whatever way it works

17  for them.  But all at once at the beginning just doesn't work.

18      THE COURT:  Okay.  I hear that.  So that was -- that

19  was what motivated that proposal, but at least now you've got

20  at least some proposal as to what you'll be doing in -- in

21  October.

22      MS. GULLEY:  Yeah.

23      THE COURT:  These are depositions that need to be

24  taken anyway.  They can be taken without substantial document

25  completion.

1          And have plaintiffs also told the defendants the deps

2     that you want to take?

3          MS. WEDGWORTH:  Yes, Your Honor, we have for October.

4          MR. HO:  Yes.

5          MS. WEDGWORTH:  And, in fact, we've got it throughout

6     the class period, and we've attached a calendar where we've put

7     in those names.

8          THE COURT:  I saw -- I saw your calendar.

9          MR. HO:  Yeah, Exhibit A to our motion has a calendar

10    where we have proposed names of all of the deponents that we

11    intend to seek.

12         So as to the number -- and I know we're going to get

13    to the number at some point -- this is not just an abstract

14    idea that we want or need to have 45 deponents.  We have

15    actually looked at the documents and identified the people that

16    we think are important to the proof in our case.

17         So that's what drives the number that we've proposed.

18    It's not an academic exercise.

19         MS. MILLER:  And, Your Honor, Britt Miller on behalf

20    of CDK.

21         Mr. Ho's comments illustrate the pickle we are in.

22    As Ms. Gulley said a moment ago, the defendants have produced

23    some 2.6 million documents that plaintiffs have had -- pages,

24    sorry -- 2.6 million pages that plaintiffs have had months and

25    months to go over.

1      And so it's quite easy for them to generate a

2  calendar based on -- on the people they think they want to

3  depose because they have all these documents.

4      We don't necessarily know who we want to depose

5  because we don't have documents for a number of the -- of the

6  parties.  We don't have -- and we certainly can't plan out,

7  obviously, until Your Honor tells us numbers because we may

8  have to make some decisions as to who we're going to call and

9  who we're not going to call.

10      But plaintiffs' calendar gave them the opportunity to

11  pick all of the days they wanted and all of the people they

12  wanted in the order they wanted, and left defendants to

13  essentially try to slot theirs in among with nothing to go on.

14      THE COURT:  Yeah.  Well, I'm not going to approve

15  that kind of calendar.  I thought it was good.

16      The exercise there was to show that -- for plaintiffs

17  to propose graphically the number of depositions that they

18  propose, even if we don't take them over Thanksgiving and

19  Christmas, can be taken within the time period that has been

20  allotted.

21      And I laughed when defendants said, "Yeah, but they

22  left us depositions to take on Monday and Friday so we have to

23  travel Sunday night and leave late on Friday."

24      So I get it.  But I looked at that calendar more as

25  illustrative or a demonstrative exhibit, because you don't know

1    if any of these people are available on any of the dates.  You

2    went through the calendar.  You picked Tuesdays and Thursdays

3    and, you know -- or Tuesday, Wednesday, and Thursday, and you

4    put some people's names down to tell me that it can be done by

5    February 15th.

6           But we don't have -- the thing that I -- the problem

7    that I have just in terms of the logistics is, A, I don't have

8    defendants' people on that calendar.  B, I don't know whether

9    any of those people are available or in Aruba at that period of

10    time.  And, C, we're not going to -- I don't think, given where

11    you are on document production and in terms of document review

12    and in running the search terms and with the motions I have

13    under advisement, you're going to be able to meet that schedule

14    head on, because you're going to say "I need these documents; I

15    need these," and stuff's going to be pushed.

16           And, again, I don't see the reason for the -- for

17    the -- for the game of chicken.

18           MR. HO:  Your Honor --

19           THE COURT:  I want to -- you've got 45 deps.

20           How many document custodians are there all over the

21    place, plaintiffs, defendants, break it down however you want?

22           Because you said in your submission that 42 of your

23    45 deponents are already document custodians that defendants

24    agreed to, right, Mr. Ho?

25           MR. HO:  I believe that's correct, Your Honor.

1    THE COURT:  Okay.  But that doesn't mean they've all

2    agreed those people have to be deposed.

3        So how many document custodians are there for

4    defendants?

5        MS. MILLER:  For defendants, it's 28, I believe, for

6    Reynolds and 31 for CDK Global.

7        The -- for the defendant CVR, which is only named in

8    one of the cases -- I believe Your Honor has a motion up --

9    they've currently asked for two deponents, but we have not

10   reached any agreement on custodians.

11       MR. HO:  I believe it's about 70 deponent --

12   custodians that we requested.

13       MR. NEMELKA:  Well, we have 59 agreed between CDK and

14   Reynolds.  And then we have a dispute over the CVR custodians,

15   and we've requested -- I think we're at eight.  But they've

16   agreed to 59 custodians and --

17       THE COURT:  And then you've got a dispute on the CDR

18   [sic] custodians, right?

19       MS. MILLER:  Yes, Your Honor.

20       THE COURT:  Okay.  So there could be up to 70

21   custodians depending upon how that -- and on plaintiffs' side?

22       MS. WEDGWORTH:  Your Honor, class plaintiffs'

23   dealerships, I'm not exactly sure on the custodian number.  I

24   think it's right at 25-ish.

25       We have 19 dealerships, and Ms. Gulley mentioned that

1  they're major corporations. They're not. Some of these are

2  mom-and-pop dealerships. Some of them are one or two rooftops

3  or three rooftops for one owner dealership type but not major

4  corporations any of the named plaintiffs with regard to the car

5  dealerships.

6          So right around 25 custodians even though they may be

7  19 dealerships.

8          THE COURT: And what about for the vendor plaintiffs

9  and Authenticom?

10          MS. MILLER: Your Honor, we actually have a list if

11  we want to make it shorter.

12          For the class plaintiffs, we show, I believe, 27 --

13  I'm sorry. For the dealer class plaintiffs, we show 27,

14  possibly 28. It's unclear.

15          For Authenticom, 17. For MVSC, 6. For Cox, 10. And

16  for Autoloop, 5.

17          MR. HO: Your Honor, as I think those numbers show,

18  you know, there -- I think one overarching point here is that

19  there's a bit of a false equivalence being made by the

20  defendants that suggest that whatever is, you know, sauce for

21  the goose ought to be sauce for the gander.

22          This case is fundamentally about the conduct of the

23  defendants. Yes, there are some counterclaims that have been

24  brought against Authenticom. There might be some other

25  counterclaims. But the plaintiffs here are, with the possible

1     exception, arguably, of Cox, as Ms. Wedgworth indicated, very

2     small companies.  There are not a lot of custodians.  There are

3     not going to be a lot of documents, certainly not anything like

4     the defendants have produced.

5           The defendants have already produced a lot of

6     documents, as Ms. Gulley and Ms. Miller indicated.  And because

7     the defendants' conduct is fundamentally what is at issue, the

8     question of whether we can get started with depositions is

9     really about whether the plaintiffs feel comfortable proceeding

10     with some depositions even as some of the last trickle of

11     documents flow in.

12           And we do feel comfortable with that.  We do not want

13     to wait for every last document to come in in order to start

14     the deposition process, precisely because of two things.  One,

15     we feel like we have a lot of the evidence that we need and

16     want to depose witnesses on.

17           And two, there is a serious imperative on the part of

18     Authenticom, in particular, to try to get this case moving as

19     quickly as -- restarted as quickly as it can be.

20           Recall, Your Honor, that Authenticom filed its

21     preliminary injunction motion in June of 2017.  So we're here

22     15 months later when we should have been at trial.  The trial

23     date before this MDL was created was October of 2018, basically

24     now.  And every month and every week that goes on where

25     Authenticom can't get to trial is another week or month where

1    it is operating on a shoe string and being subject to the
2    unlawful conduct that we think needs to be stopped.

