**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE DEALER MANAGEMENT SYSTEMS | ) | |
| ANTITRUST LITIGATION, MDL 2817 | ) | Case No. 18-cv-864 |
| | ) | |
| _____ | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| This document relates to: | ) | |
| | ) | |
| *Motor Vehicle Software Corporation v. CDK* | ) | |
| *Global, Inc. et al.* | ) | |
| Case No. 18-cv-865 | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are the motions to dismiss Plaintiff Motor Vehicle Software Corporation's second amended complaint filed by Defendants Reynolds and Reynolds Co. [44], CDK Global, Inc. [45], and Computerized Vehicle Registration, Inc. [46]. Also before the Court is the motion to strike Motor Vehicle Software Corp.'s supplemental brief in opposition to Defendants' motions to dismiss [144]. For the reasons set forth below, the Court denies the motion to strike [144] and the motions to dismiss [44; 45; 46].

**I.      Background[1]**

Plaintiff Motor Vehicle Software Corporation ("MVSC" or "Plaintiff") brings this action to remedy and put a stop to alleged ongoing federal and state antitrust violations being committed by Defendants CDK Global, Inc. ("CDK") and The Reynolds and Reynolds Company ("Reynolds"), and their joint venture Computerized Vehicle Registration, Inc. a/k/a CDK Vehicle Registration, Inc. ("CVR"). [*Motor Vehicle Software Corporation v. CDK Global, Inc., et al.*, Case No. 18-cv-865, Dkt. 76, at ¶ 1.] MVSC is a provider of electronic vehicle registration and

---

[1] For purposes of the motions to dismiss, the Court accepts as true all of Plaintiff's well-pleaded factual allegations and draws all reasonable inferences in Plaintiff's favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

titling services ("EVR"). [*Id*. at ¶ 2.] As an EVR provider, MVSC partners with state governments to issue the physical registration, license plates, and titles for vehicles sold at car dealerships. [*Id*.] Electronic registration and titling has made the process far more convenient and efficient for dealerships and consumers. [*Id*.]

Defendant CVR is a wholly-owned joint venture of CDK and Reynolds that (like MVSC) provides EVR services. [*Id*.] In order to process the registration and title with a state, EVR providers require basic information about the car sale—namely, vehicle, buyer, and financing details. [*Id*. at ¶ 3.] That data is stored on a dealership's Dealer Management System software, otherwise referred to as a dealership's "DMS." [*Id*.] Because the data is not stored anywhere else, it is impossible to provide EVR services without access to this data. [*Id*.] In addition to storing a dealer's data, the DMS manages every function of a dealer's business from sales and inventory to service and parts. [*Id*. at ¶ 4.] A car dealership cannot operate without the DMS software. [*Id*.]

Defendants CDK and Reynolds control close to 80 percent of the United States market by number of dealers and approximately 90 of the United States market by vehicles sold. [*Id*.] It is deeply disruptive and expensive for a dealer to switch DMS providers, as switching takes up to a year of preparation and training. [*Id*.] MVSC alleges that CDK and Reynolds use their market power to compel dealers to submit to long-term contracts of five to seven years in length. [*Id*.] While dealers own the data on their DMS, CDK and Reynolds also have seized control over who is allowed to access the data. [*Id*. at ¶ 5.] Many third-party vendors require access to dealer data in order to perform essential tasks—such as EVR services—for the dealer. [*Id*.] CDK and Reynolds provide vendors access (for a fee) to the data on a dealer's DMS pursuant to formal third-party access programs. [*Id*.] CDK's arrangement is called the Third Party Access ("3PA") program, and Reynolds's arrangement is called the Reynolds Certified Interface ("RCI") program.

[*Id.*] These programs allow third-party vendors to access in real time necessary data from a dealer's DMS in order to provide services for the dealership. [*Id.*]

In this case, Plaintiff challenges an alleged horizontal agreement between CDK and Reynolds to exclude MVSC from their third-party programs in order to prevent MVSC from obtaining the data it needs to provide EVR services. [*Id.* at ¶ 6.] According to MVSC, the purpose of the agreement is to block MVSC's access to the data on which its services depend, thereby eliminating a formidable competitor to CVR. [*Id.*] MVSC competes with CVR in two state EVR markets—Illinois and California. [*Id.* at ¶ 8.] In the Illinois EVR market, CVR maintains a market share of approximately 95 percent. [*Id.*] Real-time access to dealer data is a prerequisite to competing in Illinois because the state requires that a dealership provide the registration and license plates to the car buyer at the time of sale. [*Id.*] Participation in the 3PA and RCI programs is the only means for an EVR provider to obtain this real time access to dealer data. [*Id.*]

Unlike Illinois, California does not require that a car buyer receive the registration and license plates at the time of the sale. [*Id.* at ¶ 9.] Real-time access to dealer data (and participation in the 3PA and RCI programs) therefore has not been necessary in California. [*Id.*] Instead, MVSC was able to obtain the required dealer data by other means, either through companies that provided intermediary access to a dealer's DMS or through a manual workaround whereby dealers ran a daily report with the necessary data and then transmitted the information to MVSC. [*Id.*]

MVSC alleges that because it was able to compete in the California EVR market based on the quality of its products and services, CDK and Reynolds engaged in a campaign to completely block MVSC's access to dealer data in California. [*Id.* at ¶ 10.] In addition to blocking MVSC from participating in their 3PA and RCI programs, CDK and Reynolds have cut off MVSC's access through intermediaries. [*Id.*] Furthermore, according to MVSC, CDK and Reynolds are

intimidating dealers with near constant threats that if dealers continue to provide MVSC with their data, then the dealers will be in breach of their DMS contract. [*Id.*]

As of January 2014 (and possibly earlier), CDK and Reynolds had entered into an agreement in which both DMS providers agreed to block MVSC from participating in their third-party access programs. [*Id.* at ¶ 100.] Thus, CDK and Reynolds (competitors in the DMS market) coordinated their actions and agreed that they both would reject MVSC from their third-party programs. [*Id.* at ¶ 101.] The agreement continues to this day. [*Id.* at ¶ 100.]

According to MVSC, CDK and Reynolds entered into the agreement with CVR's encouragement. [*Id.* at ¶ 101.] MVSC alleges that CVR was not a bystander to the CDK and Reynolds agreement to block MVSC from their respective 3PA and RCI programs. [*Id.* at ¶ 109.] Rather, CVR executives actively participated in conspiratorial conversations with CDK and Reynolds, specifically discussing the need to block MVSC from accessing dealer data (whether through the 3PA and RCI data integration programs or otherwise) so that MVSC could not compete effectively. [*Id.*] A long-time member of CVR's Board of Directors—which is comprised of representatives from CDK, Reynolds, and CVR—admitted to MVSC that the board specifically discussed keeping MVSC at a disadvantage with respect to data access. [*Id.* at ¶ 110.] Board members recognized that MVSC "outcompeted CVR" with respect to "technology and improved services," and so board members agreed that CVR needed a competitive advantage as compared to its competitors regarding access to dealer data. [*Id.*] The CVR executives who are alleged to have had these conspiratorial conversations with CDK and Reynolds at board meetings and elsewhere include, but are not limited to, Scott Herbers (former CVR General Manager), Jim Quinlan (current CVR General Manager), and John Roeder (CVR Senior Executive of Sales and Operations). [*Id.* at ¶ 111.]

