**PUBLIC VERSION**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This document relates to:* | Hon. Robert M. Dow, Jr. |
| ALL ACTIONS | Magistrate Judge Jeffrey T. Gilbert |

**DEFENDANT CDK GLOBAL, LLC'S OPPOSITION TO MDL PLAINTIFFS' MOTION TO COMPEL CDK TO RE-DESIGNATE DOCUMENTS FROM "HIGHLY CONFIDENTIAL" TO "CONFIDENTIAL"**

The MDL Plaintiffs' motion to compel CDK Global, LLC ("CDK") to re-designate 66 documents (the "Subject Documents") from "Highly Confidential" to "Confidential" under the Agreed Confidentiality Order is meritless. The documents easily meet the operative definition of Highly Confidential discovery material: confidential information "of a highly sensitive nature the disclosure of which could result in significant harm, including but not limited to competitive harm, to the business or operations of that Party or Non-Party or to an individual." Dkt. 104, at ¶ 2(g). Plaintiffs' self-serving assessment of the documents aside, on their face the documents reflect CDK's confidential pricing information, internal discussions about competitive and pricing strategies, and communications subject to non-disclosure obligations. These are precisely the types of documents that are appropriately designated Highly Confidential—particularly when, as here, the other parties include CDK's direct competitors and customers.

Moreover, MDL Plaintiffs come nowhere close to demonstrating an overriding interest in sharing CDK's competitive information, including its pricing and marketing strategies, with their own (and co-Defendant Reynolds's) business executives. There is no reason to think that MDL Plaintiffs' outside counsel cannot understand the Subject Documents or fairly use them in the litigation—as they already have been doing—without disclosing the particulars to their clients. This is an *antitrust* case—with DMS, data services providers, and application competitors on both sides of the "v"—in which the parties currently are engaged in *discovery*. Trial of this matter will not occur for at least a year, at which point it would be appropriate for the parties to discuss the possible de-designations of documents that will be used in open Court. Until then, filing motions seeking to de-designate clearly competitively sensitive documents that counsel want to either place before the Court or their clients, without any compelling justification for

their de-designation, serves no important need or interest.[1] The motion should be denied.

## BACKGROUND

This is not the first time that MDL Plaintiffs, led by "Individual" Plaintiff and putative Vendor Class counsel Kellogg Hansen, has challenged CDK's confidentiality designations. And MDL Plaintiffs' assertions that the Highly Confidential designation is an "extraordinary" and "extreme" measure of protection that is only appropriate in limited circumstances conflicts with their unwarranted over-designation of their own productions as Highly Confidential. The record shows that, once again, MDL Plaintiffs want to impose one set of discovery rules for themselves and another for Defendants.

**The "Highly Confidential" Designation**

Two-tiered protective orders providing for both Confidential and Highly Confidential designations are the norm in cases involving competitors, "who must protect their Highly Confidential material from each other (in addition to others)." *See, e.g.*, *In re Takata Airbag Prods. Liab. Litig.*, 2015 U.S. Dist. LEXIS 177522 (S.D. Fla. Aug. 7, 2015) (collecting cases). Here, the Agreed Confidentiality Order generally limits access to discovery material designated Highly Confidential to outside counsel for the parties and persons with a need to know. *See* Dkt. 104, at ¶ 5(c). But those restrictions, to which all parties agreed, are no more "severe" (*cf.* Mot. at 2) than necessary to address the disclosing party's legitimate need to protect the confidentiality of its information. For example, Highly Confidential material may be shown to its authors,

---

[1] Not counting the omnibus motions to compel that Plaintiffs and Defendants filed on August 6, 2018 in accordance with the Court's scheduling order, MDL Plaintiffs have already filed three additional discovery motions against one or both Defendants besides this one: (1) a motion to compel production of every privileged document that CDK inadvertently produced to (but has clawed back from) the FTC in response to a CID (Dkt. 389); (2) a wholly premature motion to compel filed against Computerized Vehicle Registration ("CVR") intended to "counter" CVR's motion to stay discovery (Dkt. 386, 380); and (3) a motion for *in camera* inspection of certain partially privileged documents produced by Reynolds, which the filing Plaintiffs subsequently acknowledged was filed before complying with Local Rule 37.2 (Dkt. 397, 413 (Hr'ing Tr. at 17:12-25 (Oct. 5, 2018)).

creators, sources, and recipients, regardless of whether they are affiliated with the producing or the receiving party. *Id.* at ¶ 5(c)(7).

