IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817 Case No. 18 C 864 |
| This Document Relates to All Cases | Magistrate Judge Jeffrey T. Gilbert |

### ORDER

MDL Plaintiffs' Omnibus Motion to Compel [ECF 316] is granted in part and denied in part for the reasons discussed more fully in the Statement below. See Statement below for further details.

### STATEMENT

1. **Telephone Records.** Plaintiffs' Omnibus Motion to Compel ("Motion") [ECF 316][1] is denied with respect to records of telephone communications between Defendants'[2] document custodians going back to 2014. To begin with, CDK says it has telephone records going back only to January 2017. Christopher Tragasz Declaration [ECF 354-4] at ¶¶ 2-3. Reynolds says it has records going back only to July 2017. Robert Gibbs Declaration [ECF 354-5] at ¶ 3. Plaintiffs allege the conspiracy between Reynolds and CDK began in 2015 and that it was memorialized in written agreements signed in February 2015, in a general understanding between Defendants, and is reflected in oral statements allegedly made to Plaintiff Authenticom in 2015 and 2016 by CDK and Reynolds's executives. Memorandum Opinion and Order (St. Eve, J.) [ECF 176] at 11-14. The critical time frame for telephone communications between Defendants, therefore, at least for the traditional purpose of using communications between alleged co-conspirators as circumstantial evidence of the existence of a conspiracy, would appear to be around that time frame. That appears to be the time frame for which Plaintiffs most want to see telephone records given their theory as to why those documents are relevant. MDL Plaintiff's Memorandum In Support Of Their Omnibus Motion to Compel ("Plaintiffs' Memo") [ECF 318] at 4 ("evidence that CDK and Reynolds employees communicated by telephone would also be highly probative of the conspiracy."). Records for the most critical time frame though, the time when the alleged conspiracy allegedly incepted and began to operate, apparently no longer exist at least in terms of records maintained or kept by CDK or Reynolds. The Court cannot require Defendants to produce documents they do not have in their possession, custody, or control.

---

[1] "Plaintiffs" includes the individual plaintiffs and class plaintiffs in this Multidistrict Litigation unless otherwise stated.

[2] "Defendants" means named defendants CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") unless otherwise stated.

Plaintiffs point to a supposedly "hot" document they say shows the importance of seeing telephone records. It is an email from a top-ranking Reynolds's executive to a top-ranking CDK executive (the top-ranking characterization is Plaintiffs') in February 2015 that says "[l]et's discuss [,] no more emails" which prompted an exchange of phone numbers. Plaintiffs' Memo [ECF 318], at 5. Again, however, even if this is a "gotcha" email, which is not necessarily clear, the fact remains that neither CDK nor Reynolds have telephone records going back to 2015 or, indeed, for another two years after that email exchange.

The records that do exist (at least CDK's records) relate to a time frame that begins only months before Plaintiff Authenticom filed suit in the Western District of Wisconsin on May 1, 2017. Memorandum Opinion and Order [ECF 176] at 1. Plaintiff Motor Vehicle Software Corporation filed a somewhat different suit on February 3, 2017, Case No. 18-cv-865, Complaint [ECF 1]. See also Defendants' Opposition ("Defendants' Opp") [ECF 354] at 6, n.11. It appears that the first dealer case in this Multidistrict Litigation was filed on October 31, 2017. *Hartley Buick v. CDK, et al.,* No. 17-cv-7827 (N.D. Ill.). The Court questions the utility in this case of requiring the production of telephone records from 2017 through the present that largely cover a time period after the lawsuits in this Multidistrict Litigation were filed, and hence the proportionality of that discovery to the needs of the case.

