IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This document relates to:* | Hon. Robert M. Dow, Jr. |
| *Motor Vehicle Software Corp. v. CDK Global, Inc., et al.*, Case No. 1:18-cv-865 (N.D. Ill.) | Magistrate Judge Jeffrey T. Gilbert |
| *Authenticom, Inc. v. CDK Global, LLC et al.,* Case No. 1:18-cv-00868 (N.D. Ill.) | |
| *Cox Automotive, Inc, et al. v. CDK Global, LLC*, Case No. 1:18-cv-1058 (N.D. Ill.) | |
| *Loop, LLC, d/b/a AutoLoop v. CDK Global, LLC*, Case No. 18-cv-2521 (N.D. Ill.) | |

**DEFENDANT CDK GLOBAL, LLC'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR PROTECTIVE ORDER**

The Plaintiffs in this MDL—and, particularly, the clients of the Kellogg Hansen firm—have left no stone unturned in their demands for discovery. Over the last twelve months, in the *Authenticom* litigation and this MDL, CDK has been served with over 250 requests for production. In response to those requests and others, CDK has thus far reviewed over 2.3 million documents from 31 CDK custodians and produced over 1 million of those documents to the MDL Plaintiffs. CDK has also agreed to, and the Court has entered, a deposition protocol under which the Plaintiffs will be entitled to take up to 45 depositions of CDK, Reynolds, and third-party witnesses.

That is an incredible amount of discovery, even by the standards of an MDL like this one. Thus, as Judge Dow has previously noted, this case has already reached the brink of—if not passed—the point at which the plaintiffs' desire for more and more discovery must be "curbed by the law of diminishing marginal returns." Dkt. 330 at 3.

Notwithstanding Judge Dow's admonition, Kellogg Hansen served CDK with a Second Set of Requests for Production on October 12, 2018—the deadline for substantial *completion* of document discovery and months after the May 25 deadline for serving discovery requests. *See* Ex. A. These new RFPs not only pile on to Plaintiffs' existing requests to CDK but add even more requests focusing on CDK's recent acquisition of ELEAD1ONE, a vendor of customer relationship management ("CRM") software that has already been served with a subpoena. Answering them will require CDK to collect and process even more ESI, using some as yet undefined set of search terms and reviewing some unknown number of additional documents—a tremendously burdensome undertaking in the best of circumstances and an even more daunting one now that depositions are now underway and consuming much of counsel's time and resources.

The Court should enter a protective order directing that CDK need not respond to these cumulative and improper RFPs. Kellogg Hansen cannot credibly argue that CDK's acquisition of a

1

single vendor out of the hundreds if not thousands in the industry, more than *three years after* the alleged "conspiracy" in this case occurred, has anything whatsoever to do with the issues here. And Kellogg Hansen's requests for such irrelevant information so late in the day continue to send decidedly "mixed signals," as Judge Dow has put it, about the claims of Kellogg Hansen's clients that an early trial in this case is a vital necessity. Ex. B (10/9/18 Hr'g Tr.) at 15. Indeed, Kellogg Hansen's demands make sense only as an attempt to harass CDK and force it to waste resources. This kind of abusive, scorched-earth approach to discovery should not be tolerated.

## BACKGROUND[1]

### A. Kellogg Hansen's Sprawling Demands for Discovery

From the earliest days of this litigation, Plaintiffs have taken advantage of every opportunity to demand additional discovery. Authenticom, the first plaintiff to file suit, served more than 100 RFPs on CDK before the coordinated discovery process of the MDL even began. *See* Dkt. 320-4 (92 RFPs); 320-10 (15 additional RFPs). After receiving responses to those RFPs and more than one million Bates-numbered pages (comprising almost 325,000 documents) from CDK, Kellogg Hansen represented to Judge St. Eve back in March 2018 that Authenticom had virtually all the discovery it needed and was essentially ready to go to trial. 3/12/18 Hr'g Tr. (Dkt. 65) at 35 ("We could be ready for trial with surprisingly little additional discovery over what we have now.").

