# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817<br>Case No. 18 C 864 |
| This Document Relates to: | Hon. Robert M. Dow, Jr.<br>Magistrate Judge Jeffery T. Gilbert |
| *Motor Vehicle Software Corp. v. CDK Global, Inc., et al.*, Case No. 1:18-cv-865 (N.D. Ill.) | |
| *Authenticom, Inc. v. CDK Global, LLC, et al.,* Case No. 1:18-cv-00868 (N.D. Ill.) | **PUBLIC-REDACTED** |
| *Cox Automotive, Inc, et al. v. CDK Global, LLC*, Case No. 1:18-cv-1058 (N.D. Ill.) | |
| *Loop, LLC, d/b/a AutoLoop v. CDK Global, LLC*, Case No. 18-cv-2521 (N.D. Ill.) | |

## INDIVIDUAL AND VENDOR CLASS PLAINTIFFS' OPPOSITION
## TO CDK'S MOTION FOR A PROTECTIVE ORDER

## INTRODUCTION

The Individual and Vendor Class Plaintiffs ("Plaintiffs") respectfully submit this brief in opposition to CDK Global, LLC's ("CDK") motion for a protective order. In a Second Set of Requests for the Production of Documents ("RFPs"), Plaintiffs served requests on topics that came to light only recently. These topics center on (1) CDK's apparent change to its standard DMS contract that purports to eliminate the ability of dealers to use independent integrators (Plaintiffs did not know about CDK's recent efforts to change its standard DMS contract until CDK served its counterclaims); and (2) CDK's acquisition in September 2018 of ELEAD1ONE ("eLead"), a large vendor that competes directly with Plaintiff Loop, LLC ("AutoLoop") (the named plaintiff in the Vendor Class case) and Plaintiffs VinSolutions, Inc. and Xtime, Inc., two of Cox Automotive Inc.'s subsidiaries. CDK refused to meet and confer meaningfully with Plaintiffs regarding these RFPs, and instead filed the instant motion, in violation of Local Rule 37.2. *See infra* Part I. Plaintiffs remain willing to confer with CDK and propose in this response substantial compromises with respect to the RFPs. *See infra* Part II. CDK's primary arguments against the RFPs are that they are "late" and "irrelevant." They are neither: the RFPs concern topics only recently discovered, and they go to central issues in this MDL. *See infra* Part III. Finally, CDK devotes much of its motion to unfortunate hyperbole – accusing Plaintiffs of "abusive, scorched-earth tactics," "gamesmanship," and "inflicting the greatest possible harm" – that is untrue and distracts from the substance of the dispute. CDK's aspersions are not warranted. *See infra* Part IV.

## I.        CDK Failed To Comply with Local Rule 37.2

Before filing its motion, CDK did not comply with Local Rule 37.2, which required CDK to make "good faith attempts to resolve [its] differences" with Plaintiffs. Plaintiffs asked CDK to meet and confer regarding the RFPs to see if a compromise could be reached, but CDK refused. *See* Nemelka Decl. Ex. A ("[W]e wished CDK would have met and conferred with us as to the

substance of the requests instead of refusing to do so."). Plaintiffs then stated that they would "consider narrowing the requests to find a compromise position," but again, CDK refused to engage. *Id*. Instead, CDK filed its motion because Plaintiffs would not withdraw the RFPs completely.

Refusing to talk about the substance of the RFPs and instead filing a motion for a protective order is not a good faith attempt to resolve differences. *See Chicago Reg'l Council of Carpenters Pension Fund v. Celtic Floor Covering, Inc.*, 316 F. Supp. 3d 1044, 1046 (N.D. Ill. 2018) (denying defendant's motion to quash because defendant's certification – that it asked plaintiffs to withdraw requests for admission, interrogatories, and production but plaintiffs declined to do so – did not demonstrate that there was a "good faith attempt to resolve differences" under Local Rule 37.2). There were and are compromises to be had, as demonstrated below. *See infra* Part II. Because CDK failed to comply with Local Rule 37.2, the Court should deny its motion. *See* L.R. 37.2 ("[T]his court shall hereafter refuse to hear any and all motions for discovery" unless the moving party has engaged in "good faith attempts" to resolve the parties' dispute.); *Chicago Reg'l Council*, 316 F. Supp. 3d 1046; *O'Toole v. Sears, Roebuck & Co.*, 302 F.R.D. 490, 491 (N.D. Ill. 2014) (denying plaintiff's motion for a protective order in part because "plaintiffs broke off whatever negotiations had occurred and filed their motion without a good faith attempt to resolve the dispute").

