# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This document relates to:* | Hon. Robert M. Dow, Jr. |
| *Motor Vehicle Software Corp. v. CDK Global, Inc., et al.*, Case No. 1:18-cv-865 (N.D. Ill.) | Magistrate Judge Jeffrey T. Gilbert |
| *Authenticom, Inc. v. CDK Global, LLC et al.*, Case No. 1:18-cv-00868 (N.D. Ill.) | |
| *Cox Automotive, Inc., et al. v. CDK Global, LLC*, Case No. 1:18-cv-1058 (N.D. Ill.) | |
| *Loop, LLC, d/b/a AutoLoop v. CDK Global, LLC*, Case No. 18-cv-2521 (N.D. Ill.) | |

**DEFENDANT CDK GLOBAL, LLC'S REPLY
IN SUPPORT OF ITS MOTION FOR PROTECTIVE ORDER**

Kellogg Hansen's opposition, like its other discovery filings in this case, follows the familiar route of presuming that Defendants are liable and arguing that they therefore should be required to produce whatever information Plaintiffs think to ask for, whenever they request it. But the premise that liability is a foregone conclusion is wrong. Thus far, Plaintiffs have done no more than plead claims that survived a motion to dismiss. That entitles them to reasonable discovery (which was provided to them long ago); it does *not*, as this Court put it, give them a "God-given right" to unlimited discovery (Mem. Ex. B at 29 of 35)—or to flout the discovery deadlines set by the Case Management Order. CDK was therefore well within its rights to refuse to respond to the Second Set of RFPs, which were served months too late and concern manifestly irrelevant matters. The motion for a protective order should accordingly be granted.

## ARGUMENT

Kellogg Hansen's arguments in opposition to CDK's motion are each meritless. Local Rule 37.2 did not require CDK to compromise with Kellogg Hansen regarding the Second Set of RFPs and thereby forfeit its categorical objections to them. And on the merits, the RFPs are manifestly improper—both because they concern subjects that are irrelevant to this litigation and because they were untimely served.

**I.       CDK Complied With Local Rule 37.2.**

To begin with, Kellogg Hansen's invocation of Local Rule 37.2 is misplaced. It argues that even though CDK believes that the Second Set of RFPs are categorically irrelevant and untimely, Local Rule 37.2 required CDK to negotiate with Kellogg Hansen until a "compromise[]" could be reached. Opp. 2. But the rule mandates no such thing.

In circumstances where the recipient of a request believes the request to be categorically improper, no compromise is capable of resolving the dispute. For example, the issue of timeliness

1

cannot be resolved through compromise: untimely requests remain untimely, however they are modified. And requests that concern wholly irrelevant topics cannot be altered to become relevant.

Local Rule 37.2 thus cannot and should not be read to require the recipient of facially improper requests to compromise over them, rather than moving for a protective order. That reading would deprive parties of their ability to make categorical objections altogether. Rather, the better reading of Local Rule 37.2 is that it requires the recipient of such requests to meet and confer with the opposing party to determine whether it is willing to withdraw the requests—which CDK did. Once the opposing party has confirmed that it is unwilling to do this (as Kellogg Hansen did (Mem. Ex. C at 1)), the recipient can stand on its objections and seek relief from the court.

Kellogg Hansen's cited authorities do not support its demand for "compromise." In *Chicago Regional Council of Carpenters Pension Fund v. Celtic Floor Covering, Inc.*, 316 F. Supp. 3d 1044, 1045 (N.D. Ill. 2018), the requests at issue were the first round of the plaintiffs' discovery requests and covered "undeniably relevant" employment records that were "the very heart and soul of the case." Thus, in essence, the defendant was refusing to participate in discovery at all. The situation here is markedly different, to say the least: CDK has already responded to voluminous discovery (*see* Mem. 1), and the objections it is raising to the belated Second Set of Requests concern only specific issues (*i.e.*, relevance and timeliness). Similarly, Kellogg Hansen's position finds no support in *O'Toole v. Sears, Roebuck & Co.*, 302 F.R.D. 490, 491 (N.D. Ill. 2014), where the issues between the parties were ones susceptible to compromise (*i.e.*, the number of plaintiffs subject to discovery and the number of discovery requests permitted) rather than categorical issues.

