# EXHIBIT B

**From:** Leonard Bellavia
**Sent:** Monday, December 24, 2018 11:12 AM
**To:** 'Miller, Bradley' <BMILLER@NADA.org>; list@dealercounsel.com
**Subject:** RE: Critical Court Deadline Approaching for R&R, CDK Dealers – Dealer Action Required by January 2, 2019

Dear NADC Members:

As promised late Friday, the following is a memo prepared by me and other dealer class counsel in response to several questions received in response to the email sent via the NADC listserv by Bradley Miller of NADA on Friday. Unfortunately, many of the points raised in the memo are incorrect, misleading, or fail to present an accurate picture of the proposed settlement with Reynolds and Reynolds. In the interest of providing dealer attorneys with accurate and complete information, please see the below summary. I encourage you and your clients to carefully review the information below, as well as on the settlement website: https://dealershipclassdmssettlement.com, to fully understand the nature and benefits of this settlement, particularly before your clients undertake the time and costs necessary to opt out and pursue litigation on an individual basis.

Again, in the interest of full disclosure, I am one of the class counsel in this case, as well as being a member of the Steering Committee. I am co-counsel with Peggy Wedgworth of Milberg Tadler Phillips Grossman LLP, whom the Court appointed Interim Lead Counsel. This is an important case for all dealers who utilize Reynolds or CDK data management systems, and it would be unfortunate (and ironic) if the NADA memo unintentionally damaged the potential for a successful outcome of the overall case for its dealer members by implying that they should opt out or object. Therefore, I (and Peggy Wedgworth), am available during the upcoming holiday week to speak with anyone who wishes to discuss any issues or ask any questions about the settlement.

**Point 1: The $1,100 Distribution Calculation in the NADA Letter is Misleading**

It is entirely premature to make any sort of distribution calculation and the $1,100 figure that NADA calculates dealers would receive under this settlement is purely speculative. NADA's memo acknowledges that "it is difficult to estimate the exact payment to any class members for a number of reasons …" (page 3). Dealers were informed via mail notice sent on November 19, 2018 (*see* the notice on the settlement website), that there is no immediate distribution proposed to dealers, nor fees to the lawyers at this time. This is a *partial* settlement, and the litigation against CDK continues. No one knows at this time how much will be ultimately distributed or how it will be allocated. At the conclusion of the case, an allocation plan will be proposed to distribute the funds recovered from Reynolds and any other amounts recovered from CDK, less any court-awarded fees, expenses, and awards. As discussed in our final approval papers (posted on the website), the Reynolds settlement will *not* diminish the potential damages recoverable from remaining defendant CDK. CDK remains jointly and severally liable for *all* damages resulting from the alleged conspiracy, including those attributable to Reynolds's sales. Therefore, I emphasize again that if the settlement is approved, the principal damages case will continue against CDK – who we contend will be responsible for the *total damages caused by CDK's and Reynolds's alleged conspiracy*.

**Point 2: The NADA Letter Fails to Fully Inform Dealers of the Risks and Obligations of Opting Out**

The settlement with Reynolds **avoids the risk that class members will receive nothing at all.** If dealers opt out and wish to pursue their own claims against Reynolds, there are risks and costs of doing so. The risk that dealers may ultimately be unable to prove that Reynolds conspired with CDK cannot be overlooked. In this regard, it is noteworthy that the Seventh Circuit Court of Appeals, in vacating a preliminary injunction against Reynolds and CDK in the *Authenticom* case stated, "Until 2015, the system furnished by CDK placed no restrictions on harvesting by third-party integrators; Reynolds, in contrast, has always forbidden that practice in its system licenses." *Authenticom v. CDK Global*, *LLC*, 874 F.3d 1019, 1022 (7th Cir. 2017).

Prior to reaching settlement, Reynolds moved to dismiss the case in its entirety, on numerous grounds. (The settlement avoids the need for a ruling on the motion). One of Reynolds's principal arguments is that dealers signed arbitration agreements requiring them to individually arbitrate their claims against Reynolds. Courts (including Judge Dow presiding over this case), have routinely enforced arbitration agreements. Thus, there is a very significant risk that Reynolds dealers, in the absence of settlement, would be required to individually arbitrate their claims against Reynolds, and incur the expenses (including all the legal expenses and expert fees). This risk, as well as other risks, are more fully addressed in our final approval brief and declaration, submitted in support of the settlement, posted on the settlement website.

Additionally, as discussed in Point 4 below, the settlement releases various counterclaims that Reynolds may have against Class Members regarding the sharing of user IDs and passwords with third parties. Reynolds, however, may assert those counterclaims against dealers who opt out of the class.

