**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE DEALER MANAGEMENT SYSTEMS | ) | |
| ANTITRUST LITIGATION, MDL 2817 | ) | Case No. 18-cv-864 |
| | ) | |
| _____ | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| This document relates to: | ) | |
| | ) | |
| *Loop, LLC, d/b/a Autoloop v. CDK Global, LLC,* | ) | |
| Case No. 18-cv-2521 | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant CDK Global, LLC's motion to dismiss [259] the amended

complaint filed by Plaintiff Loop, LLC.  For the reasons set forth below, the motion is denied.

**I.     Background[1]**

Plaintiff Loop, LLC ("AutoLoop" or "Plaintiff") brings this action on behalf of itself and

other automotive software application vendors to remedy and enjoin purported ongoing antitrust

and state law violations by Defendant CDK Global, LLC ("CDK" or "Defendant").  [194 (Am.

Compl.), at ¶ 1.]  Plaintiff alleges that CDK and its non-party co-conspirator The Reynolds and

Reynolds Company ("Reynolds") have committed antitrust violations and inflicted widespread

harm on automotive dealers, vendors of software products and services (like Plaintiff), and the

automotive industry by conspiring to eliminate competition for providing data integration services

for dealer data.  [*Id*. at ¶ 2.]  Plaintiff is an automotive software products and services company,

providing integrated software solutions to more than 2,000 car dealers across the country.  [*Id*. at

¶ 6.]  Plaintiff offers three suites of software: sales, service, and marketing.  [*Id*. at ¶ 7.]  Each suite

---

[1] For purposes of this motion to dismiss, the Court accepts as true all of Plaintiff's well-pleaded factual allegations and draws all reasonable inferences in Plaintiff's favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

includes multiple software applications that dealers can select to enhance their ability to sell cars and serve customers. [*Id*.] Vendors like Plaintiff need access to dealer data for their products and services to function. [*Id*. at ¶ 8.] This dealer data includes vehicle and parts inventory, customer name and contact information, customer leads, completed and pending sales information, vehicle financing and insurance ("F&I") information, vehicle pricing information, and service and repair information. [*Id*.]

## A.    The DMS Market

Dealers traditionally have stored a significant portion of their data on a database within their data management system ("DMS"), which is software that dealers use to help manage their businesses (*e.g.*, accounting, sales, service, and human resources). [*Id*. at ¶ 9.] Defendant and non-party Reynolds both have significant market power in the DMS market. [*Id*. at ¶ 10.] Together, they control approximately 75% of the United States market by number of dealers and approximately 90% when measured by number of vehicles sold. [*Id*.] Defendant controls approximately 45% of the DMS market, and Reynolds controls approximately 30%. [*Id*.] Switching DMS providers presents significant logistical challenges and is highly disruptive to business operations. [*Id*. at ¶ 48.] It can take a dealership more than a year of preparation, staff training, and testing before a new DMS can be put into operation, resulting in significant training and implementation costs. [*Id*.] The average DMS client tenure is more than 20 years. [*Id*. at 68.] Defendant's own CEO publicly has recognized that dealers are hesitant to switch DMSs because the process can take time and can be very difficult. [*Id*. at ¶ 49.]

In addition to their DMSs, Defendant and Reynolds offer standalone software applications that compete directly with applications offered by Plaintiff and other third-party vendors. [*Id*. at ¶ 11.] DMS providers (including Defendant and Reynolds) historically have allowed dealers to

provide third parties (including vendors like Plaintiff) automated access to the dealer data stored on their DMSs through data integration service providers, which collect and standardize the data to provide it to the dealer's chosen third-party vendors. [*Id*. at ¶ 12.] Plaintiff sells automotive software products and services to dealers, including applications that help dealers market, sell, and service cars. [*Id*. at ¶¶ 6-7.] Plaintiff's applications, like those of other vendors, require access to dealer data stored on a dealers' DMSs. [*Id*. at ¶ 8.]

**B.     The Dealer Data Integration Market**

The Data Integration Services ("DIS") market consists of services that provide access to dealer data on their respective DMSs. [*Id*. at ¶ 56.] Data integrators (*i.e.*, DIS providers) also may provide value-enhancing services, such as putting data from different DMSs in a uniform format, data hygiene (*i.e.*, error correction), and granular control by dealers over which vendors receive which data. [*Id*.] Defendant and Reynolds each provide data integration services for their respective DMSs. [*Id*. at ¶ 13.] Defendant's data integration service is known as Third Party Access ("3PA"), and Reynolds's data integration service is known as the Reynolds Certified Interface ("RCI"). [*Id*.] Third parties also have provided competing data integration services. [*Id*.] Indeed, Defendant owns two such third-party data integrators—Digital Motorworks, Inc. ("DMI") and IntegraLink. [*Id*.] Other third-party data integrators have included Authenticom, Inc. ("Authenticom") and Superior Integrated Solutions, Inc. ("SIS"). [*Id*.] At one time, both CDK and Reynolds had "open" DMSs, meaning that neither took steps to prevent dealer clients from authorizing third-party access to the dealers' data. [*Id*. at ¶ 14.] During this time, the competition between data integration services made access to dealer data cost effective. For example, an application vendor could pay a data integrator $50 per dealer per month. [*Id*.] With

dealers in control of access to and use of their data, vendors created an array of innovative software products and services to help dealerships market, sell, lease, and service cars. [*Id.*]

Over time, Reynolds began to "close" its DMS by selectively blocking third-party data integrators from accessing dealer data stored on the Reynolds DMS. [*Id.* at ¶ 15.] As Reynolds reduced competition for DIS through its blocking activities, Reynolds increased the fees it charged for data integration through RCI. [*Id.*] Defendant continued to differentiate its product as an "open" DMS. [*Id.*] At the same time, Defendant's own data integration businesses provided vendors with access to dealer data on the Reynolds DMS. [*Id.*] Defendant's open-access policy allowed it to gain (albeit very slowly) DMS customers at Reynolds's expense and to enter long-term contracts with those dealers. [*Id.*] Defendant marketed its "open" system directly to dealers and issued press releases stressing that it "believes in the fair competitive environment and does not use its leverage through supply of the dealer management system to reduce competition through the restriction of data access." [*Id.* at ¶ 86.]

