# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN RE DEALER MANAGEMENT SYSTEMS   )
ANTITRUST LITIGATION, MDL 2817    )  Case No. 18-cv-864
                 )
_____ )  Judge Robert M. Dow, Jr.
                 )
This document relates to:       )
                 )
*Cox Automotive, Inc, et al. v. CDK Global, LLC,* )
Case No. 18-cv-1058 (N.D. Ill.)     )
                 )

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant CDK Global, LLC's motion to dismiss [71] the complaint filed by Plaintiffs (1) Cox Automotive, Inc., (2) Autotrader.com, Inc., (3) Dealer Dot Com, Inc., (4) Dealertrack, Inc., (5) HomeNet, Inc., (6) Kelley Blue Book Co., Inc., (7) vAuto, Inc., (8) VinSolutions, Inc., and (9) Xtime, Inc. For the reasons set forth below, the motion [71] is granted in part and denied in part.

## I. Background[1]

Plaintiff Cox Automotive, Inc. ("Cox Automotive"), along with its subsidiaries (collectively, "Plaintiffs"), bring this action to remedy and enjoin purported ongoing antitrust and state law violations by Defendant CDK Global, LLC ("CDK" or "Defendant"). [Compl., at ¶ 1.][2] Plaintiffs are vendors that provide automotive software solutions, including well-known applications like AutoTrader, Dealer.com, and Kelley Blue Book. [*Id*. at ¶¶ 6-7.] The data that

---

[1] For the purposes of this motion to dismiss, the Court accepts as true all of Plaintiffs' well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

[2] Unless otherwise noted, all references to the complaint are to the complaint filed in Case No. 18-cv-1058. [*Cox Automotive, Inc, et al. v. CDK Global, LLC*, Case No. 18-cv-1058, Dkt. 1 (N.D. Ill.).]

dealers generate in operating their businesses—such as sales, inventory, service, and customer information—is the lifeblood of these applications. [*Id*. at ¶ 8.] Dealers store this data on a database that is part of separate enterprise software known as a Dealer Management System ("DMS"). [*Id*. at ¶ 48.] Virtually every franchised new car dealership in the United States now uses a DMS. [*Id*. at 50.] While dealers generate much of their data outside of the DMS in separate software solutions, as a practical matter, a substantial portion of dealer data is stored on the DMS. [*Id*.]

## A.    The DMS Market

Defendant CDK and third-party The Reynolds and Reynolds Company ("Reynolds") provide DMS software and services to automobile dealerships throughout the United States. [*Id*. at ¶ 41.] Defendant and Reynolds together control approximately 75 percent of the DMS market when measured by number of dealers and approximately 90 percent when measured by number of vehicles sold. [*Id*. at ¶ 10.] Defendant alone controls approximately 45 percent of the DMS market. [*Id*.] Switching DMS providers presents significant logistical challenges and is highly disruptive to business operations. [*Id*. at ¶ 57.] It can take a dealership more than a year of preparation, staff training, and testing before a new DMS can be put into operation, all while the dealership is trying to sell and service cars. [*Id*.] The financial costs in terms of training and implementation are significant. [*Id*.] Defendant's own CEO publicly has recognized that dealers are hesitant to switch DMS providers because the process can take time and can be very difficult. [*Id*. at ¶ 58.]

## B.    The Dealer Data Integration Market

The dealer data integration market consists of services that provide access to dealer data on the DMS, including Defendant's and Reynolds's own in-house data integration services. [*Id*.

at ¶ 65.]  Data integrators may also provide value-enhancing services, such as putting data from different DMSs in a uniform format, performing data hygiene, and allowing granular control by dealers over which vendors receive which data.  [*Id*.]  Before a data integrator accesses dealer data on a DMS, they enter into contracts with dealers authorizing them to access the dealers' data.  [*Id*. at ¶ 66.]

Vendors of software applications like Plaintiffs rely on data integrators to provide them with access to dealer data.  [*Id*. at ¶¶ 62-65.]  There once was a competitive market for data integration services.  [*Id*. at ¶ 79.]  Independent data integrators like Authenticom, Inc. ("Authenticom") competed with the offerings provided by Defendant and Reynolds.  [*Id*.]  Defendant welcomed that competition, stating: "We don't tell the dealer, if someone wants access to their data, they have to come to [CDK] to gain access to the data.  It's ultimately the dealer's data."  [*Id*. at ¶ 76.]  In competition with independent integrators, Defendant provides data integration services through its Third-Party Access ("3PA") program, and Reynolds does the same through its Reynolds Certified Interface ("RCI") program.  [*Id*. at ¶¶ 80, 87.]  Defendant itself owns two independent integrators—DMI and IntegraLink—that provide data integration services across DMS platforms, including at one time for Reynolds dealers.  [*Id*. at ¶¶ 83, 86.]

Defendant's top executives have repeatedly made public statements that dealers may grant data integrators rights to access their DMS.  [*Id*. at ¶ 75.]  For example, "Steve Anenen, CDK's longtime CEO, publicly stated that dealers have the right to grant third parties access to, and use of, their data.  He told the industry publication Automotive News, 'We're not going to prohibit that or get in the way of that.'"  [*Id*. (citation omitted).]  He further stated, "I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it, when in fact it's really the data belonging to the dealer.  As long as they grant

permission, how would you ever go against that wish?" [*Id*. (citation omitted).] The complaint identifies similar statements made by other CDK executives. [See, e.g., *id*. at ¶ 76.]

Consistent with those statements, prior to 2015, Defendant publicly touted its "open" system as one of the competitive advantages of its DMS. [*Id*. at ¶ 96.] Defendant issued press releases stressing that it "believes in the fair competitive environment and does not use its leverage through supply of the dealer management system to reduce competition through the restriction of data access." [*Id*.] By contrast, in 2009, Reynolds began selectively blocking third-party access to its DMS, and increased its blocking efforts in 2013. [*Id*.] Despite its blocking efforts, Defendant continued to hostilely access Reynolds's DMS. Defendant was successful in marketing its "open" DMS as a competitive advantage over the Reynolds DMS. [*Id*. at ¶ 97.] As a result, Defendant very slowly gained market share from Reynolds. [*Id*.] Reynolds's DMS market share declined from about 40 percent to 30 percent, with most dealers leaving Reynolds for Defendant. [*Id*.]

