**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE DEALER MANAGEMENT SYSTEMS | ) | |
| ANTITRUST LITIGATION, MDL 2817 | ) | Case No. 18-cv-864 |
| | ) | |
| _____ | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| This document relates to: | ) | |
| | ) | |
| THE DEALERSHIP CLASS ACTION | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Defendant CDK Global, LLC's motion to compel arbitration and stay

claims, or, in the alternative, to dismiss the dealership consolidated class action complaint [262],

and Plaintiffs' unopposed motions for leave to submit supplemental authority [366; 420].

Plaintiffs' unopposed motions for leave to submit supplemental authority [366; 420] are granted.

The Court considers those submissions as well as Defendant's responses (in its reply and in its

own supplemental brief) in ruling on the pending motion to dismiss. For the reasons set forth

below, Defendant's motion to dismiss in favor of arbitration is denied, and its alternative motion

to dismiss is granted in part and denied in part.

## I. Background[1]

Defendants CDK Global, LLC ("CDK") and Reynolds and Reynolds Company

("Reynolds") provide Dealer Management System ("DMS") software and services to automobile

dealerships throughout the United States, including in Illinois. [198 (Compl.), at ¶¶ 51-52.] In

addition to providing DMS services, CDK and Reynolds also provide data integration services

---

[1] For the purposes of this motion to dismiss, the Court accepts as true all of Plaintiffs' well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

("DIS") indirectly to dealerships throughout the United States, including in Illinois. [*Id*.] Plaintiffs are automobile dealerships across the country who are purchasing and/or who have purchased DMS services from CDK or Reynolds. [*Id*. at ¶¶ 26-50.] Plaintiffs purport to bring this class action against Defendants CDK and Reynolds for alleged violations of the Sherman Act and state antitrust and consumer protection laws. [*Id*. at 5.] Plaintiffs allege that Defendants unlawfully colluded and conspired to restrain and/or eliminate competition by charging supracompetitive prices in the markets for: (1) DMS software services; and (2) DIS. [*Id*. at ¶ 1.]

A.      The DMS Market

The DMS, sometimes described as the "central nervous system" for dealerships, is an enterprise software system designed specifically for automobile dealerships. [*Id*. at ¶ 3.] The DMS functions as the dealerships' central database and repository of all its operational information, including information regarding sales, financing, inventory management (both vehicles and parts), repair and service, accounting, payroll, human resources, marketing, and car manufacturer certifications. [*Id*. at ¶¶ 3, 61.] The physical storage of the data is either onsite at the dealerships, at private data centers operated by the DMS provider, or with cloud-based data storage companies. [*Id*. at ¶61.] The DMS includes a database and data storage component that allows dealerships to enter and store data in real time. [*Id*. at ¶ 3.]

Switching DMS providers is difficult, expensive, and disruptive to a dealership's business. [*Id*. at ¶ 4.] Changing DMS providers requires entirely new hardware and software. [*Id*.] It can cost as much as $50,000 up front to change DMS providers. [*Id*.] It typically takes dealerships a year or more to prepare for changing DMS providers. [*Id*.] In November 2016, CDK's CEO acknowledged that "switching DMS providers can be very difficult. It [is] quite a process [to] change and takes time, which is part of the reason that many dealers are hesitant to switch." [*Id*.

at ¶ 66.]  Switching DMS providers is not only a costly and lengthy procedure, it is also extremely risky.  [*Id*. at ¶ 67.]  Dealers store vital data on their DMSs, and access to their data is crucial to the daily operation of their business.  [*Id*.]  DMS providers control access to dealers' DMSs and can restrict or deny access to the DMSs, severely crippling the dealers' businesses as retribution for changing DMS providers.  [*Id*.]

CDK and Reynolds are in the business of providing DMS software and services to dealerships like Plaintiffs.  [*Id*. at ¶ 2.]  Together they control approximately 75 percent of the United States DMS market measured by the number of franchised automobile dealerships using their systems, with CDK controlling approximately 45 percent of the DMS market and Reynolds controlling approximately 30 percent of the DMS market.  [*Id*.]  The remaining 25 percent is divided among other smaller DMS providers that typically service smaller dealerships in niche submarkets.  [*Id*. at ¶ 2 n.1.]  CDK and Reynolds have even higher market shares when measured by revenue, with CDK having approximately $2.2 billion in total annual revenue and Reynolds having approximately $1.7 billion in total annual revenue.  [*Id*.]

Both CDK and Reynolds have previously indicated that dealers own the data on their DMSs.  For example, Steve Annen (CDK's former CEO) stated, "I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it, when in fact it's really the data belonging to the dealer.  As long as they grant permission, how would you ever go against that wish?"  [*Id*. at ¶ 74.]  Howard Gardner (CDK's Vice President of Data Strategy) has stated that CDK "has always understood that dealerships own their data and enjoy having choices on how best to share and utilize that data with others."  [*Id*.]  Matt Parsons (CDK's Vice President of Sales and Marketing) has stated, "We're not going to limit the ability of a dealer to give an ID to someone else to, in essence, dial into their system.  That is the dealer's

right.  We have no right to tell them they can't do that."  [*Id*.]  Similarly, Reynolds spokesman Tom Schwartz stated that "[t]he data belongs to the dealers.  We all agree on that."  [*Id*.]

**B.    The DIS Market**

CDK and Reynolds also provide DIS separate from their DMS offerings.  [*Id*. at ¶ 5.] CDK's data integration service is known as Third Party Access ("3PA"), and Reynolds's data integration service is known as Reynolds Certified Interface ("RCI").  [*Id*. at. ¶ 71.]  Although 3PA and RCI only provide DIS for Defendants' respective DMSs, CDK also owns two independent data integrators—Digital Motorworks ("DMI") and IntegraLink—that provide DIS with respect to data stored on others' DMSs (*e.g.*, Reynolds) as well.  [*Id*. at ¶ 76.]  DIS are critical to the proper functioning of dealerships.  [*Id*. at. ¶ 5.]  DIS enable dealers and third-party software application providers (also known as vendors) to extract, organize, and integrate the dealers' data on their DMSs into a usable format.  [*Id*.]

To effectively run their dealerships, dealers engage vendors to provide necessary services such as inventory management, customer relationship management, warranty services, repair orders, and electronic vehicle registration and titling.  [*Id*.]  For example, a dealer might engage a vendor to electronically register new automobiles upon sale.  [*Id*. at ¶ 73.]  In providing services to dealers, vendors need to access and utilize DMS data.  [*Id*.]  A single dealership typically uses multiple vendors, with each vendor requiring access to the dealership's data stored on its DMS. [*Id*.]  Vendors generally engage DIS providers that charge vendors for their services.  [*Id*. at ¶ 5.] Although vendors have the dealers' authorization to access and utilize the data on their DMSs, vendors generally cannot obtain access to the data in a usable format directly from dealers.  [*Id*. at ¶ 75.]  To access and utilize dealer data, vendors engage data integrators to extract, format, and organize the data.  [*Id*.]  The data integrators access the data stored on the DMS and convert it into

a form suitable for the specific service provided by the vendor.  [*Id.*]

Historically, the DIS market was active, with numerous DIS providers competing to provide affordable, secure, and reliable access to DMS data for dealerships and vendors.  [*Id.* at ¶ 6.]  In 2006, Reynolds began selectively and sporadically blocking data integrators from accessing dealer data on the Reynolds DMS by disabling data integrators' dealer-created login credentials.  [*Id.* at ¶ 77.]  CDK differentiated itself and the CDK DMS from Reynolds by publicly touting the openness of its DMS.  [*Id.*]  CDK repeatedly vowed (including in public statements by its CEO and top marketing officers) that it would not block independent data integrators from accessing dealer data on its DMS.  [*Id.*]  CDK marketed its "open" system directly to dealers and issued press releases stressing that it "believes in the fair competitive environment and does not use its leverage through supply of the dealer management system to reduce competition through the restriction of data access."  [*Id.* at ¶ 78.]  CDK was successful in marketing its "open" DMS to dealers as a competitive advantage over the Reynolds DMS, and dealers purchased DMS services from CDK based in large part on CDK's public representations about the openness of its DMS. [*Id.*]  As a result, CDK gained market share from Reynolds.  [*Id.*]  In 2013, Reynolds began vigorously blocking data integrators.  [*Id.* at ¶ 79.]  CDK, however, continued to allow open access to its DMSs and to compete with Reynolds.  [*Id.*]

### C.    Alleged Agreement

Despite CDK's success in wresting market share away from Reynolds, its biggest competitor in the DMS market, competition between Reynolds and CDK suddenly ceased in 2015. [*Id.* at ¶ 80.]  Plaintiff alleges that this was the result of horizontal agreements between CDK and Reynolds to restrain competition in the DMS and DIS markets.  Specifically, CDK and Reynolds agreed to cooperate in closing their respective DMSs.  [*Id.* at ¶ 81.]  In February 2015, CDK and

Reynolds entered into three written agreements: (1) the Data Exchange Agreement or "Wind Down" Agreement; (2) the 3PA Agreement; and (3) the RCI Agreement. [*Id*. at ¶ 82.]

The Data Exchange Agreement provides that CDK is to wind down its data integration business on Reynolds's DMS. [*Id*. at ¶ 83.] In other words, CDK would stop providing services to dealers relating to the third-party integration of data stored on Reynolds's DMS. [*Id*.] At the same time, Reynolds agreed not to block CDK's access to Reynolds's DMS during the wind-down period, which lasts until 2020. [*Id*.] During that wind-down period, Defendants agreed that CDK could continue to extract dealer data from Reynolds's DMS. [*Id*. at ¶ 84.] At the same time, under § 4.2 of the Data Exchange Agreement, CDK was to notify its vendor clients of its intent to wind down its data integration related to Reynolds's DMS. [*Id*.] Under § 4.4 of the Data Exchange Agreement, CDK was to assist and cooperate with Reynolds's efforts to communicate with CDK's vendor clients and transition them to RCI. [*Id*.] In connection with that effort, CDK agreed to provide Reynolds with full information about the vendors CDK served, including their names, DMS numbers, store numbers, branch numbers, user logins, specific data access provided by CDK, data interfaces, the frequency of the data provided, the deadlines for data delivery, and the format of the data. [*Id*. at ¶ 85.] The Data Exchange Agreement also includes a "Prohibition on Knowledge Transfer and DMS Access" provision, whereby CDK and Reynolds each agreed not to provide DIS with respect to data on the other's DMS. [*Id*. at ¶ 86.]

The two other written agreements made by Defendants in February 2015 were (1) the 3PA Agreement; and (2) the RCI Agreement. [*Id*. at ¶ 87.] These two agreements, collectively referred to as the "Data Integration Agreements," provided CDK and Reynolds reciprocal access to each other's DIS programs—the 3PA and RCI programs, respectively. [*Id*.] In the agreements, Reynolds received five free years of 3PA access. [*Id*. at ¶ 88.] Reynolds also agreed to access

CDK's DMS exclusively through 3PA, and further agreed that it would not "otherwise access, retrieve, license, or otherwise transfer any data from or to a CDK system (including, without limitation, pursuant to any 'hostile interface') for itself or any other entity" or contract with any third parties to access the system. [*Id*.] The Data Integration Agreements also provided that CDK and Reynolds would deny data integrators access to each other's DMSs. [*Id*. at ¶ 89.]

Plaintiffs also allege that Defendants agreed to force vendors to use Defendants (or their affiliates) to access their respective DMSs. [*Id*. at ¶ 171.] As evidence of this agreement, the complaint references an April 2016 conversation between Dan McCray (CDK's Vice President of Product Management) and Stephen Cottrell (CEO of Authenticom, a competing data integrator), in which Mr. McCray stated:

> [W]e've entered into an agreement with Reynolds and Reynolds, okay? That agreement specifically says that we're going to support each other's third party interfaces, and we're working collaboratively to remove all hostile integrators from our DMS system.

[*Id*. at ¶ 101.] Similarly, in March 2015, Robert Schaefer (Reynolds's Vice President of OEM Relations, Data Services, and Security) told Mr. Cottrell: "We've made agreements with the other major DMS providers to support each other's third-party access agreements and to block independent integrators such as Authenticom." [*Id*. at ¶ 100.]

Defendants have claimed that their agreements with each other serve an important business justification: the need to protect thei systems and the data on those systems from cybersecurity threats. However, Plaintiffs allege that Defendants' security justification is pretextual. [*Id*. at ¶¶ 153-64.] Plaintiffs allege that "Automotive News reported that '[a] vendor executive who asked not to be named called the data-access cost a surcharge under the guise of data security.'" [*Id*. at ¶ 155.] Along the same lines, a CDK employee has made statements indicating that the security justification really was a "message" used by Defendants to justify increased fees, stating "[i]f we

are going with security as our message, I feel we MUST incorporate language into our contract * * * I feel a discussion around what these additional security items will be is warranted—once we have agreement on these security items it will help us update the managed data services agreement and further refine our message to the market." [*Id*. at ¶ 156.] Plaintiffs have identified similar statements indicating that the claimed security justification was pretextual. [*Id*. at ¶¶ 157-64.]

Plaintiffs allege that CDK and Reynolds have been able to impose massive price increases on vendors as a result of their agreements. [*Id*. at ¶ 134.] These increased fees are passed on to dealers. [*Id*.] Vendors have acknowledged that they pass increased data integration fees on to dealers. [*Id*. at ¶ 135.] For example, a vendor informed a dealer that it was raising the fees it charged the dealer by $500 a month as a result of CDK's higher integration fees. [*Id*. at ¶ 141.] Plaintiffs also allege that the agreements between CDK and Reynolds have decreased the functionality of their DMSs. The dealers' ability to freely access their own data on their DMSs through third-parties was an important feature of their DMSs and their functionality. [*Id*. at ¶ 148.] Through their unlawful conduct, however, Defendants eliminated this feature, thereby restraining competition and increasing prices paid by the dealers for their DMSs. [*Id*. at ¶ 149.]

### D. Alleged Exclusive Dealing

Plaintiffs also allege that CDK began canceling and renegotiating its 3PA vendor contracts to impose exclusive dealing provisions on vendors shortly after entering the Data Exchange Agreement. [*Id*. at ¶ 111.] These new 3PA contracts (also referred to as the "Managed Interface Agreements") required vendors to use 3PA if they wished to integrate CDK DMS data. [*Id*.] To ensure that vendors signed on to the new contracts, CDK sent an initial letter to dealers warning that access to its DMS by third-party integrators would cease. [*Id*. at ¶ 112.] Subsequently, in

September 2015, CDK sent dealers a letter indicating that it "intend[ed] to remove the majority of unauthorized third party [sic] access methods by Dec 31, 2016." [*Id*. at ¶ 112.] CDK employees were instructed that if any vendor failed to migrate to 3PA by December 31, 2016, the vendor's access to CDK's DMS would be disabled. [*Id*.] Plaintiffs allege that vendors agreed to the Managed Interface Agreements under threat of losing access to necessary data. [*Id*. at ¶ 113.]

