PUBLIC VERSION

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This filing relates to:* | Hon. Robert M. Dow, Jr. |
| *Loop, LLC, d/b/a AutoLoop v. CDK Global, LLC,* Case No. 18-CV-2521 (N.D. Ill.) | Magistrate Judge Jeffrey T. Gilbert |

**DEFENDANT CDK GLOBAL, LLC'S ANSWER AND AFFIRMATIVE AND**
**ADDITIONAL DEFENSES AND COUNTERCLAIM**

Defendant CDK Global, LLC ("CDK"), by and through its attorneys, hereby submits its Answer and Affirmative and Additional Defenses and Counterclaim in response to Plaintiff Loop, LLC's ("AutoLoop" or "Plaintiff") Complaint in this matter as follows.

**CDK'S ANSWER AND AFFIRMATIVE AND ADDITIONAL DEFENSES**

***Preliminary Statement***

Except as otherwise expressly stated below, CDK answers and responds only to those allegations contained in the Complaint that are directed toward it. CDK is without sufficient knowledge or information to form a belief concerning the truth of the allegations in the Complaint that are related to Plaintiff or non-parties and on that basis denies them.

For the reader's convenience, CDK has organized its Answers to Plaintiff's allegations by employing the headings and subheadings used within the Complaint. In doing so, CDK does not admit that the headings or subheadings are accurate or appropriate for any purpose in this matter and, to the extent that any heading can be read to contain factual allegations, denies each and every one of them unless it has expressly indicated otherwise.

## INTRODUCTION

1.      Plaintiff Loop, LLC ("AutoLoop") brings this action on behalf of itself and other automotive software application vendors to remedy and enjoin ongoing antitrust and state law violations by CDK Global, LLC ("CDK").[1]

**ANSWER:**      CDK admits that the statements attributed to CDK's counsel in footnote 1 to the

Complaint were made.  The remainder of footnote 1 to the Complaint states legal conclusions to

which no response is required.  CDK denies that it has engaged in antitrust or state law violations

and denies that Plaintiff is entitled to the relief it seeks.  CDK denies the remaining allegations in

paragraph 1 of the Complaint.

2.      As alleged herein, and supported by extensive evidence both from public sources and internal documents produced by CDK in limited discovery to date, CDK and its non-party co-conspirator The Reynolds and Reynolds Company ("Reynolds") have committed flagrant antitrust violations and inflicted widespread harm on automotive dealers, vendors of software products and services (like AutoLoop), and the automotive industry as a whole. Specifically, CDK and Reynolds have conspired to eliminate competition for providing integration with dealer data – an extremely valuable asset that belongs to dealers, but over which CDK and Reynolds have seized control. Where there was once a robust market for providing data integration services, CDK and Reynolds – through their coordinated conduct – have destroyed that competition. Where CDK and Reynolds once themselves competed in that market, they have now entered into a written covenant not to compete. Moreover, where CDK and Reynolds once offered data integration services on a level-playing field, they now place artificial and anticompetitive restrictions on dealer data in order to maintain their dominance over the Dealer Management Systems ("DMS") market, favor their own products and services, and injure competing products and services such as those offered by AutoLoop and other vendors. The resulting harm to vendors and dealers has been immense.

**ANSWER:**      Paragraph 2 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies that Plaintiff or any other

individual or entity has suffered any injury as a result of any action or conduct of CDK.  CDK

further denies that there is a "market for providing data integration services" as alleged in the

Complaint.  CDK denies that Plaintiff has identified a valid "market" much less one that CDK

---

[1] AutoLoop is authorized under Federal Rules of Civil Procedure 15(a)(1)(B) and/or 15(a)(2) to amend its Complaint without leave of court because, on May 14, 2018, CDK's counsel stated in writing that "[i]n the event Loop, LLC elects to amend its complaint pursuant to Rule 15(a)(1)(B), CDK has agreed to a 7 day-extension up to including June 6, 2018 for AutoLoop to make that filing."

"dominates," alone or with Reynolds. CDK further states that the allegations in paragraph 2 of the Complaint pertaining to a purported "DMS market" are so vague and ambiguous that CDK cannot respond to those allegations and on that basis denies them. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 2 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 2 of the Complaint.

3. Vendors like AutoLoop are direct targets of CDK's and Reynolds' conspiracy for a simple reason: CDK and Reynolds offer products and services that compete in the same markets. That is, CDK and its co-conspirator Reynolds are seeking not only to destroy and impair competition for data integration services, but, even more directly, they are seeking to impair and destroy competition for the products and services that vendors offer, and upon which dealers rely. By eliminating competition for data integration services, CDK and Reynolds have seized control over dealer data. They have thwarted dealers' ability to control access to and the usage of the dealers' own data, with no lawful or legitimate purpose. The only purposes are anticompetitive: to eliminate competition for integration services and injure competing software solution providers like AutoLoop. The result is that the competitive playing field is not only uneven, but, as CDK itself has described it in internal presentations to its executive team, "tilted" in the extreme in favor of CDK.

**ANSWER:** Paragraph 3 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that it and Reynolds offer certain products and services that compete with Cox Automotive's "solutions." CDK denies the remaining allegations in paragraph 3 of the Complaint.

4. CDK and Reynolds entered into their illegal conspiracy – a conspiracy that eliminated competition for data integration services and imposed myriad restrictions on vendor access to and use of dealer data – for multiple anticompetitive reasons. First, the conspiracy is an effort to protect their duopoly in the market for DMSs and ensures that the DMS remains central to dealers, choking off the natural progression of dealer operations to more efficient and less expensive vendor software solutions. Second, having eliminated competition for providing access to dealer data, CDK and Reynolds have imposed enormously inflated fees for access to and use of that data, reaping financial windfalls to the detriment of both dealers and vendors. These enormously "bloated" fees – as one court has described them – injure vendors like AutoLoop not only because they must pay them, but also because the fees make vendors' products and services less attractive to dealers because those dealers must ultimately bear much of the added costs. CDK's and Reynolds' own competing products and services, by contrast, do not have to pay integration fees, bloated or otherwise. Finally, as noted above, CDK and Reynolds conspired to control data integration so they could place artificial restrictions on

3

vendors' access to and use of dealer data in order to "tilt the table" in favor of CDK's and Reynolds' own solutions, leaving competing products and services (like those offered by AutoLoop) at a disadvantage.

**ANSWER:**    Paragraph 4 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that it and Reynolds offer certain products and services that compete with Cox Automotive's "solutions."  CDK denies the remaining allegations in paragraph 4 of the Complaint.

5.    The damage to the automotive industry has been immense, with the damage to AutoLoop alone from its antitrust claims in the millions of dollars even before the automatic trebling provided for by the nation's antitrust laws. AutoLoop brings this action on behalf of a class of software solution vendors to recover those damages, enjoin CDK's illegal conduct, and stave off further harm to vendors, dealers, and other participants in the automotive industry. The industry and market can no longer endure such abuses.

**ANSWER:**    Paragraph 5 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that AutoLoop purports to bring this action on behalf of a putative class and seeks damages and injunctive relief.  CDK denies that Plaintiff or any other individual or entity has suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiff is entitled to the relief it seeks. CDK denies the remaining allegations in paragraph 5 of the Complaint.

\* \* \*

6.    AutoLoop is an automotive software products and services company, providing integrated software solutions for car dealers. AutoLoop's products and services make sourcing, selling, and servicing cars easier and more efficient for dealers and consumers than ever before.

**ANSWER:**    On information and belief, CDK admits that Plaintiff is an automotive software products and services company.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 6 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 6 of the Complaint.

7.      AutoLoop provides a fully integrated dealer software system to more than 2,000 dealers across the country. AutoLoop offers three suites of software: Sales, Service, and Marketing. Each suite includes multiple software applications that dealers can select à la carte to enhance their ability to sell cars and serve customers. For example, AutoLoop's Marketing Suite includes software products such as Conquest (data-driven direct mail and email), Loyalty (a personalized customer loyalty platform), and Essentials (automated, multichannel dealer marketing campaigns). AutoLoop's Service Suite includes products such as Book (online service appointment scheduling) and SmartLane (mobile check-in and service-lane management). AutoLoop's Sales Suite includes XRM (customer relationship management), Quote (data mining and quote generation), and Newsletter (individually targeted customer newsletter production). Because all of AutoLoop's software is fully integrated, AutoLoop's products are able to share data seamlessly across all aspects of a dealer's business.

**ANSWER:**      On information and belief, CDK admits that the specific products identified in

paragraph 7 of the Complaint—Conquest, Loyalty, Essentials, Book, SmartLane, XRM, Quote,

and Newsletter—are all sold or licensed by Plaintiff to automotive dealers. CDK lacks sufficient

knowledge or information to form a belief as to the truth of the allegations in paragraph 7 of the

Complaint that relate to individuals or entities other than CDK and on that basis denies them.

CDK denies the remaining allegations in paragraph 7 of the Complaint.

8.      For vendors' products and services to function, they need access to data from their dealer clients. This dealer data is the lifeblood of the automotive industry. It includes, but is not limited to, vehicle and parts inventory, customer name and contact information, customer leads, completed and pending sales information, vehicle financing and insurance ("F&I") information, vehicle pricing information, and service and repair information.

**ANSWER:**      CDK admits that many automobile dealers ("Dealers") generate certain data in the

course of their business, including certain of those identified in the third sentence of paragraph 8

of the Complaint. CDK further admits that certain automotive software vendors ("Vendors") use

such data and other data in the course of providing services to Dealers. CDK lacks sufficient

knowledge or information to form a belief as to the truth of the allegations in paragraph 8 of the

Complaint that relate to individuals or entities other than CDK and on that basis denies them.

CDK denies the remaining allegations in paragraph 8 of the Complaint.

PUBLIC VERSION

9.     Dealers have traditionally stored a significant portion of their data on a database within their DMS, which is software that dealers use to help manage their businesses (*e.g.*, accounting, sales, service, and human resources).

**ANSWER:**     CDK admits that Dealers enter certain data into the DMS, but denies that all data residing or stored on the DMS belongs to Dealers.  CDK admits that many Dealers use DMS software to help manage their businesses.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 9 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 9 of the Complaint.

10.     CDK and Reynolds are duopolists in the DMS market. Together, they control approximately 75% of the United States market by number of dealers and at least 90% when measured by vehicles sold. CDK controls approximately 45% of the DMS market, and Reynolds controls approximately 30%. On May 24, 2017, CDK announced that it was acquiring Auto/Mate, Inc., a company that has approximately eight percent of the DMS market, in a move that would further strengthen CDK's market power. The Federal Trade Commission voted to block that acquisition because it would have further "reduce[d] competition in an already concentrated market."[2]

**ANSWER:**     Paragraph 10 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it a "duopolist" in any market.  CDK further denies that Plaintiff properly has identified the relevant market.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 10 of the Complaint that relate to CDK's purported collective share of the "DMS market" and on that basis denies them.  CDK states that the allegations in paragraph 10 of the Complaint pertaining to a purported "DMS market" are so vague and ambiguous that CDK cannot respond to those allegations and on that basis denies them.  CDK admits that it announced a planned acquisition of Auto/Mate Dealership Systems on or about May 24, 2017.  Further answering, CDK further states that the planned acquisition was subsequently terminated on or

---

[2] FTC Press Release, *FTC Challenges CDK Global, Inc.'s Proposed Acquisition of Competitor Auto/Mate, Inc.* (Mar. 20, 2018).

about March 20, 2018 following governmental regulatory review. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 10 of the Complaint that relate to Auto/Mate's purported share of the purported "DMS market" and on that basis denies them. CDK denies the remaining allegations in paragraph 10 of the Complaint.

11. In addition to their DMSs, CDK and Reynolds offer standalone software applications that compete directly with applications offered by AutoLoop and other third-party vendors. For example, CDK's Service Edge and customer relationship management applications compete directly with AutoLoop's SmartLane and XRM products.

**ANSWER:** CDK admits that it and, upon information and belief, Reynolds, offer software solutions to Dealers that are available separate from each company's DMS offering. CDK further admits that certain of these software solutions compete with solutions offered by Plaintiff and other Vendors. CDK lacks sufficient knowledge or information to form a belief as to the truth of remaining allegations in paragraph 11 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in Paragraph 11 of the Complaint.

12. Even though certain dealer data is stored on the DMS database, that data belongs to the dealers – as CDK and Reynolds have repeatedly admitted. Accordingly, DMS providers, including CDK, have historically allowed dealers to provide third parties (including vendors) with automated access to the dealer data stored on the DMS. Data integration service providers are companies that collect and standardize data from a dealer's DMS and provide it to the dealer's chosen third-party vendors of software products and services. Data integration services enable dealers to have their data integrated with vendor products and services. Such integration involves providing access to certain data elements, in addition to bidirectional "read" and "write" capabilities. Certain integrations offer near-real-time access to and use of dealer data, while other integrations enable periodic flow of dealer data.

**ANSWER:** CDK admits that Dealers input certain data into the DMS, alongside other data that does not belong to Dealers, including non-public personal and identifying information pertaining to end-use customers and proprietary data that belongs to CDK or to other third parties. CDK denies that the allegations in paragraph 12 of the Complaint accurately describe the services that so-called "data integration service providers" perform. CDK lacks sufficient

knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 12 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 12 of the Complaint.

13.     CDK and Reynolds each provide data integration services for their respective DMSs. CDK's service is known as Third Party Access ("3PA"), while Reynolds' service is known as the Reynolds Certified Interface ("RCI"). Third parties have also provided competing data integration services. CDK owns two third-party data integrators – Digital Motorworks, Inc. ("DMI") and IntegraLink. Other third-party data integrators have included Authenticom, Inc. ("Authenticom") and Superior Integrated Solutions, Inc. ("SIS").

**ANSWER:**     CDK admits that it has a "Third Party Access" program ("3PA"), n/k/a the CDK Global Partner program, that offers managed bi-directional data integration services to Vendors. CDK further admits, upon information and belief, that Reynolds has a "Reynolds Certified Interface" program. CDK admits that DMI and IntegraLink are now known as CDK Data Services, Inc., a subsidiary of CDK. CDK further admits that CDK Data Services provides certain data services to Vendors, OEMs, and other participants in the automotive industry. CDK admits that Authenticom and SIS are or were data services providers that offer certain services, among others, premised on access to data maintained in CDK's and other providers' DMSs. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 13 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 13 of the Complaint.

14.     At one time, both CDK and Reynolds had "open" DMSs, meaning that neither took steps to prevent dealer clients from authorizing third-party access to the dealers' own data or to place anticompetitive restrictions on rights with respect to that data. During this time, the competition between data integration services made access to dealer data cost effective – an application vendor would pay an integrator on the order of $50 per dealer per month. With dealers in control of access to and use of their data, vendors created an array of innovative software products and services to help dealerships market, sell, lease, and service cars. These solutions became pervasive. Today, an average dealership uses 10 to 15 different software solutions.

**ANSWER:**     CDK admits that at one time, notwithstanding provisions in its Dealer contracts that prohibit unauthorized third-party access, CDK did not actively enforce these contract rights; it did not seek to prevent Dealers from providing login credentials to third parties and did not actively take steps to block third parties from accessing the CDK DMS with these credentials. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 14 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the allegations in paragraph 14 to the extent they purport to define an "open" DMS.  CDK denies the remaining allegations in paragraph 14 of the Complaint.

15.     Over time, Reynolds began to "close" its DMS by selectively blocking third-party data integrators from accessing dealer data stored on the Reynolds DMS. As Reynolds reduced competition for data integration services through its blocking activities, Reynolds increased the fees it charged for data integration through RCI. CDK continued to differentiate itself as an "open" DMS. As CDK's chief marketing officer publicly touted, "We don't tell the dealer, if someone wants access to their data, they have to come to [CDK] to gain access to the data. It's ultimately the dealer's data. If he wants to give that data to somebody, for us to try to charge a toll doesn't seem like the right thing to do. So we're not going to go down this path." And at the same time, CDK's own data integration businesses provided vendors with access to dealer data on the Reynolds DMS. CDK's open-access policy allowed it to gain (very slowly) DMS customers at Reynolds' expense and sign those dealers to long-term contracts.

**ANSWER:**     CDK admits that, as early as 2007, Reynolds took steps to block third-party access to its DMS including by, for example, disabling certain dealer-created login credentials. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegation in paragraph 15 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK admits that the quotes attributed to CDK's former chief marketing officer in paragraph 15 of the Complaint appeared in an article in Automotive News in 2006.  CDK denies that these statements reflect CDK's policies or the state of the industry more than a decade later.  CDK admits that certain of its subsidiaries, specifically DMI and IntegraLink, did, during certain times during the relevant period, extract certain data from the

Reynolds DMS in fulfillment of certain contracts the companies had with certain Vendors. CDK further admits that today, CDK businesses formerly known as DMI and IntegraLink no longer use dealer-issued login credentials to access DMSs. CDK denies the remaining allegations in paragraph 15 of the Complaint.

16. That competition between CDK and Reynolds halted abruptly in early 2015 when CDK began blocking dealers from granting third-party access to dealer data and, at the same time, agreed to shut down its data integration business for dealers using a Reynolds DMS. CDK's sudden about-face came as a complete surprise to the market. As it turned out, CDK's about-face was the result of a horizontal agreement with Reynolds.

**ANSWER:** Paragraph 16 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that it has taken steps, consistent both with its contracts with its Dealer customers and with CDK's need to provide a stable and secure DMS product to its Dealer customers, to block hostile third-party access to its DMS. CDK further admits that its subsidiaries no longer use dealer-issued login credentials to access DMSs. CDK denies the remaining allegations in paragraph 16 of the Complaint.

17. Specifically, CDK and Reynolds colluded to block third-party access to their DMSs – eliminating competition to their respective 3PA and RCI data access programs – thereby forcing third-party solution providers (like AutoLoop) to use CDK and Reynolds for data integration services. Executives from both CDK and Reynolds have admitted that the companies agreed to block and thereby destroy third-party data integrators. CDK and Reynolds also agreed to no longer compete with each other for data integration services.

**ANSWER:** CDK denies the allegations in paragraph 17 of the Complaint.

18. CDK and Reynolds memorialized one aspect of their agreement in writing, dated February 18, 2015, pursuant to which CDK agreed to "wind down" its data integration business for Reynolds dealers, and CDK and Reynolds both agreed not to access each other's DMSs. Damningly, just before the written agreement was signed, CDK's internal documents stressed the need to "gain reciprocal agreements with DMS providers" such as Reynolds in order to destroy competition for data integration. Dkt. No. 163, at 145:24-25.[3]

---

[3] Citations to the Transcripts of the Hearing held June 26-28, 2017 in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, are referred to by their respective docket numbers (Dkt. Nos. 162-166).

**ANSWER:** CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds. CDK denies Plaintiff's characterization of the agreements and states that the contracts speak for themselves. CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction and that the transcript of those proceeding can be found as indicated in footnote 3 of the Complaint. CDK denies Plaintiff's characterization of the documents introduced at that hearing and states that the hearing transcript speaks for itself. CDK denies the remaining allegations in paragraph 18 of the Complaint.

19. Apart from the written agreement, and as detailed below, CDK and Reynolds executives have admitted to a broader agreement to destroy independent data integrators and therefore eliminate all competition to their own data integration products. These horizontal conspiracies to destroy competition and divide the data integration market are *per se* violations of the antitrust laws.

**ANSWER:** Paragraph 19 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 19 of the Complaint.

20. CDK has also imposed unlawful exclusive dealing requirements on software solution vendors like AutoLoop. As a condition of participating in CDK's 3PA data integration service, vendors must generally agree to use 3PA exclusively for *all* of the vendors' products and services. Likewise, even though CDK's standard DMS contract expressly allows dealers to use "agents" to access data on the DMS, after entering into its horizontal agreements with Reynolds, CDK has asserted that its dealer clients are prohibited from using any third-party data integration service and has taken steps to block dealer-approved third-party access.

**ANSWER:** Paragraph 20 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that a standard term of its 3PA contracts requires 3PA participants to use CDK-authorized sources for data maintained on the CDK DMS. CDK further admits that it endeavors to enforce the terms of its contracts with Dealers, and accordingly has taken steps to block hostile, unauthorized access to its DMS. CDK denies that any third party data services providers are authorized "agents" under the terms of

CDK's contracts with its Dealers. CDK denies the remaining allegations in paragraph 20 of the Complaint.

21.     Internal CDK documents explain the motivations behind CDK's agreement with Reynolds to eliminate competition in the data integration market. First, the enormous success of third-party products and services like those offered by AutoLoop – made possible by integration with dealer data – began to threaten CDK's and Reynolds' DMS duopoly. As dealers increasingly used these third-party products and services, they began to rely less on CDK's and Reynolds' antiquated, monolithic DMS enterprise software. The third-party products and services began to perform tasks traditionally performed by the DMS, and to do so more efficiently and while offering greater features and functionality. Dealers also began entering data directly into the third-party solutions in the first instance, bypassing the DMS completely. CDK and Reynolds knew that this would eventually make it less difficult for dealers to switch DMS providers or even to forgo a DMS entirely. By seizing control over dealer data, CDK and Reynolds have sought to forestall that threat to their legacy DMS duopoly.

