PUBLIC VERSION

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This filing relates to:* | Hon. Robert M. Dow, Jr. |
| *Cox Automotive, Inc, et al. v. CDK Global, LLC*, Case No. 1:18-CV-1058 (N.D. Ill.) | Magistrate Judge Jeffrey T. Gilbert |

## DEFENDANT CDK GLOBAL, LLC'S ANSWER AND
## AFFIRMATIVE AND ADDITIONAL DEFENSES AND COUNTERCLAIMS

Defendant CDK Global, LLC ("CDK"), by and through its attorneys, hereby submits its Answer and Affirmative and Additional Defenses and Counterclaims in response to Plaintiff Cox Automotive, Inc.'s ("Cox Automotive"), Autotrader.com, Inc.'s ("Autotrader"), Dealer Dot Com, Inc.'s ("Dealer.com"), Dealertrack, Inc.'s ("Dealertrack"), HomeNet, Inc.'s ("HomeNet"), Kelley Blue Book Co., Inc.'s ("Kelley Blue Book"), vAuto, Inc.'s ("vAuto"), VinSolutions, Inc.'s ("VinSolutions"), and Xtime, Inc.'s ("Xtime") (collectively, "Cox" or "Plaintiffs") Complaint (the "Complaint") in this matter as follows.

## CDK'S ANSWER AND AFFIRMATIVE AND ADDITIONAL DEFENSES

### *Preliminary Statement*

Except as otherwise expressly stated below, CDK answers and responds only to those allegations contained in the Complaint that are directed toward it. CDK is without sufficient knowledge or information to form a belief concerning the truth of the allegations in the Complaint that are related to Plaintiffs or non-parties and on that basis denies them.

For the reader's convenience, CDK has organized its Answers to Plaintiffs' allegations by employing the headings and subheadings used within the Complaint. In doing so, CDK does

**PUBLIC VERSION**

not admit that the headings or subheadings are accurate or appropriate for any purpose in this matter and, to the extent that any heading can be read to contain factual allegations, denies each and every one of them unless it has expressly indicated otherwise.

## INTRODUCTION

1.      Plaintiff Cox Automotive, Inc. ("Cox Automotive"), along with its subsidiaries Autotrader.com, Inc., Dealer Dot Com, Inc. ("Dealer.com"), Dealertrack, Inc., HomeNet, Inc., Kelley Blue Book Co., Inc., vAuto, Inc., VinSolutions, Inc., and Xtime, Inc. (collectively, "Cox Automotive" or "Plaintiffs"), bring this action to remedy and enjoin ongoing antitrust and state law violations by CDK Global, LLC ("CDK"). Cox Automotive's allegations stem in part from the evidence of unlawful anticompetitive conduct uncovered in other lawsuits against CDK. Separate and apart from those claims, Cox Automotive also brings other claims to redress misconduct by CDK directed specifically at Cox Automotive.

**ANSWER:**    CDK denies that it has engaged in antitrust and state law violations and denies that Plaintiffs are entitled to the relief they seek. CDK further denies that any evidence of unlawful anticompetitive conduct has been uncovered in other lawsuits against CDK.  CDK denies the remaining allegations in paragraph 1 of the Complaint.

2.      As alleged herein, and supported by extensive evidence even prior to discovery, CDK and its non-party co-conspirator The Reynolds and Reynolds Company ("Reynolds") have committed flagrant antitrust violations and inflicted widespread harm on automotive dealers, vendors of software products and services (like Cox Automotive), and the automotive industry as a whole. Specifically, CDK and Reynolds have conspired to eliminate competition for providing integration with dealer data – an extremely valuable asset that belongs to dealers, but over which CDK and Reynolds have seized control. Where there was once a robust market for providing data integration services, CDK and Reynolds – through their coordinated conduct – have destroyed that competition. Where CDK and Reynolds once themselves competed in that market, they have now entered into a written covenant not to compete. Moreover, where CDK and Reynolds once offered data integration services on a level-playing field, they now place artificial and anticompetitive restrictions on dealer data in order to maintain their dominance over the Dealer Management Systems ("DMS") market, favor their own products and services, and injure competing products and services such as those offered by Cox Automotive. The resulting harm to vendors and dealers has been immense.

**ANSWER:**    Paragraph 2 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition, and denies that Plaintiffs or any other individual or entity

have suffered any injury as a result of any action or conduct of CDK. CDK denies that there is a

"market for providing data integration services." CDK also denies that Plaintiffs have identified

a valid "market" much less one that CDK "dominates," alone or with Reynolds. CDK further

states that the allegations in paragraph 2 of the Complaint pertaining to a purported "DMS

market" are so vague and ambiguous that CDK cannot respond to those allegations and on that

basis denies them. CDK lacks sufficient knowledge or information to form a belief as to the

truth of the allegations in paragraph 2 of the Complaint that relate to individuals or entities other

than CDK and/or are directed toward non-parties and on that basis denies them. CDK denies the

remaining allegations in paragraph 2 of the Complaint.

3.      Vendors like Cox Automotive are direct targets of CDK's and Reynolds' conspiracy for a simple reason: CDK and Reynolds offer products and services that compete with Cox Automotive's solutions. That is, CDK and its co-conspirator Reynolds are seeking not only to destroy and impair competition for data integration services, but, even more directly, they are seeking to impair and destroy competition for the products and services that vendors offer, and upon which dealers rely. By eliminating competition for data integration services, CDK and Reynolds have seized control over dealer data. They have thwarted dealers' ability to control access to and the usage of the dealers' own data, with no lawful or legitimate purpose. The only purposes are anticompetitive: to eliminate competition for integration services and injure competing solution providers like Cox Automotive. The result is that the competitive playing field is not only uneven, but, as CDK itself has described it in internal presentations to its executive team, "tilted" in the extreme in favor of CDK.

**ANSWER:** Paragraph 3 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK admits that it and Reynolds offer

certain products and services that compete with Cox Automotive's "solutions." CDK denies the

remaining allegations in paragraph 3 of the Complaint.

4.      CDK and Reynolds entered into their illegal conspiracy – a conspiracy that eliminated competition for data integration services and imposed myriad restrictions on vendor access to and use of dealer data – for multiple anticompetitive reasons. First, the conspiracy is an effort to protect their duopoly in the market for DMSs and ensure that the DMS remains central to dealers, choking off the natural progression of dealer operations to more efficient and less expensive vendor software solutions. Second, having eliminated competition for providing access to dealer data, CDK and Reynolds have imposed enormously inflated fees for access to and use of that data, reaping financial windfalls to the detriment of both dealers and vendors.

These enormously "bloated" fees – as one court has described them – injure vendors like Cox Automotive not only because they must pay them, but also because the fees make vendors' products and services less attractive to dealers because those dealers must ultimately bear much of the added costs. CDK's and Reynolds' own competing products and services, by contrast, do not have to pay integration fees, bloated or otherwise. Finally, as noted above, CDK and Reynolds conspired to control data integration so they could place artificial restrictions on vendors' access to and use of dealer data in order to "tilt the table" in favor of CDK's and Reynolds' own solutions, leaving competing products and services (like those offered by Cox Automotive) at a disadvantage.

**ANSWER**:  Paragraph 4 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that it and Reynolds offer certain products and services that compete with Cox Automotive's "solutions."  CDK denies the remaining allegations in paragraph 4 of the Complaint.

5.      The damage to the automotive industry has been immense, with the damage to Cox Automotive alone from its antitrust claims exceeding $200 million – before the automatic trebling provided for by the nation's antitrust laws. Cox Automotive brings this action to recover those damages, enjoin CDK's illegal conduct, and stave off further harm to vendors, dealers, and other participants in the automotive industry. The industry and market can no longer endure such abuses. Cox Automotive also brings this action to recover damages for CDK's unlawful conduct aimed specifically at Cox Automotive.

**ANSWER:**     Paragraph 5 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that Plaintiffs seek damages and an injunction against CDK.  CDK denies that it has violated any applicable law or harmed competition, and denies that Plaintiffs or any other individual or entity have suffered any injury as a result of any action or conduct of CDK, and therefore denies that Plaintiffs are entitled to any damages or an injunction.  CDK denies the remaining allegations in paragraph 5 of the Complaint.

*               *               *

6.      Cox Automotive is one of the world's largest automotive software products and services companies, providing a comprehensive set of solutions for dealers, manufacturers, lenders, and other businesses in the automotive industry in the United States, and other countries. Cox Automotive's products and services have revolutionized wholesale and retail transactions

and have made sourcing, selling, and servicing cars easier and more efficient for dealers and consumers than ever before.

**ANSWER:** On information and belief, CDK admits that Plaintiff Cox Automotive is one of the world's largest automotive software products and services companies. CDK otherwise lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 6 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 6.

7. For example:

(a) Autotrader is the leading online destination for buying and selling new, certified, and used cars and trucks. For more than 20 years, Autotrader has helped consumers in the United States decide which vehicle to buy, where to buy it, and what deals are available for it. Autotrader has more than 18 million unique monthly visitors, more than 20,000 dealer clients, and averages nearly five million daily vehicle listings.

(b) Dealer.com creates a virtual showroom with the industry's most integrated digital marketing platform. Dealer.com provides consistent websites at a manufacturer level to make shopping for a new car easier and consistent, no matter the dealer. Sixty percent of United States dealerships partner with Dealer.com.

(c) Dealertrack Sales and Finance & Insurance ("F&I") offerings include electronic contracting, electronic menu, compliance, vehicle purchase and lease management solutions (known in the automotive industry as "desking"), along with a credit application portal that connects more than 22,000 dealer clients to approximately 1,700 lender partners. The automotive industry's first and largest financing network, Dealertrack's credit application portal, includes captive lenders of original equipment manufacturers of motor vehicles ("OEMs"), national banks, regional banks, subprime lenders, and credit unions.

(d) Xtime provides an all-in-one service and maintenance software solution, offering dealer clients the ability to: (i) visualize their unsold shop capacity and target it using vehicle service promotions; (ii) enable the scheduling of service appointments; (iii) check-in customers in the service line; and (iv) perform multi-point digital inspections with interactive customer approval. It processes more than 44 million service appointments each year for more than 8,000 dealer clients, accounting for $9 billion in yearly revenue for dealers.

**ANSWER:**    On information and belief, CDK admits that the entities identified in paragraph 7—Autotrader, Dealer.com, Dealertrack, and Xtime—are owned in whole or part by Plaintiff Cox Automotive.  CDK otherwise lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 7 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 7 of the Complaint.

8.    For Cox Automotive's products and services to function, they need access to data from their dealer clients. This dealer data is the lifeblood of the automotive industry. It includes, but is not limited to, vehicle and parts inventory, customer name and contact information, customer leads, completed and pending sales information, vehicle F&I information, vehicle pricing information, and service and repair information.

**ANSWER:**    CDK admits that many automobile dealers ("Dealers") generate certain data in the course of their business, including those identified in the third sentence of paragraph 8 of the Complaint.  CDK further admits that certain automotive software vendors ("Vendors") use such data in the course of providing services to Dealers.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 8 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 8 of the Complaint.

9.    Dealers have traditionally stored a significant portion of their data on a database within their DMS, which is software that dealers use to help manage their businesses (*e.g.*, accounting, sales, service, and human resources).

**ANSWER:**  CDK admits that Dealers enter certain data into the DMS, but denies that all data residing or stored on the DMS belongs to Dealers.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 9 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 9 of the Complaint.

10.     CDK and Reynolds are duopolists in the DMS market. Together, they control approximately 75 percent of the United States market by number of dealers and at least 90 percent when measured by vehicles sold. CDK controls approximately 45 percent of the DMS market, and Reynolds controls approximately 30 percent. On May 24, 2017, CDK announced that it was acquiring Auto/Mate, Inc., a company that has approximately eight percent of the DMS market, in a move that would further strengthen CDK's market power.

**ANSWER:**     Paragraph 10 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it is a "duopolist" in any market.  CDK further denies that Plaintiffs have properly identified the relevant market.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 10 of the Complaint that relate to CDK's purported collective share of the "DMS market" and/or are directed toward non-parties, and on that basis denies them.  CDK states that the allegations in paragraph 10 of the Complaint pertaining to a purported "DMS market" are so vague and ambiguous that CDK cannot respond to those allegations and on that basis denies them.  CDK admits that it announced a planned acquisition of Auto/Mate Dealership Systems on May 24, 2017.  Further answering, CDK states that the planned acquisition was subsequently terminated on March 20, 2018 following governmental regulatory review.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 10 of the Complaint that relate to Auto/Mate's purported share of the purported "DMS market" and on that basis denies them.  CDK denies the remaining allegations in paragraph 10 of the Complaint.

11.     In addition to their DMSs, CDK and Reynolds offer standalone software solutions that compete directly with solutions offered by Cox Automotive and other third-party vendors. The first two letters of CDK's name emphasize this point quite well: the "C" in CDK stands for "Cobalt," which competes directly with Dealer.com; and the "D" in CDK stands for "Dealer Services," which includes Service Edge, F&I, and customer relationship management solutions – direct competitors of Cox Automotive's Xtime, Dealertrack Sales and F&I, and VinSolutions solutions, respectively.

**ANSWER**:  CDK admits that it and, upon information and belief, Reynolds offer software solutions to Dealers that are available separate from each company's DMS offerings. CDK

further admits that certain of these software solutions compete with solutions offered by Plaintiffs and other Vendors. CDK admits that the first two letters of its name stand for "Cobalt Digital Marketing" and "dealer services," respectively. CDK lacks sufficient knowledge or information to form a belief as to the truth of remaining allegations in paragraph 11 that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 11 of the Complaint.

12. Even though certain dealer data is stored on the DMS database, that data belongs to the dealers – as CDK and Reynolds have repeatedly admitted. Accordingly, DMS providers, including CDK, have historically allowed dealers to provide third parties (including vendors) with automated access to the dealer data stored on the DMS. Data integration service providers are companies that collect and standardize data from a dealer's DMS and provide it to the dealer's chosen third-party vendors of software products and services. Data integration services enable dealers to have their data integrated with vendor products and services. Such integration involves providing access to certain data elements, in addition to bi-directional "read" and "write" capabilities. Certain integrations offer near-real-time access to and use of dealer data, while other integrations enable periodic flow of dealer data.

**ANSWER:** CDK admits that Dealers input certain data into the DMS, alongside other data that does not belong to Dealers. CDK denies that the allegations in paragraph 12 of the Complaint accurately describe the services that so-called "data integration service providers" perform. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 12 of the Complaint that relate to the details of such services and individual dealers' data practices and on that basis denies them. CDK denies the remaining allegations in paragraph 12 of the Complaint.

13. CDK and Reynolds each provide data integration services for their respective DMSs. CDK's service is known as Third Party Access ("3PA"), while Reynolds' service is known as the Reynolds Certified Interface ("RCI"). Third parties have also provided competing data integration services. CDK owns two such third-party data integrators – Digital Motorworks, Inc. ("DMI") and IntegraLink. Other third-party data integrators have included Authenticom, Inc. ("Authenticom") and Superior Integrated Solutions, Inc. ("SIS").

**ANSWER**: CDK admits that it has a "Third Party Access" program ("3PA"), n/k/a the CDK Global Partner program, that offers managed bi-directional data integration services to Vendors.

CDK further admits, upon information and belief, that Reynolds has a "Reynolds Certified Interface" program. CDK admits that DMI and IntegraLink are now known as CDK Data Services, Inc., a subsidiary of CDK. CDK further admits that CDK Data Services provides certain data services to Vendors, OEMs, and other participants in the automotive industry. CDK admits that Authenticom and Superior Integrated Solutions ("SIS") are or were data services providers that offer certain services, among others, premised on access to data maintained in CDK's and other providers' DMSs. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 13 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 13 of the Complaint.

14.     At one time, both CDK and Reynolds had "open" DMSs, meaning that neither took steps to prevent dealer clients from authorizing third-party access to the dealers' own data or to place anticompetitive restrictions on rights with respect to that data. During this time, the competition between data integration services made access to dealer data cost effective – an application vendor would pay an integrator on the order of $50 per dealer per month. With dealers in control of access to and use of their data, vendors created an array of innovative software products and services to help dealerships market, sell, lease, and service cars. These solutions became pervasive. Today, an average dealership uses ten to fifteen different software solutions.

**<u>ANSWER</u>**:     CDK admits that, at one time, notwithstanding provisions in its Dealer contracts that prohibit unauthorized third-party access to CDK's DMS, CDK did not actively enforce these contract rights; it did not seek to prevent Dealers from providing login credentials to third parties, and did not actively take steps to block third parties from accessing the CDK DMS with these credentials. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 14 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the allegations in paragraph 14 to the extent they purport to define an "open" DMS. CDK denies the remaining allegations in paragraph 14 of the Complaint.

15.     Over time, Reynolds began to "close" its DMS by selectively blocking third-party data integrators from accessing dealer data stored on the Reynolds DMS. As Reynolds reduced competition for data integration services through its blocking activities, Reynolds increased the fees it charged for data integration through RCI. CDK continued to differentiate itself as an "open" DMS. As CDK's chief marketing officer publicly touted, "We don't tell the dealer, if someone wants access to their data, they have to come to [CDK] to gain access to the data. It's ultimately the dealer's data. If he wants to give that data to somebody, for us to try to charge a toll doesn't seem like the right thing to do. So we're not going to go down this path." And at the same time, CDK's own data integration business provided vendors with access to dealer data on the Reynolds DMS. CDK's open-access policy allowed it to gain (very slowly) DMS customers at Reynolds' expense and sign those dealers to long-term contracts.

**ANSWER**:     CDK admits that, as early as 2007, Reynolds took steps to block third-party access to its DMS including by, for example, disabling certain dealer-created login credentials. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 15 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK admits that the quotes attributed to CDK's chief marketing officer in paragraph 15 of the Complaint appeared in an article in Automotive News in 2006. *See* Ralph Kisiel, *Dealer Security Stirs Insecurity: Vendors Wary of Reynolds Plan for Computer Systems,* Automotive News (Dec. 4, 2006).  CDK denies that these statements reflect CDK's policies or the state of the industry more than a decade later.  CDK admits that certain of its subsidiaries, specifically DMI and IntegraLink, did, during certain times during the relevant period, access data on the Reynolds DMS in fulfillment of certain contracts the companies had with certain Vendors.  CDK further admits that today, CDK businesses formerly known as DMI and IntegraLink no longer use dealer-issued login credentials to access DMSs. CDK denies the remaining allegations in paragraph 15 of the Complaint.

16.     That competition between CDK and Reynolds halted abruptly in early 2015 when CDK began blocking dealers from granting third parties access to dealer data and, at the same time, agreed to shut down its data integration business for dealers using a Reynolds DMS. CDK's sudden about-face came as a complete surprise to the market. As it turned out, CDK's about-face was the result of a horizontal agreement with Reynolds.

PUBLIC VERSION

**ANSWER**:     Paragraph 16 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that it has taken steps, consistent both with its contracts with its Dealer customers and with CDK's need to provide a stable and secure DMS product to its Dealer customers, to block hostile third-party access to its DMS.  CDK further admits that the CDK businesses formerly known as DMI and IntegraLink no longer use dealer-issued login credentials to access DMSs.   CDK denies the remaining allegations in paragraph 16 of the Complaint.

17.     Specifically, CDK and Reynolds colluded to block third-party access to their DMSs – eliminating competition to their respective 3PA and RCI data access programs – thereby forcing third-party solution providers like Cox Automotive to use CDK and Reynolds for data integration services. Executives from both CDK and Reynolds have admitted that the companies agreed to block and thereby destroy third-party data integrators. CDK and Reynolds also agreed to no longer compete with each other for data integration services.

**ANSWER**:     CDK denies the allegations in paragraph 17 of the Complaint.

18.     CDK and Reynolds memorialized one aspect of their agreement in writing, dated February 18, 2015, pursuant to which CDK agreed to "wind down" its data integration business for Reynolds dealers, and CDK and Reynolds both agreed not to access each other's DMSs. Damningly, just before the written agreement was signed, CDK's internal documents stressed the need to "gain reciprocal agreements with DMS providers" such as Reynolds in order to destroy competition for data integration. Dkt. No. 163, at 145:24-25.[1]

**ANSWER**:  CDK admits that, on or about February 18, 2015, it entered into three written agreements with Reynolds.  CDK denies Plaintiffs' characterization of the agreements, states that the contracts speak for themselves, and denies that the agreements were unlawful in any way. CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction and that the transcript of those proceedings can be found as indicated in footnote 1 of the Complaint. CDK denies Plaintiffs' characterization of its internal documents. CDK further states that the

---

[1] Citations to the Transcripts of the Hearing held June 26-28, 2017 in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, are referred to by their respective docket numbers (Dkt. Nos. 162-165).

hearing transcript speaks for itself. CDK denies the remaining allegations in paragraph 18 of the Complaint.

19.     Apart from the written agreement, and as detailed below, CDK and Reynolds executives have admitted to a broader agreement to destroy independent data integrators and therefore eliminate all competition to their own data integration products. These horizontal conspiracies to destroy competition and divide the data integration market are *per se* violations of the antitrust laws.

**ANSWER**:     Paragraph 19 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 19 of the Complaint.

20.     CDK has also imposed unlawful exclusive-dealing requirements on vendors like Cox Automotive. As a condition of participating in CDK's 3PA data integration service, vendors must generally agree to use 3PA exclusively for *all* of the vendors' products and services. Likewise, even though its DMS contract is to the contrary – CDK's standard DMS contract expressly allows dealers to use "agents" to access data on the DMS – after entering into its horizontal agreements with Reynolds, CDK has asserted that its dealer clients are prohibited from using any third-party data integration service and has taken steps to block dealer-approved third-party access. As a result, CDK has tied the use of its 3PA data integration service to the purchase of its DMS.

**ANSWER**:     Paragraph 20 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that a standard term of its 3PA contracts requires 3PA participants to use CDK-authorized sources for data maintained on the CDK DMS. CDK further admits that it endeavors to enforce the terms of its contracts with Dealers and, accordingly has taken steps to block hostile, unauthorized access to its DMS. CDK denies that any third party data services providers are authorized "agents" under the terms of CDK's contracts with its Dealers. CDK denies the remaining allegations in paragraph 20 of the Complaint.

21.     Internal CDK documents explain the motivation behind CDK's agreement with Reynolds to eliminate competition in the data integration market. First, the enormous success of third-party products and services like those offered by Cox Automotive – made possible by integration with dealer data – began to threaten CDK's and Reynolds' DMS duopoly. As dealers increasingly used these third-party products and services, they began to rely less on CDK's and

Reynolds' antiquated, monolithic DMS enterprise software. The third-party products and services began to perform tasks traditionally performed by the DMS, and to do so more efficiently and while offering greater features and functionality. Dealers also began entering data directly into the third-party solutions in the first instance, bypassing the DMS completely. CDK and Reynolds knew that this would eventually make it less difficult for dealers to switch DMS providers or even to forego a DMS entirely. By seizing control over dealer data, CDK and Reynolds have sought to forestall that threat to their legacy DMS duopoly.

**ANSWER**:    Paragraph 21 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 21 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 21 of the Complaint.

22.    Second, CDK wanted to eliminate competition for data integration so that it could limit access to dealer data, impose restrictions on usage rights contrary to the wishes of their dealer clients, limit bi-directional integration for competing products, raise the costs of those competing products (thereby giving its own offerings artificial advantages), and attempt to drive competing solutions out of the market. CDK's own documents state – and its employees have testified – that CDK wanted to leverage its duopoly control over the DMS market to "tilt the table" in favor of its own offerings.

**ANSWER**:    CDK denies the allegations in paragraph 22 of the Complaint.

23.    For a specific example of how CDK "tilts the table" with respect to Cox Automotive, CDK denies Dealertrack's Sales and F&I access to certain data elements in order to prevent it from electronically contracting a lease transaction. Dealers are forced to double-enter data and endure a much less efficient workflow. There is no technological or other credible reason for CDK to withhold this functionality from Dealertrack's Sales and F&I solutions other than for an anticompetitive reason: to favor CDK's own F&I solutions.

**ANSWER**:    CDK admits that Plaintiff Dealertrack's Sales and F&I applications currently finalize leasing transactions in CDK's DMS.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 23 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 23 of the Complaint.

24.    As another example, CDK prevents Xtime's suite of products from creating or modifying a "repair order" in the DMS even though CDK's own Service Edge applications can

PUBLIC VERSION

create and modify repair orders – which CDK touts to potential dealer clients. Repair orders are critical to the service lane flow at a dealership. They are the primary means by which dealers communicate parts and service costs to their customers. CDK has told Cox Automotive that Xtime cannot be allowed to create or modify "repair orders," despite dealer client and car manufacturer ("OEM") demands for such capabilities, because that could cause data integrity issues. That is pretext. CDK's internal documents reveal the actual reason: CDK wants "to disrupt the workflow" by preventing Xtime's products from creating or modifying repair orders, in order to advantage CDK's competing Service Edge product. Dkt. No. 163, at 140:3-141:13. Additionally, while CDK's Service Edge solutions receive real-time information from the DMS (via "push" notifications whenever data changes), CDK only allows Xtime to "pull" from the DMS once every five minutes, thereby preventing Xtime from having real-time information. (Most Cox Automotive solutions are restricted by CDK from making pull requests more than once every 15 minutes.) To make matters worse, many of Xtime's data "pull" requests fail or take minutes to return a response. Because dealer clients increasingly offer express service capabilities where the entire service visit is slated to be completed in under thirty minutes, timely access to the most up-to-date dealer data is essential. There are many other such examples.

**ANSWER**:  CDK admits that Xtime's scheduling and inspection applications currently do not use certified integration to create or modify repair orders in CDK's DMS, nor do they use bi-directional integration with CDK's DMS.  CDK admits that a standard provision in its Vendor contracts is to allow Vendors to extract data from CDK's DMS every 15 minutes. CDK admits that CDK's Service Edge application is capable of creating and modifying repair orders in the CDK DMS and using real-time, bi-directional integration with CDK's DMS using proprietary CDK intellectual property.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 23 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction.  CDK denies Plaintiffs' characterization of its internal documents and states that the hearing transcript speaks for itself. CDK denies the remaining allegations in paragraph 24 of the Complaint.

25.    Even where CDK and Reynolds grant competing applications access to data or provide a given integration, they still impose anticompetitive restrictions on the use of that data. For example, even though Cox Automotive pays CDK a per dealer per month fee for data integration for each product and service for the very same data elements, those same products

and services are prohibited, contractually, by CDK from sharing the data with each other despite having paid for it multiple times over. There is no legitimate basis for CDK or Reynolds to withhold those data sharing rights – especially where dealers want and authorize such rights – except to stifle innovation and make Cox Automotive's products and services more expensive.

