## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION** | MDL No. 2817<br>Case No. 18-cv-00864 |
| **This Document Relates To:** | |
| **THE DEALERSHIP CLASS ACTION** | Honorable Robert M. Dow, Jr.<br>Magistrate Judge Jeffrey T. Gilbert |

### DEFENDANT CDK GLOBAL, LLC'S ANSWER AND AFFIRMATIVE AND ADDITIONAL DEFENSES TO THE DEALERSHIP CONSOLIDATED CLASS ACTION COMPLAINT AND CDK GLOBAL, LLC'S COUNTERCLAIMS

Defendant CDK Global, LLC ("CDK"), by and through its attorneys, hereby submits its Answer and Affirmative and Additional Defenses in response to Plaintiffs ACA Motors, Inc. d/b/a Continental Acura; Baystate Ford Inc.; Cherry Hill Jaguar; Cliff Harris Ford, LLC d/b/a Warrensburg Ford; Continental Autos, Inc. d/b/a Continental Toyota; Continental Classic Motors, Inc. d/b/a Continental Autosports; 5800 Countryside, LLC d/b/a Continental Mitsubishi; HDA Motors, Inc. d/b/a Continental Honda; H & H Continental Motors, Inc. d/b/a Continental Nissan; Gregoris Motors, Inc.; Hoover Automotive, LLC d/b/a Hoover Dodge Chrysler Jeep of Summerville; JCF Autos LLC d/b/a Stevens Jersey City Ford; Jericho Turnpike Sales LLC d/b/a Ford & Lincoln of Smithtown; Jim Marsh American Corporation d/b/a Jim Marsh Mitsubishi Suzuki Kia Mahindra; John O'Neil Johnson Toyota, LLC; Kenny Thomas Enterprises, Inc. d/b/a Olathe Toyota; Marshall Chrysler Jeep Dodge, LLC d/b/a Marshall Chrysler Jeep Dodge Ram; Naperville Zoom Cars, Inc. d/b/a Continental Mazda; NV Autos, Inc. d/b/a Continental Audi; Patchogue 112 Motors LLC d/b/a Stevens Ford; Pitre Imports, LLC d/b/a Pitre Kia; Pitre, Inc. d/b/a Pitre Buick GMC; Teterboro Automall, Inc. d/b/a Teterboro Chrysler Dodge Jeep Ram; Waconia Dodge, Inc. d/b/a Waconia Dodge Chrysler Jeep Ram; and Warrensburg Chrysler Dodge Jeep, L.L.C. d/b/a Warrensburg Chrysler Dodge Jeep Ram Fiat's (collectively, "Plaintiffs")

**PUBLIC VERSION**

Consolidated Class Action Complaint (the "Complaint") as well as its Counterclaims against the Plaintiffs ("Counterclaims") in this matter as follows.

## CDK'S ANSWER AND AFFIRMATIVE AND ADDITIONAL DEFENSES

### *Preliminary Statement*

Except as otherwise expressly stated below, CDK answers and responds only to those allegations contained in the Complaint that are directed toward it. CDK is without sufficient knowledge or information to form a belief concerning the truth of the allegations in the Complaint that are directed toward Plaintiffs or other parties and on that basis denies them.

For the reader's convenience, CDK has organized its Answers to Plaintiffs' allegations by employing the headings and subheadings used within the Complaint. In doing so, CDK does not admit that the headings or subheadings are accurate or appropriate for any purpose in this matter and, to the extent that any heading can be read to contain factual allegations, denies each and every one of them unless it has expressly indicated otherwise.  In addition, Plaintiffs' Complaint contains 142 footnotes that are recited herein. To the extent the contents of those footnotes are not addressed in the text of the response to the Complaint paragraph to which the footnote relates and/or to the extent that the content of any footnote can be read to contain factual allegations, CDK denies each and every one of them.

## INTRODUCTION

1.      This antitrust action concerns the illegal and anticompetitive practices of Defendants, CDK and Reynolds, frequently referred to in the retail automobile industry as the "Duopoly" or "Big 2," who unlawfully colluded and conspired to restrain and/or eliminate competition by charging supracompetitive prices in the markets for: (1) Dealer Management System ("DMS") software services; and (2) Data Integration Services ("DIS"), the services for extracting, formatting, integrating, and organizing the data stored on Dealers' DMS's.

**ANSWER:**    Paragraph 1 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required,  CDK denies that Plaintiffs or any other

individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK states that the allegations in paragraph 1 of the Complaint are so vague and ambiguous as to the definition of the purported "markets" described in paragraph 1 of the Complaint that CDK cannot respond to those allegations and on that basis denies them. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 1 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 1 of the Complaint.

2. CDK and Reynolds are in the business of providing DMS software and services to Dealerships, and dominate the DMS industry, with total annual revenues of approximately $2.2 billion and $1.7 billion, respectively. They control a combined 75% of the United States DMS market measured by the number of franchised automobile Dealerships using their systems, and their market share is even higher in terms of revenue.[1] Because of Defendants' dominant DMS market share and the significant barriers to entry into the DMS market, the CDK and Reynolds duopoly has enormous leverage over Dealers.

**ANSWER:** Paragraph 2 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that it offers certain products and services to automobile dealerships ("Dealerships" or "Dealers"), including the licensing of its proprietary Dealer Management System ("DMS") software, and that it has reported annual revenue of approximately $2.2 billion in public filings with the Securities and Exchange Commission during the relevant period. CDK states that the reports speak for themselves. CDK states that the allegations in paragraph 2 of the Complaint are so vague and ambiguous as to the definition of the term "DMS market" that CDK cannot respond to those allegations and on that basis denies them. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 2 of the Complaint that relate to Defendants' purported individual and collective

---

[1] CDK and Reynolds control approximately 45% and 30% of the DMS market, respectively. The remaining 25% is divided among various other significantly smaller DMS providers that typically service smaller Dealerships in niche submarkets.

shares of the "DMS market" and on that basis denies them. CDK lacks sufficient knowledge or

information to form a belief as to the truth of the allegations in paragraph 2 of the Complaint that

relate to individuals or entities other than CDK and on that basis denies them. CDK denies the

remaining allegations in paragraph 2 of the Complaint.

3.      The DMS, described as a Dealership's "central nervous system," is an enterprise
software system designed specifically for automobile Dealerships, and functions as the businesses'
central database and repository of all its operational information, including payroll, inventory,
human resources, marketing, repair and service, and custome[r] information.[2]  The DMS includes
a database and data storage component that allows Dealerships to enter and store data in real time.
A Dealership's data, stored on its DMS, belongs to and is controlled by the Dealership, which has
been explicitly and repeatedly acknowledged in public statements made by Defendants over the
years.

**ANSWER:**      CDK admits that most new automotive vehicle-franchised Dealers and a number of

used car Dealers use DMS enterprise software to manage and operate their dealerships, including

with respect to payroll, inventory, human resources, marketing, repair and service, and customer

information. CDK denies that DMS software functions as the businesses' repository of all its

operational information. CDK admits that Dealers enter certain data into the DMS but denies that

CDK's DMS is merely a database or that all data entered into the DMS belongs to Dealers; there

is substantial data residing in the DMS, including non-public personal and identifying information

pertaining to end-use customers and proprietary data that belong to CDK and to other third parties,

that the Dealers neither own nor control.  CDK further admits that the certain of the data that reside

in its DMS does so on servers located in data centers maintained by CDK; in a few instances

(although this is being phased out), data resides on CDK servers that are located and maintained

on a Dealer's premises. CDK lacks sufficient knowledge or information to form a belief as to the

truth of the allegations in paragraph 3 of the Complaint as they relate to individuals or entities

---

[2] The physical storage of the data is either onsite at the Dealership, at private data centers operated by the DMS
provider, or with cloud-based data storage companies.

other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph

3 of the Complaint.

4. Switching DMS providers is extremely difficult, enormously expensive, and highly disruptive to a Dealership's business. Changing DMS providers requires new hardware and software, can cost as much as $50,000 up front, and typically requires up to a year or more lead time for preparation and training of a Dealership's staff in order to learn how to operate a new system. Switching DMS providers has been analogized by some Dealers as akin to a "heart transplant or knee replacement."

**ANSWER:** CDK admits that the text quoted in the third sentence of paragraph 4 of the

Complaint has appeared in *Automotive News*. CDK admits that changing DMS providers can

require new hardware and software and that there are switching costs when changing DMS

providers. CDK denies that "[s]witching DMS providers is extremely difficult, enormously

expensive, and highly disruptive to a Dealership's business" and that switching DMS providers

"typically requires up to a year or more lead time for preparation and training." CDK lacks

sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph

4 of the Complaint that relate to individuals or entities other than CDK and on that basis denies

them. CDK denies the remaining allegations in paragraph 4 of the Complaint.

5. CDK and Reynolds also provide Data Integration Services (DIS), separate from their DMS offerings. DIS services are critical to the proper functioning of Dealerships. DIS enables Dealers and third-party software application providers ("Vendors") to extract, organize, and integrate the Dealer's own data on its DMS into a usable format. To effectively run their Dealerships, Dealers engage Vendors to utilize their data and to provide Dealers with necessary services such as inventory management, customer relationship management, warranty services, repair orders, and electronic vehicle registration and titling. A single Dealership typically uses multiple Vendors, with each Vendor requiring access to the Dealership's data stored in its DMS database. Vendors generally engage DIS providers that charge Vendors for their services.

**ANSWER:** CDK denies that the term "DIS," as that term is used in the Complaint, is an

accurate term or appropriate for any purpose in this litigation and denies that the allegations in

paragraph 5 of the Complaint accurately describe the services that so-called "DIS" providers

perform. CDK admits that DMI and IntegraLink, now known as CDK Data Services, Inc., a

**PUBLIC VERSION**

subsidiary of CDK, provide certain data services, including extracting data from non-CDK DMSs licensed to Dealers. CDK admits that its 3PA program, now known as the CDK Global Partner program, provides integrated access to data on the CDK DMS. CDK admits that its Dealer customers typically use more than one Vendor in the operation of their businesses and that some Vendors require access to data housed in CDK's DMS. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 5 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 5 of the Complaint.

6. Historically, the DIS market was active, with numerous DIS providers competing to provide affordable, secure, and reliable access to DMS data for Dealerships and Vendors. Previously, competition thrived, and Vendors provided innovative software application products to help Dealerships sell and service vehicles.

**ANSWER:** CDK admits that there have been, and continue to be, numerous Vendors that offer software application products and services to Dealers and entities that provide data extraction and other data-related services to Vendors and Dealers. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 6 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 6 of the Complaint.

7. Prior to January 2015, CDK and Reynolds were competitors. A major point of differentiation was that, starting in 2006, Reynolds took steps to block third party data integrators from accessing Reynolds DMS's (with more vigorous efforts starting in 2013), whereas CDK publicly touted the openness of CDK systems. Leading up to 2015, CDK had succeeded in wresting market share away from Reynolds in the DMS space.

**ANSWER:** CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services and have been competitors since before January 2015. CDK admits that, as early as 2006, Reynolds took steps to block unauthorized third-party access to its DMS. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph

6

7 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 7 of the Complaint.

8.    In February 2015, however, competition between Defendants ceased, as they entered into a *per se* illegal horizontal agreement to: (1) exclude competition in the DIS market; (2) allow only CDK to access data housed on Dealers' CDK DMS's; and (3) allow only Reynolds to access data housed on Dealer's Reynolds DMS's. Defendants' agreement involved restricting and blocking independent third party data integrators' access to Dealers' DMS's, whereby forcing third party data integrators out of the DIS industry.

**ANSWER:**    Paragraph 8 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 8 of the Complaint.

9.    Defendants agreed in writing to close their respective DMS's to independent data integrators, driving third-party DIS providers out of the market, or crippling them in such a way as to cause them to exit the business. These written agreements also eliminated competition between Defendants in the DMS market. Prior to 2015, competition between the duopolists existed based upon Dealers' ability to grant access to their data, which was the primary point of differentiation.

**ANSWER:**    Paragraph 9 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 9 of the Complaint.

10.    Specifically, on February 18, 2015, CDK and Reynolds entered into three anticompetitive written agreements which destroyed competition in the DIS marketplace. The primary anticompetitive agreement is referred to as the Data Exchange Agreement or the "Wind Down" Agreement, and the other two are the 3PA and RCI data integration agreements (collectively, the three are the "Agreements"). In particular, CDK agreed that it would no longer compete in providing access to Dealer data on Reynolds' DMS, ceding that ground exclusively to Reynolds. At the same time, Reynolds agreed not to block CDK's access to the Reynolds DMS during the wind down period, which lasts until 2020. Accordingly, in making the Agreements, CDK and Reynolds agreed they would no longer compete against each other in the DIS market. These three Agreements are currently in effect.[3]

---

[3] Although not necessary in cases such as this where Dealership Plaintiffs are alleging direct evidence of Defendants' anticompetitive agreements, there are at least four plausible motives for Defendants entering into these unlawful agreements, as discussed more fully herein: (1) to eliminate competition so they could raise data integration prices; (2) to gain a competitive advantage over competing software Vendors by restricting their access to Dealer data; (3) to protect their DMS duopoly from standalone software solutions that were beginning to erode the primacy of the DMS

**ANSWER:** Paragraph 10 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds. CDK denies Plaintiffs' characterization of the agreements. CDK states that the contracts speak for themselves. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 10 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 10 of the Complaint.

11.     During the wind down period, Reynolds agreed that CDK could continue to extract Dealer data from Reynolds' DMS. At the same time, the Agreements also provided that CDK and Reynolds were to transition all of CDK's Vendor clients (those Vendors for whom CDK provided access to Dealer data on the Reynolds DMS) into the Reynolds RCI program. The Agreements specifically required CDK to "cooperate with Reynolds" in the "transition of [CDK] customers to the Reynolds RCI program with respect to Reynolds Dealers." The Agreements also provided that CDK and Reynolds would no longer access data on each other's DMS. That is, Reynolds agreed not to access the CDK DMS and CDK agreed not access the Reynolds DMS. In doing so, Reynolds agreed not to provide DIS for Dealers, Vendors or data integrators using a CDK DMS and vice-versa.

**ANSWER:** Paragraph 11 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds. CDK further admits that the excerpted text quoted in paragraph 11 of the Complaint appears in one of the three—the Data Exchange Agreement. CDK denies Plaintiffs' characterization of the agreements. CDK states that the contracts speak for themselves. CDK denies the remaining allegations in paragraph 11 of the Complaint.

12.     Capitalizing on their DMS market dominance, through implementation of a *per se* illegal written horizontal market division agreement, Defendants eliminated competition for the provision of these crucial DIS to Dealers nationwide, as well as to Vendors that require access to DMS data to provide a variety of vital services to Dealers.

---

for Dealers; and (4) to stop the defection of Reynolds DMS customers who lauded its "closed" DMS to CDK's previously "open" DMS.

**ANSWER:** Paragraph 12 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 12 of the Complaint.

13. As part of their scheme, Defendants have utilized their control of the DMS market to impose exclusive dealing provisions on Vendors. These exclusive dealing provisions necessitate that any Vendor doing business with CDK or Reynolds cannot contract with any other independent DIS provider, and these exclusive dealing provisions are purportedly infinite in duration. Accordingly, Vendors engaged by Dealers to utilize the Dealers' own data are also required to utilize Defendants' affiliated DIS. For example, if a Vendor does business with CDK then, pursuant to these exclusive dealing provisions, it can only use CDK's DIS, "Third Party Access" or "3PA" (as opposed to an independent DIS provider such as Authenticom, Inc. ("Authenticom") to utilize its Dealer client's own data. Defendants have thus exploited the uncompetitive and unlawful exclusive dealing provisions in Vendor contracts to impose exorbitant charges for data integration on Vendors, and those charges are ultimately passed through to Dealers.

**ANSWER:** Paragraph 13 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that a number of its third-party access/managed interface agreements with its Vendor customers lawfully prohibit a Vendor from taking or accepting data from CDK's proprietary DMS obtained through unauthorized means. CDK states that the contracts speak for themselves. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 13 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 13 of the Complaint.

14. Defendants colluded to drive out any vestige of competition in the two markets, and their conspiracy increased DMS and DIS prices to exorbitant levels. Defendants now charge Vendors an average of $300 per month for the DIS for one Dealership (and some Vendors are charged as much as $800 per month), whereas before the illegal conspiracy data integrators (including CDK subsidiaries) typically charged Vendors about $50 per month per Dealership for DIS. Vendors pass on these artificially inflated fees to Dealers, but Defendants prohibit Vendors from informing Dealerships that the reason for the increased Vendor charges is Defendants' increased data integration fees.

**ANSWER:** Paragraph 14 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that Plaintiffs or any other

individual or entity has suffered any injury as a result of any action or conduct of CDK or that its

conduct has had any anticompetitive effect. CDK admits that it has charged certain Vendors

approximately $50 per month per dealership connection for certain data access and related

services. CDK admits that a version of its standard 3PA contract with Vendors in place during the

relevant time period contains a provision addressing Vendors' communication of 3PA fees to their

Dealer customers. CDK states that the contracts speak for themselves. CDK lacks sufficient

knowledge or information to form a belief as to the truth of the allegations in paragraph 14 of the

Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK

denies the remaining allegations in paragraph 14 of the Complaint.

15. These significant barriers to entry are exacerbated by the lengthy duration of Defendants' DMS contracts with Dealers, which are, on average, five to seven years in length, frequently with terms that impose automatic extensions and higher monthly fees if new services are ordered in the middle of the contracts. Dealerships are "locked in" to these lengthy contracts, so only a fraction of the market is available to other DMS providers to compete for on an annual basis.

**ANSWER:** Paragraph 15 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK lacks sufficient knowledge or

information to form a belief as to the truth of the allegations in paragraph 15 of the Complaint that

relate to individuals or entities other than CDK and on that basis denies them. CDK denies the

remaining allegations in paragraph 15 of the Complaint.

16. Defendants purport to justify their artificially and illegally inflated prices on the basis of an alleged increase in data security costs. Defendants' justification, however, is a pretext for the imposition of increased charges resulting from their illegal anticompetitive conduct. In fact, Defendants' security concerns do not surface until after the Agreements are in place. Defendants' unlawful actions prevented Dealership Plaintiffs and the Classes from receiving the benefits of a fair and competitive marketplace for DMS and DIS. Defendants were able to charge higher prices than would otherwise have prevailed had there been robust competition between Defendants, and among Defendants and third-party DIS providers. As a direct and proximate consequence of Defendants' anticompetitive and illegal conduct, Dealership Plaintiffs and members of the Classes have directly paid the Defendants supracompetitive prices for the provision of DMS, and have indirectly paid the Defendants supracompetitive prices for the DIS required by Vendors. Dealership Plaintiffs bring this antitrust class action to recover damages to the maximum extent

PUBLIC VERSION

permitted by law as a result of their payment of artificially inflated prices for DMS and DIS, and for injunctive relief.

**ANSWER:** Paragraph 16 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 16 of the Complaint.

## CLASS ACTION ALLEGATIONS

17. Dealership Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3) on their own behalf and on behalf of the following Classes, of which one or more Dealership Plaintiffs are members:

**THE NATIONWIDE CLASS**

All persons and entities located in the United States engaged in the business of the retail sale of automobiles (Dealership Plaintiffs) who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the period from January 1, 2015 to the present ("Class Period").

Dealership Plaintiffs and the Nationwide Class are claiming damages and/or injunctive relief for violations of Sections 1 and 2 of the Sherman Act during the Class Period.

**THE STATE CLASSES**

Dealership Plaintiffs and the State Classes who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period seek damages and/or injunctive relief for violations of various state antitrust, trade practices and consumer protection laws in the following states:

**Alabama Class:** All persons and entities located in Alabama engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Alaska Class:** All persons and entities located in Alaska engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Arizona Class:** All persons and entities located in Arizona engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Arkansas Class:** All persons and entities located in Arkansas engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**California Class:** All persons and entities located in California engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Colorado Class:** All persons and entities located in Colorado engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Delaware Class:** All persons and entities located in Delaware engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**District of Columbia Class:** All and entities persons located in the District of Columbia engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Florida Class:** All persons and entities located in Florida engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Georgia Class:** All persons and entities located in Georgia engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Hawaii Class:** All persons and entities located in Hawaii engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Illinois Class:** All persons and entities located in Illinois engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Iowa Class:** All persons and entities located in Iowa engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from

**PUBLIC VERSION**

CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Kansas Class:** All persons and entities located in Kansas engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Maine Class:** All persons and entities located in Maine engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Massachusetts Class:** All persons and entities located in Massachusetts engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Michigan Class:** All persons and entities located in Michigan engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Minnesota Class:** All persons and entities located in Minnesota engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Mississippi Class:** All persons and entities located in Mississippi engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Nebraska Class:** All persons and entities located in Nebraska engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period..

**Nevada Class:** All persons and entities located in Nevada engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**New Hampshire Class:** All persons and entities located in New Hampshire engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**New Jersey Class:** All persons and entities located in New Jersey engaged in the business of the retail sale of automobiles who directly purchased DMS and/or and indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**New Mexico Class:** All persons and entities located in New Mexico engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**New York Class:** All persons and entities located in New York engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**North Carolina Class:** All persons and entities located in North Carolina engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**North Dakota Class:** All persons and entities located in North Dakota engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Oregon Class:** All persons and entities located in Oregon engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Rhode Island Class:** All persons and entities located in Rhode Island engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**South Carolina Class:** All persons and entities located in South Carolina engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**South Dakota Class:** All persons and entities located in South Dakota engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Tennessee Class:** All persons and entities located in Tennessee engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS

from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Utah Class:** All persons and entities located in Utah engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Vermont Class:** All persons and entities located in Vermont engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**West Virginia Class:** All persons and entities located in West Virginia engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**Wisconsin Class:** All persons and entities located in Wisconsin engaged in the business of the retail sale of automobiles who directly purchased DMS and/or indirectly purchased DIS from CDK and/or Reynolds, or any predecessor, successor, subsidiary, joint venture or affiliate, during the Class Period.

**ANSWER:** Paragraph 17 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that Plaintiffs purport to bring this action as a class action on behalf of the putative classes identified in paragraph 17 of the Complaint pursuant to the Federal Rules of Civil Procedure. CDK denies, however, that this matter is properly brought or is properly maintained as a class action. CDK further denies that any of the purported class definitions set forth in paragraph 17 of the Complaint are accurate or appropriate for any purpose in this matter. CDK denies the remaining allegations in paragraph 17 of the Complaint.

18.     Excluded from the Classes are Defendants, including any entity or division in which any Defendant has a controlling interest, as well as Defendants' joint ventures, subsidiaries, affiliates, assigns, and successors.

**ANSWER:** Paragraph 18 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that Plaintiffs purport to

bring this action as a class action under the Federal Rules of Civil Procedure and that Plaintiffs

purport to exclude from the putative class the persons identified in paragraph 18 of the Complaint.

CDK denies, however, that this matter is properly brought or is properly maintained as a class

action. CDK denies the remaining allegations in paragraph 18 of the Complaint.

19.     The exact number of Class members is unknown to Dealership Plaintiffs. Due to
the nature of the trade and commerce involved, Dealership Plaintiffs believe there are likely
thousands of Class members geographically dispersed throughout the United States, such that
joinder of all Class members is impracticable.

**ANSWER:**     Paragraph 19 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK admits that Plaintiffs purport to

bring this action as a class action under the Federal Rules of Civil Procedure. CDK denies,

however, that this matter is properly brought or is properly maintained as a class action. CDK

admits that there are thousands of automotive dealers in the United States. CDK lacks sufficient

knowledge or information to form a belief as to the truth of the allegations in paragraph 19 of the

Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK

denies the remaining allegations in paragraph 19 of the Complaint.

20.     There are questions of law and fact common to the Class, including but not limited
to the following:

(a)     Whether Defendants engaged in or entered into a contract(s), combination
or conspiracy to restrain competition;

(b)     Whether Defendants' unlawful conduct has enabled them to artificially
inflate or fix prices for DMS and/or DIS;

(c)     The impact of Defendants' unlawful conduct on the prices of DMS and DIS
during the Class Period;

(d)     Whether Defendants violated Sections 1 and 2 of the Sherman Act;

(e)     Whether Defendants violated federal and state laws;

(f)     Whether Defendants caused injury to the business of Dealership Plaintiffs
and Class members;

      (g)     The appropriate measure of damages sustained by Dealership Plaintiffs and Class members; and

      (h)     Whether injunctive relief is appropriate.

**ANSWER:**    Paragraph 20 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that Plaintiffs purport to bring this action as a class action under the Federal Rules of Civil Procedure. CDK denies, however, that this matter is properly brought or is properly maintained as a class action. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 20 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 20 of the Complaint.

21.    These common questions and others predominate over questions, if any, that affect only individual Class members.

**ANSWER:**    Paragraph 21 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that Plaintiffs purport to bring this action as a class action under the Federal Rules of Civil Procedure. CDK denies, however, that this matter is properly brought or is properly maintained as a class action. CDK denies the remaining allegations in paragraph 21 of the Complaint.

22.    Dealership Plaintiffs' claims are typical of the claims of the Classes. Dealership Plaintiffs directly purchased DMS and indirectly purchased DIS from one or both Defendants. As a result, Dealership Plaintiffs and Class members were injured by Defendants' unlawful conduct.

**ANSWER:**    Paragraph 22 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that Plaintiffs purport to bring this action as a class action under the Federal Rules of Civil Procedure. CDK denies, however, that this matter is properly brought or is properly maintained as a class action. CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any

action or conduct of CDK. CDK denies the remaining allegations in paragraph 22 of the Complaint.

23. Dealership Plaintiffs and their counsel will fairly and adequately protect and represent the interests of the Classes. Counsel for Dealership Plaintiffs are experienced in complex class action litigation, including antitrust litigation, and will vigorously assert the claims of Class members.

**ANSWER:** Paragraph 23 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that Plaintiffs purport to bring this action as a class action under the Federal Rules of Civil Procedure. CDK denies, however, that this matter is properly brought or is properly maintained as a class action. CDK denies the remaining allegations in paragraph 23 of the Complaint.

24. A class action is superior to other methods for the fair and efficient resolution of this controversy. The class action device presents fewer management difficulties; moreover, any difficulties are far outweighed by the benefit of a single adjudication and the comprehensive supervision of this controversy by a single court. The damages suffered individually by Dealership Plaintiffs and each Class member are relatively small as compared to the overall expense and burden of individual prosecution of claims asserted in this litigation. Thus, absent class certification, it would be difficult and inefficient for Dealership Plaintiffs and Class members to redress the wrongs challenged herein.

**ANSWER:** Paragraph 24 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that Plaintiffs purport to bring this action as a class action under the Federal Rules of Civil Procedure. CDK denies, however, that this matter is properly brought or is properly maintained as a class action. CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs or any other member of the purported classes are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 24 of the Complaint.

25. This action may be also certified under Rule 23(b)(1) or Rule 23(b)(2) because: (a) the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish

incompatible standards of conduct for Defendants; (b) the prosecution of separate actions by individual Class members would create a risk of adjudicative rulings as to them that would, as a practical matter, be dispositive of the interests of the other Class members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds that apply generally to the Class members, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

**ANSWER:**     Paragraph 25 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that Plaintiffs purport to bring this action as a class action under the Federal Rules of Civil Procedure.  CDK denies, however, that this matter is properly brought or is properly maintained as a class action.  CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs or any member of its purported classes are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 25 of the Complaint.

## THE PARTIES

26.     Dealership Plaintiff ACA Motors, Inc., doing business as Continental Acura ("Continental Acura"), is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 2275 Aurora Avenue, Naperville, Illinois. Continental Acura is engaged in the business of purchasing and selling automobiles. During the Class Period, Continental Acura, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Continental Acura also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Continental Acura purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Continental Acura suffered antitrust injury.

**ANSWER:**     Paragraph 26 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required,  CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK admits upon information and belief that Continental Acura is engaged in the business of purchasing and selling automobiles and that it licenses a DMS from CDK. CDK lacks sufficient knowledge

or information to form a belief as to the truth of the allegations in the first sentence of paragraph 26 of the Complaint and on that basis denies them. CDK denies the remaining allegations in paragraph 26 of the Complaint.

27.    Dealership Plaintiff Baystate Ford Inc. ("Baystate Ford") is a corporation organized and existing under the laws of the state of Massachusetts with its principal place of business located at 703 Washington Street, South Easton, Massachusetts. Baystate Ford is engaged in the business of purchasing and selling automobiles. During the Class Period, Baystate Ford, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Baystate Ford also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Baystate Ford purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Baystate Ford suffered antitrust injury.

**ANSWER:**    Paragraph 27 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required,  CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK admits upon information and belief that Baystate Ford is engaged in the business of purchasing and selling automobiles and that it licenses a DMS from CDK.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the first sentence of paragraph 27 of the Complaint and on that basis denies them. CDK denies the remaining allegations in paragraph 27 of the Complaint.

28.    Dealership Plaintiff Cherry Hill Jaguar ("Cherry Hill Jaguar") is a corporation organized and existing under the laws of the state of New Jersey with its principal place of business located at 2000 Route 70 East, Cherry Hill, New Jersey. Cherry Hill Jaguar is engaged in the business of purchasing and selling automobiles. During the Class Period, Cherry Hill Jaguar, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Cherry Hill Jaguar also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Stevens Jersey City Ford purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Cherry Hill Jaguar suffered antitrust injury.

**ANSWER:**    Paragraph 28 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required,  CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK

admits upon information and belief that Cherry Hill Jaguar is engaged in the business of purchasing and selling automobiles and that it licenses a DMS from CDK.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the first sentence of paragraph 28 of the Complaint and on that basis denies them. CDK denies the remaining allegations in paragraph 28 of the Complaint.

29.     Dealership Plaintiff Cliff Harris Ford, LLC, doing business as Warrensburg Ford ("Warrensburg Ford"), is a corporation organized and existing under the laws of the state of Missouri with its principal place of business located at 330 E. Young Street, Warrensburg, Missouri. Warrensburg Ford is engaged in the business of purchasing and selling automobiles. During the Class Period, Warrensburg Ford, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Warrensburg Ford also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Warrensburg Ford purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Warrensburg Ford suffered antitrust injury.

**ANSWER:**     Paragraph 29 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required,  CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK admits upon information and belief that Warrensburg Ford is engaged in the business of purchasing and selling automobiles and that it licenses a DMS from CDK.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the first sentence of paragraph 29 of the Complaint and on that basis denies them. CDK denies the remaining allegations in paragraph 29 of the Complaint.

30.     Dealership Plaintiff Continental Autos, Inc., doing business as Continental Toyota ("Continental Toyota"), is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 6701 South La Grange Road, Hodgkins, Illinois. Continental Toyota is engaged in the business of purchasing and selling automobiles. During the Class Period, Continental Toyota, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Continental Toyota also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Continental Toyota purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Continental Toyota suffered antitrust injury.

**ANSWER:** Paragraph 30 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK denies that Plaintiffs or any other

individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK

admits upon information and belief that Continental Toyota is engaged in the business of

purchasing and selling automobiles and that it licenses a DMS from CDK. CDK lacks sufficient

knowledge or information to form a belief as to the truth of the allegations in the first sentence of

paragraph 30 of the Complaint and on that basis denies them. CDK denies the remaining

allegations in paragraph 30 of the Complaint.

31. Dealership Plaintiff Continental Classic Motors, Inc., doing business as Continental Autosports ("Continental Autosports"), is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 420 E. Ogden Avenue, Hinsdale, Illinois. Continental Autosports is engaged in the business of purchasing and selling automobiles. During the Class Period, Continental Autosports, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Continental Autosports also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Continental Autosports purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Continental Autosports suffered antitrust injury.

**ANSWER:** Paragraph 31 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK denies that Plaintiffs or any other

individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK

admits upon information and belief that Continental Autosports is engaged in the business of

purchasing and selling automobiles and that it licenses a DMS from CDK. CDK lacks sufficient

knowledge or information to form a belief as to the truth of the allegations in the first sentence of

paragraph 31 of the Complaint and on that basis denies them. CDK denies the remaining

allegations in paragraph 31 of the Complaint.

32. Dealership Plaintiff 5800 Countryside, LLC, doing business as Continental Mitsubishi ("Continental Mitsubishi"), is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 5800 South La Grange Road, Countryside, Illinois. Continental Mitsubishi is engaged in the business of purchasing and selling

automobiles. During the Class Period, Continental Mitsubishi, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Continental Mitsubishi also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Continental Mitsubishi purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Continental Mitsubishi suffered antitrust injury.

**ANSWER:** Paragraph 32 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK admits upon information and belief that Continental Mitsubishi is engaged in the business of purchasing and selling automobiles and that it licenses a DMS from CDK. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the first sentence of paragraph 32 of the Complaint and on that basis denies them. CDK denies the remaining allegations in paragraph 32 of the Complaint.

33. Dealership Plaintiff HDA Motors, Inc., doing business as Continental Honda ("Continental Honda"), is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 5901 South La Grange Road, Countryside, Illinois. Continental Honda is engaged in the business of purchasing and selling automobiles. During the Class Period, Continental Honda, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Continental Honda also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Continental Honda purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Continental Honda suffered antitrust injury.

**ANSWER:** Paragraph 33 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK admits upon information and belief that Continental Honda is engaged in the business of purchasing and selling automobiles and that it licenses a DMS from CDK. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the first sentence of

paragraph 33 of the Complaint and on that basis denies them. CDK denies the remaining allegations in paragraph 33 of the Complaint.

34.     Dealership Plaintiff H & H Continental Motors, Inc., doing business as Continental Nissan ("Continental Nissan"), is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 5750 South La Grange Road, Hodgkins, Illinois. Continental Nissan is engaged in the business of purchasing and selling automobiles. During the Class Period, Continental Nissan, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Continental Nissan also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Continental Nissan purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Continental Nissan suffered antitrust injury.

**ANSWER:**     Paragraph 34 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required,  CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK admits upon information and belief that Continental Nissan is engaged in the business of purchasing and selling automobiles and that it licenses a DMS from CDK.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the first sentence of paragraph 34 of the Complaint and on that basis denies them. CDK denies the remaining allegations in paragraph 34 of the Complaint.

35.     Dealership Gregoris Motors, Inc. ("Gregoris Motors") is a corporation organized and existing under the laws of the state of New York with its principal place of business located at 555 West Merrick Road, Valley Stream, New York. Gregoris Motors is engaged in the business of purchasing and selling automobiles. During the Class Period, Gregoris Motors, who currently purchases DMS directly from Reynolds, paid supracompetitive prices for its direct purchases of DMS. Gregoris Motors also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Gregoris Motors purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Gregoris Motors suffered antitrust injury.

**ANSWER:**     Paragraph 35 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required,  CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK lacks

sufficient knowledge or information to form a belief as to the truth of the allegations in the first

and second sentences of paragraph 35 of the Complaint and on that basis denies them. CDK lacks

sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph

35 of the Complaint that relate to individuals or entities other than CDK and on that basis denies

them. CDK denies the remaining allegations in paragraph 35 of the Complaint.

36. Dealership Plaintiff Hoover Automotive, LLC, doing business as Hoover Dodge Jeep of Summerville ("Hoover Automotive"), is a corporation organized and existing under the laws of the state of South Carolina with its principal place of business located at 195 Marymeade Drive, Summerville, South Carolina. Hoover Automotive is engaged in the business of purchasing and selling automobiles. During the Class Period, Hoover Automotive, who currently purchases DMS directly from Reynolds, paid supracompetitive prices for its direct purchases of DMS. Hoover Automotive also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Hoover Automotive purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Hoover Automotive suffered antitrust injury.

**ANSWER:** Paragraph 36 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK denies that Plaintiffs or any other

individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK lacks

sufficient knowledge or information to form a belief as to the truth of the allegations in the first

and second sentences of paragraph 36 of the Complaint and on that basis denies them. CDK lacks

sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph

36 of the Complaint that relate to individuals or entities other than CDK and on that basis denies

them. CDK denies the remaining allegations in paragraph 36 of the Complaint.

37. Dealership Plaintiff JCF Autos LLC, doing business as Stevens Jersey City Ford ("Stevens Jersey City Ford"), is a corporation organized and existing under the laws of the state of New Jersey with its principal place of business located at 740 Route 440, Jersey City, New Jersey. Stevens Jersey City Ford is engaged in the business of purchasing and selling automobiles. During the Class Period, Stevens Jersey City Ford, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Stevens Jersey City Ford also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Stevens Jersey City Ford purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Stevens Jersey City Ford suffered antitrust injury.

**ANSWER:** Paragraph 37 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK admits upon information and belief that Stevens Jersey City Ford is engaged in the business of purchasing and selling automobiles and that it licenses a DMS from CDK. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the first sentence of paragraph 37 of the Complaint and on that basis denies them. CDK denies the remaining allegations in paragraph 37 of the Complaint.

38. Dealership Plaintiff Jericho Turnpike Sales LLC, doing business as Ford & Lincoln of Smithtown ("Smithtown Ford & Lincoln"), is a corporation organized and existing under the laws of the state of New York with its principal place of business located at 440 Jericho Turnpike, Smithtown, New York. Smithtown Ford & Lincoln is engaged in the business of purchasing and selling automobiles. During the Class Period, Smithtown Ford & Lincoln, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Smithtown Ford & Lincoln also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Smithtown Ford & Lincoln purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Smithtown Ford & Lincoln suffered antitrust injury.

**ANSWER:** Paragraph 38 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK admits upon information and belief that Smithtown Ford & Lincoln is engaged in the business of purchasing and selling automobiles and that it licenses a DMS from CDK. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the first sentence of paragraph 38 of the Complaint and on that basis denies them. CDK denies the remaining allegations in paragraph 38 of the Complaint.

39. Dealership Plaintiff Jim Marsh American Corporation, doing business as Jim Marsh Mitsubishi Suzuki Kia Mahindra ("Jim Marsh Mitsubishi") is a corporation organized and existing under the laws of the state of Nevada with its principal place of business located at 8555 W. Centennial Parkway, Las Vegas, Nevada. Jim Marsh Mitsubishi is engaged in the business of

purchasing and selling automobiles. During the Class Period, Jim Marsh Mitsubishi, who currently purchases DMS directly from Reynolds, paid supracompetitive prices for its direct purchases of DMS. Jim Marsh Mitsubishi also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Jim Marsh Mitsubishi purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Jim Marsh Mitsubishi suffered antitrust injury.

**ANSWER:** Paragraph 39 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the first and second sentences of paragraph 39 of the Complaint and on that basis denies them. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 39 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 39 of the Complaint.

40. Dealership John O'Neil Johnson Toyota, LLC ("Johnson Toyota") is a corporation organized and existing under the laws of the state of Mississippi with its principal place of business located at 2900 Highway 39 North, Meridian, Mississippi. Johnson Toyota is engaged in the business of purchasing and selling automobiles. During the Class Period, Johnson Toyota, who currently purchases DMS directly from Reynolds, paid supracompetitive prices for its direct purchases of DMS. Johnson Toyota also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Johnson Toyota purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Johnson Toyota suffered antitrust injury.

**ANSWER:** Paragraph 40 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the first and second sentences of paragraph 40 of the Complaint and on that basis denies them. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph

**PUBLIC VERSION**

40 of the Complaint that relate to individuals or entities other than CDK and on that basis denies

them. CDK denies the remaining allegations in paragraph 40 of the Complaint.

