PUBLIC VERSION

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| | Hon. Robert M. Dow, Jr. |
| *This document relates to:* | |
| *Authenticom, Inc. v. CDK Global, LLC et al.,* Case No. 1:18-cv-00868 (N.D. Ill.) | Magistrate Judge Jeffrey T. Gilbert |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO COMPEL
PLAINTIFF AUTHENTICOM TO PRODUCE THIRD-PARTY COMMUNICATIONS
OR, IN THE ALTERNATIVE, SUBMIT SUCH COMMUNICATIONS
FOR *IN CAMERA* REVIEW**

PUBLIC VERSION

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ................................................................................................... 1

**ARGUMENT & AUTHORITIES** ........................................................................... 1

    I.    Authenticom Has Not Established that the CI Team Communications are Subject to Application of Common Interest Exception ...................................... 2

        A.    Factual Summary of CI Team Communications ..................................... 2

        B.    Authenticom's CI Team Privilege Is Unsupported by the Law .............. 5

              *i.*    *Authenticom Has Not Established that CI Team Undertook Any Joint Effort* ................................................................................. 6

              *ii.*    *Authenticom Has Not Established that CI Team Shared Identical Legal Interests as Opposed to Diffuse Business or Rooting Interests* ................................................................................. 7

              *iii.*    *Authenticom Has Not Established Communications Made to Further Enterprise* ...................................................................... 9

    II.    Authenticom Has Not Established Any Common Interest with Other Parties ................................................................................................................. 10

        A.    BMO Harris Bank ............................................................................... 10

        B.    Gil Hale & Motormindz ....................................................................... 11

    III.    Authenticom's Communications with Third-Parties, Such as Management Coach Zimmer Are Not Attorney-Client Privileged .......................................... 11

    IV.    Authenticom's "Work Product" Claims over Documents Shared with Third-Parties Are Unsupported and/or Have Been Waived ......................................... 13

**CONCLUSION** ..................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Acceleration Bay Llc v. Activision Blizzard*,
    2018 WL 798731 (D. Del. Feb. 9, 2018) ..........................................................................9, 15

*Acosta v. Target Corp.*,
    281 F.R.D. 314 (N.D. Ill. 2012)..........................................................................................12

*In re Air Crash Disaster at Sioux City*,
    133 F.R.D. 515 (N.D. Ill. 1990)..........................................................................................12

*Blanchard v. EdgeMark Fin. Corp.*,
    192 F.R.D. 233 (N.D. Ill. 2000)..............................................................................9, 10, 14

*DeKalb Genetics Corp. v. Pioneer Hi-Bred Int'l*,
    2002 WL 318129 (N.D. Ill. Feb. 28, 2002) ........................................................................15

*FTC v. Rexall*,
    No. M18–304, 2001 WL 396522 (S.D.N.Y. April 19, 2001)................................................11

*Graco Children's Products, Inc. v. Dressler, Goldsmith, Shore & Milnamow, Ltd.*,
    1995 WL 360590 (N.D. Ill. 1995) .......................................................................................7

*Grochocinski v. Mayer Brown Rowe & Maw LLP*,
    251 F.R.D. 316 (N.D. III. 2008) ................................................................................ *passim*

*Heriot v. Byrne*,
    257 F.R.D. 645 (N.D.Ill.2009).............................................................................................12

*JTR Enterprises, LLC v. An Unknown Quantity of Colombian Emeralds*,
    297 F.R.D. 522 (S.D. Fla. 2013) ..........................................................................................7

*LG Elecs., Inc. v. Motorola, Inc.*,
    10 CV 3179, 2010 WL 4513722 (N.D. Ill. Nov. 2, 2010).....................................................14

*LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*,
    661 F. Supp. 2d 958 (N.D. Ill. 2009) .........................................................................9, 11, 13

*Ludwig v. Pilkington North America, Inc.*,
    2004 WL 1898238 (N.D. Ill. 2004) ......................................................................................9

*Miller UK Ltd. v. Caterpillar, Inc.*,
    17 F. Supp. 3d 711 (N.D. Ill. 2014) ............................................................................ *passim*

*In re Pacific Pictures Corp.*,
    679 F.3d 1121 (9th Cir. 2012) ..............................................................................................7

PUBLIC VERSION

*Ricoh Co., Ltd. v. Aeroflex Inc.*,
    219 F.R.D. 66 (S.D.N.Y. 2003) ............................................................................................15

*Stafford Trading, Inc. v. Lovely*,
    2007 WL 611252 (N.D. Ill. Feb. 22, 2007) ............................................................................12

