**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817<br>Case No. 18 C 864 |
| This Document Relates to:<br>*Cox Automotive, Inc., et al. v. CDK Global, LLC*, Case No. 1:18-CV-1058 (N.D. Ill.) | Hon. Robert M. Dow, Jr.<br>Magistrate Judge Jeffrey T. Gilbert<br><br>**PUBLIC-REDACTED** |

**COX AUTOMOTIVE, INC.'S ANSWER AND AFFIRMATIVE AND ADDITIONAL
DEFENSES TO DEFENDANT CDK GLOBAL, LLC'S COUNTERCLAIMS**

Cox Automotive, Inc., Xtime, Inc., vAuto, Inc., Dealertrack, Inc., and Autotrader.com, Inc. (collectively, "Cox Automotive") submit the following answer and affirmative defenses to CDK Global, LLC's counterclaims. Admissions as to "Cox Automotive" refer to one or more (but not necessarily all) of the aforementioned plaintiff entities.

**INTRODUCTION**[*]

1.    While falsely claiming that CDK is in breach of a purported "Most Favored Nations" provision in the parties' Managed Interface Agreement ("3PA Agreement")[3], *see Cox* Complaint (*Cox* Dkt. 1) ("Compl.") ¶¶ 232-36, Cox itself is knowingly violating the 3PA Agreement's express prohibition against the unauthorized syndication of DMS data (that is, transmitting, providing, or selling DMS data to third parties not authorized to receive it) to other third parties and other Cox applications. As further explained below, the 3PA Agreement expressly prohibits Cox from copying, licensing, or transferring any data that it obtains from CDK's DMS to third parties ▬▬▬▬▬▬▬▬▬▬▬ and requires Cox to use that data only in connection with providing the specific *Cox* applications identified in the 3PA Agreement.

---

[*] To the extent the headings or other content in the Counterclaims not contained in numbered paragraphs, such as section headings, are considered allegations within the pleading, Cox Automotive, Inc. denies them.

[3] In its complaint, Cox refers to the contract as the parties' "3PA agreement," in reference to CDK's Third Party Access ("3PA") Program, now known as the **CDK Global Partner Program**. For the Court's convenience, these counterclaims refer to the parties' agreement as the "3PA Agreement" and to CDK's third-party access program as the "3PA" program notwithstanding the name change.

**ANSWER:**     Denied.

2.     Cox agreed to these provisions in the 3PA Agreement with no intention of honoring them. In particular, Cox has been taking data that it obtains from CDK's DMS through the 3PA program and syndicating it to other third parties. ████████████████████ ██████████████████████████████████████████████████████ █████████████████████████████ n violation of both the 3PA Agreement and the contracts between CDK and its dealer customers.

**ANSWER:**     Cox Automotive admits that certain businesses affiliated with Cox Automotive have provided data from CDK's DMS to third parties but denies that such actions violate the 3PA Agreement.  Cox Automotive admits that certain businesses affiliated with Cox Automotive have used dealer-issued login credentials to access CDK's DMS but denies that such actions violate the 3PA Agreement or the contracts between CDK and its dealer customers.  Cox Automotive denies the remaining allegations in Paragraph 2.

3.     Cox evades technological measures that CDK has put in place to protect its DMS from this type of unauthorized third-party access. In particular, Dealertrack has repeatedly used automated means to get around CDK's CAPTCHA controls, which are designed to ensure that only authorized dealership employees, and not Cox computers, can access CDK's DMS.

**ANSWER:**     Cox Automotive admits that certain businesses affiliated with Cox Automotive have legitimately responded to CAPTCHA implemented by CDK but denies any alleged wrongdoing with respect to those CAPTCHA responses.  Cox Automotive denies the remaining allegations in Paragraph 3.

4.     In addition, Cox affiliate Autotrader is also in breach of a separate Data License Agreement between CDK and Autotrader. Pursuant to the Data License Agreement, CDK licenses certain vehicle inventory listing data maintained on Autotrader's website, which car dealers (among other sellers) use to sell new, certified, and used vehicles.

**ANSWER:**     Cox Automotive admits that CDK licenses certain vehicle inventory listing data from Cox Automotive pursuant to the Data License Agreement.  Cox Automotive denies the remaining allegations in Paragraph 4.

5.    CDK was induced to enter into the Data License Agreement ███████ █████████████████████████████ based on a provision in the Agreement that expressly requires Autotrader to work with CDK "in good faith" to develop a method of providing two sales metrics for vehicles that are advertised on the Autotrader website: the number of times those vehicles appear in user-generated search results pages ("SRP") and the number of times that users actually "click" on those results to view the vehicle details page ("VDP") maintained for those vehicles.

**ANSWER:**    Cox Automotive lacks sufficient knowledge or information to form a belief as to

the truth of CDK's allegations regarding the reasons CDK entered into the Data License

Agreement.  Cox Automotive denies CDK's characterization of the Data License Agreement,

which speaks for itself.  Cox Automotive denies the remaining allegations in Paragraph 5.

6.    Despite CDK's repeated requests, Autotrader has refused to engage with CDK in good faith about providing SRP and VDP metrics. Without these metrics, the data provided to CDK under the Data License Agreement has significantly less commercial value.

**ANSWER:**    Denied.

7.    At bottom, Cox is in breach of multiple agreements with CDK, including the 3PA Agreement that is at the center its antitrust lawsuit; is unlawfully syndicating data that it obtains from CDK's DMS; and is directly accessing CDK's DMS without authorization using automated means. CDK accordingly seeks both statutory and actual damages from Cox, as well as an injunction barring Cox from engaging in further unlawful conduct.

**ANSWER:**    To the extent this paragraph does not state legal conclusions to which no answer

is required, denied.

## PARTIES

8.    Counter-Plaintiff CDK Global, LLC is a Delaware limited liability company with its corporate headquarters and principal place of business at 1950 Hassell Road, Hoffman Estates, Illinois 60169. CDK is a global provider of integrated information technology and digital marketing solutions to the automotive retail industry.

**ANSWER:**    Cox Automotive lacks sufficient knowledge or information to form a belief as to

the truth of the allegations in Paragraph 8 and on that basis denies them.

9.    The automotive data ecosystem that CDK supports is massive, with tens of thousands of installations of approved vendor applications and millions of transactions every day, supporting hundreds of billions of dollars in commerce each year. CDK has made tremendous investments to build out and support its network of products and service offerings. Over the last

3

three years alone, CDK has spent more than $480 million researching, developing, and deploying new and enhanced product solutions for its customers.

**ANSWER**: Cox Automotive admits that the automotive data ecosystem has tens of thousands of installations of vendor applications and millions of transactions every day. Cox Automotive lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 9 and on that basis denies them.

10. In light of its network's size, scope, and importance to the American economy, CDK has been designated by the Department of Homeland Security as a Critical National Infrastructure "so vital to the United States that [its] incapacitation would have a debilitating effect on security [and] national economic security."[4]

**ANSWER**: Cox Automotive lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 10 and on that basis denies them.

11. Counter-Defendant Cox Automotive is a Delaware corporation with its corporate headquarters and principal place of business at 6205 Peachtree Dunwoody Road, Atlanta, Georgia 30328. By its own allegations, "Cox Automotive is one of the world's largest automotive software products and services companies, providing a comprehensive set of solutions for dealers, manufacturers, lenders, and other businesses in the automotive industry in the United States, and other countries." Compl. ¶ 6.

