# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This filing relates to:* | Hon. Robert M. Dow, Jr. |
| *Cox Automotive, Inc., et al. v. CDK Global, LLC*, Case No. 1:18-CV-1058 (N.D. Ill.) | Magistrate Judge Jeffrey T. Gilbert |

# CDK GLOBAL LLC'S RESPONSE TO COX AUTOMOTIVE, INC., ET AL.'S MOTION FOR PROTECTIVE ORDER TO PREVENT THE DEPOSITION OF SANDY SCHWARTZ

Cox[1] fails to show good cause for prohibiting the deposition of Sandy Schwartz. Contrary to Cox's assertions, Mr. Schwartz has unique, personal knowledge regarding matters central to this lawsuit, and that information cannot be obtained through other means. Nor does Cox demonstrate that a deposition would be unduly burdensome. Instead, Cox simply relies on Mr. Schwartz's status as the President of Cox's automotive arm, arguing he should be immune from discovery. As detailed below, however, Mr. Schwartz is not immune from discovery, nor is he being singled-out for harassment here—the mistreatment that the so-called "apex" doctrine exists to prevent. As Cox admits, numerous high-ranking executives for other parties are also being deposed in this MDL. The motion for protective order should be denied.

## BACKGROUND

This is a massive multi-district litigation, which Cox and eight of its subsidiaries joined as plaintiffs in late 2017. Cox alleges that CDK Global, LLC ("CDK") restricted third-party access to its Dealer Management System ("DMS") as part of a horizontal conspiracy and market-allocation scheme with The Reynolds & Reynolds Company ("Reynolds"), another DMS provider, "to protect [CDK's and Reynolds'] duopoly in the market for DMSs." *See* Cox Compl. (Dkt. 1) ¶ 4. Cox also asserts monopolization claims against CDK premised on allegations that DMS customers are "locked in" once they purchase a CDK DMS and cannot realistically switch to another DMS provider that allows third-party access. *See* Cox Compl. ¶¶ 56 60; Dkt. 505 ("Cox MTD Order") at 20-24.[2] Cox is represented by the same counsel who represents plaintiffs Authenticom, MVSC, and a putative nationwide class of application vendors, but Cox has only sued CDK, not Reynolds.

---

[1] The plaintiffs in Case No. 1:18-CV-1058 are Cox Automotive, Inc. and its subsidiaries Autotrader.com, Inc., Dealer Dot Com, Inc., Dealertrack, Inc., HomeNet, Inc., Kelley Blue Book Co., Inc., vAuto, Inc., VinSolutions, Inc., and Xtime, Inc.

[2] CDK recently filed counterclaims against certain Cox plaintiffs, alleging that Cox breached its contracts with CDK and violated numerous statutes by: (a) using data obtained from CDK's DMS in an unauthorized manner (including by syndicating such data to third parties); (b) circumventing CDK's security controls over its DMS; and (c) failing to provide CDK certain metrics required under a licensing agreement.

Given the high-stakes nature of this litigation, depositions involving senior executives and CEOs have not been out of the ordinary. The CEOs of plaintiffs MVSC and Authenticom have been or will be deposed. Reynolds' CEO and immediate former President both gave depositions, CDK's former President of North American Operations, Robert Karp, has been deposed, and CDK's CEO in place during the relevant time period is scheduled to give a deposition.

Cox is a major player in the automotive software industry. As relevant to the litigation, it acquired its own DMS—known as Dealertrack—in 2015 in a $4 billion deal. Dealertrack DMS is the third largest competitor in the DMS market, and it vigorously competes with CDK and Reynolds—gaining market share on both DMS brands in recent years. In addition, Cox's subsidiaries offer software applications to various types of automotive and other dealers, and those applications use data stored in the dealers' licensed DMSs. Nor is Mr. Schwartz the far-removed figurehead that Cox suggests. *See* Cox Br. at 2. He is the President of Cox Automotive—the business unit within Cox that holds the plaintiff subsidiaries that are parties to this litigation. As discussed below, moreover, he has highly relevant, unique, personal knowledge about key issues bearing not only on Cox's individual claims, but on other claims and defenses in the MDL.

