PUBLIC VERSION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-00864 |
| *This document relates to:* | Hon. Robert M. Dow, Jr. |
| THE DEALERSHIP CLASS ACTION | Magistrate Judge Jeffrey T. Gilbert |

**DEFENDANTS' RESPONSE IN OPPOSITION TO
DEALERSHIP CLASS PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF
DOCUMENTS FROM DEFENDANTS' PRIVILEGE LOGS AND TO COMPEL
DISCOVERY REGARDING DRAFTING OF AGREEMENTS**

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION AND BACKGROUND ........................................................... 1

II.    ARGUMENT ................................................................................................. 5

    A.    Distribution of Privileged Communications to "Numerous" CDK Employees Did Not Waive Privilege Over Such Communications. ........................................ 5

    B.    Dealers Specifically Agreed to a Protocol for Logging Email Distribution Lists, Under Which Defendants Provided All Required Information. ............................. 6

    C.    The Challenged Communications Between CDK and its Advisers and Consultants are Privileged because the Advisers and Consultants were Essential to the Provision of Legal Advice. ....................................................................... 7

        1.    Arthur Petrochenko (Secureworks) ............................................. 8

        2.    Morgan Stanley .......................................................................... 8

        3.    NERA Economic Consulting ...................................................... 9

        4.    Presidio Technology Partners ................................................... 10

        5.    Aberdeen Strategies, Sard Verbinnen & Co., and Joele Frank ................ 10

    D.    The Attorney-Client Privilege Protects Defendants' Communications Reflecting Legal Advice on Business Matters ................................................. 11

    E.    Neither CDK nor Reynolds Waived Privilege Over Communications Related to the DEA, the 3PA Agreement, or the Reynolds Interface Agreement. ........... 13

III.    CONCLUSION ............................................................................................ 15

**PUBLIC VERSION**

## I.    <u>INTRODUCTION AND BACKGROUND</u>

Since serving their initial privilege logs in November 2018, Defendants CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") have engaged in extensive correspondence and multiple meet-and-confers with the Dealership Class Plaintiffs ("Dealership Plaintiffs" or "Dealers") in a good faith attempt to resolve their disputes without motion practice. In pursuit of this goal, Defendants have supplemented their logs, revised many redactions, and produced formerly withheld documents. Dealers have withdrawn many of their initial challenges to Defendants' privilege logs as a result. Tellingly, moreover, no other MDL Plaintiff—including Authenticom, Cox Automotive, AutoLoop, and MVSC—has sought to join Dealers' motion or otherwise challenge any aspect of Defendants' privilege logs.[1]

Dealers' motion to compel continues to challenge Defendants' privilege logs on the following five grounds: (1) certain communications involve "numerous" recipients; (2) Defendants did not provide certain information regarding email distribution lists identified on their privilege logs, even though such information was not required by agreement of the parties; (3) certain privileged communications involve third parties; (4) certain privileged communications pertain to commercial subjects; and (5) certain privileged communications relate to the drafting of the February 2015 agreements between CDK and Reynolds that are at the heart of this MDL.[2] There is a good reason why Dealers are once again going it alone in their efforts to obtain Defendants' privileged documents: their challenges are meritless.

***"Numerous" Recipients.*** Dealers originally challenged 452 entries on CDK's log solely based on the number of recipients on the communication. *See* Exhibit 1 at 2 (02/08/2019 Letter

---

[1] The same was true for Dealers' unsuccessful motions to compel disclosure of CDK's clawback documents (Dkt. 294, 308), which no other MDL Plaintiff joined.

[2] Challenges (2), (4), and (5) pertain to documents identified on both CDK and Reynolds's privilege logs. Challenges (1) and (3) pertain to documents identified on CDK's privilege log only.

