# Exhibit 14

## MAYER•BROWN

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel +1 312 782 0600
Main Fax +1 312 701 7711
www.mayerbrown.com

**Britt M. Miller**
Direct Tel +1 312 701 8663
Direct Fax +1 312 706 8763
bmiller@mayerbrown.com

December 1, 2017

**B**Y **E-M**AIL

Michael N. Nemelka
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036

Re:   *Authenticom, Inc. v. CDK Global, LLC and The*
      *Reynolds and Reynolds Co.,*
      Case No. 17-CV-318 (W.D. Wis.)

Dear Mike:

While we appreciate your response to our good faith efforts to resolve Authenticom's outstanding concerns regarding CDK's responses to Authenticom's First Set of Requests for the Production of Documents ("Requests")—outlined in my November 15 Letter—we must echo Brian Ross's disappointment in the tone adopted throughout your letter. Lobbing pejorative statements at Defendants' proposed search terms (without identifying a single deficiency in CDK's proposed terms), is neither constructive nor in keeping with the local rules of the Court.

We trust that going forward, the parties will work to fairly address the merits of each others' positions so that we can try to discern where there is true disagreement.

With respect to the specific issues raised in your November 24 Letter, we respond below. As stated in my November 15 Letter, any offers to produce additional categories of documents are subject to and without waiver of CDK's general and specific objections set forth in its initial written responses dated November 1, 2017, and are contingent on resolving the parties' disputes as to the identified Requests.

**General Issues:**

*Search Terms.* For CDK, we are somewhat confused as to your reference of our "inappropriate" … "attempt to tie the issues of date limitations and custodians to the issue of proposed search terms" as my November 15 Letter makes no such attempt. Rather, as explained in my Letter, search terms (like document custodians and date limitations) are necessarily impacted by the ultimate scope of the Requests. And the scope of the Requests could not be known until after CDK had responded to them and the parties had engaged in (at least) some initial meet-and-confer discussions. Indeed, several of the search terms that we circulated on November 25 reflect compromises that the parties have reached with respect to the scope of CDK's responses to the Requests (*e.g.*, our proposed search No. 20 regarding "SMART-R"). It would be unreasonable to expect CDK to formulate meaningful search terms without first having analyzed

Michael N. Nemelka
December 1, 2017
Page 2

Authenticom's Requests, determined which Requests warranted a search-term-based electronic search, and then performed some initial testing to determine the efficacy of its proposed terms. Thus, the fact that Authenticom claims that it asked Defendants "shortly after Authenticom served its document requests to exchange search terms and custodians" is irrelevant. CDK reasonably provided search terms approximately three weeks from the date of serving its responses and objections to the Requests and within 30 days of entry of the ESI Order requiring the parties to meet-and-confer on the topic. Accusations of delay against CDK, therefore, are misplaced. Indeed, as noted in my November 15 Letter, any delay and/or prejudice to the parties lies with Authenticom's choice to wait six weeks after the start of the discovery period to serve its Requests. Had Authenticom served the Requests on August 17 as permitted by the Federal Rules instead of on October 2, CDK would have responded by mid-September and the parties likely would have exchanged search terms weeks ago.

As to your complaint that CDK's search terms are "woefully inadequate" we note that your letter nowhere explains in what manner they are inadequate, and only makes specific mention of Reynolds's proposed search terms. CDK formulated its search terms on a Request by Request basis (for those Requests for which CDK indicated it would undertake a search-term based custodian search)—*i.e.,* it is not just a list of terms that "might" return documents that "might" be responsive to one of the RFPs. Thus, to the extent Authenticom intends to offer additional search terms (and we understand it intends to do so in the relative short term), we would ask that it identify with respect to each such proposed term which Request Authenticom believes it relates to so that we can properly evaluate it.

*Date Range.* We appreciate Authenticom's willingness to accept the January 1, 2013 start date for the bulk of the Requests. As discussed at length previously, we believe this is more than reasonable given the date of the alleged agreement at the heart of Authenticom's antitrust claims and the applicable statutes of limitation governing all of Authenticom's claims. With respect to the two categories of "exceptions" related to the CDK Requests, we offer the following:

- CDK Request Nos. 46, 47, 48, 49, 51, 52, 53, 54, 55, 57, 58, 59, 60, 61, 62, 63, 65, 66, 67, 68, 69, & 70 (seeking CDK DMS and data integration pricing and financial information). As an initial matter, we note that your Letter is internally inconsistent with respect to these Requests. On page 2 of your Letter, you state that you believe that information dating back to 2009 is "necessary" for each of these Requests. Then, on pages 11 and 12, when discussing the details of these Requests, you ask only for information back to January 1, 2013. Although we continue to believe that January 1, 2013 is the appropriate start date, we assume that the inconsistency is merely an error on your part and you, in fact, are asking for responsive information dating back to 2009 for these Requests. If that is the case, we find Authenticom's request and rationale for DMS and data integration pricing and financial information dating back that far to be unavailing given the applicable statutes of limitation at issue in this litigation. Without waiving its rights and subject to the other limitations stated/agreed to with respect to these Requests, CDK is willing to provide information responsive to these Requests dating back to January 1, 2011, if it will resolve the parties' dispute. Please let us know.

