**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817 Case No. 18 C 864 |
| This Document Relates to: | Hon. Robert M. Dow, Jr. Magistrate Judge Jeffrey T. Gilbert |
| *Authenticom, Inc. v. CDK Global, LLC, et al.*, Case No. 1:18-cv-00868 (N.D. Ill.) | |

**PLAINTIFF AUTHENTICOM, INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO COMPEL AUTHENTICOM TO PRODUCE THIRD-PARTY
COMMUNICATIONS OR, IN THE ALTERNATIVE, SUBMIT SUCH
COMMUNICATIONS FOR *IN CAMERA* REVIEW**

## INTRODUCTION

Defendants' motion to compel principally targets privileged communications for which Defendants claim Authenticom waived the asserted privilege by sharing the documents with third parties. These challenges have no merit for four (sometimes overlapping) reasons. Attached as Exhibit A is a spreadsheet indicating which of these four reasons apply to which of the 94 challenged documents at issue.[1]

*First*, Defendants challenge the majority of the communications at issue (58 of 94) on the basis that they included a purported third-party Lori Zimmer (now Lori Wilkins). But Ms. Zimmer was functionally an employee – or, at the very least, an agent – of Authenticom. Accordingly, including her on privileged communications was no different than including any other employee of Authenticom and does not waive privilege.

*Second*, most of the remaining challenged communications (27 of 94) were for the purpose of advancing a common legal interest that Authenticom shared with the respective third parties, each of which suffered harm as a result of the same anticompetitive practices by CDK and Reynolds. Each of these communications involved legal counsel for these parties and was for the purpose of requesting or providing legal advice regarding potential litigation against CDK and Reynolds (which ultimately became this MDL). Therefore, the common interest doctrine applies to prevent any waiver of attorney-client privilege.

*Third*, several (4 of the 94) challenged communications were with attorneys that Authenticom was considering retaining and included no other third-parties. These communications fall squarely within the attorney-client privilege. Even though Authenticom

---

[1] Defendants challenged 95 documents, but upon further review, Authenticom will voluntarily produce one of those documents. *See* Defs. Att. A (PRIV_0409).

notified Defendants about this attorney-client relationship, Defendants do not address it. They have therefore forfeited any challenge to these four communications.

*Fourth*, the five remaining challenged communications (as well as 33 other challenged communications) are protected by the work-product doctrine. Defendants principally challenge these communications on grounds the work-product protection was waived by including third parties. However, it is black-letter law that sharing attorney work product with third parties does not waive the protection unless doing so "substantially increases the opportunity for potential adversaries to obtain the information." *Miller UK Ltd. v. Caterpillar, Inc.*, 17 F. Supp. 3d 711, 736 (N.D. Ill. 2014) (quoting *Appleton Papers, Inc. v. EPA*, 702 F.3d 1018, 1025 (7th Cir. 2012)). Each of these communications was with third parties that would reasonably be expected to maintain confidentiality and that certainly had no reason to share them with CDK and Reynolds.

**ARGUMENT**

**I.  Communications With Lori Zimmer Did Not Waive Privilege Because She Was The Functional Equivalent Of An Authenticom Employee**

**A.**  Defendants claim (at 11-13) that Authenticom waived privilege for 58 communications with Ms. Zimmer, a consultant to Authenticom and the functional equivalent of an employee. But "the disclosure of privileged communications to independent contractors and other third parties who are functional equivalents of employees, will not waive the attorney-client privilege." *Flagstar Bank, FSB v. Freestar Bank, N.A.*, 2009 WL 2706965, at *5 (N.D. Ill. Aug. 25, 2009) (citing *In re Bieter Co.*, 16 F.3d 929, 937-38 (8th Cir.1994)); *see United States v. Graf*, 610 F.3d 1148, 1157-59 (9th Cir. 2010) (communications with a third-party who was the "functional equivalent" of an employee did not waive privilege). This principle extends to protect communications even with third-parties who are mere agents if the disclosure is related "to the rendition of legal advice or protection of a legal interest." *Flagstar Bank*, 2009 WL 2706965, at

*5; *see Stopka v. Am. Family Mut. Ins. Co.*, 816 F. Supp. 2d 516, 529 (N.D. Ill. 2011) ("[W]hen the third party is an agent of the client, no waiver occurs.").

