**PUBLIC VERSION**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This document relates to:* | Hon. Robert M. Dow, Jr. |
| *Cox Automotive, Inc, et al. v. CDK Global, LLC*, Case No. 1:18-CV-1058 (N.D. Ill.) | Magistrate Judge Jeffrey T. Gilbert |
| *Loop, LLC, d/b/a AutoLoop v. CDK Global, LLC*, Case No. 18-cv-2521 (N.D. Ill.) | |

**DEFENDANT CDK GLOBAL, LLC'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD OR REDACTED OR, IN THE ALTERNATIVE, FOR AN *IN CAMERA* INSPECTION OF THE CHALLENGED DOCUMENTS**

**PUBLIC VERSION**

## INTRODUCTION AND ARGUMENT

Plaintiffs Loop, LLC, d/b/a AutoLoop ("AutoLoop") and Cox Automotive, Inc ("Cox") continue to improperly withhold relevant and important discovery based on inadequately supported assertions of the attorney-client privilege and the work product and common interest doctrines. Their arguments in opposition to CDK's motion are meritless and demonstrate that they do not have a valid basis to claim privilege over each category of challenged documents.[1]

**I. AUTOLOOP HAS NOT ESTABLISHED A VALID COMMON INTEREST WITH NUMEROUS THIRD PARTIES IDENTIFIED ON ITS PRIVILEGE LOGS**

After CDK's motion was filed, AutoLoop purported to assert privilege over six additional documents produced by non-party Superior Integrated Solutions ("SIS") pursuant to a common interest theory. *See* Def. Exhibit 14 (3/20/2019 Letter from D. Guarnera to A. Gulley and B. Miller); *infra*, pp. 5-6. With the addition of the SIS documents, AutoLoop's common interest claims can be summarized as follows:

| **Table 1: AutoLoop's Revised Common Interest Claims**[2] | | | |
|---|---|---|---|
| **Alleged Common Interest Subject Matter** | **Alleged Common Interest Members** | **No. of Log Entries** | **Time Period** |
| Reynolds-SIS Litigation (2013) | AutoLoop, SIS | 3 | 02/2013 |
| Reynolds "Conduct" and "Integration" | AutoLoop, SIS, EasyCare/APCO[3], Dominion, Dealer Socket, ELEAD1ONE, AutoPoint, | 35 | 10/2010 – 06/2016 |

---

[1] CDK's motion challenged five entries on AutoLoop's privilege logs and two entries on Cox's privilege log because they did not provide author and/or recipient information. *See* Dkt. 544 at 5, 6. Based on the explanations provided in Plaintiffs' response brief regarding the documents (*see* Pl. Resp. at 2, 4), CDK withdraws its challenge to the entries, as it appears that they stand-alone files or unsent drafts.

[2] For the Court's convenience, Exhibit 15, attached hereto, combines all 155 challenged entries on AutoLoop's privilege and redaction logs subject to one of its four common interest claims.

[3] AutoLoop now withdraws its common interest claim as to EasyCare/APCO in the context of purported Reynolds "conduct" and "integration" issues and in the context of a "pending regulatory matter." *See* Pl. Resp. at 8 n.2 & 9 n.3; *infra*, pp. 6, 8.

1

|  | Authenticom, Unknown/Various[4] |  |  |
|---|---|---|---|
| "Pending Regulatory Matter" | AutoLoop, Authenticom, Carfax, DARCARS, Dominion[5], EasyCare/APCO, ELEAD1ONE, NADA, SIS, Unknown/Various[6] | 104 | 12/2012 – 12/2017 |
| *In re DMS Antitrust Litig.* | AutoPoint, Dealer Fx, ELEAD1ONE, SIS, Unknown/Various[7] | 13 | 03/2017 – 10/2017 |

AutoLoop was vague about the nature of its broad "common interest" assertions during the meet-and-confer process, and its brief provides little clarification. Most strikingly, AutoLoop offers no evidence or testimony, in the form of a declaration or otherwise, identifying the membership of these common interest groups or any common interest *agreement*—either written or oral—between AutoLoop and any other purported common interest group member. To the contrary, alleged common interest group members, including AutoLoop's own head of sales, Tony Petruzzelli, and SIS's CEO, Phil Battista, have testified that ▌

