# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This document relates to:* | Hon. Robert M. Dow, Jr. |
| THE DEALERSHIP CLASS ACTION | Magistrate Judge Jeffrey T. Gilbert |

# DEFENDANT CDK GLOBAL, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PROTECTIVE ORDER

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................................ ii

BACKGROUND ................................................................................................................................ 2

    A.    The Parties' Exchange of Discovery and the Court's January 17 Order .......................... 2

    B.    The Dealers' "First Set of Counterclaim Interrogatories" ............................................... 3

ARGUMENT ..................................................................................................................................... 4

    A.    The Interrogatories Seek to Undermine The Court's January 17 Order ........................... 4

    B.    The Interrogatories Are Unnecessary to Address CDK's Counterclaims ........................ 5

    C.    The Interrogatories Are Not Proportional to the Needs of the Case .............................. 12

    D.    If the Court Allows the Dealers to Propound Their Interrogatories, CDK Must Be Allowed to Pursue Counterclaim Discovery As Well .............................................. 15

CONCLUSION ................................................................................................................................ 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Certain Underwriters at Lloyd's v. Nat'l RR. Passenger Corp.*,
    318 F.R.D. 9 (E.D.N.Y. 2016) ................................................................................................13

*Doe 1 v. Anderson*,
    2017 WL 4941467 (E.D. Mich. Nov. 1, 2017) ........................................................................14

*FTC v. A1 Janitorial Supply Corp.*,
    2018 WL 7506108 (N.D. Ill. Sept. 26, 2018) ..........................................................................14

*Lawrence E. Jaffee Pension Plan v. Household Int'l, Inc.*,
    2006 WL 3445742 (N.D. Ill. Nov. 22, 2006) .........................................................................13

**Rules**

Fed. R. Civ. P. 26 ...........................................................................................................................13

Fed. R. Civ. P. 26(a)(1)(A) ............................................................................................................12

Fed. R. Civ. P. 26(b)(1) .................................................................................................................12

Fed. R. Civ. P. 26(c) ........................................................................................................................4

Fed. R. Civ. P. 30(b)(6) .................................................................................................................13

Local Rule 37.2 ................................................................................................................................4

This Court has already admonished the parties that May 25, 2018, was a firm deadline for serving "any additional, non-duplicative, coordinated discovery requests" in this MDL under the Case Management Order entered by Judge St. Eve. *See* 01/17/2019 Order (Dkt. 498). The Dealership Class Plaintiffs ("dealers") elected not to serve CDK Global, LLC ("CDK") with any interrogatories by the May 25, 2018, deadline. When the dealers indicated in December 2018 that they still intended to serve CDK with interrogatories at some later date, the Court explained to the dealers that it was too late for them to serve their interrogatories *then*, much less *now*, just weeks away from the scheduled close of fact discovery. *See* Ex. A (12/13/2018 Hr'g Tr.) at 44:11-45:23. Nevertheless, on March 8, 2019, the dealers served CDK with eighteen interrogatories seeking both broad and incredibly detailed information on various purported events or occurrences over an 8+ year period from January 1, 2011 to the present. *See* Ex. B. The dealers' Interrogatory No. 1, reprinted below, is illustrative of the type of written discovery that the dealers belatedly seek:

> Identify all public statements by CDK executives, from January 1, 2011 to the present, concerning CDK's policy or position on whether CDK dealers were permitted to provide their DMS login credentials to third parties, including, for each such public statement, (i) the date on which the statement was made, (ii) the identity of the person who made the statement (or on whose behalf the statement was made), (iii) the identity of the persons or entities to whom the statement was made, and (iv) the content of the statement.

Ex. B at 6. Although the dealers captioned their interrogatories as "concerning CDK's counterclaims," which CDK brought on February 22, 2019,[1] the interrogatories overlap substantially, if not completely, with discovery already taken on the MDL plaintiffs' claims and with numerous discovery requests that were served on CDK on or before the May 25, 2018, deadline.

The Court should shut down the dealers' thinly-veiled attempt to evade the Case Management Order by serving additional written discovery on old topics in the guise of

---

[1] Judge Dow issued his decision on CDK's motion to dismiss the dealers' consolidated class complaint on January 25, 2019. *See* Dkt. 507. Pursuant to Paragraph A(5) of the Case Management Order (Dkt. 166), CDK's answer (and counterclaims) were due 28 days later, on February 22.

