# EXHIBIT E

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3    IN RE DEALER MANAGEMENT SYSTEMS )  No.  18 C 864
      ANTITRUST LITIGATION, MDL 2817  )
 4                                    )  Chicago, Illinois
                                      )  February 27, 2019
 5                                    )  1:00 p.m.

 6                        TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE JEFFREY T. GILBERT, MAGISTRATE JUDGE
 7
      APPEARANCES:
 8
      For the Plaintiffs          KELLOGG, HANSEN, TODD, FIGEL &
 9    Authenticom, et al.:        FREDERICK, P.L.L.C.
                                  BY:  MR. MICHAEL N. NEMELKA
10                                1615 M Street, NW
                                  Suite 400
11                                Washington, D.C.  20036
                                  (202) 326-7932
12
      For the Dealer             MILBERG LLP
13    Plaintiffs:                BY:  MS. PEGGY J. WEDGWORTH
                                 1 Penn Plaza
14                               Suite 4800
                                 New York, New York  10119
15                               (212) 631-8622

16                               ROBBINS GELLER RUDMAN & DOWD
                                 BY:  MR. FRANK ANTHONY RICHTER
17                               200 South Wacker Drive
                                 31st Floor
18                               Chicago, Illinois  60606
                                 (312) 674-4674
19
      For Defendant              MAYER BROWN LLP
20    CDK Global:                BY:  MS. BRITT MARIE MILLER
                                      MR. MATTHEW DAVID PROVANCE
21                               71 South Wacker Drive
                                 Chicago, Illinois  60606
22                               (312) 782-0600

23

24

25
```

Nancy C. LaBella, CSR, RDR, CRR
Official Court Reporter
219 South Dearborn Street, Room 1222
Chicago, Illinois  60604
(312) 435-6890
NLaBella.ilnd@gmail.com

```
 1   APPEARANCES:   (Continued)

 2   For Defendant Reynolds       GIBBS & BRUNS, L.L.P.
     and Reynolds Company:        BY:  MS. AUNDREA KRISTINE GULLEY
 3                                     MR. ROSS M. MacDONALD
                                       MR. BRIAN T. ROSS
 4                                1100 Louisiana Street
                                  Suite 5300
 5                                Houston, Texas  77002
                                  (713) 650-8805
 6
     For InDesign Data            SHUTTS & BOWEN LLP
 7   (telephonically):            BY:  MR. ERIC CHRIS CHRISTU
                                  525 Okeechobee Boulevard
 8                                Suite 1100
                                  West Palm Beach, Florida  34401
 9                                (561) 650-8556

10   Also present                 MS. CATHERINE COOK
     (telephonically):
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      (Proceedings had in open court:)

2           THE CLERK:  18 C 864, In re Dealer Management Systems

3      Antitrust Litigation.

4           THE COURT:  Hello, everybody.  I'll take appearances

5      in a second.  And then I know we have InDesign, somebody on

6      the phone.  And I had intended to address that motion first

7      because it should be addressed -- because it's quick.  Okay.

8      Hold on for one second.

9      (Brief pause.)

10          THE COURT:  Okay.  All right.  Let's get appearances

11     for anybody who wants to register an appearance here.

12          MS. WEDGWORTH:  Good afternoon, your Honor.  Peggy

13     Wedgworth on behalf of the class action dealership plaintiffs.

14          THE COURT:  Okay.

15          MR. RICHTER:  Frank Richter with the plaintiffs

16     steering committee for the dealership plaintiffs.

17          MR. NEMELKA:  Good afternoon, your Honor.  Mike

18     Nemelka on behalf of the individual and vendor class

19     plaintiffs.

20          MS. GULLEY:  Good afternoon, your Honor.  Aundrea

21     Gulley --

22          THE COURT:  The individual and vendor class?

23          MR. NEMELKA:  Vendor class plaintiffs, yes.

24          THE COURT:  And also including, as an individual

25     plaintiff, Authenticom, right?

1          MR. NEMELKA:  Authenticom, the Cox Automotive

2     entities, yes, MVSC.

3          THE COURT:  Got it.

4          MS. GULLEY:  Aundrea Gulley on behalf of the Reynolds

5     and Reynolds Company.

6          THE COURT:  Okay.

7          MR. ROSS:  Good afternoon, your Honor.  Brian Ross,

8     also for the Reynolds and Reynolds Company.

9          MR. MacDONALD:  Ross MacDonald, also for the Reynolds

10    and Reynolds Company.

11         THE COURT:  Okay.

12         MS. MILLER:  Good afternoon, your Honor.  Apologies

13    for the scratchy voice.  Britt Miller on behalf of CDK Global.

14         THE COURT:  Were you out there yesterday yelling and

15    screaming for some candidates?

16         MS. MILLER:  No comment.

17         THE COURT:  Okay.

18         MR. PROVANCE:  Good afternoon, your Honor.  Matt

19    Provance for CDK Global.

20         THE COURT:  Okay.  Great.

21         So my agenda today was to rule on -- and I'm going to

22    rule from the bench -- on the -- on the clawback motion.  Per

23    my earlier order, it seemed more imperative to rule from the

24    bench when I entered that order and then this got pushed.  I

25    wanted it -- I was feeling guilty that this had been under

1   advisement for so long, so I wanted to get it out as soon as I

2   could, which is why I wanted to set it to be ruled on in

3   court.  And then you all asked for me to move the hearing to

4   today, which is fine because I know you were meeting today.

5   But then I didn't go back and put the finishing touches on it

6   to put it in a written order.  I still might, but I think I'll

7   just give you the reasons today and then we can deal with

8   that.

9           And then per my order, I want to deal with some other

10  follow-on issues on that, the privilege issues.  I know you

11  have a date coming up this Friday on -- you know, to fish or

12  cut bait on privilege log issues.  I would like to know

13  generally how discovery is going.  I want to revisit what I

14  had in my earlier order of -- you know, I said I can't deal

15  with certain things with respect to the data security issues

16  and I just want to see if I have to do something.  Maybe

17  that's -- maybe I should let sleeping dogs lie, but I know

18  that that was an open issue.  And I think if we could be

19  efficiently -- you know, I think we could be officially

20  done -- we have an event here in the court later this

21  afternoon, but I don't see any problem with any conflict.

22          Let me deal first with CDK's motion to file instanter

23  discovery materials in opposition to InDesign's motion to

24  quash.  Looks to me like CDK wants to file some materials that

25  weren't available earlier when the issue was -- when the

1    motion was filed down in Florida.  And I want to hear what

2    InDesign has to say about it.  But maybe InDesign -- maybe if

3    I allow CDK to file what they want to file, InDesign would

4    just want to file a reply or a response to that.

5              MR. CHRISTU:  Your Honor --

6              THE COURT:  You know what, Mr. -- sorry.  We need to

7    get your appearance on the phone.  Sorry about that.

8              MR. CHRISTU:  And I didn't want to interrupt.  I'm

9    sorry.

10             Good afternoon, your Honor.  It's Eric Christu with

11   the law firm of Shutts & Bowen on behalf of non-party InDesign

12   Data, LLC.

13             THE COURT:  Great.  Thank you.  Okay.  What do you

14   have to say?

15             MR. CHRISTU:  Judge, and I first just wanted to thank

16   you for allowing me to appear by phone.  And there was some

17   kind of snafu, I think, in the process of it being transferred

18   to your Honor.  I didn't get notice of this hearing, but

19   counsel for CDK was kind enough to point that out to me, so I

20   kind of got myself on the phone here.

21             And we don't have a formal objection to the

22   supplement, and I think what your Honor mentioned is probably

23   the best way to proceed; that once we see the supplement, if

24   there's something that InDesign Data would want to say about

25   that or add or -- or your Honor's adjudication of the motion,

1    we would do it at that time.

2           MR. PROVANCE:  Yes, your Honor.  Matt Provance.

3           We did share the documents that we intended to

4    supplement to counsel for InDesign before we filed the motion,

5    so they have had those for a while.  But if your Honor would

6    like to give them a response to our filing --

7           THE COURT:  I would.  I mean, I haven't ruled on it

8    yet.  I know it's fully briefed.  I know I'm not addressing

9    things here with the lightening speed that you would like me

10   to, but I would like to give them some time to respond, as

11   long as it's not outrageous, and then I'll look at what

12   everybody has submitted to me.

13          So, Mr. Christu, what say you?

14          MR. CHRISTU:  That's fine, Judge.  And I have not

15   fully discussed with the client exactly what our position

16   would be on that, so I -- I wouldn't need a lot of time.  We

17   may have very little to say about it.  But would your Honor

18   consider two weeks?

