**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | ) ) ) ) | MDL No. 2817 Case No. 1:18-CV-00864 |
| *This Document Relates To:* | ) ) ) | Hon. Robert M. Dow, Jr. |
| i3 Brands, Inc., et al. v. CDK Global, LLC, et al., et al., No. 1:19-CV-01412 | ) ) ) | |


**DEFENDANT THE REYNOLDS AND REYNOLDS COMPANY'S MEMORANDUM IN
SUPPORT OF ITS MOTION TO DISMISS IN FAVOR OF ARBITRATION, OR IN THE
ALTERNATIVE, TO DISMISS UNDER RULE 12(B)(6)**

## TABLE OF CONTENTS

I.   Background ..................................................................................................... 1

II.  All of Plaintiffs' Claims Must Be Arbitrated, Not Litigated ........................... 3

     A.   The Parties agreed to three broad-form arbitration provisions that delegate
          arbitrability issues to the arbitrator. ................................................... 3

     B.   Incorporation of the AAA rules delegates arbitrability determinations to
          the arbitrator. ...................................................................................... 4

     C.   Plaintiffs' claims are arbitrable even if the Court disregards the delegation
          provision. ............................................................................................. 6

III. Even If the Court Denies Arbitration, Plaintiffs' Claims Must Be Dismissed for
     Failure to State a Claim on Which Relief Can Be Granted ........................... 10

     A.   The Antitrust Claims ........................................................................... 10

          1.   i3 Brands cannot recover for alleged antitrust injury to its
               subsidiaries. ................................................................................ 11

          2.   Reynolds's DMS license agreements with dealers bar Plaintiffs'
               allegations of antitrust injury and causation. ............................ 11

          3.   Plaintiffs' conspiracy allegation is implausible. ........................ 13

          4.   Plaintiffs' exclusive dealing claim regarding the vendor
               agreements fails for additional reasons. .................................... 15

          5.   Plaintiffs' monopolization claims fail. ........................................ 16

               a.   Reynolds dealer customers (and third-party vendors) knew
                    about its "aftermarket" policy. .......................................... 17

               b.   Plaintiffs do not adequately allege that dealers are "locked
                    in" to the single-brand aftermarket by switching costs. ..... 18

               c.   Plaintiffs do not adequately allege that "information costs"
                    prevented dealers from learning the total cost of the
                    "package" they were buying. ............................................. 19

     B.   The TradeMotion Claims ..................................................................... 20

     C.   The PartProtection Claims .................................................................. 21

1.  Plaintiffs' breach of contract claim fails because there was no enforceable contract. .............................................................................. 21

2.  Plaintiffs' promissory estoppel claim fails for want of a definite promise, and is in any event preempted. .................................. 24

3.  Plaintiffs' fraud claim fails for lack of particularity, and is in any event preempted. ........................................................... 25

4.  Plaintiffs have not alleged the existence or misappropriation of a trade secret. ............................................................ 26

5.  Plaintiffs' tortious interference claim fails because Reynolds's refusal to deal cannot give rise to liability. ........................... 30

IV.  Conclusion ..................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*188 LLC v. Trinity Indus., Inc.*,
  300 F.3d 730 (7th Cir. 2002) ................................................................10

*Acquaire v. Canada Dry Bottling*,
  906 F. Supp. 819 (E.D.N.Y. 1995) ...........................................................7

*Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*,
  141 F.3d 947 (9th Cir. 1998) ................................................................13

*Ali v. Vehi-Ship, LLC*,
  17 CV 02688, 2017 WL 5890876 (N.D. Ill. Nov. 27, 2017) ...................................5

*Allscripts Healthcare, LLC v. Etransmedia Tech., Inc.*,
  188 F. Supp. 3d 696 (N.D. Ill. 2016) ........................................................5

*Associated General Contractors of California, Inc. v. California State Council of
  Carpenters*,
  459 U.S. 519 (1983)........................................................................11

*AT & T Techs., Inc. v. Communications Workers of Am.*,
  475 U.S. 643 (1986)........................................................................6

*Authenticom, Inc. v. CDK Global, LLC*,
  874 F.3d 1019 (7th Cir. 2017) ..............................................................17

*Avaya Inc., RP v. Telecom Labs, Inc.*,
  838 F.3d 354 (3d Cir. 2016)................................................................17

*Awuah v. Coverall N. Am., Inc.*,
  554 F.3d 7 (1st Cir. 2009)..................................................................5

*B-S Steel of Kansas, Inc. v. Texas Indus., Inc.*,
  229 F. Supp. 2d 1209 (D. Kan. 2002) .......................................................7

*Bankers Tr. Co. v. Old Republic Ins. Co.*,
  959 F.2d 677 (7th Cir. 1992) ..............................................................25

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)....................................................................10, 14

*Bischoff v. DirecTV, Inc.*,
  180 F. Supp. 2d 1097 (C.D. Cal. 2002) .....................................................7

*Bitstamp Ltd. v. Ripple Labs Inc.*,
  15-CV-01503-WHO, 2015 WL 4692418 (N.D. Cal. Aug. 6, 2015) .......................................5

*Bollinger Shipyards Lockport LLC v. Northrop Grumman Ship Sys., Inc.*,
  CIV.A. 08-4578, 2009 WL 86704 (E.D. La. Jan. 12, 2009).........................................................5

*Brennan v. Opus Bank*,
  796 F.3d 1125 (9th Cir. 2015) ...................................................................................................5

*Brokerage Concepts v. U.S. Healthcare*,
  140 F.3d 494 (3d Cir. 1998)......................................................................................................18

*Cellairis Franchise, Inc. v. Duarte*,
  CV 2:15-CV-00101-WCO, 2015 WL 11422299 (N.D. Ga. July 20, 2015) ...........................5

*Cequent Performance Prod., Inc. v. Let's Go Aero, Inc.*,
  No. 14 C 8457, 2016 WL 4036754 (N.D. Ill. July 28, 2016) ....................................................5

*Cole Asia Bus. Ctr., Inc. v. Manning*,
  CV 12-00956 DDP CWX, 2013 WL 3070913 (C.D. Cal. June 18, 2013) .............................26

*Commercial Data Servers, Inc. v. IBM*,
  262 F. Supp. 2d 50 (S.D.N.Y. 2003).........................................................................................18

*Contec Corp. v. Remote Solution Co.*,
  398 F.3d 205 (2d Cir. 2005)........................................................................................................5

*Copeland v. Baskin Robbins U.S.A.*,
  96 Cal. App. 4th 1251, 117 Cal. Rptr. 2d 875 (2002)..............................................................23

*In re Currency Conversion Fee Antitrust Litig.*,
  265 F. Supp. 2d 385 (S.D.N.Y. 2003)........................................................................................7

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig..*,
  9 CV 3690, 2015 WL 3988488 (N.D. Ill. June 29, 2015) .................................................11, 12

*Digital Envoy, Inc. v. Google, Inc.*,
  370 F. Supp. 2d 1025 (N.D. Cal. 2005) ...............................................................................24, 25

*Digital Equip. Corp. v. Uniq Digital Techs., Inc.*,
  73 F.3d 756 (7th Cir. 1996) ..................................................................................................17, 18

*Eastman Kodak Co. v. Image Tech. Services, Inc.*,
  504 U.S. 451 (1992)..............................................................................................................16, 19

*Empire State Ethanol & Energy, LLC v. BBI Int'l*,
  No. 1:08-CV-623 .........................................................................................................................7

v

*Fallo v. High–Tech Inst.*,
  559 F.3d 874 (8th Cir. 2009) ...........................................................................5

*Gemisys Corp. v. Phoenix Am., Inc.*,
  186 F.R.D. 551 (N.D. Cal. 1999)...................................................................27

*Gen. Elec. Co. v. Bools*,
  172 F.3d 48 (6th Cir. 1998) (Ohio)................................................................24

*Gersten v. Intrinsic Techs., LLP*,
  442 F. Supp. 2d 573 (N.D. Ill. 2006) ...............................................................8

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
  998 F.2d 391 (7th Cir. 1993) ........................................................................13

*Hamilton San Diego Apartments v. RBC Capital Markets Corp.*,
  312CV2259JMBLM, 2013 WL 12090313 (S.D. Cal. Mar. 5, 2013)
  (California).....................................................................................................30

*Hellenic Inv. Fund, Inc. v. Det Norske Veritas*,
  464 F.3d 514 (5th Cir. 2006) ...........................................................................8

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  139 S. Ct. 524 (2019)........................................................................................4

*Hinc v. Lime-O-Sol Co.*,
  382 F.3d 716 (7th Cir. 2004) ........................................................................21

*HiRel Connectors, Inc. v. United States*,
  CV01-11069 DSF VGKX, 2006 WL 3618011 (C.D. Cal. Jan. 25, 2006) ...........27

*Hosp. Mktg. Concepts LLC v. Six Continents Hotels, Inc.*,
  SACV1501791JVSDFMX, 2016 WL 9045853 (C.D. Cal. May 2, 2016) .......26, 27

*Hostmark Inv'rs Ltd. v. Geac Enter. Sols., Inc.*,
  01 C 8950, 2002 WL 1732360 (N.D. Ill. July 26, 2002).....................................3

*Howsam v. Dean Witter Reynolds, Inc.*,
  537 U.S. 79 (2002)......................................................................................4, 25

*Humphreys & Associates, Inc. v. Cressman*,
  SACV150782AGRNBX, 2015 WL 12698428 (C.D. Cal. Aug. 31, 2015) ............29

*IDX Sys. Corp. v. Epic Sys. Corp.*,
  285 F.3d 581 (7th Cir. 2002) ........................................................................28

*Imperial Crane Sales, Inc. v. Sany Am., Inc.*,
  No. 15 C 859, 2015 WL 4325483 (N.D. Ill. July 15, 2015) ................................5

*In re Independent Service Organizations Antitrust Litig.*,
203 F.3d 1322 (Fed. Cir. 2000)............................................................................12

*Int'l Bhd. of Elec. Workers Local 2150 v. NextEra Energy Point Beach, LLC*,
762 F.3d 592 (7th Cir. 2014) ................................................................................6

*Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*,
206 F.3d 411 (4th Cir. 2000) ................................................................................8

*Jimenez v. Herrera*,
95 C 1956, 1996 WL 99715 (N.D. Ill. Mar. 4, 1996) ............................................21

*JLM Indus., Inc. v. Stolt-Nielsen SA*,
387 F.3d 163 (2d Cir. 2004)..............................................................................6, 8

