**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This filing relates to:* | Hon. Robert M. Dow, Jr. |
| *i3 Brands, Inc. et al. v. CDK Global LLC et al.*, Case No. 19-cv-1412 (N.D. Ill.) | |

**DEFENDANT CDK GLOBAL, LLC'S MEMORANDUM
IN SUPPORT OF ITS MOTION TO STAY OR, IN THE ALTERNATIVE, TO DISMISS**

**INTRODUCTION**

Plaintiffs' complaint merely stitches together allegations from other complaints in the MDL, complete with footnotes identifying the complaint from which each allegation was copied. CDK will not use this motion to relitigate the plausibility of most of these claims, for this Court has already ruled on motions to dismiss raising these same issues. But CDK respectfully submits that Plaintiffs' case should not proceed. As defendant Reynolds's motion to dismiss explains in greater detail, Plaintiffs' claims against Reynolds must be arbitrated under the terms of their contract with Reynolds. The Court should not allow this case to proceed in parallel while that arbitration is pending. Doing so would undermine the finality of the arbitration, unfairly reward Plaintiffs for evading their agreement to arbitrate, and consume judicial resources better spent on other matters.[1]

Should the Court decline to stay this case, it should at minimum dismiss Count II of the complaint in part and Count XI of the complaint in full. Count II asserts in part that CDK's dealer contracts are unlawful exclusive deals under Section 1 of the Sherman Act—but both this Court and Judge St. Eve have dismissed identical allegations. Count XI, meanwhile, asserts a state-law claim for tortious interference with prospective business advantage that is far too conclusory to survive scrutiny under Rule 8. i3 should not be permitted to "unlock the doors of discovery," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), with such a vague and unsubstantiated claim.

**BACKGROUND[2]**

**A.     The DMS "market"**

DMSs are proprietary enterprise software systems that manage the core business functions of automobile dealerships. Compl. ¶ 30. They manage, among other things, large volumes of data,

---

[1] The Court did not reach the question whether to stay proceedings against CDK pending arbitration in the dealer class action, because Reynolds settled with the putative class and was no longer part of the case.

[2] Given the Court's familiarity with the facts alleged in this MDL, we describe i3's allegations only briefly. We assume the truth of the well-pleaded allegations solely for purposes of this motion. *See Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015).

including inventory, customer, sales, financing, and insurance information. *Id.* ¶ 31.

A number of various-sized firms offer DMSs to new and used automobile, truck, motorcycle, marine, recreational vehicle, and heavy equipment dealers throughout the world. Reynolds and CDK are two of the largest firms serving new vehicle franchised automobile dealers in the United States. Compl. ¶ 34. i3 alleges that, by number of franchised stores served, CDK has an approximate 45% share of DMS sales in the U.S. *Id.*

Dealers often contract with third-party vendors, some of which offer software applications that leverage CDK's DMS (including the information it manages) to perform assorted dealership functions. Compl. ¶ 5. Some vendors wishing to access CDK's DMS contract with independent data "integrators" who—acting as middlemen—access the DMS to extract data and transmit it to vendors through the integrator's own software interface. Compl. ¶ 5. Indeed, i3 alleges that vendors *must* contract with such integrators because "[a] dealership's data is not stored in a useable form on the DMS" and an integrator's aid is needed to transform the data into a usable format. *Id.* Dealers have facilitated data integrator access to the DMS by providing them with user login credentials. For this reason, among others, unauthorized access by third-party vendors and integrators is known as "hostile" access.

### B. i3's allegations

Plaintiff i3 Brands is a vendor of software applications to the automotive industry; it owns or has owned several entities that provide software products to dealers, including Plaintiff PartProtection, LLC, an i3 subsidiary that offers a "point-of-sale product that allows motorists to extend the warranty coverage" on their vehicle's parts. Compl. ¶ 15.[3] i3 filed suit against CDK and Reynolds in February 2019, ten days after this Court ruled on the motions to dismiss the complaints of the putative dealer class, Cox Automotive, and AutoLoop (and the putative vendor class).

