**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This document relates to:* | Hon. Robert M. Dow, Jr. |
| THE DEALERSHIP CLASS ACTION | Magistrate Judge Jeffrey T. Gilbert |

**CDK GLOBAL, LLC'S OPPOSITION TO THE DEALERSHIP COUNTER-DEFENDANTS' MOTION TO DISMISS CDK'S COUNTERCLAIMS**

**TABLE OF CONTENTS**

<b>Page</b>

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 1

ARGUMENT ................................................................................................................... 3

I.      THE COUNTERCLAIMS STATE A BREACH OF CONTRACT CLAIM.................... 3

      A.    Authenticom's And Other Data Extractors' Access Was Not Authorized. ........... 4

      B.    This Court Has Already Held That "Authorization" Is A Question Of Fact. ........ 5

II.     THE COUNTERCLAIMS STATE A CFAA CLAIM. .................................................... 7

      A.    The Dealership Counter-Defendants Fall Within The CFAA. ............................. 8

      B.    CDK Has Sufficiently Alleged Damage Or Loss. ............................................... 11

      C.    CDK's Claims Are Timely. .................................................................................. 13

              1.    The Tolling Rule For Compulsory Counterclaims. .................................. 14

              2.    The CFAA Claim Is A Compulsory Counterclaim................................... 14

              3.    The CFAA Claims Accrued In 2016 Or Later. ........................................ 16

              4.    The Dealership Counter-Defendants' Arguments Fail. ........................... 17

III.    THE COUNTERCLAIMS STATE A DMCA CLAIM................................................. 18

      A.    The Warrensburg Counter-Defendants Are Directly Liable For DMCA
            Violations. ........................................................................................................... 19

      B.    The Continental and Warrensburg Counter-Defendants Are Secondarily
            Liable For DMCA Violations. ............................................................................. 19

CONCLUSION................................................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
   722 F.3d 1229 (10th Cir. 2013) ..........................................................................22

*In re Aimster Copyright Litig.*,
   334 F.3d 643 (7th Cir. 2003) ........................................................................21, 22

*In re Am. Online, Inc.*,
   168 F. Supp. 2d 1359 (S.D. Fla. 2001) ...............................................................12

*Asset Allocation & Mgmt. Co. v. W. Emp'rs Ins. Co.*,
   892 F.2d 566 (7th Cir. 1989) ...............................................................................14

*Boim v. Quranic Literacy Inst.*,
   291 F.3d 1000 (7th Cir. 2002) .............................................................................10

*Boim v. Holy Land Found. for Relief & Dev.*,
   549 F.3d 685 (7th Cir. 2008) ...............................................................................10

*Central Bank of Denver v. First Interstate Bank*,
   511 U.S. 164 (1994) .............................................................................................10

*CollegeSource, Inc. v. AcademyOne, Inc.*,
   2011 WL 13225283 (E.D. Pa. May 18, 2011) .....................................................17

*COR Sec. Holdings Inc. v. Banc of Cal., N.A.*,
   2018 WL 4860032 (C.D. Cal. Feb. 12, 2018) .......................................................9

*DHI Grp., Inc. v. Kent*,
   2017 WL 9939568 (S.D. Tex. Apr. 27, 2017) ........................................................9

*In re Doubleclick Privacy Litig.*,
   154 F. Supp. 2d 497 (S.D.N.Y 2001) ..................................................................12

*Ellison v. Robertson*,
   357 F.3d 1072 (9th Cir. 2004) ........................................................................20, 21

*Enargy Power Co. v. Wang*,
   2013 WL 6234625 (D. Mass. Dec. 3, 2013) ..........................................................8

*Flava Works, Inc. v. Gunter*,
   689 F.3d 754 (7th Cir. 2012) ...............................................................................22

*GC2 Inc. v. Int'l Game Tech.*,
  2018 WL 5921315 (N.D. Ill. Nov. 12, 2018) ........................................................22

*Goose Island Dev. Corp. v. Preferred Inv. IX Ltd. P'ship*,
  1992 WL 220649 (N.D. Ill. Sept. 3, 1992) ...........................................................15

*Gordon v. Nextel Commc'ns*,
  345 F.3d 922 (6th Cir. 2003) ...............................................................................21

*Hartley Buick GMC Truck, Inc. v CDK Global, LLC*,
  No. 1:17-cv-7827 (N.D. Ill.), Dkt. 1 .....................................................................14

*Int'l Ins. Co. v. Certain Underwriters at Lloyd's London*,
  1991 WL 693319 (N.D. Ill. Sept. 16, 1991) .........................................................15

*Joe N. Pratt Ins. v. Doane*,
  2008 WL 819011 (S.D. Tex. Mar. 20, 2008)...........................................................9

*Killingsworth v. HSBC Bank Nev., N.A.*,
  507 F.3d 614 (7th Cir. 2007) ........................................................................2, 3, 5

*Kirkpatrick v. Lenoir County Bd. of Educ.*,
  216 F.3d 380 (4th Cir. 2000) ...............................................................................14

*Limestone Dev. Corp. v. Village of Lemont*,
  520 F.3d 797 (7th Cir. 2008) ..........................................................................17, 18

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005)..............................................................................................20

*Meyer Tech. Solutions, LLC v. Kaegem Corp.*,
  2017 WL 4512918 (N.D. Ill. Oct. 10, 2017)......................................................17, 18

*Microsoft Corp. v. Silver Star Micro, Inc.*,
  2008 WL 115006 (N.D. Ga. Jan. 9, 2008).............................................................21

*Moore v. New York Cotton Exchange*,
  270 U.S. 593 (1926)........................................................................................15, 16

*Motorola, Inc. v. Lemko Corp.*,
  609 F. Supp. 2d 760 (N.D. Ill. 2009) ...................................................................13

*Mujica v. Occidental Petroleum Corp.*,
  381 F. Supp. 2d 1164 (C.D. Cal. 2005) ................................................................10

*Navistar, Inc. v. New Baltimore Garage, Inc.*,
  2012 WL 4338816 (N.D. Ill. Sept. 20, 2012) ...........................................11, 12, 18, 20

iii

*Palmer v. Bd. of Educ. of Cmty. Unit Sch. Dist. 201-U,*
   46 F.3d 682 (7th Cir. 1995) ...................................................................17

*In re Price,*
   42 F.3d 1068 (7th Cir. 1994) ................................................................15

*PTG Nev., LLC v. Does 1-25,*
   2016 WL 3521941 (N.D. Ill. June 28, 2016) ...................................6, 16

*Roldan v. Town of Cicero,*
   2019 WL 1382101 (N.D. Ill. Mar. 27, 2019) .....................................13

*Quantlab Techs. Ltd. (BVI) v. Godlevsky,*
   2015 WL 1651251 (S.D. Tex. Apr. 14, 2015) ...................................13

*Rosenthal v. MPC Computers, LLC,*
   493 F. Supp. 2d 182 (D. Mass. 2007) .................................................21

*Salstone v. Gen. Felt Indus., Inc.,*
   1990 WL 37265 (N.D. Ill. Mar. 5, 1990) ..........................................14

*Samantar v. Yousuf,*
   560 U.S. 305 (2010) ............................................................................20

