**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| | ) | |
| IN RE: DEALER MANAGEMENT SYSTEMS | ) | MDL No. 2817 |
| ANTITRUST LITIGATION | ) | Case No. 1:18-CV-00864 |
| | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |
| | ) | Hon. Robert M. Dow, Jr. |
| *This Document Relates To:* | ) | |
| | ) | |
| i3 Brands, Inc. et al. v. CDK Global, LLC, et al., | ) | |
| No. 1:19-CV-01412 | ) | |

**PLAINTIFFS' OPPOSITION TO THE REYNOLDS AND REYNOLDS COMPANY'S**
**MOTION TO DISMISS IN FAVOR OF ARBITRATION, OR IN THE ALTERNATIVE,**
**TO DISMISS UNDER RULE 12(B)(6)**

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND .............................................................................. 2

ARGUMENT ...................................................................................................... 3

I.     REYNOLDS CANNOT COMPEL ARBITRATION OF
PLAINTIFFS' CLAIMS ....................................................................... 3

     A.     PartProtection Did Not Delegate "Gateway" Arbitrability
Determinations ......................................................................... 3

     B.     Plaintiffs' Claims Are Not Arbitrable ...................................... 5

          1.     Plaintiffs' Antitrust Claims Are Not Arbitrable ............ 6

          2.     Plaintiffs' TradeMotion Claims Are Not Arbitrable ...... 7

          3.     Plaintiffs' Other Claims Are Not Arbitrable .................. 8

     C.     The Court Is Not Required To Stay Non-Arbitrable Claims ................... 10

II.     PLAINTIFFS HAVE SUFFICIENTLY PLEADED THEIR
CLAIMS ............................................................................................ 10

     A.     Plaintiffs Have Stated Antitrust Claims ................................. 10

          1.     i3 Brands Is A Proper Antitrust Plaintiff ...................... 10

          2.     Reynolds' DMS License Agreements Do Not Bar
Plaintiffs' Antitrust Claims .......................................... 11

               a.     Reynolds License Restrictions Are Not
"Perfectly Lawful" ............................................ 11

               b.     Reynolds' License Restrictions Do Not
"Defeat" Plaintiffs' Antitrust Claims ................ 12

          3.     Plaintiffs' Alleged Conspiracy Is Plausible .................. 14

          4.     Plaintiffs Sufficiently Plead The Relevant Market
And Substantial Foreclosure .......................................... 15

          5.     Plaintiffs Have Sufficiently Pleaded Their
Monopolization Claims .................................................. 17

i

B.     Plaintiffs Have Sufficiently Pleaded Their Other Claims Against Reynolds ...................................................................... 19

     1.     Plaintiffs Have Stated A Claim For Breach Of Contract.......................................................................... 19

     2.     Plaintiffs Have Stated A Claim For Promissory Estoppel......................................................................... 21

     3.     Plaintiffs Have Stated A Claim For Fraud ................................. 22

     4.     Plaintiffs Have Stated A Claim For Trade Secret Misappropriation.................................................................. 24

          a.     Plaintiffs sufficiently described their trade secrets............................................................... 25

          b.     Plaintiffs adequately alleged the "secrecy" element............................................................. 27

     5.     Plaintiffs Have Stated A Claim For Diminution In Value of TradeMotion.................................................... 29

     6.     Plaintiffs Have Stated A Claim For Tortious Inference .............................................................................. 29

CONCLUSION................................................................................................ 30

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A N Bros. Corp. v. Total Quality, LLC*,
   2016-Ohio-549, 59 N.E.3d 758 (Ct. App.) ............................................................................21

*Acad. of Med. of Cincinnati v. Aetna Health Inc.*,
   155 Ohio App. 3d 310, 800 N.E.2d 1185 ...........................................................................6, 7

*Acad. of Med. of Cincinnati v. Aetna Health, Inc.*,
   108 Ohio St. 3d 185 (Ohio 2006) ....................................................................................6, 7, 9

*AlliedSignal, Inc. v. B.F. Goodrich Co.*,
   183 F.3d 568 (7th Cir. 1999) ..................................................................................................7

*Alpert v. Kodee Techs.*,
   117 Ohio App. 3d 796, 691 N.E.2d 732 (1997)..............................................................19, 20

*Alta Devices, Inc. v. LG Elecs., Inc.*,
   2019 U.S. Dist. LEXIS 5048 (N.D. Cal. Jan. 10, 2019) ........................................................25

*Am. Roll Form Corp. v. Chamberlain Grp., Inc.*,
   2015 U.S. Dist. LEXIS 26560 (N.D. Ohio Feb. 27, 2015)...............................................23, 24

*Am. Signature, Inc. v. Extreme Linen, LLC*,
   2015 U.S. Dist. LEXIS 41958 (S.D. Ohio Mar. 31, 2015).....................................................21

*Applied Med. Distribution Corp. v. Ah Sung Int'l, Inc.*,
   2015 U.S. Dist. LEXIS 190176 (C.D. Cal. Dec. 14, 2015) ...................................................23

*Authenticom v. CDK, et al.*,
   313 F. Supp. 3d 931 (N.D. Ill. 2018) ..........................................................................*passim*

*Autodesk, Inc. v. Zwcad Software Co.*,
   2015 U.S. Dist. LEXIS 63610 (N.D. Cal. May 13, 2015) .....................................................26

*Autoloop v. CDK et al.*,
   2019 U.S. Dist. LEXIS 12148  (N.D. Ill. Jan. 25, 2019) .......................................................15

*Bal Seal Eng'g v. Nelson Prods.*,
   2018 U.S. Dist. LEXIS 220501 (C.D. Cal. Aug. 3, 2018).....................................................27

*Behrens v. JPMorgan Chase Bank N.A.*,
   2019 U.S. Dist. LEXIS 55952 (S.D.N.Y. Mar. 31, 2019) .......................................................4

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................................................10

*Belnap v. Iasis Healthcare*,
   844 F.3d 1272 (10th Cir. 2017) ................................................................................5

*Best v. Shell Oil Co.*,
   107 F.3d 544 (7th Cir. 1997) ...................................................................................13

*Bill Call Ford, Inc. v. Ford Motor Co.*,
   830 F. Supp. 1053 (N.D. Ohio 1993) .......................................................................30

*Bladeroom Grp. Ltd. v. Facebook, Inc.*,
   2018 U.S. Dist. LEXIS 10905 (N.D. Cal. Jan. 2, 2018) ..........................................25

*BladeRoom Grp. Ltd. v. Facebook, Inc.*,
   219 F. Supp. 3d 984 (N.D. Cal. 2017) ...............................................................27, 28

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
   152 F.3d 588 (7th Cir. 1998) ...................................................................................13

*Brian Lichtenberg, Ltd. Liab. Co. v. Alex & Chloe, Inc.*,
   2014 U.S. Dist. LEXIS 18607 (C.D. Cal. Feb. 13, 2014).........................................26

*Brocade Commc'ns Sys. v. A10 Networks, Inc.*,
   2011 U.S. Dist. LEXIS 30227 (N.D. Cal. Mar. 23, 2011)........................................26

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)..................................................................................................14

*Burris v. State Farm Fire & Cas. Co.*,
   2009-Ohio-5123 (Ct. App.)..................................................................................21, 22

*Chambers v. Groome Transp. of Ala.*,
   41 F. Supp. 3d 1327 (M.D. Ala. 2014) ......................................................................4

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
   2014 U.S. Dist. LEXIS 188283 (S.D. Ohio Mar. 21, 2014) *aff'd*, 781 F.3d 264
   (6th Cir. 2015)..........................................................................................................18

*In re Copper Antitrust Litig.*,
   98 F. Supp. 2d 1039 (W.D. Wis. 2000) .....................................................................11

*Cox Auto, Inc. v. CDK Global, LLC*, 360 F. Supp. 3d 788 (N.D. Ill. 2019)...............14, 15, 17, 18

*CytoDyn of New Mexico, Inc. v. Amerimmune Pharms., Inc.*,
   160 Cal. App. 4th 288, 72 Cal. Rptr. 3d 600 (2008).................................................24

*Deitrick v. Am. Mortg. Sols., Inc.*,
   2007-Ohio-839 (Ct. App.)................................................................22

*Direct Techs., Inc. v. Elec. Arts, Inc.*,
   2014 U.S. Dist. LEXIS 195737 (C.D. Cal. Apr. 21, 2014) .............27, 29

*Direct Techs., LLC v. Elec. Arts, Inc.*,
   836 F.3d 1059 (9th Cir. 2016) .........................................................28

*DocMagic, Inc. v. Ellie Mae, Inc.*,
   745 F. Supp. 2d 1119 (N.D. Cal. 2010) ...........................................26

*Eastman Kodak v. Image Tech. Servs, Inc.*,
   504 U.S. 451 (1992).................................................................17, 18

*eBay, Inc. v. Bidder's Edge, Inc.*,
   2000 U.S. Dist. LEXIS 21971 (N.D. Cal. Dec. 6, 2000)....................19

*Emp'rs Ins. v. Browner*,
   848 F. Supp. 1369 (N.D. Ill. 1994) ....................................................2

*In re Estate of Bohl*,
   2016-Ohio-637, 60 N.E.3d 511 (Ct. App.) ........................................20

*EEOC v. Waffle House, Inc.*,
   534 U.S. 279 (2002)...........................................................................6

*Fishman v. Estate of Wirtz*,
   807 F.2d 520 (7th Cir. 1986) ..........................................................29

*Fitspot Ventures, LLC v. Bier*,
   2015 U.S. Dist. LEXIS 116579 (C.D. Cal. Sep. 1, 2015)..................26

*Fleet v. Bank of Am. N.A.*,
   229 Cal. App. 4th 1403, 178 Cal. Rptr. 3d 18 (2014)........................22

*Ford v. Nylcare Health Plans*,
   141 F.3d 243 (5th Cir. 1998) ..........................................................6, 9

*Forney v. Ttxco*,
   2006 U.S. Dist. LEXIS 42241 (N.D. Ill. May 1, 2006) ........................2

*G&C Auto Body Inc. v. GEICO Gen. Ins. Co.*,
   552 F. Supp. 2d 1015 (N.D. Cal. 2008) ............................................30

*Gabriel Techs. Corp. v. Qualcomm Inc.*,
   2009 U.S. Dist. LEXIS 98379 (S.D. Cal. Sep. 3, 2009) .....................24

