**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>*i3 Brands, Inc. et al. v. CDK Global, LLC, et al.*, Case No. 1:19-cv-001412 (N.D. Ill.) | MDL No. 2817<br>Case No. 18 C 864<br><br>Hon. Robert M. Dow, Jr.<br>Magistrate Judge Jeffrey T. Gilbert |

**STATEMENT OF INTEREST OF INDIVIDUAL AND VENDOR CLASS PLAINTIFFS REGARDING DEFENDANT THE REYNOLDS AND REYNOLDS COMPANY'S MOTION TO DISMISS IN FAVOR OF ARBITRATION, OR IN THE ALTERNATIVE, TO DISMISS UNDER RULE 12(B)(6), THE COMPLAINT OF TAG-ALONG PLAINTIFFS I3 BRANDS, INC.'S AND PARTPROTECTION, LLC**

**INTRODUCTION**

i3 Brands, Inc. and PartProtection, LLC (collectively, "i3") filed a tag-along suit against CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") alleging antitrust claims that closely track those brought by the other plaintiffs in this MDL, including Authenticom, Inc., Cox Automotive, Inc. and eight of its subsidiaries, Loop, LLC d/b/a AutoLoop (on behalf of a class of vendors), and Motor Vehicle Software Corporation (collectively, the "Individual and Vendor Class Plaintiffs"). On April 1, 2019, CDK and Reynolds filed motions asking the Court to dismiss or stay i3's claims. *See* CDK Mem. in Supp. of Mot. to Dismiss (Dkt. 607) ("CDK MTD Br."); Reynolds Mem. in Supp. of Mot. to Dismiss (Dkt. 602).

CDK's motion to dismiss states, appropriately, that it "will not use this motion to relitigate the plausibility of most of [i3's] claims, for this Court has already ruled on motions to dismiss raising these same issues." CDK MTD Br. at 1 (Dkt. 607). In contrast, however, Reynolds asks the Court to revisit four prior rulings on the sufficiency, at the pleading stage, of the core antitrust allegations in this MDL, including: (1) the legal effect of Reynolds's Computer Fraud and Abuse Act ("CFAA") counterclaims on plaintiffs' affirmative antitrust claims; (2) the alleged horizontal conspiracy's plausibility; (3) the plausibility of the allegations of market foreclosure; and (4) the plausibility of plaintiffs' *Eastman Kodak* monopolization claims. Reynolds has addressed each of these issues in depth in past briefing, and the Court has already ruled on them (multiple times) in the cases involving the Individual and Vendor Class Plaintiffs. While Reynolds argues – in some cases expressly – that prior opinions in this MDL are wrongly decided, it advances no meaningfully new arguments at all, much less any that would call the Court's prior rulings into doubt.

The Individual and Vendor Class Plaintiffs file this Statement of Interest because it is improper for Reynolds use its motion to dismiss i3's complaint for the purpose of relitigating prior

decisions in their cases. Reynolds cannot meet the standard for reconsideration, and Reynolds encourages the Court to make inconsistent rulings that would undermine the uniformity and efficiency of MDL proceedings. In any event, Reynolds has already made almost all the arguments it now raises against i3's antitrust claims, and they have been rejected by the Court. The Court's prior rulings are correct and should not be revisited at this late stage of the MDL, after fact discovery has closed and the parties are preparing for expert reports and summary judgment.[1]

## ARGUMENT

### I. Reynolds's Attempt to Relitigate Previous Rulings in This MDL Is Improper

As the Court has recognized, past decisions in this MDL are now "law of the case." Status Hr'g Tr. at 31:3-4 (June 18, 2018), Dkt. 211; *see also In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 440-41 (3d Cir. 2009) (holding that law-of-the-case doctrine applies to decisions of MDL transferor courts, because "we do not believe that Congress intended that a 'Return to Go' card would be dealt to parties involved in MDL transfers"). "The law-of-the-case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *See Kovacs v. United States*, 739 F.3d 1020, 1024 (7th Cir. 2014) (internal quotation marks and citation omitted). Departure from the law-of-the-case doctrine is appropriate only if "there is a compelling reason, such as a change in, or clarification of, law that makes clear that the earlier ruling was erroneous." *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 572 (7th Cir. 2006); *see also Muczynski v. Lieblick*, 2013 WL 1080613, at *1–2 (N.D. Ill. Mar. 14, 2013) ("[A] motion to reconsider [the denial of a motion to dismiss] may be granted in the following circumstances: (1) the court has patently

---

[1] The Individual and Vendor Class Plaintiffs do not take a position on the arguments raised in CDK's and Reynolds's motions to dismiss involving issues that are unique to i3 and have not previously been ruled on by the Court in this MDL.

