```
 1               IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   IN RE:                       ) No. 18 CV 00864
                                  )
 4   DEALER MANAGEMENT SYSTEMS    ) Chicago, Illinois
                                  ) May 15, 2019
 5   ANTITRUST LITIGATION.        ) 9:39 a.m.

 6                    TRANSCRIPT OF PROCEEDINGS

 7          BEFORE THE HONORABLE JEFFREY T. GILBERT

 8   APPEARANCES:

 9   For the Plaintiffs:        MILBERG, LLP
                                BY:  MS. PEGGY J. WEDGWORTH
10                              One Penn Plaza, Suite 4800
                                New York, New York 10119
11                              (212) 631-8622

12                              ROBBINS GELLER RUDMAN & DOWD
                                BY:  MR. FRANK A. RICHTER
13                              200 South Wacker Drive, 31st Floor
                                Chicago, Illinois 60606
14                              (312) 674-4674

15                              KELLOGG HANSEN TODD FIGEL &
                                FREDERICK, PLLC
16                              BY:  MR. MICHAEL N. NEMELKA
                                1615 M Street, NW, Suite 400
17                              Washington, DC 20036
                                (202) 326-7932
18
     For Defendant Reynolds &   GIBBS & BRUNS, LLP
19   Reynolds:                  BY:  MS. AUNDREA K. GULLEY
                                     MR. BRIAN T. ROSS
20                                   MR. ROSS M. MacDONALD
                                1100 Louisiana, Suite 5300
21                              Houston, Texas 77002
                                (713) 650-8805
22
     For Defendant CDK          MAYER BROWN, LLP
23   Global:                    BY:  MS. BRITT M. MILLER
                                     MR. MATTHEW D. PROVANCE
24                              71 South Wacker Drive
                                Chicago, Illinois 60606
25                              (312) 782-0600
```

```
1    ALSO PRESENT:              MR. JONATHAN EMMANUAL

2    Court Reporter:           Judith A. Walsh, CSR, RDR, F/CRR
                               Official Court Reporter
3                              219 S. Dearborn Street, Room 1944
                               Chicago, Illinois 60604
4                              (312) 702-8865
                               judith_walsh@ilnd.uscourts.gov
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        (Proceedings heard in open court:)

2        THE COURT:  Good morning, everybody.  Okay.  We're

3   going to do it the way we've done it before, which is I'll get

4   appearances of the people in the courtroom.  I'll take

5   appearances of anybody on the phone who anticipates speaking.

6   Anybody who is on the phone who just wants to be listed as

7   attending or -- sends an email to -- who, Brenda?

8        THE CLERK:  I think we'll do me this time.

9        THE COURT:  Sends an email to my courtroom deputy,

10   Brenda, underscore, Rinozzi, R-i-n-o-z-z-i,

11   @ilnd.uscourts.gov, and she'll get that information to the

12   court reporter.

13        If you're going to speak, everybody please state your

14   name before you speak.  The folks in the courtroom,

15   eventually, our court reporter, who is pretty much of a crack

16   court reporter, will figure out who you are.  On the phone,

17   though, always state your name.

18        Okay.  Let's get everybody's appearances.

19        MS. WEDGWORTH:  Good morning, your Honor.  Peggy

20   Wedgworth from Milberg Tadler Phillips Grossman on behalf of

21   the dealership class plaintiffs.

22        THE COURT:  Okay.

23        MR. RICHTER:  Good morning, your Honor.  Frank

24   Richter from Robbins Geller Rudman & Dowd, on the plaintiffs

25   steering committee for the dealership class plaintiffs.

1       MR. NEMELKA:  Good morning, your Honor.  Mike Nemelka

2  from Kellogg Hansen on behalf of the individual and vendor

3  class plaintiffs.  And Derek Ho, the co-lead of the MDL for

4  the individual vendor class plaintiffs, would be here but he

5  had a baby on Monday.

6       THE COURT:  Oh, that's a heck of an accomplishment.

7       MR. NEMELKA:  Yes.

8       THE COURT:  Well, congratulate him.

9       MR. NEMELKA:  I will.

10      THE COURT:  And his significant other probably

11 contributed to that, right?

12      MR. NEMELKA:  Yes.

13      THE COURT:  Okay.  On the defense side?

14      MS. GULLEY:  Good morning, your Honor.  Aundrea

15 Gulley on behalf of The Reynolds and Reynolds Company.  Also

16 in the courtroom is Jon Emmanual who is from The Reynolds and

17 Reynolds Company.

18      THE COURT:  Okay.

19      MR. ROSS:  Good morning, your Honor.  Brian Ross from

20 Gibbs & Bruns also on behalf of The Reynolds and Reynolds

21 Company.

22      MR. MacDONALD:  Good morning, your Honor.  Ross

23 MacDonald also of Gibbs & Bruns, also on behalf of The

24 Reynolds and Reynolds Company.

25      MS. MILLER:  Good morning, your Honor.  Britt Miller

1    from Mayer Brown, LLP, on behalf of CDK Global, LLC, and

2    Computerized Vehicle Registration.

3           MR. PROVANCE:  Good morning, your Honor.  Matt

4    Provance, Mayer Brown, on behalf of CDK Global, LLC, and

5    Computerized Vehicle Registration.

6           THE COURT:  Okay.  And anybody on the phone want to

7    chime in or just -- just be silent, or do you want to just do

8    it when you speak?

9           Hearing nobody, that's fine.  Maybe nobody is on the

10   phone.  Okay.

11          PHONE CALLER:  Hello?

12          THE COURT:  I got your agenda.  I've gone through

13   your agenda.  We can use that as a guideline.  There are

14   certain things I'd like to cover, too.  I got and read the

15   submission that was made, the letter submission which I take

16   to mean -- I have not read the OEM motion but I take it to

17   mean that that motion is fully resolved, withdrawn.  I don't

18   have to deal with it.  In other words, there was -- you said

19   that plaintiffs and CDK resolved it.  There was nothing

20   vis-a-vis R and R on that or Reynolds?

21          MR. NEMELKA:  Correct.  It's resolved with respect to

22   CDK.  And based on discussions we've had this morning with

23   Reynolds, it's also resolved with respect to Reynolds.

24          THE COURT:  Okay.  Yes, that was an undistributed

25   part of that letter that I saw last night.  So we'll grant in

1    my order today, I guess, plaintiffs' oral motion to withdraw

2    the motion.  Correct?

3              MR. NEMELKA:  Correct.

4              MS. WEDGWORTH:  Yes, your Honor.  Peggy Wedgworth.

5              THE COURT:  Everybody has microphones on your table,

6    so if you -- we're recording it as well.  And they're

7    directional, so you don't have to speak right into them as

8    I've learned.  But anyway, just make sure that they're looking

9    towards you when you speak.

10             So that leaves, I guess for me by my count, seven

11   motions that I still have under advisement of a discovery

12   nature, one of which is very old which I want to talk about

13   today which is the redesignation of highly confidential to

14   confidential, but then it includes all the other motions that

15   you've listed in Paragraph 1 of your status, which is ECF 684.

16             Let me just make sure I'm right on the count.  One,

17   two, three, four, five six -- I think seven motions in front

18   of me and one in the Southern District of New York which may

19   or may not hit me at some point.  Right?  At least I have the

20   count right, right?

21             MS. MILLER:  That's what we count, your Honor.

22             THE COURT:  Ms. Wedgworth as well?

23             MS. MILLER:  Sorry.  Britt Miller.  We agree that

24   it's a count of seven.

25             THE COURT:  Okay.  Do you want to move someplace?

1      (Pause.)

2           THE COURT:  Okay.  And one of them is very, very old.

3      It's been suffering from benign neglect, at least from your

4      perspective, not necessarily from mine because that was fully

5      briefed back in November, but the rest of them are briefed in

6      March and April and May.  So I don't feel quite as neglectful

7      of those.  Some of them only recently fully briefed.

8           I'd like to address today the motion that I said I

9      would address, which is the motion with respect to the AT&T

10     subpoena where CDK is moving to quash that.  And then I want

11     to talk somewhat about the highly confidential redesignation

12     thing since it's been under advisement for so long.  Even

13     though you haven't heard from me, I've spent a lot of time

14     with it.

15          And then I want to talk about the other motions that

16     are under advisement and maybe get some color on it and decide

17     how to proceed with those because one option is just to

18     schedule you for long, long, long sessions in the courtroom to

19     go through these motions rather than -- because I find it, as

20     you see in some of my orders, difficult.  I don't know if it's

21     just this case.  I don't usually find it that difficult, but

22     this case in particular, I have a difficult time figuring out

23     what the parties are saying at a granular level as opposed to

24     a higher level, and I'm not sure exactly why that is.

25          So I'd like to address those.  And then I want to

1   address plaintiffs' additional issues and defendants'

2   additional issues.  I know you have date issues.  So we'll --

3   I think hopefully, we can march through that agenda and use

4   that as a guideline.

5            THE CLERK:  The phone just disconnected.

6            THE COURT:  Pardon?

7            THE CLERK:  The phone just disconnected.

8            THE COURT:  Okay.  I have a law clerk on the phone

9   who is participating for a little bit.

10           THE CLERK:  Sorry.  Do you know, are there any other

11  callers on the phone?

12      (Pause.)

13           THE COURT:  Okay.  Great.  So anybody who wanted to

14  come aboard came aboard.  That's fine.

15           I want to say something totally unrelated to anything

16  that's pending right now, but it is a source of extreme

17  frustration of my chambers:  Courtesy copies and how I get

18  them and what you send me.  I want to say a couple of things

19  about this.  I'm planning to amend what's on my web page, but

20  in the meantime, again, this case for some reason just doesn't

21  follow the normal rule here.

22           I have a rule that I want courtesy copies of

23  everything you're filing that I need to do something with:  A

24  motion, a memorandum of law, a status report.  I want a

25  courtesy copy, hard copy, delivered to my chambers even though

1    it is on the internet.  I get that it's on the internet.  I'm

2    a hard copy person.  I like one-sided copies, not two-sided

3    because I tend to write on the backs of pages when I'm going

4    through briefs and motions, and two-sided copies prevent me

5    from doing that without covering something that you want me to

6    read.  So courtesy copies, one-sided.

7            And please, because you file a tremendous amount of

8    stuff under seal, when you deliver to me the version of what

9    you have filed as redacted and then -- you filed unredacted,

10   rather.  Okay.  So you filed a motion to seal and first you

11   filed a redacted thing that's blacked out, and then you ask

12   for leave and you're given leave either in advance or then,

13   and then you file something under seal.  And then you deliver

14   it to me.  And a lot of times, it has a little stamp on it

15   that says, "Filed under seal."

16           Please, please, please, when you deliver that to me,

17   give me the ECF number of that filing.  So instead of just

18   copying what you have without an ECF number, print it off the

19   internet or at the very least put on the first page what the

20   ECF number is because there's so many filings, we have to then

21   search for what these are.

22           Frankly, I would prefer to have the ECF -- you know,

23   when you serve me a courtesy copy, it should be the ECF thing

24   so I can have it on every page.  Even with -- when you file

25   something in redacted form, if you give me the ECF number, if

1   I need to refer to a page, I can do it based on the ECF

2   number.

3          So I get tons of stuff that is delivered to me, you

4   know, double-sided which I already talked about but does not

5   have an ECF number on it.  Then we have to search for where it

6   is.  And sometimes, what you deliver to me in terms of just,

7   you know, without an ECF number doesn't have the same title as

8   what is on the internet or what you filed.  I don't mind any

9   of that.  All right.  But I need to be able to have a roadmap

10  on this.

11         So I want what you deliver to me to be ECF -- I would

12  prefer that what you send to me is either stapled in the top

13  left or at the very least has a binder clip on it.  If it's

14  more than 30 pages, if it's really long, I like spiral

15  binding, but whatever the heck you want to do is fine.  I'm

16  not going to go crazy on this.

17         The things that I really want are whenever you file

18  stuff that you want me to be reading and I'm going to have to

19  decide, send me a copy.  The copy should have the ECF header.

20  It should be double-sided -- it should be one-side copied

21  rather than double-side copied, and it should be delivered the

22  next business day if at all possible so that I have this stuff

23  and I don't have to start printing the stuff off the internet.

24         You know, I brought out some of the motions that I

25  had that are fully briefed.  I think I entered an order a

1  while ago asking you to deliver more.  I'm not sure what the

2  status of that is.  When I brought out what I have, I don't

3  think I have seven fully briefed motions sitting here.  So I'm

4  not sure what I have or what I don't.  And if I don't have

5  anything, you'll hear from me.

6          MS. MILLER:  Your Honor, Britt Miller.  The order

7  that you issued last week, we arranged to -- there were four

8  things.  And because we're here in Chicago, we went ahead and

9  delivered copies of three of the four of those with the

10 courtesy copy of this joint agenda that you requested.  And I

11 believe Mr. Nemelka's office handled the delivery of the

12 fourth.

13         MR. NEMELKA:  Correct.

14         THE COURT:  Okay.  All right.  I have to figure out

15 then why I don't seem to have piles of everything.  It may be

16 that we need to give you more numbers that we don't have or

17 maybe I'm just not looking at it right.  Anyway, that's a pure

18 housekeeping matter.  I would really appreciate it as we go

19 forward if we -- if we could do that.

20         MR. NEMELKA:  Your Honor, would you like us to figure

21 that out, the four that we delivered and then find out which

22 of the other three are and provide copies?

23         THE COURT:  No.  I mean, I'll let you -- I believe

24 I'll let you know.  I mean, we can do this offline.  It looks

25 like I have -- I said three.  I have four piles of motions

1    that are fully briefed, and I have the highly confidential --

2    wait.  I have the highly confidential one.  That's five.  I

3    have the interrogatories.  That's six.  Yes.  There may be one

4    I don't have, or maybe I'm just not counting something.  Okay.

5         Okay.  The next -- okay.  Before I get to the issues

6    that are listed as plaintiffs' additional issues and

7    defendants', I think I'd like to address the motion to quash

8    or modify the subpoena that was directed to AT&T and the

9    highly confidential designation.

10        Before I do that, could somebody just tell me -- or

11   maybe plaintiffs can tell me this and then defendants can

12   supplement -- where we are on the -- I know we closed fact

13   discovery, yet there's some things that are still open.  And

14   you've talked about some of them:  The Lamm deposition, the

15   Dominion deposition.  As of the order that I entered last

16   night, you've got an InDesign deposition.

17        MS. MILLER:  Consistent with your -- I'm sorry.

18   Britt Miller.  Consistent with your order last week, we are

19   still waiting for a date for the Sandy Schwartz deposition.

20        THE COURT:  Right.  Maybe we could -- I would like to

21   kind of know -- I know I have motions that -- you know, I have

22   the motion with respect to the additional interrogatories that

23   could provoke more discovery.  I know we have motions with

24   respect to privilege logs and other things that you've given

25   me.  Those are all discovery, and depending upon what happens

1    with those, other things might flow from that.  I understand

2    that.

3        I guess I'd just like to get a global sense, you've

4    stopped flying around the country taking depositions except

5    for the ones that are coming up.  You've said that -- at least

6    the defendants have said that maybe you want to change dates

7    for expert disclosures which maybe you can highlight here in

8    this little discussion.

9        Just give me a sense of where -- what's going on in

10   your case in addition to what I have on the agenda, or maybe

11   that's all that's going on in the case.  Mr. Nemelka?

12       MR. NEMELKA:  From our perspective, it's on the

13   agenda.  From our perspective, the depositions that have just

14   been listed are the only ones outstanding.  We've resolved the

15   OEM issue.  And the other items on the agenda, which we may

16   come to, but from our perspective, we're -- fact discovery is

17   closed except for these last few things.

18       MS. WEDGWORTH:  Your Honor, Peggy Wedgworth.  We

19   still have third party subpoenaed production that's still

20   coming in but no depositions scheduled with some of those

21   third parties, but those productions continue to roll in.

22   They are not complete.  Some of them are, but there were

23   numerous third party subpoenas.  We're still waiting on some

24   of that as well.

25       THE COURT:  And those are subpoenas for documents but

1   not for deposition?

2        MS. WEDGWORTH:  Correct, documents and data if you

3   make that distinction, but those -- there may be one that had

4   a deposition date, but I think we've got that covered in here

5   for the deposition you mentioned outstanding.  Dominion, yes.

6        THE COURT:  Okay.  And plaintiffs are still very

7   focused on completing discovery here and then going your

8   respective -- trying to get back to Wisconsin in your

9   Authenticom case and trying to get the case tried as soon as

10  you can, correct?

11       MR. NEMELKA:  Correct.

12       MS. WEDGWORTH:  Your Honor, dealership plaintiffs

13  have noted that defendants are interested perhaps in extending

14  an expert deadline.  Dealership class plaintiffs are not

15  opposed to that for a short period of time.

16       THE COURT:  Okay.  So Ms. Miller or Ms. Gulley, give

17  me a sense of what -- whether from your perspective the status

18  gave me everything that I need to know about the status of

19  your discovery and then what your -- what do you want to do

20  about expert dates.

