**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | ) ) ) ) | MDL No. 2817 Case No. 1:18-CV-00864 |
| *This Document Relates To:* | ) ) ) | Hon. Robert M. Dow, Jr. |
| i3 Brands, Inc., et al. v. CDK Global, LLC, et al., et al., No. 1:19-CV-01412 | ) ) | |

**DEFENDANT THE REYNOLDS AND REYNOLDS COMPANY'S REPLY IN SUPPORT
OF ITS MOTION TO DISMISS IN FAVOR OF ARBITRATION, OR IN THE
ALTERNATIVE, TO DISMISS UNDER RULE 12(b)(6) (DKT. 601)**

# **TABLE OF CONTENTS**

I.    All of Plaintiffs' Claims Must Be Dismissed in Favor of Arbitration ............................ 1

    A.    Both Plaintiffs agreed to arbitrate arbitrability. .................................................. 1

    B.    Even if the Court decides arbitrability, all of Plaintiffs' claims are arbitrable. ................................................................................................................................ 3

II.    Plaintiffs Fail to State a Claim ..................................................................................... 7

    A.    Decisions in other cases in the MDL are not law of the case here. ..................... 7

    B.    i3 Brands is not a proper antitrust plaintiff. ........................................................ 7

    C.    Plaintiffs have not pleaded an antitrust injury. .................................................... 8

    D.    Plaintiffs have not pleaded an adequate *Kodak* claim. ....................................... 9

    E.    The Agreement of Basic Terms is unenforceable. ............................................. 10

    F.    There was no "clear and unequivocal" promise, and any reliance was unreasonable. ...................................................................................................... 12

    G.    Plaintiffs have not pleaded the existence or misappropriation of a trade secret. ................................................................................................................... 13

    H.    i3 Brands concedes it cannot enforce the Reseller Agreement. ........................ 14

    I.    Plaintiffs' tortious interference claim fails. ....................................................... 14

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*AlliedSignal, Inc. v. B.F. Goodrich Co.*,
    183 F.3d 568 (7th Cir. 1999) ...............................................................4, 5

*Belnap v. Iasis Healthcare*,
    844 F.3d 1272 (10th Cir. 2017) ...........................................................2, 3

*BEM I, L.L.C. v. Anthropologie, Inc.*,
    98 C 358, 2000 WL 1849574 (N.D. Ill. Dec. 15, 2000) .........................3

*Brennan v. Opus Bank*,
    796 F.3d 1125 (9th Cir. 2015) ..............................................................4

*Cape Flattery Ltd. v. Titan Mar., LLC*,
    647 F.3d 914 (9th Cir. 2011) ................................................................3

*Carcorp, Inc. v. Chesrown Oldsmobile-GMC Truck, Inc.*,
    2007-Ohio-380 ....................................................................................12

*Cernohorsky v. Career Educ. Corp.*,
    8:13-CV-00124-EAK, 2013 WL 3287070 (M.D. Fla. June 28, 2013)....................................3

*In re Currency Conversion Fee Antitrust Litig.*,
    265 F. Supp. 2d 385 (S.D.N.Y. 2003)..................................................4, 5

*Deitrick v. Am. Mtge. Sols., Inc.*,
    2007-Ohio-839 ....................................................................................13

*In re Evanston Nw. Corp. Antitrust Litig.*,
    07-CV-04446, 2015 WL 13735423 (N.D. Ill. Sept. 4, 2015)...................5

*Gelboim v. Bank of Am. Corp.*,
    135 S. Ct. 897 (2015)...........................................................................7

*GEM Indus., Inc. v. Sun Tr. Bank*,
    700 F. Supp. 2d 915 (N.D. Ohio 2010)................................................12

*Gore v. Alltel Commc'ns, LLC*,
    666 F.3d 1027 (7th Cir. 2012) ..............................................................4

*Graves v. BP Am., Inc.*,
    568 F.3d 221 (5th Cir. 2009) ................................................................4

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
   139 S. Ct. 524 (2019) ................................................................................1

*Hosp. Mktg. Concepts LLC v. Six Continents Hotels, Inc.*,
   SAVC1501791JVSDFMX, 2016 WL 9045853 (C.D. Cal. May 2, 2016) .............13

*Howard v. Rent-A-Ctr., Inc.*,
   1:10-CV-103, 2010 WL 3009515 (E.D. Tenn. July 28, 2010) .................3

*Interstate Gas Supply, Inc. v. Calex Corp.*,
   2006-Ohio-638 ....................................................................................12

*JLM Indus., Inc. v. Stolt-Nielsen SA*,
   387 F.3d 163 (2d Cir. 2004).................................................................4, 6

*Karnes v. Doctors Hosp.*,
   51 Ohio St. 3d 139, 555 N.E.2d 280 (1990) .......................................13

*In re Kellogg Brown & Root, Inc.*,
   166 S.W.3d 732 (Tex. 2005).................................................................5

*Kemph v. Reddam*,
   13 CV 6785, 2015 WL 1510797 (N.D. Ill. Mar. 27, 2015) .................3

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134, 63 P.3d 937 (2003) ...............................................15

*Kovacs v. United States*,
   739 F.3d 1020 (7th Cir. 2014) ...........................................................7

*Kubala v. Supreme Prod. Services, Inc.*,
   830 F.3d 199 (5th Cir. 2016) .............................................................1

