# Exhibit 3

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
―――
(202) 326-7900
FACSIMILE:
(202) 326-7999

April 29, 2019

*Via Electronic Mail*

Britt M. Miller, Esq.
Mayer Brown
71 South Wacker Drive
Chicago, IL 60606

Re: *In re Dealer Management Systems Antitrust Litigation*, MDL No. 2817

Dear Counsel:

I write in response to Micah Stein's April 18 email and Dan Fenske's April 21 letter.

**April 18 Email**

**Archer Documents.** The linked Archer documents that we have been able to locate are included in today's production.

**Box.com Document.** We believe we have located the document you requested, and it is included in today's production.

**Hembd Videos.** In response to your question, yes, the videos in question are privileged and protected work product. Authenticom will update its privilege log accordingly.

**Authenticom Incident Response Plan.** We believe the IRP has already been produced, but as a courtesy, we are including it again in today's production.

**Authenticom Agency Appointment Documents.** Authenticom operates as the dealer's agent in the course of providing data integration services on the dealer's behalf. As Mr. Brown testified, that relationship is established not only by work performed by Authenticom and the control and direction that the dealers exercise over that work, but also by the contracts between Authenticom and dealers. You asked for examples of such contracts, and they were already produced long ago.

1

**30(b)(6) Testimony Regarding DataVast.** In Mr. Stein's email, CDK notes that Authenticom objected at the 30(b)(6) deposition to questions "concerning DataVast," and asks if Authenticom plans to stand on those objections. *See* Email from M. Stein to M. Nemelka (April 18, 2019). With respect, if Defendants wanted to ask about the DataVast product, then Defendants should have noticed a 30(b)(6) deposition topic on the subject. But Defendants neglected to do so. Authenticom therefore stands on its objections to Defendants' questions regarding DataVast because the questions were plainly outside the scope of the topics that were noticed. You cite two topics that you claim covered DataVast, but neither applies. The first cited topic is "efforts by Authenticom to secure or protect 'dealer data,'" and Mr. Brown testified at length on that subject. The second cited topic is "[t]he basis for Authenticom's pleaded allegation that 'Authenticom has never had a data breach,'" and again, Mr. Brown testified at length on that subject. Neither topic, however, covers questions about DataVast's business. Finally, Defendants have already asked Authenticom's witnesses about DataVast and received responsive answers. In short, the objections made at the 30(b)(6) deposition were proper.

**April 21 Letter**

Setting aside the letter's mischaracterizations of the Rule 30(b)(6) testimony, we address the substance of the letter as follows:

**DealerVault Connections Data.** As an initial matter, we disagree that there are any inconsistencies in the work product that Mr. Noth created in DX 908. If CDK wishes to argue that, then it can, but that does not entitle CDK to any more data than Authenticom has already provided. And if CDK did make that argument, it would be wrong. For example, AUTH_00339484 appears to be a snapshot of DealerVault data from July 2015 that includes columns for "Feed Status," with "active," "pending," and "setup but not approved" as options. Consequently, there are almost certainly some feeds that never made it to "active" status as they were not approved by the dealer. With respect to the differences between "Initial Delivery Start Date" found in AUTH_00339484 and the "Initial Delivery" field in DX906, those fields reflect different information. But again, CDK is free to (wrongly) argue that there are discrepancies, but that would not entitle CDK to any more information.

That said, as a show of good faith, Authenticom is willing to consider producing a "refresh" of the underlying raw data found in DX906 and DX907 in the parties' ongoing discussions regarding a mutual data refresh. Authenticom will also consider updating DX908 to bring the connections work product analysis up to the agreed-upon refresh period. We look forward to discussing these issues with you promptly as part of the parties' data refresh discussions. Furthermore, even though we have no duty to do so, in a show of good faith and as a courtesy, we are willing to produce Authenticom's actual data polling invoices. Those will be included in this evening's production.

**Instances of DMS Data Inputs.** The premise of Mr. Fenske's letter on this subject is incorrect – namely, that we represented that the work product that we created for Defendants as part of a well-documented discovery back-and-forth would provide the actual instances of DMS access. We made clear that "Authenticom does not track instances of DMS data access," and that the data we could provide would be "timing information when the dealer data is entered into

Authenticom's system." *See*, *e.g.*, Letter from M. Nemelka to Defendants (May 25, 2018). We explained this to you on many meet and confers – that the work we would undertake as part of a compromise would show the timing when the data was entered into Authenticom's system, and not actual specific instances of DMS access. *See also* Letter from M. Nemelka to Defendants (July 27, 2018) ("[A]ttached hereto is the requested sample of the proposed log we have offered to create, the limitations of which we have already explained in detail."). And as we've written many times, in reliance on that compromise, Authenticom undertook the burdensome task of creating the log. We asked when Defendants wanted Authenticom to provide the log, and made clear we would not be undertaking the burdensome work again. Defendants let us know when they wanted the log, and Authenticom undertook the work and provided it.

Mr. Noth in his testimony answered Defendants' questions about DX902, and confirmed what we had already told you – namely, that the log would show when the data was entered into Authenticom's system, which is not a proxy for instances of DMS access.

With respect to Mr. Fenske's questions about the documents available regarding instances of DMS access, we already discussed, corresponded, and addressed those questions *at length* last summer in the context of negotiating the compromise to provide the log that we did. We refer you to that correspondence.

**Distinguishing Automated Polling v. Dealer Push and CDK Log.** As Mr. Noth testified, he did not believe that Authenticom maintained data that distinguished polling by automated versus manual means. He was correct. That does not mean that *no* information exists on the form of Authenticom's polling, and Authenticom has produced documents with such information. For example, as you note, DX915 is a snapshot in time for the Reynolds DMS, as Mr. Noth testified. But that does not mean that similar documents exist for CDK. If they do, they have been produced.

If you would like to discuss any of the foregoing, we would be happy to do so.

> Very truly yours,
>
> *s/ Michael N. Nemelka*
>
> Michael N. Nemelka

Cc: Service External MDL Email List