Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

AUTHENTICOM, INC.

           Plaintiff,

vs.                                             Case No. 17-cv-318-jdp

CDK GLOBAL, LLC; and THE REYNOLDS
AND REYNOLDS COMPANY

           Defendants.

**DEFENDANT CDK GLOBAL, LLC'S FIRST REQUESTS FOR THE PRODUCTION OF
DOCUMENTS TO PLAINTIFF AUTHENTICOM, INC.**

        Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendant CDK Global, LLC hereby requests that Plaintiff Authenticom, Inc. produce all documents described below for inspection and copying at the offices of Mayer Brown LLP, 71 South Wacker Drive, Chicago, Illinois 60606, on or before 30 days after service hereof. These Requests are to be responded to in accordance with the following Definitions and Instructions.

**DEFINITIONS**

        1.     "Authenticom," "You," and "Your" means Authenticom, Inc., as well as its officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors or predecessors, all persons acting on Authenticom's behalf, and any and all persons and entities affiliated with or controlled by Authenticom.

        2.     "CDK" means CDK Global, LLC, as well as its officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors or predecessors, all persons acting on CDK's behalf, and any and all persons and entities affiliated with or controlled by CDK.

3. "CDK DMS" means any DMS licensed to a Dealer by CDK.

4. "CDK Proprietary Data" means data that are owned or created by CDK and licensed to DMS users, including, for example, service pricing guide information, operation codes and descriptions, and service labor hours and rates, regardless of whether those data have been re-keyed into another DMS field.

5. "Dealer" means any new or used auto, truck, motorcycle, marine, recreational vehicle or heavy equipment dealer operating in the United States.

6. "DMS" means an enterprise system comprised of hardware, software, databases, and related data used by Dealers to manage and operate their dealerships, usually referred to as the DMS or Dealer Management System.

7. "OEM" means any Original Equipment Manufacturer.

8. "OEM Proprietary Data" means data that are owned or created by an OEM and licensed to DMS providers, including, for example, part numbers and descriptions, part costs, part return codes, part compensation values, part supersessions, operation codes and descriptions, and service labor hours and rates, regardless of whether those data have been re-keyed into another DMS field.

9. "Relevant Services" means the services that You provide to Vendors and Dealers that are dependent on DMS access, including what You refer to as "dealer data integration services" in the Complaint, as well as any data cleansing or data standardization services.

10. "Reynolds" means The Reynolds and Reynolds Company, as well as its officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors or predecessors, all persons acting on Reynolds's behalf, and any and all persons and entities affiliated with or controlled by Reynolds.

11. "Third-Party Proprietary Data" means data that are owned or created by any third party and licensed to DMS providers, including, for example, Motors labor times, third-party vehicle description data, and incentive data, regardless of whether those data have been re-keyed into another DMS field.

12. "Vendor" means any third-party applications provider that uses Dealer or DMS data to provide Dealers with services, including inventory management, customer relationship management, and electronic vehicle registration and titling.

**INSTRUCTIONS**

1. Unless otherwise indicated, each Request relates to the time period January 1, 2013 to the present (the "Relevant Time Period").

2. You are instructed to produce all documents and communications identified by these Requests either as they are kept in the usual course of business or organized and labeled according to the record description to which they are deemed responsive.

3. You are instructed to produce all documents and communications identified by these Requests that are in Your actual or constructive possession, custody, or control.

4. Any noun used in the singular form shall be construed and applied so as to include the plural form also, and vice versa.

5. Each Request shall be construed independently, and no Request shall be viewed as limiting the scope of any other Request, except that documents responsive to more than one Request need be produced only once.

6. Each and every non-identical copy of a document, whether different from the original because of stamps, indications of the recipient(s), handwritten notes, marks, attachments, or any other reason, is a separate document that must be produced.

7. If objecting to any Request, in whole or in part, the objection must state whether any responsive materials are being withheld on the basis of that objection in accordance with Fed. R. Civ. P. 34(b)(2)(c).

