Exhibit 18



Ross M. MacDonald
Associate
rmacdonald@gibbsbruns.com
713.751.5231

November 21, 2018

**Via Email**
Michael Nemelka
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, N.W., Ste. 400
Washington, D.C. 20036-3215

      Re:    *In re: Dealer Management System Antitrust Litigation*, C.A. No. 18-C-864, MDL
             No. 2817 (N.D. Ill.)

Dear Mike,

      I write in regard to your response to my correspondence regarding various discovery issues, dated November 16, 2018. As a preliminary matter, I respectfully object to the tone and character of your response. As professionals, we can certainly disagree about the grounds for our clients' respective discovery positions in this case. But it is both unbecoming and unprofessional generally to accuse counsel of actions "border[ing] on bad faith – if not crossing the line" or acting "to put it mildly…inappropriate" for making simple requests for updated financial discovery, or for an example of one of the polling logs that Authenticom maintains in its ordinary course of business. Surely, if we disagree with discovery requests, we can say so without making such accusations. Your repeated allegations of "bad faith" are also not well taken given, for instance, your client's refusal to produce documents to substantiate its claims that this case proceed at a breakneck speed.

      Putting that aside, however, I'll try to respond below to the remaining, outstanding discovery issues raised by my correspondence and where we understand each issue stands.

1. **Updated Financial Discovery**

      To be brief, setting aside the page of recriminations that preceded your answer to this request, we understand your answer on this is "No," or at least, "No, unless Authenticom can extract something in return." We asked for updated financial discovery not because Authenticom has a general obligation to "refresh" its discovery as the case proceeds—but because the current case schedule is predicated on a fundamental assumption: that it is required by Authenticom's financial condition. In fact, you made specific representations to the Court to this effect last month. 2018-10-9 Hearing Tr. at 13:19-25 (claiming Authenticom was "cash-flow insolvent" and in "dire straits."). Representations that, we note, were not materially different than those you offered to Judge St. Eve in support of Plaintiffs' proposed case schedule. In any event, as the Court said in response, the truth of this assumption is a knowable fact. 2018-10-9 Hearing Tr. at 16:11-12. We

Michael Nemelka
November 21, 2018
Page 2

believe this assumption is inaccurate, or at least overstated, and we are entitled to supplemental financial information to test its veracity.

Not only are Defendants entitled to this information, but we are entitled to it *before* Defendants negotiate with Plaintiffs regarding the status of the deadlines set in the Case Management Order (which, as Judge Gilbert made clear, should occur after a ruling on the motions to dismiss). 2018-10-9 Hearing Tr. at 33:24-34:2. Your suggestion to the contrary is unworkable. It, like Authenticom's initial offer to produce certain Slack channels discussed below, is another attempt to get the Defendants to agree to a course of action with incomplete, and potentially inaccurate, information.

If Authenticom continues to refuse to produce this updated financial information in the near term, or to produce only on some *quid pro quo* basis, that is fine. We will let the Court know that we believe the interim deadlines in the case schedule need to be adjusted, at least to fit in with the new fact discovery deadline, and that Authenticom has refused to produce documents to substantiate any purported need for a breakneck schedule.

## 2. Username & Password Policy

We will interpret this to confirm our understanding, which is that the written username and password policy Mr. Clements testified about does not in fact exist.

## 3. Slack Channels

Your complaint that our requests for counterclaim discovery were "late, overbroad, and improper" is untrue. Defendants served their Requests for Production of Documents Relating to Counterclaims after they filed their counterclaims, in accordance with Judge St. Eve's instructions. 2018-3-12 Hearing Tr. at 63:16-23. It also rings hollow, given the fact that Plaintiffs have continued to serve additional discovery on Defendants. *See* Plaintiffs' Second Set of RFPs to CDK (served 10-12-2018). Further, it misses a crucial point, which is that Authenticom had an obligation to search and produce its Slack communications for responsive documents *before* Defendants ever served their counterclaim discovery. These communications would have been responsive to the discovery requests served on Authenticom in October 2017. Based on the testimony, Slack is an obvious repository of relevant and responsive non-custodial information. In fact, your client's heavy reliance on Slack indicates that your custodial email productions are likely lighter than other parties' given Authenticom's reliance on Slack for internal communications.

