# Exhibit 2

**SheppardMullin**

Sheppard, Mullin, Richter & Hampton LLP
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
213.620.1780 main
213.620.1398 fax
www.sheppardmullin.com

213.617.4206 direct
lcaseria@sheppardmullin.com

May 23, 2018

File Number: 48KZ-266044

<u>**VIA EMAIL**</u>

Michael E. Nemelka
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Ste. 400
Washington, DC 20036-3215
mnemelka@kellogghansen.com

Peggy J. Wedgworth
Milberg Tadler Phillips Grossman, LLP
One Pennsylvania Plaza
New York, NY 10119
pwedgworth@milberg.com

             **\*\*\*INCLUDES INFORMATION DESIGNATED AS HIGHLY CONFIDENTIAL\*\*\***

    Re:    *In re: Dealer Management System Antitrust Litigation*, C.A. No. 18-C-864; MDL No. 2817 (N.D. Ill.)

Dear Mike:

    This letter is to follow up on certain discovery issues discussed in our May 18, 21, and 22 meet-and-confer discussions.

**Reynolds's Third-Party Subpoenas to Kellogg Hansen Clients**

    First, I write to memorialize our discussions regarding various subpoenas issued by Reynolds to various clients represented by Kellogg Hansen back in November and December, 2017. With respect to Cox/DealerTrack and AutoLoop, these former non-party clients are now MDL parties (but not in cases involving Reynolds as a defendant). With respect to Ghaben Auto and Open Recalls, you have indicated that you may not represent them anymore but are not yet sure and will let us know. Please let us know of the status of representation of these parties as soon as possible.

    With respect to the parties you still represent (Cox/DealerTrack and AutoLoop, at least), you represented that you were unable or unwilling (i) to specify which document requests these parties would be willing to produce documents in response to, (ii) to discuss what sorts of documents these parties possessed, or (iii) to provide us a date by which any production would be made by these parties. For instance, with respect to switching data, you indicated that you

Michael E. Nemelka
May 23, 2018
Page 2

were not sure what switching information DealerTrack possessed and could not discuss when, whether, or what type of switching data Cox/DealerTrack would produce. Nor would you agree to provide Reynolds answers to these questions by next week (which is now this week). This, despite the fact that these non-custodial requests were outstanding for months before any stay was in place, that DealerTrack has publicly noted its commissioning of a switching study demonstrating switching is commonplace, and that CDK and Reynolds have already produced detailed switching data. In addition, you indicated that, despite the fact that CDK and Reynolds have already produced significant volumes of documents and Cox has produced nothing, the scope and volume of these third-parties' future productions would be dependent on what CDK and Reynolds were willing to produce to outstanding requests by *Authenticom*, which is not a party to these subpoenas.

You also indicated that in light of discovery requests you anticipate receiving from CDK this Friday, May 25, 2018, your clients would not produce anything in response to the Reynolds subpoenas at this time in order to avoid duplication of effort. As you know, to the extent that CDK serves discovery requests this Friday, written responses and objections would not be due until June 22, 2018 pursuant to the Case Management Order, which means that actual document production by your clients would likely not occur until sometime after that. Your request for additional delay makes no sense given your prior, repeated insistence that document review and efforts to get ready for document production should have been ongoing during the stay, and that nothing should be put off until after May 25. *See* 5/16/18 Email from Mike Nemelka to Brian Ross (waiting until after May 25th to address discovery issues would "introduce yet further unnecessary delay"). You and your clients should be sophisticated enough and have sufficient resources to produce documents (or start producing documents) in response to Reynolds's subpoena in less than six months from the date of the subpoena. Indeed, Cox, is the largest party in these cases, larger than CDK or Reynolds.

Needless to say, given the fact that Judge Peterson's stay order was not entered until January 12, 2018, Reynolds is disappointed that your clients—particularly Cox/DealerTrack, which received the subpoenas in November 2017—appear to have undertaken no meaningful effort to date to identify the documents available to be produced in response to the targeted, non-custodial subpoena topics (virtually all of which are non-custodial in nature), let alone begun gathering and producing such documents. The fact that your clients have changed from non-party to party status should encourage, not further delay, their willingness to cooperate in discovery.

Reynolds reserves all of its rights and respectfully urges Cox/DealerTrack and AutoLoop to prioritize and promptly provide a date certain by which it will make a good faith production in response to Reynolds's subpoenas. In particular, and to avoid a motion in the near term on these issues, Reynolds requests that Cox/DealerTrack's non-custodial switching and market share data be produced no later than next week.

