Exhibit 2

```
 1                   IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   IN RE:                             )  No. 18 C 864
                                        )
 4   DEALER MANAGEMENT SYSTEMS          )  Chicago, Illinois
     ANTITRUST LITIGATION.              )  June 10, 2019
 5                                      )  9:35 A.M.

 6          TRANSCRIPT OF PROCEEDINGS - Status and Motions
         BEFORE THE HONORABLE JEFFREY T. GILBERT, Magistrate Judge.
 7
     APPEARANCES:
 8

 9   For the Plaintiffs:        MILBERG TADLER PHILLIPS GROSSMAN, LLP
                                One Pennsylvania Plaza
10                              19th Floor
                                New York, New York 10119
11                              BY:  MS. PEGGY J. WEDGWORTH

12                              KELLOGG, HANSEN, TODD, FIGEL
                                   & FREDERICK, PLLC
13                              1615 M Street, N.W.
                                Suite 400
14                              Washington, D.C.   20036
                                BY:  MR. DEREK TAM HO
15                                   MR. MICHAEL N. NEMELKA

16                              ROBBINS GELLER RUDMAN & DOWD
                                200 South Wacker Drive
17                              31st Floor
                                Chicago, Illinois  60606
18                              BY:  MR. FRANK ANTHONY RICHTER

19   For Defendant CDK:         MAYER BROWN LLP
                                71 South Wacker Drive
20                              Chicago, Illinois   60606
                                BY:  MS. BRITT MARIE MILLER
21                                   MR. MATTHEW DAVID PROVANCE

22
                            PAMELA S. WARREN, CSR, RPR
23                            Official Court Reporter
                            219 South Dearborn Street
24                                  Room 2342
                            Chicago, Illinois   60604
25                                (312) 408-5100
```

1   APPEARANCES:   Continued

2   For Defendant Reynolds        GIBBS & BRUNS, L.L.P.
    and Reynolds Company:         1100 Louisiana Street
3                                 Suite 5300
                                  Houston, Texas  77002
4                                 BY:  MR. ROSS M. MacDONALD
                                       MR. BRIAN T. ROSS
5
                                       MS. AUNDREA KRISTINE GULLEY
6                                      (Appearing telephonically)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       Clarification on that?

2       MS. MILLER:  Your Honor, Britt Miller on behalf of

3   CDK.  Two quick questions.  One, obviously we did not prepare

4   responses pending the resolution of this motion.  So we'd ask

5   for 21 days to respond to the interrogatories in question.

6       And, two, I assume from the tenor of your ruling that

7   the ones that have been served are it.  There is no additional

8   ones that are coming.  There is no follow-up, additional

9   interrogatories after they get whatever responses.  Certainly

10  we'll engage whatever meet and confer process may be necessary

11  as to the responses that we serve.  And if there is motion

12  practice on that, we'll certainly engage in it.  But to the

13  extent that these are permitted to go forward, these are it.

14      THE COURT:  Yes.  These are it.  And 21 days is fine.

15      MS. MILLER:  Thank you.

16      THE COURT:  If, with the qualification that you said,

17  that if you object to something and then you meet and confer

18  and then I have to deal with it, in the never-ending discovery

19  dispute process here, I'll do it.  But I'm not saying they can

20  serve more or you could serve, I guess, any.

21      MS. MILLER:  Understood, your Honor.

22      THE COURT:  Okay.  That brings me to the issues that

23  you briefed on an expedited basis.  I will say, Mr. MacDonald,

24  I very much appreciate the email exchange that you had with

25  Mr. Nemelka in which you remind -- when Mr. Nemelka expressed a

1  desire to get this briefed in time for our June 10th.  You sent

2  an email saying, you know, Judge Gilbert has said he would like

3  to have at least a week to look at things.  And I didn't know

4  about that because the email that came to my courtroom deputy

5  had a proposed briefing schedule of June 5 and June 7, which

6  was plaintiffs's proposed briefing on this.

7       But I do appreciate at least your consideration of

8  saying, you know, maybe he should have a week to look at this

9  stuff, which he's asked for, in the give and take before filing

10  of the -- this motion.  That kind of went by the wayside in

11  some way.  But I do appreciate it.

12      And luckily for Mr. Nemelka, I didn't actually go into

13  the ECF system -- I forgot the briefs here, so I had to print

14  them at all home.  And I didn't see that you actually didn't

15  even file on June 7th, you actually filed on Saturday, June

16  8th.  But that was okay because I was able to read it

17  yesterday.  Okay?

18      I want to tell everybody here though -- and you can

19  tell that I have a little bit of an edge here, and I'm sorry

20  about it.  Okay?  I don't like the fact that I have so

21  many -- I have had so many motions under advisement, which is

22  why I'm trying to rule on as much as I can from the bench.

23      I do have an impression here that there are fights

24  here that don't need to be had.  I have had that impression

25  from the very beginning.  And I have had the -- I also have the

1   impression, you know, that sometimes positions are taken for

2   tactical reasons without fully thinking through the impact of

3   those positions on your own positions.  As an example, I'll

4   talk about these email distribution lists, which I talked about

5   before.

6           So, you know, those types of things, just in my mind,

7   increase the stress and tension in your litigation, increase

8   the stress and tension on the Court, but that shouldn't really

9   be your concern.

10          But I do generally like to have more than a weekend to

11  think about something.  The reason that I said I adopted your

12  briefing schedule and also went forward here is I do agree

13  you're entitled to rulings as soon as you can get them, as soon

14  as humanly possible.

