**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This document relates to:* | Hon. Robert M. Dow, Jr. |
| *Authenticom, Inc. v. CDK Global, LLC et al.,* Case No. 1:18-cv-00868 (N.D. Ill.) | Magistrate Judge Jeffrey T. Gilbert |

**Reply in Support of Defendants' Motion to Clarify June 12, 2019 Order**

Defendants respond briefly to the points raised in Authenticom's Opposition to Defendants' Motion to Clarify the Court's June 12, 2019 Order (Dkt. 719) (the "Opposition").

***The Polling Client Manager is not "ephemeral" or "transient" data***. Although not determinative of any issue before the Court, Authenticom continues to assert, wrongly, that the logs contained in their polling client manager ("PCM") are ephemeral or transient data. Opposition (Dkt. 733) at 3. Defendants respond briefly to correct the record. Ephemeral or transient data is data that is created by a computer system "as a temporary byproduct of digital information processing, not consciously created, viewed, or transmitted by the user." Kenneth J. Withers, *"Ephemeral Data" and the Duty to Preserve Discoverable Electronically Stored Information*, 37 U. Balt. L. Rev. 349, 366 (2008). In other words, transient or ephemeral data are created in the background, unseen or unintended by the user, and traditionally stored in something like a cache or in a computer's random access memory (RAM) where such information can be overwritten randomly or unintentionally as a result of a user's actions. *Id* A primary distinction between transient data and non-transient data—which nevertheless may be purged on a regular basis—is whether the data serves an independent "business purpose," even briefly, or whether it exists as a

1

byproduct. *Convolve, Inc. v. Compaq Computer Corp.*, 223 F.R.D. 162, 177 (S.D.N.Y. 2004), order clarified, 00 CIV. 5141 GBDJCF, 2005 WL 1514284 (S.D.N.Y. June 24, 2005); *Arista Records LLC v. Usenet.com, Inc.,* 608 F. Supp. 2d 409, 431 (S.D.N.Y. 2009) (same).

Now, just because data is ephemeral or transient does not mean it is not discoverable electronically stored information. Courts have previously held that such information is ESI within the meaning of the Federal Rules and should be preserved as such as a result of a request to do so. *E.g., Columbia Pictures Inc. v. Bunnell*, 245 F.R.D. 443, 446-47 (C.D. Cal. 2007) (defendant had obligation to preserve server log data fixed in random access memory); *Arista Records.,* 608 F. Supp. 2d at 431 ("[O]nce Defendants had actual notice that Plaintiffs were requesting the [transient] data, Defendants had the obligation to preserve it."); *see also* Fed. R. Civ. P. 34(a)(1) (2006 amendments), Advisory Committee's note ("Rule 34(a)(1) is intended to be broad enough to cover all current types of computer-based information and flexible enough to encompass future changes and developments."). Here, Authenticom made no effort to begin preserving any PCM data even after Defendants specifically requested in 2018 that the data be produced.

But even so, the PCM data is *not* transient data. The PCM is a software system developed by Authenticom for the explicit purpose of running and tracking queries on Defendants' Dealer Management Systems. Dkt. 711 at Ex. 2 (Clements Dep.) at 97:16-19; 304:19-20; 306:17-18. Its logs are kept, intentionally, to allow Authenticom employees to run quality controls and review progress, errors, and other issues that may come up with respect to Authenticom's polling operations. *Id.* The PCM, as the engine of Authenticom's polling apparatus, contains "█████ █████████████████████████████████████████████████████" are going to be polled. *Id* at 97:16-19. The fact that Authenticom has chosen—due to cost or other concerns—not to retain PCM logs for more than seven days does not make the data ephemeral, any more than a

company choosing to have a seven-day email retention policy would make emails ephemeral. Dkt. 711 at Ex. 2 (Clements Dep.) at 306:1-5; *see also Convolve*, 223 F.R.D. at 177 (distinguishing the preservation of "wave forms," which had "no business purpose" and were overwritten automatically, each time a "tuning engineer makes the next adjustment" from other electronic discovery, like e-mails, that can have a "semi-permanent existence" until they are either deliberately deleted or "automatically purged."). Rather, the PCM here serves a critical business purpose—logging transactions with dealers—it just overwrites itself every seven days because Authenticom has chosen that setting. Authenticom should not be allowed to refuse to comply with discovery requests and choose to regularly purge its PCM data and then, after the fact, claim that it is ephemeral or transitory *because* they chose to purge it.

***Authenticom's complaint about Defendants' selection of dealers is a strawman.*** Authenticom makes much of the fact that Defendants' selection of twenty sample dealers was not random. Opposition (Dkt. 733) at 4-6. But this is little more than a distraction. First, unless Authenticom planned to ask the Court to select dealers out of a hat, Authenticom's offer of a "random" twenty dealers was never that—the question was always whether Authenticom would get to choose the dealers or whether Defendants would have a say. Authenticom would obviously prefer the former. But since it will be Defendants who must rely upon and use this data, it should be Defendants who get to select those dealers. It is a basic principle of discovery that the receiving party gets to list out the information they are requesting, not the producing party who gets to pick and choose what relevant information gets produced.

