# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817<br>Case No. 18 C 864 |
| This Document Relates to: | Assigned to: Hon. Robert M. Dow Jr.<br>Magistrate Judge: Hon. Jeffery T. Gilbert |
| THE DEALERSHIP CLASS ACTION. | |

**DEALERSHIP CLASS PLAINTIFFS' FIRST SET OF INTERROGATORIES**
**TO CDK GLOBAL, LLC CONCERNING CDK'S COUNTERCLAIMS**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Dealership Class Plaintiffs hereby request that CDK Global, LLC ("CDK") answer the following interrogatories, in writing and under oath, no later than thirty (30) days after service of these interrogatories, and thereafter supplement such answers in a timely manner pursuant to Rule 26(e) of the Federal Rules of Civil Procedure through the date of any trial in this matter.

## DEFINITIONS

For purposes of these requests the following definitions shall apply:

1.      "All" shall be construed as all and any, and the term "any" shall be construed as all and any.

2.      "Authenticom" shall mean the Plaintiff in this action and a provider of data integration services in the automotive industry based in La Crosse, Wisconsin. "Authenticom" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

3.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the document request all responses that might otherwise be construed to be outside of its scope.

4.      "CDK" shall mean CDK Global, LLC, as described in Paragraph 4 of Defendants' Combined Statement of Additional Facts Requiring Denial of Preliminary Injunctive Relief, *Authenticom* Dkt. 87 (hereinafter, "SoAF"). "CDK" shall include the dealer services business of Automatic Data Processing, Inc. ("ADP") prior to September 30, 2014, as described in Paragraph 5 of the SoAF. "CDK" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

5.      "Communication" shall mean any exchange or transfer of information, whether electronic, written, oral, or in any other form. The phrase "communication between" is defined to include instances where one party addresses the other party but the other party does not necessarily respond.

6.      "Data integrators" shall refer to service providers that provide access by any means to dealer data on the DMS database, whether by extracting the data, writing data back into the

DMS, or both. For the avoidance of doubt, "data integrators" includes CDK (through its 3PA program) and Reynolds (through its RCI program).

7.     "DMI" shall mean Digital Motorworks, Inc., as described in Paragraph 215 of the SoAF. "DMI" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

8.     "Document" and "Documents" are used in the broadest extent permitted by Federal Rule of Civil Procedure 34(a).

9.      "Including" (in addition to its usual meanings) shall mean including but not limited to.

10.     "IntegraLink" shall mean IntegraLink, as described in Paragraph 215 of the SoAF. "IntegraLink" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

11.     "OEM" shall mean Original Equipment Manufacturer and shall include the present or former predecessors, subsidiaries, divisions, departments, and operating units of any Original Equipment Manufacturer.

12.     The terms "relating to," "related to," "referring to," "regarding," or "with respect to" shall mean, without limitation, the following concepts: concerning, discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part.

13.     "Reynolds" shall mean "The Reynolds & Reynolds Company," as described in Paragraphs 1-3 of the SoAF. "Reynolds" shall include its present or former predecessors,

subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

14.     "Third party integrators" shall mean data integrators that provide data integration services on a DMS platform and are unaffiliated with the DMS provider.

15.     "Vendors" or "application providers" shall mean vendors who provide software applications that perform operations functions for dealerships, as described in Paragraph 20 of the SoAF.

16.     "You," "Your" or "Your company" shall mean the responding Defendant, its predecessors, successors, parents, subsidiaries, departments, divisions, joint ventures, and affiliates, including without limitation any organization or entity that the responding Defendant manages or controls, together with all present and former directors, officers, employees, agents, representatives or any persons acting or purporting to act on behalf of the responding Defendant.

## **<u>INSTRUCTIONS</u>**

1.     If any interrogatory cannot be answered in full after exercising due diligence to secure the information to do so, please so state and answer the interrogatory to the extent possible, specifying any inability to answer the remainder of any such interrogatory, and stating whatever information or knowledge is presently available to you concerning the unanswered portion of said interrogatory.

2.     To the extent that you consider any of the following interrogatories objectionable, answer so much of each interrogatory and each part thereof as is not objectionable in your view and separately state that part of each interrogatory as to which you raise objection and each ground for each such objection.

4

3.      If you object to any interrogatory or part thereof on the claim of privilege, identify each statement or other information for which the privilege is claimed and provide a privilege log that complies with Federal Rule of Civil Procedure 26(b)(5).

4.      Whenever you are instructed to state a date or a dollar amount, if such date or amount is unknown to you, state your best estimate of such date or amount and indicate that it is an estimate.

5.      The use of the past tense shall include the present tense, and the use of the present tense shall include the past tense, so as to make the question inclusive rather than exclusive.

6.      The singular includes the plural, and vice versa, so as to make the question more inclusive.

7.      Each question is to be accorded a separate answer, and questions are not to be combined for the purpose of supplying a common answer thereto.

## INTERROGATORIES

### INTERROGATORY NO. 1

Identify all public statements by CDK executives, from January 1, 2011 to the present, concerning CDK's policy or position on whether CDK dealers were permitted to provide their DMS login credentials to third parties, including, for each such public statement, (i) the date on which the statement was made, (ii) the identity of the person who made the statement (or on whose behalf the statement was made), (iii) the identity of the persons or entities to whom the statement was made, and (iv) the content of the statement..

### INTERROGATORY NO. 2

Identify all instances, from January 1, 2011 to the present, in which CDK communicated (to any entity, including without limitation any dealer or vendor) its consent for a CDK dealer to provide its DMS login credentials to a third party, including, for each such instance, (i) the date(s) of the communication(s), (ii) the people involved in the communication(s), and (iii) the dealer to whom CDK gave the consent.

### INTERROGATORY NO. 3

Identify all instances, from January 1, 2011 to the present, in which CDK attempted to enforce §§ 6(A), 6(B), and/or 6(D) of CDK's Master Services Agreement ("MSA") against any CDK Dealer, including, for each such instance, (i) the identity of the CDK Dealer, (ii) the date(s) on which CDK attempted to enforce those provisions, (iii) the means by which CDK attempted to enforce those provisions (i.e., through the filing of a lawsuit or arbitration proceeding, the termination of CDK's contract with the dealer, or other means), and (iv) the identity of all persons who possess relevant information about the enforcement attempt.

**INTERROGATORY NO. 4**

Identify all instances, from January 1, 2011 to the present, in which CDK (including DMI and/or IntegraLink) solicited a dealer to provide DMS login credentials to CDK after the login credentials that CDK had previously been using to access that dealer's DMS had been disabled by the dealer's DMS provider, including, for each such instance, (i) the date(s) on which CDK solicited the dealer to provide the DMS login credentials, (ii) the identity of the dealer's DMS provider, (iii) whether the dealer did provide CDK with new login credentials in response to the solicitation, (iv) whether the dealer sent the new login credentials to CDK in unencrypted "plain text", and (v) the identity of all persons who possess relevant information about the solicitation.

**INTERROGATORY NO. 5**

Identify all instances, from January 1, 2011 to the present, in which CDK (including DMI and/or IntegraLink) requested or encouraged any dealers to install "software scripts and programs on the dealer's own computers" which "allowed" CDK "to access" the dealer's DMS, and/or were "used to … re-enable CDK's dealer-provider login credentials" after those credentials were disabled (as those terms are used in ¶ 64 of CDK's Counterclaims), including, for each such instance, (i) the date on which the instance occurred, (ii) the identity of the dealer(s) to whom CDK made the request or encouragement.

**INTERROGATORY NO. 6**

Identify all instances, from January 1, 2011 to the present, in which CDK (including DMI and/or IntegraLink) "dug into" or otherwise accessed any other DMS provider's "DMS software in order to research vulnerabilities" in the DMS provider's "system" and "find different ways to get data out of" the DMS provider's "system" (as those terms are used in ¶ 66 of CDK's Counterclaims) without the DMS provider's prior consent, including, for each such instance, (i)

the date on which CDK accessed the DMS provider's software, (ii) the identity of the DMS provider whose software was accessed by CDK, (iii) the people at CDK who accessed the DMS provider's software, and (iv) the identities of all people who possess relevant information about CDK's access to the DMS provider's software.

**INTERROGATORY NO. 7**

Identify all instances, from January 1, 2011 to the present, in which CDK (including DMI and/or IntegraLink) used dealer-provided DMS login credentials to extract data from a dealer's DMS, including, for each such instance, (i) the date on which the instance occurred, (ii) the identity of the provider of the DMS from which CDK extracted data; (iii) whether CDK obtained prior consent from the dealer's DMS provider to extract data from that dealer's DMS; (iv) the data fields that were extracted by CDK; (v) whether CDK extracted any proprietary information owned by third parties from the dealer's DMS (including, without limitation, any "DMS program code" or other "proprietary information" of the types referenced in ¶¶ 71-72 of CDK's Counterclaims); and (vi) whether CDK accessed or copied any data that was created using the DMS provider's "third-party proprietary forms and functions within the DMS" (as those terms are used in ¶ 74 of CDK's Counterclaims).

**INTERROGATORY NO. 8**

Identify all instances, from January 1, 2011 to the present, in which CDK (including DMI and/or IntegraLink) obtained copies of any other DMS provider's DMS software without that DMS provider's prior consent, including, for each such instance, (i) the identity of the DMS provider whose DMS software was obtained by CDK, (ii) the date on which CDK obtained the DMS software, (iii) the identity of the person or entity from whom CDK obtained the DMS software, (iv) whether CDK loaded that software onto CDK's own computers and servers, (v) the identities

8

of all individuals who possess relevant knowledge concerning the circumstances of CDK's acquisition of the DMS software; and (vi) the identities of all individuals who possess relevant information about how CDK used the DMS software.

### INTERROGATORY NO. 9

Identify all instances, from January 1, 2011 to the present, in which CDK (including DMI and/or IntegraLink) accessed another DMS provider's DMS and created a copy of "portions of the DMS program code in the computer's Random Access Memory", "original and distinctive page layouts", "graphical content", "text", "arrangement, organization, and display of information", and/or "dynamic user experience" (as those terms are used in ¶ 71 of CDK's Counterclaims) without the DMS provider's prior consent.

### INTERROGATORY NO. 10

Identify all instances, from January 1, 2011 to the present, in which CDK knowingly "engaged in unauthorized access to" another DMS provider's DMS (as those terms are used in ¶ 142 of CDK's Counterclaims), including, for each such instance, (i) the date on which CDK engaged in that unauthorized access, (ii) the identity of the dealer whose DMS was accessed by CDK, (iii) the identity of the provider of the DMS with which CDK engaged in unauthorized access, (iv) all data fields that were extracted by CDK through that unauthorized access; and (v) the identities of all individuals who possess relevant information about CDK's unauthorized access to the DMS.

### INTERROGATORY NO. 11

Identify, for each Dealership Counter-Defendant, all "losses, expenses and other damages" that CDK allegedly suffered as a result of that Dealership Counter-Defendant's alleged (i) breaches of contract, (ii) violations of the Computer Fraud and Abuse Act, and/or (iii) violations of the

Digital Millennium Copyright Act, including the date and amount each such loss, expense, and other damage.

**INTERROGATORY NO. 12**

Identify all instances, from January 1, 2011 to the present, in which any dealer's computer systems were overburdened or "tied up" as a result of any Dealership Counter-Defendant's alleged actions, including, for each such instance, (i) the date on which the instance occurred, (ii) the extent to which the dealer's computer systems were overburdened or "tied up", (iii) any damages that CDK allegedly suffered as a result of the instance, (iv) all facts supporting CDK's assertion that the instance was caused by any Dealership Counter-Defendant's alleged actions; and (v) the identities of all individuals who possess relevant knowledge concerning the instance.

**INTERROGATORY NO. 13**

Identify all instances, from January 1, 2011 to the present, in which CDK's own computer systems (i.e., not including a CDK Dealer's DMS or other computer systems) were overburdened or "tied up" as a result of any Dealership Counter-Defendant's alleged actions, including, for each such instance, (i) the date on which the instance occurred, (ii) the extent to which CDK's systems were overburdened or "tied up", (iii) any damages that CDK allegedly suffered as a result of the instance, (iv) all facts supporting CDK's assertion that the instance was caused by any Dealership Counter-Defendant's alleged actions; and (v) the identities of all individuals who possess relevant knowledge concerning the instance.

**INTERROGATORY NO. 14**

Identify all instances, from January 1, 2011 to the present, in which CDK's own computer systems (i.e., not including a CDK Dealer's DMS or other computer systems) experienced "data corruption issues" (as that term is used in ¶ 82 of CDK's Counterclaims) as a result of any

Dealership Counter-Defendant's alleged actions, including, for each such instance, (i) the date on which the "data corruption issues" occurred, (ii) the extent to which CDK's systems experienced "data corruption issues", (iii) any damages that CDK allegedly suffered as a result of the "data corruption issues", (iv) all facts supporting CDK's assertion that the "data corruption issues" were caused by any Dealership Counter-Defendant's alleged actions; and (v) the identities of all individuals who possess relevant knowledge concerning the "data corruption issues".

**<u>INTERROGATORY NO. 15</u>**

Identify all instances, from January 1, 2011 to the present, in which a data security breach occurred as a result of any Dealership Counter-Defendant's alleged actions, including, for each such instance, (i) the date on which the data security breach occurred, (ii) the date on which CDK first learned of the data security breach, (iii) the individuals or entities whose data was breached in the data security breach, (iv) any damages that CDK allegedly suffered as a result of the data security breach, (v) all facts supporting CDK's assertion that the data security breach was caused by any Dealership Counter-Defendant's alleged actions; and (vi) the identities of all individuals who possess relevant knowledge concerning the data security breach.

**<u>INTERROGATORY NO. 16</u>**



**INTERROGATORY NO. 17**

Identify, for each Dealership Counter-Defendant, all documents that you believe support your counterclaims against that Dealership Counter-Defendant.

**INTERROGATORY NO. 18**

Identify, for each Dealership Counter-Defendant, all evidence that you believe supports your contentions against that Dealership Counter-Defendant.

Dated:  March 8, 2019

Respectfully submitted,

*/s/ Peggy J. Wedgworth*
Peggy J. Wedgworth
***Dealership Interim Lead Class Counsel***
**MILBERG TADLER PHILLIPS GROSSMAN LLP**
One Pennsylvania Plaza, 19th Floor
New York, NY 10119
(212) 594-5300
pwedgworth@milberg.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2019, I caused a true and correct copy of the foregoing DEALERSHIP CLASS PLAINTIFFS' FIRST SET OF INTERROGATORIES TO CDK GLOBAL, LLC CONCERNING CDK'S COUNTERCLAIMS to be served by email upon the following recipients: service-external-dms-mdl@lists.kellogghansen.com.


       */s/ Matthew A. Kupillas*
Matthew A. Kupillas

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | MDL No. 2817<br>Case No. 1:18-CV-864 |
| *This document relates to:*<br><br>THE DEALERSHIP CLASS ACTION | Hon. Robert M. Dow, Jr.<br>Magistrate Judge Jeffrey T. Gilbert<br><br>**CONTAINS INFORMAION DESIGNATED CONFIDENTIAL AND HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER** |

**CDK GLOBAL, LLC'S RESPONSES AND OBJECTIONS TO
DEALERSHIP CLASS PLAINTIFFS' FIRST SET OF INTERROGATORIES
CONCERNING CDK'S COUNTERCLAIMS**

Defendant CDK Global, LLC ("CDK"), by and through its attorneys, and pursuant to Fed. R. Civ. P. 26 and 33, hereby submits its written objections and responses to the Dealership Class Plaintiffs' (the "Dealership Plaintiffs'") First Set of Interrogatories to CDK Global, LLC Concerning CDK's Counterclaims, dated March 8, 2019 (the "Interrogatories").

**GENERAL OBJECTIONS**

1.      CDK asserts each of the following objections to the Interrogatories. In addition to these General Objections, CDK may also state specific objections to an Interrogatory where appropriate. By setting forth such additional specific objections, CDK does not in any way intend to limit or restrict its General Objections. Moreover, to the extent CDK provides a response to any of the Interrogatories to which CDK objects, such response shall not constitute a waiver of any General Objection or specific objection.

2.      Nothing herein shall be construed as an admission by CDK regarding the competence, admissibility, or relevance of any fact sought by the Dealership Plaintiffs' Interrogatories. CDK reserves its right to challenge the competency, relevance, materiality, and admissibility of any information or documents that it produces in response to any discovery request at trial, of this or any other action, or at any subsequent proceeding, of this action or of any other action. Further, CDK intends no incidental or implied admissions by its answers to the Dealership Plaintiffs' Interrogatories. Whether CDK answers or objects to any particular Interrogatory should not be interpreted as an admission that CDK accepts or admits the existence of any fact(s) set out or assumed by such Interrogatory, that the Interrogatories are proper, that CDK's answers or objections constitute admissible evidence, that the documents or information sought are relevant, material, or otherwise within the proper bounds of discovery, that such documents or information are properly discoverable, or that other such discovery requests will be treated in a similar fashion in this or any other proceeding. Furthermore, whether CDK answers part or all of any particular Interrogatory is not intended and should not be construed as a waiver by CDK of any or all objections to such Interrogatory or any other Interrogatory.

3.      CDK objects to any Interrogatory, instruction, definition, or directive contained in the Interrogatories to the extent that it purports to impose any obligations on CDK beyond those set forth in the Federal Rules of Civil Procedure and the Local Rules of the Northern District of Illinois, or any applicable orders of the Court.

4.      CDK objects to the Interrogatories to the extent they are unlimited in time or not limited to the time period relevant to this litigation (e.g., that they purport to see information "from January 1, 2011 to the present"), on the ground that such Interrogatories seek information which is neither relevant to any claim or defense in this action and is overly broad and unduly

burdensome. Therefore, unless otherwise specified in its response to a specific Interrogatory, CDK's responses will be limited to the time period beginning on or after January 1, 2013.

5.      CDK objects to the Interrogatories to the extent they seek the identification of all "instances" or occurrences of certain events because those Interrogatories are overly broad, unduly burdensome, and not proportional to the needs of the case. In accordance with the Dealership Plaintiffs' representations concerning these Interrogatories, to the extent that CDK responds to them, it will provide an approximate number of "instances" and/or a summary of the identifying information sought by the Interrogatory. *See* ECF No. 599-4; ECF No. 632, at 4.

6.      CDK objects to the Interrogatories, and each and every definition, instruction, and request therein, to the extent they seek information and/or documents that: (a) contain privileged attorney-client communications; (b) constitute work product; (c) were prepared in anticipation of or in connection with litigation or trial; (d) disclose the mental impressions, conclusions, opinions or legal theories of any attorney for or other representative of CDK; (e) are subject to the common-interest or joint-defense privileges; or (f) are otherwise privileged or exempt from discovery. To the extent that the Interrogatories, or any one of them, seek such information, CDK hereby claims such privilege and invokes such protection. The fact that CDK does not specifically object to an individual Interrogatory on the grounds that it seeks privileged or protected material shall not be deemed a waiver of the protection afforded by any applicable privilege. Similarly, to the extent any information or documents subject to a privilege or otherwise protected from discovery are produced in response to these Interrogatories, such production is inadvertent and not intended as a waiver.

7.      CDK objects to the Interrogatories to the extent that they seek information and/or documents that are confidential or otherwise proprietary in nature. The represented parties in this

litigation have agreed upon a Second Amended Agreed Confidentiality Order ("Confidentiality Order"), which was approved and entered by the Court on April 25, 2019 (Dkt. 650). Thus, to the extent that an Interrogatory calls for production of confidential or competitively sensitive material, as defined by the Confidentiality Order, CDK will only provide information in response to such Interrogatory subject to that Order.

