# EXHIBIT C

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   IN RE:                          )  No. 18 C 864
                                     )
 4   DEALER MANAGEMENT SYSTEMS       )  Chicago, Illinois
     ANTITRUST LITIGATION.           )  June 10, 2019
 5                                   )  9:35 A.M.

 6         TRANSCRIPT OF PROCEEDINGS - Status and Motions
        BEFORE THE HONORABLE JEFFREY T. GILBERT, Magistrate Judge.
 7
     APPEARANCES:
 8

 9   For the Plaintiffs:       MILBERG TADLER PHILLIPS GROSSMAN, LLP
                               One Pennsylvania Plaza
10                             19th Floor
                               New York, New York 10119
11                             BY:  MS. PEGGY J. WEDGWORTH

12                             KELLOGG, HANSEN, TODD, FIGEL
                                 & FREDERICK, PLLC
13                             1615 M Street, N.W.
                               Suite 400
14                             Washington, D.C.   20036
                               BY:  MR. DEREK TAM HO
15                                  MR. MICHAEL N. NEMELKA

16                             ROBBINS GELLER RUDMAN & DOWD
                               200 South Wacker Drive
17                             31st Floor
                               Chicago, Illinois  60606
18                             BY:  MR. FRANK ANTHONY RICHTER

19   For Defendant CDK:        MAYER BROWN LLP
                               71 South Wacker Drive
20                             Chicago, Illinois   60606
                               BY:  MS. BRITT MARIE MILLER
21                                  MR. MATTHEW DAVID PROVANCE

22
                          PAMELA S. WARREN, CSR, RPR
23                          Official Court Reporter
                          219 South Dearborn Street
24                                 Room 2342
                          Chicago, Illinois   60604
25                             (312) 408-5100
```

1    APPEARANCES:  Continued

2    For Defendant Reynolds        GIBBS & BRUNS, L.L.P.
     and Reynolds Company:         1100 Louisiana Street
3                                  Suite 5300
                                   Houston, Texas  77002
4                                  BY:  MR. ROSS M. MacDONALD
                                        MR. BRIAN T. ROSS
5
                                        MS. AUNDREA KRISTINE GULLEY
6                                        (Appearing telephonically)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          (Proceedings had in open court.)
 2          THE COURT:  Sorry, everybody.
 3          I know Ms. Gulley is on the phone too, so we will get
 4   everybody's appearances.  Just give me one second.
 5          Okay.  We'll call the case and get the appearances and
 6   start rolling here.
 7          THE CLERK:  18 C 864, In Re:  Dealer Management
 8   Systems Antitrust Litigation, for status and motion hearing.
 9          THE COURT:  Okay.  Good morning.  Plaintiffs first and
10   then defendants.
11          MS. WEDGWORTH:  Good morning, your Honor.  On behalf
12   of dealership class plaintiffs, Peggy Wedgworth for Miller
13   Tadler Phillips Grossman.
14          MR. HO:  Good morning, your Honor.  Derek Ho from
15   Kellogg, Hansen on behalf of the individual and vendor class
16   plaintiffs.
17          MR. NEMELKA:  Good morning, your Honor.  Mike Nemelka
18   from Kellogg, Hansen on behalf of the individual and vendor
19   class.
20          MR. RICHTER:  Good morning, your Honor.  Frank Richter
21   from Robbins Geller dealership class plaintiffs steering
22   committee.
23          THE COURT:  Dealership class plaintiffs steering
24   committee.
25          And how is that different than Ms. Wedgworth?
```

1          MS. RICHTER:  Ms. Wedgworth is lead counsel for the

2     dealership class.

3          THE COURT:  Okay.  Back row.

4          MR. MacDONALD:  Good morning, your Honor.  Ross

5     MacDonald of Gibbs & Bruns for defendants Reynolds and Reynolds

6     Company.

7          MR. ROSS:  Good morning, your Honor.  Brian Ross also

8     from Gibbs & Bruns on behalf of the Reynolds and Reynolds

9     Company.

10          MS. MILLER:  Good morning, your Honor.  Britt Miller,

11     Mayer Brown, LLP, on behalf of CDK Global, LLC, and

12     Computerized Vehicle Registration.

13          MR. PROVANCE:  Good morning, your Honor.  Matt

14     Provance also with Mayer Brown for CDK Global and Computerized

15     Vehicle Registration.

16          THE COURT:  And on the phone we have?

17          MS. GULLEY:  Good morning, your Honor.  This is Andi

18     Gulley for the Reynolds and Reynolds Company.

19          THE COURT:  Thank you.

20          I'm sorry, Ms. Gulley, that we couldn't rearrange

21     this.  When you guys asked to rearrange it, I actually had a

22     trial scheduled for the 17th, 18th, and 19th, which precluded

23     me from moving this there, and so I just didn't want to -- I

24     didn't want to have to push it farther into June.

25          And then last week that case settled.  So I'm sorry.

1    But since we already had this, and since you had said

2  you were okay to appear by phone -- I don't know what you're

3  doing, I hope I'm not interfering with your vacation, but

4  whatever, I thought for a variety of reasons we ought to go

5  forward with this as planned.  So thanks for appearing by

6  phone.

7    It sounds like you're on a landline also.  Are you?

8    MS. GULLEY:  Yes, I found some temporary office.  No

9  problem.  Thanks for letting me attend this way.

10    THE COURT:  Okay.  Great.

11    Okay.  I know we have a lot of things pending.  My

12  intention today, frankly, is to go through and rule on as much

13  as I can.

14    At the end of doing that, it is possible that all we

15  will have under advisement is motions that require some in

16  camera review, which we'll have to talk about.

17    So I don't have a particular order here, but I think

18  I'm happy to deal first with this joint motion, ECF 699.  It is

19  a joint motion by the -- CDK and the dealership class

20  plaintiffs to allow some late-served discovery, subpoenas to go

21  forward because both sides agree that they should be able to do

22  that.  Authenticom, the vendor class, and Cox, as well as some

23  other folks who were included with that group, who I don't need

24  to always name, indicated some opposition to this.  So I

25  issued -- I did issue an order that said, I think, you know, I

1    didn't see how this would delay the progress of the case.

2         But as I thought about it more, either Mr. Nemelka or

3    Mr. Ho, whoever is going to address this -- oh, I did start to

4    think, you know, when is enough enough?  And I -- I thought I

5    could see some principle distinctions here.

6         But, anyway, don't you -- somebody tell me what your

7    opposition is here.

8         MR. NEMELKA:  Thank you, your Honor.  Mike Nemelka.

9    I'll be speaking on behalf of our clients.

10        It is pretty simple.  It is actually that principle

11   that at some point discovery has to end.  And these are late-

12   served subpoenas.  And Infutor, in particular, has lodged what

13   we feel are meritorious objections on timeliness.  And so we

14   don't take a position on the subpoenas that the dealers want to

15   serve to the telecom companies, which is why we, you know, can

16   join the motion.  But our basis is pretty simple, that, you

17   know, at some point this needs to come to an end.

18        THE COURT:  Why don't you oppose the AT&T -- the

19   telephone carrier subpoenas?  Because nobody objects to them,

20   and it is just a -- it is just pushing paper back and forth.

21        MR. NEMELKA:  Right.  The telecom companies haven't

22   objected on timeliness yet, unlike Infutor.  And also they just

23   -- these are routine subpoenas that the telecom companies

24   respond to in the thousands every year that it is -- they have

25   offices set up to do this.  It is basic, simple records that

1  they have available, much different from a -- the type of

2  subpoena that was issued to Infutor.

3       THE COURT:  Okay.  Who is going to speak to this from

4  the prospective of the defendants?

5       And before you speak, I have to say that I have

6  changed my mind a little bit on this.  I mean, I -- you know, I

7  know that Impact Group has produced.  Infutor Data Solutions

8  has objected.  I know that the subpoenas to the phone carriers

9  are more administrative, ministerial than the other ones.  But

10 I have to tell you what my leaning is after thinking about this

11 so that you know what you are dealing with.  I'm thinking about

12 denying the joint motion entirely, without the agreement of all

13 parties.  I'm -- you know, if -- including the telephone

14 carrier subpoenas.  Those haven't been served yet.  There is a

15 motion late to file them.  You guys served your subpoenas on

16 the last day of discovery.  That's usually not the way it is

17 done.

18      And given what I see in this case and the continuing

19 attempts to expand scope in some ways, a large part of me

20 feels, you know what, you're -- you got to wind this up.  I

21 keep hearing from Authenticom that, you know, there are -- it

22 is being delayed, we're pushing things out too long.  And while

23 I don't know how this particularly will push things out too

24 long, no doubt based on what I see in front of me, at least

25 Infutor, I'm going to have to deal with objections from a third

1     party, so that will delay what you are doing. Potentially

2     somebody gets the document and says, ah-ha, they found

3     something that I didn't know before, and now I want to reopen

4     somebody's dep. I don't know that I should be countenancing

5     any of that.

6         So, you know, your subpoenas were served on April

7     30th. Discovery closed on that date. Without disagreement of

8     the dealership class plaintiff, you wouldn't be able to serve

9     those. And without your agreement, the dealership class

10    wouldn't be permitted to serve these additional subpoenas.

11         What happened there, did we drop her?

12         THE CLERK: Ms. Gulley?

13         MS. GULLEY: Yes. Good morning. Thank you.

14         THE COURT: Okay. Just -- you know what, I'm going to

15    give you Brenda's email right now because --

16         THE CLERK: She has it.

17         THE COURT: She has it?

18         Okay. Because we have been having problems for weeks,

19    months with our AT&T connection here. So if we drop you, you

20    need to let Brenda know, and we'll get you back on. Okay?

21         MS. GULLEY: I have got her email.

22         THE COURT: Okay.

23         Yeah, so that's my feeling. Mr. Ross, you can wade in

24    to that now. But -- I don't know, I'm just thinking, let's

25    move this thing forward so you can get to summary judgment,

1    trial, settlement, anything else, appeal.

2         Go ahead.  I want to tell you what I was thinking just

3    so that you had -- you weren't -- you knew what I was thinking.

4         MR. PROVANCE:  Thank you, your Honor.  This is Matt

5    Provance.

6         THE COURT:  Oh, you're doing it.  Okay.  Fine.

7         MR. PROVANCE:  Yes.  Thank you for sharing your views

8    on the matter.  That's helpful and informs our thinking.

9         One point I would like to make is that we did serve a

10   subpoena to Infutor.  It is towards the end of discovery.  It

11   is based on information that in our view we learned very late

12   in the discovery process.  And that was the main motivation for

13   the timing of our subpoena.

14        Our main interest here is simply that the discovery be

15   a two-way street, that it go both ways.  At the last status

16   hearing, Mr. Nemelka, I believe, stated on the record that he

17   was very interested in the AT&T and carrier subpoenas going

18   forward, although he couldn't join them formally.

19        To the extent he is taking an opposite position now, I

20   think that that's somewhat inconsistent.

21        But the plaintiffs have identified some limited

22   discovery that they would like to take from the carriers.  We

23   have identified, in our view, limited and targeted discovery

24   that we would like to take from a third-party, Infutor.

