PUBLIC VERSION

# GZJ KDKV'4''

PUBLIC VERSION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

AUTHENTICOM, INC.,

                       Plaintiff,                  Case No. 17-cv-318

     vs.

CDK GLOBAL, LLC, and THE REYNOLDS
AND REYNOLDS COMPANY,

                       Defendants.

---

### AUTHENTICOM'S FIRST SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS FOR DEFENDANT CDK GLOBAL, LLC

       Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff

Authenticom, Inc. ("Authenticom") hereby requests that Defendant CDK Global, LLC ("CDK")

produce all documents in its actual or constructive possession, custody, or control related directly

or indirectly to any of the matters described below.  All documents and tangible things

responsive hereto should be produced for inspection as soon as practicable and in no event later

than thirty (30) days from the date after service of these requests for production.  Production

shall be made at the offices of KELLOGG, HANSEN, TODD, FIGEL & FREDERICK,

P.L.L.C., 1615 M Street, N.W., Suite 400, Washington, D.C. 20036, or as otherwise agreed to by

the parties.

PUBLIC VERSION

## DEFINITIONS

For purposes of these requests the following definitions shall apply:

1.        "Add-on application" means a software application that dealers use in addition to or separate from their Dealer Management System ("DMS") software in the course of operating their dealerships.

2.        "All" shall be construed as all and any, and the term "any" shall be construed as all and any.

3.        "API" shall mean Advanced Programming Interface.

4.        "Authenticom" shall mean the Plaintiff in this action and a provider of data integration services in the automotive industry based in La Crosse, Wisconsin.  "Authenticom" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

5.        The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the document request all responses that might otherwise be construed to be outside of its scope.

6.        "CDK" shall mean CDK Global, LLC, as described in Paragraph 4 of Defendants' Combined Statement of Additional Facts Requiring Denial of Preliminary Injunctive Relief (hereinafter, "SoAF"), Dkt. No. 87 (June 16, 2017).  "CDK" shall include the Dealer Services business of Automatic Data Processing, Inc. ("ADP") prior to September 30, 2014.  *See* SoAF ¶ 5.  "CDK" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

7.        "Communication" shall mean any exchange or transfer of information, whether electronic, written, oral, or in any other form. The phrase "communication between" is defined to

PUBLIC VERSION

include instances where one party addresses the other party but the other party does not necessarily respond.

8.      "Data access policy" means Your policy with respect to the ability of dealers to authorize independent integrators to access data on the DMS or otherwise grant third parties access to their data on the DMS.

9.      "Data integrators" shall refer to service providers that provide access by any means to dealer data on the DMS database, whether by extracting the data, writing data back into the DMS, or both.  For the avoidance of doubt, "data integrators" includes CDK (through its 3PA program) and Reynolds (through its RCI program).

10.      "DealerVault" shall refer to the current data integration product offered by Authenticom, which providers a unified user interface that enables dealers to add, remove, or change the data sets that Authenticom sends to vendors on the dealers' behalf.

11.      "DMI" shall mean Digital Motorworks, Inc., as described in Paragraph 215 of the SoAF.  "DMI" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

12.      The "DMS Market" shall mean the market for the provision of DMS services to new car franchised automobile dealers, as described in Paragraphs 7-15 of the SoAF.

13.      "Document" and "Documents" are used in the broadest extent permitted by Federal Rule of Civil Procedure Rule 34(a).

14.      "IntegraLink" shall mean IntegraLink as described in Paragraph 215 of the SoAF. "IntegraLink" shall include its present or former predecessors, subsidiaries, divisions,

PUBLIC VERSION

departments, operating units, directors, officers, managers, employees, attorneys, and accountants

15.     "Including" (in addition to its usual meanings) shall mean including but not limited to.

16.     "Meeting" shall mean, without limitation, any assembly, convocation, encounter, communication or contemporaneous presence (whether in person or via any electronic, computer-assisted, digital, analog, video, or telephonic method of communication) of two or more persons for any purpose, whether planned or arranged, scheduled or not.

17.     "Person" or "persons" shall mean, without limitation, any individual, corporation, partnership or any variation thereof (e.g., limited partnership, limited liability partnership), limited liability company, proprietorship, joint venture, association, government entity, group or other form of legal entity.

18.     "Preliminary Injunction Hearing" shall mean the hearing conducted in the United States District Court for the Western District of Wisconsin in this case, No. 3:17-CV-318-JDP, from June 26-28, 2017.

19.     "Price Secrecy Provision" means any contractual provision designed to prevent vendors from informing dealers or other third parties about the pricing charged under the 3PA or RCI programs.

20.     The terms "relating to," "related to," "referring to," "regarding," or "with respect to" shall mean, without limitation, the following concepts: concerning, discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part.

21.     "Reynolds" shall mean "The Reynolds & Reynolds Company" as described in Paragraphs 1-3 of the SoAF.  "Reynolds" shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

22.     "SecurityFirst" shall mean the CDK initiative described in Paragraphs 133-148 of the SoAF.

23.     "SIS" means Superior Integrated Solutions and shall include its present or former predecessors, subsidiaries, divisions, departments, operating units, directors, officers, managers, employees, attorneys, and accountants.

24.     "SFTP" means secure file transfer protocol.

25.     "Third party integrators" shall mean data integrators that provide data integration services on a DMS platform and are unaffiliated with the DMS provider.

26.     "Vendors" or "application providers" shall mean vendors who provide software applications that perform operations functions for dealerships, as described in Paragraph 20 of the SoAF.

