PUBLIC VERSION

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This document relates to:* | Hon. Robert M. Dow, Jr. |
| ALL PENDING CASES | Magistrate Judge Jeffrey T. Gilbert |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO BAR PLAINTIFFS' NEW "INITIAL CONSPIRACY" THEORY**

**PUBLIC VERSION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 4

    I.     The Alleged February 2015 Conspiracy .................................................. 4

    II.    The New Conspiracy Disclosed In Plaintiffs' Expert Reports ............................ 6

ARGUMENT ..................................................................................................................... 11

    I.     Plaintiffs Have Not Pled An "Initial Conspiracy." ............................................. 12

    II.    Allowing Plaintiffs To Proceed On A New Unpled Theory Would
           Significantly Prejudice Defendants ..................................................................... 16

    III.   The Court Should Preclude Plaintiffs From Pursuing A Theory They Did
           Not Plead In Their Complaints ............................................................................. 18

CONCLUSION .................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple, Inc. v. Samsung Electronics Co., Ltd.*,
2012 WL 3155574 (N.D. Cal. Aug. 2, 2012) ..................................................................19, 20

*Authenticom, Inc. v. CDK Global, LLC*,
2017 WL 3017048 (W.D. Wis. July 14, 2017)........................................................................12

*Blumenthal v. New York Life Ins. & Annuity Corp.*,
2010 WL 11508851 (W.D. Okla. Sept. 27, 2010) ............................................................18, 19

*Chaveriat v. Williams Pipe Line Co.*,
11 F.3d 1420 (7th Cir. 1993) ...................................................................................................4

*Chessie Logistics Co. v. Krinos Holdings, Inc.*,
867 F.3d 852 (7th Cir. 2017) ...................................................................................................4

*In re Dealer Management Sys. Antitrust Litig.*,
2018 WL 6047082 (N.D. Ill. Nov. 19, 2018) ....................................................................13, 16

360 F. Supp. 3d 788 (N.D. Ill. 2019) .......................................................................................13

362 F. Supp. 3d 477 (N.D. Ill. 2019) .......................................................................................13

362 F. Supp. 3d 510 (N.D. Ill. 2019) ......................................................................................13

*Deasy v. Hill*,
833 F.2d 38 (4th Cir. 1987) .....................................................................................................11

*Hooper v. Proctor Health Care Inc.*,
804 F.3d 846 (7th Cir. 2015) ...................................................................................................11

*Johnson v. Methodist Med. Ctr. of Illinois*,
10 F.3d 1300 (7th Cir. 1993) ....................................................................................................4

*Lodsys Grp., LLC v. Brother Int'l Corp.*,
2013 WL 5353004 (E.D. Tex. Sept. 24, 2013)........................................................................11

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*,
922 F.3d 713 (6th Cir. 2019) ...................................................................................................15

*In re Merck Mumps Vaccine Antitrust Litig.*,
2018 WL 1693348 (E.D. Pa. Apr. 6, 2018) ............................................................................15

## TABLE OF AUTHORITIES (continued)

**Page(s)**

**Cases**

*In re Milk Products Antitrust Litig.*,
195 F.3d 430 (8th Cir. 1999) ................................................................................15

*Motor Vehicle Software Corp. v. CDK Global, Inc.*,
2017 WL 5643163 (C.D. Cal. Oct. 2, 2017)..........................................................13

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Westport Ins. Corp.*,
2012 WL 698540 (N.D. Ill. Feb. 29, 2012) ...........................................................20

*Oracle USA, Inc. v. SAP AG*,
264 F.R.D. 541 (N.D. Cal. 2009).........................................................................19

*Paramount Media Grp., Inc. v. Village of Belwood*,
2015 WL 3419831 (N.D. Ill. May 28, 2015)..............................................4, 19, 20

*Park v. City of Chicago*,
297 F.3d 606 (7th Cir. 2002) ................................................................................15

*Rosenfeld v. Lion Mfg. Corp.*,
253 F.2d 90 (7th Cir. 1958) ..................................................................................11

PUBLIC VERSION

## INTRODUCTION

Two and one-half years after the cases in this multidistrict litigation were filed, Plaintiffs are attempting to use their expert reports to fundamentally amend their Complaints. The expert reports set out for the first time a new "Initial Conspiracy" starting in 2013, separate from the alleged 2015 conspiracy that Plaintiffs have maintained since the outset of the litigation. This new conspiracy theory is unsupported by evidence and purports to add perhaps hundreds of millions of dollars in new antitrust damages. But amending a complaint well after substantial motions practice, two years of litigation, and the close of fact discovery requires court permission, not expert fiat. Expert-driven amendment is inappropriate and enormously prejudicial to Defendants.

For years, MDL Plaintiffs sounded a constant and unmistakable theme: (1) that Defendants CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") historically competed with one another based on the extent to which each allowed third-party access to their respective dealer management systems ("DMSs"); and (2) that each Defendant "abruptly" stopped competing in February 2015, when CDK "began blocking dealers from granting third-party access to dealer data and, at the same time, agreed to shut down its data integration business for dealers using a Reynolds DMS." Dkt. 191 ("AutoLoop Am. Compl.") ¶ 16. Counsel for Plaintiff Authenticom, Inc. ("Authenticom") explained in his opening statement at the July 2017 preliminary injunction hearing that the "conspiracy" in this case allegedly began in February 2015:

> The evidence shows that CDK and Reynolds entered into a horizontal conspiracy to, one, divide the market, and, two, exclude all other competitors. * * * The agreement to divide and no longer compete in the data integration market is memorialized in a written agreement effective February 2015. That is Defendants' Exhibit 1.

Authenticom P.I. Tr. 1-A-9:2-9. As detailed in the Appendix, Plaintiffs Loop LLC d/b/a AutoLoop ("AutoLoop"), the Dealership Class Plaintiffs ("Dealers"), and Motor Vehicle Software Corp.

("MVSC") based their Complaints on the same alleged 2015 agreement. So did former Plaintiff Cox Automotive, Inc. ("Cox").

This supposed conspiracy to "divide the data integration market" beginning in 2015 is the centerpiece of Plaintiffs' claims, and Defendants diligently pursued discovery rebutting it. No Plaintiff has expanded on or departed from this alleged conspiracy—until now.

In August 2019, four months after the close of fact discovery on April 30, 2019, Plaintiffs submitted their opening expert reports, which dramatically altered the bases for liability and damages as pleaded in their Complaints. ████████████████████████ ████████████████████████████████████ ████████████████████████████████ These reports (with appendices/exhibits omitted) are attached to this brief as Exhibits A, B, and C, respectively. Each of these reports sets forth an additional, wholly new conspiracy theory—what ████ terms the "Initial Conspiracy"—that has not previously appeared in any of Plaintiffs' pleadings, during discovery, or during any of numerous meet-and-confers or hearings in court.

Defendants do not concede the accuracy of the many assertions and calculations in the ████████████████ reports. Nevertheless, even taking those reports at face value solely for the purposes of this Motion, it is clear that the newly alleged "Initial Conspiracy" is fundamentally different from the February 2015 conspiracy alleged in the Complaints and litigated for more than two years. For example:

- The newly alleged "Initial Conspiracy" is based on a purported agreement by Reynolds to allow CDK's data services business unit, Digital Motorworks, Inc. ("DMI"), to *continue* to access Reynolds's DMS in late 2013. By contrast, the original conspiracy involves a purported agreement between CDK and Reynolds to *block* third-party access to each Defendant's DMS, including DMI's access to the Reynolds DMS, that began no earlier than February 2015. *E.g.*, *Authenticom, Inc. v. CDK Global, LLC*, No. 18-cv-868 (N.D. Ill.), Dkt. 1 ("Authenticom Compl.") ¶ 189; AutoLoop Am. Compl. ¶ 95; Dkt. 184 ("Dealers Consol. Compl.") ¶ 8.

- During the newly alleged "Initial Conspiracy," ████████████
████████████████████████████, and there is no allegation that
CDK took steps to block access by Authenticom or other hostile third parties. By
contrast, during the original conspiracy, both Reynolds and CDK allegedly blocked
Authenticom and Authenticom allegedly *lost* large numbers of DMS connections. *E.g.*,
Authenticom Compl. ¶ 233.

- ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████ During the original conspiracy, CDK and Reynolds
supposedly worked together to raise prices for integration on both DMSs (although
Plaintiffs' experts now appear to concede that Reynolds DMS integration pricing did
not meaningfully increase after February 2015). *E.g.*, Authenticom Compl. ¶ 217;
AutoLoop Am. Compl. ¶ 138.

Rather than concede that the evidence makes clear that Reynolds and CDK engaged in unilateral

conduct separated in time, however, Plaintiffs now allege a separate "Initial Conspiracy" launched

in September 2013, long before the February 2015 conspiracy pled in the Complaints.

Defendants first learned of the new "Initial Conspiracy" theory by reviewing Plaintiffs'

August 2019 expert reports. No Plaintiff disclosed the "Initial Conspiracy" in response to any

discovery request or said when their various experts began studying the possibility of this new

theory. Rather, Plaintiffs repeatedly emphasized the 2015 alleged start date in their court filings,

stating that "[c]ompetition thrived" prior to early 2015 when CDK and Reynolds allegedly

"entered into an illegal conspiracy to eliminate competition from the data integration market." Pls.

Opp. to CDK's Mot. to Compel, Dkt. 355 at 4-5; *see also* Pls. Omnibus Mot. to Compel, Dkt. 318

at 37. Plaintiffs cannot seriously dispute that the "Initial Conspiracy" set out by their experts

requires a different defense than the longstanding February 2015 theory advanced in these cases,

or that Defendants' opportunities to pursue that defense through fact discovery are now lost.

Introducing a theory for the first time through expert reports is unquestionably prejudicial

to Defendants and is not permitted by the Federal Rules of Civil Procedure or any order of this

Court. As the Seventh Circuit has stated, "if the plaintiff in the course of pretrial discovery comes

up with a new claim, he will have to get his complaint amended if the pleadings and the proof are to be conforming," particularly where (as here) a plaintiff pleads "highly specific" claims. *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1430 (7th Cir. 1993).[1] Yet no Plaintiff has moved to amend its Complaint to conform to the newly disclosed "Initial Conspiracy." In addition, Rule 26(a) prohibits a "last minute disclosure of a new damage theory" unless the failure to disclose "was either substantially justified or harmless." *Paramount Media Grp., Inc. v. Village of Belwood*, 2015 WL 3419831, at *3 (N.D. Ill. May 28, 2015). Plaintiffs' expert-driven "Initial Conspiracy" theory violates these standards and should be barred.[2]

## BACKGROUND

### I.    The Alleged February 2015 Conspiracy.

The conspiracy alleged in Plaintiffs' Complaints has three core components: (1) a 2015 agreement between CDK and Reynolds, supposedly followed by (2) less competition for data integration services, and (3) higher prices for certified data integration. The Complaints contain so many references to 2015 as the fulcrum point of Plaintiffs' claims that to reproduce each one in the body of this brief would be impractical. A short summary of those references follows. A fuller listing is set out in the Appendix to this Motion.

***Authenticom***. Authenticom's Complaint alleges that CDK and Reynolds "entered into an illegal agreement" to restrict access to dealer data in "February 2015." Authenticom Compl. ¶ 17. The Complaint contains many more references to 2015 as the beginning of the alleged conspiracy.

---

[1] *See also Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859-60 (7th Cir. 2017) (a court may deny *de facto* amendment that "changes the complaint's factual theory" or offers new legal theories that would "cause unreasonable delay" or "make it more costly or difficult" to defend); *Johnson v. Methodist Med. Ctr. of Illinois*, 10 F.3d 1300, 1304 (7th Cir. 1993) (similar).

[2] Defendants respectively bring this Motion only as to those Plaintiffs actively asserting claims against them.

It does not hint at a different conspiracy launched seventeen months before. To the contrary, in describing a trade industry article on third-party data access from October 2013, the Complaint alleges that the article was written "*before* CDK and Reynolds entered into their agreement." *Id*. ¶ 129 (emphasis added). The Complaint also alleges that CDK developed its own solution to "circumvent" Reynolds's blocking efforts between 2011 and 2015. *Id*. ¶¶ 93-94. The new suggestion by Plaintiffs' experts that DMI was able to overcome Reynolds's blocking efforts before 2015 because Reynolds agreed to allow DMI access as part of a new Initial Conspiracy is directly at odds with the pleadings.

**AutoLoop**. AutoLoop alleges in its Amended Complaint that "competition between CDK and Reynolds halted abruptly in early 2015 when CDK began blocking dealers from granting third-party access to dealer data and, at the same time, agreed to shut down its data integration business for dealers using a Reynolds DMS." AutoLoop Am. Compl. ¶ 16. The Complaint contains a host of other allegations that the conspiracy began in 2015, including that "in early 2015"—"[a] few months" after discussions between CDK and Reynolds in June and October 2014—CDK and Reynolds supposedly "entered into agreements designed to eliminate competition in the provision of dealer data integration services." *Id*. ¶¶ 94-95. The Complaint also alleges that CDK developed the SMART-R solution to access Reynolds's DMS before 2015. *Id*. ¶ 76. There is no mention of an agreement between CDK and Reynolds with respect to DMI prior to February 2015.

**Dealers**. The Dealers allege that "[p]rior to January 2015, CDK and Reynolds were competitors," but that "[i]n February 2015 . . . competition between Defendants ceased." Dealer Consol. Compl. ¶¶ 7-8. The Consolidated Complaint expressly defines the alleged conspiracy as "Defendants' *Per Se* Illegal Horizontal Agreement (February 2015)." *Id*. at iii. The Dealers also

**PUBLIC VERSION**

purport to bring claims on behalf of all dealers who purchased a DMS or data integration services from CDK or Reynolds from January 1, 2015 to the present. *Id.* ¶ 17.

*MVSC*. MVSC's Second Amended Complaint is based on an alleged conspiracy to exclude MVSC from Defendants' third-party access programs, RCI (Reynolds) and 3PA (CDK). That conspiracy is clearly alleged to have begun in mid-2014. *Motor Vehicle Software Corp. v. CDK Global, LLC*, No. 18-cv-865 (N.D. Ill.), Dkt. 76 ("MVSC SAC") ¶ 11, 100. However, MVSC also makes allegations that track the separate conspiracy described in the Authenticom, AutoLoop, and Dealer Complaints, and fixes the start date of this conspiracy in February 2015. *Id.* ¶¶ 13, 134.

## II. The New Conspiracy Disclosed In Plaintiffs' Expert Reports

On August 26, 2019, the parties exchanged their initial expert reports. Experts for AutoLoop, MVSC, and Authenticom (███████████) and for the Dealers (███████) purport to analyze a new Initial Conspiracy that does not resemble the one in Plaintiffs' pleadings.[3]

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

The "Initial Conspiracy" that ███████ describes in his report fundamentally changes the liability and damages theories that Plaintiffs articulated prior to August 2019 and is sharply at odds with—and highlights the fatal weaknesses of—the conspiracy pled in the Complaints. By way of example, ████████████████████████████████████████████

---

[3] ████████████████████████████████████████████
████████████████████████████████

These purported facts are flatly inconsistent with the conspiracy in the Complaints. *E.g.*, AutoLoop Am. Compl. ¶ 110.

**PUBLIC VERSION**



According to Plaintiffs' pleadings, however, prices for certified integration on the CDK and Reynolds DMS have "drastically increased . . . since 2015." AutoLoop Am. Compl. ¶ 132; *see also* Authenticom Compl. ¶ 217; Dealers Consol. Compl. ¶ 127. ████████████████████████████████

████████████████████████████████████████████

Similarly problematic is the fact that during discovery Plaintiffs presented the Court with an alleged conspiracy to "eliminate competition from the data integration market" and thus to allow CDK and Reynolds to "drastically increase the prices they charged for data integration

**PUBLIC VERSION**

services." Pls. Opp. to CDK's Mot. to Compel, Dkt. 355 at 5. But in the "Initial Conspiracy" ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

    The discrepancy in terms of claimed damages is acute, ██████████████████████████

████████████████████████████████████████████████████████████████████

████████████████ That too is squarely at odds with the conspiracy alleged in the Complaints, in

which CDK purportedly conspired with Reynolds to "impose massive price increases" for certified

data integration on its DMS. Dealers Consol. Compl. ¶ 126; *see also* AutoLoop Am. Compl. ¶

143; Authenticom Compl. ¶ 217.

