**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817<br>Case No. 18-cv-00864 |
| This Document Relates To: | Hon. Robert M. Dow, Jr.<br>Magistrate Judge Jeffrey T. Gilbert |
| ALL ACTIONS | **PUBLIC-REDACTED** |

**INDIVIDUAL AND VENDOR CLASS PLAINTIFFS' OPPOSITION**
**TO DEFENDANTS' MOTION TO BAR**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 2

    I.      The *Authenticom* Complaint ................................................................. 2

    II.    The *Authenticom* Preliminary Injunction Hearing ................................ 2

    III.   The Other Individual and Vendor Class Complaints and Motion to Dismiss Rulings ......................................................................................... 3

    IV.   Evidence of Defendants' Conspiracy ...................................................... 3

    V.    Depositions, Pleadings, and Expert Reports ........................................... 9

ARGUMENT ............................................................................................................. 10

    I.      Plaintiffs' Expert Reports Are Consistent With Their Complaints ...... 10

    II.    Even Assuming an Amendment Was Required (And It Was Not), Defendants Cannot Establish Prejudice Necessary To Warrant Preclusion ........... 14

CONCLUSION .......................................................................................................... 15

## INTRODUCTION

Defendants' motion rests on the false premise that Plaintiffs alleged in their complaints that Defendants' conspiracy began only in February 2015, when CDK and Reynolds inked their formal, written agreements. But as this Court held in denying Defendants' motions to dismiss: "[T]he alleged agreements between [CDK] and Reynolds are not limited to the 2015 written agreements. Plaintiff also alleges that CDK executives admitted 'that the companies agreed to block and thereby destroy third-party data integrator[s]' and 'agreed to no longer compete with each other for data integration services.'" AutoLoop MTD Op. 16 (Dkt. 504). At the time of the complaints, Plaintiffs did not know exactly when Defendants' overall conspiracy began. They thus alleged that it started "*[n]o later than February 2015*." Compl. ¶ 117, *Authenticom, Inc. v. CDK Global, LLC*, No. 18-cv-868 (N.D. Ill.), Dkt. 1 ("*Authenticom* Compl.") (emphasis added).

Now, discovery has revealed that Defendants' collusion began nearly a year and a half before the February 2015 agreements. The focus on pre-2015 conduct was no surprise to Defendants. Indeed, discovery in this MDL – including millions of pages of documents and hundreds of questions during nearly 80 depositions – centered on Defendants' conduct before the February 2015 written agreements. Defendants' pre-2015 communications were also featured in discovery motions practice – and Magistrate Judge Gilbert squarely held them to be relevant.

In short, the evidence of anticompetitive conduct and harm set forth in Plaintiffs' expert reports is not new; it is the culmination of the case the parties have been litigating for the past two years. Defendants' procedural gambit to bury the truth and avoid being held accountable for their collusive conduct should not be permitted. The Court should deny the motion.[1]

---

[1] The Dealer Class has filed its own brief opposing Defendants' motion, which the Individual and Vendor Class Plaintiffs join in full.

## BACKGROUND

### I.    The *Authenticom* Complaint

In the spring of 2017, Authenticom learned – outside any litigation discovery – that Defendants had entered into the February 2015 written agreements, which Authenticom believed to have been executed in furtherance of an unlawful horizontal conspiracy to destroy competition in the data integration market in violation of the Sherman Act. Defendants' conspiracy included not only the February 2015 "market division" agreements, which were entered into "in furtherance" thereof, but also a "group boycott" of independent data integrators. *Authenticom* Compl. ¶ 245; *see also, e.g.*, *id.* ¶¶ 71, 91, 98, 118, 119, 131-138, 178, 245. It was never Authenticom's allegation that Defendants' conspiracy began with the execution of the February 2015 agreements. But absent discovery, Authenticom did not know when Defendants began colluding. Accordingly, in its May 1, 2017 complaint, Authenticom alleged that "*[n]o later than February 2015*, CDK and Reynolds entered into an agreement to eliminate competition in the Dealer Data Integration Market and the single-brand aftermarkets." *Id.* ¶ 117 (emphasis added).

