IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| This document relates to:<br><br>ALL PENDING CASES | Hon. Robert M. Dow, Jr.<br><br>Magistrate Judge Jeffrey T. Gilbert |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
MOTION TO BAR PLAINTIFFS' NEW "INITIAL CONSPIRACY" THEORY**

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................................................. 1

ARGUMENT .................................................................................................................................... 1

    I.    Plaintiffs' "Initial Conspiracy" Theory Is New ..................................................... 2

    II.   Plaintiffs' "Initial Conspiracy" Theory Prejudices Defendants ............................. 7

    III.  Plaintiffs' Legal Arguments Are Meritless .......................................................... 10

    IV.  (On Behalf Of CDK Only)
            The Dealers' Procedural Arguments Are Meritless ............................................ 12

CONCLUSION ............................................................................................................................... 13

## TABLE OF AUTHORITIES

Page(s)

*Apple, Inc. v. Samsung Electronics Co., Ltd.*,
  2012 WL 3155574 (N.D. Cal. Aug. 2, 2012) ..........................................................................12

*Ash v. Wallenmayer*,
  879 F.2d 272 (7th Cir. 1989) ..................................................................................................11

*Behrend v. Comcast Corp.*,
  626 F. Supp. 2d 495 (E.D. Pa. 2009) ......................................................................................12

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................................................................6

*In re Blood Reagents Antitrust Litig.*,
  2015 WL 6123211 (E.D. Pa. Oct. 19, 2015)...........................................................................11

*Brinkley v. Monterey Fin. Servs., Inc.*,
  2018 WL 2128418 (S.D. Cal. May 9, 2018)...........................................................................12

*Chaveriat v. Williams Pipe Line Co.*,
  11 F.3d 1420 (7th Cir. 1993) ......................................................................................10, 11, 12

*Evans v. McDonald's Corp.*,
  936 F.2d 1087 (10th Cir. 1991) ........................................................................................10, 11

*Giraldo v. Drummond Co., Inc.*,
  2012 WL 12897083 (N.D. Ala. Mar. 5, 2012) .........................................................................6

*Hawthorne Partners v. AT&T Techs., Inc.*,
  1993 WL 311916 (N.D. Ill. Aug. 11, 1993) ...........................................................................13

*Hawthorne v. Umpqua Bank*,
  2014 WL 295499 (N.D. Cal. Jan. 26, 2014) ...........................................................................12

*Paramount Media Grp., Inc. v. Vill. of Bellwood*,
  2015 WL 3419831 (N.D. Ill. May 28, 2015) .........................................................................12

*Peoria Day Surgery Center v. OSF Healthcare Sys.*,
  2009 WL 10682265 (C.D. Ill. Mar. 27, 2009)........................................................................11

*Spartanburg Reg'l Healthcare Sys. v. Hillenbrand Indus.*,
  2005 U.S. Dist. LEXIS 46127 (D.S.C. May 6, 2005).............................................................12

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010) ...........................................................................................12

PUBLIC VERSION

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*United States ex rel. Terry v. Wasatch Advantage Grp., LLC*,
  327 F.R.D. 395 (E.D. Cal. 2018) ............................................................................................. 12

*Toth v. USX Corp.*,
  883 F.2d 1297 (7th Cir. 1989) ................................................................................................ 11

*In re Urethane Antitrust Litig.*,
  768 F.3d 1245 (10th Cir. 2014) .............................................................................................. 11

*Vidimos, Inc. v. Laser Lab Ltd.*,
  99 F.3d 217 (7th Cir. 1996) ........................................................................................ 10, 11, 12

# INTRODUCTION[1]

Plaintiffs should be barred from dramatically expanding their theory of the case via expert report. Plaintiffs' Complaints consistently alleged a "conspiracy" to block hostile third-parties from the CDK and Reynolds DMSs starting in or around February 2015 and thereafter to raise integration prices. Now, in addition to this "conspiracy," experts for both the Individual/Vendor Plaintiffs and the Dealers describe a new and additional "conspiracy" that began in September 2013. In this new "Initial Conspiracy," Reynolds supposedly agreed to allow CDK's DMI subsidiary "hostile" access to the Reynolds DMS while CDK neither raised prices nor took action to secure its own DMS from hostile integration. No hint of an "Initial Conspiracy" is found anywhere in Plaintiffs' Complaints or in exchanges during fact discovery. But the impact of this newly conjured theory is massive. As Plaintiffs do not dispute, their experts' "Initial Conspiracy" theory adds perhaps hundreds of millions of dollars in purported damages to Plaintiffs' claims.

