**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817<br>Case No. 18-cv-00864 |
| This Document Relates To:<br><br>ALL CASES | Hon. Robert M. Dow, Jr.<br>Magistrate Judge Jeffrey T. Gilbert<br><br>**PUBLIC-REDACTED** |

**MDL PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
<u>TO EXCLUDE THE EXPERT TESTIMONY OF DR. KEVIN MURPHY</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

    I.      The CDK-Reynolds Conspiracy ................................................................ 2

    II.     Dr. Murphy's Expert Report ..................................................................... 6

ARGUMENT ....................................................................................................................... 8

    I.      Legal Standard ......................................................................................... 8

    II.     Dr. Murphy Is Prohibited By Law From Offering The Opinion That There Are No Damages Because The Same Harm Could Have Been Inflicted By Lawful Means .... 9

    III.    Dr. Murphy's Opinion Is Inadmissible Because It Is Inherently Speculative ........... 14

    IV.   Dr. Murphy's Pass-Through Analysis Should Be Excluded as Unreliable ................ 17

CONCLUSION ................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allen v. Dairy Farmers of Am., Inc.*, 2013 WL 6909953 (D. Vt. Dec. 31, 2013) ....................... 19

*Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001)................................... 12

*Authenticom, Inc. v. CDK Glob., LLC*, 2017 WL 3017048 (W.D. Wis. July 14, 2017) ............. 13

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946)......................................................... 14

*Bogathy v. Union Pac. R.R.*, 2020 WL 419406 (N.D. Ill. Jan. 24, 2020)....................................... 8

*Brand Name Prescription Drugs Antitrust Litig.*, *In re*, 186 F.3d 781 (7th Cir. 1999)............... 13

*Camp v. TNT Logistics Corp.*, 2007 WL 9724750 (C.D. Ill. Sept. 24, 2007),
   *aff'd on other grounds*, 553 F.3d 502 (7th Cir. 2009)........................................................8-9

*Cardizem CD Antitrust Litig., In re*, 105 F. Supp. 2d 618 (E.D. Mich. 2000),
   *aff'd*, 332 F.3d 896 (6th Cir. 2003)....................................................................................... 12

*Kljajic v. Whirlpool Corp.*, 2017 WL 1862640 (N.D. Ill. May 9, 2017)...................................... 14

*Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993).......................................................... 9

*Dealer Mgmt. Sys. Antitrust Litig, In re,* No. 18-cv-864*:*

   313 F. Supp. 3d 931 (N.D. Ill. 2018), *Authenticom MTD Op.*, Dkt. 176........................... 3, 13

   360 F. Supp. 3d 788 (N.D. Ill. 2019), *Cox Automotive MTD Op.*, Dkt. 505 ........... 2, 3, 4, 5, 6

   362 F. Supp. 3d 510 (N.D. Ill. 2019), Dkt. 507 .................................................................... 3

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870 (E.D. Wis. 2010) .............................. 9

*Fluidmaster, Inc., In re*, 2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) ......................................... 8

*Foreign Exch. Benchmark Rates Antitrust Litig., In re*, 74 F. Supp. 3d 581 (S.D.N.Y. 2015) .... 12

*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016) ........................................................ 9

*Irvin Indus., Inc. v. Goodyear Aerospace Corp.*, 974 F.2d 241 (2d Cir. 1992)............................ 11

*Lee-Moore Oil Co. v. Union Oil Co. of Cal.*, 599 F.2d 1299 (4th Cir. 1979) ...................... 1, 9, 11

*Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698 (7th Cir. 2009) .................................. 8

*Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002) ........................... 19

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794 (N.D. Ill. 2005) ................ 8

*Luxco, Inc. v. Jim Beam Brands Co.*, 2016 WL 4611385 (N.D. Ill. Sept. 6, 2016) ...................... 8

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983) ............................ 13

*Nat'l Constructors Ass'n v. Nat'l Elec. Contractors Ass'n*, 498 F. Supp. 510 (D. Md. 1980),
   *aff'd as modified*, 678 F.2d 492 (4th Cir. 1982) ........................ 19

*Paterson Parchment Paper Co. v. Story Parchment Co.*, 37 F.2d 537 (1st Cir. 1930),
   *rev'd*, 282 U.S. 555 (1931) ........................ 10

*Processed Egg Prods. Antitrust Litig., In re*, 81 F. Supp. 3d 412 (E.D. Pa. 2015) ...................... 16

*Rossi v. Standard Roofing, Inc.*, 156 F.3d 452 (3d Cir. 1998) ....................... 13

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931) .................. 1, 9, 10

*Syngenta Crop Prot., LLC v. Willowood Azoxystrobin, LLC*, 267 F. Supp. 3d 649
   (M.D.N.C. 2017) ........................ 17

*Texas v. Penguin Grp. (USA) Inc. (In re Elec. Books Antitrust Litig.)*, 2014 WL 1282298
   (S.D.N.Y. Mar. 28, 2014) ........................ 16

