# EXHIBIT 33

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| AUTHENTICOM, INC.,<br><br>                                          *Plaintiffs.*<br><br>v.<br><br>CDK GLOBAL, LLC and THE REYNOLDS AND REYNOLDS, COMPANY.<br><br>                                          *Defendants.* | Case No. 17-cv-318-JDP |

### DECLARATION OF STEVE COTTRELL

I, Steve Cottrell, declare as follows:

1. I am the founder, owner, and Chief Executive Officer of Authenticom, Inc. ("Authenticom"), based in La Crosse, Wisconsin. I founded Authenticom in 2002. My company provides data integration services in the automotive industry.

2. Although my company grew rapidly in its first decade – expanding from no employees and no revenue to 120 employees and more than $18 million in revenue as of 2014 – my business is now cash flow insolvent and on the verge of collapse as a result of the blocking and other tactics of CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds"). Unless their conduct and collusion is stopped, Authenticom will be forced to declare bankruptcy in the very near future.

3. I am able to declare as follows based on personal knowledge and my decades of experience in the automobile industry.



1

A.  **The Dealer Data Integration Industry**

4. Dealer Management Systems ("DMS") are sophisticated enterprise software that is used to manage and run nearly every facet of an automobile dealers' operations. CDK and Reynolds have long been the two dominant DMS providers in the United States.

5. The DMS includes a database component. Dealers input and store their data on the DMS, including information such as vehicle and parts inventory, customer name and contact information, and vehicle financing and insurance information.

6. Third-party application providers (often referred to as "vendors" in the industry) need access to the information on the DMS database in order to provide specialized services – such as inventory and customer management – upon which dealers rely. Vendors, however, typically do not obtain this data directly from dealers.

7. Rather, separate companies – called "data integrators" – specialize in extracting dealers' data from their DMS databases, organizing it, and delivering to vendors the specific data required for their applications.

8. My company – Authenticom – is a dealer data integrator.

9. Data integrators pull data from the dealer's DMS database and then convert that data from a raw, unorganized state into a standardized format that is easy for vendors to use. Each DMS provider has its data in different formats, and dealers themselves enter data differently based on their own individual practices. For example, Authenticom pulls data from dozens of different DMS platforms. Data integrators such as Authenticom interpret, reformat, and translate the disparate data into a standardized format. They also correct data-entry errors or anomalies in the data set. Integrators extract and deliver the data in an automated, seamless way without the need for manual intervention by dealers.

2

10. Data integrators charge vendors per dealership rooftop, sometimes referred to as a "connection." Thus, if a dealer has ten rooftops (i.e., ten individual franchises), then the vendor would need ten separate connections for that dealer.

11. While data access providers are commonly referred to as "integrators," there is no actual "integration" with the DMS database. Instead, "integration" is simply a synonym for data access. An "integrator" serves as a bridge between the dealer data and the vendor.

12. Some applications not only require data that is "pulled" from a dealer's DMS, but they also need to "push" data back into the database. For example, applications providing customer relationship management services not only require inventory data "pulled" from a dealer's database, but also need to "push" data regarding customers back in and therefore require "bi-directional" access.

13. The most sensitive data pulled by data integrators are names and contact information (such as home and email addresses). According to industry standard practice, independent data integrators – including Authenticom – do not have access to the more sensitive categories of data such as social security and credit card numbers.

14. For many years, CDK and Reynolds did not interfere with dealers' use of integrators to pull data from dealers' DMS databases. Defendants affirmatively supported the integration market and participated in it with their own integration products.

15. My experience is that, in this competitive market, vendors benefited from inexpensive, secure access to dealer data and this prompted innovation in applications that improved upon how dealers conducted their business.

16. In the 2006-2007 timeframe, a large coalition of dealers, application providers, data integrators, and DMS providers – including CDK and Authenticom – formed an industry

group called Open Secure Access, Inc., which described itself as "a coalition of companies that believe dealers should control access to the data they own and determine how it is used." The purpose of the coalition was to ensure that dealers maintained control over access to their own data instead of having DMS providers seize control and then impose large fees to access the data.

