**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION** | MDL No. 2817<br>Case No. 18-cv-00864 |
| **This Document Relates To:** | Hon. Robert M. Dow, Jr.<br>Magistrate Judge Jeffrey T. Gilbert |
| **THE DEALERSHIP CLASS ACTION** | **PUBLIC-REDACTED** |

**DEALERSHIP COUNTER-DEFENDANTS' MEMORANDUM
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT
ON CDK GLOBAL, LLC'S COUNTERCLAIMS**

**TABLE OF CONTENTS**

INTRODUCTION ..............................................................................................................1

LEGAL STANDARDS ....................................................................................................4

ARGUMENT ...................................................................................................................5

   I.   **DEALERSHIP COUNTER-DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON CDK'S BREACH OF CONTRACT COUNTERCLAIM** ..............5

      A.  Procedural History Regarding CDK's Breach Of Contract Counterclaim....................7

      B.  CDK Has Failed To Show Any Damages For Its Breach of Contract Counterclaim...........................................................................................................11

      C.  CDK Is Not Entitled To Nominal Damages ................................................14

      D.  There Is No Evidence To Support CDK's Request For A Permanent Injunction ........16

          1.  CDK Cannot Show Irreparable Injury ................................................17

          2.  The Issuance of a Permanent Injunction is Against Public Interest ......................21

      E.  Waiver Bars CDK's Breach Of Contract Counterclaim ............................................22

          1.  Waiver - Legal Standard ............................................................................22

          2.  CDK's Conduct Displayed Intent to Waive its Right to Assert Breach of Contract against Dealerships....................................................................................23

      F.  CDK's Breach Of Contract Counterclaim Is Barred By The Doctrine Of Unclean Hands ....................................................................................................28

          1.  Unclean Hands – Legal Standard ................................................................29

          2.  CDK Cannot Seek Injunctive Relief for the Same Alleged Conduct in Which it Engaged ..................................................................................................30

   II.  **DEALERSHIP COUNTER-DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON CDK'S DMCA COUNTERCLAIM** ...............................................32

      A.  CDK's DMCA Counterclaim Fails Because CDK Cannot Establish The Basic Elements Of Its Claim...........................................................................................33

      B.  CDK's DMCA Counterclaim Fails Because The Alleged "Circumvention" Did Not Threaten Any CDK Copyright Interest...........................................................34

          1.  Counter-Defendants' Access to CDK's DMS Software is Authorized by Express Contractual License and the Fair Use Doctrine.........................................34

              a)  Dealership Counter-Defendants .....................................................34

              b)  Authenticom .................................................................................35

i

2. There is No DMCA Liability for Circumvention by Authorized Users ................. 41

    a) The Plain Text of the DMCA ..................................................... 41

    b) Legislative History ...................................................... 42

    c) Policy Considerations Underlying Copyright Law and the DMCA ................. 44

        (i) DMCA Does Not Protect Other Interests ...................................... 44

        (ii) Misuse of Copyright and the DMCA For Anticompetitive Reasons ........... 47

3. Courts Have Applied These Principles to Bar Claims Under the DMCA .............. 49

C. CDK Cannot Offer Evidence Of Any Violations Of The DMCA By Any Specific Dealership Counter-Defendant ................................................... 53

D. CDK Cannot Offer Any Evidence Of A Secondary Violation Of The DMCA By The Continental Counter-Defendants .................................... 56

1. No Evidence of Contributory Liability ................................. 57

    a) The Continental Counter-Defendants Did Not Know of Authenticom's Alleged Circumvention of CAPTCHA ......................................... 57

    b) The Continental Counter-Defendants Did Not Materially Contribute to Any Alleged Circumvention of CAPTCHA ......................................... 64

2. CDK Cannot Adduce Any Evidence of Vicarious Liability ................... 68

    a) The Continental Counter-Defendants Did Not have a Direct Financial Interest in Authenticom's Alleged Circumvention of CAPTCHA ............................ 69

    b) There is No Evidence that the Continental Counter-Defendants had the Right or Ability to Supervise Authenticom's Alleged Circumvention of CAPTCHA ......................................................... 70

    c) There Is No Evidence that the Continental Counter-Defendants Knew of Authenticom's Alleged Circumvention of CAPTCHA .................................. 71

E. CDK Cannot Show Any Acts Of Circumvention By The Warrensburg Counter-Defendants ................................................... 73

1. Background of Authenticom's Profile Manager Progra ........................ 74

2. CDK's Judicial Admissions Preclude Its Claim of Primary Liability Against the Warrensburg Counter-Defendants ............................... 75

3. Instances of Profile Manager Merely "Running", without Re-Enabling a Disabled User Account, are Not Encompassed within the Counterclaim and are Not Acts of Circumvention under the DMCA ................................ 78

4. CDK Lacks Evidence that Any Warrensburg Counter-Defendant's User Account was Ever Re-Enabled by Authenticom's Profile Manager Script ............. 81

F.  There Is No Evidence Of Vicarious Liability For The Warrensburg
    Counter-Defendants ................................................................................................83

CONCLUSION..........................................................................................................................84

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*7-Eleven, Inc. v. Violet Spear & Viannam, Inc.*,
  No. 10-cv-6697, 2012 U.S. Dist. LEXIS 66366 (N.D. Ill. May 11, 2012) ............... 16, 17, 18

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
  888 F. Supp. 2d 431 (S.D.N.Y. 2012) ................................................................... 55

*Adobe Sys. v. Dafang U.S.*,
  No. 2:18-cv-08504-VAP-AGRx, 2019 U.S. Dist. LEXIS 226717
  (C.D. Cal. Aug. 22, 2019) ....................................................................................... 61

*Agfa Monotype Corp. v. Adobe Sys.*,
  404 F. Supp. 2d 1030 (N.D. Ill. 2005) .................................................................. 51

*In re Aimster Copyright Litig.*,
  252 F. Supp. 2d 634 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 ........................ 57, 58, 61

*In re Aimster Copyright Litig.*,
  334 F.3d 643 (7th Cir. 2003) ................................................................................. 17

*Alabi v. Homecomings Fin. LLC*,
  No. 09-cv-4757, 2011 U.S. Dist. LEXIS 107632 (N.D. Ill Sept. 21, 2011).......................... 19

*Allied Waste Transp., Inc. v. John Sexton Sand & Gravel Corp.*,
  No. 13-cv-1029, 2016 U.S. Dist. LEXIS 82001 (N.D. Ill. June 23, 2016) ..................... 12, 13

*Anderson v. Boeing Co.*,
  694 F. App'x 84 (3d Cir. 2017) ............................................................................. 79

*Antonicic v. HSBC Bank USA, N.A.*,
  No. 19-cv-101, 2020 U.S. Dist. LEXIS 53481 (N.D. Ill. Mar. 27, 2020) ............................ 12

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .............................................................................................. 4, 5

*Apple, Inc. v. Motorola, Inc.*,
  869 F. Supp. 2d 901 (N.D. Ill. 2012) .................................................................... 15

*Arista Records LLC v. Lime Grp. LLC*,
  784 F. Supp. 2d 398 (S.D.N.Y. 2011) ................................................................... 64

*Assessment Techs. of WI, LLC v. WIREdata, Inc.*,
  350 F.3d 640 (7th Cir. 2003) ........................................................................ *passim*

*Atkins v. City of Chi.*,
    631 F.3d 823 (7th Cir. 2011) ................................................................ 18, 71

*Automattic Inc. v. Steiner*,
    82 F. Supp. 3d 1011 (N.D. Cal. 2014) ...................................................44

*Bank of Am., N.A. v. Knight*,
    725 F.3d 815 (7th Cir. 2013) ...............................................................54

*Bank of Chi. v. Park Nat'l Bank*,
    640 N.E.2d 1288 (Ill. App. Ct. 1994) ...................................................15

*Bedrossian v. Northwestern Memorial Hosp.*,
    409 F.3d 840 (7th Cir. 2005) ...............................................................18

*Bell v. Chi. Cubs Baseball Club, LLC*,
    No. 19-cv-2386, 2020 U.S. Dist. LEXIS 17527 (N.D. Ill. Feb. 4, 2020)........................*passim*

*Bell v. Powell*,
    No. 1:16-cv-02491-TWP-DML, 2017 U.S. Dist. LEXIS 89587
    (S.D. Ind. June 12, 2017) ....................................................................72

*Bertam Music Co. v. P&C Enters., Inc.*,
    No. 09-CV-2253, 2011 U.S. Dist. LEXIS 71967 (C.D. Ill. July 5, 2011) ............................70

*Boehm v. Svehla*,
    No. 15-cv-379-jdp, 2017 U.S. Dist. LEXIS 158530
    (W.D. Wis. Sept. 27, 2017) ............................................................ 63, 71

*Broad. Music, Inc. v. B&B Entm't, Inc.*,
    No. 14-cv-01337-JPG-PMF, 2016 U.S. Dist. LEXIS 197214
    (S.D. Ill. July 12, 2016) ......................................................................70

*Brownmark Films, LLC v. Comedy Partners*,
    682 F.3d 687 (7th Cir. 2012) ...............................................................38

*Carrado v. Daimler AG*,
    No. 17-cv-3080-WJM-SKC, 2018 U.S. Dist. LEXIS 163026
    (D. Colo. Sept. 24, 2018) ....................................................................55

*Carter v. State Auto Ins. Cos.*,
    No. 18-CV-4227, 2019 U.S. Dist. LEXIS 187250 (C.D. Ill. Sept. 12, 2019) ......................23

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..............................................................................4

*Cent. Bank of Denver v. First Interstate Bank, N.A.*,
    511 U.S. 164 (1994) ............................................................................80

*Cent. Brown Cnty. Water Auth. v. Consoer, Townsend, Envirodyne*,
    No. 09-C-0131, 2013 U.S. Dist. LEXIS 18007 (E.D. Wis. Feb. 11, 2013) ..........................16

*Century Consultants, Ltd. v. Miller Grp., Inc.*,
    No. 03-3105, 2008 U.S. Dist. LEXIS 9005 (C.D. Ill. Feb. 6, 2008).....................................70

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.*,
    381 F.3d 1178 (Fed. Cir. 2004)..................................................................................*passim*

*Chambers v. Amazon.com Inc.*,
    632 Fed. Appx. 742 (4th Cir. 2015) (*per curiam*)................................................45

*China Cent. TV v. Create New Tech. (HK) Ltd.*,
    No. CV-15-01869 MMM, 2015 U.S. Dist. LEXIS 76005
    (C.D. Cal. June 11, 2015) ...................................................................................61

*Clutch Auto Ltd. v. Judge John Robert Blakey Navistar, Inc.*,
    No. 12-C-9564, 2015 U.S. Dist. LEXIS 34460 (N.D. Ill. Mar. 19, 2015) ...........................15

*Conrad v. AM Cmty. Credit Union*,
    No.13-cv-461-bbc, 2013 U.S. Dist. LEXIS 113168
    (W.D. Wis. Aug. 12, 2013)...................................................................................66

*Costello v. Grundon*,
    651 F.3d 614 (7th Cir. 2011) ...............................................................................22

*Crane v. Ind. High Sch. Athletic Ass'n*,
    975 F.2d 1315 (7th Cir. 1992) .............................................................................17

*Crest Hill Land Dev., LLC v. City of Joliet*,
    396 F.3d 801 (7th Cir. 2005) ...............................................................................77

*Denison v. Larkin*,
    64 F. Supp. 3d 1127 (N.D. Ill. 2014)...........................................................40, 56

*DISH Network L.L.C. v. World Cable Inc.*,
    893 F. Supp. 2d 452 (E.D.N.Y. 2012)..................................................................81

*Duncanson v. Wine & Canvas IP Holdings LLC*,
    No. 1:16-cv-00788-SEB-DML, 2018 U.S. Dist. LEXIS 168592
    (S.D. Ind. Sept. 30, 2018) ...................................................................................71

*Ediciones Quiroga, S.L. v. Fall River Music, Inc.*,
    No. 93 Civ. 3914 (RPP), 1998 U.S. Dist. LEXIS 19039
    (S.D.N.Y. Dec. 7, 1998) ......................................................................................67

*Ellis v. CCA of Tenn. LLC*,
    650 F.3d 640 (7th Cir. 2011) .................................................................................5

*Empire Indus. v. Winslyn Indus.*,
327 F. Supp. 3d 1101 (N.D. Ill. 2018) ............................................................... 30

*Evolution, Inc. v. Suntrust Bank*,
342 F. Supp. 2d 943 (D. Kan. 2004) ................................................................... 37

*Flava Works, Inc. v. Clavio*,
No. 11-C-05100, 2012 U.S. Dist. LEXIS 88673 (N.D. Ill. June 27, 2012) ..................... 56, 68

*Flava Works, Inc. v. Gunter*,
689 F.3d 754 (7th Cir. 2012) ...................................................................... 64, 76

*Ford Motor Co. v. Autel US, Inc.*,
No. 14-13760, 2015 U.S. Dist. LEXIS 133201 (E.D. Mich. Sept. 30, 2015) ................ 45, 52

*Frobe v. Vill. of Lindenhurst*,
No. 11-C-1722, 2013 U.S. Dist. LEXIS 140007 (N.D. Ill. Sept. 30, 2013) ...................... 20

*Gateway Eastern R.R. Co. v. Terminal R.R. Assoc. of St. Louis*,
35 F.3d 1134 (7th Cir. 1994) ........................................................................ 17

*GC2 Inc. v. Int'l Game Tech. PLC*,
255 F. Supp. 3d 812 (N.D. Ill. 2017) ..................................................... 68, 69, 70, 84

*Gordon v. Nextel Commc'ns*,
345 F.3d 922 (6th Cir. 2003) ........................................................................ 57

*Hammer v. Residential Credit Solutions, Inc.*,
No. 13-CV-6397, 2015 U.S. Dist. LEXIS 162636 (N.D. Ill. Dec. 3, 2015) ...................... 22

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
471 U.S. 539 (1985) .............................................................................. 38, 39

*Hernandez v. Towne Park, Ltd.*,
No. CV 12-02972 MMM, 2012 U.S. Dist. LEXIS 86975
(C.D. Cal. June 22, 2012) ........................................................................... 83

*Holson Inv. Co. v. Villelli*,
No. 97-C-988, 1998 U.S. Dist. LEXIS 8735 (N.D. Ill. June 3, 1998) ...................... 22, 23

*Huddleston v. Am. Airlines, Inc.*,
No. 16-cv-09100, 2018 U.S. Dist. LEXIS 169962 (N.D. Ill. Oct. 2, 2018) ...................... 12

*I.M.S. Inquiry Mgmt. Sys. v. Berkshire Info. Sys.*,
307 F. Supp. 2d 521 (S.D.N.Y. 2004) ............................................................... 62

*Ill. Bell Tel. Co. v. Ill. Commerce Comm'n*,
740 F.2d 566 (7th Cir. 1984) ........................................................................ 16

*In-N-Out Burgers v. Smashburger IP Holder LLC*,
  No. 17-CV-1474, 2018 U.S. Dist. LEXIS 225088 (C.D. Cal. Dec. 21, 2018) ..................... 30

*Indeck N. Am. Power Fund, L.P. v. Norweb PLC*,
  316 Ill. App. 3d 416 (Ill. App. Ct. 2000) ............................................................ 63

*Int'l Union, Allied Indus. Workers of Am. v. Local Union No. 589, Allied Indus.
  Workers of Am.*,
  693 F.2d 666 (7th Cir. 1982) ........................................................................... 29

*Jennings Water, Inc. v. City of N. Vernon, Ind.*,
  895 F.2d 311 (7th Cir. 1989) ........................................................................... 17

*Kamboj v. Eli Lilly & Co.*,
  No. 05-C-4023, 2007 U.S. Dist. LEXIS 4259 (N.D. Ill. Jan. 18, 2007) ............... 11

*Keller v. United States*,
  58 F.3d 1194 (7th Cir. 1995) ........................................................................... 77

*Kienitz v. Sconnie Nation LLC*,
  766 F.3d 756 (7th Cir. 2014) ........................................................................... 38

*Kreg Therapeutics, Inc. v. Vitalgo, Inc.*,
  11-cv-6771, 2013 U.S. Dist. LEXIS 44309 (N.D. Ill. Mar. 28, 2013)............... 17, 19

*LAJIM, LLC v. GE*,
  No. 13-CV-50348, 2017 U.S. Dist. LEXIS 144704 (N.D. Ill. Sept. 7, 2017) ....... 17

*LAJIM, LLC v. Gen. Elec. Co.*,
  917 F.3d 933 (7th Cir. 2019) ........................................................................... 21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  387 F.3d 522 (6th Cir. 2004) ..................................................................*passim*

*Livnat v. Lavi*,
  No. 96 Civ. 4967(RWS), 1998 U.S. Dist. LEXIS 917 (S.D.N.Y. Feb. 2, 1998).................. 67

*Luvdarts, LLC v. AT&T Mobility, LLC*,
  710 F.3d 1068 (9th Cir. 2013) ......................................................................... 61

*Majors v. Gen. Elec. Co.*, 714 F.3d 527 (7th Cir. 2013) ........................................... 4

*Manley v. Boat/U.S. Inc.*,
  No. 13-cv-5551, 2016 U.S. Dist. LEXIS 41036 (N.D. Ill. Mar. 29, 2016) ........... 29

*Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distribs.*,
  983 F. Supp. 1167 (N.D. Ill. 1997) ............................................................... 38, 64

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ................................................................................................5

*In re Maxim Integrated Prods.*,
No. 12-CV-244, 2013 U.S. Dist. LEXIS 196320 (W.D. Pa. Mar. 19, 2013) ........................80

*McMaken v. GreatBanc Trust Co.*,
No. 17-cv-04983, 2019 U.S. Dist. LEXIS 56876 (N.D. Ill. Apr. 3, 2019)..............................80

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
No. 09-15932, 2011 U.S. App. LEXIS 3428 (9th Cir. 2011) ..................................................52

*Melrose Park Nat'l Bank v. Carr*,
618 N.E.2d 839 (Ill. App. Ct. 1993)......................................................................................23

*MGM Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005) ................................................................................ 64, 66, 72, 76

*Microsoft Corp. v. Rechanik*,
249 Fed. Appx. 476 (7th Cir. 2007) ....................................................................................64

*Microsoft Corp. v. Silver Star Micro, Inc.*,
2008 U.S. Dist. LEXIS 1526 (N.D. Ga. Jan. 9, 2008) ..........................................................57

*Microsoft Corp., v. V3 Solutions, Inc.*,
No. 01-CV-4693, 2003 U.S. Dist. LEXIS 15008 (N.D. Ill. Aug. 27, 2003) ..........................19

*Miszczyszyn v. JPMorgan Chase Bank, N.A.*,
No. 18-cv-3633, 2019 U.S. Dist. LEXIS 45154 (N.D. Ill. Mar. 19, 2019) ...........................12

*Monotype Imaging, Inc. v. Bitstream, Inc.*,
376 F. Supp. 2d 877 (N.D. Ill. 2005)............................................................................ 57, 60

*Myers v. Harold*,
279 F. Supp. 3d 778 (N.D. Ill. 2017)....................................................................................58

*Nielsen Co. (US), LLC v. Truck Ads, LLC*,
No. 08-C-6446, 2011 U.S. Dist. LEXIS 6453 (N.D. Ill. Jan. 24, 2011) ...............................47

*Nordstrom Consulting, Inc. v. M&S Techs., Inc.*,
No. 06-C-3234, 2008 U.S. Dist. LEXIS 17259 (N.D. Ill. Mar. 4, 2008) ........................51, 52

*Oppenheimer v. Allvoices, Inc.*,
No. C 14-00499 LB, 2014 U.S. Dist. LEXIS 80320 (N.D. Cal. June 10, 2014) ...................61

*Original Great Am. Chocolate Chip Cookie Co., Inc. v. River Valley Cookies,Ltd.*,
970 F.2d 273 (7th Cir. 1992) ................................................................................................29

*Packers Trading Co. v. CFTC*,
  972 F.2d 144 (7th Cir. 1992) ...................................................................30

*Pampered Chef v. Alexanian*,
  804 F. Supp. 2d 765 (N.D. Ill. 2011) ......................................................30

*Parish v. UPMC Univ. Health Ctr. of Pittsburgh*,
  373 F. Supp. 3d 608 (W.D. Pa. 2019) .....................................................79

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ...........................................................66, 70

*PhantomALERT, Inc. v. Google Inc.*,
  No. 15-cv-03986-JCS, 2016 lexis 30321 N.D. Cal. Mar. 8, 2016) ........37

*Pictures Words, Inc. v. CM Servs. Sales & Mktg. Grp.*,
  No. 18-cv-02234, 2018 U.S. Dist. LEXIS 109488 (N.D. Cal. June 29, 2018) .....................44

*Pierce v. City of Chi.*,
  No. 09-CV-1462, 2012 U.S. Dist. LEXIS 14331 (N.D. Ill. Feb. 7, 2012) ...........................77

*Pinter v. Dahl*,
  486 U.S. 622 (1988) .................................................................................80

*Practice Mgmt. Info. Corp. v. AMA*,
  121 F.3d 516 (8th Cir. 1997) ..................................................................48

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
  324 U.S. 806 (1945) .................................................................................30

*Prewett Enters. v. Grand Trunk W. R.R. Co.*,
  No. 18-CV-04254, 2019 U.S. Dist. LEXIS 204401 (N.D. Ill. Nov. 25, 2019) ......................54

*Prima Tek II, L.L.C. v. Klerk's Plastic Indus.*,
  525 F.2d 533 (7th Cir. 2008) ..................................................................15

*Purcell & Wardrope Chartered v. Hertz Corp.*
  530 N.E.2d 994 (Ill. App. Ct. 1988) ..................................................14, 15

*Ragsdale v. Turnock*,
  841 F.2d 1358 (7th Cir. 1988) ................................................................20

*Red Label Music Publ'g, Inc. v. Chila Prods.*,
  388 F. Supp. 3d 975 (N.D. Ill. 2019) ................................................39, 41

*Rysewyk v. Sears Holdings Corp.*,
  No. 15-CV-4519, 2015 U.S. Dist. LEXIS 169124 (N.D. Ill. Dec. 18, 2015) ......................54

*Scheiber v. Dolby Labs., Inc.*,
   293 F.3d 1014 (7th Cir. 2002) ............................................................................29

