# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

AUTHENTICOM, INC.,

                            *Plaintiffs.*

v.

CDK GLOBAL, INC. and THE REYNOLDS
AND REYNOLDS COMPANY.

                            *Defendants.*

Case No. 17-cv-318

**DECLARATION OF WAYNE FITKIN**

I, Wayne Fitkin, declare as follows:

1. I am the Information Technology director for Walter's Automotive Group, which owns four car dealerships in Riverside and Ontario, California. I am responsible for overseeing all technological aspects of the business. I have worked at Walter's Automotive Group for one year, and prior to that, I worked for 29 years as the Information Technology director at Fletcher Jones Automotive Group.

2. Dealer Management System ("DMS") software is vital to the functioning of Walter's Automotive Group dealerships. Without DMS software, no transactions can take place. CDK has provided the DMS for Walter's Automotive Group dealerships for more than 20 years.

3. It is highly disruptive to switch DMS providers. Walter's Automotive Group entered into a five-year contract with CDK and is unlikely to switch DMS providers given the difficulty and cost involved in switching DMS providers.

1

4. The DMS contract is a very significant expense for the Walter's Automotive Group. As part of the contract, we pay CDK to store data owned by Walter's Automotive Group. Walter's Automotive Group owns the data that is on its DMS system. This is Walter's Automotive Group's data, and Walter's Automotive Group has the right to share this data with whomever it wishes.

5. Walter's Automotive Group works with approximately fifty third-party application providers who provide a variety of important services, including marketing and lead generation. These application providers cannot function and provide the services they were paid to perform without access to Walter's Automotive Group's data on the DMS.

6. Walter's Automotive Group has been using Authenticom's DealerVault product for the past year. I am extremely satisfied with this product, as it allows me to view and control exactly what data is being transmitted to third-party application providers. DealerVault also requires these application providers to sign confidentiality agreements.

7. Walter's Automotive Group's application providers also use Authenticom's data pulling services. Authenticom pulls Walter's Automotive Group's data from the DMS and modifies it into a format specifically requested by the third-party application provider.

8. The security of Walter's Automotive Group's data is paramount. I am satisfied with the security protections Authenticom has in place to extract the data, aggregate it, and send it to third party vendors who have signed confidentiality agreements.

9. Walter's Automotive Group specifically authorizes Authenticom to pull our data from the DMS. Authenticom extracts data using user credentials (a user ID and password) I have specifically created for Authenticom. Under this user ID, Walter's Automotive Group granted Authenticom permission to access and pull data for the dealerships in Walter's

2

Automotive Group.  Authenticom pulls the data in the same manner as the dealer itself would.  Walter's Automotive Group has authorized other data aggregators, including Digital Motorworks and IntegraLink (both owned by CDK), to pull data in this exact same way – i.e., we provided a username and password to CDK's subsidiaries so they could pull the data just as Authenticom does.

10. CDK has repeatedly blocked Authenticom from pulling Walter's Automotive Group's data from the DMS by disabling the log-in credentials that I created for Authenticom. They have created a routine that disables Authenticom's user ID ("acom") every hour on the hour.

11. Given my technical expertise, I was able to write a script that launches every five minutes and re-enables Authenticom to gain access to the DMS.  In my opinion, most dealers lack the technical ability to create work-arounds, however.  Without the work-around I created, Authenticom would not be able to access any data from the DMS; in turn, Authenticom would not be able to transmit this data to application providers that rely on this data to provide necessary services for Walter's Automotive Group.  This would cause severe disruption to Walter's Automotive Group's operations.

12. CDK sent Walter's Automotive Group a letter threatening to turn off Telnet by January 1, 2017, which would prevent my work-around from functioning and result in Authenticom being unable to pull our data from the DMS.  Telnet is a text-based communication protocol for transferring data between the user and the DMS.  It is, however, an unencrypted transmission protocol.  CDK's purported reason for turning off Telnet is to improve security, but this is a pretext; CDK's intends to force all third-party application providers to enroll in their 3PA program.  Disabling Telnet would paralyze the many applications that Walter's Automotive

3

Group utilizes and that rely on Authenticom's data aggregation service. Turning off Telnet would also cut off my ability to automate the process of pulling data from Walter's Automotive Group's own database in order to carry out important functions.

13.     Though CDK has not yet turned off Telnet, CDK has stated it will. When that happens, it will cause severe harm to Walter's Automotive Group and disrupt our business.

14.     CDK has taken the position that Walter's Automotive Group cannot allow Authenticom to pull data. This position is contrary to the ownership rights that Walter's Automotive Group has over its own data. CDK's position is also clearly designed to give CDK exclusive access to pull and aggregate our data from the DMS, to the exclusion of other data aggregators like Authenticom.

15.     CDK's blocking tactics have had the intended effect of causing application providers to sign up for CDK's own data aggregation service – the 3PA program. It is my understanding that third-party application providers needed the certainty that the data would not be interrupted, and so felt compelled to join CDK's program.

16.     In my opinion, if CDK chose to protect and control data access, and were to fairly charge for this service without blocking competitors, I would not object.

17.     CDK charges third-party application providers much more to obtain our data through the 3PA program than Authenticom charged them for the same data. If the third-party application provider has a product that competes with any CDK product, then the charge becomes astronomical.

18.     The application providers that participate in CDK's 3PA program pass on the "data access fees" that CDK charges to Walter's Automotive Group. As a result, Walter's Automotive Group must pay much more for third-party application services than it did when the

4

application providers obtained the data from Authenticom. Walter's Automotive Group does not receive a corresponding reduction in price for its DMS services from CDK to offset the higher data access fees.

19. Before CDK started its blocking tactics, Walter's Automotive Group had many more application providers to choose from. Now, many of these application providers have either gone out of business or enrolled in CDK's 3PA program, which has made their products prohibitively expensive as a result of having to pass on the higher data access fees to dealer customers such as Walter's Automotive Group.

20. CDK also charges exorbitantly high fees to application providers who have competing products to CDK in an effort to drive up CDK's profits. For example, Walter's Automotive Group was interested in using a third-party application provider called XTime to manage service appointments. XTime directly competes with an application that CDK offers. CDK's data access charges added over $400 a month to the cost of XTime, prohibiting our ability to justify the expense for XTime's product. This cost XTime our business.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in Riverside, CA, this 22nd day of March, 2017.

By: _____
Wayne Pitkin

5