# Exhibit 6

Case: 1:18-cv-00864 Document #: 980-7 Filed: 05/20/20 Page 2 of 4 PageID #:60529
Case: 3:17-cv-00318-jdp Document #: 90 Filed: 06/16/17 Page 1 of 3
HIGHLY CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| AUTHENTICOM, INC., <br><br> Plaintiff, <br><br> v. <br><br> CDK GLOBAL, LLC, and THE REYNOLDS AND REYNOLDS COMPANY, <br><br> Defendants. | No. 3:17-CV-318-JDP |

## DECLARATION OF LEIGH ANN CONVER

I, Leigh Ann Conver, hereby declare as follows:

1. I am currently the Senior Director of Strategy for CDK Global, LLC ("CDK"). I've held this position since November 2015.

2. In this role, I am responsible for supporting the strategy of CDK's Data Services Center of Excellence, which includes the CDK Partner Program (discussed below).

3. My duties as Senior Director of Strategy include developing go-to-market strategies, delivering demand generation programs, enabling sales channels, defining market requirements and business cases for product line investment, ensuring program goals fit within CDK's overall business strategy, and working with senior management on critical business decisions.

4. I have held positions in the automotive retail services industry for almost twenty years.

5. From 1998-2005, I was employed by Digital Motorworks, Inc. ("DMI"). There, I started as a business analyst, and later held the positions of Director of Technical Sales and the Director of Business Development.

6. While I was working for DMI, DMI was acquired by Automatic Data Processing Inc. ("ADP"). Following the acquisition, from 2005-2014, I was the Director of Data Strategy for ADP's Dealer Services business.

7. CDK was formerly the Dealer Services business of ADP. In 2014, CDK spun-off from ADP and became a separate publicly traded company.

8. Following the spin-off of CDK from ADP, I became the Director of Data Strategy for CDK and held that position until I was promoted to my current position as Senior Director of Strategy.

**Background**

9. CDK provides integrated dealer management systems ("DMS") and business performance solutions to dealers in the automotive retail industry.

10. CDK's DMSs hold, among other information, the dealer's operational and business data.

11. Many dealers contract with third-party providers ("vendors") that offer software applications that perform operational functions for dealerships. As a general matter, in order to provide these services, the vendors must have access to a dealer's data. Dealers often provide or create login credentials for third party intermediaries, like Authenticom, who access the DMS on

HIGHLY CONFIDENTIAL — FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

behalf of vendors without the DMS.

12. CDK has established a third-party access program, known today as the Partner Program ("3PA Program"), to facilitate the exchange of data between dealers who use the DMS and their vendors. The program is open to vendors who use access to the DMS to create operational products and services for dealerships.

13. In 2014, CDK determined that it needed to revise its 3PA Program and better secure its DMS to protect the data on CDK's systems, including dealer data.

14. At this same time, dealer concerns about data privacy were growing. Vendors were increasingly accessing dealer data with dealer-provided login credentials without the DMS providers' authorization, and this unmanaged integration was beginning to cause data corruption and was increasing security risks.

15. CDK began revising its 3PA Program, including its pricing structure, in July 2014.

16. CDK's revised 3PA Program, which focused on "SecurityFirst," was officially launched in June 2015. *See* Defs. Ex. 23, at 3.

17. The SecurityFirst initiative prohibited unauthorized access to CDK's DMS by third-parties. Dealers were instructed to no longer provide login credentials to unauthorized third-parties.

18. While some dealers were unhappy with the new access restrictions, many dealers supported CDK's revised third-party access policies.

19. As a general matter, Authenticom currently is not authorized to access CDK's DMS and is not a part of CDK's 3PA Program. Nonetheless, Authenticom has, and continues to, knowingly obtain unauthorized access to CDK's DMS using dealer-provided login credentials.

20. After securing userID and password credentials, Authenticom uses a native query tool to poll the DMS and extract data from the DMS on an almost constant basis. I am aware that Authenticom has extracted data from CDK's DMS up to 10,000 times a month for just one dealer.

21. Despite the fact that it is using dealer-provided login credentials, Authenticom is not accessing the data in the same way that a dealer would in so far as Authenticom, unlike a dealer, does not require manual input in order to query the DMS. Rather, Authenticom's process is automated and repeatable without manual input. As such, Authenticom's data access methods impose significant burden on CDK's systems.

