# Exhibit 12

```
             UNITED STATES DISTRICT COURT

        FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * *

AUTHENTICOM, INC.

        Plaintiff,

-vs-                              Case No. 17-CV-318-JDP

CDK GLOBAL, INC., LLC             Madison, Wisconsin
and THE REYNOLDS and              June 27, 2017
REYNOLDS COMPANY,                 1:50 p.m.

        Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT-SECOND DAY OF EVIDENTIARY HEARING
                    AFTERNOON SESSION
     HELD BEFORE THE HONORABLE JAMES D. PETERSON,

APPEARANCES:

For the Plaintiff:
        Godfrey & Kahn S.C.
        BY:  JENNIFER GREGOR
        One East Main Street, Ste. 500
        Madison, Wisconsin  53703

        Kellogg, Hansen, Todd, Figel & Frederick, PLLC
        BY:  MICHAEL NEMELKA
             AARON PANNER
             DAVID SCHWARZ
             DEREK HO
             JOSHUA HAFENBRACK
             KEVIN MILLER
             JOHANNA ZHANG
          1615 M Street, NW, Ste. 400
          Washington, DC  20036

Also present:  Stephen Cottrell - Authenticom president
               Steve Robb - IT technician

          Lynette Swenson    RMR, CRR, CRC
        U.S. District Court Federal Reporter
         120 North Henry Street, Rm. 520
           Madison, Wisconsin  53703
```

Case: 1:18-cv-00864 Document #: 980-12 Filed: 05/20/20 Page 3 of 11 PageID #:60571
Case: 9:17-cv-00318-JDP Document #: 163 Filed: 07/05/17 Page 79 of 265

2-P-77

1   Q    Okay.  Now, go down, and then it says "only if," and
2   then it lists three conditions.  So CDK can pull the data
3   from the Reynolds DMS only if.  Do you see the *only if*?
4   A    Yes.
5   Q    Let's go to the third.  "CDK's access to the
6   Reynolds DMS does not materially degrade or otherwise
7   materially adversely affect the operation of the
8   applicable Reynolds DMS or place Reynolds and/or a
9   Reynolds dealer at a material operational or security
10  risk – provided, however, that any such material adverse
11  risk -- effect or risk covered by this Section 4.6 must
12  be demonstrated to CDK by Reynolds with clear and direct
13  evidence and that CDK shall be given a reasonable
14  opportunity to cure any such material adverse effect or
15  risk."  Do you see that?
16  A    Yes.
17  Q    Did Reynolds ever invoke this clause?
18  A    Not that I can remember.
19  Q    Reynolds never even invoked this clause that the
20  thousands of usernames that CDK was using put any
21  material effect or risk on Reynolds' system; isn't that
22  right?
23  A    During this period of time, because we had to
24  protect it, we didn't know what they were doing, so it
25  did not put a material impact on the system.

                    ROBERT SCHAEFER – CROSS

Case: 1:18-cv-00864 Document #: 980-12 Filed: 05/20/20 Page 4 of 11 PageID #:60572
Case: 9:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 78 of 265

2-P-78

```
 1  Q    They're this pulling all this data.  They're still,
 2  as you say, grinding, aren't they?
 3  A    No.  We had set them up -- we set them up.  We knew
 4  exactly when they are going and what they were doing.  We
 5  set up all those parameters to do that.
 6  Q    But you never invoked this clause; right?  That's
 7  right?
 8  A    I said no.
 9  Q    And if you were to invoke it, you were going to --
10  you were required to show by clear and convincing
11  evidence that it did put the system at risk, weren't you?
12  A    We would have, yes.
13  Q    Which means providing specific examples; right?
14  A    That's correct.
15  Q    And if you did provide such specific examples, you
16  would at least give CDK a chance to fix it; right?  Is
17  that right?
18  A    Depending on what it was.
19  Q    And in the one example in the past --
20  A    First we'd shut them off.
21  Q    Mr. Schaefer --
22  A    They'd shut off.
23  Q    Mr. Schaefer, in the past ten years there was one
24  example where you actually called Mr. Cottrell and said
25  "I have one query running on a loop.  Will you please fix
```

ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 980-12 Filed: 05/30/20 Page 5 of 11 PageID #:60573
Case: 9:17-cv-00318-jdp Document #: 163 Filed: 07/09/17 Page 79 of 265

