PUBLIC VERSION

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| | Hon. Robert M. Dow, Jr. |
| *This document relates to:* | Magistrate Judge Jeffrey T. Gilbert |
| *Authenticom, Inc. v. CDK Global, LLC*, No. 1:18-cv-868 (N.D. Ill.) | |

## DEFENDANTS CDK GLOBAL, LLC'S AND
## THE REYNOLDS AND REYNOLDS COMPANY'S
## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

BACKGROUND ................................................................................................... 4

    A.    Industry Background ............................................................................ 4

    B.    Reynolds's Unilateral Efforts To Secure Its DMS .............................. 5

        1.    Reynolds's Longstanding Opposition To Hostile Integration .................. 5

        2.    In 2013, Reynolds Continued To Deploy Security Enhancements And Negotiate Wind Downs With Multiple Hostile Integrators. ............. 6

        3.    CDK And Reynolds Negotiate A Wind Down of DMI's Hostile Access. ..................................................................................... 8

    C.    The February 2015 Agreements ............................................................ 9

    D.    CDK's Unilateral Efforts To Secure Its DMS ................................... 11

        1.    2007- 2013: ADP Starts To Understand And Evaluate The Detrimental Impacts of Hostile Third Party Access. ............................... 11

        2.    August 2013: ADP Begins Preparing To Secure The DMS. ................... 13

        3.    October 2014: CDK Spins Off From ADP. ............................................ 13

        4.    June 2015: CDK Announces SecurityFirst And Begins Securing Its DMS. ................................................................................... 14

    E.    Authenticom's Claims & Expert Testimony ...................................... 15

ARGUMENT ...................................................................................................... 16

I.    Authenticom Has No Viable Claim That The 2015 Agreements Violate Section 1 ...................................................................................................... 17

II.    *Matsushita* Mandates Summary Judgment On Claims Of An Unwritten Conspiracy. ................................................................................................ 18

    A.    It Was In Reynolds's And CDK's Unilateral Interests To Control Access To Their DMSs And Negotiate The 2015 Agreements. ....................... 19

        1.    Reynolds Secured Its DMS Consistent With Its Unilateral Interests. .................................................................................... 19

        2.    CDK Secured Its DMS Consistent With Its Unilateral Interests. ........... 20

        3.    Defendants Could Pursue These Interests Unilaterally. ......................... 21

        4.    Negotiating The 2015 Agreements Was Lawful And Consistent With CDK's And Reynolds's Unilateral Interests. ................................. 22

    B.    Authenticom's Evidence Does Not Tend To Exclude The Possibility Of Independent Conduct. ......................................................................... 25

        1.    Authenticom Has No Economic Evidence Of Conspiracy. ..................... 26

            a.    Authenticom's Motive Theory Does Not Rule Out Unilateral Conduct. ................................................................... 26

b. Dr. Israel's So-Called "███████████" Were Consistent With Defendants' Unilateral Interests. ........................................ 29

c. There Was No Plausible Enforcement Mechanism. ................... 31

d. The Connections Data Is Inconsistent With Conspiracy. ........... 32

e. There Was No "Reduction" In DMS Competition, Which Would Be Consistent With Unilateral Conduct Anyway. .......... 33

2. Authenticom Has No Non-Economic Evidence Of Conspiracy. ............. 34

a. No Evidence Of Agreement In 2013 .......................................... 35

b. Supposed "Joint Messaging" ..................................................... 36

c. Other Pre-February 2015 Communications ................................ 37

d. Post-February 2015 Communications.......................................... 42

3. There Is No "Direct" Evidence Of Conspiracy........................................ 43

a. Cottrell's Version Of The 2015 Schaefer Conversation. ............. 44

b. Cottrell's Version Of The 2016 McCray Conversation.............. 45

c. Cottrell's Versions Are Not Direct Evidence. ............................ 46

4. The Evidence As A Whole Does Not Support A Conspiracy. ............... 50

C. Alternatively, The Rule of Reason Applies As A Matter of Law....................... 52

III. Authenticom Cannot Establish Antitrust Injury. .......................................... 56

A. Authenticom's Business Is Illegal Independent Of Defendants' Alleged Conduct. ........................................................................................................ 58

1. Copyright Violations.................................................................... 59

2. CFAA Violations ........................................................................ 61

3. DMCA Violations ...................................................................... 62

B. Authenticom Cannot Show Antitrust Injury On Its Unilateral Claims.............. 63

IV. Authenticom's Unilateral Claims Fail For Multiple, Additional Reasons. ................... 65

A. Authenticom's Section 1 Exclusive-Dealing Claims Fail. ............................... 65

1. Reynolds Does Not Have DMS Market Power. ......................... 65

2. "Data Integration Services" Is Not A Proper Relevant Market. ............. 66

3. RCI Contracts Are Not Exclusive And Are Easily Terminable. ............. 68

4. Authenticom Offers No Evidence Of Substantial Foreclosure............... 68

B. Authenticom's Section 2 Monopolization Claims Fail........................................ 70

1. Authenticom's Expert Rejects A *Kodak* Theory. .................................. 71

2. There Is No Evidence Of Substantial Information Costs........................ 72

**TABLE OF CONTENTS (continued)**

| | | | |
|---|---|---|---|
| | a. | Clear Contract Terms | 72 |
| | b. | Ability to Lifecycle Price | 73 |
| 3. | | There Is Undisputed Evidence Of Substantial DMS Switching. | 74 |
| 4. | | Dr. Israel's Untimely "Monopoly Leveraging" Theory Cannot Support A Section 2 Claim. | 76 |
| V. | | Authenticom's State Law Tortious Interference Claim Fails. | 77 |
| | A. | Performance Of Authenticom's Contracts Was Illegal. | 77 |
| | B. | The Competition Privilege Defeats Authenticom's Claim. | 79 |
| | C. | There Is No Evidence Of A Causal Connection To Damages. | 80 |
| VI. | | Authenticom's Damages Claims Fail For Multiple Additional Reasons | 81 |
| | | CONCLUSION | 83 |

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
    683 F.3d 328 (7th Cir. 2012) ................................................52

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
    166 F.3d 772 (5th Cir. 1999) ................................................72

*Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.*,
    898 F.2d 512 (7th Cir. 1990) ................................................77

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    899 F.3d 87 (2d Cir. 2018)................................................36, 39

*Apple, Inc. v. Psystar Corp.*,
    586 F. Supp. 2d 1190 (N.D. Cal. 2008) ................................................66

*Arista Records LLC v. Lime Grp. LLC*,
    532 F. Supp. 2d 556 (S.D.N.Y. 2007)................................................70

*Atlantic Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990)................................................52

*Authenticom, Inc. v. CDK Global, LLC*,
    874 F.3d 1019 (7th Cir. 2017) ................................................ *passim*

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999)................................................40

*Behnke v. Hertz Corp.*,
    235 N.W.2d 690 (Wis. 1975)................................................77

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................19, 21, 27

*Bigelow v. RKO Radio Pictures*,
    327 U.S. 251 (1946)................................................81

*Blizzard Entm't, Inc. v. Ceiling Fan Software LLC*,
    941 F. Supp. 2d 1227 (C.D. Cal. 2013) ................................................72, 73

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    152 F.3d 588 (7th Cir. 1998) ................................................81, 83

*Bob Maxfield, Inc. v. Am. Motors Corp.*,
 637 F.2d 1033 (5th Cir. 1981) ...................................................................69

*In re Brand Name Prescription Drugs Antitrust Litig.*,
 288 F.3d 1028 (7th Cir. 2002) ...................................................................20

*Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*,
 441 U.S. 1 (1979) ......................................................................................56

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
 140 F.3d 494 (3d Cir. 1998) .......................................................................74

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
 485 U.S. 717 (1988) ...................................................................................54

*Butler Corp. v. Gen. Motors Acceptance Corp.*,
 2002 WL 31926852 (D. Mass. Dec. 27, 2002) ..........................................79

*In re Canadian Imports Antitrust Litig.*,
 470 F.3d 785 (8th Cir. 2006) ................................................................57, 58

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
 996 F.2d 537 (2d Cir. 1993) .......................................................................16

*Car Carriers, Inc. v. Ford Motor Co.*,
 745 F.2d 1101 (7th Cir. 1984) ...............................................................52, 53

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
 479 U.S. 104 (1986) ...................................................................................56

*Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
 961 F.2d 667 (7th Cir. 1992) ......................................................................54

*Children's Broadcasting Corp. v. Walt Disney Co.*,
 245 F.3d 1008 (8th Cir. 2001) ....................................................................82

*Circo v. Spanish Gardens Food Mfg. Co.*,
 643 F. Supp. 51 (W.D. Mo. 1985) ..............................................................80

*City of Tuscaloosa v. Harcros Chems., Inc.*,
 158 F.3d 548 (11th Cir. 1998) ....................................................................28

*Collins v. Associated Pathologists, Ltd.*,
 844 F.2d 473 (7th Cir. 1988) ......................................................................16

*Comm. Data Servers, Inc. v. Int'l Bus. Mach. Corp.*,
 262 F. Supp. 2d 50 (S.D.N.Y. 2003) ................................................ *passim*

*Computer Assocs. Int'l v. Altai, Inc.*,
  982 F.2d 693 (2d Cir. 1992) .................................................................................... 59

*In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*,
  60 F. Supp. 3d 914 (N.D. Ill. 2014), *aff'd*, 801 F.3d 758 (7th Cir. 2015) ...................... *passim*

*Darnell v. Target Stores*,
  16 F.3d 174 (7th Cir. 1994) .................................................................................... 50

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
  36 F.3d 1147 (1st Cir. 1994) .................................................................................. 63

*Datel Holdings LTD v. Microsoft Corp.*,
  2010 WL 3910344 (N.D. Cal. Oct. 4, 2010) ............................................................ 57

*Digital Equip. Corp. v. Uniq Digital Techs., Inc.*,
  73 F.3d 756 (7th Cir. 1996) ............................................................................ 65, 72

*Dispatch Automation, Inc. v. Richards*,
  280 F.3d 1116 (7th Cir. 2002) ................................................................................ 59

*DSM Desotech Inc. v. 3D Sys. Corp.*,
  749 F.3d 1332 (Fed. Cir. 2014) ............................................................................... 66

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
  504 U.S. 451 (1992) ........................................................................................ *passim*

*El Aguila Food Prods., Inc. v. Gruma Corp.*,
  301 F. Supp. 2d 612 (S.D. Tex. 2003) .................................................................... 69

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991) .............................................................................................. 59

*Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*,
  582 F.3d 1216 (10th Cir. 2009) .............................................................................. 77

*Gen. Universal Sys., Inc. v. Lee*,
  379 F.3d 131 (5th Cir. 2004) .................................................................................. 60

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
  998 F.2d 391 (7th Cir. 1993) ............................................................................ 57, 64

*Green v. Assoc. Milk Prods., Inc.*,
  692 F.2d 1153 (8th Cir. 1982) ................................................................................ 64

*Griffiths v. Blue Cross & Blue Shield of Ala.*,
  147 F. Supp. 2d 1203 (N.D. Ala. 2001) ................................................................... 79

*Hackman v. Dickerson Realtors, Inc.*,
    746 F. Supp. 2d 962 (N.D. Ill. 2010) ........................................................................80

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ........................................................................ *passim*

*Holiday Wholesale Grocery Co. v. Philip Morris Inc.*,
    231 F. Supp. 2d 1253 (N.D. Ga. 2002), *aff'd, Williamson Oil Co., Inc. v.*
    *Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) ....................................20, 48, 49

*Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co., Inc.*,
    812 F.2d 786 (2d Cir. 1987)..................................................................................74

*Intervest Fin. Servs., Inc. v. S.G. Cowen Secs. Corp.*,
    206 F. Supp. 2d 702 (E.D. Pa. 2002) ......................................................................49

*Isaksen v. Vt. Castings, Inc.*,
    825 F.2d 1158 (7th Cir. 1987) ....................................................................81, 82, 83

*Kelsey K. v. NFL Enters. LLC*,
    2017 WL 3115169 (N.D. Cal. July 21, 2017)...........................................................23

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
    910 F.3d 927 (7th Cir. 2018) ........................................................................ *passim*

*Laurence J. Gordon, Inc. v. Brandt, Inc.*,
    554 F. Supp. 1144 (W.D. Wash. 1983)....................................................................70

*Lee v. Life Ins. Co. of N. Am.*,
    23 F.3d 14 (1st Cir. 1994)......................................................................................72

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)........................................................................................52, 54

*Magnetar Tech. Corp. v. Intamin Ltd.*,
    801 F.3d 1150 (9th Cir. 2015) ...............................................................................83

*MAI Sys. Corp. v. Peak Computer, Inc.*,
    991 F.2d 511 (9th Cir. 1993) .................................................................................60

*Maltz v. Sax*,
    134 F.2d 2 (7th Cir. 1943) ....................................................................................58

*Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*,
    271 F.3d 825 (9th Cir. 2001) .................................................................................79

*Market Force Inc. v. Wauwatosa Realty Co.*,
    906 F.2d 1167 (7th Cir. 1990) ...............................................................................41

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ................................................................................ *passim*

*McDaniel v. Loyola Univ. Med. Ctr.*,
2019 WL 1281969 (N.D. Ill. Mar. 20, 2019) ........................................... 80

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
708 F.2d 1081 (7th Cir. 1983) ................................................................. 81

*Mercatus Group, LLC v. Lake Forest Hosp.*,
641 F.3d 834 (7th Cir. 2011) ................................................................... 70

*Metso Minerals Indus., Inc. v. FLSmidth-Excel LLC*,
2010 WL 55845 (E.D. Wis. Jan. 5, 2010) ................................................ 79

*Midco Int'l, Inc. v. Metro. Life Ins. Co.*,
2017 WL 2868949 (N.D. Ill. July 5, 2017) .............................................. 76

*Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*,
309 F. Supp. 2d 1156 (N.D. Cal. 2004) ................................................... 58

*Monarch Mktg. Sys., Inc. v. Duncan Parking Meter Maint. Co., Inc.*,
1988 WL 5038 (N.D. Ill. Jan. 19, 1988) .............................................. 57, 58

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984) ............................................................................ 35, 48

*Montgomery v. Noga*,
168 F.3d 1282 (11th Cir. 1999) ............................................................... 59

*Moore v. Boating Industry Ass'ns*,
819 F.2d 693 (7th Cir. 1987) ................................................................... 55

*Musacchio v. United States*,
136 S. Ct. 709 (2016) .............................................................................. 61

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ................................................................. 21

*N. Carolina Elec. Membership Corp. v. Carolina Power & Light Co.*,
780 F. Supp. 322 (M.D.N.C. 1991) .......................................................... 50

*Nichols Motorcycle Supply, Inc. v. Dunlop Tire Corp.*,
913 F. Supp. 1088 (N.D. Ill. 1995) .......................................................... 18

*Nitro Distrib., Inc. v. Alticor, Inc.*,
565 F.3d 417 (8th Cir. 2009) ................................................................... 51

**PUBLIC VERSION**

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ........................................................................64

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
472 U.S. 284 (1985)...........................................................................................55

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018)............................................................................17, 54, 56

*Olympia Equip. Leasing Co. v. W. Union Tele. Co.*,
797 F.2d 370 (7th Cir. 1986) ............................................................................63

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
127 F.3d 1157 (9th Cir. 1997) ..........................................................................68

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
629 F.3d 697 (7th Cir. 2011) ....................................................................*passim*

*Oracle Am., Inc. v. Google Inc.*,
750 F.3d 1339 (Fed. Cir. 2014).........................................................................59

*Pac. Bell Tel. Co. v. Linkline Commcs., Inc.*,
555 U.S. 438 (2009)...........................................................................................63

*Paddock Publ'ns, Inc. v. Chi. Tribune Co.*,
103 F.3d 42 (7th Cir. 1996) ..............................................................................68

*Pearl Music Co. v. Recording Indus. Ass'n of Am., Inc.*,
460 F. Supp. 1060 (C.D. Cal. 1978) ............................................................57, 58

*Pitchford v. PEPI, Inc.*,
531 F.2d 92 (3d Cir. 1975)................................................................................69

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
776 F.2d 185 (7th Cir. 1985) ......................................................................52, 53

*In re Pool Prods. Distrib. Market Antitrust Litig.*,
158 F. Supp. 3d 544 (E.D. La. 2016)................................................................48

*Premier Comp Soln's LLC v. UPMC*,
377 F. Supp. 3d 506 (W.D. Pa. 2019)...............................................................69

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
104 F.3d 811 (6th Cir. 1997) ............................................................................72

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
615 F.3d 412 (5th Cir. 2010) ............................................................................70

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
 917 F.3d 1249 (11th Cir. 2019) ...................................................................21, 27

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
 124 F.3d 430 (3rd Cir. 1997) ...............................................................................72

*Realnetworks, Inc. v. DVD Copy Control Ass'n*,
 2010 WL 145098 (N.D. Cal. Jan. 8, 2010) ....................................................58, 62

*Reazin v. Blue Cross & Blue Shield of Kan., Inc.*,
 899 F.2d 951 (10th Cir. 1990) .............................................................................66

