**PUBLIC VERSION**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This document relates to:* | Hon. Robert M. Dow, Jr. |
| *Loop, LLC, d/b/a AutoLoop v. CDK Global, LLC*, Case No. 18-cv-2521 (N.D. Ill.) | Magistrate Judge Jeffrey T. Gilbert |

## MEMORANDUM IN SUPPORT OF DEFENDANT CDK GLOBAL, LLC'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................... 1

BACKGROUND ........................................................................................................ 2

ARGUMENT .............................................................................................................. 5

   I.   CDK Is Entitled To Summary Judgment On AutoLoop's Damages Claims In
      Whole Or In Part. ............................................................................................... 5

     A.   AutoLoop Ignores CDK's And Reynolds's Unilateral Ability To Raise
         Prices. ........................................................................................................ 5

        1. An Overcharge Model Must Account For Lawful Price Increases In The
           But-For World. ..................................................................................... 5

        2. AutoLoop's Model Does Not Address The Many Reasons To Increase
           Prices In The But-For World. ............................................................... 6

        3. AutoLoop's Model Does Not Account For Dr. Israel's Opinion That
           Defendants Had Significant Unilateral Power. .................................... 7

        4. Dr. Israel's Defense Of His Model Confirms That No Rational Jury Could
           Rely Upon It To Award Damages. ...................................................... 10

     B.   AutoLoop Inflates Its Damages Request In At Least Three Ways. ....................... 12

        1. AutoLoop Cannot Recover Damages For Cox Automotive Or Its
           Subsidiaries. ....................................................................................... 12

        2. AutoLoop Does Not Measure Reynolds's Prices. ............................... 13

        3. AutoLoop Cannot Recover "Forced Switching" Damages. ............... 14

           a. Overview of "Forced Switching" Methodology ........................... 14

           b. CDK Is Entitled to Summary Judgment For "Forced Switching"
              Damages. ....................................................................................... 15

  II.  AutoLoop Cannot Establish Liability, As Explained In The *Authenticom* Brief. ....... 16

CONCLUSION .......................................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Bearing Co., Inc. v. Litton Indus., Inc.*,
    540 F. Supp. 1163 (E.D. Pa. 1982) ..................................................................6

*Amerinet Inc. v. Xerox Corp.*,
    972 F.2d 1483 (8th Cir. 1992) ......................................................................12

*Authenticom, Inc. v. CDK Global, LLC*,
    874 F. 3d 1019 (7th Cir. 2017) ......................................................... *passim*

*Bigelow v. RTO Radio Pictures, Inc.*,
    327 U.S. 251 (1946) ............................................................................11, 16

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    152 F.3d 588 (7th Cir. 1998) ............................................................ *passim*

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    186 F.3d 781 (7th Cir. 1999) .........................................................................9

*Golden v. Barenborg*,
    53 F.3d 866 (7th Cir. 1995) ........................................................................13

*In re Graphics Processing Units Antitrust Litig.*,
    253 F.R.D. 478 (N.D. Cal. 2008) ...............................................................13

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*,
    221 F. Supp. 3d 1033 (N.D. Ind. 2016) .......................................................6

*Magnetar Tech. Corp. v. Intamin Ltd.*,
    801 F.3d 1150 (9th Cir. 2015) ....................................................................12

*MCI Commc'ns v. Am. Tel. & Tel. Co.*,
    708 F.2d 1081 (7th Cir. 1983) ......................................................................6

*Murphy Tugboat Co. v. Crowley*,
    658 F.2d 1256 (9th Cir. 1981) ......................................................................6

*Nemaizer v. Baker*,
    793 F.2d 58 (2d Cir. 1986) .........................................................................13

*Procaps S.A. v. Patheon, Inc.*,
    845 F.3d 1072 (11th Cir. 2016) ..................................................................17

*QSGI, Inc. v. IBM Glob. Fin.*,
 2012 WL 1150402 (S.D. Fla. Mar. 14, 2012) ..........................................................................18

*Reed v. Advocate Health Care*,
 268 F.R.D. 573 (N.D. Ill. 2009) ...........................................................................................13

*S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*,
 556 F. Supp. 825 (D.D.C. 1982), *as amended* (Jan. 10, 1983), *aff'd*, 740 F.2d
 980 (D.C. Cir. 1984) ............................................................................................................12

