**PUBLIC VERSION**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| This document relates to:<br><br>THE DEALERSHIP PUTATIVE CLASS ACTION | Hon. Robert M . Dow, Jr.<br><br>Magistrate Judge Jeffrey T. Gilbert |

**MEMORANDUM IN SUPPORT OF CDK GLOBAL, LLC'S
MOTION FOR SUMMARY JUDGMENT**

**PUBLIC VERSION**

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

ARGUMENT ........................................................................................................................5

   I.    The Dealers' Damages Claims Are Deficient For Multiple Reasons. ...........................5

      A.    The Dealers' Federal Damages Claims, And Certain State Claims, Are
Barred By *Illinois Brick*. ..................................................................................6

      B.    The Dealers Do Not Isolate Harm From Alleged Unlawful Conduct. ....................9

          1.    The Dealers Seek Damages For Already-Dismissed Claims. ............................10

          2.    The Dealers' Damages Model Also Fails To Account For Lawful Price
Increases...............................................................................................11

      C.    The Dealers Offer No Evidence Of Named-Plaintiff Damages, And The
Classwide Damages Calculation Fails In Any Event. ...............................................13

   II.    The Dealers Fail To Establish A Triable Issue On Liability. ......................................17

      A.    The Dealers Fail To Establish Liability On Their Conspiracy Claims...................17

      B.    The Dealers' Exclusive-Dealing Claim For Injunctive Relief Fails.......................22

      C.    The Dealers Fail To Establish Liability On Their State Claims. ...........................23

          1.    All Of The Dealers' State Claims Track Their Federal Claims. .........................23

          2.    The Dealers' Claims Lack A Nexus To DC, Massachusetts, Mississippi,
New Hampshire, New York, South Dakota, Or West Virginia. .........................24

          3.    The Dealers Cannot Bring Antitrust Claims Under Colorado, Minnesota,
North Dakota, New Mexico, Or South Dakota Consumer Protection
Laws.....................................................................................................26

          4.    The Dealers Are Not Proper Nevada And West Virginia Plaintiffs. ..................27

          5.    State Law Precludes The Dealers From Bringing Colorado, Illinois, And
South Carolina Class Action Claims.......................................................27

              a.    Justice Stevens's opinion in *Shady Grove* is controlling. ..............................28

              b.    Class-action bars are intertwined with substantive concerns..........................30

          6.    The Dealers Fail To Satisfy Arizona, Hawaii, New Jersey, Utah, And
West Virginia Statutory Notice Requirements. ...................................................32

              a.    *Shady Grove* does not apply to notice requirements........................................33

              b.    The notice requirements are enforceable under *Shady Grove*. ........................34

CONCLUSION....................................................................................................................34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Aftermarket Filters Antitrust Litig.*,
    2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) ..................................................................... 33

*Allergease Inc. v. Walgreen Co.*,
    2017 WL 66819 (N.D. Ill. Jan. 6, 2017) ........................................................................... 16

*Amerinet, Inc. v. Xerox Corp.*,
    972 F.2d 1483 (8th Cir. 1992) ................................................................................... 10, 16

*Any Occasion, LLC v. Florists' Transworld Delivery, Inc.*,
    2010 WL 3584411 (N.D.W. Va. Sept. 13, 2010) ............................................................ 27

*Apple, Inc. v. Pepper*,
    139 S. Ct. 1514 (2019) ........................................................................................................ 8

*Arabian Support & Servs. Co., Ltd. v. Textron Sys. Corp.*,
    943 F.3d 42 (1st Cir. 2019) ............................................................................................... 25

*In re Asacol Antitrust Litig.*,
    2016 WL 4083333 (D. Mass. July 20, 2016) ................................................................... 33

*Associated General Contractors of California, Inc. v. California State
    Council of Carpenters*,
    459 U.S. 519 (1983)............................................................................................................ 4

*Authenticom, Inc. v. CDK Global, LLC*,
    874 F.3d 1019 (7th Cir. 2017) ................................................................................ *passim*

*In re Automotive Parts Antitrust Litig.*,
    2013 WL 2456612 (E.D. Mich. June 6, 2013).................................................................... 9

*In re Beef Indus. Antitrust Litig.*,
    600 F.2d 1148 (5th Cir. 1979) ............................................................................................ 7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................................ 17

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    152 F.3d 588 (7th Cir. 1998) ................................................................................ 9, 10, 12

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    123 F.3d 599 (7th Cir. 1997) ............................................................................................ 7

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    186 F.3d 781 (7th Cir. 1999) ............................................................................................ 12

*In re Broiler Chicken Antitrust Litig.*,
  290 F. Supp. 3d 772 (N.D. Ill. 2017) ........................................................ 32, 33

*Ill. ex rel. Burris v. Panhandle E. Pipe Line Co.*,
  935 F.2d 1469 (7th Cir. 1991) ...................................................................... 30

*In re Chocolate Confectionary Antitrust Litig.*,
  749 F. Supp. 2d 224 (M.D. Pa. 2010) ........................................................... 25

*Ciardi v. F. Hoffmann–La Roche, Ltd.*,
  762 N.E.2d 303 (Mass. 2002) ......................................................................... 9

*Citizens for Appropriate Rural Roads v. Foxx*,
  815 F.3d 1068 (7th Cir. 2016) ...................................................................... 16

*City of Rockford v. Mallinckrodt ARD, Inc.*,
  360 F. Supp. 3d 730 (N.D. Ill. 2019) ...................................................... 32, 33

*City of Vernon v. S. Ca. Edison Co.*,
  955 F.2d 1361 (9th Cir. 1992) ...................................................................... 10

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ........................................................................................ 10

*Continental Ins. Co. v. Bahnan*,
  216 F.3d 150 (1st Cir. 2000) .......................................................................... 9

*In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*,
  60 F. Supp. 3d 914 (N.D. Ill. 2014), *aff'd*, 801 F.3d 758 (7th Cir. 2015) ............ 17, 19, 26

*Davidson v. Apple, Inc.*,
  2018 WL 2325426 (N.D. Cal. May 8, 2018) ................................................. 31

*Delgado v. Ocwen Loan Servicing, LLC*,
  2017 WL 5201079 (E.D.N.Y. Nov. 9, 2017) ............................................ 31, 34

*Drug Mart Pharmacy Corp. v. American Home Products Corp.*,
  2002 WL 31528625 (E.D.N.Y. Aug. 21, 2002) ............................................... 8

*In re Dynamic Random Access Memory (DRAM I) Antitrust Litig.*,
  516 F. Supp. 2d 1072 (N.D. Cal. 2007) ........................................................ 26

*Dynegy Mktg. & Trade v. Multiut Corp.*,
  2008 WL 2410425 (N.D. Ill. June 11, 2008) ................................................. 16

*In re Effexor Antitrust Litig.*,
  357 F. Supp. 3d 363 (D.N.J. 2018) .......................................................... 31, 34

*Fejzulai v. Sam's West, Inc.*,
  205 F. Supp. 3d 723 (D.S.C. 2016) .............................................................. 31

*Fishman Transducers, Inc. v. Paul*,
    684 F.3d 187 (1st Cir. 2012) ......................................................................... 24

*Friedman v. Dollar Thrifty Auto. Grp.*,
    2015 WL 8479746 (D. Colo. Dec. 10, 2015) ................................................ 31

*Godix Equip. Export Co. v. Caterpillar, Inc.*,
    948 F. Supp. 1570 (S.D. Fla. 1996), *aff'd*, 144 F.3d 55 (11th Cir. 1998) ......... 10

*In re Graphics Processing Units (GPU) Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ........................................................ 27

*Greene v. Gerber Prods. Co.*,
    262 F. Supp. 3d 38 (E.D.N.Y. 2017) ............................................................ 31

*Griggs-Ryan v. Smith*,
    904 F.2d 112 (1st Cir. 1990) ......................................................................... 16

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*,
    221 F. Supp. 3d 1033 (N.D. Ind. 2016) ....................................................... 11

*H-Quotient, Inc. v. Knight Trading Grp., Inc.*,
    2005 WL 323750 (S.D.N.Y. Feb. 9, 2005) ................................................... 26

*Hahn v. Walsh*,
    762 F.3d 617 (7th Cir. 2014) ....................................................................... 33

*Harris v. Reliable Reports, Inc.*,
    2014 WL 931070 (N.D. Ind. Mar. 10, 2014) ................................................ 29

*Hatchett v. Henry Schein, Inc.*,
    2020 WL 733834 (S.D. Ill. Feb. 13, 2020) .................................................. 29

*Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*,
    231 F. Supp. 2d 1253 (N.D. Ga. 2002), *aff'd sub nom. Williamson Oil Co.,
    Inc. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) ............................ 21

*Hughes v. United States*,
    138 S. Ct. 1765 (2018) ................................................................................. 29

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ............................................................................. *passim*

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
    910 F.3d 927 (7th Cir. 2018) ..................................................... 12, 18, 19, 22

*Lamb's Patio Theater, Inc. v. Universal Film Exchanges, Inc.*,
    582 F.2d 1068 (7th Cir. 1978) ..................................................................... 21

*In re Lipitor Antitrust Litig.*,
    336 F. Supp. 3d 395 (D.N.J. 2018) ..................................................... 31, 33, 34

*In re Loestrin 24 FE Antitrust Litig.*,
410 F. Supp. 3d 352 (D.R.I. 2019) .................................................................... 33

*Magid Mfg. Co., Inc. v. U.S.D. Corp.*,
654 F. Supp. 325 (N.D. Ill. 1987) ..................................................................... 21

*Magnetar Tech. Corp. v. Intamin Ltd.*,
801 F.3d 1150 (9th Cir. 2015) ........................................................................... 10

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
952 F.3d 832 (7th Cir. 2020) ............................................................................... 8

*Marks v. United States*,
430 U.S. 188 (1977) ........................................................................... 28, 29, 30

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ............................................................................................ 17

*MCI Commc'ns v. Am. Tel. & Tel. Co.*,
708 F.2d 1081 (7th Cir. 1983) .................................................................... 9, 10, 13

*McNeely v. Wells Fargo Bank, N.A.*,
115 F. Supp. 3d 779 (S.D.W. Va. 2015) ........................................................... 27

*Merican, Inc. v. Caterpillar Tractor Co.*,
713 F.2d 958 (3d Cir. 1983) ................................................................................. 7

*In re Microsoft Corp. Antitrust Litig.*,
2003 WL22070561 (D. Md. Aug. 22, 2003) .................................................... 26

