# EXHIBIT 95

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

AUTHENTICOM, INC.

       Plaintiff,

-vs-                       Case No. 17-CV-318-JDP

CDK GLOBAL, INC., LLC       Madison, Wisconsin
and THE REYNOLDS and        June 26, 2017
REYNOLDS COMPANY,          1:50 p.m.

       Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT-FIRST DAY OF EVIDENTIARY HEARING
**AFTERNOON SESSION**
    HELD BEFORE THE HONORABLE JAMES D. PETERSON,

APPEARANCES:

For the Plaintiff:
        Godfrey & Kahn S.C.
        BY:  JENNIFER GREGOR
        One East Main Street, Ste. 500
        Madison, Wisconsin  53703

        Kellogg, Hansen, Todd, Figel & Frederick, PLLC
        BY:  MICHAEL NEMELKA
            AARON PANNER
            DAVID SCHWARZ
            DEREK HO
            JOSHUA HAFENBRACK
            KEVIN MILLER
            JOHANNA ZHANG
       1615 M Street, NW, Ste. 400
        Washington, DC  20036

Also present:  Stephen Cottrell - Authenticom president
             Steve Robb - IT technician

       Lynette Swenson   RMR, CRR, CRC
     U.S. District Court Federal Reporter
      120 North Henry Street, Rm. 520
       Madison, Wisconsin  53703

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 3 of 222 PageID #:61127
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 3 of 221

1-P-2

```
 1   APPEARANCES CONTINUED:

 2   For Defendant CDK Global, LLC:

 3               Foley & Lardner
               BY:  JEFFREY SIMMONS
 4             150 East Gilman Street
               Madison, Wisconsin  53703
 5
               Mayer Brown, LLP
 6             BY:  BRITT MILLER
                    MATTHEW PROVANCE
 7             71 South Wacker Drive
               Chicago, Illinois  60606
 8
               Mayer Brown LLP
 9             BY:  MARK RYAN
               1999 K Street, NW
10             Washington, DC  20006-1101

11   Also appearing:  Lee Brunz - General Counsel CDK Global
                    Nick Hey - IT technician
12

13   For Defendant The Reynolds and Reynolds Company:

14               Perkins Coie LLP
               BY:  CHARLES CURTIS, JR.
15             One East Main Street, Ste. 201
               Madison, Wisconsin  53703
16
               Sheppard Mullin Richter & Hampton, LLP
17             BY:  MICHAEL COHEN
               2099 Pennsylvania Avenue, NW,  Ste. 100
18             Washington, DC  20006

19               Gibbs & Bruns, LLP
               BY:  AUNDREA GULLEY
20                  BRIAN ROSS
                    BRICE WILKINSON
21             1100 Louisiana Street, Ste. 5300
               Houston, Texas  77002
22

23   Also appearing:  Robert Schaefer - VP Data Services
                    Kelly Hall - Senior VP Software Dev.
24

25
```

**I-N-D-E-X**

| PLAINTIFF'S WITNESSES | EXAMINATION | PAGES |
|---|---|---|
| STEPHEN COTTRELL | Cross by Mr. Ryan | 7-41 |
| | Cross by Mr. Ross | 42-58 |
| PETER SWIRE | Direct by Mr. Schwarz | 58-85 |
| | Cross by Mr. Wilkinson | 86-103 |
| | Cross by Ms. Miller | 103-108 |
| | Redirect by Mr. Schwarz | 108-110 |
| BRIAN MAAS | Direct by Ms. Gregor | 180-185 |
| | Cross by Ms. Gulley | 185-187 |
| MICHAEL KORP | Direct by Mr. Hafenbrack | 188-200 |
| | Cross by Ms. Gulley | 201-206 |
| | Cross by Mr. Provance | 207-213 |
| | Redirect Mr. Hafenbrack | 213-215 |
| | Cross by Ms. Gulley | 215-216 |

| DEFENDANTS' WITNESSES | | |
|---|---|---|
| ERIC ROSENBACH | Direct by Ms. Miller | 111-154 |
| | Cross by Mr. Schwarz | 154-178 |
| | Redirect by Ms. Miller | 178-179 |

**E-X-H-I-B-I-T-S**

| PLAINTIFF'S EXHIBITS | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| Ex. 55 | McCray notes | 37 | --- |
| 96 | ISAC form | --- | 178 |

| DEFENDANTS' EXHIBITS | | | |
|---|---|---|---|
| Ex. 11 | | --- | 213 |
| 12 | | --- | 213 |
| 13 | CDK MSA | 212 | 213 |
| 181 | Authenticom response | 40 | 40 |
| 186 | Query data | 146 | 145 |

* * * * *

THE CLERK:  This Honorable Court is again in

session.  Please be seated and come to order.

 1          THE COURT:  All right.  We can take the witness

 2    back on the witness stand and we'll proceed with the

 3    cross-examination, part one.

 4          MS. GREGOR:  May I ask a question for the order,

 5    procedural?

 6          THE COURT:  Yes.

 7          MS. GREGOR:  Two questions actually.  One is we

 8    were wondering whether the Court is considering the

 9    declarations submitted with the PI briefing to be already

10    in evidence for purposes of considering the motion.

11          THE COURT:  I hadn't considered that very

12    question.  How do you want me to handle it?  If the

13    parties are in agreement to submitting them, then I don't

14    have to worry about taking a lot of evidence when we only

15    have two days.

16          MS. GREGOR:  We would suggest that the

17    declarations just be moved into evidence so that we don't

18    need to use time to duplicate today.

19          THE COURT:  That sounds good.  What's the

20    defense view of that?

21          MR. RYAN:  We don't have a problem with using

22    declarations.  There are a few declarations though that

23    we might like to -- Mr. Smith, paragraphs 3 for 4, it's

24    pure hearsay; to put it on the record that we objected to

25    it on hearsay grounds.  It's not -- and we don't care

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 6 of 222 PageID #:61130
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 6 of 221

1-P-5

1    about all the hearsay, but there are certain of the

2    declarations that we care about.  So subject to that, we

3    can just send the Court objections to the following

4    paragraphs of the declarations.

5            THE COURT:  I mean it would -- it would be part

6    of the other side of having the opportunity to address

7    the objections through a little more examination if we

8    just did it that way.

9            MR. RYAN:  I'm thinking of people who won't be

10   here to testify.

11           THE COURT:  Well, then the declaration is all

12   I've got; so --

13           MR. RYAN:  That's right.

14           THE COURT:  -- for those people, if I'm only

15   going to get them on paper anyway, then you can file and

16   lodge your objections on paper.

17           MR. RYAN:  That was my question.

18           THE COURT:  That would be fine too.

19           MR. RYAN:  And we're not going to object to the

20   putting in, there just may be a few paragraphs in a few

21   declarations that we want to lodge an objection to if

22   that's okay with the Court.

23           THE COURT:  That seems efficient.

24           MS. GREGOR:  That seems fine.  So they're in

25   evidence and the parties can file objections if they

Case: 4:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page: 7 of 222 PageID #:61131
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 7 of 222

1-P-6

 1    wish.  Is that --

 2              THE COURT:  Yes.

 3              MS. GREGOR:  One more question.  How long does

 4    the Court typically --

 5              THE COURT:  Usually we go -- we usually go till

 6    5:30.  So when you divided things up, is that what you

 7    had thought?

 8              MS. GREGOR:  The reason for my request is that

 9    frankly we're a little bit behind where we thought we

10    would be on time, and we have some nonparty witnesses in

11    attendance, and we want to make sure to plan accordingly

12    around schedules for travel and things like that.  So...

13              THE COURT:  Typically it's 5:30.  If you think

14    we need to adjust whatever, we can push it a little bit.

15              MS. GREGOR:  We would like more time if the

16    Court would be willing to give it.

17              THE COURT:  Why don't we -- let's go until six

18    o'clock tonight, and by announcing this, the people that

19    need to take action as a result of this can do that.  And

20    why don't we start at -- let's start at eight o'clock

21    tomorrow.

22              MS. GREGOR:  Thank you.

23              THE COURT:  Okay?  That will give us just under

24    two hours.  It's an hour ahead of schedule.

25              MS. GREGOR:  Thank you.

Case: 3-17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 790 of 221
Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 8 of 222 PageID #:61132

1-P-7

1    THE COURT:  Don't blow it.  Ready for your

2    cross?

3    MR. RYAN:  I am, Your Honor.

4                    CROSS-EXAMINATION

5    BY MR. RYAN:

6    Q    Mr. Cottrell, my name is Mark Ryan.  I represent

7    CDK.  Good afternoon.

8    A    Good afternoon, Mr. Ryan.

9    Q    Mr. Cottrell, you've been in the industry a long

10   time.

11   A    I have.

12   Q    And part of what you're doing with your lawsuit is

13   you're not just standing up for Authenticom, but you're

14   standing up for dealers as well.  That's your view;

15   correct?

16   A    That is my view, yes.

17   Q    And CDK has about 7,000 dealers in the United

18   States; that sound about right to you?  About 7,300?

19   A    Yes, that sounds correct.

20   Q    And CDK has around 4,400 or so?  Does that sound

21   about right?

22   A    You mean Reynolds and Reynolds.

23   Q    Reynolds and Reynolds.  Thank you.

24   A    Yes, that sounds correct for Reynolds and Reynolds.

25   Q    Now, your view is that the dealers, because it's

                    STEPHEN COTTRELL - CROSS

Case: 3-17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 9 of 221
Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 9 of 222 PageID #:61133

1-P-8

1  their data, they should be allowed -- they should be

2  allowed to allow Authenticom the access that Authenticom

3  obtains with those dealers; correct?  That's your view.

4  The dealers should decide whether Authenticom gets access

5  to the dealers' DMS; correct?

6  A    Yes.  I believe that the dealership be able to

7  authorize that access; correct.

8  Q    And the way you look at things, the dealers should

9  also be allowed to let other firms, not just Authenticom,

10 but if they say there's another integrator out there that

11 they'd like to deal with, that would be okay too; right?

12 A    If the dealer is so authorized, yes.

13 Q    Right.  And even vendors, if vendors wanted to hook

14 up directly, that should be up to the dealer; correct?

15 A    That's how it used to be, yes.

16 Q    Right.  And so you could have a system where 7,000

17 CDK dealers are letting in whomever the individual dealer

18 decides; correct?

19 A    That's not how I see it.

20 Q    But you would say that you, Authenticom, are

21 especially good at cybersecurity, aren't you?  And you're

22 proud of that.

23 A    We're very good at the security that's prevalent to

24 our product, yes.  I wouldn't say cybersecurity at large.

25 Q    Okay.  But data security.

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #:986-16 Filed: 05/20/20 Page 10 of 222 PageID #:61134
Case: 3:17-cv-00318-jdp Document #:162-1 Filed: 07/05/17 Page 9 of 22

1-P-9

1   A    Yes, indeed.

2   Q    Okay.  And it's conceivable then that there could be

3   another integrator in the market that's not as good at

4   data security as Authenticom; correct?

5   A    It is conceivable, yes.

6   Q    So in your view of the world, dealers would have the

7   option to deal with the best data security firm out

8   there, Authenticom, or firms that are not as good as

9   Authenticom at data security.  It's up to the dealer;

10   correct?

11   A    It's our view that the dealers are very savvy

12   business people and they make appropriate decisions based

13   on their particular business needs, yes.

14   Q    So you're confident that all 7,000 -- or all 11,000

15   dealers would make good decisions all the time with

16   respect to who they were going to let onto their systems.

17   A    In order for an integrator to be viable, they can't

18   just have a few dealers allowing them to have access to

19   their system.  In order for an integrator to be viable,

20   they have to have a significant amount of market share

21   and it would be -- it would require a lot of dealers to

22   mistakenly place their trust with an insecure integrator.

23   Q    And you don't pay the dealers for your services.  I

24   mean the dealers don't pay you.

25   A    Some dealers do.

1   Q     How many -- what percentage of your dealers do you

2   charge?

3   A     Probably somewhere less than 5 percent but more than

4   2.  2 to 5 percent.

5   Q     If I have this right, do you pay the dealers for

6   access to their systems?

7   A     No, we do not.

8   Q     So suppose a firm came along and said I'll pay the

9   dealers a little bit for the access.  That might interest

10  some dealers; correct?

11  A     Knowing the dealer community as well as I do, I

12  think they would say what's the catch.

13  Q     Right.  And the catch might be that the company is

14  skimping on data security or other aspects of smooth

15  operation unbeknownst to the dealer; right?

16  A     And a prudent dealer might say no, thank you.

17  Q     A prudent one.

18  A     That's correct.

19  Q     So at the end of the day -- we'll move on to

20  something else.  But at the end of the day, in your view

21  it's kind of open season for the dealers.  If you're an

22  integrator or a vendor or another firm of some sort that

23  wants access to the data, it's between your -- that firm

24  and the dealer, notwithstanding any contractual

25  restrictions that the DMS company might put in the

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 12 of 222 PageID #:61136
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 1196 221

1-P-11

1    dealer's contract.  Is that your view?

2    A    Can you restate the question without the

3    restrictions?

4    Q    The DMS dealer says -- a DMS provider says to the

5    dealer you can't -- you can't make your data available to

6    anyone else, only to me, the DMS provider.  I'll do all

7    the data extraction for you, and that's in the contract

8    at the time the dealer enters into the arrangement with

9    the DMS in your view should not be enforced; correct?

10   The dealer, notwithstanding the contract that the dealer

11   signed, it should still have the right to give data

12   access to whomever it pleases.

13   A    I'm probably not the best person to discuss the

14   enforceability of that provision, but I can tell you that

15   what's prevailed in the market has been exactly that.

16   The dealers have for decades been able to make that

17   choice, yes.

18   Q    Now, with respect to Reynolds and Reynolds, they

19   have been cutting Authenticom off for years; correct?

20   A    They have been attempting to interfere with our

21   contractual relationships, yes.

22   Q    And that battle has gone back and forth since at

23   least 2009?

24   A    That's correct, yes.

25   Q    And there was never a time when Reynolds really

STEPHEN COTTRELL - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 13 of 222 PageID #:61137
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 1296 of 221

1-P-12

1   stopped cutting you off; correct?

2   A    Only for their own dealers.

3   Q    Okay.  So -- right.  For their own dealers.  They

4   never stopped cutting you off with their dealers.  They

5   have never -- let me stop there; is that correct?

6   A    Yes.  For the dealerships that they contracted for

7   us to provide data access to, they never blocked us,

8   that's correct.

9   Q    Okay.  Now, you made mention earlier today, I

10  believe, of an outfit called AVRS?

11  A    That's correct.

12  Q    And you said on behalf of AVRS you extract data at

13  some CDK dealers; is that right?

14  A    That is correct, yes.

15  Q    Now, you know that AVRS is owned by a joint venture

16  of Reynolds and CDK; correct?

17  A    Yes, I do.

18  Q    AVRS is owned by CVR; right?  That's the name of the

19  joint venture.

20  A    I'll take your word for it.

21  Q    And AVRS has about 700 dealers?

22  A    I'm not familiar with their total dealer count.

23  Q    Do you know that AVRS is using Authenticom to pull

24  data at only four of the CDK dealers?

25  A    That's not correct.

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 14 of 222 PageID #:61138
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 1 of 222

1-P-13

1   Q    And that it's only about five dealers on behalf of

2   Reynolds?  Five Reynolds dealers?

3   A    Yeah.  I'm not certain of the exact number, but I

4   believe that it's more than that.  But I don't know.

5   Q    And what happened was AVRS was purchased by the CDK

6   and Reynolds joint venture in 2015.  That's how you came

7   to those contracts and those contracts are being phased

8   out; correct?

9   A    We've seen cancellations from AVRS, yes.

10        MR. RYAN:  And, Your Honor, that's in the

11  Bonifay declaration.  B-o-n-i-f-a-y.  That's a

12  declaration submitted on behalf of CDK.

13  Q    When Authenticom -- I want to ask you a couple

14  questions about -- some questions about DealerVault.  I

15  think you said at the end of the morning session that

16  DealerVault started in 2014; right?

17  A    Our first commercial launch was at NADA in 2014,

18  that's correct.

19  Q    And that was a big step for your company; correct?

20  A    Yes, it was.

21  Q    And it was in some ways revolutionary; correct?

22  From your perspective.

23  A    Thank you.

24  Q    Right.  And you were going to be collecting and

25  storing a lot of the data; correct?  In DealerVault.

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 15 of 222 PageID #:61139
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 14 of 221

1-P-14

 1   A     Yes.

 2   Q     And can you give us an idea of how much data is in

 3   DealerVault?  Can you express it in terabytes or

 4   gigabytes or --

 5   A     Actually a total capacity of DealerVault I cannot,

 6   no.

 7   Q     It's massive?

 8   A     I wouldn't say massive, no, not in the terms of

 9   databases today.

10   Q     Okay.

11   A     I think it's probably measured in terabyte.

12   Single-digit terabyte numbers would be my best guess.

13   Q     Now, a dealer can access DealerVault; correct?

14   A     Yes.

15   Q     And you give them a user ID and password?

16   A     Yes, we do.

17   Q     And in your standard contract, you tell them, the

18   dealer, only the unique user can use that logon

19   information that he or she is given; right?

20   A     I don't believe that's what the contract says.

21   Q     So can we look at -- I think it was marked earlier

22   as plaintiff's exhibit, so maybe we can use that rather

23   than the defendants' exhibit.  If you look at exhibit --

24   plaintiff's Exhibit 28.

25   A     I'm sorry, I don't see a 28 if these are in

                    STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 16 of 222 PageID #:61140
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 16 of 221

1-P-15

1    numerical orders.

2              THE COURT:  I think it's the very first one in

3    the binder, the other binder.

4              MS. MILLER:  It's in the black binder.

5              THE WITNESS:  Too many binders.

6              MR. RYAN:  That's exactly right.  There's too

7    many.

8    BY MR. RYAN:

9    Q    And could you go to paragraph 6.7?

10   A    I can.

11   Q    And that's entitled *Password Security*; is that

12   right?

13   A    It is, yes.

14   Q    And it says "DealerVault will issue to dealership or

15   shall authorize an administrator to issue a password for

16   each user authorized to use dealership's account";

17   correct?

18   A    It does.

19   Q    And then it says "Dealership and dealership's users

20   must maintain the confidentiality of all passwords and

21   ensure that each password is used only by the unique

22   authorized user to whom such password is assigned";

23   correct?

24   A    It is.

25   Q    All right.  Now, when the data is in DealerVault, in

                    STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 17 of 222 PageID #:61141
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 16 of 221

1-P-16

1   particular the dealer's data, the dealer owns that data;

2   correct?

3   A    Yes, they do.

4   Q    But under your agreement, the dealer could not give,

5   without your authorization, the password to a third-party

6   to access DealerVault; correct?

7   A    That's not how I read that paragraphs.

8   Q    That's not how you read that restriction.

9   A    No.

10   Q    So the dealers are free to hand out the user IDs

11   without your authority to whoever they please?

12   A    Let me try and explain. DealerVault will issue the

13   dealership or shall authorize the administrator to issue

14   a password for each user authorized to use dealership's

15   account. It's up to the administrator, the dealership,

16   to determine who that is. The dealer controls the

17   assessment to the interface.

18   Q    So the dealer can share the credentials with

19   whomever the dealer wishes.

20   A    Yes, they can.

21   Q    So the dealer could give those credentials, as you

22   read this, to a data firm of some sort and that data firm

23   could then pull data back from DealerVault?

24   A    They can't pull data back from DealerVault, but

25   DealerVault will push data to them pursuant to the

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 18 of 222 PageID #:61142
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 17 of 221

1-P-17

1  dealer's specific authorization, yes.

2  Q    Now, when you were taking -- when you were getting

3  logon credentials, say, at CDK dealers, you often did

4  that without telling CDK that you were going to sign on

5  as a user of the dealer system; correct?

6  A    We did not make it a point to notify CDK we were

7  using usernames or passwords, no.

8  Q    Right.  You asked the dealer to give you a set of

9  the dealer's logon credentials; correct?

10 A    We asked them to set us up on the system like they

11 would an employee and then we acted specifically as their

12 agent and authorized.

13 Q    And you knew that was contrary to the dealer's

14 agreement with the DMS -- with CDK; correct?

15 A    When we first launched this company, we were not

16 privy to those contracts or agreements.  We've only acted

17 as specifically authorized and instructed by the dealer

18 to do as their agent.

19 Q    Okay.  So you started the company in 2002 you said;

20 correct?

21 A    Authenticom.

22 Q    Right.

23 A    Yes, that's correct.  Authenticom.

24 Q    Did there come a time when you understood that you

25 were obtaining login credentials in violation of the

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 19 of 222 PageID #:61143
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 1 of 22

1-P-18

1   DMS's provider's agreement with the dealer?

2   A    Yes.  Mr. Schaefer made me aware of that in, I think

3   it was April of 2015.  He served us with a tortuous

4   interference agreement or tortious interference lawsuit.

5   Through the lawsuit.

6   Q    But April 2015, is it your testimony that that's the

7   first time that you had any idea that the way that you

8   were accessing the systems of CDK or Reynolds was in

9   violation of contracts that those firms had with dealers?

10  A    No, that's not my testimony.

11  Q    Okay.  When did you first learn that you were

12  getting around the contractual obligations that the

13  dealers had to their DMS providers?

14  A    When Mr. Schaefer provided us with a redacted copy

15  of the Reynolds dealer agreement.

16  Q    And when was that?

17  A    First quarter of 2015.

18  Q    So that's my question.  Until 2015, you did not know

19  that you had been violating dealer contracts by acquiring

20  dealer logon credentials and signing on as a dealer

21  employee.

22           MR. NEMELKA:  Objection, Your Honor.

23           THE COURT:  What's the objection?

24           MR. NEMELKA:  It's argumentative.

25           THE COURT:  Overruled.

                    STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 20 of 222 PageID #:61144
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 19 of 221

1-P-19

BY MR. RYAN:

Q    Do you have the question in mind, sir?

A    No.

Q    Okay.  Then I'll go back.  So if you --

        THE COURT:  Let me try.  So 2015, first quarter,
that's when you first found out there was a problem that
R&R had with your using the dealer credentials.

        THE WITNESS:  That's the first time I saw the
actual contract, Your Honor.

        THE COURT:  Okay.

        THE WITNESS:  Prior to that, there were lots of
things that had been said; okay?  Lots of talk in the
marketplace.  Historically there has been lots of things
said and lots of talk in the marketplace.  We had not
seen any direct evidence of that contract provision.  We
asked the dealers if we were authorized.  The dealer said
you are authorized.

        THE COURT:  Okay.  So did you ever hear about
any other lawsuits or talk about how you're not supposed
to use somebody else's credentials to log in on gmail or
Facebook or basic terms of use in other online systems?

        THE WITNESS:  I'm sorry, can you restate the
question?

        THE COURT:  Sure.  I mean it's like gmail,
Facebook, all sorts of user agreements that companies

                 STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 21 of 222 PageID #:61145
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 20 of 221

1-P-20

1    have say these are your credentials.  You can't share

2    with anybody else.  So that issue never came up until

3    2015 in your mind?

4            THE WITNESS:  That issue came up from statements

5    that Reynolds and Reynolds and CDK had made.  That was

6    not the view in the marketplace.  That was not the view

7    that the dealers shared, and that was certainly not --

8    certainly was not the view that the dealers shared

9    en masse.

10           THE COURT:  And so did the dealers ever say I

11   don't care what the agreement say.  These are my

12   credentials, my data, you're using them?

13           THE WITNESS:  Many dealers did, in fact, say

14   that.

15           THE COURT:  All right.  I think I see the lay of

16   the land here.  So people -- people were saying that

17   maybe these credentials really shouldn't be shared, but

18   the dealer said they're my credentials; my data.  I'm

19   giving them to you to use.

20           THE WITNESS:  That's correct.

21           THE COURT:  Okay.  All right.

22           MR. RYAN:  Thank you.

23   BY MR. RYAN:

24   Q    2013, I think there's been testimony that you faced

25   a very difficult situation because Reynolds had disabled

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 22 of 222 PageID #:61146
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 2196f 221

1-P-21

1    you at a lot of Reynolds dealers; correct?

2    A    That's correct.

3    Q    And that was a very difficult moment for your

4    business?

5    A    It was most challenging based on our relationships,

6    yes.

7    Q    Now, certainly at that time as you faced this

8    challenge and you saw yourself disabled, would it have

9    been hundreds of dealers?  Thousands of dealers?  What

10   was the extent of the Reynolds action at the end of 2013?

11   A    Over the course of four or five months, they

12   disabled us in several thousand dealerships approximately

13   27,000 times.

14   Q    Did you have a suspicion at that point that maybe

15   Reynolds thought that your access to their system was

16   unauthorized?

17   A    I had heard that from Reynolds, but it wasn't until

18   in the first quarter 2015 that we saw the actual

19   contract.

20   Q    Okay.  Now, are you familiar with a DMS firm by the

21   name of DealerBuilt?

22   A    Yes, I am.

23   Q    And I think you might have mentioned them today;

24   correct?

25   A    Correct.

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 23 of 222 PageID #:61147
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 2296 of 221

1-P-22

1  Q    You do some -- do you have a business relationship

2  with them?

3  A    Yes, we do.  We have an agreement with them.

4  Q    And at the end of 19 -- of last year, 2016, they

5  were hacked; correct?  DealerBuilt.

6  A    I just recently learned of that, yes.

7  Q    And if -- in the white book, Exhibit 1 -- tab 151,

8  which is defendants' Exhibit 151, that's a story that

9  appeared online in August of 2016 about the loss of data;

10  right?

11  A    It appears to be so.  I haven't seen this story.

12  Q    And in fact, millions of social security numbers and

13  the confidential information of car buyers was -- found

14  its way to the internet as a result of the DealerBuilt

15  hack; correct?

16  A    I find that highly unlikely.

17  Q    Those were the press reports; right?

18  A    I haven't read the article.  Would you like me to

19  read it?

20  Q    No.  If you weren't aware of it, if you haven't been

21  aware of it, I don't --

22  A    I was unaware of it.

23  Q    Okay.  So you didn't know that there had been this

24  massive hack.

25  A    I was unaware of the massive or I was unaware of the

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 24 of 222 PageID #:61148
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 23 of 221

1-P-23

1    preferred hack, yes.

2    Q    Well, I mean it does -- you do believe that hackers

3    may target the kind of information that's in DMSs;

4    correct?

5    A    It is possible, but it's not a high value target.

6    Q    How often does DealerVault -- how often are hack

7    attempts made of the DealerVault system?

8    A    I don't have the exact numbers of attempts against

9    the Microsoft Azure firewalls, but I'm sure that they are

10   significant.

11   Q    But you don't monitor the amount of hacking.

12   A    I don't personally, and there has been no hack.

13   Q    No, no, I'm just talking about attempts.

14   A    By attempts, if you're talking about someone trying

15   to penetrate a firewall --

16   Q    Yes.

17   A    -- that does happen routinely, yes.

18   Q    So there are routine attempts made to penetrate that

19   DealerVault firewall; right?

20   A    That's why we enlisted the support of Microsoft.

21   Q    Right.  And real quickly, everyone agrees that data

22   security is important to everyone in the automotive

23   industry; right?

24   A    Correct.

25   Q    There's no question about that.  Let me see if I

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 25 of 222 PageID #:61149
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 24 of 221

1-P-24

understand your ability to access data at a dealer.  Your

ability to access data at a dealers' DMS depends on the

level of authorization the dealer gives you; correct?

A    That is correct.

Q    And you, in the operations of Authenticom, you only

ask for authorization to get the files that you need for

your business; correct?

A    That is correct.

Q    You do not go beyond what you need to ask for other

people's data or sensitive information you do not need;

correct?

A    That is correct.  In the normal operations, that's

correct.

Q    But somebody might, right, in the future?  If

there's some other data integrator, maybe they won't be

as principled as you; correct?  They could get from the

dealer the identical access to the DMS that the top

person at the dealer has, the system administrator, if

the system administrator granted that access; correct?

A    I'm sure there's phantoms in the closet, yes.

Q    And I take it you continue to work to improve

DealerVault's and Authenticom's data security?

A    Diligently, yes.

Q    It's expensive?

A    Very expensive.

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 26 of 222 PageID #:61150
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 26 of 221

1-P-25

1   Q    Now, in tab 1 of the book is your declaration.  You

2   actually submitted two declarations in this case;

3   correct?

4   A    Yes, I did.

5   Q    There was a declaration of Steve Cottrell, which is

6   at tab one, and then there's a reply declaration of Steve

7   Cottrell which is at tab 2.  And with respect to your

8   declaration, you make reference in there to an award from

9   Microsoft; correct?

10  A    Yes, we do.

11  Q    And this is in paragraph --

12  A    It's actually not an award, it's a certification.

13  Q    A security gold certification?

14  A    Yes.  It is the gold certification, that's correct.

15  Q    And let me just find it there.  At paragraph 31,

16  page six of your declaration, behind tab 1, you say

17  "Authenticom partners with Microsoft Azure cloud services

18  and has achieved Microsoft's top-level gold security

19  certification three years in a row."  Do you see that?

20  A    I do.

21  Q    Does Microsoft give a top-level gold security

22  certification?

23  A    Not specific to security.

24  Q    And so it does not give out top-level gold security

25  certification; correct?

STEPHEN COTTRELL - CROSS

1   A      That is correct.

2   Q      And so you did not receive a top-level gold security

3   certification three years in a row; correct?

4   A      We did receive a gold certification for two areas:

5   One was application development and the other one was

6   cloud services.  In those certifications, there is

7   components around security and safe practices.

8   Q      But you didn't get what the declaration says you

9   got, did you, sir?

10  A      That does not exist, no.

11  Q      And in fact, it's not just in your declaration where

12  you've made this statement, you've made this statement

13  many times in public; correct? that you have received a

14  Microsoft top-level gold security certification.  You've

15  said that lots of times.

16  A      I think the public statements basically talk about

17  becoming a three-time Microsoft gold certified partner.

18  I don't know that the term security is involved in that.

19  Q      But you read your affidavit before you signed it in

20  this case.

21  A      I did.

22  Q      Okay.  Thank you.  I want to ask you about

23  Authenticom's access to -- I'm going to start with

24  Reynolds.

25  A      Okay.

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 28 of 222 PageID #:61152
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 27 of 221

1-P-27

1  Q    Information in a Reynolds DMS.  There is a program

2  where you can download -- where you can receive data from

3  Reynolds' dealers and its consistent with Reynolds'

4  practices and policies; correct?

5  A    If you're referring to Dynamic Reporting, I would

6  assume so, yes.

7  Q    I am referring to Dynamic Reporting.

8  A    Yes.  As they produce it, I assume that that's

9  consistent with their practices and policies, yes.

10 Q    Right.  It's one of their programs.

11 A    Correct.

12 Q    Right.  Okay.  So -- and Dynamic Reporting is that

13 the dealer is allowed to run a report; can be whatever

14 kind of report they want.  They can then electronically

15 transmit the data generated by the report to you;

16 correct?  To Authenticom?

17 A    The first part of your statement is that --

18 Q    They download the data.

19 A    The first part of your statement is that they could

20 download any data that they wanted.  I would not agree

21 with that part.

22 Q    Okay.  So I misspoke.  But suppose there's a report

23 that you would like.  There are reports that you can get

24 from the dealers by asking them, pursuant to the Dynamic

25 Reporting Program that Reynolds has, say dealer, please

STEPHEN COTTRELL - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 29 of 222 PageID #:61153
Case: 3:17-cv-00318-jdp   Document #: 162   Filed: 07/05/17   Page 28 of 221

1-P-28

1    download the following data, transmit it to me,

2    Authenticom, and then you can transmit it to the vendors;

3    correct?

4    A    That is correct, yes.

5    Q    And, in fact, you take advantage of that program.

6    A    Yes, we do.

7    Q    And so there is available to Authenticom and to

8    other data integrators access to information on the

9    Reynolds DMSs if that access is obtained in a particular

10   way, the Dynamic Reporting way; correct?

11   A    That is correct.  It does require mainly

12   intervention from the dealer.  There can be no automation

13   of that process per se.

14   Q    Exactly.  The dealer's employee, for example, might

15   manually enter into the DMS the data request.

16   A    That is correct.

17   Q    There is no automated -- let me try that again.

18   There is no automated scraping of the data as you do

19   with, say, CDK systems; right?

