# EXHIBIT 96

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

AUTHENTICOM, INC.

        Plaintiff,

-vs-                         Case No. 17-CV-318-JDP

CDK GLOBAL, INC., LLC      Madison, Wisconsin
and THE REYNOLDS and       June 27, 2017
REYNOLDS COMPANY,        1:50 p.m.

        Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT-SECOND DAY OF EVIDENTIARY HEARING
**AFTERNOON SESSION**
    HELD BEFORE THE HONORABLE JAMES D. PETERSON,

APPEARANCES:

For the Plaintiff:
        Godfrey & Kahn S.C.
        BY:  JENNIFER GREGOR
        One East Main Street, Ste. 500
        Madison, Wisconsin  53703

        Kellogg, Hansen, Todd, Figel & Frederick, PLLC
        BY:  MICHAEL NEMELKA
            AARON PANNER
            DAVID SCHWARZ
            DEREK HO
            JOSHUA HAFENBRACK
            KEVIN MILLER
            JOHANNA ZHANG
       1615 M Street, NW, Ste. 400
        Washington, DC  20036

Also present:  Stephen Cottrell - Authenticom president
              Steve Robb - IT technician

        Lynette Swenson   RMR, CRR, CRC
      U.S. District Court Federal Reporter
       120 North Henry Street, Rm. 520
        Madison, Wisconsin  53703

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 3 of 266 PageID #:61349
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 3 of 266

2-P-2

```
 1   APPEARANCES CONTINUED:

 2   For Defendant CDK Global, LLC:

 3               Foley & Lardner
                 BY:  JEFFREY SIMMONS
 4               150 East Gilman Street
                 Madison, Wisconsin  53703
 5
                 Mayer Brown, LLP
 6               BY:  BRITT MILLER
                      MATTHEW PROVANCE
 7               71 South Wacker Drive
                 Chicago, Illinois  60606
 8
                 Mayer Brown LLP
 9               BY:  MARK RYAN
                 1999 K Street, NW
10               Washington, DC  20006-1101

11   Also appearing:  Lee Brunz - General Counsel CDK Global
                      Nick Hey - IT technician
12

13   For Defendant The Reynolds and Reynolds Company:

14               Perkins Coie LLP
                 BY:  CHARLES CURTIS, JR.
15               One East Main Street, Ste. 201
                 Madison, Wisconsin  53703
16
                 Sheppard Mullin Richter & Hampton, LLP
17               BY:  MICHAEL COHEN
                 2099 Pennsylvania Avenue, NW,  Ste. 100
18               Washington, DC  20006

19               Gibbs & Bruns, LLP
                 BY:  AUNDREA GULLEY
20                    BRIAN ROSS
                      BRICE WILKINSON
21               1100 Louisiana Street, Ste. 5300
                 Houston, Texas  77002
22

23   Also appearing:  Robert Schaefer - VP Data Services
                      Kelly Hall - Senior VP Software Dev.
24

25
```

1                          I-N-D-E-X

2  DEFENDANTS' WITNESSES         EXAMINATION              PAGES

3  ROBERT SCHAEFER        Direct by Ms. Gulley          5-64
                          Cross by Mr. Nemelka         65-90
4                         Redirect by Ms. Gulley       90-93
   MALCOLM THORNE         Direct by Ms. Miller         94-132
5                         Cross by Mr. Miller         132-147
                          Redirect by Ms. Miller        147
6  HOWARD GARDNER         Direct by Mr. Ryan          149-171
                          Cross by Mr. Nemelka        171-196
7                         Redirect by Mr. Ryan          196
   SUMANTH ADDANKI        Direct by Mr. Ryan          198-227
8                         Cross by Mr. Panner         228-260
                          Redirect by Mr. Ryan        260-261

9

10                        E-X-H-I-B-I-T-S

11 PLAINTIFF'S EXHIBITS                  IDENTIFIED/RECEIVED

12 Ex. 53    RCI agreement                81         82
       54    8-19 letter                  84         86
13     75    News release                194        ---
       89    3-14 email                   86         88
14    162    2-23-16 contract             66        ---
      163    2-4-16 letter                90         93

15

16 DEFENDANTS' EXHIBITS

17 Ex.  1    Wind-down agreement          68         68
        4    CDK MSA                      95         95
18     10    CDK MSA                      95         95
       21    Security guidelines         96        103
19     24    Third Party Access  12-14   107        107
       25    PwC Audit                   105        105
20     26    Study 8-13                  103        103
       27    SecurityFirst overview      127        127
21     31    Third Party Access 10-14    118        119
       32    3PA contract                175        187
22     41    Healey email                170        171
       45    Reynolds system diagram      13         14
23     46    Reynolds system diagram      13         13
       47    Milestones                   32        ---
24     61    Email                         9          9
       62    Email link                    9          9
25     99    4-25 Cease & desist          34         34

Case: 4:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 5 of 266 PageID #:61351
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 4 of 266

2-P-4

1    THE CLERK:  This Honorable Court is again in

2    session.  Please seated and come to order.

3    THE COURT:  Okay.  I understand we're ready to

4    begin the defendants' case?

5    MS. GULLEY:  Yes, Your Honor.

6    THE COURT:  And remind me how many witnesses you

7    say you have?

8    MS. GULLEY:  Six.

9    THE COURT:  Six.  All right.  So here's my

10   proposal to you:  I do want to hear your closing

11   arguments.  If you can get six witnesses done by five

12   o'clock, I think that would be nearly a miracle.  So what

13   I'm going to suggest is that we get through the witnesses

14   today -- I don't know if you have a time estimate for me,

15   but just based on what we've done so far, six witnesses

16   probably are not going to get done in four hours -- three

17   hours.  So I'm going to suggest that we do the witnesses

18   and then come back tomorrow morning and do your closing

19   arguments to me first thing in the morning.

20   MS. GULLEY:  That's fine, Your Honor.

21   THE COURT:  Okay?

22   MR. MILLER:  Fine, Your Honor.

23   THE COURT:  It's probably disruptive to your

24   lives, but I don't see a reasonable alternative.  What

25   I'd also like to do maybe at the end of the day, I can

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 6 of 266 PageID #:61352
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 6 of 265

2-P-5

1  highlight for you some of my concerns and that might help

2  you prepare more cogent closing arguments anyway.

3       All right.  So let's proceed that way.

4           MS. GULLEY:  Defendants call Robert Schaefer.

5           THE COURT:  Very good.

6  **ROBERT SCHAEFER, DEFENDANTS' WITNESS, SWORN**

7           MS. GULLEY:  May I approach, Your Honor?

8           THE COURT:  Yes.

9                    DIRECT EXAMINATION

10  BY MS. GULLEY:

11  Q    Good afternoon, Mr. Schaefer.

12  A    Good afternoon.

13  Q    Would you introduce yourself for the Court.

14  A    I don't fit.

15  Q    Don't fall through.

16  A    I'm not going to fall through, I'm just --

17           THE COURT:  You don't need to stay that close to

18  the front.  Remember, if you stay about a foot from the

19  microphone, you're good.

20           THE WITNESS:  Got it.

21           THE COURT:  And you can pull the microphone

22  closer if it's necessary.

23           THE WITNESS:  My name is Bob Schaefer and I'm

24  Vice President of OEM Relations and Data Services at

25  Reynolds and Reynolds.  I've been with the company for 38

                    ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 7 of 266 PageID #:61353
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 6 of 265

2-P-6

1   years, and I started as a programmer and I worked up from

2   that.

3   BY MS. GULLEY:

4   Q    All right.  Thank you, sir.  You've provided a

5   lengthy declaration in this case; is that correct?

6   A    Correct.

7   Q    Now, there's a binder next to you.  Get it handy.

8   There has been some discussion about what data is

9   available to users in the DMS.  With respect to Reynolds

10  systems, when a dealership employee logs in with the

11  username and password, what DMS data is available to that

12  person on a Reynolds system?

13  A    The Reynolds system you have customer information,

14  you've got OEM proprietary-type information, you've got

15  Reynolds information, you've got name, address, a social

16  security number, service data, labor operation codes,

17  parts data, accounting, financial information as well.

18  Q    Is there a demographics information?

19  A    Yeah, demographics information, addresses in those

20  areas, yes.

21  Q    You heard Mr. Cottrell -- you've been here the whole

22  time.

23  A    Yes.

24  Q    You heard Mr. Cottrell testify that he does not have

25  access to this when he logs in as a dealer with the

ROBERT SCHAEFER - DIRECT

1  username and password and logs into the DMS.  Do you
2  agree with that?
3  A    No, I do not.
4  Q    Because -- can a dealer have access to data to send
5  to third parties of their choosing without giving away
6  access to the actual DMS?
7  A    Yes.  They can use Dynamic Reporting, which we've
8  talked a lot about; being able to download and move that
9  information.  They can schedule that up to four times a
10 day.  And then you've got Dynamic Reporting, report
11 generated.  And also a product called AVID, which is
12 Automated Vehicle Inventory Download.
13        THE COURT:  You're going to have to say that
14 again, maybe just a little bit more slowly because we
15 have not only me, but the court reporter has to get all
16 this down.
17        THE WITNESS:  Sorry about that.  It's AVID.
18 A-V-I-D.  Automatic Vehicle Inventory Download.
19 BY MS. GULLEY:
20 Q    What's that?
21 A    It's a setup that we have where a dealer can take
22 all the inventory off of their system, put it up into a
23 secure FTP site, and let as many people, as many vendors
24 come get it.  We will host it for them or they can
25 actually host it themselves.

                    ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 9 of 266 PageID #:61355
Case: 3-17-cv-00318-jdp Document #: 1605 Filed: 07/05/1 Page 9 of 266

2-P-8

Q    And that's on a secure --

A    It's on a secure environment, secure lane and a
secure FTP site as well.

Q    Do any dealers elect to send that to Authenticom?

A    We have a little over a thousand of those dealers
that ships that use that.

Q    That send it to Authenticom?

A    I don't know where they send it.  We don't keep
track of that.  What we do is we put it out there and
then they make the determination of where that can go.

Q    Would you object to them giving access of that to
Authenticom?

A    Absolutely not.

Q    So let's focus on the Dynamic Reporting.  We've
heard some about that.  If you go in your binder -- I
want to look at sort of what kind of access you can have
if you log into the system and then from there log into
Dynamic Reporting and try to run a report; all right?
The binder has tabs that are the exhibit numbers.  If
you'll look at --

        THE COURT:  And these are all defendants'
exhibit numbers, I think.  Is that right?

        MS. GULLEY:  You'll see the very last one has a
"P."

        THE COURT:  Okay.  Other than that then they're

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #:986-17 Filed: 05/20/20 Page 10 of 266 PageID #:61356
Case: 3:17-cv-00318-jdp Document #:165-1 Filed: 07/05/17 Page 9 of 265

2-P-9

1   all defendants'.

2            MS. GULLEY:  Yes, Your Honor.

3   BY MS. GULLEY:

4   Q    If you'll look at Exhibit 61 and 62 both, try to cut

5   this down a little bit.  You've seen both Exhibit 61 and

6   62 before; correct?

7   A    That's correct.

8   Q    And 61 is an email.  How did it get to you?

9   A    It came from one of our -- it came from a dealer

10  into Reynolds and Reynolds.

11  Q    If you'll turn to the second page of Exhibit 61,

12  you'll see that there's an email from Authenticom to the

13  dealer and it includes a link.  Do you see that?

14  A    Yes.

15  Q    Were you able to click that link?

16  A    Yes.

17  Q    And if you turn to Exhibit 62, is that what came up

18  if you clicked the link?

19  A    That's correct.

20           MS. GULLEY:  I would move 61 and 62.

21           THE COURT:  Any objections?

22           MR. NEMELKA:  No.

23           THE COURT:  61 and 62 are in.

24  BY MS. GULLEY:

25  Q    If you look at 62, there are a number of screen

                    ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 11 of 266 PageID #:61357
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 1 of 266

2-P-10

1  shots.  So it's an Authenticom document you see from the
2  header, but there are a number of screen shots.  What are
3  those screen shots?
4  A    Those screen shots are of Reynolds and Reynolds
5  software.
6  Q    All right.  So this is sent around to dealers.  And
7  if you look at what are Bates pages -- do you know what I
8  mean?  The numbers -- tiny numbers at the bottom?
9  A    Yes.
10 Q    I would like you to look at page 30 and 31, so I
11 guess the last two pages.
12 A    Yes.
13 Q    Looking at page 30, do you recognize what screens
14 these are?  It's pretty small.
15 A    Yes.  It allows you to move through the Dynamic
16 Reporting process.
17 Q    So the text says "Return to the subscreen menu and
18 select Dynamic Reporting dataset security."  What does
19 that mean?
20 A    Then you're going to go over and set up what reports
21 and things you can get to.
22 Q    So it's the security for the Dynamic Reporting?
23 A    That's correct.
24 Q    And then you turn to the next page.  And is this, in
25 fact, the data security screen?

ROBERT SCHAEFER - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 12 of 266 PageID #:61358
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 1196 of 265

2-P-11

1   A    Yes, it is.

2   Q    In the bullet point it says "Once the Dynamic

3   Reporting dataset security screen loads, check the 'grant

4   access to all datasets in all run areas' in the dataset

5   access section."  Do you see that?

6   A    Yes, I do.

7   Q    If someone were to do that, were to do what they

8   were instructed to do in this document, what would they

9   have access to?

10  A    All the information on this that's available within

11  this screen and stuff that you can see.

12  Q    So for user IDs and passwords on the system, they

13  would be allowed to see the demographics data, social

14  security number, driver's license?

15  A    They could see the driver's license area.  The

16  social security number would be encrypted with the last

17  four digits available.  However, if the dealer set it up,

18  which they can set up to have that access to where the

19  social security would show, they could create reports to

20  do that which would be in here as well.

21  Q    So in terms of -- okay.  All right.  While we're on

22  the topic of data, yesterday do you remember a discussion

23  about Authenticom pulling data for AVRS?

24  A    Yes, I do.

25  Q    That's -- you agree with the testimony that it's a

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 13 of 266 PageID #:61359
Case: 3:17-cv-00318-jdp Document #: 168 Filed: 07/05/17 Page 1206 of 265

2-P-12

1  car titling company?

2  A    Yes.

3  Q    Have you investigated what types of data Authenticom

4  is taking for that car titling company?

5  A    The main categories, yes.  I haven't been able to

6  look at the individual data elements.

7  Q    And are any of those categories of information that

8  they're taking not related to car titling?

9  A    Yes.

10 Q    Such as?

11 A    Service.  Their service information that goes there,

12 which is not needed for titling application.  There's

13 labor operation codes that are also requested and sent

14 that is not available and required for titling

15 information.

16 Q    Who did the labor operation codes belong to?

17 A    They actually belong to the OEM.  I don't know off

18 the top of my head what the actual franchises are, but

19 all of them have it that way.

20 Q    Do you have contractual license agreements with

21 those -- for that data?

22 A    Yes.  I'm also in charge of all those contractual

23 obligations and relationships with all of the OEMs.

24 Q    Let's talk a little bit about the kind of philosophy

25 and history of Reynolds.  We've heard it from plaintiff's

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 14 of 266 PageID #:61360
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 13 of 265

2-P-13

1   perspective.  I'd like to kind of walk through it from

2   Reynolds' perspective.  What has Reynolds and Reynolds

3   put into developing the DMS and its component systems?

4   A    We've started with Reynolds and USC and I put in

5   billions of dollars for the infrastructure and the DMS

6   applications.  Within that, we use design, development,

7   building, testing, certifying, as well as resources to

8   train all of our dealerships around all of our

9   applications for billions of dollars to do so, and

10  including all of the security enhancements with the hub.

11  Q    All right.

12        THE COURT:  I'm going to ask you to -- it looks

13  like the mic might not be pointed at you.  It's close

14  enough, but it's not aimed very well.

15        THE WITNESS:  Everybody is shorter.

16        THE COURT:  I guess so, but it's adjustable.

17        THE WITNESS:  Is that better?

18        THE COURT:  That's a little bit better.

19        MS. GULLEY:  We have seen some diagrams of the

20  Reynolds system.  I don't know if they're in evidence or

21  not.  They're No. 45 and No. 46, defendants' exhibits.

22  If they're not already in evidence, then I would move

23  that they be admitted.

24        THE COURT:  Any objection to 45 and 46?

25        MR. NEMELKA:  No objection.

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 15 of 266 PageID #:61361
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 14 of 265

2-P-14

1          THE COURT:  They're admitted.

2   BY MS. GULLEY:

3   Q     If you'll turn first to Exhibit 45, please.

4   A     I have.

5   Q     And we've got kind of the dealer-facing side on the

6   left and the machine-facing side of the DMS on the right.

7   You see that?

8   A     Yes, that's correct.

9   Q     Okay.  So let's start with the left-hand side.  Who

10  can access this side?

11  A     Employees of the dealership.

12  Q     And how do they get that access?

13  A     Within -- on every PC, what we have is our

14  intellectual property called ERA Access.  And what

15  happens is the individual employee will actually --

16  there's an icon that goes on the PC.  They will click on

17  that icon and then your menu system will come up, which

18  is the intellectual property of the rest of the DMS to be

19  able to put in the username and password.

20  Q     So they enter the username and password on the

21  program on the PC?

22  A     That's correct.

23  Q     Does every username and password have access to the

24  same things?

25  A     No.  What we do -- the system administrator can

                    ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 16 of 266 PageID #:61362
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 16 of 265

2-P-15

1    settle that up on how it's --

2              THE REPORTER:  Excuse me.

3              THE WITNESS:  System administrator.  I'm sorry.

4              THE COURT:  Again, just there you go.  That's

5    the problem.  Okay.

6              THE WITNESS:  That's better, isn't it?

7    BY MS. GULLEY:

8    Q    How do you ensure that the usernames and passwords

9    are used by individual human employees?

10   A    What we do is we have and monitor and track actual

11   key strokes.  There's a lot of monitoring and tracking we

12   do on those user IDs.  We look at and see if they just

13   goes into, as an example, just into report generator,

14   that's not a normal function of the dealership.

15   Depending on how much they print at night, how many times

16   they go in and out of the system, how many times they hit

17   our reporting application, we monitor and track all of

18   those things, as well as key strokes, to be able to

19   validate if it's humans that entered the information

20   that's actually coming from a machine.

21   Q    When you see automated access, not you physically,

22   but when the processes notice that there is automated

23   access, what happens?

24   A    We shut off that user ID.

25   Q    I mean is there like a man behind a curtain hitting

                    ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 17 of 266 PageID #:61363
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 16 of 265

2-P-16

1   the shutoff or what happens?

2   A    No.  The system actually looks at it and will

3   determine immediately that there's a risk associated with

4   the system.  We are a very risk adverse company, so we

5   will shut that off immediately --

6        THE COURT:  Hold on a second before you go on

7   with that.  The system will determine that there's a risk

8   with the system.  What you mean is if you think it's a

9   machine, you shut it off.

10       THE WITNESS:  That's correct.

11       THE COURT:  Okay.  And it's because you think

12  that there's a risk to that.  There's no other

13  determination about whether there's risk involved.  If

14  it's a machine access, it's done because you think

15  there's a risk.

16       THE WITNESS:  That's correct.

17       THE COURT:  Okay.  Good.

18  BY MS. GULLEY:

19  Q    What are the risks of machines entering the dealer

20  base inside?

21  A    They can come in and just suck every bit of

22  information out of the DMS in a matter of seconds.

23  Q    Let's look at the right-hand side that is built for

24  machines.  So you see -- it's not on here, I apologize.

25  There was a red circle around the top of the fork at the

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 18 of 266 PageID #:61364
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 1796 of 265

2-P-17

1   top, what we've called the door.  Did you hear that --

2   A    Oh, yes.

3   Q    -- explanation?  Do you agree with that?

4   A    Yes, I do.

5   Q    There is -- you see there's a Reynolds Integration

6   Hub inside that side?

7   A    Yes.

8   Q    Can you tell us just at a very high level what does

9   the Reynolds Integration Hub do?

10  A    It will be the interface between third-party

11  companies --

12  Q    I'm sorry.  I'm going to cut you off for a second.

13  You may want to reference Exhibit 46 as well.  Either

14  one, whatever works for you.

15  A    Picture-wise this one works for me.

16  Q    Exhibit 46.

17  A    It has a lot more detail.  But what the Integration

18  Hub does is it actually is the conduit and the touch

19  point between third-party companies, outside entities,

20  and the DMS.  And what it does is it actually secures,

21  monitors, tracks all of the information moving in between

22  the dealership and the outside world in a secure manner.

23  It does all the -- it will keep all of the interfaces in

24  there for all the business rules and the customized

25  interfaces that go to each individual third-party

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 19 of 266 PageID #:61365
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/19 Page 180 of 265

2-P-18

1  company, which we support a little over 50,000 of those.

2  Q    You have 50,000 what?

3  A    Interface packages, which are customized packages

4  that we provide to all of the 147 different third-party

5  companies we have, including the OEMs as well.

6  Q    So I take it that each individual organization has

7  more than one -- or maybe not each one, but some have

8  more than one interface?

9  A    Absolutely.

10 Q    We've heard talk about real-time integration.  In

11 connection with what Reynolds does, the process that

12 occurs in the hub, what is real-time information?  I

13 think it might help to give an example of how that works.

14 A    Yeah.  First real-time is when actually, and it can

15 only be done in an environment like this, there's no

16 other way and there's no data breaker or broker or any

17 way you can come in and do real-time.  You'd have to keep

18 pinging, pinging, pinging, pinging.

19 Q    Let's slow it down because I don't want to get this

20 all mixed up.  So a data integrator, what you call a data

21 broker, pinging, pinging, pinging, what does that mean?

22 A    When they want to try to do real-time, they'll try

23 to come in and get information from the system.  So

24 they'll try to get it every five minutes; every ten

25 seconds.  You cannot -- that's not real-time.

ROBERT SCHAEFER - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 20 of 266 PageID #:61366
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 190 of 265

2-P-19

1  Q    What is real-time?

2  A    Real-time is when you're in the system and you make

3  a change in the system and it immediately goes where it

4  needs to go.  So, for example, if you're in the

5  dealership and you're working an F&I deal and you want to

6  do a credit check for a consumer sitting right in front

7  of you, well, you can't do that credit check inside the

8  dealership so you have to sent it out to do a credit

9  check to the outside world.  So what will happen is

10  you'll put in the appropriate information, it will

11  immediately send it out and --

12  Q    Now, hold on.  I'm standing at the dealer --

13  A    Yep.

14  Q    -- and I want to buy a car and --

15  A    I'm going to do a credit check on you.

16  Q    Okay.  So go.

17  A    And you'll give me all of your pertinent

18  information.  It fills all that in, including social

19  security number in this particular case.  We will take

20  that information, put it into a format, and immediately

21  send it out.  There will be a response that comes back

22  and it will immediately act on that response to provide

23  it to the F&I manager, whoever did that request.  And

24  that's real-time.

25  Q    Does it populate any other part of the DMS when

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 21 of 266 PageID #:61367
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 20 of 265

2-P-20

1   they've now put in my information?

2   A   If there's changes, what we do is we monitor and

3   check.  If there's changes that are made, it will put it

4   in at the DMS.  If that change is in the DMS and there's

5   a change there, we will then immediately also distribute

6   it out to all the appropriate third-party companies that

7   have a relationship with that dealer.

8   Q   So if I also have used this dealer for servicing my

9   car and I've been in there but since then I've gotten

10   married; I changed my name; you've run this; when I go to

11   the service department, will they know that I've got

12   married?

13   A   Yes.  They won't know you got married, they'll know

14   you changed your name.  But they will know immediately;

15   that it goes across any of the applications within that

16   particular dealership's infrastructure.

17   Q   If I walk right over there and go pick up my old car

18   that's getting fixed, they'll already know?

19   A   It's immediate, yes.

20   Q   Let's talk about writeback or when a third-party

21   wants to take information and put it into the DMS.  Can

22   you tell me an example of that?

23   A   Yeah.  Service appointments is an example of that

24   particular information where someone is going to set up

25   an appointment on the system, and there's quite a few

Case: 4:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 22 of 266 PageID #:61368
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 21 of 265

2-P-21

1    interfaces that go back and forth when you do that.

2    Coming into the system, the first thing you want to do

3    is -- especially today, you don't want to populate the

4    screen as much.  So you put in Bob Schaefer.  It will

5    immediately go down to the DMS and bring out all of the

6    Bob Schaefers back so you can look at it and say that's

7    the Bob Schaefer.  And it will populate all of the rest

8    of the information.

9        You'll set up your appointment.  Then it'll take it

10   down and immediately update.  It will look and see if

11   that appointment is available on the system, what times

12   are available, is there a technician available; all of

13   the things that you would do when you brought in your car

14   to do an appointment.  And it will move all that

15   information back and forth.

16   Q    So that written back information, is it also

17   populated out to OEMs and third parties?

18   A    Yes.  So as soon as Bob Schaefer comes in, if I

19   changed my phone number as an example, it would

20   immediately populate that information out to everyone

21   else as well.

22   Q    And that's happening within the hub since that's

23   where the third-party --

24   A    All of the control and the security is within the

25   hub.  And one of the things too is the business rules

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 23 of 266 PageID #:61369
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 23 of 266

2-P-22

1   that are intellectual property need to be shared with

2   each individual vendor so they know what the validation

3   is, what the length is, so that all work properly within

4   the entire infrastructure across all the different

5   vendors as well so you keep all of that in sync to match

6   into the database of record, which is the DMS.

7   Q    Can a data syndicator do that?

8   A    No.

9   Q    Staying with the writeback concept, what is the

10  difference between a keyed-in-by-human error that is

11  written back to the DMS and an automated error?  And feel

12  free to use examples.

13  A    Yeah.  A keyed-in error, it happens one at a time.

14  You know, if you're actually sitting there as an employee

15  at the dealership, you're keying in, it hits it.  What

16  happens is in the case of a automated situation is that,

17  for example, you put it in and you change Bob Schaefer's

18  name to Bob Smith; okay?  And if that came in, what

19  happened to us was there was a vendor that changed Bob

20  Schaefer's name and put in Bob Smith 50 times into the

21  dealership with all that same information.  Well, because

22  it passes all of the rules that we have, I can't tell you

23  that Bob Smith is wrong.  The only thing I can do is

24  monitor tracking and go wait a minute.  I'm seeing all of

25  these 50 coming in at one time.  I've got to go stop.

ROBERT SCHAEFER - DIRECT

Case: 4:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 24 of 266 PageID #:61370
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 23 of 265

2-P-23

1 Q    Is that happening?  Is that process happening?

2 A    It's happened to us.

3 Q    No.  I mean where is that checking, checking,

4 checking happening?

5 A    We're checking into the hub.  Everything is checked

6 at the hub for the performance of it.  Because what can

7 happen is -- I like to use the analogy we're all human.

8 Humans make mistakes and they write code.  What happens

9 is we've got to put these protections in to make sure

10 that when it does happen, we can fix it quickly for the

11 dealer.  So what we've put in is what we call journaling.

12 Within the journaling capability is we need to keep track

13 of what was there and what's coming in so when something

14 happens, we can isolate and fix that correctly.

15      What we do is we keep track of -- because every

16 identifier that comes in, anybody that gives us anything,

17 we know that it came from that person.

18 Q    Have you ever had to use journaling or the processes

19 in the hub to fix an automated problem?

20 A    Actually what happened to us was we didn't have it

21 in when it happened to us the first time and that's when

22 we went -- I won't use the exact words, but we went oh,

23 my God.  And what happened to us was it cost us about

24 $2.4 million to fix the problem for about 250 dealerships

25 because we ended having about 6.3 million wrong usernames

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 25 of 266 PageID #:61371
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 24 of 265

2-P-24

1  out in the field within and we stopped it at noon that

2  day for 250 dealerships.

3  Q    So it happened in half a day.  It cost 2.4 million.

4  A    Correct.

5  Q    It's just a data writeback error.

6  A    That's correct.

7  Q    How much data do you transmit to and from the hub

8  each day?

9  A    Actually we run about 1.4 billion a day, data

10 elements a day.

11 Q    Okay.  And so going back to Exhibit 45 just very

12 briefly; back to the door.  Back to the door there.  Is

13 this just an open pipe -- when you say custom interfaces,

14 what are you really saying?

15 A    Each vendor has their own identifier that comes in

16 and we customize each one of those.  One of the things

17 that we make sure is, and we're very adamant about this,

18 is every data element that we're going to pass to a

19 third-party or an OEM, we make sure they're going to use

20 that information for what they say they're going to sell

21 to the dealership.  Within that, we have identifiers that

22 come in so we can identify each one of those vendors

23 specifically on who they are.  Then we also take that as

24 far as to go down to say even inside when you actually

25 bring it up, if there's a question from the dealer, we

ROBERT SCHAEFER - DIRECT

1  can actually look and see where that individual data

2  element came from so we can isolate problems quickly.

3  Q    Both in terms of writing and in writing back?

4  A    That's correct.

5  Q    So here, I've kind of messed up the picture, but

6  this is the RCI vendors.  You see that?

7  A    That's correct.

8        THE COURT:  Maybe you need to zoom in because

9  it's not actually readable at that scale for me.

10        MS. GULLEY:  Sorry.  It's also, just FYI, in the

11  binder Exhibit 45.  Thank you so much.

12  BY MS. GULLEY:

13  Q    So these vendors in this box here, are any of them

14  syndicators of data?  In other words, do any of them send

15  data on to other people from this process?

16  A    No.  In the case of the RCI program, it always has

17  to be a one-to-one relationship.  So it's passed from us

18  to one entity or one -- you make sure all the business

19  rules and the specific data is monitored and tracked and

20  we know exactly who that one entity is.  It's a

21  one-to-one relationship.

22  Q    So the custom interface is the data elements needed

23  for what?

24  A    That individual third-party company to meet their

25  functioning requirements.

ROBERT SCHAEFER - DIRECT

Case: 1-18-cv-00864 Document # 986-17 Filed: 05/20/20 Page 27 of 266 PageID #61373
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 2 of 265

2-P-26

1    Q    In terms of Authenticom, Authenticom contends in sum
2    and substance that the amount of data it takes from the
3    system is about five megabytes and has implied that it's
4    like the size of a picture, an iPhone picture.  Do you
5    agree with this?
6    A    Well, first of all, I mean let's just lay out what
7    five megs is.  Kelly Hall and I are kind of -- we like
8    math, so we took a look at it and said what we have is --
9    we went back and looked and said five megs is the same as
10   17.1 copies of War and Peace.  So about what we're saying
11   here is five megs about all the paperwork that we've all
12   put together for that case, that's about what five meg
13   is.  Okay?  And you take a look at that and say if
14   there's 50 dealerships, we'd have 50 rooms of this with
15   all this paperwork which make up all that megs would pass
16   through everything.
17   Q    Is that the only tax on the system?
18   A    No.  The key to this is that when you sit down --
19   transmission of a photo, okay? that's the least impact on
20   the system.  What happens is you've got to go build all
21   that information behind the scenes that says I'm going to
22   run a report.  I'm going to pull the appropriate
23   information.  And that's where all the grinding comes in.
24   To my analogy back on the paperwork, think about all
25   those printers that we had to make all this paperwork on

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 28 of 266 PageID #:61374
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 27 of 265

2-P-27

1  how hard they marked and how smoked they got.  It's the

2  same thing here, the intensity that it takes to make that

3  information and pull those out.

4      What happens too is sometimes they even get into

5  looking at timing, certain dates between certain time

6  frames, that becomes more complicated on the system to do

7  it as well.

8  Q   On the -- what we were seeing as the left-hand side,

9  the dealer-facing side of the DMS, have you ever seen

10  those kind of performance hits to the CPU or other

11  performance hits from automated access?

12  A   Yes.  Unfortunately, yes.  I've seen where it's

13  taken so much where, I'll use this term, it's taken 70

14  percent of the CPU, what you've looked at is that's the

15  power of the machine.  So if you put it on a 100 percent,

16  these third parties came in and they kept hitting us and

17  it took up 70 percent of it, which then what happens is

18  we get a phone call and the system has gone to its knees.

19  Q   We heard Mr. Cottrell's testimony that Authenticom

20  was once the cause of performance problems; that you

21  spoke on the phone with him.  And I believe and the

22  record will speak for itself, but to save time, the sum

23  and substance of the testimony was that it was an easy

24  fix for him.  Do you agree with that?

25  A    I can't say whether it was an easy fix for him, but

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 29 of 266 PageID #:61375
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/19 Page 29 of 266

2-P-28

1   it wasn't for us.

2   Q    What do you mean by that?

3   A    Well, what happens is it takes us, when something

4   like that happens, it takes us --

5        THE COURT:  You have to remind me what happened

6   on that.

7        THE WITNESS:  Basically what happened, it was

8   kind of -- we found like a loop.  What happened was it

9   kept hitting the system.  And so what happened was we

10  then had to step back and say where is this coming from

11  and what's happening.  Because the first thing that

12  happens is a dealership calls in to us and says I've got

13  a problem.  Well, if you look at a system, they run about

14  50 to 60 user IDs coming in.  The configuration of the

15  system is set up a certain way.  So we go out and look

16  immediately saying what's the performance?  What's

17  happening at this given point in time?  Then we start

18  nailing down, looking at the individual user IDs to see

19  what's the impact and how things are happening.  We start

20  seeing we're getting crunched.  So then you do a

21  determination and you say okay, who is that.

22      Well, what's happened to us is the third-parties or

23  the dealers that set up the user IDs set the user ID as

24  -- could be some name in the dealership; it could be Bob

25  Schaefer; it could be -- well, we can't -- so we look at

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 30 of 266 PageID #:61376
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 30 of 265

2-P-29

 1    that.  And then we've got to go look and say so where has

 2    this gone and what has it done and how is this happening.

 3    And then we start to isolate.  So that goes into our

 4    technical system center.  And they go so far and they say

 5    oh, we've got a performance issue.  Then it heads over

 6    into our expertise people on performance.  Then they take

 7    a look at it and they say oh, wait a minute.  The system

 8    is configured properly.  Why is this happening?

 9         Now, keep in mind we still don't know a third party

10    is even accessing the system because we weren't told.  So

11    we come in and then we go oh.  Then it comes in -- and

12    eventually it comes into my area.  So we've gone through

13    three different sets of groups of people.

14         Then I go and isolate and I say where is this coming

15    from.  Well, it's hard for us to determine if it's --

16    what type and who the data broker is.  So then I start to

17    look at things as okay, let me see patterns of who's come

18    in and where have they come from and how can I isolate it

19    so I can get ahold of this person and say -- so in other

20    words knock it off.  So we go through, do our evaluation,

21    do our test, and that's when I called Steve on the phone.

22    Q    And this was how many years ago?

23    A    Six or seven years, whatever it happens to be.  I

24    remember distinctly because I was at a McDonald's.  But I

25    was sitting outside and Steve and I were talking and it

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 31 of 266 PageID #:61377
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 31 of 266

2-P-30

1    was no, not us, not us, not us.  And I said "Steve, I'm

2    telling you."  So we went through it and he calls me back

3    and he says "I got it.  It's fixed."

4         Well, then what happens is all of the things that we

5    were going through with all that, we've got to call the

6    customer up and go "Well, that wasn't us."  Well, who was

7    it?  That puts us -- then we get into blame and how did

8    it happen and all of these kind of things that happen

9    from there.

10   Q    Are you aware of any other incidents involving

11   Authenticom more recently than that?

12   A    Yes.  What's happened is when we went through the

13   actual wind-down period, what we see is what we call

14   piggybacking user IDs.  And what happens here is we'll go

15   out and protect or use one of these user IDs, in this

16   case CDK to come in.  The dealership then gives that same

17   user ID to Authenticom --

18   Q    Is that authorized?

19   A    No, it's not authorized.  To that -- to Authenticom

20   and what they're doing is using this user ID for two

21   different methods, one for CDK and one for Authenticom in

22   this particular case.

23   Q    Are you saying that Authenticom knows that or

24   doesn't know that?

25   A    I don't think he knows it.  I don't think that he

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 32 of 266 PageID #:61378
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 31 of 265

2-P-31

1  knows that basically that the dealership gave him and

2  said this is what I use for CDK. I can't say that. I

3  don't know for sure. But basically what can happen there

4  is then we look at it and I call up CDK and go what the

5  heck are you guys doing. That's not what you're

6  supposed --

7  Q    And you're talking about the DMI.

8  A    The DMI. I'm sorry, the DMI people, and say what

9  are you doing? And they go "That's not us." And we

10  start to say okay. So then we shut it off. And we have

11  to recreate a new one for DMI. And then what's happening

12  is the reason that we knew it was Authenticom is this

13  third-party vendor would call us on the phone and say you

14  guys locked me out. I was using Authenticom. I'd like

15  to enter the RCI program. We'd start our process and

16  then all of a sudden what would happen is the third-party

17  company would go silent because now they figured out some

18  other way to get into the system, and we started the

19  cat-and-mouse game all over.

20  Q    So you're talking about having attempted to work

21  through the wind-down situation with DMI.

22  A    Correct.

23  Q    And running into problems with doing so. And so

24  have you been able to wrap all of that up?

25  A    No. We're close, but we're still finishing it up.

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 33 of 266 PageID #:61379
Case: 3:17-cv-00918-jdp Document #: 103 Filed: 07/05/17 Page 32 of 265

2-P-32

1    Q    Has that process been easy or a simple switch?

2    A    No, it's been hell.

3    Q    All right.  So turn to -- to kind of make this go

4 quicker, I want to kind of walk through -- we've seen the

5 timeline.  We've seen sort of the history of blocking

6 that's been called the status quo.  It hasn't come in

7 Reynolds' case yet.  One way to shortcut this though

8 might be to look at Exhibit 47 in the binder.

9        Now, is this a public document, an internal

10 document, what is it?

11   A    This is a document we take around and use at, like

12 NADA, and areas to show kind of map of what we've been

13 doing.

14   Q    So you talk to dealers about this or vendors?

15   A    Both.  Dealers, vendors and OEMs.

16   Q    And the discussion -- it's a two-page document.  I

17 think it's double sided.  But does this generally lay out

18 certain of your security milestones?

19   A    That's correct.

20   Q    Just taking the first one, it says "The GLB,

21 Gram-Leach-Bliley Act, increases personal information,"

22 then it talks about kind of the beginnings of this

23 program in 1999.  Was it caused by GLB or why is that

24 there?

25   A    No, it was not caused by GLB.  We just -- we started

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 34 of 266 PageID #:61380
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 33 of 265

2-P-33

1    that, just made us go faster and quicker about it because

2    of the GLB, but we'd already started that process.  We've

3    been working on security way before this.

4    Q    So the history of technological measures is laid out

5    in this document; you agree with that?

6    A    Correct.

7    Q    Did you take measures besides technological measures

8    to prevent what you call hostile integrators from

9    entering the dealer-facing side of the DMS?

10   A    No.  We've got contracts that hold people

11   accountable to making sure third-party companies don't

12   become our dealer contract or third-party contracts.

13   Q    Is there -- what about car manufacturers?

14   A    Car manufactures actually provide us information

15   that we have to protect the data that says we can only

16   use it for certain reasons; that we have to make sure

17   that we abide by those or that they will pull our

18   contract.

