# EXHIBIT 113

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION** | MDL No. 2817 Case No. 18 C 864 |
| This Document Relates To: | Hon. Amy J. St. Eve |
| All Dealership Class Actions |  |

### DEALERSHIP CLASS PLAINTIFFS' INITIAL RULE 26(a)(1) DISCLOSURES

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, the Dealership Class Plaintiffs ("Dealership Plaintiffs") make the following initial disclosures, which are based upon the information reasonably available to Dealership Plaintiffs at this stage of the litigation. Dealership Plaintiffs reserve the right to amend, revise or supplement these disclosures to the extent allowed by the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Northern District of Illinois ("Local Rules").

By making these disclosures, Dealership Plaintiffs do not represent that they are identifying every document, electronically-stored information, tangible thing or witness possibly relevant to this lawsuit, nor every relevant subject matter known to those individuals and entities identified herein. Rather, Dealership Plaintiffs' disclosures represent a good faith effort to identify information and documents that, at this point in the litigation, Dealership Plaintiffs reasonably believe may be used in support of their claims as required by Rule 26(a)(1). Dealership Plaintiffs do not represent that every individual or entity identified herein necessarily possesses information that Dealership Plaintiffs will use to support their claims, or that the individual or entity possesses relevant information.

The inclusion of documents or information in these disclosures shall not be construed to waive any privilege, claim, or right, including: (1) the attorney-client privilege, work product doctrine, or common interest privilege; (2) the right to object to any future discovery requests relating to the subject matter of these disclosures; or (3) the right to object, based on any appropriate grounds, to the production, admissibility or use of these disclosures or documents at any time, including at trial.

These disclosures do not include the names of any potential experts retained or consulted by Dealership Plaintiffs. Dealership Plaintiffs will produce information relating to experts as may be appropriate under Federal Rule of Civil Procedure, Local Rules or order of this Court.

## DISCLOSURES

I. **SCOPE OF THE PUTATIVE DEALERSHIP CLASS**

This class action concerns claims under both federal law and the laws of various states against CDK Global, LLC ("CDK") and the Reynolds & Reynolds Co. ("Reynolds"), and their predecessors, subsidiaries, parents, or affiliates (collectively, "Defendants"), for anticompetitive conduct in the markets for the provision of data management systems ("DMS") and data integration services ("DIS") to retail automobile dealers ("Dealers" or "Dealerships").

Dealership Plaintiffs and the nationwide class will be claiming damages and/or injunctive relief for violations of Sections 1 and 2 of the Sherman Act for the period January 1, 2015 to the present (the "Class Period").

Dealership Plaintiffs and the members of the state classes will also claim damages and/or injunctive relief for violations of various state antitrust and other laws during the Class Period.

## II.     PARTY DISCLOSURES

Dealership Plaintiffs believe the following individuals (excluding attorneys and expert witnesses) are likely to have discoverable information that Dealership Plaintiffs may use to support their claims in this matter.  Given that many individuals likely to have discoverable information that Dealership Plaintiffs may use to support their claims are current or former employees of Defendants or third parties, many of these individuals will not be identified until later in discovery.

### A.  Dealership Class Plaintiffs

The following list of Dealership Plaintiffs and subject matter areas is not exhaustive and is offered without prejudice to Dealership Plaintiffs' right to supplement these disclosures. These Dealership Plaintiffs may have information relating, to among other things, (A) allegations in the Consolidated Amended Class Action Complaint to be filed on June 4, 2018 ("Complaint"); (B) Dealership Plaintiffs' purchases of and experiences with DMS, DIS, and business management applications ("Vendor Services"); (C) knowledge and use of Defendants' DMS and DIS, including DMS access policies; (D) types of data stored by dealers on Defendants' DMS; (E) DMS competition and customer issues among DMS and DIS providers; and (F) the effect of Defendants' alleged anticompetitive conduct on Dealership Plaintiffs. The Dealership Plaintiffs identified in this section may only be contacted through Dealership Counsel.

1. **Baystate Ford Inc**.
   Frank Lupacchino, President
   Heather Paulikis, Controller
   Ronnie Eames, Division Parts Manager
   703 Washington Street
   South Easton, MA 02375

2. **Cliff Harris Ford, LLC d/b/a Warrensburg Ford**
   Cliff Harris, Managing Member
   329 E. Young Ave.

