# Exhibit 5

```
                    UNITED STATES DISTRICT COURT

               FOR THE WESTERN DISTRICT OF WISCONSIN
   ─────────────────────────────────────────────────────────────

   AUTHENTICOM, INC.,

            Plaintiff,

    -vs-                                   Case No.  17-CV-318-JDP

   CDK GLOBAL, LLC and                     Madison, Wisconsin
   THE REYNOLDS AND REYNOLDS COMPANY,      June 26, 2017
                                           9:03 a.m.

            Defendants.
   ─────────────────────────────────────────────────────────────

      STENOGRAPHIC TRANSCRIPT OF FIRST DAY OF EVIDENTIARY HEARING
                         (MORNING SESSION)
       HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

   APPEARANCES:

   For the Plaintiff:

              Godfrey & Kahn S.C.
              BY:  JENNIFER L. GREGOR
              One East Main Street, Suite 500
              Madison, Wisconsin  53701

              Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
              BY:  MICHAEL N. NEMELKA
                   AARON M. PANNER
                   DAVID L. SCHWARZ
                   DEREK T. HO
                   JOANNA T. ZHANG
                   JOSHUA HAFENBRACK
                   KEVIN J. MILLER
              1615 M Street, N.W.
              Suite 400
              Washington, D.C.  20036


               Jennifer L. Dobbratz, RMR, CRR, CRC
               U.S. District Court Federal Reporter
                  United States District Court
                120 North Henry Street, Rm. 410
                   Madison, Wisconsin  53703
                        (608) 261-5709
```

Case: 1:18-cv-00864 Document #: 988-5 Filed: 05/29/20 Page 3 of 10 PageID #:61917
Case: 3:17-cv-00318-jdp Document #: 164 Filed: 07/05/17 Page 2 of 160

1-A-2

APPEARANCES CONTINUED:

Also appearing:    STEPHEN COTTRELL, Authenticom
                  STEVE ROBB, IT Support

For the Defendant CDK Global, LLC:

                  Foley & Lardner
                  BY:   JEFFREY A. SIMMONS
                  150 East Gilman Street
                  Madison, Wisconsin  53701

                  Mayer Brown LLP
                  BY:   BRITT M. MILLER
                         MATTHEW D. PROVANCE
                  71 South Wacker Drive
                  Chicago, Illinois  60606

                  Mayer Brown LLP
                  BY:   MARK W. RYAN
                  1999 K Street, N.W.
                  Washington, D.C.  20006

Also appearing:    LEE BRUNZ, General Counsel, CDK Global, LLC
                  NICK HEY, IT Support

For the Defendant The Reynolds and Reynolds Company:

                  Perkins Coie LLP
                  BY:   CHARLES G. CURTIS, JR.
                  1 East Main Street, Suite 201
                  Madison, Wisconsin  53703

                  Sheppard Mullin Richter & Hampton, LLP
                  BY:   MICHAEL P. A. COHEN
                  2099 Pennsylvania Avenue, N.W.
                  Suite 100
                  Washington, D.C.  20006

                  Gibbs & Bruns LLP
                  BY:   AUNDREA K. GULLEY
                         BRIAN T. ROSS
                         BRICE A. WILKINSON
                  1100 Louisiana Street, Suite 5300
                  Houston, Texas  77002

Also appearing:    ROBERT SCHAEFER and KELLY HALL,
                  The Reynolds and Reynolds Company

Case: 1:18-cv-00864 Document #: 988-5 Filed: 05/29/20 Page 4 of 10 PageID #:61918
Case: 3:17-cv-00318-jdp Document #: 164 Filed: 07/05/17 Page 138 of 160
1-A-138

1        THE COURT: Okay. Thank you. It's admitted.
2   BY MR. NEMELKA:
3   Q    All right. Mr. Cottrell, what -- first of all, let's look
4   at the email. What is this email?
5   A    Essentially this is from Reynolds' counsel saying that this
6   was pursuant to the conversation that I had with Mr. Schaefer,
7   and they were presenting the wind-down access agreement for our
8   consideration.
9   Q    And what is the attachment to that email?
10  A    That's the actual agreement.
11  Q    And what did Reynolds propose you do in this agreement?
12  A    Reynolds essentially suggested that we exit the business.
13  They would protect our profiles, not block us for a period of 12
14  months. In exchange we were required to assist them, make best
15  efforts to move everyone -- all of our customers to the Reynolds
16  Certified Interface. At the end of that period of time, we had
17  to exit the business. We couldn't sell our services, our IP.
18  We couldn't consult. Basically we could never touch a Reynolds
19  and Reynolds system in any way, shape, or form.
20  Q    Did you have any conversations with anyone at Reynolds
21  about what was sent here?
22  A    I had conversations with Mr. Schaefer.
23  Q    And did you talk to Mr. Schaefer in person or on the phone?
24  A    I had conversations with Mr. Schaefer on the telephone.
25  Q    And did you talk to Mr. Schaefer after you got this?

