PUBLIC - REDACTED VERSION

# EXHIBIT A

Case: 1:18-cv-00864 Document #: 989-2 Filed: 05/29/20 Page 2 of 7 PageID #:61987
Case: 3:17-cv-00318-jdp Document #: 164 Filed: 07/05/17 Page 1 of 60
PUBLIC - REDACTED VERSION

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

---

AUTHENTICOM, INC.,

       Plaintiff,

-vs-                                       Case No. 17-CV-318-JDP

CDK GLOBAL, LLC and               Madison, Wisconsin
THE REYNOLDS AND REYNOLDS COMPANY,   June 26, 2017
                                                 9:03 a.m.

       Defendants.

---

STENOGRAPHIC TRANSCRIPT OF FIRST DAY OF EVIDENTIARY HEARING
**(MORNING SESSION)**
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

        Godfrey & Kahn S.C.
        BY: JENNIFER L. GREGOR
        One East Main Street, Suite 500
        Madison, Wisconsin 53701

        Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
        BY: MICHAEL N. NEMELKA
            AARON M. PANNER
            DAVID L. SCHWARZ
            DEREK T. HO
            JOANNA T. ZHANG
            JOSHUA HAFENBRACK
            KEVIN J. MILLER
        1615 M Street, N.W.
        Suite 400
        Washington, D.C. 20036

        Jennifer L. Dobbratz, RMR, CRR, CRC
        U.S. District Court Federal Reporter
        United States District Court
        120 North Henry Street, Rm. 410
        Madison, Wisconsin 53703
              (608) 261-5709

Case: 1:18-cv-00864 Document #: 989-2 Filed: 05/29/20 Page 3 of 7 PageID #:61988
Case: 3:17-cv-00318-jdp Document #: 164 Filed: 07/05/17 Page 138 of 160
PUBLIC - REDACTED VERSION
1-A-138

```
 1            THE COURT:  Okay.  Thank you.  It's admitted.
 2    BY MR. NEMELKA:
 3    Q    All right.  Mr. Cottrell, what -- first of all, let's look
 4    at the email.  What is this email?
 5    A    Essentially this is from Reynolds' counsel saying that this
 6    was pursuant to the conversation that I had with Mr. Schaefer,
 7    and they were presenting the wind-down access agreement for our
 8    consideration.
 9    Q    And what is the attachment to that email?
10    A    That's the actual agreement.
11    Q    And what did Reynolds propose you do in this agreement?
12    A    Reynolds essentially suggested that we exit the business.
13    They would protect our profiles, not block us for a period of 12
14    months.  In exchange we were required to assist them, make best
15    efforts to move everyone -- all of our customers to the Reynolds
16    Certified Interface.  At the end of that period of time, we had
17    to exit the business.  We couldn't sell our services, our IP.
18    We couldn't consult.  Basically we could never touch a Reynolds
19    and Reynolds system in any way, shape, or form.
20    Q    Did you have any conversations with anyone at Reynolds
21    about what was sent here?
22    A    I had conversations with Mr. Schaefer.
23    Q    And did you talk to Mr. Schaefer in person or on the phone?
24    A    I had conversations with Mr. Schaefer on the telephone.
25    Q    And did you talk to Mr. Schaefer after you got this?
```

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 989-2 Filed: 05/29/20 Page 4 of 7 PageID #:61989
Case: 3:17-cv-00318-jdp Document #: 104 Filed: 07/05/17 Page 139 of 160
PUBLIC - REDACTED VERSION
1-A-139

```
 1    A    I did.
 2    Q    On the telephone?
 3    A    I did.
 4    Q    In May 2015?
 5    A    I did.
 6    Q    Tell me as close as you can in his own words, as you can
 7    remember, what Mr. Schaefer said on the call?
 8    A    He said, "As you know, Mr. Brockman is adamant about
 9    removing all third parties from our DMS system.  This is your
10    last chance.  I suggest that you consider this carefully.  We've
11    made agreements with the other major DMS providers to support
12    each other's third-party access agreements and to block
13    independent integrators such as Authenticom."
14    Q    What did you say in response to these comments by
15    Mr. Schaefer?
16    A    I said that that was not in the best interest of
17    Authenticom, wasn't in the best interest of the dealers, wasn't
18    in the best interests of the vendors or the industry as a whole
19    and that we were going to continue to compete.
20    Q    Did anyone at CDK confirm what Mr. Schaefer said about CDK
21    and Reynolds agreeing to block independent integrators like
22    Authenticom?
23    A    They did.
24    Q    Do you recall that conversation?
25    A    Vividly.
```