3         So we really do think that it can -- this can be done
4    on a fast track, and it not only should be done but needs to be
5    done to comply with what the Seventh Circuit directed.

6         MS. GULLEY:  Your Honor, Andy Gulley again for
7    Reynolds and Reynolds.

8         The plaintiffs -- the 37 plaintiffs and 5 family
9    groups have the evidence that we need in this case.  And, you
10   know, some sort of uneven split makes no sense if it favors the
11   plaintiffs.

12        It's not just the counterclaims that have already
13   been filed regarding, you know, our proprietary systems and
14   access to those systems, but all of the damages information
15   comes from all of the plaintiffs.  Pass-through, direct
16   pricing, this comes from the vendors and dealers.

17        This idea that evidence of the conspiracy -- the
18   conspiracy alleged in this case now that has been -- that the
19   market division theory has been dismissed is just a supposed
20   conspiracy to block integrators like Authenticom.  That is
21   what -- that's all that's left.

22        Reynolds isn't sued on section 2 in the MVSC case.
23   And you've heard, I'm sure, that we have entered an agreement
24   in principle with the class.

25        What we're talking about is a conspiracy that is just

1   an agreement to block supposedly allegedly integrators.  That's

2   the -- that's the thread through this.

3          The evidence of that is going to be with the vendors

4   and the dealers and Authenticom if there is any.

5          THE COURT:  Well, there's --

6          MS. GULLEY:  Some of it.  I mean, we need those -- we

7   need evidence from them, obviously, on all of these things.

8          But your main question about how many custodians were

9   there, everyone reserved the rights to say these are not

10  appropriate witnesses.  These are apex witnesses, CEOs, CFOs,

11  whole departments, super cumulative stuff.

12         One of the witnesses on their calendar is a guy, Jeff

13  Wonderly, that left Reynolds nine months before any alleged

14  conspiracy in May 2014.  The first witnesses on their calendar

15  for CDK -- for Reynolds anyway and the second for CDK is the PR

16  guy that issues press statements.  I mean, these are, I mean,

17  peripheral witnesses for sure.

18         THE COURT:  I hear --

19         MS. WEDGWORTH:  Your Honor, may I respond to

20  Ms. Gulley's points, just a couple or --

21         THE COURT:  Yeah.  Let me just respond to one thing

22  Ms. Gulley said.

23         Yes, there's a lot of evidence in the hands of the

24  plaintiffs.  There's also a lot of evidence in the hands of CDK

25  and Reynolds in terms of their discussions, the, quote-unquote,

1    conspiracy.  They're the alleged conspirators.  There's

2    evidence in the hands of both people.

3                    You want to say one thing, Ms. Wedgworth?

4                    MS. WEDGWORTH:  Yes.  On the uneven split where Ms.

5    Gulley said the conspiracy is to block integrators, the class

6    dealership has a claim that no one else here has, and that

7    claim is regard to the monopolization of the data -- I'm

8    sorry -- dealer management systems.  We're the only ones who

9    have alleged that.  That is a different claim than the

10   conspiracy to block integrators.

11                   And from -- due to that, we've alleged in our

12   complaint the DMS which the dealerships bought directly from

13   the defendants, those prices have increased.  And more

14   importantly, the functionality has been decreased.  And that's

15   a claim that only the dealerships have.

16                   So on top of all the claims that you hear from the

17   vendors and the individual plaintiffs' dealerships who also

18   have those claims as well have a different claim.

19                   Plaintiffs have served to date 72 subpoenas.  I think

20   today we're serving two more with regard to vendors.  The

21   dealership plaintiffs have the additional task of showing the

22   pass-through.  And in showing the pass-through, that's a lot of

23   third-party discovery.  It -- the 72 subpoenas speak for

24   themselves.

25                   To limit the number of depositions that are being

1    taken for so many different groups of plaintiffs certainly

2    prejudices everyone on the plaintiffs' side, and it's not an

3    even split.  We have separate claims.

4            THE COURT:  Okay.  I get it.  I'm --

5            MS. GULLEY:  Can I -- I'm so sorry, Your Honor.  Just

6    only to respond to the -- I'm so sorry -- to the competing

7    issue of we need lots of discovery, and we're hearing from the

8    plaintiffs, and we need to move really fast.

9            I think Your Honor has already said it.  The two just

10   cannot coexist.  There was a deposition in this case before the

11   schedule happened of a 30(b)(6) of Authenticom on their need

12   for speed.  I can't talk about it because my client is in the

13   back of the courtroom and, it's under -- it's a sealed

14   deposition.

15           What I can say is we are here.  Authenticom is not

16   going out of business.  Their public statements to the press

17   are that they're well positioned and viable.  That's a quote.

18   And, you know, there's this -- this professed need for speed,

19   it just cannot coexist with the idea that we're going to have

20   70 third-party depositions and -- and that we need more than a

21   dozen depositions from each defendant in addition to all of

22   these document custodians.

23           THE COURT:  Okay.  I -- I hear everything you're

24   saying.  I'm -- I'm being presented this at a 30,000-foot

25   level.  Okay?  So I'm making 30,000-foot decisions.

1    As I get more into your case and spend more time with

2  this particular case in birth order, I'll understand this a lot

3  better.  But you're asking me -- the way you're presenting the

4  issues to me are at a 30,000-foot level.  Okay?

5    With respect -- Mr. Ho, I feel for Authenticom.  I

6  would feel for them as their lawyer, and probably they are

7  extremely frustrated.  But there's an MDL case here, and I

8  understand the Seventh Circuit's directive.  It was a directive

9  that, as far as I understand, was based upon a -- you know, an

10 imperative that every plaintiff and every piece of litigation

11 in federal court around the country wants their case to be

12 decided as soon as it can be, because it's a drain on

13 resources.  It prevents planning.

14   And Authenticom on that spectrum may be more bothered

15 or less bothered.  And they have a vote in this whole process,

16 but I'm just not sure, at least based on what I know at a

17 30,000-foot level, it controls the decision to make this case

18 go forward at breakneck speed.  I mean, I get it.

19   And the case should move forward.  I'm not saying put

20 this on a back burner someplace, but I haven't yet seen -- and

21 maybe it's because I'm a new kid on the block -- convincing

22 evidence to me that says something other than we should get

23 this done as soon as we can, in part because we have a company

24 that got dragged into this and had its own case in Wisconsin

25 and is now being prejudiced by this, but on the other side of

1    that is prejudicing a whole -- the defendants, frankly, and

2    potentially the plaintiffs who are not Authenticom, too, by

3    pushing this case at breakneck speed.

4              And, you know, the plaintiffs haven't said -- and I'm

5    not sure you want to say this -- that, you know, if we go

6    through depositions and then we get a document produced two

7    months from now that we think we should have had with

8    Mr. Jones' deposition, we want -- we're going to come back in

9    and say we want to retake Jones' deposition or reopen it.  Why?

10   Because we didn't wait to take Jones' deposition until we

11   actually got his document production.

12             So I don't know where we're going to be on that -- on

13   that spectrum.  But at a 30,000-foot level, I have to say that

14   I don't understand -- we have two defendants.  This is a

15   two-defendant case, plus a joint venture.

16             Based on what I know now -- and I appreciate what you

17   told me -- we looked at everything, and we've put on that list

18   who we think we need to depose.

19             I take that at face value.  It almost looks to me

20   like a letter from -- what Mark Twain said.  "I wrote you a

21   long letter because I didn't have time to write you a short

22   letter."  Okay?

23             I have a hard time believing that with two defendants

24   you really need 45 depositions from these folks.  I don't get

25   that.