4

MCSC further claims that, outside of board meetings, CVR executives worked with CDK to keep its integration program "closed" to MVSC. [*Id*. at ¶ 112.] In an internal CDK presentation regarding its 3PA program, there is a section entitled "Category Restrictions in Place," with a subsection dedicated to "CVR Competitors." [*Id*.] It reads: "Not allowed to sign, even with extract, only unless in a territory not of value to CVR." [*Id*.] These rules as described in the internal CDK presentation were implemented and are enforced with the express participation, input, and approval from CVR executives. [*Id*.]

CDK and Reynolds together own CVR, owning 80 percent of the company and 20 percent of the company, respectively. [*Id*. at ¶ 22.] Although MVSC alleges that CDK and Reynolds both control the management and decision making of CVR, Plaintiff alleges that it is CDK that exercises substantial control over the decision-making and operations of CVR, directing its day-to-day operations such as its marketing, dealer on-site visits, hiring and firing of employees, budgets, investments in technology and services, and other functions normally handled internally by a corporate entity. [*Id*. at ¶¶ 7, 152.] CDK controls the CVR board of directors (and CDK executives occupy most seats). [*Id*. at ¶ 56.] CVR's general manager reports directly to a CDK Vice President. [*Id*.] CVR executives are concurrently CDK executives (with CVR's longtime general manager also serving as a top executive at CDK). [*Id*.] In public filings, CDK informs investors that it holds a "controlling" financial and management interest in CVR. [*Id*.] CDK rolls up CVR's financial results into CDK's consolidated financial statements and controls CVR's budget and capital investments. [*Id*. at ¶ 57.] CVR employees have CDK email addresses and job descriptions. [*Id*.] CDK makes hiring and firing decisions for CVR and posts new job listings for CVR on the CDK website. [*Id*.] CDK houses CVR's offices within CDK's California headquarters on the same floor as CDK employees. [*Id*.] CDK dictates where CVR should focus

its sales efforts and CDK executives accompany CVR sales representatives on trips to dealerships. [*Id*.] CDK also refers to CVR as "our" EVR service. [*Id*. at ¶ 58.] Still, Reynolds retains seats on CVR's board [*id*. at ¶ 110], and reaps profits from its interest in CVR. [*Id*. at ¶ 55.]

## II. Legal Standard

To survive a Federal Rule of Civil Procedure ("Rule") 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (alteration in original). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly,* 550 U.S. at 558. In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts as true all of Plaintiff's well-pleaded factual allegations and draws all reasonable inferences in Plaintiff's favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

III.     **Analysis**

A.     **Motion to Strike**

When this case was pending in the United States District Court for the Central District of California, Judge Fischer granted Defendants' motions to dismiss MVSC's Section 2 claims and various state-law claims. [*Motor Vehicle Software Corp. v. CDK Global, Inc., et al.*, Case No. 17-896, Dkt. 73, at 10-12.] Judge Fischer concluded, however, that Plaintiff sufficiently alleged a Section 1 claim against Defendants CDK and Reynolds based on their alleged horizontal conspiracy. [*Id.* at 6-8.] MVSC filed a second amended complaint, which Defendants again moved to dismiss. After the case was transferred to the Northern District of Illinois as part of this MDL, Judge St. Eve requested that the parties file supplemental briefs addressing their respective arguments under Seventh Circuit case law.[2] [Document 144-1 in Case No. 18-cv-864, at 42:12-43:25.] After Defendants filed their supplemental briefs [118; 120; 121], MVSC filed a supplemental brief addressing Seventh Circuit case law and citing to discovery material it contends elaborates on and further supports the allegations in its second amended complaint [138].

Defendants CDK and CVR filed a motion to strike MVSC's supplemental brief because (1) it goes beyond the scope of the request for supplemental briefing on Seventh Circuit case law, (2) the Court should not consider discovery materials supporting an opposition to the motions to dismiss because Defendants have not had an opportunity to respond, and (3) MVSC's use of the discovery materials was improper. Although Judge St. Eve agreed that the parties should limit their supplemental briefs to the law and not to re-argue the factual points already set out in the initial briefing on Defendants' motions to dismiss [144-1, at 43:14-25], MVSC's supplement does

---

[2] "[I]n federal question cases consolidated under § 1407, the law of the transferor court warrants 'close consideration' but does not bind the transferee court." *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 853 (N.D. Ill. 2010) (citations omitted).

not reargue factual points already in their opposition brief. Rather, MVSC identifies discovery material purportedly supporting the allegations in its second amended complaint. Defendants argue that such supplementation is not permitted under the plain language of Rule 12, but the Seventh Circuit has indicated that a party opposing (or appealing) a Rule 12(b)(6) dismissal "may elaborate on [its] factual allegations so long as the new elaborations are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (collecting cases). Furthermore, although Defendants did not seek leave to file a sur-reply, they did take the opportunity to respond to the documents submitted by MVSC in their motion to strike. [144, at 4.] To the extent that Defendants contend that MVSC's use of the discovery material violates "the spirit, if not the letter, of a confidentiality order[,]" a position the Court takes no position on at this time, the Court is not persuaded that refusing to consider the documents is the appropriate remedy. Accordingly, Defendants' motion to strike [144] is denied. In any event, consideration of the documents MVSC attached to and referenced in its supplemental brief does not change the outcome of the Court's ruling on the arguments raised by Defendants in support of dismissal, to which the Court now turns.

### B.    Market Participant Requirement

Defendant CDK argues that Plaintiff's Section 2 claims against it fail because CDK is not a participant in the relevant EVR markets (or any EVR market for that matter). In order to state a claim against CDK for monopolization or attempted monopolization, Plaintiff must allege facts sufficient to establish that CDK competes in the relevant market.[3] *Spectrum Sports, Inc. v.*

---

[3] CDK moves to dismiss all of MVSC's Section 2 claims for failure to establish that it is participant in the EVR market. [45 (CDK Br.), at 4.] Although market power in the relevant market is an element of monopolization and attempted monopolization claims under Section 2, it is not an element of a conspiracy to monopolize claim. *Wagner v. Magellan Health Servs., Inc.*, 121 F. Supp. 2d 673, 680 (N.D. Ill. 2000) ("[M]arket power is not an element of a conspiracy to monopolize claim under section 2." (citing *United*

*McQuillan*, 506 U.S. 447, 457, 459 (1993); *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011). With respect to Count II, the relevant market is the Illinois EVR market. With respect to Count III, the relevant market is the California EVR market. MVSC argues that CDK is a participant in the relevant EVR markets by way of its relationship to its majority-owned subsidiary CVR.