At depositions, witnesses who do not fall into categories of those who may view Highly Confidential material may nonetheless see the material provided that counsel gives seven days' advance notice to the designating party; court intervention becomes necessary only if the designating party withholds consent based on a showing of good cause, an objection that party must serve within two business days of receiving notice. *See id.* at ¶ 5(c)(6).

### Kellogg Hansen's Prior Challenges to CDK's Designations

MDL Plaintiffs' assertion that they are only challenging "a tiny fraction of the documents marked by CDK as Highly Confidential" (Mot. at 2) is a red herring. Although it is true that the instant motion seeks to de-designate less than 100 documents, this is not the first time Plaintiffs have sought the de-designation of documents with little or no basis for doing so.

In January 2018, prior to MDL consolidation, Kellogg Hansen made a blanket demand for CDK to re-designate 86,569 documents from Highly Confidential to Confidential—every Highly Confidential document in CDK's then-existing production. *See* Ex. 1 (1/4/2018 Email from M. Nemelka to B. Miller).[2] CDK declined to do so, but proposed that Kellogg Hansen instead identify a reasonable subset of documents for CDK to consider. *See id.* (1/4/2018 Email from B. Miller to M. Nemelka). Kellogg Hansen returned with a demand that CDK re-designate 42,919 of its documents, an extremely overbroad list that appeared to include any document that belonged to or mentioned any one of six then-soon-to-be deponents. *See id.* (1/9/2018 Email

---

[2] The majority of these documents were initially produced to the FTC. As these documents had not been reviewed for confidentiality (*i.e.*, Confidential and Highly Confidential), Kellogg Hansen agreed to accept them all on a Highly Confidential basis, subject to their right to challenge the designation of individual documents. *See* Ex. 1 (1/4/2018 Email from B. Miller to M. Nemelka). Kellogg Hansen then nonetheless bulk-challenged the designation of every document that CDK re-produced from its FTC production. CDK has since re-reviewed the entirety of its FTC production and has designated the documents Confidential or Highly Confidential as appropriate.

3

from M. Nemelka to B. Miller); Ex. 3 (2/16/2018 Email from B. Miller to M. Nemelka (summarizing correspondence)).

Kellogg Hansen added thousands more documents to that request less than two weeks later, expanding it to include every email and attachment in CDK's productions to date, for a total of 79,686 documents. *See* Ex. 2 at 2-3 (1/19/2018 Letter from M. Nemelka to B. Miller and B. Ross); Ex. 3 (2/16/2018 Email from B. Miller to M. Nemelka (summarizing correspondence)).

Approximately two weeks after that, Kellogg Hansen made yet another overbroad, blanket request for 1,225 additional re-designations on February 7, 2018—based on arguments similar to those made here—claiming that every email CDK had produced at that point that included a Reynolds email address in the to, from, CC, or BCC lines did not warrant *any* confidentiality protection. *See* Ex. 3 (2/7/2018 Email from M. Nemelka to B. Miller); *id.* (2/16/2018 Email from B. Miller to M. Nemelka (summarizing correspondence)). CDK again rebuffed that demand, but invited Kellogg Hansen to articulate as to each of the documents it had identified why it considered the confidentiality designation to be incorrect. *See id.* (2/16/2018 Email from B. Miller to M. Nemelka). Kellogg Hansen never responded to CDK's request.

Instead, nine months later they filed the instant motion which, although targeted at a much smaller group of documents, is no less egregious than their prior efforts. If anything, the instant motion is worse in that instead of merely seeking the wholesale de-designation of swaths of document types (*e.g.*, all emails), it instead seeks to affirmatively de-designate documents that contain specific, highly confidential CDK business documents for no apparent purpose other than to allow CDK's competitors insight into CDK's business practices.