This is not a case in which Plaintiffs need to establish a conspiracy or an anti-competitive agreement with circumstantial evidence that Defendants had an opportunity to conspire because they spoke frequently by telephone. The alleged anticompetitive agreements here are in writing. It is the legal effect of those agreements and Defendants' conduct pursuant to those agreeements, not their existence, that appears to be at the core of this case. Memorandum Opinion and Order [ECF 176] at 11-14. Plaintiffs say it could be helpful in depositions for them to know which of Defendants' document custodians spoke with each other and when those conversations occurred. That probably is true to some extent. It is not clear, though, that production of telephone records that will show when those conversations occurred is proportional to the needs of a case in which no relevant telephone records exist before January 2017 and where Plaintiffs' burden of showing Defendants agreed to an allegedly anticompetitive course of conduct can be met, at least with respect to the existence of an agreement, with the written contracts Defendants entered into between themselves years earlier. Even if telephone records in 2015 and 2016 would be relevant to the claim that CDK's or Reynolds's executives told an Authenticom executive that CDK and Reynolds were going to destroy Authenticom or take steps that would harm its business, there are no telephone records from that period of time.

Plaintiffs probably would say that simply establishing a multiplicity of telephone calls between Defendants' document custodians in 2017 and beyond is relevant and probative because it shows a course of conduct between two alleged co-conspirators. And perhaps Plaintiffs want or need to show concerted action beyond that memorialized in written agreements. Again, though, the typical use of such evidence in an antitrust case is to establish circumstantially the existence of a conspiracy. Plaintiffs cite cases for that proposition. Plaintiffs' Memo [ECF 318] at 5, citing *In re Catfish Antitrust Litigation,* 908 F. Supp. 400, 405 (N.D. Miss. 1995) ("where there are a multitude of phone calls between conspirators, the 'sheer number of contacts between [the] competitors . . . is circumstantial evidence of the existence of a conspiracy'"). And in this case, there is no question that Defendants entered into agreements with each other and were involved in

2

joint ventures and the wind-down of these ventures that Plaintiffs allege have had an anti-competitive impact. There also is other evidence, circumstantial and direct, that Plaintiffs can use to argue Defendants acted in concert. So, it would seem the telephone records Plaintiffs seek for a stub period of time have only limited utility in this case.

Under these circumstances, the burden of requiring production of the phone records that exist from 2017 forward, even if that production is limited to telephone records for each of Defendant's agreed upon document custodians, may outweigh the potential benefit or utility of doing so. Or it may not. The Court would need to know more about why Plaintiffs believe production of the telephone records that do exist from January 2017 (in CDK's case) and from July 2017 (in Reynolds's case) forward would be beneficial in this case to determine whether ordering that production is proportional to the needs of this case. Plaintiffs do not engage with Defendants much on these points. Their argument appears to proceed on a more general footing that telephone records always are relevant in an antitrust case. For the reasons discussed above, though, the 10,000 foot argument may not be particularly dispositive in this case. So, on this record the Court cannot justify ordering Defendants to do what Plaintiffs request at this time. Plaintiffs' Motion is denied in this respect. It may be possible for Plaintiffs to better justify their request for the telephone records that do exist from 2017 forward, however, and, if they can, the Court is willing to revisit this issue.

2. **Attendance at Industry Conferences.** The Court agrees that the compromise agreed to by the Dealership Class Plaintiffs and CDK with respect to the production of documents relating to industry conferences represents a reasonable compromise. The compromise appears to be summarized in the Wallner Declaration [ECF 321], at ¶ 23 and Ex. K. Plaintiff's Memo [ECF 318], at 7, n. 5.

The broader category of documents that the Individual Plaintiffs and the Vendor Class appear still to be requesting is overbroad, burdensome, and not proportional to the needs of this case, in the Court's view. It also appears that a number of Plaintiffs' other requests for production of documents encompass all or some of the documents called for by Plaintiffs' industry conference requests or at least the aspects of those requests that can be interpreted as seeking relevant information. Defendants' Opposition To Plaintiffs' Omnibus Motion To Compel ("Defendants' Opp") [ECF 354], at 6, n. 10 (citing the Nemelka Declaration [ECF 320] and Exhibits thereto).