After *Authenticom* and the other pending cases were consolidated in this MDL, Judge St. Eve entered a Case Management Order (Dkt. 166) directing the parties to exchange the productions from the *Authenticom* litigation by May 9, 2018; to serve "any additional, non-duplicative, coordinated discovery requests, search terms, and custodians" by May 25, 2018; to file any motions to compel by

---

[1] CDK complied with L.R. 37.2 before filing the instant motion. As only the withdrawal of the RFPs would have been an acceptable resolution here, CDK inquired of Kellogg Hansen whether it would be willing to rescind the requests on behalf of their clients. *See* Ex. C (11/20/2018 Email from M. Provance to M. Nemelka). It refused to do so, offering instead to "consider narrowing the requests." *Id.*

August 6, 2018; and to reach substantial completion on document discovery by October 12, 2018. This schedule sought to ensure that all document discovery would be served—and responses to that discovery was substantially complete—before depositions and expert discovery commenced, allowing the parties to devote their attention to those processes without responding to additional requests for documents at the same time.

On the May 25 deadline—two months *after* representing to the Court that Authenticom was virtually ready for trial—Kellogg Hansen served CDK with more than 100 additional RFPs (*see* Dkt. 320-8) on behalf of all of its non-dealer clients (including Authenticom),[2] and in connection with those RFPs, proposed 164 new search terms and sought to designate 40 additional custodians. These new discovery requests were exceedingly broad, including requests for every single one of CDK's 3PA contracts with vendors (*id.* at 6); virtually every invoice for CDK's dealer customers over a period of 12 years (*id.* at 17); and all of CDK's communications regarding data integration with any of Authenticom's dealer customers (*id.* at 15). The search terms, meanwhile, hit on *95%* of the new proposed custodians' documents. Dkt. 356-1 at 359.

CDK was eventually able to reach agreements with Plaintiffs on custodians and many, though not all of Plaintiffs' requests. But the reduced document discovery that CDK was willing to undertake was still massive in scope, requiring CDK to review at least a million additional documents on top of the more than one million it had already reviewed. *See* Dkt. 356 at 38-39. And despite CDK's agreement to this burdensome, additional discovery, Kellogg Hansen filed a motion to compel CDK to produce even more material—which the Court ultimately denied in many

---

[2] Kellogg Hansen represents Authenticom, Inc.; Motor Vehicle Software Corporation; Cox Automotive, Inc; Autotrader.com, Inc.; Dealer Dot Com, Inc.; Dealertrack, Inc.; HomeNet, Inc.; Kelley Blue Book Co., Inc.; vAuto, Inc.; VinSolutions, Inc.; Xtime, Inc.; and Loop, LLC d/b/a Autoloop and the putative Vendor Class, as well as a non-named putative dealer class plaintiff. Notably, Kellogg Hansen also represented ELEAD1ONE in a 2017 suit against Reynolds. *See Data Software Services ("eLead") v. The Reynolds and Reynolds Company*, No. 2:17-cv-1347 (N.D. Cal. 2017).

respects. *See* Dkt. 441. That motion sought to force CDK to review nearly 400,000 additional documents beyond what CDK's best and final offer called for. *Id.* at 39.[3] Many of the subjects of the motion were tangential issues with little bearing on the case—such as CDK's correspondence with private equity firms and documents concerning the company's weighted average cost of capital. And in several instances, Kellogg Hansen's clients sought to undo a compromise between CDK and the Dealer Class Plaintiffs by seeking to compel CDK to produce more than the dealers had agreed to accept. *See, e.g.*, *id.* at 7, 27. In others, Kellogg Hansen's clients (including Authenticom) sought to undo compromises that *Authenticom* had previously agreed to accept for the same discovery requests that Kellogg Hansen served in its individual case. *See, e.g.*, *id.* at 13-14, 34-35.