## II.     CDK Should Produce Documents in Response to the Few RFPs Still at Issue

As to the substance of the RFPs, there are only two topics at issue: (1) CDK's new standard DMS contract, *see* RFP No. 103; and (2) CDK's acquisition of eLead, *see* RFP Nos. 104-108. *See* Nemelka Decl. Ex. B. Not only do these two topics go to central issues in this MDL, but Plaintiffs have substantially narrowed the relevant requests, as described below. With respect to the remaining RFPs, also as noted below, Plaintiffs will agree to withdraw some and hold others in

abeyance while the parties work through other discovery channels, such as interrogatories. If CDK had conferred with Plaintiffs, these compromises could have been discussed, possibly preventing needless motion practice.

> **A.** **CDK's Apparent Change to Its Standard DMS Contract – Removing the Key "Agent" Language – Is Highly Relevant and Justifies Discovery**

For over a decade, CDK's standard DMS contract has expressly provided that dealers may permit "employees *and agents*" to access the DMS on the dealers' behalf. *See* Authenticom MTD CDK Counterclaims at 2-5, Dkt. 276; Authenticom MTD Reply at 2-4, Dkt. 363. Accordingly, CDK repeatedly and publicly stated that dealers had the right to designate third parties like Authenticom as their agents to access the dealers' data on the dealers' behalf in providing data integration services. *See*, *e.g.*, Authenticom MTD CDK Counterclaims at 5, Dkt. 276 (CDK VP of DMS Sales: "That is the dealer's right. We have no right to tell them they can't do that."). After colluding with The Reynolds and Reynolds Company ("Reynolds"), however, CDK did an about-face and began to tell dealers that they could no longer use competitors like Authenticom – but without changing the language of its standard DMS contract that expressly allowed dealers to grant DMS access to the dealers' authorized "agents." *See id.* at 5-7, 10; *see generally* Authenticom MTD Reply, Dkt. 363. After the Authenticom preliminary injunction hearing and after multiple putative dealer class actions filed lawsuits piggybacking on Authenticom's claims, CDK apparently changed the template for its standard DMS contract in late 2017 to take out the key "agent" language (although it remains unclear what, if any, dealerships have agreed to this change). *See* Counterclaim Compl. (Dkt. 229) ¶¶ 75, 73 & n.52. That change is a transparent concession that CDK's longstanding DMS contract permitted dealers to authorize independent integrators like Authenticom as their third-party agents – otherwise the change would not have been necessary. But Plaintiffs were not aware that CDK had tried to remove the "agent" language

from its template DMS contract until CDK hinted at the fact when it filed its counterclaims against Authenticom on June 29, 2018. Authenticom has moved to dismiss CDK's counterclaims based on the unambiguous language permitting dealers to authorize Authenticom as their "agent." That motion is currently pending before the Court. *See* Dkt. 272.

Given that Plaintiffs did not know about CDK's attempt to alter its standard DMS contract, they had no reason to include a document request on the subject in their First Set of Requests for the Production of Documents served on May 25, 2018, the deadline for serving document requests. As a result, in a Second Set of RFPs, Plaintiffs have requested "[a]ll Documents and Communications relating to any purported amendment of [CDK's Master Services Agreement] to eliminate any language discussing dealer agents and/or the ability of agents of the dealer to access the DMS." *See* Nemelka Decl. Ex. B, RFP No. 103. The relevance of this discovery is self-evident: it goes to the central issue whether CDK dealers have the right to authorize independent integrators like Authenticom to access their data on their behalf. If CDK believes that "all" documents on this topic is overly burdensome, Plaintiffs are willing to offer the following compromise: (1) documents sufficient to show the rationale, justification, or need for the elimination of the "agent" language; (2) communications between CDK and any dealer regarding the change; (3) copies of all amendments to existing DMS contracts or new DMS contracts with the new contract language; and (4) internal CDK communications regarding the new contractual language from a select number of key CDK custodians to be determined through a meet and confer process.