In any event, given the unqualified nature of CDK's objections to the Second Set of RFPs, any technical noncompliance with Local Rule 37.2 is beside the point, because further negotiations would have been fruitless. This Court's decision in *Baxter International, Inc. v. AXA Versicherung*,

320 F.R.D. 158 (N.D. Ill. 2017) (Gilbert, J.), is illustrative on this point. There, this Court held that because the nonmoving party had "asserted privilege on a categorical basis" as to the requests at issue, "any deficiency in [the movant's] attempt to comply with Local Rule 37.2" was no reason for declining to review the motion because further negotiations would not have resolved the dispute. *Id.* at 167 (citing *Amarei v. City of Chicago*, 2016 WL 3693425, at *1 (N.D. Ill. July 12, 2016)). The same reasoning applies here. No amount of negotiation would have cured the fundamental flaws in the Second Set of RFPs—as evidenced by the "compromise" versions of the RFPs proffered in Kellogg Hansen's opposition, which purport to be less "burdensome" (Opp. 4) but do nothing to cure the irrelevance of the requests or their untimeliness under the Case Management Order. Thus, CDK's motion for a protective order was proper and should be entertained on the merits.

## II. The Second Set Of RFPs Are Improper.

On the merits, CDK should not be required to respond to the Second Set of RFPs, which are both irrelevant to the litigation and untimely served.

### A. The Second Set Of RFPs Are Irrelevant.

Neither of the topics covered by the disputed RFPs is relevant to this litigation. Kellogg Hansen argues that CDK's removal of the "agent" language from its MSA in 2017 is relevant because it is a "transparent concession" that the prior MSA allowed dealers to give DMS access to hostile integrators—but that argument is clearly wrong, for two reasons. First, the notion that CDK changed the MSA as a "concession" that Plaintiffs are right about the meaning of the "agent" language is fanciful. The actual explanation for the change is that given Plaintiffs' (meritless) arguments about that very language in the instant litigation, CDK acted out of an abundance of caution and to remove any doubt that the MSA forbids unauthorized third-party access. It is hardly surprising that CDK would choose to do this, given that the "agent" language is part of the fodder that has led to *19* antitrust lawsuits against the company.

3

Second, even if Kellogg Hansen were right that CDK had changed the "agent" language in 2017 because it agreed with Plaintiffs' reading of that language, that fact would be irrelevant to the claims in this litigation. To be sure, the court must decide whether the MSA gives dealers the right to give access to hostile integrators as part of resolving the claims and counterclaims of the parties. But under Illinois law, which governs the MSA, a court's task in interpreting a contract is to "give effect to the parties' intent *at the time they entered the contract*." *Shields Pork Plus, Inc. v. Swiss Valley Ag Serv.*, 767 N.E.2d 945, 949 (Ill. App. 2002) (emphasis added). CDK's decision *in late 2017* to remove the "agent" language from the MSA cannot shed any light on what CDK's understanding of the language was at the time that language was in use, and thus is irrelevant to what the "agent" language means for the parties' claims. Rather, the evidence that is relevant is evidence of what CDK understood the "agent" language to mean before the suits in this MDL commenced—and that issue is already covered by Plaintiffs' prior RFPs. *See* Mem. 7.[1]

CDK's acquisition of ELEAD1ONE is also irrelevant to the claims and defenses in the litigation. Kellogg Hansen contends that the acquisition is relevant to Plaintiffs' "tilt-the-table" allegations (Opp. 4-8), but although one would not know it from reading Kellogg Hansen's lengthy discussion of those allegations, they have very little to do with Plaintiffs' legal claims. As CDK's motion pointed out (Mem. 8), the only claim that even appears to be related to those allegations is Plaintiffs' conspiracy claim. And information on the ELEAD1ONE acquisition is irrelevant to what

---

[1] In any event, a party's subjective beliefs are only relevant to the question of a contract's meaning when the contract document itself is ambiguous as a matter of law. *Miksis v. Evanston Twp. High Sch. Dist. # 202*, 235 F. Supp. 3d 960, 995 (N.D. Ill. 2017) ("'It is generally the objective manifestation of intent which controls. It is only when there are no objective indicia of intent, or the subject matter of the bargain is described in ambiguous terms that the court must look to the subjective intent of the parties.'") (quoting *Caporale v. Mar Les, Inc.*, 656 F.2d 242, 244 (7th Cir. 1981)). Thus, given that Judge Dow may rule that the MSA unambiguously prohibits (or permits) third-party DMS access as part of his ruling on Authenticom's motion to dismiss CDK's counterclaims, this Court should—at a minimum—hold that CDK need not respond to any RFPs concerning the removal of the "agent" language until that ruling issues.