**Point 3: This Settlement Does Not Include Injunctive Relief**

The NADA letter criticizes the lack of injunctive relief in the settlement, but ignores the Seventh Circuit decision on this issue. In terms of structural or injunctive relief, including contractual changes, the availability of such relief against Reynolds – *even if we can win at trial and on the inevitable appeal* – is sharply disputed. In vacating a preliminary injunction against Reynolds and CDK in the *Authenticom* case, the Seventh Circuit Court of Appeals ruled: "The proper remedy for a section 1 violation based on an agreement to restrain trade is to set the offending agreement aside. From the standpoint of preliminary injunctive relief, that would mean ordering Reynolds and CDK not to implement their 2015 agreements or any alleged agreement collectively to bar Authenticom from their data management systems." *Authenticom v. CDK Global*, 874 F.3d at 1026. In moving to dismiss our complaint, Reynolds argued that, under the *Authenticom* ruling, any injunctive relief in this case must be similarly restricted. We encourage you and your clients to consider the availability of, and necessary showing to, secure injunctive relief (including contractual changes) against either defendant.

**Point 4: Dealers are Not Releasing Claims against Reynolds in the Ordinary Course of Business**

We encourage you and your clients to review the releases in the settlement agreement (posted on the website, Section A.1(x)-(y), ¶¶ 6-7) carefully, which, among other things: (i) "do not release, alter, or affect any existing or future contractual obligations between Reynolds and a Dealership Class Member for Reynolds to provide products or services to the Dealership Class Member and for the Dealership Class Member to pay for those products or services," and (ii) do release "any claims that Reynolds could have asserted against the Dealership Class Releases relating to the use or sharing of log-in credentials prior to the Effective Date."

Reynolds agrees to release Dealership Plaintiffs and the Class from any counterclaims that could be asserted against them, including under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, the Copyright Act, 17 U.S.C. § 501, and the Digital Millennium Copyright Act, 17 U.S.C. § 1201. Importantly, Reynolds has already asserted counterclaims against Authenticom *based on allegations that implicate the dealers*. *See* Defendant The Reynolds and Reynolds Company's Answer to Original Complaint, Affirmative Defenses, and Counterclaims (ECF No. 226) ¶ 106 ("Reynolds's Customer Agreements prohibit Reynolds's dealer customers from granting third-party integrators like Authenticom access to the Reynolds DMS without Reynolds's consent."). Dealers who opt out of the Class lose the benefit of Reynolds's release of such counterclaims.

**Point 5: Clarifying Reynolds Dealers' Participation in the Ongoing CDK Litigation**

Please note that Reynolds dealers' claims are against *both CDK and Reynolds* for their conspiracy to exclude competitors from the market and raise prices. Thus, Reynolds dealers will continue to be part of the ongoing CDK litigation.

**Point 6: Treatment of Reynolds and CDK Dealerships in this Litigation**

Reynolds and CDK dealerships are not treated differently during the pendency of the litigation as they each allegedly suffered damages due to the actions of both CDK and Reynolds who acted together to conspire to eliminate competition and raise prices. Both Reynolds and CDK dealers qualify to participate in the Reynolds settlement, and both Reynolds and CDK dealers would qualify to participate in any recovery from CDK. As set forth in the notice sent to dealers, the allocation and distribution of all money recovered in this litigation (less fees and expenses) will be distributed at the conclusion of the litigation (the Reynolds settlement, plus any

recovery from CDK, either through a settlement with CDK or a judgment entered against CDK after a trial) to both CDK and Reynolds dealerships. An expert at that time will calculate a formula used to determine the recovery that dealerships will receive.

**Point 7: Settlement Services are Not Necessary**

Dealer attorneys are advising us that non-party claim settlement services are soliciting their clients and asking if their services are mandatory. We do not believe that non-party settlement services, that have not been approved or designated by the Court, are necessary in order for dealers to participate in the settlement once claim forms become available later in the case. Right now dealers may register on the settlement website to receive further information as it becomes available: https://dealershipclassdmssettlement.com/Request. No-cost claims filing assistance will be available from Dealership Class Counsel and the Settlement Administrator once claim forms become available. *See* question 8 of the long-form notice, which is available on the settlement website.

Again, I encourage you to contact me, or Peggy Wedgworth, during the upcoming week with any additional questions or concerns you may have about the Reynolds settlement.

Sincerely,

| | |
|---|---|
| Leonard A. Bellavia | Peggy J. Wedgworth |
| Bellavia Blatt, PC | Milberg Tadler Phillips Grossman LLP |
| 200 Old Country Road, Suite 400 | One Pennsylvania Plaza, 19th Floor |
| Mineola, NY 11501 | New York, NY 10119 |
| Tel: (516) 873-3000 | Tel: (646) 515-1269 |
| lbellavia@dealerlaw.com | pwedgworth@milberg.com |