### C.    Alleged Agreement

That competition between Defendant and Reynolds halted in early 2015 when Defendant began blocking dealers from granting third-party access to dealer data and, at the same time, agreed to shut down its data integration business for dealers using a Reynolds DMS. [*Id.* at ¶ 16.] Plaintiff alleges that these changes were the result of horizontal agreements with Reynolds. [*Id.*] Effective February 18, 2015, Defendant and Reynolds entered into three written agreements. [*Id.* at ¶ 96.] The centerpiece was a "Data Exchange Agreement"—also referred to as the "wind-down" agreement—pursuant to which Defendant agreed to wind down its data integration business on the Reynolds DMS, with Reynolds promising not to block Defendant's access to the Reynolds system during the wind-down period (approximately 5 years). [*Id.*] During that period, Reynolds agreed

that CDK could continue to extract dealer data just as it had before, using login credentials provided by the dealer. [*Id*.] As for other independent integrators, Defendant and Reynolds agreed that they would not "take any steps to assist any person that it reasonably believes to have plans to access or integrate with the other party's DMS." [*Id*.]

In addition to the written agreements, senior CDK and Reynolds executives also have admitted that they have agreed to restrict access to dealer data and destroy data integrators like Authenticom, Superior Integrated Solutions, Inc. ("SIS"), and others. [*Id*. at ¶ 103.] For example, on April 3, 2016, at an industry convention in Las Vegas, Dan McCray (CDK's former Vice President of Product Management) told Steve Cottrell (Authenticom's founder and CEO) that Defendant and Reynolds had agreed to lock Authenticom and other third parties out and that they were "working collaboratively to remove all hostile integrators from our DMS system." [*Id*. at ¶ 104.] By eliminating competition for data integration services, CDK and Reynolds have seized control over dealer data and thwarted dealers' ability to control access to and the usage of their data. [*Id*. at ¶ 3.] According to Plaintiff, as a result of these agreements, vendors like Plaintiff had no choice but to access dealer data through CDK's and Reynolds's own data integration services. Plaintiff's integration fees therefore have skyrocketed from approximately $79 per month per rooftop with independent data integrators to more than $730 per month per rooftop with Defendant. [*Id*. at ¶ 27.] Other vendors have seen similar increases. [*Id*.]

### D.    Alleged Exclusive Dealing

Shortly after entering into the Data Exchange Agreement, Defendant began "renegotiating" its contracts with vendors for 3PA access. [*Id*. at ¶ 114.] Consistent with its decision to close its DMS, Defendant imposed contractual provisions requiring that vendors using 3PA for any of its dealer-customers on a CDK DMS agree to use 3PA exclusively for all of its of its dealer-customers

on CDK DMSs. [*Id*. at ¶ 115.] For example, Plaintiff's Managed Interface Agreement ("MIA") and accompanying Statement of Work, dated January 12, 2016, states in Section 1(f):

> [AutoLoop] agrees that it will not (a) otherwise access, retrieve, license, or otherwise transfer any data from or to an [sic] CDK System (including, without limitation, pursuant to any [independent data integrator]) for itself or any other entity or (b) contract with, or otherwise engage, any third party (including any [dealer]) to access, retrieve, license or otherwise transfer any data from or to an CDK System.

[*Id*.] These contractual provisions prohibit Plaintiff from sharing dealer data between its own products and services because Plaintiff's solutions cannot receive dealer data from any source other than 3PA. [*Id*. at ¶ 117.]

The new 3PA contract also includes a price-secrecy provision:

> All terms of this Agreement (including, without limitation, the pricing terms hereof) * * * shall be considered confidential information under the terms of the Non-Disclosure Agreement. [AutoLoop] may generically inform its [dealers] that CDK has charged [AutoLoop] a fee for the use of the [3PA program] as long as it does not inform any [dealer] of the amount of such fee.

[*Id*. at ¶ 118.] Internal CDK documents state the purpose of these provisions is "to create minimal awareness to dealer" regarding CDK's exorbitant pricing for data integration. [*Id*.] CDK includes the same or substantially similar provisions in its standard 3PA contract with other vendors. [*Id*. at ¶ 119.]

The CDK standard contract also bars vendors from indicating "in any way" that an increase in the price of products or services is related to an increase in the integration fees charged by CDK: "Vendor shall never indicate in any way to any CDK Vendor Client [i.e., dealer] that any increase in any price charged by Vendor to any CDK Vendor Client is in reaction to, or in any other way associated with, any modification in the price charged by CDK hereunder with respect to Vendor's use of the CDK Interface System." [*Id*. at ¶ 124.]

After entering into the Data Exchange Agreement, Defendant also took the new position

that its existing contracts with dealers prohibited allowing data integrators to access its DMS. [*Id.* at ¶ 125.] Defendant also recently forced many of its dealers to extend their contracts by years by threatening to terminate their DMS service. [*Id.* at ¶ 50.] Many of these dealers were on month-to-month contracts, and had been for a long time. [*Id.*] Without prior notice, Defendant informed these dealers that their DMS services would terminate in less than 60 days unless the dealers entered into years-long contracts. [*Id.*] Plaintiff contends that dealers generally had no choice but to sign the lengthy extensions given the impossibility of switching DMS providers in such a short amount of time. [*Id.*]

## II.    Legal Standard

To survive a Federal Rule of Civil Procedure ("Rule") 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (alteration in original). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly,* 550 U.S. at 558. In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts as true all of Plaintiff's well-pleaded factual allegations and draws

all reasonable inferences in Plaintiff's favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

## III.     Analysis

### A.     Arbitration

Plaintiff's Managed Interface Agreement with Defendant contains no arbitration clause. In Plaintiff's agreement with Reynolds (the "Reynolds Interface Agreement" or the "RIA"), however, Plaintiff agreed to arbitrate "any dispute, claim, question or disagreement arising from or relating to" the Reynolds Interface Agreement. [198-40, at § 6.12.] Defendant contends that Plaintiff's agreement to arbitrate certain claims with Reynolds extends to Defendant under the doctrine of equitable estoppel. Plaintiff argues that (1) its claims are outside the scope the arbitration agreement, (2) Defendant has not shown that it is entitled to invoke the doctrine of equitable estoppel, and (3) Defendant has waived any right to seek arbitration of Plaintiff's claims.

Before turning to the merits of these arguments, some discussion of the federal policy favoring arbitration is warranted. Pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (the "FAA"), "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction * * * shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA]." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983); see also *Int'l Ins. Agency Servs., LLC v. Revios Reinsurance U.S., Inc.*, 2007 WL 951943, at *2 (N.D. Ill. Mar. 27, 2007) ("Arbitrability is governed by federal law." (citation omitted)).