### C.    Alleged Conspiracy

In 2015, Defendant "closed" its system, coming as a complete surprise to Plaintiffs and others in the industry. [*Id*. at ¶ 98.] Before 2015, Plaintiffs used 3PA, DMI, IntegraLink, Superior Integrated Solutions, Inc. ("SIS"), and other commercial data integrators to access data for dealers using Defendant's DMS. [*Id*.] But after Defendant elected to close its system, Defendant made every effort to ensure that Plaintiff and other vendors could only integrate with dealer data through Defendant's 3PA program. [*Id*.] Plaintiffs contend that Defendant's change to a "closed" DMS was the result of a horizontal agreement with Reynolds.

In early 2015, Defendant and Reynolds entered into three written agreements that are central to this lawsuit. One of these agreements is a "Data Exchange Agreement"—also referred to as a "wind-down" agreement—pursuant to which Defendant agreed to wind down its data

integration business on the Reynolds DMS, with Reynolds promising not to block Defendant's access to the Reynolds system during the wind-down period. [*Id.* at ¶ 106.] During that period, Reynolds agreed that Defendant could continue to extract dealer data just as it had before, using login credentials provided by the dealer. [*Id.*] As for other independent integrators, Defendant and Reynolds agreed that they would not assist any other party in accessing the other's DMS. [*Id.*] Defendant and Reynolds also agreed that they themselves would no longer access data on each other's DMS. [*Id.* at ¶ 107.] Defendant also agreed to coordinate the transition of Defendant's clients that needed access to data on Reynolds's DMS to Reynolds. [*Id.* at ¶ 108.]

The other two written agreements between Defendant and Reynolds "granted reciprocal access" to each other's data integration products—via the 3PA and RCI programs, respectively. [*Id.* at ¶ 112.] Under the agreements, Defendant's proprietary products and services could integrate with data on Reynolds's DMSs via RCI, and vice versa. [*Id.*] Reynolds received five free years of 3PA integration from Defendant, while Defendant had to pay for the data integration services from Reynolds. [*Id.*] Moreover, by signing up for 3PA, Reynolds agreed that it would integrate with data on Defendant's DMSs exclusively through 3PA, and not obtain data for its products and services from anywhere else. [*Id.*] Defendant agreed to the same in its integration contract with Reynolds for the RCI program. [*Id.*]

In addition to the written agreements, senior CDK and Reynolds executives have admitted that they agreed to restrict access to dealer data and destroy data integrators like Authenticom, SIS, and others. [*Id.* at ¶ 113.] During a May 2015 phone conversation with Authenticom's founder and CEO Steve Cottrell, Reynolds's Vice President of Data Services Robert Schaefer said that Reynolds had "made agreements with the other major DMS providers"—there only is CDK—"to support each other's third-party access agreements and to block independent integrators such as

Authenticom." [*Id*.] Mr. Schaefer said that Authenticom should wind down its operations and leave the market. [*Id*.] On April 3, 2016, at an industry convention in Las Vegas, Defendant's former Vice President of Product Management Dan McCray stated that Defendant and Reynolds had agreed to "[l]ock [Authenticom] and the other third parties out," and that they were "working collaboratively to remove all hostile integrators from our DMS system." [*Id*. at ¶ 114.]

Defendant's public position has been that it closed its DMS as part of a cybersecurity initiative. [*Id*. at ¶ 150.] Plaintiffs acknowledge Defendant's claimed "security" justification but argue that it is pretextual. [*Id*. at ¶¶ 170-78.] According to Plaintiffs, a top-level CDK executive admitted in private conversation with a vendor that the rhetoric around "security" has "little credibility" and is primarily designed to force vendors to use Defendant for data integration. [*Id*. at ¶ 171.] Plaintiffs therefore claim that Defendant "closed" its DMS pursuant to its agreements with Reynolds in order to decrease competition in the data integration market, resulting in dramatically increased prices for data integration services. [*Id*. at ¶ 150-56.] For example, Plaintiffs allege that in July of 2015, Defendant proposed massive price increases of up to 900 percent. [*Id*. at ¶ 152.] Plaintiffs allege that price increases for data integration services have no corresponding increase in functionality or quality of service. [*Id*. at ¶ 28.] Given that Defendant's open system resulted in lower priced and better-quality data integration services, dealers preferred its "open" DMS. [*Id*. at ¶¶ 119-21, 144.] Dealers have openly complained about Defendant's decision to switch to a "closed" DMS. [*Id*. at ¶¶ 119-21.]

### D.    Alleged Exclusive Dealing

Shortly after entering into the Data Exchange Agreement, Defendant began "renegotiating" its contracts with vendors for 3PA access (actually, cancelling existing contracts and forcing vendors like Plaintiffs to sign new contracts). [*Id*. at ¶ 122.] Consistent with its decision to close

its DMS, Defendant imposed exclusive dealing provisions that required vendors to use 3PA alone to integrate with data on Defendant's DMSs for all of their products and services. [*Id*.] CDK also took the new position that its existing contracts with dealers prohibited allowing data integrators to access its DMS. [*Id*.] When Plaintiffs pushed back on these changes, Defendant said there would be "little flexibility" because Defendant was going to impose the same changes on every vendor. [*Id*. at ¶ 124.] After Defendant began publicly threatening to terminate Plaintiffs' access to data on CDK's DMS, Plaintiffs finally agreed to Defendant's new 3PA terms. [*Id*. at ¶¶ 125, 129.] Plaintiffs allege, however, that they agreed to Defendant's new 3PA terms in reliance (at least in part) on Defendant's representation that no other vendor would pay less than Plaintiffs for integration services in the 3PA program and that Plaintiffs would receive Most Favored Nation status. [*Id*. at ¶ 126-29.]