The Managed Interface Agreements contained provisions explicitly prohibiting vendors from obtaining dealer data from anyone other than CDK. [*Id*. at ¶ 114.] The contracts were entered on a vendor-by-vendor basis, not an application-by-application basis, so if a vendor wanted to use CDK's integration services for one application, the vendor also had to use CDK's product for all of its other applications. [*Id*.] The contracts states: "Vendor agrees that it will, beginning on the date CDK certifies the use of the first Application with the CDK Interface System, access data on, and provide data to, CDK Systems exclusively through the Managed Interface System [a.k.a. 3PA] * * * [and] will not (i) * * * transfer any data from or to a CDK System * * * or (ii) contract with * * * any third party * * * to * * * transfer any data from or to a CDK System." [*Id*.]

The Managed Interface Agreement also includes what Plaintiffs characterize as a price-fixing agreement, which provides that a vendor "shall never indicate in any way to any CDK Vendor Client that any increase in any price charged by [v]endor to any CDK Vendor Client is in reaction to, or in any other way associated with, any modification in the price charged by CDK hereunder with respect to [v]endor's use of the CDK Interface System." [*Id*. at ¶ 119.] The contract also states that the vendor "shall not include any 'interface' fee, DMS access fee or any other similar fee related to the use of the CDK Interface System in any of its invoices to its customers [dealers] or otherwise include any direct or indirect indication to its customers (in its invoices or otherwise) of the fees charged by CDK hereunder." [*Id*.] In a March 3, 2016 internal

email, one CDK employee stated, "CDK's position is that the vendor should include the integration in the price of their product as a cost of doing business and not something they line item with the dealer. Line iteming of integration fees along with claims of high DMS fees by vendors (most of them exaggerated) only leads to questions from our dealers about what CDK actually charges for integration." [*Id.*]

### E.    Reynolds Arbitration Agreement

Six named Plaintiffs (collectively the "Reynolds Dealers") signed agreements that oblige them to resolve certain claims against Reynolds in Dayton, Ohio. Relevant to this order is a binding arbitration provision included in every Reynolds Dealers' contract. The provision states in relevant part:

> Any disputes between us related directly or indirectly to an Order[2] will be settled by binding arbitration * * * under the American Arbitration Association Rules * * * It does not matter whether the controversy is based on contract, tort, strict liability, or other legal theory. * * * The arbitration will be held in Dayton, Ohio.

[255-9, at 12.] Both CDK and Reynolds moved to dismiss Plaintiffs' claims in favor of arbitration pursuant to this arbitration agreement or, in the alternative, dismiss Plaintiffs' claims for failure to state a claim. Defendant Reynolds subsequently withdrew its motion. Before the Court is the motion to dismiss filed by Defendant CDK.[3]

## II.    Legal Standard

To survive a Federal Rule of Civil Procedure ("Rule") 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled

---

[2] "Order" is defined as "the Master Agreement and/or an Exhibit that has been accepted by [Reynolds]." [255-10, at 3.]

[3] Because Reynolds withdrew its motion, all references to Defendant below are to Defendant CDK.

to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (alteration in original). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly,* 550 U.S. at 558. In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts as true all of Plaintiffs' well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

**III.    Analysis**

**A.    Arbitration**

Although there is no agreement between Plaintiffs and Defendant to arbitrate Plaintiffs' claims, Defendant argues that the Reynolds Dealers' agreement to arbitrate with Reynolds covers the claims at issue in this case and extends to the claims brought against CDK under the doctrine of equitable estoppel. Plaintiffs argue that (1) its claims are outside the scope the arbitration agreement, (2) CDK has not shown that it is entitled to invoke the doctrine of equitable estoppel, and (3) CDK has waived any right to seek arbitration of Plaintiffs' claims.

Before turning to the merits of these arguments, some discussion of the federal policy favoring arbitration is warranted. Pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq.

("FAA"), "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction * * * shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA]." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983); see also *Int'l Ins. Agency Servs., LLC v. Revios Reinsurance U.S., Inc.*, 2007 WL 951943, at *2 (N.D. Ill. Mar. 27, 2007) ("Arbitrability is governed by federal law." (citation omitted)). Section 2 of the FAA is "a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone*, 460 U.S. at 24. Thus, "[w]hen the parties have agreed to arbitrate some matters pursuant to an arbitration clause, 'the law's permissive policies in respect to arbitration counsel that any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration.'" *Local 73, Serv. Employees Int'l Union, AFL-CIO v. UChicago Argonne, LLC*, 2011 WL 635862, at *3 (N.D. Ill. Feb. 11, 2011) (quoting *Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 561 U.S. 287, 298 (2010)). "[A]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Int'l Bhd. of Elec. Workers, Local 21 v. Illinois Bell Tel. Co.*, 491 F.3d 685, 687-88 (7th Cir. 2007) (internal quotation marks and citation omitted). With these principles in mind, the Court turns to the merits of the parties' arguments regarding the Reynolds Dealers' arbitration agreement with Reynolds.

*i. Arbitrability*

CDK moves for dismissal of the Reynolds Dealers' claims against it in favor of arbitration. As a threshold issue, the Court must address whether the issue of arbitrability properly is before this Court. Reynolds argued that the issue of arbitrability itself was subject to arbitration pursuant its agreements with the Reynolds Dealers. [255, at 21-23.] In their omnibus response to Defendants' motions to dismiss, Plaintiffs argue that agreements to arbitrate the issue of arbitrability only are binding on signatories. [358, at 34.] CDK therefore would not be entitled to invoke Reynolds's agreement to arbitrate arbitrability of Plaintiffs' substantive claims. *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1127 (9th Cir. 2013) ("Given the absence of clear and unmistakable evidence that Plaintiffs agreed to arbitrate arbitrability with nonsignatories, the district court had the authority to decide whether the instant dispute is arbitrable." (citation omitted)); *Nat'l Oilwell Varco, L.P. v. Sadagopan*, 2018 WL 276364, at *2 (S.D. Tex. Jan. 3, 2018) ("The cases that do address using equitable estoppel to allow a nonsignatory to an arbitration agreement to enforce that agreement against a signatory treat this gateway issue as for the court to determine, except in circumstances not present here."); see also *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." (collecting cases)). CDK does not respond to this argument or otherwise argue that it is entitled to the benefit of Reynolds's agreement to arbitrate arbitrability.[4] Accordingly, the Court proceeds on the assumption that the Court has authority to address the threshold issue of the arbitrability of Plaintiffs' claims against CDK.

---

[4] Although CDK adopts the arguments advanced by Reynolds in support of the application of the arbitration agreement, Reynolds did not need to address whether the threshold issue of arbitrability applies to nonsignatories, as Reynolds was a signatory. And CDK's own briefs do not address the issue.

###### ii. *Equitable Estoppel*

CDK argues that because the Reynolds Dealers' claims relate to their contracts with Reynolds, in which the Reynolds Dealers agreed to arbitrate certain claims against Reynolds, the Reynolds Dealers also must arbitrate their related claims against CDK. "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). Arbitration "is a matter of consent, not coercion." *Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). However, the "mere fact" that parties are not "signatories to [an] agreement does not defeat their right to compel arbitration." *Hoffman v. Deloitte & Touche, LLP*, 143 F. Supp. 2d 995, 1004 (N.D. Ill. 2001). Still, "[a]rbitration agreements apply to nonsignatories only in rare circumstances." *I Sports v. IMG Worldwide, Inc.*, 813 N.E.2d 4, 8 (Ohio Ct. App. 2004). Here, CDK contends that the Reynolds Dealers are bound to arbitrate their claims against CDK under the doctrine of equitable estoppel.

State law governs who is bound by agreements to arbitrate. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009). The parties dispute whether Ohio law or Illinois law applies to CDK's estoppel argument. CDK contends that Ohio law applies because Reynolds's contract with the Reynolds Dealers is governed by Ohio law. Plaintiffs contend that Illinois law applies because equitable estoppel is a tort doctrine and Illinois law applies under the most significant relationship test to tort claims brought in Illinois courts. The Court need not decide which state's law applies, however, as the outcome is the same under both Illinois and Ohio law. *Coexist Found., Inc. v. Fehrenbacher*, 2016 WL 4091623, at *4 (N.D. Ill. Aug. 2, 2016) ("The Court need not decide which state's law applies as the outcome is the same under both."), aff'd, 865 F.3d 901 (7th Cir. 2017).

Under Illinois law, a party cannot enforce an arbitration agreement under an equitable estoppel theory without detrimental reliance. *Warciak v. Subway Restaurants, Inc.*, 880 F.3d 870, 872 (7th Cir.), cert. denied, 138 S. Ct. 2692 (2018) (applying Illinois law); see also *Ervin v. Nokia, Inc.*, 349 Ill. App. 3d 508, 517 (2004). Here, CDK does not even argue that it can establish detrimental reliance. Accordingly, CDK cannot invoke equitable estoppel under Illinois law.

Similarly, under Ohio law, detrimental reliance is necessary to invoke the doctrine of equitable estoppel. *Ohio State Bd. of Pharmacy v. Frantz*, 555 N.E.2d 630, 633 (Ohio 1990) ("The party claiming the estoppel must have relied on conduct of an adversary in such a manner as to change his position for the worse and that reliance must have been reasonable."); *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109, 119 (Ohio 2006) ("Equitable estoppel does not apply when there is no actual or constructive fraud and no detrimental reliance[.]"). The same contractual and estoppel principles apply to determining what parties are bound by an agreement to arbitrate. *Warciak v. Subway Restaurants, Inc.*, 880 F.3d 870, 872 (7th Cir.), cert. denied, 138 S. Ct. 2692 (2018);[5] *Judge v. Unigroup, Inc.*, 2017 WL 3971457, at *5 (M.D. Fla. Sept. 8, 2017) (holding that Ohio law requires detrimental reliance to compel arbitration with a nonsignatory of an arbitration agreement).

CDK has not cited to any authority indicating that the Ohio courts would apply a different equitable estoppel standard in the context of enforcing arbitration agreements against

---

[5] CDK argues that *Warciak* is distinguishable because it involved the application of Illinois law. However, in *Warciak*, the Seventh Circuit cited to the Supreme Court's decision in *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009), for the proposition that traditional state-law principles such as assumption, agency, and estoppel apply to determining when a contract such as an agreement to arbitrate can be enforced against nonparties. *Warciak*, 880 F.3d at 872. Thus, pursuant to *Arthur Anderson* and *Warciak*, the Court looks to Ohio's traditional equitable estoppel principles to determine when an arbitration agreement can be enforced against a nonsignatory under Ohio law.

nonsignatories.[6]  The only Ohio case cited by CDK is *I Sports v. IMG Worldwide, Inc.*, which recognizes that other courts have enforced arbitration agreements against nonsignatories when (1) a signatory must rely on the terms of the written agreement to assert claims against a non-signatory, or (2) the signatory alleges substantially interdependent and concerted misconduct by the non-signatory and one or more signatories.  813 N.E.2d 4, 9 (Ohio App. Ct. 2004).  However, the court in *I Sports* concluded that the nonsignatory did not satisfy either standard.  The Court therefore did not affirmatively conclude that either showing was sufficient to invoke equitable estoppel under Ohio law.[7]  Even if a nonsignatory has to show that the signatory relied on the written terms of the contract or that the signatory alleges substantially interdependent misconduct in order to enforce an arbitration agreement, that does not mean that detrimental reliance also is not required.  As the Seventh Circuit has explained, even in the arbitration context, "the court must apply traditional state promissory estoppel principles to decide whether a non-party should be bound by the terms of another's contract."  *Warciak*, 880 F.3d at 872.  Because detrimental reliance is required to invoke equitable estoppel under Ohio law, and because CDK does not even argue that it can show detrimental reliance, CDK cannot invoke equitable estoppel under Ohio law to force the Reynolds Dealers to arbitrate their claims against CDK.

---

[6] CDK notes that Plaintiffs fail to address the cases they cited to in their opening brief in which courts held that allegations of a conspiracy or joint venture between signatory and non-signatory defendants, including in the antitrust context, were sufficient to equitably estop the signatory plaintiff to arbitrate claims against the non-signatory defendant.  [266, at 25 n.5.]  However, none of those cases purported to apply Ohio law. Furthermore, all of those cases were decided before the Supreme Court made clear that state law governs who is bound by agreements to arbitrate.  *Arthur Andersen LLP*, 556 U.S. at 630.

[7] The only Ohio case cited by the court in *I Sports* was *Gerig v. Kahn*, which held that a signatory to a contract may enforce an arbitration provision against a nonsignatory seeking a declaration of the signatories' rights and obligations under the contract.  769 N.E.2d 381, 385-86 (Ohio 2002).  However, the Ohio Supreme Court later limited *Gerig* to situations "when a nonparty is 'seeking a declaration of the *signatories'* rights and obligations *under* the contract*."  Henderson v. Lawyers Title Ins. Corp.*, 843 N.E.2d 152, 161 (Ohio 2006).

### iii. Waiver

The Reynolds Dealers also argue that CDK waived any right to seek arbitration of their claims by failing diligently to assert its claimed right to arbitrate. "Despite the federal policy favoring arbitration, a contractual right to arbitration can be waived." *Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prod., Inc.*, 660 F.3d 988, 994 (7th Cir. 2011) (citing *St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co., Inc.*, 969 F.2d 585, 587 (7th Cir. 1992)). A waiver of a contractual right to invoke arbitration can be implied or express. *Cabinetree of Wisconsin, Inc. v. Kraftmain Cabinetry, Inc.*, 50 F.3d 388, 390 (7th Cir.1995). "For waiver of the right to arbitrate to be inferred, [the Court] must determine that, considering the totality of the circumstances, a party acted inconsistently with the right to arbitrate." *Kawasaki Heavy Indus., Ltd.*, 660 F.3d at 994.

"Although a variety of factors may be considered, diligence or a lack thereof should weigh heavily in the court's determination of whether a party implicitly waived its right to arbitrate." *Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 562 (7th Cir. 2008) (citation omitted). The Seventh Circuit therefore has directed courts to consider whether "the party seeking arbitration * * * [did] all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration[.]" *Smith v. GC Servs. Ltd. P'ship*, 907 F.3d 495, 499 (7th Cir. 2018) (quoting *Cabinetree of Wisconsin, Inc.*, 50 F.3d at 391 (internal quotation marks omitted)). Other considerations "include whether the allegedly defaulting party participated in litigation, substantially delayed its request for arbitration, or participated in discovery." *Halim*, 516 F.3d at 562. Still, "waiver is not lightly inferred; the strong federal policy favoring enforcement of arbitration agreements impresses upon a party asserting waiver a heavy burden." *Williams v. Katten, Muchin & Zavis*, 837 F. Supp. 1430, 1442 (N.D. Ill. 1993) (quoting

St. Mary's Med. Ctr. of Evansville, Inc., 969 F.2d at 590); see also *Dickinson v. Heinold Secs., Inc.*, 661 F.2d 638, 641 (7th Cir. 1981) ("a 'waiver of arbitration is not lightly to be inferred'" (quoting *Midwest Window Sys., Inc. v. Amcor Indus., Inc.*, 630 F.2d 535, 536 (7th Cir. 1980)).