**ANSWER:**     Paragraph 21 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 21 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 21 of the Complaint.

22.     Second, CDK wanted to eliminate competition for data integration so that it could limit access to dealer data, impose restrictions on usage rights contrary to the wishes of their dealer clients, limit bi-directional integration for competing products, raise the costs of those competing products (thereby giving its own offerings artificial advantages), and attempt to drive competing solutions out of the market. CDK's own documents state – and its employees have testified – that CDK wanted to leverage its duopoly control over the DMS market to "tilt the table" in favor of its own offerings.

**ANSWER:**     CDK denies the allegations in paragraph 22 of the Complaint.

23.     For example, CDK prevents AutoLoop's SmartLane product from creating or modifying "repair orders" in the DMS. Yet CDK's Service Edge application has this capability, and CDK touts this fact to potential dealer clients: its marketing materials state that CDK's Service Edge has a "workflow [that] is written into the DMS," eliminating the "need to do the same work twice," while competitors like SmartLane are denied that capability. An application's ability to open repair orders and allow customers to sign for repairs in the service lane is a desirable feature, which CDK intentionally withholds to "tilt the table" in favor of its own competing applications.

PUBLIC VERSION

**ANSWER:** CDK admits that Plaintiff's SmartLane application currently does not use certified integration to create or modify repair orders in the CDK DMS. CDK further admits that CDK's Service Edge application is capable of creating and modifying repair orders in the CDK DMS by using proprietary CDK-created intellectual property, and that the quoted statements are substantially similar to excerpts that appear in a document sent by a CDK employee and produced by Plaintiff in this litigation. CDK denies Plaintiff's characterization of the document. CDK denies the remaining allegations in paragraph 23 of the Complaint.

24. CDK also abuses the 3PA "certification" process to the detriment of third-party vendors. For example, AutoLoop joined the 3PA program in January 2016, and was required to begin paying CDK's bloated integration fees six months later. Two years into that contract, CDK still has not certified five of AutoLoop's seven products. AutoLoop thus has been double paying for integration – to CDK (for no service at all) and to an independent integrator (which CDK continues to allow). This shows CDK's only motive for the 3PA program is profit. As long as third-party vendors pay CDK, CDK does not care which data integrator third parties use. In addition, CDK has demanded that third-party vendors provide sensitive proprietary information about their products for no legitimate reason. For example, CDK has required AutoLoop to provide live demonstrations of its solutions to CDK employees, which AutoLoop would never provide for any other competitor.

**ANSWER:** CDK admits that it charges Vendors fees for certification and installation services related to accessing its proprietary DMS. CDK further admits that AutoLoop signed an agreement to join the 3PA program in 2016 and further states that pricing terms under that agreement speak for themselves. CDK further admits that the 3PA certification process typically includes a product demonstration to verify that the integration works properly. CDK denies that it has failed to certify five of AutoLoop's seven products and denies that it has been the cause of any delays in the certification of any AutoLoop products. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 24 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 24 of the Complaint.

13

25.     Even where CDK and Reynolds grant competing applications access to data or provide a given integration, they still impose anticompetitive restrictions on the use of that data. For example, AutoLoop pays CDK a per dealer per month fee for data integration for each product and service, yet CDK contractually prohibits AutoLoop's various products and services from sharing that data with each other – despite having paid for it multiple times over. There is no legitimate basis for CDK or Reynolds to withhold those data sharing rights – especially where dealers want and authorize such rights – except to stifle innovation and make AutoLoop's and other vendors' products and services more expensive.

**ANSWER:**     Paragraph 25 states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that it charges Vendors monthly fees for services provided by its 3PA program.  CDK admits that AutoLoop's January 2016 3PA contract contains certain restrictions against the sharing of data obtained from CDK's DMS other than as authorized by that contract.  CDK denies that its contract terms result in AutoLoop paying for data "multiple times over."  CDK denies the remaining allegations in paragraph 25 of the Complaint.

26.     Such rights restrictions are especially nefarious because AutoLoop and other vendors have already secured the necessary rights to the data in question – whether from the dealers, consumers, or other third-party originators of the data. In many instances, much of the data in the DMS originated in AutoLoop's and other vendors' own products and services.

**ANSWER:**     Paragraph 26 of the Complaint state legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 26 of the Complaint.

27.     Third, CDK saw an enormous financial opportunity to dramatically inflate its prices for data integration services – after it had eliminated the competition. AutoLoop's integration fees have skyrocketed from approximately $79 per month per rooftop with independent data integrators to more than ███ per month per rooftop with CDK. Other vendors have seen similar increases.

**ANSWER:**     CDK admits that AutoLoop purchases certain products and services from CDK but denies that the fees for any of those products and services, as sold to AutoLoop, exceed $730 per month per rooftop.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 27 of the Complaint that relate to individuals or

entities other than CDK and on that basis denies them. CDK denies the remaining allegations in

paragraph 27 of the Complaint.

28.     By charging monopoly prices for access to dealer data, CDK has also raised the input costs of rival solutions, including those offered by AutoLoop and other vendors. Having seen the costs of data access skyrocket – with no corresponding increase in functionality or service quality – AutoLoop and other vendors have had no choice but to pass through a portion of the additional costs to its dealer clients. Unable to afford the escalating pass-through data integration fees, many dealers have elected to reduce their use of third-party vendors' software solutions or forgo them altogether, often in favor of the competing CDK offering, even though AutoLoop's and other vendors' products and services are superior. Therefore, CDK's dramatic price increases after it entered into the conspiracy with Reynolds not only padded its bottom line, but also put competing solutions providers like AutoLoop at a severe competitive disadvantage in the marketplace.

**ANSWER:**     Paragraph 28 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK lacks sufficient knowledge or

information to form a belief as to the truth of the allegations in paragraph 28 of the Complaint

that relate to individuals or entities other than CDK and on that basis denies them. CDK denies

the remaining allegations in paragraph 28 of the Complaint.

29.     AutoLoop brings this action on behalf of itself and other software solution vendors (as set forth in the Classes defined herein) to recover the damages they have suffered at the hands of CDK's and Reynolds' anticompetitive conduct – as co-conspirators, CDK is equally liable for the damage caused by Reynolds – and to restore choice to dealers and vendors over data integration. As described in detail herein, CDK's and Reynolds' horizontal conspiracies to eliminate competition in the data integration market and their market division agreement (which is a covenant not to compete) are *per se* violations of Section 1 of the Sherman Act, *see infra* Count I; CDK's exclusive dealing arrangements with vendors are anticompetitive and unlawful under Section 1 of the Sherman Act, *see infra* Count II; CDK's monopolization of its Dealer Data Integration Aftermarket is unlawful under Section 2 of the Sherman Act, *see infra* Count III; the same conduct that violates the Sherman Act also violates state antitrust and unfair competition laws, *see infra* Count IV; and the anticompetitive conduct set forth herein independently violates state unfair competition laws, *see infra* Count V.

**ANSWER:**     Paragraph 29 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK admits that Plaintiff purports to

bring this action as a class action under the Federal Rules of Civil Procedure. CDK denies,

however, that this matter is properly brought or is properly maintained as a class action. CDK

denies that Plaintiff or any other individual or entity has suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiff is entitled to the relief it seeks. CDK denies the remaining allegations in paragraph 29 of the Complaint.

## PARTIES

30. Plaintiff AutoLoop is a private Florida limited liability company with its headquarters and principal place of business at 33 N. Garden Avenue, Clearwater, Florida 33755. AutoLoop was founded by entrepreneur Steve Anderson in 2005. Today, AutoLoop employs 400 people, and its products are used by more than 2,100 dealers.

**ANSWER:** On information and belief, CDK admits that Plaintiff AutoLoop is a Florida limited liability company with offices at the address listed in paragraph 30 of the Complaint. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 30 of the Complaint and on that basis denies them.

31. Defendant CDK is a publicly traded Delaware corporation with its corporate headquarters and principal place of business at 1950 Hassell Road, Hoffman Estates, Illinois 60169. CDK provides DMS software and services to automobile dealerships throughout the United States and has more than $2 billion in annual revenue. In 2014, CDK was spun off from ADP, LLC, and is now an independent, publicly traded company. Prior to the spin-off, CDK was referred to as ADP Dealer Services (collectively, referred to herein as "CDK"). In addition to its DMS platform, CDK also provides data integration services, and offers products and services that compete directly with other vendors' solutions. For example, CDK's Service Edge competes with AutoLoop's SmartLane product, and CDK's customer relationship management services compete with AutoLoop's XRM product.

**ANSWER:** CDK admits that its parent company, CDK Global, Inc., is a publicly traded company organized under the laws of Delaware. CDK further admits that its corporate headquarters is in Hoffman Estates, Illinois, at the address listed in paragraph 31 of the Complaint. CDK further admits that it provides certain services to Dealers, including licensing DMS software, in the United States, and that its parent company reports its annual revenue in public filings with the Securities and Exchange Commission during the relevant period. CDK states that the reports speak for themselves. CDK admits that it was spun off from Automatic Data Processing, Inc. ("ADP") in 2014. CDK further admits that it offers certain software

applications to Dealers, including service lane and customer relationship management applications, and that such applications may compete with applications offered by other entities, including AutoLoop. CDK denies the remaining allegations in paragraph 31 of the Complaint.

32.　Non-party Reynolds is an Ohio corporation with its corporate headquarters and principal place of business at One Reynolds Way, Kettering, Ohio 45430. Because Reynolds is CDK's co-conspirator, CDK is jointly and severally liable for all harm caused by Reynolds in furtherance of the conspiracy. Like CDK, Reynolds provides DMS software and services to automobile dealerships throughout the United States. Also like CDK, Reynolds provides data integration services, as well as products and services that compete directly with other vendors' solutions. Reynolds was acquired by Bob Brockman in 2006 in a leveraged buyout and taken private.

**ANSWER:**　Upon information and belief, CDK admits that non-party Reynolds is an Ohio corporation with a business location at the address identified in the first sentence of paragraph 32 of the Complaint. CDK further admits, upon information and belief, that Reynolds provides certain services to Dealers, including with respect to DMSs and related services, in the United States. Upon information and belief, CDK further admits that prior to 2006 Reynolds was a publicly traded company and that in or about 2006, it was acquired by Bob Brockman. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 32 of the Complaint and on that basis denies them.

## JURISDICTION AND VENUE

33.　This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; and state law.

**ANSWER:**　Paragraph 33 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that Plaintiff purports to bring this action pursuant to federal statutes cited in paragraph 33 of the Complaint as well as certain state's laws. CDK denies, however, that Plaintiff or any other individual or entity has suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiff

is entitled to the relief it seeks. CDK denies the remaining allegations in paragraph 33 of the Complaint.

34.    This Court has subject matter jurisdiction over the federal antitrust claims pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26. This court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because they are so closely related to the federal claims that they constitute part of the same constitutional case. Additionally, this Court has jurisdiction over AutoLoop's state law claims pursuant to 28 U.S.C. § 1332(d) because one or more of the plaintiffs is a citizen of a state different from CDK and the matter in controversy exceeds the sum of $5,000,000 exclusive of costs and interest.

**ANSWER:**    Paragraph 34 states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that this Court has jurisdiction over the claims asserted in Plaintiff's Complaint.  CDK denies the remaining allegations in paragraph 34 of the Complaint.

35.    This Court has personal jurisdiction over Defendant CDK pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d), and the nationwide service provisions therein. CDK has engaged in the unlawful acts described in this Complaint with the foreseeable or intended effects of causing substantial economic harm to AutoLoop in Wisconsin, and CDK has purposely availed itself of the privilege of doing business in Wisconsin through the widespread promotion, sale, and distribution of their products and services in the State.[4] Many dealers in Wisconsin use CDK's DMS and/or its applications.

**ANSWER:**    Paragraph 35 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that it markets and sells certain products and services in Wisconsin, including to Dealers. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 35 that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 35 of the Complaint.

---

[4] Pursuant to the Court's instructions at the April 6, 2018 status hearing in *In re Dealer Management Systems Antitrust Litigation*, No. 18 C 864 (MDL No. 2817), AutoLoop has filed this Complaint directly in the MDL court but requests that the Complaint be deemed filed in the Western District of Wisconsin and transferred to the Western District of Wisconsin for trial.

**PUBLIC VERSION**

36.     Venue is proper in the Western District of Wisconsin pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d). Defendant CDK is registered to do business, transacted business, was found, and had agents in Western District of Wisconsin; a substantial part of the events giving rise to the claims set forth herein occurred in the District; a substantial portion of the affected interstate trade and commerce described herein has been carried out in the District. AutoLoop and other vendors' have also served dealers in Wisconsin that use a CDK or Reynolds DMS.

**ANSWER:**     Paragraph 36 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that it markets and sells certain products and services in Wisconsin.  CDK further admits that it is registered to do business in Wisconsin and has a registered agent to accept service of process in Wisconsin. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 36 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 36 of the Complaint.

37.     CDK's unlawful conduct substantially affected interstate commerce by harming competition, increasing prices and quality, and limiting output, to the detriment of AutoLoop, dealers, and other vendors nationwide.

**ANSWER:**     Paragraph 37 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that it sells certain products and services in interstate commerce.  CDK denies, however, that Plaintiff or any other individual or entity has suffered any injury as a result of any action or conduct of CDK.  CDK denies the remaining allegations in paragraph 37 of the Complaint.

## FACTUAL ALLEGATIONS

## I.     The Relevant Product Markets

38.     The relevant product markets for AutoLoop's claims are: (1) the DMS market in the United States; (2) the Dealer Data Integration Market in the United States; and (3) the CDK Dealer Data Integration Single-Brand Aftermarket.

**PUBLIC VERSION**

**ANSWER:**     Paragraph 38 of the Complaint states legal conclusions to which no response is

required. To the extent that an answer may be required, CDK denies the allegations in paragraph

38 of the Complaint.

### A.     The DMS Market

39.     The DMS is enterprise software used by retail automotive dealerships to manage
their business, including sales, financing, inventory management, repairs and service,
accounting, payroll, human resources, and marketing.

**ANSWER:**     CDK admits that most new vehicle franchised Dealers and a number of used car

Dealers, as well as dealers of other motorized vehicles, use DMS enterprise software to manage

various aspects of their businesses, including with respect to sales, financing, inventory

management, repair and service, accounting, payroll, human resources, and/or marketing. CDK

denies the remaining allegations in paragraph 39 of the Complaint.

40.     The DMS also includes a database used to store certain dealer data, including
vehicle and parts inventory, customer name and contact information, completed and pending
sales, sales and F&I information, service and repair information, and more.

**ANSWER:**     CDK admits that a number of Dealers use DMSs to assist in the operation of their

dealerships and that they input certain data into the DMS as part of those operations, including a

number of the categories listed in paragraph 40 of the Complaint. CDK denies the remaining

allegations in paragraph 40 of the Complaint.

41.     Over time, the DMS became the center of a dealer's retail management platform.
Virtually every franchised new car dealership in the United States now uses a DMS. And while
dealers generate much of their data outside of the DMS in separate software solutions, as a
practical matter, a substantial portion of dealer data is stored on the DMS, even though there is
no technical reason why that must be the case.

**ANSWER:**     CDK admits that most new vehicle franchised Dealers and a number of used car

Dealers, as well as dealers of other motorized vehicles, use DMS enterprise software to manage

and operate certain aspects of their dealerships. CDK admits that Dealers enter data into the

DMS, but denies that all data residing or stored on the DMS belongs to Dealers. CDK lacks

PUBLIC VERSION

sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 41 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 41 of the Complaint.

42. The DMS market is comprised of those providers that market and sell DMS services to franchised new car dealers in the United States. There is public and industry recognition of the DMS market.

**ANSWER:** The allegations in paragraph 42 of the Complaint state legal conclusions to which no response is required. To the extent that an answer may be required, CDK states that the allegations in paragraph 42 of the Complaint are so vague and ambiguous as to the definition of the term "DMS market" that CDK cannot respond to those allegations and on that basis denies them. CDK denies the remaining allegations in paragraph 42 of the Complaint.

### 1. CDK and Reynolds Dominate the DMS Market

43. Defendant CDK and its co-conspirator Reynolds dominate the DMS market. About 45% of dealer "rooftops" (i.e., franchised stores located at a physical location) use CDK's DMS, and about 30% use Reynolds' DMS. When measured using the number of vehicles sold from franchised dealers, which is a more relevant metric, CDK and Reynolds control more than 90% of the DMS Market. Industry publications have described CDK and Reynolds as "the Big 2," "the Duopoly," "the two 400-pound gorillas," and "the two giants of the DMS market."

**ANSWER:** Paragraph 43 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 43 of the Complaint that relate to CDK's purported collective share of the "DMS market" and on that basis denies them. CDK further states that the allegations in paragraph 43 of the Complaint are so vague and ambiguous as to the definition of the term "DMS market" that CDK cannot respond to those allegations and on that basis denies them. Plaintiff has not identified the sources of the quotations that appear in the last sentence of paragraph 43 of the Complaint and thus CDK lacks sufficient knowledge or information to form a belief as to the accuracy of those quotations.

CDK denies the remaining allegations in paragraph 43 of the Complaint.

44.    On May 24, 2017, CDK announced an agreement to buy the DMS provider Auto/Mate, Inc., which has an additional eight percent of the DMS market (as measured by dealer rooftops). On March 20, 2018, the Federal Trade Commission voted to block that acquisition because it would have further "reduce[d] competition in an already concentrated market."[5] CDK subsequently abandoned the attempted acquisition.

**ANSWER:**    CDK admits that on or about May 24, 2017 it announced a planned acquisition of Auto/Mate Dealership Systems and that the planned acquisition was subsequently terminated on or about March 20, 2018.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 44 of the Complaint that relate to Auto/Mate's purported share of the "DMS market" and on that basis denies them.  CDK further states that the allegations in paragraph 44 of the Complaint are so vague and ambiguous as to the definition of the term "DMS market" that CDK cannot respond to those allegations and on that basis denies them.  CDK further admits that the Federal Trade Commission filed an administrative complaint on March 20, 2018 concerning the planned acquisition.  CDK admits that the text quoted in the second sentence of paragraph 44 appears in the FTC Press Release cited in footnote 5 of the Complaint.  CDK denies the remaining allegations in paragraph 44 of the Complaint.

45.    Apart from CDK and Reynolds, the DMS market is diffuse, with an array of providers dividing up the remaining market share. The remaining DMS providers are generally small, occupy a particular niche, or serve the country's smaller car dealerships.

**ANSWER:**    Paragraph 45 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that there are an array of other DMS providers besides CDK and Reynolds.  CDK further states that the allegations in paragraph 45 of the Complaint are so vague and ambiguous as to the definition of the term "DMS market" that CDK cannot respond to those allegations and on that basis denies them.

---

[5] FTC Press Release, *FTC Challenges CDK Global, Inc.'s Proposed Acquisition of Competitor Auto/Mate, Inc.* (Mar. 20, 2018).

CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 45 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 45 of the Complaint.

46. CDK's and Reynolds' DMS businesses are very lucrative. A single, small dealership pays up to $150,000 per year for the DMS software license and services. Mid-size dealership groups (5 to 10 stores) pay $1,500,000 or more per year, and large dealership groups can easily pay more than $5,000,000 per year. CDK's and Reynolds' profit margins on their DMSs are estimated to exceed 40%.

**ANSWER:** CDK admits that Dealer franchises' costs vary and that some incur less than $150,000 in costs per year for licensed CDK DMSs and related services, while others incur costs totaling over $5,000,000 per year, depending on a variety of factors. CDK denies that its profit margins exceed 40 percent. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 46 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 46 of the Complaint.

## 2. The CDK and Reynolds Duopoly Has Proven Durable

47. Significant barriers to entry protect CDK's and Reynolds' dominant positions in the DMS market. First, CDK and Reynolds have locked in dealers to lengthy contracts. CDK and Reynolds sell their respective DMS software and services pursuant to long-term contracts that are typically between five and seven years in length. These contracts often include automatic extensions if new services are ordered in the middle of the contract.

**ANSWER:** Paragraph 47 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that a number of its licensing contracts contain provisions pertaining to contract renewal and extension. CDK states that the contracts speak for themselves. CDK denies that its DMS contracts with Dealers are typically between five and seven years in length, and denies that Dealers are "locked in" to such contracts. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 47 of the Complaint that relate to individuals or entities other than CDK

and on that basis denies them.  CDK denies the remaining allegations in paragraph 47 of the

Complaint.

48.     Second, switching costs are high. Switching DMS providers presents significant logistical challenges and is highly disruptive to business operations. It can take a dealership over a year of preparation, staff training, and testing before a new DMS can be put into operation, all while the dealership is trying to sell and service cars. The financial costs in terms of training and implementation are significant.