**ANSWER**: Paragraph 25 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that it charges Vendors monthly fees for services provided by its 3PA program. CDK further admits that Plaintiffs' January 8, 2016 3PA Managed Interface Agreement and accompanying Statements of Work ("SOWs") with CDK (collectively, the "3PA Agreement") contain certain restrictions against the sharing of data obtained from CDK's DMS other than as authorized by the 3PA Agreement. CDK denies that its contract terms result in Plaintiffs paying for data "multiple times over." CDK denies the remaining allegations in paragraph 25 of the Complaint.

26. Such rights restrictions are especially nefarious because Cox Automotive already has secured the necessary rights to the data in question – whether from the dealers, consumers, or other third-party originators of the data. In many instances, much of the data in the DMS originated in Cox Automotive's own products and services.

**ANSWER**: Paragraph 26 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 26 of the Complaint.

27. Third, CDK saw an enormous financial opportunity to dramatically inflate its prices for data integration services – after it had eliminated the competition. For example, less than nine months after it entered into the horizontal agreement with Reynolds, CDK raised the data access fees for Cox Automotive's VinSolutions from ▮ per dealer per month to ▮ per dealer per month – a ▮ price increase without any change in the quality of service. One month, VinSolutions was paying CDK ▮ per dealer per month, and the next it was paying $595 per dealer per month for the very same services. Cox Automotive's other solutions were subject to similar price increases, as were the applications of hundreds of other vendors across the automotive industry.

**ANSWER**: CDK admits that VinSolutions has installed integration packages at new and existing Dealer rooftop customers at varying price points, but denies that VinSolutions paid $595 for any integration package per dealer per month. CDK lacks sufficient knowledge or

information to form a belief as to the truth of the remaining allegations in paragraph 27 of the

Complaint that relate to individuals or entities other than CDK and on that basis denies them.

CDK denies the remaining allegations in paragraph 27 of the Complaint.

28.     By charging monopoly prices for access to dealer data, CDK has also raised the input costs of rival solutions, including those offered by Cox Automotive. Having seen the costs of data access skyrocket – with no corresponding increase in functionality or service quality – Cox Automotive has had no choice but to pass along a portion of the additional costs to its dealer clients. Unable to afford the escalating pass-through data integration fees, many dealers have elected to reduce their use of Cox Automotive's solutions or forego them altogether, often in favor of the competing CDK offering, even though Cox Automotive's products and services are superior. Therefore, CDK's dramatic price increases after it entered into the conspiracy with Reynolds not only padded its bottom line, but also put competing solutions providers like Cox Automotive at a severe competitive disadvantage in the marketplace.

**ANSWER**:  Paragraph 28 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK lacks sufficient knowledge or

information to form a belief as to the truth of the allegations in paragraph 28 of the Complaint

that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies

the remaining allegations in paragraph 28 of the Complaint.

29.     CDK has also engaged in other conduct that violates the common law and state statutory provisions. CDK fraudulently induced Cox Automotive to enter into its 3PA Agreement, dated January 8, 2016, by falsely representing to and assuring Cox Automotive in November 2015 that no other product or service ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ when in fact CDK had previously (and secretly) agreed in February 2015 to provide such services to Reynolds *for free for five years*. This conduct also violates California's Unfair Trade Practices Act, which prohibits secret discounts. It is also a breach of contract: not only did CDK fraudulently induce Cox Automotive to enter into the 3PA Agreement with an ▮▮▮▮▮▮▮▮▮ but, by granting Reynolds free data integration, CDK has been in breach of that clause from the very start. CDK has likewise defamed Cox Automotive by falsely advising Cox Automotive's business partners (*e.g.*, Nissan Motor Acceptance Corporation and American Honda Finance Corporation) that Cox Automotive is the cause of ongoing deficiencies in data integrations between Dealertrack's Sales and F&I solutions and CDK's DMS. The true reason for such deficiencies, as revealed by CDK's own presentation to its executives, is that CDK continues to restrict Dealertrack's access to certain dealer data for the very purpose of perpetuating such deficiencies, thereby creating an advantage for CDK's competing solution.

**ANSWER**:  Paragraph 29 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 29 of the Complaint.

30.     Cox Automotive brings this action to recover the damages it has suffered at the hands of CDK's and Reynolds' anticompetitive conduct – as coconspirators, CDK is equally liable for the damage caused by Reynolds – and to restore choice to dealers and vendors over data integration. Cox Automotive also brings this action to recover damages for separate unlawful conduct aimed directly at Cox Automotive. As described in detail herein, CDK's and Reynolds' horizontal conspiracies to eliminate competition in the data integration market and their market division agreement (which is a covenant not to compete) are per se violations of Section 1 of the Sherman Act, *see infra* Count I; CDK's exclusive dealing arrangements with vendors and dealers are patently anticompetitive and unlawful under Section 1 of the Sherman Act, *see infra* Count II; the illegal tying of CDK's integration service to its DMS service is unlawful under Section 1 of the Sherman Act, *see infra* Count III; CDK's monopolization of its Dealer Data Integration aftermarket is unlawful under Section 2 of the Sherman Act, *see infra* Count IV; the same conduct that violates the Sherman Act also violates state antitrust and unfair competition laws, *see infra* Counts V and VI; the anticompetitive restrictions that CDK places on competing products and services with respect to access to certain data elements, usage rights, and bi-directional integration – its "title-the-table" strategy – independently violates state unfair competition laws, *see infra* Count VII; CDK's representations with respect to Cox Automotive's pricing under the 3PA program were false and intended to fraudulently induce, and did in fact induce, Cox Automotive to enter into the 3PA Agreement, *see infra* Count VIII; CDK's grant of free data integration to Reynolds without providing the same free access to Cox Automotive is a breach of CDK's contractual MFN clause with Cox Automotive, *see infra* Count IX; CDK's secret price discounts to Reynolds are illegal under California law, *see infra* Count X; and CDK's knowingly false statements to Cox Automotive's business partners were defamatory, *see infra* Count XI.

**ANSWER**: CDK admits that Plaintiffs seek to recover damages and injunctive relief.  The remaining allegations in Paragraph 30 of the Complaint state legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that any of its conduct violated any applicable law and denies that Plaintiffs or any other individual or entity have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 30 of the Complaint.

## PARTIES

31.     Plaintiff Cox Automotive is a private Delaware corporation with its corporate headquarters and principal place of business at 6205 Peachtree Dunwoody Road, Atlanta, Georgia 30328. Cox Automotive and its subsidiaries provide a comprehensive set of solutions for dealers, manufacturers, lenders and other businesses in the automotive industry, including third-party products and services to dealers throughout the United States that assist dealers in conducting their business. Cox Automotive has approximately 34,000 employees worldwide. It serves virtually all of the 17,000 franchised new car dealers in the United States.

**ANSWER**:     On information and belief, CDK admits that Plaintiff Cox Automotive is a

privately held Delaware corporation with offices at the address listed in paragraph 31 of the

Complaint.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the

remaining allegations in paragraph 31 of the Complaint and on that basis denies them.

32.     Plaintiff Autotrader.com, Inc. ("Autotrader") is a Delaware corporation with its corporate headquarters and principal place of business at 3003 Summit Boulevard, Suite 200, Atlanta, Georgia 30319. It is a subsidiary of Cox Automotive. Autotrader is a website where dealers can list new and used cars for sale and lease. Autotrader drives more buyers to dealerships than any other third-party automotive website.

**ANSWER:**     On information and belief, CDK admits that Plaintiff Autotrader.com is a

Delaware corporation with offices at the address listed in paragraph 32 of the Complaint and a

subsidiary of Plaintiff Cox Automotive.  CDK lacks sufficient knowledge or information to form

a belief as to the truth of the remaining allegations in paragraph 32 of the Complaint and on that

basis denies them.

33.     Plaintiff Dealer Dot Com, Inc. ("Dealer.com") is a Delaware corporation with its corporate headquarters and principal place of business at 1 Howard Street, Burlington, Vermont 05401. Dealer.com is a subsidiary of Cox Automotive. Dealer.com provides hosting for dealer websites and an integrated digital marketing platform for its dealer clients' digital marketing campaigns.

**ANSWER:**     On information and belief, CDK admits that Plaintiff Dealer.com is a Delaware

corporation with offices at the address listed in paragraph 33 of the Complaint and a subsidiary

of Plaintiff Cox Automotive.  CDK lacks sufficient knowledge or information to form a belief as

PUBLIC VERSION

to the truth of the remaining allegations in paragraph 33 of the Complaint and on that basis denies them.

34.     Plaintiff Dealertrack, Inc. ("Dealertrack") is a Delaware corporation with its corporate headquarters and principal place of business at 3400 New Hyde Park Road, North Hills, New York 11042. Dealertrack is a subsidiary of Cox Automotive. Among other things, Dealertrack provides integrated software products and services designed to help dealerships provide a better buying, borrowing, leasing, and service experience, including a portal and related products and services that connect dealer clients to lending institutions to enable and facilitate car and truck sale and lease transactions.

**ANSWER:**     On information and belief, CDK admits that Plaintiff Dealertrack is a Delaware corporation with offices at the address listed in paragraph 34 of the Complaint and a subsidiary of Plaintiff Cox Automotive.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 34 of the Complaint and on that basis denies them.

35.     Plaintiff HomeNet, Inc. ("HomeNet") is a Delaware corporation with its corporate headquarters and principal place of business at 224 Valley Creek Boulevard, Suite 400, Exton, Pennsylvania 19341. HomeNet is a subsidiary of Cox Automotive. HomeNet allows car dealers to syndicate their car and truck inventory automatically through online services such as Autotrader, CarGurus, Craigslist, eBay Motors, and Kelley Blue Book.

**ANSWER:**     On information and belief, CDK admits that Plaintiff HomeNet is a Delaware corporation with offices at the address listed in paragraph 35 of the Complaint and a subsidiary of Plaintiff Cox Automotive.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 35 of the Complaint and on that basis denies them.

36.     Plaintiff Kelley Blue Book Co., Inc. ("Kelley Blue Book") is a Delaware corporation with its corporate headquarters and principal place of business at 195 Technology Drive, Irvine, California 92618. It is a subsidiary of Cox Automotive. Kelley Blue Book provides value estimates, as well as ratings and reviews, for cars and trucks, facilitates used car trade-ins, and enables the buying and selling of new and used motor vehicles.

**ANSWER:**     On information and belief, CDK admits that Plaintiff Kelley Blue Book is a Delaware corporation with offices at the address listed in paragraph 36 of the Complaint and a

subsidiary of Plaintiff Cox Automotive. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 36 of the Complaint and on that basis denies them.

37. Plaintiff vAuto, Inc. ("vAuto") is a Delaware corporation with its corporate headquarters and principal place of business at 1901 South Meyers, Suite 700, Oakbrook Terrace, Illinois 60181. vAuto is a subsidiary of Cox Automotive. vAuto offers vehicle inventory management and pricing software solutions to dealers. It gives dealers real-time, local market supply-and-demand data to enable its dealer clients to make better acquisition, appraisal, pricing, and merchandising decisions.

**ANSWER:** On information and belief, CDK admits that Plaintiff vAuto is a Delaware corporation with offices at the address listed in paragraph 37 of the Complaint and a subsidiary of Plaintiff Cox Automotive. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 37 of the Complaint and on that basis denies them.

38. Plaintiff VinSolutions, Inc. ("VinSolutions") is a Delaware corporation with its corporate headquarters and principal place of business at 5700 Broadmoor, Mission, Kansas 66202. VinSolutions is a subsidiary of Cox Automotive. VinSolutions provides customer relationship management software and services for car and truck dealers, providing its dealer clients with a single view of their customers across the dealership, to maintain customer relationships and enable more repeat sales.

**ANSWER:** On information and belief, CDK admits that Plaintiff VinSolutions is a Delaware corporation with offices at the address listed in paragraph 38 of the Complaint and a subsidiary of Plaintiff Cox Automotive. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 38 of the Complaint and on that basis denies them.

39. Plaintiff Xtime, Inc. ("Xtime") is a Delaware corporation with its corporate headquarters and principal place of business at 1400 Bridge Parkway, Suite 200, Redwood City, California 94065. Xtime is a subsidiary of Cox Automotive. Xtime's suite of products and services are designed to provide an outstanding ownership experience for its dealer clients' customers by managing the entire service experience, including marketing, scheduling, service lane check-in, digital multi-point inspections with interactive customer approvals, reporting dashboards to identify service trends, and performance management. Xtime has approximately

8,000 dealer clients and 29 OEM partners, and it processes 44 million service appointments per year.

**ANSWER:**  On information and belief, CDK admits that Plaintiff Xtime is a Delaware corporation with offices at the address listed in paragraph 39 of the Complaint and a subsidiary of Plaintiff Cox Automotive.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 39 of the Complaint and on that basis denies them.

40.     Defendant CDK is a publicly traded Delaware corporation with its corporate headquarters and principal place of business at 1950 Hassell Road, Hoffman Estates, Illinois 60169. CDK provides DMS software and services to automobile dealerships throughout the United States and has more than $2 billion in annual revenue. In 2014, CDK was spun off from ADP, LLC, and is now an independent, publicly traded company. Prior to the spin-off, CDK was referred to as ADP Dealer Services (collectively, referred to herein as "CDK"). In addition to its DMS platform, CDK also provides data integration services, and offers products and services that compete directly with Cox Automotive's solutions, including products and services that compete with solutions offered by Plaintiffs Dealer.com, Dealertrack, HomeNet, VinSolutions, and Xtime.

**ANSWER**:  CDK admits that its parent company, CDK Global, Inc., is a publicly traded company organized under the laws of Delaware.  CDK further admits that its corporate headquarters is in Hoffman Estates, Illinois, at the address listed in paragraph 40 of the Complaint.  CDK further admits that it provides certain services to Dealers, including licensing DMS software, in the United States and that its parent company reports its annual revenue in public filings with the Securities and Exchange Commission, during the relevant period.  CDK states that the reports speak for themselves.  CDK admits that it was spun off from Automatic Data Processing, Inc. ("ADP") in 2014.  CDK further admits that it provides certain data integration services to certain car manufacturers.  CDK denies the remaining allegations in paragraph 40 of the Complaint.

41.     Non-party Reynolds is an Ohio corporation with its corporate headquarters and principal place of business at One Reynolds Way, Kettering, Ohio 45430. Because Reynolds is CDK's co-conspirator, CDK is jointly and severally liable for all harm caused by Reynolds in

furtherance of the conspiracy. Like CDK, Reynolds provides DMS software and services to automobile dealerships throughout the United States. Also like CDK, Reynolds provides data integration services, as well as products and services that compete directly with Cox Automotive's solutions, including products and services that compete with solutions offered by Plaintiffs Dealertrack, VinSolutions, and Xtime. Reynolds was acquired by Bob Brockman in 2006 in a leveraged buyout and taken private.

**ANSWER**:  Upon information and belief, CDK admits that Reynolds is an Ohio corporation with a business location at the address identified in the first sentence of paragraph 41 of the Complaint.  CDK further admits, upon information and belief, that Reynolds provides certain services to Dealers, including with respect to DMSs and related services.  Upon information and belief, CDK admits that prior to 2006 Reynolds was a publicly traded company and that in or about 2006, it was acquired by Bob Brockman.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 41 of the Complaint on that basis denies them.

## JURISDICTION AND VENUE

42.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; and state law.

**ANSWER**:  Paragraph 42 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that Plaintiffs purport to bring this action pursuant to federal statutes cited in paragraph 42 of the Complaint as well as certain state's laws.  CDK denies, however, that it has violated any applicable law or harmed competition, and denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 42 of the Complaint.

43.     This Court has subject matter jurisdiction over the federal antitrust claims pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26. This court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because they are so closely related to the federal claims that they constitute part of the same constitutional case.

**ANSWER**:    Paragraph 43 states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that this Court has jurisdiction over the claims asserted in Plaintiffs' Complaint.

44.    This Court has personal jurisdiction over Defendant CDK pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c), and (d) because CDK was served with process in this district. Furthermore, CDK has engaged in the unlawful acts described in this Complaint with the foreseeable or intended effects of causing substantial economic harm to Cox Automotive in Wisconsin, and CDK has purposely availed itself of the privilege of doing business in Wisconsin through the widespread promotion, sale, and distribution of their products and services in the State. Many dealers in Wisconsin use CDK's DMS and/or its applications.

**ANSWER**:  Paragraph 44 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that it markets and sells certain products and services in Wisconsin, including to Dealers. CDK lacks sufficient knowledge or information to form a belief as to the truth of remaining allegations in paragraph 44 that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 44 of the Complaint.

45.    Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d). Defendant CDK is registered to do business, transacted business, was found, and had agents in this District; a substantial part of the events giving rise to Cox Automotive's claims occurred in this District; a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District. Cox Automotive serves many dealers in Wisconsin that use a CDK or Reynolds DMS.

**ANSWER**:  Paragraph 45 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that it markets and sells certain products and services in Wisconsin.  CDK admits that it is registered to do business in Wisconsin and has a registered agent to accept service of process in Wisconsin.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in

paragraph 45 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 45 of the Complaint.

46.     CDK's unlawful conduct substantially affected interstate commerce by harming competition, increasing prices and quality and limiting output, to the detriment of Cox Automotive, dealers, and other vendors nationwide.

**ANSWER**:  Paragraph 46 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that it sells certain products and services in interstate commerce.  CDK denies, however, that it has violated any applicable law or harmed competition, and denies that Plaintiffs or any other individual or entity have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 46 of the Complaint.

## FACTUAL ALLEGATIONS

### I.     The Relevant Product Markets

47.     The relevant product markets for Cox Automotive's claims are: (1) the DMS market in the United States; (2) the dealer data integration market in the United States; and (3) the CDK Dealer Data Integration Single-Brand Aftermarket.

**ANSWER**:  Paragraph 47 of the Complaint states legal conclusions to which no response is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 47 of the Complaint.

### A.     The DMS Market

48.     The DMS is enterprise software used by retail automotive dealerships to manage their business, including sales, financing, inventory management, repairs and service, accounting, payroll, human resources, and marketing.

**ANSWER**:  CDK admits that most new vehicle franchised Dealers and a number of used car Dealers, as well as dealers of other motorized vehicles, use DMS enterprise software to manage various aspects of their businessess, including with respect to sales, financing, inventory

management, repair and service, accounting, payroll, human resources, and/or marketing. CDK

denies the remaining allegations in paragraph 48 of the Complaint.

49.     The DMS also includes a database used to store certain dealer data, including
vehicle and parts inventory, customer name and contact information, completed and pending
sales, sales and F&I information, service and repair information, and more.

**ANSWER**:  CDK admits that a number of Dealers use DMSs to assist in the operation of their

dealerships and that they input certain data into the DMS as part of those operations, including a

number of the categories listed in paragraph 49 of the Complaint. CDK denies the remaining

allegations in paragraph 49 of the Complaint.

50.     Over time, the DMS became the center of a dealer's retail management platform.
Virtually every franchised new car dealership in the United States now uses a DMS. And while
dealers generate much of their data outside of the DMS in separate software solutions, as a
practical matter, a substantial portion of dealer data is stored on the DMS, even though there is
no technical reason why that must be the case.

**ANSWER**:     CDK admits that most new vehicle franchised Dealers and a number of used car

Dealers, as well as dealers of other motorized vehicles, use DMS enterprise software to manage

and operate certain aspects of their dealerships. CDK admits that Dealers enter data into the

DMS, but denies that all data residing or stored on the DMS belongs to Dealers. CDK lacks

sufficient knowledge or information to form a belief as to the truth of the allegations in

paragraph 50 of the Complaint that relate to individuals or entities other than CDK and on that

basis denies them and on that basis denies them. CDK denies the remaining allegations in

paragraph 50 of the Complaint.

51.     The DMS market is comprised of those providers that market and sell DMS
services to franchised new car dealers in the United States. There is public and industry
recognition of the DMS market.

**ANSWER**:  The allegations in paragraph 51 of the Complaint state legal conclusions to which

no response is required. To the extent that an answer may be required, CDK states that the

allegations in paragraph 51 of the Complaint are so vague and ambiguous as to the definition of

the term "DMS market" that CDK cannot respond to those allegations and on that basis denies them. CDK denies the remaining allegations in paragraph 51 of the Complaint.

### 1. CDK and Reynolds Dominate the DMS Market

52. Defendant CDK and its co-conspirator Reynolds dominate the DMS market. About 45 percent of dealer "rooftops" (i.e., franchised stores located at a physical location) use CDK's DMS, and about 30 percent use Reynolds' DMS. When measured using the number of vehicles sold from franchised dealers, which is a more relevant metric, CDK and Reynolds control more than 90 percent of the DMS Market. Industry publications have described CDK and Reynolds as "the Big 2," "the Duopoly," "the two 400-pound gorillas," and "the two giants of the DMS market."

**ANSWER**: Paragraph 52 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 52 of the Complaint that relate to CDK's purported collective share of the "DMS market" and/or are directed toward non-party Reynolds, and on that basis denies them. CDK further states that the allegations in paragraph 52 of the Complaint are so vague and ambiguous as to the definition of the term "DMS market" that CDK cannot respond to those allegations and on that basis denies them. Plaintiffs have not identified the sources of the quotations that appear in the last sentence of paragraph 52 of the Complaint and thus CDK lacks sufficient knowledge or information to form a belief as to the accuracy of those quotations. CDK denies the remaining allegations in paragraph 52 of the Complaint.

53. On May 24, 2017, CDK announced an agreement – pending regulatory approval – to buy the DMS provider Auto/Mate, Inc., which has an additional eight percent of the DMS market (as measured by dealer rooftops). If that purchase is approved, more than half of dealer rooftops would use a CDK DMS.

**ANSWER**: CDK admits that on or about May 24, 2017 it announced a planned acquisition of Auto/Mate Dealership Systems and that the planned acquisition was subsequently terminated on or about March 20, 2018. CDK lacks sufficient knowledge or information to form a belief as to

the truth of the allegations in paragraph 53 of the Complaint that relate to Auto/Mate's purported

share of the "DMS market" and on that basis denies them. CDK further states that the

allegations in paragraph 53 of the Complaint are so vague and ambiguous as to the definition of

the term "DMS market" that CDK cannot respond to those allegations and on that basis denies

them. CDK denies the remaining allegations in paragraph 53 of the Complaint.

54. Apart from CDK and Reynolds, the DMS market is diffuse, with an array of providers dividing up the remaining market share. Cox Automotive owns and operates the third largest DMS provider. Cox Automotive's DMS product is known as Dealertrack DMS, which is distinct from the Dealertrack Sales and F&I products and services that are the subject of this lawsuit. The remaining DMS providers are generally small, occupy a particular niche, and serve the country's smaller car dealerships.

**ANSWER**: Paragraph 54 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK admits that there are an array of

other DMS providers besides CDK and Reynolds, including Cox Automotive's DMS product,

Dealertrack DMS. CDK further states that the allegations in paragraph 54 of the Complaint are

so vague and ambiguous as to the definition of the term "DMS market" that CDK cannot respond

to those allegations and on that basis denies them. CDK lacks sufficient knowledge or

information to form a belief as to the truth of the allegations in paragraph 54 of the Complaint as

they relate to Plaintiffs and other DMS providers and on that basis denies them. CDK denies the

remaining allegations in paragraph 54 of the Complaint.

55. CDK's and Reynolds' DMS businesses are very lucrative. A single, small dealership pays up to $150,000 per year for the DMS software license and services. Mid-size dealership groups (5 to 10 stores) pay $1,500,000 or more per year, and large dealership groups can easily pay more than $5,000,000 per year. CDK's and Reynolds' profit margins on their DMSs are estimated to exceed 40 percent.

**ANSWER**: CDK admits that Dealer franchises' costs vary and that some incur less than

$150,000 in costs per year for licensed CDK DMSs and related services, while others incur costs

totaling over $5,000,000 per year, depending on a variety of factors. CDK denies that its profit

margins exceed 40 percent. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 55 of the Complaint as they relate to Reynolds and on that basis denies them. CDK denies the remaining allegations in paragraph 55 of the Complaint.

### 2.    The CDK and Reynolds Duopoly Has Proven Durable

56.    Significant barriers to entry protect CDK's and Reynolds' dominant positions in the DMS market. First, CDK and Reynolds have locked in dealers to lengthy contracts. CDK and Reynolds sell their respective DMS software and services pursuant to long-term contracts that are typically between five and seven years in length. These contracts often include automatic extensions if new services are ordered in the middle of the contract.

**ANSWER**:    Paragraph 56 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that its DMS contracts with Dealers are typically between five and seven years in length, and denies that Dealers are "locked in" to such contracts. CDK admits that a number of its licensing contracts contain provisions pertaining to contract renewal and extension. CDK states that the contracts speak for themselves. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 56 of the Complaint as they relate to Reynolds and on that basis denies them. CDK denies the remaining allegations in paragraph 56 of the Complaint.

57.    Second, switching costs are high. Switching DMS providers presents significant logistical challenges and is highly disruptive to business operations. It can take a dealership over a year of preparation, staff training, and testing before a new DMS can be put into operation, all while the dealership is trying to sell and service cars. The financial costs in terms of training and implementation are significant.

**ANSWER**:    CDK admits that there are switching costs when changing DMS providers but lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 57 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 57 of the Complaint.

58.    One industry executive stated that changing DMS providers "is akin to a heart transplant." David Barkholz, *DMS Dilemma: Why It's So Hard to Switch – Upstarts Battle Big 2, But Dealers Weigh Cost vs. Comfort Zone*, Automotive News (May 10, 2010). CDK's CEO

recently acknowledged that "switching DMS providers can be very difficult. It [is quite a] process [to] change and takes time, which is part of the reason that many dealers are hesitant to switch." Thomson Reuters StreetEvents, *Edited Transcript: CDK – Q1 2017 CDK Global, Inc. Earnings Conference Call*, at 3 (Nov. 2, 2016) (statement by CDK Global CEO Brian MacDonald). One large dealer publicly referred to changing DMS providers as "mission impossible." David Barkholz, *Inside 'Mission Impossible': A DMS Change – How Store Succeeded in Sign-or-Switch Situation*, Automotive News (January 13, 2014). Both Reynolds and CDK have publicly touted that their market positions are secure because of how difficult it is to switch DMS providers. As a result of the high-switching costs, the *average* DMS tenure is over twenty years.

**ANSWER**:  CDK admits that the text quoted in first and fourth sentences of paragraph 58 of the Complaint appeared in two issues of Automotive News published in 2010 (over eight years ago) and 2014 (over four years ago).  CDK further admits that the text quoted in the second and third sentences of paragraph 58 of the Complaint is attributed to CDK's CEO in the source identified in paragraph 58.  CDK denies that the "average DMS client tenure" is over 20 years and lacks sufficient knowledge or information to form a belief as to the truth of the allegation in paragraph 58 of the Complaint that CDK has ever publicly made such a statement and on that basis denies said allegation.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 58 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 58 of the Complaint.

59.     CDK has recently forced many of its dealers to extend their contracts by years by threatening to terminate their DMS service. Many of these dealers were on month-to-month contracts, and had been for a long time. CDK abruptly – and without prior notice – informed these dealers that their DMS services would terminate in less than 60 days unless the dealers entered into years-long contracts. Dealers generally had no choice but to sign the lengthy extensions given the impossibility of switching DMS providers in such a short amount of time.