41.     Dealership Plaintiff Kenny Thomas Enterprises, Inc., doing business as Olathe
Toyota ("Olathe Toyota"), is a corporation organized and existing under the laws of the state of
Delaware with its principal place of business located at 685 N. Rawhide Drive, Olathe, Kansas.
Olathe Toyota is engaged in the business of purchasing and selling automobiles. During the Class
Period, Olathe Toyota, who currently purchases DMS directly from CDK, paid supracompetitive
prices for its direct purchases of DMS. Olathe Toyota also paid supracompetitive prices for its
indirect purchases of DIS, because the Vendors from which Olathe Toyota purchased software
applications passed on Defendants' artificially inflated data integration fees. As a result of
Defendants' unlawful conduct, Olathe Toyota suffered antitrust injury.

**ANSWER:**     Paragraph 41 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK denies that Plaintiffs or any other

individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK

admits upon information and belief that Olathe Toyota is engaged in the business of purchasing

and selling automobiles and that it previously licensed a DMS from CDK. CDK lacks sufficient

knowledge or information to form a belief as to the truth of the allegations in the first sentence of

paragraph 41 of the Complaint and on that basis denies them. CDK denies the remaining

allegations in paragraph 41 of the Complaint.

42.     Dealership Plaintiff Marshall Chrysler Jeep Dodge, L.L.C. doing business as
Marshall Chrysler Jeep Dodge Ram ("Marshall Chrysler") is a corporation organized and existing
under the laws of the state of Missouri with its principal place of business located at 1450 W.
Arrow Street, Marshall, Missouri. Marshall Chrysler is engaged in the business of purchasing and
selling automobiles. During the Class Period, Continental Acura, who currently purchases DMS
directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Marshall
Chrysler also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors
from which Marshall Chrysler purchased software applications passed on Defendants' artificially
inflated data integration fees. As a result of Defendants' unlawful conduct, Marshall Chrysler
suffered antitrust injury.

**ANSWER:**     Paragraph 42 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK denies that Plaintiffs or any other

individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK

admits upon information and belief that Marshall Chrysler is engaged in the business of purchasing

and selling automobiles and that it (CDK assumes the reference to "Continental Acura" is a

typographical error) licenses a DMS from CDK. CDK lacks sufficient knowledge or information

to form a belief as to the truth of the allegations in the first sentence of paragraph 42 of the

Complaint and on that basis denies them. CDK denies the remaining allegations in paragraph 42

of the Complaint.

43.     Dealership Plaintiff Naperville Zoom Cars, Inc., doing business as Continental Mazda ("Continental Mazda"), is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 2363 Aurora Avenue, Naperville, Illinois. Continental Mazda is engaged in the business of purchasing and selling automobiles. During the Class Period, Continental Mazda, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Continental Mazda also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Continental Mazda purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Continental Mazda suffered antitrust injury.

**ANSWER:**     Paragraph 43 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK denies that Plaintiffs or any other

individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK

admits upon information and belief that Continental Mazda is engaged in the business of

purchasing and selling automobiles and that it licenses a DMS from CDK. CDK lacks sufficient

knowledge or information to form a belief as to the truth of the allegations in the first sentence of

paragraph 43 of the Complaint and on that basis denies them. CDK denies the remaining

allegations in paragraph 43 of the Complaint.

44.     Dealership Plaintiff NV Autos, Inc., doing business as Continental Audi ("Continental Audi"), is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 1527 Aurora Avenue, Naperville, Illinois. Continental Audi is engaged in the business of purchasing and selling automobiles. During the Class Period, Continental Audi, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Continental Audi also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Continental Audi purchased software applications passed on Defendants' artificially inflated data

integration fees. As a result of Defendants' unlawful conduct, Continental Audi suffered antitrust injury.

**ANSWER:**    Paragraph 44 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required,  CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK admits upon information and belief that Continental Audi is engaged in the business of purchasing and selling automobiles and that it licenses a DMS from CDK.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the first sentence of paragraph 44 of the Complaint and on that basis denies them. CDK denies the remaining allegations in paragraph 44 of the Complaint.

45.    Dealership Plaintiff Patchogue 112 Motors LLC, doing business as Stevens Ford ("Stevens Ford") is a corporation organized and existing under the laws of the state of New York with its principal place of business located at 507 Route 112, Patchogue, New York. Stevens Ford is engaged in the business of purchasing and selling automobiles. During the Class Period, Stevens Ford, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Stevens Ford also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Stevens Ford purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Stevens Ford suffered antitrust injury.

**ANSWER:**    Paragraph 45 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required,  CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK admits upon information and belief that Stevens Ford is engaged in the business of purchasing and selling automobiles and that it licenses a DMS from CDK.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the first sentence of paragraph 45 of the Complaint and on that basis denies them. CDK denies the remaining allegations in paragraph 45 of the Complaint.

46.    Dealership Plaintiff Pitre Imports, LLC, doing business as Pitre Kia ("Pitre Kia"), is a corporation organized and existing under the laws of the state of New Mexico with its principal

place of business located at 9640 Eagle Ranch Road NW, Albuquerque, New Mexico. Pitre Kia is engaged in the business of purchasing and selling automobiles. During the Class Period, Pitre Kia, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Pitre Kia also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Pitre Kia purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Pitre Kia suffered antitrust injury.

**ANSWER:** Paragraph 46 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK admits upon information and belief that Pitre Kia is engaged in the business of purchasing and selling automobiles and that it licenses a DMS from CDK. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the first sentence of paragraph 46 of the Complaint and on that basis denies them. CDK denies the remaining allegations in paragraph 46 of the Complaint.

47. Dealership Plaintiff Pitre, Inc., doing business as Pitre Buick GMC ("Pitre Buick"), is a corporation organized and existing under the laws of the state of New Mexico with its principal place of business located at 9737 Eagle Ranch Road NW, Albuquerque, New Mexico. Pitre Buick is engaged in the business of purchasing and selling automobiles. During the Class Period, Pitre Buick, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Pitre Buick also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Pitre Buick purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Pitre Buick suffered antitrust injury.

**ANSWER:** Paragraph 47 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK admits upon information and belief that Pitre Buick is engaged in the business of purchasing and selling automobiles and that it licenses a DMS from CDK. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the first sentence of paragraph 47

of the Complaint and on that basis denies them. CDK denies the remaining allegations in paragraph

47 of the Complaint.

48. Dealership Plaintiff Teterboro Automall, Inc., doing business as Teterboro Chrysler Dodge Jeep Ram ("Teterboro Chrysler"), is a corporation organized and existing under the laws of the state of New Jersey with its principal place of business located at 469 Route 46, Little Ferry, New Jersey. Teterboro Chrysler is engaged in the business of purchasing and selling automobiles. During the Class Period, Teterboro Chrysler, who currently purchases DMS directly from Reynolds, paid supracompetitive prices for its direct purchases of DMS. Teterboro Chrysler also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Stevens Jersey City Ford purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Teterboro Chrysler suffered antitrust injury

**ANSWER:** Paragraph 48 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK denies that Plaintiffs or any other

individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK lacks

sufficient knowledge or information to form a belief as to the truth of the allegations in the first

and second sentences of paragraph 48 of the Complaint and on that basis denies them. CDK lacks

sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph

48 of the Complaint that relate to individuals or entities other than CDK and on that basis denies

them. CDK denies the remaining allegations in paragraph 48 of the Complaint.

49. Dealership Plaintiff Waconia Dodge, Inc. ("Waconia Dodge") is a corporation organized and existing under the laws of the state of Minnesota with its principal place of business located at 905 Strong Drive, Waconia, Minnesota. Waconia Dodge is engaged in the business of purchasing and selling automobiles. During the Class Period, Waconia Dodge, who currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases of DMS. Waconia Dodge also paid supracompetitive prices for its indirect purchases of DIS, because the Vendors from which Waconia Dodge purchased software applications passed on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful conduct, Waconia Dodge suffered antitrust injury.

**ANSWER:** Paragraph 49 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK denies that Plaintiffs or any other

individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK

admits upon information and belief that Waconia Dodge is engaged in the business of purchasing

and selling automobiles and that it licenses a DMS from CDK.  CDK lacks sufficient knowledge

or information to form a belief as to the truth of the allegations in the first sentence of paragraph

49 of the Complaint and on that basis denies them. CDK denies the remaining allegations in

paragraph 49 of the Complaint.

50.    Dealership Warrensburg Chrysler Dodge Jeep, L.L.C. doing business as
Warrensburg Chrysler Dodge Jeep Ram Fiat ("Warrensburg Chrysler") is a corporation organized
and existing under the laws of the state of Missouri with its principal place of business located at
329 E. Young Street, Warrensburg, Missouri. Warrensburg Chrysler is engaged in the business of
purchasing and selling automobiles. During the Class Period, Warrensburg Chrysler, who
currently purchases DMS directly from CDK, paid supracompetitive prices for its direct purchases
of DMS. Warrensburg Chrysler also paid supracompetitive prices for its indirect purchases of DIS,
because the Vendors from which Warrensburg Chrysler purchased software applications passed
on Defendants' artificially inflated data integration fees. As a result of Defendants' unlawful
conduct, Warrensburg Chrysler suffered antitrust injury.

**ANSWER:**    Paragraph 50 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required,  CDK denies that Plaintiffs or any other

individual or entity has suffered any injury as a result of any action or conduct of CDK. CDK

admits upon information and belief that Warrensburg Chrysler is engaged in the business of

purchasing and selling automobiles and that it licenses a DMS from CDK.  CDK lacks sufficient

knowledge or information to form a belief as to the truth of the allegations in the first sentence of

paragraph 50 of the Complaint and on that basis denies them. CDK denies the remaining

allegations in paragraph 50 of the Complaint.

51.    Defendant CDK is a publicly-traded Delaware corporation with its corporate
headquarters and principal place of business located at 1950 Hassell Road, Hoffman Estates,
Illinois. CDK provides DMS software and services to automobile dealerships throughout the
United States, including in Illinois, and has more than $2 billion in annual revenue. In 2014, CDK
was spun off from ADP, LLC, and is now an independent, publicly-traded company in which ADP
retains no ownership interest. Prior to the spin-off, CDK was referred to as ADP Dealer Services
Inc. CDK and ADP are collectively referred to herein as "CDK." In addition to providing DMS
services, CDK also provides DIS indirectly to Dealerships throughout the United States, including
in Illinois.

**ANSWER:**     CDK admits that it is a publicly traded company organized under the laws of

Delaware, and that its corporate headquarters is in Hoffman Estates, Illinois, at the address listed

in paragraph 51 of the Complaint.  CDK further admits that it offers certain products and services,

including DMS services, to automobile dealerships in the United States and in Illinois, and that it

has reported annual revenue in excess of $2 billion in public filings with the Securities and

Exchange Commission during the relevant period.   CDK states that the reports speak for

themselves.   CDK admits that it was spun off from Automatic Data Processing, Inc. ("ADP") in

October 2014.  CDK denies the remaining allegations in paragraph 51 of the Complaint.

52.     Defendant Reynolds is an Ohio corporation with its corporate headquarters and
principal place of business located at One Reynolds Way, Kettering, Ohio. Reynolds was formerly
a publicly-traded company before it was privately acquired by Bob Brockman in 2006. Reynolds
provides DMS software and services to automobile dealerships throughout the United States,
including in Illinois. In addition to providing DMS services, Reynolds also provides DIS indirectly
to Dealerships throughout the United States, including in Illinois.

**ANSWER:**     Upon information and belief, CDK admits that Reynolds is an Ohio corporation

with a business location at the address identified in the first sentence of paragraph 52 of the

Complaint.  CDK further admits, upon information and belief, that Reynolds offers a number of

products and services, including DMS services, to automobile dealerships in the United States.

Upon information and belief, CDK further admits that prior to 2006 Reynolds was a publicly traded

company and that in or about 2006, it was acquired by Bob Brockman.  CDK lacks sufficient

knowledge or information to form a belief as to the truth of the remaining allegations in paragraph

52 of the Complaint and on that basis denies them.

## JURISDICTION AND VENUE

53.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and
2; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; and various state laws.

**ANSWER:**     Paragraph 53 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK admits that Plaintiffs purport to

bring this action pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, Sections 4

and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26, and various state laws.  CDK denies, however,

that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or

conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK lacks

sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph

53 of the Complaint that relate to individuals or entities other than CDK and on that basis denies

them.  CDK denies the remaining allegations in paragraph 53 of the Complaint.

54.     This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331
and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

**ANSWER:**     Paragraph 54 states legal conclusions to which no answer is required.  To the extent

that an answer may be required, CDK admits that this Court has jurisdiction over the federal claims

asserted in Plaintiffs' Complaint.  CDK denies the remaining allegations in paragraph 54 of the

Complaint.

55.     This Court has jurisdiction over the state law claims under the Class Action Fairness
Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest
and costs, and at least one plaintiff and one defendant are citizens of different states. There are
more than 100 putative Class members.

**ANSWER:**     Paragraph 55 states legal conclusions to which no answer is required.  To the extent

that an answer may be required, CDK admits that this Court has jurisdiction over the state law

claims asserted in Plaintiffs' Complaint but denies that a class should be certified as to any of the

putative classes in this action.  CDK denies the remaining allegations in paragraph 55 of the

Complaint.

56.     This Court also has supplemental jurisdiction over the state law claims pursuant to
28 U.S.C. § 1367 because such claims are so closely related to the federal claims that they form
part of the same case or controversy.

**ANSWER:**     Paragraph 56 states legal conclusions to which no answer is required.  To the extent

that an answer may be required, CDK admits that this Court has jurisdiction over the state law

claims asserted in Plaintiffs' Complaint.  CDK denies the remaining allegations in paragraph 56 of the Complaint.

57.     This Court has personal jurisdiction over Defendants subject to the nationwide service provisions of Section 12 of the Clayton Act, 15 U.S.C. § 22. Furthermore, Defendants have engaged in the unlawful acts described in this Complaint with the foreseeable or intended effect of causing substantial economic harm to automotive dealers in the state of Illinois. Moreover, Defendants purposefully availed themselves of the privilege of doing business in Illinois through the widespread promotion, sale, marketing, and distribution of their products and services in the state of Illinois.

**ANSWER:**     Paragraph 57 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that this Court has personal jurisdiction over CDK.  CDK admits that it markets and sells certain products and services in Illinois. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 57 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 57 of the Complaint.

58.     Venue is proper in this Court pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d). Defendants are registered to do business, transacted business, were found, and had agents in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District. Among other things, CDK is headquartered in this District and Reynolds conducts business in this District.

**ANSWER:**     Paragraph 58 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that Venue is proper in this Court pursuant to the statutes identified in paragraph 58 of the Complaint. CDK admits that it markets and sells certain products and services in Illinois.  CDK admits that it is registered to do business in Illinois and is headquartered in this District.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 58 of the Complaint that

relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 58 of the Complaint.

59.     As described throughout the Complaint, Defendants' unlawful conduct has substantially affected interstate commerce by harming competition and increasing prices to the detriment of the Dealership Plaintiffs throughout the United States. The actions complained of herein have restrained and adversely affected interstate commerce throughout the United States because Defendants provide their products and services across the nation, and the markets for DMS and DIS are both nationwide markets. Furthermore, during the Class Period, Defendants sold a substantial amount of DMS and provided extensive DIS within the continuous and uninterrupted flow of interstate commerce, and as intended, their actions substantially affected that commerce.

**ANSWER:**     Paragraph 59 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that it sells certain products and services in interstate commerce. CDK denies, however, that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK states that the allegations in paragraph 59 of the Complaint are so vague and ambiguous as to the definition of the phrase "markets for DMS and DIS" that CDK cannot respond to those allegations and on that basis denies them. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 59 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 59 of the Complaint.

## FACTUAL ALLEGATIONS

### A.     The Relevant Product Markets

60.     The relevant product markets in this antitrust class action are (i) the DMS market; and (ii) the DIS market, including the single-brand aftermarkets for DIS.[4] Participants in the DMS market include Dealers and the providers of DMS. Participants in the DIS market include entities that specialize in accessing and aggregating Dealers' data from DMS databases and provide services to Dealers and Vendors by extracting, formatting and aggregating data. The single-brand aftermarkets for DIS are the derivative markets for the provision of DIS on each of the Reynolds

---

[4] There are cognizable and separate markets for the provision of DIS on the respective Reynolds and CDK DMS.

and CDK DMS.[5] There are no reasonable substitutes for DMS or the services provided by data integrators to Dealers and Vendors engaged in the retail automobile industry. The relevant geographical market for both the DIS and DMS markets is the United States.

**ANSWER:** Paragraph 60 of the Complaint states legal conclusions to which no response is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 60 of the Complaint.

> **B.   CDK and Reynolds Dominate The DMS Market And Unlawfully Exploited Their Duopoly Power**
>
> **(i)   Data Management Systems and the DMS Market**

61.    DMS is enterprise software designed for and used by retail automobile Dealerships. It is the critical software that operates as a Dealer's central database and is the repository of critical operational information. Dealerships input their important business data, including sales, financing, inventory management (both vehicle and parts), repair and service, accounting, payroll, human resources, marketing, and car manufacturer ("Original Equipment Manufacturer" or "OEM") certifications into their DMS. The physical storage of the data is either onsite at the Dealership, at private data centers operated by the DMS provider, or with cloud-based data storage companies.

**ANSWER:** CDK admits that most new vehicle franchised Dealers and a number of used car Dealers license DMS enterprise software in order to manage and operate their dealerships, including with respect to sales, financing, inventory management, repair and service, accounting, payroll, human resources, marketing, and OEM certifications. CDK admits that Dealers enter certain data into the DMS but denies that CDK's DMS is merely a database or that all data entered into the DMS belongs to Dealers; there is substantial data residing in the DMS, including non-public personal and identifying information pertaining to end-use customers and proprietary data that belongs to CDK and to other third parties, that the Dealers neither own nor control. CDK further admits that the certain of the data that resides in its DMS does so on servers located in data centers maintained by CDK; in a few instances (although this is being phased out), data resides on

---

[5] The aftermarket for Dealer data integration is derivative of the primary DMS Market because if there were no DMS systems in the first place, there would be no demand for integration services for Dealer data on those systems.

CDK servers that are located and maintained on a Dealer's premises. CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 61 of the Complaint and on that basis denies them.

62.     Dealerships rely on DMS to manage their operations because it "measures, reports and controls the functions within a dealership yielding quantifiable, reliable and timely information of significant importance to the dealer and dealership management."[6] A publication by a leading industry technology consultancy has described DMS as "the center of a dealer's entire retail management platform. It's impossible to operate without it."[7]

**ANSWER:**     CDK admits that the text quoted in the first sentences of paragraph 62 of the Complaint appears in the second source cited in footnote 6 of the Complaint. CDK admits that the text quoted in the second sentences of paragraph 62 of the Complaint appears in the source cited in footnote 7 of the Complaint. CDK denies the remaining allegations in paragraph 62 of the Complaint.

63.     Defendants' DMS business is enormously lucrative. A single, small Dealership will pay up to $150,000 per year for the DMS software license and DMS services offered by Defendants. Mid-size Dealership groups (5 to 10 stores) will pay $1,500,000 or more per year, and large Dealerships (10+ stores) can easily pay over $5,000,000 per year. Given the thousands of Dealerships that use Defendants' DMS, and with profit margins exceeding 40%, Defendants are tremendously profitable. CDK's market capitalization is well over $8 billion.[8]

**ANSWER:**     CDK admits that it serves thousands of Dealers and that certain Dealer franchises pay between up to $150,000 per year and, in some cases, over $5,000,000 per year for licensed DMSs and related services, depending on a variety of factors. CDK admits that its market

---

[6] *See* Deal Pack Blog, *Dealer Management System: What Is It and Which Dealers Need It?* http://www.dealpack.com/dealer-management-system-what-is-it-and-which-dealers-need-it/ (July 20, 2012); Jeff Smelley, *What Exactly Is DMS?* Autodealer Today, http://www.autodealermonthly.com/channel/dps-office/article/story/2006/08/what-exactly-is-dms.aspx (Aug. 2006) (both websites last accessed May 30, 2018).

[7] Gillrie Institute, "5 Dealership Technology Projects for 2016 ... Dealership Management System (DMS)," http://paulgillrie.com/5-dealership-technology-projects-for-2016/ (last accessed May 30, 2018).

[8] *See* CDK 2017 Form 10-K Annual Report, http://investors.cdkglobal.com/static-files/b1712448-ee99-4e77-a248-864931905650 (Aug. 8, 2017), 1 ("aggregate market value of common stock held by non-affiliates of the registrant, as of December 31, 2016, the last business day of the registrant's most recently completed second fiscal quarter, was approximately $8.7 billion."); *see also* Nasdaq Key Stock Data, http://www.nasdaq.com/symbol/cdk (reporting CDK's market capitalization of $8,347,831,756 as of May 29, 2018) (last accessed May 29, 2018).

capitalization, which fluctuates, exceeded $8 billion at the time the Complaint was filed. CDK

denies that its profit margins exceed 40 percent. CDK lacks sufficient knowledge or information

to form a belief as to the truth of the allegations in paragraph 63 of the Complaint that relate to

individuals or entities other than CDK and on that basis denies them. CDK denies the remaining

allegations in paragraph 63 of the Complaint.

64.  The DMS market is extremely concentrated and it is dominated by Defendants.[9]
Defendants control approximately 75% of the DMS market in the United States for Dealerships
when measured by franchised stores, and their market share is even higher when measured by the
number of vehicles sold by franchised Dealers on Defendants' systems.[10]

**ANSWER:**  Paragraph 64 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK admits that Authenticom

commenced proceedings against Reynolds and CDK alleging antitrust violations, which CDK

denies.  CDK admits that it announced a planned acquisition of Auto/Mate Dealership Systems on

---

[9] One of the last remaining competitors in the DIS market, Authenticom, commenced proceedings against Reynolds and CDK, accusing them of engaging in antitrust violations through the horizontal agreements and a coordinated campaign to block Authenticom's access to Dealer data and thereby destroy its business, and drive it out of the DIS market. *See Authenticom, Inc. v. CDK Global, LLC*, No. 17-CV-00318 (W.D. Wis. May 5, 2017), ECF No. 4, ¶¶ 178-210 ("Authenticom Complaint" or "Authenticom Case"). As part of the Authenticom Case, an evidentiary hearing regarding Authenticom's application for a preliminary injunction was held on June 26 and 27, 2017. *See* Transcript of Second Day of Evidentiary Hearing, Afternoon Session (Jun. 27, 2017), ECF No. 163 ("Authenticom Tr., ECF No. 163"), 250:14-18 (CDK's economic expert, Dr. Sumanth Addanki, testifying that the DMS market is "concentrated."). Excerpts of Authenticom Tr., ECF No. 163, are attached hereto as Exhibit 1.

[10] *See* Transcript of First Day of Evidentiary Hearing, Morning Session (Jun. 26, 2017), ECF No. 164 ("Authenticom Tr., ECF No. 164"), 150:6-151:2 (Authenticom CEO Stephen Cottrell testifying that CDK and Reynolds account for "ballpark 70% of the market"); Transcript of Second Day of Evidentiary Hearing, Morning Session (Jun. 26, 2017), ECF No. 165 ("Authenticom Tr., ECF No. 165"), 95:2-95:25 (Authenticom expert witness Hal Singer testifying that, on a revenue basis, CDK and Reynolds have a market share much higher than 72%); ██████████████████████████████ ██████████████████████████████ Excerpts of Authenticom Tr., ECF No. 164, and Authenticom Tr., ECF No. 165, are attached hereto as Exhibits 2 and 3, respectively; a copy of the email and attachment is attached hereto as Exhibit 4 (composite exhibit).

CDK recently attempted to increase its market share even further. In the fall of 2016, CDK competitor, Auto/Mate Dealership Systems, a smaller provider of DMS, placed itself up for sale. CDK attempted to purchase the company in order to eliminate a strong competitor. CDK entered into a stock purchase agreement with Auto/Mate to purchase 100% of Auto/Mate's shares. However, after the filing of the FTC complaint (which followed the initiation of this litigation), CDK abandoned the proposed acquisition. *See* Federal Trade Commission Media Release, *FTC Challenges CDK Global, Inc.'s Proposed Acquisition of Competitor Auto/Mate, Inc. - Acquisition Would Harm Competition in Dealer Management System Software For New Car Dealers*, March 20, 2018.

or about May 24, 2017.  Further answering, CDK further states that the planned acquisition was

subsequently terminated on or about March 20, 2018 following governmental regulatory review.

CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations

in paragraph 64 of the Complaint that relate to Defendants' purported collective share of the "DMS

market" and on that basis denies them.  CDK denies the remaining allegations in paragraph 64 of

the Complaint.

65.    CDK and Reynolds are referred to as "the Big 2" and the "two giants" of the
industry.[11] They are also frequently referenced as the industry's "duopoly."[12]

**ANSWER:**    CDK admits that the text quoted in the first sentences of paragraph 65 of the

Complaint appears in the source cited in footnote 11 of the Complaint.  CDK admits that the text

quoted in the second sentences of paragraph 65 of the Complaint appears in the source cited in

footnote 12 of the Complaint.  CDK denies the remaining allegations in paragraph 65 of the

Complaint.

### (ii)    Significant Switching Costs Facilitate an Antitrust Conspiracy

66.    It is extremely difficult and disruptive for a Dealer to switch DMS providers, with
some Dealers analogizing a DMS change to a "heart transplant or a knee replacement. Others say
it's akin to reading a foreign language or teaching someone how to write with their opposite
hand."[13] There are also significant costs to switching DMS, including a Dealer's need to spend up
to a year or more to train staff, via online tutorials and in person sessions, to learn how to operate
the new system.[14] In November 2016, CDK's CEO acknowledged that "switching DMS providers

---

[11] Michael Cross, *Dealer Management Systems: An Industry Ripe for Change, Autosoft Dealer Management System*,
https://www.autosoftdms.com/dealer-management-systems-an-industry-ripe-for-change/  (April 7, 2017); David
Barkholz,    *DMS    dilemma:    Why    it's    so    hard    to    switch*,    Automotive    News,
http://www.autonews.com/article/20100510/RETAIL07/305109976/dms-dilemma%3A-why-its-so-hard-to-switch
(May    10,    2010);    Vince    Bond    Jr.,    *CDK's    'fantastic    win'    is    now    lost*,
http://www.autonews.com/article/20161107/RETAIL07/311079964/cdks-fantastic-win-is-now-lost (Nov. 17, 2016)
(websites last accessed May 29, 2018).

[12] *See*, *e.g.*, Barkholz, *supra*, n.11 (describing the position of Reynolds and CDK as a "duopoly.").

[13]    Vince    Bond    Jr.,    *"Survivors    of    DMS    shifts    tell    their    tales,"*    Automotive    News,
http://www.autonews.com/article/20170508/RETAIL07/305089978/survivors-of-dms-shifts-tell-their-tales (May 8,
2017) (last accessed May 29, 2018).

[14] *Id.*

can be very difficult. It [is] quite a process [to] change and takes time, which is part of the reason that many dealers are hesitant to switch."[15]

**ANSWER:** CDK admits that the text quoted in the second sentence of paragraph 66 of the Complaint appears on the source cited in footnote 13. CDK further admits that the text quoted in the fourth and fifth sentences of paragraph 66 of the Complaint is attributed to CDK's CEO in the source identified in footnote 15. CDK admits that there are switching costs when changing DMS providers. CDK denies that switching DMS providers "is extremely difficult and disruptive" and that "Dealer's need to spend up to a year or more to train staff" to operate a new DMS. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 66 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 66 of the Complaint.

67.  Switching DMS providers is not only a costly and lengthy procedure, it is also extremely risky. Dealers store vital data on their DMS, and access to their data is crucial to the daily operation of their business. Defendants control access to the DMS and can restrict or deny access to the DMS,[16] thus severely crippling the Dealer's business, as retribution for changing DMS providers.[17]

**ANSWER:** CDK admits that Dealers store data used in the daily operation of their businesses on the DMSs they license from CDK. CDK admits that it may lawfully restrict or deny access to

---

[15] Thomson Reuters StreetEvents, *Edited Transcript: CDK – Q1 2017 CDK Global, Inc. Earnings Conference Call* (Nov. 2, 2016), 3 (statement by CDK CEO, Brian MacDonald),

http://investors.cdkglobal.com/static-files/729bb97d-d7d9-46b2-a711-b7fba4a0a4ce (last accessed May 31, 2018).

[16]



[17] Even software giant Microsoft could not overcome the barriers to entry and enter the DMS market. In 2006, Microsoft tried to enter the DMS market but failed. *See* David Barkholz, *Dealers get new management system option Dominion-Microsoft product battles giants ADP, Reynolds,* *http://www.autonews.com/article/20121202/RETAIL07/312039973/dealers-get-new-management-system-option,* Automotive News (Dec. 2, 2012) (last accessed May 31, 2018).

its proprietary DMS in appropriate circumstances. CDK admits that Microsoft introduced a competing DMS software product in 2006. CDK denies that Microsoft's DMS offering "failed" or that Microsoft cannot compete with CDK or Reynolds insofar as Microsoft recently formed a technology partnership with global DMS provider Incadea, a subsidiary of Cox Automotive, which serves more than 4,000 dealerships in 100 countries. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 67 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 67 of the Complaint.

68.     As further evidence of the high costs of switching data integration providers, ███ ████████████████████████████████████.[18]

**ANSWER:**     █████████████████████████████████████████████████████

████████████████ CDK denies the remaining allegations in paragraph 68 of the Complaint.

69.     Because of their substantial power in the DMS market, Defendants have the ability to raise prices and obtain profits substantially above the levels that would exist in a competitive market.

**ANSWER:**     Paragraph 69 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 69 of the Complaint.

>   **(iii)    Defendants' Market Dominance of the DMS Market and Their Vertical Integration Enabled Them to Unlawfully Divide Both the DMS Market and the DIS Market**

70.     CDK and Reynolds dominate the DMS market. They are also vertically integrated businesses and provide DIS. Vertical integration enabled them to leverage their market power in the DMS market into the DIS market.

---

[18] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████

**ANSWER:** Paragraph 70 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that one of the procompetitive benefits of ending hostile access to its DMS was to enable CDK to offer a more efficient, seamless service to its customers. CDK admits that DMI and IntegraLink, now known as CDK Data Services, Inc., a subsidiary of CDK, provide certain data services, including extracting data from non-CDK DMSs licensed to Dealers. CDK admits that its 3PA program, now known as the CDK Global Partner program, provides integrated access to data on the CDK DMS. CDK denies the remaining allegations in paragraph 70 of the Complaint.

71.    CDK's 2017 Annual Report states:

> We are a leading global provider of integrated information technology and digital marketing solutions to the automotive retail and adjacent industries. *Focused on enabling end-to-end automotive commerce...Our solutions automate and integrate all parts of the buying process from targeted digital advertising and marketing campaigns to the sale, financing, insuring, parts supply, repair, and maintenance of vehicles.* We believe the breadth of our integrated solutions allows us to more comprehensively address the varied needs of automotive retailers than any other single competitor in our industry.[19]

CDK's data integration service is known as 3PA (Third Party Access), and Reynolds' as RCI (Reynolds Certified Interface).[20] CDK and Reynolds control access to their respective DMS's and therefore restrict the ability of independent data integrators to service their clients.

**ANSWER:** CDK admits that the text quoted in paragraph 71 of the Complaint appears in the source cited in footnote 19. CDK admits that its 3PA program, now known as the CDK Global Partner program, provides integrated access to data on the CDK DMS. CDK admits, upon

---

[19] *See* CDK 2017 Form 10-K Annual Report, *supra*, n.8, at 3 (emphasis added).

[20] CDK and Reynolds also provide software applications offered by other Vendors, including digital marketing services, customer relationship management solutions, and finance and insurance services. Indeed, CDK and Reynolds have even entered a joint venture to provide electronic registration and titling services through Computerized Vehicle Registration, Inc. ("CVR"). *See* CVR Home Page, *About Us*, http://www.cvrconnect.com/about-us (last accessed May 29, 2018) ("[W]e are committed to creating a better customer vehicle purchasing experience through seamless, secure digital titling and registration solutions ... Our solutions incorporate both customer and state needs, and we are backed by the leading DMS providers in the industry – CDK Global and Reynolds & Reynolds.").

information and belief, that Reynolds' RCI program provides integrated access to data on the

Reynolds DMS. CDK admits that it offers software applications including digital marketing

services, customer relationship management solutions, and finance and insurance services. CDK

admits that AVRS, a subsidiary of CVR which, in turn, is a joint venture between CDK and

Reynolds, provides electronic registration and titling services in a number of states. CDK lacks

sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph

71 of the Complaint that relate to individuals or entities other than CDK and on that basis denies

them. CDK denies the remaining allegations in paragraph 71 of the Complaint.

72. Defendants' domination of the DMS market, together with the formidable
barriers to entry, has enabled them to divide and monopolize the DMS market and increase DMS
prices. At the same time, CDK and Reynolds have been able to transfer their control of the DMS
market into the DIS market and unlawfully divide the DIS market between CDK's 3PA and
Reynolds' RCI data integration platforms and destroy any competition in the DIS market.[21]

**ANSWER:** Paragraph 72 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK denies the allegations in paragraph

72 of the Complaint.

### C. CDK and Reynolds Entered Into A *Per Se* Illegal Market Division Agreement And Colluded To Destroy Competition In The DIS Market

#### (i) Dealership Data and the DIS Market

73. Dealership data is crucial to success in the retail automobile industry, and Dealers
input that data into a database within their DMS. Dealerships utilize the DMS to generate data,
including insurance, customer, vehicle financing, and titling and registration information. Dealers
frequently engage Vendors to perform associated essential services for the Dealer. A single
Dealership rooftop typically uses about 10-15 separate Vendors — and often more. For instance,
a Dealer may engage a Vendor such as a software application provider to electronically register
new automobiles upon sale. In providing their services to Dealers, Vendors necessarily access and
utilize the DMS data, with the Dealers' authorization.

---

[21] Although the DMS and DIS markets are interrelated and CDK's DMS products have been described as an
"ecosystem," because there is demand for DIS that is distinct and separate from the primary service, DMS and DIS
remain separate markets. *See* Authenticom Tr., ECF No. 165, *supra*, n.10, at 89:2-91:20 (testimony of Authenticom
expert witness, Dr. Hal Singer).

**ANSWER:** CDK admits that Dealers enter certain data into CDK's DMS. CDK also admits that Dealers utilize the DMS to generate other data, including those identified in the first sentence of paragraph 73 of the Complaint. CDK further admits that Dealers contract with various Vendors for software solutions in connection with the operation of their dealerships, including to electronically register new automobiles upon sale, and that certain Vendors use certain data maintained in the DMS. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 73 of the Complaint that relate to the number of third-party software solutions used by a "typical" Dealer and on that basis denies them. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 73 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 73 of the Complaint.

> **(ii)    Dealers Own Their Data and Authorize Access to Vendors and Data Integrators**

74.     Dealers retain ownership of the data they create and store on their DMS's as CDK and Reynolds have both repeatedly and publicly acknowledged. For example, Reynolds spokesman, Tom Schwartz, stated that, "*[t]he data belongs to the dealers*. We all agree on that."[22] Similarly, Steve Annen, CDK's former CEO, stated, "I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it, when in fact it's really the data belonging to the dealer. As long as they grant permission, how would you ever go against that wish?"[23]

---

[22]     David Barkholz, *Dealers Decry Reynolds Crackdown*, Automotive News, http://www.autonews.com/article/20111121/RETAIL07/311219997/dealers-decry-reynolds-crackdown (Nov. 21, 2011) (emphasis added) (last accessed May 29, 2018).

[23]     Ralph Kisiel, *ADP Provides Dealers 3 Options on Data Access*, Automotive News, http://www.autonews.com/article/20070219/SUB/70215040/?template=print (Feb. 19, 2007) (emphasis added) (last accessed May 29, 2018). Indeed, senior executives of CDK (and its predecessor, ADP Dealer Services, Inc.) have repeatedly stated that Dealers own and control their data:

- Howard Gardner, CDK's Vice President of Data Strategy, has stated that CDK "has always understood that dealerships own their data and enjoy having choices on how best to share and utilize that data with others." *See* Press Release, ADP Dealer Services, Inc., *ADP announces new approved vendors for ADP's Third Party Access Program*, http://www.cdkglobal.ca/company/news/adp-announces-new-approved-vendors-adp%E2%80%99s-third-party-access-program-0 (Jan. 12, 2013) (last accessed May 31, 2018).

- Matt Parsons, CDK's Vice President of Sales and Marketing, has stated, "We're not going to limit the ability of a dealer to give an ID to someone else to, in essence, dial into their system. *That is the dealer's right.* We have

---

**ANSWER:**     CDK admits that Dealers create and store certain data maintained on CDK's DMS but denies that Dealers own or control all of the data on the DMS to which Dealers have access. CDK admits that the material quoted in the second sentence of paragraph 74 of the Complaint appears in the source cited in footnote 22.  CDK admits that Steve Anenen, CDK's former CEO, is identified as the source of the quote that appears in the third sentence of paragraph 74 of the Complaint from the source cited in footnote 23.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 74 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 74 of the Complaint.

75.     Although Vendors have the Dealer's authorization to access and utilize the Dealer's data on the DMS, they generally cannot obtain access to the data in a usable format directly from the Dealer. To access and utilize the Dealer's data, Vendors engage data integrators to extract, format, and organize the data. The data integrators access the data stored on the DMS and convert it into a form suitable for the specific service provided by the Vendor. For instance, for the registration of a new car sale, an electronic registration service provider will require access to the Dealer's DMS data concerning the vehicle and the customer. To extract the data in a usable format, the electronic registration service provider will engage a data integrator. However, data integrators currently can only access a DMS with the permission of the DMS provider. Dealers regularly provide data integrator access to their DMS's by either sharing existing login credentials or creating new ones for the data integrator.

---

no right to tell them they can't do that." *See* Ralph Kisiel, *NADA, AIADA weigh Reynolds data security debate*, Automotive News, http://www.autonews.com/article/20070204/SUB/70203019/nada-aiada-weigh-reynolds-data-security-debate (Feb. 4, 2007) (emphasis added) (last accessed May 31, 2018).

• Kevin Henahan, CDK's Senior Vice President of Product Marketing, has stated, "We don't tell the dealer, if someone wants access to their data, they have to come to [CDK] to gain access to the data. *It's ultimately the dealer's data.* If he wants to give that data to somebody, for us to try to charge a toll doesn't seem like the right thing to do. So we're not going to go down this path." *See* Ralph Kisiel, *Dealer security stirs insecurity: Vendors wary of Reynolds plan for computer systems* (lower case as amended), Automotive News, http://www.autonews.com/article/ 20061204/SUB/61201031/dealer- security-stirs-insecurity (Dec. 4, 2006) (emphasis added) (last accessed May 31, 2018).

•

**ANSWER:** CDK admits that certain Vendors engage third parties to extract, format, and organize data from DMSs licensed to Dealers. CDK further admits that certain Vendors provide electronic vehicle registration and titling services that require data concerning the vehicle and the customer. CDK denies that the provision of such services requires access to the DMS. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 75 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 75 of the Complaint.