*U.S. v. Evans*,
    113 F.3d 1457 (7th Cir. 1997) ........................................................................................6, 7, 9

*United States v. BDO Seidman, LLP*,
    492 F.3d 806 (7th Cir. 2007) ...................................................................................................6

## Other Authorities

*Moore's Federal Practice* § 26.70 (3d ed. 2015) ........................................................................14

PUBLIC VERSION

**INTRODUCTION**

On May 1, 2017, Authenticom sued Defendants CDK Global LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") on an "emergency" basis and demanded an injunction hearing within a matter of weeks.  *See* Authenticom Dkt. (Case No. 18-CV-868) at 1, 61.  The district court granted an injunction on the basis of this professed emergency as well as the testimony of various third-parties Authenticom called as purported neutral, industry witnesses. *See* Auth. Dkt. 172 at 9-10 (citing Dominion and Autoloop's testimony); *id.* at 16 (discussing Authenticom's alleged financial distress).  The Seventh Circuit later dissolved the injunction and the case has proceeded to discovery in this multidistrict litigation.  Ex. 1.

Now that the parties have moved to discovery, however, Authenticom has refused to produce its communications with broad swaths of third parties—including those it called to testify at the temporary injunction hearing—dating back *years* before the "emergency" hearing that started this litigation.  Authenticom withholds these documents on the basis of a wide-ranging "common interest" it claims it shares with third parties that include DMS providers, application vendors, car-care product manufacturers, data extractor competitors, and banks, and has also claimed a shared *attorney-client* privilege with a life coach and an investment banker.

Authenticom's privilege claims are overbroad and unsupported on the law.  Authenticom should be required to produce the challenged documents, or in the alternative, submit them *in camera* and put forth evidence that any of the asserted privileges apply.

**ARGUMENT & AUTHORITIES**

Defendants challenge three "buckets" of communications being withheld despite the fact that they were shared with ostensible third parties:  (1) documents Authenticom asserts are subject to a shared, protectible common interest between Authenticom, Autoloop, Dominion, Advent Resources, MOC Products, DAR Cars, and eLead (together, the "CI Team") from May 2015 to

1

February 2017;[1] (2) documents that Authenticom asserts are subject to a two-party common interest, including communications with BMO Harris Bank, Motormindz, Inc., or data extractor Gilbert Hale, and (3) documents that Authenticom shared with third-party consultants, such as a purported management coach, Lori Zimmer, as well as communications with investment firms, The Presidio Group and Gerchen Keller. *See* Attachments A (challenged withheld communications) and B (challenged redacted communications).[2]

## I. Authenticom Has Not Established that the CI Team Communications are Subject to Application of Common Interest Exception

### A. Factual Summary of CI Team Communications

Authenticom's improperly withheld communications with members of the "CI Team" begin on May 7, 2015, with an email from Rusty Friddell, a VP and General Counsel of Dominion Dealer Solutions, to Steve Cottrell, Authenticom's CEO.[3] Att. A at ID 0463. Dominion is an application vendor, an Authenticom customer, and operates SelectQu, a hostile integration competitor of Authenticom.[4] The document supposedly reflects the legal advice of Gerry Stegmaier, an attorney who Defendants understand represented Authenticom, but not Dominion.[5]

---

[1] A number of the challenged, CI Team communications separately appear on the privilege log of CI Team member, Autoloop. Defendants simultaneously challenge the withholding of those documents by Autoloop, and incorporate by reference any arguments made here to the simultaneously filed CDK Global, LLC's Memorandum in Support of their Motion to Compel Production of Documents Withheld or Redacted by Plaintiffs Or, In the Alternative, For An In Camera Inspection of Challenged Documents (filed in the *Autoloop* and *Cox* matters).

[2] Authenticom's Third Amended Privilege Log contained over 2,000 communications. **Attachment A** is a modified version of that privilege log that is limited to only the communications that are being challenged by this Motion, which has been color coded for the Court's ease into three buckets. Yellow – CI Team Communications; Orange – Other, Two-Party Alleged Common interest communications; and Green – Communications with third-party consultants that Authenticom claims are subject to the attorney-client privilege, such as communications with management coach Lori Zimmer. Defendants have also re-ordered the documents chronologically for the Court's ease. **Attachment B** is a modified version of Authenticom's redaction log. All told, Defendants are challenging fewer than 100 communications.

[3] The challenged, "CI Team" communications have been colored Yellow in Attachment A.