**ANSWER**: Admitted.

12. Cox Automotive exercises substantial control over the decision-making and operations of its subsidiaries, including Autotrader, Dealertrack, vAuto, and Xtime. Cox Automotive also directs these affiliates' operations, including their marketing, budgets, investments in technology and services, and other functions normally handled internally by a corporate entity. Employees and agents of Cox Automotive negotiated and drafted both the 3PA Agreement and Data License Agreement.

**ANSWER**: Cox Automotive admits that certain employees and agents of Cox Automotive were involved in negotiating and drafting both the 3PA Agreement and Data License Agreement. Cox Automotive denies the remaining allegations in Paragraph 12.

---

[4] *See* Dep't of Homeland Security, What is Critical Infrastructure?, available at perma.cc/N8JR-YQ6Y.

13.     Counter-Defendant Autotrader is a Delaware corporation with its corporate headquarters and principal place of business at 3003 Summit Boulevard, Suite 200, Atlanta, Georgia 30319. Autotrader is a subsidiary of Cox Automotive.

**ANSWER:**     Admitted.

14.     Counter-Defendant Dealertrack is a Delaware corporation with its corporate headquarters and principal place of business at 3400 New Hyde Park Road, North Hills, New York 11042. Dealertrack is a subsidiary of Cox Automotive.

**ANSWER:**     Admitted.

15.     Counter-Defendant vAuto is a Delaware corporation with its corporate headquarters and principal place of business at 1901 South Meyers, Suite 700, Oakbrook Terrace, Illinois 60181. vAuto is a subsidiary of Cox Automotive.

**ANSWER:**     Admitted.

16.     Counter-Defendant Xtime is a Delaware corporation with its corporate headquarters and principal place of business at 1400 Bridge Parkway, Suite 200, Redwood City, California 94065. Xtime is a subsidiary of Cox Automotive.

**ANSWER:**     Admitted.

## NATURE OF THE COUNTERCLAIMS

17.     These counterclaims arise under the CFAA, the GCSPA, the DMCA, and common law theories of breach of contract, fraud, and unjust enrichment.

**ANSWER:**     This paragraph states legal conclusions to which no answer is required.

18.     This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1331 and 1367(a). There is federal question jurisdiction under 28 U.S.C. § 1331, because CDK alleges violations of the CFAA and DMCA. There is supplemental jurisdiction over the state law counterclaims pursuant to 28 U.S.C. § 1367(a), because they are so related to CDK's federal-law counterclaims and Cox's claims that they form part of the same case or controversy.

**ANSWER:**     This paragraph states legal conclusions to which no answer is required.

19.     This Court has personal jurisdiction over Cox, because it is located and does business in the District in which this action was filed; because many of the actions giving rise to these counterclaims occurred in, and/or were directed from, this District; and because Cox filed its complaint against CDK in this District.

**ANSWER:**     This paragraph states legal conclusions to which no answer is required.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c).

**ANSWER:**     This paragraph states legal conclusions to which no answer is required.

## FACTUAL ALLEGATIONS

### A.     CDK's DMS

21.     CDK's DMS offering (referred to herein as "CDK's DMS" or "the CDK DMS") primarily consists of two enterprise software products—Drive and DASH—that provide dealers with proprietary software tools and resources used to manage core aspects of their business. CDK's DMS currently is licensed to more than 27,000 dealerships across the world and more than 8,000 new and used car dealerships in North America.

**ANSWER:**     Cox Automotive lacks sufficient knowledge or information to form a belief as to

the truth of the allegations in Paragraph 21 and on that basis denies them.

22.     CDK has invested hundreds of millions of dollars to develop the hardware and software components of its DMS. CDK's DMS also includes, and is largely comprised of, valuable pieces of intellectual property, including patented technologies, proprietary software elements and programs created by CDK (including software programs protected by the copyright laws), and proprietary data collections, which are accessible through the DMS. At all relevant times, and as CDK's contracts with dealers and third parties make clear, the DMS has remained the sole and exclusive property of CDK. Dealers that purchase DMS services from CDK are granted a personal, non-transferable, license to *use* CDK's DMS in accordance with the terms and conditions of their agreements.

**ANSWER:**     Cox Automotive lacks sufficient knowledge or information to form a belief as to

the truth of the allegations in Paragraph 22 and on that basis denies them.

23.     CDK's DMS offering consists of software and hardware components residing at both the dealership ("dealership network") and at CDK's data centers ("CDK network").[5] CDK uses state-of-the-art technology to secure the connections between the dealerships and the CDK network, including through specialized hardware at each dealership site. That hardware creates a "virtual private network" ("VPN") or "Leased-Line Multiprotocol Label Switching network" ("MPLS") between the dealership and the CDK network, which accepts direct communications only from computers on the corresponding dealership's network.

---

[5] In a few instances, the server side of the DMS system is located on a dealership's premises rather than offsite at a CDK data center.

**ANSWER:**     Cox Automotive lacks sufficient knowledge or information to form a belief as to

the truth of the allegations in Paragraph 23 and on that basis denies them.

24.     CDK's terminal program that runs on dealer computers is an original and
independent work created and licensed by CDK. It consists of original and distinct elements,
including its source and object code; distinctive screen layouts; graphical content; text;
arrangement, organization, and display of information; and dynamic user experience.

**ANSWER:**     Cox Automotive lacks sufficient knowledge or information to form a belief as to

the truth of the allegations in Paragraph 24 and on that basis denies them.

25.     In addition to its core functionalities, the CDK DMS stores voluminous amounts
of financial and accounting information and highly sensitive data, including financial statements,
accounting data, payroll information, sales figures, inventory, parts data, warranty information,
appointment records, service and repair records, vehicle information, customer personal
identifiable information, proprietary intellectual property, and proprietary data that belongs to
CDK and third parties, including the data described below. CDK encrypts sensitive data in the
DMS and appropriately expunges stale data regularly.

**ANSWER:**     Cox Automotive lacks sufficient knowledge or information to form a belief as to

the truth of the allegations in Paragraph 25 and on that basis denies them.

26.     Data housed in CDK's DMS belongs to several different types of entities. Some
data is proprietary to OEMs, such as prices and part numbers for replacement parts, labor rates,
and rebate, incentive, and warranty information. Other data in CDK's DMS is proprietary to third-
party service providers, such as credit reporting bureaus like Equifax, Experian, and TransUnion.
Still other data in the DMS is CDK's own proprietary, copyrighted data, including forms,
accounting rules, tax tables, and proprietary tools and data compilations. And some data "belongs"
to the dealers that use CDK's DMS. While access to third-party proprietary information in the
DMS is permitted for licensed DMS customers, CDK is prohibited from sharing much of this
information with other third parties absent a valid license.

**ANSWER:**     Cox Automotive admits that some of the data in CDK's DMS belongs to the

dealers.  Cox Automotive lacks sufficient knowledge or information to form a belief as to the truth

of the remaining allegations in Paragraph 26 and on that basis denies them.

27.     CDK's DMS is password protected. To access the DMS, each dealership
employee must use his or her individual login credentials. Additionally, in or around November
2017, CDK began introducing a CAPTCHA control for particular usernames that CDK suspected
were being used to facilitate unauthorized access to its DMS by third parties. The CAPTCHA

requires the person attempting to access the system to confirm that the person is a dealership employee before accessing CDK's DMS.

**ANSWER:** Cox Automotive admits that CDK has implemented CAPTCHA controls for its DMS. Cox Automotive lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 27 and on that basis denies them.

28. The standard Master Services Agreement ("MSA") between CDK and its dealer customers prohibits dealers from supplying DMS login credentials to third parties or otherwise granting third parties access to CDK's DMS: "Client shall not allow access to [the CDK DMS] by any third parties except as otherwise permitted by this agreement." MSA § 4(D).