**Dealertrack Acquisition:** Competition in the DMS market is at the very heart of this dispute. Cox and every other MDL plaintiff have put in issue the question whether dealers can realistically switch DMSs, claiming that CDK and Reynolds have stifled competition in the DMS market. *See, e.g.*, Cox Compl. ¶ 4 (alleging that purpose of CDK and Reynolds conspiracy was to "protect their duopoly in the DMS market"); Authenticom Compl. (Dkt. 1) ¶ 3 (claiming that CDK and RR use market power to compel dealers to submit to long-term contracts and make switching DMS providers deeply disruptive and expensive); AutoLoop Compl. (Dkt. 194) ¶ 176 (claiming that purposes of conspiracy between CDK and RR include protecting their DMS duopoly (thereby

protecting monopoly profits), protecting their standalone applications, and monopolizing Dealer Data Integration Market).

Yet notwithstanding these allegations, Cox bought its own DMS to compete with CDK and Reynolds as part of the Dealertrack acquisition. Mr. Schwartz's testimony on this issue, is critical, for Cox's acquisition of a DMS, and its plans and strategies for it, are fundamental to MDL Plaintiffs' monopolization claims. These claims require Plaintiffs to prove the existence of a CDK "brand-specific" aftermarket for "data integration" services, and the existence of such a market in turn depends on dealers being "'locked in' [to] [CDK's] DMS" and incapable of switching to another competitor. *See* Cox MTD Order at 21; Cox Compl. ¶¶ 56-60, 207. If DMS providers who offer professed "open" DMSs—like Dealertrack—are viable competitors in the DMS market, then dealers are not "locked in," and the alleged aftermarket that is essential to Plaintiffs' case does not exist.

The relevant details about the strategy behind the Dealertrack acquisition (and the assessment of the ability to compete) are within Mr. Schwartz's unique, personal knowledge. He was Cox's lead representative and the primary point person (both internally and publicly) during the acquisition. Internally, Mr. Schwartz was also the primary liaison to Cox's Executive Leadership Team and the relevant business unit in all matters pertaining to the Dealertrack acquisition. *See* Ex. 1 (COX_0012945) (███); Ex. 2 (COX_0054785) (███). And he personally participated in road shows and town halls advising the public and Cox employees about the deal. *See* Ex. 3 (COX_0003965); *see also* Ex. 4 (COX_0054290) (███). It was also Mr. Schwartz who notified Cox's customers about the acquisition. *See* Ex. 5 (COX_0054298).

3

Mr. Schwartz also can provide relevant testimony regarding Cox's assessment of how differences between DMSs impacted Dealertrack's position in the market. *See, e.g.*, Ex. 6 (COX_0054556) (                                                                                                

                                                  ).  Indeed, immediately upon learning of CDK's plans to acquire the DMS provider Auto/Mate, Mr. Schwartz suggested that,                                

                                                                                                

      .  Ex. 7 (COX_0032357).

The previously deposed Cox witnesses either disclaimed knowledge, or did not have Mr. Schwartz's detailed knowledge, about acquisition-related matters.  For example, Paul Whitworth, the former head of Dealertrack DMS,                                                                         

                                                                                        .  Ex. 8 (Whitworth Tr. at 44:22-25; 76:2-7.)  Likewise, Keith Jezek, president of the Cox division that manages Dealertrack,                                                                                            

                                                                                        *See* Ex. 9 (Jezek Tr. at 345:6–346:9; 353:14–354:2).

**Applications Market:**  Both Cox and the putative vendor class also have made the "applications market" an issue in this MDL.  Both claim that CDK and Reynolds have "titled the table" in favor of their own applications, putting Plaintiffs' applications at a competitive disadvantage, both in terms of pricing and functionality.  Cox Compl. ¶¶ 162-69; AutoLoop Compl. ¶¶ 145-150.   Mr. Schwartz has extensive and unique personal knowledge about the applications market, and how Cox's applications compete.  As the division President since 2011, "[h]e has helped to build [Cox's applications] . . . portfolio by nurturing organic growth at Autotrader and Manheim, seamlessly integrating software start-ups such as vAuto and Xtime . . . ." *See* Ex. 10

4

(Schwartz Biography). Underscoring the fact that Mr. Schwartz is not a hands-off executive, he described himself as the "conductor" of a "symphony," as Cox set out to acquire numerous applications in 2011. *See* Ex. 11 (February 15, 2017 Ward Auto interview with Schwartz). Thus, it is not surprising that he made numerous presentations discussing the growth of, and strategy for, Cox's applications business. *See, e.g.*, Ex. 12 (COX_0006197). There can be no dispute that Mr. Schwartz has unique and extensive personal knowledge regarding the application market and the competition therein.