PUBLIC VERSION

from J. Michaels to D. Nordin).  In the spirit of compromise, Defendants agreed to re-review each log entry with 20 or more recipients.  *Id.*  As a result, CDK produced all but eleven of the challenged documents.  *Id.*  Dealers now challenge nine of those eleven entries.  The law is clear, however, that there is no *per se* limit on how many recipients within an organization may receive a privileged communication.  *See Muro v. Target Corp.*, 250 F.R.D. 350, 364 (N.D. Ill. 2007), *aff'd*, 580 F.3d 485 (7th Cir. 2009); *infra* pp. 5-6.

*Email Distribution Lists.*  Multiple parties in this litigation—including plaintiffs Authenticom and Cox as well as Defendants—have asserted privilege claims with respect to certain communications involving distribution lists.  Each party's initial privilege log simply identified distribution lists by name (*e.g.*, "GRP-CDK@paulweiss.com"[3]) without disclosing all of the underlying recipients.  *See* Dealers' Motion at 3.  Dealers objected to this practice, but only by Defendants.  During subsequent meet-and-confer discussions, the parties—including Dealers—agreed that each party needed only to identify the *current* purpose of any distribution list that appears on that party's privilege log as well as the *current* number of people on the distribution list.  *See* Exhibit 2 (01/11/2019 Email from D. Nordin to L. Caseria).

Defendants upheld their end of this agreement.  *See* Exhibit 1 at 8-9 (02/08/2019 Letter from J. Michaels to D. Nordin); Exhibit 3 (02/08/2019 Chart re: "Reynolds Email Distribution Lists Appearing on Privilege Log").  Nevertheless, Dealers have moved to compel disclosure of seven privileged communications involving four email distribution lists that are no longer in use (and thus have no current recipients), ostensibly because Defendants did not archeologically recreate the composition of the distribution lists at issue at the time the privileged communications occurred—something no party has done for any distribution list on its privilege

---

[3] The email domain "paulweiss.com" is maintained by Paul, Weiss, Rifkind, Wharton & Garrison LLP, one of CDK's outside counsel in connection with various matters.

log. *See* Dealers' Motion at 3-4. While Dealers appear to contend that Defendants are somehow "distorting" the parties' agreement (*see* Dealers' Motion at 7), they make no attempt to support that accusation, and the terms of the parties' agreement are attached to this brief in black and white. *See* Exhibit 2 (01/11/2019 Email from D. Nordin to L. Caseria); *infra* pp. 6-7.

**Third Parties.** Dealers have challenged communications involving certain "third parties," *i.e.*, employees of neither CDK nor the outside law firms that have represented CDK. In letters and during meet-and-confers, CDK offered detailed descriptions of the third parties and reasons why their participation in the communications at issue did not break privilege. *See* Exhibit 1 at 2-8 (02/08/2019 Letter from J. Michaels to D. Nordin); Exhibit 4 at 3-4 (01/07/2019 Letter from J. Michaels to D. Nordin). Specifically, as detailed in the Declaration of James Kinzer, submitted herewith, each third party was necessary to effectuate the provision of legal advice by CDK's counsel, and therefore the communications were properly withheld. *See infra* pp. 7-11.

**Commercial Subjects.** Dealers have also complained that Defendants' logs describe certain privileged communications "as pertaining to subjects not predominantly legal in nature," including "negotiation of contracts for sales and marketing services." Exhibit 5 at 5 (12/26/2018 Letter from D. Nordin to J. Michaels). But Defendants addressed these concerns in multiple letters and during meet-and-confers, explaining that Dealers were "conflating the subject matter of a communication with the question of whether the communication involves legal advice. Legal advice can be and often is provided on commercial subjects." Exhibit 6 at 4 (01/04/2019 Letter from L. Caseria to D. Nordin). Nevertheless, Dealers ignore this important distinction and have moved to compel production of 881 of CDK's and 71 of Reynolds' privilege log entries. Dealers' position is meritless, as "legal advice relating to business matters clearly is" privileged. *See, e.g.*, *Crabtree v. Experian Info. Sols., Inc.*, 1:16-CV-10706, 2017 WL 4740662, at *2 (N.D.