Mayer Brown LLP

PUBLIC VERSION

Michael N. Nemelka
December 1, 2017
Page 3

- CDK Request No. 20 (documents, communications, statements … with respect to third-party access to dealer data). We continue to believe that Authenticom's reliance on decade-old statements as material to any issue in this litigation is unfounded. It also is unreasonable for Authenticom to expect CDK to collect, process, and search 10 years of all of its custodian and relevant non-custodian ESI for a very specific sub-set of documents—namely communications and statements about a specific subject (a number of which are public and thus equally accessible to Authenticom). In an effort to resolve this issue, however, CDK is willing to consider conducting targeted searches of a select subset of custodians, *e.g.*, Steve Anenen and any central marketing files—for the full 10 year period using an agreed subset of search terms, to the extent CDK has readily accessible ESI for those custodians within its possession, custody or control.

<u>Request No. 1.</u> For the reasons previously stated, we disagree that everything provided to the FTC is "relevant" and, even if it were, by your own admission during our meet-and-confer, that does not make it immediately producible. And while you cite a series of cases that hold for the proposition that "if you turn over work product to an adversary—and the FTC in this context is an adversary—a party waives any work product protections," only one—*In re Steinhardt Partners*, 9 F.3d 230 (2d. Cir. 1993)—is even close to on point. That case at least arguably goes to the question of whether advocacy pieces (*e.g.*, white papers) and similar correspondence provided to the government in connection with an investigation—as opposed to pre-existing business records and factual material—are actually both relevant and discoverable. In *Steinhardt*, decided in 1993 (prior to the passage of the new discovery standards), the Court ordered the production of a "memorandum" voluntarily provided to the SEC to dissuade the SEC from bringing an enforcement proceeding. More recently, however, other Courts have found, in situations similar to that presented here, that white papers and similar materials are not discoverable. Specifically, in *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 2016 WL 6779901 (S.D.N.Y. Nov. 16, 2016), the district court analyzed this issue under the new Rule 26 "proportionality" standard and found that the plaintiffs' request for "white papers" (among other materials) provided to the CFTC was overbroad given that the defendant had already agreed—as CDK has agreed here—to re-produce pre-existing business records and similar *factual* materials that it had turned over to the government (*id.* at *3):

> Even if the Court were to presume that all of the Regulatory Documents were relevant, Rule 26(b)(1)'s proportionality requirement means their "marginal utility" must also be considered. *See Zubulake v. UBS Warburg, LLC*, 217 F.R.D. 309, 322-23 (S.D.N.Y. 2003); *see, e.g., Vaigasi v. Solow Mgmt. Corp.,* No. 11-CV-5088 (RMB) (HBP), 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016) ("Proportionality and relevance are 'conjoined' concepts; the greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate."); *see also* Fed. R. Civ. P. 26(b)(1) (directing the court to consider, inter alia, "the parties' relative access to relevant information" and "whether the burden or expense of the proposed discovery outweighs its likely benefit"). Given the breadth of Plaintiffs' requests … and the fact that Defendants

Michael N. Nemelka
December 1, 2017
Page 4

have given Plaintiffs all of the historical documents and data that they had produced to their regulators, Plaintiffs' motion falls short on that score too.

*See also Concord Boat Corp. v. Brunswick Corp.*, 1997 WL 34854479 (E.D. Ark. June 13, 1997) (analyzing "white papers" provided to the FTC in connection with an antitrust investigation under a work-product/waiver framework, ultimately holding that the materials were protected from discovery).

Here, as in the above-described cases, Authenticom is already getting the underlying relevant evidence—the factual material and underlying business records and data that CDK has provided or will provide to the FTC. It has no legitimate need for further discovery into CDK's advocacy pieces or "white papers" (if any) characterizing that evidence in an entirely different setting and for a different audience. On the other hand, the burden and possible prejudice resulting from requiring CDK to provide such discovery would be substantial. As the district court reasoned in *Concord Boat*, *supra*, "the attorneys' thoughts or analyses of important aspects of the case may well have changed since the FTC submissions. Preparation of this case is not complete. The attorneys should be free to change their thinking without fear of earlier formed, but now altered or discarded, opinions or analyses being used to hurt their clients." 1997 WL 34854479, at *6. Please let us know if a further meet-and-confer on this issue would be helpful.