As Authenticom has previously explained to Defendants, *see* Ex. 1 (B. Rudofsky Letter to J. Michaels at 5-6 (Jan. 18, 2019)), Ms. Zimmer was functionally an employee of Authenticom, or at the very least, an agent. Ms. Zimmer is a management coach and consultant. *See* Ex. 2 (Zimmer Decl.) ¶ 1. Authenticom hired Ms. Zimmer in February 2016 to advise on organizational changes associated with Authenticom's then-substantial growth (prior to the decimation of Authenticom's business by CDK and Reynolds). *See id.* ¶¶ 1-2; Ex. 2.2 (Zimmer Contract) at 1. Ms. Zimmer's contract with Authenticom specifically states that Authenticom "employs" her, *see* Ex. 2 ¶¶ 1-2; Ex. 2.2 at 2,[2] and during the period in which she was included on the challenged communications (August 2016 to April 2017), she regularly worked more than 80 hours per month for Authenticom, *see* Ex. 2.2 at 2; Ex. 2.1 (Zimmer Spreadsheet). Her duties included providing leadership consulting and strategic planning to Authenticom's senior executives – duties that required her to participate in discussions regarding the company's legal issues. *See* Ex. 2 ¶¶ 2, 4-5. This included participating in discussions about the present antitrust litigation, on which the survival of the company depends. *See id.* ¶ 6. Under her contract, Ms. Zimmer must maintain all of Authenticom's information with the "utmost confidentiality." *Id.* ¶¶ 5-6; Ex. 2.2 at 2.[3]

---

[2] The contract's statement that Ms. Zimmer "is not an Employment Agent" means only that she was not authorized to "procure or attempt to procure any employment, business or sales for" Authenticom. Ex. 2.2 at 2.

[3] Defendants contend (at 11-12) that Ms. Zimmer's role was "sporadic" given that certain Authenticom employees could not specifically identify her job duties. But the testimony that Defendants cite is from employees who had no reason to interact with Ms. Zimmer on a regular basis. *See* Ex. 2 ¶ 3 (explaining she "communicate[d] primarily with the company's CEO, Steve Cottrell, and COO, Brian Clements"); Ex. 2.2 at 2 (contract stating Mr. Cottrell and Mr. Clements would "schedule[ ] and arrange[ ]" Ms. Zimmer's work); Dkt. 541-10 (Defs. Ex. 8) at 199 (witness explaining he did not meet with Ms. Zimmer but Mr. Cottrell and Mr. Clements did).

Courts refuse to hold that the attorney-client privilege is waived by sharing attorney-client communications with functional employees like Ms. Zimmer.  As the Eighth Circuit explained in *Bieter*, 16 F.3d at 937-38, "it is inappropriate to distinguish between those on the client's payroll and those who are instead, and for whatever reason, employed as independent contractors."  Such a "literalistic" rule would deprive companies of the ability to confer confidentially with those who play an important role in the company's decision-making but who are not technically employees. *Id.* (holding privilege preserved for communications with an independent contractor who "provide[d] advice and guidance regarding commercial and retail development" to a real estate development firm); *see also*, *e.g.*, *Graf*, 610 F.3d at 1157-59 (same for independent contractor who "was authorized [by the company] to communicate with its attorneys regarding legal matters that concerned the company"); *SEC v. Hollnagel*, 2010 WL 11586980, at *13 (N.D. Ill. Jan. 22, 2010) (same for independent contractors who, among other things, were "held out as . . . employees," assisted with "day-to-day operations," and participated in meetings with management).  That is precisely the situation here:  Ms. Zimmer provided strategic advice to Authenticom's management, and she could not do so effectively if she could not be involved in discussions about Authenticom's life-or-death lawsuit against the Defendants.