▌[8] AutoLoop's conclusory statements that it "shared a common legal interest" or "the

---

[4] Certain log entries indicate that ▌, identified as an attorney, was included on communications between AutoLoop and SIS. At his deposition, Mr. Petruzzelli testified that ▌ *See* Defs. Exhibit 12 at 41:17-20 (T. Petruzzelli Dep.). However, entries on AutoLoop's privilege log for internal communications purportedly relaying advice of ▌ were withheld pursuant to a common interest claim. *See, e.g.*, Def. Exhibit 5 (AL_MDL_PRIV_0195). Therefore, it remains unknown who ▌ actually represents.

[5] AutoLoop now withdraws its common interest claim as to Dominion in the context of a "pending regulatory matter." *See* Pl. Resp. at 10; *infra*, p. 8.

[6] Many of these communications include ▌, and others of the law firm ▌, and others include ▌ (discussed above) and ▌ of the law firm ▌. The clients of these firms are unknown to CDK.

[7] Several of these communications also involve ▌.

[8] The only deposition testimony cited by AutoLoop is from Mr. Petruzzelli, AutoLoop's head of sales, in which he stated that ▌. Def. Exhibit 12 at 45:15-46:5 (T. Petruzzelli Dep.). More recently, on March 14, 2019, SIS's CEO Phil Battista ▌. *See* Def. Exhibit 16 at 310:20-23 (P. Battista Dep.) (Rough). As of the filing of this reply, only the "rough" version of Mr. Battista's deposition transcript is available.

2

same identical legal interest" are insufficient. *See* Pl. Resp. at 4-13 (*passim*). The evidence shows that in each case, the common interest doctrine does not apply.

### A. Communications with SIS and EasyCare/APCO Regarding Reynolds

#### 1. SIS-Reynolds Litigation (2013)

AutoLoop does not dispute that it never joined SIS's lawsuit against Reynolds in 2013, nor has AutoLoop brought suit against Reynolds at any time since. Moreover, the AutoLoop employee involved in almost all the challenged communications with SIS during this period—Tony Petruzzelli—testified that ███████████████████████████████████████████. *See* Def. Exhibit 12 at 42:20-43:17 (T. Petruzzelli Dep.).[9] AutoLoop's response that it nevertheless shared a common interest with SIS as a non-participant in the lawsuit because SIS's claims challenged alleged "anticompetitive practices" that also "harmed AutoLoop by decreasing competition" (Pl. Resp. at 7) is unpersuasive. That is exactly the type of indirect interest in the *outcome* of litigation that is insufficient to establish a common *legal* interest. *See United States v. Evans*, 113 F.3d 1457, 1468 (7th Cir. 1997) ("In short, Holden's interest in the Evans' proceedings is far too attenuated to support application of the common interest rule.").

AutoLoop now points to one withheld communication with SIS (Pl. Exhibit C) as evidence that "AutoLoop was also considering bringing antitrust claims against Reynolds …, and had begun working with SIS on those claims." Pl. Resp. at 6. Apparently this communication, submitted for

---

[9] Acknowledging Mr. Petuzzelli's testimony that AutoLoop had not "decided" to bring any litigation against Reynolds in 2013, AutoLoop tries to argue the negative, *i.e.*, that Mr. Petruzzelli "*did not* testify that AutoLoop *did not anticipate* litigation against Reynolds in 2013." Pl. Resp. at 6 (emphasis added). These word games do not get AutoLoop anywhere. In the very next question, counsel followed up with Mr. Petruzzelli about ████████████████████████████████████████████████████████████████████████████████████████████████████████ Def. Exhibit 12 at 43:5-17 (T. Petruzzelli Dep.) (emphasis added).