1

"counterclaim" discovery. The dealers' interrogatories cover no new terrain and could have been served long ago, well before the May 25, 2018 deadline. And even if the interrogatories concerned new subject matter, they would still be improper and not proportional to the needs of the case: As the Court has observed, courts should not "allow the discovery process to expand beyond previously set deadlines or parameters simply because a party would like the opportunity to find out more information." 1/17/2019 Order at 1. Requiring CDK to respond to these interrogatories—which would require reviewing hundreds of thousands if not millions of already-produced documents—is not proportional to the needs of the case at this late date, whether or not they pertain to new issues. CDK's motion for a protective order should be granted.

## BACKGROUND

### A. The Parties' Exchange of Discovery and the Court's January 17 Order

As the Court is well aware, the discovery process in this MDL has been a massive undertaking. CDK alone has produced a staggering amount of discovery—its responses to Plaintiffs' more than 200 combined RFPs have comprised more than 1 million documents from 31 custodians and countless other sources, totaling over *3 million* Bates-numbered pages. Plaintiffs have also deposed fifteen of CDK's witnesses, with five more on the calendar or requested.

Despite the massive amount of discovery they had already obtained, certain Plaintiffs served thirteen additional RFPs on CDK on October 12, 2018; ten additional interrogatories on November 21, 2018; and nineteen additional interrogatories on November 27, 2018. *See* Dkt. 466 & Exs. B, E, F, and G. On December 13, 2018, the parties met before the Court for a status conference, where among other things, Defendants sought clarification of whether Plaintiffs' late-served discovery requests were permissible under the May 25, 2018, deadline for written discovery established by the Case Management Order. *See id.* at 1-5. At the hearing, the Court explained that courts in this district "routinely enter orders that say … written discovery is to be severed [sic] by 'x' date or written

2

discovery requests are to be served by 'x' date, and the parties in these cases understand that [means a firm deadline for] interrogatories and requests for production." Ex. A at 49:5-10. The Court discouraged the Plaintiffs from continuing to press for additional written discovery served after the May 25 deadline and invited CDK to move for a protective order, if necessary. *Id.* at 50:11-25. Plaintiffs withdrew their interrogatories and certain of their requests for production. *See* Dkt. 475.

On January 17, 2019, the Court granted CDK's motion for a protective order against answering the discovery that remained pending, explaining that deadlines such as the May 25 cutoff for serving new discovery "are important," "especially in a case like this in which Plaintiffs repeatedly insist they want to get to trial as soon as humanly possible." 1/17/2019 Order at 1. The Court held that, even assuming that the discovery that Plaintiffs sought was relevant, the May 25 deadline should not be waived to allow for the new discovery, given the burden that the new discovery would impose on CDK, the likelihood that CDK would serve its own discovery on the plaintiffs in response (leading to further expense and delays), and the need to keep the case on the aggressive schedule that Plaintiffs have demanded. *Id.* at 2.

### B. The Dealers' "First Set of Counterclaim Interrogatories"

On January 25, 2019, Judge Dow issued his orders on defendants' motions to dismiss the complaints of the various plaintiffs. Dkt. 504, 505, 506, 507. On February 22, 2019, CDK answered the various complaints and filed counterclaims against the plaintiffs—including, as relevant here, against the putative dealership class. Dkt. 523.

On March 8, 2019—two weeks after CDK filed its answer and counterclaims and nearly two months after this Court granted CDK's motion for a protective order—the dealers served a "First Set of Interrogatories Concerning CDK's Counterclaims" on CDK. Ex. B. Many of these interrogatories are exceptionally broad, requiring CDK to identify "all instances" in which a specified event occurred and to provide numerous details about each such occurrence. *See infra,* pp. 5-11. CDK

3

asked the dealers to withdraw the interrogatories for the reasons set forth herein. Ex. C (3/15/2019 Ltr. from M. Provance). They declined. Ex. D (3/21/2019 Ltr. from M. Kupillas).[2]

## ARGUMENT

Under Federal Rule of Civil Procedure 26(c), "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Good cause for a protective order exists here. The dealers' interrogatories are an overt end run around the Case Management Order's May 25, 2018, deadline to serve additional written discovery, and will impose burdens on CDK that are not proportional to the needs to the case.