19          THE COURT:  I was thinking seven days, so I'll

20   compromise with you on ten days.  Is that okay?

21          MR. CHRISTU:  That is okay, your Honor.  Thank you

22   very much.

23          THE COURT:  Okay.  So I'll grant the motion, which is

24   ECF 511, and I'll give InDesign ten days to file a response

25   and then it will be fully submitted, and we'll -- I'll get to

1    it as soon as I can.

2              MR. CHRISTU:  Thank you, your Honor.  And I know

3    you've got a lot of other matters that probably don't have

4    anything to do with me.  Is there anything else you would

5    require from me?

6              THE COURT:  No.  I was going to -- I was going to say

7    you are excused and you can go back and do whatever you are

8    doing.  Where are you calling from?  Florida?

9              MR. CHRISTU:  Judge, I'm in Palm Beach County in West

10   Palm Beach, Florida.

11             THE COURT:  Yeah, well, then we -- everybody who is

12   here with -- in the 20s would really appreciate it if you

13   would then get off the phone.

14             MR. CHRISTU:  Understood.  Judge, I'm hanging up now.

15             THE COURT:  That's just not even fair.  Okay.

16   Bye-bye.

17             MR. CHRISTU:  Thank you, your Honor.

18     (Brief pause.)

19             THE COURT:  Okay.  As long as I'm on housekeeping

20   matters, could I say a couple of very small housekeeping

21   matters.

22             Number one, I really, really do not like double-sided

23   submitted briefs.  But I understand completely that that's to

24   save trees in this world.  But I -- particularly when -- I

25   have trouble reading them, particularly when they're bound.  I

1   take notes on the opposite side of some things, so it just

2   interferes with me.  So please, please, please, when you're

3   giving me courtesy copies, don't give me double-sided copies.

4   I promise you that I try hard when I get my -- when I'm

5   finished with briefs and I haven't totally destroyed them to

6   take the staples or bindings out and I put them in my printer

7   so that I can print on the other side.  But it's still a

8   one-sided print job.  The other side is what you just

9   submitted to me.  So I'm trying to save trees in my own way,

10  but I really don't like double-sided copies.

11          Two, you are really, really bad as a group, I

12  think -- I think more -- well, I can't even say who it is --

13  at getting me courtesy copies of stuff.  I'm not getting them

14  on a regular basis.  I don't think I've got courtesy copies of

15  the motion to quash that we just talked about with InDesign.

16  I mean, I saw stuff was filed.

17          My law clerk is on the line here.  So, Katie, speak

18  up for a second.  What else do you -- I mean, I know we

19  frequently call them or send them an e-mail asking for

20  courtesy copies.  Do you know right now what we don't have?

21    (Brief pause.)

22          THE COURT:  I think I have everything on the highly

23  confidential materials.  Are you still there?

24    (Brief pause.)

25          THE CLERK:  No.  She just e-mailed me.  I don't know

1    if she dropped off and that was her that just called back.

2            THE COURT:  Yeah, I don't know if she's going to call

3    back in.  Okay.

4            MS. MILLER:  Your Honor, with respect to the

5    InDesign, I think the overlap -- or the oversight was simply

6    because that was filed in Florida.

7            THE COURT:  Right.  I know.  I know.  But I just -- I

8    like hard stuff.  I'm not -- I'm not as facile looking at

9    things on -- either on a screen or -- so I get that.  And

10   we'll put in our order here that -- on the InDesign response

11   in ten days -- that InDesign shall, you know, deliver a

12   courtesy copy of what it files in accordance with the Court's

13   procedures on the website or something like that.

14           I will let you know if I'm missing anything.  I don't

15   have that much still under advisement.  I'm slowly getting to

16   it.  I know I have the highly confidential to confidential

17   designation motion.  I think I have all that.

18           MS. COOK:  Judge, I'm sorry.  I'm back on the line.

19   When I went to hit -- unmute the phone, I disconnected it.  I

20   apologize.

21           THE COURT:  No problem.  So do you know offhand,

22   other than the InDesign brief, anything that we're missing

23   still?  I know we've asked for stuff in the past.  Do you know

24   of anything right now that we're missing?

25           MS. COOK:  No.  It was just the InDesign papers, as

1  well as the supplement that CDK is going to file.  We'll need

2  that.  But beyond that, I am not aware of anything regarding

3  the last motion that needs to be addressed.  I think we have

4  all of those.

5          THE COURT:  I have the supplement.

6          MS. COOK:  You do have the supplement?  Okay.

7          THE COURT:  Well, I have the motion for leave, the

8  supplemental submission, and all the exhibits to it.

9          MS. MILLER:  And, your Honor, for the Court's --

10         MS. COOK:  Okay.

11         MS. MILLER:  -- courtesy, we'll provide a full set of

12  the briefing of the underlying motion that was filed in

13  Florida --

14         THE COURT:  Okay.

15         MS. MILLER:  -- so that InDesign's counsel doesn't

16  have to worry about it.  We'll send a full set over.

17         THE COURT:  Okay.  Great.  Thanks.

18         MS. MILLER:  Yes.

19         THE COURT:  And, for the record, that could either be

20  Catherine Cook, my law clerk, or it could just be unknown law

21  clerk, or voice from above.

22         Okay.  Let me just look at other -- no, those were

23  the things that I wanted to address.  So thank you for

24  indulging me.

25         Okay.  Let me tell you what I want to do with -- or

1    what my rationale is for denying dealer class plaintiffs'

2    motion to compel disclosure of CDK's clawback documents, which

3    is ECF 294, and the motion to compel disclosure of 1,807

4    documents defendant CDK Global, Inc. previously disclosed to

5    the Federal Trade Commission, which is 308.  And somewhere in

6    there -- because there are things that were filed sealed or

7    not sealed, this ruling also applies to ECF No. 308 -- I mean

8    389 and 390, I think.

9         Can you hear me okay?  Sometimes I have trouble with

10   the mic.

11        MR. PROVANCE:  Yes.

12        THE COURT:  Okay.  Good.

13        Both of -- and I'm going to read this or, you know,

14   elaborate as I see fit.  It's going to take me a little bit.

15   I'm sorry.  The reason I want to do this is if there's going

16   to be an appeal of this to Judge Dow, I want him to know my

17   reasoning, the same as if I was writing an order.  But as I

18   explained to you before, I set it for hearing a little bit ago

19   because I thought I wouldn't have time to get you an order,

20   but then I refined my thinking and I probably could have done

21   it, but -- and I may do both.

22        Both of dealership class plaintiffs' motions are

23   premised on the argument that defendant CDK Global, Inc.

24   waived its attorney-client privilege by producing to the

25   Federal Trade Commission the documents as to which CDK now

1    claims privilege.

2         The Court disagrees with the premises of the

3    dealership class plaintiffs' arguments and, therefore, denies

4    both of their motions to compel.

5         As the parties said in their briefs, the waiver

6    analysis proceeds in accordance with Federal Rule of Evidence

7    502(b).  The Court finds on the record before it that CDK did

8    not waive its privilege, for all the reasons essentially set

9    forth in CDK's response brief, which is ECF No. 341.

10         Assuming for this purpose, without deciding -- and

11    I'm going to address this in a little while after this

12    ruling -- that the documents that are being withheld are, in

13    fact, covered by the attorney-client privilege, then, in my

14    view, the record supports the conclusion that CDK's disclosure

15    of assertedly privileged documents to the FCC in response --

16    FTC -- sorry -- in response to the FTC's request for those

17    documents was inadvertent; that CDK took reasonable steps to

18    prevent disclosure of its privileged information when it

19    reviewed and produced documents to the FTC; and that CDK took

20    reasonable steps to rectify the error once it learned it had

21    occurred.  CDK, therefore, can take advantage of the safe

22    harbor provided by Federal Rule of Evidence 502(b) and

23    maintain any privilege that otherwise would cover the

24    documents it produced to and then clawed back from the FTC.

25         The Court also agrees with CDK that the document with

1    Bates No. CDK 2286595 and 96, which also has a CDK CID number

2    of 01937962 to 63, is covered by the attorney-client

3    privilege.