*Kema, Inc. v. Koperwhats*,
C09-1587MMC, 2010 WL 726640 (N.D. Cal. Mar. 1, 2010)................................26

*Keywords, LLC v. Internet Shopping Enterprises, Inc.*,
CV 05-2488 MMM (EX), 2005 WL 8156440 (C.D. Cal. June 29, 2005)..............28

*Khoury v. Trumbull Physician Hosp. Org.*,
99-T-0138, 2000 WL 1804356 (Ohio Ct. App. Dec. 8, 2000) (Ohio)....................30

*In re: Lithium Ion Batters Antitrust Litig.*,
13-MD-02420-YGR, 2016 WL 5791357 (N.D. Cal. Oct. 4, 2016)...........................5

*M.J. DiCorpo, Inc. v. Sweeney*,
634 N.E.2d 203 (Ohio 1994).................................................................................22

*MAI Sys. Corp. v. Peak Computer, Inc.*,
991 F.2d 511 (9th Cir. 1993) ..............................................................................28

*Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*,
271 F.3d 825 (9th Cir. 2001) (California)..............................................................30

*MCI Communications Corp. v. Am. Tel. & Tel. Co.*,
708 F.2d 1081 (7th Cir. 1983) .............................................................................13

*MCI Telecomm. Corp. v. Texas Utilities Elec. Co.*,
995 S.W.2d 647 (Tex. 1999).................................................................................20

*Mich. Division-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
458 F. Supp. 2d 474 (E.D. Mich. 2006).................................................................14

*Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*,
877 F.2d 1333 (7th Cir. 1989) .............................................................................11

*Mitigation Techs., Inc. v. Pennartz*,
EDCV1401954ABSPX, 2015 WL 12656936 (C.D. Cal. Mar. 13, 2015) ..............................29

*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*,
473 U.S. 614 (1985)...........................................................................................................7

*Morlife, Inc. v. Perry*,
56 Cal. App. 4th 1514, 66 Cal. Rptr. 2d 731 (1997)..............................................28

*Motorola Mobility LLC v. AU Optronics Corp.*,
775 F.3d 816 (7th Cir. 2015) ...........................................................................10

*Newcal Indus., Inc. v. IKON Office Solution*,
512 F.3d 1038 (9th Cir. 2008) ..........................................................................16

*Nextdoor.com, Inc. v. Abhyanker*,
C-12-5667 EMC, 2014 WL 1648473 (N.D. Cal. Apr. 23, 2014) ..........................26

*Noble Drilling Services, Inc. v. Certex USA, Inc.*,
620 F.3d 469 (5th Cir. 2010) .............................................................................8

*Nw. Univ. v. Insight Biomedical, Inc.*,
No. 99 C 2354, 1999 WL 417397 (N.D. Ill. June 15, 1999) ...................................6

*Oracle Am., Inc. v. Myriad Group A.G.*,
724 F.3d 1069 (9th Cir. 2013) ...........................................................................5

*Pac. Bell Tel. Co. v. Linkline Communications, Inc.*,
555 U.S. 438 (2009)..........................................................................................13

*Pellerin v. Honeywell Intern., Inc.*,
877 F. Supp. 2d 983 (S.D. Cal. 2012).................................................................28

*Petrofac, Inc. v. DynMcDermott Petrol. Ops. Co.*,
687 F.3d 671 (5th Cir. 2012) ..............................................................................5

*Phillips v. Prudential Ins. Co. of Am.*,
714 F.3d 1017 (7th Cir. 2013) .....................................................................14, 23

*POURfect Prods. v. KitchenAid*,
2010 WL 1769413 (D. Ariz. May 3, 2010) ...................................................17, 18

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
104 F.3d 811 (6th Cir. 1997) ............................................................................17

*Qualcomm Inc. v. Nokia Corp.*,
466 F.3d 1366 (Fed. Cir. 2006)...........................................................................5

*Rent-A-Ctr., W., Inc. v. Jackson*,
    561 U.S. 63 (2010) ..................................................................................................4

*Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*,
    381 F.3d 717 (7th Cir. 2004) ...............................................................................15

*Reynolds & Reynolds Co. v. Superior Integrated Sols., Inc.*,
    2013 WL 2456093 ...............................................................................................17

*Rossi v. Standard Roofing*,
    156 F.3d 452 (3d Cir. 1998) .................................................................................14

*Sanabria v. Germain Motor Co.*,
    C2:04-CV-508, 2005 WL 2313950 (S.D. Ohio Sept. 21, 2005) (Ohio) .................30

*Scan Top Enter. Co., Ltd. v. Winplus N. Am., Inc.*,
    No. 14 C 7505, 2016 WL 910502 (N.D. Ill. Mar. 9, 2016) ....................................6

*Schor v. Abbott Labs.*,
    457 F.3d 608 (7th Cir. 2006) ...............................................................................17

*Simmons v. Ware*,
    213 Cal. App. 4th 1035, 153 Cal. Rptr. 3d 178 (2013*), as modified on denial
    of reh'g* (Mar. 13, 2013) ....................................................................................27

*Simula, Inc. v. Autoliv, Inc.*,
    175 F.3d 716 (9th Cir. 1999) .................................................................................7

*Stine v. Stewart*,
    80 S.W.3d 586 (Tex. 2002) ..................................................................................20

*Stolle Mach. Co., LLC v. RAM Precision Indus.*,
    605 Fed. Appx. 473 (6th Cir. 2015) ................................................................24, 25

*Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*,
    1 F.3d 639 (7th Cir. 1993) .....................................................................................6

*Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*,
    432 F.3d 1327 (11th Cir. 2005) .............................................................................5

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. C 10-5458 SI, 2011 WL 5325589 (N.D. Cal. Sept. 19, 2011) ..........................7

*Thomson-CSF, S.A. v. Am. Arbitration Ass'n*,
    64 F.3d 773 (2d Cir. 1995) ....................................................................................8

*Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*,
    184 F. Supp. 2d 947 (D. Ariz. 2001) ...............................................................17, 19

*US Ecology, Inc. v. State of California*,
129 Cal. App. 4th 887, 28 Cal. Rptr. 3d 894 (2005) (California)...........................................24

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)...........................................................................................................14

*Wal-Mart Stores, Inc. v. Helferich Patent Licensing, LLC*,
51 F. Supp. 3d 713 (N.D. Ill. 2014) .....................................................................................5

*In re Weekley Homes, L.P.*,
180 S.W.3d 127 (Tex. 2005)..................................................................................................7

*Westwinds Dev. Corp. v. Outcalt*,
2009-Ohio-2948 ...................................................................................................................22

*Willcock v. My Goodness Games, Inc.*,
PWG-16-4020, 2017 WL 2537010 (D. Md. June 12, 2017) .................................................5

*William O. Gilley Enters, Inc. v. Atl. Richfield Co.*,
588 F.3d 659 (9th Cir. 2009) ...............................................................................................13

*Yellow Cab Affiliation, Inc. v. New Hampshire Ins. Co.*,
No. 10-CV-6896, 2011 WL 307617 (N.D. Ill. Jan. 28, 2011).............................................5

*Zurich Am. Ins. Co. v. Watts Indus., Inc.*,
417 F.3d 682 (7th Cir. 2005) ................................................................................................7

## Statutes

Cal. Civ. Code § 3426.1...........................................................................................................27

Ohio Rev. Code Ann. § 1335.05..............................................................................................21

## Other Authorities

Fed. R. Civ. P. 9(b) ..................................................................................................................25

Plaintiffs i3 Brands, Inc. and PartProtection, LLC are contractually required to arbitrate, not litigate, their claims against Defendant The Reynolds and Reynolds Company ("Reynolds"). Reynolds respectfully requests that the Court dismiss Plaintiffs' claims against Reynolds in favor of arbitration. Reynolds moves in the alternative to dismiss under Rule 12(b)(6) to the extent the Court determines that some or all claims are not subject to arbitration.

## I.    Background

Defendants Reynolds and CDK Global, LLC ("CDK") develop and license enterprise software platforms—or operating systems—for automotive dealerships, called Dealer Management Systems ("DMS"). Plaintiff i3 Brands is a technology holding company that owns various software application businesses focused on the automotive industry. *See* No. 1:19-cv-01412, Dkt. 1 (hereinafter "Compl.") at ¶ 14.[1]  i3 Brands is the current owner of Plaintiff PartProtection, LLC, and the former owner of TradeMotion, LLC and Parts.com (two automotive software businesses) and the trade name "PartShield," all of which it sold to Reynolds in April 2017. Compl. ¶¶ 15-17.[2]

Plaintiffs advance three basic theories. First, they allege Reynolds and CDK entered into a series of ostensibly anticompetitive agreements with each other, and that Reynolds and CDK separately entered into anticompetitive agreements with automotive dealerships (to license their DMS platforms) and with software vendors that service dealerships (to offer secure data integration to their DMS platforms) (together, the "***Antitrust Claims***"). *See* Compl. at ¶¶ 67-85. In sum, Plaintiffs claim Reynolds and CDK conspired with one another to drive so-called "third-

---

[1] Plaintiffs have not filed their Complaint in the main MDL docket, but the Complaint is accessible in the above-referenced individual case docket, No. 19-cv-01412. Other docket references throughout this brief are to the main *In re Dealer Management Systems* docket, No. 18-cv-864.

[2] References to "TradeMotion" in this brief are to the pre-transaction entity previously owned by i3 Brands unless otherwise specified.

party data integrators" out of a supposed market for "data integration services." Separately, Plaintiffs claim that Reynolds and CDK's unrelated, respective contracts with automotive dealerships and automotive software vendors contain unlawful exclusive dealing provisions that prohibit dealers and vendors from utilizing the services of so-called "third-party data integrators"—companies that gain unauthorized access to DMS systems, run automated queries, screen scrape data, and then sell that data to application providers. As a result, Plaintiffs claim that PartProtection is, and TradeMotion was, forced to pay supracompetitive prices to integrate to, and achieve functionality on, Defendants' respective DMSs, and furthermore were placed at a competitive disadvantage relative to CDK and Reynolds's own automotive software applications. *Id.* ¶¶ 91-103.

Second, i3 Brands alleges that, as a result of the above-described antitrust conspiracy and Reynolds's alleged breach of a "Reseller Agreement" by which Reynolds remarketed TradeMotion's product prior to Reynolds's purchase of that business, TradeMotion's value was diminished and i3 Brands was "forced" to sell TradeMotion, Parts.com, and the "PartShield" trade name to Reynolds at an artificially low price (the "***TradeMotion Claims***"). *Id.* ¶¶ 111-123.