---

[3] We refer to i3 Brands and PartProtection collectively as "i3."

Like the other vendor plaintiffs in this MDL, i3 alleges that CDK and Reynolds entered into a conspiracy to eliminate Authenticom and other hostile integrators from the marketplace (*id.* ¶¶ 142-51); that CDK and Reynolds use exclusive dealing arrangements to foreclose the market for hostile integration (*id.* ¶¶ 152-59); and that they have monopolized purported single-brand aftermarkets for data integration on their respective DMSs (*id.* ¶¶ 160-65). Indeed, i3's allegations are based almost exclusively on citations to the complaints in other cases in the MDL and the *Authenticom* preliminary injunction hearing, claiming in a single sentence that it "confirmed allegations in those complaints based on personal experience/knowledge and independent investigation." *Id.* ¶ 9 n.1.

As relevant here, i3 also asserts a common-law claim for tortious interference with prospective economic advantage against CDK, alleging CDK tortiously interfered with a potential business venture it was contemplating with Nissan North America. Compl. ¶¶ 216-24. i3 alleges that Nissan was preparing to launch a "pilot program in which it would expand its contractual relationship with i3 Brands and offer [i3 apps] to wholesalers" (*id.* ¶ 217), but that CDK refused to provide necessary integration to i3 because the "pilot program" would have "infringe[d] upon one of its largest customer's [sic] business interests" (*id.* ¶ 220).

## ARGUMENT

In determining whether a complaint fails to state a claim under Rule 12(b)(6), a court must assess whether the complaint "include[s] 'enough facts to state a claim to relief that is plausible on its face.'" *Khorrami v. Rolince*, 539 F.3d 782, 788 (7th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). As shown below, Plaintiffs fail to meet this pleading standard for at least two of their claims. As an initial matter, however, Plaintiffs' complaint should be stayed in its entirety pending i3's arbitration with Reynolds.

I.   **Plaintiffs' Claims Against CDK Should Be Stayed Pending Arbitration With Reynolds.**

Without reaching the merits of i3's allegations, the Court should stay the complaint in favor of arbitration. i3 agreed to arbitrate any and all claims against Reynolds when it signed up for Reynolds's RCI program—and that agreement unquestionably applies to its claims against Reynolds here. i3's claims against CDK should accordingly be stayed pending the outcome of its arbitration with Reynolds.[4]

In particular, i3 agreed to arbitrate ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ its Reynolds Interface Agreement ("RIA"). *See* Compl. Ex. 2, § 6.10.1. i3's claims against CDK plainly ▮▮▮▮▮ the RIA. i3 alleges, after all, that it has been compelled to pay supracompetitive prices (under the RIA and CDK's 3PA Agreement) for access to Reynolds's and CDK's DMSs, all by virtue of CDK and Reynolds's alleged conspiracy to eliminate independent "integrators." That allegation easily fits within the broad language of the RIA's arbitration clause. *See Traeger v. Am. Express Bank FSB*, 2014 WL 340421, at *8 (N.D. Ill. Jan. 30, 2014) ("[T]he phrase 'arising from or relating to' is common in arbitration clauses; the Seventh Circuit has held that arbitration clauses that contain this language are 'broad' and 'necessarily create a presumption of arbitrability.'") (quoting *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 910 (7th Cir. 1999)).

The question here, therefore, is whether i3 can evade its commitment to arbitrate claims ▮▮▮▮▮ the RIA by suing CDK in addition to Reynolds. It cannot. As the Seventh Circuit has held, a party to an arbitration agreement is not allowed to "get around it" by suing "not only the other party to the agreement but some related party with which it has no arbitration agreement, in the hope that the claim against the other party will be adjudicated first and have preclusive effect in the

---

[4] CDK preserves for further review the issue of whether it is entitled to invoke the RIA's arbitration clause against i3 under the doctrine of equitable estoppel, but in light of the Court's ruling on that issue in *Autoloop* (Dkt. 504 at 9-12), CDK does not argue the point further in this brief.