*Se. Mech. Servs., Inc. v. Brody,*
   2008 WL 4613046 (M.D. Fla. Oct. 15, 2008) .....................................8

*Seitz v. Beeter,*
   2013 WL 409428 (N.D. Ill. Jan. 31, 2013) ........................................14

*Signs & Blanks, Ltd. v. Lanan Prod., Inc.,*
   2009 WL 10695777 (N.D. Ill. Jan. 20, 2009) .....................................7

*Smith v. Med. Benefit Admin. Grp.,*
   639 F.3d 277 (7th Cir. 2011) ................................................................7

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
   464 U.S. 417 (1984) .....................................................................20, 22

*Stone v. Wright,*
   734 F. App'x 989 (7th Cir. 2018) .........................................................4

*Swanson v. Citibank, N.A.,*
   614 F.3d 400 (7th Cir. 2010) ..............................................................12

*Synthes, Inc. v. Emerge Med., Inc.,*
   2012 WL 4205476 (E.D. Pa. Sept. 19, 2012) ......................................8

iv

*Taylor, Bean & Whitaker Mortg. Corp. v. Cebulak*,
   2004 WL 2106605 (N.D. Ill. Sept. 20, 2004) ...................................................................6

*Thermal Design, Inc. v. Guardian Building Prods., Inc.*,
   2012 WL 2254195 (E.D. Wis. June 15, 2012) .................................................................14

*Tracfone Wireless, Inc. v. Simply Wireless, Inc.*,
   229 F. Supp. 3d 1284 (S.D. Fla. 2017) ............................................................................9

*United States v. Midwest Generation, LLC*,
   720 F.3d 644 (7th Cir. 2013) ..........................................................................................17

*United States v. Nosal*,
   844 F.3d 1024 (9th Cir. 2016) ..........................................................................................9

*Warshawsky & Co. v. Arcata Nat'l Corp.*,
   552 F.2d 1257 (7th Cir. 1977) ...................................................................................14, 16

*Wiwa v. Royal Dutch Petroleum Co.*,
   2002 WL 319887 (S.D.N.Y. Feb. 28, 2002) ....................................................................10

*Wolf v. Schadegg*,
   2016 WL 1117364 (D. Colo. Mar. 21, 2016) .............................................................12, 13

**Statutes**

17 U.S.C. § 512 ...........................................................................................................................20

17 U.S.C. § 1201(a)(1) .................................................................................................18, 21, 23

17 U.S.C. § 1201(a)(2) .......................................................................................................19, 21

18 U.S.C. § 1030(a)(2) ...................................................................................................................7

18 U.S.C. § 1030(b) .......................................................................................................................9

18 U.S.C. § 1030(c)(4)(A)(i)(I) .................................................................................................11

18 U.S.C. § 1030(g) .................................................................................................................7, 14

**Other Authorities**

Charles A. Wright & Arthur A. Miller, 6 FED. PRAC. & PROC. § 1419
   (3d ed. 2019) ...................................................................................................................14

## INTRODUCTION

On February 22, 2019, CDK Global, LLC ("CDK") filed its Answer and Counterclaims to the dealerships' putative class action complaint. Dkt. 523 ("Counterclaims").[1] As the Counterclaims demonstrate, the Dealership Counter-Defendants have knowingly encouraged, facilitated, and benefited from unauthorized access by third-party hostile data extractors to CDK's dealer management system ("DMS"), in violation of the dealers' Managed Service Agreements ("MSAs") and federal law. The Dealership Counter-Defendants have now moved to dismiss the Counterclaims. Dkt. 596 ("Mem.").

Much of what is set forth in the Counterclaims will sound familiar to Court, which recently sustained similar counterclaims that CDK brought against Authenticom, Inc. ("Authenticom"). *See* Dkt. 506 ("*Authenticom* Order"). The *Authenticom* Order easily disposes of many of the arguments the Dealership Counter-Defendants advance here. And the Dealership Counter-Defendants' other efforts to avoid liability are equally meritless. Their motion repeatedly misconstrues CDK's allegations or fails to read allegations in the light most favorable to CDK, attempts to litigate disputed fact questions on the pleadings, and advances unsupported and incorrect contentions of law. Accordingly, the motion to dismiss should be denied in its entirety.

## BACKGROUND

Because the Court has extensive familiarity with the facts and related claims in this MDL, CDK's description of the background to this motion will be brief. CDK will reference further factual allegations as needed in its discussion of specific claims.

Automotive dealerships license CDK's DMS to gain access to proprietary software tools and resources used to manage core aspects of their business. The DMS stores huge amounts of

---

[1] The Answer and Counterclaims contain two sets of numbered paragraphs. This brief will cite the second set of paragraphs (the Counterclaims) as "CC."

data, much of which is highly sensitive. Some of this data belongs to dealers, but much belongs to CDK or to third parties, including original equipment manufacturers and credit reporting bureaus. CC ¶¶ 31-36. CDK implements several security measures to control access to the DMS and the valuable data it contains, including individualized login credentials, screen prompts, and CAPTCHA controls. *Id*. ¶¶ 37-42. CDK's contracts with dealers also restrict dealers from giving access to third parties except as permitted by the agreement, prohibit dealers from disclosing data to persons other than dealer generally, and prohibit automated third-party access. *Id*. ¶¶ 43-50.

As part of its DMS offering, CDK has a third-party access program, called the "CDK Partner Program" (f/k/a "3PA"), that provides managed, bi-directional integration between third-party software applications and the DMS. *Id*. ¶¶ 51-56. But certain third parties called "hostile data extractors" permit software vendors to bypass this program and access CDK's systems without authorization. Such data extractors (like Authenticom) pull huge amounts of proprietary and highly sensitive data from the DMS without oversight from CDK or accountability to interested parties. Data extractors cannot access CDK's DMS on their own but must seek and receive assistance from dealers, who share login credentials and install automated software and scripts to enable the data extractors to access CDK's DMS. This conduct violates the dealers' MSAs and poses significant risks to the security and integrity of CDK's system. *Id*. ¶¶ 61-90. CDK has taken steps to block hostile integrators and has informed dealers that enabling access by hostile integrators is not permitted under the dealers' contracts or authorized by CDK. With certain dealers' assistance, however, hostile integrators continued to access CDK's system countless times throughout the period at issue in the litigation. *Id*. ¶¶ 91-132.

CDK raises three separate claims based on these allegations. First, the Dealership Counter-Defendants have breached their MSAs by facilitating data extractors' unauthorized access. *Id*.

2

¶¶ 133-37. Second, the Dealership Counter-Defendants have violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, which prohibits accessing a computer system without the owner's permission. CC ¶¶ 138-46. Third, certain of the Dealership Counter-Defendants have violated the Digital Millennium Copyright Act of 1998 ("DMCA"), 17 U.S.C. § 1201, which prohibits circumvention of access control measures, such as CAPTCHA. CC ¶¶ 147-58. The Dealership Counter-Defendants have moved to dismiss all of these claims.