*Gelboim v. Bank of Am. Corp.*,
   823 F.3d 759 (2d Cir. 2016)...................................................................................11

*Gen. Power Prods., LLC v. MTD Prods., Inc.*,
   2007 U.S. Dist. LEXIS 21181 (S.D. Ohio Mar. 26, 2007).......................................9

*Giasson Aerospace Sci., Inc. v. RCO Eng'g, Inc.*,
   680 F. Supp. 2d 830 (E.D. Mich. 2010)..................................................................27

*Gilman v. Walters*,
   61 F. Supp. 3d 794 (S.D. Ind. 2014) .........................................................................5

*Gore v. Alltel Comm., LLC*,
   666 F.3d 1027 (7th Cir. 2012) ...................................................................................6

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
   561 U.S. 287 (2010)................................................................................................5, 6

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
   998 F.2d 391 (7th Cir. 1993) ...................................................................................14

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*,
   2013 U.S. Dist. LEXIS 92133(N.D. Ind. Mar. 13, 2013) .......................................18

*Hannah's Boutique, Inc. v. Surdej*,
   112 F. Supp. 3d 758 (N.D. Ill. 2015) ......................................................................16

*Heller v. AXA Equitable Fin. Servs.*,
   2014 U.S. Dist. LEXIS 51836 (D. Mass. Apr. 15, 2014) ..........................................5

*In re High Fructose Corn Syrup Antitrust Litig.*,
   295 F.3d 651 (7th Cir. 2002) ...................................................................................15

*InfoSpan, Inc. v. Emirates NBD Bank PJSC*,
   2015 U.S. Dist. LEXIS 192303 (C.D. Cal. May 6, 2015) .................................25, 27

*Integral Dev. Corp. v. Tolat*,
   675 F. App'x 700 (9th Cir. 2017) ............................................................................26

*Jamsports & Entm't, LLC v. Paradama Prods., Inc.*,
   2003 U.S. Dist. LEXIS 6100 (N.D. Ill. Apr. 15, 2003) ..........................................15

*JLM Indus. Inc. v. Stolt-Nielsen SA*,
   387 F.3d 163 (2d Cir. 2004)......................................................................................7

*In re Kellogg Brown & Root, Inc.*,
   166 S.W.3d 732 (Tex. 2005).....................................................................................8

*Kelly v. Romines*,
   2011 U.S. Dist. LEXIS 165167 (C.D. Cal. May 27, 2011) ....................................................23

*Khoury v. Trumbull Physician Hosp. Org.*,
   2000 Ohio App. LEXIS 5785(Ct. App. Dec. 8, 2000)) ..........................................................30

*King v. Hertz Corp.*,
   2011 U.S. Dist. LEXIS 35610 (N.D. Ohio Mar. 31, 2011) ....................................................22

*Locke v. Warner Bros.*,
   57 Cal. App. 4th 354, 66 Cal. Rptr. 2d 921 (1997)................................................................22

*M.J. DiCorpo, Inc. v. Sweeney*,
   1994-Ohio-316, 69 Ohio St. 3d 497, 634 N.E.2d 203 ....................................................19, 20

*Maltz v. Sax*, 134 F.2d 2 (7th Cir. 1943)..............................................................................13

*Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*,
   271 F.3d 825 (9th Cir. 2001) ..............................................................................................29

*Martone v. Burgess*,
   2008 U.S. Dist. LEXIS 68434 (N.D. Cal. Aug. 25, 2008)......................................................24

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*,
   62 F.3d 967 (7th Cir. 1995) ..........................................................................................15, 16

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
   641 F.3d 834 (7th Cir. 2011) ..............................................................................................17

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
   2016 U.S. Dist. LEXIS 136478 (C.D. Ill. Sept. 30, 2016)......................................................17

*Miller v. Flume*,
   139 F.3d 1130 (7th Cir. 1998) ..........................................................................................4, 5

*MMCA Grp., Ltd v. Hewlett-Packard Co.*,
   2010 U.S. Dist. LEXIS 2197 (N.D. Cal. Jan. 12, 2010)........................................................27

*Nat'l Rural Telcoms. Coop. v. DIRECTV, Inc.*,
   319 F. Supp. 2d 1059 (C.D. Cal. 2003) ................................................................................30

*Nephrology & Hypertension Specialists, LLC v. Fresenius Med. Care Holdings, Inc.*,
   2010 U.S. Dist. LEXIS 78968 (S.D. Ohio Aug. 5, 2010).................................................19, 20

*In re Niaspan Antitrust Litig.*,
   42 F. Supp. 3d 735 (E.D. Pa. 2014) ....................................................................................11

*Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*,
  585 F.2d 821 (7th Cir. 1978) ................................................................14

*Panache Broad. v. Richardson Elecs.*,
  1994 U.S. Dist. LEXIS 4830 (N.D. Ill. Apr. 14, 1994) .........................11

*Raftery v. S. Lee Corp.*,
  2007 U.S. Dist. LEXIS 86860 (S.D. Ohio Nov. 15, 2007)......................23

*Rescap Liquidating Trust v. First Cal. Mortg. Co.*,
  2018 U.S. Dist. LEXIS 183507 (N.D. Cal. Oct. 25, 2018)......................30

*Roland Mach. Co. v. Dresser Indus., Inc.*,
  749 F.2d 380 (7th Cir. 1984) ................................................................14

*Scheurer v. Fromm Family Foods LLC*,
  863 F.3d 748 (7th Cir. 2017) ..................................................................6

*Sunbelt Rentals, Inc. v. Victor*,
  2014 U.S. Dist. LEXIS 14416 (N.D. Cal. Feb. 4, 2014) ........................26

*Sybaritic, Inc. v. Neoqi, Ltd.*,
  2004 WL 2066853 (D. Minn. Aug. 31, 2004) ........................................10

*Teledyne Risi, Inc. v. Martin-Baker Aircraft Co., Ltd.*,
  2016 U.S. Dist. LEXIS 190601 (C.D. Cal. Feb. 2, 2016).................20, 25

*Terrell v. Uniscribe Prof'l Servs.*,
  348 F. Supp. 2d 890 (N.D. Ohio 2004)..................................................19

*Toys "R" Us, Inc. v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ................................................................13

*US Ecology, Inc. v. State of Cal.*,
  129 Cal. App. 4th 887, 28 Cal. Rptr. 3d 894 (2005)..............................21

*Van Dusen v. Swift Transp. Co.*,
  2010 U.S. Dist. LEXIS 145553 (D. Ariz. Sep. 30, 2010)........................5

*Vinyl Interactive, Ltd. Liab. Co. v. Guarino*,
  2009 U.S. Dist. LEXIS 41498 (N.D. Cal. May 1, 2009) ........................27

*Volkswagen of Am., Inc. v. Sud's of Peoria, Inc.*,
  474 F.3d 966 (7th Cir. 2007) ................................................................10

*Westwinds Dev. Corp. v. Outcalt*,
  2009-Ohio-2948 ...............................................................................20, 21

*Wilhelm v. A.G. Edwards & Sons, Inc.,*
    2002 U.S. Dist. LEXIS 11231 (N.D. Ill. June 21, 2002) ........................................4

*Wilk v. Am. Med. Ass'n,*
    895 F.2d 352 (7th Cir. 1990) ...................................................16

*Williams v. Comm'r,*
    1 F.3d 502 (7th Cir. 1993) .....................................................13

*WMS Gaming, Inc. v. IGT,*
    31 F. Supp. 3d 974 (N.D. Ill. 2014) ..........................................10

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,*
    259 F.3d 1101 (9th Cir. 2001) .................................................27

*Zahn v. North Am. Power & Gas, LLC,*
    815 F.3d 1082 (7th Cir. 2016) ................................................10

**Federal Statutes**

Sherman Act.................................................................15, 18

**State Statutes**

California Uniform Trade Secrets Act, Cal. Civil Code § 3426, et seq. ................21, 24

Ohio Uniform Trade Secrets Act,  Ohio Rev. Code § 1333.67(B)(1) ...........................21

**Other Authorities**

Fed. R. Civ. P. 8(a)(2)........................................................10

Fed. R. Civ. P.  9(b) .........................................................23

Fed. R. Civ. P.  12(b)(6).......................................................30

LR 5.2(c)......................................................................1

**INTRODUCTION**

In its Motion to Dismiss, The Reynolds and Reynolds Company ("Reynolds") seeks to avoid the jurisdiction of this Court and avoid liability for its blatant anticompetitive conspiracy with co-defendant CDK Global, LLC ("CDK"). Through its conspiracy, not only has Reynolds been able to charge supracompetitive prices for years, it has executed a scheme in which it defrauded i3 Brands, Inc. ("i3 Brands") and PartProtection, LLC ("PartProtection") (collectively, "Plaintiffs") by stealing PartProtection's trade secrets to create a competing product. Reynolds should be forced to answer for its misconduct in this Court.

Reynolds' attempt to compel arbitration fails for multiple reasons. ***First***, its argument that an arbitrator must decide threshold issues of arbitrability (rather than the Court) is misplaced because it has failed to submit "clear and unmistakable" evidence that PartProtection agreed to delegate issues of arbitrability to an arbitrator. ***Second***, Reynolds attempts to shoehorn Plaintiffs' claims into three agreements containing arbitration provisions, but Plaintiffs did not agree to arbitrate their claims and Reynolds should not be permitted to expand the scope of its agreements.

Reynolds' motion also fails because Plaintiffs have sufficiently pleaded their claims based on Reynolds' violations of antitrust laws. For example, many of Reynolds' arguments have already been rejected by the Court and are barred by the law of the case doctrine. Reynolds also argues that Plaintiffs have failed to state claims relating to its scheme to defraud them and misappropriate PartProtection's trade secrets, but Plaintiffs have met their pleading burden.

Finally, Reynolds circumvented its stipulation to file a brief of 30 pages or less by inserting *37* footnotes containing substantive legal arguments and over *75* case citations. (*See generally,* Memo.) It also violated LR 5.2(c), which requires that footnotes be "no less than 11 point[]" font. Plaintiffs cannot reasonably respond to all of the arguments and authorities in its footnotes without engaging in the same improper tactics. Accordingly, this Court should strike Reynolds' brief, *see*

*Forney v. Ttxco,* 2006 U.S. Dist. LEXIS 42241, at *6 (N.D. Ill. May 1, 2006), or at a minimum, disregard its footnotes. *See Emp'rs Ins. v. Browner*, 848 F. Supp. 1369, 1378 n.15 (N.D. Ill. 1994).