- 2 -

misunderstood a party; (2) the court has made a decision outside the adversarial issues presented to the court by the parties; (3) the court has made an error not of reasoning but of apprehension; (4) there has been a controlling or significant change in the law since the submission of the issue to the court; or (5) there has been a controlling or significant change in the facts since the submission of the issue to the court.") (internal quotation marks and citations omitted).

Reynolds does not attempt to – and cannot – meet the showing required for reconsideration. All it has done is reargue already-decided points. That is not sufficient. *See Vasarhelyi v. Vasarhelyi*, 2010 WL 1474652, at *1 (N.D. Ill. Apr. 7, 2010) ("[The] Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure. Motions for reconsideration are appropriate to correct manifest errors of law or fact," not "to reframe arguments previously presented to the court" or "challenge the well-founded principle that on a motion to dismiss under Rule 12(b)(6), the court accepts all well-pleaded allegations as true and draws all reasonable inferences in favor of the plaintiff.") (internal quotation marks and citation omitted).

Reynolds's effort to reargue already-decided issues is particularly improper in the context of an MDL proceeding, one of the core purposes of which is to "avoid conflicting rulings." Manual for Complex Litigation (Fourth) § 20.131 (2004); *see also Bushmaker v. A. W. Chesterton Co.*, 2012 WL 12995331, at *4 (W.D. Wis. Nov. 21, 2012) (recognizing "the MDL court's goal of conducting consolidated pretrial proceedings and achieving consistent rulings on matters common to large numbers of . . . cases"). Relitigating earlier decisions in this MDL, at the risk of creating conflicting rulings, is inconsistent with "the just and *efficient* conduct" of MDL litigation. 28 U.S.C. § 1407(a) (emphasis added). That is especially true given the late stage of this litigation: six motion to dismiss opinions have already been issued by this Court or transferor courts in this

- 3 -

MDL, and fact discovery has closed. Reynolds's Hail-Mary attempt to reopen the sufficiency of the pleadings at this stage should not be permitted.

## II. The Court Has Already Ruled on Reynolds's Arguments and Those Rulings Are Correct

In any event, Reynolds's recycled arguments provide no sound reason for the Court to alter its earlier rulings.

### A. The Computer Fraud and Abuse Act Does Not Defeat Plaintiffs' Claims

Reynolds argues (at 12-13) that its counterclaims against Authenticom under the CFAA render the data integration market per se unlawful, thus foreclosing any antitrust injury. That argument will sound familiar, because Reynolds has pressed it repeatedly, to both the Seventh Circuit and to Judge St. Eve – and to no avail. *See* Reynolds *Authenticom* MTD Br. at 6-21 (Dkt. 57); Reynolds *MVSC (II)* MTD Br. at 9-16 (Dkt. 44); Reynolds 7th Cir. Opening Br. at 5-16 (7th Cir. Dkt. 46). As Reynolds recognizes (at 13), "Judge St. Eve reached the opposite conclusion" in the *Authenticom* MTD Opinion. *See id*. at 18-22. Judge St. Eve's reasoning remains sound: under settled Seventh Circuit law, an antitrust defendant may not use supposedly unlawful conduct by the plaintiff to excuse its own anticompetitive conduct. *See Authenticom* MTD Op. at 19 (Dkt. 176) ("Both things can be true: Defendants may be able to state valid cyber-security claims against Authenticom *and* Authenticom may be able to state valid antitrust claims against Defendants."); *id*. at 21 ("Even assuming, without deciding, that the CFAA prohibits Authenticom from accessing DMSs without Defendants' authorization, Defendants are not free to withhold such approval pursuant to illegal arrangements.").