21       MS. GULLEY:  Yes.  Thanks, your Honor.  This is

22  Andi Gulley.  So yes, I mean, we have definitely pushed very

23  hard since we were here in February.  We took 39 depositions

24  since we were here in February.  There are some important

25  outstanding items in this, what I think of as sort of the last

1    mile of discovery in addition to the -- I do think it's

2    primarily laid out in the agenda, but in addition to the four

3    depositions and the third party productions that Ms. Wedgworth

4    mentioned, most importantly, I think, for purposes of the

5    expert reports is the issue of refreshing data, right.  It

6    hasn't been produced in quite a while.

7            The parties are in negotiations about that, the

8    dealers in Cox.  Defendants have some issues with the dealers

9    in Cox.  In any event, I won't bore you with the details.  I

10   believe that the parties will be able to work that out.  We've

11   been trying.  But then once all of that is produced, that is

12   literally what the experts are relying on.

13           We've had a number of meet and confers leading up to

14   this hearing as you would expect.  And apparently, as we

15   understand it, the plaintiffs -- or at least I understand

16   Ms. Wedgworth doesn't oppose a short extension, but I

17   understand that Mr. Nemelka's clients do.

18           And what we understood from the meet and confers was

19   that apparently they were going to file their reports in

20   July -- mind you, we have a bunch of reports also due in July

21   for the counterclaims -- but then supplement their expert

22   reports as needed as this additional data comes in and

23   potentially information from these last depositions and

24   productions.

25           You know, for two reasons, that doesn't really work

1   for the defendants.  First of all, we want it to be over, too.

2   We want there to be an end.  It's just that we don't want to

3   engage in iterative expert reports where, you know, there's a

4   report and then a supplemental report and then sur replies and

5   that sort of thing.

6           We just want to make sure that when that deadline

7   comes -- and we expect that productions are going to be

8   happening over the next few weeks.  You know, that when those

9   reports come, those are the reports.  You know, we're not

10  having to respond twice.

11          And separately, defendants have a number of expert

12  reports due on July 1st.  There are counterclaims in four of

13  the five groups of cases.  And we need plaintiffs' remaining

14  data.  I mean, the experts are trying to get their job done,

15  obviously, but we need that data to complete the reports.

16          So ultimately, we just -- we don't want to have it

17  both ways.  We don't want to have, you know, an end of

18  discovery and then just have iterative experts instead.

19          THE COURT:  Yes.

20          MS. GULLEY:  So that's where we are.

21          THE COURT:  Can you refresh my recollection?  I

22  didn't do this before coming out here.  What are the current

23  expert disclosure dates?  Do I have -- I can't even remember.

24  Have I set those, or if they were by agreement?  I think they

25  probably were to some extent.  Plaintiffs --

1          MS. GULLEY:  Judge Dow --

2          THE COURT:  Or tell me what ECF number it is.

3          MS. GULLEY:  It is ECF --

4          MR. NEMELKA:  553.

5          THE COURT:  Okay.  Hold on.

6          MS. WEDGWORTH:  No.  Actually, 616-1.

7          MR. NEMELKA:  Okay.  Sorry.

8          THE COURT:  Okay.  Hold on for a second.

9          MS. WEDGWORTH:  And it's dated April 3rd, 2019.

10          MS. GULLEY:  So it's subject to the statements that

11 were made at the February 27th hearing, is kind of the

12 preamble, and then the first date is July 1st.

13          MS. MILLER:  And your Honor, Britt Miller, I will

14 simply add to what Ms. Gulley said.  What is not -- one of the

15 things that is not reflected in the agenda but certainly at

16 least for CDK is an issue is that the dealership class

17 plaintiffs have moved to dismiss our counterclaims.

18          And so I don't even know if I have counterclaims for

19 which I would have an affirmative report due on July 1st.

20 That motion is fully briefed and before Judge Dow.  But there

21 again to Ms. Gulley's point, this may only affect me, but I

22 shouldn't be in a position where I'm having to be fighting two

23 different things on two different fronts.

24          If I'm submitting an expert report on the

25 counterclaims, I would -- should be, I would think, be able to

1  submit those all at once on all of my counterclaims because we

2  have counterclaims pending against Authenticom, Cox, Autoloop,

3  and the dealers.

4  And so it's one of those, I don't want to be in a

5  position where my client is having to do extra work and

6  seriatim reports because I'm -- we don't have certain rulings

7  that are in the books yet.  So there are a number of

8  outstanding things, not just before your Honor but also before

9  Judge Dow that --

10  THE COURT:  Right.  That affect the scheduling.

11  MS. MILLER:  Yes, sir.  Yes, your Honor.

12  THE COURT:  Could you give me the ECF number again?

13  I thought you said 661 but that's --

14  MS. WEDGWORTH:  616-1.

15  THE COURT:  How is it dash 1?

16  MS. MILLER:  It was an attachment.

17  THE COURT:  Right, but as entered by -- oh, I see.  I

18  see.  Got it.

19  I've got to print this, Brenda.

20  THE CLERK:  Okay.  Sure.

21  THE COURT:  So because the schedule says "opening

22  merits expert reports," it's whoever's got the burden of

23  proof.

24  MS. WEDGWORTH:  Yes.

25  THE COURT:  So plaintiffs and defendants would have

 1    to serve by July 1, then rebuttals on September 3rd and

 2    October 3rd.  And one thing defendants are saying is, we've

 3    got our counterclaims.  There's a motion to dismiss them.  And

 4    you don't want to have -- I guess implicitly, what you're

 5    saying is with a motion to dismiss pending, you don't want to

 6    have your expert report due because it could be unnecessary

 7    work if you get -- if it gets granted, right.  Is that what

 8    you're saying?

 9             MS. MILLER:  That's part of it, your Honor.  I mean,

10    as Ms. Gulley said, fundamentally, we have missing data issues

11    that we have to wrap up that our experts will need to do the

12    counterclaims reports.  As I said, we do have counterclaims as

13    does Reynolds against a number of the other plaintiffs.  So we

14    need that data for those reports.

15             But with respect specifically to the dealers, yes,

16    it's the -- I don't want to be in a position, and certainly

17    there is going to be crossover and I don't want it to -- the

18    Court to have the sense that it's a standalone problem.  The

19    information that we would need for the dealer counterclaims

20    also relate to the other ones.

21             So it's a -- I don't want to have to do that extra

22    work if I'm not -- if I don't have counterclaims that remain

23    standing against those folks but it's also a, I shouldn't be

24    in a position where I am serving expert reports on the other

25    ones which have issues clearly dealing with the dealers and

1   they get a second bite at the apple.  They get to see my

2   analysis and prepare their expert to have theirs well in

3   advance because I don't have a ruling yet on the dealers.

4           THE COURT:  Well, those are two separate issues,

5   right.  One is data.  So to the extent --

6           MS. MILLER:  Yes.

7           THE COURT:  -- that data is missing, a date might

8   need to be adjusted because the expert doesn't have the data

9   to work with to put in her report.

10          The other issue is a procedural scheduling issue,

11  right?  I mean, the plaintiffs want -- are hellbent to get

12  this done as soon as they can.  You filed counterclaims in

13  March.  There's a motion to dismiss on those claims.  What

14  you're essentially saying is, "Stay my obligation to deliver

15  an expert report until I have a ruling on my motion to dismiss

16  because there's such overlap between what my expert is going

17  to be doing to defend the case that the plaintiffs have

18  brought and to affirmatively prove my case because there's

19  overlap."

20          And I understand there's overlap.  That's clear in

21  the motion and the interrogatories that were filed.  So I get

22  that.  And I guess I understand that I'll hear from

23  plaintiffs.  I guess dealership class plaintiffs are not

24  opposed to some kind of extension, though I understood that

25  was to a date rather than to a process, and it sounds like

1    Authenticom and the vendors are opposed to some things.

2           So tell me what your position is.  And what you're

3    asking for, Ms. Miller, is what?  Extension of the expert

4    reports so you can refresh your data, A; and B, a further

5    extension waiting for a decision on the motion to dismiss,

6    right?

7           MS. MILLER:  Essentially, yes, your Honor.  We're

8    happy to try to set a reasonable extension so we can work

9    towards these other things.  And I mean, obviously, we have --

10   we've -- given Judge Dow's ruling on the other counterclaims,

11   we hope that we prevail.  So we're happy to continue to work

12   towards a revised date that will allow us sufficient time and

13   hopefully allow Judge Dow sufficient time to rule so that we

14   can essentially hit the ground running or be in the process,

15   but it would be something along the same lines as what we did

16   in February, which is understanding that this is not a

17   drop-dead date.

18          I think your Honor at the last status said you

19   weren't set -- you weren't making this schedule the drop-dead,

20   the last movement ever, but we would diligently continue to

21   work to produce all the data, analyze the data, work -- push

22   forward with that analysis because some of that analysis is

23   going to be used for other counterclaims.

24          So we will continue to push forward with that

25   analysis, but being that caveat out there that if we don't

1   have a ruling, a reasonable amount of time ahead of the next

2   deadline, we may be back in front of your Honor to say, you

3   know, we still don't have this.  And we don't want to push

4   that extra work that would be perhaps -- that small part that

5   would be perhaps specific to the dealers.  We'll continue to

6   push forward with all of the others.  So if we lose the

7   motion, then that work has been done with respect to the other

8   counterclaims and with respect to, you know, defensive work.

9           But yes, with the idea that if we don't have a

10  ruling, we may be back in front of your Honor asking for some

11  additional time, but we're not asking for a complete stay of

12  the schedule.  We appreciate the points that Mr. Nemelka has

13  made consistently.  And obviously, we've been working, as

14  Ms. Gulley noted, very diligently to get all of this stuff

15  done but it's a -- my client is someone in a unique position

16  as the defendant in all of the cases.

17          THE COURT:  And -- and what your -- do you have a

18  reasonable proposal as to dates?

19          MS. MILLER:  We've talked -- we've talked amongst

20  ourselves in terms of -- assuming, of course, the open

21  questions are of the seven motions that you have on your list

22  as you noted, depending -- unless, you know, there are rulings

23  that are coming down today on certain issues, they may spawn

24  additional discovery.

25          So the results on the privilege log motions may

1    result in additional discovery.  The motion, our motion for

2    protective order on counterclaim discovery if counterclaim --

3    if targeted counterclaim discovery is going to be permitted.

4    As previously noted, we have counterclaims against all of the

5    plaintiffs with the exception of one.  So we would -- there

6    would be additional discovery that would need to obviously --

7    that would go to the counterclaims and so would be relevant to

8    the opening reports we would make on the counterclaims.

9           So again, it's the -- with the same level of caveats

10   that we gave the last time we were here of, if no additional

11   discovery is going to happen, so if no additional discovery as

12   a result of these motions is actually going to happen and we

13   still have everything that is currently outstanding, we are --

14   we would think that moving the schedule as of right now

15   subject to those caveats by eight weeks, two months, would be

16   able to allow for the refresh of all of the data, assuming the

17   parties can -- can reach agreement, allow us an opportunity to

18   have the negotiations with InDesign that your Honor ordered

19   yesterday so that we can negotiate those, get any problems

20   resolved before your Honor; get that deposition as well as get

21   the other depositions outstanding done; again, assuming there

22   is no further discovery based on the rulings.

23          THE COURT:  And what's the plaintiffs' position?

24          MR. NEMELKA:  A few points to respond.  On the data

25   refresh, that is something that is data that they already have

1    and that we have.  We're just asking for it to be refreshed up

2    to a certain date and essentially, to the end of discovery.

3         And for my clients, they already have the data

4    refresh from Autoloop and for my other clients, they will have

5    everything by the end of next week.

6         THE COURT:  When you say "they will have it," they

7    will have everything they have to produce or --

8         MR. NEMELKA:  They will have everything that they've

9    asked from us for a data refresh.

10        THE COURT:  "They," meaning defendants, will have

11   from your clients everything they want in addition to bring

12   them up to date next week?

13        MR. NEMELKA:  Yes.  And this is not something -- you

14   know, this is just, you know, some months of data that is just

15   to bring it up to date.  And we are the one that broached this

16   issue because we need this refresh data from defendants from

17   ours, and we're willing to live with the expert deadline.  And

18   we've been asking for -- and we have an agreement, as

19   Ms. Miller and Ms. Gulley said.  What we have asked from

20   defendants, they have agreed.  What they've asked from us,

21   we've agreed.

22        So it's just a timing issue of when they're going to

23   provide the refreshed data.  And from plaintiffs, they're

24   going to have it by the end of -- from my clients, they're

25   going to have it by the end of next week.

1            THE COURT:  Do you need any data refresh from the

2   defendants or no?

3            MR. NEMELKA:  Yes.  And we've asked that from them,

4   and what we've asked for, they have agreed to.  It's just a

5   timing issue of when they're going to provide it.

6            THE COURT:  So if they don't get it to you by the end

7   of next week but instead they get it to you by June 15th,

8   you're still willing to disclosure your experts on July 1?

9            MR. NEMELKA:  We are because it's just models.  It's

10  just plugging in a few additional numbers into models that are

11  already set.  It's -- you know, we're working from a huge data

12  set already that we have, and so it's getting additional

13  months of data that -- to bring it to the present.

14           THE COURT:  It seems strange to me, I guess, just

15  from my time when I was doing what you guys were doing that

16  you would produce an expert report with incomplete data, an

17  expert that would be deposed based upon the incomplete data or

18  maybe not deposed and then the person wants to come to trial

19  with refreshed data up to a particular point in time and

20  render an opinion on that.

21           MR. NEMELKA:  Well, I don't think it will be

22  incomplete data.  I think if they get it to us -- you know,

23  their timeline is going to be their timeline.  We're asking

24  them to work diligently, which, you know, they have been, to

25  give us the refreshed data.  You know, we're working fast.

1   They can have it by the end of next week.  But I think if we

2   get it the first week of June, second week of June, we can

3   implement that data into the models.

4        THE COURT:  Ms. Wedgworth, so your position is you're

5   going to produce to the defendants next week everything

6   they've asked from you.  You've asked the defendants to

7   produce to you as soon as they can, but they have to update

8   their data to you on.  You're content with the schedule as it

9   currently exists, and you don't think there's any problem with

10  it from plaintiffs' experts being able to produce.

11       MR. NEMELKA:  Correct.  And on the motions that are

12  pending that which are -- almost exclusively relate to the

13  privilege log issues, we don't think that -- however the Court

14  rules on those, it's not going to move the needle.  I mean,

15  we've had millions of documents in this case.  And a few

16  hundred, extra hundred or a few extra thousand documents is

17  not going to move the needle.  We can implement that.

18       It's largely not going to be expert stuff anyway.

19  It's summary judgment, you know, additional.  So we don't view

20  that as moving the needle.  And these depositions that are

21  outstanding, again, there are just a few.  And they'll be done

22  before the expert deadline.  And so that's our position.

23       THE COURT:  And your position, I guess, implicitly is

24  that the Court should not extend defendants' expert

25  disclosures pending a ruling on the motion to dismiss.  They

1    ought to make their expert disclosures on the case as it

2    currently exists including their counterclaims.  If you're

3    successful on the counterclaims, then they will have wasted

4    money, some aspect of money on their expert disclosures,

5    though I'm not exactly sure -- since as Ms. Miller says,

6    they're duplicative -- how much is going to be wasted and how

7    much would have to be done anyway.

8            But your position is they should make their

9    disclosures on July 1, too, and just stay with the schedule.

10           MR. NEMELKA:  And to be clear, yes, those are only

11   the counterclaims against the dealers that's pending.

12           THE COURT:  Dealership.

13           MR. NEMELKA:  The dealership -- it's only the CDK's

14   counterclaims against the dealership plaintiffs.  It's not the

15   counterclaims pending against my clients.  Those are fully --

16   those are -- those motions, to the extent there were any, have

17   been fully ruled on.  There's no discovery outstanding.

18           And so, you know, Ms. Wedgworth can talk to that, but

19   from our position, the whole case shouldn't be held up for a

20   ruling on counterclaims against one set of plaintiffs.

21           THE COURT:  And you're -- you are Authenticom?

22           MR. NEMELKA:  The class counsel for --

23           THE COURT:  Autoloop.

24           MR. NEMELKA:  Autoloop, which is the vendor class --

25   they're the named plaintiff in the vendor class -- Cox

1    Automotive and its eight subsidiaries; and MVSC.

2              THE COURT:  Which is related to --

3              MR. NEMELKA:  Which is Motor Vehicle Software

4    Corporation.

5              THE COURT:  But it's owned -- who is it owned by?

6              MR. NEMELKA:  No, but it's -- maybe -- it's its own

7    company, but a private equity investor, KKR --

8              THE COURT:  Oh, right.  That was that.  Right, right.

9    Got it.  Got it.

10             MR. NEMELKA:  But it's not related to any other

11   plaintiff in this case.