*M.J. DiCorpo, Inc. v. Sweeney*,
   1994-Ohio-316, 69 Ohio St. 3d 497, 634 N.E.2d 203 ..................2, 10, 11

*Mansfield Square, Ltd. v. Big Lots, Inc.*,
   2008-Ohio-6422 ...................................................................................12

*Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*,
   271 F.3d 825 (9th Cir. 2001) .............................................................15

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614, 105, S.Ct. 3346, 87 L.Ed.2d 444 (1985)........................4

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983)................................................................................3

*Nephrology & Hypertension Specialists, LLC v. Fresenius Med. Care Holdings, Inc.*,
  2:09-CV-781, 2010 WL 3069758 (S.D. Ohio Aug. 5, 2010) .................................................11

*Noble Drilling Services, Inc. v. Certex USA, Inc.*,
  620 F.3d 469 (5th Cir. 2010) .................................................................................................5

*Nw. Univ. v. Insight Biomedical, Inc.*,
  No. 99 C 2354, 1999 WL 417397 (N.D. Ill. June 15, 1999) ...................................................4

*Paul Davis Sys. of N. Ill. Inc., v. Paul W. Davis Sys., Inc.*,
  98 C 2027, 1998 WL 749041 (N.D. Ill. Oct. 15, 1998) ..........................................................4

*Pellerin v. Honeywell Intern., Inc.*,
  877 F. Supp. 2d 983 (S.D. Cal. 2012) ...................................................................................14

*Scan Top Enter. Co., Ltd. v. Winplus N. Am., Inc.*,
  14 C 7505, 2016 WL 910502 (N.D. Ill. Mar. 9, 2016) ...........................................................4

*Shea v. BBVA Compass Bancshares, Inc.*,
  1:12-CV-23324-KMM, 2013 WL 869526 (S.D. Fla. Mar. 7, 2013) .......................................3

*Stolle Mach. Co., LLC v. RAM Precision Indus.*,
  605 Fed. Appx. 473 (6th Cir. 2015) ......................................................................................13

*Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Intern., Ltd.*,
  1 F.3d 639 (7th Cir. 1993) ......................................................................................................4

*Ta v. Chaudhry*,
  2016-Ohio-4944 .....................................................................................................................10

*Telxon Corp. v. Smart Media of Del., Inc.*,
  2005-Ohio-4931 .................................................................................................................12, 13

*Vazquez v. Cent. States Joint Bd.*,
  547 F. Supp. 2d 833 (N.D. Ill. 2008) ......................................................................................3

*VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*,
  14-CV-00804, 2015 WL 5693735 (N.D. Ill. Sept. 28, 2015) (Dow, J.) ................................10

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ..............................................................................................................15

*Wal-Mart Stores, Inc. v. Helferich Patent Licensing, LLC*,
  51 F. Supp. 3d 713 (N.D. Ill. 2014) ........................................................................................3

*Williams-Bell v. Perry Johnson Registars, Inc.*,
  14 C 1002, 2015 WL 6741819 (N.D. Ill. Jan. 8, 2015) ..........................................................3

Plaintiffs' claims must be dismissed in favor of arbitration or, in the alternative, for failure to state a claim. Any nonarbitrable claims should be stayed pending arbitration.

## I. All of Plaintiffs' Claims Must Be Dismissed in Favor of Arbitration

### A. Both Plaintiffs agreed to arbitrate arbitrability.

i3 Brands concedes that it agreed to have the arbitrator, not this Court, decide which of its claims were subject to arbitration under the governing agreements. *See* Dkt. 675 (hereinafter "Opp.") at 3, 6 n.3. Thus, all of i3 Brands' claims must be dismissed. *See* Dkt. 602 (hereinafter "Mem.") at 4-5.[1] The Reynolds Interface Agreement with PartProtection incorporates the AAA Commercial Rules as the default scheme for any arbitration, thereby clearly and unambiguously delegating arbitrability to the arbitrator. ██████████████████████



██████████████████ PartProtection argues that the Reynolds Interface Agreement "is ambiguous as to whether the parties incorporated the AAA Rules" because, after expressly providing for arbitration under the AAA's Commercial Arbitration Rules, the agreement ███████████████ ████████████████████████████████████████" Opp. at 3-5.

This argument fails. The phrase calling for the parties to ██████████████ is an unenforceable

---

[1] As explained in Reynolds's opening brief, when the parties agree to arbitrate *some* set of claims under the AAA Rules, all analysis as to *which* set of claims they agreed to arbitrate is left to the arbitrator. *Kubala v. Supreme Prod. Services, Inc.*, 830 F.3d 199, 202 (5th Cir. 2016). Any attempt to apportion which set of claims are arbitrable under which agreement would necessarily require the Court to engage in the merits of the arbitrability analysis in violation of the Supreme Court's clear commands. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529-30 (2019) ("[A] court may not decide an arbitrability question that the parties have delegated to an arbitrator.").

agreement to agree. *See M.J. DiCorpo, Inc. v. Sweeney,* 1994-Ohio-316, 69 Ohio St. 3d 497, 503, 634 N.E.2d 203, 208. And even if it were enforceable, that clause is best interpreted (as a matter of federal law) as a gap-filling procedure for matters on which the AAA Commercial Rules are silent, with ultimate decisionmaking power lying with the AAA. That interpretation harmonizes the language of the agreement and avoids rendering the parties' express agreement to the AAA Rules meaningless.