8. If You become aware of any documents or communications requested in these Requests that have been destroyed, lost, misplaced, or are otherwise incapable of production, You are instructed to respond by providing the following information:

    (a) The type of document (*e.g.* e-mail, notes, letters, memorandum, etc.);

    (b) A description of the document and its contents;

    (c) The identity of the author of the document;

    (d) The circumstances under which the document was destroyed, lost, misplaced, or rendered otherwise incapable of production; and

    (e) The identity of all persons having knowledge of the documents or the circumstances under which the document was destroyed, lost misplaced or otherwise rendered incapable of production.

9. In the event You assert any form of objection or privilege as a ground for not producing any documents or communications requested in these Requests, You must identify the legal grounds and facts supporting the objection or privilege in accordance with Fed. R. Civ. P. 26(b)(5) and any applicable local rules and orders issued in the above-captioned proceeding. With respect to each responsive document that is withheld on the basis of an applicable privilege or other protection against disclosure, You are instructed to:

    (a) Identify the author(s), sender(s), and recipient(s) of the document;

    (b) Identify the date(s) the document was created and distributed;

    (c) Identify the applicable privilege(s) or protection(s) against disclosure; and

   (d)  Describe the nature of the document in a manner that will enable CDK to assess the applicability of the privilege(s) or protection(s) against disclosure that You rely on.

  10.  This set of Requests shall be deemed continuing in accordance with Fed. R. Civ. P. 26(e). If You obtain or become aware of any further documents responsive to this set of Requests, You are required to produce such additional documents.

## DOCUMENT REQUESTS

  1.  All documents and communications related to whether or not You have the ability to access or have accessed from any CDK DMS—either directly or indirectly, including as a technical matter and regardless of any self-imposed, legal, or contractual restrictions or obligations—any Dealer employee or customer social security numbers, Nonpublic Personal Information ("NPI"), Personally Identifiable Information ("PII"), OEM Proprietary Data, CDK Proprietary Data, Third-Party Proprietary Data, or any other non-Dealer created or non-Dealer owned data.

  2.  Documents sufficient to show the date, time, content, and duration of all queries that You have performed on any CDK DMS.

  3.  Documents sufficient to show all data fields that You have accessed in, extracted from, or "pushed" back into any CDK DMS, and the frequency of each.

  4.  All documents and communications related to any degradation in system performance or data corruption, data integrity, or data security issue or incident attributed to Your access to a CDK DMS, including any investigations or complaints, and any policies, technologies, or other measures undertaken by You to prevent or mitigate degradation in system

performance or data corruption, data integrity, or data security issues or incidents resulting from Your DMS access methods.

5. All documents and communications related to Your policies and practices for requesting, receiving, accessing, storing, securing, encrypting, or using DMS login credentials.

6. Documents sufficient to show all attempts by You to obtain username and password credentials for any CDK DMS and all username and password credentials that You have used to access any CDK DMS.

7. All documents and communications related to any request for administrator-level or "UUP user" access to any CDK DMS, or any such access that You have received whether or not it was requested.

8. One copy of any "user emulation software" or any other software code or executable programs that You have created, used, or provided to Dealers to facilitate Your access to any CDK DMS.

9. Documents sufficient to show every means and method through which You have accessed, obtained data from, or "pushed" data back into a CDK DMS.

10. All documents and communications related to Your ability or alleged inability to obtain Dealer data without directly accessing a CDK DMS, including through the use of manual reporting tools.

11. All documents and communications that relate to whether Your methods of DMS access, data distribution, or data scraping comply with data security, data privacy, or automotive industry standards or guidance, including as provided by the National Automobile Dealers Association or the American International Automobile Dealers Association.

12. All documents and communications related to whether or not Your methods of DMS access, data distribution, or data scraping are prohibited by any applicable laws, regulations, or contractual agreements.