In any event, Defendants specifically asked Plaintiffs to identify channels that "were used to communicate about gaining access to or extracting data from any CDK or Reynolds DMS by any means." *2018-10-4 Ltr. to M. Nemelka from M. Provance*. In response, Authenticom provided Defendants a list of channels it represented that would contain such responsive documents. Judging from both the testimony at Mr. Clements' deposition and the sparse, ninety-nine communication threads produced by Authenticom from Slack, this list was, at best, incomplete. Just by way of

Michael Nemelka
November 21, 2018
Page 3

example, there are dozens of responsive communications that were subsequently transmitted by email communications (and therefore, by chance, appear in Authenticom's production) that do not appear in the Slack communications produced. *E.g.,* AUTH_0027286 (Conversation between B. Clements and S. Cottrell about Bob Schaefer). Taking your representation regarding your Slack production as true, this means that responsive Slack communications were sent via *other* channels or conversations than the ones identified by Authenticom.

As we understand it, Authenticom is refusing to search and produce responsive communications from any channels or conversations other than the channels it initially (and apparently self-servingly) volunteered. If so, we are at an impasse, and we will take the issue up with the Court.

**4.  Example PCM Log**

Again, the tone of your response here is unwarranted. Authenticom keeps "Polling Client Manager" logs in its ordinary course of its business. Authenticom has represented that it cannot retain these logs for extended period of times due to system or storage constraints and that it did not retain this information as a result. Therefore, despite Authenticom's knowledge of potential litigation and despite Reynolds' specific April 30, 2017 document retention letter,[1] Authenticom continued to allow this information to be destroyed. Reynolds has never waived its rights concerning this issue. *See, e.g., 2018-5-23 Ltr to Plaintiffs from L. Caseria.* At this time, however, given this destruction of relevant information, we are simply asking for an example log to be produced, as it would be kept in its ordinary course of business, so that we can better understand the means, manner, methods, and frequency of Authenticom's polling apparatus, as well as the type of information that is constantly referred to in Authenticom's email productions as "PCM" or "PCM Logs." *See, e.g.,* AUTH_00168432. We understand that Authenticom is refusing to accommodate our request for a 7-day example of the PCM Log, and that we are at an impasse at this issue. We will take it up with the Court.

**5.  CDW/Axciom**

We understand that the Axciom documents appear to be from 2012, before the January 1, 2013 discovery cutoff date. In the past, however, Plaintiffs have made one-off requests to Defendants for certain non-custodial documents that pre-date the agreed cutoff (in addition to wholesale requests for additional custodial discovery). For instance, Authenticom asked for, and Reynolds agreed to produce, its initial, 1992 CVR Agreement. If Authenticom is refusing to produce the Axciom documents, just let us know and we will proceed accordingly.

---

[1] The April 30, 2017 litigation hold notice made clear, *inter alia,* that "All communications and documents regarding third-party vendor and/or OEM access to Reynolds' DMS or any Reynolds software, hardware, or program" should be preserved, to the extent that they were not already preserved in the normal course of Authenticom's earlier decision to initiate litigation. (4/30/2017 letter from A. Gulley to M. Nemelka, attaching hold notice).

Michael Nemelka
November 21, 2018
Page 4

**6. Screenshots**

Thank you for confirming that your vendor is working on identifying and re-imaging documents that were produced without embedded images. Our initial letter raised this issue with examples from the Authenticom and MVSC productions, but the Cox and AutoLoop productions appear to have similar problems. Please confirm that you are addressing this issue as it exists in not only the Authenticom and MVSC productions but also in the Cox and AutoLoop productions as well.

Sincerely,

*/s/ Ross MacDonald*

Ross M. MacDonald

c: MDL Counsel Service List