**Reynolds's Discovery to Authenticom**

This section memorializes our discussions on May 21 regarding deficiencies in Authenticom's responses to certain of Reynolds' discovery requests.

Michael E. Nemelka
May 23, 2018
Page 3

### I. **Reynolds's Requests for Production**

#### 1. **Usernames and Passwords**

As discussed, Reynolds believes that both usernames and passwords are relevant, and does not agree to permit Authenticom to redact usernames or passwords from documents to be produced. The Agreed Confidentiality Order will govern. The information is also responsive to Reynolds's Interrogatory No. 2. You indicated that you were leaning toward producing documents without redacting usernames or passwords. Please let us know this week whether or not Authenticom will produce documents without redacting usernames or passwords. If not, we are at impasse on this issue.

#### 2. **Custodial Productions**

You confirmed that the following statement in Authenticom's January 19, 2018 letter was accurate: "[D]uring the stay, Authenticom is continuing to work diligently to identify and prepare custodial documents responsive to Defendants' discovery requests so that we can make a very substantial custodian-based production promptly after the stay is lifted."

You advised that Authenticom will be making the first of several substantial rolling custodial productions this week. You stated that Authenticom's custodial production for this week would consist of at least 10,000 documents ("five digits"). You also confirmed that Authenticom has not completed its search for custodial documents and is not sitting on or deliberately withholding a substantial number of custodial documents that are ready for production now.

You initially indicated that you did not anticipate making additional short term productions unless and until Defendants made additional productions (despite the fact that both Defendants' productions to date are more substantial than Authenticom's). That position is not tenable nor is it in keeping with Authenticom's obligations under the Federal Rules. To be clear, Authenticom should review and produce responsive documents in a timely manner and not artificially withhold any productions in order to extract something from Defendants. In light of your representation that Authenticom will be making a "five digit" production this week, which will be the first of several rolling productions, we believe we are on the same page here, but if not, let us know.

We discussed the fact that Authenticom's production to date does not contain very many, if any, documents falling into the categories listed below. You explained that this is because Authenticom has not yet completed its production of these documents and that we should be seeing more of these types of documents in the forthcoming Authenticom productions.

- Communications regarding Reynolds with dealers, vendors, customers, potential customers, DMS providers, OEMs, or government agencies (10/13/2017 RFP No. 8);

Michael E. Nemelka
May 23, 2018
Page 4

- Documents related to Reynolds's technology, including but not limited to Reynolds's security measures, ERAaccess, ERA Link, Report Generator, 6910, Query Builder, 7601, Dynamic Reporting, ERA, POWER, DMS menus, DMS functions, data elements contained in the DMS, and/or the Reynolds Integration Hub. (10/13/2017 RFP No. 9);

- Documents sufficient to show every means by which Authenticom has accessed a Reynolds DMS ((10/13/2017 RFP No. 22-23);

- Documents sufficient to describe user emulation software used by Authenticom and how it is used (10/13/2017 RFP No. 28);

- Communications between Authenticom and its customers identifying the specific data elements available to Authenticom when DMS credentials are provided, and the specific elements which Authenticom retrieves (10/13/2017 RFP No. 36);

- Communications with BMO Harris Bank N.A. (10/13/2017 RFP No. 72);

- Communications with third parties regarding the litigation (including but not limited to the witnesses from the temporary injunction proceeding) (10/13/2017 RFP No. 85, 88);

- Documents regarding DVGO (1/5/2018 RFP No. 1).

### 3. **Instances of DMS Access**

As discussed, Reynolds has requested documents and information relating to the number and dates of specific instances when Authenticom accessed a Reynolds DMS without authorization, by dealer, from January 1, 2013 to the present. *See* 10/13/17 Requests for Production Nos. 10, 11, 33; 1/5/18 Requests for Production No. 9; Reynolds's Interrogatory No. 6.

We pointed out that Authenticom's response to Reynolds's 1/5/18 Request for Production No. 9 states that, subject to objections, it will produce "responsive, relevant, non-privileged documents in its possession, custody, or control . . . ."

You explained that Authenticom does not track data transactions. You also explained that Authenticom retains less than a week's worth of DMS access data on sequel servers. In other words, Authenticom keeps *all* DMS data taken from a DMS customer for about a week, but does not otherwise track or log these data transactions in any way. You explained that, given Authenticom's data purging policies and apparent failure to log these data transactions, that this underlying data was necessary in order to recreate some identification of instances of DMS access. Authenticom's purging practices with respect to this data and failure to log these transactions has not changed despite the onset of litigation and despite the fact that Authenticom has been on notice for many months that Reynolds intends to pursue both a defense and a counterclaim based on Authenticom's unauthorized access of Reynolds's DMS.