15          Had I known my trial from next week was going to

16  settle, I would have moved you there, so I would have had more

17  time to look at this.  But I didn't know that.  So -- but,

18  anyway, I noticed that.  Okay.  I noticed that.

19          With respect to the motion pending, I'm going to deny

20  the motion as to the reopening of the 30(b)(6) deposition as of

21  Data Vast.  My view of the arguments being made -- and I read

22  the exhibits too, and I read the deposition testimony submitted

23  -- is that defendants's argument is weak and an overreach that

24  Data Vast was a topic that was noticed for 30(b)(6) deposition.

25          This isn't an after-the-fact objection.  The objection

1  was raised by counsel at the deposition.  The deponent said he

2  wasn't prepared on that.  He was general counsel.  And so, you

3  know, he would have only been able to -- been required to

4  testify with respect to what he was prepared on.

5         I don't buy the defendants's argument in particular

6  that -- I have to find it.  Hold on for a second.

7         (Brief interruption.)

8         THE COURT:  Yeah.  Defendants kind of shoehorn in to.

9  They say, well, our 30(b)(6) notice defined Authenticom to

10  include any related companies, divisions or subsidiaries, which

11  could include Data Vast.  Okay.  I get that.  That's not

12  necessarily wrong or accelerated.  And it included any efforts

13  by Authenticom to secure or protect dealer data or any use of

14  or agreements with third-party vendors to obtain data

15  maintained on a CDK or Reynolds DMS.

16         I don't think we're talking about securing or

17  protecting data really.  And if that really was what you were

18  talking about, that's a vague way of saying it for a 30(b)(6)

19  topic.  We're not really talking about obtaining data as much

20  as distributing data from the -- that Authenticom got.

21         So I don't think you could shoehorn Data Vast into the

22  served topics.  And if this is the best that defendants can do

23  it on it, I think it falls short.  I don't think it is worth

24  reconvening a 30(b)(6) deposition to cover this topic with

25  Authenticom's general counsel, particularly when that topic, I

1    think, is being covered in other depositions.

2        I get why defendants want this information, and I get

3    why it is important to their defense and their counterclaims.

4    Talking about Authenticom accessing their systems.  But I think

5    you're getting information on that.  And I think, you know,

6    again, in the overall theme of, we got to end this at some

7    point, I think this falls on the end of, we should end it.

8        If that was on day one of discovery, maybe I would

9    look at this differently.  But it is not.  And so I am going to

10   deny the motion as to reconvening the deposition as to

11   Data Vast.

12       With respect to the polling client manager data, I

13   have -- I have some questions for Authenticom here.  I think

14   your argument -- well, first of all, let me dispense with a

15   couple of things and focus then on what needs to be focused on.

16       Timeliness.  Overrule that objection.  This issue has

17   been on the table for some time.  You have been chasing each

18   other on this for a while.  I read all the correspondence on

19   this.  I read the -- you know, what you were talking about.

20   And I don't think this was put to bed.  And I think,

21   particularly with the most recent statement, which is that we

22   can't even do this, it is impossible to do it, I just don't

23   think this was tied down.

24       Is this late in the process?  Yes.  But you have been

25   chasing each other around on this for a long time.  And some of

1  the delay, at least from what I can see, is Authenticom's

2  fault, not CDK's fault.

3      Would it have been best for CDK to not -- to tie this

4  down, you know, back in October or November?  Yes.

5      Did you do everything you could to help them tie it

6  down?  No.

7      So the timeliness document is not working for me.

8      The spoliation issue, not ripe right now.  I'm not

9  dealing with that.  And that really doesn't come into play with

10  respect to whether you should or shouldn't produce something.

11      But I'm having trouble figuring out exactly what

12  exists.  If something exists, my feeling is you have got to

13  produce it.  But I'm having -- you know, Authenticom really

14  argued the strawman here, which is we can't produce a report,

15  and we can't produce -- we shouldn't be required to create a

16  document that doesn't exist.  I agree with that.  It is not

17  clear to me that that's what the defendants are asking for

18  here.  It would be -- it sounds to me what the defendants are

19  asking for is a snapshot of what appears essentially on a

20  computer screen when somebody queries the database.

21      So they are not asking to prepare a report per se,

22  they are asking for information that is resident within your

23  system.  So it -- you possess it.  It is in your possession,

24  custody or control.  It is information in your system that is

25  either a seven-day period or it is whatever you had in November

35

1    of 2018.  I think the -- it is not clear to me from

2    Authenticom's response here whether anything exists.  Okay?

3    Whether there -- but I have seen what you have produced to them

4    as an example, which I think is exhibit -- I mean, it is quoted

5    in full in the defendant -- the 18 lines are quoted in full in

6    defendants's brief, but -- it's -- is it 16 or --

7            MR. HO:  It is an attachment to Exhibit 11.

8            THE COURT:  Right.  Yeah, it is the last -- yeah.  I

9    mean, I see that but I am having trouble figuring out what

10   exists and what is ephemeral or what's tangible.

11           And so I'm going to ask Authenticom at least to

12   explain to me whether -- in particular whether what the

13   defendants are asking for, which is the PCM log for the

14   originally requested seven-day period in November 2018 or a log

15   for the seven days between June 10th and June 16th, which I

16   know is not necessarily within -- you know, before the lawsuit

17   was filed.  But I think what they are trying to do is see how

18   does Authenticom's system interact with theirs or what kind of

19   data do you get.  I'm not 100 percent sure that I understand to

20   what use they end up putting that.  But I could see it being a

21   really nice visual in front of a jury, so I can understand why

22   they might want to see it.