Second, Defendants endeavored to choose dealerships that were representative, based on the information available to them, of a variety of different polling types and data fields. Dkt. 725 at Ex. 3. Authenticom does not suggest that the dealers are unrepresentative but does argue that

3

certain of the selected dealers contain multiple rooftops. *Id.* But CDK selected the Oremor Group (and other groups) because Authenticom uses a single log-in to poll each dealership, accessing data maintained in a single DMS—regardless of how many rooftops the dealership operates. *See* Ex. 1.[1] In any event, Authenticom did not respond to Defendants' request for these twenty dealers with an offer to produce a subset of the requested dealers, or with an indication that they objected to the way the dealers were selected, or even with a suggestion that the parties negotiate over which dealers would be chosen—they flatly refused to produce PCM information from *any* dealer. Dkt. 725 at Ex. 3 ("In short, we do not agree to your request. . . ."). The notion that Authenticom's true objection is that Defendants' selection of dealers was not sufficiently random is both beside the point and an ex-post invention.

      ***The August deadline for affirmative expert reports has no bearing.*** Finally, Authenticom argues that because the deadline for the submission of affirmative expert reports is August 26, it is now too late for Defendants to use the PCM information. Opposition (Dkt. 733) at 6-7. There is no small amount of chutzpah in this argument. The reason that the PCM log data remains unproduced is that Authenticom has—since Defendants first requested it in 2018—consistently and intentionally stalled, delayed, and then refused to produce it. *See, e.g.,* Dkt. 711 at 4-6. But even putting that aside, had Authenticom agreed to produce the twenty logs upon receiving Defendants' email on July 8 email, they could have been produced by now. Dkt. 725 at Ex. 3. Instead, Authenticom refused and has forced the parties into motion practice, no doubt with an eye to delaying this production even further. To hold that this delay obviates Defendants' right to this information would reward Authenticom's dilatory tactics.

---

[1] Exhibit 1 is an excerpt of voluminous records produced by CDK showing known non-authorized access to CDK DMSs as of April 30, 2019, filtered to show usernames (login IDs) associated with Authenticom used to access the Oremor Group DMS. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

Case: 1:18-cv-00864 Document #: 735 Filed: 08/06/19 Page 5 of 7 PageID #:27021

Even ignoring this, however, the argument fails. First, the PCM logs are not primarily relevant to Defendants' expert reports. As the Court recognized at the last hearing, given that Authenticom has destroyed years of PCM data, and that the subset of data that would be produced here is a mere twenty dealers, attempting to extrapolate meaningful patterns or trends over the years of Authenticom's illegal hacking will be difficult at best. Dkt. 725 at Ex. 2 at 38:13-15 (stating that "at best it is going to be a demonstrative or illustrative set of data."). Though it will surely be useful to Defendants' experts to be able to review Authenticom's polling on a dealer-by-dealer basis, the primary use of the data is illustrative—not extrapolative. As such, these logs might be relied upon in several ways beyond expert reports, including as visuals at trial or as evidence at the summary judgment stage.

Second, depending on when the PCM logs are produced, Defendants could incorporate the information into their rebuttal expert reports, any reply reports served by their experts, or they could elect to have their experts issue supplemental reports on the late-produced information, should they so choose. Given this, the Court should place no special meaning on the fact that this information may be produced after August 26. Doing so would reward Authenticom's delay, and unfairly prevent Defendants from using this information as they see fit to prosecute this case.

## CONCLUSION

Defendants' Motion to Clarify the June 12, 2019 Order to compel the production of example one-day PCM logs of the twenty requested dealers should be granted.

5

Dated: August 6, 2019

/s/ *Aundrea K. Gulley*
Aundrea K. Gulley
Brian T. Ross
GIBBS & BRUNS LLP
1100 Louisiana Street
Suite 5300
Houston, TX 77002
(713) 751-5258
agulley@gibbsbruns.com
bross@gibbsbruns.com

Michael P.A. Cohen
Leo D. Caseria
SHEPPARD MULLIN RICHTER & HAMPTON, LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, DC 20006
(202) 747-1900
mcohen@sheppardmullin.com
lcaseria@sheppardmullin.com

*Counsel for Defendant*
*The Reynolds and Reynolds Company*

Respectfully submitted,

/s/ *Britt M. Miller*
Britt M. Miller
Daniel T. Fenske
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
dfenske@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant*
*CDK Global, LLC*

## **CERTIFICATE OF SERVICE**

I, Aundrea Gulley, an attorney, hereby certify that on August 6, 2019, I caused a true and correct copy of the foregoing **REPLY IN SUPPORT OF DEFENDANTS' MOTION TO CLARIFY JUNE 12, 2019 ORDER**, to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

                                                      */s/ Aundrea Gulley*
                                                      Aundrea K. Gulley
                                                      GIBBS & BRUNS LLP
                                                      1100 Louisiana Street, Suite 5300
                                                      Houston, TX 77002
                                                      (713) 751-5258
                                                      agulley@gibbsbruns.com