8.      CDK objects to the Interrogatories to the extent that they violate any constitutional, statutory, or common law rights of privacy and confidentiality, including those provided under U.S. state or federal law or any other country's law, of CDK's employees and other persons, including individuals who are not parties to this litigation. CDK reserves the right to protect the privacy and confidentiality interests of non-parties to this litigation, including by allowing such parties to seek a protective order from the Court prior to the production of information that implicates their confidential or private information, or by redacting such information from any response that CDK may produce.

9.      CDK objects to the Interrogatories to the extent they purport to require the production of documents or information that are not maintained by CDK in the form or manner requested.

10.      CDK objects to the Interrogatories to the extent that they seek the production of documents or information beyond the possession, custody, or control of CDK or its current officers, directors, or employees and/or that cannot be located with a reasonably diligent search, thus making the Interrogatories unduly burdensome.

11.      CDK objects to the Interrogatories on the ground of undue burden to the extent that they seek the production of documents or information currently in the Dealership Plaintiffs'

possession, custody, or control, that is publicly available, or that can be obtained more easily from third parties.

12.     CDK's responses to the Interrogatories are based on its present knowledge, upon a reasonable inquiry. Discovery is ongoing, and CDK's investigation continues. CDK reserves the right to supplement, amend, and correct these responses and objections, if necessary, based on information later obtained through investigation, discovery, or otherwise.

13.     To the extent CDK has objected to or refused to respond to any given Interrogatory, in whole or in part, and to the extent that the Dealership Plaintiffs take issue with any such objection or refusal, CDK is willing to meet-and-confer with the Dealership Plaintiffs to see if a reasonable, mutually-acceptable compromise might be reached.

14.     CDK incorporates each of the foregoing General Objections as though fully set forth in each response and objection below.

<b><u>OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS</u></b>

1.     CDK objects to each and every "Definition" and "Instruction" set forth in the Interrogatories to the extent that such definitions or instructions purport to broaden terms beyond their ordinary meaning or impose obligations on CDK broader than or inconsistent with the obligations created by Fed. R. Civ. P. 26 and 33 and/or any applicable Local Rule or other Court Order. CDK will respond to the Interrogatories in accordance with the Federal Rules.

2.     CDK objects to the Dealership Counter-Defendants' definition of "Authenticom" in Definition No. 2 as "the Plaintiff in this action," in so far as Authenticom is not the only Plaintiff in this multidistrict litigation and these Interrogatories purport to relate to CDK's Counterclaims, not to any claims brought by Authenticom, the Dealership Plaintiffs, or other any party.

5

3.    CDK objects to the Dealership Counter-Defendants' definitions of "CDK" and "you," "your" and "your company" in Definition Nos. 4 and 16 as overly broad and unduly burdensome to the extent they purport to require CDK to produce information and/or documents beyond CDK's possession, custody, or control. In addition, CDK objects to Definition Nos. 4 and 16 to the extent they purport to require CDK to produce information and/or documents within the possession, custody, or control of any person or entity other than its current officers, directors, employees, agents, or any person acting on CDK's behalf.

4.    CDK objects to the Dealership Counter-Defendants' definition of "data integrators" in Definition No. 6, in so far as an entity that does not own or provide its own DMS but which "provide[s] access by any means to dealer data" on another provider's "DMS database, whether by extracting the data, writing data back into the DMS, or both," is not providing "integration" services as CDK uses and understands the term. To the extent that CDK responds to Interrogatories that reference "data integrators" or "third party integrators," it does not mean that CDK agrees with or accepts the Dealership Counter-Defendants' definitions.

5.    CDK objects to the Dealership Counter-Defendants' definitions of "DMI" and "IntegraLink" in Definition Nos. 7 and 10 as overly broad, unduly burdensome, and seeking documents and information that are irrelevant and not within CDK's possession, custody, or control, to the extent that these definitions purport to include any documents or information pertaining to Digital Motorworks, Inc. or IntegraLink before those entities were acquired by and incorporated into the business operations of CDK.

**CDK'S SPECIFIC RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 1**: Identify all public statements by CDK executives, from January 1, 2011 to the present, concerning CDK's policy or position on whether CDK dealers were permitted to provide their DMS login credentials to third parties, including, for each such public statement, (i) the date on which the statement was made, (ii) the identity of the person who made

the statement (or on whose behalf the statement was made), (iii) the identity of the persons or entities to whom the statement was made, and (iv) the content of the statement.

0001117; CDK-2670251; CDK-0016062; CDK-0214705; CDK-0055595; CDK-1176495; CDK-1176497; CDK-0111950; CDK-0887485; CDK-0887504; CDK-0215677; CDK-0012615.

**INTERROGATORY NO. 2**: Identify all instances, from January 1, 2011 to the present, in which CDK communicated (to any entity, including without limitation any dealer or vendor) its consent for a CDK dealer to provide its DMS login credentials to a third party, including, for each such instance, (i) the date(s) of the communication(s), (ii) the people involved in the communication(s), and (iii) the dealer to whom CDK gave the consent.

**RESPONSE:** CDK objects to this Interrogatory as overly broad and unduly burdensome in that it is not proportional to the needs of the case and seeks information that is not relevant to any of CDK's Counterclaims or any defenses to those Counterclaims, and thus is beyond the scope of permissible discovery. Any "communicat[ions]" CDK may have had with any dealers, vendors, or other "entit[ies]" that are not among the named Dealership Counter-Defendants has no bearing on those Dealership Counter-Defendants' breaches of contract and statutory violations.





**INTERROGATORY NO. 3**: Identify all instances, from January 1, 2011 to the present, in which CDK attempted to enforce §§ 6(A), 6(B), and/or 6(D) of CDK's Master Services Agreement ("MSA") against any CDK Dealer, including, for each such instance, (i) the identity of the CDK Dealer, (ii) the date(s) on which CDK attempted to enforce those provisions, (iii) the means by which CDK attempted to enforce those provisions (i.e., through the filing of a lawsuit or arbitration proceeding, the termination of CDK's contract with the dealer, or other means), and (iv) the identity of all persons who possess relevant information about the enforcement attempt.







**INTERROGATORY NO. 4**: Identify all instances, from January 1, 2011 to the present, in which CDK (including DMI and/or IntegraLink) solicited a dealer to provide DMS login credentials to CDK after the login credentials that CDK had previously been using to access that dealer's DMS had been disabled by the dealer's DMS provider, including, for each such instance, (i) the date(s) on which CDK solicited the dealer to provide the DMS login credentials, (ii) the identity of the dealer's DMS provider, (iii) whether the dealer did provide CDK with new login credentials in response to the solicitation, (iv) whether the dealer sent the new login credentials to CDK in unencrypted "plain text", and (v) the identity of all persons who possess relevant information about the solicitation.



**INTERROGATORY NO. 5**: Identify all instances, from January 1, 2011 to the present, in which CDK (including DMI and/or IntegraLink) requested or encouraged any dealers to install "software scripts and programs on the dealer's own computers" which "allowed" CDK "to access" the dealer's DMS, and/or were "used to … re-enable CDK's dealer-provider login credentials" after those credentials were disabled (as those terms are used in ¶ 64 of CDK's Counterclaims), including, for each such instance, (i) the date on which the instance occurred, (ii) the identity of the dealer(s) to whom CDK made the request or encouragement.



**INTERROGATORY NO. 6**: Identify all instances, from January 1, 2011 to the present, in which CDK (including DMI and/or IntegraLink) "dug into" or otherwise accessed any other DMS provider's "DMS software in order to research vulnerabilities" in the DMS provider's "system" and "find different ways to get data out of" the DMS provider's "system" (as those terms are used in ¶ 66 of CDK's Counterclaims) without the DMS provider's prior consent, including,

for each such instance, (i) the date on which CDK accessed the DMS provider's software, (ii) the identity of the DMS provider whose software was accessed by CDK, (iii) the people at CDK who accessed the DMS provider's software, and (iv) the identities of all people who possess relevant information about CDK's access to the DMS provider's software.



**INTERROGATORY NO. 7**: Identify all instances, from January 1, 2011 to the present, in which CDK (including DMI and/or IntegraLink) used dealer-provided DMS login credentials to extract data from a dealer's DMS, including, for each such instance, (i) the date on which the instance occurred, (ii) the identity of the provider of the DMS from which CDK extracted data; (iii) whether CDK obtained prior consent from the dealer's DMS provider to extract data from that dealer's DMS; (iv) the data fields that were extracted by CDK; (v) whether CDK extracted any proprietary information owned by third parties from the dealer's DMS (including, without limitation, any "DMS program code" or other "proprietary information" of the types referenced in ¶¶ 71-72 of CDK's Counterclaims); and (vi) whether CDK accessed or copied any data that was created using the DMS provider's "third-party proprietary forms and functions within the DMS" (as those terms are used in ¶ 74 of CDK's Counterclaims).



13



**INTERROGATORY NO. 8**: Identify all instances, from January 1, 2011 to the present, in which CDK (including DMI and/or IntegraLink) obtained copies of any other DMS provider's DMS software without that DMS provider's prior consent, including, for each such instance, (i) the identity of the DMS provider whose DMS software was obtained by CDK, (ii) the date on which CDK obtained the DMS software, (iii) the identity of the person or entity from whom CDK obtained the DMS software, (iv) whether CDK loaded that software onto CDK's own computers and servers, (v) the identities of all individuals who possess relevant knowledge concerning the circumstances of CDK's acquisition of the DMS software; and (vi) the identities of all individuals who possess relevant information about how CDK used the DMS software.



**INTERROGATORY NO. 9**: Identify all instances, from January 1, 2011 to the present, in which CDK (including DMI and/or IntegraLink) accessed another DMS provider's DMS and created a copy of "portions of the DMS program code in the computer's Random Access Memory", "original and distinctive page layouts", "graphical content", "text", "arrangement, organization, and display of information", and/or "dynamic user experience" (as those terms are used in ¶ 71 of CDK's Counterclaims) without the DMS provider's prior consent.

**\*\*\*BEGIN CONFIDENTIAL DESIGNATION\*\*\***

14



**INTERROGATORY NO. 10**: Identify all instances, from January 1, 2011 to the present, in which CDK knowingly "engaged in unauthorized access to" another DMS provider's DMS (as those terms are used in ¶ 142 of CDK's Counterclaims), including, for each such instance, (i) the date on which CDK engaged in that unauthorized access, (ii) the identity of the dealer whose DMS was accessed by CDK, (iii) the identity of the provider of the DMS with which CDK engaged in unauthorized access, (iv) all data fields that were extracted by CDK through that unauthorized access; and (v) the identities of all individuals who possess relevant information about CDK's unauthorized access to the DMS.



**INTERROGATORY NO. 11**: Identify, for each Dealership Counter-Defendant, all "losses, expenses and other damages" that CDK allegedly suffered as a result of that Dealership Counter-Defendant's alleged (i) breaches of contract, (ii) violations of the Computer Fraud and Abuse Act, and/or (iii) violations of the Digital Millennium Copyright Act, including the date and amount each such loss, expense, and other damage.



**INTERROGATORY NO. 12**: Identify all instances, from January 1, 2011 to the present, in which any dealer's computer systems were overburdened or "tied up" as a result of any Dealership Counter-Defendant's alleged actions, including, for each such instance, (i) the date on

which the instance occurred, (ii) the extent to which the dealer's computer systems were overburdened or "tied up", (iii) any damages that CDK allegedly suffered as a result of the instance, (iv) all facts supporting CDK's assertion that the instance was caused by any Dealership Counter-Defendant's alleged actions; and (v) the identities of all individuals who possess relevant knowledge concerning the instance.





**INTERROGATORY NO. 13**: Identify all instances, from January 1, 2011 to the present, in which CDK's own computer systems (i.e., not including a CDK Dealer's DMS or other

computer systems) were overburdened or "tied up" as a result of any Dealership Counter-Defendant's alleged actions, including, for each such instance, (i) the date on which the instance occurred, (ii) the extent to which CDK's systems were overburdened or "tied up", (iii) any damages that CDK allegedly suffered as a result of the instance, (iv) all facts supporting CDK's assertion that the instance was caused by any Dealership Counter-Defendant's alleged actions; and (v) the identities of all individuals who possess relevant knowledge concerning the instance.



**INTERROGATORY NO. 14**: Identify all instances, from January 1, 2011 to the present, in which CDK's own computer systems (i.e., not including a CDK Dealer's DMS or other computer systems) experienced "data corruption issues" (as that term is used in ¶ 82 of CDK's Counterclaims) as a result of any Dealership Counter-Defendant's alleged actions, including, for each such instance, (i) the date on which the "data corruption issues" occurred, (ii) the extent to which CDK's systems experienced "data corruption issues", (iii) any damages that CDK allegedly suffered as a result of the "data corruption issues", (iv) all facts supporting CDK's assertion that the "data corruption issues" were caused by any Dealership Counter-Defendant's alleged actions; and (v) the identities of all individuals who possess relevant knowledge concerning the "data corruption issues".



**INTERROGATORY NO. 15**: Identify all instances, from January 1, 2011 to the present, in which a data security breach occurred as a result of any Dealership Counter-Defendant's alleged actions, including, for each such instance, (i) the date on which the data security breach occurred, (ii) the date on which CDK first learned of the data security breach, (iii) the individuals or entities whose data was breached in the data security breach, (iv) any damages that CDK allegedly suffered as a result of the data security breach, (v) all facts supporting CDK's assertion that the data security breach was caused by any Dealership Counter-Defendant's alleged actions; and (vi) the identities of all individuals who possess relevant knowledge concerning the data security breach.







**INTERROGATORY NO. 17**: Identify, for each Dealership Counter-Defendant, all documents that you believe support your counterclaims against that Dealership Counter-Defendant.

**RESPONSE:** CDK objects to this Interrogatory as overly broad and unduly burdensome in that it is not proportional to the needs of the case, and thus is beyond the scope of permissible discovery. Identifying every single document that may support CDK's Counterclaims is grossly overbroad and unduly burdensome, especially given the vast number of documents produced thus far in this multidistrict litigation. Additionally, on information and belief, Dealership Counter-Defendants have agreed to withdraw this Interrogatory, and therefore no Response is required. *See* ECF No. 599-4; ECF No. 632, at 4, 10 (stating that Dealership Counter-Defendants' offer to withdraw Interrogatories No. 17 and 18 "still stands").

**INTERROGATORY NO. 18**: Identify, for each Dealership Counter-Defendant, all evidence that you believe supports your contentions against that Dealership Counter-Defendant.

**RESPONSE:** CDK objects to this Interrogatory as overly broad and unduly burdensome in that it is not proportional to the needs of the case, and thus is beyond the scope of permissible discovery. Identifying "all evidence" that may support CDK's Counterclaims is grossly overbroad and unduly burdensome, especially given the vast number of documents produced, depositions taken, and other evidence developed thus far in this multidistrict litigation. Additionally, on information and belief, Dealership Counter-Defendants have agreed to withdraw this Interrogatory, and therefore no Response is required. *See* ECF No. 599-4; ECF No. 632, at 4, 10 (stating that Dealership Counter-Defendants' offer to withdraw Interrogatories No. 17 and 18 "still stands").

Dated:  July 3, 2019

Respectfully submitted,

/s/ *Matthew D. Provance*
Matthew D. Provance
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
mprovance@mayerbrown.com
bmiller@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant*
*CDK Global, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2019, I caused a true and correct copy of the foregoing **CDK GLOBAL, LLC'S RESPONSE AND OBJECTIONS TO DEALERSHIP CLASS PLAINTIFFS' FIRST SET OF INTERROGATORIES CONCERNING CDK'S COUNTERCLAIMS** to be served by email upon counsel of record pursuant to the SERVICE-EXTERNAL-DMS-MDL@lists.kellogghansen.com email list by agreement of the parties in accordance with Fed. R. Civ. P. 5(b)(2)(E).

*/s/ Matthew D. Provance*
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Phone: (312) 782-0600
Fax: (312) 701-7711
E-mail: mprovance@mayerbrown.com

## VERIFICATION

I, Michael Noser, hereby declare that I am employed by CDK Global, LLC ("CDK") as Senior Director, Operations of CDK Data Services. I have read the foregoing RESPONSES AND OBJECTIONS TO DEALERSHIP CLASS PLAINTIFFS' FIRST SET OF INTERROGATORIES CONCERNING CDK'S COUNTERCLAIMS dated July 3, 2019, and based on CDK's records, on information furnished to me, or on my personal knowledge, and without waiving any objections asserted therein, the statements of fact contained in these responses are true and correct to the best of my knowledge and belief.

Except as to matters stated on information and belief, I declare under penalty of perjury of the laws of the United States that the foregoing statement is true and correct.

Executed on July 3, 2019, at Austin, Texas.

Michael Noser
Senior Director, Operations
CDK Data Services

# EXHIBIT C

1

```
                    IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
2                           EASTERN DIVISION

3    IN RE:                              )  No. 18 C 864
                                         )
4    DEALER MANAGEMENT SYSTEMS           )  Chicago, Illinois
     ANTITRUST LITIGATION.               )  June 10, 2019
5                                        )  9:35 A.M.

6          TRANSCRIPT OF PROCEEDINGS - Status and Motions
        BEFORE THE HONORABLE JEFFREY T. GILBERT, Magistrate Judge.
7
     APPEARANCES:
8

9    For the Plaintiffs:       MILBERG TADLER PHILLIPS GROSSMAN, LLP
                               One Pennsylvania Plaza
10                             19th Floor
                               New York, New York 10119
11                             BY:  MS. PEGGY J. WEDGWORTH

12                             KELLOGG, HANSEN, TODD, FIGEL
                                 & FREDERICK, PLLC
13                             1615 M Street, N.W.
                               Suite 400
14                             Washington, D.C.   20036
                               BY:  MR. DEREK TAM HO
15                                  MR. MICHAEL N. NEMELKA

16                             ROBBINS GELLER RUDMAN & DOWD
                               200 South Wacker Drive
17                             31st Floor
                               Chicago, Illinois  60606
18                             BY:  MR. FRANK ANTHONY RICHTER

19   For Defendant CDK:        MAYER BROWN LLP
                               71 South Wacker Drive
20                             Chicago, Illinois   60606
                               BY:  MS. BRITT MARIE MILLER
21                                  MR. MATTHEW DAVID PROVANCE

22
                         PAMELA S. WARREN, CSR, RPR
23                          Official Court Reporter
                          219 South Dearborn Street
24                                Room 2342
                          Chicago, Illinois   60604
25                              (312) 408-5100
```

2



```
1   APPEARANCES:   Continued

2   For Defendant Reynolds        GIBBS & BRUNS, L.L.P.
    and Reynolds Company:         1100 Louisiana Street
3                                 Suite 5300
                                  Houston, Texas  77002
4                                 BY:  MR. ROSS M. MacDONALD
                                       MR. BRIAN T. ROSS
5
                                       MS. AUNDREA KRISTINE GULLEY
6                                      (Appearing telephonically)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1          (Proceedings had in open court.)
 2          THE COURT:  Sorry, everybody.
 3          I know Ms. Gulley is on the phone too, so we will get
 4    everybody's appearances.  Just give me one second.
 5          Okay.  We'll call the case and get the appearances and
 6    start rolling here.
 7          THE CLERK:  18 C 864, In Re:  Dealer Management
 8    Systems Antitrust Litigation, for status and motion hearing.
 9          THE COURT:  Okay.  Good morning.  Plaintiffs first and
10    then defendants.
11          MS. WEDGWORTH:  Good morning, your Honor.  On behalf
12    of dealership class plaintiffs, Peggy Wedgworth for Miller
13    Tadler Phillips Grossman.
14          MR. HO:  Good morning, your Honor.  Derek Ho from
15    Kellogg, Hansen on behalf of the individual and vendor class
16    plaintiffs.
17          MR. NEMELKA:  Good morning, your Honor.  Mike Nemelka
18    from Kellogg, Hansen on behalf of the individual and vendor
19    class.
20          MR. RICHTER:  Good morning, your Honor.  Frank Richter
21    from Robbins Geller dealership class plaintiffs steering
22    committee.
23          THE COURT:  Dealership class plaintiffs steering
24    committee.
25          And how is that different than Ms. Wedgworth?
```

```
 1          MS. RICHTER:  Ms. Wedgworth is lead counsel for the
 2    dealership class.
 3          THE COURT:  Okay.  Back row.
 4          MR. MacDONALD:  Good morning, your Honor.  Ross
 5    MacDonald of Gibbs & Bruns for defendants Reynolds and Reynolds
 6    Company.
 7          MR. ROSS:  Good morning, your Honor.  Brian Ross also
 8    from Gibbs & Bruns on behalf of the Reynolds and Reynolds
 9    Company.
10          MS. MILLER:  Good morning, your Honor.  Britt Miller,
11    Mayer Brown, LLP, on behalf of CDK Global, LLC, and
12    Computerized Vehicle Registration.
13          MR. PROVANCE:  Good morning, your Honor.  Matt
14    Provance also with Mayer Brown for CDK Global and Computerized
15    Vehicle Registration.
16          THE COURT:  And on the phone we have?
17          MS. GULLEY:  Good morning, your Honor.  This is Andi
18    Gulley for the Reynolds and Reynolds Company.
19          THE COURT:  Thank you.
20          I'm sorry, Ms. Gulley, that we couldn't rearrange
21    this.  When you guys asked to rearrange it, I actually had a
22    trial scheduled for the 17th, 18th, and 19th, which precluded
23    me from moving this there, and so I just didn't want to -- I
24    didn't want to have to push it farther into June.
25          And then last week that case settled.  So I'm sorry.
```

1    But since we already had this, and since you had said

2  you were okay to appear by phone -- I don't know what you're

3  doing, I hope I'm not interfering with your vacation, but

4  whatever, I thought for a variety of reasons we ought to go

5  forward with this as planned.  So thanks for appearing by

6  phone.