25        Now if your Honor is of the view that there needs to

1    be a cutoff and the cutoff has taken place and we need to move

2    forward, the defendants are prepared to accept that.  We would

3    just ask that that rule be applied evenly to both sides, which

4    it appears that your Honor is inclined to do.

5         THE COURT:  Well, I would apply it evenly to the both

6    sides in the context of joint motion ECF 699.  This thread runs

7    through some of the other motions that are pending and that I

8    am going to have to deal with or will deal with today.  And,

9    you know, sometimes it bites one way or sometimes the other --

10   it bites the other.

11        But my ruling on ECF 699, which is this joint motion,

12   is -- and I will be saying, Mr. Provance, that I'm not such an

13   ogre that if -- and, you know, I don't -- I only see things at

14   a particular level.  I don't see things always at a granular

15   level, unless you bring me to the granular level.

16        So if all parties here, including Authenticom, Cox,

17   Auto Loop, and that whole group, end up saying to you, I

18   dropped my objection, I'm okay with you going through that one

19   because I really want to see these AT&T subpoenas because I do

20   agree -- I don't know if he changed his position or not.  And,

21   you know, changes in position -- I know in this litigation

22   everybody accuses everybody else of changing their positions.

23   But I don't necessarily see a principal distinction that

24   Mr. Nemelka is relying on.

25        Yes, I understand the AT&T stuff is easier to produce

1    and deal with, because we're not going to get a motion to quash

2    from them, than the Infutor stuff is, so I get there is a

3    distinction there potentially. But I look at this more as a

4    tactical position. We don't object to the dealership class

5    plaintiffs because we don't really want to aggravate our

6    co-plaintiffs any more than we need to aggravate them. But we

7    do object to the defendants because we don't care about

8    aggravating the defendants.

9          But if everybody says, you know what, this stuff

10   is -- if Authenticom, Cox, et al., decide, you know what, I'm

11   willing to drop my principle here, quote unquote, and agree to

12   your subpoena going forward, defendants, so that we could get

13   the AT&T, Verizon, and Sprint stuff, because I think that's

14   really valuable too, I'm not going to block it. If both of you

15   decide to go forward, you're agreeing to do it, fine. I'm

16   hoping that doesn't spawn continued litigation. But if you

17   guys are agreeing to it, I'll go it.

18         But absent agreement of the parties on all fronts with

19   respect to the joint motion, I'm going to deny that motion.

20         MS. RICHTER: Your Honor, may I get some clarification

21   on that?

22         THE COURT: Yeah.

23         MR. RICHTER: Frank Richter.

24         THE COURT: Yes.

25         MS. RICHTER: So this agreement kind of came about

1    because we had briefing for the wireless subpoenas due.  We had

2    arguments we believe good cause existed for extension of the

3    fact discovery.  And defendants then responded that they had

4    good cause for their subpoenas as well.  And that was the

5    result of the joint agreement.

6           You don't want to hear any argument as far as good

7    cause or briefing any further is the way we should understand

8    this order.

9           THE COURT:  Okay.  I have a visceral reaction to that,

10   but I want to cage my visceral reaction and consult here for a

11   second.

12      (Brief interruption.)

13          THE COURT:  Here's my ruling.  Okay?  My visceral

14   ruling was, heck no.  Okay?  My visceral ruling was you are

15   stuck with this because you agreed to go forward with this

16   joint motion.

17          However, I realize that you tried to tie my hands by

18   saying that this was an all-or-nothing agreement, Judge, so you

19   got to accept our agreement or not.  Okay?

20          You want to knock yourself out -- I mean, I will tell

21   you -- when did you seek leave --

22          MR. RICHTER:  I'm not requesting further briefing --

23          THE COURT:  Well, then why did you --

24          MR. RICHTER:  -- your Honor.

25          THE COURT:  -- are you raising the issue?

```
 1          MR. RICHTER:  I just want to make sure --

 2          THE COURT:  Just because you like to dot Is and cross

 3   Ts?

 4          MS. RICHTER:  Your Honor, just so we have

 5   clarification for the parties, they say, well, we still want --

 6   you know, defendants say, well, we would still like to brief

 7   it.  We have an answer to that --

 8          THE COURT:  Okay.  Here's my --

 9          MR. RICHTER:  -- and that way we don't have any

10   confusion that we're -- we're good to go, let's not -- let's

11   close the book on this, and we're done.  That's all I'm a

12   asking.

13          THE COURT:  Here's my response to your theoretical

14   question.  I'm ruling on 699.  It was a joint motion.  Okay?  I

15   recognize the joint motion said, this was an all-or-nothing

16   deal, Judge.  We want to tie your hands on this.  I'm denying

17   that motion, even though it was a joint motion because it is

18   opposed by the -- one class of plaintiffs.

19          If that now brings a motion for leave to serve these

20   subpoenas at a briefing schedule, you know, I'll decide that,

21   if, as, and when it is briefed.  And hopefully that's this

22   year.  But -- and I say that facetiously.  Okay?  But I'm not

23   going to rule on -- I'm not going elsewhere.

24          You need a briefing schedule on it?  Then file your

25   motion for leave -- do you have -- no, you don't even have the
```

14

1  motion for leave.  File it.  Give me a briefing schedule.  If

2  they want to brief the Infutor, knock your socks off.  I'm just

3  ruling on the joint motion that is in front of me now, and I'm

4  doing it.

5          MR. RICHTER:  Understood, your Honor.  Thank you.

6          THE COURT:  Understood?

7          MR. RICHTER:  Yep.

8          THE COURT:  Need any more clarification on that?

9          MS. RICHTER:  Absolutely not.

10          THE COURT:  Good.  Okay.

11          Next issue, motion that has been pending for a bit of

12  time, plaintiffs's motion to compel production of documents on

13  CDK's privilege log.  I think this is -- I don't even know what

14  the number of the motion -- I probably do.  Hold on.  I think

15  it is ECF 535.

16          Four issues here.  Emails to a large number of

17  recipients; emails to distribution lists where the list does

18  not identify everyone who received the email; communications to

19  third-party advisors, consultants, and agents.  I don't know

20  how many -- I might have said three issues.  There is five

21  issues.

22          Advice that is predominantly not legal in nature; and

23  implicit waiver.  Okay?

24          Here's my rulings on these.  Subject -- Topics 1 and 2

25  overlap, right?  Emails to a large number of recipients and

15

1   emails to distribution lists where the list does not identify

2   everyone who received the email.

3          As to both categories I agree with plaintiffs that CDK

4   has not met its burden of establishing privilege with respect

5   to all the recipients who received these emails.

6          With respect to the first category, the large number

7   of recipients, it seems that defendants can identify who

8   received the emails, but there is nothing in the briefing to

9   indicate why all those people are within the attorney-client

10  privilege.

11         With respect to the second group of emails, to the

12  distribution list, CDK can't even identify the recipients for

13  some of these lists.  I disagree with CDK that plaintiffs are

14  going back on some type of agreement that they reached or

15  reneging on some type of agreement that they reached to accept

16  these distribution lists because plaintiffs say, and I don't

17  say anything in the record to contradict this, that at the time

18  they were talking about that agreement, they did not know and

19  didn't -- hadn't discussed with the defendants that CDK could

20  not identify even the people who were -- to whom the email was

21  directed as part of a distribution list.

22         It is CDK's burden to show privilege.  It has not

23  shown privilege as to either group of email.  Again, because

24  the first one, they haven't told me why all those people are

25  within the privilege.  And, parenthetically, the more

1  people -- there is no -- CDK is right, there is no per se rule

2  that says, five people can be in a distribution list for a

3  privileged communication, but eight can't.  Or 20 can, but 25

4  can't.

5  　　　　But I don't even have a threshold showing by CDK that

6  the people to whom the emails in the first group are directed

7  are covered by the privilege.

8  　　　　And in the second, if you can't even identify who the

9  email went to, then you're not going to be able to identify

10 privilege.

11 　　　　So I'll grant the motion with respect to both those

12 categories of emails.

13 　　　　With respect to the next two categories,

14 communications to third-party advisors, consultants, and

15 agents, and advice that is predominantly not legal in nature, I

16 need more information.  These were briefed at a pretty high

17 level.  All I have is the privilege log really.  I don't have

18 the documents.

19 　　　　And so in order for -- and I think that's true.

20 Correct, CDK?

21 　　　　MR. PROVANCE:  Yes, your Honor, that's correct.  We

22 have not submitted those in camera.

23 　　　　THE COURT:  So that's always a painful process.  I'm

24 not going to spare you the pain of that process.  If I have to

25 go through each of these documents document by document,

17

instead I would convene a hearing in which I would go through each document and see whether or not in all or in part the document really is or is not something that fits within the privilege.

My guess is that that will be a painful process and that all the documents will not fit within that category because -- or all parts of a document won't fit within that category because I just -- that's just my experience.

But the issue was addressed at a 10,000-foot level, not on a -- you know, I agree with the plaintiffs that if the -- I mean, I agree with both parties here. Third-party advisors, such as are identified in these briefs, can be within the privilege if a communication that includes them is necessary for the lawyers to provide the advice.

If it is not, and he can't make that case, then they are not within the privilege.

I also agree that communications that are not predominantly legal in nature, or stated another way, if it is not an attorney-client communication within the law, then it is not going to be protected.

So if I have to decide this issue, I'm going to set a hearing on it. And you guys are going to come in, and we'll spend as much time as necessary going through document by document. I do want CDK to submit to me in camera ASAP the documents that are subject to this.

18

1          Does anybody have a -- I mean, I know I have read your

2     brief, but is this ten documents?  50?  150?  2000?

3          CDK, how many are we talking about here?

4          MR. PROVANCE:  Your Honor, unfortunately I don't have

5     the list in front of me.  But I think it is probably in the

6     range of hundreds.  As you know, CDK produced a lot of

7     documents in this case, and as a result our privilege log

8     contains a lot of entries.

9          THE COURT:  Okay.  Is there any benefit for me -- I

10    mean, I'm not going to decide -- I can't decide this on the

11    papers because I don't know what the document say.  I mean on a

12    broad basis, I agree that, you know, plaintiffs said, I don't

13    see how they are privileged, but all I have seen is a privilege

14    log.

15         From CDK's basis from what you say, I could say, yeah,

16    I could see how some of this stuff is privileged.  Is it all?

17    I mean, before you submit this to me in camera, you want to go

18    through these documents and redact what is actually something

19    that is privileged versus are you available for squash on

20    Saturday afternoon?

21         I mean, you know, this -- did you produce in a

22    redacted way or did you just claim privilege on the entire

23    document?

24         MR. PROVANCE:  Some of the documents at issue are

25    redacted.  Some of the documents at issue were withheld

1    entirely.

2            THE COURT:  Okay.  So for the one -- so you -- I guess

3    what you are telling me is -- I am interpreting what you are

4    telling me as you have already gone through the exercise to be

5    more scalpel-like in your invocation of privilege and not

6    macro, and so I need to look at these things and set a hearing.

7    Right?

8            MR. PROVANCE:  If I am interpreting your comments,

9    your Honor, I believe that's the way forward.