27.     "You," "your" or "your company" mean the responding defendant, its predecessors, successors, parents, subsidiaries, departments, divisions, joint ventures, and affiliates, including without limitation any organization or entity that the responding defendant manages or controls, together with all present and former directors, officers, employees, agents, representatives or any persons acting or purporting to act on behalf of the responding defendant.

## **INSTRUCTIONS**

1.     In producing documents and other materials, You must furnish all documents in Your possession, custody, or control, regardless of whether such documents or materials are

PUBLIC VERSION

possessed directly by You or Your employees or former employees, agents or former agents, parents, subsidiaries, affiliates, investigators, or by Your attorneys or their employees, agents, vendors or investigators.

2.     All documents shall be produced in the same order as they are kept or maintained by You in the ordinary course of Your business.  All documents shall be produced in the file folder, envelope or other container in which the documents are kept or maintained.

3.     Documents attached to one another should not be separated.  If any portion of any document is responsive to any portion of the document requests below, then the entire document must be produced.

4.     Documents shall be produced in such fashion as to identify the natural person in whose possession they were found (i.e., the document custodian).

5.     If any document responsive to any of these requests is privileged, and the document or any portion of the document requested is withheld based on a claim of privilege, provide a statement of the claim of privilege and all facts relied upon in support of that claim, including the following information:

  a.  the exact basis for withholding the document;
  b.  the date of such communication;
  c.  the medium of such communication;
  d.  the general subject matter of such communication (such description shall not be considered a waiver of Your claimed privilege);
  e.  the identity of any document that was the subject of such communication and the present location of any such document;
  f.  the identity of all persons involved in such communication; and
  g.  the identity of any document which records, refers, or relates to such communication and the present location of any such document.

6.     Each document requested herein should be produced in its entirety and without deletion, redaction or excision, except as permitted by a recognized privilege, regardless of whether You consider the entire document or only part of it to be relevant or responsive to these

PUBLIC VERSION

document requests. If You have redacted any portion of a document on the ground of privilege, stamp the word "REDACTED" beside the redacted information on each page of the document You have redacted.

7.      Each request for documents seeks production of all documents described along with any attachments, drafts, and non-identical copies in any language whatsoever, in the possession, custody, or control of You or Your respective agents or attorneys. You are specifically instructed to review any storage and archive facilities and the personal files, records, notes, correspondence, daily calendars, telephone logs, and records of all persons who would likely have responsive documents.

## REQUESTS FOR THE PRODUCTION OF DOCUMENTS

### *Regulatory Investigations*

**REQUEST NO. 1.**      All documents and correspondence relating to any inquiry or investigation by the Federal Trade Commission, Department of Justice, or any other federal or state regulatory authority regarding your DMS business, data integration business, add-on applications, data access policies, or any other related matter. The date limitation for this request is January 1, 2007, to the present. For the avoidance of doubt, this request includes, without limitation:

   a.      any documents produced by you (or any other party) to any such regulatory authority;

   b.      any correspondence with any such regulatory authority, including any Civil Investigative Demand ("CID") or subpoena received from any such regulatory authority;

7

PUBLIC VERSION

    c.     any transcripts, recordings, or records of any interviews and/or testimony

           provided by any witness to any such regulatory authority; and

    d.     any CDK or Reynolds internal documents relating to any investigation by any

           such regulatory authority.

***Agreements and Communications Between CDK and Reynolds***

**REQUEST NO. 2.**    All communications between CDK and Reynolds regarding their respective DMS business, data integration business, add-on applications, data access policies, or any other related matter – including all documents concerning such communications. There is no date limitation for this request.

**REQUEST NO. 3.**    All communications between CDK and Reynolds regarding access by independent data integrators to data on their respective DMS platforms. There is no date limitation for this request.

**REQUEST NO. 4.**    All documents and communications regarding any agreement (written or otherwise) between CDK and Reynolds. There is no date limitation for this request.

**REQUEST NO. 5.**    All documents and communications relating to the February 18, 2015 "Data Exchange Agreement," "3PA Agreement," and "Reynolds Interface Agreement" (collectively, the "Agreements"). There is no date limitation for this request. For the avoidance of doubt, this request includes, without limitation:

    a.     all communications between CDK and Reynolds regarding the Agreements;

    b.     all communications with other parties (whether vendors or dealers) regarding the Agreements;

    c.     all drafts of the Agreements;

    d.     all documents describing, construing, or interpreting the Agreements;

  e.  all internal documents and communications regarding the Agreements;

  f.  because CDK and Reynolds have waived their attorney-client privilege with respect to the Agreements – and any such communications are subject to the crime-fraud exception in any event – all communications with counsel for CDK and/or Reynolds regarding the Agreements; and

  g.  any other document relating in any way to the Agreements.

**REQUEST NO. 6.**  All documents and communications regarding the transition of vendor customers of CDK into the RCI program.  For the avoidance of doubt, this request includes, without limitation:

  a.  all information provided by CDK to Reynolds about its vendor customers, *see, e.g.*, §§ 4.3, 4.4, Exhibit DEA-2 of the Data Exchange Agreement;

  b.  all communications between CDK and Reynolds about CDK's vendor customers;

  c.  all communications between CDK and its vendor customers regarding the RCI program;

  d.  all communications between Reynolds and CDK's vendor customers regarding the RCI program;

  e.  all communications with Reynolds DMS customers regarding the transition of CDK's vendor customers into the RCI program;

  f.  all pricing information regarding what CDK vendor customers paid for access to data on the Reynolds DMS before the Data Exchange Agreement, and what those vendor customers (1) paid when they entered into the RCI program, and (2) what they pay now; and

PUBLIC VERSION

        g.      all communications related to any instance where Reynolds advised vendors awaiting RCI certification to move their data integration business to CDK, DMI, or IntegraLink in advance of RCI certification.