    In short, ██████████████ shows the opposite of the conspiracy Plaintiffs articulated

throughout the litigation.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████

    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████[4]

---

[4] Although the Dealers' Consolidated Complaint (at ¶ 17) defines a putative class period that begins January 2015, ████████████████████████████████████████████████████████████████████

PUBLIC VERSION

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

████████████████████████████████████████████████████████ This is
despite the fact that the Dealers' settlement with Reynolds affirmatively bars the Dealers from seeking to
certify a class that includes dealers from the pre-2015 "Initial Conspiracy" period. *See* Dkt. 427-2 at ¶ 1(b)
( "Dealership Class" defined to include "the period from January 1, 2015 through October 23, 2018"); *id.*
at ¶ 29 ("Dealership Class Plaintiffs . . . will not seek certification of any class . . . that includes persons
beyond those included in the Dealership Class" except for persons purchasing DMS after October 23, 2018
or based on class members' geographic locations).

**PUBLIC VERSION**

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████

## ARGUMENT

Plaintiffs should not be allowed to fundamentally and substantially alter their liability and damages theories through their expert reports. *See Deasy v. Hill*, 833 F.2d 38, 41 (4th Cir. 1987) (rejecting the argument that defendant "was not surprised by the new claim because she had been made aware of it through the expert witness statements"); *Lodsys Grp., LLC v. Brother Int'l Corp.*, 2013 WL 5353004, at *2 (E.D. Tex. Sept. 24, 2013) (the scope of a claim is based on the pleadings, not on "summary judgment motions" or "expert reports"). That is because the burden "rests primarily upon the plaintiff to amend his complaint, not upon the defendant to anticipate a new claim." *Deasy*, 833 F.2d at 41 (4th Cir. 1987); *see also Rosenfeld v. Lion Mfg. Corp.*, 253 F.2d 90, 93 (7th Cir. 1958) ("the burden was upon plaintiff to amend his complaint so as to set forth what he considered the agreement upon which he sues"). It is black-letter law that a complaint must plead sufficient facts to put the defendant "on notice" of the plaintiff's claim and the grounds on which it rests. *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 851 (7th Cir. 2015).

The Court accordingly should preclude Plaintiffs from offering evidence or opinions regarding an unpled "Initial Conspiracy" and from seeking damages purportedly resulting from a conspiracy that is not alleged in any of the hundreds of pages in Plaintiffs' Complaints.[5]

---

[5] To be clear, Defendants do not contend that Plaintiffs and their experts are barred from referring to any documents or events that pre-date February 2015. Plaintiffs are free to use such evidence to attempt to show the course of events leading to the alleged anticompetitive agreement set out in Plaintiffs' Complaints. What Plaintiffs may not do is wait until after the close of fact discovery and the exchange of opening expert reports to announce, without seeking leave to amend, that they intend to pursue an additional, brand-new theory of liability and new and greater damages than what is reasonably included within their Complaints.

PUBLIC VERSION

## I.      Plaintiffs Have Not Pled An "Initial Conspiracy."

As noted above, all of the Complaints in this litigation allege that CDK and Reynolds reached an illegal agreement in February 2015. In fact, in their August 2018 Opposition to CDK's Motion to Compel, Plaintiffs stated that every case in the MDL cases rests on a common premise:

1. Prior to February 2015, "[c]ompetition thrived in the data integration market, and prices were low";

2. The situation "changed" in "early 2015," when CDK and Reynolds allegedly "entered into an illegal conspiracy to eliminate competition from the data integration market" by "restricting and blocking independent data integrators' access to dealer data"; and,

3. "By eliminating competition from the data integration market," CDK and Reynolds supposedly "could (and did) drastically increase the prices they charged for data integration services."

Dkt. 355 at 4-5. Plaintiffs likewise stated in their August 6, 2018 omnibus motion to compel that they were pursuing claims regarding "CDK's *2015 conspiracy* with Reynolds." Dkt. 318 at 37 (emphasis added).[6]

Consistent with these representations, every one of the courts that has ruled on motions filed in or connected to this MDL has understood Plaintiffs to be alleging a 2015 agreement between CDK and Reynolds to "close" their systems and raise integration prices—not a 2013 agreement to "exempt" DMI from Reynolds's blocking of third-party access. Thus:

- Judge Peterson, who presided over the *Authenticom* case before it was transferred to this Court, characterized the alleged unlawful agreements as "roughly coincid[ing] with CDK and Reynolds signing written agreements in February 2015"[7];

---

[6] Plaintiffs stated in this filing that MVSC is "somewhat differently situated than the other plaintiffs" because it "alleges a distinct conspiracy involving a market that is not at issue in any other case." Dkt. 318 at 1. Yet even though MVSC's Complaint is based on a distinct conspiracy, as described above, MVSC's Complaint still references the conspiracy theory alleged by Authenticom, AutoLoop, and the Dealers, which MVSC too dates in February 2015. *See supra* p. 6.

[7] *Authenticom, Inc. v. CDK Global, LLC*, 2017 WL 3017048, at *3 (W.D. Wis. July 14, 2017), *rev'd* 874 F.3d 1019 (7th Cir. 2017).

**PUBLIC VERSION**

- The Seventh Circuit, in reversing the preliminary injunction order, called the 2015 agreements between CDK and Reynolds "the focal point of Authenticom's lawsuit"[8];

- Judge Fischer, in ruling on Defendants' motions to dismiss in *MVSC*, described MVSC's allegation that "in 2015, CDK and Reynolds agreed they would no longer compete with each other in the 'Dealer Data Integration Market'"[9];

- Judge St. Eve, in ruling on Defendants' motions to dismiss in *Authenticom*, stated that the alleged conspiracies were the written agreements entered into in February 2015 and a "general understanding" to oust Authenticom from the market[10];

- Judge Dow, in ruling on the motions to dismiss the Dealer and AutoLoop Complaints, explained that Plaintiffs alleged a conspiracy beginning in "early 2015"[11]; and,

- Judge Gilbert, in ruling on discovery disputes, stated that "Plaintiffs allege the conspiracy between Reynolds and CDK began in 2015" and that 2015–2016 was "the time when the alleged conspiracy allegedly incepted and began to operate."[12]

Every major ruling in this MDL—from the sufficiency of the pleadings to the vacated preliminary injunction to discovery dispute resolution—has rested on Plaintiffs' allegations of a "conspiracy" reached in 2015.[13]

---

[8] *Authenticom*, 874 F.3d at 1023-24.

[9] *Motor Vehicle Software Corp. v. CDK Global, Inc.*, 2017 WL 5643163, at *2 (C.D. Cal. Oct. 2, 2017).

[10] Dkt. 176 at 11-14. All the dates Judge St. Eve referenced regarding this alleged "general understanding" were in 2015 or later.

[11] *In re Dealer Management Sys. Antitrust Litig.*, 362 F. Supp. 3d 477, 484 (N.D. Ill. 2019) (alleged agreement began in "early 2015 when Defendant began blocking dealers from granting third-party access to dealer data and, at the same time, agreed to shut down its data integration business for dealers using a Reynolds DMS.") (*AutoLoop*); *In re Dealer Management Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 522 (N.D. Ill. 2019) ("competition between Reynolds and CDK suddenly ceased in 2015") (Dealers); *In re Dealer Management Sys. Antitrust Litig.*, 360 F. Supp. 3d 788, 794 (N.D. Ill. 2019) (CDK "'closed' its system" in 2015, "coming as a complete surprise to Plaintiffs and others in the industry") (*Cox*).

[12] *In re Dealer Management Sys. Antitrust Litig.*, 2018 WL 6047082, at *1 (N.D. Ill. Nov. 19, 2018).