### II.    The *Authenticom* Preliminary Injunction Hearing

In June 2017, Chief Judge Peterson of the United States District Court for the Western District of Wisconsin held a two-and-a-half-day evidentiary hearing on Authenticom's motion for preliminary injunction. As Judge Peterson's opinion recognized, Authenticom's claim was *not* limited to the February 2015 agreements. Judge Peterson credited the testimony of Steve Cottrell, Authenticom's CEO, that two of Defendants' executives, Dan McCray (CDK) and Bob Schaefer (Reynolds) had acknowledged the existence of a broader conspiracy to "drive Authenticom from the market." *Authenticom, Inc. v. CDK Global, LLC*, 2017 WL 3017048, at *6 (W.D. Wis. July 14, 2017). Moreover, Judge Peterson noted that CDK began abandoning its open-access policy in 2014, prior to the February 2015 agreements. *See id.* at *3 ("But things changed around 2014, as

2

CDK reconsidered its third-party access programs."); *id.* ("CDK's transition to a closed system roughly coincided with CDK and Reynolds signing written agreements in February 2015.").

## III.     The Other Individual and Vendor Class Complaints and Motion to Dismiss Rulings

Like the Authenticom complaint, the other Individual and Vendor Class complaints were not limited to the February 2015 agreements.  Cox Automotive's complaint, filed on December 11, 2017 – still prior to discovery – specifically alleged that by 2014, CDK was already seeking "reciprocal agreements with DMS providers" to destroy independent data integrations.  Compl. ¶¶ 18, 99-104, *Cox Automotive, Inc. v. CDK Global, LLC*, No. 17-cv-00925 (W.D. Wis.), Dkt. 1. Moreover, Cox Automotive's complaint made clear that the conspiracy between CDK and Reynolds was not limited to the February 2015 written agreements.  *Id.* ¶¶ 105, 182 (the February 2015 agreements were "[i]n furtherance of" a broader market-division and group-boycott conspiracy).  AutoLoop's Amended Class Action Complaint, filed on June 5, 2018, on behalf of the putative Vendor Class, likewise relied on CDK's correspondence and documents from 2014, *see* Am. Compl. ¶¶ 89-94 (Dkt. 194), and specifically alleged that "[t]op executives at CDK and Reynolds discussed blocking Authenticom at least as early as June 2014," *id.* ¶ 93.

In denying Defendants' motions to dismiss, this Court recognized that "the alleged agreements between [CDK] and Reynolds are not limited to the 2015 written agreements," and included the broader conspiracy to "destroy third-party data integrators."  AutoLoop MTD Op. 16 (Dkt. 504); Cox Automotive MTD Op. 9 (Dkt. 505); Authenticom MTD Op. 11-14 (Dkt. 176).

## IV.     Evidence of Defendants' Conspiracy

After the filing of the complaints, discovery produced overwhelming evidence that CDK and Reynolds reached agreement to control access to dealer data and eliminate independent data integrators, as alleged in the complaints, and did so by September 2013.

1. 

During this period, CDK also continued to facilitate data access to the Reynolds DMS through its data integration subsidiaries – Digital Motorworks, Inc. ("DMI") and IntegraLink.

---

[2] Ex. 2 (at CDK-3122887).  CDK also launched an extended public relations campaign to distinguish itself from Reynolds on the issue of access to dealer data.  As just one example, CDK's then-CEO said in an interview with *Dealer Magazine* that CDK held "near and dear to our own business philosophy" the principle that "a dealership fundamentally owns the data in its DMS, and dealers should control who accesses the data and how it is used."  Ex. 3, (at CDK-3122863).

[3] To avoid losing customers to CDK, Reynolds was forced to protect, or "whitelist,"

[4] *See* Ex. 6, Israel Report ¶¶ 123-126.

[5] *See* Ex. 8, PX 878 (at CDK-1524404.001 - .002)

███████████████████████████████████████████████.[6]

      In 2013, CDK and Reynolds switched course from competition to coordination. █

███████████████████████████████████████████████████

███████████████████████████████████████ Then, in

2013, the coordination between CDK and Reynolds began in earnest.  In June through August

2013, Reynolds rolled out its most aggressive blocking actions to date, but in private

correspondence, █████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

      On September 27, 2013, ██████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[6] *See* Ex. 9 (at CDK-3122868.002); Ex. 10, PX 877 (at CDK-0771481)███

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

Thereafter, CDK stopped "badmouthing" Reynolds's data policies in the marketplace, and Reynolds stopped blocking CDK's access (through DMI) to Reynolds's dealer data. ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████).