Plaintiffs use their response briefs to offer a highly selective and misleading account of the discovery record. At this juncture Defendants need not, and do not, argue the merits of Plaintiffs' "Initial Conspiracy" theory (or lack thereof). The question raised by Defendants' motion is much narrower: Whether Plaintiffs should be excused from their clear failure to move for leave to amend their Complaints or otherwise alert Defendants to this new theory prior to service of their expert reports. Black-letter law provides the answer: No.

# ARGUMENT

Plaintiffs do not dispute that a complaint must put the defendant on notice of the claims in a case; that the burden rests on the plaintiff to amend, not on the defendant to anticipate an

---

[1] Defendants' opening brief (Dkt. 775) is cited as "Mem."; the Dealers' opposition brief (Dkt. 815) as "Dealer Br."; and the Individual/Vendor Plaintiffs' opposition brief (Dkt. 821) as "Indiv. Pls. Br." Other capitalized terms have the meaning given in Defendants' opening brief.

1

amendment; and that the complaint, not the briefs or expert reports, defines the scope of the claims. *See* Mem. 11. Even now, however, no Plaintiff has sought to amend their pleadings to reflect their new theory. Plaintiffs nonetheless argue that they should be allowed to pursue their new "Initial Conspiracy" theory by expert fiat because (1) the "Initial Conspiracy" described in Plaintiffs' expert reports allegedly is not new; and (2) some discovery focused on the pre-2015 period.

Plaintiffs' first argument is wrong, as explained in Section I below. Their second argument is at best misleading. It is commonplace to ask questions about the pre-conspiracy period in discovery. As Defendants expressly stated, "Defendants *do not contend* that Plaintiffs and their experts are barred from referring to any documents or events that pre-date February 2015," and "Plaintiffs are free to use such evidence to attempt to show the course of events leading to the alleged anticompetitive agreement set out in Plaintiffs' Complaints." Mem. 11 n.5 (emphasis added). What Plaintiffs cannot do, however, is wait until months after the close of fact discovery "to announce . . . that they intend to pursue an additional, brand-new theory of liability and new and greater damages than what is reasonably included within their Complaints." *Id*. Plaintiffs' responses confirm that they are attempting just this sort of maneuver in their expert reports.

The Court should bar Plaintiffs from pursuing their previously undisclosed theory.

I.  **Plaintiffs' "Initial Conspiracy" Theory Is New.**

Plaintiffs alleged that CDK and Reynolds conspired to block third-party integrators and raise certified integration prices in or around February 2015. *See* Mem. 4-6 & A-1 to A-12. Every judge to opine on this MDL understood Plaintiffs' claims in that way. Mem. 12-13. But when Plaintiffs' experts realized this theory would not prevail, they tried to add a new one.

Plaintiffs nowhere explain why they waited until their expert reports to disclose their new theory. Dr. Williams (proffered on behalf of the Dealers) acknowledged in his recent deposition that ████████

2

██████████████ ███████████████████████████████████████████████████ Dr. Israel, who is proffered on behalf of the Individual/Vendor Plaintiffs and has not yet been deposed, coincidentally arrived at the exact same new conspiracy period; his report does not explain how he came to an identical conclusion regarding the "Initial Conspiracy." Israel Rpt. (Mem., Ex. A) ¶ 174. Ms. Lawton, who is proffered on behalf of Authenticom and also has not yet been deposed, simply assumes that the 2013 start-date is accurate. Lawton Rpt. (Mem., Ex. C) ¶¶ 21(f), 337.

It appears that limiting damages to a post-2015 world based on Plaintiffs' initial allegations would not result in enough damages to satisfy Plaintiffs and might highlight the unilateral nature of Defendants' conduct. Moving the start date of the purported conspiracy back to September 2013, however, allowed Plaintiffs' experts to claim tens or hundreds of millions of dollars in additional pre-trebling damages by stringing two periods of unilateral conduct together. For example, █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████ Only by expanding the conspiracy (and ignoring the unilateral changes in price) could Plaintiffs' experts include allegedly substantial Reynolds price increases in their damages models.