*Text Messaging Antitrust Litig., In re*, 782 F.3d 867 (7th Cir. 2015) ........................... 14

*Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) ........................... 13

*United States v. Gen. Motors Corp.*, 384 U.S. 127 (1966) ........................ 10

*Va. Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535 (4th Cir. 1998) ................................... 11

*Wholesale Grocery Prods. Antitrust Litig., In re*, 2018 WL 3862773 (D. Minn. Aug. 14, 2018),
   *aff'd*, 946 F.3d 995 (8th Cir. 2019) ........................ 17

*Wholesale Grocery Prods. Antitrust Litig., In re*, 946 F.3d 995 (8th Cir. 2019) .................. 15, 17

**RULES**

Fed. R. Evid. 702 ........................ 1, 8, 9

**OTHER MATERIALS**

ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*
  (3d ed. 2017) ............................................................................................................... 16

IIA Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (2019) .......................................... 12

## INTRODUCTION

On behalf of Defendant CDK Global, LLC ("CDK"), damages expert Dr. Kevin Murphy opines that even if CDK unlawfully conspired with Defendant The Reynolds and Reynolds Company ("Reynolds") – and even if actions taken pursuant to that conspiracy harmed MDL Plaintiffs – there are no damages because CDK would have unilaterally engaged in the same conduct and caused the same harm had no conspiracy occurred. That opinion is contrary to law and constitutes improper speculation, and the Court should exclude it under Rule 702.

*First*, as a matter of law, when an antitrust plaintiff can prove that it was harmed by a defendant's unlawful conduct, the defendant cannot escape liability by contending it would have caused the same harm through lawful means in the absence of the violation. The Supreme Court has long held that when a plaintiff proves a conspiracy that caused harm, a defendant cannot negate damages on the argument that its actions "would have been the same if they had been acting independently of one another." *Story Parchment Co. v. Paterson Parchment Paper Co*., 282 U.S. 555, 562 (1931). Since then, courts uniformly have upheld this principle. *See, e.g.*, *Lee-Moore Oil Co. v. Union Oil Co. of Cal.*, 599 F.2d 1299, 1302 (4th Cir. 1979). And for good reason: it would undermine established antitrust law to permit proven conspirators to escape damages liability by contending they would have engaged in the same conduct in the absence of the conspiracy.

*Second*, Dr. Murphy's prediction that CDK would have engaged in all the same conduct, absent the conspiracy, is also inadmissible because it is speculative. Discovery in this MDL has shown an extensive conspiracy between CDK and Reynolds that unfolded over several years, only after which CDK blocked data access and dramatically raised prices. Dr. Murphy's theory that – if that longstanding course of dealing were removed – CDK would have undertaken all the same conduct at all the same times lacks factual support in the record and is based on a conclusory

economic analysis. Dr. Murphy's opinions regarding the prices CDK would have charged in the but-for world fail for the same reasons.

*Finally*, Dr. Murphy's pass-through regression analysis and his criticism of Dr. Williams's pass-through regression analysis should be excluded. Dr. Murphy's analysis relies on unsupported factual assumptions and utilizes a methodology that is inconsistent with how vendors, dealers, and Defendants themselves have described the data integration fee to dealers.

## BACKGROUND

### I.     The CDK-Reynolds Conspiracy

1.     This is an antitrust and conspiracy case against CDK and Reynolds – the two dominant providers of Dealer Management System ("DMS") software at automobile dealerships. Together, Defendants have a market share of more than 70% by dealership count and some 95% among the largest and most lucrative dealerships. *See, e.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 360 F. Supp. 3d 788, 793 (N.D. Ill. 2019), No. 18-cv-864, Dkt. 505 at 2 ("*Cox Automotive MTD Op.*"). Dealers generate important data in their day-to-day operations and store that data on the DMS database. Historically, dealers have then contracted with independent companies (called "third-party integrators," such as Plaintiff Authenticom, Inc.) that specialize in providing access to the dealer's data to other third-party software vendors. *See id.* at 793-94, Dkt. 505 at 2-4.

At summary judgment and trial, MDL Plaintiffs will present evidence that Defendants conspired, beginning no later than September 2013, to coordinate their data access policies and to block third-party data integrators. Defendants jointly drove third-party integrators out of the market, forcing software vendors that depend on access to dealer data to purchase data integration services directly from them at greatly inflated prices. The Court has discussed at length the antitrust issues at the center of this MDL in several prior opinions. *See, e.g.*, *Cox Automotive MTD*

2

*Op.*, 360 F. Supp. 3d 788, Dkt. 505; *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510 (N.D. Ill. 2019), Dkt. 507.

      **2.**      Before CDK and Reynolds began coordinating their policies, data access was a point of intense competition between them.