17. Over the years, the Dealer Data Integration Market once had numerous independent providers that competed for vendor and dealer accounts, including Digital Motorworks, Inc., IntegraLink, Inc., Superior Integration Solutions, Inc., SelectQu, New Freedom Data Resources, The StoneEagle Group, and ProQuotes, Inc. I have seen how that, other than Authenticom, CDK and Reynolds have systematically destroyed or driven them all out of the market.

18. Superior Integrated Solutions, Inc. ("SIS") was a leading data integration provider. I understand that CDK and Reynolds excluded SIS from the market through blocking and litigation tactics.

19. SelectQu, which is owned by Dominion Enterprises, was another dealer data integrator. I understand that in order to obtain approval for participation in the CDK Third Party Access ("3PA") and Reynolds Certified Interface ("RCI") programs for Dominion's applications, CDK and Reynolds forced Dominion to agree that SelectQu would no longer pull data from their DMSs.

20. I understand that New Freedom Data Resources – which was founded in 1991 – was forced to largely shut down its data integration business in 2014 as a result of Reynolds' blocking actions.

21. I understand that The StoneEagle Group recently ended its data integration business in exchange for CDK and Reynolds allowing its data analytics application into the 3PA and RCI programs.

22. I understand that ProQuotes, Inc. was blocked by CDK from accessing dealer data stored on the CDK DMS, and as a result largely exited the data integration market.

**B.      The Authenticom Dealer Data Integration Service**

23. Authenticom introduced its data integration service in 2004.

24. Before Authenticom pulls data from a dealership, it gets specific authorization from the dealer. Dealers set up separate login credentials for Authenticom so that Authenticom can access the DMS database.

25. Once dealers set up login credentials for Authenticom, Authenticom automates the pulling of data through user emulation software, which uses the DMS application software to run and capture the reports in the same way a user at a dealership would. The difference is that integrators like Authenticom automate the process, whereas a user at the dealership would retrieve the data manually. The user emulation software does not in any way alter the DMS software itself.

26. Several DMS providers have set up an application programming interface ("API") for Authenticom so that dealers do not need to provide login credentials to Authenticom to pull data.

27. When Authenticom pulls dealer data, it formats the data into a consistent, usable format for third-party application providers.

28. Authenticom pulls dealer data from all available DMS platforms, whether through the standard industry protocol using login credentials or through APIs.

29. The current version of Authenticom's data integration service is called DealerVault. DealerVault provides a unified user interface where dealers are able to add, remove, or change the data sets that Authenticom sends to the vendors on the dealer's behalf. The service also provides dealers with reports detailing the data Authenticom collected and to whom it was sent, all down to the granularity of a specific data fields and numbers of records processed.

30. Authenticom's security protections and protocol are state of the art. Authenticom has never had a data breach and its firewall has never been compromised. Authenticom transfers all data using secured and encrypted protocols that meet or exceed federal standards for federally insured banking transactions.

31. Authenticom partners with Microsoft Azure cloud services and has achieved Microsoft's top-level gold security certification three years in a row. Authenticom's information security system exceeds applicable consumer privacy and protection restrictions, including the Gramm-Leach-Bliley Act of 1999 and the Federal Trade Commission's Implementing Rules. Authenticom's contracts with dealers guarantee compliance with those regulatory requirements.

32. Authenticom agrees to indemnify dealers in the event that it causes any data security event. In case such an event ever occurred, Authenticom has a $20 million cyber liability insurance policy. Authenticom has never had to draw upon its cyber insurance policy because it has never experienced a data breach.

33. Defendants themselves use Authenticom to pull data for their applications. For example, AVRS, Inc. – a wholly owned joint venture of CDK and Reynolds that provides electronic registration and titling services for dealers in California – uses Authenticom for data integration services. Reynolds also uses Authenticom to pull data from a handful of Reynolds'

own dealerships for use in Reynolds' own applications. Also, Reynolds uses Authenticom to pull data from non-CDK and non-Reynolds dealers for use in Reynolds' applications. In the recent past, CDK also used Authenticom for one of its dealer-facing products.