*Sega Enterprises Ltd. v. Accolade, Inc.*,
   977 F.2d 1510 (9th Cir.1992) ....................................................................... 40, 41

*Sibley v. Dart*,
   No. 17-cv-6298, 2019 U.S. Dist. LEXIS 26195 (N.D. Ill. Feb. 19, 2019)............................55

*Sinclair Broad. Group, Inc. v. Colour Basis, LLC*,
   No. CCB-14-2614, 2016 U.S. Dist. LEXIS 84154 (D. Md. June 29, 2016) ........................35

*Somerset Place, LLC v. Sebelius*,
   684 F. Supp.2d 1037 (N.D. Ill. 2010)..................................................................17

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) ................................................................................ 36, 68, 72

*Sony/ATV Publ'g, LLC v. Marcos*,
   651 Fed. Appx. 482 (6th Cir. 2016) .....................................................................35

*Stewart v. Abend*,
   495 U.S. 207 (1990) .........................................................................................40

*Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*,
   421 F.3d 1307 (Fed. Cir. 2005)......................................................................*passim*

*Storm Impact, Inc. v. Software of the Month Club*,
   13 F. Supp. 2d 782 (N.D. Ill. 1998) ....................................................................36

*Surgidev Corp. v. Eye Tech., Inc.*,
   648 F. Supp. 661 (D. Minn. 1986) ......................................................................28

*Swyear v. Fare Foods Corp.*,
   911 F.3d 874 (7th Cir. 2018) ...............................................................................11

*TAS Distrib. Co. v. Cummins Engine Co.*,
   491 F.3d 625 (7th Cir. 2007) ......................................................................... 11, 12

*Telebrands Corp. v. My Pillow, Inc.*,
   No. 18-CV-06318, 2019 U.S. Dist. LEXIS 72832 (N.D. Ill. Apr. 30, 2019) ........................68

*Tirado v. Bank of Am., Nat'l Ass'n*,
   No. 18-cv-5677, 2019 U.S. Dist. LEXIS 165154 (N.D. Ill. Sep. 26, 2019)...........................12

*Transp. & Transit Assocs., Inc. v. Morrison Knudsen Corp.*,
   255 F.3d 397 (7th Cir. 2001) ..................................................................... 11, 12, 13

*Ty, Inc. v. Publ'ns Int'l, Ltd.*,
    292 F.3d 512 (7th Cir. 2002) ........................................................................40

*UIRC-GSA Holdings Inc. v. William Blair & Co., L.L.C.*,
    No. 15-CV-9518, 2017 U.S. Dist. LEXIS 133287 (N.D. Ill. Aug. 21, 2017) ........................65

*United States v. Dish Network LLC*,
    256 F. Supp. 3d 810 (C.D. Ill. 2017) ..........................................................83

*Universal City Studios v. Corley*,
    273 F.3d 429 (2d Cir. 2001) ........................................................................44

*VHT, Inc. v. Zillow Grp., Inc.*,
    918 F.3d 723 (9th Cir. 2019) ......................................................................66

*Walker v. Ridgeview Constr. Co.*,
    736 N.E.2d 1184 (Ill. App. Ct. 2000) ..........................................................14

*Wert v. Cohn*,
    No. 17-C-219, 2019 U.S. Dist. LEXIS 63226 (N.D. Ill. Apr. 12, 2019) ..............................55

*Whalen v. K-Mart Corp.*,
    519 N.E.2d 991 (Ill. App. Ct. 1988) ..........................................................22

*Williams v. Ozmint*,
    726 F. Supp. 2d 589 (D.S.C. 2010) ............................................................79

*Young v. Verizon's Bell Atl. Cash Balance Plan*,
    615 F.3d 808 (7th Cir. 2010) ......................................................................29

**Statutes**

Ariz. Rev. Stat. Ann. § 28-4653(A)(3) ..........................................................52

15 U.S.C. § 6823(a) ............................................................................81

17 U.S.C. § 1203(c)(3) ........................................................................79

19 U.S.C. § 3907(a) ............................................................................81

18 U.S.C. § 1831(a)(4) ........................................................................81

17 U.S.C. § 1201 ..........................................................................*passim*

**Other Authorities**

Fed. R. Civ. P. 56(a)..............................................................................................................4

27A Am. Jur. 2d Equity § 100 (2d ed. 2009) ............................................................26

Counter-Defendants ACA Motors, Inc., d/b/a Continental Acura; Baystate Ford Inc.; Cherry Hill Jaguar; Cliff Harris Ford, LLC, d/b/a Warrensburg Ford; Continental Autos, Inc., d/b/a Continental Toyota; Continental Classic Motors, Inc., d/b/a Continental Autosports; 5800 Countryside, LLC, d/b/a Continental Mitsubishi; HDA Motors, Inc., d/b/a Continental Honda; H & H Continental Motors, Inc., d/b/a Continental Nissan; JCF Autos LLC, d/b/a Stevens Jersey City Ford; Jericho Turnpike Sales LLC, d/b/a Ford & Lincoln of Smithtown; Marshall Chrysler Jeep Dodge, L.L.C., d/b/a Marshall Chrysler Jeep Dodge Ram; Naperville Zoom Cars, Inc., d/b/a Continental Mazda; NV Autos, Inc., d/b/a Continental Audi; Patchogue 112 Motors, LLC, d/b/a Stevens Ford; Waconia Dodge, Inc.; Warrensburg Chrysler Dodge Jeep, L.L.C., d/b/a Warrensburg Chrysler Dodge Jeep Ram Fiat (collectively, "Dealership Counter-Defendants") respectfully submit this memorandum, pursuant to Rule 56 of the Federal Rules of Civil Procedure, in support of Dealership Counter-Defendants' motion for summary judgment on the counterclaims filed against them by CDK Global, LLC ("CDK").

## **INTRODUCTION**

Dealership Counter-Defendants are entitled to summary judgment on CDK's counterclaims alleging breach of contract and violations of the Digital Millennium Copyright Act ("DMCA").

Despite CDK's assertions that its expert would quantify damages for its breach of contract counterclaim, its expert did not even *attempt* to do so. Indeed, CDK recently informed counsel for Dealership Counter-Defendants that it is not seeking actual damages for its breach of contract counterclaim, and seeks only declaratory and injunctive relief "and/or" nominal damages. CDK, however, is entitled to ***no relief*** because it cannot prove actual damages – an essential element of its claim. Actual damages is not merely the typical form of relief for a breach of contract claim – it is an essential element of that claim, and must be proven before any relief can be awarded in any

1

form. Here, CDK cannot (and has not even attempted to) proffer evidence of actual damages resulting from Dealership Counter-Defendants' alleged breaches of contract. Accordingly, because CDK cannot proffer sufficient evidence to support essential element of its claim, it is not entitled to any relief, and summary judgment should be entered in Dealership Counter-Defendants' favor.

Even if CDK could proffer sufficient evidence of actual damages resulting from Dealership Counter-Defendants' purported breaches of contract (which it cannot), dealerships would still be entitled to summary judgment on CDK's counterclaim. CDK alleges that dealerships breached contractual provisions that supposedly barred data integrators from accessing their DMS using dealer-provided login credentials. However, CDK waived any right to enforce those purported prohibitions by failing to enforce them; instead, CDK historically informed dealerships that they **could** provide login credentials to data integrators. CDK's own "unclean hands" also bar CDK's counterclaim, as CDK engaged in the same type of "hostile integration" that it now claims is a breach of contract. Finally, CDK is not entitled to injunctive relief, as the record shows that no Dealership Counter-Defendant is currently providing DMS login credentials to data integrators.

CDK's DMCA counterclaim fares no better. CDK alleges that certain dealerships (the "Warrensburg Counter-Defendants" and the "Continental Counter-Defendants") violated the DMCA by purportedly "circumventing" two technological measures – CDK's CAPTCHA prompts and its disabling of DMS user accounts that, according to CDK, were being used by independent data integrators – that purportedly controlled access to the DMS. CDK also alleges that Counter-Defendants may be held liable under principles of secondary liability for acts of "circumvention" allegedly performed by Authenticom, Inc. ("Authenticom"). Those claims fail because CDK's software is not entitled to protection under the Copyright Act, CDK's

technological measures were not "circumvented," and the measures did not "effectively control" access to CDK's software.

Moreover, there can be no liability under the DMCA – the goal of which is to protect against piracy of copyrighted works, not to support the misuse of copyright to further anticompetitive goals – because any purported circumvention did not threaten any CDK copyright interest. Dealership Counter-Defendants had express contractual licenses to access CDK's DMS software and any access by Authenticom would be authorized under the "fair use" doctrine.

The counterclaim also fails because CDK has not proffered any evidence of DMCA violations by any individual Counter-Defendant. CDK's expert's opinions concerning Counter-Defendants' liability *in the aggregate* are insufficient to establish liability against any *individual* Counter-Defendant.

The DMCA counterclaim fails for additional reasons. CDK asserts a secondary liability claim (but no primary liability claim) against the "Continental Counter-Defendants," based on purported circumvention of CDK's CAPTCHA prompts by Authenticom. However, CDK's own allegations, as well as the testimony of CDK's experts and other evidence, establish that to the extent that Authenticom used technological measures to respond to CDK's CAPTCHA prompts, the Continental Counter-Defendants did not know of, contribute to, or have any direct financial interest in any such purported conduct.

CDK asserts primary and secondary liability claims against the "Warrensburg Counter-Defendants," based on the alleged use of an Authenticom software program ("Profile Manager") to re-enable DMS user accounts that CDK had disabled. However, according to CDK's expert, the purported DMCA violations principally involved instances where Profile Manager merely "launched" or "ran", but *did not re-enable* a disabled user account. Because no access controls

3

were actually "circumvented" in those instances, there was no DMCA violation. Further, in the few instances where CDK's expert opined that a user account was re-enabled, the opinion is wholly unreliable as it based solely on specious projections and flawed assumptions, not evidence of actual re-enablement. Finally, CDK's attempt to hold the Warrensburg Counter-Defendants vicariously liable for Authenticom's alleged use of Profile Manager fails, as CDK cannot proffer evidence of any direct financial interest in such conduct.

For the foregoing reasons, and as more fully described below, summary judgment should be granted for the Dealership Counter-Defendants, and CDK's counterclaims should be dismissed in their entirety.

## LEGAL STANDARDS

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532-33 (7th Cir. 2013) (citation omitted).

To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250.

Summary judgment is proper if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex*, 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

## <u>ARGUMENT</u>

### I. DEALERSHIP COUNTER-DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON CDK'S BREACH OF CONTRACT COUNTERCLAIM

CDK has alleged a counterclaim for breach of contract against all Dealership Counter-Defendants.[1] CDK's breach of contract counterclaim[2] asserts that Dealership Counter-Defendants' conduct has caused damage to CDK, "including by depriving CDK of revenue that it could otherwise earn by charging Authenticom or other unauthorized third parties to access CDK's DMS through its 3PA program or otherwise, [and] by causing CDK to incur the costs and expenses associated with investigating unauthorized third party access to its DMS."[3] Despite these allegations, CDK's representation in an interrogatory response that its expert would calculate actual damages for the counterclaim, and a motion to compel CDK to quantify such damages after

---

[1] Each of the Dealership Counter-Defendants entered into a "Master Services Agreement" ("MSA") with CDK. *See* PSUMF ¶ 5. "PSUMF" refers to Dealership Counter-Defendants' Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment on CDK Global, LLC's Counterclaims, filed contemporaneously herewith.

[2] *See* CDK's Answer and Affirmative and Additional Defenses to the Dealership Consolidated Class Action Complaint and CDK Global, LLC's Counterclaims, ECF No. 522 ("Counterclaims"), ¶¶ 7-26 and First Counterclaim for Relief ¶¶ 133-37 (dated Feb. 22, 2019).

[3] *See* Counterclaims ¶ 137.

months of stonewalling, ███████████████████████████████████

████████████████████. *See* PSUMF ¶ 7. ████████████████████

███████████████████████████████████████████████████████████

███████████. Illinois law (*see* PSUMF ¶ 6)[4] is clear that to establish a claim for breach of contract, a party must prove actual damages.[5] CDK, however, provides no evidence of actual damages caused by any Dealership Counter-Defendant's alleged breach of contract. As such, CDK cannot satisfy an essential element of its claim and summary judgment should be granted in Dealership Counter-Defendants' favor as a matter of law.

Moreover, in March 2020, more than a year after filing its Counterclaims – and only after dealership counsel inquired whether CDK would voluntarily dismiss its breach of contract counterclaim based on its failure to calculate any actual damages – CDK responded it was only seeking "declaratory and injunctive relief . . . *and/or* nominal damages" (emphasis added).[6] At this late stage of the litigation, CDK still refuses to clearly identify what remedies it seeks, and is doing so despite the fact it cannot sustain its breach of contract counterclaim. As CDK cannot sustain its counterclaim, logically, it cannot seek remedies for this claim.

In any scenario, however, there is no basis for any of the remedies sought by CDK because (1) without any calculation of actual damages, nominal damages are not recoverable;[7] (2) CDK's request for injunctive relief is meritless as the undisputed evidence shows there is no conduct to

---

[4] *See* Ex. A annexed to the Declaration of Peggy J. Wedgworth (hereinafter referred to as "Ex. __"), CONTINENTAL0056450 to 552 (DX 528), 2017 CDK Master Services Agreement between CDK and Continental Honda at § 18(I) ███████████████████████████████████████████

[5] *See infra* Section I(B).

[6] *See* Ex. B, Feb. 28, 2020 Letter from Peggy J. Wedgworth to Britt M. Miller ("Wedgworth Letter") and Ex. C, Mar. 4, 2020 Letter from Britt M. Miller to Peggy J. Wedgworth ("Miller Response").

[7] *See infra* Section I(C).

enjoin;[8] and (3) CDK's breach of contract counterclaim fails without actual damages, so there is no basis for its redundant request for declaratory relief."[9] Accordingly, summary judgment should be granted as to CDK's breach of contract counterclaim.

## A. Procedural History Regarding CDK's Breach Of Contract Counterclaim

On February 22, 2019, CDK filed three counterclaims against Dealership Counter-Defendants, including a breach of contract claim.[10] CDK's counterclaim alleges that Dealership Counter-Defendants' conduct has caused damages to CDK, "including by depriving CDK of revenue that it could otherwise earn by charging Authenticom or other unauthorized third parties to access CDK's DMS through its 3PA program or otherwise, [and] by causing CDK to incur the costs and expenses associated with investigating unauthorized third party access to its DMS."[11]

On March 8, 2019, Dealership Counter-Defendants served their First Set of Interrogatories regarding CDK's counterclaims ("Interrogatories").[12] Interrogatory No. 11 requested identification, for each Dealership Counter-Defendant, of "all 'losses, expenses and other damages' that CDK allegedly suffered as a result of each Dealership Counter-Defendant's alleged . . . breaches of contract [and CDK's other counterclaims against Dealership Counter-Defendants], including the date, and amount [of] each such loss, expense and other damage." CDK responded to Interrogatory No. 11 ("Interrogatory Response") as follows:

████████████████████████████████████████

████████████████████████████████████████

---

[8] *Id*. Section I(D).

[9] *See* Counterclaims, Prayer for Relief. *See infra* Sections I(B) and (C).

[10] *See* Counterclaims ¶¶ 133-37. This Court granted Dealership Counter-Defendants' motion to dismiss CDK's claim under the Computer Fraud and Abuse Act (Second Counterclaim), including for failure to allege sufficient losses. *See* Memorandum Opinion and Order, ECF No. 749 at 11-24, 30 (dated Sept. 3, 2019).

[11] *See* Counterclaims ¶ 137.

[12] *See* Ex. D, Interrogatories.



*See* PSUMF ¶ 7.[13]

On August 12, 2019, five months after serving the Interrogatories, Dealership Counter-Defendants filed a Motion to Compel Responses to Interrogatories ("Motion to Compel"), which, *inter alia*, sought to compel CDK to supplement its inadequate response to Interrogatory No. 11. Dealership Counter-Defendants presciently noted that:

> [I]t is only CDK's repeated efforts to avoid responding to the Interrogatories that has caused the expert report deadline to "bump up" against the filing of this Motion. Dealership Counter-Defendants should not be forced to wait any further, until CDK serves its expert reports, to learn the specific damages that CDK seeks to recover; *indeed, there is no guarantee that CDK's expert reports will contain a quantification of the damages it seeks, much less a separate quantification of the alleged damages that were caused by each individual Counter-Defendant*.[14]

On August 26, 2019, CDK's damages expert, Professor Daniel L. Rubinfeld ("Professor Rubinfeld"), submitted his Expert Damages Report regarding CDK's counterclaims against Authenticom and certain dealerships.[15] ███████ ███████ ███████ █████████ ████████

---

[13] *See* Ex. E, Interrogatory Response at 16 (dated Jul. 3, 2019) (emphasis added).

[14] *See* ECF. No. 742 at 10 (emphasis added).

[15] *See* Ex. F, Expert Damages Report of Daniel L. Rubinfeld In the Matter of: Authenticom and the putative Dealer Class ("Rubinfeld Report") (dated Aug. 26, 2019).

███████████████████████████████████████████████████

████████████ . *See* PSUMF ¶ 7.[16] And on September 3, 2019, when CDK filed its opposition to Dealerships' Motion to Compel, it simply responded that its August 26, 2019 expert report "addresses the damages associated with CDK's counterclaims against the Dealer Counter-Defendants. . . . [and] sets forth the categories of damages that CDK is seeking and the underlying methodologies used to calculate them based on the information presently available in the record."[17] On December 3, 2019, in denying the Motion to Compel, the Court (Gilbert, M.J.) explained that damages would be the subject of expert testimony:

> Both Dealership Class Plaintiffs/Counter-Defendants and CDK seem to acknowledge . . . that each side's damages theories *will be the subject of expert testim*ony *and that the damage calculations will be included in the parties' expert reports.* On August 26, 2019, CDK served an expert report that apparently addresses the damages associated with CDK's counterclaims against the Dealership Class Plaintiffs/Counter-Defendants. *CDK represents that the report sets forth the categories of damages that CDK is seeking and the underlying methodologies used to calculate them based on the information presently available in the record.* It appears CDK now is seeking to recover only statutory damages for the conduct alleged in its counterclaims.[18]

████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████ . *See* PSUMF ¶ 7.[19] Following Professor Rubinfeld's deposition, on February 28, 2020, Dealership Counter-Defendants' counsel

---

[16] *See* Ex. F, Rubinfeld Report ███████████████████████████████████████

███████████████████████████████████████████████████

████████████ *See* Ex. G, Deposition of Professor Rubinfeld (Feb. 7, 2020) ("Rubinfeld Tr.") at 364:16-365:4.

[17] *See* Response in Opposition to Dealership Class Plaintiffs' Motion to Compel Responses to Interrogatories, ECF No. 750 at 10-11 (dated Sept. 3, 2019) ("Motion to Compel Opp.").

[18] *See* Order, ECF No. 838 at 5 (dated Dec. 3, 2019) (emphasis added).

[19] *See* Ex. G, Rubinfeld Tr. at 364:16-365:4.

wrote to CDK counsel requesting that CDK voluntarily dismiss this counterclaim given its failure to disclose any actual damages. *See* PSUMF ¶ 7.[20] CDK counsel responded on March 4, 2020, declining to dismiss its breach of contract counterclaim because "CDK's counterclaims included a request for declaratory and injunctive relief [and] that it is continuing to pursue its Breach of Contract counterclaims for that relief and/or nominal damages . . . ." *See* PSUMF ¶ 7.[21] There is no evidence, however, to support such relief against Dealership Counter-Defendants. Moreover, CDK's representation that it is pursuing only declaratory and injunctive relief ***and/or*** nominal damages for its counterclaims is contrary to both ██████████████████████████

████████████████████████████████████████████████

██████████ and its representation to the Court that "specific calculations were more properly addressed by its . . . expert."[23]

In sum, CDK filed its Counterclaims in February 2019 – after the benefit of nine months of discovery, including the production of over 1.2 million documents – choosing to specifically allege that Dealership Counter-Defendants' conduct caused actual damages to CDK.[24] CDK maintained in its Interrogatory Response that quantification of such damages would be the subject of expert testimony. *See* PSUMF ¶ 7. Despite repeated requests over the next five months to quantify the damages it sought for its breach of contract counterclaim, CDK maintained that damages would be addressed in its expert report, necessitating Dealership Counter-Defendants' Motion to Compel. █████████████████████████████

---

[20] *See* Ex. B, Wedgworth Letter.

[21] *See* Ex. C, Miller Response.

[22] *See* Ex. E, Interrogatory Response at 16.

[23] *See* Motion to Compel Opp. at 10.

[24] *See* Counterclaims ¶ 137.

███████████████████████████████████

████████████████████████

Attempting to minimize the burden on judicial resources and the parties, in advance of upcoming summary judgment briefing, Dealership Counter-Defendants requested CDK voluntarily dismiss its breach of contract claim as it was not pursuing actual damages as it earlier represented. *See* PSUMF ¶ 7.[25] CDK refused, citing declaratory and injunctive relief and nominal damages it may or may not pursue, which are completely baseless pursuant to well-established legal precedent. *see* PSUMF ¶ 7.[26] As aptly stated by Judge Easterbrook, "[t]here is no point in litigating a case if the plaintiff is unprepared to demonstrate loss, so the district court was right to grant summary judgment to [defendant]." *Transp. & Transit Assocs., Inc. v. Morrison Knudsen Corp.* ("*Transp. & Transit*"), 255 F.3d 397, 401 (7th Cir. 2001).

### B.   CDK Has Failed To Show Any Damages For Its Breach of Contract Counterclaim

Under Illinois law, a plaintiff must establish the following four elements to prove a *prima facie* claim for breach of contract: (1) the existence of a valid and enforceable contract; (2) plaintiff substantially performed the contract; (3) the defendant breached that contract; and (4) damages resulted from the alleged breach of contract. *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 886 (7th Cir. 2018). All four elements must be satisfied. *Kamboj v. Eli Lilly & Co.*, No. 05-C-4023, 2007 U.S. Dist. LEXIS 4259, at *15 (N.D. Ill. Jan. 18, 2007). Damages must result from the alleged breach of contract or the claim fails. *See, e.g.*, *TAS Distrib. Co. v. Cummins Engine Co.* ("*TAS*"), 491 F.3d 625, 631 (7th Cir. 2007) ("Merely showing that a contract has been breached without demonstrating actual damage does not suffice, under Illinois law, to state a claim for breach of

---

[25] *See* Ex. B, Wedgworth Letter.