22. In response to Authenticom's automated attempts to access the DMS, over the past several years, CDK has disrupted Authenticom's activities on numerous occasions by blocking its access to the box and disabling its passwords.

**3PA Pricing**

23. Prior to the SecurityFirst initiative, the pricing for CDK's products, initially established in the late 1990s, had remained largely unchanged throughout the 2000s.

24. In 2014, concurrent with its renewed focus on security and overall improvements to the DMS and the 3PA Program, CDK decided to update its pricing model.

25. Industry press reporting on pricing under CDK's 3PA Program has been largely inaccurate and taken out of context.

26. As part of the SecurityFirst review of the 3PA Program, CDK underwent an exhaustive process to assess the costs associated with managing CDK's data-related programs. *See* Defs. Ex. 23, at 4.

27. CDK was making significant annual investments to help improve the performance and security of its integration points. However, at the time, CDK was not "fully covering these costs." Defs. Ex. 23, at 4.

28. Pricing changes were needed to "help ensure vendors [were] paying their fair share of costs." *Id.*

29. Further, there was a wide variation among the prices CDK was charging vendors for similar integration services. *Id.*

30. For example, in or about February 2015, under an earlier iteration of its 3PA Program, CDK's standard pricing for many extraction-only DMS connections was $25 per dealership/month. CDK's pricing, however, varied significantly for bi-directional (or "write-back") access. While some vendors paid more than $70 per dealership rooftop, others paid less.

31. CDK believed that it needed to establish a "level playing field" for all vendors.

Case: 1:18-cv-00864 Document #: 980-17 Filed: 05/29/20 Page 4 of 4 PageID #:60531
Case 3:17-cv-00318-jdp Document #: 905 Filed: 06/16/17 Page 5 of 5

**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

Defs. Ex. 23, at 4. "[C]onsistent *with CDK's belief in a fee-based* program. *Id.*

32. Under SecurityFirst, CDK established its fees based, in large part, upon "the cost to continue investments infrastructure and security related measures." Defs. Ex. 23, at 4.

33. CDK's 3PA pricing as to all third party vendors is now standardized across application categories. *See* Defs. Ex. 42, at 9 (CDK's 3PA pricing approach is "[b]ased on standardized pricing" that is published online).

34. CDK now charges vendors: (1) an "upfront project fee" that covers development resources to move vendors through implementation of its application; (2) a one-time, per dealer "setup fee" that covers the install of integration at a dealership; and (3) a "per dealer monthly fee" that is "charged per product" based on the level of integration contracted.

35. The amounts of these fees can vary significantly depending on the type of integration (*e.g.*, extraction-only or bi-directional) and the vendor's application category.

36. For the vast majority of integration packages available, the upfront fees under the 3PA Program are under $30,000 and the setup fees are $100.

37. With respect to monthly fees, pricing for extraction-only access is lower than pricing for write-back capabilities.

38. CDK's standard extraction pricing has remained under $50 per month for many data extracts (*e.g.*, single extracts of dealer vehicle inventory data, certain customer data, and parts inventory). Pricing for write-back packages is between $60 and $275 per month. *See* Defs. Ex. 43.

39. There are no "per-transaction fees" under CDK's 3PA Program. CDK does, however, charge vendors a per-extract fee. For this reason, vendors are economizing the number of data extracts they receive.

40. Some vendors pass through some, or all, of their integration fees to the dealer. CDK's agreements with application providers prohibit vendors from "includ[ing] any 'interface' fee, DMS access fee, or any other similar fee related to the use of the CDK Interface System in any of [their] invoices to … customers" to discourage a third-party vendors from passing such fees back to the dealer. *See* Pl. Ex. 52 § 10.

41. CDK believes the costs of the 3PA Program should not be borne by the dealers, but instead should be borne by the vendors who utilize it. *See* Defs. Ex. 23, at 4. For this reason, CDK does not offer discounts to dealers based on 3PA Program fees paid by their vendors.

42. CDK's revised 3PA Program differs from Reynolds's RCI program in several material respects. Like RCI, however, 3PA does prohibit third-parties from accessing its DMS without authorization.

I declare under penalty of perjury that the foregoing is true and correct.
Executed in Great Falls, Virginia, this 16th day of June, 2017.

*/s/ Leigh Ann Conver*
Leigh Ann Conver