2-P-79

1  it?"  Isn't that right?
2  A    I think Steve and I had several other conversations,
3  but that's the only one I was specific on because it's
4  the only one that I knew at a given point in time.
5  Q    Right.  And he fixed that in one day, didn't he?
6  A    One day doesn't -- I don't know that.  That's --
7  that's what he said.  I don't know.
8  Q    All right.  Mr. Schaefer, will you please turn to
9  the signature page?
10 A    Yes.
11 Q    This agreement was signed by Bob Brockman, wasn't
12 it?
13 A    Yes, sir.
14 Q    And it also assigned -- who signed it for CDK?
15 A    I think that's Ron Brockman, I think.
16 Q    Right.  The Senior Vice President of Business
17 Development at CDK; right?
18 A    Um-hmm.
19 Q    Turn to the last page, Exhibit DEA 2.  I was very
20 interested in your testimony when you said that you could
21 never disclose the data elements that you pulled for
22 specific vendors to other vendors.  Do you remember that?
23 A    I'm sorry, I was trying to get to the -- I was
24 trying to get to your page --
25 Q    That's my fault.  Thank you --

                    ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 980-12 Filed: 05/20/20 Page 6 of 11 PageID #:60574
Case: 9:17-cv-00318-jdp Document #: 163 Filed: 07/09/17 Page 80 of 265

2-P-80

```
 1  A    You're reading awful fast on me.
 2            THE COURT:  We can only talk one at a time.
 3  Q    I'm sorry.  That's my fault, Mr. Schaefer.  I should
 4  let you --
 5  A    You knew where I was at.  I was trying to get there.
 6            THE COURT:  Even your apologies are overlapping.
 7  One at a time.
 8            MR. ROSS:  An endless loop.
 9  BY MR. NEMELKA:
10  Q    You said that you could never disclose the data
11  elements that you pull for particular vendors to others.
12  Didn't you say that to Ms. Gulley?
13  A    To others?
14  Q    To other third parties.
15  A    That's correct.
16  Q    In this exhibit, this is all the information that
17  CDK was required to give Reynolds about each of its
18  vendor customers that it was pulling data from Reynolds'
19  dealers from, isn't it?
20  A    It's what we requested.
21  Q    Right.  The vendor name, the point of contact, their
22  address, their contact name, their DMS system number,
23  their store number, their branch number, their user
24  login, the specific data access currently provided by CDK
25  to these vendors, the data interfaces, the frequency of
```

ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 080-12 Filed: 05/20/20 Page 7 of 11 PageID #:60575
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 167 of 265

2-P-167

1   but nicer than Reynolds.  Sorry, guys.
2              THE COURT:  Let me ask you this:  I've heard a
3   lot in the last couple of days about how dealers always
4   felt like the data was theirs and they ought to be
5   entitled to give their login credentials to Authenticom
6   so that they could get their own data.  Now you're
7   suggesting that you had to do this distasteful thing of
8   twisting the arms of the dealers to get them to give up
9   their credentials so that you could do hostile
10  integration.  I thought, based on what I've heard so far,
11  dealers were only too happy to give those credentials to
12  third parties.
13             THE WITNESS:  Not always.  So many dealers are.
14  It's a shrinking number because the industry has been
15  talking about this for five, six years.  This hit the
16  mainstream in probably 2012.  There were a lot of
17  industry observers writing articles about this whole
18  situation:  Data access, hostile access and where would
19  it go.  And a lot of information about what does it mean.
20  So in the dealer world you're at risk.
21     NADA issued their letter in, I think it was 2013,
22  September of 2013, and that really created a firestorm of
23  concern in dealerships.  One of the things that happened
24  is that they -- dealers started calling and saying I
25  don't know where my data is going.  You're CDK and you've

HOWARD GARDNER - DIRECT

Case: 1:18-cv-00864 Document #: 080-12 Filed: 05/20/20 Page 8 of 11 PageID #:60576
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 168 of 265

2-P-168

1   got this thing called DMI and you've got this 3PA thing
2   and I want to know where my data is going.  And so we'd
3   send them the reports.  But they'd say I've got other
4   vendors that I'm sending data too.  Where are they on
5   this report?  We'd say I can't tell you.  I don't know.
6   That's because you're giving credentials to a third
7   party.  So I can't account for that for you.  I can't
8   tell you what they're doing with it.  So that was -- that
9   was the big moment.
10          THE COURT:  But that clearly isn't the issue
11  with Authenticom because they've got the best platform,
12  that I've heard about in this case, to tell the dealers
13  exactly where their data is going.
14          THE WITNESS:  Well, I would contest that.  I
15  think our --
16          THE COURT:  You've got DDX.
17          THE WITNESS:  Yeah.  We've got DDX.  And I think
18  our reporting is more comprehensive and more useful to
19  what the dealer really wants to do.
20          THE COURT:  Maybe it is better, but the idea of
21  somebody calling up and saying hey, I'm using
22  Authenticom's DealerVault and I don't know where my data
23  is going, that's implausible.
24          THE WITNESS:  I think in that case that's true.
25  Authenticom, my guess, is they are doing a good job