*Reifert v. S. Cent. Wis. MLS Corp.*,
 450 F.3d 312 (7th Cir. 2006) ..........................................................................66, 67

*Republic Tobacco v. N. Atl. Trading Co.*,
 381 F.3d 717 (7th Cir. 2004) ...............................................................................68

*Roland Mach Co. v. Dressler Indus., Inc.*,
 749 F.2d 380 (7th Cir. 1984) ...............................................................................68

*Ross v. Am. Ex. Co.*,
 35 F. Supp. 3d 407 (S.D.N.Y. 2014) .....................................................................38

*Rossi v. Standard Roofing, Inc.*,
 156 F.3d 452 (3d Cir. 1998) .................................................................................50

*Rozema v. Marshfield Clinic*,
 977 F. Supp. 1362 (W.D. Wisc. 1997) ..................................................................38

*Schor v. Abbot Labs.*,
 457 F.3d 608 (7th Cir. 2006) ..........................................................................76, 77

*In re Se. Milk Antitrust Litig.*,
 739 F.3d 262 (6th Cir. 2014) ...............................................................................54

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
 950 F.3d 911 (7th Cir. 2020) ...............................................................................65

*Sloan Valve Co. v. Zurn Indus., Inc.*,
 2013 WL 3147349 (N.D. Ill. June 19, 2013) ........................................................76

*SMS Sys. Maint. Services, Inc. v. Digital Equip. Corp.*,
 188 F.3d 11 (1st Cir. 1999) ............................................................................74, 75

*Snap-On Bus. Solutions Inc. v. O'Neil & Assocs.*,
 708 F. Supp. 2d 669 (N.D. Ohio 2010) ...........................................................59, 60

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
 464 U.S. 417 (1984) ............................................................................................. 56

*Speakers of Sport, Inc. v. ProServ, Inc.*,
 178 F.3d 862 (7th Cir. 1999) ............................................................................... 79

*Stamatiou v. U.S. Gypsum Co.*,
 400 F. Supp. 431 (N.D. Ill. 1975) ....................................................................... 78

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
 803 F.3d 1084 (9th Cir. 2015) ..................................................................... 28, 40

*Stenograph L.L.C. v. Bossard Assocs., Inc.*,
 144 F.3d 96 (D.C. Cir. 1998) ............................................................................... 60

*In re Sulfuric Acid Antitrust Litig.*,
 703 F.3d 1004 (7th Cir. 2012) ...................................................................... 52, 55

*Synopsys, Inc. v. AzurEngine Techs., Inc.*,
 401 F. Supp. 3d 1068 (S.D. Cal. 2019) ............................................................... 59

*Texaco Inc. v. Dagher*,
 547 U.S. 1 (2006) ................................................................................................. 52

*In re Text Messaging Antitrust Litig.*,
 630 F.3d 622 (7th Cir. 2010) ........................................................................ 44, 46

*In re Text Messaging Antitrust Litig.*,
 782 F.3d 867 (7th Cir. 2015) ........................................................................ *passim*

*United States v. Nosal*,
 844 F.3d 1024 (9th Cir. 2016) ............................................................................. 61

*United States v. Syufy Enters.*,
 903 F.2d 659 (9th Cir. 1990) ............................................................................... 66

*Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*,
 184 F. Supp. 2d 947 (D. Ariz. 2001), *aff'd*, 52 F. App'x 897 (9th Cir. 2002) ....... 70, 71, 72, 73

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
 540 U.S. 398 (2004) ..................................................................................... 1, 63, 77

*Viamedia, Inc. v. Comcast Corp.*,
 951 F.3d 429 (7th Cir. 2020) ............................................................................... 63

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
 275 F. Supp. 2d 543 (D.N.J. 2003) ...................................................................... 60

*W.G. Samuels v. Milliken & Co.*,
    1989 WL 94837 (D. Kan. 1989) ...................................................................78

*Wallingford Shopping, L.L.C. v. Lowe's Home Centers, Inc.*,
    2001 WL 96373 (S.D.N.Y. Feb. 5, 2001) ....................................................80

*Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l, Inc.*,
    328 F. Supp. 3d 824 (N.D. Ill. 2018) ......................................................28, 32

*Weit v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*,
    641 F.2d 457 (7th Cir. 1981) .....................................................................42

*Well–Made Toy Mfg. Corp. v. Goffa Int'l Corp.*,
    2002 WL 1455180 (E.D.N.Y. June 26, 2002) ...........................................60

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
    868 F.3d 132 (3d Cir. 2017)........................................................................58

*Williamson Oil Co., Inc. v. Philip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003) .................................................................34

**Statutes**

17 U.S.C. § 410(c) ...........................................................................................59

17 U.S.C. § 1201 .........................................................................................2, 55

18 U.S.C. § 1030 .........................................................................................2, 55

18 U.S.C. § 1030(a)(2)(C) ..............................................................................61

18 U.S.C. § 1030(a)(5)(C) ..............................................................................61

**Other Authorities**

Restatement (Second) of Torts § 774...............................................................78

## INTRODUCTION

Defendants CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") respectfully request summary judgment because plaintiff Authenticom, Inc. ("Authenticom") cannot offer evidence tending to rule out the possibility that the defendants acted independently when they decided, years apart, to secure their computer systems against hostile access by Authenticom and others. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Authenticom's non-conspiracy claims also warrant summary judgment.

CDK and Reynolds are technology companies that provide a variety of services to participants in the automotive industry. Both companies offer dealer management systems ("DMSs"), complex enterprise computer systems that support much of the front- and back-end business at a car dealership. DMSs manage vast amounts of data, much of which is highly sensitive, proprietary, or both. Dealers license a DMS subject to various terms and conditions, including access restrictions, from CDK, Reynolds, or one of many other providers.

Authenticom and a number of other businesses—referred to as "hostile integrators"—have sold access to Defendants' DMSs, principally by using dealer login credentials (usernames and passwords) to log on to the DMS and extract data. Hostile integrators then sell that data to third-party software vendors, who leverage it in separate software applications sold to dealers. Hostile integrators also sometimes sell that data to other parties, including data syndicators.

As the Seventh Circuit and this Court have held, however, federal antitrust law recognizes that CDK and Reynolds have the right to independently refuse to allow third parties to access their computer systems.[1] Other federal laws buttress this right. The Computer Fraud and Abuse Act

---

[1] *See Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1023 (7th Cir. 2017) ("Even monopolists are almost never required to assist their competitors . . . and neither Reynolds nor CDK is a monopolist."); Dkt. 176 at 50 ("in no event will there be an enforced duty to deal"); *see also* Dkt. 504 at 27-28 (same); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411-15 (2004).

("CFAA") makes it illegal to knowingly access a computer "without authorization" of the system owner or to "exceed authorized access." 18 U.S.C. § 1030. The Digital Millennium Copyright Act ("DMCA") makes it illegal to "circumvent a technological measure that effectively controls access" to a copyrighted work, including software. 17 U.S.C. § 1201. And the Copyright Act grants Defendants the right to decide who may copy their software and related works. *Id*. § 100 *et seq*.

Fundamentally, this case is about CDK's and Reynolds's exercise of these rights. Reynolds has sought to control and manage access to its DMS, including by hostile integrators, since at least 2006. CDK announced an initiative to manage and control access to its DMS in 2015, and began implementing technological measures to that end in 2016. Authenticom originally claimed that Reynolds and CDK conspired to drive hostile integrators out of business in connection with CDK's 2015 decision. But after discovery, Authenticom shifted course, now claiming an ill-defined conspiracy beginning in September 2013 to stop competing with each other on DMS "openness."

Whatever the contours of the alleged conspiracy, Authenticom's case may not proceed to trial. At summary judgment, the Supreme Court has long required such plaintiffs to show "that the inference of conspiracy is reasonable in light of the competing inferences of independent action." *Matsushita*, 475 U.S. at 588. The plaintiff must produce evidence that is not simply *consistent with* conspiracy, but that affirmatively *excludes* the possibility of independent conduct. Where a plaintiff cannot show "that the inference of conspiracy is reasonable in light of the competing inferences of independent action," even the most "richly detailed" conspiracy claim fails at summary judgment. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 720 (7th Cir. 2011).

At a high level, three undisputed material facts mandate summary judgment here:

1.  It was in Reynolds's independent, unilateral interest to control and manage access to its computer system in 2006 and beyond. *See* § II.A1 *infra*.

2.  It was in CDK's independent, unilateral interest to control and manage access to its computer system in 2015 and beyond. *See* § II.A.2 *infra*.

3. Neither Reynolds nor CDK needed to conspire to control and manage access to its own computer system. *See* § II.A.3 *infra*.

Authenticom has not produced evidence that creates a dispute regarding these facts. Nor has Authenticom produced evidence that tends to exclude the manifest independent interest each Defendant had in securing and monetizing their respective computer systems.

In place of evidence, Authenticom uses misdirection. Authenticom's current theory is that CDK and Reynolds conspired starting in September 2013 when they began negotiating three commercial agreements (the "2015 Agreements"), which the parties ultimately signed in February 2015. The 2015 Agreements grew out of Reynolds's increasingly effective efforts to disrupt hostile integrators' access to the Reynolds DMS, which impacted not only Authenticom, but also two CDK-owned integrators, DMI and IntegraLink.

The 2015 Agreements are not evidence of a conspiracy. They provided for a "wind-down" of DMI's and IntegraLink's access to Reynolds's DMS and for certain CDK applications to join Reynolds's certified integration program and vice versa. "[N]othing in any of the three agreements required either CDK or Reynolds to block third-party access to its own dealer management system." *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1023 (7th Cir. 2017).

To support its conspiracy claim, Authenticom cherry-picks statements made during the year and a half of negotiations over the 2015 Agreements, claiming that these statements support an inference of a separate, *unwritten* agreement requiring CDK to mirror Reynolds's approach to managed system access. But it is the 2015 Agreements themselves that reflect the deal ultimately made, and one cannot infer any separate conspiracy from the *negotiation* of those Agreements, as Authenticom tries to do. The communications Authenticom identifies had nothing to do with coordinating Reynolds's or CDK's data access policies or how those policies would apply to hostile integrators generally. They reflected *vertical* aspects of Defendants' relationship—CDK's

access to data on the Reynolds DMS and vice-versa—not competition in the DMS market. Indeed, Reynolds had similar discussions with multiple other hostile integrators around the same time.

In short, while the record shows that CDK and Reynolds communicated to facilitate a controlled wind down of DMI's and IntegraLink's access and to negotiate secure access to data for their apps, no evidence suggests that CDK and Reynolds negotiated any broader agreement about DMS "openness" generally. Instead, the record shows that Reynolds consistently maintained its policy against hostile integration, and that CDK independently secured its DMS years after Reynolds. Far from suggesting a "conspiracy," those actions were consistent with CDK's and Reynolds's legitimate, non-conspiratorial interests, entitling Defendants to summary judgment.

Authenticom's other, "unilateral" claims also fail as a matter of law. Therefore, the Court should grant summary judgment to Defendants on all claims.

## BACKGROUND

### A. Industry Background

A DMS is an enterprise software platform that dealerships use to collect, manage, and handle data generated during their operations. JSUF 2, 17, 20; RSUF 1.[2] There are many DMS providers in the United States, including CDK and Reynolds. JSUF 166. CDK's and Reynolds's DMS software is proprietary and covered by contractual licenses that specify, among other things, whether dealerships may permit third parties to access the DMS. JSUF 17, 65-67; RSUF 3. Data managed on a DMS includes sensitive information on customers, inventory, sales, financing, and insurance. JSUF 17, 20, 52-55.

---

[2] "JSUF" refers to Defendants' Joint Statement of Common Undisputed Material Facts in Support of Their Motions for Summary Judgment, filed concurrently. "RSUF" refers to Counterclaimant The Reynolds & Reynolds Company's Statement of Undisputed Material Facts in Support of its Motion for Partial Summary Judgment (Dkt. 779), which Defendants have incorporated into the JSUF. "Ex. __" refers to the exhibits to the Declaration of Daniel T. Fenske, filed concurrently.

**PUBLIC VERSION**

In addition to a DMS, dealers often use software applications ("apps"), sometimes provided by DMS providers (including CDK and Reynolds) but also by third-party developers ("vendors"). JSUF 6-9, 11, 14, 23-26, 32. Many apps seek to leverage the system functions of, and data stored on, the DMS—for example, customer data (name, address, etc.) or vehicle information (make, model, etc.). CDK and Reynolds generally offer dealers two options to share data on the DMS with third parties. First, both DMSs have built-in reporting tools allowing dealers to export (or "push") data to a file that can be sent to vendors without any third-party access to the DMS. JSUF 9, 22; RSUF 6-9. For example, Reynolds's Dynamic Reporting allows dealerships to schedule automatic reports and send them to vendors, a process that takes "a couple minutes" a day. JSUF 40. Second, CDK and Reynolds offer "certified" integration that provides vendors with automated, secure access to system-processed data for a fee. CDK's program is called the 3PA program. JSUF 23. Reynolds's is called the Reynolds Certified Interface Program ("RCI"). JSUF 6. Once a vendor joins either program, CDK or Reynolds builds custom interfaces for that vendor allowing access only to the needed system functions and processed data with consent. JSUF 7-8, 11, 24-25. 3PA and RCI also enable vendors to "write back" data into the DMS in realtime for use by the dealer or other apps. JSUF 8, 25.

Some software vendors historically used hostile integrators like Authenticom to obtain certain data on the DMS. JSUF 30-31, 77-78, 94. Integrators use software to access the DMS via dealer-issued login credentials and extract (sometimes known as "screen scrape" or "poll") DMS data, which they provide to vendors and data syndicators. JSUF 57-58, 77-78; RSUF 23-25.

**B.    Reynolds's Unilateral Efforts To Secure Its DMS**

**1.    Reynolds's Longstanding Opposition To Hostile Integration**

Consistent with the longstanding view of its CEO, Robert Brockman, Reynolds has opposed hostile third-party access at least since he became CEO in 2006. JSUF 80-81; RSUF 10-

11. Reynolds's standard DMS software license has long prohibited dealers from enabling hostile third-party access. JSUF 65-66. ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████ JSUF 80, 84.

Reynolds implemented many security measures in the ensuing years. Before September 2013, these included: ██████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████ JSUF 83; RSUF 11-20. In February 2013, Reynolds announced that it would deploy a more sophisticated version of its anti-automation measure—█████████████████—to disable and disrupt accounts suspected of being used by unauthorized third parties. JSUF 85-86; RSUF 17-20.

> **2.    In 2013, Reynolds Continued To Deploy Security Enhancements And Negotiate Wind Downs With Multiple Hostile Integrators.**

No later than June 2013, Reynolds deployed the ██████████████████ and disabled a large volume of third-party accounts. JSUF 97; RSUF 17-20. This caused substantial disruption to Authenticom and others. JSUF 97. Reynolds's 2013 disabling led to an "████████████████

███████████████████████████████████████." JSUF 86.

But Reynolds's efforts affected all hostile integrators. In 2013, ██████████████████

6

JSUF 133.

In 2012, Reynolds sued another hostile integrator, Superior Integrated Solutions ("SIS"), resulting in a decision holding that Reynolds's DMS contracts prohibited third-party access. JSUF 95. In what became a template for Reynolds's approach to other hostile integrators,

Reynolds's actions also impacted two ADP-owned[3] companies, DMI and IntegraLink (collectively "DMI"), that served third-party software vendors as well as car manufacturers ("OEMs") and accessed the Reynolds DMS through hostile means. JSUF 27-28, 97-98.

JSUF 99.

DMI observed in September 2013 that

---

[3] CDK spun off from Automatic Data Processing, Inc. ("ADP") in October 2014. JSUF 16. This brief will generally refer to "ADP" before that time, and "CDK" after.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████

### 3. CDK And Reynolds Negotiate A Wind Down of DMI's Hostile Access.

████████████████████████████████████     ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████ JSUF 101. ██████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████ JSUF 102.

In an internal ADP email, Gardner also reported that "█████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████ JSUF 102. But ADP was clear in internal communications

that ████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████  ████████████████████████████████

██████████████████████████████████████████████████

The parties negotiated intensively over many issues for the next fifteen months. ████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████  █████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████s. JSUF 107, 113. Negotiations continued into 2015. On February 16, 2015, CDK advised Reynolds, "██████████████████████████████████████████

████████████ JSUF 115.

## C.    The February 2015 Agreements

On February 18, 2015, CDK and Reynolds executed the 2015 Agreements: the Data

9

**PUBLIC VERSION**

Exchange Agreement ("DEA"), 3PA Agreement, and RCI Agreement. JSUF 116-132. The DEA provided for a DMI wind down through three key provisions.

1.    During the wind-down period—generally defined as the shorter of the duration of DMI's existing contract with a customer or one year—Reynolds would permit DMI to use closely monitored credentials to continue to access the Reynolds DMS for DMI's then-existing customers "without interruption from Reynolds security enhancements." Ex. 49, DEA §§ 1.4, 4.3; JSUF 119.