*Schiller & Schmidt, Inc. v. Nordisco*,
 969 F.2d 410 (7th Cir. 1992) ..................................................................................................9

*In re Steel Antitrust Litig.*,
 2015 WL 5304629 (N.D. Ill. Sept. 9, 2015) ...................................................................11, 16

**Other Authorities**

ABA Antitrust Section, *Proving Antitrust Damages: Legal & Economic Issues*
 (3d ed. 2017) ...............................................................................................................2, 6, 11

PUBLIC VERSION

## INTRODUCTION

Loop LLC (d/b/a AutoLoop) sells software to automotive dealerships. It has sued CDK Global, LLC ("CDK") for allegedly conspiring with The Reynolds & Reynolds Co. ("Reynolds") over the "openness" of their respective dealer management systems ("DMSs"), thereby raising AutoLoop's costs to obtain DMS data. This is the same conspiracy theory advanced by Authenticom in its lawsuit. The same counsel represents the two plaintiffs, and the same liability expert, Dr. Mark Israel, is offered in each case. One notable difference, however, is that Reynolds, which entered into mandatory arbitration agreements with vendors, is not a defendant in the AutoLoop case. Another is that Dr. Israel is AutoLoop's (but not Authenticom's) damages expert.[1]

AutoLoop seeks to represent a class of software vendors. It asks for up to ▮▮▮▮▮▮▮ in pre-trebled class damages, largely arising from alleged vendor overpayments for access to the CDK and Reynolds certified integration programs. AutoLoop alleges that CDK conspired with Reynolds and is therefore jointly and severally liable for both its own "overcharges" and for Reynolds's. AutoLoop also seeks class damages on *unilateral* (non-conspiratorial) exclusive dealing and monopolization claims, although it calculates identical CDK and Reynolds damages under its conspiracy and non-conspiracy theories. (Presumably, AutoLoop is not seeking joint and several damages on its unilateral theories.)

CDK is entitled to summary judgment because AutoLoop's damages model is fundamentally flawed. First, CDK is entitled to summary judgment on AutoLoop's damages claim as a whole because Dr. Israel calculated damages by treating all material price increases that vendors paid CDK and Reynolds after September 2013 as "damages," without addressing whether

---

[1] In this brief, "JSUF" refers to Defendants' Joint Statement of Common Undisputed Material Facts in Support of Their Motions for Summary Judgment, filed concurrently. "Ex. __" refers to the exhibits to the Declaration of Daniel T. Fenske, filed concurrently.

**PUBLIC VERSION**

and by what amount CDK and Reynolds would have increased prices over those six years in the absence of the purported conspiracy or other alleged unlawful conduct. Remarkably, Dr. Israel's methods yield exactly the same damages amount for AutoLoop's unilateral claims as they do for AutoLoop's conspiracy claims, meaning *unilateral* conduct alone apparently accounts for all of the price increases underlying the alleged conspiracy damages. And, as explained below, Dr. Israel ignored the possibility that both CDK and Reynolds had the power to unilaterally *and lawfully* raise prices even without the challenged conduct. This approach violates established, "fundamental" requirements for an antitrust damages model, which must hypothesize a "but-for" world in which "the antitrust violation did not occur" but "every other feature of the actual world" is held "constant." ABA Antitrust Section, *Proving Antitrust Damages: Legal & Economic Issues* 89 (3d ed. 2017) ("*Proving Antitrust Damages*"). This is the only way to estimate what the plaintiff "would have paid had it not been for the conspiracy." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998). *See* § I.A *infra*.

Second, AutoLoop drastically overstates its damages calculation contrary to the undisputed record by (1) including over ████████ in damages attributable to software vendor Cox, which settled and voluntarily dismissed (with prejudice) substantially similar claims against CDK, § I.B.1 *infra*, (2) failing to measure Reynolds's price increases properly, § I.B.2 *infra*, and (3) adding $22 million in "forced switching" damages without a rational basis, § I.B.3 *infra*.

Finally, AutoLoop cannot establish liability on any of its claims for the reasons explained below and in the *Authenticom* brief, which CDK incorporates by reference. *See* § II *infra.*

## BACKGROUND

AutoLoop's Amended Complaint alleges that in 2015 CDK and Reynolds "conspired to eliminate competition for providing integration with dealer data" by supposedly "collud[ing] to

block third-party access to their DMSs"—"eliminating competition to their respective 3PA and RCI data access programs"—and "thereby forcing third-party solution providers (like AutoLoop) to use CDK and Reynolds for data integration services." Dkt. 191 ("Am. Compl.") ¶¶ 2, 17-18. AutoLoop asserts five claims: horizontal conspiracy under Section 1 of the Sherman Act (Count I); exclusive dealing under Section 1 (Count II); monopolization of CDK's alleged data integration services aftermarket under Section 2 (Count III); and parallel Florida law claims (Counts IV-V).