*Moffat v. Lane Co., Inc.*,
595 F. Supp. 43 (D. Mass. 1984) ...................................................................... 21

*Morlan v. Universal Guar. Life Ins. Co.*,
298 F.3d 609 (7th Cir. 2002) ............................................................................. 13

*MSP Recovery Claims, Series, LLC v. Sanofi-Aventis U.S. LLC*,
2020 WL 831578 (D.N.J. Feb. 20, 2020) ........................................................ 27

*Mueller Co. v. U.S. Pipe & Foundry Co.*,
2003 WL 22272135 (D.N.H. Oct. 2, 2003) ...................................................... 25

*Murphy Tugboat Co. v. Crowley*,
658 F.2d 1256 (9th Cir. 1981) ........................................................................... 11

*Nanometrics, Inc. v. Optical Sol'ns, Inc.*,
2019 WL 1048253 (N.D. Cal. Mar. 5, 2019) ................................................... 25

*New England Gen-Connect, LLC v. US Carburetion, Inc.*,
2019 WL 1332891 (D. Mass. Mar. 25, 2019) .................................................. 25

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
    2011 WL 1398485 (D. Me. Apr. 13, 2011) ....................................................... 34

*In re Novartis & Par Antitrust Litig.*,
    2019 WL 3841711 (S.D.N.Y. Aug. 15, 2019) ............................................. 9, 31

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
    629 F.3d 697 (7th Cir. 2011) .................................................................. 19, 22

*In re Opana ER Antitrust Litig.*,
    162 F. Supp. 3d 704 (N.D. Ill. 2016) ........................................................... 31

*State ex rel. Palumbo v. Graley's Body Shop, Inc.*,
    425 S.E.2d 177 (W. Va. 1992) ..................................................................... 26

*Phillips v. Philip Morris Cos. Inc.*,
    290 F.R.D. 476 (N.D. Ohio 2013) ............................................................... 34

*Racher v. Westlake Nursing Home Ltd. P'ship*,
    871 F.3d 1152 (10th Cir. 2017) ................................................................... 29

*Reading Indus., Inc. v. Kennecott Copper Corp.*,
    631 F.2d 10 (2d Cir. 1980) .......................................................................... 30

*In re Refrigerant Compressors Antitrust Litig.*,
    2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) .............................................. 25

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
    355 F. Supp. 3d 145 (E.D.N.Y. 2018) ......................................................... 34

*Rodriguez v. Anselmo, Lindberg & Assocs., LLC*,
    2019 WL 4189468 (N.D. Ill. Sept. 4, 2019) ................................................. 13

*S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*,
    556 F. Supp. 825 (D.D.C. 1982) .................................................................. 12

*Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*,
    642 F.3d 560 (7th Cir. 2011) .................................................................. 29, 30

*Schoenbaum v. E.I. DuPont De Nemours & Co.*,
    517 F. Supp. 2d 1125 (E.D. Mo. 2007) ........................................................ 26

*SCVNGR, Inc. v eCharge Licensing, LLC*,
    2014 WL 4804738 (D. Mass. Sept. 25, 2014) .............................................. 24

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ............................................................................. *passim*

*Sickles v. Cabot Corp.*,
    877 A.2d 267 (N.J. App. Ct. 2005) ................................................................ 9

*In re Solodyn (Mincocyclin Hydrochloride) Antitrust Litig.*,
  2015 WL 5458570 (D. Mass. Sept. 16, 2015) ................................................................. 31

*Stanley Danielkiewicz v. Whirlpool Corp.*,
  426 F. Supp. 3d 426 (E.D. Mich. 2019) ...................................................................... 31

*Stanley v. Gilead Sciences*,
  2020 WL 1032320 (N.D. Cal. Mar. 3, 2020) .................................................................. 31

*Stanley v. Huntington Nat'l Bank*,
  492 Fed. App'x 456 (4th Cir. 2012) ........................................................................... 34

*State Farm Life Ins. Co. v. Jonas*,
  775 F.3d 867 (7th Cir. 2014) ............................................................................ 29, 30

*In re Suboxone Antitrust Litig.*,
  64 F. Supp. 3d 665 (E.D. Pa. 2014) ............................................................................ 9

*Sun Dun, Inc. of Wash. v. Coca-Cola Co.*,
  770 F. Supp. 285 (D. Md. 1991) ............................................................................... 26

*In re Target Corp. Data Sec. Breach Litig.*,
  66 F. Supp. 3d 1154 (D. Minn. 2014) ......................................................................... 31

*In re TD Bank, N.A.*,
  150 F. Supp. 3d 593 (D.S.C. 2015) ........................................................................... 31

*Technical Learning Collective, Inc. v. Daimler-Benz Aktiengesellschaft*,
  1980 WL 1943 (D. Md. Aug. 28, 1980) .......................................................................... 8

*Uncle Henry's Inc. v. Plaut Consulting Co.*,
  399 F.3d 33 (1st Cir. 2005) ................................................................................... 24

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
  873 F.3d 185 (3d Cir. 2017) ................................................................................... 22

*Walton v. Trans Union, LLC*,
  2008 WL 2038598 (S.D. Ind. May 12, 2008) .................................................................... 16

*In re Wellbutrin XL Antitrust Litig.*,
  260 F.R.D. 143 (E.D. Pa. 2009) ............................................................................... 27

*In re Wellbutrin XL Antitrust Litig.*,
  756 F. Supp.2d 670 (E.D. Pa. 2010) ........................................................................... 31

*Wilcox Indus. Corp. v. Hansen*,
  870 F. Supp. 2d 296 (D.N.H. 2012) ............................................................................ 25

*Wilson v. Volkswagen Grp. of Am., Inc.*,
  2018 WL 4623539 (S.D. Fla. Sept. 26, 2018) .................................................................. 34

**Statutes**

740 ILCS 10/7 ....................................................................................................... 27

740 ILCS 10/7(3) ................................................................................................... 30

Ariz. Rev. Stat. § 44-1415(A) ............................................................................... 32

Colo. Rev. Stat. § 6–1–105 .................................................................................... 26

Colo. Rev. Stat. § 6-1-113(2) ................................................................................ 27

Haw. Rev. Stat. § 480-13.3(a) ............................................................................... 34

Haw. Rev. Stat. § 480-13.3, N.J. ........................................................................... 32

Mass. Gen. Laws Ch. 93A, § 11 ............................................................................ 24

Minn. Stat. § 325D.44 subd. 1 ............................................................................... 26

Minn. Stat. § 325F.69 ............................................................................................. 26

N.D. Cent. Code § 51–15–02 ................................................................................. 26

N.H. Rev. Stat. Ann. § 358-A:2 ............................................................................. 25

N.M. Stat. Ann. § 57-12-3 ..................................................................................... 27

Nev. Rev. Stat. § 598.0977 .................................................................................... 27

S.C. Code Ann. § 39-5-140(a) ............................................................................... 27

S.D. Codified Laws § 37-24-1 ............................................................................... 27

Utah Code § 76-10-3109(9) .................................................................................... 32

W. Va. Code § 46A-6-106(c) ................................................................................. 32

W. Va. Stat. § 46A-6-102(2) .................................................................................. 27

**Other Authorities**

Fed. R. Civ. P. 23 ....................................................................................... 28, 29, 32, 33

Fed. R. Civ. P. 23(a) .............................................................................................. 30

Fed. R. Civ. P. 23(b)(3) ......................................................................................... 30

N.Y. CPLR § 901 .................................................................................................... 30

PUBLIC VERSION

## INTRODUCTION

Alongside similar lawsuits by Authenticom, Inc. ("Authenticom") and Loop LLC (d/b/a AutoLoop), several dozen car dealers ("Dealers") sued The Reynolds & Reynolds Co. ("Reynolds") and CDK Global, LLC ("CDK") on behalf of a purported dealer class. The Dealers allege that CDK and Reynolds conspired to close their respective dealer management systems ("DMSs") and raise prices charged to software vendors to access data stored on those systems. CDK respectfully requests that the Court grant summary judgment on all of the Dealers' claims.[1]

First, the Dealers' damages claims are fundamentally flawed. This Court has held that the *Illinois Brick* doctrine bars the Dealers from recovering damages on their Sherman Act claims for "alleged supracompetitive prices passed through [by] vendors." Dkt. 507 at 21. Yet these pass-on overcharges are the *only* damages the Dealers now seek. The Dealers simply label their pass-on damages both "direct" *and* "indirect," wordplay that courts have uniformly rejected as a way to evade *Illinois Brick*. And the Dealers' damages model fails to accurately measure overcharge damages in any event. It conflates price increases due to lawful and unlawful pricing conduct, and it includes purported effects from alleged exclusive-dealing provisions even though the Court dismissed the exclusive-dealing damages claim. *Id*. So the model cannot disentangle damages caused by lawful competition from damages caused by any unlawful conduct the jury may find. Finally, the Dealers offer no evidence of their *own* damages, instead calculating damages for a putative nationwide class that has not been certified and including multiple state-law claims for which the Dealers cannot recover damages as a matter of law.

Second, the Dealers cannot establish liability regardless of the relief they request. All

---

[1] In this brief, "JSUF" refers to Defendants' Joint Statement of Common Undisputed Material Facts in Support of Their Motions for Summary Judgment, filed concurrently. "Ex. __" refers to the exhibits to the Declaration of Daniel T. Fenske, filed concurrently.

of their damages claims—state and federal—arise from an alleged conspiracy. And to show a conspiracy, the Dealers must adduce evidence tending to rule out the possibility that CDK acted independently in deciding to secure its DMS from hostile third-party access. But as explained in CDK's summary judgment brief in *Authenticom*—which CDK incorporates here by reference—millions of pages and scores of depositions have not yielded *any* evidence of an antitrust conspiracy beginning in September 2013 (or ever). Rather, all of the evidence shows that CDK's decisions to secure its DMS from hostile access and to negotiate a commercial resolution over access to Reynolds's DMS by two CDK subsidiaries, DMI and IntegraLink, were fully consistent with CDK's unilateral interests.

Finally, the Dealers cannot establish their federal exclusive dealing claim for injunctive relief, and their state-law claims fail for additional state-specific reasons.