20   A    That is correct, yes.

21   Q    And in fact, a declaration has been submitted in

22   this case from a Lesha, L-e-s-h-a, Wood, if I remember

23   Ms. Woods' name correctly, and she is an employee of John

24   Eagle dealerships in Texas; correct?

25   A    Yep.  What's your number here?  I'm not tracking.

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 30 of 222 PageID #:61154
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 290 of 221

1-P-29

1  Q    I'm sorry.  It's tab 162 in the white book.  It's

2  the -- while you're looking for it, it's the declaration

3  of Lesha, L-e-s-h-a, Wood, W-o-o-d.

4  A    Yes, I can see that now.

5  Q    Have you looked at this prior to today?

6  A    Briefly.  I'd like to review if I could.

7  Q    Sure.  Sure.  Go ahead.

8         THE COURT:  Why don't you ask some questions and

9  then you can review it, to the extent necessary, to

10 answer the questions.  We don't need to take time to have

11 people read declarations, otherwise I'll just go upstairs

12 and read them myself.  Let's keep the questions going.

13 Q    Second page, paragraph 5, Mr. Cottrell, where

14 Ms. Wood says "I personally handled the Dynamic Reporting

15 scheduling and manual export process on a daily basis for

16 John Eagle."  Do you see that?

17 A    I do.

18 Q    Then she says she exports 100 reports a day.  Do you

19 see that?

20 A    I do.

21 Q    And it says it takes her an hour to do so, but she

22 says she's multitasking, as I guess a lot of us do these

23 days.  So it's not a full dedicated hour to do that;

24 correct?

25 A    I can see her statement, yes.

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 31 of 222 PageID #:61155
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 30 of 221

1-P-30

```
 1  Q    Okay.  Thank you.  And so she -- all I'm driving at,

 2  sir, is this is a realistic way for you to get data

 3  without touching the dealers' DMS that is actually used

 4  to a substantial extent by dealers in this country;

 5  correct?

 6  A    I would not agree with that statement.

 7  Q    And CDK has an equivalent program; right?

 8  A    I'm unaware of a CDK Program that's equivalent to

 9  that other than I deal with Ryan reports and renewing

10  them and sending them out.

11  Q    I guess what I'm saying is CDK dealers can also run

12  reports; is that correct?

13  A    Yes, they can.

14  Q    And when we're talking about reports here, we're

15  talking about electronic transmissions of data; correct?

16  A    Yes, we are.

17  Q    We're not -- because when I first was learning about

18  this, I thought gee, I have to print out a report and

19  then send a piece of paper.  That's not what's going on

20  here; correct?

21  A    That is correct.

22  Q    It goes along -- it can be sent -- what was the

23  expression was used this morning, a PTF file?  Or a --

24  A    FTP.

25  Q    -- FTP file?  They can send it with an FTP file;
```

STEPHEN COTTRELL - CROSS

1   right?

2   A    That's correct.

3   Q    Or a zip file?

4   A    We wouldn't accept a zip file via email, no.

5   Q    Okay.  So there is this other program; right?

6   A    There are other programs, yes.

7   Q    Now, you say that -- I think you said you, not only

8   you, Authenticom not only pulls data, but it pushes data

9   back into the system?

10  A    That's correct.

11  Q    And that's called writeback?

12  A    That's the term for it, yes.

13  Q    And you say -- I think you said you only run a

14  single, on average, one bulk data query per day for a

15  dealer?

16  A    One bulk filing transfer.  A query is kind of --

17  it's been used in a lot of different ways in this case,

18  but there's one bulk transfer at night, that's correct.

19  Q    So if it's only one transfer a day from a dealer,

20  that could easily been handled by the Dynamic Reporting

21  Program of Reynolds; correct?

22  A    That would not incorporate the writeback function

23  though that you're talking about.

24  Q    Thank you.  That doesn't allow you to writeback;

25  correct?

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 33 of 222 PageID #:61157
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 32 of 221

1-P-32

1    A    That is correct.

2    Q    But it's only a small percentage of your customers

3    that --

4    A    Can you go back to your previous question?

5    Q    Yes.  Can I finish the one I've got?

6    A    Sure.  Of course.

7    Q    It's only a small part, number of your customers who

8    writeback or for whom you writeback.

9    A    That is correct.

10   Q    All right.  You wanted to go back?

11   A    Yes.  So from a practical standpoint, receiving a

12   report, as you put it, from a dealership is highly

13   problematic.  Even in a single instance, okay, for a

14   dealership to utilize the Dynamic Reporting interface

15   with report generator functions that are embedded in the

16   CDK system requires a significant degree of expertise.

17   Many dealerships don't actually have that expertise.

18   Over a decade or more that we've been providing these

19   services, we've had hundreds of dealers try and send us

20   reports to our specifications.  One actually sends them,

21   what's referred to as the English statements, and ask

22   them to transpose those onto their systems and without

23   fail they never get it right; okay?  We pass files back

24   three, four, five times; okay?  This is not a process

25   that's as seamless as you make it to be.  It is not very

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 34 of 222 PageID #:61158
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 33 of 221

1-P-33

1    efficient.

2    Q    But -- I'm a little confused, I'll be honest with

3    you.  So these are the same dealers that you say or you

4    believe are perfectly capable of assessing data security

5    issues and data security risks in dealing with

6    third-party integrators.  But it's really beyond their

7    ability to download these reports and send them in an FTP

8    file.

9    A    I think we're talking about two different people in

10   the dealership.  The business assessments would --

11         THE COURT:  I'm going to cut this off because I

12   think I get the point.  Your point is that the dealers

13   are smart enough to hire somebody who's got good

14   security, but it's a pain in the ass to go through and

15   download all these reports and try to get them sent to

16   you.

17         THE WITNESS:  You got it.

18         THE COURT:  There we go.  Okay.  I understand.

19         MR. RYAN:  One more?

20         THE COURT:  Yeah, I'm not cutting you off.  I'm

21   just saying this area is covered.

22         MR. RYAN:  Okay.

23   BY MR. RYAN:

24   Q    And one thing you might do to help a dealer work

25   through that is you might pay the dealer because you're

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 35 of 222 PageID #:61159
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 34 of 221

1-P-34

1   being paid by the vendors.  Maybe the vendors and the

2   third-party integrator could pay someone at the dealer to

3   make the program work even better.  That's something that

4   you've probably considered in the past, isn't it?

5   A    I don't understand how paying the dealer would make

6   the program better.

7   Q    Having them hire somebody or having them pay for the

8   person who's got to run off -- Ms. Woods' time each day

9   for an hour to run off those hundred reports.

10  A    That wouldn't be very efficient at $25 a month.  I

11  don't know an employee we could hire at those types of

12  numbers and make any kind of margin.

13  Q    Now, I wanted to ask you about your conversation

14  with Mr. Schaefer in May of 2015 in which -- I think your

15  testimony is he told you there was an agreement between

16  Reynolds and CDK to put you guys out of business.  Is

17  that the essence of your testimony?

18  A    That's the essence, yes.

19  Q    And in April of 2015, you were in a legal dispute

20  with Reynolds; correct?

21  A    We had received the threat of a tortuous

22  interference lawsuit, yes.

23  Q    And you had responded to that threat with a letter;

24  correct?

25  A    Yes, we had.

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 36 of 222 PageID #:61160
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 36 of 222

1-P-35

1    Q    They had lawyers, you had lawyers, and the two sides

2    are gearing up for a fight; correct?

3    A    No.  There was no fight involved.

4    Q    But there was some head butting going on?

5    A    No.  It was a single response letter from us.

6    Q    Okay.  So while this is going on, you get a call

7    from Mr. Schaefer in your office; right?  In May?

8    A    I believe it was actually shortly after our response

9    letter.

10    Q    Right.  They write to you.  You write to them.

11    Mr. Schaefer calls your office.

12    A    That sounds correct.

13    Q    And he confesses to a conspiracy with CDK.

14    A    That wasn't the -- where he started the

15    conversation, but in the course of that conversation

16    that's certainly what he said.

17    Q    Okay.  And that was a serious threat to you.

18    A    Very serious threat.

19    Q    And did you send a letter back saying you better

20    stop this conspiracy or I'm going to take action?

21    A    No, I did not.

22    Q    Did you send a letter to CDK saying I've just been

23    informed of this conspiracy.  It is a threat to this

24    business that I love so much and you better cut it out?

25    A    I did not.

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 37 of 222 PageID #:61161
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 36 of 221

1-P-36

1  Q    Did you go to the United States Justice Department

2  and tell them look, here is this problem?

3  A    Yes, I did.

4  Q    And did they take action?

5  A    I'm -- the Federal Trade Commission does not

6  routinely discuss what actions they're taking or not

7  taking with someone who brings up an issue.

8  Q    Did you issue a press release to the industry saying

9  they're in this conspiracy against me?

10 A    I did not.

11 Q    Okay.

12 A    That would not be prudent.

13 Q    And then your testimony is -- oh.  And you were

14 aware that Mr. Schaefer has filed a declaration denying

15 your version of the conversation; correct?

16 A    Mr. Schaefer routinely denies things.

17 Q    Okay.  And then you had a conversation with a

18 Mr. McCray from CDK a year later; correct?  In 2016 at

19 the convention.

20 A    Yes, that's correct.

21 Q    All right.  And you're aware that Mr. McCray has

22 submitted a declaration in this case --

23 A    I --

24 Q    -- in which he denies --

25 A    I did read that one quite closely, yes.

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 38 of 222 PageID #:61162
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 37 of 221

1-P-37

1    Q    Okay.  And in that one --

2    A    Which exhibit?

3    Q    If you go to plaintiff's Exhibit 55 in the white

4    book, which has been admitted into evidence, these are

5    the notes of your conversation with Mr. McCray; correct?

6    A    Yes.

7             MR. NEMELKA:  Your Honor, it's Exhibit 55A that

8    was admitted, not 55.

9             MR. RYAN:  I apologize, Your Honor.

10            THE COURT:  All right.  So what's the status of

11   55?  What's the difference?

12            MR. NEMELKA:  55A has the second page that's

13   blank.  The other side complained that the metadata shows

14   that it had two pages and so we produced the one that

15   actually had the blank second page for them.

16            THE COURT:  All right.  Good.  So I think 55

17   will do for present purposes.

18   BY MR. RYAN:

19   Q    So -- again, so Mr. McCray tells you that, as you

20   understood it, that there's a conspiracy between Reynolds

21   and CDK to put you out of business; right?

22   A    That's correct.

23   Q    And again, did you send a letter to CDK saying this

24   guy McCray just said this and you better not -- words to

25   this effect -- and you better knock it off?

                    STEPHEN COTTRELL - CROSS

Case: 4:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 39 of 222 PageID #:61163
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 39 of 222

1-P-38

1    A    I did not send a letter, no.

2    Q    Did you send a letter to Reynolds saying this is the

3    second time someone has confessed to a conspiracy and you

4    better cut it out?  You didn't do that either, did you?

5    A    I believe that I did make a phone call to

6    Mr. Schaefer.

7    Q    Oh, and you did.  And what did you tell

8    Mr. Schaefer?

9    A    I talked to him about the fact that Mr. McCray had

10   basically repeated Mr. Schaefer's statements before about

11   the nature of their agreement and I asked him if it was

12   true.

13   Q    And what did he say?

14   A    He said Reynolds would never conspire with another

15   DMS.  That was his statement.  I accused him of

16   conspiracy and he denied it.

17   Q    So Mr. McCray talks to you.  You call Mr. Schaefer

18   and he denies it.

19   A    That's correct.

20   Q    Okay.  And then did you call anyone at CDK?

21   A    No.

22   Q    Okay.  So in your declaration you talk about this

23   conversation; correct?

24   A    That's correct.

25   Q    I'm talking about the McCray conversation.

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 40 of 222 PageID #:61164
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 39 of 221

1-P-39

1    A    That's correct.

2    Q    So let me just find it.  It's paragraph -- if we

3    look at page nine, paragraphs 48 through 51.

4              MR. RYAN:  If we can put plaintiff's Exhibit 55

5    up on the screen.  I don't see it there.

6    Q    So if you look at paragraph 48, on page nine of your

7    declaration, it says from the second sentence or third

8    sentence "Mr. McCray then told me that CDK and Reynolds

9    had agreed to 'lock you and the other third parties

10   out'."  Do you see that?

11   A    Yes, I do.

12   Q    And there's in the notes -- in the notes there's a

13   reference to that; right?  It says "Most of the major DMS

14   companies have agreed to only source data from each other

15   and effectively lock you and the other third parties

16   out"; correct?

17   A    That is correct.

18   Q    These were notes you took the next morning.

19   A    That's correct.

20   Q    And as best you can, you took -- you reported

21   exactly what Mr. McCray had said; correct?

22   A    Mr. McCray said other things besides this.

23   Q    Right.  But I'm just on this particular one.

24   A    Yes.  In the context of what you're talking about,

25   that's exactly what he said.

                    STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 41 of 222 PageID #:61165
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 40 of 221

1-P-40

1  Q    All right.  And -- but in your declaration, it says
2  "Mr. McCray then told me that CDK and Reynolds had agreed
3  to lock you and the other third parties out."  That's not
4  what it says in your notes, is it, sir?
5  A    He referred to major DMS providers.  I inferred that
6  to be Reynolds and Reynolds because there are only two.
7  Q    Right.  So what's in your declaration doesn't quite
8  match up with what's in your notes.  It's based on your
9  inference subsequently of what he said; right?
10 A    His intention was clear.  His statement was clear,
11 yes.
12 Q    Okay.  Thank you.  Can you turn to tab 181, please,
13 in the white binder.  This is defendants' Exhibit 181.
14          THE COURT:  Any objection to defendants' Exhibit
15 181?
16          MR. NEMELKA:  No.
17          THE COURT:  It's admitted.
18 BY MR. RYAN:
19 Q    You've seen this earlier.  Can we put 181 up on the
20 screen, please.  You've seen this earlier today; correct?
21 A    Yes.
22 Q    And it was characterized in court as an automatic
23 Authenticom response of yes when queried about whether an
24 authorized user was attempting to sign on to the CDK
25 system; right?

                    STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 42 of 222 PageID #:61166
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 41 of 221

1-P-41

1   A    Acting with explicit permission and as the agent of

2   the dealer, yes, we type in yes.

3   Q    So you had an automated yes, but certainly you knew

4   that this was in violation of CDK's policies; correct?

5   A    I wouldn't characterize it that way, no.

6   Q    Just a couple questions on the loan.  Your two

7   partners pulled out because they disagreed with the

8   DealerVault strategy; right?

9   A    That is correct.

10  Q    And they were concerned that might not -- that might

11  cause some consternation in the industry; right?

12  A    No.  They didn't want to invest the money in the

13  development.  We estimated that we were going to spend

14  about $2 million, and they were both CPAs and very

15  conservative, and to make that kind of investment in the

16  company at that point in time they didn't agree with.

17  Q    Thank you.

18       MR. RYAN:  Can I have one second, Your Honor?

19       THE COURT:  Yes.  (pause at 2:39 p.m.)

20       MR. RYAN:  Thank you, Mr. Cottrell.

21       THE WITNESS:  Thank you.

22       THE COURT:  Any cross-examination on behalf of

23  Reynolds?

24

25

                 STEPHEN COTTRELL - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 43 of 222 PageID #:61167
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 42 of 221

1-P-42

<u>CROSS-EXAMINATION</u>

BY MR. ROSS:

Q    Good afternoon, Mr. Cottrell.  I'm Brian Ross on

behalf of Reynolds.

A    Good afternoon, Brian.

Q    How are you today?

A    I've had better days, Brian.

Q    Well, we'll try to move through this as

expeditiously as we can.  I'd really like to focus my

questions specifically on Reynolds.  I will do my best

not to replow ground that Mr. Ryan has already covered,

but there may be a little bit of overlap.

A    Thank you.

Q    As you discussed with Mr. Ryan, Reynolds has been

blocking third parties from automated access to their DMS

for several years; right?

A    Yes, that is my testimony.

Q    And that's not just Authenticom, that's all third

parties that have attempted to access the Reynolds DMS

through automated access.

A    Yeah.  They effectively enforced everyone out of the

market, yes.

Q    Well, their blocking of third parties from accessing

the DMS through automated means is not -- does not

discriminate against Authenticom.  They've applied the

STEPHEN COTTRELL - CROSS

Case: 3:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 44 of 222 PageID #:61168
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 44 of 222

1-P-43

 1 | same policies to CDK's own subsidiaries in this case as
 2 | we've talked about.
 3 | A    They have acted as an equal opportunity blocker,
 4 | yes.
 5 | Q    Okay.  Thank you.  And that equal opportunity
 6 | blocking has been increasingly effective from 2009, I
 7 | think was the first date that you discussed blocking
 8 | earlier with Mr. Ryan, up to essentially complete
 9 | blockage in 2013.
10 | A    No.  The blockage of 2013 was not complete at all.
11 | It was when they started their most aggressive efforts.
12 | Q    Okay.  Your companies referred to that stage in the
13 | blocking as, I think, apocalypse?
14 | A    That was known as apocalypse, yes.
15 | Q    All right.  So you testified earlier on direct in
16 | your discussion with Mr. Nemelka that when it was just
17 | Reynolds blocking Authenticom, you could work with that.
18 | A    That's correct.
19 | Q    Okay.  So as it relates to Reynolds, as I understand
20 | what you're asking this Court to do is to prohibit
21 | Reynolds from blocking or attempting to block
22 | Authenticom's access to its DMS; is that right?
23 | A    That is correct, yes.
24 | Q    Okay.  So essentially what Authenticom is trying to
25 | do here as it relates to Reynolds is to rewind the clock

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 45 of 222 PageID #:61169
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 44 of 221

1-P-44

1   back to the state of play, as it were, as far back as

2   2010; right?  That's the last time that you can recall

3   that Reynolds was not effectively blocking Authenticom's

4   access.

5   A    That's not how I would characterize it, no.

6   Q    Okay.  Well, you are certainly asking the Court to

7   prohibit Reynolds from doing something that it has been

8   doing since 2010; correct?

9   A    Yes.

10  Q    The status quo as it relates to Reynolds from 2010

11  to 2017 has been that Reynolds is actively blocking

12  Authenticom and Authenticom does what it can to get

13  around those blocks; right?

14  A    Yes.  I would say that's correct, yes.

15  Q    I want to move on to a little bit of followup on the

16  Dynamic Reporting process.  This is the Reynolds --

17            THE COURT:  We know what it is.  We've got it.

18            THE WITNESS:  I'm familiar.

19  BY MR. ROSS:

20  Q    Thank you.  The example that Mr. Ryan gave you and

21  that you talked through with Mr. Ryan, the John Eagle

22  dealerships group in Texas, would you agree that that

23  dealership group uses the Dynamic Reporting process and

24  exports its data reports through manual FTP -- this was

25  the manual FTP versus automated FTP that you were

                    STEPHEN COTTRELL - CROSS

discussing with Judge Peterson earlier -- and those

reports and data are uploaded to DealerVault for use in

syndication to DealerVault and their partners.  Do you

understand that?

A    Yes, I do.  At that point in time I'd agree with

that.  I'm not familiar with what's going on today

exactly, but based on her declaration, yes, I was clear

that's what was going on.

Q    Okay.  You don't have any reason to dispute

Ms. Woods' account as of two weeks ago.

A    Other than -- the fact that they were FTP data, yes.

The rest were declaration I might dispute.  But they

were --

Q    Do you know Ms. Wood?

A    I don't.

Q    The data that is -- let me strike that.

     Authenticom is paid pulling revenues by its vendor

partners for Ms. Woods' dealership roof tops; correct?

A    Yes, that's correct.

Q    Okay.  So Reynolds is not attempting to prevent

Authenticom from collecting revenues as to any

dealerships that are willing to use the manual Dynamic

Reporting process and upload those reports up to

DealerVault, are they?

A    I can't speak to what their intent was or is.  We

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 47 of 222 PageID #:61171
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 46 of 221

1-P-46

1   have had some blocking, although it's been not as

2   significant as the apocalypse of Dynamic Reporting

3   profiles.

4   Q    Well, the difference is, Mr. Cottrell, is it not,

5   that Authenticom asks dealers to provide their usernames

6   and passwords so that Authenticom can run automated

7   versions of these Dynamic reports.

8   A    We do.  Yes, we do.

9   Q    And as you understand it, that's what Reynolds

10  objection to; right?

11  A    Honestly I believe that Reynolds objects to us being

12  in the space.

13  Q    Okay.  Well, we will cover that perception with

14  Mr. Schaefer.  Let me -- let me see if I can sum up this

15  point:  If someone were to say that Reynolds doesn't let

16  its dealers share their data with third parties as a

17  broad matter, that would be incorrect, wouldn't it?

18  A    In the -- in the exact context, yes, that would be

19  incorrect.  But as a practical statement, that would not

20  be correct and that's not the feeling in the marketplace.

21  Q    Mr. Cottrell, let me ask you there's been some

22  discussion this morning about Reynolds using Authenticom

23  to integrate with Reynolds' own dealers.  Do you recall

24  that general discussion?

25  A    Yes, I do.

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 48 of 222 PageID #:61172
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 47 of 221

1-P-47

1    Q    Do you know how many Reynolds dealers are -- to how

2    many Reynolds dealers that statement applies as we sit

3    here today?

4    A    As we sit here today I believe it's three.

5    Q    Okay.  Thank you.  Do you know how many CDK dealers

6    Reynolds' applications use Authenticom for?

7    A    Somewhere between 50 and 75.

8    Q    Okay.  Well, if we were to -- if we wanted to verify

9    that, that number would be -- if we looked at your

10   Exhibit 97, which was the large spreadsheet that you went

11   over with Mr. Nemelka --

12   A    That would be accurate, yes.

13   Q    -- we could just look at how many dealers were

14   active as of the most recent date, June 1st?

15   A    If that spreadsheet covers up to June 1st, yes.

16   Q    If the numbers are what they are.

17   A    Yes, absolutely.  Absolutely, yes.

18   Q    You agree that there are only three Reynolds

19   dealerships to whom this concept applies.

20   A    If that's what the spreadsheet says, yes.

21   Q    And you said it independently.

22   A    I believe that's what it is.  I haven't -- I haven't

23   verified it on the spreadsheet.

24   Q    Okay.  I appreciate that.  You also mentioned that

25   Reynolds, certain Reynolds' applications use Authenticom

STEPHEN COTTRELL - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 49 of 222 PageID #:61173
Case: 3-17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 49 of 221

1-P-48

 1    to pull data from other DMSs, i.e., not CDK or Reynolds

 2    but other dealers.

 3    A    That's correct.

 4    Q    But of course those DMSs don't have the same

 5    contractual provisions with their dealers that we've been

 6    discussing here today, do they?

 7    A    No.  We work collaboratively with them.

 8    Q    So for purposes of this proceeding, those

 9    dealerships are really neither here nor there.

10          MR. NEMELKA:  Objection.

11          THE COURT:  Overruled.

12          MR. ROSS:  I'll --

13          THE COURT:  It characterizes the -- it's a

14    better argument than a question.  But it's overruled.

15          MR. ROSS:  Fair enough.

16    BY MR. ROSS:

17    Q    Do you understand that this is -- that Reynolds very

18    limited use of Authenticom for its own dealerships is a

19    practice that it is trying to maintain or increase?  Or

20    is it a practice that they are winding down as we sit

21    here?

22    A    They have been decreasing.  There was a precipitous

23    dropoff first quarter of 2015 when they entered into

24    their agreement with the CDK.  It's pretty much leveled

25    off since six months ago, I believe, or a few months ago.

                    STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 50 of 222 PageID #:61174
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 49 of 221

1-P-49

1    Q    Do you not or are you not aware that Reynolds does

2    this with respect to applications that it acquires that

3    have Legacy arrangements with Authenticom?

4    A    Yes.  I'm aware of that, yes.

5    Q    And it makes sense, right, that Reynolds may not

6    immediately the first day after it acquires a company cut

7    off its access and immediately stop functionality.

8    That's a rational, prudent step by an application owner,

9    is it not?

10    A    Within the first day, yes, I would agree with you.

11    I would agree with that statement.

12    Q    There were some discussions earlier about exemptions

13    of user ID for the Penske dealership group.  Do you

14    recall that exchange?

15    A    I do.  I do.

16    Q    Could -- I don't think we have this exhibit up on

17    the screen because we were just handed it during the

18    examination.  Yes --

19    A    I have it here, yes.

20    Q    Do you have 159 in front of you?  Mr. Cottrell,

21    first of all, Exhibit 159 does not -- is not copied to

22    anybody at Reynolds, is it?

23           THE COURT:  151 you're talking about?

24           MR. ROSS:  Plaintiff's 159, Your Honor.

25           THE WITNESS:  Based on the email chain from the

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 51 of 222 PageID #:61175
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 50 of 221

1-P-50

1   first page -- I mean I'd have to scan the entire

2   document.  But I do not see any Reynolds employees, just

3   Penske employees, including their CTO and myself, my COO,

4   and one of our lead tech people.

5   BY MR. ROSS:

6   Q    Sure.  You don't have visibility, do you,

7   Mr. Cottrell, to what the Penske group tells Reynolds and

8   Reynolds that it needs any given user ID for, do you?

9   A    Restate the question, please.

10  Q    Sure.  This email does not -- does not demonstrate

11  anything about what Reynolds was told regarding these

12  three Parts I user IDs, does it?

13  A    I believe that through discovery we're going to find

14  those.  I'm sure they exist.  This particular email does

15  not exist any Reynolds employees on that.

16  Q    I think the answer to my question was yes, you're

17  hoping to find some documents that --

18  A    I'm quite certain they're there.  I mean this is a

19  pretty prevalent process.  This is not something that was

20  just thrown together or -- I mean we use it every day.

21  Q    Okay.  And if you look at what this email actually

22  talks about, these are user IDs that refer to a vendor

23  Parts I?

24  A    That's correct.

25  Q    Does it say anything about DealerVault or

                    STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 52 of 222 PageID #:61176
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 51 of 221

1-P-51

1    Authenticom in the user?

2    A    That's correct.

3    Q    And we sometimes see usernames that literally say

4    DealerVault or Authenticom that are set up by dealers;

5    right?

6    A    Not so much anymore.

7    Q    Okay.  Well, we doesn't see it here.  There's no way

8    that anybody looking at this username or set of three

9    user names could conclude that this is an Authenticom

10   used username, is there?

11   A    It's my understanding that that's -- just the

12   username is not how Reynolds identifies Authenticom or

13   DealerVault utilize usernames and passwords.  They have a

14   pretty sophisticated process as far as determining where

15   we're on the system.

16   Q    Do you know -- do you know Chuck Williams, who's

17   copied on this email?

18   A    I do.

19   Q    Do you have any personal knowledge of a conversation

20   or series of conversations that Mr. Williams and

21   Mr. Schaefer had in 2016 regarding potential exemptions

22   for Authenticom?

23   A    I have no knowledge of that, no.

24   Q    Okay.  Thank you, sir.  Mr. Ryan touched on this

25   with you a moment ago.  But you testified about an

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 53 of 222 PageID #:61177
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 53 of 221

1-P-52

1  alleged conversation with Mr. Schaefer in May of 2015 in

2  which you say that Mr. Schaefer admitted that Reynolds

3  and CDK had entered into an agreement to block out

4  Authenticom.  Do you recall that testimony?

5  A    I do.

6  Q    And then you also testified about a conversation

7  with Mr. McCray 11 months later, in April of 2016, in

8  which Mr. -- we've all heard that testimony --

9  A    Yes.

10  Q    -- repeatedly.  I don't need to revisit it.  And

11  then he said you called Mr. Schaefer back and asked him

12  if Mr. Schaefer -- maybe you called him Bob.  You may

13  have.  I just heard from Mr. McCray that Reynolds and CDK

14  are conspiring with each other; is that true.  Do you

15  recall that testimony?

16  A    Yes, I do.

17  Q    Why would you have to call Mr. Schaefer and ask him

18  if this is true when you say Mr. Schaefer already

19  admitted it 11 months earlier?

20  A    Because I hadn't heard it from Mr. McCray.

21  Mr. McCray confirmed it.  I was letting Mr. Schaefer know

22  now that I had a second confirmation of that.

23  Q    Asking Mr. Schaefer is this still true what you told

24  me 11 months ago?

25  A    I was just basically letting him know that I knew,

STEPHEN COTTRELL - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 54 of 222 PageID #:61178
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 53 of 221

1-P-53

1    okay, that they were doing that.

2    Q    Okay.  Well, that's not what you testified to a

3    moment ago, is it?

4    A    I think -- can you reask the question?  I'm sorry.

5    Q    I'll move on, Mr. Cottrell.

6    A    Thank you.

7    Q    The followup conversation that you now are

8    recounting with Mr. Schaefer, that's not anywhere in

9    either of your declarations, is it?

10   A    No, it is not.

11   Q    In any event, you do understand that Mr. Schaefer

12   denies that this statement was ever made.

13   A    Yes, I do understand that.

14   Q    And I think you said a few moments ago that well,

15   Mr. Schaefer denies a lot of things.  That was your

16   testimony?

17   A    It was.

18   Q    Let's just get it out on the table.  Are you --

19   you're saying that Mr. Schaefer has lied under oath in

20   his declaration?

21   A    I believe Mr. Schaefer has made misstatements under

22   oath in his declaration, yes.

23   Q    Well, the Court can judge the credibility when

24   Mr. Schaefer testifies.

25        After this conversation in May of 2014 -- May of

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 55 of 222 PageID #:61179
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 54 of 221

1-P-54

1  2015 in which Mr. Schaefer admitted a conspiracy with

2  CDK, according to your testimony, Mr. Cottrell, you did

3  not file a lawsuit until two years later; is that right?

4  A    I'm sorry, give me the dates again.

5  Q    The dates of the conversation as relayed by your

6  testimony was May of 2015.

7  A    Correct.

8  Q    You filed the lawsuit in May of 2017.

9  A    That's correct.

10  Q    So two years pass.  You don't seek any sort of

11  judicial relief from this admitted conspiracy that you

12  learned about in 2015 -- May of 2015.

13  A    Right.  We filed in May of 2017; that's correct.

14  Q    Okay.  Fair enough.  In early 2016, which is several

15  months after you've learned of what you contend here is a

16  conspiracy, isn't it true that you had a number of

17  cordial conversations and emails with Mr. Schaefer about

18  your requests for Dynamic Reporting to be more

19  prominently displayed on Reynolds' website?

20  A    Mr. Schaefer -- folks at Reynolds had canceled all

21  of their data-pulling services.  We effectively turned

22  off all their feeds.  And Mr. Schaefer had Mr. Wunderly

23  (ph) contact me, rather abruptly, asking us to turn those

24  feeds back on; okay?  In making that request, my

25  conversation with Mr. Schaefer was I'd love to

STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 56 of 222 PageID #:61180
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 56 of 221

1-P-55

1    accommodate you, but -- and he said "What's it going to

2    cost me?"  And I said "We don't raise our prices, Bob.

3    You know that about us.  But I will ask a favor."  And at

4    that point we entered into a conversation with Dynamic

5    Reporting.  Dynamic Reporting at that point in time was

6    behind the scenes.  It was something that was not

7    prominent and forefront in the marketplace.  So what we

8    asked Mr. Schaefer to do was to take it on and put the

9    Dynamic Reporting process on the front side of their

10   website that was accessible to the public, yes.

11   Q    And they did that; correct?

12   A    They did do that reluctantly, yes.

13   Q    And you were happy about that; right?

14   A    Yes, I was.

15   Q    Because Authenticom likes Dynamic Reporting.  It is

16   a good solution to provide data to DealerVault; right?

17   A    It provided us a survival.  It's not a good

18   solution.

19   Q    Well, Mr. Cottrell, you've said in your declaration

20   that out of the 11,000 dealerships that you serve, 10,900

21   of them can get by with daily batch data; right?

22   A    That's correct.  That doesn't make Dynamic Reporting

23   a good solution.

24   Q    Well, we've seen that if dealers are willing to

25   spend a modicum of time entering in their reports or

STEPHEN COTTRELL - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 57 of 222 PageID #:61181
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 56 of 221

1-P-56

1    scheduling their reports, that that solution worked

2    perfectly fine for their needs and they don't have to pay

3    Reynolds anything extra, do they?

4              MR. NEMELKA:  Objection.  Foundation.  Still

5    argumentative.

6              THE COURT:  Overruled.

7              THE WITNESS:  Yeah, I wouldn't characterize it

8    that way at all.  No, I would not.  I would not agree

9    with you.

10             MR. RYAN:  Okay.  Well --

11             THE COURT:  Is daily batch -- what did you call

12   it?  Daily batch data?  Daily bath downloading?  Is that

13   the same as the Dynamic Reporting we're talking about?