19   Q    Some of the papers in the case talk about a game of

20   whack-a-mole as these technological measures were being

21   in effect; contractual measures were in effect.  Are you

22   familiar with that terminology?

23   A    Who isn't?

24   Q    But in this context what did that mean?

25   A    We would just continue to -- I would block

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 35 of 266 PageID #:61381
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 34 of 265

2-P-34

1   something.  I would put on a security, then they would go

2   ahead and fight us.  I call it the cat-and-mouse game

3   where we go back and forth, back and forth.  And what

4   happened over time is that we would make a change and

5   they would figure it out.  Then we'd would be making

6   another change.  So over time what's happened is we

7   started learning more and more and more and more to where

8   we could get better at making sure that the system was

9   secure.

10  Q    Let's look at some of the other things you did.  If

11  you'll turn to defendants' Exhibit 71.  Do you recognize

12  this as a lawsuit filed by Reynolds and Reynolds in 2012?

13  A    Yes, I do.

14  Q    And the defendant was?

15  A    SIS.

16  Q    And you recall that you sued them for tortuous

17  interference and violations of the Computer Fraud and

18  Abuse Act and other things?

19  A    That's correct.

20  Q    And you also -- well, let's look at defendants'

21  Exhibit 99.

22       MS. GULLEY:  I don't think I need to move in

23  that exhibit because it's a public document, but --

24       THE COURT:  You're talking about Exhibit 71?

25       MS. GULLEY:  Yes, Exhibit 71.

ROBERT SCHAEFER – DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 36 of 266 PageID #:61382
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 36 of 265

2-P-35

BY MS. GULLEY:

Q    If you'll turn to Exhibit 99.  There's been earlier

testimony here.  Do you agree that exhibit -- defendants'

Exhibit 99 is the cease-and-desist letter -- a

cease-and-desist letter that you sent to Authenticom in

April 2015?

A    Yes, I do.

      MS. GULLEY:  I would move to admit defendants'

Exhibit 99.

      THE COURT:  Any objection?

      MR. NEMELKA:  No.

      MS. GULLEY:  Did you send --

      THE COURT:  It's admitted.

      MS. GULLEY:  Thank you, Your Honor.

BY MS. GULLEY:

Q    Did you send cease-and-desist letters to other

unauthorized automated accessors of the dealer-facing

side of the DMS?

A    Yes.

Q    For example?

A    DMI.

      THE COURT:  I'm sorry, what was that?  DMI?

      THE WITNESS:  Yeah.

BY MS. GULLEY:

Q    Anyone else?  SelectQu we heard testimony --

                ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 37 of 266 PageID #:61383
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 36 of 265

2-P-36

1  A    SelectQu was another one.

2  Q    All right.  You sent this in April 2015 saying they

3  were violating your rights.  Do you still think

4  Authenticom is violating your rights?

5  A    Yes.

6  Q    Now, you've blocked unauthorized access for a number

7  of years.  I think at this point there's really no

8  dispute about that.  But you have authorized it.  So

9  you've blocked unauthorized use, but you have authorized

10  automatic processes in certain circumstances in the past;

11  correct?

12  A    That's correct.

13  Q    We've heard it called different things.  Wind down

14  is one of the things we've heard about.  Has Authenticom

15  ever been part of your wind-down monitored access program

16  as you move people to the certified interfaces?

17  A    Not exactly.  Not directly, no.

18  Q    What do you mean not directly?

19  A    Well, what we do is we actually form the

20  relationship with a vendor, and that vendor then,

21  depending on who they're using, is who we actually end up

22  allowing to get in.  We're actually having that

23  relationship with the vendor, not with that individual

24  data broker, as an example.  So we're actually white

25  listing that vendor versus the actual Authenticom or DMI

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 38 of 266 PageID #:61384
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 37 of 265

2-P-37

1  or whoever.

2  Q    The service provider to the dealer when you say

3  vendor?

4  A    That's correct.

5  Q    So in what circumstances would that come up?  Why

6  would you -- in what circumstances would you find

7  somebody that's been using Authenticom that you would be

8  doing this?

9  A    Well, there's vendors that would be using

10 Authenticom to use to get into the DMS to get the system,

11 so we would actually protect or white list that user ID

12 so Authenticom could get in to get that data for that

13 vendor.

14 Q    What if you -- what about -- we heard some testimony

15 earlier about acquisitions of companies.  Is that --

16 A    Where we've been with that is that the ones we use

17 with Authenticom today have been acquisitions; that we've

18 actually gone out and purchased those were the ones.  The

19 other ones that we've white listed, in the case of

20 Authenticom being the data broker, would be the

21 third-party vendors we've got in the RCI program or OEMs.

22 Jaguar or BMW are an example.

23      THE COURT:  So the third-party vendors that

24 you've got in the -- I didn't catch the name of the --

25      THE WITNESS:  In the RCI program.

ROBERT SCHAEFER - DIRECT

```
 1              THE COURT:  RCI program.  Okay.

 2              THE WITNESS:  Yes, Your Honor.

 3    BY MS. GULLEY:

 4    Q    So in those circumstances when you do that, do you

 5    build them?  What do I do for those individual -- for the

 6    vendors?

 7    A    In the case of the vendors, we'll work with them to

 8    have them go through and eventually get to a certified

 9    interface.

10    Q    I'm sorry, in terms of the temporary access, do you

11    just, like, give them a username and password and they go

12    for it?

13    A    No.  What we do is we code those now.  What we

14    actually do is we sit down with that individual vendor

15    and say what's the data elements that you are going to

16    use and here is a naming convention for that user ID so

17    that we know what that is.  And then we build a template

18    so that they can only access that particular information.

19    Q    And how much cooperation does it require between the

20    two?

21    A    Significant amount.  We have to understand what the

22    data elements are they're pulling and what we have to

23    make sure they can get to.

24    Q    They have to basically tell you all about there --

25    A    That's correct.
```

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 40 of 266 PageID #:61386
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 39 of 265

2-P-39

1   Q      What they need the data for.

2   A      That's correct.

3   Q      In terms of what you have to do, what do you have to

4   do in those circumstances?  What kind of resources do you

5   have to put towards that?

6   A      I've got resources set up.  We have to monitor and

7   track it on a manual basis.  So what we do is I get a

8   report every week of every user ID, where they've gone,

9   how many times they've gone in, what information they

10  continue to pull, do they try to go somewhere else.  I

11  can see all that information.  Then I have to isolate

12  that data and look at it and see if there's any risks or

13  anything or anything that's happened where they've tried

14  to get things that they shouldn't get or someone else has

15  come in and tried to get more information.  It's not

16  necessarily that vendor or that broker that would do it,

17  it could be piggybacking, again my term, on how that

18  would work.

19  Q      Do you have a contract with Authenticom?

20  A      A contract, yes, I do.

21  Q      Did you enter into it?  Did prior --

22  A      No.  The contracts we inherited with third-party

23  companies, from the companies that we purchased.

24  Q      That contract, was it with DealerVault, the company

25  DealerVault?

ROBERT SCHAEFER - DIRECT

1   A      No, it was not.

2   Q      Who was it with?

3   A      It was with Authenticom.

4   Q      Is that difference significant to you?

5   A      Yes, it is.  Absolutely.  When we -- actually what

6   happened is Authenticom to us, when we first -- in the

7   relationship we had, I go back to the one-to-one

8   relationship, where what they would do is provide the

9   information to our one vendor -- to our one application

10  when we had that set up that way.  And then they tried to

11  move it to DealerVault.

12  Q      And the distinction between Authenticom and

13  DealerVault, if one is one-to-one, what is DealerVault?

14  A      One-to-many.

15  Q      Did you ever authorize for any Reynolds-owned or

16  related services for Authenticom to transfer it from

17  Reynolds or any other DMS onto anyone else other than the

18  application provider?

19  A      No.

20  Q      In other words, would it be okay if under your

21  contract in your mind they took data out of your DMS or

22  anyone's DMS, put it into DealerVault, and sent it to

23  someone other than your applications?

24  A      No.

25  Q      What did you do when you learned about the change in

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 42 of 266 PageID #:61388
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 41 of 65

2-P-41

 1   their corporate structure and how they were planning

 2   to --

 3   A    Well, first of all we learned about it.  What

 4   happened was --

 5         THE COURT:  Clarify.  When you say *change in the*

 6   *corporate structure*, what are you -- I'm not sure what

 7   we're talking about here.

 8         MS. GULLEY:  So -- thank you, Your Honor.  I'll

 9   clarify that.

10   BY MS. GULLEY:

11   Q    Your contract was with Authenticom.  We've heard

12   testimony that DealerVault at some point -- for some

13   period of time they both ran concurrently and then at

14   some point there was only DealerVault.  That's not your

15   area.  You're not in the details of it.  But at some

16   point were you alerted to that change?

17   A    Yes.

18   Q    And what was your reaction to that?

19   A    We sent a message, a notification to Authenticom

20   that they breached the contract because they were using

21   DealerVault, which was not in the contract, and we wanted

22   the one-to-one relationship.

23   Q    Now, are you -- since that change has occurred, are

24   you adding more vendors --

25   A    No.

ROBERT SCHAEFER - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 43 of 266 PageID #:61389
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 42 of 265

2-P-42

1  Q     -- and things like that --

2  A     We're trying to get away as quick as possible.

3  Q     Now, there's been a number -- some testimony about

4  Penske.  Penske is Reynolds' largest customer; right?

5  A     Correct.

6  Q     Did you give Penske special permission to use

7  Authenticom?

8  A     No.  About 18 months ago I received a call from

9  Chuck Williams, who's the CTO of Penske Automotive, and

10  he asked me if they could go ahead and use Authenticom

11  and I said "Absolutely not."

12  Q     When did you find out that Penske was using

13  Authenticom?

14  A     On -- pretty much on the day that we received -- you

15  received notification -- I received notification from you

16  about the lawsuit.

17  Q     Is that how you found out?

18  A     Pretty much.

19  Q     Were you already looking into --

20  A     Yeah.  Mr. Brockman asked me to -- and the reason

21  for this is our objective was, last August, to get

22  everyone off of the protected user IDs by March.  So Bob

23  sent me a note and said I want to know who we have still

24  and I want to see Penske and who they're accessing.  I

25  received the information from my guys.  Bob asked me on

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 44 of 266 PageID #:61390
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 44 of 265

2-P-43

3-26.  It took me about to 4-26 -- 4-25 until I got the
information from one of my guys, and that's how I look at
it the same day.

Q    I've got a lot of topics and not very much time.

A    Sorry.

Q    No, it's okay.  I'm just letting you know the
constraints of today.

A    Got it.

Q    Okay.  So you didn't authorize them.  How are they
getting into Penske if you didn't authorize it?

A    Penske is giving them a user ID to get in to do
that.

Q    So Exhibit 159 is the email -- that's the
plaintiffs' Exhibit 159 at the end of the binder is the
email that was used in plaintiff's case to indicate that
-- you heard that testimony --

A    Yes.

Q    -- that you had given permission?

A    Yes.

Q    To the extent that Penske said Reynolds has
confirmed protection of the user profiles, is that
statement true or false?

A    We confirmed the protection of Parts I, a user ID.

Q    Oh, I see.  And so was that for Authenticom?

A    Not to my knowledge.

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 45 of 266 PageID #:61391
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 44 of 265

2-P-44

1  Q    Who did you think --

2  A    Parts I is a company that we actually have that

3  works under Subaru, that works with Subaru that we have

4  protect user IDs with.

5  Q    You have -- you're working to move Subaru to --

6  A    In this case it happens to be an OEM interface, a

7  certified OEM interface that's secure.  We're moving that

8  now.

9  Q    Is that complete?  Almost --

10  A    We're about 30 days away from national release.

11  Q    So let's talk about what Authenticom can do in terms

12  of Reynolds' authorization.  There's been talk of data

13  cleansing services and agents under the contracts where

14  vendors can send data for cleaning services.  Do you have

15  any objection to that?

16  A    Absolutely not.

17  Q    Is that just specific to Authenticom or --

18  A    That's specific to anyone.

19  Q    I heard some testimony earlier today that there are

20  numerous data-cleansing services.

21  A    There's quite a few data-cleansing services,

22  normalization services that are out in the market today.

23  Q    It's already been discussed, there's a declaration,

24  it's defendants' Exhibit 162 from the John Eagle

25  dealership.  Do you know Lesha Wood?

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 46 of 266 PageID #:61392
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 46 of 265

2-P-45

1    A    Absolutely.

2    Q    She talks about using Dynamic Reporting and pushing

3    it to Authenticom.  Do you object of that?

4    A    No.

5    Q    Are you aware of how many dealers do that?

6    A    I have no idea how many do that.

7    Q    Are you trying to put Authenticom out of business?

8    A    Absolutely not.  In fact, we still have a contract

9    with Authenticom for data-cleansing services.  We were

10   planning on continuing that.

11   Q    There was discussion of this agent concept in terms

12   of vendors using someone to cleanse their data.  Can SIS

13   do that?

14   A    They can standardize and normalize it.  I guess

15   that's what you mean by -- yes, SIS, DMI and Authenticom

16   could do the same thing.

17   Q    Why isn't this a danger to the DMS?

18   A    Because we actually take the information and push it

19   to them on behalf of the vendor.  Our relationship is

20   between us and the third-party vendor.  We're the OEM,

21   because they also do it with OEMs, and we push that

22   information to them and then they standardize it on

23   behalf of that entity.

24   Q    Okay.  I don't have long and I need to get through

25   pricing and the agreement and other things, so let's work

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 47 of 266 PageID #:61393
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 46 of 265

2-P-46

1   towards that.  So we heard a few people testify about

2   XTime.  XTime is an RCI vendor; correct?

3   A    Correct.

4   Q    They have a certifier.

5   A    Correct.

6   Q    A couple of people testified about XTime's pricing,

7   about their integration pricing.  Do you remember that?

8   A    Yes.

9   Q    Have you seen XTime's invoices?

10  A    Yes, I have.

11  Q    And you heard somebody say they knew that it was

12  high because it said Reynolds.

13  A    It said Reynolds, CDK, and DealerTrack zero.

14  Q    Right.  And for Reynolds and CDK, it's some hundreds

15  of dollars.

16  A    Some number, yes.

17  Q    We won't say.  But it's something more than zero.

18  A    It's a number.

19  Q    XTime is owned by who?

20  A    DealerTrack.  It's owned by Cox.

21  Q    And Cox owns a competing --

22  A    DealerTrack.  A DMS, DealerTrack.

23  Q    So you heard someone say today that some DMS

24  providers have no integration fees and some have others.

25  Have you heard that also that you have dealers leaving

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 48 of 266 PageID #:61394
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 47 of 265

2-P-47

1  because they see invoices like this that say DealerTrack

2  zero?

3  A    Um-hmm.  Yes.

4  Q    Have you, Reynolds, dramatically increased RCI

5  pricing since 2015 as alleged by Authenticom?

6  A    We have not.

7  Q    Are there any outliers --

8  A    There's outliers.  What we do is we have similar

9  pricing for similar interfaces.  What we want to do is

10 keep everyone on that are in a market.  So CRM or body

11 shop, keep that pricing consistent across those.  So we

12 have -- if you have similar interfaces, we want similar

13 prices for those.  So we'll move up those ones, those

14 vendors that have been in the program for a long time so

15 it's a consistent across-the-board pricing.

16 Q    But since 2015, what has your sort of standard

17 deviation -- what's your normal percentage increase been

18 since 2015?

19 A    Right around 5 percent.  In 2017 increased to 4.

20 Q    4 in 2017.

21 A    Yes.

22       THE COURT:  Since 2015 your annual increase has

23 been about 5 percent.

24       THE WITNESS:  Yes, sir.  Actually I believe it

25 was 2014 too.  We have been consistent on that for the

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 49 of 266 PageID #:61395
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 48 of 265

2-P-48

1   last several years.

2   BY MS. GULLEY:

3   Q    Why is your pricing secret?

4   A    It's -- that one is going to take me a little bit of

5   time by the way.  It's very --

6            THE COURT:  Be succinct.

7            THE WITNESS:  Sorry.  Didn't mean to set you up.

8            THE COURT:  Don't try to talk real fast because

9   that just makes it hard for the reporter.

10           THE WITNESS:  It's very complicated.  If you've

11  got 50,000 packages, what we do is I have to sit down and

12  look at each individual vendor.  Do they have real-time?

13  Do they have writeback?  Do they have batch?  How many

14  data elements?  What kind of data elements are they?

15  What's the -- you know, basically the frequency of that.

16  Is it going to be -- do they want it multiple times

17  during the day?  Do they want to write it back?  So we

18  sit down and talk to the vendor about everything.

19      Within that, the vendor then makes the decision

20  whether they can, on the packages, of how many interfaces

21  they want to put into an individual package.  So, for

22  example, when we talked earlier about the Auto Base and

23  the Dominions, they have, like, 14 different interfaces

24  when you get all said and done with that.  It's not just

25  one.  And there's real-time in there that says as an

                    ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 50 of 266 PageID #:61396
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 49 of 265

2-P-49

example, we have triggers that there's -- I'll give you

customer information.  There's 139 specific fields in

customer data.  We have to put a trigger in there that

any time that that changes through any time within that

dealership, it immediately gets sent.  So we have that

set up, then we have all of the security and stuff that

surrounds all of that.

So we sit down with each one of those and say you

might need 20 of those, 25 of those or 30 of those by

individual interface.  Then what we do is we package

those up and we'll have individual packages.

So for me to go out and try to explain to a dealer

-- and I have to individually get with each dealer, with

each vendor, depending on which package they put in, to

sit down and explain the individual pricing for that.

Because when you look at it, someone says something is

worth $800 or $300, it doesn't matter.  But what are you

getting for that price is what counts and what's the

value you get with that information, Mr. Dealer, that

says here's why this works this way with that.

What we've seen is when people moved from a data

broker into our world, going from a batch, which is once

a day, to all of a sudden real-time is going to be more

expensive.  But it's the complexity of having to explain

that to each individual dealership based on which package

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 51 of 266 PageID #:61397
Case: 3:17-cv-00318-jdp Document #: 168 Filed: 07/05/17 Page 50 of 265

2-P-50

1   they bought, which vendor, is just an astronomical time

2   that we can't do.

3          THE COURT:  All right.  So just to quickly

4   paraphrase it, so you basically custom negotiate with

5   each of your vendors what their package price is going to

6   be.

7          THE WITNESS:  Yes.  And data elements.  Yes, all

8   the functionalities they use, yes, sir.

9          THE COURT:  So I don't want to stretch this too

10  far.  So you've 147 vendors and they have something like

11  50,000 individual interfaces.  You don't custom negotiate

12  each interface, but that's part of what you're looking at

13  when you negotiate the package price for the vendor.

14         THE WITNESS:  Yes.  And what you run is pretty

15  much on average about three-and-a-half to four packages

16  per vendor.  And then on top of that, they will also have

17  what we call *ala carte*, to where you have a service and

18  this guy might want parts for some reason because that's

19  what the dealer really wants.  So he can add in an

20  *ala cart* one, which would be a single interface, for

21  special ordering parts for those kind of things,

22  depending what they want.

23         THE COURT:  So when you do this, is there -- I

24  mean bottom line, is some sort of really complicated

25  price list that you have a price for each one of those

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 52 of 266 PageID #:61398
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 51 of 265

2-P-51

1   very many elements?  Or you put it together and you
2   negotiate it?
3           THE WITNESS:  I put it together and I negotiate
4   it.
5           THE COURT:  Okay.  All right.  And you want to
6   keep that secret why?
7           THE WITNESS:  Because then what happens is they
8   get into a comparison.  Well, I'm paying $700 and I'm
9   paying $600.  Yeah, but you're getting five more fields
10  more and you've getting real-time.  And you're getting --
11  it gets into be way too -- I don't have time to do all
12  that and put it together and negotiate.  Because, you
13  know, car dealers and vendors, their strength is
14  negotiations, and so they want to take all of the
15  information they can get and come hit me.  And so I can't
16  get into those types of negotiations if I'm comparing
17  something.  We're not necessarily always comparing apples
18  to apples.  They get into apples to oranges and want that
19  price and we just negotiate based on --
20          THE COURT:  So part of it is just it improves
21  the strength of your negotiating position if you keep it
22  secret.
23          THE WITNESS:  Sure, it does.  Sure, it does.
24  BY MS. GULLEY:
25  Q    Are you allowed to tell one vendor what another

                ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 53 of 266 PageID #:61399
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 53 of 266

2-P-52

1    vendor's data elements are?

2    A    Absolutely not.  In fact, even I can't --

3    internally our organization is set up completely

4    separate.  The actual infrastructure and all the data

5    elements no one else can see.

6    Q    Okay.  Looking at competition for a moment.  Exhibit

7    -- defendants' Exhibit 161 is the declaration of Ron

8    Lamb.  We've heard he's the former president and most

9    immediate past president of the Reynolds and Reynolds

10   Company.  You agree with that --

11   A    Yes.

12   Q    -- general comment?

13   A    Yes.

14   Q    And did you talk to Mr. Lamb about his

15   declaration --

16   A    Yes, I did.

17   Q    -- here?  He mentions on the last page that

18   "Competition in the DMS market has heightened to a fever

19   pitch" at the very end of paragraph 30.  Do you see that?

20   A    Yes.

21   Q    Do you agree with that?

22   A    Yes, I do.

23   Q    Are you still losing customers?

24   A    Yes.

25   Q    Is this a surprise to you?

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 54 of 266 PageID #:61400
Case: 3:17-cv-00318-jdp  Document #: 168  Filed: 07/05/17  Page 54 of 266

2-P-53

1   A     No, it is not.

2   Q     Why is that not a surprise to you?

3   A     Well, when I started about ten years ago now, I

4   started the security enhancements, and there's quite a

5   few internal resources coming at me.  What are you doing?

6   You're taking away sales force support organization.  So

7   I got with Mr. Brockman and I said "Bob, you've got to

8   explain to them the business that we're in."  Bob got

9   into -- brought in the room and stuff, brought all the

10  executives in the room and said "Let me set it straight.

11  We are going to make these security enhancements.  We are

12  going to lose dealers.  We know that.  We understand

13  that.  A dealer will be with us if they want to be secure

14  and they can go somewhere else, if not."

15       Then another time we had actually NADA came in,

16  their lawyers came in as well as Finbarr O'Neill, who was

17  a consultant at the time.  They asked for --

18  Q     The NADA came in?

19  A     The NADA committee came in and said you're making

20  security enhancements.  You're losing customers.

21  Mr. Brockman looks across the table and said "I

22  understand that.  I am so strong I am going to be sitting

23  on the right side of the dealerships that want to sit on

24  the right side for security and I know we're going to

25  lose dealerships."

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 55 of 266 PageID #:61401
Case: 3.17-cv-00318-jdp Document #:163 Filed: 07/05/17 Page 54 of 265

2-P-54

1   Q     And were you ever threatened to lose the entire
2   franchise base of any of the OEMs?
3   A     Yes.  We met with Subaru and had a conversation with
4   them and they went through and said you realize that all
5   of the other DMS providers are working directly with SIS
6   and will allow SIS into the system to do things.  And
7   Mr. Brockman looked back and says "We will not do that."
8   What happens is they're publicly held companies.  Those
9   publicly held companies, their responsible is to the
10  shareholders to make more money.  My responsibility is my
11  reputation.  My reputation is to make sure these systems
12  are secure.  And if -- and he says "You're going to lose
13  the Subaru business," and he said "So be it."
14  Q     All right.  The February 2015 agreement.  It's
15  Exhibit 1 in your binder if you need it.  My questions
16  will be general to begin with.  Did you enter the
17  February 2015 agreement with CDK to stop losing customers
18  to them?
19  A     Absolutely not.  I don't -- no, I did not.
20  Q     Are you losing fewer customers now that you have
21  this agreement?
22  A     No, not -- no.
23  Q     Where are the customers going?
24  A     DealerTrack.
25  Q     Did you enter the 2015 agreement with CDK to make

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 56 of 266 PageID #:61402
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 56 of 266

2-P-55

1  them close down their system?

2  A    Absolutely not.  I don't care what CDK does to be

3  honest with you.

4  Q    Did you enter the February 2015 agreement with CDK

5  to block Authenticom from the market?

6  A    Absolutely not.

7  Q    Did you enter -- did you agree with CDK that CDK

8  will no longer access your system using hostile

9  integration?

10 A    Did I -- I'm sorry, say that again.

11 Q    Did you agree with CDK that CDK would no longer

12 access your system with -- was it a blanket --

13 A    No.

14 Q    -- ban you --

15 A    No.

16 Q    -- could no longer come --

17 A    No, I did not.

18 Q    All right.  Well, why did you enter into the

19 February 2015 agreement?

20 A    Well, first of all what we knew is we had the

21 security enhancements in place.  What we wanted to do is

22 minimize the impact to the customer base which would be

23 the wind down; took a look at the customers and said

24 minimize the impact for them to all of a sudden be shut

25 off.  How do we come up with that.

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 57 of 266 PageID #:61403
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 56 of 265

2-P-56

1      The other thing that we looked at is just the
2  overall market presence of the security enhancements.  We
3  were done with it.  I mean basically we had them locked
4  out, so we weren't worried about that anymore.
5  Q    Why did you offer them the business resolution?
6  A    Couple things that -- what we wanted was is that
7  some of it is a business resolution.  We went in and
8  wanted to negotiate to get into the 3PA Program from a
9  DMS --
10  Q    Were any other DMS providers' applications in the
11  3PA Program at that time?
12  A    No, they were not.
13  Q    And you had no access to that application?
14  A    No.  That was one of their stipulations.  They would
15  not let a DMS provider in and we wanted in.
16  Q    And who else did you want to benefit by entering
17  into what you've called the soft-landing agreement?  Who
18  was the soft landing for?
19  A    It was for the vendors.  It was for the dealers.
20  Q    For the vendors and the dealers.  Okay.  Did you
21  tell Mr. Cottrell that you and CDK had agreed to support
22  each other's 3PA and RCI programs and therefore block
23  competition like Authenticom?
24  A    No.
25  Q    Have you ever talked to Mr. McCray about this

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 58 of 266 PageID #:61404
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 57 of 265

2-P-57

1    contract?

2    A    No.

3    Q    Looking at Exhibit 1 on page four, Authenticom has

4    highlighted Section 4.5.  Why is this in the agreement?

5    A    What we wanted to do -- when you get into a

6    wind-down process, you have to share a lot of information

7    together that says how do you guys work and how do we

8    block information.  And the reason that we wanted to get

9    this in there is because what we were going to share with

10   them is some of the information of how we were blocking

11   and they needed to share with us how they were getting in

12   so what we do, to the best of our ability, make sure that

13   we go ahead and protect those user IDs.

14   Q    Mr. Cottrell testified that vendors aren't allowed

15   in the program because they offer competing products to

16   Reynolds' layered applications.  Is that true?

17   A    No.

18   Q    How many applications are in the program that

19   compete with your applications?

20   A    50, 60, 70.  It's a big number.

21   Q    One of the experts has -- actually no, I'm going to

22   skip that.  So applications.  The application market.  We

23   were just talking about it.  Since February 2015, have

24   you seen more or fewer applications in the market?

25   A    More applications.

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 59 of 266 PageID #:61405
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 59 of 266

2-P-58

1  Q    And are they the same?  You know, other kinds of

2  applications you were seeing a decade ago?  Or are they

3  different in some way?

4  A    Yes.  I hate to say it that way, but you're seeing

5  new ones come in that are interested in the CRM.  You've

6  seeing CRMs getting broken apart.  You're seeing new

7  entrants come into the environment as well.

8  Q    Mr. Schaefer, we heard from two vendors today.

9  Have -- about their views of the RCI program.  Have you

10 heard contrary views from vendors?

11 A    Absolutely.

12 Q    Now, if you will, I gave you a preview of this so I

13 know you've seen it already.

14 A    Yes.

15 Q    Exhibits 50 through 60.

16 A    Yes.

17 Q    What are Exhibits 50 through 60?

18 A    Those are what they call in the market testimonials

19 or areas that sit down and support the program, and

20 support of the program from vendors.

21 Q    And have you heard from vendors -- are these the

22 only -- have you only heard positive from vendors ten

23 times about the RCI program?

24 A    No, because there's, you know, some vendors --

25           MR. HO:  Your Honor, we just object to the

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 60 of 266 PageID #:61406
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 59 of 265

2-P-59

 1   extent that this is being offered for the truth.  It's

 2   hearsay.

 3            THE COURT:  I understand.

 4            MS. GULLEY:  Right.  It's just being offered for

 5   state of mind and what you've heard from the market.

 6            THE WITNESS:  Yes.

 7   BY MS. GULLEY:

 8   Q    Are these on your -- are some of these from your

 9   website?

10   A    Yeah, there are some on website and I have more

11   conversations with third-party companies, along the

12   successes supporting the program.

13   Q    But some vendors don't like it.  Do they cancel

14   their contract sometimes?

15   A    They can, yes.

16   Q    Do -- do dealers like it when you lose important

17   contracts with application providers?

18   A    No, not at all.

19   Q    Do you have dealers that threaten or do leave

20   because you don't have contracts with certain application

21   providers?

22   A    Yes, we have had that.  Yes.

23   Q    POWER doesn't have as many application providers as

24   ERA.  Do people leave POWER for that reason?

25   A    Yes, they do.  In fact, they're starting more and

                    ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 61 of 266 PageID #:61407
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 600 of 265

2-P-60

1  more to do that, to take that into consideration, yes.

2  Q    All right.  So let's talk just briefly on the issue

3  of stop blocking and what that might mean to you; okay?

4  We talked about wind-down access and what that costs.  I

5  won't replow that.  But in terms of why it's a problem

6  for you to target one particular syndicator of data, can

7  you do that?  Can you make sure that it's only one that

8  gets in?

9  A    In the case of the username and the password I

10 can't.  They're coming in through our intellectual

11 property, through the ERA Access, and with that they look

12 like an employee to us so I don't know how to know that

13 it is an individual data broker.

14 Q    Do you make changes to your system?

15 A    Yes.

16 Q    Why?

17 A    Every day.

18 Q    General big picture categories of the kinds of

19 changes that are being made to the OEMs every day.

20 A    Changes to OEMs, changes for legality issues,

21 changes to enhance and modify the product and make better

22 security enhancements, state, federal enhancements.  We

23 make changes and modifications all day long.

24 Q    I'm talking like programming changes.

25 A    Those are programming changes.

ROBERT SCHAEFER – DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 62 of 266 PageID #:61408
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 62 of 266 PageID #:265

2-P-61

1   Q    What happens if you're trying to "protect the user
2   ID" and you make -- have to make a change to the system?
3   A    We can make a change in several areas that comes in
4   that either deletes a field, adds a field, or modifies a
5   field.  For example, taking the total out and breaking it
6   out, that would affect that side, but also could break
7   and actually look like it's blocking the system.
8   Q    It looks like it's a block when you make those
9   changes.  So --
10           THE COURT:  I'm not sure I understand that.
11           THE WITNESS:  In other words, let's say that we
12  made a change in a particular application that we changed
13  it from.  Let's say when they logged in and the character
14  they always use to log in was an A, as an example.  So
15  they logged in, they logged in and we decided what we
16  need to do is make it a B and a D for some reason because
17  of functionality changes.  We change it to a B and D, and
18  then that third-party couldn't get in anymore because
19  they had been using A in their machine piece and it looks
20  like we blocked them.  We didn't, we just made a
21  programming change that says we went and modified our
22  program to now use B and D instead of just A.
23  Q    But that doesn't happen from the hub; right?  Why?
24  A    The actual -- those types of user interfaces or the
25  user look is actually done at the DMS level.  We make

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 63 of 266 PageID #:61409
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 63 of 65

2-P-62

1    those changes just down at the DMS.

2    Q    So it doesn't happen if it's in the environment.  So

3    why not just build Authenticom a custom interface?

4    A    Because what we do is not a one-to-one relationship

5    then with DealerVault.

6    Q    So if you wanted a one-to-one relationship -- we

7    heard testimony that Authenticom has roughly 400 vendors.

8    We've heard testimony that you have more than 5,000

9    dealers.  What would it take for you to customize an

10   interface for 400 vendors across 5,000 dealers?

11   A    Years.

12   Q    What happens if there is a security incident?

13   What's your first response to data security?

14   A    When there's a security incident I shut it off.

15   Q    You shut it off.  So if you -- if a security

16   incident occurred for whatever reason on whatever part of

17   the system --

18   A    When in doubt I shut it off.

19   Q    And would that cause someone to be blocked?

20   A    Yes.

21   Q    Everyone, I guess.

22   A    Everyone would be blocked.  And I catch hell when it

23   happens.

24   Q    Okay.  If Authenticom -- we heard about

25   piggybacking.  But if Authenticom gets credentials to

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 64 of 266 PageID #:61410
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 63 of 265

2-P-63

1    allow access to the DMS and somehow that code get out to

2    the consumers data, whether through an email or any which

3    way, what concerns do you have about that?

4    A    Basically someone can come in and just use that user

5    ID to get information, get into the system, start hacking

6    around, looking around and getting information that we

7    wouldn't be able to stop or know because the hub protects

8    me from everything else.  I'm not in the hub to do that.

9    I don't have that security checks down in that

10   environment.

11   Q    Have you had to respond to investigations when

12   dealers or other third parties have had security

13   incidents?

14   A    Oh, yes.

15   Q    As far as you're aware has your system ever been

16   breached?

17   A    No, it has not.

18   Q    Were those -- were those expensive?  Can you -- sort

19   of order of magnitude of the cost of investigating it for

20   third parties?

21   A    Oh, yeah.  I've gotten involved with the IRS.  I've

22   gotten involved with fire --

23   Q    But I mean data breach incidents.

24   A    Oh, you mean if there was a data breach with us, a

25   cause for a data breach?

                    ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 65 of 266 PageID #:61411
Case 3:17-cv-00318-jep Document #: 163 Filed: 07/05/17 Page 64 of 265

2-P-64

1  Q    For example, your investigation, there's evidence in

2  the record of the eLead situation.  Even though that was

3  outside of your system, how much did that cost you?

4  A    It cost us somewhere around 750 to a million

5  dollars.

6  Q    And how many days did it take to spin that?

7  A    We fixed it in six days.

8  Q    If Authenticom were to be granted access for a year

9  or two years or something like that -- I see your face --

10 would -- do you think a $10 million bond would cover the

11 potential risk to you?

12 A    Absolutely not.

13 Q    Okay.

14       MS. GULLEY:  I will pass the witness.  Thank

15 you.  (3:00 p.m.)

16       THE COURT:  Very good.  Cross-examination.

17       THE WITNESS:  Can I just stand up?  My legs are

18 killing me.

19       MR. NEMELKA:  Absolutely.  No problem.

20       MS. GULLEY:  Bob is 6'7".

21       THE WITNESS:  Too many years of basketball.

22 Sorry about that.

23       MR. NEMELKA:  No problem.  In fact, feel free to

24 sit back so you're not so crouched under the table.

25       THE WITNESS:  Thanks.  Sorry about that.

ROBERT SCHAEFER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 66 of 266 PageID #:61412
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 66 of 265

2-P-65

1        THE COURT:  Just stay close to the mic.

2        THE WITNESS:  I will.  I'll grab it.

3                    CROSS-EXAMINATION

4  BY MR. NEMELKA:

5  Q    Good afternoon, Mr. Schaefer.  My name is Mike

6  Nemelka.  I'll be examining you this afternoon.  You

7  testified that you did not have a data integration

8  contract with Authenticom; right?

9  A    No, I said I did.

10 Q    All right.  Well, I thought you said that it was

11 your -- the vendors that you purchased that have the

12 contract with Authenticom, not Reynolds.

13 A    No, those -- no.  When we -- we actually assign

14 those when we have those contracts.  Those are Reynolds

15 and Reynolds contracts with Authenticom.

16 Q    So Reynolds itself actually has a data integration

17 contract with Authenticom; right?

18 A    Only from the -- we did not -- let me be clear here.

19 What we did is when we bought a company, that came with

20 the company, so therefore we inherited that contract.

21 Q    But Reynolds itself does not have a --

22 A    Yes, we have one.  Yeah, we have them because of

23 that.

24 Q    Okay.  Well, let's --

25        MR. NEMELKA:  Your Honor, may I distribute some

                    ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 67 of 266 PageID #:61413
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 67 of 266

2-P-66

1    binders?

2          THE COURT:  Yes.

3    BY MR. NEMELKA:

4    Q    If you could turn to tab plaintiff's Exhibit 164,

5    please.

6          THE COURT:  Are these in order?

7          THE WITNESS:  I don't have a 164.

8    BY MR. NEMELKA:

9    Q    I'm sorry, 162.  I apologize.  Do you see that

10   exhibit in front of you, Mr. Schaefer?

11   A    Um-hmm.

12   Q    You see that's a contract between Authenticom and

13   Reynolds?

14   A    Yep.

15   Q    Dated February 23, 2016?

16   A    Yep.

17   Q    For data integration services; correct?

18   A    That's correct.

19   Q    And if you please look at sub point one, *Description*

20   *of Services*.  You flipped.  Still on the first page.

21   A    Yes.

22   Q    You see it says "Reynolds has engaged Authenticom to

23   extract sales, service and inventory files from their

24   customers' data management systems for the purpose of

25   creating an electronic file which can be used to

                    ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 68 of 266 PageID #:61414
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 67 of 265

2-P-67

1   share/communicate the records with a service provider or

2   other entity."  Do you see that?

3   A    Yes.

4   Q    And do you see on the bottom there's the following

5   data elements that Authenticom would provide to you that

6   they pulled from your dealers?

7   A    Yes.

8   Q    And if you go to the last page, please, do you see

9   that this contract was signed by you?

10  A    Yes.

11  Q    On February 25, 2016?

12  A    Yes.

13  Q    Mr. Schaefer, if Authenticom was such a risk to data

14  security or your system integrity, you wouldn't use them;

15  right?

16  A    Well, first of all we had these -- what we did is

17  these were for companies that we bought that we did not

18  want to shut off, so we continued that while we go ahead

19  and finish the migration to move away.

20  Q    My question was different.  If Authenticom was such

21  a risk to data security or your system integrity, you

22  wouldn't use them; right?

23  A    I don't have any choice because when I bought them,

24  I had to continue to work with this to do it.

25  Q    All right.  Please turn to Exhibit 1.  Defendants'

ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 69 of 266 PageID #:61415
Case: 3:17-cv-00318-jdp Document #:163 Filed: 07/05/17 Page 69 of 265

2-P-68

1    Exhibit --

2            MR. NEMELKA:  We'd like to enter this into the

3    record, please.

4            THE COURT:  Any objection?

5            MS. GULLEY:  No.

6            THE COURT:  It's admitted.

7    BY MR. NEMELKA:

8    Q    Mr. Schaefer, this is the wind-down agreement

9    between Reynolds and CDK; correct?

10   A    Yes.

11   Q    We don't need to cover too many of the details here,

12   but I'd like to go over a few items.  Please turn to

13   Section 1.4.

14   A    Yes.

15   Q    Do you see that's the wind-down period?

16   A    Yes.

17   Q    And here it says that "For each DMI third-party

18   client, the period beginning on the effective date of

19   this agreement and concluding on the later of," and it

20   lists some dates here.  But what I'd like to focus on is

21   on the next page.  "That the wind-down period for any DMI

22   client cannot exceed five years from the effective date."