Warrensburg, MO 64093

**3. Hoover Automotive, LLC d/b/a Hoover Dodge Chrysler Jeep of Summerville**
Keith Roberts, General Manager
195 Marymeade Drive
Summerville, SC 29483

**4. JCF Autos LLC d/b/a Stevens Jersey City Ford**
David Benstock, General Manager
740 Rt 440
Jersey City, NJ 07304

**5. Jim Marsh American Corporation d/b/a Jim Marsh Mitsubishi Suzuki Kia Mahindra**
Jim Marsh, President
Allen Yarborough, Sales Manager
Mark Grim, Sales Manager
8555 W. Centennial Parkway
Las Vegas, NV 89149

**6. John O'Neil Johnson Toyota, LLC**
Kevin Winningham, General Manager
2900 Hwy 39 North
Meridian, MS 39301

**7. Kenny Thomas Enterprises, Inc. d/b/a Olathe Toyota**
Kelly Thomas, General Manager
685 N. Rawhide Drive
Olathe, KS 66061

**8. Marshall Chrysler Jeep Dodge, LLC**
Cliff Harris, Managing Member
1450 W. Arrow St.
Marshall, MO 65340

**9. Patchogue 112 Motors LLC d/b/a Stevens Ford**
David Benstock, General Manager
501 Medford Avenue
Patchogue, NY 11772

**10. Pitre, Inc. d/b/a Pitre Buick GMC**
Tom Stever, Chief Financial Officer
9737 Eagle Ranch Road NW
Albuquerque, NM 87114

**11. Pitre Imports, LLC d/b/a Pitre Kia**

Tom Stever, Chief Financial Officer
9640 Eagle Ranch Road NW
Albuquerque, NM 87114

12. **Teterboro Automall, Inc. d/b/a Teterboro Chrysler Dodge Jeep Ram**
Alan Graf, Jr., Comptroller and Office Manager
469 Route 46
Little Ferry, NJ 07643

13. **Waconia Dodge, Inc. d/b/a Waconia Dodge Chrysler Jeep Ram**
Andy Strong, Manager
Eric Strong, Service Manager
905 Strong Drive
Waconia, MN 55387

14. **Warrenburg Chrysler Dodge Jeep, L.L.C.**
Cliff Harris, Managing Member
329 E. Young Ave.
Warrensburg, MO 64093

15. **Jericho Turnpike Sales LLC d/b/a Ford & Lincoln of Smithtown**
David Benstock, General Manager
440 East Jericho Turnpike
Saint James, NY 11780

**B. Defendant CDK Global, LLC**

Dealership Plaintiffs identify the following individuals as persons likely to have discoverable information that Dealership Plaintiffs may use to support their claims in this case, and the subjects of such information, based upon the information presently reviewed and available to Dealership Plaintiffs. Dealership Plaintiffs expressly reserve the right to identify or to call as witnesses additional or different individuals, particularly those at or affiliated with Defendants as well as third parties, if, during the course of discovery and investigation relating to this matter, Dealership Plaintiffs learn that such individuals have relevant knowledge. Many individuals likely to have discoverable information that Dealership Plaintiffs may use to support their claims are current or former employees of Defendants or other third parties, and are unknown to Dealership Plaintiffs. As such, many of these individuals may be identified later in

5

the course of discovery. In making these disclosures, Dealership Plaintiffs do not waive their right to object to discovery of information from any of these individuals or any other individuals, by deposition or otherwise, on any and all grounds, including, without limitation, the attorney-client privilege and the work product doctrine. The subject matters described for each individual below, are not exhaustive and are offered without prejudice to Dealership Plaintiffs' right to obtain information from CDK, or those specific individuals, that is relevant to the claims or defenses of the parties. These individuals are subject to CDK's control and will be contacted through counsel for CDK. The individuals with knowledge of these areas may include, but are not limited to:

1. **Robert Karp, President, CDK North America**

Mr. Karp may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel third-party application provider ("vendor") compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) CDK's contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; (G) CDK's communications with Dealership Plaintiffs regarding vendor and independent data integrator access to DMS data and vendors); (H) CDK's DMS and data services; (I) types of

6

data stored on CDK's DMS; (J) competition among DMS providers and application providers; (K) CDK's Master Service Agreements with Dealers; (L) CDK's third-party data access and integration program; (M) the security of CDK's systems; (N) negotiation, execution and implementation of the February 2015 Data Exchange, RCI, and 3PA agreements entered into between CDK and Reynolds; and (O) Reynolds' whitelisting practices.

### 2. Ron Frey, Executive Vice President & Chief Strategy Officer

Mr. Frey may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) CDK's contracts and communications with Dealership Plaintiffs and members of the Classes, including but not limited to the drafting and implementation thereof; (G) CDK's communications with Dealership Plaintiffs regarding vendor and independent data integrator access to DMS data; (H) CDK's DMS and data services; (I) types of data stored on CDK's DMS; (J) competition among DMS providers and application providers; (K) CDK's third-party data access and integration program; (L) the security of CDK's systems; and (M) negotiation, execution, and implementation of the February 2015 Data Exchange, RCI, and 3PA agreements entered into between CDK and Reynolds.