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 988-5 Filed: 05/29/20 Page 5 of 10 PageID #:61919
Case: 3:17-cv-00318-jdp Document #: 164 Filed: 07/05/17 Page 139 of 160
1-A-139

1    A    I did.

2    Q    On the telephone?

3    A    I did.

4    Q    In May 2015?

5    A    I did.

6    Q    Tell me as close as you can in his own words, as you can
7    remember, what Mr. Schaefer said on the call?

8    A    He said, "As you know, Mr. Brockman is adamant about
9    removing all third parties from our DMS system.  This is your
10   last chance.  I suggest that you consider this carefully.  We've
11   made agreements with the other major DMS providers to support
12   each other's third-party access agreements and to block
13   independent integrators such as Authenticom."

14   Q    What did you say in response to these comments by
15   Mr. Schaefer?

16   A    I said that that was not in the best interest of
17   Authenticom, wasn't in the best interest of the dealers, wasn't
18   in the best interests of the vendors or the industry as a whole
19   and that we were going to continue to compete.

20   Q    Did anyone at CDK confirm what Mr. Schaefer said about CDK
21   and Reynolds agreeing to block independent integrators like
22   Authenticom?

23   A    They did.

24   Q    Do you recall that conversation?

25   A    Vividly.

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 988-5 Filed: 05/29/20 Page 6 of 10 PageID #:61920
Case: 3:17-cv-00318-jdp Document #: 164 Filed: 07/05/17 Page 140 of 160

1-A-140

1   Q   Who was that conversation with?
2   A   Dan McCray.
3   Q   Who is Dan McCray?
4   A   Dan McCray was essentially Mr. Schaefer's counterpart at
5   CDK at that point in time.  He was the vice president in charge
6   of their 3PA program.
7   Q   Where did this conversation take place?
8   A   In Las Vegas, Nevada, at the National Auto Dealers
9   Association convention.
10  Q   When did it take place?
11  A   April 3rd of 2016.
12  Q   How did the conversation start?
13  A   It's not --
14          THE COURT:  What was the date?
15          THE WITNESS:  April 3rd, 2016.
16  BY MR. NEMELKA:
17  Q   How did the conversation start?
18  A   Mr. McCray approached our booth wanting to have a
19  conversation with me.  I was unavailable.  He left his business
20  card.  I called his cell phone.  He said, "I'll be right over."
21  Unfortunately, a major opportunity stepped into the booth before
22  Mr. McCray got there, so when he got there, I was tied up.  I
23  stepped out for a moment and told him I'd meet him in his booth.
24  Q   Okay.  And then as you approached the booth, what did you
25  see?

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 988-5 Filed: 05/29/20 Page 7 of 10 PageID #:61921
Case: 3:17-cv-00318-jdp Document #: 164 Filed: 07/05/17 Page 141 of 160
1-A-141

```
 1    A    Mr. McCray was standing off to the side of the booth with,
 2    I believe, three other individuals.  Among them was Kevin
 3    Distelhorst.
 4    Q    As you approached the booth, what happened?
 5    A    It was kind of awkward.  You know, I approached them to
 6    greet them, and everybody was cordial, but there was something
 7    in the air.  I didn't know what it was but kind of felt like I
 8    was the -- part of a joke.
 9    Q    Okay.  And what did Mr. McCray say to you when you
10    approached?
11    A    He said, "Let's take a walk."
12    Q    I'm sorry.  Go ahead.
13    A    Basically grabbed me by the arm, not forcibly but directed
14    me down a service ramp off the convention floor through a set of
15    double doors and --
16    Q    As you got to that area, what did Mr. McCray tell you?
17    A    Mr. McCray essentially confirmed the conversation that I
18    had with Mr. Schaefer previously by saying, "You may or may not
19    be aware we've entered into an agreement with Reynolds and
20    Reynolds, okay?  That agreement specifically says that we're
21    going to support each other's third-party interfaces, and we're
22    working collaboratively to remove all hostile integrators from
23    our DMS system."
24    Q    Did he say anything else?
25    A    He said, quote, "I have clocked you on 2,000 of our
```