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 989-2 Filed: 05/29/20 Page 5 of 7 PageID #:61990
Case: 3:17-cv-00318-jdp Document #: 104 Filed: 07/05/17 Page 140 of 160
PUBLIC - REDACTED VERSION
1-A-140

```
1    Q    Who was that conversation with?
2    A    Dan McCray.
3    Q    Who is Dan McCray?
4    A    Dan McCray was essentially Mr. Schaefer's counterpart at
5    CDK at that point in time.  He was the vice president in charge
6    of their 3PA program.
7    Q    Where did this conversation take place?
8    A    In Las Vegas, Nevada, at the National Auto Dealers
9    Association convention.
10   Q    When did it take place?
11   A    April 3rd of 2016.
12   Q    How did the conversation start?
13   A    It's not --
14            THE COURT:  What was the date?
15            THE WITNESS:  April 3rd, 2016.
16   BY MR. NEMELKA:
17   Q    How did the conversation start?
18   A    Mr. McCray approached our booth wanting to have a
19   conversation with me.  I was unavailable.  He left his business
20   card.  I called his cell phone.  He said, "I'll be right over."
21   Unfortunately, a major opportunity stepped into the booth before
22   Mr. McCray got there, so when he got there, I was tied up.  I
23   stepped out for a moment and told him I'd meet him in his booth.
24   Q    Okay.  And then as you approached the booth, what did you
25   see?
```

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 989-2 Filed: 05/29/20 Page 6 of 7 PageID #:61991
Case: 3:17-cv-00318-jdp Document #: 164 Filed: 07/09/19 Page 141 of 160
PUBLIC - REDACTED VERSION
1-A-141

```
 1   A   Mr. McCray was standing off to the side of the booth with,
 2   I believe, three other individuals.  Among them was Kevin
 3   Distelhorst.
 4   Q   As you approached the booth, what happened?
 5   A   It was kind of awkward.  You know, I approached them to
 6   greet them, and everybody was cordial, but there was something
 7   in the air.  I didn't know what it was but kind of felt like I
 8   was the -- part of a joke.
 9   Q   Okay.  And what did Mr. McCray say to you when you
10   approached?
11   A   He said, "Let's take a walk."
12   Q   I'm sorry.  Go ahead.
13   A   Basically grabbed me by the arm, not forcibly but directed
14   me down a service ramp off the convention floor through a set of
15   double doors and --
16   Q   As you got to that area, what did Mr. McCray tell you?
17   A   Mr. McCray essentially confirmed the conversation that I
18   had with Mr. Schaefer previously by saying, "You may or may not
19   be aware we've entered into an agreement with Reynolds and
20   Reynolds, okay?  That agreement specifically says that we're
21   going to support each other's third-party interfaces, and we're
22   working collaboratively to remove all hostile integrators from
23   our DMS system."
24   Q   Did he say anything else?
25   A   He said, quote, "I have clocked you on 2,000 of our
```

STEPHEN COTTRELL - DIRECT

Case: 1:18-cv-00864 Document #: 989-2 Filed: 05/29/20 Page 7 of 7 PageID #:61992
Case: 3:17-cv-00318-jdp Document #: 164 Filed: 07/05/17 Page 142 of 160
PUBLIC - REDACTED VERSION
1-A-142

```
 1   systems, and I can flip the switch at any time."
 2   Q    Did he say anything about the blocking of independent
 3   integrators?
 4   A    Yes.  He said that Reynolds and Reynolds, as I mentioned
 5   before -- or excuse me, that CDK was working with the other
 6   major DMS providers to specifically block hostile integrators.
 7   Q    How many major DMS providers are there?
 8   A    Two, CDK and Reynolds and Reynolds.
 9   Q    How did -- how did he end the conversation?
10   A    Dan looked me in the eye and he said, "I admire you.  I
11   admire your company."  He said, "I'd really like to see you get
12   something for it before I fucking destroy it."
13   Q    What did you say in response to Mr. McCray?
14   A    Again, I said that I was shocked, okay, that they would
15   collaborate in such a form and it was not in the best interests
16   of the automobile industry, wasn't in the best interests of the
17   dealers and the vendors.  It certainly was not in Authenticom's
18   employees' best interests or my best interests, and I told him
19   to pack a lunch because it was going to be a tough fight.
20   Q    You told him to pack a lunch?
21   A    I did.
22   Q    Okay.  What does that mean?
23   A    Basically means that it wasn't going to be something easy
24   that he was going to be able to handle over morning coffee.
25   That it was going to be a drawn-out process, and he was going to
```

STEPHEN COTTRELL - DIRECT