1    I think defendants' proposal of 25 depositions is

2    much more.  I mean, I've been -- you know, you -- defendants

3    referenced the *In Re:  Broiler Chicken* case, which is a bigger

4    case than this.  I get it.  This courtroom is full, as well as

5    the jury box, when those people are in here.

6    But in an effort to try and streamline what needs to

7    be done -- and they have big companies, too, about broiler

8    chicken price fixing -- they're taking a lot less depositions

9    of both plaintiff and defendant families than you're proposing.

10    I have a hard time believing, based on what I know

11    now, that 45 depositions is the right number.  I have a better

12    time believing that based on what you know now you think maybe

13    I'm going to want to take 45 depositions, and we put them on

14    the calendar, but when push comes to shove, a lot of those

15    people may not get deposed.

16    Now, there's a couple ways to do this.  Again, you've

17    given it to me on a 30,000-foot level.  On a 30,000-foot level,

18    I don't see 45 depositions.  I see more like 25 or 30

19    depositions than 45, and I think that is potentially generous.

20    I don't necessarily like the "everybody has the same

21    number of depositions."  What I like is people take the number

22    of depositions that need to be taken.  But I also don't like

23    60-40 as, well, that's the way it's got to be because we got to

24    prove our case.  That doesn't make sense to me.

25    I mean, you've got a lot of plaintiffs.  They're -- I

1   want to talk about in the time we have -- and we're going to

2   run out of time here unless we're efficient, because I have a

3   settlement conference in three wrongful conviction cases coming

4   in at 11:00.  So I allowed just enough time for what I thought

5   we needed to do here.

6           But, you know, there's 25 dealer class plaintiffs.

7   Theoretically, they should be entitled to depose all those

8   people.  There's nine vendor class people, right?

9           I mean, I just -- there is something very

10  inconsistent with an insistence that we must get done by a date

11  that was set prior to this, February 15th, and the number of

12  depositions you're asking for.

13          So we can do this a couple of different ways.  I

14  could tell you right now how many depositions I think are

15  appropriate in the case based on my 30,000-foot view.  And if

16  you don't like it, you can come back with "These are the people

17  we think we need to depose for these reasons," and I'll sit

18  around the table with you and hack it up.

19          I would rather -- the way I would rather do it is

20  come up now to get a deposition protocol in place with a

21  certain number of depositions on the calendar.  And if those

22  are wrong, it can't be done, there are other people, I can deal

23  with it.  And I'd rather have you talk -- I mean, I think the

24  discovery cutoff date needs to be moved.  I don't know if it's

25  30 days or 60 days.  I'm not talking about 120 days or 6

1    months, but I don't see how you're going to get this done while
2    you're still producing documents.

3           And I understand you're going to take deps without
4    all the documents produced, but to me, you're -- I'm not sure
5    why you would want to do that.

6           To me, I could see approving in a deposition protocol
7    80 depositions; 25 plaintiffs, 25 defendants, 15 each for third
8    parties.  I could see 90 depositions even, 30, 30.  Or some --
9    I just don't see how -- I don't -- I don't understand why this
10   is a 100-deposition case.  I really don't.

11          MR. HO:  May I address that, Your Honor?

12          THE COURT:  I've been in -- I've been in and
13   supervised as the judge -- I mean, I've been in as a lawyer and
14   supervised as a judge 100- or 200-deposition cases.  I don't
15   know why this is that kind of case based on the conspiracy
16   alleged, even based on the counterclaims that are coming in.

17          I mean, those are -- to me, I understand there's
18   discovery on that, but that's securities stuff, right?  You're
19   saying that Authenticom unlawfully entered into your systems,
20   right?  So there's some -- there's document discovery -- right?

21          MS. GULLEY:  Security and intellectual property --

22          THE COURT:  Okay.

23          MS. GULLEY:  -- copyright, et cetera.

24          THE COURT:  Right.  But that's not a heavy deposition
25   case, I don't think.  That's a document case, and that's, you

1    know, some people who knew what was going on with that stuff.

2          I don't -- I don't see that as a -- on either side as

3    a heavy deposition case.  There's probably a couple people at

4    the defendants who the plaintiffs need to -- who Authenticom

5    needs to depose about that, and there's some -- some other

6    folks.

7          So, again, you're presenting it this way.  You're

8    teeing it up as -- on a 30,000-foot level.  I'm giving you my

9    30,000-foot view.  If I need to get into the weeds on it, I can

10   get into the weeds on it.  I'm not trying to prejudice anybody.

11   I'm trying to help you move the case forward in some way.

12         Mr. Ho.

13         MR. HO:  If I could, Your Honor, address the 45

14   depositions and why 25 really is not adequate for this case.

15   And I will try to bring it down ever so briefly from 30,000

16   feet to, you know, what we know about what happened.

17         As I think all parties here would concede, one core

18   element of this case is whether there was a conspiracy between

19   CDK and Reynolds to drive out independent data integrators and

20   to divide the market for data integration between the two of

21   them.

22         We know that there was, in fact, effectively a task

23   force between the two companies in which that agreement was

24   consummated and implemented.  And we know from the documents

25   that the participants of that -- in that task force included

1    nine people from Reynolds and six people from CDK.

2              We also know that for each company internally, there

3    were additional people who did not necessarily participate

4    directly in this joint task force but that were involved in

5    implementing the agreement on each side.  There were six

6    additional people on the CDK side and several additional people

7    on the Reynolds side.  So --

8              MS. MILLER:  Your Honor, I don't mean to interrupt

9    Mr. Ho, but he's speaking about documents that have been marked

10   under the protective order, and there's at least one person in

11   the courtroom that doesn't -- I don't believe belongs to both

12   sides.

13             THE COURT:  Okay.  So be careful with what you're

14   going to be talking about.

15             MR. HO:  I appreciate that reminder.  Thank you.

16             So bottom line is, if you -- if you talk about just

17   who was in the room where it happened, there are 20-some-odd

18   people who are percipient witnesses to the existence of the

19   agreement, the terms of the agreement, the implementation of

20   this agreement.

21             And I think we are highly motivated and ought to have

22   the right to depose, if not all of them, certainly the

23   substantial -- a substantial number of those people.

24             That alone, if you add it to the three or so 30(b)(6)

25   depositions that will inevitably be taken of each of the three

1   defendants, puts you above the 25 deposition limit.  And that's

2   not even considering all of the other issues that are involved

3   in this case beyond simply the existence of the conspiracy.

4       You know, we have -- we represent a company, Cox, and

5   another company, Autoloop, who are competitors of CDK and

6   Reynolds in the application market.  They have allegations that

7   CDK disadvantaged their applications.  That is another set of

8   issues separate and apart from the conspiracy.

9       And so if we were to be limited to 25 people, we

10  would either be deprived of the ability fully to investigate

11  and explore the core conspiracy, or we would have to forego

12  investigating all of the other issues that are germane to the

13  various cases in this proceeding.

14      So that's why I say, when we came up with the number

15  45, it was not, as Your Honor was suggesting, oh, we may depose

16  45 people.  We know what the core elements of this case are.

17  We have been litigating it for more than 18 months, and we

18  really do think that 45 depositions is appropriate in light of

19  the evidence that we know of and our need to develop it for

20  trial.

21      THE COURT:  If you -- I didn't know anything about

22  what you just said.  Okay?  That's more information than I have

23  in the deposition protocol in terms of the task force and the

24  people involved.