Both CDK and MVSC discuss the substantial control test set forth by United States Court of Appeals for the District of Columbia Circuit in *Caribbean Broad. System, Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080 (D.C. Cir. 1998).[4] In that case, the court held that an "ownership interest in another company is not sufficient by itself to make the owner a competitor, for purposes of the antitrust laws, of the subsidiary's rivals. To be a competitor at the level of the subsidiary, the parent must have substantial control over the affairs and policies of the subsidiary." *Id.* at 1088

---

*States v. National City Lines*, 186 F.2d 562 (7th Cir. 1951)). The Court therefore focuses on MVSC's monopolization and attempted monopolization arguments.

[4] CDK asserts that the Seventh Circuit has long followed the substantial control standard, citing *National Lead Co. v. FTC*, 227 F.2d 825 (7th Cir. 1955), rev'd on other grounds, 352 U.S. 419 (1957). [120 (CDK Supp. Br.), at 2.] However, in *National Lead*, the Court did not apply the substantial control standard. In that case, the Seventh Circuit held that a parent company should have been dismissed from an FTC action for purported violations of the Federal Trade Commission Act and the Clayton Act by the parent company's subsidiary. 227 F.2d at 829. In concluding that the parent company never "engaged in the [relevant] industry as a producer, distributor or otherwise," the court applied a "substantial identity" rule, which required "evidence of such complete control of the subsidiary by the parent as to render the former a mere tool of the latter, and to compel the conclusion that the corporate identity of the subsidiary is a mere fiction." *Id.* at 828-29. But no court has ever cited *National Lead* in support of a "substantial control" analysis. Nor would it make sense to do so. When *National Lead* was decided, the Supreme Court still applied the "now-defunct doctrine known as the 'intraenterprise conspiracy doctrine,'" under which the Supreme Court "treated cooperation between legally separate entities as necessarily covered by § 1[.]" *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 192 (2010) (discussing the history of the "'intraenterprise conspiracy doctrine"). It therefore would make sense to require "evidence of such complete control of the subsidiary by the parent as to render the former a mere tool of the latter, and to compel the conclusion that the corporate identity of the subsidiary is a mere fiction" before blurring the legal lines between a parent company and its subsidiary. Given that the Supreme Court has abandoned the intraenterprise conspiracy doctrine in favor of a more functional approach, it would be inappropriate to equate the strict "substantial identity" standard applied in *National Lead* with the "substantial control" standard advanced by the parties in this case.

(collecting cases).[5] CDK argues that the requisite "substantial control" effectively equates to "the showing required to establish that a parent company is liable for a subsidiary's act under an agency theory." [45 (CDK Br.), at 6.] Thus, in support of its substantial control argument, CDK cites to numerous cases addressing agency and veil piercing standards under various laws. While these cases may shed some light on how to analyze an investor's control in a company, the ultimate standard is whether the investor has "substantial control over the affairs and policies of the subsidiary"—meaning that the investor exercises "the type of day-to-day control" over "the company in which it invested as to make it a competitor of that company's rivals." *Caribbean Broad. Sys., Ltd.*, 148 F.3d at 1089.[6]

Plaintiff makes such allegations here. Plaintiff's second amended complaint alleges that CDK owns 80 percent of CVR. [*Motor Vehicle Software Corporation v. CDK Global, Inc., et al.*,

---

[5] Because all parties have relied on the substantial control standard, the Court assumes without deciding that the substantial control standard applies. In discussing whether Defendants are a unified entity incapable of conspiring under federal antitrust laws pursuant to *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984)—an issue addressed in more detail below—MVSC argues that Reynolds is judicially estopped from arguing that it is incapable of conspiring with CVR because Reynolds argued in prior motions to dismiss that it was not a participant in the EVR market. In other words, because Reynolds previously took the position that it is not a competitor in the EVR market, MVSC argues that it cannot claim to be a unified entity with CVR, its partially-owned subsidiary that competes in the EVR market. This position has some support. See, *e.g.*, *Copperweld Corp.*, 467 U.S. at 777 ("Any anticompetitive activities of corporations and their wholly owned subsidiaries meriting antitrust remedies may be policed adequately without resort to an intra-enterprise conspiracy doctrine. A corporation's initial acquisition of control will always be subject to scrutiny under § 1 of the Sherman Act and § 7 of the Clayton Act. Thereafter, the enterprise is fully subject to § 2 of the Sherman Act and § 5 of the Federal Trade Commission Act." (internal citations omitted)); *In re: Zinc Antitrust Litig.*, 2016 WL 3167192, at *21 (S.D.N.Y. June 6, 2016) ("[D]efendants cannot have it both ways. Glencore Ltd. and Pacorini may not * * * argue that they are incapable of conspiring with each other for purposes of forming an anticompetitive agreement in violation of Section 1 of the Sherman Act, but also argue, on the other hand, that Pacorini may not be individually liable for playing a direct and key role in Glencore Ltd.'s ability to control prices in a market in which it competes." (internal citation omitted)). If that is MVSC's position, however, it is unclear why MVSC would rely on the substantial control standard, which might allow a parent company to avoid Section 2 scrutiny in its subsidiary's market even if the parent and subsidiary were a unified entity under *Copperweld*.

[6] Although the court in *Caribbean Broadcasting System* cited cases applying agency standards, the court did not actually engage in an agency analysis. The "substantial control" test used by the court in *Caribbean Broadcasting System* has been adopting by other courts and the test appears capable of being applied without resort to agency, veil piercing, and/or alter ego standards, see, *e.g.*, *Spanish Broad. Sys. of Fla.*,

Case No. 18-cv-865, Dkt. 76, at ¶ 56.] CDK controls CVR's board of directors and CDK executives occupy most of its seats. [*Id*.] CVR's general manager reports directly to a CDK Vice President. [*Id*.] CVR executives are concurrently CDK executives, with CVR's longtime general manager also serving as a top executive at CDK. [*Id*.] In public filings, CDK informs investors that it holds a "controlling" financial and management interest in CVR. [*Id*.] CDK treats CVR as a division rather than a separate subsidiary—for example, by rolling up CVR's financial results into CDK's consolidated financial statements. [*Id*. at ¶ 57.] CDK controls CVR's budget and capital investments. [*Id*.] CVR employees have CDK email addresses and job descriptions. [*Id*.] CDK makes hiring and firing decisions of CVR employees. [*Id*.] CDK posts new job listings for CVR on the CDK website. [*Id*.] CDK houses CVR's offices within CDK's California headquarters—on the same floor as CDK employees. [*Id*.] CVR is a marketing conduit for CDK, as CDK dictates where CVR should focus its sales efforts and CDK executives accompany CVR sales representatives on trips to dealerships. [*Id*.] Finally, CDK touts CVR as "our" EVR service. [*Id*. at ¶ 58.] These allegations are sufficient to establish at the motion to dismiss stage that CDK substantially controls CVR. *Cf. In re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1064 (S.D. Cal. 2017) (merely alleging "domination or control" over "production, pricing, hiring, budgeting, capitalization, and/or marketing of canned tuna" not sufficient to establish agency).