### The Instant Challenge to CDK's Designations

In their motion, MDL Plaintiffs purport to sort the Subject Documents into six categories,

4

several of which serve more as vehicles for Plaintiffs' arguments about the merits of this litigation than as groupings to assist the Court.[3] CDK respectfully submits that, under a more logical approach, the documents fall into the following six categories:

1.  Many of the Subject Documents concern the negotiation and implementation of the Data Exchange Agreement ("DEA"), Third Party Access Agreement ("3PA Agreement"), and Reynolds Interface Agreement ("RCI Agreement") that CDK and Reynolds entered into in February 2015 (collectively, the "February 2015 Agreements").[4]

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████ Notably, CDK and Reynolds are bound to maintain the terms of these written agreements as confidential. *See* DEA § 7.3, Dkt. No. 184 (Ex. 11 to Dealership Class Pls.' Compl.).[5] ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

2.  Other Subject Documents reference specific pricing terms or material provisions in contracts with current or potential participants in CDK's Global Partner third-party access program (f/k/a the "3PA" program) and DMS customers. ████████████████

---

[3] For example, MDL Plaintiffs assert that one "category" of the Subject Documents consists of those with "statements that directly contradict CDK's key defenses and counterclaims in this litigation." Mot. at 7. Of course, CDK strongly disputes Plaintiffs' characterizations, but they are irrelevant to whether the underlying documents meet the definition of "Highly Confidential" under the Agreed Protective Order.

[4] *See* Nemelka Decl. (Dkt. 418-1) Ex. 1-10, 14-16, 18-20, 22-25, and 29-36.

[5] Section 7.3 of the DEA provides that the terms of that Agreement, the 3PA Agreement, and the RCI Agreement are confidential, and that "neither party may disclose to any third party the specific terms of such agreements, or the existence or general nature of such agreements . . . without the prior written consent" of the other party to the DEA.

5

███████████████████████████████████████████████[6] As with the February 2015 Agreements, the terms of CDK's 3PA and DMS contracts are confidential and may not be disclosed to other customers for those services (much less competitors), such as Plaintiffs and current 3PA program participants Cox Automotive and AutoLoop. *See* Gardner Decl. ¶ 9.

3. Many other Subject Documents relate to CDK's internal strategies and policies with regard to the Security First and 3PA programs.[7] ███████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████

4. A handful of documents consist of internal CDK communications reflecting assessments of threats from competitors or third-party "integrators," and CDK's corresponding strategies.[8] *See* Gardner Decl. ¶ 13. ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

5. ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████

6. Finally, MDL Plaintiffs challenge one presentation (Nemelka Decl. Ex. 21) that CDK received as a member of a joint venture called the Open Dealer Exchange. *See* Gardner Decl. ¶ 15. ███████████████████████████████████████

███████████████████████████████

---

[6] *See also* Nemelka Decl. Ex. 54 and 56.

[7] *See* Nemelka Decl. Ex. 11-13, 17, 26-28, 38, 39, 41, 43, 44, 45, 47, 49, 51, 52, 57, 60-63, and 66.

[8] *See* Nemelka Decl. Ex. 37, 46, 48, 50, 55, and 64.

**Plaintiffs' Own Confidentiality Designations**

The irony of MDL Plaintiffs' motion and their attempts to critique CDK's confidentiality designations is that Plaintiffs have applied a remarkably different standard to their own document productions, collectively designating a substantially higher proportion of documents than CDK—60% of their own productions—Highly Confidential. Three Plaintiffs—MVSC, AutoLoop, and Cox Automotive—have done so for *83% or more* of their productions:

|  |  | Confidentiality Designations[9] | | | |
|---|---|---|---|---|---|
| **Producing Party** | **Documents Produced** | **None** | **Confidential** | **Highly Confidential** | **% Highly Confidential** |
| Authenticom | 96,761 | 741 | 58,943 | 37,077 | 38% |
| MVSC | 23,114 | 40 | 1,088 | 21,986 | 95% |
| AutoLoop | 24,994 | 67 | 1,864 | 23,063 | 92% |
| Cox Automotive | 10,627 | 0 | 1802 | 8,825 | 83% |
| Dealer Class | 25,217 | 1,769 | 6,056 | 17,392 | 69% |
| **MDL Plaintiffs** | **180,713** | **2,617** | **69,753** | **108,343** | **60%** |
| **CDK** | **1,034,967** | **37,148** | **500,413** | **497,403** | **48%** |