Therefore, Reynolds shall produce the documents that fit within the parameters of the compromise reached by the Dealership Class and CDK with respect to industry conferences going back to 2013. Plaintiffs' Motion is granted to this extent and denied as to industry conference documents in all other respects.

3. **Communications Between Defendants Concerning Hostile Integration and Third-Party Integrators.** Plaintiffs' interrogatory is overbroad and imposes an unreasonable burden on Defendants. That does not mean Plaintiffs cannot inquire at depositions about this subject matter. In fact, that may be the more appropriate venue in which to conduct this kind of discovery. In addition, it seems likely that Plaintiffs' other discovery requests, particularly requests for production of documents, will result in production of at least written communications on the

subject about which Plaintiffs want to inquire. Accordingly, Plaintiffs' Motion is denied in this respect.

4. **DMS Customer Tenures.** Plaintiffs' Motion is granted to the extent Plaintiffs want the Court to require Defendants to answer an interrogatory that asks them to identify the average tenure of their DMS customers since 2009. Defendants say they do not have the information Plaintiffs are seeking in the form that Plaintiffs are asking for it. Defendants' Opp [ECF 354], at 9 ("[CDK] does not keep formal statistics on how long dealership customers have used CDK's DMS."); ("Reynolds does not track dealer tenure, and it would be impossible for it to answer this interrogatory."). But in responding to Authenticom's statements of fact filed in connection with the preliminary injunction hearing in Wisconsin, CDK apparently conceded that its average DMS client tenure is over 20 years, and Reynolds said its average DMS client tenure was less than 20 years. Plaintiffs' Memo [ECF 318], at 11. So, clearly, Defendants have some information that would allow them to answer this interrogatory. They can couch or qualify their answer however they want, but the information is relevant. Defendants have not shown that it would be unduly burdensome to obtain, and it appears to be proportional to the needs of the case given Plaintiffs' allegations and Judge St. Eve's summary of the factual allegations relevant to the case in the context of her ruling on Defendants' motions to dismiss. Memorandum Opinion and Order [ECF 176], at 6 (". . . the dealers, are also unable to freely switch between DMS providers.")

The parties should meet and confer about appropriate and reasonable parameters that Defendants can use to provide the information Plaintiffs are seeking. For example, Reynolds says it has thousands of DMS dealership clients and that it would take approximately 30 minutes of manual effort per dealer to obtain the information Plaintiffs are seeking. For thousands of customers, that could be an undue burden. But if Reynolds searched for and gleaned from its internal data or documents a representative sampling of the information Plaintiffs are seeking over a relevant period of years, the burden would be substantially reduced and may not be disproportional to the needs of the case. Accordingly, Plaintiffs' Motion is granted in part for these reasons and to the extent that the parties are directed to meet and confer about a potential method for obtaining the information Plaintiffs seek in a less burdensome but still responsive manner.

5. **Financial Information.** Plaintiffs' Motion is granted with respect to product lines involved in this case. The parties do not appear to be far apart except as to time frame. Plaintiffs' argument that Defendants should provide the financial information they are seeking back to 2009 (two years more than Defendants want to provide) does not appear to impose an undue burden on Defendants and the additional two years probably is not disproportional to the needs of the case. Defendants say that one of the Individual Plaintiffs previously agreed to limit production of financial information to 2011 forward. But they do not explain how or why the burden of producing two more years of information is particularly undue. Whether or not information going further back than 2011 will be admissible or even will be used by experts is not the sole benchmark at this point. The Court has been presented with no solid reason why financial information going back to 2009 would not be relevant here, and no solid information why production of two more years of financial information than Defendants want to produce is particularly burdensome on them.