B.     **The Second Set of RFPs**

On October 12, 2018—the same day as the deadline for substantial *completion* of document discovery and months after the deadline set by the Court for serving such discovery—Kellogg Hansen served a Second Set of Requests for Production on CDK. *See* Ex. A. In the main, the Second Set of RFPs inquire into CDK's acquisition of ELEAD1ONE, a vendor that provides customer relationship management software to dealers. *See id.* at 7-8 (RFP No. 104-108). CDK announced it would purchase ELEAD1ONE in July 2018.[4] The deal was reviewed by regulators, approved, and finally closed in September 2018.[5]

The RFPs seek virtually every piece of information that CDK possesses or could possibly possess related to the ELEAD1ONE transaction. They cover (1) *all* documents relating to the

---

[3] In a further effort to reach a compromise and save the Court time and resources resolving discovery disputes, CDK agreed to review additional documents based on a modified version of Plaintiffs' requested search terms. *See* Dkt. 407.

[4] Press Release, CDK Global, CDK Global to Acquire ELEAD1ONE (July 16, 2018), https://www.cdkglobal.com/us/media-center/cdk-global-acquire-elead1one.

[5] Press Release, CDK Global, CDK Global Completes Acquisition of ELEAD1ONE (Sept. 14, 2018), https://www.cdkglobal.com/us/media-center/cdk-global-completes-acquisition-elead1one.

4

acquisition, including CDK's analyses of ELEAD1ONE's business (RFP No. 104); (2) CDK's data integration agreements with ELEAD1ONE, going back five years (RFP No. 105); (3) all documents concerning the data integration that CDK "will provide to ELEAD1ONE," including the pricing and other features of this integration (RFP No. 106); (4) CDK's communications with dealers regarding ELEAD1ONE (RFP No. 107); and (5) all documents that CDK provided to state and federal regulators in connection with the acquisition (RFP No. 108).

The remaining RFPs seek other types of CDK business information relating to issues currently before the Court for decision or information more properly gained through depositions and expert discovery, including (1) communications regarding any amendments to CDK's Master Services Agreement ("MSA") that would alter the agreement's language referring to "agents" of dealers (Ex. A at 7 (No. 103))—language whose significance is currently before the Court as part of the motion to dismiss CDK's counterclaims (Dkt. 276, 336, 362); and (2) documents "sufficient to show the meaning or definition of any codes, abbreviations, and the contents of every data field included in any files produced by CDK" (Ex. A at 9 (No. 112)). Plaintiffs also seek documents related to CDK's dealings with A.T. Kearney, a consultancy that pitched CDK on certain cost reduction initiatives. *Id.* (RFPs No. 113-14). Plaintiffs have known about these subjects for long before now. References to the entity "A.T. Kearney," for example, appear on more than *4,250* documents produced to plaintiffs prior to the May 25, 2018 deadline to serve additional, coordinated discovery requests.

## ARGUMENT

Under Federal Rule of Civil Procedure 26(c), "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Good cause for a protective order exists here.

5

1. That is so, first and foremost, because Kellogg Hansen's service of the Second Set of RFPs violated the plain terms of the Case Management Order, which required the parties to serve "*any* additional, *non-duplicative*, coordinated discovery requests, search terms, and custodians" by May 25, 2018. Dkt. 166 at 2 (emphasis added).[6] The import of that language could not be clearer: the additional round of discovery that Plaintiffs served on May 25 was their opportunity to make a coordinated request for *any* additional documents that Plaintiffs believed they needed from CDK, and Plaintiffs took full advantage of that opportunity—serving a combined additional 149 RFPs on CDK on that date. The Second Set of RFPs pile on additional discovery requests months after the deadline established by the Case Management Order, which contemplates an intentional sequencing of document discovery, followed by oral discovery, and then finally expert discovery.