**B.      CDK Should Produce Documents On a Few Targeted Topics With Respect to Its Acquisition of eLead**

On September 14, 2018, CDK announced that it had completed its acquisition of eLead. *See* CDK's press release, https://www.cdkglobal.com/us/media-center/cdk-global-completes-

acquisition-elead1one. eLead is a leading provider of customer relationship management ("CRM") software used by dealers for sales, service, and marketing purposes. *Id.* eLead competes directly with VinSolutions in the CRM space for sales, and AutoLoop and Xtime in the CRM space for service (i.e., the car service and maintenance operations of a dealership). *Id.* Like all vendors, it needs access to dealer data to perform its services. Discovery from CDK regarding its acquisition of eLead is relevant for at least two reasons.

First, as explained in Plaintiffs' complaints, CDK sought to control access to dealer data so it could place artificial restrictions on vendors' access to and use of dealer data in order to "tilt the table" in favor of CDK's own solutions, leaving competing products and services (like those offered by Cox Automotive and AutoLoop) at a disadvantage. █████████████████



███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ Repair orders are critical to the service lane flow at a

dealership. They are the primary means by which dealers communicate parts and service costs to

their customers. eLead, which has a growing service lane application that competes directly with

AutoLoop and Xtime will now also likely have that added functionality.

CDK's own executives recognize that these artificial restrictions to dealer data are unfair

and have no basis other than to impede competition, especially given that vendors no longer have

any alternative avenues for obtaining the necessary dealer data. At her recent deposition, Elizabeth

Ayotte – CDK's Director of Marketing for the 3PA program – candidly testified ██████████

████████████████████████████████



Ayotte Dep. 120:1-22, Oct. 18, 2018.  Plaintiffs are entitled to discovery into whether eLead – now that it is owned by CDK as of two months ago – will have the same unfair advantage.

Second, the growth of vendors – especially sales and service CRM applications like eLead and VinSolutions – have threatened to reduce the importance of the DMS as dealers increasingly manage their operations through standalone software solutions outside of the DMS.  CDK and Reynolds fear that their DMS systems will simply become back-end accounting systems, but by seizing control over dealer data – the lifeblood of the software application industry – CDK and Reynolds have sought to forestall that competitive evolution from happening.  Defendants have many internal documents where they express this fear.  CDK calls it the



Dkt. 418-03 (Ex. 11), at CDK-0000797.

███████████████████████████████████████████████

██████████████████████████████ *Id.* (emphasis added). This thwarting

of competition is quintessential anticompetitive conduct. Plaintiffs are entitled to reasonable

discovery into CDK's acquisition of eLead – a one-time "dangerous competitor" and threat to

CDK's DMS business.

RFP numbers 104-108 pertain to CDK's acquisition of eLead, and are admittedly

comprehensive in seeking "all" information regarding CDK's acquisition of eLead. As a

compromise position, Plaintiffs would agree to the following targeted categories: (1) documents

sufficient to show the market analysis and purpose for the acquisition of eLead, such as deal

memorandums, powerpoints, and materials considered by CDK's Board of Directors when

approving the acquisition; (2) documents and communications sufficient to show the data

integration and pricing that CDK provided and/or will provide to eLead, including any additional

functionality or better pricing that eLead did not have before; (3) communications with dealers

regarding the eLead acquisition, particularly eLead marketing materials now that it is a part of

CDK; and (4) documents that CDK submitted to the FTC in connection with the agency's review

of the acquisition.

\* \* \* \* \* \*

The foregoing compromises are substantially narrower than what Plaintiffs originally

sought in the RFPs. If CDK had been willing to meet and confer, perhaps a compromise could

have been reached. But since CDK refused to engage – if the Court does not deny CDK's motion

outright for failure to comply with Local Rule 37.2 – it should at least order that CDK produce

documents in accordance with these compromise positions.