CDK's motives were in allegedly conspiring with Reynolds, given that the acquisition postdates the alleged conspiracy by at least three years.[2]

Kellogg Hansen argues that "the conspiracy and harm to competition *continues to this day*" (Opp. 11), but that assertion offers no support for the ELEAD1ONE RFPs. Kellogg Hansen surely cannot mean that CDK and Reynolds are *presently* coordinating their DMS access policies—an implausible idea. What Kellogg Hansen appears to mean, instead, is that the requests are relevant because they go to the continuing "harm" from the alleged conspiracy. *Id.* But as CDK's motion noted, ELEAD1ONE has already confirmed to Plaintiffs in its own subpoena responses that it is unaware of any data integration functionality that it will receive as a result of the acquisition that CDK does not or will not make available to competing applications in the 3PA program. Mem. 11. Kellogg Hansen does not explain why that response is not sufficient for its purposes. Moreover, according to the *Cox* complaint (*Cox* Dkt. 3 at ¶¶ 162-69), Plaintiffs already purport to have evidence regarding CDK's preferential treatment of *other* CDK-owned applications. And Plaintiffs had an opportunity to investigate that subject further in the May 25 RFPs. *See, e.g.*, Dkt. 320-8 at 7 (Individual Plaintiffs RFP No. 10, requesting "[a]ll documents and communications regarding any DMS access restrictions, to which CDK add-on applications are not subject, that CDK places on third-party add-on applications."). Kellogg Hansen offers no explanation why it is vital that Plaintiffs be permitted to investigate every detail of CDK's relationship with ELEAD1ONE—which is still in its infancy—in search of facts to support its tilt-the-table allegations when it has already had ample opportunity to investigate other CDK apps. In short, the Second Set of RFPs will not yield any

---

[2] Kellogg Hansen insists that "Plaintiffs' conspiracy allegations are much broader than the [2015] written agreements" and that "CDK and Reynolds began their coordination no later than 2013." Opp. 12. But that argument backfires, because if the alleged conspiracy truly dated back to 2013, that would make it even *less* likely that information about the acquisition of ELEAD1ONE would have anything to do with CDK's motives.

5

relevant information—and certainly not enough to justify the burden they would impose on CDK at this stage in the litigation.[3]

### B. The Second Set Of RFPs Are Untimely.

Even if the new RFPs were relevant to the litigation, however, they would be improper because Kellogg Hansen served them well after the May 25, 2018, deadline in the Case Management Order. Dkt. 166 at 2. Notably, Kellogg Hansen is the *only* firm in the litigation that has taken the position that the Case Management Order's deadlines do not apply to its clients and served untimely RFPs in this way. Thus, its feigned outrage at CDK's referring to the firm by name (Opp. 13-14) is unwarranted. In referring specifically to Kellogg Hansen (as opposed to the 13 individual and putative class plaintiffs they represent), CDK sought to emphasize that Kellogg Hansen has taken a different position on the propriety of post-May 25 discovery than the other counsel for Plaintiffs. That fact speaks volumes about the merits of Kellogg Hansen's claim that the Second Set of RFPs should be considered timely.

Indeed, Kellogg Hansen's position on this issue is untenable. It argues that it could not have served any RFPs related to the change in the MSA's "agent" language or the ELEAD1ONE deal by the May 25 deadline because it did not know about those subjects until later (Opp. 10)—but that misses the point. Even after Kellogg Hansen learned about the MSA amendment and the ELEAD1ONE acquisition, it waited for *months* afterwards to serve the RFPs on those issues (Mem. 11-12)—a delay that makes the requests untimely by itself.[4] And even if Kellogg Hansen had served

---

[3] Even if the Court were to hold that the ELEAD1ONE RFPs are relevant to the litigation because they go to the continuing "harm" of the alleged conspiracy, it should hold (at a minimum) that *only* documents pertaining to the data integration that CDK will provide to ELEAD1ONE are relevant. The other subjects encompassed by the ELEAD1ONE RFPs (*i.e.*, CDK's pre-acquisition analysis of ELEAD1ONE and CDK's communications with dealers and the FTC) have nothing to do with "harm" to other vendors.