Section 2 of the FAA is "a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone*, 460 U.S. at 24. Thus, "[w]hen the parties have agreed to arbitrate some matters pursuant to an arbitration clause, 'the law's permissive policies in respect to arbitration counsel that any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration.'" *Local 73, Serv. Employees Int'l Union, AFL-CIO v. UChicago Argonne, LLC*, 2011 WL 635862, at *3 (N.D. Ill. Feb. 11, 2011) (quoting *Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 561 U.S. 287, 298 (2010)). "[A]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Int'l Bhd. of Elec. Workers, Local 21 v. Illinois Bell Tel. Co.*, 491 F.3d 685, 687-88 (7th Cir. 2007) (internal quotation marks and citation omitted). With these principles in mind, the Court turns to the merits of the parties' arguments regarding Plaintiff's arbitration agreement with Reynolds.

### i. Equitable Estoppel

Even though Defendant is not a signatory to Plaintiff's arbitration agreement with Reynolds, Defendant argues that Plaintiff must arbitrate its claims against Defendant under the doctrine of equitable estoppel. "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). Arbitration "is a matter of consent, not coercion." *Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). However, the "mere fact" that parties are not "signatories to [an] agreement does not defeat their right to compel arbitration." *Hoffman v. Deloitte & Touche, LLP*, 143 F. Supp. 2d 995, 1004 (N.D. Ill. 2001). Still,

"[a]rbitration agreements apply to nonsignatories only in rare circumstances." *I Sports v. IMG Worldwide, Inc.*, 813 N.E.2d 4, 8 (Ohio Ct. App. 2004).

Here, Defendant contends that Plaintiff is bound to arbitrate its claims against Defendant under the doctrine of equitable estoppel. State law governs who is bound by agreements to arbitrate. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009). The parties dispute whether Ohio law or Illinois law applies to Defendant's estoppel argument. Defendant contends that Ohio law applies because the RIA is governed by Ohio law. Plaintiff contends that Illinois law applies because equitable estoppel is a tort doctrine and Illinois law has the most significant relationship with Defendant's equitable estoppel claim. The Court need not decide which state's law applies, however, as the outcome is the same under both Illinois and Ohio law. *Coexist Found., Inc. v. Fehrenbacher*, 2016 WL 4091623, at *4 (N.D. Ill. Aug. 2, 2016), aff'd, 865 F.3d 901 (7th Cir. 2017).

Under Illinois law, a party cannot enforce an arbitration agreement under an equitable estoppel theory without detrimental reliance. *Warciak v. Subway Restaurants, Inc.*, 880 F.3d 870, 872 (7th Cir.), cert. denied, 138 S. Ct. 2692 (2018) (applying Illinois law); see also *Ervin v. Nokia, Inc.*, 349 Ill. App. 3d 508, 517 (2004). Here, Defendant does not even argue that it can establish detrimental reliance. Accordingly, Defendant cannot invoke equitable estoppel under Illinois law.

Similarly, under Ohio law, detrimental reliance is necessary to invoke the doctrine of equitable estoppel. *Ohio State Bd. of Pharmacy v. Frantz*, 555 N.E.2d 630, 633 (Ohio 1990) ("The party claiming the estoppel must have relied on conduct of an adversary in such a manner as to change his position for the worse and that reliance must have been reasonable[.]"); *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109, 119 (Ohio 2006) ("Equitable estoppel does not apply when there is no actual or constructive fraud and no detrimental reliance."). Although Plaintiff

has not cited to any Ohio case holding that detrimental reliance is required to invoke equitable estoppel in the arbitration context, the same general contractual and estoppel principles apply to determining what parties are bound by an agreement to arbitrate. *Warciak v. Subway Restaurants, Inc.*, 880 F.3d 870, 872 (7th Cir.), cert. denied, 138 S. Ct. 2692 (2018);[2] *Judge v. Unigroup, Inc.*, 2017 WL 3971457, at \*5 (M.D. Fla. Sept. 8, 2017) (holding that Ohio law requires detrimental reliance to compel arbitration with a nonsignatory of an arbitration agreement).

Indeed, Defendant has not cited to any authority indicating that the Ohio courts would apply a different equitable estoppel standard in the context of enforcing arbitration agreements against nonsignatories.[3] The only Ohio case cited by Defendant in support of its argument, *I Sports v. IMG Worldwide, Inc.*, recognized that other courts have enforced arbitration agreements against nonsignatories when (1) a signatory must rely on the terms of the written agreement to assert claims against a non-signatory, or (2) the signatory alleges substantially interdependent and concerted misconduct by the non-signatory and one or more signatories. 813 N.E.2d 4, 9 (Ohio App. Ct. 2004). But the court in *I Sports* concluded that the nonsignatory in that case did not fall in either category. The court therefore did not affirmatively conclude that either showing was

---

[2] Defendant argues that *Warciak* is distinguishable because it involved the application of Illinois law. However, in *Warciak*, the Seventh Circuit cited to the Supreme Court's decision in *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009), for the proposition that traditional state-law principles such as assumption, agency, and estoppel apply to determining when a contract such as an agreement to arbitrate can be enforced against nonparties. *Warciak*, 880 F.3d at 872. Thus, pursuant to *Arthur Anderson* and *Warciak*, the Court looks to Ohio's traditional equitable estoppel principles to determine when an arbitration agreement can be enforced against a nonsignatory under Ohio law.

[3] The Ohio Supreme Court has not expressly considered whether detrimental reliance is necessary to enforce an arbitration agreement against a nonsignatory under the doctrine of equitable estoppel. Absent a controlling decision from the state's highest court, this Court's job is to "ascertain" what answer the Ohio Supreme Court would likely give "if the present case were before it now." *Woidtke v. St. Clair Cnty.*, 335 F.3d 558, 562 (7th Cir. 2003).

sufficient to invoke equitable estoppel under Ohio law.[4] Even if a nonsignatory has to show that the signatory relied on the written terms of the contract or that the signatory alleges substantially interdependent misconduct in order to enforce an arbitration agreement, that does not mean that detrimental reliance also is not required. As the Seventh Circuit has explained, even in the arbitration context, "the court must apply traditional state promissory estoppel principles to decide whether a non-party should be bound by the terms of another's contract." *Warciak*, 880 F.3d at 872. Because detrimental reliance is required to invoke equitable estoppel under Ohio law, and because Defendant does not even argue that it can show detrimental reliance, Defendant cannot invoke equitable estoppel to force Plaintiff to arbitrate.

The Court also notes that equitable estoppel is—as its name indicates—an equitable doctrine. Given that the relationship between Plaintiff and Defendant is governed by a contract that has no arbitration clause, the equities do not support a judicial order. *Hartford Fire Ins., Co. v. Henry Bros. Const. Mgmt., Serv.*, 2011 WL 3563138, at *8 (N.D. Ill. Aug. 10, 2011) ("To allow Defendant to invoke an arbitration clause set forth in a contract to which it was not a party when the contract to which Defendant was a party specifically disclaims arbitration would lead to an unfair and unjust result.").