Defendant also forced many of its dealers to extend their contracts by years by threatening to terminate their DMS service in less than 60 days unless they entered into years-long contracts instead of the month-to-month contracts previously used by many of the dealers. [*Id*. at ¶ 59.] Plaintiffs allege that dealers had no choice but to sign the lengthy extensions given the impossibility of switching DMS providers in such a short amount of time. [*Id*.]

## II. Legal Standard

To survive a Federal Rule of Civil Procedure ("Rule") 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (alteration in original). Second, the factual

allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly,* 550 U.S. at 558. In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts as true all of Plaintiffs' well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

### III.    Analysis

#### A.    Horizontal Conspiracy (Count I)

Plaintiffs brings a Section 1 horizontal conspiracy claim against Defendant based on agreements made between Defendant and Reynolds that Plaintiffs contend were designed to eliminate competition in the provision of dealer data integration services by "block[ing] all third-party access to their respective DMS[s]." [Compl., at ¶ 182.] Under established law, "joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle" are *per se* illegal. *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 936 (7th Cir. 2000) (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985)); see also *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959). In this case, Plaintiffs argue that Defendant conspired with Reynolds to (1) boycott and block independent data integrators such

as Authenticom, and (2) divide the market for data integration services between each other. Defendant argues that Plaintiffs' horizontal conspiracy claim fails for a number of reasons.

First, Defendant argues that Plaintiffs are wrong about what the challenged agreements provide. Focusing on the written agreements between Defendant and Reynolds, Defendant argues that the "agreements effect only a wind-down of [Defendant's] hostile access to Reynold's DMS[.]" [72, at 13.] Although the 2015 written agreements between Defendant and Reynolds do not require that Defendant and Reynolds block third-party access on their own DMSs, as Judge St. Eve noted, the agreements do "effectively require that CDK stop hostile access of Reynolds DMSs (for a period, at least) and, more importantly, expressly prohibit [Defendant and Reynolds] from assisting in the hostile access of one another's DMSs." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 951. "Such a partial ceasefire and mutual forbearance between two rivals would make sense if * * * Defendants sought to 'support' one another's integration services to the exclusion of third-party integrators from the competition." *Id.* Furthermore, the alleged agreements between Defendant and Reynolds are not limited to the 2015 written agreements. Plaintiffs also allege that Defendant's executives admitted "that the companies agreed to block and thereby destroy third-party data integrators." [Compl., at ¶ 17.] "Defendants conspired to block integrators from accessing necessary data from the dealers—meaning, 'relationships' integrators 'need'—by (among other things) withholding authorization and disabling third-party credentials, so that Defendants, ultimately, could charge more for their integration services." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 952. Such an agreement to block data integrators from the market plausibly is anticompetitive. *Id.*

Second, Defendant argues that Plaintiffs' Section 1 horizontal conspiracy claim fails because Plaintiffs merely have alleged parallel conduct. "Tacit collusion, also known as conscious

parallelism, does not violate section 1 of the Sherman Act. Collusion is illegal only when based on agreement." *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015). Defendant therefore argues that Plaintiffs' Section 1 claims fail because Plaintiffs fail to identify evidence that tends "to exclude the possibility" of independent conduct. [72, at 14 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (internal quotation marks omitted)).] Although the Supreme Court has held "that a plaintiff must present evidence showing that defendants had a 'rational economic motive to conspire' and evidence 'that tends to exclude the possibility' of independent conduct to survive summary judgment[,]" *In re Dealer Mgmt. Sys. Antitrust Litig.,* 313 F. Supp. 3d at 953 (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 588), courts have held that such a showing is not necessary at the pleading stage. *Id.* (collecting cases).

Regardless, Plaintiffs plausibly have alleged a motive to conspire. Plaintiffs allege that dealers preferred "open" DMSs and that several dealers complained when Defendant began blocking data integrators. [Compl., at ¶¶ 119-21.] It therefore is reasonable to infer that Defendant and Reynolds were motivated to conspire with each other so that they could close their systems to data integrators without fear that their customers would turn to another provider.[3] *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 953. Furthermore, accepting Defendant's argument that Plaintiffs only have alleged parallel conduct would require that the Court ignore well-pleaded

---

[3] Defendant argues that Plaintiffs concede a number of points demonstrating that Defendant and Reynolds engaged in nothing more than permissible parallel conduct. [72, at 14.] For example, Defendant argues that the fact that Reynolds's decision to close its DMS preceded Defendant's decision to do the same by several years demonstrates that there was no illicit agreement between Reynolds and Defendant. [*Id.*] However, nothing prevented Reynolds from deciding to open its DMS. Indeed, given that Plaintiffs allege that Reynolds lost business to Defendant as a result of its closed DMS, Reynolds had the incentive to do so. While Defendant is free to argue that the purported concessions demonstrate that Defendant and Reynolds merely engaged in parallel conduct, the Court cannot ignore the well-plead allegations establishing a horizontal agreement and must draw all reasonable inferences in Plaintiffs' favor on a motion to dismiss. *Killingsworth*, 507 F.3d at 618.

allegations that Defendant's executives admitted to the conspiracy. Such admissions are direct evidence of an illegal conspiracy. *In re Text Messaging Antitrust Litig.*, 630 F.3d at 628 (recognizing "an admission by an employee of one of the conspirators" as direct evidence supporting a price-fixing case).

Third, Defendant argues that, to the extent Plaintiffs' horizontal conspiracy claim is based on a purported group boycott, Plaintiffs' claim is a "conceptually flawed" because Defendant does not "deal" with data integrators directly. Rather, data integrators are non-contracting third parties who bear no accountability to Defendant or Reynolds for undermining their systems' security and performance. Still, Plaintiffs allege that Defendant conspired with Reynolds to block data integrators from accessing necessary data from the dealers by withholding authorization to access their respective DMSs and by disabling third-party credentials, thereby inhibiting the relationship between the data integrators and the dealers. This is enough to establish anticompetitive conduct under Section 1. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. at 952; see also *Toys "R" Us, Inc.*, 221 F.3d at 936 ( recognizing that "joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle" are *per se* illegal (quoting *Nw. Wholesale Stationers, Inc.*, 472 U.S. at 294)).