In this case, all relevant factors weigh in favor of finding that CDK waived any right to arbitrate the Reynolds Dealers' claims against it. To begin, CDK did not assert its intent to arbitrate at the "earliest feasible" time. CDK argues that it moved to compel arbitration at the earliest possible opportunity—when it filed its opening motion to dismiss. However, CDK earlier could have asserted its intent to arbitrate, just as Reynolds has done throughout this lawsuit. The first dealership class action, *Teterboro Automall, Inc. v. CDK Global, LLC*, Case No. 2:17-cv-08714 (D.N.J.), was filed on October 19, 2017. Although Reynolds asserted its intent to arbitrate when it and CDK moved for transfer and consolidation of the cases against them, CDK did not make any similar reservation. "[W]hen a party chooses to proceed in a judicial forum, there is a rebuttable presumption that the party has waived its right to arbitrate." *Kawasaki*, 660 F.3d at 996. Along the same lines, CDK participated in discovery without making clear that its participation in discovery was not a waiver of its now-claimed right to arbitrate.[8] *Cf. Kawasaki Heavy Indus., Ltd.*, 660 F.3d at 998 (finding no waiver where the defendant "mentioned its desire to arbitrate at every turn"). While it may not be necessary for a defendant expressly to reserve its right to arbitrate whenever it participates in discovery, in light of CDK's failure to assert its intent to arbitrate until July 2018, CDK acted inconsistent with the intent to arbitrate.

---

[8] To be sure, the Court is not saying that Defendant's participation in discovery alone is the basis for finding waiver. Defendant could have participated in discovery while reserving its right to arbitrate. Given the simplicity of Defendant's arbitration argument (*i.e.*, Plaintiffs must arbitrate all claims relating to their contract with Reynolds), however, it does not appear as though Defendant's delay was necessary for Defendant to be able to determine which of Plaintiffs' claims are or are not arbitratable. Thus, Defendant's participation in discovery without any reservation of its right to arbitrate until July 2018 was inconsistent with the intent to arbitrate.

Furthermore, although a showing of prejudice is not required in order to find waiver, it is relevant. *Kawasaki*, 660 F.3d at 995. Here, CDK argues that the Reynolds dealers would not be prejudiced as a result of CDK's delay in asserting its intent to arbitrate, but it is difficult to see how litigating a complex class action and participating in extensive discovery in court only to have litigation come to a halt would not be prejudicial to Plaintiffs. CDK argues that the Reynolds Dealers were not prejudiced because discovery from the dealers is relevant to many claims and issues raised in other MDL cases. [378, at 11 (citing *Dickinson v. Heinold Sec.*, 661 F.2d 638, 642 (7th Cir. 1981).] However, CDK—not the Plaintiffs—are parties to the other MDL cases. Thus, although it may have been necessary for CDK to participate in discovery regardless of whether it arbitrated its claims against the Reynolds Dealers, the Reynolds Dealers would not have had to participate in discovery (at least as a party). Given CDK's substantial delay in invoking its intent to arbitrate, forcing the Reynolds Dealers to arbitrate now would be highly prejudicial. Accordingly, even if CDK could invoke the doctrine of equitable estoppel to force the Reynolds dealers to arbitrate their claims, CDK waived its right to do so.

## B. Antitrust Standing

### i. Damages

Defendant argues that Plaintiffs' federal antitrust claims for damages (Counts I, III, and V) should be dismissed under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), which holds that a federal antitrust plaintiff may not seek damages based on alleged supracompetitive prices passed through by a purchaser earlier in the distribution chain. As the Seventh Circuit recently summarized, *Illinois Brick* "forbids a customer of the purchaser who paid a cartel price to sue the cartelist, even if his seller—the direct purchaser from the cartelist—passed on to him some or even all of the cartel's elevated price." *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816,

821 (7th Cir. 2015). This is because when defendants "sell to a third party who * * * could recover for any injury" it suffers as a direct purchaser, there is no need for separate and duplicative suits for "implicit overcharges" claimed further downstream. *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 482 (7th Cir. 2002). "[W]here a plaintiff's injury is derivative of a more direct injury to some other person, and that person would have a strong motivation to pursue its own antitrust claim against the defendant, standing is not likely to exist." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2013 WL 4506000, at *9 (N.D. Ill. Aug. 23, 2013) ("*DFA I*") (citing *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)).

According to Defendant, because Plaintiffs are indirect purchasers of data integration services, Plaintiffs are not proper federal antitrust Plaintiffs under *Illinois Brick*. Plaintiffs implicitly recognize that their Sherman Act claims would be barred by *Illinois Brick* to the extent that their purported antitrust injuries are derivative of more direct injuries to participants or direct consumers in the DIS market. Plaintiffs argue, however, that Defendant erroneously conflates their status as indirect purchasers in the DIS market with their status as direct purchasers in the DMS market.

The Court agrees that Plaintiffs' horizontal conspiracy claim (Count I) is—at least to some extent—based on alleged anticompetitive conduct in the DMS market, as Plaintiffs allege that its DMS lost functionality and is worth less as a result of CDK's agreements with Reynolds. Defendant argues that this alleged diminution in value and functionality is just the flip side of the purported inability to access data integration in the DIS market.[9] However, Plaintiffs allege misconduct in the DMS market resulting in harm in the DMS market. Specifically, Plaintiffs allege

---

[9] Defendant also argues that the Plaintiffs' argument that the alleged conspiracy deprived the DMS market of a "primary point of differentiation" between CDK and Reynolds fails because the 2015 Agreements do not prohibit either party from allowing hostile integration at any time. [266, at 29.] As discussed below, however, the Court would have to ignore the Plaintiffs' well-pleaded allegations to accept that argument.

that CDK and Reynolds, competitors in the DMS market, agreed not to compete with each other in certain respects (*i.e.*, permitting third-party DMS access) resulting in DMSs with less value and inferior functionality. Plaintiffs therefore allege anticompetitive conduct in the DMS market.

To the extent that Plaintiffs seek to recover alleged supracompetitive prices passed through vendors, however, the Court agrees that Plaintiffs' claims are barred by *Illinois Brick*. Although Plaintiffs argue that their exclusive dealing claim based on vendor contracts relates to alleged anticompetitive conduct in the DMS market, Plaintiffs exclusive dealing claim is based on their status as indirect purchasers in the DIS market. Indeed, in arguing that it sufficiently has alleged substantial foreclosure, as necessary to state a claim for exclusive dealing under federal law, Plaintiffs argue that they sufficiently have alleged substantial foreclosure in the DIS market. Similarly, Plaintiffs' Section 2 claims are based on alleged monopolistic conduct by Defendant in the DIS market—not the DMS market. As noted by the Seventh Circuit, in relation to the DMS market, "neither Reynolds nor CDK is a monopolist." *Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019, 1025 (7th Cir. 2017). Thus, Plaintiffs' exclusive dealing claim based on vendor contracts and Plaintiffs' Section 2 monopoly claim are barred by *Illinois Brick*. The Court grants Defendant's motion to dismiss Count II and Count V. Furthermore, to the extent that Plaintiffs seek to bring a horizontal conspiracy claim based on agreements to restrain competition in the DIS market, Plaintiffs' horizontal conspiracy claim fails under *Illinois Brick* and Plaintiffs may not proceed under that theory.

ii.      *Injunctive Relief*

Defendant also argues that Plaintiffs lack antitrust standing to bring claims for injunctive relief under the Sherman Act and therefore moves to dismiss Counts II and IV. Antitrust standing "examines the connection between the asserted wrongdoing and the claimed injury to limit the

class of potential plaintiffs to those who are in the best position to vindicate the antitrust infraction." *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993) (citations omitted). In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), the Supreme Court held that regardless of whether an antitrust plaintiff has "constitutional standing," at the pleadings stage a district court "must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Id*. at 535 & n.31. The Court announced six factors to consider in assessing whether an antitrust plaintiff is the proper party to proceed under the antitrust laws: "(1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of the damages; and (6) the risk of duplicate recovery or complex damage apportionment." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 484 (7th Cir. 2002) (citing *AGC*, 459 U.S. at 537-45). For injunctive relief, the "speculative nature of the damages" and "risk of duplicate recoveries" factors drop out of the analysis, *DFA I*, 2013 WL 4506000, at *9, but the need to establish antitrust standing remains. See *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110-11 (1986) (requiring party seeking injunctive relief to show antitrust standing). "The 'broad proposition' emanating from *AGC* is that 'a party cannot recover when others more directly injured are better able to state a claim.'" *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at *6 (N.D. Ill. June 29, 2015) ("*DFA II*") (quoting *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 489 (7th Cir. 2002)). Defendant argues that Plaintiffs' federal

antitrust claims seeking injunctive relief fail under *AGC* because there are more directly-affected purchasers that can—and in this case are—seeking the same injunctive relief.

Plaintiffs argue that Defendant's *AGC* argument fails with respect to Defendants' conspiracy directed towards the DMS market because Plaintiffs—as direct purchasers of Defendant's DMS—are the most "directly-affected purchasers." Defendant does not dispute that—to the extent that Plaintiffs' claims are based on anticompetitive conduct in the DMS market—Plaintiffs' claims are not be barred by *AGC*. As discussed above, however, Defendant contends that Plaintiffs' federal antitrust claims actually are based on alleged anticompetitive conduct in the DIS market, not the DMS market. Because Plaintiffs' federal horizontal conspiracy claims are based—at least to some extent—on alleged anticompetitive conduct in the DMS market, as discussed above, the Court denies Defendant's motion to dismiss such claims pursuant to *AGC*.

However, Plaintiffs' exclusive dealing claim for injunctive relief (Count IV) is based on alleged anticompetitive conduct in the DIS market. Plaintiffs nonetheless argue that when plaintiffs "do not seek damages for their Sherman Act claim, it is inconsequential that there are more 'immediate victims' of the scheme." [358, at 56 (quoting *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 814 (N.D. Ill. 2017) (internal quotation marks omitted)).] Still, under *AGC*, the Court must consider the directness of the injury. Defendant contends that *AGC* bars federal antitrust claims—even claims seeking injunctive relief—when more directly-affected purchasers seek the same injunctive relief that the more-remote plaintiff demands. In making that argument, Defendant relies on *DFA I*, which held that downstream participants in the retail market failed to satisfy the directedness prong of *AGC*. 2013 WL 4506000. In that case, the plaintiffs alleged that defendants conspired to buy all of the available long positions in three months' worth of Class III milk futures contracts on the Chicago Mercantile Exchange in an effort to gain control

of those markets and sell their positions at an unreasonably high price. *Id*. at *1. Plaintiffs alleged

that they were injured by defendants' actions when they purchased finished products at artificially

inflated prices. *Id*. But plaintiffs were "downstream participants in a retail market * * * separate

from the allegedly restrained market" and "the allegedly price-fixed products * * * [were] not even

components of the products that [the plaintiffs] purchased." *Id*. at *12-13. This Court therefore

concluded that plaintiffs failed to satisfy the directness factor of the antitrust standing analysis. *Id*.

The Court noted that the plaintiffs' injury was "not alleged to be a necessary step in furthering the

ends of the conspiracy involving the two relevant markets." *Id*. at *11. In fact, the causal link

between the alleged anticompetitive conduct and the antitrust injury was attenuated; "there [were]

numerous links in the chain of distribution before a finished dairy product reache[d] a retailer,

including transactions between the retailer and its distributors or wholesalers, between distributors

or wholesalers and manufacturers of cheese products, and between manufacturers and milk

producers." *Id*. at *14.

The Court did not hold, however, that *AGC* categorically bars federal antitrust claims—

even claims seeking injunctive relief—whenever more directly-affected purchasers seek the same

injunctive relief that the more-remote plaintiff demands.[10] The Court recognized that "the fact that

---

[10] Because the Court was applying the *AGC* factors to claims for damages and for injunctive relief, the Court addressed all relevant *AGC* factors. However, as recognized by the Court, "[w]hen injunctive relief alone is at issue, some factors—namely the speculative nature of the damages and the risk of duplicate recoveries or complex damages apportionment—do not apply to the antitrust standing analysis." *DFA I*, 2013 WL 4506000, at *9 (citation omitted). This is consistent with *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986), in which the Supreme Court recognized that courts should protect against multiple lawsuits for damages and duplicative recoveries by examining factors such as "the potential for duplicative recovery, the complexity of apportioning damages, and the existence of other parties that have been more directly harmed, to determine whether a party is a proper plaintiff under § 4." *Id*. at 111 n.6. Because claims for injunctive relief do not present a risk of multiple lawsuits for damages and duplicative recoveries, the Supreme Court indicated that those factors are not relevant to the antitrust standing analysis for claims seeking injunctive relief. *Id*. "[T]he fact is that one injunction is as effective as 100, and, concomitantly, that 100 injunctions are no more effective than one." *Id*. (quoting *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 261 (1972) (internal quotation marks omitted)).

the alleged conspiracy operated in the separate but related futures market [did] not necessarily doom the indirect purchaser plaintiffs' claims." *Id*. Furthermore, other courts in this district have concluded that "[w]hen damages are not at issue, as long as the plaintiffs' alleged injury is not 'remote' * * * but is directly attributable to the conspiracy, the injury satisfies *AGC*." *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 814 (N.D. Ill. 2017).

Here, Plaintiffs claimed injury is not so remote as to bar their claims for injunctive relief. The first four *AGC* factors (the factors relevant to Plaintiffs' injunctive relief claims)—including the directness factor—weigh in favor of finding that Plaintiffs have antitrust standing to pursue their federal antitrust claims for injunctive relief. Plaintiffs purchase the services of vendors who are consumers in the DIS market and who rely on DIS to provide their applications to dealers. Furthermore, the DIS market is closely related to and dependent on the DMS market in which Plaintiffs are consumers. Plaintiffs' injury therefore was a necessary step in furthering the ends of the conspiracy in the relevant markets. Furthermore, Plaintiffs allege that vendors have passed on overcharges directly to dealers. Thus, unlike *DFA I*, the causal link between the alleged anticompetitive conduct and the antitrust injury is not attenuated. Defendant does not argue that the presence of an improper motive is lacking. Nor does Defendant argue that Plaintiffs' claimed injuries are not the type of injuries Congress sought to redress in the Sherman Act. Although Defendant does dispute that Plaintiffs satisfy the directness factor—relying extensively on *DFA I*—the Court finds *DFA I* distinguishable for the reasons discussed above. Accordingly, the Court denies Defendant's motion to dismiss Plaintiffs' federal antitrust claims for injunctive relief (Counts II and IV) under *AGC*.