**ANSWER:**     CDK admits that there are switching costs when changing DMS providers.  CDK

lacks sufficient knowledge or information to form a belief as to the truth of the allegations in

paragraph 48 of the Complaint that relate to individuals or entities other than CDK and on that

basis denies them.  CDK denies the remaining allegations in paragraph 48 of the Complaint.

49.     One industry executive stated that changing DMS providers "is akin to a heart transplant." David Barkholz, *DMS Dilemma: Why It's So Hard to Switch – Upstarts Battle Big 2, But Dealers Weigh Cost vs. Comfort Zone*, Automotive News (May 10, 2010). CDK's CEO recently acknowledged that "switching DMS providers can be very difficult. It [is quite a] process [to] change and takes time, which is part of the reason that many dealers are hesitant to switch." Thomson Reuters StreetEvents, *Edited Transcript: CDK – Q1 2017 CDK Global Inc. Earnings Call*, at 3 (Nov. 2, 2016) (statement by CDK Global CEO Brian MacDonald). One large dealer publicly referred to changing DMS providers as "mission impossible." David Barkholz, *Inside 'Mission Impossible': A DMS Change – How Store Succeeded in Sign-or-Switch Situation*, Automotive News (January 13, 2014). Both Reynolds and CDK have publicly touted that their market positions are secure because of how difficult it is to switch DMS providers. As a result of the high-switching costs, the *average* DMS tenure is over twenty years.

**ANSWER:**     CDK admits that the text quoted in the first and fourth sentences of paragraph 49

of the Complaint appeared in two issues of Automotive News published in 2010 (over eight

years ago) and 2014 (over four years ago).  CDK further admits that the text quoted in the second

and third sentences of paragraph 49 of the Complaint is attributed to CDK's former CEO in the

source identified in paragraph 49.  CDK denies that the "average DMS client tenure" is over 20

years, and upon a reasonable investigation lacks sufficient knowledge or information to form a

belief as to the truth of the allegation in paragraph 49 of the Complaint that CDK has ever

publicly made such a statement—and on that basis denies said allegation.  CDK lacks sufficient

knowledge or information to form a belief as to the truth of the allegations in paragraph 49 of the

Complaint that relate to individuals or entities other than CDK and on that basis denies them.

CDK denies the remaining allegations in paragraph 49 of the Complaint.

50.     CDK has recently forced many of its dealers to extend their contracts by years by threatening to terminate their DMS service. Many of these dealers were on month-to-month contracts, and had been for a long time. CDK abruptly – and without prior notice – informed these dealers that their DMS services would terminate in less than 60 days unless the dealers entered into years-long contracts. Dealers generally had no choice but to sign the lengthy extensions given the impossibility of switching DMS providers in such a short amount of time.

**ANSWER:**     CDK admits that certain of its contracts with Dealers state that such contracts

continue month-to-month upon expiration of the initial term, which is terminable upon 30 days'

written notice by either party.  CDK further admits that certain Dealer customers are or have

been receiving DMS services on a month-to-month basis, and that CDK at one point notified

some of those Dealers of its intent to terminate the parties' month-to-month arrangement upon 60

days' written notice, while extending an offer to those Dealers to enter into a new term contract.

CDK denies that any such Dealers had no choice but to extend their contracts with CDK.  CDK

lacks sufficient knowledge or information to form a belief as to the truth of the allegations in

paragraph 50 of the Complaint that relate to individuals or entities other than CDK and on that

basis denies them.  CDK denies the remaining allegations in paragraph 50 of the Complaint.

51.     The barriers to entry are so high that even Microsoft could not compete in this market. When Microsoft tried to enter the DMS market in 2006, Reynolds' CEO Bob Brockman was not concerned, saying "there's not a chance" that Microsoft could succeed. David Barkholz, *Data System is Brockman's Latest Surprise,* Automotive News (Jan. 25, 2009). Indeed, Microsoft failed, prompting a company executive to publicly concede, "We kind of got ahead of ourselves" in trying to take on CDK and Reynolds. David Barkholz, *Dealers Get New Management System Option – Dominion-Microsoft Product Battles Giants ADP, Reynolds*, Automotive News (Dec. 2, 2012).

**ANSWER:**     Paragraph 51 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK admits that Microsoft introduced a

competing DMS software product in 2006 and that the text quoted in the third sentence of

paragraph 51 of the Complaint appears in the 2012 Automotive News article cited in paragraph

51. CDK denies that Microsoft's DMS offering "failed" or that Microsoft cannot compete with

CDK or Reynolds insofar as Microsoft recently formed a technology partnership with global

DMS provider Incadea, a subsidiary of Cox Automotive, which serves more than 4,000

dealerships in 100 countries. CDK lacks sufficient knowledge or information to form a belief as

to the truth of the allegations in paragraph 51 of the Complaint that relate to individuals or

entities other than CDK, including the quotation attributed to Reynolds CEO Bob Brockman, and

on that basis denies them. CDK denies the remaining allegations in paragraph 51 of the

Complaint.

### B. The Dealer Data Integration Market

52. Dealers use software products and services from AutoLoop (and many other vendors) to perform important sales, servicing, marketing, and operational functions. These solutions supplement and oftentimes replace functions provided by the DMS. AutoLoop's products and services are used for, among other things, customer relationship management, service lane management, lead generation, data mining, and multiplatform marketing. Other vendors offer similar products and services. A dealer may use 10 to 15 standalone products and services, and some use many more.

**ANSWER:** CDK admits that Dealers contract with various Vendors for software solutions in

connection with the operation of their dealerships, including with respect to sales, servicing,

marketing, and operational functions and a number of the tasks identified in paragraph 52 of the

Complaint. CDK further admits that those solutions can be used in addition to or, in some cases,

as a replacement for certain functionalities of a DMS. CDK denies that the core functionalities

of DMS, which are designed to work seamlessly as part of the DMS, can be displaced by third

party software. CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 52 of the Complaint that relate to the number of third-party software

solutions used by a typical Dealer and on that basis denies them. CDK lacks sufficient

knowledge or information to form a belief as to the truth of the allegations in paragraph 52 of the

Complaint that relate to individuals or entities other than CDK and on that basis denies them.

CDK denies the remaining allegations in paragraph 52 of the Complaint.

53.     To function, these solutions need integration with dealer data stored on the DMS. For example, XRM is a customer relationship management tool that requires access to, among other things, customer information, vehicle information and history, and inventory data.

**ANSWER:**     CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 53 of the Complaint and on that basis denies them.

54.     While the precise data needs of vendor solutions can vary, it has become increasingly common for vendor solutions to need or at least desire real-time bidirectional access to dealer data on the DMS – i.e., they need to read data from the DMS in near-real-time, as well as push data back into the DMS near-real-time in the many instances where that data is first generated within the vendor solution (i.e., outside of the DMS).

**ANSWER:**     CDK admits that its 3PA program offers managed, bi-directional integration with the CDK DMS and that a number of 3PA program participants have real-time access to CDK's DMS.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 54 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 54 of the Complaint.

55.     As described in more detail below, even though certain dealer data is stored on the DMS, that data belongs to the dealers, and dealers have the right to provide that data to third parties and to establish use and sharing rights for the data.

**ANSWER:**     CDK admits that Dealers enter certain data into the DMS, but denies that all data residing or stored on the DMS belongs to Dealers.  CDK denies the remaining allegations in paragraph 55 of the Complaint.

56.     The Dealer Data Integration Market consists of services that provide access to dealer data on the DMS, including CDK's and Reynolds' own in-house data integration services. Data integrators may also provide value-enhancing services, such as putting data from different DMS in a uniform format, data hygiene (i.e., error correction), and granular control by dealers over which vendors receive which data.

**PUBLIC VERSION**

**ANSWER:** CDK admits that certain data service providers, including the CDK businesses formerly known as DMI and IntegraLink, offer data processing services similar to those described in paragraph 56 of the Complaint. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 56 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 56 of the Complaint.

57. Before a data integrator can access dealer data on the DMS, the data integrator must receive specific authorization from the dealer. To grant such access, dealers enter into contracts with data integrators that authorize the data integrator to access the dealer's data.

**ANSWER:** CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 57 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 57 of the Complaint.

58. There is public and industry recognition of the existence of a Dealer Data Integration Market distinct from the DMS market. CDK and Reynolds have separate business units that provide data integration and DMS services. In its 2015 10-K, CDK described its data integration services as "a stand-alone product" separate from "the core Dealer Management System." CDK, Annual Report (Form 10-K) (Aug. 13, 2015), at 4. The Dealer Data Integration Market also has its own supply and demand curves. The usage of integrated vendor solutions – and hence the amount of data integration services – has fallen relative to what it would be in a competitive market in response to supra-competitive prices charged for data integration services by CDK and Reynolds because a significant portion of those costs are passed through to dealers. There are also no reasonable substitutes for services provided by data integrators, demonstrated most clearly by the fact that CDK and Reynolds, after closing their systems, have been able to impose massive price increases for their data integration services.

**ANSWER:** CDK admits that the excerpted quoted statements in the second sentence of paragraph 58 of the Complaint appear in CDK Global, Inc.'s 2015 Form 10-K Annual Report but denies that such statements refer specifically to CDK's data integration services. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in

paragraph 58 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 58 of the Complaint.

59. Geographically, the Dealer Data Integration Market covers the United States.

**ANSWER:** Paragraph 59 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 59 of the Complaint.

### 1. The Dealer Data in the DMS Belongs to the Dealers

60. Even though certain dealer data is stored on the DMS, that data still belongs to the dealers. The dealers therefore should decide who to authorize to access their data. CDK and Reynolds have repeatedly admitted this fundamental fact in public statements, on their websites, and in their DMS contracts with dealers.

**ANSWER:** CDK admits that Dealers may input certain data into the DMS, but denies that all data residing or stored on the DMS belongs to Dealers. CDK denies the remaining allegations in paragraph 60 of the Complaint.

61. Tom Schwartz, Reynolds' chief spokesperson, publicly declared: "The data belongs to the dealers. We all agree on that." David Barkholz, *Dealers Decry Reynolds Crackdown*, Automotive News (Nov. 21, 2011). On its website, Reynolds represents to dealers: "Your Data, Your Way. You own your data. Reynolds recognizes you need to share that data outside your dealership."

**ANSWER:** CDK admits that the material quoted in the first sentence of paragraph 61 of the Complaint appears in the publication cited in the paragraph. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 61 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 61 of the Complaint.

62. Howard Gardner, now CDK's Vice President for Data Strategy, has stated that CDK "has always understood that dealerships own their data and enjoy having choices on how best to share and utilize that data with others." CDK's website likewise states: "[D]ealerships own their data."

**ANSWER:** CDK admits that the text quoted in the first sentence of paragraph 62 of the Complaint is attributed to CDK employee Howard Gardner and appeared in a July 13, 2013 press release issued by ADP Dealer Services, Inc., CDK's predecessor. CDK states that the press release goes on to say that CDK's 3PA program is intended to "allow[ ] dealers to do business with the third-party vendors of their choice without sacrificing security." CDK further admits that the text quoted in the second sentence of paragraph 62 of the Complaint appeared in material published on CDK's website in 2014, which in its entirety reads: "CDK has always understood that dealerships own their data, so we offer an open yet secure Dealer Management System (DMS) through the CDK Third Party Access Program. We give you the flexibility to provide DMS access to third parties without sacrificing security." CDK denies the remaining allegations in paragraph 62 of the Complaint.

63. The Reynolds and CDK DMS contracts "spell out which party owns the data and there is generally little dispute: the data belongs to the dealer. This makes sense; after all, it's the dealership's customers, inventory, and transactional data that the dealership is putting into the DMS system." DrivingSales News, *The Hidden Data Tax That Dealers Don't Know They Are Paying,* Driving Sales (Oct. 17, 2013); *see* Reynolds Addenda Specific Terms and Conditions, at 3 ██████████████████████████████████████████████████████ ; CDK Master Services Agreement § 7.A ██████ ████████████████████████████████████████████████████████ .

**ANSWER:** CDK admits that the quoted text excerpted in the last sentence of paragraph 63 of the Complaint—"CDK Master Services Agreement § 7.A"—appears in a version of CDK's standard Master Services Agreement ("MSA") with Dealers in place during the relevant time period. CDK states that the contract speaks for itself. CDK admits that the material quoted in the first sentence of paragraph 63 of the Complaint appears in the article identified in the paragraph. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 63 of the Complaint that relate to individuals or entities other than CDK

and on that basis denies them. CDK denies the remaining allegations in paragraph 63 of the Complaint.

### 2. CDK Has Long Recognized That Dealers Have the Right To Control Access to, and Use of, Their Data

64. For many years, CDK publicly recognized the fundamental principle that dealers, as owners of their data, have the right to control access to and use of that data.

**ANSWER:** CDK admits that Dealers have certain rights as to their own data, but denies that dictating the terms of access to CDK's DMS, including third-party access, is one of them. CDK denies the remaining allegations in paragraph 64 of the Complaint.

65. CDK's standard DMS contract states a dealer's "employees and agents" may "have access" to the DMS. This language has existed since at least the 1990s. CDK's standard DMS contract therefore specifically permits dealers to grant their agents, including data integrators, access rights to the dealer's data stored on the DMS.

**ANSWER:** CDK admits that the quoted language excerpted in the first sentence of paragraph 65 of the Complaint has appeared in a version of CDK's standard Dealer contract in place during the relevant time period. CDK denies that such language permits access to CDK's DMS by "data integrators" and further states that the contract speaks for itself. CDK denies the remaining allegations in paragraph 65 of the Complaint.

66. Consistent with this contractual language, CDK's top executives have repeatedly made public statements that dealers may grant data integrators rights to access their DMS. For example, Steve Anenen, CDK's longtime CEO, publicly stated that dealers have the right to grant third parties access to, and use of, their data. He told the industry publication *Automotive News*, "We're not going to prohibit that or get in the way of that." Ralph Kisiel, *ADP Provides Dealers 3 Options on Data Access*, Automotive News (Feb. 19, 2007). "I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it, when in fact it's really the data belonging to the dealer. As long as they grant permission, how would you ever go against that wish?" *Id.*

**ANSWER:** CDK admits that Steve Anenen, CDK's former CEO, is identified as the source of the quotes that appear in paragraph 66 of the Complaint from an article that appeared in Automotive News approximately 11 years ago. CDK denies that these statements reflect CDK's

policies or the state of the industry more than a decade later. CDK denies the remaining allegations in paragraph 66 of the Complaint.

67. Matt Parsons, CDK's vice president of sales and marketing, similarly stated: "We're not going to limit the ability of a dealer to give an ID to someone else to, in essence, dial into their system. That is the dealer's right. We have no right to tell them they can't do that." Ralph Kisiel, *NADA, AIADA Weigh Reynolds Data Security Debate*, Automotive News (Feb. 4, 2007). Kevin Henahan, CDK's senior vice president of product marketing, delivered the same message: "We don't tell the dealer, if someone wants access to their data, they have to come to [CDK] to gain access to the data. It's ultimately the dealer's data. If he wants to give that data to somebody, for us to try to charge a toll doesn't seem like the right thing to do. So we're not going to go down this path." Ralph Kisiel, *Dealer Security Stirs Insecurity: Vendors Wary of Reynolds Plan for Computer Systems*, Automotive News (Dec. 4, 2006). Even as recently as April 2017, CDK executives have continued to say that dealers are permitted to authorize independent integrators to access their data if they wish. *See* Ex. 1 (CDK-0032559, at 562) ███████ ███████

**ANSWER:** CDK admits that former CDK employees are identified as the sources of the quotes that appear in paragraph 67 of the Complaint from two articles that appeared in Automotive News, in 2006 and 2007, some 11 and 12 years ago respectively. CDK denies that these statements reflect CDK's policies or the state of the industry more than a decade later. CDK admits that Exhibit 1 to the Complaint contains ████████████ ████████████ CDK denies Plaintiff's characterization of the document and the statements therein. CDK denies the remaining allegations in paragraph 67 of the Complaint.

68. CDK was also one of the first members of Open Secure Access, Inc., which described itself as "a coalition of companies that believe dealers should control access to the data they own and determine how it is used." Open Secure Access, Inc. Press Release, *Open Secure Access Releases Automotive Retail Data Security Guidelines* (June 28, 2007). The group published a set of basic principles to guide the industry, including that "dealers should control who accesses their data," "[t]hird parties that have dealer permission to utilize a dealer's data should be able to access the data through their own efforts or through the services of an independent company," and "DMS companies should facilitate interaction with all data available to a DMS user by providing technologically advanced means to interact with (read and write) that data, either through a robust set of APIs, system functionality, or direct access to the database."

**ANSWER:** CDK admits that its predecessor parent company, ADP, was a member of Open Secure Access, Inc. CDK denies that it was ever a member of Open Secure Access, Inc., which formed in 2006 and is now defunct. CDK admits that the text quoted in the first sentence of paragraph 68 of the Complaint purports to be excerpted from a 2007 press release attributable to Open Secure Access, Inc. CDK further admits that the text quoted in the second sentence of paragraph 68 appears in a website printout from 2007 attributable to Open Secure Access, Inc. CDK denies that the quoted text reflects CDK's policies or the state of the industry today, more than a decade later. CDK denies the remaining allegations in paragraph 68 of the Complaint.

### 3. Participants in the Data Integration Market

69. At one time, there were approximately a dozen competitors in the Dealer Data Integration market, such as SIS and SelectQu. CDK's and Reynolds' anticompetitive behavior has driven most of them out of the market. Today, there are only three remaining commercial data integrators serving CDK's and Reynolds' dealers: Reynolds through RCI, CDK through 3PA, and Authenticom. Every independent data integration provider other than Authenticom has been driven from the market by CDK's and Reynolds' anticompetitive conduct. Subject to its own litigation against CDK and Reynolds, Authenticom's ability to remain in business is in doubt. And CDK and Reynolds continue to take steps to block Authenticom from accessing their DMSs. Therefore, vendors effectively only have one integration option with respect to dealer data on a CDK DMS – CDK itself. It is the same with Reynolds.

**ANSWER:** CDK admits that it has taken steps, consistent both with its contracts with its Dealer customers and with CDK's need to provide a stable and secure DMS product to its Dealer customers, to block hostile third-party access to its DMS, including by Authenticom. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 69 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 69 of the Complaint.

### a. CDK

70. CDK provides integration with dealer data on the CDK DMS through an interface offered by CDK under its Third Party Access ("3PA") program. The 3PA program's managed interface is used exclusively for data integration with the CDK DMS.

**ANSWER:**    CDK admits that it provides secure, reliable integration to its proprietary DMS

through its 3PA program n/k/a the CDK Global Partner program and that the 3PA program is

exclusive to CDK.  CDK denies the remaining allegations in paragraph 70 of the Complaint.

71.    Prior to early 2015 – when CDK colluded with Reynolds to "close" its DMS –
CDK offered several ways by which dealers could share their data. For example, CDK offered a
"basic access" package where dealers supplied vendors with a user ID and password by which
the vendors – or their data integrators – could access dealer data on CDK's DMS. Before 2015,
CDK also allowed dealers to use other data integrators that competed with 3PA.

**ANSWER:**    CDK admits that at one time, notwithstanding provisions in its Dealer contracts

that prohibit unauthorized third-party access, CDK did not actively enforce these contract rights;

it did not seek to prevent Dealers from providing login credentials to third parties and did not

actively take steps to block third parties from accessing the CDK DMS with these credentials.

CDK further admits that the phrase "basic access" is attributed to CDK in a 2007 Automotive

News article. CDK denies the remaining allegations in paragraph 71 of the Complaint.

72.    CDK revamped the 3PA program in June 2015. Under the "refreshed" 3PA
program, CDK declares that the 3PA program's managed interface is the only CDK-approved
method of integrating with a CDK DMS. It now labels any other method for accessing data
"unauthorized," and it disables login credentials that any dealer provides to a third party. Today,
CDK disables login credentials used by third-party data integrators even though its own dealer
contracts specifically permit access by "agents" of the dealers. The "refreshed" 3PA program is a
direct market substitute for the services previously provided by independent integrators like
Authenticom. *See, e.g.*, Ex. 2 (CDK-0105062) (Slide 9) ██████████████████████████
███████████████████████████████████████████; Ex. 3 ██████████████████████████████
████████████████████████████████████████████████████

**ANSWER:**    CDK admits that it issued a press release concerning the 3PA program and the

SecurityFirst initiative on June 22, 2015.  CDK further admits that the 3PA program, generally,

is the only approved method for Vendors to integrate with CDK's DMS.  CDK denies that the

3PA program is the only means by which Vendors can obtain data necessary to provide software

solutions to Dealers.  CDK further admits that one of the mechanisms it used in its efforts to

block the unlawful extraction of data from its systems included disabling login credentials used

by hostile data extractors. CDK admits that Exhibits 2 and 3 to the Complaint contain documents produced by CDK in this litigation, and that the quoted statements excerpted in the parenthesis attributed to Exhibits 2 and 3 appear in those documents. CDK denies Plaintiff's characterization of the documents and the statements therein. CDK denies the remaining allegations in paragraph 72 of the Complaint.