**ANSWER**:  CDK admits that certain of its contracts with Dealers states that such contracts continue month-to-month upon expiration of the initial term, which is terminable upon 30 days' written notice by either party.  CDK further admits that certain Dealer customers are or have been receiving DMS services on a month-to-month basis, and that CDK at one point notified

PUBLIC VERSION

some of those Dealers of its intent to terminate the parties' month-to-month arrangement upon 60 days' written notice while extending an offer to those Dealers to enter into a new term contract. CDK denies that any such Dealers had no choice but to extend their contract with CDK. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 59 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 59 of the Complaint.

60.    The barriers to entry are so high that even Microsoft could not compete in this market. When Microsoft tried to enter the DMS market in 2006, Reynolds' CEO Bob Brockman was not concerned, saying "there's not a chance" that Microsoft could succeed. Indeed, Microsoft failed, prompting a company executive to publicly concede, "We kind of got ahead of ourselves" in trying to take on CDK and Reynolds. David Barkholz, *Dealers Get New Management System Option – Dominion-Microsoft Product Battles Giants ADP, Reynolds*, Automotive News (Dec. 2, 2012).

**ANSWER**:  Paragraph 60 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that Microsoft introduced a competing DMS software product in 2006 and that the text quoted in the third sentence of paragraph 60 of the Complaint appears in the over 6-year-old Automotive News article cited in paragraph 60.  CDK denies that Microsoft's DMS offering "failed" or that Microsoft cannot compete with CDK or Reynolds insofar as Microsoft recently formed a technology partnership with global DMS provider Incadea, a subsidiary of  Cox Automotive, which serves more than 4,000 dealerships in 100 countries.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 60 of the Complaint that relate to individuals or entities other than CDK, including the quotation attributed to Reynolds CEO Bob Brockman, and on that basis denies them.  CDK denies the remaining allegations in paragraph 60 of the Complaint.

### B. The Dealer Data Integration Market

61. Dealers use software products and services from Cox Automotive (and many other vendors) to perform important sales, servicing, marketing, and operational functions. These solutions supplement and oftentimes replace functions provided by the DMS. Cox Automotive's products and services are used for, among other things, dealer website hosting, F&I, customer relationship management, digital marketing and lead generation, inventory management and valuation, and marketing, scheduling and performing service and repair appointments. A dealer may use 10 to 15 standalone products and services, and some use many more.

**ANSWER**: CDK admits that Dealers contract with various vendors for software solutions in connection with the operation of their dealerships, including with respect to sales, servicing, marketing, and operational functions, and a number of the tasks identified in paragraph 61 of the Complaint. CDK further admits that those solutions can be used in addition to or, in some cases, as a replacement for, certain functionalities of a DMS. CDK denies that the core functionalities of DMS, which are designed to work seamlessly as part of the DMS, can be displaced by third party software. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 61 of the Complaint that relate to the number of third-party software solutions used by a typical Dealer and on that basis denies them. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 61 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 61 of the Complaint.

62. To function, these solutions need integration with dealer data stored on the DMS. For example, Cox Automotive's Dealertrack's Sales and F&I solutions connect lenders to consumers purchasing or leasing cars and trucks, which requires access to, among other things, financing or leasing information, as applicable, about the buyer and vehicle. VinSolutions is a customer relationship management tool, which requires access to, among other things, customer information, vehicle information and history, and inventory data. Xtime provides a customer relationship management tool for a dealer's service department, which requires access to, among other things, vehicle service and repair history and customer information. vAuto offers dealer clients specialized inventory management and pricing software solutions, which requires access to, among other things, inventory data.

PUBLIC VERSION

**ANSWER**:  CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 62 of the Complaint and on that basis denies them.

63.     The data needs of vendor solutions vary. Some need only periodic data extraction. However, it has become increasingly common for vendor solutions to need real-time bi-directional access to dealer data on the DMS – i.e., they need to read data from the DMS in near-real-time, as well as push data back into the DMS near-real-time in the many instances where that data is first generated within the vendor solution (i.e., outside of the DMS). For example, Dealertrack's Sales and F&I electronic contracting solution is a point-of-sale software product that needs real-time data for a seamless consumer and lender experience. As another example, Xtime needs real-time, updated data on scheduled service and repair orders and the inventory of parts available for those appointments.

**ANSWER**:  CDK admits that its 3PA program offers managed, bi-directional integration with

the CDK DMS and that a number of 3PA program participants have real-time access to CDK's

DMS.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the

allegations in paragraph 63 of the Complaint that relate to individuals or entities other than CDK

and on that basis denies them.  CDK denies the remaining allegations in paragraph 63 of the

Complaint.

64.     As described in more detail below, even though certain dealer data is stored on the DMS, that data belongs to the dealers, and dealers have the right to provide that data to third parties and to establish use and sharing rights for the data.

**ANSWER**:  CDK admits that Dealers enter certain data into the DMS, but denies that all data

residing or stored on the DMS belongs to Dealers.  CDK denies the remaining allegations in

paragraph 64 of the Complaint.

65.     The Dealer Data Integration Market consists of services that provide access to dealer data on the DMS, including CDK's and Reynolds' own in-house data integration services. Data integrators may also provide value-enhancing services, such as putting data from different DMS in a uniform format, data hygiene (i.e., error correction), and granular control by dealers over which vendors receive which data.

**ANSWER**:  CDK admits that certain data service providers, including the CDK businesses

formerly known as DMI and IntegraLink, offer data "cleansing" services similar to those

described in paragraph 65 of the Complaint.  CDK lacks sufficient knowledge or information to

form a belief as to the truth of the allegations in paragraph 65 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 65 of the Complaint.

66.     Before a data integrator can access dealer data on the DMS, the data integrator must receive specific authorization from the dealer. To grant such access, dealers enter into contracts with data integrators that authorize the data integrator to access the dealer's data.

**ANSWER**: CDK denies that dealership authorization is sufficient to legally authorize a third party to access CDK's DMS. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 66 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 66 of the Complaint.

67.     There is public and industry recognition of the existence of a dealer data integration market distinct from the DMS market. CDK and Reynolds have separate business units that provide data integration and DMS services. In its 2015 10-K, CDK described its data integration services as "a stand-alone product" separate from "the core Dealer Management System." CDK, Annual Report (Form 10-K) (Aug. 13, 2015), at 4. The Dealer Data Integration Market also has its own supply and demand curves. The usage of integrated vendor solutions – and hence the amount of data integration services – has fallen relative to what it would be in a competitive market in response to supra-competitive prices charged for data integration services by CDK and Reynolds because a significant portion of those costs are passed on to dealers. There are also no reasonable substitutes for services provided by data integrators, demonstrated most clearly by the fact that CDK and Reynolds, after closing their systems, have been able to impose massive price increases for their data integration services.

**ANSWER**: CDK admits that the excerpted, quoted statements in the second sentence of paragraph 67 of the Complaint appear in CDK's 2015 Form 10-K Annual Report but denies that such statements refer specifically to CDK's data integration services. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 67 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 67 of the Complaint.

68.     Geographically, the Dealer Data Integration Market covers the United States.

**ANSWER**: Paragraph 68 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 68 of the Complaint.

### 1. The Dealer Data in the DMS Belongs to the Dealers

69. Even though certain dealer data is stored on the DMS, that data still belongs to the dealers. The dealers therefore should decide who to authorize to access their data. CDK and Reynolds have repeatedly admitted this fundamental fact in public statements, on their websites, and in their DMS contracts with dealers.

**ANSWER**: CDK admits that Dealers may input certain data into the DMS, but denies that all data residing or stored on the DMS belongs to Dealers. CDK denies the allegations in paragraph 69 of the Complaint.

70. Tom Schwartz, Reynolds' chief spokesperson, publicly declared: "The data belongs to the dealers. We all agree on that." David Barkholz, *Dealers Decry Reynolds Crackdown*, Automotive News (Nov. 21, 2011). On its website, Reynolds represents to dealers: "Your Data, Your Way. You own your data. Reynolds recognizes you need to share that data outside your dealership."

**ANSWER**: CDK admits that the material quoted in the first sentence of paragraph 70 of the Complaint appears in the publication cited in the paragraph. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 70 of the Complaint and on that basis denies them.

71. Howard Gardner, CDK's Vice President for Data Strategy, has stated that CDK "has always understood that dealerships own their data and enjoy having choices on how best to share and utilize that data with others." CDK's website likewise states: "[D]ealerships own their data."

**ANSWER**: CDK admits that the text quoted in the first sentence of paragraph 71 of the Complaint is attributed to CDK employee Howard Gardner and appeared in the July 13, 2013 press release issued by ADP Dealer Services, Inc., CDK's predecessor. CDK states that the press release goes on to say that CDK's 3PA program is intended to "allow[ ] dealers to do business with the third-party vendors of their choice without sacrificing security." CDK further

admits that the text quoted in the second sentence of paragraph 71 appeared in material published on CDK's website in 2014, which in its entirety reads: "CDK has always understood that dealerships own their data, so we offer an open yet secure Dealer Management System (DMS) through the CDK Third Party Access Program. We give you the flexibility to provide DMS access to third parties without sacrificing security." CDK denies the remaining allegations in paragraph 71 of the Complaint.

72. The Reynolds and CDK DMS contracts "spell out which party owns the data and there is generally little dispute: the data belongs to the dealer. This makes sense; after all, it's the dealership's customers, inventory, and transactional data that the dealership is putting into the DMS system." DrivingSalesNews, *The Hidden Data Tax That Dealers Don't Know They Are Paying, Driving Sales* (Oct. 17, 2013); *see* Reynolds Addenda Specific Terms and Conditions, at 3 ("███████████████████████████████████████████████████████████████████████ ██████████████████████████████."); CDK Master Services Agreement § 7.A ("███ ██████████████████████████████████████████████████ ███████████████████████").

**ANSWER**: CDK admits that the text quoted in the last sentence of paragraph 72 of the Complaint—"CDK Master Services Agreement § 7.A"—appears in a version of CDK's standard Master Services Agreement ("MSA") with Dealers in place during the relevant time period. CDK states that the contract speaks for itself. CDK admits that the material quoted in the first sentence of paragraph 72 of the Complaint appears in the article identified in the paragraph. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 72 of the Complaint that relate to Reynolds and on that basis denies them. CDK denies the remaining allegations in paragraph 72 of the Complaint.

## 2. CDK Has Long Recognized that Dealers Have the Right to Control Access to, and Use of, Their Data

73. For many years, CDK publicly recognized the fundamental principle that dealers, as owners of their data, have the right to control access to and use of that data.

**ANSWER**:  CDK admits that Dealers have certain rights as to their own data but denies that dictating the terms of access to CDK's DMS, including third-party access, is one of them.  CDK denies the remaining allegations in paragraph 73 of the Complaint.

74.     CDK's standard DMS contract states a dealer's "employees and agents" may "have access" to the DMS. This language has existed since at least the 1990s. CDK's standard DMS contract therefore specifically permits dealers to grant their agents, including data integrators, access rights to the dealer's data stored on the DMS.

**ANSWER**:  CDK admits that the quoted language in the first sentence of paragraph 65 of the Complaint has appeared in a version of CDK's standard dealer Master Services Agreement in place during the relevant time period.  CDK denies that such language permits access to CDK's DMS by "data integrators," and further states that the contract speaks for itself.  CDK denies the remaining allegations in paragraph 74 of the Complaint.

75.     Consistent with this contractual language, CDK's top executives have repeatedly made public statements that dealers may grant data integrators rights to access their DMS. For example, Steve Anenen, CDK's longtime CEO, publicly stated that dealers have the right to grant third parties access to, and use of, their data. He told the industry publication *Automotive News*, "We're not going to prohibit that or get in the way of that." Ralph Kisiel, *ADP Provides Dealers 3 Options on Data Access*, Automotive News (Feb. 19, 2007). "I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it, when in fact it's really the data belonging to the dealer. As long as they grant permission, how would you ever go against that wish?" *Id.*

**ANSWER**:  CDK admits that Steve Anenen, CDK's former CEO, is identified as the source of the quotes that appear in paragraph 75 of the Complaint in an article that appeared in Automotive News approximately 11 years ago.  CDK denies that these statements reflect CDK's policies or the state of the industry more than a decade later.  CDK denies the remaining allegations in paragraph 75 of the Complaint.

76.     Matt Parsons, CDK's vice president of sales and marketing, similarly stated: "We're not going to limit the ability of a dealer to give an ID to someone else to, in essence, dial into their system. That is the dealer's right. We have no right to tell them they can't do that." Ralph Kisiel, *NADA Weigh Reynolds Data Security Debate*, Automotive News (Feb. 4, 2007). Kevin Henahan, CDK's senior vice president of product marketing, delivered the same message: "We don't tell the dealer, if someone wants access to their data, they have to come to [CDK] to

gain access to the data. It's ultimately the dealer's data. If he wants to give that data to somebody, for us to try to charge a toll doesn't seem like the right thing to do. So we're not going to go down this path." Ralph Kisiel, *Dealer Security Stirs Insecurity: Vendors Wary of Reynolds Plan for Computer Systems*, Automotive News (Dec. 4, 2006).

**ANSWER**: CDK admits that former CDK employees are identified as the sources of the quotes that appear in paragraph 76 of the Complaint from two articles that appeared in Automotive News in 2006 and 2007, some 11 and 12 years ago respectively. CDK denies that these statements reflect CDK's policies or the state of the industry more than a decade later. CDK denies the remaining allegations in paragraph 76 of the Complaint.

77. CDK was also one of the first members of Open Secure Access, Inc., which described itself as "a coalition of companies that believe dealers should control access to the data they own and determine how it is used." Open Secure Access, Inc. Press Release, *Open Secure Access Releases Automotive Retail Data Security Guidelines* (June 28, 2007). The group published a set of basic principles to guide the industry, including that "dealers should control who accesses their data," "[t]hird parties that have dealer permission to utilize a dealer's data should be able to access the data through their own efforts or through the services of an independent company," and "DMS companies should facilitate interaction with all data available to a DMS user by providing technologically advanced means to interact with (read and write) that data, either through a robust set of APIs, system functionality, or direct access to the database."

**ANSWER**: CDK admits that its predecessor parent company, ADP, was a member of Open Secure Access, Inc. CDK denies that it was ever a member of Open Secure Access, Inc., which formed in 2006 and is now defunct. CDK admits that the text quoted in the first sentence of paragraph 77 of the Complaint purports to be excerpted from a 2007 press release attributable to Open Secure Access, Inc. CDK further admits that the text quoted in the second sentence of paragraph 77 appears in website printout from 2007 attributable to Open Secure Access, Inc. CDK denies that the quoted text accurately reflects CDK's policies or the state of the industry today, more than a decade later. CDK denies the remaining allegations in paragraph 77 of the Complaint.

78. As CDK did in the past, Cox Automotive believes dealers are in the best position to evaluate and select secure methods for accessing and utilizing their data on the DMS. Cox

Automotive is intensely focused on data security and protecting the integrity of its DMS, but nonetheless offers three different ways that dealer-authorized third-party vendors may access and use dealer data on the Dealertrack DMS. First, with dealer authorization, third-parties may sign up for "Scheduled Jobs," which provide them with access to the dealer's data on a secure file transfer protocol ("SFTP") server. Second, with dealer authorization, third parties may integrate with dealer data through Dealertrack's Opentrack Application Programming Interface ("API"). Third, dealers may create login credentials for third parties that allow them to access the DMS just as the dealer's own employees would.

**ANSWER**:  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 78 of the Complaint that relate to Plaintiffs' operations of their businesses and on that basis denies them.  CDK denies the remaining allegations in paragraph 78 of the Complaint.

### 3. Participants in the Data Integration Market

79.     At one time, there were approximately a dozen competitors in the Dealer Data Integration market, such as SIS and SelectQu. CDK's and Reynolds' anticompetitive behavior has driven most of them out of the market. Today, there are only three remaining commercial data integrators serving CDK's and Reynolds' dealers: Reynolds through RCI, CDK through 3PA, and Authenticom. Every independent data integration provider other than Authenticom has been driven from the market by CDK's and Reynolds' anticompetitive conduct. Subject to its own litigation against CDK and Reynolds, Authenticom's ability to remain in business is in doubt. Therefore, vendors like Cox Automotive effectively only have one integration option with respect to dealer data on a CDK DMS – CDK itself. It is the same with Reynolds.

**ANSWER**:  CDK admits that it has taken steps, consistent both with its contracts with its Dealer customers and with CDK's need to provide a stable and secure DMS product to its Dealer customers, to block hostile third-party access to its DMS, including by Authenticom.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 79 of the Complaint that relate to individuals and entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 79 of the Complaint.

### a. CDK

80.     CDK provides integration with dealer data on the CDK DMS through an interface offered by CDK under its Third Party Access ("3PA") program. The 3PA program's managed interface is used exclusively for data integration with the CDK DMS.

**ANSWER**:  CDK admits that it provides secure, reliable integration to its proprietary DMS through its 3PA program, which is now known as the CDK Global Partner program, and that the 3PA program is exclusive to CDK.  CDK denies the remaining allegations in paragraph 80 of the Complaint.

81.    Prior to early 2015 – when CDK colluded with Reynolds to "close" its DMS – CDK offered several ways by which dealers could share their data. For example, CDK offered a "basic access" package where dealers supplied vendors with a user ID and password by which the vendors – or their data integrators – could access dealer data on CDK's DMS. Before 2015, CDK also allowed dealers to use other data integrators that competed with 3PA.

**ANSWER**:  CDK admits that at one time, notwithstanding provisions in its Dealer contracts that prohibit unauthorized third-party access, CDK did not actively enforce these contract rights; it did not seek to prevent Dealers from providing login credentials to third parties and did not actively take steps to block third parties from accessing the CDK DMS with these credentials. CDK further admits that the phrase "basic access" is attributed to CDK in a 2007 Automotive News article.  CDK denies the remaining allegations in paragraph 81 of the Complaint.

82.    CDK revamped the 3PA program in June 2015. Under the "refreshed" 3PA program, CDK declares that the 3PA program's managed interface is the only CDK-approved method of integrating with a CDK DMS. It now labels any other method for accessing data "unauthorized," and it disables login credentials that any dealer provides to a third party. Today, CDK disables login credentials used by third-party data integrators even though its own dealer contracts specifically permit access by "agents" of the dealers.

**ANSWER**:  CDK admits that it issued a press release concerning the 3PA program and the SecurityFirst initiative on June 22, 2015.  CDK further admits that the 3PA program, generally, is the only approved method for vendors to access and integrate with CDK's DMS.  CDK denies that the 3PA program is the only means by which vendors can obtain data necessary to provide software solutions to Dealers.  CDK further admits that one of the mechanisms it used in its efforts to block the unlawful extraction of data from its systems included disabling login

credentials used by hostile data extractors.  CDK denies the remaining allegations in paragraph 82 of the Complaint.

83.     CDK also owns two third-party data integrators, DMI and IntegraLink. DMI and IntegraLink obtain authorization from dealers to pull data from the dealer's DMS in the same way as other data integrators and provide that data to vendors.

**ANSWER**:  CDK admits that it owned two businesses formerly known as DMI and IntegraLink.  CDK denies the remaining allegations in paragraph 83 of the Complaint.

84.     At the time CDK acquired DMI in 2002, CDK stated: "As a result of its acquisition of Digital Motorworks, [CDK] now has the ability to extract, transform and standardize data from varied sources to client specifications." DMI claims to work with over 100 vendors and pull data from thousands of dealerships.

**ANSWER**:  CDK admits that ADP acquired DMI in 2002 and that the text quoted in paragraph 84 of the Complaint appeared in ADP's 2002 Form 10-K.  Upon a reasonable investigation, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegation in paragraph 84 regarding claims allegedly made by DMI and on that basis denies them. CDK denies the remaining allegations in paragraph 84 of the Complaint.

85.     CDK acquired IntegraLink in 2010. IntegraLink "specialize[s] in the collection of data from automotive retailers' dealership management systems." IntegraLink was founded in 1998 by Kevin Distelhorst, Reynolds' former director of online services and currently a vice president at CDK.

**ANSWER:**  CDK admits that ADP acquired IntegraLink in 2010 as part of an overall acquisition of the Cobalt Group.  CDK further admits that IntegraLink was founded by current CDK employee Kevin Distelhorst in 1998, who currently is a Vice President of the company. CDK admits that Mr. Distelhorst previously worked for Reynolds in the 1990s, more than 20 years ago.  CDK admits that the language quoted in paragraph 85 of the Complaint appears on IntegraLink's website.

86.     For over a decade, DMI and IntegraLink provided data integration services for CDK itself and a variety of other DMS platforms, including Reynolds. Cox Automotive had used these data integration services for some of its products and services. CDK, however, largely

discontinued these services once CDK and Reynolds entered into their February 2015 agreement not to compete, which is described below. Now, DMI and IntegraLink primarily provide data integration services for non-Reynolds and non-CDK DMSs. For these non-dominant DMSs, dealers provide CDK with login credentials or a secure connection for direct data transfers, such as an API. DMI and IntegraLink charge vendors only $25 to $50 per dealer per month.

**ANSWER**: CDK admits that DMI and IntegraLink no longer use dealer-issued login credentials

to access DMSs. CDK lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in paragraph 86 of the Complaint that relate to individuals or entities other than

CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 86 of

the Complaint.

### b. Reynolds

87. Reynolds provides integration with dealer data on the Reynolds DMS through its RCI service, which is Reynolds' equivalent to 3PA. Like the 3PA program, RCI is now the only means by which vendors are allowed to integrate with dealer data on Reynolds' DMS. Reynolds does not have a data integration service that works with other DMS platforms.

**ANSWER**: Upon information and belief, CDK admits that Reynolds offers a product/service

known as the "Reynolds Certified Interface" or "RCI" program. CDK lacks sufficient

knowledge or information to form a belief as to the truth of the remaining allegations in

paragraph 87 of the Complaint and on that basis denies them.

### c. Authenticom and Other Independent Integrators

88. Authenticom was founded in 2002, introduced its data integration service in 2004, and has served more than 15,000 dealers.

**ANSWER**: Upon information and belief, CDK admits that Authenticom was founded in or

about 2002. CDK lacks sufficient knowledge or information to form a belief as to the truth of

the remaining allegations in paragraph 88 of the Complaint and on that basis denies them.

89. Authenticom provides data integration services for all available DMS platforms – including Reynolds and CDK. Authenticom is the last significant independent data integration provider in the market.

**ANSWER**:  CDK admits that Authenticom purports to provide what it calls "data integration services," but denies that Authenticom integrates or has integrated with CDK's DMS.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 89 of the Complaint and on that basis denies them.

90.  Authenticom's standard pricing to pull data is $25 per dealer per month for the first data set, and then $50 per dealer per month for two or more. According to Authenticom, the average price a vendor pays to pull data is between $30 and $40 per dealer per month. For bi-directional integration, Authenticom has charged at most $75 per dealer per month, and that price included additional services like data hygiene.

**ANSWER**:  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 90 that relate to Authenticom and on that basis denies them.  CDK denies the remaining allegations in paragraph 90 of the Complaint.

91.  Apart from Authenticom, there were once many other independent integrators in the market – such as SIS, SelectQu, and others – before CDK and Reynolds drove them from the market.

**ANSWER**:  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 91 of the Complaint that relate to entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 91 of the Complaint.

### C.  Single-Brand Aftermarket for Dealer Data Integration on the CDK DMS

92.  The Dealer Data Integration Market for dealers using CDK's DMS is a brand-specific aftermarket. This market is derivative of the primary DMS market.

**ANSWER**:  Paragraph 92 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 92 of the Complaint.

93.  When dealers purchase the CDK DMS platform, they are locked in to that purchase because of high switching costs as described above.

**ANSWER**:  CDK denies the allegations in paragraph 93 of the Complaint.

94.     Dealers also lack information necessary to assess accurately the true cost of using CDK's DMS. CDK had historically been an "open" DMS where there were multiple competing data integration providers. Dealers could not know in advance that CDK would collude with Reynolds to "close" its DMS, thereby causing data integration prices to skyrocket, a portion of which is passed onto dealers.

**ANSWER**:     CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 94 of the Complaint that relate to entities other than CDK and on

that basis denies them.  CDK denies the remaining allegations in paragraph 94 of the Complaint.

95.     Because of these market imperfections, CDK is profitably charging supra-competitive prices for dealer data integration on its DMS. That CDK has been able to impose such large price increases for integration services on its DMS demonstrates that there are no reasonable substitutes for that service.

**ANSWER:**     CDK denies the allegations in paragraph 95 of the Complaint.

II.     **CDK's Anticompetitive Conduct**

   A.     **CDK's and Reynolds' Per Se Unlawful Horizontal Agreement To Eliminate Competition in the Data Integration Market**

      1.     **CDK's DMS Was "Open" Prior to 2015**

96.     Third-party access was a key point of competition between CDK and Reynolds. Prior to 2015, CDK publicly touted its open system as one of the competitive advantages of its DMS. As noted above, CDK repeatedly vowed (including in public statements by its CEO and top marketing officers) that it would not block third parties, including data integrators, from accessing dealer data on its DMS. CDK issued press releases stressing that it "believes in the fair competitive environment and does not use its leverage through supply of the dealer management system to reduce competition through the restriction of data access." By contrast, in 2009, Reynolds began selectively blocking third-party access, and increased its blocking efforts in 2013.

**ANSWER**:     CDK admits that the text quoted in the fourth sentence of paragraph 96 of the

Complaint appears in a February 2, 2007 press release issued by ADP Dealer Services, Inc.,

CDK's predecessor, which also states that CDK's 3PA program is focused on "providing levels

of security."  CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 96 of the Complaint that relate to entities other than CDK and on

that basis denies them.  CDK denies the remaining allegations in paragraph 96 of the Complaint.

97. CDK was successful in marketing its "open" DMS as a competitive advantage over the Reynolds DMS, and dealers purchased DMS services from CDK based, in part, on CDK's public representations and unchanged contractual language allowing for such access. As a result, CDK very slowly gained market share from Reynolds. Over a decade, Reynolds' DMS market share declined from about 40 to 30 percent, with most dealers leaving Reynolds for CDK.

**ANSWER**:     CDK admits that some Dealers have switched from Reynolds to CDK, and vice versa, prior to and during the relevant time period.   CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 97 of the Complaint that relate to entities other than CDK and on that basis denies them.   CDK denies the remaining allegations in paragraph 97 of the Complaint.

98. That competition between CDK and Reynolds abruptly halted in 2015, when CDK suddenly "closed" its system. Given CDK's unequivocal public statements (and the unchanged DMS contractual language allowing for "agent" access), CDK's abrupt about-face came as a complete surprise to Cox Automotive and to the market. Before 2015, Cox Automotive used 3PA, DMI, IntegraLink, SIS, and other commercial data integrators to access data for dealers using the CDK DMS. But after CDK elected to close its system, CDK made every effort to ensure that Cox Automotive and other vendors could only integrate with dealer data through CDK's 3PA program. CDK's about-face was the result of a horizontal agreement with Reynolds.