76. CDK and Reynolds also provide DIS, separate and apart from their DMS services through, respectively, their 3PA and RCI platforms. Although the 3PA and RCI DIS are limited to integrating data with respect to each Defendant's respective DMS, CDK also owns two independent integrators — Digital Motorworks ("DMI") and IntegraLink, which provide DIS with respect to data stored on others' DMS's (*e.g.*, Reynolds) as well.[24]

**ANSWER:** CDK admits that its 3PA program, now known as the CDK Global Partner program, provides secure, reliable access to data on the CDK DMS. CDK also admits that its 3PA program in unavailable for use on any non-CDK DMS as it is part of the CDK DMS offering and not a standalone product. CDK further admits that DMI and IntegraLink, now known as CDK Data Services, Inc., a subsidiary of CDK, provide certain data services, including extracting data from non-CDK DMSs. CDK admits that ADP acquired DMI in 2002 and acquired IntegraLink in 2010 as part of an overall acquisition of the Cobalt Group. CDK admits, upon information and belief, that Reynolds' RCI program provides access to data on the Reynolds DMS. CDK denies the remaining allegations in paragraph 76 of the Complaint.

---

[24] In 2002, CDK acquired DMI, one of the largest dealer integrators in the market, which enabled CDK to "extract, transform and standardize data" from thousands of Dealerships. In 2010, CDK acquired IntegraLink, another data integrator that specialized in collecting data from Dealerships. *See* Authenticom Tr., ECF No. 164, *supra*, n.10, at 77:21-79:5 (Opening Statement by CDK Counsel) ("THE COURT: ... Does CDK now kind of build data integration function into its DMS? MS. MILLER: And I'd actually -- yeah. THE COURT: Because you used to have a third-party integrator -- MS. MILLER: And we still do. THE COURT: So tell me again what the continued role of DMI and -- what is it called, IntegraLink? MS. MILLER: IntegraLink. Both of those were acquisitions. DMI was in 2002. IntegraLink was in 2010. As Mr. Cohen told you, they used to be hostile integrators ...").

77.     CDK and Reynolds vigorously competed in the DIS market prior to 2015.  In 2006, Reynolds began selectively and sporadically blocking data integrators from accessing Dealer data on the Reynolds DMS by disabling integrators' Dealer-created login credentials.[25] CDK differentiated itself and the CDK DMS from Reynolds by publicly touting the openness of its DMS. CDK repeatedly vowed (including in public statements by its CEO and top marketing officers) that it would not block independent data integrators from accessing Dealer data on its DMS.

**ANSWER:**     Paragraph 77 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services and have been competitors since before 2015.  CDK admits that, as early as 2006, Reynolds took steps to block unauthorized third-party access to its DMS.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 77 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 77 of the Complaint.

78.     ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████[26] Historically, CDK was successful in marketing its "open" DMS to Dealers as a competitive advantage over the Reynolds DMS, and Dealers purchased DMS services from CDK based, in large part, on CDK's public representations about the openness of its DMS. As a result, CDK gained market share from Reynolds.[27]

---

[25] At one time, over a dozen integrators competed for Dealers' business. However, after Reynolds was privately acquired by Bob Brockman in 2006, Reynolds began blocking data integrators from accessing Dealer data on the Reynolds DMS by disabling the integrators' dealer-created login credentials. CDK had issues with Reynolds' actions. When asked by *Automotive News* whether Dealers should be permitted to hand out passwords or user IDs to a Vendor for data extraction, Steven Annen, now retired CEO of CDK replied, "We're not going to prohibit that or get in the way of that. I think we've stated pretty emphatically, we really believe the dealer owns the data. Obviously, they have to grant permission ...." *See* Kisiel, *supra*, n.23.

[26] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████

[27] *See* Authenticom Tr., ECF No. 164, *supra*, n.10, at 84:5-22 (Authenticom's expert, Dr. Singer, testifying that CDK's pre-2015 commitment to an open DMS gave CDK a huge advantage over Reynolds ("CDK was committed to open this [sic]. They used this in their marketing literature. They went to the market and they said, 'We're going to need to be superior because of openness. Because of openness, think about all the things that come: low-priced integration,

**ANSWER:** CDK admits that the material quoted in the first sentence of paragraph 78 of the Complaint appears in the source cited in footnote 26. CDK admits that some Dealers have switched from Reynolds's DMS to CDK's DMS, and vice versa, prior to and during the relevant period. CDK denies the remaining allegations in paragraph 78 of the Complaint.

79. In 2013, Reynolds began vigorously blocking data integrators. CDK, however, continued to allow open access to its DMS's and compete with Reynolds.

**ANSWER:** CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 79 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 79 of the Complaint.

80. Despite CDK's success in wresting market share away from Reynolds, its biggest competitor in the DMS market, competition between Reynolds and CDK suddenly ceased in 2015.

**ANSWER:** CDK denies the allegations in paragraph 80 of the Complaint.

> **(iii)** **Defendants Entered into a *Per Se* Illegal Horizontal Agreement to Allocate Market Share in the DIS Market**

81. In February 2015, CDK and Reynolds entered into an illegal market division agreement to divide the DIS market.[28] Specifically, CDK and Reynolds agreed to cooperate in closing their respective DMS's and, as part of that agreement, CDK closed its previously "open" system. ██████████████████████████████████████████████████████████████
███████████████████████████████[29]

---

low-priced apps, the proliferation of apps. This is just going to be a better platform than what our closed rival is doing,' and they won. We see a massive, a massive share shift going from R and R during this experiment to CDK on the order of 10 percentage points of share shift, 40% market share down to — even higher than 40 I understand, down to 30% over this period.").

[28] ████████████████████████████████████████████████████████████████
████████████████████████████████████

[29] ██████████████████████████████████████████████████████████████
██████████████████████████

**ANSWER:** Paragraph 81 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that the text quoted in the final sentence of paragraph 81 of the Complaint appears in the source cited in footnote 29. CDK further admits that on or about February 18, 2015, it entered into three written agreements with Reynolds. CDK denies Plaintiffs' characterization of the agreements. CDK states that the contracts speak for themselves. CDK denies the remaining allegations in paragraph 81 of the Complaint.

82. The unlawful market division agreement featured three separate written documents: (1) the Data Exchange Agreement or "Wind Down" Agreement; (2) the 3PA Agreement; and (3) the RCI Agreement (referred to previously as the "Agreements").[30]

**ANSWER:** Paragraph 82 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds. CDK denies Plaintiffs'

---

[30] According to the U.S. District Court for the District of Wisconsin, the Agreements between CDK and Reynolds "suggest a horizontal conspiracy." *See* Authenticom Case, 2017 WL 3017048, *3, 6 (W.D. Wis. Jul. 14, 2017):

CDK's transition to a closed system roughly coincided with CDK and Reynolds signing written agreements in February 2015...

\* \* \* \* \*

The February 2015 agreements between CDK and Reynolds also suggest a horizontal conspiracy. Although the agreements do not explicitly state that defendants will work together to eliminate third-party data integrators, the agreements have that effect. The parties agree that they will not attempt to access, or help others access, the other's DMS without permission (although Reynolds gives CDK a long wind-down period to transition out of the Reynolds integration business). Both parties agree to cooperate in facilitating their dealers' access to each other's software applications. And their agreements with third-party vendors—like the 3PA Agreement and the RCI Agreement—are exclusive, in the sense that defendants agreed that in their capacity as app providers, their sole access to one another's DMSs would be through the in-house interfaces. In other words, by signing up for 3PA or RCI, defendants agreed not to use third-party integrators to access the CDK DMS or the Reynolds DMS, respectively. After the agreements, there is little room in the market for third-party integrators.

The Seventh Circuit overturned the District Court's grant of the preliminary injunction solely on the basis that the injunction was over-broad. The Seventh Circuit specifically noted that "[t]he merits of this lawsuit have yet to be tried, and so nothing we say should be taken as presaging the eventual outcome of the case. The only matter before us is the propriety of the preliminary injunction that the district court issued—a step it took out of concern for preserving Authenticom as a functioning company until the suit can be resolved one way or the other." *See Authenticom v. CDK Global, Inc.*, Nos. 17-2540 & 17-2541 (7th Cir . Nov. 6, 2017), 8.

characterization of the agreements. CDK states that the contracts speak for themselves. CDK denies the remaining allegations in paragraph 82 of the Complaint.

### (b) The Data Exchange or "Wind Down" Agreement

83. The Data Exchange Agreement or "Wind Down" agreement provides that CDK is to wind down its data integration business on Reynolds' DMS's; that is, CDK would stop providing services to Dealers relating to the integration of their data stored on Reynolds' DMS's. At the same time, Reynolds agreed not to block CDK's access to Reynolds' DMS's during the wind down period, which lasts until 2020.[31] Defendants thus effectively agreed that CDK would stop competing with Reynolds in the DIS market.

**ANSWER:** Paragraph 83 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds. CDK denies Plaintiffs' characterization of the agreements. CDK states that the contracts speak for themselves. CDK denies the remaining allegations in paragraph 83 of the Complaint.

84. During that wind down period, Defendants agreed that CDK could continue to extract Dealer data from Reynolds' DMS's.[32] At the same time, the Data Exchange Agreement provided that CDK and Reynolds were to transition all of CDK's third party Vendor clients (*i.e.*, those vendors for whom CDK provided access to Dealer data on Reynolds DMS's) into the Reynolds' RCI program. Specifically, under § 4.2 of the Agreement, CDK was to notify its Vendor clients of its intent to wind down its Reynolds DMS related integration, and under § 4.4, CDK was to assist and cooperate with Reynolds' efforts to communicate with CDK's Vendor clients and transition them to the RCI Program.[33]

---

[31] *See* CDK-0000001-13, Executed Data Exchange Agreement (Feb. 18, 2015), at CDK-0000001 ("WHEREAS, Reynolds has agreed to provide CDK an orderly Wind Down Period (the 'Wind Down Period') during which Reynolds will not attempt to prevent [CDK's Integralink and DMI affiliates] from polling data from Reynolds DMS."); *see also id.* at CDK-0000002-03, § 1.4 (Definition - "Wind Down Period"). A copy of the document is attached hereto as Exhibit 11.

[32] *See id.* at CDK-0000004, § 4.3 ("During the Wind Down Period, the parties intend that, consistent with the terms of this Agreement, CDK will continue providing its integration services through DMI in accordance with its contracts without interruption from Reynolds security enhancements ...").

[33] *See id.* at CDK-0000003-04, § 4.2 ("CDK will communicate to the DMI Third Party Clients: (a) that CDK intends to wind down its Reynolds DMS related integration and does not intend to extend service for such integration beyond the current primary term of its agreement with such DMI Third Party Client ...."); *see also id.* at CDK-0000003, § 4.4 ("During the Wind Down Period for each DMI Third Party Client, CDK agrees to reasonably assist and cooperate with Reynolds, with respect to: (1) communication with DMI Third Party Clients, their Reynolds Dealer customers and the automotive industry in general during the Wind Down Period; (2) Reynolds' development and testing of

**ANSWER:** Paragraph 84 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds. CDK denies Plaintiffs' characterization of the agreements. CDK states that the contracts speak for themselves. CDK denies the remaining allegations in paragraph 84 of the Complaint.

85.     The Data Exchange Agreement specifically required CDK to "cooperate with Reynolds" in the "transition of [CDK] customers to the Reynolds RCI program with respect to Reynolds Dealers."[34] In connection with that effort, CDK agreed to provide Reynolds with full information about the Vendors CDK served, including their names, DMS numbers, store numbers, branch numbers, user logins, specific data access provided by CDK, data interfaces, the frequency of the data provided, the deadlines for data delivery, and the format of the data.[35]

**ANSWER:** Paragraph 85 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds. CDK further admits that the excerpted text quoted in paragraph 85 of the Complaint appears in one of the three—the Data Exchange Agreement. CDK denies Plaintiffs' characterization of the agreements. CDK states that the contracts speak for themselves. CDK denies the remaining allegations in paragraph 85 of the Complaint.

86.     The Data Exchange Agreement also includes a "Prohibition on Knowledge Transfer and DMS Access" provision, whereby CDK and Reynolds each agreed not to provide DIS (*i.e.*, for Dealers or Vendors) with respect to data on the other's DMS.[36]

---

interfaces for DMI Third Party Clients who choose to join the Reynolds RCI Program; and (3) the transition of such customers to the Reynolds RCI program with respect to Reynolds Dealers.").

[34] *See id.*

[35] *See id.* at CDK-0000004, § 4.3 ("CDK understands and agrees that, in order for Reynolds to be able to provide such Interim Solution pursuant to this Section 4.3, CDK shall provide Reynolds with: (i) within 5 business days of the Effective Date, a list of Reynolds Dealers System Numbers and the OMS User Logins being used by CDK for each Dealer for whom such Interim Solution is needed; and (ii) provided CDK has secured any permission necessary to provide such information, within 60 days of the Effective Date, the information described in Exhibit DEA-2 hereto ...").

[36] *See id.* at CDK-0000004-05, § 4.5 ("Each of Reynolds and CDK further covenants and agrees not to sell, transfer, or assign to any affiliate or third party any technology, business process, or other such knowledge regarding integration

**ANSWER:** Paragraph 86 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds. CDK denies Plaintiffs' characterization of the agreements. CDK states that the contracts speak for themselves. CDK denies the remaining allegations in paragraph 86 of the Complaint.

### (c) The Data Integration Agreements

87. The two other written agreements made by Defendants in February 2015 were (1) the 3PA Agreement; and (2) the RCI Agreement. These two agreements, collectively referred to as the "Data Integration Agreements," provided CDK and Reynolds reciprocal access to each other's DIS — the 3PA and RCI programs, respectively. That is, CDK's applications could access data on Reynolds' DMS via RCI, and Reynolds' applications could access data on CDK DMS via 3PA.[37]

**ANSWER:** Paragraph 87 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds. CDK denies Plaintiffs' characterization of the agreements. CDK states that the contracts speak for themselves. CDK denies the remaining allegations in paragraph 87 of the Complaint.

88. In the agreements, Reynolds received five free years of 3PA access. Reynolds also agreed to access CDK DMS exclusively through 3PA, and further agreed that it would not "otherwise access, retrieve, license, or otherwise transfer any data from or to a CDK system (including, without limitation, pursuant to any 'hostile interface') for itself or any other entity" or contract with any third parties to access the system.[38]

---

with the other party's DMS or take any other steps to assist any person that it reasonably believes to have plans to access or integrate with the other party's DMS without other party's written consent ...").

[37] *See* CDK-0000014-0000039, Executed 3PA Agreement (Feb. 18, 2015); *see also* CDK-0000040-0000106, Executed Reynolds Interface Agreement (a.k.a. the "RCI Agreement") (Feb. 18, 2015). The documents are attached hereto as, respectively, Exhibits 12 and 13.

[38] *See* CDK-0000014-0000039, *supra*, n.37 at CDK-0000017, § 1(e) (" [Reynolds] agrees that it will not, with respect to the Application(s) (i) otherwise access, retrieve, license, or otherwise transfer any data from or to a CDK System (including, without limitation, pursuant to any 'hostile interface') for itself or any other entity or (ii) contract with, or otherwise engage, any third party to access, retrieve, license or otherwise transfer any data from or to an CDK System.").

**ANSWER:** Paragraph 88 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds. CDK further admits that the text quoted in paragraph 88 of the Complaint appears in the source cited in footnote 38. CDK denies Plaintiffs' characterization of the agreements. CDK states that the contracts speak for themselves. CDK denies the remaining allegations in paragraph 88 of the Complaint.

89. The Data Integration Agreements also provided that CDK and Reynolds would deny data integrators access to each other's DMS, effectively destroying any competition in the DIS market. The horizontal agreements are *per se* violations of the antitrust laws.

**ANSWER:** Paragraph 89 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds. CDK denies Plaintiffs' characterization of the agreements. CDK states that the contracts speak for themselves. CDK denies the remaining allegations in paragraph 89 of the Complaint.

### (iv) CDK and Reynolds Illegally Colluded to Implement the *Per Se* Illegal Agreements

90. 

**ANSWER:** Paragraph 90 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that text similar to the text quoted in paragraph 90 of the Complaint appears in the source cited in footnote 39. CDK denies the remaining allegations in paragraph 90 of the Complaint.

---

39

91. ██████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████ [40]

**ANSWER:** ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ CDK

lacks sufficient knowledge or information to form a belief as to the truth of the allegations in

paragraph 91 of the Complaint that relate to individuals or entities other than CDK and on that

basis denies them. CDK denies the remaining allegations in paragraph 91 of the Complaint.

92. ██████████████████████████████████████████
██████████████████████████████████████

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████ [41]

**ANSWER:** ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ CDK

denies the remaining allegations in paragraph 92 of the Complaint.

93. ██████████████████████████████████████████

_____

[40] ████████████████████████████████████████████████
██████████████████████████████████████

[41] ████████████████████████████████████████████████
████████████





**ANSWER:** CDK admits that the text quoted in paragraph 93 of the Complaint appears in the source cited in footnote 42. CDK denies the remaining allegations in paragraph 93 of the Complaint.

94. 

**ANSWER:** CDK admits that on or about February 18, 2015, it entered into three written agreements with Reynolds. CDK denies Plaintiffs' characterization of those agreements. CDK states that the contracts speak for themselves.

███████████████████████ CDK denies the remaining allegations in paragraph 94 of the

Complaint.

95.     Reynolds viewed this divvying up of the market as crucial to its goal of being the only data integration source for Vendors who wanted to work with Dealers using a Reynolds' DMS's.

**ANSWER:**     CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 95 of the Complaint and on that basis denies them.

### (v)     CDK and Reynolds Colluded to Restrain Competition in the DIS Market

96.     Defendants' internal documents and the testimony of competitor data integrators demonstrate that Defendants' primary purpose of the *per se* illegal horizontal agreements was the destruction of any competition in the DIS market.

**ANSWER:**     Paragraph 96 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

96 of the Complaint.



**ANSWER:**    CDK denies the allegations in paragraph 97 of the Complaint.

98.



**ANSWER:**    Paragraph 98 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████    CDK denies the remaining allegations in paragraph 98 of the Complaint.

99.



---

[48] ████████████████████████████████████████

[49] *See id.*

[50]



**ANSWER:** Paragraph 99 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████ CDK denies the remaining allegations in paragraph 99 of the Complaint.

**ANSWER:** CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction. CDK further admits that Robert Schaefer testified at the hearing. CDK denies Plaintiffs' characterization of Mr. Schaefer's testimony and states that the hearing transcript cited in footnote 52 speaks for itself. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 100 of the Complaint that relate to individuals or

---

[51] ████████████████████████████████████████████████ ████████████████████

[52] *See* Authenticom Tr., ECF No. 164, *supra*, n.10, at 139:8-13.

[53] ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████

entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 100 of the Complaint.

101. Schaefer's counterpart at CDK, Dan McCray, then CDK's Vice President of Product Management, reiterated Schaefer's threat — and in no uncertain terms. During the April 2016 National Automobile Dealers Association Convention in Las Vegas, Nevada, McCray "grabbed [Cottrell's] arm" and said "let's take a walk," informing Cottrell that, "[y]ou may or not be aware we've entered into an agreement with Reynolds and Reynolds, okay? That agreement specifically says that we're going to support each other's third party interfaces, and we're working collaboratively to remove all hostile integrators from our DMS system."[54] McCray further stated, "'I have clocked you on 2,000 of our systems, and I can flip the switch at any time.'"[55] According to Cottrell, McCray "looked [him] in the eye and he said, 'I admire you. I admire your company .... I'd really like to see you get something for it before I fucking destroy it."[56] ████████████████████████████████████████████ [57]

**ANSWER:** CDK admits that on or about April 3, 2016, Dan McCray, a former CDK employee, attended a National Automobile Dealers Association event in Las Vegas, Nevada. CDK further admits, upon information and belief, that Mr. McCray spoke to Mr. Cottrell at the event but denies the allegations in paragraph 101 of the Complaint regarding the content of that conversation. CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction. CDK further admits that Steve Cottrell testified at the hearing as stated in the excerpted text in paragraph 101 of the Complaint; but denies that Mr. Cottrell testified accurately concerning the content of his

---

[54] *See* Authenticom Tr., ECF No. 164, *supra*, n.10, at 141:11-23.

[55] *Id.* at 141:25–142:1.

[56] *Id.* at 142:10-12.

[57] *Id.* at 143:2-8. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

conversation with Mr. McCray.  CDK further states that the hearing transcript speaks for itself.

CDK denies the remaining allegations in paragraph 101 of the Complaint.

102.    CDK actively sought to use its control of its DMS to block Authenticom's business.

███████████████████████████████████████████████████████ [58]

**ANSWER:**    CDK denies the allegations in paragraph 102 of the Complaint.

103. ██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ [60]
███ [61]

**ANSWER:**    ███████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████    CDK denies the remaining allegations of paragraph 103 of the

Complaint.



104. 

**ANSWER:** CDK denies the remaining allegations of paragraph 104 of the Complaint.

105. Authenticom was not the only data integrator who fell victim to Defendants' anticompetitive conduct. Superior Integrated Solutions ("SIS") previously exited the DIS market as a result of Defendants' unlawful conduct.[63]

**ANSWER:** Paragraph 105 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations of paragraph 105 of the Complaint.

106. 

---

[62] 

[63] Authenticom alleges SIS was forced out of the integration market. *See* Authenticom Complaint, *supra* ,n.7, at ¶107 ("CDK forced SIS to shut down its integration services for dealers using the CDK DMS. In short order, SIS went from one of the most successful data integration providers, with a long litany of clients, to a bygone participant in that market.").

[64] 

[65]

**ANSWER:** Paragraph 106 states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that it has taken lawful actions to prevent unauthorized access to its DMS by third parties. CDK denies the remaining allegations in paragraph 106 of the Complaint.

107. CDK and Reynolds also colluded about jointly recruiting and sharing new customers.



66

**ANSWER:** Paragraph 107 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required,

CDK denies the remaining allegations of paragraph 107 of the Complaint.

108.

67
68

**ANSWER:** CDK admits that text similar to the text quoted in paragraph 108 of the Complaint appears in the source cited in footnote 67.

---

66

67

68 *Id.*

 CDK denies the remaining

allegations in paragraph 108 of the Complaint.

109. ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████[69]

**ANSWER:** Paragraph 109 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ CDK denies the remaining allegations in paragraph 109 of the

Complaint.

     **D.**     **CDK And Reynolds Forced Vendors Into Anticompetitive Exclusive Dealing Agreements Which Contained Price Secrecy Provisions**

     **(i)**     **CDK and Reynolds Impose Contracts on Vendors Granting Defendants an Exclusive Right to Integrate Data**

110. After entering the February 2015 Agreements, to further their stronghold on the DIS market, Defendants imposed requirements that Vendors deal exclusively with them.

**ANSWER:** Paragraph 110 of the Complaint states legal conclusions to which no answer is

required. CDK denies the allegations in paragraph 110 of the Complaint.

111. Shortly after entering the Data Exchange Agreement, CDK began canceling and renegotiating its 3PA Vendor contracts to impose exclusive dealing provisions on Vendors. These new 3PA contracts (a.k.a. "Managed Interface Agreements") required Vendors to use 3PA if they wished to integrate CDK DMS data.

---

[69] ████████████████████████████████████████████████████████████
████████████████████████

**ANSWER:** Paragraph 111 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 111.

112. To ensure Vendors signed on to the new contracts,



**ANSWER:**

CDK denies the remaining allegations in paragraph 112 of the Complaint.

113. Vendors, threatened by the prospect of losing access to data, reluctantly entered into new 3PA contracts, or Managed Interface Agreements, with CDK.[73]

**ANSWER:** CDK denies the allegations in paragraph 113 of the Complaint.

114. CDK's new 3PA contracts contained provisions explicitly prohibiting Vendors from obtaining Dealer data from anyone other than CDK. Importantly, the contracts were entered on a Vendor-by-Vendor basis, not an application-by-application basis, so if a Vendor wanted to use CDK's integration services for one application, the Vendor also had to use CDK's product for all of its other applications. The contracts stated, "Vendor agrees that it will, beginning on the date CDK certifies the use of the first Application with the CDK Interface System, access data on, and provide data to, CDK Systems exclusively through the Managed Interface System [a.k.a. 3PA] ...



[73] *See*, *e.g.* Cox *Automotive, Inc. et. al. v. CDK Global, Inc.* No. 17-CV-00925, Complaint, ECF No. 1 ("Cox Complaint"), ¶¶ 123-129 ("Because of CDK's control over integrations to dealer data on its system and CDK's public threats to disconnect such integrations – and in direct reliance upon CDK's false representations that [redacted] - Cox Automotive agreed to CDK's terms, including, but not limited to, the exclusive dealing and price secrecy provisions.").

[and] will not (i) ... transfer any data from or to a CDK System ... or (ii) contract with ... any third party ... to ... transfer any data from or to a CDK System."[74]

**ANSWER:** Paragraph 114 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that the excerpted text quoted in paragraph 114 of the Complaint appears in a version of its standard contract with Vendors during the relevant time period. CDK states that the contracts speak for themselves. CDK denies the remaining allegations in paragraph 114 of the Complaint.

115.



**ANSWER:** CDK lacks sufficient knowledge or information to form a belief as to allegations in paragraph 115 of the Complaint and on that basis denies them.

116. Thus, if a Vendor obtains Dealer data through the 3PA program (for CDK Dealers) or the Reynolds RCI program (for Reynolds Dealers), the Vendor is barred from obtaining Dealer data from any other integrator. [blacked out] [77] Cox Automotive provides various applications using Dealer DMS, with its brands including Autotrader (a leading online destination for buying and selling new, certified and used cars and trucks), Dealer.com (an integrated digital marketing platform that creates virtual showrooms), Xtime (an all-in-one service and maintenance software solution), and roughly two dozen others.[78]

---

[74] *See, e.g.*, CDK-0001070-80, Executed Dealerlogix LLC Managed Interface Agreement (Apr. 15, 2016). A copy of the document is attached hereto as Exhibit 39, at CDK-0001072, § 1(e).

[75] [blacked out]

[76] [blacked out]

[77] [blacked out]

[78] *See* Cox Website – Company at a Glance, https://www.coxautoinc.com/home-page-2/future-cox-automotive/ (last accessed May 31, 2018).

████████████████████████████████████[79] This exclusive dealing provision applies to all of Cox Automotive's services. Furthermore, because Cox Automotive is prohibited from sharing Dealer data between its own products and services, Cox Automotive must separately pay CDK each time its services access the exact same data.[80]

**ANSWER:**   CDK admits, on information and belief, that Cox Automotive provides various

applications using Dealer DMS including the brands identified in paragraph 116. ████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ CDK

lacks sufficient knowledge or information to form a belief as to the truth of the allegations in

paragraph 116 of the Complaint that relate to individuals or entities other than CDK and on that

basis denies them.  CDK denies the remaining allegations in paragraph 116 of the Complaint.

117.   █████████████████████████████████████████████
███████████████████[81]█████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████[82]████████████████████
██████████████████████[83]███████████████████████████████

**ANSWER:**   ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████ CDK lacks sufficient

knowledge or information to form a belief as to the truth of the allegations in paragraph 117 of the

---

[79] █████████████████████████████████

[80] *See* Cox Complaint, *supra*, n.73, at ¶ 134.

[81] ████████████████████████████████████████████████
████████████████████

[82] █████████████████████████

[83] █████████████████████████

Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK

denies the remaining allegations in paragraph 117 of the Complaint.

> **(ii)  The Exclusive Dealing Agreements Include Anticompetitive Price Secrecy Provisions**

118.    The anticompetitive nature of the exclusive dealing provisions in the Vendor contracts is exacerbated by the imposition of price secrecy provisions. It was clear to Defendants, even before executing the illegal horizontal agreements that it would be important to keep Dealers in the dark about the resultant price increases to DIS. In a CDK PowerPoint presentation entitled, "Third Party Access Strategy — Strategy Refresh" dated December 3, 2014, under the heading "Contract Changes," CDK stated, "[t]he vendor is required not to disclose pricing in place February 2015."[84] In accordance with Defendants' strategy to destroy competition in the DIS market, Defendants' Managed Interface (or Third Party Access) and RCI Agreements imposed price secrecy provisions on Vendors.

**ANSWER:**    Paragraph 118 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK admits that text similar to the text

quoted in paragraph 118 appears in the December 3, 2014 PowerPoint presentation cited in

footnote 84.  CDK denies the remaining allegations in paragraph 118 of the Complaint.

119.





---

[84] CDK-0000786-905, PowerPoint, "Third Party Access Strategy – Strategy 'Refresh,'" slide 103, (Dec. 3, 2014). A copy of the document is attached hereto as Exhibit 43.

███████████████████████████████████████████[87]

**ANSWER:** ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████ CDK denies the remaining

allegations in paragraph 119 of the Complaint.

    120. ████████████████████████████████████████

████████████████████████████████████████[88]

**ANSWER:** CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 120 of the Complaint and on that basis denies them.

    121. These price secrecy provisions exacerbated the anticompetitive impact of the
exclusive dealing provisions. Vendors were unable to inform their customers, *i.e.*, Dealers, that
any Vendor price increase was a consequence of increased DIS costs imposed by Defendants.[89]
Accordingly, Dealers were unaware of the true costs of their relationship with CDK or Reynolds.

**ANSWER:** Paragraph 121 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK denies the allegations in paragraph

121 of the Complaint.

---

[87] ████████████████████████████████████████████████████
██████████████ Internal CDK documents state the purpose of these provisions is "to create minimal awareness to dealer" regarding CDK's exorbitant pricing for data integration. *See* CDK-0000786-905, *supra*, n.89, at CDK-0000887, slide 102.

[88] ████████████████████████████████████████████████

[89] *See* Authenticom Tr., ECF No. 165, *supra*, n.10, at 45:4-10 (Alan Andreu, General Manager of Equity at Dominion Dealer Solutions, testifying as follows: "Q. Can we talk about your RCI agreement with Reynolds? What limitations, if any, does Reynolds place on Dominion's ability to tell dealers how much it pays for integration? A. It gags us completely. We can't tell them anything, so I'm expected to somehow pass through an $893 charge on an $1,152 product without telling them why."

> ### (iii) The Vendor Exclusive Dealing Provisions are Anticompetitive and Prevent Competition in the Single-Brand Aftermarket for Data Integration

122. The exclusive dealing provisions in the Vendor contracts are anticompetitive. Dealers are effectively "locked-in" to a DMS provider, at least partly because of the high-costs of switching DMS providers. Defendants' DIS on their respective systems are not interchangeable substitutes for one another. Among application providers, there is separate demand for integration services on the two systems. Application providers (Vendors) that want to sell their products to Dealerships that use the CDK DMS system functionally must purchase DIS from CDK. The same is true for Dealerships that use Reynolds' DMS's.

**ANSWER:** Paragraph 122 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 122 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 122 of the Complaint.

123. When a Dealer purchases a DMS, the Dealer cannot factor in Defendants' higher data integration fees resulting from any policy changes because CDK and Reynolds impose price secrecy provisions on Vendors. Accordingly, a Dealer cannot accurately forecast the total cost of the DMS when they acquire it from either Reynolds or CDK.

**ANSWER:** CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 123 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 123 of the Complaint.

124. As such, each of Reynolds and CDK has a monopoly in the market for DIS for its respective DMS. If a Vendor is engaged to provide software application services to a Dealer utilizing a CDK DMS, the Vendor must enter into CDK's Managed Interface Agreement. Pursuant to the exclusive dealing provision, if the Vendor participates in CDK's 3PA program for even a single Dealer, that Vendor may no longer access any CDK DMS through any means other than through the 3PA for *any* CDK dealer and for *any* product or service. Reynolds imposes similar exclusive dealing requirements.

**ANSWER:** Paragraph 124 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK states that its contracts with its

Vendors speak for themselves. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 124 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 124 of the Complaint.

125.    Defendants have exercised this monopoly power in the single-brand aftermarket by blocking third-party access to their respective DMS and by raising data access fees to supracompetitive levels.

**ANSWER:**    Paragraph 125 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that the text quoted in paragraph 125 of the Complaint appears in the source cited in footnotes 90 and 91. CDK admits that it directly and/or through affiliates and subsidiaries offers third-party software applications to Dealers utilizing a CDK DMS. CDK denies the remaining allegations in paragraph 125 of the Complaint.

  **E. Defendants' Anticompetitive Conduct Has Resulted In Massive Increases To Data Integration Fees And Dealers Have Been Damaged By These Increased Fees**

   **(i) Defendants' Anticompetitive Conduct has Massively Increased Data Integration Fees**

126.    Defendants' *per se* horizontal agreements have given them exclusive control over data for Dealers using their DMS's. By seizing control over access to Dealer data, CDK and



Reynolds have been able to impose massive price increases for their DIS and obtain monopoly profits.

**ANSWER:**     Paragraph 126 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK denies the allegations in paragraph

126 of the Complaint.

127.    Data integrators charge Vendors on a per site (per Dealer location) basis. As such, if a Dealership has ten locations (or "rooftops"), then the Vendor would need ten separate connections for that Dealer, thus incurring ten separate costs to access one Dealer's data. Prior to CDK and Reynold's anticompetitive conduct, the average connection cost was around $70. In July 2015, only six months after Defendants' horizontal agreements came into effect, industry publications reported on the massive price increase for data integration. Automotive News reported that, "CDK said it intends to charge each third-party vendor ... between $250 and $300 a month per store for each software product. The current fees average about $70 per software product."[93] According to Automotive News, a "vendor executive said the new program would raise monthly data fees from about $50 per store per month today to as much as $600 for customer relationship management software."[94] This estimated increase in cost from $50 to $600 per month reflects a Dealer's increased cost regarding one Vendor. As previously stated, a Dealer uses on average a minimum of 10-15 Vendors. Dealers with 20 rooftops can work with as many as 80 vendors.[95]

**ANSWER:**     CDK admits that paragraph 127 of the Complaint accurately quotes selected parts

of the publication cited in footnote 94.  Upon information and belief, CDK admits that certain data

extractors charge Vendors on a per site basis.  CDK lacks sufficient knowledge or information to

form a belief as to the truth of the allegations in paragraph 127 of the Complaint that relate to

individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining

allegations in paragraph 127 of the Complaint.

128.    As for Reynolds, "[p]articipation costs one CRM vendor more than $700 a month per Reynolds store. The Vendor requested anonymity because Reynolds has strict nondisclosure

---

[93] David Barkholz, *Dealers Will Pay Up for Vendors' Data Access After CDK Switch*, Automotive News, http://www.autonews.com/article/20150720/RETAIL07/307209962/dealers-will-pay-up-for-vendors-data-access-after-cdk-switch (July 20, 2015) (last accessed May 31, 2018).

[94] *Id.*

[95] *See* Authenticom Tr., ECF No. 165, *supra*, n.10, at 81:3-13.

provisions in its vendor contracts."[96] Since 2015, Reynolds has raised its monthly prices per connection from less than $100 to between $300 and $500.[97]

**ANSWER:** CDK admits that paragraph 128 of the Complaint accurately quotes selected parts of the publication cited in footnote 96. CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 128 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 128 of the Complaint.

129. Specifically, in 2015, CDK forced massive price increases on Cox Automotive for DIS provided by CDK.[98]

**ANSWER:** CDK admits that in 2015 it proposed pricing for various 3PA integration packages for certain Cox entities.

---

[96] *See*, Barkholz, *supra*, n.93.

[97] The same kind of massive increase came from CDK. Authenticom's expert witness, economist Dr. Hal Singer, testified that, "CDK prior to this agreement was charging, based on the best publicly available sources, $70 per rooftop per month, and after the agreement they were charging on the order of $250 to 300, and that's a very conservative estimate. We've heard a lot of testimony that suggests it was a lot higher than that. This is something on the order of a four times or five times increase — sorry, three times increase, going from 70 to 250." Authenticom Tr., ECF No. 165, *supra*, n.10, at 79:15-22.

[98] Reynolds has also raised its prices for DIS, by charging many Vendors a transaction charge for every data pull. CDK has instituted the same practice of charging some Vendors an additional per-transaction fee on top of the already large monthly fees.



███████████████████████████████████

██████████ CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 129 of the Complaint that relate to individuals or entities other than

CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 129 of

the Complaint.

130.    The experience of AutoLoop also exemplifies how Defendants' anticompetitive
conduct victimized Vendors — and ultimately, Dealers.[101] AutoLoop offers three suites of
software: Sales, Service, and Marketing.[102] Each suite includes multiple software applications that
Dealers can select à la carte to enhance their ability to sell cars and serve customers.[103]

**ANSWER:**    Paragraph 130 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, on information and belief, CDK admits

AutoLoop sells or licenses multiple software applications to Dealers.  CDK further admits that

AutoLoop has commenced proceedings against CDK alleging violations of antitrust law and state

consumer protection laws, which CDK denies.  CDK lacks sufficient knowledge or information to

form a belief as to the truth of the allegations in paragraph 130 of the Complaint that relate to

individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining

allegations in paragraph 130 of the Complaint.

131.    Before 2015, AutoLoop purchased integration services from a competitor of
Reynolds and CDK– Superior Integrated Solutions (SIS).[104] SIS charged AutoLoop $39 per
rooftop per month for DIS.[105] In 2015, CDK and Reynolds began to shut off the access to DMS
data that AutoLoop had historically enjoyed, thereby forcing AutoLoop to use CDK and Reynolds

---

[101] On April 9, 2018, AutoLoop, an automotive software products and services company that provides integrated
software solutions to more than 2000 car dealers, brought suit against CDK, alleging numerous causes of action,
including violations of the antitrust laws and state consumer protection laws. *See AutoLoop, LLC v. CDK Global,
LLC*, No. 18-CV-02521, Complaint, ECF No. 1 (N.D.Ill. Apr. 9, 2018) ("AutoLoop Complaint").

[102] *See* AutoLoop Home Page, https://www.autoloop.com/ (last accessed May 31, 2018).

[103] *See* AutoLoop Home Page, *Products,* https://www.autoloop.com/products/ (last accessed May 31, 2018).

[104] *See* Authenticom Tr., ECF No. 165, *supra*, n.10, at 57:6-9 (testimony of AutoLoop employee, Matthew
Rodeghero).

[105] *See id.*

data integration tools, 3PA and RCI.[106] After being forced to sign an agreement with Reynolds, Autoloop was being charged over $700 for the same exact services it once received from SIS.[107] AutoLoop did not fare any better under its agreements with CDK. AutoLoop was forced to pay roughly the same amount ($690) per rooftop per month for to [*sic*] integrate data from CDK DMS.[108] As a result of Defendants' anticompetitive conduct, AutoLoop's integration fees have skyrocketed from approximately $40 per month per rooftop with independent data integrators to almost $700 per month per rooftop with CDK and Reynolds.

**ANSWER:**    CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 131 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 131 of the Complaint.

132.    ███████████████████████████████████████████████████
████████████████[109]

**ANSWER:**    CDK denies the allegations in paragraph 132 of the Complaint.

133.    Authenticom's expert witness, economist Dr. Hal Singer, testified that: "the[se] price increases speak to the anticompetitive harms in this case."[110]

**ANSWER:**    CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary injunction.  CDK admits that Dr. Hal Singer testified at the hearing.  CDK states that the hearing transcript cited in footnote 110 speaks for itself.  CDK denies the remaining allegations in paragraph 133 of the Complaint.