[4] *E.g.,* https://www.dominionenterprises.com/our-brands/automotive/ (last accessed: 2/28/19)

[5] Although, as mentioned below, when Defendants attempted to confirm this in writing, Authenticom refused to answer. Ex. 2.

PUBLIC VERSION

The communication purports to be about "this litigation," which would not be filed for another two years. From May 2015 onward, the CI Team communications grow in number and parties. By August 2016, Authenticom claims a shared common interest with Dominion, Autoloop, Advent Resources (a DMS competitor of CDK and Reynolds),[6] MOC Products (an automotive equipment company)[7], and eLead (an automotive CRM vendor).[8] Att. A at ID 539, 595. Again, the purported common interest is *this litigation*, which did not yet exist. *Id.* Of these, Autoloop eventually filed suit in April 2018, but the remaining entities never joined any litigation. In fact, eLead signed a declaration in June 2017 claiming neutrality in the instant litigation. Ex. 3 ("eLead is not involved in this lawsuit and wishes to remain neutral."). Subsequently, eLead was acquired by CDK. Ex. 4. These communications contain a different lawyer, Marc Schildkraut of Cooley LLP, who Defendants understand represented Authenticom briefly, and also Dominion, but did not represent the other entities. Ex. 2. To this day, Mr. Schildkraut still represents Dominion, which has refused to produce even its FTC production in this case. *See* Dkt. 483.[9]

This same group of entities would continue to communicate throughout the fall of 2016. *See, e.g.,* Att. A at ID 0364, 0416. In late 2016, the group would add another entity, DARCARS, to its list, which is an automotive dealership group in the Washington, D.C. area.[10] *E.g.*, Att. A at ID 0125. Though the communications with DARCARS purport to indicate a common interest in the later-filed litigation, DARCARS, like the other CI Team entities, has not filed suit. The CI Team also cycled through a variety of additional lawyers, some of whom represented Authenticom

---

[6] *See* https://www.adventresources.com/ (last accessed: 2/28/19) (describing its Dealer Management Platform)

[7] *See* https://mocproducts.com/ (last accessed: 2/28/19).

[8] *See* https://www.elead-crm.com/ (last accessed: 2/28/19).

[9] Ironically, despite Dominion's involvement in secret communications with a half-dozen entities in the automotive space (including its competitor Authenticom) in the years leading up to this litigation, it now claims its documents are too sensitive to be shared in this litigation.

[10] *See* https://www.darcars.com/ (last accessed: 2/28/19).

and some of whom represented other entities.  Authenticom has been unable (or unwilling) to

identify, in full, which entities certain attorneys in the log represented.  Below is a chart of

Defendants' understanding of the "CI Team," and their representation and litigation positions.

| Member | Are they a Plaintiff? | Attorneys[11] | Business |
|---|---|---|---|
| Authenticom | Yes (May 1, 2017) | Goodwin Proctor; Reed Smith; Cooley; Kellogg Hansen | Hostile Integrator |
| Autoloop | Yes (April 8, 2018) | Kellogg Hansen | Application Vendor |
| Dominion | No | Cooley, Davis Polk | DMS Provider / Application Vendor / Hostile Integrator |
| Advent Resources | No | Unclear | DMS Provider |
| ELead | No (stated desire to "remain neutral"). | Unclear | Application Vendor |
| MOC Products | No | Unclear | Automotive Product Manufacturer |
| DARCARS | No | Unclear | Automotive Dealership |

After working with these other entities (some for nearly two years), Authenticom filed its

lawsuit in May 1, 2017.  Two weeks later, it filed its application for "emergency injunctive relief."

Auth. Dkt. 61. As part of this scheme, Authenticom called upon its CI Team members to provide

testimony at the injunction hearing as purportedly neutral industry witnesses.  For instance,

Authenticom called Alan Andreu, a product manager at Dominion, to testify regarding his use of

Authenticom's services, the Reynolds Certified Interface program, Reynolds' and CDK's blocking

efforts, and related topics.  Auth. Dkt. 165 at 2-A-27-2A-55.  It also called Matt Rodeghero, the

Chief Product Officer of Autoloop.  He also discussed his use of hostile integrators, pricing, and

Autoloop's complaints to the FTC.  Auth. Dkt. 165 at 2-A-55-2-A-76.

---

[11] The information in this chart is based on what was relayed to Defendants during various meet-and-
confers, although often with less than certain confidence.  Defendants asked for written confirmation of the
representations of the various attorneys who appear on the Challenged Communications, but Authenticom
refused to provide it. Ex. 2.  Authenticom had not even told Defendants who Arnold & Porter, one of the
firms that appears on certain of these communications, represented.  *Id.*; *E.g.,* Att. A. at ID 0032.