**ANSWER:** Denied.

29. Pursuant to the MSA, the dealer expressly agrees, among other things, that it will only use CDK's software "for its own internal business purposes and will not sell or otherwise provide, directly or indirectly, any Products or Services, or any portion thereof to any third party" (*id.* § 4(B)); and that it will "treat as confidential and will not disclose or otherwise make available any of the Products or Services (including, without limitation, screen displays or user documentation) or any … proprietary data, information, or documentation related thereto … in any form, to any person other than employees of [the dealer]…" (*id.* § 4(D)). The dealer also acknowledges that notwithstanding its license to use the CDK DMS, the DMS remains at all times "the exclusive and confidential property of [CDK]." *Id.* § 4(A).

**ANSWER:** Cox Automotive lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 29 and on that basis denies them.

30. Additionally, the MSA independently prohibits "ANY THIRD PARTY SOFTWARE TO ACCESS THE CDK DEALER MANAGEMENT SYSTEM." MSA § 6(B).

**ANSWER:** Cox Automotive lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 30 and on that basis denies them.

### B. CDK's 3PA Program

31. Introduced by CDK in 2000, the 3PA program is an interface that currently provides managed, bi-directional integration with CDK's DMS (defined in the 3PA Agreement as the "CDK Interface System"). For example, the third-party marketing website TrueCar generates sales leads on behalf of dealerships. TrueCar integrates with CDK's DMS through the 3PA program to access sales transaction data, which it uses to validate vehicle sales based on TrueCar leads. This is one example of hundreds of third-party applications that integrate with CDK's DMS through the CDK Interface System.

**ANSWER:**      Cox Automotive admits that the 3PA program is an interface that currently provides bi-directional integration with CDK's DMS.  Cox Automotive lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 31 and on that basis denies them.

32.      CDK has implemented technical and contractual restrictions to prevent unauthorized access to material that is protected by applicable law, including federal copyright law, within its DMS. Among other things, CDK places access restrictions on its DMS, including secure login credentials and CAPTCHA controls. Additionally, CDK limits each third party's access to the categories of data and permissions the third party needs for the applications it provides. CDK also audits third-party integration, including which data elements in the DMS are being accessed by each 3PA program participant and how frequently they are being accessed.

**ANSWER:**      Cox Automotive admits that CDK places access restrictions on its DMS, including login credentials and CAPTCHA controls.  Cox Automotive lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 32 and on that basis denies them.

33.      Each vendor participating in the 3PA program enters into a written agreement with CDK, which grants the vendor a limited, non-transferrable license to use the CDK Interface System to access, send, and/or receive certain data on the DMS solely for the purpose of providing specific applications to CDK dealers. These applications are described in detailed Statements of Work ("SOWs") that accompany the vendor's 3PA contract with CDK. From the inception of the 3PA program, CDK's standard 3PA contracts have strictly prohibited the unauthorized syndication of any data obtained though the 3PA program to third parties and have required 3PA program participants to use the data only in connection with providing the specific applications identified in their SOWs. These restrictions are designed to ensure that 3PA program participants are the end user of the DMS data they access and their access is limited to what is necessary to support the applications that they have certified in the 3PA program.

**ANSWER:**      Cox Automotive denies that CDK's syndication restrictions are designed to ensure a vendor's access is limited to what is necessary to support the applications of the vendor.  Cox Automotive lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 33 and on that basis denies them.

C.    **The CDK-Cox 3PA Agreement**

34.    The current 3PA Agreement between CDK and Cox is dated January 8, 2016. In accordance with that Agreement and its accompanying Statements of Work, several applications offered by Cox Automotive and its subsidiaries (identified as Cox "Affiliates" in the 3PA Agreement) use the CDK Interface System to obtain data maintained in CDK's DMS, including Cox affiliates Xtime, vAuto, and Dealertrack.

**ANSWER:**    Admitted.

35.    Among other data fields, Xtime obtains service-related data (including service appointments, service customers, service operations codes, and open and closed service sales) maintained in CDK's DMS in connection with Xtime's Spectrum and Service Pro applications. vAuto obtains inventory-related data maintained in CDK's DMS in connection with its vehicle inventory analytics applications. These Xtime and vAuto applications obtain an initial set of data from CDK's DMS and then periodically "sync" with the DMS—usually multiple times per day—to obtain new or updated data from the DMS.

**ANSWER:**    Admitted.

36.    Section 1(c) of the 3PA Agreement 

**ANSWER:**    Denied.

37.    For the avoidance of doubt, Section 1(c) of the 3PA Agreement

**ANSWER:**    Cox Automotive admits that the 3PA Agreement contains the quoted language.

Cox Automotive denies the remaining allegations in Paragraph 37.

38.    The 3PA Agreement's express prohibitions against third-party syndication were specifically negotiated and agreed upon by the parties.



None of those exceptions apply to the conduct described below.

**ANSWER:** Cox Automotive admits that limitations on syndication in the 3PA Agreement were included in the 3PA Agreement agreed to by both CDK and Cox Automotive and that Cox Automotive sought more permissive syndication rights. Cox Automotive further admits that a December 9, 2015 email from Brian Green contains the quoted language. Cox Automotive denies the remaining allegations in Paragraph 38.

39. Section 1(f) of the 3PA Agreement further provides that

**ANSWER:** Cox Automotive admits that the 3PA Agreement contains the quoted language. Cox Automotive denies the remaining allegations in Paragraph 39.

**D.    Cox's Unauthorized Data Syndication to Third Parties**

40. Contrary to its assurances, Cox has been engaging in widespread unauthorized syndication of CDK DMS data in violation of the 3PA Agreement.

**ANSWER:** Denied.

41. CDK first became aware of Cox's unlawful conduct when it discovered, through an Automotive News article published in or around April 2017, that Cox affiliate vAuto was syndicating DMS vehicle inventory data to third-party Honcker, an online car leasing application. Honcker enables consumers to complete the car leasing process online by sending lease offers to consumers after a "soft credit check." On information and belief, Honcker does not market automobile inventory through internet sites or hard copy print publications. Moreover, Cox does

not provide updates, daily or otherwise, concerning vAuto's syndication of vehicle inventory data to Honcker. Thus, vAuto's syndication of vehicle inventory data to Honcker is prohibited by the 3PA Agreement.

**ANSWER:**     Cox Automotive lacks sufficient knowledge or information to form a belief as to

the truth of CDK's allegations regarding when it became aware of an Automotive News article

and regarding Honcker's business. Cox Automotive lacks sufficient knowledge or information to

form a belief as to the truth of the allegations in Paragraph 41 regarding Honcker's operations and

on that basis denies them. Cox Automotive denies the remaining allegations in Paragraph 41.

42.     Upon learning that Cox was violating the non-syndication provisions in its 3PA Agreement, CDK promptly notified Cox of its violations and requested that Cox investigate the matter. However, Cox refused to stop syndicating data to Honcker.

**ANSWER:**     Cox Automotive admits that CDK notified Cox Automotive of concerns regarding

Honcker. Cox Automotive denies the remaining allegations in Paragraph 42.

43.     More recently, CDK learned of vAuto syndicating DMS inventory data to vendor AutoLoop (another Plaintiff in this MDL). AutoLoop provides various software solutions to car dealers. Discovery has shown that in early 2018, AutoLoop began receiving a feed of vehicle inventory data from vAuto ███████████████████████████████████████████████ ███████████████████ Moreover, Cox does not provide updates, daily or otherwise, concerning vAuto's syndication of inventory data to AutoLoop. Thus, vAuto's syndication of inventory data to AutoLoop is prohibited by the 3PA Agreement.