**Personal Communications with Industry Participants**: Mr. Schwartz regularly communicated personally with Cox's dealer customers about matters directly relevant to the litigation, and he has unique, personal knowledge about such communications. *See, e.g.*, Ex. 13 (COX_0052883) ( ); Ex. 14 (CDK-2015827) ( ). . Ex. 9 (Jezek Tr. at 241:14-19). Mr. Jezek did not attend such meetings himself (*see id.*), and thus Mr. Schwartz has unique knowledge regarding each of these potentially important interactions, which are directly relevant to plaintiffs' allegations regarding dealers' ability to switch DMSs.

Mr. Schwartz was also Cox's main point of contact with Reynolds. He met with executives Bob Brockman and Bob Schaefer on many occasions starting as early as 2014 to try to build a business relationship with Reynolds and negotiate an RCI integration agreement for Cox's applications. *See, e.g.*, Ex. 15 (REYMDL00394499) ( )

5



); Ex. 16 (COX_0042122) ( ); Ex. 17 (COX_0003424) ( ). Given Cox's allegations that Reynolds' RCI program put Cox applications at a competitive disadvantage in the marketplace (Compl. ¶¶ 162-69), Mr. Schwartz's interactions with Brockman and Schaefer are plainly relevant, and he has personal knowledge about his interactions with these individuals that cannot be obtained from other sources.

## ARGUMENT

It is Cox's burden to show that good cause exists for a protective order, and courts prohibit a deposition altogether only in extraordinary circumstances. *Johnson v. Jung*, 242 F.R.D. 481, 483, 486 (N.D. Ill. 2007); *WebSideStory, Inc. v. NetRatings, Inc.*, 06CV408 WQH(AJB), 2007 WL 1120567, at *2 (S.D. Cal. Apr. 6, 2007). There is nothing extraordinary about the deposition sought here—numerous other high-ranking executives are voluntarily appearing for their own depositions in this litigation. Mr. Schwartz is not immune from discovery, and although courts appropriately consider the potential for harassment, it is "well established" that Cox must provide "a particular and specific demonstration of fact" showing a protective order is warranted. *See Nucap Indus. Inc. v. Robert Bosch LLC*, 15-CV-2207, 2017 WL 6059770, at *2 (N.D. Ill. Dec. 7, 2017); *see also Jung* 242 F.R.D. at 483, 486; *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002). Cox falls far short of that showing here.

***Cox Fails To Show That Mr. Schwartz Lacks Unique, Personal Knowledge***: Cox argues (at 5-8) that Mr. Schwartz lacks personal knowledge—or has only limited knowledge—about relevant matters. That argument is unpersuasive for several reasons.

First, simply arguing that Mr. Schwartz lacks knowledge is insufficient. *See Jung*, 242 F.R.D. at 483 (collecting cases); *see also WebSideStory, Inc. v. NetRatings, Inc.*, 06CV408 WQH(AJB), 2007 WL 1120567, at *2 (S.D. Cal. Apr. 6, 2007) ("[g]enerally, a claimed lack of knowledge on behalf of the deponent does not alone provide sufficient grounds for a protective order"). Cox's motion is not even supported by an affidavit from Mr. Schwartz addressing the purported limitations on his relevant knowledge.

Second, even if Mr. Schwartz's claims were supported by affidavit or other evidence, his denial of involvement would be "manifestly inadequate under all the cases." *Jung*, 242 F.R.D. at 484. Such claims are "subject to testing by a party through examination." *RxUSA Wholesale, Inc. v. McKesson Corp.*, CV 06-4343 DRH AKT, 2007 WL 1827335, at *4 (E.D.N.Y. June 25, 2007).