Ill. Oct. 20, 2017) (quoting *Marusiak v. Adjustable Clamp Co.*, No. 01 C 6181, 2003 WL 21321311, at *2 (N.D. Ill. June 5, 2003)); *infra* pp. 11-13.

    ***Privileged Documents re: February 2015 Agreements*.** In February 2015, Defendants CDK and Reynolds entered into a Data Exchange Agreement (the "DEA"). All MDL Plaintiffs, including Dealers, challenge certain provisions in the DEA as allegedly anticompetitive, including § 4.5 of the DEA, which provides:

> Each of Reynolds and CDK further covenants and agrees not to sell, transfer, or assign to any affiliate or third party any technology, business process, or other such knowledge regarding integration with the other party's DMS or take any other steps to assist any person that it reasonably believes to have plans to access or integrate with the other party's DMS without the other party's written consent. *For the avoidance of doubt, this Section 4.5 is not intended as a "covenant not to compete,"* but rather as a contractual restriction of access and attempted access intended to protect the operational and data security integrity of Reynolds DMS and CDK DMS and protection of intellectual property.

Exhibit 7 (DEA) § 4.5 (emphasis added). Well after the January 11, 2019 deadline to challenge entries on Defendants' privilege logs (*see* Dkt. 496 at 3), Dealers claimed that Defendants had asserted an "advice of counsel" defense and thereby implicitly waived privilege as to the DEA because CDK referenced the "covenant not to compete" language of § 4.5 in a footnote in its motion to dismiss Dealers' consolidated class complaint and one of Reynolds's witnesses gave deposition testimony that ███████████████████████████████████████. *See* Exhibit 8 (01/29/2019 Letter from R. Wallner to M. Provance).

    Defendants explained that neither of them had raised an "advice of counsel" defense regarding the DEA, nor was there any other basis to find waiver. Exhibit 9 (02/12/2019 Letter from M. Provance to R. Wallner); Exhibit 10 (02/26/2019 Letter from M. Provance to R. Wallner). Dealers' motion goes even further than their letters: Now they are seeking to compel the production of all of Defendants' privileged communications regarding not only the DEA but two separate, concurrently executed agreements as well: the 3PA Agreement and the Reynolds

4

Interface Agreement.  Dealers' Motion at 11.  Dealers' overreaching "waiver" theory is an improper attempt to obtain Defendants' privileged documents.  *See infra* pp. 13-15.

## II.  ARGUMENT

Federal Rule of Civil Procedure 26 limits the scope of permissible discovery to "any *nonprivileged* matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1) (emphasis added).  Defendants hold privilege over all the documents at issue, and therefore Dealers have no basis to compel their production.

### A.  Distribution of Privileged Communications to "Numerous" CDK Employees Did Not Waive Privilege Over Such Communications.

Without citing any supporting authority, Dealers assert that nine of CDK's privilege log entries are inadequate because they identify communications with "numerous" recipients. Dealers' Motion at 6-7.  But "[t]here is no rule of law . . . that puts a numerical upper limit on the number of corporate employees who can be within the sphere of privilege." *Muro*, 250 F.R.D. at 364.  As the district court in *Muro* pointed out, the Supreme Court in *Upjohn Co. v. United States* found distribution of a communication to 86 employees did not result in waiver. *Id*. (citing 449 U.S. 383, 394 (1981)); *see also Baxter Travenol Labs., Inc. v. Abbott Labs.*, No. 84 C 5103, 1987 WL 12919, at *5 (N.D. Ill. June 19, 1987) (finding that "the mere fact that a document is sent to many non-legal personnel is not determinative of whether it is privileged").  No entry on CDK's privilege log even approaches the number of recipients—86—found not to constitute a waiver of privilege by the Supreme Court in *Upjohn*.[4]