*Request No. 4.* CDK confirms that it will produce documents and communications discussing the subject agreements following a search and review of agreed upon custodians' files.

*Request No. 5.* My November 15 Letter did not address Authenticom's "contention that Defendants have waived the attorney client privilege with regard to the February 2015 agreements" as until we received your November 24 Letter, Authenticom had not fully articulated its basis for that claim. Having now reviewed Authenticom's argument, we find it to be without merit. CDK's cursory statements of common sense in its legal filings in this matter fall well short of it having asserted an "advice of counsel" defense. If there is something additional here to discuss, we are happy to do so. If not, Authenticom has no basis for seeking privileged communications regarding the agreements and CDK will not agree to produce them.

*Sources of ESI.* To be clear, CDK has agreed to search for and produce responsive documents from agreed-upon custodian files and from those central or shared filed locations where CDK reasonably anticipated responsive documents may be found. Thus, for example, we are not searching contract files for marketing materials, or searching marketing files for copies of contracts. In short, if a given Request implicates a potential source of responsive documents other than those of the agreed-upon custodians, CDK will undertake a reasonable search of such files.

*Communications with Vendors and/or Dealers.* Our understanding is that the vast majority of CDK's substantive communications with vendors or dealers that would be relevant to the claims or defenses in this litigation will be found in the email files of the custodians CDK has proposed to search in connection with the Requests. Although it is the case that CDK does use a CRM

Michael N. Nemelka
December 1, 2017
Page 5

product to track certain interactions with its customers, *e.g.*, notations of contacts with customers, technical issues, etc., it is our understanding that that software product is not key-word searchable (*i.e.*, any query would be on a customer by customer basis). We are looking into whether summaries of customer call logs or some equivalent might be exportable (and searchable), in which case we will include that that collection in our search.

With respect to marketing materials, for those Requests that call for marketing-related documents CDK intends to conduct good faith searches of any centrally-maintained electronic marketing files, using appropriate search terms, for potentially responsive documents.

*Timing of Productions.* As stated in my November 15 Letter, the vast majority of the Requests will be answered by custodial searches which CDK will promptly undertake once the parties have reached agreement on the appropriate custodians and search terms. We continue to push forward with searching for documents responsive to those Requests for which CDK has committed to producing documents "sufficient to show" and expects to make a production of documents next week.

**CDK Specific Issues**

*Request No. 6.* We appreciate your clarification of Authenticom's concern with respect to this Request. Your November 13 Letter merely referenced integration pricing that CDK is paying to Reynolds (which, as noted in my November 15 Letter, has already been produced). With respect to subparagraph (f) of the Request, the inclusion of the term "all pricing information" continues to render the Request overly broad and unduly burdensome. To the extent that Authenticom is willing to accept something less than "all"—*e.g.*, documents sufficient to show the requested information, CDK would be willing to entertain such a Request. Please let us know if Authenticom is willing to meet-and-confer along these lines.

*Request No. 9.* Here again, Authenticom pejoratively labels CDK's search terms as "inadequate" (a characterization with which we disagree) but provides no explanation as to the nature of the alleged inadequacy. As noted above, in the event Authenticom proposes additional search terms targeted specifically at finding documents responsive to this Request, CDK is happy to consider them.

*Request No. 12.* It appears that the parties are agreed on this Request.

*Request No. 17.* As noted above, as we understand it, CDK's CRM software is neither text-searchable nor capable of a functional data export. As such, it is unable to include that program in its search for documents responsive to this Request. And it is both unreasonable and unduly burdensome to ask that CDK inspect and review each individual customer file for any reference to a long-defunct program. In any event, we further understand that to the extent that there are substantive communications with vendors and/or dealers regarding SMART-R, copies of such communications will likely be found in the files of Steve French and Kevin Distelhorst, two of the custodians already proposed by CDK.

Mayer Brown LLP

PUBLIC VERSION

Michael N. Nemelka
December 1, 2017
Page 6

*Request No. 19.* To the extent that Authenticom's compromise contemplates a production of documents sufficient to show the identified information as of January 1, 2013 and any subsequent changes to that information through and including the data collection date, then it appears the parties are in agreement as to this Request. If Authenticom was contemplating something else, please let us know.