The cases that CDK relies on (at 12-13) are factually inapposite because they do not concern functional employees like Ms. Zimmer.  Notably, the Court in *Stafford Trading, Inc. v. Lovely*, 2007 WL 611252 (N.D. Ill. Feb. 22, 2007), rejected the proposition that a company could not communicate with an outside investment bank (there, Goldman Sachs) without waiving the attorney-client privilege, opining that "in today's market place, attorneys need to be able to have confidential communications with investment bankers to render adequate legal advice."  *Id.* at *6. Instead, the Court held that communications with even an outside investment bank are privileged

as long as Goldman Sachs "confidentially communicated with [outside counsel] or [the company's] in-house counsel for the purpose of obtaining or providing legal advice." *Id.* at *7. As discussed above, that standard is met here. *Heriot v. Byrne*, 257 F.R.D. 645 (N.D. Ill. 2009), is wholly inapt because it involved disclosure of attorney-client communications to an "unprotected third party" and the proponent of the privilege had made no showing as to why that third party was covered by the privilege. *Id.* at 654, 665-66. Indeed, the opinion recognized that sharing communications with a company's agents does not waive the privilege – irrespective of whether they are employees. *Id.* at 665 ("Kaufman, Goodrich, and Durham are all Prime Time's agents, and their status as such does not, by itself, destroy the attorney-client privilege."). Finally, the Court in *LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 958 (N.D. Ill. 2009) (St. Eve, J.), expressly applied the "functional" employee standard but simply held it inapplicable to the company's advertising agency, which was engaged in "ordinary business dealings" and thus did not "implicate the same concerns as PR firms retained for the purpose of responding to litigation." *Id.* at 960, 964.

**B.** Defendants also conclusorily claim (at 12) that Authenticom has not provided adequate descriptions on its privilege log for some unknown number of communications with Ms. Zimmer. As an initial matter, the parties stipulated to a process requiring each side to make challenges to the others' privilege logs prior to filing a motion to compel. *See* Dkt. 491 at 1-2. Defendants' only basis for challenging communications with Ms. Zimmer was that she was a third party who broke privilege. *See* Ex. 3 (J. Coleman Email to B. Rudofsky (Feb. 20, 2019)) (attachments excerpted to show Defendants' challenges to communications with Ms. Zimmer). Accordingly, Defendants have forfeited any challenge based on asserted deficiencies with the privilege log descriptions of communications with Ms. Zimmer.

Nor is there merit to CDK's challenge. Although CDK purports to challenge (at 12) a "number of documents," it identifies only two. For those two documents (emails) the privilege log identifies the senders, recipients, and relevant legal personnel (in both, Authenticom's General Counsel). The privilege log further states that one email sought legal advice regarding Authenticom's executive meeting strategy plan and that the other sought legal advice regarding draft dealer communications. This is sufficient information to establish that a privilege exists. *See Fujitsu Ltd. v. Tellabs, Inc.*, 2009 WL 10628293, at *2 (N.D. Ill. Sept. 10, 2009) (privilege log must identify "(1) the name and capacity of each individual from whom or to whom a document was sent; (2) the date of the document and any attachments; (3) the type of document; (4) the Bates numbers of the documents; (5) the nature of the privilege asserted; and (6) a description of the subject matter in sufficient detail to determine if the document constitutes work product"). Further, had Defendants requested more information about these two documents, Authenticom would have willingly provided additional information, including that the former email seeks advice about important issues faced by Authenticom, namely the actions taken by CDK and Reynolds that resulted in this litigation and who owns the data on a DMS (a key legal issue in this case) and that the latter email seeks approval of a draft communication script with dealers that raises the legal issue of whether dealers may provide login credentials to Authenticom without breaching their DMS contract with Defendants.