3

*in camera* review, attaches a "legal memoranda dated January 31, 2012 from AutoLoop's outside counsel regarding potential antitrust claims against Reynolds." *Id.* It should be noted that AutoLoop's privilege log entry is significantly more vague and generic: ███████████████████████████████████████████████████████████████ Def. Exhibit 5 (AL_MDL_PRIV_0598). In any event, to the extent that AutoLoop ██████████████████████ ██████████████████ that is more much indicative of AutoLoop merely offering assistance to SIS in connection with litigation efforts than of an actual common interest between them. *See Marciano v. Atl. Med. Specialities, Inc.*, No. 08-CV-305-JTC, 2011 WL 294487, at *3 (W.D.N.Y. Jan. 27, 2011) (common interest doctrine did not apply to "assistance in formulating the defense strategy" provided by "a third-party with no legal interest in the ongoing litigation"). Nor does the document, which Mr. Petruzzelli himself received (*see* Pl. Exhibit C), alter his sworn testimony that AutoLoop had no litigation plans of its own.

Mr. Petruzzelli also confirmed that ████████████████████████ ████████. Def. Exhibit 12 at 45:15-46:5 (T. Petruzzelli Dep.). AutoLoop responds that "Petruzelli's lack of awareness of a written common interest agreement does not matter 'because there is no requirement that there be a written agreement to enjoy the protections of the common interest doctrine.'" Pls. Resp. at 7 (quoting *Costello v. Poisella*, 291 F.R.D. 224, 232 (N.D. Ill. 2013)). That is beside the point. Mr. Petruzzelli did not delineate between "written" and "unwritten" agreements—he testified that ████████████████. Because there is no evidence of any common interest agreement, and no evidence of AutoLoop actually participating in the SIS-Reynolds litigation, there is no privilege. *See, e.g., JTR Enters., LLC v. An Unknown Quantity of Colombian Emeralds, Amethysts & Quartz Crystals*, 297 F.R.D. 522, 528 (S.D. Fla. 2013)

4

("Sharing a desire to succeed in an action is not enough to create a common interest where there was no evidence of an agreement, the third-party was never party to the action, and the third-party never exercised control over or contributed to legal expenses.").

### 2. Other Reynolds "Conduct" and "Integration"

For the same reasons, AutoLoop has not established a valid common legal interest between it, SIS, and numerous other third parties during a nearly six-year period (10/2010 – 06/2016) with respect to unnamed litigation (which was never filed) involving Reynolds "conduct" or "integration." Once again, AutoLoop has not identified the membership of this purported common interest group or the existence of any common interest agreement between them.

AutoLoop's fallback argument that these documents "are also protected by the work-product privilege" is misguided. Pl. Resp. at 7. First, as just explained, there was no litigation (planned or actual) between AutoLoop and Reynolds as would be necessary for the work product doctrine to apply. Second, AutoLoop is simply wrong that its disclosure of these communications to SIS did not "substantially increase[]" the likelihood of their disclosure to Reynolds. Pl. Resp. at 7 (quoting *Miller UK Ltd. v. Caterpillar, Inc.*, 17 F. Supp. 3d 711, 736-38 (N.D. Ill. 2014)). In 2018, MDL Plaintiffs subpoenaed SIS for documents. *See* Def. Exhibit 17. SIS's production—to all parties in the MDL, including Reynolds—disclosed many of the same communications (or the same type of communications) with AutoLoop that are now at issue. *See, e.g.*, Def. Exhibit 18 (SIS_DMS_0006668) (Submitted *in camera*). Although *AutoLoop* has since attempted to assert privilege over certain of these documents and claw them back,[10] SIS has never made such claim

---

[10] On March 20, 2019, AutoLoop served a letter purporting to claw back SIS_DMS_0006668 and five other documents produced by SIS. *See* Def. Exhibit 14 (03/20/2019 Letter from D. Dorris). CDK disputes AutoLoop's clawback assertion for the reasons set forth above and in its opening brief. Moreover, it is extremely troubling that many of the documents that AutoLoop now seeks to claw back from SIS's production involve emails to and from agreed AutoLoop custodians during the agreed discovery period—

5

nor given any indication that it believes that a "common interest" or work product protection applies to its communications with AutoLoop. Moreover, . *See supra*, pp. 4-5.