### A. The Interrogatories Seek to Undermine The Court's January 17 Order

In the January 17, 2019, order, the Court held that Judge St. Eve's earlier Case Management Order meant what it said: May 25, 2018, was the deadline for any new discovery requests, including interrogatories, to be served. 1/17/2019 Order at 1. Judge St. Eve set that deadline in order to place reasonable limits on the discovery in this MDL, conserve the parties and the Court's resources, and keep the case on schedule. The Court reasoned that allowing the parties to seek additional discovery after that deadline would "not be productive in moving this case forward" (*id.* at 3) and would be inconsistent with plaintiffs' "repeated[] insist[ence] they want to get to trial as soon as humanly possible" (*id.* at 1). The Court thus ordered that CDK need not respond to new RFPs propounded by certain Plaintiffs, who had not shown that the new RFPs were important enough to justify the expense and delay that they would cause at this point in the proceedings. *Id.* at 3.

---

[2] CDK complied with L.R. 37.2 before filing the instant motion. As only the withdrawal of the interrogatories would have been an acceptable resolution of the dispute, CDK inquired of the dealers' counsel whether they would be willing to rescind the requests on behalf of their clients. They declined to do so. As noted in the parties' correspondence, an in-person meet-and-confer also took place on February 27, 2019, concerning the dealers' plans to serve additional interrogatories and CDK's objections. This dispute concerns a "go/no-go" discovery issue such that additional meet-and-confers would have been pointless. *See* 1/17/2019 Order at 4.

4

The same reasoning applies to the dealers' new interrogatories—which were served nearly ten months after the May 25, 2018, discovery deadline and barely two months before the close of fact discovery. Requiring CDK to answer these interrogatories now would force it to expend substantial resources (as detailed further below) and would therefore "delay materially the progress of this case overall and the conclusion of fact discovery in particular." Dkt. 498 at 3.

### B. The Interrogatories Are Unnecessary to Address CDK's Counterclaims

The dealers will no doubt contend that their late service of these interrogatories is justified because they pertain to CDK's recently-filed counterclaims. But these interrogatories are "counterclaim" discovery in name only; in substance, they pertain to topics that the dealers (and other Plaintiffs) not only could have inquired about earlier but *did* inquire about earlier. Indeed, with very few exceptions, each of the dealers' interrogatories seeks discovery that is duplicative of written discovery requests propounded on CDK prior to the May 25, 2018, deadline, as set forth below:

| **Table 1: Overlap Between Dealership Class Plaintiffs' March 8, 2019 Interrogatories and Written Discovery Served On or Before May 25, 2018** |||
|---|---|---|
| **No.** | **Interrogatory Request** | **Duplicative Prior Discovery Requests** |
| 1 | Identify all public statements by CDK executives, from January 1, 2011 to the present, concerning CDK's policy or position on whether CDK dealers were permitted to provide their DMS login credentials to third parties, including, for each such public statement, (i) the date on which the statement was made, (ii) the identity of the person who made the statement (or on whose behalf the statement was made), (iii) the identity of the persons or entities to whom the statement was made, and (iv) the content of the statement. | Dealer RFP 9: "All documents" regarding "the ability of Dealers to authorize, or Vendors to use, Third Party Integrators." Dkt. 320-6 at 13.<br><br>Dealer RFP 29: "All documents" regarding "restrictions on Dealers' use of third parties to access DMS data on the CDK systems." *Id.* at 19.<br><br>Auth. RFP 20: "All … statements (whether internal or public) regarding CDK's policies (or the policies of any other DMS provider) with respect to third-party access to dealer data on the CDK DMS." Dkt. 320-4 at 14.<br><br>Auth. RFP 22: "All … statements (whether internal or public) regarding the ability of dealers to authorize independent data integrators to access data on the CDK DMS." *Id.*<br><br>Auth. RFP 23: "All … statements (whether |