4          In my view, from looking at everything you all

5    submitted, both on the plaintiffs' side and the defendants'

6    side, the facts in this case are very similar to the Viamedia

7    case that both sides cite as instructive.  And that's

8    Viamedia, Inc. v. Comcast Corp., 2017 WL 2834535, Northern

9    District of Illinois, June 30th, 2017, an opinion issued by

10   your former judge in this case, Judge St. Eve, now on the

11   Court of Appeals.

12         Dealership class plaintiffs rely on supposed

13   distinctions between the facts of that case and this one in an

14   effort to say that Judge St. Eve's analysis in Viamedia

15   doesn't apply here.  I disagree.  The distinctions that the

16   dealership plaintiffs rely upon are not important to the

17   Court's analysis in Viamedia or here.

18         Dealer plaintiffs argue the cases are distinguishable

19   because CDK has not said exactly how it discovered it produced

20   assertedly privileged documents to the FTC or which of the two

21   law firms working with it to produce documents discovered the

22   error and because it did not produce a privilege log to the

23   FTC.  In the Court's view, none of these points convincingly

24   distinguish this case from Viamedia.

25         In my view, for example, it does not matter that CDK

1   has not said exactly how it discovered that it had produced to

2   the FDC assertedly -- FTC -- assertedly privileged material.

3   CDK says it discovered that fact in December of 2017 when it

4   was producing documents to the FTC and also producing

5   documents in this civil litigation.

6          The fact that the error was discovered at the same

7   time CDK began producing documents to Authenticom in this MDL

8   case indicates to me that the discovery of the error occurred

9   at a time of sharp focus on document production, which is when

10  errors or glitches like this are likely to occur and become

11  discovered.

12         It also doesn't matter which of CDK's two law firms

13  discovered the error.  Both law firms were working together

14  and coordinating the production of documents in two different

15  proceedings.

16         Dealer plaintiffs argue that the -- that CDK's claw

17  back may have been due to a tactical or strategic decision by

18  one of its law firms, but that is complete speculation on this

19  record.  And, frankly, my review of the documents that were

20  submitted in camera, which are supposedly -- which are the

21  privileged documents that were clawed back and that CDK is

22  maintaining are privileged, doesn't support that hypothesis.

23         I mean, as I say later, I'm not sure all those

24  documents are privileged; but it's not like they're related to

25  one particular thing that I would say is a -- you know, at

1    least I could tell -- is a tactical or strategic decision.

2    And, again, this is speculation by the plaintiffs.

3         Neither of these supposed distinctions between this

4    case and Viamedia lead me to believe that CDK should be held

5    to have waived its privileges.

6         In my view, it also is not significant to the

7    analysis that CDK did not provide a privilege log to the FTC,

8    if that, in fact, is the case.

9         The DePizzo -- how do you pronounce this?  DePizzo?

10        MR. PROVANCE:  DePizzo is correct, your Honor.

11        THE COURT:  DePizzo.  That was Mr. Provance.

12        The DePizzo affidavit submitted by CDK here, like the

13   affidavit submitted in Viamedia, attests to the magnitude of

14   the task CDK faced in responding to the FTC's civil

15   investigative demand, including the review of three million

16   potentially responsive documents in a short period of time.

17   It also attests to the steps CDK and its counsel took to guard

18   against disclosure of privileged information and the steps it

19   took once it discovered that it had produced assertedly

20   privileged materials.

21        It is clear to me that CDK engaged in a huge

22   undertaking to produce documents to the FTC on a compulsory

23   not a voluntary basis in a compressed time period; that it put

24   in place state-of-the-art procedures to guard against waiver

25   of privileges; and that once it discovered it had produced

1 | assertedly privileged documents, it acted appropriately and in
2 | a timely way to address the problem.

3 | In the Court's view, plaintiffs are nitpicking here
4 | in an attempt to poke holes in the process; but that effort
5 | comes up seriously short.

6 | The Court also does not accept plaintiffs' argument
7 | that the care CDK took to review documents for production to
8 | the FTC and to identify privileged documents shows that CDK
9 | must have intentionally produced privileged documents to the
10 | FTC and then simply changed its mind because, after all, it
11 | was being so very careful not to produce privileged documents.

12 | I'm not prepared to stand reason on its head and say
13 | that a party that takes great care to review documents before
14 | production must have intended to produce documents it later
15 | discovered should not have been produced because they were
16 | privileged.

17 | It's much more reasonable to conclude that mistakes
18 | happen even when people take great care in what they are doing
19 | than to conclude that people who take great care never make
20 | any mistakes.

21 | Courts commonly look to whether the facts in a
22 | particular case support the conclusion or inference that a
23 | party intentionally waived the privilege by producing
24 | documents to a federal agency.  And the facts in this record
25 | do not lead the Court to infer or conclude that CDK

1   intentionally waived any applicable privileges here.  In fact,

2   CDK either withheld from production to the FTC or redacted

3   some 47,000 documents.  So it clearly was not cavalier about

4   protecting its privilege or its production of documents.  CDK

5   reviewed millions of documents and ultimately produced, I

6   think, just under 800,000 documents to the FTC.

7          Mistakes can occur under those circumstances, as

8   other courts have recognized, including Judge St. Eve in

9   Viamedia, at *6 in the Westlaw reported version, in which she

10  makes the same kind of observation about what happened in that

11  case.

12         To hold that CDK intentionally rather than

13  inadvertently produced assertedly privileged documents would

14  be contrary to common sense on this record in this case.

15         Plaintiffs' arguments about CDK's supposed failure to

16  produce to them documents that were produced to Authenticom

17  and the FTC under Judge St. Eve's case management order also

18  does not hold water.  CDK's -- I mean plaintiffs' argument

19  there is that, in effect, CDK was required by Judge St. Eve to

20  produce these documents to the plaintiffs.

21         I mean, I don't read the order that way.  That order

22  can't possibly mean that CDK was required to produce to

23  plaintiffs documents that are produced to Authenticom or the

24  FTC that it later discovered should have been withheld on a

25  claim of privilege.  I just can't read the order that way.

1   It's a stretch.  And to me, frankly, stretches like that

2   indicate the lack of merit in the argument here.

3          Finally, the Court has reviewed that one particular

4   document the plaintiffs flagged as not being covered by the

5   attorney-client privilege, the number that I previously read

6   into the record.  It's clear to me from CDK's explanation of

7   the associate general counsel's involvement in the matters

8   being discussed by non-lawyers in the subject e-mail chain

9   that the lawyer was included so that he could provide legal

10  advice as necessary on the topics that were being discussed.

11  The e-mail is just a snapshot of what was going on at the

12  time, and what was going on at the time was an ongoing

13  discussion that included the lawyer.  All things considered,

14  the communications are covered by the attorney-client

15  privilege.

16          So for these reasons, plaintiffs' motion to compel

17  disclosure of CDK's clawback documents, which are 294 and 308

18  and might also be 389 and 390, depending upon sealed or

19  unsealed, are denied.  Those motions are denied.

20          Okay.  So I was looking at the clock.  That didn't

21  take terribly long.  Nobody fell asleep.  It's early enough in

22  the afternoon.  I'm sorry to burden you with that, but that's

23  my ruling.

24          Now, these motions were filed before the parties

25  exchanged fulsome privilege logs, I think.  I did get a

1   privilege log with the in-camera materials, which I did look

2   at.  I've reviewed some of the documents that were submitted

3   in camera, and I can see how some of them are privileged.  But

4   I'm not as sure about others.  But as I said in my order --

5   the previous order on February 11th -- that inquiry doesn't

6   have the benefit of the adversarial process.  I mean, I got

7   the documents from CDK.  Plaintiffs haven't been able to weigh

8   in on those at all because plaintiffs' position was CDK waived

9   the privilege on a wholesale basis.  Once I find that CDK did

10   not waive the privilege on a wholesale basis, which is what I

11   found, it probably becomes relevant as to which of these

12   documents are going to be challenged and which not.

13         And as I said at the beginning of the hearing, I

14   think you have a date of Friday of, you know, fishing or

15   cutting bait on a lot of privilege issues.  I think I'm right.

16   Maybe you can nod your heads that you submitted privilege logs

17   after these motions were briefed.

18         So both sides are nodding.

19         MR. PROVANCE:  Yes, your Honor, that's correct.

20         THE COURT:  They're not falling asleep.

21         MS. WEDGWORTH:  Your Honor, yes, it is correct.  My

22   understanding is that CDK is still producing and creating an

23   FTC privilege log which they plan to produce, which has not

24   been produced yet.

25         THE COURT:  Okay.

1          MR. PROVANCE:  Yes, your Honor, that's also correct.

2    However, the documents that were logged for you in camera are

3    also logged for the plaintiffs; and so any challenges that the

4    plaintiffs have raised as to CDK's privilege log in general

5    has included the documents that you received in camera.