Third, Plaintiffs claim that Reynolds inveigled them into a remarketing agreement governed by a so-called "Agreement of Basic Terms" with the intent of stealing PartProtection's intellectual property to create a Reynolds-branded competitor product. Moreover, Plaintiffs allege that Reynolds improperly refused to provide certain integration services to PartProtection that were necessary for PartProtection to strike a deal with Ford Motor Company, thereby tortiously interfering with that relationship (together, the "***PartProtection Claims***"). *Id.* ¶¶ 117, 124-141.

Each of these Claims are subject to broad-form arbitration provisions and should be compelled to arbitration and/or dismissed for failure to state a claim.

## II.     All of Plaintiffs' Claims Must Be Arbitrated, Not Litigated

### A. The Parties agreed to three broad-form arbitration provisions that delegate arbitrability issues to the arbitrator.

Three separate broad-form, mandatory arbitration provisions require the claims at issue to be arbitrated, not litigated.  Each of them delegates gateway arbitrability determinations—such as whether a particular claim between the Parties falls within the scope of the arbitration provision— to the arbitrator by explicitly incorporating the American Arbitration Association's ("AAA") rules. First, PartProtection and TradeMotion agreed to an arbitration provision in the Reynolds Interface Agreement by which they joined Reynolds's Certified Interface ("RCI") program.[3]  The arbitration provision in PartProtection and TradeMotion's Reynolds Interface Agreement provides that:



Ex. A at 17.

Second, Plaintiffs agreed to an additional arbitration provision in the Asset Purchase Agreement by which Reynolds acquired i3 Brands's TradeMotion and Parts.com business lines and "PartShield" trade name in 2017.  That arbitration provision provides:



---

[3] The RCI Program is the technological pathway that Reynolds first established in 2006, and has updated, developed, and maintained since, to permit companies like automotive vendors, equipment manufacturers, and credit bureaus to securely interact with the Reynolds DMS.

Ex. B at 41.[4]

Third, Plaintiffs agreed to arbitrate all claims relating to the "Reseller Agreement" by which Reynolds remarketed TradeMotion's product prior to Reynolds's acquisition of that business. That arbitration provision



Compl. Ex. 3 at 14 ¶ Q.

### B. Incorporation of the AAA rules delegates arbitrability determinations to the arbitrator.

Parties to an arbitration agreement can agree that "gateway" arbitrability determinations— i.e., whether a particular claim is arbitrable—should be decided by the arbitrator, not the Court.[5] When the parties so agree, "a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019); *id.* at 530 ("[A] court may not decide an arbitrability question that the parties have delegated to an arbitrator.").

---

[4] Plaintiffs may try to argue that the use of the phrase ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ renders this arbitration clause permissive rather than mandatory. The overwhelming weight of authority is to the contrary. *Hostmark Inv'rs Ltd. v. Geac Enter. Sols., Inc.*, 01 C 8950, 2002 WL 1732360, at *2–3 (N.D. Ill. July 26, 2002) ("[C]ourts in this circuit and other circuits have repeatedly rejected Hostmark's contention and concluded that 'neither the word 'may' or any other language used in the Agreement implies that the parties had the option of invoking some remedy other than arbitration. . . . The sole option an aggrieved party retains through the use of the word 'may' was to abandon its claim.'") (quoting *Ceres Marine Terminals, Inc. v. Int'l Longshoremen's Ass'n,* 683 F.2d 242, 246 (7th Cir.1982) and collecting cases);

[5] *See, e.g., Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-70 (2010); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002).

Here, the Parties' agreements to arbitrate explicitly incorporate the AAA Rules. This is clear and unmistakable evidence that the Parties intended for the arbitrator, not the Court, to determine whether a dispute arising between them is covered by the arbitration provision. *Wal-Mart Stores, Inc. v. Helferich Patent Licensing, LLC*, 51 F. Supp. 3d 713, 719-720 (N.D. Ill. 2014). Every Circuit that has considered the question—including the First, Second, Fifth, Eighth, Ninth, Eleventh, and Federal Circuits[6]—has reached the same result. Courts in this District agree.[7]

As a result, this Court's analysis is narrowly cabined: after confirming that the Parties agreed to arbitrate *some* set of claims that might arise between them under the AAA rules, all subsequent disputes as to what *specific* claims that eventually do arise are arbitrable are left for the arbitrator, and the claims must be dismissed.[8]

---

[6] *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015); *Petrofac, Inc. v. DynMcDermott Petrol. Ops. Co.*, 687 F.3d 671, 675 (5th Cir. 2012); *Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 11 (1st Cir. 2009); *Fallo v. High–Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1373 (Fed. Cir. 2006); *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 211 (2d Cir. 2005); *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332 (11th Cir. 2005).

[7] *E.g.*, *Cequent Performance Prod., Inc. v. Let's Go Aero, Inc.*, No. 14 C 8457, 2016 WL 4036754, at *6 (N.D. Ill. July 28, 2016) ("Given this AAA requirement that the arbitrator decide 'the arbitrability of any claim,' district courts in this circuit (and courts of appeals in other circuits, including the 1st, 2d, 5th, 8th, 9th, 11th, and Federal Circuits) have consistently held that a clause requiring arbitration according to AAA Rules requires the arbitrator to resolve arbitrability disputes."); *accord Allscripts Healthcare, LLC v. Etransmedia Tech., Inc.*, 188 F. Supp. 3d 696, 701 (N.D. Ill. 2016); *Ali v. Vehi-Ship, LLC*, 17 CV 02688, 2017 WL 5890876, at *3 (N.D. Ill. Nov. 27, 2017); *Imperial Crane Sales, Inc. v. Sany Am., Inc.*, No. 15 C 859, 2015 WL 4325483, at *4 (N.D. Ill. July 15, 2015); *Yellow Cab Affiliation, Inc. v. New Hampshire Ins. Co.*, No. 10-CV-6896, 2011 WL 307617, at *5 (N.D. Ill. Jan. 28, 2011).

[8] Plaintiffs may argue that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Courts consistently (and correctly) reject that line of argument. As ably explained by the Ninth Circuit, this argument "conflates the *scope* of the arbitration clause, *i.e.*, which claims fall within the carve-out provision, with the question of *who* decides arbitrability." *Oracle Am., Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1076 (9th Cir. 2013). When a court "decides that a claim falls within the scope of a carve-out provision, it necessarily decides arbitrability" in violation of the parties' agreement that the arbitrator, not the Court, would resolve that dispute in the first instance. *Id.*; *see also Willock v. My Goodness Games, Inc.*, PWG-16-4020, 2017 WL 2537010 (D. Md. June 12, 2017) (whether claims fell within carveout was question for the arbitrator pursuant to incorporation of AAA rules); *In re: Lithium Ion Batters Antitrust Litig.*, 13-MD-02420-YGR, 2016 WL 5791357, at *5 (N.D. Cal. Oct. 4, 2016) (same); *Cellairis Franchise, Inc. v. Duarte*, CV 2:15-CV-00101-WCO, 2015 WL 11422299, at *6 (N.D. Ga. July 20, 2015) (same); *Bitstamp Ltd. v. Ripple Labs Inc.*, 15-CV-01503-WHO, 2015 WL 4692418, at *4 (N.D. Cal. Aug. 6, 2015) (same); *Bollinger Shipyards Lockport LLC v. Northrop Grumman Ship Sys., Inc.*, CIV.A. 08-4578, 2009 WL 86704, at *6 (E.D. La. Jan. 12, 2009) (same).

### C. Plaintiffs' claims are arbitrable even if the Court disregards the delegation provision.

Even if this Court rejects the proposition that incorporation of the AAA rules delegates arbitrability determinations to the arbitrator, Plaintiffs' claims are still arbitrable because they are plainly "related to" the agreements at issue.

All three agreements contain broad-form "arising from or relating to" language. When the Parties have agreed to broad arbitration clauses like these, the court must presume that the dispute is arbitrable and should only deny arbitration if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650 (1986).[9] Broad "related to" language means that the parties must arbitrate whenever the factual allegations underlying a claim touch on the subject matter of the contract that contains the arbitration agreement.[10]

***The Antitrust Claims.*** The Antitrust Claims relate to the Reynolds Interface Agreement. Plaintiffs specifically allege that the Reynolds Interface Agreement contains unlawful exclusive dealing and price secrecy provisions. Compl. ¶¶ 79, 156. Moreover, Plaintiffs allege that PartProtection and TradeMotion were charged supracompetitive prices for integration to the Reynolds DMS provided pursuant to the Reynolds Interface Agreement. Compl. ¶ 91, 94. ■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■ Antitrust

allegations that a "conspiracy . . . undermined legitimate contractual relations between the parties"

---

[9] *See also Int'l Bhd. of Elec. Workers Local 2150 v. NextEra Energy Point Beach, LLC*, 762 F.3d 592, 594 (7th Cir. 2014); *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 642 (7th Cir. 1993).

[10] *See Scan Top Enter. Co., Ltd. v. Winplus N. Am., Inc.*, No. 14 C 7505, 2016 WL 910502, at *4 (N.D. Ill. Mar. 9, 2016); *Nw. Univ. v. Insight Biomedical, Inc.*, No. 99 C 2354, 1999 WL 417397, at *5 (N.D. Ill. June 15, 1999) (quoting *Kerr–McGee Refining Corp. v. M/T Triumph*, 924 F.2d 467, 470 (2d Cir.1991)); *see also JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 172–75 (2d Cir. 2004).

are related to the contract that established the affected business relationship.  *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 175 (2d Cir. 2004) (collecting cases).[11]

**The TradeMotion Claims.**  The TradeMotion Claims are related to all *three* contracts containing arbitration provisions: the Reynolds Interface Agreement, the Asset Purchase Agreement, and the Reseller Agreement.  Plaintiffs' allegation is that, as a result of supposed overcharges, exclusive dealing provisions, and reduced functionality that Reynolds imposed pursuant to the Reynolds Interface Agreement, as well as Reynolds's breach of ███████  ████████████████████████ Reynolds was able to purchase TradeMotion and related assets at a depressed price in the Asset Purchase Agreement.  Compl. ¶¶ 110-113.  Plaintiffs' theory is intertwined with the agreements at every turn.  The overcharges, exclusive dealing, and reduced functionality that supposedly depressed TradeMotion's valuation are just a reiteration of the Antitrust Claims—and are related to the Reynolds Interface Agreement for the reasons stated above.  Alleged breaches of the TradeMotion Reseller Agreement, Compl. ¶¶ 118-223, are necessarily related to that agreement.