4

arbitration." *IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 530 (7th Cir. 1996). In such a case, a court is "require[d] . . . to stay the proceedings before it and let the arbitration go forward unimpeded." *Id.*; *see also, e.g.*, *G&G Closed Circuit Events, LLC v. Castillo*, 2017 WL 1079241, at *11 (N.D. Ill. Mar. 22, 2017) ("[I]f proceeding in litigation would create a potentially embarrassing inconsistency with the arbitrator's decision on the issue, a stay should be used to allow the arbitrator to decide it."); *ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.,* 487 F. Supp. 2d 980, 991-92 (N.D. Ill. 2007) (staying entire case where claims against signatories were "obviously intertwined" with those against non-signatory parties); *Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prods. Inc.*, 2012 WL 13027981, at *2 (S.D. Ill. Apr. 11, 2012) (staying claims against defendants who were not parties to pending arbitration, because "plaintiffs' claims against these defendants involve[], or will be influenced by, the pending arbitration"). A stay of i3's claims against CDK would serve important interests of judicial economy and would prevent the litigation of identical claims and issues in multiple forums. The Court should accordingly grant a stay and hold i3 to its commitment to resolve these disputes in arbitration.

## II. Plaintiffs' Exclusive Dealing Claim (Count II) Must Be Dismissed To The Extent It Relates To CDK's Dealer Contracts.

If the Court declines to stay proceedings against CDK, it should at a minimum dismiss i3's exclusive-dealing claim (Count II), to the extent that it pertains to CDK's contracts with dealers. i3 alleges that CDK's dealer contracts are exclusive dealing arrangements because they "prohibit[] allowing data integrators to access [the] CDK DMS." Compl. ¶ 77. But this Court squarely rejected an identical theory in *Cox*, explaining that to state a claim for exclusive dealing with respect to *dealer* contracts, a plaintiff would have to allege that CDK "requires dealers to purchase and use its DMS exclusively." Dkt. 505 at 13. Judge St. Eve agreed in *Authenticom*, holding that CDK's (and Reynolds's) "DMS licenses with dealers are not plausible exclusive dealing." Dkt. 176 at 36. Given that i3 has not alleged and cannot allege that CDK requires dealers to purchase its DMS exclusively,

5

the Court should likewise dismiss Count II of i3's complaint to the extent that it pertains to CDK's dealer contracts.

**III.     Plaintiffs' Conclusory Tortious-Interference Claim (Count XI) Must Be Dismissed.**

The Court also should dismiss Count XI of the complaint, which fails to state a claim against CDK for tortious interference with prospective economic advantage. Under California law, a plaintiff alleging tortious interference with prospective economic advantage must show "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 950 (Cal. 2003).[5] i3's allegations do not state a claim under this framework.

Indeed, the complaint barely provides any detail about this claim at all. Apart from a few paragraphs reciting the claim's elements (Compl. ¶¶ 216-24), the complaint contains only *two* paragraphs (out of 225) discussing the alleged tortious interference (*see id.* ¶¶ 84-85). Those two paragraphs, moreover, offer only the vaguest sketch of the alleged interference. According to i3, it was preparing to "launch a pilot program" with Nissan North America that required i3's apps to become certified to access CDK'S DMS (*id.* ¶ 84), but CDK "refused to finalize integration" for the apps because "Nissan's proposal could take market share from one of CDK's largest customers"

---

[5] The complaint does not make clear which state's common law i3 relies on in asserting this claim. Under Illinois' choice-of-law rules for tort cases—which this Court must apply, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)—"the law of the place of injury controls unless another state has a more significant relationship with the occurrence and with the parties with respect to the particular issue," *Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 903 (Ill. 2007) (internal quotation marks omitted). It appears, based on the complaint, that i3's alleged injury would have occurred in California, where it is based (Compl. ¶ 14), and nothing in the complaint suggests that another state has a more significant relationship with this claim than California. Thus, the Court should apply California common law in evaluating this claim.