## ARGUMENT

In resolving the Dealership Counter-Defendants' motion, the Court must accept as true all of CDK's well-pleaded factual allegations and draw all reasonable inferences in CDK's favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

## I. The Counterclaims State A Breach of Contract Claim.

CDK's first cause of action alleges that the Dealership Counter-Defendants violated the terms of their respective MSAs by sharing login credentials with Authenticom and other third parties. CC ¶ 133-36. The allegations in the Counterclaims establish that each of the Dealership Counter-Defendants have "repeatedly violated the express contractual prohibitions" in their MSA by "actively facilitating hostile, unauthorized access to CDK's DMS." *Id*. ¶ 103; *see also id*. ¶¶ 104-132. The MSAs "expressly prohibit the Dealership Counter-Defendants from allowing third-parties to access CDK's DMS." *Id*. ¶ 43. There is a limited exception in some MSAs that allows access by "employees and agents of [the dealer] with a need-to-know," but extractors like Authenticom are not "agents" under this exception. *Id*. ¶ 49. Indeed, extractors like Authenticom expressly disclaim the existence of an agency relationship in their contracts with dealers. *Id*.; *see also* Dkt. 506 at 12 (noting that "Authenticom's own complaint" alleges that CDK's contracts with dealers prohibit dealers from granting Authenticom access to their data). Furthermore, even if data

3

extractors were "agents," the MSAs with dealers separately prohibit data extractors from using third-party software to access CDK's DMS. *Id.* ¶ 50.

### A. Authenticom's And Other Data Extractors' Access Was Not Authorized.

Notwithstanding express contrary allegations in the Counterclaims, the Dealership Counter-Defendants contend that CDK has "pleaded itself out of court" by supposedly admitting that Authenticom was acting as the dealer's agent. Mem. 5. This "gotcha" argument is based on the assertion that CDK has pleaded "that the Dealership Counter-Defendants *authorized* data extractors to extract data from the DMS," which in turn is based on Paragraph 3 of the Counterclaims. Mem. 5 (citing CC ¶ 3). This paragraph states in full:

> In knowingly providing login credentials to these data extractors and, actively or passively, "authorizing" them to access CDK's DMS to extract or insert data—including data that does not belong to the Dealership Counter-Defendants—the Dealership Counter-Defendants have breached their contracts with CDK. This conduct also violates the CFAA, which prohibits unauthorized access to protected computer systems. In addition, certain Dealership Counter-Defendants—and numerous members of the putative class—have engaged in further unlawful conduct that violates the DMCA. CDK requests that the Court enjoin the Dealership Counter-Defendants' illegal conduct and award CDK damages.

There is an obvious reason why there are quotation marks around the word "authorizing." *Cf. Stone v. Wright*, 734 F. App'x 989, 989 (7th Cir. 2018) ("enclos[ing]" a contested phrase in "scare quotes" where "it is hard to locate any part of the Constitution that creates such a claim"). Despite their efforts to characterize their illegal activity as mere "authorization," the MSA *did not permit* the Dealership Counter-Defendants to enable hostile access by data extractors.

The remainder of CDK's Counterclaims repeatedly reinforce this straightforward conclusion. As CDK clearly alleges, "[t]hird-party hostile data extractors like Authenticom *are not 'agents'* of the Dealership Counter-Defendants" within the meaning of the MSA. CC ¶ 49 (emphasis added). Furthermore, the MSA "independently prohibits ANY THIRD PARTY SOFTWARE TO ACCESS THE CDK DEALER MANAGEMENT SYSTEM." *Id.* ¶ 50

4

(quotation marks omitted). The Dealership Counter-Defendants' choice to "supply Authenticom with DMS login credentials" was thus in "clear violation of the dealer's contract with CDK." *Id.* ¶¶ 61-64. In the face of these detailed allegations, the idea that CDK pleaded itself out of court by quoting the word "authorized" in paragraph 3 of the Counterclaims is absurd—particularly because at this stage the Court must draw all inferences in CDK's favor. *Killingsworth*, 507 F.3d at 618.

Tellingly, the Dealership Counter-Defendants do not believe their own argument that CDK has "admitted" that data extractors were acting as agents. They later state that CDK's Counterclaims "*expressly disavow* an agency relationship" between dealers and data extractors. Mem. 18 (emphasis added).

**B.     This Court Has Already Held That "Authorization" Is A Question Of Fact.**

Besides grossly misreading the allegations in the Counterclaims, the Dealership Counter-Defendants' argument is impossible to square with the Court's *Authenticom* Order. In moving to dismiss CDK's counterclaims against it, Authenticom also contended that it was accessing CDK's DMS as the authorized "agent" of the dealers. The Court squarely rejected that contention. As the Court held, "CDK's allegations *do not* establish that Authenticom actually was an agent of the dealers. In fact, the facts alleged suggest that the *contrary* is true." Dkt. 506 at 9 (emphasis added).

In reaching this conclusion, the Court rejected every one of the arguments the Dealership Counter-Defendants now advance in their motion:

1.      Invoking the against-the-drafter canon of interpretation, the Dealership Counter-Defendants assert (at Mem. 7) that any ambiguity in the meaning of the term "agent" must be construed against CDK. But the Court has already stated that "the phrase 'agents and employees'" in the MSA with dealers "*is not* ambiguous." Dkt. 506 at 9 n.2 (emphasis added). Here, as in the *Authenticom* Order, the question before the Court is "whether Authenticom falls within the scope of that language." *Id.* That is a factual issue that cannot be resolved on the pleadings. *Id.* at 13; *see*

also, e.g., *Taylor, Bean & Whitaker Mortg. Corp. v. Cebulak*, 2004 WL 2106605, at *12 (N.D. Ill. Sept. 20, 2004) ("the presence or absence of an agency relationship … is a question of fact better left for determination at summary judgment").

2.    To downplay the fact that data extractors' contracts with dealers expressly disclaim any agency relationship (CC ¶ 49), the Dealership Counter-Defendants assert that "the MSA may not properly be interpreted by reference to dealerships' contracts with other entities." Mem. 8. But as the Court observed in the *Authenticom* Order, "the fact that the contract between Authenticom and the dealers expressly disclaims such an agency relationship *certainly* would be relevant" to the agency analysis. Dkt. 506 at 10 (emphasis added).

3.    The Dealership Counter-Defendants assert that CDK cannot "magically" turn an "agent" into a "third party" or "abrogate Dealership Counter-Defendants' contractual rights by mischaracterizing the 'agent's' software as impermissible 'third party software.'" Mem. 6. But there is nothing "magical" about it. As the Court already recognized, "the provision allowing dealers to disclose or otherwise make available CDK's products does not specifically address third party software"—and another provision of the MSA *does* expressly prohibit third-party software access (CC ¶ 50)—and so it "is not unambiguously clear that [the] MSA authorizes Authenticom to access CDK's DMS with its software." Dkt. 506 at 13. If anything, it is the Dealership Counter-Defendants who seek to "abrogate" contractual rights by precluding CDK from enforcing the separate and express prohibition on third-party access.