## FACTUAL BACKGROUND

On February 4, 2019, Plaintiffs, which are "vendors" that provide services to auto dealerships, (Compl. ¶ 10), filed their Complaint against Reynolds and CDK in the Southern District of California, and their case was transferred to this Court on March 5, 2019. Plaintiffs assert claims against Reynolds under antitrust law based on its anticompetitive conspiracy with CDK relating to the Dealer Management Systems ("DMS") and data integration markets. The details of Defendants' conspiracy are well-known to the Court: Defendants are the duopoly providers of DMS, which are software products that virtually every auto dealership in the United States uses to store dealer and customer data to manage their businesses. (*Id.* ¶ 4.) Every vendor that supplies a software-based product to a dealership needs to access the data stored on the dealership's DMS to serve its customers through what is called "data integration." (*Id.* ¶ 5.) Prior to 2015, the market for data integration was competitive in that Defendants competed with each other and third parties to provide data integration services. (*Id.* ¶ 6.) In February 2015, however, Defendants executed a series of illegal agreements that destroyed all competition in the data integration market and forced vendors to use CDK to access data on CDK's DMS and use Reynolds to access data on Reynolds' DMS. (*Id.* ¶ 7.)

Based on Defendants' conspiracy, they have been able to charge supracompetitive prices for data integration services and "tilt the table" in favor of their own products. (*Id.* ¶ 8.) For example, through its control of the data integration market, Reynolds was able to torpedo a potentially lucrative opportunity that PartProtection had developed with Ford—a project that would have hurt business for Reynolds' products—by refusing to provide data integration. (*Id.*. ¶ 210.) Reynolds' illegal conspiracy also damaged i3 Brands in that it depressed the value of its (i3

Brands') former subsidiary, TradeMotion, which *Reynolds* purchased from i3 Brands in 2017 for millions less than it would have been worth but for defendants' conspiracy. (*Id*. ¶¶ 112-13.)

Reynolds' misconduct goes beyond its anticompetitive conspiracy. Indeed, it desperately wanted to purchase i3 Brands' subsidiary, PartProtection, because PartProtection's innovative concept of offering warranties on individual auto parts was the "best idea" one of its executives had heard in decades. (*Id*. ¶¶ 2, 125.) i3 Brands refused to sell, though, because it believed PartProtection would become a very successful enterprise. (*Id*. ¶ 125.) Frustrated that i3 Brands would not sell PartProtection, Reynolds concocted a multi-step scheme to *steal* PartProtection from i3 Brands. (*Id*. ¶ 126.) First, it lured Plaintiffs into an agreement in which Reynolds promised to promote PartProtection and pay PartProtection a royalty for every policy issued. (*Id*.) Second, having established a relationship of trust with PartProtection, Reynolds persuaded Plaintiffs that it needed to access all of PartProtection's trade secrets and confidential information to promote it. (*Id*.) Finally, after Reynolds procured PartProtection's trade secrets, it used them to create a competing product through which it intends to put PartProtection out of business. (*Id*.)

## ARGUMENT

## I. REYNOLDS CANNOT COMPEL ARBITRATION OF PLAINTIFFS' CLAIMS

Reynolds argues that: (i) Plaintiffs delegated the issue of arbitrability of their claims to an arbitrator; and (ii) even if the Court determines arbitrability, Plaintiffs' claims are arbitrable. Plaintiffs do not dispute Reynolds' first argument as to i3 Brands, but it has failed to meet its burden to show "clear and unmistakable" evidence that *PartProtection* agreed to delegate the issue of arbitrability of *its* claims. Plaintiffs also dispute that any of their claims are arbitrable.

### A. PartProtection Did Not Delegate "Gateway" Arbitrability Determinations

According to Reynolds, "the Parties' agreements to arbitrate explicitly incorporate the AAA Rules" and "[t]his is clear and unmistakable evidence" that the Parties intended for the

arbitrator to determine whether Plaintiffs' claims are arbitrable. (Memo. at 5.) But Reynolds is wrong because it is well settled that a party fails to show "clear and unmistakable" evidence of delegation when the arbitration provision is ambiguous as to delegation. *See, e.g., Miller v. Flume*, 139 F.3d 1130, 1134 (7th Cir. 1998) (court decided arbitrability where provision was ambiguous); *Wilhelm v. A.G. Edwards & Sons, Inc.,* 2002 U.S. Dist. LEXIS 11231, at *5 (N.D. Ill. June 21, 2002) ("if the arbitration agreement is silent or ambiguous on who decides arbitrability, we must construe it as excluding arbitrability from the scope of arbitrable issues"); *see also Chambers v. Groome Transp. of Ala.,* 41 F. Supp. 3d 1327, 1338 (M.D. Ala. 2014) (court decided arbitrability where delegation provision was ambiguous). Moreover, courts construe any ambiguity in an arbitration provision against its draftsman. *See, e.g., Behrens v. JPMorgan Chase Bank N.A.*, 2019 U.S. Dist. LEXIS 55952, at *32 n.13 (S.D.N.Y. Mar. 31, 2019) ("because a court should construe ambiguous language against the interest of the party that drafted it . . . I have the authority to decide the question as opposed to the arbitrator.") (internal citations and quotations omitted).

Reynolds argues that the Court must compel arbitration under three agreements, but PartProtection is only a signatory to the RCI Agreement and it has not asserted any claims under the APA or the Reseller Agreement (which relates to i3 Brands' former subsidiary, TradeMotion).[1] Critically, the arbitration provision in the RCI Agreement is ambiguous as to whether the parties incorporated the AAA Rules because it provides on one hand that arbitration shall be ███████████████████████████████████████████████████████████████████████ ████████ but as Reynolds conveniently omits in its block quotation, (Memo. at 3), the following sentence in that provision provides that, █████████████████████████████████████████

---

[1] (*See* Ex. 3 to Compl. (Reseller Agreement between TradeMotion and Reynolds), Ex. A to Memo. (RCI Agreement between PartProtection, TradeMotion, and Reynolds), Ex. B to Memo. (Asset Purchase Agreement ("APA") between i3 Brands, Automotive Capital Ventures, Inc. and Reynolds).)

███████████████████████████████████████ (Memo. Ex. A § 6.12 (emphasis added).)
In other words, the arbitration provision provides, in complete contradiction: (i) the arbitration will
be governed by AAA Rules; and (ii) the parties will decide the rules of the arbitration ██████
████████ (*Id.*)  The arbitration provision is, thus, ambiguous, and certainly does not reach the
level of "***clear and unmistakable***" evidence of delegation.  *See, e.g., Miller*, 139 F.3d at 1133;
*Gilman v. Walters*, 61 F. Supp. 3d 794, 806 (S.D. Ind. 2014) (deciding arbitrability of claims
brought by non-signatories).

Reynolds may attempt to reconcile the two sentences by arguing that the phrase in the
second sentence, ███████████████████████ refers to rules that
govern a different aspect of an arbitration than the AAA Rules, but there is no settled meaning of
that phrase and a court has used the same phrase to refer to the AAA Rules, themselves.  *See Van
Dusen v. Swift Transp. Co.*, 2010 U.S. Dist. LEXIS 145553, at *19 (D. Ariz. Sep. 30, 2010),
(stating that the parties selected the AAA Commercial rules as the ████████████
███████████████), *rev'd on other grounds* 544 Fed. Appx. 724 (Nov. 6, 2013); *see
also Heller v. AXA Equitable Fin. Servs.*, 2014 U.S. Dist. LEXIS 51836, at *16 (D. Mass. Apr. 15,
2014) (FINRA Rules were ██████████████████████████).  Moreover,
the arbitration provision in the RCI Agreement is distinguishable from provisions in other cases
that provided the AAA Rules would govern ***by default*** "unless" the parties agreed otherwise.  *See
Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1282 (10th Cir. 2017).  Here, the RCI Agreement
provides no "default" rules because it provides both that the AAA Rules would apply *and* the
parties would ███████████ upon the governing rules.  (Memo. Ex. A § 6.12.)

## B.    Plaintiffs' Claims Are Not Arbitrable

Arbitration is a "matter of consent" and "is a way to resolve those disputes—*but only those
disputes*—that the parties have agreed to submit to arbitration." *Granite Rock Co. v. Int'l Bhd. of*

*Teamsters*, 561 U.S. 287, 299 (2010) (citations omitted) (emphasis in original).  Thus, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017).  To determine the scope of an arbitration clause, "[courts] look first to whether the parties agreed to arbitrate a dispute, not to general policy goals."  *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002).  Federal courts apply state-law principles of contract formation to determine whether a contract's arbitration clause applies to a given dispute.  *Gore v. Alltel Comm., LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012).[2]

### 1.    Plaintiffs' Antitrust Claims Are Not Arbitrable

Reynolds' argument that Plaintiffs' antitrust claims are arbitrable is misplaced for multiple reasons.[3]  ***First***, Reynolds only argues that the antitrust claims are arbitrable under the RCI Agreement, but i3 Brands is not a party to that agreement.  (*See* Memo. at 6-7; Ex. A to Memo.) ***Second***, Plaintiffs' antitrust claims are outside the scope of the RCI agreement.  In determining whether a dispute is within the scope of an arbitration agreement, courts ask whether "the action could be maintained without reference to the contract or relationship at issue."  *Acad. of Med. of Cincinnati v. Aetna Health, Inc.*, 108 Ohio St. 3d 185, 187 (Ohio 2006); *see also Ford v. Nylcare Health Plans*, 141 F.3d 243, 250-251 (5th Cir. 1998) (under Texas law, "courts look at the facts giving rise to the action and to whether the action *could* be maintained without reference to the contract.") (emphasis in original).  In *Acad. of Med.*, for example, doctors alleged that HMO's conspired to fix insurance reimbursement rates, but the HMO's moved to compel arbitration of plaintiffs' claims, alleging that their provider agreements required the parties to arbitrate any

---

[2] Ohio law governs the RCI Agreement,  (Memo. Ex A, § 6.14), and Texas law governs the Reseller Agreement and APA.  (Compl. Ex. 3, at 12 ¶ F; Memo. Ex. B at 41, § 8.7.)