Judge St. Eve already correctly rejected all of the arguments Reynolds rehashes here. Reynolds points out (at 12) that Judge St. Eve dismissed Authenticom's exclusive-dealing claim based on *dealers'* contracts with Reynolds, but this holding has no bearing on the other antitrust

theories advanced in i3's complaint – as evidenced by Judge St. Eve's rejection of Reynolds's CFAA arguments in the same opinion in which she upheld other claims parallel to i3's. Reynolds also notes (at 12) that this Court denied Authenticom's motion to dismiss CDK's CFAA counterclaim against it, but that simply indicates that CDK pleaded a plausible CFAA claim. *See Authenticom* MTD Op. at 22 (Dkt. 176) ("[A]uthorization here is a factual matter and not properly before the Court based on the pleadings alone, and thus a precise delineation of whether the events in question may or may not be covered under the statute is premature.") (internal quotation marks and citation omitted). Moreover, as the *Authenticom* MTD Opinion held, "[b]oth things can be true," and i3 – which has not even been accused of violating the CFAA – can have a valid antitrust claim *even if* Authenticom violated the CFAA (which Authenticom strongly disputes).

Finally, Reynolds suggests (at 13) that for the same reason the CFAA defeats antitrust injury, it also defeats causation: if the CFAA allows Reynolds to exclude Authenticom, then exclusion of Authenticom cannot be the but-for cause of i3's injury. But "whether Defendants' [blocking of Authenticom] was the result . . . of illegal conspiracies and anticompetitive arrangements," *Authenticom* MTD Op. at 21 n.7 (Dkt. 176) – rather than unilateral decision-making – is the factual question presented in this litigation.[2] i3 has pleaded that Reynolds, among other violations, *in fact* blocked Authenticom pursuant to anticompetitive agreements. If proven true, Reynolds's conduct would be the cause of i3's injury.

---

[2] *See Authenticom* MTD Op. at 21-22 (Dkt. 176) (citing *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 99 (2d Cir. 2000) (although a law permitted networks and stations to withhold their licenses, plaintiff adequately stated a Section 1 claim by alleging that they had colluded to do so), and *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19 (1979) ("the copyright laws confer no rights on copyright owners to fix prices among themselves or otherwise to violate the antitrust laws")).

### B. The Alleged Reynolds-CDK Horizontal Conspiracy Is Plausible.

Reynolds contends (at 13-15) that the alleged agreement between Reynolds and CDK to block independent integrators does not "make economic sense," and, as a factual matter, that Reynolds acted unilaterally. It has advanced this same argument before, as has CDK. *See, e.g.*, Reynolds *Authenticom* MTD Br. at 21-29 (Dkt. 57); CDK *Authenticom* MTD Br. at 10-13 (Dkt. 55); CDK *AutoLoop* MTD Br. at 9-12 (Dkt. 260). Every court opinion to assess the core horizontal conspiracy allegations against Reynolds and CDK has upheld them. *See, e.g.*, *Authenticom* MTD Op. (Dkt. 176); *Cox Automotive* MTD Op. (Dkt. 505); *AutoLoop* MTD Op. (Dkt. 504); *MVSC (I)* Op. (C.D. Cal. Oct. 2, 2017) (*MVSC* Dkt. 73); *Authenticom* Prelim. Inj. Hearing Op. (W.D. Wis. 2017) (*Authenticom* Dkt. 172). None of Reynolds's arguments are new or call into question the conclusions of the *four* federal judges who have ruled on this question to date. *See, e.g.*, *AutoLoop* MTD Op. at 16 (Dkt. 504) ("'Such a partial ceasefire and mutual forbearance between two rivals would make sense if . . . Defendants sought to 'support' one another's integration services to the exclusion of third-party integrators from the competition.'") (quoting *Authenticom* MTD Op. at 26-27 (Dkt. 176)). Moreover, Reynolds's arguments here appear focused exclusively on the written 2015 agreements with CDK, whereas "the alleged agreements between [CDK] and Reynolds are not limited to the 2015 written agreements," because "Plaintiff also alleges that CDK executives admitted 'that the companies agreed to block and thereby destroy third-party data integrator[s].'" *Id*. at 16.