12             THE COURT:  And there are no counterclaims pending

13   against your clients, there are counterclaims pending --

14             MR. NEMELKA:  There are no counterclaims pending

15   against MVSC.  There are counterclaims against Authenticom,

16   Cox, and Autoloop, but there are no motions pending.

17             MS. WEDGWORTH:  Your Honor, as to the counterclaims

18   against my clients, the named dealerships, those counterclaims

19   were first filed and served in late February.  Two weeks

20   later, we served the rogs for which you have a motion for

21   protective order regarding CDK.

22             Obviously, dealerships having been sued for the first

23   time at the end of February and not having served any

24   interrogatories whatsoever for CDK, we are very interested in

25   having some discovery; in particular, the rogs that we served

1  two weeks after the counterclaims in order to prepare for

2  whatever we have to do should those counterclaims, any of

3  them, survive.

4       And we are very interested in that discovery.

5  Therefore, we are interested in an extension, short as it may

6  be, concerning the deadlines for merits expert discovery.

7       THE COURT:  And so you're okay with eight weeks?  I

8  mean, what's your proposed reasonable extension?  You're okay

9  with an extension.  That extension, in your view, should be?

10      MS. WEDGWORTH:  Certainly, I -- again, there is this

11  procedural issue that would bring a lot of clarity if the

12  motion was -- the motion in front of Judge Dow was ruled on

13  sooner rather than later.  I would think eight weeks would

14  cover all of that, but even if there were still the procedural

15  outline motion in front of Judge Dow, eight weeks would be a

16  hard stop no matter where we are in any of that.  There has to

17  be an end to this and a hard schedule for us all to follow.

18      MS. MILLER:  Your Honor, if I may briefly respond to

19  some of the points that plaintiffs have raised.

20      THE COURT:  Sure.

21      MS. MILLER:  Okay.  Specifically, on the data, as I

22  think we stated at the outset, we largely reached a lot of

23  agreement, but it's the defendants' understanding that we have

24  not reached complete agreement on the data refresh.  We

25  received a request, I believe it was, a day or two ago asking

1  for an additional file to be refreshed.  We are looking at

2  that.

3       We are still waiting.  And maybe Mr. Nemelka is

4  saying that the answer to our question was yes, but at least

5  as of a couple days ago, we were still waiting for an answer

6  as to whether or not two files for plaintiff Cox was going to

7  be refreshed.

8       I also was, with apologies, remiss in terms of

9  depositions.  One of the -- one of the issues that falls under

10 the question of Cox discovery is we still have resumption of

11 the Cox data deposition that we have asked for a date and that

12 plaintiffs have refused to provide.

13      You'll recall, we had the emergency motion.  We have

14 questions with regard to the documents that were produced a

15 handful of days before the original Cox date of deposition.

16 And so specifically about some of the switching data that was

17 produced just prior to that deposition, we have questions

18 about that.  And there are -- and we can go into it in

19 whatever order your Honor would like, but in a number of the

20 issues that are on the agenda, there are other documents that

21 are outstanding from a number of folks.

22      So from our standpoint, you know, it's -- and with

23 respect to the dealers -- and Mr. Provance can go into it in

24 detail.  With respect to data, we only have data from four of

25 the 12 named -- 13 named plaintiffs -- I'm sorry, the 12

1  dealer groups.  So we don't even -- it's not even a question

2  of refresh for eight of those.  We don't have data from the

3  dealers at all.  Ms. Wedgworth has -- I'm sorry.

4          THE COURT:  Go ahead.

5          MS. MILLER:  Ms. Wedgworth and the defendants are

6  somewhat at an impasse as to her client's obligation to

7  produce that data.  We believe it's something that they

8  committed to produce months and months and months ago and

9  we've done, for our part, everything we can to help facilitate

10  that production, but it has not been made.

11          So we have data issues outstanding.  We have document

12  issues outstanding.  We have this additional Cox data

13  deposition outstanding.

14          On the point Ms. Wedgworth made with respect to

15  counterclaim discovery, obviously, we filed our counterclaims

16  when our answers were due.  So the timing of that was not one

17  of our making.  We filed them when they were due.  But to

18  Mr. Nemelka's point, there have been millions and millions and

19  millions of pages of documents produced and something like --

20  I don't even know how many, but close to -- we had up to 90

21  but it's close to 70-something depositions have been taken.

22          And as we said in our papers with respect to the

23  protective order, in a perfect world, yes, we would like to

24  have counterclaim discovery.  Obviously, as we said in our

25  brief, we think the interrogatories that Ms. Wedgworth served

1    are -- could have been served back when -- in May of last year

2    when we were actually serving discovery.

3            But if we're going to be doing counterclaim

4    discovery, those are direct -- those go directly to,

5    obviously, the counterclaims.  And we have any number -- a

6    number of targeted questions we would like to ask of the

7    dealers on the counterclaim issues.

8            They've raised the possibility of amending their

9    complaint, at which point there may be additional discovery

10   there.  But if counterclaim discovery is going to be had, we

11   would have targeted discovery of Cox and Autoloop and the like

12   because we had been prepared to deal with it based on your

13   Honor's last ruling on when discovery had been served.  We had

14   not intended to serve additional interrogatories with respect

15   to our counterclaims, but if that's going to be permitted, we

16   would have targeted discovery of those folks as well.

17           So the point is -- again, Mr. Nemelka tries to draw

18   this line between the dealership plaintiffs and his clients.

19   And the reality is, the underpinnings of those -- of all of

20   these claims are interrelated.  These are not to -- these are

21   not separate cases in the sense of -- and the point, as we've

22   talked about on a number of occasions, the point of an MDL is

23   coordinated discovery.

24           So again, it's my client that is going to be caught

25   in the cross-hairs if suddenly, I'm having to move forward

1    with certain issues and certain -- certain reports with

2    respect to Mr. Nemelka's clients, but I'm still waiting on

3    data and I'm still waiting on rulings and I'm doing a separate

4    report that overlaps with the one I've already served with

5    respect to Mr. Nemelka's clients with Ms. Wedgworth's clients.

6              THE COURT:  And so I think you've answered my

7    question, but you don't see any way to serve expert reports in

8    response to Authenticom, for example, separately from the

9    dealership plaintiffs?  What I'm trying to wonder about is

10   whether there's a way to, to some extent, de-link Authenticom

11   from the train that it's now on because that's the party that

12   is more hot to trot than anybody else and there's a separate

13   case pending with respect to them.  And if there's a way --

14   and particularly, there's no counterclaim issue with

15   Authenticom.

16             MS. MILLER:  No, there are.  There are counterclaims

17   pending against Authenticom by both Reynolds and CDK.

18             THE COURT:  Ah.

19             MS. GULLEY:  So we are -- Reynolds anyway is -- so

20   Reynolds' counterclaims against Authenticom, they didn't even

21   move to dismiss them so there's -- this is Andi Gulley.

22             THE COURT:  There's counterclaims, but there's no

23   motion to dismiss.

24             MS. MILLER:  Correct.

25             MS. GULLEY:  That's right.  I'm sorry.  You did move

1    to dismiss one of the 11 counts.

2    MS. MILLER:  So just for clarity of the record, your

3    Honor, there are counterclaims against Authenticom by both

4    Reynolds and CDK.  There are counterclaims against Cox and its

5    eight subsidiaries by just CDK.

6    There are counterclaims against Autoloop just by CDK

7    and that's only because Reynolds is not named in either the

8    Cox or the Autoloop action.  There are no counterclaims by

9    either defendant against MVSC.  And there are counterclaims by

10    CDK against the dealership plaintiffs because as your Honor is

11    aware, Reynolds has resolved the dealership claims, so it's no

12    longer in that case.

13    MS. GULLEY:  But the reason why I raised the

14    Authenticom counterclaims is because we have had our experts

15    trying to, you know, make our affirmative reports, and we are

16    waiting on this data.  So separate and apart from any

17    counterclaim issues with the dealers, we do seek an extension

18    of the expert deadline just so we can get that, get the data

19    we need to get the experts on file.

20    I will also say to the point of de-linking

21    Authenticom, I think that the issue of Authenticom's urgency

22    that was raised in the past, I think that is no longer at

23    issue.  I could be wrong.  But that's not my understanding of

24    the way that -- you know, there's been no picture of the fire,

25    as you once said.

1    THE COURT:  Yeah.  Okay.  I mean, I know that.  I

2    think their preference, though, is to push this case so that

3    they can get the case tried and to Wisconsin.  I know what

4    the -- some of what the bid and ask has been on the dire

5    financial circumstances and all that, and that's been

6    addressed by Judge Dow.  I addressed it.  But I was just

7    wondering if there was a way to de-link this or not --

8    MS. MILLER:  To your question, your Honor, so the

9    fact that -- we have now counterclaims against four of the

10   five plaintiffs, the dealers or -- or groups, I should say,

11   four of the five -- did I do that math right?  Yes.

12   THE COURT:  So you've got counterclaims against

13   Authenticom, Cox --

14   MS. MILLER:  Autoloop.

15   THE COURT:  Autoloop.

16   MS. MILLER:  And the dealers.

17   THE COURT:  And the dealership people represented by

18   Ms. Wedgworth.

19   MS. MILLER:  Yes, your Honor.  And our point is,

20   again as Ms. Gulley pointed out, she -- the data including the

21   dealers' data is important to all of these analyses because

22   they go to a number of issues that overlap across the

23   different cases.  But as plaintiffs have reminded us time and

24   time again, the underpinnings of their cases overlap.

25   THE COURT:  Yes.

1      MS. MILLER:  It's, you know, these issues.  So the

2  material -- I don't see a reasonable way to de-link, to your

3  point.  If I had no counterclaims against anyone else, that

4  might be a different story, but the work that my experts are

5  doing with respect to Autoloop and Cox and Authenticom

6  certainly overlaps with the work they are doing on the

7  dealers.

8      MS. WEDGWORTH:  Your Honor, if I may address --

9      THE COURT:  No, hold on for one second.

10     R & R, Reynolds has counterclaims pending against --

11     MS. GULLEY:  Authenticom.  Reynolds is only a

12  defendant in Authenticom and the MVSC case, and our

13  counterclaims are pending against Authenticom for computer

14  fraud and abuse and copyright, etcetera.

15     THE COURT:  Yes, Ms. Wedgworth.

16     MS. WEDGWORTH:  As to the dealership data, we are

17  certainly willing to attempt to run certain reports.  We don't

18  keep certain reports that they've asked for in the normal

19  course of business.  The data is in the DMS system.  If it's

20  not something we normally do, it -- we've had less success

21  rather than more in actually making the reports which is what

22  they're calling data useful.

23     And in some cases, we haven't had any success at all.

24  We will continue to try to do that, but we have produced

25  underlying invoices with regard to any data they may request.

1          Again, we don't do what they've asked for in the

2    normal course of business.  If -- and again, we are trying and

3    working with them to do that.  So at the end of the day, we

4    may not have the data they request in the format they request.

5    We are attempting to pull whatever is out there.

6          MR. PROVANCE:  Your Honor, Matt Provance for CDK and

7    CVR, if I could just respond to that briefly.  The data that

8    we have asked the dealers to produce is essentially data that

9    will show which software application vendors they used and, to

10   the extent that they've made payments to third party data

11   extractors, which ones they used and how much they paid them.

12   We're not talking about an incredibly complex data set that

13   we've requested.

14         I think there's no question that the dealers have

15   that data and that they maintain it.  It is generally, I

16   think, their duty to figure out how to put that data into a

17   reasonably usable format.  And, in fact, they've served many

18   subpoenas on many third parties asking for comparable data

19   sets, and they've had that expectation of not even parties to

20   the case, third parties.

21         With regard to invoices, it is true that the dealers

22   produced some invoices back in October 2018 when document

23   productions were supposed to be substantially complete.  Those

24   invoice productions are, with respect, woefully insufficient.

25   They're missing vendors we know they used.  They're missing

1   huge gaps in time periods.  It's not data that is reasonably

2   usable or reliable for expert analysis.  We went through many

3   rounds of correspondence on that.

4          We got to a point where the dealers proposed to

5   prepare reports out of their respective DMS system.  Some use

6   CDK, some use Reynolds.  We have been attempting to work

7   through that process going at it that way for quite some time.

8          And where we are today, as Ms. Miller mentioned,

9   there are 12 dealership groups.  We have some data from four

10  of those groups, approximately one-third.  The remaining

11  eight, we are in different stages of, I think, willingness or

12  perhaps in the process of attempting to make some data pulls

13  for us.

14         Ms. Wedgworth and I had a discussion this morning

15  shortly before the hearing.  I am not sure we made much

16  progress on that, but that's where we are.

17         THE COURT:  Mr. Nemelka, if you're ready to go with

18  your experts on July 1st, what would be the problem with you

19  doing that, whatever everybody else does, since it doesn't

20  seem like anybody really needs -- it doesn't seem like you

21  really need that much data from anybody else to do your expert

22  reports.  It sounds like defendants need some stuff from you,

23  but you're going to give it to them --

24         MR. NEMELKA:  Yes.

25         THE COURT:  -- quickly.

1          And then at least potentially, the defendants would

2    know what your expert -- what your experts are going to say,

3    what they look like.  And, you know, I don't know if that

4    would affect how much time they need to respond to them or

5    not.  It wouldn't -- it may or may not affect what they do

6    affirmatively on their counterclaim.

7          Why shouldn't you go forward regardless of what

8    other -- what these other people are doing other than the

9    fundamental, "I want to do it at the same time as everybody

10   else"?

11         MR. NEMELKA:  So long as they are on the same

12   schedule with us, too, then in terms of their responses.

13         THE COURT:  Yes.  No, that's not what I was saying.

14   You've got a July 1st date.

15         MR. NEMELKA:  Right.

16         THE COURT:  You're prepared to meet that date.

17         MR. NEMELKA:  Yes.

18         THE COURT:  The defendants say that they need, at

19   least for the dealership people, they need some data to

20   respond to the dealership people.  I'm not exactly sure what

21   they need from you, but it sounds to me like you're prepared

22   to give them what they've asked for next week.

23         MR. NEMELKA:  Yes.

24         THE COURT:  So I'm assuming that you're going to give

25   them what they need that they've asked for you -- from for

1    you.  And you're attached at the -- you know, this is like

2    the, "Father, Father, where art thou?"  You know, you're

3    attached at the ankles with the dealership class plaintiffs,

4    and you'd prefer not to be there.  But it sounds to me like

5    they owe data to the defendants before the defendants can make

6    their expert reports.  At least that's what they're saying.

7            But again, you didn't answer my question.  What would

8    be the matter with you meeting the July 1st date even if the

9    defendants don't have to meet the July 1st date other than the

10   fundamental parity of, "We should get their reports when we

11   give our reports."

12           MR. NEMELKA:  That's fine with me.  What I was saying

13   is in terms of their responses to our reports, meaning that

14   they -- that would stay on the same schedule so they don't

15   get, like, four months to respond to ours.

16           THE COURT:  The problem I'm having -- and I want to

17   decide things when I can decide things.  I -- this is a

18   complicated case, and I don't think I have my arms around it

19   completely in terms of the underlying -- I'm not understanding

20   completely from this discussion a couple of things.  One, I'm

21   not understanding how much the defendant -- how much the

22   defendants' reports have to be so linked that they all come

23   out on one date.  All right.

24           I mean, I also don't understand, although I've read

25   in your briefs, as much of what the conceptual overlap is

1   between the counterclaims and the underlying claims.  Your

2   counterclaims are for -- the CDK and Reynolds counterclaims

3   are for accessing your system allegedly and potentially

4   damaging it, stealing information, all the rest, right, to

5   some extent.  Is that like a 40,000-foot statement, or I'm

6   wrong?

7           MS. MILLER:  Yes.  As Ms. Gulley said, yes, computer

8   fraud and abuse, copyright, and those things.  I think the

9   linkage we -- that is also there is, there's a link at least

10  for CDK, they only have one -- Reynolds only has one set of

11  counterclaims against Authenticom.

12          The linkage between the expert reports from our

13  counterclaim perspective is across the different reports or

14  the different analyses for all of our counterclaims against --

15  and they overlap between Authenticom and Cox and Autoloop and

16  the dealers because they have a fundamental -- they all stem

17  from the same fundamental action which we say violates these

18  laws.

19          So the analysis is going to be -- that's why I said,

20  we're happy to continue to push forward with that part of the

21  analysis that is common but we can't -- we can't really

22  complete the analysis and put in that dealer piece.  And quite

23  frankly, my client doesn't want to spend the money if it

24  doesn't have to if those counterclaims are going away.

25          But if we are serving counterclaim expert reports

1    with respect to everybody except the dealers, then my -- then

2    in theory, my expert is going to be subject to a different

3    report deadline, a second deposition from the dealers.  There

4    will be -- you know, there's this whole, you know, de-linking

5    them, we'll give folks an -- certain people, the dealers will

6    have an advantage because they will have seen our analysis and

7    our reports on the counterclaims as to Authenticom and

8    Autoloop and Cox.

9         It's all of these -- staggering it, you know, puts my

10   client in a material disadvantage because it's in all of these

11   different cases.