More fundamentally, the structure of the agreement establishes the AAA Rules as the "default controlling rubric," and that is all that is needed to delegate arbitrability. *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1282 (10th Cir. 2017). The AAA Rules are the contractual default, subject to the parties' option to agree to another scheme at a later date.[2] The AAA—which has "sole and absolute discretion" over any downstream rules disputes, Mem. Ex. A § 6.12—will apply those Rules as a matter of course. *See* AAA Commercial Rule 1(a).[3]

*Belnap* decisively supports this conclusion. In *Belnap*, the provision stated that "[n]o Disputant may prosecute any suit until and unless the Disputants have submitted the issues to mediation and, if necessary, to arbitration . . . in accordance with the rules of JAMS . . . *or another suitable dispute resolution service agreeable to their respective attorneys*." *Id.* at 1281-82 (emphasis in original). The plaintiff argued against delegation because "the parties did not know at the time of the agreement what rules they were agreeing to govern any future arbitration." *Id.* at 1282 (quoting plaintiff's brief).

---

[2] The phrase on which Plaintiffs here rely states nothing more than the unremarkable proposition that the parties are free to alter a contractual rule by mutual agreement. That is generally true of any contractual agreement (parties can agree to modify their contract), and it is specifically true of any arbitration agreement that specifies a particular set of rules (the parties can, after the fact, agree that they'd prefer a different set). If Plaintiffs' argument was correct, that ability to modify the rules after the fact would defeat the conclusion that incorporation of the AAA Commercial Rules delegated arbitrability determinations. But every court that has considered the issue has reached the opposite conclusion. *See* Mem. at 5.

[3] The AAA Commercial Rules are available at https://www.adr.org/sites/default/files/Commercial%20Rules.pdf.

The Tenth Circuit properly rejected that argument:

> The plain language of the Agreement establishes the JAMS Rules as the default controlling rubric—a fact that would have been quite evident to the parties entering the Agreement. In this regard, the Agreement provides that any deviation from the JAMS Rules would require the mutual assent of the parties. . . . According to this plain language, therefore, if either party refuses to agree to another dispute-resolution service—involving the use of that service's rules—the resolution of disputes would perforce be governed by the JAMS Rules. In this sense, the JAMS Rules are incorporated into the Agreement as default rules, and no definite alternative is specified. In other words, the Agreement's language does not allow for more than an ill-defined *possibility* that—with the Disputant attorneys' agreement—the rules of another service (i.e., non-JAMS Rules) would govern the resolution of the parties' dispute. And such a possibility is not enough for us to say that the JAMS Rules are not the Agreement's ordinary controlling standard.

*Id.* The Tenth Circuit therefore correctly concluded that the parties had agreed to arbitrate arbitrability issues. *Id.*[4] The same is true here.

### B. Even if the Court decides arbitrability, all of Plaintiffs' claims are arbitrable.

Plaintiffs' claims are arbitrable even if the Court decides arbitrability. The Federal Arbitration Act "create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within [its] coverage." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24 (1983). That statute provides the substantive rule of decision even where the contract contains a general choice-of-law provision, so Plaintiffs' citations to Ohio and Texas cases are irrelevant.[5] Under the FAA, contract *formation* is an issue of state law, but "[o]nce it is

---

[4] *See also Cernohorsky v. Career Educ. Corp.*, 8:13-CV-00124-EAK, 2013 WL 3287070, at *2 (M.D. Fla. June 28, 2013) (provision where AAA rules applied "[u]nless the parties agree to an alternative" delegated arbitrability); *Shea v. BBVA Compass Bancshares, Inc.*, 1:12-CV-23324-KMM, 2013 WL 869526, at *4 (S.D. Fla. Mar. 7, 2013) (provision calling for arbitration under AAA, JAMS, or by agreement another organization's rules, delegated arbitrability by setting AAA or JAMS as default rules); *Howard v. Rent-A-Ctr., Inc.*, 1:10-CV-103, 2010 WL 3009515, at *3–4 & n.1 (E.D. Tenn. July 28, 2010) (parties delegated arbitrability by agreeing that "any arbitration shall be in accordance with the then-current National Employment Arbitration Procedures of the AAA or equivalent (if AAA is designated), the then-current JAMS Employment Arbitration Rules or equivalent (if JAMS is designated), the then-current NAF Code of Procedure (if NAF is designated), *or the applicable rules of any other service to which the parties mutually agree*.") (emphasis added).

[5] *Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, 921 (9th Cir. 2011); *Kemph v. Reddam*, 13 CV 6785, 2015 WL 1510797, at *2 n.3 (N.D. Ill. Mar. 27, 2015); *Williams-Bell v. Perry Johnson Registars, Inc.*, 14 C 1002, 2015 WL 6741819, at *4 (N.D. Ill. Jan. 8, 2015); *Wal-Mart Stores, Inc. v. Helferich Patent Licensing, LLC*, 51 F. Supp. 3d 713, 718 (N.D. Ill. 2014); *Vazquez v. Cent. States Joint Bd.*, 547 F. Supp. 2d 833, 865 n.19 (N.D. Ill. 2008); *BEM I, L.L.C.*

clear . . . that the parties have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration *as a matter of federal law*." *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032–33 (7th Cir. 2012) (emphasis added).[6] Under the federal rule, broad-form provisions like the three at issue, Mem. 3-4, cover claims "in any way connected" to the subject matter of the contract.[7]