13. All documents and communications related to any efforts by CDK to block, disable, or otherwise restrict Your access to a CDK DMS.

14. All documents and communications related to Your efforts to evade CDK's blocking and detection efforts, including any attempts to bypass or work around any security features implemented by CDK and all scripts, programs, or executable files that You have created, used, or provided to Dealers.

15. All documents and communications related to Your data security policies and practices, including as they relate to the storage and encryption of data that You obtain from DMSs, and including any data security assessments or audits (internal or external).

16. All documents and communications related to Your data transfer protocols.

17. All documents and communications related to any actual or attempted security breach of Your systems, including DealerVault.

18. All communications with Microsoft related to data storage or data security, or Your certification as a Microsoft certified "partner" in any capacity.

19. Documents sufficient to show the form, content, and security features of the "secure web form" that You claim to use to receive DMS login credentials.

20. All documents and communications related to any request for, or receipt of, DMS login credentials through plain text email, or any other method besides "secure web form."

21. All documents and communications related to Your cyber liability insurance.

22. All documents and communications related to any actual or suspected misuse or misappropriation of data maintained in DealerVault.

23. All documents and communications that You contend to be evidence of an illegal agreement between CDK and Reynolds.

24. All documents and communications related to the alleged April 3, 2016 conversation between Steve Cottrell and Dan McCray.

25. All communications between You and any government agency related to CDK, Your claims and allegations, or this litigation.

26. All documents and communications related to any complaint to, or investigation by, any government agency concerning CDK, including all documents that You have provided to any government agency in connection with such complaint or investigation, either voluntarily or pursuant to a Civil Investigative Demand or other legal process.

27. All documents and communications that relate to or mention CDK or CDK's DMS, third-party access program, business practices, policies, strategy, or pricing.

28. All communications with CDK related to Your access to any CDK DMS or Your provision of or ability to provide Relevant Services.

29. All communications with Dealers, Vendors, or current or former "independent data integrators," as that term is used in the Complaint, related to Your access to any CDK DMS, Your claims and allegations, or this litigation.

30. All documents and communications related to any presentations that You have prepared or given that refer to CDK, Your claims and allegations, or this litigation.

31. All notes or minutes of any meeting of Your board of directors, shareholders, or investors that refer to CDK, Your claims and allegations, or this litigation.

32. Documents sufficient to identify (1) each Dealer whose data You have obtained in connection with providing Relevant Services, (2) their DMS provider, and (3) whether You obtain(ed) the data by accessing the Dealer's licensed DMS, from reports generated by the Dealer, or through some other means.

33. Documents sufficient to identify (1) each Vendor to whom You provide or have provided Relevant Services, (2) the specific Relevant Services provided, and (3) each Dealer whose data You have accessed in connection with providing Relevant Services.

34. All contracts with which you claim CDK has tortiously interfered.

35. All versions of Your Terms and Conditions with Dealers—and any agreements to similar effect but otherwise named—that have been in effect at any time.

36. All versions of Your Vendor Agreement with Vendors—and any agreements to similar effect but otherwise named—that have been in effect act at any time.

37. All documents and communications related to the drafting, negotiation, interpretation, or enforcement of any of the following provisions, or provisions to the same or similar effect, in Your Terms and Conditions and Vendor Agreements:

    a.    Terms and Conditions § 6.7: "**Password Security**. DealerVault will issue to Dealership, or shall authorize an Administrator to issue, a password for each User authorized to use Dealership's account. Dealership and Dealership's Users must maintain the confidentiality of all passwords and ensure that each password is used only by the unique authorized User to whom such password is assigned. …"

    b.    Terms and Conditions § 6.8: "**General Security**. DealerVault will maintain the DealerVault Technology used to provide the Services at a third party location, hosting, and telecommunication facilities, where it is subject to commercially reasonable security precautions to prevent unauthorized access to the Services. Dealership acknowledges that, notwithstanding such security precautions, unauthorized third parties may gain access to the Services and to any or all Dealership Data. Accordingly, DealerVault cannot and does not guarantee the privacy, security, or integrity of any Dealership Data or of any other data transmitted by or through the Services."