Michael E. Nemelka
May 23, 2018
Page 5

      You justified Authenticom's failure to preserve DMS access data on the grounds that the data is transitory, short term data that would require petabytes of storage if Authenticom is required to preserve the underlying data for more than a few days.  In order for Defendants to fully understand the potential burden on Authenticom of preserving this data, please explain why data relating to nothing more than instances of DMS access (e.g., logs of these transactions) takes up such a significant amount of space.  Please also describe Authenticom's retention practices, and specifically, whether and how those practices were adjusted or updated to ensure that evidence relating to Reynolds's defenses or counterclaims have been preserved.  Also, what would the actual burden on Authenticom be had it preserved DMS access data (for example, by logging it, as opposed to storing the actual underlying data) at the point at which it reasonably anticipated litigation with Reynolds?

      You further explained that, despite Authenticom's lack of DMS access data, Authenticom is currently investigating whether it can provide a partial response using the limited, incomplete data that is available.  Specifically, Authenticom has certain records showing, for certain dealers, when data from a Reynolds or CDK DMS was entered into Authenticom's system.  You have noted that you believe that this data may not distinguish between data that is sent from a dealer versus data that is taken by Authenticom via access to one of the Defendants' DMS systems.  Authenticom is trying to determine whether it can use this data to create a partial record of instances of DMS access.

      However, this approach is also limited by a retention problem.  Authenticom only has such data for current customers, and for former customers who left Authenticom within the last 60 days (because, you assert, that Authenticom keeps *all* DMS data for customers for 60 days after they terminate services with Authenticom).  As you explained, with each passing day, the 60-day retention window moves and one more day's worth of data is potentially lost or purged.  You confirmed that Authenticom has not changed its retention practices for this data since the litigation began, and has no plans to do so now.  According to you, Authenticom purges this data 60 days after dealers leave Authenticom, though you claimed on our call that data taken from dealers by Authenticom was "Authenticom Data."  Thus, it is unclear why this data is not being preserved more than 60 days after a customer leaves Authenticom for purposes of this case.  Please explain why this data is not being preserved.

      As discussed on our call, Reynolds reserves all rights with respect to Authenticom's failure to preserve relevant and responsive documents.  Authenticom should take all reasonable steps to preserve potentially relevant or responsive materials or information.  If you are unable to otherwise log instances of Authenticom's access to the DMS, this includes shutting off automatic deletion settings as appropriate.  We are concerned that these issues are only coming to light now in connection with RFPs served over seven months ago and after months of meeting and conferring extending back to December of 2017.

      You offered to provide a sample of the DMS access data that you are able to extract or provide for both CDk and Reynolds based on the data available to Authenticom.  We welcome the opportunity to review a sample, and to further discuss these issues with you.

Michael E. Nemelka
May 23, 2018
Page 6

### 4. Authenticom's DMS Connections

Reynolds seeks full and complete information regarding Authenticom's (and DealerVault's) DMS connections by DMS type over time. As discussed, and as set forth in Reynolds's May 16, 2018 letter, the data provided by Authenticom to date regarding its DMS connections appears to be, at best, incomplete. Reynolds does not appear to have all of the data underlying Preliminary Injunction Hearing Exhibit 118 or the graph appearing at page 27 of Authenticom's brief submitted to the Seventh Circuit on September 5, 2017. Moreover, Exhibit 118 is both substantially out of date and explicitly states that data relating to certain Authenticom customers is excluded, such as Credit Acceptance. Furthermore, Steve Cottrell testified at his deposition that Credit Acceptance was one of Authenticom's major customers. Mr. Cottrell also testified that Authenticom had the ability to provide additional information relating to DMS connections.

You stated that you believed you had already provided all available information and data relating to DMS connections and would not withhold anything. But when pressed, you simply pointed Defendants to the native version of Exhibit 118, which does not provide full, current DMS connection data for Authenticom and DealerVault. At best, it excludes major customers by Authenticom's own admission. You indicated that an Authenticom database containing DMS connection data exists, but you are unwilling or unable to extract the raw data to excel and produce it to Reynolds, and you are also unwilling to offer any other means or method by which Reynolds may view or inspect the subject data. Reynolds requests that Authenticom make the data available for inspection, in some mutually-agreeable format, if you are unwilling to otherwise produce full and complete DMS connections data.