23           But I'm just -- I'm trying to figure out what exists.

24   And I will tell you that if I don't understand what you are

25   saying, Mr. Nemelka or Mr. Ho, then I'm going to appoint a

1   special master to figure out what the heck you should produce,

2   if anything.  And you guys are going to split the costs of

3   paying for it because if it is too complicated for me to

4   understand, I'm not going to have days of it.

5          I might need to have a hearing.  I might need to have

6   an evidentiary hearing.  I might need to put your computer guy

7   on the stand.  But I'm going to bring in a special master who I

8   have appointed in other cases, Nora Grossman, who is an expert

9   on e-discovery.  And, frankly, when I have appointed her in the

10  past -- I have actually never had to have an evidentiary

11  hearing because she sits down with the parties, speaks the

12  lawyer language because she's a lawyer, and also speaks

13  technical language because she is a technician.  And she

14  figures out how the parties can resolve the issue, and I don't

15  ever have to deal with it.  But if I have to deal with it, I

16  will.

17         But can you answer my question?

18         Or Mr. Ho.

19         MR. HO:  I'm going to try, your Honor.  I think there

20  is two aspects to the question of what's available.  Temporally

21  my understanding is that what is available is information that

22  goes back seven days.  So seven days from today is information

23  that is essentially overwritten.  It rolls off after seven

24  days.  But it is -- the second aspect of the answer is,

25  importantly, it is not in the database.  It is not as if you

1    can query -- type in a query or run a search over a set of data

2    and pull out from a database the information that's being

3    sought.

4         This information is essentially imbedded in the

5    software program itself.  And that's why from a legal

6    standpoint more than -- so than a technical one, we think that

7    the rule that governs this is Rule 26(b)(2)(B), and that this

8    clearly falls within the ambit of data that's not reasonably

9    accessible without undue burden or cost.  Because some computer

10   programmer actually has to go into the software program and

11   find for every dealer or -- and every day the data that they

12   want.  And so seven days doesn't sound like a lot, but when

13   you're talking about hundreds and thousands of dealers, and you

14   have to do it dealer by dealer for every day, as you see they

15   have taken a snap -- the Exhibit 11 that was alluded to is one

16   dealer for one day.  So you'd have to do that many, many

17   different times.  And it is not something that can be done in

18   an automated way.

19        As Mr. Clements's deposition -- declaration

20   highlights, and this is Exhibit 1 to our opposition, this all

21   has to be done manually by someone who actually -- a computer

22   software person who will actually have to log in to the

23   program.  And we don't think that there is good cause to do

24   that.

25        As we highlighted in our opposition brief, we think

1    that this is exactly the kind of data that the Seventh Circuit

2    discovery program and the Sedona Conference and, you know, all

3    the kind of leading authorities about ESI say are presumptively

4    off limits because of the cost and burden involved. And we

5    don't think that the defendants have made the kind of showing

6    that you would need to overcome that.

7          In particular, with respect to relevance, as your

8    Honor has already identified, it -- at best it seems like what

9    the defendants are after is a sense of the kind of information

10   that Authenticom keeps in this, again, very ephemeral way about

11   the way in which its system accesses the DMS.

12         There is not going to be data that covers the relevant

13   time period in this case. It is only seven days long. So at

14   best it is going to be a demonstrative or illustrative set of

15   data. And, frankly, given the limitations on relevance, we

16   don't see how there could be good cause to over -- to justify

17   the imposition of this kind of a burden.

18         We have, as we pointed out, offered to do somewhat

19   more than the one day for one dealer that we have offered. And

20   to the extent that a slightly broader sample or illustrative

21   set could be useful, we have offered to do that.

22         But seven days for all dealers would be a monumental

23   task for a company that has been, frankly, financially

24   decimated by the defendants. We won't go into that again. But

25   Authenticom is a small company, much smaller now than it was

1  before, and simply doesn't have the resources to do this kind

2  of highly time-intensive project.

3        THE COURT:  Okay.  Couple of questions before I ask

4  the defendants anything.  I saw the statement in Mr. Clements's

5  affidavit that Authenticom had to lay off two-thirds of their

6  work force during litigation.  So I -- you know, I'm not

7  without appreciation of that.

8        A couple of questions.  So what you're saying is that

9  the 18 lines in Exhibit 11, that was obtained by a computer

10  programmer going into one particular -- within a seven-day

11  period one particular dealer's information on the software,

12  taken a screenshot of that.  But that would have to be -- if we

13  took a seven-day period, then somebody would have to go through

14  all of the software that ran during that period of time for all

15  of Authenticom's customers and take those same essentially

16  screenshots to comply with the defendants's request, right?

17        MR. HO:  I will say I'm not a technical person, so I'm

18  not sure screenshot is exactly the right terminology.

19        THE COURT:  Okay.  Or a printout.

20        MR. HO:  But conceptually that's exactly right.

21        THE COURT:  Okay.  And how many, roughly, do you know?

22  You said hundreds or thousands.  There a difference between

23  hundreds or thousands.  We're talking about many dealers?

24        MR. HO:  Over time I would --

25        MR. NEMELKA:  I don't know exactly today.  Authenticom

1  used to service over 10,000 CDK and Reynolds dealers.  It has

2  been drastically reduced.  I think it is probably low

3  thousands.