7    It sounds like you're on a landline also.  Are you?

8    MS. GULLEY:  Yes, I found some temporary office.  No

9  problem.  Thanks for letting me attend this way.

10    THE COURT:  Okay.  Great.

11    Okay.  I know we have a lot of things pending.  My

12  intention today, frankly, is to go through and rule on as much

13  as I can.

14    At the end of doing that, it is possible that all we

15  will have under advisement is motions that require some in

16  camera review, which we'll have to talk about.

17    So I don't have a particular order here, but I think

18  I'm happy to deal first with this joint motion, ECF 699.  It is

19  a joint motion by the -- CDK and the dealership class

20  plaintiffs to allow some late-served discovery, subpoenas to go

21  forward because both sides agree that they should be able to do

22  that.  Authenticom, the vendor class, and Cox, as well as some

23  other folks who were included with that group, who I don't need

24  to always name, indicated some opposition to this.  So I

25  issued -- I did issue an order that said, I think, you know, I

6

1    didn't see how this would delay the progress of the case.

2          But as I thought about it more, either Mr. Nemelka or

3    Mr. Ho, whoever is going to address this -- oh, I did start to

4    think, you know, when is enough enough?  And I -- I thought I

5    could see some principle distinctions here.

6          But, anyway, don't you -- somebody tell me what your

7    opposition is here.

8          MR. NEMELKA:  Thank you, your Honor.  Mike Nemelka.

9    I'll be speaking on behalf of our clients.

10          It is pretty simple.  It is actually that principle

11   that at some point discovery has to end.  And these are late-

12   served subpoenas.  And Infutor, in particular, has lodged what

13   we feel are meritorious objections on timeliness.  And so we

14   don't take a position on the subpoenas that the dealers want to

15   serve to the telecom companies, which is why we, you know, can

16   join the motion.  But our basis is pretty simple, that, you

17   know, at some point this needs to come to an end.

18          THE COURT:  Why don't you oppose the AT&T -- the

19   telephone carrier subpoenas?  Because nobody objects to them,

20   and it is just a -- it is just pushing paper back and forth.

21          MR. NEMELKA:  Right.  The telecom companies haven't

22   objected on timeliness yet, unlike Infutor.  And also they just

23   -- these are routine subpoenas that the telecom companies

24   respond to in the thousands every year that it is -- they have

25   offices set up to do this.  It is basic, simple records that

7

1    they have available, much different from a -- the type of

2    subpoena that was issued to Infutor.

3            THE COURT:  Okay.  Who is going to speak to this from

4    the prospective of the defendants?

5            And before you speak, I have to say that I have

6    changed my mind a little bit on this.  I mean, I -- you know, I

7    know that Impact Group has produced.  Infutor Data Solutions

8    has objected.  I know that the subpoenas to the phone carriers

9    are more administrative, ministerial than the other ones.  But

10   I have to tell you what my leaning is after thinking about this

11   so that you know what you are dealing with.  I'm thinking about

12   denying the joint motion entirely, without the agreement of all

13   parties.  I'm -- you know, if -- including the telephone

14   carrier subpoenas.  Those haven't been served yet.  There is a

15   motion late to file them.  You guys served your subpoenas on

16   the last day of discovery.  That's usually not the way it is

17   done.

18           And given what I see in this case and the continuing

19   attempts to expand scope in some ways, a large part of me

20   feels, you know what, you're -- you got to wind this up.  I

21   keep hearing from Authenticom that, you know, there are -- it

22   is being delayed, we're pushing things out too long.  And while

23   I don't know how this particularly will push things out too

24   long, no doubt based on what I see in front of me, at least

25   Infutor, I'm going to have to deal with objections from a third

8

1    party, so that will delay what you are doing.  Potentially

2    somebody gets the document and says, ah-ha, they found

3    something that I didn't know before, and now I want to reopen

4    somebody's dep.  I don't know that I should be countenancing

5    any of that.

6           So, you know, your subpoenas were served on April

7    30th.  Discovery closed on that date.  Without disagreement of

8    the dealership class plaintiff, you wouldn't be able to serve

9    those.  And without your agreement, the dealership class

10   wouldn't be permitted to serve these additional subpoenas.

11          What happened there, did we drop her?

12          THE CLERK:  Ms. Gulley?

13          MS. GULLEY:  Yes.  Good morning.  Thank you.

14          THE COURT:  Okay.  Just -- you know what, I'm going to

15   give you Brenda's email right now because --

16          THE CLERK:  She has it.

17          THE COURT:  She has it?

18          Okay.  Because we have been having problems for weeks,

19   months with our AT&T connection here.  So if we drop you, you

20   need to let Brenda know, and we'll get you back on.  Okay?

21          MS. GULLEY:  I have got her email.

22          THE COURT:  Okay.

23          Yeah, so that's my feeling.  Mr. Ross, you can wade in

24   to that now.  But -- I don't know, I'm just thinking, let's

25   move this thing forward so you can get to summary judgment,

9

1    trial, settlement, anything else, appeal.

2           Go ahead.  I want to tell you what I was thinking just

3    so that you had -- you weren't -- you knew what I was thinking.

4           MR. PROVANCE:  Thank you, your Honor.  This is Matt

5    Provance.

6           THE COURT:  Oh, you're doing it.  Okay.  Fine.

7           MR. PROVANCE:  Yes.  Thank you for sharing your views

8    on the matter.  That's helpful and informs our thinking.

9           One point I would like to make is that we did serve a

10   subpoena to Infutor.  It is towards the end of discovery.  It

11   is based on information that in our view we learned very late

12   in the discovery process.  And that was the main motivation for

13   the timing of our subpoena.

14          Our main interest here is simply that the discovery be

15   a two-way street, that it go both ways.  At the last status

16   hearing, Mr. Nemelka, I believe, stated on the record that he

17   was very interested in the AT&T and carrier subpoenas going

18   forward, although he couldn't join them formally.

19          To the extent he is taking an opposite position now, I

20   think that that's somewhat inconsistent.

21          But the plaintiffs have identified some limited

22   discovery that they would like to take from the carriers.  We

23   have identified, in our view, limited and targeted discovery

24   that we would like to take from a third-party, Infutor.

25          Now if your Honor is of the view that there needs to

1    be a cutoff and the cutoff has taken place and we need to move

2    forward, the defendants are prepared to accept that.  We would

3    just ask that that rule be applied evenly to both sides, which

4    it appears that your Honor is inclined to do.

5            THE COURT:  Well, I would apply it evenly to the both

6    sides in the context of joint motion ECF 699.  This thread runs

7    through some of the other motions that are pending and that I

8    am going to have to deal with or will deal with today.  And,

9    you know, sometimes it bites one way or sometimes the other --

10   it bites the other.

11           But my ruling on ECF 699, which is this joint motion,

12   is -- and I will be saying, Mr. Provance, that I'm not such an

13   ogre that if -- and, you know, I don't -- I only see things at

14   a particular level.  I don't see things always at a granular

15   level, unless you bring me to the granular level.

16           So if all parties here, including Authenticom, Cox,

17   Auto Loop, and that whole group, end up saying to you, I

18   dropped my objection, I'm okay with you going through that one

19   because I really want to see these AT&T subpoenas because I do

20   agree -- I don't know if he changed his position or not.  And,

21   you know, changes in position -- I know in this litigation

22   everybody accuses everybody else of changing their positions.

23   But I don't necessarily see a principal distinction that

24   Mr. Nemelka is relying on.

25           Yes, I understand the AT&T stuff is easier to produce

1    and deal with, because we're not going to get a motion to quash

2    from them, than the Infutor stuff is, so I get there is a

3    distinction there potentially.  But I look at this more as a

4    tactical position.  We don't object to the dealership class

5    plaintiffs because we don't really want to aggravate our

6    co-plaintiffs any more than we need to aggravate them.  But we

7    do object to the defendants because we don't care about

8    aggravating the defendants.

9           But if everybody says, you know what, this stuff

10   is -- if Authenticom, Cox, et al., decide, you know what, I'm

11   willing to drop my principle here, quote unquote, and agree to

12   your subpoena going forward, defendants, so that we could get

13   the AT&T, Verizon, and Sprint stuff, because I think that's

14   really valuable too, I'm not going to block it.  If both of you

15   decide to go forward, you're agreeing to do it, fine.  I'm

16   hoping that doesn't spawn continued litigation.  But if you

17   guys are agreeing to it, I'll go it.

18          But absent agreement of the parties on all fronts with

19   respect to the joint motion, I'm going to deny that motion.

20          MS. RICHTER:  Your Honor, may I get some clarification

21   on that?

22          THE COURT:  Yeah.

23          MR. RICHTER:  Frank Richter.

24          THE COURT:  Yes.

25          MS. RICHTER:  So this agreement kind of came about

12

1   because we had briefing for the wireless subpoenas due. We had

2   arguments we believe good cause existed for extension of the

3   fact discovery. And defendants then responded that they had

4   good cause for their subpoenas as well. And that was the

5   result of the joint agreement.

6           You don't want to hear any argument as far as good

7   cause or briefing any further is the way we should understand

8   this order.

9           THE COURT: Okay. I have a visceral reaction to that,

10  but I want to cage my visceral reaction and consult here for a

11  second.

12      (Brief interruption.)

13          THE COURT: Here's my ruling. Okay? My visceral

14  ruling was, heck no. Okay? My visceral ruling was you are

15  stuck with this because you agreed to go forward with this

16  joint motion.

17          However, I realize that you tried to tie my hands by

18  saying that this was an all-or-nothing agreement, Judge, so you

19  got to accept our agreement or not. Okay?

20          You want to knock yourself out -- I mean, I will tell

21  you -- when did you seek leave --

22          MR. RICHTER: I'm not requesting further briefing --

23          THE COURT: Well, then why did you --

24          MR. RICHTER: -- your Honor.

25          THE COURT: -- are you raising the issue?

1          MR. RICHTER:  I just want to make sure --

2          THE COURT:  Just because you like to dot Is and cross

3     Ts?

4          MS. RICHTER:  Your Honor, just so we have

5     clarification for the parties, they say, well, we still want --

6     you know, defendants say, well, we would still like to brief

7     it.  We have an answer to that --

8          THE COURT:  Okay.  Here's my --

9          MR. RICHTER:  -- and that way we don't have any

10    confusion that we're -- we're good to go, let's not -- let's

11    close the book on this, and we're done.  That's all I'm

12    asking.

13         THE COURT:  Here's my response to your theoretical

14    question.  I'm ruling on 699.  It was a joint motion.  Okay?  I

15    recognize the joint motion said, this was an all-or-nothing

16    deal, Judge.  We want to tie your hands on this.  I'm denying

17    that motion, even though it was a joint motion because it is

18    opposed by the -- one class of plaintiffs.

19         If that now brings a motion for leave to serve these

20    subpoenas at a briefing schedule, you know, I'll decide that,

21    if, as, and when it is briefed.  And hopefully that's this

22    year.  But -- and I say that facetiously.  Okay?  But I'm not

23    going to rule on -- I'm not going elsewhere.

24         You need a briefing schedule on it?  Then file your

25    motion for leave -- do you have -- no, you don't even have the

1  motion for leave.  File it.  Give me a briefing schedule.  If

2  they want to brief the Infutor, knock your socks off.  I'm just

3  ruling on the joint motion that is in front of me now, and I'm

4  doing it.

5       MR. RICHTER:  Understood, your Honor.  Thank you.

6       THE COURT:  Understood?

7       MR. RICHTER:  Yep.

8       THE COURT:  Need any more clarification on that?

9       MS. RICHTER:  Absolutely not.

10       THE COURT:  Good.  Okay.

11       Next issue, motion that has been pending for a bit of

12  time, plaintiffs's motion to compel production of documents on

13  CDK's privilege log.  I think this is -- I don't even know what

14  the number of the motion -- I probably do.  Hold on.  I think

15  it is ECF 535.

16       Four issues here.  Emails to a large number of

17  recipients; emails to distribution lists where the list does

18  not identify everyone who received the email; communications to

19  third-party advisors, consultants, and agents.  I don't know

20  how many -- I might have said three issues.  There is five

21  issues.

22       Advice that is predominantly not legal in nature; and

23  implicit waiver.  Okay?

24       Here's my rulings on these.  Subject -- Topics 1 and 2

25  overlap, right?  Emails to a large number of recipients and

15

1    emails to distribution lists where the list does not identify

2    everyone who received the email.

3           As to both categories I agree with plaintiffs that CDK

4    has not met its burden of establishing privilege with respect

5    to all the recipients who received these emails.

6           With respect to the first category, the large number

7    of recipients, it seems that defendants can identify who

8    received the emails, but there is nothing in the briefing to

9    indicate why all those people are within the attorney-client

10   privilege.

11          With respect to the second group of emails, to the

12   distribution list, CDK can't even identify the recipients for

13   some of these lists.  I disagree with CDK that plaintiffs are

14   going back on some type of agreement that they reached or

15   reneging on some type of agreement that they reached to accept

16   these distribution lists because plaintiffs say, and I don't

17   say anything in the record to contradict this, that at the time

18   they were talking about that agreement, they did not know and

19   didn't -- hadn't discussed with the defendants that CDK could

20   not identify even the people who were -- to whom the email was

21   directed as part of a distribution list.

22          It is CDK's burden to show privilege.  It has not

23   shown privilege as to either group of email.  Again, because

24   the first one, they haven't told me why all those people are

25   within the privilege.  And, parenthetically, the more

16

1    people -- there is no -- CDK is right, there is no per se rule

2    that says, five people can be in a distribution list for a

3    privileged communication, but eight can't.  Or 20 can, but 25

4    can't.

5           But I don't even have a threshold showing by CDK that

6    the people to whom the emails in the first group are directed

7    are covered by the privilege.

8           And in the second, if you can't even identify who the

9    email went to, then you're not going to be able to identify

10   privilege.

11          So I'll grant the motion with respect to both those

12   categories of emails.

13          With respect to the next two categories,

14   communications to third-party advisors, consultants, and

15   agents, and advice that is predominantly not legal in nature, I

16   need more information.  These were briefed at a pretty high

17   level.  All I have is the privilege log really.  I don't have

18   the documents.

19          And so in order for -- and I think that's true.

20   Correct, CDK?

21          MR. PROVANCE:  Yes, your Honor, that's correct.  We

22   have not submitted those in camera.

23          THE COURT:  So that's always a painful process.  I'm

24   not going to spare you the pain of that process.  If I have to

25   go through each of these documents document by document,

1   instead I would convene a hearing in which I would go through

2   each document and see whether or not in all or in part the

3   document really is or is not something that fits within the

4   privilege.

5           My guess is that that will be a painful process and

6   that all the documents will not fit within that category

7   because -- or all parts of a document won't fit within that

8   category because I just -- that's just my experience.

9           But the issue was addressed at a 10,000-foot level,

10  not on a -- you know, I agree with the plaintiffs that if

11  the -- I mean, I agree with both parties here.  Third-party

12  advisors, such as are identified in these briefs, can be within

13  the privilege if a communication that includes them is

14  necessary for the lawyers to provide the advice.

15          If it is not, and he can't make that case, then they

16  are not within the privilege.

17          I also agree that communications that are not

18  predominantly legal in nature, or stated another way, if it is

19  not an attorney-client communication within the law, then it is

20  not going to be protected.

21          So if I have to decide this issue, I'm going to set a

22  hearing on it.  And you guys are going to come in, and we'll

23  spend as much time as necessary going through document by

24  document.  I do want CDK to submit to me in camera ASAP the

25  documents that are subject to this.

18

1        Does anybody have a -- I mean, I know I have read your

2    brief, but is this ten documents?  50?  150?  2000?

3        CDK, how many are we talking about here?

4        MR. PROVANCE:  Your Honor, unfortunately I don't have

5    the list in front of me.  But I think it is probably in the

6    range of hundreds.  As you know, CDK produced a lot of

7    documents in this case, and as a result our privilege log

8    contains a lot of entries.

9        THE COURT:  Okay.  Is there any benefit for me -- I

10   mean, I'm not going to decide -- I can't decide this on the

11   papers because I don't know what the document say.  I mean on a

12   broad basis, I agree that, you know, plaintiffs said, I don't

13   see how they are privileged, but all I have seen is a privilege

14   log.

15       From CDK's basis from what you say, I could say, yeah,

16   I could see how some of this stuff is privileged.  Is it all?

17   I mean, before you submit this to me in camera, you want to go

18   through these documents and redact what is actually something

19   that is privileged versus are you available for squash on

20   Saturday afternoon?

21       I mean, you know, this -- did you produce in a

22   redacted way or did you just claim privilege on the entire

23   document?

24       MR. PROVANCE:  Some of the documents at issue are

25   redacted.  Some of the documents at issue were withheld

19

1   entirely.

2          THE COURT:  Okay.  So for the one -- so you -- I guess

3   what you are telling me is -- I am interpreting what you are

4   telling me as you have already gone through the exercise to be

5   more scalpel-like in your invocation of privilege and not

6   macro, and so I need to look at these things and set a hearing.

7   Right?

8          MR. PROVANCE:  If I am interpreting your comments,

9   your Honor, I believe that's the way forward.

10         THE COURT:  Okay.

11         MR. PROVANCE:  If your Honor would like some sample of

12  the documents at issue --

13         THE COURT:  Sample is not going to do it, right?

14  Because it is -- this determination has to be made on a

15  document-by-document basis.  I don't see any way that -- I

16  mean, if this was a class certification motion in a TCPA case,

17  I could look at samples.  But, it is not.

18         I don't know how I am going to make an up or down call

19  on a document-by-document basis without seeing the documents.