10           THE COURT:  Okay.

11           MR. PROVANCE:  If your Honor would like some sample of

12   the documents at issue --

13           THE COURT:  Sample is not going to do it, right?

14   Because it is -- this determination has to be made on a

15   document-by-document basis.  I don't see any way that -- I

16   mean, if this was a class certification motion in a TCPA case,

17   I could look at samples.  But, it is not.

18           I don't know how I am going to make an up or down call

19   on a document-by-document basis without seeing the documents.

20           MR. PROVANCE:  Understood.

21           THE COURT:  So I'd like you to -- you don't have to

22   say right now, but at least by the conclusion of the hearing

23   tell me when you're going to submit those documents in camera.

24   We could talk about when I'm going to have a hearing on this.

25   Okay?

1          MR. PROVANCE:  Your Honor, I had a few points of

2     clarification, but I'm happy to wait until you have finished

3     your ruling.

4          THE COURT:  Okay.  There is just one more thing.  I

5     don't buy plaintiffs's implicit waiver argument.  That is a

6     complete flyer of an argument.  It does not work.  I address

7     the issue of when a party puts advice of counsel in issue very

8     recently in a case called Derek versus Roche Diagnostics.  It

9     is reported at 2109 Westlaw 1789883.  Some of the reasoning and

10    language in that opinion is equally applicable here.

11          Plaintiffs's argument is just completely out to lunch.

12    I mean, the page 12 of the motion -- or the memorandum in

13    support of the motion says, quote, by relying on the text of

14    the agreements, these particular agreements you're looking at

15    -- you're talking about, which were drafted by counsel for

16    the -- for their defense, defendants have put the intent of

17    those agreements at issue.

18          That just makes no sense.  I mean, that's a flyer

19    argument.  You devote about a little over a page to it if you

20    look at all of it.  There is no indication CDK is going to rely

21    on communications with counsel in support of its defense

22    relying, or at least in the briefs, with respect to this stuff.

23          I know you cite case law.  And I know the case law

24    exists that part of the privilege and waiver issue is based on

25    fairness.  I don't see any unfairness here.

1   And I don't think that by relying on the text of the

2   agreements that are drafted by counsel, which is the case in

3   every sophisticated business litigation, CDK has put the advice

4   of counsel defense at issue or its communications with counsel.

5   You guys while I was speaking, at the plaintiffs's

6   side, Ms. Wedgworth, Mr. Ho, and Mr. Nemelka, were whispering.

7   So what do you have to say on that?  Am I misperceiving

8   something?

9   MS. WEDGWORTH:  Your Honor, it is just in one of the

10  depositions there -- well, maybe more than one actually.  There

11  has been testimony that may cause that actually to come -- be

12  an issue in this case.  I appreciate your ruling.  And given

13  what you said -- and I want to look at this case -- but we do

14  have factual testimony where witnesses think one thing went in

15  the agreement, and then it is understood that because of

16  attorneys something else went in the agreement.

17  So it may be a factual issue in this case.  And I want

18  to review this particular case you have referenced in regard to

19  the testimony we have in this case.

20  THE COURT:  But none of that was in the briefing that

21  I reviewed, right?

22  MS. WEDGWORTH:  It had not happened at the time.

23  MR. NEMELKA:  Correct.

24  THE COURT:  Yeah, okay.

25  MS. WEDGWORTH:  Into the briefing predated it.  We

1    were -- we thought that might be the case when we briefed this.

2    We didn't have the testimony at the time.  We now do.

3            THE COURT:  Okay.  So listening to what you said in

4    some way critically, I would say I still -- from what you told

5    me, it didn't get me over the hump.  You know, there has to --

6    the fact that a corporate party spoke to a lawyer about what

7    was going to go in or not in the agreement.  And this -- and

8    this case -- and I recognize that there is a lot of law in this

9    area, and some of it is not as clear as you would like it to

10   be.  But I don't know that that gets you the documents unless

11   and until we hear that the party relying on the privilege is

12   going to somehow put in issue those discussions.

13           So it is not a -- it is not necessarily a sword that

14   says, well, because lawyers were involved in the drafting, and

15   on advice of counsel something did or did not go into the

16   agreement, therefore we get the entire agreement.  It might be

17   that you need more than that.

18           But, again, based on what I have seen, at least as the

19   issue has been presented to me now, I'm going to deny the

20   motion with respect to that.

21           So I'm happy to hear from Mr. Provance.  I'm granting

22   it on the first two categories on emails.

23           I'm holding it -- it remains under advisement with

24   respect to communications to third-party advisors, consultants

25   and agents, and advice that is predominantly not legal in

1   nature pending submission of the relevant documents in camera

2   and a hearing at which the Court can address those documents

3   with the parties.  And it is denied as to the implicit waiver

4   argument.

5           Mr. Provance.

6           MR. PROVANCE:  Thank you, your Honor.

7           If I understand your ruling on the fifth issue,

8   implicit waiver, it sounds like you have ruled, so I will just

9   move on.  I was otherwise going to address some of the things

10  Ms. Wedgworth said, but I'm happy to just move on.

11          The next point I wanted to raise, I think you have

12  just clarified, which was whether your Honor wanted in camera

13  submission on both Categories 3, the third-party

14  communications; and Category 4, the communications that are

15  putatively business in nature.

16          I believe you have just clarified that, and we'll get

17  those to you --

18          THE COURT:  Right.

19          MR. PROVANCE:  -- in short order.

20          On the second issue, your Honor, I just wanted to make

21  one point and clarify, if needed.  This is the issue regarding

22  distribution lists.  And the one thing -- factual nature I

23  wanted to point out is that all that was at issue on that part

24  of plaintiffs's motion were certain distribution lists that at

25  the time documents were collected and reviewed no longer

24

1    existed.  They're defunct.  And that was the reason that

2    defendants were not able, at least with using the tools that

3    were normally available to them in the ordinary course of

4    business, able to determine who was on those now defunct

5    distribution lists.

6         And the plaintiffs had the same problem with some of

7    their distribution lists.  So the agreement the parties made

8    was that for just those distribution lists that are now

9    defunct, they would not need to identify all of the recipients

10   that were on those lists.  It is a much different story for

11   distribution lists that still exist, we can look at them and

12   provide that information.  And, in fact, the defendants have.

13        So if your Honor is inclined to grant their motion and

14   require defendants to produce any communications involving now

15   defunct distribution lists, that issue is present on the other

16   side as well.  So we would ask, in fairness, if that's the way

17   your Honor wants to rule, that you would order the plaintiffs

18   to do the same thing.

19        THE COURT:  I'm not going to do that because I don't

20   have that in front of me.  But that would be my same ruling.

21   If I have a situation in which an email is sent to a

22   distribution list and the -- and the custodian of that email

23   says it is privileged, and that party cannot identify to whom

24   the email went, my ruling is going to apply equally to

25   plaintiffs and to defendants.

25

1          So if you can't work this out with my ruling -- my

2     ruling necessarily would require plaintiffs to produce any

3     emails that they have claimed as privileged that fall within

4     this kind of a category, unless there is some distinction that

5     actually is meaningful, as opposed to just a distinction --

6     being a distinction without a difference, you know, as an -- so

7     I'm not going to rule on that now, Mr. Provance.  But you can

8     get me in short order if they won't agree.

9          This strikes me as one of those mutually assured

10    destruction kind of issues which, you know, what's good for the

11    goose is good for the gander on the plaintiffs's side.  And if

12    you are sitting on protecting things that are in the same

13    category that you're talking the other side should produce, and

14    I buy your agreement, which I do, then you have got to be

15    prepared to produce yourself too.  And you say they didn't ask

16    for them yet.  Okay.  Now they are going to ask for them.

17         And so you can either go one of two directions.  You

18    can say, we want all your emails protected under this category,

19    and we'll produce to you all of ours.  Or you could say, never

20    mind.  Now that the Judge says -- has one my argument that I

21    spent some pages on, I really don't like the impact of my

22    argument on what I'm going to have to produce, and I'm in a

23    never mind zone.

24         To me, if you do that, that was a waste of time.  It

25    was a waste of my time, and it was a waste of your time.  But

1  I'll deal with whatever I deal with in the next go-around here.

2  But I will tell you that I will attempt to rule the same when

3  the same facts are in front of me provided there are no

4  differences that I think are material to a ruling.

5         So we still need -- and I'll just kind of flag here

6  that somebody should remind me -- a date for submission.  And I

7  would have to set a hearing date, which I'm not sure I'm

8  completely prepared to do now.

9         But that's where we are on the motion to compel

10  documents off the privilege log.

11         I think that brings me to the issue that everybody

12  briefed, that motion to compel versus Authenticom.

13         No, I can quickly go to CDK's motion for a protective

14  order concerning plaintiffs's interrogatories on the

15  counterclaims, which is ECF 597.  I'm going to deny that motion

16  for a protective order and allow plaintiffs's interrogatories

17  on the counterclaims to go forward.

18         I agree with plaintiffs that given the way the case

19  schedule was put together in this case, and given the pendency

20  of the motion to dismiss the counterclaims during the period of

21  time where discovery was proceeding, that plaintiffs would be

22  prejudiced unfairly if after their motion to dismiss the

23  counterclaims was denied, they are denied the opportunity to

24  proceed with written discovery on the counterclaims.

25         Those interrogatories, as far as I can tell, were

1    served within the discovery time period.  And had they been

2    responded to would have -- they were served in time for them to

3    be responded to within the existing discovery time period,

4    which as per Judge St. Eve's statement, I think, was not

5    technically including the counterclaim discovery.

6          I disagree, in case this is the next question, that

7    CDK can now serve discovery after the close of discovery on the

8    counterclaims that it didn't serve before.  CDK made a

9    calculated decision to oppose the discovery that the plaintiffs

10   serve the written discovery without serving their own as a,

11   what's good for the goose, good for the gander kind of move.

12   But, again, consistent with my attempting to get this done, I'm

13   going to deny CDK's motion.

14         Plaintiffs can serve the interrogatories that they

15   served -- CD -- I am going -- if CDK asks me, now let me do

16   that, I'm going to say, no, because it wasn't served in time

17   during the discovery process, even in a protective way.

18         And one thing I needed to look at here was whether

19   there was any -- were there any particular interrog- -- so, I

20   mean, I noticed in the briefing here, and I'm not trying to

21   override this, for example, that counterdefendants offered to

22   completely withdraw Interrogatories Numbers 17 and 18 and

23   offered to accept summary responses to the interrogatories

24   which called for CDK to identify numerous instances of certain

25   events or conduct.

1          I mean, I'm not trying to override that. You know, if

2    plaintiffs are still willing to say, we will withdraw these and

3    accept something else, I'm not saying now my ruling supersedes

4    that.

5          But what I am -- I'm just ruling on the timeliness

6    issue here, primarily, and whether plaintiffs could go forward

7    with this. I do note, in reading other motions that you have

8    pending, that there -- discovery has been going forward on the

9    counterclaims. I mean, CDK has been taking copious -- probably

10   the wrong word -- extensive discovery maybe on Authenticom

11   about its access to defendants's -- and so has Reynolds -- the

12   defendants's systems. So, you know, oral discovery has been

13   going forward on this. But, you know -- and this motion has

14   been pending since April, but it was probably fully briefed, I

15   don't know, in -- some time in May.

16        End of April. Yeah, the last day of April or the 29th

17   of April. So it hasn't been sitting there for too long.