**REQUEST NO. 7.**    All documents and communications regarding data security and/or DMS system performance with respect to CDK's access to the Reynolds DMS. There is no date limitation for this request. For the avoidance of doubt, this request includes, without limitation:

        a.      all documents and communications relating to the effect of CDK's access to the Reynolds DMS on the performance of the Reynolds DMS;

        b.      all documents and communications relating to any data security incidents caused by CDK's access to the Reynolds DMS; and

        c.      all documents and communications relating to any specific system performance issue that was or is directly attributable to CDK's access to the Reynolds DMS.

**REQUEST NO. 8.**    All documents and communications regarding the impact on CDK's business (including the business of its subsidiaries, DMI and IntegraLink) – whether on CDK's finances, its dealer and vendor relationships, or otherwise – caused by Reynolds' blocking of CDK's access to dealer data on the Reynolds DMS.

**REQUEST NO. 9.**    All documents regarding working with other data integrators – such as Authenticom, SIS, SelectQu, or others – and all communications with those entities regarding finding solutions (technological or otherwise) to Reynolds' blocking.

PUBLIC VERSION

*__Authenticom__*

**REQUEST NO. 10.**  All documents and communications referencing, relating to, or concerning Authenticom, DealerVault, or Steve Cottrell.  There is no date limitation for this request.

**REQUEST NO. 11.**  All documents and/or communications between CDK and Reynolds relating to Authenticom, DealerVault, or Steve Cottrell – including all documents concerning such communications.  There is no date limitation for this request.

**REQUEST NO. 12.**  All documents and/or communications regarding any cooperation, coordination, joint effort, assistance, exchange of information or technical knowhow, or any other type of collaboration between CDK and Reynolds in blocking Authenticom's access to dealer data on their respective DMS platforms.  There is no date limitation for this request.

**REQUEST NO. 13.**  All communications with vendors and/or dealers regarding Authenticom, DealerVault, or Steve Cottrell.  There is no date limitation for this request.

**REQUEST NO. 14.**  All documents and communications to or from Dan McCray, Steve French, Howard Gardner, Malcolm Thorne, Robert Karp, Ron Workman, Steve Anenen, or Brian MacDonald relating to the following: Authenticom, Steve Cottrell, DealerVault, "hostile" or "unauthorized" integration, dealers using independent integrators to access their data, Bob Brockman, Robert Schaefer, Ron Lamb, Chris Hellyer, or Kelly Hall.  There is no date limitation for this request.

**REQUEST NO. 15.**  All documents and communications regarding the VPN tunnel that CDK provided to Authenticom for accessing dealer data on the CDK DMS, and the reasons why CDK stopped providing Authenticom with that access.

PUBLIC VERSION

***CDK's Access to Other DMSs***

**REQUEST NO. 16.**   All documents and communications relating to CDK's (including through its subsidiaries, Digital Motorworks and Integralink) access to data on the Reynolds DMS.  There is no date limitation for this request.  For the avoidance of doubt, this request includes, without limitation:

   a.   all communications between CDK and Reynolds regarding CDK's access to the Reynolds DMS;

   b.   the technological means by which CDK accesses or accessed the Reynolds DMS;

   c.   the technological means by which Reynolds has either blocked or permitted CDK's access to the Reynolds DMS;

   d.   any internal documents and communications regarding CDK's access to the Reynolds DMS;

   e.   any communications with vendors or dealers regarding CDK's access to the Reynolds DMS;

   f.   documents sufficient to show the revenues CDK received from vendors for providing access to data on the Reynolds DMS;

   g.   documents sufficient to show the vendors for whom CDK provided access to data on the Reynolds DMS, including the time period during which CDK provided or has provided that access; and

   h.   all documents and communications relating to CDK's wind down of its access to data on the Reynolds DMS.

PUBLIC VERSION

**REQUEST NO. 17.**   All documents and communications relating to CDK's "SMART-R" program.

**REQUEST NO. 18.**   All documents and communications relating to Reynolds blocking or disabling of the dealer-provided login credentials that Digital Motorworks and/or IntegraLink used to access the Reynolds DMS.

**REQUEST NO. 19.**   All documents and communications concerning CDK's (including through its subsidiaries, Digital Motorworks and IntegraLink) access to data on non-CDK, non-Reynolds DMS platforms.  The date limitation for this request is January 1, 2014, to the present.  For the avoidance of doubt, this request includes, without limitation:

    a.    all communications between CDK and any other DMS provider regarding CDK's access to that provider's DMS;

    b.    the technological means by which CDK accesses or accessed data on any other DMS provider's DMS, including the use of login credentials, APIs, SFTPs, other file transfer protocols, cloud sharing technology (such as Dropbox), direct integration, or otherwise;

    c.    the technological means by which any DMS provider has either blocked or permitted CDK's access to that provider's DMS;

    d.    all agreements between Digital Motorworks or IntegraLink, on the one hand, and a DMS provider, on the other hand, regarding access to data on the provider's DMS;

    e.    any internal documents and communications regarding CDK's access to data on non-CDK DMSs; and

PUBLIC VERSION

  f.  any communications with vendors or dealers regarding CDK's access to data on non-CDK DMSs.