[13] In a June 2019 order allowing the Dealers to subpoena certain phone records from 2013 and 2014, Judge Gilbert noted that 2015–2016 was not "the only time-period for which discovery can be sought." Dkt. 712 at 2. But discovery often extends to periods before an alleged conspiracy began. Further, in connection with that motion, Dealers never disclosed the fundamentally new theory they are pursuing now. Although after the close of discovery the Dealers submitted a brief stating that "[d]iscovery has shown that the conspiracy between Reynolds and CDK began earlier than 2015 and is ongoing" (Dkt. 689 at 3-4), the Dealers never stated they were pursuing the altogether different "Initial Conspiracy" in which Reynolds agreed not to block DMI in exchange for CDK's supposed agreement to secure its DMS years later, a theory that seeks to add substantial, additional potential damages to the Dealers' claims.

While beyond the scope of this Motion, Defendants believe that the eleventh hour addition of the "Initial Conspiracy" reflects significant weaknesses in the evidence supporting Plaintiffs' February 2015 conspiracy theory. As detailed above, Plaintiffs' Complaints allege a conspiracy between Defendants to reduce competition and raise prices for data integration in 2015. However, Plaintiffs' experts appear to conclude that Reynolds's price increases occurred primarily *before* the onset of the alleged conspiracy in February 2015 (i.e., not during the originally alleged conspiracy period) and that CDK had zero relevant price increases in the pre-February 2015 timeframe. In other words, even assuming Plaintiffs' experts' pricing analysis is correct, it shows at best two periods of independent unilateral conduct separated by time. Moreover, again taking Plaintiffs' experts' analysis as given, Authenticom's polling connections on the Reynolds DMS have *grown* during the alleged conspiracy period to *more* than they were before any alleged agreement was reached.

These conclusions by Plaintiffs' experts makes proving the conspiracy alleged in the Complaints a daunting proposition. The addition of the new 2013 conspiracy to the case not only attempts to escape these factual realities, it also purports to capture hundreds of millions of dollars in additional antitrust damages without the benefit of notice or discovery.

Whatever the reason for Plaintiffs' attempted addition, the evidence on which their experts rely to advance a conspiracy beginning in September 2013 is not new. Of the 34 documents the ███ Report cites (at ¶¶ 142-153) to support an "Initial Conspiracy" between CDK and Reynolds, 33 were produced in April 2018 or earlier.[14] And all of the 19 documents concerning the 2013 and

---

[14] The one document produced after April 2018 (a February 2012 slide deck labeled CDK-3122867) pre-dates the time period of the newly alleged "Initial Conspiracy." ████████████████████ ███████████████████████████████████ but another copy of that document (CDK-0802599) was produced in April 2018 from a different custodian's files.

2014 time period in the ███████ Report (at ¶¶ 70-81) were produced in April 2018 or earlier. This was over a year before the close of fact discovery in April 2019 and well before the Dealers and AutoLoop filed their Amended Complaints in June 2018. Since June 2018, however, no Plaintiff has sought leave to amend its Complaint to add this new and extended conspiracy.[15]

In addition to failing to move to amend their Complaints, Plaintiffs did not do anything during fact discovery to put Defendants on notice that Plaintiffs were fundamentally revising their theory. In August 2018, months after the production of the documents now cited by Plaintiffs' experts, Plaintiffs brought a motion to compel seeking, among other things, certain pricing and other financial data from Defendants dating back to 2009. *See* Dkt. 318 at 14-15; Dkt. 354 at 14. Plaintiffs asserted that an additional two years of financial data from Defendants was a "relevant benchmark against which to judge [their] financial performance" (Dkt. 318 at 14), but did not disclose that they were pursuing a new alleged conspiracy that began much earlier than the one described in their Complaints.

Meanwhile, Plaintiffs refused to produce any discovery from their own files from before January 1, 2013. Plaintiff MVSC refused to apply even a 2013 start date to its own productions, insisting on a January 1, 2014 start date, until Defendants filed a motion to compel. *See* Dkt. 323 at 31-34. All fact discovery was conducted with the understanding that "Plaintiffs allege the

---

[15] A court need not grant leave to amend where there is undue delay, bad faith, or dilatory motive, or where amendment would cause undue prejudice to the opposing party. *Park v. City of Chicago*, 297 F.3d 606, 612 (7th Cir. 2002). At a minimum, any motion to amend in this MDL would flunk the bad faith, undue delay, and undue prejudice factors. *See, e.g.*, *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 733 (6th Cir. 2019) (affirming denial of leave to amend new claim that would "require a new round of discovery" and "significantly exten[d]" the litigation); *In re Milk Products Antitrust Litig.*, 195 F.3d 430, 438 (8th Cir. 1999) (denying motion to amend to add new named plaintiffs due to additional discovery and delay); *In re Merck Mumps Vaccine Antitrust Litig.*, 2018 WL 1693348, at *1 (E.D. Pa. Apr. 6, 2018) (denying leave to add attempted monopolization claim after close of fact discovery).

**PUBLIC VERSION**

conspiracy between Reynolds and CDK began in 2015." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2018 WL 6047082, at *1.

Plaintiffs never disclosed a new conspiracy in response to written discovery served by Defendants, during any of more than 80 party and non-party depositions that were completed, or during the status and discovery hearings in the MDL. For example, when CDK served an interrogatory to Authenticom asking it to "[s]pecifically identify every term of any agreement between CDK and Reynolds that You allege is a per se violation of the antitrust laws," Authenticom responded by pointing to its Complaint and briefing submitted in connection with its preliminary injunction motion—all of which described the alleged February 2015 conspiracy, and none of which described an agreement to "exempt" DMI from blocking efforts. Ex. D (6/22/2018 Authenticom Amended Responses to CDK's 1st Interrogatories) at 3-4. Likewise, AutoLoop amended its responses to a similar interrogatory on the last day of fact discovery but did not mention any conspiracy beginning in September 2013 or to "exempt" DMI from Reynolds's blocking efforts long before 2015. Ex. E (4/30/2019 AutoLoop Amended Responses to CDK's 1st and 2nd Interrogatories) at 8-10. Finally, the Dealers amended their responses to a similar interrogatory on June 26, 2019—two months after the close of fact discovery—again without mentioning a 2013 start date. Ex. F (6/26/2019 Dealership Plaintiffs Amended Objections and Responses to CDK's 1st Interrogatories) at 6-7.

## II. Allowing Plaintiffs To Proceed On A New Unpled Theory Would Significantly Prejudice Defendants.

Plaintiffs' new theory is not only a major shift in the litigation, it is hugely prejudicial to Defendants. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████ If Plaintiffs

16

**PUBLIC VERSION**

had disclosed this theory of liability during fact discovery, Defendants would have taken discovery to rebut that specific theory.

For example, Defendants did not pursue discovery to defend their pricing behavior prior to February 2015—because *no such conspiracy prior to that date was ever alleged*. Why would they, when, ████████████████████ Reynolds and CDK did not change prices in parallel, CDK did not raise prices until mid-2015, and Authenticom's access to CDK and Reynolds dealers grew during the "Initial Conspiracy" timeframe?

Likewise, to rebut the wholly new contention that ████████████████████████ ████████████████████, Defendants would have sought a host of additional discovery from vendors, dealers, and potentially car manufacturers about the state of the marketplace in 2013 and 2014. This discovery would have been used to establish Reynolds's unilateral and legitimate reasons for its business decisions regarding third-party access as well as general market conditions during the purported "Initial Conspiracy." For example:

- Did Reynolds also "avoid blocking" Authenticom and the other so-called integrators in 2014?

- Did Reynolds roll out any security measures during that period that hampered third-party access to the Reynolds DMS?

- Were there other forces in the marketplace, such as car manufacturer directives, that caused other hostile integrators to reevaluate their business strategies?

- Were other DMS providers—e.g., DealerTrack, Dominion, Automate, AutoSoft—taking steps that helped or hampered third-party integration to those systems during that period?

- Were alternative technologies being developed by others in the industry that required alternative strategies by DMS providers and hostile integrators?

By unveiling their new "Initial Conspiracy" theory well after the close of fact discovery, Plaintiffs precluded Defendants from exploring these and other critical issues to their defense.