As negotiations toward formal written agreements progressed, Mr. Gardner internally remarked that the failure to finalize the deal would return the companies to the pre-2013 competitive state: ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[7] Ex. 20, PX 950 (at CDK-1409655); *see also* Ex. 21, PX 955 (at CDK-0222940) ███

██████ x. 22, PX 449 (at CDK-1861079) ███████████████████████████████████

███████████████████████████████████ CDK, meanwhile, ████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

█████████████████████████████

Discovery further showed that – beginning in 2013 and 2014 – CDK and Reynolds also began coordinating to block competition from Authenticom. ████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████      ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

The negotiations in 2013 and 2014 culminated in the February 2015 written agreements, which were executed to implement certain aspects of the CDK-Reynolds conspiracy. *See, e.g.*, Cox Automotive MTD Op. 4-5 (Dkt. 505) (describing written agreements). Consistent with both parties' stated desire to promote a joint marketing message on data security, Mr. Gardner described the agreement ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

7

███████████████████████████████████████████████████████████

███████████████████████████████████ ."[8]

    **2.**    As demonstrated above, discovery has also confirmed that Defendants' conspiracy was not limited to the written agreements.  Corroborating Mr. Cottrell's testimony regarding the admissions made to him by CDK's Mr. McCray and Reynolds's Mr. Schaefer, *see supra* p. 2,

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████

    After finalizing the written agreements in February 2015, CDK and Reynolds intensified their joint efforts to destroy Authenticom.  On February 23, 2015, five days after the written agreements were executed, a CDK executive ██████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[8] Ex. 27, PX 958 (at CDK-0109348.001) ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████



## V.    Depositions, Pleadings, and Expert Reports

The pre-2015 documents described above – and there are many more such direct communications between CDK and Reynolds – were the subject of hundreds of hours of questioning at many of the nearly 80 depositions taken in this MDL, as reflected in the attached sampling of discovery by both Plaintiffs and Defendants. *See* Appendix.  Discovery motions also focused on pre-2015 communications.  The Dealer Class subpoenaed AT&T for the phone records of a CDK executive for the time period 2013 to the present.  *See* CDK Mot. to Quash at 1 (Dkt. 670).  In denying CDK's motion to quash, Judge Gilbert noted that, "based upon facts gleaned in discovery to date," "includ[ing] the deposition testimony of the [CDK] executive in which he references potentially relevant conduct going back to 2013," phone records from 2013 to the present "could contain relevant evidence concerning communications between two alleged antitrust co-conspirators during an arguably relevant time period."  Order at 1-2 (Dkt. 712).

After fact discovery closed, Dr. Mark Israel of Compass Lexecon submitted an expert report on behalf of the Individual and Vendor Class Plaintiffs.  Ex. 6, Israel Report.  Dr. Israel concluded that the economic evidence was consistent with the conclusion that CDK and Reynolds colluded to exclude competition: "Just as in a standard price-fixing conspiracy, CDK and Reynolds communicated about, and then agreed to, stop competing on an important element of DMS

competition: here, the ability for dealers and App providers to choose independent DIS [or data integration service] providers when using the DMS," an agreement that "eliminate[d] competition in DIS markets and harm[ed] competition." *Id.* ¶ 11. Dr. Israel's report then provided two damages models for the direct-purchaser Vendor Class – one modeling damages from September 2013 to April 2019, and another modeling damages for the "Initial Conspiracy Period" from September 2013 to February 2015 alongside a "Post-February 2015 Period." *Id.* ¶ 214 & Table 6. By offering a disaggregated model, Dr. Israel's report did not purport to state that there were two different conspiracies – that is a legal conclusion, not an economic one. Rather, Dr. Israel did so merely to help the factfinder more clearly see the harm associated with the various stages of what was a single conspiracy between Defendants. ████████████████████████████

████████████████████████████ *Id.* ¶ 215.

## ARGUMENT

**I.     Plaintiffs' Expert Reports Are Consistent With Their Complaints**

Defendants' core premise that Plaintiffs have "fundamentally amend[ed] their Complaints" through their expert reports is inaccurate. The conspiracy Plaintiffs pleaded is the same conspiracy whose effects Plaintiffs' expert, Dr. Mark Israel of Compass Lexecon, analyzed. From the start, Plaintiffs have alleged that CDK and Reynolds conspired, beginning "*no later than* February 2015," to coordinate their data access policies and eliminate independent data integrators' access to their respective DMSs, with the goal of driving Authenticom and other independent integrators from the market. That is precisely the conspiracy that CDK and Reynolds initiated in September 2013 and then implemented through a series of actions leading up to the effective elimination of competition in the market for data integration and severe consumer harm. It is no surprise that Plaintiffs could not say exactly when the conspiracy began before taking discovery, nor is it any

surprise that the details of the anticompetitive agreements and implementation mechanisms have only become clear with the production of documents and taking of depositions. But, for all that, Plaintiffs' claims have never changed: Defendants reached a horizontal agreement to eliminate competition in data integration services and successfully implemented that conspiracy, all in violation of Sherman Act § 1.