Plaintiffs' "Initial Conspiracy" theory is not just new but also fundamentally incompatible with the conspiracy alleged in Plaintiffs' Complaints. From September 2013 to February 2015 (the "Initial Conspiracy" period), ████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████. *See* Mem. 6-11. All of these features—based on Plaintiffs' experts' own economic analyses—are

3

starkly different from the features of the alleged conspiracy set out in Plaintiffs' Complaints.[2] What is more, the new "Initial Conspiracy" disclosed in Plaintiffs' expert reports does not involve *either* an alleged agreement "to block and thereby destroy third-party data integrator[s]" or to "no longer compete with each other for data integration services." Indiv. Pls. Br. 1 (quoting Dkt. 504). In fact, in 2013 and 2014, according to Dr. Israel, ███████████████████████████████████████████████████████████████████████████████████.

In sum, the "Initial Conspiracy" that Drs. Israel and Williams and Ms. Lawton describe does not resemble the one that Plaintiffs alleged in their Complaints. Whether Plaintiffs want to call these fundamentally different conspiracy theories two "periods" of one incongruent conspiracy (Indiv. Pls. Br. 10) or two separate conspiracies is mere wordplay. What matters is that nothing in the pleadings or fact discovery put Defendants on notice that Plaintiffs would pursue damages for a purported conspiracy that was not even hinted at prior to the service of expert reports.

In their response brief, the Individual/Vendor Plaintiffs shift ground again. Implicitly conceding that the theory that ███████████████████████████████████████ ███ is inconsistent with their Complaints, the Individual/Vendor Plaintiffs offer yet another theory: That CDK and Reynolds "began coordinating to block competition from Authenticom" in 2013 and 2014. Indiv. Pls. Br. 7 (citing Exs. 24, 25, and 26 thereto). As is clear from the face of

---

[2] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

4

the documents that the Individual/Vendor Plaintiffs cite, that is false.[3] In any event, the new pre-2015 blocking theory is immaterial to this motion. Dr. Israel does not describe coordination to block Authenticom in 2013 and 2014 as part of the "Initial Conspiracy." Israel Rpt. ¶ 174. The Individual/Vendor Plaintiffs' newest theory also is contrary to his conclusion that ███████ ████████████████████████████████████████████████████████████████████

███ Of the three documents the Individual/Vendor Plaintiffs cite as evidence of coordination on pre-2015 blocking, two (Ex. 24 and Ex. 25) are not even mentioned in Dr. Israel's report.

The Dealers similarly assert that Dr. Williams "do[es] not contend that the conspiracy in the 2013-2014 period related solely to DMI's access to the Reynolds DMS." Dealer Br. 3 n.7 (citing Williams Rpt. (Mem., Ex. B) ¶¶ 70-81). ████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████[4] Regardless

---

[3] ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████

[4] ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

of whether those agreements were anticompetitive—they were not—those negotiations could not have caused Plaintiffs harm *before* the final agreement was implemented. Indeed, Dr. Williams admitted at his deposition that ███████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███ If the Dealers intended to argue that this was evidence of a pre-2015 "conspiracy"—one flatly inconsistent with the conspiracy alleged in their Complaint (Mem. A-7 to A-8)—they were obligated to give CDK notice before the close of fact discovery.

It is no answer that Authenticom alleged that the purported conspiracy began "[n]o later than February 2015." Indiv. Pls. Br. 10. That is boilerplate. *Cf. Giraldo v. Drummond Co., Inc.*, 2012 WL 12897083, at *3 (N.D. Ala. Mar. 5, 2012) (rejecting a "strained reading" of a "single ambiguous clause" alleging that relevant conduct began "by no later than 1999" where the rest of the complaint clearly alleged conduct beginning "in November 1999"). The Supreme Court observed in *Twombly* that allegations that a conspiracy began "at least as early as" a particular date likely flunk Rule 8 in the absence of additional allegations of relevant conduct. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 565 n.10 (2007). Here, the relevant conduct Authenticom alleged centered on the 2015 period (Mem. A-1 to A-4) and nothing in the Complaint put Defendants on notice of an altogether different alleged conspiracy to "avoid blocking" DMI in September 2013. To the contrary, Authenticom alleged that an October 2013 news article was written "*before* CDK and Reynolds entered into their agreement." Authenticom Compl. ¶ 129 (emphasis added).