      Beginning in 2006 and 2007, Reynolds began to adopt a public stance against dealers using third-party data integrators. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 942 (N.D. Ill. 2018), No. 18-cv-864, Dkt. 176 at 10 ("*Authenticom MTD Op.*") (St. Eve, J.). Over the 2007-to-2013 timeframe, Reynolds worked to block dealers from using third-party integrators by introducing technological lockouts under the guise of "security" and disabling login credentials that dealers created for their chosen integration providers and third-party vendors. *See id.* In response to Reynolds's blocking policies, CDK aggressively marketed its DMS as more "open" than Reynolds's. ███████████████████████████████████████████████████ ████████████████████████████████████████████████ Dkt. 820-4 at CDK-3122887, ██████████████████████████████████ controlling access to their own data, including by using third-party integrators, *see* Dkt. 820-5.

      CDK's dealer-friendly strategy allowed CDK to overtake Reynolds as the nation's largest DMS provider. *See, e.g.*, Ex. A, Witt Dep. 179:8-12 ████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████ Ex. B, PX 443 at CDK-0244310.002 ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████



Ex. C, Whinston Rep. ¶ 307.

Dkt. 820-9.

Ex. D, Bresnahan Dep. 68:10-69:5.

Throughout this period (and still today), CDK also owned the largest third-party data integrator in the automotive industry, Digital Motorworks, Inc. ("DMI").  *See Cox Automotive MTD Op.*, 360 F. Supp. 3d at 794, Dkt. 505 at 3.  By 2013, DMI provided 80% of all third-party – or so-called "hostile" – integration with dealers that used the Reynolds DMS and had grown into a highly profitable cash generator for CDK.  Dkt. 820 at 4-5.

**3.**     No later than September 2013, CDK and Reynolds agreed to stop competing over these data access issues and instead began to collaborate on their approaches and messages with respect to "data security."  MDL Plaintiffs will introduce explicit evidence of the CDK-Reynolds conspiracy at summary judgment and trial.  *See* Dkt. 820 at 3-9 (high-level summary of conspiracy evidence).

Ex. E, Whinston Dep. 214:16-215:3,

*id.* 331:21-332:10.  *See*

*id.* 384:17-386:2 ███████████████████████████████████

████████████████████████████████

Prior to the conspiracy, CDK adhered to its long-held (and successful) stance that dealers should control access to their own data. ██████████████████████████

████████████████████████████████████████████

█████ ██████████████████████████████████████

███████████████████████ ████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████"3

Dkt. 820-22 at CDK1409655.

**4.** In February 2015, CDK and Reynolds signed a set of written contracts covering part of their agreement. *See Cox Automotive MTD Op.*, 360 F. Supp. 3d at 794-95, Dkt. 505 at 4-5. After that, both companies took action to foreclose competition and raise prices further. █████████████████████████████████ Dkt. 820 at 9. ████████

███████████████████████████████████████████

██████████████████████████ *See* Dkt. 820-34 ███████████████████

---

[1] Ex. F, CDK-0873420 (August 25, 2013)███████████████████████████████
███████████████████████ Ex. G, PX 883 at CDK-0872981 (August 25, 2013)██

[2] Ex. H, PX 882 at CDK-2395864 (August 13, 2013)███████████████████
████ Ex. I, PX 885 (September 6, 2013)███████████████████████████████
███████████████████████████████████████

[3] *See also, e.g.*, Ex. J, PX 955 at CDK-0222940 (July 5, 2014)███████████
██████

███████████████████████████████████████████████.  In June

2015, CDK publicly announced its SecurityFirst initiative, pursuant to which CDK blocked third-

party integrators with the goal "to prevent and/or severely inhibit non-approved access to DMS

forcing vendors into the 3PA [CDK's in-house data integration service] or other CDK approved

access programs *and capture additional revenue opportunities*."  *Cox Automotive MTD Op.*, 360

F. Supp. 3d at 803-04, Dkt. 505 at 20 (quoting Dkt. 126-1); *see* Ex. K, Murphy Rep. ¶ 34.

Discovery has confirmed that CDK's top executives considered the agreement with

Reynolds critical to CDK's policy change to "secure" the DMS from third-party integrators.



Ex.