C. **Defendants' Blocking of Authenticom**

34. In my company's early years, we grew rapidly to serve 15,000 dealerships (out of approximately 18,000 franchised dealers nationwide) and nearly 500 application providers. For many years, CDK and Reynolds did not interfere with Authenticom's pulling of dealer data from dealers' DMS databases.

35. Before Robert Brockman acquired Reynolds, Reynolds operated like all other DMS providers in the industry, taking the position that dealers were free to have data integrators pull their data in automated ways by using login credentials.

36. After Mr. Brockman acquired Reynolds, Reynolds started to gradually disable the dealer-created login credentials used by independent data integrators to pull dealer data.

37. Reynolds first started disabling Authenticom's polling services in 2009 when it introduced "challenge questions" and "captcha" (where the user has to enter random blurred text) to make it more difficult to automate the pulling of data. In 2011, Reynolds escalated its efforts to block integrators from accessing dealer data.

38. In June 2013, Reynolds further intensified its tactics by disabling Authenticom's login credentials en masse. Over a three-month period in the summer of 2013, Reynolds disabled 27,000 profiles used by Authenticom at more than 3,600 dealers. Reynolds' actions resulted in an almost complete collapse of Authenticom's integration business for dealers using the Reynolds DMS.

39. On August 1, 2016, CDK disabled Authenticom's login credentials, affecting thousands of dealership connections. Over the ensuing weeks and months, CDK repeatedly disabled Authenticom's login credentials for thousands of dealerships, severely disrupting the business operations of Authenticom's dealer and vendor clients. During this period, Authenticom support services were virtually overrun with dealers and vendors calling Authenticom frantic to find a way to re-establish Authenticom's connection and resume the flow of data that dealers had authorized.

40. After CDK and Reynolds disabled Authenticom's credentials, dealers worked cooperatively with Authenticom to set up new credentials and re-establish access. Given the sheer scale of the mass blocking, Authenticom was forced to redirect a majority of its 120-person workforce to the effort – including at one point hiring 50 temporary employees solely to help dealers navigate around the shutdowns.

41. To this day, CDK and Reynolds continually block – on a daily or even hourly basis – Authenticom's ability to pull dealer data by disabling the login credentials that dealers create for Authenticom.

42. In conjunction with disabling Authenticom's profiles, CDK and Reynolds have contacted dealers to convince them to have their vendors switch to the 3PA and RCI programs.

43. Reynolds has a tool called "Dynamic Reporting," which is a non-automated function for dealers to manually generate a data report.

44. To use Dynamic Reporting, Reynolds dealers must manually generate the report (or reports), and then send the necessary data to a vendor every time the vendor requires the data for its application.

45. Authenticom has tried to help dealers cut down on the manual steps for using Dynamic Reporting, but the tool still requires a dealer's manual intervention.

46. The Dynamic Reporting tool is useless for applications requiring regular data feeds or bi-directional access to dealer data, and dealers do not have the personnel available to initiate the process multiple times per day.

47. Aside from CDK and Reynolds, no other DMS company disables or blocks the login credentials that dealers create for Authenticom.

D.  **Statements by Defendants About Authenticom**

48. On April 3, 2016, at an industry convention, Dan McCray (CDK's Vice President of Product Management) approached me and told me that we should "[t]ake a walk." Mr. McCray led me off the convention floor and down a service ramp to a secluded area. Mr. McCray then told me that CDK and Reynolds had agreed to "[l]ock you and the other third parties out."

49. In reference to a prior offer that CDK had made to acquire my business for $15 million, Mr. McCray told me that the number was so low because Authenticom's "book of [Reynolds] business is worthless to us because of the agreement between CDK and Reynolds." Mr. McCray then stated: "I wanted to look you in the eye and let you know man to man, I have been mandated by our new CEO to seek you out and destroy your business on our systems."

50. Mr. McCray told me: "We will enforce our contract with dealers and sue them if needed to keep you out of our systems." Mr. McCray concluded by telling me, "For god's sake, you have built a great little business, get something for it before it is destroyed otherwise I will [f]***ing destroy it." I took detailed notes of the conversation the morning after it took place.