[26] *See* Ex. C, Miller Response.

contract")[27] *Huddleston v. Am. Airlines, Inc.*, No. 16-cv-09100, 2018 U.S. Dist. LEXIS 169962, at *19 (N.D. Ill. Oct. 2, 2018) (citing *TAS*, 491 F.3d 631 n.6) ("Illinois law is clear that, to state a claim for breach of contract, one must be able to prove actual damage.") (citation omitted).[28]

As this Court clarified recently, a breach of contract claim under Illinois law requires actual, pecuniary damage. *Tirado v. Bank of Am., Nat'l Ass'n*, No. 18-cv-5677, 2019 U.S. Dist. LEXIS 165154, at *15 (N.D. Ill. Sep. 26, 2019) (dismissing breach of contract claim where alleged injuries were insufficient to show that plaintiff suffered pecuniary damage); *see also Miszczyszyn v. JPMorgan Chase Bank, N.A.,* No. 18-cv-3633, 2019 U.S. Dist. LEXIS 45154, at *12-13 (N.D. Ill. Mar. 19, 2019); *Antonicic v. HSBC Bank USA, N.A.,* No. 19-cv-101, 2020 U.S. Dist. LEXIS 53481, at *4-5 (N.D. Ill. Mar. 27, 2020). Thus, at the summary judgment stage, CDK must offer sufficient evidence of actual, pecuniary damage, showing that the dealerships in question actually caused CDK to lose some amount of money as a result of their alleged breach.

As the party seeking recovery, it is CDK's burden to prove that it sustained damages. *Allied Waste Transp., Inc. v. John Sexton Sand & Gravel Corp.* ("*Allied Waste*"), No. 13-cv-1029, 2016 U.S. Dist. LEXIS 82001, at *68-69 (N.D. Ill. June 23, 2016) ("In Illinois, in order to prevail on a claim for breach of contract, Allied 'bears the burden of proving that [it] sustained damages' . . . . Without evidence as to the value of Allied's increase in partnership share, the Court cannot say – as a matter of law – that Allied suffered damages sufficient to succeed on its breach of contract claim."). *See also Transp. & Transit*, 255 F.3d at 401 (citation omitted) ("[T]he party claiming

---

[27] In *TAS*, the Seventh Circuit Court of Appeals affirmed the district court's decision granting summary judgment in favor of the defendant as to plaintiff's breach of contract claim "because proof of damages is an element of a breach of contract claim, and [plaintiff] had failed to present any proof that it was damaged by [defendant] . . . ." 491 F.3d at 630.

[28] "Under Illinois law, it is necessary to show damages – not the specific amount, but rather that the plaintiff did, in fact, suffer some damages." *Transp. & Transit*, 255 F.3d at 401. Merely showing that a contract has been breached without demonstrating actual damage does not suffice to state a claim for breach of contract. *Allied Waste*, 2016 U.S. Dist. LEXIS 82001, at *66-67.

injury from breach must establish the amount of damages. The demonstration need not be precise, *but the plaintiff must have a sensible basis for its claim.*") (emphasis added). Here, however, CDK has neither demonstrated, nor *even attempted* to demonstrate, *any* basis for *any* amount of damages caused by *any* Dealership Counter-Defendant.

With no evidence of actual damages, the interpretation of any contractual terms between the parties is of no import. In *Transp. & Transit*, in discussing a "most preferred vendor" provision in the agreement at issue, the Seventh Circuit concluded the parties' disputes over contract interpretation "do[] not matter unless [plaintiff] can show damages, and the district court held it could not do so." *Id.* at 401. The Seventh Circuit noted that the plaintiff "has been reduced to silence" when challenged by defendant to show one subcontract on which it could have made a profit, and granted summary judgment on plaintiff's breach of contract claim. *Id.* In this case, CDK has been reduced to silence when challenged to calculate *any* damages for its breach of contract claim. In fact, CDK chose not to even *attempt* to calculate actual damages for that claim.



---

29 *See* PSUMF ¶ 8, Ex. H, Deposition of Steve Anenen ("Anenen Tr.") (Apr. 10, 2019) at 312:15-20. *See also* Ex. J, (PX 977) (list of named dealership plaintiffs).

30 *See* PSUMF ¶ 8, Ex. I, Deposition of Howard Gardner ("Gardner Tr.") (Mar. 7, 2019) at 523:18-524:17. *See also* Ex. J, (PX 977) (list of named dealership plaintiffs).



*See* PSUMF ¶ 8.

CDK clearly cannot establish damages on such facts. *See Walker v. Ridgeview Constr. Co.*, 736 N.E.2d 1184, 1187 (Ill. App. Ct. 2000) (trial testimony clearly established plaintiff suffered no monetary damages, thus the court concluded plaintiff could not maintain a breach of contract claim: "Because [plaintiff] failed to prove that it suffered damages, an essential element of a breach of contract action, [defendant] was entitled to a directed finding as a matter of law.").

As CDK has no evidence to support an essential element of its breach of contract counterclaim, the Court should grant summary judgment dismissing the counterclaim.

### C.    CDK Is Not Entitled To Nominal Damages

As discussed in Section II(B), *supra*, Illinois law makes clear that to prevail on a claim for breach of contract, a plaintiff must be able to prove actual damages. Because CDK cannot show any actual damages for its breach of contract claim, it may not recover nominal damages.

In *Purcell & Wardrope Chartered v. Hertz Corp.*, the court reversed a $6.00 award of nominal damages due to the party's failure to prove any actual damages on its breach of contract counterclaim:

> Since no evidence was presented by Hertz to prove its right to damages, the counterclaim as a whole, must fail (citation omitted). The award of damages should have reflected the actual damages that Hertz proved had occurred. We find that Hertz did not properly prove any actual damages and conclude that the award of "nominal" damages was improper under these circumstances and hence, must be reversed and Hertz' counterclaim dismissed.

530 N.E.2d 994, 1084 (Ill. App. Ct. 1988). Similarly, in *Bank of Chi. v. Park Nat'l Bank*, 640 N.E.2d 1288, 1297 (Ill. App. Ct. 1994), the court reversed the trial court's award of nominal damages because the breach of contract damages were "merely speculative."

In *Prima Tek II, L.L.C. v. Klerk's Plastic Indus.*, the Seventh Circuit affirmed the district court's grant of summary judgment that plaintiff failed to prove damages, and rejected a requested award of nominal damages, noting that plaintiff "did not prove in its proceedings below that it lost any sales, profits, or royalty income as a result of the alleged violations, and it provided no proof that any of the violations damaged its business in any concrete way."

> Even if [defendant-appellant] could somehow show a material breach, it would still fall short of winning on its claim because it has not proven damages. [Defendant-appellant] makes two arguments here. First it contends that it should have been awarded nominal damages even if it could not prove actual damages. Second, it argues that it did in fact prove actual damages. With respect to the first point, Illinois law is clear: "[m]erely showing that a contract has been breached without demonstrating actual damages dose [sic] not suffice . . . to state a claim for breach of contract."

525 F.3d 533, 540-41 (7th Cir. 2008) (citing *TAS*, 491 F.3d at 631).[31]

Since CDK failed to present any evidence of damages, it cannot prove the elements of its claim, and should not be permitted to pursue nominal damages (or any other relief) at trial. Moreover, under these circumstances, such a result would be a massive waste of resources. *See, e.g.*, *Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 909 (N.D. Ill. 2012) ("You can't go into federal court and say you had a contract with X and X broke it and you're really annoyed even though you sustained no injury of any sort (in fact you made money because you re-contracted at

---

[31] As CDK did not even *attempt* to calculate damages as to its breach of contract counterclaim, it cannot claim nominal damages are warranted because it was unable to establish such amount with "reasonable certainty." *See Clutch Auto Ltd. v. Judge John Robert Blakey Navistar, Inc.*, No. 12-C-9564, 2015 U.S. Dist. LEXIS 34460, at *24 (N.D. Ill. Mar. 19, 2015) (granting summary judgment and concluding "Plaintiff has not proven its damages to a reasonable degree of certainty . . . . This Court, moreover, exercises its discretion and declines to award nominal damages even if Plaintiff were able to prove that Defendant breached the 2011 Release.").

a higher price) so please give me a judgment for $1 that I can pin on my wall."); *Cent. Brown Cnty.*

*Water Auth. v. Consoer, Townsend, Envirodyne*, No. 09-C-0131, 2013 U.S. Dist. LEXIS 18007,

at *21 (E.D. Wis. Feb. 11, 2013) (granting summary judgment for breach of contract counterclaims

and rejecting an award of nominal damages where plaintiff failed to demonstrate actual damages

In the absence of actual damages, CDK is precluded from seeking an award of nominal damages.

### D. There Is No Evidence To Support CDK's Request For A Permanent Injunction

As discussed in Section I(B), *supra*, CDK fails to establish the necessary elements of its

breach of contract counterclaim against Dealership Counter-Defendants, and therefore is not

entitled to any relief. However, even if CDK could prove the elements of its claim, CDK cannot

show that it is entitled to its requested injunctive relief "[p]ermanently enjoining the Dealership

Counter-Defendants from . . . providing login credentials to CDK's system to any third party."[32]

CDK's requested injunctive relief fails for multiple reasons.

Permanent injunctive relief is only available when a plaintiff proves: "(1) an irreparable

injury; (2) remedies at law, such as monetary damages, are inadequate to compensate for that

injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in

equity is warranted; and (4) the public interest would not be disserved by a permanent injunction."

*7-Eleven, Inc. v. Violet Spear & Viannam, Inc.*, No. 10-cv-6697, 2012 U.S. Dist. LEXIS 66366, at

*13 (N.D. Ill. May 11, 2012) (citing *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006):

"According to well-established principles of equity, a plaintiff seeking a permanent injunction

must satisfy a four-factor test before a court may grant such relief."). A plaintiff moving for

permanent injunction must establish each factor to be successful. *See Ill. Bell Tel. Co. v. Ill.*

---

[32] *See* Counterclaims, Prayer For Relief.

*Commerce Comm'n*, 740 F.2d 566, 571 (7th Cir. 1984). Here, however, CDK cannot meet multiple prongs of the four-factor test. Accordingly, summary judgment should be granted dismissing CDK's request for injunctive relief.

### 1. CDK Cannot Show Irreparable Injury

"Irreparable harm is the most important requirement" for issuance of a permanent injunction. *LAJIM, LLC v. GE*, No. 13-CV-50348, 2017 U.S. Dist. LEXIS 144704, at *7 (N.D. Ill. Sept. 7, 2017). Some courts, including this one, read the requirements of irreparable injury and inadequacy of a legal remedy together. *See Crane v. Ind. High Sch. Athletic Ass'n*, 975 F.2d 1315, 1326 (7th Cir. 1992) (according to the Seventh Circuit, irreparable injury is simply "one basis for showing the inadequacy of the legal remedy"); *Jennings Water, Inc. v. City of N. Vernon, Ind*., 895 F.2d 311, 318 n.6 (7th Cir. 1989) (same); *Kreg Therapeutics, Inc. v. Vitalgo, Inc.* ("*Kreg*"), 11-cv-6771, 2013 U.S. Dist. LEXIS 44309, at *54 (N.D. Ill. Mar. 28, 2013) ("[E]ven if Kreg were able to demonstrate success on the merits, it still would not be entitled to a permanent injunction at this time because it has not demonstrated irreparable harm or the absence of an adequate remedy at law. These two requirements tend to merge."). As such, for the purposes of this motion, Dealership Counter-Defendants will address these requirements together.

Harm is irreparable when damages "cannot be reliably estimated." *In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003). When seeking the issuance of a permanent injunction, the moving party must show that money damages will be a "seriously deficient remedy for the harm suffered." *7-Eleven*, 2012 U.S. Dist. LEXIS 66366, at *13. Typically, irreparable harm includes injury such as loss of customer good will (*Gateway Eastern R.R. Co. v. Terminal R.R. Assoc. of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994)), harm to reputation (*Kreg*, 2013 U.S. Dist. LEXIS 44309, at *15), or some other intangible harm that "cannot be adequately compensated in damages or when damages ***cannot*** be measured by any pecuniary standard" (*Somerset Place, LLC*

17

*v. Sebelius*, 684 F. Supp.2d 1037, 1042 (N.D. Ill. 2010) (emphasis added)). "An injunction is an equitable remedy that does not issue as a matter of course, but rather a remedy that courts may grant at their discretion in the extraordinary situations where legal remedies such as monetary damages are inadequate." *Bedrossian v. Northwestern Memorial Hosp.*, 409 F.3d 840, 842 (7th Cir. 2005). As damages are the norm in a contract case, a plaintiff requesting injunctive relief has the burden of persuading the court that its case differs from the norm. *7-Eleven,* 2012 U.S. Dist. LEXIS 66366, at *13. CDK cannot show irreparable harm or the inadequacy of legal remedies for the following four reasons.

First, CDK's own conduct shows that any harm it allegedly sustained is remediable. In each instance where CDK claims a breach of contract (*i.e.*, a specific dealership's username was attributed to unauthorized use by Authenticom or another data integrator), CDK states that it "successfully *disabled* that username [account or user ID]" on a given date.[33] *See* PSUMF ¶ 9. Thus, CDK has effectively pled itself out of a remedy by alleging the opposite of irreparable harm – that, in this case, the alleged harm was repaired by CDK. *See Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011) (plaintiff plead itself out of court by pleading facts that show it has no legal claim).

Second, the injuries that CDK alleges it sustained from Dealership Counter-Defendants' alleged breaches are traditionally compensable through the award of monetary damages – which CDK failed to calculate. When alleging damages, CDK stated the Dealership Counter-Defendants' "conduct has damaged CDK, including by *depriving CDK of revenue* that it could otherwise earn by charging Authenticom or other unauthorized third parties to access CDK's DMS through its 3PA program or otherwise, by *causing CDK to incur the costs and expenses* associated with

---

[33] *See* Counterclaims ¶¶ 104-08, 112, 115-18, 121-22, 125, 128-31.

investigating unauthorized third party access to its DMS and attempting to compel them to cease their unlawful conduct, and by degrading CDK's DMS system and corrupting the data thereon."[34] CDK did not even *attempt* to calculate any damages with respect to its breach of contract counterclaim. *See* PSUMF ¶ 7. As such, CDK should not be afforded the presumption that ordinary legal remedies (*i.e.*, monetary damages) are inadequate. *See Kreg,* 2013 U.S. Dist. LEXIS 44309, at \*55-56 (plaintiff "produced quantitative evidence documenting its reduced sales" but failed to assign a damages figure, and court held plaintiff failed to show the injury could not be compensated with legal damages and injunctive relief). Analogously, CDK alleged damages which it could have calculated, but failed to do so. Thus, CDK cannot show that it lacks an adequate remedy at law.

Third, undisputed evidence shows that Dealership Counter-Defendants are not *currently* providing login credentials to Authenticom or other data integrators, making CDK's request for injunctive relief unwarranted. *See* PSUMF ¶¶ 10-25. *See also Alabi v. Homecomings Fin. LLC*, No. 09-cv-4757, 2011 U.S. Dist. LEXIS 107632, at \*27, (N.D. Ill Sept. 21, 2011) (plaintiff brought Illinois Uniform Deceptive Trade Practices Act claim for injunctive relief, and Court granted motion to dismiss because the alleged misconduct occurred several years prior and there was "no conduct for the Court to enjoin") (citing *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 904 F. Supp. 818, 822 (N.D. Ill. 1995)).[35] Undisputed evidence demonstrates that *not a single Dealership Counter-Defendant* currently has login credentials being used by "unauthorized" data integrators. *See* PSUMF ¶¶ 10-25. CDK's *own reporting tool*, Dealer Data Exchange ("DDX")

---

[34] *See* Counterclaims ¶ 137 (emphasis added).

[35] *See also Microsoft Corp., v. V3 Solutions, Inc.*, No. 01-CV-4693, 2003 U.S. Dist. LEXIS 15008, at \*50 (N.D. Ill. Aug. 27, 2003) (Microsoft sought a permanent injunction to enjoin defendants from further infringing its software; however, because Microsoft failed to "submit any evidence or make any argument as to defendants' current conduct or likely future conduct," its request for injunctive relief was denied).

clearly shows *none* of the Dealership Counter-Defendants have a currently issued username being used by a "non-authorized" data integrator. *See* PSUMF ¶ 10-25.[36] CDK cannot demonstrate otherwise.

Lastly, CDK cannot show any reasonable likelihood that Dealership Counter-Defendants will re-engage in the same conduct in the future. An injunction is not the proper remedy where the threat of future breaches is slim or non-existent. *See Ragsdale v. Turnock*, 841 F.2d 1358, 1366 (7th Cir. 1988) ("Federal courts do not, as a rule, enjoin conduct which has been discontinued with no real prospect that it will be repeated."). Where the disputed conduct is unlikely to occur in the future, the Seventh Circuit has deemed a request for injunctive relief to be moot. *See e.g.*, *Frobe v. Vill. of Lindenhurst*, No. 11-C-1722, 2013 U.S. Dist. LEXIS 140007, at *29 (N.D. Ill. Sept. 30, 2013) (request for injunctive relief to stop legislation from being enforced against plaintiff was moot where legislation had already been deemed unconstitutional and public officials announced they would not be enforcing the legislation in the future). CDK fails to allege, let alone show, that the challenged conduct is even capable of being repeated in the future. This is true because the vast majority of vendors who used independent data integrators to access dealer data have subsequently become 3PA certified, nullifying the need to use a data integrator who would receive

---

[36] *See* PSUMF ¶ 10, Ex. K, Dealer Data Exchange ("DDX") Non-Authorized Access Report from Dealership Counter-Defendant Baystate Ford Inc.; PSUMF ¶¶ 11-18, Ex. L, DDX Non-Authorized Access Report from Dealership Counter-Defendant Continental Motors; ACA Motors, Inc., d/b/a Continental Acura; Continental Autos, Inc., d/b/a Continental Toyota; Continental Classic Motors, Inc., d/b/a Continental Autosports; 5800 Countryside, LLC, d/b/a Continental Mitsubishi; HDA Motors, Inc., d/b/a Continental Honda; H & H Continental Motors, Inc., d/b/a Continental Nissan; Naperville Zoom Cars, Inc., d/b/a Continental Mazda; NV Autos, Inc., d/b/a Continental Audi; PSUMF ¶¶ 19-21, Ex. M, DDX Non-Authorized Access Report from JCF Autos LLC, d/b/a Stevens Jersey City Ford; Jericho Turnpike Sales LLC, d/b/a Ford & Lincoln of Smithtown; Patchogue 112 Motors, LLC, d/b/a Stevens Ford; PSUMF ¶ 22, Ex. N, DDX Non-Authorized Access Report from Waconia Dodge, Inc.; PSUMF ¶¶ 23-25, Ex. O, DDX Non-Authorized Access Report from Cliff Harris Ford, LLC, d/b/a Warrensburg Ford; Marshall Chrysler Jeep Dodge, L.L.C., d/b/a Marshall Chrysler Jeep Dodge Ram; Warrensburg Chrysler Dodge Jeep, L.L.C., d/b/a Warrensburg Chrysler Dodge Jeep Ram Fiat.

login credentials from dealerships. *See* PSUMF ¶ 27.[37] Thus, the future issuance of login credentials by Dealership Counter-Defendants to data integrators (the conduct CDK alleges is a breach of contract) is unlikely.

### 2. The Issuance of a Permanent Injunction is Against Public Interest

"To merit injunctive relief, a plaintiff must demonstrate . . . that the public interest would not be disserved by a permanent injunction." *LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 944 (7th Cir. 2019) (citing *eBay*, 547 U.S. at 391 (2006)). The public interest would be disserved by the issuance of a permanent injunction in this case as demonstrated by the fact that several states have recently enacted statutes *prohibiting* DMS providers (like CDK) from interfering with dealerships' efforts to grant access to their data by data integrators through the issuance of login credentials. *See* PSUMF ¶ 33.[38] The legislatures of these several states are charged with acting in the public interest and, the passage of these statutes demonstrates that it would be a disservice to issue a permanent injunction prohibiting the issuance of dealers' login credentials to maintain access to the DMS.

Permanent injunctive relief is warranted only where the plaintiff can satisfy a multi-factor test; the failure to satisfy any one of those factors is dispositive. Here, as CDK fails to satisfy several of the factors necessary to warrant permanent injunctive relief, Dealership Counter-Defendants are entitled to summary judgment.

---

[37] *See* PSUMF ¶ 27, Ex. P, list of current 3PA partner programs showing 847 applications certified in the CDK 3PA Program as of May 18, 2020. CDK Global Partner Program List, https://www.cdkglobal.com/us/partners-list. (last accessed May 18, 2020).

[38] *See* PSUMF ¶ 38. *See*, *e.g.*, Ex. Q, H.R. 2418, 54th Leg., 1st Reg. Sess. (Ariz. 2019) (unanimously passed by the Arizona legislature); Ex. R, H.R. 3152, 80th Leg. Assemb., Reg. Sess. (Or. 2019); Ex. S, H.R. 617, 66th Leg., Reg. Sess. (Mont. 2019); Ex. T, H.R. 384, Gen. Assemb. Reg. Sess. (N.C. 2019).

**E.     Waiver Bars CDK's Breach Of Contract Counterclaim**

CDK alleges that certain provisions in its Master Services Agreements ("MSAs") with Dealership Counter-Defendants prohibit those dealers from supplying DMS login credentials to data integrators or otherwise granting data integrators access to CDK's DMS. However, any alleged prohibition against the issuance of login credentials to independent data integrators was waived by CDK's long-standing practice of permitting identical conduct from 2006 to 2015. Not only did CDK permit dealers to share log-in information with data integrators to provide DMS access, CDK publicly and aggressively advocated for dealerships' right to do so. Therefore, the waiver doctrine bars CDK's' breach of contract counterclaim and summary judgment should be granted in favor of Dealership Counter-Defendants.