HOWARD GARDNER - DIRECT

Case: 1:18-cv-00864 Document #: 080-12 Filed: 05/20/20 Page 9 of 11 PageID #:60577
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 169 of 265

2-P-169

```
 1  explaining where the data is going.  I don't think
 2  they're missing it.
 3            MR. RYAN:  Thank you, Your Honor.
 4  BY MR. RYAN:
 5  Q    When the 3PA -- when was the 3PA refresh officially
 6  rolled out?
 7  A    July 2015.
 8  Q    And at that time, about how many vendors were in the
 9  3PA Program?
10  A    About 110, I think, is in my declaration.
11  Q    And how many vendors are in the 3PA Program today?
12  A    More than twice that:  220, 250, in that range.
13  Q    And now can I --
14            MR. RYAN:  Can I ask that defendants' Exhibit 41
15  be put up on the screen, please.  If I can hand the
16  witness a copy, Your Honor.
17            THE COURT:  Sure.
18  BY MR. RYAN:
19  Q    So if you could take a look at defendants' Exhibit
20  41, Mr. Gardner, and we're not going to spend much time
21  on this.  But can you just tell me what we've got here?
22  A    Yes.  This is -- it begins with an email from
23  Stephanie at Authenticom advising a dealer that their
24  profile -- that DealerVault is using an account in other
25  words -- has been disabled and that they're proposing
```

HOWARD GARDNER - DIRECT

Case: 1:18-cv-00864 Document #: 980-12 Filed: 05/20/20 Page 10 of 11 PageID #:60578
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 170 of 265

2-P-170

1  creating a new profile so that DealerVault will continue
2  to work, and if it's interesting to the dealer that they
3  would -- Authenticom would offer a new tool that would
4  automatically re-enable the accounts on an hourly basis.
5  And they would be using a tool that's based on a function
6  called UUP in the DMS, which is a function called Update
7  User Profile, which happens to have enormous power.
8  Because it can, once in your hands, you can add accounts,
9  you did delete accounts, you can increase permissions.
10 It's the keys to the kingdom virtually in terms of user
11 access.  So the dealer is saying --
12 Q    The dealer is who?
13 A    The dealer is Healey Brothers.
14 Q    It's on the front page of the document.
15 A    The dealer is sending this to --
16 Q    Hang on just a second.  Go to the next page.  So
17 who's the dealer on this document?  If we can blow this
18 up.
19 A    The dealer is Healey Brothers, and it's being sent
20 by Brad Warren, Director of Technology.  And he's saying
21 "Jeff" -- Jeff Barr is our Product Director for DDX --
22 "This company is out of control now.  They're offering a
23 tool to run a script and re-enable their profiles ever
24 hour."  So obviously a dealer very concerned about this
25 particular situation.

Case: 1:18-cv-00864 Document #: 980-12 Filed: 05/20/20 Page 11 of 11 PageID #:60579
Case: 3:17-cv-00318-jdp Document #: 103 Filed: 07/05/17 Page 265 of 265

2-P-265

1  THE COURT: See you tomorrow morning.
2  (Proceedings concluded at 7:10 p.m.)
3
4  * * * * *
5  I, LYNETTE SWENSON, Certified Realtime and
6  Merit Reporter in and for the State of Wisconsin, certify
7  that the foregoing is a true and accurate record of the
8  proceedings held on the 27th day of June 2017 before the
9  Honorable James D. Peterson, District Judge for the
10 Western District of Wisconsin, in my presence and reduced
11 to writing in accordance with my stenographic notes made
12 at said time and place.
13 Dated this 3rd day of July 2017.
14
15
16  /s/_____
17  Lynette Swenson, RMR, CRR, CRC
    Federal Court Reporter
18
19
20
21 The foregoing certification of this transcript does not
   apply to any reproduction of the same by any means unless
22 under the direct control and/or direction of the
   certifying court reporter.
23
24
25