2.    During the wind down, CDK would "reasonably cooperate with Reynolds' efforts, if any, to have DMI [vendor clients] execute agreements to become part of the Reynolds RCI Program." Ex. 49, DEA § 4.1, JSUF 120.

3.    CDK and Reynolds would not "sell, transfer or assign to any affiliate or third party any technology, business process, or other such knowledge regarding integration with the other party's DMS or take any other steps to assist any person that it reasonably believes to have plans to access or integrate with the other party's DMS." Ex. 49, DEA § 4.5, JSUF 123.

Reynolds and CDK also agreed to coordinate over DMI's communications to its clients regarding the wind down, similar to how Reynolds and SIS coordinated communications as part of SIS's wind down. Ex. 49, DEA § 4.2; JSUF 121, 137.

The 3PA Agreement and RCI Agreement provided for certified integration for certain of Reynolds's and CDK's applications. *See* JSUF 128-132. CDK agreed to pay Reynolds monthly fees for data through RCI. Ex. 51, RCI Agmt. § 2 & Exs. E1-E7 (price lists). Reynolds received free 3PA access for specific applications for five years, up to the first 600 rooftops (the "no-fee cap"). Ex. 50, 3PA Agmt. § 3(a), (b). CDK also allowed Reynolds to use Authenticom—which used to provide data on the CDK DMS to Reynolds for certain applications—to obtain data for the specified apps while Reynolds transitioned its apps into 3PA. *Id.* § 1(c).

10

PUBLIC VERSION

As the Seventh Circuit has held, "[n]othing in any of the three agreements required either CDK or Reynolds to block third-party access to its own data management system." *Authenticom*, 874 F.3d at 1023. After the Agreements were signed, ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████

### D.     CDK's Unilateral Efforts To Secure Its DMS

#### 1.     2007- 2013: ADP Starts To Understand And Evaluate The Detrimental Impacts of Hostile Third Party Access.

Since the 1990s, CDK's (then ADP) standard dealer licenses prohibited dealers from authorizing automated third-party access to the CDK DMS. JSUF 67. ████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████

         ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████ JSUF 49. ██████████████

███████████████████████████████████████████████████████████

11

*Id.*

Finally, ADP found that hostile third-party access impaired profitability. █████████

███████████████████████████████████████████████████████████

███ JSUF 163.

### 2. August 2013: ADP Begins Preparing To Secure The DMS.

By August 28, 2013, ADP's Chief Technology Officer had ██████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████ JSUF 148.

At the same time, the national dealer trade association, NADA, issued data security guidance stating that consumer data in the DMS "raises difficult and sensitive issues for dealers that they must understand when they enter into contracts that could allow access to Dealer Data," and advising dealers to "[c]onsider implementing a strict data 'push' system," "only shar[ing] data with third parties by gathering it, and sending it to them, rather than allowing them to 'take' it by accessing your systems." JSUF 63; *see also* JSUF 64 (similar 2014 guidance). On August 29, 2013, Anenen noted that NADA was "██████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
█████████████████████████████████."

### 3. October 2014: CDK Spins Off From ADP.

█████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████" JSUF 151.

**PUBLIC VERSION**

In June 2014, ADP publicly identified risks to a successful spin-off, including several related to data privacy and any lack of security in its systems. JSUF 154.

On October 1, 2014, CDK spun off as an independent company. JSUF 155. ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████

### 4. June 2015: CDK Announces SecurityFirst And Begins Securing Its DMS.

In June 2015, CDK announced its "SecurityFirst" initiative. JSUF 158. CDK also implemented the "Secure the DMS" initiative, under which CDK would take steps to end hostile access to its system. JSUF 156-57. ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████

To give vendors, dealers, and others in the marketplace time to react to the new policies, CDK did nothing to disrupt third-party access until March 2016, when it began using security measures on a trial basis. JSUF 159. To date, CDK has deployed three principal measures to disrupt hostile third-party access: ██████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████ JSUF 159, 161. ███████████

███████████████████████ JSUF 162.

### E. Authenticom's Claims & Expert Testimony

In 2017, Authenticom sued CDK and Reynolds. Authenticom's Complaint alleges that they "entered into an express horizontal agreement to exclude competition in the market for dealer data integration services" in February 2015 by barring Authenticom and other third parties from directly accessing the DMS. Compl. ¶¶ 1, 15, 97. Authenticom brought three claims under Section 1 of the Sherman Act: horizontal conspiracy (Count I); exclusive dealing (Count II); and tying (Count III). It also brought a section 2 monopolization claim based on Defendants' "Dealer Data Integration aftermarkets" (Count IV) and a claim for tortious interference (Count V). *Id*. ¶¶ 242-86.

In June 2017, Judge Peterson granted a preliminary injunction requiring Defendants to permit Authenticom access to their DMSs, in part based upon the representation that "without relief [Authenticom] is likely to be forced to shutter its business altogether," but the Seventh Circuit stayed, and then reversed, the injunction. *Authenticom*, 874 F.3d at 1019, 1023. The court of appeals held that the antitrust laws did not permit the district court to "order the defendants to enter into an entirely new arrangement with Authenticom" and "forc[e] them to do business with Authenticom on terms to which they did not agree." *Id.* at 1025-26.

After transfer to this Court for consolidation in this MDL, Judge St. Eve ruled on Defendants' motions to dismiss. She dismissed Authenticom's claim that the 2015 Agreements constituted an unlawful "market division" agreement, holding that Authenticom could not suffer antitrust injury from such an agreement. *Id*. at 31-33. She also dismissed the exclusive-dealing claim based on dealer contracts and the tying claim. *Id.* at 36, 39, 43.

After discovery, Authenticom disclosed Dr. Mark Israel as its economic expert. Contrary to the Complaint, he opined that CDK and Reynolds began colluding in September 2013 by agreeing "████████████████████████████████████████████████████████



Ex. 322, Israel Tr. 10. He disavowed any claim that,

" *Id*. at 15. Instead, Defendants purportedly began colluding over "openness"

Ex. 72, Israel Rpt. ¶ 144, 146; Ex. 322, Israel Tr. 11, 20. Authenticom's damages expert, Catharine Lawton, issued a damages estimate for all claims combined:

5. Ex. 74, Lawton Rpt. pp. 14-15. Defendants have moved to exclude both proposed experts' opinions. *See* Dkt. 878; Dkt. 880.

## ARGUMENT

Fundamentally, this case is about Authenticom's disagreement with CDK's and Reynolds's decisions on the best way to structure access to their proprietary computer systems. But federal law reserves that decision to the system owner, not a third party unhappy that it has been denied free access. Nor can Authenticom overcome those federal rights through vague and unsupported allegations of "conspiracy." Summary judgment is a "vital procedural tool to avoid wasteful trials and may be particularly important in antitrust litigation to prevent lengthy and drawn-out litigation that has a chilling effect on competitive market forces." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 541 (2d Cir. 1993). Indeed, "the use of summary judgment is not only permitted" in antitrust cases; it is "encouraged." *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 475 (7th Cir. 1988).

The Court should grant summary judgment for Defendants. *First*, the undisputed facts establish Defendants' entitlement to judgment on Authenticom's conspiracy claims, and at a minimum on its claim that Defendants' conduct is *per se* illegal. *See* §§ I-II. *Second*, Authenticom cannot demonstrate antitrust injury because its automated access to Defendants' DMSs violated federal law, among other reasons. *See* § III. *Third,* Authenticom's unilateral exclusive dealing and

aftermarket monopolization claims fail for several reasons. *See* § IV. *Fourth*, the tortious interference claim is meritless. *See* § V. *Fifth*, Authenticom's damages model is flawed. *See* § VI.

## I. Authenticom Has No Viable Claim That The 2015 Agreements Violate Section 1.

The only actual agreements between Reynolds and CDK are the written, 2015 Agreements. These are now unchallenged. Authenticom's Complaint alleges that the 2015 Agreements included a "written market division agreement" that was *per se* illegal. Compl. ¶¶ 118, 131-38 (same). But Judge St. Eve dismissed that claim for lack of antitrust injury. Dkt. 176 at 31-33. Although the Complaint alleges that the 2015 Agreements harmed Authenticom by causing customers to move to DMI, Judge St. Eve correctly held that any such injury stemmed (if at all) from the alleged conspiracy to "block Authenticom and other third-party integrators"—not from the 2015 Agreements' alleged market allocation. *Id.* at 33.

Other than the dismissed market allocation claim, Authenticom's Complaint never challenges the 2015 Agreements alone as violating Section 1. In any case, the logic of Judge St. Eve's dismissal of the market division claim would compel dismissal of any such claim. The Seventh Circuit has ruled that "[n]othing in [the 2015 Agreements] required either CDK or Reynolds to block third-party access to its own data management system." *Authenticom,* 874 F.3d at 1023. Alone, the 2015 Agreements therefore cannot be the source of Authenticom's injury, because they do not require the "blocking" that Judge St. Eve noted is the linchpin of Authenticom's claimed injury. For this reason alone, Defendants are entitled to summary judgment on any claim that the 2015 Agreements violate Section 1.

And even if Authenticom advanced a new theory now, Authenticom cannot show the 2015 Agreements are anticompetitive. As explained below (at pp. 22-25), the 2015 Agreements are vertical in nature and had substantial pro-competitive benefits, requiring rule of reason analysis. Authenticom thus would have to prove that the 2015 Agreements, *by themselves*, had "a substantial

anticompetitive effect." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). It cannot do so.

Authenticom's economic expert, Dr. Israel, never concluded that the 2015 Agreements were anticompetitive on their own—only that they were part of a supposed broader conspiracy over "openness." *See, e.g.*, Ex. 73, Israel Reply ¶ 22 (█████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ He never attempted to analyze the anticompetitive effect of the 2015 Agreements alone—indeed, he conceded the RCI and 3PA agreements ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████. That Authenticom has no evidence of anticompetitive effects from the 2015 Agreements distinct from the broader "openness" conspiracy is confirmed by Plaintiffs' damages opinions. Neither Dr. Israel (on behalf of the vendor class) nor Ms. Lawton (on behalf of Authenticom) calculates damages specific to those Agreements or explains how they harmed Authenticom *distinct* from a broader alleged conspiracy. Failure to offer expert testimony on that issue requires summary judgement. *Nichols Motorcycle Supply, Inc. v. Dunlop Tire Corp.*, 913 F. Supp. 1088, 1101 n.11 (N.D. Ill. 1995) (plaintiff normally bears the burden of "proving anticompetitive impact to the finder of fact through market analysis by an expert economist").

## II. *Matsushita* Mandates Summary Judgment On Claims Of An Unwritten Conspiracy.

Authenticom instead alleges that prior to and alongside the 2015 Agreements, CDK and Reynolds reached an additional, *unwritten* agreement to stop competing on what Dr. Israel calls DMS "openness," a vague notion relating to the ease with which third parties can access the DMS.

Despite years of discovery, there is no evidence of such an agreement. What Authenticom calls a conspiracy to stop competing on "openness" simply reflects CDK's and Reynolds's separate decisions to secure their DMSs against hostile access at different times for their own interests.

To establish an unlawful conspiracy at summary judgment, an antitrust plaintiff "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action." *Matsushita*, 475 U.S. at 588. This means Authenticom must offer evidence "tend[ing] to rule out the possibility that the defendants were acting independently." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). In evaluating that evidence, the Court first assesses whether the evidence is "equally consistent" with Defendants' "permissible independent interests" as it is with "improper activity." *In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 947 (N.D. Ill. 2014), *aff'd*, 801 F.3d 758 (7th Cir. 2015). If the evidence "could support the conclusion" that Defendants were acting independently, then the Court "look[s] for any evidence that tends to *exclude* the possibility that Defendants were pursuing independent interests.'" *Id.* (emphasis added). Authenticom cannot pass either part of this test.

### A.    It Was In Reynolds's And CDK's Unilateral Interests To Control Access To Their DMSs And Negotiate The 2015 Agreements.

#### 1.    Reynolds Secured Its DMS Consistent With Its Unilateral Interests.

Since at least 2006, Reynolds has taken the position that it does not allow dealers to authorize third-party access to its system, and between then and 2013, Reynolds took numerous steps to disrupt hostile access. JSUF 80-86; RSUF 11-20. ████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

19

These measures were unilateral: they occurred well before September 2013, and Authenticom's liability expert refused to opine " ████████████████████████████████████

████████████████████████████████████████████████ ████████████

████████████████████████████████████████████████.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

Reynolds' unilateral decision to move to a "closed" system long before the alleged conspiracy fatally undermines any notion that Reynolds would *conspire* to pursue that strategy. *In re Brand Name Prescription Drugs Antitrust Litig.*, 288 F.3d 1028, 1034 (7th Cir. 2002) (theory that defendants joined conspiracy was "particularly shaky" because allegedly conspiratorial policy "was adopted before the alleged collusion"); *Holiday Wholesale Grocery Co. v. Philip Morris Inc.*, 231 F. Supp. 2d 1253, 1288 (N.D. Ga. 2002) (plaintiffs were "unable to support their contention that permanent allocation programs were implemented to facilitate a conspiracy initiated in November 1993" where several alleged conspirators had programs in place before the conspiracy), *aff'd*, *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003).

### 2.  CDK Secured Its DMS Consistent With Its Unilateral Interests.

CDK's actions were likewise fully consistent with its unilateral interests. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████  *See* JSUF 138-48, 163. That decision is consistent with a determination that preventing hostile access would further CDK's interest in operating a more secure DMS, a more

profitable DMS, or both. Indeed, even supposing—contrary to the record—that CDK secured its DMS *only* because it thought it could make more money by doing so, there is no need to resort to conspiracy to explain CDK's conduct. Increasing profitability is the quintessential unilateral interest. *See In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 877 (7th Cir. 2015) ("a rational profit-maximizing seller does not care about the number of customers it has but about its total revenues relative to its total costs"); *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1267 (11th Cir. 2019) ("All of these purported 'highly uniform' tactics are easily explained by the most common of corporate stimuli: a desire to increase profits.").

That some may have viewed CDK's decision to end unauthorized access as similar to Reynolds's approach makes no difference to this analysis. Antitrust law permits competitors to mirror one another's behavior, even if previously they did things differently. *Dairy Farmers*, 60 F. Supp. 3d at 964 ("parallel conduct, even conduct consciously undertaken, does not point toward a meeting of the minds") (quoting *Twombly*, 550 U.S. at 557 (alterations omitted)); *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 935 (7th Cir. 2018) (concentrated markets "make it easier for companies either to form a cartel *or* to follow the leader independently"); *Text Messaging*, 782 F.3d at 871 (similar). In any event, CDK did not begin to restrict access for years after the start of the supposed "agreement" with Reynolds, much longer than the months of non-coordinated action sufficient to undermine an inference of conspiracy. *See, e.g.*, *Text Messaging*, 782 F.3d at 877; *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) (where plaintiff alleged that defendants "adopted the policies over a period of several years," such "slow adoption of similar policies does not raise the specter of collusion").

### 3. Defendants Could Pursue These Interests Unilaterally.

Defendants not only each had an interest in pursuing a controlled-access strategy, but each had the ability to do so unilaterally. ███████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████  ██████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████

████████████████████████████████████████████████

████████████████████████████████████████████. Ex. 330, Lawton

Tr. 199; *see* § VI *infra*. Those opinions show that, without a conspiracy, Reynolds and CDK could

(and did) achieve their objectives of securing their respective systems.

> **4.**    **Negotiating The 2015 Agreements Was Lawful And Consistent With CDK's And Reynolds's Unilateral Interests.**

Authenticom now pegs the start of the unwritten conspiracy over "openness" ████████████

███████████████████████████████████████████████ *See* pp. 6-9 *supra*.

Again, Authenticom has no claim based on the 2015 Agreements alone. *Supra* § I. ████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████ But this is not the case.

*Data Exchange Agreement.* The Data Exchange Agreement is a vertical agreement

between Reynolds, as a DMS provider, and DMI, as a hostile integrator. The agreement allowed

DMI limited and monitored access to the Reynolds DMS for specified vendor and dealer customers

while DMI wound down its hostile integration business on Reynolds's system. JSUF 118-19, 124-126. Reynolds had obvious unilateral incentives to pursue this agreement. First, it had observed performance problems and cybersecurity risks from hostile integration, and the DEA offered a path to reduce that activity with minimal disruption to its dealer customers and other third parties. JSUF 44-48. Second, during the wind down, Reynolds could monitor and track DMI's activities on the Reynolds DMS, with indemnity and notification protections if anything went wrong. JSUF 102, 125; Ex. 49, DEA §§ 8.1, 8.2.

CDK likewise had interests in negotiating a controlled wind down. The DEA resolved the problems caused by Reynolds's increasingly effective disruption of DMI's access to the Reynolds DMS, offering DMI a temporary reprieve from Reynolds's security measures so that, while the wind down proceeded, DMI could continue providing data to its vendor clients through the end of their contract terms. JSUF 118. The DEA also offered an orderly means for DMI to end activities that CDK saw as growing legal risks. JSUF 100. *See Dairy Farmers*, 60 F. Supp. 3d at 952 (granting summary judgment where defendant "attempt[ed] to mitigate the harmful effects of [particular issue] on its business" prior to alleged manipulation period); *cf. Kelsey K. v. NFL Enters. LLC*, 2017 WL 3115169, at *6 (N.D. Cal. July 21, 2017) (claim that defendants paid low wages until threat of liability caused them to raise prices did not show conspiracy).