In January 2019, the Court denied CDK's motion to dismiss. Dkt. 504. The Court held that AutoLoop had adequately alleged (1) a horizontal conspiracy and (2) that CDK's vendor contracts contain unlawful exclusive dealing provisions sufficient to support each of Authenticom's claims. *See generally id.*[2] The Court also held that "to the extent Plaintiff seeks to bring a Section 2 claim based on any purported refusal to deal, Plaintiff's Section 2 claim fails." Dkt. 504 at 28.

In addition to offering liability opinions, challenged in Defendants' pending *Daubert* motion, *see* Dkt. 878, Dr. Israel provided a damages opinion for the putative vendor class.



To

---

[2] AutoLoop alleged in support of its Section 1 exclusive dealing claim that "[b]ecause CDK imposed these exclusive dealing provisions pursuant to its conspiracy with Reynolds to eliminate competition, they are *per se* illegal." Am. Compl. ¶ 186. But at the motion to dismiss stage AutoLoop abandoned any claim that the so-called exclusive dealing provisions were the result of a conspiracy. Specifically, AutoLoop argued in response to CDK's motion to dismiss that its exclusive dealing claim rested on "the same allegations" as the exclusive dealing claim brought by Authenticom (also represented by AutoLoop's counsel) and survived for the reasons stated in Judge St. Eve's *Authenticom* opinion. Dkt. 360 at 19 (citing Dkt. 176 at 35-39). As Judge St. Eve noted, however, Authenticom's exclusive dealing claims were entirely "vertical in nature." Dkt. 176 at 14 n.5. By adopting these allegations and Judge St. Eve's reasoning wholesale, AutoLoop necessarily forfeited any claim that CDK and Reynolds "allegedly agreed with one another to have exclusive-dealing . . . arrangements with their respective vendors." *Id*. In any event, the record shows that CDK had the challenged provisions in its vendor contracts long before 2013, *see* JSUF 24, so these provisions could not have been "imposed . . . pursuant to" the alleged conspiracy. Am. Compl. ¶ 186.

**PUBLIC VERSION**

[REDACTED]

**ARGUMENT**

## I. CDK Is Entitled To Summary Judgment On AutoLoop's Damages Claims In Whole Or In Part.

AutoLoop provides no basis for the up to [REDACTED] in pre-trebling class damages it seeks, meaning CDK is entitled to summary judgment on AutoLoop's damages claims as a whole. Alternatively, AutoLoop drastically exaggerates its damages estimate in at least three ways that contradict the uncontested record, and CDK is entitled to summary judgment significantly reducing this damages request.

### A. AutoLoop Ignores CDK's And Reynolds's Unilateral Ability To Raise Prices.

#### 1. An Overcharge Model Must Account For Lawful Price Increases In The But-For World.

To withstand summary judgment, a plaintiff's damages model must reliably measure *only* the harm caused by the defendant's allegedly unlawful conduct. An antitrust plaintiff "must be able to rationally separate" harm from anticompetitive conduct from losses "caused by the purely

lawful competitive actions" of a defendant. *MCI Commc'ns v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1168 (7th Cir. 1983). For an overcharge analysis, a damages model needs to estimate what the defendant would have lawfully charged for the product in question absent the purported misconduct. *E.g.*, *Marshfield Clinic*, 152 F.3d at 593 (model must estimate what plaintiff "would have paid had it not been for the conspiracy") (affirming grant of summary judgment).