## BACKGROUND

A DMS is enterprise software that dealerships use to collect, manage, and handle data generated in the course of their operations, including sensitive and proprietary information from consumers, third-parties like car manufacturers ("OEMs"), and the DMS provider itself. JSUF 2, 17, 51-55. The DMS provides much, but not all, of the software functionality that dealers need. Dealers thus often turn to additional software applications ("apps") to supplement the DMS. JSUF 5-8, 23-25. Many of those applications leverage functions of or data stored on the DMS. MDL Plaintiffs allege that CDK and Reynolds—two large DMS providers—have conspired to reduce competition in the DMS market and what the Dealers call the "data integration services" market—the supposed market in which DMS providers or third parties called "data extractors" or "hostile integrators" provide data stored on the DMS to third-party software vendors. CDK and Reynolds operate certified integration programs, which third-party vendors may join for a fee to obtain DMS data and "writeback" data to the DMS when serving particular dealership customers. JSUF 7-8, 24-25. The Dealers claim that those vendors pass

on some or all of these certified integration fees to dealers. *See* p. 5 *infra.*

The Dealers filed their consolidated class action complaint in June 2018. Dkt. 198 ("Compl."). They alleged that CDK and Reynolds entered into three contracts in February 2015 ("February 2015 Agreements" or "2015 Agreements") that "memorialized" CDK's and Reynolds's "*per se illegal horizontal agreement*" to "stop competing and profit from their duopoly" in the DMS market "principally by cornering the related market for Data Integration Services ('DIS')." Compl. p. iii. The Dealers alleged that in February 2015, "competition between Defendants ceased," and CDK and Reynolds "entered into a *per se* illegal horizontal agreement to: (1) exclude competition in the DIS market; (2) allow only CDK to access data housed on Dealers' CDK DMS's; and (3) allow only Reynolds to access data housed on Dealer's [sic] Reynolds DMS's." Compl. ¶ 8. In late 2018, Reynolds and the Dealers reached a settlement, which the Court approved on January 23, 2019. *See* Dkt. 427; Dkt. 502.

The Dealers brought claims for: (1) a horizontal conspiracy under Section 1 of the Sherman Act for damages (Count I) and injunctive relief (Count II); (2) exclusive dealing under Section 1 for damages (Count III) and injunctive relief (Count IV); and (3) monopolization of CDK's and Reynolds's aftermarkets for data integration services on their DMSs under Section 2 for damages only (Count V). Compl. ¶¶ 167-208. The Dealers also brought a bevy of parallel claims under the antitrust laws of 26 states and the District of Columbia (Counts VI-XXXI) and the consumer-protection statutes of 19 states (Counts XXXII-L). *Id.* ¶¶ 209-736.

The Dealers alleged that the conspiracy injured dealers in both the DIS (integration) and DMS markets. First, the Dealers alleged injury in the DIS market from the increased integration fees CDK and Reynolds supposedly charged vendors to participate in the 3PA and RCI programs, which the vendors then passed on to the Dealers. Compl. ¶¶ 126-145. Second, the Dealers alleged injury in the DMS market in the form of a "limited pool of integrators available," a reduction in DMS quality or "functionality," and reduced competition from third-

party vendors. *Id.* ¶¶ 146, 148-50. Ultimately, the Dealers alleged that dealers were required to "pay[] supracompetitive prices for Defendants' DMS's, and for DIS." *Id.* ¶ 151.

In January 2019, the Court ruled on CDK's motion to dismiss. The Court dismissed all of the Dealers' federal damages claims (Counts I, III, and V) as to the DIS market, holding that "[t]o the extent that Plaintiffs seek to recover alleged supracompetitive prices passed through vendors . . . Plaintiffs' claims are barred" by *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Dkt. 507 at 21. The Court allowed the Dealers' federal antitrust claims to proceed only for damages associated with the Dealers' direct purchases of DMS, if the Dealers could prove that, and quantify the extent to which, the conspiracy caused the DMS to have "less value and inferior functionality." *Id.* The Court also held that the Dealers had antitrust standing under *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983), to pursue their federal claims for injunctive relief. *Id.* at 25. On the merits, the Court held that the Dealers stated claims for both conspiracy (for damages and injunctive relief) and exclusive dealing (for injunctive relief only) under the Sherman Act. *Id.* at 26-34. But the Court dismissed several state-law claims on various grounds. *See id.* at 35-64. Otherwise, the Court denied the motion to dismiss, leaving the Dealers with 21 live state antitrust claims and 16 live state consumer-protection claims in addition to their federal claims for damages and injunctive relief. *See generally id.*; *see also* Ex. A hereto (dealer claims chart).

After extensive discovery, the Dealers disclosed Dr. Michael A. Williams as their liability and damages expert. ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████  █████████████

████████████████████████████████████████

**PUBLIC VERSION**



Ex. 317, Williams Tr. 38, 46; *see also id.* at 39-43, 45-49.

For the reasons explained in CDK's pending *Daubert* motion, Dr. Williams's damages and liability opinions are not based on any reliable methodology or analysis and should be excluded. *See* Dkt. 882.

**ARGUMENT**

**I.      The Dealers' Damages Claims Are Deficient For Multiple Reasons.**

The Dealers seek over ▮▮▮▮▮▮▮▮ in pre-trebled damages on behalf of a putative nationwide class. But even if they could prove liability on their claims—and they cannot, *see* § II *infra*—damages are not available because (A) the Dealers seek only indirect-purchaser damages that *Illinois Brick* (and certain states) foreclose; (B) their damages model does not differentiate between lawful and unlawful causes of harm, going so far as to count damages allegedly caused by *dismissed* claims; and (C) contrary to this Court's orders, the Dealers have disclosed neither individual damages nor damages for any of their state-law claims.

## A.    The Dealers' Federal Damages Claims, And Certain State Claims, Are Barred By *Illinois Brick*.

This Court previously held that under *Illinois Brick*—which allows only *direct* purchasers to recover antitrust damages—the Dealers could not recover for higher integration prices that vendors supposedly paid CDK and Reynolds as a result of the alleged conspiracy and later passed on to the Dealers. Dkt. 507 at 21. The Court stressed that the Dealers "may not proceed" with their federal antitrust claims on a theory that CDK and Reynolds conspired "to restrain competition in the [data integration services] market," in which vendors, not dealers, are the direct purchasers. *Id*. *Illinois Brick* was not an obstacle to the Dealers' damages recovery, the Court continued, only to the extent that the Dealers could show and quantify harm "in the DMS market" in the form of "DMSs with less value and inferior functionality." *Id*.

The Dealers have now disclosed a damages report—the only damages evidence they offer—that ignores this Court's ruling. In the report, ██████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████ In short, the Dealers' "direct" injury is that they purportedly had to pay "supracompetitive prices passed through [by] vendors"—precisely what this Court held non-recoverable under *Illinois Brick*. Dkt. 507 at 21.

████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

t ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████ Rather, he uses this two-step, pass-through method to

calculate direct and indirect damages alike. Having followed this approach, it is no surprise

that he arrives at an identical damages figure for each. Ex. 79, Williams Rpt. ¶ 171.

Of course, *Illinois Brick* bars recovery of indirect damages regardless of what a

plaintiff's expert calls them. Whether *Illinois Brick* applies turns "not on the plaintiff's

characterization of the illegal activity but on whether the problems identified in [that decision]

would be avoided if relief were allowed." *Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d

958, 967 (3d Cir. 1983); *see also In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1157 (5th

Cir. 1979). Thus, as the Seventh Circuit has held, where an antitrust plaintiff "seek[s] to recover

overcharges" passed on from an intermediary and paid only indirectly, the claim fails no matter

what language the plaintiff uses to describe it. *In re Brand Name Prescription Drugs Antitrust

Litig.*, 123 F.3d 599, 606 (7th Cir. 1997), *abrogated on other grounds by Rivets v. Regions

Bank of La.*, 522 U.S. 470 (1998).

Far from avoiding "the problems identified in" *Illinois Brick* (*Merican*, 713 F.2d at

967), the Dealers' damages theory would *create* precisely these problems. The *Illinois Brick*

doctrine exists to prevent the "serious risk of multiple liability for defendants" and to avoid

"transform[ing] treble-damages actions into massive efforts to apportion the recovery,"

"add[ing] whole new dimensions of complexity to treble-damages suits and seriously

undermin[ing] their effectiveness." 431 U.S. at 730, 737. There is the obvious potential for

multiple liability in this MDL. Both AutoLoop (on behalf of a putative vendor class) and the

Dealers (on behalf of a putative dealer class) seek ███████████████ in pre-trebling damages

for the *same* alleged overcharge. That is why the Supreme Court in *Illinois Brick* adopted "a

bright line that allowed direct purchasers to sue but barred indirect purchasers from suing,"

7

**PUBLIC VERSION**

*Apple, Inc. v. Pepper*, 139 S. Ct. 1514, 1522 (2019), thus ensuring that "one and only one entity in the market" can recover overcharge damages. *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 840 (7th Cir. 2020).

Courts thus reject efforts, like Dr. Williams's here, to circumvent *Illinois Brick* by characterizing indirect damages as a direct injury. In *Drug Mart Pharmacy Corp. v. American Home Products Corp.*, 2002 WL 31528625 (E.D.N.Y. Aug. 21, 2002), for example, the defendants sold pharmaceuticals to wholesalers, which then sold them to the plaintiff pharmacies. The pharmacies initially sought damages for their passed-on portion of the supracompetitive prices the wholesalers paid. When that failed under *Illinois Brick*, the pharmacies recast their damages as alleged "lost profits," claiming that the conspiracy reduced their profits because they were paying more for pharmaceuticals. Recognizing this new theory for what it was, the *Drug Mart* court held that the theory sought "*precisely* the type of damages barred by *Illinois Brick*." *Id.* at *8; *see also Technical Learning Collective, Inc. v. Daimler-Benz Aktiengesellschaft*, 1980 WL 1943, at *6 (D. Md. Aug. 28, 1980) (rejecting attempts to "mask[]" a pass-on pricing theory because "[t]he only way in which the class plaintiffs could have been injured by the defendants' price-fixing conspiracy is if all or part of the overcharge was passed on by M-B dealers to the class plaintiffs"). The same result should obtain here.

Nor is there anything to Dr. Williams's effort to pay lip service to this Court's prior order ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ Those are all harms in the supposed *data integration services* market (where the Dealers may not seek a remedy), not in the DMS market (where they may). Dkt. 507 at 20-21. If those data-integration "harms" also qualified as injury in the

DMS market, then the careful distinction this Court drew between those two markets—a distinction that *Illinois Brick* requires—would be meaningless. And Dr. Williams never sought to calculate damages from those three categories in any event.