14             THE WITNESS:  I believe what he's referring to

15   is on the John Wood example was where a dealer sends us a

16   daily batch file that's processed through the Dynamic

17   Reporting tool, yes.

18             THE COURT:  Okay.  So that's what -- so that's

19   -- supposedly that's in your declaration where you said

20   10,900 of your dealers could get by with daily batch

21   data?

22             THE WITNESS:  What's in the declaration is that

23   10,900 of our dealers we pull at night.  There is less

24   than 100 dealers where we're pulling data throughout the

25   day.  We pull things like open repair orders, service

                    STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 58 of 222 PageID #:61182
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 57 of 221

1-P-57

1    appointments, things like that which are very, very small

2    amounts.

3              THE COURT:  Those you do during the day.

4              THE WITNESS:  Yeah.  That was that point of that

5    part of the declaration; not that Dynamic Reporting was a

6    viable tool for batch data processing.

7    BY MR. ROSS:

8    Q    Well, I mean I don't mean to quibble, but you have

9    acknowledged that dealers use that reporting function to

10   send back data to Authenticom; right?

11             THE COURT:  No.  We really did cover this pretty

12   well, even with some of my questions.  So unless you have

13   something new to bring out here, I think we've covered

14   it.

15             MR. ROSS:  Nothing new.  I just wanted to make

16   sure Mr. Cottrell is not walking back from his earlier

17   testimony.

18             THE WITNESS:  I am not.

19             MR. RYAN:  Okay.

20             THE COURT:  I understand what he's saying.

21   BY MR. ROSS:

22   Q    There is no -- Reynolds has no technical restriction

23   on dealers' ability to use the Dynamic Reporting function

24   and share their data with third parties.

25   A    I'm not aware of technical restrictions, but

                    STEPHEN COTTRELL - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 59 of 222 PageID #:61183
Case 3:17-cv-00318-jpt Document #162 Filed: 07/05/17 Page 58 of 221

1-P-58

1   functional restrictions, yes.

2          THE COURT:  What are the functional

3   restrictions?  Are you just talking about how difficult

4   it is --

5          THE WITNESS:  It's very difficult.

6          THE COURT:  I think I got it.  Just as a

7   practical matter, it's faster.  Got it.

8          MR. RYAN:  We'll pass the witness, Your Honor.

9          THE COURT:  All right.  Very good.  Redirect?

10         MR. NEMELKA:  We don't have any redirect, Your

11  Honor.

12         THE COURT:  Very good.  Mr. Cottrell, you're

13  done for the day anyway.  Thank you.

14      (Witness excused at 3:02 p.m.)

15         THE COURT:  Next witness.

16         MR. NEMELKA:  Your Honor, plaintiffs call our

17  security expert Peter Swire.

18         **PETER SWIRE, PLAINTIFF'S WITNESS, SWORN,**

19         MR. SCHWARZ:  Could I approach?

20         THE COURT:  Yes.

21                   DIRECT EXAMINATION

22  BY MR. SCHWARZ:

23  Q    Good afternoon, Professor Swire.

24  A    Good afternoon.

25  Q    Can you please state your full name for the record.

                    PETER SWIRE - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 60 of 222 PageID #:61184
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 59 of 221

1-P-59

1    A    Peter Putney Swire.

2    Q    And what's your educational background?

3    A    I undergrad, I was --

4              THE COURT:  You can be very brief on this.

5              THE WITNESS:  Sure.

6              THE COURT:  Are you going to object to his

7    qualifications?

8              MR. WILKINSON:  No.

9              THE COURT:  All right.  Then just give me the

10   briefest of thumbnail sketches.

11             MR. SCHWARZ:  Absolutely.

12   BY MR. SCHWARZ:

13   Q    Professor Swire, can you advise the Court where you

14   currently are employed?

15   A    I'm currently a professor at Georgia Tech.  I teach

16   cybersecurity and privacy there, among other topics.

17   Q    Okay.  For how long have you been a professor?

18   A    I became a professor in 1990.  As a law professor I

19   came to Georgia Tech in 2013.

20             THE COURT:  Just give me your elevator pitch on

21   why you should be an expert in this case.

22             THE WITNESS:  I think -- I've been working on

23   privacy and cybersecurity since the mid-1990s.  Under

24   President Clinton, I was brought in as Chief Counselor

25   for Privacy to be the privacy lead for the U.S.

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 61 of 222 PageID #:61185
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 60 of 221

1-P-60

government.  Under President Obama after the Snowden
stuff happened, I was one of five people named to the
review group of what to do with the NSA, along with Cass
Sunstein, Geoffrey Stone, and two other people.  I write
the textbooks for privacy.

THE COURT:  Cass Sustein isn't a technical kind
of person.

THE WITNESS:  No.  They wanted some technical
people to help him with his constitutional theory.  And I
write the textbook -- if you get certified as a privacy
expert in the United States, I write the textbook for
that.  Thousands of people have taken the test.

THE COURT:  All right.  Very good.  Okay.

MR. SCHWARZ:  If we're going to do this
formally, we offer Professor Peter Swires as an expert in
information --

THE COURT:  I don't really certify the experts.
Unless they object -- they missed their chance already,
if they object.  So he's an expert.  Let's find out if
he's got anything useful to say.

THE WITNESS:  I'll try.

BY MR. SCHWARZ:

Q    Professional Swire, what did Authenticom engage you
to do in this matter?

A    They asked me to review cybersecurity practices with

PETER SWIRE - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 62 of 222 PageID #:61186
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 61 of 221

1-P-61

1    relation to Authenticom and the two defendants.

2    Q    And have you reached any opinions?

3    A    I have.

4    Q    And how did you reach those opinions?

5    A    I read a variety of documents that are listed in my

6    declarations.  I interviewed Mr. Cottrell and other

7    people for Authenticom; reviewed some public record

8    materials.

9    Q    And have you prepared some slides to use with your

10   testimony?

11   A    Yes, I have.

12   Q    They should be at the front of your book.  In front

13   of everyone's book.  Are these the slides you created?

14   A    Yes.

15   Q    What's on the first slide?

16   A    The first slide shows a summary opinion of my

17   testimony which --

18   Q    I was just going to ask what opinion you reached.

19   A    That CDK and Reynolds per se blocking of Authenticom

20   and other data integration firms is not reasonably

21   necessary to ensure the privacy and security of the car

22   dealer data.

23   Q    Okay.  Can you turn to the second slide.  And what

24   is represented here?

25   A    Three key reasons to support the overall opinion.

PETER SWIRE - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 63 of 222 PageID #:61187
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 63 of 222 PageID #:61187

1-P-62

1    Q    Okay.  And can you talk through your key opinions to

2    the Court?

3    A    Sure.  The first one is, and it's been talked about

4    extensively today, that the ownership of the data is with

5    the car dealers.  The car dealers have control over that

6    data.  They have affirmatively consented to the data

7    integrator, such as Authenticom, using that data.

8         The second point is that data integrators are

9    pervasive and essential in other industries, notably

10   health care and financial services which are very

11   sensitive.  So it's a widely known phenomenon that we're

12   talking about here.

13        And the third one is other materials I've reviewed,

14   notably the details of Authenticom's security practices,

15   indicate there's no reasonable basis in security or

16   privacy for this wholesale or per se ban on outside data

17   integrators in the car dealer industry.

18   Q    Professor Swire, have you reviewed the report

19   submitted by defense experts Mr. Rosenbach and

20   Dr. Schneck?

21   A    Yes.

22   Q    Did those reports cause you to alter your opinion in

23   any way?

24   A    They did not.

25   Q    If we could turn to slide 3, I'd like to walk

PETER SWIRE - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 64 of 222 PageID #:61188
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 64 of 221

1-P-63

through in more substance the overall basis for your

opinion.  You mentioned that Authenticom has permission

to use the data at issue.  As you understand it, what

data is at issue?

A    So the car dealers have two kinds of data the way I

think about it.  The first is consumer data.  Individuals

choose to go to the car dealer.  They give their name and

address and contact information.

And then a second thing is car dealer data about

their own business operations.  That includes things

we've talked about all day today:  Inventory, service and

sales.

Q    And as you understand it, who gives Authenticom

permission to access this data?

A    Well, so the dealer provides permission.

Q    And why are car dealerships able to grant that

permission?

A    The basic idea is consumers have chosen the car

dealer.  They've shared their data with the car dealer.

The car dealer is doing its business.  The car dealer has

control over how the data about its business is used.

Q    And what about for consumer data?

A    For consumer data, there's been a direct

relationship between the consumer and the car dealer.

It's what's called in the privacy world a first-party

PETER SWIRE - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 65 of 222 PageID #:61189
Case: 3:17-cv-00318-jdp  Document #: 162  Filed: 07/05/17  Page 65 of 221

1-P-64

1  relationship.  The consumer chose to come to this dealer.

2  And then the dealers safeguard that and do their business

3  operations.

4  Q    Based on your review of the materials for this case,

5  is there a practice concerning who controls consumer and

6  dealership data?

7  A    Yes.

8  Q    And can you please explain?

9  A    Well, it has to do with this first-party idea.

10  Consumers choice a bank or a hospital or a car dealer,

11  then that's the organization that has the principal

12  control over the individual consumer's data.  And so the

13  focus of privacy regulation, the focus of attention is

14  whether that party the consumer chose is acting properly

15  with the data.

16  Q    Can you turn to slide 4?

17  A    Yes.

18  Q    What is shown here?

19  A    What's shown here is a series of quotes, some of

20  which have come up earlier today, about statements by

21  people from Reynolds and CDK about the dealer control

22  over the data.

23  Q    So Professor -- sorry.  Mr. Rosenbach in his

24  declaration expresses an opinion that Authenticom's

25  activities and requested access violate access control

PETER SWIRE - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 66 of 222 PageID #:61190
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 66 of 221

1-P-65

1   principles.  Do you agree with that assertion?

2   A     No.

3   Q     Why not?

4   A     The dealer, who I've just said is at the center of

5   the decisions about how the data is used here, the dealer

6   chooses to do business with Authenticom.  The dealer, as

7   you saw with DealerVault, goes into a lot of details

8   about what exactly they're going to do in terms of

9   sharing the data.  And that kind of very clear consent by

10  the dealer for Authenticom to act on their behalf is the

11  correct kind of access controls.

12  Q     You referenced earlier first parties and third

13  parties as a framework.  Where does that framework come

14  from?

15  A     One place it comes from is the Federal Trade

16  Commission, which has written about this extensively and

17  then they do their regulation of privacy in

18  cybersecurity.

19  Q     Between the first and the third party within the FTC

20  framework, which of those provides access controls?

21  A     Well, if the dealer is the one in control of the

22  data, which is the idea in the first party, then the

23  dealer would be the one deciding where the data goes

24  after that and would need decisions about which third

25  parties might get the data.

PETER SWIRE - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 67 of 222 PageID #:61191
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 66 of 221

1-P-66

1    Q    Can you turn to slide 5?

2    A    Yes.

3    Q    And what is shown here?

4    A    This is a diagram that shows the family on the left

5    going to the car dealership in the middle.  That's the

6    first-party relationship, the consumer has decided to go

7    with the dealer.  And then the arrows on the right show

8    that the dealer decides to do some other things with the

9    data.  It might hire a data integrator such an

10   Authenticom.  It might hire a DMS provider such as CDK or

11   Reynolds and Reynolds.

12   Q    And from a privacy law perspective, do third parties

13   get to dictate to the first party who else the first

14   party shares data with?

15   A    No.  That's not the way it typically works.

16   Q    All right.  And from a privacy law perspective, are

17   DMS providers here, third parties, able to decide who can

18   access data on the dealer's behalf?

19   A    The dealer would be the one who ordinarily have the

20   control over deciding who gets to have access to it.

21   Q    Professor Swire, if you can turn to tab 3 in your

22   binder.  This is PX 28, which has already been admitted.

23   A    Yes.

24   Q    And you recognize this document?

25   A    Yes.

PETER SWIRE - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 68 of 222 PageID #:61192
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 67 of 221

1-P-67

 1  Q     These are the terms and conditions for DealerVault.

 2  What do you understand DealerVault to be?

 3  A     DealerVault is a software program that we saw

 4  demonstrated today that's operated by Authenticom.

 5  Q     If I could direct your attention to Section 3.4.

 6  A     3.4, okay.

 7  Q     Which is on page 5 of 15.

 8  A     Yes.

 9  Q     And can you read the first sentence there after "Use

10  and Data Limitations"?

11  A     Yes.  "DealerVault shall only extract the dealership

12  data that the dealership permits DealerVault to extract."

13  Q     And what do you understand that sentence to mean?

14  A     I understand that to be a situation where the

15  dealership is exercising control and decides exactly what

16  data it's going to allow Authenticom to get.

17  Q     And based on your experience in privacy law, are

18  there any best practices for privacy and security with

19  respect to gaining permission to access data?

20  A     Yes.

21  Q     And what is the source of these best practices?

22  A     The source comes -- the strict practices that are

23  the highest level comes from law such as HIPAA, the

24  medical privacy rule, Gramm-Leach-Bliley, wiretap law,

25  and in Europe they have strict laws on privacy also.

PETER SWIRE - DIRECT

1    Q    All right.  Could you turn to slide 6.  And at the

2    -- in the top box what's represented here?

3    A    The top box gives -- makes the point I was beginning

4    to make which is that a best practice for sharing of

5    data, the sort of gold standard, is if the dealer or the

6    person who has control is freely given consent;

7    affirmative consent, not a knockdown; specific consent,

8    data field by data field; and informed consent.  They

9    realize who they're dealing with.

10   Q    And how does the permission in the DealerVault terms

11   and conditions compare to the best practices as you

12   understand them for privacy and security?

13   A    It meets the strict practices of the highest level

14   statutory protections for HIPAA in Europe.

15   Q    Are you familiar, Professor Swire, with the concept

16   data transparency?

17   A    Yes.

18   Q    What is data transparency?

19   A    Data transparency, as it's being used in this case,

20   is the idea that the entity or individual who is trying

21   to make decisions about data would know where the data is

22   going to go.

23   Q    And were you in the courtroom earlier this morning

24   when Mr. Nemelka and Mr. Cottrell gave a demonstration of

25   the DealerVault product?

PETER SWIRE - DIRECT

1    A    Yes.

2    Q    What did that demonstration show as far as dealer

3    transparency?

4    A    It showed very good data transparency field by

5    field, vendor by vendor.  Clear indications by reports of

6    how the data is being used.

7    Q    Now, can -- as you understand it, can the DMS

8    provider see what data is going to what vendors?

9    A    For data that goes from a dealer to Authenticom, the

10   DMS provider would not necessarily know how the data is

11   moving from the dealer to DealerVault to a vendor.

12   Q    And from a privacy law perspective does that matter?

13   A    In my view, no, because it's the dealer that's the

14   center of the analysis and the dealer has given consent.

15   Q    Now, in paragraph 23(c) of his declaration, defense

16   expert Mr. Rosenbach also expresses the view that, and

17   I'll quote, "Authenticom's activities and requested

18   access undermine data transparency and auditing

19   capabilities."  Do you agree about that opinion?

20   A    That is not correct in my view in connection with

21   the dealer's transparency.

22   Q    Why not?

23   A    The dealer has the information we just described

24   that gives it tremendous transparency about where the

25   data from the dealer's business operations is going.

PETER SWIRE - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 71 of 222 PageID #:61195
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 70 of 221

1-P-70

1   Q     And Mr. Rosenbach also criticizes Authenticom and

2   asserts that "Authenticom's activities and requested

3   access violate data minimization principles."  Do you

4   agree with that assertion?

5   A     No.

6   Q     What is data minimization?

7   A     Data minimization says that you share data in a

8   business relationship only for the purposes of meeting

9   the goals of the transaction.  So, for instance, if

10  you're doing an inventory, a vendor relationship, you

11  sent information about inventory.  You don't send data

12  about employee records.

13  Q     Does DealerVault satisfy that principle?

14  A     The ability to go field by field is exactly the

15  thing that allows data minimization and only the

16  affirmative fields chosen by the dealer as the data go on

17  to the vendor.

18        THE COURT:  But isn't the problem that we're

19  talking about here is that data vault (sic) is kind of an

20  accumulating thing.  So you have the need to pass the

21  information on to a vendor for a particular transaction

22  while you've got some inventory, but DealerVault is doing

23  this constantly.  So over a period of time, you've

24  accumulated a huge amount of information and you keep it

25  for a long amount of time, more than is really needed for

PETER SWIRE - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 72 of 222 PageID #:61196
Case: 3:17-cv-00318-jdp Document #: 162-2 Filed: 07/05/17 Page 1 of 221

1-P-71

1    transaction with the vendor.

2            THE WITNESS:  My understanding is that the data

3    is kept by DealerVault pursuant to a particular do this

4    for a vendor.  And that the history files, as I

5    understood it, are often for three years and the data

6    that's being pulled is minimized so that only the things

7    from a particular dealership the dealership has asked for

8    are being pulled.  So I'm not clear where the sort of

9    excess data is.  Maybe if there's further questions, I

10   could try to --

11           THE COURT:  You're kind of anticipating what I'm

12   -- what I think the defendants' perspective on it, which

13   is that it used to be you just pass the data along to the

14   vendors, but now you keep it in this vault.

15           THE WITNESS:  Well, a vault is a pretty good

16   place to keep things compared to other places.

17           THE COURT:  It's safety, but it's not

18   minimizing, I guess, is the point.

19           THE WITNESS:  So minimizing doesn't mean we only

20   use a little data.  We live in an economy that uses data

21   for a lot of things.  Hospital records have a lot of

22   data.  Data minimization, the idea is you transfer it

23   from A to B for a purpose and it's only the data for that

24   purpose.  And so the data minimization here is the dealer

25   might have the ability to get all this data over here if

PETER SWIRE - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 73 of 222 PageID #:61197
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 73 of 221

1-P-72

1   the dealer manager decided to get it.  The specific data

2   fields that are relevant to a vendor is what goes to

3   Authenticom.  So it's minimized compared to what the

4   dealer could have gotten itself, only the things from the

5   seven buckets, I guess, that Authenticom sells.  Only

6   those fields, and carefully excluding other fields, go to

7   Authenticom.

8           THE COURT:  All right.

9   BY MR. SCHWARZ:

10  Q    So let me try to hit this another way.  If a dealer

11  has ten vendors that can sent data, data minimization

12  principles dictate that the data sent to each individual

13  vendor is limited in what way?

14  A    So that's right.  So the vendor would get the fields

15  that are relevant to that vendor.  They wouldn't get the

16  fields relevant to vendors over there that aren't part of

17  their business.

18  Q    Okay.  And for DealerVault to be able to satisfy

19  each of the ten vendors who each need a different piece

20  of data, what does DealerVault need to collect?

21  A    So in order to meet the ten contracts, it needs to

22  pull the data fields that -- all the data fields that go

23  into any one of the ten contracts with the vendors.

24  Q    Okay.  So DealerVault may be at the center of the

25  circle and spokes going to vendors with just the minimal

                    PETER SWIRE - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 74 of 222 PageID #:61198
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 73 of 221

1-P-73

1    data that they need.

2    A    The vendors get exactly the data that the vendors

3    need.  DealerVault get exactly the data for the contracts

4    the dealer has signed with those ten vendors.

5    Q    And Mr. Rosenbach also criticized Authenticom for

6    decreasing the accountability of data handlers, which I

7    understand to be vendors.  Do you agree with that

8    assertion?

9    A    No.

10   Q    Why not?

11   A    The key parts of accountability, as Mr. Rosenbach

12   and I, I think, agree in terms of theory, is do we have

13   written procedures, do we have confidentiality

14   agreements, do we have requirements to keep the data

15   within the bounds of what's being done for the purpose.

16   And so the contracts here, there's a contract in each

17   instant from the dealer to DealerVault.  There's also a

18   contract in each instance from the dealer to the vendor.

19   And the vendor and dealer work out exactly what data is

20   going to go to the vendor through DealerVault.  The point

21   being there's a written record, there's a series of

22   contracts, there's a series of promises, and so is

23   accountability in the sense that everybody is tied up in

24   the contract and has to handle the data properly.

25   Q    In the course of preparing your declarations, were

                    PETER SWIRE - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 75 of 222 PageID #:61199
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 75 of 222

1-P-74

1  you able to review contracts between Authenticom and the

2  vendors?

3  A    Yes.

4  Q    And do Authenticom's contract with its vendors limit

5  the vendors' uses of data?

6  A    Yes.  It limits reuse.  It says the data has to be

7  returned or destroyed when a contract term is up.  It

8  sets the purpose limits only for the purposes of the

9  dealer's contract with the vendor.

10 Q    Switching topics.  Professor Swire, are you aware of

11 any other sectors in which companies chosen by a consumer

12 grant an intermediary or a data integrator access to data

13 about the consumer?

14 A    Yes.

15 Q    In your experience how common is it for data

16 intermediaries to be used in other sectors?

17 A    Extremely common.

18 Q    Can you identified some of the more important

19 industries where data intermediaries are used?

20 A    My declaration talked about the health care

21 industry.  So in health care, HIPAA covers hospitals and

22 other providers, and it also covers what are called

23 health care clearinghouses.  And a health care

24 clearinghouse is exactly a data integrator.  So, for

25 instance, a number of doctors' offices might send their

PETER SWIRE - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 76 of 222 PageID #:61200
Case: 3:17-cv-00318-jdp Document #:162 Filed: 07/05/17 Page 76 of 221

1-P-75

1  data to the health care clearinghouse.  The health care

2  clearinghouse puts it in standard format, cleans up the

3  data, and then submits the claims, for instance, to

4  Medicare, Medicaid or an insurance company.  So that's a

5  data integration or function by these health care

6  clearinghouses.  They're specifically contemplated in

7  HIPAA as part of how the system works.

8  Q    When you refer to HIPAA, are you referring to HIPAA

9  the statute or HIPAA the privacy rule?

10 A    I'm referring to the HIPAA privacy and security

11 rules.

12 Q    Do you have any experience with the HIPAA privacy

13 and security rules?

14 A    Yes.

15 Q    Can you describe your experience for the Court?

16 A    I was the White House coordinator for the HIPAA

17 proposed rule in 1999.  We got 50,000 public comments.

18 And I was the HIPAA coordinator or the White House

19 coordinator for the final rule in 2000.

20 Q    What exactly does the HIPAA privacy rule do?

21 A    What does it do.  It provides a comprehensive set of

22 rules and requirements for covered entities to handle

23 patient data carefully.

24 Q    Can we turn to slide 7.  What does slide 7 show?

25 A    This puts more detail on the health care sector and

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 77 of 222 PageID #:61201
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 76 of 221

1-P-76

1    how they're sharing with third parties even this very

2    confidential health care information.

3    Q    And you indicated that the HIPAA privacy rules

4    specifically addresses data sharing with third-parties.

5    Can you explain how it does that?

6    A    Well, I've talked with health care clearinghouses,

7    which are specifically a data integration function that's

8    widely used in the industry.  And then the other thing in

9    HIPAA is what are called business associate contracts.

10   So there's a hospital that's trying to provide health

11   care.  It contracts with various entities that need

12   access to the data.  The cafeteria company needs to know

13   who has low salt diets.  Maybe the hospital has a IT

14   company to back up and do the computer records for the

15   hospital.  But those are business associate contracts.

16   They're very widely used.

17   Q    And does the HIPAA privacy rule permit or prohibit

18   the use of business associates?

19   A    It recognizes them as an essential part of the

20   industry.

21   Q    And are they significant to the industry?

22   A    They are very significant.  There's more than 2

23   million covered entities in the United States.  There's

24   many, many more millions than that, business associate

25   contracts in the United States.

PETER SWIRE - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 78 of 222 PageID #:61202
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 78 of 221

1-P-77

1   Q    And what type of data is shared with intermediaries

2   in the health care industry?

3   A    The payment records and also clinical records.

4   Q    In your opinion, how does the sensitivity of the

5   data provided to clearinghouses and business associates

6   in the health care industry compare to the data that's at

7   issue for car dealerships?

8   A    Much more sensitive.

9   Q    And why is that?

10  A    Why is that.  Well health care information has

11  been -- the Hippocratic oath goes back millennia and it

12  has a requirement of confidentiality with health care

13  data.  People can be denied insurance or have all sorts

14  of consequences of embarrassment and other things if

15  their medical records, their psychiatric records were

16  released to other people.

17  Q    Let's turn to the financial industry, which is

18  another that you mentioned.  Do you have any experience

19  with respect to the privacy rules that govern financial

20  institutions?

21  A    Yes.

22  Q    Can you describe that experience to the Court?

23  A    Yeah.  So Gramm-Leach-Bliley, the law that we're

24  under now, was passed in 1999.  I was in the White House

25  as the bill was being passed.  And there was a

PETER SWIRE - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 79 of 222 PageID #:61203
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 79 of 221

1-P-78

1    rule-writing committee and I was the White House person

2    with the Federal Reserve, the banking agencies, to write

3    the Gramm-Leach-Bliley privacy rule.

4    Q    And what exactly is Gramm-Leach-Bliley or GLB?

5    A    It's the name of the statute passed in 1999.  It's a

6    very long statute that does a lot of different things,

7    but in Title V of it sets forth privacy and security

8    safeguards.

9    Q    And does it address data sharing with third parties?

10   A    Yes.

11   Q    Let's turn to slide 8.  What does this slide show?

12   A    This slide provides information about the financial

13   sector and how data share.

14   Q    And you reference here a service provider.  What's a

15   service provider under GLBA?

16   A    Service provider is the equivalent of business

17   associate contracts.  The bank or other financial

18   institution writes contracts with its service providers.

19   Q    And are financial institutions permitted to share

20   consumer data with service providers under GLBA?

21   A    Yes, they do it routinely.

22   Q    What type of data is shared with intermediaries in

23   the financial industry?

24   A    Any kind of data held in a bank or other financial

25   institution.

PETER SWIRE - DIRECT

Case: 1-18-cv-09864 Document # 986-16 Filed: 05/20/20 Page 80 of 222 PageID #:61204
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 79 of 221

1-P-79

1   Q     And are there other ways in which data integrators

2   are used in the financial industry by consumers?

3   A     Yes.

4   Q     Can you identify some of those?

5   A     Yes.  So this is companies that are known, such as

6   Mint and Yodlee, that work as data integrators.  The

7   simplest way to think about it is if I'm trying to manage

8   my home finances and I have accounts at five or six

9   places, retirement accounts, bank accounts, securities

10  account, I can ask Mint to go and get the data from all

11  of these places so I could have an integrated spreadsheet

12  of my information from these different providers.

13  Q     And how does Mint get access to that information?

14  A     One way that they do it is through screen scraping,

15  depending on the relationship with the financial

16  institution.  But screen scraping would be -- I, as an

17  individual, would give them credentials to get into the

18  bank account.  They would then pull the data into the

19  spreadsheet to do what I've asked them to do.

20  Q     So a consumer would provide login credentials to

21  Mint or Yodlee which they would then use to --

22  A     That's a commonly used part of that industry.

23  Q     Okay.  I'd like to focus on a couple other areas of

24  disagreement.

25             THE COURT:  Before you move on, does it function

                    PETER SWIRE - DIRECT

1    like it does here?  I mean --

2              THE WITNESS:  In what respect, sir?

3              THE COURT:  Well, so you log on to Mint and

4    you're going to do some work, do you just give your login

5    and password to Mint and they keep it and they use it

6    whenever you tell them you need an update?

7              THE WITNESS:  That's one way that it works.

8    There's comments in the record about security problems

9    and security advantages of how that's done.  But the

10   consumer does that.  One of the security problems there

11   can be that I give access to my bank account and they

12   have access to my full bank account.  In dealer involved,

13   it's field by field and limited, so there's controls here

14   in the DealerVault setting that are stricter than the

15   controls we have in the banking sector.

16             THE COURT:  Well, they're contractual in nature.

17             THE WITNESS:  The DealerVault controls?

18             THE COURT:  Yes.

19             THE WITNESS:  Well, technical and contractual.

20   The software is written a certain way.  There's data

21   fields for some things and not for other things.  That's

22   more technical.  And contractual would be there's a

23   consent from the dealer to DealerVault to do certain

24   things.

25             THE COURT:  And I guess I'm still a little bit

                   PETER SWIRE - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 82 of 222 PageID #:61206
Case: 3:17-cv-00318-jdp Document #: 162-5 Filed: 07/05/17 Page 81 of 221

1-P-81

 1    surprised that if I -- and I don't use Mint so I'm not

 2    speaking of any experience here.  But you just give them

 3    -- let's say I've got ten different financial accounts.

 4    I just give all my logins and credentials to Mint and

 5    they --

 6            THE WITNESS:  Millions of people do it.  There

 7    are other mechanisms.  So with the bigger banks

 8    especially, Mint and Yodlee have created APIs.  We've

 9    heard APIs earlier today.  Basically the software

10    handshake.  So rather than having me give up my

11    credentials to Mint, if it's working with a particular

12    bank, then I'm -- then Mint pulls it, subject to my

13    authorization in a more security way, which is APIs.

14            THE COURT:  So I tell the bank hey, I'm working

15    with Mint --

16            THE WITNESS:  Yes.  Work with Mint from now on,

17    I'm in for this.  Right.

18            THE COURT:  Okay.  Is that more common?

19            THE WITNESS:  It's becoming more common over

20    time.  It's up to the banks, just like it would be up to

21    CDK whether they want to provide that kind of

22    functionality.  And one thing is that in the banking

23    sector, there's thousands of financial institutions.  So

24    writing a contract for Mint to every institution is a

25    very big project and in the absence of that they use

PETER SWIRE - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 83 of 222 PageID #:61207
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 82 of 221

1-P-82

1    screen scraping.

2          THE COURT:  All right.

3    BY MR. SCHWARZ:

4    Q    Professor Swire, in your opinion is the data that's

5    accessed by DealerVault more or less sensitive than the

6    information used by -- transmitted to data integrators in

7    the health care and financial industries?

8    A    The information DealerVault gets is much less

9    sensitive than financial institutions.

10   Q    During your tenure as chief counselor of privacy for

11   OMB, did you ever hear anyone suggest that the retail

12   automotive industry held information that was as

13   sensitive as the health care industry?

14   A    No.

15   Q    Have you ever heard anyone make that suggestion

16   prior to this case?

17   A    Not prior to this case.

18   Q    Have you ever heard anyone suggest that the retail

19   auto industry information is as sensitive as the

20   information available in the financial industry?

21   A    Did you ask financial already?

22   Q    I meant health care.

23   A    I think -- okay.  Neither financial nor health

24   care --

25   Q    Sorry.

PETER SWIRE - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 84 of 222 PageID #:61208
Case: 3:17-cv-00318-jdp Document #: 162-5 Filed: 07/05/17 Page 83 of 221

1-P-83

1   A    Sorry.  Financial and health care are routinely

2   understood, as shown by the statutes, to be more

3   sensitive.

4   Q    And just if you can explain why you believe in the

5   health care sector that the information is more sensitive

6   than the automotive industry.

7   A    Well, the data is more sensitive.  Once health care

8   information is disclosed, you can't get it back and it

9   could be any set of things --

10          THE COURT:  I think I get the idea.

11          THE WITNESS:  That's fine.

12          THE COURT:  I don't care if I have cancer more

13  than they care about what kind of tires I have.

14  BY MR. SCHWARZ:

15  Q    And what about threat risks?  In your opinion, where

16  is the threat risk higher?  In the automotive industry or

17  in the health care and finance industry?

18  A    Well, in the financial industry, if a bad actor gets

19  into my bank account, they can steal all the money there.

20  So that's a huge problem.  Health care, we've had

21  problems, for instance, with ransomware attacks where --

22  ransomeware is where the hospital wakes up one day and

23  its entire system has been encrypted and the bad guys are

24  asking for ransom to turn the system back on.  The

25  hospital is trying to do the operations and they can't

                    PETER SWIRE - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 85 of 222 PageID #:61209
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 84 of 221

1-P-84

access the medical records.  So that's been a prominent

problem in the health care industry recently, subject to

ransomeware attacks.

        THE COURT:  Those are common.  I mean any

industry could be subject to that.  Where they could have

the ransomware --

        THE WITNESS:  That's right.  Though if somebody

is on the table about to be operated on --

        THE COURT:  I get it.  It's more important --

it's not life and death, but --

        THE WITNESS:  Also often with ransomware there's

some backup available somewhere.  And so the

inconvenience of my service appointment being two days

later, because I get it all from the backup, is different

from the real-time problems you have in health care.

        THE COURT:  What about that national critical

infrastructure thing that CDK has?  I can't remember

exactly what it was called.