23   Do you see that?

24   A    Yes.

25   Q    This is entered in 2015; right?

                    ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 70 of 266 PageID #:61416
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 69 of 265

2-P-69

1  A    Yes.

2  Q    So that's clear until 2020 that you were going to

3  allow CDK to use usernames and passwords to pull data

4  from Reynolds dealers; right?

5  A    No.  Once we got done with each of the vendors,

6  which we were trying to get that done as quickly as

7  possible, then we were done.

8  Q    Are you done with every single vendor?

9  A    We're very close.

10  Q    But you're not done currently, are you?

11  A    We're very close.

12  Q    You still allow CDK to use usernames and passwords

13  to pull data from Reynolds dealers, don't you?

14  A    We're very close to being done.

15  Q    So Reynolds is perfectly capable of white listing

16  all of the usernames and passwords that CDK once used, at

17  least for a period of time; right?

18  A    We put a preliminary place in place, yes.

19  Q    You did that --

20          THE COURT:  I'm sorry, I didn't hear your

21  answer.

22          THE WITNESS:  Yes, I did.

23  BY MR. NEMELKA:

24  Q    Yes, Reynolds was able to; correct?

25  A    Yeah.  I looked away when I said yes.  I apologize.

ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 71 of 266 PageID #:61417
Case: 3:17-cv-00318-jdp Document #: 168 Filed: 07/05/17 Page 71 of 265

2-P-70

1  Q    And you did that for all of CDK's usernames and

2  passwords that they were using for vendors; correct?

3  A    I did not do it for CDK.  What I did it for was the

4  vendors we had relationships for under the RCI program.

5  Q    That wasn't my question.  You did it for the

6  usernames and passwords that CDK was using to pull data

7  from Reynolds dealers; right?

8  A    I did it for the vendors and they happen to be using

9  CDK.

10 Q    I don't want to argue, Mr. Schaefer.  It's just a

11 simple fact.  You protected the usernames and passwords

12 that CDK was using to pull data from Reynolds dealers;

13 isn't that right?

14 A    I protected the user IDs that the vendors were using

15 that -- who they used, I protected those on behalf of the

16 vendor.

17 Q    I think we get the point.  All right.  If you could

18 please turn to Section 4.4.  Mr. Schaefer, I understand

19 it's one thing not to have CDK no longer access

20 Reynolds's DMS.  But wouldn't you agree with me it's an

21 entire nother thing to have CDK actually cooperate with

22 Reynolds to transfer their own vendor clients to

23 Reynolds?

24 A    They didn't transfer them.

25 Q    They were required to cooperate with you in

ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 72 of 266 PageID #:61418
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 73 of 266

2-P-71

1  transferring their own vendor clients to Reynolds,

2  weren't they?

3  A    They were required -- they provided information.  I

4  did all the negotiations with the vendors.  They had

5  nothing to do with those.  Once the vendor -- I talked

6  with the vendor, I took over all responsibility of

7  negotiation and CDK had nothing to do with it.

8  Q    Under this contract, Mr. Schaefer, CDK was required

9  to cooperate with you in transferring CDK vendor clients

10  to Reynolds; correct?

11  A    The cooperation I had from them was a letter.  The

12  rest of it I did negotiation myself.

13  Q    All right.  Let's look at that agreement then.

14  Section 4.4, if you look at the last -- it's about midway

15  down, it says "During the wind-down period for each DMI

16  third-party client..."  Do you see that?  It's one, two,

17  three, six lines down.

18  A    I got it.

19  Q    "So during the wind-down period for each DMI

20  third-party client, CDK agrees to reasonably assist and

21  cooperate with Reynolds with respect to..." and if you go

22  down to No. 3, "the transition of such customers to the

23  Reynolds RCI program with respect to Reynolds dealers."

24  Do you see that?

25  A    Um-hmm.

ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 73 of 266 PageID #:61419
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 73 of 266

2-P-72

1  Q    Don't you agree it's maybe one thing to agree for

2  CDK to access a system, but it's entirely another thing

3  to -- for two competitors to cooperate to transfer

4  customers from one to another?

5  A    It didn't say anything about transferring customers.

6  I made it so what we could do is understand what the data

7  elements are because they were passing the data.

8  Q    Transition.  That's correct.  So instead of

9  transfer, the contract says transition.

10 A    Transition.  So that's part of the transition.

11 Q    Okay.  So Ms. Gulley asked you this question, I

12 wrote it down because I was very interested in your

13 answer.  She said:  "Did you agree with CDK that CDK will

14 no longer access your system using hostile integration?"

15 And you said "No," didn't you?

16 A    Yes.

17 Q    Let's look at Section 4.5.

18 A    Um-hmm.

19 Q    It says "Each of Reynolds and CDK further covenants

20 and agrees..." do you see that how it starts out?  "Each

21 of Reynolds and CDK further covenants and agrees..."  Do

22 you see that?

23 A    Yes.

24 Q    "... not to..." and let's go after the disjunctive

25 or, "... not to..." on the last line "...take any other

ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 74 of 266 PageID #:61420
Case: 3:17-cv-00318-jdp Document #:163 Filed: 07/05/17 Page 73 of 265

2-P-73

1  steps to assist any person that it reasonably believes to

2  have plans to access or integrate with the other party's

3  DMS without the other party's written consent."  Do you

4  see that?

5  A    Yeah.

6        MS. GULLEY:  I'm just going to object on the

7  optional completeness of this paragraph.  You get it.

8        THE COURT:  You can flesh it out if we need to,

9  but go ahead.

10 BY MR. NEMELKA:

11 Q    And then the next line explains what this means.

12 "For the avoidance of doubt, this Section 4.5 is not

13 intended as a covenant not to compete but rather as a

14 contractual restriction of access."  CDK agreed not to

15 access the Reynolds DMS, didn't they?

16 A    While we're in the wind down.

17 Q    Is there anything in here limited to the wind down?

18 A    The -- during the wind down.  That's what we agreed

19 to.

20 Q    Where does it say this is only limited to the wind

21 down?

22       THE COURT:  You know, you can just help me out

23 here, and I don't mean to disrupt your cross-examination,

24 but if I understand this -- this is how I understand the

25 agreement.  You had a wind-down period during which you

                ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 75 of 266 PageID #:61421
Case: 3:17-cv-00918-jdp Document #: 163 Filed: 07/05/17 Page 74 of 265

2-P-74

1    would allow basically DMI to access using piggybacking, I

2    guess.  Some usernames that they would use.

3            THE WITNESS:  Yes.

4            THE COURT:  They would more or less emulate

5    dealers that come in through --

6            THE WITNESS:  That is correct.

7            THE COURT:  -- the dealer door.  After the wind

8    down, if I understand this right, the wind down is over,

9    then they have to stop that; correct?  Isn't that the

10   agreement?

11           THE WITNESS:  They have to stop -- we never

12   agreed --

13           THE COURT:  They have to stop coming in through

14   the dealer door.  You're giving them a soft landing; they

15   got five years' maximum which they can continue to do the

16   techniques that is similar to the hostile integration.

17   It's not hostile here because you're agreeing to it.

18           THE WITNESS:  Correct.

19           THE COURT:  But when that's over, when the five

20   years is done and preferably sooner, you're going to stop

21   that.  They can't come in that door anymore; right?

22           THE WITNESS:  Once this contract is over, this

23   is done anyway, so -- that agreement is done.  The

24   contract is over.  So they could do whatever they wanted

25   to do.

                    ROBERT SCHAEFER - CROSS

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 76 of 266 PageID #:61422
Case: 3:17-cv-00318-jdp Document #:163 Filed: 07/05/17 Page 76 of 266

2-P-75

1      THE COURT:  So they could start that up again.

2      THE WITNESS:  Yeah, but we -- we were not

3  worried about that because we've got our security blocks.

4  So we were like yep, that's fine.  If you want to try it

5  again, go for it.  But our security will continue to

6  enhance and modify.

7      THE COURT:  All right.  So the whole thing --

8  this whole thing terminates then after the wind-down

9  period and then everybody is free to do --

10      THE WITNESS:  As soon as the last one winds

11  down, the contract it over.

12      MR. NEMELKA:  Your Honor, I think the contract

13  can help us here.

14      THE COURT:  Perhaps it can.  Go ahead.

15  BY MR. NEMELKA:

16  Q    Let's turn to Section 6.1, please, Mr. Schaefer.  Do

17  you see that it says "Term.  With the exception of the

18  obligations set forth in Sections 4.5 (prohibition on DMS

19  access) the terms which are set forth specifically

20  herein, this agreement will terminate at the end of this

21  wind-down period."  Do you see that?

22  A    Um-hmm.

23  Q    So Section 4.5, contrary to your testimony 30

24  seconds ago, does not terminate at the end of the

25  wind-down period, does it?

ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 17 of 266 PageID #:61423
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 77 of 266

2-P-76

1  A    Correct.

2  Q    And it wasn't just CDK that agreed not to access the

3  DMS -- to access Reynolds' DMS, Reynolds agreed not to

4  access CDK's DMS either, didn't you?

5  A    I've never accessed CDK's DMS.

6  Q    That's not my question.  In this contract by its

7  plain term Section 4.5, Reynolds agreed not to access the

8  CDK DMS; isn't that right?

9  A    That would be correct.

10  Q    And that means that Reynolds agreed -- if it can't

11  access the CDK DMS, Reynolds agreed not to provide data

12  integration services for CDK dealers; isn't that right?

13  A    Say that again.

14  Q    If you cannot access the DMS, you cannot provide

15  integration services for those dealers; right?

16  A    I'm lost on your question.

17  Q    Strike it.  Okay.  Let's go to Section 4.6.

18  "Limitations on use.  During the wind-down period for DMI

19  third-party client..." -- do you see where I am?

20  A    Yes.

21  Q    "CDK will collect, transmit and/or store operational

22  data from the Reynolds DMS."  So it's saying that during

23  the wind-down period, CDK pull this data from the

24  Reynolds DMS; right?

25  A    Yes.

ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 78 of 266 PageID #:61424
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 79 of 265

2-P-77

1  Q    Okay.  Now, go down, and then it says "only if," and

2  then it lists three conditions.  So CDK can pull the data

3  from the Reynolds DMS only if.  Do you see the *only if*?

4  A    Yes.

5  Q    Let's go to the third.  "CDK's access to the

6  Reynolds DMS does not materially degrade or otherwise

7  materially adversely affect the operation of the

8  applicable Reynolds DMS or place Reynolds and/or a

9  Reynolds dealer at a material operational or security

10 risk - provided, however, that any such material adverse

11 risk -- effect or risk covered by this Section 4.6 must

12 be demonstrated to CDK by Reynolds with clear and direct

13 evidence and that CDK shall be given a reasonable

14 opportunity to cure any such material adverse effect or

15 risk."  Do you see that?

16 A    Yes.

17 Q    Did Reynolds ever invoke this clause?

18 A    Not that I can remember.

19 Q    Reynolds never even invoked this clause that the

20 thousands of usernames that CDK was using put any

21 material effect or risk on Reynolds' system; isn't that

22 right?

23 A    During this period of time, because we had to

24 protect it, we didn't know what they were doing, so it

25 did not put a material impact on the system.

                    ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 79 of 266 PageID #:61425
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 78 of 265

2-P-78

1  Q    They're this pulling all this data.  They're still,

2  as you say, grinding, aren't they?

3  A    No.  We had set them up -- we set them up.  We knew

4  exactly when they are going and what they were doing.  We

5  set up all those parameters to do that.

6  Q    But you never invoked this clause; right?  That's

7  right?

8  A    I said no.

9  Q    And if you were to invoke it, you were going to --

10  you were required to show by clear and convincing

11  evidence that it did put the system at risk, weren't you?

12  A    We would have, yes.

13  Q    Which means providing specific examples; right?

14  A    That's correct.

15  Q    And if you did provide such specific examples, you

16  would at least give CDK a chance to fix it; right?  Is

17  that right?

18  A    Depending on what it was.

19  Q    And in the one example in the past --

20  A    First we'd shut them off.

21  Q    Mr. Schaefer --

22  A    They'd shut off.

23  Q    Mr. Schaefer, in the past ten years there was one

24  example where you actually called Mr. Cottrell and said

25  "I have one query running on a loop.  Will you please fix

ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 80 of 266 PageID #:61426
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 79 of 265

2-P-79

1  it?"  Isn't that right?

2  A    I think Steve and I had several other conversations,

3  but that's the only one I was specific on because it's

4  the only one that I knew at a given point in time.

5  Q    Right.  And he fixed that in one day, didn't he?

6  A    One day doesn't -- I don't know that.  That's --

7  that's what he said.  I don't know.

8  Q    All right.  Mr. Schaefer, will you please turn to

9  the signature page?

10 A    Yes.

11 Q    This agreement was signed by Bob Brockman, wasn't

12 it?

13 A    Yes, sir.

14 Q    And it also assigned -- who signed it for CDK?

15 A    I think that's Ron Brockman, I think.

16 Q    Right.  The Senior Vice President of Business

17 Development at CDK; right?

18 A    Um-hmm.

19 Q    Turn to the last page, Exhibit DEA 2.  I was very

20 interested in your testimony when you said that you could

21 never disclose the data elements that you pulled for

22 specific vendors to other vendors.  Do you remember that?

23 A    I'm sorry, I was trying to get to the -- I was

24 trying to get to your page --

25 Q    That's my fault.  Thank you --

ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 81 of 266 PageID #:61427
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 80 of 265

2-P-80

1   A    You're reading awful fast on me.

2          THE COURT:  We can only talk one at a time.

3   Q    I'm sorry.  That's my fault, Mr. Schaefer.  I should

4   let you --

5   A    You knew where I was at.  I was trying to get there.

6          THE COURT:  Even your apologies are overlapping.

7   One at a time.

8          MR. ROSS:  An endless loop.

9   BY MR. NEMELKA:

10  Q    You said that you could never disclose the data

11  elements that you pull for particular vendors to others.

12  Didn't you say that to Ms. Gulley?

13  A    To others?

14  Q    To other third parties.

15  A    That's correct.

16  Q    In this exhibit, this is all the information that

17  CDK was required to give Reynolds about each of its

18  vendor customers that it was pulling data from Reynolds'

19  dealers from, isn't it?

20  A    It's what we requested.

21  Q    Right.  The vendor name, the point of contact, their

22  address, their contact name, their DMS system number,

23  their store number, their branch number, their user

24  login, the specific data access currently provided by CDK

25  to these vendors, the data interfaces, the frequency of

                  ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 82 of 266 PageID #:61428
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 81 of 265

2-P-81

1  the data provider -- provided, any deadlines for data

2  delivery, the format of the data.  Mr. Schaefer, do you

3  share that information in the ordinary course with your

4  competitors?

5  A    Not unless there's an agreement.  But they're

6  sharing with me, my customer, and their information to

7  get into it and it just gives me who the third-party is

8  in order to talk to them.

9  Q    This is about your customer?

10  A    This is about -- I'm sorry.  This is about their

11  vendor and stuff is just sharing information with them.

12  I apologize.

13  Q    This is about CDK's customers that they're sharing

14  with you; right?

15  A    I said I apologize.

16  Q    Do you share this type of information with your

17  competitors in the ordinary course?

18  A    Not unless I've got an agreement, a reason to.

19  Q    Exactly.  Not unless you have an agreement.  All

20  right.  Let's turn to tab 53.  This is the Reynolds

21  Interface Agreement.  This is a standard Reynolds RCI

22  agreement; isn't that right?

23  A    I assume it is.

24  Q    You don't have an executed version to use in this

25  hearing because unfortunately Reynolds didn't produce one

ROBERT SCHAEFER - CROSS

1    so this is what we've got.

2            MS. GULLEY:  Your Honor, just one moment.  This

3    is marked highly confidential -- I'm sorry, it's not.  I

4    didn't know -- does this one have anybody's

5    sensitive information?

6            MR. NEMELKA:  It's all X's.

7            MS. GULLEY:  Okay.  I just wanted to check.

8            MR. NEMELKA:  We'd like to move this into

9    evidence.

10           THE COURT:  Any objection?

11           MS. GULLEY:  No, Your Honor.

12           THE COURT:  So this is --

13           MR. NEMELKA:  53.  Plaintiff's Exhibit 53.

14           THE COURT:  PX53.  It's admitted.

15   BY MR. NEMELKA:

16   Q    This is your standard Reynolds RCI agreement;

17   correct?

18   A    Unless -- I guess.  I mean unless I -- I'm going to

19   have to read it to make sure it's my standard one because

20   I don't know where you got it from; but...

21           THE COURT:  Why don't you tell him where you got

22   it.

23           MR. NEMELKA:  It actually was out there in the

24   public that we found.

25           THE COURT:  Okay.

                    ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 84 of 266 PageID #:61430
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 83 of 265

2-P-83

BY MR. NEMELKA:

Q   Okay.  If you go to Section 1.9, do you see it says
*Nonapproved Access*?

A   Yes.

Q   So when a vendor signs up for RCI, they can't get
data after they sign up.  They are precluded from getting
data from any other integrator, aren't they?

A   Until they're certified.  We allow it during the --
what we call the wind-down period where they aren't using
our stuff yet, which is what we've been through.

Q   But once they're fully certified or fully integrated
with Reynolds, you don't allow them to get data from
anywhere else, do you?

A   No.

Q   So this is an exclusive dealing contract, isn't it?

        MS. GULLEY:  Objection.  Leading.

        MR. NEMELKA:  I'll strike it.

        THE COURT:  I'll sustain the objection.

BY MR. NEMELKA:

Q   But if a vendor signs with you, the vendor has to
agree that it can't use Authenticom; right?

A   It can't use an unauthorized access.

Q   If a vendor signs with you, it has to agree that it
can't get data from anywhere else; right?

A   They do get -- they can get data from other places.

                ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 85 of 266 PageID #:61431
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 84 of 265

2-P-84

1    I'll give you an example; okay?  As an example, they take

2    the data and they send it off to IHS for cleansing

3    services or other things and they give it to us to do

4    those so they can add those services for their piece.

5    But to go get other data out of our DMS, the answer no.

6    Q    The answer is no; right?

7    A    Um-hmm.  And the reason --

8    Q    Ms. Gulley can ask you further reasons.  Please

9    turn -- you enforce this exclusive provision that they

10   can only get data from you.  Reynolds enforces that,

11   doesn't it?

12   A    Yes.

13   Q    Okay.  Please turn to tab 54.  This is plaintiff's

14   hearing Exhibit 54.  This is a letter that you sent on

15   April 19 -- you personally, Mr. Schaefer, you sent this

16   on August 19, 2016, to a vendor because that vendor used

17   Authenticom for data integration; right?

18   A    That's correct.

19   Q    And you said they cannot use Authenticom for data

20   integration because they have the contract with you,

21   right?

22   A    That's correct.

23   Q    And you demanded that they pay you $100,000 for

24   slipping up and using Authenticom; right?

25   A    When I sent it, that's what we -- for using an

                   ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 86 of 266 PageID #:61432
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 85 of 265

2-P-85

1  unauthorized access, yes.

2  Q     You demanded $100,000 from this vendor, didn't you?

3  A     Yes.

4  Q     Is there anything in this letter, Mr. Schaefer,

5  about data security or system integrity?

6  A     Going to get data from another source that isn't

7  secure on our system we don't know about, yeah, that's a

8  risk that we don't want to take.

9  Q     That wasn't my question.  Is there anything in this

10  letter about data security or system integrity?  There

11  isn't, is there?

12  A     No.

13  Q     You just wanted $100,000 from the vendor for using

14  Authenticom; right?

15  A     No.

16  Q     All right.  Please turn to tab 89.  We're almost

17  done.

18         MR. NEMELKA:  I'd like to move -- excuse me, I

19  forgot.  I'd like to move that prior exhibit into

20  evidence, please.

21         THE COURT:  Any objection to 54?

22         MS. GULLEY:  Just I object that I don't know

23  where the extraneous notes come from and that I

24  previously sent Mr. Nemelka several letters regarding the

25  confidentiality of that letter.  But with that stated

ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 87 of 266 PageID #:61433
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 86 of 265

2-P-86

1    that it's confidential and that I don't know what the

2    notations are, I --

3              THE COURT:  Okay.  We'll preserve the

4    confidentiality.  And the notation is -- it looks like

5    there's highlighting and a handwritten note.

6              MS. GULLEY:  Yes, Your Honor.  Thank you.

7              THE COURT:  Okay.  With that exception, I don't

8    know what to make of the notation either, so subject to

9    that proviso about the notations, it's admitted.

10             MR. NEMELKA:  Thank you.

11   BY MR. NEMELKA:

12   Q    Exhibit 89, Mr. Schaefer, is an email from

13   Authenticom dated March 13, 2014, to among other people,

14   Chris Hellyer at Reynolds; correct?

15   A    Yes, yes.

16   Q    Okay.  And it attaches a report of Jaguar, Land

17   Rover and other dealers that -- Reynolds dealers that

18   Authenticom pulled data from; correct?

19   A    I would assume.  I don't know that specific, but I

20   would assume.

21   Q    And if you look at the attachment -- actually let's

22   look at the email, what she writes to Reynolds.  In the

23   middle -- middle paragraph, that last sentence says "We

24   will continue to send in requests to Reynolds and

25   Reynolds to protect new profiles for new Jaguar orders

                    ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 88 of 266 PageID #:61434
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 87 of 265

2-P-87

1   that we get."  Do you see that?

2   A    Yes.

3   Q    So these are profiles -- these are names and

4   passwords that Authenticom uses to pull data from

5   Reynolds dealers that Reynolds agreed to protect; right?

6   A    Yes.

7   Q    And if you look at the attachment, you can see it

8   includes the actual usernames that were used; right?

9   A    That's correct.

10  Q    So it's possible for you to get a list of usernames

11  and you to protect them and not block them; right?

12  A    I'm sorry?

13  Q    It's possible for Authenticom to send you a list of

14  usernames and you to protect them and not block them;

15  right?

16  A    As long as I have -- I don't -- again, I do it on

17  behalf of the vendor who is using Authenticom.  I don't

18  do it for Authenticom.

19  Q    But you could also do it if the Court ordered

20  Authenticom to give you a list of usernames to protect;

21  right?

22  A    Not without a hell of a lot of work.

23  Q    And for these names and passwords, Authenticom

24  accessed the Reynolds DMS in an automated way; right?

25  A    That's our wind-down period that we do consistently

                    ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 89 of 266 PageID #:61435
Case 3:17-cv-00318-jgh Document #: 163 Filed: 07/05/17 Page 89 of 266 PageID #:65

2-P-88

1  across the market.

2  Q    All right.  If you go to the last page in the

3  middle.

4  A    Last page of?

5  Q    Last page of this exhibit.

6  A    Yes.

7  Q    Do you see the Penske dealerships there?

8  A    Yes, I do.

9  Q    All right.

10         MR. NEMELKA:  Can we move that into evidence,

11  please?

12         THE COURT:  You can make a motion.

13         MR. NEMELKA:  Yes.

14         THE COURT:  Any objection?

15         MS. GULLEY:  I don't think I have any objection

16  so long as there's no emails or anything we have to

17  protect by the law.  I'm not positive in terms of

18  confidentiality.  I have no objection to admission.

19         THE COURT:  Okay.  It's admitted.

20  BY MR. NEMELKA:

21  Q    Okay.  Last document, Mr. Schaefer.  Let's turn to

22  PHX 159.

23         THE COURT:  Before we leave that document, so it

24  attaches all these Jaguar Land Rover dealers.  So is this

25  -- is this one of those transition situations?

ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 90 of 266 PageID #:61436
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 90 of 265

2-P-89

```
 1              THE WITNESS:  Yes, sir.
 2              THE COURT:  Or is it because the profiles all
 3    involve these dealers?  So what's the -- I don't see any
 4    mention of a vendor here.  These are all a bunch of
 5    dealers.
 6              THE WITNESS:  That's what the GLR, that's for
 7    Jaguar.  So we have a contract with Jaguar to provide the
 8    data.  They were using Authenticom, so we were in a
 9    wind-down period for that.
10              THE COURT:  Okay.  Thank you.  Go ahead.
11    BY MR. NEMELKA:
12    Q    All right.  Last document.  PHX 159.  Are you there?
13    Actually I don't think it's in your binder.  I apologize.
14    A    I thought I was losing my mind.
15              MS. GREGOR:  Nicole provided a courtesy copy
16    this morning.
17    BY MR. NEMELKA:
18    Q    It's PHX -- I'm sorry, it's PHX 163.  The numbering
19    is off in the binder.  Could you pull that up?
20    A    That's in my book?
21    Q    No, if you just would mind looking at the screen.
22    These are my last questions.
23              THE COURT:  I think it is in my book.
24    Q    I'm sorry, I'm confused.  163.  Do you see that this
25    is a letter dated February 4, 2016, from you to
```

ROBERT SCHAEFER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 91 of 266 PageID #:61437
Case: 3:17-cv-00318-jdp Document #:168 Filed: 07/05/17 Page 90 of 265

2-P-90

1   Mr. Cottrell?

2   A    Yes.

3   Q    And do you see that previously Reynolds had written

4   to Authenticom to cancel the data integration contracts?

5   A    Yes.

6   Q    But the last paragraph says "Reynolds is hereby

7   rescinding the above-detailed notices to terminate the

8   statements of work.  As such, none of the above

9   statements of work shall terminate and all will continue

10  in accordance with the terms thereof."  Do you see that?

11  A    Yes.

12  Q    Again, Mr. Schaefer, if Authenticom was such a risk

13  to data security and system integrity, you wouldn't use

14  them, would you?

15  A    They're still in a wind-down period with us.  We've

16  got three dealers left.

17          MR. NEMELKA:  No further questions, Your Honor.

18          MS. GULLEY:  Could you just leave that up there

19  for me, please?  Thank you.

20                  <u>REDIRECT EXAMINATION</u>

21  BY MS. GULLEY:

22  Q    Now, this document was signed before you were

23  notified about the switch from Authenticom's one-to-one

24  to DealerVault's one to --

25  A    That's correct.

                ROBERT SCHAEFER - REDIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 92 of 266 PageID #:61438
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 91 of 265

2-P-91

```
 1  Q    If you will turn back to Exhibit 1, DEA 2, which is
 2  page CDK 13, the list of data elements that you needed.
 3  A    Slow down.  Say that again.  Which one?
 4  Q    Exhibit 1 in my binder that I gave you.
 5  A    Oh.  Now I'm in your binder.
 6  Q    Page 13.  CDK 13.  The list of data elements
 7  attached to the CDK contract -- and you remember what I'm
 8  talking about.
 9  A    Oh, yes.
10  Q    The vendor name, all of these points --
11  A    Yes, yes, yes.
12  Q    -- that Mr. Nemelka asked you about.
13  A    Yes.
14  Q    With Jaguar, with DMI, with all of these so-called
15  protected IDs, do dealers gives out those IDs or does
16  Reynolds?
17  A    Dealers give out the IDs.
18  Q    In terms of --
19  A    We give out the IDs of what those are.  So what we
20  do is we get those in and we change those IDs to match
21  the acronym, the setup that we do.
22  Q    And why do you ask for these elements?  Are these
23  used in connection with your building of the IDs?
24  A    It's connection in building with the relationship to
25  understand who they are so we can get in touch with them
```

ROBERT SCHAEFER - REDIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 93 of 266 PageID #:61439
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 93 of 265

2-P-92

1    and also to start to build for the IDs as well so we know

2    what the naming convention would be and stuff.

3    Q    In order to "protect" Authenticom or anyone else,

4    would you need this for all 400 of Authenticom's vendors

5    in order to protect those IDs?

6    A    Yes, I would.

7    Q    If you'll look at Exhibit 4 -- back on the 4.5 of

8    this contract, page four and five of the contract.

9    A    Is that --

10   Q    It's the same one.

11   A    Which one?  I'm sorry.

12   Q    So Section 4.5 --

13   A    Yes.

14   Q    -- the *Prohibition on Knowledge Transfer*.  Earlier

15   you had talked about you exchanged intellectual property.

16   Was that exhibit to the contract what you were referring

17   to in terms of the exchange of the intellectual property?

18   A    That was some of it, yes.

19   Q    And so does 4.5 say that the parties will never

20   access the DMS or does it say they won't take steps to

21   assist others?

22   A    Steps to assist others.

23   Q    Would you have been happy to have the additional

24   agreement that CDK and DMI would never access the DMS?

25   A    Yes, I would.

ROBERT SCHAEFER - REDIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 94 of 266 PageID #:61440
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 93 of 265

2-P-93

 1  Q    Isn't that the goal of all of this blocking?

 2  A    That's -- yes, I would have.

 3  Q    Why isn't that in here?

 4  A    CDK wouldn't agree to it.

 5        MS. GULLEY:  Thanks.  Nothing further.

 6        MR. NEMELKA:  Your Honor, I forgot to move --

 7  ask if we could have PHX 163 entered into evidence.

 8        THE COURT:  Any objection?

 9        MS. GULLEY:  Sorry.

10        THE COURT:  You had it just a second go.  That's

11  the nonrescinding letter?

12        MS. GULLEY:  No objection.  Thank you.

13        MR. NEMELKA:  It's the nonrescinding letter.

14        THE COURT:  Okay.  163 is admitted.  With that

15  is Mr. Schaefer done?  Okay.  You're done.  Thank you.

16     (Witness excused at 3:31 p.m.)

17        THE COURT:  Let's do another witness before we

18  take a break.  Who is it?

19        MS. MILLER:  Your Honor, we're calling Malcolm

20  Thorne to the stand, please.

21     Your Honor, may I approach?

22        THE COURT:  Thank you.

23     **MALCOLM THORNE, DEFENDANTS' WITNESS, SWORN**

24        THE COURT:  You heard the speech about the

25  microphone?

                    ROBERT SCHAEFER - REDIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 95 of 266 PageID #:61441
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 94 of 265

2-P-94

1        THE WITNESS:  I have.  Keep it close.

2        THE COURT:  About a foot.  Not too close.

3        THE WITNESS:  Okay.

4        THE COURT:  Whenever you're ready.

5                    DIRECT EXAMINATION

6   BY MS. MILLER:

7   Q    Good afternoon, Mr. Thorne.

8   A    Good afternoon.

9   Q    Will you please state your name for the record.

10  A    Malcolm Laurick Thorne.

11  Q    Can you tell the Court your title?

12  A    I'm formerly the Global Chief Strategy Officer of

13  CDK.

14  Q    And you say formally.  Do you currently have a title

15  with the company?

16  A    I am -- will be with the company through July 1st.

17  I have -- we have hired my successor and he replaced me

18  on April 17.

19  Q    And do you already have your next position lined up?

20  A    I don't.

21  Q    And are you leaving voluntarily?

22  A    I am.

23  Q    Okay.  Can you tell me what CDK's historical

24  approach to data security was?

25  A    What our historical approach to security was?  We

                    MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 96 of 266 PageID #:61442
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 96 of 265

2-P-95

1    have a MSA with our vendors.

2    Q    I'd like you to turn in your binder to tab 4.  This

3    is defendants' Exhibit 4.  This is an example of CDK's or

4    at the time ADP's Master Services Agreement.

5    A    It is.

6            MS. MILLER:  Your Honor, I'd like to move this

7    into evidence.

8            THE COURT:  Any objection?

9            MR. MILLER:  No.

10           THE COURT:  It's admitted.

11   BY MS. MILLER:

12   Q    And if you'd also look at tab 10, defendants'

13   Exhibit 10.  This is a later version of the same Master

14   Services Agreement, is it not?

15   A    Yes.

16           MS. MILLER:  Your Honor, I'd like to move this

17   into evidence.

18           THE COURT:  Any objection?

19           MR. MILLER:  No, Your Honor.

20           THE COURT:  It's admitted.

21   BY MS. MILLER:

22   Q    Mr. Thorne, how long have CDK's contracts with

23   dealers prohibited unauthorized third-party access?

24   A    Roughly since 1995.

25   Q    Have there been exceptions to these provisions?

                    MALCOLM THORNE - DIRECT

```
 1  A    There have been some exceptions to this, yes.

 2  Q    And how far back have those exceptions gone?

 3  A    I'm not aware how far, but there have been

 4  exceptions over the course of years.  We started to phase

 5  out exceptions in June of 2014, July of 2014 when I took

 6  this position.  And today we do not allow any exceptions

 7  at all to that agreement.

 8  Q    If you could look in your binder at Exhibit 21.  And

 9  this document is entitled Information Security Guidelines

10  for ADP Dealer Services Clients.  Do you see that?

11  A    Yes.

12  Q    Just for clarification, CDK used to be a division of

13  ADP; is that correct?

14  A    That's correct.

15  Q    And CDK spun off as a separately incorporated

16  publicly traded company, did it not?

17  A    That's correct.

18  Q    And that was in April of 2014?

19  A    No.  It spun off on October 1st of 2014.

20  Q    I apologize.  It was announced, I believe, in

21  April --

22  A    That is correct.

23  Q    -- of 2014.

24  A    That is correct.

25  Q    And spun off in October of 2014.  So ADP was the
```

MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 98 of 266 PageID #:61444
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 97 of 265

2-P-97

1    predecessor.

2    A    Correct.

3    Q    So again, Exhibit 21 is Information Security

4    Guidelines for ADP Dealer Services Clients.  Are you

5    familiar with this document?

6    A    I am.

7    Q    Is it your understanding that this document

8    represents CDK's, or at the time ADP's, corporate policy

9    in 2013?

10   A    It is.

11   Q    I'd like specifically -- it indicates that this is

12   "Considerations and best practices for your information

13   security plan."  Do you see that on the first page?

14   A    Yes.

15   Q    What was your understanding of where this document

16   or who this document was prepared for?

17   A    This document was prepared for the client community

18   that we had.

19   Q    So these were considerations for your dealer

20   services clients; correct?

21   A    Correct.

22   Q    Can you please turn to page -- what is Bates

23   numbered CDK 0000764.

24   A    Okay.

25   Q    And actually on the preceding page at the bottom it

MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 99 of 266 PageID #:61445
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 99 of 266

2-P-98

1  says Third Party Access.  *Third Party Data Access*.

2  A    Yes.

3  Q    It says "Giving the keys to your most valuable

4  asset, your customer database should be done with careful

5  planning and attention to the details.  Your attorney

6  should be engaged in writing these contracts.  Put

7  everything in writing.  Don't just take their word for it

8  that they won't access data you have not given permission

9  to see."  And on the top of the next page, "Never allow

10  third parties to use your user ID or screen scrape your

11  data."  And it goes on to explain why never giving third

12  parties your user ID or screen scraping your data is a

13  good idea; correct?

14  A    Correct.

15  Q    And this was the recommendation of the company with

16  respect to screen scraping with respect to user IDs;

17  correct?

18  A    Yes.  This was the recommendation as of March 2013.

19  Q    Was the company always consistent in enforcing the

20  restriction on third-party access at this time?

21  A    No, it was not.

22  Q    Did there come a time when that changed?

23  A    Yes, there did.

24  Q    And when was that?

25  A    When I took this position around July of 2014, we

MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/30/20 Page 100 of 266 PageID #:61446
Case: 3:17-cv-00318-jdp Document #: 165-34 Filed: 07/05/19 Page 59 of 265

2-P-99

1   started to really enforce the security practices and the

2   provisions in this agreement.

3   Q    Can you explain to me why that change took place?

4   A    There were a number of changes in the marketplace.

5   Let me give you sort of a context where the market

6   existed at this particular point of time.  First of all,

7   I'll put this in context.  We are a very small division

8   inside a very large company.  We're about to go public.

9   We have our own IPO.  We know that we're going to have a

10  company --

11          THE COURT:  CDK is going public?

12          THE WITNESS:  CDK is going public, separating

13  off from our parent.  We know that we're going to have a

14  market cap of billions of dollars.  We, as a leadership

15  team, executive team, feel significant pressure and

16  accountability to our investor base, our board, our

17  employees to ensure that our business is secure.

18      So I come into this position at the time.  My CEO

19  says to me "Malcolm, I'm concerned about the Third Party

20  Access Program and that we're not getting enough value

21  for this particular program.  I'm also concerned about

22  security risks that we have in our business.  Would you

23  please take a comprehensive review of this entire program

24  and everything that's here."

25      During this time, there are a number of things going

MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 101 of 266 PageID #:61447
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/19 Page 100 of 265

2-P-100

1  on in the marketplace.  So leading up to this, there are

2  significantly increased pressures on dealers relative to

3  data security, privacy, and legal concerns about all of

4  the risks relative to data information and security.  As

5  is referenced by this document that we published to our

6  clients in March of 2013, as is referenced by us working

7  collaboratively with NADA in the 2013 time frame to

8  jointly put a series of best practices together with the

9  market and, in fact, at this time we had spent many

10 years, several years trying to educate the market on the

11 best practices for security in conjunction with NADA.

12      In addition, data breaches and security hacks are

13 becoming very frequent public knowledge; right?  So

14 you've got Facebook.  You've got Sony.  You've got

15 Target.  You have massive frequent data breaches

16 occurring on a large scale, having massive disruption and

17 huge implications to large publicly traded companies.  At

18 the same time, our customers are facing an

19 ever-and-changing environment.  So the number of vendors

20 that are connected to our DMS ecosystem is growing

21 rapidly; the size and scope of our DMS has increased

22 massively over the years; manufacturers are now building

23 extensive third-party applications and they're looking

24 for rich bidirectional integration for these

25 applications.  And so our customers are coming to us at

MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 102 of 266 PageID #:61448
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 103 of 205

2-P-101

1    this time saying I want transparency to where all my data

2    is going.  I'm getting pressure from my attorneys.  I'm

3    getting pressure from vendors.  I want to know where all

4    this data is flowing, not just from vendors, but from my

5    employees and from the manufacturers.  They want much

6    broader access --

7              THE COURT:  Who's asking you?  You say your

8    customers are coming --

9              THE WITNESS:  Our dealer customers are coming to

10   us also.

11             THE COURT:  Dealer customers.

12             THE WITNESS:  Dealer customers.  The

13   manufacturers are coming to us saying --

14             THE COURT:  So the car dealers are saying I need

15   more transparency and security.

16             THE WITNESS:  Correct.

17             THE COURT:  Okay.

18             THE WITNESS:  The manufacturers are coming to us

19   saying we want to launch nationwide programs that can be

20   run by all of our dealer bodies and we want rich

21   bidirectional integration to your applications to enable

22   these programs.  And these programs would, you know, be

23   things like CRM applications, sales applications, service

24   appointment applications.

25         In addition to that, I am sitting faced at this time

MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 103 of 266 PageID #:61449
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/19 Page 102 of 265

2-P-102

1   taking this job with an existing 3PA Program that has

2   been put in place and has evolved somewhat in an *ad* hoc

3   manner over roughly a 15-year period.  And to be quite

4   frank, I would say that this program was not particularly

5   well managed up until this point in time.  And so I'm

6   looking at a situation where the vendors in this program

7   have very different levels of access.  They have very

8   different levels of pricing.  And I'll give you an

9   extreme example, but it shows just the extent of this.