### 3. Dean Crutchfield, Executive Vice President and Chief Information Officer

Mr. Crutchfield may have knowledge of the following subject matters, among others: (A) CDK's efforts to block independent data integrators such as Authenticom; (B) CDK's network architecture and infrastructure; (C) CDK's data security policies and Global Security Office; (D) technical aspects of CDK's DMS and data services; (E) CDK's third-party data access and integration program; and (F) the security of CDK's systems.

### 4. Howard Gardner, Vice President, Data Services

Mr. Gardner may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or 'wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) CDK's contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; (G) CDK's communications with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data;  (H) CDK's DMS and data services; (I) types of data stored on CDK's DMS; (J) competition among DMS providers and application providers; (K) CDK's third-party data access and integration program; (L) the security of CDK's systems; (M) the managed data service offered by CDK through Digital Motorworks, Inc. ("DMI") and IntegraLink; (M) the

manner in which DMI and IntegraLink interact with and obtain data from other DMS providers; (N) negotiation, execution and implementation of the February 2015 Data Exchange, RCI, and 3PA agreements entered into between CDK and Reynolds; and (O) CDK's contracts with vendors which prohibit disclosure to dealers of pricing paid for DIS.

### 5. Jason Bonifay, Vice President, Development

Mr. Bonifay may have knowledge of the following subject matters, among others: (A) Defendants' market division agreements; (B) Defendants' agreement to block independent data integrators; (C) CDK's blocking tactics; (D) CDK's decision to move to a closed system; (E) communications between independent data integrators, including Authenticom and AVRS Inc.; and (F) coordination between CDK and Reynolds to stop using Authenticom for data integration services in conjunction with AVRS Inc.

### 6. Leigh Ann Conver, Senior Director of Strategy

Ms. Conver may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) CDK's contracts and communications with Dealership Plaintiffs and members of the Classes, including but not limited to the drafting and implementation thereof; (G) CDK's

communications with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data; (H) CDK's DMS and data services; (I) types of data that are stored on CDK's DMS; (J) CDK's third-party data access and integration program; (K) CDK's current and historical pricing for third-party data access and integration, and contracts governing third-party data access and integration; (L) the managed data services that are offered by CDK through DMI and IntegraLink; and (M) the security of CDK's systems.

**7. Ronald Workman, Vice President, Corporate Development**

Mr. Workman may have knowledge of the following subject matters, among others (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynold'' RCI program; (F) CDK's contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; (G) CDK's communications with the Class regarding vendor and independent data integrator access to DMS data; (H) CDK's DMS and data services; (I) types of data that are stored on CDK's DMS; (J) competition among DMS providers and third-party applications providers; (K) CDK's third-party data access and integration program; (L) CDK's current and historical pricing for third-party data access and

integration, and contracts governing third-party data access and integration; (M) the security of CDK's systems; and (N) the relationship of AVRS by Defendants.

### 8. Steven French, Senior Director, Client & Data Services

Mr. French may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants'' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) CDK's contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; (G) CDK's communications with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data; (H) CDK's communication with dealerships and strategy regarding vendor and independent data integrator access to dealer DMS data; (I) CDK's third-party data access and integration program; (J) the allegations related to Mr. French that appear in the complaint filed in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-cv-318 (W.D. Wis. May 5, 2017), ECF No. 4 ("Authenticom Complaint"); (K) the allegations related to Mr. French that appear in the Declaration of Steven Cottrell dated May 18, 2017, ECF No. 62; (L) the managed data services that are offered by CDK through DMI and IntegraLink; (M) the history and structure of DMI and IntegraLink; (N) the manner in which DMI and IntegraLink interact with and obtain data from

other DMS providers; and (O) the scheduling and subject matter of weekly calls between CDK and Reynolds to discuss overarching tactical issues between organizations.

### 9. Michael Noser, Senior Director, Data Ecosystems

Mr. Noser may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) CDK's contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; (G) CDK's communications with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data; (H) technical aspects of CDK's DMS and data services, as well as its third-party data access and integration program; and (I) the security of CDK's systems.

### 10. Malcolm Thorne, former Executive Vice President & Chief Global Strategy Officer

Mr. Thorne may have knowledge of the following subject matters, among others (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access

12

to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) CDK's contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; (G) CDK's communications with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data; (H) CDK's corporate structure; (I) CDK's DMS and data services; (J) CDK's third-party data access and integration program; (K) CDK's decision to launch its Security First initiative; (L) CDK's overall strategy prior to April 2017 for its DMS, data services and applications; and (M) the security of CDK's systems.

**11. Dan McCray, former Vice President, Product Management**

Mr. McCray may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) CDK's contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; (G) CDK's communications

with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data; (H) the security of CDK's systems; and (I) allegations related to Mr. McCray that appear in the Authenticom Complaint and the May 18, 2017 Declaration of Steven Cottrell.