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 988-5 Filed: 05/29/20 Page 8 of 10 PageID #:61922
Case: 3:17-cv-00318-jdp Document #: 164 Filed: 07/05/17 Page 142 of 160

1-A-142

1     systems, and I can flip the switch at any time."
2     Q    Did he say anything about the blocking of independent
3     integrators?
4     A    Yes.  He said that Reynolds and Reynolds, as I mentioned
5     before -- or excuse me, that CDK was working with the other
6     major DMS providers to specifically block hostile integrators.
7     Q    How many major DMS providers are there?
8     A    Two, CDK and Reynolds and Reynolds.
9     Q    How did -- how did he end the conversation?
10    A    Dan looked me in the eye and he said, "I admire you.  I
11    admire your company."  He said, "I'd really like to see you get
12    something for it before I fucking destroy it."
13    Q    What did you say in response to Mr. McCray?
14    A    Again, I said that I was shocked, okay, that they would
15    collaborate in such a form and it was not in the best interests
16    of the automobile industry, wasn't in the best interests of the
17    dealers and the vendors.  It certainly was not in Authenticom's
18    employees' best interests or my best interests, and I told him
19    to pack a lunch because it was going to be a tough fight.
20    Q    You told him to pack a lunch?
21    A    I did.
22    Q    Okay.  What does that mean?
23    A    Basically means that it wasn't going to be something easy
24    that he was going to be able to handle over morning coffee.
25    That it was going to be a drawn-out process, and he was going to

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 988-5 Filed: 05/29/20 Page 9 of 10 PageID #:61923
Case: 3:17-cv-00318-jdp Document #: 164 Filed: 07/05/17 Page 143 of 160

1-A-143

|     |                                                                      |
| --- | -------------------------------------------------------------------- |
| 1   | need to pack a lunch.                                                |
| 2   | Q   Did you take notes after that conversation happened?             |
| 3   | A   I did.                                                           |
| 4   |         MR. NEMELKA:  We'd like to introduce Plaintiff's             |
| 5   | Exhibit 55A.                                                         |
| 6   |         MR. RYAN:  No objection, Your Honor.                         |
| 7   |         THE COURT:  All right.  Good.  55A is admitted.              |
| 8   | BY MR. NEMELKA:                                                      |
| 9   | Q   Mr. Cottrell, what is Exhibit 55A?                               |
| 10  | A   55A is a copy of the Word document that I wrote the next         |
| 11  | morning.                                                             |
| 12  | Q   Okay.  Why did you take notes the next morning after this        |
| 13  | conversation?                                                        |
| 14  | A   Honestly, I didn't sleep that night.  It kept playing over       |
| 15  | and over in my head.  I had confirmation that two multibillion       |
| 16  | dollar corporations were, you know, conspiring to put me out of      |
| 17  | business.  The words that Mr. McCray used were almost identical      |
| 18  | to the words that Mr. Schaefer had used, and I didn't know what      |
| 19  | to do, so I thought it was important to preserve that                |
| 20  | conversation.                                                        |
| 21  | Q   You can take it down, Steve.                                     |
| 22  |     After your conversation did Mr. McCray, did CDK take any         |
| 23  | action to destroy your business?                                     |
| 24  | A   They did.                                                        |
| 25  | Q   What did they do?                                                |

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 988-5 Filed: 05/29/20 Page 10 of 10 PageID #:61924
Case: 3:17-cv-00518-jdp Document #: 164 Filed: 07/05/17 Page 160 of 160

1-A-160

```
 1    2:00.  All right.  See you then.
 2         (Recess taken at 12:49 p.m.)
 3                        ***
 4      I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit
 5    Reporter in and for the State of Wisconsin, certify that the
 6    foregoing is a true and accurate record of the proceedings held
 7    on the 26th day of June, 2017, before the Honorable James D.
 8    Peterson, Chief U.S. District Judge for the Western District of
 9    Wisconsin, in my presence and reduced to writing in accordance
10    with my stenographic notes made at said time and place.
11         Dated this 5th day of July, 2017.
12
13
14
15
16                                   /s/ Jennifer L. Dobbratz
17                            Jennifer L. Dobbratz, RMR, CRR, CRC
                                     Federal Court Reporter
18
19
20
21
22
23
24    The foregoing certification of this transcript does not apply to
      any reproduction of the same by any means unless under the
25    direct control and/or direction of the certifying reporter.
```