25      I don't know, as I sit here, whether everybody on the

1    task force needs to be deposed or only some people do, but I
2    understand how you're pulling numbers.
3           Explain to me, then, why with 25 dealer class reps, 9
4    vendor class people, Authenticom's witnesses, you want to limit
5    the defendants to only 25 depositions.
6           MR. HO:  Well, they've only asked -- they only
7    requested 30.  So I think the bid and the ask on the
8    plaintiffs' side is relatively --
9           MR. NEMELKA:  Well, 25 is the --
10          MR. HO:  Well, the --
11          THE COURT:  Well, they requested 30 in -- with a
12   couple of -- you know, one, in an attempt to get you down and,
13   two, in an attempt to shoehorn everything reasonably they
14   thought or at least possibly into a February 15th discovery
15   cutoff date, right?
16          MS. MILLER:  That's exactly right, Your Honor.
17          MS. GULLEY:  And, Your Honor, just to be clear, we
18   dispute very strongly that there was any such task force, and
19   the -- you know, obviously Reynolds has been blocking
20   Authenticom and integrators like Authenticom for more than a
21   decade.  They did not need a task force.
22          MR. HO:  Well, Your Honor, I'd be happy to --
23          THE COURT:  I mean, I read -- I know what the case is
24   about.  I know what they're alleging --
25          MS. GULLEY:  Yeah.

1          THE COURT:  -- that you've done and the consequences

2     of it.  And that's what you're going to fight about but --

3          MS. GULLEY:  But to your -- to your point --

4          MR. HO:  And, Your Honor, I'd be happy to lodge the

5     document with the Court if Your Honor would like to look at the

6     document that I was referring to.

7          THE COURT:  What document?

8          MR. HO:  The document that actually shows the minutes

9     of the meeting that involved these nine and, you know, the

10    people that I was alluding to before.

11         MS. MILLER:  Your Honor, of course, the -- their

12    interpretation of what that document says and what it -- it

13    does is very different than we think reality.

14         THE COURT:  Yeah, but they --

15         MR. HO:  And, Your Honor, that's exactly --

16         THE COURT:  -- I'm not interpreting -- excuse me.

17    I'm sorry to interrupt, and it drives Nancy crazy, I know, when

18    I do that.  I try not to do it much.

19         But I'm not going to decide the case.  The only

20    question is how many of those people should be deposed.  That's

21    what I'm looking at here.

22         Mr. Ho, I have a very simple answer to what you're

23    telling me.  If you need to depose all of those people -- if we

24    have to take 100 depositions in the case, I think that I need

25    to allow more time to do that.  Okay?

1      So if you convince me -- you know, if you and

2  Authenticom and everybody else on the plaintiffs' side says,

3  "Judge, we're going to be terribly prejudiced if we can't take

4  these depositions," then something has to give, because I don't

5  think you can get them done in that period of time other than

6  doing it at breakneck speed with some prejudice to the

7  defendants' interests, too.

8      And I haven't yet been convinced that that breakneck

9  speed is necessary other than based on two things.  One,

10 Authenticom started this fight in Wisconsin, and everybody

11 jumped into the pool, and it's disrupting their ability to get

12 their case done; and two, some conflicting views about how

13 their financial circumstances are strangling it.  You know, if

14 public comments are out there that they're well positioned and

15 financially strong, fine.  I get it.

16     There's no question in my mind that Authenticom's ox

17 is gored by the fact that everybody jumped into the pool when

18 they started to swim.  And -- and the Seventh Circuit has

19 said -- and I take that seriously -- that we need to keep

20 that -- take that into consideration as we move this case

21 forward.

22     But I -- you know, and I appreciate the fact you put

23 all your depositions on a calendar.  But, you know, that and

24 2.50 will get you on a bus in Chicago.  I'm not sure all of

25 those depositions are going to be taken on those days and

1     you're going to be at breakneck speed.

2          So, you know, I'm not averse to being convinced that

3     there are more depositions needed in this case even though

4     there's only two defendants, but you're going to have to do

5     something if you want to keep the discovery being done in a

6     relatively narrow period of time that says, maybe we're not

7     going to depose all the nine people from Reynolds and the six

8     people from CDK on the task force.  Maybe we don't have to

9     depose all of those people.  Maybe we only have to depose

10    people who are going to be called as witnesses by them.

11         I mean, I don't know, but there are -- there are ways

12    to deal with this.  Based on the 30,000-foot level that I am

13    seeing, I didn't -- the only thing you told me as to why 45

14    depositions were necessary is, we know what we're doing; 42 of

15    those people are document custodians; and therefore, we should

16    be able to take their depositions and preclude the defendants

17    from taking any more because we have the burden of proof, and

18    they don't.  But you got a lot of plaintiffs.

19         One question I wanted to deal with -- and I don't

20    want to forget it, and I want to deal with sooner rather than

21    later -- is defendants' request about deposing other people

22    during class certification, because I think that was kind of a

23    safety valve that you oppose.

24         And, again, I'm not sure how you can have both your

25    cake and eat it too on that.  They're plaintiffs.  I don't know

1    why they shouldn't be deposed.  I agree with you.  I'd rather

2    have them deposed during the discovery period than after the

3    discovery period, but that adds depositions.

4         MR. HO:  Your Honor, if I could just add one point.

5         You know, I think that what the Seventh Circuit

6    directed and what Judge St. Eve directed before she was

7    elevated to the Court of Appeals was for -- to have creative

8    solutions.  And we've been proponents of those kinds of

9    creative solutions.

10        I think one creative solution that we've put on the

11   table is to have more than your ordinary number of half-day

12   depositions.  So I think that in many of these -- in many

13   cases, depositions of these folks need not take an entire seven

14   hours on the record.

15        And so if you're talking about a window where there's

16   80 however many business days, not counting all the holidays,

17   and we want to get to a number of depositions that allows us to

18   at least touch on all of the people that we think, again,

19   include percipient witnesses to the unlawful agreement, I think

20   having a significant number of half-day depositions that could

21   be scheduled two on a day is a creative solution that could

22   bridge that gap.

23        THE COURT:  Yeah.  And when we get to that, which

24   we're going to have to get to soon, I agree.  I agree that

25   half-day depositions should be taken.  I agree that some

1  depositions -- some weeks there's going to be multiple tracks.
2  I'm not necessarily going to mandate it, but I'm not going to
3  say we can't do it either.  It depends on how you're scheduling
4  these things.  But if double-tracking depositions is necessary,
5  I'm good with that.
6         I am also good, again, in a two-defendant case to --
7  with defendants' proposal -- and I don't know that you opposed
8  it -- that, you know, they shouldn't have to be defending
9  multiple deps of their employees on the same day.
10        But, Ms. Gulley, of the 45 depositions that the
11  plaintiffs put on their hypothetical calendar, how many of
12  those depositions do the defendants say or would you move in a
13  protective order to say they're not necessary?  Have you even
14  done that analysis?
15        MS. GULLEY:  Well, we did the analysis to this
16  extent, that we felt that 25 depositions for the defendants was
17  enough in a case where this conspiracy was alleged -- this
18  narrow conspiracy was alleged.
19        We also think that what Judge St. Eve's four-month
20  order did is give us a creative solution, which is a small
21  amount of time, not in which to kill ourselves and put our
22  families in -- at least put me crossways with mine, but,
23  rather, to -- you know, because she saw this as what it is.
24  There are two -- generally two defendants and the companies'
25  JV, because the prejudice is not really to me, right, or to the

1    lawyers.  It's to my client, who is sitting here.  And, you

2    know, the reason he's here today is to figure out whether he

3    needs to basically shut down the company for four months or

4    whether or not this is going to be on a schedule that's doable.

5          So to your question 25, now, there is the issue of

6    the caveat.  I agree we need to talk about that, or Ms. Miller

7    does, with respect to the class, because obviously in terms of

8    class certification, we need to hear from all the plaintiffs in

9    some way.

10         One of the creative solutions that Judge St. Eve did

11   come up with in her calendar was the bifurcation of the class

12   cert issue, which is much later than it might otherwise be.