CDK cites cases indicating that some of these allegations standing alone would be insufficient to establish that an investor company controls the day-to-day operations of its subsidiary. See, *e.g.*, *Caribbean Broad. Sys., Ltd.*, 148 F.3d at 1089 (allegations that company

---

*Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065 (11th Cir. 2004), which are applied differently under various state and federal laws. Although there may be reason to adopt such standards as part of the "substantial control" analysis, the parties have not explained why any such standards are appropriate and/or necessary here.

with minority ownership interest had one representative on subsidiary's board of directors and "engaged in discussions and negotiations" regarding the relationship between the parent and its subsidiary was not sufficient to establish substantial control).  But many of the cases cited by CDK stand for the proposition that mere oversight and/or high-level involvement by a parent corporation (which likely exists to some extent in any parent/subsidiary relationship) is not enough to establish substantial control.  See, *e.g., Phoenix Canada Oil Co. v. Texaco, Inc.*, 658 F. Supp. 1061, 1084 (D. Del. 1987), aff'd, 842 F.2d 1466 (3d Cir. 1988) (shared officers and directors and involvement in substantial financial decisions not enough to establish an agency relationship); *United States v. Bestfoods*, 524 U.S. 51, 72 (1998) (noting that "supervision of the subsidiary's finance and capital budget decisions" is "consistent with the parent's investor status") (internal quotation marks omitted); *whiteCryption Corp. v. Arxan Techs., Inc.*, 2016 WL 3275944, at *11 (N.D. Cal. June 15, 2016) (holding that parent company's involvement in "higher level policy and strategy decisions" was not sufficient to establish agency liability).

Here, MVSC alleges that CDK is involved in more than oversight and high-level policy and strategy decisions.  To begin, MVSC alleges facts indicating that CDK employees work closely with CVR employees in the day-to-day operations of CVR.  MVSC alleges that at least one CVR executive reports directly to a CDK Vice President, and CVR executives serve concurrently as CDK executives.  CDK executives also accompany CVR sales representatives on trips to dealerships.  CDK even makes hiring and firing decisions for CVR employees and posts new job listings for CVR on the CDK website.  CDK does not explain how these allegations are consistent with the typical, high-level involvement of any parent corporation.  Furthermore, MVSC alleges facts indicating the operations of CVR and CDK are intertwined.  CVR employees have

CDK email addresses and job descriptions.[7]  And CDK houses CVR's offices within CDK's California headquarters—on the same floor as CDK employees.

CDK criticizes MVSC's response by noting that "MVSC does not defend the adequacy of *any* of its specific allegations" but instead simply compiles its allegations to argue that they "overall" are comparable to the kinds of allegations that have been found sufficient in other cases. [49 (CDK Reply), at 2.]  But the Court does not need to look at MVSC's allegations in isolation. Taking MVSC's allegations together, it is unclear to the Court what additional allegations could be necessary to establish at the pleading stage that CDK substantially controls MVSC.  CDK appears to argue that MVSC must allege comingling of funds and a lack of corporate formalities to establish substantial control.  [49 (CDK Reply), at 5 (distinguishing *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938 (N.D. Cal. 2015); *Barba v. Seung Heun Lee*, 2009 WL 8747368, at *5 (D. Ariz. Nov. 4, 2009); *Sawyer v. Bill Me Later, Inc.*, 2010 WL 11492736, at *14 (C.D. Cal. Dec. 14, 2010)).]  Although such allegations certainly would support a finding of substantial control, CDK does not cite any case indicating that such allegations are necessary.

Furthermore, where a plaintiff alleges—as MVSC does here—that a parent company has directed its subsidiary to engage in anticompetitive conduct and itself engages in anticompetitive conduct, such allegations are sufficient to establish market participation by the parent company. See, e.g., *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1070 (D. Colo. 2004) ("[A] parent can be considered a competitor in a market where its subsidiary is a participant if, and only if, the parent sufficiently controls, dictates, or encourages

---

[7] One of the cases relied extensively upon by CDK recognizes that the use of a parent company's email addresses supports a finding of substantial control, even though it is not sufficient by itself. *whiteCryption Corp. v. Arxan Techs., Inc.*, 2016 WL 3275944, at *11 (N.D. Cal. June 15, 2016) ("[B]eyond the use of [ ] associated email addresses, the acts appear to be more consistent with higher level policy and strategy decisions.").

the policies of the subsidiary. When the parent controls, directs, or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act." (citations omitted)); *Intellectual Ventures I LLC v. Cap. One Fin. Corp.*, 2016 WL 160263, at *5 (D. Md. Jan. 14, 2016) (plaintiff adequately alleged market participation of defendant where the defendant "is a parent company, controlling or directing the anticompetitive conduct" of its affiliates);[8] see also I*n re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1059 (S.D. Cal. 2017) (allegations that parent companies "directly conspired with their respective subsidiaries" sufficient to establish market participation). Because MVSC alleges facts sufficient to establish that CDK controlled the day-to-day operations of CVR and directly participated in the alleged anticompetitive conduct, MVSC states a plausible claim that CDK was a participant in the relevant EVR markets.[9]

### C. Monopoly versus Oligopoly

CDK argues that Plaintiff's monopolization and attempted monopolization claims fail because they are premised on concerted action, not just the action of a single firm. In support of this argument, CDK relies on cases recognizing that "monopolization and attempted monopolization are single-firm violations." *United Food & Commercial Workers Local 1776 & Participating Emp'ls Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1076 (N.D. Cal. 2014) (citations omitted); see also *Standfacts Credit Servs., Inc. v. Experian Info.*

---

[8] CDK argues that *Intellectual Ventures* and *Nobody in Particular* can be dismissed as wrongly decided because they did not reference the "day-to-day" analysis discussed in *Caribbean Broadcasting System*. [49 (CDK Reply), at 3.] However, both cases still analyzed whether and to what extent the parent companies exercised substantial control over their respective subsidiaries.

[9] MVSC also has submitted documents elaborating (albeit to a very limited extent) on its factual allegations relating to CDK's substantial control over CVR. For example, Bob Karp (CDK's North America President) was involved in discussions regarding at least one CVR executive's bonus grid and was praised for his "deep level of engagement in CVR." [*Motor Vehicle Software Corporation v. CDK Global, Inc. et al.*, Case No. 18-cv-865, Dkt. 118, at 7-9.]