If one thing is clear from this chart, it is that Plaintiffs certainly do not believe, contrary to their stated position on this motion, that the Highly Confidential designation in this case "should only be used on a relatively small and select number of documents." Mot. at 8.

Moreover, a sampling of those documents reveals that the MDL Plaintiffs have at times blatantly overreached with their Highly Confidential designations.[10] ███████

███████

███████

███████

---

[9] These statistics are provided as of October 29, 2018, reflecting additional productions made by the parties since CDK raised this issue in pre-motion correspondence. *See* Nemelka Decl. Ex. B at 2.

[10] CDK reserves its right to challenge the referenced designations under the Agreed Confidentiality Order, but raises them here in order to illustrate why the Highly Confidential designation does not impede the effective *use* of discovery material by outside counsel in this litigation.

█████████ Of course, in a production as large as CDK's (totaling more than one million documents) there are bound to be some similar mis-designations, but each of the CDK documents at issue qualify for protection as Highly Confidential.

## ARGUMENT

### I. CDK's Documents Meet the Standard for Highly Confidential Protection.

MDL Plaintiffs' argument (at 9-13) essentially is that the Subject Documents contain no competitively sensitive information, but that is simply wrong. Even a cursory review reveals that the documents contain confidential pricing and contract terms, internal company strategies, and potential acquisitions. Disclosure of this information to CDK's *competitors*—including, specifically, Cox Automotive (which competes with CDK in the DMS, data services, and application marketplace), AutoLoop (a competitor in the application space), and Authenticom (which is actively seeking to circumvent CDK's contracts and security measures), not to mention co-Defendant Reynolds—would not only undermine CDK's ability to effectively compete and negotiate with those parties but affirmatively put it at a competitive disadvantage, which is precisely why a two-tiered confidentiality protocol is especially appropriate in cases involving competitors and their customers. *See Hitz Entm't Corp. v. Mosley*, 2017 WL 444073, at *7 (N.D. Ill. Feb. 1, 2017) ("[T]here is good cause to protect [highly confidential] information from disclosure to a competitor where the competitor could use that information to obtain a competitive advantage."); *Global Material Techs., Inc. v. Dazheng Metal Fibre Co.*, 133 F. Supp. 3d 1079, 1090 (N.D. Ill. 2015) ("Courts have made clear that the AEO designation is particularly appropriate in situations where the confidential information might otherwise be used to gain a commercial advantage by a direct competitor.").[11] As further detailed in the

---

[11] The MDL Plaintiffs rely on *Global Material* as well (*see*, *e.g.,* Mot. at 10), but to the extent the district court in that case did not extend Attorney's Eyes Only ("AEO") protection to certain documents, the

8

accompanying Declaration of Howard Gardner, CDK's Vice President, Data Services, each category of documents is properly designated.

*The February 2015 Agreements.* Re-designation of the documents in this category will cause CDK significant harm. To begin with, the terms and negotiations of the February 2015 Agreements are subject to binding confidentiality and non-disclosure agreements. *See* DEA § 7.3; Gardner Decl. ¶¶ 3-8. It would cause CDK significant business injury if these materials were disclosed to CDK's other competitors and counterparts involved in this litigation.