4

At this point, however, the Court is not convinced that Plaintiffs need or are entitled to financial information for product lines that are not involved in this case. Plaintiffs do not adequately respond to this argument made by Defendants other than in vague generality. Accordingly, Plaintiffs' Motion is granted in part and denied in part with respect to financial information.

6. **Reynolds's Transactional Data and Invoices.** With respect to invoices, Plaintiffs should live with the agreement they reached with Reynolds before they filed their Motion. That agreement called for Reynolds to produce invoices for 75 dealer customers and 30 RCI vendors dating back to April 2014. Reynolds makes a convincing argument that it would be unduly burdensome for it to produce invoices for all its customers going back to 2011, as Plaintiffs request. With respect to transactional data, Reynolds says it already has produced all transactional invoice data for all dealership customers from August 2014 to October 2017. For RCI vendor customers, Reynolds has produced data sufficient to show every price for every package for every vendor customer dating back to 2010.

Plaintiffs respond by saying CDK has agreed to produce transactional data going back to 2011 so it must be possible for Reynolds to do the same. According to Reynolds, "[p]roducing 'all invoices' as Plaintiffs have requested, would take years." Defendants' Opposition [ECF 354], at 15. Plaintiffs do not respond to this argument, other than to say Reynolds must be able to produce the information Plaintiffs have requested because CDK has done so. Plaintiffs' argument makes no sense unless Reynolds's systems are the same as CDK's, and Plaintiffs have not shown that they are. There is no reason on this record for the Court to disbelieve Reynolds's arguments about burden or to find that the proposed compromise Reynolds and Plaintiffs apparently reached on invoices and the information Reynolds already has produced or agreed to produce with respect to transactional data is not sufficient for Plaintiffs' purposes. Therefore, Plaintiffs' Motion is denied in this respect.

7. **OEM Pricing Information.** Plaintiffs' Motion is denied in this respect. As the case is currently pled, it appears that Plaintiffs' request for documents and communications relating to prices charged to OEMs for access to data on the CDK and Reynolds DMSs (Nemelka Decl. [ECF 320], at 28) is overbroad, seeks information that is not relevant to a claim or defense pled in this case, and is not proportional to the needs of the case. To the extent Plaintiffs want to discover "the surpa-competitive prices that Defendants charged OEMs for data integration," Plaintiffs' Memo [ECF 318], at 18, a narrower request would seem to do the trick assuming for this purpose without deciding that information is relevant to a claim or defense. The same is true if the predicate for Plaintiffs' request for production is that the documents are relevant to Authenticom's damages. *Id.* If the Court is misperceiving either the scope or the purpose of Plaintiffs' request for documents relating to prices charged to OEMs, Plaintiffs can bring the issue back to the Court's attention.

8. **Cost of Capital.** Plaintiffs' request that Defendants produce "[a]ll documents concerning [their] cost of capital, cost of equity, cost of debt, and/or weighted average cost of capital, including any documents upon which any of the foregoing are based." Plaintiffs' Memo [ECF 318] at 19. That request is overbroad, unduly burdensome, and seeks information that is neither relevant nor proportional to a claim or defense in this case. For these reasons, Plaintiffs' Motion is denied in this respect. Plaintiffs' rationale for why they need this information is

5

unconvincing. The cases they cite in support of their request for this information are distinguishable. The Court can see no reason that the information Plaintiffs are requesting from CDK and Reynolds is relevant to computing their own weighted cost of capital even if that is something Plaintiffs need to do as part of their own damages analysis, and the Court also is not convinced Plaintiffs need to conduct that analysis. Further, although Defendants offer some products or services that may compete with or overlap with products or services offered by one or more Plaintiffs, both CDK and Reynolds also appear to be very differently situated than any particular Plaintiff or Plaintiff Class in terms of their overall business so that the documents Plaintiffs are seeking from Defendants are unlikely to have any utility at all for Plaintiffs' legitimate purposes in this case.