Kellogg Hansen may claim that the May 25 deadline should be excused for the Second Set of RFPs because Plaintiffs were not aware of the ELEAD1ONE acquisition until July. But allowing such an excuse would undermine the purpose of the Case Management Order—which was to provide the parties with the discovery most relevant to their claims and defenses while keeping the case moving, consistent with Plaintiffs' demands for an early trial. Any number of ancillary issues may pop up in this case as discovery continues to proceed; if Plaintiffs pause to serve 20 or so additional RFPs every time they find something new that interests them, discovery will never be completed, much less at the breakneck pace that Plaintiffs are seeking.[7]

Additionally, the Second Set of RFPs are neither "coordinated" or "non-duplicative," as the Case Management Order required. For example, RFP No. 103, related to amendments of the

---

[6] The May 25 deadline does *not* apply to any discovery on CDK's counterclaims. Those counterclaims were not filed until after May 25 (Dkt. 230), and Judge St. Eve made clear (Dkt. 65 at 63) that counterclaim discovery did not need to be served until after the counterclaims were on file.

[7] Moreover, even if the Court is inclined to excuse the untimeliness with respect to the RFPs concerning the ELEAD1ONE deal, it should not excuse the untimeliness of the remaining RFPs, all of which Plaintiffs could have propounded *before* May 25, 2018.

6

purported "agent" provision in CDK's MSA, is just a reformulation of prior discovery that Plaintiffs have already served (and to which CDK has already responded). *See, e.g.*, Dkt. 320-6 at 17 (Dealer Class RFP No. 18, seeking "[a]ll documents relating to any changes or proposed changes to material terms in the CDK DMS contract, including with respect to the use of Third Party Integrators"). And RFP No. 110, which seeks documents related to "CDK's financial expenditures related to its blocking of Authenticom and other independent Data Integrators" (Ex. A at 9), is likewise duplicative of several prior RFPs related to CDK's security measures. *See, e.g.*, Dkt. 320-4 at 17 (Authenticom RFP No. 27(g), seeking "[a]ll documents and communications relating to any security enhancements instituted as part of the 'Security First' and/or '3PA Refresh' initiative"); *id.* at 29 (Authenticom RFP No. 76, seeking "[a]ll documents and communications regarding data security and/or DMS system performance with respect to Authenticom's access to the Reynolds or CDK DMSs"); *id.* at 30 (Authenticom RFP No. 81, seeking "[d]ocuments and communications sufficient to show the specific security measures CDK has instituted to protect the security of dealer data").

2. Even leaving aside their untimeliness and duplicative nature, the Second Set of RFPs are improper. To be discoverable, information must be "*relevant* to a[] party's claim or defense and *proportional* to the needs of the case." Fed. R. Civ. P. 26(b)(1) (emphasis added). The material that Kellogg Hansen seeks in the Second Set of RFPs is neither.

This litigation revolves around allegations that, in 2015, CDK and Reynolds set out "to block third-party integrators' access to DMSs" by various means—principally, a Section 1 conspiracy. Dkt. 176 at 31. According to Plaintiffs, this "block[ing]" allowed CDK and Reynolds to seize the revenue from data "integration" on their respective DMSs for themselves.

The Second Set of Requests have nothing to do with those allegations. As explained above, the Second Set of Requests primarily concern CDK's acquisition of a single vendor, ELEAD1ONE,

7

in a transaction that was not announced until mid-2018 and did not close until late 2018. Any documents responsive to those requests would almost surely postdate CDK and Reynolds' alleged "conspiracy" in 2015 to "block" Authenticom and other hostile integrators. Thus, they are irrelevant to Plaintiffs' Section 1 claims based on that "conspiracy," because they would not shed any light on whether that "conspiracy" occurred or what the purposes of the alleged "conspiracy" were.

Likewise, the information is irrelevant to Plaintiffs' Section 2 claims. Those claims depend on the allegation that CDK has monopolized a purported aftermarket for data integration on the CDK DMS. But CDK's acquisition of a *vendor* has no relation to whether there is an aftermarket for integration on CDK's DMS, or whether CDK has behaved anticompetitively in that purported aftermarket.