D. **Plaintiffs Will Agree to Withdraw Some Requests and Hold Others In Abeyance**

Plaintiffs are willing to resolve the dispute over the remaining RFPs by either withdrawing them, or for others, holding them in abeyance given that the information will be received through other discovery avenues.

**Withdrawal of RFPs.** Plaintiffs agree to withdraw two requests: RFP No. 110 (CDK's financial expenditures with respect to blocking independent integrators), and RFP No. 111 (documents sufficient to show all blocked dealer login credentials). After further review of CDK's document production to date, Plaintiffs have found documents responsive to these requests. CDK's point that these RFPs may have been duplicative of prior requests is therefore well taken.

**RFPs Held in Abeyance.** Plaintiffs agree to stand down on four requests for the time being as they pursue the discovery through other means. In particular:

RFP No. 112. This request seeks documents sufficient to show the meaning of codes, abbreviations, and the contents of the data fields in the financial information produced by CDK. The parties are negotiating the submission of written deposition questions, pursuant to Fed. R. Civ. P. 31, to clarify such information. As a result, this request may not be necessary.

RFP No. 115. This request seeks financial and related information regarding CDK's own add-on applications that compete directly with the Vendor Plaintiffs. CDK contends (at 11) that this request is duplicative of prior requests. If CDK has therefore provided the requested information already, then Plaintiffs agree this RFP is unnecessary. For example, Reynolds has confirmed that it is producing the requested information with respect to its add-on applications, and Plaintiffs have asked CDK for the same confirmation. Finally, Plaintiffs have propounded interrogatories requesting information similar to what is sought in this RFP, and CDK's response to those interrogatories will likely obviate the need for a full response to this RFP.

9

RFP Nos. 113 and 114.  These requests seek documents relating to non-party A.T. Kearney's work for CDK.  CDK hired the firm to advise on ways to improve its margins by, among other things, raising prices for data integration.  Plaintiffs have subpoenaed A.T. Kearney and have had productive conversations with the firm.  It is therefore possible that Plaintiffs may get the requested information from A.T. Kearney, even though it would be more appropriate to obtain the documents from Defendant CDK.  But to minimize the burden on CDK, Plaintiffs agree to stand down on these requests until after they can evaluate A.T. Kearney's document production.

RFP No. 109.  This request seeks documents relating to CDK's data sharing contracts and communications with car manufacturers ("OEMs").  Plaintiffs agree to hold this RFP in abeyance in light of the Court's motion to compel ruling on OEM discovery.  Plaintiffs will raise this RFP if it becomes necessary to ask the Court to reconsider that ruling.

## III.    CDK's Arguments with Respect to "Timing" and "Relevance" Are Without Merit

**1.**    CDK argues (at 6-7) that the RFPs are untimely because Plaintiffs did not include them with the First Set of RFPs on May 25, 2018.  But Plaintiffs could not have served the disputed requests by the Case Management Order's deadline for serving "additional, non-duplicative, coordinated discovery requests" because the requests are based on facts that came to light *only after* May 25th:  (1) Plaintiffs learned of CDK's efforts to take out the "agent" language from its standard DMS contract on June 29, 2018, when CDK filed its counterclaims against Authenticom and alluded to the fact and (2) CDK announced its acquisition of eLead on July 16, 2018, and completed the acquisition on September 14, 2018.  Therefore, the suggestion that Plaintiffs should have served the requests on May 25, 2018, is counterfactual.

CDK erects a strawman by saying (at 6) that "[a]ny number of ancillary issues may pop up" and Plaintiffs may "pause to serve 20 or so additional RFPs every time they find something

new that interests them." But the two topics at issue – covering just six RFPs, and even fewer after Plaintiffs' agreed narrowing – are *not* ancillary issues: they go to central issues in the case raised by Defendants in their counterclaims and internal documents.