[4] Kellogg Hansen's claim that it acted virtuously by not "burden[ing] this Court with a motion for a protective order" regarding CDK's purportedly similar delay in serving its counterclaim RFPs (Opp. 11 n.1) is absurd.

6

the requests promptly, the fact remains that the May 25, 2018, deadline was the deadline for serving *any* document discovery, other than defendants' counterclaim discovery, which Judge St. Eve affirmatively exempted from the deadline (Mem. 6 & n.6). That deadline cannot be excused simply because a party discovers a new topic that it would like to investigate.

It is commonplace for parties to uncover new issues during discovery that they would be interested in investigating further, given the opportunity. But if the desire to investigate such issues automatically entitled parties to continue serving discovery requests *ad infinitum*, discovery would never end and litigation would become unmanageable. Thus, district courts are entitled to set and enforce hard cutoffs for discovery in order to keep litigation moving. *See Stevo v. Frasor*, 662 F.3d 880, 886 (7th Cir. 2011) ("Discovery must have an end point, and the decision to cut off discovery is committed to the management skills of the district court.") (internal quotation marks omitted); *Vakharia v. Swedish Covenant Hosp.*, 1994 WL 75055, at *2 (N.D. Ill. Mar. 9, 1994) ("The discovery rules are not a ticket to an unlimited, never-ending exploration of every conceivable matter that captures an attorney's interest. Parties are entitled to a reasonable opportunity to investigate the facts—and no more."). That is exactly what Judge St. Eve did, and Kellogg Hansen's clients should be required to abide by her deadline.

Kellogg Hansen's misguided insistence that the RFPs at issue "go to central issues in the case" (Opp. 11) is no basis for allowing it to evade the May 25 deadline. For one thing, the notion that the RFPs go to "central issues in the case" is clearly wrong, given that the two events Kellogg Hansen wishes to investigate—the amendment of the MSA and the acquisition of ELEAD1ONE— postdate every complaint in this MDL. Kellogg Hansen can hardly suggest that events that formed no part of any of Plaintiffs' complaints are "central" to the claims in those complaints. Kellogg

---

As the motion for a protective order explained, Judge St. Eve authorized this discovery to be served after the May 25 deadline. Mem. 6 & n.6. Kellogg Hansen thus had no basis on which to seek a protective order.

Hansen's conduct makes clear that, far from going to "central" issues, the RFPs concern (at most) tangential matters that its clients wish to explore in hopes of finding additional useful information. And although Kellogg Hansen takes offense (Opp. 13) at CDK's use of the term "scorched-earth tactics," there is no other suitable description for its request to go on what is obviously a fishing expedition some nine months *after* representing to Judge St. Eve that its clients were essentially "ready for trial." Dkt. 65 at 35.

In any event, if the subjects at issue truly *did* "go to central issues in the case" and Kellogg Hansen wished to investigate them, the appropriate course would have been for Kellogg Hansen to move to reopen document discovery. Kellogg Hansen clearly has no interest doing so—both because it would require moving the trial date (a necessary occurrence in any event) and because it would allow Defendants to serve their own follow-up requests. But if the Court is not inclined to strike Kellogg Hansen's requests outright, reopening document discovery is the only viable response to Kellogg Hansen's conduct.

To be clear, CDK opposes reopening document discovery and believes that the Court should order that no discovery be had on the Second Set of RFPs. But if the Court disagrees and wishes to allow additional discovery because the RFPs concern purportedly new issues, the only fair means of proceeding is to pause oral discovery, reopen document discovery, and allow *both* sides to serve additional RFPs and interrogatories. As the opposition here notes in passing (Opp. 9), on November 21-27, 2018, Kellogg Hansen doubled down on its position that it remains open season on written discovery, by serving new interrogatories on Defendants on behalf of each of its clients. *See* Dkt. 466-1 at 1-77 of 97. Moreover, three days later, Kellogg Hansen requested that CDK add a new document custodian. *Id.* at 79-80 of 97. To permit Kellogg Hansen (and only Kellogg Hansen) to serve all of this untimely discovery while keeping the schedule unchanged would be to allow

8

Kellogg Hansen to have its cake and eat it too, while penalizing Defendants for having complied with the May 25 deadline.