    *ii.*    *Waiver*

Plaintiff argues that even if Defendant could enforce the arbitration agreement between Plaintiff and Reynolds, Defendant waived its right to do so by failing diligently to assert its claimed right to arbitrate. "Despite the federal policy favoring arbitration, a contractual right to arbitration

---

[4] The only Ohio Supreme Court case cited by the appellate court in *I Sports* was *Gerig v. Kahn*, which held that a signatory to a contract may enforce an arbitration provision against a nonsignatory seeking a declaration of the signatories' rights and obligations under the contract. 769 N.E.2d 381, 385-86 (Ohio 2002). However, the Ohio Supreme Court later limited *Gerig* to situations "when a nonparty is 'seeking a declaration of the *signatories'* rights and obligations *under* the contract." *Henderson v. Lawyers Title Ins. Corp.*, 843 N.E.2d 152, 161 (Ohio 2006).

can be waived." *Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Products, Inc.*, 660 F.3d 988, 994 (7th Cir. 2011) (citing *St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co., Inc.*, 969 F.2d 585, 587 (7th Cir. 1992)). A waiver of a contractual right to invoke arbitration can be implied or express. *Cabinetree of Wisconsin, Inc. v. Kraftmain Cabinetry, Inc.*, 50 F.3d 388, 390 (7th Cir. 1995). "For waiver of the right to arbitrate to be inferred, [the Court] must determine that, considering the totality of the circumstances, a party acted inconsistently with the right to arbitrate." *Kawasaki Heavy Indus., Ltd.*, 660 F.3d at 994 (citation omitted). "Although a variety of factors may be considered, diligence or a lack thereof should weigh heavily in the court's determination of whether a party implicitly waived its right to arbitrate." *Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 562 (7th Cir. 2008) (citation omitted). The Seventh Circuit therefore has directed courts to consider whether "the party seeking arbitration * * * [did] all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration[.]" *Smith v. GC Servs. Ltd. P'ship*, 907 F.3d 495, 499 (7th Cir. 2018) (quoting *Cabinetree of Wisconsin, Inc.*, 50 F.3d at 391 (internal quotation marks omitted)). Other considerations "include whether the allegedly defaulting party participated in litigation, substantially delayed its request for arbitration, or participated in discovery." *Kawasaki Heavy Indus., Ltd.*, 660 F.3d at 994 (citation omitted). Still, "waiver is not lightly inferred; the strong federal policy favoring enforcement of arbitration agreements impresses upon a party asserting waiver a 'heavy burden.'" *Williams v. Katten, Muchin & Zavis*, 837 F. Supp. 1430, 1442 (N.D. Ill. 1993) (quoting *St. Mary's Med. Ctr. of Evansville, Inc.*, 969 F.2d at 590); see also *Dickinson v. Heinold Secs., Inc.*, 661 F.2d 638, 641 (7th Cir. 1981) ("a 'waiver of arbitration is not lightly to be inferred'" (quoting *Midwest Window Sys., Inc. v. Amcor Indus., Inc.*, 630 F.2d 535, 536 (7th Cir. 1980)).

In this case, all relevant factors weigh in favor of finding that Defendant waived any right to arbitrate Plaintiff's claims against it. To begin, Defendant did not assert its intent to arbitrate at the "earliest feasible" time. The first dealership class action—*Teterboro Automall, Inc. v. CDK Global, LLC*, Case No. 2:17-cv-08714 (D.N.J.)—was filed on October 19, 2017, yet Defendant waited until July 2018 to raise the prospect of arbitration. This was after CDK filed its motion to dismiss Plaintiff's initial complaint and after Judge St. Eve issued her opinion in *Authenticom, Inc. v. CDK Global, LLC* (Case No. 18-cv-868), which rejected many of the substantive arguments raised in Defendant's initial motion to dismiss.[5] [176.] This substantial delay is inconsistent with an intent to arbitrate. See *Cabinetree*, 50 F.3d at 391 ("Parties know how important it is to settle on a forum at the earliest possible opportunity, and the failure of either of them to move promptly for arbitration is powerful evidence that they made their election—against arbitration."); *cf. Kawasaki Heavy Indus., Ltd.*, 660 F.3d at 996 (no waiver when the defendant's "assertion of its right to arbitrate was not out of the blue" because it "mentioned its desire to arbitrate at every turn"). Furthermore, although Reynolds asserted its intent to arbitrate when it and Defendant moved for transfer and consolidation of the cases against them, CDK did not make any similar reservation. "[W]hen a party chooses to proceed in a judicial forum, there is a rebuttable presumption that the party has waived its right to arbitrate." *Kawasaki*, 660 F.3d at 996. Along the same lines, CDK participated in discovery without making clear that its participation in

---

[5] Defendant argues that it is not engaging in improper forum shopping by raising the arbitration issue only after Judge St. Eve ruled on the motion to dismiss in the *Authenticom* matter. Defendant notes that anytime a party files an amended complaint, it always is possible that "the opposing party will come up with new and better arguments in favor of dismissal." *G&G Closed Circuit Events, LLC v. Castillo*, 2018 WL 3046934, at *9 n.15 (N.D. Ill. June 20, 2018). While it is true that Defendant's argument in support of dismissal are not limited to those raised by Defendant in its initial motion to dismiss, this does not mean that Defendant is relieved of its obligation to assert its intent to arbitrate at the "earliest feasible" time. Indeed, there is no indication that anything in the amended complaint had any impact on Defendant's arbitration argument.

discovery was not a waiver of its now-claimed right to arbitrate.[6] *Cf. Kawasaki Heavy Indus., Ltd.*, 660 F.3d at 998 (finding no waiver where the defendant "mentioned its desire to arbitrate at every turn"). While it may not be necessary for a defendant expressly to reserve its right to arbitrate whenever it participates in discovery, in light of Defendant's failure to assert its intent to arbitrate until July 2018, Defendant acted inconsistent with the intent to arbitrate. Accordingly, even if Defendant could invoke the doctrine of equitable estoppel to force Plaintiff to arbitrate its claims, Defendant waived its right to do so.[7] The Court therefore denies Defendant's motion to dismiss Plaintiff's claims in favor of arbitration and turns to Defendant's substantive arguments for dismissal.

## B. Horizontal Conspiracy (Count I)

Plaintiff brings a Section 1 horizontal conspiracy claim against Defendant based on agreements between Defendant and Reynolds that were designed to eliminate competition in the provision of dealer data integration services. Defendant argues that Plaintiff's horizontal conspiracy claim fails for a number of reasons.