Fourth, Defendant argues that Plaintiffs' horizontal conspiracy claim essentially amounts to "refusal to deal" claim, and a refusal to deal almost never amounts to an antitrust violation. However, *concerted* refusals to deal have long been forbidden under antitrust law. *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959); see also *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608 n.38 (1985) ("In considering the competitive effect of [a firm's] refusal to deal or cooperate * * * it is not irrelevant to note that similar conduct carried

out by the concerted action of three independent rivals with a similar share of the market would constitute a *per se* violation of § 1 of the Sherman Act."). As discussed above, Plaintiffs sufficiently have alleged concerted conduct, not just parallel conduct.

Finally, Defendant argues that—to the extent Plaintiffs' horizontal conspiracy claim is based on a market-division theory—Plaintiffs fail to allege that Defendant and Reynolds entered into an agreement to divide any market. Plaintiffs argue that they sufficiently have alleged such an agreement because their allegations establish that Defendant and Reynolds agreed that Defendant would be the sole provider of data integration services for dealers using Defendant's DMS and that Reynolds would be the sole provider of integration services for dealers using Reynolds's DMS. A market-division agreement is an agreement amongst competitors "to stay out of each other's territories." *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 591 (7th Cir. 1998). Market-division agreements are *per se* illegal, *United States v. Sealy, Inc.*, 388 U.S. 350, 358 n. 5 (1967) (citation omitted), meaning that they fall within the category of agreements that "because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). The Court sees no reason for the inclusion of an agreement to stop unauthorized access of a competitor's computer systems in that category. Indeed, Plaintiffs do not cite to—and the Court is not aware of—any cases treating the servicing and/or use of a competitor's product as a "territory" for the purposes of a market-division agreement. The Court therefore grants Defendant's motion to dismiss Plaintiffs' horizontal

conspiracy claim to the extent that it is based on a market-division theory but denies Defendant's motion to dismiss Plaintiffs' horizontal conspiracy claim in all other respects.[4]

## B. Exclusive Dealing (Count II)

Defendant also argues that Plaintiffs have not sufficiently alleged that Defendant engaged in exclusive dealing. "An exclusive dealing contract obliges a firm to obtain its inputs from a single source." *Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 46 (7th Cir. 1996). "The objection to exclusive-dealing agreements is that they deny outlets to a competitor during the term of the agreement." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 393 (7th Cir. 1984). Because of the procompetitive benefits of exclusive dealing (*e.g.*, increasing allocative efficiency, preventing free-riding), courts analyze exclusive dealing claims under the rule of reason. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 956-57. Plaintiffs argue that Defendant has engaged in exclusive dealing by preventing dealers and vendors (such as Plaintiffs) from working with independent data integrators (such as Authenticom).

To the extent that Plaintiffs seek to bring an exclusive dealing claim based on Defendant's contracts with dealers, Plaintiffs fail to state a claim. Plaintiffs do not allege or even argue that Defendant requires dealers to purchase and use its DMS exclusively, which is necessary to state a claim for exclusive dealing. *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 2015 WL 5693735, at *12 (N.D. Ill. Sept. 28, 2015) (dismissing exclusive dealing claim where there was "no exclusivity").

---

[4] CDK also argues that Plaintiffs' market-division claim fails because Plaintiffs do not allege a market-division agreement "among competitors at the same market level[.]" [72, at 15-16 (quoting *Cal. ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1137 (9th Cir. 2011).] However, Defendant does not identify what is necessary to make such a showing. Here, Plaintiffs allege that Reynolds and CDK were both competitors in the data integration market. [See, *e.g.*, Compl., at ¶ 2.] Plaintiffs further allege that Defendant and Reynolds each provide data integration services for their respective DMSs. Without an explanation by Defendants as to why these allegations are insufficient, the Court declines to address this undeveloped argument at this time.

To the extent that Plaintiffs seek to bring an exclusive dealing claim based on Defendant's contract with vendors, however, Plaintiffs state a claim for exclusive dealing. Plaintiffs allege that "[a]s a condition of participating in CDK's 3PA data integration service, vendors must generally agree to use 3PA exclusively for all of the vendors' products and services." [Compl., at ¶ 20; see also *id*. at ¶¶ 122-23, 132-34.] Defendant argues that Plaintiffs' exclusive dealing claim fails because 3PA is a "'managed interface' that is part of CDK's DMS, not a separate product." [160, at 15.] According to Defendant, there is no separate market for data integration services because the "peculiar characteristics" of 3PA "preclude any finding that it is a separate product." [*Id*.] However, Defendant fails fully to develop this argument. Although Defendant identifies two relevant factors for determining a product market (*i.e.*, "separate demand" and "the products peculiar characteristics and uses"), Defendant does not even address other relevant factors such as "distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Of the two factors identified by Defendant, only one (*i.e.*, the products peculiar characteristics and uses) arguably support a finding of a separate product. The other relevant factors appear to weigh in favor of finding a separate market for data integration services.[5] For example, as Defendant repeatedly recognizes, it is not the dealers that purchase data integration services. There are distinct customers and distinct prices for data integration services. Furthermore, based on the fact-intensive nature of the product-market inquiry, the issue generally is not properly resolved on a motion to dismiss. *Ploss v. Kraft Foods Grp., Inc.*, 197 F.Supp.3d 1037, 1070 (N.D. Ill. 2016) ("Courts should dismiss antitrust claims

---

[5] In the *Authenticom* decision, Judge St. Eve described the data-integration market and the DMS market as separate markets based on similar allegations. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 940. The Court sees no reason to change course based on Defendant's current arguments, especially given that Plaintiffs have alleged that Defendant itself treats its data-integration services as a separate product from its DMS. [See, *e.g.*, Compl., at ¶ 67 ("In its 2015 10-K, CDK described its data integration services as 'a stand-alone product' separate from 'the core Dealer Management System.'" (citation omitted)).]

based on a market argument only when it is certain that the alleged relevant market clearly does not encompass all interchangeable substitute products"); accord *Avnet, Inc. v. Motio, Inc.*, 2015 WL 5307515, at *4 (N.D. Ill. Sept. 9, 2015) ("[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market") (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001)) (alteration in original)).