C.      **Failure to State a Claim Under Federal Law**

i.      *Horizontal Conspiracy Claims (Counts I-II)*

Plaintiffs bring Section 1 horizontal conspiracy claims against Defendant based on agreements made between CDK and Reynolds that—according to Plaintiffs—amount to agreements to restrain competition in the DMS and DIS markets.  With respect to the DMS market, Plaintiffs allege that Defendant and Reynolds are "horizontal competitors" that both possess "dominant positions" in the DMS market.  [198, at ¶¶ 170, 177.]  Plaintiffs further allege that Defendant and Reynolds agreed to restrain competition in that market by agreeing to "reduce the functionality of CDK's DMS (including dealerships' ability to freely access their DMS data through authorized persons)."  [*Id.* at ¶ 171; see also ¶¶ 148-49 (Dealerships' ability to access their data on DMS through third parties "was an important feature of the DMS and its functionality," and Defendants unlawfully "eliminated this feature of the DMS and its functionality.").]  With respect to the DIS market, Plaintiffs allege that Defendants agreed that CDK would stop hostilely accessing Reynolds's DMS.  Defendants also agreed that they would not assist in the hostile access of one another's DMSs.  Still, Defendant argues that Plaintiffs' allegations of a horizontal conspiracy are insufficient to state a claim for a number of reasons.

First, Defendant argues that Plaintiffs are wrong about what the challenged agreements provide.  Focusing on the language of the written agreements between Defendant and Reynolds, Defendant argues that the "agreements merely wind-down CDK's hostile access to Reynolds's DMS."  [266, at 33.]  According to Defendant, "[t]hey do not divide any market, restrain any competition, or say anything about CDK's or Reynolds's third-party access policies (which either company could change tomorrow)."  *Id.*; see also *Authenticom*, 874 F.3d at 1025 ("nothing in the 2015 agreements forbade CDK itself from allowing access to its own data integration system").

To be sure, the 2015 written agreements between Defendant and Reynolds do not expressly require that Defendant and Reynolds block third-party access on their own DMSs. Yet, as noted by Judge St. Eve in the *Authenticom* case, the agreements do "effectively require that CDK stop hostile access of Reynolds DMSs (for a period, at least) and, more importantly, expressly prohibit [Defendant and Reynolds] from assisting in the hostile access of one another's DMSs." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 951. As Judge St. Eve also noted, "[s]uch a partial ceasefire and mutual forbearance between two rivals would make sense if * * * Defendants sought to 'support' one another's integration services to the exclusion of third-party integrators from the competition." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 951 (N.D. Ill. 2018). The anticompetitive effects of this "partial ceasefire" and "mutual forbearance between two rivals" were not limited to the DIS market. The alleged horizontal agreement is between two competitors in the DMS market. CDK and Reynolds—"horizontal competitors" and possessors of "dominant positions" in the DMS market—agreed to restrain competition in that market by agreeing to "reduce the functionality of CDK's DMS (including dealerships' ability to freely access their DMS data through authorized persons)." [198 (Compl.), ¶¶ 170-71.] Evidence of "retardation of innovation and subsequent decrease in the quality of [products] potentially available to consumers, if believed, could qualify as a harm to competition and consumers." *Aventis Envtl. Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 504 (S.D.N.Y. 2005). Plaintiffs allege such a decrease in the quality of the products they purchased from Defendant here.

Furthermore, the alleged agreements between Defendant and Reynolds are not necessarily limited to the 2015 written agreements. Plaintiffs claim that Defendant's executives admitted to an agreement between Defendant and Reynolds to block third-party access of their respective

DMSs. For example, in April 2016, CDK's Vice President of Product Management, Dan McCray, told Authenticom's CEO Stephen Cottrell:

> [W]e've entered into an agreement with Reynolds and Reynolds, okay? That agreement specifically says that we're going to support each other's third party interfaces, and we're working collaboratively to remove all hostile integrators from our DMS system.

[198 (Compl.), at ¶ 101.] CDK's argument that Plaintiffs only have alleged an agreement to wind-down CDK's hostile access to Reynolds's DMS therefore fails, as it ignores Plaintiffs' well-pleaded allegations of a horizontal agreement beyond the written agreements between Defendant and Reynolds.

In the *Authenticom* matter, Defendant argued that the court should disregard these allegations because the best evidence of CDK's and Reynolds's agreement is their written contracts. Judge St. Eve found that argument unpersuasive, concluding that the argument "backfire[d]" because it "suggests that [CDK and Reynolds] (or at least their executives) thought that the 2015 Agreements aimed to 'block' third-party integrators." [176, at 29.] CDK argues that conclusion was erroneous because using allegations of oral statements to inform the meaning of a written contract would upend the established contractual cannon that oral evidence may not supplement a fully integrated, written agreement. [266, at 37 n.13 (citing 11 Williston on Contracts § 33:1 (4th ed. 2018)).]

However, to the extent the statements made by Defendant's and Reynolds's executives refer to the 2015 written agreements, the Court agrees that they indicate that the *aim* of those agreements was to block third-party integrators. The Court would not expect that CDK and Reynolds would identify that intent in the text of the contract, but that does not mean the parties' statements regarding their intent is being used to interpret the parties' obligations under the contract. Indeed, although the Seventh Circuit recognized that the 2015 written agreements "do

not explicitly state that defendants will work together to eliminate third-party data integrators, the agreements have that effect * * * After the agreements, there is little room in the market for third-party integrators." *Authenticom*, 2017 WL 3017048 at *6. Regardless, as Judge St. Eve also noted, in order to accept Defendant's argument, the Court would have to infer that Defendant's and Reynolds's executives were referring to the written agreements—as opposed to an extracontractual agreement—requiring that the Court make an inference in Defendant's favor, which the Court cannot do at the motion to dismiss stage. Furthermore, to the extent that the statements made by CDK's and Reynolds's executives are not reflected in the agreement, it reasonable can be inferred that there was an extracontractual agreement between CDK and Reynolds. Again, the Court would not expect CDK and Reynolds to memorialize all aspects of the alleged anticompetitive agreement in their written agreements. The Court must make this reasonable inference at the motion to dismiss stage.

Second, Defendant argues that Plaintiffs' Section 1 horizontal conspiracy claim fails because Plaintiffs merely have alleged parallel conduct. "Tacit collusion, also known as conscious parallelism, does not violate section 1 of the Sherman Act. Collusion is illegal only when based on agreement." *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015). Defendant therefore argues that Plaintiffs' Section 1 claims fail because Plaintiffs fail to identify "evidence that 'tends to exclude the possibility' of independent conduct." [260, at 14 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)).] Although the Supreme Court has held "that a plaintiff must present evidence showing that defendants had a 'rational economic motive to conspire' and evidence 'that tends to exclude the possibility' of independent conduct to survive summary judgment[,]" *In re Dealer Mgmt. Sys. Antitrust Litig.,*

313 F. Supp. 3d at 953 (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 588), courts have held that such a showing is not necessary at the pleading stage. *Id.* (collecting cases).

Regardless, Plaintiffs plausibly have alleged a motive to conspire. Plaintiffs allege that dealers preferred CDK's "open" DMS and that Reynolds therefore lost market share in the DMS market when it closed its DMS. [198 (Compl.), at ¶¶ 7, 77-78.] It therefore is reasonable to infer that Defendant and Reynolds were motivated to conspire with each other so that they could close their systems to data integrators without fear that their customers would turn to another provider.[11] *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 953. Furthermore, accepting Defendant's argument that Plaintiffs only have alleged parallel conduct would require that the Court ignore well-pleaded allegations that Defendant's executives admitted to the conspiracy. Such admissions are direct evidence of an illegal conspiracy. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (recognizing "an admission by an employee of one of the conspirators" as direct evidence supporting a price-fixing case). Accordingly, the Court denies Defendant's motion to dismiss Plaintiffs' horizontal conspiracy claims (Counts I-II).

> ii.     *Exclusive Dealing (Counts III-IV)*

Defendant also argues that Plaintiffs have not sufficiently alleged that Defendant engaged in exclusive dealing. "An exclusive dealing contract obliges a firm to obtain its inputs from a

---

[11] Defendant argues that such a motive is not plausible because it would not risk treble-damages liability in exchange for Reynolds's mere agreement to continue doing what it already had done for years. [266, at 34.] Defendant also argues that Plaintiffs concede a number of points demonstrating that Defendant and Reynolds engaged in nothing more than permissible parallel conduct. [*Id.*] For example, Defendant argues that the fact that Reynolds's decision to close its DMS preceded Defendant's decision to do the same by several years demonstrates that there was no illicit agreement between CDK and Reynolds. [*Id.*] However, nothing prevented Reynolds from deciding to open its DMS. Indeed, given that Plaintiffs allege that Reynolds lost business to Defendant as a result of its closed DMS, Reynolds had the incentive to do so. While Defendant is free later to argue that the purported concessions demonstrate that Defendant and Reynolds merely engaged in parallel conduct, the Court cannot ignore the well-pled allegations of a horizontal agreement and must draw all reasonable inferences in Plaintiffs' favor on a motion to dismiss. *Killingsworth*, 507 F.3d at 618.

single source." *Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 46 (7th Cir. 1996). "The objection to exclusive-dealing agreements is that they deny outlets to a competitor during the term of the agreement." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 393 (7th Cir. 1984). Because of the procompetitive benefits of exclusive dealing (*e.g.*, increasing allocative efficiency, preventing free-riding), courts analyze exclusive dealing claims under the rule of reason. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 956-57.

Plaintiffs argue that Defendant has engaged in exclusive dealing by preventing vendors from working with independent data integrators (such as Authenticom). Plaintiffs allege that "Defendants have utilized their control of the DMS market to impose exclusive dealing provisions on Vendors. These exclusive dealing provisions necessitate that any Vendor doing business with CDK or Reynolds cannot contract with any other independent DIS provider, and these exclusive dealing provisions are purportedly infinite in duration." [198 (Compl.), at ¶ 13.]

Defendant argues that Plaintiffs' exclusive dealing claim fails because 3PA is a "'managed interface' that is *part of* CDK's DMS," not a separate product. [266, at 38.] However, Defendant fails fully to develop this argument. For example, Defendant does not even discuss the relevant consideration for determining a product market, such as separate demand, the products peculiar characteristics and uses, "distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). These factors appear to weigh in favor of finding a separate market for data integration services.[12] For example, it is not the dealers that purchase data integration services. There are therefore distinct customers and distinct prices for data integration services. Furthermore, based on the fact-intensive nature

---

[12] In the *Authenticom* decision, Judge St. Eve described the data-integration market and the DMS market as separate markets based on similar allegations. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 940. The Court sees no reason to change course based on the cursory argument raised by Defendant now.

of the product-market inquiry, the issue generally is not properly resolved on a motion to dismiss. *Ploss v. Kraft Foods Grp., Inc.*, 197 F.Supp.3d 1037, 1070 (N.D. Ill. 2016) ("Courts should dismiss antitrust claims based on a market argument only when it is certain that the alleged relevant market clearly does not encompass all interchangeable substitute products"); accord *Avnet, Inc. v. Motio, Inc.*, 2015 WL 5307515, at *4 (N.D. Ill. Sept. 9, 2015) ("[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market" (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001)) (alteration in original)).

Finally, Defendant argues that even if Plaintiffs sufficiently allege exclusive dealing, Plaintiffs fail to allege substantial foreclosure. [266, at 38-39.] "[E]xclusive dealing arrangements violate antitrust laws only when they foreclose competition in a substantial share of the line of commerce at issue[.]" *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737-38 (7th Cir. 2004) (citing *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 320-27 (1961)). Defendant argues that Plaintiffs have not alleged substantial foreclosure because (1) there are no allegations that Defendant's vendor contracts foreclosed Plaintiffs from a substantial share of any market, and (2) any argument that hostile integrators are excluded by the contracts "would fail because hostile integrators are still able to deal with DMS providers covering a sizeable portion of the market for car dealership DMS services." [266, at 38-39.] In its response brief, Plaintiffs appear to concede the former argument, focusing on allegations that the foreclosure caused by the agreements raised prices for data integration services, which Plaintiffs allege were passed onto Plaintiffs. [198 (Compl.), at ¶¶ 149-155, 157, 161.] Defendant argues that Plaintiffs lack antitrust standing to challenge the foreclosure of independent integrators such as Authenticom. As discussed above, to the extent that Plaintiffs seek damages, that is true and the Court grants

Defendant's motion to dismiss Plaintiffs exclusive dealing claim for damages (Count III) on that basis.

Still, Plaintiffs have standing to pursue their exclusive dealing claim for injunctive relief, and Plaintiffs have alleged facts sufficient to establish substantial foreclosure. Specifically, Plaintiffs allege that CDK and Reynolds together control approximately 75 percent of the DMS market, with CDK alone controlling approximately 45 percent. [198 (Compl.), at ¶ 2.] With the two dominant DMS providers agreeing to block independent data integrators, CDK and Reynolds have been able to charge supracompetitive prices for data integration services. [198 (Compl.), at ¶¶ 144, 185.] Vendors are forced to pay supracompetitive prices for data integration services because they need to be able to service dealers who have CDK or Reynolds as their DMS providers. Vendors are likely only willing to pay such prices because competitors like Authenticom are foreclosed from competing for that business. These allegations are sufficient to establish foreclosure at the pleading stage. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 957 (concluding that similar allegations were sufficient to establish at the motion to dismiss stage that the "exclusive-dealing contracts [foreclosed] a substantial portion of the data-integration market"); see also *Pipe Fittings Direct Purchaser Antitrust Litig.*, 2013 WL 812143, at *19 (D.N.J. Mar. 5, 2013) ("The question of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line of commerce is a merits question not proper for the pleading stage."). Accordingly, Defendant's motion to dismiss Plaintiffs' exclusive dealing claim for injunctive relief (Count IV) is denied.

### iii. Rule of Reason

Defendant argues that, even assuming that Plaintiffs sufficiently allege the kind of conduct that requires a rule-of-reason analysis under Section 1, its conduct rested on a clear and important

business justification: the need to protect its system and the data on that system from cybersecurity threats. [198 (Compl.), at ¶ 154.] However, whether challenged conduct has a procompetitive effect on balance so as to survive scrutiny under a rule-of-reason analysis is a factual issue for trial. *Cook Inc. v. Boston Sci. Corp.*, 2002 WL 335314, at *4 (N.D. Ill. Feb. 28, 2002) ("The rule of reason entails a complex inquiry into the surrounding circumstances that is not susceptible to resolution on a motion to dismiss[.]"); *Watkins v. Smith*, 2012 WL 5868395, at *7 (S.D.N.Y. Nov. 19, 2012) ("The rule-of-reason inquiry requires, at the motion to dismiss stage, that the plaintiff identify the relevant market affected by the challenged conduct and allege an actual adverse effect on competition in the identified market."). Furthermore, Plaintiffs specifically allege that Defendant's security justification is pretextual. [198 (Compl.), at ¶¶ 153-64.] Accepting all of Plaintiffs' well-pleaded factual allegations and drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs sufficiently have alleged that Defendant's proffered justification for the challenged conduct is pretextual. According, whether Defendant's conduct is justified under a rule-of-reason analysis cannot be determined at the motion to dismiss stage.