73. CDK also owns two third-party data integrators, DMI and IntegraLink. DMI and IntegraLink obtain authorization from dealers to pull data from the dealer's DMS in the same way as other data integrators and provide that data to vendors.

**ANSWER:** CDK admits that it owned two businesses formerly known as DMI and IntegraLink. CDK denies the remaining allegations in paragraph 73 of the Complaint.

74. At the time CDK acquired DMI in 2002, CDK stated: "As a result of its acquisition of Digital Motorworks, [CDK] now has the ability to extract, transform and standardize data from varied sources to client specifications." DMI claims to work with over 100 vendors and pull data from thousands of dealerships.

**ANSWER:** CDK admits that ADP acquired DMI in 2002 and that the text quoted in paragraph 74 of the Complaint appeared in ADP's 2002 Form 10-K Annual Report. Upon a reasonable investigation, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegation in paragraph 74 regarding claims allegedly made by DMI and on that basis denies them. CDK denies the remaining allegations in paragraph 74 of the Complaint.

75. CDK acquired IntegraLink in 2010. IntegraLink "specialize[s] in the collection of data from automotive retailers' dealership management systems." IntegraLink was founded in 1998 by Kevin Distelhorst, Reynolds' former director of online services and currently a vice president at CDK.

**ANSWER:** CDK admits that ADP acquired IntegraLink in 2010 as part of an overall acquisition of the Cobalt Group. CDK further admits that IntegraLink was founded by current CDK employee Kevin Distelhorst in 1998, who currently is a Vice President of the company. CDK admits that Mr. Distelhorst previously worked for Reynolds in the 1990s, more than 20

years ago. CDK admits that the language quoted in paragraph 75 of the Complaint appears on

IntegraLink's website.

76.     For over a decade, DMI and IntegraLink provided data integration services for
CDK itself and a variety of other DMS platforms, including Reynolds. ████████████
████████████████████████████████████████████████████
████████████████████████████████████████ Ex. 4 (CDK-0602338).
Even after Reynolds began to block Digital Motorworks and IntegraLink – that is, prevent them
from accessing Reynolds DMSs – CDK devised the "SMART-R" solution, which permitted its
integrators to continue to access Reynolds DMSs. As a result, CDK (through Digital Motorworks
and IntegraLink) continued to access Reynolds DMSs on behalf of its vendor clients, again at
least until 2015. AutoLoop and other vendors had used these data integration services for some
of its products and services. CDK, however, largely discontinued these services once CDK and
Reynolds entered into their February 2015 agreement not to compete, which is described below.
Now, DMI and IntegraLink primarily provide data integration services for non-Reynolds and
non-CDK DMSs. For these non-dominant DMSs, dealers provide CDK with login credentials or
a secure connection for direct data transfers, such as an API. DMI and IntegraLink charge
vendors only $25 to $50 per dealer per month.

**ANSWER:**     CDK admits that DMI and IntegraLink no longer use dealer-issued credentials to

access DMSs. CDK admits that Exhibit 4 to the Complaint contains a document produced by

CDK in this litigation, which contains the statements quoted in paragraph 76 of the Complaint.

CDK denies Plaintiff's characterization of the document and the statements therein. CDK lacks

sufficient knowledge or information to form a belief as to the truth of the allegations in

paragraph 76 of the Complaint that relate to individuals or entities other than CDK and on that

basis denies them. CDK denies the remaining allegations in paragraph 76 of the Complaint.

### b.     Reynolds

77.     Reynolds provides integration with dealer data on the Reynolds DMS through its
RCI service, which is Reynolds' equivalent to 3PA. Like the 3PA program, RCI is now the only
means by which vendors are allowed to integrate with dealer data on Reynolds' DMS. Reynolds
does not have a data integration service that works with other DMS platforms.

**ANSWER:**     Upon information and belief, CDK admits that Reynolds offers a product/service

known as the "Reynolds Certified Interface" or "RCI" program. CDK lacks sufficient

knowledge or information to form a belief as to the truth of the remaining allegations in

paragraph 77 of the Complaint and on that basis denies them.

### c. Authenticom and Other Independent Integrators

78. Authenticom was founded in 2002, introduced its data integration service in 2004, and has served more than 15,000 dealers.

**ANSWER:** Upon information and belief, CDK admits that Authenticom was founded in or about 2002. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 78 of the Complaint and on that basis denies them.

79. Authenticom provides data integration services for all available DMS platforms – including Reynolds and CDK. Authenticom is the last significant independent data integration provider in the market.

**ANSWER:** CDK admits that Authenticom purports to provide what it calls "data integration services," but denies that Authenticom integrates or has integrated with CDK's DMS. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 79 of the Complaint and on that basis denies them.

80. Authenticom's standard pricing to pull data is $25 per dealer per month for the first data set, and then $50 per dealer per month for two or more. According to Authenticom, the average price a vendor pays to pull data is between $30 and $40 per dealer per month. For bi-directional integration, Authenticom has charged at most $75 per dealer per month, and that price included additional services like data hygiene.

**ANSWER:** CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 80 of the Complaint and on that basis denies them.

81. Apart from Authenticom, there were once many other independent integrators in the market – such as SIS, SelectQu, and others – before CDK and Reynolds drove them from the market.

**ANSWER:** CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 81 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 81 of the Complaint.

### C. Single-Brand Aftermarket for Dealer Data Integration on the CDK DMS

82. The Dealer Data Integration Market for dealers using CDK's DMS is a brand-specific aftermarket. This market is derivative of the primary DMS market.

**ANSWER:** Paragraph 82 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 82 of the Complaint.

83. When dealers purchase the CDK DMS platform, they are locked in to that purchase because of high switching costs as described above.

**ANSWER:** CDK denies the allegations in paragraph 83 of the Complaint.

84. Dealers also lack information necessary to assess accurately the true cost of using CDK's DMS. CDK had historically been an "open" DMS where there were multiple competing data integration providers. Dealers could not know in advance that CDK would collude with Reynolds to "close" its DMS, thereby causing data integration prices to skyrocket, a portion of which is passed through to dealers.

**ANSWER:** CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 84 of the Complaint that relate to entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 84 of the Complaint.

85. Because of these market imperfections, CDK is profitably charging supra-competitive prices for dealer data integration on its DMS. That CDK has been able to impose such large price increases for integration services on its DMS demonstrates that there are no reasonable substitutes for that service.

**ANSWER:** CDK denies the allegations in paragraph 85 of the Complaint.

## II. CDK's Anticompetitive Conduct

### A. CDK's and Reynolds' Per Se Unlawful Horizontal Agreement to Eliminate Competition in the Data Integration Market

#### 1. CDK's DMS Was "Open" Prior to 2015

86. Third-party access was a key point of competition between CDK and Reynolds. Prior to 2015, CDK publicly touted its open system as one of the competitive advantages of its DMS. As noted above, CDK repeatedly vowed (including in public statements by its CEO and top marketing officers) that it would not block third parties, including data integrators, from accessing dealer data on its DMS. CDK issued press releases stressing that it "believes in the fair competitive environment and does not use its leverage through supply of the dealer management

PUBLIC VERSION

system to reduce competition through the restriction of data access." By contrast, in 2009, Reynolds began selectively blocking third-party access, and increased its blocking efforts in 2013.

**ANSWER:** CDK admits that the text quoted in the fourth sentence of paragraph 86 of the Complaint appears in a February 2, 2007 press release issued by ADP Dealer Services, Inc., CDK's predecessor, which also states that CDK's 3PA program is focused on "providing levels of security." CDK denies Plaintiff's characterization of the press release. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 86 of the Complaint that relate to entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 86 of the Complaint.

87. CDK was successful in marketing its "open" DMS as a competitive advantage over the Reynolds DMS, and dealers purchased DMS services from CDK based, in part, on CDK's public representations and unchanged contractual language allowing for such access. As a result, CDK very slowly gained market share from Reynolds. Over a decade, Reynolds' DMS market share declined from about 40 to 30 percent, with most dealers leaving Reynolds for CDK.

**ANSWER:** CDK admits that some Dealers have switched from Reynolds to CDK, and vice versa, prior to and during the relevant period. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 87 of the Complaint that relate to entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 87 of the Complaint.

88. That competition between CDK and Reynolds abruptly halted in 2015, when CDK suddenly "closed" its system. Given CDK's unequivocal public statements (and the unchanged DMS contractual language allowing for "agent" access), CDK's abrupt about-face came as a complete surprise. Before 2015, AutoLoop used SIS to access data for dealers using the CDK DMS. But after CDK elected to close its system, CDK made every effort to ensure that AutoLoop and other vendors could only integrate with dealer data through CDK's 3PA program. CDK's about-face was the result of a horizontal agreement with Reynolds.

**ANSWER:** CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 88 that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 88 of the Complaint.

> 2.  **CDK "Closed" Its DMS in 2015 After Entering into an Agreement with Reynolds To Eliminate Competition in the Data Integration Market**
>
>> a.  **CDK's Internal Documents Reveal Its Motivations for Colluding with Reynolds**

89.     In 2014, CDK decided that it wanted to capture more value for itself by charging dramatically increased rates for integration with dealer data. Prior to entering into its unlawful agreements with Reynolds, CDK charged on average $70 per dealer per month for integration. Dealers could choose methods of access on a vendor-by-vendor basis, giving dealers flexibility in managing how their vendors obtained data and the costs that would be passed through to the dealers. But by closing its DMS, CDK saw an opportunity to impose huge price increases on its data integration services – increasing CDK's profits while also advantaging its competing products and services by raising the input costs and decreasing the integration available to its rivals. Internal CDK presentations specifically recognized the "risk of vendors willing to move" to competing data integrators "instead of accept[ing] increase price" if those competing integrators were allowed to continue to provide their services. Dkt. No. 163, at 134:11-15.

**ANSWER:**     CDK admits that beginning in 2015, CDK sought to standardize its integration pricing and that, as a result, some Vendors' integration fees increased.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 89 that relate to individuals or entities other than CDK and on that basis denies them.  CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction.  CDK denies Plaintiff's characterization of the documents introduced at that hearing and states that the hearing transcript speaks for itself.  CDK denies the remaining allegations in paragraph 89 of the Complaint.

90.     In addition, CDK believed that destroying competition for data integration and subsequently raising prices for data integration would help address the threat posed by standalone products and services to the primacy of the DMS to a dealer's operations. The growth of standalone solutions – especially sales and service customer relationship management applications – have threatened to reduce the importance of the DMS as dealers increasingly manage their operations through the standalone solutions outside of the DMS. Moreover, many of those solutions are where dealers generate much of their data in the first instance – for example, customer relationship management software products are often where dealers first capture and store information about their customers and sales transactions – and, as those products are able to host and manage a dealer's data, the DMS again loses its importance. By

"closing" its DMS and raising the input costs for standalone solutions, CDK has sought to forestall the growth of those solutions, which is what would naturally occur absent the anticompetitive restraints.

**ANSWER:** CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 90 that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 90 of the Complaint.

91. Finally, CDK sought to advantage its own offerings that compete with products and services provided by other vendors like AutoLoop. Destroying competition for data integration gave CDK control over competing service providers' access to, and ability to use and update, dealer data. CDK recognized that it could "tilt the table" in favor of its own applications by withholding needed data access, imposing use restrictions, and limiting write permissions for certain data elements. CDK's actions have disrupted the workflow of competing solutions, and denied data access completely for some competing offerings. Internal CDK strategy documents reveal the specific purposes of CDK's conspiracy with Reynolds. According to CDK, "One of the 3PA Program's principles was to protect CDK products through a tilt-the-table approach." Dkt. No. 163, at 140:13-15. By "tilt the table," CDK meant it would advantage its products and services over those of third-party vendors by providing itself greater access and use rights to dealer data. CDK intended to keep an "advantage to CDK-layered applications" as compared to third-party solutions, providing additional "margin" that could be achieved through a "closed" system. *Id*. at 139:2-7.

**ANSWER:** CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 91 that relate to individuals or entities other than CDK and on that basis denies them. CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC, No. 17-318*, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction. CDK denies Plaintiff's characterization of the documents introduced at that hearing and states that the hearing transcript speaks for itself. CDK denies the remaining allegations in paragraph 91 of the Complaint.

92. CDK's own documents show that it sought to "disrupt the workflow" of competing applications and services, and of those that compete with CDK's own "service workflow application[s]" in particular. For example, although CDK's Service Lane is able to create and modify repair orders, CDK does not permit AutoLoop's SmartLane application to do so. There is no bona fide justification for that limitation other than to disadvantage competing applications, and thereby to allow CDK to gain market share that it could not obtain on the merits of its products. Other software solution vendors have seen the functionality of their products artificially diminished in similar ways.

**ANSWER:**    CDK admits that it offers an application called Service Edge which is capable of creating and modifying repair orders in the CDK DMS using proprietary CDK intellectual property.  CDK admits that Plaintiff's SmartLane application currently does not use certified integration to create or modify repair orders in the CDK DMS.  CDK denies the remaining allegations in paragraph 92 of the Complaint.



93.

*See* Ex. 5 (CDK-2182930). Mr. Gardner wrote,

*Id.*

*Id.*

**ANSWER:**    CDK admits that Exhibit 5 to the Complaint contains ████████████ ██████████████████████████████████████, which, in turn, contains the quoted text excerpted in paragraph 93 of the Complaint.  CDK denies Plaintiff's characterization of the document.  CDK denies the remaining allegations in paragraph 93 of the Complaint.

94.    In order to achieve these aims, as CDK's internal documents acknowledged, CDK needed Reynolds' cooperation. In an October 2014 presentation, CDK stated that it needed to enter into "***reciprocal agreements with DMS providers***," including specifically Reynolds, in order to eliminate competing data integrators. And Reynolds needed CDK to close CDK's system to reduce the number of dealers leaving Reynolds for CDK on the basis of CDK's previously "open" system. Moreover, with the two dominant DMS providers agreeing to block independent integrators, it would be impossible for competing data integrators to survive. CDK thus contemplated reaching an agreement with Reynolds to reduce, and ultimately eliminate, competition for integration to dealer data.

**ANSWER:**    CDK admits that the excerpted text quoted in the second sentence of paragraph 94 of the Complaint appears in an October 2014 presentation prepared by CDK employees.  CDK denies Plaintiff's characterization of the document.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 94 of the Complaint

that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 94 of the Complaint.

### b.      CDK and Reynolds Agreed To Divide the Market and Block Independent Integrators

95.      A few months later, in early 2015, CDK and Reynolds entered into agreements designed to eliminate competition in the provision of dealer data integration services. First, in February 2015, CDK and Reynolds entered into three written agreements in which they promised not to compete in providing data integration services and, in their capacity as providers of proprietary applications and services, not to use the services of independent integration service providers to obtain data from the other's DMS. Second, CDK and Reynolds further agreed that each would block independent integrators' access to their DMS customers' data, in an effort to drive independent integrators from the market entirely.

**ANSWER:**      CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds. CDK denies Plaintiff's characterization of the agreements. CDK states that the contracts speak for themselves. CDK denies the remaining allegations in paragraph 95 of the Complaint.

### i.      The Market Division Agreement and Data Integration Agreements

96.      **Market Division Agreement.** Effective February 18, 2015, CDK and Reynolds entered into three written agreements. The centerpiece was a so-called "Data Exchange Agreement" – also referred to as a "wind-down" agreement – pursuant to which CDK agreed to wind down its data integration business on the Reynolds DMS, with Reynolds promising not to block CDK's access to the Reynolds system during the wind-down period, which might last as long as five years – until the year 2020. *See* Data Exchange Agreement § 1.4. During that period, Reynolds agreed that CDK could continue to extract dealer data just as it had before, using login credentials provided by the dealer. *See id.* § 4.3. As for other independent integrators, CDK and Reynolds agreed that they would not "take any steps to assist any person that it reasonably believes to have plans to access or integrate with the other party's DMS." *Id.* § 4.5.

**ANSWER:**      Paragraph 96 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds. CDK further admits that the excerpted text quoted in paragraph 96 of the Complaint appears in one of the three—the Data Exchange Agreement. CDK denies Plaintiff's characterization of the agreements. CDK states

43

that the contracts speak for themselves. CDK lacks sufficient knowledge or information to form

a belief as to the truth of the allegations in paragraph 96 of the Complaint that relate to

individuals or entities other than CDK and on that basis denies them. CDK denies the remaining

allegations in paragraph 96 of the Complaint.

97.     CDK and Reynolds also agreed that they themselves would no longer access data
on each other's DMS. *Id.* (agreeing to "[p]rohibition on .. . DMS Access"). Specifically, the
agreement states: "For the avoidance of doubt, this Section 4.5 is not intended as a 'covenant not
to compete,' but rather as a contractual restriction of access and attempted access." *Id.* This
restriction lasts forever. *See id.* § 6.1. Reynolds' own top executive confirmed that Section 4.5
prohibits CDK and Reynolds from accessing each other's DMS. Robert Schaefer, Reynolds'
Vice President of Data Services, has testified under oath to the following: "Q: In this contract by
its plain term Section 4.5, Reynolds agreed not to access the CDK DMS; isn't that right? A: That
would be correct." Dkt. No. 163, at 76:6-9. Mr. Schaefer offered similar sworn testimony with
respect to CDK's prohibition on access of Reynolds' DMS. *Id.* at 73:1116; 75:16-76:1. Internal
emails between CDK and Reynolds confirm the same agreement: Mr. Schaefer promised CDK
███████████████████████████████ Ex. 6 (CDK-0222945, at 946); *see also* Ex. 7 (CDK-0189652)
███████.

**ANSWER:**     Paragraph 97 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK admits that on or about February

18, 2015, it entered into three written agreements with Reynolds. CDK admits that the excerpted

text quoted in paragraph 97 of the Complaint appears in one of the three—the Data Exchange

Agreement. CDK denies Plaintiff's characterization of the agreements. CDK states that the

contracts speak for themselves. CDK admits that the district court in *Authenticom, Inc. v. CDK*

*Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion

for a preliminary injunction. CDK admits that Robert Schaefer testified at the hearing, but

denies Plaintiff's characterization of his testimony and states that the hearing transcript speaks

for itself. CDK admits that Exhibits 6 and 7 to the Complaint cited in paragraph 97 of the

Complaint contain, respectively, ████████████████████████████

████████████████████████████████████████

████████████████████████████████. CDK admits that the quoted statements excerpted in paragraph 97 of the Complaint appear in those documents, but denies Plaintiff's characterizations thereof. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 97 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 97 of the Complaint.

98.    Further, the agreement also mandated coordination between the competitors in transitioning all of CDK's vendor clients (*i.e.*, those vendors for which CDK provided access to dealer data on the Reynolds DMS) into the Reynolds RCI program. *See* Data Exchange Agreement § 4.4. The agreement specifically required CDK to "cooperate with Reynolds" in the "transition of [CDK] customers to the Reynolds RCI program with respect to Reynolds Dealers." *Id*. In connection with that effort, CDK agreed to give Reynolds full information about the vendors CDK served, including their name, DMS number, store number, branch number, user login, specific data access provided by CDK, data interfaces, the frequency of the data provided, the deadlines for data delivery, the format of the data, and more. *See id.* § 4.3, Exhibit DEA-2. Absent an agreement not to compete, CDK would treat this information as a highly confidential customer trade secret and would not share it with rivals. Indeed, Mr. Schaefer of Reynolds admitted under oath that Reynolds would never share such highly sensitive information with a competitor absent an agreement with that competitor. ████████████████████████████ ██████████████████████████████ *see* Ex. 8 (CDK-0774207); ██████████████████████, *see id*.; ███████████████████████████ *see* Ex. 9 ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████ Ex. 10 (CDK-1424529, at 532). ████████████ ████████████████████████████████████████████████████ *Id*. at CDK-1424531.

**ANSWER:**    Paragraph 98 of the Complaint states legal conclusions to which no answer is require. To the extent that an answer may be required, CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds. CDK further admits that the excerpted text quoted in paragraph 98 of the Complaint appears in one of the three—the Data Exchange Agreement. CDK denies Plaintiff's characterization of the agreements. CDK states that the contracts speak for themselves. CDK admits that the district court in *Authenticom, Inc.*

*v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's

motion for a preliminary injunction. CDK further admits that Robert Schaefer testified at the

hearing. CDK denies Plaintiff's characterization of Mr. Schaefer's testimony and states that the

hearing transcript speaks for itself. CDK admits that Exhibits 8, 9, and 10 to the Complaint cited

in this paragraph contain, ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████. CDK admits that the quoted

statements excerpted in paragraph 98 of the Complaint appear in those documents, but denies

Plaintiff's characterizations thereof. CDK lacks sufficient knowledge or information to form a

belief as to the truth of the allegations in paragraph 98 of the Complaint that relate to individuals

or entities other than CDK and on that basis denies them. CDK denies the remaining allegations

in paragraph 98 of the Complaint.