**ANSWER**:  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 98 that relate to individuals or entities other than CDK and on that basis denies them.   CDK denies the remaining allegations in paragraph 98 of the Complaint.

2.     **CDK "Closed" Its DMS In 2015 After Entering Into an Agreement with Reynolds To Eliminate Competition in the Data Integration Market**

a.     **CDK's Internal Documents Reveal Its Motivation for Colluding with Reynolds**

99. In 2014, CDK decided that it wanted to capture more value for itself by charging dramatically increased rates for integration with dealer data. Prior to entering into its unlawful agreements with Reynolds, CDK charged on average $70 per dealer per month for integration. Dealers could choose methods of access on a vendor-by-vendor basis, giving dealers flexibility in managing how their vendors obtained data and the costs that would be passed through to the dealers. But by closing its DMS, CDK saw an opportunity to impose huge price increases on its data integration services – increasing CDK's profits while also advantaging its competing products and services by raising the input costs and decreasing the integration available to its

rivals. Internal CDK presentations specifically recognized the "risk of vendors willing to move" to competing data integrators "instead of accept increase price" if those competing integrators were allowed to continue to provide their services. Dkt. No. 163, at 134:11-15.

**ANSWER**:    CDK admits that, beginning in 2015, CDK sought to standardize its integration pricing and that, as a result, some Vendors' integration fees increased.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 99 that relate to individuals or entities other than CDK and on that basis denies them.  CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction. CDK denies Plaintiffs' characterization of the documents introduced at that hearing and states that the hearing transcript speaks for itself.  CDK denies the remaining allegations in paragraph 99 of the Complaint.

100.    In addition, CDK believed that destroying competition for data integration and subsequently raising prices for data integration would help address the threat posed by standalone products and services to the primacy of the DMS to a dealer's operations. The growth of standalone solutions – especially sales and service customer relationship management applications – have threatened to reduce the importance of the DMS as dealers increasingly manage their operations through the standalone solutions outside of the DMS. Moreover, many of those solutions are where dealers generate much of their data in the first instance – for example, customer relationship management software products are often where dealers first capture and store information about their customers and sales transactions – and, as those products are able to host and manage a dealer's data, the DMS again loses its importance. By "closing" its DMS and raising the input costs for standalone solutions, CDK has sought to forestall the growth of those solutions, which is what would naturally occur absent the anticompetitive restraints.

**ANSWER**:    CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 100 that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 100 of the Complaint.

101.    Finally, CDK sought to advantage its own offerings that compete with products and services provided by other vendors like Cox Automotive. Destroying competition for data integration gave CDK control over competing service providers' access to, and ability to use and update, dealer data. CDK recognized that it could "tilt the table" in favor of its own applications by withholding needed data access, imposing use restrictions, and limiting write permissions for

certain data elements. CDK's actions have disrupted the workflow of competing solutions, and denied data access completely for some competing offerings.

**ANSWER**:  CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 101 that relate to individuals or entities other than CDK and on that

basis denies them.  CDK denies the remaining allegations in paragraph 101 of the Complaint.

102.    Internal CDK strategy documents reveal the specific purposes of CDK's conspiracy with Reynolds. According to CDK, "One of the 3PA Program's principles was to protect CDK products through a tilt-the-table approach." Dkt. No. 163, at 140:13-15. By "tilt the table," CDK meant it would advantage its products and services over those of third-party vendors by providing itself greater access and use rights to dealer data. CDK intended to keep an "advantage to CDK-layered applications" as compared to third-party solutions, providing additional "margin" that could be achieved through a "closed" system. *Id*. at 139:2-7.

**ANSWER**:  CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC,* No.

17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary

injunction.  CDK denies Plaintiffs' characterization of the documents introduced at that hearing

and states that the hearing transcript speaks for itself.  CDK denies the remaining allegations in

paragraph 102 of the Complaint.

103.    One example specifically referenced by CDK included "disrupt[ing] the workflow" of competing products and services – including Cox Automotive's Dealertrack's Sales and F&I electronic contracting solution and lender portal, which connect lenders with car buyers for retail vehicle purchasing and leasing. *Id*. at 141. CDK wrote internally that deals "only, pushed [in] pending, must be finalized in CDK F&I," with the goal being to "disrupt the workflow" of those competing solutions. *Id*. Another example includes disadvantaging products that compete with CDK's "service workflow application" (called Service Edge) by not allowing those competing offerings – such as Cox Automotive's Xtime suite of products and services – to create or modify "repair orders." There is no bona fide justification for that limitation other than to disadvantage competing solutions, and thereby to allow CDK to gain market share that it could not obtain on the merits of its products.

**ANSWER**:     CDK admits that Plaintiff Dealertrack's Sales and F&I applications currently

finalize leasing transactions in CDK's DMS.  CDK admits that it offers an application called

Service Edge, which is capable of creating and modifying repair orders in the CDK DMS using

proprietary CDK intellectual property.  CDK admits that Xtime's scheduling and inspection

products currently do not use certified integration to create or modify repair orders. CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC,* No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction. CDK denies Plaintiffs' characterization of the documents introduced at that hearing and states that the hearing transcript speaks for itself. CDK denies the remaining allegations in paragraph 103 of the Complaint.

104. In order to achieve these aims, as CDK's internal documents acknowledged, CDK needed Reynolds' cooperation. In an October 2014 presentation, CDK stated that it needed to enter into "***reciprocal agreements with DMS providers***," including specifically Reynolds, in order to eliminate competing data integrators. And Reynolds needed CDK to close CDK's system to reduce the number of dealers leaving Reynolds for CDK on the basis of CDK's previously "open" system. Moreover, with the two dominant DMS providers agreeing to block independent integrators, it would be impossible for competing data integrators to survive. CDK thus contemplated reaching an agreement with Reynolds to reduce, and ultimately eliminate, competition for integration to dealer data.

**<u>ANSWER</u>**: CDK admits that the excerpted text quoted in the second sentence of paragraph 104 of the Complaint appears in an October 2014 presentation prepared by CDK employees. CDK denies Plaintiffs' characterization of the document. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 104 of the Complaint that relate to non-party Reynolds and on that basis denies them. CDK denies the remaining allegations in paragraph 104 of the Complaint.

### b. CDK and Reynolds Agreed To Divide the Market and Block Independent Integrators

105. A few months later, in early 2015, CDK and Reynolds entered into agreements designed to eliminate competition in the provision of dealer data integration services. First, in February 2015, CDK and Reynolds entered into three written agreements in which they promised not to compete in providing data integration services and, in their capacity as providers of proprietary applications and services, not to use the services of independent integration service providers to obtain data from the other's DMS. Second, CDK and Reynolds further agreed that each would block independent integrators' access to their DMS customers' data, in an effort to drive independent integrators from the market entirely.

**ANSWER**:  CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds.  CDK denies Plaintiffs' characterization of the agreements.  CDK states that the contracts speak for themselves.  CDK denies the remaining allegations in paragraph 105 of the Complaint.

### i.     The Market Division Agreement and Data Integration Agreements

106.    **Market Division Agreement.**  Effective February 18, 2015, CDK and Reynolds entered into three written agreements. The centerpiece was a so-called "Data Exchange Agreement" – also referred to as a "wind-down" agreement – pursuant to which CDK agreed to wind down its data integration business on the Reynolds DMS, with Reynolds promising not to block CDK's access to the Reynolds system during the wind-down period, which might last as long as five years – until the year 2020. *See* Data Exchange Agreement § 1.4. During that period, Reynolds agreed that CDK could continue to extract dealer data just as it had before, using login credentials provided by the dealer. *See id.* § 4.3. As for other independent integrators, CDK and Reynolds agreed that they would not "take any steps to assist any person that it reasonably believes to have plans to access or integrate with the other party's DMS." *Id.* § 4.5.

**ANSWER**:  Paragraph 106 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds.  CDK further admits that the excerpted text quoted in paragraph 106 of the Complaint appears in one of the three—the Data Exchange Agreement.  CDK denies Plaintiffs' characterization of the agreements.  CDK states that the contracts speak for themselves.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 106 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 106 of the Complaint.

107.    CDK and Reynolds also agreed that they themselves would no longer access data on each other's DMS. *Id.* (agreeing to "[p]rohibition on . .. DMS Access"). Specifically, the agreement states: "For the avoidance of doubt, this Section 4.5 is not intended as a 'covenant not to compete,' but rather as a contractual restriction of access and attempted access." *Id.* This restriction lasts forever. *See id.* § 6.1. Reynolds' own top executive confirmed that Section 4.5 prohibits CDK and Reynolds from accessing each other's DMS. Robert Schaefer, Reynolds' Vice President of Data Services, has testified under oath to the following: "Q: In this contract by

its plain term Section 4.5, Reynolds agreed not to access the CDK DMS; isn't that right? A: That would be correct." Dkt. No. 163, at 76:6-9. Mr. Schaefer offered similar sworn testimony with respect to CDK's prohibition on access of Reynolds' DMS. *Id*. at 73:11-16; 75:16-76:1.

**ANSWER**:  Paragraph 107 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds.  CDK admits that the excerpted text quoted in paragraph 107 of the Complaint appears in one of the three agreements—the Data Exchange Agreement. CDK denies Plaintiffs' characterization of the agreements.  CDK states that the contracts speak for themselves.  CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction. CDK admits that Robert Schaefer testified at the hearing, but denies Plaintiffs' characterization of the testimony and states that the hearing transcript speaks for itself.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 107 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 107 of the Complaint.

108.    Further, the agreement also mandated coordination between the competitors in transitioning all of CDK's vendor clients (*i.e.*, those vendors for which CDK provided access to dealer data on the Reynolds DMS) into the Reynolds RCI program. *See* Data Exchange Agreement § 4.4. The agreement specifically required CDK to "cooperate with Reynolds" in the "transition of [CDK] customers to the Reynolds RCI program with respect to Reynolds Dealers." *Id*. In connection with that effort, CDK agreed to give Reynolds full information about the vendors CDK served, including their name, DMS number, store number, branch number, user login, specific data access provided by CDK, data interfaces, the frequency of the data provided, the deadlines for data delivery, the format of the data, and more. *See id.* § 4.3, Exhibit DEA-2. Absent an agreement not to compete, CDK would treat this information as a highly confidential customer trade secret and would not share it with rivals. Indeed, Mr. Schaefer of Reynolds admitted under oath that Reynolds would never share such highly sensitive information with a competitor absent an agreement with that competitor.

**ANSWER**:    Paragraph 108 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that on or about February

18, 2015, it entered into three written agreements with Reynolds. CDK further admits that the excerpted text quoted in paragraph 108 of the Complaint appears in one of the three agreements—the Data Exchange Agreement. CDK denies Plaintiffs' characterization of the agreements. CDK states that the contracts speak for themselves. CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction. CDK further admits that Robert Schaefer testified at the hearing. CDK denies Plaintiffs' characterization of Mr. Schaefer's testimony and states that the hearing transcript speaks for itself. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 108 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 108 of the Complaint.

109. Consistent with the agreement to cooperate in transitioning customers from CDK to Reynolds, CDK sent letters to its vendor customers with a "roadmap" and "deadline" for joining Reynolds' integration program. On March 2, 2015, CDK sent a letter to its vendor clients announcing that the vendors "will be provided with a roadmap to transition to the [RCI] program without any further risk of interruption to existing services." CDK explained that "we are in a transition period to allow time for [DMI] clients to enroll in the RCI program in support of your [Reynolds] dealers," and that "we will assist you to facilitate a smooth transition." The letter noted that Reynolds had "agreed to protect the current DMI process for collecting data from [Reynolds] dealers during this transition" and promised "a more detailed letter within the next couple of weeks that outlines the transition process."

**ANSWER**: CDK admits that on or about March 2, 2015, DMI sent a letter to certain of its Vendor customers that contained the quoted statements excerpted in paragraph 109 of the Complaint. CDK denies Plaintiffs' characterization of that letter and the statements therein. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 109 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 109 of the Complaint.

110.     On April 1, 2015, CDK sent a follow-up letter to its vendor customers. The letter began: "As announced earlier this month, the recent business agreement between CDK Global and The Reynolds and Reynolds Company (R&R) provides for the clients of Digital Motorworks, Inc. (DMI) a streamlined process to enroll in the Reynolds Certified Interface (RCI) program for their R&R dealers. We are now in the transition period to allow sufficient time for this enrollment, and R&R has agreed to provide a grace period for the existing DMI process for R&R data collection during this time."

**ANSWER**:  CDK admits that on or about April 1, 2015, DMI sent a letter to certain of its

Vendor customers that contained the quoted statements excerpted in paragraph 110 of the

Complaint.  CDK denies Plaintiffs' characterization of the letter and the statements therein.

CDK denies the remaining allegations in paragraph 110 of the Complaint

111.     Reynolds followed up CDK's letters with its own communications. Reynolds has also pushed vendors to use DMI and IntegraLink during the wind down, and away from other third-party providers, in order to drive competing data integration providers completely out of the market.

**ANSWER**:  CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 111 of the Complaint that relate to actions taken by non-party

Reynolds and on that basis denies them.  CDK denies the remaining allegations in paragraph 111

of the Complaint.

112.     **Integration Agreements.** Two additional written agreements between CDK and Reynolds "granted reciprocal access" to each other's data integration products – via the 3PA and RCI programs, respectively. Under the agreements, CDK's proprietary products and services could integrate with data on Reynolds DMSs via RCI, and vice versa. Reynolds received five free years of 3PA integration from CDK, while CDK pays for the data integration services from Reynolds. Moreover, by signing up for 3PA, Reynolds agreed that it would integrate with data on CDK's DMSs exclusively through 3PA, and not obtain data for its products and services from anywhere else. CDK agreed to the same in its integration contract with Reynolds for the RCI program.

**ANSWER**:  CDK admits that on or about February 18, 2015, it entered into three written

agreements with Reynolds.  CDK denies Plaintiffs' characterization of the agreements.  CDK

states that the contracts speak for themselves. CDK denies the remaining allegations in paragraph

112 of the Complaint.

ii.  **Top Executives at CDK and Reynolds Have Admitted That They Agreed To Block Third-Party Access**

113.    In addition to the written agreements, senior CDK and Reynolds executives also have admitted that they have agreed to restrict access to dealer data and destroy data integrators like Authenticom, SIS, and others. During a phone conversation with Steve Cottrell – Authenticom's founder and CEO – in May 2015, Mr. Schaefer of Reynolds said that Reynolds had "made agreements with the other major DMS providers" – there is only CDK – "to support each other's third-party access agreements *and* to block independent integrators such as Authenticom." Dkt. No. 164, at 139:6-13. Mr. Schaefer said that Reynolds' owner, Bob Brockman, was "adamant" that all third-party data integrators must be cut off. *Id.* As a result, Mr. Schaefer said that Authenticom should wind down its operations and leave the market. *Id.* at 138:3-139:19.

**ANSWER**:  CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction.  CDK further admits that Robert Schaefer testified at the hearing. CDK denies Plaintiffs' characterization of Mr. Schaefer's testimony and states that the hearing transcript speaks for itself. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 113 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 113 of the Complaint.

114.    A top executive at CDK delivered the same message to Mr. Cottrell. *Id.* at 140:1-143:1. On April 3, 2016, at an industry convention in Las Vegas, Dan McCray (CDK's former Vice President of Product Management) stopped by Authenticom's booth to talk with Mr. Cottrell, who was occupied with a customer. *Id.* After Mr. Cottrell finished with the customer, he walked to CDK's booth, where he saw Mr. McCray "standing off to the side" with "three other individuals." *Id.* After cordial greetings, Mr. McCray took Mr. Cottrell by the arm and said, "Let's take a walk." *Id.* Mr. McCray led Mr. Cottrell off the convention floor and down a service ramp to a secluded area. *See id.* Mr. McCray then confirmed the existence of the illegal agreement, stating that CDK and Reynolds had agreed to "[l]ock you and the other third parties out," and that they were "working collaboratively to remove all hostile integrators from our DMS system." *Id.* at 140:1-143:1. Mr. McCray then grew threatening: "I wanted to look you in the eye and let you know man to man, I have been mandated by our new CEO to seek you out and destroy your business on our systems." "For god's sake," he concluded, "you have built a great little business, get something for it before it is destroyed otherwise I will f***ing destroy it." Mr. Cottrell rejected Mr. McCray's threats, and insisted that Authenticom would continue to serve its dealer and vendor customers.

**ANSWER**: CDK admits that on or about April 3, 2016, Dan McCray, a former CDK employee, attended a National Automobile Dealers Association ("NADA") event. CDK further admits, that Mr. McCray spoke to Mr. Cottrell at the event but denies Plaintiffs' allegations regarding the content of that conversation. CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction. CDK further admits that Steve Cottrell testified at the hearing; but denies that Mr. Cottrell testified accurately concerning the content of his conversation with Mr. McCray. CDK further states that the hearing transcript speaks for itself. CDK denies the remaining allegations in paragraph 114 of the Complaint.

115. CDK and Reynolds even have employees actively working together to coordinate the technical aspects of blocking third-party access. In December 2016, during one particular vendor's discussions with CDK about joining the 3PA program and leaving Authenticom, Steve French – CDK's senior director of client and data services – told the vendor that a large portion of his job was to work with Reynolds to ensure third-party data integrators like Authenticom remain locked out. Mr. French suggested that resistance to getting dealer data from CDK and Reynolds was futile as they were working together to lock out third-party access.

**ANSWER**: CDK denies the allegations in paragraph 115 of the Complaint.

116. CDK's and Reynolds' conspiracy was formed and implemented by top-level executives at each company. For CDK, the leading actors in the conspiracy include Robert N. Karp, the President of CDK North America and the person with oversight of CDK's 3PA program; Howard Gardner, CDK's Vice President and Manager of Data Strategy and the person who took the lead on the February 2015 agreement; Dan McCray, CDK's recently retired Vice President of Product Management; Ron Workman, CDK's Senior Vice President of Global Corporate Development, who signed the February 2015 agreement; Kevin Distelhorst, CDK's Chief Customer Officer, the founder of IntegraLink, and a former executive at Reynolds; and Malcolm Thorne, CDK's former Chief Global Strategy Officer and the person who took the lead on spearheading the changes to 3PA in 2014 and 2015.

**ANSWER**: CDK denies the allegations in paragraph 116 of the Complaint.

117. For Reynolds, the leading actors in the conspiracy include Bob Brockman, Reynolds' Owner, Chairman, and CEO and the person who approved and executed the February 2015 agreement and formulated the policy to eliminate competitive data integrators through blocking; and Robert Schaefer, Reynolds' Vice President of OEM Relations, Data Services, and Security, the person in charge of the RCI program.

**ANSWER**:  CDK denies the allegations in paragraph 117 of the Complaint.

### iii. CDK and Reynolds Implemented the Agreement With Aggressive Blocking

118.    In the wake of their agreements, CDK and Reynolds have aggressively blocked data integrators and other third parties from accessing their DMS. By eliminating the use of other data integrators, CDK has required dealers who use CDK's DMS also to use CDK's 3PA service.

**ANSWER**:.  CDK admits that it has taken steps, consistent both with its contracts with its Dealer customers and with CDK's need to provide a stable and secure DMS product to its Dealer customers, to block hostile third-party access to its DMS.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegation in paragraph 118 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 118 of the Complaint.

119.    Dealers have repeatedly demanded that CDK and Reynolds stop blocking data integrators. Dealers have made clear that they own the data, that they control access to it, and that disrupting their preferred access methods has impaired their business operations and caused financial harm. But CDK and Reynolds have rejected or ignored the dealers' objections.

**ANSWER**:  CDK admits that some Dealers have complained about the steps CDK has taken, consistent both with its contracts with its Dealer customers and with CDK's need to provide a stable and secure DMS product to its Dealer customers, to block hostile third-party access to its DMS.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 119 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 119 of the Complaint.

120.    The dealer complaints are too numerous to fully recount here, but a few examples make the point. In November 2016, one Mercedes dealership in California wrote to CDK: "When will you stop the blocking of our user profiles? This must stop." The dealer decried CDK's "attempt to stop all other data access routes thereby forcing us to use [CDK's] data monetizing scheme if we want to access our data." As the dealer recognized, the blocking actions were intended to obtain the economic benefits of the dealers' data. "When will CDK stop trying

to monetize data owned by [us] at our expense? All being orchestrated under the guise of 'protecting our data.' Frankly most can see right through this propaganda smoke screen. The data could be protected by using available technology that doesn't cut off the dealers' access to their data using fully automated routines."

**ANSWER**: CDK admits that the excerpt quoted in paragraph 120 of the Complaint appears in a November 2016 email that an employee of a Dealer customer sent to CDK. CDK denies Plaintiffs' characterization of the document. CDK denies the remaining allegations in paragraph 120 of the Complaint.

121. One Virginia dealer asked his employees "to raise holy hell with CDK. This is really affecting our business." And a Lexus dealership in California wrote that "[a]s a dealership owner, I believe that CDK has no right to deny me access to my own data. By extension, I also retain my rights to distribute my data to chosen vendors who meet my strict criteria for data security."

**ANSWER**: CDK admits that the quoted text in paragraph 121 of the Complaint appears in a document produced by Authenticom in this litigation. CDK denies the remaining allegations in paragraph 121 of the Complaint.

### B.    CDK's and Reynolds' Exclusive Dealing Provisions With Vendors and Dealers

122. Shortly after entering into the Data Exchange Agreement, CDK began "renegotiating" its contracts with vendors for 3PA access (actually, cancelling existing contracts and forcing vendors like Cox Automotive to sign new contracts). Consistent with its decision to close its DMS, CDK imposed exclusive dealing provisions that required vendors to use 3PA alone to integrate with data on CDK DMSs for all of their products and services. CDK also took the new position that, notwithstanding their plain language, its existing contracts with dealers prohibited allowing data integrators to access CDK DMSs.

**ANSWER**: CDK admits that, beginning in 2015, CDK sought to standardize its 3PA contract terms and conditions and that, as a result, some Vendors entered into new 3PA contracts. CDK denies that it "forced" vendors to enter into new 3PA contracts or that such contracts were related to or a result of the Data Exchange Agreement entered into between CDK and Reynolds. CDK admits that its standard contract with Dealers prohibits Dealers from permitting

unauthorized third parties to access their licensed DMS. CDK denies that this is a "new position." CDK denies the remaining allegations in paragraph 122 of the Complaint.

1.     **CDK's New 3PA Contract With Cox Automotive**

a.     **CDK Fraudulently Induced Cox Automotive to Enter Into the New 3PA Contract By Falsely Representing That** ███████████
███████████ **In the Revamped 3PA Program**

123.    On July 2, 2015, CDK gave a presentation to Cox Automotive about the new vendor contracts that CDK would require. These new contracts required Cox Automotive to use the CDK 3PA program's managed interface exclusively, imposed massive price increases, and contained price-secrecy provisions that would prohibit Cox Automotive from disclosing to dealers precisely how much Cox Automotive must pay CDK to integrate with dealer data on CDK DMSs. CDK also issued a notice of intent to terminate Cox Automotive's existing vendor contracts.

**ANSWER**:    CDK admits that it discussed its SecurityFirst initiative with Cox on July 2, 2015.

CDK admits that, as part of its SecurityFirst initiative, CDK sought to standardize its 3PA

contract terms and conditions and that, as a result, some Vendors, including Plaintiffs, entered

into new 3PA contracts. CDK admits that, as part of this same initiative, it sought to standardize

its integration pricing and that, as a result, some vendors' prices increased. CDK further admits

that, in 2015, it sent certain Plaintiffs letters notifying them of the nonrenewal of the existing

terms and conditions of their 3PA contracts and of transitioning onto new 3PA contracts. CDK

denies the remaining allegations in paragraph 123 of the Complaint.

124.    When Cox Automotive pushed back on these changes, CDK said there would be "little flexibility" because CDK was going to impose the same changes on every vendor.

**ANSWER**:    CDK denies the remaining allegations in paragraph 124 of the Complaint.

125.    By the end of September 2015, CDK and Cox Automotive had still not reached agreement on the terms of new vendor contracts. CDK began threatening publicly that it intended to terminate Cox Automotive's vAuto, VinSolutions, and Xtime from integrating with dealer data on a CDK DMS if Cox Automotive did not agree to CDK's 3PA terms.

**ANSWER**:    CDK admits that, as of September 2015, it had not yet entered into the 3PA

Agreement with Plaintiffs, in part due to Cox repeatedly cancelling scheduled meetings or

ignoring CDK's requests for meetings between the parties' representatives to discuss the 3PA

Agreement.  CDK denies the remaining allegations in paragraph 125 of the Complaint.

126.    As the negotiations continued, CDK represented to Cox Automotive that it was
one of the first vendors being signed up to the newly "refreshed" 3PA program. CDK promised
that, as a first mover and the largest vendor, Cox Automotive would receive t███████████
███████████. CDK made these representations regarding best pricing repeatedly throughout the
negotiations, and stated that because Cox Automotive would receive ████████. Cox
Automotive should sign up as a charter participant of the revamped 3PA program.

**ANSWER**:    CDK denies the allegations in paragraph 126 of the Complaint.

127.    CDK also made these representations in writing. For example, on December 22,
2015, Malcolm Thorne emailed Cox Automotive's Business Development executives, Brian
Green and Jay Hicks, and stated that with respect to 3PA pricing, "████████████████████
███████████████████." CDK made this representation after Cox Automotive had
again argued that the proposed dramatic price increases for 3PA participation were too onerous
and would put it at a disadvantage compared to CDK's competing offerings and those of other
solution providers. CDK repeatedly reassured Cox Automotive, however, that Cox Automotive
would obtain ██████████████████████████.

**ANSWER**:  CDK admits that the excerpt quoted in paragraph 127 of the Complaint appears in a

document produced by CDK in this litigation.  CDK denies Plaintiffs' characterization of the

document.  CDK denies the remaining allegations in paragraph 127 of the Complaint.

128.    These representations were false. In the February 2015 Data Exchange
Agreement, CDK had given Reynolds' products and services free 3PA integration for five years
– far lower than the tens of millions of integration fees that Cox Automotive paid for 3PA
annually.

**ANSWER**:  CDK denies the allegations in paragraph 128 of the Complaint.

129. Because of CDK's control over integrations to dealer data on its system and CDK's
public threats to disconnect such integrations – and in direct reliance upon CDK's false
representations that ██████████████████████████████████████████ – Cox
Automotive agreed to CDK's terms, including, but not limited to, the exclusive dealing and price
secrecy provisions. On January 8, 2016, Cox Automotive and its subsidiaries entered into an
omnibus 3PA Managed Interface Agreement, and product-specific statements of work thereto,
with CDK. Had Cox Automotive known that CDK had lied about the pricing provision, it would

not have agreed to enter into the new 3PA Managed Interface Agreement on the terms contained therein. CDK had fraudulently induced Cox Automotive to enter into the new 3PA contract.