---

[106] *See id.* at 57:21-58:20 ("we got notice from SIS that they would no longer be continuing to support integration for RCI...").

[107] *See id.* at 59:2-5.

[108] *See id.* at 61:13-15.

[109] ███████████████████████████████████████████

[110] *See* Authenticom Tr., ECF No. 165, *supra*, n.10, at 78:6.

### (ii) These Increased Data Integration Fees are Passed On to Dealers

134. As CDK and Reynolds have imposed massive price increases on Vendors, Vendors have passed those increased charges onto Dealers.[111]

[image: black redaction bar] [112]

**ANSWER:** Paragraph 134 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 134 of the Complaint.

135. [image: black redaction bar] [113] Cox Automotive passes on a portion of these integration fees as data integration surcharges, and such surcharges are a substantial percentage of the total monthly cost of Cox Automotive's DMS-integrated solutions. AutoLoop also confirmed it passes the increased data integration costs onto Dealers.[114]

**ANSWER:** CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 135 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 135 of the Complaint.

---

[111] Dealers themselves cannot easily determine the amount of the excessive fees passed onto them by Vendors because the standard RCI Vendor contract prohibits the Vendor from discussing RCI costs and, "[s]imilarly, CDK prevents vendors from putting a line item on their bills attributable to 3PA charges." *See* Authenticom Case, 2017 WL 3017048 at *5.

[112]



[113]

[114] *See* Authenticom Tr., ECF No. 165, *supra*, n.10, at 62:22-23.

136. Mitch Walters, president of the Friendship Family of Dealerships in Bristol, Tennessee, wrote a December 20, 2016 letter to Peter Welch, President of the National Automobile Dealers Association ("NADA"), stating that Dealers are "stuck in the middle of a war between DMS providers and third-party vendors as more companies decide to charge for access."[115]

**ANSWER:** CDK admits that the text quoted in paragraph 136 of the Complaint appears in the source cited in footnote 115. CDK denies the remaining allegations in paragraph 136 of the Complaint.

137. Walters' December 20, 2016 letter stated in pertinent part:

I am writing to ask for the assistance of NADA in helping not only me, but other retail automobile dealers, resolve the issue of the integration surcharges that are being charged to dealerships as a result of a conflict between the DMS providers (e.g., CDK and Reynolds & Reynolds) and most every third party vendor that a retail automobile dealership maintains a partner relationship.

I struggle with the fact that dealerships provide data to a DMS provider and then the DMS provider charges a third party vendor an 'integration surcharge' to access the data, which actually belongs to the dealership. The third party vendor is then compelled to pass this unfair charge or assessment to the dealer who created the data in the first place.

It is like a dealership is "held hostage" with its own data. This is unfair and unreasonable. The DMS providers insist that the only way for a dealer not to experience this unfair surcharge is to utilize products that are exclusive to the DMS provider in lieu of a dealership choosing the vendor it desires. I believe that a dealership should be able to partner with the third party vendor that has the best solution to assist the dealership with making more sales and more gross profit, and not an internal vendor that is owned and controlled by a DMS provider.

Each dealership should have the right to control its own data and authorize partners (vendors) that provide software and programs that use the dealer's data to achieve operational efficiencies and the best ROI.[116]

**ANSWER:** CDK admits that the text quoted in paragraph 137 of the Complaint appears in the source cited in footnote 116. CDK denies the remaining allegations in paragraph 137 of the Complaint.

---

[115] Vince Bond Jr., *'Held hostage': Dealer's battle with software giants escalates*, Automotive News, http://www.autonews.com/article/20161226/RETAIL07/312269969/dealer-asks-nadas-help-in-dms-dispute (Dec. 26, 2016) (last accessed May 30, 2018).

[116] *Id.*

138.    NADA released a response, stating that it "is aware of the concerns voiced by many dealers about the third-party certification requirements imposed by some of the DMS companies, and about limited options in the DMS marketplace generally. Transparency, choice and fairness are just as important to dealers running their businesses as they are to the customers those dealers serve ...."[117]

**ANSWER:**    CDK admits that the text quoted in paragraph 138 of the Complaint appears in the source cited in footnote 117.  CDK denies the remaining allegations in paragraph 138 of the Complaint.

139.    Walters stated that his eight stores had been using customer-relationship management tools from the Vendor, VinSolutions, owned by Cox Automotive. Based on the DIS charged imposed on VinSolutions by CDK, the monthly bills at Walter's Dealership increased by approximately $2,400, leading Walters to conclude that "we've got $30,000 overhead now that we shouldn't have. It's our data."[118]

**ANSWER:**    CDK admits that the text quoted in paragraph 139 of the Complaint appears in the source cited in footnote 117.  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 139 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 139 of the Complaint.

140.    Dealerships using the CDK DMS that have more than 20 rooftops (stores) are likely to work with more than 80 Vendors that need third-party access to CDK. Accordingly, if a Dealership works with 80 Vendors and has to pay $200 fees that are passed on from a Vendor, they could end up paying an extra $16,000 per month.[119]

**ANSWER:**    CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 140 of the Complaint that relate to the number of third-party software

---

[117] *Id.*

[118] *Id.*

[119] *See*, Authenticom Tr., ECF No. 165, *supra*, n.10, at 81:3-13 (Authenticom's expert, Dr. Hal Singer, testifying: "The immediate harm is it's higher prices paid by vendors who are seeking access to dealers' data on their respective defendant's systems, but we've also heard that those vendors in turn pass along those prices to their dealer clients. So it's not only the vendors who are harmed here but also dealers. And these numbers, it's hard to think about an abstract going from 70 to 250, but a very simple example is if you just use the before/after benchmark and say it's on the order of a $200 price increase, for a dealer that has ten applications and five rooftops, you're talking on the order of $10,000 extra per month that can be attributed to these price increases.").

solutions that are "likely" to be used by Dealers that have more than 20 rooftops and on that basis

denies them. CDK further lacks sufficient knowledge or information to form a belief as to the

truth of the allegations in paragraph 140 of the Complaint that relate to individuals or entities other

than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 140

of the Complaint.

141. The Lexus of Westminster car dealership, located in Orange County, California — a medium-sized dealership — indirectly pays CDK between $200 and $500 a month to access its own data. According to its President, Chris Longpre, "[a]s a result of CDK's integration fees, DealerSocket [a Vendor] has informed me they are raising the prices it charges my dealership by $500 a month. In short, I am indirectly footing the bill for a large fee increase so that one of my key application providers can access my own data."[120]

**ANSWER:** CDK admits that the text quoted in paragraph 141 of the Complaint appears in the

source cited in footnote 120. CDK lacks sufficient knowledge or information to form a belief as

to the truth of the allegations in paragraph 141 of the Complaint that relate to individuals or entities

other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph

141 of the Complaint.

142. ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████[121]

**ANSWER:** ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[120] Authenticom Case, Declaration of Chris Longpre, President of Lexus of Westminster, ECF No. 55 (May 18, 2017) ¶¶ 5, 7, 8.

[121] ████████████████████████████████

PUBLIC VERSION

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 142 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 142 of the Complaint.

143.  The fees charged by Reynolds for Vendors to access their own data through Reynolds' Dealer DIS have also been passed onto Dealers, causing them injury.

**ANSWER:**  CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 143 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 143 of the Complaint.

144.  Even CDK's economic expert, Dr. Sumanth Addanki, recognized that increased data integration fees are passed onto Dealers. As he testified at the Authenticom preliminary injunction hearing, increased data integration costs to Vendors are "[a]bsolutely" passed on to Dealers.[122]

**ANSWER:**  CDK admits that the district court in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, held a hearing on June 26-28, 2017 concerning Authenticom's motion for a preliminary

---

[122] *See* Authenticom Tr., ECF No. 163, *supra*, n.9, at 215:2. Dr. Addanki further testified:

If you are going to stick it to the vendors by raising the data fees in a competitive vendor environment, the economics is straightforward. They will be passed through. They're not going to be called passed through, they're going to pass through. They're either going to get out of business or raise the price.

And the point is, Your Honor, it's system wide. It's to all vendors. So the whole price thing goes up, which means that the cost of doing business to the dealer has gone up; which means that the cost of using a CDK DMS has gone up.

*Id.* at 211:12-23.

injunction. CDK further admits that Dr. Sumanth Addanki testified at the hearing. CDK denies

Plaintiffs' characterization of Mr. Schaefer's testimony and states that the hearing transcript cited

in footnote 122 speaks for itself. CDK denies the remaining allegations in paragraph 144 of the

Complaint.

145.    Indeed, Defendants' price secrecy provisions, discussed above, implicitly
recognize that Vendors will pass on data integration fees to Dealers; hence they tried to avoid
alerting Dealers of the extent of those fees.

**ANSWER:**    CDK lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in paragraph 145 of the Complaint that relate to individuals or entities other than

CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 145 of

the Complaint.

> **(iii)    Defendants' Dominance of the DMS Market and Their Illegal
> Agreements Enabled Them to Sharply Reduce the Functionality of
> the DMS and Charge Artificially Inflated Prices for DMS**

146.    In illegally reducing competition in the DIS market, Defendants have also reduced
competition in the DMS market. A DMS supplier's services are useless if the data stored on the
system cannot be utilized. The data on a DMS generally can only be utilized if it is integrated —
that is, extracted and formatted into a usable format. However, as a consequence of Defendants'
illegal agreements, each Defendant will only integrate its own, and independent data integrators
are being driven out of the market. Accordingly, any potential competitor DMS supplier will have
a limited pool of integrators available.

**ANSWER:**    Paragraph 146 of the Complaint states legal conclusions to which no answer is

required. To the extent that an answer may be required, CDK admits that it takes steps to prevent

unauthorized third-party access to its DMS. CDK lacks sufficient knowledge or information to

form a belief as to the truth of the allegations in paragraph 146 of the Complaint that relate to

individuals or entities other than CDK and on that basis denies them. CDK denies the remaining

allegations in paragraph 146 of the Complaint.

147.    Moreover, before Defendants entered into their unlawful horizontal agreements,
Dealers using CDK DMS's enjoyed unfettered access to their own data stored on the DMS's, and

such data was freely available to third-parties (such as Authenticom, an independent data integrator) that were authorized by the Dealers to access the data.

**ANSWER:** Paragraph 147 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that at one time, notwithstanding provisions in its Dealer contracts that prohibit unauthorized third-party access, CDK did not actively enforce these contract rights. CDK denies the remaining allegations in paragraph 147 of the Complaint.

148. The Dealers' ability to freely access their own data on their DMS's through third-parties was an important feature of the DMS and its functionality.

**ANSWER:** CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 148 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 148 of the Complaint.

149. Through their unlawful conduct, however, Defendants eliminated this feature of the DMS and its functionality, thereby restraining competition and increasing prices paid by the Dealers for DMS.

**ANSWER:** Paragraph 149 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 149 of the Complaint.

150. Moreover, as other Vendors' software applications began to provide many of the same features as a DMS, CDK and Reynolds felt their lucrative DMS businesses were under attack, and acted to preserve their DMS duopoly by preventing the natural progression of Dealers away from Defendants' DMS's to lower cost and more efficient solutions being offered by Vendors.

**ANSWER:** CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 150 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 150 of the Complaint.

151.    Defendants' unlawful conduct restrained competition in both the DMS and DIS markets, and resulted in the Dealers paying supracompetitive prices for Defendants' DMS's, and for DIS.[123]

**ANSWER:**    Paragraph 151 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 151 of the Complaint.

152.    Defendants viewed the DMS and DIS markets, collectively, as an "ecosystem," to be controlled by them, free of competitive pressures from other actors.[124]

**ANSWER:**    CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 152 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 152 of the Complaint.

### F.    Defendants' "Security" Claim is a Pretext

153.



---

[123] Authenticom Tr., ECF No. 165, *supra*, n.10, at 81:25 (according to Authenticom's expert Dr. Singer, DMS prices have "gone up over this period [since the unlawful agreement came into effect].").

[124] *See* Authenticom Tr., ECF No. 164, *supra*, n.10, at 62:3-9 (At the *Authenticom* preliminary injunction hearing, a CDK attorney described (albeit self-servingly) the "ecosystem," stating: "We are trying to grow a value-add ecosystem for our dealers. That's the whole point. But the point is in order to provide that option for our dealers, we have to build, we have to maintain, and we have to secure that DMS and all of the data that resides therein, and we have to have the ability to control what plugs in and what interacts with all of those moving parts."); *see also* Authenticom Tr., ECF No. 163, *supra*, n.9, at 100:19-21 (Additionally, CDK's former Global Chief Strategy Officer, Malcolm Thorne, testified that "the number of vendors that are connected to our DMS ecosystem is growing rapidly[.]").

[125]

[126]

**ANSWER:** Paragraph 153 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 153 of the Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK denies the remaining allegations in paragraph 153 of the Complaint.

154. CDK formally announced a "refreshed" 3PA program on June 22, 2015 as part of its so-called "Security First" initiative. "CDK is rolling out a new cybersecurity initiative," Automotive News reported, "that will raise monthly integration fees for most of the third-party software vendors that dealerships use in addition to CDK software. It is patterned after a program at Reynolds and Reynolds."[127] This initiative used data security as the pretext for "closing" the DMS and imposing massive price increases on Vendors.[128]

**ANSWER:** CDK admits that it issued a press release concerning its SecurityFirst program on June 22, 2015, and that the quoted text in paragraph 154 of the Complaint appears in the source cited in footnote 127. CDK denies the remaining allegations in paragraph 154 of the Complaint.

155. Vendors recognized that the purportedly enhanced data security was a mere a pretext for increased data integration charges: Automotive News reported that "[a] vendor executive who asked not to be named called the data-access cost a surcharge under the guise of data security." Industry publications similarly reported that "Vendors briefed on CDK's new data-security program said nothing will change in the way they get data from CDK-served DMS dealerships under SecurityFirst except for a higher price."[129] Automotive News reported that Vendors in the CDK program "lament that they plan to pass those extra costs on to their dealer

---

[127] David Barkholz, *CDK Global Sees Earnings Boost from Cost-Cutting, Improved Efficiency*, Automotive News, http://www.autonews.com/article/20151103/RETAIL/151109957/cdk-global-sees-earnings-boost-from-cost-cutting-improved-efficiency (Nov. 3, 2015) (last accessed May 30, 2018).

[128] Dealers using CDK's "open" DMS system before 2015 had the clear choice to opt for Reynold's closed system but chose not to. Accordingly, CDK's SecurityFirst initiative could not be said to be a DMS product enhancement. Additionally, at the Authenticom hearings, Authenticom's expert economist, Dr. Singer, testified:

> If you believe the defendants' claim that closed is superior from a quality perspective, what you should see is that customers walking with their feet, dealer customers, ought to be migrating over to the closed system. In fact, we see the opposite, Your Honor. We see massive substitution away from R and R's closed system towards the CDK system over this period [before CDK closed its DMS pursuant to the horizontal agreement] . . . . [CDK] went to the market and they said . . . '[The open platform] is just going to be a better platform than what our closed rival is doing,' and they won. We see a massive, a massive share shift going from R and R during this experiment to CDK on the order of 10 percentage points of share shift, 40% market share down to — even higher than 40 I understand, down to 30% over this period.

Authenticom Tr., ECF No. 165, *supra*, n.10, at 83:16-22; 84:8-17.

[129] *See* Barkholz, *supra*, n.93.

customers," asserting that the costs charged by CDK far exceeded any alleged value of increased data security.[130]

**ANSWER:** CDK admits that the quoted text in paragraph 155 of the Complaint appears in the source cited in footnote 129. CDK denies the remaining allegations in paragraph 155 of the Complaint.

156. 

**ANSWER:** CDK admits that the quoted text in paragraph 156 of the Complaint appears in the source cited in footnote 131. CDK denies the remaining allegations in paragraph 156 of the Complaint.

157. 

**ANSWER:** CDK admits that the quoted text in paragraph 157 of the Complaint appears in the source cited in footnote 133. CDK denies the remaining allegations in paragraph 157 of the Complaint.

---

[130] *Id.*



158. 

**ANSWER:** CDK admits that the quoted text in paragraph 158 of the Complaint appears in the source cited in footnote 134. CDK denies the remaining allegations in paragraph 158 of the Complaint.

159. 

**ANSWER:** CDK admits that text similar to the text quoted in paragraph 159 of the Complaint appears in the source cited in footnote 135. CDK denies the remaining allegations in paragraph 159 of the Complaint.

160. 

**ANSWER:**

---

[134] *See id.*

[135]

[136]



CDK denies the remaining allegations in paragraph 160 of the Complaint.

**ANSWER:**   CDK admits that the text quoted in paragraph 161 of the Complaint appears in the source cited in footnote 137.  CDK denies the remaining allegations in paragraph 161 of the Complaint.

162.   Tellingly, at the Authenticom preliminary injunction hearing, CDK was unable to offer a single example of a data security incident involving any data integrator, and Reynolds could only cite to one incident — which actually involved a query being stalled, not a data security issue — that was quickly and easily resolved.[138]

**ANSWER:**   CDK lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 162 that relate to individuals or entities other than CDK and on that basis denies them.  CDK denies the remaining allegations in paragraph 162 of the Complaint and denies that the vacated order from *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318 cited in footnote 138 supports those allegations.

163.   As noted above, the price increases for data integration imposed by Defendants have been massive. In October 2015, The Banks Report reported that "[a]ccording to numerous vendors I've talked with, ... prices to access data in CDK's systems under the new initiative could

---

[137]

[138] *See* Authenticom Case, 2017 WL 3017048 at * 5 n.2.

increase anywhere from 300% to 800%."[139] However, these price increases do not correlate with any data security costs.[140]

**ANSWER:** CDK admits that the text quoted in paragraph 163 of the Complaint appears in the

source cited in footnote 140. CDK denies the remaining allegations in paragraph 163 of the

Complaint.

164. Finally, Authenticom's cybersecurity and privacy regulation expert, Professor Swire testified that it is consumers who give their data to Dealers and therefore the Dealer has the principal control over the individual consumer's data — accordingly, it is the Dealer who is the focus of privacy regulation.[141] Thus it is the Dealer, and not the DMS provider, who is responsible for the data security of the data and the security provided by any third parties. "[I]f the dealer is the one in control of the data, which is the idea in the first party, then the dealer would be the one deciding where the data goes after that and would need decisions about which third parties might get the data."[142]

**ANSWER:** CDK admits that the text quoted in paragraph 164 of the Complaint appears in the

source cited in footnote 141. CDK denies the remaining allegations in paragraph 164 of the

Complaint.

## ANTITRUST INJURY

165. Defendants' unlawful conduct, as challenged herein, had the following effects, among others:

> (a) Competition in the DMS and DIS markets, including price competition, has been unlawfully restrained and suppressed;

---

[139] Cliff Banks, *Data Access Battle Goes Nuclear*, The Banks Report, https://dealervault.files.wordpress.com/2015/12/tbr_data_access_15.pdf (Oct. 12, 2015) (last accessed May 30, 2018).

[140] In the Authenticom Case, Defendants attempted to justify the increased costs of their data integration services based on "the burden of maintaining the DMS and preserving its security." *See* Authenticom case, 2017 WL 3017048 at *7. However, the District Court was not persuaded because "defendants did not present evidence of the cost of data integration [and] the dealers already pay a lot for the DMS, and defendants did not put in any evidence to quantify the additional expense of providing data integration." *Id.* Furthermore, "defendants did not show that properly managed third-party access, even using dealer credentials and screen scraping, really poses additional security risks." *Id.* The Court also noted that, "Reynolds allows significant exceptions by 'whitelisting' certain third parties that it allows to access its system, most notably DMI, CDK's third-party integrator." *Id.*

[141] *See* Transcript of First Day of Evidentiary Hearing, Afternoon Session (Jun. 26, 2017), ECF No. 162 ("Authenticom Tr., ECF No. 162"), 64:16 - 65:25. Excerpts of Authenticom Tr., ECF No. 162 are attached hereto as Exhibit 61.

[142] *See id.* at 65:21-25.

> (b)     Prices paid by Dealers for DMS and DIS have been unlawfully fixed, raised, maintained and/or stabilized at supracompetitive levels;
>
> (c)     Direct purchasers of DMS, including Dealership Plaintiffs and Class members, were deprived of the benefit of free and open competition; and
>
> (d)     Indirect purchasers of DIS, including Dealership Plaintiffs and Class members, were deprived of the benefit of free and open competition.

**ANSWER:**     Paragraph 165 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK.  CDK denies the remaining allegations in paragraph 165 of the Complaint.

166.     As a result of the Defendants' anticompetitive conduct, Dealership Plaintiffs and Class members paid more for DMS and DIS than they would have paid in the absence of such conduct, and has sustained, and will continue to sustain, injury in their business and substantial damages.

**ANSWER:**     Paragraph 166 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that Plaintiffs or any other individual or entity has suffered any injury as a result of any action or conduct of CDK.  CDK denies the remaining allegations in paragraph 166 of the Complaint.

## CLAIMS FOR RELIEF

### COUNT I

### CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR A HORIZONTAL CONSPIRACY (ON BEHALF OF THE NATIONWIDECLASS)

167.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**     The Court has granted CDK's motion to dismiss Count I's horizontal conspiracy claim to the extent it is based on alleged agreements to restrain competition in the alleged "DIS" market.  Accordingly, no response to this paragraph is required to the extent it is based on alleged

agreements to restrain competition in the "DIS" market. To the extent that an answer may be required, CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

168.    Defendants CDK and Reynolds entered into and engaged in an agreement, combination or conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count I's horizontal conspiracy claim to the extent it is based on alleged agreements to restrain competition in the DIS market, accordingly, no response to this paragraph is required to the extent it is based on alleged agreements to restrain competition in the alleged "DIS" market. In addition, Paragraph 168 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 168 of the Complaint.

169.    CDK and Reynolds are horizontal competitors in the DMS and DIS markets.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count I's horizontal conspiracy claim to the extent it is based on alleged agreements to restrain competition in the alleged "DIS" market. Accordingly, no response to this paragraph is required to the extent it is based on alleged agreements to restrain competition in the "DIS" market. In addition, paragraph 169 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 169 of the Complaint.

170.    CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count I's horizontal conspiracy claim to the extent it is based on alleged agreements to restrain competition in the alleged "DIS" market. Accordingly, no response to this paragraph is required to the extent it is based on alleged agreements to restrain competition in the "DIS" market. In addition, paragraph 170 of the

Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 170 of the Complaint.

171. Defendants have entered into a continuing agreement, combination or conspiracy to restrain competition in the DMS and DIS markets. In furtherance thereof, in February 2015, Defendants entered into agreements not to compete with each other by blocking access to their respective DMS by independent data integrators. In addition, Defendants agreed to reduce the functionality of CDK's DMS (including Dealers' ability to freely access their DMS data through authorized persons). Moreover, Defendants colluded to force Vendors to use the Defendants (or their affiliates) to access their respective DMS. Defendants' actions constitute *per se* violations of the Sherman Act and, in any event, are unreasonable and unlawful restraints of trade. There is no procompetitive justification for Defendants' conduct.

**ANSWER:** The Court has granted CDK's motion to dismiss Count I's horizontal conspiracy claim to the extent it is based on alleged agreements to restrain competition in the alleged "DIS" market. Accordingly, no response to this paragraph is required to the extent it is based on alleged agreements to restrain competition in the "DIS" market. In addition, paragraph 171 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 171 of the Complaint.

172. Defendants' challenged conduct was intended to and did reduce competition in the DMS market and cause actual injury to Dealership Plaintiffs and the Class.

**ANSWER:** The Court has granted CDK's motion to dismiss Count I's horizontal conspiracy claim to the extent it is based on alleged agreements to restrain competition in the alleged "DIS" market. Accordingly, no response to this paragraph is required to the extent it is based on alleged agreements to restrain competition in the "DIS" market. In addition, paragraph 172 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 172 of the Complaint.

173. Dealership Plaintiffs and the Nationwide Class members, as direct purchasers of Defendants' DMS, are entitled to treble damages for the violations of the Sherman Act alleged herein.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count I's horizontal conspiracy claim to the extent it is based on alleged agreements to restrain competition in the alleged "DIS" market.  Accordingly, no response to this paragraph is required to the extent it is based on alleged agreements to restrain competition in the "DIS" market.  In addition, paragraph 173 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 173 of the Complaint.

### COUNT II

### CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR A HORIZONTAL CONSPIRACY (ON BEHALF OF THE NATIONWIDE CLASS FOR INJUNCTIVE RELIEF)

174.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**    CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

175.    Defendants CDK and Reynolds entered into and engaged in an agreement, combination or conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER:**    Paragraph 175 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 175 of the Complaint.

176.    CDK and Reynolds are horizontal competitors in the DMS and DIS markets.

**ANSWER:**    Paragraph 176 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that CDK and Reynolds are

competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 176 of the Complaint.

177.     CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:**     Paragraph 177 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 177 of the Complaint.

178.     Defendants have entered into a continuing agreement, combination or conspiracy to restrain competition. In furtherance thereof, in February 2015, Defendants entered into formal written agreements not to compete with each other in the DIS market and to block access to their respective DMS by independent data integrators. Moreover, Defendants colluded to force Vendors to use the Defendants (or their affiliates) to access their respective DMS. Defendants' actions constitute *per se* violations of the Sherman Act and, in any event, are unreasonable and unlawful restraints of trade. There is no procompetitive justification for Defendants' conduct.

**ANSWER:**     Paragraph 178 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 178 of the Complaint.

179.     Dealership Plaintiffs and the Nationwide Class have no adequate remedy at law and will suffer irreparable injury unless Defendants are enjoined from continuing their unlawful conduct. Accordingly, Dealership Plaintiffs and Nationwide Class members are entitled to injunctive relief against Defendants.

**ANSWER:**     Paragraph 179 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition. CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 179 of the Complaint.

## COUNT III

## CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR THE IMPOSITION OF EXCLUSIVE DEALING PROVISIONS (ON BEHALF OF THE NATIONWIDE CLASS)

180.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count III; accordingly, no response to this paragraph is required.  To the extent that an answer may be required, CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

181.    CDK and Reynolds entered into contracts with Vendors that contain exclusive dealing provisions that unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count III; accordingly, no response to this paragraph is required.  In addition, paragraph 181 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the remaining allegations in paragraph 181 of the Complaint.

182.    Pursuant to their conspiracy to eliminate competition, CDK and Reynolds inserted exclusive dealing provisions in their contracts with Vendors. Those contracts provide that Vendors cannot obtain data for Dealers using the CDK or Reynolds DMS from any data integrator except CDK or Reynolds, respectively.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count III; accordingly, no response to this paragraph is required.  In addition, paragraph 182 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 182 of the Complaint.

183.    CDK and Reynolds were able to impose these exclusive dealing provisions on Vendors as a result of their market power.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count III; accordingly, no response to this paragraph is required.  In addition, paragraph 183 of the Complaint states legal

conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 183 of the Complaint.

184. Because CDK and Reynolds imposed these exclusive dealing provisions pursuant to their conspiracy to eliminate competition in the DMS and DIS markets, they are *per se* illegal.

**ANSWER:** The Court has granted CDK's motion to dismiss Count III; accordingly, no response to this paragraph is required. In addition, paragraph 184 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 184 of the Complaint.

185. These exclusive dealing provisions are an unlawful and unreasonable restraint of trade and have led to increased prices, and reduced competition in the DMS and DIS markets.

**ANSWER:** The Court has granted CDK's motion to dismiss Count III; accordingly, no response to this paragraph is required. In addition, paragraph 185 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 185 of the Complaint.

186. These exclusive dealing provisions have caused actual injury to competition in the DMS and DIS markets.

**ANSWER:** The Court has granted CDK's motion to dismiss Count III; accordingly, no response to this paragraph is required. In addition, paragraph 186 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 186 of the Complaint.

187. There is no procompetitive business justification for Defendants' exclusive dealing agreements, and the exclusive dealing arrangements do not enhance efficiency or competition in the DMS or DIS markets. On the contrary, the agreements have produced only anticompetitive effects in both markets.

**ANSWER:** The Court has granted CDK's motion to dismiss Count III; accordingly, no response to this paragraph is required. In addition, paragraph 187 of the Complaint states legal

**PUBLIC VERSION**

conclusions to which no answer is required.  To the extent that an answer may be required, CDK

denies the allegations in paragraph 187 of the Complaint.

188.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and
the Nationwide Class have suffered injury to their business or property.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count III; accordingly, no

response to this paragraph is required.  In addition, paragraph 188 of the Complaint states legal

conclusions to which no answer is required.  To the extent that an answer may be required, CDK

denies the allegations in paragraph 188 of the Complaint.

189.    Dealership Plaintiffs and the Nationwide Class are entitled to treble damages for
the violations of the Sherman Act alleged herein.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count III; accordingly, no

response to this paragraph is required.  In addition, paragraph 189 of the Complaint states legal

conclusions to which no answer is required.  To the extent that an answer may be required, CDK

denies that it has violated any applicable law or harmed competition.  CDK further denies that

Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or

conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies

the remaining allegations in paragraph 189 of the Complaint.

## COUNT IV

### CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR THE IMPOSITION OF EXCLUSIVE DEALING PROVISIONS (ON BEHALF OF THE NATIONWIDE CLASS FOR <u>INJUNCTIVE RELIEF ONLY</u>)

190.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding
paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**    CDK incorporates, as if fully set forth herein, its answers to the preceding

paragraphs of the Complaint.

191.    CDK and Reynolds entered into contracts with Vendors that contain exclusive dealing provisions that unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER:**    Paragraph 191 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 191 of the Complaint.

192.    Pursuant to their conspiracy to eliminate competition in the DIS market, CDK and Reynolds inserted exclusive dealing provisions in their contracts with Vendors. The contracts with Vendors provide that Vendors cannot obtain data for Dealers using the CDK or Reynolds DMS from any data integrator except CDK or Reynolds, respectively.

**ANSWER:**    Paragraph 192 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 192 of the Complaint.

193.    CDK and Reynolds were able to impose these exclusive dealing provisions on Vendors as a result of their market power in the DMS and DIS markets

**ANSWER:**    Paragraph 193 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 193 of the Complaint.

194.    Because CDK and Reynolds imposed these exclusive dealing provisions pursuant to their conspiracy to eliminate competition in the DIS market, they are *per se* illegal.

**ANSWER:**    Paragraph 194 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 194 of the Complaint.

195.    These exclusive dealing provisions are an unlawful and unreasonable restraint of trade and have led to increased prices, and have reduced competition in both the DIS markets.

**ANSWER:**    Paragraph 195 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 195 of the Complaint.

196.    These exclusive dealing provisions have caused actual injury to competition in the DIS markets.

**ANSWER:**    Paragraph 196 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 196 of the Complaint.

197.    There is no procompetitive business justification for Defendants' exclusive dealing agreements, and the exclusive dealing arrangements do not enhance efficiency or competition in the DMS or DIS markets. On the contrary, the agreements have produced only anticompetitive effects.

**ANSWER:**    Paragraph 197 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 197 of the Complaint.

198.    As a direct and proximate result of Defendants' unlawful conduct, Dealership Plaintiffs and the Class have suffered injury to their business or property.

**ANSWER:**    Paragraph 198 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 198 of the Complaint.

199.    As indirect purchasers of DIS, Dealership Plaintiffs and the Nationwide Class have no adequate remedy at law and will suffer irreparable injury unless Defendants are enjoined from continuing their unlawful conduct. Accordingly, Dealership Plaintiffs and the Nationwide Class members are entitled to injunctive relief against Defendants.

**ANSWER:**    Paragraph 199 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 199 of the Complaint.

## COUNT V

## UNLAWFUL MONOPOLIZATION IN VIOLATION OF SECTION 2
## OF THE SHERMAN ACT
## (ON BEHALF OF THE NATIONWIDE CLASS )

200.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count V; accordingly, no response to this paragraph is required. To the extent that an answer may be required, CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

201.    Defendants have unlawfully monopolized the aftermarket for DIS on Defendants' respective DMS in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count V; accordingly, no response to this paragraph is required.  In addition, paragraph 201 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 201 of the Complaint.

202.    In the primary DMS product market, Defendants have a longstanding duopoly. When Dealers purchase Defendants' DMS, they are "locked in" to that DMS because, at least in part, of the significant financial costs, burdens and time associated with implementing an alternative system.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count V; accordingly, no response to this paragraph is required.  In addition, paragraph 202 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 202 of the Complaint.

203.    When a Dealer purchases a DMS, Dealers cannot factor in Defendants' higher data integration fees resulting from any policy changes because CDK and Reynolds impose price secrecy provisions on Vendors. Accordingly, Dealers cannot accurately forecast the total cost of the DMS when they acquire it from either Reynolds and CDK.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count V; accordingly, no response to this paragraph is required.  In addition, paragraph 203 of the Complaint states legal conclusions

to which no answer is required. To the extent that an answer may be required, CDK lacks sufficient

knowledge or information to form a belief as to the truth of the allegations in paragraph 203 of the

Complaint that relate to individuals or entities other than CDK and on that basis denies them. CDK

denies the remaining allegations in paragraph 203 of the Complaint.

204. Wrongfully exploiting customer lock-in in the primary DMS market, CDK and Reynolds have monopolized the markets for DIS on their respective DMS platforms. Defendants have wrongfully excluded competition by blocking third-party integrators from accessing Dealer data stored on its DMS system and has raised integration fees to supracompetitive levels.

**ANSWER:** The Court has granted CDK's motion to dismiss Count V; accordingly, no response

to this paragraph is required. In addition, paragraph 204 of the Complaint states legal conclusions

to which no answer is required. To the extent that an answer may be required, CDK denies the

allegations in paragraph 204 of the Complaint.

205. Defendants used anticompetitive means to acquire and maintain their monopoly position in the aftermarket for DIS on their respective DMS, including, *inter alia*, by blocking and disabling third-party integrators from accessing Dealer data, entering into a market division agreement pursuant to which they agreed not to compete in the aftermarkets, and imposing anticompetitive exclusive dealing arrangements on Vendors.

**ANSWER:** The Court has granted CDK's motion to dismiss Count V; accordingly, no response

to this paragraph is required. In addition, paragraph 205 of the Complaint states legal conclusions

to which no answer is required. To the extent that an answer may be required, CDK denies the

allegations in paragraph 205 of the Complaint.

206. Defendants' ability to exclude competition and impose massive price increases demonstrates its power in the market. And such conduct has no procompetitive business justification.

**ANSWER:** The Court has granted CDK's motion to dismiss Count V; accordingly, no response

to this paragraph is required. In addition, paragraph 206 of the Complaint states legal conclusions

to which no answer is required. To the extent that an answer may be required, CDK denies the

allegations in paragraph 206 of the Complaint.

207.    As a direct and proximate result of Defendants' unlawful use of their duopoly power in the DMS market and monopoly power in the aftermarket for DIS on their respective DMS, the Dealer Plaintiffs and the Nationwide Class have suffered injury to their business or property.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count V; accordingly, no response to this paragraph is required.  In addition, paragraph 207 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the remaining allegations in paragraph 207 of the Complaint.

208.    Plaintiffs and the Nationwide Class are entitled to treble damages.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count V; accordingly, no response to this paragraph is required.  In addition, paragraph 208 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 208 of the Complaint.

### COUNT VI

### VIOLATION OF ALABAMA ANTITRUST LAWS, ALA. CODE §§ 6–5–60, *ET SEQ.*, AND §§ 8–10–1, *ET SEQ.* (ON BEHALF OF THE ALABAMA CLASS)

209.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count VI; accordingly, no response to this paragraph is required.  To the extent that an answer may be required, CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

210.    As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in flagrant violation of Alabama antitrust laws, Ala. Code. §§ 6–5–60 and 8–10–1, *et seq.*

**PUBLIC VERSION**

**ANSWER:** The Court has granted CDK's motion to dismiss Count VI; accordingly, no response to this paragraph is required. In addition, paragraph 210 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 210 of the Complaint.

211. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:** The Court has granted CDK's motion to dismiss Count VI; accordingly, no response to this paragraph is required. In addition, paragraph 211 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 211 of the Complaint.

212. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:** The Court has granted CDK's motion to dismiss Count VI; accordingly, no response to this paragraph is required. In addition, paragraph 212 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 212 of the Complaint.

213. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** The Court has granted CDK's motion to dismiss Count VI; accordingly, no response to this paragraph is required. In addition, paragraph 213 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 213 of the Complaint.

214. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition,

**PUBLIC VERSION**

CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:** The Court has granted CDK's motion to dismiss Count VI; accordingly, no response to this paragraph is required. In addition, paragraph 214 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 214 of the Complaint.

215. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

(a) to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b) to eliminate or significantly curtail competition in the DIS market in the State on their respective DMSs, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:** The Court has granted CDK's motion to dismiss Count VI; accordingly, no response to this paragraph is required. In addition, paragraph 215 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 215 of the Complaint.

216. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and caused actual injury to Dealership Plaintiffs and the Alabama Class.

**ANSWER:** The Court has granted CDK's motion to dismiss Count VI; accordingly, no response to this paragraph is required. In addition, paragraph 216 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 216 of the Complaint.

217. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Alabama.

**ANSWER:** The Court has granted CDK's motion to dismiss Count VI; accordingly, no response to this paragraph is required. In addition, paragraph 217 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 217 of the Complaint.

218. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Alabama Class.

**ANSWER:** The Court has granted CDK's motion to dismiss Count IV; accordingly, no response to this paragraph is required. In addition, paragraph 218 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the remaining allegations in paragraph 218 of the Complaint.

219. Defendants' conduct has a significant nexus with Alabama because the Alabama Class members are located in Alabama, owned DMS in Alabama, and engaged Vendors who utilized DIS in Alabama.

**ANSWER:** The Court has granted CDK's motion to dismiss Count VI; accordingly, no response to this paragraph is required. In addition, paragraph 219 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 219 of the Complaint.

220. Defendants' conduct substantially affected Alabama commerce.

**ANSWER:** The Court has granted CDK's motion to dismiss Count VI; accordingly, no response to this paragraph is required. In addition, paragraph 220 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 220 of the Complaint.

221. Accordingly, Plaintiffs and the Alabama Class seek all forms of relief available under Alabama antitrust laws, Ala. Code. §§ 6–5–60 and 8–10–1, *et seq.*

**ANSWER:** The Court has granted CDK's motion to dismiss Count VI; accordingly, no response to this paragraph is required. In addition, paragraph 221 of the Complaint states legal

conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition. CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 221 of the Complaint

## COUNT VII

### VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT, ARIZ. REV. STAT., § 44-1401, *ET SEQ.* (ON BEHALF OF THE ARIZONA CLASS)

222. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

223. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in flagrant violation of Arizona's Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, *et seq.*

**ANSWER:** Paragraph 223 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 223 of the Complaint.

224. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:** Paragraph 224 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 224 of the Complaint.

225. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:** Paragraph 225 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 225 of the Complaint.

226. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** Paragraph 226 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 226 of the Complaint.

227. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:** Paragraph 227 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 227 of the Complaint.

228. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

> (a)    to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and
>
> (b)    to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:** Paragraph 228 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 228 of the Complaint.

229. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Arizona Class.

**ANSWER:** Paragraph 229 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 229 of the Complaint.

230. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Arizona

**ANSWER:** Paragraph 230 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 230 of the Complaint.

231. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Arizona Class.