PUBLIC VERSION

The court granted an injunction that the Seventh Circuit later dissolved.  Ex. 1.  Once in discovery, however, Authenticom refused to produce all of its communications with these entities, despite the fact that they are third-parties, who compete in different markets, and who (with one exception) are not parties in any action related to this MDL.  What's more, most of these entities were represented by other, non-aligned attorneys (if represented at all).

In meet-and-confers, Defendants have attempted to gain a better understanding of the common interest being asserted here, whether there was any sort of written common interest agreement,[12] and an understanding of which entities represented which clients.  *E.g.,* Ex. 5.  Authenticom was never able to fully answer these questions orally, and as such, Defendants reduced them to writing and asked Authenticom to clarify the specific common interest being asserted with a number of these parties, when it arose, and so on.  Ex. 2.  Authenticom, however, refused to answer these questions, or even confirm the exact common interest being asserted, beyond their rote privilege log entries that suggest it had something to do with this litigation.  *Id.*[13]

### B.  Authenticom's CI Team Privilege Is Unsupported by the Law

It is axiomatic that "a party waives the attorney-client privilege when the otherwise privileged documents are disclosed to a third party."  *Grochocinski v. Mayer Brown Rowe & Maw LLP*, 251 F.R.D. 316, 326 (N.D. Ill. 2008).  Authenticom asserts that "CI Team" communications are nevertheless privileged under the so-called "common interest" doctrine.  This is not a privilege

---

[12] Mr. Tony Petruzzelli, of Autoloop, a participant in a number of these communications, ███████████████. Ex. 12 (Petruzzelli Dep.) at 45:22-46:5.

[13] Authenticom's basis for refusing to answer these questions—that they were untimely—is flimsy pretext. Defendants first began asking these questions in *November*, prior to the deposition of one of the members of the CI Team, Tony Petruzzelli of Autoloop.  *See* Ex. 5. The parties met and conferred, for the first of many times, regarding these issues on November 19, a call during which Defendants asked about both the purported "common interest" as well as which attorneys represented which parties and received only partial answers. Defendants subsequently raised the issue in letters. *E.g,* Ex. 6 (2019-1-7 Correspondence) at 3-4. In any event, the partial answers Defendants have received to date have not satisfactorily demonstrated any of the privileges herein challenged.

PUBLIC VERSION

itself, but a narrowly construed "exception to the rule that no privilege attaches to communications between a client and an attorney in the presence of a third person." *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007). *See also U.S. v. Evans,* 113 F.3d 1457, 1467 (7th Cir. 1997) ("The 'common interest' or 'joint defense' doctrine generally allows a defendant to assert the attorney-client privilege to protect his statements made in confidence not to his own lawyer, but to an attorney for a co-defendant for a common purpose related to the defense of both.").

The common interest doctrine can only apply when (1) parties undertake a joint effort (2) with respect to an identical legal interest, as opposed to a business or rooting interest, and (3) the withheld communications are made to further said ongoing legal enterprise. *BDO Seidman, LLP*, 492 F.3d at 815–16; *Miller UK Ltd. v. Caterpillar, Inc*., 17 F. Supp. 3d 711, 732 (N.D. Ill. 2014). Authenticom has failed to establish each of the elements of its alleged common interest claim. *Grochocinski*, 251 F.R.D. at 327 ("[P]arty asserting the privilege then has the burden of proving the common interest.").

### i. *Authenticom Has Not Established that CI Team Undertook Any Joint Effort*

Authenticom has not established that the CI Team entities undertook any joint effort. When asked what the specific common interest shared by these entities was—Authenticom refused to answer. Ex. 2. The privilege log does not provide much additional color. The revised entries only indicate that the purported joint effort related to *this litigation,* even as far back as May 2015. *See, e.g.,* Att. A at ID_105 ("Confidential communication between common interest parties compiling information necessary for counsel to advise regarding CDK and Reynolds data access issues for this litigation."); Att. A at ID_0463 ("Confidential communication between common interest parties reflecting the request for and the provision of legal advice of Stegmaier*, Gerry regarding CDK and Reynolds data access issues for this litigation.").