**ANSWER:**     Cox Automotive admits that vAuto provides feeds of vehicle inventory data to

AutoLoop's Quote application and that AutoLoop provides various software solutions to car

dealers. Cox Automotive lacks sufficient knowledge or information to form a belief as to CDK's

knowledge of any syndication by vAuto and as to the functioning of AutoLoop's Quote

application. Cox Automotive denies the remaining allegations in Paragraph 43.

44.     CDK also became aware that Cox affiliate Xtime was engaged in unlawful syndication of service-related DMS data when ███████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████

████████████████████████████████████████████████████ On information and belief, this vendor does not market automobile inventory through internet sites or hard copy print publications. Moreover, Cox does not provide updates, daily or otherwise, concerning Xtime's syndication of inventory data to this vendor. Thus, Xtime's syndication of data to this vendor is prohibited by the 3PA Agreement.

**ANSWER:**  Cox Automotive lacks sufficient knowledge or information to form a belief as to

the circumstances surrounding an unnamed third party's application to the 3PA program in or

around June 2017 (including CDK's state of mind and discussions with the unnamed third party)

and as to the functioning of the unnamed third party's application.  Cox Automotive lacks

sufficient knowledge or information to form a belief as to whether Cox Automotive provides

updates to CDK concerning any syndication to this unnamed third party.  Cox Automotive denies

the remaining allegations in Paragraph 44.

45.  Upon learning that Cox was once again violating the non-syndication provisions in its 3PA Agreement, on October 2, 2017, CDK notified Cox of its violations and requested meetings to discuss the matter. After Cox failed to respond to this notification, CDK followed up with Cox on October 12, 2017 and again on January 29, 2018. Cox did not respond to CDK's multiple notices and requests, and it has not ceased its unlawful conduct.

**ANSWER:**  Cox Automotive denies that it did not respond to CDK and that it has engaged in

any unlawful conduct.  Cox Automotive lacks sufficient knowledge or information to form a belief

as to the truth of the remaining allegations in Paragraph 45 and on that basis denies them.

46.  In addition to being in clear violation of the 3PA Agreement, Cox's unauthorized syndication of DMS data to other third parties undermines the fundamental purpose of the 3PA program and creates security risks. Among other things, the success of the 3PA program depends on CDK's ability to verify that each vendor in the program is using the data that it obtains only for an approved end use and with the dealer's express, written consent. These requirements are reflected in the standard terms of CDK's 3PA contracts, as well as its 3PA certification and audit procedures. When Cox unlawfully syndicates DMS data to undisclosed third parties, CDK loses the ability to monitor who is using the data, much less verify whether they are using the data for an approved purpose or with the dealer's knowledge or consent.

**ANSWER:**  Denied.

47. Cox's unlawful syndication of DMS data to third parties also effectively prevents CDK from pursuing licensing arrangements with those third parties under the 3PA program and deprives CDK of the 3PA fees it would otherwise earn.

**ANSWER:** Cox Automotive lacks sufficient knowledge or information to form a belief as to

the truth of the allegations in Paragraph 47 and on that basis denies them.

### E. Cox's Unauthorized Access to CDK's DMS Using Dealer Issued Login Credentials and Circumvention of CAPTCHA Controls

48. Notwithstanding that Cox and its affiliates have certified several applications in the 3PA program, they also continue to use dealer-issued login credentials and employ various technological means to access the CDK DMS directly. Such access to CDK's DMS is unauthorized by CDK, strictly prohibited by CDK's MSA with its dealer customers, and in clear violation of the 3PA Agreement.

**ANSWER:** Cox Automotive admits that it has several applications certified by the 3PA

program, that certain businesses affiliated with Cox Automotive have used dealer-issued login

credentials to access the CDK DMS, and that Cox Automotive employs various technological

means to access the CDK DMS, including through the 3PA program. Cox Automotive denies the

remaining allegations in Paragraph 48.

49. In or around December 2017, ███████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ However, Dealertrack did not stop using dealer-issued login credentials to access CDK's DMS on behalf of itself and, on information and belief, other Cox affiliates. CDK has employed technological measures to prevent such access, which Cox attempts to evade.

**ANSWER:** Denied.

50. In or around November 2017, CDK introduced a CAPTCHA control designed to prevent unauthorized, automated third-party access to its DMS:



**ANSWER:**     Cox Automotive lacks sufficient knowledge or information to form a belief as to

the truth of the allegations in Paragraph 50 and on that basis denies them.

51.     CDK has applied this CAPTCHA protocol to dealer-issued login credentials that
CDK determined Dealertrack is using to gain unauthorized access to CDK's DMS.

**ANSWER:**     Cox Automotive admits that CDK has introduced CAPTCHA protocols.  Cox

Automotive lacks sufficient knowledge or information to form a belief as to the truth of the

remaining allegations in Paragraph 51 and on that basis denies them.

52.     The CAPTCHA states that "[o]nly dealer personnel are authorized to use the CDK
Global DMS. Use or access by unauthorized third parties is strictly prohibited and is in violation
of the terms on which CDK licenses its software and services. Machine/automated access . . . or
issuing of user names and passwords for third party use is considered non- authorized access." The
CAPTCHA then required the user to identify a word or series of letters and numbers, as shown
above, to "confirm you are an authorized dealer employee" before allowing the user to log in to

the CDK DMS. Accordingly, CDK's use of CAPTCHA controls for any login credentials made clear that Cox's access to CDK's system was unauthorized.

**ANSWER:** Cox Automotive admits that CDK has introduced CAPTCHA protocols

containing the quoted text. Cox Automotive denies the remaining allegations in Paragraph 52.

53. Nonetheless, Dealertrack sought to improperly bypass these CAPTCHA controls.

This is but one example of Cox Automotive's and its affiliates' use of computer-aided scripts to bypass CDK's CAPTCHA controls, allowing them to access CDK's DMS without CDK's permission.

**ANSWER:** Denied.

### F. The CDK-Cox Data License Agreement

54. Pursuant to a Data License Agreement dated January 8, 2016, CDK licenses a daily feed of vehicle inventory data ("ATC Data") maintained by Cox affiliate Autotrader related to vehicles that are sold and marketed on the Autotrader website. CDK integrates ATC Data into its own DMS and add-on software applications in order to provide enhanced vehicle inventory management services and predictive selling analytics.

**ANSWER:** Cox Automotive admits that Cox Automotive and CDK entered into a Data

License Agreement that provided a license to CDK to use a daily feed of vehicle inventory data

for certain permissible purposes. Cox Automotive lacks sufficient knowledge or information to

form a belief as to the truth of the allegations in Paragraph 54 and on that basis denies them.

55. The 3PA Agreement and the Data License Agreement were executed on the same day and were negotiated, in large part, by the same people on behalf of Cox and CDK.

**ANSWER:** Cox Automotive admits that the 3PA Agreement and Data License Agreement

were executed on the same day and that certain people at Cox Automotive and CDK were involved

in negotiating both agreements. Cox Automotive denies the remaining allegations in

Paragraph 55.

56. Among the data that Autotrader maintains for vehicles listed on its website are SRP and VDP metrics, which track how often website users search for a given vehicle (SRP) and

select that vehicle from the search results to explore further (VDP). An article published by Cox affiliate vAuto describes SRP and VDP as follows:

> Many dealers are familiar with the phrase "popcorn cars." This refers to cars that sell or "pop" quickly off the lot. … Today, dealers have access to information that can help them pop every car perfectly every time. This new information is the number of search result page (SRP) hits and vehicle detail page (VDP) conversions. So what is an SRP and a VDP? If an online shopper searches for a 2009 F150 truck, they may get five pages of F150 trucks returned. Depending on the site, there are usually between 25 and 50 vehicles on a page. Assume that your dealership's vehicle is on page four and the shopper only looks at vehicles on pages one, two and three. In this case, your dealership does not get credit for an SRP until and unless the shopper looks at page four, the one that contains your vehicle. If the shopper who looks at page four drills down on your vehicle to see all the photos and description, then you get credit for a VDP.