Third, and in any event, the attempt to cast Mr. Schwartz as far removed from relevant matters is demonstrably meritless. Although Cox tries (at 8) to downplay it, the record is clear that Mr. Schwartz has "unique, specialized and/or personal knowledge relevant to the litigation." *In re Pradaxa Prods. Liab. Litig.*, 2014 WL 257566, at *2-*4 (S.D. Ill. Jan. 23, 2014) (permitting deposition of CEO who played "hands on" role in drug's development). As shown above, Mr. Schwartz was at the very center of Cox's efforts to acquire its own DMS, he is intimately familiar with the DMS market, and he can provide unique, detailed testimony about Dealertrack's position in it, along with its growth and marketing strategies. *See supra*, pp. 2-4. As the self-proclaimed "conductor" in the Cox applications space, he is also uniquely positioned to testify regarding the applications market in which the Cox plaintiffs compete. *See supra*, pp. 4-5. Moreover, Mr.

Schwartz has also had numerous direct conversations with dealers about Dealertrack's DMS, and with competing DMS providers like Reynolds. *See supra*, pp. 5-6. Such discussions, for example, about the functionality or viability of Cox's Dealertrack DMS offering are central to this lawsuit, for they tend to undercut Cox's (and the other MDL Plaintiffs') allegations that CDK and Reynolds have few viable competitors and that CDK customers are "locked in" to CDK's DMS, unable to switch to another provider. And CDK is clearly entitled to question Mr. Schwartz about his direct communications and negotiations with both CDK and Reynolds, which Cox concedes (at 8) took place. All of these are matters placed squarely in issue by Cox and the other Plaintiffs' claims. *See supra*, pp. 2-6.

Cox tries to suggest a limited role for Mr. Schwartz by arguing (at 5) that he has produced only about 100 documents from his files. In CDK's view, that has much more to do with Cox's general and widespread failures to comply with its discovery obligations in this MDL than with Mr. Schwartz's supposed lack of involvement in the relevant issues. Cox was required to substantially complete its document production by October 12, 2018, but failed to do so, withholding many key, relevant documents such as organizational charts, marketing and branding research, ***and all of Mr. Schwartz's documents***. Ultimately, Cox produced Mr. Schwartz's documents only months later, citing a processing error. Ex. 18 (December 10, 2018 D. Dorris Ltr. to A. Marovitz.) But CDK and Reynolds have located documents involving Mr. Schwartz in their own files that Cox never produced. Additionally, although Cox is by far the largest party in this MDL, it has to date produced only 20,281 documents. By contrast, individual MDL Plaintiff Authenticom, Inc. has produced 111,990 documents, while CDK has produced over one million documents and Reynolds has produced over 220,000. Numerous meet-and-confers have taken place between CDK and Cox regarding the deficiencies in Cox's production, and the issue may yet become the subject of

8

contested motions. But for present purposes, Cox cannot rely on its failure to produce sufficient discovery as grounds to prevent this deposition. And in any event, as demonstrated above, there are numerous documents produced from Mr. Schwartz's files that show his direct involvement in relevant matters. *See supra*, pp. 5-6.

***Cox Fails To Demonstrate Undue Burden***: Cox does not claim any actual burden if Mr. Schwartz is deposed, and instead points solely to his high-ranking professional status. Cox's motion should be denied on this basis alone. *See, e.g.*, *Simpson v. Home Depot, Inc.,* Case No. 00–2285, 2002 WL 485661, at *2 (D. Kan. March 7, 2002) (Home Depot failed to demonstrate burden needed to bar apex deposition). Nor could Cox credibly make a burden argument, because every other non-dealer company in this litigation who has received a request for the deposition of its CEO during the relevant period is making or has made that individual available, including: Steve Anenen (CDK), Bob Brockman (Reynolds), Steve Cottrell (Authenticom), and Don Armstrong (MVSC). The so-called "apex" doctrine is principally concerned with the potential for abuse and harassment, but "[t]his is not a case where one party is engaging in vexatious discovery tactics by seeking the deposition of an executive far removed from the facts of the case." *Dyson, Inc. v. Sharkninja Operating LLC*, 1:14-CV-0779, 2016 WL 1613489, at *2 (N.D. Ill. Apr. 22, 2016).