The fact that a few privileged communications within a corporation of over 8,500 employees have upwards of 20, 30, or even 50 recipients is hardly surprising and does not waive

---

[4] *See* Dealers' Motion, Nordin Decl., Ex. J: CDK_Priv_0000636 (59 recipients), CDK_Priv_0000640 (32 recipients), CDK_Priv_0000642 (32 recipients), CDK_Priv_0002591 (22 recipients), CDK_Priv_0002952 (24 recipients), CDK_Priv_0003651 (23 recipients), CDK_Priv_0005774 (24 recipients), CDK_Priv_0005960 (38 recipients), and CDK_Priv_0008898 (27 recipients).

privilege. *See Upjohn*, 449 U.S. at 394; *cf. SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 478 (E.D. Pa. 2005) (declining to characterize documents as "widely distributed" where "[t]he recipient lists were limited to between five and twenty-five individuals within a 50,000-person organization"). Additionally, as the description for each of the log entries at issue makes clear, all nine communications involved a request for or provision of legal advice from CDK's counsel or a communication between non-lawyers that was necessary for counsel to provide legal advice. *See* Dealers' Motion, Nordin Decl., Ex. J.

**B.** **Dealers Specifically Agreed to a Protocol for Logging Email Distribution Lists, Under Which Defendants Provided All Required Information.**

As noted above, all parties reached a global compromise concerning email distribution lists on their privilege logs, under which "[i]nstead of names, email addresses and/or job descriptions, [the parties would] provide the number of *current* members of each group email address that is challenged . . . along with a brief description of the *current* general purpose of the group." *See* Exhibit 2 (01/11/2019 Email from D. Nordin to L. Caseria) (emphasis added). CDK, Reynolds, and MDL Plaintiff Authenticom each provided supplemental information about the distribution lists identified on its log as required by the parties' global agreement. Exhibit 1 at 8-9 (02/08/2019 Letter from J. Michaels to D. Nordin); Exhibit 3 (02/08/2019 Chart re: "Reynolds Email Distribution Lists Appearing on Privilege Log"); Exhibit 11 (02/22/2019 Letter from C. Bonomo to J. Michaels).[5] No party provided historical information about the purpose or membership of distribution lists at the time the privileged communications took place. Indeed, the parties' stipulation specifically required them to provide information about the "current"

---

[5] MDL Plaintiff Cox Automotive, however, failed to provide this information per the parties' agreement. Cox's failure to abide by the parties' global agreement regarding distribution lists is addressed in CDK's brief (Dkt. 544 at 13-14) in support of its Motion to Compel Production of Documents Withheld or Redacted by Plaintiffs Loop, LLC d/b/a AutoLoop and Cox Automotive, Inc. or, In the Alternative, for an *In Camera* Inspection of the Challenged Documents.

membership and purpose of distribution lists because historical information would have been unduly burdensome if not impossible to provide.

Dealers' motion to compel production of seven entries on Defendants' privilege logs involving four now-defunct distribution lists for which no current membership information exists (*see* Dealers' Motion, Nordin Decl., Exs. K & N) is an improper attempt to renege on the parties' express agreement. And Dealers' reliance on *Muro* is misplaced (*see* Dealers' Motion at 7), for in *Muro* there was no express agreement among the parties defining what information about email distribution lists was required for each party's privilege log. That agreement is "the end of the matter since lawyers are expected to honor the promises they have made to their adversaries." *BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 326 F.R.D. 171, 172 (N.D. Ill. 2018) (citations omitted); *Miller UK Ltd. v. Caterpillar, Inc.*, No. 10 C 3770, 2013 WL 474380, at *7 (N.D. Ill. 2013) (a party may not renege on its discovery agreement). In addition, Dealers fail to articulate any reason—such as a meaningful concern that these distribution lists include recipients who would destroy the privilege claim—for requiring Defendants (and only Defendants) to engage in the extremely burdensome if not impossible exercise of recreating the historical membership of now-defunct email distribution lists on their privilege logs.