*Request No. 25.* It would appear that the only difference between CDK's proposal and Authenticom's proposal is your deletion of the phrase "with policies restricting unauthorized third-party access." Our inclusion of that phrase was intended to limit the search to responsive documents related to so-called "closed" systems as whether CDK uses third-party integrators to access "open" systems—*i.e.,* those that have no restrictions on access—has no bearing on any claim or defense in this matter. If Authenticom can articulate a compelling basis for its request or narrow its breadth, CDK is happy to consider it. If a further meet-and-confer would be beneficial, let us know.

*Request No. 28.* It is unclear as to the basis of Authenticom's presumption that there are centrally maintained documents responsive to this Request, but CDK is unaware of such a repository. In any event, CDK expects that communications responsive to this Request will be found in the files of the custodians already agreed upon, *e.g.*, Howard Gardner.

*Request Nos. 35 & 36.* It would appear that the only difference between CDK's proposal and Authenticom's proposal is the relevant date, with CDK offering documents created after January 1, 2015 and Authenticom asking for documents created after January 1, 2014. CDK used the 2015 date for two reasons: (1) it is the date that Authenticom specified in its Requests (*see* Request 35 (no time period was indicated in Request 36)), and (2) as SecurityFirst and the 3PA Refresh Program did not launch until mid-2015 and was not even conceived of until the end of 2014, it would highly unlikely (and likely impossible) for there to be documents about the potential loss of customers in connection with SecurityFirst or 3PA Refresh as far back as January 1, 2014. In an effort to bring this issue to a close, however, we are prepared to extend this date back an additional 3 months, to October 2014 (when the spin-off of CDK was accomplished) and the design and development of the two initiatives began in earnest. Please let us know if this is acceptable.

*Request No. 41.* It appears that the parties are agreed on this Request.

*Request Nos. 46, 47, 48, 49, 62, 63, & 68.* Setting OEMs to the side for the moment (as they will be discussed in connection with Request 73, below), it appears the only outstanding issues in this group are with respect to Request Nos. 62 and 63. On Request No. 62, perhaps the parties should engage in a further meet-and-confer on this issue as we still fail to see the relevance of the pricing customers paid for integration services from DMI and/or IntegraLink for data on the CDK DMS. Any attempt by Authenticom to compare those prices to Authenticom's prices would be inapt and misleading as DMI and IntegraLink (as Authenticom is very aware) are part of CDK's Data Services division—*i.e.,* part of the CDK service offerings and thus not "free riding" on anything—whereas Authenticom is an unaffiliated third party that bears none of the

Michael N. Nemelka
December 1, 2017
Page 7

costs associated with providing the DMS or any related Data Services. Although the comparison Authenticom is attempting to draw between its prices and DMI and IntegraLink's prices for data on non-CDK DMSs, remain, in our opinion, completely irrelevant, in the spirit of compromise, we are prepared to offer documents sufficient to show DMI and IntegraLink's pricing for data integration services beginning in January 1, 2011 (*see above* at 2 re: your Letter's inconsistency on the relevant time period for these Requests).

*Request Nos. 51, 52, 53, 54 & 55.* CDK is prepared to further meet-and-confer on these Requests as Authenticom suggests. With respect to DMS pricing, CDK's offer to provide "basic" DMS pricing (Requests 51 and 54) was an attempt to provide Authenticom with the data regarding the price of the DMS. As you might expect, most (if not all) of CDK's customers purchase more than just a DMS license resulting in a quoted price for a "bundle" of products and services. In order to arrive at that "bundled" price, various elements of the bundle would have been discounted with very little rhyme or reason (much less consistency) to the discounting from customer to customer. Thus, the "actual" price of the DMS cannot always be readily discerned. As to revenue (Request 52), we think there may simply be a misunderstanding on Authenticom's part as to CDK's offer. Our use of the term "basic" in the phrase "total monthly basic DMS pricing and revenue for DMS services" was intended only to relate to the term "pricing", not "revenue" such that we believe that we are not at issue on this Request (other than, perhaps, on the applicable time period). As to profit (Request 53), that is something that CDK does not have the practical ability to accurately provide. CDK does not allocate all of its costs by product line. As such, it does not have documents showing the actual "profit" or "margin" for its DMS business. To be sure, there will be documents within various custodians' files purporting to show profit or margin at various points in time, based on different methodologies and different assumptions, but none will be accurate as none fully capture allocatable costs. With respect to revenue and profit projections (Request 55), to the extent any relevant revenue projections exist we would expect them to be found in the files of the already agreed-upon custodians. Thus, CDK would consider a targeted set of search terms aimed at searching for such documents. Profit projects are problematic for the same reasons that actual profits are problematic—namely that CDK does not allocate costs by product line.