## II.     Many Challenged Communications Furthered A Common Legal Interest

Courts have long recognized that sharing attorney-client communications with third-parties does not waive the privilege when "the parties undertake a joint effort with respect to a common legal interest, and . . . those communications [are] made to further an ongoing enterprise." *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815-16 (7th Cir. 2007). The common interest doctrine

"applies broadly" and "in a wide range of circumstances." *Pampered Chef v. Alexanian*, 737 F. Supp. 2d 958, 965 (N.D. Ill. 2010); *Dexia Credit Local v. Rogan*, 231 F.R.D. 268, 273 (N.D. Ill. 2004). It "applies to *any* parties who have a 'common interest' in current or *potential* litigation, either as actual or *potential* plaintiffs." *Dexia*, 231 F.R.D. at 273 (emphases added). The parties do not need to be "perfectly aligned"; they need only share the same "common legal goal." *Id.*; *see also Pampered Chef*, 737 F. Supp. 2d at 966-67 ("The plaintiff contends that the parties to the agreement might one day become adversaries. And so they might. But as Judge Cardozo wrote famously in another context, 'such a calculus of [possibilities] is beyond the science of the chancery.'") (quoting *Meinhard v. Salmon*, 164 N.E. 545, 547 (N.Y. 1928)) (alteration in original).

The common interest doctrine protects the attorney-client privilege for 27 challenged communications that Authenticom shared with the following third parties: Dominion, AutoLoop, Advent Resources, CarFax, eLead, MOC1 Solutions,[4] and DARCARS. Each of these third parties shared a common legal interest: pursuit of potential antitrust litigation against CDK and Reynolds concerning their restrictions on accessing dealer data stored on CDK's and Reynolds's DMS. Defendants' anticompetitive practices had harmed each of these third parties. Those practices decimated competing data integrators (Advent,[5] Authenticom, and Dominion), raised the prices paid by application vendors for access to data on CDK's and Reynolds's DMS (Dominion, CarFax, AutoLoop, eLead, and MOC1 Solutions), and resulted in dealers paying more for vendors'

---

[4] Defendants incorrectly claim (at 4) that communications were shared with MOC Products, a manufacturer of car-care products. The communications in question were sent to Dave Waco, the owner of MOC1 Solutions, which is an application vendor like AutoLoop, eLead, and Dominion. *See* Ex. 4, Dave Waco LinkedIn Profile. The communications were sent to Mr. Waco's "mocproducts.com" email address because he was also employed by MOC Products.

[5] Defendants also erroneously state (at 4) that Advent was only a DMS provider. At the relevant time, Advent was also a data integrator but later exited that business.

applications (DARCARS). *See* Dkt. 175 (Authenticom MTD Op.) at 10-14; Dkt. 504 (Autoloop MTD Op.) at 5; Dkt. 505 (Cox MTD Op.) at 4-6; Dkt. 507 (Dealer Class MTD Op.) at 5-8.

These 27 challenged communications concern legal discussions about what ultimately became this MDL. Each of these communications includes attorneys who were either consulted for or provided legal services with respect to potential antitrust litigation against CDK and Reynolds, including:

- **Rusty Friddell** – Dominion's General Counsel;
- **Dane Brown** – Authenticom's General Counsel;
- **Nathan Jaye** – AutoLoop's General Counsel;
- **Cooley LLP** – Dominion's outside counsel (and who was considering formal representation of Authenticom and who had provided Authenticom with legal advice);
- **Davis Polk & Wardwell LLP** – Potential outside counsel for Authenticom who had provided legal advice in connection with the possible representation (though no formal representation occurred);
- **Arnold & Porter Kaye Scholer LLP** – CarFax's outside counsel; and
- **Gerry Stegmaier of Goodwin Procter LLP and Reed Smith LLP** – Authenticom's outside counsel.