AutoLoop has also now withdrawn its claim that a January 2014 communication with third party EasyCare/APCO is subject to a common interest, claiming instead that the communication is protected work product. Pl. Resp. at 8 & n.2. This work product theory suffers from the same flaws noted above, and in any event, AutoLoop's revised description makes clear that any supposed "work product" in the communication was prepared for the benefit of EasyCare/APCO. *See Moore's Federal Practice* § 26.70 (3d ed. 2015) ("[A] document prepared for a nonparty is not deemed work product even if the nonparty is closely related to litigation.").[11]

### B. Communications with Numerous Third Parties Including Vendors, SIS, and Authenticom Regarding a "Pending Regulatory Matter"

AutoLoop's response does not supply any of the basic facts needed to establish a common interest between it and numerous third parties over the five-year period (12/2012 – 12/2017) during which the challenged communications occurred. In fact, AutoLoop remains evasive even about what "pending regulatory matter" it is talking about, explaining only that a "portion" of the communications relate to a joint-conduct investigation of CDK and Reynolds opened by the FTC in 2017. Pl. Resp. at 8. No explanation is given for the majority of communications that date back much earlier, most of which are from 2013 and 2016.

---

for example, SIS_DMS_0006668, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓—yet did not appear on AutoLoop's initial privilege logs.

[11] AutoLoop asserts that the redacted portion of AL_MDL_0081576 includes a statement by AutoLoop unilaterally declaring that the content is "very confidential." Pl. Resp. at 8. Assuming this is true, this does not establish an *agreement* for confidentiality between AutoLoop and EasyCare/APCO.

6

AutoLoop largely incorporates the arguments made by Authenticom, who has claimed a similar "common interest" exception regarding its communications with AutoLoop and numerous others. *Id.* at 9 (citing Dkt. 571 at 6-11, 12-15). Defendants respond to those arguments in their reply brief concerning Authenticom's privilege log, filed concurrently herewith. In addition:

*No Common Interest Agreement*. If a broad coalition of the automotive industry actually *had* formed to lobby for the FTC's investigation of CDK and/or Reynolds over a five-year period, with guidance from law firms like , one would imagine that at some point, someone would have prepared a common interest agreement for those participants to sign; at a minimum, they would have reached *some* explicit understanding of the group's goals and its obligations to maintain the confidentiality of shared attorney-client communications. Yet AutoLoop can produce no such agreement and offers no testimony, in a declaration or otherwise, that such an agreement ever existed. To the contrary, AutoLoop's Tony Petruzzelli, who is included on most of the challenged communications at issue, testified as follows:

[redacted]

Def. Exhibit 12 at 45:15-46:6 (T. Petruzzelli Dep.).

*No Common Interest*. Even if AutoLoop had formed a *bona fide* "common interest" group to lobby for the FTC's investigation of CDK and/or Reynolds, such a group of private citizens would have lacked standing to intervene in the FTC's investigation or file. *See, e.g.*, Askew v. Wachovia Bank of Delaware, No. 4:08-CV-65-D, 2009 WL 10708317, at *3 (E.D.N.C. May 15, 2009) ("Section 5 of the FTC Act does not 'bestow upon either competitors or consumers standing to enforce its provisions.'") (quoting *Alfred Dunhill Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 237 (2d Cir. 1974)). At most, this group would have lobbied the FTC and cheered it on from the

7

sidelines. This is exactly the type of "shared rooting interest" in the outcome of a dispute that falls short of establishing a common *legal* interest. *See Miller UK Ltd.*, 17 F. Supp. 3d at 732–33 ("A shared rooting interest in the 'successful outcome of a case'. . . . is not a common legal interest."); *JTR Enters.*, 297 F.R.D. 522, 528 (S.D. Fla. 2013) (shared desire to uncover a purported fraud is insufficient to support a common interest).

Moreover, several purported "common interest" members did not even share a common *rooting* interest in the FTC's investigation(s). SIS's CEO Phil Battista recently testified that ███████████████████████████████████████████████████████████████████████████████████████████ Def. Exhibit 16 at 308:17-309:2 (P. Battista Dep.) (Rough). Further proving the point, in its response brief AutoLoop now abandons any claims of "common interest" regarding two more purported common interest group members, EasyCare/APCO and Dominion. *See* Pl. Resp. at 9 n.2 (EasyCare/APCO) & 10 (Dominion).

***Non-Attorney Communications***. AutoLoop points out that many of the communications between it and the other purported common interest members did not involve attorneys. Pl. Resp. at 9. But while it is true that non-lawyers may serve as "the conduit" for attorney-client advice without waiving privilege in certain circumstances, *id.*, the absence of attorneys on many of the communications now at issue suggests that any interests shared by the parties to those communications were not *legal* in nature.