5

| **Table 1: Overlap Between Dealership Class Plaintiffs' March 8, 2019 Interrogatories and Written Discovery Served On or Before May 25, 2018** | | |
|---|---|---|
| **No.** | **Interrogatory Request** | **Duplicative Prior Discovery Requests** |
| | | internal or public) regarding the ability of vendors to use independent integrators to access data on the CDK DMS." *Id.* at 15. |
| 2 | Identify all instances, from January 1, 2011 to the present, in which CDK communicated (to any entity, including without limitation any dealer or vendor) its consent for a CDK dealer to provide its DMS login credentials to a third party, including, for each such instance, (i) the date(s) of the communication(s), (ii) the people involved in the communication(s), and (iii) the dealer to whom CDK gave the consent. | Dealer RFP 9, 29; Auth. RFP 20, 22, 23 |
| 3 | Identify all instances, from January 1, 2011 to the present, in which CDK attempted to enforce §§ 6(A), 6(B), and/or 6(D) of CDK's Master Services Agreement ("MSA") against any CDK Dealer, including, for each such instance, (i) the identity of the CDK Dealer, (ii) the date(s) on which CDK attempted to enforce those provisions, (iii) the means by which CDK attempted to enforce those provisions (i.e., through the filing of a lawsuit or arbitration proceeding, the termination of CDK's contract with the dealer, or other means), and (iv) the identity of all persons who possess relevant information about the enforcement attempt. | Dealer RFP 18: "All documents relating to any changes or proposed changes to material terms in the CDK DMS contract, including with respect to the use of Third Party Integrators." Dkt. 320-6 at 17.<br><br>Auth. RFP 40: "All DMS contracts (and/or any addendum, exhibit, or part thereof) that authorize or acknowledge that dealers may provide independent integrators access to data on the CDK DMS." Dkt. 320-4 at 21.<br><br>Auth. RFP 41: "All documents and communications with respect to § 6.D of CDK's DMS contract or any other similar provision relating to the fact that a dealer's 'employees and agents' may 'have access' to the DMS." *Id.* |
| 4 | Identify all instances, from January 1, 2011 to the present, in which CDK (including DMI and/or IntegraLink) solicited a dealer to provide DMS login credentials to CDK after the login credentials that CDK had previously been using to access that dealer's DMS had been disabled by the dealer's DMS provider, including, for each such instance, (i) the date(s) on which CDK solicited the dealer to provide the DMS login credentials, (ii) the identity of the dealer's DMS provider, (iii) whether the dealer did provide CDK with new login credentials in response to the solicitation, (iv) whether the dealer sent the new login credentials to CDK in | Dealer RFP 31: "All documents regarding CDK's use of any Third Party Integrator, including but not limited to Authenticom, for Data Integration Services." Dkt. 320-6 at 20.<br><br>Auth. RFP 18: "All documents and communications relating to Reynolds blocking or disabling of the dealer-provided login credentials that Digital Motorworks and/or IntegraLink used to access the Reynolds DMS." Dkt. 320-4 at 13.<br><br>Auth. RFP 19: "All documents and communications concerning CDK's (including through its subsidiaries, Digital Motorworks and |

6

| Table 1: Overlap Between Dealership Class Plaintiffs' March 8, 2019 Interrogatories and Written Discovery Served On or Before May 25, 2018 | | |
|---|---|---|
| **No.** | **Interrogatory Request** | **Duplicative Prior Discovery Requests** |
| | unencrypted "plain text", and (v) the identity of all persons who possess relevant information about the solicitation. | IntegraLink) access to data on non-CDK, non-Reynolds DMS platforms." *Id.*<br><br>Auth. RFP 100: "Communications and documents concerning any instance in which a CDK, DMI, and/or Integralink employee, agent, or independent contractor sent a dealership user-id and/or password in an unencrypted format through email." Dkt. 320-10 at 7. |
| 5 | Identify all instances, from January 1, 2011 to the present, in which CDK (including DMI and/or IntegraLink) requested or encouraged any dealers to install "software scripts and programs on the dealer's own computers" which "allowed" CDK "to access" the dealer's DMS, and/or were "used to … re-enable CDK's dealer-provider login credentials" after those credentials were disabled (as those terms are used in ¶ 64 of CDK's Counterclaims), including, for each such instance, (i) the date on which the instance occurred, (ii) the identity of the dealer(s) to whom CDK made the request or encouragement. | Dealer RFP 31; Auth. RFP 18, 19, 100 |
| 6 | Identify all instances, from January 1, 2011 to the present, in which CDK (including DMI and/or IntegraLink) ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ | Dealer RFP 31; Auth. RFP 18, 19, 100 |
| 7 | Identify all instances, from January 1, 2011 to the present, in which CDK (including DMI | Dealer RFP 31; Auth. RFP 18, 19, 100 |