6          THE COURT:  Okay.  And, P.S., even though I was like

7    a troglodyte or something or a dinosaur, I did appreciate the

8    flash drive, and I was able to -- with the documents on it --

9    and I was able to get that into my laptop and look at the

10   documents that way rather than carrying them all around in

11   hard copy.

12         But I have some problem -- I mean, I -- if the

13   privilege logs are going to look like what you produced to me,

14   you know, privilege -- I hate privilege log issues.  But, you

15   know, I have a -- I have some tough time with this particular

16   privilege log.  I mean, some of the documents don't have a to

17   or from.  Maybe that's because they don't have a to or from.

18   But, you know, that's -- it's hard to deal with on a privilege

19   basis.

20         Some of the descriptions are good and some of the

21   descriptions, frankly, don't give the plaintiffs much, if

22   anything, to go on and certainly didn't give me anything to go

23   on.  They're real generic.  And I understand that this is --

24   you know, doing a privilege log is an art form, and a

25   paralegal or associate who can do one of these things well is

1    worth their weight in gold.  And I don't know how to really

2    give you guidance.  But, you know, a description like, for

3    example, No. 3 on the log, "E-mail between clients providing

4    information to obtain legal advice regarding Authenticom

5    litigation and/or settlement in July of 2017," which I've

6    looked at; and I have to tell you, I've got some question as

7    to whether or not that really is privileged, but I would have

8    to go document by document like this.  But I don't know how

9    somebody reading that would know what the heck that is.

10          You know, there are a lot of e-mail -- there are a

11   lot of descriptions that say e-mail between clients providing

12   information regarding X, Y, or Z and, you know, with multiple

13   people on the e-mail.

14          So I'm really at a loss.  I mean, I don't feel

15   comfortable going through -- you know, I know I asked you --

16   because this was one of the things that was in the briefs when

17   I read it, and I said, well, I might as well get the documents

18   in camera before I rule.  So I asked you to submit to me a,

19   you know, sampling -- which ended up to be a lot of

20   documents -- but a sampling of the documents that were being

21   withheld because I thought -- when I read plaintiffs' brief

22   the first time, I thought, well, maybe I've got to look --

23   make the initial privilege call first because if they're not

24   privileged, then it doesn't matter if the privilege was

25   waived.  But then wading through this, I thought, holy moly, I

1   can't do that.  So I went back to the analysis under 502(b).

2           So I want to talk to you about what should happen

3   here.  I'm not making a ruling here that CDK's privilege log

4   is garbage.  I'm not.  And I know that this is really a hard

5   subject.  But I -- you're a little farther down in the

6   litigation now and you've looked at other logs and, as you

7   say, you're still waiting for an FTC log.  I need some help to

8   figure out what the next steps should be here.

9           MR. PROVANCE:  So, your Honor, if I could respond to

10  a few of your points.

11          THE COURT:  Mr. Provance.

12          MR. PROVANCE:  Yes, that's right.  Provance.

13          THE COURT:  Yeah.

14          MR. PROVANCE:  To your point about to-from, that is a

15  field that should exist on the logs for any documents that

16  have a sender or a recipient.  We have an ESI protocol that

17  governs that.  Now, if it's an attachment to an e-mail that

18  we've separately logged, it may not have a to or from.  But

19  there shouldn't be any systemic problem on that regard.  If

20  there's one entry that doesn't include one for whatever

21  reason, that's always been something that we've been willing

22  to fix.  But we don't think that that's a widespread problem.

23          THE COURT:  Okay.  And you're right.  Now that I'm

24  looking, a lot of them are attachments.  Then you've got to

25  look at the e-mail to figure out whether that was the

1    attachment to it and what the heck it is.

2          Some of the attachments that I saw, for example, are

3    drafts intended for distribution outside of the company, which

4    I think have a special place in, you know, privilege lore,

5    but -- okay.

6          MR. PROVANCE:  That's correct.

7          THE COURT:  Go ahead.

8          MS. WEDGWORTH:  Your Honor, if I can, just on that

9    point, if he's going to move on to another, if we can address

10   each point at the same time?

11         THE COURT:  Yes.

12         MS. WEDGWORTH:  If the attachment is another

13   e-mail -- and sometimes you can't tell -- then the to-from

14   would be helpful as to the attachment as well.

15         THE COURT:  He probably acknowledges that.  I mean,

16   some of these are.  There's document No. 44 --

17         MR. PROVANCE:  Okay.  Yes, and --

18         THE COURT:  -- has an author but no from.  And I'm

19   not sure how that happens.

20         MS. WEDGWORTH:  And maybe some of it is an oversight,

21   but if some of it -- with your guidance, we can go back on

22   some of this perhaps so we can get further down; and we offer

23   the down the road given that we have a deadline of Friday; but

24   given, nonetheless, as you point out on the FTC log, we can't

25   even start to negotiate on that until we get an FTC log, which

1    we still don't have.

2              THE COURT:  Yeah.  No, I'm going to -- I'm going to

3    let counsel continue for CDK.

4              MR. PROVANCE:  Thank you.

5              As to the level of detail provided in the logs, those

6    issues are subject to ongoing meet and confers between the

7    parties.  They have an agreed schedule by which all sides

8    could raise challenges in that regard.

9              CDK, for one, has supplemented some of its log

10   entries.  And CDK has raised issues, as the other parties

11   have, with the level of detail provided in the plaintiffs'

12   logs.  You know, we have issues with the level of detail and

13   the specificity in those logs as well.  Those are all ongoing.

14   And I believe that the parties have agreed on February 1st as

15   the date by -- or, excuse me -- March 1st.

16             MS. WEDGWORTH:  March 1st.

17             MR. PROVANCE:  -- March 1st by when they will raise

18   any of those issues to the Court's attention.

19             THE COURT:  Okay.  And so is -- so is the privilege

20   log that I was provided when I asked for the in-camera review

21   dated October 3rd, 2018, is that one of the many privilege --

22   is that one of the many privilege logs that are being

23   discussed in your meet-and-confer process?  Has it been

24   supplemented already?  Is it going to be part of your FTC

25   supplement?  All of the above?

1       MR. PROVANCE:  Yes.  It's -- the answer is -- maybe

2    I'll leave -- this was -- the log that your Honor has is the

3    first part of CDK's total privilege log.  The vast majority of

4    the documents on CDK's log were logged later, but this is part

5    of it.  So all of the meet and confers that have been going on

6    have included these documents, and some challenges were raised

7    to some of the documents on the log that your Honor has.  CDK

8    has supplemented some of its descriptions.  The parties have

9    met and conferred about, you know, lesser redactions as to

10   some of these documents, as they have with -- with the balance

11   of CDK's log.

12       THE COURT:  Yeah, and I -- and, P.S., on that last

13   point -- and I'm not going to really wade into this now

14   because you're in the middle of doing this and I'll wait until

15   something gets surfaced per the case management order timeline

16   or the order I entered on -- I think it's docket entry 496

17   from my notes.  But I, too, noted when I was looking at the

18   documents that were being withheld that, to me, I thought with

19   many of them, there could be more selective redaction than the

20   entire document.  And I'm hoping -- I mean, I don't know what

21   your protocol is for this, but there -- you know, there might

22   be a, you know, e-mail or series of e-mails in which there's

23   one or two lines that were, you know, lawyer-client.  The

24   other lines might be, you know, I'll send this to Bob, you

25   know.  I mean, it -- so I just -- I'm hoping that that process

1  continues, too, when you said, you know, you've agreed to more

2  selective redaction.

3      MR. PROVANCE:  So, your Honor, many of the documents

4  that you had received in camera are only partially privileged

5  and were redacted, rather than completely withheld.  But we

6  gave you in camera the complete document.

7      THE COURT:  Ah.  So I didn't even know what was

8  redacted and what's not.

9      MR. PROVANCE:  It -- there are notations on the log

10  that say where redactions were made.  But the actual copy of

11  the document that you received would be completely -- well,

12  just the document as it exists with no redactions.

13      THE COURT:  So you -- so you mean the thing that says

14  "has redactions," even though I didn't see the redactions,

15  they were there someplace?

16      MR. PROVANCE:  That's correct.

17      THE COURT:  Okay.  I'm glad I spent only as much time

18  as I did with those documents then.