Plaintiffs will likely protest that ████████████████████████ ███████ That is true but irrelevant. ████████████████████



███████████████████████████████████ hold that a nonsignatory

attempting to assert a claim under the terms of a contract is bound to arbitrate against a signatory

---

[11] *See also Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 624 n.13 (1985);  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721–22 (9th Cir. 1999); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 10-5458 SI, 2011 WL 5325589, at *3 (N.D. Cal. Sept. 19, 2011); *Empire State Ethanol & Energy, LLC v. BBI Int'l*, No. 1:08-CV-623 GLS/DRH, 2009 WL 790962, at *6-7 (N.D.N.Y. Mar. 20, 2009); *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 405 (S.D.N.Y. 2003); *B-S Steel of Kansas, Inc. v. Texas Indus., Inc.*, 229 F. Supp. 2d 1209, 1226 (D. Kan. 2002); *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1106 (C.D. Cal. 2002); *Acquaire v. Canada Dry Bottling*, 906 F. Supp. 819, 835-38 (E.D.N.Y. 1995).

defendant.[12]

Even if neither the Reynolds Interface Agreement nor the Reseller Agreement were controlling, the TradeMotion Claims would *also* be arbitrable under the Asset Purchase Agreement: that arbitration provision ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████ i3 Brands's theory is that, due to the supposed antitrust conspiracy and contractual breaches, Reynolds was able to negotiate for a price lower than i3 Brands now believes was fair. Thus, its claim is squarely 'related to' the purchase contract that memorialized the terms and price for the transaction. *JLM*, 387 F.3d at 175.

***The PartProtection Claims.*** Finally, the PartProtection Claims are arbitrable under the Reynolds Interface Agreement and the Asset Purchase Agreement. There are two sets of PartProtection Claims: alleged trade-secret theft (pleaded under multiple legal theories) and alleged tortious interference with a potential transaction between PartProtection and Ford. The trade-secret claims relate to both contracts. Plaintiffs allege that, as part of the certification process for the RCI Program—carried out by Reynolds *pursuant to* the Reynolds Interface Agreement— Reynolds sought "proprietary information about the functionality of software applications

---

[12] *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 688 (7th Cir. 2005) ("A nonsignatory party is estopped from avoiding arbitration if it knowingly seeks the benefits of the contract containing the arbitration clause."); *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 131 (Tex. 2005) ("a nonparty may be compelled to arbitrate 'if it seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provisions.'"); *see also Noble Drilling Services, Inc. v. Certex USA, Inc.*, 620 F.3d 469, 474 (5th Cir. 2010) ("the doctrine of direct benefits estoppel also applies when a non-signatory sues to enforce certain terms in a contract containing an arbitration clause, or brings claims that can only be determined by reference to an agreement containing an arbitration clause"); *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 519 (5th Cir. 2006) (nonsignatory was bound when its claim relied on alleged breach of contract containing forum-selection clause); *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000); *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995) (denying motion to compel arbitration on estoppel theory but noting that, had the plaintiff attempted to enforce ████████████████████████ arbitration under estoppel theory would have been proper); *Gersten v. Intrinsic Techs., LLP*, 442 F. Supp. 2d 573, 579 (N.D. Ill. 2006).

provided by . . . PartProtection—the type of information one would want to know about a competitor's products in order to gain a competitive advantage against third-party vendors." Compl. ¶ 107. PartProtection further alleges that that certification process serves "no purpose other than to provide [Reynolds] with valuable and confidential proprietary information about their products...." *Id.* ¶ 103. In other words, Plaintiffs allege (wrongly, as Reynolds will demonstrate to the arbitrator) that Reynolds misappropriated PartProtections' trade secrets in the course of ███ ████████████████████████████████████████████████████████████

The trade-secrets claims also relate to the Asset Purchase Agreement. ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████ And as part of that transaction, Reynolds, i3 Brands, and PartProtection specifically agreed that Reynolds had acquired trade secrets and proprietary information that overlapped with PartProtections' trade secrets *and* that former i3 Brands and TradeMotion personnel who joined Reynolds after the transaction were permitted to share that information. *See* Compl. ¶ 198, Compl. Ex. 5.

i3 Brands's own allegations therefore demonstrate the direct relationship between PartProtection's trade secret claims, the Reynolds Interface Agreement, and the Asset Purchase Agreement: any decisionmaker will have to examine the Parties' course of dealing and interpret the contracts to determine whether ███████████████████████████████████ ████████████████████████ Thus, these claims must be dismissed in favor of arbitration.

The tortious interference claims also must be dismissed as they, too, relate to the Reynolds Interface Agreement. Plaintiffs' allegation is that they had a potential deal with Ford that would require certain Reynolds integration interfaces—*i.e.,* certain interoperability with Reynolds'

proprietary DMS through the RCI Program—but that Reynolds "refused to integrate PartProtection['s]" application. Compl. ¶ 210. The Reynolds Interface Agreement is the contract that ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████ An allegation that Reynolds improperly refused to provide a certain integration at the very least "touches on" the subject matter of that contract and so must be arbitrated.

Because the Parties agreed to delegate arbitrability to the arbitrator, and in any event the claims are closely related to the three contracts, the claims must be dismissed in favor of arbitration. Any claim that the court determines is not arbitrable must be stayed pending arbitration of any arbitrable claims. *Air Freight Services, Inc. v. Air Cargo Transp., Inc.*, 919 F. Supp. 321, 324 (N.D. Ill. 1996).

## III. Even If the Court Denies Arbitration, Plaintiffs' Claims Must Be Dismissed for Failure to State a Claim on Which Relief Can Be Granted

To withstand a Rule 12(b)(6) motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[13] In evaluating a Rule 12(b)(6) motion, the court can consider well-pleaded allegations in the complaint; documents attached to the complaint; documents incorporated by reference into the complaint; and matters of which a court may take judicial notice. *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002).

### A. The Antitrust Claims

---

[13] This Rule 12(b)(6) motion is filed subject to and without waiver of Reynolds's right to arbitrate, not litigate, all of Plaintiffs' claims. The Court should resolve these merits arguments only in the event it determines that certain claims are not arbitrable.

**1. i3 Brands cannot recover for alleged antitrust injury to its subsidiaries.**

i3 Brands is not a proper antitrust plaintiff, so its claims must be dismissed. Its alleged injury is that its current and former subsidiaries were harmed by the alleged anticompetitive agreements. i3 Brands itself does not directly purchase integration services, pay allegedly supracompetitive integration fees, or face unfair competition in the automotive software industry as a result of the supposed conspiracy between Reynolds and CDK. Instead, it owns companies, including PartProtection, that allegedly suffer those harms. That bars i3 Brands's claims: *Illinois Brick* prohibits a parent company from recovering for overcharges to its subsidiaries that are passed through to the parent. *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 820–21 (7th Cir. 2015); *Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*, 877 F.2d 1333, 1335 (7th Cir. 1989). And *Associated General Contractors* bars suits by more remotely injured plaintiffs when a more directly injured plaintiff can more efficiently prosecute the suit. *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"). California applies the same rule. *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 9 CV 3690, 2015 WL 3988488, at *11 (N.D. Ill. June 29, 2015). Here, PartProtection is the alleged direct purchaser of the affected product and competitor in the relevant market and is plainly capable of seeking relief for the alleged harms it suffered, so i3 Brands's claims are barred.

**2. Reynolds's DMS license agreements with dealers bar Plaintiffs' allegations of antitrust injury and causation.**

Plaintiffs allege that Reynolds has prohibited third-party access to the Reynolds DMS through licensing restrictions in its DMS contracts with dealers since at least 2009, and possibly since 2006. Compl. ¶¶ 59, 105, 154. These restrictions are perfectly lawful. First, they have no relation to the alleged conspiracy. Plaintiffs make conclusory assertions that these provisions were

put in place pursuant to the alleged conspiracy, but the *facts* Plaintiffs plead demonstrate the opposite: these restrictions predated any alleged conspiracy by at least six years. Moreover, there is no allegation that Reynolds would have changed this prohibition but for the conspiracy. Second, as this Court and Judge St. Eve before it properly held, the license restrictions in Reynolds' DMS contracts are not exclusive dealing provisions. As Judge St. Eve held, "[t]he only thing the Complaint alleges that Defendants sell to dealers through those licenses are DMSs, and there is no allegation (or argument) that Defendants require dealers to purchase and use their respective DMS exclusively. There is therefore 'no exclusivity.'" Dkt. 176 at 36; *see also* Dkt. 505 at 13.[14] The same holds true here.

These lawful provisions defeat all the Antitrust Claims for two distinct reasons. First, they demonstrate that hostile integrators' access to and use of the Reynolds DMS was unlawful under, among other statutes, the Computer Fraud and Abuse Act (the "CFAA"). As this Court's opinion denying Authenticom's motion to dismiss CDK's counterclaim under the CFAA makes clear, third-party integrators' access to and use of a DMS using dealer-provided credentials without CDK or Reynolds's authorization is a violation of that statute. *See* Dkt. 506 at 14.

Reduced competition in an illegal market is not an antitrust injury. *See*, *e.g.*, *Maltz v. Sax*, 134 F.2d 2, 5 (7th Cir. 1943). In this MDL, Judge St. Eve recognized the central point that plaintiffs cannot suffer antitrust injury by virtue of their inability to engage in independently unlawful activities. *See* Dkt. 176 at 20. Here, that proposition is fatal to Plaintiffs' antitrust claims, because Plaintiffs affirmatively allege that Reynolds unilaterally prohibited third-party access to

---

[14] Moreover, the provisions in question are garden-variety scope-of-license terms. Software and technology licenses are frequently limited solely to the licensor and forbid them from sharing the licensed product with their contractors, agents, or other third parties. There is nothing actionably anticompetitive about such a term. To the contrary: the lawful "copyright monopoly" is a specific and independent immunity from antitrust liability for unilateral conduct. *In re Independent Service Organizations Antitrust Litig.*, 203 F.3d 1322, 1328-29 (Fed. Cir. 2000).

its DMS in its license agreements with dealers since 2009 and "increased its blocking efforts in 2013," years before the alleged conspiracy. Compl. ¶ 59, 105, 154. In other words, the third-party access of Reynolds's system was not authorized by Reynolds—therefore making such access unlawful under the CFAA—long before and independent from the alleged anticompetitive conduct in this case. For these reasons, while Judge St. Eve reached the opposite conclusion in the face of similar allegations, *see* Dkt. 176 at 21-22, Reynolds respectfully submits that opinion was in error.