6

(¶ 85). i3 provides no detail about how this "pilot program" was going to work, or how it would affect i3's business prospects. Nor does i3 explain what "customer[]" CDK was acting to protect, or how i3's "pilot program" would have affected that customer. And i3 fails to explain why, if CDK "refused to finalize integration" for PartProtection in March 2015, i3's complaint seeks damages for allegedly supracompetitive 3PA fees that PartProtection paid from 2015 onward. Compl. ¶ 93.

These bare allegations fail to satisfy i3's pleading burden. A plaintiff cannot state a claim by "offer[ing] nothing more than 'threadbare recitals of the elements of a cause of action' and conclusory statements." *Cunningham v. Health Plan Intermediaries Holdings, LLC*, 2018 WL 835222, at *5 (N.D. Ill. Feb. 13, 2018) (quoting *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008)). Rather, the plaintiff must set forth "sufficient factual matter" to support a "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). i3 has not laid a sufficient factual predicate to support a claim that it had an economic relationship with Nissan, that CDK knew about that relationship and intentionally disrupted it, or that the disruption actually occurred. Its tortious-interference claim therefore must be dismissed. *See, e.g.*, *Greene v. Mizuho Bank, Ltd.*, 206 F. Supp. 3d 1362, 1373 (N.D. Ill. 2016) (dismissing plaintiff's tortious-interference claim because he did not allege sufficient facts to raise his "'right to relief above a speculative level'") (quoting *Bravo v. Midland Credit Mgmt., Inc.*, 812 F.3d 599, 601-02 (7th Cir. 2016)).

## CONCLUSION

The Court should stay further proceedings pending the outcome of an arbitration between Plaintiffs and Reynolds. In the alternative, it should dismiss Count XI of the complaint, along with Count II to the extent that it pertains to CDK's dealer contracts.

Dated: April 1, 2019

Respectfully submitted,

/s/ *Britt M. Miller*
Britt M. Miller
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant*
*CDK Global, LLC*

# **CERTIFICATE OF SERVICE**

       I, Britt M. Miller, an attorney, hereby certify that on April 1, 2019, I caused a true and correct copy of the foregoing **DEFENDANT CDK GLOBAL, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO STAY OR, IN THE ALTERNATIVE, TO DISMISS**, to be filed UNDER SEAL via the Court's CM/ECF system and served via email upon counsel of record:

Jennifer A. Miller
Whitney M. Carlson
BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP
555 California Street
Suite 4925
San Francisco, CA 94104
jamiller@beneschlaw.com
wcarlson@beneschlaw.com

J. Erik Connolly
Nicole E. Wrigley
Michael E. Bloom
Kate Watson Moss
BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP
333 W. Wacker Dr. Suite 1900
Chicago, IL 60606
econnolly@beneschlaw.com
nwrigley@beneschlaw.com
mbloom@beneschlaw.com
kwatsonmoss@beneschlaw.com

Aundrea K. Gulley
Kathy Patrick
Brian T. Ross
Brice A. Wilkinson
Ross M. MacDonald
Justin D. Patrick
GIBBS & BRUNS, LLP
1100 Louisiana, Suite 5300
Houston, Texas 77002
agulley@gibbsbruns.com
kpatrick@gibbsbruns.com
bross@gibbsbruns.com
bwilkinson@gibbsbruns.com
rmacdonald@gibbsbruns.com
jpatrick@gibbsbruns.com

Michael P.A. Cohen
Amar S. Naik
SHEPPARD MULLIN RICHTER
& HAMPTON LLP
Suite 100
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
MCohen@sheppardmullin.com
ANaik@sheppardmullin.com

Leo D. Caseria
SHEPPARD MULLIN RICHTER
& HAMPTON, LLP
333 S. Hope St., 43rd Floor
Los Angeles, CA 90071
lcaseria@sheppardmullin.com

Dylan I. Ballard
SHEPPARD MULLIN RICHTER
& HAMPTON, LLP
Four Embarcadero Center., 17th Floor
San Francisco, CA 94111
dballard@sheppardmullin.com

*/s/ Britt M. Miller*_____
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Phone: (312) 782-0600
Fax: (312) 701-7711
E-mail: bmiller@mayerbrown.com