4.    The Dealership Counter-Defendants argue that "an agent may be both an independent contractor in one relationship and an agent in another." Mem. 7. As the Court previously explained, however, "[a]lthough an independent contractor may be considered an agent for certain purposes under certain circumstances, there is *no indication* that those circumstances

exist here." Dkt. 506 at 11 (emphasis added). Curiously, this is the only time the Dealership Counter-Defendants even cite the *Authenticom* Order in connection with their request to dismiss CDK's contract claim. *See* Mem. 7-8 (citing Dkt. 506). But the Dealership Counter-Defendants offer no pincite to any particular page in the court's order and no explanation for why they think the order helps them, when, as shown above, it does not.[2]

## II. The Counterclaims State A CFAA Claim.

The CFAA provides that anyone who accesses a computer without authorization or in excess of authorized access is subject to civil liability to the extent such access causes $5,000 in damage or loss. 18 U.S.C. § 1030(a)(2)(C), (g). The Dealership Counter-Defendants violated this provision by repeatedly providing login credentials to data extractors like Authenticom to use for the Dealership Counter-Defendants' benefit and by inducing data extractors to unlawfully access data on the DMS. *See* CC ¶¶ 141-42. Facilitating third-party access to the DMS with dealer-provided login credentials was either unauthorized access or, at a minimum, in excess of the Dealership Counter-Defendants' authorization to access the DMS under the MSA.[3] Furthermore, the unlawful access caused significant losses in the form of investigation and response costs, data remediation costs, and service disruptions to CDK's systems. *Id.* ¶ 144.

---

[2]     The other case on which the Dealership Counter-Defendants rely in this section, *Signs & Blanks, Ltd. v. Lanan Prod., Inc.*, 2009 WL 10695777 (N.D. Ill. Jan. 20, 2009), does not help them either. *Signs & Blanks* arose on summary judgment, not a motion to dismiss, found the agency question subject to a genuine dispute of material fact, and did not, as here (*see* CC ¶ 49), involve contractual language in which the putative agent expressly disclaimed the existence of an agency relationship.

[3]     The Dealership Counter-Defendants' suggestion (at Mem. 11-12 n.5) that CDK cannot pursue a CFAA claim under the "exceeding authorized access" prong because the Counterclaims only reference the "without authorization" prong is incorrect. CDK's pleading included both the "without authorization" and "exceeds authorized access" prongs from 18 U.S.C. § 1030(a)(2). *See* CC ¶ 139. In any event, a complaint need only plead facts, not legal theories. *Smith v. Med. Benefit Admin. Grp.*, 639 F.3d 277, 283 n.2 (7th Cir. 2011). The Counterclaims more than adequately allege facts supporting both prongs of CFAA liability. In addition, although CDK believes that its Counterclaims are currently sufficient, CDK is willing to amend its pleading to specify an "exceeds authorization" theory if the Court deems it necessary.

### A.     The Dealership Counter-Defendants Fall Within The CFAA.

The Dealership Counter-Defendants contend that CDK's CFAA claim against them fails because the statute does not provide for secondary liability. Mem. 10-11. There is no need to decide this question, because the Dealership Counter-Defendants are directly liable under the CFAA.

As a number of courts have recognized, the CFAA does not contain any requirement that a defendant *personally* access data on a computer system. "[T]he plain language of the statute requires only 'access'—no modifying term suggesting the need for 'personal access' is included." *Synthes, Inc. v. Emerge Med., Inc.*, 2012 WL 4205476, at *17 (E.D. Pa. Sept. 19, 2012). It thus is enough if, as here, the party encourages, facilitates, and directly benefits from an unlawful form of access implemented by another. *See, e.g.*, *id*. (collecting cases); *Enargy Power Co. v. Wang*, 2013 WL 6234625, at *3 (D. Mass. Dec. 3, 2013) (reasonable likelihood of success that "instructing a third party to access a computer constitutes unauthorized access under the CFAA"); *Se. Mech. Servs., Inc. v. Brody*, 2008 WL 4613046, at *14 (M.D. Fla. Oct. 15, 2008) (evidence that defendants "implicitly induced and/or encouraged" others to access computers and supply information was sufficient to allege access). Indeed, because a defendant could easily evade the CFAA's prohibitions simply by finding a third party to access data without authorization or in excess of authorization, "[r]equiring personal access of a computer would, in some respects, hinder the intent of the act." *Synthes*, 2012 WL 4205476, at *17. In short, by sharing their login credentials with Authenticom and using them to obtain unauthorized access to CDK's DMS, the Dealership Counter-Defendants directly violated the CFAA. *Cf.* CC ¶ 67 (stating that Authenticom's intent in accessing the CDK DMS "is to 'emulate' an ordinary dealership employee'").

The Counterclaim also shows that the Dealership Counter-Defendants are directly liable under the CFAA because they conspired with Authenticom to enable unlawful DMS access. CDK alleges that the Dealership Counter-Defendants gave "active assistance and encouragement" to

third party data extractors, including by providing login credentials and installing software scripts (CC ¶¶ 61, 64, 69, 100-01), and continued to do so despite knowing that such conduct creates risks to the integrity of the DMS and is considered unauthorized access by CDK (*id*. ¶¶ 85, 92-93). Some of the Dealership Counter-Defendants' employees even provided suggestions to Authenticom on how to evade CDK's security measures. *Id*. ¶ 110. Conspiracy is an express basis for liability under the CFAA. *See* 18 U.S.C. § 1030(b); *DHI Grp., Inc. v. Kent*, 2017 WL 9939568, at *11 (S.D. Tex. Apr. 27, 2017).[4]

Finally, although the Court need not decide the question in light of the two independent bases for direct liability, the Dealership Counter-Defendants can also be held secondarily liable for Authenticom's CFAA violations. A host of courts have recognized that the CFAA provides for aiding and abetting liability. *See, e.g.*, *COR Sec. Holdings Inc. v. Banc of Cal., N.A.*, 2018 WL 4860032, at *7 (C.D. Cal. Feb. 12, 2018); *Tracfone Wireless, Inc. v. Simply Wireless, Inc.*, 229 F. Supp. 3d 1284, 1296-97 (S.D. Fla. 2017); *Joe N. Pratt Ins. v. Doane*, 2008 WL 819011, at *10 (S.D. Tex. Mar. 20, 2008); *see also United States v. Nosal*, 844 F.3d 1024, 1039-40 (9th Cir. 2016) (criminal context). In *Tracfone*, for instance, the court held that allegations that the defendant "provided PINs to customers which allowed them to access the plaintiff's computers" despite knowing that the sale of such PINs "was not authorized by the agreement between the parties" sufficiently pleaded "the unauthorized or in excess of authorization elements" of the CFAA. 229 F. Supp. 3d at 1296-97. That is essentially the same conduct that the Dealership Counter-Defendants engaged in in this case.

---

[4] Although CDK did not plead a conspiracy claim in the Counterclaims, it has pleaded sufficient facts to state a conspiracy claim and, as noted above, is willing to amend its Counterclaim to state a conspiracy claim to the extent the Court thinks it necessary. *See supra* n.3.