[3] Although i3 Brands does not dispute Reynolds' argument concerning delegation of the arbitrability issue, it sets forth herein reasons (among others) why its claims are not subject to arbitration.

disputes arising out of, or related to, those agreements or the parties' business relationship. 155 Ohio App. 3d 310, 311. The court denied the HMO's motion because "[t]he express elements of an antitrust claim [did] not depend, as a matter of law, on the provider agreements between the individual doctors and HMOs." *Id.* at 313, *affirmed* 108 Ohio St. 3d 185; *see also AlliedSignal, Inc. v. B.F. Goodrich Co.,* 183 F.3d 568, 573 (7th Cir. 1999) (antitrust claims were not arbitrable defendant could "fully comply with the [agreement] and still cause [plaintiff] antitrust injury by charging uncompetitive prices.").

As in *Acad. of Med.*, Plaintiffs' antitrust claims do not depend as a matter of law on any contract between Plaintiffs and Reynolds. While a portion of Plaintiffs' antitrust damages were caused by supracompetitive integration prices, those damages were caused by Reynolds' anticompetitive agreement with CDK to block Plaintiffs' access to the DMS. (*See* Compl. ¶¶ 87-97.) The RCI Agreement is not the cause of Plaintiffs' antitrust injury and is not an element of Plaintiffs' claims. Indeed, like the agreements in *AlliedSignal*, the RCI Agreement does not bar Reynolds from charging prices artificially inflated by anticompetitive behavior—Reynolds can "fully comply with" the Reynolds Interface Agreement while still causing antitrust injury.[4]

### 2. The TradeMotion Claims Are Not Arbitrable

The TradeMotion claims are outside the scope of the RCI Agreement for the same reasons Plaintiffs' antitrust claims are outside the scope of it. As Plaintiffs alleged, the value of i3 Brands' former subsidiary, TradeMotion, was substantially reduced as a direct result of Reynolds' anticompetitive behavior and scheme with CDK. (Compl. ¶¶ 110-17.) i3 Brands can prove its losses without referencing the Reseller Agreement. Further, as a non-signatory, i3 Brands is not bound by the arbitration provision because "a non-signatory plaintiff cannot be compelled to

---

[4] Reynolds' reliance on *JLM Indus. Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 175 (2d Cir. 2004) is misplaced because it is non-binding and contrary to Ohio law. *See Acad. of Med.*, 155 Ohio App. 3d at 311.

arbitrate on the sole ground that, but for the contract containing the arbitration provision, it would have no basis to sue." *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005).

Plaintiffs' TradeMotion claims are also not related to the APA. Defendants entered into their anticompetitive agreements that devalued TradeMotion well before the parties negotiated the APA, (Compl. ¶¶ 111-23), and the parties clearly did not contemplate that the APA's arbitration provision would encompass disputes based on prior antitrust violations. (*See* Memo., Ex. B at 41.) Nor does Reynolds explain why these claims are related to the RCI Agreement. (*Id.* at 7.)

### 3. Plaintiffs' Other Claims Are Not Arbitrable

Reynolds attempts to wedge Plaintiffs' other claims, including their claims for trade secret theft and breach of the Agreement of Basic Terms (which does not contain an arbitration provision), into the APA and the RCI Agreement, but these arguments also fail.

*First*, Reynolds' tortured construction of the APA lacks any credibility. It argues that, under the APA, Reynolds acquired the intellectual property "of ***TradeMotion*** and ***Parts.com***." (Memo. at 9 (emphasis added).) It then argues this information "overlapped" with the PartProtection trade secrets it stole, (*id.*); however, the APA does not provide for the sale of PartProtection; the transfer of PartProtection's trade secrets; or Reynolds' promise to partner with PartProtection. (*See generally* Memo. Ex. B.) Rather, Plaintiffs' claims relate to under the ***Agreement of Basic Terms*** that Reynolds effected months after the APA to lure plaintiffs into a purported partnership. (Compl. ¶¶ 126, 130.) It is irrelevant that some of TradeMotion's intellectual property may have "overlapped" with the PartProtection trade secrets that Reynolds stole—the subject matter of plaintiffs' trade secret-related claims is well beyond the scope of the APA and Plaintiffs can clearly prove their claims independently of the APA. (*See* Compl. ¶¶ 124-41.)

*Second*, Reynolds' argument that Plaintiffs' trade secret-related claims fall within the scope of the arbitration provision in the RCI Agreement conflates two independent acts of Reynolds' misconduct. (Memo. at 8-9.) As Reynolds notes, Plaintiffs have alleged that it uses its "certification process" under the RCI agreement to extort money and confidential information from vendors who have no choice but to give into its demands due its monopolistic activity. (*See, e.g.,* Compl. ¶ 107.) While Plaintiffs have certainly been damaged by that misconduct in various respects, their trade secret-related claims arise out of Reynolds' unrelated scheme to steal PartProtection. (*See* Compl. ¶¶ 124-41.) Indeed, Reynolds used the *Agreement of Basic Terms* and *Acknowledgment* to steal PartProtection's trade secrets and otherwise damage Plaintiffs in this instance, rather than the "certification" process. (*See id.*) Accordingly, Plaintiffs' trade secret-related claims are outside the scope of the arbitration provision in the RCI agreement.

*Finally*, Plaintiffs' tortious interference claims are also not arbitrable because they can establish the elements of their claims regardless of the RCI Agreement. *See Ford*, 141 F.3d at 251 ("Examining the legal elements of a tortious interference claim . . . the existence of the contract between the plaintiff and defendants was unnecessary to establish the claim."); *Gen. Power Prods., LLC v. MTD Prods., Inc.*, 2007 U.S. Dist. LEXIS 21181, at *13 (S.D. Ohio Mar. 26, 2007) ("While the existence of the Memorandum . . . may form the factual basis for GPP's tortious interference claim . . . it is not necessary for GPP to prove a breach of the Memorandum in order to sustain the claim."). Indeed, Plaintiffs' tortious interference allegations are based on their relationship with Ford and Reynolds' motivation for interfering in that relationship, and Plaintiffs can prove their claims without proving a breach of contract. (*See* Compl. ¶¶ 207-15.) Therefore, Plaintiffs' tortious interference claims are outside the scope of the arbitration provision in the RCI agreement. *See id.*; *see also Acad. of Med*, 108 Ohio St. 3d at 190.

### C. The Court Is Not Required To Stay Non-Arbitrable Claims

Even if this Court finds that some claims are arbitrable, it is not required to stay proceedings for the non-arbitrable claims. *Volkswagen of Am., Inc. v. Sud's of Peoria, Inc.*, 474 F.3d 966, 971 (7th Cir. 2007) ("whether to stay the entire case [is] discretionary in cases involving both arbitrable and nonarbitrable issues.") Courts consider the risk of inconsistent rulings, the strain of judicial resources, and the prejudice caused by delay. *WMS Gaming, Inc. v. IGT*, 31 F. Supp. 3d 974, 977 (N.D. Ill. 2014); *see also Sybaritic , Inc. v. Neoqi, Ltd.*, 2004 WL 2066853, at *4 (D. Minn. Aug. 31, 2004) (denying motion to stay non-arbitrable tort claims where the tort claims and arbitrable contract claims were independent and the tort claims required prompt resolution"). Here, for example, allowing Plaintiffs to litigate their non-arbitrable antitrust claims is the best use of judicial resources because this Court is already overseeing similar antitrust claims in this case.

## II. PLAINTIFFS HAVE SUFFICIENTLY PLEADED THEIR CLAIMS

Plaintiffs must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that a defendant has "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The factual allegations in the complaint must be sufficient to raise the possibility of relief above a "speculative level." *Id.* In resolving Reynolds' motion, the Court must assume the truth of the factual allegations in Plaintiffs' Complaint, drawing all reasonable inferences in Plaintiffs' favor. *Zahn v. North Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016).

### A. Plaintiffs Have Stated Antitrust Claims

#### 1. i3 Brands Is A Proper Antitrust Plaintiff

Reynolds' argument that i3 Brands is not a proper antitrust plaintiff, (Memo. at 11), is meritless. ***First***, i3 Brands has alleged that it suffered direct injuries from Defendants' anticompetitive conspiracy, including its payment of supracompetitive prices for data integration

services. (*See, e.g.*, Compl. ¶¶ 88, 94-96.)  Nothing more is required.  *See In re Niaspan Antitrust Litig.,* 42 F. Supp. 3d 735, 757 (E.D. Pa. 2014) ("plaintiffs' allegations support an inference that they suffered an injury-of-fact flowing from defendants' allegedly unlawful conduct. More is not required at the pleading stage,"); *In re Copper Antitrust Litig*., 98 F. Supp. 2d 1039, 1050 (W.D. Wis. 2000) ("Plaintiff's injury of paying higher prices reflects the anticompetitive effect of the violation, making it a sufficient antitrust injury"); *Panache Broad. v. Richardson Elecs*., 1994 U.S. Dist. LEXIS 4830, at *59 (N.D. Ill. Apr. 14, 1994) ("Plaintiffs need only allege that they paid inflated prices as a result of Defendants' alleged anticompetitive conduct").

***Second***, Reynolds baldly asserts that "i3 Brands itself does not directly purchase integration services [and] pay allegedly supracompetitive integration fees," (Memo. at 11), but its attempt to contradict Plaintiffs' allegations is improper at this stage.  *See, e.g., Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 783 (2d Cir. 2016) ("Although novel features of this case raise a number of fact issues, we think it is clear that, once appellants' allegations are taken as true (as must be done at this stage), they have plausibly alleged both antitrust violation and antitrust injury.").

### 2. Reynolds' DMS License Agreements Do Not Bar Plaintiffs' Antitrust Claims

Reynolds claims that it DMS license restrictions bar Plaintiffs' antitrust claims because those agreements are "perfectly lawful" and they "demonstrate that hostile integrators' access to and use of the Reynolds DMS was unlawful," but these arguments are misplaced.