### C. Plaintiffs Have Alleged Foreclosure in the Data Integration Market

Reynolds quibbles (at 15-16) that i3 has not adequately pleaded that the exclusive-dealing provisions in Reynolds's vendor contracts foreclosed a substantial percentage of the data integration market. Reynolds (and CDK) have raised the same arguments before. *See* Reynolds

- 6 -

*Authenticom* MTD Br. at 43-46 (Dkt. 57); CDK *AutoLoop* MTD Br. at 12-14 (Dkt. 260). The exact argument Reynolds recycles here has already been rejected. *See AutoLoop* MTD Op. at 21-22 (Dkt. 504) ("[CDK] argues that Plaintiff fails sufficiently to allege that Authenticom was foreclosed from the data integration market. However, Plaintiff alleges that [CDK] and Reynolds together control approximately 75 percent of the DMS market by number of dealers and approximately 90 percent when measured by number of vehicles sold. . . . [V]endors are likely only willing to pay [supracompetitive] prices because Authenticom (the only other remaining data integrator) is foreclosed from competing for that business. These allegations raise a reasonable inference that Authenticom is foreclosed from competing in a substantial portion of the data-integration market."); *see also Authenticom* MTD Op. at 37 (Dkt. 176) ("The Complaint also has pleaded sufficient facts indicating that these exclusive-dealing [vendor] contracts could foreclose a substantial portion of the data-integration market."); *Cox Automotive* MTD Op. at 16 (Dkt. 505) ("Plaintiffs sufficiently have alleged that the exclusive-dealing contracts foreclose a substantial portion of the data-integration market, resulting in increased prices"). Reynolds's demand for even more detail about the data integration market is not appropriate for the pleading stage. *See AutoLoop* MTD Op. at 20 ("[B]ased on the fact-intensive nature of the product-market inquiry, the issue is not properly resolved on a motion to dismiss."). As before, Reynolds offers nothing new to justify altering these prior rulings.

### D. The Court Has Already Upheld i3's *Eastman Kodak* Monopolization Claim

Reynolds argues (at 16-20) that i3 has not alleged a single-brand aftermarket claim under *Eastman Kodak*. Once more, this issue has been extensively briefed before. *See, e.g.*, Reynolds *Authenticom* MTD Br. at 29-39 (Dkt. 57); CDK *Authenticom* MTD Br. at 17-20 (Dkt. 55); CDK

*AutoLoop* MTD Br. at 17-18 (Dkt. 260). And Plaintiffs' *Eastman Kodak* claims have been uniformly upheld. None of Reynolds's three arguments are new or call these holdings into doubt.

First, Reynolds contends (at 17-18) that *Eastman Kodak* and Seventh Circuit precedent require a defendant to have "change[d]" its aftermarket practices. Reynolds and CDK have made the same arguments before. *See, e.g.*, Reynolds *Authenticom* MTD Br. at 35-39 (Dkt. 57); CDK *AutoLoop* MTD Br. at 17-18 (Dkt. 260). Judge St. Eve squarely disagreed, concluding that "a change in aftermarket practices is not the sole worry of *Eastman Kodak* and its progeny." *Authenticom* MTD Op. at 48 (Dkt. 176). Reynolds contends (at 18) that Judge St. Eve's conclusion to the contrary was "contrary to binding Seventh Circuit law," namely *Digital Equipment Corporation v. Uniq Digital Technologies, Inc.*, 73 F.3d 756, 763 (7th Cir. 1996). But Judge St. Eve recognized that *Digital Equipment Corporation* "elucidated *Eastman Kodak*'s holding," *Authenticom* MTD Op. at 45 (Dkt. 176), and she addressed it in depth, *see id.* at 45-46, 49. She ultimately concluded that "'[c]ompetition among manufacturers fully protects buyers who *accurately* calculate life-cycle costs,' but where customers cannot do so, a supplier-defendant . . . can charge supracompetitive prices in the aftermarket." *Id.* at 49 (quoting *Digital Equip. Corp.*, 73 F.3d at 762 (emphasis added in the *Authenticom* MTD Op.); *see also AutoLoop* MTD Op. at 23-25 (Dkt. 504) (upholding AutoLoop's *Eastman Kodak* claim). Other than voicing its disagreement with Judge St. Eve's conclusion, Reynolds offers no reason why her conclusion warrants reconsideration.