12        THE COURT:  Yes, but I'm not -- I'm not -- I mean, I

13   don't know how sympathetic I am to the notion that just

14   because there are motions to dismiss counterclaims that were

15   filed in March, things should stop until you get a decision.

16   And I'm not sure how sympathetic I am to, "Because I'm getting

17   that extension, I should not have to produce any reports with

18   respect to things that are not going to be affected by a

19   motion to dismiss regardless."

20        And I understand your claims are common.  So you have

21   counterclaims against Authenticom, Autoloop, Cox, and --

22        MS. MILLER:  The dealers.

23        THE COURT:  -- that's it -- well, the dealership, but

24   you don't want to deal with the dealership because you've got

25   motions to dismiss but you've got counterclaims against these

1    other folks where there are no motions to dismiss, so those

2    are going ahead.  And, you know, you don't like the tactical

3    position you're in of having to disclose experts and reports

4    with respect to Authenticom, Autoloop, and Cox since what your

5    expert says is going to be very similar to what they're going

6    to say with respect to the dealership class if and when you

7    have to say it with respect to the dealership class.

8              MS. MILLER:  But there's also, as I said, the

9    additional burden of -- presumably, if we are on an

10   accelerated schedule with respect to Mr. Nemelka's clients, my

11   expert's going to be deposed.  Presumably, Ms. Wedgworth is

12   going to want a deposition of my expert on her report.

13             So it's additional steps that my client is involved

14   in in connection with those when, quite frankly, they should

15   be deposed once on their reports.

16             MS. WEDGWORTH:  Actually, your Honor, that -- we

17   disagree with that.  There's an additional counterclaim that

18   CDK has lodged against the dealerships, a breach of contract

19   claim, which is not true for the Authenticom, others.  And

20   that is separate.  And for that, we would expect extra time at

21   a deposition alone for that.

22             This is more than a seven-hour deposition if all

23   these parties are taking an expert deposition.  Dealerships,

24   we will propose, are entitled to a seven-hour deposition based

25   upon the counterclaims and our claims, etcetera.  Our case

1    alone would be entitled to seven hours with an expert

2    regardless of linking, decoupling, etcetera.

3              THE COURT:  Ms. Miller?

4              MS. MILLER:  Yes, sir.

5              THE COURT:  If you're going to have -- if there's

6    overlap and similarity between your counterclaims against

7    Authenticom, Autoloop, and Cox, overlap between those claims

8    and your claims against the dealership class and the

9    Authenticom, Autoloop, Cox claim -- counterclaims are not

10   subject to a motion to dismiss and their underlying claims are

11   going forward, so you're going to have to respond to those no

12   matter what, what's the additional burden on you, your client,

13   your expert in having to make your dealership class plaintiff

14   disclosures of experts at the same time you make Authenticom,

15   Autoloop, and Cox because it sounds to me like although

16   there's -- two issues, I guess.

17             One, you don't have a lot of the data for the

18   dealership class plaintiffs but, two, it sounds to me based on

19   what you're telling me that your experts are going to say

20   similar things with respect to Authenticom, Autoloop, and Cox

21   as they are going to be with the dealership class plaintiffs

22   with respect to your counterclaims and possibly with respect

23   to the underlying claims, too, you know, depending upon what

24   systems are used and so forth.

25             So that's a long question.  Let me repeat my smaller

1    question, which is, if you're -- if no matter what, you're

2    going to have to have your experts opine with respect to your

3    counterclaims and the underlying claims involving Authenticom,

4    Autoloop, and Cox, what's the prejudice to you and your client

5    from having your experts address at the same time the

6    dealership class plaintiff issues that are common there; and

7    P.S., even if they're not common.

8           And then if your motion -- if the motion to dismiss

9    is successful and those are gone, so you wipe those out but

10   you've still moved ahead with the other stuff.  Do you

11   understand my question?

12          MS. MILLER:  I believe so, your Honor.  The answer to

13   your question is, is two-part.  One, I want to make sure that

14   the data that we're asking for from the dealers is not

15   relevant only to the analysis that is going to be done as to

16   the dealers.  So we need that data with respect to our

17   disclosures as -- on our counterclaims generally.

18          THE COURT:  Okay.

19          MS. MILLER:  So that overlaps across all of them.  So

20   that's point number one.

21          Point number two, the answer is, it's an additional

22   cost.  Yes, there is substantial overlap between the claims

23   relating to Autoloop and Cox and Authenticom and the dealers,

24   there's no question.  You can read them yourself, and you'll

25   see there's a lot of the same statutory basis and whatnot in

1     the counterclaims, but there will be some analysis that will

2     be somewhat unique to the dealers in that presentation.

3            And we can do that, but the point is, it's simply an

4     additional expenditure of time, resources, and money on behalf

5     of my client that if Judge Dow grants their motion, as will,

6     as you know, be wiped away and the money will be spent and it

7     will be of no use to us.  But that's really the issue there.

8            The more fundamental question separate and apart from

9     that, from the impact of Judge Dow's decision is really the

10    data and completing all of the discovery.  And I appreciate

11    Mr. Nemelka's representation that we'll have all of his

12    information by next week.

13           I hope we can resolve all of these other issues that

14    we have outstanding that goes to that question as well as the

15    questions, the Cox data dep, which goes to data questions and

16    whatnot.  So we can have those.

17           We will, of course, move expeditiously as much as we

18    can, but I want to make sure that the primary concern that CDK

19    has and I believe that Reynolds has is making sure that we

20    have all of this discovery and all of this data done so that

21    our experts can be as fulsome as they can, including if your

22    Honor orders that we do the analysis all at once.

23           THE COURT:  Yes.  I mean, I -- there are two issues:

24    The data that you need and when you're going to deliver your

25    reports after you get that data.  You obviously need the data.

1    And you're not going to know whether you have everything until

2    you get the stuff.

3         And Ms. Wedgworth, what about their position that

4    eight of your 12 dealership groups owe information?

5         MS. WEDGWORTH:  Again, we have produced the

6    underlying invoices, and he can say things are missing.  Well,

7    given more time, if they're missing, we're not going to be

8    able to produce them.  This data is on the DMS system of

9    defendants.  And it only goes back so far.

10        And one of the reasons we don't have all of it --

11   even the ones we have produced have not been perfect.  It's a

12   Byzantine system.  If you don't run the report, it's not easy.

13   And they can say it's in the accounting department, but if

14   it's something our dealers don't do, then we -- we've

15   generated something to them that, even I think both sides

16   agree, are imperfect at best.

17        And you can go back and look at the invoices.  If

18   they're not there, we can't create something that's not there.

19   We are certainly working to get it.  I would like to have

20   perfect data, too, but given the system and the way it works,

21   we are trying to do the best.  And we will produce something.

22        Again, I'm not sure it will be in the format that

23   they want to use.  It is as described:  Vendor data.  And that

24   is one of the reasons we have gone after third parties to get

25   the vendor data.  If the system, if the DMS data only goes

1    back 18 months, then that may be all our dealers can produce

2    and even then, it may not be in a format that we all think is

3    acceptable for our experts.

4           Thus, our belt and suspenders method of going and

5    getting third party data and documents in the subpoenas,

6    etcetera, in hopes of giving us more belts and suspenders on

7    that, which we have done, and for the most part, that's

8    produced, but as I said originally, some of that is still

9    coming in as well.

10          THE COURT:  But to Mr. Provance's vague point that,

11    "We've asked for some material, and they've got to get it to

12    us in some usable format," you push back on that because you

13    say, "I've got to produce what I have and in the format that I

14    have it, but I'm not required as part of a production of

15    documents to you to create documents I don't have, run reports

16    that I don't do," full stop.  Right?

17          MS. WEDGWORTH:  Correct.

18          THE COURT:  And Mr. Provance, you disagree with that?

19          MR. PROVANCE:  Yes, your Honor.  I would just like to

20    reiterate one point.  We're talking about basic information.

21          THE COURT:  Timeout.  I'm not going to -- the

22    question is how much of this can I go into at this status

23    hearing as opposed to a sit-down with you on the discovery

24    scheduling.

25          MR. PROVANCE:  Understood.

1       THE COURT:  I'm getting -- I wanted to get a taste.

2  Now I'm getting a couple of courses of the meal.  And I need

3  to reflect on this.  I mean, my -- and I probably have to set

4  a date for you to come in again.  We're having to have to

5  spend more time together than we've spent because it's this

6  kind of complication that is so difficult to put into briefs,

7  I think, at least for me.

8       And, you know, even though you guys talk about data

9  and the DMS systems and the platforms, I mean, I've never held

10  it in my hands and seen it.  I have a lot of trouble often

11  figuring out exactly what you're talking about.  This is

12  something I'm going to have to sit down with you about, I

13  think.

14       I think there's no question in my mind that before

15  I'm going to require expert reports to be served, you're going

16  to exhaust your efforts to get whatever data those experts

17  need.

18       At a high level, Mr. Provance, I have to say I

19  disagree with your nuance here.  Maybe you have some good

20  argument that says the opposing party has to create something

21  that your expert needs, but you'd have to convince me of that.

22       You know, I mean, and maybe there's a nuance here

23  that I'm missing, but normally just in kind of the Zeitgeist

24  of this kind of stuff, you're entitled to what they have.

25  You're not required -- I don't know that you're entitled,

1   without showing me cases, for them to run reports for you that

2   they don't run or that they don't have or to create stuff that

3   your experts want.

4          It might be that they're required to provide you with

5   all the data that you have and your guys can run the reports.

6   You know, and again, maybe you're going to tell me, "We don't

7   have all the data."  So that's a different problem.  You're

8   entitled to the data, I think.

9          MR. PROVANCE:  So, your Honor, perhaps we need to do

10  a better job explaining it to you, but we are not asking them

11  to create documents.  We are asking for the data.  And whether

12  here or at some other forum, I think we can explain to you

13  better what it is that we're seeking and why we don't --

14         THE COURT:  Yes, right.  And even pregnant within

15  there, there may be something -- maybe that's not the right

16  term to use.  Embedded in that statement is because

17  Ms. Wedgworth is saying, "I'm going to give you the invoices.

18  That's the data I have."

19         You say, "They have the data, more than the invoices.

20  I think they got it, and that's what we need."  Right?

21         MR. PROVANCE:  That's correct.

22         THE COURT:  So I think I get the nuance here, but I

23  don't know how to resolve that.  But I think it's a data issue

24  and an expert date issue.  I'm not -- I'm not completely

25  moved, I have to say, but I have to -- this is a preliminary

1  thought, by the notion that the motions to dismiss are --

2  should slow down the expert disclosures because a primary

3  argument that Ms. Miller is advancing is cost.  And that

4  hasn't been quantified to me.

5      And I don't know the additional cost of the

6  dealership piece of this.  I suspect it may not be great, but

7  I don't know.  And at the very least, depending upon what that

8  cost is, I'm not -- I'm not sure I would slow down the train

9  to save that cost because a lot of cost has to be spent

10 anyway.  But without the data, you can't do what you need to

11 do anyway.

12     Ms. Gulley, you were going to say something?

13     MS. GULLEY:  Thank you, your Honor.  I just want to

14 go -- so we don't have that same issue, obviously, for

15 Reynolds.

16     THE COURT:  Yes.

17     MS. GULLEY:  We do have a problem with the deadline

18 with respect to Authenticom and the Authenticom reports.  And

19 you had mentioned, you know, why can't Mr. Nemelka file his

20 reports first and have us file ours later, because you cannot

21 separate the counterclaims from the claims, right.  Our

22 argument is that, you know, that even if there was a

23 conspiracy to get together to stop possible integration that

24 the antitrust laws do not reach illegal behavior, that you are

25 permitted to work to stop illegal behavior.  They disagree.

1    But the two are completely intertwined.

2            Second of all, it's the same experts that are going

3    to be our affirmative experts on damages and are responsive --

4    I mean, potentially, I guess.  I suppose we could always have

5    even more experts.

6            But, you know, for now, the idea is that it would be

7    the same experts.  And so the idea that they would file theirs

8    and then we would both be filing ours and our responsive

9    reports at the same time, it doesn't save anyone time.  They

10   have to all be done before summary judgment because all of

11   these issues are going to brief together in our summary

12   judgment motions under *Matsushi* -- I forget the Japanese.

13           The point is that in Authenticom, it wouldn't make

14   any sense to have a counterclaim schedule and a claim

15   schedule.  They're the same.  Mr. Nemelka says we're going to

16   have the data next week.  I hope that's true.  We've worked

17   together fairly well to this point.  But the end of discovery

18   was supposed to be April 30th, and the end of next week is

19   four weeks later.

20           And our experts need the extra four weeks.  This is a

21   lot of work.  It's extremely expensive.  And we're trying to

22   get it done as fast as we can after just having done a

23   deposition nearly every day for the last month.  Some days,

24   there were three on the same day.

25           So the point is, we are working hard.  We do agree

1   there should be an end to this, but separating the claims from

2   the counterclaims in Authenticom makes no sense.  And we do

3   need an extension because discovery is ongoing, and it's after

4   April 30th.

5          THE COURT:  And so the proposal on the table from CDK

6   and Reynolds is, kick all dates from July 1st for eight weeks

7   with the caveat from Ms. Miller that maybe that may not even

8   be enough time, particularly if you don't get a ruling from

9   Judge Dow.

10          Kicking and screaming, the dealership class people

11  say, "I don't -- that would be the farthest I would want to

12  kick it, but I could do that," in part potentially because

13  you're still dealing with what other data you might get from

14  them.  And Authenticom, Autoloop, and Cox and MVSC say, "Don't

15  move these dates at all."

16          MR. NEMELKA:  We've already moved them several times

17  and this -- they're talking about a refresh -- you know,

18  Ms. Miller talked about an expedited schedule.  We've already

19  moved these dates.  And there's got to be an end at some

20  point.

21          And the refresh data from Authenticom is literally

22  just updated financials that we have been giving them already.

23  We already gave them a refresh of the financials in December.

24  And so --

25          THE COURT:  But so the answer to my question is, yes,

1    your position is, we don't move dates.  I correctly

2    articulated your position, Ms. Wedgworth?

3              MS. WEDGWORTH:  Yes, your Honor.  I think we could do

4    it in four weeks, but my hesitation is, if eight weeks is not

5    a hard stop and that turns into something else, then that

6    becomes a problem.

7              THE COURT:  Well, it's a hard -- I'm going to hear

8    it's not a hard stop if they don't have the data.

9              And then from the defendants, I correctly articulated

10   your position:  Right now, for all the reasons that you

11   articulated, "We want an eight-week push"?

12             MS. MILLER:  Yes, your Honor.

13             THE COURT:  Okay.  I'm not -- I think I at least

14   understand at some level where you are.

15             Ms. Gulley, your last points were helpful to me at

16   least in understanding a little bit what your position is on

17   these.

18             I think I want to think about that a little bit

19   without speaking off the top of my head right now, but based

20   on the discussion, I either can enter an order or I can

21   schedule you to come back.  Okay.  But I think I understand

22   where you are.

23             I would like to try and address a couple of things

24   here.  You've got more on your agenda.  I wonder if there's

25   some more stuff I can deal with quickly on your agenda.  So we

1　dealt with the financial data refresh.  The parties will

2　advise the Court if they're able to resolve this issue in

3　advance of the hearing.

4　　　　So does somebody want me to put a date on refresh, or

5　you're still talking about this?  Authenticom is going to

6　produce, etcetera, Authenticom and everybody, you're producing

7　next week.  Fine.  They're going to look at it and they're

8　going to say either it's good or not.  They're still talking

9　about you with respect to your eight groups --

10　　　　MS. WEDGWORTH:  Yes, and --

11　　　　THE COURT:  -- and reach a conclusion on that.

12　　　　MS. WEDGWORTH:  Yes.

13　　　　THE COURT:  And information that you need from those

14　folks, information that the plaintiffs need from the

15　defendants --

16　　　　MR. NEMELKA:  There's one small piece on CVR, but

17　other than that, CDK and Reynolds, we already have an

18　agreement of what they are going to provide us.

19　　　　MS. WEDGWORTH:  We don't have a date of when they are

20　to produce.

21　　　　MR. NEMELKA:  Right.  We don't know when they're

22　going to produce it.  We would like it as soon as possible.

23　　　　THE COURT:  Okay.  So let's -- so can we do this at

24　least?  Authenticom will refresh the financial data it is

25　going to refresh by --

1        MR. NEMELKA:  The end of next week.

2        THE COURT:  -- May -- what is that?

3        MS. MILLER:  The 24th, your Honor.

4        MS. GULLEY:  I don't think it's just financial data.

5   It's just data.

6        THE COURT:  Data.  Okay.  So Authenticom, etcetera,

7   everybody, Authenticom, Cox, Autoloop, MVSC --

8        MR. NEMELKA:  Yes, with the -- I just heard from them

9   about Cox and this 30(b)(6).  This is not something that we

10  agreed to have another witness on, but that's something on the

11  agenda we can talk about.