The Antitrust Claims are arbitrable under the Reynolds Interface Agreement. That contract was the instrument through which PartProtection licensed DMS interfaces from Reynolds. The Reynolds Interface Agreement set the (allegedly inflated) price and contains the confidentiality and alleged exclusive dealing provisions about which PartProtection complains. Federal courts routinely compel arbitration of antitrust claims under broad-form arbitration provisions in the contract that set allegedly anticompetitive terms and pricing. *See JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 175 (2d Cir. 2004) (collecting cases).[8]

Plaintiffs' sole federal arbitrability decision, *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 573 (7th Cir. 1999), is inapposite. There, the arbitration agreement was not contained in the plaintiff's contract to purchase the allegedly affected product. As Judge Chang subsequently explained:

> The contract had nothing to do with either the plaintiff or that defendant buying or

---

[6] *See also, e.g.*, *Mitsubishi*, 473 U.S. at 626 (1985) (interpretation of scope is matter of "federal substantive law of arbitrability"); *Brennan v. Opus Bank*, 796 F.3d 1125, 1129 (9th Cir. 2015) (federal, not state, law governs arbitrability); *Graves v. BP Am., Inc.*, 568 F.3d 221, 222–23 (5th Cir. 2009) (same).

[7] *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Intern., Ltd.*, 1 F.3d 639, 642 (7th Cir. 1993); *see also Mitsubishi*, 473 U.S. at 624 n.13 (arbitration under broad-form provision is proper when allegations "touch matters" covered by the contract); *Scan Top Enter. Co., Ltd. v. Winplus N. Am., Inc.*, 14 C 7505, 2016 WL 910502, at *4 (N.D. Ill. Mar. 9, 2016) (same); *Nw. Univ. v. Insight Biomedical, Inc.*, No. 99 C 2354, 1999 WL 417397, at *5 (N.D. Ill. June 15, 1999) (same).

[8] *See also In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 410 (S.D.N.Y. 2003) ("Plaintiffs allege a conspiracy to fix currency conversion fee prices . . . . The terms of plaintiffs' use of those credit card accounts are governed by the cardholder agreements containing the arbitration clause. Thus, the antitrust claims are related to the cardholder agreements and the plaintiffs' credit card accounts such that the claims 'touch matters' covered by the cardholder agreement.").

> selling anything from each other—it was just about seeking business opportunities together. This was key: the cooperation agreement just did not have anything to do with the antitrust claim. *AlliedSignal*, 183 F.3d at 573. The same is not true here. The contracts here are about the MCOs paying NorthShore for care that NorthShore provides to the MCOs members. The antitrust claim alleges that the MCOs paid too much *under those contracts*. Unlike in *Allied*, the contract and the antitrust claim here are related.

*In re Evanston Nw. Corp. Antitrust Litig.*, 07-CV-04446, 2015 WL 13735423, at *7 (N.D. Ill. Sept. 4, 2015).[9] As a result, "*AlliedSignal* must be confined to its facts" and has no bearing here.[10]

The TradeMotion Claims are similarly arbitrable. To the extent those claims are based on diminution of TradeMotion's value as a result of allegedly supracompetitive integration fees, Compl. ¶¶ 114-117, they are duplicative of the Antitrust Claims and thus arbitrable as discussed above. To the extent they are based on Reynolds's alleged breaches of the Reseller Agreement, Compl. ¶¶ 118-123, the claims are necessarily related to that agreement and direct-benefits estoppel requires arbitration. Mem. at 8 & n.12. Plaintiffs' citation to *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005), is not to the contrary. That decision recognized that a nonsignatory cannot be estopped simply because a contract with an arbitration provision was part of the factual chain that gave rise to the dispute. The court nonetheless reaffirmed that direct-benefits estoppel is proper when, as here, a party "seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provision." *Id.* at 741. The Reseller Agreement is not simply a factual predicate—Plaintiffs affirmatively allege breaches of that Agreement, Compl. ¶¶ 114-117, and so must arbitrate. *Noble Drilling Services, Inc. v. Certex USA, Inc.*, 620 F.3d 469, 474 (5th Cir. 2010).

---

[9] Moreover, the "relatedness" analysis on which Plaintiffs rely is contrary to the Seventh Circuit's rule for analyzing broad-form "arising out of or relating to" arbitration clauses. It appears that the *AlliedSignal* panel mistakenly applied the test for narrower "arising *under*" arbitration clauses, as evidenced by its performance-and-breach based analysis and its conclusion that "AlliedSignal's antitrust claims do not arise under the SAA . . . ." *AlliedSignal*, 183 F.3d at 573.

[10] *Currency Conversion*, 265 F. Supp. 2d at 410 n.6 (quoting *LCA, Inc. v. Sharp Elec. Corp.*, No. 00–3283, 2000 WL 1222044, at *3 (N.D. Ill. Aug. 22, 2000)).

The TradeMotion Claims are also arbitrable under the Asset Purchase Agreement by which Reynolds acquired TradeMotion. Plaintiffs' sole response—that "the parties clearly did not contemplate that the APA's arbitration provision would encompass disputes based on prior antitrust violations," Opp. at 8—is unpersuasive and unsupported. The parties contemplated precisely what the agreement says: that they would ███████████████████████████████ ████████████████████████████████████████████████████████" *See* Mem. Ex. B at 41. Allegations that Reynolds obtained an unfairly low price—for whatever reason—are intimately related to the agreement setting that price. *JLM*, 387 F.3d at 175.