  c. Terms and Conditions § 7.1: "**Mutual Warranties**. Each Party represents and warrants that: (I) it has the legal right, power, and authority to enter into these Terms and Conditions and to perform all of its obligations under these Terms and Conditions, and (II) its entrance into these Terms and Conditions does not violate any agreement between such Party and any third party."

  d. Terms and Conditions § 10.4: "**Relationship of the Parties**. The Parties expressly agree that they are independent contractors and do not intend for these Terms and Conditions to be interpreted as an employment agency, joint venture, or partnership relationship."

  e. Vendor Agreement § 1.2: "Vendor agrees that Vendor will not furnish to any third party any Data provided to Vendor by DealerVault without written authorization from DealerVault or the Dealership."

  f. Vendor Agreement § 1.3: "Vendor is only authorized to use the Data received from DealerVault in accordance with the specific written instruction of the specific Dealership from which DealerVault obtained the Data or with written authorization provided by DealerVault."

  g. Vendor Agreement § 1.4: "Vendor agrees that the Vendor will protect all Data provided by DealerVault so as to preclude access by any third party."

  h. Vendor Agreement § 3.1: "Vendor is granted a non-transferable, revocable, non-exclusive, non-sub licensable (without prior written permission from Dealership), limited license to the Data only to the extent to perform the services or provide the products to Dealership as those are specifically set forth and defined in the written contract between Dealership and Vendor. If no such written contract exists Vendor may not receive Dealership Data until the basic terms of the provision of the products and/or services are set forth in writing. …"

  i. Vendor Agreement § 7.11: "Authority. Each Party represents that it has full power and authority to enter into this Agreement, that the execution of this Agreement and the matters contemplated in this Agreement have been fully authorized by all necessary legal action, and that this Agreement is binding upon such Party. Each Party further represents that it has not entered into, nor will it enter into, any agreements that would conflict with its obligations under this Agreement or would render it incapable of satisfactorily performing hereunder."

38. All documents and communications related to Your polices and procedures for providing notification and/or obtaining consent or authorization from Dealers to access DMSs.

39. All documents and communications that You contend establish Authenticom as any Dealer's "agent" or authorize Authenticom to access any CDK DMS.

40. All documents and communications related to any circumstances in which You have accessed a CDK DMS without first obtaining express, written authorization from a Dealer purporting to permit such access.

41. All documents and communications related to any Dealer who has declined to authorize or has asked You to stop accessing, or extracting data from, any DMS.

42. Documents sufficient to show Your total monthly DMS connections (as measured by dealer rooftops) for each DMS provider.

43. Documents sufficient to identify the Vendors and/or Dealers that comprise the "CDK" line and the Relevant Service or Services associated with the "connections" attributed to the "CDK" line in the "DMS Connections" chart on page 27 of Authenticom's Consolidated Brief filed in the Seventh Circuit on September 5, 2017, and any comparable data as may become available through the close of fact discovery.

44. Documents sufficient to show Your total monthly revenues, expenses, net cash flows, net profits, and EBITDA for each Relevant Service that You provide.

45. Documents sufficient to show all projected revenues, profits, and earnings for Relevant Services on an annual and quarterly basis.

46. Documents sufficient to show Your current and historical pricing for all Relevant Services.

47. Documents sufficient to show any up-front fees, initial installation fees, and monthly fees charged to Dealers and Vendors for each Relevant Service that You provide, or which You have provided.

48. Documents sufficient to show Your fixed and variable costs associated with providing each Relevant Service.

49. All documents and communications comparing Your costs or pricing for Relevant Services against CDK's costs or pricing.

50. All documents and communications related to Your development of DealerVault.

51. Documents sufficient to show how data is received, stored, and transmitted by DealerVault, including Your network and systems architecture related to DealerVault.