You offered to further investigate what additional DMS connection data might exist that can either be produced or made available for inspection. Please let us know this week what DMS connection data is in Authenticom's possession, custody or control, what format it is in, and whether Authenticom will produce it or make it available for inspection. If Authenticom refuses to produce such data or make it available for inspection, please explain why.

### 5. Requests Appropriate for Search Terms

With respect to the following requests for production, Authenticom confirmed that despite its objections, it was willing to discuss proposed search terms and/or custodians: 10/13/2017 RFP No. 33; 1/5/2018 RFP Nos. 4-8 & 11. Reynolds will propose search terms for these requests consistent with the Court's schedule.

### II. Reynolds's Requests for Admission

We explained that Authenticom's responses to Reynolds's RFAs 1-3 rephrased each RFA and then proceeded to respond not to the RFA actually propounded by Reynolds but to a completely different RFA crafted by Authenticom. You said you would consider whether to amend Authenticom's responses. Please let us know this week if Authenticom will amend its response to actually respond to Reynolds's RFAs. If not, we are at impasse.

Michael E. Nemelka
May 23, 2018
Page 7

### III. Reynolds's Interrogatories

#### 1. Business Arrangements With Cox

Reynolds's Interrogatory No. 13 asks Authenticom to identify its business arrangements with Cox, "including the name, date, amount of remuneration provided for, and substance of any such agreement." We explained that this information is obviously relevant to the MDL cases in several ways. Authenticom alleges that Defendants blocked Authenticom from DMS access and unlawfully took action to destroy Authenticom and prevent it from providing integration services to vendors. Cox is a major competing DMS provider and a major vendor, and it has also filed a complaint in this case. Therefore, Defendants are entitled to explore Authenticom's relationship with Cox. For instance, Authenticom may have had business arrangements with Cox relating to integration to Cox's DMS product, or integration to competitors' DMS products for the benefit of Cox's applications. Cox may have had other business arrangements with Authenticom to help Cox compete against other DMS providers or vendors. Defendants can only speculate as to all of the potential business arrangements that might exist between Authenticom and Cox, all of which would be relevant in the MDL cases.

You failed to explain why any business relationship between Authenticom and Cox would not be relevant, and you also failed to identify a single category of agreements or contracts that should be excluded from your response. Let us know this week if Authenticom will supplement its interrogatory response. If not, we are at impasse.

#### 2. Authenticom's Tortious Interference Claim

Reynolds's Interrogatory No. 20 asks Authenticom to "[i]dentify each contract that Reynolds or CDK allegedly interfered with, including the name, date, contracting party, and whether that party is a dealer or vendor." Authenticom has asserted a tortious interference with contract claim, and Defendants are entitled to know what contracts they allegedly interfered with in order to defend against that claim. You conceded this on our call.

You explained that Authenticom's response to Interrogatory No. 20 points to every single Authenticom contract as a contract that Defendants interfered with (it actually doesn't, but thank you for the clarification). However, the response does not identify a single specific contract that Defendants allegedly interfered with. Supplementing this response should be easy for Authenticom because it does not require Authenticom to segregrate some contracts from others. If, as Authenticom asserts, Defendants interfered with each and every Authenticom contract, it can simply list every single contract it had during the relevant period in response to this Interrogatory.

Authenticom offered to supplement its response to identify the bates numbers for documents that contain the requested information pursuant to Fed. R. Civ. Proc. 33(d). However, Authenticom admitted that it had not yet produced all of Authenticom's contracts or other documents it might refer to for its response. When we asked how long Authenticom would need in order to provide a full and complete supplemental response, you refused to provide an anticipated date by which a response could be provided, and stated that it might take weeks or

Michael E. Nemelka
May 23, 2018
Page 8

months before such a response could be provided. You could not even commit to doing this before the discovery cutoff. You suggested instead that Defendants be more "creative" and work to piece together information by digging through Authenticom's incomplete production to date.

      This is unacceptable. Defendants cannot prepare a defense to Authenticom's tortious interference claim or conduct discovery into the claim without knowing what contracts are at issue. Please let us know by the end of this week if Authenticom will supplement its response to Interrogatory No. 20 by a reasonable date certain. If not, we are at impasse.

      Please let me know if we have misunderstood any of your positions.

Sincerely,

Leo D. Caseria
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

SMRH:227583694.3