4      THE COURT:  Okay.  And I take it by your response to

5  my question, CDK questions whether something exists in tangible

6  form that had been preserved from November of 2018.  Is that no

7  longer -- is that not the case?

8      MR. HO:  Your Honor, there were never reports

9  or -- these ephemeral data were never preserved or reduced to a

10  documentary form in the way that we would think of it under

11  Rule 34.  With the exception of the one snapshot from December

12  of 2018 that we have then produced to the defendants in March

13  of 2019.  So all we would be talking about, as far as I know,

14  is the seven-day period rolling back from today.

15      THE COURT:  Okay.  I know they are going to have

16  a -- they will have a field day on that particular point, but

17  I'll listen to them.

18      Okay.  So we're talking about -- really just talking

19  about a seven-day period now as illustrative of what this would

20  look like.  And what you are telling me -- and I think I

21  understand this without having a terribly substantial technical

22  background -- what you are telling me is because this data

23  resides in the software that Authenticom runs on a daily and

24  hourly and minute-by-minute basis, in order to provide even a

25  seven-day snapshot of this kind of polling data, CDK --

1     Authenticom would have to go into the software and physically

2     go in, query through that to find each transaction where you

3     could find something that looks like those 18 lines that you

4     produced in March of 2019, would have to replicate that for

5     every dealer who you had during that period of time, and what

6     software was being run.  And that's a very burdensome

7     labor -- time intensive and costly process for a small company

8     that's lost a lot of its employees, at least in its technical

9     side.

10         The relevance of all that data for all the dealers is

11     minimal in your view.  But you are offering to do something

12     that is much less burdensome.  And I wasn't sure what -- that

13     changed overtime, it seemed to me, in the discussions you had.

14         So what are you now offering to do for certain -- you

15     mention 24 or something.  I don't know what you're offering.

16         MR. HO:  Ten CDK dealers and ten Reynolds data --

17     dealer rather.

18         MR. NEMELKA:  Twenty.

19         MR. HO:  So 20 total.

20         THE COURT:  So you're offering to do what they're

21     asking for.

22         MR. HO:  For one day.

23         THE COURT:  Okay.  And who is arguing this for your

24     side there?

25         Mr. MacDonald?

1          MR. MacDONALD:  I am, your Honor.

2          THE COURT:  Okay.  So why is their offer not

3    sufficient?

4          MR. MacDONALD:  Well, as your Honor referenced, the

5    polling client manager that contains information about what

6    files Authenticom polls, how long it polled for, when it

7    polled, how it polled.  And Authenticom has told us they don't

8    otherwise track this information.

9          So polling client manager is really the only source of

10   instances -- of tracking instance Authenticom accesses

11   defendants's DMSs.  Now obviously there are illustrative

12   reasons we want this that you mentioned.  But also, as part of

13   our counterclaims, and defendants have counterclaims under the

14   Computer Fraud and Abuse Act, the Digital and Millennium

15   Copyright Act, and various other federal and state claims,

16   under those counterclaims, defendants need to be able to show

17   instances of wrongful Authenticom access.  And Authenticom has

18   said they don't otherwise track this access.

19         And one of the problems we have is that, as you read

20   in the briefing, in the summer of 2018 Authenticom offered this

21   alternative log that they would produce to us to try to satisfy

22   us.  And we took the deposition of Authenticom's 30(b)(6)

23   witness in April of this year.  And it was the deposition

24   just -- this was a deposition just about data.  And the first

25   topic in that notice was solely this issue of that alternative

1   log they produced.  And their witness testified that that was

2   not -- this is a quote -- not an accurate representation of

3   polling, and that we couldn't rely on it for any of the

4   purposes to try to -- tended to show DMS access.

5          So the data they have on DMS access is stored in their

6   PCM log.  They haven't retained it.  They only have seven days.

7   And now they say they can't export it.  And the alternative

8   data they gave us they say we can't rely on.

9          So if we don't get any better data -- and, again, this

10  is seven days, so it is going to be hard from that to do

11  extrapolation.  It is not going to be great.

12         But if we don't get slightly better data, we are going

13  to come in here in a few months, and they are going to have

14  Daubert challenges against our expert saying, oh, you guys

15  relied on bad data.  We told you it was bad data.  But we don't

16  have anything else to rely on.  So we're between a rock and a

17  hard place on this issue.

18         Now on the technical issues, we agree, we acknowledge,

19  we put to the side the spoliation issues.  There are only seven

20  days of data.  It is in a log.  That's what their documents --

21  that's what their witnesses say.  It is kept on their system.

22  The witnesses said, you can log in, you can look at this log,

23  whether you have to click on individual dealers or not, I'm not

24  sure.  But somebody could log in and look at the last seven

25  days of polls right now.

1          Now we're willing to accept this in multiple forms if

2     it can be copy and pasted into a document, and we can do that.

3     Your Honor mentioned screenshots.  We would accept it in the

4     form of screenshots that can be OCRd.

5          You know, if the manual difficulty of screenshots is

6     too high, and they want to set up a terminal for one of our

7     experts on the AEO basis to go in and manually create the log

8     themselves, we can do that.  If it is easier to have a special

9     master do it, we can do that.  Or we're open to alternative

10    solutions that would lessen the burden.  But this is the only

11    place they store the data.  That is what they have told us.