20         MR. PROVANCE:  Understood.

21         THE COURT:  So I'd like you to -- you don't have to

22  say right now, but at least by the conclusion of the hearing

23  tell me when you're going to submit those documents in camera.

24  We could talk about when I'm going to have a hearing on this.

25  Okay?

20

1    MR. PROVANCE:  Your Honor, I had a few points of

2  clarification, but I'm happy to wait until you have finished

3  your ruling.

4    THE COURT:  Okay.  There is just one more thing.  I

5  don't buy plaintiffs's implicit waiver argument.  That is a

6  complete flyer of an argument.  It does not work.  I address

7  the issue of when a party puts advice of counsel in issue very

8  recently in a case called Derek versus Roche Diagnostics.  It

9  is reported at 2109 Westlaw 1789883.  Some of the reasoning and

10  language in that opinion is equally applicable here.

11    Plaintiffs's argument is just completely out to lunch.

12  I mean, the page 12 of the motion -- or the memorandum in

13  support of the motion says, quote, by relying on the text of

14  the agreements, these particular agreements you're looking at

15  -- you're talking about, which were drafted by counsel for

16  the -- for their defense, defendants have put the intent of

17  those agreements at issue.

18    That just makes no sense.  I mean, that's a flyer

19  argument.  You devote about a little over a page to it if you

20  look at all of it.  There is no indication CDK is going to rely

21  on communications with counsel in support of its defense

22  relying, or at least in the briefs, with respect to this stuff.

23    I know you cite case law.  And I know the case law

24  exists that part of the privilege and waiver issue is based on

25  fairness.  I don't see any unfairness here.

1        And I don't think that by relying on the text of the

2   agreements that are drafted by counsel, which is the case in

3   every sophisticated business litigation, CDK has put the advice

4   of counsel defense at issue or its communications with counsel.

5        You guys while I was speaking, at the plaintiffs's

6   side, Ms. Wedgworth, Mr. Ho, and Mr. Nemelka, were whispering.

7   So what do you have to say on that?  Am I misperceiving

8   something?

9        MS. WEDGWORTH:  Your Honor, it is just in one of the

10  depositions there -- well, maybe more than one actually.  There

11  has been testimony that may cause that actually to come -- be

12  an issue in this case.  I appreciate your ruling.  And given

13  what you said -- and I want to look at this case -- but we do

14  have factual testimony where witnesses think one thing went in

15  the agreement, and then it is understood that because of

16  attorneys something else went in the agreement.

17       So it may be a factual issue in this case.  And I want

18  to review this particular case you have referenced in regard to

19  the testimony we have in this case.

20       THE COURT:  But none of that was in the briefing that

21  I reviewed, right?

22       MS. WEDGWORTH:  It had not happened at the time.

23       MR. NEMELKA:  Correct.

24       THE COURT:  Yeah, okay.

25       MS. WEDGWORTH:  Into the briefing predated it.  We

22

1    were -- we thought that might be the case when we briefed this.

2    We didn't have the testimony at the time.  We now do.

3         THE COURT:  Okay.  So listening to what you said in

4    some way critically, I would say I still -- from what you told

5    me, it didn't get me over the hump.  You know, there has to --

6    the fact that a corporate party spoke to a lawyer about what

7    was going to go in or not in the agreement.  And this -- and

8    this case -- and I recognize that there is a lot of law in this

9    area, and some of it is not as clear as you would like it to

10   be.  But I don't know that that gets you the documents unless

11   and until we hear that the party relying on the privilege is

12   going to somehow put in issue those discussions.

13        So it is not a -- it is not necessarily a sword that

14   says, well, because lawyers were involved in the drafting, and

15   on advice of counsel something did or did not go into the

16   agreement, therefore we get the entire agreement.  It might be

17   that you need more than that.

18        But, again, based on what I have seen, at least as the

19   issue has been presented to me now, I'm going to deny the

20   motion with respect to that.

21        So I'm happy to hear from Mr. Provance.  I'm granting

22   it on the first two categories on emails.

23        I'm holding it -- it remains under advisement with

24   respect to communications to third-party advisors, consultants

25   and agents, and advice that is predominantly not legal in

23

1    nature pending submission of the relevant documents in camera

2    and a hearing at which the Court can address those documents

3    with the parties.  And it is denied as to the implicit waiver

4    argument.

5         Mr. Provance.

6         MR. PROVANCE:  Thank you, your Honor.

7         If I understand your ruling on the fifth issue,

8    implicit waiver, it sounds like you have ruled, so I will just

9    move on.  I was otherwise going to address some of the things

10   Ms. Wedgworth said, but I'm happy to just move on.

11        The next point I wanted to raise, I think you have

12   just clarified, which was whether your Honor wanted in camera

13   submission on both Categories 3, the third-party

14   communications; and Category 4, the communications that are

15   putatively business in nature.

16        I believe you have just clarified that, and we'll get

17   those to you --

18        THE COURT:  Right.

19        MR. PROVANCE:  -- in short order.

20        On the second issue, your Honor, I just wanted to make

21   one point and clarify, if needed.  This is the issue regarding

22   distribution lists.  And the one thing -- factual nature I

23   wanted to point out is that all that was at issue on that part

24   of plaintiffs's motion were certain distribution lists that at

25   the time documents were collected and reviewed no longer

1   existed.  They're defunct.  And that was the reason that

2   defendants were not able, at least with using the tools that

3   were normally available to them in the ordinary course of

4   business, able to determine who was on those now defunct

5   distribution lists.

6         And the plaintiffs had the same problem with some of

7   their distribution lists.  So the agreement the parties made

8   was that for just those distribution lists that are now

9   defunct, they would not need to identify all of the recipients

10  that were on those lists.  It is a much different story for

11  distribution lists that still exist, we can look at them and

12  provide that information.  And, in fact, the defendants have.

13        So if your Honor is inclined to grant their motion and

14  require defendants to produce any communications involving now

15  defunct distribution lists, that issue is present on the other

16  side as well.  So we would ask, in fairness, if that's the way

17  your Honor wants to rule, that you would order the plaintiffs

18  to do the same thing.

19        THE COURT:  I'm not going to do that because I don't

20  have that in front of me.  But that would be my same ruling.

21  If I have a situation in which an email is sent to a

22  distribution list and the -- and the custodian of that email

23  says it is privileged, and that party cannot identify to whom

24  the email went, my ruling is going to apply equally to

25  plaintiffs and to defendants.

1        So if you can't work this out with my ruling -- my

2   ruling necessarily would require plaintiffs to produce any

3   emails that they have claimed as privileged that fall within

4   this kind of a category, unless there is some distinction that

5   actually is meaningful, as opposed to just a distinction --

6   being a distinction without a difference, you know, as an -- so

7   I'm not going to rule on that now, Mr. Provance.  But you can

8   get me in short order if they won't agree.

9        This strikes me as one of those mutually assured

10  destruction kind of issues which, you know, what's good for the

11  goose is good for the gander on the plaintiffs's side.  And if

12  you are sitting on protecting things that are in the same

13  category that you're talking the other side should produce, and

14  I buy your agreement, which I do, then you have got to be

15  prepared to produce yourself too.  And you say they didn't ask

16  for them yet.  Okay.  Now they are going to ask for them.

17       And so you can either go one of two directions.  You

18  can say, we want all your emails protected under this category,

19  and we'll produce to you all of ours.  Or you could say, never

20  mind.  Now that the Judge says -- has one my argument that I

21  spent some pages on, I really don't like the impact of my

22  argument on what I'm going to have to produce, and I'm in a

23  never mind zone.

24       To me, if you do that, that was a waste of time.  It

25  was a waste of my time, and it was a waste of your time.  But

1    I'll deal with whatever I deal with in the next go-around here.

2    But I will tell you that I will attempt to rule the same when

3    the same facts are in front of me provided there are no

4    differences that I think are material to a ruling.

5            So we still need -- and I'll just kind of flag here

6    that somebody should remind me -- a date for submission.  And I

7    would have to set a hearing date, which I'm not sure I'm

8    completely prepared to do now.

9            But that's where we are on the motion to compel

10   documents off the privilege log.

11           I think that brings me to the issue that everybody

12   briefed, that motion to compel versus Authenticom.

13           No, I can quickly go to CDK's motion for a protective

14   order concerning plaintiffs's interrogatories on the

15   counterclaims, which is ECF 597.  I'm going to deny that motion

16   for a protective order and allow plaintiffs's interrogatories

17   on the counterclaims to go forward.

18           I agree with plaintiffs that given the way the case

19   schedule was put together in this case, and given the pendency

20   of the motion to dismiss the counterclaims during the period of

21   time where discovery was proceeding, that plaintiffs would be

22   prejudiced unfairly if after their motion to dismiss the

23   counterclaims was denied, they are denied the opportunity to

24   proceed with written discovery on the counterclaims.

25           Those interrogatories, as far as I can tell, were

27

1    served within the discovery time period.  And had they been

2    responded to would have -- they were served in time for them to

3    be responded to within the existing discovery time period,

4    which as per Judge St. Eve's statement, I think, was not

5    technically including the counterclaim discovery.

6         I disagree, in case this is the next question, that

7    CDK can now serve discovery after the close of discovery on the

8    counterclaims that it didn't serve before.  CDK made a

9    calculated decision to oppose the discovery that the plaintiffs

10   serve the written discovery without serving their own as a,

11   what's good for the goose, good for the gander kind of move.

12   But, again, consistent with my attempting to get this done, I'm

13   going to deny CDK's motion.

14        Plaintiffs can serve the interrogatories that they

15   served -- CD -- I am going -- if CDK asks me, now let me do

16   that, I'm going to say, no, because it wasn't served in time

17   during the discovery process, even in a protective way.

18        And one thing I needed to look at here was whether

19   there was any -- were there any particular interrog- -- so, I

20   mean, I noticed in the briefing here, and I'm not trying to

21   override this, for example, that counterdefendants offered to

22   completely withdraw Interrogatories Numbers 17 and 18 and

23   offered to accept summary responses to the interrogatories

24   which called for CDK to identify numerous instances of certain

25   events or conduct.

1    I mean, I'm not trying to override that.  You know, if

2    plaintiffs are still willing to say, we will withdraw these and

3    accept something else, I'm not saying now my ruling supersedes

4    that.

5    But what I am -- I'm just ruling on the timeliness

6    issue here, primarily, and whether plaintiffs could go forward

7    with this.  I do note, in reading other motions that you have

8    pending, that there -- discovery has been going forward on the

9    counterclaims.  I mean, CDK has been taking copious -- probably

10   the wrong word -- extensive discovery maybe on Authenticom

11   about its access to defendants's -- and so has Reynolds -- the

12   defendants's systems.  So, you know, oral discovery has been

13   going forward on this.  But, you know -- and this motion has

14   been pending since April, but it was probably fully briefed, I

15   don't know, in -- some time in May.

16   End of April.  Yeah, the last day of April or the 29th

17   of April.  So it hasn't been sitting there for too long.

18   But, anyway, whatever you want to do to make it easier

19   on CDK, I'm not saying don't do.  And whatever you referenced

20   in your briefs, I'm saying not do.

21   But in terms of the up or down as to whether or not

22   you can -- you are allowed within the interstices of discovery

23   scheduling to serve these when you served them, I'm siding with

24   plaintiffs on that versus CDK, and denying the protective

25   order.

1    Clarification on that?

2    MS. MILLER:  Your Honor, Britt Miller on behalf of

3    CDK.  Two quick questions.  One, obviously we did not prepare

4    responses pending the resolution of this motion.  So we'd ask

5    for 21 days to respond to the interrogatories in question.

6    And, two, I assume from the tenor of your ruling that

7    the ones that have been served are it.  There is no additional

8    ones that are coming.  There is no follow-up, additional

9    interrogatories after they get whatever responses.  Certainly

10   we'll engage whatever meet and confer process may be necessary

11   as to the responses that we serve.  And if there is motion

12   practice on that, we'll certainly engage in it.  But to the

13   extent that these are permitted to go forward, these are it.

14   THE COURT:  Yes.  These are it.  And 21 days is fine.

15   MS. MILLER:  Thank you.

16   THE COURT:  If, with the qualification that you said,

17   that if you object to something and then you meet and confer

18   and then I have to deal with it, in the never-ending discovery

19   dispute process here, I'll do it.  But I'm not saying they can

20   serve more or you could serve, I guess, any.

21   MS. MILLER:  Understood, your Honor.

22   THE COURT:  Okay.  That brings me to the issues that

23   you briefed on an expedited basis.  I will say, Mr. MacDonald,

24   I very much appreciate the email exchange that you had with

25   Mr. Nemelka in which you remind -- when Mr. Nemelka expressed a

1    desire to get this briefed in time for our June 10th.  You sent

2    an email saying, you know, Judge Gilbert has said he would like

3    to have at least a week to look at things.  And I didn't know

4    about that because the email that came to my courtroom deputy

5    had a proposed briefing schedule of June 5 and June 7, which

6    was plaintiffs's proposed briefing on this.

7         But I do appreciate at least your consideration of

8    saying, you know, maybe he should have a week to look at this

9    stuff, which he's asked for, in the give and take before filing

10   of the -- this motion.  That kind of went by the wayside in

11   some way.  But I do appreciate it.

12        And luckily for Mr. Nemelka, I didn't actually go into

13   the ECF system -- I forgot the briefs here, so I had to print

14   them at all home.  And I didn't see that you actually didn't

15   even file on June 7th, you actually filed on Saturday, June

16   8th.  But that was okay because I was able to read it

17   yesterday.  Okay?

18        I want to tell everybody here though -- and you can

19   tell that I have a little bit of an edge here, and I'm sorry

20   about it.  Okay?  I don't like the fact that I have so

21   many -- I have had so many motions under advisement, which is

22   why I'm trying to rule on as much as I can from the bench.

23        I do have an impression here that there are fights

24   here that don't need to be had.  I have had that impression

25   from the very beginning.  And I have had the -- I also have the

31

1    impression, you know, that sometimes positions are taken for

2    tactical reasons without fully thinking through the impact of

3    those positions on your own positions.  As an example, I'll

4    talk about these email distribution lists, which I talked about

5    before.

6           So, you know, those types of things, just in my mind,

7    increase the stress and tension in your litigation, increase

8    the stress and tension on the Court, but that shouldn't really

9    be your concern.

10          But I do generally like to have more than a weekend to

11   think about something.  The reason that I said I adopted your

12   briefing schedule and also went forward here is I do agree

13   you're entitled to rulings as soon as you can get them, as soon

14   as humanly possible.

15          Had I known my trial from next week was going to

16   settle, I would have moved you there, so I would have had more

17   time to look at this.  But I didn't know that.  So -- but,

18   anyway, I noticed that.  Okay.  I noticed that.

19          With respect to the motion pending, I'm going to deny

20   the motion as to the reopening of the 30(b)(6) deposition as of

21   Data Vast.  My view of the arguments being made -- and I read

22   the exhibits too, and I read the deposition testimony submitted

23   -- is that defendants's argument is weak and an overreach that

24   Data Vast was a topic that was noticed for 30(b)(6) deposition.

25          This isn't an after-the-fact objection.  The objection

1  was raised by counsel at the deposition.  The deponent said he

2  wasn't prepared on that.  He was general counsel.  And so, you

3  know, he would have only been able to -- been required to

4  testify with respect to what he was prepared on.

5       I don't buy the defendants's argument in particular

6  that -- I have to find it.  Hold on for a second.

7       (Brief interruption.)

8       THE COURT:  Yeah.  Defendants kind of shoehorn in to.

9  They say, well, our 30(b)(6) notice defined Authenticom to

10  include any related companies, divisions or subsidiaries, which

11  could include Data Vast.  Okay.  I get that.  That's not

12  necessarily wrong or accelerated.  And it included any efforts

13  by Authenticom to secure or protect dealer data or any use of

14  or agreements with third-party vendors to obtain data

15  maintained on a CDK or Reynolds DMS.

16       I don't think we're talking about securing or

17  protecting data really.  And if that really was what you were

18  talking about, that's a vague way of saying it for a 30(b)(6)

19  topic.  We're not really talking about obtaining data as much

20  as distributing data from the -- that Authenticom got.

21       So I don't think you could shoehorn Data Vast into the

22  served topics.  And if this is the best that defendants can do

23  it on it, I think it falls short.  I don't think it is worth

24  reconvening a 30(b)(6) deposition to cover this topic with

25  Authenticom's general counsel, particularly when that topic, I

33

 1   think, is being covered in other depositions.

 2          I get why defendants want this information, and I get

 3   why it is important to their defense and their counterclaims.

 4   Talking about Authenticom accessing their systems.  But I think

 5   you're getting information on that.  And I think, you know,

 6   again, in the overall theme of, we got to end this at some

 7   point, I think this falls on the end of, we should end it.

 8          If that was on day one of discovery, maybe I would

 9   look at this differently.  But it is not.  And so I am going to

10   deny the motion as to reconvening the deposition as to

11   Data Vast.

12          With respect to the polling client manager data, I

13   have -- I have some questions for Authenticom here.  I think

14   your argument -- well, first of all, let me dispense with a

15   couple of things and focus then on what needs to be focused on.

16          Timeliness.  Overrule that objection.  This issue has

17   been on the table for some time.  You have been chasing each

18   other on this for a while.  I read all the correspondence on

19   this.  I read the -- you know, what you were talking about.

20   And I don't think this was put to bed.  And I think,

21   particularly with the most recent statement, which is that we

22   can't even do this, it is impossible to do it, I just don't

23   think this was tied down.

24          Is this late in the process?  Yes.  But you have been

25   chasing each other around on this for a long time.  And some of

1  the delay, at least from what I can see, is Authenticom's

2  fault, not CDK's fault.

3       Would it have been best for CDK to not -- to tie this

4  down, you know, back in October or November?  Yes.

5       Did you do everything you could to help them tie it

6  down?  No.

7       So the timeliness document is not working for me.

8       The spoliation issue, not ripe right now.  I'm not

9  dealing with that.  And that really doesn't come into play with

10  respect to whether you should or shouldn't produce something.

11       But I'm having trouble figuring out exactly what

12  exists.  If something exists, my feeling is you have got to

13  produce it.  But I'm having -- you know, Authenticom really

14  argued the strawman here, which is we can't produce a report,

15  and we can't produce -- we shouldn't be required to create a

16  document that doesn't exist.  I agree with that.  It is not

17  clear to me that that's what the defendants are asking for

18  here.  It would be -- it sounds to me what the defendants are

19  asking for is a snapshot of what appears essentially on a

20  computer screen when somebody queries the database.

21       So they are not asking to prepare a report per se,

22  they are asking for information that is resident within your

23  system.  So it -- you possess it.  It is in your possession,

24  custody or control.  It is information in your system that is

25  either a seven-day period or it is whatever you had in November

35

1     of 2018.  I think the -- it is not clear to me from

2     Authenticom's response here whether anything exists.  Okay?

3     Whether there -- but I have seen what you have produced to them

4     as an example, which I think is exhibit -- I mean, it is quoted

5     in full in the defendant -- the 18 lines are quoted in full in

6     defendants's brief, but -- it's -- is it 16 or --

7               MR. HO:  It is an attachment to Exhibit 11.

8               THE COURT:  Right.  Yeah, it is the last -- yeah.  I

9     mean, I see that but I am having trouble figuring out what

10    exists and what is ephemeral or what's tangible.