18        But, anyway, whatever you want to do to make it easier

19   on CDK, I'm not saying don't do. And whatever you referenced

20   in your briefs, I'm saying not do.

21        But in terms of the up or down as to whether or not

22   you can -- you are allowed within the interstices of discovery

23   scheduling to serve these when you served them, I'm siding with

24   plaintiffs on that versus CDK, and denying the protective

25   order.

29

1          Clarification on that?

2          MS. MILLER:  Your Honor, Britt Miller on behalf of

3    CDK.  Two quick questions.  One, obviously we did not prepare

4    responses pending the resolution of this motion.  So we'd ask

5    for 21 days to respond to the interrogatories in question.

6          And, two, I assume from the tenor of your ruling that

7    the ones that have been served are it.  There is no additional

8    ones that are coming.  There is no follow-up, additional

9    interrogatories after they get whatever responses.  Certainly

10   we'll engage whatever meet and confer process may be necessary

11   as to the responses that we serve.  And if there is motion

12   practice on that, we'll certainly engage in it.  But to the

13   extent that these are permitted to go forward, these are it.

14         THE COURT:  Yes.  These are it.  And 21 days is fine.

15         MS. MILLER:  Thank you.

16         THE COURT:  If, with the qualification that you said,

17   that if you object to something and then you meet and confer

18   and then I have to deal with it, in the never-ending discovery

19   dispute process here, I'll do it.  But I'm not saying they can

20   serve more or you could serve, I guess, any.

21         MS. MILLER:  Understood, your Honor.

22         THE COURT:  Okay.  That brings me to the issues that

23   you briefed on an expedited basis.  I will say, Mr. MacDonald,

24   I very much appreciate the email exchange that you had with

25   Mr. Nemelka in which you remind -- when Mr. Nemelka expressed a

1   desire to get this briefed in time for our June 10th.  You sent

2   an email saying, you know, Judge Gilbert has said he would like

3   to have at least a week to look at things.  And I didn't know

4   about that because the email that came to my courtroom deputy

5   had a proposed briefing schedule of June 5 and June 7, which

6   was plaintiffs's proposed briefing on this.

7           But I do appreciate at least your consideration of

8   saying, you know, maybe he should have a week to look at this

9   stuff, which he's asked for, in the give and take before filing

10  of the -- this motion.  That kind of went by the wayside in

11  some way.  But I do appreciate it.

12          And luckily for Mr. Nemelka, I didn't actually go into

13  the ECF system -- I forgot the briefs here, so I had to print

14  them at all home.  And I didn't see that you actually didn't

15  even file on June 7th, you actually filed on Saturday, June

16  8th.  But that was okay because I was able to read it

17  yesterday.  Okay?

18          I want to tell everybody here though -- and you can

19  tell that I have a little bit of an edge here, and I'm sorry

20  about it.  Okay?  I don't like the fact that I have so

21  many -- I have had so many motions under advisement, which is

22  why I'm trying to rule on as much as I can from the bench.

23          I do have an impression here that there are fights

24  here that don't need to be had.  I have had that impression

25  from the very beginning.  And I have had the -- I also have the

31

impression, you know, that sometimes positions are taken for
tactical reasons without fully thinking through the impact of
those positions on your own positions.  As an example, I'll
talk about these email distribution lists, which I talked about
before.

So, you know, those types of things, just in my mind,
increase the stress and tension in your litigation, increase
the stress and tension on the Court, but that shouldn't really
be your concern.

But I do generally like to have more than a weekend to
think about something.  The reason that I said I adopted your
briefing schedule and also went forward here is I do agree
you're entitled to rulings as soon as you can get them, as soon
as humanly possible.

Had I known my trial from next week was going to
settle, I would have moved you there, so I would have had more
time to look at this.  But I didn't know that.  So -- but,
anyway, I noticed that.  Okay.  I noticed that.

With respect to the motion pending, I'm going to deny
the motion as to the reopening of the 30(b)(6) deposition as of
Data Vast.  My view of the arguments being made -- and I read
the exhibits too, and I read the deposition testimony submitted
-- is that defendants's argument is weak and an overreach that
Data Vast was a topic that was noticed for 30(b)(6) deposition.

This isn't an after-the-fact objection.  The objection

1    was raised by counsel at the deposition.  The deponent said he

2    wasn't prepared on that.  He was general counsel.  And so, you

3    know, he would have only been able to -- been required to

4    testify with respect to what he was prepared on.

5           I don't buy the defendants's argument in particular

6    that -- I have to find it.  Hold on for a second.

7           (Brief interruption.)

8           THE COURT:  Yeah.  Defendants kind of shoehorn in to.

9    They say, well, our 30(b)(6) notice defined Authenticom to

10   include any related companies, divisions or subsidiaries, which

11   could include Data Vast.  Okay.  I get that.  That's not

12   necessarily wrong or accelerated.  And it included any efforts

13   by Authenticom to secure or protect dealer data or any use of

14   or agreements with third-party vendors to obtain data

15   maintained on a CDK or Reynolds DMS.

16          I don't think we're talking about securing or

17   protecting data really.  And if that really was what you were

18   talking about, that's a vague way of saying it for a 30(b)(6)

19   topic.  We're not really talking about obtaining data as much

20   as distributing data from the -- that Authenticom got.

21          So I don't think you could shoehorn Data Vast into the

22   served topics.  And if this is the best that defendants can do

23   it on it, I think it falls short.  I don't think it is worth

24   reconvening a 30(b)(6) deposition to cover this topic with

25   Authenticom's general counsel, particularly when that topic, I

1 think, is being covered in other depositions.

2   I get why defendants want this information, and I get

3 why it is important to their defense and their counterclaims.

4 Talking about Authenticom accessing their systems.  But I think

5 you're getting information on that.  And I think, you know,

6 again, in the overall theme of, we got to end this at some

7 point, I think this falls on the end of, we should end it.

8   If that was on day one of discovery, maybe I would

9 look at this differently.  But it is not.  And so I am going to

10 deny the motion as to reconvening the deposition as to

11 Data Vast.

12   With respect to the polling client manager data, I

13 have -- I have some questions for Authenticom here.  I think

14 your argument -- well, first of all, let me dispense with a

15 couple of things and focus then on what needs to be focused on.

16   Timeliness.  Overrule that objection.  This issue has

17 been on the table for some time.  You have been chasing each

18 other on this for a while.  I read all the correspondence on

19 this.  I read the -- you know, what you were talking about.

20 And I don't think this was put to bed.  And I think,

21 particularly with the most recent statement, which is that we

22 can't even do this, it is impossible to do it, I just don't

23 think this was tied down.

24   Is this late in the process?  Yes.  But you have been

25 chasing each other around on this for a long time.  And some of

34

1    the delay, at least from what I can see, is Authenticom's

2    fault, not CDK's fault.

3           Would it have been best for CDK to not -- to tie this

4    down, you know, back in October or November?  Yes.

5           Did you do everything you could to help them tie it

6    down?  No.

7           So the timeliness document is not working for me.

8           The spoliation issue, not ripe right now.  I'm not

9    dealing with that.  And that really doesn't come into play with

10   respect to whether you should or shouldn't produce something.

11          But I'm having trouble figuring out exactly what

12   exists.  If something exists, my feeling is you have got to

13   produce it.  But I'm having -- you know, Authenticom really

14   argued the strawman here, which is we can't produce a report,

15   and we can't produce -- we shouldn't be required to create a

16   document that doesn't exist.  I agree with that.  It is not

17   clear to me that that's what the defendants are asking for

18   here.  It would be -- it sounds to me what the defendants are

19   asking for is a snapshot of what appears essentially on a

20   computer screen when somebody queries the database.

21          So they are not asking to prepare a report per se,

22   they are asking for information that is resident within your

23   system.  So it -- you possess it.  It is in your possession,

24   custody or control.  It is information in your system that is

25   either a seven-day period or it is whatever you had in November

1    of 2018.  I think the -- it is not clear to me from

2    Authenticom's response here whether anything exists.  Okay?

3    Whether there -- but I have seen what you have produced to them

4    as an example, which I think is exhibit -- I mean, it is quoted

5    in full in the defendant -- the 18 lines are quoted in full in

6    defendants's brief, but -- it's -- is it 16 or --

7            MR. HO:  It is an attachment to Exhibit 11.

8            THE COURT:  Right.  Yeah, it is the last -- yeah.  I

9    mean, I see that but I am having trouble figuring out what

10   exists and what is ephemeral or what's tangible.

11           And so I'm going to ask Authenticom at least to

12   explain to me whether -- in particular whether what the

13   defendants are asking for, which is the PCM log for the

14   originally requested seven-day period in November 2018 or a log

15   for the seven days between June 10th and June 16th, which I

16   know is not necessarily within -- you know, before the lawsuit

17   was filed.  But I think what they are trying to do is see how

18   does Authenticom's system interact with theirs or what kind of

19   data do you get.  I'm not 100 percent sure that I understand to

20   what use they end up putting that.  But I could see it being a

21   really nice visual in front of a jury, so I can understand why

22   they might want to see it.

23           But I'm just -- I'm trying to figure out what exists.

24   And I will tell you that if I don't understand what you are

25   saying, Mr. Nemelka or Mr. Ho, then I'm going to appoint a

1    special master to figure out what the heck you should produce,

2    if anything.  And you guys are going to split the costs of

3    paying for it because if it is too complicated for me to

4    understand, I'm not going to have days of it.

5         I might need to have a hearing.  I might need to have

6    an evidentiary hearing.  I might need to put your computer guy

7    on the stand.  But I'm going to bring in a special master who I

8    have appointed in other cases, Nora Grossman, who is an expert

9    on e-discovery.  And, frankly, when I have appointed her in the

10   past -- I have actually never had to have an evidentiary

11   hearing because she sits down with the parties, speaks the

12   lawyer language because she's a lawyer, and also speaks

13   technical language because she is a technician.  And she

14   figures out how the parties can resolve the issue, and I don't

15   ever have to deal with it.  But if I have to deal with it, I

16   will.

17        But can you answer my question?

18        Or Mr. Ho.

19        MR. HO:  I'm going to try, your Honor.  I think there

20   is two aspects to the question of what's available.  Temporally

21   my understanding is that what is available is information that

22   goes back seven days.  So seven days from today is information

23   that is essentially overwritten.  It rolls off after seven

24   days.  But it is -- the second aspect of the answer is,

25   importantly, it is not in the database.  It is not as if you

1   can query -- type in a query or run a search over a set of data

2   and pull out from a database the information that's being

3   sought.

4         This information is essentially imbedded in the

5   software program itself.  And that's why from a legal

6   standpoint more than -- so than a technical one, we think that

7   the rule that governs this is Rule 26(b)(2)(B), and that this

8   clearly falls within the ambit of data that's not reasonably

9   accessible without undue burden or cost.  Because some computer

10   programmer actually has to go into the software program and

11   find for every dealer or -- and every day the data that they

12   want.  And so seven days doesn't sound like a lot, but when

13   you're talking about hundreds and thousands of dealers, and you

14   have to do it dealer by dealer for every day, as you see they

15   have taken a snap -- the Exhibit 11 that was alluded to is one

16   dealer for one day.  So you'd have to do that many, many

17   different times.  And it is not something that can be done in

18   an automated way.