### *CDK's Data Access Policies*

  **REQUEST NO. 20.** All documents, communications, and statements (whether internal or public) regarding CDK's policies (or the policies of any other DMS provider) with respect to third-party access to dealer data on the CDK DMS.  There is no date limitation for this request.  For the avoidance of doubt, this request includes, without limitation:

  a.  all documents and communications relating to your public statements regarding the data access policies of any other DMS provider, including Reynolds; and

  b.  all documents and communications regarding your marketing of your open or closed data access policies as contrasted with the data access policies of other DMS providers.

  **REQUEST NO. 21.** All documents and communications relating to Open Secure Access, Inc., including your participation or membership in the group, the policies and purpose of the group, the stated principles espoused by the group, or any other documents relating to the group and your own data access policies.  The date limitation for this request is January 1, 2006, to the present.

  **REQUEST NO. 22.** All documents, communications, and statements (whether internal or public) regarding the ability of dealers to authorize independent data integrators to access data on the CDK DMS.  There is no date limitation for this request.  For the avoidance of doubt, this request includes, without limitation:

**PUBLIC VERSION**

> a.      all communications with dealers or vendors, representations to dealers or vendors, or statements relating to dealers or vendors (whether internal to CDK or public) regarding the ability of dealers to authorize independent data integrators to access data on the CDK DMS;
>
> b.      all public statements regarding the ability of dealers to authorize independent integrators to access data on the CDK DMS; and
>
> c.      all internal documents and communications regarding the ability of dealers to authorize independent integrators to access data on the CDK DMS.

**REQUEST NO. 23.**    All documents, communications, and statements (whether internal or public) regarding the ability of vendors to use independent integrators to access data on the CDK DMS. There is no date limitation for this request. For the avoidance of doubt, this request includes, without limitation:

> a.      all communications with dealers or vendors, representations to dealers or vendors, or statements relating to dealers or vendors (whether internal to CDK or public) regarding the ability of vendors to use independent integrators to access data on the CDK DMS;
>
> b.      all public statements regarding the ability of vendors to use independent integrators to access data on the CDK DMS; and
>
> c.      all internal documents and communications regarding the ability of vendors to use independent integrators to access data on the CDK DMS.

**REQUEST NO. 24.**    All communications between CDK and any provider of data integration services – such as SIS, Authenticom, or otherwise – including all documents

PUBLIC VERSION

concerning such communications. There is no date limitation for this request. For the avoidance of doubt, this request includes, without limitation:

      a.      any communications regarding the integration provider's access to dealer data on the CDK DMS;

      b.      any internal documents regarding the integration provider's access to dealer data on the CDK DMS; and

      c.      any cease and desist letters or similar complaints regarding the integration provider's access to dealer data on the CDK DMS.

**REQUEST NO. 25.** All documents relating to any agreements between CDK and any provider of data integration services. There is no date limitation for this request. For the avoidance of doubt, this request includes, without limitation:

      a.      any "wind down," settlement, or other agreements entered into between CDK and any data integration provider;

      b.      all communications between CDK and the integration provider regarding the agreements;

      c.      all communications with other parties (whether vendors or dealers) regarding the agreements;

      d.      all drafts of the agreements;

      e.      all documents describing, construing, or interpreting the agreements;

      f.      all internal documents and communications regarding the agreements;

      g.      all communications with counsel for CDK regarding the agreements; and

      h.      any other document relating in any way to the agreements.

**PUBLIC VERSION**

*<u>CDK's 3PA Program</u>*

**REQUEST NO. 26.** Documents and communications sufficient to describe the

characteristics of the 3PA Program before the "SecurityFirst" and/or "3PA Refresh" initiative.

The date limitation for this request is January 1, 2007, to January 1, 2016.

**REQUEST NO. 27.** All documents and communications relating to CDK's

"SecurityFirst" and/or "3PA Refresh" initiative. The date limitation for this request is January 1,

2014, to the present. For the avoidance of doubt, this request includes, without limitation:

      a.      All internal presentations and communications regarding the "Security First"
   and/or "3PA Refresh" initiative;

      b.      All financial analyses conducted relating to the "Security First" and/or "3PA
   Refresh" initiative;

      c.      All documents and communications relating to the reasons CDK introduced
   the "Security First" and/or "3PA Refresh" initiative;

      d.      All communications with dealers and vendors regarding the "Security First"
   and/or "3PA Refresh" initiative;

      e.      Documents to show the differences between the 3PA program before and after
   the "Security First" and/or "3PA Refresh" initiative;

      f.      All documents and communications with respect to the technological
   implementation of the "Security First" and/or "3PA Refresh" initiative; and

      g.      All documents and communications relating to any security enhancements
   instituted as part of the "Security First" and/or "3PA Refresh" initiative.

**REQUEST NO. 28.** Documents and communications regarding the ability of dealers to

extract their data from the DMS manually, including when that capability was instituted; the

17

PUBLIC VERSION

means by which dealers extract the data manually; how often dealers extract their own data for purposes of providing the data to third-party vendors; and the means by which dealers send their manually-extracted data to vendors.  The date limitation for this request is January 1, 2007, to the present.

**REQUEST NO. 29.**  Documents and communications regarding whether vendors that participate in the 3PA program are able to obtain data directly from dealers consistent with the terms of the 3PA contract.  The date limitation for this request is January 1, 2014, to the present.