17

Moreover, had Plaintiffs indicated that they were pursuing a separate conspiracy starting in September 2013, CDK and Reynolds would have sought documents and financial data—from Authenticom, Dealers, and third parties—back to at least 2011, rather than January 1, 2013. When Plaintiffs appeared to be pursuing a February 2015 theory, they urged in their omnibus motion to compel that Defendants had to provide "benchmark" data going back to *2009*. *See* Dkt. 318 at 13-15. At the same time, Plaintiffs refused to produce any documents prior to January 1, 2013, on the grounds that such requests were purportedly unduly burdensome and not relevant to the alleged 2015 agreement. *See, e.g.*, Ex. G (7/30/2018 Ltr. from M. Provance) at 1-2; Ex. H (8/2/2018 Ltr. from D. Dorris) at 1. Defendants certainly would have demanded an earlier start-date for Plaintiffs' production had they known that Plaintiffs were alleging a conspiracy beginning 2013. Now that Plaintiffs' experts have moved the goalposts from 2015, a 2013 start date for Plaintiffs' data and documents is plainly inadequate.

There is no plausible doubt that timely disclosure of a different conspiracy theory would have caused Defendants to work in discovery to defend against and defeat that specific theory. Defendants would have requested additional categories of documents over a broader time period, sought deposition testimony from additional witnesses, asked different and additional questions at depositions, and undertaken different and additional expert analysis based on these discovery materials. The prejudice to Defendants as a result of Plaintiffs' gamesmanship is manifest.

## III.    The Court Should Preclude Plaintiffs From Pursuing A Theory They Did Not Plead In Their Complaints.

Springing significant new theories on opposing parties through expert reports served after the close of fact discovery is not allowed in litigation. In *Blumenthal v. New York Life Ins. & Annuity Corp.*, 2010 WL 11508851 (W.D. Okla. Sept. 27, 2010), *aff'd*, 445 Fed. Appx. 59 (10th Cir. 2011), for example, the plaintiff submitted an expert report addressing the purportedly

negligent design of the defendant's insurance policy. The court held that, because no such claim had been made in the pleadings, expert testimony on that issue should not be presented to the jury. In particular, the court declined "to allow the complaint to be collaterally amended by Mr. Sanderford to assert any such negligence claim. The deadline for amending the complaint has long since expired and plaintiff has never sought leave to amend the complaint to allege any negligence theories." *Id*. at *6.

Similarly, in *Paramount Media Group, Inc. v. Village of Bellwood*, 2015 WL 3419831 (N.D. Ill. May 28, 2015), the plaintiff served amended Rule 26(a) disclosures and an amended expert report two months after the close of discovery that increased claimed damages from $1.6 million to $14 million based on a new theory (that the plaintiff would have used a digital, rather than static, billboard). *Id*. at *3. The court held that the plaintiffs' new theory of liability and damages was inappropriate. "If a digital sign was, as Paramount fecklessly suggests, in the game all along, the damage claim should have been accounted for in the initial and subsequent disclosures." *Id*. Accordingly, the Court excluded plaintiffs' belatedly disclosed theory. *Id*.; *see also Oracle USA, Inc. v. SAP AG*, 264 F.R.D. 541, 544 (N.D. Cal. 2009) (excluding damages theory for lost profits from newly disclosed customers where "from [the case's] inception [plaintiffs focused] on lost support revenue" from a narrower set of customers).

Finally, in *Apple, Inc. v. Samsung Electronics Co., Ltd*., 2012 WL 3155574, (N.D. Cal. Aug. 2, 2012), the court struck portions of the expert reports pertaining to undisclosed theories even though "expert discovery had not yet concluded," because "the experts were in effect locked-in to the factual record as of the time fact discovery closed and could not test the factual basis for the newly amended contentions by conducting additional discovery." *Id*. at *5. In so ruling, the

PUBLIC VERSION

Court found that the new theories would unduly prejudice the other party, who "did not have the opportunity to conduct additional fact discovery regarding [Plaintiffs'] new theories." *Id.*

In short, it is no answer for Plaintiffs to say that Defendants' experts are free to respond to the new "Initial Conspiracy." Expert opinions are developed and based in large measure on facts developed in discovery. Now, because Plaintiffs never suggested prior to August 2019 that a September 2013 conspiracy to exempt DMI from Reynolds's blocking efforts was "in the game" (*Paramount*, 2015 WL 3419831, at *3), Defendants have lost the opportunity to use discovery to build facts to defend against Plaintiffs' new theory. Compounding the problem, Defendants' experts had been working for months prior to August 2019 to rebut the conspiracy pled in the Complaints. *Cf. Nat'l Union Fire Ins. Co. of Pittsburgh v. Westport Ins. Corp.*, 2012 WL 698540, at *3 (N.D. Ill. Feb. 29, 2012) (denying leave to amend where defendant had "expended considerable time and expense conducting discovery to defend against Plaintiff's original theory.") That Defendants' experts are now forced to respond not only to hundreds of pages of reports but to a new and substantially different unpled theory contained therein does not excuse Plaintiffs' late-inning switch. It simply exacerbates the prejudice.

## CONCLUSION

Plaintiffs are not permitted to amend their Complaints by expert report. Moreover, any attempt to amend the Complaints at this stage would invariably require significant additional fact discovery on any new theory. Such delay is directly contrary to Plaintiffs' repeated position that this litigation should move forward as rapidly as possible. For the foregoing reasons, the Court should preclude Plaintiffs from pursuing a conspiracy theory not pled in their Complaints.

**PUBLIC VERSION**

Dated: October 14, 2019

Respectfully submitted,

/s/ *Aundrea K. Gulley*
Aundrea K. Gulley
Brian T. Ross
Brice A. Wilkinson
Ross A. MacDonald
GIBBS & BRUNS LLP
1100 Louisiana Street
Suite 5300
Houston, TX 77002
(713) 751-5258
agulley@gibbsbruns.com
bross@gibbsbruns.com
bwilkinson@gibbsbruns.com
rmacdonald@gibbsbruns.com

Michael P.A. Cohen
Leo D. Caseria
SHEPPARD MULLIN RICHTER & HAMPTON, LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, DC 20006
(202) 747-1900
mcohen@sheppardmullin.com
lcaseria@sheppardmullin.com

*Counsel for Defendant*
*The Reynolds and Reynolds Company*

/s/ *Britt M. Miller*
Britt M. Miller
Daniel T. Fenske
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
dfenske@mayerbrown.com
mprovance@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant*
*CDK Global, LLC*

## CERTIFICATE OF SERVICE

I, Britt M. Miller, an attorney, hereby certify that on October 25, 2019, I caused a true and correct copy of the foregoing **DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO BAR PLAINTIFFS' NEW "INITIAL CONSPIRACY" THEORY** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/ Britt M. Miller*
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com

# Appendix[*]

| Authenticom Complaint (May 1, 2017) No. 18-cv-868 (N.D. Ill.), Dkt. 1 | |
|---|---|
| ¶ 15 | The anticompetitive harm associated with Defendants' conduct is evidenced by the resulting increase in prices for dealer data integration services. Authenticom charges vendors approximately $50 per month per dealership connection. Other independent data integrators charged similar rates when they were still in business, as did CDK before it entered into its agreement with Reynolds. **Since the unlawful 2015 agreement**, CDK and Reynolds have charged vendors on average $300 per month for the same services, and other vendors as much as $800 per month. |
| ¶ 71 | In addition to these unequivocal statements, CDK benefits from these principles in practice. For more than a decade, CDK's subsidiaries – Digital Motorworks and IntegraLink– pulled dealer data from Reynolds' DMS using the standard industry method: using login credentials provided by dealers. **It was not until CDK and Reynolds entered into their market division agreement in 2015 that CDK changed its policy position** and it stopped pulling data from the Reynolds DMS. Even now, CDK still pulls data from dealers using other DMS systems, again using the same industry methods as before. See infra Parts I.B.5; VI. |
| ¶ 94 | In short, with the help of its workaround, CDK continued to pull data of dealers using the Reynolds DMS. **That state of affairs abruptly changed in February 2015, when CDK and Reynolds entered into an agreement to divide the data integration market**. Pursuant to this agreement, CDK agreed that it would no longer compete with Reynolds in providing integration services for dealers using the Reynolds DMS. See infra Part III.A. After the agreement, Digital Motorworks and IntegraLink discontinued their data pulling business for dealers using the Reynolds DMS, ceding that ground exclusively to Reynolds. |
| ¶ 97 | **Before February 2015 – when CDK and Reynolds entered into their illegal agreement** – the 3PA program had three levels. The first level was "basic access" by which a dealer "supplie[d] third-party vendor[s] a user ID and password to access the dealership's system." This level of access was a recognition that dealers have a right to grant access to their data to whomever they wish, and CDK imposed no charges for this. The second level was "subscriber access" in which CDK "provide[d] secure, |