Defendants focus (at 1, 5, 12-14) on the complaints' allegations that market conditions prior to February 2015 were more competitive than after the February 2015 agreements. Of course, that is accurate: the February 2015 agreements had an adverse effect on competition. But the allegations about the impact of the February 2015 agreements cannot reasonably be read to foreclose what the evidence has now shown – namely, that market competition at the time of those agreements was already adversely affected by Defendants' horizontal collusion. Plaintiffs' expert evidence is thus wholly consistent with the complaints; there was no need to amend.

Even if one reads Plaintiffs' complaints to allege that Defendants' conspiracy began "in" – rather than "no later than" – February 2015, Plaintiffs would not have had to amend their complaints. The Federal Rules require notice pleading as to *claims* – but they do not require pleading of legal theories. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("[W]e have stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned during discovery."); *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1996) ("The Federal Rules of Civil Procedure do not require a plaintiff to plead legal theories."). Here, not even Defendants contend that Plaintiffs are attempting to assert a new claim. At most, they (incorrectly) characterize (at 2, 11, 16, 18-19) the 2013-2014 collusion evidence as a new *theory*. But as Defendants' own cases (at 11, 18-19) hold, a plaintiff need not amend to add new theories.

11

Indeed, it is common in antitrust cases for evidence in Defendants' hands to shed light on exactly when the alleged conspiracy began. *Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 473 (1962) ("[I]n complex antitrust litigation" the "proof is largely in the hands of the alleged conspirators."). It is perfectly permissible for Plaintiffs to follow the evidence where it leads. *See, e.g.*, *In re Blood Reagents Antitrust Litig.*, 2015 WL 6123211, at *12 (E.D. Pa. Oct. 19, 2015) (declining to exclude expert damages model that assumed a conspiracy start date different from that alleged in initial complaint); *cf. Albert v. Bank of Am., N.A.*, 2015 WL 1406518, at *4 n.6 (N.D. Ill. Mar. 24, 2015) ("[A]llegations – based on discovery – [that] further flesh out the basis of an existing cause of action" are not a new claim.). Tellingly, Defendants cite no case where antitrust plaintiffs were barred from presenting evidence of a horizontal conspiracy on the ground that they had failed to plead the conspiracy's exact start date. And such a result would make no sense. Defendants have access to the same discovery. Requiring re-pleading serves no meaningful notice function and would require the Court to decide repeated rounds of Rule 12 motions. That is not what the Federal Rules envision. *See Ash v. Wallenmeyer*, 879 F.2d 272, 274 (7th Cir. 1989) ("The federal rules do not contemplate that parties will amend their pleadings to reflect new information obtained in the discovery process. The information is to be reflected in the framing of issues in the pretrial order, which supersedes the complaint.").

To support the notion that Plaintiffs are presenting a "new theory," Defendants erroneously contend (*e.g.*, at 2, 18) that Plaintiffs are presenting a "different conspiracy" that began in 2013.[9] As explained at length above, that is not correct. The evidence shows that CDK and Reynolds

---

[9] Throughout their motion, Defendants mistakenly contend that their collusion in the 2013-2014 timeframe pertained only to DMI's access to the Reynolds DMS. To the contrary, there is overwhelming evidence that Defendants' agreement in 2013 to foreclose competition was much broader than just DMI's access to the Reynolds DMS. *See supra* p. 5-9.

engaged in a single conspiracy – with the object of coordinating their positions on "data security" and eliminating independent providers of data integration – that developed and intensified over time. *See supra* p. 5-9. Indeed, the February 2015 agreements did not spring fully-grown from the head of Zeus. The coordination and collusion between CDK and Reynolds in 2013 and 2014 culminated in the February 2015 written agreements (and involved the same key players, from both companies, throughout). *See id.* The evidence is wholly consistent with the complaints.