---

████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

6

In addition, Plaintiffs continued to stress the 2015 start date in the Dealers' Consolidated Class Action Complaint and AutoLoop Amended Complaint. Mem. A-4 to A-8. Neither of these Complaints contain the "no later than" language. Both were filed in June 2018, long after Plaintiffs had obtained the discovery on which their experts rely.[5] Plaintiffs also did not mention the "Initial Conspiracy" in response to interrogatories asking them to identify the terms of the purported illegal agreements. *See* Mem. 16. Given these failures, Plaintiffs cannot credibly claim that five words of boilerplate in the Authenticom Complaint justifies an immense expansion in the claimed conspiracy after fact discovery.

## II. Plaintiffs' "Initial Conspiracy" Theory Prejudices Defendants.

Contrary to Plaintiffs' arguments, the prejudice to Defendants from Plaintiffs' expert-driven theories is undeniable. Not only must Defendants face an artificially expanded conspiracy period designed to capture vast amounts of additional pre-trebling damages, they must respond to the new theories without the benefit of fact discovery directed at those specific theories. Each of them would have sought evidence that would clearly demonstrate that each unilateral period was characterized by unilateral decisionmaking and unilateral effects.

Plaintiffs argue that Defendants suffer no prejudice because the parties have exchanged documents from 2013 and 2014 and conducted depositions where pre-2015 activity was discussed. Indiv. Pls. Br. 14; Dealer Br. 9-11. But the problem with Plaintiffs' late-inning switch is not that Defendants were prevented from asking questions about 2013 and 2014 in general. It is that

---

[5] It is uncontested that virtually all of the documents Plaintiffs' experts cite in support of their "Initial Conspiracy" theory were produced in April 2018 or earlier. *See* Mem. 14-15. For that matter, versions of Exhibits 24 and 25, the two new documents that the Individual/Vendor Plaintiffs offer as belated evidence of pre-2015 "coordination" to block Authenticom (*see supra* pp. 6-7), were produced in April 2018 or earlier as well.

Defendants had no clue that they needed to ask questions or seek documents concerning the particulars of a theory of a conspiracy that was not alleged in the Complaints.

To be sure, it is uncontroversial that events in 2013 and 2014 may be *relevant* to the conspiracy in the Complaints. AutoLoop's Complaint, for example, contains allegations regarding ▌

▌ Reynolds is not a party to the AutoLoop case. Setting that aside, as the subsequent Complaint paragraphs make clear, the discussions AutoLoop references are simply discussions leading up to the 2015 agreements.[6] CDK thus had reason to believe that discussions leading up to the 2015 agreements would be relevant to *those* agreements, including allegedly unwritten contemporaneous agreements to "block" independent integrators or raise integration prices. But nothing in the AutoLoop Complaint reasonably suggested that Plaintiffs intended to pursue a claim against CDK based on a conspiracy to "exempt" DMI beginning in September 2013. If CDK had known that, it would have pursued discovery targeted at that additional theory specifically.[7]

For similar reasons, the argument that Defendants "fought tooth-and-nail against Plaintiffs' attempts to obtain broader discovery prior to 2013" (Indiv. Pls. Br. 14) is unavailing. In fact, it affirmatively supports Defendants' point. In a case based on 2015 agreements, documents going back to 2013 might be relevant to provide context and understand market dynamics and the reasons for the agreements, but the relevance of pre-2013 documents is questionable at best. In a case based

---

[6] AutoLoop Compl. ¶ 94 (Defendants allegedly "needed to enter" agreements to "achieve" the "aims" they had discussed); *id*. ¶ 95 ("A few months later, in early 2015, CDK and Reynolds entered into agreements designed to eliminate competition in the provision of dealer data integration services.").

[7] The Dealers' argument that the MVSC Complaint should have put CDK on notice of the "Initial Conspiracy" is even more far-fetched. *See* Dealer Br. 8 n.15. The conspiracy alleged in the *MVSC* case "was in place at least by January 2014." MVSC Compl. ¶¶ 11, 100. But as the Dealers and other MDL Plaintiffs told the Court in August 2018, "MVSC alleges a *distinct conspiracy* involving a market that is *not at issue in any other case*." Dkt. 318 at 1 (emphasis added).

on a 2013 conspiracy, by contrast, the parties need materials going back farther than 2013 to gain this understanding. It is disingenuous for Plaintiffs to conceal their intention to seek recovery for a 2013 "conspiracy" until after the close of fact discovery and then fault Defendants for not agreeing to an earlier start date during the discovery negotiation process.