L, Workman Dep. 98:14-16; *see also* Ex. M, PX 391 ██████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

## II.     Dr. Murphy's Expert Report

Dr. Murphy responds to the analyses of class-wide damages submitted by the experts for

MDL Plaintiffs, Dr. Mark Israel and Dr. Michael Williams.[4]  Murphy Rep. ¶¶ 8, 11.  Dr. Israel and

Dr. Williams calculated overcharges resulting from the conspiracy by comparing the actual prices

Defendants charged vendors for data access with the prices that would have prevailed but for the

---

[4] █████████████████████████████████████  *See* Murphy

Rep. ¶¶ 11 & n.6, 49 ████████████  *id.* ¶¶ 25, 47 █████████; Ex. N, Murphy Dep. 15:5-9

████████████████████████  Murphy Dep. 279:23-280:5 ██████████████████

███████████████████████████████████████████

conspiracy.[5]  Their analyses found massive overcharges resulting from the conspiracy.  *See* Ex. O,

Israel Rep. ¶ 215 ████████████████████████████████████ *ee also* Ex. P, Israel Reply

Rep. at Table 7 ██████████████████████████████████ Ex. Q, Williams Rep. at

Table 3 ████████████████████████████████████████████████

████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████ Murphy Rep. ¶ 28; Ex. R, Williams Reply

Rep. ¶ 57.[6] █████████████████████████████████████

████████████████████████████████████████████████

Murphy Rep. ¶ 45. ████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████ *Id.* ¶ 46. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ *Id.* ████████████████████████████████████

████████████████████████████ *Id.*

[5] To calculate those overcharges, Plaintiffs' experts employed a "difference-in-differences" approach, comparing changes in the prices for Reynolds's RCI data access service and CDK's 3PA service with changes in the price for data access services unaffected by the conspiracy.  *See* Israel Rep. ¶¶ 197-199 (describing method); Williams Rep. ¶¶ 157-163 (describing method).

[6] *See also* Williams Reply Rep. ¶ 57.



*Id.* ¶ 12; *see also id.* ¶ 47.

*Id.* ¶¶ 75-79.[7]

## ARGUMENT

### I.   Legal Standard

Federal Rule of Evidence 702 "requires the district court judge to act as a gatekeeper to ensure that admitted expert testimony is relevant, reliable, and has a factual basis." *Bogathy v. Union Pac. R.R.*, 2020 WL 419406, at *2 (N.D. Ill. Jan. 24, 2020). In this gatekeeping role, courts must ensure that the expert's opinion is reliable and relevant. *See In re Fluidmaster, Inc.*, 2017 WL 1196990, at *3 (N.D. Ill. Mar. 31, 2017). As the proponent of Dr. Murphy's testimony, CDK bears the burden of establishing its admissibility. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

"Expert opinions that are contrary to law are inadmissible. They cannot be said to be scientific, to be reliable, or to be helpful to the trier of fact." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005); *see Luxco, Inc. v. Jim Beam Brands Co.*, 2016 WL 4611385, at *5 (N.D. Ill. Sept. 6, 2016) (same); *Camp v. TNT Logistics Corp.*, 2007 WL 9724750, at *6 (C.D. Ill. Sept. 24, 2007) (same), *aff'd on other grounds*, 553 F.3d 502 (7th Cir.

---

[7] Dr. Murphy also offers certain criticisms of Plaintiffs' experts' econometric methodology; those critiques (which relate to the choice of appropriate benchmarks and treatment of certain data) have been addressed in Plaintiffs' experts' reply reports and are not at issue here. *See* Murphy Rep. ¶¶ 80-101.

2009). Expert opinions based only on "subjective belief or unsupported speculation," or that ignore contrary evidence, are also unreliable and inadmissible. *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993); *see also Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 889-90 (E.D. Wis. 2010) (damages opinion unreliable where expert ignored "contrary evidence").

## II. Dr. Murphy Is Prohibited By Law From Offering The Opinion That There Are No Damages Because The Same Harm Could Have Been Inflicted By Lawful Means

Dr. Murphy opines that MDL Plaintiffs suffered zero or minimal damages, even assuming Defendants entered into an unlawful horizontal conspiracy pursuant to which CDK blocked access to dealer data and dramatically increased 3PA prices, because CDK would have engaged in the same conduct unilaterally, causing the same harm, absent the conspiracy. *See supra* pp. 6-7; Murphy Rep. ¶¶ 12, 45-49, 75-79. That opinion is contrary to the legal principle that a wrongdoer cannot escape liability for the damages caused by its unlawful conduct by asserting that it could have accomplished the same ends lawfully. The opinion is therefore inadmissible under Rule 702.

1. Courts repeatedly and uniformly have held that where an antitrust plaintiff "can show damages caused by [a defendant's] antitrust violation, the fact that [the defendant] might have caused the same damages by a lawful" means "is irrelevant." *Lee-Moore Oil*, 599 F.2d at 1302; *see also, e.g.*, *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 777 n.15 (2d Cir. 2016) (rejecting same argument as "unsupported by precedent").