51. I declined Mr. McCray's proposal and told him that Authenticom would continue to serve its dealer and vendor customers.

52. In May 2015, Robert Schaefer – Reynolds' head of data services – told me during a phone conversation that CDK and Reynolds had an agreement to support each other's 3PA and RCI programs and therefore block competitors like Authenticom from pulling dealer data. During this phone call, Mr. Schaefer said that Mr. Brockman was adamant that all third-party data integrators must be cut off. Mr. Schaefer also said that he was in communications with other DMS companies to try to convince them to join CDK and Reynolds in blocking independent data integrators.

53. I understand that, in December 2016, Steve French – CDK's senior director of client and data services and a former data collection manager for Reynolds – told Vince Rubino of TotalLoop that a large portion of his job was to work with Reynolds to ensure third-party data integrators like Authenticom remain locked out. Mr. French suggested to Mr. Rubino that resistance to getting dealer data from CDK and Reynolds was futile as they were working together to lock out third-party data integrators like Authenticom.

54. CDK and Reynolds have made false or misleading statements to vendors and dealers about Authenticom's data security. With respect to my company, CDK has warned of "unauthorized software" being "installed on your CDK DMS system," but that is incorrect: Authenticom does not install any software on the DMS system; rather, it simply runs data reports just as the dealer can. These false and misleading statements have damaged my company's reputation and its relationships with its customers.

55. I understand that for many years, CDK – through Digital Motorworks and IntegraLink – provided data integration services for dealers using the Reynolds DMS. (I

understand that Reynolds, however, did not have an integration product that provided integration services for dealers using the CDK DMS.)

56. I understand that CDK no longer provides data integration services for dealers using the Reynolds DMS.

57. However, I understand that CDK does continue to pull data from dealerships using non-Reynolds DMS systems.

58. After February 2015, many vendors decided to leave Authenticom (which was being blocked) and join CDK (which was no longer being blocked).

59. In April 2015, Reynolds threatened to sue Authenticom for tortious interference. I rejected the threat, and in response noted that "a significant percentage of [Reynolds' dealer] customers also are Authenticom's customers" and, like Reynolds, Authenticom and the dealers "have contractual agreements." In response, on May 7, 2015, Reynolds' lawyer sent me a proposed "Wind Down" agreement. Under the agreement, Authenticom would shut down its data integration business and, in exchange, Reynolds would stop blocking Authenticom's access to dealer data during the one-year wind down period. During that so-called "grace" period, Authenticom would be required to transition Authenticom's vendor clients into the RCI program.

60. Mr. Schaefer told me that the draft agreement Reynolds provided was word-for-word what Reynolds and CDK had agreed to.

E.  **Prices Charged For Data Integration Services**

61. Dealers authorize but typically do not pay integrators to pull their data. Instead, vendors pay integrators for their data services.

62. Authenticom's contracts with vendors have one-year terms (though vendors can cancel services at any time).

11

63. Authenticom's standard pricing to pull data is $25 for the first data set, and then $50 for two or more (Authenticom can supply up to seven different data sets). The average price per vendor to pull data is between $30 and $40 per dealership rooftop per month.

64. For bi-directional access – i.e., for data "pulled" from the dealer's DMS database as well as "pushed" back in – Authenticom has charged at most $75 per month for that bundled service, and that price included additional services such as data hygiene.

65. Authenticom has a startup fee of $2,500 for its services, but that works as a down payment credited against the vendor's first invoices. Authenticom does not charge any additional per-dealership setup fees.

66. Before leaving the market, I understand that other independent data integrators charged similar rates to Authenticom. For example, between 2008 and 2016, SIS charged around $40 per connection for pulling data and $70 per connection for bi-directional access (until it was forced out of the data integration market).

67. Today, because of the blocking of independent data integrators and other conduct, I understand that CDK has nearly all of the market share – close to 100 percent – for dealer data integration services for dealers using the CDK DMS, and Reynolds has the same for dealers using the Reynolds DMS.

68. One vendor paid Authenticom $35 per month to pull data; when it was forced to join the RCI program for data integration services, I understand that the monthly rate charged by Reynolds was $210, a 500 percent increase.