1.     Waiver - Legal Standard

Under Illinois law, waiver is a relinquishment of a known contractual right based on the conduct of the waiving party that indicates that strict compliance with a contractual provision will not be required. *Holson Inv. Co. v. Villelli*, No. 97-C-988, 1998 U.S. Dist. LEXIS 8735, at *19-22 (N.D. Ill. June 3, 1998) (citing *Wagner Excello Foods, Inc. v. Fearn Int'l, Inc.*, 601 N.E.2d 956, 961 (Ill. App. Ct. 1992)). Waiver may be either express or implied. *Hammer v. Residential Credit Solutions, Inc.*, No. 13-CV-6397, 2015 U.S. Dist. LEXIS 162636, at *28 (N.D. Ill. Dec. 3, 2015) (citing *Wagner*, 601 N.E.2d at 961). Implied waiver of a contractual right (as in this case) arises when the conduct of the person or entity claimed to have waived the right is inconsistent with any intention other than to waive that right. *Whalen v. K-Mart Corp.*, 519 N.E.2d 991, 994 (Ill. App. Ct. 1988). The party claiming waiver has the burden of proving (1) the waiving party knew of its right to assert breach of the contract; and (2) the waiving party intended to waive the alleged breaches. *Costello v. Grundon*, 651 F.3d 614, 641 (7th Cir. 2011); *see Holson*, 1998 U.S. Dist.

22

LEXIS 8735, at *20 (defendants' summary judgment motion granted where plaintiff's intent was inconsistent with his conduct and amounted to waiver of his contractual claim).

Waiver is an equitable doctrine, the purpose of which is to ensure that a party to a contract will not "lull[] another into a false assurance that strict compliance with a contractual duty will not be required and then sue for noncompliance." *Carter v. State Auto Ins. Cos.*, No. 18-CV-4227, 2019 U.S. Dist. LEXIS 187250, at *10 (C.D. Ill. Sept. 12, 2019) (quoting *Wagner*, 601 N.E.2d at 962). Waiver is a question for the fact-finder where the material facts are in dispute or where reasonable minds may draw different inferences from undisputed facts. *See Melrose Park Nat'l Bank v. Carr*, 618 N.E.2d 839, 844 (Ill. App. Ct. 1993). However, where, as here, "there is no dispute as to the material facts which underlie a claim of waiver, then the determination of what facts constitute a waiver is a question of law" appropriate for determination at the summary judgment stage. *Holson*, 1998 U.S. Dist. LEXIS 8735, at *20.

2.     <u>CDK's Conduct Displayed Intent to Waive its Right to Assert Breach of Contract against Dealerships</u>

CDK alleges that at least since 1994, its MSA has contained provisions that prohibit dealers from issuing login credentials to data integrators.[39] Significantly, the MSA provisions relied on by CDK have contained substantially the same language since the mid-1990's. *See* PSUMF ¶ 26.[40]



*See* PSUMF ¶¶ 28-32.

---

[39] *See* Counterclaims ¶¶ 44-50.

[40] *See* Ex. H, Anenen Tr. at 259:16-260:23 (testifying that CDK was using a form MSA, created in 1994, as late as 2010).

██████████████████████████████████████████████████ *See*

PSUMF ¶¶ 29-32, 34. █████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████ It was only well after CDK reached its improper agreement with

The Reynolds and Reynolds Company ("Reynolds") to block all data integrators from accessing

the DMS that CDK made any attempt to enforce the provisions at issue.

The record is replete with CDK's knowledge and intent to waive its purported contractual

rights. *See* PSUMF ¶¶ 29-30, 32. ████████████████████████████

████████████████████████████████ *See* PSUMF ¶¶ 29-30. For

example:



- ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████ █
████████████████████████████████████████████
██████████████████████████ *See* PSUMF ¶ 29.[42]

- ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████ *See* PSUMF ¶ 29.[43]

- ████████████████████████████████████████████
████████████████████████████████████████████
██████████ *See* PSUMF ¶ 30.[44]

---

[41] *See* Ex. U, CDK-3122887.

[42] *See id.* (emphasis added).

[43] *See* Ex. V, CDK-0012547 to 549 (PX 1037).

[44] *See* Ex. W, CDK-0012649 to 652 (PX 1038) (emphasis added).



- ██████████████████████████████████████████████
███████████ █████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████ ████████████████████████████████████
██████████████████████████████████████████████████
██████ ." PSUMF ¶ 30.[47]

- ██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████ " PSUMF ¶ 30.[48]

- ██████████████████████████████████████████████████
████████████████████████████ :

PSUMF ¶ 30.[49]

- ██████████████████████████████████████████████████
██████████████████████████████████████████████████
PSUMF ¶ 32.[50]

The evidence thus demonstrates that CDK not only permitted dealerships to provide login credentials to data integrators; it *actively encouraged* this activity. *See* PSUMF ¶¶ 29-30, 32. While

---

[45] *See* Ex. X, CDK-3122936.

[46] *See id.*

[47] *See id.* (emphasis added).

[48] *See* Ex. Y, CDK-0012545 to 546 (PX 1179) (emphasis added).

[49] *See* Ex. Z, CDK-0804065 to 068 (PX 933).

[50] *See* Ex. AA, Deposition of Michael Whinston ("Whinston Tr.") (Jan. 10, 2020) at 183:11-16 ██
██████████████████████████████████████████████████

these terms were in the MSAs, CDK was using statements like the above ███████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ *See* PSUMF ¶ 31.[51] CDK cannot use the MSA provisions as both a sword and a shield.

Additional record evidence demonstrates that ████████, CDK continued to intentionally waive its right to enforce the provisions at issue. *See* PSUMF ¶¶ 32-33. For example:



- ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██ ████████████████████████████████████████████████ ██ ██ ████████████████████████████████████████████████████ *See* PSUMF ¶ 24.[53]

- ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████ ██ ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ *See* PSUMF ¶ 32.[55]

- ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████ *See* PSUMF ¶ 26. Mr. French wrote:

---

[51] *See* Ex. BB, Deposition of Robert Brockman (Reynolds Chief Executive Officer) (Jan. 16, 2019) at 77:9-78:17 (████████████████████████████████████████████████ ████████████████████████ Ex. CC, CDK-3120854 to 860 (████████████████ ████████████████████████████ Ex. VVV, CDK-1326294 to 295 (PX 1573) (██ ██ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ )

[52] *See* Ex. DD, CDK-3118702 to 711 (emphasis in original).

[53] *See id.* (emphasis added).

[54] *See* Ex. EE, CDK-2878952 to 954 (PX 835) (emphasis added).

[55] *See id.* (emphasis added).

█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
████████████████████████████ *See* PSUMF ¶ 32.[56]

████████████████████████████████████████████████████

██████████████████████████████ *See* PSUMF ¶ 32. In Interrogatory No. 3, Dealership Counter-Defendants asked CDK to "[i]dentify all instances, from January 1, 2011 to the present, in which CDK attempted to enforce §§ 6(A), 6(B), and/or 6(D) of CDK's MSA against any CDK Dealer . . ."[57] In response, ███████████████████████████████████████████ ████████████████████████████. *See* PSUMF ¶ 32.[58] ███████████████████ ██████████████████████████████████████. *See* PSUMF ¶ 32. █████████████████████████████████████████████████████. *See* PSUMF ¶ 32.[59]

Evidence shows that even ████████████████████████████████ ██████████████████████████████████████████████████████ ████████. *See* PSUMF ¶ 33. In other words, CDK prioritized its financial gain over enforcement of the provisions purportedly prohibiting the issuance of login credentials to data integrators. ████ ██████████████████████████████████████████████████████

---

[56] *See* Ex. FF, CDK-0847676 to 683 (emphasis added).

[57] *See* Ex. D, Interrogatories at 6.

[58] *See* Ex. E, Interrogatory Response at 10-11.

[59] *See* Ex. GG, Deposition of Michael Noser (CDK Sr. Director of Operations for Data Services Group) ("Noser Tr.") (Feb. 13, 2019) at 49:3-50:16 (████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████

███████████████████████████████████████████████████████████. *See* PSUMF ¶ 33.[60] CDK's conduct not only waived its alleged rights against ████████████████████, but also waived them against other dealerships as well. *See Surgidev Corp. v. Eye Tech., Inc.*, 648 F. Supp. 661, 697-98 (D. Minn. 1986) (finding that defendant waived right to enforce non-compete clause with former employee where it failed to enforce it against numerous former employees stating "it would be inequitable to permit plaintiff to now rely on a non-compete agreement which it has so blithely ignored in the past.").

The undisputed evidence clearly demonstrates that any alleged prohibition against dealerships issuing login credentials to data integrators was waived by CDK's long-standing practice, ████████████████████████. Accordingly, the waiver doctrine bars CDK's breach of contract counterclaim and summary judgment should be granted in favor of Dealership Counter-Defendants.

## F. CDK's Breach Of Contract Counterclaim Is Barred By The Doctrine Of Unclean Hands

Dealership Counter-Defendants also move for summary judgment in the alternative on their "unclean hands" affirmative defense. CDK requests injunctive relief against Dealership Counter-Defendants barring them from issuing login credentials to data integrators in order to access the CDK DMS.[61] However, CDK would unfairly benefit if such equitable relief was granted

---

[60] *See* Ex. II, CDK-0050564 to 565 (█████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████).

[61] *See* Counterclaims, Prayer For Relief (CDK requests that the Court "[p]ermanently enjoin[] the Dealership Counter-Defendants from . . . providing login credentials to CDK's system to any third party.").

because CDK engaged in conduct that constitutes unclean hands.[62] Specifically, CDK historically engaged in the same conduct it now claims is wrongful for Dealership Counter-Defendants to have engaged in (*i.e.*, ███████████████████████████████████

████████████████████████████████). *See* PSUMF ¶¶ 34-37.

### 1.    Unclean Hands – Legal Standard

CDK's request for the equitable remedy of injunctive relief is subject to the doctrine of unclean hands. *See Original Great Am. Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 281 (7th Cir. 1992) ("Unclean hands is a traditional defense to an action for equitable relief."). An unclean hands defense allows the Court to deny equitable relief to a requesting party who itself has engaged in wrongful conduct regarding the matter from which it seeks relief. *See Scheiber v. Dolby Labs., Inc.,* 293 F.3d 1014, 1021 (7th Cir. 2002). Wrongful conduct pursuant to the unclean hands doctrine includes: misconduct; bad faith; and fraud, as well as unfair, dishonest, and unconscionable behavior. *See Manley v. Boat/U.S. Inc.*, No. 13-cv-5551, 2016 U.S. Dist. LEXIS 41036, at *11-12 (N.D. Ill. Mar. 29, 2016); 27A Am. Jur. 2d Equity § 100 (2d ed. 2009) (same). "A plaintiff who acts unfairly, deceitfully, or in bad faith may not through equity seek to gain from that transgression." *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 822 (7th Cir. 2010).

In the Seventh Circuit, the doctrine of unclean hands typically applies when there is a "direct nexus" between the wrongful conduct and the activities subject to equitable relief. *Int'l Union, Allied Indus. Workers of Am. v. Local Union No. 589, Allied Indus. Workers of Am.*, 693

---

[62] *See* Dealership Counter-Defendants' Answer and Affirmative and Additional Defenses to Counter-Plaintiff CDK Global LLC's Counterclaims, ECF No. 765 at 69 (Dealership Counter-Defendants' Seventh Affirmative Defense states: "CDK's counterclaims are barred by the doctrine of unclean hands.").

F.2d 666, 672 (7th Cir. 1982) (citing *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)). The unclean hands doctrine applies when the plaintiff is "tainted with inequitableness or bad faith *relative to the matter in which he seeks relief*, however improper may have been the behavior of the defendant." *Packers Trading Co. v. CFTC*, 972 F.2d 144, 148 (7th Cir. 1992) (quoting *Precision Instrument*, 324 U.S. at 814) (emphasis added). Nevertheless, Courts have wide "discretion in refusing to aid the unclean litigant." *Precision Instrument*, 324 U.S. at 815.

Unclean hands is a viable defense where a company seeks to enjoin another from participating in an activity in which it also engaged. *See Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 800-02 (N.D. Ill. 2011) (preliminary injunction denied where "[t]here is a tinge of unclean hands" and Pampered Chef sought to preclude defendant from conducting business exactly like Pampered Chef). In these situations, courts have found this type of conduct meets the nexus requirement. *See Empire Indus. v. Winslyn Indus.*, 327 F. Supp. 3d 1101, 1116 (N.D. Ill. 2018) ("Unlike in *Pampered Chef*, in which the plaintiff engaged in the same conduct for which it sued the defendant, Goren's misrepresentation lacks any nexus to the conduct for which Empire sued Winslyn."); *In-N-Out Burgers v. Smashburger IP Holder LLC*, No. 17-CV-1474, 2018 U.S. Dist. LEXIS 225088, at *14-18 (C.D. Cal. Dec. 21, 2018) (court allowed an unclean hands defense asserted by Smashburger related to the same conduct that In-N-Out was claiming was false advertising, finding "[t]his relationship is sufficiently close for the proper application of the unclean hands doctrine.").

2.    CDK Cannot Seek Injunctive Relief for the Same Alleged Conduct in Which it Engaged

Because CDK itself engaged in the *exact same behavior* that it now alleges is a breach of contract, the unclean hands doctrine bars its claims for injunctive relief. *See Pampered Chef*, 804

F. Supp. 2d at 800. There is ample evidence that CDK, ████████████████████

████████ (*see* PSUMF ¶ 34),[63] ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████ *See* PSUMF ¶ 34.[64] ████████████████████████

████████████████████████ *See* PSUMF ¶ 34.[65] ██████████████████

████████████████████████████████████████████████████. *See* PSUMF

¶ 34.[66]

The use of dealer login credentials to access the DMS without the DMS provider's authorization is the *exact same* conduct CDK now alleges is a breach of the MSA by Dealership Counter-Defendants. *See* PSUMF ¶ 35.[67] Prior to the conspiracy, ███████████████████

████████████████████████████████████████████████████████████████

████████████████ *See* PSUMF ¶ 36.[68]

---

[63] *See* Ex. GG, Noser Tr. at 142:21-143:1 (████████████████████████████ ████); Ex. JJ, Deposition of Kevin Distelhorst (CDK VP of Client Services) ("Distelhorst Tr.") (Nov. 16, 2018) at 20:22-24 (████████████████████████████).

[64] *See* Ex. I, Gardner Tr. at 40:20-41:12; 87:11-24; *see also* Ex. KK, Deposition of Hubert ("Trey") Gerlich (Sr. Director of Solutions Engineering, CDK) ("Gerlich Tr.") (Nov. 28, 2018) at 18:12-19:8; 33:15-21; 51:17-52:9; 55:19-56:16; 169:8-170:3 (███████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ *See* CDK-2873095 to 097 (PX 945).

[65] *See* Ex. MM, CDK-1390278 to 280 (PX 872).

[66]*See* Ex. NN, CDK-2673485 to 492 (PX 885) ████████████████████████████ ████████████████████████████████████").

[67] *See* Ex. OO, CDK-2981832 to 835 (PX 852) at CDK-2981835 (█████████████ ████████████████████████████████████████).

[68] *See* Ex. PP, CDK-0974988 to 989 (PX 875).

. *See* PSUMF ¶ 37.[69] Although CDK alleges that the issuing of login credentials by Dealership Counter-Defendants is a breach of contract, as evidenced above, CDK did not always hold this view and extensively engaged in the same conduct. This rises to the level of unclean hands ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████. Accordingly, CDK should be barred from receiving injunctive relief due to its own unclean hands.

## II. DEALERSHIP COUNTER-DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON CDK'S DMCA COUNTERCLAIM

CDK asserts a counterclaim under the Digital Millennium Copyright Act, 17 U.S.C. § 1201 ("DMCA") against certain Dealership Counter-Defendants (the "Continental Counter-Defendants" and "Warrensburg Counter-Defendants", as described below). CDK's DMCA counterclaim cannot survive summary judgment for multiple reasons. As threshold matters, CDK cannot establish the basic elements of its claim; any purported "circumvention" of CDK's technological measures posed no threat to CDK's copyright interests; and CDK lacks evidence of any violations of the DMCA by any individual counter-defendant. Specifically, as to the "Continental Counter-Defendants," CDK is not asserting a claim for primary DMCA liability; and CDK cannot meet its evidentiary burden to establish secondary liability (on theories of contributory or vicarious liability). With regard to the "Warrensburg Counter-Defendants," instances where Authenticom's Profile Manager software program ran but did not re-enable any disabled user accounts do not qualify as acts of "circumvention" under the DMCA; CDK lacks evidence that the Profile Manager program actually re-enabled any disabled user accounts

---

[69] *See* Ex. I, Gardner Tr. at 374:2-10, 406:19-410:8.

associated with any of the Warrensburg Counter-Defendants; CDK's counterclaim allegations are judicial admissions which negate any possible primary DMCA liability; and CDK's claim for vicarious liability under the DMCA fails as CDK cannot show evidence of any direct financial benefit to any Warrensburg Counter-Defendant from the purported circumvention.

### A. CDK's DMCA Counterclaim Fails Because CDK Cannot Establish The Basic Elements Of Its Claim

CDK asserts a counterclaim under Section 1201(a)(1)(A) of the DMCA, which prohibits "circumvent[ing] a technological measure that effectively controls access to a work protected under [Title 17]." 17 U.S.C. § 1201(a)(1)(A). Thus, in order to prevail on its DMCA counterclaim, it is CDK's burden to establish that Counter-Defendants "circumvent[ed]" "technological measures" that "effectively control[led] access" to a "work protected" by the Copyright Act. *Id.*

However, as set forth in Authenticom's Memorandum of Law in Support of its Motion for Summary Judgment on Defendants' Counterclaims,[70] CDK's DMCA counterclaim fails as a matter of law because: (i) CDK's technological measures (*i.e.*, its CAPTCHA prompts and disabling of DMS login credentials) did not "effectively control access" to CDK's DMS software; (ii) Counter-Defendants did not "circumvent" CDK's technological measures; and (iii) CDK's technological measures did not protect copyrighted works. CDK's inability to prove any one of those essential elements of its counterclaim requires the entry of judgment in Dealership Counter-Defendants' favor.

---

[70] *See* Authenticom's contemporaneously-filed Memorandum of Law in Support of its Motion for Summary Judgment on Defendants' Counterclaims, at Sections II(A)-II(C). Dealership Counter-Defendants hereby incorporate those arguments by reference as if fully set forth herein.

**B. CDK's DMCA Counterclaim Fails Because The Alleged "Circumvention" Did Not Threaten Any CDK Copyright Interest**

Summary judgment should be granted in Dealership Counter-Defendants' favor on CDK's counterclaim for liability under the DMCA because Counter-Defendants' access to CDK's DMS software did not infringe on any copyright, and any alleged "circumvention" of CDK's access controls did not affect or threaten CDK's interest in its alleged copyrighted works.

The Warrensburg and Continental Counter-Defendants, as paying licensees of CDK's DMS, undisputedly had the right to access (and copy) the DMS software and cannot be held liable for circumventing a purported access control in order to exercise that right. Further, because Authenticom's purported access to (and copying of) CDK's DMS software constitutes "fair use" under fundamental principles of copyright law, CDK's counterclaims against Authenticom under the DMCA – and CDK's counterclaims against dealers for secondary liability under the DMCA based on Authenticom's primary liability – also fail.

As discussed more fully below, this conclusion is compelled by the plain text of the DMCA itself, the legislative history behind the enactment of the DMCA, and decades of jurisprudence in the area of copyright law.

1. <u>Counter-Defendants' Access to CDK's DMS Software is Authorized by Express Contractual License and the Fair Use Doctrine</u>

Counter-Defendants' alleged conduct is protected by both an explicit license and the "fair use" doctrine. As paying licensees of the DMS, the Dealership Counter-Defendants undisputedly had the contractual right to access the DMS software – even if CDK otherwise had a protectable copyright interest in, and was permitted to construct access barriers to, the DMS.

a) *Dealership Counter-Defendants*

CDK has not claimed that the Continental or Warrensburg Counter-Defendants infringed any CDK copyright. Nor could it. ████████████████████████

34

████████████████████████████████████████. PSUMF ¶ 39.[71] *See Sony/ATV Publ'g, LLC v. Marcos*, 651 Fed. Appx. 482, 485 (6th Cir. 2016) ("A valid license is an affirmative defense to copyright infringement.") (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984)). CDK alleges that the incidental copying of its DMS software onto the dealers' computers takes place automatically when dealers log into the DMS[72]; thus, dealers' license to use CDK's DMS software necessarily includes the right to create such incidental copies. Because dealers' use of CDK's DMS software is ***not*** an infringement of copyright, CDK's efforts to block that use (including through the use of technological barriers) are ***not*** protected by the DMCA. Likewise, because there can be no infringement, there can be no unlawful "circumvention" by the dealers of CDK's purported access controls. *See Sinclair Broad. Group, Inc. v. Colour Basis, LLC*, No. CCB-14-2614, 2016 U.S. Dist. LEXIS 84154, at *19 (D. Md. June 29, 2016) ("Because, however, the counterclaimants gave the counter-defendants access to the copyrighted work, the PDF Style Guide, they cannot make out a violation of the DMCA.").

b) *Authenticom*

Authenticom's access to (and any incidental copying of) CDK's DMS software is protected under the "fair use" doctrine as a matter of law. "The defense of fair use carves out of the exclusive

---

[71] *See* Ex. QQ, CONTINENTAL0028163 to 177 at § 4(A) (DX 523) (███████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████); Ex. A, CONTINENTAL0056450 to 552 at CONTINENTAL0056526 at § 4(A) (DX 528) (████████████████████████████████████); Ex. RR, CLIFF_HARRIS0001923 to 937 at § 4(A) (████████████████████ ████████.); Ex. SS, CLIFF_HARRIS0001938 to 952 at § 4(A) (████████████ ████████.); Ex. TT, CLIFF_HARRIS0001953 to 966 at § 4(A) (██████ ████████████████████.

[72] *See* Counterclaims ¶ 71 (every time the CDK DMS is accessed, "it creates a copy of portions of the DMS program code in the computer's Random Access Memory . . . .").

rights conferred by the Copyright Act, and legally empowers a person to use the copyrighted works in a reasonable manner without the consent of the copyright owner." *Storm Impact, Inc. v. Software of the Month Club*, 13 F. Supp. 2d 782, 787 (N.D. Ill. 1998). As the Supreme Court explained in *Sony Corp.*, 464 U.S. 417:

> Copyright protection . . . . has never accorded the copyright owner complete control over all possible uses of his work. . . . Any individual may reproduce a copyrighted wor [sic] for a "fair use"; the copyright owner does not possess the exclusive right to such a use. Compare [17 U.S.C.] § 106 with [17 U.S.C.] § 107.