Authenticom's economic evidence only reinforces these conclusions. Dr. Israel testified that ███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

at 451-53. ████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████ Ex. 72, Israel Rpt. ¶ 167.

Dr. Israel's assertion ██████████████████████████████████████████████

████████████████████████████████████ Ex. 322, Israel Tr. 571, is irrelevant under

*Matsushita*. He offers no economic basis for the conclusion that Defendants' respective interests in entering into the wind down provided an incentive to enter into the *separate*, unwritten conspiracy on "openness" that he now posits. On the contrary, the prospect of a hard landing incentivized Defendants to wind down DMI's hostile access to Reynolds's DMS *regardless* of whether CDK agreed to any "openness" policies for its own system. Accordingly, the fact that CDK and Reynolds negotiated a wind down was at least "equally consistent" with Defendants' "permissible independent interests as it [was] with improper activity." *Omnicare*, 629 F.3d at 707.

*3PA and RCI Agreements.* Like the DEA, the 3PA and RCI Agreements were vertical agreements between application providers on the one hand and a DMS provider on the other. CDK and Reynolds had clear unilateral and pro-competitive interests in certifying their respective applications in the other's integration program. For CDK, Reynolds's security measures meant it could no longer rely on DMI to obtain data from the Reynolds DMS. It was in CDK's interest to find an alternative to sell applications to Reynolds dealers, which RCI certification provided. And by ensuring that Reynolds dealers could continue to use the certified CDK applications, the RCI agreement furthered Reynolds's independent business interests. Similarly, 3PA certification gave Reynolds secure and reliable access to CDK DMS data for those CDK dealers seeking to use Reynolds's applications—with the added benefit to Reynolds of a substantial no-fee period. JSUF 129. That was in Reynolds's interests regardless of any separate conspiracy on "openness."

These agreements thus benefitted both CDK and Reynolds, enabling them to improve the

PUBLIC VERSION

quality of their app offerings, and their dealers, who obtained access to a broader set of apps without threat of disruption. Certified integration through the 3PA and RCI Programs enables apps to achieve more complex integrations, including the ability to write back data into the DMS in real-time. JSUF 8, 25, 33-35. Indeed, ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

That other market participants similarly decided to end hostile integration on the Reynolds DMS or enter into certified integration agreements further undermines any inference of conspiracy.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████ There are no allegations that CDK or Reynolds "conspired" or "colluded" with any of these parties. That is because all of this conduct—like the DMI wind down and the reciprocal integration CDK and Reynolds negotiated for their own apps—is lawful and makes sense for reasons unrelated to an alleged conspiracy.

### B. Authenticom's Evidence Does Not Tend To Exclude The Possibility Of Independent Conduct.

Because everything Defendants did in the course of the alleged "conspiracy" was consistent with their unilateral interests, Authenticom must marshal evidence "tend[ing] to exclude

the possibility that Defendants were pursuing independent interests." *Dairy Farmers*, 60 F. Supp. 3d at 947. Authenticom cannot do so. "[A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case," *Matsushita*, 475 U.S. at 588, so Authenticom cannot meet its burden with ambiguous evidence. Rather, Authenticom must "*rule out* the hypothesis that the defendants were engaged in self-interested but lawful oligopolistic behavior during the relevant period." *Kleen Prods.*, 910 F.3d at 934 (emphasis added). Further, under *Matsushita*, quality, not quantity, is what matters. Even "bountiful circumstantial evidence" cannot foreclose summary judgment if that evidence is at all consistent with self-interested but lawful behavior. *Id.*

### 1. Authenticom Has No Economic Evidence Of Conspiracy.

Authenticom offers expert testimony that Defendants agreed to stop competing on DMS "openness" in September 2013. Defendants have explained why that evidence is unreliable. *See* Dkt. 878. Here, they explain why it does not rule out independent action in any event.

### a. Authenticom's Motive Theory Does Not Rule Out Unilateral Conduct.

Both CDK and Reynolds had the incentive and the ability to secure their DMSs unilaterally. *See* § II.A.3 *supra.* That shows that neither had an incentive to conspire. ██████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ But why would Reynolds or CDK agree to violate the antitrust laws in a *different* way—through a supposedly unlawful agreement on DMS "openness"—when they could, as Dr. Israel's opinions show, achieve the same aim by securing their DMSs unilaterally? Of course they would not, because "[t]he possible gains" from conspiring "would be more than offset by the inevitable legal risks." *See Text Messaging*, 782 F.3d at 878.

Dr. Israel seeks to overcome this lack of incentive by arguing that competition from CDK

on "openness" ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████

Further, the claim that Reynolds had a motive to induce CDK to stop competing on "openness" fails legally and empirically. Legally, it amounts to saying that one competitor would benefit if another stopped competing as aggressively. That is *always* true. A store that refuses to take coupons will benefit if its competitor decides to stop taking coupons; a firm that offers product at a premium will benefit if another firm raises its prices to reduce the gap. But again, the fact that competitors act in parallel fails to show a conspiracy as a matter of law. *See, e.g.*, *Twombly*, 550 U.S. at 557; *Kleen Prods.*, 910 F.3d at 935; *Text Messaging*, 782 F.3d at 873; *Dairy Farmers*, 60 F. Supp. 3d at 964. So Dr. Israel's argument cannot "rule out the hypothesis that the defendants were engaged in self-interested but lawful oligopolistic behavior." *Kleen Prods.*, 910 F.3d at 934.

Empirically, Authenticom cites evidence of integration "price" changes, but even if true, that too is more consistent with unilateral action than conspiracy.[4] ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Those increases

---

[4] Defendants dispute the admissibility and reliability of Dr. Israel's price calculations generally. For example, he does not report RCI unit prices, but rather average unit revenue, which changes even when Reynolds did not change RCI unit prices. *See* Dkt. 878 at 16-19.

cannot be tied to a *September* 2013 agreement. Thus, there is no question that Reynolds's price increases, years before any CDK 3PA price increases, were unilateral. *See Quality Auto Painting*, 917 F.3d at 1267. At best, Authenticom can show only a continuation of Reynolds's historic pattern of price increases, which does not plausibly allow an inference of conspiracy. *See Kleen Products*, 910 F.3d at 937.

In any event, none of this offers an incentive for *CDK* to conspire. Dr. Israel opines that CDK had substantial unilateral power to profitably close its system. *See* § II.A.3 *supra*. ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████ On Authenticom's theory, CDK immediately gave up a competitive advantage by ceasing to compete with Reynolds on "openness" in exchange for speculative profits years in the future. But it is implausible that "losses would be incurred in the near term in exchange for the speculative possibility of more than making them up in the uncertain and perhaps remote future." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661 (7th Cir. 2002).

Nor does it make sense that CDK "would agree to . . . [give] such a lop-sided benefit to its competitor." *Baxter Int'l*, 328 F. Supp. 3d at 837. A conspiracy is not plausible if only "one side stood to gain," and here the only alleged benefits for years after the conspiracy started would inure to Reynolds alone. *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1090 (9th Cir. 2015); *accord City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 568-69 (11th Cir. 1998) (affirming summary judgment where defendants allegedly "took part in a conspiracy that earned them zero market share and zero dollars").

**b.** **Dr. Israel's So-Called "** ████████ **" Were Consistent With Defendants' Unilateral Interests.**

Dr. Israel attempts to explain CDK's nearly two-year participation in a "conspiracy" from which it did not benefit by citing supposed ████████ "

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████ Yet calling those negotiated contract terms "side payments" makes sense only if it was not in CDK's and Reynolds's interests to make these "payments" *absent* a conspiracy. Dr. Israel never analyzed that issue. Dkt. 878 at 15. In fact, the soft landing and app certification were in the independent interests of all parties, as discussed above. *See* § II.A.4 *supra*.

More fundamentally, the "side payment" theory bolsters Authenticom's conspiracy claim only if it rules out the possibility that CDK and Reynolds entered into the wind down and RCI Agreement *without* agreeing to a broader unwritten conspiracy over "openness." But the "side payment" theory comes nowhere close to eliminating that possibility. Dr. Israel never calculated the lost revenue to CDK from his alleged conspiracy, let alone show that the value of the supposed "side payments" (which he also declined to calculate) would exceed those losses, as required to make it economically rational for CDK to conspire. Ex. 322, Israel Tr. 259-60, 284.[5]

In fact, the value of the supposed ████████ " to CDK was limited at best. ███████████████████████████████████████████ JSUF 119; Ex. 49, DEA § 1.4. There is no evidence that this temporary forbearance would offset what

---

[5] ███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████ r.

**PUBLIC VERSION**

Dr. Israel assumes are long-term losses from CDK's supposed decision to stop competing for DMS customers in its core DMS business on the basis of "openness." *See Dairy Farmers*, 60 F. Supp. 3d at 961 (rejecting theory that defendant "would have incurred the risk of participating in an illegal conspiracy," with only the potential of speculative future gains to offset those risks). There is no reliable basis, therefore, to conclude that the "side payments" were anything other than the benefits CDK received from the 2015 Agreements, which were in its independent interest.[6]

This is not the only problem with Dr. Israel's "side payments" theory. As discussed above (at p. 20), R███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████ That Reynolds offered non-"conspirators," including Authenticom, the same wind-down it offered CDK shows that Reynolds's offer was fully consistent with its independent interests, not part of any alleged conspiracy.

F███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ But again, there is *no evidence* that

---



[6] The only cost/benefit analysis in the record comes from CDK and shows there was no agreement on "openness."

**PUBLIC VERSION**

Reynolds ever considered reversing its policy on "openness." JSUF 88. Nor is there evidence that CDK sought or valued a supposed assurance that Reynolds would remain closed. And again, this "assurance" argument proves too much. As explained above, every firm would benefit from a competitor's assurance that it would act in a particular way. Inferring a conspiracy from such "assurances" would gut *Matsushita* and turn all parallel conduct into evidence of conspiracy.

### c. There Was No Plausible Enforcement Mechanism.

"Game theory teaches us that a cartel cannot survive absent some enforcement mechanism because otherwise the incentives to cheat are too great." *Kleen Prods.*, 276 F. Supp. 3d at 842 (alteration omitted). Plaintiff's conspiracy theory fails on this ground alone.

Initially, the absence of any evidence of enforcement undercuts the conspiracy claim. As noted, C██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████. There is no evidence that Reynolds ever complained or threatened punitive action against CDK for continuing to allow third-party access, or even *asked* when CDK would start to prevent access. Nor is there evidence that CDK monitored, complained, or threatened punitive action regarding Reynolds's adherence to the alleged agreement or ████████████████████

████████████████████████████████████████████████████ *See* JSUF 37-38. The "conspicuous[] absen[ce]" of this evidence warrants summary judgment. *Kleen Products*, 910 F.3d at 937.

Rather than monitoring and enforcing the alleged conspiracy, ████████████████████

████████████████████████████████████████████████████████ That is the opposite of what would occur if CDK and Reynolds had agreed to compete less on openness.

████████████████████████████████████████████████████████████████████████

████████████████████████████████ The undisputed facts show no punishment or enforcement.

The lack of discipline is no surprise, for neither Defendant had means to discipline the other in the event of defection. Dr. Israel suggests that Reynolds could enforce the conspiracy by withholding the "████████████" discussed above. Ex. 73, Israel Reply ¶ 120. But this makes no sense. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

### d.    The Connections Data Is Inconsistent With Conspiracy.

The volume and trend of Authenticom's "connections" to Defendants' respective DMSs also undermine Authenticom's case. "Connections" in this context measure the amount of business Authenticom had on the Reynolds or CDK DMS at a given point. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ ████████████████████

████████████████████████████████████████████████

████████████  *See Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l, Inc.*, 328 F. Supp. 3d 824, 836 (N.D. Ill. 2018) ("It is hardly plausible to infer that, having supposedly agreed on a scheme to

create a shortfall by means of bogus product recalls, the defendants then sat on their hands for the next 16 months without making any product recalls."). The Reynolds connection data likewise undermines any inference of conspiracy. A █████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████

These patterns are inconsistent with a conspiracy to align Defendants' data access policies to impair Authenticom's access to their DMSs at any time, much less in September 2013. *See Kleen Prods.*, 910 F.3d at 936 (affirming summary judgment where "a close look at the record reveals that [plaintiffs] overstate how coordinated" defendants' conduct was); *Text Messaging*, 782 F.3d at 877 ("[T]he four defendants in this case did not move in lockstep. For months on end there were price differences in their services.").

> **e.** **There Was No "Reduction" In DMS Competition, Which Would Be Consistent With Unilateral Conduct Anyway.**

Lastly, Dr. Israel contends that ███████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

But again, Dr. Israel fails to rule out the possibility of independent action, as he must for Authenticom to survive summary judgment. First, even if the data showed that competition on "openness" had softened (it does not), that is not evidence of conspiracy. "[T]he Sherman Act

imposes no duty on firms to compete vigorously, or for that matter at all, in price" or any other factor. *Text Messaging*, 782 F.3d at 873. What Dr. Israel characterizes as a "softening" of competition between two firms is consistent with lawful action.

Second—to the extent competition on "openness" was, in fact, an actual dimension of competition—nothing in the record suggests that competition between Defendants *actually* decreased in 2013, much less that competition decreased due to a conspiracy. ███████

████████████████████████████████████████████████████████████

████████████████████████████ *see Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1321 (11th Cir. 2003) (shifting market shares and continued marketing efforts undermined existence of conspiracy). I█████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

### 2. Authenticom Has No Non-Economic Evidence Of Conspiracy.

Nor does the non-economic evidence offered by Authenticom rule out independent action. Defendants' witnesses uniformly denied under oath that Reynolds and CDK entered into the alleged conspiracy or anything similar, instead affirming that the 2015 Agreements alone contain the parties' agreements. JSUF 194. Authenticom attempts to twist Defendants' negotiation of deal

points leading up to the 2015 Agreements into evidence of a secret, unwritten conspiracy about "openness." But negotiations about potential deal points are, by definition, not agreements. Authenticom's non-economic evidence does not "suggest[] that [the defendants] were not competing because they had agreed not to compete." *Dairy Farmers*, 60 F. Supp. 3d at 947.

### a. No Evidence Of Agreement In 2013

The most glaring flaw in Authenticom's conspiracy theory is its shift to an alleged September 2013 start date. To show an "agreement" under Section 1, Authenticom must demonstrate that CDK and Reynolds shared a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). Yet there is *no* evidence that the parties reached *any* agreement in September 2013 other than to begin negotiating the 2015 Agreements. No document suggests that CDK and Reynolds agreed to coordinate data access policies in September 2013. No witness testified that CDK and Reynolds began competing less on DMS "openness" or otherwise reached an understanding with respect to third-party integrators at that time. And no witness testified that Reynolds or CDK changed its policy on hostile integration at that point.

The basis for the new September 2013 start date—a year-and-a-half earlier than the Complaint alleges— █████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████.

████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████ A commitment to work toward a possible

future (written) agreement cannot sustain any Section 1 claim at summary judgment, much less

show a conspiracy on a concept that does not appear in the email. *See Omnicare*, 629 F.3d at 708

(memo's "prospective language" defeated any argument that conspiracy existed); *Anderson News,*

*L.LC. v. Am. Media, Inc.*, 899 F.3d 87, 111 (2d Cir. 2018) (email expressing "uncertainty about

what would happen" did not show extant conspiracy). It is implausible that after proposing a

framework for negotiation, Defendants spent over a year negotiating and redlining the 2015

Agreements even though they had *already* entered into (with apparent ease) a never-mentioned,

off-the-books agreement to stop competing on "openness." Yet that is Authenticom's case now.

### b. Supposed "Joint Messaging"

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████ The record refutes this theory. ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

Ultimately, of course, the DEA required CDK and Reynolds to cooperate on

communications with DMI customers *about the DEA wind-down*. Ex. 49, DEA § 4.2. But this does

PUBLIC VERSION

not suggest a conspiracy on "openness." Requiring CDK and Reynolds to communicate the terms of their agreement to customers benefitted those customers and the market, and the ultimate communication they sent is neither anticompetitive nor implies any broader conspiracy. JSUF 121.

Finally, even if CDK and Reynolds had agreed to joint *messaging*, one could not infer they also conspired over their underlying *data access policies*. Firms, through trade groups and otherwise, often engage in lawful joint marketing efforts. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th ed.) ¶ 2023c2. Authenticom itself trumpets the "joint marketing" efforts of organizations like NADA and "Open Secure Access" on data-access policies. *E.g.*, Compl. ¶ 75. Those examples of market participants jointly advocating a position on DMS access show that such conduct is consistent with lawful interests and not indicative of an illegal conspiracy.[7]

### c.  Other Pre-February 2015 Communications

As noted, Authenticom relies on the existence of "extensive communications" between CDK and Reynolds from 2013-2015 to show a conspiracy. *See, e.g.*, Ex. 72, Israel Rpt. ¶¶ 140-43, 160. But even extensive inter-firm communications are not evidence of a conspiracy where, as here, there are valid business reasons to communicate. *See Kleen Prods.*, 910 F.3d at 938-39 (frequent contacts not suspicious given "the amount of trading that was taking place among the firms"); *Dairy Farmers*, 801 F.3d at 763 (communications between competitors "could be understood as part of a legitimate business relationship as readily as they could be understood as part of a conspiracy" where one was other's "main supplier").