Thus, the "fundamental step" in computing damages is describing how "a particular market would have developed" in a "but-for" world where "the antitrust violation did not occur," holding "every other feature of the actual world constant." *Proving Antitrust Damages* at 89. The model must "take[] into account" any "nonconspiratorial factors" that influence prices "to make a responsible estimate of the prices that [the plaintiff] would have paid had it not been for the conspiracy." *Marshfield Clinic*, 152 F.3d at 593. In particular, a long line of cases hold that an antitrust damages model must assume that the defendant would have engaged in lawful profit-maximizing competition. *See Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, 221 F. Supp. 3d 1033, 1042-43 (N.D. Ind. 2016) (but-for world "does not assume no competition from [the defendant]," but rather "lawful competition"); *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1262 (9th Cir. 1981) ("A reasonable jury could not . . . indulge in the assumption that a competitor would follow a course of behavior other than which it believed would maximize its profits."); *Am. Bearing Co., Inc. v. Litton Indus., Inc.*, 540 F. Supp. 1163, 1173-75 (E.D. Pa. 1982) (granting new trial where damages expert ignored "rational economic reactions" by defendant in but-for world). A plaintiff who would have paid higher prices in a but-for world due to the defendant's *lawful* behavior cannot count those higher prices toward damages.

## 2. AutoLoop's Model Does Not Address The Many Reasons To Increase Prices In The But-For World.

AutoLoop's damages model attributes nearly all of CDK's and Reynolds's certified

6

integration price increases from September 2013 forward to alleged anticompetitive conduct. *See* Ex. 322, Israel Tr. 267-68, 270; Ex. 76, Murphy Rpt. ¶ 69; *see also* Dkt. 878 at 19-22 (*Daubert* motion). Dr. Israel's model thus implies that CDK and Reynolds would not have raised prices by any material amount absent a conspiracy or other anticompetitive conduct. But he never considers the many reasons why firms might raise prices unilaterally due to market factors. ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

Further, Dr. Israel must conclude that CDK would not take additional steps to secure its DMS in the but-for world, because he also concludes that it was CDK's decision to secure its DMS that allowed it to raise integration prices in the real world. Ex. 322, Israel Tr. 76; *see also* Ex. 72, Israel Rpt. ¶ 179. In addition, Dr. Israel's analysis shows that prior to the conspiracy's alleged September 2013 start date, Reynolds's RCI prices were far higher than CDK's 3PA prices. *Id.*, fig. 7. Yet his model finds that over a six-year period, CDK would do nothing to close that price gap.

### 3. AutoLoop's Model Does Not Account For Dr. Israel's Opinion That Defendants Had Significant Unilateral Power.

Dr. Israel's conclusion that there would be at most negligible price increases in the but-for world is further undermined by his analysis of Defendants' *unilateral* market power. Dr. Israel affirmatively states that CDK and Reynolds each had the power to raise integration prices unilaterally. ████████████████████████████████████████████████

███████████████████████████████████████████████████████████t

**PUBLIC VERSION**

████████. He also opines that CDK and Reynolds could exercise this power "profitably." *Id.* ¶¶ 209, 211. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████. In other words, and there is no mistaking this aspect of Dr. Israel's analysis, there would be large price increases absent a conspiracy. Yet he factors no price increases into his but-for world, invalidating his analysis.

It is no answer for AutoLoop to suggest that non-conspiratorial price increases by either CDK or Reynolds would be illegal and can therefore be ignored in the but-for world. Dr. Israel offers no analysis that any unilateral price increases would be unlawful. But more critically, a price increase resulting from a refusal by either CDK or Reynolds to deal with hostile integrators would be lawful. *See* Dkt. 504 at 28 (either Defendant could lawfully exercise market power "to the extent" that they did so through a unilateral "refusal to deal"). ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████.

Dr. Israel cannot have it both ways. He cannot say on the one hand that there were large unilateral price increases because Reynolds and CDK would not do business with third parties, and on the other hand offer *no* "but for" analysis that accounts for the possibility of material

unilateral price increases when calculating conspiracy damages. As the Seventh Circuit has held, "[a]ny nonconspiratorial factors likely to have made the prices" charged by the defendant "higher than the prices charged by other [firms] *had* to be taken into account in order to make a responsible estimate of the prices" that the plaintiff "would have paid had it not been for the conspiracy." *Marshfield Clinic*, 152 F.3d at 593 (emphasis added). Dr. Israel's own opinion and this Court's decision on the refusal-to-deal claim suggest that CDK and Reynolds had substantial, lawful, unilateral power to raise prices in the but-for world. At a minimum, this discrepancy required Dr. Israel to assess Defendants' unilateral incentives and ability to raise prices and to explain why, absent the challenged conduct, CDK and Reynolds would have chosen to keep prices flat.