Finally, the foregoing analysis bars damages not only on the Dealers' federal claims, but also on their claims under Massachusetts (Count XXXIX) and New Jersey (Count XLIV) law, which follow *Illinois Brick*. *See In re Automotive Parts Antitrust Litig.*, 2013 WL 2456612, at \*29 (E.D. Mich. June 6, 2013) (Section 11[2] of Massachusetts's law "has not been extended to indirect purchasers"); *In re Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665, 703-04 (E.D. Pa. 2014) (New Jersey applies *Illinois Brick* to both its "antitrust law" and its "consumer protection law"); *Sickles v. Cabot Corp.*, 877 A.2d 267, 277 (N.J. App. Ct. 2005) (same). The Court has already dismissed the Dealers' South Carolina claim for this reason. Dkt. 507 at 35.

### B. The Dealers Do Not Isolate Harm From Alleged Unlawful Conduct.

Beyond the *Illinois Brick* bar, the Dealers' damages theory suffers from a second fatal flaw. A valid damages model measures *only* the harm caused by the defendant's allegedly unlawful conduct. That is, a plaintiff "must be able to rationally separate" harm from anticompetitive conduct from "losses (or reductions in profit) which are caused by the purely lawful competitive actions" of a defendant or other factors. *MCI Commc'ns v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1168 (7th Cir. 1983); *see also Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998).

The Dealers fail to meet this standard for two reasons. ████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

---

[2] The Dealers sue under Section 11 of Chapter 93A. *See* Compl. ¶ 608. Massachusetts does allow indirect-purchaser claims under Section 9 of that statute, *Ciardi v. F. Hoffmann–La Roche, Ltd.*, 762 N.E.2d 303, 311-12 (Mass. 2002), but Section 9 is not available to businesses. *See Continental Ins. Co. v. Bahnan*, 216 F.3d 150, 156 (1st Cir. 2000) ("the two sections of chapter 93A that create private rights of action are mutually exclusive."); *In re Novartis & Par Antitrust Litig.*, 2019 WL 3841711, at \*8 (S.D.N.Y. Aug. 15, 2019) (dismissing indirect-purchaser claim by non-consumer plaintiff).

**PUBLIC VERSION**

[REDACTED]

Alone, failure to provide evidence of damages attributable specifically and exclusively to the alleged anticompetitive conduct compels summary judgment for the defendant. *See, e.g.*, *Magnetar Tech. Corp. v. Intamin Ltd.*, 801 F.3d 1150, 1159-60 (9th Cir. 2015); *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1494-98 (8th Cir. 1992); *City of Vernon v. S. Ca. Edison Co.*, 955 F.2d 1361, 1371-73 (9th Cir. 1992); *Godix Equip. Export Co. v. Caterpillar, Inc.*, 948 F. Supp. 1570, 1582-84 (S.D. Fla. 1996), *aff'd*, 144 F.3d 55 (11th Cir. 1998). Because Dr. Williams's analysis cannot "provide a rational basis for a judgment," *Marshfield Clinic*, 152 F.3d at 593, CDK is entitled to summary judgment on the Dealers' damages claims.

### 1. The Dealers Seek Damages For Already-Dismissed Claims.

This Court dismissed the Dealers' damages claim for alleged exclusive dealing, holding that the Dealers lack antitrust standing to seek those damages. Dkt. 507 at 21. [REDACTED]

[REDACTED] Because the Dealers do not have standing to recover exclusive-dealing damages, a model that includes those damages is improper as a matter of law. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("a model purporting to serve as evidence of damages in this class action must measure only those damages attributable" to legally valid theories).[3]

---

[3] [REDACTED] But a damages model agnostic to the defendant's underlying liability—one that produces the same result whether or not some of the plaintiff's claims fail or the plaintiff even has standing to recover for those claims—"does not permit a jury to make a reasonable and principled estimate of the amount of damage." *MCI*, 708 F.2d at 1162; *see also Marshfield Clinic*, 152 F.3d at 593 (finding it "hard to take seriously" opinion of damages expert who reached the same opinion after some claims dropped out of case).

### 2. The Dealers' Damages Model Also Fails To Account For Lawful Price Increases.

Dr. Williams offers no way for jurors to decide what portion of the price increase he measures arises from Defendants' lawful ability to raise integration prices and what portion arises solely from the alleged conspiracy. As Dr. Williams acknowledged, a "fundamental step" in computing antitrust damages is describing the "but-for" world—"envision[ing] the manner in which a particular market would have developed, assuming that the antitrust violation did not occur and holding *every other feature* of the actual world constant." Ex. 80, Williams Reply ¶ 10 (quoting ABA Antitrust Section, *Proving Antitrust Damages: Legal & Economic Issues* 89 (3d ed. 2017)) (emphasis added). Accordingly, a damages model must estimate how the defendant would have acted absent the allegedly unlawful conduct—especially how the defendant would have priced its product. *See, e.g.*, *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, 221 F. Supp. 3d 1033, 1042-43 (N.D. Ind. 2016); *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1262 (9th Cir. 1981). CDK's *AutoLoop* summary judgment brief, incorporated here by reference, further explains these principles. *See AutoLoop* SJ Br. § I.A.

This unilateral power gave CDK and Reynolds the ability to raise integration prices without conspiring, at least to some extent. ███████████████████████████

217, 258-59. But he failed to account for this power when it came time to calculate damages.[4]

The Seventh Circuit has repeatedly explained that to obtain damages antitrust plaintiffs must "separate the price effects of [alleged] collusion from the price effects of the defendants' lawful market power." *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 786 (7th Cir. 1999); *see also Marshfield Clinic*, 152 F.3d at 593 (experts may not ignore the defendant's "large market share," "which might confer enough market power on it to enable it all by itself, without dividing markets with its competitors, to charge a price somewhat above" yardstick prices). ███████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

██████████████████████ *Marshfield Clinic*, 152 F.3d at 593. He never did so.

In short, ███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████ That "is plainly contrary to practical experience and unreasonable on its face." *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 556 F. Supp. 825, 1080-81 (D.D.C. 1982). Because the evidence does not permit the jury to make "a reasonable and principled estimate of the amount of damage" from the alleged conspiracy," CDK is

---

[4] The need for the Dealers to proffer a damages model that accounts for CDK's and Reynolds's lawful ability to increase their prices is underscored by this Court's prior ruling on the viability of a refusal-to-deal claim. In *AutoLoop*, this Court recognized that "there is no antitrust duty to deal in selling services to competitors in the retail market," and thus dismissed any unilateral claim "based on any purported refusal to deal" by CDK with third parties. Dkt. 504 at 27-28 (cleaned up). Further, "it is not a violation of antitrust law for a firm to raise its price" if the firm acts unilaterally. *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 935-36 (7th Cir. 2018) (quotations omitted); *see also Authenticom* SJ Br. § III.B; *AutoLoop* SJ Br. § I.A. Under these principles, CDK's or Reynolds's independent decision to block hostile access to the DMS and raise integration prices is lawful and must be taken into account in the but-for world.

entitled to summary judgment on all damages claims. *MCI*, 708 F.2d at 1162.

### C. The Dealers Offer No Evidence Of Named-Plaintiff Damages, And The Classwide Damages Calculation Fails In Any Event.

The Dealers' damages model is defective for a third reason. It fails to answer the only relevant question at this stage in the litigation: whether the *named plaintiffs* can proffer sufficient evidence to withstand summary judgment. Although the Dealers' Complaint is styled as a class action, the Dealers have not moved for class certification and no class has been certified. "[U]ntil certification there is no class action but merely the prospect of one; the only action is the suit by the named plaintiffs." *Morlan v. Universal Guar. Life Ins. Co.*, 298 F.3d 609, 616 (7th Cir. 2002); *see also Rodriguez v. Anselmo, Lindberg & Assocs., LLC*, 2019 WL 4189468, at *4 (N.D. Ill. Sept. 4, 2019) ("A putative class action is just that—putative, and not yet certified."). Thus, the named dealers are the only plaintiffs in this case, and as such their merits expert reports needed to disclose an estimate of *their* damages.

The Court's scheduling orders further support this conclusion. Judge St. Eve's original order bifurcated disclosures and required Plaintiffs to file "Opening Merits Expert Reports" while deferring "class certification" expert disclosures until after the *Authenticom* trial. Dkt. 166 at 2-3. Subsequent scheduling orders continued to contemplate "merits" disclosures prior to summary judgment. *See* Dkt. 553; Dkt. 769; Dkt. 800.

Contrary to these orders, however, when the Dealers submitted their opening merits expert reports, they disclosed nothing about their individual damages. Dr. Williams calculated only "total" damages for a putative nationwide class. He never attempted to allocate any portion of these classwide damages to any of the 25 named dealer plaintiffs. Nor did he analyze any named plaintiff's individual vendor purchase data to calculate its individual harm. *See* Ex. 79, Williams Rpt. ¶ 171. In contrast, the expert for the putative vendor class, Dr. Mark Israel, broke out alleged class damages by class member, enabling straightforward identification of the named plaintiff's (AutoLoop's) claimed damages. *See* Ex. 72, Israel Rpt. tbl. 8. Dr. Williams's

oversight is especially perplexing because his report states that he was retained by the named dealer plaintiffs and recognizes that the putative class is entirely prospective. *See* Ex. 79, Williams Rpt. ¶¶ 6-9.

Dr. Williams's classwide calculations are the only evidence the Dealers offer of their alleged damages in this litigation. On May 10, 2018, the Dealers served initial disclosures, asserting that "[c]omputation of damages pursuant to Rule 26(a)(1)(C) is premature" because their overcharge theory would "require discovery" and "expert reports and analysis that has not yet been performed." Ex. 113 (Dealers' Initial Rule 26(a)(1) Disclosures) at p. 39. CDK later served an interrogatory asking the Dealers to identify the categories and amounts of their damages. See Ex. 110 (CDK's 1st Interrogatories to Dealership Plaintiffs) at Interrogatory No. 6. It asked the Dealers to describe "You[r]" damages, a term that meant the named plaintiffs specifically. *Id.* at Definition No. 8 ("Unless otherwise specified, 'Dealer Class Plaintiffs,' 'You,' and 'Your' means all named plaintiffs in the Consolidated Amended Complaint and the Complaints in the following legal proceedings . . . ."). On June 22, 2018, the Dealers responded that these amounts would be the subject of expert testimony:



Ex. 111 (Dealers' Responses and Objections to CDK's First Interrogatories) at pp. 11-12. The Dealers served amended responses on June 26, 2019, after the close of discovery, but did not change this response. Ex. 112 (Dealers' Amended Objections and Responses to CDK's First Interrogatories) at pp. 11-12. Then, after repeatedly promising expert evidence of the amount of their damages, the Dealers submitted an expert report on August 26, 2019, that failed to calculate damages for any named plaintiff.