        THE WITNESS:  Right.  I reviewed something

called a CRADA that they signed, which was a research

agreement between CDK and Homeland Security which was

referenced, I believe, in Mr. Rosenbach's thing.  So

there are thousands -- I looked it up there's more than

9,000 CRADAs in existence per year in the United States.

And the CRADAs could be Homeland Security thinks this

PETER SWIRE - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 86 of 222 PageID #:61210
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 86 of 221

1-P-85

1  particular partner has something valuable to add.  We're

2  going to do a research product together to try to work

3  out something.

4       THE COURT:  Okay.  All right.

5  BY MR. SCHWARZ:

6  Q    Do you have a sense of how many CRADAs there are

7  across the federal government?

8  A    As I said, I looked it up last night and it was in

9  excess of 9,000 for 2014.  And I believe the CRADA that I

10  reviewed was 2015, so that's roughly the same time.

11  Q    Okay.  Let's turn to slide 9.  This is an excerpt

12  from your reply report.  I was hoping you could boil down

13  the syllogism here.

14  A    Okay.  So steps 1, 2 and 3.  Step one is health care

15  and financial is very serious stuff.  It's sensitive data

16  and they face high risk.  Number 2.  The kinds of

17  practices we're seeing here, data integrators and consent

18  given by the individual, are widespread in health care

19  and financial.  So it's hard to see how it's okay for

20  health care and finance, but it's way too risky for a

21  retail car.

22       MR. SCHWARZ:  No further questions for this

23  witness.

24       THE COURT:  All right.  Cross-examination.

25

PETER SWIRE - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 87 of 222 PageID #:61211
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 86 of 221

1-P-86

                              CROSS-EXAMINATION

BY MR. WILKERSON:

Q    Good afternoon, Mr. Swire.  My name is Brice
Wilkinson on behalf of the Reynolds and Reynolds Company.
I'll try to use your time efficiently here.

      As I understand your opinions, you largely agree
with Mr. Rosenbach and Dr. Schneck's stances on
cybersecurity, but disagree with them in several regards
regarding the facts.  Is that a fair summary?

A    Yes.  We overall agree in theory on what's
important.

Q    And the facts that you're referring to are primarily
about Authenticom's current practices supplied to you by
Mr. Cottrell; is that fair?

A    That's a big part of what I relied on, yes.

Q    You've never investigated the practices of any other
data integrators or similar companies, have you?

A    Except for my experience over time with health care
clearinghouses and things like that.

Q    But not in the automotive industry.

A    Not in the automotive industry.

Q    And your exploration of the facts has been limited
primarily to looking at Authenticom's current DealerVault
product as it exists today, not as it existed back in
2014 or 2010; is that fair?

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 88 of 222 PageID #:61212
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 87 of 221

1-P-87

1   A     That's correct.

2   Q     So you're not offering any opinions on what risks or

3   effects those other data integrator practices may cause,

4   are you?

5   A     So there have been discussions about data

6   integrators who were putting code on CDK's machines and I

7   do see that as highly distinct from the kind of access

8   that Authenticom has.

9   Q     Okay.  But just to be clear, you're not offering an

10  opinion on sort of other data integrators practices,

11  cybersecurity methods, et cetera.

12  A     No.

13  Q     Okay.  Nor what they may have done in the past.

14  A     Correct.

15  Q     Okay.  Mr. Swire, I guess it was referenced in your

16  PowerPoint and it's also referenced in your report

17  there's a concept of -- you talk about a per se ban --

18  A     Yes.

19  Q     -- on data; right?

20  A     Um-hmm.

21  Q     And I think over the course of today, we've had a

22  lot of testimony talking about, for example, Reynolds

23  report generator function.  You were here for that

24  testimony; yes?

25  A     Yes.

PETER SWIRE - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 89 of 222 PageID #:61213
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 89 of 221

1-P-88

1  Q    And you've heard sort of Mr. Cottrell and during the

2  openings talking about how there are ways for dealers to

3  send data to Authenticom independent of Reynolds and CDK

4  systems; right?

5  A    I heard that testimony, yes.

6  Q    And you don't have any reason to disagree with it,

7  do you?

8  A    No.

9  Q    No.  And so you understand that from Reynolds and

10 CDK's perspective, the dispute is not about dealers

11 sending data to Authenticom, it is about Authenticom

12 accessing their systems.  You understand that

13 distinction?

14 A    I agree with that.

15 Q    Data access and system access; is that fair?

16 A    With the automated access that Authenticom uses,

17 yes.

18 Q    Right.  So when you're talking about a per se ban,

19 what you're talking about is really a per se ban on

20 access to the systems, the dealer systems.

21 A    I'm right on this.  Automated access of the sort

22 that Authenticom does, yes.

23 Q    You understand that that's where the dispute is

24 here.

25 A    I agree.

PETER SWIRE - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 90 of 222 PageID #:61214
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 89 of 221

1-P-89

1   Q    Okay.  You've reviewed some of the Auto Dealer

2   Association's memos and publications in connection with

3   your work in this case; is that right?

4   A    Yes.

5   Q    Can we pull up -- I think I'm going to use very few

6   documents, so I'll try to skip the binders here.  We've

7   got enough of them.  Can we pull up defendants' Exhibit

8   15?

9   A    Can I find that in a book here?

10   Q    I think it should come up on the screen.

11   A    Okay.  Yes, I see it.

12   Q    Okay.  You've seen this document before; yes?

13   A    The 2013, yes.

14   Q    Right.  So this is a memo that NADA issued to

15   dealers.

16   A    Yes.

17   Q    Regarding dealer data guidance; right?

18   A    Yes.

19   Q    Okay.  And turning to Bates label page CDK 320, you

20   see there's a checklist provided here.  Exhibit A.

21   A    I'm sorry, you're bouncing around.

22   Q    Sorry.

23   A    So check one completed and no one understand, is

24   that what you're referring to?

25   Q    Yes.  And at the top it says "Exhibit B - dealer

PETER SWIRE - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 91 of 222 PageID #:61215
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 90 of 221

1-P-90

1  data checklist. Do you recall this portion of the

2  document?

3  A     I reviewed it, yes.

4  Q     Turning to the next page, you'll see at the top

5  there it says "Consider implementing a strict data push

6  system for sharing data."  Do you see that?

7  A     Yes.

8  Q     And then right underneath that bullet point, there's

9  a second one, that says "This means that you would only

10 share data with third parties by gathering it and sending

11 it to them rather than allowing them to take it by

12 accessing your systems."  Do you see that?

13 A     Yes.

14 Q     So this was NADA's guidance to dealers in 2013.

15 A     Right.  To consider implementing it.

16 Q     To consider implementing it.  And that is, in fact,

17 the system what Reynolds and CDK have implemented;

18 correct?

19 A     Yes.

20 Q     Okay.  And you recall that in 2014, NADA issued a

21 similar set of ten steps to dealers where they

22 recommended that the dealers consider implementing this

23 same system.

24 A     I've reviewed the document.  I haven't memorized it.

25 Q     Okay.  But you don't have any reason to disagree

PETER SWIRE - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 92 of 222 PageID #:61216
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 91 of 221

1-P-91

1    with that.  NADA hasn't changed its mind since 2013.

2    A    Not that I'm aware of.

3    Q    Okay.  One other -- this is just perhaps an

4    elementary point of language.  I saw in your report at

5    least once, and I know it's happened in the pleadings,

6    you occasionally refer to it as the dealer's DMS.  But

7    you recognize the DMS itself belongs to Reynolds.

8    A    The DMS used by a dealer would be a better way to

9    say that.  That's what I intended to say.

10   Q    It may be used, but it's licensed to the dealer

11   pursuit to a set of contracts with Reynolds or CDK;

12   right?

13   A    Correct.

14   Q    And Reynolds and CDK are the ones who build and

15   maintain and own these systems; right?

16   A    Yes.

17   Q    So your view is that even though the DMSs

18   technically belong to Reynolds and CDK, because the

19   dealer's data is in the DMS, the dealer can give, I

20   believe what you called delegated consent for Authenticom

21   and I guess other third parties to come into the system

22   and take that data; is that right?

23   A    Right.  The dealer would make decisions about who

24   would access the data about the dealer's activities.

25   Q    Right.  And then they give these third parties

                    PETER SWIRE - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 93 of 222 PageID #:61217
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 93 of 221

1-P-92

1    ostensibly its permission, its consent -- you talk about

2    consent a fair amount; right?

3    A    Yeah.  They do it by written contract, yes.

4    Q    And you've looked at the DMS contracts, which in

5    turn say that the dealers can't give that kind of

6    consent.

7    A    Correct.

8    Q    There's not dispute about that; right?

9    A    That's what the DMS contracts say, yes.

10   Q    So I want to ask you once the dealer's data is in

11   Authenticom system, using that same consent of delegated

12   consent, if the dealer wanted to say okay, I've got a

13   vendor.  I'm delegating my consent to that vendor to go

14   in and scrape data out of Authenticom system, could the

15   dealer do that?

16   A    Well, let's see.  I haven't really thought about

17   that.  So what would happen here is the dealer is the one

18   who has control of the data.  It's their data.  They have

19   the following inventory items.  And they have a contract

20   with DealerVault and they have a contract with the

21   vendor.  And so pursuant to those two contracts, I don't

22   see a legal bar on the contracts all agreeing that the

23   vendor would have certain kinds of access to Authenticom

24   system.

25   Q    So if the dealer wanted to let the vendors come into

PETER SWIRE - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 94 of 222 PageID #:61218
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 93 of 221

1-P-93

1   Authenticom system for free, just like Authenticom does
2   under Reynolds and CDK's, the dealer could do that.
3   A    If the contracts of all the parties concerned said
4   it, then they would be the ability to do that, yes.
5   Q    Well, I mean you just said it doesn't matter what
6   the DMS contract says with respect to the dealer giving
7   delegated consent to coming into Reynolds' system or
8   CDK's.
9   A    And so what I've said in the FTC model I talked
10  about earlier in my direct is the idea that you start
11  with who's in control of the data, is the data about the
12  consumer, is the data about the dealer's dealer activity,
13  and the locus of control in that story is the dealer.
14  And so if the dealer then writes contracts with a vendor
15  and Authenticom in a certain way, the dealer is
16  exercising his control over the data.  So that would be
17  consistent with the view of what the dealer's role is.
18  Q    I'm not quite sure you understood or answered my
19  question.  But let me ask it a little bit differently.
20  A    Okay.  I tried.
21  Q    Authenticom sells access to the data in its system
22  to the vendors; right?  That's how Authenticom's business
23  model works.
24  A    Right.  There's a contract with the dealer.  There's
25  a contract with the vendor.  When they both say go, then

PETER SWIRE - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 95 of 222 PageID #:61219
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 94 of 221

1-P-94

1  it goes, yes.

2  Q    Right.  And if the dealer tried to say to the vendor

3  I'm giving you my delegated consent to come into

4  Authenticom system for free, Authenticom would not allow

5  that.  Mr. Cottrell said so on the stand just now.

6       MR. NEMELKA:  Objection.  That's contrary to his

7  testimony.

8       THE COURT:  Yeah, I don't know if that was his

9  testimony.  Other than ask the question, you don't --

10  BY MR. WILKINSON:

11  Q    If the dealer wanted to give delegated consent to a

12  vendor to come into Authenticom system for free and

13  scrape its data out, under your theory it could do so

14  regardless of what its contract with Authenticom says.

15  A    In this -- I don't -- that doesn't fit with my

16  theory.  Not theory, but the way I think about it is the

17  dealer has the data.  The dealer is writing contracts

18  with the vendor and the -- and Authenticom.  And I think

19  -- I think that what you're asking gets to the point of

20  why is the dealer different from DMS provider, roughly

21  speaking.  And the answer to that is the heart of the

22  dispute that the judge will resolve which is whether the

23  contractual limits in the DMS vendors apply here or

24  whether there's some reason they don't apply.

25  Q    I'm asking a slightly different question.  I'm

                    PETER SWIRE - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 96 of 222 PageID #:61220
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 96 of 221

1-P-95

1  asking you why Authenticom is allowed to have a close

2  system and Reynolds and CDK aren't.

3  A    Closed system.  So what we have here is the

4  Authenticom is acting specifically under the control and

5  direction of the dealer, and when the dealer says do this

6  or do that, Authenticom acts pursuant to that and that's

7  consistent with the data having been entrusted in the

8  dealer by the consumers, for instance.

9  Q    Okay.  Let's talk briefly about your syllogism if we

10  could.  You've analogized Authenticom to -- Authenticom's

11  accessing of Reynolds and CDK systems as being similar to

12  screen scraping that's used in the financial industry in

13  particular; is that right?

14  A    Yes.

15  Q    Subject to certain distinctions as you laid out

16  earlier.

17  A    Correct.

18  Q    Are you aware that the European banking federation

19  has officially requested that screen scraping be

20  outlawed?

21  A    Yes, several of the world unit.

22  Q    And you cite to the CFIB comments -- I'm sorry.  You

23  cite to the request for information from the Consumer

24  Finance Protection --

25  A    That's correct.

PETER SWIRE - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 97 of 222 PageID #:61221
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 04/05/17 Page 96 of 221

1-P-96

1   Q      -- Bureau.  I assume you've reviewed the comments

2   that were --

3   A    I have reviewed the comments that defendants put in

4   as exhibits.

5   Q    Okay.  And suffice it to say that there are plenty

6   of banks that have problems with screen scraping; is that

7   a fair statement?

8   A    There certainly are, especially in the large banks

9   that have objected to the screen scraping.

10  Q    They view it as insecure.

11  A    That APIs are better, which I agree with.

12  Q    In Reynolds and CDK's view, the RCI Program and the

13  3PA Program are better and more secure.  That's our view.

14  You understand that; right?

15  A    We're talking about a mechanism for transfer and

16  Reynolds and Reynolds and CDK has not made APIs available

17  to Authenticom that would be more secure than screen

18  scraping.

19  Q    Well, you understand that neither of those companies

20  actually have APIs in the sense you're using the term.

21  A    I imagine that they have -- I mean this is where the

22  details of Reynolds and Reynolds -- but CDK, for the

23  vendor list and for the data integrators, have similarly

24  transferred data to the DMS and there may well be APIs.

25  I don't know the answer to that.

                    PETER SWIRE - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 98 of 222 PageID #:61222
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 98 of 221

1-P-97

1    Q    Okay.  But you'll defer to the technical witnesses

2    from those companies on --

3    A    For the details of their system, absolutely.

4    Q    Yes.  Have you spoken to anyone that's worked for a

5    DMS company recently?  In the course of preparing for

6    this case, did you interview anybody that --

7    A    I don't believe -- no.  No one comes to mind.

8    Q    Okay.  So your perspective is from Authenticom's

9    sort of --

10   A    In my experience in the field for a lot of years,

11   yeah.

12   Q    But not from sort of what Reynolds and CDK have seen

13   and experienced internally.

14   A    Correct.

15   Q    In the health care arena, you talked a little bit

16   about clearinghouses.

17   A    Yes.

18   Q    Both in your report and today.  You talk about them

19   as sort of an example of, I don't want to use the wrong

20   word, you call them data aggregators?

21   A    Integrators.

22   Q    Integrators.  Okay.  Now, clearinghouses don't use

23   screen scraping to pull their data; right?

24   A    I don't -- I don't know the full range of activities

25   out there, but there's no -- but in many cases they have

PETER SWIRE - CROSS

Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 99 of 221
Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 99 of 222 PageID #:61223

1-P-98

1    a direct relationship, for instance, with a doctor's
2    office and then they set up however they set up the
3    access between the doctor's office and the clearinghouse.
4    Q    Right.  And in the example you describe in your
5    report, the doctor's office, the physicians send or push
6    them the data themselves; right?
7    A    Yes.  Though it does -- there would be nothing in
8    the structure that would prohibit a pull wherein, for
9    instance, a clearinghouse came in every night and pulled
10   it.  I'm not aware right now of what the common practices
11   are with clearinghouses for that.
12   Q    Okay.  On a high level, Mr. Swire, you don't dispute
13   that the DMS contains sensitive information; is that
14   fair?
15   A    I agree with that.
16   Q    Okay.  And so you are -- obviously you've discussed
17   social security numbers in your reply.
18   A    Yes.
19   Q    Were you aware that the DMS contains social security
20   numbers at the time you wrote your initial report?
21   A    I know -- I heard more details certainly after the
22   initial report as it became a subject of controversy.
23   Q    Okay.  And your opinion is based on sort of the
24   assumption or the fact that, provided to you by
25   Authenticom, that Authenticom has no access to social

PETER SWIRE - CROSS

security numbers.

A    I believe there were other things in the record that said the same thing from other sources, but Authenticom is one of those sources, yes.

Q    And you're not testifying that it would be impossible for Authenticom to gain access to its -- to social security numbers if, for example, it was configured with higher level login credentials.

A    If it was given administrator login credentials and if it created has data fields it doesn't currently have to accept the data, then there's not a technical barrier to getting it except that my understanding is it's encrypted, that the social security number would still be encrypted that they receive so you wouldn't be able to tell what the social is.

Q    Right.  And you understand that those barriers to, for example, the encryption, those are security measures put in place by Reynolds and CDK.

A    Yes.

Q    And so you agree that they should implement strong safeguards to protect that kind of information.

A    Absolutely.

Q    Okay.  So turning back to sort of the more other categories of consumer information in the DMS; right? When somebody walks into a dealership and hands them

PETER SWIRE - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 101 of 222 PageID #:61225
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 100 of 221

1-P-100

1    their driver's license for a test drive, all that

2    information goes into the DMS; right?

3    A    I believe so.

4    Q    So that's name, address, date of birth, driver's

5    license number.

6    A    Okay.

7    Q    And even though those consumers generally don't sign

8    any kind of privacy agreement or policy, your opinion is

9    that information belongs to the dealership at that point.

10   A    That the dealership has control over its uses to do

11   the business that it's allowed to do.  If the dealership

12   posted that to the internet, I'm not saying that would be

13   okay.  I'm just saying the consumer chose the dealership

14   and now there's going to be the business practices of the

15   dealer.

16   Q    Absolutely.  So you'd agree that if that was posted

17   to the internet, it would harm the consumer; right?

18   A    It could, yes.

19   Q    And it would be harm -- there would be harm to the

20   dealer too, wouldn't there?

21   A    The dealer's reputation for that?  Yes.

22   Q    And if that information was taken out of the DMS,

23   there would be harm to the DMS provider too.  It could

24   suffer the same kinds of --

25   A    If it was posted to the internet?

PETER SWIRE - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 102 of 222 PageID #:61226
Case: 3:17-cv-00318-jdp   Document #: 162   Filed: 07/05/19   Page 101 of 221

1-P-101

1    Q    Yes.

2    A    And was trackable to the DMS, then its reputation

3    would be hurt by that, yes.

4    Q    Right.  And it would potentially face legal

5    consequences, there would be investigation costs, all

6    kind of potential problems.

7    A    I agree.

8    Q    And you understand these DMSs, a single dealership

9    DMS can contain tens of thousands of customer records;

10   right?

11   A    Yes.

12   Q    Okay.  But you're saying essentially that Reynolds

13   and CDK just need to trust that Authenticom's requested

14   logins won't be the cause of such a breach; right?

15   A    Well, there's two layers here.  Cybersecurity often

16   has defense and depth.  One layer is a technical measure,

17   which is encrypted social security numbers.  So if they

18   got breached, under data breach law it's encrypted

19   usually, that's not considered a breach.  And then the

20   second is administrative controls, which is if contrary

21   to Authenticom's contracts and contrary to practice in

22   the industry and contrary to the data fields the dealer

23   decided to put the social security numbers into the feed

24   to Authenticom, then that would be -- then Authenticom

25   would get the encrypted social security numbers.

PETER SWIRE - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 103 of 222 PageID #:61227
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 103 of 221

1-P-102

 1           MR. WILKERSON:  Objection.  Nonresponsive.  I

 2    think I must have posed a poor question.

 3    Q    I'm sorry.  Let me try again.  It's my fault.

 4    A    I'm trying.

 5    Q    So ignore social security -- set social security

 6    numbers aside for a second.  Just the data fields that

 7    Authenticom has access to.

 8    A    Okay.

 9    Q    All right?  Authenticom has access and pulls through

10    these logins that it's requesting things like customer

11    names, date of birth, email address, telephone number,

12    driver's license; right?

13    A    Yes.

14    Q    That's consistent with your understanding.  And so

15    Authenticom's logins necessarily have access to those

16    types of information.

17    A    Correct.

18    Q    And so if one of those logins was used to download

19    50,000 sets of that information and that information

20    ended up on the dark web or wherever, that would

21    constitute serious harm to the DMS provider, wouldn't it?

22    A    Serious harm.  So I think one of the things here is

23    that the dealership already has individual employees who

24    have access.  The administrator has access.  They can

25    hire a temp agency that would have its employees have

                    PETER SWIRE - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 104 of 222 PageID #:61228
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 103 of 221

1-P-103

1   access.  And in this case, Authenticom would have access.

2   So if there was data taken out of the DMS and posted to

3   the dark web, whether that's done by a dealer employee

4   who's gone rogue or whether it's being done by

5   Authenticom, that would be a breach of that data,

6   whatever the data is, and there would be whatever harm is

7   associated with that breach.

8           MR. WILKINSON:  Pass the witness, Your Honor.

9           THE COURT:  All right.  Is there other

10  cross-examination here of this witness?

11          MS. MILLER:  Just a few questions, Your Honor.

12                      CROSS-EXAMINATION

13  BY MS. MILLER:

14  Q    Good afternoon.  Britt Miller on behalf of CDK.

15  A    Good afternoon.

16  Q    I just have a few followup questions, if I may.  I

17  believe you testified earlier, using your example, that

18  if Authenticom had ten contracts with vendors, that it

19  would only have a need to pull the individual data fields

20  it needs for those ten contracts that it has on behalf of

21  the dealers with those vendors.  Did I understand you

22  correctly?

23  A    That's my understanding.

24  Q    Okay.  So it only pulls those.  It doesn't pull

25  anything else.

                    PETER SWIRE - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 105 of 222 PageID #:61229
Case: 3:17-cv-00318-jdp  Document #: 162  Filed: 07/05/19  Page 104 of 221

1-P-104

1   A    Whatever the dealers have authorized in DealerVault,

2   those data fields are what goes to Authenticom, and under

3   the contract Authenticom and the vendors say they're

4   only -- the vendors will only get the data needed to do

5   the vendor's job.

6   Q    Okay.  I understand the designation from dealer

7   through DealerVault. I'm talking about the actual pull.

8   So if a dealer has ten contracts with vendors and each

9   vendor needs one piece of data, we'll make this easy for

10  math purposes.

11  A    Okay.

12  Q    Is Authenticom -- is it your understanding that

13  Authenticom then, because those are the ten contracts

14  that the dealer has, is going to just pull those ten

15  pieces of data from the DMS because those are the ten

16  that have been authorized by those contracts?

17  A    So the answer is yes, sort of, and I'm going to try

18  to explain very briefly.

19  Q    Please.

20  A    So the data that goes into the data fields that

21  Authenticom then uses and sends along to the vendors

22  would be exactly that data.  But the way, as I understand

23  the screen scraping working, would be that -- the way I

24  understand is like when you buy an airline ticket online.

25  So I log in and a screen comes up.  Then I say I'm going

PETER SWIRE - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 106 of 222 PageID #:61230
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 106 of 221

1-P-105

1    to travel to this city round trip and a screen comes up.

2    Then I'm going to have the return ticket and a screen

3    comes up and I get seats.  And that's the script you go

4    through.

5         Now, in the course of that, at the end in the

6    airline world I get an airline ticket with seats.  But I

7    will have seen various pages of information that are in

8    the screens as I went along.  So Authenticom puts into

9    Authenticom's system, as I understand it, the equivalent

10   of the airline ticket.  But the Authenticom script will

11   be viewing, as it were, though it's the machine version,

12   but would be viewing the other thing such as the other

13   cities you might have flown to or the other tickets you

14   might have brought.

15        So there's more information that Authenticom's

16   emulation would view, but the amount that actually that

17   goes into Authenticom's system is the data fields, as I

18   understand it.

19   Q    So it may view it, but it is your testimony that it

20   doesn't scrape all of those different views or samples.

21   It doesn't scrape all of the data from those fields, it

22   just scrapes the end field of the plane ticket, just in

23   my example, the ten fields that it needs to fulfill those

24   vendor contracts.

25   A    So I don't know exactly when in the process deletion

PETER SWIRE - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 107 of 222 PageID #:61231
Case: 3:07-cv-00315-jdp Document #: 162 Filed: 07/05/17 Page 106 of 221

1-P-106

1  happens of any of that other data, the equivalent of the

2  tickets you didn't buy.  So I don't know exactly at the

3  level of software exactly when that's discarded.  So I

4  don't know the answer exactly when, but my understanding

5  is the part that's kept in the data field and used for

6  business purposes is under the data fields that were

7  requested.

8  Q    Okay.  I appreciate that.  I'm just trying to

9  understand your understanding of what actually gets

10 scraped.  So is it your understanding that they scrape

11 all of those screens and then only put the ten they need

12 in DealerVault and then delete the rest?

13 A    This is at a level where I don't know exactly how

14 that works, and Mr. Cottrell or somebody could tell you.

15 Q    Okay.  In your slide deck that you put up with

16 respect to the summaries of your opinions, one of the

17 slides you put up for the key reasons was a slide -- and

18 I apologize.  It's key reason number one:  Dealers

19 control the data and give consent, where you have a bunch

20 of pictures of various articles?

21 A    Yes.

22 Q    Do you remember that one?

23 A    Yes.

24 Q    I believe the only one that you have on here from an

25 article that you have two CDK documents, one of them is

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 108 of 222 PageID #:61232
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 107 of 221

1-P-107

1   from Steve Anenen and then other is a quote from a CDK

2   Master Services Agreement.

3   A     Okay.

4   Q     The Steve Anenen quote is the same 2007 quote that

5   Mr. Nemelka referenced in his opening statement.  Do you

6   have any statements in the last ten years from CDK

7   expressly endorsing hostile integration or third-party

8   access to data in the way that Authenticom does it?

9   A     I don't remember for the balance side what the date

10  is for that.

11  Q     Okay.  And then --

12        THE COURT:  Just for the record, that was slide

13  4 of that slide deck.

14        MS. MILLER:  Yes, sir.

15  BY MS. MILLER:

16  Q     And then I'd like to have you turn to your slide 5

17  for a moment, your diagram.

18  A     Yes.

19  Q     And I want to make sure I understand this because

20  this was not how I understood Mr. Cottrell's testimony.

21  It is not that Authenticom is communicating with the

22  dealer and the dealer is then communicating with the DMS

23  provider.  In fact, as I understood the testimony, it's

24  Authenticom using dealer credentials to communicate

25  directly with the DMS provider.

PETER SWIRE - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 109 of 222 PageID #:61233
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 108 of 221

1-P-108

1  A    So the diagram here shows the contracts that exist.

2  The consumer goes to the dealership; buys a car.  The car

3  dealer has a contract with CDK.  The car dealer has a

4  contract with Authenticom.  When it comes to the actual

5  data going to Authenticom, they use the dealer

6  credentials and into the DMS that way.

7          MS. MILLER:  We tender the witness.  (3:58 p.m.)

8          THE COURT:  All right.  Any redirect?

9          MR. SCHWARZ:  Yes, just briefly.  If you could

10 just keep slide up for a second.

11               REDIRECT EXAMINATION

12 BY MR. SCHWARZ:

13 Q    Can you explain the FTC framework set forth in this

14 slide?  There seems to be a bit of disconnect.

15 A    Right.  So for purposes of protecting consumer data,

16 and by the way --

17          THE COURT:  I think I get this.

18          THE WITNESS:  It could be a hospital or it could

19 be a bank in the middle.  That's the simplest --

20          THE COURT:  So the FTC framework isn't really

21 about the contractual relationships as they might exist

22 among the parties, it's just the framework that the FTC

23 takes is that the entity with the first-party

24 relationship with the consumer is the one that's in the

25 best position to figure out what the consumer wants to

PETER SWIRE - REDIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 110 of 222 PageID #:61234
Case: 3.97-cv-00310-jdp Document #: 162 Filed: 07/05/17 Page 109 of 221

1-P-109

  1    happen to his or her information.

  2            THE WITNESS:  That's consistent with my view.

  3            THE COURT:  Got it.

  4            MR. SCHWARZ:  Last question.

  5    BY MR. SCHWARZ:

  6    Q    If we could pull up DX 15, which were the guidelines

  7    you were shown real quick.  So if you go to the page that

  8    you were on which they showed before the checklist which

  9    is CDK 321.  And you were asked some questions about the

 10    top box that said --

 11    A    Yes.

 12    Q    -- "Consider implementing a strict data pull system

 13    for sharing data."  Do you see that?

 14    A    Yes.

 15    Q    Could you look at the final bullet that's under

 16    that.

 17    A    It says "If there's no or limited IT staff or

 18    expertise, then consider a vendor to help."

 19    Q    As you understand is Authenticom a vendor?

 20    A    This is using vendor in a different way than we've

 21    used it in the case where the vendor has been the app

 22    provider.  But in this case, Authenticom would be an

 23    example of a contract party with the dealer who's helping

 24    the dealer with this.  And as I said in my reply

 25    declaration, CDK called Authenticom in 2014 or '15 a

                    PETER SWIRE - REDIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 111 of 222 PageID #:61235
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 111 of 222

1-P-110

 1    dealer data security solution.  So it's one of the ways

 2    that the dealers can have greater discipline about how

 3    data is accessed.

 4            MR. SCHWARZ:  No further questions.

 5            THE COURT:  Thank you.  Thank you, Mr. Swire.

 6        (Witness excused 4:00 p.m.)

 7            THE COURT:  We're at a perfect time to take our

 8    afternoon break, so we'll reconvene at 4:15 and then

 9    we'll press on until six o'clock.

10        (Recess       4:00-4:17 p.m.)

11            THE CLERK:  This Honorable Court is again in

12    session.  Please be seated and come to order.

13            MR. SCHWARZ:  Your Honor, because of scheduling

14    conflicts and witnesses, we agreed with the defendants

15    that we're going to take some witnesses out of order.

16            THE COURT:  Very good.

17            MR. SCHWARZ:  So Mr. Rosenbach, who's the

18    defendants' security expert, is going to testify now.

19    Professor Swire has to get out and leave the country;

20    so...

21            THE COURT:  All right.  Very good.

22            MR. SCHWARZ:  Not that that means anything

23    but...

24            THE COURT:  Usually we have people turn over

25    their passports to the clerk's office.  All right.  So

                    PETER SWIRE - REDIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 112 of 222 PageID #:61236
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 112 of 221

1-P-111

1    we're going to hear a defense witness now; is that right?

2              MR. MILLER:  Yes.

3              THE COURT:  Very good.  You can call the

4    witness.

5              MS. MILLER:  Your Honor, we call Eric Rosenbach.

6         **ERIC ROSENBACH, DEFENDANTS' WITNESS, SWORN**

7                     <u>DIRECT EXAMINATION</u>

8    BY MS. MILLER:

9    Q    Mr. Rosenbach, good afternoon.

10   A    Good afternoon.

11   Q    As you know, I'm Britt Miller and I represent CDK.

12   For the Court, would you please give me your elevator

13   speech as to your qualifications.

14   A    So I first started working on cybersecurity and

15   intelligence issues about 20 years ago.  I was an active

16   duty Army intelligence officer working very closely with

17   the National Security Agency, NSA, for five years where

18   basically what I was doing was doing trying to steal

19   people's telephone calls and their emails and figure out

20   how to crack into their systems.

21        After that, in a way that was a little ironic, I was

22   the Chief Security Officer for the largest telecom in

23   Europe where I was charged with defending our networks

24   from all the bad guys getting in for about three years.

25   Several years, you know, I was doing some things related

                    ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 113 of 222 PageID #:61237
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 113 of 221

1-P-112

1    to cybersecurity, but for the last seven years is what's

2    most pertinent where by the end, I was the chief staff

3    for the Department of Defense, but had also been the

4    cyber czar for the Department of Defense, Assistant

5    Secretary of Defense and Deputy Assistant to the

6    Secretary of Defense.

7         Basically we have three roles in the Department of

8    Defense that I was responsible as it goes to czar cyber.

9    The first is we do things on --

10        THE COURT:  I'm going to ask you -- I'm glad to

11   get the elevator pitch, but for the sake of the court

12   reporter slow down just a touch.