10          I could have a vendor that has a service appointment

11  application, so it's a bidirectional integration

12  application.  And that vendor at the time that I took

13  this job was paying $250 a month.  Maybe they were

14  writing back 20 fields.  I had another vendor that might

15  have had 200 fields of information that they are writing

16  back to the system and they're paying $25 a month.  There

17  was no consistency to the enforcement of the program and

18  the level of access.

19  BY MS. MILLER:

20  Q    All right.  So just to place this in time, this is

21  when you first -- this is when you were taking on your

22  new role as Director of Strategy in July of 2014.

23  A    Correct.

24  Q    So you undertook this review of the system.

25  A    Correct.

MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 104 of 266 PageID #:61450
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/19 Page 103 of 265

2-P-103

1   Q    Okay.

2        MS. MILLER:  And before I forget, Your Honor, I

3   think I forgot to move Exhibit 21 into evidence.  I'd

4   like to do so at this time.

5        THE COURT:  Any objection?

6        MR. MILLER:  No, Your Honor.

7        THE COURT:  21 is received.

8        MS. MILLER:  Thank you, Your Honor.  And that's

9   defense Exhibit 21.

10  BY MS. MILLER:

11  Q    As part of this process, did ADP or CDK ever conduct

12  or review to determine whether hostile integration by

13  third-party vendors was causing the DMS to experience

14  data corruption issues?

15  A    Yes, they did.  They had conducted an extensive

16  study in March of 2013.

17  Q    If you'll at Exhibit 26 in your binder.

18  A    Yes.

19  Q    Is this the study that you are referring to?

20  A    This is the study.

21       MS. MILLER:  And Your Honor, this is defendants'

22  Exhibit 26 and I would move to have this admitted.

23       THE COURT:  Any objection?

24       MR. MILLER:  No, Your Honor.

25       THE COURT:  It's admitted.

                    MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 105 of 266 PageID #:61451
Case: 3:07-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 104 of 265

2-P-104

BY MS. MILLER:

Q     So this is a copy of the review that was performed
to determine whether -- about hostile integration on to
ADP systems; is that correct?

A     That's correct.

Q     And what was the ultimate conclusion of the study?

A     The ultimate conclusion of the study is that
basically every single DMS system that we had had some
level of data corruption on it, and we believed that was
largely caused by third-party integrators.

Q     So July 2014, you have described all of the things
that the company is facing.  You've got 100 percent of
your systems have some level of corruption, you're facing
all of these challenges that you just described in terms
of what the company was facing, and you're getting ready
to spin off as a publicly traded company.  So what do you
do?

A     So we built a revised strategy around this, a
strategy called *SecurityFirst* which really had four key
pillars to it.

Q     Did the company seek -- was this something you came
up with on your own or did you seek some outside guidance
on the strategy?

A     No, we sought a lot of help.  We sought a lot of
help from a whole bunch of internal experts that did a

MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 106 of 266 PageID #:61452
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 106 of 265

2-P-105

1    lot of analysis inside our business.  We met with a large

2    number of our clients.  In fact, we have three major

3    client groups:  We have a CIO user group, we have a CFO

4    user group, and we have a CEO called the Strategic

5    Advisory Board Dealer Group.  We met and discussed this

6    topic with all three of those dealer group bodies at

7    meetings that we conducted with them.  We consulted with

8    outside parties like NADA in this.  And we also

9    commissioned PricewaterhouseCoopers in January of 2015 to

10   conduct a security audit of our business.

11   Q    And would you turn in your binder to defendants'

12   Exhibit 25.

13   A    I'm there.

14   Q    Is this the PwC security audit you just mentioned?

15   A    Yes, it is.

16   Q    And can you tell me what GSO stands for?

17   A    Global Security Organization.

18        MS. MILLER:  Your Honor, I'd like to move

19   Defendants' 25 into evidence.

20        THE COURT:  Any objection?

21        MR. MILLER:  No objection, Your Honor.

22        THE COURT:  All right.  It's admitted.

23   BY MS. MILLER:

24   Q    Does this document reflect the results of PwC's

25   security audit?

MALCOLM THORNE - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 107 of 266 PageID #:61453
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 106 of 125

2-P-106

1    A    Yes, it does.

2    Q    I'm not going to ask you to read the whole document

3    in the record obviously, but can you tell me what the

4    ultimate -- let me back up.  Did you have any discussions

5    with PwC about their audit results?

6    A    Yes, we did.

7    Q    And as a result of this security audit and your

8    discussions with PwC, what was their ultimate

9    recommendation and the company's ultimate conclusion?

10   A    So our ultimate recommendation conclusion was to

11   eliminate hostile access providers in the marketplace.

12   And we also identified many, many areas that CDK needed

13   to invest to improve security and minimize security risk

14   for the company.

15   Q    And I want to clarify something you said.  You said

16   you wanted to eliminate hostile integration in the

17   marketplace?  Or what it you wanted to eliminate hostile

18   integration out of CDK systems?

19   A    Eliminate hostile integration into CDK systems.

20   Q    And why was this of such concern to the company?

21   A    So as is evident from the prior report, hostile

22   integration caused us significant costs concerned with

23   hostile integration.  So it was very expensive for us to

24   have hostile integrators access our DMS, both for reading

25   data and writing data, and that caused a significant

MALCOLM THORNE - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 108 of 266 PageID #:61454
Case: 3:07-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 107 of 265

2-P-107

1   amount of issues to our business.

2   Q    I think you mentioned a moment before that as part

3   of this introduction of this new security approach, this

4   new SecurityFirst approach, you were going to do a look

5   at the Third Party or the 3PA Access Program; is that

6   correct?

7   A    That is correct.

8   Q    Can you look at tab 24 in your binder?  That's

9   defendants' Exhibit 24.  Let me know when you're there.

10  A    I'm there.

11  Q    Okay.  This document is entitled *Third Party Access*

12  *Strategy* and it says *Strategy Refresh*.  Do you see that?

13  A    Yes.

14       MS. MILLER:  And Your Honor, I'd like to move

15  defendants' Exhibit 24 into evidence.

16       THE COURT:  Any objection?

17       MR. MILLER:  No objection, Your Honor.

18       THE COURT:  It's admitted.

19  BY MS. MILLER:

20  Q    Can you tell me what was the refresh?

21  A    So the refresh is the revision of the 3PA Program,

22  the recommended strategy revision of the 3PA Program.

23  Q    And I want to get a sense from you, if I can, some

24  of the considerations that went into the refresh strategy

25  and why you all felt that the 3PA Program needed to be

MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 109 of 266 PageID #:61455
Case: 3:97-cv-00319-jdp Document #: 163 Filed: 07/05/17 Page 108 of 265

2-P-108

1    overhauled.  Can you turn to page 14 of the slide deck,

2    CDK 0000799?

3    A    I'm there.

4    Q    On the right-hand side under *Implications*, it says

5    "CDK is the largest DMS provider that is not considered

6    secure by the industry.  We are an outlier."  Do you see

7    that?

8    A    Yes.

9    Q    What does that mean?

10   A    Several other DMS providers:  Reynolds, DealerTrack,

11   Auto/Mate had implemented many security measures that CDK

12   at this point had not implemented.  Many of them had

13   real-time integration access, single sign-on, some of the

14   secure layer technologies, some auditing capabilities,

15   detection methods for hostile access, things like that.

16   We were behind.

17   Q    Was it known throughout the industry at this time

18   that Reynolds had a secure DMS?

19   A    Yes.

20   Q    And it had for some time; yes?

21   A    Yes, for quite awhile.

22   Q    On this same slide it says "CDK is unable to capture

23   full value for our CDK-approved integration due to lack

24   of DMS security."

25   A    I'm sorry, which slide are you on?

MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 110 of 266 PageID #:61456
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 10 of 265

2-P-109

1   Q    Sorry, wrong slide.  I'm sorry.  Next one down.  "R&R

2   has suffered..." -- right underneath that.  "R&R has

3   suffered significant brand damage as a result of their

4   forced march security strategy with dealers.  A lesson

5   for CDK."

6        Can you explain to me what this paragraph means?

7   A    Reynolds had lost clients in the marketplace based

8   on their security position.

9   Q    So you knew that --

10            THE COURT:  What was the forced march?

11            THE WITNESS:  So the -- really what the choice

12   was for vendors to integrate into RCI or to push data

13   directly.

14            THE COURT:  So the forced march is kind of the

15   elimination of the third-party integrators?

16            THE WITNESS:  Yes.

17            THE COURT:  Okay.  Thanks.

18   BY MS. MILLER:

19   Q    So R&R had gone -- had closed its system and had

20   suffered significant brand damage as a result of their

21   decision to do so.

22   A    Yes.

23   Q    But CDK was deciding to do so nonetheless.

24   A    Yes.  We were well aware that this was a risk.  We

25   expected to lose some dealers over this.  But we thought

                    MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 111 of 266 PageID #:61457
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 111 of 265

2-P-110

1    that this was the right thing to do from a company

2    perspective.

3           THE COURT:  I'm not quite sure I get the point

4    here.  What was the lesson that CDK learned?

5           THE WITNESS:  Well, we knew that there was a

6    risk that we would lose dealers over increasing security

7    that was here.  So, you know, we had spent years trying

8    to educate our dealers through the security documents,

9    through our GSO, don't hand out user IDs, don't allow

10   screen scraping.  And so we knew that as we took more

11   proactive measures to enforce the security, we would

12   upset some dealers and we would likely lose some clients

13   over this.  And we were willing to lose those clients

14   because we believed that to protect our brand, to protect

15   our multi-billion dollar market cap, to protect the fact

16   that we didn't want to end up on the front page like

17   Target, we were willing to accept that risk.

18          THE COURT:  It seems odd to put it that way

19   because it seems like you were -- the lesson to learn was

20   don't try to do it as a forced march.  You're telling me

21   what the lesson was is that's just part of the damage

22   you're going to have to suffer if you do this.

23          THE WITNESS:  Well, so there's -- I mean we

24   tried in this process -- and we did learn this.  We tried

25   to work collaboratively with the marketplace to get them

                    MALCOLM THORNE - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 112 of 266 PageID #:61458
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 1 of 1

2-P-111

1    to move.  So we used education extensively.  We tried to

2    convince people to move to secure methods, to move to the

3    3PA Program.  We then offered people, when we launched

4    the program, we offered them phase-in for new pricing.

5    We offered them wind-over periods so we didn't force them

6    to move immediately.  We gave them periods where they

7    could -- so we tried to be as accommodating as possible.

8    And I think that was a lesson learned that if we could

9    try to be as accommodating as possible in the

10    marketplace, it would help us with our brand.  It was

11    still a risk that we knew that we would -- some people

12    would be upset with us.

13           THE COURT:  All right.  Go ahead.

14    BY MS. MILLER:

15    Q    So you spoke a moment -- the point of the refresh

16    you spoke a moment ago about, you had to refresh the

17    entire program and realign the program with the value

18    that you thought CDK was delivering but not receiving

19    value for.  Can you tell me about that?

20    A    Yes.  So I mean one of the things is that the

21    program, as it was designed, did not really differentiate

22    between extract only, basic writeback capabilities, and

23    things that leveraged intellectual property.  So we, when

24    we designed this program, we took a very sort of systemic

25    approach to look at writeback extract and IP-related

                    MALCOLM THORNE - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 113 of 266 PageID #:61459
Case: 3.97-cv-00313-jep Document #: 1655 Filed: 07/05/17 Page 113 of 265

2-P-112

1   functions and assigned very different values to those.

2   And based on history, we really hadn't been getting our

3   fair share of value for a lot of the intellectual value

4   that CDK was creating.  To be quite honest, when I took

5   this position, I thought this was a good business

6   opportunity for CDK for something that they had not done

7   in the past.

8   Q    So as part of -- as part of the refresh, did the

9   pricing structure of the 3PA Program change?

10  A    Yes, the pricing structure of the 3PA program did

11  change.

12  Q    How?

13  A    So it changed in a number of ways.  The first way it

14  changed is every vendor pays the same price.  So we

15  standardized -- first of all, we standardized pricing

16  across the whole program.  Everyone pays the same price

17  and we are fully transparent with pricing.  So pricing is

18  published.  It's on the internet.  You can look it up.

19       The second thing is we created intended use

20  categories.  So vendors are licensed by intended use.  We

21  bundled, to the best of our ability, what vendors -- what

22  data vendors needed, both data coming out and going into

23  the system for a particular application.  An example

24  would be a CRM vendor or a service appointment vendor.

25  And we tried to create bundles of applications that

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 114 of 266 PageID #:61460
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 113 of 265

2-P-113

1   vendors could use.  And then we assigned new pricing to

2   those vendors.

3       Then what we did in order to align that pricing is

4   we started to recontract all existing vendors in the

5   marketplace and sort of level the playing field so that

6   everybody, regardless of large vendors or small vendors,

7   everyone paid the same amount of money for the access

8   that they received.

9   Q    Did every one of CDK's clients' prices, its vendors

10  prices go up?

11  A    No.

12  Q    You've heard testimony --

13          THE COURT:  Hold on.  Mostly they did though.

14          THE WITNESS:  I would say mostly they did, yes.

15  That's a fair statement.

16          THE COURT:  I mean the implication from "we

17  weren't getting the value that we deserved" suggest you

18  were going to charge more.  Maybe that's simplistic, but

19  that's the takeaway for me.

20          THE WITNESS:  No, we charged more.  We were not

21  getting our fair share of value in the marketplace.

22          THE COURT:  Okay.

23  BY MS. MILLER:

24  Q    You've heard testimony that they went up

25  astronomically.  Did they all go up by the same amount?

                    MALCOLM THORNE - DIRECT

Case: 4-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 115 of 266 PageID #:61461
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 115 of 266

2-P-114

1   Were they based -- what were the increases based on?

2   A    So the increases were based on the value derived by

3   the end-user for that particular point of integration,

4   and that's what the basis was for the price that was

5   being charged.

6   Q    Did the dealers -- was it simply the dealer's price

7   went up for the same thing they'd been receiving before?

8   Or were their additional value adds as part of those

9   prices?

10  A    So there's significant additional value.  So first

11  of all, I'll give you several examples.  So one is a

12  vendor, based on historical contracting, potentially

13  could have had access to, say, 500 fields to download and

14  200 fields to writeback.  But based on historical

15  contracting, they were only allowed 30 fields to extract

16  and 4 fields to writeback.

17       So first of all, based on a category, pretty much

18  everyone got the broadest level of access for every

19  category.  You had the ability to extract as much data as

20  you wanted, and in that category you could writeback all

21  the data into the system for that category.  So vendors

22  and thereby their dealers or manufacture partners got

23  significantly higher levels of integration available to

24  them in the same type of categories.

25       In addition, as part of this we have made

MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 116 of 266 PageID #:61462
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 116 of 265

2-P-115

substantial investments in security which benefit the
entire ecosystem.  So we have written -- I think we've
had some discussion today about real-time integration
points where the moment a record is created we pushed
that out.  We have built the same technology so a vendor
does not have to query our system.  That has substantial
benefits to people that are in the program.

     We also implemented things like single sign-on.
We've had six data platforms that people were integrating
to in various shapes and form which we have standardized
on one global data platform across all of our products,
which is simplifying the integration costs for a number
of our vendors.

     And then another example is we spent a significant
amount of money building our DDX product.  And what DDX
is is across our entire ecosystem, we wanted to provide
our dealers with complete transparency of every data flow
that was occurring in an ecosystem, both outbound and
inbound to the system.  And so we built a product called
DDX.  It reports on not only flows to third parties, but
it also reports on flows to manufacturers as well as
outflows on behalf of the dealer.  And that provides the
dealership with full transparency of all data flows in
and out of the system, and that is provided free of
charge.  That was a massive investment.

                    MALCOLM THORNE - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 117 of 266 PageID #:61463
Case: 3:97-cv-00319-jdp Document #: 169 Filed: 07/05/17 Page 11 of 125

2-P-116

 1        If you think about the size and scope of data

 2   processing that CDK does and the ability to provide, you

 3   know, complete data flow accountability, that ecosystem

 4   is a very large investment to do that.

 5   Q    We've heard testimony that there is a restriction

 6   that CDK puts on putting a line item of the 3PA Program

 7   charges on its vendor invoices.  Are you familiar with

 8   that?

 9   A    Yes, I am.

10   Q    Why?

11   A    So our philosophy is that the benefit of this

12   bidirectional integration and this flow into our system

13   and our intellectual property is housed in the

14   application that is provided to the dealer.  And we don't

15   believe that that cost should be passed on to the dealer.

16   We believe that it should be borne by the application

17   provider.  And in fact, one of the things that is

18   occurring in the marketplace is, say, a vendor prior to

19   this refresh paid $150 for CRM and then in a revision of

20   this they paid $225 for CRM.

21        What's happened is previously vendors never line

22   itemed their bill.  They never charged the dealer

23   anything for integration access.  Now they took this

24   opportunity to go to the dealer and say oh, by the way,

25   we've got this new massive charge from CDK, and in fact,

                    MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 118 of 266 PageID #:61464
Case: 3:07-cv-00313-jdp Document #: 163 Filed: 07/05/17 Page 118 of 265

2-P-117

 1   we have at least two known cases and we believe there are

 2   many more cases where dealers are significantly marking

 3   up this charge in the marketplace to make us look bad in

 4   the marketplace.

 5        THE COURT:  You mean where vendors are marking

 6   up the charge.

 7        THE WITNESS:  Vendors are making up the charges,

 8   yes.  So we were trying to prevent this from occurring.

 9   We thought that there would be behavior in the market

10   that would be negative, but we thought that vendors

11   should be bearing the cost, just like they bear other

12   third-party software or integration costs inside of the

13   agreement, don't line item them, and we anticipated some

14   potential behavior like this.  The situation has been

15   much worse than we ever anticipated to be honest.

16        THE COURT:  I'm a little confused because I

17   thought you talked about how perfectly transparent you

18   were about the pricing.

19        THE WITNESS:  We are perfectly transparent with

20   the pricing.  Our pricing is all published on the

21   internet.  The access is here.  But, you know, as I think

22   Mr. Schaefer mentioned in his testimony, it's not as

23   simple as sort of just line item one individual piece;

24   right?  So somebody can have lots of different data

25   integration points.  So if a dealer has 10 stores and 12

MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 119 of 266 PageID #:61465
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 118 of 265

2-P-118

 1   different vendors, it's not always that simple to figure

 2   out exactly what services they've signed up for at a

 3   given point in time.

 4        So they struggle sometimes, as much as we've tried

 5   to work through this issue, they struggle sometimes to

 6   understand exactly what the vendor is saying to them

 7   they're paying versus what the line item pricing is.

 8             THE COURT:  If I'm a dealer, I can go on your

 9   website and I can look up --

10             THE WITNESS:  You can look it up.  It's all

11   there.

12             THE COURT:  -- what you're telling vendors they

13   have to pay.

14             THE WITNESS:  Yes.  Yes.

15             THE COURT:  But your rule is just that the

16   vendor can't put a line item on the bill for data

17   integration from --

18             THE WITNESS:  Correct.  From CDK.

19             THE COURT:  Okay.  All right.

20   BY MS. MILLER:

21   Q    Mr. Thorne, can you turn to Exhibit 31 in your

22   binder.  And this is again defendants' Exhibit 31.  The

23   prior presentation, which was Exhibit 24, was dated 12-3,

24   2014, and this one is dated 10-31, 2014, so this would

25   be, am I correct, an earlier iteration of that?

                    MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 120 of 266 PageID #:61466
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 119 of 265

2-P-119

1  A    Yes.  So this was an iterative process that we were

2  developing the strategy in the fall of 2014 and this is

3  an earlier document related to the same topic.

4        MS. MILLER:  And Your Honor, I'd like to move

5  this into evidence.

6        MR. MILLER:  No objection.

7        THE COURT:  It's admitted.

8  BY MS. MILLER:

9  Q    Can you turn to slide 24.  Let me know when you're

10 there.

11 A    I am here.

12 Q    And this slide is entitled *DMS Provider Strategy*;

13 correct?

14 A    Correct.

15 Q    And it says *Rationale For Providing Integration*.

16 Can you explain to me what this slide says?

17 A    So this slide is based on October is a discussion

18 about what our strategy is relative to DMS providers.  So

19 there was a point in time when we did not allow DMS

20 vendors into the 3PA Program at all.

21 Q    Okay.  And why was that?

22 A    I wasn't there when the rule was created; so...

23 Q    So what would be the benefit of allowing DMS

24 providers to be in the 3PA Program?

25 A    So if you looked at the market at this point in time

MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 121 of 266 PageID #:61467
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 121 of 265

2-P-120

1    when this document was created, there's a couple things

2    going on.  We, as a company, were trying to find this

3    balance between providing our dealers with choice and

4    broad access to our ecosystem, at the same time ensuring

5    that it was secure and we protected our intellectual

6    property rights; right?  So what was happening in the

7    marketplace is us, as DMS vendors, as well as the entire

8    marketplace, the number of late applications that exist

9    around the DMS has been exploding.  It started in the

10   early 2000s.  There's sort of been a second wave, I would

11   say, over the last five years as private equity has

12   gotten aggressive in the automotive market.  Innovation

13   has been rampant.  And so there are a number of

14   applications that exist around the DMS.  And so we, as

15   DMS vendors, have a number of applications that we would

16   like to sell to nonCDK DMS clients and our clients want

17   to use applications from other DMS vendors.

18       So I heard you -- Cox was mentioned yesterday.  Cox

19   has a lot of applications.  Reynolds has applications.

20   So our customers want choice.  They want choice in the

21   marketplace.  And part of that choice is they want choice

22   from DMS vendors, not just from the hundreds and hundreds

23   of late application providers who are not in the DMS

24   market.  So part of this was how do we -- and there was a

25   debate on the strategy and then ultimately a decision was

MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 122 of 266 PageID #:61468
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 122 of 265

2-P-121

1  made that we would open up and change the historical

2  position prior to me taking this job.  And so we decided

3  basically to open the program to DMS vendors and get them

4  into the 3PA Program.

5  Q   So that someone like a Cox who owns DealerVault

6  could bring its layered applications and offer them to

7  CDK vendors and CDK could take its layered applications

8  and offer them to DealerVault customers.

9  A   So you said DealerVault.  You meant DealerTrack.

10 Q   I'm sorry, DealerTrack.

11 A   DealerTrack.  Yes, correct statement.  Yes.

12 Q   Corrected by DealerTrack.  Thank you.  Under that

13 second point there -- there's two bullet points under No.

14 2.  The second one says "Secure the CDK DMS through

15 eliminating opportunities for key enablers of hostile

16 integration."  And it says "R&R - Authenticom, Dominion

17 and SelectQu."  Do you see that?

18 A   I do.

19 Q   What does that mean?

20 A   So there's a standard contract or standard piece of

21 language in our 3PA agreement that states that if you are

22 in the 3PA Program, you agree not to use hostile access

23 to access our DMS.  So by signing up Reynolds to this

24 program, signing up Dominion, we would -- it would help

25 us with the goal of eliminating hostile access into our

MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 123 of 266 PageID #:61469
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 122 of 265

2-P-122

1    DMS.

2    Q    So not only were you expanding the vendor

3    application options for your dealers, but you were also

4    succeeding in eliminating hostile integration into your

5    system and thereby securing your system.

6    A    Correct.

7    Q    Could you turn to slide --

8         THE COURT:  Before you move on, this is going to

9    seem like really a detailed question.  But in that

10   parenthetical in that same bullet point, you have R&R,

11   then you have a dash, and then you have Authenticom,

12   Dominion, SelectQu.  Punctuation is a little weird there

13   because it's not just a list of four entities.  R&R is

14   first and then there's a dash.  Why?

15        THE WITNESS:  So somebody on my team drafted

16   this.  I mean the document actually -- so there's another

17   one that doesn't make sense.  SelectQu is owned by

18   Dominion.  Authenticom has nothing to do with Reynolds.

19   So I don't know what the --

20        THE COURT:  And Reynolds never did hostile

21   integration in the first place.

22        THE WITNESS:  Well, so the point is Reynolds did

23   not do hostile integration, but Reynolds had applications

24   that they had acquired that were using hostile

25   integration and were continuing to use hostile

MALCOLM THORNE - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 124 of 266 PageID #:61470
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 123 of 265

2-P-123

1    integration.

2              THE COURT:  All right.  Here's another question

3    I've got for you.  So one of the motivations for the

4    refresh was security.  But one of the motivations for the

5    refresh was, as you put it, to derive the value you think

6    you deserved from the Third Party Access Program.  And

7    you said that you wanted to price it based on the value,

8    the value that is derived by the user for the access.  By

9    that I think you mean the vendors; right?

10             THE WITNESS:  It's based on what the vendor is

11   doing, but also the value of intellectual property that

12   CDK is contributing to that.

13             THE COURT:  But one of the factors that would

14   influence the price you would set is the competitive

15   environment in which you would be providing this service

16   to vendors; is that right?

17             THE WITNESS:  Yes, that is correct.  So that is

18   a factor.

19             THE COURT:  So you've got people in the

20   environment at this time that are providing more or less

21   buffet-style unlimited access for $50 a month.

22             THE WITNESS:  No, they don't provide unlimited

23   access for $50 a month.

24             THE COURT:  It's not quite unlimited.  But the

25   Authenticom model here is for 50 bucks a month or even

                   MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 125 of 266 PageID #:61471
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 124 of 265

2-P-124

1   less sometimes.  You really get whatever the vendor needs

2   for integration.

3          THE WITNESS:  So let's take a comparison.  So a

4   dealer testified yesterday about needing service

5   appointments -- service repair order data for a recall

6   program; okay?  And I don't know exactly what he paid

7   because there was a 65, a 45 and a 35 number mentioned.

8   But on the CDK, that is $49 a month.  So in order to run

9   a recall program, be able to contact customers' vehicles

10  and have open errors, that would be $49 a month under the

11  3PA Program.  So we absolutely looked at competitors'

12  pricing and it is a factor in what we did.  And so

13  pricing is higher than dealer -- than Authenticom's.  But

14  it's not a magnitude higher.

15         THE COURT:  I guess that what I'm getting at

16  here is it sure seems to make sense to me from an

17  economic perspective that if you wanted to refresh this

18  so you could get better value for your Third Party

19  Access, it would be a nice thing to get the third-party

20  integrators out of the market.  That would be very

21  consistent with your objective here of getting better

22  value for your Third Party Access if you could knock out

23  the guys that were doing it at the low price.

24         THE WITNESS:  It doesn't have anything to do

25  with knocking out the guys who have a low price.

MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 126 of 266 PageID #:61472
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 126 of 265

2-P-125

1    They're, you know, violating my MSA, running my system,

2    have the potential to corrupt all my data; all the other

3    associated costs that have gone on.  I have no concern

4    with the other portions of Authenticom's business that

5    they do:  Data cleansing or anything else.  But as far as

6    hacking into my system, distributing passwords around the

7    environment which potentially have administrative access

8    to my system, I take serious issue to that.

9            THE COURT:  So it wasn't the reason you did it,

10   it just was a convenient benefit.

11           THE WITNESS:  What was a convenient benefit?

12           THE COURT:  To eliminate hostile integration.

13           THE WITNESS:  It's not a convenient benefit.  We

14   view hostile integration as insecure.  And as many people

15   have testified here, they believe it is insecure.  We

16   believe hostile integration is fundamentally secure.  The

17   fact that you are screen scraping technology, you have

18   access to data you shouldn't have access to, passwords

19   are flying over email, this is a fundamentally insecure

20   mechanism.  We do not view this as a viable way to be

21   viewing this.

22       And this is a change of opinion.  We were in this

23   business at one point.  We made a strategic decision at

24   this time to exit this for these reasons.

25           THE COURT:  Okay.  All right.  Go ahead.

                    MALCOLM THORNE - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 127 of 266 PageID #:61473
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 126 of 265

2-P-126

BY MS. MILLER:

Q    Mr. Thorne, if you can turn to page six in that same deck.

A    Page six in the same deck?

Q    Yes, sir.

A    31.

Q    Entitled *3PA Product Strategy*.

A    Yes.

Q    Do you see that?  What was the purpose of this slide?

A    So this is what I talked about earlier where previously there was no real differentiation between extract, writeback and IP-based functions.  So this started to talk about how we differentiated between standard extract, things that were written back to the system, and then things that were using significant amounts of CDK IP.

Q    When you say in point No. 3 here "Extract functions are regarded as dealer's data and have a limited risk and cost to 3PA."  Do you see that?

A    I do.

Q    What did you mean by that?

A    So extract functions are regarded as dealer's data and have a limited risk and cost.  So the limited risk is if they are using our 3PA connection mechanism, so within

MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 128 of 266 PageID #:61474
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 127 of 265

2-P-127

1   a proved method of connection there is a limited risk to

2   extract functions.  There is a significantly higher risk

3   in writeback functions because you have the ability to

4   corrupt the data, as is shown by the report that we have.

5   And then the limited cost is that -- is when they are

6   done in conjunction with 3PA.  So used in our 3PA system.

7   Q    Is the risk associated with extracting data equally

8   limited if a third party engages in hostile integration

9   for extractionally purposes?

10  A    No, it's much higher.

11  Q    I'm going to briefly, in the interests of time,

12  touch on the SecurityFirst initiative.  Specifically if

13  you could turn to Exhibit 27 in your binder.  That's the

14  SecurityFirst overview.

15          MS. MILLER:  Your Honor, this is defendants'

16  Exhibit 27, which I would move to be admitted into

17  evidence.

18          THE COURT:  Any objection?

19          MR. MILLER:  No, Your Honor.

20          THE COURT:  It's admitted.

21          MS. MILLER:  Thank you.

22  BY MS. MILLER:

23  Q    And again in the interests of time, Mr. Thorne, and

24  to the Court's question, was the SecurityFirst program

25  just about prohibiting third-party access?

MALCOLM THORNE - DIRECT

Case: 1-18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 129 of 266 PageID #:61475
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 129 of 265

2-P-128

1    A    Not at all.

2    Q    What was it about?

3    A    It was a comprehensive program that had essentially

4    four pillars to it.  The first was educating the market

5    on security and the right measures and procedures to take

6    to ensure security.  Giving them full transparency about

7    the program and everything associated with it.  And we

8    took that very seriously.  We invested more than seven

9    figures in the education awareness when we launched the

10   program.

11        The second thing is we made massive security

12   enhancements to our ecosystem and to our environment.

13   I've talked about real-time integration.  We deployed

14   SSO.  We had moved all our clients to end a multiyear

15   effort to get them on a single version of software.

16        THE COURT:  What's SSO?

17        THE WITNESS:  Single sign-on.  We also

18   implemented SSL technology in our business.  We

19   implemented specific security architects inside our

20   product development teams.  We made hundreds of millions

21   of dollars of investments in infrastructure and detection

22   technology in our hosting environment.  We built hostile

23   access detection and interrogation mechanisms.  So

24   massive security investments.

25        We also revised the entire 3PA Program.  And that

MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 130 of 266 PageID #:61476
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/19 Page 129 of 265

2-P-129

1  revision wasn't just about hostile access, it was about a

2  level-playing field for all the vendors in the

3  marketplace, large or small.  It was about standardized

4  pricing.  Part of the strategy was to dramatically

5  increase access to the CDK ecosystem.  So when I took

6  this job, there was only access to the DMS.  We quickly

7  added integration to our credit application platform.  We

8  added integration to our desking product, which is a

9  product where we key in all the lease and finance rates

10 and programs every single day for dealers.  And then

11 we're currently working on integration to our CRM

12 application and to our service-edge products which are

13 our service workflow applications.  So we've expanded the

14 number of integration points and the number of products

15 that are included with this.

16     We also released our digital 3PA Program which

17 provides the marketplace with complete access to our very

18 vast and extensive digital marketing ecosystem, and in

19 fact, we have over 200 vendors that are in the process of

20 signing up for that ecosystem.  So there was a whole

21 standardization of pricing.  There was a standardizing of

22 terms; us capturing the value, but then massively opening

23 up the ecosystem to broader participation.

24     And then the last component was DDX; right?  So

25 creating the transparency, the accountability back to our

MALCOLM THORNE - DIRECT

Case: 1-18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 131 of 266 PageID #:61477
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 130 of 265

2-P-130

1    dealer, the back to our dealer base, back to our OEM

2    partners, that they could see all of the data --

3              THE COURT:  Okay.  I don't mean to cut you off,

4    but I think we've covered it.  It was not just about

5    stopping hostile access.

6    BY MS. MILLER:

7    Q    In shutting down hostile integration, does CDK

8    prevent dealers from extracting their data and sharing it

9    with third parties?

10   A    No, we don't.

11   Q    Is it particularly different to do so?

12   A    No, it's not.

13   Q    Yesterday the Court asked a question as to whether

14   or not the dealers are already paying the costs imposed

15   on CDK as a result of hostile integration.  I responded

16   to that question, but I'd like the Court to hear it from

17   you.  Are those costs part of the costs that you already

18   charge dealers for their DMS access?

19   A    No, they're not.

20   Q    Why not?

21   A    There are substantial costs when you have hostile

22   integration.  You have system performance issues that you

23   have to pay for.  And when there's a system performance

24   issue, we're the ones that get the phone call to say my

25   system is slow, something is going on.  We have to go

                    MALCOLM THORNE - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 132 of 266 PageID #:61478
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 131 of 265

2-P-131

1    through an extensive detection mechanism.  When somebody

2    extracts data out of the DMS and then ships it off to

3    dozens, potentially hundreds of providers, when those

4    providers get that data and start using that data, they

5    more often than not have significant questions on the

6    data.  And if they have a question on the data, they call

7    the dealer, the dealer calls CDK, and we have to burden

8    all of that support cost.

9        The second -- the other issue is that when these

10   hostile integrations are pulling data out, they describe

11   this process as being batch.  Well, the problem with

12   batch is that you, on a Monday morning, extract a whole

13   bunch of data out of the DMS; okay?  And a service

14   reminder company gets that data on Monday night and then

15   they take a little bit of work, and on Tuesday, they send

16   out a huge market email.  Well, little do they know that

17   a whole bunch of that information on Monday changed in

18   the DMS.  Malcolm no longer owns that car.  Well, all of

19   those data integrity issues that are a result of whatever

20   that business happens to be doing, and there are hundreds

21   of thousands of potential applications across the

22   industry, every single error based on the timing of that

23   data comes back to a CDK call center case.  Why did this

24   user get this service reminder?  Why did this happen?  We

25   bear that cost.  So --

MALCOLM THORNE - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 133 of 266 PageID #:61479
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 132 of 205

2-P-132

1  Q    Mr. Thorne, two last quick questions, if I may.  Is

2  a DMS space competitive?

3  A    Very competitive.

4  Q    Is CDK losing some customers and gaining others?

5  A    Yes.

6  Q    Does it consider DealerTrack to be a competitor?

7  A    Very viable competitor.

8  Q    Reynolds?

9  A    Yes, very viable.

10 Q    Advent?

11 A    Yes.

12 Q    Any others?  I'm running out of --

13 A    Auto/Mate, Autosoft, DealerBuilt.  There's many

14 competitors in the DMS space.

15        MS. MILLER:  Thank you, sir.  I pass the

16 witness.   (4:20 p.m.)

17        THE COURT:  All right.  Cross-examination.

18                 CROSS-EXAMINATION

19 BY MR. MILLER:

20 Q    Good afternoon, Mr. Thorne.  Kevin Miller on behalf

21 of Authenticom.  So you testified earlier that part of

22 the rationale for the 3PA refresh was a profit motive for

23 CDK; correct.

24 A    That is correct.

25 Q    And in fact, one way of increasing profits would be

                    MALCOLM THORNE - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 134 of 266 PageID #:61480
Case: 3:07-cv-00318-jdp Document #: 165 Filed: 07/05/13 Page 134 of 265

2-P-133

1  for CDK to raise integration prices for vendors; correct?

2  A    That is correct.

3  Q    In fact, the Judge asked you some questions earlier

4  wouldn't it be helpful to get rid of lower-priced

5  third-party integrators as part of the program.  Do you

6  recall those questions?

7  A    I recall that question, yes.

8  Q    In fact, the 3PA refresh strategy recognized that

9  CDK should be prepared for issues arising from increased

10  pricing for existing vendors, didn't it?

11  A    Can you restate the question?

12  Q    Sure.  The 3PA refresh strategy recognized that CDK

13  should be prepared for issues arising from increased

14  pricing for existing vendors.

15  A    That is correct.  We anticipated that we would have

16  some dealer reaction related to our increased prices.

17  Q    And the risk was that vendors would be willing to

18  move to what you referred to as hostile means instead of

19  accept the increased price, especially if the DMS was not

20  secure.

21  A    I have no idea what the vendor risk would be.  The

22  dealer risk is that we would lose our customers.

23  Q    Can you pull up Defendants' Exhibit 31, page 14.

24  This is in your binder.

25  A    Exhibit 31.

                    MALCOLM THORNE - CROSS

Case: 1-18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 135 of 266 PageID #:61481
Case: 3:07-cv-00315-jdp  Document #: 163  Filed: 07/05/17  Page 134 of 265

2-P-134

1  Q    Yes.  Slide 14.  I think if you have the Bates

2  labels, it's CDK 1052 at the bottom there.

3  A    1052?

4  Q    Correct.

5  A    The page is labeled *Conversion Strategy*?

6  Q    Yes.  And as part of the conversion strategy, No. 5

7  here is what we talked about a moment ago.  "CDK should

8  be prepared for issues arising from increased pricing for

9  existing vendors"; correct?  Do you see that?

10  A    That's correct.

11  Q    And then No. 6 says "There's a risk of vendors

12  willing to move to hostile means instead of accept

13  increase price, especially if DMS not secure."  Do you

14  see that?

15  A    Yes.  You read that correctly.

16  Q    So in other words, CDK was concerned that if it

17  raised prices on vendors, the vendors would switch to

18  independent integrators and access the dealers' data that

19  way; right?

20  A    Yes.  There's a potential risk that vendors would

21  switch.

22  Q    But if CDK could lock down its DMS and be the

23  exclusive integration provider, then it could raise

24  prices without worrying about price competition from

25  independent integrators; right?

MALCOLM THORNE - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 136 of 266 PageID #:61482
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 136 of 265

2-P-135

 1   A    Locking down the DMS had nothing to do about raising

 2   the price.  Locking down had to do with the fact that

 3   people were hostilely accessing our system and causing

 4   all the issues that have been outlined in some of the

 5   previous documents provided.

 6   Q    No. 6 specifically refers to price as a reason to

 7   secure the DMS, doesn't it?

 8   A    No. 6 explicitly says that there is a risk that some

 9   vendors may choose to move to a hostile provider if there

10   is an increase in price.

11   Q    If the DMS is not secure; correct?

12   A    Yes.

13   Q    And you testified earlier also about not wanting

14   integration fees to be included on invoices and -- you

15   recall that testimony?

16   A    Correct.

17   Q    CDK knew that much or all of the increase in

18   integration fees to vendors would, in fact, be passed on

19   to dealers; correct?

20   A    No, we did not.

21   Q    Well, if you look at No. 4 on the slide, we see that

22   the rollout should be designed to create minimal

23   awareness to the dealer.  Do you see that right?