### 12. Brian P. MacDonald, CEO

Mr. MacDonald may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) CDK's contracts and communications with Dealership Plaintiffs and the Classes, including the drafting and implementation thereof; (G) CDK's communications with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data; and (H) CDK's position as to whether Dealerships own and have full control of the data they input into their DMS.

### 13. Steven J. Anenen, former CEO

Mr. Anenen may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel

vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) CDK's contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; (G) CDK's communications with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data;  (H) CDK's position as to whether Dealerships own and have full control of the data they input into their DMS; (I) CDK's communications with and regarding independent data integrators such as Authenticom; and   (J) CDK's contracts with vendors which prohibit disclosure to dealers of pricing paid for DIS.

### 14. Josh Douglas, Senior Director of Operations, DMI

Mr. Douglas may have knowledge of the following subject matters, among others:  (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications between one another in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and

Reynolds' RCI program; (F) CDK's contracts and communications with Dealership Plaintiffs and the Classes, including the drafting and implementation thereof; and (G) CDK's communications with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data.

**15. Jeffrey Nosek, former Vice President of North American Data Services**

Mr. Nosek may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications between one another in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) CDK's contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; and (G) CDK's communications with the Class regarding vendor and independent data integrator access to DMS data.

**16. Elizabeth Ayotte, Director of Marketing, Data Access**

Ms. Ayotte may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and

implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) CDK's contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; and (G) CDK's communications with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data.

### 17. Joe Bihner, DVP & GM North America

Mr. Bihner may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) CDK's contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; and (G) CDK's communications with Dealership Plaintiffs and Classes regarding vendor and independent data integrator access to DMS data.

**18. Kevin Distelhorst, VP & Chief Customer Officer of Digital Motorworks**

Mr. Distelhorst may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) CDK's contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; (G) CDK's communications with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data; (H) CDK's acquisition of IntegraLink; (I) CDK's DIS; (J) CDK's development of SMART-R; (K) CDK's communications with dealerships regarding, among other things, CDK's decision to move to a closed system; and (L) the scheduling and subject matter of weekly calls between CDK and Reynolds to discuss overarching tactical issues between organizations.

**19. Mark Imowitz, VP Marketing and Sales Operations**

Mr. Imowitz may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and

implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) CDK's contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; and (G) CDK's communications with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data.

**20. Jesse Traucht, Account Director (Program Manager)**

Mr. Traucht may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) CDK's contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; and (G) CDK's communications with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data.

**21. Trey Gerlich, Senior Director, Solutions Engineering**

Mr. Gerlich may have knowledge of the following subject matters, among others (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) CDK's contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; and (G) CDK's communications with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data.

**C. Defendant The Reynolds and Reynolds Company**

Dealership Plaintiffs identify the following individuals as persons likely to have discoverable information that Dealership Plaintiffs may use to support their claims in this case, and the subjects of such information, based upon the information presently reviewed and available to Dealership Plaintiffs. Dealership Plaintiffs expressly reserves the right to identify or to call as witnesses additional or different individuals, particularly those at or affiliated with Defendants as well as third parties, if, during the course of discovery and investigation relating to this matter, Dealership Plaintiffs learn that such individuals have relevant knowledge. Many individuals likely to have discoverable information that Dealership Plaintiffs may use to support

their claims are current or former employees of Defendants or other third parties, and are unknown to Dealership Plaintiffs. As such, many of these individuals may be identified later in the course of discovery. In making these disclosures, Dealership Plaintiffs do not waive their right to object to discovery of information from any of these individuals or any other individuals, by deposition or otherwise, on any and all grounds, including, without limitation, the attorney-client privilege and the work product doctrine. The subject matters described for each individual below, are not exhaustive and are offered without prejudice to Dealership Plaintiffs' rights to obtain information from Reynolds, or those specific individuals, that is relevant to the claims or defenses of the parties. These individuals are subject to Reynolds's control and will be contacted through counsel for Reynolds. The individuals with knowledge of these areas may include, but are not limited to:

**1. Robert Brockman, Chairman and CEO**

Mr. Brockman may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) Reynolds' contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; (G) Reynolds'

communications with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data;  (H) Reynolds' position as to whether Dealerships own the data they input into their DMS; (I) Reynolds' pricing of DIS to vendors; and (J) Reynolds' contracts with vendors that  prohibit disclosure to Dealers of pricing paid for DIS.

### 2. Robert Schaefer, Vice President of OEM Relations and Data Services

Mr. Schaefer may have knowledge of the following subject matters, among others:  (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) Reynolds' contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; (G) Reynolds' communications with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data; (H) the planning and organization of meetings between CDK and Reynolds; (I) the composition and roles of members of the combined Reynolds/CDK team which developed the 2015 agreements; (J) Reynolds' position as to whether Dealerships own and have full control of the data they input into Reynolds' DMS;  (K) communications  with CDK regarding  alterations  to the Reynolds' agreements with CDK; (L) Reynolds' efforts and mechanisms used to enforce and implement its policies allegedly related to data security; and

(M) the efforts of vendors and independent data integrators to circumvent Reynolds' enforcement of its anticompetitive agreements.