13         MS. MILLER:  Your Honor, I'll just echo what

14   Ms. Gulley said from the standpoint of we -- you would not be

15   surprised to learn that the parties are on two different ends

16   of the spectrum of who they think must be deposed.

17         There's any number of people that the disputes were

18   documented quite heavily when we were negotiating document

19   custodians.  There's any number of custodians that were agreed

20   to despite defendants' belief that they are not witnesses that

21   should be either custodians or deponents, but certainly -- but

22   we agreed in order to reach an agreement and try to move the

23   case forward knowing that we were on an accelerated schedule,

24   but now that we're at the deposition phase, at no point did we

25   say simply because we agreed that these people are going to be

1    document custodians were we contemplating that we would be

2    having most of them deposed.

3            I think of the 45 that they are proposing, I believe

4    it's a -- it's a split that has more CDK witnesses than has

5    Reynolds' witnesses.  I don't have the exact split, as I sit

6    here.  But I would -- and we haven't done an analysis insofar

7    as who we think is -- is -- doesn't need to be deposed, because

8    there's a whole bunch of them that we don't think needs to be

9    deposed, but we thought 25 when we proposed it was a reasonable

10    number under the circumstances.

11            And they could, as we all have to do in this kind of

12    big litigation, is make decisions as to who we're going to

13    depose and who we're not.

14            THE COURT:  I mean, if you -- if you depose

15    hypothetically 90 people in four months, which is what we're

16    talking about, half of October, half of February -- half of

17    February, and that's five to six depositions a week, so by

18    definition, some of those are multi-track.  Some of them could

19    be half-day depositions, too.  I don't know.

20            What's defendants' -- what's plaintiffs' position

21    on --

22            THE COURT REPORTER:  Judge.  I can't hear you.  Can

23    you use the mic?

24            THE COURT:  Oh, I'm sorry.  I'm standing, sitting,

25    and I don't move it.  That's fine.

1        THE COURT REPORTER:   Thank you.

2        THE COURT:   Yeah.

3        What's plaintiffs' position -- and I recognize that

4   maybe this is a premature decision because we don't have

5   rulings on the pending motions -- discovery motions and all

6   that.

7        But what's your position as to whether discovery

8   should be extended at all?  Absolutely no, we have to do this

9   by February 15th?  Or you're willing to discuss a modest

10   extension of discovery in order to get more depositions done?

11        MS. WEDGWORTH:   I think we want to discuss it.  We

12   haven't contemplated that.  We really felt the schedule we

13   proposed we could do by February 15th.

14        We obviously hear the tension between the number and

15   the time.  So if the -- a small amount of time is proposed in

16   order for us to cover the number of depositions we think

17   necessary to prove this case, we certainly need to discuss that

18   if you're asking for a position from us.

19        And to answer your question with regard to the class

20   reps in the dealership case, we initially proposed, Your Honor,

21   in front of St. Eve that the depositions of class

22   representatives for dealerships be postponed until class

23   certification.  Defendants were opposed to that and wanted all

24   discovery to be consolidated into one discovery period.

25        Thus, Judge St. Eve denied -- as defendants

1   requested, denied our request to move all that class cert
2   discovery until the end.
3                   MS. MILLER:  Your Honor --
4                   MS. WEDGWORTH:  So now they want to somehow reserve
5   some of those rights doesn't make sense to us.
6                   THE COURT:  Why not?  I don't get that.  If class
7   discovery is reserved to the end and you have 25 dealership
8   class plaintiffs and they're required to take those depositions
9   in this phase of discovery rather than at the end, doesn't that
10  automatically increase the number of depositions that they have
11  to be allowed to take?
12                  I mean, your proposal says 25 deps total for the
13  defendants to take.  That means all they can take is the dealer
14  class plaintiff reps, and that's it.
15                  MS. MILLER:  And, Your Honor, if I could respond
16  briefly to what Ms. Wedgworth said.  Britt Miller on behalf of
17  CDK.
18                  When those discussions happened in front of
19  Judge St. Eve, there were less named class plaintiffs than
20  there currently are.  I think there were something like 16 or
21  17.  So there was at least 10 or 12 less than there currently
22  are.  So it was certainly contemplated.
23                  And in our proposal, we would go ahead and take some
24  of those plaintiffs now, because we need merits -- not just
25  class, but we need merits discovery from them.  But, yes, if

1    there are some that we need to depose only on class issues,

2    then we wouldn't seek to depose people twice.  We would -- to

3    the extent we depose a class rep as part of this merits phase,

4    we would take it on both class issues as well as on merits

5    issues.

6              But to the extent, as Your Honor noted, we can't get

7    them all in, if there were several that we felt we needed after

8    we've completed all of our depositions and we're further down

9    the road, then we wanted to make sure that we reserved our

10   right to have depositions on strictly class issues when we get

11   to the class phase.

12             MS. WEDGWORTH:  And, Your Honor, we proposed that

13   initially.  They rejected that.

14             So at this point, Judge St. Eve has ruled all

15   discovery go forward.  We're willing to do that.  We think we

16   can do it certainly by February 15th.  If you're telling us to

17   do all that, we can't.  Perhaps --

18             THE COURT:  I don't understand.  You proposed that.

19   Judge St. Eve rejected it.  Now they are proposing what you

20   proposed, and you're rejecting it because we have to get

21   everything done by February 15th, which is also what

22   Judge St. Eve said.

23             And there's no denying that if they have to depose

24   all the class plaintiffs within the structure that you're

25   proposing, they can't depose anybody else.  I don't get that.

1    I don't understand why that is -- why that makes sense.

2              I understand how you got there logically.  We

3    proposed it.  They said no.  Judge St. Eve said no.  We're

4    stuck with that.

5              But I don't understand why that makes sense when now

6    you're telling them they can't take another deposition during

7    that time period.

8              MS. WEDGWORTH:  Well, it was more to the point of

9    having two bites at the apple.

10             THE COURT:  Yeah.  Okay.  I'm not going to --

11             MR. HO:  Your Honor --

12             THE COURT:  I'm not -- no, we've got to move on.

13             I'm not going with that, Ms. Wedgworth.  It doesn't

14   make sense to me.

15             I completely agree that we're going to allocate

16   depositions.  We're going to say how many should be taken.

17   If -- if we've got a bifurcation of class and merits discovery

18   and defendants want the ability to depose class reps solely on

19   class issues after the close of the merits discovery, they're

20   entitled to do it and not take up the limited depositions they

21   have during this phase doing it.

22             It makes -- to me that's perfectly consistent with a

23   reasonable schedule here, and it makes even more sense because

24   there's many more people now than when Judge St. Eve was trying

25   to -- talking about putting everybody in merits phase.  And I

1    don't think -- I would doubt that she was thinking as

2    granularly as -- granularly as we're thinking now about that.

3    Okay?

4         I -- based on everything that I'm hearing, I mean --

5    let me pause for a second.

6         Again, at a 30,000-foot level, based on everything

7    I'm hearing, with the plaintiffs proposing 100 depositions and

8    the defendants saying essentially 75, based upon the number of

9    party depositions and third-party depositions and based on some

10   of the things I've heard today about, you know, who may be on

11   an A list of people to depose, at this early stage of the case

12   and if -- I mean, I'm glad everybody is moving forward with

13   this document production.  And given the Seventh Circuit's

14   admonition or directive to get this done as soon as we could,

15   my call on this, which is not perfect, but it's just a call, is

16   I would say 90 depositions.

17        I would say based on what -- I don't see any reason

18   yet to not allow that to be --

19        (Brief pause.)

20        THE COURT:  Give me a second here.  I'm doing some

21   math.

22        (Brief pause.)