*Sols., Inc.*, 405 F. Supp. 2d 1141, 1152 (C.D. Cal. 2005) ("section 2 prohibits only monopolization by a single entity, as opposed to shared monopolization"), aff'd in part 294 F. App'x 271 (9th Cir. 2008).

While this case was pending before the Central District of California, the court accepted that argument with respect to the monopolization and attempted monopolization claims in MVSC's first amended complaint, noting that they were "based on concerted conduct rather than on the conduct of a single entity." [*Motor Vehicle Software Corp. v. CDK Global, Inc., et al.*, Case No. 17-cv-896, Dkt. 73, at 8 (N.D. Cal. Oct. 2, 2017).] In reaching that conclusion, the court cited *Rebel Oil Co. v. Atlantic Richfield Co.*, which held that "[t]o pose a threat of monopolization, one firm *alone* must have the power to control market output and exclude competition." 51 F.3d 1421, 1443 (9th Cir. 1995) (citation omitted). In *Rebel Oil*, the court noted that an oligopolist lacks such unitary power. Since MVSC had not established that Defendants were a unitary entity, the court dismissed MVSC's monopolization and attempted monopolization claims. [*Motor Vehicle Software Corp. v. CDK Global, Inc., et al.*, Case No. 17-cv-896, Dkt. 73, at 8 (N.D. Cal. Oct. 2, 2017).] Here, however, Plaintiff is not challenging an alleged oligopoly. Rather, Plaintiff is challenging the anticompetitive conduct of the unitary CDK/CVR entity.[10] Because MVSC's monopolization and attempted monopolization claims do not challenge an oligopoly, the Court will not dismiss MVSC's monopolization and attempted monopolization claims on that basis.

**D.      Anticompetitive Conduct**

Defendant CDK also argues that MVSC's Section 2 claims also fail because MVSC has not alleged that CDK engaged in any anticompetitive conduct. To state a claim for monopolization or attempted monopolization under Section 2, a plaintiff must allege that that defendant engaged

---

[10] For the reasons discussed below, CDK and CVR can be treated as a single entity under *Copperweld* for the purposes of examining MVSC's antitrust claims.

in predatory or anticompetitive conduct. *Spectrum Sports, Inc.*, 506 U.S. at 456 (recognizing "predatory or anticompetitive conduct" as an element of an attempted monopolization claim); *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011) (holding that a claim for monopolization under Section 2 requires that the defendant "willfully acquired or maintained that power by means other than the quality of its product, its business acumen, or historical accident"). "Anti-competitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008). To state a claim for conspiracy to monopolize under Section 2, a plaintiff must allege "the existence of a combination or conspiracy[.]" *Goodloe v. Nat'l Wholesale Co.*, 2004 WL 1631728, at *6 (N.D. Ill. July 19, 2004) (citing *The Great Escape, Inc. v. Union City Body Co., Inc.*, 791 F.2d 532, 541-42 (7th Cir. 1986)). Plaintiff contends that CDK has engaged in anticompetitive conduct by (1) conspiring to deny Plaintiff access to dealer data, and (2) refusing to sell Plaintiff a service sold to non-competitors. [47 (MVSC Opp.), at 10.]

   To the extent that MVSC seeks to bring Section 2 claims based on the alleged conspiracy to deny MVSC access to dealer data, MVSC sufficient has alleged the requisite anticompetitive conduct. CDK argues that because Plaintiffs' Section 2 claims are based on an alleged "group boycott" of Plaintiff, Plaintiff essentially is challenging concerted action. However, the CDK/CVR entity cannot use the allegedly anticompetitive agreement between CDK and Reynolds in the DMS market to maintain or obtain monopoly power in the EVR market. As MVSC notes, "[h]orizontal collusion is anti-competitive conduct that supports liability under Section 2." [47 (MVSC Opp.), at 9.] A defendant violates "Section 2 of the Sherman Act * * * [if it] 'has acquired or maintained his strategic position, or sought to expand his monopoly, or expanded it by means

of those restraints of trade which are cognizable under [Section] 1.'" *Fin. & Sec. Prods. Ass'n v. Diebold, Inc.*, 2005 WL 1629813, at *4 (N.D. Cal. July 8, 2005) (quoting *United States v. Griffith*, 334 U.S. 100, 106 (1948)); see also *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, 2013 WL 3214983, at *7 (N.D. Ind. Mar. 13, 2013) ("Where defendant has engaged in unlawful restraint of trade that would independently violate Section 1 of the Sherman Antitrust Act, it is well established that it also violates Section 2 if it acquires or maintains a monopoly by means of that restraint of trade." (citing *Griffith*, 334 U.S. at 106). Because Plaintiff has alleged that the CDK/CVR entity is attempting to maintain and/or acquire monopoly power in the Illinois and California EVR markets by way of conduct that violates Section 1 (*i.e.* CDK's alleged horizontal agreement with Reynolds), Plaintiff has alleged sufficient anticompetitive conduct to state a claim against the CDK/CVR entity under Section 2.

To the extent that Plaintiff seeks to establish an antitrust violation based on the CDK/CVR entity's alleged unilateral refusal to deal, however, Plaintiff's Section 2 claims fail. Plaintiff argues that the fact that the CDK refuses to allow Plaintiff to purchase its services at the rates generally available to others shows that CDK's refusal to deal with Plaintiff is motivated by anticompetitive conduct and therefore is improper. However, as Judge St. Eve noted, there is "no antitrust duty to deal * * * in selling services to [ ] competitors in the retail market*." In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 955 (N.D. Ill. 2018) (citing *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 450 (2009)); see also *Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006) ("[A]ntitrust law does not require monopolists to cooperate with rivals by selling them products that would help the rivals to compete. Cooperation is a problem in antitrust, not one of its obligations." (internal citation omitted)); *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d

1019, 1025 (7th Cir. 2017) ("Even monopolists are almost never required to assist their competitors[.]" (citation omitted).

The Supreme Court has recognized an exceedingly narrow exception to this principle in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), in which the Supreme Court held that a plaintiff could bring a refusal-to-deal claim under Section 2 where the "unilateral termination of a voluntary (and thus presumably profitable) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004) (summarizing *Aspen Skiing*). The Supreme Court has recognized, however, that *Aspen Skiing* "is at or near the outer boundary of § 2 liability." *Id*. The Supreme Court therefore has rejected refusal-to-deal claims unless they fall within the "limited exception recognized by *Aspen Skiing*." *Id*. For example, in *Trinko*, the Supreme Court rejected a refusal-to-deal claim because the complaint did not allege that the defendant "engaged in a course of dealing with its rivals, or would ever have done so absent statutory compulsion." *Id*. Because MVSC has not made such allegations here, MVSC has not sufficiently alleged its refusal-to-deal claim. *Viamedia, Inc. v. Comcast Corp.*, 2017 WL 698681, at *4 (N.D. Ill. Feb. 22, 2017) (plaintiff bringing a unilateral refusal-to-deal claim must show "a preexisting voluntary and presumably profitable course of dealing between the monopolist and rival" (citing *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013)).