For example,  Those portions of the Agreements have not been made public in connection with this litigation, and they remain in force today. Gardner Decl. ¶¶ 4-5. If Plaintiffs Cox Automotive and AutoLoop, both of whom currently participate in CDK's 3PA program, had access to the confidential terms of the Reynolds 3PA Agreement, they would gain an unfair

---

circumstances underlying those rulings are readily distinguishable. The *Global Material* court's denial of AEO status for some documents was largely influenced by the fact that there remained a "disturbingly murky question" regarding whether two of the producing parties were "still functioning companies" that could even be considered competitors of the plaintiff. *See Global Material Techs., Inc.*, 133 F. Supp. 3d at 1086, 1090. Other sets of documents did not qualify for AEO protection because the producing party failed to respond to arguments challenging that designation, or because the documents did not "reveal any product information, pricing details, or sourcing strategy" but instead concerned only an inquiry into a supply-reporting mistake. *See id.* at 1091-92. In contrast, the *Global Material* court found the AEO designation appropriate for documents, like the ones here, that "reveal[ed] pricing strategies, product characteristics, and/or supply quantity and quality data" that "could skew current negotiations and strategies," or revealed "supply strategies and product requirements" that could potentially "be interpreted to predict [the company's] future purchasing strategies." *Id.* at 1091.

9

advantage in future negotiations with CDK and other 3PA program participants. *See id.* ¶ 6.

MDL Plaintiffs argue (at 10-11) that CDK's communications with Reynolds could never qualify as Highly Confidential, but that cannot be true. Regardless of the fact that certain Reynolds executives necessarily had access to those communications, disclosure of that same information to Plaintiffs' executives (who are 3PA customers)—which Reynolds is contractually barred from making—would significantly harm CDK's commercial relationships with those customers.[12] And MDL Plaintiffs' argument that such communications cannot be Highly Confidential because they are "collusive" or "*per se* unlawful" is both erroneous and wholly improper. Plaintiffs are asking the Court to rule now on the merits of their claims, but a designations motion is not "an appropriate forum for this [C]ourt to decide the substantive issues" on the merits. *See Global Material*, 133 F. Supp. 3d at 1090-91.

Other documents in this category reflect CDK's internal discussions and strategy regarding the negotiations of the February 2015 Agreements; those documents have *not* been shared with Reynolds—or any other external parties, *see* Gardner Decl. ¶ 8—and disclosure of those documents even to Reynolds' executives could threaten CDK's operations by giving insight into CDK's negotiation strategies and tactics that could be used against CDK in future negotiations with any number of the other parties. ███████████████████████
███████████████████████████████████████████████

***Specific Terms of Other CDK Contracts.*** Documents in this category ████████
███████████████████████████████████████████████

---

[12] *See, e.g.*, *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2012 WL 6160468, at *5 (E.D. Cal. Dec. 11, 2012) (declining to downgrade AEO designations, recognizing "substantial risk of serious harm could come from sources other than direct competitors"); *id.* (while "plaintiff may not be a direct competitor of defendants," the "disclosure of the pricing and quantity strategies would give plaintiff a significant negotiating leverage as a customer of [the defendants'] customer" (internal quotation marks omitted)).

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The specific terms of each of CDK's 3PA and DMS agreements are kept confidential—by contractual requirement—between the parties to the agreement. Gardner Decl. ¶ 9. The disclosure of these documents to other customers—including 3PA members Cox Automotive and AutoLoop and Dealership Class Plaintiffs—would give those parties an unfair advantage in their own negotiations with CDK, and over other similarly situated customers. *See id.*; *see also Hitz Entm't*, 2017 WL 444073, at *7 (finding Highly Confidential protection appropriate for contracts containing "confidential pricing and strategic information").

***SecurityFirst and 3PA "Refresh" Documents***. Several documents in this category reflect



Over Plaintiff Authenticom's objections, the Seventh Circuit has already found that two documents in this category—Nemelka Decl. Ex. 11 and 11—contain information that is sufficiently confidential and competitively sensitive to warrant sealing in the *Authenticom* appellate record. *See* Nemelka Decl. Ex. 11 & 12; Ex. 7 (*Authenticom, Inc. v. CDK Global, LLC*, Nos. 17-2540, Dkt. 85 (7th Cir. Sept. 15, 2017)). That amounts to a ruling that the documents reflect CDK's trade secrets "or something comparable whose economic value depends on its secrecy." *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 547 (7th Cir. 2002).