      9. **Reynolds's Security Tools, Processes, and Training.** Plaintiffs and Reynolds agree that Plaintiffs have narrowed their requests in this area to three categories of documents related to security tools, processes, and training for Reynolds's software developers. Both sides also agree that an important question in this case is whether Reynolds's professed rationale for blocking access to its systems was to protect or enhance the security of its system against outsiders. Reynolds argues even if Plaintiffs are entitled to discovery into <u>why</u> Reynolds thought security was important and <u>whether</u> legitimate security concerns supported Reynolds's conduct, they do not need to know <u>how</u> Reynolds's security tools and processes work to properly discover their case. The discovery Plaintiffs are seeking goes to the "how" question and Plaintiffs say that discovery is necessary for them to evaluate properly and possibly challenge Reynolds's purported security rationale for what Plaintiffs contend is anti-competitive conduct. Plaintiffs also note that CDK apparently has agreed to produce the documents called for by Plaintiffs' narrowed requests for production.

      The Court agrees with Plaintiffs. The security issue appears to be a central one in this case, and the documents Plaintiffs are seeking in their narrowed requests for production appear to be relevant to an evaluation of Reynolds's security rationale for the change in the way it did business implemented in 2015. The Court does not agree with Reynolds that Plaintiffs' discovery in this area should be limited to why Reynolds says it thought security was important. The Court agrees with Reynolds that Plaintiffs should be entitled to discover whether Reynolds's professed security concerns were legitimate. Contrary to Reynolds's argument, however, the discovery Plaintiffs are seeking appears to be relevant to that inquiry and proportional to the needs of the case.

      Reynolds does not raise a burden argument. At best, it says that many of the documents Plaintiffs are seeking already are responsive to others of Plaintiffs' requests for production and those documents will be produced in response to those other requests. But if that is the case, then Reynolds can point Plaintiffs to documents produced in response to other requests when they respond to the requests at issue in this dispute provided that, in doing so, it does not confuse the issue or prevent Plaintiffs from the discovery to which they appear to be entitled.

      The Court is more sympathetic to Reynolds's objection that the information Plaintiffs are requesting could be used by Plaintiffs to evade Reynolds's security measures under the guise of discovery. But it is not clear that the protections afforded by the confidentiality order already entered in this case [ECF 104], or any further protections that might be necessary along those lines for these particular kinds of documents, are not sufficient to protect against the inappropriate use

6

of information produced in discovery outside the confines of the litigation. Therefore, Plaintiffs' Motion is granted in these respects.

10. **"Whitelisting" and SecurityFirst:**

(a) **Reynolds's "Whitelisting."** Here, again, the Court disagrees with Reynolds's rationale that Plaintiffs are not entitled to documents that show how "whitelisting" works from a technical perspective so as to be able to challenge Reynolds's rationale for the practice or the feasibility of maintaining that practice over the long term. Plaintiffs make a convincing argument that evidence about how "whitelisting" is accomplished is relevant to evaluating and responding to Reynolds's argument about the burdens associated with that practice. Plaintiffs also point to comments made by Judge Peterson after the Authenticom preliminary injunction hearing, also referenced by Judge St. Eve in her Memorandum Opinion and Order [ECF 176], to the effect that Reynolds's practice of "whitelisting" under certain circumstances undercuts to some extent its security rationale for blocking access to Reynolds's systems. On a purely relevance basis, Plaintiffs appear to need the information they are requesting to question effectively Defendants' employees about this practice.

Here, also, it appears that CDK agreed to produce the requested documents. There may be differences in scale between the two companies, but Reynolds's argument against producing the requested documents does not appear to invoke burden. Rather, it seems to be grounded in relevance objections and the sensitivity of its confidential and proprietary information. Again, it is not clear why the existing confidentiality order or other appropriate protections would not be sufficient to protect Reynolds's technical information.