Kellogg Hansen has asserted that the information is relevant to the vendor Plaintiffs' allegations that CDK unilaterally "tilts the table" in favor of its own vendor affiliates by providing better integration capabilities to its subsidiaries' applications than to other firms' applications. *See, e.g.*, Compl. ¶¶ 101-02, *Cox Automotive, Inc. v. CDK Global, LLC*, No. 3:17-cv-00925 (N.D. Ill. Dec. 11, 2017), ECF No. 1; Dkt. 191 (*AutoLoop* Amended Complaint) at ¶¶ 145-46. But those allegations, in addition to being substantively flawed, offer no basis for these discovery requests, as such tilt-the-table allegations are irrelevant to Plaintiffs' claims: Plaintiffs' Section 2 claims and exclusive dealing claims concern alleged anticompetitive effects on the purported data-integration market, not on any market for vendor applications. The vendor Plaintiffs cite "tilting the table" as one possible motive for the alleged 2015 Section 1 conspiracy (*e.g.*, Dkt. 191 at ¶ 91), but for the reasons explained above (pp. 7-8), documents going to CDK's relationship with (and acquisition of) ELEAD1ONE in *2018* will not provide any information about whether the opportunity to "tilt the table" was, in fact, a motive for the alleged conspiracy in *2015*. Moreover, there is no indication that

discovery into the ELEAD1ONE acquisition would offer any support for Plaintiffs' tilt-the-table allegations in any event. *See infra* pp. 10-11. In short, the documents sought in the Second Set of Requests will do nothing to advance any of Plaintiffs' claims.[8]

Courts routinely block discovery where, as here, it is irrelevant to the claims being litigated. *See, e.g.*, *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 766 (7th Cir. 2015) (affirming grant of protective order precluding depositions, where plaintiffs did not present "any evidence that the six depositions, if permitted, would yield relevant information"); *Endotach LLC v. Cook Med. Inc.*, 2014 WL 839991, at *2 (S.D. Ind. Mar. 4, 2014) (granting motion for protective order covering deposition topics "irrelevant to this litigation"); *Borom v. Town of Merrillville*, 2008 WL 2003075, at *5 (N.D. Ind. May 8, 2008) (granting motion for protective order covering interrogatory that was "irrelevant to the claims and defenses germane to the case"); *Rubin v. Islamic Republic of Iran*, 349 F. Supp. 2d 1108, 1113 (N.D. Ill. 2004) (granting motion for protective order blocking discovery on activities "irrelevant to this action"), *aff'd*, 2005 WL 783057 (N.D. Ill. Mar. 18, 2005). This Court should do so here, as well.

3. In any event, even if the Second Set of RFPs were marginally relevant, it would be improper to require CDK to answer them, because they are not "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Determining whether discovery is proportional requires courts to consider "the importance of the discovery in resolving the issues" and "whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* The amendments adding these requirements to the rule in 2015 were "intended to encourage judges to be more aggressive in

---

[8] To the extent Kellogg Hansen is hoping to find material that can be used as grist for *new* claims, courts "are unanimous in prohibiting discovery from being used as a 'fishing expedition'" in this way. *BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, No. 15 C 10340, 2018 WL 946396, at *4 (N.D. Ill. Feb. 20, 2018) (collecting cases). "The discovery rules are not an excursion ticket to an unlimited, never-ending exploration of every conceivable matter that captures an attorney's interest." *O'Toole v. Sears Roebuck & Co.*, 2014 WL 1388660, at *3 (N.D. Ill. Apr. 10, 2014).

identifying and discouraging discovery overuse by emphasizing the need to analyze proportionality before ordering production," even "of relevant information." *Certain Underwriters at Lloyd's v. Nat'l RR. Passenger Corp.*, 318 F.R.D. 9, 14 (E.D.N.Y. 2016) (citations omitted).