CDK also points to the fact (at 12-13) that Authenticom complained that Defendants served discovery requests on August 13, 2018 – which was Defendants' *Fourth Set* of RFPs to Authenticom – well after the May 25, 2018 deadline. But that is a red herring because Authenticom negotiated and reached compromises with Defendants on that discovery and produced documents in response to it, unlike CDK here.[1]

    **2.** The discussion above refutes CDK's argument (at 7-9) that the requests seek irrelevant information. In addition, CDK says (at 8) that its acquisition of eLead in 2018 cannot be relevant to a conspiracy that started years earlier. But the conspiracy and harm to competition *continues to this day* – which is precisely why the FTC and state attorneys general are currently investigating Defendants' conduct. The harm is not frozen in time. Thus, the fact that CDK acquired eLead – and may give it preferential data access treatment, while removing what was a major threat to its DMS business – is evidence of continued harm stemming from Defendants' seizure of control over dealer data and the elimination of competition for data access.

---

[1] A few addition points bear noting. First, Defendant Reynolds first served its counterclaims on July 21, 2017, *see Authenticom, Inc., v. CDK Global, LLC*, Dkt. 180, and so of course Defendants could have and should have included RFPs with respect to their counterclaims by the May 2018 deadline, unlike Plaintiffs' RFPs at issue here. Second, in negotiating search terms and custodians throughout the summer of 2018, Defendants specifically referenced the need for certain terms and categories of information in light of their counterclaims. *See* Exhibit E to CDK's Motion, Dkt. 446-5. Therefore, when Defendants served 35 additional, extremely broad RFPs *after* the parties had reached agreements on Authenticom's search terms and other discovery issues, it felt like a bait and switch. And finally, to reiterate, while Authenticom certainly let Defendants know that they should have served their Fourth Set of RFPs earlier, Authenticom did not burden this Court with a motion for a protective order. Instead, Authenticom negotiated compromises with Defendants, resolved all disputes with respect to the new discovery requests, and ultimately reviewed and produced numerous additional documents as a result.

CDK also claims (at 10-11) that Plaintiffs have sought the requested information from eLead, but that misses the point. Plaintiffs are entitled to know what *CDK*'s purpose was for acquiring eLead; what preferential data access *CDK* may give eLead; what *CDK* is telling dealers with respect to the purchase; and what *CDK* told the FTC about its acquisition.

Finally, CDK continues to misrepresent (at 7) Plaintiffs' conspiracy claims as centering only on the 2015 written agreements between CDK and Reynolds. While those written agreements are themselves illegal as a market division agreement and proof that CDK and Reynolds coordinated their data access policies, Plaintiffs' conspiracy allegations are much broader than the written agreements. CDK and Reynolds began their coordination no later than 2013, as the evidence in discovery shows, and that coordination entailed an agreement to (1) eliminate independent integrators like Authenticom, (2) coordinate their data access policies, (3) divide vendor customers between them, and (4) create a market where Reynolds controlled all access to dealer data belonging to dealers using a Reynolds DMS, and CDK controlled the same for dealers using its DMS, among other things.

**3.** CDK makes several extraneous points that nonetheless require a response. First, CDK's assertion (at 9 n.8) that the RFPs are designed "to find material that can be used as grist for *new* claims" is completely unfounded and off base. Plaintiffs' discovery is centered on and directly relevant to their *existing* claims. Second, CDK worries (at 13) that Plaintiffs will seek to depose witnesses a second time based on any new information produced, but Plaintiffs have taken no such position and, indeed, the Deposition Protocol Order already addresses that issue. *See* Dkt. 422. Third, CDK repeatedly cites (at 1, 13) Judge Dow's statement that "further discovery eventually is curbed by the law of diminishing marginal returns." *See* Order, Dkt. 330 at 3. Plaintiffs agree. We have no desire to waste time or resources in seeking marginal discovery. The

few topics at issue in this motion, however, are new issues that are not duplicative of any prior discovery and cannot fairly be described as marginal, for all the reasons discussed above. And Plaintiffs have substantially narrowed the requests to make them even more targeted. Contrary to CDK's assertion (at 14), there are no "mixed signals" in the fact that Plaintiffs have sought to obtain this necessary discovery, while Authenticom (which has been much diminished by massive layoffs directly stemming from CDK and Reynolds' conduct) continues to be in financial straits. Fact discovery does not end until April 15, 2019. There is ample time to obtain this discovery within the confines of the case schedule.