Moreover, even if the Court does not wish to reopen document discovery generally, an extension of the current fact discovery schedule would be needed in order for CDK to respond to the Second Set of RFPs. Kellogg Hansen's assertion (Opp. 13) that "[t]here is ample time to obtain this discovery" by the current fact discovery cutoff of April 15, 2019, is dubious. In the earlier round of document discovery, the process of collecting documents from custodians, processing those documents, negotiating search terms, and producing the documents took the parties many months— and at that time, counsel were devoting their entire energy to the document-discovery process. There is no telling how long a new round of document discovery on the Second Set of RFPs would take now that counsel are in the thick of an oral discovery period in which multiple witnesses are being deposed every week (with some 70 depositions remaining between January 1 and April 15), but it would likely be longer than the four months remaining for fact discovery under the current schedule. Thus, requiring CDK to respond to the improper Second Set of RFPs will require an even longer extension of the schedule (which, as Defendants explained in their status submission (Dkt. 466), is already necessary). That is yet another reason why a protective order is warranted.

**C.     At A Minimum, The Court Should Hold That CDK Need Not Respond To The Requests Not "At Issue."**

With respect to the requests in the Second Set of RFPs that do not concern ELEAD1ONE or the "agent" language, Kellogg Hansen offers to "withdraw[]" those requests or "hold[] them in abeyance." Opp. 9. But the Court should reject that offer. These requests were improper (which is why Kellogg Hansen does not bother to defend them on the merits). The Court should therefore order that CDK need not respond to them, however it rules as to the other requests.

9

To begin with, Kellogg Hansen effectively admits that several of the requests in this category are improper. It all but concedes that RFPs Nos. 110 and 111 are duplicative. Opp. 9. And it acknowledges that RFP No. 109 is precluded by the Court's ruling on its motion to compel, which declined to compel discovery into CDK's communications with OEMs. Dkt. 441 at 5. There is no basis for allowing Kellogg Hansen to "withdraw" or hold these requests in abeyance; they have no legal basis.

As to RFP No. 112, Kellogg Hansen states that the parties "are negotiating the submission of written deposition questions" on the topic (Opp. 9)—but that is a surprising statement, to say the least. It was *Defendants* who, after receiving multiple letters from Plaintiffs with "questions" about Defendants' data productions, proposed addressing data questions by means of written deposition questions, and to date, Plaintiffs have never responded to that proposal. *See* Dkt. 466-1 at 82-83 of 97 (November 16, 2018 Letter). The statement in the opposition that the parties are "negotiating" on this issue is the first that CDK has heard of any "negotiati[ons]." Kellogg Hansen cannot rely on negotiations that have not occurred as an excuse for holding this request in abeyance.

With respect to RFPs Nos. 113 and 114, which pertain to CDK's dealings with A.T. Kearney, Kellogg Hansen offers to "stand down" based on the fact that it may get the information it wants from A.T. Kearney itself. But although Kellogg Hansen may think this offer magnanimous, it is not: as CDK's motion explained, the A.T. Kearney requests are clearly improper, given that Kellogg Hansen had thousands of documents regarding A.T. Kearney in its possession *prior* to the May 25 deadline and yet failed to serve any RFPs on that topic. *See* Mem. 5. The Court should hold that CDK has no obligation to respond to these RFPs—rather than allowing Kellogg Hansen to hedge its bets and hold them in abeyance indefinitely.

## CONCLUSION

CDK's motion for a protective order should be granted.

Dated: December 11, 2018

Respectfully submitted,

*/s/ Britt M. Miller*
Britt M. Miller
Michael A. Scodro
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mscodro@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant
CDK Global, LLC*

## CERTIFICATE OF SERVICE

      I, Britt M. Miller, an attorney, hereby certify that on December 11, 2018, I caused a true and correct copy of the foregoing **DEFENDANT CDK GLOBAL, LLC'S REPLY IN SUPPORT OF ITS MOTION FOR PROTECTIVE ORDER**, to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

                                    */s/ Britt M. Miller*
                                      Britt M. Miller
                                      MAYER BROWN LLP
                                      71 South Wacker Drive
                                      Chicago, IL 60606
                                      Phone: (312) 782-0600
                                      Fax: (312) 701-7711
                                      E-mail: bmiller@mayerbrown.com