First, Defendant argues that Plaintiff is wrong about what the challenged agreements provide. Focusing on the written agreements between Defendant and Reynolds, CDK argues that

---

[6] To be sure, the Court is not saying that Defendant's participation in discovery alone is the basis for finding waiver. Defendant could have participated in discovery while reserving its right to arbitrate. Given the simplicity of Defendant's arbitration argument (*i.e.*, Plaintiff must arbitrate all claims relating to the RIA), however, it does not appear that any delay was necessary for Defendant to be able to determine which of Plaintiff's claims are or are not arbitratable. Thus, Defendant's participation in discovery without any reservation of its right to arbitrate until July 2018 was inconsistent with the intent to arbitrate. Similarly, the Court is not saying that Defendant's motion to transfer and consolidate alone is the basis for finding waiver. Rather, taking all of Defendant's actions together, it cannot be said that Defendant acted consistent with the intent to arbitrate.

[7] Because the Court finds that Defendant waived any right to arbitrate Plaintiff's claims and that Defendant does not have any right to invoke Reynolds's right to arbitrate in the first place, the Court does not address whether Plaintiff's claims fall within the scope of Plaintiff's arbitration agreement with Reynolds.

the "agreements effect only a wind-down of CDK's hostile access to Reynolds's DMS[.]" [260, at 13.] Although the 2015 Agreements do not require CDK and Reynolds to block third-party access on their own DMSs, as noted by Judge St. Eve in the *Authenticom* case, the agreements do "effectively require that CDK stop hostile access of Reynolds DMSs (for a period, at least) and, more importantly, expressly prohibit Defendants from assisting in the hostile access of one another's DMSs." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 951 (N.D. Ill. 2018).[8] "Such a partial ceasefire and mutual forbearance between two rivals would make sense if * * * Defendants sought to 'support' one another's integration services to the exclusion of third-party integrators from the competition." *Id.* Furthermore, the alleged agreements between Defendant and Reynolds are not limited to the 2015 written agreements. Plaintiff also alleges that CDK executives admitted "that the companies agreed to block and thereby destroy third-party data integrator" and "agreed to no longer compete with each other for data integration services." [194 (Am. Compl.), at ¶ 17.]

Second, CDK argues that Plaintiff's Section 1 claims fail because Plaintiff merely has alleged parallel conduct. "Tacit collusion, also known as conscious parallelism, does not violate section 1 of the Sherman Act. Collusion is illegal only when based on agreement." *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015). Defendant therefore argues that

---

[8] The parties dispute to what extent the Court must rely on earlier decisions made by the MDL court. Throughout its brief, Plaintiff relies on Judge St. Eve's opinion in the *Authenticom* matter. Defendant contends that the Court is free to disagree with that opinion as it sees fit. [376, at 17.] In making this argument, Defendant notes that MDLs "are not one case." [*Id*. (citing *In re Actos (Pioglitazone) Prod. Liab. Litig.*, 274 F. Supp. 3d 485, 519 (W.D. La. 2017)).] Although that assertion is true, "it would defeat the purpose of using MDL for consolidated pretrial proceedings if the parties could simply re-hash all of the arguments previously addressed by the MDL court." *Spychalla v. Boeing Aerospace Operations Inc.*, 2015 WL 3504927, at *7 (E.D. Wis. June 3, 2015). In any event, the Court finds Judge St. Eve's decision in the *Authenticom* matter to be thorough and well-reasoned. The Court will of course address the specific allegations in the amended complaint currently before the Court, but the Court sees no basis for deviating from Judge St. Eve's opinion to the extent it is relevant to the allegations in the amended complaint here.

Plaintiff's Section 1 claims fail because Plaintiff fails to identify "evidence that 'tends to exclude the possibility' of independent conduct." [260, at 14 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)).] Although the Supreme Court has held "that a plaintiff must present evidence showing that defendants had a 'rational economic motive to conspire' and evidence 'that tends to exclude the possibility' of independent conduct to survive summary judgment[,]" *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 953 (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 588), courts have held that such a showing is not necessary at the pleading stage. *Id.* (collecting cases).

Regardless, Plaintiff plausibly has alleged a motive to conspire. Plaintiff alleges that dealers preferred "open" DMSs and that several dealers complained when Defendant began blocking data integrators. [194 (Am. Compl.), at ¶¶ 111-13.] It therefore is reasonable to infer that Defendant and Reynolds were motivated to conspire with each other so they could close their systems to data integrators without fear that their customers would turn to another provider.[9] *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 953. Furthermore, accepting CDK's argument that Plaintiff only has alleged parallel conduct would require that the Court ignore well-pleaded allegations that CDK executives admitted to the agreement.[10] Such admissions are direct

---

[9] Defendant argues that such a motive is not plausible because CDK would not risk treble-damages liability in exchange for Reynolds's mere agreement to continue doing what it already had done for years. [260, at 15.] However, based on the allegations in the amended complaint, there was no guaranty that Reynolds would maintain its closed policy. Discovery ultimately may reveal that CDK lacked any motive to conspire with Reynolds, but the Court must draw all reasonable inferences in Plaintiff's favor on a motion to dismiss. *Killingsworth*, 507 F.3d at 618.

[10] CDK argues that the complaint concedes a number of points demonstrating that CDK and Reynolds engaged in nothing more than permissible parallel conduct. [260, at 14.] For example, CDK argues that the fact that Reynolds's decision to close its DMS preceded CDKK's decision by several years demonstrates that there was no illicit agreement between Reynolds and CDK. [*Id.*] However, nothing prevented Reynolds from deciding to open its DMS. Indeed, given that Plaintiff alleges that Reynolds lost business to CDK as a result of its closed DMS, Reynolds had the incentive to do so. While CDK is free to argue that the purported concessions demonstrate that Reynolds and CDK merely engaged in parallel conduct,

evidence of an illegal conspiracy. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (recognizing "an admission by an employee of one of the conspirators" as direct evidence supporting a price-fixing case). The Court therefore rejects Defendant's argument that Plaintiff only has alleged parallel conduct insufficient to establish a horizontal conspiracy claim under Section 1. As Judge St. Eve noted in the *Authenticom* decision, accepting Defendant's argument that AutoLoop only has alleged parallel conduct "requires the Court to ignore well-pleaded allegations of fact (that the executives admitted the agreement), and then credit an inference in Defendants' favor (that the agreement did not exist because Reynolds had already engaged in integrator blocking) over a contrary one in [Plaintiff's] favor (that Reynolds agreed, for example, to escalate or enhance its blocking, or agreed not to go after CDK for its hostile access, in exchange for CDK's commitment to begin blocking). The Court cannot do that at [the motion to dismiss] stage." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 952.