Finally, Defendant argues that even if Plaintiffs sufficiently allege an exclusive dealing claim—which the Court concludes Plaintiffs have done with respect to Defendant's contract with vendors—Plaintiffs fail to allege substantial foreclosure. [72, at 21.] "[E]xclusive dealing arrangements violate antitrust laws only when they foreclose competition in a substantial share of the line of commerce at issue[.]" *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737-38 (7th Cir. 2004) (citing *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 320-27 (1961)). Defendant argues that Plaintiffs have not alleged substantial foreclosure because (1) there are no allegations that Defendant's vendor contracts foreclosed Plaintiffs from a substantial share of any market, and (2) any argument that hostile integrators are excluded by the contracts "would fail because hostile integrators are still able to deal with DMS providers covering a sizeable portion of the market for car dealership DMS services." [72, at 21.] In its response brief, Plaintiffs appear to concede the former argument, focusing on allegations that the foreclosure caused by the agreements raised prices for data integration services and therefore reduced output below competitive levels. Specifically, Plaintiffs allege that Defendant's anticompetitive conduct dramatically raised integration fees for software vendors, often doubling or even tripling the price. [Compl., at ¶¶ 149-155, 157, 161.]

Defendant argues that Plaintiffs lack antitrust standing to challenge the foreclosure of independent integrators such as Authenticom, but Defendant does not cite to any authority for that

proposition.  Defendant therefore has waived this argument by failing fully to develop it.[6]  *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived[.]" (citations omitted)).  In its reply, Defendant identifies specific factual allegations regarding the foreclosure of hostile integrators it contends are lacking in the complaint. [160, at 16 n.7.]

These belated arguments are not persuasive.  With respect to Defendant's antitrust standing argument, as a purchaser of data integration services, Plaintiffs have antitrust standing to challenge anticompetitive conduct resulting in increased prices for such services.  *Warner Mgmt. Consultants, Inc. v. Data Gen. Corp.*, 545 F. Supp. 956, 963 (N.D. Ill. 1982) ("It is well-settled that direct purchasers of a product the price of which has been inflated by anticompetitive conduct have standing to sue under the antitrust laws." (collecting cases)).  Here, Plaintiffs allege that they were forced to pay increased fees for data integration services.  [Compl., at ¶¶ 149-155, 157.]

With respect to Defendant's argument regarding the sufficiency of Plaintiffs' allegations of foreclosure, Plaintiffs sufficiently have alleged that the exclusive-dealing contracts foreclose a substantial portion of the data-integration market, resulting in increased prices.  CDK and Reynolds together control approximately 75 percent of the DMS market by number of dealers and approximately 90 percent when measured by number of vehicles sold.  [Compl., at ¶ 10.]  CDK alone controls approximately 45 percent of the DMS market.  [*Id*.]  Plaintiffs further allege that "with the two dominant DMS providers agreeing to block independent integrators, it would be

---

[6] In its opening brief, Defendant merely asserts that "it is doubtful that [Plaintiffs] have standing" to challenge the exclusion of data integrators.  [72, at 21.]  Defendant does not, however, affirmatively argue the point.  Instead, Defendant asserts that an exclusive dealing claim based on the foreclosure of hostile integrators would fail because hostile integrators still were able to deal with DMS providers covering a sizeable portion of the market for car dealership DMS services.  [*Id*.]  Still, Defendant does not provide any authority or factual support for that assertion.

impossible for competing data integrators to survive." [*Id.* at ¶ 104.] Indeed, vendors like Plaintiffs are forced to pay supracompetitive prices for data integration services because they need to be able to service dealers who have CDK or Reynolds as their DMS providers. Vendors are likely only willing to pay such prices because Authenticom (the only other remaining data integrator) is foreclosed from competing for that business. These allegations raise a reasonable inference that Authenticom is foreclosed from competing in a substantial portion of the data-integration market. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 957 (concluding that similar allegations were sufficient to establish that the "exclusive-dealing contracts [foreclosed] a substantial portion of the data-integration market"); see also *Pipe Fittings Direct Purchaser Antitrust Litig.*, 2013 WL 812143, at *19 (D.N.J. Mar. 5, 2013) ("The question of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line of commerce is a merits question not proper for the pleading stage."). Plaintiffs therefore sufficiently have alleged an exclusive dealing claim based on Defendant's contract with vendors.

## C. Unlawful Tying (Count III)

Defendant argues that Plaintiffs' Section 1 tying claim fails because such a claim requires that the buyer of the tying product and the tied product be the same. "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-62 (1992) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958)). "Such an arrangement violates § 1 of the Sherman Act if the seller has appreciable economic power in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 832 (7th Cir. 2014) (quoting *Eastman Kodak*, 504 U.S. at 462)

(internal quotation marks omitted).  "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all."  *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), abrogated on other grounds by *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

Here, Defendant argues that Plaintiffs' tying claim fails because the dealers buy the tying product (*i.e.*, the DMS) but not the tied product (*i.e.*, integration services).  Plaintiffs argue that because dealers pay a portion of the integration fees (which are passed on by the vendors) and make the purchasing decision for both the DMS and the integration service, dealers functionally are the purchasers of both the tied and tying products.  In support of that argument, Plaintiffs cite to *Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346, 1354 (7th Cir. 1982).  In that case, the Seventh Circuit noted that a patient might not be the real purchaser of anesthesiology services "[b]ecause the patient generally takes no part in the selection of a particular anesthesiologist" and "because the expense of anesthesia services to the patient is ordinarily at least partially insured or otherwise payable by a third party[.]"  *Id*. at 1354.  However, the court in *Dos Santos* also noted that the patient does not make "*any* significant economic decision" in that regard.  *Id*. (emphasis added).