### D.     State Claims Dependent on Federal Antitrust Claims

Because Plaintiffs' state antitrust claims parallel their federal antitrust claims [266, at 44 n.19 (collecting sources)], Defendant argues that Plaintiffs' state antitrust claims (Counts VI–XXXI) fail in lockstep with the federal claims asserted in Counts I through V. Defendant also argues that at least four of the consumer protection claims fail for the same reason. Courts applying Alaska, California, Florida, and South Carolina law have held that consumer protection claims based on the same factual allegations as a failed antitrust claim must likewise be dismissed. *Alaska Gasline Port Auth. v. ExxonMobil Corp.*, 2006 WL 1718195, at *3 n.24 (D. Alaska June 19, 2006) (Alaska); *In re Wellpoint, Inc., Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 927-28

(C.D. Cal. 2012) (California); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 819 (N.D. Ill. 2017) (Florida); *In re Aggrenox Antitrust Litig.*, 2016 WL 4204478, at *9 (D. Conn. Aug. 9, 2016) (South Carolina). Because Plaintiffs federal antitrust claims survive (at least to some extent), the Court denies Defendant's motion to dismiss Plaintiffs' state antitrust claims and consumer protection claims under Alaska, California, Florida, and South Carolina law for failure to allege a federal antitrust violation.

### E.  Application of *Illinois Brick* to South Carolina Claim

Defendant argues that Plaintiffs' antitrust claims under South Carolina law also should be dismissed under *Illinois Brick*.[13] South Carolina courts interpret the state's antitrust laws consistent with federal law. *In re Microsoft Corp. Antitrust Litig.*, 401 F. Supp. 2d 461, 463 (D. Md. 2005) ("South Carolina has long adhered to a policy of following federal precedents in matters relating to state trade regulation enforcement.") (quoting *Drs. Steuer & Latham, P.A. v. Nat'l Med. Enters.*, 672 F. Supp. 1489, 1521 (D.S.C. 1987), aff'd, 846 F.2d 70 (4th Cir. 1988)); *S.C. Cotton Growers' Co-op. Ass'n v. English*, 133 S.E. 542, 543 (S.C. 1926) (looking to federal case law to construe South Carolina's antitrust statute). Because South Carolina has not enacted an *Illinois Brick* repealer statute, the Court grants Defendant's motion for dismissal of Plaintiffs' South Carolina antitrust claim (Count XXV).[14]

---

[13] Defendant also argues that Plaintiffs' claim under Illinois law should be dismissed because the Illinois Antitrust Act provides that only the Illinois Attorney General may bring a class action asserting indirect purchaser claims. See 740 Ill. Comp. Stat. 10/7(2). Because Illinois otherwise allows indirect purchaser claims, see *id*., the Court views the limit on class actions to be a kind of class action bar, which the Court addresses below.

[14] Indeed, Plaintiffs do not even respond to Defendant's *Illinois Brick* argument under South Carolina law, implicitly conceding its merit of the argument.

### F.  *AGC* and Related State-Law Causation Requirements

#### i.  *Applicability of* AGC

Plaintiffs argue that *AGC* does not apply to state-law claims of indirect purchasers who participate in the market that was restrained.  However, neither the Supreme Court nor the Seventh Circuit has limited the application of *AGC* to certain kinds of antitrust claims.  To the contrary, the Seventh Circuit has explained that *AGC* sets forth factors to consider whether a plaintiff satisfies the proximate cause (*i.e.*, antitrust standing) requirement implicit in every antitrust case.  *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 743 (7th Cir. 2018) ("Proximate causation is an essential element that plaintiffs must prove in order to succeed on any of their claims.").  To be sure, this is not to say that *AGC* bars such claims.  Whether *AGC* applies and whether *AGC* bars Plaintiffs' state law claims are different.

Although the Court concludes that *AGC*'s antitrust standing requirement applies in all federal antitrust cases, that does not answer whether *AGC* applies to Plaintiffs' claims under state law.  "While most states model their antitrust statutes and jurisprudence on federal law, they are under no obligation to do so."  *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 743 (7th Cir. 2018) (citing *California v. ARC Am. Corp.*, 490 U.S. 93, 102 (1989)).  Still, many states have harmonization provisions—which can either be statutory or derived from common law—that provide that the state's antitrust laws are to be read in harmony with federal antitrust laws.  Even though all but one state at issue has a harmonization provision, many states expressly have rejected *Illinois Brick*'s bar on indirect purchaser claims by enacting "'repealer statutes' abrogating the Supreme Court's prohibition on indirect-purchaser actions as articulated in *Illinois Brick*."  *DFA II*, 2015 WL 3988488, at *6.  The key question is how, if at all, these repealer statutes impact the Court's application of *AGC* under each state's law.

Plaintiffs argue generally that the adoption of an *Illinois Brick* repealer forecloses the application of *AGC* because *AGC* borrowed the reasoning of *Illinois Brick*. Although some courts have adopted that position, see, e.g., *Broiler Chicken*, 290 F. Supp.3d at 815-16, this Court rejected that position in *DFA II*. 2015 WL 3988488, at *6. In that case, this Court held "that the presence of a statutory harmonization provision (either statutory or common law), *absent any countervailing statutory law or case law from a state appellate court,* is sufficient to permit a district court to apply federal antitrust-standing law—including *AGC*—to claims brought under that state's antitrust laws." *Id*. at *4. In reaching that conclusion, the Court noted that, absent countervailing authority, it would be odd to read an exception into a state's harmonization provision. *Id*. The Court also noted that "[t]he fact that so many states took action in response to *Illinois Brick* shows that states are quite capable of rejecting federal antitrust law when they see fit to do so." *Id*. at 6. This position is supported by recent Seventh Circuit case law.

In *Supreme Auto Transport, LLC v. Arcelor Mittal USA, Inc.*, the Seventh Circuit recognized that the adoption of an *Illinois Brick* repealer statute did not preclude the application of *AGC*. 902 F.3d 735, 744 (7th Cir. 2018). In reaching that conclusion, the Seventh Circuit explained how the *Illinois Brick* and *AGC* analyses are analytically distinct, stating that "[i]t is one thing to say that a state is willing to allow someone other than a direct purchaser to have the opportunity to shoulder the burden of showing proximate causation; it is quite another thing to say that the state has thrown both the direct-purchaser rule *and* proximate causation out the window." *Id.* States with *Illinois Brick*-repealer statutes have not "replaced one *per se* rule with another," so that all indirect-purchaser suits can proceed "no matter how far removed the purchasers are from the production process and no matter how speculative the damages award would be." *Id*. at 743-44. The Court therefore cannot assume—absent some in-state authority to the contrary—that

states that have enacted *Illinois Brick* repealers also have abandoned *AGC*'s antitrust standing requirement. Still, because the application of *AGC* to Plaintiffs' claims ultimately is a question of state law, the Court must examine whether any of the states under which Plaintiffs have brought antitrust claims would apply a different standard.

The Court therefore must now "undertake the back-breaking labor involved in deciphering the state of antitrust standing in each" relevant state to determine whether to apply *AGC* to Plaintiffs' claims. *In re Flash Memory Antitrust Litig.*, 643 F.Supp.2d at 1153. This Court has already conducted that analysis with respect to claims brought under California, Kansas, Michigan, New York, and North Carolina law,[15] concluding that *AGC* applies. *DFA II*, 2015 WL 3988488, at *11. The Court now turns to analyzing whether *AGC* applies to Plaintiffs' claims under the laws of other states not already addressed.[16]

---

[15] Plaintiffs argue that the Court's analysis regarding North Carolina law in *DFA II* is incorrect, citing to a North Carolina appellate court decision that declined to apply *AGC* where the product at issue was a component of the product purchased by indirect purchasers. [358, at 97 n.79 (citing *Teague v. Bayer AG*, 671 S.E.2d 550 (N.C. Ct. App. 2009)).] However, in *DFA II*, the Court acknowledged *Teague*, but found a lower-court decision—*Crouch v. Crompton Corp.*, 2004 WL 2414027 (N.C. Super. Oct. 28, 2004)—to be more well-reasoned and a better reflection of that the North Carolina Supreme Court would do when given the opportunity to address the issue. *DFA II*, 2015 WL 3988488, at *15. In *Crouch*, the court applied "a modified version of the *AGC* test to determine antitrust standing that retains the proximate-cause inquiry inherent in *AGC* while still respecting *Illinois Brick*'s ban on indirect-purchaser actions." *Id.* (summarizing *Crouch*, 2004 WL 2414027). The parties do not address whether Plaintiffs' claim under North Carolina satisfied the modified *AGC* test applied in *Crouch*. Given that the Court finds that Plaintiffs satisfy the more stringent federal *AGC* standard, as discussed below, Plaintiffs also would satisfy the modified *AGC* test applied in *Crouch*.

[16] In deciding whether to apply *AGC* to state-law antitrust claims, the Court looks to whether the relevant state supreme court or state legislature has spoken to the issue. See *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Jean v. Dugan*, 20 F.3d 255, 260 (7th Cir.1994). "In the absence of guiding decisions by the state's highest court, [federal courts] consult and follow the decisions of intermediate [state] appellate courts unless there is a convincing reason to predict [that] the state's highest court would disagree." *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012).

### 1.    District of Columbia

Harmonization Provision: "It is the intent of the Council of the District of Columbia that in construing this chapter, a court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes."  D.C. Code Ann. § 28-4515.

*Illinois Brick* Repealer Statute: "Any indirect purchaser in the chain of manufacture, production, or distribution of goods or services, upon proof of payment of all or any part of any overcharge for such goods or services, shall be deemed to be injured[.]"  D.C. Code Ann. § 28-4509(a).

Analysis:  At least one court in the District of Columbia has applied *AGC* despite its *Illinois Brick* repealer statute.  *Peterson v. Visa U.S.A., Inc.*, 2005 WL 1403761, at *5 (D.C. Super. Ct. Apr. 22, 2005).  Absent any binding District of Columbia authority to the contrary, the *Peterson* decision and the deferential harmonization provision remain the best indicators of how the District of Columbia Court of Appeals (the highest court in the District of Columbia) would address the issue, and both lean in favor of applying *AGC* to Plaintiffs' antitrust claim under District of Columbia law.

### 2.    Iowa

Harmonization Provision: "This chapter shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter.  This construction shall not be made in such a way as to constitute a delegation of state authority to the federal government, but shall be made to achieve uniform application of the

state and federal laws prohibiting restraints of economic activity and monopolistic practices." Iowa Code Ann. § 553.2.[17]

*Illinois Brick* Repealer Statute: None.  However, the Iowa Supreme Court has rejected the application of *Illinois Brick* to Iowa competition law.  *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 446 (Iowa 2002).

Analysis: Although the Iowa Supreme Court has rejected the application of *Illinois Brick* to Iowa competition law, the Iowa Supreme Court has continued to apply *AGC*.  *Southard v. Visa U.S.A. Inc.*, 734 N.W.2d 192, 198 (Iowa 2007) ("We think the *AGC* test is more reflective of the legal context within which the Iowa legislature enacted Iowa's competition law. Therefore, we apply the *AGC* factors to determine whether the plaintiffs may recover under Iowa law.").  Given that there is no indication that Iowa law has changed since that decision, *AGC* applies to Plaintiffs' antitrust claim under Iowa law.

### 3.    Maine

Harmonization Provision: None.  However, courts have recognized that Maine's antitrust statute parallels federal law and therefore have analyzed state claims according to federal law.  *Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 998 F.2d 1073, 1081 (1st Cir. 1993) ("The Maine antitrust statutes parallel the Sherman Act[.]" (citing Me. Rev. Stat. Ann. tit. 10, §§ 1101 et seq.)).

*Illinois Brick* Repealer Statute: "Any person, including the State or any political subdivision of the State, injured directly or indirectly in its business or property by any other person

---

[17] The Court notes that Iowa courts have interpreted the state's harmonization provision narrowly.  *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 446 (Iowa 2002) (noting that the purpose of Iowa's antitrust harmonization statute was to "achieve uniform application of the state and federal laws prohibiting monopolistic practices," not to define who can sue under antitrust law).  Given that the Iowa Supreme Court has applied *AGC*, however, this narrow interpretation has no impact on the Court's analysis.

or corporation by reason of anything forbidden or declared to be unlawful by section 1101, 1102 or 1102-A, may sue for the injury in a civil action." Me. Rev. Stat. tit. 10, § 1104(1).

Analysis: One Maine trial court has applied *AGC* despite Maine's *Illinois Brick* repealer statute, but ignored the directness factor in its analysis. *Knowles v. Visa U.S.A., Inc.*, 2004 WL 2475284, at *6 (Me. Super. Oct. 20, 2004) ("In light of Maine's *Illinois Brick* repealer, the next factor-directness or remoteness of the asserted injury-should be disregarded entirely in any inquiry as to standing under Maine's antitrust laws."). In that case, however, the court appears to have assumed that the directness inquiries automatically weighs against finding antitrust standing whenever there are more directly injured parties. *Id.* This Court does not read the directness factor so narrowly. Nor does the Court see any basis for concluding that the Maine Supreme Judicial Court would apply *AGC* so narrowly. Accordingly, the Court will consider all *AGC* factors in analyzing Plaintiffs' claim under Maine law.

### 4. Nebraska

Harmonization Provision: "When any provision of sections 59-801 to 59-831 and sections 84-211 to 84-214 or any provision of Chapter 59 is the same as or similar to the language of a federal antitrust law, the courts of this state in construing such sections or chapter shall follow the construction given to the federal law by the federal courts." Neb. Rev. Stat. Ann. § 59-829.

*Illinois Brick* Repealer Statute: "Any person who is injured in his or her business or property by any other person or persons by a violation of sections 59-801 to 59-831, whether such injured person dealt directly or indirectly with the defendant, may bring a civil action in the district court in the county in which the defendant or defendants reside or are found, without respect to the amount in controversy, and shall recover actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained and which

damages are not susceptible of measurement by ordinary pecuniary standards and the costs of suit, including a reasonable attorney's fee."  Neb. Rev. Stat. Ann. § 59-821.

Analysis:  The Supreme Court of Nebraska has applied *AGC* despite the state's repealer statute, noting that *Illinois Brick* and *AGC* are analytically distinct.  *Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293, 300 (Neb. 2006); see also *Tackit v. Visa U.S.A., Inc.*, 2004 WL 2475281, at *1 (Neb. Dist. Ct. Oct. 19, 2004) (applying *AGC* to claim under Nebraska Unlawful Restraint of Trade Act).  Accordingly, the Court will apply *AGC* to Plaintiffs' claims under Nebraska law.

### 5.    New Mexico

Harmonization Provision: "Unless otherwise provided in the Antitrust Act, the Antitrust Act shall be construed in harmony with judicial interpretations of the federal antitrust laws. This construction shall be made to achieve uniform application of the state and federal laws prohibiting restraints of trade and monopolistic practices."  N.M. Stat. Ann. § 57-1-15.

*Illinois Brick* Repealer Statute: "[A]ny person threatened with injury or injured in his business or property, directly or indirectly, by a violation of Section 57-1-1 or 57-1-2 NMSA 1978 may bring an action for appropriate injunctive relief, up to threefold the damages sustained and costs and reasonable attorneys' fees."  N.M. Stat. Ann. § 57-1-3(A).