99.     Consistent with the agreement to cooperate in transitioning customers from CDK
to Reynolds, CDK sent letters to its vendor customers with a "roadmap" and "deadline" for
joining Reynolds' integration program. On March 2, 2015, CDK sent a letter to its vendor clients
announcing that the vendors "will be provided with a roadmap to transition to the [RCI] program
without any further risk of interruption to existing services." CDK explained that "we are in a
transition period to allow time for [DMI] clients to enroll in the RCI program in support of your
[Reynolds] dealers," and that "we will assist you to facilitate a smooth transition." The letter
noted that Reynolds had "agreed to protect the current DMI process for collecting data from
[Reynolds] dealers during this transition" and promised "a more detailed letter within the next
couple of weeks that outlines the transition process."

**ANSWER:**     CDK admits that on or about March 2, 2015, DMI sent a letter to certain of its

Vendor customers that contained the quoted statements excerpted in paragraph 99 of the

Complaint. CDK denies Plaintiff's characterization of the letter and the statements therein.

CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations

in paragraph 99 of the Complaint that relate to individuals or entities other than CDK and on that

basis denies them. CDK denies the remaining allegations in paragraph 99 of the Complaint.

100.    On April 1, 2015, CDK sent a follow-up letter to its vendor customers. The letter began: "As announced earlier this month, the recent business agreement between CDK Global and The Reynolds and Reynolds Company (R&R) provides for the clients of Digital Motorworks, Inc. (DMI) a streamlined process to enroll in the Reynolds Certified Interface (RCI) program for their R&R dealers. We are now in the transition period to allow sufficient time for this enrollment, and R&R has agreed to provide a grace period for the existing DMI process for R&R data collection during this time."

**ANSWER:**    CDK admits that on or about April 1, 2015, DMI sent a letter to certain of its

Vendor customers that contained the quoted statements excerpted in paragraph 100 of the

Complaint. CDK denies Plaintiff's characterization of the letter and the statements therein.  CDK

denies the remaining allegations in paragraph 100 of the Complaint.

101.    Reynolds followed up CDK's letters with its own communications. Reynolds has also pushed vendors to use DMI and IntegraLink during the wind down, and away from other third-party providers, in order to drive competing data integration providers completely out of the market. ███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████. Ex. 10 (CDK-1424529, at 532).

**ANSWER:**    CDK admits that Exhibit 10 to the Complaint cited in paragraph 101 of the

Complaint contains ████████████████████████████████████████████████████████

████████████.  CDK denies Plaintiff's characterization of the document. CDK lacks sufficient

knowledge or information to form a belief as to the truth of the allegations in paragraph 101 of

the Complaint that relate to individuals or entities other than CDK and on that basis denies them.

CDK denies the remaining allegations in paragraph 101 of the Complaint

102.    **Integration Agreements.** Two additional written agreements between CDK and Reynolds "granted reciprocal access" to each other's data integration products – via the 3PA and RCI programs, respectively. Under the agreements, CDK's proprietary products and services could integrate with data on Reynolds DMSs via RCI, and vice versa. Reynolds received five free years of 3PA integration from CDK, while CDK pays for the data integration services from Reynolds. Moreover, by signing up for 3PA, Reynolds agreed that it would integrate with data on CDK's DMSs exclusively through 3PA, and not obtain data for its products and services from anywhere else. CDK agreed to the same in its integration contract with Reynolds for the RCI program.

**ANSWER:** CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds. CDK denies Plaintiff's characterization of the agreements. CDK states that the contracts speak for themselves. CDK denies the remaining allegations in paragraph 102 of the Complaint.

### ii. Top Executives at CDK and Reynolds Have Admitted That They Agreed To Block Third-Party Access

103. In addition to the written agreements, senior CDK and Reynolds executives also have admitted that they have agreed to restrict access to dealer data and destroy data integrators like Authenticom, SIS, and others. During a phone conversation with Steve Cottrell – Authenticom's founder and CEO – in May 2015, Mr. Schaefer of Reynolds said that Reynolds had "made agreements with the other major DMS providers" – there is only CDK – "to support each other's third-party access agreements *and* to block independent integrators such as Authenticom." Dkt. No. 164, at 139:6-13. Mr. Schaefer said that Reynolds' owner, Bob Brockman, was "adamant" that all third-party data integrators must be cut off. *Id*. As a result, Mr. Schaefer said that Authenticom should wind down its operations and leave the market. *Id*. at 138:3-139:19.

**ANSWER:** CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction. CDK further admits that Robert Schaefer testified at the hearing. CDK denies Plaintiff's characterization of Mr. Schaefer's testimony and states that the hearing transcript speaks for itself. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 103 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 103 of the Complaint.

104. A top executive at CDK delivered the same message to Mr. Cottrell. *Id*. at 140:1-143:1. On April 3, 2016, at an industry convention in Las Vegas, Dan McCray (CDK's former Vice President of Product Management) stopped by Authenticom's booth to talk with Mr. Cottrell, who was occupied with a customer. *Id*. After Mr. Cottrell finished with the customer, he walked to CDK's booth, where he saw Mr. McCray "standing off to the side" with "three other individuals." *Id*. After cordial greetings, Mr. McCray took Mr. Cottrell by the arm and said, "Let's take a walk." *Id*. Mr. McCray led Mr. Cottrell off the convention floor and down a service ramp to a secluded area. *See id*. Mr. McCray then confirmed the existence of the illegal agreement, stating that CDK and Reynolds had agreed to "[l]ock you and the other third parties

out," and that they were "working collaboratively to remove all hostile integrators from our DMS system." *Id.* at 140:1-143:1. Mr. McCray then grew threatening: "I wanted to look you in the eye and let you know man to man, I have been mandated by our new CEO to seek you out and destroy your business on our systems." "For god's sake," he concluded, "you have built a great little business, get something for it before it is destroyed otherwise I will f***ing destroy it." Mr. Cottrell rejected Mr. McCray's threats, and insisted that Authenticom would continue to serve its dealer and vendor customers.

**ANSWER:**   CDK admits that on or about April 3, 2016, Dan McCray, a former CDK

employee, attended a National Automobile Dealers Association ("NADA") event.  CDK further

admits that Mr. McCray spoke to Mr. Cottrell at the event but denies the allegations in paragraph

104 of the Complaint regarding the content of that conversation.  CDK admits that the district

court in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017

concerning Authenticom's motion for a preliminary injunction.  CDK further admits that Steve

Cottrell testified at the hearing; but denies that Mr. Cottrell testified accurately concerning the

content of his conversation with Mr. McCray.  CDK further states that the hearing transcript

speaks for itself.  CDK denies the remaining allegations in paragraph 104 of the Complaint.

105.    CDK and Reynolds even have employees actively working together to coordinate the technical aspects of blocking third-party access. In December 2016, during one particular vendor's discussions with CDK about joining the 3PA program and leaving Authenticom, Steve French – CDK's senior director of client and data services – told the vendor that a large portion of his job was to work with Reynolds to ensure third-party data integrators like Authenticom remain locked out. Mr. French suggested that resistance to getting dealer data from CDK and Reynolds was futile as they were working together to lock out third-party access.

**ANSWER:**   CDK denies the allegations in paragraph 105 of the Complaint.

106.    Documents produced by CDK to date reinforce the conclusion that CDK and Reynolds agreed to block independent integrators like Authenticom. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

      Ex. 11 (CDK-1974207). ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

      Ex. 12 (CDK-0048430). ████████████████████████████

████████████████████████████

49

**ANSWER:**     CDK admits that Exhibits 11 and 12 to the Complaint cited in paragraph 106 of

the Complaint contain, respectively, ████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████. CDK admits that the excerpted quoted statements in

paragraph 106 of the Complaint appear in those documents, but denies Plaintiff's

characterizations of said documents.  CDK denies the remaining allegations in paragraph 106 of

the Complaint.

107.    CDK's internal documents show its callous infliction of harm on Authenticom
and the dealers and vendors who relied on independent integrators. ███████████████
████████████████████████████████████████████████████████████████
██████████████████ Ex. 13 (CDK-0855506). ███████████████████████
████████████████████████████████████████████████████████████████
███████████████████ Ex. 14 (CDK-0018738).

**ANSWER:**     CDK admits that Exhibits 13 and 14 to the Complaint contain, respectively, ██

████████████████████████████████████████████████████████████████

█████████████████████████████████████ CDK admits that the excerpted

quoted statements in paragraph 107 of the Complaint appear in those documents, but denies

Plaintiff's characterizations of said quotes.  CDK denies the remaining allegations in paragraph

107 of the Complaint.

108.    CDK's and Reynolds' conspiracy was formed and implemented by top-level
executives at each company. For CDK, the leading actors in the conspiracy include Robert N.
Karp, the President of CDK North America and the person with oversight of CDK's 3PA
program; Howard Gardner, CDK's Vice President and Manager of Data Strategy and the person
who took the lead on the February 2015 agreement; Dan McCray, CDK's recently retired Vice
President of Product Management; Ron Workman, CDK's Senior Vice President of Global
Corporate Development, who signed the February 2015 agreement; Kevin Distelhorst, CDK's
Chief Customer Officer, the founder of IntegraLink, and a former executive at Reynolds; and
Malcolm Thorne, CDK's former Chief Global Strategy Officer and the person who took the lead
on spearheading the changes to 3PA in 2014 and 2015.

**ANSWER:**     CDK denies the allegations in paragraph 108 of the Complaint.

109.    For Reynolds, the leading actors in the conspiracy include Bob Brockman, Reynolds' Owner, Chairman, and CEO and the person who approved and executed the February 2015 agreement and formulated the policy to eliminate competitive data integrators through blocking; and Robert Schaefer, Reynolds' Vice President of OEM Relations, Data Services, and Security, the person in charge of the RCI program.

**ANSWER:**    CDK denies the allegations in paragraph 109 of the Complaint.

### iii.    CDK and Reynolds Implemented the Agreement with Aggressive Blocking

110.    In the wake of their agreements, CDK and Reynolds have aggressively blocked data integrators and other third parties from accessing their DMS. By eliminating the use of other data integrators, CDK has required dealers who use CDK's DMS also to use CDK's 3PA service.

**ANSWER:**    CDK admits that it has taken steps, consistent both with its contracts with its Dealer customers and with CDK's need to provide a stable and secure DMS product to its Dealer customers, to block hostile third-party access to its DMS.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 110 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 110 of the Complaint.

111.    Dealers have repeatedly demanded that CDK and Reynolds stop blocking data integrators. Dealers have made clear that they own the data, that they control access to it, and that disrupting their preferred access methods has impaired their business operations and caused financial harm. But CDK and Reynolds have rejected or ignored the dealers' objections.

**ANSWER:**    CDK admits that some Dealers have complained about the steps CDK has taken, consistent both with its contracts with its Dealer customers and with CDK's need to provide a stable and secure DMS product to its Dealer customers, to block hostile third-party access to its DMS.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 111 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 111 of the Complaint.

112.    The dealer complaints are too numerous to fully recount here, but a few examples make the point. In November 2016, one Mercedes dealership in California wrote to CDK: "When will you stop the blocking of our user profiles? This must stop." The dealer decried CDK's "attempt to stop all other data access routes thereby forcing us to use [CDK's] data monetizing scheme if we want to access our data." As the dealer recognized, the blocking actions were intended to obtain the economic benefits of the dealers' data. "When will CDK stop trying to monetize data owned by [us] at our expense? All being orchestrated under the guise of 'protecting our data.' Frankly most can see right through this propaganda smoke screen. The data could be protected by using available technology that doesn't cut off the dealers' access to their data using fully automated routines."

**ANSWER:**    CDK admits that the quoted excerpted text in paragraph 112 of the Complaint appears in a November 2016 email that an employee of a Dealer customer sent to CDK. CDK denies Plaintiff's characterization of the document.  CDK denies the remaining allegations in paragraph 112 of the Complaint.

113.    One Virginia dealer asked his employees "to raise holy hell with CDK. This is really affecting our business." And a Lexus dealership in California wrote that "[a]s a dealership owner, I believe that CDK has no right to deny me access to my own data. By extension, I also retain my rights to distribute my data to chosen vendors who meet my strict criteria for data security."

**ANSWER:**    CDK admits that the quoted text in paragraph 113 of the Complaint appears in a document produced by Authenticom in this litigation.  CDK denies the remaining allegations in paragraph 113 of the Complaint.

### B.    CDK's and Reynolds' Exclusive Dealing Provisions with Vendors and Dealers

114.    Shortly after entering into the Data Exchange Agreement, CDK began forcing vendors to enter into new contracts for the 3PA program. Consistent with its decision to close its DMS, CDK imposed exclusive dealing provisions that required vendors to use 3PA alone to integrate with data on CDK DMSs for all of their products and services. CDK also took the new position that, notwithstanding their plain language, its existing contracts with dealers prohibited allowing data integrators to access CDK DMSs.

**ANSWER:**    CDK admits that beginning in 2015, CDK sought to standardize its 3PA contract terms and conditions and that as a result, some Vendors entered into new 3PA contracts.  CDK denies that it "forced" Vendors to enter into new 3PA contracts or that such contracts were

related to or a result of the Data Exchange Agreement entered into between CDK and Reynolds. CDK admits that its standard contract with Dealers prohibits them from permitting unauthorized third parties to access their licensed DMS.  CDK denies that this is a "new position."  CDK denies the remaining allegations in paragraph 114 of the Complaint.

### 1. CDK Imposes Exclusive Dealing and Price-Secrecy Provisions on Vendors

115.    CDK requires that any vendor using 3PA for any of its dealer-customers on a CDK DMS must agree to use 3PA exclusively for all of its of its dealer-customers on CDK DMSs. For example, AutoLoop's Managed Interface Agreement ("MIA") and accompanying Statement of Work, dated January 12, 2016, states in Section 1(f): ███████████ ██████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ MIA § 1(f).

**ANSWER:**    Paragraph 115 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that Section 1(f) of CDK's Managed Interface Agreement with AutoLoop states, in part: ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████    CDK denies Plaintiff's characterization of the contract and states that the contract speaks for itself.  CDK denies the remaining allegations in paragraph 115 of the Complaint.

116.    The exclusive dealing provision purports to apply to nearly every AutoLoop product and service, so that the use of 3PA for any one of AutoLoop's current offerings essentially binds AutoLoop to use 3PA for all existing, and future, offerings. If AutoLoop breaches this provision by using another data integrator, CDK may terminate the entire agreement. *See id.* § 4(g) (████████████████████████████████████████████████

.

**ANSWER:**    Paragraph 116 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that Section 4(g) of CDK's January 2016 Managed Interface Agreement with AutoLoop states, in part: ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮    CDK denies Plaintiff's characterization of the contract and states that the contract speaks for itself.  CDK denies the remaining allegations in paragraph 116 of the Complaint.

117.    These exclusive dealing provisions even prohibit AutoLoop from sharing dealer data between its own products and services because AutoLoop's solutions cannot receive dealer data from any source other than 3PA, even where each such AutoLoop product or service is separately paying CDK to access the exact same data. Because AutoLoop cannot share data between its solutions, it must pay for a new 3PA integration interface for each of its solutions. That is a very inefficient and highly anticompetitive process. It also means that CDK can charge repeatedly for access to the same data, in addition to thwarting AutoLoop's ability to integrate its solutions.

**ANSWER:**    Paragraph 117 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that AutoLoop's January 2016 3PA contract contains certain restrictions against sharing data obtained from CDK's DMS other than as authorized by that contract.  CDK denies that as a result of these restrictions, AutoLoop must pay for a new 3PA integration interface for each of its solutions, or that CDK charges AutoLoop repeatedly for access to the same data.  CDK denies the remaining allegations in paragraph 117 of the Complaint.

118.    The new 3PA contract also includes a price-secrecy provision in Section 8: ▮▮

Internal CDK documents state the purpose of these provisions is "to create minimal awareness to dealer" regarding CDK's exorbitant pricing for data integration.

**ANSWER:** Paragraph 118 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that the excerpted quoted text cited in paragraph 118 of the Complaint appears in CDK's January 2016 3PA Agreement with AutoLoop. CDK denies Plaintiff's characterization of the contract and states that the contract speaks for itself. CDK admits that the excerpt quoted in the last sentence of paragraph 118 of the Complaint appears in a document produced by CDK in this litigation, but denies Plaintiff's characterization of the document. CDK denies the remaining allegations in paragraph 118 of the Complaint.

119. CDK also imposes the same or substantially similar exclusive dealing and price-secrecy provisions in its standard 3PA contract with other vendors. The current CDK 3PA contract template imposes an exclusive dealing condition on vendors, stating: "███████████████ ████████████████████████████████████████████████████████████████████ ███████████ *See* CDK 3PA Contract §§ 1(a)(*l*), 2(e). The contract goes on to state that the vendor cannot "████████████████████████████████████████████████████ ██████████████████████████████████████████████" *Id*.

**ANSWER:** Paragraph 119 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that the excerpted quoted text cited in paragraph 119 of the Complaint appears in certain contracts with Vendors in place during the relevant time period. CDK denies Plaintiff's characterization of the contract and states that the contract speaks for itself. CDK denies the remaining allegations in paragraph 119 of the Complaint.

120. The penalty for accessing dealer data other than through CDK's 3PA interface is termination of the entire agreement: "████████████████████████████████ ████████████" *Id*. § 6(g).

**ANSWER:**     Paragraph 120 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that the excerpted quoted text cited in paragraph 120 of the Complaint appears in certain contracts with Vendors in place during the relevant time period.  CDK denies Plaintiff's characterization of the contract and states that the contract speaks for itself.  CDK denies the remaining allegations in paragraph 120 of the Complaint.

121.    The exclusive dealing terms in CDK's standard form contract purportedly last forever. The contract template states: "███████████████████████████████████████ ██████████████████████████████████████" *Id.* § 6(j). This provision seeks to tie the vendor to the 3PA program indefinitely. Even if a vendor were to stop participating in the 3PA program, it would still be barred from obtaining data from any CDK dealer from any other source. That gives CDK carte blanche to raise integration prices once they enter the 3PA program because vendors need integration with data on the CDK DMS.

**ANSWER:**     Paragraph 121 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that the excerpted quoted text cited in paragraph 121 of the Complaint appears in certain contracts with Vendors in place during the relevant time period.  CDK denies Plaintiff's characterization of the contract and states that the contract speaks for itself.  CDK denies the remaining allegations in paragraph 121 of the Complaint.

122.    ████████████████████████████████████████████████████████ ███████████████████████████ *See id.* § 5(d).

**ANSWER:**     Paragraph 122 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that certain contracts with Vendors ███████████████████████████████████████████████████ ███████████████████ CDK denies Plaintiff's characterization of the contract and states that the contract speaks for itself.  CDK denies the remaining allegations in paragraph 122 of the Complaint.

123.    The standard vendor contract also has a price-secrecy provision. It states that vendors " ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████." *Id.* § 10.

**ANSWER:**    Paragraph 123 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that the excerpted text quoted in paragraph 123 of the Complaint appears in certain contracts with Vendors in place during the relevant time period.  CDK denies Plaintiff's characterization of the contract and states that the contract speaks for itself.  CDK denies the remaining allegations in paragraph 123 of the Complaint.

124.    The CDK standard contract bars vendors from indicating " ████████ " that an increase in the price of products or services is related to an increase in the integration fees charged by CDK: " ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████ " *Id.* CDK's price-secrecy provisions prevent dealers from evaluating the true life-cycle cost – including integration fees that will ultimately be passed on to dealers – of CDK's DMS when deciding which DMS platform to buy.

**ANSWER:**    Paragraph 124 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that the excerpted text quoted in paragraph 124 of the Complaint appears in certain contracts with Vendors in place during the relevant time period.  CDK denies Plaintiff's characterization of the contract and states that the contract speaks for itself.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 124 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 124 of the Complaint.

### 2. CDK's DMS Contracts with Dealers

125.    CDK has changed its position on the meaning of its existing contracts with dealers. Those contracts allow "agents" of the dealer – such as data integrators – to access the DMS on the dealer's behalf. Consistent with that provision, CDK had long marketed its DMS as an "open system" that data integrators could access on the dealer's behalf, and dealers relied upon those representations in agreeing to purchase the CDK DMS. But in 2015, CDK began insisting (contrary to the language in the standard contract itself) that its dealer contracts prohibited data integrators other than 3PA, and it began disabling the logins that dealers had provided to third-party data integrators to access the DMS. This has required dealers who are using CDK's DMS to use CDK's 3PA exclusively.

**ANSWER:**    Paragraph 125 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that it has taken steps, consistent both with its contracts with its Dealer customers and with CDK's need to provide a stable and secure DMS product to its Dealer customers, to block hostile third-party access to its DMS.  CDK further admits that one of the mechanisms it has used in its efforts to block the unlawful extraction of data from its systems includes disabling login credentials used by hostile data extractors.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 125 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 125 of the Complaint.