**ANSWER**:  Paragraph 129 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that it entered into the 3PA Agreement with Plaintiffs on January 8, 2016.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 129 that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegation in paragraph 129 of the Complaint.

> **b.    CDK Has Breached Its 3PA Contract With Cox Automotive By Giving Reynolds ▮▮▮▮▮▮▮ Than Cox Automotive**

130.    CDK memorialized its promise to grant Cox Automotive ▮▮▮ pricing in Section 3(b) of the new 3PA contract, which stated: "



"

**ANSWER**:  CDK admits that the excerpt quoted in paragraph 130 of the Complaint appears in the 3PA Agreement that was in place during the relevant time period. CDK denies Plaintiffs' characterization of the contract and states that the contract speaks for itself.  CDK denies the remaining allegations in paragraph 130 of the Complaint.

131.    For the same reason that CDK's representations about the pricing were false when it fraudulently induced Cox Automotive to enter into the new 3PA contract, CDK has unequivocally breached this provision granting Cox Automotive ▮▮▮ status with respect to pricing. Since February 2015, CDK has given Reynolds' applications free 3PA access for five years – including Reynolds' business development center applications, its Service Sales Kit tablet application, which is a service application substantially similar to certain Xtime products, and its Naked Lime marketing, advertising, lead generation and digital media solutions, which compete with solutions offered by Autotrader, Dealer.com, Kelley Blue Book, VinSolutions, and Xtime – all while Cox Automotive has been paying tens of millions of dollars in integration fees to CDK during that same time.

**ANSWER**:  Paragraph 131 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 131 of the Complaint.

> **c.**   **CDK Imposed Exclusive Dealing and Pricing Secrecy Provisions in Cox Automotive's 3PA Contract**

132.   Cox Automotive's 3PA contract includes an exclusive dealing provision in Section 1(f): "



."

**ANSWER**:  CDK admits that Section 1(f) of the 3PA Managed Interface Agreement states, in part:



CDK denies Plaintiffs' characterization of the contract and states that the contract speaks for itself.  CDK denies the remaining allegations in paragraph 132 of the Complaint.

133.   The exclusive-dealing provision purports to apply to nearly every Cox Automotive product and service, so that the use of 3PA for any one of Cox Automotive's current offerings essentially binds Cox Automotive to use 3PA for all existing, and future, offerings. If Cox Automotive breaches this provision by using another data integrator, CDK may terminate the entire agreement. *See* § 4(g) ("

**PUBLIC VERSION**



**ANSWER**: CDK admits that Section 4(g) of the 3PA Agreement states, in part: "███████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████." CDK denies Plaintiffs' characterization of the contract and

states that the contract speaks for itself. CDK denies the remaining allegations in paragraph 133

of the Complaint.

134. These exclusive dealing provisions even prohibit Cox Automotive from sharing
dealer data between its own products and services because Cox Automotive's solutions cannot
receive dealer data from any source other than 3PA, even where each such Cox Automotive
product or service is separately paying CDK to access the exact same data. Because Cox
Automotive cannot share data between its solutions, it is essentially prohibited from having its
solutions work together, and must pull dealer data from the DMS each time it is needed. That is a
very inefficient and highly-anticompetitive process. It also means that CDK can charge
repeatedly for access to the same data, in addition to thwarting Cox Automotive's ability to
integrate its solutions.

**ANSWER**: Paragraph 134 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK admits that the 3PA Agreement

contains certain restrictions against the sharing of data obtained from CDK's DMS other than as

authorized by the 3PA Agreement. CDK denies that as result of these restrictions, Plaintiffs

must pay for a new 3PA integration interface for each of its solutions, or that CDK charges

Plaintiffs repeatedly for access to the same data. CDK denies the remaining allegations in

paragraph 134 of the Complaint.

135. The new 3PA contract also includes a price-secrecy provision in Section 8: "████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████" Internal CDK documents state the
purpose of these provisions is "to create minimal awareness to dealer" regarding CDK's
exorbitant pricing for data integration.

**ANSWER**:  Paragraph 135 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that the excerpt quoted in paragraph 135 of the Complaint appears in the 3PA Agreement.  CDK denies Plaintiffs' characterization of the contract and states that the contract speaks for itself.  CDK admits that the excerpt quoted in the last sentence of paragraph 135 of the Complaint appears in a document produced by CDK in this litigation, but denies Plaintiffs' characterization of the document. CDK denies the remaining allegation in paragraph 135 of the Complaint.

2.     **CDK's Standard 3PA Contract Contains Exclusive Dealing and Price Secrecy Provisions**

136.     CDK also imposes exclusive dealing and price-secrecy provisions in its standard 3PA contract with other vendors. The current CDK 3PA contract template states: "███████████████████████████████████████████████████████████████████." *See* CDK 3PA Contract § 2(e), § 1(a)(*l*). The contract goes on to state that the vendor cannot "███████████████████████████████████████████████." *Id*.

**ANSWER**:  Paragraph 136 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that the excerpt quoted in paragraph 136 of the Complaint appears in certain contracts with Vendors in place during the relevant time period. CDK denies Plaintiffs' characterization of the contract and states that the contract speaks for itself. CDK denies the remaining allegations in paragraph 136 of the Complaint.

137.     The penalty for accessing dealer data other than through CDK's 3PA interface is termination of the entire agreement: "██████████████████████████████████████████." *Id*. § 6(g).

**ANSWER**:  Paragraph 137 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that the excerpt quoted in paragraph 137 of the Complaint appears in certain contracts with Vendors in place during the

relevant time period. CDK denies Plaintiffs' characterization of the contract and states that the contract speaks for itself. CDK denies the remaining allegations in paragraph 137 of the Complaint.

138. The exclusive-dealing terms in CDK's standard form contract purportedly last forever. The contract template states: "███████████████████████████████████████████ ████████████████████████████████████████" *Id*. § 6(j). This provision seeks to tie the vendor to the 3PA program indefinitely. Even if a vendor were to stop participating in the 3PA program, it would still be barred from obtaining data from any CDK dealer from any other source. That gives CDK carte blanche to raise integration prices once they enter the 3PA program because vendors need integration with data on the CDK DMS.

**ANSWER**: Paragraph 138 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that the excerpt quoted in paragraph 138 of the Complaint appears in certain contracts with Vendors in place during the relevant time period. CDK denies Plaintiffs' characterization of the contract and states that the contract speaks for itself. CDK denies the remaining allegations in paragraph 138 of the Complaint.

139. ███████████████████████████████████████████████ █████████████████████████████████ *See id*. § 5(d).

**ANSWER**: Paragraph 139 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that a term in certain contracts with Vendors in place during the relevant time period ████████████████████ ████████████████████████████████. CDK denies Plaintiffs' characterization of the contract and states that the contract speaks for itself. CDK denies the remaining allegations in paragraph 139 of the Complaint.

140. The standard vendor contract also has a price-secrecy provision. It states that vendors "██████████████████████████████████████████████████ █████████████████████████████████████████████████████ ████████████████████" *Id*. § 10.

**ANSWER**: Paragraph 140 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that the excerpt quoted in paragraph 140 of the Complaint appears in certain contracts with Vendors in place during the relevant time period. CDK denies Plaintiffs' characterization of the contract and states that the contract speaks for itself. CDK denies the remaining allegations in paragraph 140 of the Complaint.

141. The CDK standard contract bars vendors from indicating "in any way" that an increase in the price of products or services is related to an increase in the integration fees charged by CDK: "██████████████████████████████████████████████████████████████████████████████████████████████████████████████████." *Id.*

**ANSWER**: Paragraph 141 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that the excerpt quoted in paragraph 141 of the Complaint appears in certain contracts with Vendors in place during the relevant time period. CDK denies Plaintiffs' characterization of the contract and states that the contract speaks for itself. CDK denies the remaining allegations in paragraph 141 of the Complaint.

### 3. CDK DMS Contracts with Dealers

142. CDK has changed its position on the meaning of its existing contracts with dealers. Those contracts allow "agents" of the dealer – such as data integrators – to access the DMS on the dealer's behalf. Consistent with that provision, CDK had long marketed its DMS as an "open system" that data integrators could access on the dealer's behalf, and dealers relied upon those representations in agreeing to purchase the CDK DMS. But in 2015, CDK began insisting (contrary to the language in the standard contract itself) that its dealer contracts prohibited data integrators other than 3PA, and it began disabling the logins that dealers had provided to third-party data integrators to access the DMS. This has required dealers who are using CDK's DMS to use CDK's 3PA exclusively.

**ANSWER**: Paragraph 142 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that it has taken steps,

consistent both with its contracts with its Dealer customers and with CDK's need to provide a

stable and secure DMS product to its Dealer customers, to block hostile third-party access to its

DMS. CDK further admits that one of the mechanisms it has used in its efforts to block the

unlawful extraction of data from its systems includes disabling login credentials used by hostile

data extractors. CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 142 of the Complaint that relate to individuals or entities other than

CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 142 of

the Complaint.

### 4. The Vendor and Dealer Exclusive Dealing Provisions Are Anticompetitive

143. The exclusive dealing provisions are independently anticompetitive. They foreclose all competition in the Dealer Data Integration Market for approximately 40% of dealers who use CDK DMSs (and an even greater percentage when considered in terms of the number of new cars sold). And they foreclose all competition in the Single-Brand Aftermarket for Dealer Data Integration on CDK DMS. From the perspective of vendors, the foreclosure is even more extreme. If a vendor participates in CDK's 3PA program for even a single CDK dealer, that vendor may no longer access any CDK DMS through any means other than through 3PA for *any* CDK dealer and for *any* product or service. Reynolds also imposes similar exclusive dealing requirements.

**ANSWER**: Paragraph 143 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK lacks sufficient knowledge or

information to form a belief as to the truth of the allegations in paragraph 143 of the Complaint

that relate to individuals or entities other than CDK and on that basis denies them. CDK denies

the remaining allegations in paragraph 143 of the Complaint.

## III. CDK's Actions Have Harmed Competition

144. CDK's illegal horizontal agreement with Reynolds and its anticompetitive exclusive dealing provisions have severely harmed competition in the Dealer Data Integration Market to the detriment of solutions that rely on data integration services. CDK and Reynolds currently have a monopoly on data integration for their respective DMSs. This monopoly has had predictable effects: prices have skyrocketed and quality has stagnated or even decreased. CDK's internal documents candidly explain that this was precisely CDK's goal. It needed to "close" its

DMS because otherwise the dramatically increased prices would cause vendors "to move to [other data integrators] instead of accept increase price."

**ANSWER**: CDK admits that some of the excerpt quoted in the fifth sentence of paragraph 144 of the Complaint appears in a document produced by CDK in this litigation. CDK denies Plaintiffs' characterization of the document. CDK denies that it has violated any applicable law or harmed competition, and denies that Plaintiffs or any other individual or entity have suffered any injury as a result of any action or conduct of CDK. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 144 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 144 of the Complaint.

145. Even though Cox Automotive and other vendors pass through a portion of CDK's and Reynolds' inflated data integration costs to dealers, many vendors (including Cox Automotive) have no choice but to absorb some of the increased data integration fees because dealers are unable or unwilling to pay such excessive fees. This results in slashed development budgets, support, and other investments in their products and services. These cost-cutting measures ultimately reduce the quality of such products and services.

**ANSWER**: CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 145 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 145 of the Complaint.

146. The increased data integration prices and reduced quality of data integration services have also "tilted the table" in favor of CDK's own offerings. CDK's products and services do not have to pay excessive data integration fees, and those solutions have near real-time, read and write integration to all necessary dealer data on the DMS.

**ANSWER**: CDK admits that certain applications that are owned and operated by CDK do not pay fees to CDK for integration with CDK's DMS, just as, upon information and belief, Plaintiffs' applications do not pay Dealertrack for integration with Dealertrack's DMS. CDK denies the remaining allegations in paragraph 146 of the Complaint.

147.     Dealers are on record stating that they do not use some of their preferred vendors because of the huge pass-through data integration surcharges. For example, one dealer explained, "We would like to purchase the XTime [sic] application. The CDK data access charges make that option prohibitively expensive. Did CDK actually think that these exorbitant data access charges levied against our third party solution providers would not get passed directly back to us?"

**ANSWER**:  CDK admits that the excerpt quoted in paragraph 147 of the Complaint appears in a document produced in this litigation.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 147 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 147 of the Complaint.

148.     Additionally, vendors have had to scale back the functionality of their products and services or pull them off the market entirely. For example, at the Authenticom hearing, Alan Andreu of Dominion – a vendor – testified that Dominion had to shutter one application because the cost of integration fees exceeded the cost of the product itself. Likewise, Michael Korp, owner of the vendor Open Recalls, testified that he could not afford CDK's and Reynolds' high integration prices. He had therefore been forced to rely on Authenticom for integration, but CDK's blocking has forced the vendor to lay off employees and halt plans for growth.

**ANSWER**:  CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction. CDK further admits that Alan Andreu and Michael Korp testified at that hearing. CDK denies Plaintiffs' characterization of the testimony and states that the hearing transcript speaks for itself. CDK denies the remaining allegations in paragraph 148 of the Complaint.

### A.     Data Integration Prices Have Skyrocketed

149.     CDK and Reynolds have drastically increased the prices they charge for their data integration services (3PA and RCI) since 2015. These prices are now far higher than the prices that would exist in a competitive Dealer Data Integration Market.

**ANSWER**:  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 149 that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 149 of the Complaint.

150. CDK formally announced a "refreshed" 3PA program on June 22, 2015 – just a few months after its collusive agreement with Reynolds – as part of its "Security First" initiative. This initiative used data security as the pretext for "closing" the DMS and imposing massive price increases on vendors. "CDK is rolling out a new cybersecurity initiative," *Automotive News* reported, "that will raise monthly integration fees for most of the third-party software vendors that dealerships use in addition to CDK software. It is patterned after a program at Reynolds and Reynolds." David Barkholz, *CDK Global Sees Earnings Boost from Cost-Cutting, Improved Efficiency*, Automotive News (Nov. 3, 2015).

**ANSWER**: CDK admits that it issued a press release concerning SecurityFirst on June 22, 2015.

CDK further admits that the quoted text in paragraph 150 of the Complaint appears in the

Automotive News article cited in the paragraph. CDK denies the remaining allegations in

paragraph 150 of the Complaint.

151. The industry saw this for what it was. Vendors and dealers received little, if anything, in return for the dramatically higher prices. CDK's presentation to Cox Automotive in July 2015 stated, "███████████████████████████████████████ ███████████████████████████████████." Industry publications likewise reported that, "Vendors briefed on CDK's new data-security program said nothing will change in the way they get data from CDK-served DMS dealerships under SecurityFirst except for a higher price." David Barkholz, *Dealers Will Pay Up for Vendors' Data Access After CDK Switch*, Automotive News (July 20, 2015).

**ANSWER**: CDK admits that the quoted text in paragraph 151 of the Complaint appears in a

document produced in this litigation and in the Automotive News article cited in the paragraph.

CDK denies Plaintiffs' characterizations of those documents. CDK denies the remaining

allegations in paragraph 151 of the Complaint.

152. During the July 2, 2015 presentation to Cox Automotive regarding the proposed new vendor contracts, CDK proposed massive price increases of up to 900%:

    a)    Prior to 2015, HomeNet had not participated in CDK's 3PA program and had not been required to do so. CDK insisted that HomeNet participate in the 3PA program and begin paying ████ per dealer per month.

    b)    vAuto paid ████ per dealer per month under its pre-2015 agreement; CDK insisted on an increase to ███ per dealer per month.

    c)    VinSolutions paid ████ per dealer per month under its pre-2015 agreement; CDK insisted on an increase to ████ per dealer per month.



      d)      Xtime paid ▮ per dealer per under its pre-2015 agreement; CDK insisted on an increase to ▮ per dealer per month.

**ANSWER**: CDK admits that it discussed SecurityFirst with Cox on July 2, 2015. CDK further admits that, during those discussions, it proposed certain pricing for various 3PA integration packages for certain Cox Plaintiffs. CDK denies Plaintiffs' characterization of that discussion. CDK further admits that, prior to the 3PA Agreement, vAuto, VinSolutions and Xtime paid ▮, ▮ and ▮ per month per dealership rooftop, respectively, for certain 3PA integration packages. CDK denies the remaining allegations in paragraph 152 of the Complaint.

153.    Cox Automotive attempted to negotiate lower prices, but CDK indicated there would be "little flexibility" and threatened publicly to block or terminate integration of Cox Automotive's products and services to the dealer data that the solutions needed to function. Accordingly, Cox Automotive was forced to agree to drastic price increases:

      a)      Autotrader and Kelley Blue Book were charged ▮ per month – a 100% price increase.

      b)      Dealer.com was charged ▮ per dealer per month – a 100% price increase.

      c)      Dealertrack was charged ▮ per dealer per month for its electronic menu Sales and F&I solution and ▮ per dealer per month for its desking Sales and F&I solution – compared to nothing before for either solution.[2]

      d)      HomeNet was charged ▮ per dealer per month – compared to nothing before.

      e)      VinSolutions was charged ▮ per dealer per month, a ▮ price increase.

      f)      vAuto was charged ▮ per dealer per month – more than a ▮ price increase.

      g)      Xtime was charged ▮ per dealer per month, a ▮ price increase, for its scheduling and check-in products, and ▮ per dealer per month in order to add integration for its inspection product – compared to nothing before for Xtime's inspection product.[2]

---

[2] Cox Automotive acquired Dealertrack in October 2015, which is why CDK did not initially propose a price for 3PA integration of the Sales and F&I solutions in the July 2, 2015 presentation. Similarly, Xtime's inspection product was added via the October 2015 Dealertrack acquisition as well.

**ANSWER**:  CDK admits that Plaintiffs attempted to negotiate lower prices during negotiations related to the 3PA Agreement.  CDK further admits that the 3PA Agreement ultimately included, among other things, the following: (a) a fee of ███ per month per Dealer rooftop that used an integration package supporting Autotrader.com's and Kelley Blue Book's applications; (b) a fee of ███ per month per Dealer rooftop for an integration package supporting Dealertrack's eMenu F&I application; (c) a fee of ███ per month per Dealer rooftop for an integration package supporting Dealertrack's SalesMaker desking application; (d) a fee of ███ per month per new Dealer rooftop customer for an integration package supporting HomeNet's Inventory Online application; (e) a fee of ███ per month per new Dealer rooftop customer for an integration package supporting VinSolutions' VinConnect CRM application; (f) a fee of ███ per month per new Dealer rooftop customer for an integration package supporting vAuto's inventory analytics application; (g) a fee of ███ per month per new Dealer rooftop customer for an integration package supporting Xtime's appointment scheduling/checkin application, then marketed as Spectrum; and (h) a fee of ███ per month per new Dealer rooftop customer for an integration package supporting Xtime's appointment scheduling/checkin and inspection applications, then marketed as Spectrum and Service Pro, respectively.  CDK denies the remaining allegations in paragraph 153 of the Complaint.

154.    CDK has continued to increase these fees since then.

**ANSWER**:  CDK denies the allegations in paragraph 154 of the Complaint.

155.    By increasing Cox Automotive's integration fees so dramatically, CDK has significantly raised the costs of Cox Automotive's solutions. Cox Automotive must pass on significant portions of these integration fees to the dealers who purchase these products and services, including for VinSolutions (whose integration fee jumped from ███ to ███), for Xtime (whose scheduling and check-in product bundle's integration fee jumped from ███ to ███████████████████████████████████████████), and for Dealertrack (whose Sales and F&I integration fees jumped from nothing to ████████████████████████████████████████). Cox Automotive passes on a portion of these integration fees as

data integration surcharges, and such surcharges are a substantial percentage of the total monthly cost of Cox Automotive's DMS-integrated solutions.

**ANSWER**:  CDK admits that, prior to the 3PA Agreement, VinSolutions and Xtime paid $150 and $50 per month per dealership rooftop respectively for certain 3PA integration packages. CDK admits that Plaintiffs' 3PA Agreement with CDK included: (a) a fee of ███ per month per new Dealer rooftop customer for an integration package that supported VinSolutions' ████████████████████; (b) a fee of ████ per month per new Dealer rooftop customer for an integration package supporting Xtime's ██████████████████████████ ███████████████; (c) an initial phase-in fee of █████ per month per new Dealer rooftop customer for an integration package supporting Xtime's ████████████████████ ████████████████████████████████████████████████████████ ████████████ and (d) a fee of ████████████████████████████████████ ████████████████████████████████████████████████████████ █████████.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 155 of the Complaint relating to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 155 of the Complaint.

156.    After entering into the unlawful 2015 agreement with CDK, Reynolds has also increased its RCI prices far higher than it could if there were any competition. Every year, RCI prices increase by approximately █████ (and as much as █████), which exceeds any reasonable measure like the CPI.

**ANSWER**:    Paragraph 156 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 156 that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 156 of the Complaint.

157.    Cox Automotive is not alone in being forced to pay these extreme prices. For example, at the Authenticom hearing, a witness for vendor Dominion Enterprises testified that his company paid $30 per dealer per month for data integration with Authenticom, but now is paying CDK ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for the same service. At that same hearing, vendor AutoLoop testified that it had paid $160 per dealer per month for 3PA in 2014, which increased to $694 in 2016 and $735 in July 2017.

**ANSWER**:    CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction. CDK further admits that witnesses for Dominion Enterprises and AutoLoop testified at that hearing. CDK denies Plaintiffs' characterization of the testimony and states that the hearing transcript speaks for itself.  CDK denies the remaining allegations in paragraph 157 of the Complaint.

158.    CDK has also engaged in deceptive advertising. As part of the revamped 3PA program, CDK posted a pricing guide on its website that CDK represents as "standardized" pricing for all vendors. "Our 3PA pricing philosophy is simple," CDK states in its program guide, "standardized pricing for all customers." But that is false. Not only does Reynolds pay zero for 3PA integration for a five-year period, but CDK seeks to impose much higher prices on vendors than it advertises. CDK's internal documents show that, for its biggest competitors like Dealertrack's Sales and F&I products and services, CDK contemplates pricing far in excess of any published "standard" pricing packages. CDK told another vendor providing electronic vehicle registration and titling that the vendor would have to pay 25% of its top-line revenues to participate in the 3PA program, which is many times more than the posted "standard" pricing.

**ANSWER**:    CDK admits that it has sought to standardize its pricing for certain products and services, and a representative pricing guide available on CDK's public website contains the quoted statements in paragraph 158 of the Complaint.  CDK denies the remaining allegations in paragraph 158 of the Complaint.

159.    In addition to these monthly fees, CDK also charges vendors enormous upfront fees to initiate services. CDK charges at least ▮▮▮▮▮ to join the 3PA program, with "setup" fees of around ▮▮▮ (or more) per dealership rooftop. These initiation fees are much more than anything correspondingly charged by independent data integrators.

**ANSWER**:  CDK admits that it charges vendors fees for certification and installation services, which vary, depending on the complexity of the interface needed by each vendor.  CDK denies

that it charges "at least" $30,000 to join the 3PA program. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 159 of the Complaint relating to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 159 of the Complaint.

160. The current 3PA and RCI prices are much higher than the prices that were charged by competing data integrators prior to CDK's and Reynolds' illegal agreement in 2015. For example, between 2008 and 2016 before it was forced out of the market, SIS charged around $40 per dealer per month for pulling data and $70 per dealer per month for bi-directional, read-write integration. Similarly, Authenticom charged vendors $25 per dealer per month for one data feed and $50 per dealer per month for two or more (up to seven). On average, Authenticom charged vendors between $30 and $40 per dealer per month, and $75 per dealer per month for bi-directional, read-write integration.

**ANSWER**: CDK admits that certain of its 3PA fees—including those for bi-directional access, real-time data updates, and more complex data packages—are higher than $75 per dealer per month, while some are lower. CDK denies that such fees are comparable to the fees allegedly charged by Authenticom, SIS, and other so-called "data integrators." CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 160 that relate to non-parties Authenticom or SIS and on that basis denies them. CDK denies the remaining allegations in paragraph 160 of the Complaint.

161. CDK's prices for the 3PA program stand in stark contrast to the prices CDK charges for data integration services for non-CDK and non-Reynolds DMSs. DMI and IntegraLink charge between $25 and $50 per dealer per month for non-CDK and non-Reynolds DMSs.

**ANSWER**: CDK denies the allegations in paragraph 161 of the Complaint.

> ### B. CDK's and Reynolds' Anticompetitive Conduct Has Tilted the Table in Favor of Their Applications to the Detriment of Competing Applications

162. As of 2015, third-party solutions, like those offered by Cox Automotive, had been growing steadily due, in part, to reliable integration to dealer data. CDK and Reynolds have attempted to stop that by providing their own products and services with preferential data access and ubiquitous read-write permissions through a "tilt-the-table" approach. Malcolm Thorne, CDK's former chief strategy officer, has admitted under oath that 3PA "protect[ed] CDK products through a tilt-the-table approach." Dkt. No. 163, at 140:11-25. And CDK's internal

documents state that one of the "3PA Program Principles" is to "[p]rotect CDK Products through a 'tilt-the-table' approach" and to "[k]eep value add advantage to CDK layers applications." *Id.* at 139:2-140:25.

**ANSWER**:  CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC,* No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction. CDK further admits that former CDK employee Malcolm Thorne testified at that hearing. CDK denies Plaintiffs' characterization of the testimony and documents introduced during the testimony and states that the hearing transcript speaks for itself. CDK denies the remaining allegations in paragraph 162 of the Complaint.

163.    CDK commonly restricts Cox Automotive's access to and rights regarding dealer data on the DMS for no reason other than to make Cox Automotive's offerings more difficult to use or to reduce the features and functionality of those solutions, thereby harming Cox Automotive, and providing an artificial advantage to CDK's own competing products and services.

**ANSWER**:  CDK denies the allegations in paragraph 163 of the Complaint.

164.    For example, Cox Automotive's popular Xtime Inspect product enables dealer clients to perform digital multi-point inspections for vehicles at the dealership for service and maintenance appointments, and interact with vehicle owners in real time to obtain approvals for required repairs. To operate as designed and requested by dealers, Xtime Inspect needs to be able to modify repair orders. Real-time modifications to repair orders ensure that all dealer personnel are receiving the most current information about maintenance and repair jobs. Without this data integration, dealer clients are unable to optimize use of their personnel and vehicle service bays, and vehicle owner experience is impacted negatively.

**ANSWER**:  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 164 that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 164 of the Complaint.

165.    CDK affirmatively disables repair order write capability for Xtime. CDK has told Cox Automotive that it prohibits Xtime from creating or modifying repair orders for the purported reason that doing so could cause "data integrity" issues. That is a pretext. CDK's own documents reveal the real reason – CDK wants "to disrupt [Xtime's] workflow" by preventing Cox Automotive from creating or modifying "repair order[s]." Dkt. No. 163, at 140:3-141:13. CDK also allows the Xtime integration to pull dealer data elements only once every five minutes. CDK's competing application – Service Edge – faces none of these restrictions.