**ANSWER:** Paragraph 231 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 231 of the Complaint.

232. Defendants' conduct has a significant nexus with Arizona because the Arizona Class members are located in Arizona, owned DMS in Arizona, and engaged Vendors who utilized DIS in Arizona.

**ANSWER:** Paragraph 232 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 232 of the Complaint.

233. Defendants' conduct substantially affected Arizona commerce.

**ANSWER:** Paragraph 233 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 233 of the Complaint.

234.    Accordingly, Plaintiffs and the Class seek all forms of relief available under Arizona's Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, *et seq.*

**ANSWER:**    Paragraph 234 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 234 of the Complaint.

## COUNT VIII

### VIOLATION OF CALIFORNIA ANTITRUST LAWS, CAL. BUS. & PROF. CODE §§ 16700 AND §17200, *ET SEQ.* (ON BEHALF OF THE CALIFORNIA CLASS)

235.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**    CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

236.    As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of Cal. Bus. & Prof. Code §§ 16700 and 17200, *et seq.*, and Defendants entered into and engaged in a continuing unlawful trust as defined by Cal. Bus. & Prof. Code § 16720, and unlawful competition as defined in Cal. Bus. & Prof. Code § 17200.

**ANSWER:**    Paragraph 236 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 236 of the Complaint.

237.    CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:**    Paragraph 237 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that CDK and Reynolds are

competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 237 of the Complaint.

238. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:** Paragraph 238 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 238 of the Complaint.

239. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** Paragraph 239 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 239 of the Complaint.

240. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:** Paragraph 240 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 240 of the Complaint.

241. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

    (a)    to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

    (b)    to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:** Paragraph 241 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 241 of the Complaint.

242. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the California Class.

**ANSWER:** Paragraph 242 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 242 of the Complaint.

243. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust and unfair competition laws of California.

**ANSWER:** Paragraph 243 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 243 of the Complaint.

244. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the California Class.

**ANSWER:** Paragraph 244 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 244 of the Complaint.

245. Defendants' conduct has a significant nexus with California because the California Class members are located in California, owned DMS in California, and engaged Vendors who utilized DIS in California.

**ANSWER:** Paragraph 245 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 245 of the Complaint.

246. Defendants' conduct substantially affected California commerce.

**ANSWER:**     Paragraph 246 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 246 of the Complaint.

247.     Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Cal. Bus. & Prof. Code §§ 16700 and 17200, *et seq.*

**ANSWER:**     Paragraph 247 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 247 of the Complaint.

## COUNT IX

### VIOLATION OF THE DISTRICT OF COLUMBIA CODE, § 28-4501, *ET SEQ.* (ON BEHALF OF THE DISTRICT OF COLUMBIA CLASS)

248.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**     CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

249.     As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of the District of Columbia Code § 28-4501, *et seq.*

**ANSWER:**     Paragraph 249 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 249 of the Complaint.

250.     CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:** Paragraph 250 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 250 of the Complaint.

251. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:** Paragraph 251 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 251 of the Complaint.

252. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** Paragraph 252 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 252 of the Complaint.

253. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:** Paragraph 253 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 253 of the Complaint.

254. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

(a) to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

     (b)    to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:**    Paragraph 254 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 254 of the Complaint.

255.    These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the District of Columbia Class.

**ANSWER:**    Paragraph 255 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 255 of the Complaint.

256.    Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of the District of Columbia.

**ANSWER:**    Paragraph 256 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 256 of the Complaint.

257.    Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the District of Columbia Class.

**ANSWER:**    Paragraph 257 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 257 of the Complaint.

258.    Defendants' conduct has a significant nexus with the District of Columbia because the District of Columbia members are located in California, owned DMS in the District of Columbia, and engaged Vendors who utilized DIS in the District of Columbia.

**ANSWER:**    Paragraph 258 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 258 of the Complaint.

259.    Defendants' conduct substantially affected District of Columbia commerce.

**ANSWER:**    Paragraph 259 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 259 of the Complaint.

260.    Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq.*

**ANSWER:**    Paragraph 260 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 260 of the Complaint.

## COUNT X

### VIOLATION OF HAWAII REVISED STATUTES ANNOTATED, § 480-1, *ET SEQ.* (ON BEHALF OF THE HAWAII CLASS)

261.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**    CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

262.    As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq.*

**ANSWER:** Paragraph 262 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 262 of the Complaint.

263. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:** Paragraph 263 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 263 of the Complaint.

264. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:** Paragraph 264 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 264 of the Complaint.

265. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** Paragraph 265 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 265 of the Complaint.

266. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition and are unreasonable and unlawful restraints of trade.

**ANSWER:** Paragraph 266 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 266 of the Complaint.

267. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

> (a) to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and
>
> (b) to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:** Paragraph 267 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 267 of the Complaint.

268. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Hawaii Class.

**ANSWER:** Paragraph 268 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 268 of the Complaint.

269. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, constituting violations of the state antitrust laws of Hawaii.

**ANSWER:** Paragraph 269 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 269 of the Complaint.

270. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Hawaii Class.

**ANSWER:** Paragraph 270 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 270 of the Complaint.

271. Defendants' conduct has a significant nexus with Hawaii because the Hawaii Class members are located in Hawaii, owned DMS in Hawaii, and engaged Vendors who utilized DIS in Hawaii.

**ANSWER:** Paragraph 271 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 271 of the Complaint.

272. Defendants' conduct substantially affected Hawaii commerce.

**ANSWER:** Paragraph 272 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 272 of the Complaint.

273. Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Hawaii Revised Statutes Annotated § 480-1, *et seq.*

**ANSWER:** Paragraph 273 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition. CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 273 of the Complaint.

## COUNT XI

### VIOLATION OF THE ILLINOIS ANTITRUST ACT, 740 ILCS 10/1, *ET SEQ.* (ON BEHALF OF THE ILLINOIS CLASS)

274. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

275. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of the Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*

**ANSWER:** Paragraph 275 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 275 of the Complaint.

276. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:** Paragraph 276 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 276 of the Complaint.

277. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:** Paragraph 277 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 277 of the Complaint.

278. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** Paragraph 278 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 278 of the Complaint.

279. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition,

CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:**     Paragraph 279 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 279 of the Complaint.

280.    Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

> (a)    to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

> (b)    to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:**     Paragraph 280 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 280 of the Complaint.

281.    These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Illinois Class.

**ANSWER:**     Paragraph 281 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 281 of the Complaint.

282.    Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Illinois.

**ANSWER:**     Paragraph 282 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 282 of the Complaint.

**PUBLIC VERSION**

283. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Illinois Class.

**ANSWER:** Paragraph 283 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 283 of the Complaint.

284. Defendants' conduct has a significant nexus with Illinois because the Illinois Class members are located in Illinois, owned DMS in Illinois, and engaged Vendors who utilized DIS in Illinois.

**ANSWER:** Paragraph 284 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 284 of the Complaint.

285. Defendants' conduct substantially affected Illinois commerce.

**ANSWER:** Paragraph 285 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 285 of the Complaint.

286. Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*

**ANSWER:** Paragraph 286 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition. CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 286 of the Complaint.

## COUNT XII

## VIOLATION OF THE IOWA COMPETITION LAW, IA ST § 553.4, *ET SEQ.* (ON BEHALF OF THE IOWA CLASS)

287.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**    CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

288.    As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of the Iowa Competition Law, IA ST § 553.4, *et seq.*

**ANSWER:**    Paragraph 288 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 288 of the Complaint.

289.    CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:**    Paragraph 289 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services.  CDK denies the remaining allegations in paragraph 289 of the Complaint.

290.    CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:**    Paragraph 290 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 290 of the Complaint.

291.    CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** Paragraph 291 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 291 of the Complaint.

292. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:** Paragraph 292 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 292 of the Complaint.

293. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

    (a)    to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

    (b)    to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:** Paragraph 293 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 293 of the Complaint.

294. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Iowa Class.

**ANSWER:** Paragraph 294 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 294 of the Complaint.

295.     Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Iowa.

**ANSWER:**     Paragraph 295 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 295 of the Complaint.

296.     Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Iowa Class.

**ANSWER:**     Paragraph 296 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 296 of the Complaint.

297.     Defendants' conduct has a significant nexus with Iowa because the Iowa Class members are located in Iowa, owned DMS in Iowa, and engaged Vendors who utilized DIS in Iowa.

**ANSWER:**     Paragraph 297 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 297 of the Complaint.

298.     Defendants' conduct substantially affected Iowa commerce.

**ANSWER:**     Paragraph 298 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 298 of the Complaint.

299.     Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Iowa Competition Law, IA ST § 553.4, *et seq.*

**ANSWER:**     Paragraph 299 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore

denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 299 of the Complaint.

## COUNT XIII

### VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT, K.S.A. 50–101, *ET SEQ.* (ON BEHALF OF THE KANSAS CLASS)

300. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

301. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of the Kansas Restraint of Trade Act, K.S.A. 50–101, *et seq.*

**ANSWER:** Paragraph 301 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 301 of the Complaint.

302. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:** Paragraph 302 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 302 of the Complaint.

303. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:** Paragraph 303 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 303 of the Complaint.

304. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** Paragraph 304 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 304 of the Complaint.

305. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:** Paragraph 305 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 305 of the Complaint.

306. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

      (a)    to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

      (b)    to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:** Paragraph 306 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 306 of the Complaint.

307. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Kansas Class.

**ANSWER:** Paragraph 307 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 307 of the Complaint.

308. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Kansas.

**ANSWER:** Paragraph 308 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 308 of the Complaint.

309. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Kansas Class.

**ANSWER:** Paragraph 309 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 309 of the Complaint.

310. Defendants' conduct has a significant nexus with Kansas because the Kansas Class members are located in Kansas, owned DMS in Kansas, and engaged Vendors who utilized DIS in Kansas.

**ANSWER:** Paragraph 310 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 310 of the Complaint.

311. Defendants' conduct substantially affected Kansas commerce.

**ANSWER:** Paragraph 311 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 311 of the Complaint.

312. Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under the Kansas Restraint of Trade Act, K.S.A. 50–101, *et seq.*

**ANSWER:** Paragraph 312 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition. CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 312 of the Complaint.

## COUNT XIV

### VIOLATION OF MAINE ANTITRUST LAW, 10 M.R.S. § 1101, *ET SEQ.* (ON BEHALF OF THE MAINE CLASS)

313. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

314. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of Maine antitrust law, 10 M.R.S. § 1101, *et seq.*

**ANSWER:** Paragraph 314 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 314 of the Complaint.

315. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:** Paragraph 315 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 315 of the Complaint.

316. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:** Paragraph 316 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 316 of the Complaint.

317. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** Paragraph 317 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 317 of the Complaint.

318. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:** Paragraph 318 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 318 of the Complaint.

319. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

    (a)    to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

    (b)    to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:** Paragraph 319 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 319 of the Complaint.

320.    These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Maine Class.

**ANSWER:**    Paragraph 320 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 320 of the Complaint.

321.    Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Maine.

**ANSWER:**    Paragraph 321 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 321 of the Complaint.

322.    Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Maine Class.

**ANSWER:**    Paragraph 322 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 322 of the Complaint.

323.    Defendants' conduct has a significant nexus with Maine because the Maine Class members are located in Maine, owned DMS in Maine, and engaged Vendors who utilized DIS in Maine.

**ANSWER:**    Paragraph 323 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 323 of the Complaint.

324.    Defendants' conduct substantially affected Maine commerce.

**ANSWER:**    Paragraph 324 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 324 of the Complaint.

**PUBLIC VERSION**

325. Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Maine antitrust law, 10 M.R.S. M.C.L.A. 445.7721101, *et seq.*

**ANSWER:** Paragraph 325 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition. CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 325 of the Complaint.

**COUNT XV**

**VIOLATION OF MICHIGAN ANTITRUST REFORM ACT,
M.C.L. § 445.771, *ET SEQ.*
(ON BEHALF OF THE MICHIGAN CLASS)**

326. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

327. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of the Michigan Antitrust Reform Act, M.C.L. § 445.771, *et seq.*

**ANSWER:** Paragraph 327 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 327 of the Complaint.

328. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:** Paragraph 328 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are

competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 328 of the Complaint.

329.     CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:**     Paragraph 329 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 329 of the Complaint.

330.     CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:**     Paragraph 330 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 330 of the Complaint.

331.     The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:**     Paragraph 331 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 331 of the Complaint.

332.     Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

> (a)     to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

> (b)     to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:** Paragraph 332 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 332 of the Complaint.

333. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Michigan Class.

**ANSWER:** Paragraph 333 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 333 of the Complaint.

334. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Michigan.

**ANSWER:** Paragraph 334 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 334 of the Complaint.

335. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Michigan Class.

**ANSWER:** Paragraph 335 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 335 of the Complaint.

336. Defendants' conduct has a significant nexus with Michigan because the Michigan Class members are located in Michigan, owned DMS in Michigan, and engaged Vendors who utilized DIS in Michigan.

**ANSWER:** Paragraph 336 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 336 of the Complaint.

337. Defendants' conduct substantially affected Michigan commerce.

**ANSWER:**   Paragraph 337 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 337 of the Complaint.

338.   Accordingly, Dealership Plaintiffs and the Indirect Purchaser Class seek all forms of relief available under the Michigan Antitrust Reform Act, M.C.L. § 445.771, *et seq.*

**ANSWER:**   Paragraph 338 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 338 of the Complaint.

## COUNT XVI

### VIOLATION OF THE MINNESOTA ANTITRUST LAW OF 1971, MINN. STAT. § 325D.49, *ET SEQ.* (ON BEHALF OF THE MINNESOTA CLASS)

339.   Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**   CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

340.   As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of the Minnesota Antitrust Law of 1971, Minn. Stat. § 325D.49, *et seq.*

**ANSWER:**   Paragraph 340 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 340 of the Complaint.

341.   CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:** Paragraph 341 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 341 of the Complaint.

342. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:** Paragraph 342 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 342 of the Complaint.

343. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** Paragraph 343 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 343 of the Complaint.

344. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:** Paragraph 344 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 344 of the Complaint.

345. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

> (a) to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b)     to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:**     Paragraph 345 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 345 of the Complaint.

346.     These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Minnesota Class.

**ANSWER:**     Paragraph 346 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 346 of the Complaint.

347.     Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Minnesota.

**ANSWER:**     Paragraph 347 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 347 of the Complaint.

348.     Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Minnesota Class.

**ANSWER:**     Paragraph 348 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 348 of the Complaint.

349.     Defendants' conduct has a significant nexus with Minnesota because the Minnesota Class members are located in Minnesota, owned DMS in Minnesota, and engaged Vendors who utilized DIS in Minnesota.

**ANSWER:**     Paragraph 349 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 349 of the Complaint.

350.     Defendants' conduct substantially affected Minnesota commerce.

**ANSWER:**     Paragraph 350 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 350 of the Complaint.

351.     Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under the Minnesota Antitrust Law of 1971, Minn. Stat. § 325D.49, *et seq.*

**ANSWER:**     Paragraph 351 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 351 of the Complaint.

## COUNT XVII

### VIOLATION OF MISSISSIPPI ANTITRUST LAW, MISS. CODE ANN. § 75-21-1, *ET SEQ.* (ON BEHALF OF THE MISSISSIPPI CLASS)

352.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**     CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

353.     As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of Mississippi antitrust law, Miss. Code Ann. § 75-21-1, *et seq.*

**PUBLIC VERSION**

**ANSWER:**     Paragraph 353 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 353 of the Complaint.

354.    CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:**     Paragraph 354 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services.  CDK denies the remaining allegations in paragraph 354 of the Complaint.

355.    CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:**     Paragraph 355 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 355 of the Complaint.

356.    CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:**     Paragraph 356 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 356 of the Complaint.

357.    The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:** Paragraph 357 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 357 of the Complaint.

358. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

> (a) to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and
>
> (b) to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:** Paragraph 358 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 358 of the Complaint.

359. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Mississippi Class.

**ANSWER:** Paragraph 359 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 359 of the Complaint.

360. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Mississippi.

**ANSWER:** Paragraph 360 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 360 of the Complaint.

361. Defendants' conduct has a significant nexus with Mississippi because the Mississippi Class members are located in Mississippi, owned DMS in Mississippi, and engaged Vendors who utilized DIS in Mississippi.

**ANSWER:** Paragraph 361 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 361 of the Complaint.

362. Defendants' conduct substantially affected Mississippi commerce.

**ANSWER:** Paragraph 362 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 362 of the Complaint.

363. Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Mississippi antitrust law, Miss. Code Ann. § 75-21-1, *et seq.*

**ANSWER:** Paragraph 363 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition. CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 363 of the Complaint.

## COUNT XVIII

### VIOLATION OF NEBRASKA'S JUNKIN ACT, NEB. REV. STAT. § 59-801, *ET SEQ.* (ON BEHALF OF THE NEBRASKA CLASS)

364. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

365. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of the Junkin Act, Neb. Rev. Stat. § 59-801, *et seq.*

**ANSWER:** Paragraph 365 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 365 of the Complaint.

366. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:** Paragraph 366 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 366 of the Complaint.

367. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:** Paragraph 367 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 367 of the Complaint.

368. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** Paragraph 368 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 368 of the Complaint.

369. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:** Paragraph 369 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 369 of the Complaint.

370. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

> (a) to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and
>
> (b) to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:** Paragraph 370 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 370 of the Complaint.

371. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Nebraska Class.

**ANSWER:** Paragraph 371 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 371 of the Complaint.

372. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Nebraska.

**ANSWER:** Paragraph 372 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 372 of the Complaint.

373. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Nebraska Class.

**ANSWER:**     Paragraph 373 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 373 of the Complaint.

374.     Defendants' conduct has a significant nexus with Nebraska because the Nebraska Class members are located in Nebraska, owned DMS in Nebraska, and engaged Vendors who utilized DIS in Nebraska.

**ANSWER:**     Paragraph 374 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 374 of the Complaint.

375.     Defendants' conduct substantially affected Nebraska commerce.

**ANSWER:**     Paragraph 375 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 375 of the Complaint.

376.     Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under the Junkin Act, Neb. Rev. Stat. § 59-801, *et seq.*

**ANSWER:**     Paragraph 376 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 376 of the Complaint.

## COUNT XIX

### VIOLATION OF NEW HAMPSHIRE ANTITRUST LAW, N.H. REV. STAT. ANN. § 356:1, *ET SEQ.* (ON BEHALF OF THE NEW HAMPSHIRE CLASS)

377.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

378. As described hereinabove, Defendants willfully engaged in a conspiracy and entered into unlawful agreements to restrain trade, in flagrant violation of New Hampshire antitrust laws, N.H. Rev. Stat. Ann. § 356:1, *et seq.*

**ANSWER:** Paragraph 378 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 378 of the Complaint.

379. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:** Paragraph 379 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 379 of the Complaint.

380. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:** Paragraph 380 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 380 of the Complaint.

381. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** Paragraph 381 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 381 of the Complaint.

382. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition,

CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:** Paragraph 382 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 382 of the Complaint.

383. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

> (a) to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

> (b) to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:** Paragraph 383 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 383 of the Complaint.

384. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the New Hampshire Class.

**ANSWER:** Paragraph 384 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 384 of the Complaint.

385. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of New Hampshire.

**ANSWER:** Paragraph 385 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 385 of the Complaint.

386. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the New Hampshire Class.

**ANSWER:** Paragraph 386 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 386 of the Complaint.

387. Defendants' conduct has a significant nexus with New Hampshire because the New Hampshire Class members are located in New Hampshire, owned DMS in New Hampshire, and engaged Vendors who utilized DIS in New Hampshire.

**ANSWER:** Paragraph 387 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 387 of the Complaint.

388. Defendants' conduct substantially affected New Hampshire commerce.

**ANSWER:** Paragraph 388 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 388 of the Complaint.

389. Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under New Hampshire antitrust law, N.H. Rev. Stat. Ann. § 356:1, *et seq.*

**ANSWER:** Paragraph 389 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition. CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 389 of the Complaint.

## COUNT XX

### VIOLATION OF THE NEW MEXICO ANTITRUST ACT,
### N. M.S.A. § 57-1-1, *ET SEQ.*
### (ON BEHALF OF THE NEW MEXICO CLASS)

390. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

391. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of the New Mexico Antitrust Act, N.M.S.A. § 57-1-1, *et seq.*

**ANSWER:** Paragraph 391 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 391 of the Complaint.

392. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:** Paragraph 392 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 392 of the Complaint.

393. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:** Paragraph 393 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 393 of the Complaint.

394. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:**     Paragraph 394 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

394 of the Complaint.

395.     The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:**     Paragraph 395 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

395 of the Complaint.

396.     Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

> (a)     to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

> (b)     to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:**     Paragraph 396 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

396 of the Complaint.

397.     These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the New Mexico Class.

**ANSWER:**     Paragraph 397 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

397 of the Complaint.

398.    Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of New Mexico.

**ANSWER:**    Paragraph 398 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 398 of the Complaint.

399.    Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the New Mexico Class.

**ANSWER:**    Paragraph 399 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 399 of the Complaint.

400.    Defendants' conduct has a significant nexus with New Mexico because the New Mexico Class members are located in New Mexico, owned DMS in New Mexico, and engaged Vendors who utilized DIS in New Mexico.

**ANSWER:**    Paragraph 400 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 400 of the Complaint.

401.    Defendants' conduct substantially affected New Mexico commerce.

**ANSWER:**    Paragraph 401 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 401 of the Complaint.

402.    Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under the New Mexico Antitrust Act, N.M.S.A. § 57-1-1, *et seq.*

**ANSWER:**    Paragraph 402 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals

or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 402 of the Complaint.

## COUNT XXI

### VIOLATION OF NEW YORK'S DONNELLY ACT, N. Y. GEN.BUS. LAWS § 340, *ET SEQ.* (ON BEHALF OF THE NEW YORK CLASS)

403.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**     CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

404.     As described hereinabove, Defendants engaged in a conspiracy and entered unlawful agreements to restrain trade, in violation of the New York's Donnelly Act, New York Gen. Bus. Law § 340, *et seq.*

**ANSWER:**     Paragraph 404 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 404 of the Complaint.

405.     CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:**     Paragraph 405 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 405 of the Complaint.

406.     CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:**     Paragraph 406 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 406 of the Complaint.

407.     CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:**     Paragraph 407 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 407 of the Complaint.

408.     The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:**     Paragraph 408 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 408 of the Complaint.

409.     Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

> (a)     to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

> (b)     to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:**     Paragraph 409 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 409 of the Complaint.

410.     These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the New York Class.

**ANSWER:**     Paragraph 410 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 410 of the Complaint.

411.     Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of New York.

**ANSWER:**     Paragraph 411 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 411 of the Complaint.

412.     Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the New York Class.

**ANSWER:**     Paragraph 412 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 412 of the Complaint.

413.     Defendants' conduct has a significant nexus with New York because the New York Class members are located in New York, owned DMS in New York, and engaged Vendors who utilized DIS in New York.

**ANSWER:**     Paragraph 413 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 413 of the Complaint.

414.     Defendants' conduct substantially affected New York commerce.

**ANSWER:**     Paragraph 414 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 414 of the Complaint.

415.     Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under New York's Donnelly Act, New York Gen. Bus. Law § 340, *et seq.*

**PUBLIC VERSION**

**ANSWER:** Paragraph 415 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition. CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 415 of the Complaint.

**COUNT XXII**

**VIOLATION OF NORTH CAROLINA ANTITRUST LAWS,
N.C.G.S.A. § 75-1, *ET SEQ.*
(ON BEHALF OF THE NORTH CAROLINA CLASS)**

416. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXII; accordingly, no response to this paragraph is required. To the extent that an answer may be required, CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

417. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of North Carolina antitrust laws, N.C.G.S.A. § 75-1, *et seq.*

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXII; accordingly, no response to this paragraph is required. In addition, paragraph 417 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 417 of the Complaint.

418. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXII; accordingly, no response to this paragraph is required. In addition, paragraph 418 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK

admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 418 of the Complaint.

419.    CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count XXII; accordingly, no response to this paragraph is required.  In addition, paragraph 419 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 419 of the Complaint.

420.    CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count XXII; accordingly, no response to this paragraph is required.  In addition, paragraph 420 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 420 of the Complaint.

421.    The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count XXII; accordingly, no response to this paragraph is required.  In addition, paragraph 421 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 421 of the Complaint.

422.    Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

(a) to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b) to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXII; accordingly, no response to this paragraph is required. In addition, paragraph 422 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 422 of the Complaint.

423. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the North Carolina Class.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXII; accordingly, no response to this paragraph is required. In addition, paragraph 423 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 423 of the Complaint.

424. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of North Carolina.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXII; accordingly, no response to this paragraph is required. In addition, paragraph 424 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 424 of the Complaint.

425. Defendants' conduct has a significant nexus with North Carolina because the North Carolina Class members are located in North Carolina, owned DMS in North Carolina, and engaged Vendors who utilized DIS in North Carolina.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXII; accordingly, no response to this paragraph is required. In addition, paragraph 425 of the Complaint states legal

conclusions to which no answer is required. To the extent that an answer may be required, CDK

denies the allegations in paragraph 425 of the Complaint.

426. Defendants' conduct substantially affected North Carolina commerce.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXII; accordingly, no

response to this paragraph is required. In addition, paragraph 426 of the Complaint states legal

conclusions to which no answer is required. To the extent that an answer may be required, CDK

denies the allegations in paragraph 426 of the Complaint.

427. Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available
under North Carolina antitrust laws, N.C.G.S.A. § 75-1, *et seq.*

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXII; accordingly, no

response to this paragraph is required. In addition, paragraph 427 of the Complaint states legal

conclusions to which no answer is required. To the extent that an answer may be required, CDK

denies that it has violated any applicable law or harmed competition. CDK further denies that

Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or

conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies

the remaining allegations in paragraph 427 of the Complaint.

## COUNT XXIII
## VIOLATION OF OREGON REVISED STATUTES § 646.705, *ET SEQ.*
## (ON BEHALF OF THE OREGON CLASS)

428. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding
paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding

paragraphs of the Complaint.

429. As described hereinabove, Defendants engaged in a conspiracy and entered into
unlawful agreements to restrain trade, in violation of Oregon Revised Statutes § 646.705, *et seq.*

**ANSWER:** Paragraph 429 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 429 of the Complaint.

430. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:** Paragraph 430 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 430 of the Complaint.

431. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:** Paragraph 431 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 431 of the Complaint.

432. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** Paragraph 432 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 432 of the Complaint.

433. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:** Paragraph 433 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 433 of the Complaint.

434. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

(a) to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b) to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:** Paragraph 434 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 434 of the Complaint.

435. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Oregon Class.

**ANSWER:** Paragraph 435 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 435 of the Complaint.

436. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Oregon.

**ANSWER:** Paragraph 436 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 436 of the Complaint.

437. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Oregon Class.

**ANSWER:** Paragraph 437 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 437 of the Complaint.

438. Defendants' conduct has a significant nexus with Oregon because the Oregon Class members are located in Oregon, owned DMS in Oregon, and engaged Vendors who utilized DIS in Oregon.

**ANSWER:** Paragraph 438 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 438 of the Complaint.

439. Defendants' conduct substantially affected Oregon commerce.

**ANSWER:** Paragraph 439 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 439 of the Complaint.

440. Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Oregon Revised Statutes § 646.705, *et seq.*

**ANSWER:** Paragraph 440 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition. CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 440 of the Complaint.

## COUNT XXIV

### VIOLATION OF THE RHODE ISLAND ANTITRUST ACT, R.I. GEN. LAWS § 6-36-1, *ET SEQ.* (ON BEHALF OF THE RHODE ISLAND CLASS)

441. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

442. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq.*

**ANSWER:** Paragraph 442 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 442 of the Complaint.

443. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:** Paragraph 443 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 443 of the Complaint.

444. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:** Paragraph 444 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 444 of the Complaint.

445. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** Paragraph 445 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 445 of the Complaint.

446. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition,

CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:** Paragraph 446 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 446 of the Complaint.

447. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

(a)  to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b)  to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:** Paragraph 447 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 447 of the Complaint.

448. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Rhode Island Class.

**ANSWER:** Paragraph 448 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 448 of the Complaint.

449. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Rhode Island.

**ANSWER:** Paragraph 449 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 449 of the Complaint.

450.    Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Rhode Island Class.

**ANSWER:**    Paragraph 450 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 450 of the Complaint.

451.    Defendants' conduct has a significant nexus with Rhode Island because the Rhode Island Class members are located in Rhode Island, owned DMS in Rhode Island, and engaged Vendors who utilized DIS in Rhode Island.

**ANSWER:**    Paragraph 451 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 451 of the Complaint.

452.    Defendants' conduct substantially affected Rhode Island commerce.

**ANSWER:**    Paragraph 452 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 452 of the Complaint.

453.    Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq.*

**ANSWER:**    Paragraph 453 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 453 of the Complaint.

## COUNT XXV

### VIOLATION OF SOUTH CAROLINA CODE ANNOTATED § 39-3-10, *ET SEQ.* (ON BEHALF OF THE SOUTH CAROLINA CLASS)

454.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**     The Court has granted CDK's motion to dismiss Count XXV; accordingly, no response to this paragraph is required.  To the extent that an answer may be required, CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

455.     As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of South Carolina Code Annotated § 39–3–10, *et seq.*

**ANSWER:**     The Court has granted CDK's motion to dismiss Count XXV; accordingly, no response to this paragraph is required.  In addition, paragraph 455 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 455 of the Complaint.

456.     CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:**     The Court has granted CDK's motion to dismiss Count XXV; accordingly, no response to this paragraph is required.  In addition, paragraph 456 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 456 of the Complaint.

457.     CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:**     The Court has granted CDK's motion to dismiss Count XXV; accordingly, no response to this Paragraph is required.  In addition, Paragraph 457 of the Complaint states legal

conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 457 of the Complaint.

458. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXV; accordingly, no response to this paragraph is required. In addition, paragraph 458 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 458 of the Complaint.

459. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXV; accordingly, no response to this paragraph is required. In addition, paragraph 459 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 459 of the Complaint.

460. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

(a) to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b) to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXV; accordingly, no response to this paragraph is required. In addition, paragraph 460 of the Complaint states legal

conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 460 of the Complaint.

461. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the South Carolina Class.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXV; accordingly, no response to this paragraph is required. In addition, paragraph 461 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 461 of the Complaint.

462. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of South Carolina.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXV; accordingly, no response to this paragraph is required. In addition, paragraph 462 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 462 of the Complaint.

463. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the South Carolina Class.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXV; accordingly, no response to this paragraph is required. In addition, paragraph 463 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 463 of the Complaint.

464. Defendants' conduct has a significant nexus with South Carolina because the South Carolina Class members are located in South Carolina, owned DMS in South Carolina, and engaged Vendors who utilized DIS in South Carolina.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXV; accordingly, no response to this paragraph is required. In addition, paragraph 464 of the Complaint states legal

conclusions to which no answer is required.  To the extent that an answer may be required, CDK

denies the allegations in paragraph 464 of the Complaint.

465.    Defendants' conduct substantially affected South Carolina commerce.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count XXV; accordingly, no

response to this paragraph is required.  In addition, paragraph 465 of the Complaint states legal

conclusions to which no answer is required.  To the extent that an answer may be required, CDK

denies the allegations in paragraph 465 of the Complaint.

466.    Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available
under South Carolina Code Annotated § 39–3–10, *et seq.*

**ANSWER:**    The Court has granted CDK's motion to dismiss Count XXV; accordingly, no

response to this paragraph is required.  In addition, paragraph 466 of the Complaint states legal

conclusions to which no answer is required.  To the extent that an answer may be required, CDK

denies that it has violated any applicable law or harmed competition.  CDK further denies that

Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or

conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies

the remaining allegations in paragraph 466 of the Complaint.

## COUNT XXVI

### VIOLATION OF SOUTH DAKOTA CODIFIED LAWS § 37–1–33, *ET SEQ.* (ON BEHALF OF THE SOUTH DAKOTA CLASS)

467.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding
paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**    CDK incorporates, as if fully set forth herein, its answers to the preceding

paragraphs of the Complaint.

468.    As described hereinabove, Defendants engaged in a conspiracy and entered into
unlawful agreements to restrain trade, in violation of South Dakota Codified Laws § 37–1–33, *et
seq.*

**PUBLIC VERSION**

**ANSWER:** Paragraph 468 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 468 of the Complaint.

469. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:** Paragraph 469 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 469 of the Complaint.

470. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:** Paragraph 470 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 470 of the Complaint.

471. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** Paragraph 471 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 471 of the Complaint.

472. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:** Paragraph 472 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 472 of the Complaint.

473. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

  (a) to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

  (b) to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:** Paragraph 473 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 473 of the Complaint.

474. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the South Dakota Class.

**ANSWER:** Paragraph 474 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 474 of the Complaint.

475. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of South Dakota.

**ANSWER:** Paragraph 475 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 475 of the Complaint.

476. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the South Dakota Class.

**ANSWER:** Paragraph 476 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 476 of the Complaint.

477. Defendants' conduct has a significant nexus with South Dakota because the South Dakota Class members are located in South Dakota, owned DMS in South Dakota, and engaged Vendors who utilized DIS in South Dakota.

**ANSWER:** Paragraph 477 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 477 of the Complaint.

478. Defendants' conduct substantially affected South Dakota commerce.

**ANSWER:** Paragraph 478 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 478 of the Complaint.

479. Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under South Dakota Codified Laws § 37–1–33, *et seq.*

**ANSWER:** Paragraph 479 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition. CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 479 of the Complaint.

## COUNT XXVII

### VIOLATION OF THE TENNESSEE CODE § 47-25-101, *ET SEQ.*
### (ON BEHALF OF THE TENNESSEE CLASS)

480. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXVII; accordingly, no response to this paragraph is required. To the extent that an answer may be required, CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

481. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of Tennessee Code § 4725-101, *et seq.*

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXVII; accordingly, no response to this paragraph is required. In addition, paragraph 481 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 481 of the Complaint.

482. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXVII; accordingly, no response to this paragraph is required. In addition, paragraph 482 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 482 of the Complaint.

483. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXVII; accordingly, no response to this paragraph is required. In addition, paragraph 483 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 483 of the Complaint.

484. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXVII; accordingly, no response to this paragraph is required. In addition, paragraph 484 of the Complaint states legal

conclusions to which no answer is required. To the extent that an answer may be required, CDK

denies the allegations in paragraph 484 of the Complaint.

485. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXVII; accordingly, no

response to this paragraph is required. In addition, paragraph 485 of the Complaint states legal

conclusions to which no answer is required. To the extent that an answer may be required, CDK

denies the allegations in paragraph 485 of the Complaint.

486. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

    (a)    to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

    (b)    to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXVII; accordingly, no

response to this paragraph is required. In addition, paragraph 486 of the Complaint states legal

conclusions to which no answer is required. To the extent that an answer may be required, CDK

denies the allegations in paragraph 486 of the Complaint.

487. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Tennessee Class.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXVII; accordingly, no

response to this paragraph is required. In addition, paragraph 487 of the Complaint states legal

conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 487 of the Complaint.

488.    Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Tennessee.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count XXVII; accordingly, no response to this paragraph is required.  In addition, paragraph 488 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 488 of the Complaint.

489.    Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Tennessee Class.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count XXVII; accordingly, no response to this paragraph is required.  In addition, paragraph 489 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 489 of the Complaint.

490.    Defendants' conduct has a significant nexus with Tennessee because the Tennessee Class members are located in Tennessee, owned DMS in Tennessee, and engaged Vendors who utilized DIS in Tennessee.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count XXVII; accordingly, no response to this paragraph is required.  In addition, paragraph 490 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 490 of the Complaint.

491.    Defendants' conduct substantially affected Tennessee commerce.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count XXVII; accordingly, no response to this paragraph is required.  In addition, paragraph 491 of the Complaint states legal

conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 491 of the Complaint.

492. Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Tennessee Code § 47-25-101, *et seq.*

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXVII; accordingly, no response to this paragraph is required. In addition, paragraph 492 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition. CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 492 of the Complaint.

## COUNT XXVIII

### VIOLATION OF THE UTAH CODE § 76-10-3101, *ET SEQ.*
### (ON BEHALF OF THE UTAH CLASS)

493. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

494. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of Utah Code § 76-103101, *et seq.*

**ANSWER:** Paragraph 494 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 494 of the Complaint.

495. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:** Paragraph 495 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 495 of the Complaint.

496. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:** Paragraph 496 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 496 of the Complaint.

497. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** Paragraph 497 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 497 of the Complaint.

498. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:** Paragraph 498 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 498 of the Complaint.

499. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

        (a)    to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

(b)     to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:**     Paragraph 499 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 499 of the Complaint.

500.     These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Utah Class.

**ANSWER:**     Paragraph 500 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 500 of the Complaint.

501.     Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Utah.

**ANSWER:**     Paragraph 501 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 501 of the Complaint.

502.     Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Utah Purchaser Class.

**ANSWER:**     Paragraph 502 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 502 of the Complaint.

503.     Defendants' conduct has a significant nexus with Utah because the Utah Class members are located in Utah, owned DMS in Utah, and engaged Vendors who utilized DIS in Utah.

**ANSWER:** Paragraph 503 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 503 of the Complaint.

504. Defendants' conduct substantially affected Utah commerce.

**ANSWER:** Paragraph 504 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 504 of the Complaint.

505. Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Utah Code § 76-10-3101, *et seq.*

**ANSWER:** Paragraph 505 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition. CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 505 of the Complaint.

### COUNT XXIX

### VIOLATION OF VERMONT STATUTES, TITLE 9, § 2453(a), *ET SEQ.* (ON BEHALF OF THE VERMONT CLASS)

506. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

507. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of Vermont Statutes, Title 9, § 2453(a), *et seq.*

**ANSWER:** Paragraph 507 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 507 of the Complaint.

508. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:** Paragraph 508 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 508 of the Complaint.

509. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:** Paragraph 509 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 509 of the Complaint.

510. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** Paragraph 510 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 510 of the Complaint.

511. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:** Paragraph 511 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 511 of the Complaint.

512. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

      (a)    to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

      (b)    to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:** Paragraph 512 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 512 of the Complaint.

513. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Vermont Class.

**ANSWER:** Paragraph 513 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 513 of the Complaint.

514. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Vermont.

**ANSWER:** Paragraph 514 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 514 of the Complaint.

515. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Vermont Class.

**ANSWER:**     Paragraph 515 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 515 of the Complaint.

516.     Defendants' conduct has a significant nexus with Vermont because the Vermont Class members are located in Vermont, owned DMS in Vermont, and engaged Vendors who utilized DIS in Vermont.

**ANSWER:**     Paragraph 516 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 516 of the Complaint.

517.     Defendants' conduct substantially affected Vermont commerce.

**ANSWER:**     Paragraph 517 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 517 of the Complaint.

518.     Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available under Vermont Statutes, Title 9, § 2453(a), *et seq.*

**ANSWER:**     Paragraph 518 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 518 of the Complaint.

### COUNT XXX

### VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT, W. VA.CODE § 47-18-1, *ET SEQ.* (ON BEHALF OF THE WEST VIRGINIA CLASS)

519.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

520. As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of the West Virginia Antitrust Act, W. Va. Code, § 47-18-1, *et seq.*

**ANSWER:** Paragraph 520 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 520 of the Complaint.

521. CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:** Paragraph 521 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 521 of the Complaint.

522. CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:** Paragraph 522 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 522 of the Complaint.

523. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** Paragraph 523 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 523 of the Complaint.

524. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition,

CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:**     Paragraph 524 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 524 of the Complaint.

525.    Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

> (a)     to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

> (b)     to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:**     Paragraph 525 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 525 of the Complaint.

526.    These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the West Virginia Class.

**ANSWER:**     Paragraph 526 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 526 of the Complaint.

527.    Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of West Virginia.

**ANSWER:**     Paragraph 527 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 527 of the Complaint.

528.    Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the West Virginia Class.

**ANSWER:**    Paragraph 528 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 528 of the Complaint.

529.    Defendants' conduct has a significant nexus with West Virginia because the West Virginia Class members are located in West Virginia, owned DMS in West Virginia, and engaged Vendors who utilized DIS in West Virginia.

**ANSWER:**    Paragraph 529 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 529 of the Complaint.

530.    Defendants' conduct substantially affected West Virginia commerce.

**ANSWER:**    Paragraph 530 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 530 of the Complaint.

531.    Accordingly, Plaintiffs and the Class seek all forms of relief available under West Virginia Antitrust Act, W. Va. Code, § 47-18-1, *et seq.*

**ANSWER:**    Paragraph 531 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 531 of the Complaint.

**PUBLIC VERSION**

## COUNT XXXI

### VIOLATION OF WISCONSIN ANTITRUST LAWS, WIS. STAT. § 133.01, *ET SEQ.* (ON BEHALF OF THE WISCONSIN CLASS)

532.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**     The Court has granted CDK's motion to dismiss Count XXXI; accordingly, no response to this paragraph is required.  To the extent that an answer may be required, CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

533.     As described hereinabove, Defendants engaged in a conspiracy and entered into unlawful agreements to restrain trade, in violation of Wisconsin antitrust laws, Wis. Stat. § 133.01, *et seq.*

**ANSWER:**     The Court has granted CDK's motion to dismiss Count XXXI; accordingly, no response to this paragraph is required.  In addition, paragraph 533 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 533 of the Complaint.

534.     CDK and Reynolds are horizontal competitors of one another in the DMS and DIS markets.

**ANSWER:**     The Court has granted CDK's motion to dismiss Count XXXI; accordingly, no response to this paragraph is required.  In addition, paragraph 534 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK admits that CDK and Reynolds are competitors in the provision of DMS products and services. CDK denies the remaining allegations in paragraph 534 of the Complaint.

535.     CDK and Reynolds possess dominant positions in the DMS and DIS markets.

**ANSWER:**     The Court has granted CDK's motion to dismiss Count XXXI; accordingly, no response to this paragraph is required.  In addition, paragraph 535 of the Complaint states legal

conclusions to which no answer is required. To the extent that an answer may be required, CDK

denies the allegations in paragraph 535 of the Complaint.

536. CDK and Reynolds utilized their market dominance in the DMS and DIS markets to further their anticompetitive conspiracy.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXI; accordingly, no

response to this paragraph is required. In addition, paragraph 536 of the Complaint states legal

conclusions to which no answer is required. To the extent that an answer may be required, CDK

denies the allegations in paragraph 536 of the Complaint.

537. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding or concerted action to eliminate competition in the DMS and DIS markets. In furtherance of their conspiracy, in February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the DIS market. CDK and Reynolds also colluded to block access to their respective DMS by competing independent data integrators. In addition, CDK and Reynolds colluded to force Vendors to only use the Defendants, or their affiliates, to access their respective DMS. The agreement not to compete and Defendants' collusive conduct in furtherance of their conspiracy to eliminate or reduce competition are unreasonable and unlawful restraints of trade.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXI; accordingly, no

response to this paragraph is required. In addition, paragraph 537 of the Complaint states legal

conclusions to which no answer is required. To the extent that an answer may be required, CDK

denies the allegations in paragraph 537 of the Complaint.

538. Defendants' intentions in entering the unlawful writing agreement and engaging in collusive conduct were:

    (a)    to maintain and protect their duopoly in the DMS market in the State, and thereby maintain their monopoly profits; and

    (b)    to eliminate or significantly curtail competition in the DIS market in the State on their respective DMS's, and thereby monopolize the DIS market in the State and reap monopoly profits.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXI; accordingly, no

response to this paragraph is required. In addition, paragraph 538 of the Complaint states legal

conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 538 of the Complaint.

539. These horizontal market-share agreements and collusive and anticompetitive conduct were intended to and did reduce competition in the DMS and DIS markets in the State and cause actual injury to Dealership Plaintiffs and the Wisconsin Class.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXI; accordingly, no response to this paragraph is required. In addition, paragraph 539 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 539 of the Complaint.

540. Defendants knowingly and willfully engaged in an illegal conspiracy and entered into unlawful agreements in order to eliminate competition and increase prices in the DMS and DIS markets, and constitute violations of the state antitrust laws of Wisconsin.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXI; accordingly, no response to this paragraph is required. In addition, paragraph 540 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 540 of the Complaint.

541. Defendants' illegal conduct caused proximate, distinct, and palpable injury to direct purchasers of DMS and indirect purchasers of DIS: Dealership Plaintiffs and the Wisconsin Class.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXI; accordingly, no response to this paragraph is required. In addition, paragraph 541 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 541 of the Complaint.

542. Defendants' conduct has a significant nexus with Wisconsin because the Wisconsin Class members are located in Wisconsin, owned DMS in Wisconsin, and engaged Vendors who utilized DIS in Wisconsin.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXI; accordingly, no response to this paragraph is required. In addition, paragraph 542 of the Complaint states legal

conclusions to which no answer is required. To the extent that an answer may be required, CDK

denies the allegations in paragraph 542 of the Complaint.

543. Defendants' conduct substantially affected Wisconsin commerce.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXI; accordingly, no

response to this paragraph is required. In addition, paragraph 543 of the Complaint states legal

conclusions to which no answer is required. To the extent that an answer may be required, CDK

denies the allegations in paragraph 543 of the Complaint.

544. Accordingly, Dealership Plaintiffs and the Class seek all forms of relief available
under Wisconsin antitrust laws, Wis. Stat. § 133.01, *et seq.*

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXI; accordingly, no

response to this paragraph is required. In addition, paragraph 544 of the Complaint states legal

conclusions to which no answer is required. To the extent that an answer may be required, CDK

denies that it has violated any applicable law or harmed competition. CDK further denies that

Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or

conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies

the remaining allegations in paragraph 544 of the Complaint.

## COUNT XXXII

### VIOLATION OF ALASKA STATUTES, § 45.50.471, *ET SEQ.*
### (ON BEHALF OF THE ALASKA CLASS)

545. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding
paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding

paragraphs of the Complaint.

546. Defendants have engaged in unfair competition or unfair, unconscionable,
deceptive and/or fraudulent acts or practices in violation of the Alaska Statute § 45.50.471, *et seq.*

**ANSWER:** Paragraph 546 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 546 of the Complaint.

547. During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Alaska Class to pay supracompetitive prices.

**ANSWER:** Paragraph 547 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 547 of the Complaint.

548. Defendants' practices, even if not considered unlawful, offend public policy and the common law and are categorically within the penumbra of unfairness. These actions were immoral, unethical, oppressive, and/or unscrupulous and each had the tendency to deceive purchasers.

**ANSWER:** Paragraph 548 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 548 of the Complaint.

549. Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual and substantial injury to Dealership Plaintiffs and members of the Alaska Class.

**ANSWER:** Paragraph 549 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 549 of the Complaint.

550. Defendants' conduct substantially affected commerce in Alaska throughout the Class Period.

**ANSWER:** Paragraph 550 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 550 of the Complaint.

551.    In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Alaska Class.

**ANSWER:**    Paragraph 551 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 551 of the Complaint.

552.    Therefore, Dealership Plaintiffs and members of the Alaska Class seek any and all relief, to the fullest extent allowable, under Alaska Statute § 45.50.471, *et seq.*

**ANSWER:**    Paragraph 552 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 552 of the Complaint.

## COUNT XXXIII

### VIOLATION OF ARKANSAS CODE ANNOTATED, §4-88-101, *ET SEQ.* (ON BEHALF OF THE ARKANSAS CLASS)

553.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count XXXIII; accordingly, no response to this paragraph is required.  To the extent that an answer may be required, CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

554.    Defendants have violated Arkansas Code Annotated, §4-88-101, *et seq.*, through their unfair and/or deceptive practices.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count XXXIII; accordingly, no response to this paragraph is required.  In addition, paragraph 554 of the Complaint states legal

conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 554 of the Complaint.

555. During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Arkansas Class to pay these supracompetitive prices.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXIII; accordingly, no response to this paragraph is required. In addition, paragraph 555 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 555 of the Complaint.

556. Defendants knowingly made false representations about the characteristics, uses, and benefits of their products and related services.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXIII; accordingly, no response to this paragraph is required. In addition, paragraph 556 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 556 of the Complaint.

557. Defendants engaged in the aforesaid conduct which is unconscionable, false, or deceptive. Defendants' acts affront the sense of justice, decency, and/or reasonableness and violate public policy.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXIII; accordingly, no response to this paragraph is required. In addition, paragraph 557 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 557 of the Complaint.

558. Due to Defendants' concerted actions, Dealership Plaintiffs and members of the Arkansas Class, have suffered actual injury to their businesses and properties and are threatened with further actual injury. Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the Arkansas Class.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXIII; accordingly, no response to this paragraph is required. In addition, paragraph 557 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 557 of the Complaint.

559. Defendants' conduct substantially affected commerce and consumers in Arkansas throughout the Class Period.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXIII; accordingly, no response to this paragraph is required. In addition, paragraph 559 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 559 of the Complaint.

560. In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Arkansas Class.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXIII; accordingly, no response to this paragraph is required. In addition, paragraph 560 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 560 of the Complaint.

561. Therefore, Dealership Plaintiffs and members of the Arkansas Class seek any and all relief, to the fullest extent allowable, under Arkansas Code Annotated, §4-88101, *et seq.*, and as equity so requires.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXIII; accordingly, no response to this paragraph is required. In addition, paragraph 561 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition. CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 561 of the Complaint.

PUBLIC VERSION

## COUNT XXXIV

## VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONAL CODE § 17200, ET SEQ.
### (ON BEHALF OF THE CALIFORNIA CLASS)

562.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**    CDK incorporates, as if fully set forth herein, its answers to the preceding

paragraphs of the Complaint.

563.    Defendants have violated California Business and Professional Code § 17200, *et seq.*, through their unfair and/or deceptive practices.

**ANSWER:**    Paragraph 563 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

563 of the Complaint.

564.    During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the California Class to pay these supracompetitive prices.

**ANSWER:**    Paragraph 564 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

564 of the Complaint.

565.    These business acts or practices were unlawful, unfair, and/or fraudulent. Defendants' acts constitute a common, continuous, and continuing illegal and unlawful course of conduct, which Defendants will continue into the future.

**ANSWER:**    Paragraph 565 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

565 of the Complaint.

566.    Dealership Plaintiffs and members of the California Class have suffered injury in fact and lost money or property as a result of Defendants' concerted actions.

**ANSWER:**     Paragraph 566 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 566 of the Complaint.

567.     Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the California Class. Defendants' conduct substantially affected commerce and consumers in California throughout the Class Period.

**ANSWER:**     Paragraph 567 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 567 of the Complaint.

568.     In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the California Class.

**ANSWER:**     Paragraph 568 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 568 of the Complaint.

569.     Therefore, Dealership Plaintiffs, and members of the California Class seek any and all relief, to the fullest extent allowable, under California Business and Professional Code § 17200, *et seq.*, and as equity so requires, including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants.

**ANSWER:**     Paragraph 569 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 569 of the Complaint.

## COUNT XXXV

### VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT, COLO. REV. STAT., § §6-1-101, *ET SEQ.* (ON BEHALF OF THE COLORADO CLASS)

570.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**     CDK incorporates, as if fully set forth herein, its answers to the preceding

paragraphs of the Complaint.

571.     Defendants have violated the Colorado Consumer Protection Act, Colorado Rev. Stat. §6-1-101, *et seq.*, through their unfair and/or deceptive practices. During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Colorado Class to pay these supracompetitive prices.

**ANSWER:**     Paragraph 571 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

571 of the Complaint.

572.     Defendants engaged in an unfair or deceptive trade practice during the course of their regular business that significantly impacted Dealership Plaintiffs and members of the Colorado Class, as well as other actual or potential consumers of Defendants' goods/services. Dealership Plaintiffs and members of the Colorado Class have suffered injury in fact to a legally protected interest and lost money or property as a result of Defendants' concerted actions.

**ANSWER:**     Paragraph 572 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

572 of the Complaint.

573.     Defendants' actions have already severely impacted consumers in the state and have the potential to further negatively impact Colorado consumers in the future.

**ANSWER:**     Paragraph 573 of the Complaint states legal conclusions to which no answer is

required.  To the extent that an answer may be required, CDK denies the allegations in paragraph

573 of the Complaint.

574.    Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the Colorado Class. Defendants' conduct substantially affected commerce and consumers in Colorado throughout the Class Period.

**ANSWER:**    Paragraph 574 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 574 of the Complaint.

575.    In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Colorado Class.

**ANSWER:**    Paragraph 575 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 575 of the Complaint.

576.    Therefore, Dealership Plaintiffs and members of the Colorado Class seek any and all relief, to the fullest extent allowable, under the Colorado Consumer Protection Act, Colorado Rev. Stat. §6-1-101, *et seq.*, and as equity so requires.

**ANSWER:**    Paragraph 576 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 576 of the Complaint.

## COUNT XXXVI

### VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT, 6 DEL. CODE § 2511, *ET SEQ.* <u>(ON BEHALF OF THE DELAWARE CLASS)</u>

577.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXVI; accordingly, no response to this paragraph is required. To the extent that an answer may be required, CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

578. Defendants have violated the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq.*, through their unfair and/or deceptive practices. During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Delaware Class to pay these supracompetitive prices.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXVI; accordingly, no response to this paragraph is required. In addition, paragraph 578 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 578 of the Complaint.

579. Defendant engaged in an unlawful practice which caused an ascertainable loss to Dealership Plaintiffs and members of the Delaware Class. Included among those actions are deliberate failures to disclose material facts to Dealership Plaintiffs and members of the Delaware Class. Defendants also misrepresented that the prices of their DMS and DIS were competitive and were set by a free and fair market.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXVI; accordingly, no response to this paragraph is required. In addition, paragraph 579 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 579 of the Complaint.

580. As a result, Defendants misled Dealership Plaintiffs and members of the Delaware Class as purchasers and/or consumers of those products.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXVI; accordingly, no response to this paragraph is required. In addition, paragraph 580 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 580 of the Complaint.

581.    Dealership Plaintiffs and members of the Delaware Class are entitled to the benefit-of-the-bargain in that they should be made whole and restored to a position that they would have been in, if the representations of Defendants were true.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count XXXVI; accordingly, no response to this paragraph is required.  In addition, paragraph 581 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 581 of the Complaint.

582.    This includes damages to equal the difference between the price paid and the actual value of the product and/or service received.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count XXXVI; accordingly, no response to this paragraph is required.  In addition, paragraph 582 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 582 of the Complaint.

583.    Due to Defendants' concerted actions there now exists a gross disparity between the price of DMS and DIS and the value of DMS and DIS. Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the Delaware Class.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count XXXVI; accordingly, no response to this paragraph is required.  In addition, paragraph 583 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 583 of the Complaint.

584.    Defendants' conduct substantially affected commerce and consumers in Delaware throughout the Class Period. In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Delaware Class.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count XXXVI; accordingly, no response to this paragraph is required.  In addition, paragraph 584 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 584 of the Complaint.

585.     Therefore, Dealership Plaintiffs and members of the Delaware Class seek any and all relief, to the fullest extent allowable, under the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq.*, and as equity so requires.

**ANSWER:**     The Court has granted CDK's motion to dismiss Count XXXVI; accordingly, no response to this paragraph is required.  In addition, paragraph 585 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 585 of the Complaint.

## COUNT XXXVII

### VIOLATION OF DISTRICT OF FLORIDA DECEPTIVE TRADE PRACTICES ACT, FLA. STAT. § 501.201, *ET SEQ.* (ON BEHALF OF THE FLORIDA CLASS)

586.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**     CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

587.     Defendants have violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*, through their unfair and/or deceptive practices. During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Florida Class to pay these supracompetitive prices.

**ANSWER:**     Paragraph 587 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 587 of the Complaint.

588.     To be sure, Dealership Plaintiffs and members of the Florida Class suffered an ascertainable loss that is both concrete and actual, not conjectural or hypothetical.

**PUBLIC VERSION**

**ANSWER:** Paragraph 588 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 588 of the Complaint.

589. Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the Florida Class. Defendants' conduct substantially affected commerce and consumers in Florida throughout the Class Period.

**ANSWER:** Paragraph 589 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 589 of the Complaint.

590. In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Florida Class.

**ANSWER:** Paragraph 590 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 590 of the Complaint.

591. Therefore, Dealership Plaintiffs and members of the Florida Class seek any and all relief, to the fullest extent allowable, under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*, and as equity so requires.

**ANSWER:** Paragraph 591 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition. CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 591 of the Complaint.

## COUNT XXXVIII

**VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT,
GEORGIA CODE § 10-1-390, *ET SEQ.*
(ON BEHALF OF THE GEORGIA CLASS)**

592.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**     The Court has granted CDK's motion to dismiss Count XXXVIII; accordingly, no response to this paragraph is required.  To the extent that an answer may be required, CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

593.     Defendants have violated the Georgia Fair Business Practices Act, Georgia Code § 10-1-390, et seq., through their unfair and/or deceptive practices.

**ANSWER:**     The Court has granted CDK's motion to dismiss Count XXXVIII; accordingly, no response to this paragraph is required.  In addition, paragraph 593 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 593 of the Complaint.

594.     During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Georgia Class to pay these supracompetitive prices.

**ANSWER:**     The Court has granted CDK's motion to dismiss Count XXXVIII; accordingly, no response to this paragraph is required.  In addition, paragraph 594 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 594 of the Complaint.

595.     All of Defendants' illegal, unfair, and deceptive actions were perpetuated in the consumer marketplace.

**ANSWER:**     The Court has granted CDK's motion to dismiss Count XXXVIII; accordingly, no response to this paragraph is required.  In addition, paragraph 595 of the Complaint states legal

conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 595 of the Complaint.

596. Included among these actions are Defendants' deliberate failure to disclose material facts to Dealership Plaintiffs and members of the Georgia Class.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXVIII; accordingly, no response to this paragraph is required. In addition, paragraph 596 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 596 of the Complaint.

597. Defendants misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market and in turn Defendants misled Dealership Plaintiffs and members of the Georgia Class as purchasers and/or consumers of those products.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXVIII; accordingly, no response to this paragraph is required. In addition, paragraph 597 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 597 of the Complaint.

598. Dealership Plaintiffs and members of the Georgia Class were unaware that they were being unfairly and illegally overcharged for the DMS and DIS provided by Defendants.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXVIII; accordingly, no response to this paragraph is required. In addition, paragraph 598 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 598 of the Complaint.

599. Therefore, Dealership Plaintiffs and members of the Georgia Class, could not exercise diligence to ascertain the falsity of Defendants' statements, misrepresentations, and material omissions.

**ANSWER:** The Court has granted CDK's motion to dismiss Count XXXVIII; accordingly, no response to this paragraph is required. In addition, paragraph 599 of the Complaint states legal

conclusions to which no answer is required.  To the extent that an answer may be required, CDK

denies the allegations in paragraph 599 of the Complaint.

600.    Dealership Plaintiffs and members of the Georgia Class reasonably relied upon these misrepresentations and material omissions.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count XXXVIII; accordingly, no

response to this paragraph is required.  In addition, paragraph 600 of the Complaint states legal

conclusions to which no answer is required.  To the extent that an answer may be required, CDK

denies the allegations in paragraph 600 of the Complaint.

601.    Dealership Plaintiffs and members of the Georgia Class have also suffered an ascertainable loss of money and/or property as a result of Defendants' concerted actions.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count XXXVIII; accordingly, no

response to this paragraph is required.  In addition, paragraph 601 of the Complaint states legal

conclusions to which no answer is required.  To the extent that an answer may be required, CDK

denies that it has violated any applicable law or harmed competition.  CDK further denies that

Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or

conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies

the remaining allegations in paragraph 601 of the Complaint.

602.    Holding defendant accountable for the aforesaid actions will serve the public interest and aid in ending unfair and/or deceptive acts which have the potential for great harm to the general consuming public in Georgia. Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the Georgia Class. Defendants' conduct substantially affected commerce and consumers in Georgia throughout the Class Period.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count XXXVIII; accordingly, no

response to this paragraph is required.  In addition, paragraph 602 of the Complaint states legal

conclusions to which no answer is required.  To the extent that an answer may be required, CDK

denies the allegations in paragraph 602 of the Complaint.

603.    In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Georgia Class.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count XXXVIII; accordingly, no response to this paragraph is required.  In addition, paragraph 603 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 603 of the Complaint.

604.    Therefore, Dealership Plaintiffs and members of the Georgia Class seek any and all relief, to the fullest extent allowable, under the Georgia Fair Business Practices Act, Georgia Code § 10-1-390, et seq. and as equity so requires.

**ANSWER:**    The Court has granted CDK's motion to dismiss Count XXXVIII; accordingly, no response to this paragraph is required.  In addition, paragraph 604 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 604 of the Complaint.

## COUNT XXXIX

### VIOLATION OF MASSACHUSSETS GENERAL LAWS CH. 93A, § 1, *ET SEQ.* (ON BEHALF OF THE MASSACHUSSETS CLASS)

605.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**    CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

606.    Defendants have violated the Massachusetts Gen. Laws, Ch. 93A, § 1, *et seq.*, through their unfair and/or deceptive practices.

**ANSWER:** Paragraph 606 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 606 of the Complaint.

607. During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Massachusetts Class to pay these supracompetitive prices.

**ANSWER:** Paragraph 607 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 607 of the Complaint.

608. Defendants knowingly and willfully engaged in actions that constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," as outlined in M.G.L.A. 93A, §§ 2, 11.

**ANSWER:** Paragraph 608 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 608 of the Complaint.

609. Defendants' unfair and unlawful acts directly and/or indirectly affected not only Dealership Plaintiffs and members of the Massachusetts Class, but also the people of the commonwealth of Massachusetts.

**ANSWER:** Paragraph 609 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 609 of the Complaint.

610. Defendants deliberately failed to disclose material facts to Dealership Plaintiffs and members of the Massachusetts Class.

**ANSWER:** Paragraph 610 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 610 of the Complaint.

611.    Defendants misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market.

**ANSWER:**    Paragraph 611 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 611 of the Complaint.

612.    In turn, Defendants misled Dealership Plaintiffs and members of the Massachusetts Class as purchasers and/or consumers of those products.

**ANSWER:**    Paragraph 612 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 612 of the Complaint.

613.    These statements and material omissions created an over-all misleading impression of Defendants' product and services.

**ANSWER:**    Paragraph 613 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 613 of the Complaint.

614.    Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of an actual and distinct injury to Dealership Plaintiffs and members of the Massachusetts Class.

**ANSWER:**    Paragraph 614 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 614 of the Complaint.

615.    Defendants' conduct substantially affected commerce and consumers in Massachusetts throughout the Class Period.

**ANSWER:**    Paragraph 615 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 615 of the Complaint.

616.     In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Massachusetts Class.

**ANSWER:**     Paragraph 616 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 616 of the Complaint.

617.     Therefore, Dealership Plaintiffs and members of the Massachusetts Class, seek any and all relief, to the fullest extent allowable, under Massachusetts Gen. Laws, Ch. 93A, § 1, *et seq.*, and as equity so requires.

**ANSWER:**     Paragraph 617 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 617 of the Complaint.

## COUNT XL

### VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT, MINN. STAT. § 325F.68, *ET SEQ.* (ON BEHALF OF THE MINNESOTA CLASS)

618.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**     CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

619.     Defendants have violated the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq.*, through their unfair and/or deceptive practices.

**ANSWER:**     Paragraph 619 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 619 of the Complaint.

620.    During the Class Period, Defendants have willfully acted unlawfully by: (1)knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2)substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4)causing Dealership Plaintiffs and members of the Minnesota Class to pay these supracompetitive prices.

**ANSWER:**    Paragraph 620 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 620 of the Complaint.

621.    Included among these actions are Defendants' deliberate failures to disclose material facts to Dealership Plaintiffs and members of the Minnesota Class.

**ANSWER:**    Paragraph 621 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 621 of the Complaint.

622.    Defendants misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market. In turn, Defendants misled Dealership Plaintiffs and members of the Minnesota as purchasers of those products.

**ANSWER:**    Paragraph 622 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 622 of the Complaint.

623.    Defendants' actions have already severely impacted consumers and have the potential to further negatively impact consumers in the future.

**ANSWER:**    Paragraph 623 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 623 of the Complaint.

624.    Defendants' unlawful conduct was a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the Minnesota Class. Defendants' conduct substantially affected commerce and consumers in Minnesota throughout the Class Period.

**ANSWER:**     Paragraph 624 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 624 of the Complaint.

625.     In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Minnesota Class.

**ANSWER:**     Paragraph 625 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 625 of the Complaint.

626.     Therefore, Dealership Plaintiffs and members of the Minnesota Class seek any and all relief, to the fullest extent allowable, under the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq.*, and as equity so requires.

**ANSWER:**     Paragraph 626 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 626 of the Complaint.

627.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**     CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

628.     Defendants have violated the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325D.43, *et seq.*, through their unfair and/or deceptive practices.

**ANSWER:**     Paragraph 628 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 628 of the Complaint.

629.     During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Minnesota Class to pay these supracompetitive prices.

**ANSWER:**     Paragraph 629 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 629 of the Complaint.

630.     Included among these actions are Defendants' deliberate failures to disclose material facts to Dealership Plaintiffs and members of the Minnesota Class.

**ANSWER:**     Paragraph 630 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 630 of the Complaint.

631.     Defendants misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market. In turn, Defendants misled Dealership Plaintiffs and members of the Minnesota as purchasers of those products.

**ANSWER:**     Paragraph 631 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 631 of the Complaint.

632.     These statements created the likelihood of confusion or misunderstanding. Dealership Plaintiffs and members of the Minnesota Class were the actual and/or potential consumers of Defendants' goods/services. In addition, Defendants' actions have already severely impacted consumers and have the potential to further negatively impact consumers in the future.

**ANSWER:**     Paragraph 632 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 632 of the Complaint.

633.     Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the Minnesota Class. Defendants' conduct substantially affected commerce and consumers in Minnesota throughout the Class Period.

**ANSWER:** Paragraph 633 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 633 of the Complaint.

634. In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Minnesota Class.

**ANSWER:** Paragraph 634 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 634 of the Complaint.

635. Therefore, Dealership Plaintiffs and members of the Minnesota Class seek any and all relief, to the fullest extent allowable, under the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*, and as equity so requires.

**ANSWER:** Paragraph 635 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition. CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 635 of the Complaint.

## COUNT XLI

### VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT, NEB. REV. STAT, § 59-1601, *ET SEQ.* (ON BEHALF OF THE NEBRASKA CLASS)

636. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

637. Defendants have violated the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.*, through their unfair and/or deceptive practices.

**ANSWER:**    Paragraph 637 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 637 of the Complaint.

638.    During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Nebraska Class to pay these supracompetitive prices.

**ANSWER:**    Paragraph 638 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 638 of the Complaint.

639.    Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the Nebraska Class.

**ANSWER:**    Paragraph 639 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 639 of the Complaint.

640.    Defendants' conduct substantially affected commerce and consumers in Nebraska throughout the Class Period.

**ANSWER:**    Paragraph 640 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 640 of the Complaint.

641.    In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Consumer Protection Class.

**ANSWER:**    Paragraph 641 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 641 of the Complaint.

642.    Therefore, Dealership Plaintiffs and members of the Nebraska Class seek any and all relief, to the fullest extent allowable, under the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.*, and as equity so requires.

**ANSWER:**    Paragraph 642 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 642 of the Complaint.

## COUNT XLII

### VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT, NEV. REV. STAT. § 598.0903, *ET SEQ.* (ON BEHALF OF THE NEVADA CLASS)

643.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**    CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

644.    Defendants have violated the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*, through their unfair and/or deceptive practices.

**ANSWER:**    Paragraph 644 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 644 of the Complaint.

645.    During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the Nevada Class to pay these supracompetitive prices.

**ANSWER:** Paragraph 645 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 645 of the Complaint.

646. Defendants knowingly and willfully engaged in these actions.

**ANSWER:** Paragraph 646 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 646 of the Complaint.

647. Dealership Plaintiffs and the Nevada Class are victims of the consumer fraud perpetuated by Defendants.

**ANSWER:** Paragraph 647 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 647 of the Complaint.

648. Defendants affirmatively misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market.

**ANSWER:** Paragraph 648 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 648 of the Complaint.

649. These affirmative misrepresentations misled Dealership Plaintiffs and members of the Nevada Class as purchasers of those products.

**ANSWER:** Paragraph 649 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 649 of the Complaint.

650. In addition, Dealership Plaintiffs and members of the Nevada Class have suffered an ascertainable loss of money and/or property as a result of Defendants' concerted actions.

**ANSWER:**    Paragraph 650 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 650 of the Complaint.

651.    That loss was caused by Defendants' willful and deceptive conduct. Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the Nevada Class.

**ANSWER:**    Paragraph 651 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 651 of the Complaint.

652.    Defendants' conduct substantially affected commerce and consumers in Nevada throughout the Class Period.

**ANSWER:**    Paragraph 652 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 652 of the Complaint.

653.    In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Nevada Class.

**ANSWER:**    Paragraph 653 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 653 of the Complaint.

654.    Therefore, Dealership Plaintiffs and members of the Nevada Class seek any and all relief, to the fullest extent allowable, under the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*, and as equity so requires.

**ANSWER:**    Paragraph 654 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore

denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 654 of the Complaint.

## COUNT XLIII

## VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT, N.H. REV. STAT. § 358-A:1, *ET SEQ.* (ON BEHALF OF THE NEW HAMPSHIRE CLASS)

655. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

656. Defendants have violated New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*, through their unfair and/or deceptive practices.

**ANSWER:** Paragraph 656 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 656 of the Complaint.

657. During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the New Hampshire Class to pay these supracompetitive prices.

**ANSWER:** Paragraph 657 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 657 of the Complaint.

658. Defendants' concerted actions, as outlined above, rise to a level of rascality which far surpasses the normal level found in everyday commerce and/or business.

**ANSWER:** Paragraph 658 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 658 of the Complaint.

659. Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the New Hampshire Class. Defendants' conduct substantially affected commerce and consumers in New Hampshire throughout the Class Period.

**ANSWER:**     Paragraph 659 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 659 of the Complaint.

660. In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the New Hampshire Class.

**ANSWER:**     Paragraph 660 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 660 of the Complaint.

661. Therefore, Dealership Plaintiffs and members of the New Hampshire Class seek any and all relief, to the fullest extent allowable, under the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*, and as equity so requires.

**ANSWER:**     Paragraph 661 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 661 of the Complaint.

## COUNT XLIV

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT, N.J. STAT. ANN. 56:8-1, *ET SEQ*. (ON BEHALF OF THE NEW JERSEY CLASS)

662. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

663. Defendants have violated the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*, through their unfair and/or deceptive practices.

**ANSWER:** Paragraph 663 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 663 of the Complaint.

664. During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the New Jersey Class to pay these supracompetitive prices.

**ANSWER:** Paragraph 664 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 664 of the Complaint.

665. Defendants used and/or employed unconscionable commercial practices, deception, fraud, false pretenses, false promises, and misrepresentations with intent for Dealership Plaintiffs and members of the New Jersey Class to rely on those statements and actions.

**ANSWER:** Paragraph 665 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 665 of the Complaint.

666. These actions constituted "deception" as it is understood from the perception of a reasonable consumer in New Jersey.

**ANSWER:** Paragraph 666 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 666 of the Complaint.

667. Included among these actions are Defendants' deliberate failures to disclose material facts to Dealership Plaintiffs and members of the New Jersey Class.

**PUBLIC VERSION**

**ANSWER:** Paragraph 667 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 667 of the Complaint.

668. Defendants misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market.

**ANSWER:** Paragraph 668 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 668 of the Complaint.

669. In turn, Defendants misled and victimized Dealership Plaintiffs and members of the New Jersey Class as purchasers and/or consumers of those products.

**ANSWER:** Paragraph 669 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 669 of the Complaint.

670. These products were sold in the consumer marketplace.

**ANSWER:** Paragraph 670 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 670 of the Complaint.

671. Defendants knowingly and willfully engaged in these actions. Dealership Plaintiffs and members of the New Jersey Class have suffered an ascertainable loss of money and/or property as a result of Defendants' concerted actions.

**ANSWER:** Paragraph 671 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 671 of the Complaint.

672. Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the New Jersey Class. Defendants' conduct substantially affected commerce and consumers in New Jersey throughout the Class Period.

**ANSWER:**    Paragraph 672 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 672 of the Complaint.

673.    In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the New Jersey Class.

**ANSWER:**    Paragraph 673 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 673 of the Complaint.

674.    Therefore, Dealership Plaintiffs and members of the New Jersey Class seek any and all relief, to the fullest extent allowable, under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*, and as equity so requires.

**ANSWER:**    Paragraph 674 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 674 of the Complaint.

### COUNT XLV

### VIOLATION OF NEW MEXICO STAT. ANN. § 57-12-1, *ET SEQ.* (ON BEHALF OF THE NEW MEXICO CLASS)

675.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**    CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

676.    Defendants have violated New Mexico Stat. Ann. § 57-12-1, *et seq.*, through their unfair and/or deceptive practices.

218

**ANSWER:** Paragraph 676 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 676 of the Complaint.

677. During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the New Mexico Class to pay these supracompetitive prices.

**ANSWER:** Paragraph 677 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 677 of the Complaint.

678. These actions constitute "unconscionable trade practices," in violation of N.M. Stat. Ann. § 57-12-3. Dealership Plaintiffs and members of the New Mexico Class were unaware that they were being unfairly and illegally overcharged for the DMS and DIS provided by Defendants.

**ANSWER:** Paragraph 678 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 678 of the Complaint.

679. Defendants' conduct, with regard to the sale of DMS and DIS, was substantively unconscionable.

**ANSWER:** Paragraph 679 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 679 of the Complaint.

680. Defendant took grossly unfair advantage of Dealership Plaintiffs and members of the New Mexico Class.

**ANSWER:** Paragraph 680 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 680 of the Complaint.

681.    Due to Defendants' concerted actions, there now exists a gross disparity between the price of DMS and DIS and the value of DMS and DIS.

**ANSWER:**    Paragraph 681 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 681 of the Complaint.

682.    Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the New Mexico Class. Defendants' conduct substantially affected commerce and consumers in New Mexico throughout the Class Period.

**ANSWER:**    Paragraph 682 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 682 of the Complaint.

683.    In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the New Mexico Class.

**ANSWER:**    Paragraph 683 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 683 of the Complaint.

684.    Therefore, Dealership Plaintiffs and members of the New Mexico Class seek any and all relief, to the fullest extent allowable, under New Mexico Stat. Ann. § 5712-1, *et seq.*, and as equity so requires.

**ANSWER:**    Paragraph 684 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 684 of the Complaint.

## COUNT XLVI

## VIOLATION OF THE NORTH DAKOTA UNLAWFUL SALES OR ADVERTISING PRACTICES STATUTE, N.D. CENT. CODE. § 51-15-01, *ET SEQ.* (ON BEHALF OF THE NORTH DAKOTA CLASS)

685.     Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**     CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

686.     Defendants have violated the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Cent. Code § 51-15-01, *et seq.*, through their unfair and/or deceptive practices.

**ANSWER:**     Paragraph 686 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 686 of the Complaint.

687.     During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the North Dakota Class to pay these supracompetitive prices.

**ANSWER:**     Paragraph 687 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 687 of the Complaint.

688.     Defendants misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market. In turn Defendants misled Dealership Plaintiffs and members of the North Dakota Class as purchasers and/or consumers of those products.

**ANSWER:**     Paragraph 688 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 688 of the Complaint.

689.    Defendant made these misrepresentations with the intent that Dealership Plaintiffs and members of the Consumer Protection Class would rely on them. In addition, Dealership Plaintiffs and members of the North Dakota Class have suffered an ascertainable loss of money and/or property as a result of Defendants' concerted actions.

**ANSWER:**    Paragraph 689 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 689 of the Complaint.

690.    That loss was caused by Defendants' knowing and willfully deceptive conduct. Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the North Dakota Class.

**ANSWER:**    Paragraph 690 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 690 of the Complaint.

691.    Defendants' conduct substantially affected commerce and consumers in North Dakota throughout the Class Period.

**ANSWER:**    Paragraph 691 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 691 of the Complaint.

692.    In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the North Dakota Class.

**ANSWER:**    Paragraph 692 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 692 of the Complaint.

693.    Therefore, Dealership Plaintiffs and members of the North Dakota Class seek any and all relief, to the fullest extent allowable, under the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Cent. Code § 51-15-01, *et seq.*, and as equity so requires.

**ANSWER:**    Paragraph 693 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any

applicable law or harmed competition. CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 693 of the Complaint.

## COUNT XLVII

### VIOLATION OF THE SOUTH CAROLINA'S UNFAIR TRADE PRACTICES ACT, S.C. CODE ANN. §§ 39-5-10, *ET SEQ*. <u>(On Behalf of the South Carolina Class)</u>

694. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

695. Defendants have violated the South Carolina U n f a i r Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*, through their unfair and/or deceptive practices.

**ANSWER:** Paragraph 695 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 695 of the Complaint.

696. During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the South Carolina Class to pay these supracompetitive prices.

**ANSWER:** Paragraph 696 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 696 of the Complaint.

697. The injury of Dealership Plaintiffs and members of the South Carolina Class resulted from these actions.

**PUBLIC VERSION**

**ANSWER:**     Paragraph 697 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 697 of the Complaint.

698.     Included among the actions of Defendants are their deliberate failures to disclose material facts to Dealership Plaintiffs and members of the South Carolina Class.

**ANSWER:**     Paragraph 698 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 698 of the Complaint.

699.     Defendants misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market.

**ANSWER:**     Paragraph 699 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 699 of the Complaint.

700.     In turn, Defendants misled Dealership Plaintiffs and members of the South Carolina Class as purchasers and/or consumers of those products. These affirmative misrepresentations and omissions were regarding information important to Dealership Plaintiffs and members of the South Carolina Class.

**ANSWER:**     Paragraph 700 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 700 of the Complaint.

701.     In addition, Dealership Plaintiffs and members of the South Carolina Class have suffered an ascertainable loss of money and/or property as a result of Defendants' concerted actions.

**ANSWER:**     Paragraph 701 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 701 of the Complaint.

702.     As purchasers of DMS and DIS, Dealership Plaintiffs and South Carolina Class were adversely affected by the actions of Defendants, and overall these actions were injurious to the public interest.

**ANSWER:**     Paragraph 702 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 702 of the Complaint.

703.     Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the South Carolina Class. Defendants' conduct substantially affected commerce and consumers in South Carolina throughout the Class Period.