6

But if so, the asserted common interest must fail, because there is no *joint effort* here—at the time of these communications, there was no litigation filed, and only Autoloop—not Dominion, not eLead, not Advent, not MOC Products, nor DARCARS—ever filed suit. Further, eLead, in June 2017, signed a declaration specifically denying any joint effort here. Ex. 3 (stating eLead did "not consent to the use of [their] correspondence in this lawsuit" and that they were "not involved in this lawsuit and wish[ed] to remain neutral."). The fact that there may be some attenuated interest between these non-parties to the litigation—some of whom may want a certain outcome—is certainly not sufficient to establish that the parties agreed to undertake a joint, protectible effort here. *Evans*, 113 F.3d at 1468 ("In short, Holden's interest in the Evans' proceedings is far too attenuated to support application of the common interest rule.").

### ii. Authenticom Has Not Established that CI Team Shared Identical Legal Interests as Opposed to Diffuse Business or Rooting Interests

Even if Authenticom could establish that the CI Team had collectively agreed to undertake a joint effort, for it to be protectable, the shared interest must (1) be identical and (2) be a shared legal interest, as opposed to a business or common interest. "The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial." *Graco Children's Products, Inc. v. Dressler, Goldsmith, Shore & Milnamow, Ltd*., 1995 WL 360590, *5 (N.D. Ill. 1995). Moreover, simply because various entities may desire the same outcome in a particular case—and cheer it on from the sidelines—is not enough for the common interest exception to attach. "A shared rooting interest in the 'successful outcome of a case'. . . . is not a common legal interest." *Miller UK Ltd.,* 17 F. Supp. 3d at 732–33. *See also, In re Pacific Pictures Corp.,* 679 F.3d 1121, 1129-30 (9th Cir. 2012) ("However, a shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within this exception."); *Grochocinski,* 251 F.R.D. at 327 (funding agreement giving third party percentage of proceeds from award does not create a common legal interest); *JTR Enterprises, LLC v. An*

7

*Unknown Quantity of Colombian Emeralds*, 297 F.R.D. 522, 528 (S.D. Fla. 2013) (shared desire to uncover a purported fraud is insufficient to support a common interest).

Here, the CI Team's interests are not identical. First, the CI Team's entities all operate different business types with distinct interests in both the outcome of this litigation and their options for data integration generally. For instance, Authenticom is a hostile integrator; Dominion offers hostile integration but also offers automotive applications and a DMS product; DARCARS is a dealership group; eLead is a vendor that has been in the Reynolds Certified Interface program since 2014; Advent offers a DMS system that competes against CDK and Reynolds, and MOC Products manufactures car care products. *See* Part I(A) *supra*. These parties do not share identical postures, in business, in their positions against Reynolds and CDK, or in this case.

Second, the CI Team entities' interests are not *legal* in nature. Since only Authenticom and Autoloop ever filed suit, the only possible shared interest between Authenticom and Autoloop, on the one hand, and the remaining entities, on the other hand, is that those entities may have an expressed desire for a certain litigation outcome. Even that is an uncertain premise given that certain of the CI Team entities are members of certified integration programs and others are not. But even if true, that would not be a protectable interest. Entities with purely financial interests in the outcome of the case do not share common interests with entities actually involved in litigation. *Miller UK Ltd.,* 17 F. Supp. 3d at 732–33 ("The funders, for their part, were interested in profit… [T]he funders and Miller did not share a common legal interest, and materials shared with any actual or prospective funders lost whatever attorney-client privilege they might otherwise have enjoyed"); *Grochocinski,* 251 F.R.D. at 327 ("SC is not involved in the claims against Defendant . . . . SC and CMGT have a joint financial interest rather than a joint legal interest.").

The asserted common interest here is even more attenuated than in the cases cited above. There is not even a shared financial interest. Rather, there is, at best, simply a shared desire to see

a particular outcome, or, barring that, to cause harm and disruption to Reynolds and CDK. That is not enough to create an identical, shared *legal* interest sufficient to void the otherwise applicable rule that no privilege attaches to communications with third-parties. *Grochocinski*, 251 F.R.D. at 328 ("Thus, because SC only has a financial interest in this case, but does not share a common litigation interest, the Court finds that the common interest doctrine does not apply to Plaintiff's attorney's communications with SC or SC's attorneys."); *Blanchard v. EdgeMark Fin. Corp.*, 192 F.R.D. 233, 237 (N.D. Ill. 2000) ("DLJ is not a party to this lawsuit, there is no evidence that it was called upon to assist in the defense of this case or that there was otherwise a joint, concerted effort by EdgeMark and DLJ to advance a common legal enterprise.").