**ANSWER:**     Admitted.

57.     In a brochure for dealers titled *How to Market New Cars Online*, Autotrader states that "VDP views are a key performance indicator because they help account for the 66% of New car buyers who walk into the dealership without submitting a lead beforehand."

**ANSWER:**     Admitted.

58.     Given the foregoing, CDK's initial negotiations with Cox surrounding the Data License Agreement focused on SRP and VDP metrics. Indeed, an initial draft of the Agreement, prepared by Cox, stated that █████████████████████████████████████████

**ANSWER:**     Cox Automotive admits that a draft of the Data License Agreement contained the

quoted text.  Cox Automotive denies the remaining allegations in Paragraph 58.

59.     However, when Cox later provided examples of the specific ATC Data fields that it intended to provide under the Data License Agreement, CDK was surprised to find that no SRP or VDP metrics were included. Without SRP and VDP metrics, the Data License Agreement had significantly less commercial value to CDK.

**ANSWER:**     Cox Automotive lacks sufficient knowledge or information to form a belief as to

the truth of the allegations in Paragraph 59 and on that basis denies them.

60.     Eventually, Cox agreed to work with CDK "in good faith" to build an interface that would allow CDK to access SRP and VDP metrics on behalf of specific CDK customers who sold and marketed vehicles on Autotrader. The parties memorialized their agreement in Exhibit B to the Data License Agreement, which provides:

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

[REDACTED]

**ANSWER:**     Cox Automotive admits that the Data License Agreement contains the quoted text.

Cox Automotive denies the remaining allegations in Paragraph 60.

61.     Cox received the following licensing fees under the Data License Agreement: [REDACTED] These fees are significantly higher than similar third-party data feeds that CDK licenses from other online vehicle marketing websites that do not include VDP and SRP metrics. For example, [REDACTED] CDK agreed to pay the fees that Cox demanded only because it believed that Cox would work with CDK in good faith to develop a method to deliver SRP and VDP metrics for specific CDK customers.

**ANSWER:**     Cox Automotive admits that it received the stated fees.  Cox Automotive lacks

sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph

61 and on that basis denies them.

### G.     Cox's Breach of the Data License Agreement

62.     In August 2016, CDK requested meetings with Cox to move forward with leveraging the SRP and VDP metrics for individual clients per the Data License Agreement.

**ANSWER:**     Cox Automotive admits that CDK requested discussions with Cox Automotive

regarding SRP and VDP metrics in August 2016.   Cox Automotive denies the remaining

allegations in Paragraph 62.

63.     However, instead of working with CDK to provide the data, Cox abruptly claimed that [REDACTED]

**ANSWER:**     Cox Automotive admits that it made the quoted statements to CDK.   Cox

Automotive denies the remaining allegations in Paragraph 63.

64.     In response to Cox's purported concerns, CDK proposed simply having Autotrader provide links to SRP and VDP metrics for CDK clients as they appear to those clients on the Autotrader website, which CDK could embed within its own applications. This would have required virtually no additional effort by Cox and would have fully addressed Cox's stated concern

about providing SRP and VDP metrics without additional "context and insights" available to clients within the Autotrader website. Cox ignored this proposal. It never gave CDK any reason why the proposal was unworkable, nor did it propose an alternative.

**ANSWER:** Cox Automotive admits that CDK wrote an email in March 2017 discussing the possibility of "a link that [Cox Automotive] provide[s] [CDK] to put into [CDK's] application." Cox Automotive denies the remaining allegations in Paragraph 64.

65.     In April 2017, CDK's former Vice President Ron Workman reached out to Cox's then Senior Vice President of Corporate Development, Eric Jacobs, ███████

**ANSWER:** Cox Automotive admits that, in April 2017, Ron Workman sent an email to Eric Jacobs containing the quoted text. Cox Automotive denies the remaining allegations in Paragraph 65.

66.     To date, Cox has received more than ██████ in licensing fees from CDK under the Data Licensing Agreement but has never provided or even attempted to provide the SRP and VDP metrics. Despite its obligation under the Data Licensing Agreement to work with CDK "in good faith" to develop a method to provide SRP and VDP metrics, Cox has refused to meaningfully engage with CDK about the issue on any level.

**ANSWER:** Cox Automotive admits that it has received the stated amount in licensing fees from CDK under the Data License Agreement and that it has not provided the SRP and VDP metrics to CDK. Cox Automotive denies the remaining allegations in Paragraph 66.

## FIRST COUNTERCLAIM FOR RELIEF
### (Cox Automotive, vAuto, Xtime, and Dealertrack – Breach of Contract)

67.     Paragraphs 1-66 above are incorporated herein by reference.

**ANSWER:** Cox Automotive incorporates its answer to Paragraphs 1-66.

68.     The 3PA Agreement between CDK and Cox Automotive is a valid and enforceable contract and is binding on Cox and its affiliates. CDK has fully performed or tendered all performance required under the 3PA Agreement.

**ANSWER:** Denied.

69.     Cox Automotive, vAuto, and Xtime have breached their obligations under the 3PA Agreement by syndicating DMS data to unauthorized third parties.

**ANSWER:**     Denied.

70.     Cox Automotive and Dealertrack have breached their obligations under the 3PA Agreement by, among other things, using unapproved means to directly access and obtain data from CDK's DMS outside the 3PA program.

**ANSWER:**     Denied.

71.     Cox Automotive's, vAuto's, Xtime's, and Dealertrack's conduct have damaged CDK, including by depriving CDK of revenue that it would otherwise earn through its 3PA program and by causing CDK to incur the costs and expenses that CDK has incurred investigating Cox Automotive's, vAuto's, and Xtime's, and Dealertrack's unlawful conduct and attempting to compel them to cease their unlawful conduct.

**ANSWER:**     Cox Automotive lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 71 and on that basis denies them.

### SECOND COUNTERCLAIM FOR RELIEF
#### (Cox Automotive, vAuto, Xtime, and Dealertrack Violations of the Computer Fraud and Abuse Act)

72.     Paragraphs 1-71 above are incorporated herein by reference.

**ANSWER:**     Cox Automotive incorporates its answer to Paragraphs 1-71.

73.     The Computer Fraud and Abuse Act ("CFAA") provides that "[w]hoever … intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains … information from any protected computer," is subject both to criminal and civil liability. 18 U.S.C. § 1030(a)(2)(C); *see also id.* § 1030(c) (criminal penalties); *id.* § 1030(g) (civil damages and injunctive relief). The CFAA provides for a private cause of action for "compensatory damages and injunctive relief or other equitable relief" to anyone who suffers at least $5,000 in damage or loss in any one-year period "by reason of a violation" of its terms. *Id.* § 1030(g); *see id.* § 1030(c)(4)(A)(i)(I).

**ANSWER:**     This paragraph states legal conclusions to which no answer is required.

74.     CDK's DMS is a "computer" within the meaning of the CFAA, which defines that term to include "any data storage facility or communications facility directly related to or operating in conjunction with [a computing] device." *Id.* § 1030(e)(1). CDK's DMS also relies on the operation of one or more computing devices in its operations. The DMS itself, and the computing devices by which it operates, are "protected computers" within the meaning of the CFAA because they are connected to the internet and thus are used in and affect interstate and foreign commerce and communications. *See id.* § 1030(e)(2)(B).