***Cox's Remaining Arguments Are Meritless***: Cox makes a handful of additional arguments to avoid Mr. Schwartz's deposition, none of which has any merit. Cox argues (at 5) it should not have to present Mr. Schwartz because it considers the topics for examination identified by CDK during the meet-and-confer process to be "vague," but CDK has no duty to supply detailed deposition topics or an outline in advance. In any event, CDK has been forthcoming about why it seeks Mr. Schwartz's deposition, *see* Cox Br., Ex. A (Feb. 19, 2019 Email from B. Miller), and

CDK's contention that Mr. Schwartz has unique, relevant information is amply supported by the record.

Cox also claims that CDK should look to other employees first, or notice a Rule 30(b)(6) witness instead. That is absurd. *See, e.g.*, *In re Google Litig.*, C 08-03172 RMW PSG, 2011 WL 4985279, at *1–2 (N.D. Cal. Oct. 19, 2011). In *Google*, for example, the court ordered CEO Larry Page's deposition because he had relevant personal knowledge about a patent, and plaintiff was not required to depose other employees first. *See also Home Depot, Inc.*, 2002 WL 485661, at *2-*3 (party not required to first depose others where executive had personal knowledge). There can be no reasonable dispute that CDK is entitled to examine Mr. Schwartz in these circumstances, regardless of whether it will also depose other witnesses and a corporate representative.[3]

Furthermore, Cox's suggestion that CDK should first depose numerous other Cox employees ignores the practical reality that Defendants are allotted only 30 total party depositions in this MDL, and they must be allocated across three individual plaintiffs, one putative vendor class representative, and eight putative dealership class plaintiff groups (comprising 30 separately-named dealership class plaintiffs). Setting aside the fact that CDK—not Cox—has the right to determine how best to use its allotted depositions, CDK is in no position to burn an additional 4-5 party depositions on Mr. Schwartz's subordinates prior to the April 30 fact discovery cutoff simply because Mr. Schwartz is an executive and does not want to be bothered with a deposition.

Finally, Cox argues (at 10) that "CDK has refused to make Brian MacDonald, who was CDK's CEO from 2016 to 2018, available for a deposition unless Cox Automotive makes Mr. Schwartz available for a deposition" and that "CDK's refusal to make Mr. MacDonald available for deposition would be inconsistent with [its] request to depose Mr. Schwarz." That is incorrect. As an

---

[3] CDK issued its Rule 30(b)(6) deposition notices to Cox on March 6, 2019.

10

initial matter, CDK is already producing its CEO prior to Mr. MacDonald, Steve Anenen—who led the company during the events alleged in Plaintiffs' complaints—for deposition. Moreover, CDK has not "refused" to make Mr. MacDonald available for a deposition; CDK simply (and reasonably) requested reciprocity from Plaintiffs concerning their own respective CEOs or CEO-equivalents. *See* Cox Br., Ex. A (Feb. 19, 2019 Email from B. Miller). But more importantly, Cox ignores the critical distinction here: Mr. Schwartz has unique, personal knowledge about matters that are highly relevant, whereas Mr. MacDonald—did not oversee the day-to-day operations of the business lines involved in the litigation, nor was even an employee of CDK in *any* capacity during the time period at issue (2013-2016)—does not. In any event, Cox's argument is both wrong and irrelevant. Whether CDK's former CEO would be an appropriate deponent has nothing to do with Cox's failure to show good cause for avoiding a deposition of Mr. Schwartz.

## CONCLUSION

Cox's motion for a protective order should be denied.

Dated: March 8, 2019

Respectfully submitted,

/s/ *Britt M. Miller*
Britt M. Miller
Andrew S. Marovitz
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
amarovitz@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

11

*Counsel for Defendant*
*CDK Global, LLC*

Case: 1:18-cv-00864 Document #: 560 Filed: 03/08/19 Page 13 of 14 PageID #:21859

## CERTIFICATE OF SERVICE

      I, Britt M. Miller, an attorney, hereby certify that on March 8, 2019, I caused a true and correct copy of the foregoing **DEFENDANT CDK GLOBAL, LLC'S RESPONSE TO COX'S MOTION FOR PROTECTIVE ORDER** to be served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

      /s/ *Britt M. Miller*
      Britt M. Miller
      MAYER BROWN LLP
      71 South Wacker Drive
      Chicago, IL 60606
      Phone: (312) 782-0600
      Fax: (312) 701-7711
      E-mail: bmiller@mayerbrown.com