### C. The Challenged Communications Between CDK and its Advisers and Consultants are Privileged because the Advisers and Consultants were Essential to the Provision of Legal Advice.

Dealers argue that CDK did not establish privilege with regard to certain third parties who acted as advisers and consultants to CDK and its attorneys. *See* Dealers' Motion at 7-10; Nordin Decl., Ex. L. Dealers' narrow construction of privilege law belies the reality of modern business and legal practice, as "the complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others, and the attorney-client privilege must include all the persons who act as the attorney's agents." *Lawrence E. Jaffe Pension Plan v.*

7

**PUBLIC VERSION**

*Household Int'l, Inc.*, 244 F.R.D. 412, 420 (N.D. Ill. 2006) (finding communication with third-party privileged when third-party gathered information to aid counsel in rendering legal advice); *see In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000) ("[M]aterial transmitted to [a third party] may fall under the attorney-client privilege if the [third party] is acting as an agent of an attorney for the purpose of assisting with the provision of legal advice."). Here, each of the challenged communications with CDK's advisers and consultants was necessary for the provision of legal advice by CDK's counsel.[6]

        1.      <u>Arthur Petrochenko (Secureworks)</u>

        2.      <u>Morgan Stanley</u>

---

[6] Moreover, unlike the variety of third-party communications that Defendants are challenging on Authenticom and AutoLoop's privilege logs—which reflect those Plaintiffs' communications with, for example, their direct competitors in the automotive space—here the challenged third parties on CDK's privilege log were all actual agents of either CDK or CDK's attorneys retained for specific, legal purposes. Nor does CDK contend, as Authenticom and AutoLoop do, that these third parties are part of some broad and constantly evolving "common interest" group. Defendants' motions to compel address why those contentions by Authenticom and AutoLoop are incorrect. *See* Dkt. 540 at 5-10; Dkt. 544 at 6-13.

**PUBLIC VERSION**



████ *see also Stafford Trading, Inc. v. Lovely*, No. 05-C-4868, 2007 WL 611252, at \*6, 8-12 (N.D. Ill. Feb. 22, 2007) ("[I]n today's market place, attorneys need to be able to have confidential communications with investment bankers to render adequate legal advice.").

### 3. NERA Economic Consulting

Additionally, one of the challenged communications with NERA is protected by the work-product doctrine. *See* Dealers' Motion, Nordin Decl., Ex. L (CDK_Priv_0003786). But Dealers' motion does not address third-party waiver in the context of the work product doctrine at all. Accordingly, their challenge is waived. *See Carlvin v. Ditech Fin. LLC*, 237 F. Supp. 3d 753, 758 n.2 (N.D. Ill. 2017) (party's "failure to raise these arguments in its opening brief . . . results in a waiver of the arguments"). Even if Dealers had not waived this challenge, moreover, it is clear that the work-product doctrine would protect communications in anticipation of litigation with third-party consultants. *See, e.g.*, *In re Vioxx Prods. Liab. Litig.*, No. MDL 1657,

2007 WL 854251, at *6 n.3 (E.D. La. Mar. 5, 2007) (work-product protection extended to emails with "communications consultants . . . acting under the direction of Debevoise attorneys"). Additionally, the presence of third-party consultants on work-product communications would only waive protection to the extent disclosure makes it "more likely that [an opposing party] would obtain the protected material." *Doe v. Soc'y of Missionaries of Sacred Heart*, 2014 WL 1715376, at *4 (N.D. Ill. May 1, 2014). Dealers make no argument that such risk exists here.