With respect to the time period applicable to these Requests, again we note the internal discrepancy on the applicable date range, but again offer to produce responsive information as of January 1, 2011 (*see above* at 2).

*Request No. 56.* It appears that the parties are agreed on this Request.

*Request Nos. 57, 58, 59, 60, 61, 65, 66, 67, 69, & 70.* The same internal inconsistency identified above, exists here. *See* p. 2. As with those Requests, CDK is prepared to compromise and provide responses back to January 1, 2011 if that will resolve the issue. Please let us know.

With respect to the specific Requests you raise—Requests 57, 58, and 59—we aren't sure what Authenticom's issue is with respect to Request 58 given that CDK committed to producing "documents or information sufficient to show CDK's monthly pricing ***and revenue*** for services

Michael N. Nemelka
December 1, 2017
Page 8

offered through the 3PA program …" (emphasis added).  It remains to be seen whether CDK maintains the data broken out in the manner Authenticom requests, but CDK will produce it in the manner in which it is kept in the ordinary course of CDK's business.  As to the cost and profit information sought by Request Nos. 57 and 59, CDK has the same issue with these Requests as it does with the same Requests as they relate to the DMS—namely that CDK does not track or allocate costs by individual product (*i.e.*, DMS, 3PA, etc.) such that it does not believe that it has accurate data it can produce in response to either Request.  With respect to revenue and profit projections (Request 60), here again, to the extent any relevant revenue projections exist we would expect them to be found in the files of the already agreed-upon custodians.  Thus, CDK would consider a targeted set of search terms aimed at searching for such documents.  Profit projects are problematic for the same reasons that actual profits are problematic—namely that CDK does not allocate costs by product line.

Finally, CDK accepts Authenticom's offer with respect to Request Nos. 65, 66, 67, 69, and 70 with the caveat that any production of the "extensive communications" Authenticom believes that CDK had with vendors regarding changes to its pricing after January 1, 2015 would be the result of a reasonable search of agreed-upon custodian files and appropriate centralized files.

Please let us know if there is anything else we need to discuss with respect to these Requests.

*Request No. 71.*  It appears that the parties are agreed on this Request.

*Request No. 72.*  It appears that the parties are agreed on this Request.

*Request No. 73.*  The parties appear at an impasse on this Request.

*Request No. 74.*  It is a little unclear from your letter where the parties are with respect to this Request.  In response to other Requests, CDK has already committed to producing documents and communications regarding SecurityFirst and its justifications for the implementation of the program.  That production would, to the extent such documents exist, include documents detailing the design of the program and how it would be implemented.  CDK has also committed to producing documents sufficient to show how dealer data is stored on the DMS, including where those data are stored and whether and the extent to which data is stored separate from the data of other dealers (to the extent, of course, that such documents exist).  *See* Resp. to Request 80.  Thus, Authenticom is getting documents that will allow it to test the veracity of CDK's "justifications".  If Authenticom is standing by its request for granular system design documents, source code, scripts, algorithms, etc. embodied in Request 74 then CDK stands by its objection and the parties are at impasse.  You letter seems to intimate, however, that Authenticom might be willing to consider "technical documents that go short of the specific implementations or source code".  CDK is willing to consider such a production if the parties can agree on what such documents might look like (*e.g.*, what level of specificity would be required).  To the extent a further meet-and-confer on this issue would be fruitful, please let us know.

*Request No. 79.*  It appears that the parties are agreed on this Request.

Michael N. Nemelka
December 1, 2017
Page 9

*Request No. 80.* It appears that the parties are agreed on this Request.

*Request No. 91.* Despite Authenticom's aspersions to the contrary, CDK's offer of compromise was not an attempt to artificially limit its search for documents responsive to this Request. While CDK continues to think that Authenticom's argument with respect to these types of strategies is without merit (and Authenticom's characterization of them continues to be inaccurate), CDK's offer was intended to signify that it was willing to search for documents responsive to this Request from the files of agreed-upon custodians as well as from appropriate centralized marketing files. As previously indicated, if Authenticom would like to suggest specific search terms aimed at finding responsive documents, CDK would be happy to consider them.

*Custodians.* We look forward to receiving Authenticom's response regarding custodians and search terms so that we can begin our custodian-based searches promptly.

\* \* \* \* \* \*

We believe the above resolves most of the parties' outstanding disputes. As always, we stand ready to meet-and-confer in good faith in the event further discussion of any of these issues would be productive.

Sincerely,

*Britt M. Miller*

Britt M. Miller

cc:  Mark W. Ryan
     Matt D. Provance
     Brian T. Ross

726088289