As the privilege log states, these communications concern legal advice regarding "data access issues for *this litigation*," "legal strategy for *this litigation*," or "anticipation of litigation regarding CDK and Reynolds data access issues."[6] Because the 27 challenged communications were between third parties who shared a common interest (seeking legal redress for CDK's and Reynolds's anticompetitive practices) and furthered that legal enterprise (which ultimately became this litigation), the common interest doctrine applies to them. *See United States v. AT&T Co.*, 642 F.2d 1285, 1300 (D.C. Cir. 1980) ("The United States and MCI shared common interests in developing legal theories and analyses of documents on which to proceed on those issues where

---

[6] One entry states the documents concerns "CDK third party access," but it is also about what became this litigation. *See* Defs. Att. A (PRIV_1635).

they both made the same antitrust claims against AT&T."); *Dexia*, 231 F.R.D. at 273-74 (common interest for parties in "pursuit of litigation against a common adversary").

Defendants' challenge to the application of the common interest doctrine is based on nothing more than their say-so. Their motion should be denied for that reason alone. *See King v. Univ. Healthcare Sys., L.C.*, 645 F.3d 713, 721 (5th Cir. 2011) (rejecting "speculat[ive]" challenges to privilege log); *Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343, 353 (9th Cir. 2013) (as amended Jan. 22, 2014) (same for "unfounded suspicion"); *Rabushka ex rel. U.S. v. Crane Co.*, 122 F.3d 559, 565 (8th Cir. 1997) (same for "speculation").

Even if considered proper, Defendants' unsupported arguments fail. Most importantly, Defendants' contention that there was no common interest is factually wrong, as Authenticom has repeatedly told Defendants. To resolve any doubt that there was a common legal enterprise well in advance of this litigation, Authenticom submits *in camera* the document underlying PRIV_0539 – an August 5, 2016 email titled "Common Interest Privileged: R&R and CDK" and for which the content speaks for itself. *See* Ex. 5. Moreover, the day before filing this opposition, Authenticom learned from Defendants that a third party had inadvertently produced a privileged communication dated June 2, 2016 that also plainly establishes the existence of a common legal enterprise. *See* Ex. 6 (SIS_DMS_0018107) (submitted *in camera*). Therefore, Defendants have no good-faith basis to continue denying the existence of a common legal enterprise.[7]

---

[7] Defendants have contended this communication is not privileged because it does not include outside counsel. But the communication plainly discloses legal counsel provided by Dominion's General Counsel Rusty Friddell, who is included in the communication. In any case, Defendants' "insistence that an attorney must be involved as a participant in the communication before it can be found to reflect a client confidence or legal advice is misplaced." *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 407, 433 (N.D. Ill. 2006). Defendants have also claimed a participant testified there was no common interest, but the participant actually testified that he participated in preliminary discussions (hence, the common interest), that he then decided not to pursue the common efforts (which does not retroactively waive the privilege), and that he was unaware of a written common interest agreement (which is irrelevant).

Defendants' arguments fail for additional reasons as well. *First*, Defendants argue (at 6-7, 9-10) that there could not have been any joint effort with respect to this litigation because the communications occurred before any litigation was filed and because several participants purportedly have not filed suit. But "litigation need not be pending" for the common interest doctrine to apply. *BDO Seidman*, 492 F.3d at 815-16. Nor is it relevant that some participants in the communications never filed suit. The privilege extends to potential litigation even if never pursued. *See id.* at 816 n.6. In any case, two of the participants (Authenticom and AutoLoop) did file suit, and four others (Dominion, CarFax, MOC1 Solutions, and DARCARS) are members of the putative dealer and vendor classes. *See Schacher v. Am. Acad. of Opthalmology, Inc.*, 106 F.R.D. 187, 192 (N.D. Ill. 1985) (applying common interest privilege to communications between putative class members). Only two (eLead and Advent) have not filed suit, but that decision does not undermine the common interest that attached at the time the communications were made. *See BDO Seidman*, 492 F.3d at 817 (privilege for common interest communications can be waived only by agreement of all participants).[8]