***Adversity (ELEAD1ONE)***. Nor is there anything to AutoLoop's arguments that it has not created adversity with purported common interest group member ELEAD1ONE ("eLead") by suing CDK, its parent corporation. AutoLoop cites no authority supporting its assertion that "there is no adversity here," Pl. Resp. at 11, and its efforts to distinguish contrary authority in CDK's opening brief do not withstand scrutiny. For example, in *Dexia Credit Local v. Rogan*, 231 F.R.D.

287 (N.D. Ill. 2004), a common interest was found to exist between two entities, EMC and the Management Companies (as the court referred to them). *Id.* at 294-95. One of those entities, the Management Companies, later became involved in litigation with Dexia, which "share[d] an identical legal interest with EMC" in the outcome of the litigation. *Id.* at 296. As such, the court concluded that "Dexia should … be considered as standing in the 'adverse party' shoes of EMC." *Id.* The same is true here, where AutoLoop does not dispute that CDK and eLead (as its wholly-owned subsidiary) share an identical legal interest in the success of CDK's defense against AutoLoop's lawsuit. *See, e.g., In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 366 (3d Cir. 2007) ("parents and their wholly owned subsidiaries have the same interests").

AutoLoop is also wrong that adversity with eLead would merely destroy AutoLoop's ability "to assert privilege *against eLead*." Pl. Resp. at 11 (emphasis in original). Because CDK is "standing in the 'adverse party' shoes of [eLead]," *Dexia*, 231 F.R.D. at 296, AutoLoop cannot assert a privilege against either CDK *or* eLead. The decision that AutoLoop cites, *Lislewood Corp. v. AT&T Corp.*, 2015 WL 1539051 (N.D. Ill. Mar. 31, 2015), is not to the contrary. It addressed a two-party common interest group (AT&T and Marriott) that had become adverse *in part* as to Marriott's duty to indemnify AT&T in the lawsuit, but retained a common interest in defeating the underlying claims of the plaintiff, Lislewood. *Id.* Thus, the court denied Lislewood's motion to compel AT&T to produce privileged communications with Marriott on matters in which AT&T and Marriott continued to share a common interest *against* Lislewood. *Id.* at *5. Similar facts do not exist here: eLead and AutoLoop do not share a common adversity (and thus a potential common interest) against CDK. To the contrary, as a wholly-owned subsidiary of CDK, eLeads's interests are fully aligned with CDK's and fully opposed to AutoLoop's.[12]

---

[12] AutoLoop's reliance on *United States v. Balsiger*, No. 07-CR-57, 2011 WL 10879630, at *9 (E.D. Wis. May 11, 2011) is misplaced. Despite the court's conflation of the joint defense, co-client, and community-

### C. Communications with Third Parties Regarding "This Litigation"

AutoLoop's conclusory claim (at 12) that it shared "identical legal interests" with yet another purported common interest group—which included SIS and vendors AutoPoint, Dealer FX, and eLead—once again runs contrary to the available facts. Before becoming outright *adverse* to AutoLoop (*see supra*, pp. 8-9), eLead submitted a sworn declaration in June 2017 stating that it "wish[ed] to remain neutral" in this litigation. Def. Exhibit 13 ¶ 4 (Penney Decl.). Presenting no evidence to the contrary, AutoLoop continues to argue that it somehow "maintained a common interest" with eLead as to this litigation for months after the declaration was signed. Pl. Resp. at 12. Similarly, SIS's CEO made clear that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Defs. Exhibit 16 at 317:23-318:10 (P. Battista Dep.) (Rough). Nor does AutoLoop mention that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *See* Def. Exhibit 19 (CVR-0556976). ▬

---

of-interest rules, *Balsiger* involved an attempt by one defendant to waive privilege over documents prepared in defense of wire fraud allegations for both it and 11 other defendants. This fits squarely within the exception to unilateral waiver outlined in *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 689 F. Supp. 841, 844-845 (N.D. Ill. 1988), and does nothing to undermine the ruling in *Medcom*. There, after noting "the special protection to confidentiality between jointly represented defendants," the court found that one party to a joint defense may not unilaterally waive privilege. *Id*. at 845. In contrast, where there was a common interest relationship not in the joint defense context, the courts in both *Medcom* and *Bass* held that voluntary disclosure by a subsidiary to its new corporate parent waives privilege. *Medcom*, 689 F. Supp. at 844; *Bass Pub. Co. v. Promus Cos.*, 868 F. Supp. 615, 620 (S.D.N.Y.1994). AutoLoop's reference to a footnote in *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 380 n.35 (3d Cir. 2007), as amended (Oct. 12, 2007), fails to undermine the continued legitimacy of *Medcom* in this district.