7

| No. | Interrogatory Request | Duplicative Prior Discovery Requests |
|---|---|---|
| | **Table 1: Overlap Between Dealership Class Plaintiffs' March 8, 2019 Interrogatories and Written Discovery Served On or Before May 25, 2018** | |
| | and/or IntegraLink) used dealer-provided DMS login credentials to extract data from a dealer's DMS, including, for each such instance, (i) the date on which the instance occurred, (ii) the identity of the provider of the DMS from which CDK extracted data; (iii) whether CDK obtained prior consent from the dealer's DMS provider to extract data from that dealer's DMS; (iv) the data fields that were extracted by CDK; (v) whether CDK extracted any proprietary information owned by third parties from the dealer's DMS (including, without limitation, any "DMS program code" or other "proprietary information" of the types referenced in ¶¶ 71-72 of CDK's Counterclaims); and (vi) whether CDK accessed or copied any data that was created using the DMS provider's "third party proprietary forms and functions within the DMS" (as those terms are used in ¶ 74 of CDK's Counterclaims). | |
| 8 | Identify all instances, from January 1, 2011 to the present, in which CDK (including DMI and/or IntegraLink) obtained copies of any other DMS provider's DMS software without that DMS provider's prior consent, including, for each such instance, (i) the identity of the DMS provider whose DMS software was obtained by CDK, (ii) the date on which CDK obtained the DMS software, (iii) the identity of the person or entity from whom CDK obtained the DMS software, (iv) whether CDK loaded that software onto CDK's own computers and servers, (v) the identities of all individuals who possess relevant knowledge concerning the circumstances of CDK's acquisition of the DMS software; and (vi) the identities of all individuals who possess relevant information about how CDK used the DMS software. | Dealer RFP 31; Auth. RFP 19 |
| 9 | Identify all instances, from January 1, 2011 to the present, in which CDK (including DMI and/or IntegraLink) accessed another DMS provider's DMS and created a copy of "portions of the DMS program code in the | Dealer RFP 31; Auth. RFP 19 |

8

| No. | Interrogatory Request | Duplicative Prior Discovery Requests |
|---|---|---|
| | **Table 1: Overlap Between Dealership Class Plaintiffs' March 8, 2019 Interrogatories and Written Discovery Served On or Before May 25, 2018** | |
| | computer's Random Access Memory", "original and distinctive page layouts", "graphical content", "text", "arrangement, organization, and display of information", and/or "dynamic user experience" (as those terms are used in ¶ 71 of CDK's Counterclaims) without the DMS provider's prior consent. | |
| 10 | Identify all instances, from January 1, 2011 to the present, in which CDK knowingly "engaged in unauthorized access to" another DMS provider's DMS (as those terms are used in ¶ 142 of CDK's Counterclaims), including, for each such instance, (i) the date on which CDK engaged in that unauthorized access, (ii) the identity of the dealer whose DMS was accessed by CDK, (iii) the identity of the provider of the DMS with which CDK engaged in unauthorized access, (iv) all data fields that were extracted by CDK through that unauthorized access; and (v) the identities of all individuals who possess relevant information about CDK's unauthorized access to the DMS. | Dealer RFP 31; Auth. RFP 19 |
| 11 | Identify, for each Dealership Counter-Defendant, all "losses, expenses and other damages" that CDK allegedly suffered as a result of that Dealership Counter-Defendant's alleged (i) breaches of contract, (ii) violations of the Computer Fraud and Abuse Act, and/or (iii) violations of the Digital Millennium Copyright Act, including the date and amount each such loss, expense, and other damage. | |
| 12 | Identify all instances, from January 1, 2011 to the present, in which any dealer's computer systems were overburdened or "tied up" as a result of any Dealership Counter-Defendant's alleged actions, including, for each such instance, (i) the date on which the instance occurred, (ii) the extent to which the dealer's computer systems were overburdened or "tied up", (iii) any damages that CDK allegedly suffered as a result of the instance, (iv) all facts supporting CDK's assertion that the instance | Dealer RFP 32: "All documents regarding data security and/or DMS system performance with respect to any Third Party Integrator's access to the Reynolds or CDK DMSs." Dkt. 320-6 at 21.<br><br>Auth. RFP 76: "All documents and communications regarding data security and/or DMS system performance with respect to Authenticom's access to the Reynolds or CDK DMSs." Dkt. 320-4 at 29. |