19      Okay.  I mean, it seems to me rather than wading in

20  here, Ms. Wedgworth, that I ought to wait to have -- for this

21  process to develop because I don't want to jump in half-armed

22  with anything.  And you guys have a process that you're going

23  through, and I should let that happen.

24      MS. WEDGWORTH:  Agreed, your Honor.  And, again, just

25  so we can move things along, the sooner we get the FTC

1   privilege log, we could get all that done at one time, but we

2   don't have that to even start the process here of this whole

3   meet and confer, et cetera.

4           THE COURT:  Yeah, so I'm not going to wade into that.

5   You know, Local Rule 37.2 still applies, so talk about it.  If

6   you can't work something out, somebody files a motion.  I

7   don't know how I resolve that issue other than setting a date

8   if it doesn't happen by when it's supposed to happen, but I'm

9   fine to deal with stuff.

10          Okay.  If you don't have anything more on this

11  particular subject, I would like to raise the issue that was

12  still open in -- from my ECF 442, which is an order I entered

13  on November 19th, 2018 on defendants' omnibus motion to compel

14  certain plaintiffs' compliance with their discovery

15  obligations in response to defendants' written discovery

16  requests; in particular, with respect to the data security,

17  data integrity, and system performance issues.  And I may

18  totally regret raising this, but is there anything I have to

19  do on this?  Do you want to submit something more?  Are you

20  still talking about it?  Or, praise be, have you resolved it?

21          MS. WEDGWORTH:  We think we have it resolved from our

22  end.  We are in the process of continuing production on behalf

23  of the dealership plaintiffs and have a target of being

24  complete on March the 15th.  Obviously anything can come up,

25  but that is our stated goal right now, to wrap up production

1   on that date.

2           MR. PROVANCE:  Your Honor, that's correct.  We did

3   discuss this issue before the hearing, and that's what was

4   explained to us.  Obviously we want these documents.  We think

5   they're very important, and we've received some of them.

6   We're hoping to receive the balance as soon as we can.  And if

7   there are any issues with that, then we may be bringing them

8   to your attention, but nothing at this time.

9           THE COURT:  Okay.  You guys all know where I live, so

10  that's all good.

11          Okay.  And, again, at the risk of opening Pandora's

12  boxes, but that one wasn't that bad, how are you doing on

13  discovery?  I mean, I've been -- I haven't been setting you --

14  I'm still kind of climbing the mountain in this case.  And I

15  don't know how long I can make that excuse, but for as long as

16  you --

17          MS. GULLEY:  Your Honor --

18          THE COURT:  -- for as long as you let me do it, I'll

19  do it.  Tell me how you're doing.

20          MR. NEMELKA:  Before Ms. Gulley goes -- well, go

21  ahead.

22          MS. GULLEY:  Well, I think we have pretty good news,

23  your Honor.

24          MR. NEMELKA:  Good news.

25          MS. GULLEY:  One of the last times we were in here,

1    you helped us out and moved the discovery schedule for fact

2    discovery out to April 15th, which is coming right up.  And

3    we're doing pretty well.  We're pretty close to on track.  We

4    have been meeting throughout and scheduling together.  We had

5    another nice long meeting this morning.  And, you know, we're

6    pretty close to on track.  The plaintiffs have taken 19 of the

7    defense witnesses.  We've taken 13 of theirs.

8            The -- because discovery was staggered with -- you

9    know, our documents came out first and then theirs -- it's

10   kind of a little bit staggered, so -- there's been three third

11   parties already.  There's quite a few still out there that

12   we're aware of, more than a dozen that we're trying to

13   schedule and working together.  We've got almost all

14   scheduled.  We also have an agreement to identify the

15   remainder -- the balance of those by next week, Wednesday.  So

16   we will know sort of how much -- you know, what's left, you

17   know, the specific identity of who is left.  So that's --

18   we're really close on that.  We are not going to be able to

19   complete all of the depositions of those people by the 15th,

20   but we're actually aiming for the 30th of April, so that's

21   only two more weeks.

22           So there are some caveats there.  You've heard some

23   issues with the privilege logs.  There are other

24   outstanding -- quite a few, of course always, outstanding

25   discovery issues that the parties are negotiating.  Ms. Miller

1    is prepared to talk about any of those that we might need to

2    talk about.

3          But if we're able to do so, if we're able to complete

4    this by April 30th, as we all, both sides, are hoping to do,

5    we've even hammered out a possible schedule for the remaining

6    phases, for the expert phases and for the M- -- for the, you

7    know, dispositive motions.  Last time we were here, I think

8    you mentioned you might want to talk to Judge Dow about that.

9    We are facing currently scheduled expert deadlines that were

10   not -- you know, we always all knew were not possible.  We

11   moved the fact discovery deadlines and not the expert

12   deadlines.

13         THE COURT:  Oh, I didn't do anything about that,

14   right?

15         MS. GULLEY:  Right.

16         THE COURT:  Okay.  Sorry about that.

17         MS. GULLEY:  So we have tentative agreements, like,

18   assuming that we can all meet this goal, which is a worthy

19   one, of getting through the fact witnesses by the end of

20   April, we've worked out sort of what we propose in that regard

21   and we can talk about that today or however you want to

22   proceed.

23         THE COURT:  Mr. Nemelka wants to say something.  He

24   wants to say that he was ready to complete all depositions by

25   February 15th, right, Mr. Nemelka?

1              MR. NEMELKA:  No.  Actually I wanted to echo

2     Ms. Gulley's statement that the parties have been working very

3     hard.  And we appreciate all the efforts of all the parties,

4     and we are very close.  April 15th -- and that obviously would

5     be our preference, but there are some, just for practical

6     reasons -- we do agree with Ms. Gulley about letting it go to

7     April 30th.  And I just want to echo her comments that the

8     parties have been working very hard in good faith together.

9              THE COURT:  Okay.  That's great.  Gold stars all

10    around on that.

11             MS. WEDGWORTH:  Your Honor, I hate -- I hate to bring

12    some -- some question into there.  We did have some caveats,

13    and I think others have some caveats too.  But I certainly

14    have a caveat, in that, CDK filed counterclaims against my

15    individual clients, who are CDK auto dealerships, this past

16    Friday.  So that is new to us.  I haven't even reached all of

17    the individual clients yet to discuss the counterclaims with

18    them.  We anticipate some discovery, at a minimum.  And

19    Ms. Miller and I have begun the conversation of how quickly

20    can we do it and what exactly it would entail.  We are

21    attempting to reach some agreement, with the understanding we

22    still have to speak to clients.  And hopefully we can make it

23    work where the schedule will hopefully stay in place.  If not,

24    perhaps maybe it's a one-off, along those lines.

25             THE COURT:  Okay.  Thank you for the caveat.

33

```
 1              MS. MILLER:  Your Honor, if I could add a little bit
 2   to the --
 3              THE COURT:  Can I just ask a question --
 4              MS. MILLER:  Certainly.
 5              THE COURT:  -- before you add that.
 6              Is the plan still, with respect to Authenticom, to
 7   complete fact, maybe as well as expert discovery, and then go
 8   back to Wisconsin to try this case or is that not clear?
 9              MR. NEMELKA:  Yes, the plan is still to go back to
10   Wisconsin to try the case.
11              MS. GULLEY:  The defendants, of course, would prefer
12   that this be decided at summary judgment.
13              THE COURT:  Okay.  Okay.  Here?
14              MS. GULLEY:  Right.  The --
15              THE COURT:  There --
16              MS. GULLEY:  -- summary judgment will be decided here
17   either way, we believe.
18              THE COURT:  Okay.  That's a decision Judge Dow makes.
19   But Authenticom at least is here in this party until -- or
20   attending this party until expert discovery is done?
21              MR. NEMELKA:  And actually through summary judgment.
22   We agree that Judge Dow would do summary judgment.  It's --
23   but after that, it would go back to Wisconsin to have the case
24   tried.
25              THE COURT:  Ms. Miller?
```

1      MS. MILLER:  I don't want to detract from anything

2  that Ms. Gulley or Mr. Nemelka said.  We have been -- I talk

3  to them on a regular basis.  They talk to me on a regular

4  basis.  So the parties have been working very diligently.

5      Ms. Wedgworth identified the fact that we filed

6  counterclaims.  We filed counterclaims against the dealers

7  after Judge Dow ruled on the motions to dismiss.  So we

8  answered and filed counterclaims.  We did the same with

9  respect to the Cox entities and with respect to the AutoLoop

10  entities.