In any event, Plaintiffs can recover only to the extent they show that Defendants' unlawful activity was the but-for cause of the harm they suffered.[15] Plaintiffs' alleged injuries all flow from their inability to hire so-called "third-party data integrators" to log into the Reynolds DMS using dealer-provided login credentials and exfiltrate data. But even in a but-for world with no alleged conspiracy or vendor exclusive dealing provisions, Plaintiffs would still suffer the exact same injury. That is because it would still be perfectly lawful for Reynolds to prohibit dealers, under the terms of the DMS license agreement, from giving third-party integrators access to and use of the Reynolds DMS to exfiltrate data. Thus, neither the alleged conspiracy nor the alleged exclusive dealing provisions in Reynolds's vendor contracts are but-for causes of Plaintiffs' injuries.

### 3. Plaintiffs' alleged conspiracy is implausible.

Each of the Antitrust Claims turns on an alleged conspiracy between Reynolds and CDK to block so-called "third-party integrators" from accessing the two firms' respective DMSs. That allegation is implausible because it does not "make economic sense."[16] Plaintiffs allege that Reynolds has prohibited third-party access to the Reynolds DMS for a decade. Compl. ¶¶ 59, 105,

---

[15] *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993). By contrast, "[i]f a plaintiff has suffered financial loss from the *lawful* activities of a competitor, then no damages may be recovered under the antitrust laws." *MCI Communications Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983).

[16] *Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998); *see also William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009) (in applying *Twombly* to antitrust claim, court must consider "basic economic principles.").

154. Such purely unilateral conduct is not actionable as an antitrust violation. *See Pac. Bell Tel. Co. v. Linkline Communications, Inc.*, 555 U.S. 438, 450 (2009); *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 410 (2004). None of Plaintiffs' allegations overcome that bar. There is no allegation that the 2015 Agreements (either as written or as alleged) resulted in *any* material change to Reynolds's pre-2015 business practices. There is no allegation that Reynolds made any changes to its policies prohibiting unauthorized access of its DMS. There is no allegation that Reynolds changed its contracts with dealers or vendors.[17] It does not make economic sense for a defendant to conspire to do something it had already done, years earlier, unilaterally.[18]

Nor is there any plausible allegation that, but for the alleged conspiracy, Reynolds might have changed these practices—for example by reversing its longstanding unilateral policy, changing its contracts to permit third-party access, or redesigning its DMS with more "open" architecture. Plaintiffs suggest that "Reynolds needed CDK to close CDK's system to reduce the number of dealers leaving Reynolds for CDK on the basis of CDK's previously 'open' system." Compl. ¶¶ 60, 66. But nothing in the agreements obliges CDK to close its DMS (nor do the agreements even mention such a possibility). *See* Dealership Class Complaint Exs. 11-13, Dkt. 198-11, Dkt. 198-12, Dkt. 198-13 (alleged February 2015 agreements).[19] Moreover, Plaintiffs do

---

[17] Indeed, Plaintiffs specifically allege that their Reynolds Interface Agreement signed in *January of 2014* (over a year before the alleged conspiracy agreements) contains precisely the supposedly unlawful exclusive dealing provisions about which they complain. Compl. ¶ 79.

[18] *See, e.g.*, *Rossi v. Standard Roofing*, 156 F.3d 452, 481 (3d Cir. 1998) ("it would be unreasonable to infer that Servistar would conspire with GAF to do what GAF could do unilaterally"); *Twombly*, 550 U.S. at 557 ("parallel conduct that could just as well be independent action" is not sufficient to allege antitrust conspiracy); *Mich. Division-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 458 F. Supp. 2d 474, 486 (E.D. Mich. 2006) (conspiracy claims were "economically implausible" where defendants could have achieved asserted goal of conspiracy—to "force out independent sellers of monuments"—through "unilateral decision").

[19] The Court can properly consider the 2015 written agreements on this Rule 12(b)(6) motion because they form the basis of Plaintiffs' complaint and are pervasively referenced throughout the Complaint. Moreover, to the extent such a properly-considered document contradicts Plaintiffs' pleadings, the document's actual contents control. *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013)

not allege that there was any unwritten agreement that CDK would close its DMS—indeed, Plaintiffs do not even allege that Reynolds knew CDK intended to close its DMS.[20] The Complaint provides no basis to plausibly conclude that CDK's decision to close its DMS was anything other than unilateral—just like Reynolds' decision had been years previously.

### 4. Plaintiffs' exclusive dealing claim regarding the vendor agreements fails for additional reasons.

For the reasons stated above, Plaintiffs' exclusive dealing claim regarding the licensing provisions in the Reynolds DMS contract with dealerships fails. The exclusive dealing claim with respect to the vendor agreements (the "Reynolds Interface Agreements") also fails because Plaintiffs have not alleged a substantial foreclosure of competition. "[E]xclusive dealing arrangements violate antitrust laws only when they foreclose competition in a substantial share of the line of commerce at issue," and in order to plead substantial foreclosure the plaintiff "must precisely establish a relevant market . . . ." *Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 737–38 (7th Cir. 2004). Plaintiffs have not done so here. Plaintiffs' only foreclosure allegation is that **CDK's** alleged exclusive dealing provision forecloses "competition in the Dealer Data Integration Market for approximately 40% of dealers who use CDK DMS . . . ." Compl. ¶ 86. That says nothing at all about the foreclosure effects of *Reynolds's* alleged exclusive dealing provision. More importantly, that figure purports to represent CDK's market share in the *DMS Market*, not the so-called "Dealer Data Integration" market. The Complaint is devoid of allegations regarding the size of the invented "Dealer Data Integration" market (to the extent such a market lawfully exists for a given DMS provider), Reynolds and CDK's purported share of that

---

[20] Moreover, any such allegation would be implausible on its face: for those dealers that prefer more controlled, secure DMS architecture, CDK's decision only heightened the competition with Reynolds, and threatened to diminish one of Reynolds's primary *market differentiators*: its controlled, secure DMS. For dealers looking for an "open" DMS, the easily foreseeable effect of an "agreement" to close CDK's DMS was not that those dealers would stay with Reynolds, but that they would depart for competing providers of open DMSs, like DealerTrack and Auto/Mate, instead of CDK. Such switching to competing, open DMS providers was commonplace before and after the 2015 agreements.

market, or what portion of the market is allegedly foreclosed. There are no allegations of how many third-party software vendors purchase such services, how many applications those vendors provide, or how many different DMS platforms those vendors seek data from. There are no allegations regarding how many vendors have joined Reynolds's RCI Program (or CDK's 3PA program), how many applications those vendors are servicing through those programs, and whether vendors actually abide by the alleged exclusive dealing provisions or instead continue to use third-party integration services. And the Complaint makes no attempt to differentiate between hostile, automated third-party data extraction (barred under Reynolds's license agreements with dealers) and dealer-driven 'manual push' data movement (which Reynolds permits). The Complaint therefore does not allege substantial foreclosure.

### 5. Plaintiffs' monopolization claims fail.

Plaintiffs' monopolization claims fail because Plaintiffs have not (and cannot) adequately allege the necessary elements of a single-brand aftermarket monopolization claim under *Eastman Kodak*. In general, Courts reject single-brand aftermarkets. *Newcal Indus., Inc. v. IKON Office Solution*, 512 F.3d 1038, 1050 (9th Cir. 2008). In *Kodak*, the Supreme Court carved out a narrow exception to this presumption, holding that the presumption against single-brand aftermarkets could be rebutted by evidence that (1) Kodak's customers did not know at the time they contracted with Kodak that they would be giving Kodak the exclusive right to provide parts and services for the equipment they were purchasing; (2) Kodak's customers were effectively "locked in" to using Kodak equipment by "very high" "switching costs" that prevented them from switching to competing products; and (3) high "information costs" made it "impossible" for customers to reasonably predict before entering into a contract the total cost they were agreeing to (*i.e.*, the combined cost for equipment, parts, and service). *Eastman Kodak Co. v. Image Tech. Services, Inc.*, 504 U.S. 451, 473-74 (1992). In the wake of *Kodak*, "[a] plaintiff faces a *substantial* burden

16

to overcome the presumption under the antitrust laws that 'normal' market forces are at work." *Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*, 184 F. Supp. 2d 947, 955 (D. Ariz. 2001) (emphasis in original). To meet this burden at the pleadings stage, a plaintiff must plausibly allege *each* of *Kodak*'s prerequisites for a single-brand aftermarket claim. *POURfect Prods. v. KitchenAid*, 2010 WL 1769413, at *4 (D. Ariz. May 3, 2010) (citing Areeda, ¶ 1740 at 138). Here, Plaintiffs do not, and cannot, allege *any* of *Kodak*'s prerequisites.

### a. Reynolds dealer customers (and third-party vendors) knew about its "aftermarket" policy.

Courts have unanimously held that the exception identified in *Kodak* is "limited to situations in which the seller's [aftermarket] policy was not generally known."[21] Reynolds's longstanding, widely publicized policy distinguishes Reynolds's position from that of CDK and renders this Court's prior rejection of CDK's arguments inapposite. For more than a decade, Reynolds's contracts with dealers made clear that access to Reynolds's DMS was limited to non-automated access by dealer employees, and Reynolds has required vendors that wish to interoperate with the Reynolds DMS to do so through a "Reynolds Certified Interface," a built-in component of Reynolds's DMS. Compl. ¶¶ 59, 105, 154.[22] Reynolds's contracts make no allowance for DMS access by dealer "agents" or any other third party. Nor is there any allegation

---

[21] *See, e.g.*, *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 819 (6th Cir. 1997); *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996) ("The Court did not doubt in *Kodak* that if spare parts had been bundled with Kodak's copiers from the outset, or Kodak had informed customers about its policies before they bought its machines, purchasers could have shopped around for competitive life-cycle prices."); *Schor v. Abbott Labs.*, 457 F.3d 608, 613–14 (7th Cir. 2006) (rejecting single-brand aftermarket because, unlike in *Kodak*, "Schor does not accuse Abbott of any similar [aftermarket policy] switch that would exploit customers' sunk costs"); *see also Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 405 (3d Cir. 2016).