The Dealership Counter-Defendants urge that the absence of express "aiding and abetting" in the CFAA precludes the imposition of secondary liability. Mem. 10-11 (citing *Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164 (1994)). But *Central Bank* does not hold that a statute "must explicitly allow for secondary liability" to permit an action for aiding and abetting. *Wiwa v. Royal Dutch Petroleum Co.*, 2002 WL 319887, at *16 (S.D.N.Y. Feb. 28, 2002); *see also Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1172 (C.D. Cal. 2005) (rejecting the idea that *Central Bank* "precludes aiding and abetting liability unless expressly provided for via the language of the statute"). *Central Bank* involved a very different statutory scheme—and an implied rather than express cause of action—and the Court went out of its way to cabin its holding to that unique context. *E.g.*, 511 U.S. at 177 (noting that "aiding and abetting a wrongdoer ought to be actionable in certain instances," although doing so would be "inconsistent with settled methodology in § 10(b) cases"); *id*. at 180 (noting that an aiding and abetting requirement would be inconsistent with the "careful limits" courts have imposed on section 10b-5 actions).[5]

\*    \*    \*

The Dealership Counter-Defendants' contention that they cannot be held secondarily liable under the CFAA is ironic in light of their alternative argument (at Mem. 12) that "authorization" under the CFAA should mean only the authorization "of the *user*." This position is of course squarely foreclosed by the Court's *Authenticom* Order. *See* Dkt. 506 at 15. But if accepted the Dealership Counter-Defendants' interpretation would blow a hole in the CFAA. Any user of a

---

[5]    In *Boim v. Quranic Literacy Institute*, the Seventh Circuit agreed that there was "no support" for the claim "that *Central Bank* eliminates all aiding and abetting liability in federal civil cases except when the words 'aid and abet' appear in a statute." 291 F.3d 1000, 1019 (7th Cir. 2002). While the Seventh Circuit subsequently questioned *Boim I*'s analysis of the availability of an aiding-and-abetting claim for the statute at issue in that case, the court did so only in dictum. *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 689 (7th Cir. 2008) (en banc); *see also id*. at 721 (Wood, J., concurring in part and dissenting in part) (noting that "[t]he *en banc* majority expresses doubt about this holding, although in the end it neither adopts nor rejects it").

computer system who wished to obtain data without permission of the computer's owner could simply "authorize" a third-party to access the system on the user's behalf, and thereby immunize both itself *and* the third party from CFAA liability. That cannot be—and is not—the law.[6]

### B. CDK Has Sufficiently Alleged Damage Or Loss.

The Dealership Counter-Defendants argue (at Mem. 13-14) that CDK has not adequately alleged $5,000 of damage or loss required to state a claim. *See* 18 U.S.C. § 1030(c)(4)(A)(i)(I). This argument is once again contrary to CDK's express allegations. CDK alleges that:

> The Dealership Counter-Defendants' violations of the CFAA have caused CDK to suffer damages and losses. *These damages and losses include the costs of investigating and responding to the Dealership Counter-Defendants' unlawful actions; the costs of restoring the DMS and the data it contains to their condition prior to the Dealership Counter-Defendants' unlawful actions; and all revenue lost, costs incurred, and other consequential damages incurred because of disruption of service caused by the unlawful actions of the Dealership Counter-Defendants and the third parties acting in concert with the Dealership Counter-Defendants.* On information and belief, these losses have exceeded $5,000 within a twelve-month period.

CC ¶ 144 (emphasis added).

In excerpting this paragraph in their motion to dismiss, the Dealership Counter-Defendants elide the italicized language with an ellipsis. Mem. 13. But these allegations of specific and plausible harms resulting from the Dealership Counter-Defendant's unauthorized access easily satisfy the pleading requirements of Rule 8. As this Court held in *Navistar, Inc. v. New Baltimore Garage, Inc.*, 2012 WL 4338816 (N.D. Ill. Sept. 20, 2012), "a plaintiff can satisfy the CFAA's definition of loss by alleging costs reasonably incurred in responding to an alleged CFAA offense." *Id*. at *8 (holding that "at a minimum" the plaintiff "stated a CFAA claim by alleging that [it]

---

[6]     The argument (at Mem. 11-12) that the CFAA claim fails because Authenticom was authorized to access the DMS fares no better than the Dealership Counter-Defendants' identical argument on the contract claim. *See* Part I *supra*; *see also* Dkt. 506 at 14 (refusing to dismiss CFAA claim on the grounds that Authenticom had supposed "authorization" to access the DMS because "CDK sufficiently has alleged a lack of authorization to survive a motion to dismiss").

incurred costs in investigating an alleged CFAA offense"). CDK's allegations go farther than that, alleging additional losses and damage, like restoring data on the DMS and disruption of service.

The Dealership Counter-Defendants respond that CDK cannot aggregate losses "caused by multiple dealerships" to reach the $5,000 threshold. Mem. 13. But the two aggregation cases the Dealership Counter-Defendants cite are inapposite. Both discussed whether to aggregate claims by many plaintiffs/victims against a single defendant—a different issue than whether and how to plead harm in a case involving multiple defendants, as here.[7] The rule for multi-defendant cases is set forth in *Wolf v. Schadegg*, 2016 WL 1117364 (D. Colo. Mar. 21, 2016). In *Wolf*, the defendants similarly contended that the CFAA claim should be dismissed because the allegations of loss and damage did not "allocate the cost of the computer forensic investigation to each individual [defendant]" and did not "clearly allege that each Defendant's individual act or acts caused loss in the amount of $5,000 or more." *Id*. at *4. The court rejected this argument for two reasons.

First, even assuming that a plaintiff must identify $5,000 in loss or damage attributable to each defendant, the defendants' contention that this standard had not been met was "simply one inference of many that many be drawn from Plaintiffs' Complaint." *Id*. A plaintiff must only plead enough factual content to support a "reasonable inference that the defendant is liable." *Id*.; *accord Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (holding that Rule 8 imposes a "plausibility" standard, not a "probability" standard). Here too, the Dealership Counter-Defendants' hypothesis (at Mem. 13 n.7) that "each of the dealerships *could* have caused as little as $294.12 in alleged losses" (emphasis added) is insufficient for dismissal. At this stage, the Court must draw all inferences in favor of CDK, not the Dealership Counter-Defendants.

---

[7] Even on the question of aggregation across victims, the two cases cited in the motion to dismiss point in opposite directions. *See In re Am. Online, Inc.*, 168 F. Supp. 2d 1359, 1373 (S.D. Fla. 2001) (criticizing *In re Doubleclick Privacy Litig.*, 154 F. Supp. 497 (S.D.N.Y 2001), for reaching its result "[w]ithout significant analysis" and for having "ignored" and "overlooked" statutory language).

In addition, the *Wolf* court noted that while "there appear to be no cases determining whether a plaintiff is required to meet the $5,000 floor with respect to each defendant individual or all defendants collectively," analogous decisions in the CFAA context suggest that allocation questions are at best fact issues that cannot be resolved on a motion to dismiss. 2016 WL 1117364, at *4; s*ee also, e.g.*, *Quantlab Techs. Ltd. (BVI) v. Godlevsky*, 2015 WL 1651251, at *3 (S.D. Tex. Apr. 14, 2015) (whether plaintiff incurred more than $5,000 in losses from one defendant's intrusions alone raised "a question of fact" that did not warrant dismissal). This approach is consistent with *Motorola, Inc. v. Lemko Corp.*, 609 F. Supp. 2d 760 (N.D. Ill. 2009), in which the court held that allegations that "Wu's acts, *as well as those of all the defendants*, caused it to incur losses of over $5,000 during a one-year period related to damage and security assessments" were "sufficient to allege loss for purposes of the CFAA." *Id.* at 768 (emphasis added). CDK's allegations here are likewise sufficient to state a claim.