#### a. Reynolds' License Restrictions Are Not "Perfectly Lawful"

Reynolds' argument that its DMS license restrictions are "perfectly lawful" should be rejected because it is inconsistent with Plaintiffs' allegations (which must be taken as true) that defendants conspired to eliminate competition through their unlawful horizontal agreement and placed restrictions on their DMS pursuant to that agreement.  (Compl., ¶¶ 59-109.)  Further,

Reynolds argues that its restrictions predated its conspiracy by at least six years, (Memo. at 12), but it ignores Plaintiffs' allegations that "in 2009, Reynolds *began selectively* blocking third-party access, and *increased* its blocking efforts in 2013." (Compl., ¶ 59) (emphasis added).) This is entirely consistent with Plaintiffs' allegations of a subsequent horizontal agreement between defendants to eliminate competition. (*Id.*, ¶¶ 59-61, 87, 142-151.)

Reynolds also cites the Court's Order on CDK's motion to dismiss Authenticom's claim regarding "exclusivity," *Authenticom v. CDK, et al.*, 313 F. Supp. 3d 931, 957 (N.D. Ill. 2018), but its reliance is misplaced. *First*, Reynolds omits the portion of the opinion in which the Court ruled that "[t]he allegations regarding Defendants' integration-services contracts with **vendors** are a different story" because they "require a vendor that uses the 3PA or RCI programs for one dealer to use those programs to obtain data for any and all of its dealer-customers that use CDK or Reynolds DMSs, respectively." *Id.* (emphasis added). The Court then ruled that Authenticom "pleaded sufficient facts indicating that these exclusive-dealing contracts could foreclose a substantial portion of the data-integration market." *Id.* Plaintiffs plead the same allegations in their Complaint. (Compl., ¶¶ 34, 78-80.) *Second*, Plaintiffs allege that Defendants currently have a monopoly on data integration for their respective DMS and it has had predictable effects: prices have skyrocketed and quality has stagnated or even decreased. (*Id.* ¶ 87.)

**b.    Reynolds' License Restrictions Do Not "Defeat" Plaintiffs' Antitrust Claims**

Reynolds argues that its "lawful" DMS license agreements "defeat all the Antitrust Claims for two distinct reasons," (Memo. at 12), but neither has any merit. ***First***, it asserts that "hostile integrators' access to and use of the Reynolds DMS was unlawful" and that reduced competition in an illegal market is not an antitrust injury. (*Id.*) The Court has already rejected Reynolds' argument. *Authenticom.*, 313 F. Supp. 3d at 946–48. Indeed, the only reason that data integrators'

access could possibly be construed as "illegal" is because of Reynold's own illegal, anticompetitive blocking of access. *Id.* (citations omitted). These findings constitute law of the case, which are binding absent clear error or a change in the controlling law—neither of which is present here. *Best v. Shell Oil Co*., 107 F.3d 544, 546 (7th Cir. 1997) ("the law of the case doctrine . . . reflects the rightful expectation of litigants that a change of judges mid-way through a case will not mean going back to square one."); *Williams v. Comm'r*, 1 F.3d 502, 503 (7th Cir. 1993) ("The second judge may alter previous rulings if new information convinces him that they are incorrect, but he is not free to do so . . . merely because he has a different view of the law or facts").

Reynolds relies on *Maltz* to support its argument that "[r]educed competition in an illegal market is not an antitrust injury," (Memo. at 12), but *Maltz* is distinguishable because plaintiff's business "could only be used by purchasers in furtherance of the business of gambling." *Maltz v. Sax,* 134 F.2d 2, 6 (7th Cir. 1943). Here, Reynolds cannot show that data integrators' access is illegal independent of its misconduct. *Authenticom*, 313 F. Supp. 3d at 948. In fact, the Court rejected this argument even when it *assumed* that data integrators' access was illegal. *Id.* at 948.

**Second**, Reynolds argues that "even in a but-for world with no alleged conspiracy or vendor exclusive dealing provisions, Plaintiffs would still suffer the exact same injury" because it could still prohibit data integrators from accessing its DMS. (Memo. at 13.) Reynolds construes Plaintiffs' harm too narrowly: whether or not it was permitted to bar data integrators, Defendants' anticompetitive agreements allowed them to charge supracompetitive prices and to tilt the table in favor of their own products, (*see generally* Compl.), which are *per* se violations of Section 1. *See Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000) (group boycott); *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 591 (7th Cir. 1998) (market division).

Even absent the *per se* antitrust violations set forth in the Complaint, Plaintiffs' allegations are more than sufficient to state a claim. A plaintiff alleging exclusionary anticompetitive conduct must show two things: (i) the exclusion is likely to keep at least one significant competitor of the defendant from doing business in a relevant market; and (ii) the probable (not certain) effect of the exclusion will be to raise prices above (and therefore reduce output below) the competitive level, or otherwise injure competition. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984). Plaintiffs plead both of those elements. (Compl., ¶¶ 78-80, 163–65.)

Finally, to satisfy the antitrust injury requirement, Plaintiffs must show that their injury "flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). "An antitrust violation need not be the sole cause of the alleged injuries, but the plaintiff must establish, with a fair degree of certainty, that the violation was a material element of, and substantial factor in producing, the injury." *See Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 401 (7th Cir. 1993). Plaintiffs satisfy this requirement because they have alleged, among other injuries: Defendants have monopolized the data integration aftermarket through their anticompetitive agreements; they have raised their integration fees to supracompetitive levels; and Plaintiffs have been forced to pay those supracompetitive fees. (*See, e.g.,* Compl., ¶¶ 10–13, 163–65.); *see also Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 832–33 (7th Cir. 1978) (damages sufficient under *Brunswick* "so long as they involve anticompetitive conduct aimed at the plaintiff.").

### 3. Plaintiffs' Alleged Conspiracy Is Plausible

Reynolds argues that the conspiracy alleged by Plaintiffs is "implausible" and that its own explanation of its conduct is *more* "plausible," but the Court already rejected a similar attack on multiple occasions, noting that accepting Defendant's argument "requires the Court to ignore well pleaded allegations of fact." *Cox Auto., Inc. v. CDK Glob., LLC*, 360 F. Supp. 3d 788, 798 (N.D.

Ill. 2019); *Authenticom*, 313 F. Supp. 3d at 952; *see also Autoloop v. CDK et al.*, 2019 U.S. Dist. LEXIS 12148, at *37 (N.D. Ill. Jan. 25, 2019). Further, Plaintiffs allege—and Reynolds does not deny—the existence of an express anticompetitive agreement between Reynolds and CDK, (Compl., ¶¶ 59–76), and specific, credible allegations of an admitted conspiracy far exceed the plausibility threshold. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002) (admission by defendants of a *per se* violation of the Sherman Act is "all the proof a plaintiff needs.").

Similarly unavailing are Reynolds' arguments that Defendants' actions could have been accomplished unilaterally. (Memo. at 13-15.) Indeed, Reynolds ignores the allegations in Plaintiffs' Complaint of *concerted* activity between Defendants. (Complaint, ¶¶ 71-76.) The Court must take these allegations as true. In fact, when the Court previously evaluated these allegations and Reynolds' identical challenge, it rejected Reynolds' argument and expressly determined that Reynolds' reliance on *Trinko* and *Linkline* was misplaced because "the Court cannot adjudicate that issue at this stage." *Authenticom*, 313 F. Supp. 3d at 956.

### 4. Plaintiffs Sufficiently Plead The Relevant Market And Substantial Foreclosure

Reynolds also argues that Plaintiffs have not pleaded an exclusive dealing claim because they have not (1) "precisely established a relevant market" and (2) demonstrated that the foreclosure of competition is "substantial." (Memo. at 15-16.) Even if these arguments were appropriate on a motion to dismiss, they fail for multiple reasons.

***First***, "[m]arket definition[] involves a deeply fact-intensive inquiry. . . . [F]or this reason a court must be hesitant to grant a motion to dismiss for failure to plead a relevant market." *JamSports & Entm't, LLC v. Paradama Prods.*, 2003 U.S. Dist. LEXIS 6100, at *17-18 (N.D. Ill. Apr. 15, 2003); *see also MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.,* 62 F.3d 967,

976 (7th Cir. 1995) ("an antitrust plaintiff need not 'include the particulars of his claim' to survive a motion to dismiss."). Rather, plaintiffs need only show the "rough contours" of the market and that defendants control a substantial share of it. *See, e.g., Hannah's Boutique, Inc. v. Surdej*, 112 F. Supp. 3d 758, 772 (N.D. Ill. 2015) ("a plaintiff needs to make a minimum initial showing that the defendant possesses a substantial market share in a roughly-defined relevant market.").

Plaintiffs have clearly pleaded: (i) the "rough contours" of the relevant markets (*i.e.* the DMS Market in the United States, the Dealer Integration Market in the United States, and the Dealer Data Integration Single-Brand Aftermarket), (Compl., ¶¶ 29–50); (ii) that Defendants "control more than 90 percent of the DMS Market" (*id.*, ¶ 34), and they control a substantial share of the Dealer Data Integration Market; (iii) that their anticompetitive agreement has "severely harmed competition in the Dealer Data Integration Market" and caused monopolistic effects, (*id.*, ¶ 87); and (iv) their control of the Dealer Data Integration Single-Brand Aftermarket is substantial enough for them to charge supracompetitive prices in the absence of any reasonable substitute for their services. (*Id.*, ¶¶ 42, 58, 89, 91.) These anticompetitive effects are clear indications of Defendants' control of a substantial share of the market. In sum, plaintiffs state a claim. *See, e.g., Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 360 (7th Cir. 1990) (where the complaint demonstrates "proof of actual detrimental effects," there is no "need for an inquiry into market power.").

**Second**, Reynolds asserts that Plaintiffs' "only" allegation of market foreclosure is that CDK has foreclosed competition in the Dealer Data Integration Market for approximately 40% of dealers who use CDK's DMS. (Memo. at 15.) But this ignores Plaintiffs' allegations that Defendants control approximately either 75% of the US DMS market (by number of dealers) or 90% based on vehicles sold, (Compl., ¶ 4), and Defendants "foreclose all competition in the Single-Brand Aftermarket for Dealer Data Integration on Defendants' DMS." (*Id.*, ¶ 86.) Moreover,

16

Plaintiffs allege that Reynolds' share of the DMS market by "rooftops" is at least 30%. (*Id.*, ¶ 34.) These allegations are sufficient to support Plaintiffs' claim. *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 2016 U.S. Dist. LEXIS 136478, at *23 (C.D. Ill. Sep. 30, 2016), *aff'd*, 859 F.3d 408 (7th Cir. 2017) ("Courts typically require a plaintiff to make an initial showing of foreclosure from competing in at least 30 to 40 percent of a market to proceed with a claim.").