Second, Reynolds argues (at 18-19) that dealers were not "locked in" to their DMS because they *could have* switched, despite the high switching costs. Reynolds has previously argued that "Dealers are anything but 'locked in,'" Reynolds *Authenticom* MTD Br. at 38 (Dkt. 57), and that "it is worth noting that Authenticom's complaint acknowledges that switching DMS providers is

- 8 -

entirely possible," Reynolds *Authenticom* Reply at 30 n.10 (Dkt. 63). Judge St. Eve disagreed, holding that it was sufficient that "the Complaint pleads that Reynolds employs contracts that prohibit vendors from sharing with dealers Reynolds's integration fees, which are allegedly subject to varying, significant, and frequent increases." *Authenticom* MTD Op. at 49 (Dkt. 176). To the extent Reynolds suggests (at 19) that Plaintiffs must show that "substantial numbers of dealers *could not switch* to another DMS even if they wanted to" (emphasis added), that is not the standard; even in *Kodak*, the photocopier owners "could have" switched photocopiers if they were willing to incur the high cost of doing so. Plaintiffs' lock-in allegations, as Judge St. Eve held, are sufficient for a motion to dismiss. *See e.g., Collins Inkjet Corp. v. Eastman Kodak Co.*, 2014 WL 11516553, at *9 (S.D. Ohio Mar. 21, 2014) (holding plaintiff established a likely *Eastman Kodak* aftermarket where office printers had a lifespan of 10-20 years and buyers "have invested time and money into training their employees" on the system), *aff'd*, 781 F.3d 264 (6th Cir. 2015); *Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218, 1232 (E.D. Cal. 1999) (holding that where there is competing evidence on lock-in, "disputed issues for trial" preclude summary judgment).

Finally, Reynolds argues (at 19-20) that dealers can adequately assess the lifecycle cost of the Reynolds DMS, notwithstanding Reynolds's price-secrecy provisions, by adding the total price charged by each vendor for its application (inclusive of Reynolds's integration fees) to the price of the Reynolds DMS. This proposed calculation would not reveal the cost of the Reynolds DMS itself, of course, but rather the DMS *plus* various configurations of third-party applications. Reynolds's proposal also fails to address one of the primary concerns cited by Judge St. Eve – that vendors are "allegedly subject to *varying, significant, and frequent increases*" in integration fees. *Authenticom* MTD Op. at 49 (Dkt. 176). In other words, even if a dealer knew the lifecycle cost of the DMS at a moment in time, the dealer would not know whether to attribute any future price

hikes to the vendor or to increases in Reynolds's integration fees. Reynolds's proposal also turns on the fact-bound question of the extent to which it would actually have been feasible for dealers to receive accurate price quotes from each of the 10-15 (or more) vendors that most dealers use, given that the vendors might not know how much Reynolds would charge to integrate with a given prospective dealer customer. Ultimately, Reynolds's argument fails because even if "dealers, industrywide, are concerned about increased prices for vendor applications on so called 'closed' DMSs . . . . the fact that dealers know the price of vendor applications . . . *does not mean that dealers industrywide are aware of the exact cost of data integration services*, even if they are concerned about increasing costs and the reduced efficiency of vendor applications." *AutoLoop* MTD Op. at 26-27 (Dkt. 504) (emphasis added).

## CONCLUSION

The Court should not reconsider its core antitrust rulings in this MDL, and if it does the earlier rulings should be affirmed.

Dated: May 3, 2019                                         Respectfully submitted,

*/s/ Derek T. Ho*
Derek T. Ho
**KELLOGG, HANSEN, TODD,**
 **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com

*Counsel for Plaintiffs Authenticom, Inc., Cox Automotive, Inc., Autotrader.com, Inc., Dealer Dot Com, Inc., Dealertrack, Inc., HomeNet, Inc., Kelley Blue Book Co., Inc., vAuto, Inc., VinSolutions, Inc., Xtime, Inc., Loop, LLC d/b/a AutoLoop, and Motor Vehicle Software Corporation*

## **CERTIFICATE OF SERVICE**

       I, Derek T. Ho, an attorney, hereby certify that on May 3, 2019, I caused a true and correct copy of the foregoing **STATEMENT OF INTEREST OF INDIVIDUAL AND VENDOR CLASS PLAINTIFFS REGARDING DEFENDANT THE REYNOLDS AND REYNOLDS COMPANY'S MOTION TO DISMISS IN FAVOR OF ARBITRATION, OR IN THE ALTERNATIVE, TO DISMISS UNDER RULE 12(B)(6), THE COMPLAINT OF TAG-ALONG PLAINTIFFS I3 BRANDS, INC.'S AND PARTPROTECTION, LLC** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by email to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

       */s/ Derek T. Ho*
       Derek T. Ho
       **KELLOGG, HANSEN, TODD,**
        **FIGEL & FREDERICK, P.L.L.C.**
       1615 M Street, NW, Suite 400
       Washington, D.C. 20036
       (202) 326-7900
       dho@kellogghansen.com