12       MS. MILLER:  Your Honor, as you know, you already

13  ordered that in the emergency hearing we had that we were

14  entitled to have another deposition if we -- after reviewing

15  the documents we received, we believed we needed one and, in

16  fact, we do.  And we've asked for a date.  And they've refused

17  to give us one.

18       THE COURT:  I don't -- this was the phone conference,

19  right?  And I don't have 100 percent recall on that, but I --

20  this was, was this a bunch of data that was produced late?

21       MS. MILLER:  Yes, your Honor.

22       THE COURT:  Okay.  Well, I think I pretty -- didn't I

23  pretty much say go ahead with the dep because everybody's

24  convening but if they need more, I'm going to say okay?

25       MS. MILLER:  Yes, your Honor.  The order you entered,

1   which is docket No. 619, said that the Rule 30(b)(6) Cox

2   Automotive deposition noticed for 4/4/9 -- '19 will proceed as

3   scheduled.  If it turns out that Cox has not produced

4   reasonably before the deposition documents requested by CDK,

5   that CDK needs to examine the witness on the noticed Rule

6   30(b)(6) topics.  Where the parties have not resolved their

7   dispute, then CDK can resume the Rule 30(b)(6) deposition on a

8   mutually agreed date unless the parties agree that any

9   additional inquiries CDK wants to make can be done on written

10  questions.

11          MR. NEMELKA:  And my point there is, we have answered

12  their questions.  We do not know what questions remain

13  unanswered.  They asked about this data at the deposition.

14  We've been asking them since the deposition over a month ago

15  for the specific questions.  They've given us letters.  We've

16  responded in writing.  We don't know which specific questions

17  are not answered.

18          MS. MILLER:  Your Honor, if -- and we're happy to

19  provide you with the transcript.  As your Honor said -- agreed

20  during that hearing, it's rare that a deposition can be done

21  by written questions because they're usually written by the

22  lawyers.

23          It is true, we have not written out every single

24  question that we would like to ask about the data that was

25  produced four days before the original deposition.  We asked

1    some of the questions we could.  Now that we are -- our folks

2    have looked at that data and our experts have analyzed it, we

3    have some questions.

4         Do I think I need another seven hours?  No.  But do I

5    think I -- your Honor clearly made clear that I get a

6    deposition for at least some time to ask about those documents

7    that were late produced that we need to ask questions about.

8         If you will recall, Mr. Nemelka's colleague,

9    Mr. Dorris, asked that it be made on a good cause standard and

10   that we have to make a motion.  And your Honor said, if memory

11   serves, "No, I don't plan on kicking the can -- I don't

12   intend -- I was not intending to kick the ball down the road

13   like that" and that we would get the deposition if, in fact,

14   we determined that, after reviewing those documents that were

15   produced, we needed it.

16        We've told them we believe we need it.  And I don't

17   think I'm under an obligation to write out every single

18   question I would intend to ask at that deposition as opposed

19   to being granted the deposition.

20        THE COURT:  Okay.  I've read my order as you're

21   talking.  What you both said refreshes my recollection on

22   this.  And what, Mr. Nemelka, you're basically saying is,

23   "They haven't shown me that they can't do this on written

24   questions."

25        MR. NEMELKA:  We don't even know --

1          THE COURT:  You don't know what the questions are.

2          MR. NEMELKA:  We -- they sent us a letter.  We

3    responded.  And we just -- you know, we don't know actually

4    what hasn't been answered.

5          THE COURT:  Yes.  Okay.  I'm -- my order, I'm going

6    to -- you know, there's ultimate discretion here, I suppose.

7    My order says that, you know, unless the parties agree that

8    any additional inquiry can be made on written questions.  You

9    haven't agreed.  They don't want to make it on written

10   questions.  They think that's cumbersome.  I agree.  They

11   haven't given you the questions.  They also haven't told you

12   exactly the questions they want to answer, but the documents

13   were produced late.

14         I can arbitrarily put a time limit on the dep, on a

15   resumed deposition, but I'm not going to prevent them from

16   coming back.

17         MR. NEMELKA:  Okay.

18         THE COURT:  All right.  So how much time do you need,

19   Ms. Miller?  You don't know, right?

20         MS. MILLER:  I don't know, but I certainly don't

21   expect that it's going to be a full day.  I think we can be

22   efficient.  I would hope that a half day or less would be

23   sufficient but the team that, quite frankly, that has been

24   leading the charge on this one is not sitting in this

25   courtroom, so I can't -- I don't want to foreclose their

1    answer.

2           But at least based on what they've told me, we do not

3    expect it to be a full-day deposition.  And I would expect,

4    barring difficulty with the witness, that a half day would be

5    sufficient.  That would be my hope.

6           MR. NEMELKA:  Our position, that's a whole another

7    bite at the apple.  This is limited data that they should ask

8    some questions about.  We've been responding in writing

9    diligently.  They should do that very efficiently, you know.

10   We don't want to give them a whole another bite at the apple.

11   This will be a fourth day of a 30(b)(6) for CDK -- for Cox.

12          THE COURT:  In my view, I think you ought to take

13   another two hours with this person.  If that -- if you

14   can't -- once you talk to your team, if you can't do it -- so

15   I want to say two hours for the resumed deposition of the Cox

16   30(b)(6) deposition.

17          If you can't do it in two hours and you can't agree

18   for more then, you know, file a motion and I'll -- but I'll

19   conduct a hearing either telephonically or orally.  I don't

20   want to be unreasonable, but I also am cognizant of resumed

21   depositions that then plow ground that was already plowed or

22   asked questions that could have been asked -- you know, I'm

23   not going to stake anything here, but I think you ought to be

24   efficient in two hours as to what you're doing with this

25   person, period.  If that can't be done, let me know.

1          MS. MILLER:  We'll do our best, your Honor.

2          MR. ROSS:  Your Honor, Brian Ross.  At the risk of

3     circling back to a previous issue, there have been some

4     references to how long it would take defendants to complete

5     their data refresh.  I believe I have some helpful information

6     from Reynolds' standpoint if the Court is interested in some

7     clarity on that.

8          THE COURT:  Thank you for getting me back to that.

9     So Authenticom is going to refresh data by May 24th.  And the

10    dealers are going to refresh -- dealership class people are

11    going to refresh data by when?

12         MS. WEDGWORTH:  Your Honor, we are working on it.  We

13    would certainly try to see what we can do in two weeks.

14         THE COURT:  Okay.

15         MR. PROVANCE:  Your Honor, I understand that there

16    may be more issues that we need to discuss at a later time.  I

17    would just note, we don't have an agreement from the dealers

18    to refresh any data set because the only data that they

19    produced, their position is that they shouldn't be refreshing

20    that.  So --

21         MS. WEDGWORTH:  And --

22         MR. PROVANCE:  -- I'm not sure what Ms. Wedgworth is

23    talking about.

24         THE COURT:  I'm going to say this.  Within by -- is

25    it unreasonable to say, by May 24th, which is a week from this

1   Friday, you'll meet and confer about the data that defendants

2   are asking for and you either will or will not agree to

3   refresh it by a date certain or you'll -- see, I don't want

4   this briefed.  I mean --

5        MS. MILLER:  Your Honor, to your point earlier, it

6   may make sense, with respect to the dealerships, if your Honor

7   has time to have us come in sometime either next week or the

8   week after to walk through these issues so that, you know, we

9   can try to explain it apparently better than we have today in

10  terms of the data sets that we don't even have, setting aside

11  refreshed data sets.

12       THE COURT:  I don't know that I want to host a food

13  fight.  And I have limited time.

14       Mr. Ross, you were going to give me something on

15  defendants' refreshing.

16       MR. ROSS:  Yes, at least with respect to Reynolds.

17  So just briefly for context, I think everybody on both sides

18  will agree that all of these discussions relating to a data

19  refresh have always been subject to reaching a global

20  agreement.  That is, we've discussed individually, okay, I

21  would be willing to refresh these ten categories assuming

22  everybody else agrees to refresh a reasonable set of

23  categories.  So that has been the framework of our discussions

24  over the last couple of weeks.

25       We, Reynolds, have responded -- it was a week to ten

1    days ago -- essentially that, yes, we are agreeable to

2    refreshing all of the requested categories subject to a global

3    agreement and provided plaintiffs with very specific time

4    estimates for each category of how long it would take Reynolds

5    to refresh.

6          Some of them, the vast majority of them, frankly,

7    were two weeks or less, 17 days or less.  There are a couple

8    of categories, however, and among the more important

9    categories for plaintiffs' experts as I have come to

10   understand it from plaintiffs' counsel that simply are going

11   to take longer.

12         And what perked my ears up earlier was kind of the

13   hypothetical discussion of, "Well, if we could -- if we,

14   plaintiffs, could get all of defendants' data by early June or

15   mid-June, then we're happy to go forward with a June -- a July

16   1st expert disclosure."

17         Unfortunately, one or two of the key data categories

18   that we are willing to refresh are simply going to take

19   longer.  The good-faith estimate we've provided is six weeks.

20   This is compared to, when we originally produced this

21   similar -- this same type of data for the older time period at

22   the beginning of discovery, it actually took our client four

23   months to do the pull.

24         I will spare the Court the details of why that is the

25   case, but it is in part set forth in the affidavit of Sheri

1    Robinson in response to the August 2018 motions to compel.

2    We're happy to have that discussion in more detail if the

3    Court is ever interested.

4         Bottom line is that we have committed to refreshing

5    these documents subject, as soon as a global agreement is

6    reached -- and I'm very hopeful that we are virtually there

7    subject to the issue with the dealer productions.  But as soon

8    as that clock starts, we will jump right on it, and I believe

9    we will be complete approximately six weeks after everybody

10   says "go."

11        So I guess part of the reason that I circled back to

12   that is that one of the concerns that I think Ms. Gulley has

13   articulated in terms of Authenticom, for example, going ahead

14   and producing their expert report earlier than everybody else,

15   in a vacuum, that sounds fine, but our concern is the

16   inevitable iterative expert reports from Authenticom who say

17   they need our data, they're not going to have our data until

18   late June at the earliest now that we're talking.  And when we

19   get their expert report, we would like that to be their expert

20   report so we know what we're shooting at.

21        MS. MILLER:  Your Honor, with respect to CDK, we

22   similarly provided a letter to plaintiffs.  And I believe, and

23   Mr. Provance can correct me, but we said we would need

24   approximately three weeks from the -- to use Mr. Ross'

25   terminology, from the time the parties reached agreement and

1   said "go."

2        MR. ROSS:  And if I could add one more thing, so that

3   there is no misunderstanding that somehow Reynolds was trying

4   to spring this data at the last minute, not pointing fingers

5   at anybody, any way, but to be fair to Reynolds, we did ask

6   the plaintiffs in early March what categories of data they

7   wanted us to refresh.  We got their response on that in late

8   April.  So we have been very responsive and are ready to go,

9   but we are where we are in terms of the calendar.

10       THE COURT:  Yes.  I am disinclined to link this to

11  some type of a global deal to the extent that that's holding

12  stuff up.  I don't -- you know, there are too many moving

13  parts and too many parties in this case to say the defendants

14  will not do what they need to do unless the dealership class

15  plaintiffs agree that they -- I mean, what I hear you saying

16  is that they won't -- "If the dealership class plaintiffs are

17  not going to provide us the data that we want," which they say

18  we don't have to provide you, "then we're not going to refresh

19  our data," among other things.  And I'm not going to -- I'm

20  not going to buy into that.

21       I don't know what data needs to be refreshed, but I'm

22  not going to hold up production of refreshed data on a rolling

23  basis simply because we don't have agreement with everybody.

24  I might have to resolve something between CDK and the

25  dealership class plaintiffs on this, and I'm not going to --

1    I'm not going to hold everybody else's refreshing their data

2    up while that happens.  I just -- it's not practical to me.

3            I get why you would want to do that.  We may be

4    willing to do something if you're willing to do something

5    else, but you've got to make your calls.  And those are --

6    those are issues that are particularly ill suited to judicial

7    resolution.

8            I don't want any more on that right now.  I've got to

9    decide -- I can't see you next week, for example.  Okay.  So I

10   have a very full calendar right now.  I happen to be -- you

11   know, so -- but I am clearly not inclined to hold things up

12   pending a global deal.  I get why you would do that, but that

13   only works if you actually are willing to negotiate with each

14   other and come to an agreement quickly.  If you're not, then

15   that has the effect of holding everything up.  And I'm not

16   really willing to hold everything up that needs to be done.

17           You know, I'm inclined to order everybody to refresh

18   the data to the extent they are agreeing to refresh it.  And,

19   you know, I hate to have you file more paper because every

20   time you file something, it kills a lot of trees, as to what

21   the disagreements are, but I'm not going to be able to

22   understand the disagreements from the language that you put in

23   there, to the extent I can understand it better in person.

24           Okay.  Let me just -- can I go through some of these

25   agenda things and see where we're going to get today?  The

1    pending motion regarding financial data for -- that's done.

2         MR. NEMELKA:  That's been resolved.

3         THE COURT:  Leave to take -- file subpoenas on third

4    parties.  I've already got an AT&T subpoena which I'm prepared

5    to address, but these are other ones.  So you're currently

6    discussing whether that's going to be opposed.  Still

7    discussing?

8         MS. WEDGWORTH:  Your Honor, we haven't heard from

9    defendants if they're opposing this.

10        MR. PROVANCE:  Yes.  Your Honor, our position is

11   going to be that plaintiff's seeking leave to serve new

12   subpoenas on carriers for both cell phone records and text

13   messages would be embarking on a new subject of discovery.  We

14   don't see any good cause to do so.  And, you know, we can

15   explain our position more, but we are opposed.

16        THE COURT:  So that's what you're looking for, cell

17   phone and text in addition to what you've already served on

18   AT&T for Gardner and certain numbers.

19        MS. WEDGWORTH:  These are limited just to three:

20   Gardner, Workman, and Schaefer.

21        THE COURT:  Right.

22        MS. WEDGWORTH:  And these are phone records that

23   defendants don't have.  The text messages, I think, are one

24   off on AT&T which have been fully briefed.  But we've come to

25   find out that Verizon and Sprint also were the carriers that

1    we haven't addressed, and that's just a cleanup to get all

2    that.

3           Given that this deals with communications between

4    alleged competitors, it's highly important.  It's a cleanup

5    subpoena that is targeted strictly to those phone records for

6    those three individuals.

7           THE COURT:  Right.  But the motion that I currently

8    have is for calls, right, from or to certain numbers --

9           MS. WEDGWORTH:  Yes.

10           THE COURT:  -- for Gardner.

11           MS. WEDGWORTH:  And that is a different motion, and

12    we can address that now.

13           THE COURT:  No.  And what you're asking for is cell

14    phone and texts from AT&T and --

15           MS. WEDGWORTH:  Sprint and Verizon.

16           THE COURT:  Right.  And the defendants say that's a

17    new tack and why wouldn't you have served those earlier.

18           MS. WEDGWORTH:  Actually, your Honor, we had 30(b)(6)

19    depositions in the past couple of weeks.  Those kind of

20    questions, we asked there.  And throughout discovery with all

21    the different witnesses, we've asked questions for phone

22    numbers, carriers, etcetera.

23           And as a cleanup to look at the testimony that's come

24    in in the last two months and most recently last week

25    regarding phone information which the 30(b)(6) people didn't

1  have, it is a culmination of boiling down exactly what we need

2  from the deposition testimony in the last two months.  And in

3  particular, the 30(b)(6) depositions on this were not helpful

4  at all.

5          MS. MILLER:  Your Honor, if I may briefly respond.

6          THE COURT:  You're going to say they should have done

7  this a lot earlier, right?

8          MS. MILLER:  There's -- yes, but there's another

9  nuance, a slight nuance here, your Honor, and that is they

10  asked -- they deposed, for example, Mr. Workman back in

11  December.  If they wanted to subpoena his phone records or

12  additional text messages from him -- CDK, in fact, produced

13  text messages for Mr. Workman in April of 2018.

14          So they -- it's not that they were looking, needing

15  his phone number and had to wait until the 30(b)(6) to get his

16  phone number.  The same is true of Mr. Gardner.  Mr. Schaefer,

17  certainly, his deposition took place later in the schedule but

18  there are, I'm willing to bet, thousands of documents that had

19  his signature block on it in Reynolds' production.

20          They've have their phone numbers.  They've had text

21  messages.  They had -- again, they had Mr. Workman for his

22  deposition in December.  They could have asked for this stuff

23  at any point, and saying that they had to wait for the

24  30(b)(6)s to do this is somewhat -- I think is belied by the

25  record.