Finally, the PartProtection Claims are arbitrable. The alleged trade-secret theft is deeply intertwined with the Reynolds Interface Agreement and the Asset Purchase Agreement. First, Plaintiffs allege that Reynolds misappropriated PartProtection's trade secrets during the certification process governed by the Reynolds Interface Agreement. Compl. ¶ 103. Moreover, Plaintiffs entered into an "Acknowledgement" agreeing that the trade secrets that Reynolds acquired under the TradeMotion Asset Purchase Agreement materially overlapped with PartProtection's trade secrets. Compl. Ex. 5. Any decisionmaker evaluating the PartProtection claims will necessarily have to analyze and interpret the Reynolds Interface Agreement and the Asset Purchase Agreement, and the parties' course of dealing thereunder, to determine whether Reynolds misappropriated trade secrets (or instead acquired them pursuant to the parties' bargained-for agreements). Thus, the PartProtection Claims readily "touch on" those agreements. Further, the tortious interference claim is arbitrable under the Reynolds Interface Agreement: Reynolds's duties to develop, test, and certify interfaces between PartProtection and the Reynolds DMS were governed by that agreement and the claims "touch on" its central subject matter.

## II.     Plaintiffs Fail to State a Claim

Even if the Court denies arbitration, Plaintiffs' claims must be dismissed on the merits.[11]

### A.     Decisions in other cases in the MDL are not law of the case here.

Law of the case is a presumption that prior decisions "should continue to govern the same issues in subsequent stages *in the same case*." *See Kovacs v. United States*, 739 F.3d 1020, 1024 (7th Cir. 2014) (emphasis added). But cases in an MDL "retain their separate identities." *Gelboim v. Bank of Am. Corp.*, 135 S. Ct. 897, 899 (2015). Decisions in *Authenticom*, *Cox*, the Dealership Class Action, or *MVSC* are not decisions in *i3 Brands*. Thus, the Court is not bound by those prior rulings and there is no basis to impose a heightened standard on Reynolds's arguments.

### B.     i3 Brands is not a proper antitrust plaintiff.

i3 Brands is not a proper antitrust plaintiff because it is a holding company that does not itself pay to license interfaces from Reynolds—its subsidiary application companies like PartProtection do. To be sure, i3 Brands repeatedly alleges that Reynolds charged "Plaintiffs" inflated integration fees. But i3 Brands describes itself as "a technology-based corporation that has developed a *portfolio of entities* specializing in software and data-driven solutions in the automotive industry." Compl. ¶ 14 (emphasis added). i3 Brands does not identify any applications that i3 Brands itself owns or operates. It denies that it is a party to the current Reynolds Interface Agreement, Opp. at 6, and admits in its opposition to CDK's parallel motion to dismiss that the draft 2018 agreement attached to its Complaint was never executed. Dkt. 679 at 6-7. The Complaint contains no well-pleaded factual allegation that would render i3 Brands' claim that it directly paid Reynolds plausible, so *Illinois Brick* and *AGC* bar its claims. *See* Mem. at 11.

---

[11] These Rule 12(b)(6) arguments are presented subject to and without waiver of Reynolds's arbitration rights. To the extent this Reply does not address specific arguments raised in the Opposition, Reynolds stands on its opening brief.

### C.     Plaintiffs have not pleaded an antitrust injury.

Plaintiffs' alleged antitrust injuries all stem from Reynolds's contractual prohibition on unauthorized third-party access to and use of the Reynolds DMS contained in the Reynolds DMS license agreement.  Compl. ¶ 154 (alleging that Reynolds DMS license agreement prohibits unauthorized third-party access).  That contractual provision is unrelated to the alleged conspiracy, is not an unlawful exclusive dealing provision, and defeats Plaintiffs' antitrust claims.

Plaintiffs affirmatively allege—with citations to industry publications—that Reynolds has unilaterally prohibited third-party DMS access in its license agreements with dealers for over a decade, long before any alleged conspiracy with CDK.[12]  Plaintiffs' Opposition brief reiterates the conclusory allegation that these DMS license access provisions were put in place pursuant to the alleged conspiracy.  Opp. at 11-12.  But that is contradicted by the Complaint's own alleged timeline.  Plaintiffs also contend that their allegations regarding Reynolds's "selective" blocking in 2009 and "increased" blocking in 2013 are consistent with a later conspiracy.  Opp. at 11-12.  But those blocking allegations are irrelevant: Plaintiffs allege that the contractual prohibition is longstanding and unilateral.

Further, this Court has repeatedly and correctly held that the dealer agreement access provisions are not unlawful exclusive dealing provisions.  Dkt. 176 at 36; *see also* Dkt. 505 at 13.  Plaintiffs' only response is to cite unrelated rulings regarding Reynolds's *vendor* contracts.  Opp. at 12.  Those rulings have no bearing on the legality of the DMS licenses with dealers.