52. Documents sufficient to show Your investments in DealerVault including, specifically, any investments in DealerVault related to data security.

53. Any written business plan or presentation related to DealerVault or Your provision of Relevant Services.

54. All communications with investors, potential investors, employees, partners, owners, shareholders, principals, or third parties in which those individuals have expressed doubt or disapproval of the DealerVault business model.

55. All documents, communications, and agreements related to Your repurchase of stock, shares, or other ownership interests from any of Your investors or shareholders.

56. All documents and communications related to Your April 2014 loan transactions with BMO Harris, as reflected in the credit agreement, promissory note, and related loan documents, including all documents that form the loan, all documents provided to BMO Harris in connection with the loan, all communications with BMO Harris related to the loan, and any efforts to obtain refinancing or forbearance on the loan.

57. All documents and communications related to any efforts to obtain refinancing on the 2014 loan transactions with any other lender besides BMO Harris, including all documents provided to the lender and communications with the lender.

58. All documents and communications related to the "Going Concern" note to Your financial statement for the years ended October 31, 2016 and 2015 prepared by WIPFLi LLP.

59. All documents relied upon, considered, reviewed, or consulted by You in connection with Your Complaint, Your motion for a preliminary injunction, including any briefs, declarations, argument, expert reports, or other papers filed in support thereof, or any papers filed in the appeal thereof now pending before the Seventh Circuit.

60. All documents and communications related to Your claims that CDK has engaged in any anticompetitive activity or that competition in any market has been harmed.

61. All documents and communications related to Your alleged injuries or damages.

62. All documents and communications related to the existence or bounds of the alleged "DMS Market," the "Dealer Data Integration Market," and any alleged "single-brand aftermarket," as those terms are used in the Complaint.

63. All documents and communications related to competition with or among any participants in the alleged "DMS Market" or "Dealer Data Integration Market," including all documents related to customer switching.

64. All documents and communications related to any products or services offered by current or former "independent data integrators," as that term is used in the Complaint, including InDesign Data/1DMS, Superior Integrated Solutions, SelectQu, New Freedom Data Resources, The StoneEagle Group, and ProQuotes Inc.

65. Documents sufficient to show your policies concerning the preservation, retention, storage, or destruction of any documents or ESI.

66. Documents sufficient to show Your organizational structure from January 1, 2013 to the present, including the identity of all officers, employees, investors, partners, owners, shareholders, or principals with management-level responsibility for Relevant Services.

67. All documents requested by or produced to Reynolds in this litigation.

68. All documents provided to You by any non-party that are related to this litigation or otherwise responsive to these Requests, whether pursuant to a subpoena or otherwise.

Dated: October 13, 2017						CDK GLOBAL, LLC

*/s/ Mark W. Ryan*
Britt M. Miller (*pro hac vice*)
Matthew D. Provance (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Tel: (312) 782-0600
Fax: (312) 701-7711
bmiller@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan (*pro hac vice*)
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006-1101
Tel: (202) 263-3000
Fax: (202) 263-3300
mryan@mayerbrown.com

Jeffrey Allan Simmons
Joseph S. Harper
FOLEY & LARDNER LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI 53701-1497
Tel: (608) 257-5035

Fax: (608) 258-4258
jsimmons@foley.com
jharper@foley.com

*Counsel for CDK Global, LLC*

## **CERTIFICATE OF SERVICE**

I, Matthew D. Provance, an attorney, certify that I caused a copy of the foregoing **DEFENDANT CDK GLOBAL, LLC'S FIRST REQUESTS FOR THE PRODUCTION OF DOCUMENTS TO PLAINTIFF AUTHENTICOM, INC.** to be served on counsel of record in the above-captioned proceeding via email in accordance the parties' written stipulation to receive service by electronic means pursuant to Fed. R. Civ. P. 5(b)(2)(E).

    /s/ *Matthew D. Provance*