12    And this is data that we need.

13         THE COURT:  Okay.  I don't think I need a special

14    master here, thank God.  And thankfully for you -- although her

15    rates are not outrageous.  But I don't think I need a special

16    master here to understand this.  I either underestimated myself

17    or overestimated the complexity of the issue that you have

18    here.

19         I -- from -- based on what I can read in the

20    documents, I think -- or in your briefs, I think -- and based

21    on what I saw in some of the deposition transcripts, the parts

22    that you did submit to me -- and I think you were -- were you

23    talking about Dane Brown's deposition?

24         MR. MacDONALD:  No, this is Joe Noth's deposition.

25         THE COURT:  Okay.  Yeah, okay.  That's -- you also

 1    submitted that too, I think.

 2           I think you are -- defendants are developing

 3    information that potentially they could use to support their

 4    theory of unauthorized access to your system.  You describe

 5    some of that information at pages 2 and 3 of your brief on this

 6    issue, which is sealed.  It is ECF 711.

 7           Plaintiffs take you to task for saying, well, why are

 8    they saying all this stuff?  They're just trying to dirty us

 9    up.  True.

10           But it also to me illustrates the type of discovery

11    you're developing.  And while I understand your issue of

12    Daubert, you know, I don't know how that ends up coming out at

13    trial if the other side didn't produce or said I couldn't

14    produce the information, but they did give you a sampling.

15    That's beyond my pay grade, at least at this point, to decide.

16    But I do think you're entitled to some information on this

17    topic.

18           I agree with the plaintiffs that the burden on a small

19    or shrinking company of going through the so-called ephemeral

20    data to find this for hundreds, if not more, customers or even,

21    frankly, many, many tens of customers is burdensome and not

22    proportional to the needs of the case.  I think the proposal of

23    ten CDK dealers and ten Reynolds dealers for one day during

24    this period of time will provide the defendants with -- and I

25    don't care if it is a screenshot or however it is.  I mean, I

46

1    am not going to micromanage that process.

2         But the information to show the polling data for those

3    CDK and Reynolds dealers, as best as I can, determine what

4    you're -- again, the relevance of this information is not that

5    it is the recipe for Coke, it is for you to illustrate that

6    this happens.  And yet another way, in addition to what you

7    have already illustrated, and I'm -- I can't really, based on

8    the testimony that you're getting, I can't see how this is not

9    adequate for the purpose that you need it for.  What I do know

10   is that requiring lots more is not proportional to the needs of

11   the case.

12        And, again, we're talking about one day in 2019, I

13   think.  We're not talking about prior time.  But probably the

14   information is still helpful to you.

15        But I -- so in substance, I think the information that

16   you're looking for has some relevance.  The burden on CDK -- on

17   Authenticom of producing a complete seven-day set of

18   information -- of this information, I'm convinced, is unduly

19   burdensome and not proportional to the needs of the case from

20   what I understand the information will show and how it will be

21   used.

22        I do think that the proposal of ten CDK and ten

23   Reynolds dealers is much more proportional to the needs of the

24   case and will provide the defendants with some of the

25   information they're getting, at least on an exemplar basis.

1       And my understanding really of what the defendants

2  want is an exemplar basis because whether it is a full seven

3  days or it is a one day, you're looking -- you're not going to

4  get the entire history of the polling data, you're only going

5  to get a sample.  So the only question really is how large the

6  sample should be.  And, I mean, I don't know if ten is right or

7  12 is right or whatever.  But I think that's within the realm.

8       Hold on for one second.

9     (Brief interruption.)

10      THE COURT:  I'm thinking something.  Hold on.

11    (Brief interruption.)

12      THE COURT:  I take it, Mr. Ho, that the burden on

13  Authenticom really is in the process of querying the software

14  to get the information.  So hypothetically if you did, you

15  know, ten exemplars for CDK dealers and Reynolds for day one,

16  and then for day three you did ten different dealers, they

17  would get 20 dealers for CDK and 20 for Reynolds on different

18  days, that would double your burden in the sense that you have

19  to look at two days.

20      Well, hold your answer to that for a second.

21      Mr. MacDonald.

22      MR. MacDONALD:  Yes, your Honor, I --

23      THE COURT:  Is your objection -- is your objection to

24  -- I mean, here's my problem with your argument.  You're not

25  getting a statistically significant sample, in my view, under

1  any scenario for the entire time period that this occurred.

2  Whether they give you seven days, whether they give you a

3  rolling seven days or not, that's not a statistically

4  significant sample, I think.  I mean, you know, I'm beyond my

5  pay grade on that too.

6         But what you are getting is an exemplar.  And the only

7  question is how large that exemplar should be.  So why is an

8  exemplar that shows ten CDK and ten Reynolds dealers on one

9  day, why is that materially less helpful to you, for example,

10  than seven days?

11         MR. MacDONALD:  Well, your Honor, I'm not a

12  statistician either, but my understanding is the larger the

13  sample we can get, the -- you know, anything that we do here,

14  since Authenticom doesn't really track or keep this

15  information, is going to be an attempted extrapolation.  There

16  is going to be some uncertainty there.

17         But a larger sample will give us slightly more comfort

18  in doing that sort of extrapolation to see kind of what they

19  are doing on a systemic basis, how often they are accessing our

20  systems, how often they are polling for certain types of files,

21  how often they are running certain types of scripts or running

22  circumvention on our security.  So the larger the sample, the

23  better off -- the better data we would have.

24         And I also wanted to say, to the extent that we're

25  limited to 20 CDK dealers or, you know, ten CDK and ten

1    Reynolds dealers, however it is, defendants will request that

2    we get to pick the dealers that are used.