11              And so I'm going to ask Authenticom at least to

12    explain to me whether -- in particular whether what the

13    defendants are asking for, which is the PCM log for the

14    originally requested seven-day period in November 2018 or a log

15    for the seven days between June 10th and June 16th, which I

16    know is not necessarily within -- you know, before the lawsuit

17    was filed.  But I think what they are trying to do is see how

18    does Authenticom's system interact with theirs or what kind of

19    data do you get.  I'm not 100 percent sure that I understand to

20    what use they end up putting that.  But I could see it being a

21    really nice visual in front of a jury, so I can understand why

22    they might want to see it.

23              But I'm just -- I'm trying to figure out what exists.

24    And I will tell you that if I don't understand what you are

25    saying, Mr. Nemelka or Mr. Ho, then I'm going to appoint a

36

1    special master to figure out what the heck you should produce,

2    if anything.  And you guys are going to split the costs of

3    paying for it because if it is too complicated for me to

4    understand, I'm not going to have days of it.

5         I might need to have a hearing.  I might need to have

6    an evidentiary hearing.  I might need to put your computer guy

7    on the stand.  But I'm going to bring in a special master who I

8    have appointed in other cases, Nora Grossman, who is an expert

9    on e-discovery.  And, frankly, when I have appointed her in the

10   past -- I have actually never had to have an evidentiary

11   hearing because she sits down with the parties, speaks the

12   lawyer language because she's a lawyer, and also speaks

13   technical language because she is a technician.  And she

14   figures out how the parties can resolve the issue, and I don't

15   ever have to deal with it.  But if I have to deal with it, I

16   will.

17        But can you answer my question?

18        Or Mr. Ho.

19        MR. HO:  I'm going to try, your Honor.  I think there

20   is two aspects to the question of what's available.  Temporally

21   my understanding is that what is available is information that

22   goes back seven days.  So seven days from today is information

23   that is essentially overwritten.  It rolls off after seven

24   days.  But it is -- the second aspect of the answer is,

25   importantly, it is not in the database.  It is not as if you

37

1   can query -- type in a query or run a search over a set of data

2   and pull out from a database the information that's being

3   sought.

4        This information is essentially imbedded in the

5   software program itself.  And that's why from a legal

6   standpoint more than -- so than a technical one, we think that

7   the rule that governs this is Rule 26(b)(2)(B), and that this

8   clearly falls within the ambit of data that's not reasonably

9   accessible without undue burden or cost.  Because some computer

10  programmer actually has to go into the software program and

11  find for every dealer or -- and every day the data that they

12  want.  And so seven days doesn't sound like a lot, but when

13  you're talking about hundreds and thousands of dealers, and you

14  have to do it dealer by dealer for every day, as you see they

15  have taken a snap -- the Exhibit 11 that was alluded to is one

16  dealer for one day.  So you'd have to do that many, many

17  different times.  And it is not something that can be done in

18  an automated way.

19       As Mr. Clements's deposition -- declaration

20  highlights, and this is Exhibit 1 to our opposition, this all

21  has to be done manually by someone who actually -- a computer

22  software person who will actually have to log in to the

23  program.  And we don't think that there is good cause to do

24  that.

25       As we highlighted in our opposition brief, we think

1   that this is exactly the kind of data that the Seventh Circuit

2   discovery program and the Sedona Conference and, you know, all

3   the kind of leading authorities about ESI say are presumptively

4   off limits because of the cost and burden involved.  And we

5   don't think that the defendants have made the kind of showing

6   that you would need to overcome that.

7           In particular, with respect to relevance, as your

8   Honor has already identified, it -- at best it seems like what

9   the defendants are after is a sense of the kind of information

10  that Authenticom keeps in this, again, very ephemeral way about

11  the way in which its system accesses the DMS.

12          There is not going to be data that covers the relevant

13  time period in this case.  It is only seven days long.  So at

14  best it is going to be a demonstrative or illustrative set of

15  data.  And, frankly, given the limitations on relevance, we

16  don't see how there could be good cause to over -- to justify

17  the imposition of this kind of a burden.

18          We have, as we pointed out, offered to do somewhat

19  more than the one day for one dealer that we have offered.  And

20  to the extent that a slightly broader sample or illustrative

21  set could be useful, we have offered to do that.

22          But seven days for all dealers would be a monumental

23  task for a company that has been, frankly, financially

24  decimated by the defendants.  We won't go into that again.  But

25  Authenticom is a small company, much smaller now than it was

39

1    before, and simply doesn't have the resources to do this kind

2    of highly time-intensive project.

3            THE COURT:  Okay.  Couple of questions before I ask

4    the defendants anything.  I saw the statement in Mr. Clements's

5    affidavit that Authenticom had to lay off two-thirds of their

6    work force during litigation.  So I -- you know, I'm not

7    without appreciation of that.

8            A couple of questions.  So what you're saying is that

9    the 18 lines in Exhibit 11, that was obtained by a computer

10   programmer going into one particular -- within a seven-day

11   period one particular dealer's information on the software,

12   taken a screenshot of that.  But that would have to be -- if we

13   took a seven-day period, then somebody would have to go through

14   all of the software that ran during that period of time for all

15   of Authenticom's customers and take those same essentially

16   screenshots to comply with the defendants's request, right?

17           MR. HO:  I will say I'm not a technical person, so I'm

18   not sure screenshot is exactly the right terminology.

19           THE COURT:  Okay.  Or a printout.

20           MR. HO:  But conceptually that's exactly right.

21           THE COURT:  Okay.  And how many, roughly, do you know?

22   You said hundreds or thousands.  There a difference between

23   hundreds or thousands.  We're talking about many dealers?

24           MR. HO:  Over time I would --

25           MR. NEMELKA:  I don't know exactly today.  Authenticom

1  used to service over 10,000 CDK and Reynolds dealers.  It has

2  been drastically reduced.  I think it is probably low

3  thousands.

4      THE COURT:  Okay.  And I take it by your response to

5  my question, CDK questions whether something exists in tangible

6  form that had been preserved from November of 2018.  Is that no

7  longer -- is that not the case?

8      MR. HO:  Your Honor, there were never reports

9  or -- these ephemeral data were never preserved or reduced to a

10  documentary form in the way that we would think of it under

11  Rule 34.  With the exception of the one snapshot from December

12  of 2018 that we have then produced to the defendants in March

13  of 2019.  So all we would be talking about, as far as I know,

14  is the seven-day period rolling back from today.

15      THE COURT:  Okay.  I know they are going to have

16  a -- they will have a field day on that particular point, but

17  I'll listen to them.

18      Okay.  So we're talking about -- really just talking

19  about a seven-day period now as illustrative of what this would

20  look like.  And what you are telling me -- and I think I

21  understand this without having a terribly substantial technical

22  background -- what you are telling me is because this data

23  resides in the software that Authenticom runs on a daily and

24  hourly and minute-by-minute basis, in order to provide even a

25  seven-day snapshot of this kind of polling data, CDK --

1    Authenticom would have to go into the software and physically

2    go in, query through that to find each transaction where you

3    could find something that looks like those 18 lines that you

4    produced in March of 2019, would have to replicate that for

5    every dealer who you had during that period of time, and what

6    software was being run.  And that's a very burdensome

7    labor -- time intensive and costly process for a small company

8    that's lost a lot of its employees, at least in its technical

9    side.

10            The relevance of all that data for all the dealers is

11   minimal in your view.  But you are offering to do something

12   that is much less burdensome.  And I wasn't sure what -- that

13   changed overtime, it seemed to me, in the discussions you had.

14            So what are you now offering to do for certain -- you

15   mention 24 or something.  I don't know what you're offering.

16            MR. HO:  Ten CDK dealers and ten Reynolds data --

17   dealer rather.

18            MR. NEMELKA:  Twenty.

19            MR. HO:  So 20 total.

20            THE COURT:  So you're offering to do what they're

21   asking for.

22            MR. HO:  For one day.

23            THE COURT:  Okay.  And who is arguing this for your

24   side there?

25            Mr. MacDonald?

42

1          MR. MacDONALD:  I am, your Honor.

2          THE COURT:  Okay.  So why is their offer not

3     sufficient?

4          MR. MacDONALD:  Well, as your Honor referenced, the

5     polling client manager that contains information about what

6     files Authenticom polls, how long it polled for, when it

7     polled, how it polled.  And Authenticom has told us they don't

8     otherwise track this information.

9          So polling client manager is really the only source of

10    instances -- of tracking instance Authenticom accesses

11    defendants's DMSs.  Now obviously there are illustrative

12    reasons we want this that you mentioned.  But also, as part of

13    our counterclaims, and defendants have counterclaims under the

14    Computer Fraud and Abuse Act, the Digital and Millennium

15    Copyright Act, and various other federal and state claims,

16    under those counterclaims, defendants need to be able to show

17    instances of wrongful Authenticom access.  And Authenticom has

18    said they don't otherwise track this access.

19          And one of the problems we have is that, as you read

20    in the briefing, in the summer of 2018 Authenticom offered this

21    alternative log that they would produce to us to try to satisfy

22    us.  And we took the deposition of Authenticom's 30(b)(6)

23    witness in April of this year.  And it was the deposition

24    just -- this was a deposition just about data.  And the first

25    topic in that notice was solely this issue of that alternative

1    log they produced.  And their witness testified that that was

2    not -- this is a quote -- not an accurate representation of

3    polling, and that we couldn't rely on it for any of the

4    purposes to try to -- tended to show DMS access.

5           So the data they have on DMS access is stored in their

6    PCM log.  They haven't retained it.  They only have seven days.

7    And now they say they can't export it.  And the alternative

8    data they gave us they say we can't rely on.

9           So if we don't get any better data -- and, again, this

10   is seven days, so it is going to be hard from that to do

11   extrapolation.  It is not going to be great.

12          But if we don't get slightly better data, we are going

13   to come in here in a few months, and they are going to have

14   Daubert challenges against our expert saying, oh, you guys

15   relied on bad data.  We told you it was bad data.  But we don't

16   have anything else to rely on.  So we're between a rock and a

17   hard place on this issue.

18          Now on the technical issues, we agree, we acknowledge,

19   we put to the side the spoliation issues.  There are only seven

20   days of data.  It is in a log.  That's what their documents --

21   that's what their witnesses say.  It is kept on their system.

22   The witnesses said, you can log in, you can look at this log,

23   whether you have to click on individual dealers or not, I'm not

24   sure.  But somebody could log in and look at the last seven

25   days of polls right now.

1    Now we're willing to accept this in multiple forms if

2    it can be copy and pasted into a document, and we can do that.

3    Your Honor mentioned screenshots.  We would accept it in the

4    form of screenshots that can be OCRd.

5    You know, if the manual difficulty of screenshots is

6    too high, and they want to set up a terminal for one of our

7    experts on the AEO basis to go in and manually create the log

8    themselves, we can do that.  If it is easier to have a special

9    master do it, we can do that.  Or we're open to alternative

10   solutions that would lessen the burden.  But this is the only

11   place they store the data.  That is what they have told us.

12   And this is data that we need.

13   THE COURT:  Okay.  I don't think I need a special

14   master here, thank God.  And thankfully for you -- although her

15   rates are not outrageous.  But I don't think I need a special

16   master here to understand this.  I either underestimated myself

17   or overestimated the complexity of the issue that you have

18   here.

19   I -- from -- based on what I can read in the

20   documents, I think -- or in your briefs, I think -- and based

21   on what I saw in some of the deposition transcripts, the parts

22   that you did submit to me -- and I think you were -- were you

23   talking about Dane Brown's deposition?

24   MR. MacDONALD:  No, this is Joe Noth's deposition.

25   THE COURT:  Okay.  Yeah, okay.  That's -- you also

1   submitted that too, I think.

2          I think you are -- defendants are developing

3   information that potentially they could use to support their

4   theory of unauthorized access to your system.  You describe

5   some of that information at pages 2 and 3 of your brief on this

6   issue, which is sealed.  It is ECF 711.

7          Plaintiffs take you to task for saying, well, why are

8   they saying all this stuff?  They're just trying to dirty us

9   up.  True.

10          But it also to me illustrates the type of discovery

11  you're developing.  And while I understand your issue of

12  Daubert, you know, I don't know how that ends up coming out at

13  trial if the other side didn't produce or said I couldn't

14  produce the information, but they did give you a sampling.

15  That's beyond my pay grade, at least at this point, to decide.

16  But I do think you're entitled to some information on this

17  topic.

18          I agree with the plaintiffs that the burden on a small

19  or shrinking company of going through the so-called ephemeral

20  data to find this for hundreds, if not more, customers or even,

21  frankly, many, many tens of customers is burdensome and not

22  proportional to the needs of the case.  I think the proposal of

23  ten CDK dealers and ten Reynolds dealers for one day during

24  this period of time will provide the defendants with -- and I

25  don't care if it is a screenshot or however it is.  I mean, I

1    am not going to micromanage that process.

2           But the information to show the polling data for those

3    CDK and Reynolds dealers, as best as I can, determine what

4    you're -- again, the relevance of this information is not that

5    it is the recipe for Coke, it is for you to illustrate that

6    this happens.  And yet another way, in addition to what you

7    have already illustrated, and I'm -- I can't really, based on

8    the testimony that you're getting, I can't see how this is not

9    adequate for the purpose that you need it for.  What I do know

10   is that requiring lots more is not proportional to the needs of

11   the case.

12          And, again, we're talking about one day in 2019, I

13   think.  We're not talking about prior time.  But probably the

14   information is still helpful to you.

15          But I -- so in substance, I think the information that

16   you're looking for has some relevance.  The burden on CDK -- on

17   Authenticom of producing a complete seven-day set of

18   information -- of this information, I'm convinced, is unduly

19   burdensome and not proportional to the needs of the case from

20   what I understand the information will show and how it will be

21   used.

22          I do think that the proposal of ten CDK and ten

23   Reynolds dealers is much more proportional to the needs of the

24   case and will provide the defendants with some of the

25   information they're getting, at least on an exemplar basis.

47

1          And my understanding really of what the defendants

2     want is an exemplar basis because whether it is a full seven

3     days or it is a one day, you're looking -- you're not going to

4     get the entire history of the polling data, you're only going

5     to get a sample.  So the only question really is how large the

6     sample should be.  And, I mean, I don't know if ten is right or

7     12 is right or whatever.  But I think that's within the realm.

8          Hold on for one second.

9       (Brief interruption.)

10         THE COURT:  I'm thinking something.  Hold on.

11      (Brief interruption.)

12         THE COURT:  I take it, Mr. Ho, that the burden on

13    Authenticom really is in the process of querying the software

14    to get the information.  So hypothetically if you did, you

15    know, ten exemplars for CDK dealers and Reynolds for day one,

16    and then for day three you did ten different dealers, they

17    would get 20 dealers for CDK and 20 for Reynolds on different

18    days, that would double your burden in the sense that you have

19    to look at two days.

20         Well, hold your answer to that for a second.

21         Mr. MacDonald.

22         MR. MacDONALD:  Yes, your Honor, I --

23         THE COURT:  Is your objection -- is your objection to

24    -- I mean, here's my problem with your argument.  You're not

25    getting a statistically significant sample, in my view, under

48

1   any scenario for the entire time period that this occurred.

2   Whether they give you seven days, whether they give you a

3   rolling seven days or not, that's not a statistically

4   significant sample, I think.  I mean, you know, I'm beyond my

5   pay grade on that too.

6          But what you are getting is an exemplar.  And the only

7   question is how large that exemplar should be.  So why is an

8   exemplar that shows ten CDK and ten Reynolds dealers on one

9   day, why is that materially less helpful to you, for example,

10  than seven days?

11         MR. MacDONALD:  Well, your Honor, I'm not a

12  statistician either, but my understanding is the larger the

13  sample we can get, the -- you know, anything that we do here,

14  since Authenticom doesn't really track or keep this

15  information, is going to be an attempted extrapolation.  There

16  is going to be some uncertainty there.

17         But a larger sample will give us slightly more comfort

18  in doing that sort of extrapolation to see kind of what they

19  are doing on a systemic basis, how often they are accessing our

20  systems, how often they are polling for certain types of files,

21  how often they are running certain types of scripts or running

22  circumvention on our security.  So the larger the sample, the

23  better off -- the better data we would have.

24         And I also wanted to say, to the extent that we're

25  limited to 20 CDK dealers or, you know, ten CDK and ten

49

1    Reynolds dealers, however it is, defendants will request that

2    we get to pick the dealers that are used.

3            THE COURT:  Okay.  I know you're not a statistician,

4    but I don't buy your argument because what your argument really

5    sounds like is an exemplar argument.  I mean, and you have got

6    testimony from Authenticom -- and I can't remember which

7    deposition it was in, but I read it.  Maybe it is Noth -- that

8    Authenticom queried the system for hundreds of people -- of

9    dealers, I think.  I mean, you have got that testimony, right?

10           MR. MacDONALD:  But the issue, your Honor, is that

11   under some of the statutory claims that we have brought, the

12   Digital Millennium Copyright Act, each instance, each query is

13   its own statutory violation.  So we need to be able to quantify

14   how many times they have queried our systems.  Authenticom has

15   not produced very good data on that, so we're trying to

16   extrapolate it from a variety of sources.  And this would be

17   one of our sources.

18           And, obviously, you know, a seven-day period in June

19   2019 is not the ideal data set, but it is better than nothing.

20   And it is better than just having kind of a limited set of

21   dealers.

22           THE COURT:  Yeah, I mean, I think -- I'm not sure how

23   much better than -- this snapshot is proportional to the needs

24   of the case.  Let me just look here for a second at what you

25   said in your briefs.  Your brief.

```
 1        (Brief interruption.)
 2             THE COURT:  Yeah, I mean, my guess from what -- you
 3   know, I mean, I know plaintiffs say you gave me this
 4   information to prejudice them.  I don't know, not really.  But
 5   you're trying to give me a picture of why the polling data is
 6   important because you have already established wholesale -- in
 7   your view wholesale access to the CDK system.  So one of your
 8   bullet points on page 3 says, Authenticom had CDK dealers
 9   install a program called Profile Manager and used a system
10   administrator-level account to automatically re-enable DMS
11   log-in credentials that Authenticom was using to extract data
12   from CDK's DMS within minutes after CDK's security measures
13   disabled them.  And you cite the 30(b)(6) deposition of Brown,
14   right?
15             MR. MacDONALD:  Yes.
16             THE COURT:  And that's really what we're talking about
17   here, right?
18             MR. MacDONALD:  Well, that's --
19             THE COURT:  To some extent.
20             MR. MacDONALD:  Well, seeing the actual scripts run is
21   to some extent also trying to quantify it.
22             THE COURT:  Right.  But you're never going to get all
23   the scripts that were run.  Instead you are going to have
24   testimony that says this happened a lot, and here's an example
25   of what it looked like in June of 2019.
```

1    But you're never going to get, I don't think, today,

2    from data that disappears, what happened prior to that date.

3    So even if I were to give you seven days from today, yes, you

4    could argue that you could extrapolate that.  Everything else

5    is arbitrary in terms -- and I still haven't -- I mean, given

6    that it -- what you're asking for, I think, is illustrative,

7    I'm not sure how a larger sample, other than it is just a

8    bigger illustrative set, gets you anyplace.

9    I mean, how are you going to use this -- you say you

10   are going to give this to your experts, but your expert is not

11   here.  Or you tell me you're not a statistician.  I think

12   Authenticom would have an interesting time with an expert who

13   says, based upon a seven-day sample in June 2019, this is how

14   often I think this happened for a four- or five-year period.

15   MR. ROSS:  Your Honor, just to chime in briefly.  This

16   is Brian Ross.