19         As Mr. Clements's deposition -- declaration

20   highlights, and this is Exhibit 1 to our opposition, this all

21   has to be done manually by someone who actually -- a computer

22   software person who will actually have to log in to the

23   program.  And we don't think that there is good cause to do

24   that.

25         As we highlighted in our opposition brief, we think

1    that this is exactly the kind of data that the Seventh Circuit

2    discovery program and the Sedona Conference and, you know, all

3    the kind of leading authorities about ESI say are presumptively

4    off limits because of the cost and burden involved.  And we

5    don't think that the defendants have made the kind of showing

6    that you would need to overcome that.

7           In particular, with respect to relevance, as your

8    Honor has already identified, it -- at best it seems like what

9    the defendants are after is a sense of the kind of information

10   that Authenticom keeps in this, again, very ephemeral way about

11   the way in which its system accesses the DMS.

12          There is not going to be data that covers the relevant

13   time period in this case.  It is only seven days long.  So at

14   best it is going to be a demonstrative or illustrative set of

15   data.  And, frankly, given the limitations on relevance, we

16   don't see how there could be good cause to over -- to justify

17   the imposition of this kind of a burden.

18          We have, as we pointed out, offered to do somewhat

19   more than the one day for one dealer that we have offered.  And

20   to the extent that a slightly broader sample or illustrative

21   set could be useful, we have offered to do that.

22          But seven days for all dealers would be a monumental

23   task for a company that has been, frankly, financially

24   decimated by the defendants.  We won't go into that again.  But

25   Authenticom is a small company, much smaller now than it was

1  before, and simply doesn't have the resources to do this kind

2  of highly time-intensive project.

3       THE COURT:  Okay.  Couple of questions before I ask

4  the defendants anything.  I saw the statement in Mr. Clements's

5  affidavit that Authenticom had to lay off two-thirds of their

6  work force during litigation.  So I -- you know, I'm not

7  without appreciation of that.

8       A couple of questions.  So what you're saying is that

9  the 18 lines in Exhibit 11, that was obtained by a computer

10  programmer going into one particular -- within a seven-day

11  period one particular dealer's information on the software,

12  taken a screenshot of that.  But that would have to be -- if we

13  took a seven-day period, then somebody would have to go through

14  all of the software that ran during that period of time for all

15  of Authenticom's customers and take those same essentially

16  screenshots to comply with the defendants's request, right?

17       MR. HO:  I will say I'm not a technical person, so I'm

18  not sure screenshot is exactly the right terminology.

19       THE COURT:  Okay.  Or a printout.

20       MR. HO:  But conceptually that's exactly right.

21       THE COURT:  Okay.  And how many, roughly, do you know?

22  You said hundreds or thousands.  There a difference between

23  hundreds or thousands.  We're talking about many dealers?

24       MR. HO:  Over time I would --

25       MR. NEMELKA:  I don't know exactly today.  Authenticom

1   used to service over 10,000 CDK and Reynolds dealers.  It has

2   been drastically reduced.  I think it is probably low

3   thousands.

4          THE COURT:  Okay.  And I take it by your response to

5   my question, CDK questions whether something exists in tangible

6   form that had been preserved from November of 2018.  Is that no

7   longer -- is that not the case?

8          MR. HO:  Your Honor, there were never reports

9   or -- these ephemeral data were never preserved or reduced to a

10  documentary form in the way that we would think of it under

11  Rule 34.  With the exception of the one snapshot from December

12  of 2018 that we have then produced to the defendants in March

13  of 2019.  So all we would be talking about, as far as I know,

14  is the seven-day period rolling back from today.

15         THE COURT:  Okay.  I know they are going to have

16  a -- they will have a field day on that particular point, but

17  I'll listen to them.

18         Okay.  So we're talking about -- really just talking

19  about a seven-day period now as illustrative of what this would

20  look like.  And what you are telling me -- and I think I

21  understand this without having a terribly substantial technical

22  background -- what you are telling me is because this data

23  resides in the software that Authenticom runs on a daily and

24  hourly and minute-by-minute basis, in order to provide even a

25  seven-day snapshot of this kind of polling data, CDK --

41

1    Authenticom would have to go into the software and physically
2    go in, query through that to find each transaction where you
3    could find something that looks like those 18 lines that you
4    produced in March of 2019, would have to replicate that for
5    every dealer who you had during that period of time, and what
6    software was being run.  And that's a very burdensome
7    labor -- time intensive and costly process for a small company
8    that's lost a lot of its employees, at least in its technical
9    side.
10          The relevance of all that data for all the dealers is
11   minimal in your view.  But you are offering to do something
12   that is much less burdensome.  And I wasn't sure what -- that
13   changed overtime, it seemed to me, in the discussions you had.
14          So what are you now offering to do for certain -- you
15   mention 24 or something.  I don't know what you're offering.
16          MR. HO:  Ten CDK dealers and ten Reynolds data --
17   dealer rather.
18          MR. NEMELKA:  Twenty.
19          MR. HO:  So 20 total.
20          THE COURT:  So you're offering to do what they're
21   asking for.
22          MR. HO:  For one day.
23          THE COURT:  Okay.  And who is arguing this for your
24   side there?
25          Mr. MacDonald?

1          MR. MacDONALD:  I am, your Honor.

2          THE COURT:  Okay.  So why is their offer not

3     sufficient?

4          MR. MacDONALD:  Well, as your Honor referenced, the

5     polling client manager that contains information about what

6     files Authenticom polls, how long it polled for, when it

7     polled, how it polled.  And Authenticom has told us they don't

8     otherwise track this information.

9          So polling client manager is really the only source of

10    instances -- of tracking instance Authenticom accesses

11    defendants's DMSs.  Now obviously there are illustrative

12    reasons we want this that you mentioned.  But also, as part of

13    our counterclaims, and defendants have counterclaims under the

14    Computer Fraud and Abuse Act, the Digital and Millennium

15    Copyright Act, and various other federal and state claims,

16    under those counterclaims, defendants need to be able to show

17    instances of wrongful Authenticom access.  And Authenticom has

18    said they don't otherwise track this access.

19         And one of the problems we have is that, as you read

20    in the briefing, in the summer of 2018 Authenticom offered this

21    alternative log that they would produce to us to try to satisfy

22    us.  And we took the deposition of Authenticom's 30(b)(6)

23    witness in April of this year.  And it was the deposition

24    just -- this was a deposition just about data.  And the first

25    topic in that notice was solely this issue of that alternative

43

1    log they produced.  And their witness testified that that was

2    not -- this is a quote -- not an accurate representation of

3    polling, and that we couldn't rely on it for any of the

4    purposes to try to -- tended to show DMS access.

5         So the data they have on DMS access is stored in their

6    PCM log.  They haven't retained it.  They only have seven days.

7    And now they say they can't export it.  And the alternative

8    data they gave us they say we can't rely on.

9         So if we don't get any better data -- and, again, this

10   is seven days, so it is going to be hard from that to do

11   extrapolation.  It is not going to be great.

12        But if we don't get slightly better data, we are going

13   to come in here in a few months, and they are going to have

14   Daubert challenges against our expert saying, oh, you guys

15   relied on bad data.  We told you it was bad data.  But we don't

16   have anything else to rely on.  So we're between a rock and a

17   hard place on this issue.

18        Now on the technical issues, we agree, we acknowledge,

19   we put to the side the spoliation issues.  There are only seven

20   days of data.  It is in a log.  That's what their documents --

21   that's what their witnesses say.  It is kept on their system.

22   The witnesses said, you can log in, you can look at this log,

23   whether you have to click on individual dealers or not, I'm not

24   sure.  But somebody could log in and look at the last seven

25   days of polls right now.

1    Now we're willing to accept this in multiple forms if

2    it can be copy and pasted into a document, and we can do that.

3    Your Honor mentioned screenshots.  We would accept it in the

4    form of screenshots that can be OCRd.

5    You know, if the manual difficulty of screenshots is

6    too high, and they want to set up a terminal for one of our

7    experts on the AEO basis to go in and manually create the log

8    themselves, we can do that.  If it is easier to have a special

9    master do it, we can do that.  Or we're open to alternative

10   solutions that would lessen the burden.  But this is the only

11   place they store the data.  That is what they have told us.

12   And this is data that we need.

13   THE COURT:  Okay.  I don't think I need a special

14   master here, thank God.  And thankfully for you -- although her

15   rates are not outrageous.  But I don't think I need a special

16   master here to understand this.  I either underestimated myself

17   or overestimated the complexity of the issue that you have

18   here.

19   I -- from -- based on what I can read in the

20   documents, I think -- or in your briefs, I think -- and based

21   on what I saw in some of the deposition transcripts, the parts

22   that you did submit to me -- and I think you were -- were you

23   talking about Dane Brown's deposition?

24   MR. MacDONALD:  No, this is Joe Noth's deposition.

25   THE COURT:  Okay.  Yeah, okay.  That's -- you also

1    submitted that too, I think.

2         I think you are -- defendants are developing

3    information that potentially they could use to support their

4    theory of unauthorized access to your system.  You describe

5    some of that information at pages 2 and 3 of your brief on this

6    issue, which is sealed.  It is ECF 711.

7         Plaintiffs take you to task for saying, well, why are

8    they saying all this stuff?  They're just trying to dirty us

9    up.  True.

10        But it also to me illustrates the type of discovery

11   you're developing.  And while I understand your issue of

12   Daubert, you know, I don't know how that ends up coming out at

13   trial if the other side didn't produce or said I couldn't

14   produce the information, but they did give you a sampling.

15   That's beyond my pay grade, at least at this point, to decide.

16   But I do think you're entitled to some information on this

17   topic.

18        I agree with the plaintiffs that the burden on a small

19   or shrinking company of going through the so-called ephemeral

20   data to find this for hundreds, if not more, customers or even,

21   frankly, many, many tens of customers is burdensome and not

22   proportional to the needs of the case.  I think the proposal of

23   ten CDK dealers and ten Reynolds dealers for one day during

24   this period of time will provide the defendants with -- and I

25   don't care if it is a screenshot or however it is.  I mean, I

1    am not going to micromanage that process.

2            But the information to show the polling data for those

3    CDK and Reynolds dealers, as best as I can, determine what

4    you're -- again, the relevance of this information is not that

5    it is the recipe for Coke, it is for you to illustrate that

6    this happens.  And yet another way, in addition to what you

7    have already illustrated, and I'm -- I can't really, based on

8    the testimony that you're getting, I can't see how this is not

9    adequate for the purpose that you need it for.  What I do know

10   is that requiring lots more is not proportional to the needs of

11   the case.

12           And, again, we're talking about one day in 2019, I

13   think.  We're not talking about prior time.  But probably the

14   information is still helpful to you.

15           But I -- so in substance, I think the information that

16   you're looking for has some relevance.  The burden on CDK -- on

17   Authenticom of producing a complete seven-day set of

18   information -- of this information, I'm convinced, is unduly

19   burdensome and not proportional to the needs of the case from

20   what I understand the information will show and how it will be

21   used.

22           I do think that the proposal of ten CDK and ten

23   Reynolds dealers is much more proportional to the needs of the

24   case and will provide the defendants with some of the

25   information they're getting, at least on an exemplar basis.