*Whitelisting*

**REQUEST NO. 30.**  All documents and communications relating to "whitelisting" – or CDK otherwise declining to disable or block – the login credentials created by dealers for certain vendors or data integrators.  The date limitation for this request is January 1, 2015, to the present.  For the avoidance of doubt, this request includes, without limitation:

a.     All communications with data integrators, vendors, and/or dealers regarding the whitelisting of login credentials;

b.     Documents sufficient to show for which data integrators, vendors, or other third parties CDK whitelisted login credentials;

c.     Documents sufficient to show how whitelisting is accomplished, including all technical, system architecture, workflow processes, or other mechanisms used to whitelist login credentials;

d.     All internal documents and communications regarding whitelisting of login credentials, including whether to whitelist, how to whitelist, the benefits and drawbacks of whitelisting, or any other such materials regarding the protection of login credentials used by third parties; and

e.       Documents sufficient to show the number of dealers with a CDK DMS for

which SIS continued to provide any data integration services after July 1,

2016, and the specific services that SIS provided and/or provides to each such

dealer.

***DMS Business***

**REQUEST NO. 31.**   CDK's "win/loss" reports, communications, analysis, or any other

documents sufficient to show the DMS customers (including by dealership group and by rooftop)

that CDK has lost every year since 2000, including the reasons the DMS customer switched

DMS providers and the identity of the DMS provider to whom the dealer switched.

**REQUEST NO. 32.**   CDK's "win/loss" reports, communications, analysis, or any other

documents sufficient to show the DMS customers (including by dealership group and by rooftop)

that CDK has won every year since 2000, including the reasons the DMS customer switched to

CDK and the identity of the DMS provider from whom the dealer switched.

**REQUEST NO. 33.**   Documents sufficient to show or list the DMS customers that CDK

has lost to Reynolds or won from Reynolds for every year since 2000.

**REQUEST NO. 34.**   All communications from CDK to dealers (whether existing or

prospective DMS customers) regarding the differences or similarities between CDK and

Reynolds with respect to data access policies.  The date limitation for this request is January 1,

2006, to the present.  For the avoidance of doubt, this request includes, without limitation, any

documents or communications in which CDK marketed its open access policy as a point of

differentiation with the Reynolds DMS.

**REQUEST NO. 35.**   All documents and communications from January 1, 2015, to the

present regarding any loss or potential loss of DMS customers in connection with the

"SecurityFirst" initiative, "3PA Refresh," and/or CDK's decision to restrict dealers from using independent integrators.

**REQUEST NO. 36.**   Documents sufficient to show the tenure (i.e., how long they have been using a CDK DMS) of CDK's current DMS customers.

***Contracts with Dealers, Vendors, or OEMs***

      ***a.***      ***DMS Contracts***

**REQUEST NO. 37.**   One (1) representative Master Services Agreement signed each year from 1990 to the present between CDK and its dealer customers for DMS services.  Each representative agreement should include all documents that comprise a DMS contract between CDK and its dealer customers, including any user guides, addendums, exhibits, and other documents that form the agreement between CDK and its dealer customers.

**REQUEST NO. 38.**   One (1) representative example of each version of CDK's standard DMS contract with its dealer customers as it has materially changed over time from 1990 to the present.  Each representative version should include all documents that comprise a DMS contract between CDK and its dealer customers, including any user guides, addendums, exhibits, and other documents that form the agreement between CDK and its dealer customers.

**REQUEST NO. 39.**   Twenty (20) representative, current signed Master Services Agreements between CDK and its dealer customers.  Each agreement should include all documents that comprise the DMS contract between CDK and the dealer, including any user guides, addendums, exhibits, and other documents that form the agreement between CDK and its dealer customers.

PUBLIC VERSION

**REQUEST NO. 40.**  All DMS contracts (and/or any addendum, exhibit, or part thereof) that authorize or acknowledge that dealers may provide independent integrators access to data on the CDK DMS.  *See*, *e.g.*, Fitkin Reply Decl. ¶ 14, Dkt. No. 141 (June 22, 2017).

**REQUEST NO. 41.**  All documents and communications with respect to § 6.D of CDK's DMS contract or any other similar provision relating to the fact that a dealer's "employees and agents" may "have access" to the DMS.  There is no date limitation for this request.  For the avoidance of doubt, this request includes, without limitation:

    a.      all communications with other parties (whether vendors or dealers) regarding the provision or the ability for dealers to grant access to

    b.      all documents describing, construing, or interpreting the agreements;

    c.      all internal documents and communications regarding the agreements;

    d.      all communications with counsel for CDK regarding the agreements; and

    e.      any other document relating in any way to the agreements.

**REQUEST NO. 42.**  All documents and communications relating to CDK no longer allowing dealers to authorize independent integrators to access data on the CDK DMS.  The date limitation for this request is January 1, 2015, to the present.  For the avoidance of doubt, this request includes, without limitation:

    a.      All communications with dealers relating to whether they can (or cannot) authorize independent integrators to access data on the CDK DMS, including any communications that cite provisions in a particular DMS contract to that effect;

21

PUBLIC VERSION

b.      All documents and communications relating to the enforcement or threat of enforcement of CDK's DMS contract against dealers with respect to third-party access to data on the CDK DMS; and

c.       Any internal documents relating to the dealer rights under their DMS contract to authorize third parties to access data on the CDK DMS.