---

[*]   Footnotes are omitted and emphasis added throughout.

| | Authenticom Complaint (May 1, 2017)<br>No. 18-cv-868 (N.D. Ill.), Dkt. 1 |
|---|---|
| | high-speed Internet access" to the DMS, with the "[d]ealer maintain[ing] responsibility for data access." CDK charged a small amount for the Internet service. The final level was "Third-Party Integration," which was data access obtained directly from CDK and included "real-time access" and a "bi-directional interface," allowing for both pulling data from and pushing data into the DMS. Id. CDK's prices for this increased level of data access were higher than the prices charged by Authenticom, averaging approximately $70 per month per dealership rooftop. Importantly, dealers could choose access levels on a vendor-by-vendor basis, giving dealers flexibility in managing how their vendors obtained data. |
| ¶ 98 | **This changed after CDK and Reynolds entered into their market division agreement in February 2015**. CDK scrapped the old version of the 3PA program in exchange for one that matched Reynolds'. CDK now blocks dealers from granting third-party data integrators |
| ¶ 102 | Reynolds provides access to dealer data on the Reynolds DMS through the Reynolds Certified Interface, or RCI, program, which is Reynolds' equivalent to CDK's 3PA data integration product. Before Mr. Brockman acquired Reynolds, Reynolds operated like all others in the industry. Dealers were free to have data integrators pull their data in automated ways by using login credentials and user emulation software. But Mr. Brockman put a stop to that in the name of "security" and transformed the RCI program into the exclusive method for automated access to data on the Reynolds DMS, imposing large price hikes in the process. **Prior to 2015, CDK even used Reynolds' blocking of data access as a marketing tool to convince dealers to switch DMS platforms**, and some dealers did switch from Reynolds to CDK on reliance that CDK would not take the same position. But now that CDK blocks independent integrators just like Reynolds, there is no difference between them. |
| ¶ 129 | In an article entitled "The Hidden Data Tax That Dealers Don't Know They Are Paying," a leading industry publication explained that "[b]ehind dealership DMS systems, there is a big fight taking place worth hundreds of millions of dollars that few dealers know about, despite its potential to take huge profits from the bottom line." As the publication reported, the "elephant in the room is how much money third parties must pay to access the DMS data on behalf of a dealership, and how those charges are hidden as they are passed on down to the dealers. It's as if there is a massive 'data tax' being paid by most dealerships that few know they are paying, let alone how much they are paying. Because it's an unknown, it is currently near impossible to manage, and such a tax has large effects on dealership profits and technology innovation." *Id*. **This article was written in 2013, before CDK and Reynolds entered into their agreement and when there was still somewhat robust** |

A-2

| Authenticom Complaint (May 1, 2017) |
| :---: |
| No. 18-cv-868 (N.D. Ill.), Dkt. 1 |

| | |
| :---: | :--- |
| | **competition in the Dealer Data Integration Market**. Today, the situation is much worse, with the "data tax" imposed by CDK and Reynolds having become a monopoly rent. |
| ¶ 189 | Reynolds' blocking tactics started earlier and have been more sustained than CDK's, as **CDK did not start blocking independent data integrators until it entered into the agreement with Reynolds in 2015**. Reynolds first started disabling Authenticom's usernames in 2009 when it introduced gimmicks such as "challenge questions" and "captcha" (where the user has to enter random blurred text) to make it more difficult to automate the pulling of data. Reynolds also targeted Authenticom's usernames for specific vendors, disrupting the data flow for those vendors and thereby forcing them to join the RCI program. In June 2013, Reynolds intensified its tactics by disabling Authenticom's usernames en masse. "Effective immediately," Reynolds announced to its dealers, "Reynolds will begin the rollout of prohibiting automated access into" its DMS. "This will impact any process that is set up to directly access [the DMS] without any manual intervention." Over a three-month period in the summer of 2013, Reynolds disabled 27,000 profiles used by Authenticom at over 3,600 dealers. Reynolds' actions resulted in an almost complete collapse of Authenticom's integration business for dealer data for dealers using the Reynolds DMS. |
| ¶ 217 | CDK and Reynolds dramatically **raised their data integration fees upon entering into their conspiracy in February 2015** to divide the market and coordinate their efforts to block Authenticom and other independent data integrators. |
| ¶ 218 | **Before entering the agreement with Reynolds in February 2015, CDK charged an average of $70 per connection. Since 2015, the average cost per connection has risen to at least $250 to $300 (and often much more)**. This constitutes, at the conservative end, an increase in the range of 250 to 325 percent in the price of data integration services. |
| ¶ 220 | As for Reynolds, before 2010, Reynolds generally charged vendors less than $100 per month per connection. By 2013 – after it had begun to block independent data integrators and impose (and enforce) exclusivity provisions in its contracts with dealers and vendors – Reynolds raised its monthly prices per connection from less than $100 to between $300 and $500. This constitutes a price increase in the range of 200 to 400 percent in the price of data integration services. And **since Defendants entered the agreement in 2015, Reynolds has been raising its prices for data integration services even more**, including by charging |

| | **Authenticom Complaint (May 1, 2017)**<br>**No. 18-cv-868 (N.D. Ill.), Dkt. 1** |
|---|---|
| | many vendors a transaction charge for every data pull. CDK has instituted the same practice of charging some vendors an additional per-transaction fee on top of their already large monthly fees. |
| ¶ 222 | **In July 2015, shortly after CDK and Reynolds entered their agreement**, Automotive News reported that "CDK said it intends to charge each third-party vendor . . . between $250 and $300 a month per store for each software product. The current fees average about $70 per software product." Another "vendor executive said the new program would raise monthly data fees from about $50 per store per month today to as much as $600 for customer relationship management software." *Id.* As for Reynolds, "[p]articipation costs one CRM vendor more than $700 a month per Reynolds store. The vendor requested anonymity because Reynolds has strict nondisclosure provisions in its vendor contracts." *Id.* |

| | **AutoLoop Amended Complaint – Class Action (June 5, 2018)**<br>**No. 18-cv-864 (N.D. Ill.), Dkt. 194** |
|---|---|
| ¶ 16 | That **competition between CDK and Reynolds halted abruptly in early 2015** when CDK began blocking dealers from granting third-party access to dealer data and, at the same time, agreed to shut down its data integration business for dealers using a Reynolds DMS. CDK's sudden about-face came as a complete surprise to the market. As it turned out, CDK's about-face was the result of a horizontal agreement with Reynolds. |
| ¶ 71 | **Prior to early 2015 – when CDK colluded with Reynolds to "close" its DMS** – CDK offered several ways by which dealers could share their data. For example, CDK offered a "basic access" package where dealers supplied vendors with a user ID and password by which the vendors – or their data integrators – could access dealer data on CDK's DMS. Before 2015, CDK also allowed dealers to use other data integrators that competed with 3PA. |
| ¶ 76 | For over a decade, DMI and IntegraLink provided data integration services for CDK itself and a variety of other DMS platforms, including Reynolds. In fact, just a few months before CDK and Reynolds entered into their market-division agreement, DMI celebrated a "milestone" in accessing the Reynolds DMS – a "90% success rate." Ex. 4 (CDK-0602338). Even after Reynolds began to block Digital Motorworks and IntegraLink – that is, prevent them from accessing Reynolds DMSs – CDK devised the |