So are Plaintiffs' expert reports, which analyze the impact of a single conspiracy that began – as Defendants' own internal documents reveal – in September 2013. In particular, Dr. Israel's economic analysis confirms the economic validity of Plaintiffs' conspiracy allegations – it is hardly "opposite" (Mot. at 9) to those allegations – and establishes the harm that the conspiracy caused consumers. Although Reynolds partially blocked independent data integrators earlier than CDK did, the documentary and econometric evidence shows that Reynolds was only able to fully block them once it conspired with CDK. *See* Ex. 6, Israel Report ¶¶ 135-160. Moreover, Dr. Israel's econometric analysis shows that ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

*See id.* ¶¶ 200-214 & Tables 4-6. Dr. Israel's report labeled the 2013-2015 timeframe as the "Initial Conspiracy Period" simply to delineate alternative damages figures, depending on when the jury determines the conspiracy was formed. But the key point is this: all of Dr. Israel's analysis is consistent with the allegation that Reynolds and CDK agreed to data access policies, coordinated blocking of independent data integrators, and, as a result, imposed massive price increases for data access. That Reynolds imposed those price increases earlier is hardly inconsistent with that theory

13

– and what is most notable is that, ██████████████████████████████████████████

███████████████████████████████████████████ .

## II. Even Assuming an Amendment Was Required (And It Was Not), Defendants Cannot Establish Prejudice Necessary To Warrant Preclusion

Because Plaintiffs had no need to amend, this Court need not reach Defendants' prejudice argument. *See, e.g.*, *Albert*, 2015 WL 1406518, at \*3-4 (no prejudice as a matter of law if there was no obligation to amend). But regardless, there is no prejudice. By their own admission, discovery in this case focused extensively on the 2013 and 2014 time frame. The parties in this MDL have exchanged millions of pages of records – a great many from 2013-2014 – and conducted nearly 80 depositions, including hours of questioning on 2013-2014 conduct. *Supra* p. 9. Indeed, Magistrate Judge Gilbert recognized that collusion in that period was relevant to Plaintiffs' claims. *See* Order at 2 (Dkt. 712) (Judge Gilbert's order noting "potentially relevant conduct going back to 2013" that "could contain relevant evidence concerning communications between two alleged antitrust co-conspirators during an arguably relevant time period"). Defendants had no limit on their ability to obtain discovery as to the 2013 to 2014 time frame.

Given this, Defendants are left only with the contention that they would have sought discovery of an even earlier time frame (back to 2011), but that rings hollow. Discovery in this case focused on *Defendants*' documents, and Defendants fought tooth-and-nail against Plaintiffs' attempts to obtain broader discovery prior to 2013. It blinks reality for CDK and Reynolds to claim that they were prejudiced because discovery was too narrow. Nor do CDK and Reynolds offer any plausible argument that they would have needed more discovery from Plaintiffs or third parties to defend against the assertion that they reached an unlawful agreement in the fall of 2013. In short, Defendants have failed to point to any concrete evidence that they would have sought and

been able to obtain. *See, e.g.*, *Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 793 (7th Cir. 2004) (defendants must produce more than conclusory allegations of prejudice).

Defendants have been on notice from the outset that Plaintiffs might seek damages going back to 2013 (the full four-year statute of limitations period under the Sherman Act). Far from any unfair surprise, Defendants' conduct in 2013 and 2014 was the focus of extensive discovery and examination at depositions, as well as motions practice. *See supra* p. 9; Appendix. And as described above, discovery in this MDL produced a mountain of evidence about Defendants' conduct in the marketplace before 2015. What would be prejudicial in this context is to deprive Plaintiffs of the ability to rely on the true facts to support their claims.

The Federal Rules embody a strong preference for a "merits-based determination of a claim." *Talbert v. City of Chi.*, 236 F.R.D. 415, 419 (N.D. Ill. 2006). Preclusion of expert testimony, which impedes the factfinder's truth-seeking function, is a "severe" remedy. *Liberty Mut. Ins. Co. v. Ecowater Sys., Inc.*, 2004 WL 1073687, at *2 (N.D. Ill. May 12, 2004); *Nilssen v. Motorola, Inc.*, 1998 WL 513090, at *3 (N.D. Ill. Aug. 14, 1998) (rejecting "harsh sanction of evidence preclusion"). This case does not come close to warranting that drastic remedy. The Court should reject Defendants' attempt to avoid responsibility for their anticompetitive conduct.

## CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.

Dated:  November 12, 2019

Respectfully submitted,

/s/ Derek T. Ho
Derek T. Ho
**KELLOGG, HANSEN, TODD,**
  **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com

*MDL Co-Lead Counsel*

16

<u>**CERTIFICATE OF SERVICE**</u>

I, Derek T. Ho, an attorney, hereby certify that on November 12, 2019 I caused a true and correct copy of the foregoing **INDIVIDUAL AND VENDOR CLASS PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO BAR** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

*/s/ Derek T. Ho*

Derek T. Ho
**Kellogg, Hansen, Todd,**
**Figel & Frederick, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com

17