Finally, Plaintiffs argue that there is no prejudice to Defendants because the discovery Defendants need supposedly comes from their own witnesses and files. Dealer Br. 12; Indiv. Pls. Br. 14. That is not true. Defendants spelled out with particularity examples of the questions they would have asked and the documents they would have used sought to rebut Plaintiffs' new theory that CDK and Reynolds "conspired" beginning in 2013. *See* Mem. 16-18. Among other things, Defendants would have sought discovery from vendors, dealers, and potentially car manufacturers about Reynolds' blocking and exemption efforts in 2013, including blocking and exemption of third-parties other than DMI. Defendants also would have used discovery to show, for example, that the marketplace not only understood in 2013 and 2014 that CDK *might* close its DMS to hostile integrators (a point relevant to CDK's unilateral incentives to engage in the 2015 and 2016 conduct alleged in the Complaints) but that CDK had not *in fact* closed or started to block hostile integrators in this period. Plaintiffs do not even attempt to address these points, which go far beyond "conclusory allegations of prejudice." Indiv. Pls. Br. 15.

In short, Defendants approached discovery based on Plaintiffs' framing of the case—as one based on a 2015 conspiracy, not a 2013 conspiracy—and have lost the opportunity to conduct a full scope of discovery targeting this different alleged agreement in a different time period. If Plaintiffs later decided to pursue a new, different, or expanded theory, it was incumbent on them to make that known in a timely fashion to both Defendants and the Court. They failed to do so, and the resulting prejudice to Defendants is substantial.

### III. Plaintiffs' Legal Arguments Are Meritless.

Plaintiffs' legal arguments in support of their new theory also fall flat. In fact, much of the authority Plaintiffs cite recognizes that where, as here, a late change in position prejudices the opposing party, a court has ample discretion to hold the plaintiff to its originally pleaded theory.

For example, the Individual/Vendor Plaintiffs contend that the Federal Rules require notice pleading as to claims, but not necessarily as to legal theories. Indiv. Pls. Br. 11. As one of the very cases they cite explains, however, "alteration" of a legal theory is not "always permissible":

> If the complaint explicitly or implicitly disclaims certain legal characterizations of the claim, an effort to retract the disclaimer may come as a surprise to the defendant and make it more costly or difficult for him to defend, or may simply protract the lawsuit inexcusably. Or by tacit agreement of the parties a possible interpretation of the complaint may simply not be pursued—the case may develop along quite other lines—and an effort to redirect the case may cause unreasonable delay even if there is no surprise to the defendant. *In either of these cases the district court can and should hold the plaintiff to his original theory*.

*Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1996) (emphasis added) (cited at Indiv. Pls. Br. 11). That principle applies here with full force.

The Seventh Circuit in *Vidimos* cited several cases that further undermine Plaintiffs' position. For instance, *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420 (7th Cir. 1993), holds that "if the plaintiff in the course of pretrial discovery comes up with a new claim, he will have to get his complaint amended if the pleadings and the proof are to be conforming," and that "the defendant may object to the injection of a new claim after there has been extensive discovery during which that claim was never so much as hinted at." *Id*. at 1430. Defendants cited *Chaveriat* in their opening brief (Mem. 3-4), but Plaintiffs ignored it in their responses. Similarly, *Evans v. McDonald's Corp.*, 936 F.2d 1087 (10th Cir. 1991), observes that "liberalized pleading rules" do not "permit plaintiffs to wait until the last minute to ascertain and refine the theories on which they intend to build their case." *Id*. at 1091. As the court explained, "This practice, if permitted, would

10

waste the parties' resources, as well as judicial resources, on discovery aimed at ultimately unavailing legal theories and would unfairly surprise defendants, requiring the court to grant further time for discovery or continuances." *Id.*[8]

The other cases cited by Plaintiffs are no more helpful to their cause. In *In re Blood Reagents Antitrust Litig.*, 2015 WL 6123211 (E.D. Pa. Oct. 19, 2015), for example, the court declined to exclude an expert report that assumed a *later* conspiracy start date than the one in the complaint. The court noted that the selection of the later start date and accompanying pricing benchmark was "consistent with plaintiffs' theory of the case," *id*. at *8, and that the effect of the change was to produce "a more conservative estimate of damages," *id*. at *8 n.10. Here, precisely the opposite is true. The selection of the September 2013 start date is *in*consistent with the prior theory of the case and purports to result in a massive *increase* in claimed damages.