This principle dates back to the Supreme Court's decision in *Story Parchment*, which concerned a conspiracy among producers to monopolize the market for parchment paper. *See* 282 U.S. at 559-60. There, the court of appeals overturned the jury's damages award on the ground that, even though the plaintiff proved the existence of a conspiracy that harmed it, "there was no basis for a reasonable inference that prices in excess of those actually realized would have

prevailed if there had been no combination." *Id.* at 561. The court of appeals did not question there was sufficient evidence of an unlawful conspiracy to cut prices (to drive out an upstart competitor) and in fact "assum[ed] that the jury was warranted in finding for the plaintiff on this issue." *Paterson Parchment Paper Co. v. Story Parchment Co.*, 37 F.2d 537, 539 (1st Cir. 1930), *rev'd*, 282 U.S. 555 (1931). Rather, the court of appeals concluded that because it was a "certainty" and "not mere conjecture" that the defendants "would, independently of each other," have cut prices out of their own self-interest, the plaintiff could not prove damages. *Id.* at 541. The Supreme Court reversed and reinstated the damages award, holding that once the jury found damages "attributable to the unlawful combination . . . the assumption indulged by the court below, *that respondents' acts would have been the same if they had been acting independently of one another, with the same resulting curtailment of prices, must be rejected as unsound.*" *Story Parchment*, 282 U.S. at 562 (emphasis added); *see also United States v. Gen. Motors Corp.*, 384 U.S. 127, 140 (1966) (when the conspiracy is proven, "[w]hatever General Motors might or might not lawfully have done" on a unilateral basis is "beside the point").

*Story Parchment* forecloses Dr. Murphy's core damages theory as a matter of law. Dr. Murphy's report assumes the existence of an unlawful conspiracy that harmed MDL Plaintiffs. *See supra* pp. 6-7 & n.4. From that starting assumption, his opinion then turns on the prediction that CDK would have engaged in the same conduct – blocking third-party integrators and raising 3PA prices – absent that conspiracy. *See, e.g.*, Murphy Rep. ¶¶ 12, 46-47. That is no different from the reasoning *Story Parchment* held "must be rejected as unsound." 282 U.S. at 562.

**2.** Since *Story Parchment*, courts repeatedly have prohibited antitrust defendants – as a matter of law – from avoiding liability on the ground that they would have caused the same harm absent the antitrust violation. For example, in *Lee-Moore Oil*, the district court granted summary

judgment for the defendant Union Oil on the ground that, even if Union Oil had cancelled its supply contract with the plaintiff Lee-Moore Oil (a self-service gas station) pursuant to a conspiracy with other oil producers, the plaintiff suffered no harm because the same damages "could result from even the lawful termination of a supply agreement."  599 F.2d at 1302.  The Fourth Circuit reversed, holding that "the fact that Union might have caused the same damages by a lawful cancellation of the contract is irrelevant."  *Id.*  That Union Oil could have lawfully cancelled the contract absent conspiracy does not "limit a plaintiff's right of recovery . . . once a Sherman Act violation is established."  *Id.*; *accord Va. Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 540 (4th Cir. 1998) (Luttig, J.) (antitrust defendant "is foreclosed from challenging causation simply on the basis that it could have achieved the same result through lawful means").

The Second Circuit issued a similar holding in *Irvin Industries, Inc. v. Goodyear Aerospace Corp.*, 974 F.2d 241 (2d Cir. 1992), a case involving allegations of predatory pricing to win a government contract.  Again on summary judgment, the district court assumed the defendant had monopoly power and in fact engaged in predatory pricing, depriving the plaintiff of the government contract at issue.  Nevertheless, the district court concluded the plaintiff suffered no injury as a matter of law because, absent the predatory pricing, the defendant still would have undercut the plaintiff with a lawful bid that would have caused the same injury.  *Id.* at 245 ("[A] lawful Goodyear bid . . . would still have resulted in [the plaintiff's] loss of the contract.").  The Second Circuit reversed, and ordered the case to trial, because the defendant "did not submit such a [non-predatory lawful] bid."  *Id.* at 245-46 (rather, the defendant's "predatory bid won the contract").  The Second Circuit explained: "The possibility that it might have submitted a lawful bid, and, if so, the same damage might have resulted, cannot in and of itself negate causation as a matter of law."  *Id.* (citing *Lee-Moore Oil*, 599 F.2d at 1302).

Other courts have rejected similar arguments by antitrust defendants seeking to negate injury based on what they would have done absent the alleged antitrust violation. *See In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 648-52 (E.D. Mich. 2000), *aff'd*, 332 F.3d 896 (6th Cir. 2003) (rejecting same argument and noting "the only difference between legal and illegal conduct is the existence of an agreement to do the same thing the parties could have done unilaterally and thus legally"); *Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 813 (D.C. Cir. 2001) (rejecting same argument).[8]

These cases make clear that an antitrust defendant cannot escape liability by asserting that it would have lawfully produced the same injury absent the alleged violation. Courts foreclose such arguments not because a jury could never reasonably credit, as a factual matter, the possibility that the defendant would have achieved the same ends through lawful conduct; the opinions reviewed above do not address sufficiency of evidence. Rather, the holdings reflect a *legal* principle that a wrongdoer cannot escape responsibility for the harm caused by its wrongful conduct by asserting that it would have achieved the same result through lawful means. Accordingly, even if Dr. Murphy had a sufficient basis in fact and economic reasoning for his conclusion that the unlawful conspiracy did not affect CDK's decision to block access to dealer data – which he does not (*see infra* pp. 14-17) – his opinion provides no admissible basis for limiting MDL Plaintiffs' right of recovery for the harm caused by the conspiracy.