69. I understand that one large vendor purchased data integration services from SIS for years, at a rate of $45 to $50 per month. That vendor now pays CDK and Reynolds monthly charges of between $300 and $700 (CDK) and between $300 and $866 (Reynolds).

70. I understand that CDK's prices for the 3PA program stand in contrast to the prices CDK charges for data access to non-CDK dealers. I understand that CDK (through Digital Motorworks and IntegraLink) charges between $25 and $50 per connection to non-CDK dealers, while it charges much more for the same services to CDK dealers.

71. I understand that CDK and Reynolds are also now charging many vendors a transaction charge for every record included in a data push, imposing an additional per-record transaction fee on top of their already large monthly fees.

72. I understand that CDK and Reynolds charge at least $30,000 to join the 3PA and RCI programs, with "setup" fees of around $300 (or more) per connection.

F. **Harm to Authenticom**

73. From a single employee with no revenue in 2002, Authenticom grew to a business with 120 employees and over $18 million in revenue in 2014 – all from our offices in a renovated historical building in downtown La Crosse, Wisconsin. I am extremely proud of my company and the employees who helped me build it.

74. In 2015, I had the honor of appearing with President Obama in La Crosse, where he singled out Authenticom as one of America's fastest-growing private companies.

75. The business that my employees and I built is in now dire straits.

76. For years, Authenticom suffered customer losses and slower growth because of Reynolds' blocking. The company would have grown much faster and had many more customers without Reynolds' blocking.

77. But the recent action of both CDK and Reynolds has accelerated my company's losses.

78. Because of CDK's and Reynolds' actions, many of our customers have told me and my employees they have no choice but to leave Authenticom and join the CDK 3PA and Reynolds RCI programs. Our relationship with our existing customers has been strained, as they are understandably frustrated with the constant blocking and service interruptions.

79. I understand that a large number of dealers complained to CDK and Reynolds and demanded that they stop blocking Authenticom.

80. I understand that in their complaints, many dealers have stated that the data is theirs, that they control access to it, and that the disabling of Authenticom has interrupted their operations and caused economic harm.

81. Since 2015, Authenticom's profits and revenues have been plummeting. As measured by EBITDA, profits dropped by 77.22 percent from the third quarter of 2015 (when CDK and Reynolds intensified their blocking efforts) to the first quarter of 2017. During the same timeframe, Authenticom's active data fees have fallen by almost half and data integration revenues have decreased by 27.11 percent.

82. After experiencing robust growth for five consecutive years (2010-2014), Authenticom is now cash flow insolvent, with insufficient earnings and resources to satisfy its outstanding debt obligations.

83. In particular, Authenticom was unable to pay an $11 million principal payment on a loan from BMO Harris Bank due April 16, 2017, and has received a limited 90-day forbearance from the Bank pending the outcome of this preliminary injunction motion. That forbearance expires on July 15 2017. Authenticom was also unable to pay an approximately $1.17 million tax-related obligation due April 18, 2017.

84. Authenticom has sought additional financing from, among others, BMO Harris Bank and Citizens State Bank, but they have declined to provide this financing, citing doubts about Authenticom's continued viability in light of Defendants' actions.

85. The blocking tactics of CDK and Reynolds also have severely damaged Authenticom's reputation and goodwill among its customers. CDK threatens its own dealer customers with automated messages that appear on their computer screens when they create new profiles or credentials.

86. Defendants' blocking disrupts Authenticom's ability to provide reliable data integration services. Understandably, our customers have expressed repeated frustrations with the service interruptions caused by Defendants' disabling and blocking of dealer-created passwords.

87. Moreover, Defendants' blocking – and their threats to destroy my company entirely – have made it exceedingly difficult to attract new customers.

88. Without a stop to CDK's and Reynolds' blocking of Authenticom's ability to provide data integration services, I do not see how the company can avoid declaring bankruptcy.

I declare that the foregoing is true and correct to the best of my knowledge.

Executed in Viola, Wisconsin, this 18th day of May, 2017.

By: _____