*Id.* at 432-23 (footnotes omitted).

Even assuming *arguendo* that CDK's DMS software was temporarily copied by Authenticom when it logged into the DMS, such copying constitutes "fair use", not copyright infringement. As clarified by the Seventh Circuit's analysis in *Assessment Techs. of WI, LLC v. WIREdata, Inc*., 350 F.3d 640 (7th Cir. 2003), there can be no copyright infringement where, as here, the defendants were not seeking to sell copies of the software, but merely made "intermediate copies" of the software. Judge Posner explained:

> [Plaintiff copyright owner] would lose this copyright case even if the raw data were so entangled with [the copyrighted program] Market Drive that they could not be extracted without making a copy of the program. The case would then be governed by *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1520-28 (9th Cir.1992). Sega manufactured a game console, which is a specialized computer, and copyrighted the console's operating system, including the source code. Accolade wanted to make computer games that would be compatible with Sega's console, and to that end it bought a Sega console and through reverse engineering reconstructed the source code, from which it would learn how to design its games so that they would activate the operating system. For technical reasons, Accolade had to make a copy of the source code in order to be able to obtain this information. It didn't want to sell the source code, produce a game-console operating system, or make any other use of the copyrighted code except to be able to sell a noninfringing product, namely a computer game. The court held that this "intermediate copying" of the operating system was a fair use, since the only effect of enjoining it would be to give Sega control over noninfringing products, namely Accolade's games . . . .

*Id*. at 644-45 (citations omitted). Following the Ninth Circuit's reasoning in *Sega*, Judge Posner explained:

> Similarly, if the only way [the alleged infringer] WIREdata could obtain public-domain data about properties in southeastern Wisconsin would be by copying the data in the municipalities' databases as embedded in Market Drive, so that it would be copying the compilation and not just the compiled data only because the data and the format in which they were organized could not be disentangled, it would be privileged to make such a copy, and likewise the municipalities. For ***the only purpose of the copying would be to extract noncopyrighted material***, and not to go into competition with [plaintiff] by selling copies of Market Drive.

*Id*. at 645 (emphasis added).

Here, there is no evidence (or allegation) that Authenticom accessed and copied CDK's DMS software in order to "pirate" that software. Instead, "[t]his case is about the attempt of a copyright owner [CDK] to use copyright law to block access to data [stored in the DMS] that not only are neither copyrightable nor copyrighted, but were not created or obtained by the copyright owner." *Id*. at 641. As in *WIREdata*, Authenticom sought to obtain access to noncopyrightable material (here, data stored in a dealer's DMS, such as customer information, car inventory, accounting data, etc.), and any copying of DMS software was necessary in order for Authenticom to access that data. As in *Sega*, Authenticom's "intermediate copying" of CDK's software (if any), which would be necessary for "technical reasons" (not for piracy), was a fair use of that software.[73]

---

[73] *See also Evolution, Inc. v. Suntrust Bank*, 342 F. Supp. 2d 943, 956 (D. Kan. 2004) (granting defendants' summary judgment motion to dismiss copyright claim, explaining that defendants "copied portions of plaintiff's source code in order to write . . . computer programs, which extracted defendants' own data from plaintiff's program," and that "the present defendants wished to access and extract uncopyrightable data that was embedded in a copyrighted computer program. Such use of plaintiff[']s source code falls well within the fair use doctrine as several federal circuit courts have articulated it.") (citing the "factually similar" *WIREdata* case); *PhantomALERT, Inc. v. Google Inc*., No. 15-cv-03986-JCS, 2016 LEXIS 30321, at *15 (N.D. Cal. Mar. 8, 2016) ("copying of a database by a defendant who used it only to extract the raw data was a fair use that did not give rise to a claim for copyright infringement") (analyzing *WIREdata*).

37

Consideration of specific copyright "fair use" factors further compels summary dismissal of the claim. The Copyright Act's "fair use" provision provides, in pertinent part:

> [T]he fair use of a copyrighted work . . . is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include --
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. These factors, especially the fourth factor (which is "undoubtedly the single most important element of fair use," *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 566 (1985)), decisively point to Authenticom's access to (and any incidental copying of) CDK's DMS software as protected under fair use. *See also Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 758-59 (7th Cir. 2014)).

"Fair use is a mixed question of law and fact." *Harper & Row*, 471 U.S. at 560. As such, fair use is properly resolved on summary judgment when the defense does not turn on any material factual disputes. *See*, *e.g.*, *WIREdata*, 350 F.3d at 644 (granting summary judgment where copying was fair use as a matter of law); *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir. 2012) (affirming district court's grant of summary judgment to defendants on fair use defense); *Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distribs*., 983 F. Supp. 1167, 1175 (N.D. Ill. 1997) ("when there are no material factual disputes that impede [the] determination of fair use, summary judgment is appropriate.") (internal quotations omitted). "'Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the

work which is copied.'" *Harper & Row*, 471 U.S. at 566-67 (quoting 1 Nimmer, Copyright §
1.110[D], at 1-87 (1984)). As the putative owner of the (purportedly) copyrighted material (the
DMS software), CDK bears the burden to show evidence that the challenged use of its copyrighted
works materially impaired the DMS's marketability. *See Red Label Music Publ'g, Inc. v. Chila
Prods.*, 388 F. Supp. 3d 975, 987 (N.D. Ill. 2019). CDK cannot meet that burden, as the creation
of incidental and temporary RAM copies of the DMS software for the limited purpose of extracting
dealer data has no conceivable effect on the value of the copyrighted elements of the DMS
software. CDK cannot show lost DMS software licensing revenue as a result of any alleged
circumvention; ████████████████████████████████████████████████████

████████████████████████████████████████ (PSUMF ¶ 40)[74], and
there is no evidence that Authenticom's alleged circumvention of CDK's access controls reduced
CDK's sales of DMS platforms. Nor can CDK show that Authenticom accessed the DMS software
in order to make a copy and then sell it to others. *See Red Label*, 388 F. Supp. 3d at 989 (granting
defendants' motion for summary judgment: "The defendants did not 'bring[] to the marketplace a
competing substitute for the original, or its derivative, so as to deprive the rights holder of
significant revenues because of the likelihood that potential purchasers may opt to acquire the copy

---

[74] *See* Ex. WWW, CONTINENTAL0012870 to 873 at CONTINENTAL00128870 (████████████
████████████████████████████████████); Ex. XXX, CONTINENTAL0012855 to 858 at
CONTINENTAL00128855 (████████████████████████████████
████████████████████████████"); Ex. YYY, CONTINENTAL0012844
to 847 at CONTINENTAL0012844 (████████████████████████████████
████████████████████████████").

in preference to the original.'") (quoting *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 662 (2d Cir. 2018) (internal citation omitted)).[75]

████████████████████████████████████████████████████

████████████████████████████████████████████████.[76]

████████████████████████████████████████████████████

███████████████████████████████████████████ (PSUMF ¶ 31).[77] Thus, if anything, the value and market acceptance of CDK's DMS software was ***enhanced*** by the ability of data integrators to access the DMS for dealers' benefit.

Consideration of the other "fair use" factors supports a finding that Authenticom's access was fair use as a matter of law. The second factor – the "nature of the copyrighted work" – supports fair use, as CDK's software code is essentially technical in nature, not fictional or creative. *See Denison v. Larkin*, 64 F. Supp. 3d 1127, 1134 (N.D. Ill. 2014) ("Fictional and creative works are closer to the heart of copyright law than factual works."); *accord Stewart v. Abend*, 495 U.S. 207, 237 (1990) ("In general, fair use is more likely to be found in factual works than in fictional works."); *Sega Enters.*, 977 F.2d at 1524 ("computer programs are, in essence, utilitarian articles – articles that accomplish tasks.").

---

[75] *See also Ty, Inc. v. Publ'ns Int'l, Ltd.*, 292 F.3d 512, 522 (7th Cir. 2002) (the fourth factor "glances at the distinction . . . between substitute and complementary copying, since the latter does not impair the potential market or value of the copyrighted work except insofar as it criticizes the work, which is the opposite of taking a free ride on its value.").

[76] *See* Ex. G, Rubinfeld Tr. at 364:3-9; Ex. F, Rubinfeld Report ¶ 78 & Table 5 (████████████████████ ████████.

[77] CDK's expert economist, Professor Michael D. Whinston, testified that the historical openness of CDK's DMS was "an attribute that [CDK] marketed." Ex. AA, Whinston Tr. at 172:11-173:1; *see also id.* at 182:22-183:9, 213:19-22, 223:17-224:4, 244:2-10. As Professor Whinston also explained, such openness helped CDK win DMS customers away from Reynolds. *See* Ex. UU, Expert Report of Michael D. Whinston (dated Nov. 15, 2019), ¶ 307 ("There is clear evidence that many dealers responded to changes in Reynolds's 'closure' of its DMS to hostile integration by switching DMS providers . . . ."); Ex. AA, Whinston Tr. at 245:14-22.

The other two "fair use" factors are largely inapplicable to the present facts. While Authenticom is engaged in commercial activity, the first factor ("the purpose and character of the use") "really only comes up when the alleged infringement substitutes for the copyrighted work in the market." *Red Label*, 388 F. Supp. 3d at 985 ("When the defendant does not merely duplicate and copy verbatim the original in its entirety, pecuniary gain is largely a non-issue."). Here, however, there is no evidence or allegation that Authenticom is seeking to "pirate" CDK's DMS software code; thus, the first factor is a "non-issue." The third "fair use" factor (the amount of the work that is copied) is largely irrelevant in cases alleging the intermediate copying of software, where such copying was done for a "limited," non-substitutionary purpose. *See Sega Enterprises*, 977 F.2d at 1526-27 (the third factor is "of very little weight" in cases where the ultimate use of the software is limited); *see generally WIREdata*, 350 F.3d 640 (copying entire database was fair use).

### 2. There is No DMCA Liability for Circumvention by Authorized Users

Because Dealership Counter-Defendants and Authenticom were authorized, pursuant to express contractual licenses and the fair use doctrine, to access and make "intermediate copies" of CDK's DMS software, dealers and Authenticom cannot be held liable for circumvention under the DMCA. The plain text of the DMCA, the legislative history behind its enactment, fundamental policy considerations underlying the DMCA, and decades of copyright jurisprudence compel this result.

#### a) *The Plain Text of the DMCA*

The DMCA defines "circumvention" as an activity taken "without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A). Therefore, a plaintiff alleging circumvention must prove that the defendant's access to the copyrighted work was "unauthorized". However, a copyright owner has no authority to block expressly permitted (*i.e.*, licensed) use, or "fair use", of

its copyrighted works. Accordingly, circumvention measures that do not constitute (or facilitate) copyright infringement cannot constitute activity undertaken "without the authority of the copyright owner" and cannot lead to liability under Section 1201(a)(1). *See Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1193 (Fed. Cir. 2004) ("*Chamberlain*") ("The plain language of the [DMCA] therefore requires a plaintiff alleging circumvention (or trafficking) to prove that a defendant's access was unauthorized -- a significant burden where, as here, the copyright laws authorize consumers to use the copy of Chamberlain's software embedded in the [products] they purchased."). As explained in *Lexmark Int'l, Inc.,* 387 F.3d 522:

> [U]nder the plain meaning of the law, circumventing a technological measure is only a violation of § 1201(a) if the device allows consumers access to a work that they are not otherwise permitted to have. Therefore, even if Defendant has circumvented the authentication sequence to gain access to the Printer Engine Program, or designed a chip with that as its main purpose, it has not violated the statute, because it has not given anyone access to the program who did not already have authority from Lexmark to use it.

*Id.* at 564 (Feikens, J., concurring in part and dissenting in part).

Section 1201(c)(1) also compels this reading of Section 1201(a)(1)(A). Section 1201(c)(1) provides that "[n]othing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title." 17 U.S.C. § 1201(c)(1). But, if Section 1201(a)(1)(A) is interpreted to permit liability for mere "circumvention" in absence of any actual or threatened copyright infringement, such an interpretation would permit a copyright owner to block even fair uses of its copyrighted works, and would "flatly contradict § 1201(c)(1) -- a simultaneously enacted provision of the [DMCA]." *Chamberlain*, 381 F.3d at 1200.

b)      *Legislative History*

The DMCA's legislative history confirms this interpretation of the statutory text: that, just as a person cannot steal her own property, a lawful licensee or user of copyrighted material cannot

be deemed to unlawfully "circumvent" a technological barrier to access that material. As explained in the House Report accompanying H.R. 2281:

> [Section 1201](a)(1) does not apply to the subsequent actions of a person once he or she has obtained authorized access to a copy of a work protected under Title 17, even if such actions involve circumvention of additional forms of technological protection measures. In a fact situation where the access is authorized, the traditional defenses to copyright infringement, including fair use, would be fully applicable. So, an individual would not be able to circumvent in order to gain unauthorized access to a work, but *would be able to do so in order to make fair use of a work which he or she has acquired lawfully*.

H.R. Rep. No. 105-551, pt. 1, at 18 (1998) (emphasis added).[78]

Applied here, the absence of any copyright infringement requires dismissal of CDK's DMCA claims. There can be no "primary liability" for dealers under the DMCA, even if CDK's access controls were circumvented, given that the dealers were accessing CDK's DMS software pursuant to a license they had lawfully acquired in the first place. *See Chamberlain*, 381 F.3d at 1203 ("The DMCA cannot allow [plaintiff] to retract the most fundamental right that the Copyright Act grants consumers: the right to use the copy of [plaintiff's] . . . software that they purchased."). Similarly, the "fair use" doctrine precludes primary DMCA liability for Authenticom, and concomitant secondary DMCA liability for the Warrensburg and Continental Counter-Defendants, as any access by Authenticom to CDK's software was "fair use". *See id.* at 1202 (DMCA's statutory structure and legislative history "make it clear" that Congress did not rescind "the basic bargain granting the public noninfringing and fair uses of copyrighted materials").

---

[78] *See also* Ex. VV, S. Rep. No. 105-190, at 28 (1998) ("This paragraph does not apply to the subsequent actions of a person once he or she has obtained authorized access to a copy of a work protected under title 17, even if such actions involve circumvention of other types of technological protection measures."); Ex. WW, 144 Cong. Rec. H7093 (daily ed. Aug. 4, 1998) (legislation contains "a strong fair use provision to ensure that consumers as well as libraries and institutions of higher learning will be able to continue to exercise their historical fair use rights.") (statement of Rep. Bliley); Ex. XX, 144 Cong. Rec. H7097 (daily ed. Aug. 4, 1998) (June 16, 1998 letter of Rep. Coble: H.R. 2881's anti-circumvention provisions were intended to leave "users free to circumvent [technological protection] measures . . . to make fair use copies.").

c)    *Policy Considerations Underlying Copyright Law and the DMCA*

Dismissal of CDK's DMCA counterclaims is further supported by policies underlying the DMCA and developed through decades of copyright jurisprudence.

(i)    DMCA Does Not Protect Other Interests

The DMCA is specifically concerned with the protection of copyright -- not the protection against technological "circumvention" methods that do not infringe, or threaten to infringe, any copyright interest. *See Lexmark Int'l, Inc.*, 387 F.3d at 552 (Merritt, C.J., concurring) ("[T]he main point of the DMCA [is] to prohibit the pirating of copyright-protected works such as movies, music, and computer programs.").[79] Consistent with this statutory goal, Section 1201 of the DMCA "prohibits only forms of access that bear a reasonable relationship to the protections that the Copyright Act otherwise affords copyright owners." *Chamberlain*, 381 F.3d at 1202. Thus, as here, where an alleged "circumvention" does not result in, or facilitate, any copyright infringement, there can be no liability under the DMCA. *See Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307 (Fed. Cir. 2005):

> A copyright owner alleging a violation of section 1201(a) consequently must prove that the circumvention of the technological measure either "infringes or facilitates infringing a right protected by the Copyright Act." . . . To the extent that [defendant's] activities do not constitute copyright infringement or facilitate copyright infringement, StorageTek is foreclosed from maintaining an action under the DMCA.

---

[79] *See also Chamberlain*, 381 F.3d at 1197 ("Congress crafted the new anticircumvention and antitrafficking provisions here at issue to help bring copyright law into the information age."); *Universal City Studios v. Corley*, 273 F.3d 429, 440 (2d Cir. 2001) (the primary goal of the DMCA is to address "problems faced by copyright enforcement in the digital age"); *Pictures Words, Inc. v. CM Servs. Sales & Mktg. Grp.*, No. 18-cv-02234, 2018 U.S. Dist. LEXIS 109488, at *10 n.3 (N.D. Cal. June 29, 2018) (discussing "the DMCA's purpose of regulating copyrights in the digital realm"); *Automattic Inc. v. Steiner*, 82 F. Supp. 3d 1011, 1016-17 (N.D. Cal. 2014) ("The purpose of the DMCA was to create an environment that facilitated electronic commerce, digital technology, and expression while protecting intellectual property rights."); S. Rep. No. 105-190, at 2 (the purpose of the DMCA was to bring "U.S. copyright law squarely into the digital age").

*Id.* at 1318 (citing *Chamberlain*, 381 F.3d at 1202-03).[80]

In *Lexmark, Int'l, Inc.*, 387 F.3d 522, Chief Justice Merritt addressed this principle:

[Plaintiff] would have us read [Section 1201(a)] in such a way that any time a manufacturer intentionally circumvents any technological measure and accesses a protected work it necessarily violates the statute regardless of its "purpose." Such a reading would ignore the precise language -- "for the purpose of" -- as well as the main point of the DMCA -- to prohibit the pirating of copyright-protected works such as movies, music, and computer programs. . . . Congress did not intend to allow the DMCA to be used offensively in this manner, but rather only sought to reach those who circumvented protective measures "for the purpose" of pirating works protected by the copyright statute. Unless a plaintiff can show that a defendant circumvented protective measures for such a purpose, its claim should not be allowed to go forward.

*Id.* at 552 (Merritt, C.J., concurring). *See also id.* at 564 (citing legislative history showing that "the aim of § 1201(b) was to restrict devices used primarily for piracy, and not those that facilitate legal use of products.") (Feikens, J., concurring in part and dissenting in part); *Ford Motor Co. v. Autel US, Inc.*, No. 14-13760, 2015 U.S. Dist. LEXIS 133201, at *19-20 (E.D. Mich. Sept. 30, 2015) (dismissing claims under Sections 1201(a)(1) and 1201(a)(2) where "[t]he Complaint in this matter does not allege that Autel circumvented [plaintiff's] technological security measures 'for the purpose of' engaging in piracy.").

The DMCA itself contains multiple provisions showing that Congress' principal concern was the protection of ***copyright*** interests. First and foremost, liability for circumvention or trafficking under the DMCA can exist only where technological measures protect a "work protected under this title" (*i.e.*, protected by copyright) (*see* 17 U.S.C. § 1201(a)(1)(A), 1201(a)(2)); accordingly, the existence of a valid copyright is an express requirement for claims arising under the DMCA. Likewise, Section 1201(b)(1) imposes liability only where "a right of a

---

[80] *See also Chambers v. Amazon.com Inc.*, 632 Fed. Appx. 742, 744 (4th Cir. 2015) (a plaintiff "must prove that the circumvention of the technological measure either infringes or facilitates infringing a right protected by the Copyright Act.") (*per curiam*).

copyright owner" is at issue. 17 U.S.C. § 1201(b)(1). Indeed, the fact that the anti-circumvention provisions of the DMCA were included in Title 17 of the United States Code, alongside the rest of federal copyright law, demonstrates the connection between the DMCA and the protection of copyright interests.

As set forth above, Dealership Counter-Defendants' and Authenticom's alleged conduct does not constitute copyright infringement. CDK has not asserted claims against any party in this action for copyright infringement, nor could it. There is no evidence, or allegation, that Authenticom or Dealership Counter-Defendants accessed CDK's DMS software in order to "pirate" that software -- *i.e.*, that Authenticom was seeking to sell CDK's DMS software code, or to develop its own DMS software platform based on CDK's DMS software code. [81]

The record evidence shows the absence of any link between CDK's technological measures and any CDK copyright interest. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. PSUMF ¶ 43.[82] Further, ██████████████████████████████████████

---

[81] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. *See* PSUMF ¶ 45 (citing Ex. YY, CDK-1468122 to 124 (PX 258) ████████████████████████████████████████████████████████████████████████████████████████████████████); Ex. JJ, Distelhorst Tr. at 304:3-305:17 (██████████████████████████████████)).

[82] *See* Ex. ZZ, CDK-2470059 to 060 (████████████████████████████████████████████████████████████████████████████████████████ *see also* Ex. AAA, CONTINENTAL0060014 to 015 (DX 530) (████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████.[83] Similarly, CDK's Counterclaims do not allege any link between CDK's implementation of these technological measures and any copyright interests.[84]

Given the absence of any threat to CDK's (alleged) copyright interests, and the overwhelming evidence that CDK's purported "access controls" had no connection to any CDK copyright interests, CDK's claim does not advance the essential purpose of the DMCA.

        (ii)      Misuse of Copyright and the DMCA For Anticompetitive Reasons

Courts have long been concerned over the potential misuse of copyright to achieve anticompetitive ends. "Copyright misuse is ordinarily presented as an affirmative defense to an action for copyright infringement where the copyright holder is misusing that right for a competitive advantage beyond the scope of the monopoly created by the copyright itself." *Nielsen Co. (US), LLC v. Truck Ads, LLC*, No. 08-C-6446, 2011 U.S. Dist. LEXIS 6453, at *17 (N.D. Ill. Jan. 24, 2011); *see generally* Dealership Counter-Defendants' Answer and Affirmative Defenses

---

████████████████████████████ (emphasis added); Ex. BBB, CDK-2470057 to 058 (██████ ████████████████████████████████████████████████████████████████ ).

[83] *See* Ex. CCC, Reply Expert Report of Edward M. Stroz, dated Dec. 19, 2019 ("Stroz Reply Report") ¶ 95 ██████████████████████████████████████████████ ███████████████████████████████████); Ex. DDD, Expert Report of Edward M. Stroz, dated Aug. 26, 2019 ("Stroz Report") ¶¶ 67-108 (██████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████).