---

[7] At the same time that Dr. Israel hypothesizes a conspiracy between Defendants, NADA was promulgating "joint" data security messaging from dealers. JSUF 63-64. Likewise, Authenticom's "industry" expert touts his experience as founder of Open Secure Access, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**PUBLIC VERSION**

CDK and Reynolds had several valid reasons to communicate in 2013-2015, the most obvious being the ongoing dispute over DMI's access to the Reynolds DMS and CDK's and Reynolds's desires to obtain certified data access for apps on the other's DMS. Those discussions involved legitimate *vertical* relationships between CDK and Reynolds. Inferring conspiracy from Defendants' efforts to wind down DMI's hostile access in the least disruptive manner and expand data access for their respective apps risks hurting consumers by "chill[ing] business activity"— exactly what courts should not construe the antitrust laws to do. *Omnicare*, 629 F.3d at 709-10.

Further, the pre-February 2015 communications are important for what they do *not* say. CDK's and Reynolds's negotiations were protracted and well-documented. Yet there was no discussion of the conspiracy that Dr. Israel or Authenticom purport to identify. Reynolds nowhere requests, and CDK never promises, to "close" CDK's DMS. Reynolds does not demand, and CDK does not offer, to stop competing on "openness." CDK did not give Reynolds any inside knowledge on SecurityFirst. JSUF 158. Nor did Reynolds threaten to "open" its system if CDK did not comply with Reynolds's demands. To the contrary, ██████████████████████████████ ██████████████████████████████████████████████

In short, the record of Defendants' discussions regarding the 2015 Agreements identify the topics for negotiation—and third-party data access policies were not on the table. That is fatal to Authenticom's efforts to twist these communications into evidence of a conspiracy. *See Ross v. Am. Ex. Co.*, 35 F. Supp. 3d 407, 452 (S.D.N.Y. 2014) (refusing to "read evidence of [a] benign agreement as evidence of a separate, illegal agreement"); *Rozema v. Marshfield Clinic*, 977 F. Supp. 1362, 1377 (W.D. Wisc. 1997) ("The existence of [other] cooperative arrangements does not tend to exclude the possibility that the parties' failure to compete in each other's areas resulted from independent decisions.").

Several documents that Authenticom cites as evidence of conspiracy make this plain. *First,*

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██

████████████████████████████████████████████████

████████████████████

████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████B████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████ │ ████████████████████████████████

██████████████████████████████████████████████████████

**PUBLIC VERSION**

██████████████████████████████████████████ *See Anderson News*, 899 F.3d at 113 ("internal and interfirm communications" must be "viewed in the setting of each defendant's conduct and industry conditions"); *Stanislaus Food*, 803 F.3d at 1093 (communications must be "[c]onsidered against the backdrop of market conditions in the industry").

The context that Authenticom ignores shows that Gardner's statements are *at least* as well understood as a reference to DMI's efforts to continue accessing the Reynolds DMS as a reference to CDK's DMS "openness" policies. That is sufficient for summary judgment. *Omnicare*, 629 F.3d at 708; *see also Kleen*, 910 F.3d at 936 (statement that "the party begins" could "merely express enthusiasm about the upward trend in pricing"); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 127 (3d Cir. 1999) (reference to competitors' "truce" did not prove conspiracy, as it may have referred to lawful interdependence after a price war).

*Second*, ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████ ████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████.

*Third*, A ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████"

*Fourth,* ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ "[C]ompetitors in concentrated markets watch each other like

hawks," *Text Messaging*, 782 F.3d at 875, so knowledge of a competitor's objectives does not

suggest a conspiracy. In any event, the documents Authenticom cites once again concern the *2015*

*Agreements*. ████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████ Dkt. 820 at 7. Further, Reynolds's opposition to Authenticom's hostile

integration was well-known for years before these communications, and Reynolds's decision to

use certified integration for its apps wherever possible—with many DMS providers, not just

CDK—was a vertical, lawful choice. JSUF 14.

*Fifth*, Authenticom cites documents using colorful language to describe competition with

Authenticom. ███████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████ But DMI and Authenticom were

competitors, and Authenticom does not contend that CDK coordinated with Reynolds on this issue.

████████████████████████████████████████████████████████

**PUBLIC VERSION**

███████████████ *See Market Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1173 (7th Cir. 1990) (hostile statements about plaintiff "do not foreclose the conclusion that the competitors were not engaged in a conspiracy").

### d.    Post-February 2015 Communications

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████

First, ███████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████ The DEA established a wind-down process requiring ongoing coordination. Reynolds had to program templates and protocols for the DMI credentials that would be wound-down, requiring contact with CDK. JSUF 119, 124-25. These documents reflect that coordination. None discusses CDK's or Reynolds's policies on third-party access. *See Weit v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*, 641 F.2d 457, 462 (7th Cir. 1981) (meetings "lack[ed] significant probative value" where competitors' venture required "some degree of cooperation").

Second, ████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████ JSUF 5.

Similarly, in court filings, Authenticom points to other post-2015 communications or statements as evidence of a broader conspiracy. Dkt. 820 at 8 (citing Exhibits 30-31 thereto). But much of this evidence is self-evidently about the 2015 Agreements and nothing more. ███████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████.

Nor was that the only time Reynolds ridiculed CDK's security efforts. I███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

### 3.    There Is No "Direct" Evidence Of Conspiracy.

Authenticom also claims that two conversations involving Authenticom's CEO, Steve Cottrell, provide "direct" evidence of conspiracy. *See, e.g.*, Dkt. 60 at 12-13. The first was in 2015 with Robert Schaefer of Reynolds. The second was in 2016 with CDK's Daniel McCray. Schaefer and McCray deny Cottrell's recollection of their statements, but Defendants do not ask the Court

to resolve that dispute here. Even taking Cottrell's retelling as true, these conversations do not come close to meeting the standard for direct evidence of conspiracy.

Direct evidence "is evidence tantamount to an acknowledgment of guilt." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002). It is a "smoking gun," "usually tak[ing] the form of an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed *explicitly* on the terms of a conspiracy." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (emphasis added). "With direct evidence the fact finder is not required to make inferences to establish facts." *Omnicare*, 629 F.3d at 706; *see also Text Messaging*, 782 F.3d at 872.

**a.    Cottrell's Version Of The 2015 Schaefer Conversation.**

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████

    ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████

        **b.**      **Cottrell's Version Of The 2016 McCray Conversation.**

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████  ███████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

    ■  ████████████████████████████████████████████████

      ███████████████████████████

    ■  ██████████████████████████████

    ■  ██████████████████████████████████

---

[8] Cottrell's initial Declaration—provided to Defendants before the notes—omits important words from the fifth bullet point, ████████████████████████████████████████████████

██████████████████████ *Compare* Ex. 32, DX 744, *with* Ex. 98, Cottrell Decl. ¶ 48.



### c. Cottrell's Versions Are Not Direct Evidence.

On its face, neither conversation establishes anything like a secret agreement between Reynolds and CDK on DMS "openness." At best, the statements that Cottrell describes are ambiguous, requiring multiple inferences to deduce a conspiracy. The conversations are therefore quintessentially circumstantial, rather than direct, evidence. *High Fructose*, 295 F.3d at 662.

*First*, nothing in the two conversations unambiguously shows "the defendants had met and agreed explicitly on the terms" of the alleged conspiracy. *Text Messaging*, 630 F.3d at 628. ▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████-15.

     Cottrell's recollection of McCray's statements likewise fail the test for direct evidence. Most of the statements are expressly *unilateral*: promising or describing action by CDK without referencing Reynolds. In fact, Reynolds is only mentioned once ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████ No fact-finder could determine the existence of the alleged conspiracy based on this statement, and certainly not without drawing inferences. It therefore is not direct evidence. *See Text Messaging*, 782 F.3d at 872.

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

**PUBLIC VERSION**

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████ To be sure, this vertical arrangement might impact Authenticom, but it is lawful and, more to the point, is not "smoking gun" evidence of the horizontal conspiracy on DMS "openness" alleged here. *See In re Pool Prods. Distrib. Market Antitrust Litig.*, 158 F. Supp. 3d 544, 556-57 (E.D. La. 2016) (email that manufacturers "have all agreed" to minimum price just as likely referred to vertical agreements with distributor, not alleged horizontal agreement).

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

*Second*, there is no reference in the conversations to a conspiracy starting in September 2013, as Authenticom now alleges, much less one to reduce competition on "openness," which is the centerpiece of Dr. Israel's testimony. *Pool Prods.*, 158 F. Supp. 3d at 556-57 (email that "fails to mention any agreement that allegedly occurred two years earlier" was not direct evidence of earlier agreement); *Holiday Grocery*, 231 F. Supp. 2d at 1273 ("illogical" to treat statement made

48

"four years after the initiation of the alleged conspiracy" as "direct evidence").

*Third*, extensive record evidence—chiefly Authenticom's own actions in the ensuing days and months—confirms that McCray's statements do not unambiguously establish a conspiracy.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

*Fourth,* all we have are Cottrell's *characterizations* of Schaefer's and McCray's statements. Even if one assumes Cottrell recounted everything Schaefer or McCray said accurately, those statements are not direct evidence for the reasons just discussed. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

*Finally*, the fact that Plaintiffs' "direct evidence" allegations survived motions to dismiss, Dkt. 176 at 26, is not controlling on summary judgment, as the question now is whether the factual record shows the statements were an unambiguous "acknowledgment of guilt." *High Fructose*, 295 F.3d at 662. Moreover, now that Cottrell has testified in a deposition about the conversations, the declarations Plaintiffs used to oppose dismissal (Dkt. 60 at 13) carry little weight. *See Darnell v. Target Stores*, 16 F.3d 174, 176-77 (7th Cir. 1994) (holding that earlier affidavits could not create genuine dispute of material fact where deponent later "backed away" from affidavit statements during deposition, and explaining that depositions "[i]nherently . . . carry an increased level of reliability"), *abrogated in part on other grounds*, *Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013). Cottrell's testimony as to what Schaefer and Cottrell said in the two conversations, which Defendants accept as true only for purposes of summary judgment, is not direct evidence of a conspiracy. *See High Fructose*, 295 F.3d at 662.

### 4. The Evidence As A Whole Does Not Support A Conspiracy.

Even if the Court were to conclude that Cottrell's testimony about the alleged conversations amounts to "direct" evidence, a reasonable jury still could not conclude that a conspiracy is more likely than not. Determining whether direct evidence exists is a step in applying the *Matsushita* test, not an alternative to that test. And as described above, the overwhelming weight of economic and circumstantial evidence points against a finding of conspiracy and shows instead that CDK and Reynolds acted to further their unilateral interests. The only provable agreements between them are legitimate commercial contracts. McCray's and Schaefer's alleged statements, years after the start of the alleged conspiracy, must be evaluated against that entire body of evidence. *See N. Carolina Elec. Membership Corp. v. Carolina Power & Light Co.*, 780 F. Supp. 322, 339 (M.D.N.C. 1991) ("sparse" direct evidence, consisting of isolated statements by executives

without documentary "smoking gun," fails at summary judgment).

Citing *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452 (3d Cir. 1998), Authenticom has argued that direct evidence renders "circumstantial evidence of the defendant's unilateral incentives . . . inapposite." Dkt. 875 at 13. But that is contrary to *Matsushita*, which holds that summary judgment should be granted where the record "*as a whole* could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587 (emphasis added); *see also Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 424 (8th Cir. 2009) ("it does not follow that the possibility of independent action need not be excluded when direct evidence is provided"); Areeda & Hovenkamp ¶ 308i ("Though factual doubts arise most often when the evidence is circumstantial, the *Matsushita* principle holds that there is no genuine issue unless the whole record, including direct and circumstantial evidence, makes a necessary fact more likely than not in the mind of a reasonable juror."). In fact, the Seventh Circuit has called the distinction between direct and circumstantial evidence "largely if not entirely superfluous," for the ultimate question is whether the evidence "considered as a whole and in combination with the economic evidence" is sufficient to defeat summary judgment. *High Fructose*, 295 F.3d at 661-62.

Authenticom's claims hinge on whether it can present evidence that CDK restricted third-party access to its DMS *only pursuant to an agreement* with Reynolds. It cannot. Viewing the evidence as a whole, as *Matsushita* requires, Authenticom offers no coherent economic or noneconomic explanation for the conspiracy. In fact, Authenticom offers no consistent theory at all. Rather, it has grasped at different conspiracies with different aims and start dates and has piled inference on inference in an attempt to explain why CDK and Reynolds, notwithstanding their supposed conspiracy as to "openness," instituted different policies at different times in different ways. These arguments are "contradicted by the extensive evidence" that Reynolds and CDK were

51

not coordinating on data access policies or any other horizontal element of competition and were instead "engag[ed]" in "independent effort[s] to defend [their] interests." *Dairy Farmers*, 60 F. Supp. 3d at 964. Summary judgment is therefore proper.

### C. Alternatively, The Rule of Reason Applies As A Matter of Law.

Authenticom claims that in September 2013, CDK and Reynolds agreed to coordinate their policies as to DMS "openness," and that the negotiation and execution of the 2015 Agreements were part of that "single" conspiracy. *See* p. 18 *supra*; Ex. 73, Israel Reply ¶ 22. That alleged conspiracy is not subject to *per se* treatment and therefore must be evaluated under the rule of reason. This is a question of law for the Court that is appropriate for resolution at summary judgment. *See In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1008 (7th Cir. 2012).

The Sherman Act prohibits only "unreasonable" restraints. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990). The "standard framework" for this inquiry is the rule of reason, which requires plaintiffs to prove that the restraint's "anticompetitive effects outweigh its procompetitive effects." *Id.*; *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012); *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Only where an agreement "is so likely to be anticompetitive that there is no point in searching for a potentially beneficial instance" is an agreement illegal *per se*. *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985). This determination can be made "only after courts have had considerable experience with the type of restraint at issue." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). Accordingly, "condemnation *per se* is an unusual step." *Polk Bros.*, 776 F.2d at 189.

The alleged agreement on "openness" is not *per se* unlawful. *First*, it is unlike any of the traditional *per se* categories, such as "price-fixing schemes, as well as certain types of group boycotts, market allocations, and tying arrangements." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1108 (7th Cir. 1984). ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████  ███████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████ None of this bears any

resemblance to *per se* unlawful agreements. *Car Carriers*, 745 F.2d at 1108. Relatedly, the vague

nature of Dr. Israel's posited conspiracy cuts against applying the *per se* rule. A court must be

"very sure" that the agreement is unreasonable to apply that rule. *Polk Bros.*, 776 F.2d at 189. But

where the constraint is so unclear, Dkt. 878 at 4-7, it is impossible to be sure that an agreement is

so likely to cause competitive harm that there is no point in *considering* pro-competitive benefits.

*Second*, ████████████████████████████████████████████████████

████████████████████████████████████████████ That precludes *per se*

treatment because those agreements plainly—and at the very least arguably—provide a number of

procompetitive benefits. As explained above, *see* § II.A.4, the DEA's orderly wind down allowed

DMI to continue serving dealers and vendors without interruption for the remainder of their

**PUBLIC VERSION**

███████████████████████████████████████████████████████

███  The RCI and 3PA Agreements also offered CDK and Reynolds applications guaranteed, secure access to the other's DMS, opening the door to significantly broader distribution of each firm's apps. Participation in certified integration programs also meant each firm had access to complex integration services, w█████████████████████████████████████████████████ In short, the 2015 Agreements brought about "the very expansion of output that the antitrust laws foster." *Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 673 (7th Cir. 1992). In addition, in assessing net anti-competitive effects, the Court would have to consider whether the Agreements also facilitated more reliable and secure DMSs, to the benefit of dealers, vendors, consumers, and OEMs. ████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

*Third*, the alleged conspiracy involves substantial *vertical* elements, which by nature "should be assessed under the rule of reason." *Am. Express*, 138 S. Ct. at 2284. Those elements are obvious in the 2015 Agreements: The DEA was between Reynolds in its capacity as a DMS provider and CDK in its capacity (through DMI) as a data extractor. The 3PA and RCI Agreements were between CDK or Reynolds as the DMS provider, on the one hand, and the other as an application provider. All three agreements, therefore, were "between firms at different levels of distribution," thus qualifying as "vertical restraints." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988); *see also* pp. 22-25 *supra*. The intermingling of those vertical restraints with alleged horizontal ones in the DMS "openness" conspiracy is sufficient to compel use of the rule of reason. *See In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 272-73 (6th Cir. 2014) (where alleged conspirators had "complex relationship" that "involve[d] vertical elements" as well as horizontal

54

elements, *per se* treatment was inappropriate, notwithstanding plaintiffs' claim of horizontal agreement "not to compete"); *see also Leegin*, 551 U.S. at 893 (vertical agreement "entered upon to facilitate" horizontal cartel "would need to be held unlawful under the rule of reason").