Dr. Israel's failure to account for the consequences of his opinions regarding CDK's and Reynolds's unilateral market power is, in fact, exactly the error the Seventh Circuit condemned in *Marshfield Clinic*. *See id.* (holding that experts could not ignore the defendant's "large market share," "which might confer enough market power on it to enable it all by itself, without dividing markets with its competitors, to charge a price somewhat above" yardstick prices). In *In re Brand Name Prescription Drugs Antitrust Litigation*, the Seventh Circuit reiterated this principle, "remind[ing]" plaintiffs that they must "separate the price effects of [alleged] collusion from the price effects of the defendants' lawful market power" to obtain damages. 186 F.3d 781, 786 (7th Cir. 1999) (citing *Marshfield Clinic*, 152 F.3d at 593-94); *cf. Schiller & Schmidt, Inc. v. Nordisco*, 969 F.2d 410, 415-16 (7th Cir. 1992) (expert "should have tried to separate the damages that resulted from the lawful entry of a powerful competitor" from "the damages that resulted from particular forms of misconduct allegedly committed by that competitor").

Contrary to these principles, Dr. Israel's model does not attempt to separate the price effects of collusion from the price effects of what he claims is CDK's and Reynolds's substantial

PUBLIC VERSION

unilateral power. The model purports to quantify the price increases resulting from "blocking" hostile integrators, *regardless* of whether that blocking was done unilaterally and lawfully. Ex. 76, Murphy Rpt. ¶ 72 (Dr. Israel's "indicator variable[] for the period of alleged conspiracy" would also measure damages from any "unilateral securing of the DMS and 3PA refresh"). Accordingly, the jury could not rely upon Dr. Israel's damages model to answer the fundamental question: What portion of the alleged price increases (if any) occur only because of the challenged conduct?

Suppose, for example, that the jury finds for AutoLoop on all of its Sherman Act claims. Dr. Israel's model purports to quantify the integration fees that vendors paid in the real world, the first half of the damages equation. But no reasonable jury could rely on that model to calculate the second half—what vendors *would have paid* in the but-for world—because the model does not account for any unilateral, lawful price increases predicted by the opinions on unilateral power in Dr. Israel's own report. The problem would be magnified if jurors found for AutoLoop only on the conspiracy claim but not the unilateral claims (or vice versa). In that event, AutoLoop's damages model would fail to account not only for lawful price increases from a unilateral refusal to deal, but any *additional* price increases arising from conduct for which the jury declined to find liability.

In short, if the jury finds for AutoLoop on any theory, AutoLoop's model offers no means for jurors to award damages based solely on injury attributable to that theory. Such a model is "worthless" and cannot provide "a rational basis for a judgment." *Marshfield Clinic*, 152 F.3d 593.

### 4. Dr. Israel's Defense Of His Model Confirms That No Rational Jury Could Rely Upon It To Award Damages.

Dr. Israel has no cogent explanation for his failure to account for CDK's and Reynolds's unilateral pricing power in his damages model.

First, he claimed that whether CDK and Reynolds conspired or acted unilaterally, ■

██████████████████████████████████████████████████████ But this is
wrong, for as discussed, this Court has already held that any unilateral decision not to permit hostile
integration was lawful. Dkt. 504 at 27-28.

Second, ████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████ But that is a dispute with
fundamental antitrust damages principles, which *require* an expert to analyze the "world without
[the defendants'] joint action." *Proving Antitrust Damages* at 89 ("a "fundamental step" in
computing damages is specifying the "but-for" world, including "the manner in which a particular
market would have developed"). Without that analysis, jurors are not equipped to assess damages.

Nor may AutoLoop sidestep the problem by insisting that price increases in the but-for
world are incapable of *precise* estimate. The problem is not that AutoLoop's model calculated
damages arising from alleged unlawful conduct imprecisely. The problem is that the model "does
not even attempt" to calculate those damages because it does not account for the lawful price
increases that the undisputed record, and Dr. Israel's own opinions, predict. *See In re Steel
Antitrust Litig.*, 2015 WL 5304629, at *10 (N.D. Ill. Sept. 9, 2015) (even though antitrust damages
calculations "need not be exact," "a model that does not even attempt to identify and isolate
'damages' that are not the certain result of the wrong cannot be used to establish" damages). So
although a "just and reasonable estimate" may suffice, AutoLoop would improperly invite the jury
to engage in "speculation or guesswork" as to what but-for prices, and thus damages, would be.
*Bigelow v. RTO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946).