14

Because they offer no evidence of named plaintiff damages, the Dealers' damages claims fail as a matter of law. But the Dealers' classwide damages model fails even on its own terms, for it offers nothing jurors could use to award damages to a putative class. ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ As explained above, however, "indirect" damages for federal claims are barred by *Illinois Brick*, and Dr. Williams made no effort to quantify "decreased functionality" damages. *See* § I.A *supra*.

Nor would indirect damages available under *state laws* come anywhere close to ████

████ and Dr. Williams offers no way for jurors to calculate indirect damages for the subset of states that recognize that form of relief. The Dealers do not have state claims that would cover all the members of their putative nationwide class. To start, their Complaint brings claims under the law of only 36 states. Three of those states follow *Illinois Brick*. *See* § I.A *supra*. The court has already dismissed seven other state-law claims on other grounds. Dkt. 507 at 51-54, 63-65 (Alabama, Arkansas, Delaware, Georgia, North Carolina, Tennessee, Wisconsin). And it should dismiss many more for the reasons set forth in § II.C *infra*. Moreover, Dr. Williams started calculating class damages as of September 2013, Ex. 79, Williams Rpt. ¶ 162, although the Dealers' settlement with Reynolds prohibits them from certifying a class period that starts before 2015. *See* Dkt. 427-2 ¶¶ 1(b), 29.

In short, the classwide damages the Dealers could potentially recover under state law do not correspond to their calculation of a nationwide pass-through overcharge. No putative class (or set of putative subclasses) could possibly recover ████████ in pass-through damages from Defendants even if the Dealers were to prevail on all of their remaining claims.

There is no easy fix for this problem. Antitrust disputes involve complicated damages calculations requiring expert testimony. *See Illinois Brick*, 431 U.S. at 736-44. Yet Dr.

**PUBLIC VERSION**

Williams admitted that he never tried to calculate state-by-state damages ████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████ The Federal Rules

and this Court's orders required the Dealers not to present a "methodology" that would enable

their expert to calculate damages, but to provide actual, admissible evidence. *See Walton v.*

*Trans Union, LLC*, 2008 WL 2038598, at *1 (S.D. Ind. May 12, 2008) (party could not

"promise to provide [damages information] at some later date" in responses served after close

of discovery). A party cannot avoid summary judgment by promising to patch holes in expert

opinions at some future date. *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068,

1082 (7th Cir. 2016) (a party who "fails to comply with deadlines related to discovery or

otherwise forestalls prosecution of their own case is not entitled to seek additional discovery

when the opposing side moves for summary judgment"); *Griggs-Ryan v. Smith*, 904 F.2d 112,

115 (1st Cir. 1990) ("promise[s] to produce admissible evidence at trial" do not prevent

summary judgment) (quotations omitted).

Damages are an essential element of the Dealers' claims. *See, e.g.*, *Amerinet, Inc. v.*

*Xerox Corp.*, 972 F.2d 1483, 1490-91 (8th Cir. 1992) (antitrust plaintiff must show amount of

its own damages). Because the Dealers have no evidence of individual damages and offer a

calculation that does not even fit their class theory, the Court should award summary judgment

to CDK. *See, e.g.*, *Allergease Inc. v. Walgreen Co.*, 2017 WL 66819, at *5-6 (N.D. Ill. Jan. 6,

2017) (granting summary judgment where plaintiff failed to produce specific evidence of

damages); *Dynegy Mktg. & Trade v. Multiut Corp.*, 2008 WL 2410425, at *8 (N.D. Ill. June

11, 2008) (same where party "provided no evidence to quantify damages").

**II. The Dealers Fail To Establish A Triable Issue On Liability.**

The Dealers' liability case fares no better than their damages case. The Dealers essentially track the claims of the other MDL Plaintiffs, alleging a conspiracy between CDK and Reynolds to close their respective systems and raise integration prices. Indeed, although the Dealers' economic expert and Authenticom and AutoLoop's expert purportedly did not coordinate on these issues, the Dealers, Authenticom, and AutoLoop all concluded that the alleged conspiracy began in September 2013, an entirely different theory from the one alleged in their respective complaints. *See* Dkt. 775; Dkt. 832; Dkt. 899.

In its concurrently filed motion in the *Authenticom* case, CDK sets out the relevant factual background and explains that the voluminous MDL discovery record lacks any evidence of a conspiracy beginning in September 2013 (or ever). Rather, the evidence shows that CDK and Reynolds acted to further their independent interests. *See Authenticom* SJ Br. § II. CDK incorporates that briefing by reference here. As CDK explains below, moreover, the Dealers' additional evidence on liability, in the form of "economic" opinions by Dr. Williams, does nothing to help them make out a conspiracy where the other MDL Plaintiffs could not.

**A. The Dealers Fail To Establish Liability On Their Conspiracy Claims.**

The Dealers' federal antitrust claims fail under *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). At summary judgment, the Dealers must offer evidence that "tend[s] to rule out the possibility that the defendants were acting independently." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). That means the Dealers "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action." *Matsushita*, 475 U.S. at 588; *see also In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 949 (N.D. Ill. 2014), *aff'd*, 801 F.3d 758 (7th Cir. 2015).

The Dealers' unique evidence of the alleged conspiracy between CDK and Reynolds are the "economic" opinions offered by the Dealers' expert, Dr. Williams. But he does not

**PUBLIC VERSION**

address the major economic issues in this case. ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████

Rather than bring economic analysis to bear on these issues, Dr. Williams purported to

interpret record evidence to exclude the possibility of unilateral action. S███████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ Regardless, as discussed in CDK's

*Daubert* motion (Dkt. 882), the factors Dr. Williams identifies do not move the ball across the

50-yard line, as required at summary judgment. *Kleen Prods*, 910 F.3d at 934.

*First*, Dr. Williams argues ████████████████████████████████████████

████████████████████████████████████████████████████████████████

18

**PUBLIC VERSION**

███████ Ex. 79, Williams Rpt. ¶¶ 114-16. As the Seventh Circuit has held, however, "it is not a violation of antitrust law for a firm to raise its price" so long as the firm acts unilaterally. *Kleen Prods.*, 910 F.3d at 935-36. ███████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████ That prices were supposedly elevated thus says nothing about whether Defendants *conspired* to raise prices.

        *Second,* ███████████████████████████████████████

███████ Ex. 79, Williams Rpt. ¶¶ 117-20. But CDK's *Authenticom* brief details the legitimate nature of the communications on which Dr. Williams relies, which relate merely to the negotiation and implementation of the 2015 Agreements. *Authenticom* SJ Br. II.A.4. The fact that two companies are negotiating cannot support an inference that they entered into an unwritten conspiracy, "[e]specially" where, as here, the "companies have legitimate business reasons for their contacts." *Kleen Prods.*, 910 F.3d at 938; *see also Dairy Farmers*, 801 F.3d at 763; *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 709 (7th Cir. 2011).

        Dr. Williams ignores the legitimate reasons for those negotiations. Rather, he assumes that because CDK and Reynolds were communicating about sensitive issues these communications must have been against CDK's unilateral self-interest. That makes no sense.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

**PUBLIC VERSION**

t███████████████████████████████████. JSUF 102-15.

Dr. Williams's decision to ignore these undisputed facts renders his "economic" analysis of information exchanged in the course of negotiations worthless. ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

*Third*, ██████████████████████████████████████████

████████████████████████████ Consistent with his approach to the record generally, however, his analysis of these agreements is entirely conclusory. Ex. 79, Williams Rpt. ¶¶ 121-22. Further, the Seventh Circuit has held that "nothing in any of the three agreements required either CDK or Reynolds to block third-party access to its own data management system." *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1023 (7th Cir. 2017). And again, Dr. Williams ignores the undisputed evidence that CDK and Reynolds had unilateral incentives to wind down DMI's hostile access and obtain access to certified integration for their respective apps wholly apart from any conspiracy to block third-party integrators. *See Authenticom* SJ Br. II.A.4.

*Fourth*, ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ It is undisputed that the Data Exchange Agreement required these communications, Ex. 49, DEA § 4.2, and

thus they do nothing to suggest that CDK and Reynolds had reached an additional, anticompetitive agreement. *See, e.g.*, *Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1295 (N.D. Ga. 2002) (fact that device could be used to punish cartel cheating cannot defeat summary judgment unless evidence "tend[s] to exclude the possibility" that defendants engaged in lawful conduct), *aff'd sub nom. Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003). Defendants' *Authenticom* brief (at pp. 31-32) shows the alleged conspiracy had no plausible enforcement mechanism, and Dr. Williams never identifies one.

   *Fifth*, ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ But pretextual statements do not suggest a conspiracy. *See Lamb's Patio Theater, Inc. v. Universal Film Exchanges, Inc.*, 582 F.2d 1068, 1070 (7th Cir. 1978) ("even if Lamb's could show that Universal's announced business reasons were not legitimate, such showing would not satisfy Lamb's burden of establishing the existence of the conspiracy element essential to its prima facie antitrust case"); *Magid Mfg. Co., Inc. v. U.S.D. Corp.*, 654 F. Supp. 325, 330 (N.D. Ill. 1987) ("mere pretext" is not sufficient to establish a conspiracy); *Moffat v. Lane Co., Inc.*, 595 F. Supp. 43, 49 (D. Mass. 1984) ("that a business reason advanced for action against plaintiff is pretextual does not without more" suggest conspiracy).

   *Finally*, Dr. Williams discusses characteristics that, in his view, make collusion easier in the DMS industry than elsewhere. These include a concentrated market, barriers to entry, and switching costs. Ex. 79, Williams Rpt. ¶¶ 96-112. As noted above, however, Dr. Williams performed no analysis of DMS switching costs. He relies entirely on media reports and MDL testimony about the supposed difficulty of switching. *Id.* ¶¶ 108-12. Regardless, the fact that a market supposedly has "certain structural features that make it 'conducive to successful

collusion,'" does not support an inference of conspiracy because each of those factors is *equally* consistent with lawful conscious parallelism. *Kleen Prods.*, 910 F.3d at 935; *see also Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 196-97 & n.9 (3d Cir. 2017) (rejecting industry analysis by Dr. Williams because "[t]here is no dispute that the market was primed for anticompetitive interdependence and that it operated in that manner," so that "Valspar's expert evidence confirming these facts mastered the obvious").