13        THE WITNESS:  Oh, okay.  All right.  Three

14   admissions; two don't matter that much for here.  One is

15   do an offensive cyber, which is to keep the country safe

16   by going after bad guys offensively.  Secondly is defend

17   the nation.  That means when people are going after our

18   critical infrastructure, you're finding ways to prevent

19   that from happening.  The third, which is probably the

20   most relevant for here, is in charge of defending

21   Department of Defense networks.  So we have three million

22   people in the Department, have the largest enterprise

23   network in the world, spend $37 billion a year on IT

24   because it enables our mission.  So we place a very high

25   priority on defending our networks.

                    ERIC ROSENBACH - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 114 of 222 PageID #:61238
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 113 of 221

1-P-113

1    As you can imagine, we're also probably the most

2    attacked network in the world because every bad guy in

3    the entire world wants to get into DOD networks, try to

4    do something bad to us, from the Russians, to the

5    Chinese, to the North Koreans, to anarchist-type hackers.

6           THE COURT:  Very good.

7    Q    And you submitted a declaration in this matter, have

8    you not?

9    A    Yes, I have.

10           MS. MILLER:  And it's marked, Your Honor, as

11    defendants' Exhibit 125.

12           THE COURT:  Very good.  I see it.

13    BY MS. MILLER:

14    Q    And Mr. Rosenbach, what's your current position?

15    A    Right now I'm the codirector for the Belfer Center

16    for Science and International Affairs at the Harvard

17    Kennedy School.

18    Q    And what was your assignment in this case?

19    A    My assignment in this case was to provide

20    independent advice as related to this case, review all

21    available documents, conduct a lot of interviews, do due

22    diligence, also review the expert testimony of Mr. Swire.

23    Q    And what did you do to prepare your declaration?

24    A    I went through this in somewhat the same way that I

25    would do to prepare for meetings we have the Secretary of

                    ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 115 of 222 PageID #:61239
Case: 3-17-cv-00318-jdp  Document #: 162  Filed: 07/05/17  Page 114 of 221

1-P-114

1   Defense where we're trying to assess risks to

2   organizations.  And so I developed a framework, and then

3   went through multiple interviews with people, and in

4   particular, the technical personnel at both CDK and

5   Reynolds to assess their network architecture and

6   structure.  So, for example, you saw a diagram earlier

7   today that had the network architecture on it.  Those

8   were one of the first things that we started asking

9   about.  They even made some adjustments based on the

10  interviews we had; reviewed multiple documents as

11  identified in the filing, and then did a lot of outside

12  research to just make sure I understood everything that

13  was going on in this vertical sector.

14  Q    And you were here to listen to Mr. Swires'

15  testimony, were you not?

16  A    I was, yeah.

17  Q    And have you done anything since you submitted your

18  declaration in connection with this case in forming your

19  opinions in this matter?

20  A    I read the second opinions of Mr. Cottrell and

21  Mr. Swire; did some additional research based on those.

22  Q    And in anything that you read or that you have heard

23  since you submitted your declaration change your opinions

24  in any way?

25  A    No, it didn't change my opinions.

                    ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864-Document #: 986-16 Filed: 05/20/20 Page 116 of 222 PageID #:61240
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 116 of 221

1-P-115

1   Q    Can you give me a basic sense of some of the basic

2   prince of cybersecurity that informed your opinion in

3   this matter?

4   A    Right.  So when I look at cybersecurity, there are a

5   couple basic things that are really important.  First,

6   you start with the network architecture and the way data

7   flows.  And the reason you do that is you're trying to

8   build a solid house, if that's the way you want to think

9   about it.  And when you're designing your house or your

10  fortress as described earlier today, you want to limit

11  the number of points at which someone can bring in data

12  or ex-fill data.  And so I wanted to start -- and that's

13  one of the first principles, that you defend that.

14       The second thing you do is you think about

15  authorized access and how you're going to allow that to

16  happen.  Because if you invest a lot of time and money in

17  building a good fort, you want to make sure that the

18  people who are about to come in and out are the right

19  people who are doing the right thing.  So that's why you

20  have that type of management.

21       The second thing is I believe transparency is very

22  important.  You want to know what's going on in your

23  network.  You want to know what's going on with your

24  data.  You want to know who is in your network, and you

25  want to know what they're doing to the maximum extent

                    ERIC ROSENBACH – DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 117 of 222 PageID #:61241
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 117 of 221

1-P-116

1    possible.  You do that because it's a lot easier to pick

2    out bad guys from good guys and see what data belongs

3    there and what doesn't.

4         And the final thing, which may sound a little bit

5    strange, but it's really important to have a system of

6    education and awareness and training.  Because you hear a

7    lot of technical things, but when it comes down to it,

8    the human element to cybersecurity is really the most

9    important and people often will be lazy with their

10   computers and they generally don't like security and

11   they'll try to take shortcuts.

12        So, for example, in the Department of Defense if you

13   did not complete your quarterly cybersecurity training,

14   you could not get on your computer.  Another example, the

15   Chairman of the Joint Chiefs of Staff, at the time Marty

16   Dempsey, four-star Army, the Chairman, he wrote a memo to

17   the entire Department of Defense in the uniform military

18   that said if you're a commander and in your unit there's

19   a breach, I'm holding you responsible, because we wanted

20   to raise awareness and the level of education about these

21   issues that people would take this as seriously as they

22   take some of their operational issues.

23   Q    And do those cybersecurity principles apply across

24   businesses regardless of the nature of those businesses?

25   A    They do, yeah.

                    ERIC ROSENBACH - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 118 of 222 PageID #:61242
Case: 3.97-cv-00319-jdp Document #: 1625 Filed: 07/05/17 Page 117 of 221

1-P-117

1  Q     And in your declaration you discuss various

2  industries that you say are targets for cyberattacks.

3  A     Right.

4  Q     Have you formed any opinion as to whether the auto

5  industry, in which CDK and Reynolds operate, is a target

6  for such an attack?

7  A     Yeah.  I will admit I did not know a lot about the

8  automotive industry before I started this, in particular

9  about the DMS infrastructure.  But if you look side by

10 side at the actual data that is in the financial sector,

11 the health care sector, but in the retail sector in

12 particular, you see many of the same types of data that

13 exist.  So, for example, people might be surprised until

14 they actually look at it that when you're talking about

15 the automotive retail sector, dealers have lots of money.

16 They have the ability to cut checks.  They have social

17 security numbers.  They have payroll.  They have driver's

18 license information.  Much of that is stored on the DMS.

19 Some of it is not.  What I would like to point out though

20 is that a network is connected to other networks.

21     Another maximum cybersecurity is that you try to

22 protect all of your networks because you know they're

23 connected to other things.  So just because Authenticom

24 doesn't have access to a certain type of data or other

25 parts of the dealer network, they are connected, and a

ERIC ROSENBACH – DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 119 of 222 PageID #:61243
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 119 of 221

1-P-118

1   weakness in one is something that gives a seam that could

2   open up another.  And I'll talk with seams a little bit

3   more down the road, but it's a very important thing to

4   keep in mind.

5   Q    And have you seen anything in the automotive

6   industry specifically that has given you or led to your

7   opinion as to specifically the automotive industry being

8   a target?  Is there any industry guidance or advice that

9   has led you to your opinion?

10  A    Yeah.  So y'all have heard already today about all

11  the things that were happening in 2013, 2014, 2015.  That

12  was a very stressful time in my life because I was over

13  in the White House almost every day when these major

14  breaches were going on, not to mention the Chinese

15  stealing our intellectual property, the Iranians

16  attacking the financial sector, North Koreans trying to

17  take down Sony.  That same environment was going on when

18  the auto industry was becoming more modern from a

19  technology perspective; right?

20       So those two things are correlated, and there's also

21  causation from my humble perspective about why those

22  things evolved.  So you see during that exact same time

23  frame, the guidance from NADA that was just reviewed

24  saying here are some of the things you should do if

25  you're working with third-party providers and if you're a

ERIC ROSENBACH - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 120 of 222 PageID #:61244
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 1 of 1 Page ID #:1244

1-P-119

dealer.  So pretty important to keep in mind.  If you
fast forward to now, all you have to do is read the
newspaper or even the last six months, and doing a little
research, you see some pretty, I would say, eye-opening
things that are going on in the automotive retail sector
itself.

So you heard about the breach of the one DMS
provider where they left some of their data insecure.
They were being sloppy.  You cannot be sloppy when you're
in this business.  One small mistake opens up a lot of
vulnerabilities.  Also you probably saw in the Washington
Post this morning a couple weeks ago where I believe
accessing a DMS there were some organized criminals that
stole the identifying information of keys and then made
away with 150 Gs.  There are a lot of things happening
like this.

Even more importantly is what you don't hear but if
you talk to experts in the field and you kind of solicit
and ask that are even more kind of nerve-wracking.  So,
for example, when I was doing the interviews to prepare
for all of this, both on the CDK and the Reynolds side,
they would say now, if you really talk to dealers, and
they would never want to say this, you know, in front of
the judge, they'll tell you that they're actually the
victim of ransomeware pretty often.  Or that organized

ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864-Document #: 986-16 Filed: 05/20/20 Page 121 of 222 PageID #:61245
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 121 of 222

1-P-120

 1  crime has figured out that car dealers are actually cash

 2  rich, and, without trying to sound condescending,

 3  actually have very weak cybersecurity practices for

 4  whatever reason; probably because they just haven't been

 5  developing it as much, which means that they're

 6  vulnerable.  And you'll see that people will have bank

 7  accounts wiped out or there'll be check fraud because

 8  those are all things that are residing within that

 9  ecosystem of a dealership.

10  Q    And I want to pause for a moment to address two

11  things that the Court has asked about:  Specifically the

12  cooperative research and development agreements that CDK

13  has entered, or the CRADAS as Mr. Swire related to, and

14  distinguishing that from the critical national

15  infrastructure, and specifically speak as to what those

16  are as the judge has specifically inquired about them.

17  A    Right.  Yes, sir.  So the CRADA was just one thing.

18  And you hear that there are 9,000 CRADAS.  That doesn't

19  actually mean that much.  But the CRADA is established by

20  the Department of Homeland Security, and I used to work

21  with the Under Secretary who would make those decisions

22  all the time.  They do it in sectors where they know

23  there's a vulnerability and they know there's a threat

24  and they want to try to facilitate helpful research and

25  development in the cyberfield.  So it is important.

ERIC ROSENBACH - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 122 of 222 PageID #:61246
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 122 of 222

1-P-121

1  Don't get lost on there being 9,000 because they're

2  trying to designate.

3      More importantly, the sector itself designated

4  itself as critical infrastructure instead of an ISAC.

5  What's an ISAC?  That's Information Sharing Analysis

6  Center.  That's because all of the dealers and the OEM

7  folks and everyone, they recognize that the threat to the

8  sector is growing.  At the same time, automobiles and the

9  dealerships, the need and the technology and the software

10 is developing also very quickly.  Rather than be forced

11 to do this by the government or by legislation, they

12 stood up this ISAC by themselves.  So it is critical

13 infrastructure and it was self-designated.

14 Q    Do you have an opinion as to whether CDK and

15 Reynolds specifically are vulnerable to a cyberattack?

16 A    I believe that they are, and, you know, you can get

17 into a little bit of a debate about whether they're more

18 vulnerable or less vulnerable than the financial sector

19 or the health care sector, but here's the way I think

20 about it:  You don't actually think about vulnerability,

21 you think about risk.  Here's the way I assess risk.

22 Here's the way we assess risk in the Department of

23 Defense when I was talking to the Secretary.

24      First of all, you say do they have information that

25 is valuable and is there someone who would go after that.

ERIC ROSENBACH – DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 123 of 222 PageID #:61247
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 122 of 221

1-P-122

1    I believe that when I looked and did research on this

2    sector that that is definitely the case, because you

3    could get money, you could steal social security numbers,

4    you could steal -- remember, even email addresses.  There

5    are a lot of nation states that want just that

6    information because they can spearfish the heck out of

7    everyone.  And I can tell you a little more about

8    spearfishing down the line.

9        So is there something that's valuable.  Second of

10   all, are there people who want to take the valuable

11   stuff?  And the answer is yes.  It may not be the North

12   Korean cyberoperatives, but it definitely would be

13   cybercriminals.  It's the most, I think, lucrative

14   criminal enterprise in the world right now is cybercrime.

15   These people are very smart, they know where the money

16   is, and they know where people are weak.

17       So when you think about risk, the final thing is how

18   well do you defend yourself and how good is your

19   cybersecurity program.  That often can be the most

20   determinative aspect of risk.  So if other things even

21   we're not that sensitive, if you just take that, but

22   someone has very weak cybersecurity practices, weak

23   cybersecurity program, that's their risk mitigation

24   factor would definitely alter the calculus of that thing.

25   Q    Would you say that Authenticom is vulnerable to a

                    ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 124 of 222 PageID #:61248
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 124 of 221 PageID #:...

1-P-123

1   cyberattack?

2   A     Of course, yes.

3   Q     Did you review the architecture of CDK and Reynolds'

4   DMS systems?

5   A     I did, yeah, in pretty great detail, and, you know,

6   kudos to the technical staff because they're probably

7   even maybe a little annoyed by the end.  I asked them so

8   many questions so many times, so many times over because

9   I really wanted to understand exactly how it was

10  architected, why it had happened that way, and, you know,

11  understand now I think to a pretty strong degree how the

12  networks worked.

13         THE COURT:  Can I just ask a point of

14  clarification here?

15         THE WITNESS:  Yes, sir.

16         THE COURT:  Are you going to talk about how

17  Authenticom is structured?  Or is your opinion really

18  more about Reynolds and CDK?

19         THE WITNESS:  I definitely know Reynolds and CDK

20  very well.  But from what I've learned about Authenticom,

21  I have some, I think, informed opinion and have learned

22  even more today from some of the testimony of the

23  Authenticom people.

24         THE COURT:  I just want to clarify something.

25  The question is, as it was pitched to you really, was is

                 ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 125 of 222 PageID #:61249
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 124 of 221

1-P-124

1    CDK and Reynolds vulnerable to cyberattack and you kind

2    of turned it around.  Your answer was they're at risk of

3    cyberattack, I think was the way you presented it.

4              THE WITNESS:  Yes, sir.  I mean they're all --

5              THE COURT:  Then when you answered the question

6    about Authenticom, you said yeah, they're vulnerable.  So

7    you didn't go into --

8              THE WITNESS:  You're right.  Sorry.

9              THE COURT:  Same thing?

10             THE WITNESS:  Same thing.  They're all

11   vulnerable and the point where I would distinguish, and I

12   think it is actually more helpful as a metric, is how at

13   risk are they.  Because then you would look at those

14   three things, the framework that I propose there to help

15   get a better grasp.

16             THE COURT:  So if you say they're vulnerable,

17   I'm expecting you to point out some deficiency on the

18   defense side.

19             THE WITNESS:  Yes, sir.  I'll do that later.

20             THE COURT:  The valuable information is there.

21   There are people who want to get it.  And kind of in a

22   sense there's nothing you can do about those two things.

23             THE WITNESS:  You're right, yeah.

24             THE COURT:  So really the question is how well

25   defended is it.

                    ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 126 of 222 PageID #:61250
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 126 of 122

1-P-125

1           THE WITNESS:  That's right.

2           THE COURT:  Okay.  All right.

3           THE WITNESS:  Yes.  Absolutely.

4    BY MS. MILLER:

5    Q    So let's go there.  What is your opinion as to CDK's

6    and Reynolds' perspective approaches to cybersecurity?

7    A    I was actually, I very impressed.  Again, maybe I

8    was a little surprised that in the automotive retail

9    industry that there is such a level of sophistication.

10   But I went through my framework and I said okay, how have

11   they architected their networks in order to try to

12   mitigate risk?  What are the things that they've done?

13   The things that I saw in both cases, but I will make a

14   little bit of a distinction at the end, is that they

15   think very carefully about that in transit.  That means

16   that whenever they can, they encrypt it, and if they

17   don't encrypt it, they use something that makes it

18   impenetrable.  So there's an MPLS is my statement.  It's

19   a special protocol that you use.  When data is at rest,

20   it's encrypted.  The way the architecture itself is set

21   up means there are very few entry points and they thought

22   consciously about that.

23           Now, I want to point out I think Reynolds has done a

24   better job at this over a longer period of time, and CDK

25   seems to even talk about that this morning too.  So when

                    ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 127 of 222 PageID #:61251
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 127 of 221

1-P-126

1    I talked about the other things, the principles that are

2    important, that close attention to access management is

3    something that is very important.  And both of these

4    firms pay close attention to that because again,

5    credentials are the most important thing when it comes to

6    cybersecurity.  They are keys to the castle.  You can

7    architect it beautifully, but if someone gives you the

8    keys, you can come in.

9        Also I think that both place a pretty high premium

10   on educating both their internal work force and their

11   customers about good cybersecurity practices, placing a

12   premium on it.  And again, something that quite frankly I

13   was a little bit surprised to see is that they invest a

14   lot of money in it.  Because right now, this is my

15   professional opinion, there's a lot of underinvestment in

16   cybersecurity in the private sector, which is a type of

17   market failure.

18   Q    Did you have an opportunity to evaluate both CDK's

19   and Reynolds' third-party partner programs and the

20   security around those programs?

21   A    I did.  I think I actually spent more time asking

22   about the Third Party Access Programs than anything

23   because it's one of the key issues of the case.  And so

24   in both cases, in Reynolds in particular, they've even

25   architected, as you heard earlier about the sandbox, the

                    ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 128 of 222 PageID #:61252
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 127 of 221

1-P-127

1    so-called sandbox, a way that third-party people,

2    third-party vendors -- and I want to be very clear about

3    this: that could include a data integrator, so a

4    third-party could be anyone who is not this -- have

5    access to the data.  I did not encounter anything in any

6    of the interviews I did where the reason that they were

7    doing certain security mechanisms was designed to lock a

8    specific type of business or firm out.  It was to make

9    sure that people who needed the data had access to it,

10   but that it was done in a very, very secure way.

11        If I could, I'd just like to tell you a little bit

12   about that technically.  And I know you hear some

13   technical terms, but the way that they do that is with a

14   specialized software interface.  So you've heard the term

15   API.  That's essentially what they do.  The reason that

16   that is qualitatively better and thus introduced less

17   risk to the firms who were doing it, in this case CDK and

18   Reynolds, is that it's a clean match-up of software as a

19   way to pass the data rather than what is what I call a

20   forced extraction and using screen scraping.  Screen

21   scraping is something -- it's very sloppy.  It's not very

22   exact.  And you end up getting a lot more data than you

23   probably should from my professional perspective.

24   Q    In your investigation, did you come across any

25   cybersecurity measures taken by CDK or Reynolds that did

ERIC ROSENBACH - DIRECT

1  not address a legitimate security concern?

2  A    No.  Everything that I saw made sense to me in the

3  holistic way that they would look at possible threats and

4  their businesses.  So again, a really important part of

5  this is when you're a business like CDK or Reynolds and

6  you're the CEO, the most important thing when it comes

7  down to it is you want to make money and you want to have

8  a good relationship with your customers, but you can't be

9  so secure that you totally lockdown the firm and you

10 don't make any money because you're super secure but

11 there's nothing going on.  So you have to make decisions

12 based on risk.  Again, it comes down to that.  You say

13 well, we're going to invest a certain amount of money

14 because it mitigates this risk and it fits within the

15 overall business case.  So everything I saw from my

16 perspective made sense, in particular knowing all the bad

17 things that had happened in 2013 to '15 period, to ramp

18 up their security, build a more secure architecture, and

19 also address the fact that in order to be successful,

20 they need to have third-party vendors access the data.

21 They're more successful the more people access the data.

22 So it's a major point where they had to balance risk as

23 opposed to the business opportunity.

24 Q    Is it fair to say that you disagree with Mr. Swire

25 about whether CDK and Reynolds are justified in

ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864-Document #: 986-16 Filed: 05/20/20 Page 130 of 222 PageID #:61254
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 129 of 221

1-P-129

1    limiting third-party access to their DMS?

2    A    Yeah.  I completely disagree with that.  It's very

3    clear that the decision they make to block access by

4    Authenticom is a security business decision and nothing

5    else.  The idea that it's a per se blockage to me, I saw

6    no evidence of that.  I saw lots of evidence of sloppy

7    security practices by Authenticom, which I think is a

8    great firm and seems to have great people, but they're

9    sloppy in some of their security stuff.  And when you see

10   that and, you know, it means risk to your firm, I think

11   you have to make a security decision based on that.

12   Q    Okay.  Let's go there.  You heard Mr. Cottrell

13   testify this morning that they have state-of-the-art

14   security practices and you just said that you disagree

15   with that approach.  So what is your opinion as to

16   Authenticom's approach to security?

17   A    Well, there are some things that on their face they

18   seem to be very solid.  Having your stuff in the

19   Microsoft cloud, that's a solid thing.  There's no

20   debating that.  But the things that concern me are things

21   that are very simple.  They're very basic cybersecurity

22   things, but that are not buttoned down.  And I don't want

23   to sound mean, but they're sloppy.

24        The best example is literally in the way that

25   Authenticom solicits username and password information.

ERIC ROSENBACH - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 131 of 222 PageID #:61255
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 130 of 221

1-P-130

So as you saw in my declaration, we took a little screen
shot because I just wanted people to understand this,
where literally it will say please give us our username
and login information.  I promise you I, in everything I
have seen, have seen very few cases where a professional
firm will solicit user credentials like that.  And the
thing that really made me nervous is that they said you
can even do it over email if you want.  There's no one
who's serious about cybersecurity who says pass me your
user credentials in clear text over email.

Now, again, I don't want to pick on Mr. Cottrell.
He seems like a really nice guy and it's a good firm.
But in his response to that point, he said something that
made me even more nervous which is that it's okay because
they do it in two separate emails.  It will be the
username and then it'll be the password.  But I hate to
tell you this.  That doesn't make any difference.  It
still make them severely vulnerable.  And here is why:
Any hacker who is after this stuff, all they do is they
put a sniffer on the line.  If you send two emails, it
doesn't make any difference because they still sniff both
of them and they still have the username and password.

So the part, to be clear, that makes me nervous
about this relates back to the culture of cybersecurity
that I was talking about.  And if there are people -- and

ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 132 of 222 PageID #:61256
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 131 of 221

1-P-131

again, I don't want to pick on Mr. Cottrell, but it
usually starts with the leader of the organization who
think that that actually is an acceptable cybersecurity
practice.  Then it doesn't -- it doesn't bode well for
the rest of the firm.

So I think that's a very basic thing.  And remember
what I said is that username password, these are the
credentials where people could get into the fortress,
they're the most important thing to protect.  They're the
most important thing.

Another thing that really from a cybersecurity
perspective I thought was problematic that I read in the
most recent responses is there was a dealer who works
with Authenticom who said that they were using Telnet to
craft a workaround to the very legitimate, and I think
good cybersecurity practices for both CDK and Reynolds.
Telnet is a protocol that's been known to be insecure and
vulnerable for at least 15 years, and no one who is any
way serious about cybersecurity would ever use Telnet to
pass passwords and definitely not to do a workaround so
that the people could reactivate username and passwords.
So pretty basic things just on the authentication.

THE COURT:  What is the device that's being
worked around by the use of Telnet?

THE WITNESS:  The thing that's being worked

ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 133 of 222 PageID #:61257
Case: 3:97-cv-00919-jdp Document #: 162 Filed: 07/05/17 Page 133 of 221

1-P-132

1   around with Telnet is, from what I understand, they were

2   using Telnet to log back in to the Reynolds'

3   infrastructure, reset the username and password on a

4   five-minute basis.  So when Reynolds tried to defend

5   itself from what they think and identify as an intruder,

6   and that's what you do in cybersecurity, they disabled

7   that login and password, which is what you do any time.

8   If you see spurious behavior and you do it by a lot of

9   different means, you disable it.  These people are

10  re-enabling it by logging in over an insecure mechanism.

11      The reason this matters is you're opening up another

12  hole in the castle wall with an insecure mechanism not

13  encrypted over Telnet.  Telnet should not even be used.

14  And so I know that we're doing away with that too.

15  Q    And how do -- what is your understanding of how CDK

16  and Reynolds issue or handle passwords and usernames?

17  A    Well, the contractual arrangements are exactly what

18  you would expect is that you want a username and password

19  to be identified for a specific individual.  It's called

20  role-based access.  You do role-based access because you

21  want those individuals to be responsible for what they're

22  doing.  You want to be able to track them.  You want to

23  be able to talk to them and see that's who it is.

24      Again, another thing I'd like to emphasize about the

25  use of credentials is they should be by a human.  Giving

ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864-Document-#-986-16-Filed-05/20/20-Page-134-of-222-PageID-#-61258
Case: 3:17-cv-00318-jdp   Document #: 162   Filed: 07/05/17   Page 1 of 1   Page ID #: 61258

1-P-133

1  a credential to a machine that runs a script that then

2  pulls back data is something that in cybersecurity

3  practice is very, very poorly looked upon because it's

4  not a human.  Cybersecurity mechanisms, even in the

5  technology, intrusion detection, when you're doing kind

6  of like the holistic assessment of how a human would

7  behave, they're designed to look at humans.  When

8  machines suddenly start doing something, you set off

9  those alarms, an intrusion detection system, and they

10  shut it down.  So that means when you shut it down, the

11  people who shut it down incur a cost to their systems too

12  because they have to figure out what wrong.  They have to

13  do a lot of forensics on that.  It's another layered-on

14  cost.

15  Q    You've heard earlier today one of the claims made by

16  Authenticom is that they only pull the data that dealers

17  specify.  Based on the research you've done, is that

18  accurate in your opinion?

19  A    So it was very interesting when Mr. Swire,

20  Dr. Swire, Professor Swire was up here, the exchange you

21  had talking about the information that they pull and what

22  you know they pull and what they don't.  And here's what

23  I'd like to try to explain.  I don't know this for

24  certain, but normally when you use scraping software and

25  you go in and you use credentials, scraping software gets

ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 135 of 222 PageID #:61259
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 134 of 221

1-P-134

1    everything on that page.  The way I understand the

2    scripts, which is the small software program that

3    Authenticom is using, and actually Mr. Cottrell even

4    mentioned this, he said they're English script.  That

5    means it scrapes the page.  It pulls all that back.  It

6    doesn't read it.  It's not AI.  It doesn't read it and

7    only pick what's there.  It scrapes it.  It pulls

8    everything back.

9         It puts in a request to go to the next page.  It

10   scrapes it.  It pulls all that data back.  It puts in a

11   request to go to the next page.  It scrapes it.  By the

12   time, using the airline analogy, you get to your ticket,

13   it's already scraped five pages worth of data that may

14   not have anything to do with what the actual query was.

15        Now, I know that they do try to limit, but my

16   impression, in particular when it's not run through the

17   Reynolds reporting software, Dynamic Reporting, is that

18   there's a very high likelihood, I don't know this for

19   certain, there's a very high likelihood that in this

20   phase between when they're pulling back the data and it

21   gets to DealerVault, they're pulling back a lot of stuff

22   that is not just exactly what is in there.

23        Now, when we talk about transparency, DealerVault

24   itself, I think, is good.  That's an impressive piece of

25   technology.  It does give the dealer transparency on data

ERIC ROSENBACH - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 136 of 222 PageID #:61260
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 136 of 221

1-P-135

1    that's there and where it's going.  The point that I'm

2    most concerned about from a transparency perspective is

3    what happens from the time they scrape, they pull all of

4    that back, and it goes into DealerVault because no one

5    has any visibility on that except for the people within

6    Authenticom.  The DMS providers don't.  The dealers

7    don't.  It's in that pullback and you don't know what's

8    there.

9    Q    And why is this a problem from a cybersecurity

10   perspective?

11   A    Well, in the earlier conversation about data

12   minimization, that was the principle that I was talking

13   about.  So you want to try to take only the specific

14   things that you need.  When you do, this is what I call

15   brute force, it's a term of art.  It's not trying to be

16   derogatory.  A brute force-type approach like that, it

17   means you're taking a lot of stuff and it takes a lot of

18   confrontational power to do that.  That's a brute force

19   pull.  You get a lot of stuff that you don't need and you

20   don't want, which is why in other sectors where there are

21   data-like integrators, you don't use screen scraping;

22   right?  Because it's too inexact.  You use a push-type

23   mechanism because then you're sure the data that is going

24   to the recipient, the third-party vendor, is the data

25   that it should be.

ERIC ROSENBACH – DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 137 of 222 PageID #:61261
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 136 of 221

1-P-136

1       Additionally, people don't have to break into your
2   system or have access to your system to do that.  You
3   push it out.  They get it.  That can be done in a very
4   dynamic or realtime-like way.
5           THE COURT:  On the kind of overscraping I'll
6   call it --
7           THE WITNESS:  Yes, sir.
8           THE COURT:  -- I get the concept.  But do you
9   know specifically whether there's any meaningful or
10  particularly high value information that's in that extra
11  scrapings that -- not just the stuff that shows up in
12  DealerVault, but it's the extra stuff -- I mean like in
13  my vision using the airline analogy, now we've got a lot
14  of little menu tabs, the Delta logo, and a bunch of other
15  junk that is really not high-value stuff.  It's extra,
16  but it's not very value.
17          THE WITNESS:  Right.  Again, I don't know for
18  certain, but, you know, depending on how they pull up the
19  report, there could be stuff that's in there that
20  shouldn't be.  Whether it's a social security number, I
21  don't know.  I doubt that they want that.  I don't think
22  they do.  But remember when you talk about social
23  security numbers being encrypted, from what I understand
24  from the Reynolds and CDK systems, they are encrypted,
25  but you bring it up on a screen.  If it's brought up on a

                    ERIC ROSENBACH - DIRECT

screen, that means someone can scrape it. And it doesn't

matter whether it's encrypted at rest, if you bring it up

on a screen it could be scraped. Trust me, I've seen

this done.

THE COURT: So the potential is there, but you

don't really know whether there is actually anything like

that.

THE WITNESS: No, sir. Based on professional

experience with screen scraping, I would say there's a

pretty high probability that when you scrape, you get a

lot of extra stuff that you didn't intend on.

THE COURT: Okay.

THE WITNESS: If I could make one other point

about the login credentials. I don't think in any way

that Authenticom has any intent on, like, pulling social

security numbers or stealing financial data. What I

really do worry about is the way they handle those

credentials is sloppy. And that the bad guys who are

looking for seams like that will take those and they'll

use that seam that maybe even inadvertently is created by

Authenticom and they go in the system. And remember,

when they're in the system, these guys are very smart.

They do things called privilege access. They would get

in the local area network of the dealer, and all they

need is one way in, and you get in a system and you can

ERIC ROSENBACH – DIRECT

Case: 1-18-cv-00864-Document #: 986-16 Filed: 05/20/20 Page 139 of 222 PageID #:61263
Case: 3:07-cv-00819-jdp Document #: 162 Filed: 07/05/17 Page 138 of 221

1-P-138

1 move laterally through things the whole way through the

2 network.  And they could steal financial information.

3 They could steal credit card information.  It's by

4 getting that one seam in you're opening up a lot of risk

5 to the dealer.

6      Second of all, you're opening up risk for the DMS

7 providers because they have it structured so that it is

8 locked down.  Their are credentials there.  If you give

9 an opening to some of the bad hackers, then they're going

10 to take it and they'll use that vulnerability for

11 something different.

12 Q    You've used the term seam several times and you use

13 it in your report.  Can you explain what the concept is

14 from a cybersecurity perspective?

15 A    Sure.  From a cybersecurity perspective, you look at

16 anyplace where there's a connection between one thing,

17 and in particular, where there would be a human

18 connection or a human interface.  It's because humans are

19 very fallible, and as I said, one of the biggest problems

20 with cybersecurity.  So here's an example of a seam.  A

21 seam would be, for example, when Authenticom is trying to

22 connect into the DMS.  They're connecting in.  It has to

23 go into a port hole.  Just like you would know a seam in

24 plumbing or electricity, there's an area right there that

25 is now exposed.  I remember and, you know, have spent a

ERIC ROSENBACH - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 140 of 222 PageID #:61264
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/14 Page 139 of 221

1-P-139

1    lot of time around NSA and Cybercom the last several

2    years, that's exactly what you look for.  You look for a

3    seam anywhere in the network.

4        The more hops there are when you transfer data, the

5    more seams there are.  Just imagine plumbing.  The

6    plumbing in your house, the longer you go, the more

7    likely there's a joint, the more likely it is to break or

8    for someone to try to get in.

9        Now, the seams that are the most helpful are the

10   ones that are based on credentials, because you get in

11   and it means you're a trusted person.  Once that user is

12   inside that network, you assume that they're safe.  That

13   means they can go and they can work around.  That's the

14   seam that you worry the most about.

15   Q    And is it your testimony that what Authenticom's

16   access, their automated access into the DMS creates that

17   kind of seam?