24   A    Just put this in context.  You are looking at "Next

25   steps for DMS vendor.  This is a conversion strategy for

MALCOLM THORNE - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 137 of 266 PageID #:61483
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 137 of 206

2-P-136

1   next steps for DMS vendor."  Let's put this document in

2   context because -- so we're talking about, first of all,

3   DMS vendor strategy, the approach to DMS providers.

4   We're talking about the conversion strategy.  And what we

5   are saying here is that we want to essentially minimize

6   the disruption to dealers that are in this specific

7   situation.

8   Q    Well, but in order for the refresh strategy to work,

9   CDK needed to keep dealers in the dark about the massive

10  increased fees it intended to impose for integration;

11  right?

12  A    I don't read that in the paragraph.

13  Q    Well, that's exactly why the 3PA refresh strategy

14  included the restriction that the vendor would be

15  required not to disclose its pricing; right?

16  A    That's completely false.

17  Q    Let's turn to -- it's Exhibit -- defendants' Exhibit

18  24 at page 103.  You should have that in your binder as

19  well.  Are you with me?

20  A    I'm with you.  I'm on page 24.  It's 1062; correct?

21  Q    I'm sorry.  It's in Exhibit 24.  I changed tabs on

22  you.  I apologize.

23  A    Exhibit 24.  Page?

24  Q    Page 28, which is CDK 13.  I'm sorry.

25          THE COURT:  Page 103.

                    MALCOLM THORNE - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 138 of 266 PageID #:61484
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 137 of 265

2-P-137

```
 1   Q    Page 103.  CDK 888?

 2   A    Is that a final?

 3   Q    That is my final --

 4             THE COURT:  Do you know what a Bates number is?

 5             THE WITNESS:  No.  Is that the bottom right-hand

 6   number?

 7             THE COURT:  You're a lucky man.  Just look where

 8   it says page 103.

 9             THE WITNESS: Okay.  103.

10             THE COURT:  Yes.

11   BY MR. MILLER:

12   Q    Are you with me?

13   A    No, I'm not.  We're in 24.

14   Q    24, page 103.  And if you look at the very bottom,

15   it's CDK that ends in 888.  The top of the page says

16   Contract Changes.

17   A    All right.

18   Q    It's on the screen --

19   A    I'm here.

20   Q    -- if it will help you.

21   A    I'm here.

22   Q    Okay.  And do you see that the ultimate bullet point

23   there says that "The vendor is required not to disclose

24   pricing.  In place February 2015."

25   A    I see it.
```

MALCOLM THORNE - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 139 of 266 PageID #:61485
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 139 of 266

2-P-138

1  Q     The 3PA -- you can turn that aside.  The 3PA refresh

2  also provided an opportunity for CDK to increase the

3  market share and profitability of its own applications;

4  right?

5  A     I don't know how you draw that conclusion.

6  Q     Well, you were here earlier.  You heard Mr. Schaefer

7  say that Reynolds wasn't interested in protecting its own

8  layered apps by shutting down competing applications?  Do

9  you remember that testimony?

10  A     Not the exact wording of it, no.

11  Q     But CDK is shutting down competing apps as part of

12  the refresh; correct?

13  A     We are shutting down competing apps.  I'm not aware

14  of what -- maybe you can be specific.

15  Q     Well, that was part of the refresh plan, wasn't it?

16  A     No, it's not at all.

17  Q     It was to protect the layered apps for CDK, wasn't

18  it?

19  A     No, not at all.

20  Q     Can you pull up defendants' Exhibit 24 at CDK 813,

21  page 28.  That's in your Exhibit 24.  Are you with me,

22  Mr. Thorne?  Page 28.  You can also look at the screen.

23  A     Yes, I'm here.

24  Q     We're trying to pull the full screen up there for

25  you if it's easier.

                    MALCOLM THORNE - CROSS

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 140 of 266 PageID #:61486
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/10 Page 139 of 265

2-P-139

1    A     Okay.  I'm here.

2    Q     On the right-hand side about halfway down under CDK,

3    do you see the bullet point that says "Keep value add

4    advantage to CDK-layered applications"?

5    A     I do.

6    Q     Do you also see "Protect margin of layered apps if

7    dealers chooses not to use CDK"?

8    A     I do.  So it's something you should bear in mind,

9    this is a work-in-process strategy.  When we started out

10   in this strategy process, we went through multiple

11   iterations, and in fact, we debated at the beginning of

12   this process which applications would be concluded and

13   which categories would be created.  And in fact, when we

14   got towards the end of this process, we opened many

15   categories and many applications that we debated at the

16   beginning of the process are possibly being closed and

17   not open.  Example is CVR.  An example is service

18   workflow in applications like XTime.  So I just want to

19   make sure you take this document in context.  This is not

20   a final document.  It was not published strategy.  It is

21   a work-in-process that reflects the thoughts that were

22   going here during that process.

23   Q     But the draft we're looking at here or the document

24   we're looking at here is the later document, the December

25   2014 one I think you cite in your declaration.

                    MALCOLM THORNE - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 141 of 266 PageID #:61487
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/41 Page 141 of 266

2-P-140

1    A    Correct.  And the program was launched in July of

2    2015.

3    Q    And you said this was not published.  This was just

4    for internal purposes; correct?

5    A    Correct.

6    Q    You didn't -- you didn't publish these goals or

7    strategies to the public; correct?

8    A    What is your definition of publish?  We discussed

9    certain parts of this strategy with our clients, with

10   NADA, with the dealer base.

11   Q    Let me have you turn in the same document to page 33

12   of Exhibit 24, and if it's easier we'll also have it up

13   on the screen.  If you see Item No. 1: "One of the 3PA

14   Program's principles was to protect CDK products through

15   a tilt-the-table approach."  Do you see that?

16   A    Where are we?

17   Q    No. 1.  It's on the screen right next to you.

18   A    Yep.  So there are certain intellectual property --

19   we're quite open about this.  So there are certain

20   intellectual property that we believe belongs to the DMS

21   company.  So we have spent over a billion dollars

22   building a service workflow application.  We believe that

23   a repair order creation is something that is specific.

24   It's intellectual property that we are not willing to

25   license to the marketplace.

MALCOLM THORNE - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 142 of 266 PageID #:61488
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/19 Page 142 of 205

2-P-141

1  Q    And one of your goals stated here, you use the order

2  example, one of your goals for the 3PA Program was to

3  disrupt the workflow; correct?

4  A    Dealers only, pushed and pending must be finalized

5  in CDK F&I all to dispute workflow -- dealers only,

6  pushed and pending -- so there is only one vendor that I

7  am aware on -- there's only one vendor in the marketplace

8  that would ever even have the capability of not pushing a

9  pending deal.  So I'm not exactly sure what this is

10 referring to.  Every CRM desking vendor we have, of which

11 there are dozens, would push a dealer in a pending

12 status.  So I'm not really sure what this goal to disrupt

13 workflow relative to finalizing a deal in F&I.

14 Q    You testified earlier also, I think the phrase you

15 said is you wanted to level the playing field as part of

16 the refresh program.  Do you remember testifying about

17 that?

18 A    That is correct.

19 Q    But, in fact, CDK did not want there to be a level

20 or fair playing field between its applications and those

21 offered by competing software vendors who might seek to

22 be certified on 3PA; right?

23 A    There are certain areas that we deem as are

24 significant enough intellectual property that we're not

25 going to license to third parties.

MALCOLM THORNE - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 143 of 266 PageID #:61489
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 142 of 265

2-P-142

1  Q    In fact, this is what CDK -- the next slide if you

2  look at page 34.  But it's on the screen.  That's what

3  CDK, in fact, wanted the playing field to look like for

4  competing applications; correct?

5  A    Well, by nature CDK products that run in our

6  environment have access to our system; are going to have

7  better integration to the marketplace than third-party

8  applications.

9  Q    I want to go back to some of the answers you gave

10  earlier or the documents you were shown earlier about

11  security.  I'd like to move through those fairly quickly.

12  If we could go first to Exhibit 21, which was the ADP

13  Information Security Guidelines.  I think you were asked

14  to look at page 13, so I'm going to direct you to that

15  same page, which is CDK 764.

16  A    I'm on page 13.

17  Q    And the first full paragraph there, there's a

18  sentence --

19        MR. MILLER:  If you could blow it up, Steve.

20  Q    -- that says "Third parties should always have

21  unique IDs and be required to authenticate to the system

22  before they can access the data."  Do you see that?

23  A    Yep.

24  Q    So as long as Authenticom follows that practice, ADP

25  is okay with that approach to third-party integration;

MALCOLM THORNE - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 144 of 266 PageID #:61490
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/14 Page 144 of 265

2-P-143

1    correct?

2    A    No, they're not for all the other reasons we've

3    discussed today.

4    Q    You were also asked about Exhibit 25, which was the

5    PwC GSO threat and security assessment.  Do you recall

6    that?

7    A    I do.

8    Q    And first of all, this agreement was dated after the

9    wind down or this document was dated after the wind-down

10   agreement that we've been talking about.  You've heard

11   testimony about some today; correct?

12   A    I don't recall the wind-down agreement; so...

13   Q    Do you recall that it was February of 2015, the

14   agreement between CDK and Reynolds?

15   A    Okay.  Yes.

16   Q    Okay.  The record I think is fairly clear.  I'll

17   move on.  If you could turn to page 40, which is CDK 945

18   of this document.  The top page is *Identity and Access*

19   *Management* and then there's some observations and

20   recommendations.

21   A    It's CDK 9 -- I'm sorry -- 45?

22   Q    945.

23   A    Okay.  I have that.

24   Q    Nowhere in this PwC report commends or mentions

25   issues with third-party integrations, does it?

                    MALCOLM THORNE - CROSS

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 145 of 266 PageID #:61491
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 144 of 265

2-P-144

1    A    I'd have to be -- nowhere in where?  Sorry.

2    Q    Well, I won't make you read the document.  But are

3    you aware -- you testified about the document earlier.

4    Are you aware of any conclusions in here reached about

5    third-party integrators?

6    A    I'm not aware -- in this conclusion section, I don't

7    believe there is specific mention of specifically

8    third-party hostile integrators.

9    Q    And certainly you don't mention about that in --

10   A    I don't recall mention of anything.

11   Q    The last security question I want to ask you is on

12   tab 26, which was the ADP data corruption review from

13   August of 2013.  There was a section on the very first

14   page there about the sources of data corruption?

15   A    Page -- sorry, where are you?

16   Q    The very first page of tab 26.

17   A    Okay.  I'm here.

18   Q    Are you with me?  And again, Authenticom is not

19   listed as a source of data corruption here; correct?

20   A    No.  This is not specifically about Authenticom.

21   It's specifically about any hostile integrator.

22   Q    But 3PA is actually listed as a source of data

23   corruption; correct?

24   A    3PA could be -- at the time could have been a source

25   of hostile integration.

MALCOLM THORNE - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 146 of 266 PageID #:61492
Case: 3.18-cv-00318-jdp Document #: 163 Filed: 07/05/14 Page 145 of 265

2-P-145

1  Q    And ADP is listed?

2  A    Yes.  It is possible that some legacy applications

3  or integrations that have access to the DMS could have

4  been.

5  Q    Last topic, Mr. Thorne, because we're running a

6  little late.  You stated in your declaration that CDK

7  wanted to achieve the goals of 3PA in collaboration with

8  dealers, vendors and part-and-manufacture OEMs.  Do you

9  remember that?

10 A    I do.

11 Q    But for the CDK refresh strategy of locking down the

12 DMS access to work, CDK also needed to reach agreements

13 with competing DMS providers; right?

14 A    We needed to sign -- if those vendors were going to

15 likely stop using hostile access methods to try to access

16 our DMS, we wanted them to come into the standard 3PA

17 Program like everybody else.

18 Q    I'd like to ask you to turn back to defendants'

19 Exhibit 31, which I think your counsel showed you

20 earlier, this particular slide, which was page 24, the

21 DMS provider strategy.  Are you with me?

22 A    I'm here.

23 Q    And Ms. Miller pointed to the second bullet point

24 that the "Part of the DMS provider strategy was to gain

25 reciprocal agreements with DMS providers that would help

MALCOLM THORNE - CROSS

Case: 1-18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 147 of 266 PageID #:61493
Case: 3.07-cv-00918-jdp Document #: 165 Filed: 07/05/17 Page 147 of 205

2-P-146

 1  CDK on multiple fronts."  Do you see that?

 2  A    Yes.

 3  Q    So again, we weren't talking about DMS providers,

 4  we're talking about CDK's competitors; right?

 5  A    Yes.

 6  Q    And part of the reason you wanted to gain reciprocal

 7  agreements was to secure the CDK DMS through eliminating

 8  opportunities for key enablers of hostile integration;

 9  among those included Authenticom, right?

10  A    As I have stated earlier, I mean there were a number

11  of reasons.  One was related to manufacture programs

12  wanting access -- wanting us to provide services across

13  the entire ecosystem.  The second was we had our own

14  suite of layered applications that we wanted access to

15  their program --

16          THE COURT:  Let's just answer the program.

17  Authenticom was one of the hostile integrators --

18          THE WITNESS:  Yes.

19          THE COURT:  -- that you were -- go on.

20  BY MR. MILLER:

21  Q    So you agreed that CDK's goal was to enter into an

22  agreement with its competitor to stop competing for data

23  integration on each other's DMS; correct?

24  A    No, I don't agree that it was to stop competing for

25  data integration.

                    MALCOLM THORNE - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 148 of 266 PageID #:61494
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/18 Page 147 of 205

2-P-147

1          MR. MILLER:  No further questions.  (4:39 p.m.)

2          THE COURT:  Any redirect?

3          MS. MILLER:  Yes.  One briefly, Your Honor.

4                    REDIRECT EXAMINATION

5  BY MS. MILLER:

6  Q    Mr. Thorne, does CDK still compete in the field for

7  integration services?

8  A    Yes, we do.

9          MS. MILLER:  Nothing else, Your Honor.

10          THE COURT:  Okay.  Thank you very much.

11          MS. MILLER:  Something for the record or just

12  for housekeeping, both Exhibit 24 and Exhibit 31 were

13  designated as highly confidential given their strategic

14  nature to the company.  We'd ask that they not be in the

15  public record.

16          THE COURT:  Okay.  That will be fine.  Just for

17  housekeeping purposes, nothing that's been submitted here

18  is going to really be in the public record just because

19  it got to me.

20          MS. MILLER:  Fair enough.

21          THE COURT:  If the discussion of -- the

22  transcript at some point will become public and you'll

23  have the chance to redact the transcript.  I don't know

24  if any of our discussion here involves the

25  confidentiality concerns, but you'll get a chance to

                  MALCOLM THORNE - REDIRECT

1    redact the transcript.  But the exhibits aren't going

2    anywhere and they were designated highly confidential,

3    filed under steel, and I'm going to keep them that way.

4         MS. MILLER:  Appreciate that.

5         MR. HO:  Your Honor, could we just get

6    clarification?  Obviously there are people in this room

7    for whom the bell cannot really be unring.

8         THE COURT:  Yeah, that's one of the things about

9    doing an evidentiary hearing.

10        MR. HO:  Right.  So I just clarification that

11   whatever confidentiality applies from here on out doesn't

12   include people in this room.

13        THE COURT:  Yeah.  The things that have been

14   discussed or shown, I mean that's -- you needed to tell

15   it to me to base my decision on it so I'm going to do

16   that.  I'm not going to get nondisclosure agreements from

17   everybody here in the courtroom.  But I'm not going to

18   unseal, for example, the documents that have been

19   designated highly confidential filed under seal.  I'm

20   going to keep those that way.  But I'm not putting a gag

21   order on anybody about what has happened in this hearing.

22        MS. GULLEY:  Your Honor, just to clarify,

23   there's a protective order in this case and the parties

24   are already bound by it.

25        THE COURT:  Oh, they're still bound.

MALCOLM THORNE - REDIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 150 of 266 PageID #:61496
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 149 of 205

2-P-149

1      MS. GULLEY:  And so if something is
2  confidential, they can't just go use it for business
3  purposes.  I just want to make sure, to the extent the
4  protective order protects the use of the confidential --
5      THE COURT:  Everybody who is bound by the
6  protective order is going to be bound by the protective
7  order, even if they heard something in this courtroom.
8  So they're still stuck with it.  But I don't know who
9  else is in the courtroom here.  Apparently there's very
10 limited recreational opportunities and they decide to --
11 but I'm not going to try to gag all those people who
12 aren't parties.  But if you're bound by the protective
13 order, you're bound by the protective order even though
14 you attended this hearing.
15     MS. GULLEY:  Thank you, Your Honor.
16     THE COURT:  I don't know if we've even had our
17 afternoon break, I don't remember.  But we're just going
18 to press on and get as much done as we can.  So let's do
19 another witness.
20     MR. RYAN:  Your Honor, we call Howard Gardner.
21  **HOWARD GARDNER, DEFENDANTS' WITNESS, SWORN**
22                 DIRECT EXAMINATION
23 BY MR. RYAN:
24 Q    Would you state your name, please.
25 A    Howard Gardner.

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 151 of 266 PageID #:61497
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 150 of 265

2-P-150

1    Q    And where do you work, Mr. Gardner?

2    A    I work at CDK Global.

3    Q    What is your job?

4    A    I am Vice President of Data Services, and my

5    responsibilities include oversight of the Third Party

6    Access Program.

7    Q    And how long have you been responsible for oversight

8    of the Third Party Access Program?

9    A    About nine years.

10   Q    Thank you.

11          MR. RYAN:  Your Honor --

12          THE COURT:  Yep.  Bring them up.

13          MR. RYAN:  This is Exhibit 186 which is in

14   evidence.  This was shown to Mr. Rosenbach and there were

15   some -- I thought there might have been some questions

16   for the Court about it.

17          THE COURT:  Okay.

18          MR. RYAN:  Do you have a copy of it?

19          THE COURT:  I probably do, but it's easier for

20   me to just grab this one than find the one I have.

21   BY MR. RYAN:

22   Q    We're not going to go through it.  If we could put

23   186 up on the screen the first page.  Do you have Exhibit

24   186 in front of you, Mr. Gardner?

25   A    Yes, I do.

                    HOWARD GARDNER - DIRECT

Case: 1-18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 152 of 266 PageID #:61498
Case: 3.97-cv-00319-jdp  Document #: 165  Filed: 07/05/17  Page 152 of 265
2-P-151

 1   Q     Can you just tell us what that is, please?

 2   A     This is a sample report of a typical report that we

 3   would run that shows hostile activity on the CDK DMS.

 4   Q     And that's quite a lengthy report; correct?

 5   A     Correct.  And we also would expose and show this to

 6   our dealers through our DDX tool that's been talked about

 7   earlier.

 8   Q     Is there a summary page in the report?

 9   A     There is.  That's what I'm looking at now.

10   Q     And can you briefly just walk us through the summary

11   page and tell us what it shows.

12   A     Sure.  This is a summary report of 30 days of

13   identified Authenticom activity on the CDK DMS.  This

14   would be hostile activity.  If you see in cell B2, there

15   are 542 servers are represented on this report.  And then

16   queries over the prior 30 days was 12.9 million queries

17   across those 542 servers by Authenticom.

18         And then the bottom section is the top six dealers

19   that showed hostile activity in the report.  So for all

20   Authenticom activity detected in that period of time,

21   these are the top six in terms of actual activity.

22            THE COURT:  And so the number of DMS servers,

23   that's the number of DMS servers that had hostile

24   activity.

25            THE WITNESS:  That's the number that we were

                    HOWARD GARDNER - DIRECT

Case: 1:18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 153 of 266 PageID #:61499
Case: 3:97-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 152 of 265

2-P-152

1    able to detect, yes.

2            THE COURT:  And so what were the universe of all

3    DMS servers in the CDK DMS system?

4            THE WITNESS:  About 3,000.

5            THE COURT:  Okay.

6            MR. RYAN:  Your Honor, would you like any

7    further explanation of this report?

8            THE COURT:  I guess my fundamental question is

9    is there a way of identifying what proportion of the

10   system resources were devoted to the hostile activity?

11           THE WITNESS:  I couldn't produce that today, but

12   there would be a way to determine that.

13           THE COURT:  Okay.

14           THE WITNESS:  I mean I think it would be a good

15   -- a way to establish a metric around that.  It wouldn't

16   be exact, but I think there would be a way to do that.

17   We don't have it today.

18           THE COURT:  And then if the hostile activity

19   were eliminated, then these dealers would still want to

20   get data and the vendors who are serving those dealers

21   would still -- the dealers would want to get the data to

22   the vendors and the vendors would still want to get it so

23   that they could serve it through some other means other

24   than the hostile means.

25           THE WITNESS:  Presumably, yes.

                    HOWARD GARDNER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 154 of 266 PageID #:61500
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 153 of 265

2-P-153

1        THE COURT:  So what I really would also like to

2    know is not only the percentage of resources that are

3    devoted to the hostile activity, but what's the marginal

4    impact of the hostility of this activity as opposed to

5    using the data integration means that your company would

6    find acceptable?

7        THE WITNESS:  Okay.  Numbers would be hard to

8    get to you today.  Qualitatively one of the points in

9    dispute is that the process of accessing a DMS through

10   the user credentials as a user would results in data

11   access using the tools available within the user account

12   versus direct calls to the database, which is what we

13   would use in our Third Party Access Program.

14       THE COURT:  And those direct calls would be more

15   powerful and more efficient.

16       THE WITNESS:  More powerful and more efficient;

17   correct.  The other point to raise here is that the tools

18   that are available to the dealers are very powerful.

19   They have very broad access.  They can get to --

20       THE COURT:  Powerful in a different sense

21   though.

22       THE WITNESS:  In terms of the tools available to

23   get to the data.  They are powerful and they do have some

24   constraints, but they don't have a lot of constraints

25   built around them because the presumption is that they're

                    HOWARD GARDNER - DIRECT

Case: 1-18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 155 of 266 PageID #:61501
Case: 3:17-cv-00318-jdp  Document #: 163  Filed: 07/05/17  Page 154 of 265

2-P-154

1    used for dealers.  The other -- point I want to make here

2    is that this is called English.  I think we talked about

3    this.  This is an English-scripting language that's used

4    in the database.

5         THE COURT:  Yeah.  I think we heard that from

6    the IT guy from California.

7         THE WITNESS:  Right.  So we're going to get to

8    the limits of my knowledge on that pretty quick here.

9    But my understanding of English is that -- first, I know

10   it's a scripting language.  But it's also a very powerful

11   language, so you can do a lot with it.  You can slice and

12   dice; state in a different ways.  You can pull large sets

13   of data.  You can write scripts that produce smaller sets

14   of data.  But it's also something that requires a fair

15   amount of skill.  So to use it well, you need to be

16   knowledgeable in the use of that English Query language

17   so that you can produce efficient queries.  And if you

18   produce them efficiently, then you might get good

19   results; not as much burden on the system.  But if you're

20   not as well equipped to use the tools, then you might get

21   very inefficient results which could, you know, cause

22   extra burden on the dealership.

23       The other point is the volume of access is then

24   restrained so you can run -- you can understand it

25   without constraint.  You can continue to run queries.

HOWARD GARDNER - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 156 of 266 PageID #:61502
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 156 of 266

2-P-155

1    And there are cases where -- when we talked about

2    real-time earlier -- there are cases where vendors have

3    attempted to use this technique to simulate real-time; in

4    other words, they're getting data very rapidly.

5        THE COURT:  It's still a batch approach, but you

6    get the batch --

7        THE WITNESS:  You're getting -- you're trying to

8    hit the system as fast as you can to get data out so you

9    can produce reports that show real-time status.  So that

10   would be a typical case where you would see that, where

11   they're trying to run a report to show dashboards in the

12   dealership of real-time access, where real-time is

13   happening.

14       THE COURT:  But the point of that is that you'd

15   have to have an awful lot of these English-scripted

16   queries to try to emulate real-time process.

17       THE WITNESS:  Correct.  And if you had any

18   number of third parties, then you have that starting to

19   multiply.  So you could have a very huge volume of

20   accesses that are unconstrained and without, you know,

21   the ability to detect and audit what's happening, what

22   data is moving, where it's going, those kinds of things.

23   The transparency and accountability principles tend to

24   get disrupted by that.

25       THE COURT:  I think this is my last question

HOWARD GARDNER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 157 of 266 PageID #:61503
Case: 3:07-cv-00313-jdp Document #: 163 Filed: 07/06/17 Page 156 of 265

2-P-156

1    about it, but I think the implication has been that this

2    report is a typical periodic report of hostile activity.

3    But I think the implication that I've had is this is all

4    Authenticom in this stack.

5            THE WITNESS:  That's correct.

6            THE COURT:  So explain that to me.  This isn't

7    just, like, here is the June 6th report for -- of hostile

8    activity over the last 30 days.  This is some special set

9    of reports of the inquiries that you think are from

10   Authenticom.

11           THE WITNESS:  That's correct.

12           THE COURT:  So do you have some other report on

13   the nonAuthenticom hostile activity?

14           THE WITNESS:  Well, we have -- yes.  So this is

15   a sample, as I said -- let me start over -- of the data

16   that's focused on Authenticom.  And for every hostile

17   activity that we can identify, we have that information

18   as well.  So -- and if you look in our DDX tool, I don't

19   know if we have that here, but we produce reports that

20   the dealers can see any time they wish and they can see

21   everything that we can tell them about data access to

22   their system.  And that's one of the really powerful

23   things of the Third Party Access Program is we can do

24   that.  And it shows them all the data connectivity that

25   we manage.

                    HOWARD GARDNER - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 158 of 266 PageID #:61504
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 157 of 265

2-P-157

1    So if we're -- we manage connections to the OEMs, to

2    the car companies related to sales and parts,

3    transactions and things of that type.  And we manage all

4    of their connections through the Third Party Access

5    Program.  And any other connection that we're managing,

6    we show them that.  And then we do our best to show them

7    access that is not approved.  So we would call this

8    unauthorized unapproved integration.

9         THE COURT:  So how do you use this report then

10   because -- I do have one more question:  How do you use

11   this report?  Is this, like, you want to call up

12   Bergstrom.  I assume that's the Bergstrom Automotive

13   Group here in Wisconsin?

14        THE WITNESS:  Right.

15        THE COURT:  You're going to call up

16   Mr. Bergstrom and scold him about how much unauthorized

17   use --

18        THE WITNESS:  I don't know scold.  I don't know

19   if we would scold him, but we might very well call him if

20   we have a team that is receiving calls from dealers and

21   explaining to them their report.  And we've done

22   outreaches to dealers to do that.  So it's been something

23   that we've used to inform dealers and tell them that

24   we're here to help you address these issues if you'd

25   like.

                    HOWARD GARDNER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 159 of 266 PageID #:61505
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 158 of 265

2-P-158

1          THE COURT:  And he says I really like

2   Authenticom.

3          THE WITNESS:  Well, we would tell him that

4   Authenticom is not an authorized provider of integration

5   services.

6          THE COURT:  All right.  Okay.  Thank you.

7   BY MR. RYAN:

8   Q     During your time as head of the CDK 3PA Program,

9   were you ever a hostile integrator at Reynolds?

10  A     I'm sorry.  Was I?

11  Q     Was CDK.

12  A     Yes.  So that was as DMI.  So you've heard, Your

13  Honor, DMI, IntegraLink, so that would be that activity.

14  Q     And just directing your attention generally to

15  2013/2014, what was happening in terms of your hostile

16  integration at Reynolds?

17  A     Well, if we go back to 2009, that was referred to

18  earlier, yesterday I believe, there was a progressive

19  effort by Reynolds and Reynolds to secure their DMS, and

20  they started small and worked hard to do that more

21  capably over time.  And between -- I joined in 2008, so

22  between 2008 and 2013/2014 Reynolds had effectively

23  secured their DMS.  So it was very difficult to reliably

24  access data in the Reynolds DMS as a hostile integrator.

25          So the result of that was we were unable to serve

                    HOWARD GARDNER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 160 of 266 PageID #:61506
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/19 Page 159 of 265

2-P-159

 1    our clients.  It was very difficult time in terms of

 2    running a business.  We couldn't provide the data that

 3    our clients needed to run their applications.  And we

 4    determined that there was inevitability about what was

 5    happening that the system would close and it would be an

 6    impossibility to continue to remain in business as a

 7    Reynolds hostile integrator.  So it was -- that's

 8    essentially where we were.

 9    Q    And was a decision ultimately made to end hostile

10    integration?

11    A    Yes.  That led to a decision to exit Reynolds'

12    hostile integration as a business.

13    Q    And other than what you've described as Reynolds'

14    efforts to -- successful efforts to block CDK's hostile

15    integration and the impact on your dealer customers, were

16    there other reasons that CDK was going to exit hostile

17    integration?

18    A    Yes.  So we heard about SecurityFirst and the

19    strategy to make security the centerpiece of our

20    marketing approach going forward.  We felt we were behind

21    the curve from a business perspective and that we needed

22    to take a stronger position on security in general.  So

23    the practice of being a hostile integrator was not

24    consistent with being a leader in security in our view.

25    So there was that.

                    HOWARD GARDNER - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 161 of 266 PageID #:61507
Case: 3:17-cv-00315-jdp Document #: 165 Filed: 07/05/17 Page 160 of 265

2-P-160

1    And then, you know, some of the methods that you

2    have to use to be a hostile integrator become more and

3    more distasteful over time.  So there are things you have

4    to do that, like soliciting usernames and passwords and

5    finding clever ways to get around security mechanisms

6    that are often there for a very good reason, and it was

7    just not something that was in keeping with what I wanted

8    to do.  It was just not a good -- didn't feel good to do

9    it.

10   Q    Can we have Exhibit 1 up, defense Exhibit 1.

11        MR. RYAN:  This is the wind-down agreement, Your

12   Honor, in evidence.  Can I hand him a copy?

13        THE COURT:  Yes.

14   BY MR. RYAN:

15   Q    Are you familiar with Exhibit 1?

16   A    Yes, I am.

17   Q    And what is it?

18   A    This is -- it's the data exchange agreement.  This

19   is the result of the decision that CDK made to exit the

20   hostile integration business with respect to Reynolds.

21   Q    And do you recall what the wind-down period was?

22   A    The wind-down period was as long as it -- this is my

23   recollection without rereading it -- was the duration of

24   the client.  There was a wind-down period defined for

25   each individual client.  And as each client was wound

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 162 of 266 PageID #:61508
Case: 3:07-cv-00319-jdp Document #: 169 Filed: 07/05/17 Page 161 of 265

2-P-161

1  down to either -- you know, to whatever service they

2  wanted to move to, including Reynolds, then that was --

3  that was the end of the wind down when the last client

4  moved off of the protected integration that Reynolds was

5  providing.

6          THE COURT:  And the clients are the vendors?

7          THE WITNESS:  Yes.  The clients are the vendors.

8  BY MR. RYAN:

9  Q    Were there other agreements that were negotiated --

10 A    Yes.

11 Q    -- in conjunction with the wind-down agreement?

12 A    Yes.  There were two others referenced here.  Both

13 -- one was a Reynolds RCI agreement for certain CDK

14 applications to join the RCI program and there was an

15 agreement that covered certain Reynolds applications that

16 Reynolds wanted to have part of the 3PA Program.

17 Q    And could you turn to page three of the wind-down

18 agreement, and specifically Section 4.1 for me.

19 A    Um-hmm.

20 Q    Do you see that?

21 A    Yes.

22 Q    And then in the middle of that section it says

23 "During the wind-down period, Reynolds and CDK shall

24 discuss in good faith the technical and operational

25 aspects of the wind-down period as they relate to the

                    HOWARD GARDNER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 163 of 266 PageID #:61509
Case: 3:07-cv-00315-jdp Document #: 163 Filed: 07/05/17 Page 162 of 265

2-P-162

1   ongoing servicing by DMI, DMI third-party clients, and

2   their transition to the Reynolds RCI program after the

3   wind-down period."  Do you see that?

4   A    Yes.

5   Q    I don't think we've heard anything on this, but the

6   reference there to technical and operational aspects of

7   the wind down, could you briefly describe for us what

8   that entailed?  What's going on there?

9   A    Yeah.  So that, I think, refers primarily to what

10  Mr. Schaefer was talking about, the protected ID process;

11  that it was important to establish a user account that

12  they could specifically identify as being used by DMI or

13  IntegraLink, and DMI is the broader reference here, to

14  continue to provide service during the wind-down period.

15  So they would protect that, white list it in other words,

16  and it would continue to operate so we could continue to

17  serve the client without disruption.

18  Q    So there was a certain amount of cooperation in the

19  wind down that was required between CDK and Reynolds; is

20  that fair?

21  A    Yes.  To make sure that the client was able to

22  continue to function during the wind-down period.

23  Q    And this is again, as the Court said, the vendors?

24  A    Yes, I'm sorry.

25  Q    No.  No need to apologize.

HOWARD GARDNER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 164 of 266 PageID #:61510
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/19 Page 163 of 265

2-P-163

1    A    Vendor and client in this case I'm using

2    synonymously.

3    Q    And could you go to page 10 of the document, please.

4    And Section 11.3.  Do you see that?

5    A    Yes.

6    Q    And toward the end there's a reference, a

7    representation that "Each party has had an opportunity to

8    review this agreement with counsel of its choosing."  Do

9    you see that?

10   A    Yes.

11   Q    Would it be fair to say that CDK had lawyers

12   involved in the drafting of this agreement?

13   A    Yes.  Extensively.

14   Q    And could you also go to Section -- page five,

15   Section 6.  Do you see that?

16   A    Yes.

17   Q    And 6.1?

18   A    Yes.

19   Q    And this refers to three sets of obligations that

20   survive the expiration of the wind-down period; correct?

21   A    Correct.

22   Q    One is -- we'll go backwards.  One is

23   confidentiality; right?

24   A    Yes.

25   Q    One is privacy compliance; correct?

HOWARD GARDNER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 165 of 266 PageID #:61511
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 164 of 265

2-P-164

```
 1    A     Yes.

 2    Q     And the other is prohibition on knowledge transfer

 3    and DMS access; correct?

 4    A     Yes.

 5    Q     And then if we go to Section 4.5 on page four, that

 6    is prohibition on knowledge transfer and DMS access.  See

 7    that?

 8    A     Yes.

 9    Q     And we'll cut to the chase.  You've been looking at

10    this agreement in preparation for your testimony;

11    correct?

12    A     Correct.

13    Q     Can you just tell the Court how you interpret 4.5?

14    A     So what I think this is saying is that CDK is not

15    permitted to provide knowledge or technology or I think

16    business processes to a third-party who might endeavor to

17    access the Reynolds DMS and its reciprocal to CDK as

18    well.  So that both are not permitted to do that.

19          THE COURT:  Is there any restriction on, not

20    only not helping third parties -- well, I guess who

21    includes -- in other words, you're not going to -- CDK is

22    agreeing it's not going to help Authenticom.

23          THE WITNESS:  Or any other party who endeavors

24    to find its way into the ranks.

25          THE COURT:  What about CDK itself?
```

HOWARD GARDNER - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 166 of 266 PageID #:61512
Case: 3:97-cv-00313-jdp Document #: 1695 Filed: 07/05/17 Page 166 of 265

2-P-165

1          THE WITNESS:  I believe that this says that CDK

2    can continue to access the DMS.

3          THE COURT:  That --

4          THE WITNESS:  That CDK isn't restricted.  That's

5    my interpretation.

6          THE COURT:  Well, the agreement itself allows

7    you to use DMI to access Reynolds.

8          THE WITNESS:  For certain -- for certain

9    vendors, yes.

10          THE COURT:  And then after that -- apart from

11    that and after that, you think the agreement still would

12    allow CDK, say, to change its mind and say you know what?

13    The whole security thing is really not working out for

14    us.

15      Let me put it in a little more plausible -- a closed

16    system isn't working out for us.  We really need to have

17    open systems in this industry and so we're going back to

18    being a hostile integrator.

19          THE WITNESS:  Yeah.  So --

20          THE COURT:  Could you do that without violating

21    the affirmative agreement?

22          THE WITNESS:  I don't see anything in here that

23    would prevent that.  So no, I think it would be

24    permitted.

25          MR. RYAN:  Can I follow up on the Court's

                   HOWARD GARDNER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 167 of 266 PageID #:61513
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 166 of 265

2-P-166

1   question though, please.

2   BY MR. RYAN:

3   Q    By the time that this agreement was signed in

4   February of 2015, as the head of the 3PA Program for

5   several years at CDK, what was your understanding of the

6   likelihood that CDK was ever going to go back to hostile

7   integration at Reynolds?  That's really what I was

8   referring to earlier is that from my point of view, it

9   was not -- it was a distasteful business.  I didn't want

10  to continue to do it.  And that wasn't a discovery in

11  2015, that was an evolution, a feeling about the

12  processes we had to go through.  And it was just not --

13  talk about getting employees to do hard things when they

14  call a dealer and the dealer says I don't want to share

15  that credential with you because it's against my MSA or

16  I'm not allowed to do that anymore.  Or you had a partner

17  in 3PA or a potential partner in 3PA say to us you're

18  telling me that if I'm a 3PA, I can't use Authenticom;

19  right?  You're telling me I have to use your service.

20  But you're doing it.  You're doing the same thing that

21  Authenticom is doing.  So you're not being consistent.

22  Your house isn't clean.  So part of this was getting our

23  house clean.  If we're going to go down the path, which

24  we were, of being -- taking a security leadership

25  position, the goal was to try and be better at Reynolds

HOWARD GARDNER - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 168 of 266 PageID #:61514
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 167 of 205

2-P-167

1    but nicer than Reynolds.  Sorry, guys.

2              THE COURT:  Let me ask you this:  I've heard a

3    lot in the last couple of days about how dealers always

4    felt like the data was theirs and they ought to be

5    entitled to give their login credentials to Authenticom

6    so that they could get their own data.  Now you're

7    suggesting that you had to do this distasteful thing of

8    twisting the arms of the dealers to get them to give up

9    their credentials so that you could do hostile

10   integration.  I thought, based on what I've heard so far,

11   dealers were only too happy to give those credentials to

12   third parties.

13             THE WITNESS:  Not always.  So many dealers are.

14   It's a shrinking number because the industry has been

15   talking about this for five, six years.  This hit the

16   mainstream in probably 2012.  There were a lot of

17   industry observers writing articles about this whole

18   situation:  Data access, hostile access and where would

19   it go.  And a lot of information about what does it mean.

20   So in the dealer world you're at risk.

21      NADA issued their letter in, I think it was 2013,

22   September of 2013, and that really created a firestorm of

23   concern in dealerships.  One of the things that happened

24   is that they -- dealers started calling and saying I

25   don't know where my data is going.  You're CDK and you've

                    HOWARD GARDNER - DIRECT

Case: 1-18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 169 of 266 PageID #:61515
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 169 of 266

2-P-168

1    got this thing called DMI and you've got this 3PA thing

2    and I want to know where my data is going.  And so we'd

3    send them the reports.  But they'd say I've got other

4    vendors that I'm sending data too.  Where are they on

5    this report?  We'd say I can't tell.  I don't know.