### 3. Ronald Lamb, immediate Past President and former Senior Vice President of Sales

Mr. Lamb may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independentdata integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) Reynolds' contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; (G) Reynolds' communications with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data; (H) Reynolds' position as to whether Dealerships own and have full control of the data they input into Reynolds' DMS; and (I) the DMS market, the applications market, competition between DMS competitors, Reynolds' efforts to compete in the DMS market, Dealers' DMS purchasing decisions, and other DMS providers' products.

### 4. Chris Hellyer, Data Services Manager

Mr. Hellyer may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel

vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) Reynolds' contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; (G) Reynolds' communications with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data; (H) the planning and organization of meetings between CDK and Reynolds; (I) the composition and roles of members of the combined Reynolds/CDK team that developed the 2015 agreements; (J) Reynolds' position as to whether Dealerships own and have full control of the data they input into Reynolds' DMS; (K) communications with CDK regarding alterations to the Reynolds' agreements with CDK; (L) communications with CDK regarding alterations to the Reynolds' agreements with CDK; and (M) communications with CDK requesting migration of CDK's DIS vendor clients to Reynolds' RCI program.

**5. Kelly Hall, Senior Vice President of Software Development**

Mr. Hall may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications between in furtherance of the

anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) Reynolds' contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; (G) Reynolds' communications with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data; (H) third-party access to Reynolds' DMS; (I) Reynolds DMS closed architecture/system; (J) Reynolds' blocking tactics; (K) Reynolds' communications with and regarding independent data integrators such as Authenticom; and (L) Reynolds' perception of the harm and losses it attributed to third-party access to Reynolds' DMS.

### 6. Dave Bates, VP of Customer Support

Mr. Bates may have knowledge of the following subject matters, among others: (A) Defendants' market division agreements; (B) Defendants' agreement to block independent data integrators; (C) Reynold's blocking tactics; and (D) Reynold's communications with Dealerships relating to alleged anticompetitive conduct.

### 7. Tim Boughan, Business Development Supervisor

Mr. Boughan may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Reynold's communications with Dealerships

relating to alleged anticompetitive conduct; (F) communications between Reynolds and CDK to coordinate division of the DIS market; (G) communications with vendors regarding access to Reynold's DMS system; and (H) Reynolds' whitelisting practices.

**8. Will Farley, Business Development Manager**

Mr. Farley may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) Reynold's communications with Dealerships relating to alleged anticompetitive conduct; and (G) communications regarding Authenticom and other independent data integrators.

**9. Michael Hahn, Business Development Manager**

Mr. Hahn may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants; strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive

agreements between CDK and Reynolds; (E) Reynold's communications with Dealerships relating to alleged anticompetitive conduct; (F) communications between Reynolds and CDK to coordinate division of the DIS market; and (G) communications with vendors regarding access to Reynold's DMS system.

### 10. Jon Martin, Director of New Business Development; Director RCI Operations and data security

Mr. Martin may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) Reynolds' contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; (G) Reynolds' communications with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data; (H) the planning and organization of meetings between CDK and Reynolds; (I) the composition and roles of members of the combined Reynolds/CDK team which developed the 2015 agreements; (J) Reynolds' position as to whether Dealerships own and have full control of the data they input into Reynolds' DMS; (K) communications with CDK regarding alterations to the Reynolds' agreements with CDK; (L) communications with CDK requesting migration of CDK's DIS vendor clients to Reynolds' RCI program; (M) Reynolds'

pretextual data security rationale for its agreements with CDK; and (N) technical details of Reynolds' data security programs.

### 11. Joel Maurer, Business Development Manager

Mr. Maurer may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Reynold's communication with Dealerships relating to alleged anticompetitive conduct; (F) communications between Reynolds and CDK to coordinate division of the DIS market; and (G) communications with vendors regarding access to Reynold's DMS system.

### 12. Thomas Schwartz, Director of Corporate Communications

Mr. Schwartz may have knowledge of the following subject matters, among others:  (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK''s 3PA program and Reynolds' RCI

program; (F) Reynolds' position as to whether Dealerships own and have full control of the data they input into Reynolds' DMS; and (G) Reynolds' formulation of public statements regarding its pretextual information security programs.