23        THE COURT:  Okay.  Sorry.

24        As I was saying, based on everything I'm hearing, I

25   could see 90 depositions.  I'm not convinced -- Mr. Ho has

1    convinced me that he needs, you know, more than the 25 that the

2    plaintiffs are -- or the defendants were suggesting.  I'm not

3    sure I'm convinced you need 45.

4            I am convinced that the case needs to move and to

5    continue to move.  And so the way I would divide those up if I

6    was doing it at a 30,000-foot level is 30 for plaintiffs, 30

7    for the defendants, 15 plaintiff third parties, and 15

8    defendant third parties.

9            I -- I don't know where you are on the discovery --

10   *sua sponte*, I would extend the discovery date because I just

11   don't think this is -- that the brain damage -- that there

12   should be -- that you should undergo the brain damage that

13   we're talking about.

14           I would waiver between *sua sponte* extending the

15   discovery date by 30 versus 45 days.  To me, 45 days is

16   eminently reasonable, but I don't -- you know, I don't know yet

17   what's going on.  I don't know when I'm going to give you the

18   rulings.

19           So I would *sua sponte* extend your discovery cutoff so

20   you could play with the calendar a little bit more by 30 days.

21   So I'd move it from -- discovery cutoff from February 15th to

22   March 15th without prejudice to anybody on the defendants' side

23   or the plaintiffs' side saying we're going to need a little bit

24   more time to do that.

25           And this is a call I'm making today.  If somebody,

1    plaintiffs, convince me you need more than that, I will listen,

2    but I'll listen to it based upon facts that I get rather than

3    the 30,000-foot level.

4            Again, I think there's a balance between what

5    plaintiffs need to do.  If plaintiffs want to get this done

6    quick, then they have to make some compromises on who they're

7    going to depose.  If you want to get this done in a year of

8    depositions, then you don't have to compromise, and we just go

9    ahead and do it.  But I think that there's a tension between

10    those two that is not fully appreciated in the proposal that

11    has -- proposals that had been made.

12            And you'll continue to discuss these things.  And if

13    there's things you need to bring to my attention on this, I

14    will look at it.

15            Let me address some of the other issues that have

16    been percolating here.

17            I think as a baseline, defendants' proposal of four

18    party depositions a week and two third-party depositions a week

19    by each side, so that's six depositions a week, that's not a

20    bad default, with no party to be deposed in more than one dep

21    per day.

22            I think that where necessary, deps can be double

23    tracked, either by agreement of the parties or with a motion to

24    me.  I hope I don't get motions on this.  There's no reason

25    that unrelated depositions can't be double tracked during this

1    period.

2           I agree with plaintiffs that there should be half-day

3    depositions if that's all that is necessary for a witness, and

4    two can be on the same day, one in the morning, one in the

5    afternoon.  I don't see there's any reason why we can't do

6    that.

7           I'm also -- I'm more than willing to be in agreement

8    with any other creative proposals.  I don't know how you're

9    going to do this.  Plaintiffs have one week; defendants have

10   one week.  You know, you could talk about that kind of stuff.

11   And if there are disputes you can't resolve, I'll do that.

12          Let me talk about the two-day depositions for

13   Schaefer and Gardner.  I don't see anything unreasonable with

14   that.  These guys are at the center of this.  I can't believe

15   that -- or I would say I would bet that there's a need to take

16   these guys for up to two days, and I would permit that.

17          I don't think the tit for tat, "Well, then we need

18   two-day depositions for the five family groups" really is -- is

19   persuasive to me.  I mean, I don't -- I don't get there.  I

20   don't know whether Authenticom would need a two-day dep.

21   They're a major player here, so I could see that.  But I

22   wouldn't approve just *pro forma*, well, they get two-day deps;

23   you get two-day deps.

24          I don't -- I don't think the dealer class plaintiffs,

25   you need two-day deps for those people.  Those are -- those

1  are -- those are not there.

2          So I would approve in your schedule Schaefer and

3  Gardner.  If -- if you wanted to take a two-day of Authenticom,

4  I wouldn't have a cow over that.  But I'm not just going to

5  say, well, because they get it, you get it on the other side.

6          30(b)(6) depositions, okay, I agree with whoever said

7  it -- and I don't know who this is -- but my ruling on that is

8  they should count as one deposition even if multiple witnesses

9  testify to different topics.  But if the topics are so diffuse

10  or unrelated and burdensome and if there's too many of them,

11  for example, I would impose a limit.

12          If the notice -- the 30(b)(6) notice contains more

13  than 20 topics, I'd say that counts for two depositions.  All

14  right?  If it contains more than 40, then it counts for three

15  depositions.  You know, if it contains 30, maybe it's

16  two-and-a-half.

17          But, you know, I think you can't unreasonably put 70

18  30(b)(6) topics in that's going to require five people and say

19  that's one deposition.  So I just think reason comes in there.

20          With respect to the dispute about conferences with

21  the deponent, which is defendants' section 9(c) of their

22  protocol and the plaintiffs' section 7(a)(3) --

23          MS. GULLEY:  I believe it's both places for

24  plaintiffs.

25          THE COURT:  Okay.  Well, regardless, I'm not going to

1    put in the order that counsel can inquire of the deponent

2    whether he or she conferred with counsel during a break about

3    his or her testimony.  That's a -- you could drive a truck

4    through that.  That is very broad.  It's vague.  It can be used

5    to harass the witness.

6              Now, if it comes up during a deposition that a

7    question like that is appropriate, multiple breaks, talking in

8    the hall, you need to make a record of it.  You're not trying

9    to get the substance of the testimony or the discussion.  You

10   just want to make a factual record of it.  I'll deal with that

11   if it comes up.

12             I'm not going to preclude somebody from asking the

13   question, but I'm also not going to put a protocol that you

14   could ask every witness that every time.  I think it's a -- I

15   just don't think it's necessary.  It's attacking a gnat problem

16   with a baseball bat.

17             If it becomes more than a gnat problem in this case,

18   if witnesses are getting coached all over the place, I could

19   deal with it, and I can impose that kind of requirement.  But

20   I'm not sure you get by it.  If you get a yes answer, what do

21   you do?  Well, then what did you talk about?  You can't do

22   that.  If you get a no answer but you saw them talking, then

23   what are you going to prove up extrinsically?

24             So I think this is a little bit of a silly dispute.

25   I understand why -- I think it was plaintiffs wanted it, right?

 1          MS. WEDGWORTH:  Yes, Your Honor.

 2          THE COURT:  I understand why you wanted it.  I'm just

 3     not going to put it in a protocol order.

 4          And as you're trying to shoehorn your -- so that's

 5     where I come up with on my 30,000-foot rulings here.  Is there

 6     something in the protocol issue that I have not expressed an

 7     opinion on yet?

 8          MS. MILLER:  Your Honor, may I ask a clarifying

 9     question?

10          THE COURT:  Sure.

11          MS. MILLER:  And that's just as to half-day

12     depositions.

13          We're fine to have half-day depositions.  So I just

14     want to -- and if there's two back to back, again, I want to

15     make sure that the no -- they're not two defendant back to

16     backs in the same day, because it is conceivably possible and,

17     quite frankly, likely that even if plaintiffs only want a half

18     day that there may be questions that the defendants need to

19     ask, especially of a third-party witness.  And so the actual

20     time on the record will extend beyond a half day, so that we

21     can't necessarily start another half-day one if it's the same

22     party, or whatnot, right at noon.