Indeed, in *Authenticom, Inc. v. CDK Glob.*, the Seventh Circuit concluded that CDK's decision to prevent unauthorized access to its DMS is "a far cry from *Aspen Skiing*" and it is clear that a refusal-to-deal theory "cannot support relief" based on that purported refusal to deal. 874 F.3d at 1026 ("And as we have noted, even if it did, this case is a far cry from *Aspen Skiing*, which represented the high-water mark in section 2 cases for a duty-to-deal theory. *Trinko* and *Linkline*

18

leave no doubt that such a theory cannot support relief."). The Court sees no reason to depart from that reasoning here.[11] Still, because CDK's agreement with Reynolds supports MVSC's Section 2 claims, MVSC sufficiently has alleged that CDK engaged in anticompetitive conduct supporting its Section 2 claims against CDK.

### E. Antitrust Injury

Defendant Reynolds argues that Plaintiff "cannot establish any viable antitrust injury where the allegedly restrained trade is illegal." [44 (Reynolds Mem.), at 9-16.] To succeed on an antitrust claim, Plaintiff must establish actual or threatened "'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent.'" *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Federal courts therefore have held that a plaintiff cannot establish an antitrust injury where the business alleged to have been restrained itself was unlawful. See, *e.g., Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*, 309 F. Supp. 2d 1156, 1169-70 (N.D. Cal. 2004), aff'd, 158 F. App'x 807 (9th Cir. 2005) (plaintiff lacked antitrust injury because its conduct was "unlawful by its own terms"); *Maltz v. Sax*, 134 F.2d 2, 4 (7th Cir. 1943) (company "engaged in the business of making and selling gambling devices" could not establish an antitrust injury). Still, "[c]ourts have generally held that a plaintiff's wrongdoing is not a defense to an antitrust suit." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 946. "Proof of the plaintiff's unrelated

---

[11] In *Authenticom*, the Seventh Circuit was addressing a refusal-to-deal claim under Section 1. Although the court distinguished *Aspen Skiing*, which was a Section 2 claim, on that ground, that distinction was not the only basis for the court's decision. The court also focused on the fact that the history between the parties did not fit within the narrow exception established by *Aspen Skiing*, which also is true with respect to MVSC's Section 2 claims.

unlawful conduct is not a valid *in pari delicto* defense to an antitrust charge." *Pinto Trucking Serv., Inc. v. Motor Dispatch, Inc.*, 649 F.2d 530, 534 (7th Cir. 1981).

Here, Reynolds frames MVSC's antitrust injury as the denial of access to Reynolds's DMS without authorization through Authenticom. Because—according to Reynolds—it is a violation of the Computer Fraud and Abuse Act ("CFAA") and the California Computer Crime Law ("CCCL") for Plaintiff to access Reynolds's DMS without authorization through Authenticom, Reynolds contends that Plaintiff cannot establish an antitrust injury. To the extent Reynolds seeks to raise an *in pari delicto* defense based on Plaintiff's purported violations of the CFAA and related state-law claims, the court recently rejected such an argument in ruling on the motions to dismiss in *Authenticom, Inc. v. CDK Global, LLC* (Case No. 18-cv-868). That Reynolds may have claims against Plaintiff under the CFAA and related state laws does not foreclose Plaintiff's antitrust claims. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 947 ("Both things can be true: Defendants may be able to state valid cyber-security claims against Authenticom *and* Authenticom may be able to state valid antitrust claims against Defendants.").

To the extent that Reynolds argues that Plaintiff cannot establish an antitrust injury because Plaintiff's conduct purportedly violates the CFAA and/or the CCCL, Reynolds argument also fails. Even assuming Plaintiff's conduct violates the CFAA or the CCCL,[12] it would only be because Reynolds denied it access to its DMS pursuant to the alleged conspiracy. Unlike the cases cited by Reynolds, Plaintiff's "as-alleged practices are not illegal independent of Defendants' challenged conduct." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 947; *cf. In re*

---

[12] The Court takes no position on whether Plaintiff's conduct violates the CFAA and/or the CCCL. As the Court noted in ruling on the motions to dismiss in *Authenticom, Inc. v. CDK Global, LLC* (Case No. 18-cv-868), "'authorization' here is 'a factual matter' and 'not properly before the Court based on the pleadings alone[.]'" *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 949 (quoting *Weingand v. Harland Fin. Sols., Inc.*, 2012 WL 3763640, at *2 (N.D. Cal. Aug. 29, 2012)).

*Canadian Import Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006) (finding no antitrust injury where alleged injury (not being able to import less expensive drugs distributed by Canadian pharmacies) was caused by "federal statutory and regulatory scheme adopted by the United States government * * *, not by the conduct of the defendants"); *Pearl Music Co. v. Recording Indus. Ass'n of Am., Inc.*, 460 F. Supp. 1060, 1068 (C.D. Cal. 1978) (finding lack of standing or capacity to bring antitrust claim where plaintiff's conduct was "totally illegal under the laws of forty-nine states"); *Modesto Irrigation Dist.*, 309 F. Supp. 2d at 1170 (plaintiff lacked antitrust injury because its conduct was "unlawful by its own terms"); *Snake River Valley Elec. Ass'n v. PacifiCorp*, 357 F.3d 1042, 1050 n.8 (9th Cir. 2004) (noting that there would be no antitrust injury where plaintiff had not obtained required state approval to engage in conduct allegedly restrained); *Maltz v. Sax*, 134 F.2d 2, 4 (7th Cir. 1943) (company "engaged in the business of making and selling [illegal] gambling devices" could not establish an antitrust injury). Even if Reynolds's authorization is necessary for Plaintiff to be able to access its DMS, Reynolds "is not free to withhold such approval pursuant to illegal arrangements." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 948 (collecting cases).

Regardless, whether MVSC and/or Authenticom violated the CFAA or the CCCL is a question of fact that cannot be determined based on the pleadings alone. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 949 (rejecting similar argument with respect to purported violations of the CFAA and related state laws by Authenticom). Accordingly, Reynolds's motion to dismiss Plaintiff's conspiracy claim based on a failure to allege an antitrust injury is denied.[13]

---

[13] Neither CDK nor CVR moved to dismiss MVSC's antitrust claims for failure to allege an antitrust injury. They did, however, adopt Reynolds's argument in their supplemental briefs. [120 (CDK Supp. Br.), at 7; 121 (CVR Supp. Br.), at 7.] Because MVSC adequately has alleged an antitrust injury, the Court need not address whether CDK and CVR properly joined Reynolds's motion.