***Competitive Assessments.*** Documents in this category reflect CDK's assessment of

11

▮

Gardner explains that this information is sufficiently confidential and competitively sensitive that a CDK employee found to have intentionally disclosed it outside CDK could well be terminated for putting the company's business at risk. *See id.*

***Potential Acquisitions.*** ▮



***Open Dealer Exchange Presentation.*** Finally, highly confidential information is also reflected in the document in this category, ▮

\*     \*     \*

MDL Plaintiffs make four additional arguments in an attempt to distract from the confidential nature of the Subject Documents, none of which has merit.

*First*, MDL Plaintiffs say the Subject Documents do not include any of three "enumerated categories" of Highly Confidential information set out in the Agreed Confidentiality Order. *See* Mot. at 9-10. But that simply ignores the Order, which makes clear that these categories are "without limitation to other forms of Confidential Information properly designated as "HIGHLY CONFIDENTIAL." Dkt. 104 at ¶ 2(g). MDL Plaintiffs seem to

12

understand this concept when it comes to their own productions, more than half of which are designated Highly Confidential. *See supra*, at 7-8.

*Second*, MDL Plaintiffs assert that the confidential information in the documents at issue is necessarily "stale," *see* Mot. at 10, if it is more than two years old. That, too, is wrong. The information relates in many instances to ongoing contracts, strategies, and pricing arrangements. *See Global Material Techs., Inc.*, 133 F. Supp. 3d at 1090-91 (documents revealing "pricing strategies, product characteristics, and/or supply quantity and quality data" were properly designated AEO because, "despite their age," they "could skew current negotiations and strategies"). Moreover, this purported "two year" requirement for Highly Confidential designations appears to apply only to CDK's documents. Of all the documents that MDL Plaintiffs have collectively designated Highly Confidential, at least 61,269 (approximately 56%) are more than two years old, based on available metadata associated with the documents.

*Third*, MDL Plaintiffs suggest that re-designating the documents Confidential will "fully protect" CDK's interests. *See* Mot. at 2. If that would provide sufficient protection, however, there would be no need for the two-tier protective order to which all parties agreed.[13] The Highly Confidential designation exists for a reason: documents containing highly sensitive information

---

[13] For the same reason, the suggestion that the Highly Confidential designation is unnecessary because Plaintiffs' employees will be barred from *further* disclosing or using CDK's sensitive information should be rejected. *See* Mot. at 11-12. If Plaintiffs were correct, there would be no need for the Highly Confidential tier, and courts would not emphasize—as they repeatedly do—the propriety of such elevated protections in litigation involving competitors or competitive risks. *See supra*, at 8-9 (citing cases).

Moreover, MDL Plaintiffs miss the point by assuring the Court that their executives will abide by the Agreed Confidentiality Order and will not "use the Subject Documents for non-litigation purposes." *See* Mot. at 11. The problem, instead, is that "once the Highly Confidential information in this case is disclosed, the bell cannot be unrung." *Silversun Indus., Inc. v. PPG Indus., Inc.*, 296 F. Supp. 3d 936, 947 (N.D. Ill. 2017) (internal quotation marks omitted). The competitive nature of this case, and of the relationships between the parties involved, "make litigation decision-making and competitive decision-making blend imperceptibly together." *See Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.*, 237 F.R.D. 405, 411 (N.D. Ill. 2006). The inherent risk that party representatives will directly or even indirectly use Highly Confidential information during the course of their dealings with (and against) CDK outside the context of this litigation is too great to allow for re-designation.

that could cause significant harm if disclosed warrant greater protection than that afforded by the lower, Confidential status. Yet again, Plaintiffs seem to agree when it comes to their own documents, 60% of which they designate Highly Confidential.