The Court understands Reynolds's argument that the actual request for production at issue here was issued only by Authenticom, that Authenticom did not properly meet and confer about Reynolds's objection to the request when it was raised last year, and that other Plaintiffs now are moving to compel production of documents in response to Authenticom's request for production even though they did not originally request those documents. That is a glitch in the system. But the Court will not stand on that procedural pedestal to deny Plaintiffs' Motion to Compel on this ground in this MDL case. Also, as a technical matter, Authenticom apparently did raise the issue with Reynolds, although just a week before the motion to compel was filed which, though late in the process, may be enough of a fig leaf to hide behind under all the circumstances.

(b) **CDK's Implementation of SecurityFirst.** The Court agrees with CDK that the compromise it reached with the Dealership Plaintiffs seems like a reasonable way to deal with this dispute, and it is a compromise that should satisfy the other Plaintiffs. CDK not only has proposed a common sense, practical compromise that appears to get Plaintiffs information about the implementation of SecurityFirst in layman's terms but also to produce relevant, technical documents from custodial and non-custodial sources. Plaintiffs devote just a paragraph of their Motion to the dispute with CDK about production of documents relevant to the technical implementation of SecurityFirst, and they do not explain at all why the documents CDK has produced are not sufficient for their purposes.

Therefore, for all the reasons discussed above, Plaintiffs' Motion is granted in part and denied in part with respect to the "whitelisting" and SecurityFirst implementation documents.

11. **Granular System Design Documents.** The Court does not understand what Plaintiffs are requesting here or the crux of the dispute. If Plaintiffs want to press this argument, then the Court will need to address this issue with the parties either at an in-person hearing or Plaintiffs will have to supplement their Motion or file a new one. For now, the Motion is denied in this respect.

12. **CDK Correspondence with Private Equity Firms.** Plaintiffs' request for "all communications between CDK and any potential acquirer or acquirers, including [six identified private equity firms] regarding the valuation of CDK, its subsidiaries, or any aspect of their business" (Nemelka Declaration [ECF 320], at Ex H, at 15-16 (Request for Production No. 70)), is overbroad, unduly burdensome, and not proportional to the needs of this case. Also, information that would be facially responsive to this Request clearly is covered by other requests for production. Plaintiffs do not even attempt to justify the full breadth of Request for Production No. 70. Rather, they say "CDK's communications with private equity firms are relevant because they are likely to contain documents where CDK offered opinions and insights about its business and industry." Plaintiffs' Memo [ECF 318], at 28. Assuming for the sake of argument that CDK's opinions or insights about its business and industry are somewhat relevant to the claims and defenses in this case if they were offered or made during a relevant time period, which the Court accepts without deep analysis for this purpose, Plaintiffs' Request for Production No. 70 still is way overbroad as written if Plaintiffs really are seeking this much narrower category of documents rather than the extremely broad category contained in Request for Production No. 70. The information Plaintiffs describe, for example, might be contained in an offering or due diligence memorandum or in a PowerPoint presentation that may or may not be relatively easy to produce perhaps in redacted form.

The Court is unwilling to rewrite Plaintiffs' request for production here, however. Therefore, Plaintiffs' Motion with respect to all of CDK's communications with private equity firms regarding valuation is denied. If Plaintiffs significantly narrow the scope of their request to the material they claim is relevant, and the parties can agree that documents containing that information will be produced, that is fine. If the parties cannot agree, then Plaintiffs can bring the issue back before the Court if they think that is necessary and would be productive.

13. **CDK's Involvement in CVR.** Plaintiffs' Motion was filed and briefed before Judge Dow ruled on Defendants' motion to dismiss Plaintiff Motor Vehicle Software Corporation's complaint in Case No. 18-cv-865. Judge Dow ruled on the motion to dismiss on October 22, 2018. [ECF 425]. CDK's main, though not only, reason for refusing to respond to discovery relating to the Computerized Vehicle Registration ("CVR") joint venture owned by CDK and Reynolds was the pendency of the motion to dismiss. Now that the motion to dismiss has been denied, the parties need to revisit Request for Production No. 57 which appears to be the crux of the dispute at issue in this Motion. In the materials now before the Court, it appears that CDK agreed to produce the documents Plaintiffs are seeking here if the motion to dismiss was denied. Nemelka Declaration [ECF 320], Exhibit T at 7. If the Court needs to address this issue after the parties have met and conferred in the wake of the denial of the motion to dismiss, it will do so.