In short, Rule 26 protects against discovery requests where the costs of review and production outstrip the potential benefits—a principle this Court acknowledged in its recent ruling on Plaintiffs' Omnibus Motion to Compel. Dkt. 441 at 2; *see also, e.g.*, *Vallejo v. Amgen, Inc.*, 2016 WL 2986250, at *4 (D. Neb. May 20, 2016) (plaintiffs' discovery request failed proportionality requirement considering, among other things, "the volume of reports Plaintiff's requests would return" and "the amount of irrelevant information likely to be included"); *Knauf Insulation, LLC v. Johns Manville Corp.*, 2015 WL 7089725, at *2 (S.D. Ind. Nov. 13, 2015) (courts "may limit even relevant discovery if the burden outweighs the benefits"); *Bayer Healthcare LLC v. Norbrook Labs., Ltd.*, 2011 WL 6046602, at *5 (E.D. Wis. Dec. 6, 2011) (denying motion to compel "[b]ecause the burden that the discovery would impose upon [defendant] outweighs its relevance"); *Lawrence E. Jaffee Pension Plan v. Household Int'l, Inc.*, 2006 WL 3445742, at *4 (N.D. Ill. Nov. 22, 2006) (affirming magistrate judge's denial of motion to compel because "the burden on [defendant] in having to produce the documents sought is immense" and information was only "marginally probative").

The benefits to Kellogg Hansen's clients from CDK's responding to the Second Set of RFPs would be minimal, for two reasons. First, as explained above, they concern topics with little to no relevance to this case. And second, as to the Second Set of RFPs related to ELEAD1ONE, the Dealer Class Plaintiffs subpoenaed ELEAD1ONE directly for much of the same information that Kellogg Hansen is seeking from CDK. ELEAD1ONE has responded that it is unaware of any differences in "functionality" or "access" between its own applications and competing applications

10

offered by CDK or Reynolds. *See* Ex. D at 16 (ELEAD1ONE Resp. to RFP 11). ELEAD1ONE also stated that it is aware of no functional differences in the data integration services that CDK provides, has provided, or will provide to ELEAD1ONE, or in the data integration services that ELEAD1ONE receives in connection with any other DMS, following the acquisition. *See id.* at 24 (ELEAD1ONE Resp. to RFP 22). And ELEAD1ONE is aware of no data integration functionality that CDK provides or plans to provide to ELEAD1ONE that it does not or will not make available to competing CRM applications in the 3PA program. *See id.* at 24 (ELEAD1ONE Resp. to RFP 23).

In addition, as discussed above (*supra* pp. 6-7), several of the remaining RFPs are similarly duplicative of discovery that Plaintiffs have already served on CDK. There is little benefit to requiring CDK to produce information in response to these new RFPs when Plaintiffs have already obtained (or will obtain) that information by other means. *Cf.*, *Doe 1 v. Anderson*, 2017 WL 4941467, at *14 (E.D. Mich. Nov. 1, 2017) (declining to enforce third-party subpoena because "Defendants have already produced documents responsive to these requests, and that production presumably satisfies Plaintiffs' stated need for the information; any further production . . . would be either duplicative or irrelevant").

Kellogg Hansen will no doubt claim that its need for these documents is pressing and that they are essential to its clients' cases. But such claims will ring hollow, to say the least, given Kellogg Hansen's substantial delay in making these requests. It was aware of most of the topics in the Second Set of RFPs—such as the MSA's "agent" language (*see* Ex. A at 7 (No. 103)), CDK's alleged "blocking" of Authenticom and deactivation of Authenticom login credentials (*id.* at 9 (Nos. 110 and 115)), CDK's vendor application offerings (*id.* (No. 115)), and CDK's relationship with A.T. Kearney (Nos. 113 and 114) well before the May 25 document-request deadline, and it has known about the ELEAD1ONE acquisition since July. If the subjects covered by the Second Set of

11

RFPs were truly central to this case, Kellogg Hansen would have inquired into these subjects earlier and within the timeframe contemplated for additional document discovery.