## IV. CDK's Hyperbole is Unwarranted

In its motion, CDK uses lamentable hyperbole to describe Plaintiffs' pursuit of discovery in this case. The language is not warranted.

**"Abusive, Scorched-Earth."** CDK says that the new RFPs are "abusive," represent "scorched-earth tactics," and involve "gamesmanship." Plaintiffs respectfully believe that such exaggeration is not constructive. From Plaintiffs' perspective, it would have been a dereliction of duty for them not to have sought this discovery. The requests go to central issues in the case; the evidence will support Plaintiffs' claims; and the subjects came to light only recently. In pursuing this discovery, Plaintiffs have sought to be reasonable – dropping some requests; holding off on others; and unilaterally narrowing the ones still in dispute. Such actions are not fairly described as "abusive" or "scorched earth."

**"Kellogg Hansen."** Throughout its motion, CDK does not refer to "Plaintiffs," but instead takes the unusual step of repeatedly criticizing Plaintiffs' counsel, Kellogg Hansen, by name. Plaintiffs do not believe that is appropriate or merited. CDK is correct that Kellogg Hansen is the firm that developed the core claims in this MDL and brought Defendants' wrongdoing to light on

13

behalf of its clients. *See* Mot. for Appointment as MDL Lead Counsel, Dkt. 91. But the Plaintiffs here are not nominal. They include Cox Automotive – a multi-billion dollar company – as well as Authenticom, MVSC, and AutoLoop. All of Kellogg Hansen's clients are significant players in the automotive software ecosystem; all suffered enormous harm as a result of Defendants' anticompetitive conduct. To treat this case as if it is lawyer-driven litigation is flat wrong.

What CDK appears to be bitter about is the litigation risk it now faces as a result of Kellogg Hansen's diligent efforts. Four separate federal courts have upheld the antitrust claims at issue, *see* Opinion & Order *Authenticom, Inc., v. CDK Global, LLC* (July 14, 2017), Dkt. 172; Memorandum Opinion, *Motor Vehicle Software Corp. v. CDK Global, Inc.* (C.D. Cal. Oct. 2, 2017), Dkt. 73; Memorandum Opinion and Order (May 14, 2018), Dkt. 176; Memorandum Opinion and Order (October 22, 2018), Dkt. 425.; the FTC and New York Attorney General have launched active investigations; the Dealership Class Plaintiffs filed their own follow-on lawsuits and have already settled for $30 million with Reynolds; and this MDL is in the middle of fruitful discovery. The Court should interpret CDK's attempt to cast aspersions on Plaintiffs' counsel for what it is: an effort to distract from the real issues and prevent the revelation of yet further evidence of Defendants' wrongdoing and the enormous harm it has caused to competition.

**"Settlement Leverage."** At the end of its motion, CDK suggests (at 13) that the real reason Plaintiffs served the new requests was to gain "settlement leverage" and "inflict[] the greatest possible harm on the Defendants between now and trial." Again, that characterization is simply baseless. The only harm likely to be caused by discovery here is the revelation of new and damning evidence, which is exactly why CDK's efforts to thwart Plaintiffs' timely and valid requests should be rejected.

14

## CONCLUSION

The Court should deny CDK's motion for a protective order in its entirety, or in the alternative, order CDK to produce documents in response to the compromises Plaintiffs have proposed herein.

Dated:  December 4, 2018                    Respectfully submitted,

                                            */s/ Derek T. Ho*
                                            Derek T. Ho
                                            **KELLOGG, HANSEN, TODD,**
                                            **  FIGEL & FREDERICK, P.L.L.C.**
                                            1615 M Street, NW, Suite 400
                                            Washington, D.C. 20036
                                            (202) 326-7900
                                            dho@kellogghansen.com

                                            *MDL Co-Lead Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I, Derek T. Ho, an attorney, hereby certify that on December 4, 2018, I caused a true and correct copy of the foregoing **INDIVIDUAL AND VENDOR CLASS PLAINTIFFS' OPPOSITION TO CDK'S MOTION FOR A PROTECTIVE ORDER** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by email to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

 */s/ Derek T. Ho*
Derek T. Ho
**Kellogg, Hansen, Todd,**
 **Figel & Frederick, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com