Third, Defendant argues that Plaintiff fails to allege a horizontal conspiracy claim under a market-division theory. However, in making that argument, Defendant did not cite to any cases establishing what a plaintiff must allege to survive a motion to dismiss a market-division claim. In fact, Defendant does not cite to any cases addressing the necessary showing for such a claim. While it is clear that market-division agreements are agreements between "competitors to stay out of each other's territories[,]" *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 591 (7th Cir. 1998), it is not clear whether the agreements here fall within the scope of that rule. Neither party sufficiently addresses the relevant legal standards. Without the benefit of adequate briefing supported by relevant case law, the Court declines to rule on whether Plaintiff

---

the Court cannot simply ignore the well-pled allegations of a horizontal agreement at the motion to dismiss stage.

sufficiently has alleged a market-division claim. In the absence of a sufficient justification to make a ruling, the tie goes to the non-moving party and the claim survives.

## B.      Exclusive Dealing (Count II)

Defendant also argues that Plaintiff has not sufficiently alleged that Defendant engaged in exclusive dealing. "An exclusive dealing contract obliges a firm to obtain its inputs from a single source." *Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 46 (7th Cir. 1996). "The objection to exclusive-dealing agreements is that they deny outlets to a competitor during the term of the agreement." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 393 (7th Cir. 1984). Because of the procompetitive benefits of exclusive dealing (*e.g.*, increasing allocative efficiency, preventing free-riding), courts analyze exclusive dealing under the rule of reason. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 956-57. Plaintiff argues that it sufficiently has alleged that Defendant's contracts with vendors contain unlawful exclusive dealing provisions, adopting Judge St. Eve's analysis in the *Authenticom* case and referring to the briefing in *Cox Automotive, Inc, et al. v. CDK Global,* LLC, Case No. 18-cv-1058 (N.D. Ill.).

To the extent that Plaintiff seeks to bring an exclusive dealing claim based on Defendant's contract with vendors, the Court agrees that Plaintiff states a claim for exclusive dealing. Plaintiff alleges that "[a]s a condition of participating in CDK's 3PA data integration service, vendors must generally agree to use 3PA exclusively for all of the vendors' products and services." [194 (Am. Compl.), at ¶ 20; see also *id*. at ¶¶ 114-124.] Defendant argues that Plaintiff's exclusive dealing claim fails because 3PA is a "'managed interface' that is part of CDK's DMS, not a separate product." [260, at 19.] According to Defendant, there is no separate market for data integration services because the "'peculiar characteristics' of 3PA preclude any finding that it is a separate

product." [160 (Reply Br. in *Cox Automotive*), at 15.][11] However, Defendant fails fully to develop this argument. Although Defendant identifies two relevant factors for determining a product market (*i.e.*, "separate demand" and "the products peculiar characteristics and uses"), Defendant does not even discuss other relevant indicia such as "distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Of the two factors identified by Defendant, only one (*i.e.*, the products peculiar characteristics and uses) arguably support a finding of a separate product. The other relevant factors appear to weigh in favor of finding a separate market for data integration services.[12] For example, as Defendant repeatedly recognizes, it is not the dealers that purchase data integration services. Thus, there are distinct customers and distinct prices for the data integration services. Furthermore, based on the fact-intensive nature of the product-market inquiry, the issue is not properly resolved on a motion to dismiss. *Ploss v. Kraft Foods Grp., Inc.*, 197 F.Supp.3d 1037, 1070 (N.D. Ill. 2016) ("Courts should dismiss antitrust claims based on a market argument only when it is certain that the alleged relevant market clearly does not encompass all interchangeable substitute products"); accord *Avnet, Inc. v. Motio, Inc.*, 2015 WL 5307515, at *4 (N.D. Ill. Sept. 9, 2015) ("because market definition is a deeply fact-intensive inquiry, courts hesitate to grant

---

[11] Plaintiff incorporated certain briefing from *Cox Automotive, Inc, et al. v. CDK Global,* LLC, Case No. 18-cv-1058 (N.D. Ill.). [See, *e.g.*, 359. at 26.] In its reply, CDK similarly incorporated its briefing in that case. [See, *e.g.*, 376, at 19.] Because the parties incorporated certain arguments from the *Cox* matter, the Court references briefs from that case where appropriate.

[12] In the *Authenticom* decision, Judge St. Eve described the data-integration market and the DMS market as separate markets based on similar allegations. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 940. The Court sees no reason to change course based on the arguments raised by Defendant now, especially given that Plaintiff has alleged that Defendant itself treats its data-integration services as a separate product from its DMS. [See, *e.g.*, 194 (Am. Compl.), at ¶ 58 ("In its 2015 10-K, CDK described its data integration services as 'a stand-alone product' separate from 'the core Dealer Management System.'" (citation omitted)).]

motions to dismiss for failure to plead a relevant product market") (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001)).

Finally, Defendant argues that even if Plaintiff sufficiently alleges an exclusive dealing claim—which the Court concludes Plaintiff has with respect to Defendant's contract with vendors—Plaintiff fails to allege substantial foreclosure. [260, at 19.] "[E]xclusive dealing arrangements violate antitrust laws only when they foreclose competition in a substantial share of the line of commerce at issue[.]" *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737-38 (7th Cir. 2004) (citing *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 320-27 (1961)). Defendant argues that Plaintiff has not alleged substantial foreclosure because there are no allegations that Defendant's vendor or dealer contracts foreclosed Plaintiff from a substantial share of any market.

Plaintiff appears to concede that it has not been foreclosed from a substantial share of any market, but argues that the foreclosure of Authenticom from the data integration market caused an increase in prices and a reduction in output below competitive levels. [126 (Resp. Br. in *Cox Automotive*), at 19-20.] For example, Plaintiff alleges that Defendant's anticompetitive conduct dramatically raised integration fees for software vendors, often doubling or even tripling the price. [194 (Am. Compl.), at ¶¶ 126-139, 142-144.] In its reply, Defendant argues that Plaintiff fails sufficiently to allege that Authenticom was foreclosed from the data integration market. [160 (Reply. Br. in *Cox Automotive*), at 16 n.7.] However, Plaintiff alleges that Defendant and Reynolds together control approximately 75 percent of the DMS market by number of dealers and approximately 90 percent when measured by number of vehicles sold. [194 (Am. Compl.), at ¶ 10.] Defendant alone controls approximately 45 percent of the DMS market. [*Id.*] Plaintiff further alleges that "with the two dominant DMS providers agreeing to block independent