Although Plaintiffs allege that a vendor must receive authorization from the dealer before a data integrator can access the dealer's data, this does not establish that vendors such as Plaintiffs do not make any significant economic decision in selecting data integration services.  Nor does the fact that some costs are passed on to dealers establish that the dealers are the actual purchasers of the data integration services.  *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 961.  Plaintiffs reliance on *Dos Santos*, which was not even a tying case, therefore is misplaced.  The

Court recognizes that "formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." *Eastman Kodak*, 504 U.S. at 466-67. Still, Plaintiffs' allegations do "not plausibly suggest that dealers, not vendors, make the economic choice about which integrator to use and suffer the consequences of those decisions." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 961 (dismissing tying claim) (citations omitted). Accordingly, the Court grants Defendant's motion to dismiss Plaintiffs' tying claim.[7]

## D.    Rule of Reason

Defendant argues that, even assuming Plaintiffs sufficiently allege the kind of conduct that requires a rule of reason analysis under Section 1, its conduct rested on a clear and important business justification: the need to protect its system and the data on that system from cybersecurity threats.[8] [Compl., at ¶ 170.] However, whether challenged conduct has a procompetitive effect on balance so as to survive scrutiny under a rule-of-reason analysis presents a factual issue that cannot be resolved at this stage of the case. *Cook Inc. v. Boston Sci. Corp.*, 2002 WL 335314, at *4 (N.D. Ill. Feb. 28, 2002) ("The rule of reason entails a complex inquiry into the surrounding circumstances that is not susceptible to resolution on a motion to dismiss[.]"); *Watkins v. Smith*, 2012 WL 5868395, at *7 (S.D.N.Y. Nov. 19, 2012) ("The rule-of-reason inquiry requires, at the motion to dismiss stage, that the plaintiff identify the relevant market affected by the challenged conduct and allege an actual adverse effect on competition in the identified market.").

---

[7] When the Seventh Circuit reviewed the preliminary injunction entered in the *Authenticom* case, the Seventh Circuit indicated that it was "dubious in the extreme" that the alleged conduct of Defendant and Reynolds "amounts to tying, rather than simply participation at two levels of the market[.]" *Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019, 1026 (7th Cir. 2017). For the reasons discussed above, the Court reaches the same conclusion with respect to the allegations currently before the Court.

[8] As noted by Plaintiffs [126, at 20-21], Defendant does not appear to be arguing that Plaintiffs have failed to allege an actual adverse effect on competition in the identified market.

Furthermore, Plaintiffs specifically allege that Defendant's security justification is pretextual. [Compl., at ¶¶ 170-78.] For example, Plaintiffs allege that "a top-level CDK executive admitted in private conversation with a vendor that the rhetoric around 'security' has 'little credibility' and is primarily designed to force vendors to use CDK for data integration." [*Id*. at ¶ 171.] Accepting all of Plaintiffs' well-pleaded factual allegations and drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs sufficiently have alleged that Defendant's proffered justification for the challenged conduct is pretextual.[9]

Finally, Plaintiffs have identified discovery materials supporting the argument that the objective of the challenged conduct "is to prevent and/or severely inhibit non-approved access to DMS forcing vendors into the 3PA or other CDK approved access programs *and capture additional revenue opportunities*." [126-1 (Ex. 16 (CDK-0843493)), at 214 (emphasis added).] This evidence further supports Plaintiffs' arguments against dismissal. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) ("A party appealing a Rule 12(b)(6) dismissal may elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings." (collecting cases)).

## B.    Section 2 Claim (Count IV)

### 1.    Brand Specific Aftermarkets

To prevail on its Section 2 claim, Plaintiffs must demonstrate that Defendant has monopoly power in the relevant market. Here, Plaintiffs allege that Defendant has monopolized a brand-specific "Dealer Data Integration aftermarket" limited to its own DMS. [Compl., at ¶ 208.] "In rare circumstances, a single brand of a product or service can constitute a relevant market for antitrust purposes." *PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d 412, 418 (5th Cir.

---

[9] The Supreme Court has recognized that whether a justification is a pretext can be evaluated under the rule of reason analysis. *Nw. Wholesale Stationers, Inc.*, 472 U.S. at 297.

2010) (citation omitted).  The seminal case setting forth the circumstances under which such a claim may be viable is *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, which held that a brand-specific aftermarket can constitute a relevant market for antitrust purposes when consumers effectively are "locked-in" that brand's market because of structural barriers and/or commercial realities (*e.g.*, high transaction costs for switching brands).  504 U.S. at 461-62.  The Seventh Circuit has made clear, however, that firms with market power are not "forbidden to deal in complementary products[.]"  *Schor v. Abbott Labs.*, 457 F.3d 608, 614 (7th Cir. 2006).  Rather, what *Eastman Kodak* holds that firms with market power cannot deal in complementary products in "ways that take advantage of costumers' sunk costs."  *Id*.  Courts therefore have found "that an *Eastman Kodak* claim depends on the consumer's unawareness of the supplier's aftermarket power and its terms when it purchased the primary-market product."  *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 962-63 (collecting cases); see also *Schor*, 457 F.3d at 614 (recognizing same).

Turning to the facts of this case, Plaintiffs plausibly allege an *Eastman Kodak* claim.  Plaintiffs allege that dealers are "locked in" Defendant's DMS.  [Compl., at ¶¶56-60, 207.]  In support of that assertion, Plaintiffs allege that "switching costs are high" and "[s]witching DMS providers presents significant logistical challenges and is highly disruptive to business operations." [*Id*. at ¶ 57.]  "It can take a dealership over a year of preparation, staff training, and testing before a new DMS can be put into operation, all while the dealership is trying to dell and service cars." [*Id*.]  Indeed, Plaintiffs allege that Defendant's own CEO publicly has recognized that dealers are hesitant to switch DMSs because the process can take time and can be very difficult.  [*Id*. at ¶ 58.]

Defendant argues that because of its contractual bars on third-party DMS access, dealers were aware of its aftermarket power and its terms when they purchased contract with Defendant.

21

[72, at 24.] However, Plaintiffs repeatedly allege that Defendant publicly took the position that it permitted access by third-party integrators. [Compl., at ¶¶ 75-77.] For example, Plaintiffs allege that "CDK's top executives have repeatedly made public statements that dealers may grant data integrators rights to access their DMS." [*Id*. at ¶ 75.] "Steve Anenen, CDK's longtime CEO, publicly stated that dealers have the right to grant third parties access to, and use of, their data. He told the industry publication Automotive News, 'We're not going to prohibit that or get in the way of that.'" [*Id*. (citation omitted).] He further stated, "I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it, when in fact it's really the data belonging to the dealer. As long as they grant permission, how would you ever go against that wish?" [*Id*. (citation omitted).] The complaint identifies similar statements made by other CDK executives. [See, *e.g., id*. at ¶ 76.]