Analysis:  The New Mexico Supreme Court has not addressed whether *AGC* applies to claims under the New Mexico Antitrust Act ("NMAA"), but a New Mexico appellate court has concluded that *AGC* applies.  *Nass-Romero v. Visa U.S.A. Inc.*, 279 P.3d 772, 776 (N.M. Ct. App. 2012) (applying *AGC* to claim brought under the NMAA); see also *New Mexico Oncology v. Presbyterian Healthcare Servs.*, 169 F. Supp. 3d 1204, 1206 (D.N.M. 2016) (assuming without discussion that *AGC* applied to claim under NMAA).  Accordingly, the Court will apply *AGC* to Plaintiffs' claims under New Mexico law.

6.     **South Dakota**

Harmonization Provision: "It is the intent of the Legislature that in construing this chapter, the courts may use as a guide interpretations given by the federal or state courts to comparable antitrust statutes." S.D. Codified Laws § 37-1-22.

*Illinois Brick* Repealer Statute: "No provision of this chapter may deny any person who is injured directly or indirectly in his business or property by a violation of this chapter the right to sue for and obtain any relief afforded under § 37-1-14.3. In any subsequent action arising from the same conduct, the court may take any steps necessary to avoid duplicative recovery against a defendant." S.D. Codified Laws § 37-1-33.

Analysis: The parties do not cite—and the Court has not found—any South Dakota case addressing whether *AGC* applies to claims brought under the South Dakota Deceptive Trade Practices and Consumer Protection Statute. Federal courts to have addressed the issue have been split. Compare *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1151-53 (N.D. Cal. 2009) (declining to apply *AGC*), with *In re Aftermarket Auto. Lighting Prod. Antitrust Litig.*, 2009 WL 9502003, at *6 (C.D. Cal. July 6, 2009) (concluding that South Dakota would apply *AGC*). In light of South Dakota's harmonization statute and absent any state-law authority to the contrary, the Court concludes that South Dakota would apply *AGC* to claims under South Dakota law.

7.     **Vermont**

Harmonization Provision: "It is the intent of the General Assembly that in construing this section and subsection 2451a(h) of this title, the courts of this State shall be guided by the construction of federal antitrust law and the Sherman Act, as amended, as interpreted by the courts of the United States." Vt. Stat. Ann. tit. 9, § 2453a(c).

*Illinois Brick* Repealer Statute: "In any action for damages or injury sustained as a result of any violation of State antitrust laws, pursuant to section 2453 of this title, the fact that the State, any public agency, political subdivision, or any other person has not dealt directly with a defendant shall not bar or otherwise limit recovery. The Court shall take all necessary steps to avoid duplicate liability, including the transfer or consolidation of all related actions." Vt. Stat. Ann. tit. 9, § 2465.

Analysis: The Vermont Supreme Court has not addressed whether *AGC* applies to antitrust claims brought under Vermont law. The only Vermont appellate court to have addressed the issue concluded that the Vermont Supreme Court would apply *AGC*. Absent any authority to the contrary, the Court again concludes that *AGC* applies to claims brought under Vermont law in light of Vermont's harmonization statute.

## 8.    Wisconsin

Harmonization Provision: None. However, caselaw indicates that courts are to look to federal courts for guidance in interpreting Wisconsin antitrust law. See, *e.g., Ashley Furniture Indus., Inc. v. Packaging Corp. of Am.*, 275 F. Supp. 3d 957, 968-69 (W.D. Wis. 2017) (noting that "Wisconsin courts traditionally look to federal law to interpret substantive violations of the Wisconsin antitrust statutes").

*Illinois Brick* Repealer Statute: "Except as provided under par. (b), any person injured, directly or indirectly, by reason of anything prohibited by this chapter may sue therefor and shall recover threefold the damages sustained by the person and the cost of the suit, including reasonable attorney fees." Wis. Stat. Ann. § 133.18 (1)(a).

Analysis: The Wisconsin Supreme Court has not addressed whether *AGC* applies under Wisconsin antitrust law, nor has any appellate court in Wisconsin. However, one trial court has concluded that Wisconsin's higher courts would apply *AGC*. Other federal courts have relied on

this decision to conclude that *AGC* applies under Wisconsin law.  See, *e.g., In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 42 (D.D.C. 2008).  But other federal courts have reached the opposite conclusion.  See, *e.g., Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*, 2015 WL 4755335, at *19 (N.D. Cal. Aug. 11, 2015).  Even though Wisconsin does not have a harmonization statute, the fact that courts have long applied federal law to Wisconsin antitrust claims convinces the Court that the Wisconsin Supreme Court likely would apply *AGC* to antitrust claims brought under Wisconsin law.

### 9.      Other States

Plaintiffs also bring claims under states that have harmonization provisions and *Illinois Brick*-repealer statutes, but in which no in-state court has addressed the applicability of *AGC*. Specifically, Plaintiffs bring claims under the laws of Alabama, Arizona, Hawaii, Mississippi, New Hampshire, Oregon, Rhode Island, Tennessee, Utah, and West Virginia.  As discussed above, "the presence of a statutory harmonization provision (either statutory or common law), absent any countervailing statutory law or case law from a state appellate court, is sufficient to permit a district court to apply federal antitrust-standing law—including *AGC*—to claims brought under that state's antitrust laws."  *DFA I*, 2015 WL 3988488, at *6.

### ii.      *Application*

Now that the Court has addressed in which states *AGC* applies, the Court must determine whether Plaintiffs' claims fail under *AGC*.  As discussed above, under *AGC*, the Court must consider: "(1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of the damages; and (6) the risk of duplicate

recovery or complex damage apportionment." *Loeb*, 306 F.3d at 484 (citing *AGC*, 459 U.S. at 537-45).

The Court already has addressed the first four factors above. With respect the speculative nature of the damages, Plaintiffs sufficiently have alleged that costs have been passed on to dealers. Indeed, Plaintiffs have cited to examples of vendors specifically connecting fee increases to Defendant's allegedly anticompetitive conduct. [See, *e.g.*, 198 (Compl.), at ¶ 141.] Because the causal link between the alleged misconduct and Plaintiffs' claimed harm is short, these allegations are sufficient to state a claim at the pleading stage. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1124 (N.D. Cal. 2008) ("The Court finds that, as a pleading matter, plaintiffs have sufficiently alleged that overcharges are passed on to consumers, and that such overcharges can be traced through the relatively short distribution chain.").

That leaves the risk of duplicative recovery. With respect to the DIS market, the Court recognizes that there are other parties that have been more directly harmed by the alleged misconduct by Defendant. Still, it cannot be true that state antitrust claims are categorically barred whenever other parties have been more directly harmed. Such an application of *AGC* would in effect "'repeal' the *Illinois Brick* 'repealers,' as it is difficult to image an indirect purchaser ever having antitrust standing under [such a] formulation." *In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *11 (N.D. Cal. Aug. 3, 2011). Again, given that the causal link between the alleged misconduct and Plaintiffs' claimed harm is short, the Court finds it likely that damages can reasonably be apportioned among Plaintiffs and others more directly harmed. Discovery ultimately may reveal that such apportionment cannot be done with reasonable accuracy. However, there is no indication based on the information before the Court that is the case here.

Accordingly, taking all of the *AGC* factors into account, the Court concludes that Plaintiff sufficiently has alleged proximate causation.

This conclusion is consistent with the Seventh Circuit's decision in *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 744 (7th Cir. 2018). In that case, indirect purchasers of end-user consumer products containing steel (including clothes washers, automobiles, barbeque grills, air conditioners, and snow blowers), filed an amended complaint asserting state-law claims based on an alleged antitrust conspiracy among steel manufacturers to increase steel prices. See *id*. at *3. Although the Seventh Circuit ultimately found that the plaintiffs' claims were barred for failure to allege sufficient facts to establish antitrust standing (*i.e.*, proximate causation), the Court indicated that antitrust standing would be satisfied if the plaintiffs alleged sufficient facts to establish that their claimed injuries still were "fairly traceable to the defendant steel manufacturers." *Id*. at *6. The Seventh Circuit reasoned:

> There are many suits that satisfy ordinary principles of proximate causation but nevertheless would be barred under federal law by *Illinois Brick*'s direct-purchaser requirement. This very case provides an example: many if not all *Illinois-Brick* repealer states would have allowed Supreme Auto's original complaint to go forward. That first complaint alleged injury based on the purchase of steel rods and similar items from distributors who, in turn, had purchased those same items from the defendants. The original complaint involves an indirect purchase (and so would be barred by *Illinois Brick* at the federal level) where the alleged injury is still fairly traceable to the defendant steel manufacturers.
>
> The amended complaint is a different story. It alleges that plaintiffs purchased steel only insofar as it was one among many components of other more complex products, all of which have gone through numerous manufacturing alterations and lines of distribution. In many of these products, steel is not even a primary or necessary ingredient. We cannot imagine—and plaintiffs have not told us—how one might tackle the task of tracing the effect of an alleged overcharge on steel through the complex supply and production chains that gave rise to the consumer products at issue here. The district court thus appropriately ruled that the claims asserted here were too remote to support a claim under the different state laws plaintiffs invoked.

*Id*. at \*6-7.  Defendant attempts to distinguish *Supreme Auto* by noting that the original complaint—which the Seventh Circuit indicated sufficiently alleged proximate cause—involved the "traditional indirect-purchaser" relationship in which the indirect purchaser buys the same item produced by the defendant through a distributor.  [378, at 25.]  Still, in *Supreme Auto*, the Seventh Circuit relied on the fact that the defendant's product "was not even a primary or necessary ingredient" in the purchased product and that defendant's product had "gone through numerous manufacturing alterations and lines of distribution."  Although DIS is not a component part of the vendor services purchased by Plaintiffs, it certainly is a necessary ingredient to such services. Furthermore, there is only one link in the chain (*i.e.*, vendors) between dealers and data integrators. The Court recognizes that the allegations of proximate cause in this case fall somewhere in between the allegations in the original and amended complaints in *Supreme Auto*.  Nevertheless, the allegations here are enough to establish at the motion to dismiss stage that Plaintiffs' claimed harms are fairly traceable to the alleged misconduct by Defendant.[18]  Accordingly, Plaintiffs have alleged sufficient facts to establish proximate causation at the motion to dismiss stage.

> iii.  *Application of Other State-Law Standing and Remoteness Doctrines*

Defendant argues that—to the extent that Plaintiffs' claims are not subject to *AGC*—they nonetheless remain subject to general state-law causation requirements.  [266, at 50-51 n. 26

---

[18] Defendant also cites to cases across the country finding that *AGC* or similar causation standards barred consumer litigation against Visa and Mastercard, who allegedly required merchants using their credit cards to accept their debit cards as well.  In those cases, however, the plaintiffs did not allege that they overpaid for goods or services either directly or indirectly from Defendant.  Rather, the plaintiffs claimed that merchants increased the prices of all goods sold (goods not related in any way to defendants) to account for the increased fees charges for debit services.  They did not allege that they overpaid for purchases of debit processing services, either directly or indirectly.  See, e.g., *Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293, 299 (Neb. 2006) ("Appellants do not and cannot allege that they overpaid for purchases of debit processing services from merchants."); *Nass-Romero v. Visa U.S.A. Inc.*, 279 P.3d 772, 778 (N.M. Ct. App. 2012) ("Plaintiff is neither a consumer nor a competitor in the market allegedly being restrained by Defendants and does not appear in that chain of distribution; thus, she cannot be identified as a consumer of the service provided by Visa and MasterCard. Plaintiff, instead, is a consumer of goods sold by merchants who happen to be part of the affected market.").  Here, on the other hand, Plaintiffs are indirect purchasers of DIS.

(collecting authorities).]  Because Defendant does not argue that any of these standards are more stringent than *AGC*, which Plaintiffs have satisfied at the motion to dismiss stage, the Court denies Defendant's motion to dismiss any of Plaintiffs' state-law claims based on the other state-law causation and remoteness standards cited by Defendant.

### G.    Failure to State a Claim Under State Law (Counts VI-L)

#### i.    *No Operations or Purchases*

Defendant argues that Plaintiffs cannot bring claims under the laws of states that are unrelated to any named Plaintiffs' place of business or commercial operations.  The named Plaintiffs are twenty-five car dealerships doing business in eleven states: Illinois, Kansas, Massachusetts, Minnesota, Mississippi, Missouri, New Jersey, New Mexico, New York, Nevada, and South Carolina.  Plaintiffs nonetheless seek to advance claims under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Iowa, Maine, Michigan, Nebraska, New Hampshire, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

Although courts (including this Court) have held that claims "brought under the laws of the states in which no named [plaintiff] purchased goods" must be dismissed for lack of Article III standing, see, *e.g.*, *DFA I*, 2013 WL 4506000, at *7-8 (citing *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 922 (N.D. Ill. 2009)); *In re Plasma–Derivative Protein Therapies Antitrust Litig.*, 2012 WL 39766, at *6.  (N.D. Ill. Jan. 9, 2012), the trend has been to treat the issue as one of statutory standing that can be deferred until class certification.  See *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 96 (2d Cir. 2018) ("We fail to see how the fact that the defendant's wrongful conduct impacted customers in two states rendered the injuries of the

Massachusetts consumers somehow more indefinite than the identical injuries of the Connecticut consumers." (footnote omitted)); *Muir v. Nature's Bounty (DE), Inc.*, 2018 WL 3647115, at *7 (N.D. Ill. Aug. 1, 2018) (noting that the "weight of recent authority points" against analyzing standing to bring class actions by legal theory); *In re Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d 307, 359 (D.R.I. 2017) (recognizing trend); see also *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) ("That a plaintiff's claim under his preferred legal theory fails has nothing to do with subject-matter jurisdiction[.]" (citing *Bell v. Hood*, 327 U.S. 678 (1946)). This trend is consistent with recent Seventh Circuit caselaw holding that "the question of who is authorized to bring an action under a statute is one of statutory interpretation; it does not implicate Article III or jurisdiction." *Woodman's Food Market, Inc. v. Clorox Co.*, 833 F.3d 743, 750 (7th Cir. 2016). Accordingly, at this stage, the Court denies Defendant's motion to dismiss Plaintiffs' state-law claims in states where no named Plaintiff operates for lack of Article III standing.

ii.    *Territorial Conduct/Effect*

Defendant argues that Plaintiffs' claims under Delaware, Massachusetts, North Carolina, Wisconsin, and New Hampshire law (Counts XXII, XXXI, XXXVI, XXXIX, and XLIII) should be dismissed for failure to allege any significant in-state conduct or injury. As noted by Defendant, those states all require some territorial conduct and/or affect to bring a claim under those statutes. To begin, the Delaware Consumer Fraud Act, 6 Del. § 2512, requires that the relevant conduct "occur 'in part or wholly within this State.'" *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 117 (Del. 2006) (quoting 6 Del. § 2512). Although Plaintiffs allege that Defendant and certain Plaintiffs are incorporated in Delaware [198 (Compl.), Compl. ¶¶ 27, 41, 51], that does not

establish that any relevant conduct occurred in Delaware.[19]  The only allegation that even arguable addresses conduct in Delaware does so in a conclusory manner.  [*Id*. at ¶ 584 ("Defendants' conduct substantially affected commerce and consumers in Delaware throughout the Class Period.  In addition, Defendants have fraudulently concealed their actions from Plaintiffs and members of the Delaware Class.").][20]  Because Plaintiffs have not sufficiently alleged conduct occurring in Delaware, the Court grants Defendant's motion to dismiss Plaintiffs' claim under the Delaware Consumer Fraud Act (Count XXXVI).