### 3. The Vendor and Dealer Exclusive Dealing Provisions Are Anticompetitive

126.    The exclusive dealing provisions are independently anticompetitive. The provisions in CDK's contracts with dealers foreclose all competition in the Dealer Data Integration Market for approximately 40% of dealers who use CDK DMSs (and an even greater percentage when considered in terms of the number of new cars sold). And they foreclose all competition in the Single-Brand Aftermarket for Dealer Data Integration on CDK DMS. The foreclosure effects of the exclusive dealing provisions imposed directly on vendors are even more extreme. If a vendor participates in CDK's 3PA program for even a single CDK dealer, that vendor may no longer access any CDK DMS through any means other than through 3PA for *any* CDK dealer and for *any* product or service.  Reynolds also imposes similar exclusive dealing requirements. Defendants' exclusive-dealing provisions with vendors could foreclose a substantial portion of the data-integration market. The effect of CDK's provisions is to exclude third-party data integrators from the market, force vendors to pay supracompetitive data

integration prices, and reduce output. Indeed, there are few, if any, vendors that could survive without serving CDK dealers, much less CDK *and* Reynolds dealers.

**ANSWER:** Paragraph 126 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 126 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 126 of the Complaint.

## III.    CDK's Actions Have Harmed Competition

127.    CDK's illegal horizontal agreement with Reynolds and its anticompetitive exclusive dealing provisions have severely harmed competition in the Dealer Data Integration Market to the detriment of solutions that rely on data integration services. CDK and Reynolds currently have a monopoly on data integration for their respective DMSs. This monopoly has had predictable effects: prices for data integration services have skyrocketed and quality has stagnated or even decreased. CDK's internal documents candidly explain that this was precisely CDK's goal. It needed to "close" its DMS because otherwise the dramatically increased prices would cause vendors "to move to [other data integrators] instead of accept increase price."

**ANSWER:** CDK admits that some of the quoted excerpted text in the fifth sentence of paragraph 127 of the Complaint appears in a document produced by CDK in this litigation. CDK denies Plaintiff's characterization of the document. CDK denies that it has violated any applicable law or harmed competition, and denies that Plaintiff or any other individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 127 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 127 of the Complaint.

128.    Even though AutoLoop and other vendors pass through a portion of CDK's and Reynolds' inflated data integration costs to dealers, many vendors (including AutoLoop) have no choice but to absorb some of the increased data integration fees because dealers are unable or unwilling to pay such excessive fees. This results in slashed development budgets, support, and other investments in their products and services. These cost-cutting measures ultimately reduce the quality of such products and services.

**ANSWER:**     CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 128 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 128 of the Complaint.

129.     The increased data integration prices and reduced quality of data integration services have also "tilted the table" in favor of CDK's own software application offerings. CDK's products and services do not have to pay excessive data integration fees, and those solutions have near real-time, read and write integration to all necessary dealer data on the DMS.

**ANSWER:**     CDK admits that certain applications that are wholly owned and operated by CDK do not pay fees to CDK for integration with CDK's own DMS.  CDK denies the remaining allegations in paragraph 129 of the Complaint.

130.     Dealers are on record stating that they do not use some of their preferred vendors because of the huge pass-through data integration surcharges.

**ANSWER:**     CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 130 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 130 of the Complaint.

131.     Additionally, vendors have had to scale back the functionality of their products and services or pull them off the market entirely. For example, at the Authenticom hearing, Alan Andreu of Dominion – a vendor – testified that Dominion had to shutter one application because the cost of integration fees exceeded the cost of the product itself. Likewise, Michael Korp, owner of the vendor Open Recalls, testified that he could not afford CDK's and Reynolds' high integration prices. He had therefore been forced to rely on Authenticom for integration, but CDK's blocking has forced the vendor to lay off employees and halt plans for growth.

**ANSWER:**     CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction.  CDK further admits that Alan Andreu and Michael Korp testified at that hearing. CDK denies Plaintiff's characterization of the testimony and states that the hearing transcript speaks for itself.  CDK denies the remaining allegations in paragraph 131 of the Complaint.

## A. Data Integration Prices Have Skyrocketed

132. CDK and Reynolds have drastically increased the prices they charge for their data integration services (3PA and RCI) since 2015. These prices are now far higher than the prices that would exist in a competitive Dealer Data Integration Market.

**ANSWER:** CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 132 that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 132 of the Complaint.

133. CDK formally announced a "refreshed" 3PA program on June 22, 2015 – just a few months after its collusive agreement with Reynolds – as part of its "SecurityFirst" initiative. This initiative used data security as the pretext for "closing" the DMS and imposing massive price increases on vendors. "CDK is rolling out a new cybersecurity initiative," *Automotive News* reported, "that will raise monthly integration fees for most of the third-party software vendors that dealerships use in addition to CDK software. It is patterned after a program at Reynolds and Reynolds." David Barkholz, *CDK Global Sees Earnings Boost from Cost-Cutting, Improved Efficiency*, Automotive News (Nov. 3, 2015).

**ANSWER:** CDK admits that it issued a press release concerning SecurityFirst on June 22, 2015, and that the quoted text in paragraph 133 of the Complaint appears in the two Automotive News articles cited in the paragraph. CDK denies the remaining allegations in paragraph 133 of the Complaint.

134. CDK's own internal documents reveal that the reason for the 3PA "refresh" was revenue, not security: ███████████████████████████████████████████████████████████████████████ Ex. 15 (CDK-0843493) (emphasis added). According to plan, CDK's revenues and profit margin for data integration increased substantially in 2017 compared to 2016.

**ANSWER:** CDK admits that Exhibit 15 to the Complaint cited in paragraph 134 contains a document produced by CDK in this litigation, and that the quoted text in paragraph 134 of the Complaint appears in the document. CDK denies Plaintiff's characterization of the document. CDK denies the remaining allegations in paragraph 134 of the Complaint.

135. Vendors received little, if anything, in return for the dramatically higher prices. Industry publications reported that, "Vendors briefed on CDK's new data-security program said nothing will change in the way they get data from CDK-served DMS dealerships under

SecurityFirst except for a higher price." David Barkholz, *Dealers Will Pay Up for Vendors' Data Access After CDK Switch*, Automotive News (July 20, 2015).

**ANSWER:**     CDK admits that the quoted text in paragraph 135 of the Complaint appears in the

Automotive News article cited in the paragraph.   CDK denies the remaining allegations in

paragraph 135 of the Complaint.

136.     The price increases faced by AutoLoop are illustrative. CDK and AutoLoop began negotiating a 3PA agreement shortly after the launch of CDK's SecurityFirst initiative. They ultimately entered into a Managed Interface Agreement and accompanying Statement of Work on January 12, 2016.

**ANSWER:**     CDK admits that it entered into a 3PA agreement with AutoLoop on or about

January 12, 2016.  CDK denies the remaining allegations in paragraph 136 of the Complaint.

137.     When AutoLoop joined 3PA in January 2016, CDK charged $672 per rooftop per month for a dealer buying the entire AutoLoop suite. CDK increased the price to $694 per rooftop per month in July 2016. Today, CDK charges upwards of $730 per rooftop per month for the full suite of AutoLoop products.

**ANSWER:**     CDK admits that AutoLoop's January 2016 3PA agreement with CDK initially

included a fee of $672 per Dealer rooftop per month that used an integration package supporting

the full suite of AutoLoop applications, which increased to $694 in approximately July 2016.

CDK denies the remaining allegations in paragraph 137 of the Complaint.

138.     After entering into the unlawful 2015 agreement with CDK, Reynolds has also increased its RCI prices far higher than it could if there were any competition. Every year, RCI prices increase by approximately four to five percent. Furthermore, the year after the CDK and Reynolds agreement, Reynolds began charging AutoLoop a fee for each "transaction" between AutoLoop's applications and the Reynolds DMS. In other words, Reynolds now charges AutoLoop an additional fee every time certain of its applications accesses the DMS. As of mid-2017, these fees were ██████ per transaction. For applications that require frequent communication with the DMS – such as scheduling software – transaction fees *alone* can cost AutoLoop hundreds of dollars per dealer per month. Given the combination of Reynolds' exorbitantly high standard integration fees and its transaction fees, many dealers pay more in fees than AutoLoop charges for its products. Other vendors have seen the cost of integration fees charged by Reynolds increase by similar margins, and have been forced to pay transaction fees.

**ANSWER:**     Paragraph 138 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK lacks sufficient knowledge or

information to form a belief as to the truth of the allegations in paragraph 138 that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 138 of the Complaint.

139.   As an example of the fee increases imposed on other vendors, at the Authenticom hearing, a witness for vendor Dominion Enterprises testified that his company paid $30 per dealer per month for data integration with Authenticom, but now is paying CDK ████████ ███████████ for the same service. ███████████████████████████████████ ████████████████████████████████████████████████████████ *See* Ex. 16 (CDK-0248042) (Slide 5).

**ANSWER:**   CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction. CDK further admits that a witness for Dominion Enterprises testified at that hearing. CDK denies Plaintiff's characterization of the testimony and states that the hearing transcript speaks for itself. CDK admits that Exhibit 16 to the Complaint contains a document produced by CDK in this litigation. CDK denies Plaintiff's characterization of the document. CDK denies the remaining allegations in paragraph 139 of the Complaint.

140.   CDK has also engaged in deceptive advertising to the market. As part of the revamped 3PA program, CDK posted a pricing guide on its website that CDK represents as "standardized" pricing for all vendors. "Our 3PA pricing philosophy is simple," CDK states in its program guide, "standardized pricing for all customers." But that is false and misleading. CDK's internal documents show that, for certain vendors like AutoLoop, the actual 3PA fees charged by CDK are far in excess of its published "standard" pricing packages. CDK told another vendor providing electronic vehicle registration and titling that the vendor would have to pay 25% of its top-line revenues to participate in the 3PA program, which is many times more than the posted "standard" pricing.

**ANSWER:**   CDK admits that it has sought to standardize its pricing for certain products and services, and that a representative pricing guide available on CDK's public website contains the excerpted quoted statements in paragraph 140 of the Complaint. CDK denies the remaining allegations in paragraph 140 of the Complaint.

141.   More egregious still, CDK has refused to provide integration for data elements if

the data will be used in an application that competes against one of CDK's applications. For example, AutoLoop has requested to be able to modify an open repair order in the service lane for one of its solutions, and CDK has refused that request.

**ANSWER:** CDK admits that Plaintiff's service lane application currently does not use certified integration to modify open repair orders in the CDK DMS. CDK denies the remaining allegations in paragraph 141 of the Complaint.

142. In addition to these monthly fees, CDK also charges vendors enormous upfront fees to initiate services. CDK charged AutoLoop ▆▆▆▆▆ to join the 3PA program, with "setup" fees of around ▆▆ (or more) per dealership rooftop. These initiation fees are much more than anything correspondingly charged by independent data integrators. CDK charges other vendors similar setup fees.

**ANSWER:** CDK admits that it charges Vendors fees for certification and installation services, which vary depending on the complexity of the interface needed by each Vendor. CDK admits that it charged AutoLoop a ▆▆▆▆▆▆▆▆▆ and a one-time installation fee of ▆▆ for each physical CDK Dealer location at which its applications were installed. CDK further states that CDK waived the installation fees for up to 900 Dealer locations during the first 12 months of AutoLoop's membership in the 3PA program. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 142 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 142 of the Complaint.

143. The current 3PA and RCI prices are much higher than the prices that were charged by competing data integrators prior to CDK's and Reynolds' illegal agreement in 2015. For example, between 2008 and 2016, SIS charged around $40 per dealer per month for pulling data and $70 per dealer per month for bi-directional, read-write integration, which included the ability to share data between AutoLoop's solutions. Similarly, Authenticom charged vendors $25 per dealer per month for one data feed and $50 per dealer per month for two or more (up to seven). On average, Authenticom charged vendors between $30 and $40 per dealer per month, and $75 per dealer per month for bi-directional, read-write integration.

**ANSWER:** CDK admits that certain of its 3PA fees—including those for bi-directional access, real-time data updates, and more complex data packages—are higher than $75 per dealer

per month, while some are lower. CDK denies that such fees are comparable to the fees

allegedly charged by Authenticom, SIS, and other so-called "data integrators." CDK lacks

sufficient knowledge or information to form a belief as to the truth of the allegations in

paragraph 143 of the Complaint that relate to individuals or entities other than CDK and on that

basis denies them. CDK denies the remaining allegations in paragraph 143 of the Complaint.

144.    CDK's prices for the 3PA program stand in stark contrast to the prices CDK
charges for data integration services for non-CDK and non-Reynolds DMSs. DMI and
IntegraLink charge between $25 and $50 per dealer per month for non-CDK and non-Reynolds
DMSs.

**ANSWER:**    CDK denies the allegations in paragraph 144 of the Complaint.

**B.    CDK's and Reynolds' Anticompetitive Conduct Has Tilted the Table in Favor of Their Applications to the Detriment of Competing Applications**

145.    As of 2015, third-party applications, like those offered by AutoLoop, had been
growing steadily due, in part, to reliable third-party integration to dealer data. CDK's and
Reynolds' conduct has had anticompetitive effects in the software application market because it
has provided their own products and services with preferential data access and ubiquitous read-
write permissions. In addition to raising prices for data integration services to supracompetitive
levels, CDK now provides inferior services to third-party vendors to "tilt the table" in favor of its
own applications. Malcolm Thorne, CDK's former chief strategy officer, has admitted under
oath that 3PA "protect[ed] CDK products through a tilt-the-table approach." Dkt. No. 163, at
140:11-25. And CDK's internal documents state that one of the "3PA Program Principles" is to
"[p]rotect CDK Products through a 'tilt-the-table' approach" and to "[k]eep value add advantage
to CDK-layered applications." *Id.* at 139:2140:25.

**ANSWER:**    CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC*, No.

17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary

injunction. CDK further admits that former CDK employee Malcolm Thorne testified at that

hearing. CDK denies Plaintiff's characterization of the testimony and documents introduced

during the hearing and states that the hearing transcript speaks for itself. CDK denies the

remaining allegations in paragraph 145 of the Complaint.

146.    CDK restricts AutoLoop's and other vendors' access to and rights regarding
dealer data on the DMS for no reason other than to make their offerings more difficult to use or

to reduce the features and functionality of those products, thereby harming AutoLoop and other vendors, and providing an artificial advantage to CDK's own competing products and services.

**ANSWER:** CDK denies the allegations in paragraph 146 of the Complaint.

147. For example, CDK withholds from AutoLoop the ability to create and modify repair orders using its SmartLane program, even though CDK has enabled this capability for its own competing program, Service Edge. There is no justification for doing so other than to give CDK's Service Edge a leg up in its competition against AutoLoop and other vendors. Similarly, CDK does not allow customers to sign repair orders in the dealer's service lane, even though that capability is available in Service Edge. These artificial capability restrictions insulate CDK's applications from having to compete on their merits against AutoLoop's products and those offered by other vendors.

**ANSWER:** CDK admits that it offers an application called Service Edge which is capable of creating and modifying repair orders in the CDK DMS using proprietary CDK intellectual property. CDK admits that Plaintiff's SmartLane application currently does not use certified integration to create or modify repair orders in the CDK DMS. CDK denies the remaining allegations in paragraph 147 of the Complaint.

148. CDK actively markets Service Edge by pointing to the artificial functionality limitations imposed by CDK on Service Edge's competitors. For example, one marketing presentation depicts the following:

**Missing Features Compared to CDK Service EDGE**

|   | Feature | Impact |
|---|---------|--------|
| 2 | Bi-directional integration to DMS. Read and Writeback data | CDK Service Edge workflow is written into DMS. No need to do the same work twice. |
|   | *Repair Order Creation* | Service Edge is the only solution that can open a Repair Order outside of the DMS |
|   | *Electronic payments posted directly to accounting G/L (competitor requires additional manual processing to DMS)* | Non-CDK solutions require additional manual step |
| 5 | Digital Signature capture on RO's and Vehicle Walkaround | Customers electronically sign RO's Invoices and Inspection forms. Immediately available in DMS. |
| 9 | Cost | CDK bundles appointments, lane inspection, electronic MPI and electronic payments into one affordable payment. Also eliminates any 3rd party integration charges. Nissan Newport News bundle is much less than 3rd party pricing. |

**ANSWER:**    CDK admits that the image in paragraph 148 of the Complaint contains excerpts from a document originated by a CDK employee, but denies Plaintiff's characterization of the document. CDK denies the remaining allegations in paragraph 148 of the Complaint.

149.    As another example of "tilting the table," CDK limits how frequently its applications can send data to, or receive data from, the DMS. Whereas independent integrators like SIS were able to exchange data with the DMS in less than 30 seconds, AutoLoop's contract with CDK limits data exchanges to once every 15 minutes. Other vendors experience similar restrictions on their ability to access data in the DMS. CDK's own applications, however, are able to communicate with the DMS in near-real-time.

**ANSWER:**    CDK admits that its January 2016 3PA agreement with AutoLoop provides that certain data extracts may be performed every 15 minutes, unless otherwise provided in the agreement; however pursuant to that same agreement other data extractions may be performed every 5 minutes. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 149 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 149 of the Complaint.

150.    CDK also forces AutoLoop to go through onerous 3PA "certification" exercises that serve no purpose other than to provide CDK with valuable and confidential proprietary information about AutoLoop's products. CDK has demanded that AutoLoop: (a) provide proprietary information about the functionality of AutoLoop's products; (b) conduct live demonstrations of its products during which CDK employees ask detailed questions about AutoLoop's technology; (c) provide a "workflow" model showing how each AutoLoop product uses data; and (d) justify how the AutoLoop product will use each data element. CDK has refused to confirm that it will not use AutoLoop's proprietary information to gain a competitive advantage against AutoLoop. On information and belief, CDK imposes similarly invasive 3PA certification requirements on other vendors.

**ANSWER:**    CDK admits that applications seeking to join the 3PA program, including AutoLoop applications, are required to complete four phases of CDK's 3PA certification process: (1) Orientation and Planning; (2) Development; (3) Certification; and (4) Deployment. CDK denies Plaintiff's characterization of the 3PA certification process. CDK denies the remaining allegations in paragraph 150 of the Complaint.

## IV.    CDK's Anticompetitive Conduct Has No Pro-Competitive Justification

151.    There are no pro-competitive justifications for CDK's anticompetitive behavior. CDK has claimed that "closing" the DMS is necessary to protect "data security" because, it asserts, other data integrators are "unsecure." But that is simply not true.

**ANSWER:**    Paragraph 151 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK admits that one of the reasons it

has taken steps, consistent both with its contracts with its Dealer customers and with CDK's need

to provide a stable and secure DMS product to its Dealer customers, to block hostile third-party

access to its DMS is that hostile data extractors pose threats to the security and integrity of the

data residing on the DMS and the system itself.  CDK denies the remaining allegations in

paragraph 151 of the Complaint.

152.    First, there is nothing unusual or unsecure about third parties integrating with the DMS on the dealer's behalf. CDK itself owns two data integrators (DMI and IntegraLink) that interact with and syndicate data in the same way as other data integrators. Malcolm Thorne – CDK's then chief strategy officer – told *Automotive News* in March 2015 that "the pull process of extracting data is as safe as pushing out." David Barkholz, *Dealerships Work To Safeguard Data as Security Breaches Loom*, Automotive News (Mar. 9, 2015). Indeed, until they entered their agreement in February 2015, CDK pulled data using login credentials from Reynolds dealers (and still does today pursuant to the "wind down" agreement). And Reynolds for over a decade consistently allowed third-party access to its DMS. It was only after Mr. Brockman acquired Reynolds in 2006 that it changed its position with respect to competitors' access. Similarly, a top-level CDK executive admitted in private conversation with a vendor that the rhetoric around "security" has "little credibility" and is primarily designed to force vendors to use CDK for data integration.

**ANSWER:**    CDK admits that the quoted text in paragraph 152 of Complaint attributed to a

former CDK employee appears in a March 2015 Automotive News article.  CDK further admits

that certain of its subsidiaries, specifically DMI and IntegraLink, did, at certain times during the

relevant period, extract certain data from the Reynolds DMS in fulfillment of certain contracts

the companies had with certain Vendors.  CDK lacks sufficient knowledge or information to

form a belief as to the truth of the allegations in paragraph 152 of the Complaint that relate to

individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 152 of the Complaint.

153.    Significantly, while CDK's own SecurityFirst initiative itself recommended improving third-party integration practices and retiring "certain integration that risks data security," it did not recommend terminating all third-party integration.

**ANSWER:**    CDK admits that the SecurityFirst initiative recommends the elimination of certain practices that create security risks, has led to improvements in the 3PA program, and does not recommend terminating all third-party integration with the CDK DMS. CDK denies the remaining allegations in paragraph 153 of the Complaint.