**ANSWER**:  CDK admits that Xtime's scheduling and inspection applications currently do not use certified integration to create or modify repair orders in CDK's DMS.  CDK further admits that CDK's Service Edge application is capable of creating and modifying repair orders in the CDK DMS using proprietary CDK intellectual property.  CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC,* No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction.  CDK denies Plaintiffs' characterization of the documents introduced at that hearing and states that the hearing transcript speaks for itself.  CDK denies the remaining allegations in paragraph 165 of the Complaint.

166.    In fact, CDK uses Service Edge's ability to seamlessly create and modify repair orders, not pay integration fees, and other "tilt-the-table" features, when it markets the product to dealers. For example, one CDK marketing presentation depicts the following:

## Missing Features Compared to CDK Service Edge

| 2 | Bi-directional integration to DMS. Read and Write-back data | CDK Service Edge workflow is written into DMS.  No need to do the same work twice. |
|---|---|---|
| | *Repair Order Creation* | Service Edge is the only solution that can open a Repair Order outside of the DMS |
| | *Electronic payments posted directly to accounting G/L (competitor requires additional manual processing to DMS)* | Non-CDK solutions require additional manual step |
| 9 | Cost | CDK bundles appointments, lane inspection, electronic MPI and electronic payments into one affordable payment. Also eliminates any 3rd party ingtegration charges.  Nissan Newport News bundle is much less than 3rd party pricing. |

**ANSWER**:  CDK admits that the image in paragraph 166 of the Complaint contains excerpts from a document originated by a CDK employee, but denies Plaintiffs' characterization of the document.  CDK denies the remaining allegations in paragraph 166 of the Complaint.

167. Another example is Cox Automotive's popular Dealertrack's Sales and F&I offerings that link dealers and their customers to lenders for vehicle sale and lease transactions. CDK prevents Dealertrack from accessing dealer data elements required to finalize lease transactions in Dealertrack's Sales and F&I product, instead requiring that the transactions be

finalized in CDK's DMS and F&I offering. As a result of CDK's refusal to allow access to lease-related financial data elements, dealer client personnel are required to re-enter all lease-related financial data elements into Dealertrack in order to populate the required fields and transmit the data to the applicable lender. Again, CDK's "goal [was] to disrupt workflow" by requiring that lease transactions "must be finalized in CDK." Dkt. No. 163, at 141:1-13. The purpose is purely anticompetitive.

**ANSWER**:  CDK admits that Dealertrack's Sales and F&I applications currently finalize lease transactions in CDK's DMS.  CDK further admits that the district court in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction. CDK denies Plaintiffs' characterization of the documents and testimony introduced at that hearing and states that the hearing transcript speaks for itself. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 167 that relate to individuals or entities other than CDK and on that basis denies them.  The allegations in the last sentence of paragraph 167 of the Complaint state legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in the last sentence of paragraph 167 of the Complaint.  CDK denies the remaining allegations in paragraph 167 of the Complaint.

168.    When lenders like Nissan Motor Acceptance Corp. and American Honda Finance Corporation complained to CDK and Cox Automotive about the clunky workflow – which required switching between the applicable Dealertrack Sales and F&I solutions and CDK's DMS and F&I solutions – CDK unabashedly lied to these lenders, claiming that Cox Automotive had refused to cooperate with CDK, when it was CDK imposing the anticompetitive impediments.

**ANSWER**:  CDK denies the allegations in paragraph 168 of the Complaint.

169.    These actions not only cause Cox Automotive significant harm but they also leave dealers with fewer and lower quality options.

**ANSWER**:  CDK denies that it has violated any applicable law or harmed competition, and denies that Plaintiffs or any other individual or entity have suffered any injury as a result of any action or conduct of CDK.  CDK denies the remaining allegations in paragraph 169 of the Complaint.

## IV.    CDK's Anticompetitive Conduct Has No Pro-Competitive Justification

170.    There are no pro-competitive justifications for CDK's anticompetitive behavior. CDK has claimed that "closing" the DMS is necessary to protect "data security" because, it asserts, other data integrators are "unsecure." But that is simply not true.

**ANSWER**:  Paragraph 170 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that one of the reasons it has taken steps, consistent both with its contracts with its Dealer customers and with CDK's need to provide a stable and secure DMS product to its Dealer customers, to block hostile third-party access to its DMS is that hostile data extractors pose threats to the security and integrity of the data residing on the DMS and the system itself.  CDK denies the remaining allegations in paragraph 170 of the Complaint.

171.    First, there is nothing unusual or unsecure about third parties integrating with the DMS on the dealer's behalf. CDK itself owns two data integrators (DMI and IntegraLink) that interact with and syndicate data in the same way as other data integrators. Malcolm Thorne – CDK's then chief strategy officer – told *Automotive News* in March 2015 that "the pull process of extracting data is as safe as pushing out." Indeed, until they entered their agreement in February 2015, CDK pulled data using login credentials from Reynolds dealers (and still does today pursuant to the "wind down" agreement). And Reynolds for over a decade consistently allowed third-party access to its DMS. It was only after Mr. Brockman acquired Reynolds in 2006 that it changed its position with respect to competitors' access. Similarly, a top-level CDK executive admitted in private conversation with a vendor that the rhetoric around "security" has "little credibility" and is primarily designed to force vendors to use CDK for data integration.

**ANSWER**:  CDK admits that the quoted text in paragraph 171 of the Complaint attributed to a former CDK employee appears in a March 2015 Automotive News article.  CDK further admits that the CDK businesses formerly known as DMI and IntegraLink did, at certain times during the relevant period, extract certain data from the Reynolds DMS in fulfillment of certain contracts the companies had with certain vendors.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 171 of the Complaint relating to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 171 of the Complaint.

172.    Significantly, while CDK's own Security First initiative itself recommended improving third-party integration practices and retiring "certain integration that risks data security," it did not recommend terminating all third-party integration.

**ANSWER**:    CDK admits that the SecurityFirst initiative recommends the elimination of certain practices that create security risks, has led to improvements in the 3PA program, and does not recommend terminating all third-party integration with the CDK DMS. CDK denies the remaining allegations in paragraph 172 of the Complaint.

173.    Using independent integrators to enable data flow between parties is standard across industries, including in banking and healthcare, where the data is much more sensitive than anything accessible from dealers. Taking the banking industry as an example, thousands of third party products and services – from well-established companies like PayPal, Mint, Square, and Quicken to new startups like Even – require access to a customer's banking data. There are large data integrators like Intuit and Yodlee that pull data from the consumers' bank accounts and provide that data to the third-party solutions. As the Consumer Financial Protection Bureau stated, "the availability of consumer financial account data . . . has made possible a range of benefits to consumers." *Consumer Access to Financial Records*, Request for Information, Bureau of Consumer Financial Protection, Docket No.: CFPB-2016-0048, at 7 (Nov. 17, 2016).

**ANSWER**:    CDK admits that the quoted text in paragraph 173 of the Complaint appears in the source referenced in the paragraph.    CDK denies that this source justifies hostile access to CDK's DMS.    CDK denies the remaining allegations in paragraph 173 of the Complaint.

174.    At the Authenticom hearing, CDK was unable to offer a single example of a data-security incident involving any independent data integrator. *See* Op. & Order, *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, 2017 WL 3017048, at *2 n.2 (July 14, 2017). Reynolds could cite only a single incident (not involving data security) in which a query became stalled, but the problem was quickly and easily resolved. This is not surprising given that the methods used by third parties to integrate with the DMS are standard methods employed by integrators in multiple industries. CDK has never explained why the standard methods that work in other industries do not work here.

**ANSWER**: CDK denies the allegations in the first sentence of paragraph 174 of the Complaint and denies that the vacated order from *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318 supports those allegations.    CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 174 that relate to individuals or entities other than CDK

and on that basis denies them. CDK denies the remaining allegations in paragraph 174 of the Complaint.

175. CDK also actually uses third-party integration to non-CDK DMS to pull data for *their own standalone products and services*. For example, CDK and Reynolds pay Authenticom to pull data from dealerships using their DMSs and to distribute that data to their applications. And DMI continues to screen scrape data from the Reynolds DMS during the five-year wind-down period pursuant to the February 2015 Agreement. The fact that Reynolds and CDK actually use third-party access themselves proves there is nothing inherently "unsecure" about it.

**ANSWER**: CDK admits that AVRS, a subsidiary of CVR which, in turn, is a joint venture between CDK and Reynolds that provides electronic vehicle registration ("EVR") services in a number of states, used Authenticom for certain data access services at the time of CVR's acquisition of AVRS in 2015. As AVRS's operations are incorporated into CVR, its use of Authenticom is being discontinued. CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds. CDK denies Plaintiffs' characterization of the agreements and states that the contracts speak for themselves. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 175 of the Complaint relating to individuals and entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 175 of the Complaint.

176. In fact, CDK's insistence that vendors integrate with dealer data only through the 3PA program actually imposes unnecessary burdens on the underlying systems. Instead of querying the DMS once, and syndicating any data that is pulled to all vendors that need it, CDK requires every product and service to impose upon the network for the exact same data. That serves no purpose other than to allow CDK to reap a financial windfall by charging each vendor for integration with the same underlying data. For these reasons, the district court in the Authenticom matter concluded that CDK had failed to present evidence of a procompetitive justification for its anticompetitive acts.

**ANSWER**: Paragraph 176 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies Plaintiffs' characterization of the district court's vacated order in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318. CDK denies the remaining allegations in paragraph 176 of the Complaint.

177.    CDK has also used security concerns to defend its arbitrary restrictions on Cox Automotive's integrations with dealer data. For example, CDK has claimed that Xtime cannot be allowed to create or modify repair orders because that would be a security risk. Yet CDK allows other third-parties that it does not fear as competitive threats (*e.g.*, WSA Solutions, formerly known as MOC1 Solutions, and certain other third parties including one or more automotive groups) the right to create and modify repair orders. This shows the security justification is mere pretext; the true reason why CDK denies repair order creation and modification capabilities is that it wants to harm Xtime – the primary competitor to CDK's Service Edge product.

**ANSWER**:  CDK admits that it has taken steps, consistent both with its contracts with its Dealer customers and with CDK's need to provide a stable and secure DMS product to its Dealer customers, to limit the ability of third parties to create and modify dealer data.  CDK denies the remaining allegations in paragraph 177 of the Complaint.

178.    Finally, CDK has failed to implement less-restrictive means of protecting dealer data. For example, CDK could establish application programming interfaces ("APIs") for independent integrators. Indeed, before entering the agreement with Reynolds, CDK even advocated that DMS providers should offer APIs for third-party integrators. Other DMS providers – including Cox Automotive itself – regularly provide API access for third-party integrators. Alternatively, other DMS providers also allow for dealers and vendors to utilize APIs between them directly, which is another less-restrictive means.

**ANSWER**:  Paragraph 178 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 178 of the Complaint relating to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 178 of the Complaint.

## COUNT I:
## HORIZONTAL CONSPIRACY IN VIOLATION OF
## SECTION 1 OF THE SHERMAN ACT

179.    Plaintiffs incorporate by reference the preceding allegations.

**ANSWER**:   CDK incorporates, as if fully set forth herein, its answers to the preceeding paragraphs of the Complaint.

180.    Plaintiffs incorporate by reference the preceding allegations. CDK and Reynolds entered into and engaged in an agreement in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

**ANSWER**:  The Court has granted CDK's motion to dismiss the horizontal conspiracy claim to the extent it is based on a market-division theory and, accordingly, no response to this paragraph is required to the extent it alleges a market-division theory.  To the extent a response is required, CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint. Paragraph 180 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 180 of the Complaint.

181.    CDK and Reynolds are horizontal competitors of one another in the DMS market and the Dealer Data Integration Market.

**ANSWER**:  The Court has granted CDK's motion to dismiss the horizontal conspiracy claim to the extent it is based on a market-division theory and, accordingly, no response to this paragraph is required to the extent it alleges a market-division theory.  To the extent a response is required, paragraph 181 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that CDK and non-party Reynolds are horizontal competitors in the licensing of DMSs to automotive dealers.   CDK denies the remaining allegations in paragraph 181 of the Complaint.

182.    The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding, or concerted action to eliminate competition in the Dealer Data Integration Market and their respective brand-specific aftermarkets. In furtherance of that conspiracy, in February 2015, CDK and Reynolds entered into a written market division agreement pursuant to which they agreed to "close" their DMSs and not to compete in the Dealer Data Integration Market. CDK and Reynolds also engaged in a group boycott to block all third-party access to their respective DMS. The agreement not to compete between CDK and Reynolds is a per se violation of the Sherman Act and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

PUBLIC VERSION

**ANSWER**:  The Court has granted CDK's motion to dismiss the horizontal conspiracy claim to the extent it is based on a market-division theory and, accordingly, no response to this paragraph is required to the extent it alleges a market-division theory.  To the extent a response is required, paragraph 182 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 182 of the Complaint.

183.    The purposes of the conspiracy between CDK and Reynolds include (1) to protect their DMS duopoly (thereby protecting their monopoly profits), (2) to protect their standalone applications, and (3) to monopolize the Dealer Data Integration Market so that they can reap monopoly profits.

**ANSWER**:  The Court has granted CDK's motion to dismiss the horizontal conspiracy claim to the extent it is based on a market-division theory and, accordingly, no response to this paragraph is required to the extent it alleges a market-division theory.  To the extent a response is required, paragraph 183 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 183 of the Complaint.

184.    Through their conspiracy, CDK and Reynolds have caused actual injury to competition for applications and in the Dealer Data Integration Market and respective aftermarkets.

**ANSWER**:  The Court has granted CDK's motion to dismiss the horizontal conspiracy claim to the extent it is based on a market-division theory and, accordingly, no response to this paragraph is required to the extent it alleges a market-division theory.  To the extent a response is required, paragraph 184 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 184 of the Complaint.

185.    The CDK and Reynolds agreement has cut off access to dealer data that solution providers need in order to compete with CDK and Reynolds.

**PUBLIC VERSION**

**ANSWER**:  The Court has granted CDK's motion to dismiss the horizontal conspiracy claim to the extent it is based on a market-division theory and, accordingly, no response to this paragraph is required to the extent it alleges a market-division theory.  To the extent a response is required, paragraph 185 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 185 the Complaint.

186.    CDK and Reynolds possess dominant positions in the DMS market, which they have utilized to further the conspiracy.

**ANSWER**:  The Court has granted CDK's motion to dismiss the horizontal conspiracy claim to the extent it is based on a market-division theory and, accordingly, no response to this paragraph is required to the extent it alleges a market-division theory.  To the extent a response is required, paragraph 186 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 186 of the Complaint.

187.    CDK's and Reynolds' conspiracy and anticompetitive conduct in furtherance thereof do not enhance efficiency or competition in any market. On the contrary, their conduct has produced only anticompetitive effects.

**ANSWER**:  The Court has granted CDK's motion to dismiss the horizontal conspiracy claim to the extent it is based on a market-division theory and, accordingly, no response to this paragraph is required to the extent it alleges a market-division theory.  To the extent a response is required, paragraph 187 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 187 of the Complaint.

188.    As a proximate result of CDK's and Reynolds' unlawful conduct, for which CDK is jointly and severally liable, Cox Automotive has suffered injury to its business or property in an amount to be proven at trial and automatically trebled.

**ANSWER**:  The Court has granted CDK's motion to dismiss the horizontal conspiracy claim to the extent it is based on a market-division theory and, accordingly, no response to this Paragraph is required to the extent it alleges a market-division theory.  To the extent a response is required, Paragraph 188 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition, and denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 188 of the Complaint.

**COUNT II:**
**UNLAWFUL RESTRAINT OF TRADE IN VIOLATION OF**
**SECTION 1 OF THE SHERMAN ACT**

189.    Plaintiffs incorporate by reference the preceding allegations.

**ANSWER**:  CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

190.    CDK entered into contracts with dealers and vendors that contain exclusive dealing provisions that unreasonably restrict trade or commerce in violation of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

**ANSWER**:  Paragraph 190 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 190 of the Complaint.

191.    CDK's contracts with dealers provide that dealers cannot provide any third parties with access to the DMS. Likewise, the contracts with vendors provide that vendors cannot access the DMS except through 3PA. These provisions are standard throughout CDK's contracts with dealers and vendors.

**PUBLIC VERSION**

**ANSWER**: Paragraph 191 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 191 of the Complaint.

192. CDK was able to impose these exclusive dealing provisions on dealers and vendors as a result of its market power in the DMS market and the respective dealer data integration aftermarket.

**ANSWER**: Paragraph 192 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 192 of the Complaint.

193. Because CDK imposed these exclusive dealing provisions pursuant to its conspiracy with Reynolds to eliminate competition, they are per se illegal. Nevertheless, whether entered into pursuant to CDK's agreement with Reynolds or independently, CDK's vertical restraints are unlawful because they have led to increased prices and reduced output.

**ANSWER**: Paragraph 193 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 193 of the Complaint.

194. Through its exclusive dealing provisions, CDK has injured competition in the DMS and Dealer Data Integration markets.

**ANSWER**: Paragraph 194 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition, and denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 194 of the Complaint.

195. CDK's exclusive dealing agreements do not enhance efficiency or competition in any market. On the contrary, the agreements have produced only anticompetitive effects.

PUBLIC VERSION

**ANSWER**:  Paragraph 195 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 195 of the Complaint.

196.    As a proximate result of CDK's unlawful conduct, Cox Automotive has suffered injury to its business or property in an amount to be proven at trial and automatically trebled.

**ANSWER**:  Paragraph 196 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition, and denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 196 of the Complaint.

## COUNT III:
## UNLAWFUL TYING IN VIOLATION OF
## SECTION 1 OF THE SHERMAN ACT

197.    Plaintiffs incorporate by reference the preceding allegations.

**ANSWER:**  The Court has granted CDK's motion to dismiss the tying claim and, accordingly, no response to this paragraph is required.  To the extent one is required, CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

198.    CDK has imposed an unlawful tying arrangement on dealers in violation of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

**ANSWER**:  The Court has granted CDK's motion to dismiss the tying claim and, accordingly, no response to this paragraph is required.  To the extent one is required, paragraph 198 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 198 of the Complaint.

199.    CDK has market power in the DMS market. When a dealer purchases CDK's DMS, CDK also forces the dealer to rely on CDK's data integration product, 3PA. Dealers have no choice to utilize other data integration products for CDK's DMS.

**ANSWER**:  The Court has granted CDK's motion to dismiss the tying claim and, accordingly, no response to this paragraph is required.  To the extent one is required, paragraph 199 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 199 of the Complaint.

200.    Dealers, not vendors, make the decision regarding which data integration product to "purchase." Dealers must provide authorization for any data integrator to access a DMS, and a vendor cannot use a data integrator that a dealer has not approved. Accordingly, the dealer is the purchaser of both the tying product (the DMS) and the tied product (data integration).

**ANSWER**:  The Court has granted CDK's motion to dismiss the tying claim and, accordingly, no response to this paragraph is required.  To the extent one is required, paragraph 200 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 200 of the Complaint.

201.    CDK has sufficient market power in the tying market (DMS) to appreciably restrain free competition in the market for the tied product (data integration). CDK has demonstrated its ability to leverage their market power in the tying market to control prices and exclude competition in the tied market.

**ANSWER**:  The Court has granted CDK's motion to dismiss the tying claim and, accordingly, no response to this paragraph is required.  To the extent one is required, paragraph 201 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 201 of the Complaint.

202.    CDK's tying arrangement has affected a substantial amount of commerce in the market for the tied product.

**ANSWER**:  The Court has granted CDK's motion to dismiss the tying claim and, accordingly, no response to this paragraph is required.  To the extent one is required, paragraph 202 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 202 of the Complaint.

203.    Although vendors often pass on a portion of the costs of data integration to the dealer, this tying arrangement directly harms vendors like Cox Automotive because those

vendors are: (i) at a competitive disadvantage versus CDK's corresponding products and services (because such products and services do not incur integration fees); (ii) not able to pass on all data integration costs; and (iii) less able to allocate funding to develop new products, services, functionality, and features.

**ANSWER**: The Court has granted CDK's motion to dismiss the tying claim and, accordingly, no response to this paragraph is required. To the extent one is required, paragraph 203 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition, and denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 203 of the Complaint.

204. As a proximate result of CDK's unlawful tying arrangement, Plaintiffs have suffered injury to their business or property in an amount to be proven at trial and automatically trebled.

**ANSWER**: The Court has granted CDK's motion to dismiss the tying claim and, accordingly, no response to this paragraph is required. To the extent one is required, paragraph 204 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition, and denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 204 of the Complaint.

## COUNT IV:
## UNLAWFUL MONOPOLIZATION IN VIOLATION OF
## SECTION 2 OF THE SHERMAN ACT

205. Plaintiffs incorporate by reference the preceding allegations.

**ANSWER**: CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

206.    CDK has unlawfully monopolized the aftermarket for dealer data integration services with respect to dealer data stored on the CDK DMS, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER**:  Paragraph 206 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 206 of the Complaint.

207.    When dealers purchase DMS services from CDK, they are "locked in" to that purchase through a long-term contractual relationship and high switching and information costs.

**ANSWER**:  Paragraph 207 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 207 of the Complaint.

208.    Because of customer lock-in in the primary DMS market, CDK has monopoly power – and in fact has monopolized – the Dealer Data Integration aftermarket on its DMS platform.  CDK has demonstrated its ability to control prices and exclude competition by blocking third-party access to their DMS by raising data access fees to supracompetitive levels.

**ANSWER**:  Paragraph 208 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 208 of the Complaint.

209.    CDK used anticompetitive means to acquire and maintain its monopoly, including, *inter alia*, by blocking third-party access to the DMS, entering into a market division agreement pursuant to which it agreed with Reynolds that neither DMS provider would provide third-party access to the other's DMS, and imposing anticompetitive exclusive dealing arrangements on vendors and dealers.

**ANSWER**:  Paragraph 209 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 209 of the Complaint.

210.    As a direct and proximate result of CDK's monopolization, Cox Automotive has suffered damage to its business or property in an amount to be proven at trial and automatically trebled.

**ANSWER**: Paragraph 210 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition, and denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 210 of the Complaint.

## COUNT V:
## VIOLATION OF THE CARTWRIGHT ACT

211. Plaintiffs incorporate by reference the preceding allegations.

**ANSWER**: CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

212. CDK and non-defendant co-conspirator Reynolds engaged in a conspiracy in unreasonable restraint of trade in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, for all the reasons set forth in the preceding allegations. This conspiracy is a per se violation of the Cartwright Act and is, in any event, an unreasonable and unlawful restraint of trade and commerce. CDK's exclusive dealing requirements are also unlawful under the Cartwright Act.

**ANSWER**: Paragraph 212 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 212 of the Complaint.

213. A substantial portion of the unlawful and unfair acts and practices alleged herein occurred in California – where numerous dealers, Kelly Blue Book, and Xtime are located – and harm to Kelly Blue Book, Xtime, car dealers, and car buyers was suffered in California.

**ANSWER**: Paragraph 213 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 213 of the Complaint.

214. As a direct and proximate result of CDK's unlawful conduct, Cox Automotive has suffered injury to its business or property. Cox Automotive is entitled to treble damages for the violations of the Cartwright Act alleged herein.

**ANSWER**:  Paragraph 214 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition, and denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 214 of the Complaint.

## COUNT VI:
## UNLAWFUL PRACTICES IN VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW

215.    Plaintiffs incorporate by reference the preceding allegations.

**ANSWER:**    CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

216.    The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, defines "unfair competition" to include, among other things, any "unlawful . . . business act or practice."

**ANSWER**:  Paragraph 216 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.,* defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

217.    CDK has engaged in "unlawful" business acts and practices as alleged herein in violation of, among other laws, the Sherman Act, 15 U.S.C. §§ 1 and 2; the Cartwright Act, Cal. Bus. & Prof. Code § 16720; and common law, including the torts of interference with prospective economic relations and defamation.

**ANSWER**:  Paragraph 217 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 217 of the Complaint.

218.    A substantial portion of the unlawful acts and practices alleged herein occurred in California – where numerous dealers, Kelly Blue Book, and Xtime are located – and harm to Kelly Blue Book, Xtime, car dealers, and car buyers was inflicted in California, for all the reasons set forth in the preceding allegations.

**ANSWER**:  Paragraph 218 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 218 of the Complaint.

219.    As a direct and proximate result of CDK's unlawful conduct, Cox Automotive has suffered injury to its business or property. Cox Automotive is entitled to restitution in an amount to be proven at trial.

**ANSWER**:  Paragraph 219 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition, and denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 219 of the Complaint.

**COUNT VII:**
**UNFAIR PRACTICES IN VIOLATION OF CALIFORNIA UNFAIR**
**COMPETITION LAW**

220.    Plaintiffs incorporate by reference the preceding allegations.

**ANSWER**:  CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

221.    The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, defines "unfair competition" to include, among other things, any "unfair . . . business act or practice."

**ANSWER**:  Paragraph 221 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq*., defines "unfair competition"

to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

222.     CDK's acts and practices as alleged herein have been "unfair" under the UCL. CDK's conduct – for instance, its "tilt-the-table approach" in placing anticompetitive restrictions on competing services and products that it does not place on its own corresponding solutions – has violated the policy and spirit of the antitrust laws (namely, the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Cartwright Act, Cal. Bus. & Prof. Code § 16720) and significantly threatened and harmed competition for data integration services and among the products and services that rely on those services. Furthermore, any utility from CDK's conduct does not outweigh the harm it causes to competitors, car dealers, and car buyers.

**ANSWER**:  Paragraph 222 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 222 of the Complaint.

223.     A substantial portion of the unfair acts and practices alleged herein occurred in California and the harm to application providers, car dealers, and car buyers was inflicted in California, for all the reasons set forth in the preceding allegations.

**ANSWER**:  Paragraph 223 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 223 of the Complaint.

224.     As a direct and proximate result of CDK's unfair conduct, Cox Automotive has suffered injury to its business or property. Cox Automotive is entitled to restitution in an amount to be proven at trial.

**ANSWER**:  Paragraph 224 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition, and denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 224 of the Complaint.

## COUNT VIII:
## FRAUDULENT INDUCEMENT

225.    Plaintiffs incorporate by reference the preceding allegations.

**ANSWER**:  CDK incorporates, as if fully set forth herein, its answers to the preceding

paragraphs of the Complaint.

226.    In order to induce Cox Automotive to sign the Managed Interface Agreement in
January 2016, CDK falsely represented to Cox Automotive that Cox Automotive would receive
the ▮▮▮▮▮ for data access given to any third-party solution vendor. That representation was
false and intended to induce Cox Automotive to enter into the Managed Interface Agreement. In
fact, CDK provided Reynolds with 3PA access for free for five years.

**ANSWER**:  Paragraph 226 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

226 of the Complaint.