**ANSWER:**     Paragraph 703 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 703 of the Complaint.

704.     In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the South Carolina Class.

**ANSWER:**     Paragraph 704 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 704 of the Complaint.

705.     Therefore, Dealership Plaintiffs and members of the South Carolina Class seek any and all relief, to the fullest extent allowable, under South Carolina U n f a i r Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.,* as equity so requires.

**ANSWER:**     Paragraph 705 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 705 of the Complaint.

COUNT XLVIII

**VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES
AND CONSUMER PROTECTION STATUTE,
S.D. CODIFIED LAWS, § 37-24-1, *ET SEQ.*
(ON BEHALF OF THE SOUTH DAKOTA CLASS)**

706. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

707. Defendants have violated the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq.*, through their unfair and/or deceptive practices.

**ANSWER:** Paragraph 707 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 707 of the Complaint.

708. During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the South Dakota Class to pay these supracompetitive prices.

**ANSWER:** Paragraph 708 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 708 of the Complaint.

709. The injury of Dealership Plaintiffs and members of the South Dakota Class resulted from these actions.

**ANSWER:** Paragraph 709 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 709 of the Complaint.

710. Included among the actions of Defendants are their deliberate failures to disclose material facts to Dealership Plaintiffs and members of the South Dakota Class.

**ANSWER:** Paragraph 710 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 710 of the Complaint.

711. Defendants misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market.

**ANSWER:** Paragraph 711 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 711 of the Complaint.

712. In turn, Defendants misled Dealership Plaintiffs and members of the South Dakota Class as purchasers and/or consumers of those products. These affirmative misrepresentations and omissions were regarding information important to Dealership Plaintiffs and members of the South Dakota Class.

**ANSWER:** Paragraph 712 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 712 of the Complaint.

713. In addition, Dealership Plaintiffs and members of the South Dakota Class have suffered an ascertainable loss of money and/or property as a result of Defendants' concerted actions.

**ANSWER:** Paragraph 713 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 713 of the Complaint.

714. As purchasers of DMS and DIS, Dealership Plaintiffs and South Dakota Class were adversely affected by the actions of Defendants.

**ANSWER:** Paragraph 714 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 714 of the Complaint.

715. Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the South

Dakota Class. Defendants' conduct substantially affected commerce and consumers in South Dakota throughout the Class Period.

**ANSWER:** Paragraph 715 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 715 of the Complaint.

716. In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the South Dakota Class.

**ANSWER:** Paragraph 716 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 716 of the Complaint.

717. Therefore, Dealership Plaintiffs and members of the South Dakota Class seek any and all relief, to the fullest extent allowable, under South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq.*, as equity so requires.

**ANSWER:** Paragraph 717 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition. CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 717 of the Complaint.

## COUNT XLIX

### VIOLATION OF THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT, W. VA. CODE, § 46A-6-101, *ET SEQ.* (ON BEHALF OF THE WEST VIRGINIA CLASS)

718. Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:** CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

719.     Defendants have violated the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A-6-101, *et seq.*, through their unfair and/or deceptive practices.

**ANSWER:**     Paragraph 719 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 719 of the Complaint.

720.     During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the West Virginia Class to pay these supracompetitive prices.

**ANSWER:**     Paragraph 720 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 720 of the Complaint.

721.     Defendants misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market.

**ANSWER:**     Paragraph 721 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 721 of the Complaint.

722.     In turn, Defendants misled Dealership Plaintiffs and members of the West Virginia Class as purchasers and/or consumers of those products.

**ANSWER:**     Paragraph 722 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 722 of the Complaint.

723.     Dealership Plaintiffs and members of the West Virginia Class have suffered an ascertainable loss of money and/or property as a result of Defendants' concerted actions.

**ANSWER:**     Paragraph 723 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 723 of the Complaint.

724.    Defendants' actions were not fair and honest competition, but rather were unreasonable in relation to the development and preservation of business and overall these actions were injurious to the public interest.

**ANSWER:**    Paragraph 724 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 724 of the Complaint.

725.    Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the West Virginia Class. Defendants' conduct substantially affected commerce and consumers in West Virginia throughout the Class Period.

**ANSWER:**    Paragraph 725 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 725 of the Complaint.

726.    In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the West Virginia Class.

**ANSWER:**    Paragraph 726 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 726 of the Complaint.

727.    Therefore, Dealership Plaintiffs and members of the West Virginia Class seek any and all relief, to the fullest extent allowable, under the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A-6-101, *et seq.*, and as equity so requires.

**ANSWER:**    Paragraph 727 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition.  CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore denies that Plaintiffs are entitled to the relief they seek.  CDK denies the remaining allegations in paragraph 727 of the Complaint.

## COUNT L

## VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT, WIS. STAT. § 100.18, *ET SEQ.* (ON BEHALF OF THE WISCONSIN CLASS)

728.    Dealership Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

**ANSWER:**    CDK incorporates, as if fully set forth herein, its answers to the preceding paragraphs of the Complaint.

729.    Defendants have violated the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, *et seq.*, through their unfair and/or deceptive practices.

**ANSWER:**    Paragraph 729 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 729 of the Complaint.

730.    During the Class Period, Defendants have acted unlawfully by: (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and causing Dealership Plaintiffs and members of the Wisconsin Class to pay these supracompetitive prices.

**ANSWER:**    Paragraph 730 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 730 of the Complaint.

731.    Defendants misrepresented that the prices of their DMS and DIS were competitive and set by a free and fair market.

**ANSWER:**    Paragraph 731 of the Complaint states legal conclusions to which no answer is required.  To the extent that an answer may be required, CDK denies the allegations in paragraph 731 of the Complaint.

732.    In turn, Defendants misled Dealership Plaintiffs and members of the Wisconsin Class as purchasers and/or consumers of those products.

**ANSWER:** Paragraph 732 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 732 of the Complaint.

733. These statements came in the form of affirmative misrepresentations and material omissions of information important to Dealership Plaintiffs and members of the Wisconsin Class.

**ANSWER:** Paragraph 733 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 733 of the Complaint.

734. Dealership Plaintiffs and members of the Consumer Protection Class have suffered an ascertainable loss of money and/or property as a result of Defendants' concerted actions. Defendants' unlawful, unfair, and/or deceptive trade and business practices were a direct and proximate cause of actual injury to Dealership Plaintiffs and members of the Wisconsin Class.

**ANSWER:** Paragraph 734 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 734 of the Complaint.

735. Defendants' conduct substantially affected commerce and consumers in Wisconsin throughout the Class Period. In addition, Defendants have fraudulently concealed their actions from Dealership Plaintiffs and members of the Wisconsin Class.

**ANSWER:** Paragraph 735 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies the allegations in paragraph 735 of the Complaint.

736. Therefore, Dealership Plaintiffs and members of the Wisconsin Class seek any and all relief, to the fullest extent allowable, under the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, *et seq.*, and as equity so requires.

**ANSWER:** Paragraph 736 of the Complaint states legal conclusions to which no answer is required. To the extent that an answer may be required, CDK denies that it has violated any applicable law or harmed competition. CDK further denies that Plaintiffs or any other individuals or entities have suffered any injury as a result of any action or conduct of CDK and therefore

denies that Plaintiffs are entitled to the relief they seek. CDK denies the remaining allegations in paragraph 736 of the Complaint.

## **PRAYER FOR RELIEF**

WHEREFORE, Dealership Plaintiffs requests that the Court enter judgment in their favor, and against Defendants and order the following relief:

(a)      Certification of the action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Dealership Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

(b)      Declaring that the unlawful horizontal agreement alleged in Counts I and II be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(c)      Declaring that the exclusive dealing provisions alleged in Counts III and IV be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(d)      Declaring that the monopolization of the after-market for DIS on CDK DMS alleged in Count V be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(e)      Declaring that the monopolization of the after-market for DIS on Reynolds DMS alleged in Count VI be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(f)      Declaring that the conduct alleged herein constitutes unconscionable and/or unfair business acts or practices in violation of the various state laws alleged herein in Counts VI-L;

(g)      Permanent injunctive relief which enjoins Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claims to act on their behalf, from, in any manner, continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and from otherwise violating the antitrust laws by entering into and carrying out their illegal agreements, and requires them to take affirmative steps to dissipate the effects of the violation;

(h)      Awarding damages for all damages arising from Defendants' unlawful conspiracy in restraint of trade as alleged herein, as provided under the

Sherman Act, State Antitrust Acts, and the State Consumer Protection Acts, and holding Defendants jointly and severally liable for all damages;

(i) Declaring that Dealership Plaintiffs and the Class recover treble their damages as caused by the conspiracy alleged herein, as provided by law, and that judgment in favor of Dealership Plaintiffs and the Class be entered against Defendants in that amount;

(j) By awarding Dealership Plaintiffs and Class members prejudgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the complaint in this action;

(k) Ordering that Dealership Plaintiffs and Class members recover their costs of this suit, including reasonable attorneys' fees and costs, as provided by law; and

(l) Such other and further relief as the Court deems just and proper.

**ANSWER:** To the extent that an answer may be required to the Prayer for Relief at the end of the Complaint, CDK denies each and every allegation contained therein and denies that Plaintiffs are entitled to the relief they seek.

## DEMAND FOR JURY TRIAL

737. Trial by jury is demanded on all issues so triable.

**ANSWER:** To the extent that an answer may be required to the Jury Demand at the end of the Complaint, CDK denies each and every allegation therein. CDK further states that Plaintiffs who licensed DMSs from CDK (including Continental Acura; Baystate Ford; Cherry Hill Jaguar; Warrensburg Ford; Continental Toyota; Continental Autosports; Continental Mitsubishi; Continental Honda; Continental Nissan; Stevens Jersey City Ford; Smithtown Ford & Lincoln; Olathe Toyota; Marshall Chrysler; Continental Mazda; Continental Audi; Stevens Ford; Pitre Kia; Pitre Buick; Waconia Dodge; Warrensburg Chrysler) have waived any right to trial by jury they might otherwise have had by operation of the CDK Master Services Agreements they each signed therefore, are not entitled to trial by jury on any of their claims.

PUBLIC VERSION

### DENIAL

CDK denies each and every allegation of the Complaint not specifically admitted above.

### AFFIRMATIVE AND ADDITIONAL DEFENSES

Without assuming any burden of proof that it would not otherwise bear, CDK also asserts the following affirmative and additional defenses:

### First Defense

The Complaint fails to state a claim upon which relief may be granted.

### Second Defense

For the reasons stated in CDK's Counterclaims, Plaintiffs' and the putative classes' actions are illegal independent of any conduct or action by CDK. As such, all of Plaintiffs' and the putative classes' claims are barred as a matter of law. Restraint of illegal trade is not redressable under the antitrust laws, and because Plaintiffs' and the putative classes' claims are based on Plaintiffs' and the putative classes' illegal business activities, Plaintiffs and the putative classes lack antitrust injury.

### Third Defense

Plaintiffs' and the putative classes' claims are barred, in whole or in part, by the applicable statute of limitations. The first class action complaint to be consolidated in this action was filed on October 19, 2017. Plaintiffs have not pled any event that would toll any applicable limitations period. As such, the statutory time limitation applicable to some or all of each of Plaintiffs' and the putative classes' claims has passed and thus are time-barred.

### Fourth Defense

If and to the extent that Plaintiffs and members of the putative classes have been damaged, which CDK denies, the amount of damages that Plaintiffs allege to have suffered is too remote or

speculative to allow recovery, and it is impossible to ascertain and allocate such alleged damages with reasonable certainty.

## Fifth Defense

If and to the extent Plaintiffs and members of the putative classes have been damaged, which CDK denies, Plaintiffs and members of the putative classes, by the exercise of reasonable diligence, could have mitigated their damages but did not, and Plaintiffs and the putative classes are therefore barred from recovery. Alternatively, any damages sustained by Plaintiffs and the putative classes, which CDK denies, must be reduced by the amount that such damages would have been reduced had Plaintiffs and the putative classes exercised reasonable diligence in mitigating their damages.

## Sixth Defense

Plaintiffs' and the putative classes' claims are barred, in whole or in part, based on the doctrines of estoppel, laches, and waiver, as Plaintiffs' and the putative classes' claims are based, in part, on actions and events spanning more than 10 years. Plaintiffs have pled no facts to explain or justify why this lawsuit was filed when it was filed. To the extent that Plaintiffs and the putative classes could have brought essentially the same suit years earlier, Plaintiffs are barred from pursuing all or part of their claims by the doctrines of estoppel and laches.

## Seventh Defense

Plaintiffs' and the putative classes' claims are barred, in whole or in part, because CDK's conduct was pro-competitive, reasonable and permissible, and was based on independent, legitimate, and self-interested business and economic justifications.

**PUBLIC VERSION**

### Eighth Defense

Plaintiffs' and the putative classes' claims are barred, in whole or in part, because Plaintiffs and the putative classes have not suffered any legally cognizable injury, including because Plaintiffs have not suffered any injury-in-fact and their alleged injuries are too speculative, indirect, and remote from the alleged conduct, and cannot be ascertained and apportioned.

### Ninth Defense

Plaintiffs' and the putative classes' claims are barred, in whole or in part, because none of CDK's alleged actions or omissions substantially lessened competition within any properly defined market.

### Tenth Defense

Plaintiffs' and the putative classes' claims are barred, in whole or in part, because to the extent Plaintiffs or any member of the putative classes have suffered any injury or incurred any damages as alleged in the Complaint, which CDK denies, CDK's alleged conduct was not the actual or proximate cause of any such injury or damage.

### Eleventh Defense

Plaintiffs' and the putative classes' claims are barred, in whole or in part, because to the extent Plaintiffs or any member of the putative classes suffered any injury or incurred any damages as alleged in the Complaint, which CDK denies, any such injury or damage was caused and brought about by the acts, conduct, or omissions of individuals or entities other than CDK, and, as such, any recovery herein should be precluded or diminished in proportion to the amount of fault attributable to such other individuals or entities.

### Twelfth Defense

Plaintiffs' and the putative classes' claims are barred, in whole or in part, because to the extent Plaintiffs and the putative classes suffered any injury or incurred any damages as alleged in the Complaint, which CDK denies, any such injury or damage was caused and brought about by intervening or superseding events, factors, occurrences, conditions, or acts of others, including forces in the marketplace, and not by the alleged wrongful conduct on the part of CDK.

### Thirteenth Defense

Plaintiffs' and the putative classes' claims are barred, in whole or in part, because any recovery would result in unjust enrichment to Plaintiffs and the putative classes.

### Fourteenth Defense

Plaintiffs' and the putative classes' claims are barred, in whole or in part, because their alleged damages, if any, are too speculative, uncertain. and not of the nature or to the extent alleged.

### Fifteenth Defense

Plaintiffs' and the putative classes' claims are barred, in whole or in part, because the Complaint has insufficiently alleged a relevant product market and geographic market and is so vague and ambiguous as to deny CDK notice of the markets alleged by Plaintiffs.

### Sixteenth Defense

Some or all of Plaintiffs' and the putative classes' claims are subject to valid and enforceable contractual limitations on liability and damages.

\* \* \* \* \* \*

In addition, CDK has insufficient knowledge or information upon which to form a basis as to whether it may have additional, as yet unstated, separate defenses or counterclaims available to

**PUBLIC VERSION**

it. CDK reserves the right to amend this Answer to add, supplement, or modify defenses and counterclaims based upon legal theories that may be or will be divulged through clarification of the Complaint, through decisions of the Court, through discovery, or through further factual or legal analysis of Plaintiffs' allegations, contentions, and positions in this litigation.

## JURY DEMAND

If the Court determines that Plaintiffs, or any subset of Plaintiffs, are entitled to a trial by jury on their affirmative claims, CDK hereby demands, pursuant to Federal Rules of Civil Procedure, Rule 38(b), trial by jury on its defenses against those Plaintiffs. If the Court determines that Plaintiffs are not entitled to a trial by jury on any their affirmative claims, pursuant to Federal Rules of Civil Procedure, Rule 38(b), CDK does not demand trial by jury on any of its defenses.

## PRAYER FOR RELIEF

WHEREFORE, CDK requests that Plaintiffs' Complaint be dismissed with prejudice, that the Court find that Plaintiffs are not entitled to any judgment or relief, that the Court enter judgment in favor of CDK, and that the Court award CDK its attorneys' fees, costs, and expenses, pre-judgment interest, and such other and further relief as the Court deems just and proper.

**PUBLIC VERSION**

## COUNTERPLAINTIFF CDK GLOBAL'S COUNTERCLAIMS
## AGAINST CERTAIN DEALERSHIP PLAINTIFFS

CDK Global, LLC ("CDK" or "Counter-Plaintiff") brings these Counterclaims against Counter-Defendants ACA Motors, Inc., Continental Classic Motors, Inc., 5800 Countryside, LLC, HDA Motors, Inc., H & H Continental Motors, Inc., Continental Autos, Inc., Naperville Zoom Cars, Inc., NV Autos, Inc., Baystate Ford Inc., Cliff Harris Ford, LLC, Marshall Chrysler Jeep Dodge, L.L.C., Warrensburg Chrysler Dodge Jeep, L.L.C., Cherry Hill Jaguar, JCF Autos LLC, Jericho Turnpike Sales LLC, Patchogue 112 Motors LLC, and Waconia Dodge, Inc., (collectively, "Counter-Defendants" or "Dealership Counter-Defendants") for breach of contract and for violations of the Computer Fraud and Abuse Act ("CFAA") and the Digital Millennium Copyright Act ("DMCA").

CDK alleges the following based upon information and belief, except as to those allegations set forth below that are based on CDK's knowledge.

## INTRODUCTION

1.     CDK brings these counterclaims in response to the Dealership Counter-Defendants flagrant and repeated breaches of their contracts and violations of federal law protecting access to secure computer systems. CDK licenses access and use of its dealer management system ("DMS") software to the Dealership Counter-Defendants pursuant to Master Services Agreements that expressly prohibit automated third-party access. That prohibition is designed to allow CDK to monitor and protect the sensitive data in its DMS—including highly sensitive consumer information and proprietary information owned by CDK as well as third parties—and ensure optimal system performance and data integrity in this age of ever growing cybersecurity threats.

2.     The Dealership Counter-Plaintiffs have repeatedly breached their contracts with CDK by handing out their DMS login credentials, directly or through their software vendors, to

PUBLIC VERSION

third party data extractors, including Authenticom (another Plaintiff in this MDL), for the express purpose of enabling those third parties to use those credentials to repeatedly and relentlessly access CDK's DMS using sophisticated computer software that extracts (or "scrapes") large volumes of data from the system. Many of these data extractors—including Authenticom—then resell that data to other third party application providers, paying nothing to CDK. This unauthorized access not only threatens the security of the data in CDK's DMS, it threatens the integrity of that data because ungoverned extraction and insertion of data into the DMS may corrupt the DMS databases. Moreover, the thousands upon thousands of unauthorized extractions and the high volume of data in many of those extractions degrade the performance of the DMS, impairing its value for all of CDK's DMS customers.

3.      In knowingly providing login credentials to these data extractors and, actively or passively, "authorizing" them to access CDK's DMS to extract or insert data—including data that does not belong to the Dealership Counter-Defendants—the Dealership Counter-Defendants have breached their contracts with CDK. This conduct also violates the CFAA, which prohibits unauthorized access to protected computer systems. In addition, certain Dealership Counter-Defendants—and numerous members of the putative class—have engaged in further unlawful conduct that violates the DMCA. CDK requests that the Court enjoin the Dealership Counter-Defendants' illegal conduct and award CDK damages.

## PARTIES

4.      Counter-Plaintiff CDK Global, LLC is a Delaware limited liability company with its corporate headquarters and principal place of business at 1950 Hassell Road, Hoffman Estates, Illinois 60169. CDK is a global provider of integrated information technology and digital marketing solutions to the automotive retail industry.

PUBLIC VERSION

5.     The automotive data ecosystem that CDK supports is massive, with tens of thousands of installations of approved vendor applications and millions of transactions every day, supporting hundreds of billions of dollars in commerce each year. CDK has made tremendous investments to build out and support its network of product and service offerings. Over the last four years alone, CDK has spent more than $480 million researching, developing, and deploying new and enhanced product solutions for its customers.

6.     In light of its network's size, scope, and importance to the American economy, CDK has been designated by the Department of Homeland Security as a Critical National Infrastructure "so vital to the United States that [its] incapacitation would have a debilitating effect on security [and] national economic security."[1]

**The Continental Counter-Defendants**

7.     Counter-Defendant ACA Motors, Inc., d/b/a Continental Acura ("Continental Acura"), is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 2275 Aurora Avenue, Naperville, Illinois.

8.     Counter-Defendant Continental Classic Motors, Inc., d/b/a Continental Autosports ("Continental Autosports"), is an Illinois corporation with its principal place of business located at 420 E. Ogden Avenue, Hinsdale, Illinois.

9.     Counter-Defendant 5800 Countryside, LLC, d/b/a Continental Mitsubishi ("Continental Mitsubishi"), is an Illinois corporation with its principal place of business located at 5800 South La Grange Road, Countryside, Illinois.

---

[1] *See* Dep't of Homeland Security, What is Critical Infrastructure?, *available at* perma.cc/N8JR-YQ6Y.

PUBLIC VERSION

10. Counter-Defendant HDA Motors, Inc., d/b/a Continental Honda ("Continental Honda"), is an Illinois corporation with its principal place of business located at 5901 South La Grange Road, Countryside, Illinois.

11. Counter-Defendant H & H Continental Motors, Inc., d/b/a Continental Nissan ("Continental Nissan"), is an Illinois corporation with its principal place of business located at 5750 South La Grange Road, Hodgkins, Illinois.

12. Counter-Defendant Continental Autos, Inc., d/b/a Continental Toyota ("Continental Toyota"), is an Illinois corporation with its principal place of business located at 6701 South La Grange Road, Hodgkins, Illinois.

13. Counter-Defendant Naperville Zoom Cars, Inc., d/b/a Continental Mazda ("Continental Mazda"), is an Illinois corporation with its principal place of business located at 2363 Aurora Avenue, Naperville, Illinois.

14. Counter-Defendant NV Autos, Inc., d/b/a Continental Audi ("Continental Audi"), is an Illinois corporation with its principal place of business located at 1527 Aurora Avenue, Naperville, Illinois.

15. On information and belief, the foregoing entities (hereinafter the "Continental Counter-Defendants") share common ownership, managers, and employees and therefore operate as a single business unit. The Continental Counter-Defendants also share one DMS licensed from CDK.

**Counter-Defendant Baystate Ford**

16. Counter-Defendant Baystate Ford Inc. ("Baystate Ford") is a Massachusetts corporation with its principal place of business located at 703 Washington Street, South Easton, Massachusetts.

**PUBLIC VERSION**

**The Warrensburg Counter-Defendants**

17.     Counter-Defendant Cliff Harris Ford, LLC, d/b/a Warrensburg Ford ("Warrensburg Ford"), is a Missouri corporation with its principal place of business located at 330 E. Young Street, Warrensburg, Missouri.

18.     Counter-Defendant Marshall Chrysler Jeep Dodge, L.L.C. d/b/a Marshall Chrysler Jeep Dodge Ram ("Marshall Chrysler") is a Missouri corporation with its principal place of business located at 1450 W. Arrow Street, Marshall, Missouri.

19.     Counter-Defendant Warrensburg Chrysler Dodge Jeep, L.L.C. d/b/a Warrensburg Chrysler Dodge Jeep Ram Fiat ("Warrensburg Chrysler") is a Missouri corporation with its principal place of business located at 329 E. Young Street, Warrensburg, Missouri.

20.     On information and belief, the foregoing entities (hereinafter the "Warrensburg Counter-Defendants") share common ownership, managers, and employees and therefore operate as a single business unit. The Warrensburg Counter-Defendants also share one DMS licensed from CDK.

**Counter-Defendant Cherry Hill**

21.     Counter-Defendant Cherry Hill Jaguar ("Cherry Hill") is a New Jersey corporation with its principal place of business located at 2000 Route 70 East, Cherry Hill, New Jersey. Cherry Hill Jaguar uses a CDK DMS.

**The Stevens Counter-Defendants**

22.     Counter-Defendant JCF Autos LLC, d/b/a Stevens Jersey City Ford ("Stevens Jersey City Ford"), is a New Jersey corporation with its principal place of business located at 740 Route 440, Jersey City, New Jersey.

PUBLIC VERSION

23.     Counter-Defendant Jericho Turnpike Sales LLC, d/b/a Ford & Lincoln of Smithtown ("Smithtown Ford & Lincoln"), is a New York corporation with its principal place of business located at 440 Jericho Turnpike, Smithtown, New York.

24.     Counter-Defendant Patchogue 112 Motors LLC, d/b/a Stevens Ford ("Stevens Ford") is a New York corporation with its principal place of business located at 507 Route 112, Patchogue, New York.

25.     On information and belief, the foregoing entities (hereinafter the "Stevens Counter-Defendants") share common ownership, managers, and employees and therefore operate as a single business unit. The Stevens Counter-Defendants also share one DMS licensed from CDK.

**Counter-Defendant Waconia Dodge**

26.     Counter-Defendant Waconia Dodge, Inc. ("Waconia Dodge") is a Minnesota corporation with its principal place of business located at 905 Strong Drive, Waconia, Minnesota. Waconia Dodge uses a CDK DMS.

## NATURE OF THE COUNTERCLAIMS

27.     These counterclaims arise under the CFAA, the DMCA, and state common law causes of action for breach of contract.

28.     This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1331 and 1367(a). There is federal question jurisdiction under 28 U.S.C. § 1331, because CDK alleges violations of the CFAA and DMCA. There is supplemental jurisdiction over the state law counterclaims pursuant to 28 U.S.C. § 1367(a), because they are so related to CDK's federal-law counterclaims and the Dealership Counter-Defendants' affirmative claims against CDK that they form part of the same case or controversy.

29.     This Court has personal jurisdiction over the Dealership Counter-Defendants, because (a) many of the Dealership Counter-Defendants are located and do business in the District

in which this action was filed; (b) many of the actions giving rise to these counterclaims occurred in, and/or were directed from, this District; and/or (c) because the Dealership Counter-Defendants filed their complaint against CDK in this District.

30.　　Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c).

## FACTUAL ALLEGATIONS

### A.　CDK's DMS

31.　　CDK's DMS offering (referred to herein as "CDK's DMS" or "the CDK DMS") primarily consists of two enterprise software products—Drive and DASH—that provide dealers with proprietary software tools and resources used to manage core aspects of their business. CDK's DMS currently is licensed to more than 27,000 dealerships across the world and more than 8,000 new and used car dealerships in North America.

32.　　CDK has invested hundreds of millions of dollars to develop the hardware and software components of its DMS. CDK's DMS also includes, and is largely comprised of, valuable pieces of intellectual property, including patented technologies, proprietary software elements and programs created by CDK (including software programs protected by the copyright laws), and proprietary data collections, which are accessible through the DMS. At all relevant times, and as CDK's contracts with the Dealership Counter-Defendants and third parties make clear, the DMS has remained the sole and exclusive property of CDK. Dealers that purchase DMS services from CDK are granted a personal, non-transferable license to *use* CDK's DMS in accordance with the terms and conditions of their agreements.

33.　　CDK's DMS offering consists of software and hardware components residing at both the dealership ("dealership network") and at CDK's data centers ("CDK network").[2] CDK

---

[2] In a few instances, the server side of the DMS system is located on a dealership's premises rather than offsite at a CDK data center.

**PUBLIC VERSION**

uses state-of-the-art technology to secure the connections between the dealerships and the CDK network, including through specialized hardware at each dealership site. That hardware creates a "virtual private network" ("VPN") or "Leased-Line Multiprotocol Label Switching network" ("MPLS") between the dealership and the CDK network, which accepts direct communications only from computers on the corresponding dealership's network.

34. CDK's terminal program that runs on dealer computers is an original and independent work created and licensed by CDK. It consists of original and distinct elements, including its source and object code; distinctive screen layouts; graphical content; text; arrangement, organization, and display of information; and dynamic user experience.

35. In addition to its core functionalities, the CDK DMS stores voluminous amounts of financial and accounting information and highly sensitive data, including financial statements, accounting data, payroll information, sales figures, inventory, parts data, warranty information, appointment records, service and repair records, vehicle information, customer personal identifiable information, proprietary intellectual property, and proprietary data that belongs to CDK and third parties, including the data described below. CDK encrypts sensitive data in the DMS and appropriately expunges stale data regularly.

36. Data housed in CDK's DMS belongs to several different types of entities. Some data is proprietary to original equipment manufacturers ("OEMs") (*e.g.*, General Motors, Ford, Subaru), such as prices and part numbers for replacement parts, labor rates, and rebate, incentive, and warranty information. Other data in CDK's DMS is proprietary to third-party service providers, such as credit reporting bureaus like Equifax, Experian, and TransUnion. Still other data in the DMS is CDK's own proprietary, copyrighted data, including forms, accounting rules, tax tables, and proprietary tools and data compilations. And some data "belongs" to the dealers that

**PUBLIC VERSION**

use CDK's DMS. While access to third-party and CDK proprietary information in the DMS is permitted for licensed DMS customers, CDK is prohibited from sharing much of this information with other third parties absent a valid license.

### B.  Security Features to Control Access to CDK's DMS

37.  CDK's DMS is password protected. To access the DMS, each dealership employee must use his or her individual login credentials.

38.  Typically, at least one employee at each dealership using CDK's DMS has "system administrator" or "SA" level access privileges. A dealership employee who has testified in one of the cases within this MDL compared system administrator-level access to CDK's DMS to possessing "the keys to the kingdom." 06/27/2017 Tr. (*Authenticom* Dkt. 165) 2-A-9:10-11.[3] Users with system administrator-level privileges have the authority to create new accounts (and corresponding login credentials) for other dealership employees. They also have the ability to define the data and functions each employee may access within CDK's DMS by creating and assigning the employees different "roles." In other words, each user has access to the DMS that is commensurate with the access privileges assigned to his or her login credentials.

39.  Data maintained in CDK's DMS are used in four primary application areas: Accounting, F&I Sales, Parts, and Service. The login credentials that dealerships create for their employees can be configured to have general access to all four functions or just certain of them. Login credentials can also be configured to run reports, data queries, and writeback commands using what is known as an English Statement processor ("ENG"). Upon information and belief, the login credentials that the Dealership Counter-Defendants have provided to third-party data

---

[3] All references to the *Authenticom* case refer to Case No. 17-cv-00318 (W.D. Wis.).

**PUBLIC VERSION**

extractors like Authenticom to gain automated access to CDK's DMS are configured for ENG functionality and often have general access to most or all application areas.

40.     CDK has implemented security features in addition to password protection. In early 2016, CDK created a login prompt (image of screen prompt provided below) requiring users to certify that they were an "authorized dealer employee" before they could access CDK's DMS:



```
login: heidi
Password:
Last login: Thu Mar 24 09:10:10 from 139.126.150.113
A RAID EVENT has been reported in the raid event directory.
It is important to notify your CRR of this RAID EVENT as soon as possible.
The CDK Global DMS is for authorized Dealer personnel only.
Use or access by unauthorized third parties is prohibited.
Those using this system without authorization will be denied
access and may have their services revoked.
Enter "YES" to confirm you are an authorized dealer employee
in order to continue,  enter "NO" to exit this program.
yes
```

41.     Further, in November 2017, CDK began introducing a CAPTCHA control for particular login credentials that CDK suspected were being used to facilitate unauthorized access to its DMS by third parties. Humans can easily pass CAPTCHA tests, but automated scripts—like the ones that Authenticom and other third party data extractors use—often encounter difficulty. Thus, CAPTCHA controls are specifically designed to prevent access to computers through automated means. CDK implemented the following CAPTCHA control:



42.     The CAPTCHA states that "[o]nly dealer personnel are authorized to use the CDK Global DMS. Use or access by unauthorized third parties is strictly prohibited and is in violation of the terms on which CDK licenses its software and services. Machine/automated access . . . or issuing of user names and passwords for third party use is considered non-authorized access." The CAPTCHA then requires the user to identify a word or series of letters and numbers, as shown in the example above, to "confirm you are an authorized dealer employee" before allowing the user to login to the CDK DMS.

### C.     The MSAs Between CDK and Dealership Counter-Defendants.

43.     CDK has entered into a Master Service Agreement ("MSA") with each of the Dealership Counter-Defendants (collectively, the "MSAs"). The MSAs expressly prohibit the Dealership Counter-Defendants from allowing third-parties to access CDK's DMS.

PUBLIC VERSION

44. The MSA between CDK and its dealer customers prohibits those dealers from supplying DMS login credentials to third parties or otherwise granting third parties access to CDK's DMS: "Client shall not allow access to [the CDK DMS] by any third parties except as otherwise permitted by this agreement." MSA § 6(D).

45. In addition, each CDK dealer expressly agrees, among other things, that it will only use CDK's software "for its own internal business purposes and will not sell or otherwise provide, directly or indirectly, any of the Services or Software,[4] or any portion thereof, to any third party" (*id.* § 6(B)); and that it will "treat as confidential and will not disclose or otherwise make available any of the [CDK] Products (including, without limitation, screen displays or user documentation) or any … proprietary data, information, or documentation related thereto … in any form, to any person other than employees and agents of [the dealer]…" (*id.* § 6(D)). Each dealer also acknowledges that notwithstanding its license to use the CDK DMS, the DMS remains at all times "the exclusive and confidential property of [CDK]." *Id.* § 6(A).

46. Additionally, CDK's MSA independently prohibits "ANY THIRD PARTY SOFTWARE TO ACCESS THE [CDK] DEALER MANAGEMENT SYSTEM EXCEPT AS OTHERWISE PERMITTED BY THIS AGREEMENT." *Id.* § 6(B).

47. Every version of CDK's standard MSA since at least 1994 has expressly stated that dealers are prohibited from permitting unauthorized third parties to access their licensed DMS. Further, the language quoted from Section 6 has remained substantially the same in every version of the MSA since approximately 2010.[5]

---

[4] In some of the Dealership Counter-Defendants' MSAs, ███████████████████████ ████████████████████████████████████████████

[5] Later MSAs with other dealers include these confidentiality restrictions in Section 4, but each MSA applicable to the Dealer Counter-Defendants contains these provisions in Section 6.

**PUBLIC VERSION**

48. Each of the Dealership Counter-Defendants has entered into an MSA with CDK containing these provisions.

49. As discussed above, CDK's MSAs prohibit the Dealership Counter-Defendants from providing access to the CDK DMS "to any person other than employees *and agents* of [the dealer] with a need-to-know." Third party hostile data extractors like Authenticom are not "agents" of the Dealership Counter-Defendants. Indeed, Authenticom's own contract with dealers makes clear that Authenticom is <u>not</u> the dealer's "agent," and in fact refers to "agents" of the dealer repeatedly as third parties to the agreement. Pl. P.I. Ex. 28 (*Authenticom* Dkt. 65-3) §§ 1.12, 3.2, 8.1, 10.4. Similarly, the standard End-User License Agreement ("EULA") offered by Superior Integrated Solutions, another third party data extractor, states that "[t]he parties shall be independent contractors under this Agreement, and nothing herein will constitute either party as the employer, employee, *agent* or representative of the other party, or both parties as joint ventures or partners for any purpose." EULA § 10.6 (emphasis added).[6]

50. Moreover, even if an "agent" exception existed (and it does not), the MSA independently prohibits "ANY THIRD PARTY SOFTWARE TO ACCESS THE CDK DEALER MANAGEMENT SYSTEM." MSA § 6(B).

**D. CDK's 3PA Program**

51. Introduced by CDK in 2000, the third party access program, or "3PA,"[7] is a CDK DMS interface that currently provides managed, bi-directional integration between software applications (sometimes referred to as "layered applications" or "layered apps") and CDK's DMS.

---

[6] https://superiorintegratedsolutions.com/eula_licensing-agreementnew.pdf (visited February 22, 2019).

[7] Today, the 3PA program is now known as the CDK Global Partner Program. For the Court's convenience, however, these counterclaims refer to CDK's third-party access program as the "3PA" program notwithstanding the name change.

**PUBLIC VERSION**

By way of example, the third-party marketing website TrueCar generates sales leads on behalf of dealerships. TrueCar integrates with CDK's DMS through the 3PA program to access sales transaction data, which it uses to validate vehicle sales based on TrueCar leads. This is one example of hundreds of third-party applications that use CDK's 3PA program.

52.    CDK has implemented technical and contractual restrictions to prevent unauthorized access to material that is protected by applicable law, including federal copyright law, within its DMS. As discussed above, CDK places access restrictions on its DMS, including secure login credentials and CAPTCHA controls. Additionally, CDK limits each third party's access to the categories of data and permissions the third party needs for the applications it provides. CDK also audits third-party integration, including which data elements in the DMS are being accessed by each 3PA program participant and how frequently they are being accessed.

53.    Each vendor participating in the 3PA program enters into a written agreement with CDK, which grants the vendor a limited, non-transferrable license to use the CDK Interface System to access, send, and/or receive certain data on the DMS solely for the purpose of providing specific application services to CDK dealers. These applications are described in detailed Statements of Work ("SOWs") that accompany the vendor's 3PA contract with CDK. From the inception of the 3PA program, CDK's standard 3PA contracts have strictly prohibited the unauthorized syndication (*i.e.*, the further transfer or sale) of any data obtained through the 3PA program to third parties and have required 3PA program participants to use the data only in connection with providing the specific application services identified in their SOWs. These restrictions are designed to ensure that 3PA program participants are the end user of the data they access and their access is limited to what is necessary to support the applications that they have certified in the 3PA program.

### 1.    3PA Certification Requirements

54.    The 3PA certification process consists of four phases: Orientation and Planning; Development; Certification; and finally, Deployment. During the Orientation and Planning stage, CDK works with third-party application vendors to determine their integration requirements, including the scope, workflows, frequency of access, and required data elements. CDK then proposes (and the parties agree to) an integration plan, which includes specifications for pre-defined integration points ("PIPs") and other details of the integration. In the Development stage, the vendor builds the components of its application that will interface with CDK's DMS. The vendor's requested integrations are then configured and rigorously tested in a special staging environment using a "test" dealer linked to a set of accounts on a server that contain sample data. Vendors are expected to implement logging into their integration framework, including the complete request and response for each data extraction, writeback command, etc. Logging is used to both troubleshoot any issues created by the interface and validate the precise data elements that are being copied from and/or written back to the CDK DMS. At the Certification stage, these results are verified and a final version of the software that the vendor plans to deploy is tested once again. Only after these steps are successfully completed does the application enter Deployment, when the application's interface is actually released into the ecosystem. Each step is designed by CDK to protect the security, integrity, and performance of its DMS.

55.    Each third party certified under 3PA enters into a written agreement with CDK, including a Statement of Work that describes the integration (including the specific "PIPs") called for by the integration plan. In addition, among other things, the agreement obligates the vendor to access CDK's DMS only through CDK's approved interface. The vendor also agrees to work with CDK on an ongoing basis to ensure that the integration remains healthy as both CDK's DMS and the third party's software evolves. The agreement imposes liability on the vendor for misuse of the

**PUBLIC VERSION**

system or the data and requires the vendor to obtain written consent from the dealer before accessing its licensed DMS and to refrain from re-syndicating the data to unapproved third parties. Further, the agreement indemnifies CDK for the vendor's failure to comply with data collection, privacy, and other applicable laws and regulations.

56.     CDK charges third-party participants in the 3PA program fees for the integration services it provides. These fees allow CDK to recoup its investment in both the 3PA program and the DMS itself and compensate CDK for the value of its services and the intellectual property that makes secure data integration with CDK's DMS possible.