### iii. Authenticom Has Not Established Communications Made to Further Enterprise

Finally, as the Seventh Circuit has previously held, in order to be subject to the common interest exception, communications must have been made "in the course of an ongoing common enterprise." *Evans*, 113 F.3d at 1467 (denying common interest protection to communications before disciplinary action was filed, when common interest could have theoretically arisen). While this does not require that litigation necessarily has been filed, it does require that a joint effort be *underway*. *See Ludwig v. Pilkington North America, Inc.*, 2004 WL 1898238, *3–4 (N.D. Ill. 2004) (where no evidence of earlier informal agreement, joint defense privilege did not arise prior to date of signed common interest agreement); *Acceleration Bay Llc v. Activision Blizzard*, 2018 WL 798731, at *1-2 (D. Del. Feb. 9, 2018) (same).

Here, the alleged common interest communications date back to May 2015, two years before any litigation was filed, and involve a half-dozen parties, most of whom never filed suit. *E.g.*, Att. A at ID 0463, 0539. The fact that litigation might have been contemplated or possible is simply not enough. *Cf. LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 958, 966 (N.D. Ill. 2009) ("Whirlpool's position that fear of lawsuit, alone, justifies a common legal interest has no

9

PUBLIC VERSION

cognizable boundaries and runs the risk of allowing the common interest exception to swallow the rule."). As such, Authenticom cannot meet its burden to establish that these years-old communications were otherwise made in furtherance of an ongoing legal enterprise.

## II. Authenticom Has Not Established Any Common Interest with Other Parties

### A. BMO Harris Bank

Authenticom has claimed one-off common interest privileges with a variety of other entities, including BMO Harris Bank. [14] Att. A at ID 0296. BMO Harris is Authenticom's lender on a loan that Authenticom ██████████████████████████████████. Ex. 8 (Noth Dep.) at 113:6-13. Despite the alleged common interest, Authenticom has previously claimed that BMO Harris's posture in this case is adversarial. In fact, Authenticom has alleged that the size of this outstanding obligation—and the risk that BMO could foreclose—is the reason that it believes it is in financial distress. Auth. Dkt. 238 at ¶ 9 (claiming that BMO Harris could foreclose if discovery was stayed). This is a classic sword/shield tactic.

In any event, any interest shared with BMO Harris is a purely financial one—not a common, identical legal interest. BMO Harris's only concern is the recovery of their outstanding debt. Courts in the Northern District of Illinois have been consistent that communications with lenders, financiers, or other parties whose sole interest in a case is the financial income are not entitled to such a protection. *Miller UK Ltd.*, 17 F. Supp. at 732–33 ("The funders, for their part, were interested in profit…. [They] did not share a common legal interest, and materials shared with any actual or prospective funders lost whatever attorney-client privilege they might otherwise have enjoyed."); *Grochocinski*, 251 F.R.D. at 328 ("Thus, because SC only has a financial interest

---

[14] These communications have been colored Orange in Attachment A.

in this case . . . the Court finds that the common interest doctrine does not apply to Plaintiff's attorney's communications with SC or SC's attorneys."); *Blanchard*, 192 F.R.D. at 237 (similar).

### B. Gil Hale & Motormindz

As with the CI Team, Authenticom cannot establish a common interest with either Gil Hale, a competitive data extractor, or Motormindz, a marketing company Authenticom previously hired to assist with the "marketing and launch of its products." Ex. 7 at 3, 5; Att. A at ID 1676, 302, 1403. Neither of these entities were similarly situated to Authenticom nor did any of them ever join this litigation. As to Motormindz, outside marketing agencies do not generally share a common interest in litigation. *LG Elecs. U.S.A., Inc.*, 661 F. Supp. 2d at 966; *see also FTC v. Rexall*, No. M18–304, 2001 WL 396522, at \*5 (S.D.N.Y. April 19, 2001) (no common interest where one company's counsel provided legal advice to ad agency).

### III. Authenticom's Communications with Third-Parties, Such as Management Coach Zimmer Are Not Attorney-Client Privileged

Authenticom has withheld 30+ communications that were either to, from, or shared with, third-party consultants.[15] These are predominantly communications with a Ms. Lori Zimmer. *E.g.,* ID 603. According to Ms. Zimmer's website, she is a professional coach who performs executive and team coaching services for individuals and organizations.[16] At depositions, Authenticom's executives could only provide vague descriptions of her services. For instance, Authenticom's Controller, Joe Noth, testified that Ms. Zimmer provided "███████████████████████████████ ████████████████████████████" but when asked for specifics, he said that "█ ██████████████████████████████." Ex. 8 (Noth Dep.) at 199:11-200:1. Meanwhile, Chris Kirby, Authenticom's Chief Technology Officer said she was, "███████████████████

---

[15] These documents are colored "Green" on Attachment A and "Green" on Attachment B (the redactions log).