**ANSWER:**     This paragraph states legal conclusions to which no answer is required.

75.     Cox Automotive, vAuto, Xtime, and Dealertrack have repeatedly and intentionally accessed CDK's DMS without CDK's authorization. Every time that Cox Automotive, vAuto, and Xtime access CDK's DMS with the intent of obtaining and syndicating data to other third parties or internally in a manner not authorized by the 3PA Agreement, they exceed the scope of their authorization to access CDK's DMS. Every time that Cox Automotive and Dealertrack bypassed CDK's CAPTCHA controls, which stated that only dealer employees were authorized to access CDK's DMS, Cox Automotive and Dealertrack accessed CDK's DMS without authorization or in excess of their authorization.

**ANSWER:**     Denied.

76.     CDK has informed Cox Automotive and its affiliates that their conduct is unauthorized and prohibited. CDK has demanded that Cox Automotive and its affiliates cease their unlawful conduct, but they have refused to do so.

**ANSWER:**     Denied.

77.     Cox Automotive's, vAuto's, Xtime's, and Dealertrack's violations of the CFAA have caused CDK to suffer damages and losses. These damages and losses include the costs of investigating and responding to Cox Automotive's, vAuto's, Xtime's, and Dealertrack's unlawful actions; the costs of restoring the DMS and the data it contains to their condition prior to Cox Automotive's, vAuto's, Xtime's, and Dealertrack's unlawful actions; and all revenue lost, costs incurred, and other consequential damages incurred because of disruption of service caused by Cox Automotive's, vAuto's, Xtime's, and Dealertrack's unlawful actions. On information and belief, these losses have exceeded $5,000 within a twelve-month period.

**ANSWER:**     Cox Automotive lacks sufficient knowledge or information to form a belief as to

the truth of the allegations in Paragraph 77 and on that basis denies them.

78.     Cox Automotive, vAuto, Xtime, and Dealertrack will continue to violate the CFAA if not enjoined by this Court, causing CDK irreparable harm. Among other things, Cox Automotive's, vAuto's, and Xtime's unauthorized syndication of data sourced from CDK's DMS to unknown third parties and Dealertrack's unauthorized access to CDK's DMS and evasion of CDK's CAPTCHA controls increase the risk that CDK will suffer a security breach and widespread data corruption issues and degrades the performance of its DMS, all of which constitute an irreparable harm.

**ANSWER:**     Denied.

79.     CDK is also entitled to equitable relief in the form of restitution for the benefits that Cox Automotive, vAuto, Xtime, and Dealertrack accrued and/or disgorgement of the unlawful profits they have received.

**ANSWER:**     Denied.

### THIRD COUNTERCLAIM FOR RELIEF
### (Cox Automotive, vAuto, Xtime, and Dealertrack –
### Violations of the Georgia Computer Systems Protection Act)

80.     Paragraphs 1-79 above are incorporated herein by reference.

**ANSWER:**     Cox Automotive incorporates its answer to Paragraphs 1-79.

81.     The Georgia Computer Systems Protection Act ("GCSPA") provides that "[a]ny person who uses a computer or computer network with knowledge that such use is without authority and with the intention of: (1) Taking or appropriating any property of another, whether or not with the intention of depriving the owner of possession; (2) Obtaining property by any deceitful means or artful practice; or (3) Converting property to such person's use in violation of an agreement or other known legal obligation to make a specified application or disposition of such property" commits "computer theft." Ga. Code Ann. § 16-9-93(a); *see also id.* § 16-9-93(g) (civil penalties).

**ANSWER:**     This paragraph states legal conclusions to which no answer is required.

82.     CDK's DMS is a "computer" within the meaning of the GCSPA, which defines that term to include any electronic device" that "can automatically perform computer operations with or on computer data and can communicate the results to another computer or to a person." *Id.* § 16-9-92(1). Alternatively, CDK's DMS is a "computer network" within the meaning of the GCSPA, because it is "a set of related, remotely connected computers and any communications facilities with the function and purpose of transmitting data among them through the communications facilities." *Id.* § 16-9-92(2).

**ANSWER:**     This paragraph states legal conclusions to which no answer is required.

83.     CDK's DMS is "property" within the meaning of the GCSPA, which defines that term to include "computers, computer networks, computer programs, data, financial instruments, and services." *Id.* § 16-9-92(13).

**ANSWER:**     This paragraph states legal conclusions to which no answer is required.

84.     Cox Automotive, vAuto, Xtime, and Dealertrack have repeatedly and intentionally accessed CDK's DMS without CDK's authorization. Every time that Cox Automotive, vAuto, and Xtime access CDK's DMS with the intent of obtaining and syndicating data to other third parties or internally in a manner not authorized by the 3PA Agreement, they exceed the scope of their authorization to access CDK's DMS. Every time that Cox Automotive and Dealertrack bypassed CDK's CAPTCHA controls, which stated that only dealer employees were authorized to access CDK's DMS, they accessed CDK's DMS without authorization or in excess of their authorization.

**ANSWER:**     Denied.

85. CDK has informed Cox Automotive and its affiliates that their conduct is unauthorized and prohibited. CDK has demanded that Cox Automotive and its affiliates cease their unlawful conduct, but they have refused to do so.

**ANSWER:** Denied.

86. Cox Automotive's, vAuto's, Xtime's, and Dealertrack's violations of the GCSPA have caused CDK to suffer damages and losses. These damages and losses include the costs of investigating and responding to Cox Automotive's, vAuto's, Xtime's, and Dealertrack's unlawful actions; the costs of restoring the DMS and the data it contains to their condition prior to Cox Automotive's, vAuto's, Xtime's and Dealertrack's unlawful actions; and all revenue lost, costs incurred, and other consequential damages incurred because of disruption of service caused by Cox Automotive's, vAuto's, Xtime's, and Dealertrack's unlawful actions.

**ANSWER:** Cox Automotive lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 86 and on that basis denies them.

87. Cox Automotive, vAuto, Xtime, and Dealertrack will continue to violate the GCSPA if not enjoined by this Court, causing CDK irreparable harm. Among other things, Cox Automotive's, vAuto's, and Xtime's unauthorized syndication of data sourced from CDK's DMS to unknown third parties and Dealertrack's unauthorized access to CDK's DMS and evasion of CDK's CAPTCHA controls dramatically increase the risk that CDK will suffer a security breach and widespread data corruption issues and degrades the performance of its DMS, all of which constitute an irreparable harm.

**ANSWER:** Denied.

88. CDK is also entitled to equitable relief in the form of restitution for the benefits that Cox Automotive, vAuto, Xtime, and Dealertrack accrued and/or disgorgement of the unlawful profits they have received.

**ANSWER:** Denied.

## FOURTH COUNTERCLAIM FOR RELIEF
### (Cox Automotive and Dealertrack – Digital Millennium Copyright Act)

89. Paragraphs 1-88 above are incorporated herein by reference.

**ANSWER:** Cox Automotive incorporates its answer to Paragraphs 1-88.

90. The Digital Millennium Copyright Act, 17 U.S.C. § 1201 ("DMCA"), prohibits, among other things, "circumvent[ing] a technological measure that effectively controls access to a work protected under this title." *Id.* § 1201(a)(1)(A).

**ANSWER:** This paragraph states legal conclusions to which no answer is required.

91.     CDK's DMS software is an original creative work protected under Title 17. Among its original and creative elements are its source and object code; distinctive screen layouts; graphical content; text; arrangement, organization, and display of information; and dynamic user experience.