### 4.   Presidio Technology Partners

Dealers also challenge three communications involving Presidio Technology Partners ("Presidio"), ███████████████████████████████████████████[7] *See* Nordin Decl. Ex. L (CDK_Priv_0000486-488). These communications were not withheld as independently privileged, however, but rather as attachments to a separate email ███████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████ *See* Exhibit 12 (CDK_Priv_0000485 (parent email)). Dealers do not dispute that the email itself is privileged. The attachments were properly withheld as integral (or "part-and-parcel") to a privileged attorney-client communication. *See, e.g.*, *Muro*, 250 F.RD. at 363 ("As *Upjohn Co.* makes clear, the fact that non-privileged information was communicated to an attorney may be privileged, even if the underlying information remains unprotected."); *Rainey v. Plainfield Cmty. Consol. Sch. Dist. No. 202*, 2009 WL 1033654, at *2 (N.D. Ill. Apr. 16, 2009) (same).

### 5.   Aberdeen Strategies, Sard Verbinnen & Co., and Joele Frank

Courts regularly find that the attorney-client privilege covers communications between counsel and non-attorneys hired to assist in providing legal advice by advising on public

---

[7] In one of its meet-and-confer letters, CDK's counsel misidentified Presidio as CDK's investment banking firm in connection with the proposed Auto/Mate acquisition. *See* Dealers' Motion, Nordin Decl., Ex. F. We apologize for this mistake, which was inadvertent.

relations issues related to legal strategy. *See, e.g., Eagle Harbor Holdings, LLC v. Ford Motor Co.*, 2014 WL 1681623, at *1 (W.D. Wash. Apr. 28, 2014) (holding privileged communications between the plaintiff's counsel and a PR firm); *In re Grand Jury Subpoenas*, 265 F. Supp. 2d 321, 330 (S.D.N.Y. 2003) ("This Court is persuaded that the ability of lawyers to perform some of their most fundamental client functions … would be undermined seriously if lawyers were not able to engage in frank discussions of facts and strategies with the lawyers' public relations consultants."); *In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213, 219 (S.D.N.Y. 2001) (finding communications with a public relations firm privileged where the firm was hired to handle all issues relating to publicity and public comments regarding high-profile litigation).



D.    **The Attorney-Client Privilege Protects Defendants' Communications Reflecting Legal Advice on Business Matters.**

Dealers contend that attorney-client communications on Defendants' privilege logs relating to CDK's SecurityFirst initiative, vendor contracts, and other topics are "not predominately legal in nature" and are therefore not protected by the attorney-client privilege. Dealers' Motion at 11. Dealers' argument conflates two different concepts: the nature of advice

---

[8] Additionally, as discussed above regarding communications involving NERA, Dealers' motion does not address any of the communications with these third parties that are separately protected by the work product doctrine, thereby waiving the issue. *See supra* p. 9.

(*i.e.*, business vs. legal) and the subject to which that advice relates (*e.g.*, the First Amendment vs. contract interpretation).  This distinction dooms their argument.

Defendants agree that advice from lawyers must concern the legal implications of an issue for the attorney-client privilege to apply.  But it is equally clear that the privilege protects legal advice provided with regard to a commercial—or nearly any other—subject.  As courts in this district have explained: "solely personal or business advice is not protected by the attorney-client privilege," but "legal advice relating to business matters clearly is."  *Crabtree*, 2017 WL 4740662, at *2 (quoting *Marusiak*, 2003 WL 21321311, at *2).

The communications at issue here are paradigmatic examples of "legal advice relating to business matters" and are therefore "clearly" protected by the attorney-client privilege.  *See id*. A "matter committed to a professional legal adviser is prima facie so committed for the sake of legal advice . . . and is therefore within the privilege unless it appears to be lacking in aspects requiring legal advice." *Id.* (quoting *Weeks v. Samsung Heavy Indus., Ltd.*, 93 C 4899, 1996 WL 288511, at *2 (N.D. Ill. May 30, 1996)).  No one disputes that the communications were "committed to a professional legal adviser."  *Id.*  Nor can anyone reasonably dispute that Defendants' commercial decisions often require legal input: CDK and Reynolds compete in a heavily regulated industry, and the evolving rules related to intellectual property, data security, and other subjects require legal analysis.  When attorneys provide advice on the legal implications of those subjects—as they did for the communications here—their attorney-client communications are protected.  *See id.*; *see also Muro*, 250 F.R.D. at 363 (upholding privilege claim after finding a suggested "rule exempting all communications of business information from protection . . . contrary to the Seventh Circuit's law").