*Second*, Defendants claim (at 8) that the participants in the communications did not have identical interests because they had different business models. That is irrelevant. For the common interest doctrine to apply, the participants need not be "perfectly aligned"; they only need to have a "shared interest" that is "identical." *Dexia*, 231 F.R.D. at 273. Here, the participants had an identical shared interest in pursuing potential litigation to redress the harms caused to each of the participants by CDK's and Reynolds's anticompetitive practices. The suits by data integrators (Authenticom), application vendors (AutoLoop, Cox Automotive, and MVSC), and dealerships

---

[8] Although eLead has not formally opted out of the vendor class action, it has submitted an affidavit stating its desire to "remain neutral." *See* Dkt. 541-5 (Defs. Ex. 3). This is not surprising given that eLead has been acquired by one of the defendants (CDK). *See* Ex. 7.

have all been consolidated in this MDL precisely because of the identical legal issues. This places the communications well within the common interest doctrine. *See id.* at 274 (holding creditor and debtor had identical legal interests); *Terra Found. for Am. Art v. Solomol+ Bauer+Giambastiani Architects, Inc.*, 2015 WL 1954459, at *4-5 (N.D. Ill. Apr. 29, 2015) (holding architect and sub-contractor had identical legal interests).[9]

* * *

Defendants' complaints (at 5) about Authenticom's willingness to provide information are unfounded. On telephonic meet-and-confers, Authenticom explained the nature of the common interest (discussions about the antitrust litigation currently before the Court). Those meet-and-confers were not productive because Defendants stated they did not believe Authenticom's claims of a common legal enterprise and took the (erroneous) position that none of the communications prior to the filing of a complaint could be subject to the common interest privilege. Authenticom has also answered Defendants' various written inquiries about the privilege log. *See*, *e.g.*, Ex. 1. The only inquiry that Authenticom refused to respond to was a list of at least 24 questions that Defendants sent to Authenticom on February 25, 2019, *see* Dkt. 541-4 (Defs. Ex. 2) – five days after the parties had stipulated that they would complete their meet-and-confers, *see* Dkt. 491 at 3. Authenticom had already answered the questions that were pertinent to the privilege claims (*e.g.*, the nature of the common interest asserted), and the remainder were make-work. *See* Dkt. 541-4 (Def. Ex. 2) (*e.g.*, questions about the precise dates of legal representations).[10]

---

[9] Defendants note (at 5 & n.12) that there was no written common interest agreement. But there is "no requirement that there be a written agreement to enjoy the protections of the common interest doctrine." *Costello v. Poisella*, 291 F.R.D. 224, 232 (N.D. Ill. 2013). In any case, the parties expressed intent to maintain privilege by, among other things, marking documents as being subject to the common interest doctrine, *see*, *e.g.*, Ex. 8 (PRIV_1195), and by circulating (although never executing) a written common interest agreement, *see* Ex. 9 (PRIV_1016), each submitted for *in camera* review.

[10] Authenticom no longer relies on the common interest doctrine with respect to BMO Harris Bank, Gil Hale, and Motormindz. Defendants' arguments (at 10-11) therefore need not be considered.

### III. Certain Challenged Communications Were Solely With Attorneys Representing Or Considering Representing Authenticom

As Authenticom has explained to Defendants, Defendants incorrectly claim that four of the challenged communications were shared with third parties because they were sent to Davis Polk. *See* Ex. 1.  At this time, Davis Polk was not a third party because Authenticom was considering formal retention of Davis Polk.  It is black-letter law that the attorney-client privilege "extends to preliminary consultation by a prospective client with a view to retention of the lawyer, although actual employment does not result."  *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir. 1978); *see* McCormick on Evidence § 88 (7th ed. 2016) ("Communications in the course of preliminary discussion with a view to employing the lawyer [even] though the employment is . . . not accepted.").  Accordingly, the four communications between Authenticom and Davis Polk are protected by ordinary application of the attorney-client privilege.  *See Westinghouse Elec.*, 580 F.2d at 1319-20; *Pac. Dunlop Holdings, Inc. v. Barosh*, 1992 WL 168535, at *6 n.11 (N.D. Ill. July 14, 1992).