████████████████████████████████████████████████████████

████████████████████████████████████ *Id.*[13]

AutoLoop provides no details about its relationship with the other members of this purported common interest group, including AutoPoint and Dealer FX. There is no basis to conclude that either of them shared a common legal interest in pursuing litigation against Defendants any more than eLead or SIS did. And once again, a shared desire to see a litigation succeed is no basis for a common legal interest where there is no evidence of a common interest agreement, the purported common interest member is not party to the litigation, and it exercises no control over the litigation. *JTR Enters.*, 297 F.R.D. at 528; *see also Blanchard v. EdgeMark Fin. Corp.*, 192 F.R.D. 233, 237 (N.D. Ill. 2000) ("DLJ is not a party to this lawsuit, there is no evidence that it was called upon to assist in the defense of this case or that there was otherwise a joint, concerted effort by EdgeMark and DLJ to advance a common legal enterprise.").

\* \* \*

Against this backdrop, AutoLoop's refrains to "fairness" and preventing CDK from gaining a "strategic advantage" ring hollow. Pl. Resp. at 11. Putative common interest group members have already testified in this MDL with the imprimatur of non-party witnesses, including Dominion, who sent a representative to the Western District of Wisconsin to testify live in support of Authenticom's then-pending preliminary injunction motion. *See* Auth. Dkt. 165 at 2-A-27—2-A-55. If anything, Plaintiffs are the ones using these third parties' testimony of as a "sword" to advance their claims while attempting to "shield" their communications with said third parties on the same subject matter of their testimony using dubious claims of privilege.

---

[13] MVSC and SIS resolved their dispute before MVSC filed suit against CDK and Reynolds only.

## II. COX HAS NOT PROVIDED AUTHOR OR RECIPIENT INFORMATION FOR MORE THAN 1,000 ENTRIES ON ITS PRIVILEGE LOG

Cox has steadfastly refused to provide author and recipient information for over 1,000 entries on its privilege log that lack this basic metadata. Its explanation that *most* (but apparently not all) of these entries are email attachments and that ¶ 9(b) of the parties' ESI Stipulation (Dkt. 105) allows for family logging (one log entry for an email plus its attachments) is irrelevant. Cox chose *not* to provide family-wide log entries and instead provided separate log entries for emails and their attachments. If attachments are separately logged, the parties' ESI stipulation is clear: each privilege log entry must identify, among other things, the "author" and "recipient(s)" of the document being withheld or redacted. Dkt. 105 ¶ 9(a).[14]

In an effort to avoid needless motions practice over this issue, CDK asked Cox whether the attachments on its privilege log were being withheld as integral to privileged communications reflected in the cover emails to which the attachments belong (the so-called "part-and-parcel" doctrine). *See, e.g.*, *Muro v. Target Corp.*, 250 F.R.D. 350, 363 (N.D. Ill. 2007). Cox declined to confirm that is the case.[15] In its brief, Cox now clarifies that "the challenged attachments are a

---

[14] Cox argues that any relief ordered by the Court for its failure to provide author and recipient information for the challenged log entries should be "applied to CDK and Reynolds" as well. Pl. Resp. at 4. *See also id.* at 15 (same argument regarding Cox's substitution of "Cox Legal Department" for attorney information on challenged log entries). Cox is grasping for an equivalency that does not exist. Where CDK and Reynolds received inquiries about why certain information did not appear on their log entries, including author and recipient information, they worked to provide reasonable explanations why that information did not exist or was not available. Similarly, where Cox provided reasonable explanations why some of its log entries lacked author or recipient information (*e.g.*, because the document is an unsent draft email), CDK accepted those representations. *See supra* n.1. That is not the case for the privilege log entries now at issue. Cox's various references to CDK's FTC privilege log (*see* Pl. Resp. at 4, 15) are similarly irrelevant. CDK's FTC privilege log was prepared for the FTC and turned over to MDL Plaintiffs immediately after its completion, in the same form that it was delivered to the FTC. To the extent Plaintiffs have issues with the form or format of the FTC log, meet-and-confer discussions about the matter are ongoing.