| Table 1: Overlap Between Dealership Class Plaintiffs' March 8, 2019 Interrogatories and Written Discovery Served On or Before May 25, 2018 |||
|---|---|---|
| **No.** | **Interrogatory Request** | **Duplicative Prior Discovery Requests** |
| | was caused by any Dealership Counter-Defendant's alleged actions; and (v) the identities of all individuals who possess relevant knowledge concerning the instance. | Auth. RFP 78: "All documents, communications, or analyses with respect to the effects on DMS system performance of Authenticom's (or any other independent integrator's) automated access to data on the CDK or Reynolds DMSs." Dkt. 320-4 at 29. |
| 13 | Identify all instances, from January 1, 2011 to the present, in which CDK's own computer systems (i.e., not including a CDK Dealer's DMS or other computer systems) were overburdened or "tied up" as a result of any Dealership Counter-Defendant's alleged actions, including, for each such instance, (i) the date on which the instance occurred, (ii) the extent to which CDK's systems were overburdened or "tied up", (iii) any damages that CDK allegedly suffered as a result of the instance, (iv) all facts supporting CDK's assertion that the instance was caused by any Dealership Counter-Defendant's alleged actions; and (v) the identities of all individuals who possess relevant knowledge concerning the instance. | Dealer RFP 32; Auth. RFP 76, 78 |
| 14 | Identify all instances, from January 1, 2011 to the present, in which CDK's own computer systems (i.e., not including a CDK Dealer's DMS or other computer systems) experienced "data corruption issues" (as that term is used in ¶ 82 of CDK's Counterclaims) as a result of any Dealership Counter-Defendant's alleged actions, including, for each such instance, (i) the date on which the "data corruption issues" occurred, (ii) the extent to which CDK's systems experienced "data corruption issues", (iii) any damages that CDK allegedly suffered as a result of the "data corruption issues", (iv) all facts supporting CDK's assertion that the "data corruption issues" were caused by any Dealership Counter-Defendant's alleged actions; and (v) the identities of all individuals who possess relevant knowledge concerning the "data corruption issues". | Dealer RFP 32; Auth. RFP 76, 78 |

10

| **Table 1: Overlap Between Dealership Class Plaintiffs' March 8, 2019 Interrogatories and Written Discovery Served On or Before May 25, 2018** | | |
|---|---|---|
| **No.** | **Interrogatory Request** | **Duplicative Prior Discovery Requests** |
| 15 | Identify all instances, from January 1, 2011 to the present, in which a data security breach occurred as a result of any Dealership Counter-Defendant's alleged actions, including, for each such instance, (i) the date on which the data security breach occurred, (ii) the date on which CDK first learned of the data security breach, (iii) the individuals or entities whose data was breached in the data security breach, (iv) any damages that CDK allegedly suffered as a result of the data security breach, (v) all facts supporting CDK's assertion that the data security breach was caused by any Dealership Counter-Defendant's alleged actions; and (vi) the identities of all individuals who possess relevant knowledge concerning the data security breach. | Dealer RFP 32<br><br>Auth. RFP 77: "All documents, communications, or analyses regarding any specific security incident directly caused by Authenticom's (or any other independent integrator's) automated access to data on the CDK or Reynolds DMSs." Dkt. 320-4 at 29. |
| 16 | Identify all losses, costs, expenses, and damages ████████ including the date and amount of each such loss, cost, expense and damage. | Auth. RFP 81: "Documents and communications sufficient to show the specific security measures CDK has instituted to protect the security of dealer data." Dkt. 320-4 at 30.<br><br>Auth. RFP 107: All documents that reference the terms "data breach" and "OneEighty" or "One Eighty." Dkt. 320-10 at 8. |
| 17 | Identify, for each Dealership Counter-Defendant, all documents that you believe support your counterclaims against that Dealership Counter-Defendant. | |
| 18 | Identify, for each Dealership Counter-Defendant, all evidence that you believe supports your contentions against that Dealership Counter-Defendant. | |