11      We heard today for the first time that Ms. Wedgworth

12  thinks she needs additional discovery.  We're going to talk

13  about that.  That's not, I think, an agreement among the

14  parties that such additional discovery would be warranted; but

15  we're certainly going to discuss it.

16      The April 30th date I think we're all working towards

17  with all due diligence.  But as Ms. Gulley noted, there are a

18  number of things that are outstanding, not to mention the

19  InDesign motion that your Honor has in front of you,

20  Dominion's appeal of your ruling with respect to discovery of

21  Dominion.

22      There are -- we've been informed now that there is

23  going to be a motion for protective order with respect to one

24  of the depositions coming up.  There are still 30(b)(6)

25  notices left to be served, objections to be served in response

1    to those, and possible disputes that will need to be resolved

2    by your Honor with respect to those 30(b)(6) notices.

3           There may or may not -- I do not know yet whether or

4    not plaintiffs intend to file motions to dismiss our

5    counterclaims, and so there could be repercussions as a result

6    of those; as well as your Honor may have noticed a new case

7    was just consolidated with this MDL, so we have the i3 case,

8    which will inevitably be subject to a motion to compel

9    arbitration, as well as related issues to that case.  And then

10   as Ms. Gulley and Mr. Nemelka alluded to, there are a number

11   of issues the parties are currently discussing.

12          Also, I suspect there will be a request to your Honor

13   to reconsider some of the rulings your Honor made with respect

14   to the omnibus motion to compel with respect to plaintiffs

15   that you said were more akin to counterclaim discovery.  And

16   now that our counterclaims are, in fact, on file, we may ask

17   your Honor to revisit those.

18          But I wanted to make sure that your Honor was aware

19   that although, yes, we are all diligently working, there are

20   certain things within this, including decisions by your Honor

21   and the schedules of third parties, that the devil is always

22   in the details.

23          THE COURT:  Right.  We're not at nirvana yet.  And

24   then you didn't mention -- it was nice of you -- that I also

25   have under advisement the motion to de-designate highly

1    confidential documents to confidential documents, which,

2    thankfully, I don't think is as thick as a lot of the other

3    stuff you guys file.  I know you're trying to hide how thick

4    stuff is by giving me the double-sided stuff, but I'll deal

5    with the thickness myself.  Okay.

6          And is there -- because I saw it, but I didn't focus

7    on this as I have in another case -- is there a procedure

8    under your case management order -- probably not -- as to how

9    you fold in newly filed cases?

10         MS. WEDGWORTH:  There is not.

11         MR. NEMELKA:  There's not.

12         THE COURT:  Okay.

13         MS. GULLEY:  I will just say, your Honor, that both

14   of the newly filed cases will be subject to a motion to compel

15   arbitration before -- in fact, the one coming from Louisiana

16   is already fully briefed.  It was fully briefed there.  And

17   the one coming from San Diego is -- that will be the next step

18   in the next, I think -- don't quote me on this -- 30 days.  It

19   will be subject to a motion to compel arbitration, so that

20   will be the first step.

21         THE COURT:  But didn't Judge Dow rule on at least the

22   motions to compel arbitration that were --

23         MS. GULLEY:  Yes, he did, your Honor.

24         MR. PROVANCE:  This is different.

25         THE COURT:  Or is this different?

1          MS. GULLEY:  Well, so these are based on Reynolds's

2     contracts and Reynolds's arguments.  He's not had an

3     opportunity to rule on that because our settlement with the

4     dealers mooted that argument.  And also these would -- these

5     are actually slightly different ones than the dealer ones, the

6     vendor.  But they both have their own arbitration contracts.

7          THE COURT:  Okay.  Thank you for the update.

8          To me what I would like to do, with your -- you know,

9     at your suggestion, is file a date by which you're going to --

10    you say you've hammered out some modifications to the existing

11    schedule.  I'd love for you to submit something to me and/or

12    Judge Dow or you can submit a, you know, proposed modified

13    whatever you want to do; and one of us who is supposed to sign

14    it would sign it.

15         MS. GULLEY:  Sure.  I mean, subject to the caveats

16    that we've talked about today, we actually have the dates

17    right here if you want --

18         MR. NEMELKA:  We actually hammered them out.

19         MS. GULLEY:  We're happy to read them into the record

20    if --

21         THE COURT:  Oh, you want to read them into the

22    record?

23         MS. GULLEY:  Happy to do so, your Honor.

24         THE COURT:  The --

25         MS. WEDGWORTH:  And when do we -- with the caveats as

1    well?

2           MS. GULLEY:  The caveats are hypothetical.  They're

3    in the record, but --

4           THE COURT:  Well, the caveats meaning that these --

5    all these dates are subject to all these other things that

6    Ms. Miller just inventoried out?

7           MS. GULLEY:  Potentially.

8           MS. WEDGWORTH:  Yes.  And also there may be motions

9    to compel concerning third parties as well.

10          MR. NEMELKA:  Your Honor, our position is we're

11   working very hard to hammer them out.  But, you know, if there

12   are some outstanding one-off motions, that does not merit

13   continuing to delay the entire case.

14          THE COURT:  Well, here, I'm not -- I can be real

15   simple on this.  I'm not interested in the caveats

16   necessarily.  I'm interested in the dates.  Dates can change.

17   Okay.  I don't think by agreeing to the -- I mean, maybe by

18   plaintiffs agreeing to move this to April 30th, they're

19   saying, And we will never agree to move anything else.  I

20   don't know that I would ever enter an order that says -- at

21   least at this point without knowing more -- I mean, I've

22   entered, you know, draconian -- or, you know, ax motions that

23   say this is the final extension and nothing else is happening.

24   But I don't know what's going on here on that.  I mean, if

25   somebody is not available for a deposition and everybody has

1    tried to get that deposition, am I not going to let that

2    deposition after April 30th?  Again, I'd listen to everybody.

3         I mean, what I hear you saying is you've hammered out

4    some dates that seem to make sense to you in the context of

5    the litigation where it is.  You've still got discovery to

6    complete, oral discovery.  Then you're going to have expert

7    discovery.  And there's a bunch of stuff going on right now

8    that could affect how this case proceeds in little ways or big

9    ways:  InDesign's motion to quash; Dominion's appeal.  If

10   that's reversed, then, you know, we have to figure out how to

11   deal with that kind of thing.  I'm not sure what it would

12   take.

13        A motion for a protective order about a deposition,

14   I'll decide.  30(b)(6) notice disputes, I'll decide.  New

15   cases, arbitration, I mean, I don't know whether those people

16   are going to fold into discovery or not, whether there's going

17   to be a motion to stay pending that.  I guess the motion to

18   stay discovery -- I'm not exactly sure where that should go.

19   Probably -- probably me because I'm doing discovery.  But I

20   know Judge Dow is well -- is much more steeped in the

21   arbitration issue than I am, but it could be a different

22   arbitration issue than he already decided.  But if you tee it

23   up, you tee it up.

24        Request for reconsideration on counterclaim

25   discovery, I'm not exactly sure what that is.  But anybody

1    want to bring something on, they can bring it on.

2          I have the highly confidential and confidential.  I

3    don't know that that's going -- I mean, I don't -- I can't

4    conceive of that really affecting the trajectory of discovery.

5    That's just who could see these documents, which is why I

6    haven't exactly jumped on it, but --

7          MR. NEMELKA:  Correct.

8          THE COURT:  But I know it's there.  It's on my

9    conference table.  And it's about like this, I think.  It's

10   not that bad.

11         And motions to compel third parties I'll take.

12         So what I would prefer to do is either memorialize in

13   an order today the dates you've all agreed to -- I'm not going

14   to caveat them and I'm not going to say they can never be

15   moved.  I'm just going to say you guys have -- you know, by

16   agreement of the parties, the schedule is amended as follows;

17   and you're going to read me the things and Brenda will put

18   them in an order.  I'm good with that.

19         MS. MILLER:  Okay.

20         THE COURT:  Otherwise you're going to have to submit

21   something in writing and I'll have to write something about

22   what I'm caveating.