[22] S*ee also Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1021-22 (7th Cir. 2017) ("Reynolds . . . has always forbidden [Authenticom's practice of screen-scraping] in its system licenses."); *Reynolds & Reynolds Co. v. Superior Integrated Sols., Inc.*, 2013 WL 2456093, at *2 (Reynolds's dealer customers expressly agree that third parties, including integrators, may not access the DMS).

in the Complaint that Reynolds has contradicted the express language of its dealer contracts.[23] In assessing Authenticom's aftermarket allegations, Judge St. Eve confirmed that "Reynolds's closed architecture was generally known to customers before they purchased the product," and therefore Reynolds did not engage in the "change in aftermarket practices" at issue in *Kodak*. Dkt. No. 176 at 48. That ruling should have been dispositive, just as it is dispositive of Plaintiffs' claims here. Instead, however, Judge St. Eve interpreted *Kodak* as authorizing single-brand aftermarket claims even where the seller's aftermarket policy is clearly disclosed at the time of purchase, provided that there are "information costs" and "switching costs" in the primary market. *Id.* at 49. That conclusion was contrary to binding Seventh Circuit law, *see Digital Equip. Corp.*, 73 F.3d at 763, and the overwhelming weight of authority nationwide.

> ### b. Plaintiffs do not adequately allege that dealers are "locked in" to the single-brand aftermarket by switching costs.

To adequately plead the "very high" switching costs at issue in *Kodak*, a plaintiff must "face switching costs significant enough to constitute a lock in[,]" *see Brokerage Concepts v. U.S. Healthcare*, 140 F.3d 494, 515 (3d Cir. 1998), and plausibly demonstrate that the lock-in affected a "substantial number of customers" by preventing them from switching to another product, *POURfect Prods.*, 2010 WL 1769413, at *4. The mere allegation that switching would cost money "does not establish lock in." *Commercial Data Servers, Inc. v. IBM*, 262 F. Supp. 2d 50, 69 (S.D.N.Y. 2003).

Here, the Complaint does not come close to alleging a "lock in" within the meaning of *Kodak*, much less that such a lock in affected a substantial portion of the DMS market. Instead, the Complaint alleges that switching DMS providers is "disruptive," "takes time," and requires

---

[23] Indeed, the news articles cited in the Complaint demonstrate that Reynolds's policy prohibiting third-party integration was widely known and discussed in the automotive industry. *E.g.*, Compl. ¶¶ 44, 45 (citing 2011 and 2007 Automotive News articles referencing Reynolds's third-party access policies and contract provisions).

dealers to train their staff, making some dealers "hesitant to switch." Compl. ¶¶ 38-39. Glaringly absent, however, are any factual allegations plausibly suggesting that substantial numbers of dealers could not switch to another DMS even if they wanted to. Indeed, Plaintiffs affirmatively allege that there has been a large-scale market-share shift from Reynolds to CDK in recent years, decreasing Reynolds's market share from above 40% to around 30%. Compl. ¶ 60. Such shifts in market share are incompatible with the notion that dealers cannot switch.

### c. Plaintiffs do not adequately allege that "information costs" prevented dealers from learning the total cost of the "package" they were buying.

"In assessing the issue of information deficits between the foremarket and the aftermarket, perfect information about the aftermarket is not required." *Universal Avionics*, 184 F. Supp. 2d at 956. "In fact, very imperfect knowledge suffices to defeat the assertion of a *Kodak* lock-in market." *Id.* (quoting *SMS Systems Maintenance Services, Inc. v. Digital Equipment Corp.*, 188 F.3d 11, 19 & n.3 (1st Cir. 1999)). In *Authenticom*, Judge St. Eve based her *Kodak* analysis with respect to Reynolds entirely on this issue of "information costs," reading Authenticom's allegation that Reynolds prohibits vendors from itemizing integration fees in their invoices to dealers to "suggest that dealers may be unable to assess lifecycle costs" like the plaintiffs in *Kodak*. Dkt. No. 176 at 49. That conclusion was erroneous. In *Kodak*, the purchasers found it "difficult" or "impossible" to "inform themselves of the *total cost of the 'package'*—equipment, service, and parts—at the time of purchase . . . ." 504 U.S. at 473 (emphasis added). Here, however, the *total cost of the package* to dealers is easily discoverable—and no one contends otherwise. A dealer licensing integrated third party application software pays two fees: (1) the DMS license fee to the DMS provider, and (2) the application fee (including any passthrough integration fees), to the vendor. Each of these costs is knowable—a dealer considering switching can discover both what Reynolds will charge that dealer for its DMS and what a vendor would charge for its application.

The only allegation here is that Reynolds prohibits vendors from specifically itemizing the integration fee that the vendors allegedly pass on to dealers. But knowledge of a specific *component* of total cost for an aftermarket service is irrelevant under *Kodak* if a dealer is capable of determining the all-in price of the package.

### B. The TradeMotion Claims

To the extent the TradeMotion Claims are predicated on diminution of the enterprise value of TradeMotion, Parts.com, and the PartShield trade name as a result of overcharges and unfair competition resulting from the alleged antitrust conspiracy, those claims must be dismissed for the reasons articulated above.

Plaintiffs' argument that TradeMotion's value was further depressed by Reynolds's alleged breaches of the TradeMotion "Reseller Agreement" also fails. First, Plaintiffs cannot enforce that contract, which was signed only by TradeMotion. Texas law— ███████████████████████ ████████████████████████████████████████—provides that "[a] third party may recover on a contract made between other parties only if the parties intended to secure some benefit to that third party, and only if the contracting parties entered into the contract directly for the third party's benefit." *MCI Telecomm. Corp. v. Texas Utilities Elec. Co.*, 995 S.W.2d 647, 651-52 (Tex. 1999).[24] ███████████████████████████████████████ ███████████████████████████

Even if i3 Brands could potentially assert a claim for breach of the Reseller Agreement, any such claim is time-barred. Plaintiffs' breach allegation is that, in January 2014, Reynolds purchased an ostensible competitor—Add-On Auto—and preferentially marketed Add-On Auto's

---

[24] This rule does not change the fact that Plaintiffs are estopped to resist application of the arbitration provision in the Reseller Agreement: the test for arbitration estoppel is whether the plaintiff is *asserting* rights under the contract, not whether the plaintiff, on the merits, *has* rights under the contract.

product over TradeMotion's.  Compl. ¶ 121.  Plaintiffs did not file suit until February of 2019,

long after the four-year statute of limitations for a Texas contract claim ran.  *Stine v. Stewart*, 80

S.W.3d 586, 592 (Tex. 2002) (citing Tex. Civ. Prac. & Rem. Code § 16.051).  Because the

limitations bar is evident on the face of the complaint, dismissal is proper.  *Jimenez v. Herrera*,

95 C 1956, 1996 WL 99715, at *5 (N.D. Ill. Mar. 4, 1996).

### C.  The PartProtection Claims

To the extent Plaintiffs' PartProtection claims depend on their underlying antitrust claims,

they must be dismissed for the reasons articulated above.  The remaining claims fail for additional

reasons.

#### 1.  Plaintiffs' breach of contract claim fails because there was no enforceable contract.

Plaintiffs' contract claim is based on an "Agreement of Basic Terms" between Reynolds

and i3 Brands.[25]  Compl. ¶¶ 178, 180.  The Court should apply Ohio substantive law.  Illinois

choice-of-law rules control.  *Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004).  Illinois

applies the "most significant contacts" test to determine what substantive law applies when a

contract does not specify choice-of-law.  *Id.*  That multifactor balancing test requires the Court to

look to "the place of contracting, negotiation, performance, location of the subject matter of the

contract, and the domicile, residence, place of incorporation, and business of the parties."  *Id.*

(quoting *Wildey v. Springs*, 47 F.3d 1475, 1483 (7th Cir. 1995)).  The immediately relevant options

---

[25] Plaintiffs make repeated reference throughout the complaint to an alleged unwritten "partnership agreement" with Reynolds.  But the Complaint alleges that the parties "reduced their partnership agreement to writing" in the form of the "Agreement of Basic Terms."  Compl. ¶ 129.  Moreover, the breach of contract count alleges only that "The Agreement of Basic Terms"—and *not* any preexisting oral agreement—"is an enforceable contract."  Compl. ¶ 180.  Plaintiffs do not allege terms sufficient to render any alleged oral contract definite and thus enforceable; there is no allegation as to the agreed price, duration, or any other term of the contract.  To the extent Plaintiffs attempt to allege breach of some oral contract distinct from the Agreement of Basic Terms, enforcement of such an agreement is barred by the statute of frauds.  Plaintiffs allege that the agreement's term was for more than one year, and indeed perhaps as many as 30 years.  *See* Compl. ¶ 132.  The Statute of Frauds bars enforcement of oral contracts whose performance is not complete within one year of the date of the alleged contract.  Ohio Rev. Code Ann. § 1335.05.

are California law (based on Plaintiffs' place of business) and Ohio law (based on Reynolds's place of business). The Complaint does not set out any allegations regarding the place of contracting or negotiation. However, the place of performance and location of the subject matter of the contract factors strongly favor application of Ohio law: Plaintiffs allege that the primary purpose of the contract was for Reynolds to develop a private-label version of PartProtection's product under the "PartShield" trade name and promote that product to Reynolds dealers; PartProtection would receive a royalty on part insurance policies sold through that private-label product. Compl. ¶¶ 127, 134. That activity would be centered on Reynolds's Ohio headquarters.