### C.    CDK's Claims Are Timely.

The Dealership Counter-Defendants finally contend that the CFAA claims are not timely. Mem. 8-10. "A limitations defense is not often resolved on a Rule 12(b)(6) motion because 'a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations.'" *Roldan v. Town of Cicero*, 2019 WL 1382101, at *4 (N.D. Ill. Mar. 27, 2019). Thus, at the pleading stage, a court may dismiss a claim on limitations grounds only where the complaint "alleges facts that conclusively demonstrate that [a] claim is time-barred." *Id.*

The Dealership Counter-Defendants do not come close to meeting that standard here. As an initial matter, they assume that the limitations period for the CFAA claim should be calculated based on the date that CDK filed its Counterclaims. *See* Mem. 9. That is wrong. The statute of limitations was tolled on the date the first putative dealer class action complaint was filed: October

31, 2017.[8] Because CDK's compulsory CFAA claims accrued in 2016 or later, the claims are all within the CFAA's two-year statute of limitations. *See* 18 U.S.C. § 1030(g).

### 1. The Tolling Rule For Compulsory Counterclaims.

Courts in this Circuit and elsewhere hold that "the institution of plaintiff's suit tolls or suspends the running of the statute of limitations governing a compulsory counterclaim." Charles A. Wright & Arthur A. Miller, 6 FED. PRAC. & PROC. § 1419 (3d ed. 2019); *see, e.g.*, *Seitz v. Beeter,* 2013 WL 409428, at *2 (N.D. Ill. Jan. 31, 2013); *Thermal Design, Inc. v. Guardian Building Prods., Inc.*, 2012 WL 2254195, at *13 (E.D. Wis. June 15, 2012); *Salstone v. Gen. Felt Indus., Inc.*, 1990 WL 37265, at *3 (N.D. Ill. Mar. 5, 1990); *accord, e.g.*, *Kirkpatrick v. Lenoir County Bd. of Educ.*, 216 F.3d 380, 387-88 (4th Cir. 2000). This rule makes good sense as a matter of basic fairness and also furthers the Federal Rules' goal of "prevent[ing] multiplicity of actions" and "achiev[ing] resolution in a single lawsuit of all disputes arising out of common matters." *Warshawsky & Co. v. Arcata Nat'l Corp.*, 552 F.2d 1257, 1261 (7th Cir. 1977). Although the Seventh Circuit has never squarely addressed the question, it has suggested in dictum that it would agree. *See Asset Allocation & Mgmt. Co. v. W. Emp'rs Ins. Co.*, 892 F.2d 566, 571 (7th Cir. 1989) (citing Wright & Miller § 1419).

### 2. The CFAA Claim Is A Compulsory Counterclaim.

A counterclaim is compulsory if it arises out of the same "transaction or occurrence" as the original pleading. Fed. R. Civ. P. 13(a). To determine if this standard is met, the Seventh Circuit applies a "logical relationship" test, which is "flexible" rather than "formalistic" and which takes into account "the totality of the claims, including the nature of the claims, the legal basis for

---

[8]     The first-filed dealer class action complaint in the MDL was *Hartley Buick GMC Truck, Inc. v CDK Global, LLC*, No. 1:17-cv-7827 (N.D. Ill.), Dkt. 1. On June 6, 2018, pursuant to Court order (MDL Dkt. 146), the dealers filed a Consolidated Class Action Complaint (MDL Dkt. 184), which is the operative pleading with respect to the dealers' claims.

recovery, the law involved, and the respective factual backgrounds." *In re Price*, 42 F.3d 1068, 1073 (7th Cir. 1994). "The pertinent inquiry is whether the claim *arises out of* the same transaction or occurrence and not whether the claims are *from* the same transaction or occurrence." *Id*.

Here, both the dealers' claims and the CFAA counterclaim arise out of the same occurrence—CDK's efforts to close its DMS to hostile extractors—and turn on many overlapping facts. For instance, both the dealers' claims and CDK's Counterclaims turn on the technical details of integration and data extraction, the terms of CDK's contracts with dealers, and the risks posed by hostile access. The CFAA counterclaim also overlaps with several of CDK's affirmative defenses. *See Goose Island Dev. Corp. v. Preferred Inv. IX Ltd. P'ship*, 1992 WL 220649, at *4 (N.D. Ill. Sept. 3, 1992) (concluding that certain claims were compulsory counterclaims based on overlap with arguments raised "in the form of affirmative defenses"); *Int'l Ins. Co. v. Certain Underwriters at Lloyd's London*, 1991 WL 693319, at *11 (N.D. Ill. Sept. 16, 1991) (same). One of CDK's defenses to the dealers' antitrust claims is that CDK is legally entitled—for the reasons stated in its Counterclaims—to control access to its DMS. Dkt. 523 at 235 (Second Defense). Another is that precluding hostile access is procompetitive because it furthers legitimate security concerns. *Id*. at 236 (Seventh Defense). The close factual and legal overlap between the claims, counterclaims, and defenses in this case easily satisfies the "logical relationship" test.

*Moore v. New York Cotton Exchange*, 270 U.S. 593 (1926), is instructive. In *Moore*, a "bucket shop" sued the New York Cotton Exchange under the antitrust laws, claiming that the Exchange had a monopoly on price quotations for cotton futures and was illegally precluding the plaintiff from accessing the quotations via telegraphic ticker service. The Exchange answered and counterclaimed, asserting that the plaintiff, "though it had been refused permission to use the quotations of the New York exchange, was purloining them, or receiving them from some person

15

who was purloining them, and giving them out to its members." *Id*. at 603. After dismissing the antitrust claims, the *Moore* Court held that there was jurisdiction over the Exchange's counterclaim because it was one "arising out of the transaction which is the subject-matter of the suit." *Id*. at 609. As the *Moore* Court noted, "transaction" is "a word of flexible meaning." *Id*. So long as the "[e]ssential facts" in the original claim "enter into and constitute in part the cause of action set forth in the counterclaim," the fact that the allegations "are not precisely identical, or that the counterclaim embraces additional allegations, as, for example, that appellant is unlawfully getting the quotations, does not matter." *Id*.[9]

CDK's Counterclaims allege that CDK "refused permission" to unauthorized data extractors and that, in violation of the CFAA, the Dealership Counter-Defendants nevertheless continued to assist and benefit from third-party data extractors who "purloined" data from CDK's DMS. This claim too "aris[es] out of the transaction which is the subject-matter of the suit.'"