### 5. Plaintiffs Have Sufficiently Pleaded Their Monopolization Claims

To state a claim for monopolization under Section 2, a plaintiff must allege (1) that the defendant "possessed monopoly power" in an antitrust market, and (2) that the defendant "willfully acquired or maintained that power by means other than the quality of its product, its business acumen, or historical accident." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011). Plaintiffs have sufficiently pleaded both elements.

*First*, Reynolds asserts that Plaintiffs have not alleged a plausible antitrust aftermarket under *Eastman Kodak*, but the Court has rejected all of its arguments, *Authenticom*, 313 F. Supp. 3d at 961-64 (N.D. Ill. 2018), and Reynolds cites no valid basis to depart from that ruling. In fact, the Court recently applied the same principles when it denied CDK's motion to dismiss Cox Automotive's Section 2 claim. *See Cox*, 360 F. Supp. 3d at 804-06.

Further, Plaintiffs plausibly allege that defendants possess market power in the brand specific aftermarkets for dealer data integration on their platforms. (Compl., ¶¶ 51, 55-58.) The alleged markets fit squarely within *Eastman Kodak*: Plaintiffs have alleged enormous switching and information costs in the DMS market, which have allowed Defendants to "profitably . . . maintain supracompetitive prices in the aftermarket" for data integration on their platforms. (*See id.*); *Eastman Kodak v. Image Technical Services, Inc.,* 504 U.S. 451, 476 (1992)[5]; *see also Cox*,

---

[5] In *Eastman Kodak*, there were two relevant markets: the primary market for photocopiers and micrographic equipment and a derivative aftermarket for service and replacement parts for such

360 F. Supp. 3d at 804 ("Plaintiffs plausibly allege an *Eastman Kodak* claim . . . ."). Plaintiffs have thus adequately alleged that the DMS market is extraordinarily sticky such that Defendants' conduct is anticompetitive under *Eastman Kodak*. *See* 504 U.S. at 477 (switching costs include "heavy initial outlay" for copy machines and other brand-specific investment); *see also Collins Inkjet Corp. v. Eastman Kodak Co.*, 2014 U.S. Dist. LEXIS 188283, at *32 (S.D. Ohio Mar. 21, 2014) *aff'd*, 781 F.3d 264 (6th Cir. 2015) (plaintiff established likely aftermarket where office printers had a lifespan of 10-20 years and buyers "have invested time and money into training their employees" on the system).

**Second**, Reynolds does not argue that Plaintiffs have failed to plead the second element of a Section 2 claim and it apparently concedes that the Court's previous rulings on this issue control. *See Cox,* 360 F. Supp. 3d at 807, *Authenticom,* 313 F. Supp. 3d at 965. In any event, Plaintiffs have plausibly alleged that Defendants acquired or maintain monopoly power through anticompetitive means by pleading that Defendants: entered into an unlawful horizontal market division agreement; conspired to exclude all other data integrators from the market; engaged in concerted activities to disrupt dealers' access to third-party integration services; and imposed exclusive dealing arrangements and price secrecy provisions. (Compl. ¶¶ 59-86.); *see, e.g., Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, 2013 U.S. Dist. LEXIS 92133, at *18 (N.D. Ind. Mar. 13, 2013) ("Where defendant has engaged in unlawful restraint of trade that would independently violate Section 1 of the Sherman Antitrust Act, it is well established that it also violates Section 2 if it acquires or maintains a monopoly by means of that restraint of trade.")

---

equipment. 504 U.S. at 463. The plaintiffs alleged that the market for servicing Kodak-brand equipment was a cognizable aftermarket, and the Court agreed. *Id.* at 486.

### B. Plaintiffs Have Sufficiently Pleaded Their Other Claims Against Reynolds

### 1. Plaintiffs Have Stated A Claim For Breach Of Contract

Reynolds argues that the Agreement of Basic Terms ("ABT") is an "unenforceable 'agreement to agree'," (Memo. at 22); however, its argument should be rejected.[6]

*First*, whether Plaintiffs and Reynolds formed a contract is an issue of *fact* that cannot be decided on a motion to dismiss. *See, e.g., Terrell v. Uniscribe Prof'l Servs*., 348 F. Supp. 2d 890, 893 (N.D. Ohio 2004) ("the existence of a contract . . . is generally a matter left for the trier of fact."); *eBay, Inc. v. Bidder's Edge, Inc*., 2000 U.S. Dist. LEXIS 21971, at *5 (N.D. Cal. Dec. 6, 2000) ("whether a valid contract exists is a question of fact").

*Second*, "it is not the law that an agreement to make an agreement is *per se* unenforceable." *See Alpert v. Kodee Techs.,* 117 Ohio App. 3d 796, 800, 691 N.E.2d 732, 735 (1997); *see also Nephrology & Hypertension Specialists, LLC v. Fresenius Med. Care Holdings, Inc*., 2010 U.S. Dist. LEXIS 78968, at *14 (S.D. Ohio Aug. 5, 2010) ("Ohio law allows recovery of damages for the breach of an agreement to agree."). Indeed, as illustrated by a case cited by Reynolds, courts enforce such agreements if the parties have "manifested an intention to be bound" by them and their intentions are sufficiently definite to be specifically enforced. *See M.J. DiCorpo, Inc. v. Sweeney,* 1994-Ohio-316, 69 Ohio St. 3d 497, 503, 634 N.E.2d 203, 208. Parties "manifest their intention" to be bound by agreements when they partially perform their obligations. *See Nephrology*, 2010 U.S. Dist. LEXIS 78968 at *12 (denying motion to dismiss where the parties partially performed their agreement by working on a joint venture together); *Alpert*, 117 Ohio App. 3d at 801 (parties manifested intention to be bound by agreement that referenced future

---

[6] Reynolds does not dispute that PartProtection has standing to enforce the ABT. (*See* Memo. at 21-24.)

negotiations where the defendant acted in accordance with their agreement).[7]  Further, the parties need not agree on every conceivable circumstance that might arise in order for a contract to exist, and must only agree upon the contract's "essential terms"—*i.e.* the parties to the contract and its subject matter.  *In re Estate of Bohl*, 2016-Ohio-637, ¶ 33, 60 N.E.3d 511, 520 (Ct. App.).

The ABT is enforceable because, as Plaintiffs have alleged, the parties took steps to *perform* under the Agreement.  Under that contract—which sets forth the essential terms, including the parties to the agreement and the purpose of their agreement—Reynolds agreed to a schedule of the maximum price that it would pay for the right to promote PartProtection to its dealership-customers and the royalty it would pay for each policy that it sold.  (Compl ¶ 131, Ex. 4.)  The parties then effectuated their agreement: Reynolds had i3 Brands sign an "Acknowledgement" agreement so that it could obtain PartProtection's trade secrets and prepare the version of PartProtection that it purportedly intended to offer to its dealerships.  (Compl. ¶¶ 133-34.)  Then, Reynolds executives and employees gathered information about PartProtection, including its proprietary source code, "eligibility file," and its agreements with underwriters.  (*Id.* ¶ 135.)  Thus, the parties "manifested an intention" to effect their partnership and perform under the Agreement. *See Nephrology*, 2010 U.S. Dist. LEXIS 78968 at *12; *Alpert*, 117 Ohio App. 3d at 801.

Reynolds principally relies upon *M.J. DiCorpo* to support its argument, (*see* Memo. at 22-23), but that case is distinguishable because the parties entered into a *merger agreement* and the court did not consider whether the parties took sufficient steps to manifest their intention to be bound by the agreement.  *See* 634 N.E.2d at 207-08.  Reynolds also cites *Westwinds Dev. Corp. v. Outcalt,* (Memo. at 23 n.26), but that case is distinguishable because the purported contract lacked

---

[7] The same principles apply under California law.  *See, e.g.*, *Teledyne Risi, Inc. v. Martin-Baker Aircraft Co., Ltd.*, 2016 U.S. Dist. LEXIS 190601, at *10 (C.D. Cal. Feb. 2, 2016) (MSA was enforceable where parties partially performed even though they "left open" material terms).

"any of the usual terms found in a construction contract." 2009-Ohio-2948, ¶ 38 (Ct. App.). Moreover, Reynolds' argument that plaintiffs' breach of contract and promissory estoppel claims fail to the extent they are "predicated on Reynolds's alleged misappropriation of PartProtection's trade secrets," (Memo. at 24-25), is misplaced because neither Ohio nor California law preempts contractual remedies "whether or not based upon misappropriation of a trade secret." Cal. Civ. Code § 3426.7(b); Ohio Rev. Code § 1333.67(B)(1); *see also US Ecology, Inc. v. State of Cal.,* 129 Cal. App. 4th 887, 903, 28 Cal. Rptr. 3d 894, 906 (2005) ("promissory estoppel claims [are] basically the same as contract actions").