1       MS. WEDGWORTH:  And if I may respond, for instance,

2   at Mr. Schaefer's deposition which occurred not so long ago --

3   in the last month.  I can't remember.  I've been at several.

4   But within the last month, Mr. Schaefer said his phone, all

5   this stuff was lost in February 2015.  We just learned that.

6   We just -- we assumed a lot of this had been searched for and

7   was either produced if they had it or not.

8       It turns out, we find out with regard to

9   Mr. Schaefer, his phone, his computer, everything in February

10  2015 was lost or stolen or something.  That kind of

11  information we're just now getting.  And we processed -- it's

12  a targeted subpoena for three people.

13      THE COURT:  Did Reynolds produce some texts way back?

14  Did CDK produce some texts?

15      MS. WEDGWORTH:  For Mr. Workman, I do believe we have

16  some texts, so CDK did produce some for Mr. Workman in a very

17  limited quantity, but there were some for him.

18      MR. ROSS:  And, your Honor, Brian Ross.  Some of

19  those texts that were produced by CDK were between Mr. Workman

20  and Mr. Schaefer.  With respect to Mr. Schaefer's records, the

21  point that Mr. Schaefer's devices were stolen in February of

22  2015 is not new information.  That was disclosed in our

23  production.  It was disclosed in writing to Mr. Nemelka's

24  partner, Mr. Dorris, late last year, 2018.

25      This has been widely known.  There was a police

1    report issued.  There was no new information on that point

2    that came out in Mr. Schaefer's April 17th and April 18th

3    deposition.

4           Meanwhile, we have gone and searched all possible

5    sources for text messages that Mr. Schaefer may have and have

6    kept the plaintiffs updated on that front step by step.

7           MS. WEDGWORTH:  Respectfully, your Honor, if I might

8    just correct one --

9           THE COURT:  Can I just ask you a question?  When this

10   status report says "plaintiffs," is that really dealership

11   class plaintiffs want to serve this or Authenticom wants this,

12   Authenticom, et al., the Kellogg people want this, too?

13          Mr. Nemelka, are you joining in these subpoenas?

14          MR. NEMELKA:  We'd like it, too, but it's the

15   dealership class plaintiffs' motion.

16          MS. WEDGWORTH:  So --

17          THE COURT:  Ms. Wedgworth?

18          MR. NEMELKA:  We have a conflict with the carriers.

19          THE COURT:  Go ahead.

20          MS. WEDGWORTH:  With regard to Mr. Ross' point,

21   respectfully, there was a new point at Mr. Schaefer's

22   deposition learned for the first time that Mr. Schaefer in his

23   deposition said he thought that some of the text messages and

24   that type of information had been stored on the cloud, new

25   information to us.  We did not know that.  We're hoping

1  through AT&T, Verizon, Sprint, whatever is out there, that we

2  would at least have a shot at this.

3      MR. ROSS:  And respectfully, Mr. Schaefer's testimony

4  having to do with the cloud has nothing to do with cellular

5  carriers whatsoever.  That was a reference to the fact that he

6  used an Apple phone that for a time had iCloud backups made of

7  it, and those have been searched for.

8      THE COURT:  So your major objection on the defense

9  side is, enough is enough, you should have done this earlier,

10  you shouldn't be allowed to continue to string this out.

11  That's your main objection, right?

12      MR. ROSS:  Yes, your Honor.

13      MS. MILLER:  Yes.  The text messages, for example,

14  that they put in front of Mr. Schaefer at his deposition to

15  ask questions about his interactions were the texts that had

16  been produced out of Mr. Workman's files in April of 2018.

17      THE COURT:  Yes, but they just got his deposition

18  now, was what they're going to say.  Okay.  And to some

19  extent, "enough is enough," is your argument on the

20  interrogatories, too.  I was prepared to address that.  Now

21  I'm wondering how much this is interrelated.

22      We're going to take a quick break and then resume and

23  go to -- you know, there's still a dispute about Authenticom

24  production.  Is that going to end up with motions and briefing?

25      MR. MacDONALD:  Potentially, your Honor, there remain

1   a number of outstanding issues that we have not been able to

2   resolve.

3           MR. NEMELKA:  We're prepared to discuss those.  Those

4   were fully discussed before the end of discovery.

5           THE COURT:  The same thing with respect to the Cox

6   production?

7           MS. MILLER:  Yes, your Honor.  We have a couple of

8   outstanding things.  If we can't reach agreement on their

9   production, then we'll move.

10          THE COURT:  Okay.  We're going to take five minutes

11  here.

12      (Recess from 11:18 a.m. to 11:40 a.m.)

13          THE COURT:  I know that was the longest five minutes

14  you've ever experienced.  I'm sorry.  I just wanted to think

15  through where we are, where we're going here, and see if I can

16  make some progress here.

17          Okay.  Based on what I heard this morning, I am going

18  to move the discovery dates the eight weeks.  Mr. Nemelka, I

19  don't -- I don't think it is efficient -- I was going to say,

20  I don't buy that you should produce your expert reports, get

21  some more data from them, and then just move that, a couple of

22  numbers in there.  You know, numbers matter.

23          I think -- the primary reason I'm doing this is the

24  refreshing the data issue.  Based upon what Mr. Clark is

25  telling me -- or what Mr. Ross is telling me, there's data

1    that you need from them that will take a while both from them

2    and CDK.  They need data from the dealership class plaintiffs

3    or they're going to argue with you about it.  And I'm going to

4    require you to tee this up to me.

5         Really, the sole reason I'm doing this is because I

6    think you ought to get the data from each other that you need.

7    And I know you're going to give them your data next week, but

8    if they have problems with it, they're going to ask you for

9    more data.

10        I'm not doing this because of the pendency of the

11   motion to dismiss the counterclaims.  I think if push comes to

12   shove and you need -- and the defendants need to -- CDK needs

13   to produce expert reports on claims that are subject to a

14   motion to dismiss, unless I can get a much better sense of the

15   added expense on top of which you're already going to have to

16   do -- and I know that's difficult to come up with because

17   they're all related, but I'm not inclined to push, continue to

18   push it down the road for that reason alone.

19        I don't know if this is a hard stop, but this is

20   getting to a hard stop.  All right.  I mean, I don't want to

21   say "never say never," but assuming that everybody has the

22   data they need for their experts, you ought to go ahead with

23   these expert disclosures pending a ruling on the motion to

24   dismiss.

25        As I see in the docket, CDK's counterclaims have

1   already been -- the motion to dismiss those claims has already

2   been granted in part or denied in part once, right?  I know

3   they were repled.  Correct?

4           MS. MILLER:  No, your Honor.  With respect to the

5   counterclaims against the dealership plaintiffs, they've been

6   fully briefed once.

7           THE COURT:  What happened -- what was docket entry

8   506?  Hold on.  That's a Judge Dow opinion:  "Before the Court

9   are the motion to dismiss the counterclaims of defendant/

10  counter-plaintiff CDK Global, LLC, and the motion to dismiss

11  the conversion counterclaim of Reynolds" --

12          MS. MILLER:  That's with respect to Authenticom, your

13  Honor.  So he, Judge Dow, sustained most of our counterclaims

14  as against Authenticom.  He did dismiss the counterclaims in

15  part, but I believe that was only one or two of the

16  counterclaims, of the 13 or so counterclaims.  So he has --

17  those counterclaims are still going forward.

18          There has been no ruling yet on -- Cox and Autoloop

19  did not move to dismiss our counterclaims.  And so the

20  dealership plaintiff -- or counterclaims against the

21  dealership plaintiffs, we think -- that's why we think, we

22  expect or we hope that they will survive based on that prior

23  decision, but there's been no ruling on the dealership

24  plaintiffs' counterclaim motion to dismiss at all.

25          THE COURT:  Okay.  Thank you for the correction,

1  though your response provides support for my saying I don't

2  know that the motion to dismiss should stop CDK from going

3  forward with its experts because you think you're going to win

4  that motion.  You thought you had good counterclaims.  The

5  judge might disagree, but that happens in litigation.

6       I just think there's got to be a -- but I am

7  convinced by this discussion that the data has to be

8  refreshed.  And I don't have a great sense of when the

9  plaintiffs are going to have all the data they need from the

10  defendants, and I don't want there to be a series of reports

11  with new data.

12       And I also don't have a good sense of when the

13  defendants are going to need -- get from plaintiffs,

14  particularly the dealership plaintiffs, what they want and

15  think they are entitled to.  So I'm moving those dates eight

16  weeks.

17            MR. NEMELKA:  Your Honor?

18            THE COURT:  Yes.

19            MR. NEMELKA:  CDK said they can give us the data

20  within three weeks from today and most of the data from

21  Reynolds within two weeks, although a few categories, six

22  weeks.  This may be a losing battle.  Could I ask --

23            THE COURT:  Losing battle.

24            MR. NEMELKA:  -- for --

25            THE COURT:  Losing battle.  For better or worse, I

1    don't have the granular information necessary to be able to

2    parse this that way.  And even if I had granular information,

3    I'm not convinced that my ruling would change on this.  You

4    know, Authenticom is hitched to this multidistrict train, and

5    this always happens in multidistrict litigation.  There is

6    somebody out there who would be much better off, they think,

7    if they weren't part of the multidistrict litigation.

8         That's not my call.  It wasn't my call for you all to

9    come here.  And so I get it.  But this is a problem in a piece

10   of litigation this big with so many moving pieces.  Somebody's

11   ox is going to get gored to some extent because of some of the

12   scheduling.

13        But at least what I heard this morning -- and I don't

14   want this briefed -- is that all the data that everyone needs

15   for their experts has not yet been produced.  And nobody has

16   sworn on a stack of Bibles, nor have I asked them, when that

17   data is going to be produced.  Some of that data needs to be

18   subject to discussion between the dealership plaintiffs and

19   CDK.  And I don't know how long that's going to take and

20   whether I'm going to have to resolve something there.

21        What I am sure I don't want is the production of a

22   report by Authenticom, et al., plaintiffs and then you get

23   more data and now you supplement that report with the new

24   data.  I just don't want that to happen.  And there's no way

25   you're not going to do that.

1    And as I sit here now, I don't know how those numbers

2  are going to change and neither do you.  But what I'm really

3  sure of is that I don't want the defendants to have to respond

4  to report number one and then report number two.  And I don't

5  have any assurance that that's not going to happen.  In fact,

6  your plan would be to have that happen but you don't think

7  it's material to anybody.

8    Go ahead.  You've got one more shot.

9    MR. NEMELKA:  Okay.  To be clear, just so the record

10  is clear, we never said that we would -- that's what

11  defendants said that we would have to do.  We never said that

12  we'd have to supplement.  Our experts think they have what

13  they need.  This is simply a refresh for some, you know, more

14  up-to-date data.

15    THE COURT:  I don't buy that.  I just don't buy it

16  based on common sense.  I mean, I really don't.  You know, and

17  even if you were willing to say right now, "I stipulate I will

18  never amend my expert report," what you would end up getting

19  stuck with, frankly, is you do it by July 1st and everybody

20  else has eight weeks.  Okay.  And I don't think you really

21  want that.  And I don't think your client really wants that.

22    MR. NEMELKA:  I agree with that.

23    THE COURT:  You know, I can do that to stick it to

24  you, but I'm not going to do that.  I just don't buy it.  I

25  just don't buy it.  And so all those dates are moving eight

1    weeks, number one.

2        Two, I actually was prepared to rule on the motion to

3    quash or modify the subpoena that CDK filed with respect to

4    what I consider to be some limited additional documents with

5    respect to Gardner.  I think CDK over-reads my November 19th,

6    2018, order as to what I said there or what I didn't say

7    there.

8        I thought that the plaintiffs made a very credible,

9    reasonable argument as to why they were asking for this

10   information and why the dates going back were appropriate

11   based upon discovery taken.  I had a question about why to the

12   present, but it looks like everybody is asking for stuff to

13   the present, and that doesn't seem to be a huge push-back.  I

14   did not say that the only period that's ever relevant in this

15   case is 2015 to 2016.

16       Based on what I saw in the briefs back on October

17   19th, 2018, and what I understood the case to be, I was in

18   that mode but I clearly said, you know, the Court would need

19   to know more about why plaintiffs believe production of

20   telephone records outside that timeframe was relevant.  And

21   plaintiffs never came back to me.  And so I didn't put my feet

22   in concrete there with respect to a time period.

23       For what the plaintiffs have said in this -- in their

24   response to the motion, they quote things that happened before

25   2015, 2016 which wasn't quoted in what I had before me in

1   November.  So I get that.  And they've referenced CDK's own

2   subpoenas and others that go for documents to the present.

3         The only reason I'm not prepared to go that far right

4   now is because I didn't completely understand the potential

5   linkage with this other thing, this other shoe that's dropping

6   which also has to do with more subpoenas that plaintiffs want

7   to serve on other phone carriers.  And the primary issue of

8   the defendants is, discovery has to stop at some point.

9         So I'm not -- I want to set a date for a joint

10  filing.  You're going to have to talk to each other.  You're

11  going to have to put something together jointly rather than

12  responsively.  But I want a joint filing that addresses the

13  additional subpoenas that are referenced in your joint status

14  or agenda:  Plaintiffs seek leave to file subpoenas on third

15  parties AT&T, Verizon, and Sprint.

16        I want a joint filing where plaintiffs say, "This

17  is -- this is why we want to file -- this is why we want to

18  serve them and why we think we're entitled to them and why

19  we're not late."  And the defendants say why you think enough

20  is enough and they shouldn't do it.

21        I think I need to look at that because I don't want

22  to be inconsistent on these things.  And, you know, it may be

23  that the same rationale is going to apply there.  It may not

24  be.

25        I have some concern -- I guess I do agree with what

1  Judge Cole has said in a published opinion someplace, and I

2  don't know if I ever cited it in this case:  At some point,

3  discovery ends.

4       So but, you know, I'm not sure whether this is

5  legitimate discovery that plaintiffs couldn't have served a

6  lot earlier.  I don't know what the prejudice and burden is on

7  them serving it now.  I don't know if this is kind of cleanup;

8  "We don't really need it but we're just shooting these

9  subpoenas out" versus critical stuff.

10      So I want a joint filing.  Limit it to ten pages

11 including footnotes that tells me your positions on these

12 additional subpoenas.  And I want to set a date for you to do

13 that.  And that would be -- Ms. Wedgworth, your proposal would

14 be --

15      MS. WEDGWORTH:  May 30th -- is the 30th a Friday?

16      THE CLERK:  A Thursday.

17      THE COURT:  Really?

18      MS. MILLER:  The 31st is a Friday.

19      MS. WEDGWORTH:  May 30th?

20      THE COURT:  That's a surprise to me from people who

21 just really want to move like crazy.

22      So today is the -- okay.  So that's two weeks.

23      MS. WEDGWORTH:  Oh, I'm sorry.  Today --

24      THE COURT:  Okay.  Today is the 15th.  Yes.  You want

25 two weeks.  Okay.  May 30th.  You're okay with that,

1    defendants?

2        MR. ROSS:  Can I --

3        THE COURT:  That's 2019.

4        MR. ROSS:  Can I make a request?  As the person on

5    the Reynolds team that I assume is going to draw the black

6    bean of working on this joint filing, I am supposed to be

7    largely out on vacation that week, the 27th to the 31st.

8        Is there any way we can do this deadline on the 3rd

9    or the 4th of June because it's that last 24 hours of these

10   joint filings that turns into the situation where you really

11   need to be on the phone with each other and coordinating, and

12   that's going to be more difficult on that week.

13       MS. WEDGWORTH:  On the 24th?

14       MR. ROSS:  Frankly, yes, I can do the 24th.

15       MS. WEDGWORTH:  The 24th, your Honor?

16       MR. PROVANCE:  And for CDK, that works as well, any

17   of the dates.

18       THE COURT:  How bad does that squeeze you, Mr. Ross?

19       MR. ROSS:  It would be fine.

20       THE COURT:  I mean, I think this just has to be, you

21   have to sit down and say why you think they're wrong and

22   they're going to say why they think they're right.  I'm not

23   looking for a real long, involved thing.  You know, I'm

24   looking at timeliness.  I don't really want a whole lot of

25   briefing on -- or anything in there really on standing and all

1    the rest of this.  I mean, I know what the standing issues

2    are.

3            They're going to say that as a party to the

4    litigation, they're burdened by having to look at all this

5    stuff and having to deal with it and having to deal with late

6    discovery.  I'm now getting a better sense of why timing is

7    important here from what you said.

8            MR. ROSS:  Your Honor, I feel like I probably ask a

9    similar question every time that we're assigned to do a joint

10   filing, but just to give us the best --

11           THE COURT:  Plaintiffs will do a draft.  Is that what

12   you're -- go ahead.

13           MR. ROSS:  Well, I guess in order to get the best

14   sense of the ground rules, sometimes a joint filing really

15   does require collaborative, trading drafts, sentence by

16   sentence, paragraph by paragraph.