Reynolds's contractual restrictions on third-party DMS access defeat Plaintiffs' antitrust claims for two reasons.  First, they render hostile integrators' access to and use of the DMS independently unlawful.  Judge St. Eve's *Authenticom* opinion concluded that if Reynolds's

---

[12] *See* Compl. ¶¶ 44-45 (citing 2007 and 2011 *Automotive News* articles discussing Reynolds's contractual prohibitions and policies with respect to third-party access); 105 (alleging that Reynolds adopted its current policy in 2006).

prohibition on Authenticom's access to and use of the Reynolds DMS was independent of the alleged conspiracy, tying, and exclusive dealing, then Authenticom had no antitrust injury. *See* Dkt. 176 at 20-21. But the opinion failed to reconcile that conclusion with (1) Authenticom's allegations, mirrored here, that Reynolds had unilaterally imposed the DMS contracts' access provisions long before the alleged 2015 conspiracy, and (2) the Court's subsequent holding that the DMS contract access provisions were *not* illegal tying or exclusive dealing. *Id.* at 36, 43. Plaintiffs' factual allegations are incompatible with the notion that Reynolds refused to permit third-party access to the DMS pursuant to a conspiracy, and the restrictions in question are otherwise lawful. Therefore, hostile integrators' access to the Reynolds DMS is independently unlawful, so Plaintiffs have not pleaded an antitrust injury.

These license restrictions also defeat causation, because Plaintiffs' alleged harms all flow from Reynolds's prohibition on unauthorized third-party access to the Reynolds DMS. *See* Mem. at 13. Plaintiffs' sole argument in response is that, "whether or not Reynolds was permitted to bar data integrators," Plaintiffs were still harmed by supracompetitive prices and so-called table-tilting. Opp. at 13-14. That argument is circular: Plaintiffs allege that higher prices and table-tilting are downstream *effects* of Reynolds's refusal to allow unauthorized third-party access, and such effects are only an antitrust injury to the extent they flow from unlawful restrictions. Put differently, even in a but-for world with no (alleged) conspiracy and no (alleged) exclusive dealing in the Reynolds vendor contracts, dealers **still** could not permit hostile integrators to access the Reynolds DMS, leaving Plaintiffs no better off than they claim to be today. Thus, the alleged conspiracy and vendor exclusive dealing contracts are not a but-for cause of Plaintiffs' harms.

### D. Plaintiffs have not pleaded an adequate *Kodak* claim.

Plaintiffs' allegation that Reynolds's policy of prohibiting third-party DMS access has been well-known in the marketplace for a decade or longer also defeats the aftermarket monopolization

claim under binding Seventh Circuit law (and the overwhelming weight of authority). *See* Mem. at 17 n.21; *see also VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 14-CV-00804, 2015 WL 5693735, at *12 (N.D. Ill. Sept. 28, 2015) (Dow, J.) ("*Kodak* imposes a duty to deal where ***changing an existing course of distribution*** enables a firm to 'take advantage of customers' sunk costs.'") (emphasis added). Under *Kodak*, if dealers knew going in to the contract that third-party access was prohibited, the inquiry is over: no "aftermarket" claim exists. Plaintiffs in *this* case affirmatively allege that Reynolds's contractual restriction was notorious and longstanding to the point it received industry press coverage.[13] Judge St. Eve's decision allowing Authenticom's *Kodak* claims to move forward against Reynolds is impossible to reconcile with these facts and binding authority. And this Court's opinions denying CDK's motions to dismiss in subsequent cases to which Reynolds was not a party are distinguishable: Plaintiffs not only fail to allege such a change but affirmatively allege that Reynolds has had the same policy for nearly a decade.

### E.    The Agreement of Basic Terms is unenforceable.

The Agreement of Basic Terms is not an enforceable contract. Plaintiffs concede that Ohio law controls but deny the applicability of the Ohio Supreme Court case on all fours with this one. In *M.J. DiCorpo*, the Ohio Supreme Court, on materially identical facts, held as a matter of law that (1) the parties did *not* manifest an intention to be bound by the agreement and (2) the terms of the agreement were *not* sufficiently definite to be enforced. *M.J. DiCorpo, Inc. v. Sweeney,* 1994-Ohio-316, 69 Ohio St. 3d 497, 503, 634 N.E.2d 203, 208.[14] That decision is dispositive. Plaintiffs'

---

[13] Compl. ¶¶ 44-45, 105.

[14] Plaintiffs' suggestion that the enforceability of the Agreement of Basic Terms is not properly resolved on a motion to dismiss is meritless. Under Ohio law, "[c]ourts generally determine the existence of a contract as a matter of law." *Ta v. Chaudhry*, 2016-Ohio-4944, ¶ 11. In cases where there is a dispute as to whether the parties made any agreement at all, or whether the parties agreed on certain terms, it may be proper to leave the decision to the factfinder. That is not this case: Plaintiffs specifically allege that the Agreement of Basic Terms reduced the parties' agreement to writing and allege only a breach of that written instrument. Compl. ¶¶ 129, 180. Reynolds's Motion to Dismiss presents a purely legal issue: assuming the truth of the allegations, is the written document an enforceable contract?

first basis for distinguishing the case—that the contract it addressed was "a *merger agreement*," Opp. at 20, is puzzling. Nothing in the opinion suggests that merger agreements are subject to different enforceability rules. Plaintiffs' second proffered basis is that the Ohio court did not analyze "whether the parties took sufficient steps to manifest their intention to be bound by the agreement." *Id.* But that misapprehends the Ohio court's analysis: it looked to the agreement's express terms (not the parties' later actions) to determine whether the parties had manifested an intent to be bound. *M.J. DiCorpo*, 634 N.E.2d at 208. They had not. *Id.* Just so here: the Agreement of Basic Terms is plainly not intended as a final binding agreement. *See* Mem. at 23.