3        THE COURT:  Okay.  I know you're not a statistician,

4    but I don't buy your argument because what your argument really

5    sounds like is an exemplar argument.  I mean, and you have got

6    testimony from Authenticom -- and I can't remember which

7    deposition it was in, but I read it.  Maybe it is Noth -- that

8    Authenticom queried the system for hundreds of people -- of

9    dealers, I think.  I mean, you have got that testimony, right?

10        MR. MacDONALD:  But the issue, your Honor, is that

11    under some of the statutory claims that we have brought, the

12    Digital Millennium Copyright Act, each instance, each query is

13    its own statutory violation.  So we need to be able to quantify

14    how many times they have queried our systems.  Authenticom has

15    not produced very good data on that, so we're trying to

16    extrapolate it from a variety of sources.  And this would be

17    one of our sources.

18        And, obviously, you know, a seven-day period in June

19    2019 is not the ideal data set, but it is better than nothing.

20    And it is better than just having kind of a limited set of

21    dealers.

22        THE COURT:  Yeah, I mean, I think -- I'm not sure how

23    much better than -- this snapshot is proportional to the needs

24    of the case.  Let me just look here for a second at what you

25    said in your briefs.  Your brief.

1          (Brief interruption.)

2          THE COURT:  Yeah, I mean, my guess from what -- you

3     know, I mean, I know plaintiffs say you gave me this

4     information to prejudice them.  I don't know, not really.  But

5     you're trying to give me a picture of why the polling data is

6     important because you have already established wholesale -- in

7     your view wholesale access to the CDK system.  So one of your

8     bullet points on page 3 says, Authenticom had CDK dealers

9     install a program called Profile Manager and used a system

10    administrator-level account to automatically re-enable DMS

11    log-in credentials that Authenticom was using to extract data

12    from CDK's DMS within minutes after CDK's security measures

13    disabled them.  And you cite the 30(b)(6) deposition of Brown,

14    right?

15         MR. MacDONALD:  Yes.

16         THE COURT:  And that's really what we're talking about

17    here, right?

18         MR. MacDONALD:  Well, that's --

19         THE COURT:  To some extent.

20         MR. MacDONALD:  Well, seeing the actual scripts run is

21    to some extent also trying to quantify it.

22         THE COURT:  Right.  But you're never going to get all

23    the scripts that were run.  Instead you are going to have

24    testimony that says this happened a lot, and here's an example

25    of what it looked like in June of 2019.

1          But you're never going to get, I don't think, today,

2     from data that disappears, what happened prior to that date.

3     So even if I were to give you seven days from today, yes, you

4     could argue that you could extrapolate that.  Everything else

5     is arbitrary in terms -- and I still haven't -- I mean, given

6     that it -- what you're asking for, I think, is illustrative,

7     I'm not sure how a larger sample, other than it is just a

8     bigger illustrative set, gets you anyplace.

9          I mean, how are you going to use this -- you say you

10    are going to give this to your experts, but your expert is not

11    here.  Or you tell me you're not a statistician.  I think

12    Authenticom would have an interesting time with an expert who

13    says, based upon a seven-day sample in June 2019, this is how

14    often I think this happened for a four- or five-year period.

15          MR. ROSS:  Your Honor, just to chime in briefly.  This

16    is Brian Ross.

17          Before -- part of the problem is that we don't know

18    what the numbers are for these most recent seven days.  But one

19    of the things that we would hope to do would be to establish a

20    bare minimum, a conservative estimate that our experts can

21    apply.  If you see a similar number of instances over June -- a

22    certain week in June 2019, and you combine that with testimony

23    where Authenticom is saying, we have lost customers, and we are

24    accessing your systems much less often nowadays than we were

25    back in the 2015 to 2017 period, then we would hope to

1    establish a floor in terms of quantifying these improper

2    instances of access.  So that would be one example.

3          Would that be ideal?  Of course not, but it would be a

4    -- certainly better than what we have to work with now on core

5    elements of our claims.

6          THE COURT:  Yeah.  And you all say you want to

7    identify the dealers.  So do you -- is part of your proposal --

8    I'm not going to give you a seven-day look at hundreds of

9    transactions.  I'm just not.  That's unduly burdensome, it

10   seems to me.  And I don't think it is proportional to the needs

11   of the case, as I understand what this is going to be used for.

12   Even if it is a better sample for you for your expert.  Because

13   although I don't have hard data from Authenticom on this, I

14   have the Clements's affidavit.  And his affidavit at some level

15   convinces me that this is a labor intensive exercise for a

16   company that may not have the folks to do it.  And it has got

17   to be expensive.  And it has got to be real expensive.

18         Unless you want to pay for them to go through there

19   and reimburse them for the costs of doing this.

20         So I'm not going to give you seven days.

21         You hesitate.  You'll pay for it.

22         MR. MacDONALD:  Depending on the cost, we would

23   consider it, yes.  Or, you know, as I said earlier, we're

24   willing to have an expert do it if they will give us a terminal

25   and --

1       THE COURT:  I doubt that's happening.

2       Right, Mr. Nemelka -- Mr. Ho?

3       MR. HO:  We would certainly object to that, your

4  Honor.

5       THE COURT:  Yeah.

6       I mean, we're talking -- at a -- conservatively we're

7  talking about hundreds of dealers through this period of time.