17   Before -- part of the problem is that we don't know

18   what the numbers are for these most recent seven days.  But one

19   of the things that we would hope to do would be to establish a

20   bare minimum, a conservative estimate that our experts can

21   apply.  If you see a similar number of instances over June -- a

22   certain week in June 2019, and you combine that with testimony

23   where Authenticom is saying, we have lost customers, and we are

24   accessing your systems much less often nowadays than we were

25   back in the 2015 to 2017 period, then we would hope to

1  establish a floor in terms of quantifying these improper

2  instances of access.  So that would be one example.

3      Would that be ideal?  Of course not, but it would be a

4  -- certainly better than what we have to work with now on core

5  elements of our claims.

6      THE COURT:  Yeah.  And you all say you want to

7  identify the dealers.  So do you -- is part of your proposal --

8  I'm not going to give you a seven-day look at hundreds of

9  transactions.  I'm just not.  That's unduly burdensome, it

10  seems to me.  And I don't think it is proportional to the needs

11  of the case, as I understand what this is going to be used for.

12  Even if it is a better sample for you for your expert.  Because

13  although I don't have hard data from Authenticom on this, I

14  have the Clements's affidavit.  And his affidavit at some level

15  convinces me that this is a labor intensive exercise for a

16  company that may not have the folks to do it.  And it has got

17  to be expensive.  And it has got to be real expensive.

18      Unless you want to pay for them to go through there

19  and reimburse them for the costs of doing this.

20      So I'm not going to give you seven days.

21      You hesitate.  You'll pay for it.

22      MR. MacDONALD:  Depending on the cost, we would

23  consider it, yes.  Or, you know, as I said earlier, we're

24  willing to have an expert do it if they will give us a terminal

25  and --

1          THE COURT:  I doubt that's happening.

2          Right, Mr. Nemelka -- Mr. Ho?

3          MR. HO:  We would certainly object to that, your

4    Honor.

5          THE COURT:  Yeah.

6          I mean, we're talking -- at a -- conservatively we're

7    talking about hundreds of dealers through this period of time.

8    Or at least a substantial number of more than ten.

9          I mean, another way to cut this is ten that you could

10   identify for the seven-day period.  I mean, I'm not sure how

11   much incremental burden that imposes on Authenticom.  Ten

12   dealers a day for seven days.

13         Or ten CDK, ten Reynolds for seven days.

14         MR. NEMELKA:  We'll multiply the effort by seven.

15         MR. HO:  And, your Honor, if I could just make one

16   observation about --

17         THE COURT:  How long -- do you know -- yeah, you can

18   in a second.

19         MR. HO:  Sure.

20         THE COURT:  Do you know, just because the party that

21   is raising the burden usually has to quantify the burden, do

22   you know for Mr. Clements's -- let's me see.  I'll look at

23   Clements's affidavit.  Hold on.

24      (Brief interruption.)

25         THE COURT:  Yeah, see, he talks about a -- he is

 1   talking about the strawman here.  Rewriting the software to be

 2   able to get a -- yeah, I'm getting to the point where maybe

 3   I -- well, if --

 4        (Discussion off the record.)

 5        THE COURT:  Right.  I mean, do you have any idea as

 6   you sit here today how much time it would take for ten CDK

 7   dealers and ten Reynolds dealers?  I mean, because you're

 8   making that proposal, you must have talked to somebody

 9   technically to find out how -- and then you just multiply it by

10   seven.  So how much time is that?  Time and expense.

11        MR. NEMELKA:  They didn't give me a specific time.

12   They told me it would take about a week to get it to me because

13   I wanted to know about timing if this -- if this is something

14   that was offered or accepted.  So they said it would take them

15   about a week.  I don't know how they divided up their -- they

16   only have about three or four people now in their development,

17   and so I don't know how they would divide up -- how that

18   divides up man hours.

19        MR. HO:  But --

20        MS. MILLER:  Your Honor, this is Britt Miller.  And I

21   don't purport to have had a sneak peek at Authenticom software

22   so as to say how it operates.  But drawing on my limited

23   computer science background, I would think that you could -- if

24   you had identified the same ten dealers and you write the

25   script to be able to query the system for those ten CDK dealers

55

1    and those ten Reynolds dealers, you could run that query as and

2    against seven of the days, and return the results.  I.e., you

3    wouldn't have to rewrite the program or rewrite the poll or

4    rewrite the query because it is the same query, just changing

5    the date.

6          THE COURT:  I would bet they are not talking about

7    writing a query, I would bet that they are talking about

8    manually going into the system and locating the stuff.  Because

9    Clements talks about the burden on actually writing a program

10   to do this.

11         Am I right?

12         MR. HO:  Yes, your Honor.

13         THE COURT:  Yeah.  I think what they are talking about

14   is putting somebody in front of a computer screen and looking

15   at this, you know, what the seven-day period and extracting

16   from the software database this information.  And, again, this

17   is without prejudice to their argument that the, you know,

18   courts have said this, quote unquote, ephemeral data that

19   shouldn't have to be produced anyway.  It is kind of like just

20   scrolling stuff.

21         Right, Mr. Ho?

22         MR. HO:  Yes, your Honor.  I think of it as sort of

23   footprints in the sand.  I mean, they are only there for seven

24   days, and then they are washed away as in the ordinary

25   operation of the software program.  And that's exactly the kind

56

1    of data that we ordinarily think of as too burdensome to have

2    to preserve, maintain, and then produce in discovery.  And we

3    think that that ordinary principle ought to apply here.

4         If I could just make one observation about your

5    Honor's point that I think is well taken, that this can only be

6    for illustrative purposes.  I mean, I'm not a statistician, but

7    a red flag, you know, is raised in my mind when I hear the

8    defendant saying, well, actually we'd like to pick the dealers

9    because a central principle of any kind of extrapolation is

10   that it be from a statistically random sample.  So they are

11   skewing the sample by their very request to decide which

12   dealers to choose, which leads me to think this really isn't

13   about experts or about extrapolation, it is, as your Honor

14   suggested, about trying to find as many illustrations as

15   possible that they can use, however they intend to, in front of

16   the jury.

17        THE COURT:  Yeah, I mean, I do think it is trial

18   presentation.  At least that's my gut here.  I don't think

19   you're -- you know, Mr. MacDonald's -- I mean, Mr. Ross's ears

20   perking up and saying, well, we'll pay for it.  We'll pay for

21   it.  We'll put an expert there.  We'll find all this stuff.  I

22   still kind of envision, which hopefully they are not going to

23   be in front of me, the Daubert arguments about whether -- what

24   information in June of 2019 has to do with something else.

25        But I suppose defendants would argue, since the

57

1    company is smaller and retrenched somewhat, it can only be

2    worse earlier on in the period.

3          MR. ROSS:  And just to be clear, your Honor, one point

4    of clarification.  Mr. Ho has mentioned this concept of who is

5    picking the dealers.  Obviously the statistical significance of

6    this data is precisely why we wanted to get a production of a

7    full day or days, irrespective of anybody picking dealers.  But

8    in a world where we are -- we understand the Court's comments.

9    And in a world where we are going to be limited to a limited

10    subset of dealers, that's why we would like at least the

11    flexibility to choose.  And if -- if we decide to choose them

12    in a randomly generated way, we'll do that.  But the --

13    ultimately that was why we thought we shouldn't be limited on

14    the number of dealers.

15          THE COURT:  Well, and to say it differently, you don't

16    want them to pick them.  You would rather -- if somebody is

17    going to pick, you would rather pick.

18          What -- do you know, Mr. Nemelka, what's the over and

19    under?  What's the difference on whether I were to say, for

20    example, all the polling data for one day between June whatever

21    and whatever versus ten CDK dealers for one day?  I guess

22    depending upon how many dealers you're running, it could be

23    hundreds as opposed to ten, right?

24          MR. NEMELKA:  Yeah, it's -- that's just very

25    burdensome.  It is the seven dealers -- excuse me -- the 20

1    dealers over seven days is much less burdensome than doing all

2    of one day, by an order of magnitude.

3         THE COURT:  So might I assume if it takes one week for

4    ten and ten, it would take two weeks for 20 and 20, right?  Or

5    it would take two weeks for ten and ten over two days, right?

6    Probably, right?

7         MR. NEMELKA:  Probably, that's right.

8         MR. HO:  And, your Honor, more than just the number of

9    hours, this is a company that is on a -- you know, trying to

10   run a business at the same time and has been reduced to the

11   absolute bear number of people -- minimum number of people that

12   is required to continue to operate its business.  So to take

13   one of those people and say, you have got to spend a week or

14   two weeks trying to find data for these, even, 20 CDK and

15   Reynolds customers is still a very significant burden on

16   management.

17        MS. GULLEY:  Your Honor?

18        THE COURT:  Yes, Ms. Gulley.

19        MS. GULLEY:  Thank you.  Sorry.  I wasn't sure whether

20   there was a window.  I was waiting for a window.  Can I make

21   some comment for -- momentarily?

22        THE COURT:  Sure.  Now we will have a one, two, three,

23   three lawyers arguing for Reynolds and Reynolds.

24        MS. GULLEY:  I'm so sorry, your Honor.

25        THE COURT:  That's okay.  We have got two for CDK, so

59

1    we have got the whole family in here.

2         MS. GULLEY:  Okay.  Well, thank you.  So I just want

3    to address a couple of issues that you raised.  First of all, I

4    appreciate that you are not addressing the spoliation issue

5    today.  Obviously there are bigger issues.  There are prima

6    facie elements that the defendants say in having to prove their

7    counterclaims, you know, that where we sent them hold orders

8    long, long ago and have asked for the type of data for a long

9    time, which we're just learning the data that we got wasn't

10   good enough.

11        With respect to the burdens, we understand, you know,

12   that this employee situation with the reduced forces that

13   plaintiffs put in their recent motions has been something that

14   they have been putting in their motions since this case was in

15   front of the Seventh Circuit, and after which Mr. Cottrell made

16   his statement to the press that the company was well positioned

17   and battled.  That came after those layoffs when he made that

18   statement.  We have talked about this many times.

19        Nevertheless we appreciate the burdens of this.

20   Reynolds and CDK have also had significant burdens.  In polling

21   the transactional data that the plaintiffs requested, Reynolds

22   has to essentially shut down its accounting system every night

23   for months to pull that and had to pay tens of thousands of

24   dollars to buy additional server space.

25        So as an order of magnitude, we're talking about two

1  weeks for them.  We have worked on this for months and months

2  and months.  Because it goes to elements of the plaintiffs's

3  case, we have had to do that.  This goes to a core element of

4  the defendants's case.

5        I understand that now, given that the plaintiffs have

6  continued to delete that information on an ongoing basis since

7  the case began, we only have seven days, but seven days is

8  better than zero days.

9        THE COURT:  Okay.  I hear you.

10     (Brief interruption.)

11        THE COURT:  You know, there is nothing in -- I'm

12  re-reading the defendants's brief on this, which is sealed as

13  ECF 711.  And really the whole import of what defendants are

14  arguing there is the illustrative purpose of this data rather

15  than, you know, a huge -- I'm interpreting it as more of a -- I

16  don't know how this gets you -- there is no affidavit from an

17  expert that says, I need seven days of data, for example, for X

18  number of Y dealers.

19        What you say at page 7 is the PCM log, which is

20  ephemeral data, I'm convinced, even though it would only

21  contain data for a limited time period, may be the only means

22  through which defendants can understand Authenticom's polling

23  activities on a poll-by-poll dealer-by-dealer basis.  So it is

24  an attempt to understand kind of what's going on.  Maybe I'm

25  putting too much weight in that.

61

```
 1          Okay.  I want to take a really quick break here.  We
 2    have been going since 9:30.  I know I have an 11:15 criminal
 3    hearing, which everybody has not yet arrived for.  My intention
 4    is to end you there.
 5          Was there anything else you wanted me to deal
 6    with -- I understand -- I guess there is -- there are a couple
 7    of things that I would like to deal with with you.  I want to
 8    make sure I know when the documents are going to be produced.
 9    I want to know of the remaining things under advisement what
10    your priorities are.
11          MS. MILLER:  All of that -- your Honor, this is Britt
12    Miller.  I'll let Mr. Provance speak as to when we can get the
13    documents to you.
14          As to other matters that remain under advisement,
15    Docket 539 and docket 543, which are defendants's motions to
16    compel production, they were both listed on the May 15th status
17    hearing report --
18          THE COURT:  Uh-huh.
19          MS. MILLER:  -- which actually implicate a number of
20    issues that your Honor ruled on with respect to CDK today.
21          THE COURT:  Well, isn't 539 your motion to compel
22    Authenticom, which gets taken care of by what I am doing here
23    or is this more in --
24          MS. MILLER:  No, this is a -- this is the motion to
25    compel Authenticom to produce communications off of their log.
```

62

1        THE COURT:  Okay.

2        MS. MILLER:  So these are specifically as to the

3  documents that they have claimed privilege to.

4        THE COURT:  Okay.

5        MS. MILLER:  Same thing is true of 543 --

6        THE COURT:  Got it.

7        MS. MILLER:  -- which is as to Auto Loop and Cox

8  Automotive.  Again, we have asked for both of them either to

9  produce them or to put them for in camera review.

10       So to the extent your Honor is going to plan a

11  hearing, you might want to do it all at once.

12       THE COURT:  I don't think I am going to -- I don't

13  want that kind of punishment.

14       MS. MILLER:  Fair enough.  Fair enough.

15       So those are the other -- so in terms of primacy, I

16  would -- considering the crossover, I would suspect that those

17  two would be ones we would be looking for for rulings in the

18  relative short-term.

19       THE COURT:  Okay.  And for those you would say I would

20  want the opposing party to send me the document -- I don't have

21  those documents in camera either, right?

22       MR. NEMELKA:  Correct.

23       MS. MILLER:  Correct.

24    (Discussion off the record.)

25       THE COURT:  Something we received as zip file

63

1    documents on.  Do you know which one that was?

2         MS. MILLER:  That may have been the last round of in

3    cameras with respect to the class plaintiffs's motions that you

4    have already ruled on.

5         THE COURT:  Okay.

6         MS. MILLER:  So I don't believe we have submitted --

7    either side has submitted the actual documents with respect to

8    these three motions.

9         MR. PROVANCE:  Your Honor, it is hard for us to know

10   for certain, but those may have been submitted in connection

11   with Docket 633, which is a separate motion to compel.

12        THE COURT:  Yeah, the clawback documents and FTC

13   privilege, right?

14        MS. MILLER:  Correct.

15        THE COURT:  And then in addition to those, I have got

16   -- I had this issue about briefs for refreshing data.  Has that

17   been taken care of?  You don't have to do that?

18        MS. MILLER:  There are a number of things that are

19   outstanding from the May 15th status.  We have produced -- a

20   number of people have produced their refresh data.  A number of

21   portions of that refresh are still outstanding as to certain

22   parties.  There are agreed dates by which folks expect to

23   produce that data.  But there may be issues following those

24   refreshes which may need to be produced or may need to be

25   addressed with your Honor.

64

1          There are also a handful of other items from the May

2    15th agenda, not motions, but issues that were raised that the

3    parties are still working through.  But if those are not

4    resolved, obviously, we will have to bring those to your Honor

5    as well.

6          THE COURT:  Okay.  Mr. Provance, what's your thought

7    on when you can get me the documents in camera?

8          MR. PROVANCE:  Your Honor, the short answer is that I

9    I will need to talk to my staff as well as probably our

10   discovery vendor.  But in general we'll move with all alacrity.

11         One --

12         THE COURT:  All deliberate speed.

13         Why don't you, plaintiffs, also talk to Mr. Provance

14   about when you can get me something with respect to what I

15   would need to look at with the -- off of log issues that you

16   have raised.

17         MR. NEMELKA:  On the corollary issue?

18         THE COURT:  Yeah.

19         MR. NEMELKA:  Yes.

20         MR. PROVANCE:  Okay.  Your Honor, if I have could

21   just --

22         THE COURT:  And send an email to Brenda as to when you

23   can do it.  I'll enter an order.

24         MR. PROVANCE:  If I could ask one question.  One thing

25   that we have learned in the process with your Honor is that

65

1    submitting documents in camera that were produced with
2    redactions are often difficult for the Court to understand.  We
3    could undertake an effort to identify documents that were
4    redacted, but then, you know, try some way to identify what we
5    have redacted, but make it so that you could still see it.  We
6    can explore those things.  But obviously it will take a little
7    bit longer to put those together.

8         THE COURT:  Yeah.  I mean, obviously, I'm going to
9    want to know what was redacted.  I don't know if it is a
10   problem just with me or with other judges.  But I am going to
11   want to know what's redacted in order to understand it.  It may
12   be highlighting it or something, I don't know.  But I -- that's
13   part of the process.

14        MR. PROVANCE:  That's certainly an understandable
15   request, and we'll build that in to our estimate of how quickly
16   we can get you the documents.

17        MS. WEDGWORTH:  Your Honor, if I may bring up, I think
18   ECF 294 and 308, going way back to July, August of 2018, we had
19   a motion where you ruled on the waiver part, but you didn't
20   rule on the underlying privilege part of those clawback
21   documents with the CDK production there, which got rolled into
22   the current clawback motions.

23        So when you do rule on the clawback motions, with
24   regard to CDK 294 and 308, which I think consist of roughly
25   1400 documents, still need the review for privilege.

1      And that I think rolls into the Docket 633, which

2  we -- which we have been discussing.

3      MR. PROVANCE:  Your Honor, this is Matt Provance.  I'm

4  not sure I agree with what Ms. Wedgworth just explained.  There

5  were a set of clawback motions filed last year.  Your Honor did

6  rule on the waiver portion.

7      As to substantive questions about whether those

8  documents were in fact privileged on a document-by-document

9  basis, your Honor instructed the parties to incorporate that

10  into broader challenges, because those clawback documents were

11  logged and part of defendants's privilege logs.  And if there

12  are challenges to those documents based on their privilege log

13  entries, they could have, should have, and I believe were

14  raised in connection with the parties's discussions about

15  privilege logs that took place in November of last year.

16      And so from the Court's perspective we believe the

17  motions that were teed up, the documents that were challenged,

18  the privilege log entries that were challenged, they

19  incorporate all of that.

20      THE COURT:  I think I agree with that.  I mean, as I

21  recall this was a kitchen sink 1400 documents.  I didn't have a

22  document-by-document challenge.  And I think I said something

23  after I dealt with the waiver issue that if the parties really

24  want to do this on document-by-document basis, you have got to

25  tee it up to me on a document-by-document basis.  And my

67

1    thought was that that's what was done with ECF 633.

2         I don't think -- if I am correct, and the 1400

3    documents from before was a kitchen sink basis -- and I'll go

4    back and look at that, but I am not interested -- I don't think

5    it was a -- I don't think I -- I think what I said at the time

6    was I can't rule on this on a kitchen sink basis.

7         Isn't that right, Ms. Wedgworth?

8         MS. WEDGWORTH:  I thought this was the one where you

9    requested and received a sampling of those documents.

10        THE COURT:  Yeah.

11        MS. WEDGWORTH:  And when you looked at those, there

12   was this issue about the redactions weren't in the documents,

13   which delayed everything.  So I thought we were still dealing

14   with the issue of how the redactions work with the sampling you

15   got.

16        To the extent they are rolled up into 633, we

17   certainly want everything ruled on at one point.  I don't think

18   we have set aside the 1400, but they are included in the 633.

19   And, nonetheless, the 294 and 308 on the docket are still open

20   for that -- for the privilege.