1          And my understanding really of what the defendants

2     want is an exemplar basis because whether it is a full seven

3     days or it is a one day, you're looking -- you're not going to

4     get the entire history of the polling data, you're only going

5     to get a sample.  So the only question really is how large the

6     sample should be.  And, I mean, I don't know if ten is right or

7     12 is right or whatever.  But I think that's within the realm.

8          Hold on for one second.

9     (Brief interruption.)

10          THE COURT:  I'm thinking something.  Hold on.

11     (Brief interruption.)

12          THE COURT:  I take it, Mr. Ho, that the burden on

13     Authenticom really is in the process of querying the software

14     to get the information.  So hypothetically if you did, you

15     know, ten exemplars for CDK dealers and Reynolds for day one,

16     and then for day three you did ten different dealers, they

17     would get 20 dealers for CDK and 20 for Reynolds on different

18     days, that would double your burden in the sense that you have

19     to look at two days.

20          Well, hold your answer to that for a second.

21          Mr. MacDonald.

22          MR. MacDONALD:  Yes, your Honor, I --

23          THE COURT:  Is your objection -- is your objection to

24     -- I mean, here's my problem with your argument.  You're not

25     getting a statistically significant sample, in my view, under

1    any scenario for the entire time period that this occurred.

2    Whether they give you seven days, whether they give you a

3    rolling seven days or not, that's not a statistically

4    significant sample, I think.  I mean, you know, I'm beyond my

5    pay grade on that too.

6         But what you are getting is an exemplar.  And the only

7    question is how large that exemplar should be.  So why is an

8    exemplar that shows ten CDK and ten Reynolds dealers on one

9    day, why is that materially less helpful to you, for example,

10   than seven days?

11        MR. MacDONALD:  Well, your Honor, I'm not a

12   statistician either, but my understanding is the larger the

13   sample we can get, the -- you know, anything that we do here,

14   since Authenticom doesn't really track or keep this

15   information, is going to be an attempted extrapolation.  There

16   is going to be some uncertainty there.

17        But a larger sample will give us slightly more comfort

18   in doing that sort of extrapolation to see kind of what they

19   are doing on a systemic basis, how often they are accessing our

20   systems, how often they are polling for certain types of files,

21   how often they are running certain types of scripts or running

22   circumvention on our security.  So the larger the sample, the

23   better off -- the better data we would have.

24        And I also wanted to say, to the extent that we're

25   limited to 20 CDK dealers or, you know, ten CDK and ten

1    Reynolds dealers, however it is, defendants will request that

2    we get to pick the dealers that are used.

3             THE COURT:  Okay.  I know you're not a statistician,

4    but I don't buy your argument because what your argument really

5    sounds like is an exemplar argument.  I mean, and you have got

6    testimony from Authenticom -- and I can't remember which

7    deposition it was in, but I read it.  Maybe it is Noth -- that

8    Authenticom queried the system for hundreds of people -- of

9    dealers, I think.  I mean, you have got that testimony, right?

10            MR. MacDONALD:  But the issue, your Honor, is that

11   under some of the statutory claims that we have brought, the

12   Digital Millennium Copyright Act, each instance, each query is

13   its own statutory violation.  So we need to be able to quantify

14   how many times they have queried our systems.  Authenticom has

15   not produced very good data on that, so we're trying to

16   extrapolate it from a variety of sources.  And this would be

17   one of our sources.

18            And, obviously, you know, a seven-day period in June

19   2019 is not the ideal data set, but it is better than nothing.

20   And it is better than just having kind of a limited set of

21   dealers.

22            THE COURT:  Yeah, I mean, I think -- I'm not sure how

23   much better than -- this snapshot is proportional to the needs

24   of the case.  Let me just look here for a second at what you

25   said in your briefs.  Your brief.

50

1     (Brief interruption.)

2          THE COURT:  Yeah, I mean, my guess from what -- you

3     know, I mean, I know plaintiffs say you gave me this

4     information to prejudice them.  I don't know, not really.  But

5     you're trying to give me a picture of why the polling data is

6     important because you have already established wholesale -- in

7     your view wholesale access to the CDK system.  So one of your

8     bullet points on page 3 says, Authenticom had CDK dealers

9     install a program called Profile Manager and used a system

10    administrator-level account to automatically re-enable DMS

11    log-in credentials that Authenticom was using to extract data

12    from CDK's DMS within minutes after CDK's security measures

13    disabled them.  And you cite the 30(b)(6) deposition of Brown,

14    right?

15         MR. MacDONALD:  Yes.

16         THE COURT:  And that's really what we're talking about

17    here, right?

18         MR. MacDONALD:  Well, that's --

19         THE COURT:  To some extent.

20         MR. MacDONALD:  Well, seeing the actual scripts run is

21    to some extent also trying to quantify it.

22         THE COURT:  Right.  But you're never going to get all

23    the scripts that were run.  Instead you are going to have

24    testimony that says this happened a lot, and here's an example

25    of what it looked like in June of 2019.

51

1      But you're never going to get, I don't think, today,

2  from data that disappears, what happened prior to that date.

3  So even if I were to give you seven days from today, yes, you

4  could argue that you could extrapolate that.  Everything else

5  is arbitrary in terms -- and I still haven't -- I mean, given

6  that it -- what you're asking for, I think, is illustrative,

7  I'm not sure how a larger sample, other than it is just a

8  bigger illustrative set, gets you anyplace.

9      I mean, how are you going to use this -- you say you

10  are going to give this to your experts, but your expert is not

11  here.  Or you tell me you're not a statistician.  I think

12  Authenticom would have an interesting time with an expert who

13  says, based upon a seven-day sample in June 2019, this is how

14  often I think this happened for a four- or five-year period.

15      MR. ROSS:  Your Honor, just to chime in briefly.  This

16  is Brian Ross.

17      Before -- part of the problem is that we don't know

18  what the numbers are for these most recent seven days.  But one

19  of the things that we would hope to do would be to establish a

20  bare minimum, a conservative estimate that our experts can

21  apply.  If you see a similar number of instances over June -- a

22  certain week in June 2019, and you combine that with testimony

23  where Authenticom is saying, we have lost customers, and we are

24  accessing your systems much less often nowadays than we were

25  back in the 2015 to 2017 period, then we would hope to

1    establish a floor in terms of quantifying these improper

2    instances of access.  So that would be one example.

3         Would that be ideal?  Of course not, but it would be a

4    -- certainly better than what we have to work with now on core

5    elements of our claims.

6         THE COURT:  Yeah.  And you all say you want to

7    identify the dealers.  So do you -- is part of your proposal --

8    I'm not going to give you a seven-day look at hundreds of

9    transactions.  I'm just not.  That's unduly burdensome, it

10   seems to me.  And I don't think it is proportional to the needs

11   of the case, as I understand what this is going to be used for.

12   Even if it is a better sample for you for your expert.  Because

13   although I don't have hard data from Authenticom on this, I

14   have the Clements's affidavit.  And his affidavit at some level

15   convinces me that this is a labor intensive exercise for a

16   company that may not have the folks to do it.  And it has got

17   to be expensive.  And it has got to be real expensive.

18        Unless you want to pay for them to go through there

19   and reimburse them for the costs of doing this.

20        So I'm not going to give you seven days.

21        You hesitate.  You'll pay for it.

22        MR. MacDONALD:  Depending on the cost, we would

23   consider it, yes.  Or, you know, as I said earlier, we're

24   willing to have an expert do it if they will give us a terminal

25   and --

```
1              THE COURT:  I doubt that's happening.
2              Right, Mr. Nemelka -- Mr. Ho?
3              MR. HO:  We would certainly object to that, your
4    Honor.
5              THE COURT:  Yeah.
6              I mean, we're talking -- at a -- conservatively we're
7    talking about hundreds of dealers through this period of time.
8    Or at least a substantial number of more than ten.
9              I mean, another way to cut this is ten that you could
10   identify for the seven-day period.  I mean, I'm not sure how
11   much incremental burden that imposes on Authenticom.  Ten
12   dealers a day for seven days.
13             Or ten CDK, ten Reynolds for seven days.
14             MR. NEMELKA:  We'll multiply the effort by seven.
15             MR. HO:  And, your Honor, if I could just make one
16   observation about --
17             THE COURT:  How long -- do you know -- yeah, you can
18   in a second.
19             MR. HO:  Sure.
20             THE COURT:  Do you know, just because the party that
21   is raising the burden usually has to quantify the burden, do
22   you know for Mr. Clements's -- let's me see.  I'll look at
23   Clements's affidavit.  Hold on.
24        (Brief interruption.)
25             THE COURT:  Yeah, see, he talks about a -- he is
```

1    talking about the strawman here.  Rewriting the software to be

2    able to get a -- yeah, I'm getting to the point where maybe

3    I -- well, if --

4         (Discussion off the record.)

5         THE COURT:  Right.  I mean, do you have any idea as

6    you sit here today how much time it would take for ten CDK

7    dealers and ten Reynolds dealers?  I mean, because you're

8    making that proposal, you must have talked to somebody

9    technically to find out how -- and then you just multiply it by

10   seven.  So how much time is that?  Time and expense.

11        MR. NEMELKA:  They didn't give me a specific time.

12   They told me it would take about a week to get it to me because

13   I wanted to know about timing if this -- if this is something

14   that was offered or accepted.  So they said it would take them

15   about a week.  I don't know how they divided up their -- they

16   only have about three or four people now in their development,

17   and so I don't know how they would divide up -- how that

18   divides up man hours.

19        MR. HO:  But --

20        MS. MILLER:  Your Honor, this is Britt Miller.  And I

21   don't purport to have had a sneak peek at Authenticom software

22   so as to say how it operates.  But drawing on my limited

23   computer science background, I would think that you could -- if

24   you had identified the same ten dealers and you write the

25   script to be able to query the system for those ten CDK dealers

55

1  and those ten Reynolds dealers, you could run that query as and

2  against seven of the days, and return the results.  I.e., you

3  wouldn't have to rewrite the program or rewrite the poll or

4  rewrite the query because it is the same query, just changing

5  the date.

6          THE COURT:  I would bet they are not talking about

7  writing a query, I would bet that they are talking about

8  manually going into the system and locating the stuff.  Because

9  Clements talks about the burden on actually writing a program

10 to do this.

11         Am I right?

12         MR. HO:  Yes, your Honor.

13         THE COURT:  Yeah.  I think what they are talking about

14 is putting somebody in front of a computer screen and looking

15 at this, you know, what the seven-day period and extracting

16 from the software database this information.  And, again, this

17 is without prejudice to their argument that the, you know,

18 courts have said this, quote unquote, ephemeral data that

19 shouldn't have to be produced anyway.  It is kind of like just

20 scrolling stuff.

21         Right, Mr. Ho?

22         MR. HO:  Yes, your Honor.  I think of it as sort of

23 footprints in the sand.  I mean, they are only there for seven

24 days, and then they are washed away as in the ordinary

25 operation of the software program.  And that's exactly the kind

56

1     of data that we ordinarily think of as too burdensome to have

2     to preserve, maintain, and then produce in discovery.  And we

3     think that that ordinary principle ought to apply here.