### b.      3PA Contracts and Other Data Integration Contracts

**REQUEST NO. 43.**  All current 3PA contracts between CDK and vendors.

**REQUEST NO. 44.**   All contracts for data integration services between CDK and vendors that existed prior June 15, 2015.  The date limitation for this request is January 1, 2012, to the present.

**REQUEST NO. 45.**   All documents and communications (internal or external) with respect to any changes to material terms in the 3PA contract, including with respect to the use of other data integrators; price secrecy provisions; and the duration of any terms, including those that survive the termination of the 3PA contract.  The date limitation for this request is January 1, 2014, to the present.

**REQUEST NO. 46.**   All current contracts between IntegraLink and vendors, dealers, or OEMs.

**REQUEST NO. 47.**   All contracts between IntegraLink and vendors, dealers, or OEMs that existed prior to June 15, 2015.  The date limitation for this request is January 1, 2012 to the present.

**REQUEST NO. 48.**   All current contracts between Digital Motorworks and vendors, dealers, or OEMs.

PUBLIC VERSION

**REQUEST NO. 49.**   All contracts between Digital Motorworks and vendors, dealers, or OEMs that existed prior to June 15, 2015.  The date limitation for this request is January 1, 2012 to the present.

**REQUEST NO. 50.**   All documents and communications relating to CDK's enforcement, threat of enforcement, or CDK's interpretation of contractual provisions in vendors' current 3PA contracts.  The date limitation for this request is January 1, 2015, to the present.  For the avoidance of doubt, this request includes, without limitation:

a.   All communications with vendors relating to whether they can (or cannot) use independent integrators to access data on the CDK DMS, including any communications that cite provisions in a particular 3PA contract to that effect;

b.   All documents and communications relating to the enforcement or threat of enforcement of CDK's 3PA contract against vendors with respect to accessing data on the CDK DMS by means other than through the 3PA program;

c.   All documents and communications relating to the enforcement or threat of enforcement of the price secrecy provisions in the 3PA contract;

d.   All documents and communications relating to what vendors can tell dealers (whether on invoices, in general communications, or otherwise) with respect to what vendors pay CDK under the 3PA program for data integration;

e.   All documents and communications with vendors and/or dealers with respect to any other contractual provision in the vendor's current 3PA contract; and

f.   all documents describing, construing, or interpreting the 3PA agreements.

**PUBLIC VERSION**

***Pricing and Financial Documents***

  ***a.  DMS***

  <u>**REQUEST NO. 51.**</u> Documents sufficient to show the monthly price for DMS services paid by CDK's dealer customers, from 2000 to the present.

  <u>**REQUEST NO. 52.**</u> Documents sufficient to show CDK's revenue for DMS services, on a quarterly basis, from 2000 to the present.

  <u>**REQUEST NO. 53.**</u> Documents sufficient to show CDK's profit (including profit margins) for DMS services, on a yearly basis, from 2000 to the present.

  <u>**REQUEST NO. 54.**</u> Documents and communications sufficient to show the price increases for DMS services paid by CDK's dealer customers, from 2000 to the present, including whether those price increases were mandated by contract.

  <u>**REQUEST NO. 55.**</u> Documents and communications sufficient to show CDK's projections with respect to revenue and profit for its DMS services.  The date limitation for this request is January 1, 2015, to the present.

  <u>**REQUEST NO. 56.**</u> Documents and communications relating to CDK's announced acquisition of Auto/Mate.  The date limitation for this request is January 1, 2017, to the present. For the avoidance of doubt, this request includes, without limitation:

    a.  documents sufficient to show the affect of CDK's acquisition of Auto/Mate on CDK's DMS business, including with respect to revenue, profit margins, and market share;

    b.  internal documents and communications relating to the rationale for the acquisition;

PUBLIC VERSION

    c.    documents produced to any governmental regulatory authority with respect to the acquisition;

    d.    communications (whether by CDK or Auto/Mate) with vendors and/or dealers with respect to the acquisition;

    e.    documents and communications relating to Auto/Mate's data access policies and dealer use of independent integrators; and

    f.    documents and communications relating to Auto/Mate dealers' ability to authorize independent integrators to access data on the DMS after the close of the acquisition.

### *b.*      *Data Integration*

**REQUEST NO. 57.**   Documents sufficient to show the cost of providing data integration services separate and apart from providing DMS services.

**REQUEST NO. 58.**   Documents sufficient to show CDK's revenue for data integration services, on a quarterly basis, from 2000 to the present, with the revenues of 3PA, DMI, and IntegraLink broken out separately.

**REQUEST NO. 59.**   Documents sufficient to show CDK's profit (including profit margins) for data integration services, on a yearly basis, from 2000 to the present, with the revenues of 3PA, DMI, and IntegraLink broken out separately.

**REQUEST NO. 60.**   Documents and communications sufficient to show CDK's projections with respect to revenue and profit for its data integration services, with projections for 3PA, DMI and IntegraLink broken out separately.  The date limitation for this request is January 1, 2014, to the present.

PUBLIC VERSION

**REQUEST NO. 61.**  Documents sufficient to show (1) which vendor applications are or were participants in the 3PA program; (2) when they became participants in the program; (3) what they paid for integration services when they joined the program; (4) what they paid in January 1, 2015; (5) what they paid after the "3PA refresh"; (6) what they pay now; and (7) if they are no longer participants in the 3PA program, when they stopped and what they paid when they left.