| | **AutoLoop Amended Complaint – Class Action (June 5, 2018)**<br>**No. 18-cv-864 (N.D. Ill.), Dkt. 194** |
|---|---|
| | "SMART-R" solution, which permitted its integrators to continue to access Reynolds DMSs. As a result, **CDK (through Digital Motorworks and IntegraLink) continued to access Reynolds DMSs on behalf of its vendor clients, again at least until 2015**. AutoLoop and other vendors had used these data integration services for some of its products and services. CDK, however, largely discontinued these services once CDK and Reynolds entered into their February 2015 agreement not to compete, which is described below. Now, DMI and IntegraLink primarily provide data integration services for non-Reynolds and non-CDK DMSs. For these non-dominant DMSs, dealers provide CDK with login credentials or a secure connection for direct data transfers, such as an API. DMI and IntegraLink charge vendors only $25 to $50 per dealer per month. |
| ¶ 86 | Third-party access was a key point of competition between CDK and Reynolds. **Prior to 2015, CDK publicly touted its open system as one of the competitive advantages of its DMS**. As noted above, CDK repeatedly vowed (including in public statements by its CEO and top marketing officers) that it would not block third parties, including data integrators, from accessing dealer data on its DMS. CDK issued press releases stressing that it "believes in the fair competitive environment and does not use its leverage through supply of the dealer management system to reduce competition through the restriction of data access." By contrast, in 2009, Reynolds began selectively blocking third-party access, and increased its blocking efforts in 2013. |
| ¶ 88 | That **competition between CDK and Reynolds abruptly halted in 2015**, when CDK suddenly "closed" its system. Given CDK's unequivocal public statements (and the unchanged DMS contractual language allowing for "agent" access), CDK's abrupt about-face came as a complete surprise. Before 2015, AutoLoop used SIS to access data for dealers using the CDK DMS. But after CDK elected to close its system, CDK made every effort to ensure that AutoLoop and other vendors could only integrate with dealer data through CDK's 3PA program. CDK's about-face was the result of a horizontal agreement with Reynolds. |
| p. 31 | 2. **CDK "Closed" Its DMS in 2015 After Entering into an Agreement with Reynolds** To Eliminate Competition in the Data Integration Market |
| ¶ 95 | **A few months later, in early 2015, CDK and Reynolds entered into agreements designed to eliminate competition in the provision of dealer data integration services**. First, in February 2015, CDK and Reynolds entered into three written agreements in which they promised not to compete in providing data integration services and, in their capacity as providers of |

| AutoLoop Amended Complaint – Class Action (June 5, 2018)<br>No. 18-cv-864 (N.D. Ill.), Dkt. 194 | |
|---|---|
| | proprietary applications and services, not to use the services of independent integration service providers to obtain data from the other's DMS. Second, CDK and Reynolds further agreed that each would block independent integrators' access to their DMS customers' data, in an effort to drive independent integrators from the market entirely. |
| ¶ 132 | CDK and Reynolds have drastically increased the prices they charge for their data integration services (3PA and RCI) **since 2015**. These prices are now far higher than the prices that would exist in a competitive Dealer Data Integration Market. |
| ¶ 133 | CDK formally announced a "refreshed" 3PA program **on June 22, 2015 – just a few months after its collusive agreement with Reynolds** – as part of its "SecurityFirst" initiative. This initiative used data security as the pretext for "closing" the DMS and imposing massive price increases on vendors. "CDK is rolling out a new cybersecurity initiative," Automotive News reported, "that will raise monthly integration fees for most of the third-party software vendors that dealerships use in addition to CDK software. It is patterned after a program at Reynolds and Reynolds." David Barkholz, CDK Global Sees Earnings Boost from Cost-Cutting, Improved Efficiency, Automotive News (Nov. 3, 2015). |
| ¶ 138 | **After entering into the unlawful 2015 agreement with CDK**, Reynolds has also increased its RCI prices far higher than it could if there were any competition. Every year, RCI prices increase by approximately four to five percent. Furthermore, the year after the CDK and Reynolds agreement, Reynolds began charging AutoLoop a fee for each "transaction" between AutoLoop's applications and the Reynolds DMS. In other words, Reynolds now charges AutoLoop an additional fee every time certain of its applications accesses the DMS. As of mid-2017, these fees were $0.0525 per transaction. For applications that require frequent communication with the DMS – such as scheduling software – transaction fees alone can cost AutoLoop hundreds of dollars per dealer per month. Given the combination of Reynolds' exorbitantly high standard integration fees and its transaction fees, many dealers pay more in fees than AutoLoop charges for its products. Other vendors have seen the cost of integration fees charged by Reynolds increase by similar margins, and have been forced to pay transaction fees. |
| ¶ 143 | The current 3PA and RCI prices are much higher than the prices that were charged by competing data integrators **prior to CDK's and Reynolds' illegal agreement in 2015**. For example, between 2008 and 2016, SIS charged around $40 per dealer per month for pulling data and $70 per dealer per month for bi-directional, read-write integration, which included the ability to share data between AutoLoop's solutions. Similarly, Authenticom charged vendors $25 per dealer per month for one data feed |

A-6

| | AutoLoop Amended Complaint – Class Action (June 5, 2018)<br>No. 18-cv-864 (N.D. Ill.), Dkt. 194 |
|---|---|
| | and $50 per dealer per month for two or more (up to seven). On average, Authenticom charged vendors between $30 and $40 per dealer per month, and $75 per dealer per month for bi-directional, read-write integration. |

| | Dealers' Consolidated Class Action Complaint (June 4, 2018)<br>No. 18-cv-864 (N.D. Ill.), Dkt. 184 |
|---|---|
| p.iii¶ | 1. **Defendants' *Per Se* Illegal Horizontal Agreement (February 2015)**: The agreement(s) between CDK and Reynolds to stop competing and profit from their duopoly as the "Big 2" in the automobile industry's Dealer Management Systems ("DMS") market, principally by cornering the related market for Data Integration Services ("DIS") (programs used to extract data from DMS's for the benefit of application Vendors), as memorialized in three (3) written contracts. |
| ¶ 7 | **Prior to January 2015, CDK and Reynolds were competitors**. A major point of differentiation was that, starting in 2006, Reynolds took steps to block third party data integrators from accessing Reynolds DMS's (with more vigorous efforts starting in 2013), whereas CDK publicly touted the openness of CDK systems. Leading up to 2015, CDK had succeeded in wresting market share away from Reynolds in the DMS space. |
| ¶ 8 | **In February 2015, however, competition between Defendants ceased, as they entered into a per se illegal horizontal agreement** to: (1) exclude competition in the DIS market; (2) allow only CDK to access data housed on Dealers' CDK DMS's; and (3) allow only Reynolds to access data housed on Dealer's Reynolds DMS's. Defendants' agreement involved restricting and blocking independent third party data integrators' access to Dealers' DMS's, whereby forcing third party data integrators out of the DIS industry. |
| ¶ 77 | **CDK and Reynolds vigorously competed in the DIS market prior to 2015**. In 2006, Reynolds began selectively and sporadically blocking data integrators from accessing Dealer data on the Reynolds DMS by disabling integrators' Dealer-created login credentials.25CDK differentiated itself and the CDK DMS from Reynolds by publicly touting the openness of its DMS. |

| Dealers' Consolidated Class Action Complaint (June 4, 2018) No. 18-cv-864 (N.D. Ill.), Dkt. 184 | |
|---|---|
| | CDK repeatedly vowed (including in public statements by its CEO and top marketing officers) that it would not block independent data integrators from accessing Dealer data on its DMS. |
| ¶ 80 | Despite CDK's success in wresting market share away from Reynolds, its biggest competitor in the DMS market, **competition between Reynolds and CDK suddenly ceased in 2015**. |
| ¶ 81 | **In February 2015, CDK and Reynolds entered into an illegal market division agreement to divide the DIS market**. Specifically, CDK and Reynolds agreed to cooperate in closing their respective DMS's and, as part of that agreement, CDK closed its previously "open" system. In addition to dividing the DIS market, Defendants' agreement had the effect of eliminating competition between CDK and Reynolds in the DMS market. CDK itself described the agreement as a "game changer[]." |
| ¶ 110 | **After entering the February 2015 Agreements**, to further their stronghold on the DIS market, Defendants imposed requirements that Vendors deal exclusively with them. |
| ¶ 127 | Data integrators charge Vendors on a per site (per Dealer location) basis. As such, if a Dealership has ten locations (or "rooftops"), then the Vendor would need ten separate connections for that Dealer, thus incurring ten separate costs to access one Dealer's data. Prior to CDK and Reynold's anticompetitive conduct, the average connection cost was around $70. **In July 2015, only six months after Defendants' horizontal agreements came into effect**, industry publications reported on the massive price increase for data integration. Automotive News reported that, "CDK said it intends to charge each third-party vendor … between $250 and $300 a month per store for each software product. The current fees average about $70 per software product."93 According to Automotive News, a "vendor executive said the new program would raise monthly data fees from about $50 per store per month today to as much as $600 for customer relationship management software." This estimated increase in cost from $50 to $600 per month reflects a Dealer's increased cost regarding one Vendor. As previously stated, a Dealer uses on average a minimum of 10-15 Vendors. Dealers with 20 rooftops can work with as many as 80 vendors. |