In *In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014), the plaintiffs "chose to pursue a shorter conspiracy" than the one they initially alleged in the complaint. *Id*. at 1250. Likewise, in *Peoria Day Surgery Center v. OSF Healthcare Sys.*, 2009 WL 10682265 (C.D. Ill. Mar. 27, 2009), the court permitted the plaintiff to pursue a narrower geographic market than that set forth in the complaint. *Id*. Neither case supports Plaintiffs' attempt to dramatically *expand* the time period and damages at issue in this case. The *Peoria* court in fact refused to let plaintiffs add a request for punitive damages, observing that the defendant "might well have approached discovery differently had it known earlier that punitive damages were sought in these counts" and

---

[8] *Ash v. Wallenmayer*, 879 F.2d 272 (7th Cir. 1989), is not to the contrary. No amendment was necessary in *Ash* because "defendants were not surprised, having known since discovery that underbilling was the heart of [the plaintiff's] case." *Id*. at 274-75. And subsequent decisions by the Seventh Circuit confirm that plaintiffs cannot add new claims or theories if, as here, doing so would prejudice defendants. *See Vidimos*, 99 F.3d at 222; *Chaveriat*, 11 F.3d at 1420; *Toth v. USX Corp.*, 883 F.2d 1297, 1298 (7th Cir. 1989) ("As we have noted many times, the complaint merely serves to put the defendant on notice and is to be freely amended or constructively amended as the case develops, *as long as amendments do not unfairly surprise or prejudice the defendant*.") (emphasis added; citing *Ash*, 879 F.2d at 274).

11

that the plaintiff did not "adequately explain its delay." *Id*. at *5. *Behrend v. Comcast Corp.*, 626 F. Supp. 2d 495 (E.D. Pa. 2009), similarly cuts against Plaintiffs. There, the court found that the defendant was on notice that a new liability theory "was an issue in the case" as shown by the "interrogatory responses, depositions and disclosures." *Id*. at 506. Here, none of the voluminous interrogatories, depositions, or other disclosures in this MDL put Defendants on notice of Plaintiffs' new theory, and because fact discovery has closed Defendants' opportunity to uncover relevant evidence directed at that new and expanded theory is now lost.[9]

## IV. (On Behalf Of CDK Only) The Dealers' Procedural Arguments Are Meritless.

The Dealers—who have settled their claims against Reynolds but continue to pursue claims against CDK—contend that CDK's motion is procedurally improper. *See* Dealer Br. 2. Notably, the Individual/Vendor Plaintiffs make no such contention. As the cases in Defendants' opening brief demonstrate, courts have substantial discretion to bar plaintiffs from pursuing theories that impermissibly expand the scope of liability and damages beyond what is reasonably encompassed by the complaint. *See* Mem. 18-20 (citing, *e.g.*, *Paramount Media Grp., Inc. v. Vill. of Bellwood*, 2015 WL 3419831 (N.D. Ill. May 28, 2015), and *Apple, Inc. v. Samsung Electronics Co., Ltd.*, 2012 WL 3155574 (N.D. Cal. Aug. 2, 2012)); *see also Vidimos*, 99 F.3d at 222; *Chaveriat*, 11