**3.**     The consequences of a contrary rule would be to risk shielding price-fixers and other antitrust violators from significant (or any) damages liability, undermining the deterrence

---

[8] *See also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 597 (S.D.N.Y. 2015) ("Simply because conduct can be legal when undertaken individually, does not prevent it from becoming illegal if undertaken collusively—that is the essence of a conspiracy."); IIA Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 338c (2019) ("[D]enying injury when the plaintiff is no worse off than in the absence of any violation does not mean that the defendant should prevail merely by asserting what it would otherwise have done.").

and compensation functions of the antitrust laws. Many conspiracy cases turn on whether the plaintiff can prove, by a preponderance of the evidence, that the defendants acted pursuant to agreement rather than unilaterally. *See In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 787 (7th Cir. 1999) (rejecting as "absurd" the suggestion that to prevail in a conspiracy case, an antitrust plaintiff must "exclude all possibility that the [defendant's conduct] was unilateral rather than collusive"); *see also Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 934-35 (7th Cir. 2000).

When a plaintiff proves the existence of a conspiracy that caused harm under that standard, the defendant should not be permitted to re-litigate – at the damages phase – whether the actions taken pursuant to that conspiracy are consistent with the defendant's unilateral interests and thus would have occurred in the absence of a conspiracy. That is particularly true because once wrongdoing and the fact of damage are established, courts impose "a more lenient standard for calculating the *amount* of damages." *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983). Indeed, in cases featuring direct evidence of conspiracy – such as this one[9] – circumstantial analysis of the defendant's unilateral incentives is inapposite *even for purposes of liability*, much less at the damages phase after the conspiracy and causation already have been established. *See, e.g.*, *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 466 (3d Cir. 1998).

Consider a price-fixing case where a corporate whistleblower takes the stand and admits to an agreement among suppliers to raise prices. Assume further that, as a result of the conspiracy, prices increased. Under Dr. Murphy's theory, even those proven price-fixers would be permitted

---

[9] *See Authenticom MTD Op.*, 313 F. Supp. 3d at 951, Dkt. 176 at 26 ("[T]he fact that two of Defendants' executives admitted an agreement to block Authenticom and other integrators from accessing dealer data shows directly the existence of such an agreement. No further inference is required."); *Authenticom, Inc. v. CDK Glob., LLC*, 2017 WL 3017048, at *6 (W.D. Wis. July 14, 2017) (crediting Authenticom's direct evidence of conspiracy based on live testimony from the relevant witnesses).

to contend that although they conspired and although the conspiracy resulted in higher prices, damages are zero because the Defendants could have achieved the same result through tacit coordination – a result that, at his deposition, Dr. Murphy acknowledged (albeit with some hesitation) follows from his approach. *See* Murphy Dep. 237:3-240:19. That would "enable the wrongdoer to profit by his wrongdoing at the expense of his victim." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946). The Seventh Circuit has noted the "danger of the law's treating tacit collusion as if it were express collusion." *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 874 (7th Cir. 2015). The danger of treating express collusion as though it were tacit collusion is at least as great.

## III. Dr. Murphy's Opinion Is Inadmissible Because It Is Inherently Speculative

Dr. Murphy's opinion that the conspiracy did not affect CDK's decision to block access to its dealers' data should also be excluded as unreliable because (1) it lacks a foundation in the record; (2) fails to engage in the economic analysis required to show that it would have been in CDK's unilateral interest to engage in the same blocking conduct absent the conspiracy; and (3) rests on an unsupportable assertion about the prices CDK would have charged in the but-for world.

*First*, Dr. Murphy's own theory is that CDK made the decision to "secure" its DMS in July 2014, *see* Murphy Rep. ¶ 34, long after Defendants already had engaged in extensive discussions and agreed upon a mutual cease-fire and collaborative approach to data issues. And it is undisputed that Defendants entered into a series of written contracts in February 2015. It was only after these agreements were reached that Reynolds "locked down" its DMS and CDK rolled out its new blocking policy and 3PA price increases. *See supra* p. 6. Dr. Murphy points to no evidence showing that CDK would have undertaken the same policy changes and price increases – at the same times – if that course of conduct had not occurred. On the contrary, Dr. Murphy "simply ignore[s]," *Kljajic v. Whirlpool Corp.*, 2017 WL 1862640, at *15 (N.D. Ill. May 9, 2017), the

14

record evidence of CDK's behavior and internal deliberations at the time, which indicates CDK would *not* have changed its stance on so-called "hostile" integration absent the agreement with Reynolds, *see supra* pp. 5-6.