[84] *See* Counterclaims, ¶ 41 ("CAPTCHA controls are specifically designed to prevent access to computers through automated means."); CDK's Answer and Affirmative and Additional Defenses and Counterclaims ("Counterclaims Against Authenticom"), ¶ 6, *Authenticom, Inc. v. CDK Global, LLC* (June 30, 2018) (identifying the possibility of a data breach, degraded system performance, and file corruption as potential harms from Authenticom's access to the DMS, but *not* identifying copyright infringement as a potential harm); *id.* ¶ 90 ("More recently, in November 2017, CDK also introduced a CAPTCHA control designed to stop Authenticom's automated access").

to CDK's Counterclaims, dated Oct. 1, 2019, Affirmative Defense No. 13 (re: copyright misuse). "The doctrine of misuse prevents copyright holders from leveraging their limited monopoly to allow them control of areas outside the monopoly." *WIREdata*, 350 F.3d at 647 (citations and quotations omitted). "[A] defendant in a copyright infringement suit need not prove an antitrust violation to prevail on a copyright misuse defense." *Practice Mgmt. Info. Corp. v. AMA*, 121 F.3d 516, 521 (8th Cir. 1997) (citing *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 978 (4th Cir. 1990)).

Courts have expressed similar concerns over the potential misuse of the DMCA to further anticompetitive goals. *See Lexmark*, 387 F.3d at 552 ("If we were to adopt [plaintiff's] reading of the [DMCA], manufacturers could potentially create monopolies for replacement parts simply by using similar, but more creative, [access controls]. Automobile manufacturers, for example, could control the entire market for replacement parts for their vehicles by including lock-out chips. Congress did not intend to allow the DMCA to be used offensively in this manner . . . .") (Merritt, C.J., concurring).

> As the Federal Circuit explained in *Chamberlain*:
>
> [An interpretation of the DMCA which does not require a "nexus" between circumvention and copyright infringement] would allow any manufacturer of any product to add a single copyrighted sentence or software fragment to its product, wrap the copyrighted material in a trivial 'encryption' scheme, and thereby gain the right to restrict consumers' rights to use its products in conjunction with competing products. In other words, [plaintiff's] construction of the DMCA would allow virtually any company to attempt to leverage its sales into aftermarket monopolies—a practice that both the antitrust laws, and the doctrine of copyright misuse, normally prohibit.

*Chamberlain*, 381 F.3d at 1201 (internal citations omitted). And that is exactly what CDK seeks to do here: take the (purported) copyrighted elements of its DMS platform, "wrap the copyrighted material in a trivial [security] scheme", and thereby restrict dealers' rights to use their licensed

DMS "in conjunction with competing" data integrators such as Authenticom. *Id*. But CDK may not "leverag[e] [its] limited monopoly" over its purportedly copyrighted works to "allow [it] control of areas," such as the DIS market, which are "outside the [limited copyright] monopoly." *WIREdata*, 350 F.3d at 647. If CDK's DMCA counterclaims are permitted to go forward, those claims would effectively permit CDK to engage in conduct that is prohibited by antitrust and copyright jurisprudence.

3. <u>Courts Have Applied These Principles to Bar Claims Under the DMCA</u>

Federal courts have applied the principles discussed above to claims under the DMCA's "anti-circumvention" provisions. In *Chamberlain*, the Federal Circuit, in an appeal from the Northern District of Illinois, held that Section 1201 "prohibits only forms of access that bear a reasonable relationship to the protections that the Copyright Act otherwise affords copyright owners." *Chamberlain*, 381 F.3d at 1202. Thus, a copyright owner alleging a Section 1201(a) violation must prove that the circumvention either "infringes or facilitates infringing a right *protected* by the Copyright Act." *Id.* at 1203 (emphasis in original). The court summarized its holding that liability under the DMCA requires the plaintiff to demonstrate the "critical nexus between access and protection":

> A copyright owner seeking to impose liability on an accused circumventor must demonstrate a reasonable relationship between the circumvention at issue and a use relating to a property right for which the Copyright Act permits the copyright owner to withhold authorization—as well as notice that authorization was withheld.

*Id.* at 1204. The Federal Circuit concluded that "it is the standard that the Seventh Circuit would most likely follow." *Id.* at 1201.

As the Federal Circuit explained, absent a "nexus" between circumvention and copyright infringement, the DMCA would essentially create a new property right allowing a copyright holder

49

to implement technological access controls that would effectively give it the ability to prohibit

even non-infringing uses of its products:

> The notion of authorization is central to understanding § 1201(a). . . . Underlying
> Chamberlain's argument on appeal that it has not granted such authorization lies in
> the necessary assumption that Chamberlain is entitled to prohibit legitimate
> purchasers of its embedded software from "accessing" the software by using it.
> Such an entitlement, however, would go far beyond the idea that the DMCA allows
> copyright owner to prohibit "fair uses . . . as well as foul." . . . Chamberlain's
> proposed construction would allow copyright owners to prohibit *exclusively fair*
> uses even in the absence of any feared foul use. It would therefore allow any
> copyright owner, through a combination of contractual terms and technological
> measures, to repeal the fair use doctrine with respect to an individual copyrighted
> work—or even selected copies of that copyrighted work.

*Id.* at 1202 (emphasis in original).[85]

In *Storage Tech. Corp.*, 421 F.3d 1307, the Federal Circuit applied its ruling in

*Chamberlain* to a dispute between StorageTek, a company that manufactures "automated tape

cartridge libraries," and CHE, a company "that repairs data libraries manufactured by StorageTek".

*Id.* at 1309-10. Applying the "nexus" requirement, the court held that "[t]o the extent that CHE's

activities do not constitute copyright infringement or facilitate copyright infringement, StorageTek

is foreclosed from maintaining an action under the DMCA." *Id.* at 1318. The court ultimately held

that there was an insufficient nexus between CHE's circumvention devices and potential copyright

infringement for the imposition of liability under the DMCA:

> The problem in this case is that the copying of the software into RAM . . . takes
> place regardless of whether the LEM or ELEM is used[,] . . . there is no nexus

---

[85] *See also* Eric Wanner, *Navigating the Nexus: DMCA Anticircumvention Protection of Computer Software*, 43 Ariz. St. L.J. 1081, 1106 (2011) ("The *Chamberlain* nexus requirement, if uniformly adopted, would solve many of the problems that courts have been addressing, allowing expanded definitions of access and effectiveness without the need for exceptions such as the unauthorized use of an authorized password doctrine, all without giving the DMCA broad, overreaching results. Furthermore, it is consistent with standard statutory interpretation, the stated policy goal of Congress to discourage access to perfect copies of works, and allow the rejection of claims aiming to monopolize other markets without resorting to technicalities that future plaintiffs may trivially avoid.").

between any possible infringement and the use of the circumvention devices. . . . ***The activation of the maintenance code may violate StorageTek's contractual rights vis-a-vis its customers, but those rights are not the rights protected by copyright law.*** There is simply not a sufficient nexus between the rights protected by copyright law and the circumvention of the GetKey system.

*Id.* at 1319 (emphasis added).

In *Nordstrom Consulting, Inc. v. M&S Techs., Inc.*, No. 06-C-3234, 2008 U.S. Dist. LEXIS 17259 (N.D. Ill. Mar. 4, 2008), the plaintiff (NCI) alleged that the defendant (Butler) violated the DMCA by disabling the password protection on the computer in which NCI's software source code was stored in order to gain access to that software code; the defendant argued that it did so in order to repair or replace the software on behalf of a valid licensee of that software. The court cited *Chamberlain* for the requirement that "to show a violation of § 1201(a)(2) of the DMCA, a plaintiff must show that the access resulting from the circumvention of the technological measure must be in a manner that 'infringes or facilitates infringing a right protected by the Copyright Act.'" *Id.* at *23 (citing *Chamberlain*, 381 F.3d at 1203). The court also cited *Storage Tech.* for the extension of that holding to § 1201(a)(1). *Id.* at *24 (citing *Storage Tech.*, 381 F.3d at 1318). The court, applying this requirement, granted summary judgment to the defendant:

> Plaintiffs have failed to show that Defendants' circumvention of the password protection to gain access to the NCI Software infringed or facilitated infringing on Plaintiffs' rights under the Copyright Act. It is undisputed that Butler accessed the NCI Software in order to repair or replace the software of a client of M&S and a valid licensee of the NCI Software. Thus, Defendants' motion for summary judgment on [the DMCA] Count . . . is granted.

*Id.*[86]

---

[86] Another court in this district has recognized the "nexus" requirement for claims under the DMCA. In *Agfa Monotype Corp. v. Adobe Sys.*, 404 F. Supp. 2d 1030 (N.D. Ill. 2005) (Leinenweber, J.), the plaintiff (a developer of typeface fonts) alleged that Adobe violated multiple sections of the DMCA by designing and producing technology (the Adobe Acrobat 5.0 program) that circumvented technological measures ("embedded bits") employed by the plaintiff to prevent access to the plaintiff's copyrighted fonts. The court cited the holding in *Chamberlain* applying

*Nordstrom Consulting* also compels summary judgment to dealerships in this case. It is undisputed that Authenticom accessed CDK's DMS in order to extract data on behalf of dealers who were valid licensees of the DMS software -- not for software piracy. As in *Nordstrom Consulting*, Counter-Defendants are entitled to summary judgment on CDK's DMCA claims. *See also Autel*, 2015 U.S. Dist. LEXIS 133201, at *19-20 (dismissing claims under Sections 1201(a)(1) and 1201(a)(2) where "[t]he Complaint in this matter does not allege that Autel circumvented [plaintiff's] technological security measures 'for the purpose of' engaging in piracy.").

As shown above, CDK's alleged "access controls" were not implemented in order to prevent copyright infringement, and Counter-Defendants' alleged circumvention of those access controls did not result in (or facilitate) any copyright infringement. Accordingly, because there is no "nexus" between any alleged circumvention and any CDK interest in copyright, there can be no liability under the DMCA.[87]

---

the "nexus" requirement to claims under the DMCA, and the parties acknowledged that *Chamberlain* set forth the applicable standard for claims under the DMCA. *See id.* at 1034. The court's decision to grant summary judgment to the defendant was based on other grounds. *See id.* at 1036, 1040 (finding that the "embedded bits" did not, as a technical matter, "effectively control access" to the plaintiff's copyrighted fonts). *But see MDY Indus., LLC v. Blizzard Entm't, Inc.*, No. 09-15932, 2011 U.S. App. LEXIS 3428, at *45-46 (9th Cir. 2011) (rejecting the "nexus" requirement set forth in *Chamberlain*).

[87] The questions of (i) whether CDK's DMS software is protected under the Copyright Act, and (ii) whether the DMCA prohibits independent data integrators' access to the CDK DMS, are also currently being litigated in another federal district court. CDK and Reynolds are challenging Arizona's recently-enacted "Dealer Data Security Law" (codified at Arizona Revised Statute ("A.R.S.") Sections 28-4651 to 26-4655) which, *inter alia*, prohibits DMS providers (such as CDK and Reynolds) from taking actions to "prohibit or limit a dealer's ability to protect, store, copy, share, or use protected dealer data," A.R.S. § 28-4653(A)(3), and from placing any "unreasonable restriction" on the ability of a dealer-authorized third party to access a dealer's stored in on the dealer's DMS database, *id.* § 28-4653(A)(3)(b).

CDK and Reynolds have filed an action in the District of Arizona challenging the enforceability of the Dealer Data Security Law, arguing, *inter alia*, that it is preempted by the DMCA and the Copyright Act. *See* Complaint, ECF No. 1, *CDK Global, LLC v. Brnovich*, No. 2:19-cv-4849-GMS (D. Ariz. July 29, 2019). The defendants in that action (the Attorney General of Arizona, the Director of the Arizona Dep't of Transportation, and the Arizona Automobile Dealers Association) moved to dismiss CDK's and Reynolds's complaint. *See* ECF Nos. 39 and 40. While the District of Arizona has not ruled on those motions to dismiss, on May 5, 2020, that court issued an order

### C.   CDK Cannot Offer Evidence Of Any Violations Of The DMCA By Any Specific Dealership Counter-Defendant

CDK has failed to offer any evidence attributing any specific "acts of circumvention" to any specific Dealership Counter-Defendant. Instead, CDK has improperly lumped together the Counter-Defendants, in an improper attempt to hold each dealership liable for the (purported) acts of others. Because CDK cannot offer evidence of any DMCA violations by any specific Dealership Counter-Defendant, each of them is entitled to summary judgment.

Although CDK asserts a counterclaim against three separate parties (that CDK has collectively labelled the "Warrensburg Counter-Defendants"),[88] 



*See* Ex. DDD, Stroz Report ¶ C51; Ex. EEE, Deposition of Edward M. Stroz (CDK cybersecurity expert) ("Stroz Tr.") (Jan. 23, 2020) at 263:3-23 

_____

in which it indicated how it was "inclined to rule" on the motions. *See* Order Regarding Final Prehearing Conference, ECF No. 83.

The Arizona district court stated that it is inclined to dismiss CDK's claim that the Dealer Data Security Law is preempted by the Copyright Act: "CDK has not alleged any copyrighted material, only *copyrightable* material. Thus, the Copyright Act cannot preempt the Dealer Law as it applies to persons that do not have copyright protection." *Id.* at 1-2 (emphasis in original). The Arizona district court also stated that it is inclined to dismiss CDK's claim that the law was preempted by the DMCA "for the same reasons set forth above", and further noted that "the DMCA is concerned with preventing unauthorized access to copyrighted works by 'pirates who aim to destroy the value of American intellectual property' . . . ," not with statutes governing access to dealer data. *Id.* at 2.

[88] The three separate Counter-Defendants that CDK has collectively labelled the "Warrensburg Counter-Defendants" are (1) Cliff Harris Ford, LLC, d/b/a Warrensburg Ford; (2) Marshall Chrysler Jeep Dodge, L.L.C., d/b/a Marshall Chrysler Jeep Dodge Ram; and (3) Warrensburg Chrysler Dodge Jeep, L.L.C., d/b/a Warrensburg Chrysler Dodge Jeep Ram Fiat. *See* Counterclaims ¶¶ 17-19; *see also* Ex. DDD, Stroz Report ¶ C2 n.1 (same).

Similarly, CDK asserts a counterclaim against eight separate entities that CDK has collectively labelled the "Continental Counter-Defendants,"[89] but  *See* Ex. DDD, Stroz Report ¶ C26; Ex. EEE, Stroz Tr. at 241:12-242:10. Accordingly, [90]

Courts routinely dismiss complaints where plaintiffs engage in impermissible "group pleading," *i.e.*, where plaintiffs bring allegations against multiple defendants without identifying each defendant's individual responsibility for the challenged acts. "A complaint based on a theory of collective responsibility must be dismissed." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) (affirming dismissal of allegations where the complaint "lump[ed] all of the defendants together, never describing which defendant is responsible for what conduct or when each defendant participated in that unspecified conduct.").[91]

---

[89] The eight separate Counter-Defendants that CDK has collectively labelled the "Continental Counter-Defendants" are (1) ACA Motors, Inc., d/b/a Continental Acura; (2) Continental Class Motors, Inc., d/b/a Continental Autosports; (3) 5800 Countryside, LLC, d/b/a Continental Mitsubishi; (4) HAD Motors, Inc., d/b/a Continental Honda; (5) H & H Continental Motors, Inc., d/b/a Continental Nissan; (6) Continental Autos, Inc., d/b/a Continental Toyota; (7) Naperville Zoom Cars, Inc., d/b/a Continental Mazda; and (8) NV Autos, Inc., d/b/a Continental Audi. *See* Counterclaims ¶¶ 7-14; *see also* Ex. DDD, Stroz Report ¶ C2 n.1 (same).

[90] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* MDL Plaintiffs' Memorandum in Support of Motion to Exclude the Expert Testimony of Edward M. Stroz (ECF No. 861) at 19, 23.

[91] *See also Prewett Enters. v. Grand Trunk W. R.R. Co.*, No. 18-CV-04254, 2019 U.S. Dist. LEXIS 204401, at *20-21 (N.D. Ill. Nov. 25, 2019) ("By failing to specify which defendant was responsible for which services, [plaintiff] runs afoul of restrictions on collective pleading.") *Rysewyk v. Sears Holdings Corp.*, No. 15-CV-4519, 2015 U.S. Dist. LEXIS 169124, at *22-23 (N.D. Ill. Dec. 18, 2015) (where complaint defined "Sears" to include three defendants, the court rejected that "group pleading" and dismissed the claims against one of those defendants, as "such

While courts sometimes permit "group pleading" at the motion to dismiss stage, it is wholly *impermissible* at summary judgment. *See Wert v. Cohn*, No. 17-C-219, 2019 U.S. Dist. LEXIS 63226, at *42-43 (N.D. Ill. Apr. 12, 2019) ("[T]he group pleading doctrine . . . has no application at [the summary judgment] stage. The question is no longer whether the plaintiffs have successfully pleaded their claims but rather whether they have produced evidence from which a reasonable jury could find in their favor.") (internal quotations and emphasis omitted); *Sibley v. Dart*, No. 17-cv-6298, 2019 U.S. Dist. LEXIS 26195, at *13 (N.D. Ill. Feb. 19, 2019) (in civil rights action against multiple police officers, where plaintiff did not yet know the extent of each officer's participation in the alleged violations, the Court permitted plaintiff to rely on group pleading at the motion to dismiss stage, but stated that "Plaintiff must eventually tie particular Defendants to particular injuries to survive summary judgment"); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 448 (S.D.N.Y. 2012) ("Group pleading, however, is only a pleading device, and plaintiffs cannot rely on it at [the summary judgment] stage of the proceedings."). Reliance on collective proof at the summary judgment stage is not permitted because, *inter alia*, the plaintiff has had the opportunity to develop proof each defendant's individual liability during discovery. *See Carrado v. Daimler AG*, No. 17-cv-3080-WJM-SKC, 2018 U.S. Dist. LEXIS 163026, at *12 (D. Colo. Sept. 24, 2018) ("While pleading of allegations against 'Mercedes' is adequate here at the pleadings stage, by the summary judgment stage, Plaintiffs will have had the benefit of discovery and must be able to distinguish between MBUSA and Daimler.").

---

group pleading cannot save a complaint when more specific allegations do shed light on the roles of the different entities.").

*Cf.* Dealership Class MTD Opp., ECF No. 749 at 24 (dismissing CFAA counterclaim against Dealership Counter-Defendants for failing to disaggregate alleged damages, since CDK "can[not] aggregate losses caused by multiple acts of multiple defendants").

Because there is no evidence showing a DMCA violation by any of the individual Dealership Counter-Defendants, each of them is entitled to summary judgment.

### D.    CDK Cannot Offer Any Evidence Of A Secondary Violation Of The DMCA By The Continental Counter-Defendants

CDK is not asserting a claim for primary (*i.e.*, direct) liability against the Continental Counter-Defendants.[92] It does, however, seek to hold the Continental Counter-Defendants secondarily liable under Section 1201(a)(1)(A) on theories of contributory and/or vicarious liability. *See* ECF No. 749 at 26 n.10 ("CDK's opposition brief makes clear that they are proceeding on vicarious and contributory liability theories."). Each of the Continental Counter-Defendants are entitled to summary judgment on CDK's secondary liability claims, because among other things, (a) CDK lacks any evidence that any of the Continental Counter-Defendants knew of Authenticom's methods for responding to CDK's CAPTCHA prompts, or materially contributed to Authenticom's CAPTCHA responses; and (b) CDK lacks any evidence that any of the Continental Counter-Defendants experienced a direct financial benefit from, had the ability to control or monitor, or had actual or constructive knowledge of any purported circumvention of CAPTCHA.[93]

---

[92] CDK recently confirmed that it is not pursuing a primary liability claim against the Continental Counter-Defendants. *See* Ex. FFF, Daniel Fenske email to Matthew Kupillas, dated Apr. 7, 2020 ("CDK . . . is only pursuing a secondary liability claim under the DMCA against the Continental Counter-Defendants.").

[93] Of course, if the Court finds that Authenticom has not committed a primary violation of the "anti-circumvention" provision of the DMCA, CDK's claims for secondary must also fail. *See*, *e.g.*, *Denison*, 64 F. Supp. 3d at 1135 ("In order to have a valid claim for contributory or vicarious copyright infringement, Plaintiff must allege a valid direct copyright infringement claim."); *Flava Works, Inc. v. Clavio*, No. 11-C-05100, 2012 U.S. Dist. LEXIS 88673, at *7 (N.D. Ill. June 27, 2012) (dismissing vicarious and contributory infringement claims where complaint failed to state a direct infringement claim).

### 1. No Evidence of Contributory Liability

The Court has held that it is appropriate to "appl[y] secondary liability principles drawn from copyright law to claims brought under the DMCA." ECF No. 749 at 27.[94] Contributory copyright infringement occurs where a defendant "with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another." *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 649 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643. Accordingly, to state a claim for contributory copyright infringement, a plaintiff must plead "(1) direct infringement by a primary infringer, (2) the defendant's knowledge of the infringement, and (3) the defendant's material contribution to the infringement." *Monotype Imaging, Inc. v. Bitstream, Inc.*, 376 F. Supp. 2d 877, 883 (N.D. Ill. 2005) (citing *Marobie-FL, Inc.*, 983 F. Supp. at 1178).

CDK has not offered, and ***cannot*** offer, any evidence that any of the Continental Counter-Defendants had actual or constructive knowledge of Authenticom's alleged circumvention of CDK's CAPTCHA prompts, or that any of the Continental Counter-Defendants materially contributed to Authenticom's alleged circumvention of CAPTCHA.[95]

#### a) *The Continental Counter-Defendants Did Not Know of Authenticom's Alleged Circumvention of CAPTCHA*

Application of secondary copyright infringement caselaw to CDK's claim against the Continental Counter-Defendants for secondary liability under Section 1201(a)(1)(A) would require proof that they "kn[e]w or ha[d] reason to know of the direct [circumvention]." *In re*

---

[94] *See also Gordon v. Nextel Commc'ns*, 345 F.3d 922, 925 & n.1 (6th Cir. 2003) (applying principles of secondary copyright infringement to claims for secondary liability under the DMCA); *Microsoft Corp. v. Silver Star Micro, Inc.*, 2008 U.S. Dist. LEXIS 1526, at *24 n.8 (N.D. Ga. Jan. 9, 2008) (same).

[95] Dealership Counter-Defendants do ***not*** concede that Authenticom improperly circumvented CDK's purported CAPTCHA prompts.

*Aimster*, 252 F. Supp. 2d at 650; *see also Myers v. Harold*, 279 F. Supp. 3d 778, 796 (N.D. Ill. 2017) ("[K]nowledge of the [circumventing] activity" is required).