*Fourth,* the setting of the alleged conspiracy supports use of the rule of reason. This novel case occurs in an area where Congress has conferred substantial rights on computer-system owners to prevent unauthorized access to their systems. Through multiple statutes, including the CFAA and DMCA, Congress made paramount the right of computer system owners to identify, and use technological measures to prevent, unauthorized access to their systems. 18 U.S.C. § 1030; 17 U.S.C. § 1201. At the very least, the Court would have to consider the federal interest in vindicating owners' rights to control access to their computer systems when determining whether any supposed agreement between CDK and Reynolds on "openness" had anticompetitive effects outweighing those interests. *See Moore v. Boating Industry Ass'ns*, 819 F.2d 693, 696 (7th Cir. 1987) ("the promotion of compliance with federal requirements" means that agreement does not "fall into 'a category likely to have predominantly anticompetitive effects'") (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 298 (1985)).

Further*,* courts have little to no experience with a "conspiracy" like this, occurring at the intersection of cybersecurity and antitrust laws. This is not a simple price-fixing conspiracy that decades of case law and economic analysis show almost never has any redeeming qualities. The Court thus has no reservoir of knowledge to draw upon to confidently condemn this particular agreement as anticompetitive without balancing any anticompetitive effects against pro-competitive virtues. Because it "is a bad idea to subject a novel way of doing business (or an old way in a new and previously unexamined context . . .) to *per se* treatment," the Court should not apply the *per se* rule here. *Sulfuric Acid*, 703 F.3d at 1011-12.

This case also implicates intellectual property rights. *See* JSUF 20-21, 71-79; RSUF 5; *see* § III.A.1 *infra* (discussing Reynolds and CDK's copyrights in their DMSs). A copyright owner's right to exclude serves the "important public purpose" of incentivizing creative works. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984). So "we would not expect that any market arrangements reasonably necessary to effectuate the rights that are granted would be deemed a *per se* violation of the Sherman Act." *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 19 (1979). On Authenticom's theory that the alleged agreement was reasonably necessary to prohibit third-party access to Defendants' software, that agreement cannot be *per se* illegal.

*Finally*, the Court would have to consider whether the alleged agreement reduces negative externalities. *See Am. Express*, 138 S. Ct. at 2289 (recognizing that agreement that "stem[s] negative externalities" is not anticompetitive). The risks posed by third-party access are not borne by dealers alone—Defendants also bear the risk of a DMS data breach or performance disruption, which will affect Defendants' reputations and consumer confidence in their products. Ex. 78, Whinston Rpt. ¶¶ 358-66; Ex. 71, Bresnahan Rpt. ¶¶ 65-69. Dealers that enable hostile third-party access do not factor in the risks they impose on the DMS provider.

## III. Authenticom Cannot Establish Antitrust Injury.

For years, Authenticom built its hostile integration business by disregarding Defendants' legal rights to control access to their DMSs. Authenticom's basic service of automated access to the Reynolds and CDK DMSs violated multiple federal laws. When it eventually lost its "cat and mouse" game with Defendants, Authenticom sued, claiming that it violated the antitrust laws (i) for either DMS firm to unilaterally bar Authenticom's access or (ii) for the two firms to (allegedly) agree that each would keep hostile integrators out of its systems.

In bringing these claims, Authenticom bears the burden of establishing "antitrust injury."

*Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111 (1986). That is, Authenticom must show that its alleged injury is among "the *type* of interests protected by the antitrust laws," and that Defendants' challenged conduct was the "but-for" cause of that injury. *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993). As to allegations of antitrust injury caused by unilateral (*i.e.*, non-conspiratorial) conduct, however, it is fundamental that the antitrust laws impose no obligation on either Reynolds or CDK to do business with or to facilitate Authenticom's automated access to their DMS systems. An injury flowing from Authenticom's inability to obtain Reynolds's or CDK's cooperation in building or maintaining Authenticom's business on their respective DMSs is not an injury of the type the antitrust laws were intended to prevent. That ends Authenticom's case as to its unilateral claims.

But there is more. The antitrust laws do not protect a company's ability to profit illegally from bootlegged copies of software, to violate copyrights, to disregard the denial of computer-access authorization, or to override technical measures intended to prevent access. Authenticom's business depended entirely on such unlawful acts, including years of illegality predating any alleged conspiracy. In short, Authenticom sought to "engage[] in wholly illegal enterprises." *Pearl Music Co. v. Recording Indus. Ass'n of Am., Inc*., 460 F. Supp. 1060, 1068 (C.D. Cal. 1978); *see also Monarch Mktg. Sys., Inc. v. Duncan Parking Meter Maint. Co., Inc.*, 1988 WL 5038, at *4 (N.D. Ill. Jan. 19, 1988), *vacated in part on other grounds*, 1988 WL 23830 (N.D. Ill. Mar. 8, 1988). It did not merely "engage[] in some wrongful conduct in developing" its product. *Datel Holdings LTD v. Microsoft Corp.*, 2010 WL 3910344, at *4 (N.D. Cal. Oct. 4, 2010). Because Authenticom could not lawfully offer automated access to the Reynolds and CDK DMSs— *regardless* of any alleged conspiracy—its claimed injury does not flow "from that which makes defendants' acts unlawful." *Canadian Imports*, 470 F.3d at 791. Its conspiracy claim also fails.

57

### A.     Authenticom's Business Is Illegal Independent Of Defendants' Alleged Conduct.

"[A]n action under the antitrust laws will not lie where the business conducted by the plaintiff, and alleged to have been restrained by the defendant, was itself unlawful." *Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*, 309 F. Supp. 2d 1156, 1169-70 (N.D. Cal. 2004). Courts therefore hold that a plaintiff cannot recover under the antitrust laws where its business hinges on illegal acts. *E.g.*, *Realnetworks, Inc. v. DVD Copy Control Ass'n*, 2010 WL 145098, at *6 (N.D. Cal. Jan. 8, 2010) (DMCA violations); *Monarch Mktg. Sys.*, 1988 WL 5038, at *3 ("virtually all of the labels [plaintiff] sold . . . were labels that infringed [defendant's] patents"); *Pearl Music Co.*, 460 F. Supp. at 1068 (copyright infringement). "That a regulatory or legislative bar can break the chain of causation in an antitrust case is beyond fair dispute." *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 165 (3d Cir. 2017); *see also In re Canadian Imports Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006); *Maltz v. Sax*, 134 F.2d 2, 4 (7th Cir. 1943).

In ruling on motions to dismiss, Judge St. Eve recognized that "a plaintiff whose desired trade is illegal independent of the defendants' complained-of conduct lacks antitrust injury." Dkt. 176 at 20. She nonetheless held that because Authenticom allegedly "lacks authorization or access to Defendants' DMSs . . . *because of* Defendants' anticompetitive conduct," it had not "pleaded itself out of antitrust injury at this stage." *Id*. at 19-22. At summary judgment, mere allegations are no longer sufficient. The undisputed record shows that Authenticom's business at Reynolds was always illegal—it depended on unlawfully copying Reynolds's software and circumventing Reynolds's access controls. And while Authenticom claims that CDK once tacitly approved its access to the CDK DMS, that supposed tacit acceptance does not qualify as actual authorization to violate CDK's contracts with dealers or to copy aspects of CDK's proprietary database under federal law. CDK's later explicit objections to Authenticom access made no practical difference,

58

as Authenticom continued to ignore CDK's rights just as it had always ignored Reynolds's. Thus, as to both Reynolds and CDK, its practices *were* "illegal independent of Defendants' challenged conduct," *id.*, and Authenticom cannot establish antitrust injury.

### 1. Copyright Violations

Reynolds and CDK have at all times had copyright interests in their DMS software and code, which are original creative works protected by the Copyright Act. JSUF 3, 20-21, 71-79. Specifically, CDK and Reynolds "independently created" their respective DMS software, these software systems "possess[] at least some minimal degree of creativity," *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 358 (1991), and their creative elements are not "incidental to [the software's] function," *Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693, 704-05 (2d Cir. 1992). Under that standard, "almost all novel software code constitutes a creative, original work of authorship that is automatically protected under the Copyright Act." *Synopsys, Inc. v. AzurEngine Techs., Inc.*, 401 F. Supp. 3d 1068, 1073 (S.D. Cal. 2019); *see also Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1355 (Fed. Cir. 2014). Reynolds has registered copyrights (prima facie evidence of validity) in two software programs (EraAccess.exe and ERA-IGNITE.exe) that Authenticom infringes. JSUF 72, 74-76; RSUF 5; 17 U.S.C. § 410(c); Dkt. 777 at 7-8.[9] Similarly, Defendants enjoy copyright protection in their DMSs given the creativity used to create, compile, organize, and display data in ways useful and valuable to dealers. JSUF 3, 20-21, 76; *Snap-On Bus. Solutions Inc. v. O'Neil & Assocs.*, 708 F. Supp. 2d 669, 685 (N.D. Ohio 2010) (plaintiff organized data "in an original data tree and create[d] relationships between the levels of the tree that would not otherwise exist").

---

[9] The remainder of Reynolds's copyrights and CDK's relevant copyrights are not registered. But "[r]egistration . . . is not a condition for copyright protection." *Dispatch Automation, Inc. v. Richards*, 280 F.3d 1116, 1120 (7th Cir. 2002). Copyright "automatically inheres in the work at the moment it is created without regard to whether it is ever registered." *Montgomery v. Noga*, 168 F.3d 1282, 1288 (11th Cir. 1999).

PUBLIC VERSION

Each time Authenticom accesses the CDK or Reynolds DMS, it infringes Defendants' copyrights by creating unauthorized copies of copyrighted material. JSUF 20-21, 71-79. For example, ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

It is well-established that both "the loading of software into a computer" and "loading of copyrighted software into RAM" creates a copy in violation of the Copyright Act. *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518-19 (9th Cir. 1993); *see, e.g.*, *Stenograph L.L.C. v. Bossard Assocs., Inc.*, 144 F.3d 96, 100 (D.C. Cir. 1998); *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 275 F. Supp. 2d 543, 556 (D.N.J. 2003); *Well–Made Toy Mfg. Corp. v. Goffa Int'l Corp.*, 2002 WL 1455180, at *6 (E.D.N.Y. June 26, 2002). So too does copying the distinctive page layouts, graphical content, text, arrangement, organization and display of a database like the DMS. *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 142 (5th Cir. 2004); *Snap-On*, 708 F. Supp. 2d at 685.

In short, independent of and prior to any alleged conspiracy, the very service that Authenticom claims was foreclosed—automated access to and querying of Reynolds and CDK

DMSs—required Authenticom to run and make illegal copies of Defendants' software and aspects of their proprietary databases. Authenticom has no evidence that, absent the alleged conspiracy, Reynolds and CDK would have agreed to provide Authenticom with thousands of licenses for their DMS software or that Authenticom's access otherwise violated copyright law only "because of" this conspiracy. Dkt. 176 at 21. Authenticom therefore cannot show antitrust injury because, in a but-for world, it would still be prohibited from selling the service it claims was harmed.

### 2. CFAA Violations

The CFAA imposes criminal liability on anyone who "[1] intentionally accesses [2] a computer [3] without authorization or exceeds authorized access, and thereby [4] obtains . . . information from any protected computer." 18 U.S.C. § 1030(a)(2)(C); *id.* § (a)(5)(C); *see also Musacchio v. United States*, 136 S. Ct. 709, 713 (2016). There is no dispute about elements [1], [2], and [4] here. The only question is whether Authenticom lacked or exceeded CDK's or Reynolds's authorization to access their respective DMSs. *See* Dkt. 506 at 15 (holding that "authorization" required by CFAA is authorization of the system owner).[10]

The record shows that Authenticom lacked authorization to access Defendants' systems. Reynolds's and CDK's dealer DMS license agreements have barred dealers from permitting third parties to access the DMS in automated fashion for years before September 2013. JSUF 65-67.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[10] A DMS is a "protected computer" under the CFAA. "[C]omputer" includes "*any data storage facility or communications facility* directly related to or operating in conjunction with such device." *Id.* § 1030(e)(1) (emphasis added); *see, e.g., United States v. Nosal*, 844 F.3d 1024, 1032 n.2 (9th Cir. 2016) (citing cases applying CFAA to "computer networks" and "databases"). And a computer is "protected" so long as it is "used in or affecting interstate or foreign commerce or communication." *Id.* § 1030(e)(2)(B); *see also* Compl. ¶ 26 (alleging that Defendants' conduct "has substantially affected interstate commerce"). Authenticom's polling process intentionally accessed the Reynolds and CDK DMSs to extract data. JSUF 31, 74-78; RSUF 23-28.

██████████████████████████████ There is thus no but-for world in which Authenticom

could have sold its service legally on Reynolds's DMS.

Likewise, Authenticom lacked authorization to access the CDK system. I███████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

### 3. DMCA Violations

As explained in Reynolds's motion for partial summary judgment, Dkt. 777, 779, 785,

Authenticom's automated polling has long depended not only on routine copyright violation, but

on overriding many of the technical "blocks" (for example, CAPTCHA prompts) that Authenticom

challenges in connection with its antitrust claims. Reynolds put the majority of these measures,

including CAPTCHA and its ████████████ detection system, in place before September

2013. In the but-for world, Authenticom has no evidence that Reynolds would have removed those

controls. On the contrary, the undisputed facts show that Authenticom's polling of Reynolds's

DMS violated the DMCA and was therefore unlawful independent of any alleged conspiracy. *See*

---

[11] Authenticom previously argued that it was permitted to access the CDK DMS under a provision in CDK's dealer license stating that dealers "will not disclose or otherwise make available any of the CDK Products" or other CDK proprietary information "to any person other than employees and *agents* of [the dealer] with a need-to-know." Dkt. 506 at 7 (emphasis added). This Court expressed skepticism that Authenticom was the "agent" of the dealers. Dkt. 506 at 9. But the Court need not resolve that question here. As the Court has held, even if CDK's dealer contract permitted dealers to allow third-party access, CDK could still withhold authorization *from Authenticom*. Dkt. 506 at 15 ("Although dealers might have a breach of contract claim against CDK if CDK's denial of authority violated its contract with the dealers, that does not change the fact that CDK denied Authenticom authority."). Thus, even if the "agent" provision means what Authenticom claims (and it does not), its access to the CDK DMS still violates the CFAA.

Dkt. 777, 779, 785; *Realnetworks, Inc. v,* 2010 WL 145098, at *6.

**B.    Authenticom Cannot Show Antitrust Injury On Its Unilateral Claims.**

Authenticom's unilateral claims likewise fail. Antitrust law imposes no duty on either Reynolds or CDK to deal with Authenticom. "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. Linkline Commcs., Inc.*, 555 U.S. 438, 488 (2009); *see also Verizon Commcs. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 410 (2004). This principle is so firmly embedded in antitrust law that even a finding of conspiracy does not allow courts to impose a "duty to deal." *Authenticom*, 874 F.3d at 1026. Accordingly, this Court has held that a unilateral refusal-to-deal theory fails as a matter of law. Dkt. 504 at 27-28; *see also* Dkt. 176 at 50 (holding that "in no event will there be an enforced duty to deal") (citing *Authenticom*, 874 F.3d at 1025-26).[12]

Defendants' unilateral right to refuse to deal with Authenticom is fatal to Authenticom's unilateral claims. Authenticom alleges harm through its inability to compete in the "data integration services" market, defined as "extracting" or "pulling" DMS data in an "automated, seamless way without the need for manual intervention by dealers." Compl. ¶¶ 54, 232-33. If CDK

---

[12] *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020), which reinstated a refusal to deal claim dismissed on the pleadings, is not to the contrary. First, *Viamedia* cited with approval the Seventh Circuit's prior opinion in this case. *Id.* at 454 (citing *Authenticom*, 874 F.3d at 1025). Second, only firms with monopoly power can ever have a duty to deal under the antitrust laws, *Olympia Equip. Leasing Co. v. W. Union Tele. Co.*, 797 F.2d 370, 377 (7th Cir. 1986), and "neither Reynolds nor CDK is a monopolist," *Authenticom*, 874 F.3d at 1025; *see also* § IV.B *infra*. Third, a copyright holder's desire to control access to its copyrighted works creates a "presumptively valid business justification" as to any *Aspen Skiing* refusal-to-deal claim. *See Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1188 (1st Cir. 1994), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010). The CDK and Reynolds DMSs are protected by the copyright laws, *see* § III.A.1 *supra*, but no such copyright issue lurked in *Viamedia*. Finally, that case is missing two factors on which the *Viamedia* court relied to find a duty to deal: "a prior course of voluntary conduct" and "sacrifice of short-term profits." 961 F.3d at 463. Authenticom does not contract with Defendants to hostilely access their systems and accessed Defendants' DMS over Defendants' express objection. And Authenticom's theory is that by preventing hostile access, Defendants *increased* "short-term profits" by increasing enrollment in their certified integration programs.

and Reynolds refused to permit Authenticom to use automated methods to access their respective systems, however, Authenticom could not provide vendor clients with automated extraction regardless of the provisions in Defendants' contracts with vendors. Thus, the alleged "exclusive dealing" provisions in CDK's and Reynolds's vendor contracts cannot be the but-for cause of Authenticom's injuries and therefore do not give rise to antitrust injury. *See Rockford Energy*, 998 F.2d at 395; *see also Green v. Assoc. Milk Prods., Inc.*, 692 F.2d 1153, 1157-58 (8th Cir. 1982) (affirming summary judgment because plaintiffs' "damage, if any, was wholly the result of their later termination, which we have held was not unlawful"); Areeda & Hovenkamp ¶ 338b-c (if lawful conduct "fully accounts" for plaintiff's claimed harm, there can be no antitrust injury because "plaintiff's situation would be the same with or without the challenged restraint").