In short, Dr. Israel's key conclusion—that absent the unlawful conduct neither CDK nor
Reynolds would raise integration prices for six years, despite having the unilateral power to raise

**PUBLIC VERSION**

prices *and* an economic incentive to do so—is "plainly contrary to practical experience and unreasonable on its face." *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 556 F. Supp. 825, 1080-81 (D.D.C. 1982), *as amended* (Jan. 10, 1983), *aff'd*, 740 F.2d 980 (D.C. Cir. 1984). Because AutoLoop's only evidence of damages treats essentially all price increases as injury, rather than separating the effects of lawful and unlawful conduct as the law requires, summary judgment is appropriate. *Marshfield Clinic*, 152 F.3d at 593; *Magnetar Tech. Corp. v. Intamin Ltd.*, 801 F.3d 1150, 1159-60 (9th Cir. 2015); *Amerinet Inc. v. Xerox Corp.*, 972 F.2d 1483, 1494 (8th Cir. 1992).

      **B.**      **AutoLoop Inflates Its Damages Request In At Least Three Ways.**

      **1.**      **AutoLoop Cannot Recover Damages For Cox Automotive Or Its Subsidiaries.**

AutoLoop seeks damages on behalf of a putative class including eight vendor subsidiaries of Cox Automotive, Inc. ("Cox."): Autotrader.com, Inc.; Dealer Dot Com, Inc.; Dealertrack, Inc.; HomeNet, Inc.; Kelley Bluebook, Co., Inc.; vAuto, Inc.; VinSolutions, Inc.; and Xtime, Inc. (collectively the "Cox Vendors"). Excluding Autotrader.com (a named plaintiff in the *Cox* case that is mentioned in Dr. Israel's report, but that does not appear to be listed in his breakdown of vendor damages), the Cox Vendors' alleged damages total just ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[3]

Cox and the Cox Vendors filed their own litigation against CDK in December 2017 based on the same conduct alleged in the AutoLoop Complaint. *See* Dkt. 505. Indeed, the same counsel filed suit on behalf of both AutoLoop and Cox. In July 2019, however, Cox and the Cox Vendors voluntarily dismissed all of their claims against CDK—with prejudice—pursuant to a confidential settlement. *See* Dkt. 723; *Cox Automotive, Inc. v. CDK Global, LLC*, No. 18-cv-1058, Dkt. 48.

---

[3] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

That dismissal is *res judicata* as to Cox and the Cox Vendors, precluding them from recovering damages from CDK in this suit. *Golden v. Barenborg*, 53 F.3d 866, 868-69 (7th Cir. 1995); *Nemaizer v. Baker*, 793 F.2d 58, 60-61 (2d Cir. 1986). The Court should award CDK summary judgment on any damages claim arising from alleged purchases by the Cox Vendors.

### 2.    AutoLoop Does Not Measure Reynolds's Prices.

As detailed in Defendants' pending motion to exclude Dr. Israel's opinions, Dr. Israel's overcharge analyses fail to use the actual prices Reynolds charged vendors during the alleged conspiracy period. Instead, he used the average price per unit across *all* of Reynolds's integration products. *See* Dkt. 878 at 16-19. Courts have recognized that basing damages on average prices for a basket of goods or services "can lead to serious analytical problems" because "average prices may combine the prices of different package sizes of the same product or of somewhat different products. When this happens, the average price paid by a customer can change when the mix of products that the customer buys changes—even if the price of no single product changed." *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 494 (N.D. Cal. 2008) (quotations omitted); *see also Reed v. Advocate Health Care*, 268 F.R.D. 573, 592 (N.D. Ill. 2009) (similar). That is exactly what Dr. Israel has done here. He finds that Reynolds's average price increased *even when prices for the underlying, individual services did not. See* Dkt. 878 at 17-18.

The Seventh Circuit has held that similar errors justify "throw[ing] out the damages claim on summary judgment." *Marshfield Clinic*, 152 F.3d at 595. In that case, an expert compared a defendant clinic's prices with those of other clinics, but only "on the basis of price per patient . . . rather than price per service." *Id*. at 594-95. The court held that "no reasonable jury" could award damages based on the expert's analysis because it would have indicated a price increase simply because the defendant "provided on average more treatment per patient than other providers." *Id*. Likewise, if vendors purchased more complex and expensive integration packages from Reynolds

**PUBLIC VERSION**

on average than they had previously, Dr. Israel's average-pricing methodology would show price increases even if the price for the underlying packages remained the same. CDK thus is entitled to summary judgment on the damages claims to the extent AutoLoop seeks to recover for RCI overcharges, ███████████████████████████. Ex. 72, Israel Rpt. tbl. 7.