In sum, nothing in Dr. Williams's economic analysis tends to rule out the possibility that CDK and Reynolds were pursuing their independent, unilateral interests in securing their DMSs from hostile integration. The evidence shows only that CDK and Reynolds negotiated legitimate 2015 Agreements and separately secured their respective DMSs at different times and for unilateral reasons. In any event, the evidence is at least *equally* consistent "with [CDK's] permissible independent interests as it is with improper activity." *Omnicare,* 629 F.3d at 707. CDK is therefore entitled to summary judgment on the conspiracy claims.[5]

**B.     The Dealers' Exclusive-Dealing Claim For Injunctive Relief Fails.**

In addition to their conspiracy claims, the Dealers bring Section 1 claims for exclusive dealing for which the Court has already held the Dealers may seek only injunctive relief. *See* Dkt. 507 at 33. The Dealers claim that, "[p]ursuant to their conspiracy to eliminate competition in the DIS market, CDK and Reynolds inserted exclusive dealing provisions in their contracts with Vendors," and that these provisions have increased prices and reduced competition. Compl. ¶¶ 190-99; *see also* Dkt. 357 at 50-51. But the record refutes that any exclusive-dealing provisions in vendor contracts were inserted pursuant to a conspiracy. CDK and Reynolds's vendor contracts have included the challenged provisions since well before 2013 (the supposed conspiracy start date). JSUF 6-7, 9, 15, 24. And as the *Authenticom* and *AutoLoop* summary

---

[5] As explained in the *Authenticom* brief, even if the Dealers could adduce evidence to support a Section 1 conspiracy claim, the claim must be evaluated under the rule of reason. *Authenticom* SJ Brief § II.C.

judgment motions explain, any exclusive-dealing claim is doomed to fail in any event. Among other things, the harm the Dealers allegedly incurred as a result of these provisions—the inability to have hostile integrators service the Dealers' vendors—does not flow from the alleged exclusive dealing provisions but instead is the product of Defendants' unilateral decisions to secure their DMSs and prevent hostile integrators from accessing the system without authorization. *See Authenticom* SJ Br. §§ III.B & IV.A.4; *AutoLoop* SJ Br. § II.

### C. The Dealers Fail To Establish Liability On Their State Claims.

Summary judgment also is appropriate on the Dealers' 37 remaining state-law claims.

#### 1. All Of The Dealers' State Claims Track Their Federal Claims.

As CDK explained in its motion to dismiss, as the Court recognized, and as the Dealers did not dispute, all of the Dealers' state antitrust claims (Counts VI-XXXI) and four of their state consumer protection claims are interpreted consistent with the Sherman Act. *See* Dkt. 507 at 34-35; Dkt. 358 at p. 77; Dkt. 265 at 28-29 n.19, 44 n.*. Because the federal antitrust claims fail at summary judgment, CDK is entitled to summary judgment on those state claims as well.

Even for those consumer-protection claims for which there is no binding authority requiring application of Sherman Act standards, the Dealers' claims are *factually* inseparable from the failed federal claims. All of the Dealers' consumer-protection claims are based on the same conspiracy allegation—that CDK engaged in "unfair and/or deceptive practices" by:

> (1) knowingly conspiring, contracting, and/or agreeing to restrain trade in the DMS and DIS markets; (2) substantially diminishing competition in the DMS and DIS markets; (3) increasing prices to monopolistic levels for services related to the DMS and DIS markets; and (4) causing Dealership Plaintiffs and members of the [State] Class to pay these supracompetitive prices.

*E.g.*, Compl. ¶¶ 555, 564, 571, 578. But as just explained, the Dealers have no evidence of any such "conspiracy," "contract," or "agreement" to withstand summary judgment. *See* § II.A *supra*. Having hitched their wagon to a conspiracy theory, the Dealers' state and federal claims fall together. And even if the Dealers intended to pursue a unilateral theory to support their

state claims, the Dealers cannot establish any unlawful unilateral conduct. *See Authenticom* SJ

Br. § IV. Thus, the Court should award summary judgment to CDK on all state claims.

## 2. The Dealers' Claims Lack A Nexus To DC, Massachusetts, Mississippi, New Hampshire, New York, South Dakota, Or West Virginia.

Seven claims fail because the Dealers cannot show a nexus to the relevant jurisdiction.

***Massachusetts***. Under Massachusetts's consumer protection statute (Count XXXIX),

the Dealers must show that the "actions and transactions constituting the alleged unfair method

of competition" have "occurred *primarily and substantially*" in Massachusetts. Mass. Gen.

Laws Ch. 93A, § 11 (emphasis added). The Dealers must show that, in the context of the

"entire" claim, the "center of gravity of the circumstances that give rise to the claim is primarily

and substantially within the Commonwealth." *SCVNGR, Inc. v eCharge Licensing, LLC*, 2014

WL 4804738, at *6 (D. Mass. Sept. 25, 2014). They cannot do so.

Neither CDK nor Reynolds is located in or has its principal place of business in

Massachusetts. JSUF 1, 16. There is no evidence that CDK or Reynolds took any action to

reach the purportedly illegal agreement in Massachusetts. Nor is there any evidence that CDK

or Reynolds specifically targeted dealers there. The only evidence tying the Dealers' claims to

Massachusetts is that CDK and Reynolds allegedly increased integration prices, affecting

dealers in Massachusetts (and many other states) that used applications enrolled in 3PA or RCI.

"Where wrongdoing is not focused on Massachusetts but has relevant and substantial

impact across the country, the 'primarily' requirement of section 11 cannot be satisfied."

*Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 197 (1st Cir. 2012); *see also Uncle Henry's*

*Inc. v. Plaut Consulting Co.*, 399 F.3d 33, 45 (1st Cir. 2005) ("[I]f the significant contacts of

the competing jurisdictions are approximately in the balance, the conduct in question cannot

be said to have occurred primarily and substantially in Massachusetts."). Accordingly, courts

often grant summary judgment where, as here, the undisputed facts show that the defendant's

alleged conduct had at most an incidental effect on Massachusetts. *See, e.g., Arabian Support & Servs. Co., Ltd. v. Textron Sys. Corp.*, 943 F.3d 42, 47-48 (1st Cir. 2019); *New England Gen-Connect, LLC v. US Carburetion, Inc.*, 2019 WL 1332891, at *1-2 (D. Mass. Mar. 25, 2019).

*New Hampshire*. The analysis is the same under the Dealers' New Hampshire claim (Count XLIII). Similar to Massachusetts, New Hampshire's consumer-protection law applies only to "the conduct of any trade or commerce within" that state. N.H. Rev. Stat. Ann. § 358-A:2. This Court previously declined to decide whether the Dealers satisfied this requirement, noting that both sides cited cases "supporting their respective positions." Dkt. 507 at 53. But now that discovery has closed, it is clear that the Dealers do not satisfy the nexus requirement.

The New Hampshire statute demands not just "increased prices paid in New Hampshire," but "alleged conspirators taking action in New Hampshire." *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *17 (E.D. Mich. Apr. 9, 2013). Many other federal courts agree.[6] One case, *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224 (M.D. Pa. 2010), reaches a different conclusion but is not persuasive. There, the court purported to focus its analysis (as required) "upon the 'offending conduct' itself," but then concluded that it was enough that defendants allegedly "colluded to fix the price of chocolate products that were then introduced into the New Hampshire market." *Id.* at 235. That effectively erases the recognized distinction between "conduct" and "harm."

*Other Jurisdictions*. Five other relevant antitrust laws incorporate a territorial nexus requirement as well. They are: (1) Mississippi (Count XVII); (2) New York (Count XXI); (3) South Dakota (Count XXVI); (4) West Virginia (Count XXX); and (5) the District of

---

[6] *See, e.g., Nanometrics, Inc. v. Optical Sol'ns, Inc.*, 2019 WL 1048253, at *7 (N.D. Cal. Mar. 5, 2019) (dismissing claim where "most if not all of the relevant conduct is alleged to have occurred in California"); *Wilcox Indus. Corp. v. Hansen*, 870 F. Supp. 2d 296, 305 (D.N.H. 2012) (fact that harm from defendants' conduct allegedly "occurred in New Hampshire" is "insufficient to bring the offending conduct within the fold of the NHCPA."); *Mueller Co. v. U.S. Pipe & Foundry Co.*, 2003 WL 22272135, at *6 (D.N.H. Oct. 2, 2003) (absent unfair or deceptive acts that "took place within New Hampshire," "harm suffered by [the plaintiff] within the state does not state a claim.").

Columbia (Count IX). Each requires at least some intrastate conduct by the Defendant, beyond a national conspiracy with in-state effects, to sustain a state antitrust claim.[7] Similar to the reasons for disposing of the Dealers' Massachusetts and New Hampshire claims—as well as the Delaware, North Carolina, and Wisconsin claims already dismissed for lack of territorial conduct or effect and the Alabama and Tennessee claims dismissed for lack of intrastate conduct, Dkt. 507 at 50-54—the factual record shows that the Dealers cannot satisfy the nexus requirements in Mississippi, New York, South Dakota, West Virginia, or the District of Columbia, either. Accordingly, summary judgment is appropriate as to those jurisdictions too.

### 3. The Dealers Cannot Bring Antitrust Claims Under Colorado, Minnesota, North Dakota, New Mexico, Or South Dakota Consumer Protection Laws.

In *Dairy Farmers*, this Court held that the Arkansas Deceptive Trade Practices Act's prohibition on "unconscionable, false, or deceptive" conduct does not reach price-fixing or other antitrust claims. 2015 WL 3988488, at *35-36. The Court thus previously dismissed the Dealers' Arkansas claim for failure to allege "fraudulent and/or unconscionable acts." Dkt. 507 at 65. The Colorado (Count XXXV); Minnesota (Count XL); New Mexico (Count XLV); North Dakota (Count XLVI); and (5) South Dakota (XLVIII) claims fail for the same reasons. Those statutes similarly prohibit only "deceptive," "false, or "unconscionable" conduct, which courts have held does not reach antitrust violations like those alleged here.[8]

---

[7] *See* **Mississippi**: *In re Microsoft Corp. Antitrust Litig.*, 2003 WL22070561, at *2 (D. Md. Aug. 22, 2003) (dismissing antitrust claims for failure to allege "at least some conduct by Microsoft which was performed wholly intrastate"); **New York**: *H-Quotient, Inc. v. Knight Trading Grp., Inc.*, 2005 WL 323750, at *4 (S.D.N.Y. Feb. 9, 2005) (dismissing claim "[w]here the conduct complained of principally affects interstate commerce, with little or no impact on local or intrastate commerce"); **South Dakota**: *In re Dynamic Random Access Memory (DRAM I) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1099 (N.D. Cal. 2007) (insufficient to allege national conspiracy with substantial effects on interstate commerce); **West Virginia**: *State ex rel. Palumbo v. Graley's Body Shop, Inc.*, 425 S.E.2d 177, 183 n.11 (W. Va. 1992) ("West Virginia's antitrust law is directed towards *intrastate* commerce."); **District of Columbia**: *Sun Dun, Inc. of Wash. v. Coca-Cola Co.*, 770 F. Supp. 285, 289 (D. Md. 1991) ("no evidence . . . to show sales in the District of Columbia that did not have an interstate aspect").