18   A    Yeah.  It's -- this is -- my professional

19   perspective is it's a seam that does not need to exist.

20   Again, look at what analogous-type firms are doing in the

21   financial sector.  So Professor Swire talked about

22   Yodlee.  If you look at Yodlee right now, they do not do

23   screen scraping and they do not take user credentials.

24   They set up an API.  There's a software-to-software

25   interface.  They make an arrangement with the bank, it's

ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 141 of 222 PageID #:61265
Case: 3.07-cv-00313-jgp Document #: 162 Filed: 07/05/11 Page 140 of 221

1-P-140

 1    a consensual agreement, and the data most often is pushed

 2    and it's pushed in a way that's secure.  There's not a

 3    seam.

 4         Mint.  There's a lot of talk about Mint and how Mint

 5    goes and they pull and they scrape.  That's what they

 6    used to do.  Their business model, if you look at it now,

 7    is changing very quickly because they've sensed that the

 8    big banks, consumers, the law, the Europeans are always,

 9    you know, a little stricter about this than we are.

10    They're not looking at that as an accepted business

11    practice.

12         Even in Mint now a lot of y'all use Mint.  They have

13    two-factor authentication.  The idea that Mint would ever

14    send you an email that says hey, send your username and

15    password in clear a text email would be kind of crazy.

16    So it's a different thing.  There's an analogous idea of

17    an integrator.  The way it's implemented is something

18    that is very different.

19    Q    So it doesn't matter -- if I understood you

20    correctly, it doesn't matter what the data is that is

21    being removed from the system.  So even if Mr. Cottrell

22    is correct that he's only removing seven categories of

23    data, the seam is nonetheless created.

24    A    The seam is nonetheless created.  Right, yes.  Of

25    course.

                    ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 142 of 222 PageID #:61266
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 142 of 222

1-P-141

1   Q    And do CDK and Reynolds do anything to reduce or

2   mitigate seams?

3   A    They do a lot to mitigate seams.  I mean --

4        THE COURT:  Just to be clear, seam just means a

5   point of vulnerability.  We got like a physical metaphor

6   here.  It's a point of vulnerability.

7        THE WITNESS:  It's a point of vulnerability

8   whereas -- I mean here's the best example.  A firewall is

9   not a point of vulnerability.  There's no hacker that

10  tries to go through the firewall anymore because it's

11  mostly impossible.  Why would you do that you can

12  spearfish someone, which is you send them an email that

13  -- another thing that I would be nervous about --

14       THE COURT:  I think I get it.  We'll let your

15  counsel kind of guide you a little bit more.

16  BY MS. MILLER:

17  Q    You said a moment ago, and I just want to make sure

18  I understand some terminology here.  You made a reference

19  to the concept of a dealer network.  You're not making

20  that synonomous with the DMS.  That's the dealer's

21  network; the land.

22  A    Yes.  Right.  Exactly.

23  Q    I just want to make sure I understood the

24  terminology.

25  A    And remember, on the dealer's network there are a

                    ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 143 of 222 PageID #:61267
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 142 of 221

1-P-142

1    lot of things that are not the DMS.  That's all their

2    personal commuters, some financial stuff, I'm sure credit

3    card information.  But it's connected to the DMS and it's

4    connected to the other networks that are connected to it.

5    And again, I'm telling you I see this all the time, bad

6    guys go in through the weakest door and they go in,

7    they'll go on that network, and it's called swimming

8    upstream.  And you go anyplace else that's connected,

9    because once you're in those pipes, you can do a lot of

10   bad things.

11   Q    You testified earlier about transparency and that

12   you said, I believe, please correct me in I got this

13   wrong, that Authenticom does provide some transparency to

14   the data that sits in the DealerVault interface.

15   A    Yes.

16   Q    To what extent is there transparency either on the

17   front end through the DMS provider or once the data

18   leaves DealerVault?

19   A    So I talked a little bit about the concern I have

20   with the transparency from the point they pull the data

21   to the point that it gets in DealerVault or where they're

22   holding it.  I think that seems apparently to be a black

23   hole, and I offered my hypothesis about some things that

24   could be there.  But again, I don't know that.  From the

25   point the data goes to DealerVault then to other vendors,

ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 144 of 222 PageID #:61268
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/14 Page 144 of 221

1-P-143

1    it seems that there is transparency on that and that's a

2    good thing from that perspective.

3    Q    Okay.  So once the data is actually in DealerVault,

4    and then I believe the testimony was then they send that

5    data out, is there any transparency once it leaves the

6    dealer interface other than they know it was sent?

7    A    I don't think that the dealer has any visibility of

8    the data once it's with a third-party vendor.  So this is

9    an application provider that does something else.  From

10   everything I know and have seen and heard today, there's

11   no visibility on that data.

12       So here's one point of concern.  It sounds like, I

13   did hear it today, Authenticom in their contract

14   stipulates that you have to destroy the data when you're

15   done with it.  But I'm not sure what visibility is in

16   place for doing that or what they do with it.  It's kind

17   of out there.

18   Q    You talked a moment ago about brute force methods.

19   Do those methods cause any kind of impact on CDK's and

20   Reynolds' systems?

21   A    Yeah.  When you use screen scraping or you're doing

22   multiple queries on a system, the thing you're most

23   concerned about is not actually the size of the file.  So

24   I wanted to highlight that as something that I think is a

25   little bit spurious.  But the tax that it puts on the

                    ERIC ROSENBACH - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 145 of 222 PageID #:61269
Case: 3:07-cv-00313-jdp Document #: 162 Filed: 07/05/14 Page 144 of 221

1-P-144

1    computational power of the systems that are there.  So

2    here's why:  The 5-meg file that the team here was

3    talking about could be a compressed data file that

4    resulted from 10,000 queries; right?  You do all these

5    pulls, package it up, and then you send it out.  So in

6    terms of the tax on the bandwidth pipe, it's almost

7    nothing.

8        But in terms of computational power put on all of

9    the network, that's something that is completely

10   different and the more you send the little pings in the

11   queries, the more it will raise the computational power

12   right there that needs to be used.

13   Q    Are you aware of there being instances where these

14   kind of brute force methods have, in fact, taxed CDK's

15   and Reynolds' systems?

16   A    There are two specific cases.  The one Mr. Cottrell

17   mentions in his statement, which is evidence in and of

18   itself that it definitely can happen.  It's not just a

19   theoretical thing.  And then there is another instance in

20   which another third-party, the name I can't remember

21   exactly but I think it was like XFactor or XData, also

22   had a misconfiguration of their software which resulted

23   in something like 900,000 files being corrupted and also

24   taxing the system to the point that it had to be taken

25   down for a little while.

ERIC ROSENBACH – DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 146 of 222 PageID #:61270
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/14 Page 146 of 222

1-P-145

1    Another thing -- another thing I asked in doing my

2  diligence for the case is if the Reynolds or CDK team had

3  evidence in their logs of this happening.  Because the

4  great thing about cyber on the one hand is there's a lot

5  of data to see from a cybersecurity perspective.  You can

6  go into logs and see how many times did people actually

7  log in.  Because I wanted to test the hypothesis of how

8  often Authenticom actually was doing these queries.  So

9  based on that, I saw log data that showed during a

10  specific month, and this report came out on the 6th of

11  June, that in one day there were 18,000 queries of the

12  CDK DMS system.  So --

13  Q    Let's actually put that exhibit in front of you so

14  you can look at it specifically.  This is defendants'

15  Exhibit 186.

16            THE COURT:  Is there any objection to

17  defendants' 186?

18            MR. SCHWARZ:  Yeah.  I mean the document is

19  extremely misleading, but we'll go into that on cross.

20            THE COURT:  Okay.  All right.  I'll admit it and

21  then we can find out why it's misleading.

22            MR. SCHWARZ:  Actually is that 186 or 187?

23            MS. MILLER:  186.

24

25  BY MS. MILLER:

ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 147 of 222 PageID #:61271
Case: 3:97-cv-00318-jdp Document #: 162 Filed: 07/05/47 Page 147 of 221

1-P-146

1    Q     So, Mr. Rosenbach, have you seen this document

2    before?

3    A     I have, yes.

4    Q     And what is your understanding what this document

5    is?

6    A     My understanding is that this is data pulled from

7    CDK systems that shows the number of queries to the DMS

8    system for CDK.  So you can see, for example, the number

9    of DMS servers that they surveyed to pull the data out.

10   Q     And is this -- if I understand correctly, this is

11   the number of servers on which they saw Authenticom

12   activity; is that correct?

13   A     That's correct, yes.  So you can see in pages

14   further down in the document that they did analysis to

15   determine who it was, and a lot of the Authenticom user

16   IDs are kind of self-evident.  Mr. Cottrell, you'd be

17   happy to know you're prominently featured as a login name

18   for a lot of these.  And so the team was able to pretty

19   easily identify who it was that was doing the pull in a

20   lot of cases, the query I think I want to say to make it

21   more accurate.

22   Q     So if you look at this summary page -- so it is --

23   this report data I think you said was 6-6-2017.  I'm

24   sorry, did you discuss and go through this report with

25   anyone at CDK?

                    ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 148 of 222 PageID #:61272
Case: 3-17-cv-00318-jdp Document #: 162 Filed: 07/05/18 Page 14 of 22

1-P-147

1    A    I did, yeah.

2    Q    And who was that person?

3    A    I spoke to the vice president of business

4    operations.

5    Q    And that gentleman's name is -- I'm sorry, is that

6    Howard Gardner?

7    A    That's Howard Gardner, yes.

8    Q    And so the report is the activity they saw of

9    Authenticom, so for -- and how long a period is this?

10   A    This was for 30-day period.

11   Q    Okay.  And so they saw Authenticom activity on the

12   CDK servers on 542 DMS servers.

13   A    Correct, yes.

14         THE COURT:  And what is a DMS server?

15         THE WITNESS:  So the way that these firms have

16   their architecture built is that in most cases each

17   individual dealer will be hosted on a server.  The server

18   is the computer that dishes up information back and

19   forth.  They do that primarily for security reasons and

20   for performance reasons because if you have the server

21   segregated, it means someone who hacks into one server

22   can't get into all the data of all the dealers.  It's

23   segregated on purpose, but it also is built that way so

24   you can optimize operational performance.

25   BY MS. MILLER:

                    ERIC ROSENBACH - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 149 of 222 PageID #:61273
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 148 of 221

1-P-148

1    Q    What is your understanding of what a query is for

2    these purposes?

3    A    My understanding is a query is when there's a

4    specific request and command put in by, in this case

5    Authenticom, to do a pull of data back.  It's a query.

6    So they're talking to the computer.  It's the little

7    script that they run that says hey computer, I would like

8    this data.  Please send this data back.

9    Q    Is it possible for a query or for a single command

10   line of English to contain multiple queries that will

11   seek thousands of pieces of data at a single time?

12   A    Yeah.  As I understand it, it's a single query

13   written as a script that could be for that, and then, you

14   know, we'd pull that back.  Now, depends on how they have

15   it configured, there could be a query, packages the data,

16   and then they compress it and they pull back one five-meg

17   file.  But for the purposes of computational power, it

18   makes a big difference because it's a query.  It tasks

19   it.  As soon as it tasks, the computer has to respond.

20   It spikes in computational power.

21        Another thing to point out here is that, you know,

22   as you've heard, this didn't crash the system.  But

23   they -- both firms, CDK and Reynolds, that means that

24   they have to plan in from a capital investment

25   perspective to architecture for additional computational

ERIC ROSENBACH - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 150 of 222 PageID #:61274
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 149 of 221

1-P-149

1  power for all this to be in there.  So they don't want to

2  take the risk that they're going to underinvest in

3  computational power and servers and bandwidth when they

4  now know that there is this type of burden put on their

5  systems and their network by Authenticom.

6  Q    Okay.  Just to -- we'll talk to Mr. Gardner about

7  this more tomorrow.  But just to get some clarity, what

8  is your understanding of the information in terms of how

9  CDK is able to determine that these hits are all caused

10  by Authenticom?

11  A    Yeah.  The hits come in because using the method

12  that Authenticom uses with the username and password, you

13  can identify what the username is.  It's pretty apparent.

14  And in other data that I saw that backed this up, I think

15  in one of the other exhibits, actually list the username

16  and that's the way -- one of two ways you can identify

17  who it is that's doing the query.

18      The second, by the way, is that I know Authenticom

19  for obvious reasons tries to disguise the username so

20  that they don't get blocked, but the fingerprint of the

21  script that they use is consistent throughout, and just

22  the same way you do computer forensics when someone hacks

23  you, the fingerprint of that script is readily

24  identifiable.

25  Q    And if you --

ERIC ROSENBACH - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 151 of 222 PageID #:61275
Case: 3:97-cv-00318-jdp Document #: 162 Filed: 07/05/41 Page 1500 of 221

1-P-150

1      THE COURT:  Just so I -- is the contention here

2   that lines 10 through 15 are Authenticom queries?

3      THE WITNESS:  Yes, sir.  That's my

4   understanding.  And the reason I think it's important is

5   in --

6      THE COURT:  And it's an Authenticom query by

7   virtue of a username that's not shown in these reports

8   here; right?

9      MS. MILLER:  They are shown.  I'll take you

10  there next, Your Honor.

11     THE COURT:  All right.

12  BY MS. MILLER:

13  Q    If you go to page 17 of the exhibit.  At the top of

14  the Descriptions, across the top, I think column A is --

15  line is cut off by a hole punch, but I think it says

16  username -- *Vendor Name*.  Column B is *Username*.  Column C

17  is *User Description*.  And then it goes on from there.

18  Account file.  Count of accesses.  File accessed.

19  Account accessed.  Acknowledged.  Last seen and comments.

20  And you see in the column A it's identified as

21  Authenticom.  This goes on for 400 some-odd pages.  The

22  actual user description and usernames are given in

23  columns B and C.  We can scroll through, but they come in

24  -- if you want to take me through.

25  A    So there are a couple things I think are important

                    ERIC ROSENBACH – DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 152 of 222 PageID #:61276
Case: 3-17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 151 of 221

1-P-151

1    to understand from this.  The first is that this is a tax

2    on any IT system when you do something like this, as

3    opposed to if you set either in API or you actually did a

4    once daily report that was pulled by the dealer and sent

5    it to Authenticom, the two DMS providers would not have

6    to account for this type of tax on their system.

7         The second thing is that I also looked at the time

8    of day, because my understanding was that Authenticom

9    said that this only happens at night.  You can see it

10   happens very often during the day.  And the ones, in some

11   ways it looked the most concerning, is there was one big

12   batch of stuff that was on Friday at about six o'clock in

13   the evening, which from what I understand and even when

14   I've bought cars is probably one of the busiest times for

15   a dealer.  So I'm not sure that the data that I saw is

16   consistent with some of the things that have been

17   presented by Authenticom, either in the scope of how they

18   do this, nor in the timing nor the potential effect.

19   Q    And then if we could turn to defendants' Exhibit

20   187.  And have you seen this document before?

21   A    I have, yes.

22   Q    What is your understanding of what this document is?

23   A    So this is a summarized version of the same, which

24   is showing some that are authorized and then some

25   unauthorized.  But you can see here that most of these

ERIC ROSENBACH - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 153 of 222 PageID #:61277
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 153 of 221

1-P-152

1   are going to DealerVault.

2   Q     So this is nonauthorized access.  Is this a CDK --

3   is this a screen shot?

4   A     Yeah.  This is a CDK screen shot of data analysis

5   they do on queries and things going on.  So as I

6   mentioned before, if you look at the last scene, you can

7   basically take a lot of data from the queries in the last

8   30 days for this specific dealer.  And then also you can

9   see the time at which it was done; specific times which

10  may be busier or not.

11  Q     You were here for Mr. Swire's testimony earlier?

12  A     Yes.

13  Q     And I think you've already touched on the Mint and

14  Yodlee points.  Was there anything else -- I want to

15  touch on the FTC guidance and the third-party distinction

16  that Mr. Swire discussed.  In his reply, he discusses the

17  FTC guidance that distinguished between first parties and

18  second and third parties.  Are you familiar with the FTC

19  guidance?

20  A     I am, yes.

21  Q     And what is your understanding of the purpose of the

22  FTC's approach?

23  A     Well, I think, like Professor Swire explained, they

24  want to make sure that someone is taking care of

25  consumers' data and that there's someone who's

ERIC ROSENBACH - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 154 of 222 PageID #:61278
Case: 3:17-cv-00318-jdp   Document #: 162   Filed: 07/05/17   Page 154 of 221

1-P-153

1    responsible for it.

2    Q    Do you agree with the FTC's approach to data

3    protection?

4    A    I agree with the framework and the approach.  I

5    think the interpretation in this case of who is actually

6    responsible for protecting the data is something where I

7    think my analysis is different than where Professor

8    Swire's is.

9    Q    So it is not -- would it be fair to say it's not

10   your interpretation that the FTC guidance mandates

11   intermediate access to the data so long as the dealer

12   approves it?

13   A    No, I don't believe that at all.  Also I think the

14   contractual issue is one thing, but just the business

15   decision of who has to protect the data is of preeminent

16   importance.  So you talked a little bit about, and

17   Professor Swire, you know, mentioned this as well, is if

18   there's a hack of one of these DMSs and all the data goes

19   out, maybe the dealers, like, share some blame.  But my

20   professional opinion is it's the DMS providers who are

21   going to really, really suffer the reputational risk,

22   probably the litigation risk, probably the business risk

23   as well.  And so, you know, an FTC framework is one thing

24   and it always seems neat when you read it, neat and tidy,

25   not neat like it's cool.  But then you have a complicated

ERIC ROSENBACH - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 155 of 222 PageID #:61279
Case: 3:97-cv-00318-jdp Document #: 162 Filed: 07/05/15 Page 154 of 221

1-P-154

1   case like this and you just have to decide okay, well,

2   that's all fine.  But who has to take care of the data so

3   that their business risk is minimized.  And in this case,

4   I think that is the DMS provider.  The dealers, of

5   course, share that, but remember the dealers are

6   essentially contracting the security of the data out to

7   the DMS.  So I think there's some even importation of

8   responsibility there.

9   Q    Having heard Mr. Swire and having read both of his

10  declarations, was there anything -- and I may have asked

11  this, and if I did I apologize.  Was there anything in

12  his testimony that changed your opinions as you sit here

13  today?

14  A    No.

15  Q    Was there anything else in his testimony that I

16  haven't already covered that you disagree with that we

17  need to cover here today?

18  A    No.

19          MS. MILLER:  Your Honor, we tender the witness.

20          THE COURT:  All right.  Cross-examination.

21  (5:12 p.m.)

22                  CROSS-EXAMINATION

23  BY MR. SCHWARZ:

24  Q    Good afternoon, Mr. Rosenbach.

25  A    Hi.  How you doing?

                    ERIC ROSENBACH - CROSS

Case: 1:18-cv-00864-Document #: 986-16 Filed: 05/20/20 Page 156 of 222 PageID #:61280
Case: 3:17-cv-00318-jdp   Document #: 162   Filed: 07/05/17   Page 156 of 221

1-P-155

1  Q    I'd like to -- you testified about Yodlee and -- I

2  believe just about the Yodlee.  You've never engaged in

3  the screen scraping; correct?

4  A    I said Yodlee, for the predominant stuff they do

5  right now, they work through vendor services, through

6  APIs.

7  Q    We just pulled up Yodlee's website.  And take a look

8  what it says on screen scraping.

9  A    So remember what I said is they do it through an

10 API.

11 Q    But it says one of the most common ways -- your

12 testimony was that Yodlee would never, doesn't generally

13 do screen scraping.

14 A    I said they're moving away from screen scraping and

15 Yodlee does not use user login credentials, they use

16 APIs.

17 Q    Okay.  Why don't you read what the first paragraph

18 here says.  "One of the most common ways Yodlee

19 aggregates data is through screen scraping, a script or

20 agent is coded by Yodlee to log into a site."  So

21 according to Yodlee's website at least, that's one of the

22 most common ways they obtain data; right?

23 A    Right.  Through an API and an agreement with the

24 financial institutions that they're working through.  So

25 they're a data aggregator.  Right now Yodlee has become

ERIC ROSENBACH - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 157 of 222 PageID #:61281
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/06/17 Page 156 of 221

1-P-156

1  kind of the center for a lot of the fintech firms.  I was

2  just at a fintech conference a couple weeks ago talking

3  on cybersecurity.  They take the data, do some of the

4  things that Authenticom does, and then allow this very

5  interesting ecosystem of fintech firms to have access to

6  it.

7          THE COURT:  Just clarify this for me.  Because

8  during your testimony I really thought that you were

9  drawing a distinction between screen scraping and the

10  APIs.  Now you're telling me that based on what you're

11  seeing in the Yodlee website, they do screen scraping

12  through an API.  Am I misunderstanding something?  Or are

13  you just saying this is old news here on their website.

14  Their new way of doing it, which you have firsthand, is

15  that they do it through an API.

16          THE WITNESS:  Not only firsthand, I think if you

17  look at other parts of the Yodlee website, you'll see, in

18  fact, they say that they're moving almost completely to

19  APIs.

20          THE COURT:  I just want to make sure I

21  understand this.  Screen scraping is not the API way.

22  That's a different way.  Two different things.

23          THE WITNESS:  Well, I mean it gets a little

24  complicated.  You could do screen scraping through that,

25  but I think the major distinguishing factor is whether or

                    ERIC ROSENBACH - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 158 of 222 PageID #:61282
Case: 3-17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 157 of 221

1-P-157

1  not you do it with login credentials or with an API that

2  would allow the software to create this connection where

3  the screen scraper would go through there, still a more

4  security connection.

5       THE COURT:  Okay.  So then I totally polar

6  different types.

7       THE WITNESS:  There are two difference things.

8  The API itself is -- it's the connective tissue between

9  these two things.  The reason that you do that is so that

10  you try to limit the seam itself.  That creates a

11  connection through which different types of software can

12  work.  One might be screen scraping, but remember in this

13  case it's not -- it's not hostile to use the word I know

14  they don't like.  They're doing it in an agreement

15  with -- in an agreement with the different banks.  At

16  least that's the -- not in every case.  That's the strong

17  direction that these financial firms are going as well.

18  BY MR. SCHWARZ:

19  Q    I mean look at the next bullet.  Take several

20  seconds, sometimes up to 30 seconds or more to retrieve

21  data, especially the first time an account is added.

22  This makes sense because some data will be available at

23  the login screen and some data will be available two or

24  three pages deeper in the navigation.

25       Isn't it a fact that Yodlee has developed APIs with

ERIC ROSENBACH - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 159 of 222 PageID #:61283
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 159 of 221
1-P-158

```
 1   large financial institutions and it uses screen scraping
 2   and logins with the thousands of other small banks where
 3   individual consumers have accounts?
 4   A    I think some of the things you said are fact and
 5   some of those things I don't know.  You just mentioned
 6   four or five different things.  It's a fact that they are
 7   developing APIs.  I don't debate that they do screen
 8   scraping.  That's also what I said.  Remember what I
 9   said.  I'll clarify -- sorry, Your Honor also if this was
10   confusing.
11        Screen scraping, and in particular the use of login
12   credentials, login credentials in particular is very
13   quickly going down.
14   Q    But for small banks.
15   A    For smaller banks it's --
16   Q    Yodlee does not -- has yet to develop APIs; correct?
17   A    I don't know that for sure.
18   Q    Okay.
19   A    I mean that would make sense.  Smaller banks have --
20   they have less resources to invest in IT-type stuff.
21   Q    And therefore -- and there are thousands of smaller
22   banks; correct?
23   A    I assume that's correct, yes.
24   Q    And many more than there are JPMorgan Chases of the
25   world.
```

                         ERIC ROSENBACH - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 160 of 222 PageID #:61284
Case: 3:17-cv-00318-jdp  Document #: 162  Filed: 07/05/19  Page 159 of 221

1-P-159

1   A     Yeah, there's no doubt about that.

2   Q     Let's go back to 186, in defendants' Exhibit 186.

3   So you were describing screen scraping in a way I thought

4   was interesting.

5   A     Okay.

6   Q     You described it as show a page, grab the data on

7   the page, and then there's a request show me the next

8   page.  Grab the data on that page.  Show me the next

9   page.  Grab the data on that page.

10  A     Yes.

11  Q     And with screen scraping, that's all automated;

12  correct?

13  A     Depends, yeah.

14  Q     And you can actually, because the computers type

15  faster than human beings, it can quickly flip through

16  pages; correct?

17  A     That's the idea behind screen scraping, because you

18  don't want to have a human doing it, yes.

19  Q     And each of the requests to show me the next page,

20  that's another query; correct?

21  A     It's hard to tell.

22  Q     But if --

23  A     It's not necessary -- here's why that's not

24  necessarily the case is that the query, depending on the

25  way the script is written, could be one query that says

ERIC ROSENBACH - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 161 of 222 PageID #:61285
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 160 of 221

1-P-160

1    do this, this, this, this. Flip the page. This, this,

2    this. You're not able to know.

3    Q    Okay. What if the query says, which is from my

4    understanding of how it works, show me columns A through

5    H and then I scrape that data. And then another query

6    that says show me columns I through Z and that data is

7    scraped. Show me columns AA through HH. Scraped. Each

8    of those would be a separate query; correct?

9    A    I'm not familiar with what you're talking about; so

10   I wouldn't --

11   Q    There's no reason that that wouldn't be --

12   A    There could be because of what I just said.

13            THE COURT: Hold on. There's an objection.

14   You've got to let me rule on it.

15            THE WITNESS: Yes, sir. Sorry.

16            THE COURT: I'm going to overrule. Now you can

17   go. Seems formalistic, but sometimes it matters a lot.

18            THE WITNESS: No, sir. I understand. It's

19   interesting for me because I want to law school but never

20   got to do real law. So I get to watch y'all and face the

21   wrath of opposing counsel here. Here's why: The script

22   you write could do multiple things or you could have a

23   specific script there. But in the end, the numbers that

24   are here are either what they are, one-for-one like you

25   were just saying, or they're even worse in that each one

                ERIC ROSENBACH - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 162 of 222 PageID #:61286
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 161 of 221

1-P-161

1    of those actually represents multiple commands and taxes

2    on the system.  We don't know.  I don't claim to know

3    that.  But I am able to say it's almost impossible that

4    something lower than that number in terms of pure number

5    of queries.

6    BY MR. SCHWARZ:

7    Q    But let's look at Bob Rohrman.  Bob Rohrman, as I

8    understand it, is a large dealership with multiple

9    particular car dealers in the midwest.  Let's assume Bob

10   Rohrman has 50 dealers and there's reference here to --

11   A    I have no idea how many dealers Bob Rohrman has.

12   Q    It could be 30.  It could be 50.  I'm just -- we're

13   doing the math here.

14   A    It makes a big difference though.

15   Q    Yeah, clearly.  And that's why it's important we not

16   use spreadsheets that could potentially be misleading.

17   So let's assume that Bob Rohrman has 50 dealers.

18   A    Actually that's probably a factual question.  Sorry.

19   I don't want to get out of line.

20           THE COURT:  Let's wait for the question that can

21   be answered here.  Go ahead.

22   Q    So when it refers to queries per in the last 30

23   days, you've got a number here of 718,000.  So if there's

24   50 dealers, you divide that number by 50 to come up with

25   the number of queries per dealer; correct?

                    ERIC ROSENBACH - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 163 of 222 PageID #:61287
Case: 3:07-cv-00313-jdp Document #: 162 Filed: 07/05/17 Page 162 of 221

1-P-162

1   A    My -- my understanding, which you will be able to

2   ask the experts tomorrow, is that each dealer has a

3   server.

4   Q    But it's the top six servers by query count and

5   there's one server here for Bob Rohrman.

6   A    I don't know which dealer that is though.

7   Q    Okay.  Well, assume the accuracy of my comment --

8        THE COURT:  So I guess you don't know whether

9   the server is dedicated to the automotive group that

10  might have 50 or 60 dealerships.

11       THE WITNESS:  Right.  It could be a group.  It

12  could be the dealer.  I think the point is --

13       THE COURT:  No, no.  The point is what do you

14  know.  You don't know whether it's 50 dealers or one

15  dealer.  It's one server, that's all you know.

16       THE WITNESS:  Yes, sir.  That's the only thing I

17  can say with complete --

18       THE COURT:  Okay.  Good.

19  BY MR. SCHWARZ:

20  Q    And so you don't know whether it's 50 dealers.  You

21  also don't know whether the query structure works the way

22  we were just discussing, whether if it's 70 columns, A

23  through H, that's one query.  And 70 columns, I through

24  Z, that's a second query.

25  A    That's correct.

                    ERIC ROSENBACH - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 164 of 222 PageID #:61288
Case: 3:97-cv-00019-jdp Document #: 162 Filed: 07/05/17 Page 163 of 221

1-P-163

1  Q    You don't know that either; correct?

2  A    That's correct.

3  Q    And so if that's the structure in the sales query to

4  get a sales report takes 50 different asks because that's

5  how many columns there are across the board.

6  A    Um-hmm.

7  Q    And there could be 50 isolated queries just for one

8  report; correct?

9  A    There could.  I believe --

10 Q    You just don't know.

11 A    The thing that I do know and the point that I

12 believe remains is that this is a number that is there

13 that is factually accurate and represents at a very

14 minimum one specific request of a script run by

15 Authenticom at a very minimum.  That's the reason I think

16 it's instructive.  Because it could be something much

17 worse.  It could be that there are scripts built within

18 it and it could be something else.

19 Q    Okay.  But you don't know one way or the other

20 whether the query structure is the way that I posited.

21 A    I don't, no.  I have not seen your query structure.

22 Q    And if -- this is all querying text in a database;

23 correct?

24 A    I don't know that.  Could be, yeah.  Most likely.  I

25 hope you wouldn't tell us that you're querying outside of

ERIC ROSENBACH - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 165 of 222 PageID #:61289
Case: 3:97-cv-00319-jdp Document #: 162 Filed: 07/05/17 Page 164 of 221

1-P-164

1    that.

2    Q    Do you think the numbers are stored in text or

3    stored as pictures?

4    A    I don't understand what you mean, I'm sorry.

5    Q    So if one -- if it's pulling VIN numbers, those are

6    alphanumeric numbers; correct?

7    A    Yeah.

8    Q    That's going to be text.

9    A    Okay.

10   Q    Did you watch the video on DealerVault?

11   A    I did, yeah.  Maybe you could restate your question,

12   then I'll be able to help you.  I didn't understand what

13   you said.

14   Q    My apologies.  What I'm trying to show is that or

15   what I'm trying to ask is assuming the query structure is

16   -- vision it this way:  You've got the equivalent of a

17   spreadsheet that you're pulling something off of and you

18   want to pull this many columns and that far down.

19   A    No, I know how you find out how they work.

20   Q    And you say show me this amount of text.  Does that

21   tax the computational power of the server?

22   A    Of course it does.

23   Q    To pull 12 columns across and --

24   A    Of course it does.

25   Q    -- 8 columns down.

ERIC ROSENBACH - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 166 of 222 PageID #:61290
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 166 of 221

1-P-165

1    A    Of course it does.

2    Q    Significant impairment in text files on the server.

3    A    The fact that it's a text file doesn't matter that

4    much.  It's the pull on the system.  So here's something

5    that can help you understand this, maybe for you, sir, is

6    that a denial of service is not a big amount of data.

7    But, for example, we saw the Iranians do a distributed

8    denial of service against all the financial web pages by

9    sending very, very, very small bits of data but at an

10   extremely high frequency.  Why?  Because it taxes the

11   system.  It makes it spin.  And it increases the data,

12   the computational utilization.  So it sends the text

13   file.  It's scraping -- actually it doesn't have --

14           THE COURT:  I think we get the idea.  You're

15   getting beyond the point of diminishing returns here.  I

16   just want to make sure I understand the spreadsheet here.

17   So lines 10 through 15 on the summary report, these are

18   what you've identified as the Authenticom queries?

19           THE WITNESS:  10 through 15, just to make sure

20   I'm looking right.  Yes, sir, all of the numbers you see

21   by the server number are Authenticom queries.  So on this

22   page and then all of the pages on down there.

23           THE COURT:  Okay.  And so, like, all these 493

24   pages, these are all Authenticom queries?

25           THE WITNESS:  Yes, sir.  As best everyone can

                    ERIC ROSENBACH - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 167 of 222 PageID #:61291
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 166 of 221

1-P-166

1   tell from doing the data analysis on both the username,

2   the login information, and the fingerprint of the

3   scripts.