6    That's because you're giving credentials to a third

7    party.  So I can't account for that for you.  I can't

8    tell you what they're doing with it.  So that was -- that

9    was the big moment.

10           THE COURT:  But that clearly isn't the issue

11   with Authenticom because they've got the best platform,

12   that I've heard about in this case, to tell the dealers

13   exactly where their data is going.

14           THE WITNESS:  Well, I would contest that.  I

15   think our --

16           THE COURT:  You've got DDX.

17           THE WITNESS:  Yeah.  We've got DDX.  And I think

18   our reporting is more comprehensive and more useful to

19   what the dealer really wants to do.

20           THE COURT:  Maybe it is better, but the idea of

21   somebody calling up and saying hey, I'm using

22   Authenticom's DealerVault and I don't know where my data

23   is going, that's implausible.

24           THE WITNESS:  I think in that case that's true.

25   Authenticom, my guess, is they are doing a good job

                    HOWARD GARDNER - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 170 of 266 PageID #:61516
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 169 of 205

2-P-169

1    explaining where the data is going.  I don't think

2    they're missing it.

3              MR. RYAN:  Thank you, Your Honor.

4    BY MR. RYAN:

5    Q    When the 3PA -- when was the 3PA refresh officially

6    rolled out?

7    A    July 2015.

8    Q    And at that time, about how many vendors were in the

9    3PA Program?

10   A    About 110, I think, is in my declaration.

11   Q    And how many vendors are in the 3PA Program today?

12   A    More than twice that:  220, 250, in that range.

13   Q    And now can I --

14             MR. RYAN:  Can I ask that defendants' Exhibit 41

15   be put up on the screen, please.  If I can hand the

16   witness a copy, Your Honor.

17             THE COURT:  Sure.

18   BY MR. RYAN:

19   Q    So if you could take a look at defendants' Exhibit

20   41, Mr. Gardner, and we're not going to spend much time

21   on this.  But can you just tell me what we've got here?

22   A    Yes.  This is -- it begins with an email from

23   Stephanie at Authenticom advising a dealer that their

24   profile -- that DealerVault is using an account in other

25   words -- has been disabled and that they're proposing

                    HOWARD GARDNER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 171 of 266 PageID #:61517
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 171 of 265

2-P-170

1   creating a new profile so that DealerVault will continue

2   to work, and if it's interesting to the dealer that they

3   would -- Authenticom would offer a new tool that would

4   automatically re-enable the accounts on an hourly basis.

5   And they would be using a tool that's based on a function

6   called UUP in the DMS, which is a function called Update

7   User Profile, which happens to have enormous power.

8   Because it can, once in your hands, you can add accounts,

9   you did delete accounts, you can increase permissions.

10  It's the keys to the kingdom virtually in terms of user

11  access.  So the dealer is saying --

12  Q    The dealer is who?

13  A    The dealer is Healey Brothers.

14  Q    It's on the front page of the document.

15  A    The dealer is sending this to --

16  Q    Hang on just a second.  Go to the next page.  So

17  who's the dealer on this document?  If we can blow this

18  up.

19  A    The dealer is Healey Brothers, and it's being sent

20  by Brad Warren, Director of Technology.  And he's saying

21  "Jeff" -- Jeff Barr is our Product Director for DDX --

22  "This company is out of control now.  They're offering a

23  tool to run a script and re-enable their profiles ever

24  hour."  So obviously a dealer very concerned about this

25  particular situation.

HOWARD GARDNER - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 172 of 266 PageID #:61518
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 173 of 266

2-P-171

1  Q     Thank you.

2            MR. RYAN:  I'd like to move defendants' Exhibit

3  41.

4            THE COURT:  Any objection?

5            MR. NEMELKA:  No.

6            THE COURT:  Okay.  It's admitted.

7            MR. RYAN:  Thank you, Mr. Gardner.  You have to

8  stay, but I'm done with questions.

9            THE COURT:  He's grateful, but you're not done.

10 Okay.  Cross-examination.

11                    CROSS-EXAMINATION

12 BY MR. NEMELKA:

13 Q     Mr. Gardner, can you go back to defendants' Exhibit

14 1.  It's in your binder there that Mr. Ryan gave you.

15 A     The Data Exchange Agreement?

16 Q     Yeah, the wind-down agreement.  Move to Section 4.5,

17 please.  Were you here when Mr. Schaefer testified?

18 A     Yes.

19 Q     And you heard him say that it was actually a

20 restriction on CDK accessing the Reynolds DMS; did you

21 hear that?

22 A     He may have said that.

23 Q     And did you hear him say that it was a restriction

24 on Reynolds accessing the CDK DMS?  Did you hear that?

25 A     That it was -- that that 4.5 is that?

                    HOWARD GARDNER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 173 of 266 PageID #:61519
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 173 of 265

2-P-172

```
 1  Q     Yes.  Did you hear that testimony?

 2  A     I believe I did.

 3  Q     And Reynolds is the counterparty to this contract,

 4  isn't it?

 5  A     They are.

 6  Q     So that's their interpretation, isn't it?

 7           MS. MILLER:  Objection.  Misstates the witness.

 8           THE COURT:  Hold on.  There's an objection.  I'm

 9  going to sustain the objection, but also suggest that we

10  don't need to spend a whole lot of time on this because I

11  don't think Mr. Gardner's interpretation is really

12  definitive here.

13           MR. NEMELKA:  We can move on.

14           THE COURT:  Good idea.

15           MR. NEMELKA:  May I distribute the witness

16  binders?

17           THE COURT:  Yes.

18  BY MR. NEMELKA:

19  Q    Mr. Gardner, CDK's DMS contract explicitly allows

20  agents of a dealer to access the DMS; isn't that right?

21  A    I'm not familiar with the DMS contract.

22  Q    Doesn't the contract state that the dealer "will not

23  disclose or otherwise make available any of the CDK

24  products to any other person other than employees and

25  agents of the dealer"?
```

HOWARD GARDNER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 174 of 266 PageID #:61520
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 173 of 265

2-P-173

1    A    Where are you referring to in there?

2    Q    I'm just wondering if you have any knowledge of

3    that.

4    A    I don't.

5    Q    All right.  Well, let's go to Exhibit -- defendants'

6    Exhibit 10.  Do you see this is the CDK Master Services

7    agreement -- DMS Master Services Agreement?

8    A    Yes.

9    Q    If you look down, it's the 2015 version?  Look at

10   the very bottom.  It's 2015 CDK Global?

11   A    Yes, I do.

12   Q    This is the most recent version of the Master

13   Services Agreement?

14   A    I would -- I presume so, yes, if it's in this

15   exhibit.

16   Q    Please go to Section 6D.  Are you there?

17   A    Yes.

18   Q    I'm going to read this with you.  "Client shall

19   treat as confidential and will not disclose or otherwise

20   make available any of the CDK products."  And CDK

21   products includes the database; right?

22   A    I presume that would be part of the products, yes.

23   Q    Where the dealer's data is stored; right?

24   A    Correct.

25   Q    So it was saying it will not available any of the

HOWARD GARDNER - CROSS

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 175 of 266 PageID #:61521
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 174 of 265

2-P-174

```
 1   CDK products.  And if you go down "...to any person other
 2   than...", do you see that?
 3   A     Yes.
 4   Q     "...to any person other than employees and agents of
 5   client."  Do you see that?
 6   A     Yes.
 7   Q     You understand that dealers designate Authenticom as
 8   their agent; correct?
 9         MR. RYAN:  Objection, Your Honor.  The witness
10   has testified three times he is not familiar with this
11   agreement.  Now he's --
12         THE COURT:  Now this is a question not about the
13   agreement.
14         MR. RYAN:  If it's clear to the witness.
15         THE COURT:  He might not know the answer, but
16   it's a fair question.  Go ahead.
17   BY MR. NEMELKA:
18   Q     You understand, Mr. Gardner, that dealers designate
19   Authenticom as their agent; correct?
20   A     I don't know that definitively.  I've heard that
21   testified.
22   Q     Were you here today during the testimony--
23         THE COURT:  He said he heard it testified.  So
24   he's got that part of it covered.
25   BY MR. NEMELKA:
```

HOWARD GARDNER - CROSS

Case: 1-18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 176 of 266 PageID #:61522
Case: 3.97-cv-00316-jgp Document #: 1635 Filed: 07/05/17 Page 176 of 265

2-P-175

1   Q    And this is the -- and this is the language that you

2   say hasn't been changed or CDK says hasn't been changed

3   since the 1990s; right?

4   A    I heard that, yes.  At least not materially.

5   Q    And even though CDK has now switched positions with

6   respect to the use of independent integrators, you

7   haven't changed this language with respect to the use of

8   agents, have you?

9   A    I don't know.  I mean I don't know if it's changed.

10  Q    It's not changed in this most recent version, is it?

11  A    It changed from when?

12  Q    It still includes -- it still allows agents to --

13  A    It says agents, yes.

14  Q    It still allows agents to access the CDK database;

15  correct?

16  A    Correct.  Well, I don't know if it says that.

17  Q    All right.  We'll move on.  If you could flip to --

18         MR. NEMELKA:  I'd request to move this into

19  evidence, please.

20         THE COURT:  I think this one is already in.

21         MR. NEMELKA:  Okay.  I'm not sure.

22         THE COURT:  If it's not --

23         MR. RYAN:  It is, Your Honor.

24  BY MR. NEMELKA:

25  Q    Let's go to Exhibit 32, defendants' Exhibit 32.  I

                    HOWARD GARDNER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 177 of 266 PageID #:61523
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 177 of 265

2-P-176

```
 1   wanted to -- we talked a lot about defendants' position

 2   that only they can access dealer data, but I want to talk

 3   about the exclusive terms with the vendors now.  Do you

 4   recognize Exhibit 32, Mr. Gardner?

 5   A    Yes.

 6   Q    What is it?

 7   A    That's the managed interface agreement that is used

 8   to contract with vendors of Third Party Access Program.

 9   Q    So this is the standard 3PA contract; right?

10   A    I presume so.

11   Q    And once a vendor signs to up to get data through

12   the 3PA Program, that vendor is prohibited from getting

13   dealer data from the CDK system from anywhere else;

14   right?

15   A    So if -- let me just make sure I'm clear on your

16   question.  So you're saying if they're part of 3PA, are

17   they prohibited from getting data from any other place.

18   Q    Yes.

19   A    They have to get data through a CDK-approved

20   process, yes.

21   Q    So once the vender starts using CDK for integration

22   services through the 3PA Program, the vendor can't get

23   the data from Authenticom; right?

24   A    That's correct.

25   Q    And let's say the vendor has many applications, not
```

HOWARD GARDNER - CROSS

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 178 of 266 PageID #:61524
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 178 of 266

2-P-177

1    just one, but five.  This requires the vendor to use the

2    3PA Program for all of them; right?

3    A    Can you point me to where that says that?

4    Q    Sure.

5    A    I'll check it for you.

6    Q    Let's go to Section 1E.

7    A    It's a long paragraph.  Point me to it.

8    Q    The first sentence says "Vendor agrees that it will,

9    beginning on the date CDK certifies the use of the first

10   application with the managed interface system, access

11   data on, and provide data to, CDK systems exclusively

12   through the managed interface system."  Do you see that?

13   A    Yes.

14   Q    And then if you go down it says "Vendor agrees that

15   it will not," and go down to the little (ii) "contract

16   with or otherwise engage any third-party (including any

17   vendor client) to access, retrieve, license or otherwise

18   transfer any data from or to the CDK system."

19        Do you see that?

20   A    Yes.

21   Q    So a vendor can't use Authenticom -- so this

22   requires the vendor to only get data from the CDK-managed

23   interface system once it has an application certified;

24   right?

25   A    That appears to be the case, yes.

HOWARD GARDNER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 179 of 266 PageID #:61525
Case: 3:07-cv-00313-jdp Document #: 163 Filed: 07/05/17 Page 179 of 265

2-P-178

1    Q    Do you know how vendor client is defined in this
2    contract?
3    A    That would be dealer.
4    Q    That's the dealer; right?
5    A    Correct.
6    Q    Do you see that this little (ii) prohibits the
7    vendor from getting the data from the dealer?
8    A    Yes, it would in this case.
9    Q    So if a vendor is part of the 3PA Program, it is
10   prohibited from getting the data from the dealer; right?
11   A    That's correct.  Well, there are cases where they
12   still can, but in general that's true.
13   Q    So it's false that dealers can just send the data to
14   the vendors, at least those who are in the 3PA Program;
15   right?
16   A    Send them directly to the dealer?
17   Q    Right.
18   A    That's correct.  Send them directly to the vendor?
19   Yes, that's correct.
20   Q    And this restriction that they have to get the data
21   from the interface, this restriction lasts forever,
22   doesn't it?
23   A    It lasts while they're in the program.
24   Q    It lasts forever, doesn't it?
25   A    While they're in the program.

                    HOWARD GARDNER – CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 180 of 266 PageID #:61526
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/19 Page 1 of 1

2-P-179

1  Q    Let's go to Section 4(I).  Are you there?  Section 4

2  (I).  Are you there?

3  A    Yes.

4  Q    And then this is the section on *Term and*

5  *Termination*.  Section 4 is.  Do you see that?  So will

6  you read for the Court what Section 4(I) says?

7          THE COURT:  You don't have to.  I can read it.

8  I speed readed it.

9  Q    "So all restrictions set forth in Section 1," that's

10  the section we just were, "of this agreement shall

11  survive the termination of this agreement" --

12          THE COURT:  You didn't have to read it either.

13  I get it.

14  BY MR. NEMELKA:

15  Q    So how can CDK possibly justify imposing this

16  exclusive dealing term forever?

17          THE COURT:  Do you know if there's any

18  justification for doing that?

19          THE WITNESS:  No, and I'm not -- I'm puzzled by

20  that.

21  BY MR. NEMELKA:

22  Q    And you're in charge -- you're in charge of the 3PA

23  Program, aren't you?

24  A    Well, I'm wondering this is a 2016 contract.  I

25  would want to see if what the current one is.

HOWARD GARDNER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 181 of 266 PageID #:61527
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 180 of 265

2-P-180

1  Q    Are you aware that counsel has represented -- your

2  counsel has represented this is the current version of

3  the 3PA contract in their statement of facts that they

4  submitted to the Court?

5  A    Well, let's see.  What's the date on it?  Well, we

6  don't -- we don't know when this contract was -- what

7  version of the contract this is.  So --

8  Q    All right.

9  A    -- I'm surprised to see that in there, that that's

10 something that I would want to look at more carefully.

11 Q    Okay.  We've talked about how CDK prohibits vendors

12 from putting any access fee on their invoices to dealers;

13 right?  We've already talked about that today.

14 A    I'm sorry.  Please repeat that.

15 Q    We're talked about CDK prohibits vendors from

16 putting any data access fee on their invoices to dealers.

17 A    Yes.

18 Q    But, in fact, you do more than just -- you prohibit

19 more than just that, don't you?  You also prohibit any

20 vendor from even telling the dealers about the

21 integration of prices that CDK charges; right?

22 A    Yes.

23 Q    And let's go to Section 8.

24 A    Section 8 of the same agreement?

25 Q    Yes.  Actually what I what to focus on is the last

HOWARD GARDNER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 182 of 266 PageID #:61528
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 182 of 265

2-P-181

1    sentence of Section 8 which is -- again, it says -- in

2    addition, not just that no line item -- it's not just

3    that you can't tell the dealer about it, it says "The

4    vendor shall never indicate in any way to the vendor

5    client that any increase in any price charged by vendor

6    to any vendor client is in reaction to or in any other

7    way associated with any modification in the price charged

8    by CDK hereunder."  Do you see that?  Do you see that?

9    A    I'm just reading it.  Yes.

10   Q    CDK has this provision in the contract because it

11   doesn't want dealers to know the true cost of using the

12   CDK DMS; isn't that right?

13   A    No, that's not true.  So --

14   Q    Your counsel can ask you for your explanation.

15   Let's go to Exhibit 31.  We've established that CDK has

16   applications in the market that compete with third-party

17   apps, right, Mr. Gardner?

18   A    Please repeat.

19   Q    Sure.  We've established that CDK has applications

20   in the market that compete with third-party applications;

21   right?

22   A    And vice versa.

23   Q    Right.  And CDK Reynolds jointly own an application

24   that provides electronic vehicle registration and

25   titling; right?

HOWARD GARDNER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 183 of 266 PageID #:61529
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 182 of 265

2-P-182

1    A    It's part of a joint venture, yes.

2    Q    And that application is called CVR; right?

3    A    Right.

4    Q    And CVR competes with other registration and titling

5    providers that also need dealer data from the DMS; right?

6    A    It's helpful to have the data, yes.

7    Q    You can't -- they can't provide their services

8    without the data; right?

9    A    No, typically they can rekey.

10   Q    Okay.  Well --

11   A    It's a convenience factor for them.

12   Q    CDK agreed that it would not let CVR's competitors

13   participate in the 3PA Program, at least not on the same

14   terms as CVR; right?

15   A    Where are you looking?

16   Q    I'm just asking you.

17   A    Oh.  Repeat the question.

18   Q    CDK agreed that it would not let CVR's competitors

19   participate in the 3PA Program, at least not on the same

20   terms as CVR; right?

21   A    So my understanding is that the terms are actually

22   more favorable.

23   Q    CVR's competitors were "not allowed to sign"; right?

24   A    They are now.

25   Q    Will you go to page 26.

HOWARD GARDNER - CROSS

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 184 of 266 PageID #:61530
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 183 of 265

2-P-183

1   A     26?

2   Q     Yes.  It's slide page 26 of the presentation.

3   A     Okay.

4   Q     And the title is *Category Restriction in Place*.  Do

5   you see that?

6   A     Yes.

7   Q     And some examples.  Look at the third bullet point.

8   *CVR Competitors*.

9   A     Correct.

10  Q     "Not allowed to sign, even with extract, only unless

11  in a territory not of value to CVR."  What does that

12  mean, *not in a territory of value to CVR*?

13  A     I'm not sure.  I presume it means that it's an area

14  where they're not operating.

15  Q     Right.  It's in a state where CVR doesn't operate;

16  right?

17  A     It's not clear, but that sounds reasonable.

18  Q     And then it says "Could allow extract only

19  integration or extract/writeback with higher pricing."

20  Do you see that?

21  A     Correct.

22  Q     Now, Mr. Malcolm Thorne testified about the change

23  in pricing structure and I wrote down exactly what he

24  said.  He said "The first way that pricing structure

25  changed is every vendor pays the same price."  Do you see

HOWARD GARDNER - CROSS

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 185 of 266 PageID #:61531
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 184 of 265

2-P-184

1    that?  I mean do you recall that -- do you recall that

2    testimony from Mr. Thorne?

3    A    Yes.

4    Q    And he said yes, everyone paid the same money for

5    the access that they received.

6    A    I don't know if that's a direct quote.

7    Q    You remember that testimony generally.

8    A    I remember that in concept he said that.  So whether

9    he -- I don't know what he intended to say.

10   Q    This bullet point is not consistent with that

11   testimony, is it?

12   A    So Mr. Thorne also said that this was a preliminary

13   draft.  It's dated October 31, 2014.  We're almost three

14   years from there.  And there are CVR vendors who have

15   joined the program since then.

16   Q    Have there been in California where CVR operates?

17   A    I don't recall where they are.

18   Q    Has there been a competing EVR (sic) application

19   allowed to compete in the 3PA Program from California?

20   A    I'm not sure.

21   Q    There hasn't been, has there?

22   A    I'm not sure.

23   Q    Okay.

24   A    I would have to check.

25   Q    All right.  Let's go to Exhibit 24, please.

                    HOWARD GARDNER - CROSS

Case: 1-18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 186 of 266 PageID #:61532
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 186 of 266

2-P-185

 1   A     24?

 2   Q     Yes.  Are you there?

 3   A     Yes.

 4   Q     Okay.  First a few questions.  CDK believes that

 5   DealerVault is secure, doesn't it?

 6         MR. RYAN:  Your Honor, I request to take this

 7   off the screen as highly confidential.

 8         THE COURT:  Sure.

 9         THE WITNESS:  Repeat the question again.

10   BY MR. NEMELKA:

11   Q     Sure.  CDK believes that DealerVault is secure,

12   doesn't it?

13   A     Are you directing me to a page or are you just

14   asking?

15   Q     Not yet.  I'm just asking you a question.  CDK

16   believes that DealerVault is secure; right?

17   A     I don't think that that's necessarily true.  I think

18   that security is a matter of degree.

19   Q     CDK --

20   A     So I could talk about the security of the data as it

21   leaves the DMS.  I could talk about the ability of

22   DealerVault to access large amounts of data on the DMS.

23   We could talk about the Microsoft Azure network.  If

24   you're talking about that, it seems plausible that, yes,

25   it probably is secure.

                    HOWARD GARDNER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 187 of 266 PageID #:61533
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 13 of 25

2-P-186

 1   Q     CDK believes that DealerVault is a solution to data

 2   security, doesn't it?

 3   A     Repeat the question, please.

 4   Q     CDK believes that DealerVault is a solution to data

 5   security, doesn't it?

 6   A     A solution to data security?

 7   Q     Um-hmm.

 8   A     That's a pretty big order.

 9   Q     Right.

10   A     Solution to all data security?

11   Q     You think it's a data security solution; right?

12         MR. RYAN:  Objection.  He's just arguing with

13   him.  It's a very vague question.

14         THE COURT:  It is kind of argumentative.  I'll

15   sustain it.

16   BY MR. NEMELKA:

17   Q     Okay.  Let's go to page 13.  Are you there?

18   A     Yes.

19   Q     This says, the top, the slide is titled *Situation*

20   *Assessment/Market*.  Do you see that?

21   A     Yes.

22   Q     If you look at the last box in the bottom left, it

23   says "Dealer data solutions gaining traction."  Do you

24   see that?  "Dealer data security solutions gaining

25   traction."  Do you see that?

                    HOWARD GARDNER - CROSS

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 188 of 266 PageID #:61534
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 1 of 2

2-P-187

1    A    Yes.

2    Q    And then the first one it lists is *DealerVault*.  Do

3    you see that?

4    A    Yes.

5    Q    And then it also says "Support from NADA."  Do you

6    see that?

7    A    Yes.

8    Q    That's the same NADA whose memo CDK has been -- you

9    refer to in your testimony, isn't it?

10   A    Yes.

11   Q    So DealerVault supported by NADA; right?

12   A    Well, I don't know what NADA knows about their

13   access methods.

14        MR. NEMELKA:  Your Honor, we move to admit

15   Exhibit 32.  DX 32.

16        THE COURT:  Is there any objection to 32?

17        MR. RYAN:  What was 32?

18        MR. NEMELKA:  I forgot to do DX 32.

19        THE COURT:  DX 32 is the CDK vendor contract.

20        MR. RYAN:  No objection.

21        THE COURT:  Okay.  That's in.

22        MR. NEMELKA:  I also move to admit DX Exhibit

23   24.

24        MS. GULLEY:  Already done.

25        MR. NEMELKA:  Already done.  All right.

                    HOWARD GARDNER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 189 of 266 PageID #:61535
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 188 of 205

2-P-188

BY MR. NEMELKA:

Q    Mr Garner, could you please go to your declaration,
which is -- it should be the very first thing in your
binder.  Is it?

A    No.

        MR. NEMELKA:  Steve, can you pull up the Howard
Gardner declaration?

        THE COURT:  I think it's DX 155 in the binder.

        MR. NEMELKA:  Yeah, it's 155.

        MR. RYAN:  Can I give him a hard copy?

        THE COURT:  It's in the binder.

        MR. RYAN:  Oh, I thought it wasn't.

        THE COURT:  Yeah, it's in there.  Assuming it's
the same declaration.

        MR. NEMELKA:  It is.

BY MR. NEMELKA:

Q    Mr. Gardner, could you go to paragraph 21, please.

        THE COURT:  No, it's in the binder.  You just
can look at that one.  But in the binder, DX 155.  155 is
your declaration.

        MR. NEMELKA:  Thank you, Your Honor.

BY MR. NEMELKA:

Q    Could you please go to paragraph 21.  Are you there?

A    Yes.

Q    The last sentence of your declaration in the

                    HOWARD GARDNER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 190 of 266 PageID #:61536
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/19 Page 190 of 265

2-P-189

1  paragraph says "For example, dealers can use CDK report

2  writing tools to extract and send their data to whomever

3  they choose."

4  A    Correct.

5  Q    That's not true, is it?

6  A    Well, they can send it to whomever they choose.

7  It's true that the Third Party Access members can't use

8  the data.

9  Q    So dealers can send it to whomever they choose, but

10 the vendors can't actually use it?

11 A    There's a reason for that and I'll let him do the

12 redirect.

13        MR. RYAN:  Maybe he would like to ask.

14 BY MR. NEMELKA:

15 Q    Sure.  Go ahead.

16 A    So the 3PA Program has core principles built into

17 it.  Malcolm talked about those.  It's about security,

18 which means certain things.  It's about accountability,

19 which means certain thing.  It's about transparency,

20 which means certain things.  It's about a level-playing

21 field, which means certain things, which we could go into

22 great detail on all of those.

23 Q    No, I'll let you answer, but be respectful of our

24 time.

25 A    But the point is that for the brand 3PA to mean

                    HOWARD GARDNER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 191 of 266 PageID #:61537
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/06/17 Page 190 of 265

2-P-190

1  anything, for it to serve its purpose of providing a

2  guarantee and assurances and peace of mind to dealers and

3  to vendors, it has to consistently stand for the same set

4  of principles.  So if data is coming from the DMS point

5  to point to the third-party, it's more secure.  And it's

6  more accountable and more transparent when the data

7  starts to move from other sources, including dealers, all

8  those things start to break down.  So the 3PA Program

9  stands for that.

10  Q    Okay.  Mr. Gardner, please go to paragraph 51.

11  A    I'm sorry, 51?

12  Q    Paragraph 51 of your declaration, yes.  Do you see

13  that it says "CDK -- The guidelines and requirements of

14  CDK's 3PA Program.  Vendors are permitted to execute bulk

15  extraction queries on the DMS only between 10 p.m. and 5

16  a.m. in order to reduce system burden."  Do you see that?

17  A    Yes, I do.

18  Q    Are you aware that that's exactly when Authenticom

19  most often pulls data, long after the store is closed?

20  A    I have data that says otherwise.

21  Q    Are you aware that that is exactly when Authenticom

22  most often pulls data?

23        MR. RYAN:  Objection.  I'm sorry.

24        THE COURT:  He modified it.  Overruled.  Go

25  ahead.  Usually they do it at night; is that right?

HOWARD GARDNER - CROSS

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 192 of 266 PageID #:61538
Case: 3:07-cv-00018-jdp Document #: 169 Filed: 07/05/19 Page 191 of 265

2-P-191

1          THE WITNESS:  Very often they do it at night,

2    but not exclusively.  So we have data that says there's a

3    lot of activity during the day.

4    BY MR. NEMELKA:

5    Q    Okay.  Two more lines of questions, then I'm --

6    A    It's the same.

7    Q    Please go to paragraph 84.  Here you're describing

8    Auto/Mate.  So you write here "Another DMS provider,

9    Auto/Mate, requires DMI to submit authorization forms

10   executed by the dealers before it allows DMI to access

11   the DMS and obtain data on their behalf using DMS login

12   credentials supplied by Auto/Mate."  Do you see that?

13   A    Yes.

14   Q    So you still use login credentials to access data on

15   the Auto/Mate DMS; right?

16   A    What we've done is we've establish a principle which

17   is that you would want to receive data in a method that's

18   authorized by the DMS provider, which is what this is

19   saying.

20   Q    But you do use login credentials to access data from

21   the Auto/Mate DMS.

22   A    As provided by Auto/Mate, the DMS provider.

23   Q    So CDK is acquiring Auto/Mate, isn't it?

24   A    There's an offer in progress or a purchase in

25   progress.

                    HOWARD GARDNER - CROSS

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 193 of 266 PageID #:61539
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/19 Page 192 of 205
2-P-192

```
 1   Q    And Auto/Mate has 7 percent market share?

 2            MR. RYAN:  Objection.  Relevance.

 3            THE COURT:  Overruled.

 4            THE WITNESS:  I don't know what their market

 5   share is.  I don't think it's that high.

 6   BY MR. NEMELKA:

 7   Q    Well, you stipulated it is.  So after the

 8   acquisition, CDK will have 50 percent of the DMS market;

 9   right?

10   A    I don't think that's the case.  I don't know.  I'm

11   not sure if you know.  But I don't believe it's 50

12   percent.

13   Q    Okay.  Well, adding 43 percent to --

14            THE COURT:  Okay.  He doesn't know.  Move on.

15   BY MR. NEMELKA:

16   Q    So question for you.  After CDK closes its

17   acquisition of Auto/Mate, is CDK still going to let

18   Legacy Auto/Mate dealers provide login credentials to

19   independent integrators like Authenticom?

20   A    That's still to be decided as far as I know.

21   Q    So CDK might?

22            MR. RYAN:  Asked and answered.

23            THE COURT:  It is.  But might they do it?

24            THE WITNESS:  Sure.  I mean --

25            THE COURT:  Good enough.
```

HOWARD GARDNER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 194 of 266 PageID #:61540
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/19 Page 193 of 265

2-P-193

BY MR. NEMELKA:

Q    Okay.  Go to paragraph 14.

A    Same declaration?

Q    Yes.  So here you write "In or about July 2013, to
the best of my recollection, I made a statement to the
effect that ADP has always understood that dealerships
own their data and enjoy having choices on how best to
share and utilize that data with others."  Do you see
that?

A    Yes.

Q    Did you write that statement yourself?

A    It was written my marketing and I approved it.

Q    And you say here that you were referring just to the
3PA Program; right?

A    I don't know -- well, it was -- the declaration says
it's in support of the 3PA Program.  It doesn't mean it's
exclusively in support of the 3PA Program.

Q    But you weren't referring to dealers having the
choice to share usernames and passwords with independent
integrators, were you?

A    So you're asking me if I was referring to that in
this case?

Q    Uh-huh.

A    In the context of 3PA I probably was not.

Q    Okay.  Let's go to Exhibit 75.  Are you there?

HOWARD GARDNER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 195 of 266 PageID #:61541
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/19 Page 194 of 265

2-P-194

1    A      There it is.  Okay.

2    Q      This is a press release from ADP CDK on February

3    2nd, 2007; right?

4    A      Sorry.  75?  November 18, 2013.

5    Q      Exhibit 75 is where I'm trying to go.

6    A      That's where I am.

7    Q      Are you there?

8    A      Yeah.  Automotive News of November 18, 2013.

9    Q      Oh.  It's plaintiff's Exhibit 75.  There could be

10   the wrong one in your binder.

11           MR. PANNER:  Can we have the monitor restored,

12   Your Honor?

13           THE COURT:  Sure.

14   BY MR. NEMELKA:

15   Q      All right.  Just look at the screen.  Are you there?

16   A      Yeah.  It's kind of hard to read.

17   Q      We can blow that up.  If you go down to the third --

18   the last paragraph there at the bottom.  It says "ADP has

19   always understood that dealership's only data and enjoy

20   having choices on how best to share and utilize that

21   data."  Do you see that?

22   A      Yes.

23   Q      That's word for word what you said a few years

24   later; right?

25   A      Yes.

                    HOWARD GARDNER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 196 of 266 PageID #:61542
Case: 3:07-cv-00313-jdp Document #: 163 Filed: 07/05/19 Page 196 of 266

2-P-195

1    Q    And if you look up in the press release --

2              MR. NEMELKA:  Sorry, Steve.  It's the -- the

3    first two paragraphs there.

4    Q    It says -- the last sentence of the first paragraph

5    says "ADP's Third Party Access Program consists of three

6    different levels of access to dealership data to choose

7    from."  And the first one is "Dealer provides access to

8    third party through dealer-supplied user IDs and strong

9    passwords."  Do you see that?

10   A    Can you point me to it?

11   Q    Sure.  The first sentence in the next paragraph.

12   A    Yeah, I see that.

13   Q    So when you said this statement, were you referring

14   to this?  Like --

15   A    I was referring -- when was my statement made?

16   Q    2013.

17   A    Yeah, so this was 2007.  I was talking 2013.

18   Q    But using the exact same language as Mr. McCray;

19   right?

20   A    The quote was pulled, I'm sure, because it was

21   convenient for somebody in marketing.

22   Q    Last questions.  If you go to the -- if you go to

23   the next page of this press release.

24             MR. NEMELKA:  If you go to the top, if you just

25   pull out the first two paragraphs, Steve, if you could.

                    HOWARD GARDNER - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 197 of 266 PageID #:61543
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 196 of 265

2-P-196

1   Q    It says "ADP recently joined the open secure access

2   organization in support -- in order to support its policy

3   in regard to third-party access."  Do you see that?

4   A    Yes.

5   Q    And "The ADP supports the five key principles

6   outlined by OSA."  If you go to the fifth principle,

7   could you please read that out loud?

8   A    "ADP believes in the fair, competitive environment

9   and does not use its leverage through supply of the

10  Dealer Management System to reduce competition through

11  the restriction of data access."

12  Q    But that's exactly what CDK is doing now, isn't it?

13  Using its leverage through supply of the Dealer

14  Management System to reduce competition through the

15  restriction of data access.

16  A    No.

17          MR. NEMELKA:  No further questions.

18          THE COURT:  Okay.  Redirect?  (5:40 P.M.)

19                  REDIRECT EXAMINATION

20  BY MR. RYAN:

21  Q    Did you have something you wanted to say when

22  counsel said I could ask you?  Do you recall that?

23  A    I don't actually recall --

24          THE COURT:  I think we followed up with the time

25  actually.

                    HOWARD GARDNER - REDIRECT

Case: 1:18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 198 of 266 PageID #:61544
Case: 3:17-cv-00318-jdp  Document #: 163  Filed: 07/05/19  Page 197 of 265

2-P-197

1          MR. RYAN:  No questions.

2          THE COURT:  All right.  Very good.  Thank you,

3   Mr. Gardner.

4       (Witness excused at 5:40 p.m.)

5          THE COURT:  Let's check in and see where we are.

6   We've got ten minutes to get in what I think by my count

7   are three witnesses, including two experts.

8          MR. RYAN:  Mr. Addanki, I believe, is next.

9          THE COURT:  Okay.  Tell me who all we have.

10          MR. RYAN:  Mr. Addanki is our economist.  Dr. Z.

11          THE COURT:  And that is the --

12          MR. RYAN:  Irreparable injury, financial

13   analyst.

14          THE COURT:  Yes.  The counter to Mr. Klein.

15          MS. MILLER:  There's it.

16          THE COURT:  Not Mr. McCray?

17          MR. RYAN:  No.  Mr. McCray's declaration is

18   here.  He retired but he lives in California.

19          THE COURT:  Good.  Very good.  All right.

20   Sounds good.  So how should we proceed?  I can give you

21   until about 6:30 here tonight.

22          MR. RYAN:  I think we can move straight ahead

23   unless the Court wants to take a break.

24          THE COURT:  Let's just keep going until 6:30 and

25   then I've got enough time that I can -- maybe we could

                    HOWARD GARDNER - REDIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 199 of 266 PageID #:61545
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/19 Page 198 of 265

2-P-198

 1   finish up a witness before you do your closings.  Just so

 2   you can --

 3           MR. RYAN:  Tomorrow morning you mean?

 4           THE COURT:  Yeah.  I'm also very open to you

 5   saying the declaration is in.  Come on up.  You're going

 6   to get settled while we debate the technicalities here.

 7   I'm also very open, if you feel that you've got an

 8   adequate declaration -- if you feel you've got an

 9   adequate declaration, you know, you can rely on it; so...

10           MR. RYAN:  For anyone, for either one of these

11   two.

12           THE COURT:  For anyone.  I am particularly

13   interested in hearing from Mr. Addanki.

14       **SUMANTH ADDANKI, DEFENDANTS' WITNESS, SWORN**

15                   <u>DIRECT EXAMINATION</u>

16   BY MR. RYAN:

17   Q    Can you state your name for us, please.

18   A    Sumanth Addanki.

19   Q    And Mr. Addanki -- Dr. Addanki, you're here as an

20   expert witness in this case?

21   A    I am.

22   Q    Could you summarize for the Court, please, your

23   background that's relevant to your testimony as an expert

24   witness.

25   A    Yes, Your Honor.  I have a Ph.D. in economics from

                 SUMANTH ADDANKI - DIRECT

Case: 1:18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 200 of 266 PageID #:61546
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 199 of 265

2-P-199

Harvard University.  I have worked in the field of

antitrust economics, specializing in intellectual

property, and in consulting for the last 31 years.  I

have testified frequently about these subjects; written

many articles about these subjects; been invited to

testify by the Senate Judiciary Committee; by the

Chairman of the Federal Trade Commission on these

subjects as an expert, not an a lobbyist.  And I have

been retained by the U.S. Department of Justice, what I

believe to be the most principal plaintiff out there, to

serve as their antitrust expert in cases they were

bringing.

THE COURT:  Very good.  All right.  Let's dig

into this case.

BY MR. RYAN:

Q     Okay.  And you've written a report in this case?

A     I have.

Q     And you've reached certain conclusions?

A     I have.

Q     We're looking for that summary of conclusions to go

up on the screen.  I have a sheet of paper that's in

front of you while we're looking for it as well.

A     This just sets forth, Your Honor, in a few simple

sentences really what I think is important from the

economic standpoint in this case and what we absolutely

SUMANTH ADDANKI - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 201 of 266 PageID #:61547
Case: 3.17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 200 of 265

2-P-200

1    need to keep in mind if we're not going to end up with --

2            THE REPORTER:  I'm sorry, speak in to the mic,

3    please.

4            THE WITNESS:  I certainly will.

5    BY THE WITNESS:

6    Q    And your first -- the first point is what,

7    Mr. Addanki?

8    A    So, Your Honor, understanding the parties'

9    incentives is always important from an economic

10   standpoint.  It's crucial here because the parties'

11   incentives, the defendants on the one side and

12   Authenticom on the other, have very different intensives.

13   They have very different business models, and, therefore,

14   that gives them different incentives.  And those

15   different incentives leads to very different behaviors on

16   each of their parts.

17       I think it's worth taking a moment to understand

18   those because they have important implications for how to

19   interpret, from the economic standpoint, what we're

20   seeing going on here.

21       First and foremost, Authenticom and others like it

22   are not in the DMS business.  They make their money

23   through accessing databases and doing whatever processing

24   of the data they scrape from those databases and selling

25   them to people who have a need for those data.  First and

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 202 of 266 PageID #:61548
Case: 3:07-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 201 of 265

2-P-201

1    foremost, Reynolds and CDK are in the DMS business.

2    That's where they make the majority of their investments.

3    That's where they make the majority of their revenue and

4    their profits.  What Authenticom does is a small piece of

5    the revenue pie for a Reynolds or a CDK.  Very important

6    to understand that.

7         Because they are first and foremost DMS suppliers,

8    they have certain interests and incentives that

9    Authenticom simply doesn't have.  For instance, they have

10   a deep interest in assuring the performance, reliability

11   and integrity of the DMS.  It's self-evident why.  They

12   are the supplier of the DMS.  As the core engine,

13   software engine of an automobile dealership or a vehicle

14   dealership, the supplier of that has certain explicit

15   implicit responsibilities from an economic standpoint.