**13. Ed Thornhill, Billing Operations and Vendor Compliance Manager**

Mr. Thornhill may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) Reynolds' contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; (G) Reynolds' communications with Dealership Plaintiffs and the Classes regarding vendor and independent data integrator access to DMS data; (H) Reynold's communications with Dealerships relating to alleged anticompetitive conduct; (I) communications regarding Authenticom and other independent data integrators; (J) Reynolds's RCI program; (K) communications with vendors and Dealerships regarding Reynolds RCI program; (L) communications with CDK regarding alterations to the Reynolds' agreements with CDK; and (M) communications with CDK requesting migration of CDK's DIS vendor clients to Reynolds' RCI program.

**14. Jon Strawsburg  Vice President, Product Planning**

Mr. Strawsburg may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendants' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) Reynolds' contracts and communications with Dealership Plaintiffs and the Classes, including but not limited to the drafting and implementation thereof; (G) Reynolds' whitelisting practices; and (H) the acquisition of AVRS by Defendants.

**15. Chris Grabill, Position believed to be known by Defendant**

Mr. Grabill may have knowledge of the following subject matters, among others: (A) the planning and implementation of Defendants' strategy to exclude independent data integrators from the DIS market; (B) the planning and implementation of Defendants' strategy to compel vendor compliance with contractual exclusive dealing provisions; (C) the planning and implementation of Defendant' strategy to restrict Dealerships from allowing third-party access to Defendants' DMS; (D) Defendants' communications between one another in furtherance of the anticompetitive agreements between CDK and Reynolds; (E) Defendants' agreements, whether written or verbal with one another, including but not limited to the 2015 Data Exchange or "wind down" agreement and reciprocal access agreements to CDK's 3PA program and Reynolds' RCI program; (F) Reynolds' contracts and communications with Dealership Plaintiffs and the

Classes, including but not limited to the drafting and implementation thereof; (G) Reynolds' whitelisting practices; and (H) the coordination and sharing of Dealer UserIDs between CDK and Reynolds.

## D.  Third Parties

### 1.  Authenticom

Current and former directors, officers, employees, partners, members, representatives, and/or agents of Authenticom, or any of its subsidiaries, affiliates or related entities (if any), may possess relevant information concerning: Defendants' agreement to drive Authenticom and other independent data integrators out of the DIS market; Defendants' blocking tactics; harms caused to the Dealership Class due to increased DIS costs passed on from vendors to Dealers and others as a result of Defendants' anticompetitive actions, as alleged by Dealership Plaintiffs.

The individuals with knowledge of these areas may include but are not limited to:

#### a.  Steve Cottrell, Owner and CEO

Mr. Cottrell may have knowledge of the following subject matters, among others:  (A) Defendants' agreement to drive Authenticom out of the DIS market; (B) tactics use by Defendants to block Authenticom's access to DMS data; (C) harm caused by Defendants' actions; and (D) communications with Defendants regarding efforts to drive independent data integrators from the DIS market.

#### b.  Joe Noth, Controller

Mr. Noth may have knowledge of the following subject matters, among others:  (A) tactics use by Defendants to block Authenticom's access to DMS data; and (B) harm caused by Defendants' actions.

#### c.  Brian Clements, Chief Operating Officer

Mr. Clements may have knowledge of the following subject matters, among others: (A) Authenticom's business model and technology; (B) Defendants' blocking tactics; and (C) Authenticom's agreements with vendors and Dealers.

### d. Katie Wiersgalla, Vice President of Product Design & User Experience

Ms. Wiersgalla may have knowledge of the following subject matters, among others: (A) Authenticom's communications with Defendants; (B) Authenticom's marketing efforts; (C) Defendants' blocking tactics; and (D) Reynolds' whitelisting practice.

### 2. Cox Automotive, Inc.

Current and former directors, officers, employees, partners, members, representatives, and/or agents of Cox Automotive, Inc. or any of their subsidiaries, affiliates or related entities may have knowledge of the following subject matters, among others: (A) competition within the DMS and application markets; (B) its DealerTrack DMS product/competition with Reynolds; and (C) design of Cox's DMS product.

### 3. Motor Vehicle Software Corporation

Current and former directors, officers, employees, partners, members, representatives, and/or agents of Motor Vehicle Software Corporation ("MVSC") or any of their subsidiaries, affiliates or related entities may have knowledge of the following subject matters, among others: (A) competition within the DMS and application markets; and (B) harm caused to the Dealership Class due to increased DIS costs passed on from vendors to Dealers and others as a result of Defendants' anticompetitive actions, as alleged by Plaintiffs.

### 4. Loop, LLC, d/b/a AutoLoop

Current and former directors, officers, employees, partners, members, representatives, and/or agents of Loop, LLC, d/b/a AutoLoop, or any of their subsidiaries, affiliates or related

entities may have knowledge of the following subject matters, among others: (A) competition within the DMS and application markets; and (B) harm caused to the Dealership Class due to increased DIS costs passed on from endors to Dealers and others as a result of Defendants' anticompetitive actions, as alleged by Dealership Plaintiffs.