23          I want to make sure that if there are half days

24     scheduled that they're scheduled of different parties, because

25     I don't think it's realistic to say that they get four hours

1  and no one else gets to ask questions other than plaintiffs or
2  defendants, either way.
3          THE COURT:  Yeah.  You know what, in answer to that
4  question, I'm going to walk back something I said, okay, which
5  I wasn't a hundred percent sure of as to how I would do it.
6  And given the time constraints here, I think it may be
7  inconsistent.
8          I'm going to walk back what I said that I would put
9  in the protocol order that no individual party may be required
10  to sit for more than -- oh, one deposition on the same day is
11  what you have.
12          MS. GULLEY:  Right.
13          MS. MILLER:  Yeah.
14          MS. GULLEY:  So the client only -- the actual party
15  only has to do one a day.
16          THE COURT:  Yeah.  But that -- but you would agree to
17  more than one a week?
18          MS. MILLER:  Oh, yeah.
19          MS. GULLEY:  Yeah, we suggested a total of six
20  depositions per week, a total for all parties.
21          THE COURT:  Okay.  So your question on the half day
22  is what again?
23          MS. MILLER:  As I understand plaintiffs' proposal,
24  they wanted to sometimes schedule two half-day depositions in a
25  single day.

1          THE COURT:  Right.

2          MS. MILLER:  My -- my question is, okay, that can't

3     -- shouldn't be, for example, two CDK witnesses back to back

4     because it may be that they -- plaintiffs want to take the

5     first half day, and they'll take all of their time, and there

6     may be some redirect that needs to happen, at which point we're

7     putting off another start time of another party.

8          So as long as the no, you know, two parties in the

9     same -- the same party can't be deposed in one day, I would

10     like that to apply to half-day deps as well.

11          THE COURT:  No, I'm not going to micromanage it like

12     that, I don't think.

13          MS. MILLER:  Okay.

14          THE COURT:  I mean, I understand, but that's

15     something you should discuss, it seems to me.

16          I think it would be very efficient to have CDK have

17     two people deposed on the same day, one in the morning and one

18     in the afternoon when they're pretty -- pretty focused.  And I

19     don't want to prevent that from happening.

20          And if that's what you're saying I should prevent

21     from happening, I don't want to do that.  Everybody has been

22     around the block here.  You could figure out how to do that.

23          I mean, if that becomes a problem -- again, I like to

24     set out guidelines.  I like people to get along to the extent

25     they can.  If they can't, I know that I have to make the calls.

1    But to me, that's micromanaging it more than I would make it.

2         If I were taking depositions, I could very well see

3    there's two short CDK witnesses.  I want them both on Tuesday.

4    I want one to begin at 9:00 and one to begin at 1:00.  And if

5    one bleeds over to the afternoon, then there's an issue there.

6    Fine, we'll do that.

7         And if they want to -- and then if somebody has to be

8    deposed the next day and it's also -- or two days later, it's

9    also -- or the next day and it's a CDK witness, I'm not going

10   to prevent that from happening.

11        But I just think a half-day dep is different than two

12   full-day deps.  I mean, theoretically the same lawyer could

13   defend both of those deps, I mean, on the same day.

14        MS. MILLER:  Understood, Your Honor.

15        THE COURT:  So I'm not going to micromanage that.

16        MS. MILLER:  Okay.

17        MS. GULLEY:  Your Honor, I have a question for you,

18   though, as in terms of managing the process.

19        You had talked about today extending the schedule 30

20   days, but just kind of realistically as we look at the

21   plaintiffs' proposed calendar and we see, you know, the

22   holidays, and so on and so forth, 90 depositions -- 6

23   depositions a week for 16 weeks is tough.  Six depositions a

24   week for 20 weeks is tougher.

25        I suspect that as we are just now getting the

1  documents and we still have rulings to go on discovery, that we
2  will run into problems at the end. And I just am -- I just
3  want to make sure that we're not prejudiced to come back and
4  say, like, this is just not going to work.

5          THE COURT: You're not prejudiced at all. And I'm
6  torn with this, because I think you're going to need more time.

7          MS. GULLEY: I agree.

8          THE COURT: Okay? I mean, I do. I can understand
9  the plaintiffs saying, you know, we're tough; we're going to
10 get it done.

11         I mean, before coming in here, I thought -- I thought
12 defendants' proposal of April 15th was eminently reasonable.
13 And two months of cash flow for Authenticom to get these things
14 done by April 15th, in the grand scheme of things, to me is
15 nothing.

16         So, you know, that was my gut walking in here. I
17 also think, frankly, I am -- you know, I won't give you an "I
18 told you so," but I think months down the road, we're going to
19 be having discussions of whether the stuff can get done when
20 you're trying to get it done.

21         Mr. Ho, Ms. Wedgworth is going to come up and say,
22 "Judge" -- number one, they're going to -- you'll point to the
23 defendants that they're obstructionist, and they're doing all
24 this bad stuff, and they won't get on planes, and they won't do
25 stuff.

1        But bottom line is, I would be surprised -- I'd be --

2   I'd be impressed, but I'd be surprised that you can get it

3   done.

4        Hold on for one second.

5        (Discussion off the record.)

6        THE COURT:  Yeah.  I mean, as long as I'm going *sua*

7   *sponte* here, I'm going to go on where I was when I walked in.

8   All right?

9        Defendants made the proposal of April 15th in their

10  submission.  I thought it was fine, and I don't think that it

11  breaks the bank here.  And I think it gives a little bit more

12  time to breathe that you're going to need to breathe.  I really

13  do.

14       And it -- you know, you're not going to get the

15  rulings on the motions -- on the motions to compel tomorrow.

16  All right?  And I know from looking at those already, I'm going

17  to grant some of that, and I'm going to deny of some of it.

18  But the stuff I'm going to grant may require some decently

19  additional production of stuff.

20       And so I don't want to have motion practice on this.

21  No, I'm going to go with the gut that I had when I walked in.

22       I think it's not inconsistent, Mr. Ho, with your plea

23  that let's get this done.  But I don't know why we should be

24  stuck with a date that was set a long time ago before all the

25  parties that are now in the case are in the case, before the

1    counterclaims were in the case.

2           And I respect Judge St. Eve hugely, and I'm thrilled

3    that she's going to be on the Seventh Circuit, because she's

4    somebody who knows what abuse of discretion means.

5           (Laughter.)

6           THE COURT:  And that's a quote from her.  Okay?

7           (Laughter.)

8           THE COURT:  That's not Gilbert -- that's not Gilbert

9    opinion -- opining.  But she has said, with a smile on her face

10   several times with Seventh Circuit judges present, that, you

11   know, having served so long as a district judge, she knows what

12   abuse of discretion means.  So I'm not criticizing by any means

13   the Seventh Circuit by that.

14          But, no, you know what, I think you're going to need

15   the time, people.  I really do.

16          I mean, Mr. Ho, do you want to talk me out of that?

17          MR. HO:  Your Honor, I think that I would urge you to

18   go with the 30-day extension, and let's try to hold everyone's

19   feet to the fire.

20          The danger I see here is as -- is that Ms. Gulley's

21   reaction and Ms. Miller's reaction that this just can't be done

22   is -- is a prophecy that is going to be self-fulfilling if the

23   Court doesn't say, "This is the deadline.  If there is good

24   cause to extend it, you all come back and convince me that it

25   needs to be extended and that you did everything that you could

1   to meet that deadline."

2          But to say, "This is a deadline, but really it's a

3   soft deadline, and we all know that it's going to be extended,"

4   I think is the worst of both worlds for everybody, because what

5   it's going to mean as a practical matter is that there's going

6   to be no urgency to doing this.  There is going -- there are

7   going to be objections that it's not convenient; there are

8   kids' soccer games.

9          We all know the imposition on the personal lives of

10  counsel and of witnesses that this process is inevitably going

11  to take to some degree.  And I think that the critical thing

12  here is that there be -- if there is going to be any extension,

13  a very modest extension, and that at least for now that

14  deadline be a firm deadline subject only to extension based on

15  an ordinary showing of good cause under Rule 16 so that

16  everybody knows this really is the date that you all have to be

17  targeting.  And, of course, if things really cannot be done in

18  that time, we can all come back.