F.    **Conspiracy to Monopolize Claim**

i.    *Plausibility of Allegations*

The court previously dismissed Plaintiff's conspiracy to monopolize claim because Plaintiff failed to plead sufficient facts to find that CVR engaged in conspiratorial conversations with either CDK or Reynolds. [*Motor Vehicle Software Corp. v. CDK Global, Inc., et al.*, Case No. 17-896, Dkt. 73, at 11.] At most, Plaintiff alleged that CVR had the motive and opportunity to conspire. [*Id.*] Plaintiff's second amended complaint alleges more than the motive and opportunity to conspire. Defendants argue, however, that Plaintiff's additional allegations are lacking sufficient factual details to survive a motion to dismiss.

Defendants cite cases indicating that Plaintiff must allege the who, what, where, and when of its antitrust claims. [See, *e.g.*, 44 (Reynolds Br.), at 5-6.] However, such specific allegations are only necessary to survive a motion to dismiss under Rule 9(b). *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016). Plaintiff's antitrust claims are not subject to the heightened pleading standards of Rule 9(b). *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 999 (N.D. Ill. 2011) (citing *Twombly*, 550 U.S. at 569 n. 14). Plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. 570. Plaintiff has done so here.

In its second amended complaint, Plaintiff alleges that "CVR executives actively participated in conspiratorial conversations with CDK and Reynolds, specifically discussing the need to block MVSC from accessing dealer data (whether through the 3PA and RCI data integration programs or otherwise) so that MVSC could not effectively compete." [*Motor Vehicle Software Corporation v. CDK Global, Inc., et al.*, Case No. 18-cv-865, Dkt. 76, at ¶ 109.] Plaintiff further alleges that "[a] long-time member of CVR's Board of Directors—which is [comprised] of

22

representatives from CDK, Reynolds, and CVR—admitted MVSC that the board specifically discussed keeping MVSC at a disadvantage with respect to data access. Board members recognized that MVSC 'outcompeted CVR' with respect to 'technology and improved services,' and so board members agreed that CVR needed a competitive advantage as compared to its competitors regarding access to dealer data." [*Id*. at ¶ 110.] Plaintiff further alleges which CVR executives participated in the conspiratorial conversations. [*Id*. at ¶ 111.] In conjunction with Plaintiff's allegations regarding an improper agreement between CDK and Reynolds, these allegations are sufficient to state a claim to relief that is plausible on its face.

This case therefore is unlike the cases relied upon by Defendants, in which the plaintiff merely alleged parallel conduct, *Twombly*, 550 U.S. at 557, alleged conduct equally consistent with innocent conduct, *id*., or offered conclusory assertions without any factual detail. See, *e.g.*, *Oliver v. SD-3C LLC*, 2016 WL 5950345, at *11 (N.D. Cal. Sept. 30, 2016) (alleging "upon information and belief" that all companies who participated in licenses and who abided by the terms of licenses were co-conspirators). The Court recognizes that MVSC's allegations with respect to Reynolds's involvement in the alleged conspiracy are not robust. Still, MVSC's allegations regarding Reynolds's involvement in discussions regarding the need to block MVSC from accessing dealer data and keeping MVSC at a disadvantage with respect to data access, in conjunction with Reynolds's alleged agreement with CDK, are sufficient to state a plausible claim, and Rule 8 requires no more. Thus, to the extent that Defendants seek dismissal of MVSC's conspiracy claim based on the plausibility of MVSC's allegations, Defendants motions to dismiss are denied.

ii.    *Copperweld* Doctrine

Defendants argue that Plaintiff's conspiracy-to-monopolize claim fails under *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), which held that legally separate entities— such as a parent company and its wholly owned subsidiary—may constitute a single entity that it is incapable of engaging in concerted action under the Sherman Act.[14]  "Although *Copperweld* did not set clear parameters for what constitutes a single economic entity beyond the parent-subsidiary context, it nonetheless encouraged the courts to analyze the substance, not the form, of economic arrangements."  *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 834 (3d Cir. 2010) (citations and quotations omitted).  "The relevant inquiry, therefore, is whether there is a contract, combination * * * or conspiracy amongst separate economic actors pursuing separate economic interests, such that the agreement deprives the marketplace of independent centers of decisionmaking, and therefore of diversity of entrepreneurial interests, and thus of actual or potential competition."  *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (internal quotation marks omitted).  As the Supreme Court noted in *American Needle*, "it is not determinative that two parties to an alleged [Sherman Act] violation are legally distinct entities. Nor, however, is it determinative that two legally distinct entities have organized themselves under a single umbrella or into a structured joint venture."  *Id*. at 196.  If an agreement joins independent centers of decision-making, "the entities are capable of conspiring[.]"  *Id*.

Defendants argue that under *Copperweld*, MVSC cannot bring an antitrust conspiracy claim against a joint venture (CVR) and its parent corporations (CDK and Reynolds).  Based on

---

[14] Although *Copperweld* involved a conspiracy claim under Section 1, courts have held that *Copperweld* also applies to Section 2 claims.  See, *e.g., Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1234 (10th Cir. 2017); *Fid. Nat'l Title Ins. Co. of New York v. Intercounty Nat'l Title Ins. Co.*, 161 F. Supp. 2d 876, 883 (N.D. Ill. 2001).

CDK's majority ownership interest in CVR and CDK's involvement in the operations of CVR,[15] Plaintiff admits that CDK and CVR are a unified entity for antitrust purposes. MVSC argues, however, that Reynolds still is capable of conspiring with the CDK/CVR entity. Defendants argue that because MVSC alleges that Reynolds and CDK jointly own CVR and that they jointly control the management and decision making of CVR, Reynolds also is incapable of conspiring with the CDK/CVR entity.[16] [See, *e.g, Motor Vehicle Software Corporation v. CDK Global, Inc., et al.*, Case No. 18-cv-865, Dkt. 76, at ¶ 152.] Defendants also note that MVSC alleges that Reynolds retains seats on CVR's board [*id*. at ¶ 110], and reaps profits from its interest in CVR. [*Id*. at ¶ 55.] According to Defendants, this makes Reynolds a participant in the "economically integrated joint venture" incapable of conspiring because of Defendants' unity of interests.

But Defendants here do not have a unity of interests. CDK and Reynolds are competitors. Their status as competitors is not changed by the fact that they entered into a joint venture. To the contrary, as the Supreme Court has noted, "the most significant competitive threats arise when joint venture participants are actual or potential competitors[.]" *Am. Needle, Inc.*, 560 U.S. at 197

---

[15] In support of its argument that Defendants are incapable of conspiring under the *Copperweld* doctrine, Defendant CVR cites a number of cases applying the *Copperweld* doctrine to partially owned subsidiaries. [46 (CVR Br.), at 3 n.3.] However, almost all of the cases cited involved one majority owner. Given that CDK has a majority interest in CVR and is alleged to be extensively involved in the operations of CVR, these cases support the argument that CDK and CVR may be considered a unified entity pursuant to *Copperweld*. Still, Plaintiff has alleged that CDK, CVR, *and Reynolds* conspired with each other. Defendants have only cited to one case—*Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 2010 WL 3521979 (E.D. Cal. Sept. 3, 2010)—in which the alleged misconduct involved a joint venture and its *two* parent companies. For the reasons discussed below, that case also is distinguishable.