*Fourth*, MDL Plaintiffs point to CDK's pre-motion agreement to re-designate thirteen documents Confidential (Nemelka Decl. Exs. 67-79), as if that changes the calculus for the 66 documents that remain at issue. *See* Mot. at 12-13. Apparently, no good deed—here, that CDK engaged in good faith efforts to resolve or narrow this dispute—goes unpunished. Moreover, a review of the documents that CDK agreed to re-designate refutes Plaintiffs' assertion that "[t]here is no basis to say those documents are any less commercially or competitively sensitive than the remaining Subject Documents." Mot. at 13. There is an obvious difference between ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ which CDK acknowledges do not rise to the level of Highly Confidential information, and documents that reflect pricing, company strategies, competitive assessments, and specific terms of CDK's contracts.

## II. MDL Plaintiffs' Clients Lack an Overriding Need To See the Documents.

MLD Plaintiffs also argue that their clients need access to the Subject Documents to "set their litigation strategy and priorities" and "provide knowledgeable input to counsel," Mot. at 14, but those vague assertions are not close to compelling. The fact that some of the documents have already been cited in or attached to filings or used at depositions (*see* Mot. at 4-5, 14) only shows that the Highly Confidential designation has not impeded MDL Plaintiffs' ability to use them in litigation. Plaintiffs offer no logical reason why their own clients' purported interests trump CDK's rights under the Agreed Confidentiality Order, nor do they explain, if Plaintiffs are so "deprived" (Mot. at 2, 14) of their ability to litigate, why they are only now raising the issue.

MDL Plaintiffs also argue that re-designations are needed to "determine whether and

when to settle," Mot. at 14, but a desire to "direct[] settlement negotiations [is] insufficient to lift the highly confidential designation." *Stanislaus Food Prods.*, 2012 WL 6160468, at *6. And of course, MDL Plaintiffs' clients may review the more than 535,000 documents CDK has produced that are not Highly Confidential, and any deposition testimony not designated Highly Confidential, pursuant to the Agreed Confidentiality Order's terms. They also may discuss the strength and status of their claims with counsel, who can advise them without referring to specific information designated Highly Confidential, just as Defendants are doing.

The argument that CDK's Highly Confidential designations will "unjustifiably" make depositions "more difficult and expensive" also carries no weight. *See* Mot. at 15. The Agreed Confidentiality Order includes a procedure for using Highly Confidential documents at the depositions of witnesses who would not otherwise have access to the documents as an author or recipient. *Supra*, at 3. No disputes have arisen under this procedure so far, and it was not even invoked during the recent October 18 deposition of CDK witness Beth Ayotte, where MDL Plaintiffs marked twenty-eight Highly Confidential documents as exhibits.

At the end of the day, MDL Plaintiffs simply "have not come up with anything that would convince one that their outside counsel would be hamstrung in their trial preparations" under the current designations. *Fed. Trade Comm'n v. Advocate Health Care Network*, 162 F. Supp. 3d 666, 672 (N.D. Ill. 2016); *see also Stanislaus Food Prods.*, 2012 WL 6160468, at *5 ("Where a party challenges an attorney's eyes only designation, that party must show the protective order actually prejudice[s] presentation of [that] party's case, not merely increase[s] the difficulty of managing the litigation." (internal quotation marks omitted)).

## CONCLUSION

This motion to re-designate CDK's Highly Confidential documents should be denied.

| | |
|---|---|
| Dated: October 30, 2018 | Respectfully submitted, |

*/s/ Britt M. Miller*
Britt M. Miller
Michael A. Scodro
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mscodro@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant*
*CDK Global, LLC*

**PUBLIC VERSION**

## CERTIFICATE OF SERVICE

I, Britt M. Miller, an attorney, hereby certify that on October 30, 2018, I caused a true and correct copy of the foregoing **DEFENDANT CDK GLOBAL, LLC'S OPPOSITION TO MDL PLAINTIFFS' MOTION TO COMPEL CDK TO RE-DESIGNATE DOCUMENTS FROM "HIGHLY CONFIDENTIAL" TO "CONFIDENTIAL"** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

                */s/ Britt M. Miller*
                Britt M. Miller
                MAYER BROWN LLP
                71 South Wacker Drive
                Chicago, IL 60606
                Phone: (312) 782-0600
                Fax: (312) 701-7711
                E-mail: bmiller@mayerbrown.com