8

14. **DMI and IntegraLink Customer Information.** Plaintiffs' Motion is denied in this respect. As far as the Court can tell, the information Plaintiffs, broadly speaking, now are requesting from CDK was not encompassed within Authenticom's Request for Production No. 63 which is the request for production at issue here. In addition, it appears that Authenticom agreed with CDK's proposal that it would produce a certain category of documents in response to this request for production, and CDK has done that. Plaintiffs do not address these matters in their memorandum filed in support of their Motion and no reply memorandum was filed. At this point, however, the Court is not inclined to order CDK to produce documents that are not called for by the request for production at issue or allow Plaintiffs to re-trade an agreement previously made by Authenticom as the proponent of the discovery request at issue.

15. **Reynolds Customer Relationship Management Data.** Plaintiffs' Motion is denied in this respect. First, Reynolds says it does not have a CRM data base and the system it does use for tracking certain sales calls and opportunities is not searchable and does not have the analytic and data management features typically found in CRM software. Plaintiffs argue Reynolds's position must be disingenuous since CDK produced its CRM information, but Plaintiffs provide no reason for the Court to believe the two Defendants' systems are the same such that CDK's ability to produce information Plaintiffs requested means that Reynolds must be able to do so, too.

Second, Reynolds says it offered to work with Plaintiffs toward a method for extracting information Plaintiffs want from the system it uses, but Plaintiffs did not engage in that process and filed their Motion before the meet and confer process had been completed. The correspondence Reynolds references in its opposition memorandum seems to support its argument. A failure to complete the Local Rule 37.2 meet and confer process is an independent reason to deny Plaintiffs' Motion.

Finally, Reynolds argues that it already has produced a great deal of information that is responsive to Plaintiffs' discovery requests focused on Reynolds's DMS customers switching to a different DMS provider and Plaintiffs' apparent request for more information in this vein is overbroad, unduly burdensome, and not proportional to the needs of the case. On the present record, the Court has no way to evaluate whether the information Reynolds has produced already is sufficiently responsive to Plaintiffs' requests, but it appears that Reynolds has gone a fair distance toward producing information that is responsive to Plaintiffs' requests.

For example, Plaintiffs say they want information that shows changes in pricing for DMS services paid by Reynolds's dealer customers, and Reynolds says it has produced all DMS transactional data from August 2014 to October 2017 which shows the price of every product purchased by every dealer customer. Plaintiffs also say they want information about Reynolds's DMS customers switching or attempting to switch to a different DMS provider, and Reynolds says it has produced data sufficient to identify every customer that switched to another DMS provider since 2008, if known. Although Reynolds does not say it produced information about customers that attempted to switch DMS providers, it is possible that information also has been produced or that communications between Reynolds and its dealer customers have been produced that will contain this information.

9

Therefore, to the extent Plaintiffs need to run to ground the meet and confer process concerning this request, they should do so. And to the extent Reynolds's has not produced or refuses to produce information in its possession, custody, or control that is responsive to Plaintiffs' requests, is not unreasonably burdensome to produce, and is proportional to the needs of the case, Plaintiffs can bring this issue back to the Court on a more complete record.

16. **Search Terms.** The parties have resolved this issue. *See* Notice of Partial Resolution [ECF 407]. Therefore, no court action is required.

For all the reasons discussed above, Plaintiffs' Omnibus Motion to Compel [ECF 316] is granted in part and denied in part.

It is so ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated: November 19, 2018