Indeed, Kellogg Hansen has repeatedly criticized Defendants for their purported delay in serving discovery related to Defendants' counterclaims in *Authenticom*—a delay that did not approach the severity of Kellogg Hansen's own delay in propounding the Second Set of RFPs and, in fact, was not a delay at all. CDK filed its *Authenticom* counterclaims on June 29, 2018, and served its counterclaim discovery requests several weeks later on August 13, 2018. In response, Kellogg Hansen cried foul, protesting that "nothing in the operative Case Management Order … permits or contemplates" serving RFPs so late and that CDK's decision to serve discovery after the parties had already "reached final agreement on search terms and custodians" was "plainly calculated to harass and abuse Authenticom." 10/1/2018 Ltr. from M. Nemelka to A. Gulley & B. Miller (Ex. E) at 2. CDK disagrees with these insinuations, given that CDK's discovery related to its counterclaims *necessarily* followed the filing of those claims—a fact that Judge St. Eve previously acknowledged. *See* 3/12/18 Hr'g Tr. (Dkt. 65) at 63.[9] Suffice it to say that if CDK's six-week delay in serving counterclaim discovery was excessive, *a fortiori* Kellogg Hansen's delay in serving the Second Set of RFPs by three months in the case of the ELEAD1ONE RFPs and five months in the case of the other RFPs in the Second Set is beyond the pale, further demonstrating that the contribution of these documents to the case is likely to be minimal.

---

[9] Any claim by Kellogg Hansen that CDK could have served its counterclaim discovery prior to filing its counterclaims or could have answered Authenticom's complaint earlier and thereby filed its counterclaims earlier is wrong. A cursory review of Plaintiffs' objections to CDK's prior discovery that related—in those Plaintiffs' view—to unasserted or not-yet-asserted counterclaims as "premature," "speculative," and "improper" (Dkt. 355 at 7, 26) makes clear that, had CDK served its counterclaim discovery prior to actually answering the Authenticom complaint and filing its counterclaims, Kellogg Hansen would have objected to them for that reason, instead. Similarly, requiring CDK to file its answer and counterclaims (and by extension, serve its counterclaim discovery) before the Court ruled on its motion to dismiss—something else that Kellogg Hansen has suggested (*see* Ex. E at 1)—would have made no sense. CDK had a valid pending motion to dismiss that, had it been granted, would have obviated the need for an answer at all and would have informed CDK's crafting of its counterclaims.

12

On the other side of the ledger, meanwhile, requiring CDK to respond to the new Second Set of RFPs would only further add to CDK's already-considerable discovery burden (which is undisputedly the greatest of any party to the MDL). CDK has already produced a staggering amount of discovery in this MDL—its responses to Plaintiffs' more than 200 combined RFPs have comprised more than 1 million documents from 31 custodians and countless other sources, totaling over *3 million* Bates-numbered pages. And Plaintiffs will be gathering a copious amount of oral discovery over the next few months. In short, as Judge Dow observed, the case is fast approaching—if it has not already reached—the point at which "the law of diminishing marginal returns" limits the value of any additional discovery. Dkt. 330 at 3.

To respond to the Second Set of RFPs, CDK would need to identify documents, if any, responsive to the new requests; collect and process additional ESI, as needed; potentially negotiate search terms; and review and produce the documents. All of this would need to be done in short order, given that the deadline for substantial completion of document discovery has come and gone and the deadline to complete oral discovery is approaching. And the productions could lead to additional complications: the Plaintiffs may, for example, claim that they need to depose certain individuals a second time, contrary to the agreed-upon Deposition Protocol Order (Dkt. 422), based on documents that may ultimately be produced. Thus, even if the Second Set of RFPs are "somehow relevant in a tangential sense" to the vendor Plaintiffs' claims, "such broad"—and burdensome— "discovery is [not] proportional to the needs of this case." *Maui Jim, Inc. v. SmartBuy Guru Enterprises*, 2018 WL 4356594, at *3 (N.D. Ill. Sept. 12, 2018) (Gilbert, J.).