integrators, it would be impossible for competing data integrators to survive." [*Id*. at ¶ 104.] Indeed, vendors like Plaintiff are forced to pay supracompetitive prices for data integration services because they need to be able to service dealers who have CDK or Reynolds as their DMS providers. Vendors are likely only willing to pay such prices because Authenticom (the only other remaining data integrator) is foreclosed from competing for that business. These allegations raise a reasonable inference that Authenticom is foreclosed from competing in a substantial portion of the data-integration market. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 957 (concluding that similar allegations were sufficient to establish at the motion to dismiss stage that the "exclusive-dealing contracts [foreclosed] a substantial portion of the data-integration market"); see also *Pipe Fittings Direct Purchaser Antitrust Litig.*, 2013 WL 812143, at *19 (D.N.J. Mar. 5, 2013) ("The question of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line of commerce is a merits question not proper for the pleading stage."). Plaintiff therefore sufficiently has alleged an exclusive dealing claim based on Defendant's contract with vendors.

### C.     Rule of Reason

Defendant argues that, even assuming Plaintiff sufficiently alleges the kind of conduct that requires a rule of reason analysis under Section 1, its conduct rested on clear and important business justifications: the need to protect its system and the data on that system from cybersecurity threats and Defendant's desire to capitalize on its investment in its DMS infrastructure instead of letting third parties capture that value for themselves. However, whether challenged conduct has a procompetitive effect on balance so as to survive scrutiny under a rule-of-reason analysis is a factual issue for trial. *Cook Inc. v. Boston Sci. Corp.*, 2002 WL 335314, at *4 (N.D. Ill. Feb. 28, 2002) ("The rule of reason entails a complex inquiry into the surrounding circumstances that is not

susceptible to resolution on a motion to dismiss[.]"); *Watkins v. Smith*, 2012 WL 5868395, at *7 (S.D.N.Y. Nov. 19, 2012) ("The rule-of-reason inquiry requires, at the motion to dismiss stage, that the plaintiff identify the relevant market affected by the challenged conduct and allege an actual adverse effect on competition in the identified market." (citations omitted)).

Furthermore, Plaintiff specifically alleges that Defendant's security justification is pretextual. [194 (Am. Compl.), at ¶¶ 133-34, 151-60.] For example, Plaintiff alleges that "a top-level CDK executive admitted in private conversation with a vendor that the rhetoric around 'security' has 'little credibility' and is primarily designed to force vendors to use CDK for data integration." [*Id*. at ¶ 152.] Accepting all of Plaintiff's well-pleaded factual allegations and drawing all reasonable inferences in Plaintiff's favor, Plaintiff sufficiently has alleged that Defendant's proffered justification for the challenged conduct is pretextual.[13]

### D. Section 2 Claim (Count III)

#### 1. Brand Specific Aftermarkets

To prevail on its Section 2 claim, Plaintiff must demonstrate that is has monopoly power in the relevant market. Here, Plaintiff alleges that Defendant has monopolized a "brand-specific aftermarket" for data integration for dealers using Defendant's DMS.[14] [194 (Am. Compl.), at ¶ 82.] "In rare circumstances, a single brand of a product or service can constitute a relevant market for antitrust purposes." *PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010) (citation omitted). The seminal case setting forth under what circumstances such a claim is viable is *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, which held that a brand-

---

[13] The Supreme Court has recognized that whether a justification is a pretext can be evaluated under the rule of reason analysis. *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 297 (1985).

[14] AutoLoop argues that it "has adequately pleaded monopolization based on the same allegations found sufficient in the *Authenticom* [motion to dismiss decision]." [360, at 26.]

specific aftermarket can constitute a relevant market for antitrust purposes when customers effectively are "locked-in" that brand's market because of structural barriers and/or commercial realities (*e.g.*, high transaction costs for switching brands). 504 U.S. 451, 461-62 (1992). The Seventh Circuit has made clear, however, that firms with market power are not "forbidden to deal in complementary products[.]" *Schor v. Abbott Labs.*, 457 F.3d 608, 614 (7th Cir. 2006). Rather, what *Eastman Kodak* holds is that firms with market power cannot deal in complementary products in "ways that take advantage of costumers' sunk costs." *Id*. Courts therefore have found "that an *Eastman Kodak* claim depends on the consumer's unawareness of the supplier's aftermarket power and its terms when it purchased the primary-market product." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 962-63 (collecting cases); see also *Schor*, 457 F.3d at 614 (recognizing same).

Turning to the facts of this case, Plaintiff plausibly alleges an *Eastman Kodak* claim. Plaintiff alleges that dealers are "locked in" CDK's DMS. [194 (Am. Compl.), at ¶¶ 47-51.] In support of that assertion, Plaintiff alleges that "switching DMS providers presents significant logistical challenges and is highly disruptive to business operations. It can take a dealership over a year of preparation, staff training, and testing before a new DMS can be put into operation * * * The financial costs in terms of training and implementation are significant." [*Id*. at ¶ 48.] Indeed, Plaintiff alleges that Defendant's own CEO publicly has recognized that dealers are hesitant to switch DMSs because the process can take time and can be very difficult. [*Id*. at ¶ 49.]

Defendant argues that because of its contractual bars on third-party DMS access, dealers were aware of its aftermarket power and its terms when they purchased the contracted with CDK. [260, at 23.] However, Plaintiff repeatedly alleges that Defendant publicly took the position that it permitted access by third-party integrators. [194 (Am. Compl.), at ¶¶ 64-68.] For example,

Plaintiff alleges that "CDK's top executives have repeatedly made public statements that dealers may grant data integrators rights to access their DMS." [*Id*. at ¶ 66.] "Steve Anenen, CDK's longtime CEO, publicly stated that dealers have the right to grant third parties access to, and use of, their data. He told the industry publication Automotive News, 'We're not going to prohibit that or get in the way of that.'" [*Id*. (citation omitted).] He further stated, "I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it, when in fact it's really the data belonging to the dealer. As long as they grant permission, how would you ever go against that wish?" [*Id*. (citation omitted).] The amended complaint identifies similar statements made by other CDK executives. [See *id*. at ¶ 67.]