Defendant nonetheless argues that dealers could not be justified in relying on these representations given contrary language in their contracts with Defendant. [160, at 19.] In making this argument, Defendant cites to cases recognizing that "[a] party is not justified in relying on representations outside of or contrary to the written terms of a contract he or she signs when the signer is aware of the nature of the contract and had a full opportunity to read it." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003). However, it is not apparent from the face of the complaint that Defendant's contracts with dealers contradict these representations. Although Defendant's contract with dealers permitted dealers to authorize its agents to access the DMS [Compl., at ¶¶ 20, 74, 82], it is not clear whether third-party data integrators were acting as the dealers' agents. Defendant argues in a footnote that Plaintiffs have not plausibly alleged that the data integrators are the agents of dealers [72, at 10 n.2], but Plaintiffs do not need to anticipate factual defenses that Defendant may raise regarding their claim. *Richards*

*v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012) ("Complaints need not anticipate defenses and attempt to defeat them." (citing *Gomez v. Toledo*, 446 U.S. 635 (1980)).  Although discovery ultimately may demonstrate that data integrators were contractually prohibited from accessing Defendant's DMS, based on the well-pleaded obligations in the amended complaint it is plausible that dealers believed that they could authorize third-party integrators to access their DMSs, especially in light of public statements by CDK executives indicating that dealers had such authority.  Accordingly, CDK plausibly has alleged an *Eastman Kodak* claim.[10]

Defendant further argues that Plaintiffs cannot complain about the alleged foreclosure of competition in the dealer-data-integration aftermarket for Defendant's DMS because any hostile integration of its DMS is unlawful under the Computer Fraud and Abuse Act ("CFAA").  [72, at 25.]  However, as Defendant notes, whether a data integrator violates the CFAA depends in part on whether the data integrator "accesses a computer without authorization or exceeds authorized access[.]"  [72, at 25 (quoting 18 U.S.C. § 1030(a)(2)(C)) (internal quotation marks omitted).]  And, as discussed above, it is not at all clear from the complaint that data integrators lacked authorization to access Defendant's DMS.  Given Plaintiffs' allegations regarding Defendant's repeated and unequivocal statements indicating that it permitted third-party integrator access, the allegations in the complaint support the contrary conclusion.  Furthermore, whether data integrators violated the CFAA is a question of fact that cannot be determined based on the pleadings alone.[11]  *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 949 (rejecting

---

[10] The Court notes that the complaint indicates that Defendant later revoked any authorization.  Still, according to the allegations in the complaint, dealers already using Defendant's DMS were effectively locked in their purchase.  [Compl., at ¶¶ 56-60, 207.]

[11] Although Plaintiffs did not make this argument, the Court also notes that "a plaintiff's wrongdoing is not a defense to an antitrust suit."  *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 946.

similar argument with respect to purported violations of the CFAA and related state laws by Authenticom).  Plaintiffs therefore sufficiently have alleged that Defendant has monopoly power in the relevant market—namely, a brand-specific dealer data integration aftermarket limited to its own DMS.

### 2.    Anticompetitive Conduct

To state a claim for monopolization under Section 2, a plaintiff must allege that defendant engaged in predatory or anticompetitive conduct.  *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011) (holding that a claim for monopolization under Section 2 requires that the defendant "willfully acquired or maintained that power by means other than the quality of its product, its business acumen, or historical accident").  Defendant argues that Plaintiffs' Section 2 claim fails because it is premised on an alleged refusal to deal, which does not amount to predatory or anticompetitive conduct under the Supreme Court's decision in *Verizon Communications Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398 (2004).

Plaintiffs recognize that their Section 2 claim would fail if it were based on a refusal to deal,[12] but argue that their Section 2 claim is based on the predatory conduct that serves as the basis of their Section 1 claims.  A defendant violates "Section 2 of the Sherman Act * * * [if it] 'has acquired or maintained his strategic position, or sought to expand [its] monopoly, or expanded it by means of those restraints of trade which are cognizable under [Section] 1.'"  *Fin. & Sec. Prods. Ass'n v. Diebold, Inc.*, 2005 WL 1629813, at *4 (N.D. Cal. July 8, 2005) (quoting *United*

---

[12] The parties' agreement on this issue is supported by case law, as there is "no antitrust duty to deal * * * in selling services to [ ] competitors in the retail market."  *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 955 (citing *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 450 (2009)); see also *Schor*, 457 F.3d at 610 ("[A]ntitrust law does not require monopolists to cooperate with rivals by selling them products that would help the rivals to compete.  Cooperation is a *problem* in antitrust, not one of its obligations." (internal citation omitted)); *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1025 (7th Cir. 2017) ("Even monopolists are almost never required to assist their competitors[.]" (citation omitted)).

*States v. Griffith*, 334 U.S. 100, 106 (1948)); *see also Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, 2013 WL 3214983, at *7 (N.D. Ind. Mar. 13, 2013) ("Where defendant has engaged in unlawful restraint of trade that would independently violate Section 1 of the Sherman Antitrust Act, it is well established that it also violates Section 2 if it acquires or maintains a monopoly by means of that restraint of trade." (citing *Griffith*, 334 U.S. at 106)). Although a unilateral refusal to deal alone does not establish an antitrust violation, that does not mean that other anticompetitive conduct is insulated because it involves a refusal to deal. *Glaberson v. Comcast Corp.*, 2006 WL 2559479, at *10 (E.D. Pa. Aug. 31, 2006) ("*Trinko* does not provide a basis for insulating claims based on well-established examples of anticompetitive conduct, such as horizontal market allocations, from judicial review.").[13] Because Plaintiffs plausibly have alleged a horizontal conspiracy claim and an exclusive dealing claim,[14] Plaintiffs sufficiently have alleged anticompetitive conduct sufficient to state a claim under Section 2. Accordingly, the Court denies Defendant's motion to dismiss Plaintiffs' Section 2 monopolization claim.