Similarly, North Carolina's Unfair Trade Practices Act reaches only conduct causing a "'substantial' in-state injury," not "merely an 'incidental'" one.  *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *18-19 (E.D. Mich. Apr. 9, 2013) (citing *The "In" Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494, 502 (M.D.N.C. 1987)); *Merck & Co., Inc. v. Lyon*, 941 F. Supp. 1443, 1463 (M.D.N.C. 1996)).  When plaintiffs do not allege that any wrongful conduct occurred in North Carolina, allegations that indirect purchasers payed inflated prices are not sufficient to establish a substantial, in-state injury.  Because Plaintiffs have alleged no more here, the Court grants Defendant's motion to dismiss Plaintiffs' claim under North Carolina's Unfair Trade Practices Act (Count XXII).

The Wisconsin Supreme Court also has made clear that "[a] civil plaintiff filing an action under Wisconsin's antitrust act must allege that (1) actionable conduct, such as the formation of a combination or conspiracy, occurred within this state, even if its effects are felt primarily outside

---

[19] Plaintiffs do not argue that being incorporated in Delaware is sufficient to establish conduct occurring in Delaware for the purposes of the Delaware Consumer Fraud Act.  Nor do Plaintiffs cite to any cases indicating that such a showing is sufficient.

[20] In support of its claim under Delaware law, Plaintiffs also cite to an allegation that Defendant "violated the Delaware Consumer Fraud Act, 6 Del. Code § 2511, et seq., through their unfair and/or deceptive practices."  [198 (Compl.), at ¶ 578.]  However, that allegation does not identify any conduct occurring in Delaware.

Wisconsin; or (2) the conduct complained of 'substantially affects' the people of Wisconsin and has impacts in this state, even if the illegal activity resulting in those impacts occurred predominantly or exclusively outside this state." *Olstad v. Microsoft Corp.*, 700 N.W.2d 139, 158 (Wis. 2005) (quoting *State v. Allied Chem. & Dye Corp.*, 101 N.W.2d 133, 134 (1960)). Plaintiffs argue that the Wisconsin Supreme Court has rejected the view that Wisconsin's antitrust statute applies only to intrastate conduct. [356, at 106-07 (citation omitted).] Still, Plaintiffs fail entirely to explain how their allegations are sufficient to satisfy either standard set forth in *Olstad*. Accordingly, the Court grants Defendant's motion to dismiss Plaintiffs' Wisconsin antitrust claim (Count XXXI).

Massachusetts's consumer protection statute requires that the "actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice" must have "occurred primarily and substantially" in Massachusetts. Mass. Gen. Laws Ch. 93A, § 11. However, "the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth." *Id.* "As this presents a factual question, 'a section eleven cause of action, attacked via a motion to dismiss, should survive a 'primarily and substantially' challenge so long as the complaint alleges that the plaintiff is located, and claims an injury, in Massachusetts.'" *SCVNGR, Inc. v. eCharge Licensing, LLC*, 2014 WL 4804738, at *6 (D. Mass. Sept. 25, 2014) (quoting *Back Bay Farm, LLC v. Collucio*, 230 F.Supp.2d 176, 188 (D. Mass. 2002)). Because Plaintiffs make such allegations here [198 (Compl.), at ¶¶ 27, 605-617], the Court denies Defendant's motion to dismiss Plaintiffs' Massachusetts consumer protection claim (Count XXXIX) for failure to allege that the challenged conduct occurred primarily and substantially in Massachusetts.

Finally, New Hampshire's consumer protection act applies only to "the conduct of any trade or commerce within" that state. N.H. Rev. Stat. Ann. § 358-A:2. "[C]ourts interpreting New Hampshire's consumer protection law disagree as to whether a nationwide scheme in which plaintiffs play a higher price in the state is sufficient to satisfy the statute's requirements." *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 761 (E.D. Pa. 2014) (quoting *In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*, 2013 WL 5503308, at *22 (D.N.J. Oct. 2, 2013) (internal quotation marks omitted)). Although both parties cite to cases supporting their respective positions on whether Plaintiffs' allegations of conduct of trade or commerce within New Hampshire are sufficient to state a claim, neither party addresses the split in authority or why the Court should follow the cases supporting their respective positions. Accordingly, a definitive ruling on this issue would be premature. The Court thus denies Defendant's motion to dismiss Plaintiffs' New Hampshire consumer protection claim (Count XLIII) on that basis.

   *iii.* *Intrastate Conduct*

Defendant argues that Plaintiffs' claims under Alabama and Tennessee law fail because those claims are limited to purely (or at least predominantly) intrastate conduct. Alabama's antitrust statute regulates conduct occurring intrastate. *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 429 (E.D. Pa. 2010) (concluding that "antitrust violations as claimed by the plaintiffs [did] not violate Alabama's antitrust statute because they involve[d] interstate, and not purely intrastate, conduct"); see also *Abbott Labs. v. Durrett*, 746 So.2d 316, 339 (Ala. 1999) (Alabama antitrust laws "regulate monopolistic activities that occur 'within this state'—within the geographic boundaries of [the] state."). Plaintiffs appear to concede that their Alabama antitrust claim fails for this reason, failing entirely to address

Defendant's argument.  Accordingly, the Court grants Defendant's motion to dismiss Plaintiffs' Alabama antitrust claim (Count VI) for failure to allege intrastate conduct.

The Court also grants Defendant's motion to dismiss Plaintiffs' antitrust claim under the Tennessee Trade Practices Act (the "TTPA") (Count XXVII).  "[V]arious courts have interpreted the scarce Tennessee authority [on the intrastate standard requirement] to espouse different tests for whether Tennessee's antitrust statute applies."  *Sherwood v. Microsoft Corp.*, 2003 WL 21780975, at *15 (Tenn. Ct. App. July 31, 2003).  Some courts have held that plaintiffs must allege that the challenged conduct occurred "predominately intrastate" in order to state a claim under Tennessee law.  See, *e.g., Lynch Display Corp. v. Nat'l Souvenir Ctr., Inc.*, 640 S.W.2d 837, 840 (Tenn. Ct. App. 1982) ("The Tennessee antitrust law applies to transactions which are predominantly intrastate in character.").  However, other courts have held that plaintiffs must allege that the challenged conduct had a "substantial effect" in Tennessee in order to state a claim under Tennessee law.  See, *e.g., Sherwood v. Microsoft Corp.*, 2003 WL 21780975, at *1 (Tenn. Ct. App. July 31, 2003) ("[T]he Tennessee Trade Practices Act applies to activity that has substantial effects on commerce within the state[.]").  The Court need not decide which standard applies, as Plaintiffs have not even alleged sufficient facts to satisfy even the less stringent standard (*i.e.*, that challenged conduct had a substantial effect in Tennessee).  Indeed, Plaintiffs have not identified any Tennessee-specific allegations supporting its claim.  Accordingly, Defendant's motion to dismiss Plaintiffs' Tennessee antitrust case (Count XXVII) for failure to allege sufficient intrastate conduct is granted.

### iv.    Intangible Services

Defendant also argues that Plaintiffs' claim under TTPA (Count XXVII) fails because that statute does not apply to services.  "The law is well settled that the TTPA applies only to tangible

goods, not intangible services." *Bennett v. Visa U.S.A. Inc.*, 198 S.W.3d 747, 751 (Tenn. Ct. App. 2006). Plaintiffs argue that the software constitutes a tangible good under the TTPA. In support of that argument, Plaintiffs cite to *Sherwood v. Microsoft Corp.*, in which the Tennessee Court of Appeals allowed a TTPA claim based on the purchase of computer software to proceed. 2003 WL 21780975, at *1 (Tenn. Ct. App. July 31, 2003). Although *Sherwood* did not specifically address whether software constitutes a tangible good, the court gave no indication that it had any doubts about the applicability of the TTPA to the purchase of software. Furthermore, in other contexts, courts have concluded that software is a tangible good. See, *e.g., Simulados Software, Ltd. v. Photon Infotech Private, Ltd.*, 40 F. Supp. 3d 1191, 1199 (N.D. Cal. 2014) ("Generally, courts have found that mass-produced, standardized, or generally available software, even with modifications and ancillary services included in the agreement, is a good that is covered by the UCC."); *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 675-76 (3d Cir. 1991) ("The topic has stimulated academic commentary with the majority espousing the view that software fits within the definition of a 'good' in the U.C.C."). Given these authorities, the Court declines to conclude that software does not constitute a tangible good under the TTPA.[21]

Defendant also argues that even if software constitutes a tangible good under the TTPA, Plaintiffs cannot bring a TTPA claim based on the purchase of software because they do not actually use the data integration software. However, Defendant does use *DMS software*. Furthermore, it is not clear that a party directly must use software to bring a claim under the TTPA. Defendant has not cited to any authority in support of that argument. In fact, the cases cited by

---

[21] Despite the lack of Tennessee authority on point, the Court would have appreciated a fulsome explanation as to why software should or should not be considered a tangible good under the TTPA. Although the Court would have entertained any such argument on a motion for summary judgment, the Court already is dismissing Plaintiffs TTPA claim for failure to allege sufficient intrastate conduct. The issue therefore is moot.

the parties indicate the indirect users can bring claims under the TTPA. See, *Sherwood*, 2003 WL 21780975, at *29-30. Accordingly, Defendant's motion to dismiss Plaintiffs' TTPA claim for failure to allege a tangible good is denied.

v.    *Alleged Antitrust Conduct Not Covered*

Defendant argues that Plaintiffs' claims under Arkansas's and West Virginia's consumer protection statutes (Counts XXX and XXXIII) fail because those consumer protection statutes do not apply to traditional antitrust conduct. With respect to Plaintiffs' consumer protection claim under Arkansas law, Defendant's motion is denied. The only authority in support of this argument cited in Defendant's opening brief was *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072 (N.D. Cal. 2007), which actually concluded that indirect purchaser suits alleging antitrust violations could also state claims under the Arkansas Deceptive Trade Practices Act ("ADTPA"). In its reply brief, Defendant also notes that the ADTPA does not explicitly prohibit "unfair competition" at all. [378, at 28 (citing Ark. Code Ann. § 4-88-107).] Defendant also asserts that "'Arkansas law recognizes the remoteness doctrine' as applied to claims under the ADTPA, favoring suits by those directly injured over more-indirect victims." [*Id.* (quoting *DFA II*, 2015 WL 3988488, at *17).] Because Defendant first raised these arguments in its reply brief and because Defendant fails fully to develop these arguments, the Court will not consider them at this time. *Peterson v. Vill. of Downers Grove*, 103 F. Supp. 3d 918, 925 (N.D. Ill. 2015) ("Arguments raised for the first time in reply briefs are ordinarily waived, and rightly so given the lack of opportunity for the other party to respond to them." (citing *Carroll v. Lynch*, 698 F.3d 561, 564 n. 2 (7th Cir. 2012)); *Argyropoulos v. City of Alton*, 539 F.3d 724, 738 (7th Cir. 2008) (finding "perfunctory and undeveloped" argument waived). Defendant therefore has not

established that antitrust conduct is not covered by the ADTPA.  Accordingly, the Court denies

Defendant's motion to dismiss Plaintiffs' ADTPA claim (Count XXXIII) on that basis.

Defendant's motion to dismiss Plaintiffs' West Virginia consumer protection claim (Count

XXX) on the basis that antitrust violations are not covered under the West Virginia statute also is

denied.  There does not appear to be any in-state authority regarding the application of West

Virginia's consumer protection statute in the antitrust context.  As the parties note, out-of-state

authorities are split regarding whether anticompetitive conduct can be challenged under the statute.

Compare *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072,

1118 (N.D. Cal. 2007), with *In re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d 1033,

1087 (S.D. Cal. 2017).

In *In re Packaged Seafood*, the court recognized authority concluding that West Virginia's

consumer protection statute does not cover anticompetitive conduct such as price fixing, but

nonetheless disregarded those decisions, noting that "none of [those] courts had the benefit of the

West Virginia Legislature's 2015 amendment to the WVCCPA intending that 'in construing this

article, the courts be guided by the policies of the Federal Trade Commission and interpretations

given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal

Trade Commission Act[.]'"  242 F. Supp. 3d at 1087 (quoting W. Va. Code § 46A-6-101).

Defendant does not argue that the challenged conduct does not constitute "unfair or deceptive acts

or practices" under Section 5(a)(1) of the Federal Trade Commission Act.  Rather, Defendant

argues that case was decided erroneously because "that amendment should not be read to so

drastically expand the scope of the statute, especially where the dealers identify no West Virginia

authority saying it does."  [378, at 27-28.]  But Defendant does not explain how the court's

application of the 2015 amendment to the WVCCPA in *In re Seafood* drastically expanded the

scope of the statute. Nor does Defendant explain how the courts application of the 2015 amendment to the WVCCPA in *In re Seafood* was incorrect. Given the plain language of the 2015 amendment to the WVCCPA, the Court agrees with the reasoning of *In re Seafood* and concludes that the WVCCPA prohibits anticompetitive conduct.[22] Accordingly, the Court denies Defendant's motion to dismiss Plaintiffs' WVCCPA claim (Count XXX) on the basis that antitrust violations are not covered.

### vi. *Class Actions Not Authorized*

Defendant similarly argues that Plaintiffs are precluded from pursuing a class action under the consumer protection statutes of Alaska, Arkansas, Georgia, Illinois, and South Carolina because of class action bars. Although it is true that Alaska, Arkansas, Georgia, and South Carolina bar the kind of class action claims that Plaintiffs seek to bring here, see Alaska Stat. § 45.50.531(b); Ark. Code Ann. § 4-88-113(f)(1)(B); Ga. Code Ann. § 10-1-399(b); 740 Ill. Comp. Stat. Ann. 10/7(2); S.C. Code Ann. § 39-5-140(a), Plaintiffs brought their claims in federal court— not state court.

In *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, the Supreme Court had to address whether a New York class action bar conflicted with Rule 23 and, if so, whether the federal rule or the state rule applied. 559 U.S. 393 (2010). The Supreme Court held that Rule 23—not the New York class action bar—applied in federal court. *Id*. Justice Scalia's plurality decision took the position that properly enacted federal rules of procedure always apply in federal court. *Id*. at 410. Justice Stevens's concurring opinion took the position that properly

---

[22] Defendant's memorandum in support of its motion to dismiss does cite to one district court case from California for the proposition that West Virginia's consumer protection statute does not cover antitrust violations. [266, at 57 (citing See *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1118 (N.D. Cal. 2007)).] However, that case was decided before the 2015 amendment to the WVCCPA. For that reason and for the reasons discussed above, the Court finds the reasoning in *In re Packed Seafood* to be more persuasive.

enacted federal rules generally apply in federal court, unless the federal rule "would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 423 (2010).