154.    Second, using independent integrators to enable data flow between parties is standard across industries, including in banking and healthcare, where the data is much more sensitive than anything accessible from dealers. Taking the banking industry as an example, thousands of third party products and services – from well-established companies like PayPal, Mint, Square, and Quicken to new startups like Even – require access to a customer's banking data. There are large data integrators like Intuit and Yodlee that pull data from the consumers' bank accounts and provide that data to the third-party applications. As the Consumer Financial Protection Bureau stated, "the availability of consumer financial account data . . . has made possible a range of benefits to consumers." *Consumer Access to Financial Records*, Request for Information, Bureau of Consumer Financial Protection, Docket No. CFPB-2016-0048, at 7 (Nov. 17, 2016).

**ANSWER:**    CDK admits that the excerpted quoted text in paragraph 154 of the Complaint appears in the source referenced in the paragraph.  CDK denies Plaintiff's characterization of the document.  CDK denies the remaining allegations in paragraph 154 of the Complaint.

155.    Third, at the Authenticom hearing, CDK was unable to offer a single example of a data-security incident involving any independent data integrator. *See* Op. & Order, *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, 2017 WL 3017048, at *2 n.2 (July 14, 2017). Reynolds could cite only a single incident (not involving data security) in which a query became stalled, but the problem was quickly and easily resolved. This is not surprising given that the methods used by third parties to integrate with the DMS are standard methods employed by integrators in multiple industries. CDK has never explained why the standard methods that work in other industries do not work here.

**ANSWER:**    CDK denies the allegations in the first sentence of paragraph 155 of the Complaint and denies that the preliminary injunction order from *Authenticom, Inc. v. CDK*

*Global, LLC*, No. 17-318, supports those allegations. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 155 that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 155 of the Complaint.

156. Fourth, CDK has allowed AutoLoop to use another independent integrator (SIS) as long as AutoLoop pays the 3PA integration fees. CDK "whitelists" SIS from its usual blocking practices. These examples show that profit – not security – is the sole motivation for the 3PA program.

**ANSWER:** CDK admits that in an effort to avoid disruption of service to AutoLoop's customers, CDK has allowed AutoLoop a period of time to transition from unapproved integration methods, including the use of SIS, to certified 3PA integration. CDK denies the remaining allegations in paragraph 156 of the Complaint.

157. Fifth, based on AutoLoop's experience with CDK's onerous 3PA certification process, CDK does not ask any questions actually related to vendors' security practices, such as how it secures data it retrieves from the DMS during transit and storage. Rather, CDK seeks proprietary information about the functionality of software applications provided by vendors such as AutoLoop – the type of information one would want to know about a competitor's products in order to gain a competitive advantage against third-party vendors.

**ANSWER:** CDK denies the allegations in paragraph 157 of the Complaint.

158. Sixth, CDK also uses third-party integration to non-CDK DMS to pull data for *their own standalone products and services*. For example, CDK and Reynolds pay Authenticom to pull data from dealerships using their DMSs and to distribute that data to their applications. And DMI continues to screen scrape data from the Reynolds DMS during the five-year wind-down period pursuant to the February 2015 agreement. The fact that Reynolds and CDK actually use third-party access themselves proves there is nothing inherently "unsecure" about it.

**ANSWER:** CDK admits that AVRS, a subsidiary of CVR which, in turn, is a joint venture between CDK and Reynolds that provides EVR services in a number of states, used Authenticom for certain data access services at the time of CVR's acquisition of AVRS in 2015. As AVRS's operations are incorporated into CVR, its use of Authenticom is being discontinued. CDK admits that on or about February 18, 2015, it entered into three written agreements with

PUBLIC VERSION

Reynolds. CDK denies Plaintiff's characterization of the agreements and states that the contracts speak for themselves. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 158 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations of paragraph 158 of the Complaint.

159. In fact, CDK's insistence that vendors integrate with dealer data only through the 3PA program actually imposes unnecessary burdens on the underlying systems. Instead of querying the DMS once, and syndicating any data that is pulled to all vendors that need it, CDK requires every product and service to impose upon the network for the exact same data. That serves no purpose other than to allow CDK to reap a financial windfall by charging each vendor for integration with the same underlying data. For these reasons, the district court in the Authenticom matter concluded that CDK had failed to present evidence of a procompetitive justification for its anticompetitive acts.

**ANSWER:** Paragraph 159 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies Plaintiff's characterization of the district court's vacated order in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318. CDK denies the remaining allegations in paragraph 159 of the Complaint.

160. Finally, CDK has failed to implement less-restrictive means of protecting dealer data. For example, CDK could establish application programming interfaces ("APIs") for independent integrators. Indeed, before entering the agreement with Reynolds, CDK even advocated that DMS providers should offer APIs for third-party integrators. Other DMS providers regularly provide API access for third-party integrators. Alternatively, other DMS providers also allow for dealers and vendors to utilize APIs between them directly, which is another less-restrictive means.

**ANSWER:** Paragraph 160 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 160 of the Complaint relating to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 160 of the Complaint.

## CLASS ALLEGATIONS

161.    AutoLoop brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking damages and equitable and injunctive relief on behalf of the following class:

**Nationwide Sherman Act Class:** All automotive software vendors (i.e., persons or entities engaged in the sale of software solutions to car dealers) located in the United States that, at any time since April 9, 2014, purchased data integration services from CDK or Reynolds.

**ANSWER:**    Paragraph 161 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that Plaintiff purports to bring this action as a class action under the Federal Rules of Civil Procedure.  CDK denies, however, that this matter is properly brought or is properly maintained as a class action.  CDK further denies that the purported "Nationwide Sherman Act Class" definition set forth in paragraph 161 of the Complaint is accurate or appropriate for any purpose in this matter.  CDK denies the remaining allegations in paragraph 161 of the Complaint.

162.    AutoLoop also brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking damages and equitable and injunctive relief pursuant to state antitrust and consumer protection statutes on behalf of the following class:

**Florida State-Law Subclass:** All automotive software vendors (i.e., persons or entities engaged in the sale of software solutions to car dealers) located in the United States that, at any time since April 9, 2014, purchased data integration services from CDK or Reynolds to serve car dealerships located in Florida.

**ANSWER:**    Paragraph 162 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that Plaintiff purports to bring this action as a class action under the Federal Rules of Civil Procedure.  CDK denies, however, that this matter is properly brought or is properly maintained as a class action. CDK further denies that the purported "Florida State-Law Subclass" definition set forth in paragraph

162 of the Complaint is accurate or appropriate for any purpose in this matter. CDK denies the remaining allegations in paragraph 162 of the Complaint.

163. Excluded from the foregoing Classes are CDK, Reynolds, and any of their officers, directors, management, employees, subsidiaries, and affiliates.

**ANSWER:** Paragraph 163 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that Plaintiff purports to bring this action as a class action under the Federal Rules of Civil Procedure and that Plaintiff purports to exclude from the putative class the persons identified in paragraph 163 of the Complaint. CDK denies, however, that this matter is properly brought or is properly maintained as a class action. CDK denies the remaining allegations in paragraph 163 of the Complaint.

164. Also excluded from the foregoing Classes are any vendor that has filed an individual complaint, as of the date of this Amended Complaint, against CDK or Reynolds regarding the provision of data integration services.

**ANSWER:** Paragraph 164 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that Plaintiff purports to bring this action as a class action under the Federal Rules of Civil Procedure and that Plaintiff purports to exclude from the putative class the persons identified in paragraph 164 of the Complaint. CDK denies, however, that this matter is properly brought or is properly maintained as a class action. CDK denies the remaining allegations in paragraph 164 of the Complaint.

165. This action may properly be brought as a class action because it satisfies the requirements of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

**ANSWER:** Paragraph 165 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that Plaintiff purports to bring this action as a class action under the Federal Rules of Civil Procedure. CDK denies, however, that this matter is properly brought or is properly maintained as a class action. CDK denies the remaining allegations in paragraph 165 of the Complaint.

166.     The members of the Classes are so numerous that individual joinder of all Class Members is impracticable. There are at least dozens of automotive software solution vendors in the United States. On information and belief, nearly all of those vendors serve dealers using CDK's or Reynolds' DMS, including over 860 car dealers located in Florida. The precise number of Class Members, as well as their names and addresses, are currently unknown to Plaintiff but may be ascertained through CDK's and Reynolds' books and records.

**ANSWER:**     Paragraph 166 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that Plaintiff purports to bring this action as a class action under the Federal Rules of Civil Procedure.  CDK denies, however, that this matter is properly brought or is properly maintained as a class action.  CDK admits that there are dozens of automotive software Vendors and thousands of automotive dealers in the United States, including in Florida.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 166 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 166 of the Complaint

167.     Common questions of law and fact exist as to the Classes, as required by Rule 23(a)(2), and those questions predominate over any questions that may affect only individual Class Members, as required by Rule 23(b)(3). The common questions of law and fact include, but are not limited to:

a.     whether CDK and Reynolds unlawfully conspired to exclude third-party data integrators from the market;

b.     whether CDK's and Reynolds' February 2015 agreements constitute an unlawful conspiracy in restraint of trade or commerce;

c.     whether CDK's contractual exclusive dealing provisions violate the antitrust laws;

d.     CDK's and Reynolds' historical and current policies and practices with respect to dealer ownership of data on their DMSs, dealer authorization of third-party access to data on their DMSs, and security of data on their DMSs;

e.     CDK's and Reynolds' historical and current policies and practices with respect to their own third-party access to dealer data on other DMSs;

      f.      whether vendors have paid inflated integration prices and received inferior quality data integration services as a result of the unlawful conspiracy between CDK and Reynolds;

      g.      the anticompetitive effects of the unlawful conspiracy between CDK and Reynolds;

      h.      whether, through the acts complained of herein, Defendants have violated federal and state antitrust laws;

      i.      whether the acts complained of herein constitute unlawful, deceptive, and/or unfair business acts or practices; and

      j.      whether the acts complained of herein constitute unconscionable and/or unfair trade or business practices or unfair competition.

**ANSWER:**    Paragraph 167 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that Plaintiff purports to bring this action as a class action under the Federal Rules of Civil Procedure. CDK denies, however, that this matter is properly brought or is properly maintained as a class action. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 167 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 167 of the Complaint.

    168.    Alternatively, this action may be certified under Rule 23(b)(1) or Rule 23(b)(2) because: (a) the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendants; (b) the prosecution of separate actions by individual Class Members would create a risk of adjudicative rulings as to them that would, as a practical matter, be dispositive of the interests of the other Class Members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds that apply generally to the Class Members, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

**ANSWER:**    Paragraph 168 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that Plaintiff purports to bring this action as a class action under the Federal Rules of Civil Procedure. CDK denies,

however, that this matter is properly brought or is properly maintained as a class action. CDK denies that Plaintiff or any other individual or entity has suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiff or any member of its purported classes are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 168 of the Complaint.

169. AutoLoop's claims are typical of the claims of the Classes it seeks to represent, as required by Rule 23(a)(3), because AutoLoop and the Class Members have been subject to the same wrongful practices and have been injured in the same manner thereby.

**ANSWER:** Paragraph 169 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that Plaintiff purports to bring this action as a class action under the Federal Rules of Civil Procedure. CDK denies, however, that this matter is properly brought or is properly maintained as a class action. CDK denies that Plaintiff or any other individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK denies the remaining allegations in paragraph 169 of the Complaint.

170. AutoLoop will adequately represent the interests of Class Members as required by Rule 23(a)(4). AutoLoop has no interests adverse to any Class Members. AutoLoop is committed to the prosecution of this action and has retained competent and experienced counsel.

**ANSWER:** Paragraph 170 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that Plaintiff purports to bring this action as a class action under the Federal Rules of Civil Procedure. CDK denies, however, that this matter is properly brought or is properly maintained as a class action. CDK denies the remaining allegations in paragraph 170 of the Complaint.

171. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial harms suffered by AutoLoop and each Class Member are relatively small compared to the burden and expense that would be required to individually litigate their claims against CDK, so it would be impracticable for each

PUBLIC VERSION

Class Member to individually seek redress for CDK's wrongful conduct. Even if Class Members could afford individual litigation, individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, a class action presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**ANSWER:** Paragraph 171 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that Plaintiff purports to bring this action as a class action under the Federal Rules of Civil Procedure. CDK denies, however, that this matter is properly brought or is properly maintained as a class action. CDK denies that Plaintiff or any other individual or entity has suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiff or any other member of the purported classes are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 171 of the Complaint.

## COUNT I:
### HORIZONTAL CONSPIRACY IN VIOLATION OF
### SECTION 1 OF THE SHERMAN ACT
### (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE
### SHERMAN ACT CLASS)

172. Plaintiff incorporates by reference the preceding allegations.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

173. CDK and Reynolds entered into and engaged in an agreement in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

**ANSWER:** Paragraph 173 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 173 of the Complaint.

174. CDK and Reynolds are horizontal competitors of one another in the DMS market and the Dealer Data Integration Market.

**PUBLIC VERSION**

**ANSWER:** Paragraph 174 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and non-party Reynolds are horizontal competitors in the licensing of DMSs to automotive dealers. CDK denies the remaining allegations in paragraph 174 of the Complaint.

175. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding, or concerted action to eliminate competition in the Dealer Data Integration Market and their respective brand-specific aftermarkets. In furtherance of that conspiracy, in February 2015, CDK and Reynolds entered into a written market division agreement pursuant to which they agreed to "close" their DMSs and not to compete in the Dealer Data Integration Market. CDK and Reynolds also engaged in a group boycott to block all third-party access to their respective DMSs. The agreement not to compete between CDK and Reynolds is a *per se* violation of the Sherman Act and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

**ANSWER:** Paragraph 175 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 175 of the Complaint.

176. The purposes of the conspiracy between CDK and Reynolds include: (1) to protect their DMS duopoly (thereby protecting their monopoly profits); (2) to protect their standalone applications; and (3) to monopolize the Dealer Data Integration Market so that they can reap monopoly profits.

**ANSWER:** Paragraph 176 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 176 of the Complaint.

177. Through their conspiracy, CDK and Reynolds have caused actual injury to competition for applications and in the Dealer Data Integration Market and respective aftermarkets.

**ANSWER:** Paragraph 177 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 177 of the Complaint.

178. The CDK and Reynolds agreement has cut off access to dealer data that solution providers need in order to compete with CDK and Reynolds.

**ANSWER:**     Paragraph 178 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 178 of the Complaint.

179.     CDK and Reynolds possess dominant positions in the DMS market, which they have utilized to further the conspiracy.

**ANSWER:**     Paragraph 179 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 179 of the Complaint.

180.     CDK's and Reynolds' conspiracy and anticompetitive conduct in furtherance thereof do not enhance efficiency or competition in any market. On the contrary, their conduct has produced only anticompetitive effects.

**ANSWER:**     Paragraph 180 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 180 of the Complaint.

181.     As a proximate result of CDK's and Reynolds' unlawful conduct, for which CDK is jointly and severally liable, AutoLoop and the Nationwide Sherman Act Class have suffered injury to their business or property in an amount to be proven at trial and automatically trebled.

**ANSWER:**     Paragraph 181 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that Plaintiff or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiff is entitled to the relief it seeks.  CDK denies the remaining allegations in paragraph 181 of the Complaint.

### COUNT II:
### UNLAWFUL RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE SHERMAN ACT CLASS)

182.     Plaintiff incorporates by reference the preceding allegations.

PUBLIC VERSION

**ANSWER:**    CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

183.    CDK entered into contracts with vendors that contain exclusive dealing provisions that unreasonably restrict trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

**ANSWER:**    Paragraph 183 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 183 of the Complaint.

184.    CDK's contracts with vendors provide that vendors cannot access the DMS except through 3PA. These provisions are standard throughout CDK's contracts with vendors.

**ANSWER:**    Paragraph 184 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 184 of the Complaint.

185.    CDK was able to impose these exclusive dealing provisions on vendors as a result of its market power in the DMS market and the respective dealer data integration aftermarket.

**ANSWER:**    Paragraph 185 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 185 of the Complaint.

186.    Because CDK imposed these exclusive dealing provisions pursuant to its conspiracy with Reynolds to eliminate competition, they are *per se* illegal. Moreover, whether entered into pursuant to CDK's agreement with Reynolds or independently, CDK's vertical restraints are unlawful because they have led to increased prices and reduced output.

**ANSWER:**    Paragraph 186 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 186 of the Complaint.

187.    Through its exclusive dealing provisions, CDK has injured competition in the DMS and Dealer Data Integration markets.

**ANSWER:** Paragraph 187 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 187 of the Complaint.

188. CDK's exclusive dealing agreements do not enhance efficiency or competition in any market. On the contrary, the agreements have produced only anticompetitive effects.

**ANSWER:** Paragraph 188 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 188 of the Complaint.

189. As a proximate result of CDK's unlawful conduct, AutoLoop and the Nationwide Sherman Act Class have suffered injury to their business or property in an amount to be proven at trial and automatically trebled.

**ANSWER:** Paragraph 189 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that Plaintiff or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiff is entitled to the relief it seeks. CDK denies the remaining allegations in paragraph 189 of the Complaint.

### COUNT III:
### UNLAWFUL MONOPOLIZATION IN VIOLATION OF
### SECTION 2 OF THE SHERMAN ACT
### (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE
### SHERMAN ACT CLASS)

190. Plaintiff incorporates by reference the preceding allegations.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

191. CDK has unlawfully monopolized the aftermarket for dealer data integration services with respect to dealer data stored on the CDK DMS, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:**     Paragraph 191 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 191 of the Complaint.

192.     When dealers purchase DMS services from CDK, they are "locked in" to that purchase through a long-term contractual relationship and high switching and information costs.

**ANSWER:**     Paragraph 192 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 192 of the Complaint.

193.     Because of customer lock-in in the primary DMS market, CDK has monopoly power – and in fact has monopolized – the Single-Brand Dealer Data Integration Aftermarket on its DMS platform. CDK has demonstrated its ability to control prices and exclude competition by blocking third-party access to their DMS by raising data access fees to supracompetitive levels.

**ANSWER:**     Paragraph 193 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 193 of the Complaint.

194.     CDK used anticompetitive means to acquire and maintain its monopoly, including, *inter alia*, by blocking third-party access to the DMS, entering into a market division agreement pursuant to which it agreed with Reynolds that neither DMS provider would provide third-party access to the other's DMS, and imposing anticompetitive exclusive dealing arrangements on vendors and dealers.

**ANSWER:**     Paragraph 194 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 194 of the Complaint.

195.     As a direct and proximate result of CDK's monopolization, AutoLoop and the Nationwide Sherman Act Class have suffered damage to their business or property in an amount to be proven at trial and automatically trebled.

**ANSWER:**     Paragraph 195 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that Plaintiff or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and

therefore denies that Plaintiff is entitled to the relief it seeks. CDK denies the remaining allegations in paragraph 195 of the Complaint.

## COUNT IV:
## VIOLATION OF THE FLORIDA ANTITRUST ACT
## (ON BEHALF OF PLAINTIFF AND THE FLORIDA STATE-LAW
## SUBCLASS)

196.    Plaintiff incorporates by reference the preceding allegations.

**ANSWER:**    CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

197.    CDK and non-defendant co-conspirator Reynolds engaged in a conspiracy in unreasonable restraint of trade in violation of the Florida Antitrust Act, Fla. Stat. Ann. § 542.15 *et seq.*, for the reasons set forth in the preceding allegations. This conspiracy is a *per se* violation of the Florida Antitrust Act and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

**ANSWER:**    Paragraph 197 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 197 of the Complaint.

198.    CDK's exclusive dealing requirements and monopolization of the aftermarket for dealer data integration services are also unlawful under the Florida Antitrust Act.

**ANSWER:**    Paragraph 198 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 198 of the Complaint.

199.    The violations of the Florida Antitrust Act alleged herein had a significant effect on commerce in Florida, where at least 860 car dealers – and AutoLoop – are located. AutoLoop and the Florida State-Law Subclass – as well as Florida-based car dealers and car buyers – suffered adverse effects in Florida resulting from CDK's violations of the Florida Antitrust Act.

**ANSWER:**    Paragraph 199 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 199 of the Complaint.

200.    As a direct and proximate result of CDK's unlawful conduct, AutoLoop and the Florida State-Law Subclass have suffered injury to their business or property. AutoLoop and the Florida State-Law Subclass are entitled to treble damages for the violations of the Florida Antitrust Act alleged herein.

**ANSWER:**    Paragraph 200 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that Plaintiff or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiff is entitled to the relief it seeks.  CDK denies the remaining allegations in paragraph 200 of the Complaint.

## COUNT V:
## UNFAIR PRACTICES IN VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
## (ON BEHALF OF PLAINTIFF AND THE FLORIDA STATE-LAW SUBCLASS)

201.    Plaintiff incorporates by reference the preceding allegations.

**ANSWER:**    CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

202.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") defines "unfair competition" to include, among other things, any "unfair methods of competition" and "unfair or deceptive acts or practices." Fla. Stat. Ann. § 501.204.

**ANSWER:**    Paragraph 202 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that the text quoted in paragraph 202 appears in the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.204.