227.    CDK knew that the statements made to Cox Automotive were false. It had entered
into the Data Exchange Agreement in February 2015, before it approached Cox Automotive to
negotiate a "refreshed" omnibus 3PA agreement.

**ANSWER**:  Paragraph 227 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

227 of the Complaint.

228.    CDK intended for Cox Automotive to rely on these false representations. These
representations were made during negotiations about the "refreshed" 3PA agreements.

**ANSWER**:  Paragraph 228 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

228 of the Complaint.

229.    Cox Automotive justifiably relied on CDK's false representations. Cox
Automotive had no way of knowing that CDK was giving away free 3PA integration to another
third-party solution vendor (Reynolds).

**ANSWER**:  Paragraph 229 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 229 of the Complaint.

230.     If Cox Automotive had known that these representations were false, it would have demanded different terms in the Managed Interface Agreement entered into by Cox Automotive and CDK on January 8, 2016, or would never have entered into the agreement at all.

**ANSWER**:  Paragraph 230 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 230 of the Complaint.

231.     At trial, Cox Automotive will prove the precise amount of damages suffered.

**ANSWER**:  Paragraph 231 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition, and denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 231 of the Complaint.

### COUNT IX:
### BREACH OF CONTRACT

232.     Plaintiffs incorporate by reference the preceding allegations.

**ANSWER**:  CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

233.     Section 3(b) of the vendor contract dated January 8, 2016 between CDK and Cox Automotive states: "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"

**ANSWER**:  Paragraph 233 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that the substance of the excerpted text cited in paragraph 233 of the Complaint appears in CDK's 3PA agreement with Cox that was in place during the relevant time period.

234.    Cox Automotive is in compliance with all material obligations of the vendor contract with CDK.

**ANSWER**:  Paragraph 234 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 234 of the Complaint.

235.    CDK has breached Section 3(b) by providing Reynolds' products and services that are substantially similar to Cox Automotive's corresponding solutions with free 3PA integration (such as Reynolds SSK Tool) and by not reducing the integration fees charged to Cox Automotive accordingly.

**ANSWER**:  Paragraph 235 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 235 of the Complaint.

236.    At trial, Cox Automotive will prove the precise amount of damages suffered.

**ANSWER**:  Paragraph 236 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition, and denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 236 of the Complaint.

## COUNT X:
## UNFAIR TRADE PRACTICES

237.    Plaintiffs incorporate by reference the preceding allegations.

PUBLIC VERSION

**ANSWER**:  The Court has granted CDK's motion to dismiss the Unfair Trade Practices claim and, accordingly, no response to this paragraph is required.  To the extent one is required, CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

238.    The California Unfair Trade Practices ("UTP"), Cal. Bus. & Prof. Code § 17000 *et seq.*, makes unlawful "secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition." *Id.* § 17045.

**ANSWER**:  The Court has granted CDK's motion to dismiss the Unfair Trade Practices claim and, accordingly, no response to this paragraph is required.  To the extent one is required, paragraph 238 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that the California Unfair Trade Practices Act, Cal. Bus. & Prof. Code § 17045, states: "The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful."

239.    CDK has granted secret discounts to Reynolds – free 3PA access – through the Data Exchange Agreement that are not made available to other vendors.

**ANSWER**:  The Court has granted CDK's motion to dismiss the Unfair Trade Practices claim and, accordingly, no response to this paragraph is required.  To the extent one is required, paragraph 239 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 239 of the Complaint.

240.    CDK's preferential data access to certain products and services (for its own and for Reynolds') tends to destroy competition for such products and services because integration with dealer data is essential to the proper functioning of those solutions.

**ANSWER**:  The Court has granted CDK's motion to dismiss the Unfair Trade Practices claim and, accordingly, no response to this paragraph is required.  To the extent one is required, paragraph 240 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 240 of the Complaint.

241.    At trial, Cox Automotive will prove the precise amount of damages suffered.

**ANSWER**:  The Court has granted CDK's motion to dismiss the Unfair Trade Practices claim and, accordingly, no response to this paragraph is required.  To the extent one is required, paragraph 241 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition, and denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 241 of the Complaint.

## COUNT XI:
## DEFAMATION

242.    Plaintiffs incorporate by reference the preceding allegations.

**ANSWER**:  CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

243.    CDK published false statements to Nissan Motor Acceptance Corp. and American Honda Finance Corp. about why Cox Automotive's Dealertrack Sales and F&I electronic contracting solution could not complete a lease transaction without manual, duplicative data entry.

**ANSWER**:  Paragraph 243 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 243 of the Complaint.

244.    These false statements have damaged Cox Automotive's reputation with its business partner, Nissan Motor Acceptance Corp., and within the retail automotive industry more generally.

**ANSWER**:  Paragraph 244 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 244 of the Complaint.

245.    CDK's false statements were neither privileged nor authorized.

**ANSWER**:  Paragraph 245 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 245 of the Complaint.

246.    At trial, Cox Automotive will prove the precise amount of damages suffered.

**ANSWER**:  Paragraph 246 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition, and denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 246 of the Complaint.

### JURY DEMAND

247.    In accordance with Federal Rule of Civil Procedure 38(b), Cox Automotive demands a trial by jury on all issues so triable.

**ANSWER**:  To the extent that an answer may be required to the Jury Demand at the end of Plaintiffs' Complaint, CDK denies each and every allegation therein.

### PRAYER FOR RELIEF

WHEREFORE, Cox Automotive requests that the Court:

(a)    decree that CDK entered into an unlawful horizontal conspiracy with Reynolds in violation of Section 1 of the Sherman Act;

(b) decree that the exclusive dealing provisions in CDK's contracts with Cox Automotive, other vendors, and dealers are anticompetitive and illegal restrictions of trade under Section 1 of the Sherman Act;

(c) decree that the tying provisions in CDK's contracts with Cox Automotive are anticompetitive and illegal restrictions in trade under Section 1 of the Sherman Act;

(d) decree that CDK has illegally monopolized the market for integration services for dealer data stored on its DMS platform under Section 2 of the Sherman Act;

(e) enjoin the enforcement of the exclusive dealing provisions in the CDK contracts with dealers and vendors;

(f) reform Cox Automotive's 3PA contract with CDK to remedy CDK's fraud and other unlawful behavior;

(g) enjoin CDK from privileging its own products and services – as compared to Cox Automotive's products and services – with respect to integration with data elements stored on mutual dealer clients' DMSs, including with respect to data access and usage rights, and bidirectional integration;

(h) award Cox Automotive damages, as provided under the Sherman Act and the Cartwright Act, and hold CDK jointly and severally liable for all damages resulting from CDK's unlawful conspiracy in restraint of trade with Reynolds, to be entered against CDK in an amount to be trebled in accordance with the Sherman Act and the Cartwright Act;

(i) award appropriate actual and punitive damages for CDK's common law violations;

(j) award Cox Automotive its reasonable costs and expenses incurred in this action, including expert fees and attorneys' fees;

(k) award Cox Automotive prejudgment interest; and

(l) award Cox Automotive any such further relief that the Court may deem just and proper.

**ANSWER**: To the extent that an answer may be required to the Prayer for Relief at the end of the Complaint, CDK denies each and every allegation contained therein and denies that Plaintiffs are entitled to the relief they seek.

* * * * * *

## DENIAL

CDK denies each and every allegation of the Complaint not specifically admitted above.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

Without assuming any burden of proof that it would not otherwise bear, CDK also asserts the following affirmative and additional defenses:

### First Defense

The Complaint fails to state a claim upon which relief may be granted.

### Second Defense

Plaintiffs' claim is barred, in whole or in part, by the applicable statute of limitations. Plaintiffs filed this action on December 11, 2017. Plaintiffs have not pled any event that would toll any applicable limitations period. As such, the statutory time limitation applicable to some or all of each of Plaintiffs' claims have passed and thus are time-barred.

### Third Defense

If and to the extent that Plaintiffs have been damaged, which CDK denies, the amount of damages that Plaintiffs allege to have suffered is too remote or speculative to allow recovery, and it is impossible to ascertain and allocate such alleged damages with reasonable certainty.

### Fourth Defense

If and to the extent Plaintiffs have been damaged, which CDK denies, Plaintiffs, by the exercise of reasonable diligence, could have mitigated their damages but did not, and Plaintiffs are therefore barred from recovery. Alternatively, any damages sustained by Plaintiffs, which CDK denies, must be reduced by the amount that such damages would have been reduced had Plaintiffs exercised reasonable diligence in mitigating their damages.

### Fifth Defense

Some or all of Plaintiffs' claims are subject to a valid and enforceable contractual limitation on liability. For instance, under Section 6 of the 3PA Agreement Plaintiffs may not recover any monetary damages from CDK "in excess of the amount of fees actually paid or payable to CDK by vendor and its affiliates under this Agreement during the six months precending the date when such liability accrued." In addition, that same section bars recovery of any "special, indirect, incidental, consequential or exemplary damages which the other party of its affiliates may incur or experience on account of entering into or relying on this agreement . . . ." (capitalization removed). Accordingly, Cox is not entitled to recover any damages inconsistent with Section 6 of the 3PA Agreement.

### Sixth Defense

Plaintiffs' claims are barred, in whole or in part, based on the doctrines of estoppel, laches, and waiver as Plaintiffs' claims are based, in part, on actions and events spanning more than 10 years. Plaintiff has pled no facts to explain or justify why this lawsuit was filed when it was filed. To the extent that Plaintiffs could have brought essentially the same suit years earlier, Plaintiffs are barred from pursuing all or part of its claims by the doctrines of estoppel and laches.

### Seventh Defense

Plaintiffs' claims are barred, in whole or in part, because CDK's conduct was pro-competitive, reasonable and permissible, and was based on independent, legitimate and self-interested business and economic justifications.

### Eighth Defense

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have not suffered any legally cognizable injury, including because Plaintiffs have not suffered an injury-in-fact and

**PUBLIC VERSION**

their alleged injuries are too speculative, indirect and remote from the alleged conduct, and cannot be ascertained and apportioned.

### Ninth Defense

Plaintiffs' claims are barred, in whole or in part, because none of CDK's alleged actions or omissions substantially lessened competition within any properly defined market.

### Tenth Defense

Plaintiffs' claims are barred, in whole or in part, because to the extent Plaintiffs suffered any injury or incurred any damages as alleged in the Complaint, which CDK denies, CDK's alleged conduct was not the actual or proximate cause of any injury or damage to Plaintiff.

### Eleventh Defense

Plaintiffs' claims are barred, in whole or in part, because to the extent Plaintiffs suffered any injury or incurred any damages as alleged in the Complaint, which CDK denies, any such injury or damage was caused and brought about by the acts, conduct or omissions of individuals or entities other than CDK and, as such, any recovery herein should be precluded or diminished in proportion to the amount of fault attributable to such other individuals or entities.

### Twelfth Defense

Plaintiffs' claims are barred, in whole or in part, because to the extent Plaintiff suffered any injury or incurred any damages as alleged in the Complaint, which CDK denies, any such injury or damage was caused and brought about by intervening or superseding events, factors, occurrences, conditions or acts of others, including forces in the marketplace, and not by the alleged wrongful conduct on the part of CDK.

### Thirteenth Defense

Plaintiffs' claims are barred, in whole or in part, because any recovery would result in unjust enrichment to Plaintiffs.

PUBLIC VERSION

## Fourteenth Defense

Plaintiffs' claims are barred, in whole or in part, because their alleged damages, if any, are too speculative, uncertain, and not of the nature or to the extent alleged.

## Fifteenth Defense

Plaintiffs' claims are barred, in whole or in part, because the Complaint has insufficiently alleged a relevant product market and geographic market and is so vague and ambiguous as to deny CDK notice of the markets alleged by Plaintiffs.

\* \* \* \* \* \*

In addition, CDK has insufficient knowledge or information upon which to form a basis as to whether it may have additional, as-yet-unstated, separate defenses available to it. CDK reserves the right to amend this Answer to add, supplement, or modify defenses based upon legal theories that may be or will be divulged through clarification of the Complaint, through the Court's decision on CDK's concurrently filed motion to dismiss, through discovery, or through further factual or legal analysis of Plaintiff's allegations, contentions and positions in this litigation.

## JURY DEMAND

Pursuant to Federal Rules of Civil Procedure, Rule 38(b), CDK hereby demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, CDK requests that Plaintiffs' Complaint be dismissed with prejudice, that the Court find that Plaintiffs are not entitled to any judgment or relief, that the Court enter judgment in favor of CDK, and that the Court award CDK its attorneys' fees, costs and expenses, pre-judgment interest, and such other and further relief as the Court deems just and proper.

**COUNTER-PLAINTIFF CDK GLOBAL, LLC'S COUNTERCLAIMS AGAINST COX AUTOMOTIVE, INC., XTIME, INC., VAUTO, INC., DEALERTRACK, INC., AND AUTOTRADER.COM, INC.**

CDK Global, LLC ("CDK" or "Counter-Plaintiff") brings these Counterclaims against Counter-Defendants Cox Automotive, Inc. ("Cox Automotive"), Xtime, Inc. ("Xtime"), vAuto, Inc. ("vAuto"), Dealertrack, Inc. ("Dealertrack"), and Autotrader.com, Inc. ("Autotrader") (collectively, "Counter-Defendants" or "Cox") for violations of the Computer Fraud and Abuse Act ("CFAA"), the Georgia Computer Systems Protection Act ("GCSPA"), the Digital Millennium Copyright Act ("DMCA"), and for breach of contract, fraud, and unjust enrichment.

CDK alleges the following based upon information and belief, except as to those allegations set forth below that are based on CDK's knowledge.

**INTRODUCTION**

1.      While falsely claiming that CDK is in breach of a purported "Most Favored Nations" provision in the parties' Managed Interface Agreement ("3PA Agreement")[3], *see Cox Complaint* (*Cox* Dkt. 1) ("Compl.") ¶¶ 232-36, Cox itself is knowingly violating the 3PA Agreement's express prohibition against the unauthorized syndication of DMS data (that is, transmitting, providing, or selling DMS data to third parties not authorized to receive it) to other third parties and other Cox applications. As further explained below, the 3PA Agreement expressly prohibits Cox from copying, licensing, or transferring any data that it obtains from CDK's DMS to third parties ████████████████ and requires Cox to use that data only in connection with providing the specific *Cox* applications identified in the 3PA Agreement.

---

[3] In its complaint, Cox refers to the contract as the parties' "3PA agreement," in reference to CDK's Third Party Access ("3PA") Program, now known as the CDK Global Partner Program. For the Court's convenience, these counterclaims refer to the parties' agreement as the "3PA Agreement" and to CDK's third-party access program as the "3PA" program notwithstanding the name change.

**PUBLIC VERSION**

2.      Cox agreed to these provisions in the 3PA Agreement with no intention of honoring them. In particular, Cox has been taking data that it obtains from CDK's DMS through the 3PA program and syndicating it to other third parties. ██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ in violation of both the 3PA Agreement and the contracts between CDK and its dealer customers.

3.      Cox evades technological measures that CDK has put in place to protect its DMS from this type of unauthorized third-party access. In particular, Dealertrack has repeatedly used automated means to get around CDK's CAPTCHA controls, which are designed to ensure that only authorized dealership employees, and not Cox computers, can access CDK's DMS.

4.      In addition, Cox affiliate Autotrader is also in breach of a separate Data License Agreement between CDK and Autotrader. Pursuant to the Data License Agreement, CDK licenses certain vehicle inventory listing data maintained on Autotrader's website, which car dealers (among other sellers) use to sell new, certified, and used vehicles.

5.      CDK was induced to enter into the Data License Agreement—██████████████ ████████████████████████████████████████—based on a provision in the Agreement that expressly requires Autotrader to work with CDK "in good faith" to develop a method of providing two sales metrics for vehicles that are advertised on the Autotrader website: the number of times those vehicles appear in user-generated search results pages ("SRP") and the number of times that users actually "click" on those results to view the vehicle details page ("VDP") maintained for those vehicles.

**PUBLIC VERSION**

6.      Despite CDK's repeated requests, Autotrader has refused to engage with CDK in good faith about providing SRP and VDP metrics. Without these metrics, the data provided to CDK under the Data License Agreement has significantly less commercial value.

7.      At bottom, Cox is in breach of multiple agreements with CDK, including the 3PA Agreement that is at the center its antitrust lawsuit; is unlawfully syndicating data that it obtains from CDK's DMS; and is directly accessing CDK's DMS without authorization using automated means. CDK accordingly seeks both statutory and actual damages from Cox, as well as an injunction barring Cox from engaging in further unlawful conduct.

## PARTIES

8.      Counter-Plaintiff CDK Global, LLC is a Delaware limited liability company with its corporate headquarters and principal place of business at 1950 Hassell Road, Hoffman Estates, Illinois 60169. CDK is a global provider of integrated information technology and digital marketing solutions to the automotive retail industry.

9.      The automotive data ecosystem that CDK supports is massive, with tens of thousands of installations of approved vendor applications and millions of transactions every day, supporting hundreds of billions of dollars in commerce each year. CDK has made tremendous investments to build out and support its network of products and service offerings. Over the last three years alone, CDK has spent more than $480 million researching, developing, and deploying new and enhanced product solutions for its customers.

10.     In light of its network's size, scope, and importance to the American economy, CDK has been designated by the Department of Homeland Security as a Critical National

**PUBLIC VERSION**

Infrastructure "so vital to the United States that [its] incapacitation would have a debilitating effect on security [and] national economic security."[4]

11.     Counter-Defendant Cox Automotive is a Delaware corporation with its corporate headquarters and principal place of business at 6205 Peachtree Dunwoody Road, Atlanta, Georgia 30328. By its own allegations, "Cox Automotive is one of the world's largest automotive software products and services companies, providing a comprehensive set of solutions for dealers, manufacturers, lenders, and other businesses in the automotive industry in the United States, and other countries." Compl. ¶ 6.

12.     Cox Automotive exercises substantial control over the decision-making and operations of its subsidiaries, including Autotrader, Dealertrack, vAuto, and Xtime. Cox Automotive also directs these affiliates' operations, including their marketing, budgets, investments in technology and services, and other functions normally handled internally by a corporate entity. Employees and agents of Cox Automotive negotiated and drafted both the 3PA Agreement and Data License Agreement.

13.     Counter-Defendant Autotrader is a Delaware corporation with its corporate headquarters and principal place of business at 3003 Summit Boulevard, Suite 200, Atlanta, Georgia 30319. Autotrader is a subsidiary of Cox Automotive.

14.     Counter-Defendant Dealertrack is a Delaware corporation with its corporate headquarters and principal place of business at 3400 New Hyde Park Road, North Hills, New York 11042. Dealertrack is a subsidiary of Cox Automotive.

---

[4] *See* Dep't of Homeland Security, What is Critical Infrastructure?, *available at* perma.cc/N8JR-YQ6Y.

PUBLIC VERSION

15.     Counter-Defendant vAuto is a Delaware corporation with its corporate headquarters and principal place of business at 1901 South Meyers, Suite 700, Oakbrook Terrace, Illinois 60181. vAuto is a subsidiary of Cox Automotive.

16.     Counter-Defendant Xtime is a Delaware corporation with its corporate headquarters and principal place of business at 1400 Bridge Parkway, Suite 200, Redwood City, California 94065. Xtime is a subsidiary of Cox Automotive.

## NATURE OF THE COUNTERCLAIMS

17.     These counterclaims arise under the CFAA, the GCSPA, the DMCA, and common law theories of breach of contract, fraud, and unjust enrichment.

18.     This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1331 and 1367(a). There is federal question jurisdiction under 28 U.S.C. § 1331, because CDK alleges violations of the CFAA and DMCA. There is supplemental jurisdiction over the state law counterclaims pursuant to 28 U.S.C. § 1367(a), because they are so related to CDK's federal-law counterclaims and Cox's claims that they form part of the same case or controversy.

19.     This Court has personal jurisdiction over Cox, because it is located and does business in the District in which this action was filed; because many of the actions giving rise to these counterclaims occurred in, and/or were directed from, this District; and because Cox filed its complaint against CDK in this District.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c).

PUBLIC VERSION

## FACTUAL ALLEGATIONS

### A.  CDK's DMS

21.     CDK's DMS offering (referred to herein as "CDK's DMS" or "the CDK DMS") primarily consists of two enterprise software products—Drive and DASH—that provide dealers with proprietary software tools and resources used to manage core aspects of their business. CDK's DMS currently is licensed to more than 27,000 dealerships across the world and more than 8,000 new and used car dealerships in North America.

22.     CDK has invested hundreds of millions of dollars to develop the hardware and software components of its DMS. CDK's DMS also includes, and is largely comprised of, valuable pieces of intellectual property, including patented technologies, proprietary software elements and programs created by CDK (including software programs protected by the copyright laws), and proprietary data collections, which are accessible through the DMS. At all relevant times, and as CDK's contracts with dealers and third parties make clear, the DMS has remained the sole and exclusive property of CDK. Dealers that purchase DMS services from CDK are granted a personal, non-transferable, license to *use* CDK's DMS in accordance with the terms and conditions of their agreements.

23.     CDK's DMS offering consists of software and hardware components residing at both the dealership ("dealership network") and at CDK's data centers ("CDK network").[5] CDK uses state-of-the-art technology to secure the connections between the dealerships and the CDK network, including through specialized hardware at each dealership site. That hardware creates a "virtual private network" ("VPN") or "Leased-Line Multiprotocol Label Switching network"

---

[5] In a few instances, the server side of the DMS system is located on a dealership's premises rather than offsite at a CDK data center.

**PUBLIC VERSION**

("MPLS") between the dealership and the CDK network, which accepts direct communications only from computers on the corresponding dealership's network.

24.     CDK's terminal program that runs on dealer computers is an original and independent work created and licensed by CDK. It consists of original and distinct elements, including its source and object code; distinctive screen layouts; graphical content; text; arrangement, organization, and display of information; and dynamic user experience.

25.     In addition to its core functionalities, the CDK DMS stores voluminous amounts of financial and accounting information and highly sensitive data, including financial statements, accounting data, payroll information, sales figures, inventory, parts data, warranty information, appointment records, service and repair records, vehicle information, customer personal identifiable information, proprietary intellectual property, and proprietary data that belongs to CDK and third parties, including the data described below. CDK encrypts sensitive data in the DMS and appropriately expunges stale data regularly.

26.     Data housed in CDK's DMS belongs to several different types of entities. Some data is proprietary to OEMs, such as prices and part numbers for replacement parts, labor rates, and rebate, incentive, and warranty information. Other data in CDK's DMS is proprietary to third-party service providers, such as credit reporting bureaus like Equifax, Experian, and TransUnion. Still other data in the DMS is CDK's own proprietary, copyrighted data, including forms, accounting rules, tax tables, and proprietary tools and data compilations. And some data "belongs" to the dealers that use CDK's DMS. While access to third-party proprietary information in the DMS is permitted for licensed DMS customers, CDK is prohibited from sharing much of this information with other third parties absent a valid license.

27. CDK's DMS is password protected. To access the DMS, each dealership employee must use his or her individual login credentials. Additionally, in or around November 2017, CDK began introducing a CAPTCHA control for particular usernames that CDK suspected were being used to facilitate unauthorized access to its DMS by third parties. The CAPTCHA requires the person attempting to access the system to confirm that the person is a dealership employee before accessing CDK's DMS.

28. The standard Master Services Agreement ("MSA") between CDK and its dealer customers prohibits dealers from supplying DMS login credentials to third parties or otherwise granting third parties access to CDK's DMS: "Client shall not allow access to [the CDK DMS] by any third parties except as otherwise permitted by this agreement." MSA § 4(D).

29. Pursuant to the MSA, the dealer expressly agrees, among other things, that it will only use CDK's software "for its own internal business purposes and will not sell or otherwise provide, directly or indirectly, any Products or Services, or any portion thereof to any third party" (*id.* § 4(B)); and that it will "treat as confidential and will not disclose or otherwise make available any of the Products or Services (including, without limitation, screen displays or user documentation) or any … proprietary data, information,  or documentation related thereto … in any form, to any person other than employees of [the dealer]…" (*id.* § 4(D)).  The dealer also acknowledges that notwithstanding its license to use the CDK DMS, the DMS remains at all times "the exclusive and confidential property of [CDK]." *Id.* § 4(A).

30. Additionally, the MSA independently prohibits "ANY THIRD PARTY SOFTWARE TO ACCESS THE CDK DEALER MANAGEMENT SYSTEM." MSA § 6(B).

**PUBLIC VERSION**

### B. CDK's 3PA Program

31. Introduced by CDK in 2000, the 3PA program is an interface that currently provides managed, bi-directional integration with CDK's DMS (defined in the 3PA Agreement as the "CDK Interface System"). For example, the third-party marketing website TrueCar generates sales leads on behalf of dealerships. TrueCar integrates with CDK's DMS through the 3PA program to access sales transaction data, which it uses to validate vehicle sales based on TrueCar leads. This is one example of hundreds of third-party applications that integrate with CDK's DMS through the CDK Interface System.

32. CDK has implemented technical and contractual restrictions to prevent unauthorized access to material that is protected by applicable law, including federal copyright law, within its DMS. Among other things, CDK places access restrictions on its DMS, including secure login credentials and CAPTCHA controls. Additionally, CDK limits each third party's access to the categories of data and permissions the third party needs for the applications it provides. CDK also audits third-party integration, including which data elements in the DMS are being accessed by each 3PA program participant and how frequently they are being accessed.

33. Each vendor participating in the 3PA program enters into a written agreement with CDK, which grants the vendor a limited, non-transferrable license to use the CDK Interface System to access, send, and/or receive certain data on the DMS solely for the purpose of providing specific applications to CDK dealers. These applications are described in detailed Statements of Work ("SOWs") that accompany the vendor's 3PA contract with CDK. From the inception of the 3PA program, CDK's standard 3PA contracts have strictly prohibited the unauthorized syndication of any data obtained though the 3PA program to third parties and have required 3PA program participants to use the data only in connection with providing the specific

**PUBLIC VERSION**

applications identified in their SOWs. These restrictions are designed to ensure that 3PA program participants are the end user of the DMS data they access and their access is limited to what is necessary to support the applications that they have certified in the 3PA program.

## C.    The CDK-Cox 3PA Agreement

34.    The current 3PA Agreement between CDK and Cox is dated January 8, 2016. In accordance with that Agreement and its accompanying Statements of Work, several applications offered by Cox Automotive and its subsidiaries (identified as Cox "Affiliates" in the 3PA Agreement) use the CDK Interface System to obtain data maintained in CDK's DMS, including Cox affiliates Xtime, vAuto, and Dealertrack.

35.    Among other data fields, Xtime obtains service-related data (including service appointments, service customers, service operations codes, and open and closed service sales) maintained in CDK's DMS in connection with Xtime's Spectrum and Service Pro applications. vAuto obtains inventory-related data maintained in CDK's DMS in connection with its vehicle inventory analytics applications. These Xtime and vAuto applications obtain an initial set of data from CDK's DMS and then periodically "sync" with the DMS—usually multiple times per day—to obtain new or updated data from the DMS.