### 2.     Alternatives to 3PA

57.     While many dealers and vendors exchange data through the 3PA program, it is not the only way that data residing on CDK's DMS can be exchanged. CDK's flagship DMS product, Drive, includes several reporting tools that dealers can use to compile and export their operational data, which they can use or distribute to third parties—including third-party application providers and entities like Authenticom. Some of these are the same reporting tools that unauthorized third parties use when they access the DMS using dealer-issued login credentials—the difference being that when a dealer uses those tools, the actual dealership employee running the reports does not call them up hundreds or thousands of times throughout the day and night to constantly query data. Additional reporting tools are also available to Drive users on an add-on basis.

58.     CDK dealers can and do use these reporting tools to share data with third-party vendors, often instead of having those vendors access CDK's DMS through the 3PA program. This approach is not only viable; it is specifically approved by the National Auto Dealers Association ("NADA"), which published a set of data security guidelines for dealers in 2014 suggesting that dealers should "consider implementing a strict data 'push' system for sharing data." Defs. P.I. Ex. 16 (*Authenticom* Dkt. 106-16).

59. Upon information and belief, several CDK dealers elect to "push" data to Authenticom and other third party data extractors that they obtain themselves from the CDK DMS using the reporting tools described above. Authenticom, and upon information and belief the other extractors, accept data from dealers in this manner.

60. In addition, other DMS providers permit third-party access to their systems (including by Authenticom) outside of a certification program and/or without requiring those third parties to pay integration fees. If some dealers prefer that system, they are free to switch DMS providers. Some dealers have switched; many others have stayed or switched *to* CDK since it began taking steps to prevent unauthorized third-party access to its DMS. Indeed, Dealership MDL Plaintiff Kenny Thomas Enterprises, Inc. d/b/a Olathe Toyota terminated its contract with CDK and switched to another DMS provider, DealerBuilt, in or around August 2018.

## E. Hostile Access to CDK's DMS

### 1. Hostile Data Extractors

61. With Dealership Counter-Defendants' active assistance and encouragement, third parties have, without CDK's authorization and without paying any compensation to CDK, repeatedly accessed CDK's DMS using dealer-provided login credentials to extract data and then re-sell it to third party application providers.

62. Among the most egregious hostile third party data extractors is Authenticom. Authenticom refers to itself as a "dealer data integration provider," *Authenticom* Compl. ¶ 2 (*Authenticom* Dkt. 1), but that is a fiction. Authenticom admits that it offers "no *actual* 'integration'" with CDK's DMS "in the traditional sense," only "data access." *Id.* ¶ 54 n.4 (emphasis added).

63. Authenticom is a free rider. Its business model revolves around gaining free access to DMSs (including CDK's DMS), extracting and exporting the data from those DMSs, often

**PUBLIC VERSION**

copying it into its own system, and then selling the data to third parties—principally vendors that provide software applications to support the dealers' operations.

64.     Authenticom does not engage in these bad acts on its own. To the contrary, it actively seeks out assistance from "████████████████"[8] who supply Authenticom with DMS login credentials—in clear violation of the dealer's contract with CDK—and install Authenticom's software scripts and programs on the dealer's own computers. These scripts and programs not only allow Authenticom to access CDK's DMS at will, but have also been used to automatically re-enable Authenticom's dealer-provided login credentials minutes after CDK has disabled them after detecting Authenticom's unauthorized access. As detailed below, each Dealership Counter-Defendant was a "████████" CDK dealer who engaged in unlawful conduct to assist Authenticom and other hostile third-party vendors.

65.     Once Authenticom has collected data from CDK's DMS by its unauthorized and unlawful methods, it often exports the data to its own mirrored database known as "DealerVault." From there, Authenticom sells access to the data—precisely what it takes from CDK for free—to other third-party vendors, all with the dealers' active encouragement and "authorization."

66.     

████████████████████████████████[9] Authenticom software engineer ████████ created

---

[8] Ex. 1, AUTH_00058562.
[9] Ex. 2, AUTH_00109383.

67.     When Authenticom accesses CDK's DMS using dealer-issued login credentials from a computer running on the dealer's network, Authenticom's CEO Steve Cottrell admits that the intent is to "emulate" an ordinary dealership employee (whose access would be permitted under the dealer's MSA). 06/26/2017 Tr. (*Authenticom* Dkt. 164) 1-A-108:15-19.

68.     Despite these and other efforts to evade detection, the repetitive queries run by Authenticom's and other third parties' scripts create a distinct usage pattern. And often, the dealer-created login credentials that Authenticom or other third parties use are themselves identifying, *e.g.*, "authcom," "dlrvault," and "acom." By identifying usage patterns and login credentials linked to particular hostile third parties, CDK does its best to track, monitor, and attempt to mitigate the adverse effects of this unauthorized access to its systems.

69.     Other third parties besides Authenticom engage in similar illegal conduct on behalf of dealers, including the Dealership Counter-Defendants. For example, as further detailed below, certain of the Dealership Counter-Defendants have facilitated hostile access by third party Dealertrack (another Plaintiff in this MDL) in violation of each dealer's MSA. Dealertrack provides a number of third party applications and, in connection with those applications, has used dealer-issued login credentials to gain unauthorized access to CDK's DMS. Dealertrack repeatedly accesses CDK's DMS and queries the CDK DMS in large volumes. For example, between ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, a login credential provided by the Continental Counter-Defendants for use by Dealertrack accessed files in CDK's DMS at least ▮▮▮▮ times, or over ▮ times per day on average.

### 2.     Misappropriation of Proprietary Information

70.     Each and every time that an unauthorized or "hostile" third party like Authenticom accesses CDK's DMS using dealer-provided login credentials, that third party uses valuable pieces of CDK's intellectual property, including patented technologies and original software elements

PUBLIC VERSION

and programs. For example, as confirmed by sworn witness testimony, Authenticom has illegally obtained copies of CDK's DMS software and loaded that software onto Authenticom's own computers and servers. Former Authenticom software engineer ████████ testified that ██████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████. Authenticom employees then ███████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████.[10]

71.     Further, each and every time that Authenticom accesses the CDK DMS, it creates a copy of portions of the DMS program code in the computer's Random Access Memory, as well as copies of the original and distinctive page layouts; graphical content; text; arrangement, organization, and display of information; and dynamic user experience. On information and belief, other unauthorized third party data extractors accomplish the same result.

72.     In addition, queries by third-party data extractors regularly access files containing proprietary information that belongs to neither the third-party data extractor nor the dealers it purports to serve. For example, Authenticom's queries regularly access certain files—called the "PARTS," "OP-CODES," and "WIP-HISTORY" files—that are maintained in the CDK DMS. Each of these files contains OEM proprietary data, such as part costs and pricing information and service labor rates. As noted above, under the terms of its agreements with the OEMs, CDK is contractually restricted from sharing this data with unlicensed third parties.

73.     Authenticom's unauthorized access to these files is rampant. For example, an investigation performed by CDK in June 2017 showed that in just the preceding 30 days,

---

[10] Ex. 3, AUTH_00153602.

Authenticom ran queries ███████████████████████████████████████████

█████████████████████████████████████████████████.

74.     Even when Authenticom does not access proprietary data directly, it often accesses and copies data that were created using CDK and third-party proprietary forms and functions within the DMS. For example, dealers use CDK's proprietary programs to calculate the expected monthly payment for a financed car deal based on inputs like the sale price, the customer's down payment, and the term. All four data elements in this example—including the monthly payment calculated using CDK's proprietary dataset—are stored in the DMS files that Authenticom can, using dealer login credentials, access, scrape, and copy into its mirrored DealerVault database.

75.     Access by other unauthorized third parties, including Dealertrack, poses similar risks to CDK's DMS. As noted above, Dealertrack accessed CDK's DMS over ████ times using a single login credential provided by the Continental Counter-Defendants and accessed data from the DMS. Further, between ██████████████████████, Dealertrack used a username provided by Waconia Dodge to run ENG queries in CDK's DMS ████ times to pull data from the DMS, or approximately ███ times per day. Further examples of Dealertrack's unauthorized access, enabled by the Dealership Counter-Defendants, are discussed below.

### 3.     Burdens On System Performance

76.     Unauthorized, automated methods of accessing and extracting data like those used by Authenticom place considerably more strain on CDK's DMS than approved third-party access through the 3PA interface or the ordinary dealership employees for whom access was designed, degrading system performance and consuming valuable computing resources.

77.     Third-party application providers often seek to replicate a narrow subset of data in the CDK DMS in their own databases. For example, a vendor offering a service appointment scheduling application may need to maintain up-to-date sets of service and repair order data from

PUBLIC VERSION

the DMS for each dealer it serves. This normally requires priming the vendor's database with a full dataset once, when the vendor begins providing services, and then updating the vendor's dataset with changes on an ongoing basis. In the 3PA program, vendors work with CDK to develop efficient data queries that retrieve only new data, cutting down on extraction of duplicative records and conserving computing resources. Nearly half of the third-party data extractions that occur through the 3PA interface are minimized in this manner.

78.     Third-party data extractors, however, do not update datasets with only the new data that they need to stay current. Instead, they often pull a complete set of data *every* time they access CDK's DMS, and run queries constantly in an attempt to mimic the *bona fide* integration available to vendors through the 3PA program. Authenticom repeats this process throughout the day for hundreds of dealers, adding to the cost of the computing services that CDK must provide to each of them. In one instance, CDK observed that Authenticom's scripts hit a single CDK server with ███████ large data pulls in a single day. On information and belief, other unauthorized third parties similarly pull massive datasets in a manner that overburdens CDK's system.

79.     Among the many guidelines and requirements of the 3PA program, vendors are restricted in most cases from performing bulk extraction queries between 5:00 a.m. and 10:00 p.m. The purpose of this restriction is to minimize system burden and performance degradation caused by third-party access during dealership business hours. These restrictions cannot be enforced against unauthorized third-party data extractors. Authenticom, for example, ████████████████ ████████████████████████████████████████████████

80.     Investigations of Authenticom's data extraction methods also show that Authenticom burdens CDK's systems with poorly-constructed, inefficient and repetitive queries that extract too much data, too frequently, and during peak dealer business hours. For example,

CDK has found ████████████████████████████████████████████████████

████████████████████████████ In addition, CDK's analyses have shown that Authenticom is

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

81.     One of the reasons that CDK includes a contractual restriction on dealers' enabling of third party access to CDK's system is so that CDK can control and monitor who has access to its system to ensure that access does not degrade the DMS's performance. But because Authenticom and other unauthorized third parties essentially hack into the CDK DMS outside the 3PA interface and use automated methods to extract data through decentralized interfaces that were designed for manual use by dealership employees, CDK effectively has no control over the queries that these third parties run or how frequently those queries are run. CDK then struggles to manage the strain on system resources and mitigate any performance issues that result.

82.     The burdens on CDK's DMS that result from unauthorized third party access and querying are real and measurable. For example, in some instances, Authenticom accesses more than ██ times the number of records that a vendor would access if it were to obtain a comparable dataset using CDK's managed 3PA interface. Authenticom's inefficient and poorly constructed queries ███████████████████████████████████████████ than comparable queries executed through the 3PA interface. At times, for at least some dealers, Authenticom's constant querying ███████████████████████████████████████. On information and belief, querying by other unauthorized third parties has similar effects. For example, the repetitive and voluminous data queries by Dealertrack discussed above affect CDK's DMS in a similar way to such queries by Authenticom.

### 4.    Data Corruption Risks

83.    An internal report prepared in 2013 by CDK's former parent company Automatic Data Processing, Inc. ("ADP") found that *all* of the more than 2,900 CDK DMS servers examined had some level of data corruption issues, many of which were attributable to "hostile," unauthorized access to the DMS similar to Authenticom's methods of access.

84.    Moreover, in addition to extracting data from CDK's DMS, third party data extractors also attempt to write back altered data to the DMS. *See, e.g., Authenticom* Compl. ¶¶ 50, 54-55 & n.4, 77-80 (Authenticom seeks not only to "pull," "extract" and "scrape" data from CDK's DMS; but also to "push data back into the database" in altered form).

85.    Unauthorized "writeback" activity creates a high risk of introducing data errors and undermining the integrity of CDK's DMS. CDK has formatting requirements called "business rules" for data fields in the DMS's various databases, which govern precisely how applications should input data. When unauthorized third-parties attempt writeback functions, they often apply business rules incorrectly (or not at all) and cause data entry errors—which CDK is then forced to fix. While a manual error by a dealership employee can be a minor annoyance, a series of errors by automated systems—such as the scripts that Authenticom and other unauthorized third parties run on CDK's DMS—can rapidly propagate across an entire dataset, causing major disruption or denial of service. CDK can effectively address these risks for third-party application providers who access writeback functionality through the 3PA program through technical evaluations of the provider's applications and extensive testing during the certification process. Pre-certification testing and evaluation also ensures that the application is not adversely affecting performance of the DMS. These sort of protections do not exist for unauthorized, automated access using dealer-issued login credentials. Accordingly, by providing login credentials to third parties like

**PUBLIC VERSION**

Authenticom, the Dealer Counter-Defendants knowingly enable conduct that risks the integrity of CDK's DMS.

### 5. Data Security Risks

86. Unauthorized third party access to CDK's DMS is significantly less secure than the 3PA managed interface that CDK requires third-party vendors to use.

87. As described above, 3PA participants access the CDK DMS through PIPs, which act as an intermediary between the participant's application and the actual DMS. Before allowing any data to be transferred in or out of the DMS, the application must pass rigorous authentication protocols initiated by the PIP. The authentication token that each application uses is transmitted through a secured communication channel. By contrast, Authenticom uses dealer-issued login credentials that it often obtains through unsecured channels, including unencrypted, plain-text email. This exposes the credentials—and by extension, CDK's DMS—to the risk of interception or compromise and violates widely accepted cybersecurity practices.

88. In addition, CDK's investigation to date has revealed that ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████

89. Authenticom's use of dealer-issued login credentials is particularly concerning because Authenticom implemented a software tool called Profile Manager, as it bragged to one CDK dealer, that automatically re-enables any disabled user IDs "every hour." Defs. P.I. Ex. 41 (*Authenticom* Dkt. 106-48). This software was run by a system administrator-level account at the dealership—the highest level of user access permitted for CDK's DMS, usually limited to one or two trusted employees at each dealership. Upon information and belief, the software used an

"update user profile" ("UUP") function to constantly re-enable certain dealer login credentials that CDK had disabled. Further, while the UUP function is used to create and maintain user profiles within the DMS, it also defines the access granted to each user profile. Using the UUP function, Authenticom could do virtually anything, *e.g.*, it could create more login credentials for itself, with each granted the highest available access to restricted files and functions within the DMS.

90.     Unauthorized access by third parties like Authenticom also violates the tenet of data minimization, *i.e.*, that each user of a secured system should receive no greater access or privileges than necessary. The 3PA interface abides by this principle and strictly controls each participant's access at a granular level, to only the specific categories of data needed for that party's approved purposes. By contrast, Authenticom claims that "[a]s a matter of practice," it accesses and scrapes data from all primary directories in the CDK DMS for every dealer: sales, service, inventory, customers, and parts. Cottrell Reply Decl. (*Authenticom* Dkt. 143) ¶¶ 3, 13. What this means, and what CDK's investigation indicates, is that Authenticom's login credentials regularly have access to (and often, are constantly querying) all application areas in CDK's DMS, regardless of whether the purported end users—the application providers—actually need or have even asked for such access. Other hostile third-party data extractors engage in similar practices.

**F.     Attempts to Evade CDK's Security Measures**

91.     In June 2015, CDK announced a multipart strategy called "SecurityFirst," one aspect of which was an initiative by the company to remove third-party code installed on its DMS and eliminate unauthorized third-party access, including through the use of dealer-issued login credentials. When SecurityFirst was announced, over 52% of CDK's DMS servers were infected with "hostile" code and 27,000 login credentials were being used by unauthorized third parties.

92.     CDK's SecurityFirst announcement was well publicized within the industry. Upon information and belief, the Dealership Counter-Defendants became aware that CDK objected to

PUBLIC VERSION

unauthorized access to the CDK DMS by third parties like Authenticom no later than when CDK announced SecurityFirst in June 2015, and in all likelihood, much earlier.

93. CDK also directly notified its dealer customers that hostile third party access to its DMS was not authorized and was in violation of the MSA. For example, on August 22, 2016, CDK sent a letter to those dealers who had " ███████████████████████████████████████ ███████████████████████████████████ " ██████████████████████████████████ ███████████████████████████████████████████████ and, on information and belief, so did the other Dealership Counter-Defendants who had been identified as enabling unauthorized access to the CDK's DMS at the time.[11]

94. In 2016, CDK began implementing security measures to prevent unauthorized access to its DMS by Authenticom and other unauthorized third-party vendors and data extractors. These measures have included the login prompt and CAPTCHA control described above, as well as the disabling of DMS login credentials based on characteristics, including usage patterns, that strongly indicate automated (and unauthorized) third-party access. The Dealership Counter-Defendants, working in concert with Authenticom and other unapproved third parties, have actively worked to evade and circumvent these security measures, often succeeding.

95. For example, in June 2016 when Authenticom encountered the CDK prompt requiring that it certify that it was a dealer employee to access CDK's DMS, ████████████ ████████████████████████████████████████████████ ██████████[12] Within a day, Authenticom's ████████████████████████████ reported that

---

[11] Ex. 4, BAYSTATE0001499; Ex 5, STEVENS0005244; Ex. 6, CHERRY_HILL0000574.
[12] Ex. 7, AUTH_00197197.

**PUBLIC VERSION**

Authenticom had ███████████████████████████████████████████

███████████████████████████████████████.[13]

96.     A few months later, in August 2016, CDK implemented a security measure to disable numerous login credentials that Authenticom was using to perpetrate its unauthorized data scraping. In response, ████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████

97.     Upon information and belief, Authenticom sent hundreds, if not thousands, of these emails, including to the Dealership Counter-Defendants.

98.     Some CDK dealers have refused to engage in these unsafe practices. ████████

████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

---

[13] Ex. 8, AUTH_00197253.



[14]

99.    ██████████████████████████████████

██████████████████████████████[15] Nonetheless, Authenticom continued to solicit

CDK DMS login credentials from dealers over plain-text, unencrypted email. For example, over a

year later, ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████[16]

100.    When CDK began to disable the login credentials that Authenticom was using to

access CDK's DMS, Authenticom deployed its Profile Manager tool, described above, which

attempted to automatically re-enable them from a computer installed on the dealer's network. ███

████████████████████████████████████████████

█████████████████████████[17] An Authenticom document ███████████████

████████████████████████████████████████████

████████████████████████████████████[18]

101.    CDK's investigation to date shows that several Dealership Counter-Defendants are

among the "████████" of dealers who have installed Authenticom's Profile Manager tool. For

---

[14] Ex. 9, AUTH_00200499.

[15] *Id.*

[16] Ex. 10, CONTINENTAL0011245.

[17] Ex. 11, AUTH_00206515.

[18] Ex. 12, AUTH_00146045.

**PUBLIC VERSION**

example, ██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

102.　　Additionally, beginning in approximately November 2017, CDK deployed the above-described CAPTCHA test to hundreds of specific login credentials associated with, among others, Authenticom in order to prevent their automated access to the CDK DMS. It worked, briefly. Authenticom was able to, and purposefully did, crack the CAPTCHA almost immediately and resumed its unauthorized access of CDK's DMS using computer-automated scripts. In doing so, Authenticom once again falsely certified to CDK that it was "an authorized dealer employee" in order to bypass a security measure specifically designed to keep it (and other unauthorized third parties) out of the system. Unauthorized third party Dealertrack has evaded CDK's CAPTCHA security controls in similar fashion. During the week of ███████████ alone, Dealertrack evaded CAPTCHA ██████ times to successfully access CDK's system.　CDK's efforts to prevent circumvention of its security measures are ongoing in the face of this kind of unauthorized third party access.

### G.　　Dealership Counter-Defendants' Repeated Breaches of their MSAs

103.　　Each Dealership Counter-Defendant has repeatedly violated the express contractual prohibitions in its MSA by actively facilitating hostile, unauthorized automated access to CDK's DMS by Authenticom and/or other unauthorized third parties, including Dealertrack.

### 1.　　The Continental Counter-Defendants

104.　　The Continental Counter-Defendants have repeatedly enabled unauthorized third-party access to CDK's DMS in violation of their MSA. For example, the Continental user ID "████," associated with Authenticom's DealerVault program, was used to successfully access

files in CDK's DMS at least ███████ times from ███████████ until CDK successfully

disabled the account on or around ███████████ .

105.    Between ██████████████████████ , a user ID ("███████") provided

by the Continental Counter-Defendants for use by Authenticom accessed files in CDK's DMS at

least ████ times. CDK successfully disabled that account on ███████████ .

106.    Between ██████████████████████ , a user ID ("███████") provided

by the Continental Counter-Defendants for use by Authenticom accessed files in CDK's DMS at

least ████ times. CDK successfully disabled that account on ███████████ .[19]

107.    Between ██████████████████████ , a user ID ("████") provided by the

Continental Counter-Defendants for use by Authenticom accessed files in CDK's DMS at least

████ times. CDK successfully disabled that account on ███████████ .

108.    Between █████████████████████ , a user ID ("██████") provided by the

Continental Counter-Defendants for use by Dealertrack accessed files in CDK's DMS at least

████ times. CDK successfully disabled that account on ███████████ .[20]

109.    Further, these login credentials were used to circumvent CDK's technological

security controls. Between ███████████████████████████ , the user ID from the

Continental Counter-Defendants called "█████" that Authenticom used to access CDK's DMS

confronted a CAPTCHA prompt at least █████ times, successfully evading CAPTCHA and

accessing CDK's DMS at least █████ times. The volume and nature of Authenticom's responses

to the CAPTCHA prompt suggest that Authenticom had enabled its automated script to respond

---

[19] The date that CDK disables an account can precede the last date of activity from that account within
CDK's DMS if the account in question was signed into CDK's DMS when CDK first disabled the account
but did not sign out of the account until later.

[20] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

to the prompt in all or most of these occurrences. For instance, of the ██ times where the CDK DMS presented a CAPTCHA prompt to the "██████" user ID and the user did not successfully respond to the CAPTCHA and obtain access to CDK's DMS, the user failed to provide any response to the prompt ██ times. Such a pattern indicates that a computer script (as opposed to an authorized, human employee of the Continental Counter-Defendants) was running in an attempt to evade CDK's CAPTCHA.

110.     The Continental Counter-Defendants knew that Authenticom's hostile access to CDK's DMS was unauthorized and in violation of the MSA, but actively encouraged Authenticom to circumvent CDK's security measures. For example, ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████[21] Further, ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████[22]

### 2.     The Warrensburg Counter-Defendants

111.     The Warrensburg Counter-Defendants have repeatedly enabled unauthorized third-party access to CDK's DMS in violation of their MSA. For example, ████████████████████

████████████████, Authenticom used at least ██ user IDs associated with the Warrensburg Counter-

---

[21] Ex. 13, CONTINENTAL0060014.
[22] Ex. 10, CONTINENTAL0011245.

Defendants to access CDK's DMS. Authenticom used these login credentials to access files in CDK's DMS at least ███ times between ████████████████████.

112.    As soon as CDK disabled certain of these login credentials, new ones immediately popped up in their place. With one exception, the user IDs each start with "████" which CDK has associated with Authenticom based on their usage patterns. CDK disabled the first account, "████" on ████████. The Warrensburg Counter-Defendants then promptly created "████" which CDK disabled on ████████. The pattern continued until "██████" which CDK disabled on ████████.

113.    The Warrensburg Counter-Defendants similarly knew that Authenticom's hostile access to CDK's DMS was unauthorized and in violation of the MSA, but actively encouraged Authenticom to circumvent CDK's security measures. As described above, when CDK disabled several of the login credentials that the Warrensburg Counter-Defendants had provided to Authenticom, the Warrensburg Counter-Defendants installed Authenticom's Profile Manager tool in an attempt to re-enable them, succeeding to at least some degree. ████████████ ████████████████████████████████████████████ ████████████████████.

### 3.    Cherry Hill

114.    Counter-Defendant Cherry Hill has repeatedly enabled unauthorized third-party access to CDK's DMS in violation of its MSA.

115.    Between March 14, 2016 and September 23, 2016, a user ID ("██████") provided by Cherry Hill for use by Authenticom accessed files in CDK's DMS at least ████ times. CDK successfully disabled that user ID on ████████.

116.    Between █████████████████████, a different user ID ("███████") provided by Cherry Hill for use by Authenticom accessed files in CDK's DMS at least ████ times. CDK successfully disabled that user ID on ██████████.

117.    Between ██████████████████████, a third user ID ("████") provided by Cherry Hill for use by Authenticom accessed files in CDK's DMS at least ████ times. CDK successfully disabled that user ID on ██████████.

118.    Between ███████████████████, a user ID ("██████") provided by Cherry Hill for use by an unauthorized third party associated with the entity "Dealer Rewards" accessed files in CDK's DMS at least ████ times. CDK successfully disabled that user ID on ██████████.

119.    Cherry Hill knew that Authenticom's and Dealer Rewards' hostile access to CDK's DMS was unauthorized and in violation of the MSA, but actively encouraged them to circumvent CDK's security measures by continuing to provide them with login credentials once the credentials they were using had been disabled.

### 4.    The Stevens Counter-Defendants

120.    The Stevens Counter-Defendants have repeatedly enabled unauthorized third-party access to CDK's DMS in violation of their MSA.

121.    Between ██████████████████, a user ID ("█████") provided by the Stevens Counter-Defendants for use by Authenticom accessed files in CDK's DMS at least █████ times. CDK successfully disabled that user ID on ██████████.

122.    Between ████████████████████, a user ID ("████") provided by the Stevens Counter-Defendants for use by Authenticom accessed files in CDK's DMS at least ████ times. CDK successfully disabled that user ID on ██████████.

123. The Stevens Counter-Defendants knew that Authenticom's hostile access to CDK's DMS was unauthorized and in violation of the MSA, but actively encouraged Authenticom to circumvent CDK's security measures by continuing to provide Authenticom with login credentials once the credentials that it was using had been disabled.

### 5. Waconia Dodge

124. Counter-Defendant Waconia Dodge has repeatedly enabled unauthorized third-party access to CDK's DMS in violation of its MSA.

125. For example, between ███████████████████████, a user ID ("████") provided by Waconia Dodge for use by hostile third party Dealertrack performed queries in CDK's DMS at least ████ times. CDK successfully disabled that username on ███████.

126. Waconia Dodge knew that Dealertrack's hostile access to CDK's DMS was unauthorized and in violation of the MSA, but actively encouraged Dealertrack to circumvent CDK's security measures by providing Dealertrack with login credentials.

### 6. Baystate Ford

127. Counter-Defendant Baystate Ford has repeatedly enabled unauthorized third-party access to CDK's DMS in violation of its MSA.

128. Between ████████████████, a user ID ("█") provided by Baystate Ford for use by Authenticom queried CDK's DMS at least ████ times. CDK successfully disabled that user ID on ██████.

129. Between ████████████████, a user ID ("████") provided by Baystate Ford for use by Authenticom queried CDK's DMS at least ███ times. CDK disabled that user ID on ██████.

130. Between ████████████████, a user ID ("████") provided by Baystate Ford for use by an unauthorized third party associated with the entity "Aspen Marketing"

PUBLIC VERSION

accessed files in CDK's DMS at least ██ times. CDK successfully disabled that username on ████████████.

131.    Between ████████████████████████, a different user ID ("██") provided by Baystate Ford for use by an unauthorized third party associated with the entity "Aspen Marketing" accessed files in CDK's DMS at least ██ times. CDK successfully disabled that username on ████████████.

132.    Baystate Ford knew that Authenticom's and Aspen Marketing's hostile access to CDK's DMS was unauthorized and in violation of the MSA, but actively encouraged them to circumvent CDK's security measures by continuing to provide them with DMS login credentials once the credentials they were using had been disabled.

## FIRST COUNTERCLAIM FOR RELIEF
### (All Counter-Defendants – Breach of Contract)

133.    Paragraphs 1-132 above are incorporated herein by reference.

134.    The MSAs between CDK and each Dealership Counter-Defendant are valid and enforceable contracts and are binding on the Dealership Counter-Defendants and their affiliates. CDK has fully performed or tendered all performance required under the MSAs.

135.    The MSAs each prohibit the Dealership Counter-Defendants from (1) allowing anyone other than a dealership employee to access CDK's DMS or (2) allowing any third party software to access CDK's DMS.

136.    The Dealership Counter-Defendants have breached their obligations under the MSAs by providing login credentials to Authenticom and other third parties to enable those third parties to hostilely access CDK's DMS.

137.    The Dealership Counter-Defendants' conduct has damaged CDK, including by depriving CDK of revenue that it could otherwise earn by charging Authenticom or other

unauthorized third parties to access CDK's DMS through its 3PA program or otherwise, by causing CDK to incur the costs and expenses associated with investigating unauthorized third party access to its DMS and attempting to compel them to cease their unlawful conduct, and by degrading CDK's DMS system and corrupting the data thereon.

## SECOND COUNTERCLAIM FOR RELIEF
### (All Counter-Defendants – Computer Fraud and Abuse Act)

138.    Paragraphs 1-137 above are incorporated herein by reference.

139.    The Computer Fraud and Abuse Act ("CFAA") provides that "[w]hoever … intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains … information from any protected computer," is subject both to criminal and civil liability. 18 U.S.C. § 1030(a)(2)(C); *see also id.* § 1030(c) (criminal penalties); *id.* § 1030(g) (civil damages and injunctive relief). The CFAA provides for a private cause of action for "compensatory damages and injunctive relief or other equitable relief" to anyone who suffers at least $5,000 in damage or loss in any one-year period "by reason of a violation" of its terms. *Id.* § 1030(g); *see id.* § 1030(c)(4)(A)(i)(I).

140.    CDK's DMS is a "computer" within the meaning of the CFAA, which defines that term to include "any data storage facility or communications facility directly related to or operating in conjunction with [a computing] device." *Id.* § 1030(e)(1). CDK's DMS also relies on the operation of one or more computing devices in its operations. The DMS itself, and the computing devices by which it operates, are "protected computers" within the meaning of the CFAA because they are connected to the internet and thus are used in and affect interstate and foreign commerce and communications. *See id.* § 1030(e)(2)(B).

141.    The Dealership Counter-Defendants have repeatedly and intentionally accessed the CDK DMS without CDK's authorization by inducing Authenticom and other third parties to access

276

CDK's DMS without CDK's authorization. The MSAs prohibit the Dealership Counter-Defendants from granting Authenticom and other third parties access to the CDK DMS without CDK's consent. Nonetheless, the Dealership Counter-Defendants have repeatedly provided their login credentials to Authenticom and other third parties to enable those third parties to access CDK's DMS. Accordingly, by inducing those third parties to access CDK's DMS without authorization, the Dealership Counter-Defendants have accessed CDK's DMS without authorization. Further, the Dealership Counter-Defendants obtained information from the CDK DMS through that unauthorized access when, for example, the Dealership Counter-Defendants received data from a third party application vendor containing data originally extracted through unauthorized means from CDK's DMS.

142. Alternatively, and regardless of whether the Dealership Counter-Defendants engaged in unauthorized access to CDK's DMS themselves, the Dealership Counter-Defendants are liable for the unauthorized access of Authenticom and other third parties that the Dealership Counter-Defendants knowingly induced to engage in unauthorized access to CDK's DMS.

143. CDK has informed the Dealership Counter-Defendants that their conduct is unauthorized and prohibited. CDK has demanded that the Dealership Counter-Defendants cease their unlawful conduct, but they have refused to do so.

144. The Dealership Counter-Defendants' violations of the CFAA have caused CDK to suffer damages and losses. These damages and losses include the costs of investigating and responding to the Dealership Counter-Defendants' unlawful actions; the costs of restoring the DMS and the data it contains to their condition prior to the Dealership Counter-Defendants' unlawful actions; and all revenue lost, costs incurred, and other consequential damages incurred because of disruption of service caused by the unlawful actions of the Dealership Counter-

Defendants and the third parties acting in concert with the Dealership Counter-Defendants. On information and belief, these losses have exceeded $5,000 within a twelve-month period.

145.    The Dealership Counter-Defendants will continue to violate the CFAA if not enjoined by this Court, causing CDK irreparable harm. Among other things, the Dealership Counter-Defendants' unauthorized access to CDK's DMS and their deliberate enabling of Authenticom's and other third parties' unauthorized access to CDK's DMS increases the risk that CDK will suffer a serious security breach, widespread data corruption issues, and degradation of the performance of its DMS, all of which constitute irreparable harm.

146.    CDK is also entitled to equitable relief in the form of restitution for the benefits that the Dealership Counter-Defendants accrued and/or disgorgement of the unlawful profits they have received as a result of their CFAA violations.

### THIRD COUNTERCLAIM FOR RELIEF
### (Continental Counter-Defendants and Warrensburg Counter-Defendants – Digital Millennium Copyright Act)

147.    Paragraphs 1-146 above are incorporated herein by reference.

148.    The Digital Millennium Copyright Act, 17 U.S.C. § 1201 ("DMCA"), prohibits, among other things, "circumvent[ing] a technological measure that effectively controls access to a work protected under this title." *Id.* § 1201(a)(1)(A).

149.    CDK's DMS software is an original creative work protected under Title 17. Among its original and creative elements are its source and object code; distinctive screen layouts; graphical content; text; arrangement, organization, and display of information; and dynamic user experience.

150.    CDK uses several technological measures to control access to and prevent copying of the CDK DMS software program. These technological measures include: requiring CDK dealer

employees to log on with passwords; text prompts asking a user to certify that he or she is an authorized dealer employee; CAPTCHA controls; and disabling of dealer credentials that CDK finds have been used for automated access by third parties. In the ordinary course of their operation, these password controls, certification prompts, CAPTCHA controls, and credential disabling measures required application of information, or a process or treatment, with CDK's authority as the owner of the DMS, to gain access to the CDK DMS software or a portion of the CDK DMS software. These measures effectively control access to the DMS software program in that the program, or portions of the program, cannot be run, and its original, expressive elements cannot be displayed or copied, unless these measures have been navigated. These access control measures were effective in preventing Authenticom and other third parties from accessing the CDK DMS before those third parties circumvented them.

151. The Continental Counter-Defendants and Warrensburg Counter-Defendants have intentionally induced Authenticom and other third parties to repeatedly circumvent CDK's access control measures in order to access the CDK DMS, extract data from it, and push data back into it. The Continental Counter-Defendants and Warrensburg Counter-Defendants wrongfully provided dealer login credentials to Authenticom and other third parties in violation of contractual requirements that such credentials be given to and used only by authorized dealer employees.

152. After CDK disabled login credentials that had been improperly used for automated DMS access by Authenticom or other third parties, the Warrensburg Counter-Defendants and Authenticom worked to evade this form of blocking by having new credentials created and/or by restoring disabled credentials—including on information and belief by automated means.

153. Finally, when accessing CDK's DMS using login credentials provided by the Continental Counter-Defendants, Authenticom circumvented, or gave outright false answers to,

multiple CAPTCHA controls through the use of automated computer scripts when accessing CDK's DMS. The Continental Counter-Defendants knew Authenticom would attempt to evade CDK's security measures when accessing CDK's DMS on their behalf. This conduct constitutes circumvention of technological measures that effectively controlled access to CDK's DMS in violation of 17 U.S.C. § 1201(a)(1)(A).

154.    The Continental Counter-Defendants and Warrensburg Counter-Defendants materially contributed to the ability of Authenticom and other third parties to circumvent CDK's technological measures that control access to its DMS. Without the Continental Counter-Defendants' and Warrensburg Counter-Defendants' login credentials, Authenticom and other third parties would not have been able to access CDK's DMS.

155.    On information and belief, the Continental Counter-Defendants and Warrensburg Counter-Defendants intended Authenticom to evade, or were willfully blind to the fact that Authenticom would evade, technological measures through whatever means necessary, including automated means, to access CDK's DMS.

156.    Under 17 U.S.C. § 1203, CDK is entitled to either actual damages and any additional profits from the Continental Counter-Defendants' and Warrensburg Counter-Defendants' violations of the DMCA or statutory damages of between $200 and $2,500 "per act of circumvention," at CDK's election. CDK is also entitled to injunctive relief under 17 U.S.C. § 1203(b)(1).

157.    The Continental Counter-Defendants and Warrensburg Counter-Defendants, in concert with Authenticom and other third parties, will continue to violate the DMCA if not enjoined by this Court.

**PUBLIC VERSION**

158.    Moreover, the Continental Counter-Defendants' and Warrensburg Counter-Defendants' unauthorized access to the CDK DMS dramatically increases the risk that CDK will suffer a security breach and widespread data corruption issues and degrades the performance of its DMS, all of which constitute irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, CDK respectfully requests that this Court enter judgment:

A.    Declaring that the Dealership Counter-Defendants' conduct:

    (1)    constitutes breach of contract;

    (2)    violates the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; and

    (3)    as to the Continental Counter-Defendants and Warrensburg Counter-Defendants, violates the Digital Millennium Copyright Act, 17 U.S.C. § 1201;

B.    Permanently enjoining the Dealership Counter-Defendants from engaging in the actions that violate these laws, including providing login credentials to CDK's system to any third party;

D.    Awarding CDK its full losses, expenses, and other damages, including but not limited to statutory damages;

E.    Disgorging the Dealership Counter-Defendants of their unlawful profits and unjust enrichment;

F.    Awarding CDK costs and litigation expenses, including attorney's fees; and

G.    Awarding CDK such other and further relief that this Court deems just, proper, and equitable.

PUBLIC VERSION

## <u>JURY DEMAND</u>

CDK does not demand a trial by jury unless the Dealership Plaintiffs/Counter-Defendants are permitted a trial by jury on their affirmative claims against CDK, in which case CDK demands a trial by jury on all counterclaims so triable.

Dated: February 22, 2019                        Respectfully submitted,

                                         */s/ Britt M. Miller*
                                         Britt M. Miller
                                         Michael A. Scodro
                                         Matthew D. Provance
                                         MAYER BROWN LLP
                                         71 South Wacker Drive
                                         Chicago, IL 60606
                                         (312) 782-0600
                                         bmiller@mayerbrown.com
                                         mscodro@mayerbrown.com
                                         mprovance@mayerbrown.com

                                         Mark W. Ryan
                                         MAYER BROWN LLP
                                         1999 K Street NW
                                         Washington, DC 20006
                                         (202) 263-3000
                                         mryan@mayerbrown.com

                                         *Counsel for Defendant and Counter-Plaintiff CDK Global, LLC*

PUBLIC VERSION

## CERTIFICATE OF SERVICE

I, Britt M. Miller, an attorney, hereby certify that on February 22, 2019, I caused a true and correct copy of the foregoing **DEFENDANT CDK GLOBAL, LLC'S ANSWER AND AFFIRMATIVE AND ADDITIONAL DEFENSES TO THE DEALERSHIP CONSOLIDATED CLASS ACTION COMPLAINT AND CDK GLOBAL, LLC'S COUNTERCLAIMS** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

*/s/ Britt M. Miller*
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Phone: (312) 782-0600
Fax: (312) 701-7711
E-mail: bmiller@mayerbrown.com