[16] Ex. 11 (excerpts from http://www.zimmercoach.com/services/coaching/) (accessed on 3/1/19).



■" and when asked what her role, "■

■" Ex. 9 (Kirby Dep.) at 224:5-13. Katie Wiersgalla, another executive,

said she provided "■

■" Ex. 10 (Wiersgalla Dep.) at 36:17-21. Whatever her role, it appears to have been

sporadic, and Ms. Zimmer ■. *Id.* at 36:22-23.

Defendants challenge the asserted privileges on two grounds. First, Authenticom has not adequately supported its claims of privilege to these communications making it difficult to determine which of these communications could actually be privileged, and which are simply business communications that may have copied an in-house counsel. *Acosta v. Target Corp.*, 281 F.R.D. 314, 321 (N.D. Ill. 2012) ("Where a document is prepared for simultaneous review by legal and non-legal personnel and legal and business advice is requested, it is not primarily legal in nature and is therefore not privileged."); *In re Air Crash Disaster at Sioux City*, 133 F.R.D. 515, 519, 524 (N.D. Ill. 1990) (same). A number of the documents appear on their face to be business communications. *See, e.g.,* Att. A at ID 472 (communication regarding issues list for executive meeting); *id. at* ID 603 (communication regarding draft dealer communications).

Second, even if these documents were ostensibly privileged when sent, their disclosure to a third-party waives that privilege. *Grochocinski*, 251 F.R.D. at 326. Authenticom may claim that Ms. Zimmer was a "de facto" employee or the "functional equivalent" of an employee, and thus communications with her do not break any privilege. But this argument is wrong on both the facts on the law. On the facts, Authenticom's executives largely could not specify *what* Ms. Zimmer did there. She was certainly not so integrated into Authenticom's operations to be an employee.

On the law, courts in the in this District have expressed doubt regarding the functional equivalent test and have limited its application to only those situations where a third-party consultant expressly communicated "for the purpose of obtaining or providing legal advice."

*Stafford Trading, Inc. v. Lovely*, 2007 WL 611252, at *7 (N.D. Ill. Feb. 22, 2007). This is an inquiry that must be done on a "document by document basis." *Id.* Similarly, in *Heriot v. Byrne*, the court held privilege would only extend to an accountant "who performs services (i) that are not required by federal law or do not otherwise make him an individual acting on the public's behalf; (ii) on behalf of a party; (iii) for the purposes of rendering legal advice; and (iv) that make the accountant . . . necessary, or at least highly useful, for the effective consultation between the client and the lawyer." 257 F.R.D. 645, 665-66 (N.D. Ill. 2009). *See also LG Elecs. U.S.A.*, 661 F. Supp. 2d at 963 ("Nor do Whirlpool's claims of privilege relate to an agent or to an outside accountant or investment advisor whose work was necessary to assist counsel in rendering legal advice.").

Authenticom has made no showing that Lori Zimmer's management coaching was "necessary to assist counsel in rendering legal advice," "highly useful, for the effective consultation between the client and the lawyer," or done for the "purpose of obtaining or rendering legal advice." The descriptions given by Authenticom's actual executives are just the opposite.

These arguments would be even more tenuous as to Mr. Lamm, the investment banker, and Gerchen Keller. Att. A at ID 0409, 1103. Mr. Lamm was hired to "help market the company" to investors in 2013. Ex. 7 at 6. There is no indication that his servicers were necessary to render legal advice related to the application of a Reynolds' contract, as described in the privilege log.[17] And, ████████████████████████████████████████████████████████████, it has never signed an agreement with Gerchen Keller, and there is no privilege with such a third-party. Ex. 8 (Noth Dep.) at 22:19-23:15; *Miller UK Ltd.,* 17 F. Supp. 3d at 732–33.

### IV. Authenticom's "Work Product" Claims over Documents Shared with Third-Parties Are Unsupported and/or Have Been Waived

---

[17] The communication with Mr. Lamm appears to merely copy an Authenticom in-house counsel, amongst others, and does not appear that it would be privileged even if it hadn't been shared. Att. A at ID 0409.