**ANSWER:**     This paragraph states legal conclusions to which no answer is required.

92.     CDK uses several technological measures to control access to and prevent copying of the CDK DMS software program. These technological measures include: requiring dealer employees to log on with passwords; text prompts asking a user to certify that he or she is an authorized dealer employee; CAPTCHA controls; and disabling of dealer credentials that CDK finds have been used for automated access by Cox or other third parties. In the ordinary course of their operation, these password controls, certification prompts, CAPTCHA controls, and credential disabling measures required application of information, or a process or treatment, with CDK's authority as the owner of the DMS, to gain access to the CDK DMS software or a portion of the CDK DMS software. These measures effectively control access to the DMS software program in that the program, or portions of the program, cannot be run, and its original, expressive elements cannot be displayed or copied, unless these measures have been navigated. These access control measures were effective in preventing Cox from accessing the CDK DMS before Cox circumvented them.

**ANSWER:**     Cox Automotive lacks sufficient knowledge or information to form a belief as to

the truth of the allegations in Paragraph 92 and on that basis denies them.

93.     Cox Automotive and Dealertrack have repeatedly circumvented CDK's access control measures in order to access the CDK DMS and extract data from it. They have wrongfully obtained login credentials in violation of contractual requirements that such credentials be given to and used by authorized dealer employees only unless otherwise allowed by CDK. And they have circumvented, or given outright false answers to, multiple CAPTCHA controls through the use of automated computer scripts. This conduct constitutes circumvention of technological measures that effectively controlled access to CDK's DMS in violation of 17 U.S.C. § 1201(a)(1)(A).

**ANSWER:**     Denied.

94.     Under 17 U.S.C. § 1203, CDK is entitled to either actual damages and any additional profits from Cox Automotive's and Dealertrack's violations of the DMCA or statutory damages of between $200 and $2,500 "per act of circumvention," at CDK's election. CDK is also entitled to injunctive relief under 17 U.S.C. § 1203(b)(1). Cox Automotive and Dealertrack will continue to violate the DMCA if not enjoined by this Court. Moreover, Cox Automotive's and Dealertrack's unauthorized access to the CDK DMS dramatically increases the risk that CDK will suffer a security breach and widespread data corruption issues and degrades the performance of its DMS, all of which constitute an irreparable harm.

**ANSWER:** To the extent this paragraph does not state legal conclusions to which no answer is required, denied.

### FIFTH COUNTERCLAIM FOR RELIEF
### (Cox Automotive and Dealertrack – Fraud – CAPTCHA Misrepresentations)

95. Paragraphs 1-94 above are incorporated herein by reference.

**ANSWER:** Cox Automotive incorporates its answer to Paragraphs 1-94.

96. In the course of accessing the CDK DMS without authorization, Cox Automotive and Dealertrack have frequently and repeatedly represented to CDK that Dealertrack is a human employee of a CDK dealer customer who is authorized to access the DMS. That representation occurs whenever Dealertrack uses login credentials provided by dealers and is confronted with a CAPTCHA prompt similar to the one described in Paragraphs 50-52. That CAPTCHA prompt states that "[o]nly dealer personnel are authorized to use the CDK Global DMS," that "[u]se or access by unauthorized third parties is strictly prohibited and is in violation of the terms on which CDK licenses its software and services," and that "[m]achine/automated access … or issuing of user names and passwords for third party use is considered non-authorized access." The CAPTCHA control then requires the user to represent to CDK that "you are an authorized dealer employee" before successfully logging in to the CDK DMS by identifying a word or series of letters and numbers. Thus, each time that Dealertrack bypassed that CAPTCHA control through automated means, it represented that it was a dealer employee.

**ANSWER:** Denied.

97. Those representations are false. Dealertrack is not and never has been a dealer employee and is forbidden under CDK's dealer contracts from accessing the CDK DMS without CDK's authorization. Cox Automotive and Dealertrack know these facts and thus know that Dealertrack's representations to CDK when it bypasses CAPTCHA are untrue.

**ANSWER:** Denied.

98. CDK was misled by Dealertrack's false misrepresentations and relied on them by allowing Dealertrack, masquerading as a dealership employee, to access the CDK DMS. CDK's technological measures were not always effective to detect and prevent Dealertrack's unauthorized access. If CDK knew when Dealertrack was attempting to access its system without authorization, it would have affirmatively sought to prevent Dealertrack from doing so.

**ANSWER:** Denied.

99. Dealertrack's fraudulent misrepresentations are the direct and proximate cause of harm and damages to CDK. As a result of Cox Automotive's and Dealertrack's interference and the breaches of the dealer contracts, CDK has had to devote substantial resources to monitoring and remediating any harmful effects of Dealertrack's unauthorized DMS access and to preventing such unauthorized access in the future. CDK has also been denied any compensation for

Dealertrack's access to the CDK DMS. For example, Dealertrack pays CDK for access to the CDK DMS through the 3PA program for certain authorized Dealertrack applications. Dealertrack would have had to pay CDK in similar fashion to lawfully obtain the access to CDK's DMS that Dealertrack obtained through its false representations.

**ANSWER:**     Cox Automotive lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 99 and on that basis denies them.

100.    Cox Automotive's and Dealertrack's fraud will continue if not enjoined by this Court. Among other things, Dealertrack's unauthorized access to the CDK DMS dramatically increases the risk that CDK will suffer a security breach and widespread data corruption issues and degrades the performance of its DMS, all of which constitute an irreparable harm.

**ANSWER:**     Denied.

### SIXTH COUNTERCLAIM FOR RELIEF
### (Autotrader – Breach of Contract)

101.    Paragraphs 1-100 above are incorporated herein by reference.

**ANSWER:**     Cox Automotive incorporates its answer to Paragraphs 1-100.

102.    The Data License Agreement between CDK and Autotrader is a valid and enforceable contract. CDK has fully performed or tendered all performance required under the Data License Agreement.

**ANSWER:**     Cox Automotive admits that the Data License Agreement between CDK and Autotrader is a valid and enforceable contract.  Cox Automotive lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 102 and on that basis denies them.

103.    Despite multiple requests, Autotrader has refused to cooperate with CDK to discuss or develop methods for displaying individual SRP and VDP metrics and has not responded to CDK's attempts to find a solution.

**ANSWER:**     Denied.

104.    Autotrader's conduct violates its express and implied contractual obligation to act in good faith with respect to the provision of SRP and VDP data.

**ANSWER:**     Denied.

105.     Autotrader's refusal to work with CDK has damaged CDK by depriving it of the benefit of the bargain. Had CDK known that Autotrader would not cooperate to provide SDP and VDP metrics, CDK would have paid significantly less for the ATC Data than it agreed to pay in the Data License Agreement or would not have entered into the agreement at all.

**ANSWER:**     Cox Automotive lacks sufficient knowledge or information to form a belief as to

the truth of the remaining allegations in Paragraph 105 and on that basis denies them.

## SEVENTH COUNTERCLAIM FOR RELIEF
### (Autotrader – Unjust Enrichment)

106.     Paragraphs 1-105 above are incorporated herein by reference.

**ANSWER:**     Cox Automotive incorporates its answer to Paragraphs 1-105.

107.     This counterclaim is plead in the alternative to CDK's breach of contract counterclaim against Autotrader and to the extent the Data License Agreement is found not to be a valid and enforceable contract.

**ANSWER:**     This paragraph states legal conclusions to which no answer is required.

108.     Because of its improper conduct, Autotrader has unjustly received millions of dollars in licensing fees from CDK without giving CDK any compensation in exchange for the benefit.