Dealers also complain that Defendants' log entries are "vague," but the log description cannot "reveal[] information itself privileged or protected," Fed. R. Civ. P. 26(b)(5)(A)(ii), and courts have therefore upheld claims of privilege with no more detail than provided in Defendants' logs. *See, e.g., Crabtree*, 2017 WL 4740662, at *2 ("Contrary to Plaintiff's assertion that Defendant's descriptions are boilerplate, Defendant has provided enough information about each communication to show why privilege attaches without simultaneously destroying privilege by sharing too much."); *Marusiak*, 2003 WL 21321311, at *1 (finding communications privileged merely because "there is no evidence to suggest that attorney Lockwood's advice was business advice rather than legal advice"). Indeed, Dealers' own privilege log—with its mere 62 entries compared to more than 15,000 entries (combined) on Defendants' logs—contains no more detail on the nature of the legal advice provided.[9]

### E. Neither CDK nor Reynolds Waived Privilege Over Communications Related to the DEA, the 3PA Agreement, or the Reynolds Interface Agreement.

Dealers argue that Defendants "implicitly" waived privilege regarding the February 2015 agreements that are at the heart of this case—the DEA, the 3PA, and the Reynolds Interface Agreement (collectively, the "February 2015 Agreements")—by "relying *on the text of the Agreements*, which were drafted by counsel, for their defense." Dealers' Motion at 11, 12 (emphasis added). This is another overreaching attempt by Dealers to improperly gain access to broad categories of Defendants' privileged documents.

To begin, Dealers' argument is unsupported by any authority, and, if adopted, would effectively impose a privilege waiver whenever a party relies on contractual language that was

---

[9] *Compare, e.g.,* "███████████████████████████████████████████████████████████████████████" (Dealers' Motion, Nordin Decl., Ex. M (CDK_Priv_0009616)), *with* "███████████████████████████████████████████████" (Exhibit 13 (Dealers' Revised Privilege Log, STEVENS0006533)).

drafted with advice from an attorney. In litigation involving disputes over written agreements, both sides are likely to rely on the text of those agreements for any number of arguments. The upshot of Dealers' absurd position is that all privileged communications over the drafting, negotiation, or implementation of those agreements is somehow waived, which of course is not the case. Nor does it matter that aspects of the "intent" behind the February 2015 Agreements may be at issue in this litigation. Courts in this district have "specifically rejected the proposition that a party impliedly waives the privilege merely by asserting a defense that would make an attorney's advice relevant." *Beneficial Franchise Co. v. Bank One, N.A.*, 205 F.R.D. 212, 216-17 (N.D. Ill. 2001) (citing *Rhone–Poulenc Rorer, Inc. v. Home Indemnity Co.*, 32 F.3d 851 (3d Cir. 1994)). "[A]t issue waiver 'does not occur simply by the assertion of a claim or defense; rather, to waive the privilege, the party to whom the privilege belongs must affirmatively put at issue the specific communication, document, or information to which the privilege attaches.'" *Quality Croutons*, *Inc. v. George Weston Bakeries, Inc.*, No. 05 C 4928, 2006 WL 2375460, at *4 (N.D. Ill. Aug. 14, 2006) (quoting *Dexia Credit Local v. Rogan*, 231 F.R.D. 268, 275-76 (N.D. Ill. 2004)); *Nucap Indus. Inc. v. Robert Bosch LLC*, No. 15-CV-2207, 2017 WL 3624084, at *5 (N.D. Ill. Aug. 23, 2017) (same).[10]