Even though Authenticom notified Defendants of this basis for privilege, Defendants have not addressed the issue in their motion to compel.  Therefore, they have forfeited their challenge to these four communications.  *See Labella Winnetka, Inc. v. Gen. Cas. Ins. Co.*, 259 F.R.D. 143, 151 (N.D. Ill. 2009) (argument raised for the first time on reply is waived and cannot be considered) (citing *United States v. Adamson*, 441 F.3d 513, 521 n.2 (7th Cir. 2006)).

### IV. Many Of The Challenged Communications Are Also Work Product

**A.**   Thirty-seven of the challenged communications are attorney work-product, including many that are also subject to the attorney-client privilege.  *See* Exs. A, B.  The work-product privilege "protect[s] against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney."  Fed. R. Civ. P. 26(b)(3)(B); *see Miller*, 17 F. Supp. 3d at

- 12 -

734-35.  This privilege "establishes a zone of privacy in which lawyers can analyze and prepare their client's case free from scrutiny or interference by an adversary."  *Id.* at 734.

      **1.**      CDK claims (at 14-15) that Authenticom has not established the existence of work product for two reasons.  Neither has merit.  *First*, CDK argues (at 14) that CDK has not established that the communications were made in anticipation of litigation.  The applicable test is "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation."  *Caremark, Inc. v. Affiliated Comput. Servs., Inc.*, 195 F.R.D. 610, 614 (N.D. Ill. 2000) (quoting *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1118-19 (7th Cir. 1983)).  Authenticom's privilege log plainly asserts that each of the 38 challenged communications were made in anticipation of litigation.  *See* Exs. A, B.  This is supported by the evidence that Authenticom has submitted from June and August 2016 showing that discussions about this litigation had begun at least by those dates.  *See* Ex. 5 (PRIV_0539); Ex. 6 (SIS_DMS_0018107).  For the three challenged communications for which Authenticom asserts work-product privilege prior to June 2016 (PRIV_0105, PRIV_1006, PRIV_1958), each was shared by Authenticom with Dominion's General Counsel Rusty Friddell as part of the common legal enterprise that led to this litigation.  This demonstrates that litigation was anticipated at the time of those communications.  *See Sanchez v. Matta*, 229 F.R.D. 649, 657 (D.N.M. 2004) (applying privilege to material generated three years before litigation); *Nat'l Jockey Club v. Ganassi*, 2006 WL 733549, at *1 (N.D. Ill. Mar. 22, 2006).

      *Second*, CDK contends (at 14) the challenged communications are not protected work product because they were not "created by Authenticom *for* Authenticom."  Work-product protection, however, does not require that the material be created "by" *and* "for" Authenticom; it

- 13 -

requires that the material be created "by *or* for" Authenticom or its representatives. Fed. R. Civ. P. 26(b)(3) (emphasis added); *see Caremark*, 195 F.R.D. at 615-16. Each of the challenged communications was either created "by" or "for" Authenticom or its representatives. Of the 38 challenged communications for which Authenticom asserts work-product privilege, eight are solely between Authenticom and its counsel (including Ms. Zimmer and Davis Polk), and thus, were necessarily created by or for Authenticom. Twenty-five are with participants in the common legal enterprise, and for those, the work product was necessarily either created "by" Authenticom or "by" another participant "for" Authenticom and the other participants. Two (PRIV_1103 and PRIV_0296) were created "by" Authenticom and its representatives (Dane Brown and Cooley LLP) for other third parties (BMO, Authenticom's lender, and Gerchen Keller, a litigation finance company).[11] Two (PRIV_1676 and PRIV_0392) were created "for" Authenticom by a third party at the direction of Kellogg Hansen. The last challenged communication (PRIV_1409) contains work product that was sent to the participants in the common legal enterprise and then forwarded to another third party (Motormindz). In short, all of the documents were created by or for Authenticom "because of" anticipated litigation. That is all the work-product doctrine requires.