[15] Cox claims that "CDK never asked" about whether Cox was withholding email attachments under the part-and-parcel doctrine or pursuant to an independent privilege claim "until February 21, 2019, a week before the motion to compel was due." Pl. Resp. at 4 n.1. The reality is that CDK's counsel asked this question several times during telephonic meet-and-confers before asking it again by letter on February 21.

mixture of documents that are independently privileged, integral to the email, or both." Pl. Resp. at 4 n.1. However, Cox's belated answer only raises more questions. For the attachments that Cox is asserting are "independently privileged" as opposed to privileged pursuant to the part and parcel doctrine, author and recipient information is necessary for either CDK or the Court to evaluate Cox's privilege claim. *See RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209, 218 (N.D. Ill. 2013) (finding that failure "to identify the author or recipient . . . significantly limits the Court's ability to find that documents are protected under the attorney-client privilege"). That is the only way CDK can determine whether the underlying documents were, for example, sent or received by third parties. *See id.* CDK has repeatedly asked for this information and, even in Cox's response brief, has received no clear answers.

### III. COX FAILED TO COMPLY WITH THE PARTIES' GLOBAL AGREEMENT FOR LOGGING EMAIL DISTRIBUTION LISTS

Cox does not dispute that the parties reached a stipulation requiring them to provide the current number of recipients associated with each email distribution list that appears on their privilege logs. *See* Mot. at 13-14. Instead, Cox argues that *Cox* (and only Cox) never joined this agreement even though both Defendants and all other Plaintiffs did. Pl. Resp. 13. Respectfully, that is disingenuous.[16] Perhaps realizing this, Cox agreed to provide the requested information for

---

In any event, the parties were working diligently to resolve open issues before the March 1 motions deadline for privilege log disputes, and eight days was plenty sufficient for Cox to provide a response.

[16] Following a meet-and-confer that representatives of all parties attended, Leo Caseria, on behalf of Defendants, proposed that "defendants will provide the number of current members of each group email address … , along with a brief description of the current general purpose of the group. Defendants are willing to agree to do this *if all plaintiffs* agree to do this as well." Def. Exhibit 9 (1/9/2019 Email from L. Caseria to D. Nordin) (emphasis added). Dan Nordin, responding on behalf of Plaintiffs, confirmed that the parties had "agreement on the substance" of Defendants' proposal. Def. Exhibit 20 (1/11/2019 Email from D. Nordin to L. Caseria). Defendants *and* Plaintiffs provided the agreed-upon information regarding email distribution lists as required by their stipulation. *See* Def. Exhibit 10 at 8-9 (02/08/2019 Letter from J. Michaels to D. Nordin) (CDK); Def. Exhibit 21 (02/08/2019 Chart re: "Reynolds Email Distribution Lists Appearing on Privilege Log") (Reynolds); Def. Exhibit 22 (02/22/2019 Letter from C. Bonomo to J. Michaels) (Authenticom). Cox attended these meet-and-confers and participated in the parties' discussions

its distribution lists (something it could have done absent motions practice), which CDK received on March 21, the day before this brief was due. It is now immediately clear why Cox attempted to back out of the parties' agreement. One of the challenged distribution lists ("NCSSGroup@Manheim.com") has well over *500* members. *See* Exhibit 23 (3/21/2019 Email from D. Dorris to J. Coleman). At this time, CDK is still evaluating whether to maintain its challenge to emails sent to this massive distribution list. CDK will advise the Court promptly if the parties are able to resolve their dispute over this aspect of CDK's motion.