There is no reason why the dealers could not have served their interrogatories on these topics prior to the original May 25, 2018, deadline for written discovery requests established by the Case

11

Management Order. The only possible exceptions are Interrogatories No. 11, 17 and 18, which seek the identification of CDK's damages and evidence that CDK intends to affirmatively rely on to support its counterclaims. However, this is material that CDK already plans to disclose to the dealers pursuant to Rule 26(a)(1)(A) and interrogatories on the subject are thus unnecessary. CDK anticipates making supplemental Rule 26 disclosures prior to the close of fact discovery.

\* \* \*

To be sure, CDK would like to serve the dealers with additional discovery requests concerning its counterclaims, on which CDK has the burden of proof. But engaging in discovery with the dealers in this MDL has proven to be a costly and time-consuming endeavor, requiring motions practice on the substantive issues and then weeks of follow-up around ESI search terms, custodians, and the like. As their counsel recently advised the Court, the dealers did not represent to be substantially complete in their production of documents responsive to CDK's requests for production—originally served on May 25, 2018—until almost ten months later, on March 15, 2019. *See* Ex. E (2/27/2019 Hr'g Tr.) at 28:21-29:1. Moreover, as demonstrated by the Table above, the discovery relevant to CDK's counterclaims is largely subsumed by the discovery already propounded by the parties in the broader MDL. Thus, in the interest of facilitating an orderly and timely completion of fact discovery in this matter, CDK is willing to rely on the discovery it has already served to support its counterclaims and forego serving *additional* discovery. If CDK can abide by that limitation on discovery for its own counterclaims, so, too, can the dealers.

### C. The Interrogatories Are Not Proportional to the Needs of the Case

Even if the topics encompassed by these interrogatories were ones that the dealers could not have inquired about earlier, a protective order still would be warranted because the dealers' new interrogatories are not "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).

12

Determining whether discovery is proportional requires courts to consider "the importance of the discovery in resolving the issues" and "whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* The amendments adding these requirements to the rule in 2015 were "intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse by emphasizing the need to analyze proportionality before ordering production," even "of relevant information." *Certain Underwriters at Lloyd's v. Nat'l RR. Passenger Corp.*, 318 F.R.D. 9, 14 (E.D.N.Y. 2016) (citations omitted). In short, Rule 26 protects against discovery requests where the costs of review and production outstrip the potential benefits. *See, e.g.*, *Lawrence E. Jaffee Pension Plan v. Household Int'l, Inc.*, 2006 WL 3445742, at *4 (N.D. Ill. Nov. 22, 2006).

The Court's January 17, 2019, order is instructive here. There, the Court made clear that even assuming that some of the Plaintiffs' late-served discovery requests were predicated on new developments, they were improper because they were untimely and because Plaintiffs could not show the need for additional, burdensome discovery at so late a date. The same is true here: even if the dealers' interrogatories covered new ground (which they do not), they would not warrant a response given the burden they would impose and the delay that they would create.

The benefit to the dealers of taking this discovery would be vanishingly small. As discussed above, the interrogatories at issue are duplicative of discovery that both the dealers and other Plaintiffs have already served on CDK and to which CDK has provided voluminous responses. The topics encompassed by the interrogatories have also been discussed at length at the depositions of numerous CDK witnesses. And to the extent that any stone remains unturned as to these topics (which is highly unlikely), the dealers will have an opportunity to inquire about them at depositions of CDK's remaining witnesses and at CDK's Rule 30(b)(6) deposition. There is little benefit to requiring CDK to produce information in response to these new interrogatories when that

13

information has already been produced or otherwise disclosed long ago (or is likely to be covered in remaining depositions). *Cf. Doe 1 v. Anderson*, 2017 WL 4941467, at *14 (E.D. Mich. Nov. 1, 2017) (declining to enforce third-party subpoena because "Defendants have already produced documents responsive to these requests, and that production presumably satisfies Plaintiffs' stated need for the information; any further production . . . would be either duplicative or irrelevant"). Indeed, some of the dealers' interrogatories (*e.g.*, Interrogatory No. 16) have no relation to CDK's counterclaims at all and are simply attempts to dig up more discovery on topics have already been explored.