23         MS. MILLER:  As long as it's clear that it's not

24   the -- to use your words -- the ax order, then I think that

25   should be fine.

```
 1              THE COURT:  Yes.

 2              MR. NEMELKA:  So --

 3              THE COURT:  Do you want to --

 4              MS. WEDGWORTH:  Let me -- let me just say, your

 5    Honor, that I -- that we will be filing a motion to dismiss on

 6    the counterclaims that were filed against the individual

 7    dealerships on Friday as well.

 8              THE COURT:  Okay.

 9              MS. GULLEY:  And so -- this is Ms. Gulley.

10              So the dates:  As we said, for the fact discovery --

11    and these dates are keyed off of Judge St. Eve's case

12    management order.

13              THE COURT:  Yes.  And you know what, I'm happy to

14    take these, but I'm thinking about it.  Because they're keyed

15    off the case management order and any other dates that I set,

16    I think it would be good for the docket in the future so that

17    I -- when I look back -- I'm happy to put those here, but

18    could you file something that says, you know, agreed --

19    agreement concerning modification of --

20              MS. GULLEY:  We'll come up with a title.

21              THE COURT:  -- case management dates or something.

22    That way we can always find it on the record.  But I'm happy

23    to hear from you because I'm interested in what you're doing.

24              MR. NEMELKA:  Good idea.

25              MS. GULLEY:  No problem.
```

```
 1              So as we said, the fact discovery date would be
 2    April 30th from April 15th.  For expert reports:  Opening
 3    reports, July 1st, 2019; rebuttal reports, September 3rd,
 4    2019; reply reports, October 3rd, 2019.  For expert
 5    challenges:  The challenges due November 4th.
 6              THE COURT:  So -- I'm sorry.  I'm -- so expert
 7    reports initially due July?
 8              MS. GULLEY:  1st.
 9              THE COURT:  1st.  Second is?
10              MS. GULLEY:  The rebuttal reports is September 3rd.
11              THE COURT:  Okay.
12              MS. GULLEY:  And the order had reply reports and so
13    those are October 3rd.
14              THE COURT:  Okay.  And when are these experts going
15    to be deposed?
16              MS. GULLEY:  So it's not in the current schedule, but
17    it would be between the expert reports and what I'm about to
18    tell you, which is the -- yeah, Dauberts.
19              THE COURT:  Okay.  You're -- just to understand, so I
20    understand it, your intention is expert disclosures, followed
21    by any depositions that anybody wants to take of those experts
22    before rebuttal expert reports, then depositions of the
23    rebuttals, and then any reply stuff -- any reply expert
24    reports or supplemental expert reports?  Is that what you're
25    saying?  That's what you're anticipating?
```

```
 1          MS. GULLEY:  So actually we have not discussed when
 2   exactly in the process the depositions would occur other than
 3   before the expert challenges.
 4          THE COURT:  Okay.  So I would say then, if you're
 5   going to submit something -- and when do you have the expert
 6   challenges?
 7          MS. GULLEY:  So the challenges, November 4th;
 8   responses to that, December 16th; and replies, January 21.
 9          THE COURT:  So I would say in your -- whatever you're
10   going to submit to me -- and if I feel like it's -- we're
11   capable of memorializing this as we're getting all this
12   information orally -- I would say all depositions of disclosed
13   expert witnesses must be taken by November 4th --
14          MS. GULLEY:  Agreed.
15          THE COURT:  -- which is when you're going to start
16   your challenges, right?
17          MS. GULLEY:  Agreed.
18          THE COURT:  And you could decide who is going to be
19   deposed when and under what schedule.  Okay.
20          MS. GULLEY:  Correct.
21          And then there's a staggered but simultaneous
22   schedule that we've agreed to for summary judgment, for the
23   dispositive motions, with the initial briefs November 18th;
24   the responses, January 13th, 2020; and replies, February 3rd,
25   2020.
```

```
1            THE COURT:  Okay.  So I do -- this makes it more

2    important for you to file something with these.  This is good.

3    Thank you for letting me know these things.  I may simply say

4    the parties are going to file something because Judge Dow has

5    to sign off on the summary judgment schedule.  I don't want to

6    presume to set his schedule, though he's a nice guy; I don't

7    think he'd mind.  But I think technically I'm just the

8    discovery guy and he's the merits guy so he's going to have to

9    sign off on that.  But this sounds like a schedule that you're

10   going to move right along to.  And at first blush, I'm fine

11   with it.

12           MS. GULLEY:  So as a -- just as a technical matter,

13   would you prefer that we sent in the proposed order like we

14   normally do through the clerk?  No?

15           THE COURT:  You've got to file it.  There's so many

16   filings in this case and it's hard to find stuff and --

17           MS. MILLER:  We'll file it as a stipulation so it

18   appears on the docket as a standalone.

19           THE COURT:  Yeah, that's what I'm talking about

20   because otherwise I'm going to enter something and it's going

21   to be hard to reconcile that with what you guys have done.

22   But if you do that, he can enter an order and I can enter an

23   order or we'll enter one order that he can sign and it will

24   all be good.  Okay?

25           MS. GULLEY:  No problem.
```

1        THE COURT:  Okay.  And the final thing would be, I

2    think -- and it depends on how you want to do this.  I don't

3    have another status hearing set.  You could also designate it

4    as a -- I'm getting a text from my law clerk here.  Sorry.

5    She had to work from -- remotely today.

6        You could also designate it as an amended case

7    management order or case management order No. 2 or something

8    like that.  You decide.  I'm fine with anything you want to

9    do.

10        Generally, I have regular status hearings in my

11   cases.  I don't want to interfere with what you're doing, and

12   I don't know when the next regular break point would be with

13   you.  But it seems to -- I've been getting up to speed in your

14   case, and I think if you want to do that, I'm fine to do that.

15   If you don't want to do that, I'm fine not to.  I like to do

16   it because that way I can often head off things that would

17   otherwise fester and otherwise require written stuff.  I try

18   and do as much as I can from the bench.

19        MR. NEMELKA:  Speaking for my clients, we would

20   appreciate that as well.  And we found, for example, that, you

21   know, rulings from the bench be effective and welcome that.

22        THE COURT:  Okay.

23        MS. MILLER:  Given all the caveats that we've now put

24   on the record, it probably wouldn't -- it wouldn't be a bad

25   idea to have another one before the April 30th cutoff so we

1    can give you a status of where those caveats are.

2           THE COURT:  Yeah, I would like to do that.  And what

3    I would like to do -- and, again, it creates more work for

4    you, but I like, a little bit before then, to get a written

5    report from you all --

6           MR. NEMELKA:  Sure.

7           THE COURT:  -- giving me information because what

8    I've done in other cases is there are oftentimes where either

9    I could rule or I could provide some guidance on things, and

10   that sometimes helps people get over a hump.

11          So I'm looking at dates here.  I'm waiting for the

12   calendar to load.  My March is terrible, so April is better.

13          MS. MILLER:  And it may make sense to go May 1st,

14   after the -- we can -- so we can see what's done, but it's up

15   to your Honor.

16          THE COURT:  So I can throw some dates out here.

17   April 15th I could do it -- something -- but then I would have

18   to have something submitted probably the week before.

19          I can do April 19th in the morning with the caveat

20   that Passover begins that evening, so if anybody is traveling

21   or if it matters to anybody, I just want you to -- would just

22   say that.  And I think Easter is around this time.

23          MS. MILLER:  It's the same weekend.  That's Good

24   Friday.

25          THE COURT:  Oh, then don't do that.  I don't want to

```
 1    set it on Good Friday.  The 19th is Good Friday?  Really?
 2              MS. MILLER:  Yes, sir.
 3              THE COURT:  Why is that not on our calendar?  Because
 4    of Judge Williams's ruling years ago that said it's not a
 5    federal --
 6              MS. MILLER:  Probably.
 7              THE COURT:  That's probably why, right?  Yeah.
 8              MS. MILLER:  That's probably why.
 9              THE COURT:  Okay.  So not then.  I guess that's why I
10    don't have anything -- nobody wanted to come in then, but
11    thanks.
12              The following week after Easter is good for me,
13    either the morning of the 24th or the 26th.  Yeah, I really
14    open up here, so what -- what do you guys -- why don't you
15    guys talk and let me know what you want to put on the
16    calendar.
17              MS. MILLER:  And, your Honor, what is your
18    availability the week of the 29th?
19              THE COURT:  I'm -- okay.  So I'm good April 29th in
20    the afternoon; April 30th, late morning; May 1, any time;
21    May 2, late morning through the end of the day.
22              MS. GULLEY:  We're just conferring because between
23    now and the end of April, we're taking a lot of depositions.
24              THE COURT:  I'm fine to do it after.  I'm totally --
25    I really would like to hear what you want to do collectively.
```

```
 1  If you disagree, you know, tell me.  But I'm happy to be -- to
 2  deal with -- to do what you want me to do.
 3          MS. WEDGWORTH:  Does May 1 work, your Honor?
 4          THE COURT:  Yes.
 5          MS. WEDGWORTH:  We'll take it.
 6          THE COURT:  Okay.  And I can do the morning then.
 7  Okay?  I'm going to say --
 8          MS. MILLER:  That would be fine, your Honor.
 9          MS. WEDGWORTH:  9:15?
10          THE COURT:  Pardon?
11          MS. WEDGWORTH:  9:15?
12          THE COURT:  No, I'm going to say 10:00, just in case
13  I want to set somebody ahead of you.
14          MR. NEMELKA:  We may all come in here crawling, given
15  that we would have just finished.
16          MS. WEDGWORTH:  And would you like a status report --
17          THE COURT:  Yes, I would.
18          MS. WEDGWORTH:  -- a week in advance?
19          THE COURT:  And, again, you guys are killing
20  yourselves on deps, so I don't want to -- I just don't want to
21  be blindsided with stuff.  And sometimes if I get stuff in
22  writing, I can think about it and you -- I mean, I'd like it,
23  you know, a week before, but you may be --
24          MS. WEDGWORTH:  April 24th?
25          THE COURT:  Yeah, but you may be --
```