The first theory—that the contract required Reynolds to promote and resell the product and pay Plaintiffs royalties on those sales—fails under the plain terms of the agreement. The Agreement of Basic Terms is an unenforceable "agreement to agree." The Ohio Supreme Court's decision in *M.J. DiCorpo, Inc. v. Sweeney*, 634 N.E.2d 203 (Ohio 1994), is directly on point. There, two law firms signed a letter of intent setting out an "agreement to principles" for a contemplated acquisition of one firm by the other. *Id.* at 204. The letter set forth "some of the basic terms" of the proposed acquisition, a term of employment and salary for the principal attorney at the firm, a fixed price and payment schedule for the equity, client relationships, and cases of the acquired firm, and granular price-adjustment metrics for the purchase price based on future billings. *Id.* Further, it stated that the "agreement to principles" would "be followed by a definitive agreement within 15 days of signing." *Id.* The Ohio Supreme Court held that the letter of intent was unenforceable: it was "nothing more than an agreement to principles which were subject to further negotiation and a detailed and definitive merger agreement." *Id.* at 208. "While the letter may have provided the basic framework… the letter itself did not address all the essential

22

terms of the merger. Thus, the letter of intent is not a legally enforceable contract." *Id.*[26]

Just so here. The language of the "Agreement of Basic Terms" belies Plaintiffs' allegations, and that language is controlling over Plaintiffs' characterization of it in the pleadings. *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013). In the document, the parties agreed to "*continue* to negotiate a business agreement . . . ." Compl. Ex. 4 at 1 ¶ 1 (emphasis added). Other language in the document similarly makes clear that it is not a final memorialization of an agreement to actually undertake the contemplated transactions: its preamble states that the parties "are *currently in negotiations* whereby PartProtection, LLC, owned by i3 Brands, and Reynolds *may* enter into an agreement to do business together." *Id.* at 1 (emphasis added). Plaintiffs' allegation that this memorializes a fully consummated agreement by which Reynolds became obliged to promote PartProtection's product and pay PartProtection certain commissions for sales is simply wrong: the list of terms that they refer to is preceded by additional qualifying language making clear that the agreement does not yet exist: "*[a]ny such agreement* entered into by the Parties *will* include the following terms." *Id.* at 1 ¶ 2 (emphasis added). The writing is, by its plain terms, an "agreement to agree"—*not* an agreement under which Reynolds assumed an obligation to promote PartProtection's product on a resale basis and pay Plaintiffs royalties.[27]

---

[26] *See also Westwinds Dev. Corp. v. Outcalt*, 2009-Ohio-2948, ¶ 37 ("Where an agreement contemplates further action toward formalization or if an obligation to become binding rests on a future agreement to be reached by the parties, so that either party may refuse to agree, there is no contract. In other words, as long as both parties contemplate that something remains to be done to establish a contractual relationship, there is no binding contract.") (quoting *Weston, Inc v. Brush Wellman, Inc.*, 65793, 1994 WL 393685, at *5 (Ohio Ct. App. July 28, 1994).

[27] That conclusion is bolstered by the fact that the Agreement of Basic Terms is utterly silent as to all *other* terms: *what* insurance services PartProtection would provide; over what term it would provide them; whether Reynolds would exclusively promote PartProtection's product or could market other similar products; on what grounds either party could terminate the contract; the mechanisms by which Reynolds would 'promote' PartProtection's product; which entity—Reynolds or PartProtection—would be responsible to customers for problems that arose; which entity owned what intellectual property related to the rebranded "PartShield" solution; what if any confidentiality obligations the parties had toward the other; whether the parties could audit one another's books with respect to the resale or promotion agreement; and so on.

Because there is no enforceable contract, the breach of contract claim must be dismissed.[28]

To the extent Plaintiffs' contract theory is predicated on Reynolds's alleged misappropriation of PartProtection's trade secrets, the claim fails for two additional reasons. First, nothing in the Agreement of Basic Terms says *anything at all* about PartProtection's intellectual property or trade secrets, and so Reynolds cannot have breached that nonexistent provision. Second, the Ohio Uniform Trade Secrets Act preempts all claims arising out of the same nucleus of operative facts as a trade secret claim. *Stolle Mach. Co., LLC v. RAM Precision Indus.*, 605 Fed. Appx. 473, 484–85 (6th Cir. 2015).

### 2. Plaintiffs' promissory estoppel claim fails for want of a definite promise, and is in any event preempted.

Plaintiffs' promissory estoppel claim fails for two distinct reasons. First, Plaintiffs have not adequately alleged its elements. Under both Ohio and California law, an element of a promissory estoppel claim is that the alleged promise must be "clear and unambiguous in its terms." *Gen. Elec. Co. v. Bools*, 172 F.3d 48 (6th Cir. 1998) (Ohio); *US Ecology, Inc. v. State of California*, 129 Cal. App. 4th 887, 901, 28 Cal. Rptr. 3d 894, 905 (2005) (California). There is no such allegation here. Plaintiffs base their promissory estoppel allegations on the same Agreement of Basic Terms they rely on for their contract claims. Compl. ¶ 186. But that document, by its express terms, is *not* a clear and unambiguous promise on which Plaintiffs could have reasonably relied, for the same reasons it is not an enforceable contract. The claim therefore fails.

Second, to the extent the promissory estoppel claim is predicated on Reynolds's alleged misappropriation of trade secrets, *see* Compl. ¶¶ 186-187, it is preempted (regardless of whether

---

[28] Even in the event the Court concludes that California law applies, the Agreement of Basic Terms provides *at most* for an obligation to negotiate in good faith, *not* an agreement to undertake the actual contemplated transaction. Plaintiffs cannot recover their expectation damages as to the underlying contemplated transaction for breach of such an agreement; at most they can pursue a claim that the other party did not negotiate in good faith and recover reliance damages for the costs of the negotiating process. *Copeland v. Baskin Robbins U.S.A.*, 96 Cal. App. 4th 1251, 1262–63, 117 Cal. Rptr. 2d 875, 885 (2002).

the Court applies Ohio or California law). The Ohio Uniform Trade Secrets Act and the California Uniform Trade Secrets Act both preempt common-law claims that arise out of the same nucleus of operative facts as a trade secret claim. *Stolle*, 605 Fed. Appx. at 484-85; *Digital Envoy, Inc. v. Google, Inc.*, 370 F. Supp. 2d 1025, 1035 (N.D. Cal. 2005).

### 3. Plaintiffs' fraud claim fails for lack of particularity, and is in any event preempted.

Plaintiffs' fraud claim fails for two reasons. First, Plaintiffs' allegations lack the particularity required to allege fraud under the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 9(b). A plaintiff claiming fraud must allege "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Bankers Tr. Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992) (quoting *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990)). But Plaintiffs do not identify any specific fraudulent statement by any individual at any discrete time. Instead, they allege in general terms that "*Reynolds* knowingly misrepresented" various facts at some unidentified time and location in the past. Compl. ¶¶ 191-194 (emphasis added). Plaintiffs allegations do not clear Rule 9(b)'s specificity bar, and so they must be dismissed.

Second, the fraud claim is entirely derivative of the alleged trade-secrets theft and is therefore preempted: Plaintiffs' sole allegation of harm resulting from the supposed fraud is that Reynolds misappropriated PartProtection's trade secrets. Compl. ¶¶ 191-192. As with the promissory estoppel claim, both California and Ohio's trade secrets statutes preempt common-law claims arising from the same nucleus of operative fact as a trade secret claim. *Digital Envoy*, 370 F. Supp. 2d at 1035; *Stolle*, 605 Fed. Appx. at 484-85.

### 4. Plaintiffs have not alleged the existence or misappropriation of a trade secret.

Plaintiffs' claims under the California Uniform Trade Secrets Act fail. Plaintiffs must show "(1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff."[29]

Plaintiffs affirmatively allege that they sold Reynolds trade secrets that overlapped with PartProtection's trade secrets when Reynolds acquired TradeMotion.[30] Plaintiffs further allege that they released their former employees from nondisclosure obligations for the express purpose of permitting those employees to describe those overlapping trade secrets to Reynolds.[31] Thus, Plaintiffs have not alleged secrecy. It is axiomatic that "[i]nformation that an individual discloses to others who are under no obligation to protect its confidentiality . . . lacks secrecy."[32] Plaintiffs' claims are therefore barred. By alleging that they sold overlapping secrets and expressly permitted their former employees to divulge overlapping trade secret information to Reynolds, Plaintiffs have affirmatively pleaded that they destroyed their proprietary rights in such secrets.

Moreover, Plaintiffs do **not** allege that they required Reynolds to agree to confidentiality or nondisclosure terms prior to voluntarily disclosing additional alleged PartProtection trade secrets after the TradeMotion transaction. Disclosure of trade secrets without a confidentiality

---

[29] *Nextdoor.com, Inc. v. Abhyanker*, C-12-5667 EMC, 2014 WL 1648473, at *4 (N.D. Cal. Apr. 23, 2014) (quoting *Sargent Fletcher, Inc. v. Able Corp.* 110 Cal.App. 4th 1658, 1665 (2003)).

[30] Compl. ¶¶ 134, 198 ("Plaintiffs signed an 'Acknowledgment' that permitted Reynolds to access PartProtection's confidential, proprietary, and trade secret information."); 200 (accusing Reynolds of acquiring the trade secrets by "interviewing former i3 Brands employees who worked for Reynolds"); Compl. Ex. 5 ("Acknowledgment" stating that trade secrets sold to Reynolds in TradeMotion transaction were overlapping and expressly authorizing former employees to describe trade secrets to Reynolds).

[31] *Id.*

[32] *Hosp. Mktg. Concepts LLC v. Six Continents Hotels, Inc.*, SACV1501791JVSDFMX, 2016 WL 9045853, at *5 (C.D. Cal. May 2, 2016); *Nextdoor.com, Inc. v. Abhyanker*, C-12-5667 EMC, 2014 WL 1648473, at *4 (N.D. Cal. Apr. 23, 2014) (both applying California trade secret law and citing *Ruckelhaus v. Monsanto Co.,* 467 U.S. 986, 1002 (1984)).

agreement destroys secrecy as a matter of law.[33]  Plaintiffs' barebones allegations, *see* Compl. ¶¶ 128, 197, are entirely inadequate.  First, these allegations are purely conclusory: Plaintiffs do not allege any *facts* sufficient to show Reynolds's awareness that Plaintiffs regarded the information in question as trade secrets.  (For example, Plaintiffs do not allege that they told Reynolds that the material was a trade secret or confidential, marked the shared information as such, or for that matter did anything else at all to put Reynolds on notice.)  Second, even if these allegations were legally adequate to show Reynolds's knowledge of Plaintiffs' opinion about the information (and they are not), that would not create a duty of nondisclosure: "a business relationship alone, with no corresponding confidentiality or non-disclosure agreement, is insufficient to impose an obligation on the parties to preserve the confidentiality of trade secrets."  *Hosp. Mktg. Concepts*, 2016 WL 9045853, at *5.[34]  Plaintiffs' allegation of unilateral belief that the information shared after the TradeMotion transaction constituted a confidential trade secret and would be treated as such—without any allegation of an agreement to that effect by Reynolds—is insufficient as a matter of law to plead a protectible secret.