### 3. The CFAA Claims Accrued In 2016 Or Later.

CDK's Counterclaims explain that from 2016 on "[e]ach Dealership Counter-Defendant has repeatedly violated the express contractual prohibitions in its MSA by actively facilitating hostile, unauthorized automated access to CDK's DMS." CC ¶ 103. For example, the Continental Defendants "repeatedly enabled unauthorized third-party access to CDK's DMS" from March 2016 through 2018 by providing login credentials that accessed CDK's DMS hundreds or thousands of times. *Id*. ¶¶ 104-110. The same is true of the other Dealership Counter-Defendants. *See id*. ¶ 111-12 (Warrensburg); ¶¶ 115-18 (Cherry Hill); *id*. ¶¶ 121-22 (Stevens); *id*. ¶ 125 (Waconia Dodge); *id*. ¶¶ 128-31 (Baystate Ford). This unauthorized access occurred well within

---

[9]      *Moore* construed Civil Rule 13(a)'s predecessor, Equity Rule 30. Courts frequently cite *Moore* for guidance on Rule 13(a)'s "transaction or occurrence" test. *See, e.g.*, *Warshawsky*, 552 F.2d at 1261; *PTG Nev., LLC v. Does 1-25*, 2016 WL 3521941, at *3 (N.D. Ill. June 28, 2016); Fed. R. Civ. P. 13, 1937 adv. comm. notes (stating that Rule 13 is "substantially [former] Equity Rule 30").

16

two years of the date the dealers first brought suit. Indeed, much of this access even occurred within two years of the date CDK filed its Counterclaims. Because "the statute of limitations begins to run when the claim accrues" (*United States v. Midwest Generation, LLC*, 720 F.3d 644, 646 (7th Cir. 2013)), CDK's claims based on recent instances of unauthorized access are timely under foundational limitations principles.

### 4. The Dealership Counter-Defendants' Arguments Fail.

The Dealership Counter-Defendants' attempts to show that CDK knew of its CFAA claims in 2015 or earlier falls flat. Even if CDK did have knowledge of some claims outside the limitations period, the Dealership Counter-Defendants *continued* to permit, facilitate, and benefit from unauthorized access of CDK's DMS throughout 2016, 2017, and 2018. *See* CC ¶¶ 104-32. Nothing in the CFAA provides that a plaintiff who does not sue within two years of an initial incursion is forever barred from suing based on subsequent unauthorized access. To the contrary, it is a basic legal principle that "[a] series of wrongful acts . . . creates a *series* of claims." *Palmer v. Bd. of Educ. of Cmty. Unit Sch. Dist. 201-U*, 46 F.3d 682, 686 (7th Cir. 1995) (emphasis added). When the Dealership Counter-Defendants and Authenticom accessed the DMS without authorization in 2016 and later—after CDK had notified its customers that third-party hostile access to the DMS was not authorized (CC ¶ 93)—they violated the CFAA regardless of whether the limitations period for earlier violations may have expired.[10]

---

[10]     CDK acknowledges that *Meyer Technology Solutions, LLC v. Kaegem Corp.*, 2017 WL 4512918 (N.D. Ill. Oct. 10, 2017), dismissed a CFAA counterclaim even though the counter-defendant allegedly continued accessing the plaintiff's computer systems "in the same fashion" within the limitations period. *Id.* at *1. Respectfully, that case's reasoning is not persuasive and should not be followed. The *Meyer* court based its conclusion on the fact that the "continuing violation" exception did not apply to CFAA claims because the first instance of unauthorized conduct was sufficient to make out a claim. 2017 4512918, at *1 (citing *Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 801 (7th Cir. 2008)); *but see CollegeSource, Inc. v. AcademyOne, Inc.*, 2011 WL 13225283, at *4 (E.D. Pa. May 18, 2011) (applying continuing violation to CFAA claim). Even if *Meyer* were right about continuing violations—a question the Court need not decide here—it was wrong that *Limestone* required dismissal of claims based on *subsequent* unauthorized access. In *Limestone*, the Seventh Circuit explained that when the limitations

Moreover, the Counterclaims do not affirmatively show that CDK had the requisite knowledge in any event. The Dealership Counter-Defendants point to the allegation that they "became aware that CDK objected to unauthorized access to the CDK DMS by third parties like Authenticom" in June 2015 or earlier. Mem. 9 (quoting CC ¶ 92). But the Dealership Counter-Defendants' knowledge is not relevant. As this Court has held, the limitations period "begins to run when the plaintiff [i.e., CDK] knew or reasonably should have known that he or she was wrongfully injured.'" *Navistar*, 2012 WL 4338816, at *9. The Dealership Counter-Defendants also point to a 2013 report from CDK's parent company about data corruption issues, some of which the report attributed to hostile access. Mem. 9 (citing CC ¶ 83). This does not suggest that CDK was aware in 2013 of unlawful activity by the Dealership Counter-Defendants—let alone that the Dealership Counter-Defendants would continue to enable hostile access in 2016 and beyond.

## III.    The Counterclaims State A DMCA Claim.

The DMCA prohibits circumvention of a "technological measure" that controls access to a work without the authority of the copyright user. 17 U.S.C. § 1201(a)(1), (3)(A). CDK's DMCA claim against the Continental and Warrensburg Counter-Defendants is based on the same general allegations that successfully stated a DMCA claim against Authenticom. *See* Dkt. 506 at 16. Nevertheless, the Dealership Counter-Defendants argue that CDK has not stated a claim here because the Continental or Warrensburg Counter-Defendants are not primarily liable and secondary liability does not exist under the DMCA. Mem. 16. Once again, their argument fails.

---

period begins to run upon injury, you cannot "wait until year 15 (assuming for the sake of illustration that the statute of limitations is five years) and then sue *not only* for the wages you should have received in year 10 *but also* for the wages you should have received in years 1 through 9." 520 F.3d at 801 (emphasis added). At most, then, *Limestone* suggests that CDK cannot state a claim for unauthorized access that CDK knew about more than two years before the dealers filed suit ("years 1 through 9"). It does not bar CDK from bringing a claim for "year 10"—i.e., additional unauthorized access occurring within the limitations period.

### A. The Warrensburg Counter-Defendants Are Directly Liable For DMCA Violations.

The Warrensburg Counter-Defendants are directly liable under the DMCA because they "installed Authenticom's Profile Manager tool" (CC ¶ 113) and worked with Authenticom "to evade [user ID blocking] by having new credentials created and/or by restoring disabled credentials—including on information and belief by automated means." *Id.* ¶ 152. In the *Authenticom* Order, the Court held that this exact conduct—"implement[ing] a software tool that automatically renewed user IDs"—constitutes "circumvention" within the meaning of the DMCA. Dkt. 506 at 16-17.

The Dealership Counter-Defendants stress that CDK did not allege that the Warrensburg Counter-Defendants "created [the software] tool, knew how it operated, or ran it themselves." Mem. 16. But the DMCA contains no requirement that a defendant "create" or "run" a tool or know all the details of its technical operation to "circumvent a technological measure" under the statute. Indeed, the statue creates a separate cause of action, 17 U.S.C. § 1201(a)(2), against those who "manufacture, import, . . . provide, or otherwise traffic in" technology or devices designed to circumvent a technological measure. The allegation that the Warrensburg Counter-Defendants implemented and used Authenticom's software tool to evade CDK's blocking and user ID measures (CC ¶¶ 113, 152) is sufficient to state a claim under the DMCA.