### 2. Plaintiffs Have Stated A Claim For Promissory Estoppel

Reynolds' argument that Plaintiffs have failed to state a claim for promissory estoppel because they have failed to allege a "clear and unambiguous promise," (Memo. at 24), misses the mark for multiple reasons. *First,* "the question of whether a promise is 'clear and unambiguous' [] is a question of fact" that is "appropriate for a jury." *Am. Signature, Inc. v. Extreme Linen, LLC,* 2015 U.S. Dist. LEXIS 41958, at *48 (S.D. Ohio Mar. 31, 2015) (interpreting Ohio law). *Second,* even if the Court determines this issue as a matter of law, Plaintiffs have sufficiently pleaded their claim because they alleged that Reynolds made a promise "that a promisor would expect to induce reliance." *See Burris v. State Farm Fire & Cas. Co.,* 2009-Ohio-5123, ¶ 23 (Ct. App.); *see also A N Bros. Corp. v. Total Quality, LLC,* 2016-Ohio-549, ¶ 67, 59 N.E.3d 758, 774 (Ct. App.) ("the promise only need be one the promisor 'should reasonably expect to induce action or forbearance.'"). In fact, they have alleged that Reynolds promised, both orally and in writing, that it would promote PartProtection to dealerships that use its DMS and pay Plaintiffs a royalty for each policy that it sold under the parties' arrangement. (Compl. ¶¶ 127-31, 185.) Reynolds' promises were intended to, and did, induce Plaintiffs' reliance—at Reynolds' request, and in furtherance of Reynolds' promise to promote PartProtection, Plaintiffs permitted Reynolds to

access PartProtection's proprietary information and also executed a Right of First Refusal and bought out PartProtection's other shareholder. (*Id.* ¶¶ 128-35, 187.) Thus, Plaintiffs have sufficiently alleged a "clear and unambiguous" promise. *See Burris*, 2009-Ohio-5123 ¶ 23.[8]

### 3. Plaintiffs Have Stated A Claim For Fraud

Reynolds argues that Plaintiffs' fraud claim is preempted and lacks the requisite particularly, but these arguments too have no merit. While failing to perform a contract does not constitute fraud, a promise made without the intention to perform is actionable as promissory fraud. *See Locke v. Warner Bros.,* 57 Cal. App. 4th 354, 367-68, 66 Cal. Rptr. 2d 921, 928 (1997). Specifically, "[a] cause of action for promissory fraud requires the plaintiff to allege that the promissor did not intend to perform at the time the promise was made, that the promise was intended to deceive and induce reliance, that it did induce reliance, and that this reliance resulted in damages." *Fleet v. Bank of Am. N.A.*, 229 Cal. App. 4th 1403, 1411, 178 Cal. Rptr. 3d 18, 25 (2014) (citations omitted); *see also Deitrick v. Am. Mortg. Sols., Inc.,* 2007-Ohio-839, ¶ 16 (Ct. App.) ("a plaintiff may prevail upon a claim for promissory fraud if he proves that the defendant made a promise without the present intention of performing") (collecting cases).[9]

That is exactly what Plaintiffs have alleged here. After Reynolds entered into an initial oral agreement with i3 Brands to promote PartProtection, Reynolds accessed PartProtection's trade secrets so it could purportedly deploy PartProtection to its dealerships. (Compl. ¶ 128.) Plaintiffs further allege that, on October 6, 2017, Reynolds employee, Matt Zachary, sent i3 Brands an "execution version" of the ABT that had been "approved" by Reynolds Vice President, Sidney

---

[8] As discussed above, Reynolds' preemption argument has no merit. (*See* Section II(B)(1), *supra*.)

[9] Plaintiffs can properly plead claims for both breach of contract and promissory fraud under the same agreement or transaction. *See, e.g., King v. Hertz Corp.*, 2011 U.S. Dist. LEXIS 35610, at *10 (N.D. Ohio Mar. 31, 2011); *Fleet*, 229 Cal. App. 4th at 1409-11.

Haider.  (Compl. ¶¶ 126, 127-31, 133, 191.)  Reynolds, however, had no intention to perform its obligations; in fact, it had already removed PartProtection's source code from its applications.  (*Id.* ¶ 129-30.)  Rather, Reynolds deceptively lured Plaintiffs into that agreement as part of its greater plan to eliminate PartProtection as a potential competitor in the marketplace.  (*Id.* ¶¶ 133-41.)

Plaintiffs also relied on Reynolds' misrepresentations in several respects: (i) i3 Brands entered into the ABT; (ii) it granted Reynolds a Right of First Refusal to purchase PartProtection for the following *thirty years*, (*id.* ¶ 132), and (iii) it paid millions to acquire the necessary control of PartProtection to facilitate the parties' partnership agreement.  (*Id.* ¶¶ 129, 134.)  i3 Brands took all of these actions, and Plaintiffs suffered corresponding damages, based on Reynolds' promise that it would promote PartProtection.  Accordingly, Plaintiffs have sufficiently pleaded a claim for fraud under Rule 9(b).  *See Applied Med. Distribution Corp. v. Ah Sung Int'l, Inc.,* 2015 U.S. Dist. LEXIS 190176, at *22-23 (C.D. Cal. Dec. 14, 2015) (plaintiff satisfied Rule 9(b) where it alleged "who" committed the fraud; "where" the fraud took place; "when" the fraud occurred; and that defendant "misrepresented its intent to perform [the agreement at issue]"); *Kelly v. Romines,* 2011 U.S. Dist. LEXIS 165167, at *13 (C.D. Cal. May 27, 2011) (plaintiff sufficiently pleaded fraud based on theory that defendant misrepresented intent to pay obligation under HOA agreement); *Raftery v. S. Lee Corp.*, 2007 U.S. Dist. LEXIS 86860, at *10-11 (S.D. Ohio Nov. 15, 2007) (plaintiff stated fraud claim where it alleged that defendant misrepresented its intent to perform under agreement).

Further, the damages that Plaintiffs suffered are distinct from the damages they suffered from Reynolds' misappropriation of PartProtection's trade secrets.  (*See* Compl. ¶¶ 129-32.)  In other words, plaintiffs' fraud claim is viable irrespective of Reynolds' trade secret misappropriation, and is therefore not preempted by the Uniform Trade Secret Act.  *See Am. Roll*

*Form Corp. v. Chamberlain Grp., Inc.,* 2015 U.S. Dist. LEXIS 26560, at *13 (N.D. Ohio Feb. 27, 2015); *Gabriel Techs. Corp. v. Qualcomm Inc.,* 2009 U.S. Dist. LEXIS 98379, at *41 (S.D. Cal. Sep. 3, 2009); *Martone v. Burgess,* 2008 U.S. Dist. LEXIS 68434, at *11 (N.D. Cal. Aug. 25, 2008).

### 4. Plaintiffs Have Stated A Claim For Trade Secret Misappropriation

Plaintiffs have also sufficiently pleaded a claim for trade secret misappropriation based upon Reynolds' scheme to steal PartProtection's trade secrets to start a competitor. To state a claim under the California Uniform Trade Secrets Act, a plaintiff must demonstrate: "(1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff." *CytoDyn of New Mexico, Inc. v. Amerimmune Pharma., Inc*., 160 Cal. App. 4th 288, 297 (2008). Reynolds' arguments that Plaintiffs have failed to state a claim all fail.

***First***, Reynolds' argument that Plaintiffs have not sufficiently alleged misappropriation, (Memo. at 28), is meritless. "Misappropriation" is, in pertinent part, the "[a]quisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or "use of a trade secret of another . . . by a person who . . . at the time of disclosure or use, knew or had reason to know that . . . the trade secret was . . . [d]erived from or through a person who had utilized improper means to acquire it." Cal. Civ. Code § 3426.1(b). "Improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 3426.1(a).

Plaintiffs allege that, after Reynolds became frustrated that i3 Brands would not sell PartProtection, Reynolds concocted a multi-step scheme to *steal* PartProtection. (*See* Compl. ¶¶ 124-40.) First, Reynolds lured Plaintiffs into the ABT by falsely asserting that it intended to promote PartProtection. (*Id.* ¶ 127-30.) Then, after Plaintiffs agreed to partner with Reynolds,

Reynolds asserted that it needed to access PartProtection's trade secrets to effectuate their partnership agreement. (*Id.* ¶¶ 127, 133-35.) Finally, having induced Plaintiffs to disclose PartProtection's trade secrets, Reynolds used them to create its own product. (*Id.* ¶ 136.) Plaintiffs have, therefore, pleaded "misappropriation." *See, e.g., Bladeroom Grp. Ltd. v. Facebook, Inc.,* 2018 U.S. Dist. LEXIS 10905, at *19 (N.D. Cal. Jan. 2, 2018) (denying motion for summary judgment where plaintiff presented evidence that defendant acquired its trade secrets "by misrepresenting its motivation for engaging it in discussions concerning [plaintiff's] technology"); *InfoSpan, Inc. v. Emirates NBD Bank PJSC*, 2015 U.S. Dist. LEXIS 192303, at *14 (C.D. Cal. May 6, 2015) (denying motion for summary judgment based upon evidence that defendant fraudulently induced plaintiff to disclose its trade secrets).

    ***Second***, Reynolds argues that Plaintiffs "voluntarily disclosed" their trade secrets and did not plead them with particularity. Yet again, its arguments are misplaced.

### a. Plaintiffs sufficiently described their trade secrets

    A trade secret broadly "consists of any unpatented idea which may be used for industrial and commercial purposes." *BladeRoom*, 2018 U.S. Dist. LEXIS 10905 at *5 (citation omitted). The party alleging misappropriation need not "define every minute detail of its claimed trade secret at the outset of the litigation." *Id.* at *7 (citation omitted). Rather, it must only identify its trade secret with "adequate detail to allow the defendant to investigate how it might differ from matters already known and to allow the court to craft relevant discovery." *Alta Devices, Inc. v. LG Elecs., Inc.*, 2019 U.S. Dist. LEXIS 5048, at *4 (N.D. Cal. Jan. 10, 2019); *see also Teledyne Risi, Inc. v. Martin-Baker Aircraft Co., Ltd.*, 2016 U.S. Dist. LEXIS 190601, at *17 (C.D. Cal. Feb. 2, 2016) (plaintiff sufficiently alleged that defendant misappropriated its "various designs, techniques, processes, materials, and methods of fabrication of sequencers and their associated components").

Plaintiffs have alleged that Reynolds misappropriated three of PartProtection's trade secrets. *First*, Reynolds fraudulently induced Plaintiffs to disclose PartProtection's proprietary source code for its software and Reynolds used that source code to create its own competing product. (Compl. ¶¶ 128-29, 135-36, 200-02.) Under California law, PartProtection's source code "is undoubtedly a trade secret." *See Fitspot Ventures, LLC v. Bier*, 2015 U.S. Dist. LEXIS 116579, at *8 (C.D. Cal. Sep. 1, 2015); *see also Integral Dev. Corp. v. Tolat,* 675 F. App'x 700, 703 (9th Cir. 2017) ("Source code . . . qualifies for trade secret protection"); *Autodesk, Inc. v. Zwcad Software Co*., 2015 U.S. Dist. LEXIS 63610, at *13 (N.D. Cal. May 13, 2015) (plaintiff alleged protectable trade secret where defendant wrongfully acquired its source code and used it).