17           My sense from your Honor's comments is that this is

18   really more of a, one side gets five pages, the other side

19   gets five pages and you have to essentially disclose them

20   before they're filed in a joint instrument, but we are not to

21   be nitpicking the language of each other's sections.  We can

22   respond as we think is appropriate and cover the issues as we

23   think are appropriate and that --

24           THE COURT:  Okay.  Fair enough.

25           MR. ROSS:  Would that be a fair characterization?

1          THE COURT:  Fair enough.  I hear you.  By Friday the

2     17th, the parties shall speak generally about their respective

3     positions on this motion.  By the 20th, plaintiffs shall

4     provide to defendants a draft of their section of this joint

5     filing explaining both why they think they're entitled to this

6     and dealing with the issues that defendants have said they're

7     going to raise so that at least you have this.

8          By the 23rd, defendants shall provide a full document

9     to the plaintiffs that includes plaintiffs' proposed section

10    and their proposed section.  And a finalized version should be

11    filed by the 24th.

12         Does that help you at least in terms of ground rules?

13         MS. MILLER:  Yes, your Honor.

14         MR. ROSS:  It does, your Honor.

15         THE COURT:  Is it terribly unreasonable in terms of

16    timing?

17         MR. ROSS:  No, your Honor.  Compared to the last

18    several weeks, this will be a walk in the park.

19         THE COURT:  A piece of cake.

20         MR. ROSS:  Yes.

21         THE COURT:  And I will say if you manage to wrangle

22    somebody else into doing this at Gibbs & Bruns and you need

23    more time into the following week to file this, I would not be

24    opposed to moving this date.  Frankly, I wasn't opposed to the

25    June date.  I just thought it was longer, but I would

1    accommodate your schedule.

2         I'm going to be out of town at a conference the

3    following week.  Okay.  So I'm putting it on the 24th because

4    you can get it done before you leave.  Whether I'm going to be

5    able to rule on it or not the following week, I don't know.

6    Okay.  So --

7         MR. ROSS:  Thank you, your Honor.

8         THE COURT:  If you guys agree to a different

9    schedule, I will not have a cow over this.  All right.

10        MR. ROSS:  Appreciate it, your Honor.  We don't feel

11   pressured by the Court as far as the timing on this, but I'm

12   happy to get it done.

13        THE COURT:  Okay.  A couple other things.  I had

14   intended to cap this at 12:00 because I had an internal thing,

15   but I'm giving myself a little bit more time.

16        On the interrogatory issue, I'm prepared to address

17   that, too, but when I read the reply, it looks to me like CDK

18   has dropped its timeliness argument because plaintiffs

19   helpfully pointed out that Judge St. Eve said that her

20   discovery schedule didn't apply to counterclaim discovery, and

21   nobody actually asked me to do anything with respect to

22   counterclaim discovery.  So Nature abhors a vacuum, and so

23   that's why we are here today.

24        But it sounds to me like CDK's big -- you know, more

25   substantive argument in your reply brief is they're underly

1   burdensome, they're duplicative, we shouldn't have to do

2   these, they should have been done earlier.  Is that wrong?

3            MS. MILLER:  We didn't withdraw our timeliness

4   objection.

5            THE COURT:  You didn't mention it, though.

6            MS. MILLER:  I'm sorry?

7            THE COURT:  You didn't mention it, though.

8            MS. MILLER:  In the -- well, which we addressed, we

9   believe -- and I don't have the reply in front of me.  I

10  apologize.  I wasn't prepared to --

11           THE COURT:  Okay.  I'll get it.  I'm not going to

12  argue it now.

13           MS. MILLER:  Okay.

14           THE COURT:  This was a point of clarification only.

15       (Pause.)

16           MS. MILLER:  And, your Honor, I think the question is

17  more of, our position has been consistently that all of the

18  interrogatories that plaintiffs purported to serve as

19  counterclaim discovery should have, could have, etcetera, back

20  in May such that this is an attempt at a second bite at the

21  apple.  This is not, quote, unquote, true counterclaim

22  discovery.

23           But our point is, if the Court is going to indulge

24  the request for counterclaim discovery, then it should then --

25  then Judge St. Eve's rule should apply universally, and we

1    should be allowed to take targeted counterclaim discovery on

2    our counterclaims as well.

3         THE COURT:  I completely understand that.  That

4    actually was very clear in the briefing.  And I think I would

5    revise what I said not to mean that you have withdrawn your

6    timeliness argument, but you're not really arguing that merits

7    discovery and counterclaim discovery was required to be done

8    by the date that written discovery was supposed to be served

9    under Judge St. Eve's long-ago order because she said my --

10   that timing doesn't apply to the counterclaim discovery, but

11   you're not withdrawing your argument that any counterclaim

12   discovery that she would have permitted should have happened

13   well before now.

14        MS. MILLER:  I believe -- without having the briefs

15   in front of me, I believe that's an accurate statement.  I'll

16   defer to the briefs.

17        THE COURT:  Yeah, I won't -- you can stand on your

18   brief to the extent that I characterize it one way or the

19   other.  Okay.  I understand what you're saying.  You would

20   still make a timeliness argument because it's intertwined with

21   your duplicative argument.

22        MS. MILLER:  Yes.  It can, should have back in May.

23        THE COURT:  You're not really saying they should have

24   served counterclaim discovery before you served your

25   counterclaim.

1      MS. MILLER:  No, your Honor.  We're just saying this

2  isn't really counterclaim discovery.  This is stuff that can

3  and should have been served.

4      THE COURT:  Right, which requires me to look at the

5  discovery, understand the issues encyclopedically, and be able

6  to understand whether or not it's duplicative or unnecessary

7  or certain things could have been done before or not.  Okay.

8  I have some --

9      MR. NEMELKA:  Your Honor, can I just say on that, I

10  heard CDK say that that also means they think they can get

11  counterclaim discovery against --

12      THE COURT:  You bet you.

13      MR. NEMELKA:  -- against Cox --

14      THE COURT:  Yes.

15      MR. NEMELKA:  -- and Autoloop.  But we've already

16  provided -- I mean, they deposed our witnesses on that.  They

17  got documents on that.

18      THE COURT:  Why should you be allowed to serve

19  counterclaim discovery on them and they can't serve discovery

20  on their counterclaims on you?

21      MR. NEMELKA:  We didn't serve counterclaim discovery

22  on them.

23      THE COURT:  Oh, just dealership class plaintiffs

24  served, right?

25      MR. NEMELKA:  Yes.

1      MS. MILLER:  And to be clear, your Honor, there were

2  a number of things that plaintiffs objected to and did refuse

3  to supply documents on on the grounds that they would have

4  related only to any counterclaims that may have been filed

5  because at the time, they were not.

6      THE COURT:  So the nuance here is, the Authenticom,

7  Autoloop, Cox people have not served any interrogatories.

8  Again, you're attached at the wrist and ankles with people who

9  don't seem to share your timeline.  But your position would be

10  if -- if dealership class is allowed to serve counterclaim

11  discovery on CDK and CDK is allowed to serve counterclaim

12  discovery on them, that doesn't mean that they should be able

13  to serve discovery on Authenticom, Autoloop, etcetera, with

14  respect to the counterclaims that you've answered and not

15  moved to dismiss because you're not in that fight.

16      MR. NEMELKA:  Right.  And we provided a lot of

17  discovery on that.  They've deposed us on it.  This is not

18  something that we were ever -- they've never alerted us that

19  they would ever want more discovery.  In fact, if your Honor

20  recalls, we did serve some interrogatories that we withdrew

21  because of this issue.

22      THE COURT:  And your position on this, Ms. Miller, is

23  since you've deposed these people after you've had the

24  counterclaims either in production or on file, are you

25  actually saying that if dealership class plaintiffs are

1    allowed to serve their discovery, the tit for tat from CDK

2    would include interrogatories not only on the dealership class

3    but also on the Authenticom people who are --

4           MS. MILLER:  We were able to take some discovery of

5    the dealership plaintiffs.  Yes, we were able to take some

6    discovery of Cox and Autoloop on our counterclaims given the

7    timing of their depositions vis-a-vis the filing of the

8    counterclaims.

9           To the extent we would need -- it would be targeted

10   interrogatories to clarify, we simply didn't serve them

11   because given all the mass of discovery that had been

12   conducted, but as we stated in our papers, it was a -- we

13   didn't think that there was additional discovery at that point

14   that we wanted to undertake.  But if there is going to be

15   targeted counterclaim discovery, then it should be targeted

16   counterclaim discovery of plaintiffs, plural.

17          THE COURT:  Okay.  I understand the clarification.

18          MS. WEDGWORTH:  And, your Honor, just for

19   clarification, in CDK's earlier filings, they state point-

20   blank the May 25 deadline does not apply to any discovery on

21   CDK's counterclaims.  That's docket 230.  They said that a

22   long time ago.

23          THE COURT:  I know.  I read that in your brief.

24          Okay.  I want to ask some questions about highly

25   confidential and confidential, a motion that I characterized

1   as being subject to benign neglect.  You know, one of the

2   problem I have with this motion, frankly, is that your

3   confidentiality order, the definitions of "confidential

4   material" and "highly confidential material" that everybody

5   agreed to and everybody is operating under, you could drive a

6   Mack truck through those definitions.

7        There is -- you know, there's a spectrum of

8   confidentiality definitions in these orders.  These leave very

9   subjective -- to very subjective interpretation what is either

10  confidential, highly confidential.  And both sides seem to

11  have taken advantage of that.  CDK says that the plaintiffs, I

12  don't know, some huge percentage of your documents were

13  designated as highly confidential.

14       They've designated documents, and plaintiffs are

15  focused on now -- sometimes, Mr. Nemelka, in your affidavit

16  and what you filed, it says 66 documents, but I think there's

17  like 79 tabs to the affidavit.  It's really all the documents

18  that are attached to the affidavit, right?

19       MR. PROVANCE:  Your Honor, my best recollection is

20  that there are 66 documents at issue, but Mr. Nemelka's

21  declaration included additional documents that were not at

22  issue on his motion but which he wanted to bring to the

23  Court's attention.

24       THE COURT:  I've read all of them.  Okay.  I've read

25  every single document.  I paged through all of those

1     documents.

2          I have a couple of questions about this.  Have the

3     facts on the ground overtaken the motion?  In other words,

4     since you filed the motion, you anticipated in your motion

5     with the sky is falling that if the Court didn't resolve this

6     immediately, there was going to be -- hell would break loose

7     during the depositions because there would be huge problems

8     about how this stuff was going to be used.  I know we've

9     had -- since the motion has been under advisement, I think I

10    had two kind of scuffles about that, but most of the

11    depositions are now over.

12         Have -- for example, has information that was

13    designated by CDK as highly confidential been disclosed in the

14    depositions in some way only as confidential?  Has there been

15    any clarification of this on the ground in the depositions?

16         MR. NEMELKA:  I would say the depositions have gone

17    pretty well actually.  And there have been some instances

18    where documents were redesignated by CDK in the middle of the

19    deposition.

20         THE COURT:  Some of those are attached to your

21    affidavit?

22         MR. NEMELKA:  No.

23         THE COURT:  Different ones?

24         MR. NEMELKA:  Yes, different ones.

25         THE COURT:  Okay.

1       MR. NEMELKA:  But I would have to say that for the

2  most part, the depositions have run pretty smoothly.

3       THE COURT:  So your main -- your main problem here is

4  that you can't talk about certain documents with your clients.

5       MR. NEMELKA:  For the most part, we can't talk about

6  the key evidence in the case with any of our clients at all.

7  We can't advise them on the state of discovery which, you

8  know, your Honor will see at summary judgment but is quite

9  striking, in our view, of the coordination, but we can't

10 advise our clients on the -- and since that motion, what's

11 actually happened is we've gotten much more evidence and --

12 which is highly confidential that we can't discuss with our

13 clients in terms of advising them on the strength of their

14 case.

15      THE COURT:  And have the documents -- I get that.  I

16 get that both as a practical perspective.  In my mind, a

17 document can both be highly confidential and be a key

18 document, a smoking gun that the plaintiffs would introduce in

19 evidence at trial or attach to a summary judgment motion or

20 that the district judge would cite in a summary judgment

21 opinion, in which case it's no longer highly confidential

22 under Judge -- under the Seventh Circuit's rationale because

23 if it forms the basis of a judicial decision, it's not going

24 to be highly confidential anymore.

25      But I do think -- I mean, I do understand -- there's

1    nothing inconsistent to me if a highly confidential

2    designation was appropriate that that document could be a

3    killer document but still could be highly confidential in

4    terms of -- I mean, if it had the recipe for Coca-Cola and the

5    other side stole it and you used it in its -- but it still

6    could be a highly confidential document.  I'm not sure I see

7    the recipe of Coca-Cola anywhere here.

8         So as far as you're concerned, your motion remains

9    germane, remains important because whether or not the

10   depositions went smoothly, you're being prevented from

11   discussing with your clients key documents.

12        MR. NEMELKA:  That's correct.  I would say the first

13   argument still applies.  The second, as your Honor points out,

14   is generally new because depositions have, frankly, gone

15   pretty smoothly.

16        THE COURT:  Right.  And -- okay.  And some of these

17   documents are going to experts, right?  Or your experts mostly

18   quantified that they don't need to see an email between

19   Gardner and somebody else that, "We shouldn't talk anymore and

20   we've got to talk about this stuff and this is our plan,"

21   right?

22        MR. NEMELKA:  Fair question.  I would say the expert

23   reports primarily are going to be data driven, but certainly

24   in terms of the coordination and what they see in the data,

25   mapping the coordination, they will be discussing some of the

1    actual evidence.

2          THE COURT:  They're not going to be opining --

3    they're not going to be opining on conspiracy, right?

4          MR. NEMELKA:  Correct.

5          THE COURT:  They're opining on, you know, the

6    underlying data.

7          MR. NEMELKA:  What they see in the data, the economic

8    rationale for why they were doing it but also it's, you know,

9    still compelling to them that they see the coordination map of

10   the data.

11         THE COURT:  Is this motion just the tip of the

12   iceberg for either side?  In other words, because of the huge

13   volume of material that's been designated as highly

14   confidential, if I were to say it's over-designated, it has to

15   be redesignated to confidential -- which still keeps it under

16   wraps to some extent but allows you to talk to clients about

17   it -- is your next move, "Well, there's a whole bunch of other

18   stuff now that we want to de-designate as highly confidential

19   based upon what your Honor just said."

20         And I'll have the same question for the defendants

21   with respect to the 80 percent or so of the material that

22   plaintiffs have designated as highly confidential.

23         MR. NEMELKA:  For plaintiffs, and you should talk --

24         THE COURT:  Just talk for your clients.

25         MR. NEMELKA:  For my clients, it would be targeted.

1    Like, it wouldn't be hundreds of documents.  It would be --

2    like, the 66 that we're asking for, it would be more in the

3    range of 50 to 100.  I mean, as your Honor knows, you can't

4    show a jury more than -- they're going to be overwhelmed, too,

5    so similarly with clients, we show them the hottest documents.

6              THE COURT:  Okay.  So it is a precursor to other

7    motions if I were to grant the motion.

8              MR. NEMELKA:  Targeted.

9              THE COURT:  Targeted.  To be clear, the way I

10   understand this is if you're showing something to the jury,

11   it's no longer going to be designated as highly confidential.

12             MR. NEMELKA:  Correct.

13             THE COURT:  Right?

14             MR. NEMELKA:  Correct.

15             THE COURT:  I mean, you know, at some point between

16   now and the trial, if you or they are showing documents to the

17   jury, they're not going to close the courtroom and force your

18   clients not to be there.

19             MR. NEMELKA:  I agree with that, that this is really

20   just before trial, up to the point of trial or as your Honor

21   points out --

22             THE COURT:  Summary judgment.

23             MR. NEMELKA:  -- in a summary judgment ruling that

24   gets relied on.

25             THE COURT:  You're the same position?

1        MS. WEDGWORTH:  Yes, your Honor.  And since the time

2   of this motion, counterclaims have been lodged against our

3   clients, and deposition testimony as well has been relevant to

4   our clients I would like to discuss with them, but at this

5   point, a lot of that is highly confidential.

6        THE COURT:  Yes.  I understand the, "would like to

7   discuss with them."  Part of what I've had trouble with, I've

8   got to tell you, in the -- well, I'll leave it at that.

9        Defendants:  Tip of the iceberg here or -- you guys

10  are big on what's good for the goose is good for the gander.

11  So if you have to de-designate some of your documents, then

12  the next step is to look at their documents, say -- targeted

13  as Mr. Nemelka says, but "There's really no reason for these

14  documents to be highly confidential, and we likewise would

15  like to talk to our clients about it."