Plaintiffs cite nonbinding Ohio intermediate and federal district court opinions for the proposition that the "intent to be bound" factor is analyzed by reference to the parties' actions rather than the agreement's language. Even if these decisions were sufficient to override *M.J. DiCorpo* (they are not), Plaintiffs' cases are distinguishable. In Plaintiffs' cases, the actions that courts took as manifestations of intent to be bound were actions *specifically called for under the terms of the relevant agreement*.[15] But here, the actions to which Plaintiffs point—execution of the "Acknowledgment" so that Reynolds "could obtain PartProtection's trade secrets and prepare the version of PartProtection that it purportedly intended to offer to its dealerships" and "gather[ing] information about PartProtection," Opp. at 19-20—have no relationship to the written agreement's terms, which do not mention the Acknowledgment, any action by Reynolds to develop a "version of PartProtection," or any other steps.

Moreover, Plaintiffs' contention that the Agreement of Basic Terms is sufficiently definite

---

[15] For example, in *Nephrology & Hypertension Specialists, LLC v. Fresenius Med. Care Holdings, Inc.*, 2:09-CV-781, 2010 WL 3069758 (S.D. Ohio Aug. 5, 2010), the disputed agreement provided specifically for payment of a sum certain, formation and joint operation of one medical clinic, and a subsequent right to purchase an interest in a preexisting medical clinic. The payment was made and the new clinic was formed and operated, but the owner of the existing clinic refused to allow the counterparty to buy into the existing clinic. In those circumstances, the district court held that the existence of a contract was a question for the factfinder given the parties' performance of the specific terms of the disputed agreement. *Id.* at 4-5.

to be specifically enforced is impossible to square with even a cursory look at the one-and-a-quarter page agreement. As explained in Reynolds's opening brief, the Agreement is silent as to nearly every material term. Mem. at 23 n.27. Critically, it does not identify who would be bound in the contemplated transaction—i3 Brands signed the agreement, but Plaintiffs allege that the agreement was between Reynolds and PartProtection, Compl. ¶ 178—and it does not specify the parties' respective roles in the contemplated transaction. What would an injunction specifically enforcing the Agreement of Basic Terms actually say? The Court would be fabricating a contract, not enforcing an existing agreement. Ohio law prohibits such an exercise.[16]

### F. There was no "clear and unequivocal" promise, and any reliance was unreasonable.

Plaintiffs' promissory estoppel claim fails too. Under Ohio law, the Court can hold as a matter of law that a promise was not sufficiently clear and unambiguous to induce reasonable reliance. *Interstate Gas Supply, Inc. v. Calex Corp.*, 2006-Ohio-638, ¶¶ 105-06; *Telxon Corp. v. Smart Media of Del., Inc.*, 2005-Ohio-4931, ¶¶ 59, 81-82. Plaintiffs allege that the Agreement of Basic Terms "reflected the specific terms of Reynolds' promise." Compl. ¶ 186. As explained, the terms of that Agreement are *not* clear and unambiguous; they are shot through with references to ongoing negotiations, the *possibility* of a future definitive agreement, and so on. Moreover, a sophisticated business's "reliance on a statement of future intent made prior to the conclusion of negotiations in a complex business transaction is unreasonable as a matter of law." *Mansfield Square, Ltd. v. Big Lots, Inc.*, 2008-Ohio-6422, ¶¶ 20-22; *Carcorp, Inc. v. Chesrown Oldsmobile-GMC Truck, Inc.*, 2007-Ohio-380, ¶ 20. That principle also defeats Plaintiffs' claim for

---

[16] *GEM Indus., Inc. v. Sun Tr. Bank*, 700 F. Supp. 2d 915, 921 (N.D. Ohio 2010) ("[I]f the parties' manifestations taken together as making up the contract, when reasonably interpreted in the light of all the circumstances, do not enable the court to determine what the agreement is and to enforce it without, in effect, 'making a contract for the parties,' no enforceable obligation results.") (quoting *Barstow v. O.U. Real Estate, III, Inc.*, 4th Dist. No. 01CA49, 2002-Ohio-4989, 2002 WL 31108801, ¶ 40).

promissory fraud, for which justifiable reliance is an element. *Deitrick v. Am. Mtge. Sols., Inc.*, 2007-Ohio-839, ¶ 16.

Moreover, the promissory estoppel and promissory fraud claims are preempted to the extent they rely on Plaintiffs' trade-secrets allegations. Plaintiffs cite a California case for the proposition that promissory estoppel is a species of contract claim and therefore not preempted. Opp. at 21. But Plaintiffs concede that Ohio law is controlling, and under Ohio law promissory estoppel "is not a contractual theory." *Karnes v. Doctors Hosp.*, 51 Ohio St. 3d 139, 142, 555 N.E.2d 280, 283 (1990). Instead it is a purely equitable theory for which a party can recover only equitable remedies. *Telxon*, 2005-Ohio-4931, ¶ 58. Thus, the Ohio Uniform Trade Secrets Act preempts both claims to the extent Plaintiffs are attempting to recover for the alleged trade-secret theft. *Stolle Mach. Co., LLC v. RAM Precision Indus.*, 605 Fed. Appx. 473, 485 (6th Cir. 2015).