8  Or at least a substantial number of more than ten.

9       I mean, another way to cut this is ten that you could

10  identify for the seven-day period.  I mean, I'm not sure how

11  much incremental burden that imposes on Authenticom.  Ten

12  dealers a day for seven days.

13       Or ten CDK, ten Reynolds for seven days.

14       MR. NEMELKA:  We'll multiply the effort by seven.

15       MR. HO:  And, your Honor, if I could just make one

16  observation about --

17       THE COURT:  How long -- do you know -- yeah, you can

18  in a second.

19       MR. HO:  Sure.

20       THE COURT:  Do you know, just because the party that

21  is raising the burden usually has to quantify the burden, do

22  you know for Mr. Clements's -- let's me see.  I'll look at

23  Clements's affidavit.  Hold on.

24       (Brief interruption.)

25       THE COURT:  Yeah, see, he talks about a -- he is

54

1    talking about the strawman here.  Rewriting the software to be
2    able to get a -- yeah, I'm getting to the point where maybe
3    I -- well, if --
4          (Discussion off the record.)
5          THE COURT:  Right.  I mean, do you have any idea as
6    you sit here today how much time it would take for ten CDK
7    dealers and ten Reynolds dealers?  I mean, because you're
8    making that proposal, you must have talked to somebody
9    technically to find out how -- and then you just multiply it by
10   seven.  So how much time is that?  Time and expense.
11         MR. NEMELKA:  They didn't give me a specific time.
12   They told me it would take about a week to get it to me because
13   I wanted to know about timing if this -- if this is something
14   that was offered or accepted.  So they said it would take them
15   about a week.  I don't know how they divided up their -- they
16   only have about three or four people now in their development,
17   and so I don't know how they would divide up -- how that
18   divides up man hours.
19         MR. HO:  But --
20         MS. MILLER:  Your Honor, this is Britt Miller.  And I
21   don't purport to have had a sneak peek at Authenticom software
22   so as to say how it operates.  But drawing on my limited
23   computer science background, I would think that you could -- if
24   you had identified the same ten dealers and you write the
25   script to be able to query the system for those ten CDK dealers

1   and those ten Reynolds dealers, you could run that query as and

2   against seven of the days, and return the results.  I.e., you

3   wouldn't have to rewrite the program or rewrite the poll or

4   rewrite the query because it is the same query, just changing

5   the date.

6          THE COURT:  I would bet they are not talking about

7   writing a query, I would bet that they are talking about

8   manually going into the system and locating the stuff.  Because

9   Clements talks about the burden on actually writing a program

10  to do this.

11         Am I right?

12         MR. HO:  Yes, your Honor.

13         THE COURT:  Yeah.  I think what they are talking about

14  is putting somebody in front of a computer screen and looking

15  at this, you know, what the seven-day period and extracting

16  from the software database this information.  And, again, this

17  is without prejudice to their argument that the, you know,

18  courts have said this, quote unquote, ephemeral data that

19  shouldn't have to be produced anyway.  It is kind of like just

20  scrolling stuff.

21         Right, Mr. Ho?

22         MR. HO:  Yes, your Honor.  I think of it as sort of

23  footprints in the sand.  I mean, they are only there for seven

24  days, and then they are washed away as in the ordinary

25  operation of the software program.  And that's exactly the kind

56

1   of data that we ordinarily think of as too burdensome to have

2   to preserve, maintain, and then produce in discovery.  And we

3   think that that ordinary principle ought to apply here.

4        If I could just make one observation about your

5   Honor's point that I think is well taken, that this can only be

6   for illustrative purposes.  I mean, I'm not a statistician, but

7   a red flag, you know, is raised in my mind when I hear the

8   defendant saying, well, actually we'd like to pick the dealers

9   because a central principle of any kind of extrapolation is

10  that it be from a statistically random sample.  So they are

11  skewing the sample by their very request to decide which

12  dealers to choose, which leads me to think this really isn't

13  about experts or about extrapolation, it is, as your Honor

14  suggested, about trying to find as many illustrations as

15  possible that they can use, however they intend to, in front of

16  the jury.

17       THE COURT:  Yeah, I mean, I do think it is trial

18  presentation.  At least that's my gut here.  I don't think

19  you're -- you know, Mr. MacDonald's -- I mean, Mr. Ross's ears

20  perking up and saying, well, we'll pay for it.  We'll pay for

21  it.  We'll put an expert there.  We'll find all this stuff.  I

22  still kind of envision, which hopefully they are not going to

23  be in front of me, the Daubert arguments about whether -- what

24  information in June of 2019 has to do with something else.

25       But I suppose defendants would argue, since the

1    company is smaller and retrenched somewhat, it can only be

2    worse earlier on in the period.

3         MR. ROSS:  And just to be clear, your Honor, one point

4    of clarification.  Mr. Ho has mentioned this concept of who is

5    picking the dealers.  Obviously the statistical significance of

6    this data is precisely why we wanted to get a production of a

7    full day or days, irrespective of anybody picking dealers.  But

8    in a world where we are -- we understand the Court's comments.

9    And in a world where we are going to be limited to a limited

10   subset of dealers, that's why we would like at least the

11   flexibility to choose.  And if -- if we decide to choose them

12   in a randomly generated way, we'll do that.  But the --

13   ultimately that was why we thought we shouldn't be limited on

14   the number of dealers.

15        THE COURT:  Well, and to say it differently, you don't

16   want them to pick them.  You would rather -- if somebody is

17   going to pick, you would rather pick.