21        THE COURT:  How am I supposed to rule on the issues of

22   privilege on a sample basis, without knowing whether the sample

23   you gave me actually is really an exemplar for each and every

24   other document, and without some writing on there?  I mean, how

25   -- I mean, I remember you gave me some samples or I asked for

68

1    some exemplars.  I think I asked for a hundred or something

2    like that.  And I had them in a box.  And when I went through

3    them, it didn't help me at all, so --

4         MS. WEDGWORTH:  I appreciate that question and

5    appreciate the answer is normally document by document.  In my

6    experience in other cases, and I thought maybe this is where

7    you were going when you requested the sample, many times

8    magistrates or judges rules -- rule on those sampling, saying

9    here is a scenario where this is in or out.  And then the

10   attorneys take that ruling and apply it to the rest of the

11   documents.

12        In this scenario, the Judge has already ruled that

13   this is coming in for whatever reason or this is -- this

14   remains on the privilege log.  And we will follow that example

15   in going through.  And that has worked in the past, and I -- I

16   didn't try to read into too much what you were doing with the

17   sampling.

18        But with the ruling from that sampling, we certainly

19   could adjust and figure out the rest of the production with the

20   understanding there are usually some documents that do not

21   cleanly fall into one of your previous rulings.

22        But, again, the issue that happened in one of the

23   hearings was when defense counsel produced that sampling, the

24   redactions didn't appear, it threw off the review of it, and we

25   left it at that.

1          MR. PROVANCE:  Your Honor, I won't belabor the point

2     because we have a full record on this.  We had prior hearings.

3     We can all go back and check what was said.

4          There have now been four motions to either clawback or

5     seek production of privileged documents against CDK.

6     Ms. Wedgworth on behalf of the dealers filed motions seeking

7     all certain categories of privileged documents that were

8     initially produced to the FTC original, but then clawed back.

9          But all those documents have now been logged.  And

10    they were logged before plaintiffs filed not only Docket 633,

11    but also their general omnibus motion challenging clawback

12    entries at Docket Number 535.

13         So in terms of specific documents, there has been a

14    full opportunity to challenge entries, challenge individual

15    documents.  And indeed the dealership class members and now the

16    individual plaintiffs as well have made many, many challenges.

17    And we have responded to them, and those issues are now fully

18    briefed.

19         MS. WEDGWORTH:  My -- a brief response, your Honor.  I

20    appreciate we're dragging this out.  I'm not clear in that

21    response that that 1400 -- those 1400 documents have been

22    logged.

23         Mr. Provance, are you representing they have been?

24         MR. PROVANCE:  So, first of all, I believe it is 2400

25    documents that were initially challenged by clawbacking.  And,

1    yes, all those documents were either logged in connection with

2    the initial clawback motion that the plaintiffs filed last

3    summer in 2018 or were produced or have been included on the

4    privilege logs that CDK has now provided across its entire

5    productions.

6         THE COURT:  Okay.  We're going to probably have to

7    leave it there right this minute.  I'm going to want you, given

8    that I have another hearing that has to start, and our

9    defendant is here -- I'd like you to jointly email Brenda a

10   date by which you're going to submit the in camera documents

11   that we talked about.

12        I'm taking under advisement this issue of the polling

13   data so I could think about it and decide which way I want to

14   go or whether I want to call you back in or whether I need an

15   evidentiary hearing on it.

16        How far do defendants want to push the issue?  Do you

17   want to bring in your experts?  I mean, is the primary basis to

18   get data for your experts or to get information that is -- that

19   you can as exemplar or illustration?

20        So, for example, if I say, you know, the amount of

21   burden that I'm going to put Authenticom through is related to

22   how deeply important this information is to the defendants.  Do

23   you want to bring in your experts to testify about why they

24   need this information and how a seven-day sample from 2019 is

25   going to be the be all or end all of their analysis?  Do you

1    want to have that?

2           And then do you want me to appoint the special master

3    so you can pay that special master to do this and go off and go

4    on that track?  Or do you want to accept some measure, ten or

5    20 of these over a day or two days, and take that for your

6    purposes?

7           I just -- I'm trying to gauge how important this issue

8    is in the grand scheme of things.  How much time I should spend

9    on it.  How much time you want to spend on it.

10          MR. MacDONALD:  Your Honor, we think this issue is

11   very important.  We want it for two reasons.  One is the

12   illustrative reason you talked about.  One is, as I said, one

13   of the elements of our claims is quantifying the number of

14   times they run scripts on our system.  And this is one of the,

15   if not the only, source of that information.

16          THE COURT:  So you have other sources of information.

17          MR. MacDONALD:  There --

18          THE COURT:  It is obvious from what you have got here.

19   And so why didn't you, in your motion, wax eloquent on the

20   quantification aspect as opposed to the illustrative aspect?

21          I mean, getting this information from a lot of

22   different ways.  You have got Authenticom people testifying

23   about how the fact that they did this on hundreds of occasions.

24   You have got your own systems that can show who -- probably how

25   many times you were hit.  You have got other data coming in.

72

1      So is this another pebble of information?  Is it a

2  boulder?  Is it outcome determinative?

3      MR. MacDONALD:  I don't believe --

4      THE COURT:  Or don't you know?

5      MR. MacDONALD:  I don't believe it is outcome

6  determinative.  But it is a substantial source of information.

7  This is the best information Authenticom keeps on this.

8      THE COURT:  It may be the best information that

9  Authenticom keeps on it, but do you have other information that

10 you can prove your case with?

11      MR. MacDONALD:  Well, we're going to -- if we don't

12 get this information, we're going to have to prove it with

13 other information.  But they are going to challenge that as not

14 reliable.  They are going to say your information isn't good

15 enough because you don't have access to the instance-by-

16 instance data, which is only kept on the --

17      THE COURT:  Yeah, but they are going to challenge that

18 on a seven-day sample too, right?

19      MR. MacDONALD:  That's true.  But then we have another

20 pillar to stand on.

21      THE COURT:  Okay.  So we're talking about how many

22 pillars you need to stand on, right?

23      MR. MacDONALD:  Well, you need at least three or four

24 for a chair.

25      THE COURT:  Okay.  A question whether a pedestal is

73

1   enough here.

2          Okay.  We're going to -- we're going to stop right

3   now.  I think I understand where we are.

4          I know I have to set another date to see you.  I have

5   other motions under advisement.

6          I think by and large the motions I now continue to

7   have under advisement, pending what you're going to tell me

8   about whether you work out everything on the issues in the

9   agenda, including depositions and stuff like that, are --

10  motions mostly are in camera review, redaction, clawback kind

11  of issues, which are terribly labor intensive.  So we would

12  have to set out some time for that.

13         But right now I think, unless there is anything else

14  somebody wants to raise quickly, I think we are going to break.

15         MS. WEDGWORTH:  Your Honor, just one brief thing.  We

16  have a third-party motion to compel that we briefed in the

17  Southern District of New York, which was transferred here on

18  May 30th.  It was assigned to Judge Tharp.  So we will be --

19  good news, bad news -- getting it to you, hopefully, this week.

20  So there is a pending motion to compel from a third-party

21  production.

22         THE COURT:  Well, that depends on whether Judge Tharp

23  wants to send it over here.

24         MS. WEDGWORTH:  Correct, your Honor.

25         THE COURT:  I think maybe it should go to Dow and then

74

1    to me.  I don't know.

2           MS. WEDGWORTH:  I suspect we have to get it in front

3    of Dow and then to you.

4           THE COURT:  Well, it is not yet on my brief motions

5    calendar, so -- okay.  Can we break?

6           MR. NEMELKA:  We thank you for your time.

7           MS. WEDGWORTH:  Thank you, your Honor.

8           MR. HO:  Thank you, your Honor.

9           MS. GULLEY:  Thank you, your Honor.

10        (Which concluded the proceedings:)

11                          CERTIFICATE

12           I HEREBY CERTIFY that the foregoing is a true, correct

13    and complete transcript of the proceedings had at the hearing

14    of the aforementioned cause on the day and date hereof.

15

16    */s/Pamela S. Warren*                   June 10, 2019
      Official Court Reporter                      Date
17    United States District Court
      Northern District of Illinois
18    Eastern Division

19

20

21

22

23

24

25

# EXHIBIT D



Matthew A. Kupillas
Direct Dial: (212) 613-5697
mkupillas@milberg.com

July 11, 2019

<u>BY EMAIL</u>

Britt M. Miller
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606

   Re: *In re Dealer Management Systems Antitrust Litigation - CDK's Responses*
     *and Objections to Dealership Class Plaintiffs' First Set of Interrogatories*
     *Concerning CDK's Counterclaims*

Dear Counsel,

   I write concerning CDK's Responses and Objections to Dealership Class Plaintiffs' First
Set of Interrogatories Concerning CDK's Counterclaims, which were served by CDK on July 3,
2019 (the "Responses"). For the reasons set forth below, Dealership Plaintiffs request a meet-and-
confer conference concerning the Responses.

   **<u>Interrogatory No. 1</u>**:

   Dealership Plaintiffs believe that CDK's objections to Interrogatory No. 1 are without
merit. The information sought by the interrogatory is relevant to CDK's Counterclaims, as CDK's
publicly stated policy on dealer-permissioned access to the CDK DMS may, *inter alia*, inform the
Court's interpretation of certain provisions of the Master Services Agreements ("MSAs") between
Counter-Defendants and CDK, establish that CDK waived certain provisions of the MSAs, and
demonstrate that Dealership Counter-Defendants did not knowingly induce any third parties to
engage in unauthorized access to CDK's DMS. CDK's objection that "the burden of deriving or
ascertaining information responsive to this Interrogatory is substantially the same for Dealership
Counter-Defendants as it is for CDK" is factually incorrect, as CDK's executives will certainly
have a greater knowledge of their own public statements on this subject than Dealership Counter-
Defendants possess. CDK's objection to the term "CDK executives" is meritless; despite CDK's
size, the number of executives who would have been making public statements about this subject
on CDK's behalf is likely to be small. Accordingly, we believe that CDK should fully respond to
this Interrogatory.

July 11, 2019
Page 2

Moreover, while CDK identified "various documents responsive to this Interrogatory", that response is insufficient. This Interrogatory seeks the identification of "all public statements", not merely a handful of self-serving examples. Further, many of the documents identified by CDK do not contain any responsive information, as those documents say nothing about "CDK's policy or position on whether CDK dealers were permitted to provide their DMS login credentials to third parties", but instead reflect only general statements about DMS security.[1]

**Interrogatory No. 2**:

Dealership Plaintiffs believe that CDK's objections to Interrogatory No. 2 are without merit. The information sought by this Interrogatory is relevant to CDK's Counterclaims, as CDK's giving of consent to individual dealers to provide their DMS login credentials to third parties, *inter alia*, would have informed Dealership Counter-Defendants about CDK's policy concerning dealer-permissioned access to the DMS. It is also relevant to whether CDK gave "authorization" to dealers to allow third parties to access their DMS as that term is used in the Computer Fraud and Abuse Act ("CFAA"), and whether Dealership Counter-Defendants knowingly induced any third parties to engage in unauthorized access to CDK's DMS.

Further, while CDK did identify a small number of documents that purportedly identify dealers whose MSAs contained Non-Standard Addenda ("NSAs") permitting those dealers to provide their DMS login credentials to third parties, Interrogatory No. 2 seeks the identification of all communications of such consent, not merely those that were formally documented in MSAs. To the extent that CDK is aware of other instances -- aside from the MSAs -- in which CDK communicated its consent for a CDK dealer to provide its DMS login credentials to a third party, CDK is required to identify those instances.

**Interrogatory No. 3**:

Dealership Plaintiffs believe that CDK's objections to Interrogatory No. 3 are without merit. The information sought by this Interrogatory is relevant to CDK's Counterclaims, as CDK's efforts to enforce (or failure to enforce) the relevant provisions of the MSAs may, *inter alia*, inform the Court's interpretation of those provisions of the MSA, and may establish that CDK waived those provisions of the MSAs through its consistent and intentional failure to enforce them.

While CDK did provide a narrative response to this Interrogatory, CDK's response is deficient. Interrogatory No. 3 calls for the identification of "all" efforts by CDK to enforce the relevant provisions of the MSA, but CDK has only provided examples of those enforcement efforts. Further, many of the examples identified by CDK are not responsive to this Interrogatory,

---

[1] Two of the documents that CDK identified as responsive to Interrogatory No. 1 (CDK-0887485 and CDK-0887504) have been withheld from production by CDK under claim of privilege. This is puzzling, as Interrogatory No. 1 seeks the identification of public statements made by CDK executives, and due to their public nature, such statements would not be protected from disclosure by claim of privilege. Dealership Plaintiffs request that CDK clarify if it is continuing to assert privilege over the production of these documents, or if CDK intends to withdraw those claims of privilege.



MILBERG
PHILLIPS GROSSMAN LLP

July 11, 2019
Page 3

as they do not reflect efforts by CDK to enforce the relevant provisions of the MSA, but instead reflect general suggestions concerning data security. CDK should amend its responses to identify all instances in which it attempted to enforce the relevant provisions of the MSA, and to remove any non-responsive information.

**Interrogatories Nos. 4, 7 and 10**:

Dealership Plaintiffs believe that CDK's objections to Interrogatories Nos. 4, 7, and 10 are without merit. CDK objects to each of these Interrogatories on the ground that "[a]ny past conduct by CDK, DMI and/or IntegraLink with respect to the DMSs of other DMS providers is not relevant to whether the Dealership Counter-Defendants' actions with respect to the CDK DMS were lawful or appropriate."

However, the information sought by these Interrogatories is directly relevant to CDK's Counterclaims and Dealership Counter-Defendants' defenses thereto, for multiple reasons. For example, CDK's own "unauthorized" access to other DMS providers' DMSs may well prove fatal to CDK's allegations. *See Hellyer Communs. v. WRC Props.*, 969 F. Supp. 1150, 1154 (S.D. Ind. 1997) ("Rules of contract interpretation ordinarily confine the Court's analysis to the explicit terms of the instrument. However, the Restatement (Second) of Contracts permits evidence extrinsic to a contract to be considered in order to establish an industry usage which would have been understood by the contracting parties to form the backdrop to their agreement.").

Further, to the extent that CDK engaged in "unauthorized" access to other DMS providers' DMSs, that conduct would have been well-known within the automotive sales industry, and thus would be relevant to Dealership Counter-Defendants' knowledge and belief that third parties' access to the CDK DMS was authorized. Similarly, to the extent that CDK circumvented technological measures imposed by other DMS providers to prevent access to their DMSs, industry knowledge of CDK's actions would be relevant to whether Dealership Counter-Defendants "intentionally induced Authenticom and other third parties to repeatedly circumvent CDK's access control measures in order to access the CDK DMS …", as CDK alleges. Counterclaims ¶ 151.

CDK's unauthorized access to other DMS providers' DMSs is also relevant to CDK's demand for injunctive relief against Dealership Counter-Defendants. To the extent that CDK has engaged in (and may continue to engage in) unauthorized access to other providers' DMSs, CDK's own "unclean hands" and, more generally, the overall equities may bar its request for injunctive relief. *See Original Great American Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 281 (7th Cir. 1992) ("Unclean hands is a traditional defense to an action for equitable relief."). Further, in evaluating requests for injunctive relief, courts consider a number of factors, including the public interest. *See LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933 (7th Cir. 2019) ("To merit injunctive relief, a plaintiff must demonstrate . . . that the public interest would not be disserved by a permanent injunction.") (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). To the extent that CDK has engaged, and may still engage, in "unauthorized" access, it would be against the public interest for the Court to enjoin Dealership Counter-Defendants from engaging in similar conduct.



July 11, 2019
Page 4

### Interrogatories Nos. 11, 12, 13, and 14:

Dealership Plaintiffs believe that CDK's objections to these Interrogatories are without merit. Each of these Interrogatories seeks information concerning the damages and losses that CDK purportedly suffered as a result of Dealership Counter-Defendants' alleged breaches of contract and statutory violations. As such, CDK's objection that these Interrogatories "seek[] information that is not relevant to any of CDK's Counterclaims or any defenses to those Counterclaims" is patently incorrect. Further, while CDK objects to these Interrogatories on the ground that they are "premature in that [they] seek[] information subject to expert opinion and analysis", CDK may not withhold responsive information concerning its alleged damages and losses that is currently within CDK's knowledge. *See, e.g., Sanimax AGS, Inc. v. Gulf Hydrocarbon, Inc.*, 1:09-cv-37-SEB-TAB, 2010 U.S. Dist. LEXIS 26443, at *6 (S.D. Ind. Mar. 19, 2010) (rejecting counter-plaintiff's argument that it need not respond to damages-related interrogatory because it has "no duty to prove its damages at the discovery stage" and "will produce an expert report on damages in accordance with the Case Management Plan …").

With regard to Interrogatory No. 14, CDK asserts multiple objections, and does not provide any response; however, CDK then states "that its investigation is ongoing, and it reserves the right to supplement its response to this Interrogatory to the extent additional information becomes available." Dealership Plaintiffs request that CDK clarify its response to this Interrogatory: Does CDK assert that Interrogatory No. 14 is so objectionable that it does not merit a response, or does CDK assert that it does not currently possess any information that is responsive to this Interrogatory?

### Interrogatory No. 16:

Dealership Plaintiffs believe that CDK's objections to this Interrogatory are without merit. The information sought by this Interrogatory is relevant to CDK's Counterclaims; Dealership Plaintiffs are entitled to know the specific damages and costs that CDK incurred as a result of its own data security weaknesses and failures, *inter alia*, in order to ensure that CDK does not include those same damages and costs in any calculation of the damages and losses that are allegedly attributable to Dealership Counter-Defendants' alleged breaches of contract and statutory violations.

### Interrogatories Nos. 17 and 18:

In its responses to these Interrogatories, CDK states that "on information and belief, Dealership Counter-Defendants have agreed to withdraw this Interrogatory, and therefore no Response is required." CDK is correct that Dealership Counter-Defendants offered to withdraw these Interrogatories, both before CDK moved for a protective order, and in the briefing on that motion. However, by continuing to pursue its motion for protective order to a decision by the Court, CDK implicitly rejected Dealership Counter-Defendants' offer. Moreover, at the hearing on CDK's motion for protective order, Judge Gilbert stated that "You know, if plaintiffs are still willing to say, we will withdraw these and accept something else, I'm not saying now my ruling supersedes that." Transcript of Proceedings, June 10, 2019, at 28. However, following that hearing, Dealership Counter-Defendants did not indicate that we are still willing to withdraw these



July 11, 2019
Page 5

Interrogatories, and CDK was wrong to presume so "on information and belief". CDK is required to fully respond to these Interrogatories.

* * *

      The foregoing is not intended to provide an exhaustive description of the inadequacies of the Responses or our arguments pertaining thereto.  We request a conference to meet-and-confer concerning the matters discussed above.  Please inform us of your availability for a conference in the next week.

                                   Very truly yours,

                                   */s/ Matthew A. Kupillas*

                                   Matthew A. Kupillas

MAK:ln

cc:     All counsel of record



# EXHIBIT E



NEW YORK
LOS ANGELES

Matthew A. Kupillas
Direct Dial: (212) 613-5697
mkupillas@milberg.com

July 22, 2019

<u>BY EMAIL</u>

Matthew D. Provance
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606

Re:   *In re Dealer Management Systems Antitrust Litigation – CDK's Responses and Objections to Dealership Class Plaintiffs' First Set of Interrogatories Concerning CDK's Counterclaims*

Dear Matt:

I write in follow-up to our July 17, 2019 meet-and-confer call concerning CDK's Responses and Objections to Dealership Class Plaintiffs' First Set of Interrogatories Concerning CDK's Counterclaims, served on July 3, 2019 (the "Responses").

**<u>Interrogatory No. 1</u>**:

On our call, you represented that CDK made a reasonably diligent effort to identify all responsive public statements by CDK executives from January 1, 2013 through the present, and that the Responses identify all responsive public statements identified by CDK in that search.