4          If I could just make one observation about your

5     Honor's point that I think is well taken, that this can only be

6     for illustrative purposes.  I mean, I'm not a statistician, but

7     a red flag, you know, is raised in my mind when I hear the

8     defendant saying, well, actually we'd like to pick the dealers

9     because a central principle of any kind of extrapolation is

10    that it be from a statistically random sample.  So they are

11    skewing the sample by their very request to decide which

12    dealers to choose, which leads me to think this really isn't

13    about experts or about extrapolation, it is, as your Honor

14    suggested, about trying to find as many illustrations as

15    possible that they can use, however they intend to, in front of

16    the jury.

17          THE COURT:  Yeah, I mean, I do think it is trial

18    presentation.  At least that's my gut here.  I don't think

19    you're -- you know, Mr. MacDonald's -- I mean, Mr. Ross's ears

20    perking up and saying, well, we'll pay for it.  We'll pay for

21    it.  We'll put an expert there.  We'll find all this stuff.  I

22    still kind of envision, which hopefully they are not going to

23    be in front of me, the Daubert arguments about whether -- what

24    information in June of 2019 has to do with something else.

25          But I suppose defendants would argue, since the

1    company is smaller and retrenched somewhat, it can only be

2    worse earlier on in the period.

3        MR. ROSS:  And just to be clear, your Honor, one point

4    of clarification.  Mr. Ho has mentioned this concept of who is

5    picking the dealers.  Obviously the statistical significance of

6    this data is precisely why we wanted to get a production of a

7    full day or days, irrespective of anybody picking dealers.  But

8    in a world where we are -- we understand the Court's comments.

9    And in a world where we are going to be limited to a limited

10   subset of dealers, that's why we would like at least the

11   flexibility to choose.  And if -- if we decide to choose them

12   in a randomly generated way, we'll do that.  But the --

13   ultimately that was why we thought we shouldn't be limited on

14   the number of dealers.

15       THE COURT:  Well, and to say it differently, you don't

16   want them to pick them.  You would rather -- if somebody is

17   going to pick, you would rather pick.

18       What -- do you know, Mr. Nemelka, what's the over and

19   under?  What's the difference on whether I were to say, for

20   example, all the polling data for one day between June whatever

21   and whatever versus ten CDK dealers for one day?  I guess

22   depending upon how many dealers you're running, it could be

23   hundreds as opposed to ten, right?

24       MR. NEMELKA:  Yeah, it's -- that's just very

25   burdensome.  It is the seven dealers -- excuse me -- the 20

1  dealers over seven days is much less burdensome than doing all

2  of one day, by an order of magnitude.

3       THE COURT:  So might I assume if it takes one week for

4  ten and ten, it would take two weeks for 20 and 20, right?  Or

5  it would take two weeks for ten and ten over two days, right?

6  Probably, right?

7       MR. NEMELKA:  Probably, that's right.

8       MR. HO:  And, your Honor, more than just the number of

9  hours, this is a company that is on a -- you know, trying to

10  run a business at the same time and has been reduced to the

11  absolute bear number of people -- minimum number of people that

12  is required to continue to operate its business.  So to take

13  one of those people and say, you have got to spend a week or

14  two weeks trying to find data for these, even, 20 CDK and

15  Reynolds customers is still a very significant burden on

16  management.

17       MS. GULLEY:  Your Honor?

18       THE COURT:  Yes, Ms. Gulley.

19       MS. GULLEY:  Thank you.  Sorry.  I wasn't sure whether

20  there was a window.  I was waiting for a window.  Can I make

21  some comment for -- momentarily?

22       THE COURT:  Sure.  Now we will have a one, two, three,

23  three lawyers arguing for Reynolds and Reynolds.

24       MS. GULLEY:  I'm so sorry, your Honor.

25       THE COURT:  That's okay.  We have got two for CDK, so

 1   we have got the whole family in here.

 2        MS. GULLEY:  Okay.  Well, thank you.  So I just want

 3   to address a couple of issues that you raised.  First of all, I

 4   appreciate that you are not addressing the spoliation issue

 5   today.  Obviously there are bigger issues.  There are prima

 6   facie elements that the defendants say in having to prove their

 7   counterclaims, you know, that where we sent them hold orders

 8   long, long ago and have asked for the type of data for a long

 9   time, which we're just learning the data that we got wasn't

10   good enough.

11        With respect to the burdens, we understand, you know,

12   that this employee situation with the reduced forces that

13   plaintiffs put in their recent motions has been something that

14   they have been putting in their motions since this case was in

15   front of the Seventh Circuit, and after which Mr. Cottrell made

16   his statement to the press that the company was well positioned

17   and battled.  That came after those layoffs when he made that

18   statement.  We have talked about this many times.

19        Nevertheless we appreciate the burdens of this.

20   Reynolds and CDK have also had significant burdens.  In polling

21   the transactional data that the plaintiffs requested, Reynolds

22   has to essentially shut down its accounting system every night

23   for months to pull that and had to pay tens of thousands of

24   dollars to buy additional server space.

25        So as an order of magnitude, we're talking about two

1   weeks for them.  We have worked on this for months and months

2   and months.  Because it goes to elements of the plaintiffs's

3   case, we have had to do that.  This goes to a core element of

4   the defendants's case.

5         I understand that now, given that the plaintiffs have

6   continued to delete that information on an ongoing basis since

7   the case began, we only have seven days, but seven days is

8   better than zero days.

9         THE COURT:  Okay.  I hear you.

10        (Brief interruption.)

11        THE COURT:  You know, there is nothing in -- I'm

12  re-reading the defendants's brief on this, which is sealed as

13  ECF 711.  And really the whole import of what defendants are

14  arguing there is the illustrative purpose of this data rather

15  than, you know, a huge -- I'm interpreting it as more of a -- I

16  don't know how this gets you -- there is no affidavit from an

17  expert that says, I need seven days of data, for example, for X

18  number of Y dealers.

19        What you say at page 7 is the PCM log, which is

20  ephemeral data, I'm convinced, even though it would only

21  contain data for a limited time period, may be the only means

22  through which defendants can understand Authenticom's polling

23  activities on a poll-by-poll dealer-by-dealer basis.  So it is

24  an attempt to understand kind of what's going on.  Maybe I'm

25  putting too much weight in that.

1          Okay.  I want to take a really quick break here.  We

2     have been going since 9:30.  I know I have an 11:15 criminal

3     hearing, which everybody has not yet arrived for.  My intention

4     is to end you there.

5          Was there anything else you wanted me to deal

6     with -- I understand -- I guess there is -- there are a couple

7     of things that I would like to deal with with you.  I want to

8     make sure I know when the documents are going to be produced.

9     I want to know of the remaining things under advisement what

10    your priorities are.

11         MS. MILLER:  All of that -- your Honor, this is Britt

12    Miller.  I'll let Mr. Provance speak as to when we can get the

13    documents to you.

14         As to other matters that remain under advisement,

15    Docket 539 and docket 543, which are defendants's motions to

16    compel production, they were both listed on the May 15th status

17    hearing report --

18         THE COURT:  Uh-huh.

19         MS. MILLER:  -- which actually implicate a number of

20    issues that your Honor ruled on with respect to CDK today.

21         THE COURT:  Well, isn't 539 your motion to compel

22    Authenticom, which gets taken care of by what I am doing here

23    or is this more in --

24         MS. MILLER:  No, this is a -- this is the motion to

25    compel Authenticom to produce communications off of their log.

```
 1              THE COURT:  Okay.

 2              MS. MILLER:  So these are specifically as to the

 3    documents that they have claimed privilege to.

 4              THE COURT:  Okay.

 5              MS. MILLER:  Same thing is true of 543 --

 6              THE COURT:  Got it.

 7              MS. MILLER:  -- which is as to Auto Loop and Cox

 8    Automotive.  Again, we have asked for both of them either to

 9    produce them or to put them for in camera review.

10              So to the extent your Honor is going to plan a

11    hearing, you might want to do it all at once.

12              THE COURT:  I don't think I am going to -- I don't

13    want that kind of punishment.

14              MS. MILLER:  Fair enough.  Fair enough.

15              So those are the other -- so in terms of primacy, I

16    would -- considering the crossover, I would suspect that those

17    two would be ones we would be looking for for rulings in the

18    relative short-term.

19              THE COURT:  Okay.  And for those you would say I would

20    want the opposing party to send me the document -- I don't have

21    those documents in camera either, right?

22              MR. NEMELKA:  Correct.

23              MS. MILLER:  Correct.

24         (Discussion off the record.)

25              THE COURT:  Something we received as zip file
```

1  documents on.  Do you know which one that was?

2      MS. MILLER:  That may have been the last round of in

3  cameras with respect to the class plaintiffs's motions that you

4  have already ruled on.

5      THE COURT:  Okay.

6      MS. MILLER:  So I don't believe we have submitted --

7  either side has submitted the actual documents with respect to

8  these three motions.

9      MR. PROVANCE:  Your Honor, it is hard for us to know

10 for certain, but those may have been submitted in connection

11 with Docket 633, which is a separate motion to compel.

12     THE COURT:  Yeah, the clawback documents and FTC

13 privilege, right?

14     MS. MILLER:  Correct.

15     THE COURT:  And then in addition to those, I have got

16 -- I had this issue about briefs for refreshing data.  Has that

17 been taken care of?  You don't have to do that?

18     MS. MILLER:  There are a number of things that are

19 outstanding from the May 15th status.  We have produced -- a

20 number of people have produced their refresh data.  A number of

21 portions of that refresh are still outstanding as to certain

22 parties.  There are agreed dates by which folks expect to

23 produce that data.  But there may be issues following those

24 refreshes which may need to be produced or may need to be

25 addressed with your Honor.

64

1          There are also a handful of other items from the May

2     15th agenda, not motions, but issues that were raised that the

3     parties are still working through.  But if those are not

4     resolved, obviously, we will have to bring those to your Honor

5     as well.

6          THE COURT:  Okay.  Mr. Provance, what's your thought

7     on when you can get me the documents in camera?

8          MR. PROVANCE:  Your Honor, the short answer is that I

9     I will need to talk to my staff as well as probably our

10     discovery vendor.  But in general we'll move with all alacrity.

11          One --

12          THE COURT:  All deliberate speed.

13          Why don't you, plaintiffs, also talk to Mr. Provance

14     about when you can get me something with respect to what I

15     would need to look at with the -- off of log issues that you

16     have raised.

17          MR. NEMELKA:  On the corollary issue?

18          THE COURT:  Yeah.

19          MR. NEMELKA:  Yes.

20          MR. PROVANCE:  Okay.  Your Honor, if I have could

21     just --

22          THE COURT:  And send an email to Brenda as to when you

23     can do it.  I'll enter an order.

24          MR. PROVANCE:  If I could ask one question.  One thing

25     that we have learned in the process with your Honor is that

1    submitting documents in camera that were produced with

2    redactions are often difficult for the Court to understand.  We

3    could undertake an effort to identify documents that were

4    redacted, but then, you know, try some way to identify what we

5    have redacted, but make it so that you could still see it.  We

6    can explore those things.  But obviously it will take a little

7    bit longer to put those together.