**REQUEST NO. 62.**  Documents sufficient to show (1) which vendor applications obtain or obtained data integration services from Integralink and/or Digital Motorworks *for data on the CDK DMS*; (2) when those applications started to obtain such data integration services, and when they ended, as applicable; (3) what they paid for integration services when they started to obtain such integration services; (4) what they paid in January 1, 2015; (5) what they paid after the "3PA refresh"; and (6) what they pay now, if they still obtain such data integration services from Integralink and/or Digital Motorworks for data on the CDK DMS.

**REQUEST NO. 63.**  Documents sufficient to show (1) which vendor applications obtain or obtained data integration services from Integralink and/or Digital Motorworks *for data on non-CDK DMSs*; (2) when those applications started to obtain such data integration services, and when they ended, as applicable; (3) what they paid for integration services when they started to obtain such integration services; (4) what they paid in January 1, 2015; (5) what they paid after the "3PA refresh"; and (6) what they pay now, if they still obtain such data integration services from Integralink and/or Digital Motorworks for data on non-CDK DMSs.

**REQUEST NO. 64.**  All documents and communications with respect to any vendor application that once obtained data integration services from CDK for data on the CDK DMS,

but no longer, including documents sufficient to show the reasons why those vendor applications no longer obtain data integration from CDK.

**REQUEST NO. 65.**   Documents sufficient to show the change in CDK's pricing for 3PA participants from January 1, 2007, to the present.

**REQUEST NO. 66.**   Documents and communications relating to the change in any pricing for 3PA participants after January 1, 2015.

**REQUEST NO. 67.**   All internal documents and presentations with respect to changes in pricing for participants in the 3PA program.  The date limitation for this request is January 1, 2014, to the present.

**REQUEST NO. 68.**   All documents and communications relating to the prices charged by Integralink and Digital Motorworks for access to data on the CDK DMS as opposed to prices charged by CDK to participants in the 3PA program for access to data on the CDK DMS.

**REQUEST NO. 69.**   Documents sufficient to show any up-front initiation or certification fees, per-dealership setup fees, or other one-time charges that CDK has charged to participants in the 3PA program from January 1, 2007, to the present.

**REQUEST NO. 70.**   Documents sufficient to show any per-transaction fees charged to participants in the 3PA program, including when those per-transaction fees were instituted; why they were instituted; their amounts; and by how much they increase a vendor's monthly integration fees.  The date limitation for this request is January 1, 2014, to the present.

**REQUEST NO. 71.**   All documents and communications relating to the practice of vendors passing through 3PA integration fees to dealers.  This request includes not only internal documents and correspondence but also, without limitation, any correspondence between CDK

PUBLIC VERSION

and dealers or vendors regarding pass-through integration fees. The date limitation for this request is January 1, 2014, to the present.

**REQUEST NO. 72.** All documents and communications relating to the pricing charged by other data integrators for data integration services, including but not limited to Reynolds (through its RCI program), Authenticom, SelectQu, and SIS, from January 1, 2007 to the present.

**REQUEST NO. 73.** Documents and communications relating to prices charged to OEMs for access to data on the CDK DMS.

### *DMS Architecture, Data Security and System Performance*

**REQUEST NO. 74.** Documents, communications, codes, scripts, and algorithms sufficient to show the system architecture of your DMS, technological aspects for retrieving data from the DMS database, blocking automated access to data on your DMS, or any other relevant technological matter to the claims and defenses in this case. The date limitation for this request is January 1, 2016, to the present. For the avoidance of doubt, this request includes, without limitation:

a. Codes, scripts, and/or algorithms sufficient to show how you block automated access to data on the DMS;

b. Codes, scripts, and/or algorithms sufficient to show how data is retrieved from the DMS database;

c. Codes, scripts, and/or algorithms sufficient to show how data is entered, stored, and organized on the DMS database;

d. Documents sufficient to show the technological aspects for how data extraction occurs from the DMS database when using the RCI and/or 3PA programs;

PUBLIC VERSION

e. Documents sufficient to show the technological aspects for how data extraction occurs from the DMS database when using independent integrators such as DMI, IntegraLink, or otherwise; and

f. All documents and communications reviewed by any testifying and/or consulting experts on data security and system performance engaged by you for this case, whether for the Authenticom preliminary injunction hearing or otherwise.

**REQUEST NO. 75.** All documents and communications regarding CDK's use of Authenticom for data integration services. The date limitation for this request is January 1, 2007, to the present. For the avoidance of doubt, this request includes any instance in which a CDK-owned (wholly, jointly, or partially) add-on application used Authenticom for data integration services with respect to any DMS platform.

**REQUEST NO. 76.** All documents and communications regarding data security and/or DMS system performance with respect to Authenticom's access to the Reynolds or CDK DMSs. There is no date limitation for this request.

**REQUEST NO. 77.** All documents, communications, or analyses regarding any specific security incident directly caused by Authenticom's (or any other independent integrator's) automated access to data on the CDK or Reynolds DMSs. There is no date limitation for this request.

**REQUEST NO. 78.** All documents, communications, or analyses with respect to the effects on DMS system performance of Authenticom's (or any other independent integrator's) automated access to data on the CDK or Reynolds DMSs, including any specific system

PUBLIC VERSION

performance issue directly caused by Authenticom or any other independent integrator. There is no date limitation for this request.

**REQUEST NO. 79.** All documents and communications relating to the technological methods used by CDK to block or disable dealer-provided login credentials. The date limitation for this request is January 1, 2014, to the present.