| MVSC Second Amended Complaint (November 2, 2017) |
| --- |
| No. 18-cv-865 (N.D. Ill.), Dkt. 76 |

| ¶ 13¶ | This is not the first time that CDK and Reynolds have illegally conspired. **In February 2015, CDK and Reynolds entered into an agreement to block data "integrators"**—companies that specialize in pulling data from dealers' DMS, aggregating it, correcting errors, putting it into a standardized format, and delivering it to vendors— **from accessing dealer data**. Indeed, it is that conspiracy that makes it impossible for MVSC to access dealer data through intermediaries: CDK and Reynolds have agreed to block them. That conspiracy has therefore had a direct impact on MVSC and any other vendor in need of dealer data. Moreover, pursuant to their agreement to eliminate competition in the data integration market, CDK and Reynolds also agreed not to compete with each other, even putting that agreement in writing, with an effective date of February 18, 2015. The fact that CDK and Reynolds have colluded to control access to dealer data generally corroborates that they have colluded to block access to MVSC specifically. |
| --- | --- |
| ¶ 134 | For man years, CDK and Reynolds competed in the market data integration – i.e., the market for providing dealer data to application providers. For over a decade, CDK had provided data integration services for dealers using the Reynolds DMS, competing directly with Reynolds' own RCI integration product. **Effective February 18, 2015, however, CDK and Reynolds entered into a written agreement categorized as a "Wind Down Access Agreement" whereby Defendants agreed that they would no longer compete in the Dealer Data Integration Market**. It is a classic case of illegal market division: CDK agreed that it would no longer compete in providing access to dealer data on the Reynolds DMS, ceding that ground exclusively to Reynolds. Moreover, because Reynolds already did not compete with CDK in providing access to data for dealers using the CDK DMS, the agreement ensured that CDK and Reynolds would be the exclusive providers of data integration services for dealer data on their respective DMS platforms. |

| Cox Complaint (December 11, 2017) |
| --- |
| No. 18-cv-1058 (N.D. Ill.), Dkt. 1 |

| ¶ 16¶ | That **competition between CDK and Reynolds halted abruptly in early 2015** when CDK began blocking dealers from granting third parties access to dealer data and, at the same time, agreed to shut down its data integration business for dealers using a Reynolds DMS. CDK's sudden about-face came as a complete surprise to the market. As it turned out, CDK's about-face was the result of a horizontal agreement with Reynolds. |
| --- | --- |

| Cox Complaint (December 11, 2017)<br>No. 18-cv-1058 (N.D. Ill.), Dkt. 1 | |
|---|---|
| ¶ 81 | **Prior to early 2015 – when CDK colluded with Reynolds to "close" its DMS** – CDK offered several ways by which dealers could share their data. For example, CDK offered a "basic access" package where dealers supplied vendors with a user ID and password by which the vendors – or their data integrators – could access dealer data on CDK's DMS. Before 2015, CDK also allowed dealers to use other data integrators that competed with 3PA. |
| ¶ 86 | For over a decade, DMI and IntegraLink provided data integration services for CDK itself and a variety of other DMS platforms, including Reynolds. Cox Automotive had used these data integration services for some of its products and services. CDK, however, **largely discontinued these services once CDK and Reynolds entered into their February 2015 agreement not to compete**, which is described below. Now, DMI and IntegraLink primarily provide data integration services for non-Reynolds and non-CDK DMSs. For these non-dominant DMSs, dealers provide CDK with login credentials or a secure connection for direct data transfers, such as an API. DMI and IntegraLink charge vendors only $25 to $50 per dealer per month. |
| ¶ 96 | Third-party access was a key point of competition between CDK and Reynolds. **Prior to 2015, CDK publicly touted its open system as one of the competitive advantages of its DMS**. As noted above, CDK repeatedly vowed (including in public statements by its CEO and top marketing officers) that it would not block third parties, including data integrators, from accessing dealer data on its DMS. CDK issued press releases stressing that it "believes in the fair competitive environment and does not use its leverage through supply of the dealer management system to reduce competition through the restriction of data access." By contrast, in 2009, Reynolds began selectively blocking third-party access, and increased its blocking efforts in 2013. |
| ¶ 98 | That **competition between CDK and Reynolds abruptly halted in 2015**, when CDK suddenly "closed" its system. Given CDK's unequivocal public statements (and the unchanged DMS contractual language allowing for "agent" access), CDK's abrupt about-face came as a complete surprise to Cox Automotive and to the market. Before 2015, Cox Automotive used 3PA, DMI, IntegraLink, SIS, and other commercial data integrators to access data for dealers using the CDK DMS. But after CDK elected to close its system, CDK made every effort to ensure that Cox Automotive and other vendors could only integrate with dealer data through CDK's 3PA program. CDK's about-face was the result of a horizontal agreement with Reynolds |

| Cox Complaint (December 11, 2017) |
|---|
| No. 18-cv-1058 (N.D. Ill.), Dkt. 1 |

| p. 37 | **2. CDK "Closed" Its DMS in 2015 After Entering into an Agreement with Reynolds** To Eliminate Competition in the Data Integration Market |
|---|---|
| ¶ 105 | **A few months later, in early 2015, CDK and Reynolds entered into agreements designed to eliminate competition** in the provision of dealer data integration services. First, in February 2015, CDK and Reynolds entered into three written agreements in which they promised not to compete in providing data integration services and, in their capacity as providers of proprietary applications and services, not to use the services of independent integration service providers to obtain data from the other's DMS. Second, CDK and Reynolds further agreed that each would block independent integrators' access to their DMS customers' data, in an effort to drive independent integrators from the market entirely. |
| ¶ 142 | CDK has changed its position on the meaning of its existing contracts with dealers. Those contracts allow "agents" of the dealer – such as data integrators – to access the DMS on the dealer's behalf. Consistent with that provision, CDK had long marketed its DMS as an "open system" that data integrators could access on the dealer's behalf, and dealers relied upon those representations in agreeing to purchase the CDK DMS. **But in 2015, CDK began insisting (contrary to the language in the standard contract itself) that its dealer contracts prohibited data integrators other than 3PA,** and it began disabling the logins that dealers had provided to third-party data integrators to access the DMS. This has required dealers who are using CDK's DMS to use CDK's 3PA exclusively. |
| ¶ 149 | **CDK and Reynolds have drastically increased the prices they charge for their data integration services (3PA and RCI) since 2015.** These prices are now far higher than the prices that would exist in a competitive Dealer Data Integration Market. |
| ¶ 156 | **After entering into the unlawful 2015 agreement with CDK,** Reynolds has also increased its RCI prices far higher than it could if there were any competition. Every year, RCI prices increase by approximately 10% (and as much as 29%), which exceeds any reasonable measure like the CPI. |

PUBLIC VERSION

| Cox Complaint (December 11, 2017) |
| No. 18-cv-1058 (N.D. Ill.), Dkt. 1 |

¶ 160 | **The current 3PA and RCI prices are much higher than the prices that were charged by competing data integrators prior to CDK's and Reynolds' illegal agreement in 2015**. For example, between 2008 and 2016 before it was forced out of the market, SIS charged around $40 per dealer per month for pulling data and $70 per dealer per month for bi-directional, read-write integration. Similarly, Authenticom charged vendors $25 per dealer per month for one data feed and $50 per dealer per month for two or more (up to seven). On average, Authenticom charged vendors between $30 and $40 per dealer per month, and $75 per dealer per month for bi-directional, read-write integration.