---

[9] Plaintiffs cite other cases in which courts permitted a late amendment or change in theory, but all of these cases similarly recognized that, because discovery remained open or the amendment would narrow rather than expand the scope of liability, amendment would not prejudice defendants. *See, e.g.*, *United States ex rel. Terry v. Wasatch Advantage Grp., LLC*, 327 F.R.D. 395, 407 (E.D. Cal. 2018) ("plaintiffs have shortened the proposed class period by two years"); *Brinkley v. Monterey Fin. Servs., Inc.*, 2018 WL 2128418, at *5 (S.D. Cal. May 9, 2018) (magistrate had "vacat[ed] the deadlines for class discovery and the designation of class experts"); *Hawthorne v. Umpqua Bank*, 2014 WL 295499, at *3 (N.D. Cal. Jan. 26, 2014) ("the close of fact discovery has not yet been set" and "ample time remains in the case schedule to conduct the necessary discovery"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 591 (N.D. Cal. 2010) (modifying class definition where "the proposed modifications are minor, require no additional discovery, and cause no prejudice to defendants"); *Spartanburg Reg'l Healthcare Sys. v. Hillenbrand Indus.*, 2005 U.S. Dist. LEXIS 46127, at *23-24 (D.S.C. May 6, 2005) (allowing amendment where discovery would not close for another five months). None support Plaintiffs' actions here.

F.3d at 1430; *Hawthorne Partners v. AT&T Techs., Inc.*, 1993 WL 311916, at *6-7 (N.D. Ill. Aug. 11, 1993) (barring plaintiff from advancing a new theory at trial).

The Dealers' procedural objections ring hollow for two other reasons. First, by failing to move for leave to amend, the Dealers are the ones who violated their procedural obligations and failed to put CDK on notice of their new, significantly expanded theory. It is absurd to assert that a plaintiff can fundamentally expand case theories after the close of fact discovery and then disable a defendant from objecting to those new theories simply by refusing to seek leave to amend.

Second, the Dealers cannot amend their putative class to include DMS purchases prior to 2015. When the Dealers settled their class claims with Reynolds, the Dealers explicitly agreed that they would not seek in the future to certify any class with respect to purchases made before January 1, 2015. Mem. 9-10 n.4 (citing Dkt. 427-2 ¶¶ 1(b), 29). This Court has already approved that compromise. Dkt. 502 (final approval). The Dealers inexplicably do not even try to explain what amounts to a breach of the Settlement Agreement. Instead, they embrace it. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Moreover, in seeking the Court's approval of the Reynolds settlement, nowhere did counsel disclose that the Class was settling and releasing damages claims that purportedly extended back to September 2013 and could amount to many tens of millions of dollars in additional recovery for the Class.

## CONCLUSION

The Court should bar Plaintiffs from pursuing their new pre-2015 conspiracy theory.

13

Dated: November 26, 2019

Respectfully submitted,

/s/ *Aundrea K. Gulley*  
Aundrea K. Gulley  
Brian T. Ross  
Brice A. Wilkinson  
Ross A. MacDonald  
GIBBS & BRUNS LLP  
1100 Louisiana Street  
Suite 5300  
Houston, TX 77002  
(713) 751-5258  
agulley@gibbsbruns.com  
bross@gibbsbruns.com  
bwilkinson@gibbsbruns.com  
rmacdonald@gibbsbruns.com  

Michael P.A. Cohen  
Leo D. Caseria  
SHEPPARD MULLIN RICHTER & HAMPTON, LLP  
2099 Pennsylvania Avenue NW, Suite 100  
Washington, DC 20006  
(202) 747-1900  
mcohen@sheppardmullin.com  
lcaseria@sheppardmullin.com  

*Counsel for Defendant*  
*The Reynolds and Reynolds Company*

/s/ *Britt M. Miller*  
Britt M. Miller  
Daniel T. Fenske  
Matthew D. Provance  
MAYER BROWN LLP  
71 South Wacker Drive  
Chicago, IL 60606  
(312) 782-0600  
bmiller@mayerbrown.com  
dfenske@mayerbrown.com  
mprovance@mayerbrown.com  

Mark W. Ryan  
MAYER BROWN LLP  
1999 K Street NW  
Washington, DC 20006  
(202) 263-3000  
mryan@mayerbrown.com  

*Counsel for Defendant*  
*CDK Global, LLC*

## **CERTIFICATE OF SERVICE**

      I, Britt M. Miller, an attorney, hereby certify that on November 26, 2019, I caused a true and correct copy of the foregoing **DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO BAR PLAINTIFFS' NEW "INITIAL CONSPIRACY" THEORY** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

                                                */s/ Britt M. Miller*
                                                Britt M. Miller
                                                MAYER BROWN LLP
                                                71 South Wacker Drive
                                                Chicago, IL 60606
                                                (312) 782-0600
                                                bmiller@mayerbrown.com