*Second*, Dr. Murphy's analysis of CDK's purported unilateral incentives is unreliable because it ignores the potential benefits to CDK from continuing to compete vigorously in the DMS market on the basis of less costly data access. Dr. Murphy asserts in conclusory fashion that CDK's blocking strategy turned out to be profitable. *See* Murphy Dep. 274:18-23; Murphy Rep. ¶ 42. But Dr. Murphy never conducted any analysis to compare CDK's higher 3PA revenues, after it blocked third-party integrators, against the revenues CDK lost on the DMS side as a result of dealers leaving CDK (or not switching to CDK) because of the policy change and price increases. Indeed, Dr. Murphy never conducted any analysis of CDK's profitability. *See In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1002 (8th Cir. 2019) (excluding *ipse dixit* analysis with "too great an analytical gap between the facts of the case and the benchmark chosen").



*See* Whinston Dep. 183:17-184:12

. Dr. Murphy offered no quantitative analysis that would support the assertion that – absent the benefits of collusion with Reynolds – the balance ever changed.

*Third*,

███████████████ Murphy Rep. ¶ 75. [10]  That opinion is unsupported and contrary to the principle – which Dr. Murphy acknowledges – that the but-for world must differ from what actually happened only with respect to the antitrust violation.  *See* Murphy Rep. ¶ 25 n.30; ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* 89 (3d ed. 2017) ("A fundamental step in computing antitrust damages is to envision the manner in which a particular market would have developed, assuming that the antitrust violation did not occur and *holding every other feature of the actual world constant*.") (emphasis added).

In the real world, CDK did not launch its "Security First" program and 3PA price increases until June 2015.  Dr. Murphy's report fails to mention – much less explain – why removing the conspiracy from the but-for world would cause CDK to ████████████████████████ ████████████████████████████████  This speculative and unreliable analysis should be excluded.  *See In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 424-25 (E.D. Pa. 2015) ("[E]xamination of the factual record is necessary" for "sound economic practice" and "formulat[ing] a hypothesis that can then be tested using economic theory."); *Texas v. Penguin Grp. (USA) Inc.* (*In re Elec. Books Antitrust Litig.*), 2014 WL 1282298, at *7 (S.D.N.Y. Mar. 28, 2014) (excluding analysis based on "false assumptions").[11]

---

[10] ████████████████████████████████████████████ ██████████████████████ *See* Ex. S, Murphy Damages Spreadsheet. ██████ ███████████████████████████████ *See id.* at 6.

[11] ████████████████████████████████████████████ █████████████████████ Murphy Dep. 54:23-55:7. █████████ ████████████████████████████████ *Id.* at 62:2-12.

Dr. Murphy also incorrectly claims that Dr. Israel and Dr. Williams assume "that, but for conspiracy, Reynolds and CDK would have continued to behave and set prices as in the past." Murphy Rep. ¶ 28. Dr. Israel and Dr. Williams make no such an assumption – rather, their regression methodologies use *changes* in Authenticom's and SIS's monthly data integration fees as the counterfactual estimate of how CDK's and Reynolds's monthly fees would have changed over time but for the alleged conspiracy. Dr. Israel and Dr. Williams' regression, therefore, provides a quantitative estimate of the effects of the alleged conspiracy on CDK's and Reynolds's monthly data integration fees (i.e., overcharges) by controlling for other potentially significant factors that explain changes in the fees.[12]

Dr. Murphy's improper, speculative assumptions underlying his but-for world provide further grounds to exclude his opinion. *See In re Wholesale Grocery Prods. Antitrust Litig.*, 2018 WL 3862773, at *7 (D. Minn. Aug. 14, 2018) (excluding expert opinion that "failed to validate the foundational premise of his benchmarking model"), *aff'd*, 946 F.3d 995 (8th Cir. 2019); *Syngenta Crop Prot., LLC v. Willowood Azoxystrobin, LLC*, 267 F. Supp. 3d 649, 659-60 (M.D.N.C. 2017) (expert opinion inadmissible where expert provided only "scant analysis for how or why" his benchmark was proper).

## IV. Dr. Murphy's Pass-Through Analysis Should Be Excluded as Unreliable[13]

Dr. Murphy's pass-through regression analysis and his criticism of Dr. Williams' pass-through regression analysis, *see* Murphy Rep. ¶¶ 105-111, should also be excluded because Dr. Murphy assumes facts not present in this case. ███████████████████████

---

[12] The overcharges are the percentage differences between (1) actual monthly data integration fees during the damages period; and (2) estimated, but-for monthly fees in the absence of the alleged conspiracy.

[13] Because Dr. Murphy's pass-through opinion affects only the Dealership Plaintiffs, the Vendor Class and Individual Plaintiffs (i.e., Authenticom and Motor Vehicle Software Corporation) do not join Section IV and express no view on the pass-through analysis.



*Id.* ¶ 109.