CDK lacks any evidence showing that any of the Continental Counter-Defendants knew (or had reason to know) that Authenticom was purportedly circumventing CDK's CAPTCHA controls through automated means. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████. *See* PSUMF ¶ 46. ██████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████. *Id.* (citing Ex. AAA, CONTINENTAL0060014 to 015 (DX 530): ██████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████ PSUMF ¶ 47 (citing Ex. GGG, Deposition of Mark Johnson (Continental Motors IT Director) ("M. Johnson Tr.") (Feb. 28, 2019) at 375:22-376:11).

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████ *See* Counterclaims ¶ 110. However, ██████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ PSUMF ¶

48 (citing Ex. GGG, M. Johnson Tr. at 372:9-374:14), ███████████████████████

█████████████████████████████████████████████████████████████████████████

███████████████ (*id.* at 375:12-20). ██████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

██████████████████████████████████████. PSUMF ¶ 46 (citing Ex. GGG, M. Johnson Tr. at

377:11-19). ███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

███████████████████████ PSUMF ¶ 46 (citing Ex. GGG, M. Johnson Tr. at 237:9-13, 377:24-

378:6).[96]

     CDK also lacks any expert evidence showing the Continental Counter-Defendants'

knowledge of any alleged circumvention of CAPTCHA by Authenticom.██████████████████

███████████████████████████████████████████████████████████████ (PSUMF ¶

53), ████████████████████████████████████████████████████████████████████████

---

[96] █████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

████████████████████████████████████ PSUMF ¶ 49 (citing Ex. GGG, M. Johnson

Tr. at 237:14-238:6).

█████ (PSUMF ¶ 54), negating any suggestion that any of the Continental Counter-Defendants knowingly helped Authenticom engage in any unlawful circumvention.[97]

"The knowledge element for contributory copyright infringement is met in those cases where a party has been notified of specific infringing uses of its technology and fails to act to prevent future such infringing uses, or willfully blinds itself to such infringing uses." *Monotype Imaging, Inc.*, 376 F. Supp. 2d at 886. However, there is no evidence that CDK ever notified any of the Continental Counter-Defendants that automated means were being used to circumvent CDK's CAPTCHA prompt. PSUMF ¶ 51. For example, there is no evidence that CDK ever sent any cease-and-desist letters, or any other communications notifying any of the Continental Counter-Defendants that CDK's CAPTCHA prompt was being improperly circumvented. *See Bell v. Chi. Cubs Baseball Club, LLC*, No. 19-cv-2386, 2020 U.S. Dist. LEXIS 17527, at *13 (N.D. Ill. Feb. 4, 2020) (complaint did not adequately plead knowledge of copyright infringement where

---

[97] █████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████ *See* Ex. EEE, Stroz Tr. at 244:22-246:2.

████████████████████████████████████████ (Ex. HHH, Expert
Report of Scott Tenaglia dated Aug. 26, 2019 ("Tenaglia Report"), at 2), ███████████
███████████████████████████████████████████
███████████████████████████████████████████
█████████████ *Id*. at 9 (footnote omitted; emphasis added). ██████████████
███████████████████████████████████████ *Id.* at 8-9
(emphasis added); *see also id.* at 25 ████████████████████████████
███████████████████████████████████████████
████████████████████████████

"Plaintiff does not allege, for instance, that he notified the Cubs (or Lifrak) that they were using his copyrighted material without permission and Defendants refused to take the retweet down.").[98]

As to any argument that the Continental Counter-Defendants "should have known" that Authenticom would use automated means to circumvent CDK's CAPTCHA prompts, there was no reason for any of the Continental Counter-Defendants to assume that Authenticom would respond to CDK's CAPTCHA prompts in an automated manner. For example, Authenticom could have manually responded to the CAPTCHA prompts in the typical manner, by employing a human to read the CAPTCHA and enter the correct responses, just as any dealer could have done for itself ███████████████████████████████████████████████████████████████

████[99]). *See Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013) ("more than a generalized knowledge by the [defendant] of the possibility of infringement" is

---

[98] *Contrast* with *In re Aimster Copyright Litig.*, 252 F. Supp. 2d at 650 (multiple cease-and-desist letters sent to defendant established "knowledge" element of contributory copyright infringement); *Adobe Sys. v. Dafang U.S.*, No. 2:18-cv-08504-VAP-AGRx, 2019 U.S. Dist. LEXIS 226717, at *2, *15 (C.D. Cal. Aug. 22, 2019) (entering default judgment on claim for contributory copyright infringement where "Defendants directly and knowingly sold and distributed Plaintiff's counterfeited products even after they were repeatedly made aware by Plaintiff of their infringement and the counterfeit nature of the products they were selling" through "multiple cease and desist notices and letters"); *China Cent. TV v. Create New Tech. (HK) Ltd.*, No. CV-15-01869 MMM (MRWx), 2015 U.S. Dist. LEXIS 76005, at *25 (C.D. Cal. June 11, 2015) (sustaining claim for contributory copyright infringement, where "Defendants had actual knowledge of the infringing activity because plaintiffs sent them cease and desist letters."); *Oppenheimer v. Allvoices, Inc.*, No. C 14-00499 LB, 2014 U.S. Dist. LEXIS 80320, at *26-27 (N.D. Cal. June 10, 2014) (sustaining claim for contributory copyright infringement, where the plaintiff's cease-and-desist notice put the defendant on notice of the infringing activity).

[99] *See* PSUMF ¶ 55 (citing Ex. III, AUTH_00092142 to 143 (██████████████████  ████████████████████████████████████████████████████████████████ ████████████████████████); Ex. JJJ, AUTH_00091909 to 910 (███████████ ████████████████████████████████████████████████)); Ex. KKK, Deposition of Dane Brown (Authenticom Rule 30(b)(6) designee) ("Brown Tr.") (Apr. 5, 2019) at 153:4-10 ("█████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████

required to sustain a claim for contributory copyright infringement). Such a human response would not "circumvent" CDK's CAPTCHA prompt in violation of the DMCA, because it would not involve the use of automated means to respond to CAPTCHA, ██████████████████████████ ███████████████████████████████████████████ *See* Ex. DDD, Stroz Report ¶ 115 ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

████████ Instead, a human response to CAPTCHA is exactly what CAPTCHA demands, and therefore, would not qualify as "circumvention" under the DMCA. *See I.M.S. Inquiry Mgmt. Sys. v. Berkshire Info. Sys.*, 307 F. Supp. 2d 521, 532 (S.D.N.Y. 2004) ("Circumvention requires either descrambling, decrypting, avoiding, bypassing, removing, deactivating or impairing a technological measure *qua* technological measure."). The use of human means by Authenticom to respond to CAPTCHA is analogous to Authenticom's use of dealer-provided username/ password combinations to log into CDK's DMS; responding to a prompt with the requested information does ***not*** constitute "circumvention" under the DMCA (as this Court has recognized), *see* ECF No. 749 at 27-29.

In fact, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

PSUMF ¶ 50 (citing Ex. LLL, CONTINENTAL0007941 to 942 at § 7.2 (DX 516) (████████████

62



")).

. *Cf. Indeck N. Am. Power Fund, L.P. v. Norweb PLC*, 316 Ill. App. 3d 416, 427-28 (Ill. App. Ct. 2000) ("Since representations and warranties are assurances upon which a party may rely, they are 'intended precisely to relieve the promisee of any duty to ascertain the fact for himself.'") (citations omitted) (quoting *Metro. Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946)).

Because CDK has not adduced evidence from which a jury could reasonably find that any of the Continental Counter-Defendants knew that Authenticom was purportedly circumventing CDK's CAPTCHA prompt through automated means, all of the Continental Counter-Defendants are entitled to summary judgment on CDK's claims for contributory DMCA liability. *See Bell*, 2020 U.S. Dist. LEXIS 17527, at *12-13 (dismissing claim for contributory copyright infringement where "[t]he amended complaint contains no facts from which it could plausibly be inferred that the Cubs knew that Lifrak was infringing Plaintiff's copyright, yet failed to act to stop the infringement or willfully blinded themselves to the infringement."); *Boehm v. Svehla*, No. 15-cv-379-jdp, 2017 U.S. Dist. LEXIS 158530, at *51 (W.D. Wis. Sept. 27, 2017) (granting defendant's motion for summary judgment: "Plaintiffs have not adduced evidence that [defendant] *knew* that the photos he printed and distributed were infringing, so they have not met their burden of production regarding contributory infringement.") (emphasis in original).

b) *The Continental Counter-Defendants Did Not Materially Contribute to Any Alleged Circumvention of CAPTCHA*

In addition to the "knowledge" requirement, secondary copyright infringement caselaw (when applied to secondary "circumvention" claims under the DMCA) requires proof that the defendant engaged in "personal conduct that encourage[d] or assist[ed] the [circumvention]." *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 757 (7th Cir. 2012).[100] "Participation by the defendant must be substantial." *Marobie-FL, Inc.*, 983 F. Supp. at 1178; *see also Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 432 (S.D.N.Y. 2011) ("A defendant's contribution to a third party's infringing activities must be 'material' to give rise to a claim for contributory infringement.") (citing *Gershwin Publ'g Corp. v. Columbia Artist Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)).

However, there is no evidence that any of the Continental Counter-Defendants materially contributed to Authenticom's alleged circumvention of CDK's CAPTCHA prompt. CDK cannot identify even a single act taken by any of the Continental Counter-Defendants to contribute to Authenticom's purported circumvention of CDK's CAPTCHA prompt. ████████████

████████████████████████████████████████████

████████████████████████████ *See* PSUMF ¶ 56. There is no evidence that the Continental Counter-Defendants did anything to cause that alleged circumvention to take place. There is no evidence that any Continental Counter-Defendant even knew it was happening.

████████████████████████████████████████

████████████████████████ (*see* Ex. DDD, Stroz Report ¶¶ 115, C4-C27), Mr.

---

[100] *See also MGM Studios Inc. v. Grokster, Ltd.* ("*Grokster*"), 545 U.S. 913, 930 (2005) ("One infringes contributorily by intentionally inducing or encouraging direct infringement[.]"); *Microsoft Corp. v. Rechanik*, 249 Fed. Appx. 476, 479 (7th Cir. 2007) (where one defendant intentionally encourages another defendant's copyright and trademark infringement, he may be held personally liable as a contributor).



███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████. [101]

███████████████████████████████████████████████████

██████████████████████████████████████████. *Id.* ¶ C26 ███████

███████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████ (*Id.*

¶ C4), ████████████████████████████████████████████████

████████████████████████████ [102]

CDK also cannot identify any evidence that any of the Continental Counter-Defendants intentionally encouraged or induced Authenticom to circumvent CAPTCHA through automated means, because none exists. To the contrary, ████████████████████████

███████████████████████████████████████████████████

███████ ███████████ ████ █ ████████ ████████ ███████ █ ████ ████████

███████████████████████████████████████████████████

---

[101] *See* Ex. DDD, Stroz Report ¶ 115 ██████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████ *id.* ¶ C5 (███████████████████████
███████████ *id.* ¶ C11 ████████████████████████████████████.

[102] *Contrast with UIRC-GSA Holdings Inc. v. William Blair & Co., L.L.C.*, No. 15-CV-9518, 2017 U.S. Dist. LEXIS 133287, at *14 (N.D. Ill. Aug. 21, 2017) (plaintiff's allegations that defendant's employee "personally supervised the creation of the infringing materials and had consistent input during the drafting process", "directed or supervised [defendant's] use of the infringing materials", and "personally circulated the infringing materials to potential clients", were sufficient at the pleading stage "to meet the contributory liability standards.").

███████████████ PSUMF ¶ 46 (citing Ex. AAA, CONTINENTAL0060014 to 015 (DX 530)). ███████████████████████████████████████████████████████

█████████████████████████████. *See Grokster*, 545 U.S. at 936-37 (inducement liability requires evidence of "***active steps*** . . . taken to encourage direct infringement.") (citation and quotation omitted) (emphasis added); *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 746 (9th Cir. 2019) ("a 'failure to take ***affirmative steps*** to prevent infringement' alone cannot trigger inducement liability") (citing *Grokster*, 545 U.S. at 939 n.12) (emphasis added); *Conrad v. AM Cmty. Credit Union*, No.13-cv-461-bbc, 2013 U.S. Dist. LEXIS 113168, at *12 (W.D. Wis. Aug. 12, 2013) ("One does not 'induce' or 'encourage' direct infringement simply by remaining silent.").

CDK alleges that by providing their DMS login credentials to Authenticom, the Continental Counter-Defendants "materially contributed to" Authenticom's circumvention of CAPTCHA[103]; however, such an argument is unavailing. As this Court has already ruled, the sharing of dealer-provided login credentials to access the CDK DMS does not violate the DMCA. *See* ECF No. 749 at 28 ("[T]he use of valid username/password combinations alone is insufficient to establish liability under Section 1201(a)(1)(A) of the DMCA."). Further, the mere provision of DMS login credentials to Authenticom did not make it "substantially certain" that Authenticom would then respond to CAPTCHA via automated means. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1171 (9th Cir. 2007) ("[U]nder *Grokster*, an actor may be contributorily liable for

---

[103] *See* Counterclaims ¶ 154 (alleging that "[t]he Continental Counter-Defendants . . . materially contributed to the ability of Authenticom and other third parties to circumvent CDK's technological measures that control access to its DMS. Without the Continental Counter-Defendants' . . . login credentials, Authenticom and other third parties would not have been able to access CDK's DMS.").

intentionally encouraging direct infringement if the actor knowingly takes steps that are substantially certain to result in such direct infringement").

Moreover, even if the provision of DMS login credentials to Authenticom was the "means" by which Authenticom accomplished its alleged circumvention of CAPTCHA (which it was ***not***), evidence that a defendant "merely provid[ed] the means to accomplish an infringing activity" is insufficient to establish a claim for contributory liability. *Livnat v. Lavi*, No. 96 Civ. 4967(RWS), 1998 U.S. Dist. LEXIS 917, at *8 (S.D.N.Y. Feb. 2, 1998) (citing *Sony Corp.*, 464 U.S. at 435 n.17) (internal quotations omitted); *see also Ediciones Quiroga, S.L. v. Fall River Music, Inc.*, No. 93 Civ. 3914 (RPP), 1998 U.S. Dist. LEXIS 19039, at *106 (S.D.N.Y. Dec. 7, 1998) (granting summary judgment to defendant on contributory copyright infringement claim: "A mere allegation that the defendant provided the third party with the opportunity to engage in wrongful conduct would not even be enough to survive a motion to dismiss."). Instead, "[t]he authorization or assistance must bear a direct relationship to the infringing acts, and the contributory infringer must have acted in concert with the direct infringer." *Livnat*, 1998 U.S. Dist. LEXIS 917, at *9 (citation omitted). ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████     ██████████████████████████████████████████████

████████████████████████████████

Because CDK lacks any evidence that any of the Continental Counter-Defendants materially contributed to, induced, or encouraged Authenticom's purported automated responses

---

[104] *See* PSUMF ¶ 52 (citing Ex. MMM, CONTINENTAL0002981 to 985 (DX 529): ███████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████

to CDK's CAPTCHA prompt, the Continental Counter-Defendants are entitled to summary judgment on CDK's claim for contributory DMCA liability. *See Telebrands Corp. v. My Pillow, Inc.*, No. 18-CV-06318, 2019 U.S. Dist. LEXIS 72832, at *9 (N.D. Ill. Apr. 30, 2019) (dismissing claim for contributory false advertising under the Lanham Act "because My Pillow does not allege that Telebrands engaged in the alleged false advertising by inducing, causing, or materially participating in the conduct"); *Flava Works*, 2012 U.S. Dist. LEXIS 88673, at *11 (dismissing claims for contributory copyright infringement where the complaint was "lacking any factual allegations that [defendant] took affirmative steps to induce infringement by others.").

### 2. CDK Cannot Adduce Any Evidence of Vicarious Liability

CDK also cannot prevail on a claim against the Continental Counter-Defendants for vicarious liability under the DMCA. To identify the standards potentially applicable to a vicarious liability claim under the DMCA, it is again appropriate to look to caselaw involving claims for vicarious copyright infringement. "To prevail on a claim for vicarious copyright infringement, a plaintiff must establish that 'the defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity.'" *GC2 Inc. v. Int'l Game Tech. PLC*, 255 F. Supp. 3d 812, 824 (N.D. Ill. 2017) (quoting *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673 (9th Cir. 2017)). Additionally, the Supreme Court has indicated that actual or constructive knowledge is an essential element of vicarious copyright infringement. *See Sony Corp. of Am.*, 464 U.S. at 439 ("If vicarious liability is to be imposed on Sony in this case, it must rest on the fact that tit [sic] has sold equipment ***with constructive knowledge*** of the fact that its customers may use that equipment to make unauthorized copies of copyrighted material.") (emphasis added).

CDK cannot establish that the Continental Counter-Defendants (1) had any direct financial interest in Authenticom's alleged circumvention of CAPTCHA; (2) had the right or ability to

supervise Authenticom's alleged circumvention; or (3) had any knowledge of Authenticom's alleged circumvention. CDK's inability to offer evidence on *any* of these three points compels the entry of judgment against CDK on its claims for vicarious DMCA liability.

> a) *The Continental Counter-Defendants Did Not have a Direct Financial Interest in Authenticom's Alleged Circumvention of CAPTCHA*

In order to establish vicarious liability under Section 1201(a)(1)(A), CDK must offer evidence that the Continental Counter-Defendants had "a direct financial interest in the [circumventing] activity." *GC2 Inc.*, 255 F. Supp. 3d at 824 (internal quotation omitted). However, CDK can proffer no evidence demonstrating any financial interest by any of the Continental Counter-Defendants in Authenticom's alleged circumvention of CDK's CAPTCHA prompts.

This Court recently addressed the "direct financial interest" element of vicarious liability in the context of a claim for vicarious copyright infringement:

> For purposes of a vicarious copyright infringement claim, "a financial benefit exists where there is evidence of a direct financial gain or that the 'availability of infringing material acts as a draw for customers.'" *GC2*, 255 F. Supp. 3d at 825 (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1078 (9th Cir. 2004)) (emphasis added). The second type of financial interest exists 'where the availability of an infringing work is a contributing factor in a consumer's decision to purchase a product or service.' *Id.* Importantly, '[t]he size of the 'draw' relative to a defendant's overall business is immaterial.'' *Id.* (citing *Perfect 10*, 847 F.3d at 673). 'Under either method of proof, '[t]he essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits.'' *Id.* (quoting *Ellison*, 357 F.3d at 1079); see also *Flava Works, Inc. v. Clavio*, 2012 U.S. Dist. LEXIS 88673, 2012 WL 2459146, at *4 (N.D. Ill. June 27, 2012).

*Bell*, 2020 U.S. Dist. LEXIS 17527, at *15-16. While these types of financial benefits from copyright infringement do not directly translate to the DMCA context, one point remains clear: a party asserting a claim for vicarious liability under the DMCA must offer evidence of "a causal relationship between the [circumventing] activity and any financial benefit a defendant reaps . . .

69

." *Id.* at *16. Here, no such relationship exists, as the Continental Counter-Defendants did not reap any financial benefit from Authenticom's alleged circumvention of CDK's CAPTCHA prompts. PSUMF ¶ 57.

The lack of direct financial interest in Authenticom's alleged circumvention is even ***more*** striking when contrasted with decisions upholding claims for vicarious copyright infringement. *See*, *e.g.*, *Broad. Music, Inc. v. B&B Entm't, Inc.*, No. 14-cv-01337-JPG-PMF, 2016 U.S. Dist. LEXIS 197214, at *8 (S.D. Ill. July 12, 2016) (defendants had an ownership interest in the infringing business); *Bertam Music Co. v. P&C Enters., Inc.*, No. 09-CV-2253, 2011 U.S. Dist. LEXIS 71967, at *26 (C.D. Ill. July 5, 2011) (defendant "was entitled to one half of any profits made by" the infringing entity); *Century Consultants, Ltd. v. Miller Grp., Inc.*, No. 03-3105, 2008 U.S. Dist. LEXIS 9005, at *26 (C.D. Ill. Feb. 6, 2008) (the infringing entity was contractually required to pay defendant 10% of the revenues generated from the infringing software application).

As demonstrated above, CDK's inability to offer evidence of the Continental Counter-Defendants' direct financial interest in Authenticom's alleged circumvention of CATPCHA is fatal to CDK's claim for vicarious liability.

> b) *There is No Evidence that the Continental Counter-Defendants had the Right or Ability to Supervise Authenticom's Alleged Circumvention of CAPTCHA*

CDK's claim for vicarious liability also fails because CDK can proffer no evidence that the Continental Counter-Defendants possessed "the right and ability to supervise the infringing conduct" – *i.e.*, Authenticom's alleged circumvention of CAPTCHA. *GC2 Inc.*, 255 F. Supp. 3d at 824; *see also Perfect 10, Inc.*, 508 F.3d at 1173 (vicarious copyright infringement requires "both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so.").

Tellingly, CDK's counterclaims contain no allegation that the Continental Counter-Defendants had the "right and ability to supervise" Authenticom's alleged circumvention of CAPTCHA. In fact, CDK alleges that "[t]hird party hostile data extractors like Authenticom are not 'agents' of the Dealership Counter-Defendants." Counterclaims ¶ 49. Thus, to the extent that the Continental Counter-Defendants' alleged "right and ability to supervise" Authenticom's circumvention of CAPTCHA is based on a principal-agent relationship, CDK has "plead itself out of court." *See Atkins*, 631 F.3d at 832 (a plaintiff can plead itself out of court by pleading facts that show it has no legal claim).

Moreover, CDK's failure to proffer evidence on this necessary element of vicarious liability warrants summary judgment. *See Duncanson v. Wine & Canvas IP Holdings LLC*, No. 1:16-cv-00788-SEB-DML, 2018 U.S. Dist. LEXIS 168592, at *36 (S.D. Ind. Sept. 30, 2018) (granting defendants' motion for summary judgment on plaintiff's vicarious copyright infringement claim, where plaintiff failed to show "compelling evidence" that infringing copies "were produced under conditions which [defendants] had the right or ability to supervise. Rather, the facts suggest that the infringing copies were produced independently of [defendants'] involvement and submitted to [defendants] only after they were produced."); *Boehm v. Svehla*, No. 15-cv-379-jdp, 2017 U.S. Dist. LEXIS 158530, at *51-52 (W.D. Wis. Sept. 27, 2017) (granting defendant's motion for summary judgment on claim for vicarious copyright infringement: "Plaintiffs have not adduced evidence that [defendant] supervised these entities' infringing activities, so they have not met their burden of production regarding vicarious infringement.").