It makes no difference that Authenticom now bases all its non-conspiracy claims on "exclusive dealing" rather than a refusal to deal. Regardless of the label, there is no antitrust injury where the alleged harm arises from the exercise of a defendant's right not to cooperate with the plaintiff. In *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) (Gorsuch, J.), Novell sued Microsoft for withdrawing access to Microsoft application programming interfaces ("APIs"), impairing Novell's development of a software application to run on Microsoft's operating system. *Id.* at 1067-68. The Tenth Circuit affirmed judgment as a matter of law, holding that Microsoft had no duty to provide its APIs to Novell under *Aspen Skiing*. *Id.* at 1074-78. That spelled the end of Novell's claim for anticompetitive deception, for deception "wasn't the cause of Novell's injury or any possible harm to consumers—Microsoft's refusal to deal was." *Id.* at 1080.

The same reasoning applies here. Even if Reynolds's and CDK's vendor contracts had no "exclusivity" provisions, Authenticom still would not have had access to the Reynolds and CDK systems. Thus, Authenticom's case "falters when it comes to the antitrust injury requirement." *Id.*

64

## IV.    Authenticom's Unilateral Claims Fail For Multiple, Additional Reasons.

In addition to its horizontal conspiracy claim, Authenticom brings Sherman Act claims for (1) exclusive dealing under Section 1, Compl. ¶¶ 157, 253-61; and (2) monopolization of CDK's and Reynolds's separate "DIS aftermarkets" under Section 2, Compl. ¶¶ 270-76. Although these claims have different legal elements, both are rooted in the same theory: that CDK and Reynolds allegedly required vendors seeking to participate in the 3PA or RCI programs to purchase "data integration services" and receive data *exclusively* from CDK or Reynolds. Dkt. 176 at 50.[13] As explained above, any "exclusive dealing" provisions could not have caused Authenticom antitrust injury, for Defendants lawfully could deny Authenticom access to the DMS regardless. Even if Authenticom could establish antitrust injury, however, its unilateral claims still would fail.

### A.    Authenticom's Section 1 Exclusive-Dealing Claims Fail.

#### 1.    Reynolds Does Not Have DMS Market Power.

To prove an exclusive dealing claim, Authenticom must show that each Defendant has market power in a relevant market. *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020); Ex. 72, Israel Rpt. ¶¶ 207-08 (acknowledging need to show DMS market power for unilateral claims). The record shows that Reynolds does not have DMS market power.

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████ "Courts have consistently held that firms with market shares of less than 30% are presumptively incapable of exercising market power." *Comm. Data Servers, Inc. v. Int'l Bus.*

---

[13] Authenticom's monopolization claim is alternatively predicated on the alleged horizontal conspiracy. *See* Dkt. 176 at 50. Since the conspiracy claim fails for the reasons discussed above, *see* § II *supra* , Defendants do not address that aspect of Authenticom's monopolization claim here. Authenticom has abandoned any claim that CDK and Reynolds engaged in a horizontal conspiracy to include exclusive dealing provisions in their respective vendor contracts. Dkt. 176 at 14 n.5.

*Mach. Corp.*, 262 F. Supp. 2d 50, 74 (S.D.N.Y. 2003) ("*CDS*") (collecting cases); *see also Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 761 (7th Cir. 1996) ("30% is not enough to confer substantial market power unless there are high barriers to competition"). Moreover, "market power, to be meaningful for antitrust purposes, must be durable." *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 968 (10th Cir. 1990); *see also CDS*, 262 F. Supp. 2d at 75 ("The fact that IBM's share was declining . . . is further evidence that IBM did not possess market power."). In short, "it is not market share that counts, but the ability to *maintain* market share" while taking action that would (in the absence of market power) result in a loss of share. *United States v. Syufy Enters.*, 903 F.2d 659, 665-66 (9th Cir. 1990). Reynolds's small and declining market share shows that it lacks market power as a matter of law. To the extent Authenticom argues that RCI pricing is "direct" proof of market power, Dr. Israel's "price" analysis is fatally flawed as explained in Defendants' *Daubert* motion. *See* Dkt. 878 at 16-19; *AutoLoop* SJ Br. § I.B.2.

### 2. "Data Integration Services" Is Not A Proper Relevant Market.

Authenticom's exclusive-dealing claim is premised on harm in what it calls the "data integration services" market. But that is not a "market" at all, and failure to properly define an antitrust market is grounds for summary judgment. *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 318 (7th Cir. 2006); *DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1339–40 (Fed. Cir. 2014); *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1200-03 (N.D. Cal. 2008).

Product markets "are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Reifert*, 450 F.3d at 318. That is, products and services are in the same market if they are "good substitutes for one another." *Id.*; *see also* Ex. 72, Israel Rpt. ¶ 32 (similar for hypothetical monopolist test). Authenticom defines the DIS market to include only data integration services through "automated access" to a DMS. Ex. 72, Israel Rpt. ¶¶ 49-52; Ex. 73, Israel Reply ¶ 69. As Defendants explain in the Israel *Daubert*

brief, however, this market definition fails as a matter of law. *See* Dkt. 878 at 22-24.

First, the alleged "DIS Market" improperly excludes substitutable products. The proposed market is limited to automated data extraction services and improperly excludes substitutable data-access methods that do not require third parties to access the DMS directly. This leaves out, for example, built-in DMS functionality like Reynolds's Dynamic Reporting, which allows dealerships to export DMS data and transmit it to third parties. JSUF 5, 9, 38-39. As Authenticom witnesses concede, ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████.

Second, the alleged "DIS market" improperly includes services that are *not* reasonable substitutes for basic data extraction. Many third-party applications require the ability to write back (or edit) data in the DMS in real or near-real time. JSUF 8, 25, 32. Some apps also rely on "triggers" (logic or functionality built-in to the DMS) to propagate or respond to these data inputs in real-time. JSUF 8. For instance, a service app may update a service request as the customer sits in the service center at the dealership, then notify the sales team that a past customer is there, facilitating a sales opportunity. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████ Because Authenticom's unilateral claims are based on a DIS market

that is both over- and under-inclusive, those claims fail as a matter of law. *Reifert*, 450 F.3d at 318.

### 3. RCI Contracts Are Not Exclusive And Are Easily Terminable.

As to Reynolds, Authenticom's exclusive dealing claim also fails because Reynolds's vendor contracts are not exclusive. "An exclusive dealing contract obliges a firm to obtain its inputs from a single source." *Paddock Publ'ns, Inc. v. Chi. Tribune Co.*, 103 F.3d 42, 46 (7th Cir. 1996). R███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ Thus, RCI contracts are undisputedly not exclusive. And even if they were, they are mutually terminable at will on short notice, typically 180 days or less. JSUF 10. Such contracts are "presumptively lawful" because they cannot meaningfully foreclose competition. *Roland Mach Co. v. Dressler Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984); *see also Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163–64 (9th Cir. 1997) (collecting cases).

### 4. Authenticom Offers No Evidence Of Substantial Foreclosure.

Finally, Authenticom's exclusive-dealing claims fail because Authenticom offers no evidence that the challenged contractual provisions "foreclose competition in a substantial share of the line of commerce at issue." *Republic Tobacco v. N. Atl. Trading Co.*, 381 F.3d 717, 737-38 (7th Cir. 2004). To show substantial foreclosure, Authenticom must offer evidence that an exclusive arrangement "is likely to keep at least one significant competitor of the defendant from doing business in a relevant market" and "that the probable (not certain) effect of the exclusion will be to raise prices above (and therefore reduce output below) the competitive level." *Roland Mach.*, 749 F.2d at 394. Yet Dr. Israel does not analyze the exclusive dealing provisions in any

meaningful way. He mentions exclusive dealing provisions in a single paragraph of his opening report, noting that they were essentially redundant in light of Defendants' decisions to "become blocked systems." Ex. 72, Israel Rpt. ¶ 159. His reply report is even less substantive, mentioning exclusive dealing only in a footnote in defining "blocking." Ex. 73, Israel Reply 2 n.3.

Dr. Israel identifies no evidence that the alleged exclusive-dealing provisions caused substantial foreclosure. His opening report does not claim that exclusive dealing provisions *alone* harmed competition. Ex. 72, Israel Rpt. ¶ 206. And he does not claim or provide evidence to suggest that CDK or Reynolds could not have secured their DMSs absent these contractual provisions with vendors. Without such evidence, any exclusive dealing claim fails. *See Premier Comp Soln's LLC v. UPMC*, 377 F. Supp. 3d 506, 532-33 (W.D. Pa. 2019) (granting summary judgment where plaintiff's expert "did not opine that Premier was substantially foreclosed from any market"); *El Aguila Food Prods., Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, 621 (S.D. Tex. 2003) (rejecting exclusive-dealing theory where "the evidence fails to establish that [the defendant's agreements] are the reason that some of the plaintiffs are suffering loss of shelf space with retailers"); *Pitchford v. PEPI, Inc.*, 531 F.2d 92, 100 (3d Cir. 1975) (rejecting claim where plaintiff "could not cite any examples of sales that were missed because of exclusive dealing practices by PEPI during the damage period").

As shown above, moreover, Authenticom's alleged exclusion from the "DIS market" was not the product of exclusive dealing provisions. Rather, Authenticom's ability to service its customers was hampered by CDK's and Reynolds's unilateral decisions to disrupt Authenticom's unauthorized access. *See* § III.B *supra*. Again, because there is no evidence that the exclusive-dealing provisions foreclosed Authenticom or anyone else from a relevant market, the exclusive dealing claim fails. *See Bob Maxfield, Inc. v. Am. Motors Corp.*, 637 F.2d 1033, 1036 (5th Cir.

1981) ("mere existence of an exclusive dealing clause" not actionable); *Laurence J. Gordon, Inc. v. Brandt, Inc.*, 554 F. Supp. 1144, 1154–55 (W.D. Wash. 1983) (plaintiff failed to establish antitrust violation due to "absence of proof" that provisions impacted "competitive conditions").

## B. Authenticom's Section 2 Monopolization Claims Fail.

A monopolization claim requires evidence of (1) monopoly power in a relevant market; and (2) willful acquisition or maintenance of that power by anticompetitive means. *Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011). It is undisputed that "[n]either Reynolds nor CDK is a monopolist" in the DMS market. *Authenticom*, 874 F.3d at 1025; *see also* Dkt. 176 at 44; *Arista Records LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 580 (S.D.N.Y. 2007) ("allegations of a 'shared monopoly' do not state a claim under section 2"). Rather, Authenticom contends that Reynolds and CDK have monopoly power in two separate brand-specific aftermarkets for data integration services. Compl. ¶ 271.

Claims based on single-brand markets—like the so-called "DIS" market on the CDK DMS or Reynolds DMS—are rarely appropriate. *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010). In *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 468-77 (1992), the Supreme Court explained that such claims are cognizable only if the information and switching costs in the primary market (here, the DMS market) are high enough to allow significant exploitation in the aftermarket through a "lock-in" effect. But a plaintiff bears a "substantial burden" to overcome the presumption that primary-market competition precludes the exercise of aftermarket power. *Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*, 184 F. Supp. 2d 947, 955 (D. Ariz. 2001), *aff'd*, 52 F. App'x 897 (9th Cir. 2002). At the motion-to-dismiss stage, the Court held that "[t]he proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers," and warned Authenticom that it "must produce hard evidence dissociating the competitive situation in the aftermarket from

activities occurring in the primary market." Dkt. 176 at 49. Despite this warning, Authenticom has

not produced any "hard evidence," much less carried its high summary judgment burden.[14]

Although Authenticom has only ever pleaded or argued a *Kodak* theory before this Court, its expert

rejects a *Kodak* theory in favor of a brand-new "monopoly leveraging" theory. Both theories fail.

### 1. Authenticom's Expert Rejects A *Kodak* Theory.



A plaintiff bringing a *Kodak* claim must

show (1) a change in aftermarket policy or other high "information costs" preventing customers

from making interbrand comparisons, and (2) prohibitive switching costs in the primary market.

*CDS*, 262 F. Supp. 2d at 67; *Universal Avionics*, 184 F. Supp. 3d at 955. The record shows neither.

---

[14] Authenticom's Section 2 claims fail for a number of additional reasons discussed above. Authenticom cannot establish monopoly power in a relevant market because the supposedly monopolized market for "data integration services" is deficient as a matter of law. *See* § IV.A.2 *supra*. Authenticom cannot establish that Defendants acquired or maintained monopoly power through anticompetitive means because the conduct it challenges is not anticompetitive. *See* §§ I, II, IV.A *supra*. Finally, Authenticom cannot show antitrust injury. *See* § III *supra*.

PUBLIC VERSION

## 2.    There Is No Evidence Of Substantial Information Costs.

### a.    Clear Contract Terms

Reynolds "has always forbidden" hostile integration "in its system licenses." *Authenticom*, 874 F.3d at 1022. As the record shows, Reynolds's contractual restrictions and policies regarding third-party access were well known since at least 2007. JSUF 65-66, 81-83; RSUF 11. The fact that Reynolds never changed its aftermarket policy requires dismissal of the aftermarket claim as to Reynolds. *Digital Equip.*, 73 F.3d at 763 (granting summary judgment where plaintiff had not "supplied [any] evidence" of a "change in policy" enabling the defendant to extract supra-competitive prices).[15] CDK too has consistently prohibited automated access to its DMS in its dealer contracts. JSUF 67-68. Whether or not CDK actively enforced these provisions against dealers before 2015, dealers were on notice that CDK's contracts prohibited this form of access.

████████████████████████████████████████████████████████████

███████████████████████████████ *See Universal Avionics*, 184 F. Supp. 3d at 959 (no *Kodak* claim where evidence is that customers "can and do" protect themselves contractually).

In short, the record shows that dealers were capable of "protect[ing] themselves by judicious interbrand comparisons or by contract" before licensing Defendants' DMSs. *Universal Avionics*, 184 F. Supp. 2d at 955. This defeats any *Kodak* claim, because dealers who did not like these terms were free to shop elsewhere or try to negotiate concessions. *See Queen City Pizza, Inc.*

---

[15] At the motion to dismiss stage, Judge St. Eve stated that the Reynolds aftermarket claim could proceed even without a midstream policy change because the possibility of "market imperfections" meant dealers might be unable to estimate lifecycle price. Dkt. 176 at 49. That is contrary to *Digital Equipment* and many other cases recognizing that *Kodak* claims are "limited to situations in which the seller's policy was not generally known." *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 819 (6th Cir. 1997) (citing *Digital Equipment*); *see, e.g., Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 783 & n.29 (5th Cir. 1999); *Lee v. Life Ins. Co. of N. Am.*, 23 F.3d 14, 20 (1st Cir. 1994). In any event, Authenticom's economists have not identified any market imperfections with respect to the Reynolds DMS. And Reynolds's publicly stated policy against hostile integration is dispositive evidence that dealers did not face information barriers, particularly because, as explained below, dealers could estimate lifecycle prices.

PUBLIC VERSION

*v. Domino's Pizza, Inc.*, 124 F.3d 430, 440 (3rd Cir. 1997).

*Blizzard Entertainment, Inc. v. Ceiling Fan Software LLC* is directly on point. 941 F. Supp. 2d 1227 (C.D. Cal. 2013). There, a computer game provider's software license prohibited players from using unauthorized third-party software or hardware in conjunction with the game. *Id*. at 1229. The defendant, who sold unauthorized "bot" software, brought a counterclaim alleging that Blizzard had unlawfully monopolized the market for "leveling up" characters by disabling the defendant's software. *Id.* at 1230 (setting out allegations materially similar to Authenticom's theory). The court rejected this theory, holding that "any market power Blizzard has over the [alleged] aftermarket is the result of restrictive contractual provisions" in its license agreement and was therefore not "cognizable" as a source of competitive harm. *Id*. at 1232. As here, Blizzard's steps to disable the defendant's unauthorized software "amount[ed] to no more than policing the restrictions to which the purchasers agreed upfront." *Id*. at 1237 n.8.