### 3. AutoLoop Cannot Recover "Forced Switching" Damages.

#### a. Overview of "Forced Switching" Methodology

As discussed in Section I.A, Dr. Israel's "overcharge" model captures supposed damages for increased certified integration prices that CDK and Reynolds charged because of the alleged conspiracy. On top of this, Dr. Israel adds ███████ in so-called "forced switching" damages. These "forced switching" damages are not recoverable.

Forced-switching damages arise from Dr. Israel's hypothesis that certain vendors who "preferred" hostile integration were "forced" to switch to certified integration (as opposed to vendors who already used certified integration for the majority of their connections or who joined 3PA or RCI during the alleged conspiracy but had not been using hostile integration).[4] Ex. 72, Israel Rpt. ¶ 217. ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[4] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
.

PUBLIC VERSION

████████████████████████████████████████████████████.

The amount of this additional harm, Dr. Israel opines, is equal to the difference between the price the hostile integrator charged the vendor and the amount that CDK or Reynolds charged for certified integration before the alleged conspiracy. *Id.* An example may be helpful. Suppose that, before September 2013, AutoLoop paid Authenticom $20/month for integration but was "forced" by the conspiracy to switch to CDK's 3PA program. Suppose further that AutoLoop purchased an integration package for which CDK charged $40 before September 2013 and $100 afterwards. In simplified form, Dr. Israel would calculate "forced switching" damages to AutoLoop of $20 ($40-$20) and separate "overcharge" damages of $60 ($100-$40).

████████████████████████████████████████████

████████████████████████████████████████████

**b.**      **CDK Is Entitled to Summary Judgment For "Forced Switching" Damages.**

AutoLoop's model does not even try to measure the amount by which switching actually harmed vendors ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Again, however, Dr. Israel assumed that the *entire* difference between the price for hostile integration and the pre-conspiracy price for certified integration was a "forced switching" cost. He chose not to account for the added value vendors received from certified integration. In the AutoLoop example used above, for instance, Dr. Israel's model would assume that AutoLoop valued CDK's integration package at $20 (the same price AutoLoop paid Authenticom). Yet

15

**PUBLIC VERSION**

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████

At one point, Dr. Israel actually acknowledged this problem. ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████ In other words, Dr. Israel

chose to exaggerate damages knowingly because the math was easier.

As explained above, *see* pp. 5-6, a damages model must try to measure the plaintiff's *harm*, which here means attempting to account for higher prices that at least partially reflect the increased value of certified integration. Dr. Israel was not required to calculate that value with surgical precision. *See Bigelow*, 327 U.S. at 264. But he could not simply ignore the issue. *See, e.g.*, *Marshfield Clinic*, 152 F.3d at 593; *Steel Antitrust Litig.*, 2015 WL 5304629, at *10.

## II.   AutoLoop Cannot Establish Liability, As Explained In The *Authenticom* Brief.

As to liability, AutoLoop's claims rest on the same factual and legal foundation as Authenticom's, and AutoLoop's claims fail for the same reasons: (1) the 2015 Agreements *by themselves* were not anticompetitive, *Authenticom* SJ Br. § I; (2) AutoLoop's conspiracy claim fails because all of CDK's conduct was consistent with its unilateral interests and AutoLoop cannot produce evidence that "tends to exclude" the possibility that CDK acted unilaterally, as *Matsushita* requires, *id.* § II(A) & (B); (3) even if there were an agreement between CDK and Reynolds as to DMS "openness," as AutoLoop claims, CDK is entitled to summary judgment on any *per se*

16

Section 1 claim because that agreement would have to be analyzed under the Rule of Reason, *id.* § II(C); (4) AutoLoop cannot establish antitrust injury on either its conspiracy claims or its unilateral claims (exclusive dealing under Section 1 or monopolization under Section 2) because AutoLoop's injury flows from (a) hostile integrators' inability to *unlawfully* access CDK's and Reynolds's DMSs, and (b) CDK's lawful refusal to deal with third-party hostile integrators, *id.* § III; (5) CDK's vendor contracts do not contain unlawful exclusive dealing provisions as a matter of law, *id.* § IV(A); and (6) AutoLoop cannot prove its *Kodak* aftermarket monopolization claims, *id.* § IV(B). CDK refers the Court to the *Authenticom* briefing for a full discussion of these issues.