[8] **Colorado**: Colo. Rev. Stat. § 6–1–105; *New Motor Vehicles*, 350 F. Supp. 2d at 179-80 (alleged conspiracy to prevent import of cheaper Canadian vehicles into the U.S. market did not constitute "fraudulent or deceptive conduct"); **Minnesota**: Minn. Stat. §§ 325D.44 subd. 1 & 325F.69 subd.1;

### 4. The Dealers Are Not Proper Nevada And West Virginia Plaintiffs.

The Court should award CDK summary judgment on the Nevada Deceptive Trade Practices Act claim (Count XLII) because the Dealers are not proper plaintiffs. "The only provision of this Act providing for a private civil action is limited to suits by 'an elderly person or a person with a disability.'" *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 163 (E.D. Pa. 2009) (citing Nev. Rev. Stat. § 598.0977). The Dealers do not fall within either category.

Similarly, a plaintiff must be a "consumer" to maintain a private cause of action under the West Virginia Consumer Credit and Protection Act (Count XLIX). *McNeely v. Wells Fargo Bank, N.A.*, 115 F. Supp. 3d 779, 784-85 (S.D.W. Va. 2015). Because "consumer" means "natural person," W. Va. Stat. § 46A-6-102(2), courts have held that the statute "applies only to natural persons and not business entities." *MSP Recovery Claims, Series, LLC v. Sanofi-Aventis U.S. LLC*, 2020 WL 831578, at *11 (D.N.J. Feb. 20, 2020); *see also Any Occasion, LLC v. Florists' Transworld Delivery, Inc.*, 2010 WL 3584411, at *2 (N.D.W. Va. Sept. 13, 2010). This Court dismissed the Dealers' Georgia claims because Georgia's statute limits the definition of "consumer" to "natural persons." Dkt. 507 at 63-64. It should do the same here.

### 5. State Law Precludes The Dealers From Bringing Colorado, Illinois, And South Carolina Class Action Claims.

The Court should dismiss three of the Dealers' claims because they arise under state laws that expressly prohibit class actions like those the Dealers bring here—the Illinois antitrust claim (Count XI) and the Colorado (Count XXXV) and South Carolina (Count XLVII) consumer-protection claims.[9] CDK moved to dismiss Count XI and Count XLVII on this

---

*Schoenbaum v. E.I. DuPont De Nemours & Co.*, 517 F. Supp. 2d 1125, 1154 (E.D. Mo. 2007) (rejecting the contention that it is deceptive to state a price for a product "while knowing that the conspiracy maintained prices at an artificially high level"); **North Dakota**: N.D. Cent. Code § 51–15–02; *New Motor Vehicles*, 350 F. Supp. 2d at 197-98 (same); **New Mexico**: N.M. Stat. Ann. § 57-12-3; *In re Graphics Processing Units (GPU) Antitrust Litig.*, 527 F. Supp. 2d 1011, 1029-30 (N.D. Cal. 2007); **South Dakota**: S.D. Codified Laws § 37-24-1; *New Motor Vehicles*, 350 F. Supp. 2d at 202-03.

[9] *See* Colo. Rev. Stat. § 6-1-113(2) (defendants liable for damages "[e]xcept in a class action"); 740 ILCS 10/7 ("no person shall be authorized to maintain a class action in any court of this State for indirect

ground, but the Court denied the motion absent authority applying *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), to such provisions. Dkt. 507 at 59.

### a.      Justice Stevens's opinion in *Shady Grove* is controlling.

In *Shady Grove*, the Supreme Court addressed the question of whether a New York law precluding class actions in suits seeking statutory penalties applied in federal court. Justice Scalia, writing for a four-Justice plurality, concluded that the New York law conflicted with Rule 23, 559 U.S. at 399-406, and further that Rule 23 governed because under the Rules Enabling Act valid federal rules of procedure always apply in federal court. *Id*. at 406-410.

Justice Stevens, concurring in the judgment, agreed that federal rules would "generally" apply in federal court. *Id*. at 423. Unlike the plurality, however, Justice Stevens would not apply federal law if doing so "would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right." *Id*. at 423. Justice Stevens ultimately concluded that the New York class-action bar did not qualify because it was not intertwined with any state-created right. Rather, the provision "expressly and unambiguously applies not only to claims based on New York law but also to claims based on federal law or the law of any other State." *Id*. at 429-32.

Justice Ginsburg, writing for the four remaining Justices, dissented. Finding "common ground" with Justice Stevens on the issue, she emphasized that "a majority of this Court . . . agrees that Federal Rules should be read with moderation in diversity suits to accommodate important state concerns." *Id*. at 442 n.2. But she reasoned that New York's class-action bar *was* intertwined with state substantive law and should apply in federal court. *Id*. at 443-45.

Because no single opinion in *Shady Grove* garnered a majority, this Court must apply the principle of *Marks v. United States*, 430 U.S. 188 (1977), to determine which opinion is

---

purchasers asserting claims under this Act, with the sole exception of this State's Attorney General"); S.C. Code Ann. § 39-5-140(a) (granting an individual, not representative, right to recover damages).

controlling. In *Marks*, the Supreme Court held that when a majority of the Court does not agree

on a rationale to decide a case, "the holding of the Court may be viewed as that position taken

by those Members who concurred in the judgments on the narrowest grounds." *Id*. at 193. In

*Shady Grove*, Justice Stevens and the plurality agreed that in the event of conflict between a

federal procedural rule and a "purely" procedural state rule, the federal rule applies. The

plurality would have gone further and held that a federal procedural rule trumps a state

procedural rule even when the state rule is intertwined with substantive state law. Thus, as

many courts have recognized, Justice Stevens's approach is narrower than the plurality's,

which means his concurrence controls. *E.g.*, *Harris v. Reliable Reports, Inc.*, 2014 WL 931070,

at *7-8 (N.D. Ind. Mar. 10, 2014) (applying concurrence); *Racher v. Westlake Nursing Home

Ltd. P'ship*, 871 F.3d 1152, 1162 (10th Cir. 2017) (following Justice Stevens's opinion).[10]

      In its prior opinion, this Court noted that two decisions—*Sawyer v. Atlas Heating &

Sheet Metal Works, Inc.*, 642 F.3d 560 (7th Cir. 2011), and *State Farm Life Ins. Co. v. Jonas*,

775 F.3d 867 (7th Cir. 2014)—might be read to suggest that the Seventh Circuit would follow

Justice Scalia's *Shady Grove* opinion, but the Court expressly declined to decide the issue.

Dkt. 507 at 59 & n.23. But neither *Sawyer* nor *Jonas* goes that far.

      *Sawyer* did not address whether a state procedural rule applies in federal court

notwithstanding Rule 23. Rather, the issue was whether the *American Pipe* doctrine applied to

a putative class claim. To be sure, in discussing an Eleventh Circuit decision on tolling rules,

---

[10] Some courts have concluded that Justice Stevens's opinion does not control under *Marks* because it is not a "logical subset" of the plurality's opinion. *E.g.*, *Hatchett v. Henry Schein, Inc.*, 2020 WL 733834, at *3 (S.D. Ill. Feb. 13, 2020). There is uncertainty over whether *Marks* has a "logical subset" requirement, however. *See Hughes v. United States*, 138 S. Ct. 1765, 1772 (2018) (granting certiorari over this question but ultimately deciding the case on other grounds). Read expansively, the requirement would make *Marks* a dead letter. The premise of the *Marks* rule is that there is no true logical subset—*i.e.*, "no single rationale explaining the result [that] enjoys the assent of five Justices." *Marks*, 430 U.S. at 193. In any event, to the extent the requirement has force, Justice Stevens's opinion in *Shady Grove* is a "logical subset" of the plurality opinion. Both opinions agree that valid federal rules trump pure state procedural rules in the case of a conflict. That the plurality would hold that a federal rule trumps even when a state procedural rule is intertwined with substantive concerns shows that the plurality would go farther than Justice Stevens, which means that Justice Stevens's concurrence is "narrower."

*Sawyer* observed in *dicta* that Rule 23 "applies to all federal suits, even if that prevents achieving some other objective that a court thinks valuable." 642 F.3d at 564. But the interaction between a *federal* tolling rule and Rule 23 is immaterial to the issue here. *Jonas* is the same. It merely observed that generally "federal procedures govern in federal litigation" without addressing which *Shady Grove* opinion controls. 775 F.3d at 869. Thus, neither *Sawyer* nor *Jonas* overcomes what *Marks* compels—that Justice Stevens's narrower opinion controls.

### b. Class-action bars are intertwined with substantive concerns.

The Colorado, Illinois, and South Carolina class-action bars are intertwined with state-created antitrust and consumer-protection rights and so apply in federal court under Justice Stevens's controlling *Shady Grove* opinion. Illinois's provision illustrates the point. The Illinois Antitrust Act permits private parties to sue for damages but states that no private person "shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act." 740 ILCS 10/7(3). This partial *Illinois Brick* repealer "reflects different judgments about the feasibility of trying such claims and the potential danger of duplicative recoveries." *Ill. ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1480 (7th Cir. 1991). It is thus inextricably intertwined with a substantive determination about the proper scope of a defendant's liability. *Cf. Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 14 (2d Cir. 1980) (*Illinois Brick* "has a broader significance in indicating that there are inherent limitations in the substantive protection afforded by the antitrust laws").