4           THE COURT:  Also and the summary page then just

5   gives me the top --

6           THE WITNESS:  It's some examples of some so that

7   you can see --

8           THE COURT:  Well, it's not just some examples,

9   it's --

10          THE WITNESS:  Yes, sir.

11          THE COURT:  -- as judged by the percent of the

12  total queries --

13          THE WITNESS:  Yes, sir.  You're right.

14          THE COURT:  -- these are the top six.

15          THE WITNESS:  Yes, sir.  Sorry.

16          THE COURT:  And so the point that the

17  spreadsheet is trying to make is that there's a certain

18  amount of effort that the DMS system is exerting in

19  response to the Authenticom queries.

20          THE WITNESS:  Yes, sir.  And the broader point

21  is that's the method by which they do those pulls is

22  something that does have an operational cost to the DMS

23  providers.

24          THE COURT:  Sure.  Everything, even like a tiny

25  request takes up, and if you have a lot of tiny little

ERIC ROSENBACH - CROSS

Case: 1-18-cv-00864-Document #: 986-16 Filed: 05/20/20 Page 168 of 222 PageID #:61292
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 168 of 221

1-P-167

1    requests, it adds up to a lot.

2              THE WITNESS:  Yes, sir.

3              THE COURT:  Okay.  Here is -- like if these are

4    all Authenticom queries, why didn't you, like, total them

5    up and tell me what percentage was devoted to Authenticom

6    queries?  Instead I got just some examples of what seem

7    like they must be big dealers that work with Authenticom.

8              THE WITNESS:  Yes, sir.  I think we could

9    probably do that for you, but that's not something that

10   we did.

11             THE COURT:  Here's another question I have.

12   These queries are made by Authenticom.  Presumably Bob

13   Rohrman, whatever he's got, 50 dealerships or 75 or one,

14   he's going to need that information somehow.  So if

15   Authenticom wasn't doing it, somebody could be doing it

16   for Bob Rohrman.  He'd be going through an API or he'd be

17   having his vendors or whatever.  So yeah, there's 5

18   percent of it that's devoted to Rohrman, but somebody's

19   goin to -- the DMS server is going to have to do it for

20   him one way or another.

21             THE WITNESS:  Um --

22             THE COURT:  So what I'd like to know is how much

23   extra was added because it's done the Authenticom way

24   instead of some other way?

25             THE WITNESS:  Right.

                    ERIC ROSENBACH - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 169 of 222 PageID #:61293
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 169 of 221

1-P-168

 1          THE COURT:  That doesn't tell me that.

 2          THE WITNESS:  No, it doesn't tell you that.  But

 3    if you think about the approach, either with an API where

 4    people pushed it out, right?  There's not the ping, the

 5    response -- the response and the acknowledgement in the

 6    computer --

 7          THE COURT:  I get it.  This way is a bigger drag

 8    than --

 9          THE WITNESS:  Yes, Your Honor.  But it could be

10    push, it could be something that's less.  I don't know

11    exactly how much.  Or they could run the manual Dynamic

12    Reporting report once a day and that would be some tax on

13    the system; most certainly considerably less than this

14    and they could send it to him.

15          THE COURT:  But we don't really know how much.

16    It doesn't give me a very good quantification of how much

17    extra the Authenticom system is taxing the system as

18    opposed to the other alternatives that are authorized by

19    CDK.

20          THE WITNESS:  It's not -- it's not, you know,

21    perfect analysis for that, that's correct.

22          THE COURT:  All right.

23    BY MR. SCHWARZ:

24    Q    So you testified a bit about the concept of a seam

25    and I believe your testimony was that every time there's

                    ERIC ROSENBACH - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 170 of 222 PageID #:61294
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 169 of 221

1-P-169

 1    an additional seam, there's an additional point of risk;

 2    correct?

 3    A    That's correct, yeah.

 4    Q    And any new user login and password is a seam in

 5    your opinion; correct?

 6    A    It's potentially vulnerability; right.

 7    Q    So every new employer that's assigned a username and

 8    login in your opinion it's a new seam and a new point of

 9    risk; correct?

10    A    Absolutely.  Yes.

11    Q    So every time that someone gets hired in the service

12    department and gets a username and login, that's a new

13    threat; correct?

14    A    I didn't say it's a threat.  I said that it's

15    potentially a risk, which is why you want them to have

16    good IT training.  You want to make sure you do a

17    criminal background check.  But they have access to your

18    system.  They're on your network.  They're a risk, as

19    you've seen from all the insider attacks that the U.S.

20    government suffered recently.

21    Q    And do you have any sense of how many employees

22    there are that work at car dealerships in the United

23    States?

24    A    In total?

25    Q    Yes.

                        ERIC ROSENBACH - CROSS

Case: 1-18-cv-00864-Document #: 986-16 Filed: 05/20/20 Page 171 of 222 PageID #:61295
Case: 3:17-cv-00318-jdp  Document #: 162  Filed: 07/05/17  Page 171 of 221

1-P-170

1   A     I don't, no.

2   Q     Significantly greater number than just the one that

3   is Authenticom; correct?

4   A     Than --

5   Q     Authenticom is just one entity; correct?

6   A     Yeah.  Sure.

7   Q     Okay.  So in terms of seams at risk, there are

8   significantly more risks at dealerships just that hire

9   people?

10  A     No, because they're qualitatively different things.

11  You're talking about pure numbers.  What I'm talking

12  about is a user ID that's created for someone that's not

13  a person; that is used in a way that gives access to pull

14  data out.  User ID for an employee on the network,

15  whether they have access to the DMS and updates, it's a

16  much more controllable thing.  That's why you do that.

17  You give a user ID, a password to a person because you

18  can monitor the person.

19        On your network, you have intrusion detection and

20  you have heuristics that monitor whether that person is

21  doing something that is unusual for them or not.  They're

22  printing out a lot of stuff late at night.  So it's not a

23  pure number thing.  The risk is different because of the

24  way it's being used.

25  Q     But if you can monitor a username and a login, you

                   ERIC ROSENBACH - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 172 of 222 PageID #:61296
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 172 of 221

1-P-171

```
 1   can also monitor the username and login assigned to

 2   Authenticom; correct?

 3   A    Of course.  That's exactly what they're doing.  They

 4   see it's negative and hostile and they close it down.

 5   That's what you do in cybersecurity.

 6   Q    But my question is about the dealer, not about the

 7   defendants.  So if the dealer can monitor Ken, who got

 8   hired in service, and monitor Bob, who got hired in

 9   sales, and check to see whether they're doing anything

10   unusual, the dealer could do also do the same thing with

11   the login and username that's used by Authenticom;

12   correct?

13   A    I'm not sure.  They are using a username and

14   password that's coming into the Reynolds and CDK systems

15   or could, yeah.

16   Q    And Bob in service, who needs to know where his

17   service appointments, you know, needs to log into the DMS

18   to be able see that, doesn't he?

19   A    To be able to see what?

20   Q    His service appointments, the cars he's got to work

21   on that day.

22   A    Yeah, of course.

23   Q    So that's a risk and another example.

24   A    Yeah.  It's a smaller risk because he's doing his

25   assigned role.  This is called role-based access.  You
```

ERIC ROSENBACH - CROSS

Case: 1-18-cv-00864-Document #: 986-16 Filed: 05/20/20 Page 173 of 222 PageID #:61297
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 173 of 221

1-P-172

1  want Bob.  You assign his specific role.  He's in one

2  department.  He has access only to that data.  The

3  credentials as configured -- and there are some materials

4  that are viewed that show that a specific user will be

5  given access to several different departments, that's not

6  role-based access.  That's saying you're giving access to

7  all of these different areas so that that one, in this

8  case script, can pull back all that data.  That's

9  definitely different than Bob who is working in finance

10 or wherever he is to do his specific job.

11 Q    So Bob gets access to three datasets and that's

12 role-based access because that has to do with his job.

13 A    What's his job at the dealer?

14 Q    Bob is the, who knows, the deputy assistant manager

15 who's number 7 in the dealership.

16 A    Okay.  Yeah.

17 Q    And Authenticom gets access to five datasets.  Why

18 is that not role-based access?

19 A    Because the role would be simulating, from what I

20 understand, emulating access that very few people in the

21 dealership have in aggregate.  So again, when you're

22 trying to mitigate risk, what you do is you say people

23 who only need to know this data, they only have this type

24 of access.  That means if you're in parts, why do you

25 need to see something in finance or business

ERIC ROSENBACH - CROSS

Case: 1-18-cv-00864-Document #: 986-16 Filed: 05/20/20 Page 174 of 222 PageID #:61298
Case: 3:17-cv-00318-jdp Document #:162 Filed: 07/05/17 Page 174 of 221

1-P-173

1  transactions. And that's why you set it up that way, so

2  that they only see the data they should. It's also part

3  of data minimization in trying to mitigate your risk for

4  everything.

5  Q    Do you have any idea in any given dealership how

6  many people have access to the same five datasets that

7  Authenticom has access to?

8  A    Can you say that again? Do I have any idea --

9  Q    Do you have any idea -- have you spent time studying

10  the structure of car dealerships?

11  A    I have not spent extensive time studying car

12  dealerships.

13  Q    Have you gone and interviewed any car dealership to

14  understand how many people at that dealership have access

15  to the same five datasets as Authenticom?

16  A    No.

17  Q    So you don't know one way or the other how many

18  people may have the same access to the same five datasets

19  as Authenticom.

20  A    The same five people who for which datasets?

21  Q    You don't know -- you don't know what's the norm at

22  a dealership in terms of having access to the same narrow

23  five datasets that Authenticom has access to.

24  A    I'm not an expert on datasets for employees. What I

25  would like to say and repeat is that --

ERIC ROSENBACH - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 175 of 222 PageID #:61299
Case: 3:07-cv-00313-jdp Document #: 162 Filed: 07/05/17 Page 174 of 221

1-P-174

1          THE COURT:  Don't repeat.

2          THE WITNESS:  Okay.  Yes, sir.

3          THE COURT:  Don't repeat.  We don't have time

4    for repeat.

5          THE WITNESS:  Okay.  Gotcha.

6          THE COURT:  I think we get your point.  Go

7    ahead.

8    BY MR. SCHWARZ:

9    Q    So you testified on direct that even independent

10   data integrators can have access to Reynolds, can be

11   partners through RCI and partners through 3PA.  Do you

12   remember that testimony?

13   A    I said that I -- I think what I said is conceivably

14   they could; right?

15   Q    Do you know that CDK and Reynolds have a policy of

16   prohibiting data integrators like Authenticom from

17   participating in the RCI and 3PA Programs?

18   A    From what I understand is this is something that's

19   been offered in the past and Authenticom has declined.  I

20   think that the policy for data integrators is based on

21   not them being data integrators, it's based on the

22   methods and the practices they use for getting the data.

23   Q    You also testified, I believe, that you were aware

24   of two -- through your questioning, you were aware of

25   only two instances where there was a significant tax on

                    ERIC ROSENBACH - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 176 of 222 PageID #:61300
Case: 3:07-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 176 of 221

1-P-175

1   computational power.  Do you remember that testimony?

2   A    I said that those are the two specific ones that I

3   mentioned, and there are other instances that were not as

4   specific where the technical staff told me that they

5   noticed that there is taxes on the computational systems.

6   Q    The one time was approximately eight years ago, the

7   single query from Authenticom?

8   A    Yeah, that's right.

9   Q    Just one instance?

10  A    That's the only one known.

11  Q    And you also mentioned XTime.  Were you aware that

12  XTime is a company that puts its code on the DMS boxes?

13  A    Okay.

14  Q    Does that create a different kind of risk?

15       MS. MILLER:  Objection.  Foundation.

16       THE COURT:  Overruled.  Go ahead.

17       MR. SCHWARZ:  I'd should ask --

18       THE COURT:  Maybe you can be a little closer to

19  the mic or move it back.

20  BY MR. SCHWARZ:

21  Q    Did you hear the question?  I asked whether you were

22  aware that XTime was a company that placed its own

23  software code on the DMS box.

24  A    I understood at some time they did that.

25       MR. WILKERSON:  Objection.

ERIC ROSENBACH - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 177 of 222 PageID #:61301
Case: 3:17-cv-00318-jdp   Document #: 162   Filed: 07/05/17   Page 177 of 222

1-P-176

 1              THE COURT:  Overruled.

 2              THE WITNESS:  But from what I understand, that

 3   was not the reason for the incident.

 4   BY MR. SCHWARZ:

 5   Q    Is there significantly greater risk when a company

 6   puts code on the DMS box?

 7   A    Yeah, of course.

 8   Q    And you're aware that Authenticom never does that?

 9   A    That's what I've heard, yeah.

10   Q    You've testified a little bit about that the dealers

11   were so critical that they created an ISAC.  Do you

12   recall that testimony?

13   A    Yes.  Now, I didn't say just the dealers, I said the

14   industry.

15   Q    The industry.  Fair enough.  The industry created an

16   ISAC.  And the concern there --

17              THE COURT:  Can you tell us what an ISAC is?

18              THE WITNESS:  Yes, sir.  It's an Information

19   Sharing Analysis Center.  And so the role of an ISAC is

20   all these private sector companies come together and they

21   share threat information and best practices.  So if

22   there's one dealer or even one car manufacturer that's

23   seeing a specific type of malware or specific type of

24   attack, in confidence they'll share it with everyone else

25   there because they're trying to raise the overall

                   ERIC ROSENBACH - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 178 of 222 PageID #:61302
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 178 of 221

1-P-177

1  protective ability of the sector itself.  They'll share

2  best practices too.  This is what we do.  This is how we

3  obviate the risk.

4          THE COURT:  Okay.  Good.  Next question.

5  BY MR. SCHWARZ:

6  Q    In the auto industry, ISAC was created to deal with

7  issues associated with connected vehicles; right?

8  A    No.  I think it was connected -- I think it was

9  established to deal with issues of cybersecurity.

10 Connected vehicles are definitely one of those, sure.

11 Q    Can you pull up PHX 096.  If you can turn to page 3

12 of 6.  First question -- let's go back to the first page.

13 I apologize.  Do you recognize this document?

14 A    I think this is the one that is probably similar to

15 the what I reviewed before, yes.

16 Q    And this is about the auto or about ISAC and the

17 Auto-ISAC.  Let's turn to page 306 and the next

18 paragraph.  If you could pull up the first paragraph

19 "What is Auto-ISAC?"  Is this the ISAC you were referring

20 to?

21 A    Yes.

22 Q    And this is an ISAC form in August of 2015 by

23 automakers?

24 A    That's right.

25 Q    And the last sentence "Auto-Isaac operates a central

                    ERIC ROSENBACH - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 179 of 222 PageID #:61303
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 179 of 221

1-P-178

1   hub for sharing, tracking and analyzing intelligence

2   about cyberthreats, vulnerabilities, and incidents

3   related to the connected vehicle"; correct?

4   A    That's correct, yeah.

5   Q    Authenticom doesn't have access to any information

6   related to connected vehicles, does it?

7   A    I don't know that.

8   Q    You don't know one way or the other?

9   A    No.  I think, you know, it's -- I don't know that,

10  but it's possible that you do.

11  Q    Anything is possible.  You don't know one way or the

12  other; correct?

13  A    No.

14          MR. SCHWARZ:  Can we move PX 96 into evidence?

15          THE COURT:  Yes.  Any objection?

16          MS. MILLER:  No objection.   (5:39 p.m.)

17          THE COURT:  Okay.  It's admitted.

18          MR. SCHWARZ:  No further questions, Your Honor.

19          THE COURT:  All right.  Any redirect?

20          MS. MILLER:  One question on redirect.

21                  REDIRECT EXAMINATION

22  BY MS. MILLER:

23  Q    Opposing counsel asked you specifically about

24  incidents, specifically about Authenticom and threats

25  that Authenticom was taxing the system.  In your

ERIC ROSENBACH - REDIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 180 of 222 PageID #:61304
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/09/18 Page 179 of 221

1-P-179

1  discussions with the folks at CDK and Reynolds, did they

2  describe any system integrity problems or data corruption

3  issues that they couldn't trace specifically to

4  Authenticom but that had been caused by potentially other

5  third parties?

6  A    Yes.  There was one issue in particular where there

7  has been data corruption and I think the concern from CDK

8  and Reynolds folks is that Mr. Cottrell described the way

9  that with the right function that they writeback on the

10  data that's resident in the DMS.  In data corruption

11  cases, even small mistakes to that data can not only

12  poison the data so that it's incorrect, but can cause the

13  processing of it also to get hung up.  And so I think

14  that that is part of the concern right there is that

15  that's access to a system that is different just than the

16  data.  It cannot only have negative effect on the data

17  but also on the system itself.

18       THE COURT:  And that happened in an incident

19  involving Authenticom's writing back?

20       THE WITNESS:  No.  I don't know that for

21  certain.

22       MS. MILLER:  That's all we have, Your Honor.

23       MR. SCHWARZ:  No questions, Your Honor.

24       THE COURT:  Thank you very much.  Thank you.

25       (Witness excused at 5:45 p.m.)

ERIC ROSENBACH - REDIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 181 of 222 PageID #:61305
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 180 of 221

1-P-180

 1          THE COURT:  All right.  We've have 20 minutes

 2     left.  Let's get started on another witness.  Are we

 3     going back to the plaintiff's case now?

 4          MS. GREGOR:  Yes, we are.  We have a couple

 5     witnesses, nonparties we'd like to put on with very short

 6     direct testimonies.  Maybe eight to ten minutes each.

 7          THE COURT:  Good.  Let's do the two of them.

 8          MS. GREGOR:  The plaintiff calls Brian Maas.

 9          **BRIAN MAAS, PLAINTIFF'S WITNESS, SWORN**

10                    DIRECT EXAMINATION

11     BY MS. GREGOR:

12     Q    Good afternoon.

13     A    Good afternoon.

14     Q    Can you please state your name for the record.

15     A    Brian Wayne Maas.

16     Q    Where do you live?

17     A    Sacramento, California.

18     Q    What is your occupation?

19     A    I'm president of the California New Car Dealers

20     Association.

21     Q    Can you explain what the California New Car Dealers

22     Association is?

23     A    It's a trade association representing franchised new

24     car dealers in the state of California.  It's the largest

25     such state trade association in the country.

                    BRIAN MAAS - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 182 of 222 PageID #:61306
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 182 of 221

1-P-181

1   Q    What are the goals of the association?

2   A    We focus on two aspects.  First is advocacy.  We

3   lobby legislators and regulatory agencies in the state

4   capitol principally, although we assist on occasion in

5   Washington.  And we also do compliance work with our

6   dealers.  We do seminars.  We have legal hotlines for

7   them to call with questions about how to comply with the

8   various laws that apply to them.  We produce manuals that

9   are guidebooks for them to follow.

10  Q    How many dealers are in the association?

11  A    We have about 1,150 members out of approximately

12  1,300 franchised new car dealers.

13  Q    What is the size of the California auto market?

14  A    Approximately one out of every eight new cars sold

15  in the United States is sold in California.  Last year it

16  was just under 2.1 million new cars.

17  Q    How does the association know what issues are

18  important to its dealer members?

19  A    The structure of the association itself is a trade

20  association.  It's designed as a representative entity

21  for our members.  So they know that they can call us, let

22  us know what issues are happening, particularly as it

23  relates to how they do their business.  We have a board

24  of directors, executive committee, various legislative

25  and regulatory committees.  As I mentioned, we have a

                    BRIAN MAAS - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 183 of 222 PageID #:61307
Case: 3:07-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 183 of 221

1-P-182

1   hotline.  We do all kinds of seminars.  We're constantly

2   hearing from our dealers about the issues that are of

3   concern to them.

4   Q    Do you talk with dealers or associations from other

5   states?

6   A    We do.  There's an association of associations of

7   car dealers and we meet frequently, share ideas on

8   legislative issues, compliance issues, et cetera.

9   Q    In your experience, can you explain why dealers

10   would want to work with an integrator rather than pulling

11   the data from a DMS system themselves?

12   A    Dealers are in the business of selling and servicing

13   vehicles and they hire a whole range of experts to

14   perform functions for them.  Pulling data isn't something

15   that they're focused on, so they'd likely hire an expert

16   to assist them.

17   Q    Are you familiar with Authenticom's DealerVault

18   product?

19   A    I am.

20   Q    Outside of the testimony and demonstration that

21   you've seen today.

22   A    Yes.

23   Q    How so?

24   A    We developed a relationship with DealerVault shortly

25   after they came on the market.  We looked at their

BRIAN MAAS - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 184 of 222 PageID #:61308
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 183 of 221

1-P-183

1  product.  We beta tested it.  We talked to a number of

2  dealers.  And they thought it would be a fabulous product

3  to give them control over who accesses dealer

4  information.  It's a principle concern of my dealer

5  members.  They made it very clear to us they wanted tools

6  that would give them control over who could or who could

7  not get access to the information in their databases.

8  Q    You mentioned a relationship with Authenticom or

9  DealerVault just now.  What is that relationship?  Can

10  you explain?

11  A    So we have a series of vendors that we have

12  relationships with where we license the use of our name

13  and logo in exchange for royalty payments.

14  Q    And you have an opinion on the quality of the

15  DealerVault products?

16  A    Yes.  I think it's the best product in its market

17  space.  There's no user interface that's easier to use.

18  The fact that it limits by field, et cetera, as we saw in

19  the demonstration this morning, all the feedback that

20  we've heard from our dealer members it's a quality

21  product.

22  Q    You lived in Sacramento, but you traveled to Madison

23  to testify today.  Why is that?

24  A    Again, we heard from a number of dealers that they

25  care about the ability to use a product like a

BRIAN MAAS - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 185 of 222 PageID #:61309
Case: 3:07-cv-00918-jdp Document #: 162 Filed: 07/05/17 Page 184 of 221

1-P-184

1    DealerVault and we've heard a lot of angst amongst our

2    dealer body about the fact that DealerVault isn't able to

3    provide the quality of service that they had been

4    providing previously.  And as I've learned through

5    reading various pleadings in this case, apparently that's

6    because of changes in business practices of CDK and

7    Reynolds.

8    Q    We heard a lot of testimony today about security.

9    In your view as the president of the largest state

10   association of car dealers, how do dealers approach data

11   security?

12   A    It's a critical issue.  I saw the NADA memo that was

13   referenced earlier.  We repeatedly talk to our dealers

14   about data security.  We've done seminars on the topic.

15   California law is among the strictly in data security and

16   data breaches in the country on top of what federal law

17   already requires.  So our dealers care deeply about it.

18   They read the same news accounts we all do and they want

19   to make sure that they're doing what they can to protect

20   themselves and that's why we thought a relationship with

21   DealerVault made sense.

22   Q    Is it fair to say DealerVault is consistent with the

23   2013 NADA guidelines?

24   A    Yeah.  The purpose of those guidelines, which I've

25   read, are dealers take control of your data and do it in

                        BRIAN MAAS - DIRECT

Case: 1-18-cv-00864-Document #: 986-16 Filed: 05/20/20 Page 186 of 222 PageID #:61310
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 186 of 221

1-P-185

1    a way that you feel comfortable with.  Here's a series of

2    questions you should ask any vendor with whom you do

3    business.  And get the best answer you can get to those

4    questions.  And we felt that DealerVault was a vendor

5    that would provide great assistance in that regard.

6    Q    Have dealers ever complained to your association

7    about their systems being degraded by integrators like

8    Authenticom?

9    A    No.

10   Q    Have dealers ever complained to your association

11   with data security being negatively affected by

12   integrators like Authenticom?

13   A    No.

14           MS. GREGOR:  No further questions.  (5:47 p.m.)

15           THE COURT:  Cross-examination?

16           MS. GULLEY:  Yes, Your Honor.

17                    CROSS-EXAMINATION

18   BY MS. GULLEY:

19   Q    Good afternoon, Mr. Maas.  How are you?

20   A    Doing well.

21   Q    Good.  So the California New Car Dealers Association

22   has a license agreement with Authenticom; correct?

23   A    We do.

24   Q    With DealerVault.  I'm sorry.

25   A    Yeah.

                    BRIAN MAAS - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 187 of 222 PageID #:61311
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 186 of 221

1-P-186

1     Q    And how much does DealerVault pay your association a

2 year?

3     A    Less than $25,000.  We also have an agreement with

4 Reynolds and Reynolds.

5     Q    Right.  And so in other words -- so you don't have

6 an agreement with Reynolds and Reynolds related to the

7 DMS; correct?

8     A    No.  We have a relationship with their document

9 services.

10     Q    Right.  Nothing related to applications; right?

11     A    With document services, as I stated.

12     Q    Related to law forms related to California legal

13 forms; correct?

14     A    Correct.

15     Q    Right.  But DealerVault itself related to the issues

16 in this case pays you $25,000 a year; am I right?

17     A    Less than 25,000.

18     Q    And is that the only payment or are there other

19 payments associated with that contract?

20     A    That's it.

21     Q    Okay.  You believe that all 1,150 dealership members

22 of the California New Car Dealers Association should have

23 the ability to give their Reynolds DMS username and

24 passwords out; right?

25     A    I believe the dealers have the right to control

BRIAN MAAS - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 188 of 222 PageID #:61312
Case: 3:17-cv-00318-jdp  Document #: 162  Filed: 07/05/19  Page 187 of 221

1-P-187

1   their data.

2   Q    That's not my question.  My question is can they

3   give access to the system away by giving their username

4   and passwords out in your opinion?  Is that what you're

5   advocating?

6   A    I'm advocating that the dealers have control over

7   their data.

8   Q    Yeah, I understand sir.  But my question is this:

9   Is it your opinion or not that all 1,150 dealership

10  members of the California New Car Dealers Association

11  should have the ability to give their username and

12  passwords to the Reynolds DMS out to someone else?

13  A    That's up to the dealer to determine.

14  Q    So yes, it should be up to the dealer to determine

15  whether to give their username and passwords out?

16  A    It's the dealer's decision.  It's their data.

17  Q    So yes?

18          THE COURT:  I think he's answered yes.

19          MS. GULLEY:  Okay.  I didn't hear it.

20          THE COURT:  I think you got him.  He said yes.

21          MS. GULLEY:  Okay.  All right.  No more

22  questions.  Thank you.  (5:50 p.m.)

23          THE COURT:  Any redirect?

24          MS. GREGOR:  No, Your Honor.

25          THE COURT:  Thank you very much.  I don't know

                    BRIAN MAAS - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 189 of 222 PageID #:61313
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 188 of 221

1-P-188

1    whether to apologize or tell you to consider yourself

2    lucky that your testimony was so short.  Let's do one

3    more witness.

4           MR. NEMELKA:  Your Honor, we call Michael Korp.

5    And my colleague Josh Hafenbrack will examine him.

6           THE COURT:  Very good.

7           **MICHAEL KORP, PLAINTIFF'S WITNESS, SWORN,**

8                    <u>DIRECT EXAMINATION</u>

9    BY MR. HAFENBRACK:

10   Q    Good afternoon, Mr. Korp.  I guess it's good

11   evening.  Could you please state your full name for the

12   record.

13   A    Yeah.  It's Michael Korp.

14   Q    And where do you live, Mr. Korp?

15   A    In the Chicagoland area.

16   Q    What is your occupation?

17   A    I own a software company called Open Recalls and I

18   am the director of operations of the mid-size dealer in

19   Chicago.

20   Q    Okay.  Let's start on the software size.  When did

21   your company Open Recalls launch?

22   A    In midsummer of 2014.

23   Q    And what does Open Recalls do?

24   A    As you'll soon see on the news today, like Takata

25   they filed for bankruptcy.  We try and find open recalls

                    MICHAEL KORP - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 190 of 222 PageID #:61314
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 189 of 221

1-P-189

1   on cars that the repair hasn't been done yet.  So like in

2   the case of Takata, there's almost 40 million vehicles

3   that were affected, 16 deaths.  And like General Motors

4   in 2014 that made national news, you had about -- plus

5   150 deaths.  So we went and closed those campaigns.

6   Q    How many cars are on the road today with an

7   unresolved safety --

8   A    According to CARFAX 63 million.  It's about one out

9   of every four cars.

10  Q    And does your company, Open Recalls, focus on any

11  particular segment of that population?

12  A    Yeah.  Because the manufacturers -- there's

13  oversight over the manufacturers for the first 18 months

14  that they track a campaign and communicate with the

15  customers and we pick it up after that.

16  Q    So you focus on the older cars.

17  A    Correct.

18  Q    Fair to say that the cars with the older, unresolved

19  safety recalls are the hardest owners to track down?

20  A    Yes.

21  Q    And when you are able to track down a car owner who

22  is driving in a car with an unrecalled -- with a recalled

23  safety part, does that benefit the dealership?

24  A    Yeah, of course.  I mean it gives them a new

25  customer, and in a lot of cases, it gives them a customer

MICHAEL KORP - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 191 of 222 PageID #:61315
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 190 of 221

1-P-190

 1  that they haven't seen in many years and the manufacturer

 2  actually reimburses the dealer for the repairs.

 3  Q    To perform your services do you need access to

 4  dealer data?

 5  A    Yes.

 6  Q    What kind of data?

 7  A    Consumer data, vehicle data, repair data and dates

 8  that the services were performed.

 9  Q    How do you get that data?

10  A    We get it from Authenticom.

11  Q    Have you used Authenticom since the founding of your

12  company?

13  A    Yes.

14  Q    And still today?

15  A    Yes.

16  Q    What does Authenticom charge Open Recalls?

17  A    Per login is about $50, but if you -- it's $50.  If

18  you break it out per roof top, it comes to 35.

19  Q    So 35 per roof top.

20  A    Correct.

21  Q    And are you happy with Authenticom's service?

22  A    Very.

23  Q    Can you -- why is that?

24  A    Well, their DealerVault platform, that's safe, it's

25  secure, it's transparent between us and our dealers.

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 192 of 222 PageID #:61316
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 191 of 221

1-P-191

1    Q    After you launched Open Recalls in July 2014, did
2    your company experience early success?
3    A    We did.  So we went from three employees to nine
4    full-time employees.  We were campaigning to customers on
5    behalf of 30 dealers, with over 40 that were -- that we
6    had signed up.
7    Q    And were you able to track down some of these car
8    owners who were driving around on recalled safety parts?
9    A    Yes.
10   Q    How many?
11   A    So up until the spring, we were contacting about
12   40,000 unique consumers a month and at least 2,000
13   campaigns were being closed.
14   Q    So your company is doing well.  Did it encounter a
15   roadblock at some point?
16   A    Yes.
17   Q    When was that?
18   A    I remember -- I don't remember the exact date, but I
19   remember it being a Wednesday in March of 2015.  My
20   business partner and I came out of a breakfast we were
21   having and I checked my email for some reason and we had
22   gotten emails from Authenticom that our users per
23   Reynolds had been disabled.
24   Q    Your usernames and logins had been disabled.
25   A    Correct.

MICHAEL KORP - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 193 of 222 PageID #:61317
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 192 of 221

1-P-192

```
 1    Q    What company did that?

 2    A    Reynolds and Reynolds.

 3    Q    How significant of a problem was this for your

 4    business?

 5    A    It was devastating.

 6    Q    Can you explain why?

 7    A    Well, one, we couldn't get the data that we needed

 8    to bill the dealers.  So we're strictly a

 9    pay-for-performance.  We're not -- we don't have monthly

10    licensing fees for what we do.  So it pretty -- I mean we

11    were -- we pretty much shut down operations once we

12    realized the extent of the problem.  And Reynolds'

13    stance, we stopped marketing and kept three employees

14    that were vital until we could figure a way around it.

15    Q    So you laid off six employees?

16    A    Correct.

17    Q    And at this time in 2015 was CDK blocking your

18    access to dealer data?

19    A    No.

20    Q    Did that change?

21    A    Yes, it did.

22    Q    When did that change?

23    A    I want to say August of 2016.

24    Q    And throughout all this time you're always getting

25    the data through Authenticom; is that correct?
```

MICHAEL KORP - DIRECT

1    A      Correct.

2    Q      So CDK -- we're in August 2016 now.

3    A      Throughout my entire career, no matter what dealer

4    group I worked for or ran, I always used Authenticom to

5    pull our data.

6    Q      Thank you for that clarification.

7    A      You're welcome.

8    Q      So August 2016, CDK then began blocking your

9    Authenticom-provided access; is that correct?

10   A      Correct.

11   Q      Can you please describe the effect that has had on

12   your business?

13   A      In the beginning it wasn't as devastating as what

14   happened with Reynolds because it started off slower

15   where they went after our smaller dealers and our smaller

16   dealer groups.  Then it intensified over time wherein as

17   a whole, it's been extremely damaging to our business.

18   Q      Did the blocking you've described here this

19   afternoon, has it harmed innovation in the auto industry?