16   So they will -- they have a big interest in ensuring

17   those expectations are met.  They invest a lot of money

18   in making sure those expectations are met.  If something

19   goes wrong along those dimensions, they bear the cost of

20   it.

21        Another important implication of these different

22   incentives is that companies like Reynolds and CDK have a

23   very significant interest in making sure that the

24   application universe for their DMS is thriving, is

25   flourishing.  Because that is a very important part in

SUMANTH ADDANKI - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 203 of 266 PageID #:61549
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 203 of 266

2-P-202

1   creating, as time goes on, of what makes the DMS

2   important, attractive and reliable in the view of the

3   dealer customer that they serve.  So their ability to

4   attract and retain DMS customers depends not just on

5   their keeping the DMS functioning well, but also on

6   making sure that there is a good universe, a thriving

7   universe of vendor applications from third parties

8   available for their DMS.

9           THE COURT:  Why do they necessarily have to be

10  from third parties?

11          THE WITNESS:  Simply because if you look at the

12  Reynolds case, what they have in the application space is

13  a tiny fraction of what is actually used on Reynolds

14  DMSs.  CDK's fraction is little bigger, but it's still

15  definitely less than the majority of what's out there.

16  And ultimately it's a question of core competencies also,

17  Your Honor.  What they are good at is the DMS and they've

18  got some things that they bought as applications, but

19  there's a lot more going on out there that doesn't need a

20  lot of DMS skill but needs a lot of application

21  development skill.  And that's really the way systems

22  have kind of evolved.  The layers are layered on.

23      This has kind of really important implications if --

24  and Your Honor, obviously you're going to ask me any

25  questions you want.  I hope you don't mind if I just

                SUMANTH ADDANKI - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 204 of 266 PageID #:61550
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 203 of 265

2-P-203

1    speak in a matter of form.

2            THE COURT:  No.  As long as you keep the pace

3    moving, I'm okay.

4            THE WITNESS:  That's great.  So once we

5    understand these incentives, I think we step back and

6    take a look at some of what's been going on, the events

7    in this case that have been -- I think, even the expert

8    for the plaintiffs admitted have been a little difficult

9    to understand or at least put in an appropriate economic

10   context.

11       Let me start with the agreements.  Every time I, as

12   an antitrust economist, look at an agreement potentially

13   having horizontal implications, and certainly on the

14   letter of the agreements here I think there's no obvious

15   horizontal effect.  But if there's a potential for

16   horizontal effect, I want to know about it because we

17   don't like horizontal agreements.  Typically we tend to

18   regard them as potentially sensitive.

19       Here I see two things going on.  I see a company

20   that has had a particular view, a particular approach to

21   its DMS product change; do a 180 on that approach.  And I

22   find that's an interesting fact.  But the company with

23   whom it's entering into these agreements has had that

24   other philosophy for at least a decade.  So when I look

25   at what could have been in these agreements that somehow

SUMANTH ADDANKI - DIRECT

Case: 1-18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 205 of 266 PageID #:61551
Case: 3:17-cv-00318-jdp   Document #: 163   Filed: 07/05/19   Page 204 of 265

2-P-204

 1    tip the balance in favor of moving to this model on CDK's

 2    part, I think we can all agree we come up with basically

 3    nothing.  It was either in CDK's interest, Your Honor,

 4    unilaterally to make this change -- and I want to talk a

 5    little bit about the change and what we can infer from

 6    the fact that these parties made these changes.  And that

 7    decision stands or falls on the economics of what it

 8    means for CDK as a DMS vendor.

 9         Reynolds has not in recorded history been a hostile

10    integrator into CDK systems.  Any move to a closed system

11    would necessarily require CDK to put up the walls; right?

12    In other words, it's not enough to just declare that

13    you're making -- you're closing your system.  You have to

14    do all of the security stuff that keeps the hostile

15    integrators out.

16         So there's nothing really beyond a paragraph, that I

17    think of as having an economic content, to an assurance

18    from Reynolds that it's not going to hostilely integrate

19    into CDK.  It's never done it.  I think anyone observing

20    this industry would be -- make the perfect reasonable

21    inference that that was not a realistic threat of any

22    kind to CDK's decision.

23         So when I look at the decision to close the system,

24    I find two decisions separated by probably close to a

25    decade, taken independently, to say this is the way to

                     SUMANTH ADDANKI - DIRECT

Case: 1:18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 206 of 266 PageID #:61552
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 206 of 266

2-P-205

1    go.  So let me talk a little bit about those decisions.

2         I think we've heard pretty extensive testimony that

3    when the decision was made to close the system, there

4    were losses.  And for a DMS company, the losses were

5    where it really hurts.  They were --

6              THE COURT:  You're talking about the Reynolds

7    decision?

8              THE WITNESS:  The Reynolds decision first.  And

9    the losses hurt because that's where they make their

10   revenue and profit.  So I, as an economist, step back

11   from that, Your Honor, and say okay, here's a decision

12   that probably was anticipated to cost where it really

13   hurts in the DMS space:  Core, revenue and profit.  It

14   did, in fact, have exactly that effect.  Companies don't

15   undertake that kind of change unless they really believe

16   as an economic matter that not doing so is going to be

17   even more expensive.  Basically you always assume that

18   companies act in their best interests.  So I look at that

19   and I say I don't know what exactly -- again, I'm not in

20   their heads.  But we've heard some of it.  And the

21   security issues absolutely could arise to the level of

22   solid economic cause, they just say I can't afford it.

23   I'm not going to be in the position a year or two years,

24   three years, four years down the line of being left

25   holding the baby with a breach or a scandal of some kind

                 SUMANTH ADDANKI - DIRECT

Case: 1-18-cv-00864-Document-#:-986-17-Filed:-05/20/20-Page-207-of-266-PageID-#:61553
Case: 3-07-cv-00313-jgp  Document #:165  Filed: 07/05/07  Page 200 of 265

2-P-206

 1    having to do with security.  So to me the idea that --

 2              THE COURT:  I think I get Reynolds.

 3              THE WITNESS:  So now --

 4              THE COURT:  It would be rational for them to say

 5    okay, where security is going to be really important,

 6    we're making it a closed system.  That's how we do it;

 7    make that decision more than a decade ago.  That part I

 8    get.

 9              THE WITNESS:  And as they get better at it, and

10    whatever was referred to as the forced march, as they're

11    getting better at it and it is creating problems in the

12    DMS space, they're losing clients, CDK is picking up

13    clients.  CDK is picking up those clients, as we saw in

14    those slides.  When you see CDK in view of that

15    development saying I could be picking up more clients,

16    growing my market share, making a lot of money from these

17    DMS customers that I'm getting instead say I'm going to

18    close the system, I'm going to close the system and

19    forego all of these extra additional customers that have

20    been defecting from Reynolds to me, again, I look at it

21    and say there is no earthly reason to do that, to stop

22    essentially laughing all the way to the bank unless you

23    believed that there was some real cost for not doing so.

24    And we've heard testimony about that.  We've seen

25    documents about that.  But to me, looking abstracting at

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 208 of 266 PageID #:61554
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/19 Page 207 of 265

2-P-207

1  the documents, Your Honor, just the very fact that in

2  light -- in view of the success you were having with --

3  the apparent success you were having with this open

4  model, the idea that you would close it then to me says

5  you saw a real cost coming down the pike if you didn't

6  close it.

7       Now, given the revenue pie and the profit pie, just

8  as a starting gate matter it's not plausible to suggest

9  that this was something done to increase your profits by

10 charging more for data integration.  And there I've got

11 to drill a little deeper into this, Your Honor.  And

12 let's say already --

13      THE COURT:  You're saying the opportunity to

14 increase profits doesn't explain CDK's decision.

15      THE WITNESS:  It absolutely cannot explain CDK

16 -- the numbers just don't work.  The total of the

17 integration business is some single digit percentage, 4

18 percent or so of CDK's revenues.

19      THE COURT:  And where do you get that number?

20      THE WITNESS:  From data I've seen over the

21 course of time.  I don't think data was produced in the

22 course of litigation, but it's very small.

23      THE COURT:  Because you heard Mr. Thorne say

24 that was one of the things he wanted to do --

25      THE WITNESS:  Yes.

SUMANTH ADDANKI - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 209 of 266 PageID #:61555
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 208 of 265

2-P-208

1          THE COURT:  -- in the 3PA refresh.  We weren't

2    making enough money on it, so we're going to make more

3    money.

4          THE WITNESS:  I think it's a couple things.  I

5    think it's fair value is what he used; right?  And

6    there's something that I think -- if you'd like me to

7    talk about that for a minute, Your Honor.

8          THE COURT:  There's two explanations.

9          THE WITNESS:  Right.

10          THE COURT:  The explanation I've been given is

11    security is a big problem.  That's the defendants' view.

12    And so we all recognize the Target breach and all the

13    other stuff that happens in 2015 really sensitized people

14    to it.  And so presumably the market values it and we

15    realize that in order to not face some catastrophic cost,

16    CDK says now is the time we finally have to close the

17    system.  Security is so important we have to do that.

18    But Mr. Thorne concedes, and the plaintiff's story is

19    that really the primary reason was that they could

20    capture the market for data integration services if the

21    two largest suppliers both went to a closed system.  If

22    you got rid of the third-party integrators, the two of

23    them together would make virtually all the money in the

24    data integration market.  So yeah, I get it.  Their

25    proffered explanation is security.

                    SUMANTH ADDANKI - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 210 of 266 PageID #:61556
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 209 of 265

2-P-209

1    But the plaintiff's explanation is that if they both

2 agreed, they would be able to successfully capture the

3 market for data integration.  But if they didn't agree,

4 it would all go somewhere else.

5        THE WITNESS:  See, the problem I think --

6 there's two problems.  There's a very fundamental problem

7 with the theory, which I'll come to in a second, but the

8 problem even with the agreed part is you didn't have an

9 agreement.  Reynolds had Authenticom out of Reynolds

10 systems for all practical purposes.  Reynolds had DMI out

11 of Reynolds systems for all practical purposes.  All it

12 takes is your investment in the technology.

13        THE COURT:  That explains how Reynolds could do

14 it.

15        THE WITNESS:  Right.

16        THE COURT:  They could just unilaterally say you

17 guys are out.  We have econological means; we've learned

18 this over a decade.  We can stop you guys from getting

19 in.  Now CDK comes out of it.  I think the plaintiff's

20 theory is in this environment, as long as there's not a

21 really good alternative open system, CDK is now in a

22 position to say all right, I'll join you on the forced

23 march and we will be able to capture the third-party

24 integration market because now there's no longer a viable

25 alternative.

                    SUMANTH ADDANKI - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 211 of 266 PageID #:61557
Case: 3:07-cv-00819-jdp Document #: 165 Filed: 07/05/11 Page 211 of 265

2-P-210

1       THE WITNESS:  But there's no agreement involved

2  there, Your Honor.  The point being that CDK --

3       THE COURT:  That's the fact that we have to

4  establish.

5       THE WITNESS:  Well, the point is though -- let's

6  look at the economics here; right?  Reynolds is closed.

7  That has been a historical fact for decades.  If CDK

8  chooses to close, the success of that closure, whether or

9  not there's an agreement, the success of the closure

10  depends entirely on whether they can block access.  As

11  long as they cannot block access, there's going to be

12  hostile integration because the entry cost is minimal for

13  hostile integration.  So there's going to be hostile

14  integration as long as they cannot block access.  If they

15  can block access, the fact that the other big DMS is

16  closed is a fact.  There's no agreement needed to affect

17  that.  That's my point about where is the agreement?  Why

18  do I need an agreement for this?  This is your election.

19  I can just sit here and say as long as I can succeed in

20  closing the system, I'm done.  I can change to that

21  model.

22      The problem with viewing, if I may switch to that,

23  the real fundamental with this whole theory -- let's go

24  back to what I said earlier, Your Honor.  They are DMS

25  suppliers.  When they lose DMS customers to Reynolds, to

SUMANTH ADDANKI - DIRECT

Case: 1-18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 212 of 266 PageID #:61558
Case: 3:07-cv-00310-jdp Document #: 169 Filed: 07/05/17 Page 211 of 265

2-P-211

1   DealerTrack, CDK bleeds the same when that DMS customer

2   goes.

3       Now, the vendor infrastructure, the vendor ecosystem

4   I think I've heard the word used, is very important to

5   that business also.  But fundamentally, and I think all

6   of the calculations done by Dr. Singer really are

7   entirely consistent with this, there is a cost of

8   ownership for the dealer to use the DMS.  These are smart

9   sophisticated buyers.  Whether or not they're good at

10  social security, I don't know.  But they're smart

11  sophisticated buyers, the car dealers.  They know what

12  the cost of doing business is.  If you are going to stick

13  it to the vendors by raising the data fees in a

14  competitive vendor environment, the economics is

15  straightforward.  They will passed through.  They're not

16  going to be called passed through, they're going to pass

17  through.  They're either going to get out of business or

18  raise the price.

19      And the point is, Your Honor, it's system wide.

20  It's to all vendors.  So the whole price thing goes up,

21  which means that the cost of doing business to the dealer

22  has gone up; which means that the cost of using a CDK DMS

23  has gone up.

24      There's a very simple fundamental principle in

25  economics, Your Honor, that you may have an important

SUMANTH ADDANKI – DIRECT

Case: 1-18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 213 of 266 PageID #:61559
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 213 of 265

2-P-212

product, but you get to collect your rent for that
product once.  If you raise the price here, you will get
defections or you will have to lower your price somewhere
else.  You can't make it both places because the dealer
knows what they're paying.

THE COURT:  Well, I think we've had a lot of
evidence then about the price secrecy agreements; so...

THE WITNESS:  Yes.  It's not about -- it's not
about the dealer caring where it's coming from.  It's if
I go to DMS from CDK, here's what I pay.  If I go to a
DMS from R&R, here's what I pay.  If I go to a DMS from
DealerTrack, here's what I pay.  It's a cost of ownership
for the product.  And cost of ownership, Your Honor, has
been studied by consultants for at least the 30 years
I've been doing antitrust.  It's something that companies
will -- if they don't have the expertise in-house,
they'll go and find it.  And on the internet today, it's
not hard to find.

So the idea that there's more money to be made
really is saying well, you'll be leaving money on the
table then.  I don't think any of these companies will be
leaving money on the table.  So the idea that there's
this trove of money that you could exploit if you could
just get these people out of the business, there isn't
any money there because it's all part of the dealer cost

SUMANTH ADDANKI - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 214 of 266 PageID #:61560
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 2 of 2 #25

2-P-213

1    of using the system.  And if you --

2              THE COURT:  I'm not sure I'm really following

3    this argument --

4              THE WITNESS:  Okay.

5              THE COURT:  -- because this template would work

6    for -- in any antitrust case.

7              THE WITNESS:  Not in any antitrust case, Your

8    Honor, in an antitrust case, where as in here, you've

9    really got the apps and the DMS being the two parts that

10   have to function together and that the dealer understands

11   it's paying for in order to go forward with the DMI.  So

12   I will put it this way:  I could say to a perspective

13   client here is my billing rate, and they could decide --

14   you know, when I set my rate, I have to think about what

15   the market is going to do with my billing rate.  And I

16   could say -- people work for me, their rates are such and

17   such.  So my rate, just to pick a number, is $1,000.  The

18   people who work for me, their rates are $500.  If I then

19   go to the market and say oh, and by the way, there's

20   going to be a 20 percent surcharge on all work that's

21   done on weekends, I've raised my price.  Isn't there

22   going to be a reaction?  The cost of doing business with

23   my firm has gone up.  And it's not a particularly

24   difficult going up sea.  It's not like I'm getting, you

25   know, ten years down the line my VW is worth $2 instead

SUMANTH ADDANKI - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 215 of 266 PageID #:61561
Case: 3:07-cv-00318-jdp Document #: 169 Filed: 07/05/11 Page 214 of 265

2-P-214

1  of $2,000.  It's right there.  It's what it's costing me

2  to buy these apps.

3      So the idea that you're making all the money you can

4  on the DMS and somehow you're going to find these extra

5  hundreds and thousands of dollars, there's an economic

6  problem with that because if you could have charged that

7  for it, you would have charged it.  Where do you --

8          THE COURT:  But you couldn't charge it if there

9  are cheap data integrators that are available.

10         THE WITNESS:  And so therefore, Your Honor, if I

11  think about I'm buying A and B; I'm buying, I don't know,

12  the bow tie and the suspenders; right?  If the bow tie

13  price is low for the package, you can charge a little bit

14  more for the suspenders so that's all that's in the

15  package.  When the bow tie price goes up, you know what?

16  You're going to lose sales if the suspender prices don't

17  adjust to match.  Because there really only is --

18         THE COURT:  But I'm not going to buy the package

19  if I can get the bow tie somewhere else for free.

20         THE WITNESS:  But the point is it's not --

21  you're not even paying the integrators.  As --

22         THE COURT:  Well, you can't have it both ways.

23  If it's a cost of the dealer to have the system, then we

24  have to recognize that even though the vendors are the

25  ones that are paying the data integration bill, it's a

SUMANTH ADDANKI - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 216 of 266 PageID #:61562
Case: 3:17-cv-00918-jdp Document #: 165 Filed: 07/05/17 Page 216 of 265

2-P-215

 1  cost that ultimately is borne by the dealer.

 2          THE WITNESS:  Absolutely.  So the point is if

 3  the vendor application's bill is going to be $5,000

 4  because they're using third-party integrators and the

 5  vendor application bill is going to go up to $8,000,

 6  there are going to be defections, substantial defections

 7  because the total dealer cost has gone up.  And the total

 8  dealer cost --

 9          THE COURT:  Where will the defections go?

10          THE WITNESS:  Well, just as they have been

11  doing.  They'll go to DealerTrack.  They'll go to other

12  places.  It's not --

13          THE COURT:  I assume that there's going to be

14  some defections to the minority part of the market that

15  has the open systems now.  But I've heard plenty of

16  evidence to suggest that there's -- I could use the term,

17  there isn't an economic term.  I just called it

18  stickiness in the market.  Some people can go, but some

19  people aren't going to go.  There are switching costs

20  that -- and the natural barriers to entry that suggest

21  that having a readily available alternative open system

22  isn't that easy; not impossible, but the switching costs

23  are high, the barriers to entry are high, and so at least

24  for awhile over the mid-run there's not a good

25  alternative anymore to go to an open system.

                    SUMANTH ADDANKI - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 217 of 266 PageID #:61563
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 216 of 265

2-P-216

 1          THE WITNESS:  One of the things, there again,

 2    Your Honor, keep in mind, is that even though there may

 3    be plenty of people who say I'm not changing.  I'm just

 4    going to suck it up, I'm not changing.  One of the

 5    principles that we rely on a lot in antitrust is it's

 6    competition at the margin that really protects everyone.

 7    So basically what that means is that the threat to move,

 8    as long as it's made good by some players, and we've seen

 9    some nontrivial-size players moving to nonstandard DMS

10    integrators, as long as that's happening it's a real

11    threat.  And the fact is there were these losses and

12    defections.  This is not made up; right?

13        When I looked at CDK's win and losses, yes, they

14    absolutely won some, but --

15          THE COURT:  You can help me understand this.  My

16    understanding is when I look at this from an economic

17    perspective, I don't have to find that CDK had a complete

18    seal on the market.  It didn't lose anybody.  This is the

19    point of the critical loss analysis that I guess I got

20    from --

21          THE WITNESS:  Dr. Singer.

22          THE COURT:  -- Dr. Singer is that yeah, they'll

23    tolerate some losses.  But they'll more than make up for

24    it by being able to charge what he thinks is a

25    supercompetitive price.

                    SUMANTH ADDANKI - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 218 of 266 PageID #:61564
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 2 of 60
2-P-217

1      THE WITNESS:  Yeah.  And this is -- this is the

2  part where you run into the other fundamental problem.

3  You're saying basically you could impose a 30 percent

4  price increase on dealers.  And if someone told me that

5  here's a company that could impose a 30 percent price

6  increase on dealers and just get away with it, why didn't

7  they do it?  Why didn't they just put that 30 percent

8  price increase in?  What I'm saying that tells us --

9      THE COURT:  When are you --

10     THE WITNESS:  Just raise the price.  Why did CDK

11  have to spread $200 million on doing all this stuff if it

12  really could raise the price effectively by 20 percent?

13  30 percent?  Why don't they do it?  So it just proves too

14  much, Your Honor.  These analyses that say oh, these huge

15  price increases that are getting passed on, and they're

16  getting no value; right?  That's the point.  They're

17  getting no value for it.  They prove way too much because

18  they're saying you could essentially -- you're leaving

19  money on the table.  You're leaving hundreds of millions

20  of dollars on the table.  That can't be either; right?

21     So when I look at these analyses and look at these

22  facts, I say you've got a change that's happening.  That

23  changed that's happening is going to change the way

24  business is done because when systems go closed, yes,

25  people who were providing ancillary services to an open

SUMANTH ADDANKI - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 219 of 266 PageID #:61565
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 219 of 265

2-P-218

1    system are going to be out of a job for those systems.

2    The systems are closed.  The ways of doing business will

3    change.  But the market does have a way of sorting it

4    out.  And the fact is the price to the dealer today is

5    being constrained by exactly what the price to the dealer

6    would be constrained by tomorrow, which is competition

7    among DMSs.

8         And the idea that the competition among DMSs was --

9    somehow ended up leaving all this money on the table that

10   they just have to shut out these integrators and they

11   could charge hundreds of thousands dollars more for the

12   dealer doesn't make sense.  I'm happy to explain that

13   more if it would be helpful.

14           THE COURT:  No, I think I get your theory.  All

15   right.  So why don't you clean up anything else that you

16   think that I need to hear from Dr. Addanki.

17   BY MR. RYAN:

18   Q    Dr. Addanki, you were here when Dr. Singer testified

19   that CDK did not need Reynolds to close its system.  Do

20   you recall that?

21   A    Yes.

22   Q    Do you agree with that?

23   A    I do.  That's the whole point.

24   Q    For the reasons that you just said.

25   A    Yes, sir.

                     SUMANTH ADDANKI - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 220 of 266 PageID #:61566
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 219 of 265

2-P-219

1  Q    And when you say they did not need Reynolds, you

2  mean they could do it without an agreement; correct?

3  A    They could do it unilaterally.

4  Q    And that makes a big difference in the antitrust

5  world whether it's unilateral or by agreement; right?

6  A    It always does.

7  Q    In your report you did a switching analysis;

8  correct?

9  A    I did.

10 Q    And that's at paragraphs -- that's at paragraph 48

11 of the report, if the Court would like us to talk about

12 it.  What was -- essentially what did your switching

13 analysis show briefly?

14 A    Briefly, Your Honor, it showed that there was

15 switching going on.  And it's yes, there are five-year

16 contracts, but what that basically means is that every

17 year you're going to get a crop of dealers --

18        THE COURT:  20 percent.

19        THE WITNESS:  I think it's something -- the

20 average is a little south of five years.  So -- and those

21 are your opportunities you're going after.  And of those

22 20 percent, a nontrivial amount like 15, 16, 20

23 percent --

24        THE COURT:  17 percent, I think.

25        THE WITNESS:  17 percent.  Thank you, Your

SUMANTH ADDANKI - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 221 of 266 PageID #:61567
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 221 of 266

2-P-220

1 Honor.  Were switching.  Were switching and --

2    THE COURT:  Now, how do I know whether that's a

3 lot or a little?  Because the same statistic is what

4 Dr. Singer says, look, 97 percent stay year after year.

5    THE WITNESS:  Well, that's because --

6    THE COURT:  Or really --

7    THE WITNESS:  -- 4 percent aren't coming up.

8    THE COURT:  It's just arithmetic.  This not

9 fancy stuff, it's just arithmetic.

10    THE WITNESS:  That's an excellent point; right?

11 So in other words, there isn't a magic metric for how big

12 or small is big enough.  But certainly --

13    THE COURT:  This common sense I hear so much --

14 it's kind of anecdotal because I don't have a lot of

15 statistical evidence about this.  But I've seen enough to

16 suggest the industry is highly irritated by the Reynolds

17 forced march thing.  They're not leaving in droves.  I

18 mean it's some attrition and some people get mad enough

19 to leave, but it's not as -- the departures don't match

20 the energy with which the irritation is expressed.  And

21 again, I don't have, like, comprehensive data about it,

22 but like I said, they're not leaving in droves.

23    THE WITNESS:  And this is my experience from

24 having analyzed a lot of mergers, Your Honor, having done

25 merger analysis, you get to hear from the people who are

SUMANTH ADDANKI - DIRECT

1  unhappy.  This is just the way of human nature.  You

2  don't get to hear from all the people who we're okay with

3  it.  We're okay.  So we always hear the squawks, that's

4  the first thing.  And number two is there's a fair amount

5  of new business, there's a fair amount of new doors

6  coming in.  A lot of CDKs -- when I look at CDK's

7  switching analysis, there's new stores coming in every

8  year.  Those are up for grabs.  There's no stickiness

9  there.  They're totally up for grabs.

10         THE COURT:  Well, I don't know about that.  If

11  Penske opens up a new store and gets a new dealership,

12  they're going to go with the system Penske has.

13         THE WITNESS:  If Penske does, yes, absolutely.

14  If it's someone else, you know, a smaller or a --

15         THE COURT:  I think I've heard evidence here

16  that the little guys that have got one or two stores are

17  not really what people are really worked up about.

18  It's -- most of them are dealer groups that have a lot of

19  dealerships.

20         THE WITNESS:  So let's go back to how much is

21  enough.  The factions from Reynolds, I think we've heard

22  numbers saying something like 40 percent to 28 percent

23  that move.  That's --

24         THE COURT:  Of those who move that --

25         THE WITNESS:  No, no.  Their share used to be

SUMANTH ADDANKI - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 223 of 266 PageID #:61569
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 223 of 265

2-P-222

1   around 40.

2           THE COURT:  Oh, you're talking about their

3   market share.

4           THE WITNESS:  Right.  And went down to 28.

5   That's a big change.  By any measure, that's a big

6   change.  That's a lot.

7           THE COURT:  Okay.  Fair enough.

8           THE WITNESS:  So I'd say that are people voting

9   with their feet?  Yeah, they are voting with their feet.

10  And ultimately --

11          THE COURT:  That is a really good point.  But

12  what I don't think I have is really compelling evidence

13  of what will happen now that CDK has got a closed system.

14          THE WITNESS:  That's a good point.  I think if

15  you say that openness is important to dealers, if that is

16  going to be the problem that's viewed as a problem --

17          THE COURT:  I mean is that a debate?  I mean I

18  think that's kind of been suggested.  I don't know that

19  anybody has just laid it out in those terms, but I've

20  kind of been inferring that, especially given the way CDK

21  thought about it as the forced march, is that that was

22  the big disadvantage of the Reynolds system and that's

23  what -- that's what drove people to go to CDK.

24          THE WITNESS:  I would say --

25          THE COURT:  Now that CDK is not an open option,

                    SUMANTH ADDANKI - DIRECT

1   is that going to continue?

2           THE WITNESS:  Well, I think that when you think

3   about someone like Cox Automotive who have more

4   applications, I believe, than anyone else, they are the

5   leading provider of layered application, they certainly

6   know the automotive business.  They know the dealers.

7   They've got DealerTrack.  It's an open system.  It's an

8   opportunity for them, if openness really is as important

9   as we've heard it made out to be in this courtroom,

10  they'll run with it.  They will absolutely run with it.

11  And they have the credibility.  It's not like they're --

12  we've heard, you know, different opinions about the

13  product itself, but the company certainly has the

14  credibility.  And they have the application base to sort

15  of say you use us for a lot of things, buy DealerTrack.

16      So in a highly technically oriented business, Your

17  Honor, I would say that you have a pretty good shot that

18  those things will be overcome because if it's really

19  important -- and if it isn't really important, it's a red

20  herring.  I am not sure, as an economist who actually

21  studies markets like this, and I've studied them a lot,

22  I'm not sure it's that important, the openness.  Everyone

23  would like to get something for nothing.  Everyone would.

24  The fact that a company like SIS or Authenticom that have

25  tiny costs of doing business compared to the costs of,

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 225 of 266 PageID #:61571
Case: 3:97-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 224 of 265

2-P-224

1  say, a CDK or a Reynolds in providing an integrated

2  offering of beta would charge a lower price, yeah, that

3  will have an effect on the market.  And when the model

4  changes where that isn't viable anymore, it will affect

5  the market.  But whether the effect will be anything that

6  changes the market considerably in terms of another

7  player bubbling to the surface, who knows.  But in a

8  sense, it doesn't mean anything anti-competitive is going

9  on, it's a change in business model.

10          THE COURT:  Well, you said who knows.  But I

11  think that Dr. Singer pointed out and we've heard some

12  evidence that some app providers have just baled on their

13  products because of the increased data integration fees

14  or data access fees, whatever you want to label it, the

15  data fees from CDK and Reynolds that made it too

16  expensive to provide some of the apps.  So the price goes

17  up, supply goes down as a result of the surcharge that's

18  being imposed on vendor market as a result of the

19  elimination of the third-party integrators.  I don't have

20  comprehensive data, but I have a few examples.

21          THE WITNESS:  Right.

22          THE COURT:  And Singer says this is what you

23  would predict.

24          THE WITNESS:  Yes, he does.  Here's what happens

25  when you change from someone who has essentially not

SUMANTH ADDANKI - DIRECT

Case: 1-18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 226 of 266 PageID #:61572
Case: 3:17-cv-00918-jdp Document #: 163 Filed: 07/05/17 Page 226 of 266

2-P-225

 1   bearing any costs of pulling the data out to something

 2   that is set up to actually do it without imposing the

 3   cost on the system; do it in a way that preserves all the

 4   good things you want to preserve about tractability and

 5   accountability and so on and so forth.

 6       A certain amount of rationing also happens, Your

 7   Honor, in the sense that when you've got all the data

 8   you're scraping off the systems and you've got it in your

 9   box and you can set it out because the incremental cost

10   to you of selling it is zero, it's there, you've got it,

11   you may not really distinguish at all between what's

12   really needed for an application to do its job and what

13   really isn't.  And one of the things we heard testimony

14   about today, which I think is important to keep in mind,

15   is some things would like to have real-time access if

16   it's cheap to get.  But if you pay the real price of what

17   real-time access costs the system, you wouldn't -- you

18   don't need it.

19       And one of the things that happens when you have the

20   DMS supplier who's actually running and maintaining the

21   DMS pricing the service is you get pricing that better

22   reflects what the load is on the system.  And then we

23   economists believe that prices are the best signals, and

24   so people will buy what they need and not buy what they

25   don't need because the prices are better by the signals

SUMANTH ADDANKI - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 227 of 266 PageID #:61573
Case: 3-97-cv-00318-jdp Document #: 1695 Filed: 07/05/17 Page 227 of 266

2-P-226

1  then.  It's more efficient that way.

2          THE COURT:  Yeah, I get it.

3          MR. RYAN:  One more question, Your Honor?

4          THE COURT:  Sure.

5  BY MR. RYAN:

6  Q    I seem to remember that Dr. Singer's market share

7  analysis showed that CDK was already beginning to lose

8  business.  Is that your --

9  A    CDK is certainly -- the greater growth of CDK's

10  business slowed abruptly after they went closed.  Whether

11  they actually lost on that I don't recall.  But it

12  absolutely slowed down.

13  Q    And what happens with Reynolds?  Do you recall?

14  A    Reynolds -- initially there was -- we saw the chart

15  today.  There was fairly substantial defections early on,

16  and then was really flat or slightly rising in the

17  defections.  It didn't kind of stop after CDK went

18  closed.

19          THE COURT:  It got a limited amount of data.

20          THE WITNESS:  For 2016 you have -- for 2017 we

21  have a limited amount of data; right.

22          THE COURT:  We have a partial year.  Here's what

23  I mean about a limited amount of data is that -- and

24  again, nobody really presented a statistical analysis of

25  it.  I just got the raw numbers, which are not -- we're

                  SUMANTH ADDANKI - DIRECT

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 228 of 266 PageID #:61574
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 227 of 265

2-P-227

not talking millions of events here.  So even if I got a

full year of '16 and a partial year of '17, it's like I

don't really have what I think is a really robust trend

over several months.

THE WITNESS:  No.  I agree, Your Honor.  What

I'd say is I don't see any obvious change.  I don't see

any obvious falloff or anything of the kind.  I do see

from the very first year that was presented to the next

year there was a falloff there.  But after that --

looking as someone spotting trends, I would say it's not

doing a whole lot.

THE COURT:  It did not strike me as dramatic

trend setter.  I mean some other event in 2014 could have

accounted for 30 dealers doing something, so I didn't

know how much to read into that.

THE WITNESS:  Well, I'd say the one thing I

would take away from it is that the Reynolds -- the

impact on Reynolds from the CDK decision seems to have

been negative.  Nothing much happened there in terms of

just looking at the trend.

THE COURT:  Okay.        (6:23 p.m.)

MR. RYAN:  No more questions, Your Honor.

THE COURT:  All right.  I'd love to do the

cross-examination tonight if we could.  I don't know how

long you think it will take, but let's try to endure and

SUMANTH ADDANKI - DIRECT

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 229 of 266 PageID #:61575
Case: 3:07-cv-00315-jdp  Document #: 169  Filed: 07/05/17  Page 229 of 265

2-P-228

1   get it done.

2            MR. PANNER:  Okay.

3            THE WITNESS:  Thank you, Your Honor.

4                      CROSS-EXAMINATION

5   BY MR. PANNER:

6   Q    Did you introduce -- you introduced a declaration in

7   this case, but I'm not sure that Mr. Ryan asked you to

8   look at it.  I believe it's defendants' Exhibit 124.  I

9   actually have a little binder.

10           MR. PANNER:  May I approach, Your Honor?

11           THE COURT:  Yes.

12           THE WITNESS:  I don't know your name, do I?

13  BY MR. PANNER:

14  Q    I'll introduce myself.  Dr. Addanki, my name is

15  Aaron Panner.  I represent Authenticom.

16  A    How do you do.

17  Q    I'll be asking you a few questions --

18  A    Please.

19  Q    -- this early evening.  Now, you prepared a

20  declaration in this case.  I think it's defendants'

21  Exhibit 124; is that right?

22  A    That's right.

23  Q    Have your -- any of your opinions changed since you

24  prepared this declaration?

25  A    Certainly nothing material has changed.  My opinions

                   SUMANTH ADDANKI - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 230 of 266 PageID #:61576
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/19 Page 230 of 266

2-P-229

1    have been further informed by what I've heard here in

2    live testimony, but I wouldn't say I've changed anything

3    here.

4    Q    Okay.  Well, let me just ask you:  Do you have

5    anything to -- do you stand by the opinions in your

6    declaration or do you want to amend anything in the

7    declaration?

8    A    I wouldn't amend anything.  I think perhaps there

9    have been enhanced or refined ways I've discussed with

10   the Court here.

11   Q    Okay.  So you can't think of anything to tell me

12   that I should be aware that actually it's not your

13   opinion anymore.

14   A    Nothing comes to mind.

15   Q    Okay.  Now, all of your opinions in this case are

16   based on your understanding that there was, in fact, no

17   horizontal agreement between CDK and Reynolds; is that

18   fair?

19   A    It's based on my understanding given to me by

20   counsel about what the agreements meant as a legal

21   matter, but it's also based on my interpretation as an

22   economic matter based on the economic facts of this case

23   of what I could reasonably infer from the agreements.

24   Q    I appreciate that.  But I asked you something a

25   little simpler I think.

SUMANTH ADDANKI - CROSS

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 231 of 266 PageID #:61577
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 230 of 265

2-P-230

1   A    Okay.

2   Q    Your opinions in this case are based on your

3   understanding that there was no horizontal agreement

4   between CDK and Reynolds.  Is that correct or is that not

5   correct?

6   A    They aren't based entirely on that.

7   Q    To what extent are they not based on that?

8   A    I can't give you a percentage.

9   Q    Do you --

10          THE COURT:  Let me try this:  It'll be a test to

11  see if I understand what you're saying.  You've kind of

12  been informed there's no horizontal agreement.  I don't

13  know how much time you spent reviewing the agreement or

14  actually analyzing it.  I gather that's really not your

15  focus.

16          THE WITNESS:  Right.

17          THE COURT:  But I think what your opinion is is

18  that the conduct of the actors here, the defendants,

19  would not require there to be an agreement.  Their

20  conduct is otherwise economically rational.  You wouldn't

21  need to have the agreement to explain what they did.

22          THE WITNESS:  Exactly, Your Honor.

23          THE COURT:  Okay.

24  BY MR. PANNER:

25  Q    Now, you would agree with me that horizontal

                    SUMANTH ADDANKI - CROSS

Case: 1-18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 232 of 266 PageID #:61578
Case: 3:97-cv-00319-jdp Document #: 169 Filed: 07/05/17 Page 231 of 265

2-P-231

1    agreements not to compete are appropriately a focus of

2    antitrust concern.  I think you said that in your direct

3    testimony; isn't that right?

4    A    Yes.

5    Q    And that's because, as any first-year antitrust

6    student knows, less vigorous competition can harm

7    consumers by leading to higher prices, lower quality,

8    less innovation and fewer choices; isn't that right?

9    A    Yes.  In the typical case, reduced competition,

10   horizontal competition leads to all of those and more.

11   Q    Okay.  And that's just not controversial at all.

12   A    It's not controversial.

13   Q    And you would agree with me that if CDK and

14   Reynolds, in fact, reached an agreement with respect to

15   third-party access to their respective DMSs, that that

16   would be a horizontal agreement?

17   A    No, I'm not sure it would be.

18   Q    Okay.  Let me try again.  If CDK in its capacity as

19   a DMS provider reached an agreement with Reynolds in its

20   capacity as a DMS provider with respect to the manner of

21   access to their respective DMSs, would that be a

22   horizontal agreement?

23   A    I see.  If you're saying if you do this with respect

24   to horizontal access and I do this with respect to

25   horizontal -- excuse me -- with respect to dealer access

SUMANTH ADDANKI - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 233 of 266 PageID #:61579
Case: 3:07-cv-00315-jdp Document #: 165 Filed: 07/05/13 Page 233 of 265

2-P-232

1    and I do this with respect to dealer access would that be

2    a horizontal agreement?

3    Q    Yes.

4    A    I've seen agreements of that kind a lot and I would

5    not think that they would raise -- ordinarily they would

6    raise the kinds of questions that I would be concerned

7    about with horizontal agreements.

8    Q    That's not my question.  My question is is that a

9    horizontal agreement in your view.

10   A    Not in the sense of my answer to the previous

11   question.

12   Q    Okay.  In what way is it not a horizontal agreement?

13   I'm sorry.  Strike that.

14        Is it an agreement between two competitors at the

15   same level of production?

16   A    Yes, absolutely.

17   Q    Okay.  And, in fact, an agreement to limit the

18   manner in which they will permit access to their

19   respective DMSs would be a significant limitation on the

20   competition between the two competitors, don't you think?

21   A    I don't believe so, no.

22   Q    And that's because DMS providers compete with

23   respect to how data stored on their system may be

24   provided to vendors; isn't that right?