**5. Carfax, Inc.**

Current and former directors, officers, employees, partners, members, representatives, and/or agents of Carfax, Inc. or any of their subsidiaries, affiliates or related entities may have knowledge of the following subject matters, among others: (A) knowledge of its receipt and usage of data from data integrators; (B) dealer authorizations of data to be shared with Carfax; and (C) other aspects of the data syndication process.

**6. TrueCar**

Current and former directors, officers, employees, partners, members, representatives, and/or agents of TrueCar, or any of their subsidiaries, affiliates or related entities may have knowledge of the following subject matters, among others: (A) competition within the DMS and application markets; and (B) harm caused to the Dealership Class due to increased DIS costs passed on from vendors to Dealers and others as a result of Defendants' anticompetitive actions, as alleged by Dealership Plaintiffs.

**7. Autotrader**

Current and former directors, officers, employees, partners, members, representatives, and/or agents of Autotrader, or any of their subsidiaries, affiliates or related entities may have knowledge of the following subject matters, among others: (A) competition within the DMS and application markets; and (B) harm caused to the Dealership Class due to increased DIS costs

passed on from vendors to Dealers and others as a result of Defendants' anticompetitive actions, as alleged by Dealership Plaintiffs.

### 8. Cars.com

Current and former directors, officers, employees, partners, members, representatives, and/or agents of Cars.com, or any of their subsidiaries, affiliates or related entities may have knowledge of the following subject matters, among others: (A) competition within the DMS and application markets; and (B) harm caused to the Dealership Class due to increased DIS costs passed on from vendors to Dealers and others as a result of Defendants' anticompetitive actions, as alleged by Dealership Plaintiffs.

### 9. DealerSocket

Current and former directors, officers, employees, partners, members, representatives, and/or agents of DealerSocket, or any of their subsidiaries, affiliates or related entities may have knowledge of the following subject matters, among others: (A) competition within the DMS and application markets; and (B) harm caused to the Dealership Class due to increased DIS costs passed on from vendors to Dealers and others as a result of Defendants' anticompetitive actions, as alleged by Dealership Plaintiffs.

### 10. RouteOne

Current and former directors, officers, employees, partners, members, representatives, and/or agents of RouteOne, or any of their subsidiaries, affiliates or related entities may have knowledge of the following subject matters, among others: (A) competition within the DMS and application markets; and (B) harm caused to the Dealership Class due to increased DIS costs passed on from vendors to Dealers and others as a result of Defendants' anticompetitive actions, as alleged by Dealership Plaintiffs.

**11. NakedLime**

Current and former directors, officers, employees, partners, members, representatives, and/or agents of NakedLime, or any of their subsidiaries, affiliates or related entities may have knowledge of the following subject matters, among others: (A) competition within the DMS and application markets; and (B) harm caused to the Dealership Class due to increased DIS costs passed on from vendors to Dealers and others as a result of Defendants' anticompetitive actions, as alleged by Dealership Plaintiffs.

**12. DealerRater**

Current and former directors, officers, employees, partners, members, representatives, and/or agents of DealerRater, or any of their subsidiaries, affiliates or related entities may have knowledge of the following subject matters, among others: (A) competition within the DMS and application markets; and (B) harm caused to the Dealership Class due to increased DIS costs passed on from vendors to Dealers and others as a result of Defendants' anticompetitive actions as alleged by Dealership Plaintiffs.

**13. Star Performance Marketing**

Current and former directors, officers, employees, partners, members, representatives, and/or agents of Star Performance Marketing, or any of their subsidiaries, affiliates or related entities may have knowledge of the following subject matters, among others: (A) competition within the DMS and application markets; and (B) harm caused to the Dealership Class due to increased DIS costs passed on from vendors to Dealers and others as a result of Defendants' anticompetitive actions, as alleged by Dealership Plaintiffs.

**14. IntelliPayment**

Current and former directors, officers, employees, partners, members, representatives,

and/or agents of IntelliPayment, or any of their subsidiaries, affiliates or related entities may have knowledge of the following subject matters, among others: (A) competition within the DMS and application markets; and (B) harm caused to the Dealership Class due to increased DIS costs passed on from vendors to Dealers and others as a result of Defendants' anticompetitive actions, as alleged by Dealership Plaintiffs.

### 15. Ford Direct

Current and former directors, officers, employees, partners, members, representatives, and/or agents of Ford Direct, or any of their subsidiaries, affiliates or related entities may have knowledge of the following subject matters, among others: (A) competition within the DMS and application markets; and (B) harm caused to the Dealership Class due to increased DIS costs passed on from vendors to Dealers and others as a result of Defendants' anticompetitive actions, as alleged by Dealership Plaintiffs.