19         MS. GULLEY:  If I could just respond.

20         THE COURT:  Yeah, you -- no, you don't need to

21  respond.  Somebody once told me if you're winning, you don't

22  need to respond.

23         You convinced me by what you said, that my gut was

24  right to move you to six months or April 15th.  That's not a

25  soft deadline.  I don't want to give you a soft deadline.  But

1    six months, when you take out the week of Christmas, New

2    Year's, Thanksgiving, other stuff that's going to be

3    inevitable, that's -- you're taking four to five depositions a

4    week during that time period.  That's a lot of depositions in a

5    case like this, particularly if you're traveling around the

6    country.

7            If I were to give you 30 days, that would be the soft

8    deadline, because then people are going to come in; i.e., the

9    defendants, and say, "Well, Judge, you know, I'm telling you we

10   can't get it done."

11           To me you could take 90 depositions in six months,

12   some of them double tracked, some of them half days.  You're

13   going to work hard, but I don't know that it's -- it's

14   certainly not as bad as the February 15th date.  I think it's

15   more doable than that.

16           That doesn't mean that somebody can't come in and ask

17   for more time for good cause because stuff happens, and I'll

18   look at that, but I'm not promising to extend it beyond then.

19   But I think six months is a reasonable compromise based upon

20   what I'm hearing.

21           I mean, I just -- I think that that's a push, but

22   it's not an impossible push.  It may have to get extended on

23   good cause, and I'll look at that, but I'm not promising right

24   now.

25           And I think if I do a 60-day extension now, it puts

1    everybody on notice that you got to make every effort to get it

2    done during that time for all the considerations and reasons

3    that I've been talking about here.

4         So I think, you know, based on what you said, I think

5    I should do April 15th and say get it done by April 15th, and

6    allow you to move the case forward rationally on that -- on

7    that basis.

8         So that's what I am going to do.  Final answer in

9    terms of what I'm thinking.

10        Okay.  Is there anything I haven't covered here?

11        MS. MILLER:  Your Honor, on a -- on a separate -- if

12   we're done with the deposition protocol, there was just one

13   separate question we had.

14        We appeared in front of Judge --

15        THE COURT:  Wait.  Let me talk about the protocol.

16        So somebody has to submit to me something that makes

17   these changes, all right, so that I can sign it.

18        MS. MILLER:  We'll be happy to do so.

19        MS. GULLEY:  We will, Your Honor.

20        THE COURT:  Okay.  Go ahead.  Yeah.

21        MS. MILLER:  We appeared in front of Judge Dow last

22   week on CVR's motion to stay discovery as to just CVR, which,

23   again, is an entity that's only named in one case.

24        The MVSC filed a motion to compel in front of Your

25   Honor after we filed our motion to stay.  Judge Dow indicated

1    that you would indicate -- tell us today whether or not Judge

2    Dow was going to be ruling on this issue or whether or not you

3    were going to be ruling on this issue, because he's extended

4    our -- CVR's response date for responses to the RFPs pending a

5    decision from either him or Your Honor.

6           (Discussion off the record.)

7           THE COURT:  Yeah, we haven't talked about it, so

8    maybe that fell between the cracks.  I wasn't aware of that,

9    and I wasn't aware it was on the agenda today.

10          I will talk about it with him.  I mean, if it's not

11   stayed, I have to decide the motion to compel.  But that may be

12   an issue that is more in his bailiwick than mine, but I

13   haven't -- I haven't -- I'm not on top of that.  I'm sorry.

14          I'll talk to him --

15          MS. MILLER:  No, I appreciate that, Your Honor.

16          THE COURT:  I'll talk to him, if not today, then

17   Tuesday.

18          MS. MILLER:  The only reason we raised it is because

19   he extended our response deadline until next Wednesday to

20   respond to the RFPs.

21          And so, obviously, if we're going to -- if our motion

22   for a stay is going to be granted, then we won't be responding

23   to those on Wednesday.

24          If the motion to compel is going to be granted, then

25   we will be responding to those on Wednesday.

1          THE COURT:  Okay.

2          MS. MILLER:  If Your Honor would simply like to --

3          THE COURT:  Extend the briefing schedule.

4          MS. MILLER:  It's not the briefing schedule.  It's

5     the deadline --

6          THE COURT:  The response to the RFPs --

7          MS. MILLER:  Correct.

8          THE COURT:  -- the requests for production.  I get

9     it.

10         MS. MILLER:  And we also have a hearing in front of

11    Judge Dow on Tuesday if that's any help.

12         THE COURT:  I know, and I was going to try to be

13    there, too.

14        (Discussion off the record.)

15         THE COURT:  The short answer is, I'm going to extend

16    your time to respond to the request for production by at least

17    a week and potentially have this dealt with on Tuesday.

18         MS. MILLER:  That would be appreciated, Your Honor.

19         THE COURT:  Okay.

20         MS. MILLER:  Thank you.

21         THE COURT:  So, Nakita, we just need to say -- I

22    mean, do you guys object to that?

23         MR. HO:  Under the circumstances, no, Your Honor.

24         THE COURT:  Okay.  So CVR's --

25         MS. MILLER:  Computerized Vehicle Registration, CVR.

1       THE COURT:  -- oral motion to extend the time for it

2   to respond to plaintiffs' request for production is granted,

3   along with the other stuff that's here.  We'll talk about it.

4       MR. HO:  Your Honor, we are prepared to answer any

5   questions that you may have about the motion to compel, if any.

6       THE COURT:  I don't have them now because I, frankly,

7   in my mind -- there was a glitch there.  In my mind, I wasn't

8   going to look at it until the motion to stay was resolved.

9   Because if there was a motion to stay that was granted, then

10  it's a tree falling in the forest, and nobody's going to hear

11  it.  And I only want to look at the stuff if I have to look at

12  it.

13      So I didn't realize that we were supposed to talk

14  about it, but I'll let him know that or I'll talk -- I'll try

15  and talk to him about it.  But extending the RFP response does

16  it.

17      I'm afraid we're out of time before I have to then

18  take off the robe, put on a suit jacket, and do a large

19  settlement conference.

20      So I appreciate those who have come in on a Friday,

21  particularly from out of town.  I'm sorry you had to do that,

22  but at least you're not getting out of here at 3:30.  You're

23  getting out of here in the morning.  I'll try not to have you

24  have travel problems like that.

25      I appreciate your patience with me as I'm continuing

1    to learn your case.  I reserve the right to continue to do

2    that, and I'm looking forward to you helping me learn the case

3    more.

4            I'd like you to get me this deposition protocol

5    incorporating the things that we've talked about, and I am

6    going to *sua sponte* extend the fact discovery close date in my

7    order to April 15th, 2019.  And we'll keep on rolling.  Okay?

8            MS. MILLER:  Thank you, Your Honor.

9            MS. WEDGWORTH:  Thank you, Your Honor.

10           MR. HO:  Thank you, Your Honor.

11        (Chorus of "Thank you, Your Honor.")

12           THE COURT:  Okay.  Bye.

13        (Proceedings concluded.)

1      C E R T I F I C A T E

2

3

4    I, Nancy L. Bistany, certify that the foregoing is a

5 complete, true, and accurate transcript from the record of

6 proceedings on October 5, 2018, before the HON. JEFFREY T.

7 GILBERT in the above-entitled matter.

8

9

10

11 */s/ Nancy L. Bistany, CSR, RPR, FCRR*   October 7, 2018

12   Official Court Reporter     Date
    United States District Court
13   Northern District of Illinois
    Eastern Division
14

15

16

17

18

19

20

21

22

23

24

25