[16] While this case still was in the Central District of California, Reynolds argued that the allegations in MVSC's first amended complaint regarding Reynolds's extensive control over CVR barred MVSC's *Copperweld* arguments. Because MVSC's first amended complaint was not verified, Reynolds has abandoned this argument because of Seventh Circuit caselaw only holds that an amended complaint cannot contradict an earlier *verified* complaint. [118 (Reynolds Supp. Br.), at 7 (citing *Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017).] Regardless, although MVSC's first amended complaint included more allegations regarding Reynolds's control over CVR, it is not clear to the Court that those allegations directly undermine MVSC's *Copperweld* argument.

(quoting 7 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1464c, at 206 (2d ed. 2003)).  For example, in *American Needle*, the Supreme Court held that that a joint venture created by National Football League to develop, license, and market the intellectual property of member teams involved concerted action subject to antitrust scrutiny.  560 U.S. at 199.  The Supreme Court concluded that even when a "group of firms agree to produce a joint product, cooperation amongst those firms" still may be treated as concerted action.  *Id*.

Defendants argue that *American Needle* is distinguishable because in that case, the NFL teams competed against each other in the market of their joint venture and captured "individual economic benefits separate and apart from [the joint venture's] profits as a result of the decisions they [made] for [the joint venture]."  [50 (CVR Reply), at 3.]  Because (according to Defendants) CDK and Reynolds do not compete in the EVR market or capture economic benefits from that market separate and apart from their joint venture's profits, Defendants contend that *American Needle* does not support MVSC's argument.  Defendants submit instead that this case is more similar to *Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 2010 WL 3521979 (E.D. Cal. Sept. 3, 2010), in which the court found that a joint venture was incapable of conspiring with its two parent companies.

However, in *Stanislaus*, the creation of the joint venture eliminated the competition that previously existed between its two parent companies.  The Court noted, "[i]f two erstwhile competitors combine to become a single economic entity—by merger or acquisition, for example—the act of combination may violate the antitrust laws, but their subsequent relations are generally immune from section 1."  *Id*. at 19.  Because the parent companies did not have any business enterprise other than their joint venture, the court concluded that Defendants were an economically integrated joint venture incapable of conspiring pursuant to *Copperweld*.

26

In this case, Plaintiff alleges that Defendants CDK and Reynolds are competitors in the DMS market. Although they both have an ownership interest and involvement in the operations of their joint venture CVR, they have their own respective business enterprises. As the Supreme Court noted in *American Needle*, even when a joint venture "partially [unites] the economic interests of the parent firms," the parent companies "still have distinct, potentially competing interests." 560 U.S. at 198 (internal quotations omitted). Although antitrust concerns might be stronger where—as in *American Needle*—the parent firms competed in the market of their joint venture, that does not mean that two parent companies have completely united economic interests simply because they enter into a joint venture. Although MVSC alleges that Reynolds has an ownership interest in CVR and controls CVR with CDK, these allegations do not change the fact that CDK and Reynolds are separate economic actors pursuing separate economic interests. Their interests may be partially united as a result of their joint venture, but that is not enough to avoid antitrust scrutiny.

Defendants have not identified a single case in which a court has concluded that *two* parent companies that compete against each other in one market are incapable of conspiring with their joint venture. Although Defendants cite cases applying *Copperweld's* holding that a parent company is incapable of conspiring with its wholly-owned subsidiary or extending that holding to similar situation in which there was a similar unity of interests, see, *e.g., McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 681 (7th Cir. 2014) (parent company and two wholly-owned subsidiaries not capable of engaging in concerted action); *Vollrath Co. v. Sammi Corp.*, 9 F.3d 1455, 1463 (9th Cir. 1993) (parent company, its subsidiary, and its subsidiary's subsidiary not capable of engaging in concerted action), Defendants have not identified such a unity of interests in this case.

27

Implicitly recognizing that Defendants do not have a complete unity of interests, Defendants argue that "CVR's supposed participation in a conspiracy with Reynolds (and CDK) to restrict MVSC's unauthorized access to the respective DMSs does not deprive the market place of independent centers of decisionmaking, as it pertains to the alleged wrongful conduct." [121 (CVR Supp. Br.), at 3 (quotations and alterations omitted).] However, given that Reynolds and CDK compete in the DMS market—where the horizontal agreement to advance CVR's monopoly power is claimed to have occurred—the alleged misconduct actually does deprive the market of independent decisionmakers. This case is unlike *Texaco Inc. v. Dagher*, cited by Defendants, in which the Court concluded that the purely internal pricing decisions of a joint venture entered into by Texaco Inc. and Shell Oil were not horizontal price-fixing agreements subject to *per se* liability under the Sherman Act.[17] Because Defendants are capable of engaging in concerted conduct, Defendants' motion to dismiss MVSC's conspiracy claim under *Copperweld* is denied.[18]

## G.     State-Law Claims

Defendants have moved for dismissal of certain state-law claims that—according to Defendants—fail for the same reasons that Plaintiff's federal antitrust claims fail. [See (Reynolds Mem.), at 16-17; (CDK Mem.), at 12; (CVR Mem.), at 6-7.] Although MVSC did not respond to Defendants' arguments for dismissing MVSC's state-law claims, MVSC did respond fully to

---

[17] Defendants rely on *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) in support of their *Copperweld* argument. However, in *Texaco*, the Supreme Court did not actually address whether the defendants were capable of conspiring under *Copperweld*. Because the plaintiff only argued that defendants conduct was a *per se* violation of the Sherman Act, the Court limited its analysis to whether a joint venture's internal price setting was subject to a *per se* or rule of reason analysis.

[18] Given that the Court is denying Defendants' motion to dismiss MVSC's conspiracy claim under *Copperweld*, the Court does not address Plaintiff's alternative argument that Reynolds is judicially estopped from invoking *Copperweld* because Reynolds previously took the position that it was not a competitor in the CVR market. The Court notes, however, that it is not readily apparent that such position is inconsistent with the invocation of *Copperweld*.

Defendants' arguments regarding the federal antitrust claims. Because Plaintiff's federal antitrust claims survive, Defendants' motions to dismiss Plaintiff's related state-law claims are denied.

## IV.    Conclusion

For the reasons set forth below, the Court denies the motion to strike [144] and the motions to dismiss [44; 45; 46].

Date: October 22, 2018

_____
Robert M. Dow, Jr.
United States District Judge