4. Given the tenuous connection between the Second Set of RFPs and the claims in this MDL—and Kellogg Hansen's unsupportable delay in waiting until the substantial-completion deadline to serve them—it is difficult to view these RFPs as anything other than an attempt to harass

13

CDK and thereby gain the upper hand in the litigation. Responding to the requests will force CDK to divert resources away from oral discovery—which is now well underway—to gathering and reviewing documents to respond to these new and burdensome requests.

This is not the first time Kellogg Hansen has engaged in such gamesmanship in this MDL. It has repeatedly taken the position that an early trial on Authenticom's claims is essential if Authenticom is to be saved from collapse, and it has steadfastly opposed any extension of the case schedule. Yet all along the way, Kellogg Hansen has requested amounts of discovery that make an early trial virtually—if not completely—impossible. This Court recognized as much at the October 5, 2018, hearing on the parties' proposals for a deposition protocol, observing that Kellogg Hansen was playing a "game of chicken" by seeking to take an amount of depositions that was unreasonable in light of the time available and the nature of this case. 10/5/18 Hr'g Tr. (Dkt. 413) at 27. Judge Dow has agreed, commenting that Kellogg Hansen is sending "mixed signals" by requesting such voluminous discovery while claiming at the same time that it is necessary to keep this case on a breakneck schedule. Ex. B at 15.

Kellogg Hansen's explanation for these "mixed signals" is that they result from the confluence of two factors—(1) its need to fully investigate defendants' conduct and (2) Authenticom's dire financial straits. But it is wrong on both counts. The number of depositions plaintiffs intend to take is far from necessary—as the Court later put it at the parties' October 9, 2018, hearing, there is "no God-given right to depose everybody who is going to testify at trial." Ex. B at 28. And as explained above, it likewise is not necessary (or even helpful) for plaintiffs to waste the parties' time on discovery related to matters as far afield as the ELEAD1ONE acquisition. Claims about Authenticom's financial difficulties, meanwhile, have proved to be overblown. As Defendants have repeatedly pointed out, based on the discovery produced to date by Authenticom,

14

there is no meaningful prospect that it will fail or go out of business prior to a trial and verdict in *Authenticom*.[10]

There is a simpler and much more persuasive explanation for the Plaintiffs' "mixed signals." Simply put, Kellogg Hansen's goal is to wear down the Defendants with discovery costs, with the aim of gaining possible settlement leverage and inflicting the greatest possible harm on the Defendants between now and trial. Kellogg Hansen may believe that it is serving its clients' interests with these scorched-earth tactics, but it is doing a great disservice to the Defendants, this Court, and the discovery process. The Court should therefore issue a protective order relieving CDK of any obligation to respond to the Second Set of RFPs.

## CONCLUSION

CDK's motion for a protective order should be granted.

---

[10] Tellingly, the evidence that Kellogg Hansen relied on at the October 9, 2018, hearing to argue against any further extension of the discovery schedule was essentially the same evidence it had presented to Judge St. Eve more than five months earlier to argue (unsuccessfully) for an April 2019 trial date. *Compare* Ex. B at 13 *with* Dkt. 151 at 10-11.

Dated: November 20, 2018 Respectfully submitted,

*/s/ Britt M. Miller*
Britt M. Miller
Michael A. Scodro
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mscodro@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant
CDK Global, LLC*

## CERTIFICATE OF SERVICE

      I, Britt M. Miller, an attorney, hereby certify that on November 20, 2018, I caused a true and correct copy of the foregoing **DEFENDANT CDK GLOBAL, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PROTECTIVE ORDER**, to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

                                                    */s/ Britt M. Miller*
                                                   Britt M. Miller
                                                   MAYER BROWN LLP
                                                 71 South Wacker Drive
                                                 Chicago, IL 60606
                                                 Phone: (312) 782-0600
                                                 Fax: (312) 701-7711
                                                 E-mail: bmiller@mayerbrown.com