Defendant nonetheless argues that dealers could not be justified in relying on these representations given contrary language in their contracts with Defendant. [260, at 23.] In making this argument, Defendant cites to cases recognizing that "[a] party is not justified in relying on representations outside of or contrary to the written terms of a contract he or she signs when the signer is aware of the nature of the contract and had a full opportunity to read it." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003). However, it is not apparent from the face of the amended complaint that Defendant's contracts with dealers contradict these representations. Although Defendant's contract with dealers permitted dealers to authorize its agents to access the DMS [194 (Am. Compl.), at ¶¶ 65, 72, 88], it is not clear whether third-party data integrators were acting as the dealers' agents. Defendant argues that Plaintiff has not plausibly alleged that the data integrators are the agents of dealers [260, at 9], but Plaintiff need not anticipate factual defenses that Defendant may raise regarding Plaintiff's claim. *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012) ("Complaints need not anticipate defenses and attempt to defeat them." (citing *Gomez v. Toledo*, 446 U.S. 635 (1980)). Although discovery ultimately may

demonstrate that data integrators were contractually prohibited from accessing Defendant's DMS, based on the well-pleaded allegations in the amended complaint it is plausible that dealers believed that they could authorize third-party integrators to access their DMSs, especially in light of public statements by CDK executives indicating that dealers had such authority.[15]

Defendant CDK also argues that Plaintiff's allegation that vendors are prohibited from informing dealers of how much Defendant's integration services cost does nothing to support Plaintiff's *Eastman Kodak* claim because—according to Defendant—that allegation is contradicted by Plaintiff's allegations that dealers are aware of the price differences between 3PA and third-party data integrators. Judge St. Eve reached the opposite conclusion in *Authenticom*, concluding that it is reasonable to infer from such an allegation "that dealers cannot price shop for 'lifecycle'—a fact that the *Eastman Kodak* court found critical." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 963. In reaching that conclusion, Judge St. Eve noted that a few vendors might share pricing information despite the contractual prohibition, but still found that "[t]he proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers." *Id.* (quoting *Eastman Kodak*, 504 U.S. at 482) (internal quotation marks omitted). Defendant argues that the allegations in this case differ from the allegations in *Authenticom*, because the allegations here "tell a story that dealers, industry-wide, are concerned about increased prices for vendor applications on so called 'closed' DMSs." [260, at 24.] However, the fact that dealers know the price of vendor applications and are unwilling

---

[15] CDK argues that Judge St. Eve's opinion in *Authenticom* is not pertinent here because she "did not consider the principle that contracting parties—particularly sophisticated businesses like AutoLoop—are charged with knowing the terms of their contracts." [260, at 23 (citing *Cromeens, Holloman, Sibert, Inc.*, 349 F.3d at 394).] Although Judge St. Eve did not specifically cite to cases holding that a party cannot rely on representations outside of or contrary to the written terms of a contract, she did consider the effect of Defendant's contract with dealers in considering whether the dealers were "locked in" after purchasing CDK's DMS. See *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 963.

to fully absorb increased costs for data integration services does not mean that dealers industry-wide are aware of the exact cost of data integration services, even if they are concerned about increasing costs and the reduced efficiency of vendor applications. Accordingly, Plaintiff plausibly has alleged an *Eastman Kodak* claim.[16]

### 2. Anticompetitive Conduct

Defendant argues that Plaintiff fails to allege that it engaged in any anticompetitive conduct. To state a claim for monopolization under Section 2, a plaintiff must allege that that defendant engaged in predatory or anticompetitive conduct. *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011) (holding that a claim for monopolization under Section 2 requires that the defendant "willfully acquired or maintained that power by means other than the quality of its product, its business acumen, or historical accident"). Here, Plaintiff does not dispute that it cannot bring a Section 2 claim based on any purported refusal to deal. That position is supported by ample case law recognizing that there is "no antitrust duty to deal * * * in selling services to [ ] competitors in the retail market." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 955 (citing *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 450 (2009)); see also *Schor.*, 457 F.3d at 610 ("[A]ntitrust law does not require monopolists to cooperate with rivals by selling them products that would help the rivals to compete. Cooperation is a *problem* in antitrust, not one of its obligations." (internal citation omitted)); *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1025 (7th Cir. 2017) ("Even monopolists are almost never required to assist

---

[16] The Court notes that the complaint indicates that Defendant later revoked any authorization. Still, according to the allegations in the complaint, dealers already using Defendant's DMS were effectively locked in to their purchase.

their competitors[.]" (citation omitted)).  Thus, to the extent Plaintiff seeks to bring a Section 2 claim based on any purported refusal to deal, Plaintiff's Section 2 claim fails.

Plaintiff argues, however, that its allegations of Defendant's horizontal conspiracy with Reynolds and its exclusive dealing constitute exclusionary conduct sufficient to state a claim under Section 2.  [360, at 27.]  A defendant violates "Section 2 of the Sherman Act * * * [if it] 'has acquired or maintained his strategic position, or sought to expand [its] monopoly, or expanded it by means of those restraints of trade which are cognizable under [Section] 1.'" *Fin. & Sec. Prods. Ass'n v. Diebold, Inc.*, 2005 WL 1629813, at *4 (N.D. Cal. July 8, 2005) (quoting *United States v. Griffith*, 334 U.S. 100, 106 (1948)); see also *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, 2013 WL 3214983, at *7 (N.D. Ind. Mar. 13, 2013) ("Where defendant has engaged in unlawful restraint of trade that would independently violate Section 1 of the Sherman Antitrust Act, it is well established that it also violates Section 2 if it acquires or maintains a monopoly by means of that restraint of trade." (citing *Griffith*, 334 U.S. at 106)).  Defendant argues that because Plaintiff fails to state a claim under Section 1, its Section 2 claim also should be dismissed. Because Plaintiff's Section 1 claims survive, the Court denies Defendant's motion to dismiss Plaintiff's Section 2 claims for failure to allege exclusionary conduct.

### E.    Florida State-Law Claims

CDK argues that the dismissal of Plaintiff's Sherman Act claims would be fatal to its parallel claim under the Florida Antitrust Act.  "Federal and Florida antitrust laws are analyzed under the same rules and case law."  *All Care Nursing Serv., Inc. v. High Tech Staffing Servs.*, Inc., 135 F.3d 740, 745 n.11 (11th Cir. 1998).  Likewise, the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") defines "deceptive and unfair practices" to include "violations of '[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition,

or unfair, deceptive, or unconscionable acts or practices.'" *Cross v. Point & Pay, LLC*, 274 F. Supp. 3d 1289, 1296 (M.D. Fla. 2017) (quoting Fla. Stat. Ann. § 501.203(3)(c)).  Because Plaintiff's Sherman Act claims survive, Defendant's motion to dismiss Plaintiff's parallel state-law claims is denied.

## IV.     Conclusion

For the reasons set forth above, CDK's motion to dismiss [259] AutoLoop's amended complaint is denied.


Date: January 25, 2019                                  _____
                                                                 Robert M. Dow, Jr.
                                                                 United States District Judge