### D. Cartwright Act and California Unfair Competition Law (Counts V, VI, and VII)

Defendant argues that the dismissal of Plaintiffs' Sherman Act claims would be fatal to their antitrust-related claim under the Cartwright Act. "[B]ecause the Cartwright Act is patterned after the federal Sherman Act and both have their roots in the common law, federal cases interpreting the Sherman Act are applicable in construing the Cartwright Act." *In re Copper*

---

[13] Defendant notes that *Glaberson* and another case cited by Plaintiffs do not address Section 2 claims. However, Plaintiffs cite these cases for the proposition that *Trinko* is limited to refusal-to-deal claims and does not insulate a defendant who engages in other misconduct from liability.

[14] To the extent that Plaintiffs' Section 2 claim rests on allegations of a horizonal conspiracy, Defendant contends Plaintiffs are limited to bringing a Section 1 claim. But Defendant does not cite to any authority holding that violations of Section 1 are insufficient to establish anticompetitive conduct for the purposes of Section 2. As noted above, the case law supports the contrary position.

*Antitrust Litig.*, 436 F.3d 782, 802 (7th Cir. 2006) (internal quotation marks omitted) (quoting *Oakland-Alameda Cnty. Builders' Exch. v. F.P. Lathrop Constr. Co.*, 482 P.2d 226, 231 n. 3 (Cal. 1971)). Thus, Plaintiffs' Cartwright Act claim rises or falls with Plaintiffs' Sherman Act claims. Similarly, to the extent that Plaintiffs seek to bring a claim under the "unlawful" prong under of the California Unfair Competition Law ("UCL"), Plaintiffs' claim depends on allegations of antitrust violations and therefore also rises or falls with Plaintiffs' Sherman Act claims. Because Plaintiffs sufficiently have alleged claims under the Sherman Act, Plaintiffs' claims under the Cartwright Act and the California UCL survive.[15] Accordingly, Defendant's motion to dismiss Plaintiffs' Cartwright Act and California UCL claims is denied.

### E. California Unfair Practices Act

Defendant argues that Plaintiffs fail to state a claim under California's Unfair Practices Act ("CUPA"). California's Unfair Practices Act ("UPA") makes unlawful the "secret payment or allowance of rebates * * * or unearned discounts * * * or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions." Cal. Bus. & Prof. Code § 17045. Defendant argues that Plaintiffs have not sufficiently alleged (1) a secret discount, or (2) injury caused by the purported secret discount [72, at 30], which is necessary to state a claim for a violation of Section 17045 of the CUPA.

The Court agrees that Plaintiffs have not sufficiently alleged injury caused by any purported discount given to Reynolds. Plaintiffs allege that the fee waiver given to Reynolds places Plaintiffs' applications "at a severe competitive disadvantage in the market place," which Plaintiffs contend is sufficient to establish injury under Section 17045 of the CUPA. [126, at 30.]

---

[15] Plaintiffs also argue that they have stated a claim under the "unfair prong" of the California UCL. [126, at 28.] Plaintiffs do not, however, identify what conduct it contends satisfies the "unfair prong" of the California UCL. Because Plaintiffs sufficiently have alleged violations of the Sherman Act, however, Plaintiffs' California UCL claim survives.

However, a plaintiff bringing a claim under Section 17045 of the CUPA must allege an actual injury in addition to a competitive disadvantage. *Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1043 (N.D. Cal. 2001) (finding "a tendency to destroy competition" but granting summary judgment for failure to establish "actual injury"); *cf. Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.*, 16 Cal. App. 4th 202, 213 (1993) (plaintiff established actual injury by showing that "its gross sales and profits drastically declined"). Because Plaintiffs have not done so here, Plaintiffs CUPA claim fails.

Furthermore, Plaintiffs' allegation of a severe competitive disadvantage relates to the alleged conspiracy between Defendant and Reynolds. [Compl., at ¶ 28.] Thus, even if allegations of a competitive disadvantage were sufficient to state a claim, Plaintiffs fail sufficiently to allege a competitive disadvantage caused by the purported secret discount. Accordingly, the Court grants Defendant's motion to dismiss Plaintiffs' CUPA claim.

### F.     Fraudulent Inducement (Count VIII), Breach of Contract (Count IX), and Defamation (Count XI)

Defendant also moves to dismiss Plaintiffs' fraudulent inducement claim, breach of contract claim, and defamation claim. However, neither party addresses what law applies to these claims. Furthermore, neither party addresses the elements of these claims. Given that the parties have not fully developed their arguments, the Court declines to address the sufficiency of Plaintiffs' allegations with respect to these claims. *Doherty v. City of Chicago*, 75 F.3d 318, 324 (7th Cir.1996) ("Given our adversary system of litigation, it is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.") (citation omitted)); *Waldock v. M.J. Select Glob., Ltd.*, 2005 WL 3542527, at *14 (N.D. Ill. Dec. 27, 2005) ("[W]ithout engaging in a choice-of-law analysis, they 'have failed to lay the proper ground work for the court to address their argument.'" (quoting *In re Air Crash Disaster,*

*at Sioux City, Iowa, on July 19, 1989*, 1991 WL 268656, at *2 (N.D. Ill. Dec.4, 1991))).

Accordingly, the Court denies Defendant's motion to dismiss Plaintiffs' fraudulent inducement claim, breach of contract claim, and defamation claim. *Waldock v. M.J. Select Glob., Ltd.*, 2005 WL 3542527, at *14 (N.D. Ill. Dec. 27, 2005) (denying motion to dismiss claim because defendants failed to lay the proper ground work for the court to address their argument); *McDaniel v. Loyola Univ. Med. Ctr.*, 2014 WL 4269126, at *6 (N.D. Ill. Aug. 28, 2014) (denying motion to dismiss claims that were not supported by case law or legal authority).

## IV.    Conclusion

For the reasons set forth above, Defendant's motion to dismiss [71] Plaintiffs' complaint is granted in part and denied in part.

Date: January 25, 2019

_____
Robert M. Dow, Jr.
United States District Judge