Some courts have treated Justice Stevens's opinion as the controlling opinion, as it provides the narrowest grounds for the Supreme Court's decision. See, *e.g., James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1217 (10th Cir. 2011). Although the Seventh Circuit has not squarely addressed which opinion controls, it otherwise has indicated that Justice Scalia's plurality sets forth the controlling legal standard. See *Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*, 642 F.3d 560, 564 (7th Cir. 2011) (*Shady Grove* "holds that Rule 23 applies to all federal civil suits, even if that prevents achieving some other objective that a court thinks valuable"); *State Farm Life Ins. Co. v. Jonas*, 775 F.3d 867, 869 (7th Cir. 2014) ("[F]ederal procedures govern in federal litigation[.]" (citing *Shady Grove*, 559 U.S. 393)). Even if Justice Stevens's plurality opinion applied, Defendant has not identified any authority for concluding that the class action bars at issue are so intertwined with a state-created right or remedy as to justify finding that it trumps Rule 23 under Justice Stevens's analysis.[23] Accordingly, the Court denies Defendant's motion to dismiss Plaintiffs' class claims under Alaska, Arkansas, Georgia, and South Carolina based on the relevant class action bars in those states.

### vii.    No Damages Claim

Defendant argues that Plaintiffs' claims under California's Unfair Competition Law (Counts VIII and XXXIV) and Colorado Consumer Protection Act (XXXV) fail because those causes of action are equitable in nature and do not allow for the recovery of damages. With respect

---

[23] Because the Court would reach the same conclusion under the standards set forth in the plurality and in the concurrence, the Court need not address which standard applies.

to Plaintiffs' claims under California Unfair Competition Law ("UCL"), it is true—as Plaintiffs concede—that damages cannot be recovered under California's UCL. *In re Tobacco II Cases*, 207 P.3d 20, 29 (Cal. 2009). Plaintiffs argue, however, that they can proceed on their UCL claims to obtain injunctive relief and/or restitution. Defendant does not dispute that assertion, which is supported by case law. *Id*. at 29 ("[P]laintiffs are generally limited to injunctive relief and restitution."); see also *Vasic v. PatentHealth, L.L.C.*, 171 F. Supp.3d 1034, 1041 (S.D. Cal. 2016) ("An order for restitution is one compelling a UCL defendant to return the money obtained through the unfair business practice."). Furthermore, Count VIII also is brought under "the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., [which] was modeled after the Sherman Act." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001). Defendant does not contest that damages are not recoverable under the Cartwright Act. Cal. Bus. & Prof. Code § 16750 ("Any person who is injured * * * may sue * * * and recover three times the damages sustained[.]"). Accordingly, the Court denies Defendant's motion to dismiss Plaintiffs' claims under California's Unfair Competition Law (Counts VIII and XXXIV) based on the lack of availability of damages.

Colorado's Consumer Protection Act bars class claims for money damages. Colo. Rev. Stat. § 6-1-113(2) (noting defendants are liable for damages "[e]xcept in a class action"); *In re Myford Touch Consumer Litig.*, 2016 WL 7734558, at *26 (N.D. Cal. Sept. 14, 2016) ("Colorado law prohibits class actions for monetary damages based on the Consumer Protection Act."). Defendant cites to one case from the Northern District of California—*Davidson v. Apple, Inc.*, 2018 WL 2325426, at *11 (N.D. Cal. May 8, 2018)—in which the court held that it would be inappropriate to "overlook the statute's plain language" in the absence of any Colorado authority "actually holding that the CCPA bar is inapplicable or explaining why the CCPA bar can be

ignored." *Id.* However, as noted by the court in *Davidson*, whether the federal procedural rule allowing class actions (*i.e.*, Rule 23) trumps the state-law bar on class actions under the CCPA depends on the two-step analysis established by the Supreme Court in *Shady Grove*. Neither party here has engaged in such an analysis. To the extent that Defendant relies on the court's analysis in *Davidson*, that decision lacks persuasive force. To begin, the court in *Davidson* indicated that it was not inclined to overlook the statute's plain language absent any Colorado decision actually holding that the CCPA bar is inapplicable or explaining why the CCPA bar can be ignored. But Colorado courts would have no reason to engage in a *Shady Grove* analysis. Furthermore, the *Davidson* court noted some uncertainty regarding the proper application of *Shady Grove*. *Davidson*, 2018 WL 2325426, at *11 (discussing cases reaching different conclusions regarding the proper application of *Shady Grove* to the CCPA's class action bar). Without the benefit of thorough briefing on this issue, the Court declines to rule at this time on whether Plaintiffs' CCPA claim for damages is barred under *Shady Grove*.

viii. *Notice Requirements Unsatisfied*

Defendant argues that Plaintiffs' Hawaii antitrust claim and Georgia, New Jersey, and West Virginia[24] consumer protection claims (Counts X, XXXVIII, XLIV, and XLIX) fail because those statutes carry notice requirements—as to either the defendants or the state attorney general—that Plaintiffs here do not allege that they satisfy. Ga. Code Ann. § 10-1-399(b); Haw. Rev. Stat. § 480-13.3(a)(1); N.J. Stat. Ann. § 56:8-20; W. Va. Code § 46A-6-106(c). The parties dispute whether the notice requirements apply in federal court, but the parties fail to engage in a full analysis of the relevant legal standards.

---

[24] Defendant has withdrawn its argument that notice is required to bring a claim under Alaska's consumer protection statute. [378, at 28 n.11.]

To begin, neither party sufficiently addresses whether there is a conflict between Rule 23 (or any other federal rule) and these state notice requirements.[25]  If there is no conflict, then the state notice requirements would apply.  *Hahn v. Walsh*, 762 F.3d 617, 631 (7th Cir. 2014) ("If there is no conflict, then our inquiry ends because there is no need to displace any rule.").  Courts have reached different conclusions on that issue.  Compare *In re Lipitor Antitrust Litig.*, 336 F.Supp.3d 395, 415 (D.N.J. 2018) ("[T]he Court finds that Rule 23 is not 'sufficiently broad' to cover the state statutory notice provisions."); *In re Asacol Antitrust Litig.*, 2016 WL 4083333, at *15 (D. Mass. July 20, 2016) (same), with *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 2018 WL 5928143, at *6 (E.D.N.Y. Nov. 13, 2018) (holding that Rule 23 and state notice provisions conflict and applying the *Shady Grove* analysis).

The parties also fail sufficiently to engage in any analysis under *Shady Grove*.  For example, the parties do not address which opinion in *Shady Grove* is controlling.  Plaintiffs appear to take the position advanced in Justice Scalia's plurality—namely, that federal procedural rules always apply.  But Plaintiffs provide no argument as to why that opinion should control.  To the extent that Justice Stevens's opinion controls, the parties do not address whether and to what extent each state's notice requirement "is so intertwined with a state right or remedy that it functions to define the scope of the state-created right."  *Shady Grove*, 559 U.S. at 423.  Without the benefit of briefing on these complex questions, the Court declines to rule on the applicability of state-law notice requirements in federal lawsuits.

---

[25] Defendant does cite to one case which held that the state notice requirements applied because there was no conflict with Rule 23, but only did so in its reply brief.  [378, at 28 (citing *In re Asacol Antitrust Litig.*, 2016 WL 4083333, at *14–15 (D. Mass. July 20, 2016).]  Plaintiffs do not address the issue at all, but cannot be faulted for not doing so, as Defendant did not raise the issue in its opening brief.

ix. *Insufficient Tie to Consumers*

Defendant argues that Plaintiffs' consumer protection claims under Arkansas and Georgia law fail because Plaintiffs fail to allege a sufficient connection to consumers or consumer-related conduct. To state a claim under the Arkansas Deceptive Trade Practices Act ("ADTPA"), plaintiffs must allege a "consumer-oriented act." *Apprentice Info. Sys., Inc. v. DataScout, LLC*, 544 S.W.3d 536, 539 (Ark. 2018) (quotations omitted). In support of its argument for dismissal, Defendant cites to *Apprentice*, a decision by the Arkansas Supreme Court, which held that there was no such consumer-oriented act where the parties "were competitors in the market of selling counties' public data" and where the plaintiff "sued over its thwarted business model, not a specific harm to consumers." *Id*. at 539-40. Defendant argues that Plaintiffs similarly have not alleged a specific harm to consumers. However, unlike *Apprentice*, Plaintiffs are not competitors with Defendant. Furthermore, Defendant's argument assumes that Plaintiffs are not "consumers" under the ADTPA. Without any argument or authority addressing whether Plaintiffs are "consumers" under the ADTPA, the Court cannot determine whether Plaintiffs sufficiently have alleged a consumer-oriented act. Accordingly, the Court denies Defendant's motion to dismiss Plaintiffs' claim under the ADTPA (Count XXXIII) for failure to allege sufficient consumer ties without prejudice to raising the argument in the future.

With respect to Plaintiffs' claim under the Georgia Fair Business Practices Act ("GFBPA"), however, the Court agrees that Plaintiffs have not alleged that they are consumers as the term is used under that statute. The GFBPA makes unlawful "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" but limits the definition of "consumer" to "a natural person" and "consumer transactions" to those that are "primarily for personal, family, or household purposes." Ga. Code

Ann. §§ 10–1–393(a), 10-1- 392(6), (10). Although business entities may bring suit under the GFPPA, "the allegedly deceptive actions and practices that are the subject of the suit must be those directed at natural persons." *Forth v. Walgreen Co.*, 2018 WL 1235015, at *10 (N.D. Ill. Mar. 9, 2018). Plaintiffs fail entirely to explain how the deceptive actions and practices alleged here are directed at natural persons. Accordingly, the Court grants Defendant's motion to dismiss Plaintiffs GFBPA claim (Count XXXVIII) for failure to allege sufficient consumer ties.

x.     *No "Unfairness" Claim*

Defendant argues that Plaintiffs' claim under the Arkansas consumer protection statute (Count XXXIII) fails because the dealers have not alleged the type of extreme conduct covered by that statute. As this Court has previously noted, the Arkansas Deceptive Trade Practices Act ("ADTPA") prohibits "'unconscionable, false, or deceptive' business practices without reference to 'unfair' business practices." See *DFA II*, 2015 WL 3988488, at *35 (citing Ark. Code Ann. § 4–88–107(a)(10)). The ADTPA further notes that "[t]he deceptive and unconscionable trade practices listed in this section are in addition to and do not limit the types of unfair trade practices at common law or *under other statutes* of this state." Ark. Code Ann. § 4-88-107(b) (emphasis added). Courts—including this Court—therefore have concluded that claims under the ADTPA are limited to "instances of false representation, fraud, or the improper use of economic leverage in a trade transaction." *Universal Coops., Inc. v. AAC Flying Serv., Inc.*, 710 F.3d 790, 795-96 (8th Cir. 2013); see also *DFA II*, 2015 WL 3988488, at *35. "An 'unconscionable' act is an act that 'affront[s] the sense of justice, decency, or reasonableness.'" *Universal Coops.*, 710 F.3d at 795 (citation omitted).

Defendant argues that Plaintiffs' claim under the ADTPA should be dismissed because Plaintiffs fail to allege the kind of fraudulent and/or unconscionable acts necessary to bring a claim

under the ADTPA.  Plaintiffs do not contend that they have made such allegations, but they argue nonetheless that in their ADTPA claim should be allowed in light of the intention for the ADTPA to be construed liberally.  [358, at 110 (citations omitted).]  Although Plaintiffs note that courts are split regarding whether antitrust claims can be brought under the ADTPA [358, at 110 n.95 (citing *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1166–67 (N.D. Cal. 2015))], Plaintiffs make no efforts to explain why the Court's previous application of Arkansas law was incorrect.  Accordingly, Defendant's motion to dismiss Plaintiffs ADTPA claim (Count XXXIII) for failure to allege fraudulent and/or unconscionable acts is granted.

### xi.  *Grossly Unequal Bargaining Power Not Alleged*

Defendant argues that Plaintiffs' claim under New Mexico's consumer protection statute (Count XLV) requires that Plaintiffs plead "grossly unequal bargaining power," which Defendant contends Plaintiffs fail sufficiently to allege.  Although one court has held that allegations of grossly unequal bargaining power are necessary to state a claim under New Mexico's consumer protection statute, *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1029-30 (N.D. Cal. 2007), other courts have reached the opposite conclusion.  *In re Domestic Drywall Antitrust Litig. Civil Action*, 2016 WL 3769680, at *10 (E.D. Pa. July 13, 2016) ("[T]he New Mexico statute does not require a plaintiff to plead grossly unequal bargaining power.").  The Court finds the reasoning of the latter category cases to be more persuasive.  A plaintiff may state a claim under the New Mexico Act by pleading that defendant either acted in a way that "(1) [took] advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) result[ed] in a gross disparity between the value received by a person and the price paid."  N.M. Stat. § 57-12-2(E) (2016).  Nothing in the statute or in caselaw from New Mexico limits consumer protection claims to those involving grossly unequal bargaining power.

Accordingly, the Court denies Defendant's motion to dismiss Plaintiffs' claim under New Mexico's consumer protection statute (Count XLV) for failure to allege grossly unequal bargaining power.

<em>xii.    Failure To Allege Specific Violation</em>

Defendant argues that Plaintiffs' claim under the Nevada Deceptive Trade Practices Act (Count XLII) should be dismissed because Plaintiffs fail to identify the specific aspects of the statute that they contend CDK violated.  In support of that argument, Defendant cites to a case from the District of Nevada in which the court granted a motion to dismiss a Nevada Deceptive Practices Act claim with leave to amend where the plaintiffs failed to identify "which kinds of violations are alleged."  *In re Zappos.com, Inc.*, 2013 WL 4830497, at *6 (D. Nev. Sept. 9, 2013). However, it is not clear from that opinion whether the plaintiffs in that case failed to cite to the specific statutory provision or failed substantively to identify the challenged conduct.  Defendant appears to read *Zappos* as taking the latter position, as Defendant does not argue that Plaintiffs' factual allegations are insufficient.  To the extent that *Zappos* stands for the proposition that plaintiffs must cite the specific statutory authority on which it relies to state a claim, the Court finds *Zappos* unpersuasive in light of Seventh Circuit case law making clear that "[p]laintiffs need only plead facts, not legal theories, in their complaints."  *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014) (citing *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 742 (7th Cir. 2010)).  Indeed, the court in *Zappos* did not cite to any authority indicating that such allegations are necessary.  Accordingly, the Court denies Defendant's motion to dismiss Plaintiffs' claim under the Nevada Deceptive Trade Practices Act (Count XLII) for failure to identify the specific statutory provision upon which Plaintiffs' claim relies.

## IV.   Conclusion

Plaintiffs' unopposed motions for leave to submit supplemental authority [366; 420] are granted.  In regard to Defendant's other motion [262], Defendant's motion to compel arbitration is denied, and its alternative motion to dismiss is granted in part and denied in part.


Date: January 25, 2019

Robert M. Dow, Jr.
United States District Judge