203.    CDK's acts and practices as alleged herein have been "unfair" and "deceptive" under the FDUTPA. CDK's conduct – for instance, its "tilt-the-table approach" in placing anticompetitive restrictions on competing services and products that it does not place on its own corresponding products, its conspiratorial agreement with Reynolds, and its concealment from dealers of the reasons for integration price increases and diminished functionality in non-CDK applications – offends established public policy (including federal and state antitrust statutes) and significantly threatened and harmed consumers of both data integration services and the products and services that rely on those services, including car dealers and car buyers. Furthermore, any

**PUBLIC VERSION**

utility from CDK's conduct does not outweigh the harm it causes to competitors, car dealers, and car buyers.

**ANSWER:** Paragraph 203 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 203 of the Complaint.

204. A substantial portion of the unfair acts and practices alleged herein occurred in Florida, and harm to application vendors, car dealers, and car buyers was inflicted in Florida for all the reasons set forth in the preceding allegations.

**ANSWER:** Paragraph 204 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 204 of the Complaint.

205. As a direct and proximate result of CDK's unfair conduct, AutoLoop and the Florida State-Law Subclass have suffered injury to their business or property. AutoLoop and the Florida State-Law Subclass are entitled to restitution in an amount to be proven at trial and automatically trebled.

**ANSWER:** Paragraph 205 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that Plaintiff or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiff is entitled to the relief it seeks. CDK denies the remaining allegations in paragraph 205 of the Complaint.

## JURY DEMAND

206. In accordance with Federal Rule of Civil Procedure 38(b), AutoLoop demands a trial by jury on all issues so triable.

**ANSWER:** To the extent that an answer may be required to the Jury Demand at the end of Plaintiff's Complaint, CDK denies each and every allegation therein.

## PRAYER FOR RELIEF

WHEREFORE, AutoLoop requests that the Court:

**PUBLIC VERSION**

(a)     certify this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the Classes defined above;

(b)     decree that CDK entered into an unlawful horizontal conspiracy with Reynolds in violation of Section 1 of the Sherman Act;

(c)     decree that the exclusive dealing provisions in CDK's contracts with AutoLoop, other vendors, and dealers are anticompetitive and illegal restrictions of trade under Section 1 of the Sherman Act;

(d)     decree that CDK has illegally monopolized the market for integration services for dealer data stored on its DMS platform under Section 2 of the Sherman Act;

(e)     enjoin the enforcement of the exclusive dealing provisions in the CDK contracts with dealers and vendors;

(f)     enjoin CDK from privileging its own products and services – as compared to AutoLoop's and other vendors' products and services – with respect to integration with data elements stored on mutual dealer clients' DMSs, including with respect to data access and usage rights, and bi-directional integration;

(g)     award damages, as provided under the Sherman Act and Florida law, and hold CDK jointly and severally liable for all damages resulting from CDK's unlawful conspiracy in restraint of trade with Reynolds, to be entered against CDK in an amount to be trebled in accordance with the Sherman Act and Florida law;

(h)     award appropriate actual and punitive damages for CDK's state law violations;

(i)     award its reasonable costs and expenses incurred in this action, including expert fees and attorneys' fees;

(j)     award prejudgment interest; and

(k)     award any such further relief that the Court may deem just and proper.

**ANSWER:**     To the extent that an answer may be required to the Prayer for Relief at the end of the Complaint, CDK denies each and every allegation contained therein and denies that Plaintiff is entitled to the relief it seeks.

**PUBLIC VERSION**

## DENIAL

CDK denies each and every allegation of the Complaint not specifically admitted above.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

Without assuming any burden of proof that it would not otherwise bear, CDK also asserts the following affirmative and additional defenses:

### First Defense

The Complaint fails to state a claim upon which relief may be granted.

### Second Defense

Plaintiff's and the putative classes' claims are barred, in whole or in part, by the applicable statute of limitations. Plaintiff filed this action on June 5, 2018. Plaintiff has not pled any event that would toll any applicable limitations period. As such, the statutory time limitation applicable to some or all of each of Plaintiff's and the putative classes' claims have passed and thus are time-barred.

### Third Defense

If and to the extent that Plaintiff and the members of the putative classes have been damaged, which CDK denies, the amount of damages that Plaintiff and the members of the putative classes allege to have suffered is too remote or speculative to allow recovery, and it is impossible to ascertain and allocate such alleged damages with reasonable certainty.

### Fourth Defense

Some or all of Plaintiff's and the putative classes' claims are subject to valid and enforceable contractual limitations on liability and damages.

**PUBLIC VERSION**

## Fifth Defense

Plaintiff's and the putative classes' claims are barred, in whole or in part, based on the doctrines of estoppel, laches, and waiver as Plaintiff's and the putative classes' claims are based, in part, on actions and events spanning more than 10 years. Plaintiff has pled no facts to explain or justify why this lawsuit was filed when it was filed. To the extent that Plaintiff could have brought essentially the same suit years earlier, Plaintiff and the putative classes are barred from pursuing all or part of their claims by the doctrines of estoppel and laches.

## Sixth Defense

Plaintiff's and the putative classes' claims are barred, in whole or in part, because CDK's conduct was pro-competitive, reasonable and permissible, and was based on independent, legitimate and self-interested business and economic justifications.

## Seventh Defense

Plaintiff's and the putative classes' claims are barred, in whole or in part, because they have not suffered any legally cognizable injury, including because Plaintiff and the putative classes have not suffered an injury-in-fact and their alleged injuries are too speculative, indirect and remote from the alleged conduct, and cannot be ascertained and apportioned.

## Eighth Defense

Plaintiff's and the putative classes' claims are barred, in whole or in part, because none of CDK's alleged actions or omissions substantially lessened competition within any properly defined market.

## Ninth Defense

Plaintiff's and the putative classes' claims are barred, in whole or in part, because to the extent Plaintiff or any member of the putative classes has suffered any injury or incurred any

**PUBLIC VERSION**

damages as alleged in the Complaint, which CDK denies, CDK's alleged conduct was not the actual or proximate cause of any such injury or damage.

### Tenth Defense

Plaintiff's and the putative classes' claims are barred, in whole or in part, because to the extent Plaintiff or any member of the putative classes suffered any injury or incurred any damages as alleged in the Complaint, which CDK denies, any such injury or damage was caused and brought about by the acts, conduct or omissions of individuals or entities other than CDK and, as such, any recovery herein should be precluded or diminished in proportion to the amount of fault attributable to such other individuals or entities.

### Eleventh Defense

If and to the extent Plaintiff or any member of the putative classes has been damaged, which CDK denies, Plaintiff and the putative classes, by the exercise of reasonable diligence, could have mitigated their damages but did not, and Plaintiff and the putative classes are therefore barred from recovery. Alternatively, any damages sustained by Plaintiff or any member of the putative classes, which CDK denies, must be reduced by the amount that such damages would have been reduced had Plaintiff or the putative classes exercised reasonable diligence in mitigating their damages.

### Twelfth Defense

Plaintiff's and the putative classes' claims are barred, in whole or in part, because any recovery would result in unjust enrichment to Plaintiff and the putative classes.

### Thirteenth Defense

Plaintiff's and the putative classes' claims are barred, in whole or in part, because their alleged damages, if any, are too speculative, uncertain and not of the nature or to the extent alleged.

PUBLIC VERSION

## Fourteenth Defense

Plaintiff's and the putative classes' claims are barred, in whole or in part, because the Complaint has insufficiently alleged a relevant product market and geographic market and is so vague and ambiguous as to deny CDK notice of the markets alleged by Plaintiff.

\* \* \* \* \* \*

In addition, CDK has insufficient knowledge or information upon which to form a basis as to whether it may have additional, as yet unstated, separate defenses available to it. CDK reserves the right to amend this Answer to add, supplement or modify defenses based upon legal theories that may be or will be divulged through clarification of the Complaint, through discovery, or through further factual or legal analysis of Plaintiff's allegations, contentions and positions in this litigation.

## JURY DEMAND

Pursuant to Federal Rules of Civil Procedure, Rule 38(b), CDK hereby demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, CDK requests that Plaintiff's Complaint be dismissed with prejudice, that the Court find that Plaintiff is not entitled to any judgment or relief, that the Court enter judgment in favor of CDK, and that the Court award CDK its attorneys' fees, costs and expenses, pre-judgment interest, and such other and further relief as the Court deems just and proper.

PUBLIC VERSION

### COUNTER-PLAINTIFF CDK GLOBAL, LLC'S COUNTERCLAIMS

CDK Global, LLC ("CDK" or "Counter-Plaintiff") brings these Counterclaims against Counter-Defendant Loop, LLC ("AutoLoop" or "Counter-Defendant") for breach of contract. CDK alleges the following based upon information and belief, except as to those allegations set forth below that are based on CDK's knowledge.

### INTRODUCTION

1.      In January 2016, AutoLoop entered into a Managed Interface Agreement ("3PA Agreement"[6]) with CDK, pursuant to which AutoLoop has certified several applications for managed, bi-directional integration with CDK's DMS through the CDK Third Party Access ("3PA program") n/k/a the CDK Global Partner Program. Under the express terms of the 3PA Agreement, AutoLoop is prohibited from receiving data from CDK's DMS through unapproved means outside of the 3PA program. This contractual restriction in the 3PA Agreement is an essential element of the 3PA program itself, which is built on CDK's ability to manage when and how data maintained in its DMS is accessed by third parties.

2.      Discovery has now shown that AutoLoop is in breach of this provision in its 3PA Agreement. Beginning at least as early as January 2018, AutoLoop began receiving a feed of vehicle inventory data sourced from CDK's DMS from vAuto, Inc. ("vAuto"), a participant in CDK's 3PA program, and another plaintiff in this MDL. vAuto's unauthorized syndication of vehicle inventory data to AutoLoop is in violation of a separate Managed Interface Agreement between CDK and vAuto's parent corporation, Cox Automotive, Inc. ("Cox Automotive").

---

[6] In its complaint, AutoLoop refers to the contract as the parties' "3PA agreement," in reference to CDK's Third Party Access ("3PA") Program, now known as the CDK Global Partner Program. For the Court's convenience, these counterclaims refer to the parties' agreement as the "3PA Agreement" and to CDK's third-party access program as the "3PA" program notwithstanding its name change.

Concurrent with the filing of this counterclaim, CDK brings separate counterclaims against vAuto, Cox Automotive, and other Cox-affiliated entities for their unlawful conduct.

3.      AutoLoop's unauthorized receipt of data sourced from CDK's DMS creates significant security risks in addition to violating CDK's contractual rights. Each time that AutoLoop receives DMS data syndicated by vAuto (or from any other source outside the 3PA program), CDK is deprived of the ability to monitor AutoLoop's access to the data, much less verify whether AutoLoop is using the data for an approved purpose or with the relevant dealer's knowledge or consent. CDK accordingly seeks damages from AutoLoop as well as an injunction barring it from engaging in further conduct in breach of the 3PA Agreement.

## PARTIES

4.      Counter-Plaintiff CDK Global, LLC is a Delaware limited liability company with its corporate headquarters and principal place of business at 1950 Hassell Road, Hoffman Estates, Illinois 60169. CDK is a global provider of integrated information technology and digital marketing solutions to the automotive retail industry.

5.      The automotive data ecosystem that CDK supports is massive, with tens of thousands of installations of approved vendor applications and millions of transactions every day, supporting hundreds of billions of dollars in commerce each year. CDK has made tremendous investments to build out and support its network of products and service offerings. Over the last three years alone, CDK has spent more than $480 million researching, developing, and deploying new and enhanced product solutions for its customers.

6.      In light of its network's size, scope, and importance to the American economy, CDK has been designated by the Department of Homeland Security as a Critical National

PUBLIC VERSION

Infrastructure "so vital to the United States that [its] incapacitation would have a debilitating effect on security [and] national economic security."[7]

7.      Counter-Defendant AutoLoop is a Florida limited liability company with its headquarters and principal place of business at 33 N. Garden Avenue, Clearwater, Florida 33755. *See* Compl. ¶ 30. AutoLoop is an automotive software products and services company, providing integrated software solutions for car dealers. *Id* ¶ 6. AutoLoop alleges that its products are used by "more than 2,100 dealers," including numerous dealers who use CDK's DMS. *Id* ¶ 30.

## NATURE OF THE COUNTERCLAIM

8.      This counterclaim arises for breach of contract.

9.      This Court has subject matter jurisdiction over this counterclaim pursuant to 28 U.S.C. §§ 1332(a)(1) and 1367(a). There is diversity jurisdiction under 28 U.S.C. § 1332(a)(1) because CDK is a citizen of Delaware and Illinois, AutoLoop is, on information and belief, a citizen of Florida, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. In addition, there is supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because it is so related to AutoLoop's claims against CDK that they form part of the same case or controversy.

10.     This Court has personal jurisdiction over AutoLoop because it is located and does business in this District; because many of the actions giving rise to these counterclaims occurred in, and/or were directed from, this District; and because AutoLoop filed its complaint against CDK in this District.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c).

---

[7] *See* Dep't of Homeland Security, What is Critical Infrastructure?, *available at* perma.cc/N8JR-YQ6Y.

## FACTUAL ALLEGATIONS

### A.    CDK's DMS and 3PA Program

12.    CDK's DMS offering (referred to herein as "CDK's DMS" or "the CDK DMS") primarily consists of two enterprise software products—Drive and DASH—that provide dealers with proprietary software tools and resources used to manage core aspects of their business. CDK's DMS currently is licensed to more than 27,000 dealerships across the world and more than 8,000 new and used car dealerships in North America.

13.    In addition to its core functionalities, the CDK DMS houses voluminous amounts of financial and accounting information and highly sensitive data, including financial statements, accounting data, payroll information, sales figures, inventory, parts data, warranty information, appointment records, service and repair records, vehicle information, customer personal identifiable information, proprietary intellectual property, and proprietary data that belongs to CDK and third parties, including the data described below. CDK encrypts sensitive data in the DMS and appropriately expunges stale data regularly.

14.    Data housed in CDK's DMS belongs to several different types of entities. Some data is proprietary to OEMs, such as prices and part numbers for replacement parts, labor rates, and rebate, incentive, and warranty information. Other data in CDK's DMS is proprietary to third-party service providers, such as credit reporting bureaus like Equifax, Experian, and TransUnion. Still other data in the DMS is CDK's own proprietary, copyrighted data, including forms, accounting rules, tax tables, and proprietary tools and data compilations. And some data "belongs" to the dealers that use CDK's DMS. While access to third-party proprietary information in the DMS is permitted for licensed DMS customers, CDK is prohibited from sharing much of this information with other third parties absent a valid license.

94

15.     One of the ways that CDK maintains the stability and security of its DMS is by requiring that third parties—for example, software application providers that wish to interact with the DMS—access the CDK DMS primarily through a CDK-designed interface that provides managed, bi-directional integration with CDK's DMS (defined in the 3PA Agreement as the "CDK Interface System"). These restrictions are designed to ensure that 3PA program participants are the end user of the DMS data they access, that their access is limited to what is necessary to support the applications that they have certified in the 3PA program, and that such access is centrally managed by CDK in order to optimize data and system security and to prevent degradation of system performance and data corruption.

16.     Each vendor participating in the 3PA program enters into a written agreement with CDK, which grants the vendor a limited, non-transferrable license to use the CDK Interface System to access, send, and/or receive data on the DMS solely for the purpose of providing specific applications to CDK dealers. These applications are described in detailed Statements of Work ("SOWs") that accompany the vendor's contract with CDK. From the inception of the 3PA program, CDK's standard 3PA contracts have strictly prohibited the unauthorized syndication of any data obtained though the 3PA program to third parties and have required 3PA program participants to use the data only in connection with providing the specific applications identified in their SOWs. These restrictions are designed to ensure that 3PA program participants are the end user of the DMS data they access and their access is limited to what is necessary to support the applications that they have certified in the 3PA program.

## B.     The CDK-AutoLoop 3PA Agreement

17.     In accordance with the January 2016 3PA Agreement between CDK and AutoLoop and its accompanying Statements of Work, certain Autoloop applications use 3PA integration to obtain data maintained in CDK's DMS.

18.    Section 1(f) of the 3PA Agreement expressly prohibits AutoLoop from receiving any data sourced from CDK's DMS outside the 3PA program:



19.    Indeed, in its Complaint, AutoLoop cites this very provision of the 3PA Agreement and alleges that the Agreement "requires that any vendor using 3PA for any of its dealer-customers on a CDK DMS must agree to use 3PA exclusively for all of its dealer-customers on CDK DMSs." Compl. ¶ 115.

**C.    AutoLoop's Breach of the 3PA Agreement**

20.    Discovery conducted to date has shown that beginning at least as early as January 2018, AutoLoop began receiving a daily feed of inventory data from vAuto ████████ ████████████████ On information and belief, the vAuto inventory data feed includes vehicle inventory data sourced from CDK's DMS.

21.    First, vAuto itself is a participant in the 3PA program, under which vAuto receives inventory-related data maintained in CDK's DMS for the purpose of supplying data for vAuto's vehicle inventory analytics applications. For each CDK dealership customer, vAuto extracts an initial set of inventory data from CDK's DMS and then periodically "syncs" with the DMS—usually multiple times per day—to extract new or updated data from the DMS.

22.    Second, AutoLoop internal documents ████████████████████████ ████████████████████████████████████████

PUBLIC VERSION

████████████████████████████████████████████████

███████████████████████████████████

23.     CDK has never authorized AutoLoop to obtain inventory data sourced from its DMS though vAuto, and only learned of AutoLoop's unauthorized receipt of such data through discovery conducted in this MDL.

24.     AutoLoop's unauthorized receipt of DMS data though vAuto harms CDK in multiple ways. First, it allows AutoLoop to avoid paying CDK the integration fees that it would otherwise owe under the 3PA Agreement for secure access to this data. Second, AutoLoop's receipt of DMS data outside the 3PA program allows it to sidestep the processes and procedures of the 3PA program that are designed to monitor how and when AutoLoop obtains data sourced from CDK's DMS. The success of the 3PA program depends on CDK's ability to verify that each vendor in the program is using the data that it obtains for an approved end-use and with the dealer's express, written consent. These requirements are reflected in the standard terms of CDK's 3PA contracts as well as its 3PA certification and audit procedures. When AutoLoop unlawfully obtains DMS data without using secure 3PA integration, CDK cannot monitor how data is being transmitted, who is using and has access to the data, or verify whether AutoLoop is using the data for an approved purpose and with the dealer's knowledge or consent.

## FIRST COUNTERCLAIM FOR RELIEF
### (Breach of Contract)

25.     Paragraphs 1-24 above are incorporated herein by reference.

26.     The 3PA Agreement between CDK and AutoLoop is a valid and enforceable contract and is binding on AutoLoop. CDK has fully performed or tendered all performance required under the 3PA Agreement.

**PUBLIC VERSION**

27.     AutoLoop has breached its obligations under the 3PA Agreement by receiving data sourced from CDK's DMS from an unauthorized source, vAuto.

28.     AutoLoop's conduct has damaged CDK, including by depriving CDK of integration fees that CDK would otherwise charge for the data that AutoLoop has received.

29.     Unless AutoLoop is enjoined from engaging in its unlawful conduct, AutoLoop will continue to violate the provisions in its 3PA Agreement that prohibit the receipt of DMS data from unauthorized sources, increasing the risk that CDK will suffer a security breach, incur liability to its dealer customers, and/or incur significant harm to its reputation, all which would constitute an irreparable harm because no amount of monetary compensation could make CDK whole for the resulting potential loss of business, loss of goodwill, and reputational loss.

**PRAYER FOR RELIEF**

WHEREFORE, CDK respectfully requests that this Court enter judgment:

A.     Declaring that AutoLoop's unlawful receipt of DMS data from unauthorized sources is in breach of the parties' 3PA Agreement;

B.     Permanently enjoining AutoLoop from engaging in its unlawful conduct;

C.     Awarding CDK its full losses, expenses, and other damages;

D.     Awarding CDK costs and litigation expenses, including attorney's fees; and

E.     Awarding CDK such other and further relief that this Court deems just, proper, and equitable.

**JURY DEMAND**

CDK hereby demands a trial by jury for all claims so triable.

**PUBLIC VERSION**

Dated: February 15, 2019

Respectfully submitted,

*/s/ Britt M. Miller*
Britt M. Miller
Michael A. Scodro
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mscodro@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant and*
*Counter-Plaintiff CDK Global, LLC*

PUBLIC VERSION

## CERTIFICATE OF SERVICE

I, Britt M. Miller, an attorney, hereby certify that on February 15, 2019, I caused a true and correct copy of the foregoing **DEFENDANT CDK GLOBAL, LLC'S ANSWER AND AFFIRMATIVE AND ADDITIONAL DEFENSES AND COUNTERCLAIM** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

*/s/ Britt M. Miller*
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Phone: (312) 782-0600
Fax: (312) 701-7711
E-mail: bmiller@mayerbrown.com