36.    Section 1(c) of the 3PA Agreement █████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

37.     For the avoidance of doubt, Section 1(c) of the 3PA Agreement █████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████

38.     The 3PA Agreement's express prohibitions against third-party syndication were

specifically negotiated and agreed upon by the parties. ██████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████. None of

those exceptions apply to the conduct described below.

39.     Section 1(f) of the 3PA Agreement further provides that ████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████

[REDACTED]

**D.      Cox's Unauthorized Data Syndication to Third Parties**

40.      Contrary to its assurances, Cox has been engaging in widespread unauthorized syndication of CDK DMS data in violation of the 3PA Agreement.

41.      CDK first became aware of Cox's unlawful conduct when it discovered, through an Automotive News article published in or around April 2017, that Cox affiliate vAuto was syndicating DMS vehicle inventory data to third-party Honcker, an online car leasing application. Honcker enables consumers to complete the car leasing process online by sending lease offers to consumers after a "soft credit check." On information and belief, Honcker does not market automobile inventory through internet sites or hard copy print publications. Moreover, Cox does not provide updates, daily or otherwise, concerning vAuto's syndication of vehicle inventory data to Honcker. Thus, vAuto's syndication of vehicle inventory data to Honcker is prohibited by the 3PA Agreement.

42.      Upon learning that Cox was violating the non-syndication provisions in its 3PA Agreement, CDK promptly notified Cox of its violations and requested that Cox investigate the matter. However, Cox refused to stop syndicating data to Honcker.

43.      More recently, CDK learned of vAuto syndicating DMS inventory data to vendor AutoLoop (another Plaintiff in this MDL). AutoLoop provides various software solutions to car dealers. Discovery has shown that in early 2018, AutoLoop began receiving a feed of vehicle inventory data from vAuto [REDACTED]

[REDACTED]

[REDACTED] Moreover, Cox does not provide updates, daily or otherwise,

concerning vAuto's syndication of inventory data to AutoLoop. Thus, vAuto's syndication of inventory data to AutoLoop is prohibited by the 3PA Agreement.

44.     CDK also became aware that Cox affiliate Xtime was engaged in unlawful syndication of service-related DMS data when ███████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

On information and belief, this vendor does not market automobile inventory through internet sites or hard copy print publications. Moreover, Cox does not provide updates, daily or otherwise, concerning Xtime's syndication of inventory data to this vendor. Thus, Xtime's syndication of data to this vendor is prohibited by the 3PA Agreement.

45.     Upon learning that Cox was once again violating the non-syndication provisions in its 3PA Agreement, on October 2, 2017, CDK notified Cox of its violations and requested meetings to discuss the matter. After Cox failed to respond to this notification, CDK followed up with Cox on October 12, 2017 and again on January 29, 2018. Cox did not respond to CDK's multiple notices and requests, and it has not ceased its unlawful conduct.

46.     In addition to being in clear violation of the 3PA Agreement, Cox's unauthorized syndication of DMS data to other third parties undermines the fundamental purpose of the 3PA program and creates security risks. Among other things, the success of the 3PA program depends on CDK's ability to verify that each vendor in the program is using the data that it obtains only for an approved end use and with the dealer's express, written consent. These requirements are

**PUBLIC VERSION**

reflected in the standard terms of CDK's 3PA contracts, as well as its 3PA certification and audit procedures. When Cox unlawfully syndicates DMS data to undisclosed third parties, CDK loses the ability to monitor who is using the data, much less verify whether they are using the data for an approved purpose or with the dealer's knowledge or consent.

47. Cox's unlawful syndication of DMS data to third parties also effectively prevents CDK from pursuing licensing arrangements with those third parties under the 3PA program and deprives CDK of the 3PA fees it would otherwise earn.

**E. Cox's Unauthorized Access to CDK's DMS Using Dealer-Issued Login Credentials and Circumvention of CAPTCHA Controls**

48. Notwithstanding that Cox and its affiliates have certified several applications in the 3PA program, they also continue to use dealer-issued login credentials and employ various technological means to access the CDK DMS directly. Such access to CDK's DMS is unauthorized by CDK, strictly prohibited by CDK's MSA with its dealer customers, and in clear violation of the 3PA Agreement.

49. In or around December 2017, ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████████████ However, Dealertrack did not stop using dealer-issued login credentials to access CDK's DMS on behalf of itself and, on information and belief, other Cox affiliates. CDK has employed technological measures to prevent such access, which Cox attempts to evade.

50. In or around November 2017, CDK introduced a CAPTCHA control designed to prevent unauthorized, automated third-party access to its DMS:



51.     CDK has applied this CAPTCHA protocol to dealer-issued login credentials that CDK determined Dealertrack is using to gain unauthorized access to CDK's DMS.

52.     The CAPTCHA states that "[o]nly dealer personnel are authorized to use the CDK Global DMS. Use or access by unauthorized third parties is strictly prohibited and is in violation of the terms on which CDK licenses its software and services. Machine/automated access . . . or issuing of user names and passwords for third party use is considered non-authorized access." The CAPTCHA then required the user to identify a word or series of letters and numbers, as shown above, to "confirm you are an authorized dealer employee" before allowing the user to log in to the CDK DMS. Accordingly, CDK's use of CAPTCHA controls for any login credentials made clear that Cox's access to CDK's system was unauthorized.

53.     Nonetheless, Dealertrack sought to improperly bypass these CAPTCHA controls.

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████ This is but one example of Cox Automotive's and its affiliates' use of computer-aided scripts to bypass CDK's CAPTCHA controls, allowing them to access CDK's DMS without CDK's permission.

**F.     The CDK-Cox Data License Agreement**

54.     Pursuant to a Data License Agreement dated January 8, 2016, CDK licenses a daily feed of vehicle inventory data ("ATC Data") maintained by Cox affiliate Autotrader related to vehicles that are sold and marketed on the Autotrader website. CDK integrates ATC Data into its own DMS and add-on software applications in order to provide enhanced vehicle inventory management services and predictive selling analytics.

55.     The 3PA Agreement and the Data License Agreement were executed on the same day and were negotiated, in large part, by the same people on behalf of Cox and CDK.

56.     Among the data that Autotrader maintains for vehicles listed on its website are SRP and VDP metrics, which track how often website users search for a given vehicle (SRP) and select that vehicle from the search results to explore further (VDP). An article published by Cox affiliate vAuto describes SRP and VDP as follows:

> Many dealers are familiar with the phrase "popcorn cars." This refers to cars that sell or "pop" quickly off the lot. … Today, dealers have access to information that can help them pop every car perfectly every time. This new information is the number of search result page (SRP) hits and vehicle detail page (VDP) conversions. So what is an SRP and a VDP? If an online shopper searches for a 2009 F150 truck, they may get five pages of F150 trucks returned. Depending on the site, there are usually between 25 and 50 vehicles on a page. Assume that your dealership's vehicle is on page four and the shopper only

**PUBLIC VERSION**

looks at vehicles on pages one, two and three. In this case, your dealership does not get credit for an SRP until and unless the shopper looks at page four, the one that contains your vehicle. If the shopper who looks at page four drills down on your vehicle to see all the photos and description, then you get credit for a VDP.

57.     In a brochure for dealers titled *How to Market New Cars Online*, Autotrader states that "VDP views are a key performance indicator because they help account for the 66% of New car buyers who walk into the dealership without submitting a lead beforehand."

58.     Given the foregoing, CDK's initial negotiations with Cox surrounding the Data License Agreement focused on SRP and VDP metrics. Indeed, an initial draft of the Agreement, prepared by Cox, stated that ███████████████████████████████████

59.     However, when Cox later provided examples of the specific ATC Data fields that it intended to provide under the Data License Agreement, CDK was surprised to find that no SRP or VDP metrics were included. Without SRP and VDP metrics, the Data License Agreement had significantly less commercial value to CDK.

60.     Eventually, Cox agreed to work with CDK "in good faith" to build an interface that would allow CDK to access SRP and VDP metrics on behalf of specific CDK customers who sold and marketed vehicles on Autotrader. The parties memorialized their agreement in Exhibit B to the Data License Agreement, which provides:

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████

61.     Cox received the following licensing fees under the Data License Agreement:

███████████████████████████████████████████████████

**PUBLIC VERSION**

██████████████████████████████████████████ These fees are significantly higher than similar third-party data feeds that CDK licenses from other online vehicle marketing websites that do not include VDP and SRP metrics. For example, ████ ██████████████████████████████████████████ CDK agreed to pay the fees that Cox demanded only because it believed that Cox would work with CDK in good faith to develop a method to deliver SRP and VDP metrics for specific CDK customers.

**G.    Cox's Breach of the Data License Agreement**

62.    In August 2016, CDK requested meetings with Cox to move forward with leveraging the SRP and VDP metrics for individual clients per the Data License Agreement.

63.    However, instead of working with CDK to provide the data, Cox abruptly claimed that ███████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

64.    In response to Cox's purported concerns, CDK proposed simply having Autotrader provide links to SRP and VDP metrics for CDK clients as they appear to those clients on the Autotrader website, which CDK could embed within its own applications. This would have required virtually no additional effort by Cox and would have fully addressed Cox's stated concern about providing SRP and VDP metrics without additional "context and insights" available to clients within the Autotrader website. Cox ignored this proposal. It never gave CDK any reason why the proposal was unworkable, nor did it propose an alternative.

65.    In April 2017, CDK's former Vice President Ron Workman reached out to Cox's then Senior Vice President of Corporate Development, Eric Jacobs, ███████████████
████████████████████████████████████████████████

PUBLIC VERSION

██████████████████████████████████████████████████████████████

████████████████████████████████████

66.     To date, Cox has received more than ████████ in licensing fees from CDK under the Data Licensing Agreement but has never provided or even attempted to provide the SRP and VDP metrics. Despite its obligation under the Data Licensing Agreement to work with CDK "in good faith" to develop a method to provide SRP and VDP metrics, Cox has refused to meaningfully engage with CDK about the issue on any level.

## FIRST COUNTERCLAIM FOR RELIEF
### (Cox Automotive, vAuto, Xtime, and Dealertrack – Breach of Contract)

67.     Paragraphs 1-66 above are incorporated herein by reference.

68.     The 3PA Agreement between CDK and Cox Automotive is a valid and enforceable contract and is binding on Cox and its affiliates. CDK has fully performed or tendered all performance required under the 3PA Agreement.

69.     Cox Automotive, vAuto, and Xtime have breached their obligations under the 3PA Agreement by syndicating DMS data to unauthorized third parties.

70.     Cox Automotive and Dealertrack have breached their obligations under the 3PA Agreement by, among other things, using unapproved means to directly access and obtain data from CDK's DMS outside the 3PA program.

71.     Cox Automotive's, vAuto's, Xtime's, and Dealertrack's conduct have damaged CDK, including by depriving CDK of revenue that it would otherwise earn through its 3PA program and by causing CDK to incur the costs and expenses that CDK has incurred investigating Cox Automotive's, vAuto's, and Xtime's, and Dealertrack's unlawful conduct and attempting to compel them to cease their unlawful conduct.

PUBLIC VERSION

## SECOND COUNTERCLAIM FOR RELIEF
### (Cox Automotive, vAuto, Xtime, and Dealertrack
### Violations of the Computer Fraud and Abuse Act)

72.     Paragraphs 1-71 above are incorporated herein by reference.

73.     The Computer Fraud and Abuse Act ("CFAA") provides that "[w]hoever …

intentionally accesses a computer without authorization or exceeds authorized access, and

thereby obtains … information from any protected computer," is subject both to criminal and

civil liability. 18 U.S.C. § 1030(a)(2)(C); *see also id.* § 1030(c) (criminal penalties); *id.*

§ 1030(g) (civil damages and injunctive relief). The CFAA provides for a private cause of action

for "compensatory damages and injunctive relief or other equitable relief" to anyone who suffers

at least $5,000 in damage or loss in any one-year period "by reason of a violation" of its terms.

*Id.* § 1030(g); *see id.* § 1030(c)(4)(A)(i)(I).

74.     CDK's DMS is a "computer" within the meaning of the CFAA, which defines

that term to include "any data storage facility or communications facility directly related to or

operating in conjunction with [a computing] device." *Id.* § 1030(e)(1). CDK's DMS also relies

on the operation of one or more computing devices in its operations. The DMS itself, and the

computing devices by which it operates, are "protected computers" within the meaning of the

CFAA because they are connected to the internet and thus are used in and affect interstate and

foreign commerce and communications. *See id.* § 1030(e)(2)(B).

75.     Cox Automotive, vAuto, Xtime, and Dealertrack have repeatedly and

intentionally accessed CDK's DMS without CDK's authorization. Every time that Cox

Automotive, vAuto, and Xtime access CDK's DMS with the intent of obtaining and syndicating

data to other third parties or internally in a manner not authorized by the 3PA Agreement, they

exceed the scope of their authorization to access CDK's DMS. Every time that Cox Automotive

PUBLIC VERSION

and Dealertrack bypassed CDK's CAPTCHA controls, which stated that only dealer employees were authorized to access CDK's DMS, Cox Automotive and Dealertrack accessed CDK's DMS without authorization or in excess of their authorization.

76.     CDK has informed Cox Automotive and its affiliates that their conduct is unauthorized and prohibited. CDK has demanded that Cox Automotive and its affiliates cease their unlawful conduct, but they have refused to do so.

77.     Cox Automotive's, vAuto's, Xtime's, and Dealertrack's violations of the CFAA have caused CDK to suffer damages and losses. These damages and losses include the costs of investigating and responding to Cox Automotive's, vAuto's, Xtime's, and Dealertrack's unlawful actions; the costs of restoring the DMS and the data it contains to their condition prior to Cox Automotive's, vAuto's, Xtime's, and Dealertrack's unlawful actions; and all revenue lost, costs incurred, and other consequential damages incurred because of disruption of service caused by Cox Automotive's, vAuto's, Xtime's, and Dealertrack's unlawful actions. On information and belief, these losses have exceeded $5,000 within a twelve-month period.

78.     Cox Automotive, vAuto, Xtime, and Dealertrack will continue to violate the CFAA if not enjoined by this Court, causing CDK irreparable harm. Among other things, Cox Automotive's, vAuto's, and Xtime's unauthorized syndication of data sourced from CDK's DMS to unknown third parties and Dealertrack's unauthorized access to CDK's DMS and evasion of CDK's CAPTCHA controls increase the risk that CDK will suffer a security breach and widespread data corruption issues and degrades the performance of its DMS, all of which constitute an irreparable harm.

PUBLIC VERSION

79.     CDK is also entitled to equitable relief in the form of restitution for the benefits that Cox Automotive, vAuto, Xtime, and Dealertrack accrued and/or disgorgement of the unlawful profits they have received.

### THIRD COUNTERCLAIM FOR RELIEF
#### (Cox Automotive, vAuto, Xtime, and Dealertrack – Violations of the Georgia Computer Systems Protection Act)

80.     Paragraphs 1-79 above are incorporated herein by reference.

81.     The Georgia Computer Systems Protection Act ("GCSPA") provides that "[a]ny person who uses a computer or computer network with knowledge that such use is without authority and with the intention of: (1) Taking or appropriating any property of another, whether or not with the intention of depriving the owner of possession; (2) Obtaining property by any deceitful means or artful practice; or (3) Converting property to such person's use in violation of an agreement or other known legal obligation to make a specified application or disposition of such property" commits "computer theft." Ga. Code Ann. § 16-9-93(a); *see also id*. § 16-9-93(g) (civil penalties).

82.     CDK's DMS is a "computer" within the meaning of the GCSPA, which defines that term to include any electronic device" that "can automatically perform computer operations with or on computer data and can communicate the results to another computer or to a person." *Id.* § 16-9-92(1). Alternatively, CDK's DMS is a "computer network" within the meaning of the GCSPA, because it is "a set of related, remotely connected computers and any communications facilities with the function and purpose of transmitting data among them through the communications facilities." *Id.* § 16-9-92(2).

83.     CDK's DMS is "property" within the meaning of the GCSPA, which defines that term to include "computers, computer networks, computer programs, data, financial instruments, and services." *Id.* § 16-9-92(13).

84.     Cox Automotive, vAuto, Xtime, and Dealertrack have repeatedly and intentionally accessed CDK's DMS without CDK's authorization. Every time that Cox Automotive, vAuto, and Xtime access CDK's DMS with the intent of obtaining and syndicating data to other third parties or internally in a manner not authorized by the 3PA Agreement, they exceed the scope of their authorization to access CDK's DMS. Every time that Cox Automotive and Dealertrack bypassed CDK's CAPTCHA controls, which stated that only dealer employees were authorized to access CDK's DMS, they accessed CDK's DMS without authorization or in excess of their authorization.

85.     CDK has informed Cox Automotive and its affiliates that their conduct is unauthorized and prohibited. CDK has demanded that Cox Automotive and its affiliates cease their unlawful conduct, but they have refused to do so.

86.     Cox Automotive's, vAuto's, Xtime's, and Dealertrack's violations of the GCSPA have caused CDK to suffer damages and losses. These damages and losses include the costs of investigating and responding to Cox Automotive's, vAuto's, Xtime's, and Dealertrack's unlawful actions; the costs of restoring the DMS and the data it contains to their condition prior to Cox Automotive's, vAuto's, Xtime's and Dealertrack's unlawful actions; and all revenue lost, costs incurred, and other consequential damages incurred because of disruption of service caused by Cox Automotive's, vAuto's, Xtime's, and Dealertrack's unlawful actions.

87.     Cox Automotive, vAuto, Xtime, and Dealertrack will continue to violate the GCSPA if not enjoined by this Court, causing CDK irreparable harm. Among other things, Cox

Automotive's, vAuto's, and Xtime's unauthorized syndication of data sourced from CDK's DMS to unknown third parties and Dealertrack's unauthorized access to CDK's DMS and evasion of CDK's CAPTCHA controls dramatically increase the risk that CDK will suffer a security breach and widespread data corruption issues and degrades the performance of its DMS, all of which constitute an irreparable harm.

88.     CDK is also entitled to equitable relief in the form of restitution for the benefits that Cox Automotive, vAuto, Xtime, and Dealertrack accrued and/or disgorgement of the unlawful profits they have received.

### FOURTH COUNTERCLAIM FOR RELIEF
### (Cox Automotive and Dealertrack – Digital Millennium Copyright Act)

89.     Paragraphs 1-88 above are incorporated herein by reference.

90.     The Digital Millennium Copyright Act, 17 U.S.C. § 1201 ("DMCA"), prohibits, among other things, "circumvent[ing] a technological measure that effectively controls access to a work protected under this title." *Id.* § 1201(a)(1)(A).

91.     CDK's DMS software is an original creative work protected under Title 17. Among its original and creative elements are its source and object code; distinctive screen layouts; graphical content; text; arrangement, organization, and display of information; and dynamic user experience.

92.     CDK uses several technological measures to control access to and prevent copying of the CDK DMS software program. These technological measures include: requiring dealer employees to log on with passwords; text prompts asking a user to certify that he or she is an authorized dealer employee; CAPTCHA controls; and disabling of dealer credentials that CDK finds have been used for automated access by Cox or other third parties. In the ordinary course of their operation, these password controls, certification prompts, CAPTCHA controls,

**PUBLIC VERSION**

and credential disabling measures required application of information, or a process or treatment, with CDK's authority as the owner of the DMS, to gain access to the CDK DMS software or a portion of the CDK DMS software. These measures effectively control access to the DMS software program in that the program, or portions of the program, cannot be run, and its original, expressive elements cannot be displayed or copied, unless these measures have been navigated. These access control measures were effective in preventing Cox from accessing the CDK DMS before Cox circumvented them.

93. Cox Automotive and Dealertrack have repeatedly circumvented CDK's access control measures in order to access the CDK DMS and extract data from it. They have wrongfully obtained login credentials in violation of contractual requirements that such credentials be given to and used by authorized dealer employees only unless otherwise allowed by CDK. And they have circumvented, or given outright false answers to, multiple CAPTCHA controls through the use of automated computer scripts. This conduct constitutes circumvention of technological measures that effectively controlled access to CDK's DMS in violation of 17 U.S.C. § 1201(a)(1)(A).

94. Under 17 U.S.C. § 1203, CDK is entitled to either actual damages and any additional profits from Cox Automotive's and Dealertrack's violations of the DMCA or statutory damages of between $200 and $2,500 "per act of circumvention," at CDK's election. CDK is also entitled to injunctive relief under 17 U.S.C. § 1203(b)(1). Cox Automotive and Dealertrack will continue to violate the DMCA if not enjoined by this Court. Moreover, Cox Automotive's and Dealertrack's unauthorized access to the CDK DMS dramatically increases the risk that CDK will suffer a security breach and widespread data corruption issues and degrades the performance of its DMS, all of which constitute an irreparable harm.

## FIFTH COUNTERCLAIM FOR RELIEF
### (Cox Automotive and Dealertrack – Fraud – CAPTCHA Misrepresentations)

95.     Paragraphs 1-94 above are incorporated herein by reference.

96.     In the course of accessing the CDK DMS without authorization, Cox Automotive and Dealertrack have frequently and repeatedly represented to CDK that Dealertrack is a human employee of a CDK dealer customer who is authorized to access the DMS. That representation occurs whenever Dealertrack uses login credentials provided by dealers and is confronted with a CAPTCHA prompt similar to the one described in Paragraphs 50-52. That CAPTCHA prompt states that "[o]nly dealer personnel are authorized to use the CDK Global DMS," that "[u]se or access by unauthorized third parties is strictly prohibited and is in violation of the terms on which CDK licenses its software and services," and that "[m]achine/automated access … or issuing of user names and passwords for third party use is considered non-authorized access." The CAPTCHA control then requires the user to represent to CDK that "you are an authorized dealer employee" before successfully logging in to the CDK DMS by identifying a word or series of letters and numbers. Thus, each time that Dealertrack bypassed that CAPTCHA control through automated means, it represented that it was a dealer employee.

97.     Those representations are false. Dealertrack is not and never has been a dealer employee and is forbidden under CDK's dealer contracts from accessing the CDK DMS without CDK's authorization. Cox Automotive and Dealertrack know these facts and thus know that Dealertrack's representations to CDK when it bypasses CAPTCHA are untrue.

98.     CDK was misled by Dealertrack's false misrepresentations and relied on them by allowing Dealertrack, masquerading as a dealership employee, to access the CDK DMS. CDK's technological measures were not always effective to detect and prevent Dealertrack's

unauthorized access. If CDK knew when Dealertrack was attempting to access its system without authorization, it would have affirmatively sought to prevent Dealertrack from doing so.

99.     Dealertrack's fraudulent misrepresentations are the direct and proximate cause of harm and damages to CDK. As a result of Cox Automotive's and Dealertrack's interference and the breaches of the dealer contracts, CDK has had to devote substantial resources to monitoring and remediating any harmful effects of Dealertrack's unauthorized DMS access and to preventing such unauthorized access in the future. CDK has also been denied any compensation for Dealertrack's access to the CDK DMS. For example, Dealertrack pays CDK for access to the CDK DMS through the 3PA program for certain authorized Dealertrack applications. Dealertrack would have had to pay CDK in similar fashion to lawfully obtain the access to CDK's DMS that Dealertrack obtained through its false representations.

100.    Cox Automotive's and Dealertrack's fraud will continue if not enjoined by this Court. Among other things, Dealertrack's unauthorized access to the CDK DMS dramatically increases the risk that CDK will suffer a security breach and widespread data corruption issues and degrades the performance of its DMS, all of which constitute an irreparable harm.

### SIXTH COUNTERCLAIM FOR RELIEF
#### (Autotrader – Breach of Contract)

101.    Paragraphs 1-100 above are incorporated herein by reference.

102.    The Data License Agreement between CDK and Autotrader is a valid and enforceable contract. CDK has fully performed or tendered all performance required under the Data License Agreement.

103.    Despite multiple requests, Autotrader has refused to cooperate with CDK to discuss or develop methods for displaying individual SRP and VDP metrics and has not responded to CDK's attempts to find a solution.

**PUBLIC VERSION**

104. Autotrader's conduct violates its express and implied contractual obligation to act in good faith with respect to the provision of SRP and VDP data.

105. Autotrader's refusal to work with CDK has damaged CDK by depriving it of the benefit of the bargain. Had CDK known that Autotrader would not cooperate to provide SDP and VDP metrics, CDK would have paid significantly less for the ATC Data than it agreed to pay in the Data License Agreement or would not have entered into the agreement at all.

**SEVENTH COUNTERCLAIM FOR RELIEF**
**(Autotrader – Unjust Enrichment)**

106. Paragraphs 1-105 above are incorporated herein by reference.

107. This counterclaim is plead in the alternative to CDK's breach of contract counterclaim against Autotrader and to the extent the Data License Agreement is found not to be a valid and enforceable contract.

108. Because of its improper conduct, Autotrader has unjustly received millions of dollars in licensing fees from CDK without giving CDK any compensation in exchange for the benefit.

109. Permitting Autotrader to retain the licensing fees under these circumstances violates the fundamental principles of justice, equity, and good conscience.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, CDK respectfully requests that this Court enter judgment:

A.     Declaring that Cox Automotive's, vAuto's, Xtime's, and Dealertrack's conduct:

    (1) violates the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

    (2) violates the Georgia Computer Systems Protection Act, Ga. Code § 16-9-90;

    (3) violates the Digital Millennium Copyright Act, 17 U.S.C. § 1201; and

    (4) constitutes breach of contract and fraud;

131

PUBLIC VERSION

B.      Permanently enjoining Cox Automotive, vAuto, Xtime, and Dealertrack from engaging in the actions that violate these laws, including accessing, using, copying, or syndicating any portion or part of CDK's DMS without CDK's authorization;

C.      Declaring that Autotrader has failed to perform under the Data License Agreement in good faith, constituting breach of contract and unjust enrichment;

D.      Awarding CDK its full losses, expenses, and other damages, including but not limited to statutory damages;

E.      Disgorging Cox of its unlawful profits and unjust enrichment;

F.      Awarding CDK costs and litigation expenses, including attorney's fees; and

G.      Awarding CDK such other and further relief that this Court deems just, proper, and equitable.

## **JURY DEMAND**

CDK hereby demands a trial by jury for all claims so triable.

**PUBLIC VERSION**

Dated: February 15, 2019

Respectfully submitted,

*/s/ Britt M. Miller*
Britt M. Miller
Michael A. Scodro
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mscodro@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant and Counter-Plaintiff CDK Global, LLC*

PUBLIC VERSION

## <u>CERTIFICATE OF SERVICE</u>

I, Britt M. Miller, an attorney, hereby certify that on February 15, 2019, I caused a true and correct copy of the foregoing **DEFENDANT CDK GLOBAL, LLC'S ANSWER AND AFFIRMATIVE AND ADDITIONAL DEFENSES AND COUNTERCLAIMS** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

*/s/ Britt M. Miller*
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Phone: (312) 782-0600
Fax: (312) 701-7711
E-mail: bmiller@mayerbrown.com