PUBLIC VERSION

Authenticom has made "work product" claims to a number of documents that were shared with third-parties but that it claims are subject to a common interest or attorney-client protection. *E.g.,* Att. A at ID_003; 012. To establish work-product protection for a document, Authenticom must show that the "the primary motivating purpose behind the creation of a document . . . must be to aid in possible future litigation." *Blanchard,* 192 F.R.D. at 237. The documents must have been prepared because of the prospect of litigation. *Id.*

In addition, the documents must have been prepared for the party claiming the privilege. "[A] document prepared for a nonparty is not deemed work product even if the nonparty is closely related to litigation." *Moore's Federal Practice* § 26.70 (3d ed. 2015). *See also*, Fed. R. 26(b)(3) (work product only applies to documents "prepared in anticipation of litigation or for trial by or for another party or its representative."); *LG Elecs., Inc. v. Motorola, Inc.*, 10 CV 3179, 2010 WL 4513722, at *3 (N.D. Ill. Nov. 2, 2010) ("This court has adhered to the plain language of that rule and held that its protections are limited to one who is a party (or a party's representative) to the litigation in which discovery is sought"). A party may waive a work product protection, just like the attorney-client privilege, if disclosure increases the likelihood that the document could be obtained by adversaries. *Grochocinski*, 251 F.R.D. at 329.

Authenticom has not established the application of the work product doctrine to any of these otherwise withheld, third-party communications. First, Authenticom has not established that it reasonably anticipated this litigation months or years before the litigation was filed. Second, Authenticom has not established that the various communications withheld were created by Authenticom *for* Authenticom. As mentioned above, these communications are by a number of differently situated parties, some of whom had their own lawyers. Authenticom cannot assert a work product privilege over any document created or prepared *by* any of the other "CI Team" entities. Fed. R. 26(b)(3). Further, Authenticom cannot assert a work product privilege over any

14

PUBLIC VERSION

documents created *for* any third-party entity (as opposed to documents created for Authenticom and then shared). *See Acceleration Bay LLC.*, 2018 WL 798731, at *1 (documents created for litigation finance company not entitled to work product protection).

Even if Authenticom could plausibly claim work product protection over these communications, it waived such a protection by disclosing the documents to a half-dozen other entities, some of whom are Authenticom's competitors, such as Dominion. Auth Dkt. 165 at 2-A-28. Many of these entities have contractual relationships with either CDK or Reynolds, thereby increasing the risk of disclosure to the adversaries. For instance, eLead has been a Reynolds Certified Interface customer since before it purportedly joined in the CI Team—and less than a year later—was acquired by Defendant CDK. Ex. 3, 4.

Finally, Authenticom knew that many of these parties were likely to be witnesses in this case—Authenticom called two of them to trial at the temporary injunction hearing—and thus the sharing of any work product privileged information made it likely such information would be disclosed and waives any protection. *Ricoh Co., Ltd. v. Aeroflex Inc*., 219 F.R.D. 66, 70 (S.D.N.Y. 2003) ("Defendants waived protection for these e-mails under the work product doctrine when counsel shared his observations with a third-party who was likely to be an independent witness in the case."). As such, Authenticom's brazen disclosure of any work product, if applicable, would have waived the protections of any privilege.

## CONCLUSION

Defendants respectfully request that the Court order Authenticom to produce unredacted copies of the documents listed on Attachments A and B. In the alternative, Defendants request that the Court order Authenticom to submit said documents for *in camera* review to evaluate whether Authenticom has met its burden to show that the challenged communications are, in fact, protected by the asserted privileges.

Dated:  March 1, 2019

Respectfully submitted,

*/s/ Britt M. Miller*
Britt M. Miller
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant CDK Global, LLC*

*/s/ Aundrea K. Gulley*
Aundrea K. Gulley
Brian T. Ross
GIBBS & BRUNS LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
(713) 751-5258
agulley@gibbsbruns.com
bross@gibbsbruns.com

Michael P.A. Cohen
SHEPPARD MULLIN RICHTER & HAMPTON, LLP
2099 Pennsylvania Ave., NW, Suite 100
Washington, DC 20006
(202) 747-1900
mcohen@sheppardmullin.com

*Counsel for Defendant The Reynolds and Reynolds Company*

PUBLIC VERSION

## CERTIFICATE OF SERVICE

I, Aundrea Gulley, an attorney, hereby certify that on March 1, 2019, I caused a true and correct copy of the foregoing DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO COMPEL PLAINTIFF AUTHENTICOM TO PRODUCE THIRD-PARTY COMMUNICATIONS OR, IN THE ALTERNATIVE, SUBMIT SUCH COMMUNICATIONS FOR IN CAMERA REVIEW, to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/ Aundrea Gulley*
Aundrea K. Gulley
GIBBS & BRUNS LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
(713) 751-5258
agulley@gibbsbruns.com

17