**ANSWER:**     Denied.

109.     Permitting Autotrader to retain the licensing fees under these circumstances violates the fundamental principles of justice, equity, and good conscience.

**ANSWER:**     Denied.

## PRAYER FOR RELIEF

**ANSWER:**     To the extent that an answer may be required to the Prayer for Relief at the end of

the Counterclaims, Cox Automotive denies each and every allegation contained therein and denies

that CDK is entitled to the relief it seeks.

## JURY DEMAND

CDK hereby demands a trial by jury for all claims so triable.

**ANSWER**:     To the extent that an answer may be required to the Jury Demand at the end of

CDK's Counterclaims, Cox Automotive denies each and every allegation therein.

*　　　　　*　　　　　*

## DENIAL

Cox Automotive denies each and every allegation of the Counterclaims not specifically admitted above.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

Without assuming any burden of proof that it would not otherwise bear, Cox Automotive also asserts the following affirmative and additional defenses.

### First Defense

The Counterclaims fail to state a claim upon which relief may be granted.

### Second Defense

As detailed in Cox Automotive's complaint, CDK's actions and contracts purporting to prohibit Cox Automotive's business activities are part of an unlawful scheme to eliminate competition. As such, the contractual and legal restrictions alleged herein are void as a matter of law. As a result, CDK has failed to state a cause of action.

### Third Defense

CDK's claim is barred, in whole or in part, by the applicable statute of limitations. CDK filed these Counterclaims on February 15, 2019. CDK has not pled any event that would toll any applicable limitations period. As such, the statutory time limitation applicable to some or all of CDK's claims has passed and thus are time-barred.

### Fourth Defense

If and to the extent that CDK has been damaged, which Cox Automotive denies, the amount of damages that CDK alleges to have suffered is too remote or speculative to allow recovery, and

it is impossible to ascertain and allocate such alleged damages with reasonable certainty.

### Fifth Defense

If and to the extent CDK has been damaged, which Cox Automotive denies, CDK, by the exercise of reasonable diligence, could have mitigated its damages but did not, and CDK is therefore barred from recovery. Alternatively, any damages sustained by CDK, which Cox Automotive denies, must be reduced by the amount that such damages would have been reduced had CDK exercised reasonable diligence in mitigating its damages.

### Sixth Defense

CDK's claims are barred, in whole or in part, because to the extent CDK suffered any injury or incurred any damages as alleged in the Counterclaims, which Cox Automotive denies, any such injury or damage was caused and brought about by the acts, conduct or omissions of individuals or entities other than Cox Automotive and, as such, any recovery herein should be precluded or diminished in proportion to the amount of fault attributable to such other individuals or entities.

### Seventh Defense

CDK's claims are barred by the doctrine of unclean hands. The unclean hands doctrine bars CDK from bringing these claims to allege that Cox Automotive engaged in unlawful activity based on the manner in which Cox Automotive has organized its corporate infrastructure, facilities, personnel, job responsibilities, and computer systems, because Cox Automotive is informed and believes that CDK have themselves made similar decisions and engage in similar practices to those alleged of Cox Automotive, including with regard to independent data integration services, both on its own behalf and by and through its subsidiaries and affiliates. The unclean hands doctrine demands that a plaintiff act fairly in the matter for which it seeks a remedy. The plaintiff must

come into court with clean hands, and keep them clean, or it will be denied relief, regardless of the merits of its claim. The defense applies to bar legal and equitable claims, and need not involve criminal or tortious activity – simply conduct that violates conscience, good faith, and equitable standards of conduct. To the extent CDK seeks to contend that Cox Automotive engaged in unlawful activity by allegedly performing the same or similar acts as CDK, within the same nexus of common customers and common sources of data or classes of software, its claims are barred because such conduct infects its claims and renders pursuing this action inequitable.

### Eighth Defense

To the extent lack of authorization for access is deemed an affirmative defense rather than an element on which CDK bears the burden of proof (and Cox Automotive contends that the latter applies), CDK is barred from claiming violations of any statute or source of law because Cox Automotive's access was authorized.

### Ninth Defense

CDK's claims are barred by the doctrine of acquiescence.

### Tenth Defense

CDK's claims are barred by the doctrines of laches, waiver, and estoppel.

### Eleventh Defense

The privilege of competition and other privileges available under state law bar CDK from pursuing its claims for relief.

### Twelfth Defense

The doctrine of implied license bars CDK from pursuing their claims for relief.

### Thirteenth Defense

CDK's claims are barred, in whole or in part, because CDK has not suffered any legally

cognizable injury, including because CDK has not suffered an injury-in-fact and its alleged injuries are too speculative, indirect and remote from the alleged conduct, and cannot be ascertained and apportioned.

### Fourteenth Defense

CDK's claims are barred, in whole or in part, because to the extent CDK suffered any injury or incurred any damages as alleged, which Cox Automotive denies, Cox Automotive's alleged conduct was not the actual or proximate cause of any injury or damage to CDK.

### Fifteenth Defense

CDK's claims are barred, in whole or in part, because any recovery would result in unjust enrichment to CDK.

### Sixteenth Defense

CDK is barred from recovering because its acts are in violation of public policy.

### Seventeenth Defense

CDK's claims are barred because the "good faith" provision of the Data License Agreement is unenforceable.

### Eighteenth Defense

CDK's unjust enrichment claim is precluded by its breach of contract claim.

### Nineteenth Defense

CDK's breach of contract claims are barred because CDK has not tendered performance under the applicable contracts.

*      *      *

Cox Automotive adopts by reference any applicable defense pled by any other counterclaim-defendant not expressly set forth herein. In addition, Cox Automotive has

insufficient knowledge or information upon which to form a basis as to whether it may have additional, as yet unstated, separate defenses available. Cox Automotive reserves the right to amend this Answer to add, supplement or modify defenses based upon legal theories that may be or will be divulged, through discovery, or through further factual or legal analysis of CDK's allegations, contentions and positions in this litigation.

## JURY DEMAND

Pursuant to Federal Rules of Civil Procedure, Rule 38(b), Cox Automotive hereby demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Cox Automotive requests that CDK's Counterclaims be dismissed with prejudice, that the Court find that CDK is not entitled to any judgment or relief, that the Court enter judgment in favor of Cox Automotive, and that the Court award Cox Automotive its attorneys' fees, costs and expenses, pre-judgment interest, and such other and further relief as the Court deems just and proper.

Dated:  March 8, 2019

Respectfully submitted,

/s/ Derek T. Ho
Derek T. Ho
**KELLOGG, HANSEN, TODD,**
 **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com

*Counsel for Plaintiff Cox Automotive, Inc.,*
*Autotrader.com, Inc., Dealer Dot Com, Inc.,*
*Dealertrack, Inc., HomeNet, Inc., Kelley Blue*
*Book Co., Inc., vAuto, Inc., VinSolutions, Inc.,*
*and Xtime, Inc.*

## CERTIFICATE OF SERVICE

I, Derek T. Ho, an attorney, hereby certify that on March 8, 2019, I caused a true and correct copy of the foregoing **COX AUTOMOTIVE, INC.'S ANSWER AND AFFIRMATIVE AND ADDITIONAL DEFENSES TO DEFENDANT CDK GLOBAL, LLC'S COUNTERCLAIMS** to be filed electronically via the court's CM/ECF system. Notice of this filing will be sent by email to all counsel of record by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Copies were served on counsel of record via email.

*/s/ Derek T. Ho*
Derek T. Ho
**KELLOGG, HANSEN, TODD,**
 **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com