Dealers also suggest that Defendants might have waived privilege by asserting an "advice of counsel" defense regarding the import of the February 2015 Agreements. *See* Dealers' Motion at 12. But an advice of counsel defense is one "where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney-client communication." *Bank One*, 205 F.R.D. at 216-17. That is not the case here. Defendants

---

[10] Dealers' primary case on this point, *Patrick v. City of Chicago*, 154 F. Supp. 3d 705 (N.D. Ill. 2015), is inapposite. There, the party claiming privilege affirmatively conceded that the privilege had been waived in another proceeding. *Id*. at 709. Defendants have not waived privilege with respect to the February 2015 Agreements in this or any other proceeding.

14

have never voluntarily disclosed or relied on the contents of any attorney-client communications regarding the February 2015 Agreements, nor have they otherwise come close to asserting any type of "advice of counsel" defense. To the contrary, Defendants have consistently confirmed that they *have not* asserted such a defense. *See* Exhibit 14 at 4 (12/1/2017 Letter from B. Miller to N. Nemelka); Exhibit 15 at 2 (12/1/2017 Letter from B. Ross to M. Nemelka); Exhibit 9 (02/12/2019 Letter from M. Provance to R. Wallner). Dealers point merely to a footnote in CDK's motion to dismiss Dealers' consolidated class complaint that references the text of § 4.5 of the DEA—not any attorney communications with or advice of counsel regarding that provision—and deposition testimony from a Reynolds witness who explained, unsurprisingly, that ███████████████████████████████████████. Dealers' Motion at 4. Neither of these references comes close to invoking an advice of counsel defense.

Moreover, Dealers' efforts to obtain Defendants' privileged documents related to the February 2015 Agreements are untimely. The issue was first raised as a potential discovery dispute over a year ago by MDL Plaintiff Authenticom (who declined to press the issue or join in Dealers' motion). *See* Exhibit 14 at 4 (12/1/2017 Letter from B. Miller to N. Nemelka); Exhibit 15 at 2 (12/1/2017 Letter from B. Ross to M. Nemelka). Yet Dealers inexplicably waited until now, near the close of fact discovery, to challenge Defendants' privilege claims. At the very latest, Dealers should have raised their challenge by January 11, 2019, the deadline for all parties to challenge withheld or redacted documents identified on their respective privilege logs. *See* Dkt. 496 at 3. Dealers neglected to raise this challenge until January 29, 2019, almost three weeks after the agreed-upon deadline. Dealers' motion is improper for this reason as well.

## III.  **CONCLUSION**

For the foregoing reasons, Dealership Class Plaintiffs' motion should be denied.

**PUBLIC VERSION**

Dated: March 15, 2019

*/s/ Aundrea K. Gulley*
Aundrea K. Gulley
Brian T. Ross
GIBBS & BRUNS LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
(713) 751-5258
agulley@gibbsbruns.com
bross@gibbsbruns.com

Michael P.A. Cohen
SHEPPARD MULLIN RICHTER &
HAMPTON, LLP
2099 Pennsylvania Ave., NW, Suite 100
Washington, DC 20006
(202) 747-1900
mcohen@sheppardmullin.com

*Counsel for Defendant The Reynolds and
Reynolds Company*

Respectfully submitted,

*/s/ Britt M. Miller*
Britt M. Miller
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant
CDK Global, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, Britt M. Miller, an attorney, hereby certify that on March 15, 2019, I caused a true and correct copy of the foregoing **DEFENDANTS' RESPONSE IN OPPOSITION TO DEALERSHIP CLASS PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM DEFENDANTS' PRIVILEGE LOGS AND TO COMPEL DISCOVERY REGARDING DRAFTING OF AGREEMENTS** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/ Britt M. Miller*
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com