     **2.**     CDK also asserts (at 15) that Authenticom has waived any work-product privilege that existed by sharing the communications with third parties. But "disclosure to a third party does not automatically waive work-product protection." *Miller*, 17 F. Supp. 3d at 736. Waiver occurs

---

[11] Contrary to Defendants' argument (at 15), communications with litigation finance firms (like Gerchen Keller) or traditional banks (BMO Harris) may receive work-product protection. *See Miller*, 17 F. Supp. 3d at 735 ("Materials that contain counsel's theories and mental impressions created to analyze [the] case do not necessarily cease to be protected because they may also have been prepared or used to help . . . obtain financing."); *see Viamedia, Inc. v. Comcast Corp.*, 2017 WL 2834535, at *3 (N.D. Ill. June 30, 2017) (holding communications with Burford Capital LLC, another litigation finance company, protected by the work-product doctrine; citing cases). The case on which Defendants rely is inapposite because the court found that the communications were made in connection with an ordinary loan, not in connection with anticipated litigation. *See Acceleration Bay LLC v. Activision Blizzard, Inc.*, 2018 WL 798731, at *1-2 (D. Del. Feb. 9, 2018).

only where disclosure to a third party "substantially increases the opportunity for potential adversaries to obtain the information." *Id.* (quoting *Appleton*, 702 F.3d at 1025). That is a significantly more stringent standard than for waiver of the attorney-client privilege, and Defendants bear "the burden to show that a waiver occurred." *Id.* at 737.

Defendants fall far short of satisfying their burden. They claim (at 15) that Authenticom risked disclosure by sharing information with its competitors and with third parties who had contracts with CDK and Reynolds. But CDK and Reynolds do not point to any specific contract provision by which they could have compelled the disclosure. Absent any ability to compel disclosure, there was no reasonable prospect that the participants in these communications would have disclosed their discussions to CDK or Reynolds voluntarily. Rather, they had a unity of interest *against* CDK and Reynolds because they were contemplating legal action against them.[12]

Nor does it matter that certain third parties could be called as trial witnesses, as Defendants assert (at 15). Defendants' argument is circular. If the communications are protected by the work-product doctrine, Authenticom would be able to assert the work-product protection to prevent disclosure even at trial. At any rate, Defendants nowhere attempt to explain why communications discussing possible litigation would even be relevant trial evidence. Notably, even the case on which Defendants rely (at 15) acknowledges that disclosure of work product to third parties sharing a common interest would not result in waiver even if that third party may become a witness. *See Ricoh Co. v. Aeroflex Inc.*, 219 F.R.D. 66, 70 (S.D.N.Y. 2003).

## CONCLUSION

The Court should deny Defendants' motion to compel.

---

[12] Certain challenged communications state they are the subject of a non-disclosure agreement. *See*, *e.g.*, Ex. 10 (PRIV_0416) (submitted *in camera*); Ex. 11 (PRIV_1886) (submitted *in camera*).

Dated:  March 15, 2019                    Respectfully submitted,

*/s/ Derek T. Ho*
Derek T. Ho
**KELLOGG, HANSEN, TODD,**
   **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com

*Counsel for Plaintiff Authenticom, Inc.*

## CERTIFICATE OF SERVICE

I, Derek T. Ho, an attorney, hereby certify that on March 15, 2019, I caused a true and correct copy of the foregoing **PLAINTIFF AUTHENTICOM, INC.'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL AUTHENTICOM TO PRODUCE THIRD-PARTY COMMUNICATIONS OR, IN THE ALTERNATIVE, SUBMIT SUCH COMMUNICATIONS FOR *IN CAMERA* REVIEW** to be filed electronically via the court's CM/ECF system. Notice of this filing will be sent by email to all counsel of record by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Copies of the under seal exhibits were served on counsel of record via email.

*/s/ Derek T. Ho*
Derek T. Ho
**KELLOGG, HANSEN, TODD,**
  **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com