Most of the remaining email distribution lists on Cox's privilege log are no longer in service and thus have zero current members. This information may have been withheld during the meet-and-confer process because it severely undercuts the Dealership Class Plaintiffs argument, in their own motion to compel, that the same issue with certain email distribution lists on Defendants' privilege logs is a "serious defect." Dkt. 538 at 7. Defendants, of course, oppose the Dealership Class Plaintiffs' motion. *See* Dkt. 569 at 6-7. However, if the Court is inclined to agree with the Dealers and compel production of entries on Defendants' privilege logs involving email distribution lists that are no longer in use, then it should do the same for Cox.

IV. **COX MUST PRODUCE THE DOCUMENTS CONTAINING ANONYMOUS REFERENCES TO THE "COX LEGAL DEPARTMENT" OR DESCRIBED AS REFLECTING THE "IMPRESSIONS OF COUNSEL."**

At issue here are more than 400 entries on Cox's privilege log that anonymously refer to the source of privileged information as the "Cox Legal Department" and more than 350 entries that only vaguely describe the information withheld as "impressions of counsel." In its response brief, Cox explains that "this designation *predominantly* references an in-house attorney or staff member working on behalf of the attorney." Pls. Resp. at 14 (emphasis added). That is precisely

---

about what information would be provided about email distribution lists. Cox never once voiced an objection to the parties' global agreement or stated that it was opting out of the agreement.

the problem. Which entries are subject to the "predominantly" qualifier? If the document contains legal advice provided by an in-house attorney or staff member working on behalf of the attorney, then absent other problems, CDK does not challenge Cox's privilege claims. Yet Cox cannot even provide that assurance for every entry. Cox cites to *Crabtree v. Experian Info. Sols., Inc.*, 2017 WL 4740662, at *2 & n.2 (N.D. Ill. Oct. 20, 2017), but that case does not involve an admission, as here, that a reference to the "Legal Department" in at least some instances does *not* refer to an in-house attorney or staff member working on their behalf. *See* Pl. Resp. at 14.

Cox is similarly evasive with its references to "impressions of counsel." Cox claims that when "fairly read, 'impressions of counsel' refers to communications that reflect the request for or provision of legal advice." Pls. Resp. at 14. But that cannot be the case. Cox's privilege log contains many entries described as reflecting the "request" or "provision" of legal advice. *See, e.g.*, Def. Ex. 7 (COX_MDL_P0001, COX_MDL_P0015). So "impressions of counsel" must mean something else, but Cox has never explained what it is. Because Cox has declined many requests to cure the defects in its log and the log entries remain deficient, the documents should now be produced. *SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 482, 483 (E.D. Pa. 2005) (categorizing documents described as "reflect[ing] the mental impressions of counsel" as vague and finding that they are unprotected by the attorney-client privilege); *AVX Corp. v. Horry Land Co.,* 2010 WL 4884903, at *10 (D.S.C. Nov. 24, 2010) (similar).[17]

## CONCLUSION

For the foregoing reasons, CDK's motion to compel should be granted.

---

[17] In an attempt to distinguish *SmithKline Beecham Corp.* and *Apotex*, Cox argues that the communications there concerned "impressions of counsel" not communicated to a client. Pl Resp. 14 n.6. But Cox offers no explanation for why that distinction matters. Regardless of whether they were sent to a client, communications described as reflecting the mere "impressions of counsel" do not state a valid privilege claim. *See SmithKline Beecham Corp.*, 232 F.R.D. at 482, 483; *AVX Corp.*, 2010 WL 4884903, at *10.

**PUBLIC VERSION**

Dated: March 22, 2019

Respectfully submitted,

*/s/ Britt M. Miller*
Britt M. Miller
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant*
*CDK Global, LLC*

**PUBLIC VERSION**

## CERTIFICATE OF SERVICE

      I, Britt M. Miller, an attorney, hereby certify that on March 22, 2019, I caused a true and correct copy of the foregoing **DEFENDANT CDK GLOBAL, LLC'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD OR REDACTED OR, IN THE ALTERNATIVE, FOR AN IN CAMERA INSPECTION OF THE CHALLENGED DOCUMENTS** and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

                                          */s/ Britt M. Miller*
                                          Britt M. Miller
                                          MAYER BROWN LLP
                                          71 South Wacker Drive
                                          Chicago, IL 60606
                                          (312) 782-0600
                                          bmiller@mayerbrown.com