By contrast, the burden on CDK of responding to these interrogatories would be immense. Fourteen of the eighteen interrogatories ask CDK to identify each instance, during a period of more than *eight years*, in which a particular kind of event occurred, and to provide various details about these occurrences. *See* Ex. B at 6-11 (Interrogatories Nos. 1-10, 12-15). Another two interrogatories ask CDK to identify "all documents" (No. 17) and "all evidence" (No. 18) supporting its counterclaims against the dealers. *Id.* at 12. CDK has to date produced more than a million documents, exceeding *3 million* Bates-numbered pages, in this MDL. Practically speaking, the only way that CDK could attempt to respond to the dealers' interrogatories seeking CDK to identify the "who, what, where, and when" associated with every instance of various purported events and occurrences that took place over the course of several years (*see, e.g.*, Interrogatory No. 1) would be to have its attorneys review, again, the documents that CDK produced in response to requests for production covering the same topics—a herculean task in the best of circumstances and next to impossible in the weeks remaining before the close of fact discovery.

Moreover, given that CDK's document production is already in the hands of the dealers, there is no reason to require *CDK* to perform this intensive re-review of the documents. The dealers can and should gather this information for themselves. *See, e.g.*, *FTC v. A1 Janitorial Supply Corp.*,

14

2018 WL 7506108, at *5 (N.D. Ill. Sept. 26, 2018) (granting motion for protective order because the plaintiff "has equal access to the information sought as do the defendants"). In short, just as the Court ruled previously, the Court should block the dealers' bid to embark on another unnecessary discovery campaign "down roads and into detours" that would only serve to prevent the "orderly and timely conclusion" of discovery in this MDL. 1/17/2019 Order at 3.

### D. If the Court Allows the Dealers to Propound Their Interrogatories, CDK Must Be Allowed to Pursue Counterclaim Discovery As Well

If the Court is inclined to deny this motion and require CDK to respond to the dealers' interrogatories, CDK has narrow and targeted discovery related to its counterclaims that it will promptly serve on the dealers. CDK has similar discovery prepared for the counterclaims it has recently filed against Plaintiffs Cox Automotive, Inc. and certain of its subsidiaries and Loop, LLC d/b/a AutoLoop. *See* Dkt. 515, Dkt. 519. Although CDK has thus far declined to serve any discovery on Plaintiffs related to its counterclaims, it has done so on the premise that both sides should rest on the discovery that has already been exchanged. In the interest of fairness, the Court should afford CDK the opportunity to serve its own discovery in support of its counterclaims if it permits the dealers to take the discovery that they have propounded. This new round of discovery likely could not be completed within the current April 30, 2019, cutoff for fact discovery—which is yet another reason why a protective order is warranted. *See* 1/17/2019 Order at 2 (noting that CDK might serve its own additional discovery if Plaintiffs were permitted to do so, which "presents the very realistic risk of the 'never-ending exploration'" of issues that courts should avoid in discovery).

### CONCLUSION

CDK's motion for a protective order should be granted.

15

Dated: April 1, 2019

Respectfully submitted,

*/s/ Britt M. Miller*
Britt M. Miller
Michael A. Scodro
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mscodro@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant
CDK Global, LLC*

16

## CERTIFICATE OF SERVICE

   I, Britt M. Miller, an attorney, hereby certify that on April 1, 2019, I caused a true and correct copy of the foregoing **DEFENDANT CDK GLOBAL, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PROTECTIVE ORDER** to be filed and served by email upon counsel of record pursuant to the SERVICE-EXTERNAL-DMSMDL@lists.kellogghansen.com email list.

             */s/ Britt M. Miller*
             Britt M. Miller
             MAYER BROWN LLP
             71 South Wacker Drive
             Chicago, IL 60606
             Phone: (312) 782-0600
             Fax: (312) 701-7711
             E-mail: bmiller@mayerbrown.com