1           MR. NEMELKA:  We can put something together.

2           THE COURT:  Okay.  Why don't I say the 24th.  And let

3    me tell you what I'm looking for just so that we're all on the

4    same page here.  I'm not looking for summary judgment.  All

5    right.  I'm looking for something that's joint.  I'm looking

6    for something that identifies agenda items and has short --

7    either one short description of what we're talking about

8    and -- or each side's respective view on something.

9           These don't always have to be disputed things.  So

10   you could tell me, this is where we are on depositions and

11   everybody agrees; and these are some depositions, for example,

12   that have to be held over, but after that there's nothing

13   else.  Or you could tell me, you know, we want to adjust some

14   dates and we're all in agreement about that.  Or you could

15   say, plaintiffs want to adjust dates and defendants don't or

16   vice versa.  You could tell me, we've resolved X and so we're

17   withdrawing a motion.  These are all things that could be in

18   there.

19          You could also say that there's an issue that we

20   have, you know, met and conferred about and we're at

21   loggerheads and here's a description of the issue and either

22   we have to brief it or we'd like your guidance on that.  All

23   right.  And it might be something I say we need to have it

24   briefed and we set a schedule.  It might be something that I

25   say, you know what, what about this, and it might move the

1　process forward.  If it doesn't move the process forward, it

2　might be something that I could rule on based on what you've

3　given me.  But if anybody says, I don't want you to rule on it

4　this way because there's more information you need, that's

5　fine.

6　　　　　What I don't want is something that is really -- you

7　know, is four inches thick that has a tremendous amount of

8　material that I'm really not going to be able to get through

9　and in the end would have to be resubmitted in some other

10　form.  Okay.  So it's a snapshot of where you are to give me a

11　sense of what's going on, to give me a sense of how I can be

12　of help, if I can be of help, what kind of things I have to

13　deal with in terms of scheduling, and what things are coming

14　down the pike that you need me to do.

15　　　　　It's a judgment call as to what you put in there, but

16　I'm not looking for a 50-page document.  And I'm not even

17　looking for a 25-page document.  Although this is an MDL case,

18　the number of counsel is relatively limited and so, you know,

19　I don't think we have -- there's not as many moving parts; and

20　I'm getting a sense of what those moving parts are.  So I just

21　look at -- I'm looking for something to give me a sense of

22　what is going on, what I need to do, what traffic I need to

23　direct, or if there's something that I could actually help you

24　with.

25　　　　　MR. ROSS:  Fair to say, your Honor, you're not

1    looking for a bunch of advocacy by either side in this

2    instrument?

3            THE COURT:  It's going to be impossible not to have

4    any advocacy in here.  Okay.  I mean, I recognize that.  To

5    the extent you could be restrained on it and just give me the

6    facts, Jack, that's fine.  But I -- if you're going to argue

7    about whether this is -- I mean, if, for example, on an

8    issue -- there's a 30(b)(6) deposition that has yet to be

9    scheduled, you know; defendants feel that whatever has been

10    taken has been taken and this is unnecessary; plaintiff feels

11    not, okay, that's very objective.  But the minute you go to

12    the next thing, which I'm not saying you shouldn't do, which

13    is here's why we feel that way -- that's advocacy, right --

14    and then plaintiffs could say and here's why we disagree.  I'm

15    not looking for multi-page arguments with subheads.  But if

16    there's a two-line advocacy, I'm not going to have -- I'm not

17    going to have a fit over it.  Okay.  I mean, I think it's

18    impossible to tell trial lawyers -- I mean, you wake up in the

19    morning and you're an advocate, you know, for every tie in the

20    closet.  You know, you could wear this one, you could wear

21    that one; there's good reasons for both.  So -- but you're

22    right -- you're right, Mr. Ross, right?

23            MR. ROSS:  Yes, your Honor.

24            THE COURT:  Yeah, you're right, Mr. Ross, that I'm

25    not looking -- I'm not looking for a food fight here with this

1    stuff.  I'm really not.  Because I'm thinking that if

2    there's -- if we really need some advocacy, I'm going to get

3    briefs on it or I'm going to have an oral argument on it.  So

4    it's really just what's necessary to let me know what's going

5    on.  And it shouldn't be real hot.  I'm hoping that it's not

6    going to be real hot.

7         I would say -- I mean, I've used these with a lot of

8    effect in the In re Broiler Chickens Antitrust Litigation.  I

9    would direct you to those status reports, except some of them

10   are over the top and I've told the lawyers that.  Okay.  I

11   mean, some of them I had, you know, run to 40 pages and

12   there's too much advocacy in there.  To some -- to good

13   effect -- and that's a case with many more lawyers and many

14   more related cases in three different antitrust price-fixing

15   classes.  So it's a different case than this.  So I don't want

16   to refer you there because there's a tremendous -- often

17   there's lot of advocacy there; good lawyers but good advocacy.

18   And I'm not looking for that kind of a thing.  So, I mean, if

19   you looked at that, you say, well, I don't want to make it

20   look like that because it's too long and too involved.  I

21   don't know how much more I should say about this.

22        MS. MILLER:  We have examples from other cases in

23   front of your Honor.

24        THE COURT:  Yeah.  I mean, you've done this before,

25   right.  I'm not looking for a food fight.  Advocacy is fine,

1  as long as you're not -- just so that I can get the flavor of

2  it.  But I'm not looking -- it's not -- I don't want it to be

3  your last -- it doesn't have to be your last shot.  It's just

4  a snapshot of what's going on.

5          MR. NEMELKA:  That's helpful guidance.

6          THE COURT:  Yeah, I mean, I don't have to --

7          MR. ROSS:  In the spirit of your Honor's --

8          THE COURT:  Yeah, I mean, you've done this before.

9  You know, if you get in a fight about it, you'll get in a

10  fight about it and I'll see it and I'll deal with it.

11  Ms. Miller is right, I don't know why I'm talking to you like

12  you're entering kindergarten.  You guys are real sophisticated

13  in this.  You've done this a lot so -- but it just would be

14  helpful to me, before we stand up there, to figure out what's

15  going on because, in part, the hearing might not last as long

16  as this, which is going to come to a conclusion now.  But if I

17  know what's coming up, we could do it more quickly and more

18  succinctly and I will have thought about it first.

19          MS. MILLER:  Understood, your Honor.  Thank you.

20          MR. NEMELKA:  Understood.  Thank you.

21          THE COURT:  Okay.  So I'll see you then.  I don't

22  think there's anything else more we need to discuss.  You know

23  where I live if there is.  Have a good time with all the

24  depositions you're taking.

25          MR. NEMELKA:  Thank you.

```
 1              THE COURT:  Or don't come to blows if you're not

 2    having a good time.

 3              Okay.  Thank you.

 4              MR. NEMELKA:  Very good lunches have been provided by

 5    the firm so --

 6              THE COURT:  Well, eating well is always important.

 7    Okay.  Good.  See you in a couple of months.

 8              MS. MILLER:  Thank you, your Honor.

 9              MS. WEDGWORTH:  Thank you.

10              MR. NEMELKA:  Thank you, your Honor.

11              THE COURT:  Well, actually a little over a month,

12    yeah.  Okay.  Great.  Thank you.

13        (Which were all the proceedings heard.)

14                        *    *    *    *    *

15

16    I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.
17

18
      /s/ Nancy C. LaBella                    March 7, 2019
19    Official Court Reporter

20

21

22

23

24

25
```