---

[33] *Hosp. Mktg. Concepts*, 2016 WL 9045853, at *5 ("Hospitality Marketing's failure to enter a confidentiality or non-disclosure agreement before voluntarily disclosing its alleged trade secrets to InterContinental, its Australian subsidiary, or its third-party consultants extinguished their secrecy."); *Cole Asia Bus. Ctr., Inc. v. Manning*, CV 12-00956 DDP CWX, 2013 WL 3070913, at *4 (C.D. Cal. June 18, 2013) (same); *Kema, Inc. v. Koperwhats*, C09-1587MMC, 2010 WL 726640, at *4 (N.D. Cal. Mar. 1, 2010) (same); *HiRel Connectors, Inc. v. United States*, CV01-11069 DSF VBKX, 2006 WL 3618011, at *8 (C.D. Cal. Jan. 25, 2006) (same); *Gemisys Corp. v. Phoenix Am., Inc.*, 186 F.R.D. 551, 562 (N.D. Cal. 1999) (same).

[34] Plaintiffs may argue that their allegations establish the existence of a partnership agreement that would impose on Reynolds a heightened duty of confidentiality.  But the Complaint does not allege a valid partnership agreement.  First, Plaintiffs specifically allege that the "Agreement of Basic Terms" was the written embodiment of the supposed partnership agreement.  Compl. ¶ 129.  That agreement does not reflect any of the indicia of a partnership: there is no agreement to share profits and losses, and there is no agreement to jointly manage and control an enterprise.  That defeats finding a partnership.  *Simmons v. Ware*, 213 Cal. App. 4th 1035, 1054, 153 Cal. Rptr. 3d 178, 194 (2013*), as modified on denial of reh'g* (Mar. 13, 2013) (California law); *Anchor v. O'Toole*, 94 F.3d 1014, 1024 (6th Cir. 1996) (Ohio law).  Even if Plaintiffs' gestures at a prior oral partnership agreement were not rendered moot by their affirmative allegation that the "Agreement of Basic Terms" superseded that earlier agreement, Plaintiffs do not plead a single fact that could support a finding of a partnership.  As with the "Agreement of Basic Terms," there is no allegation that Plaintiffs and Reynolds agreed to operate a business together, share profits and losses, and share management and control rights.  Because Plaintiffs' partnership allegations are wholly conclusory, they cannot rely on that alleged partnership as a basis for imposing a duty of confidentiality on Reynolds in the absence of specific factual allegations showing the existence of the indicia of a partnership agreement.

Second, Plaintiffs' voluntary disclosure allegations defeat any claim of misappropriation (the second required element for a trade secret claim). Plaintiffs do not allege facts sufficient to show that Reynolds acquired the alleged secrets through intentional "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage," *see* Cal. Civ. Code § 3426.1; instead they allege that Plaintiffs voluntarily gave the alleged secrets over without requiring Reynolds to agree to any duty of confidentiality. Plaintiffs' failure to plausibly allege misappropriation is a further bar to their claims.

Third, Plaintiffs' trade secrets claim fails because Plaintiffs have failed to describe the alleged trade secrets with reasonable particularity. A trade secret complaint must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Pellerin v. Honeywell Intern., Inc.*, 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012).

Plaintiffs' barebones description of the trade secrets—a single sentence broken over three short bullet-points—falls far short. First, Plaintiffs allege that Reynolds misappropriated "[a]ll of PartProtection's proprietary source code for its software[.]" Compl. ¶ 200. Courts routinely reject similar efforts to claim trade secret protection for the entirety of a computer program.[35] Thus, Plaintiffs have not adequately pleaded a trade secret with respect to the software code.

Second, Plaintiffs allege that Reynolds misappropriated "PartProtection's 'eligibility file,'

---

[35] *E.g.*, *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583–84 (7th Cir. 2002) (despite 43-page description of functionality of software package, plaintiffs failed to allege a trade secret because they did not specifically identify which aspects of the software were trade secrets not generally known in the industry); *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522–23 (9th Cir. 1993) ("Since the trade secrets are not specifically identified, we cannot determine whether Peak has misappropriated any trade secrets by running the MAI operating software and/or diagnostic software in maintaining MAI systems for its customers . . . ."); *Keywords, LLC v. Internet Shopping Enterprises, Inc.*, CV 05-2488 MMM (EX), 2005 WL 8156440, at *17 (C.D. Cal. June 29, 2005) ("Keywords has failed to identify what portions of the source codes constitute trade secrets, and the court thus cannot determine whether they meet the UTSA's definition of a trade secret.").

which took years to build, contained PartProtection's confidential database of auto parts that it could insure and the prices of those parts[.]" Compl. ¶ 200. As the leading California case explains in the related context of customer lists, "courts are reluctant" to extend trade-secret protection to the extent a data compilation "embod[ies] information which is 'readily ascertainable' through public sources, such as business directories." *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1521, 66 Cal. Rptr. 2d 731, 735 (1997). Generic allegations that a data compilation contains "customer, product, and pricing information" are insufficient to show the existence of a trade secret, because such allegations are insufficient to allow the court and defense to separate the alleged secret from broadly available information.[36] Here, Plaintiffs' alleged trade-secret information—a list of auto parts and their prices—is precisely the sort of readily ascertainable data to which courts deny protection. Plaintiffs do not allege, and there is no reason to believe, that the conclusorily-alleged automotive parts lists and prices are not ascertainable through other legitimate means or sources. And aside from a bare assertion that compiling the information "took years," Plaintiffs do not identify the amount of time, effort, and resources they dedicated to assembling the database. Moreover, there are no non-conclusory allegations as to the economic usefulness of the database— *i.e.,* its purpose, the advantages it possesses over perusal of public or other sources of parts and pricing information, etc.

Finally, Plaintiffs allege that Reynolds misappropriated "PartProtection's confidential contracts with the companies that agreed to underwrite the policies issued by PartProtection." Compl. ¶ 200. Again, that scant allegation is insufficient. Plaintiffs make no effort to identify the contents of those contracts, what specific information in the contracts constitute trade secrets,

---

[36] *See Humphreys & Associates, Inc. v. Cressman*, SACV150782AGRNBX, 2015 WL 12698428, at *3–4 (C.D. Cal. Aug. 31, 2015); *Mitigation Techs., Inc. v. Pennartz*, EDCV1401954ABSPX, 2015 WL 12656936, at *6–7 (C.D. Cal. Mar. 13, 2015).

whether and how the terms of those contracts vary from ordinary parts insurance or commercial inventory insurance more generally, whether the identity of the underwriters is otherwise publicly ascertainable or would be obvious to sophisticated market participants, and so on.

### 5. Plaintiffs' tortious interference claim fails because Reynolds's refusal to deal cannot give rise to liability.

PartProtection's tortious interference claim fails because the alleged wrong—Reynolds's alleged refusal to provide integration services to facilitate PartProtection's contemplated deal with Ford, Compl. ¶ 210—is privileged as a matter of law. When a contemplated business relationship is predicated on performance by a nonparty, that nonparty is privileged to refuse to deal without incurring liability for tortious interference under both California and Ohio law.[37] Plaintiffs do not allege that Reynolds breached any contractual obligation by so refusing.

Plaintiffs try to circumvent that principle by alleging that Reynolds's refusal was "pursuant to Reynolds's illegal conspiracy to drive all competition out of the data integration market," and designed to give Reynolds's applications a competitive advantage. Compl. ¶¶ 210-211. These allegations fail for the same reasons the Antitrust Claims fail, explicated at length above.

## IV. Conclusion

All of Plaintiffs' claims must be sent to arbitration to allow the arbitrator to decide in the first instance whether the parties' arbitration agreements cover the claims asserted. To the extent the Court determines that certain of the claims are not arbitrable, those claims should be dismissed.

---

[37] *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825, 831-35 (9th Cir. 2001) (California); *Hamilton San Diego Apartments v. RBC Capital Markets Corp.*, 312CV2259JMBLM, 2013 WL 12090313, at *3–4 (S.D. Cal. Mar. 5, 2013) (California); *Sanabria v. Germain Motor Co.*, C2:04-CV-508, 2005 WL 2313950, at *4 (S.D. Ohio Sept. 21, 2005) (Ohio); *Khoury v. Trumbull Physician Hosp. Org.*, 99-T-0138, 2000 WL 1804356, at *3 (Ohio Ct. App. Dec. 8, 2000) (Ohio).

DATED: April 1, 2019

Respectfully submitted,

*/s/ Aundrea K. Gulley*
Aundrea K. Gulley
agulley@gibbsbruns.com
Kathy Patrick
kpatrick@gibbsbruns.com
Brian T. Ross
bross@gibbsbruns.com
Brice A. Wilkinson
bwilkinson@gibbsbruns.com
Ross M. MacDonald
rmacdonald@gibbsbruns.com
Justin D. Patrick
jpatrick@gibbsbruns.com
**GIBBS & BRUNS, LLP**
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone: 713-650-8805
Facsimile: 713-750-0903

Michael P.A. Cohen
MCohen@sheppardmullin.com
Amar S. Naik
ANaik@sheppardmullin.com
**SHEPPARD MULLIN RICHTER
& HAMPTON LLP**
Suite 100
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: 202-747-1900
Facsimile: 202-747-1901

Leo D. Caseria
lcaseria@sheppardmullin.com
**SHEPPARD MULLIN RICHTER
& HAMPTON, LLP**
333 S. Hope St., 43rd Floor
Los Angeles, CA 90071
(213) 617-4206

Dylan I. Ballard
dballard@sheppardmullin.com
**SHEPPARD MULLIN RICHTER
& HAMPTON, LLP**
Four Embarcadero Center., 17th

Floor
San Francisco, CA 94111
(415) 434-9100

*Attorneys for Defendant The Reynolds and Reynolds Company*

## CERTIFICATE OF SERVICE

I, Aundrea K. Gulley, an attorney, hereby certify that on this 1st day of April, 2019, I caused a true and correct copy of the foregoing **DEFENDANT THE REYNOLDS AND REYNOLDS COMPANY'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS IN FAVOR OF ARBITRATION, OR IN THE ALTERNATIVE, TO DISMISS UNDER RULE 12(B)(6)** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

*/s/ Aundrea K. Gulley*
Aundrea K. Gulley
**GIBBS & BRUNS LLP**
1100 Louisiana Street, Suite 5300
Houston, TX 77002
(713) 650-8805
agulley@gibbsbruns.com