### B. The Continental and Warrensburg Counter-Defendants Are Secondarily Liable For DMCA Violations.

Aside from direct DMCA liability, the Continental and Warrensburg Counter-Defendants are also liable based on secondary liability principles, which are part of the backdrop against which Congress legislated when it enacted the DMCA.

As this Court has recognized, the DMCA builds upon the federal law of copyright. "Congress enacted the DMCA . . . to strengthen copyright protection in the digital age." *Navistar*,

2012 WL 4338816, at *3. Secondary liability is "well established" in the copyright context as a matter of common law. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005). A defendant can be held liable not only for direct infringement of a copyright but also for vicarious infringement (profiting from another's infringement while declining to stop or limit it) and contributory infringement (intentionally inducing or encouraging direct infringement by another). *Id*. Although "[t]he Copyright Act does not expressly render anyone liable for infringement committed by another," "[t]he absence of such express language in the copyright statute does not preclude the imposition of liability for copyright infringements on certain parties who have not themselves engaged in the infringing activity." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 434-35 (1984).

Congress did not displace these general principles when it enacted the DMCA. As the Supreme Court has explained, "Congress is understood to legislate against a background of common-law … principles, and when a statute covers an issue previously governed by the common law, we interpret the statute with the presumption that Congress intended to retain the substance of the common law." *Samantar v. Yousuf*, 560 U.S. 305, 320 n.13 (2010). The DMCA does not rebut this presumption. As one court has put it, the DMCA did not "rewrite copyright law for the on-line world." *Ellison v. Robertson*, 357 F.3d 1072, 1077 (9th Cir. 2004).

In Title II of the DMCA, for instance, Congress created a series of safe harbors for internet service providers who might be subject to secondary liability for infringing activities occurring on their servers. *See* 17 U.S.C. § 512. With the exception of these safe harbors, however, Congress deliberately left existing secondary liability doctrines as they found them. Thus, the Seventh Circuit has stated that the DMCA "does not abolish contributory infringement." *In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003). And the Ninth Circuit has similarly recognized

that even after the DMCA, "[c]laims against service providers for direct, contributory, or vicarious copyright infringement . . . are generally evaluated just as they would be in the non-online world." *Ellison*, 357 F.3d at 1076-77.

It is therefore unsurprising the courts have applied secondary liability principles drawn from copyright law to causes of action arising under the DMCA. *See, e.g.*, *Gordon v. Nextel Commc'ns*, 345 F.3d 922, 925 & n.1 (6th Cir. 2003); *Microsoft Corp. v. Silver Star Micro, Inc.*, 2008 WL 115006, at *8 n.8 (N.D. Ga. Jan. 9, 2008) (citing *Ellison*); *Rosenthal v. MPC Computers, LLC*, 493 F. Supp. 2d 182, 190 (D. Mass. 2007) (citing *Gordon*). Applying secondary liability principles from the copyright context to claims under 17 U.S.C. § 1201(a)(1) makes particular sense in light of the DMCA's structure. As the statute and the legislative history makes clear, § 1201(a)(1) is a kind of "access" analogue to traditional copyright law's prohibition on unauthorized copying—a prohibition that, as described above, has long included secondary liability, including for those who aid or encourage directly liable infringers.[11]

The Dealership Counter-Defendants' arguments against secondary liability in the DMCA context once more fail to persuade. Mem. 17-18. Even if the absence of statutory "aiding and abetting" language were convincing as to the CFAA (and it is not, for the reasons discussed above), the DMCA must be read against its copyright background, which recognizes secondary liability

---

[11]     Section 1201(a) of the DMCA targets circumvention of restrictions on *access* to a protected work. Section 1201(b), by contrast, targets circumventions of restrictions on *copying* a protected work. But while § 1201(b) only restricts the manufacture of devices that assist with the circumvention of restrictions on copying, § 1201(a) contains two separate restrictions: one on circumventing conduct (subsection (a)(1)) and one of the manufacture of devices that facilitate circumvention (subsection (a)(2)). The Senate Report accompanying the DMCA explains that the reason for this discrepancy is that § 1201(a)(1) extends existing protections from the *copying* context into the *access* context. "The copyright law has long forbidden copyright infringements, so no new prohibition was necessary." S. Rep. No. 105-190, at 12 (1998).

     Incidentally, the Dealership Counter-Defendants misconstrue the import of the "acting in concert" language in 17 U.S.C. § 1201(a)(2)(C). *See* Mem. 18 n.9. That language neither creates nor contracts secondary liability; it merely defines the category of circumventing products or technologies for which a person may be liable under the statute.

21

despite "[t]he absence of … express language in the copyright statute." *Sony*, 464 U.S. at 435. Accordingly, application of secondary liability to DMCA claims is entirely appropriate.

The Dealership Counter-Defendants also suggest (at Mem. 18) that a snippet of text from *GC2 Inc. v. International Game Technology*, 2018 WL 5921315 (N.D. Ill. Nov. 12, 2018), shows that there is no secondary liability under the DMCA. But that decision did not address secondary liability, evaluate the DMCA's history or structure, or consider the broader common-law principles from the copyright context. Indeed, the *GC2* court found the parties' arguments so undeveloped that it could not even determine "what [the plaintiff] is contending" with regard to third parties— and the court was careful to note that a different case "might be a different matter for purposes of DMCA liability." *Id*. at *8.

Finally, the Dealership Counter-Defendants contend that CDK cannot bring a secondary liability claim based on "agency" principles. Mem. 18. But CDK is not bringing such a claim. Contributory infringement does not turn on an agency relationship between the direct and secondary infringer. Rather, it requires something akin to aiding and abetting: "personal conduct that *encourages or assists* the infringement. *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 757 (7th Cir. 2012) (emphasis added); *see also Aimster*, 334 F.3d at 651 (discussing "analogies in the law of aiding and abetting … to contributory infringement"); *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1237-38 (10th Cir. 2013) (same). CDK has alleged that the Continental and Warrensburg Counter-Defendants encouraged or assisted Authenticom's circumvention of CDK's security measures by "induc[ing] Authenticom and other third parties to repeatedly circumvent CDK's access control measures" and by installing software and sharing user IDs necessary to evade these measures. CC ¶¶ 151-55. Because the DMCA should be construed in keeping with

secondary liability principles from the general copyright context, these allegations are sufficient to state a claim under § 1201(a)(1).

## CONCLUSION

The Dealership Counter-Defendants' motion to dismiss should be denied in its entirety.

Dated: April 19, 2019

Respectfully submitted,

*/s/ Britt M. Miller*
Britt M. Miller
Michael A. Scodro
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mscodro@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant*
*CDK Global, LLC*

## CERTIFICATE OF SERVICE

I, Britt M. Miller, an attorney, hereby certify that on April 19, 2019, I caused a true and correct copy of the foregoing **CDK GLOBAL, LLC'S OPPOSITION TO THE DEALERSHIP COUNTER-DEFENDANTS' MOTION TO DISMISS CDK'S COUNTERCLAIMS** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/ Britt M. Miller*
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Phone: (312) 782-0600
Fax: (312) 701-7711
E-mail: bmiller@mayerbrown.com