*Second*, Reynolds also misappropriated PartProtection's "eligibility file," which "took years to build, and contained PartProtection's confidential database of auto parts that it could insure and the prices of those parts." (Compl. ¶ 200.) Reynolds asserts that the information in PartProtection's eligibility file is publicly available, (Memo. at 29); however, Plaintiffs' complaint does not contain any such allegation. Rather, Plaintiffs have alleged that the eligibility file contains a "confidential" list of the auto parts for which PartProtection can offer policies and the corresponding prices for those parts. (Compl. ¶¶ 200, 204.) PartProtection's eligibility file qualifies for trade secret protection under California law. *See Brian Lichtenberg, Ltd. Liab. Co. v. Alex & Chloe, Inc.,* 2014 U.S. Dist. LEXIS 18607, at *17 (C.D. Cal. Feb. 13, 2014) ("customer lists, manufacturer lists, [and] product specifications" were protectable); *Sunbelt Rentals, Inc. v. Victor*, 2014 U.S. Dist. LEXIS 14416, at *18 (N.D. Cal. Feb. 4, 2014) (pricing information was protectable); *Brocade Commc'ns Sys. v. A10 Networks, Inc*., 2011 U.S. Dist. LEXIS 30227, at *4, 17-18 (N.D. Cal. Mar. 23, 2011) (information relating to "potential product development plans"

26

and "market opportunities" was protectable); *DocMagic, Inc. v. Ellie Mae, Inc*., 745 F. Supp. 2d 1119, 1145 (N.D. Cal. 2010) ("pricing and pricing policies" were protectable).

***Finally***, Reynolds argues that Plaintiffs' confidential contracts with the underwriters of PartProtection's policies—contracts that it misappropriated and used to broker more favorable agreements for its competing product (Compl. ¶¶ 200, 203)—are not protectable, but it does not cite a single authority in support of its argument. (Memo. at 29-30.) In fact, courts have routinely determined that vendor and supplier information is protectable. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1108 (9th Cir. 2001); *Giasson Aerospace Sci., Inc. v. RCO Eng'g, Inc*., 680 F. Supp. 2d 830, 844 (E.D. Mich. 2010) (vendor and pricing information was protectable because it would be valuable to a competitor in a bidding process); *Vinyl Interactive, Ltd. Liab. Co. v. Guarino*, 2009 U.S. Dist. LEXIS 41498, at *19 (N.D. Cal. May 1, 2009) (vendor list and information was trade secret because competitor could use it to gain an advantage).

### b. Plaintiffs adequately alleged the "secrecy" element

Reynolds also argues that Plaintiffs' trade secret claim is "barred" because the parties did not enter into a nondisclosure agreement before plaintiffs disclosed PartProtection's trade secrets to Reynolds, (Memo. at 26-27); however, Plaintiffs are not required to enter into nondisclosure agreements to satisfy the "secrecy" element of their CUTSA claims. *See BladeRoom Grp. Ltd. v. Facebook, Inc.,* 219 F. Supp. 3d 984, 992 (N.D. Cal. 2017) ("CUTSA's definition of what can constitute a 'trade secret' does not require . . . the use of nondisclosure agreements in all instances."); *see also Bal Seal Eng'g v. Nelson Prods*., 2018 U.S. Dist. LEXIS 220501, at *17 (C.D. Cal. Aug. 3, 2018); *InfoSpan,* 2015 U.S. Dist. LEXIS 192303, at *8; *Direct Techs., Inc. v. Elec. Arts, Inc*., 2014 U.S. Dist. LEXIS 195737, at *21 (C.D. Cal. Apr. 21, 2014). Further, "secrecy" is not lost "if the holder of the trade secret reveals the trade secret to another in

confidence and under an implied obligation not to use or disclose it." *MMCA Grp., Ltd v. Hewlett-Packard Co.*, 2010 U.S. Dist. LEXIS 2197, at *13-14 (N.D. Cal. Jan. 12, 2010).

Indeed, courts have recognized that, where a defendant induces a plaintiff to disclose its trade secrets by falsely representing that it intends to enter into a business relationship with the plaintiff, a plaintiff can sufficiently maintain the "secrecy" of its trade secrets even in the absence of a nondisclosure agreement. *See BladeRoom*, 219 F. Supp. 3d at 992 (denying motion to dismiss where "Facebook told BRG that it would be asked to submit a bid for an expansion of the Prineville data center, while in actuality Facebook had already agreed that its own contractors would submit a substantially lower bid for the same work"); *Direct Techs, Inc.*, 2014 U.S. Dist. LEXIS 195737 at *18-21 (denying defendant's motion for summary judgment where plaintiff disclosed trade secrets to parties purportedly interested in working with plaintiff but which did not sign nondisclosure agreements); *see also Direct Techs., LLC v. Elec. Arts, Inc.,* 836 F.3d 1059, 1070-71 (9th Cir. 2016) ("It may be that in some factual circumstances, a rational jury could find that when an implied relationship of confidentiality exists between two business partners, it is 'reasonable under the circumstances' for the prospective seller to not make additional efforts to maintain secrecy of the prototype.").

Although Reynolds argues that Plaintiffs "voluntarily disclosed" PartProtection's trade secrets to it, (Memo. at 26), Plaintiffs have alleged that Reynolds induced them to disclose those trade secrets through its misrepresentations that it intended to partner with PartProtection and it needed access to PartProtection's trade secrets to promote PartProtection. (*See* Compl. ¶¶ 124-41, 197.) Regardless of whether the parties executed a nondisclosure agreement, Reynolds was clearly aware that the information it sought was confidential. (*See Id.* ¶ 201, Ex. 5, Acknowledgement (describing "proprietary information" that Reynolds intended to extract from

former employees of Plaintiffs).) Moreover, Plaintiffs took reasonable steps to preserve the secrecy of PartProtection's trade secrets, including by storing them in secured databases, (*id.* ¶ 203), and they reasonably expected that their purported business partner, Reynolds, would maintain the secrecy of PartProtection's trade secrets. (*See Id.* ¶¶ 199-201.) These allegations are sufficient to allege "secrecy." *See Direct Techs.,* 2014 U.S. Dist. LEXIS 195737, at *21.

Reynolds also argues that Plaintiffs did not adequately maintain the "secrecy" of PartProtection's trade secrets because they "sold Reynolds trade secrets that ***overlapped*** with PartProtection's trade secrets when Reynolds acquired TradeMotion." (Memo. at 26 (emphasis added).) But the extent of any overlap is a question of fact. Further, in any event, the Court must accept Plaintiffs' allegations as true—and they have alleged that PartProtection possessed trade secrets that Reynolds did not acquire when it purchased TradeMotion, and Reynolds acquired PartProtection's unique trade secrets under fraudulent pretenses. (Compl. ¶¶ 124-41.)

### 5. Plaintiffs Have Stated A Claim For Diminution In Value of TradeMotion

Reynolds argues that i3 Brands cannot recover for its actions that diminished the value of TradeMotion and caused i3 Brands to sell that entity at an artificially low price. (Memo. at 20.) But the law is clear that i3 Brands can recover such damages based on Defendants' anticompetitive practices. *See Fishman v. Estate of Wirtz*, 807 F.2d 520, 551 (7th Cir. 1986) (a plaintiff can recover "lost going-concern value of a business damaged . . . because of an antitrust violation").

### 6. Plaintiffs Have Stated A Claim For Tortious Inference

With respect to Plaintiffs' claim for tortious interference, Reynolds argues only that it was "privileged to refuse to deal" with Plaintiffs. (Memo. at 30.) But its argument is based on law that has been overruled. In the case it cites, *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825 (9th Cir. 2001), the Ninth Circuit predicted that the California Supreme Court would not

permit plaintiff to maintain a claim for tortious interference against Shell because Shell was not a "stranger" to plaintiff's prospective economic advantages in that "the economic relationship between Marin Tug and [its prospective partner] depend[ed] on Shell's cooperation." *See Nat'l Rural Telcoms. Coop. v. DIRECTV, Inc.,* 319 F. Supp. 2d 1059, 1070 (C.D. Cal. 2003) (explaining *Marin*). But courts have repeatedly repudiated *Marin* since it was decided. *Rescap Liquidating Trust v. First Cal. Mortg. Co*., 2018 U.S. Dist. LEXIS 183507, at *21 (N.D. Cal. Oct. 25, 2018) (rejecting *Marin* because the "stranger test" is "no longer good law"); *G&C Auto Body Inc. v. GEICO Gen. Ins. Co*., 552 F. Supp. 2d 1015, 1021 (N.D. Cal. 2008) (*Marin* most likely "would not be adopted by California's highest court"). Thus, Reynolds' argument has no merit.

Further, even to the extent Ohio law applies, Reynolds' argument has no merit because it refused to provide integration in order to "accomplish[] an illegal effect on competition." *See Bill Call Ford, Inc. v. Ford Motor Co*., 830 F. Supp. 1053, 1064 (N.D. Ohio 1993) (citations omitted) (relied upon in *Khoury v. Trumbull Physician Hosp. Org*., 2000 Ohio App. LEXIS 5785, at *8 (Ct. App. Dec. 8, 2000)).

## CONCLUSION

For the foregoing reasons, the Court should deny Reynolds' Motion to Dismiss in Favor Arbitration, or in the alternative, to Dismiss Under Rule 12(b)(6). To the extent that the Court determines that Plaintiffs have not sufficiently pleaded any of their claims, Plaintiffs respectfully request the opportunity to cure any deficiencies in an amended complaint.

Dated: May 3, 2019                              Respectfully submitted,

                                                /s/ Michael E. Bloom
                                                J. Erik Connolly
                                                Michael E. Bloom
                                                Lauren C. Tortorella
                                                Benesch, Friedlander, Coplan & Aronoff LLP

333 Wacker Drive, Suite 1900
Chicago, IL 60606
Telephone: (312) 212-4949
econnolly@beneschlaw.com
mbloom@beneschlaw.com
ltortorella@beneschlaw.com

*Attorneys for Plaintiffs i3 Brands, Inc. and PartProtection, LLC*

## CERTIFICATE OF SERVICE

Michael E. Bloom, an attorney, hereby certifies that on May 3, 2019, he caused a true and correct copy of the foregoing **PLAINTIFFS' OPPOSITION TO THE REYNOLDS AND REYNOLDS COMPANY'S MOTION TO DISMISS IN FAVOR OF ARBITRATION, OR IN THE ALTERNATIVE, TO DISMISS UNDER RULE 12(B)(6)** to be filed and served electronically via the court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system.

*/s/ Michael E. Bloom*