16       MS. GULLEY:  And there's no question that all of the

17  evidence of Authenticom's illegal behavior that's the subject

18  of our counterclaims is being kept secret from our client as

19  well as all the information about their damages and our

20  damages.  There's no doubt about that, but that's the price

21  that Reynolds is willing to pay because CDK is its chief

22  competitor.  And Cox Automotive represented by Mr. Nemelka is

23  its chief competitor.  And these documents are seriously

24  sensitive.  And this is discovery.

25       We all understand that if it's a reliance document

1   for MSJ, it's different, but it's not completely out the

2   window.  We've already been to the Seventh Circuit in this

3   case.  We've already had a four-day long hearing in Wisconsin

4   where things were kept confidential.  And the Seventh Circuit

5   granted our motions to keep certain things confidential even

6   at that time on the very limited record that went up to the

7   Seventh Circuit.

8          So, well, yes, of course, if there's a new set of

9   rules for discovery in this case, we will have a lot of things

10   our client would love to see.  It would be terrifically

11   uncomfortable for our client to have its chief competitors and

12   rivals and folks that it's accused of hacking its system

13   having those security -- I mean, this case is about data

14   security so, obviously, there are issues here.

15          THE COURT:  And so from your perspective, just

16   building on that, Ms. Gulley, with respect to the emails

17   internally, let's say -- or you, Ms. Miller, it's more of you,

18   I guess.  Internal email -- you have the same perspective

19   about your competitor Reynolds, right?

20          MS. MILLER:  And our competitor Cox.

21          THE COURT:  So your feeling is that these emails, you

22   know, among your people about strategy vis-a-vis what they

23   were doing with Reynolds, you're not -- that's why you

24   designated those as highly confidential because that's

25   competitively sensitive for you.

1          MS. MILLER:  To be clear, your Honor, I mean, I

2     appreciate Mr. Nemelka has his perspective.  We don't think

3     the documents that he says -- show what he says they show.

4     And, in fact, they do have some highly confidential strategy

5     and business decisions that were made by fierce competitors in

6     this marketplace.

7          I don't think that he could say that his inability to

8     show these documents to his client has impeded his ability to

9     efficiently and zealously represent his clients in this

10    litigation going forward.  And, of course, when we get to

11    trial, there will be some documents that will inevitably be

12    shown to the jury or may form the basis of the Court's

13    opinion, at which point, yes, I don't expect this is going to

14    be a sealed opinion.  I don't even know if such a thing

15    exists, certainly not in this -- in this circuit.

16         But so that's a different question as to whether or

17    not to downgrade all of these documents at this point because

18    I don't think -- they are highly confidential.  They're not

19    necessarily going to use all of these at trial.  And I think,

20    yes, it is the tip of the iceberg because there are a number

21    of things, as Ms. Gulley said, that I'm sure my client would

22    really like to understand about the nuances of the

23    counterclaims that we filed and some of the underlying

24    evidence that supports those counterclaims with respect to

25    the, you know, illegal action that we say was taken by all of

1    these plaintiffs, not just Authenticom.

2          So from a pure goose/gander perspective, yes, your

3    Honor, if that's the way this is going -- I mean, this

4    question of downgrading has been a saga since the very

5    beginning when Mr. Nemelka asked us to downgrade every single

6    communication with Reynolds we ever had.

7          THE COURT:  Right.  I read the letters.  They walked

8    that back to the 66 or 79 or whatever documents.

9          MS. MILLER:  No question.  So it's a -- we always

10   want to be able to share more and do more, but the protective

11   orders, which your Honor noted, is agreed, are there for a

12   reason.  And yes, our experts can see them because all of the

13   experts are permitted under the order and have signed, you

14   know, the required documents to maintain that information as

15   highly confidential as appropriate.

16         So I think all of the requisite precautions are being

17   taken by the parties.  And, you know, as evidenced by the

18   zealousness of the counsel and able efforts they've made, I

19   don't think it's impeded them in any material respect.

20         THE COURT:  Okay.  That's helpful.

21     (Pause.)

22         THE COURT:  Okay.  I did not -- and I intentionally

23   did not set dates for this supplementation of your data.  I'm

24   just looking at your agenda here.

25         Okay.  This helps me -- what you've helped me

1   understand more is what I didn't necessarily understand

2   before.  And I have not spent a lot of time with the other

3   four or whatever motions that are under advisement, five.  It

4   gives me a sense of the interrelatedness of some of this stuff

5   that I didn't appreciate before, so it's helpful.

6           I can see you again on either June 10th -- and I want

7   to set this date.  And I'm not sure what we're talking about

8   on this date, but I want it on the calendar.  I can see you

9   again either June 10th in the morning with a hard stop at noon

10  or June 14th with a hard stop at the end of the day, but I

11  have both -- I have open times on both those dates.

12          Do either of those dates not work or work?

13          MS. MILLER:  The 14th does not work for me.  I'm --

14          THE COURT:  But the 10th does.

15          MS. MILLER:  The 10th does.

16          THE COURT:  How does the 10th work for everybody

17  else?

18          MR. NEMELKA:  The same as Ms. Miller.  The 10th works

19  for me.  The 14th does not.

20          MS. GULLEY:  I have to be in another city on the

21  11th, so if we did morning, that's no problem.

22          THE COURT:  9:30 a.m., 6/10, with a hard stop at noon

23  both for what I have scheduled in the afternoon in another

24  case and also so you can travel to some other city.  Again, I

25  want that date only because I want -- I don't want to not meet

1 with you.  If I have to see you before then, I'll let you

2 know.  I will -- so I'm getting a filing on the 24th.

3     MS. MILLER:  Your Honor, if I may, with respect to

4 that date, I think works great.  You started earlier to set

5 a -- I know you're not going to set dates by which things have

6 to be refreshed, but if we might be able to structure some

7 time between now and June 10th where the dealership plaintiffs

8 and we can -- you know, a date by which we need to meet and

9 confer and then a briefing schedule so that if we need to talk

10 about where we are on that issue by the 10th or shortly

11 thereafter, we can because, obviously, we don't want that to

12 languish in endless meet and confers and we're still where we

13 are now --

14     THE COURT:  Yes.

15     MS. MILLER:  -- come June 10th.

16     THE COURT:  Yes.  So what I would like to say is

17 Authenticom will refresh its data as it said it was going to

18 do by May 24th.  The other parties shall meet and confer about

19 dates that the dealership class plaintiffs and defendants will

20 refresh their data.  I want to say you'll meet and confer by X

21 date.

22     And God forbid, if you can't agree on a date by which

23 you will refresh the data, then you will file by Y date a

24 joint submission again because that shouldn't be long -- well,

25 I don't know.  You guys are not going to be good at joint

1    submissions.

2            MS. MILLER:  If not joint, perhaps concurrent

3    submissions like we did --

4            THE COURT:  Well, joint or concurrent submission by Y

5    date.  So what are the X and Y dates?  You're going to meet

6    and confer by X date.  Do you need more than a week to do

7    that, ten days?

8            MS. WEDGWORTH:  May 29th, we could do meet and

9    confer, or May 27th even.

10           THE COURT:  Well, he's gone.  But you have to be

11   involved in this, Mr. Ross?

12           MR. ROSS:  Not really.  I can -- I can do my part

13   remotely or before that.

14           THE COURT:  Okay.

15           MR. PROVANCE:  Your Honor, both Ms. Miller and I --

16           MS. MILLER:  The 28th and 29th, I am not here.

17           MR. PROVANCE:  And that's in May.  Oh, I'm sorry.

18           MS. MILLER:  Yes.

19           MR. PROVANCE:  And I will be traveling as well, so as

20   long as we do it before then, those dates.

21           THE COURT:  Before when?  I didn't hear what you guys

22   said.  I'm sorry.  You are out of pocket --

23           MS. MILLER:  I am out of pocket and in other

24   obligations on the 28th and the 29th.

25           THE COURT:  Okay.

1        MS. MILLER:  And so for everybody's Memorial Day

2    weekend, if we can either move it prior to that --

3        THE COURT:  After.

4        MS. MILLER:  -- for the meet and confer date or

5    farther --

6        THE COURT:  After.

7        MS. MILLER:  -- in that week, that would be better.

8        THE COURT:  Okay.

9        MS. WEDGWORTH:  Your Honor, I just realized May 27th

10   is Memorial Day to file the briefing.  May 30th, we can have

11   the meet and confer with a --

12       THE COURT:  No, she's out of town.

13       MS. MILLER:  We're happy to try to have the meet and

14   confer by the 24th if that works.  If not, we can try to do it

15   on -- I will be back, I can do sometime --

16       THE COURT:  What I would like to do is get you to

17   file something before we get together on the 10th.

18       MS. MILLER:  That's what we would like.

19       THE COURT:  So, you know, I'd like something by like

20   the 3rd, which is a week before the 10th, if you can meet and

21   confer by the 24th.  Unfortunately, you're out of pocket the

22   next week so you're drafting something.  But I can even live

23   with, you know, getting me something by the 4th or something.

24   I mean, I just would like --

25       MS. MILLER:  Your Honor, from my perspective, in

1    terms of, if concurrent submissions are acceptable so we don't

2    have to do this back and forth of trade draft, trade draft,

3    trade draft --

4            THE COURT:  Yes.

5            MS. MILLER:  -- I can certainly work on things and my

6    team can work on things while I'm on the road.  So we're --

7    we, too, would like to get this teed up and resolved so that

8    we're not dealing with a situation where we, you know, are

9    getting data or we're at the same place we are now.

10            So we would be happy to meet and confer by the 24th

11   and then have concurrent submissions submitted on either the

12   3rd or the 4th and then be prepared to discuss them with your

13   Honor on the 10th.

14            THE COURT:  Are you okay with that?

15            MS. WEDGWORTH:  To meet --

16            THE COURT:  Meet and confer by the 24th and file by

17   the 3rd or the 4th.

18            MS. WEDGWORTH:  The 24th, I'm out, your Honor.  So

19   that pushes it back.  And we're filing something else on the

20   24th concerning the subpoenas.  I'm certainly fine with the

21   June 4th date.  Could we have the meet and confer on the 29th

22   or the 30th?

23            THE COURT:  No.  Ms. Miller is not there.

24            MS. WEDGWORTH:  Then perhaps meeting on the 31st and

25   move the concurrent filings to the 5th?  The goal for me, in

1   my mind, of meeting later here on the 31st is hopefully to

2   have worked with each and every dealership to have exhausted

3   every avenue.

4   THE COURT:  I can't remember how those dates affect

5   you, Ms. Miller.

6   MS. MILLER:  I'm sorry.  Could you repeat those so I

7   can look?

8   MS. WEDGWORTH:  31st, by the 31st for a meet and

9   confer and concurrent filings on June 5th.

10  THE COURT:  No, I mean, because you're just jamming

11  me then.  I mean, I need to stand up for myself.  Okay.

12  MS. WEDGWORTH:  So meet and confer by the 24th and

13  filing on June the 4th?

14  THE COURT:  No.  This is not -- I don't know -- I

15  mean, I would say meet and confer by the 22nd.  That's a week

16  from today.  You've already been meeting and conferring, you

17  know, ad nauseam.  I'm not sure how much more meeting and

18  conferring you need to do.

19  You're going to say to them, "Ms. Dealership

20  Plaintiffs, I'm not giving you any more stuff" or, "This is

21  what I'm going to give and that's it."  And you've already

22  talked to your clients about that.

23  And CDK is going to say, "I need three weeks to do

24  this."  And R & R is going to say, "I need X time."  And

25  that's either going to be sufficient for you or not.  And so I

1    think you ought to do it by a week from today, and fish or cut

2    bait, and then file what you're going to file on the 3rd.  And

3    do the best you can.  And I'll do the best I can by getting

4    this stuff then.  And hopefully, I'll have done the pretrial

5    conference I have to do and I have everything else I need to

6    do so I will be fresh for you guys on the 10th.

7          MR. ROSS:  Your Honor, Brian Ross again.  There are a

8    couple of items on defendants' list of issues that we've not

9    gotten to today.  And I was going to throw out a couple

10   possible suggestions.

11         THE COURT:  Okay.

12         MR. ROSS:  One would be to, if the Court were

13   interested in submissions, for example, with respect to the

14   Authenticom production issues, we could certainly agree to

15   submit concurrent filings on the same timeframe that we just

16   spoke about with respect to the refresh items.  So that would

17   be one idea.

18         Another idea would be if the Court simply wants to

19   carry that issue over to the next status conference to talk

20   about before your Honor decides whether you would like any

21   additional briefing on that, that would be fine.

22         There is one item on here that's a little bit more

23   time sensitive; namely, the William Lamm deposition issue.

24   I'll let Mr. MacDonald speak to that if the Court wants to

25   entertain it, but that's a deposition, the date of which has

1     been agreed.  It's going forward on May 31st.  But as I

2     understand it, there are still open questions about the

3     document production in advance of that deposition.

4          So I don't think we can wait until June to deal with

5     that, but we are open to the Court's suggestion on how to deal

6     with that.

7          THE COURT:  Well, is there a subpoena out on Presidio

8     Technology Partners?

9          MR. MacDONALD:  Yes, your Honor.

10         THE COURT:  And who served it?  CDK or Reynolds?

11         MR. MacDONALD:  Reynolds and Reynolds served a

12    subpoena on Presidio Technology Partners in late January.

13    Kellogg Hansen represents both Presidio and Mr. Lamm.  They

14    served objections and responses, essentially refused to

15    produce documents initially.  We've had multiple meet and

16    confers with them.

17         A separate entity called The Presidio Group which was

18    Mr. Lamm's former employer produced documents in response to

19    similar subpoenas.  And we told Kellogg Hansen that we just

20    wanted, you know, two boxes of documents that The Presidio

21    Group didn't produces which were a short email search because

22    Mr. Lamm took his emails with him to Presidio Technology

23    Partners as well as some DMS prospective stuff for work he did

24    in the DMS industry.

25         Right before the end of fact discovery, they said

1    that they didn't have any documents that hadn't already been

2    produced by The Presidio Group, but that didn't make any sense

3    to us because The Presidio Group hadn't produced any emails,

4    and we had specifically just asked for stuff that Presidio

5    Group hadn't produced.

6         We had a meet and confer on May 3rd in which they

7    said they were still considering whether they were going to

8    produce those limited buckets of documents, and we have not

9    heard back from them, but we would like an answer before May

10   31st.

11        MR. NEMELKA:  We are undertaking that email review

12   now and seeing what documents were taken by Mr. Lamm from his

13   former employer.  We have never said we wouldn't produce the

14   emails, and we're undertaking that review now.  So I think we

15   just need to talk.

16        MR. MacDONALD:  We would request that any responsive

17   emails get produced sufficiently before the deposition that we

18   can use them.

19        THE COURT:  Right, or else he's coming back.  But

20   he's a third party, not a plaintiff like Cox.

21        MR. MacDONALD:  Correct.

22        THE COURT:  I'm not going to conduct your meet and

23   confer here.  I don't know what to do about that.  The guy is

24   either going to be deposed on May 31st or somebody is going to

25   pull the plug on it, and then you're going to have motion

1    practice.  I -- I'm not going to address that.  I can't -- I'm

2    overloaded on this right now.

3              On Authenticom and Cox, I'm also not going to set any

4    dates.  I'm happy -- I'm not happy.  To the extent that you

5    have drilled down on what the problems are in Authenticom and

6    Cox and you're prepared to submit something to me before June

7    10th that I can actually look at that is not as big as what

8    you normally submit, I'll deal with that on the 10th if you

9    get it to me in enough time, but I -- it appears to me that

10   things in this case kind of fester a little bit.

11             I understand you've been on a back-breaking

12   deposition schedule, and I can understand how stuff can

13   fester, but I'm not setting a briefing schedule on Authenticom

14   and Cox right now.  Do what you have to do and tee it up to me

15   the way you want to tee it up to me.

16             I'm not 100 percent sure I'm going to keep briefing

17   all these things because they tend to sit, and I don't like

18   that.  And that's not my style usually, which is aggravating

19   to me.  So I've got to figure out a different way to manage

20   your particular litigation.

21             We're going to end.  Have good trips back to where

22   you're flying to.  The people who are here, have a nice rest

23   of the day.

24             MR. NEMELKA:  We thank you very much for your time

25   this morning.

1     THE COURT: Thanks for coming in.

2    (Proceedings adjourned at 12:35 p.m.)

3       * * * * * * *

4      C E R T I F I C A T E

5    I, Judith A. Walsh, do hereby certify that the

6 foregoing is a complete, true, and accurate transcript of the

7 proceedings had in the above-entitled case before the

8 Honorable JEFFREY T. GILBERT, one of the judges of said Court,

9 at Chicago, Illinois, on May 15, 2019.

10

11 */s/ Judith A. Walsh, CSR, RDR, F/CRR*_____ May 17, 2019

12 Official Court Reporter

13 United States District Court

14 Northern District of Illinois

15 Eastern Division

16

17

18

19

20

21

22

23

24

25