### G.     Plaintiffs have not pleaded the existence or misappropriation of a trade secret.

Plaintiffs have not properly alleged the existence of a trade secret. First, they have not alleged secrecy that is reasonable under the circumstances, because disclosing trade secrets without a confidentiality agreement in an ordinary business relationship is unreasonable as a matter of law. *Hosp. Mktg. Concepts*, 2016 WL 9045853, at *5; *see also* Mem. at 27 & n.33. (That is doubly true given that Plaintiffs took the further, affirmative step of releasing former employees from existing confidentiality agreements for the express purpose of allowing those employees to describe overlapping trade secrets to Reynolds. Compl. Ex. 4.) Plaintiffs argue that, under certain circumstances, a plaintiff can show secrecy by pleading or proving the existence of a confidential relationship. Opp. at 27-28. But Plaintiffs have not alleged any factual basis for an implied duty of confidentiality. Plaintiffs instead point to conclusory assertions that Reynolds "was fully aware" that the information at issue was a trade secret, Compl. ¶ 201, but that is a legal conclusion, not a factual allegation. Plaintiffs' reliance on the "Acknowledgment" to show Reynolds's

13

knowledge of an implied confidentiality obligation is similarly flawed: that document expressly *releases* former employees from confidentiality obligations for the specific purpose of telling Reynolds overlapping information. On analogous fact patterns, courts hold that disclosure without a confidentiality agreement destroys trade secret status as a matter of law. *See* Mem. at 27 & n.33.

Moreover, Plaintiffs fail to plead their trade secrets with sufficient particularity. While Plaintiffs need not exhaustively detail their trade secrets, under the "widely adopted" California pleading standard, Plaintiffs must meet the minimum burden of describing the alleged secrets with sufficient particularity to "separate [them] from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret[s] lie[]." *Pellerin v. Honeywell Intern., Inc.*, 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012). They have not. Plaintiffs' Opposition arguments misapprehend their pleading burden. Opp. at 26-27. It is not enough to allege that the materials were secret: Plaintiffs were required to provide at least enough detail to distinguish the alleged trade secrets from information ascertainable from public sources or by those skilled in the trade. Plaintiffs did not do so.

### H.     i3 Brands concedes it cannot enforce the Reseller Agreement.

Plaintiffs' Complaint alleges breaches of the Reseller Agreement between Reynolds and i3 Brands's former TradeMotion subsidiary. Compl. ¶¶ 118-123. Plaintiffs do not respond to, and therefore concede, Reynolds's argument that i3 Brands cannot enforce that agreement. Mem. at 20-21. To the extent the damages they seek stem from the alleged antitrust conspiracy, they must be dismissed for the reasons articulated above.

### I.     Plaintiffs' tortious interference claim fails.

Plaintiffs misapprehend Reynolds's reliance on the principle that a nonparty to another entity's prospective agreement is privileged to refuse to deal. Plaintiffs vigorously protest that

*Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825 (9th Cir. 2001) is bad law. Opp. at 29-30. But Reynolds does not rely on *Marin Tug* for the proposition that a party with an economic interest in another party's prospective transaction can *never* be liable for tortious interference (the rule that Plaintiffs' cited cases disapprove of). Reynolds's argument stems from that opinion's refusal-to-deal analysis, which was based on still-valid California law. Reynolds had no duty under California tort law or federal antitrust law to provide Plaintiffs with business services to facilitate the alleged Ford transaction. *Marin Tug*, 271 F.3d at 832 (citing *A–Mark Coin Co. v. General Mills, Inc.,* 148 Cal.App.3d 312, 195 Cal.Rptr. 859, 867 (1983)); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 410 (2004).

Instead, Reynolds's sole source of duties to Plaintiffs with respect to Reynolds's provision of so-called "integration services"—including the timeline on which Reynolds would develop, test, and certify an interface for Plaintiffs' software—is the Reynolds Interface Agreement. *See, e.g.*, Mem. Ex. A at ¶ 2.1. Plaintiffs have not alleged any breach of that agreement by Reynolds. Plaintiffs' conclusory allegation that Reynolds refused to provide the requested integration "pursuant to Reynolds' illegal conspiracy to drive all competition out of the data integration market," Compl. ¶ 211, is untethered to any plausible factual allegation: Plaintiffs do not identify any agreement between Reynolds and CDK with respect to Plaintiffs generally or the Ford transaction specifically. (And of course, the antitrust arguments fail for the reasons identified above.) Thus, Reynolds's refusal to deal was not independently wrongful and the interference claim fails. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1158, 63 P.3d 937, 953 (2003).

DATED: May 24, 2019

Respectfully submitted,

*/s/ Aundrea K. Gulley*
Aundrea K. Gulley
agulley@gibbsbruns.com
Kathy Patrick
kpatrick@gibbsbruns.com
Brian T. Ross
bross@gibbsbruns.com
Brice A. Wilkinson
bwilkinson@gibbsbruns.com
Ross M. MacDonald
rmacdonald@gibbsbruns.com
Justin D. Patrick
jpatrick@gibbsbruns.com
**GIBBS & BRUNS, LLP**
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone: 713-650-8805
Facsimile: 713-750-0903

Michael P.A. Cohen
MCohen@sheppardmullin.com
Amar S. Naik
ANaik@sheppardmullin.com
**SHEPPARD MULLIN RICHTER
& HAMPTON LLP**
Suite 100
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: 202-747-1900
Facsimile: 202-747-1901

*Attorneys for Defendant The Reynolds and
Reynolds Company*

16