18        What -- do you know, Mr. Nemelka, what's the over and

19   under?  What's the difference on whether I were to say, for

20   example, all the polling data for one day between June whatever

21   and whatever versus ten CDK dealers for one day?  I guess

22   depending upon how many dealers you're running, it could be

23   hundreds as opposed to ten, right?

24        MR. NEMELKA:  Yeah, it's -- that's just very

25   burdensome.  It is the seven dealers -- excuse me -- the 20

1  dealers over seven days is much less burdensome than doing all

2  of one day, by an order of magnitude.

3  THE COURT:  So might I assume if it takes one week for

4  ten and ten, it would take two weeks for 20 and 20, right?  Or

5  it would take two weeks for ten and ten over two days, right?

6  Probably, right?

7  MR. NEMELKA:  Probably, that's right.

8  MR. HO:  And, your Honor, more than just the number of

9  hours, this is a company that is on a -- you know, trying to

10  run a business at the same time and has been reduced to the

11  absolute bear number of people -- minimum number of people that

12  is required to continue to operate its business.  So to take

13  one of those people and say, you have got to spend a week or

14  two weeks trying to find data for these, even, 20 CDK and

15  Reynolds customers is still a very significant burden on

16  management.

17  MS. GULLEY:  Your Honor?

18  THE COURT:  Yes, Ms. Gulley.

19  MS. GULLEY:  Thank you.  Sorry.  I wasn't sure whether

20  there was a window.  I was waiting for a window.  Can I make

21  some comment for -- momentarily?

22  THE COURT:  Sure.  Now we will have a one, two, three,

23  three lawyers arguing for Reynolds and Reynolds.

24  MS. GULLEY:  I'm so sorry, your Honor.

25  THE COURT:  That's okay.  We have got two for CDK, so

1    we have got the whole family in here.

2         MS. GULLEY:  Okay.  Well, thank you.  So I just want

3    to address a couple of issues that you raised.  First of all, I

4    appreciate that you are not addressing the spoliation issue

5    today.  Obviously there are bigger issues.  There are prima

6    facie elements that the defendants say in having to prove their

7    counterclaims, you know, that where we sent them hold orders

8    long, long ago and have asked for the type of data for a long

9    time, which we're just learning the data that we got wasn't

10   good enough.

11        With respect to the burdens, we understand, you know,

12   that this employee situation with the reduced forces that

13   plaintiffs put in their recent motions has been something that

14   they have been putting in their motions since this case was in

15   front of the Seventh Circuit, and after which Mr. Cottrell made

16   his statement to the press that the company was well positioned

17   and battled.  That came after those layoffs when he made that

18   statement.  We have talked about this many times.

19        Nevertheless we appreciate the burdens of this.

20   Reynolds and CDK have also had significant burdens.  In polling

21   the transactional data that the plaintiffs requested, Reynolds

22   has to essentially shut down its accounting system every night

23   for months to pull that and had to pay tens of thousands of

24   dollars to buy additional server space.

25        So as an order of magnitude, we're talking about two

1   weeks for them.  We have worked on this for months and months

2   and months.  Because it goes to elements of the plaintiffs's

3   case, we have had to do that.  This goes to a core element of

4   the defendants's case.

5            I understand that now, given that the plaintiffs have

6   continued to delete that information on an ongoing basis since

7   the case began, we only have seven days, but seven days is

8   better than zero days.

9            THE COURT:  Okay.  I hear you.

10         (Brief interruption.)

11           THE COURT:  You know, there is nothing in -- I'm

12  re-reading the defendants's brief on this, which is sealed as

13  ECF 711.  And really the whole import of what defendants are

14  arguing there is the illustrative purpose of this data rather

15  than, you know, a huge -- I'm interpreting it as more of a -- I

16  don't know how this gets you -- there is no affidavit from an

17  expert that says, I need seven days of data, for example, for X

18  number of Y dealers.

19           What you say at page 7 is the PCM log, which is

20  ephemeral data, I'm convinced, even though it would only

21  contain data for a limited time period, may be the only means

22  through which defendants can understand Authenticom's polling

23  activities on a poll-by-poll dealer-by-dealer basis.  So it is

24  an attempt to understand kind of what's going on.  Maybe I'm

25  putting too much weight in that.

 1          Okay.  I want to take a really quick break here.  We

 2    have been going since 9:30.  I know I have an 11:15 criminal

 3    hearing, which everybody has not yet arrived for.  My intention

 4    is to end you there.

 5          Was there anything else you wanted me to deal

 6    with -- I understand -- I guess there is -- there are a couple

 7    of things that I would like to deal with with you.  I want to

 8    make sure I know when the documents are going to be produced.

 9    I want to know of the remaining things under advisement what

10    your priorities are.

11          MS. MILLER:  All of that -- your Honor, this is Britt

12    Miller.  I'll let Mr. Provance speak as to when we can get the

13    documents to you.

14          As to other matters that remain under advisement,

15    Docket 539 and docket 543, which are defendants's motions to

16    compel production, they were both listed on the May 15th status

17    hearing report --

18          THE COURT:  Uh-huh.

19          MS. MILLER:  -- which actually implicate a number of

20    issues that your Honor ruled on with respect to CDK today.

21          THE COURT:  Well, isn't 539 your motion to compel

22    Authenticom, which gets taken care of by what I am doing here

23    or is this more in --

24          MS. MILLER:  No, this is a -- this is the motion to

25    compel Authenticom to produce communications off of their log.