With regard to the two privileged documents (CDK-0887485 and CDK-0887504) that CDK's Responses identified as responsive to this Interrogatory, you represented that those two documents were withheld from production because they are attachments to privileged emails, but that CDK has already produced non-privileged copies of those two attachments. On the call, Dealership Plaintiffs asked you, and you agreed, to identify the Bates numbers of those two documents.

**<u>Interrogatory No. 2</u>**:

On our call, you represented that although CDK objected to Interrogatory No. 2 on relevance grounds, CDK's Responses did not withhold any responsive information. You further

July 22, 2019
Page 2

represented that CDK is not aware of any instances, other than through the execution of NSAs to MSAs, in which CDK communicated its consent for a CDK dealer to provide its login credentials to a third party. However, you acknowledged that in your efforts to gather information in response to this Interrogatory, you did not ask any CDK employees specifically whether CDK ever gave such consent through oral communications, and you stated that you would consider going back to ask CDK employees that question. Dealership Plaintiffs believe that a complete response to this Interrogatory requires you to ask that question of CDK employees.

**Interrogatory No. 3**:

On our call, you stated that CDK's Response to this Interrogatory was intended to be a "comprehensive summary" of all efforts made by CDK from January 1, 2013 to the present, to enforce the relevant provisions of the MSA. Specifically, you represented that (i) CDK is not aware of any instances in which CDK attempted to enforce those provisions through the termination of any contracts with dealers, and (ii) other than the lawsuits identified in the Responses, CDK is not aware of any instances in which CDK has attempted to enforce those provisions through the filing of a lawsuit or arbitration proceeding.

You stated that CDK's Response to Interrogatory No. 3 was a "summary", in that the Response identifies certain "security events" undertaken by CDK to enforce the relevant provisions of the MSA, but does not identify every individual "security event" undertaken by CDK; you also stated that CDK's Response to Interrogatory No. 12 identifies documents concerning additional "security events" that would be response to Interrogatory No. 3. In response to Dealership Plaintiffs' request, you stated that CDK would consider supplementing its response to Interrogatory No. 3 to identify other documents that contain responsive information.

**Interrogatories Nos. 4, 7, and 10**:

On our call, Dealership Plaintiffs stated that we continue to believe these Interrogatories are relevant to CDK's Counterclaims and to Dealership Counter-Defendants' defenses thereto, including for the reasons set forth in my letter dated July 11, 2019. You stated that CDK continues to believe that these Interrogatories seek information that is completely irrelevant to the Counterclaims, and that you would need to confirm with CDK whether it intends to stand on those "relevance" objections.

**Interrogatories Nos. 11-14**:

On our call, you again asserted the objection that these Interrogatories are more properly the subject of expert testimony, and reiterated your belief that Dealership Plaintiffs would be unable to obtain a ruling compelling CDK to further respond to these Interrogatories before the due date for service of CDK's damages-related expert report(s). We reiterated our belief that regardless of the case schedule for expert discovery, to the extent that CDK is in possession of information that is responsive to these Interrogatories, CDK is required to identify that information



July 22, 2019
Page 3

now; however, we recognized that given the case schedule, we may be unlikely to obtain an order compelling CDK to respond to these Interrogatories before CDK serves its expert reports.

With specific regard to Interrogatory No. 14, you clarified that CDK currently is not in possession of any responsive information, but that CDK reserves its right to supplement its Response to Interrogatory No. 14 to the extent that additional information becomes available.

In the spirit of cooperation, Dealership Plaintiffs offer the following compromise: Dealership Plaintiffs will agree not to move to compel CDK to more fully respond to Interrogatories Nos. 11-14 until <u>after</u> CDK serves its damages-related expert reports, if CDK agrees <u>not</u> to argue that a motion to compel filed after service of CDK's expert reports is untimely. Please let us know if CDK accepts this offer.

**<u>Interrogatory No. 16</u>**:

On our call, Dealership Plaintiffs stated that we continue to believe this Interrogatory is relevant to CDK's Counterclaims and to Dealership Counter-Defendants' defenses thereto, including for the reasons set forth in my July 11 letter. You stated that CDK continues to believe that this Interrogatory seeks information that is completely irrelevant to the Counterclaims, and that you would need to confirm with CDK whether it intends to stand on its "relevance" objection.

**<u>Interrogatories Nos. 17-18</u>**:

On our call, we explained that our prior offer to withdraw Interrogatories Nos. 17 and 18 was contingent on CDK's agreement to respond to the Interrogatories Nos 1-16, and that by moving forward with its motion for protective order, CDK rejected that offer. You reiterated your belief that Dealership Plaintiffs had left that prior offer open, and that withdrawing that offer now would be inconsistent with Dealership Plaintiffs' representations in the briefing of CDK's motion for protective order. In an effort to resolve this dispute, Dealership Plaintiffs stated that if CDK is willing to withdraw its objections to some or all of the other disputed Interrogatories, and to provide substantive responses to those Interrogatories, Dealership Plaintiffs may be willing to withdraw Interrogatories Nos. 17 and 18.

\* \* \*

We look forward to hearing back from you with regard to the open issues identified above.

Very truly yours,

*/s/ Matthew A. Kupillas*
Matthew A. Kupillas

cc:     All counsel of record



# EXHIBIT F



Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
United States of America

T: +1 312 782 0600
F: +1 312 701 7711
mayerbrown.com

July 26, 2019

Matthew D. Provance
Partner
T: +1 312 701 8598
mprovance@mayerbrown.com

BY EMAIL

Matthew A. Kupillas
Milberg Tadler Phillips Grossman LLP
One Pennsylvania Plaza
New York, NY 10119

Re:   *In re Dealer Management System Antitrust Litig.,*
      MDL 2817, Case No. 18-cv-864 (N.D. Ill.)

Dear Matt:

I write in response to your July 11 and July 22, 2019 letters regarding CDK Global, LLC's Responses and Objections to Dealership Class Plaintiffs' First Set of Interrogatories Concerning CDK's Counterclaims and our July 17, 2019 meet-and-confer. CDK's response and position concerning each Interrogatory that remains in dispute is set forth below.

**Interrogatory No. 1**

In response to your inquiry, we confirm that when identifying the Bates numbers associated with documents that contain information responsive to this Interrogatory, CDK inadvertently identified Bates numbers associated with two documents that are privileged as attachments to communications with counsel (and accordingly those documents have been withheld from production). Below are replacement Bates numbers that identify non-privileged versions of these documents in CDK's production.

| Bates Number of Document Cited in CDK's Response to Interrogatory No. 1 | Replacement Bates Number |
| --- | --- |
| CDK-0887485 | CDK-0744485 |
| CDK-0887484 | CDK-2448949 |

**Interrogatory No. 2**

CDK's investigation preceding its response to this Interrogatory considered instances of "consent" without regard to their form. Nevertheless, we have taken under advisement your request that we specifically investigate any instances of "oral" consent. As of the date of this letter, CDK's investigation has not uncovered any additional information that would require amendment or supplementation to its response.

Mayer Brown is a global services provider comprising an association of legal practices that are separate entities including
Mayer Brown LLP (Illinois, USA), Mayer Brown International LLP (England), Mayer Brown (a Hong Kong partnership)
and Tauil & Chequer Advogados (a Brazilian partnership).

Mayer Brown LLP

Matthew A. Kupillas
July 26, 2019
Page 2

**Interrogatory No. 3**

To the extent that it would resolve our remaining disputes regarding this Interrogatory, CDK is willing to consider supplementing its response to include a citation to Bates ranges in its production that identify security events that CDK has implemented in order to enforce the terms of its DMS contracts. However, as we explained during our July 17 meet-and-confer, we believe that this information has already been identified in CDK's responses to other Interrogatories served by Dealership Counter-Defendants and by other parties in this MDL.

**Interrogatories No. 4, 7, and 10**

We continue to believe that these Interrogatories, all of which seek an accounting of "all" instances of various purported conduct by former CDK subsidiaries DMI and IntegraLink vis-à-vis other providers' DMSs, seek information that is neither relevant to CDK's counterclaims nor proportional to the needs of the case. Fundamentally, we disagree that purported conduct by DMI and IntegraLink regarding the manner in which they previously accessed and extracted data from *other* DMSs is relevant to interpreting the DMS contracts that CDK entered into with its customers, whether the hostile access to the CDK DMS that Dealership Counter-Defendants facilitated was authorized by CDK, or whether Dealership Counter-Defendants have grounds to assert an "unclean hands" defense. Contrary to Plaintiffs' assertions of relevance, there is no overlap between the subject-matter of these Interrogatories and the basis of CDK's counterclaims. Moreover, answering these Interrogatories would impose a substantial and undue burden on CDK, particularly in light of the fact that CDK has already produced documents and ESI in response to Plaintiffs' previous discovery requests on this same subject-matter, which are readily and equally available to Dealership Counter-Defendants.

**Interrogatories No. 11-14**

It appears that we may no longer have a live dispute concerning these Interrogatories. However, we will point out that CDK's responses identify the type and nature of the losses, expenses, and other damages that it seeks to recover on its counterclaims. To the extent that Dealership Counter-Defendants are seeking a full itemization of CDK's damages as will be forthcoming from CDK's experts in accordance with the deadline for affirmative expert disclosures established by the Court (*see* Dkt. 695), their request is premature. In fact, Dealership Counter-Defendants have made similar objections, and have provided no more information about their alleged damages than CDK has provided, in response to CDK's Interrogatory No. 6, which asks each Dealership Class Plaintiff to identify and describe in detail "how, when, the manner in which, and the extent to which You believe You have been damaged as a result of the conduct alleged in the Consolidated Amended Complaint." Moreover, with affirmative expert disclosures due in a matter of weeks, motions practice over this Interrogatory would serve no purpose other than to needlessly waste the time and resources of the parties and the Court.

Upon disclosure of the expert opinion that supports CDK's damages claims, Dealership Counter-Defendants will have a full opportunity to engage in expert discovery, including a deposition of

Mayer Brown LLP

Matthew A. Kupillas
July 26, 2019
Page 3

CDK's experts regarding the basis of their opinions. We do not see what possible grounds Dealership Counter-Defendants would have to move to compel further responses to these Interrogatories. Rather, any need that Plaintiffs have for further discovery of CDK's damages claims will be adequately served by the expert discovery and disclosures that are forthcoming.

**Interrogatory No. 16**

CDK's expenses associated with "Project Stone" are irrelevant to CDK's counterclaims or the damages that it is seeking to recover from Dealership Counter-Defendants. Your assertion that Dealership Counter-Defendants are entitled to discovery of CDK's expenses in connection with Project Stone "in order to ensure that CDK does not include those same damages and costs in any calculation of the damages and losses that are allegedly attributable to Dealership Counter-Defendants' alleged breaches of contract and statutory violations" is without merit. CDK has not identified—nor does it intend to identify—Project Stone as a source of damages that CDK seeks to recover from Dealership Counter-Defendants. Accordingly, the costs and expenses associated with Project Stone would not shed light on the basis of CDK's damages or whether those damages are causally related to Dealership Counter-Defendants' unlawful conduct.

**Interrogatories No. 17 and 18**

We are surprised that Dealership Counter-Defendants continue to pursue these Interrogatories after representing to the Court in their opposition to CDK's motion for a protective order that they would withdraw them. *See* Dkt. 632 at 4, 10. Nevertheless, blanket requests for a party to identify "all documents" and "all evidence" that support its claims have been roundly rejected as overly broad, unduly burdensome, and harassing. *See, e.g.*, *Dakota Station II Condominium Assoc., Inc. v. Owners Ins. Co.*, 2016 WL 9735773, at *6 (D. Colo. May 16, 2016). As such, it appears that we remain at issue regarding these Interrogatories.

Regards,


*/s/ Matthew D. Provance*
Matthew D. Provance

cc: MDL 2817 Counsel of Record

# EXHIBIT G
# (FILED UNDER SEAL)

# EXHIBIT H
# (FILED UNDER SEAL)

# EXHIBIT I
# (FILED UNDER SEAL)

# EXHIBIT J



NEW YORK
LOS ANGELES

Matthew A. Kupillas
T: 212-613-5697
mkupillas@milberg.com

March 21, 2019

Matt Provance
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606-4637

Re: *In re Dealer Management Systems Antitrust Litigation*,
MDL No. 2817, No. 18-cv-00864

Dear Matt,

I write in response to your letter dated March 15, 2019, in which you requested that Dealership Plaintiffs withdraw their March 8, 2019 interrogatories to CDK (the "Interrogatories"). Dealership Plaintiffs decline that request, and do not agree to withdraw the Interrogatories, as explained further below.

In your March 15 letter, you wrote that "much discovery in this MDL has already been propounded to all parties, and in particular to CDK." However, it is important to note that CDK has not yet responded to <u>any</u> interrogatories from Dealership Plaintiffs; the Interrogatories are the <u>only</u> set of interrogatories that Dealership Plaintiffs have served on CDK. In your letter, you also wrote that "based on the Court's prior rulings and its statements made in open court, [] the Court tends to agree" that "enough written discovery has been served in this case." We disagree with your assumption about the Court's views on this matter. At the March 4, 2019 status conference with the Court, Dealership Plaintiffs' counsel Peggy Wedgworth informed the Court (on more than one occasion) that Dealership Plaintiffs intended to serve counterclaim-related interrogatories on CDK, and the Court did <u>not</u> prohibit or discourage Plaintiffs from doing so.

Your letter references a meet-and-confer held on February 27, 2019, in which CDK communicated its position that Dealership Plaintiffs should not serve any new counterclaim-related discovery, but instead should rely on CDK's previously-served discovery responses. However, as your letter correctly notes, Dealership Plaintiffs did not agree with CDK's position. You also stated in your letter that CDK "understood that the Dealership Class Plaintiffs were willing to engage with CDK" concerning any "limited", non-duplicative discovery on CDK's counterclaims; while I am not aware of the basis for CDK's understanding, Dealership Plaintiffs believe that the Interrogatories <u>are</u> limited and not duplicative of previously-served discovery.

Matt Provance
March 21, 2019
Page 2 of 3

In your letter, you assert that certain of the Interrogatories "are duplicative of discovery that [Plaintiffs] have already served." However, as noted above, CDK has not yet responded to any interrogatories served by Dealership Plaintiffs. As examples of "duplicative" discovery requests, your letter states that Dealership Plaintiffs have already served document requests on many of the same topics raised by the Interrogatories. That is not surprising, as interrogatories often (indeed, typically) relate to the same issues that are raised in parties' document requests. However, interrogatories serve a different purpose than document requests, and for that reason, the Federal Rules of Civil Procedure permit parties to use both discovery methods to obtain evidence relevant to their claims. *See, e.g., V. O. Machinoimport v. Clark Equipment Co.*, 11 F.R.D. 55, 60 (S.D.N.Y. 1951) ("The deposition-discovery rules create integrated procedural devices. The sections are complementary to one another and the use of one does not restrict the further use of the other on the same subject matter. The various sections may be used independently, simultaneously or consecutively as required.") (internal citations and quotation marks omitted).

For example, your letter states that "Plaintiffs have already served extensive written discovery" on the subject of Interrogatory No. 1, which seeks the identification of "all public statements by CDK executives . . . concerning CDK's policy or position on whether CDK dealers were permitted to provide their DMS login credentials to third parties". While CDK has produced a handful of documents reflecting such public statements, there is no reason to believe that those documents reflect all of CDK executives' public statements on that topic; instead, those documents were only included in CDK's production because CDK employees happened to send internal emails in which they pasted the text of news articles containing such public statements. Dealership Plaintiffs are entitled to request that CDK identify all such public statements, not merely those public statements which CDK employees decided to copy and paste into internal emails.

The fact that Plaintiffs have questioned CDK witnesses on the subjects of the Interrogatories also does not negate the need for responses to the Interrogatories. CDK's witnesses have acknowledged having a poor memory of some specific events and have testified that they were not (and/or would not have been in a position to be) aware of certain activities that took place at CDK. Plaintiffs' Interrogatories may, to some extent, fill in the gaps in the testimony of CDK's employees. *See In re Folding Carton Antitrust Litig.*, 83 F.R.D. 256, 259 (N.D. Ill. 1979) ("Interrogatories are not improper simply because the same information can be obtained by use of a different discovery procedure.") (citing 8 C. Wright & A. Miller, Federal Practice and Procedure § 2169); *B. & S. Drilling Co. v. Halliburton Oil Well Cementing Co.*, 24 F.R.D. 1, 4 (S.D. Tex. 1959) (Although a party may have given relevant deposition testimony on a particular topic, the opposing party "still is entitled to obtain a clear answer subsequently through interrogatories, unless a hardship or injustice would be done to plaintiff thereby.").

Further, while previously-produced documents and testimony touch on some of the subjects of the Interrogatories, those subjects have taken on a greater importance due to CDK's filing of counterclaims against certain Dealership Plaintiffs. Dealership Plaintiffs are entitled to take further discovery on those topics in light of CDK's decision to file counterclaims.

Matt Provance
March 21, 2019
Page 3 of 3

Additionally, many of the Interrogatories seek information which has not, and could not have been, addressed in previously-served discovery. For example, Interrogatory No. 16 seeks information about the specific damages and losses that CDK claims to have suffered as a result of the alleged actions of each Dealership Counter-Defendant. That Interrogatory obviously could not have been served prior to CDK's filing of its counterclaims, and Dealership Plaintiffs are entitled to receive responses to that Interrogatory.

However, Dealership Plaintiffs are willing to try to address some of CDK's concerns. First, your letter states that the Interrogatories are "incredibly burdensome, purporting to require CDK to 'identify' each and every instance of numerous events across an 8+ year period." Dealership Plaintiffs do not seek to unduly burden CDK in that manner. To the extent that CDK's responses to any Interrogatory would require CDK to identify an unduly burdensome number of "instances", Dealership Plaintiffs are willing to accept a response which states the approximate number of instances of the events which are the subject of the Interrogatory, and which provides a summary of the other identifying information sought in the Interrogatory. For example, if Interrogatory No. 10 would require CDK to identify more than fifty (50) instances in which CDK knowingly "engaged in unauthorized access to" another DMS provider's DMS, Dealership Plaintiffs are willing to accept a response which states the approximate number of such instances, the time period in which those instances took place, the identities of the DMS providers whose DMSs were accessed without their authorization, and the identities of the CDK employees who possess relevant information about CDK's unauthorized access.

Second, in order to reduce CDK's burden in responding to the Interrogatories, and in the spirit of cooperation, if CDK agrees to respond to the Interrogatories 1-16, Dealership Plaintiffs are willing to withdraw Interrogatories Nos. 17 and 18. If CDK identifies other specific interrogatories which CDK believes are particularly burdensome, Dealership Plaintiffs are willing to listen to CDK's position on why those Interrogatories are unduly burdensome, and may be willing to amend those Interrogatories in order to reduce the burden on CDK. Additionally, if CDK believes that it requires more time to respond to the Interrogatories, Dealership Plaintiffs would be willing to extend the response date.

Finally, we believe that your threat to serve Dealership Plaintiffs with additional counterclaim-related discovery – if, and only if, CDK is required to respond to the Interrogatories – is improper "gamesmanship". If CDK truly believed that it needed discovery relating to its counterclaims, CDK could have served counterclaim-related discovery concurrently with the service of its counterclaims, but CDK did not do so. Instead, CDK now seeks to use the threat of discovery against Dealership Plaintiffs as leverage to induce Dealership Plaintiffs to withdraw the Interrogatories, or as retaliation for Dealership Plaintiffs' refusal to withdraw the Interrogatories. Such tactics are plainly improper.

Sincerely,

*/s/ Matthew A. Kupillas*
Matthew A. Kupillas

Cc: All counsel of record