8         THE COURT:  Yeah.  I mean, obviously, I'm going to

9    want to know what was redacted.  I don't know if it is a

10   problem just with me or with other judges.  But I am going to

11   want to know what's redacted in order to understand it.  It may

12   be highlighting it or something, I don't know.  But I -- that's

13   part of the process.

14        MR. PROVANCE:  That's certainly an understandable

15   request, and we'll build that in to our estimate of how quickly

16   we can get you the documents.

17        MS. WEDGWORTH:  Your Honor, if I may bring up, I think

18   ECF 294 and 308, going way back to July, August of 2018, we had

19   a motion where you ruled on the waiver part, but you didn't

20   rule on the underlying privilege part of those clawback

21   documents with the CDK production there, which got rolled into

22   the current clawback motions.

23        So when you do rule on the clawback motions, with

24   regard to CDK 294 and 308, which I think consist of roughly

25   1400 documents, still need the review for privilege.

1           And that I think rolls into the Docket 633, which

2    we -- which we have been discussing.

3           MR. PROVANCE:  Your Honor, this is Matt Provance.  I'm

4    not sure I agree with what Ms. Wedgworth just explained.  There

5    were a set of clawback motions filed last year.  Your Honor did

6    rule on the waiver portion.

7           As to substantive questions about whether those

8    documents were in fact privileged on a document-by-document

9    basis, your Honor instructed the parties to incorporate that

10   into broader challenges, because those clawback documents were

11   logged and part of defendants's privilege logs.  And if there

12   are challenges to those documents based on their privilege log

13   entries, they could have, should have, and I believe were

14   raised in connection with the parties's discussions about

15   privilege logs that took place in November of last year.

16          And so from the Court's perspective we believe the

17   motions that were teed up, the documents that were challenged,

18   the privilege log entries that were challenged, they

19   incorporate all of that.

20          THE COURT:  I think I agree with that.  I mean, as I

21   recall this was a kitchen sink 1400 documents.  I didn't have a

22   document-by-document challenge.  And I think I said something

23   after I dealt with the waiver issue that if the parties really

24   want to do this on document-by-document basis, you have got to

25   tee it up to me on a document-by-document basis.  And my

1    thought was that that's what was done with ECF 633.

2         I don't think -- if I am correct, and the 1400

3    documents from before was a kitchen sink basis -- and I'll go

4    back and look at that, but I am not interested -- I don't think

5    it was a -- I don't think I -- I think what I said at the time

6    was I can't rule on this on a kitchen sink basis.

7         Isn't that right, Ms. Wedgworth?

8         MS. WEDGWORTH:  I thought this was the one where you

9    requested and received a sampling of those documents.

10        THE COURT:  Yeah.

11        MS. WEDGWORTH:  And when you looked at those, there

12   was this issue about the redactions weren't in the documents,

13   which delayed everything.  So I thought we were still dealing

14   with the issue of how the redactions work with the sampling you

15   got.

16        To the extent they are rolled up into 633, we

17   certainly want everything ruled on at one point.  I don't think

18   we have set aside the 1400, but they are included in the 633.

19   And, nonetheless, the 294 and 308 on the docket are still open

20   for that -- for the privilege.

21        THE COURT:  How am I supposed to rule on the issues of

22   privilege on a sample basis, without knowing whether the sample

23   you gave me actually is really an exemplar for each and every

24   other document, and without some writing on there?  I mean, how

25   -- I mean, I remember you gave me some samples or I asked for

1    some exemplars.  I think I asked for a hundred or something

2    like that.  And I had them in a box.  And when I went through

3    them, it didn't help me at all, so --

4          MS. WEDGWORTH:  I appreciate that question and

5    appreciate the answer is normally document by document.  In my

6    experience in other cases, and I thought maybe this is where

7    you were going when you requested the sample, many times

8    magistrates or judges rules -- rule on those sampling, saying

9    here is a scenario where this is in or out.  And then the

10   attorneys take that ruling and apply it to the rest of the

11   documents.

12         In this scenario, the Judge has already ruled that

13   this is coming in for whatever reason or this is -- this

14   remains on the privilege log.  And we will follow that example

15   in going through.  And that has worked in the past, and I -- I

16   didn't try to read into too much what you were doing with the

17   sampling.

18         But with the ruling from that sampling, we certainly

19   could adjust and figure out the rest of the production with the

20   understanding there are usually some documents that do not

21   cleanly fall into one of your previous rulings.

22         But, again, the issue that happened in one of the

23   hearings was when defense counsel produced that sampling, the

24   redactions didn't appear, it threw off the review of it, and we

25   left it at that.

69

1          MR. PROVANCE:  Your Honor, I won't belabor the point

2    because we have a full record on this.  We had prior hearings.

3    We can all go back and check what was said.

4          There have now been four motions to either clawback or

5    seek production of privileged documents against CDK.

6    Ms. Wedgworth on behalf of the dealers filed motions seeking

7    all certain categories of privileged documents that were

8    initially produced to the FTC original, but then clawed back.

9          But all those documents have now been logged.  And

10   they were logged before plaintiffs filed not only Docket 633,

11   but also their general omnibus motion challenging clawback

12   entries at Docket Number 535.

13         So in terms of specific documents, there has been a

14   full opportunity to challenge entries, challenge individual

15   documents.  And indeed the dealership class members and now the

16   individual plaintiffs as well have made many, many challenges.

17   And we have responded to them, and those issues are now fully

18   briefed.

19         MS. WEDGWORTH:  My -- a brief response, your Honor.  I

20   appreciate we're dragging this out.  I'm not clear in that

21   response that that 1400 -- those 1400 documents have been

22   logged.

23         Mr. Provance, are you representing they have been?

24         MR. PROVANCE:  So, first of all, I believe it is 2400

25   documents that were initially challenged by clawbacking.  And,

1  yes, all those documents were either logged in connection with

2  the initial clawback motion that the plaintiffs filed last

3  summer in 2018 or were produced or have been included on the

4  privilege logs that CDK has now provided across its entire

5  productions.

6      THE COURT:  Okay.  We're going to probably have to

7  leave it there right this minute.  I'm going to want you, given

8  that I have another hearing that has to start, and our

9  defendant is here -- I'd like you to jointly email Brenda a

10  date by which you're going to submit the in camera documents

11  that we talked about.

12      I'm taking under advisement this issue of the polling

13  data so I could think about it and decide which way I want to

14  go or whether I want to call you back in or whether I need an

15  evidentiary hearing on it.

16      How far do defendants want to push the issue?  Do you

17  want to bring in your experts?  I mean, is the primary basis to

18  get data for your experts or to get information that is -- that

19  you can as exemplar or illustration?

20      So, for example, if I say, you know, the amount of

21  burden that I'm going to put Authenticom through is related to

22  how deeply important this information is to the defendants.  Do

23  you want to bring in your experts to testify about why they

24  need this information and how a seven-day sample from 2019 is

25  going to be the be all or end all of their analysis?  Do you

71

1    want to have that?

2         And then do you want me to appoint the special master

3    so you can pay that special master to do this and go off and go

4    on that track?  Or do you want to accept some measure, ten or

5    20 of these over a day or two days, and take that for your

6    purposes?

7         I just -- I'm trying to gauge how important this issue

8    is in the grand scheme of things.  How much time I should spend

9    on it.  How much time you want to spend on it.

10        MR. MacDONALD:  Your Honor, we think this issue is

11   very important.  We want it for two reasons.  One is the

12   illustrative reason you talked about.  One is, as I said, one

13   of the elements of our claims is quantifying the number of

14   times they run scripts on our system.  And this is one of the,

15   if not the only, source of that information.

16        THE COURT:  So you have other sources of information.

17        MR. MacDONALD:  There --

18        THE COURT:  It is obvious from what you have got here.

19   And so why didn't you, in your motion, wax eloquent on the

20   quantification aspect as opposed to the illustrative aspect?

21        I mean, getting this information from a lot of

22   different ways.  You have got Authenticom people testifying

23   about how the fact that they did this on hundreds of occasions.

24   You have got your own systems that can show who -- probably how

25   many times you were hit.  You have got other data coming in.

1    So is this another pebble of information?  Is it a
2  boulder?  Is it outcome determinative?
3        MR. MacDONALD:  I don't believe --
4        THE COURT:  Or don't you know?
5        MR. MacDONALD:  I don't believe it is outcome
6  determinative.  But it is a substantial source of information.
7  This is the best information Authenticom keeps on this.
8        THE COURT:  It may be the best information that
9  Authenticom keeps on it, but do you have other information that
10  you can prove your case with?
11        MR. MacDONALD:  Well, we're going to -- if we don't
12  get this information, we're going to have to prove it with
13  other information.  But they are going to challenge that as not
14  reliable.  They are going to say your information isn't good
15  enough because you don't have access to the instance-by-
16  instance data, which is only kept on the --
17        THE COURT:  Yeah, but they are going to challenge that
18  on a seven-day sample too, right?
19        MR. MacDONALD:  That's true.  But then we have another
20  pillar to stand on.
21        THE COURT:  Okay.  So we're talking about how many
22  pillars you need to stand on, right?
23        MR. MacDONALD:  Well, you need at least three or four
24  for a chair.
25        THE COURT:  Okay.  A question whether a pedestal is

1    enough here.

2            Okay.  We're going to -- we're going to stop right

3    now.  I think I understand where we are.

4            I know I have to set another date to see you.  I have

5    other motions under advisement.

6            I think by and large the motions I now continue to

7    have under advisement, pending what you're going to tell me

8    about whether you work out everything on the issues in the

9    agenda, including depositions and stuff like that, are --

10   motions mostly are in camera review, redaction, clawback kind

11   of issues, which are terribly labor intensive.  So we would

12   have to set out some time for that.

13           But right now I think, unless there is anything else

14   somebody wants to raise quickly, I think we are going to break.

15           MS. WEDGWORTH:  Your Honor, just one brief thing.  We

16   have a third-party motion to compel that we briefed in the

17   Southern District of New York, which was transferred here on

18   May 30th.  It was assigned to Judge Tharp.  So we will be --

19   good news, bad news -- getting it to you, hopefully, this week.

20   So there is a pending motion to compel from a third-party

21   production.

22           THE COURT:  Well, that depends on whether Judge Tharp

23   wants to send it over here.

24           MS. WEDGWORTH:  Correct, your Honor.

25           THE COURT:  I think maybe it should go to Dow and then

```
 1   to me.  I don't know.

 2          MS. WEDGWORTH:  I suspect we have to get it in front

 3   of Dow and then to you.

 4          THE COURT:  Well, it is not yet on my brief motions

 5   calendar, so -- okay.  Can we break?

 6          MR. NEMELKA:  We thank you for your time.

 7          MS. WEDGWORTH:  Thank you, your Honor.

 8          MR. HO:  Thank you, your Honor.

 9          MS. GULLEY:  Thank you, your Honor.

10      (Which concluded the proceedings:)

11                          CERTIFICATE

12          I HEREBY CERTIFY that the foregoing is a true, correct

13   and complete transcript of the proceedings had at the hearing

14   of the aforementioned cause on the day and date hereof.

15

16   /s/Pamela S. Warren                    June 10, 2019
     Official Court Reporter                    Date
17   United States District Court
     Northern District of Illinois
18   Eastern Division

19

20

21

22

23

24

25
```