**REQUEST NO. 80.** Documents sufficient to show how dealer data is stored on the CDK DMS. The date limitation for this request is January 1, 2014, to the present. For the avoidance of doubt, this request includes, without limitation:

      a. Documents sufficient to show whether a dealer's data is stored separate from the data of other dealers;

      b. Documents sufficient to show whether a dealer's data is commingled with data that does not belong to the dealer; and

      c. Documents sufficient to show where dealer data is stored (whether on servers at the dealership; at CDK-managed server farms; at third-party managed server farms; or somewhere else).

**REQUEST NO. 81.** Documents and communications sufficient to show the specific security measures CDK has instituted to protect the security of dealer data. The date limitation of this request is January 1, 2014, to the present.

**REQUEST NO. 82.** Documents sufficient to show the security infrastructure of the CDK DMS and how it has changed over time. The date limitation for this request is January 1, 2014, to the present.

**REQUEST NO. 83.**   All documents and communications referencing, relating to, or concerning the August 28, 2013 memo of the National Automobile Dealers Association, which was introduced as Defendants' Exhibit 15 at the Preliminary Injunction Hearing.

**REQUEST NO. 84.**   All documents and communications referencing, relating to, or concerning the Gramm-Leach-Bliley Act in connection with data integration services.  This request includes, without limitation, all documents and communications referencing, relating to, or concerning the Gramm-Leach-Bliley Act in connection with CDK's Digital Motorworks and IntegraLink data integration products.

**REQUEST NO. 85.**   All documents and communications referencing, relating to, or concerning the "GSO Threat and Security Assessment" report prepared by PwC, dated May 6, 2015 and introduced as Defendants' Exhibit 25 at the Preliminary Injunction Hearing.

**REQUEST NO. 86.**   All documents and communications relating to Elliott Management's investment in CDK, as well as any requests that Elliott Management has made on CDK (e.g., through letters to the CDK Board of Directors).  The date limitation for this request is January 1, 2014, to the present.

**REQUEST NO. 87.**   All documents and communications relating to Elliott Management in connection with CDK's "SecurityFirst" and/or "3PA Refresh" initiatives.  The date limitation for this request is January 1, 2014, to the present.

**REQUEST NO. 88.**   Documents concerning any instance in which CDK has made dealer data available to an OEM from a dealership that sells a different brand of automobile.  For the avoidance of doubt, this request would include any instance where CDK made available to an OEM (e.g., Honda) the DMS data from a dealership family that included a Honda dealer as well as other non-Honda dealerships.

PUBLIC VERSION

## *Miscellaneous*

**REQUEST NO. 89.**  All documents and communications relating to any competitive threat or challenge posed by independent data integrators to CDK's business, including without limitation, to CDK's core DMS business and CDK's add-on applications.  The date limitation for this request is January 1, 2014, to the present.

**REQUEST NO. 90.**  All documents and communications relating to any competitive threat or challenged posed by application providers to CDK's DMS business, including without limitation, any threat of disintermediation.

**REQUEST NO. 91.**  All documents and communications regarding CDK's effort to "tilt the table" for or advantage its own add-on applications as compared to applications offered by third-party vendors.  The date limitation for this request is January 1, 2014, to the present.  For the avoidance of doubt, this request includes, without limitation:

    a.    All documents and communications regarding any "closed categories" of application types that CDK would not permit into the 3PA program;

    b.    All documents and communications regarding any functionality with respect to access to dealer data requested by vendors through the 3PA program that CDK refused, such as the ability to write repair orders back into the DMS; and

    c.    All documents and communications regarding any effort to disrupt the workflow of applications offered by competing vendors.

**REQUEST NO. 92.**  Documents sufficient to show CDK's organizational structure, including leadership positions over CDK's DMS and data integration businesses, from January 1, 2007, to the present.

Dated:  October 2, 2017             Respectfully submitted,

*s/ Jennifer L. Gregor*
_____

Jennifer L. Gregor
Allison W. Reimann
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI 53703
Phone: 608-257-3911
Fax:     608-257-0609
Email: jgregor@gklaw.com
areimann@gklaw.com

Michael N. Nemelka *(pro hac vice)*
Aaron M. Panner *(pro hac vice)*
David L. Schwarz (*pro hac vice*)
Kevin J. Miller (*pro hac vice*)
Derek T. Ho *(pro hac vice)*
Joshua Hafenbrack *(pro hac vice)*
Joanna T. Zhang *(pro hac vice)*
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax:     (202) 326-7999
Email:  mnemelka@kellogghansen.com
apanner@kellogghansen.com
dschwarz@kellogghansen.com
kmiller@kellogghansen.com
dho@kellogghansen.com
jhafenbrack@kellogghansen.com
jzhang@kellogghansen.com

*Attorneys for Plaintiff Authenticom, Inc.*

PUBLIC VERSION

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 2, 2017, I caused a true and correct copy of the foregoing Authenticom, Inc.'s First Set of Requests for the Production of Documents for Defendant CDK Global, LLC to be served by email upon the following individuals:

Mark W. Ryan (mryan@mayerbrown.com)
Britt M. Miller (bmiller@mayerbrown.com)
Jeffrey A. Simmons (jsimmons@foley.com)
Aundrea K. Gulley (agulley@gibbsbruns.com)
Michael P. A. Cohen (mcohen@sheppardmullin.com)
John S. Skilton (jskilton@perkinscoie.com)

*s/ Michael N. Nemelka*
Michael N. Nemelka