Dr. Murphy's argument is fundamentally flawed. *First*, DIS fees and App prices are two different price components for two different services. App prices are affected by demand and cost factors other than data integration fees charged by data integrators to vendors. Prices of different Apps can move in opposite directions unrelated to data integration fees charged by data integrators to vendors.

*Second*, Dr. Murphy's assumptions are not sufficiently aligned with Plaintiffs' theory of the case. The data integration fee itself was inflated due to the conspiracy, so irrespective of

---

[14] *See* Ex. T, Rubinfeld Dep. 427:9-17

[15] *See* Murphy Rep. ¶ 110, Exhibit 22.

whether a dealer could negotiate a lower App price, the dealer was still charged the data integration fee due to the conspiracy. *See Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 487-88 (7th Cir. 2002) (reversing district court ruling that price components were inseparable and "that the two [price] components 'offset' or that the premium somehow compensated for the defendants' manipulat[ion]" of the base price); *Allen v. Dairy Farmers of Am. Inc.*, 2013 WL 6909953, at *13 (D. Vt. Dec. 31, 2013) (damages analysis in a price-fixing case properly focuses on the "component of price Plaintiffs allege the conspiracy suppressed"); *Nat'l Constructors Ass'n v. Nat'l Elec. Contractors Ass'n*, 498 F. Supp. 510, 538-39 (D. Md. 1980) (when a surcharge is added on top of an existing base rate, the overcharge can be calculated by the amount of the fixed surcharge; there was no need to examine the net price paid because "[t]he amount of the overcharge is ascertainable" by looking solely to the surcharge), *aff'd as modified*, 678 F.2d 492, 506 (4th Cir. 1982).

Indeed, many times, the data integration fee was set forth separately from the App price in the invoice from the vendor to the dealer.[16]  There is abundant evidence that when data integration fees charged by vendors to dealers increased from one month to the next, App prices remained the same.[17]  Dr. Murphy does not offer any evidence to the contrary.  While Dr. Murphy hypothesizes that the alleged conduct could have caused dealers to negotiate for lower App prices to offset any increase in data integration fees, he does not cite even a single example of that occurring.

---

[16] *See* Ex. U (compilation of invoices detailing a separate data integration fee from vendors to dealers).

[17] *See* Ex. V at KENNY_THOMAS0004145, and -0004144 ███████████████████████

███████████████████████████████████████████████████

*id.* at CONTINENTAL0012318-19, and -00012315-16 ██████

███████████████████████████████████████████████████

*Third*, Dr. Murphy's methodology is inconsistent with how vendors, dealers, and Defendants themselves described the data integration fee charged by vendors to dealers.[18] Similarly, when Defendants themselves discussed the data integration fee, CDK and Reynolds recognized that the increased data integration fees were passed on to dealers by vendors.[19] Without any evidence to support Dr. Murphy's assumptions that a total price must be used to determine pass-through, and substantial evidence to the contrary, Dr. Murphy's analysis is unreliable and should be excluded.

## CONCLUSION

For the reasons stated above, the Court should exclude Dr. Murphy's opinion that in the absence of an unlawful conspiracy with Reynolds, CDK would have caused the same harm through lawful unilateral action and that, in the but-for world, CDK would have "secured" its DMS and doubled its 3PA prices *two years before* it **actually did so**. In addition, the Court should exclude Dr. Murphy's pass-through analysis.

---

[18] Ex. W at CONTINENTAL0049989 (February 1, 2016) ███████████████████████

█████████████████████████████████ *id.* at REYMDL00542097 (January 29, 2016)

███████████████████████████████████████████████████████

████████ at CDK-0877877 (October 1, 2015) ██████████████████████████

██████████████████████████████████████████████

[19] *See* Ex. X at CDK-0177588 (June 22, 2016) █████████████████████

*id.* at REYMDL00697217 (PX 354) (July 28, 2017) ███████████████████████

Dated:  February 28, 2020           Respectfully submitted,

*/s/ Peggy J. Wedgworth*                 */s/ Derek T. Ho*

Peggy J. Wedgworth                  Derek T. Ho

**MILBERG PHILLIPS GROSSMAN LLP**   **KELLOGG, HANSEN, TODD,**

One Pennsylvania Plaza, 19th Floor         **FIGEL & FREDERICK, P.L.L.C.**

New York, NY 10119                  1615 M Street, NW, Suite 400

(212) 594-5300                      Washington, D.C. 20036

pwedgworth@milberg.com           (202) 326-7900

                                     dho@kellogghansen.com

*MDL Co-Lead Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I, Derek T. Ho, an attorney, hereby certify that on February 28, 2020 I caused a true and correct copy of the foregoing **MDL PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. KEVIN MURPHY** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system. Copies of the Under Seal filing were served on counsel of record via email.

*/s/ Derek T. Ho*
Derek T. Ho
**KELLOGG, HANSEN, TODD,**
 **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com