> c)     *There Is No Evidence that the Continental Counter-Defendants Knew of Authenticom's Alleged Circumvention of CAPTCHA*

CDK's claim for vicarious liability fails due to the lack of evidence of any actual or constructive knowledge by any of the Continental Counter-Defendants.

The Supreme Court has indicated that actual or constructive knowledge is an essential element of vicarious copyright infringement. *See Sony Corp. of Am.*, 464 U.S. at 439 ("If vicarious liability is to be imposed on Sony in this case, it must rest on the fact that it has sold equipment **with constructive knowledge** of the fact that its customers may use that equipment to make unauthorized copies of copyrighted material.") (emphasis added). The Supreme Court has also held that "[o]ne . . . infringes [a copyright] vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it," while explaining that vicarious liability "allows imposition of liability when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the defendant ***initially*** lacks knowledge of the infringement". *Grokster*, 545 U.S. at 930-31 and n.9 (citations omitted; emphasis added). These Supreme Court rulings recognize that a defendant cannot be said to "declin[e] to exercise a right to stop or limit" improper conduct unless and until that defendant ***knows*** of the improper activity -- *i.e.*, a party cannot be held liable for failing to stop or control activity of which it is unaware. *Id.* at 930.

As established in Section II.D.1.a above, there is no evidence that any of the Continental Counter-Defendants had any knowledge of Authenticom's automated responses to CDK's CAPTCHA prompts. That lack of knowledge further warrants summary judgment. *See Bell v. Powell*, No. 1:16-cv-02491-TWP-DML, 2017 U.S. Dist. LEXIS 89587, at *17 (S.D. Ind. June 12, 2017) (dismissing claim for vicarious copyright infringement where plaintiff alleged that defendant was liable "regardless of whether Defendant was aware that the third party was creating the downloaded copy.").

### E.   CDK Cannot Show Any Acts Of Circumvention By The Warrensburg Counter-Defendants

CDK alleges that the three "Warrensburg Counter-Defendants" violated the DMCA "by having new [DMS] credentials created and/or by restoring disabled credentials—including on information and belief by automated means." Counterclaims ¶ 152. According to CDK, that "automated means" was Authenticom's "Profile Manager" script. *Id.* ¶ 113. CDK maintains that a DMCA violation is committed both (i) when Profile Manager re-enables a disabled user account, and (ii) when Profile Manager "launches" or "runs" on the DMS, even if the Profile Manager script does *not* re-enable any disabled user accounts. *See* Ex. F, Rubinfeld Report ¶ 78 ███████

█████████████████████████████████████████████████████████

The Warrensburg Counter-Defendants are entitled to summary judgment on CDK's counterclaims on multiple grounds. First, CDK's own counterclaims allege that the Warrensburg Counter-Defendants merely "induced" Authenticom's alleged circumvention of CDK's access controls; those allegations are judicial admissions which negate any primary DMCA liability on the part of the Warrensburg Counter-Defendants. Second, Authenticom *and* the Warrensburg Counter-Defendants are entitled to summary judgment on CDK's "Profile Manager" counterclaims insofar as those claims are based on alleged instances where Profile Manager "launches" or "runs" -- but does not re-enable any disabled user accounts -- because such instances do not qualify as acts of "circumvention" under the DMCA. Third, CDK lacks sufficient evidence that any Warrensburg Counter-Defendant's user account was ever actually re-enabled by the Profile Manager program. And fourth, CDK cannot show, as it must for a finding of vicarious liability, that any Warrensburg Counter-Defendant had a direct financial interest in the circumvention of CDK's access controls.

1.   Background of Authenticom's Profile Manager Program

█████████, Authenticom developed the "Profile Manager" computer program (or "script").[105] PSUMF ¶ 59 (citing Ex. DDD, Stroz Report ¶ C36). ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████ *Id.* ██████████████

███████████████████████████████████████████████████████

████████████████████████████████████████. *Id.* ██████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ PSUMF ¶ 60 (citing Ex. NNN, CDK-2665782 at p. 77 ("█

████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████ PSUMF ¶ 61 (citing Ex. DDD, Stroz Report ¶ C36).

If ████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████ *Id.* ████████████████████████

███████████████████████████████████████████████████████

████████████████████████████

---

[105] ██████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████ *See* Ex. DDD, Stroz Report ¶ C36.

████████████████████████████████████████████████████████

██████████████████████████████████ PSUMF ¶ 62.

### 2. CDK's Judicial Admissions Preclude Its Claim of Primary Liability Against the Warrensburg Counter-Defendants

CDK recently advised Counter-Defendants that, in addition to a claim for secondary liability under the DMCA, it is also pursuing a primary liability claim under the DMCA against the Warrensburg Counter-Defendants.[106] CDK's binding judicial admissions, however, preclude the claim.

CDK's claim is premised upon the alleged "circumvent[ion of] a technological measure that effectively controls access to a [protected] work," as proscribed by 17 U.S.C. § 1201(a)(1)(A). *See* Counterclaims ¶ 148 (quoting § 1201(a)(1)(A)). But CDK's counterclaim indicates that (alleged) acts of circumvention -- including, specifically, the alleged acts of circumvention resulting from the alleged use of the Profile Manager program on the Warrensburg Counter-Defendants' DMS – were committed *by **Authenticom***. Thus, any primary liability claim may lie only against Authenticom (if anyone), not the Warrensburg Counter-Defendants.

CDK's counterclaims state:

> The Warrensburg Counter-Defendants similarly knew that Authenticom's hostile access to CDK's DMS was unauthorized and in violation of the MSA, but actively ***encouraged Authenticom to circumvent CDK's security measures***. As described above, when CDK disabled several of the login credentials that the Warrensburg Counter-Defendants had provided to Authenticom, the Warrensburg Counter-Defendants installed Authenticom's Profile Manager tool in an attempt to re-enable them, succeeding to at least some degree.

---

[106] *See* Ex. FFF, Fenske email to M. Kupillas, dated Apr. 7, 2020.

Counterclaims ¶ 113 (emphasis added).[107] *See also id.* ¶ 89 ("***Authenticom implemented a software tool called Profile Manager*** . . . that automatically re-enables any disabled user IDs 'every hour.'"); *id.* ("the software used an 'update user profile' ('UUP') function to constantly re-enable certain dealer login credentials that CDK had disabled" and "***[u]sing the UUP function, Authenticom could do virtually anything***, *e.g.*, it could create more login credentials for itself, with each granted the highest available access to restricted files and functions within the DMS.") (emphasis added); *id.* ¶ 150 ("These access control measures were effective in preventing Authenticom and other third parties from accessing the CDK DMS before ***those third parties circumvented them***.") (emphasis added); *id.* ¶ 151 (Warrensburg Counter-Defendants "induced" Authenticom to circumvent access control measures).[108]

CDK's counterclaims against Authenticom, also filed in this MDL proceeding, likewise allege that it was ***Authenticom*** that committed the purported acts of circumvention:

> ***Authenticom has repeatedly circumvented CDK's access control measures*** in order to access the CDK DMS, extract data from it, and push data back into it. . . . And after CDK disabled login credentials that had been improperly used for automated DMS access by third parties, Authenticom worked to evade this form of blocking ***by having new credentials created on its behalf and/or by restoring disabled credentials -- including by automated means***. This conduct constitutes circumvention of technological measures that effectively controlled access to CDK's DMS, in violation of Section 1201(a)(1)(A).

---

[107] As shown in Section II.E.3-4 below, summary judgment should be granted dismissing all DMCA counterclaims against the Warrensburg Counter-Defendants -- primary and secondary – because (i) instances where Authenticom's Profile Manager program ran, but did not re-enable any disabled user accounts, are not "circumvention" under the DMCA, and (ii) CDK lacks evidence that Profile Manager actually re-enabled any disabled user accounts associated with the Warrensburg Counter-Defendants.

[108] To the extent that "inducement" supports a claim for liability under the DMCA, it would be for secondary liability, ***not*** primary liability. *See Grokster*, 545 U.S. at 930-31 (addressing inducement of copyright infringement as a "doctrine[] of ***secondary*** liability" under Copyright Act) (emphasis added); *Flava Works, Inc.*, 689 F.3d at 757 ("A typical, and typically unhelpful, definition of 'contributory infringer' is 'one who, with knowledge of the infringing activity, ***induces***, causes or materially contributes to ***the infringing conduct of another***.'") (emphasis added; citation omitted).

Counterclaims Against Authenticom, ¶ 108 (emphasis added), *Authenticom, Inc. v. CDK Global, LLC* (June 30, 2018). *See also* ECF No. 337, CDK's Opposition to Authenticom's Motion to Dismiss Counterclaims, at 5 (". . . Authenticom created and implemented a software tool that would automatically re-enable any disabled user IDs 'every hour.' ███████████████████

████████████████████████████████████████████

████████████████████████████) (citing CDK Counterclaims Against Authenticom, ¶ 63) (emphasis added).

It is black letter law that "[j]udicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them. They may not be controverted at trial." *Pierce v. City of Chi.*, No. 09-CV-1462, 2012 U.S. Dist. LEXIS 14331, at *9 (N.D. Ill. Feb. 7, 2012) (quoting *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995)). "Judicial admissions . . . are not limited to statements made in a particular motion or application pending. Any deliberate, clear, and unequivocal statement, either written or oral, made in the course of judicial proceedings qualifies as a judicial admission." *Id.* at *9-10 (internal quotations and citations omitted). As the Seventh Circuit has explained, a judicial admission has "the effect of withdrawing a fact from contention." *Keller*, 58 F.3d at 1198 n.8. *See Crest Hill Land Dev., LLC v. City of Joliet*, 396 F.3d 801, 805 (7th Cir. 2005) (affirming summary judgment against plaintiff, based on plaintiff's judicial admission).

Because CDK's pleadings state that the (alleged) acts of circumvention were committed *by Authenticom*, those statements constitute binding judicial admissions that the acts were *not* committed by any of the Warrensburg Counter-Defendants. Accordingly, CDK's primary liability claim against the Warrensburg Counter-Defendants should be dismissed. *See Pierce*, 2012 U.S.

Dist. LEXIS 14331, at *16 (granting summary judgment dismissing plaintiff's claim, based on plaintiffs' judicial admissions that third person, not the defendant, committed the challenged acts).

       3.      <u>Instances of Profile Manager Merely "Running", without Re-Enabling a Disabled User Account, are Not Encompassed within the Counterclaim and are Not Acts of Circumvention under the DMCA</u>

Although CDK's Counterclaim does not challenge or seek recovery for instances where Profile Manager was launched but did not re-enable a user account, ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████. Ex. DDD, Stroz Report ¶ C38 (emphasis in original). ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████. *Id.* ¶ C51.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████ Ex. F, Rubinfeld Report ¶ 78, Table 5.

CDK's counterclaim, however, (rightly) does not seek to impose liability for attempts (*i.e.*, launches) that did not result in re-enablements of user accounts. CDK alleges that its "disabling of dealer credentials that CDK finds have been used for automated access by third parties" was the access control measure that Authenticom and the Warrensburg Counter-Defendants allegedly circumvented "by having new credentials created and/or by restoring disabled credentials . . . by automated means." Counterclaims ¶¶ 150, 152; *see also id.* ¶ 89. Thus, under CDK's own pleading, a "launch" of Profile Manager does not constitute a DMCA violation unless Profile Manager

actually creates "new credentials" or "restor[es] disabled credentials".[109] Counter-Defendants would be unduly prejudiced if CDK is permitted to seek damages with respect to conduct not challenged in its counterclaim.[110] *See Williams v. Ozmint*, 726 F. Supp. 2d 589, 595 (D.S.C. 2010) (where "Plaintiff did not allege th[e] claim in his complaint, but only seemed to craft it as the litigation . . . progressed," the court granted defendants summary judgment on the claim, "to the extent Plaintiff's complaint can even be read to assert it.").[111]

Moreover, even assuming, *arguendo*, that the counterclaim could be construed to reach such conduct, the claim fails. The DMCA does not provide liability for mere "queries," much less instances of "attempted circumvention" -- *i.e.*, where a technological measure may attempt (or intend) to, but does not actually, circumvent an access control. The DMCA provides, in relevant part, that "No person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A). Thus, by its plain terms, liability under Section 1201(a)(1)(A) occurs only when a technological access control measure is actually circumvented. Similarly, Section 1203(c)(3)(A) equates a violation of Section 1201 with an "act of circumvention", reinforcing that liability under Section 1201(a)(1)(A) requires the actual circumvention of a technological access control measure. 17 U.S.C. § 1203(c)(3)(A).

---



[109] ███████████████████████████████████████████████ PSUMF ¶ 64 (citing Ex. DDD, Stroz Report ¶ C36).

[110] ███████████████████████████████████████████████ (*see* Ex. F, Rubinfeld Report ¶ 78, Table 5) ███████

[111] *See also Anderson v. Boeing Co.*, 694 F. App'x 84, 88 n.12 (3d Cir. 2017) ("The District Court rightly dismissed this claim [on summary judgment], noting that [plaintiff] did not allege this claim in her Complaint and may not belatedly do so now."); *Parish v. UPMC Univ. Health Ctr. of Pittsburgh*, 373 F. Supp. 3d 608, 638 (W.D. Pa. 2019) (granting summary judgment with respect to "purported" claim that was not plead in the complaint).

In contrast, Section 1201(a)(2) provides liability for persons who "manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that (A) is primarily designed or produced ***for the purpose of circumventing*** a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(2)(A) (emphasis added). The absence of similar language in Section 1201(a)(1)(A) demonstrates Congress's deliberate intent to prohibit only actual acts of circumvention, not acts taken "for the purpose of circumventing" a technological access control measure but which do not result in circumvention. *Cf. Cent. Bank of Denver v. First Interstate Bank, N.A.*, 511 U.S. 164, 176-77 (1994) (holding that because "Congress knew how to impose aiding and abetting liability when it chose to do so," and the statute in question did not include the words "aid" and "abet," the statute did not provide for aiding and abetting liability).[112]

Further, according to Section 1201(a)(3)(A), "to 'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner". 17 U.S.C. § 1201(a)(3)(A). Thus, to qualify as an act of circumvention, a technological access control measure must actually be "descramble[d]", "decrypt[ed]", "avoid[ed]", "bypass[ed]", "remove[d]", "deactivate[d], or "impair[ed]". *See also In re Maxim Integrated Prods.*, No. 12-CV-244, 2013 U.S. Dist. LEXIS 196320, *97-98 (W.D. Pa. Mar. 19, 2013) ("To state a claim under §1201(a)(1)(A), a plaintiff must show . . . ***that the measure was***

---

[112] *See also Pinter v. Dahl*, 486 U.S. 622, 650 (1988) ("When Congress wished to create such liability, it had little trouble doing so."); *McMaken v. GreatBanc Trust Co.*, No. 17-cv-04983, 2019 U.S. Dist. LEXIS 56876, at *20 (N.D. Ill. Apr. 3, 2019) (where Congress narrowed the scope of some ERISA provisions, but did not do so for the provision at issue in the litigation, the court interpreted the provision at issue broadly: "It is clear that Congress knew how to narrow the scope of certain prohibited transactions to transactions involving the plan itself, but declined to do so for ERISA § 406(b)(1).").

*'circumvented'* in order to obtain access.") (emphasis added).[113] Attempts to circumvent -- or, more accurately, queries that determine whether an attempt should be made -- are not "acts of circumvention".

The U.S. Code is replete with examples showing Congress' ability to impose "attempt" liability when it sees fit.[114] The absence of any language in Section 1201(a)(1)(A) creating liability for "attempted circumvention" or queries to determine whether an attempt should be made reflects Congress's decision not to impose liability under such circumstances.



", *see* Ex. F, Rubinfeld Report ¶ 78, Table 5)).

The Court should enter summary judgment against CDK to the extent that it seeks recovery for instances where Profile Manager launched but did not re-enable disabled user accounts.

4.    CDK Lacks Evidence that Any Warrensburg Counter-Defendant's User Account was Ever Re-Enabled by Authenticom's Profile Manager Script

To show that a Warrensburg Counter-Defendant user account was ever re-enabled by Profile Manager,

---

[113] *See also DISH Network L.L.C. v. World Cable Inc.*, 893 F. Supp. 2d 452, 466 (E.D.N.Y. 2012) ("[T]he use of the words 'avoid' and 'bypass' in the statute, 'as well as the remainder of the words describing circumvent, imply that a person circumvents a technological measure *only when he affirmatively performs an action that disables or voids the measure that was installed to prevent them from accessing the copyrighted material*.'") (citation omitted) (emphasis added).

[114] *See, e.g.*, the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831(a)(4) (prohibiting "attempts to commit" economic espionage); 15 U.S.C. § 6823(a) (prohibiting "attempts" to obtain customer information by false pretenses); 19 U.S.C. § 3907(a) (prohibiting "attempts to violate" regulations re: diamond trading).

███ *See* Ex. DDD, Stroz Report ¶ C51. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████. PSUMF ¶ 63. ████████████████

████████████████████████████████████████████████████████

███████ (*see* Ex. DDD, Stroz Report ¶ C49); ████████████████

████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ *See* Ex. OOO, Expert Rebuttal Report of Seth Nielson, Ph.D., dated

Nov. 15, 2019 ("Nielson Report") ¶ 368. ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ *See*

Ex. CCC, Stroz Reply Report ¶ 91 n.204. ████████████████████

████████████████████████████████████████████████████████

██████████████████████████████ Ex. EEE, Stroz Tr. at 271:17-274:10.

███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████ (ECF No. 861). ████████████████████████████████

███████████████████████████████████████████████. Ex. PPP,

CDK-0049552 to 553 (cited in Ex. DDD, Stroz Report ¶ C49 n.40). ████████████



, *see* Stroz Report ¶ C36,

*id.* ¶ C51

*see id.* ¶ C49,

. *See United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 916 (C.D. Ill. 2017) (in case alleging illegal telemarketing calls, although the court concluded "it is more likely than not that from March 25, 2004 to August 31, 2007, [defendant] made millions [of] illegal Registry Calls", the court held that the plaintiff was not entitled to damages for calls during that period, as the plaintiff "failed to prove the number of calls [during that period] with sufficient certainty to impose an [sic] civil penalties for specific calls"); *Hernandez v. Towne Park, Ltd.*, No. CV 12-02972 MMM (JCGx), 2012 U.S. Dist. LEXIS 86975, at *55 (C.D. Cal. June 22, 2012) (court rejected defendant's calculation of "the number of [statutory] violations occurring per week", where the "calculation piles assumption on assumption, none of which is supported by 'summary judgment-type evidence.'"). As there is no evidence that any Warrensburg Counter-Defendant's account was ever re-enabled by Authenticom's Profile Manager script, summary judgment is warranted.

## F. There Is No Evidence Of Vicarious Liability For The Warrensburg Counter-Defendants

In addition to the multiple grounds for summary judgment identified above, the Warrensburg Counter-Defendants are also entitled to summary judgment on CDK's counterclaim

for vicarious DMCA liability. To prevail on that claim (and based on caselaw addressing vicarious copyright infringement), CDK must establish that the defendant had "a direct financial interest in the [circumvention] activity." *GC2 Inc.*, 255 F. Supp. 3d at 824.

CDK cannot make that showing. There is no evidence that the Warrensburg Counter-Defendants had a direct financial interest in any purported circumvention of CDK's access controls resulting from Authenticom's Profile Manager program (PSUMF ¶ 65), much less any evidence of "a causal relationship" between any such circumvention and financial benefit. *Bell*, 2020 U.S. Dist. LEXIS 17527, at *15-16. Indeed, CDK's Counterclaims do not identify ***any*** purported financial benefit to the Warrensburg Counter-Defendants resulting from the alleged use of Profile Manager, much less a "direct" financial benefit. The absence of such evidence is fatal to CDK's claim.

## CONCLUSION

Dealership Counter-Defendants respectfully submit that, for the reasons set forth above, they are entitled to summary judgment on CDK's counterclaims in their entirety.

DATED: May 20, 2020                     Respectfully submitted,

                                        */s/ Peggy J. Wedgworth*
                                        Peggy J. Wedgworth (*pro hac vice*)
                                        Elizabeth McKenna (*pro hac vice*)
                                        **MILBERG PHILLIPS GROSSMAN LLP**
                                        One Pennsylvania Plaza, Suite 1920
                                        New York, New York 10119-0165
                                        Tel: (212) 594-5300
                                        Fax: (212) 868-1229
                                        pwedgworth@milberg.com
                                        emckenna@milberg.com

                                        ***Interim Lead Counsel for the Dealership Class***

Leonard A. Bellavia (*pro hac vice*)
**BELLAVIA BLATT, PC**
200 Old Country Road, Suite 400
Mineola, New York 11501
Tel: (516) 873-3000
Fax: (516) 873-9032
lbellavia@dealerlaw.com

*Dealership Class Plaintiffs' Steering Committee*

Daniel C. Hedlund (*pro hac vice*)
Michelle J. Looby (*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, Minnesota 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com

*Dealership Class Plaintiffs' Steering Committee*

James E. Barz
Frank Richter
**ROBBINS GELLER RUDMAN & DOWD LLP**
200 South Wacker Drive, 31st Floor
Chicago, Illinois 60606
Tel: (312) 674-4674
Fax: (312) 674-4676
jbarz@rgrdlaw.com
frichter@rgrdlaw.com

*Dealership Class Plaintiffs' Steering Committee*

Robert A. Clifford
**CLFFORD LAW OFFICES, P.C.**
120 N. LaSalle Street, 31st Floor
Chicago, Illinois 60602
Tel: (312) 899-9090
Fax: (312) 251-1160
RAC@cliffordlaw.com

*MDL Liaison Counsel*

## CERTIFICATE OF SERVICE

I, Peggy J. Wedgworth, an attorney, hereby certify that on May 20, 2020, I caused a true and correct copy of the foregoing **DEALERSHIP COUNTER-DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON CDK GLOBAL, LLC'S COUNTERCLAIMS** to be filed and served electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Peggy J. Wedgworth*
Peggy J. Wedgworth