### b.     Ability to Lifecycle Price

Even apart from the contractual restrictions, a *Kodak* claim is not viable here because dealers were able to evaluate the likely lifecycle costs of a DMS. Dealers are sophisticated shoppers who enter into commercial contracts regularly. ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

These market forces made lifecycle pricing possible for many dealers, particularly on the Reynolds DMS, whose policy against hostile integration and higher integration prices were well

known. The dealers were also able to gauge the potential for price increases as to CDK. "In assessing the issue of information deficits between the foremarket and the aftermarket, perfect information about the aftermarket is not required." *Universal Avionics*, 184 F. Supp. 2d at 956. So long as "many buyers know the risks of dealing initially with the defendant rather than with his rivals," buyers can adjust prices by some "rough quality" even if they "cannot perfectly calculate life-cycle payments," thus exerting discipline on aftermarket policies. Areeda & Hovenkamp ¶ 1740d3. ████████████████████████████████████████████████████

████████████████████████████████████████████. JSUF 149.

### 3. There Is Undisputed Evidence Of Substantial DMS Switching.

In addition to information costs, a *Kodak* claim requires evidence that a substantial number of buyers face switching costs "significant enough to constitute a lock in" in the primary market. *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 515 (3d Cir. 1998). The record demonstrates that DMS switching costs are not significant enough to create aftermarket lock-in. To the contrary, dealers can and do switch DMS providers in substantial numbers.

Reynolds's experience shows this most directly. ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████ This level of competition in the primary market is incompatible with aftermarket treatment. *SMS Sys. Maint. Services, Inc. v. Digital Equip. Corp.*,

**PUBLIC VERSION**

188 F.3d 11, 17 (1st Cir. 1999) (aftermarket is relevant only if evidence shows "that the manufacturer can exert raw power in the aftermarket without regard for commercial consequences in the foremarket"); *cf. Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786, 792 (2d Cir. 1987) (judgment as matter of law on attempted monopolization claim where, despite "disputed" barriers-to-entry issue, one new competitor entered and three competitors expanded).

███████████████████████████████████████████████████

███████████ The fact that "existing . . . customers would need to spend money to migrate to another computing system" is not enough to establish lock-in. *CDS*, 262 F. Supp. 2d at 69. That is especially so where providers offer significant discounts and training and installation support, in effect "internalizing much of the switching costs." *SMS* 188 F.3d at 22-23 (granting summary judgment). The record shows DMS providers offered dealers similar assistance here. JSUF 175.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████ This evidence of "actual behavior" of switching is fatal to any *Kodak* claim. *SMS*, 188 F.3d at 23.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████ *Cf.*

*CDS*, 262 F. Supp. 2d at 72 ("It is not rational to assume that every single person who ever bought [the defendant's product] would prefer to switch to another vendor.").

      **4.**     **Dr. Israel's Untimely "Monopoly Leveraging" Theory Cannot Support A Section 2 Claim.**

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████ If that is now Authenticom's Section 2 monopolization theory, there are three insurmountable obstacles to this argument.

      First, Authenticom did not plead a stand-alone monopoly-leveraging claim or raise monopoly leveraging in response to Defendants' motion to dismiss. ████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████ *Cf. Midco Int'l, Inc. v. Metro. Life Ins. Co.*, 2017 WL 2868949, at *4 n.3 (N.D. Ill. July 5, 2017) (a "new theory" of liability "raised for the first time in response to the motion for summary judgment" that "was not plaintiff's theory at the motion-to-dismiss stage" is waived); *Sloan Valve Co. v. Zurn Indus., Inc.*, 2013 WL 3147349, at *1 (N.D. Ill. June 19, 2013)

("The reply report is not the appropriate vehicle for presenting new opinions.").

Second, the critical question in a monopoly leveraging case is whether the defendant "enjoys a *monopoly*" in the leveraged market. *Schor v. Abbot Labs.*, 457 F.3d 608, 611 (7th Cir. 2006) (emphasis added). Neither CDK nor Reynolds is a monopolist in the DMS market. *Authenticom*, 874 F.3d at 1025; *see also* § IV.A.1 *supra* (Reynolds does not have market power).

Third, there is no freestanding "monopoly leveraging" claim. *Trinko*, 540 U.S. at 540 n.4; *Schor*, 457 F.3d at 611-13. Authenticom has failed to identify any anticompetitive conduct that would allow CDK or Reynolds to leverage DMS market power into the supposed DIS market. *See* §§ II, IV.A *supra*; *see also* Dkt. 176 at 36, 43 (dismissing Authenticom's claims based on Defendants' DMS license agreements). "Where, as here, the only possible candidate for anticompetitive conduct" are claims that fail in their own right, "denominating one's claim as sounding in 'monopoly leveraging' won't do anything to save it." *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1222 (10th Cir. 2009) (Gorsuch, J.).

## V.     Authenticom's State Law Tortious Interference Claim Fails.

Authenticom contends that CDK and Reynolds tortiously interfered with its contracts with customers, causing dealers and vendors to leave Authenticom and join RCI and 3PA. Compl. ¶¶ 277-286. Wisconsin courts "have adopted the Restatement (Second) of Torts on tortious interference with contracts." *Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.*, 898 F.2d 512, 516 (7th Cir. 1990). The same is true of many other jurisdictions cited in this section.

### A.     Performance Of Authenticom's Contracts Was Illegal.

A plaintiff cannot succeed on a tortious interference claim by arguing that the defendant prevented the plaintiff from performing a contract with a third party in an illegal manner. *Behnke v. Hertz Corp.*, 235 N.W.2d 690, 692-94 (Wis. 1975). As this Court has recognized, accessing a DMS without authorization from the DMS provider is illegal under federal law. Dkt. 506 at 15.

This section will not repeat the earlier discussion, other than to note that the record shows that Authenticom's access to the Reynolds DMS has *always* been unauthorized, and that its access to the CDK DMS has been unauthorized since at least August 2014. JSUF 65-67, 70; RSUF 49-56.

Because Authenticom's efforts to access CDK's and Reynolds's DMSs against their wishes were contrary to federal law, CDK and Reynolds did not act improperly by disrupting Authenticom's connections to further their respective positions on hostile access. *See* Restatement (Second) of Torts § 774 ("One who by appropriate means causes the nonperformance of an illegal agreement or an agreement having a purpose or effect in violation of an established public policy is not liable."); *Stamatiou v. U.S. Gypsum Co.*, 400 F. Supp. 431, 435 (N.D. Ill. 1975) (granting summary judgment where "alleged contract was an agreement in violation of the Illinois theft statute"). To hold otherwise would use state tort law to override the federal policy permitting owners to control who can and cannot access their computer systems.

It is no answer that CDK at one point tolerated hostile access. As the Court has held, the CFAA's prohibition on accessing a computer "without authorization" applies where a system owner revokes express or implied permission. Dkt. 506 at 15. Nor does it matter whether CDK's contracts purportedly authorized dealers to use Authenticom. Even assuming that that reading of the contracts were correct (and it is not)—as discussed, this Court has rejected the argument that language in *dealer* contracts prevents a DMS provider from telling third parties that they are not authorized to access the DMS. *See id.*; *see* p. 62 n.11 *supra*. That Authenticom's business model depended on CDK choosing to allow access to their proprietary systems does not mean that CDK's choice to revoke that access is tortious. *See W.G. Samuels v. Milliken & Co.*, 1989 WL 94837, at *4 (D. Kan. 1989) (granting summary judgment where the defendant "was at liberty to terminate" its dealership arrangement with the plaintiff "at any time").

## B. The Competition Privilege Defeats Authenticom's Claim.

CDK's and Reynolds's conduct was independently justified under the competition privilege. The Restatement recognizes that "[o]ne's privilege to engage in business and to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors." Restatement § 768 cmt. b. In short, "[c]ompetition is not a tort." *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 865 (7th Cir. 1999). The competition privilege applies where (1) the relation concerns a matter involved in the competition between the actor and the competitor; (2) the actor does not employ improper means; (3) the actor does not intend thereby to create or continue an illegal restraint of competition; and (4) the actor's purpose is at least in part to advance his interest in his competition with the other. *Metso Minerals Indus., Inc. v. FLSmidth-Excel LLC*, 2010 WL 55845, at *3-4 (E.D. Wis. Jan. 5, 2010). Parties do not need to compete in the same market for the privilege to apply. Restatement § 768 cmt. c.

As to the first element, Authenticom alleges that the conduct at issue concerns a matter on which Defendants and Authenticom compete: DMS data access. Compl. ¶¶ 4, 20-21. As to the second and third elements, Authenticom cannot defeat summary judgment by contending that Defendants acted pursuant to a conspiracy to restrain competition. *See* Compl. ¶ 285. As explained in Part II *supra*, there is no evidence from which a jury could conclude that CDK and Reynolds colluded to "block" Authenticom. And aside from Authenticom's failed conspiracy theory, there was nothing "improper" about Defendants' conduct. Wrongful means of competition include things like "physical violence, fraud, civil suits and criminal prosecutions." *Metso*, 2010 WL 55845, at *4. Authenticom alleges nothing of the sort here, and a tortious inference claim will not

lie based on "mere refusal to deal." Restatement § 766 cmt. b.[16] Finally, as to the fourth element,

Authenticom alleges that Defendants deployed security enhancements to encourage switching to

their own certified integration programs. Compl. ¶¶ 282-83. Taken as true, that would simply mean

that CDK and Reynolds acted at least in part to advance their legitimate competitive interests. *See*

*Hackman v. Dickerson Realtors, Inc.*, 746 F. Supp. 2d 962, 972–73 (N.D. Ill. 2010).

### C. There Is No Evidence Of A Causal Connection To Damages.

Authenticom's tortious interference claim also fails because Authenticom shows no

"causal connection" between CDK's and Reynolds's alleged tortious interference with contract

and its claimed damages, as required. Dkt. 176 at 51. Ms. Lawton, Authenticom's damages expert,

presents no damages evidence specific to Authenticom's tortious interference claim. █████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████ But Authenticom's claim for tortious interference is

based only on Authenticom's "existing contracts with dealers and vendors." Compl. ¶ 278. The

damages for that claim cannot encompass lost profits from prospective contracts that Authenticom

supposedly would have executed in the future but had not at the time of the alleged "interference."

*See Wallingford Shopping, L.L.C. v. Lowe's Home Centers, Inc.*, 2001 WL 96373, at *15

(S.D.N.Y. Feb. 5, 2001) ("Economic damages resulting from an existing contract falls within a

---

[16] *See, e.g.*, *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825, 834 (9th Cir. 2001) (finding "nothing wrongful" about "a simple refusal to deal"); *Butler Corp. v. Gen. Motors Acceptance Corp.*, 2002 WL 31926852, at *5 (D. Mass. Dec. 27, 2002) ("refusal to do business does not constitute an actionable unfair trade practice, absent monopolistic purpose or concerted effort to hinder trade"); *Griffiths v. Blue Cross & Blue Shield of Ala.*, 147 F. Supp. 2d 1203, 1222 (N.D. Ala. 2001) ("[e]ven a wholesale refusal to deal does not constitute tortious interference"); *Circo v. Spanish Gardens Food Mfg. Co.*, 643 F. Supp. 51, 57 (W.D. Mo. 1985) ("mere unilateral refusal to deal . . . , which violates neither the anti-trust laws . . . nor otherwise amounts to an independent wrong, is simply not actionable as a tortious interference . . . , no matter what the defendant's motive, purpose or intent may have been").

tortious interference with contract claim, while a claim for tortious interference with prospective economic advantage redresses damages suffered as a result of the plaintiff's inability to enter into putative, future contracts."). Ms. Lawton does not distinguish between extant contracts customers terminated because of the alleged interference and those Authenticom might have entered later.[17]

## VI.    Authenticom's Damages Claims Fail For Multiple Additional Reasons.

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

Antitrust damages cannot be based "on speculation or guesswork" and must be "directly attributable" to "unlawful competition" as opposed to lawful competition or other market factors. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946); *see also MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1162-63 (7th Cir. 1983). The Seventh Circuit does "not allow antitrust plaintiffs or any other plaintiffs to obtain damage awards without proving what compensable damages were actually suffered as a result of the defendant's unlawful conduct." *Isaksen v. Vt. Castings, Inc.*, 825 F.2d 1158, 1165 (7th Cir. 1987).

Authenticom's evidence of damages does not pass this test. To begin, Authenticom offers a single damages model that purports to apply to all of Authenticom's claims: two separate conspiracy theories, unilateral monopolization claims against each Defendant, unilateral exclusive dealing claims against each Defendant, and tortious interference. Ms. Lawton admits she does not

---

[17] Allegations that CDK and Reynolds "spread[] false and disparaging information about Authenticom's security practices and protocol" (Compl. ¶ 280) cannot save Authenticom's claim. Authenticom identifies no disparaging communications, much less shows that such statements were false. As explained above, Authenticom also fails to show how any of these statements correspond to damages, *i.e.*, what specific contracts dealers terminated because of something "false" CDK or Reynolds said. *See McDaniel v. Loyola Univ. Med. Ctr.*, 2019 WL 1281969, at *23 (N.D. Ill. Mar. 20, 2019) (Dow, J.) (granting summary judgment where there was "no evidence that Plaintiff suffered any damages as a result of any [alleged] statements").

distinguish between theories of liability. Ex. 330, Lawton Tr. 206-08, 211-14. ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ The Seventh

Circuit is skeptical of damages analyses that assume "that the alleged violations were redundant;

like the assassins of Rasputin, who drowned him after poisoning and shooting him in order to make

sure he was really dead." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d

588, 593 (7th Cir. 1998); *see also Children's Broadcasting Corp. v. Walt Disney Co.*, 245 F.3d

1008, 1018 (8th Cir. 2001) (same). No reasonable jury could rely on Ms. Lawton's analysis, for

she combines harm from lawful causes (*e.g.*, Defendants' unchallenged dealer contracts) with

injury from all of Authenticom's pending claims, with no way to segregate damages "actually

suffered as a result of" whatever the jury may ultimately find unlawful. *Isaksen*, 825 F.2d at 1165.

Even if Ms. Lawton's analyses were tied to a particular theory of liability, her analysis—

based on a "yardstick" assuming that Authenticom's CDK- and Reynolds-related business would

have performed as well in the but-for world as Authenticom's non-CDK/Reynolds business did in

the real world—fails as a matter of law. As discussed in Defendants' *Daubert* motion, which

Defendants incorporate by reference here, Ms. Lawton's conclusion that Authenticom suffered

████████████ in damages is little more than a "magic trick," *Isaksen*, 825 F.2d at 1165.



*See* Dkt. 880 at 7-16. In addition, Ms. Lawton's model, which relies on Dr. Israel's liability

opinions, does not account for Dr. Israel's opinions on Defendants' unilateral power, which imply that CDK and Reynolds had the ability to raise "DIS" prices or disrupt access by Authenticom and other hostile integrators even absent a conspiracy. *See id.* at 20-23; *see also* pp. 21-22 *supra* (Dr. Israel's opinions). For the reasons explained in CDK's motion for summary judgment in the *AutoLoop* case, these opinions show that no reasonable jury could rely on Ms. Lawton's model to award damages in this case. *See AutoLoop* SJ Br. § I.A. A plaintiff that does not provide evidence of a reasonable connection between the allegedly unlawful practice and claimed damages is not entitled to a trial on that issue. *Marshfield Clinic*, 152 F.3d at 593-94; *Isaksen*, 825 F.2d at 1165; *Magnetar Tech. Corp. v. Intamin Ltd.*, 801 F.3d 1150, 1159-60 (9th Cir. 2015).

## CONCLUSION

The Court should award summary judgment to Defendants on all claims.

**PUBLIC VERSION**

Dated: May 20, 2020

Respectfully submitted,

/s/ *Aundrea K. Gulley*
Aundrea K. Gulley
Brian T. Ross
Brice A. Wilkinson
Ross M. MacDonald
GIBBS & BRUNS LLP
1100 Louisiana Street
Suite 5300
Houston, TX 77002
(713) 751-5258
agulley@gibbsbruns.com
bross@gibbsbruns.com
bwilkinson@gibbsbruns.com
rmacdonald@gibbsbruns.com

Michael P.A. Cohen
Leo D. Caseria
SHEPPARD MULLIN RICHTER & HAMPTON, LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, DC 20006
(202) 747-1900
mcohen@sheppardmullin.com
lcaseria@sheppardmullin.com

*Counsel for Defendant*
*The Reynolds and Reynolds Company*

/s/ *Britt M. Miller*
Britt M. Miller
Michael A. Scodro
Daniel T. Fenske
Matthew D. Provance
Jed W. Glickstein
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mscodro@mayerbrown.com
dfenske@mayerbrown.com
mprovance@mayerbrown.com
jglickstein@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant*
*CDK Global, LLC*

**PUBLIC VERSION**

## <u>CERTIFICATE OF SERVICE</u>

I, Britt M. Miller, an attorney, hereby certify that on May 20, 2020, I caused a true and correct copy of the foregoing **DEFENDANTS CDK GLOBAL, LLC'S AND THE REYNOLDS AND REYNOLDS COMPANY'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/ Britt M. Miller*
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