Three liability issues require discussion here: (a) AutoLoop's Section 1 "market division" theory; (b) evidence that AutoLoop, like Authenticom, pegs its claimed injury to CDK's and Reynolds's decisions to block hostile integration, showing that AutoLoop cannot prove antitrust injury for the same reasons that Authenticom cannot; and (c) AutoLoop's Florida state law claims.

**a.** AutoLoop's Amended Complaint alleges that the 2015 Agreements constituted *per se* unlawful "market division." Am. Compl. ¶¶ 29, 96-102. This claim is based on AutoLoop's (erroneous) allegation that in one of the 2015 Agreements, CDK and Reynolds supposedly agreed not to hostilely access the other's DMS. *Id.* ¶¶ 97; Dkt. 126 at 9-10. But AutoLoop has abandoned this claim. Dr. Israel, who also serves as AutoLoop's liability expert, does not mention "market division" or "market allocation" in his reports—much less calculate damages on a "market division" theory. *See Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1085 (11th Cir. 2016) (affirming summary judgment where expert offered "inferences" and "abstract understandings" rather than "specific and concrete facts" to support a market-division claim).

In any event, the market-division claim fails as a matter of law. "Market-division agreements are agreements between 'competitors to stay out of each other's territories.'"

18

**PUBLIC VERSION**

*Marshfield Clinic*, 152 F.3d 591. In another case in this MDL, this Court held that the 2015 Agreements do not contain such an agreement because no case "treat[s] the servicing and/or use of a competitor's product as a 'territory' for the purposes of a market-division agreement." Dkt. 505 at 12-13 (*Cox* case). As the Court explained, it could think of "no reason" why "an agreement to stop unauthorized access of a competitor's computer systems" constitutes "market division." Dkt. 505 at 12-13. Thus, CDK is entitled to summary judgment on the market-division claim.

      **b.** Authenticom cannot recover on its unilateral claims because its supposed injury flows from CDK's and Reynolds's lawful decisions not to permit hostile integration. *See Authenticom* SJ Br. §§ III.B & IV.A.4. AutoLoop's unilateral claims fail for the same reason: its alleged injury flows from lack of access to Defendants' DMSs, and a unilateral decision not to permit hostile integrators to access the DMS is lawful. *See* p. 8 *supra*; Dkt 504 at 27-28; *Authenticom, Inc. v. CDK Global, LLC*, 874 F. 3d 1019, 1025 (7th Cir. 2017) ("Even monopolists are almost never required to assist their competitors . . . and neither Reynolds nor CDK is a monopolist.").

      **c.** AutoLoop also brings two Florida state antitrust claims (Counts IV and V), which rise and fall with its Sherman Act claims. *See* Dkt. 504 at 28-29 ("Federal and Florida antitrust laws are analyzed under the same rules and case law."); *QSGI, Inc. v. IBM Glob. Fin.*, 2012 WL 1150402, at *4 (S.D. Fla. Mar. 14, 2012) (same for unfair practices claim). AutoLoop previously acknowledged these parallel standards. Dkt. 359 at 20. Thus, for the same reasons that AutoLoop's Sherman Act claims warrant summary judgment, its Florida claims do as well.

## CONCLUSION

      As set forth more fully in the *Authenticom* summary judgment briefing, the Court should award CDK summary judgment on all of AutoLoop's claims. In addition, the Court should grant summary judgment on AutoLoop's claims for the reasons set forth above.

PUBLIC VERSION

Dated: May 20, 2020

Respectfully submitted,

/s/ *Britt M. Miller*
Britt M. Miller
Michael A. Scodro
Daniel T. Fenske
Matthew D. Provance
Jed W. Glickstein
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mscodro@mayerbrown.com
dfenske@ mayerbrown.com
mprovance@mayerbrown.com
jglickstein@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant*
*CDK Global, LLC*

PUBLIC VERSION

## CERTIFICATE OF SERVICE

I, Britt M. Miller, an attorney, hereby certify that on May 20, 2020, I caused a true and correct copy of the foregoing **MEMORANDUM IN SUPPORT OF CDK GLOBAL, LLC'S MOTION FOR SUMMARY JUDGMENT** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/ Britt M. Miller*
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com