Illinois's class-action bar is also distinguishable from the bar in *Shady Grove* in critical ways. The New York provision pertained to all class actions for statutory damages and appeared immediately after the enumeration of standard class-action prerequisites. *Compare* N.Y. CPLR § 901, *with* Fed. R. Civ. P. 23(a), (b)(3). As Justice Stevens explained, nothing in the text, legislative history, or judicial interpretation of § 901(b) suggested that it was limited to a particular cause of action or even to claims arising under New York law. *Shady Grove*,

559 U.S. at 432-33. To the contrary, the legislative history suggested that § 901(b) was "classically procedural," intended to "ma[k]e it easier to litigate claims in New York courts (under any source of law) only when it is necessary to do so." *Id.* at 435.

Here, by contrast, Illinois's class-action bar is specific to one type of claim (antitrust) brought by one type of claimant (indirect purchasers) under one body of law (Illinois state law). It is nothing like the "pan-statutory" provision the Supreme Court addressed in *Shady Grove*. *Delgado v. Ocwen Loan Servicing, LLC*, 2017 WL 5201079, at *9 (E.D.N.Y. Nov. 9, 2017). Accordingly, a host of courts have held that the Illinois antitrust statute's class ban is enforceable in federal court. As Judge Leinenweber explained, "[u]nder *Shady Grove*, state procedural rules control in federal court when they are 'part of a State's framework of substantive rights or remedies,'" and therefore "the Court must apply the Illinois Antitrust Act and dismiss with prejudice [the] indirect purchaser antitrust claim brought under Illinois law." *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 723 (N.D. Ill. 2016).[11]

Courts have reached the same conclusion about the analogous class-action bars in the Colorado Consumer Protection Act, *Davidson v. Apple, Inc.*, 2018 WL 2325426, at *11 (N.D. Cal. May 8, 2018); *Friedman v. Dollar Thrifty Auto. Grp.*, 2015 WL 8479746, at *2–5 (D. Colo. Dec. 10, 2015); and in the South Carolina Unfair Trade Practices Act, *Fejzulai v. Sam's West, Inc.*, 205 F. Supp. 3d 723, 728-29 (D.S.C. 2016); *In re TD Bank, N.A.*, 150 F. Supp. 3d 593, 635 (D.S.C. 2015). They have also enforced similar class-action bars under the consumer laws of other states (not at issue here) for the same reasons.[12]

---

[11] *See also Stanley v. Gilead Sciences*, 2020 WL 1032320, at *36 (N.D. Cal. Mar. 3, 2020) ("the Illinois prohibition on class actions is deeply intertwined with the rights under the *Illinois Brick* repealer"); *Novartis & Par*, 2019 WL 3841711, at *7 (a "majority of courts" hold that the Illinois Antitrust Act "is distinguishable" from the law in *Shady Grove*); *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 392 (D.N.J. 2018); *In re Solodyn (Mincocyclin Hydrochloride) Antitrust Litig.*, 2015 WL 5458570, at *17 (D. Mass. Sept. 16, 2015); *In re Wellbutrin XL Antitrust Litig.*, 756 F. Supp.2d 670, 677 (E.D. Pa. 2010).

[12] *See, e.g.*, *Stanley Danielkiewicz v. Whirlpool Corp.*, 426 F. Supp. 3d 426, 438 (E.D. Mich. 2019) (Georgia); *In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 416 (D.N.J. 2018) (Montana); *Greene v. Gerber Prods. Co.*, 262 F. Supp. 3d 38, 61 (E.D.N.Y. 2017) (Ohio); *In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1165 (D. Minn. 2014) (Kentucky, Louisiana).

A minority of courts have concluded that state class-action bars linked to the *Illinois Brick* rule do not apply in federal court. *E.g.*, *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 765 (N.D. Ill. 2019); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 817-18 (N.D. Ill. 2017). These decisions are inconsistent with the binding opinion in *Shady Grove*. In *Broiler Chicken*, for instance, the court noted that "the *Illinois Brick* issue— whether indirect purchasers can bring suit at all, even individually—is certainly substantive in that it affects the 'rights and remedies' of indirect purchasers," but declined to give Illinois's class-action rule effect because "whether such plaintiffs may bring a class action does not affect their substantive rights." 290 F. Supp. 3d at 818. That reasoning is inconsistent with Justice Stevens's *Shady Grove* opinion, which does not ask whether a state law pertains to a procedural vehicle, but whether "a state law that is procedural in the ordinary use of the term . . . is so *intertwined* with a state right or remedy that it functions to define the scope of the state-created right." *Shady Grove*, 559 U.S. at 424 (emphasis added). That is precisely the function and effect of the Illinois, Colorado, and South Carolina class-action bars at issue here.

> **6.      The Dealers Fail To Satisfy Arizona, Hawaii, New Jersey, Utah, And West Virginia Statutory Notice Requirements.**

The Court should award summary judgment to CDK on the Arizona (Count VII), Hawaii (Count X), and Utah (Count XXVIII) antitrust claims and the New Jersey consumer-protection claim (Count XLIV) because the Dealers did not give notice to the state attorney general as required by Ariz. Rev. Stat. § 44-1415(A), Haw. Rev. Stat. § 480-13.3, N.J. Stat. § 56:8-20, and Utah Code § 76-10-3109(9). In addition, the dealers violated a similar West Virginia provision (Count XLIX) requiring notice to the defendant rather than the attorney general. W. Va. Code § 46A-6-106(c). CDK raised these statutory notice requirements in its motion to dismiss. In response, the Court called for further briefing on *Shady Grove*. Dkt. 507 at 62. As explained below, the state notice requirements do not implicate *Shady Grove* because they do not conflict with Rule 23. Even if they did conflict, the requirements are enforceable.

32

a.    ***Shady Grove* does not apply to notice requirements.**

*Shady Grove* questions arise only if the Court cannot apply both Rule 23 (or some other federal rule) and the state procedural rule in question. As this Court has recognized, "[i]f there is no conflict" between the state and federal rule, then the "state notice requirements would apply." Dkt. 507 at 62 (citing *Hahn v. Walsh*, 762 F.3d 617, 631 (7th Cir. 2014)).

With respect to state notice requirements, there is no conflict. As noted above, the state law in *Shady Grove* spoke directly to the subject covered by Rule 23: whether a plaintiff could maintain its suit as a class action. But Rule 23 does not require, prohibit, or even address pre-suit notice or a litigant's failure to provide pre-suit notice otherwise required by statute. State notice requirements and Rule 23 simply "do not attempt to answer the same question or subject." *Lipitor*, 336 F. Supp. 3d at 415-16. As a "majority" of district courts that have "been presented with . . . the issue" have concluded, the absence of a conflict between state and federal rules means that the "state statutory notice provisions control in federal court." *Id.* (collecting cases); *see also, e.g.*, *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 375 (D.R.I. 2019); *In re Asacol Antitrust Litig.*, 2016 WL 4083333, at *15 (D. Mass. July 20, 2016).

Some courts, including a handful in this District, have declined to enforce state notice requirements in federal litigation. *See, e.g.*, *Broiler Chicken*, 290 F. Supp. 3d at 772; *In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041 (N.D. Ill. Nov. 5, 2009). But those decisions are not on point. In *Broiler Chicken*, the plaintiffs did serve notice on the attorney general, albeit after the suit was filed, and the court was willing to accept tardy but reasonably prompt service. 290 F. Supp. 3d at 817. By contrast, the Dealers have never indicated that they served the notice required by statute. *Cf. Mallinckrodt*, 360 F. Supp. 3d at 765 (deferring issue until parties had opportunity to collect facts on "post-filing efforts," if any, to give notice). In *Aftermarket Filters*, the court reasoned that Hawaii did not require dismissal for failure to provide notice. 2009 WL 3754041, at *6. But Hawaii's provision is mandatory ("shall be

33

served") and numerous courts have dismissed claims for failure to follow its requirement. *See Lipitor*, 336 F. Supp. 3d at 416 (collecting cases). *Aftermarket Filters* did not address any *Shady Grove* questions or suggest that state notice requirements conflicted with Rule 23.

Another decision the Court previously identified, Dkt. 507 at 62, likewise fails to persuade. *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 355 F. Supp. 3d 145 (E.D.N.Y. 2018). It reasoned that notice requirements "restrict[]" what types of claims are eligible for class treatment. *Id*. at 156. But notice requirements do not "restrict" the types of claims that can be brought as class actions; they simply establish a condition precedent to such suits. *E.g., Stanley v. Huntington Nat'l Bank*, 492 Fed. App'x 456, 461 (4th Cir. 2012) (West Virginia requirement is a "mandatory prerequisite"); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 2011 WL 1398485, at *8 (D. Me. Apr. 13, 2011) (a "private plaintiff can proceed only if the [Hawaii] Attorney General affirmatively consents or fails to act").

### b. The notice requirements are enforceable under *Shady Grove*.

Even if a *Shady Grove* analysis were necessary, it supports CDK. The requirements that the Dealers violated are not "pan-statutory" procedural rules. *Delgado*, 2017 WL 5201079, at *9. They are specific to the antitrust or consumer-protection statutes in question. For example, Hawaii's law applies to claims "on behalf of indirect purchasers," Haw. Rev. Stat. § 480-13.3(a), and thus functions similarly to Illinois's partial *Illinois Brick* repealer. *See* § II.C.5.b *supra*. Enforcing these requirements serves *Erie*'s twin goals of avoiding forum shopping and inequitable administration of the laws. Thus, *Shady Grove* (to the extent it applies at all) allows use of state notice requirements in federal court. *See, e.g., Effexor*, 357 F. Supp. 3d at 388-90; *Wilson v. Volkswagen Grp. of Am., Inc.*, 2018 WL 4623539, at *13 (S.D. Fla. Sept. 26, 2018); *Phillips v. Philip Morris Cos. Inc.*, 290 F.R.D. 476, 481 (N.D. Ohio 2013).

### CONCLUSION

The Court should grant CDK summary judgment on all of the Dealers' claims.

**PUBLIC VERSION**

Dated: May 20, 2020

Respectfully submitted,

/s/ *Britt M. Miller*

Britt M. Miller
Michael A. Scodro
Daniel T. Fenske
Matthew D. Provance
Jed W. Glickstein
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mscodro@mayerbrown.com
dfenske@ mayerbrown.com
mprovance@mayerbrown.com
jglickstein@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant*
*CDK Global, LLC*

**PUBLIC VERSION**

## CERTIFICATE OF SERVICE

I, Britt M. Miller, an attorney, hereby certify that on May 20, 2020, I caused a true and correct copy of the foregoing **MEMORANDUM IN SUPPORT OF CDK GLOBAL, LLC'S MOTION FOR SUMMARY JUDGMENT** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/ Britt M. Miller*
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com