20   A      Absolutely.

21   Q      How so?

22   A      A lot of services that these DMS companies do not

23   provide, whether you have your kids in your garages there

24   building software to make our business better --

25             THE COURT:  You're going to have to slow down

                    MICHAEL KORP - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 195 of 222 PageID #:61319
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 194 of 221

1-P-194

just a little bit.  I know we're all eager to get out of
here, but you'll have to slow down a little bit so I can
follow you and the court reporter can get it too.  So
you're talking about the services that the DMS companies
do not provide.

         THE WITNESS:  Correct.  So there's obviously --
there's gaps in technology in my opinion in our business.
So whether you have big box retailers that deal with,
like, attribution model and things like, they want to
come in the industry, they need transactional data.  But
if they're going to pay high fees and can only get $800
or $1000 a month for our software, they're not going to
enter our industry because they can't make money.  Then
you have the kids that are coding in the garage that are
building -- there's a company right now that's in -- a
CDK or they're moving to a 3PA Program, I mean they build
algorithms that are totally based on how many phone calls
you get where your cars are priced, what clicked on
tenacities on the internet, how many cars you'll sell
that month or that day.  And those companies just can't
compete paying those fees.
BY MR. HAFENBRACK:
Q    After the blocking by Reynolds and CDK, did you
consider purchasing data integration directly from CDK
and Reynolds?

                    MICHAEL KORP - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 196 of 222 PageID #:61320
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 196 of 222

1-P-195

1    A    Yes.

2    Q    Why didn't you?

3    A    Because of the expense.

4    Q    If Authenticom goes out of business, what will

5    happen to Open Recalls?

6    A    We're going to go out of business.

7    Q    Why is that?

8    A    Because we can't afford it.

9    Q    I'd like to switch very briefly and discuss -- you

10   mentioned a car dealership, Ghaben Auto Group; is that

11   correct?

12   A    Correct.

13   Q    And you're the director of operations there?

14   A    Yes.

15   Q    What is the Ghaben Auto Group?

16   A    We have five stores throughout the Chicagoland area.

17   Q    And who is the Ghaben Auto Group's DMS provider?

18   A    CDK.

19   Q    Since when?

20        THE COURT:  Can you tell us the name of that?

21   What's the name of that?

22        THE WITNESS:  It's Ghaben Auto Group.

23        THE COURT:  Can you spell it for us?

24        THE WITNESS:  G-h-a-b-e-n.

25        THE COURT:  G-h-a-b-e-n.

MICHAEL KORP - DIRECT

Case: 1-18-cv-00864-Document #: 986-16-Filed: 05/20/20 Page 197 of 222 PageID #:61321
Case: 3-17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 196 of 221

1-P-196

1          THE WITNESS:  Correct.

2          THE COURT:  Thank you.

3   BY MR. HAFENBRACK:

4   Q     And you've been with CDK since 2004?

5   A     Correct.

6   Q     And does the Ghaben Auto Group use software vendors

7   like we've been discussing here today to help you sell

8   and service cars?

9   A     Yes.

10  Q     About how many?

11  A     About a dozen.

12  Q     And can you please describe maybe an example or two

13  of the kind of functions they perform?

14  A     Accounting, telling us what cars to buy, how to

15  price them, advertising our cars like on CARFAX that we

16  talked about earlier today, key performance indicator

17  software to make sure that we're buying well.

18  Q     Do some of your vendors use Authenticom to pull your

19  data?

20  A     Yes.

21  Q     When they do that, do you authorize Authenticom to

22  pull your data?

23  A     Yes.

24  Q     When Authenticom pulls your data, do they act as

25  your agent?

                    MICHAEL KORP - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 198 of 222 PageID #:61322
Case: 3-17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 197 of 221

1-P-197

1    A    Yes.

2    Q    As a dealer, do you ever put social security

3    information on your DMS?

4    A    No.

5    Q    As a dealer, do you ever put credit card information

6    on your DMS?

7    A    No.

8    Q    As a dealer, do you ever driver's license

9    information on your DMS?

10   A    No.

11   Q    Has CDK blocked your ability to provide data to

12   Authenticom?

13   A    Yes.

14   Q    When did that start?

15   A    Same time in -- same time as for Open Recalls in

16   August of 2016.

17   Q    Does that continue today?

18   A    Yes.

19   Q    Has it hurt your business?

20   A    Yes.

21   Q    How so?

22   A    So some of the vendors that were providing data to

23   us chose to stop providing us with those software

24   programs because they were not going to go into the

25   integration programs or the data integration programs.

MICHAEL KORP - DIRECT

1　And then the ones that went and moved over that had to

2　recode or were taking data that was coming in a different

3　format as -- we had cars not on the internet, we had cars

4　not priced right.  We had just a loss of being able to

5　that make a decision as to what cars to buy, what to pay

6　for them, what to sell them for, when to move them.

7　Q     In today's world, if the car is not on the internet

8　you can't sell it; is that right?

9　A     That's correct.  Right.

10　Q     Do you have any vendors that received data

11　integration directly from CDK?

12　A     Yes.

13　Q     Are you aware of whether those vendors passed

14　through the data fees they paid to CDK to your

15　dealership?

16　A     I can tell you one specific instance.

17　Q     Please do.

18　A     So at NADA in New Orleans this year I signed a

19　contract with Cox Automotive.  And on their pricing

20　sheet, although it doesn't use the words CDK and Reynolds

21　in writing, they ask you are you a CDK or Reynolds dealer

22　and then they check the box if you are and then you pay a

23　$600 data integration fee a month.

24　Q     So 600 more if you're with CDK and Reynolds as

25　opposed to any other DMS.

MICHAEL KORP - DIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 200 of 222 PageID #:61324
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 199 of 221

1-P-199

```
 1   A    That's correct.

 2             THE COURT:  Per month you said?

 3             THE WITNESS:  Yes.

 4             THE COURT:  And what does Cox Automotive provide

 5   you?

 6             THE WITNESS:  Do have Auto Trader, DealerTrack,

 7   those talked about earlier today.  They own Manheim Auto

 8   Auctions.

 9   BY MR. HAFENBRACK:

10   Q    Cox is the largest automotive vendor in the country,

11   is they not?

12   A    That's correct.  That's right.

13   Q    As a dealer, Mr. Korp, are you capable of making

14   decisions about the data security of your dealership's

15   data?

16   A    Yes.

17   Q    Would you ever do business with a company that you

18   risked your data security?

19   A    No.

20             MR. HAFENBRACK:  No further questions.

21             THE COURT:  Before you leave off, you said you

22   were able to track down 40,000 unresolved recalls per

23   month; is that right?

24             THE WITNESS:  At the time we were contacting

25   40,000 unique.
```

MICHAEL KORP - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 201 of 222 PageID #:61325
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 200 of 221

1-P-200

         1            THE COURT:  That's 40,000 cars you're talking

         2    about; is that right?

         3            THE WITNESS:  Yeah.  Correct.

         4            THE COURT:  Okay.  And then you said 2,000

         5    campaigns being closed.  So that means you got a recall

         6    on some defective switch that might cause a fire or

         7    something like that, that's a campaign?

         8            THE WITNESS:  Right.

         9            THE COURT:  2,000 of those got closed because

        10    you tracked down every last one?  Or what does it take to

        11    close the campaign?

        12            THE WITNESS:  In our business, like it's open if

        13    it hasn't been completed on that car and then it's closed

        14    if it's just that car, not the entire campaign.

        15            THE COURT:  Okay.  So 2,000 of them got closed

        16    so --

        17            THE WITNESS:  We are dealing with a dealer base;

        18    right.

        19            THE COURT:  So 2,000 campaigns.  Is that per

        20    month?

        21            THE WITNESS:  Yes.

        22            THE COURT:  So you got 40,000 contacts and then

        23    that produced 2,000 basically recall service engagements.

        24            THE WITNESS:  Right.    (6:02 p.m.)

        25            THE COURT:  Okay.  I got it.  Cross-examination.

                           MICHAEL KORP - DIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 202 of 222 PageID #:61326
Case: 3:07-cv-00319-jdp Document #: 162 Filed: 07/05/17 Page 201 of 221

1-P-201

1          MS. GULLEY:  Thank you.

2                    CROSS-EXAMINATION

3   BY MS. GULLEY:

4   Q    Good afternoon, Mr. Korp.  What DMS data do you pay

5   Authenticom for?  The category.

6   A    Are we talking Open Recalls or for the --

7   Q    I'm sorry.  Yeah, for Open Recalls.  I'm thinking

8   it's probably information about the customers --

9   A    Correct.

10  Q    -- how to find the customers.  Is there anything

11  else?

12  A    The repair, when it was performed, the op codes.

13  Q    So repair --

14  A    Customer contact information.

15  Q    So it's basically repair information and customer

16  contact information.  How frequently do you need it?  It

17  doesn't sound like it's a real-time situation.

18  A    We used to get it overnight.

19  Q    So what --

20  A    Before we got blocked, we could call the dealer and

21  alert them and say hey, let our car out of service

22  without before performing the recall campaign.

23  Q    So it's the kind of thing that you could do once a

24  day; right?

25  A    Correct.

                    MICHAEL KORP - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 203 of 222 PageID #:61327
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 203 of 221

1-P-202

1    Q    What you've heard called batch.  Is that not a

2    familiar term to you?

3    A    No, I know what that is.

4    Q    So it's that kind of service.  Okay.  And you're

5    paying -- your declaration had said you paid a 200 to

6    $300 one-time fee plus 50 to $65 a month.  And then today

7    you've amended that to be around $35 a roof top?

8    A    No, I'm not amending it.  That was a setup fee

9    initially.  He didn't ask me about it.  The $65 that I

10   alluded to was before they switched to Dealer -- before

11   they switched to the new product.

12   Q    But now in terms of you said you had -- in terms of

13   the employees at the Auto Group where you are -- am I

14   saying this right?  Ghaben?

15   A    Ghaben.

16   Q    Ghaben.  I'm sorry.  The Ghaben Auto Group.  Now, do

17   you have personnel and IT?

18   A    We have an outside company.

19   Q    Who's that?

20   A    It's an outside IT company --

21   Q    So --

22   A    -- we work with.

23   Q    -- you have an agent to do your IT and cybersecurity

24   and that's an outside firm.  It's not Authenticom, it's

25   like a cybersecurity firm.

MICHAEL KORP - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 204 of 222 PageID #:61328
Case: 3:07-cv-00313-jdp Document #: 162 Filed: 07/08/10 Page 203 of 221

1-P-203

1   A    No, they're more network.

2   Q    A network IT-type agent.

3   A    Right.

4   Q    So in terms of -- going back to the data that you

5   need from Authenticom.  So in terms of customers and

6   repair orders, you do understand that dealers have the

7   right to give you that data directly for free; right?

8   A    No.

9   Q    You don't understand that.

10  A    No.

11  Q    Well, you're not a Reynolds dealer.  Your auto group

12  doesn't --

13  A    I've used Reynolds for years, so I would consider

14  myself an expert on Reynolds.

15  Q    So you don't believe that they can give you customer

16  information and information about repairs by publishing

17  that data through a reporting process and sending it

18  directly --

19  A    No.  Reynolds has never made -- with the dealers

20  that I work with -- actually your older system, UCS on

21  Reynolds' platform, those are the only people that pushed

22  with Authenticom on our behalf.

23  Q    But you don't -- so basically you don't know one way

24  or another whether this -- all this testimony about

25  Dynamic Reporting could work for you?  You've never

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 205 of 222 PageID #:61329
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 204 of 221

1-P-204

1  investigated that?

2  A    No.

3  Q    Okay.  And you serve 40 dealerships right now

4  according to your declaration.  Is that roof tops?

5  A    At the time we did.

6  Q    This is around that now?

7  A    Yeah, it's around that now.  It's more.

8  Q    And there are more than 4,000 dealerships in America

9  that do not use CDK or Reynolds.  You could go after them

10 right now; correct?

11 A    Correct.

12 Q    You said that there were --

13 A    Can I answer the previous question about Dynamic

14 Reporting?  I mean what it sounds from sitting here today

15 that the solution is to have dealership employees to FTP

16 the data to Authenticom to solve it, then my opinion is

17 the dealer doesn't work.

18 Q    But you don't know whether they could just FTP it

19 straight to you, do you?

20 A    I'm unaware.

21 Q    So you don't know how Dynamic Reporting works;

22 you've never investigated getting the data for free;

23 whether sending it to Authenticom and paying them or

24 giving it straight to you for free, you just don't have

25 any idea; right?

MICHAEL KORP - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 206 of 222 PageID #:61330
Case: 3:07-cv-00018-jdp Document #: 162 Filed: 07/05/10 Page 206 of 221

1-P-205

1    A    Correct.

2    Q    Okay.  All right.  You said that there were too high

3    of fees to enter the RCI Program.  Have you ever filled

4    out a perspective RCI participant form?

5    A    No.

6    Q    You have no idea what the fees are that they would

7    charge, do you?

8    A    I do from conversations that I had with Reynolds

9    years ago before I even started Open Recalls.

10   Q    What year was that?

11   A    I don't remember.

12   Q    Was it more than five years ago?

13   A    I don't remember.

14   Q    Could it --

15   A    I'm sorry.

16   Q    You just don't know what the RCI prices would have

17   been charged to you, do you?

18   A    No.  I mean I have a good idea what it would be

19   based on under feedback that we have in our community

20   and --

21   Q    But you've never taken the time to find out; right?

22   A    Not since we started Open Recalls, no.

23   Q    Okay.  Are there any relatives of Mr. Cottrell's

24   employed by the Ghaben group?

25   A    No.

                    MICHAEL KORP - CROSS

Case: 1-18-cv-00864-Document #: 986-16 Filed: 05/20/20 Page 207 of 222 PageID #:61331
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 206 of 221

1-P-206

 1  Q    You've never heard of Jennifer Cottrell?

 2  A    I know a Jennifer -- oh, that's true.  Jennifer

 3  Cottrell, yes.

 4  Q    Who's that?

 5  A    Jennifer Cottrell?  She's the office manager for our

 6  Mazda store.

 7  Q    Okay.  Do you know if she's any relation to --

 8  A    Oh, no.

 9  Q    Okay -- Mr. Cottrell.  Sorry.  Okay.  All right.  So

10  in paragraph 17 of your declaration, you say that if

11  Authenticom goes out of business, there's no way you can

12  get the data.  You've said something similar today.  But

13  you don't know or didn't even know whether you could get

14  the data from Reynolds through other processes, including

15  through RCI or Dynamic Reporting; correct?

16  A    Can you ask me that again?  I'm sorry.

17  Q    You don't know as you sit here today whether you

18  could afford RCI or whether you could get it from Dynamic

19  Reporting; isn't that right?

20  A    I wouldn't say that.

21  Q    You don't have any personal knowledge; right?

22  A    I wouldn't say that.

23       MS. GULLEY:  Well, we'll just stand on the

24  testimony you've given.  Thank you.

25

MICHAEL KORP - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 208 of 222 PageID #:61332
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 207 of 221

1-P-207

1

CROSS-EXAMINATION

2

3  BY MR. PROVANCE:

4  Q    Good afternoon, Mr. Korp.  My name is Matt Provance.

5  I represent CDK.

6  A    Hi, Matt.

7  Q    Let's start with Open Recalls.  You testified with

8  Ms. Gulley that you had never applied to the RCI Program.

9  Is it also true that you've never applied to the CDK and

10  3PA program?

11  A    Correct.

12  Q    And is it fair to say that the only reason you

13  haven't applied is because you don't like the price?  You

14  think the prices are too high?

15  A    No.

16  Q    That's not fair to say?

17  A    That that's the only reason?

18  Q    Yeah.  That's --

19  A    No, that's not the only reason.

20  Q    Why haven't you applied to the --

21  A    As a dealer, to be told that I cannot give out my

22  data to a third party --

23  Q    Hold on a second.  I'm asking you about Open

24  Recalls, just to be clear.

25  A    Okay.

MICHAEL KORP - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 209 of 222 PageID #:61333
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/19 Page 208 of 221

1-P-208

1   Q    And I asked you if there was any other reason

2   besides the price why you haven't applied to the 3PA

3   Program --

4   A    That's the other reason.

5   Q    -- on behalf of Open Recalls.  And that's because

6   why?

7   A    Because as a dealer we should be able to send our

8   data to Authenticom.

9   Q    So you have an issue with the program in principle

10  as a dealer.

11  A    Correct.

12  Q    Not as a vendor.

13  A    Can you rephrase that?

14  Q    Just to be clear, you have an issue with the program

15  in principle as a dealer.

16  A    Correct.

17  Q    It doesn't affect how it -- how the service you

18  receive as a vendor --

19  A    I feel the same way as a vendor.  If the dealer

20  grants me access through a third-party as an agent to

21  collect their data from, yeah, it bothers me on both

22  sides whether I'm a dealer or a vendor.

23  Q    Sir, isn't it true that the Ghaben Auto Group just

24  signed a new DMS contract with CDK?

25  A    Yes and no.

MICHAEL KORP - CROSS

Case: 1-18-cv-00864-Document #: 986-16 Filed: 05/20/20 Page 210 of 222 PageID #:61334
Case: 3:17-cv-00318-jdp   Document #: 162   Filed: 07/05/17   Page 209 of 221

1-P-209

 1   Q     Yes, it signed a contract?

 2   A     Yes.

 3   Q     And that was a few weeks ago; correct?

 4   A     No.  It was a few months ago.  It was in April.

 5   Q     The contract was signed in April?

 6   A     That's correct.

 7   Q     Okay.  And it was signed by CDK at a later time?

 8   A     I think June 9th.

 9   Q     Okay.  So there's a new contract in place; correct?

10   A     That's correct.

11   Q     And --

12         THE COURT:  You said yes and no.  What's the no

13   part?

14         THE WITNESS:  What?

15         THE COURT:  You said yes and no.  What's the no

16   part?

17         THE WITNESS:  I mean, the no part is it's not in

18   the contract.  So when you do a new contract with ADP,

19   you usually do five-year terms.  So there was 30 months

20   left in our term.  They asked us to extend it.  We said

21   no.  And it was over this issue that we're talking about

22   today.  So we added a store.  There's 30 months left and

23   we're exploring our options.

24   BY MR. PROVANCE:

25   Q     Excuse me, you're exploring your options?

                    MICHAEL KORP - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 211 of 222 PageID #:61335
Case: 3:07-cv-00315-jdp Document #: 162 Filed: 07/05/11 Page 21 of 22

1-P-210

1   A   Um-hmm.

2   Q   So you may go with a new DMS provider.

3   A   We're exploring our options.

4   Q   Sure.  And I think you mentioned that you had signed

5   a contract with Cox Automotive; correct?

6   A   Correct.

7   Q   And that was at an NADA conference earlier this

8   year?

9   A   Correct.

10   Q   And that contract was with respect to what?

11   A   Same thing we're talking about right now.

12   Q   I'm sorry, what is the same thing that we're talking

13   about right now?

14   A   DMS data, CRM data.

15   Q   So you had signed a contract with Cox Automotive for

16   DMS?

17   A   CRM.

18   Q   Oh, for CRM.

19   A   Correct.

20   Q   And that's an application that you would use in

21   connection with DMS?

22   A   Well, you're DMS.  That's why there's a data fee of

23   $600.  If I use their DMS, there wouldn't be any.

24   Q   Correct.  So they were very interested in having you

25   use their DMS, weren't they?

MICHAEL KORP - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 212 of 222 PageID #:61336
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 211 of 221

1-P-211

1   A    Of course.

2   Q    And that's one of the options that you're now

3   exploring; correct?

4   A    Right, of course.

5   Q    And there's other options too; right?

6   A    Not many, but yeah.

7   Q    But there's a couple other and you're exploring

8   them.

9   A    Yes.

10  Q    Now, back to the contract that you just signed with

11  CDK.  You're aware, sir, right, that there are provisions

12  in that contract that prohibit Ghaben from sharing access

13  to that DMS with third parties, are you not?

14  A    We are not.  As of yesterday, the gentleman that

15  signed it from the dealer group, I found out from

16  Authenticom's legal team yesterday that you guys had made

17  it an exhibit.  I read it.  I contacted Joe, and I said

18  "Did you realize that they changed the terms of our

19  agreement?"  Because we were just supposed to add a

20  store.  And he said "No."  I said why -- "Didn't you read

21  it?"  He goes "No."  He was, like, I got an electronic

22  version of the document, signed it, and moved on.  So we

23  didn't realize that you guys actually restated the

24  material language in our new contract because it wasn't

25  supposed to be brand new as a new term.

MICHAEL KORP - CROSS

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 213 of 222 PageID #:61337
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 213 of 221

1-P-212

```
 1   Q    So your testimony is that the language in the
 2   contract that prohibits third-party access is new; is
 3   that right?
 4   A    Correct.  The verbiage of the contract?  Yes.
 5   Q    The provision in the contract that prohibits
 6   third-party access you're saying is new; right?
 7   A    In my opinion, yes.
 8        MR. PROVANCE:  Your Honor, I'd like to show the
 9   witness some exhibits I have here in binders.
10        THE COURT:  Okay.  While we're getting squared
11   away with the binders, why wouldn't it work to use the
12   Dynamic Reporting to get the information out of the
13   Reynolds DMS system and use it?
14        THE WITNESS:  I'm not all that familiar with it,
15   just pretty much what we've heard today.  And it sounds
16   like we're saying that instead of having a few companies
17   in control of it and pulling the data, that we're going
18   to have each dealership push data to Authenticom.  So to
19   me, they're talking about replacing a few players in the
20   market with 10, 12, 15,000 employees pushing data doesn't
21   make sense to me.  Seems a lot less secure.
22        THE COURT:  Okay.  Go ahead.
23   BY MR. PROVANCE:
24   Q    Mr. Korp, if you could flip to defendants' Exhibit
25   13.  Do you recognize that as the most recent CDK MSA?
```

MICHAEL KORP - CROSS

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 214 of 222 PageID #:61338
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 213 of 221

1-P-213

1    A    I didn't review it until yesterday, so no, I do not.

2    Q    Okay.  If you could flip, sir, to page --

3         MR. PROVANCE:  Your Honor, we would move to

4    introduce this as an exhibit and I wouldn't have further

5    questions about it if there's no objection.

6         MR. HAFENBRACK:  No objection.

7         THE COURT:  All right.  Let's move it in.  This

8    is defendants' Exhibit 13 and it's admitted.

9         MR. PROVANCE:  And I would have the same request

10   with respect to defendants' Exhibit 11 and 12.  I have no

11   questions unless there's on objection.

12        MR. HAFENBRACK:  No objection, Your Honor.

13        THE COURT:  All right.  11 and 12 are also in.

14   Very efficient.  Thank you.

15        MR. PROVANCE:  Thank you.  We'll pass the

16   question.

17        MR. HAFENBRACK:  I just have a couple questions

18   on redirect, Your Honor.

19        THE COURT:  Okay.

20                  REDIRECT EXAMINATION

21   BY MR. HAFENBRACK:

22   Q    Does Authenticom standardize the data that you get

23   from many different DMS providers?

24   A    Yes.

25   Q    And is that valuable service to you?

                   MICHAEL KORP - REDIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 215 of 222 PageID #:61339
Case: 3-17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 215 of 221

1-P-214

```
 1   A     For sure.  Absolutely.

 2   Q     Why is that?

 3   A     We don't have to worry about it.  We get it, we

 4   import it in the database and move forward every day.

 5   Q     And did I understand your testimony earlier that

 6   Authenticom has actually lowered the price it charges you

 7   since you signed up in 2014?

 8   A     Yes.

 9   Q     You mentioned you are -- you are considering

10   switching DMS providers in your contracts within 30

11   months; is that right?

12   A     Yes.

13   Q     And that's because of the pain CDK is inflicting on

14   you; is that right?

15   A     Absolutely.

16   Q     Is it difficult to switch DMS providers from your

17   standpoint?

18   A     Very, yes.

19   Q     And why that?

20   A     I mean it changes everything about your dealership.

21   I mean it's -- the last time we did it, we just moved

22   from -- we've moved from one of CDK's Legacy applications

23   to their new drive system and you were behind for a good

24   six, seven, eight months.

25   Q     So fair to say you have to -- you have to really
```

MICHAEL KORP - REDIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 216 of 222 PageID #:61340
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 216 of 221

1-P-215

1   want to switch to --

2   A    Oh, yeah.  You definitely have to want to switch to

3   switch.

4   Q    There was talk earlier of a provision about

5   unauthorized access.  Is Authenticom pulling data with or

6   without your authorization?

7   A    Rephrase that.

8   Q    Does Authenticom have your authorization to pull

9   your data at your dealerships?

10  A    Yes.

11  Q    Are they unauthorized in your view?

12  A    No.

13        MR. HAFENBRACK:  No further questions.

14        THE COURT:  All right.  Thank you, Mr. Korp.

15  You can step down.

16        MS. GULLEY:  Your Honor, can I ask one thing?

17                 RECROSS-EXAMINATION

18  BY MS. GULLEY:

19  Q    Do you know whether or not Reynolds objects -- do

20  you know that Reynolds does not object to Authenticom

21  standardizing data for you?  Do you know that?

22  A    No.

23  Q    And in terms of switching, you've said last time, so

24  you've already switched once and you're thinking about

25  switching again; right?

                MICHAEL KORP - REDIRECT

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 217 of 222 PageID #:61341
Case: 3-97-cv-00319-jgp Document #: 165 Filed: 07/05/17 Page 2 of 222 ID #:21

1-P-216

1   A     Switching what?

2   Q     DMS providers.

3   A     No.  We went CDK to CDK.  We were on a Legacy CDK

4   system.  We needed to upgrade.

5   Q     So you went through the whole switch and now you're

6   thinking about going through it again.

7   A     Yes.

8         MS. GULLEY:  Okay.  Nothing further.

9         THE COURT:  All right.  Thank you, Mr. Korp.

10       (Witness excused at 6:17 p.m.)

11        THE COURT:  I'm going to ask counsel to just

12  kind of update me on where we are on the progress of

13  getting through the evidence.  As I recall, you also

14  wanted to make closing arguments to me as well.

15        MS. GULLEY:  That's correct.

16        MR. RYAN:  Perhaps the plaintiff should go

17  first, what they have left.

18        THE COURT:  That's a good idea.  Looks like

19  they're thinking about it.  If you guys need to confer

20  about how long you're going to take --

21        MS. GREGOR:  May we have a moment?

22        THE COURT:  Yes.  And if you need time to confer

23  on your side because it will be your turn soon enough,

24  figure out how much time you're going to need.

25       (Pause)

MICHAEL KORP - REDIRECT

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 218 of 222 PageID #:61342
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 2 of 6 61342

1-P-217

1          MS. GREGOR:  We're ready whenever everyone is.

2     I'll just say that we have five witnesses left.  Three

3     will be very short examinations of nonparty witnesses,

4     fact witnesses, and the remaining two are two experts

5     that have submitted declarations.

6          THE COURT:  Okay.  All right.  And so where are

7     we on the clock?  I assume that you kind of figured out

8     how much time you have for a two-day hearing and you know

9     how much time you have left.

10          MS. GREGOR:  Here is our calculation is

11     Authenticom clocking in at 3 hours and 25 minutes and the

12     defendants clocking in at 3 hours and 57 minutes.

13          THE COURT:  Okay.

14          MS. GREGOR:  I think there may have been a

15     little bit of time -- there's an app for this as it turns

16     out.  There's a chess clock app.

17          THE COURT:  Good.  Excellent.

18          MS. GREGOR:  And there's 16 minutes of

19     unaccounted time, possibly court questions.  I'm not

20     actually sure.  It's some sort of third category.

21          THE COURT:  I gave you an extra hour-and-a-half

22     today; so...

23          MS. GREGOR:  Yes.  We -- we'll put it wherever

24     you want it.

25          MS. GULLEY:  We'll do the clock afterwards.

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 219 of 222 PageID #:61343
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 219 of 222

1-P-218

 1    We've got a different amount.

 2              MS. MILLER:  I'm not sure.

 3              MS. GULLEY:  Can you tell me who your five

 4    witnesses are?  I only count you have four left.

 5              MR. NEMELKA:  Wayne Fitkin.  We have Dominion.

 6    We have Auto Leep, Gordon Klein, and Hal Singer.

 7              MS. GULLEY:  Okay.  Got it.

 8              THE COURT:  So how much time do you have left by

 9    your calculation?  I know there's a dispute about it,

10    but...

11              MS. GREGOR:  Three-and-a-half to four hours

12    includes closing and cross.

13              THE COURT:  Okay.  So you have three-and-a-half?

14    Okay.  So that means that defendant must have

15    three-and-a-half.

16              MS. GULLEY:  Well, just to be clear, when you

17    say five, that's just they have five witnesses left for

18    the plaintiff's case.  And then the defendants have six

19    witnesses in their case.

20              THE COURT:  I assumed you'd have some witnesses.

21              MS. GULLEY:  You're right.

22              THE COURT:  But just by rough measure then, just

23    in terms of time left, we're probably talking about

24    three-and-a-half to four hours then you have for your

25    case.

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 220 of 222 PageID #:61344
Case: 3:17-cv-00313-jdp Document #: 162 Filed: 07/05/17 Page 219 of 221

1-P-219

1      MS. GULLEY:  Yeah, and we'll work it out by
2   email.  Basically, yes.
3      THE COURT:  And so how many witnesses do you
4   have?
5      MS. GULLEY:  We have six.
6      THE COURT:  Okay.  So if my math is correct,
7   that means 11 witnesses for tomorrow.
8      MS. GULLEY:  It's ambitious.
9      THE COURT:  Well, we burned through a lot here
10  in the last 45 minutes.  So if we go at that pace, that
11  would be good.  The experts are a load, and so I would
12  suggest that, you know, I don't want to flatter myself,
13  but you don't need to repeat it quite as much as you
14  would if you were talking to a jury.  So there's a lot of
15  redundant testimony today.  So if you can just eliminate
16  the redundant testimony, I'm sure we can get this done.
17  And so let's think about that for tomorrow, and then I
18  will try to guide you by letting you know when I -- I
19  tried to do that some today.  I probably could have been
20  a little bit more aggressive when I was getting bored.
21  But I'll try to do that more tomorrow so you can move on.
22  But I'll direct you now, especially with the experts,
23  move them along more quickly.  I get the ideas.  Then I
24  think we'll get it in.
25      So how much time -- remind me how much time you

Case: 1-18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 221 of 222 PageID #:61345
Case: 3-27-cv-00318-jgb Document #: 162 Filed: 07/05/21 Page 220 of 221

1-P-220

1    reserved for your closing arguments.

2            MR. SCHWARZ:  I think we were going to see how

3    much time we had left.

4            THE COURT:  Whatever you had left.  Okay.

5            MS. MILLER:  We were capped at 30 minutes each,

6    Your Honor.

7            THE COURT:  Okay.  Thirty minutes was what you

8    had in mind.  Okay.  I would appreciate your closing

9    arguments, so I don't want those to get short shrift.

10   And so let's figure on doing that.

11       And we're starting -- we're starting -- what did I

12   say?  Eight o'clock?  We're starting at eight o'clock, so

13   be prepared for a little bit longer day.  So if we have

14   to go to 6, we can.  I'm not telling you to do that, but

15   I'm just saying that I want coherent closing arguments.

16   I think that will be useful to me.  So I want to have at

17   least an hour for that.

18           MS. GREGOR:  Understood.  Thank you.

19           THE COURT:  Al right.  That's a good road map

20   for tomorrow.  So enjoy the evening if that's possible,

21   and we'll see you at eight o'clock tomorrow.

22       (Proceedings concluded at 6:22 p.m.)

23

24

25

Case: 1:18-cv-00864 Document #: 986-16 Filed: 05/20/20 Page 222 of 222 PageID #:61346
Case: 3:17-cv-00318-jdp Document #: 162 Filed: 07/05/17 Page 222 of 222

1-P-221

1

2        I, LYNETTE SWENSON, Certified Realtime and

3  Merit Reporter in and for the State of Wisconsin, certify

4  that the foregoing is a true and accurate record of the

5  proceedings held on the 26th day of June 2017 before the

6  Honorable James D. Peterson, District Judge for the

7  Western District of Wisconsin, in my presence and reduced

8  to writing in accordance with my stenographic notes made

9  at said time and place.

10  Dated this 30th day of June 2017.

11

12

13                        /s/_____

14                        Lynette Swenson, RMR, CRR, CRC

                          Federal Court Reporter

15

16

17

18  The foregoing certification of this transcript does not

19  apply to any reproduction of the same by any means unless
    under the direct control and/or direction of the
    certifying court reporter.

20

21

22

23

24

25