25   A    Certainly there have been efforts by DMS providers

SUMANTH ADDANKI - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 234 of 266 PageID #:61580
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 233 of 265

2-P-233

1  to make that a point of differentiation, yes.

2  Q    Exactly.  Data interfaces for vendor applications

3  are selling points that are used to advertise and promote

4  DMSs; isn't that your opinion?

5  A    They are points of differentiation, yes.

6  Q    And it's also because DMS providers compete with

7  respect to how secure their systems are; isn't that

8  right?

9  A    Those are also points of differentiation.

10 Q    And it's your position that CDK agreed not to

11 provide data from Reynolds DMS to vendors; isn't that

12 right?

13 A    CDK agreed not to do hostile access to Reynolds'

14 DMSs, that's right.

15 Q    Okay.  But you were informed -- you say in your

16 declaration that I'm informed that no provision in the

17 Data Exchange Agreement prohibits CDK from offering to

18 provide data from Reynolds DMSs should CDK should so

19 chose.  Do you remember writing that?

20 A    Yes.  After the wine-and-dine period, that was my

21 analysis.

22 Q    Who informed you of that?

23 A    Counsel.

24 Q    Okay.  And if that was not correct, would that

25 change your opinions in this matter?

SUMANTH ADDANKI - CROSS

Case: 1-18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 235 of 266 PageID #:61581
Case: 3:07-cv-00018-jdp Document #: 169 Filed: 07/05/13 Page 23 of 125

2-P-234

1   A    I think as a practical matter, no, because CDK had

2   essentially been blocked out of Reynolds DMSs.

3   Q    Then why did you put it in your declaration?

4   A    Because I was informed of that.  I thought it might

5   be relevant.

6   Q    Okay.  In paragraph 31 of your declaration, you say

7   that DMI agreed not to engage in unauthorized access to

8   Reynolds' DMS.

9   A    Let me just go there.  Yes.

10  Q    Which of those is -- can you explain what the basis

11  for your opinion is with respect to CDK's position with

12  regard to access to Reynolds' DMS?

13  A    So what I say here is my understanding of what these

14  agreements are specifying or setting forth, which was

15  provided to me by counsel.

16  Q    So counsel wrote those paragraphs?

17  A    No.  The agreement -- as far as the reference to the

18  agreement not to engage in unauthorized access is

19  concerned, I am informed by counsel that DMI had that

20  agreement.

21  Q    Okay.

22  A    Made that agreement.

23  Q    And you understand that Reynolds also agreed not to

24  engage in unauthorized access to Reynolds -- excuse me,

25  to CDK's DMS; correct?

                    SUMANTH ADDANKI - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 236 of 266 PageID #:61582
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 236 of 266

2-P-235

 1    A     That's my understanding.

 2    Q     Okay.  Do you know how Reynolds obtained access to

 3    CDK's DMS prior to February 2015?

 4    A     Don't recall.

 5    Q     Was that not important to your investigation in this

 6    matter?

 7    A     No, I simply don't recall.

 8    Q     Do you know how Reynolds obtained -- do you know how

 9    Reynolds obtained access to CDK's DMS after February

10    2015?

11    A     When you say Reynolds obtained access, you're

12    talking about the application part I am assuming.

13    Q     Correct.

14    A     My understanding is that Reynolds was to join the

15    3PA Program to get data from DMS -- CDK DMSs.

16    Q     Did you hear testimony today that Reynolds

17    considered it a substantial benefit to be able to

18    participate in the 3PA Program?

19    A     I don't recall.

20    Q     You don't recall Mr. Schaefer's testimony about

21    that?

22    A     I don't, no.

23    Q     Okay.  Do you know what the terms were under which

24    CDK agreed to provide Reynolds access to the 3PA Program?

25    A     My recollection is that at least for a period it was

                    SUMANTH ADDANKI - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 237 of 266 PageID #:61583
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 237 of 266

2-P-236

1  no charge.

2  Q    How long?

3  A    I don't remember.

4  Q    Was it five years?

5  A    It may have been, I don't remember.

6  Q    Okay.  Do you know why CDK did that?

7  A    My recollection is that it was in part because

8  Reynolds doesn't actually have a lot of applications, so

9  there wouldn't be that much data involved.  But I don't

10  remember the rest of it.

11  Q    So your testimony is that because it wasn't very

12  valuable, CDK gave away access for free?

13  A    No.  In the scheme of things it was not a big

14  imposition or big demand being imposed on the resources

15  of the 3PA Program.

16  Q    Why would CDK give it away for free?

17  A    I don't know what's in CDK's mind.  I can tell you

18  as an economist that there were things being resolved at

19  the time which included a controversy that had existed

20  for awhile about the hostile access by DMI.  They were

21  winding down that hostile access period and permitting an

22  orderly transition, which I think benefited both parties,

23  but perhaps CDK felt that they were getting a good deal

24  there.  And so I don't know.  I don't know what's in

25  their minds.

Case: 1-18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 238 of 266 PageID #:61584
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 237 of 265

2-P-237

1    Q    Well, did you find it curious as an economist that

2    CDK was providing its biggest competitor with this huge

3    price advantage?

4    A    It was really not its biggest competitor.  In the

5    application space Reynolds is quite small.

6    Q    What percentage of the application space does

7    Reynolds have?

8    A    I don't know about percents, but it has very few

9    applications.

10   Q    Do any of those applications compete with CDK's

11   applications?

12   A    Possibly.

13   Q    Did you investigate that?

14   A    No.

15   Q    Both CDK and Reynolds are vertically integrated in

16   this market; isn't that right?

17   A    By vertically integrated you mean?

18   Q    They compete with regard to DMS systems that they

19   provide to dealers; isn't that right?

20   A    Yes.

21   Q    And they compete with regard to the integration

22   services that they provide to their dealer customers;

23   isn't that right?

24   A    No, not really.

25   Q    And they compete with regard to the vendor -- with

SUMANTH ADDANKI - CROSS

Case: 1-18-cv-00864 Document # 986-17 Filed: 05/20/20 Page 239 of 266 PageID #:61585
Case: 3:17-cv-00318-jdp  Document #: 169  Filed: 07/05/17  Page 239 of 265

2-P-238

1   the applications that they provide, both to their own

2   customers and to the customers of their competitor DMS?

3   A    Yes.

4   Q    And they both have an incentive to try to make

5   arrangements that will exclude -- that will potentially

6   foreclose competitors at all levels of that integration;

7   isn't that true?

8   A    Not -- I don't know how you would foreclose a DMS

9   customer -- a DMS competitor.  Not true about

10  applications.  You want there to be, and I think we some

11  evidence today about thinking -- the economic thinking

12  behind CDK's decisions about allowing DMS suppliers, who

13  had an application arm, participating in 3PA.  And as for

14  the middle, the integration, no, not particularly.  No.

15  Q    Now, did you review any -- did you see any documents

16  during testimony today to suggest that CDK believed it

17  was important to enter into reciprocal agreements with

18  other DMS providers not to deal with hostile integrators?

19  A    I think we saw some documents up today on that

20  subject, yes.

21  Q    And did you consider that in forming your opinions

22  in this matter?

23  A    Yes.

24  Q    You saw that document before you formed your opinion

25  in this matter?

                    SUMANTH ADDANKI - CROSS

Case: 4:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 240 of 266 PageID #:61586
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/17 Page 239 of 265

2-P-239

1  A     Yes, I did.

2  Q     Did you list it in your declaration?

3  A     I don't recall.

4  Q     Okay.  Are you aware that the February 2015

5  agreement -- well, I assume you are aware at this point

6  that it includes an express agreement not to assist

7  others in obtaining unauthorized access to the other

8  parties' respective DMS?

9  A     Yes.

10  Q     And that's a horizontal agreement, don't you agree?

11  A     It's certainly an agreement between companies of the

12  same -- in the same line of commerce that are horizontal

13  competitors.  It is not an agreement that pertains to

14  competition in any material way.

15  Q     You don't believe it's material to competition the

16  manner in which these respective DMSs provide access?

17  A     I think the -- the idea of not helping someone else

18  breach a system is essentially a security agreement.

19  It's not --

20         THE COURT:  Let me just -- you can help me out

21  on this because you do this all the time.  So it's

22  clearly a horizontal agreement in the sense that we have

23  competitors at the same level reaching agreement about

24  how they conduct their business.  So are you suggesting

25  that there are categories of horizontal agreements that

SUMANTH ADDANKI - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 241 of 266 PageID #:61587
Case: 3:17-cv-00318-jdp Document #: 165 Filed: 07/05/41 Page 2 of 26

2-P-240

1  aren't horizontal in the pertinent antitrust sense so

2  that there's some sort of agreement that is somehow

3  privileged, that they can enter because it's justified by

4  some greater good or something like that?

5       THE WITNESS:  A whole range, Your Honor.  I mean

6  if you and I own competing drycleaning companies across

7  the street from one another, we could absolutely agree

8  that our sidewalks are going to be swept by the same

9  person.  We could absolutely agree even --

10      THE COURT:  We could -- we could do that?

11 There's no chance that's going to impose an antitrust

12 issue?

13      THE WITNESS:  No.  I mean I think the fact that

14 we're horizontal competitors doesn't make everything that

15 we agree on a horizontal agreement in the sense that we

16 mean in antitrust laws.  And if I say I'm going to agree

17 not to drive my car into your fence and you're going to

18 do the same, it doesn't have any antitrust connotation.

19 I agree that I'm not going to help someone burglarize

20 your shop and you agree the same thing, that's not

21 antitrust.

22      THE COURT:  So that depends on kind of a moral

23 assessment of the restriction; right?  I mean I don't

24 know if drycleaners compete by driving into each other's

25 fences.  I don't know that business.  That's kind of --

SUMANTH ADDANKI - CROSS

2-P-241

1          THE WITNESS:  I do actually, Your Honor.  I did

2     a case on drycleaning.

3          THE COURT:  Was there a lot of fence driving in

4     that?

5          THE WITNESS:  There was, actually.  Even in

6     Columbia, Missouri they don't.

7          THE COURT:  But it's a closer call here that the

8     fence driving that's at issue here is the hostile access.

9     And the moral status or the legal status of that hostile

10    access is one of the key issues I have to deal with.

11         THE WITNESS:  It is.  But here's the question:

12    If you're saying I'm agreeing that -- because we are

13    going to have to share information about how you got in

14    and how I blocked you, that's pretty privileged

15    information.  If we're going to have to share that for

16    the purpose of winding down this problem --

17         THE COURT:  I'm not talking about the wind-down

18    thing here.

19         THE WITNESS:  I understand.

20         THE COURT:  It's the deal that CDK says I'm not

21    going to let third parties take my data and you're going

22    to -- and I'm not going to let anybody help get into

23    yours, and you're going to make the same agreement to me,

24    it has a big impact on entities like Authenticom.

25         THE WITNESS:  But, Your Honor, if you're talking

                    SUMANTH ADDANKI - CROSS

Case: 1-18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 243 of 266 PageID #:61589
Case: 3:17-cv-00318-jdp  Document #: 1635  Filed: 07/05/43  Page 242 of 265

2-P-242

1    about a situation where to some extent you are obliged to

2    share some of this information about -- which is fairly

3    sensitive information about how blocking is happening and

4    how the blocking is being worked around and it's being

5    reblocked again and that has to happen for the wind down

6    to continue in an orderly way, that's information that

7    you are sharing as part of this wind down.

8            THE COURT:  Let's put that to the side.

9            THE WITNESS:  No, but --

10           THE COURT:  I'm talking about the deal here that

11   Reynolds says I'm going to agree not to facilitate

12   anybody getting what we'll call hostile access to your

13   DMS and I'm not going to do it to you.  And CDK says the

14   same thing back.

15           THE WITNESS:  Right.

16           THE COURT:  And the result is that we're

17   basically agreeing that we are not going to let

18   Authenticom get hostile access to either one of us.

19           THE WITNESS:  I think what it's saying -- I'm

20   just an economist, Your Honor.  But I think what it's

21   saying is I'm not going to help someone do that.  And the

22   reason why I would expect to see something vaguely like

23   that here is I'm learning stuff from you that you

24   wouldn't tell me in the ordinary course of business and

25   I'm learning it because of this wind down.  That's why I

                    SUMANTH ADDANKI - CROSS

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 244 of 266 PageID #:61590
Case: 3-17-cv-00318-jdp Document #: 163 Filed: 07/05/14 Page 244 of 266

2-P-243

1   keep talking about the wind down.  I'm gaining

2   information about how you're doing this blocking.  I'm

3   not going to share that with someone else.  Because of

4   doing this other business thing we're doing, we're kind

5   of fixing this hostile access problem that we've been

6   fighting about for awhile, you're telling me stuff and

7   I'm telling you stuff, and we're not going to pass those

8   things on to other people because these are things we

9   wouldn't have learned but for having a general

10  disagreement in the first place.

11          THE COURT:  What if they made this agreement:

12  We've learned a lot about hostile access here.  And so

13  let's agree that we're not going to share what we've

14  learned about hostile access.  We have to exchange

15  information here, but let's agree that we'll just keep it

16  to ourselves and we're not going to tell DealerTrack

17  about it because we don't want them to gain the

18  advantages that we have.  Is that okay?

19          THE WITNESS:  I don't know.  I mean --

20          THE COURT:  Because my concern here is that the

21  third-party access is the cornerstone of this case.

22          THE WITNESS:  Right.

23          THE COURT:  And they seem to have made an

24  agreement that they were going to work with each other to

25  prevent what they labeled hostile integration.  And there

SUMANTH ADDANKI - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 245 of 266 PageID #:61591
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/14 Page 244 of 265

2-P-244

1    were companies that did it and made -- they were economic

2    actors that -- you know, they're going to paint them as

3    outlaws because they breached the data agreements, but

4    it's -- if not for that, you'd have to say they've agreed

5    to limit competition for data integration.

6           THE WITNESS:  I understand what you're saying.

7    I guess I never really viewed this as having a lot of

8    significance, partly because I would view it as just an

9    extraordinary unlikely thing to happen in any case.  Why

10   on earth would CDK give away secrets about how to break

11   into Reynolds' system because all of those would end up

12   being used against CDK.  Why on earth would Reynolds give

13   away secrets about how to break into CDK's system,

14   because those would end up being used against Reynolds in

15   any case.  If you know something valuable here, you're

16   answer is going to be hang on to it if you close your

17   system.

18       So I understand what you're saying and now I totally

19   do see that if there were some real prospect that that

20   might happen, then agreeing not to do it might have some

21   real impact.  I frankly don't see the real prospect of

22   that happening.  Why would that be in anyone's

23   self-interest to do, as an economist.

24          THE COURT:  Once they decided to close the

25   system.

                    SUMANTH ADDANKI - CROSS

Case: 1-18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 246 of 266 PageID #:61592
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/19 Page 246 of 266

2-P-245

```
 1          THE WITNESS:  Once they decided to close the
 2   system they don't do that.
 3          THE COURT:  Back to the cross.
 4   BY MR. PANNER:
 5   Q    Dr. Addanki, I'm sure you're familiar with the joke
 6   about the economist who doesn't pick up the $20 bill on
 7   the platform.
 8   A    Yes.
 9   Q    And why doesn't the economist pick up the $20 on the
10   platform?
11   A    The joke, Your Honor, is if it were a real $20 bill,
12   someone would have picked it up already.
13   Q    Okay.
14   A    It's not a very funny joke.
15          THE COURT:  I think it depends on how many times
16   you've heard it and how you feel about economists.
17          THE WITNESS:  That's probably true, Your Honor.
18   BY MR. PANNER:
19   Q    Now, Dr. Addanki -- excuse me, is it Addanki?  I
20   apologize.
21   A    Addanki.
22   Q    Dr. Addanki, would it have mattered to CDK when it
23   was making a decision about adopting a closed policy that
24   Reynolds had a closed policy?  That's not a hard
25   question.
```

                    SUMANTH ADDANKI - CROSS

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 247 of 266 PageID #:61593
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 247 of 266

2-P-246

1   A      I have no idea.

2   Q      Dr. Addanki, you're under oath.

3   A      Yes.

4   Q      You understand that policies with respect to system

5   openness are competitively significant, don't you?

6   A      They are used as points of differentiation.  If

7   you're asking me the counterfactual had Reynolds remained

8   a closed system through 2015 and CDK's management learned

9   all the things that CDK's management learned would they

10  have made a difference, I have no idea.

11  Q      I'm sorry.  I think you may have misunderstood my

12  question.

13  A      I beg your pardon.

14  Q      And that may be why I was so surprised by your

15  answer.  You understand that in the 20 -- let's say 2014,

16  Reynolds DMS has been closed for some period of years;

17  correct?

18  A      Yes.

19  Q      So CDK is then making an analysis about whether to

20  close its system; correct?

21  A      It is making an analysis, yes.

22  Q      And in making that analysis, it would be highly

23  important, highly significant to CDK that Reynolds system

24  is closed.  No?

25  A      It's part of the market fact.

SUMANTH ADDANKI - CROSS

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 248 of 266 PageID #:61594
Case: 3:17-cv-00315-jdp Document #: 169 Filed: 07/05/18 Page 247 of 265

2-P-247

1  Q     Of course it's a part of the market fact.

2  A     Yeah, it's as significant as anything else in the

3  market.  It's the reality they live in.

4  Q     And CDK knows that its major competitor is closed.

5  A     CDK knows everything it knows about the market, and

6  if Reynolds is closed, that's what it knows.

7  Q     And, therefore, the risk of losing customers as a

8  result of closing is less than it would be if its major

9  competitor were open.

10 A     So who knows.

11 Q     Really?

12 A     I don't know.

13 Q     Really?  You don't know?  There's no economic

14 evidence to indicate one way or the other whether there's

15 a market advantage from being open?

16 A     So I don't know what all the attributes are because

17 I haven't studied it; all the attributes that people are

18 evaluating when they say am I going to pick this DMS or

19 am I going to pick this DMS.

20       THE COURT:  I'm kind of surprised too because

21 you were so ready to admit that the openness of the CDK

22 system was one of the reasons for the defections from

23 Reynolds.

24       THE WITNESS:  Here's what I mean, Your Honor:

25 What I mean is if you are in a world where Reynolds is an

SUMANTH ADDANKI - CROSS

Case: 1-18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 249 of 266 PageID #:61595
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/19 Page 249 of 266

2-P-248

1    open system and CDK is a closed system, it is a

2    completely different world.  And you asked me a question

3    about a world that is so completely different, I was

4    really haven't thought --

5           THE COURT:  Well, it's somewhat different.  I

6    mean the rules of logic and --

7           THE WITNESS:  Yes.

8           THE COURT:  -- I assume all the economics that

9    you've studied at Harvard is still applicable.  So it's

10   not that different.

11          THE WITNESS:  Absolutely true.  I don't know,

12   for instance, what CDK's position would have been if --

13   would they have had a 40 percent share?  I don't know.

14   So would -- or 45 or 42 percent share or whatever it is,

15   I don't know.  So asking a question like that, this is

16   different.  It's the classic question, Your Honor.  Would

17   it matter?  I'm sure it matters in some way.  Would it be

18   a deal breaker?  I have no idea.  I just don't know how

19   much it would matter because it's hard to conceive of

20   hypotheticals that are so different in the real world and

21   say okay, let's talk about that world now.  It's

22   different.  I don't know.

23       So would it matter?  Yes, it would matter.  But

24   would that world -- how would that world look?  I don't

25   know.

SUMANTH ADDANKI - CROSS

1  BY MR. PANNER:

2  Q    Dr. Addanki, again I think you may have

3  misunderstood my question.  In 2014, Reynolds system is

4  closed; correct?

5  A    Yes.

6  Q    And CDK's system is open?

7  A    Yes.

8  Q    And CDK is making a decision about whether to move

9  to closed system.

10  A    Yes.

11  Q    And in making the evaluation as to whether to do

12  that, the fact that Reynolds system is closed was very

13  important to it in determining the competitive

14  consequences of going to a closed system.  True or false?

15  A    I just don't know.

16  Q    You haven't looked at documents that indicate that?

17  A    Oh.  Did they take into account the fact that it was

18  an open system and a closed system?  Yes, absolutely they

19  did.

20  Q    And it was important to them in terms of evaluating

21  the competitive consequences of closing their --

22  A    I just don't know how important it was.  That's my

23  point.

24  Q    Okay.  Fair enough.

25  A    They absolutely took it into account.

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 251 of 266 PageID #:61597
Case: 3:97-cv-00319-jdp Document #: 163 Filed: 07/05/51 Page 250 of 265

2-P-250

```
 1   Q    It would have been a valuable thing for CDK -- I'm
 2   not asking you to give me an estimate of how valuable.
 3   But it would be a valuable thing for CDK to have
 4   assurances from Reynolds that it does not intend to open
 5   its system; correct?
 6   A    If you're asking would there be some value greater
 7   than zero having that assurance, possibly, yes.
 8   Q    And do you think that it was of business
 9   significance to Reynolds that CDK made a decision to
10   close its system?
11   A    I actually haven't seen any of Reynolds' documents
12   on it.  I would expect that Reynolds probably had mixed
13   feelings about it.
14   Q    But let me ask you -- let me try to ask you this
15   question:  There's no dispute that in a concentrated
16   market -- and you would agree with me that the DMS market
17   is highly concentrated, wouldn't you?
18   A    It's concentrated, yes.
19   Q    That in a concentrated market, rivals monitor the
20   behavior of the other competitors, other large
21   competitors in the market, and make decisions about how
22   to conduct their business based in part on what their
23   competitors are doing; correct?
24   A    Yes.  There isn't a difference in concentrated
25   markets.
```

                    SUMANTH ADDANKI - CROSS

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 252 of 266 PageID #:61598
Case: 3:77-cv-00319-jdp Document #: 163 Filed: 07/05/47 Page 252 of 265

2-P-251

1  Q    No doubt about it; right?

2  A    That's right.

3  Q    So what's going on at a minimum is coordination

4  between DMS -- excuse me.  There's coordination between

5  CDK and Reynolds with respect to the policy of keeping a

6  closed system.

7  A    No, I wouldn't agree with that at all.

8  Q    Before, a point of competitive differentiation

9  between CDK and Reynolds was that CDK was open and

10  Reynolds was closed; correct?

11  A    That was a point of differentiation, that you

12  stressed, yes.

13  Q    And when CDK decided to close its system, that was

14  no longer a point of competitive differentiation;

15  correct?

16  A    That's correct.

17  Q    And that reduced the intensity of competition

18  between the two providers; isn't that fair?

19  A    No, I haven't seen evidence of that.

20  Q    Okay.  Do you have an -- well, I should ask you

21  this:  Many economists are very good with computers and I

22  want to know whether you consider yourself an expert in

23  computers and information technology.

24  A    I've been a software author, a published software

25  author.  I have consulted in many cases involving

SUMANTH ADDANKI - CROSS

1  software and computers and I'm surrounded by computers

2  scientists.

3  Q    I'm sorry?

4  A    I'm surrounded by computer scientists.  Most of my

5  friends are computer scientists.

6        THE COURT:  Only the software authoring is

7  something that would plausibly contribute to your

8  expertise as a -- in the field of computing.

9        THE WITNESS:  Yes.

10        THE COURT:  So let's see if we can get an answer

11  here.  Is your software authoring extensive?  Are you a

12  coder or --

13        THE WITNESS:  I have designed, implemented,

14  coded programs, Your Honor.  But I mean I don't consider

15  myself to be a software expert.

16  BY MR. PANNER:

17  Q    Okay.  And I'm just trying to determine it because

18  you made a number of statements in your declaration about

19  matters of security and you gave an opinion, if I

20  understand it, that concerns about security were part of

21  the justification for the decision to close the DMSs; is

22  that right?

23  A    That was my understanding.

24  Q    And do you -- is that your opinion as an economist

25  or are you simply relaying the information that you were

SUMANTH ADDANKI - CROSS

Case: 1:18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 254 of 266 PageID #:61600
Case: 3:97-cv-00313-jdp Document #: 165 Filed: 07/05/17 Page 253 of 265

2-P-253

1   provided by the defendants in this matter?

2   A    So it's -- where the -- my expertise as an economist

3   comes in is in evaluating the plausibility of security as

4   being a motivation for a change like that.  But certainly

5   I was informed by the documents and by speaking with the

6   parties that it absolutely played a role.

7   Q    Okay.  Now, with respect to system security, I

8   believe that you referred to the benefits of having a DMS

9   supplier manage and curate the entire process of data

10  integration, namely the ability to secure the system to a

11  very high degree and maintain audits of all data

12  transfers.

13  A    If you're quoting, what are you reading from?

14  Q    Oh, certainly.  That is -- if I can find where I was

15  if my outline.  I believe that that is in paragraph 15.

16  If I'm wrong, I'll correct it.  No sorry.  I'll strike

17  the question.  I'm sorry, it's in paragraph 13 of your

18  declaration.

19  A    13.  I'm there.

20  Q    And you describe a system like that in paragraph 40

21  of your report when you talk about an NADA recommendation

22  with regard to a strict data push system for sharing

23  data; right?  I'm at the top of page 15 of your

24  declaration.  It's part of paragraph 40.

25  A    Right.

SUMANTH ADDANKI - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 255 of 266 PageID #:61601
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 255 of 265

2-P-254

1    Q    And did you -- did you select this paragraph or is

2    this something that counsel -- I understand we've all

3    done this.  Counsel works with you to prepare your

4    declaration.  Was this your -- did you say I think this

5    is particularly good evidence about this or was it

6    something that counsel said you might want to think about

7    this?  I'm not trying to get into work product or

8    anything like that, I'm just trying to understand are you

9    sort of buying this or is that -- have you not really

10   thought about it?

11   A    I think actually my staff and I found this more as

12   an indication of what a trained group was saying than

13   anything else.

14   Q    Okay.  And did you look at what they actually said

15   and consider how it applied to the facts of this case?

16   A    Yes.

17   Q    You did.

18   A    Yeah.

19   Q    Okay.  And did you understand anything about how

20   DealerVault product works at the time that you prepared

21   your declaration?

22   A    No.  Actually I did not know much about DealerVault

23   at the time that I wrote my declaration.

24   Q    So now that -- you were here throughout the

25   testimony in this matter; isn't that right?

SUMANTH ADDANKI - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 256 of 266 PageID #:61602
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 256 of 266

2-P-255

1    A    Most of it, yes.

2    Q    And you saw the demonstration about how DealerVault

3    operates?

4    A    I did.

5    Q    Okay.  Would you agree with me that DealerVault

6    certainly complies with the guidance that's provided in

7    this paragraph at the top of page 40?

8    A    As an economist and someone who only is otherwise

9    knowledgeable as a layperson about these things, it seems

10   to.

11   Q    Okay.

12   A    But I'm not an expert on these issues.

13   Q    Quite fair.  Now, do you have any opinion as an

14   economist as to whether in order to reap the benefits of

15   a closed system, the system -- strike that.

16        You say in your declaration at paragraph 42 that "It

17   is reasonable for a DMS supplier acting in its own and

18   its customers' interest to undertake to manage all

19   integration functionality in-house."  Do you recall

20   saying that?

21   A    I do.

22   Q    And if I refer to a closed system -- I guess I have

23   been all day so I'm sure you know what I mean.  But it's

24   your understanding that Reynolds has done that?

25   A    That's my understanding.

                    SUMANTH ADDANKI - CROSS

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 257 of 266 PageID #:61603
Case: 3:97-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 257 of 266

2-P-256

1    Q    And you state in paragraph 35 that, "In fact, for

2    both CDK and Reynolds, their own proprietary data

3    integration programs are the only approved way for

4    vendors to obtain electronic interface on the DMS."  Is

5    that your understanding?

6    A    So my understanding is subject to all of the wind

7    downs and the caveats and the qualifications we've heard

8    about over the last two days.  And apart from the Dynamic

9    Reporting function that we heard described, that's

10   correct.

11   Q    Okay.  And is it your opinion that the benefits of a

12   closed system are lost if exceptions to that are made?

13   A    So again, I don't have an opinion as a computer

14   scientist on that.  As an economist, I'll say that if the

15   closed system is -- has benefits because of keeping out

16   unauthorized users who may or may not be hostile, then

17   making exceptions -- the more exceptions you make, the

18   more it undermines the benefits you're getting from

19   closing a system.

20          MR. PANNER:  And I see it's getting very late so

21   I'm going to try to speed up, Your Honor.

22   Q    Is it your view as an economist that once the

23   decision to close a DMS is made, disabling a third-party

24   is necessary to be able to realize the security and

25   performance benefits being sought?  That was your

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 258 of 266 PageID #:61604
Case: 3:97-cv-00319-jdp Document #: 169 Filed: 07/05/17 Page 257 of 265

2-P-257

1    statement in paragraph 42 and you continue to think

2    that's right?

3    A    I do.

4    Q    And it's also your view that if you allowed DMS

5    customers to make the decision about whether to have a

6    closed system or an open system, that if the DMS provider

7    provided that as an option, that that would undermine the

8    objectives that DMS firms seek to achieve by closing the

9    systems?

10   A    I do.

11   Q    Okay.  So if a DMS provider said to customers, you

12   know, we can have an open system or we can have a closed

13   system.  The closed system will give you better security;

14   it's going to cost a little bit more, but it's a system

15   that is better.  Also our interface is better.  But we

16   have both, and you can choose and make your decision

17   about which you'd prefer.  You believe that it would

18   undermine the benefits of having the closed system if the

19   supplier also offered the open system?

20   A    I think if they were trying to coexist within the

21   same system, I think it would seriously undermine it.

22   Q    Okay.  Now, you're aware that Reynolds does, in fact

23   -- I guess you qualified your opinion, you said Reynolds

24   does make exceptions to your knowledge.

25   A    Yes.

SUMANTH ADDANKI - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 259 of 266 PageID #:61605
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 259 of 266

2-P-258

1    Q    And you're aware that they made an exception for

2    CDK?

3    A    That's right.

4    Q    I think there were -- actually there was a question

5    from His Honor this morning, and I'm sure you were here

6    to hear it.  What did CDK get out of -- what did CDK get

7    out of the agreement with Reynolds?

8    A    I really think as an economist what CDK got out of

9    the agreement with Reynolds was a way to make a gracious

10   exit from what was a failing program of hostile

11   integration with DMI.  And other than that, it's hard to

12   see.  Well, I guess they got participation in RCI for the

13   application layer.

14   Q    But they paid for that.

15   A    Right.

16   Q    Why would -- why would CDK be concerned about a

17   gracious exit from the integrator market?

18   A    Well, these are customers of yours that you had

19   difficulty serving, and you would like to preserve your

20   reputation in the marketplace by having some sort of

21   orderly wind down of your agreements to serve them.

22   Q    Okay.  Now, you agree that there's a market for

23   third-party integration services, don't you?

24   A    Not a relevant market for purposes of this case, no.

25   Q    For purposes of DealerTrack, is there a market for

SUMANTH ADDANKI - CROSS

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 260 of 266 PageID #:61606
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/19 Page 259 of 265

2-P-259

```
 1  independent integration services?

 2  A    I don't understand what you mean.

 3  Q    Do you know what DealerTrack is?

 4  A    Yes, I do.

 5  Q    What is it?

 6  A    It's a DMS.

 7  Q    Correct.  Now, do you know if Authenticom provides

 8  third-party integration services for DealerTrack?

 9  A    I believe they do.

10  Q    Do you know if DMI provides integration services to

11  DealerTrack vendors -- excuse me.

12  A    I believe they do.

13  Q    To vendors for use of DealerTrack?

14  A    I believe they do.

15  Q    Do you believe that they compete in providing those

16  services?

17  A    I would suspect they do, yes.

18  Q    Okay.  And is that a market, leaving aside whether

19  it's a relevant market in this case, that's a market, is

20  it not?

21  A    That's a market.

22  Q    And so it's a single brand market just for

23  DealerTrack?

24  A    I haven't looked into that, so I'd want to think

25  about it.
```

1    Q    Okay.  But so there is competition for integration

2    services with regard to dealers who use DealerTrack.

3    A    Yes.

4    Q    But there's no competition for integration services

5    with respect to dealers who use CDK DMS.

6    A    Today there is not.

7    Q    And there's no competition for integration services

8    with respect to dealers who use Reynolds DMS.

9    A    Today there is not.

10   Q    Okay.  But both Reynolds and CDK sell integration

11   services to vendors; isn't that true?

12   A    They do.

13   Q    Do you know if CDK allowed Authenticom to access CDK

14   DMS for providing integration services prior to 2015?

15   A    I don't recall.

16           MR. PANNER:  No further questions.

17           THE COURT:  Okay.  Redirect?  (7:05 p.m.)

18                    REDIRECT EXAMINATION

19   BY MR. RYAN:

20   Q    I think, Dr. Addanki, you were just asked a minute

21   ago if Reynolds competes for integration services to

22   vendors.  Were you asked that question?

23   A    No.

24   Q    What was it?  Do they compete for -- let me ask it

25   this way:  Reynolds only integrates for the Reynolds

                    SUMANTH ADDANKI - REDIRECT

1    dealers; right?

2              MR. PANNER:  Objection.  Leading.

3              THE COURT:  I'll allow it.  It will be efficient

4    here.  Let's just --

5              THE WITNESS:  RCI is only for Reynolds DMS.

6              MR. RYAN:  Thank you.  Thank you.  No further

7    questions.

8              THE COURT:  Okay.  Thank you for your endurance.

9              THE WITNESS:  Thank you, Your Honor.

10             THE COURT:  All right.  So we're going to

11   reconvene --

12             THE WITNESS:  I'm done?

13             THE COURT:  Yeah, you're free to go.  You're

14   released, as everyone will be very soon.

15        (Witness excused.)

16             THE COURT:  Eight o'clock we'll reconvene.  I

17   understand you have one witness left; is that right?  And

18   so that is the counterpart to Dr. Klein?

19             MS. MILLER:  Correct.

20             THE COURT:  All right.  And I think that can be

21   brief.  I'm anticipating that to be brief.

22             MS. MILLER:  Yes, Your Honor.

23             THE COURT:  My anticipation should be fulfilled.

24   I'm not ordering you to restrain your examination, but I

25   think it should be brief.  And I think we have time in my

                    SUMANTH ADDANKI - REDIRECT

Case: 1-18-cv-00864-Document #: 986-17 Filed: 05/20/20 Page 263 of 266 PageID #:61609
Case: 3:17-cv-00318-jdp Document #: 169 Filed: 07/05/17 Page 263 of 265

2-P-262

schedule to finish up that witness and then do your

closing arguments.  And I think you can tell from my

questions what my concerns are, but let me just highlight

a couple of things.

On the irreparable harm issue, I have what I think

are a variety of worst case scenarios and kind of really

pretty bad case scenarios from Dr. Klein.  But it also

strikes me that as I look back in the period between the

wind-down agreement and the aggressive and successful

blocking by Reynolds, and the Reynolds affected walking

came first, but in that period between the really robust

walking and integration agreement, it seemed like

Authenticom was getting by.  Obviously the walking is a

huge blow to the business, but I don't see in that period

that losing the Reynolds integration business was enough

to put Authenticom under water.  So I'd like to hear

whether the irreparable harm could be parsed between CDK

and Reynolds.

And in terms of -- and if I were to grant an

injunction, for example, would I be able to say look, I

think that Authenticom was getting by when it was only

Reynolds doing the walking, but the CDK intervention and

their going to a closed system put them over the edge.

And I don't think that Dr. Klein really parsed those two

things.

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 264 of 266 PageID #:61610
Case: 3.97-cv-00018-jph Document #: 163 Filed: 07/05/07 Page 263 of 265

2-P-263

1    So in terms of crafting an injunction if I'm looking

2    at the harm, do I have to enjoin both of the defendants

3    or is one enough to do it?  And I'm not sure that

4    enjoining only one of them would be appropriate in any

5    way.  You can address that too if you want.  But just in

6    terms of the harm, it seems to me that the really

7    catastrophic effects, and I don't know if this was the

8    thing that got labeled as Apocalypse 2, but Apocalypse 1

9    wasn't enough to prompt this lawsuit or send Authenticom

10   over the edge, but subsequently it did.  And of course, I

11   realize I'm looking at the irreparable harm issues really

12   without the benefit of the defense presentation on their

13   expert.  But that is a question that I have.

14   The other thing I would like to see in your closings

15   is -- and the examinations have really brought this out a

16   lot with Exhibit 1, defense Exhibit 1 which is what we've

17   been calling the wind-down agreement which actually has a

18   different title that I've completely forgotten by now

19   because we always call it the wind-down agreement, but

20   there were two corollate agreements that haven't been

21   much discussed, and so I hope that counsel in their

22   arguments -- they're in the record so it's in evidence.

23   But I hope that the parties will make clear what they

24   think the impact of those -- the two sort of subsidiary

25   agreements are in the antitrust analysis.

Case: 1-18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 265 of 266 PageID #:61611
Case: 3:17-cv-00318-jdp Document #: 163 Filed: 07/05/17 Page 264 of 265

2-P-264

1    And then I don't want you to think that my

2    expression of these specific concerns really should

3    completely cabin your closing arguments.  I want you to

4    articulate to me what you think is important, and I don't

5    want you to just necessarily think that what I've been

6    fixated on is really what's important.  You guys really

7    are the experts in these areas from a legal perspective,

8    and so I want you to feel free to emphasize for me the

9    points that you think are important regardless of

10   whatever you think my preoccupations are.  Because I do

11   feel that I've been, as we've gone here, had a pretty

12   free hand in asking questions of your witnesses.  So I do

13   feel as my concerns came up, I voiced them and got

14   answers, to the extent that there were answers available.

15        So like I said, I don't want you to just exclusively

16   focus on the things you think I'm interested in, really

17   it's your closing so you tell me what you think I need to

18   know.

19        So if I give you any more help tonight other than

20   letting you go, if there's anything else.  So like I

21   said, we'll start at 8.  We'll finish up the last

22   witness, and then we'll do the closings.

23            MR. RYAN:  Thank you, Your Honor.

24            THE COURT:  Anything else?

25            MR. PANNER:  Thank you, Your Honor.

Case: 1:18-cv-00864 Document #: 986-17 Filed: 05/20/20 Page 266 of 266 PageID #:61612
Case: 3:17-cv-00319-jdp Document #: 163 Filed: 07/05/17 Page 266 of 265

2-P-265

1    THE COURT:  See you tomorrow morning.

2       (Proceedings concluded at 7:10 p.m.)

3

4              * * * * *

5    I, LYNETTE SWENSON, Certified Realtime and

6  Merit Reporter in and for the State of Wisconsin, certify

7  that the foregoing is a true and accurate record of the

8  proceedings held on the 27th day of June 2017 before the

9  Honorable James D. Peterson, District Judge for the

10  Western District of Wisconsin, in my presence and reduced

11  to writing in accordance with my stenographic notes made

12  at said time and place.

13  Dated this 3rd day of July 2017.

14

15

16                  /s/_____

17                  Lynette Swenson, RMR, CRR, CRC
                   Federal Court Reporter
18

19

20

21  The foregoing certification of this transcript does not
   apply to any reproduction of the same by any means unless
22  under the direct control and/or direction of the
   certifying court reporter.
23

24

25