In addition, we may depose or call as a witness:

1. Any individual identified as an expert witness;

2. All signatories to any document used as an exhibit;

3. All individuals necessary to authenticate exhibits and to establish admissibility of exhibits;

4. Any individuals whose name is contained in pleadings, witness lists, deposition testimony, discovery responses, or documents produced by any of the parties to this case;

5. All necessary rebuttal witnesses;

6.  Individuals disclosed by any other party to this litigation, including disclosures made previously in actions that have now been consolidated into this MDL proceeding;

7.  Individuals whose name is contained in pleadings, witness lists, deposition testimony, discovery responses, documents produced by any of the parties to this litigation, or documents used as an exhibit;

8.  Individuals necessary to authenticate and establish admissibility of exhibits; and

9.  All necessary rebuttal witnesses.

## III.     IDENTIFICATION OF DEALERSHIP PLAINTIFF DOCUMENTS

Dealership Plaintiffs identify the following categories of non-privileged documents, electronically-stored information and/or tangible things ("Documents") in the possession, custody, or control of Dealership Plaintiffs that may be used to support their claims in this matter.

1. Documents sufficient to demonstrate Dealership Plaintiffs' communications and business dealings with Defendants;

2. Documents sufficient to demonstrate Dealership Plaintiffs' purchases of DMS;

3. Documents sufficient to demonstrate Dealership Plaintiffs' purchases of Vendor Services;

4. Documents sufficient to demonstrate Dealership Plaintiffs' purchases of DIS;

5. Dealership Plaintiffs' agreements and communications with DMS and DIS providers, including Defendants;

6. Dealership Plaintiffs' contracts and communications with vendors;

7. Filings in the related litigations against Defendants;

8. Documents and/or data related to the harm caused to Dealership Plaintiffs by Defendants' conduct;

9. Documents within Dealership Plaintiffs' possession, custody, or control that any other party identifies in its Rule 26(a)(1)(A)(ii) disclosures and supplemental disclosures; and

10. Documents produced or made available to Dealership Plaintiffs by any other party or third-party witness in response to a discovery request or subpoena.

Copies of the documents identified above are maintained in either electronic or hard copy version at Dealership Plaintiffs' places of business and/or with their counsel. Additional documents that Dealership Plaintiffs may use to support their claims and defenses are likely in the possession, custody, or control of Defendants and third parties. This disclosure is not intended to be a complete list of documents that Dealership Plaintiffs may use in this litigation.

Dealership Plaintiffs reserve the right to supplement the foregoing list as necessary during the course of discovery and further proceedings.

## IV.    DAMAGES

Dealership Plaintiffs seek all actual, compensatory, punitive and statutory damages in an amount to be determined at trial, and where applicable, trebled in accordance with the law.  In addition, Dealership Plaintiffs seek all reasonable attorneys' fees and costs incurred in this action.

Computation of damages pursuant to Rule 26(a)(1)(C) is premature.  Dealership Plaintiffs allege an overcharge theory and the calculation of damages arising from such overcharges will require discovery, as well as any expert reports and analysis that has not yet been performed.

## V.    INSURANCE

Dealership Plaintiffs are not currently aware of an insurance agreement under which an insurance business may be liable to satisfy all or part a judgment that may be entered in this action or to indemnify or reimburse for payments made to satisfy the judgment.

Dated: May 10, 2018                   Respectfully submitted,

*/s/ Peggy J. Wedgworth*
Peggy J. Wedgworth
Elizabeth McKenna
**MILBERG TADLER PHILLIPS GROSSMAN LLP**
One Pennsylvania Plaza, 19th Floor
New York, NY 10119
(212) 594-5300
pwedgworth@milberg.com
emckenna@milberg.com

*Dealership Interim Lead Class Counsel*

39

### Certificate of Service

I hereby certify that on this 10th day of May, 2018, I caused a true and correct copy of the foregoing Dealership Class Plaintiffs' Initial Disclosures to be served on the following counsel via email.

*/s/ Peggy J. Wedgworth*
Peggy J. Wedgworth

bmiller@mayerbrown.com
mprovance@mayerbrown.com
agulley@gibbsbruns.com
bross@gibbsbruns.com
bwilkinson@gibbsbruns.com
rmacdonald@gibbsbruns.com
jpatrick@gibbsbruns.com
kpatrick@gibbsbruns.com
mcohen@sheppardmullin.com
anaik@sheppardmullin.com
jmcginnis@sheppardmullin.com
jskilton@perkinscoie.com
ccurtis@perkinscoie.com
mumberger@perkinscoie.com
blewis@perkinscoie.com
jbair@perkinscoie.com
kstetsko@perkinscoie.com
dho@kellogghansen.com
mnamelka@kellogg.com
jgregor@gklaw.com
rac@cliffordlaw.com
smm@cliffordlaw.com