**PUBLIC VERSION**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| | Hon. Robert M. Dow, Jr. |
| *This document relates to:* ALL CASES | Magistrate Judge Jeffrey T. Gilbert |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DANIEL L. RUBINFELD**

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................... 1

ARGUMENT ........................................................................................................... 3

I.  PROFESSOR RUBINFELD'S RELIANCE ON STAFF WAS
    APPROPRIATE.................................................................................... 3

    A.  Expert witnesses are permitted to make use of supervised
        assistants. ................................................................................... 3

    B.  Plaintiffs' complaints about Professor Rubinfeld's errata are
        unwarranted and do not go the admissibility of his opinions. ................... 8

II. PROFESSOR RUBINFELD'S RESPONSE TO MS. LAWTON'S
    DAMAGES REPORT IS MOOT, OR ALTERNATIVELY,
    ADMISSIBLE.......................................................................................... 9

    A.  The Court need not address Plaintiffs' challenge to Professor
        Rubinfeld's rebuttal to Authenticom's damages expert........................... 9

    B.  Professor Rubinfeld's analysis of Ms. Lawton's but-for world is
        admissible. ................................................................................. 10

    C.  Professor Rubinfeld's critiques of Ms. Lawton's ▮▮▮▮▮ are
        admissible. ................................................................................. 13

III. PROFESSOR RUBINFELD'S DMCA DAMAGES OPINIONS ARE
     ADMISSIBLE........................................................................................ 15

    A.  Professor Rubinfeld's analysis quantifying Authenticom's acts of
        circumvention to access Reynolds's DMS is reliable and
        conservative. .............................................................................. 15

    B.  Professor Rubinfeld properly relies on Defendants' data security
        expert to determine the number of circumventions as to CDK's
        DMS............................................................................................ 17

    C.  Professor Rubinfeld's DMCA damages opinions are not "simple
        math."......................................................................................... 18

    D.  Professor Rubinfeld Properly Assessed DMCA Damages
        Attributable To The Continental And Warrensburg Dealership
        Groups........................................................................................ 20

IV. PROFESSOR RUBINFELD CALCULATED A REASONABLE
    ROYALTY BASED ON AUTHENTICOM'S UNAUTHORIZED
    ACCESS TO CDK'S DMS. ................................................................. 21

V.   PROFESSOR RUBINFELD'S IMPAIRMENT OPINIONS ARE
     ADMISSIBLE..................................................................................................... 23

VI.  PLAINTIFFS DO NOT CHALLENGE PROFESSOR RUBINFELD'S
     REBUTTAL OPINION REGARDING MVSC'S ALLEGED DAMAGES........ 25

**CONCLUSION** ......................................................................................................... **25**

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Astra Aktiebolag v. Andrx Pharm., Inc.*,
    222 F. Supp. 2d 423 (S.D.N.Y. 2002)......................................................................................5

*ATA Airlines, Inc. v. Fed. Exp. Corp.*,
    665 F.3d 882 (7th Cir. 2011) ................................................................................................6

*Bank of Ill. v. Allied Signal Safety Restraint Sys.*,
    75 F.3d 1162 (7th Cir. 1996) ................................................................................................9

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
    807 F.3d 1283 (Fed. Cir. 2015)...........................................................................................17

*Castro v. DeVry Univ., Inc.*,
    786 F.3d 559 (7th Cir. 2015) ................................................................................................8

*Cook Inc. v. Endologix, Inc.*,
    2012 WL 3948614 (S.D. Ind. Sept. 10, 2012) ...................................................................16

*DataQuill Ltd. v. Handspring, Inc.*,
    2003 WL 737785 (N.D. Ill. Feb. 28, 2003) .........................................................................7

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
    285 F.3d 609 (7th Cir. 2002) ....................................................................................3, 4, 6, 8

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*,
    879 F.3d 1332 (Fed. Cir. 2018)...........................................................................................22

*GC2 Inc. v. Int'l Game Tech., IGT, Doubledown Interactive LLC*,
    391 F. Supp. 3d 828 (N.D. Ill. 2019) ..................................................................................18

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970)..............................................................................21, 22

*Gilbane Bldg. Co. v. Downers Grove Cmty. High Sch. Dist. No. 99*,
    2005 WL 838679 (N.D. Ill. Apr. 5, 2005) ...........................................................................3

*GPNE Corp. v. Apple, Inc.*,
    2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ....................................................................22

*Holder v. Interlake Steamship Co.*,
    2018 WL 1725694 (W.D. Wis. Apr. 10, 2018) ....................................................................9

*Kelly v. Paschall*,
    2005 WL 5988648 (W.D. Tex. Apr. 19, 2005)......................................................................6

*Lee Valley Tools, Ltd. v. Industrial Blade Co.*,
  288 F.R.D. 254 (W.D.N.Y. 2013)..................................................................7, 8

*LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*,
  2010 WL 3397358 (N.D. Ill. Aug. 24, 2010) ...............................................13

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
  372 F. Supp. 2d 1104 (N.D. Ill. 2005) ........................................................15

*Manpower, Inc. v. Ins. Co. of Pa.*,
  732 F.3d 796 (7th Cir. 2013) .........................................................12, 15, 25

*McCann v. Iroquois Mem. Hosp.*,
  622 F.3d 745 (7th Cir. 2010) .....................................................................8, 9

*McReynolds v. Sodexho Marriot Servs., Inc.*,
  349 F. Supp. 2d 30 (D.D.C. 2004) .................................................................6

*In re Mentor Corp. ObTape Transobturator Sling Prod. Liab. Litig.*,
  2010 WL 1782272 (M.D. Ga. Apr. 29, 2010) ...............................................19

*Meyers v. Nat'l R.R. Passenger Corp. (Amtrak)*,
  619 F.3d 729 (7th Cir. 2010) .......................................................................14

*Monsanto Co. v. McFarling*,
  488 F.3d 973 (Fed. Cir. 2007).....................................................................21

*Oto v. Metro. Life Ins. Co.*,
  224 F.3d 601 (7th Cir. 2000) .........................................................................8

*PECO Pallet, Inc. v. Nw. Pallet Supply Co.*,
  2018 WL 10602201 (N.D. Ill. Oct. 25, 2018)................................................10

*People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*,
  111 F.3d 528 (7th Cir. 1997) .........................................................................3

*Quad/Graphics, Inc. v. One2One Commc'ns, LLC*,
  2011 WL 4478440 (E.D. Wis. Sept. 23, 2011)...............................................6

*Saint Lawrence Commc'ns LLC v. ZTE Corp.*,
  2017 WL 679623 (E.D. Tex. Feb. 21, 2017) .................................................22

*Sloan Valve Co. v. Zurn Indus., Inc.*,
  33 F. Supp. 3d 984 (N.D. Ill. 2014) .............................................................22

*Sony Computer Entm't Am., Inc. v. Divineo, Inc.*,
  457 F. Supp. 2d 957 (N.D. Cal. 2006) .........................................................20

*Southwire Co. v. J.P. Morgan Chase & Co.*,
528 F. Supp. 2d 908 (W.D. Wis. 2007) ...................................................................5

*Stachon v. Woodward*,
2015 WL 6449490 (N.D. Ind. Oct. 23, 2015) .......................................................4

*In re Steel Antitrust Litig.*,
2015 WL 5304629 (N.D. Ill. Sept. 9, 2015) .......................................................13

*Stollings v. Ryobi Techs., Inc.*,
725 F.3d 753 (7th Cir. 2013) ...............................................................................17

*In re Sulfuric Acid Antitrust Litig.*,
235 F.R.D. 646 (N.D. Ill. 2006) ..........................................................................11

*Sunbeam Prods., Inc. v. Homedics, Inc.*,
670 F. Supp. 2d 873 (W.D. Wis. 2009) .................................................................6

*Thorn v. Sundstrand Aerospace Corp.*,
207 F.3d 383 (7th Cir. 2000) ............................................................................8, 9

*United States v. SuperValu, Inc.*,
2019 WL 1277031 (C.D. Ill. Mar. 20, 2019) ......................................................15

*Van v. Ford Motor Co.*,
332 F.R.D. 249 (N.D. Ill. 2019) ..........................................................................10

*Walker v. Soo Line R.R. Co.*,
208 F.3d 581 (7th Cir. 2000) ...............................................................................25

*Watts v. Laurent*,
774 F.2d 168 (7th Cir. 1985) ...............................................................................24

*Weitz Co., LLC v. Lloyd's of London*,
2007 WL 7131908 (S.D. Iowa Sept. 28, 2007) ............................................6, 7, 8

*Whitserve, LLC v. Computer Packages, Inc.*,
694 F.3d 10 (Fed. Cir. 2012)................................................................................22

*Wilbern v. Culver Franchising Sys., Inc.*,
2015 WL 5722825 (N.D. Ill. Sept. 29, 2015) ...............................................12, 17

*In re Zimmer Nexgen Knee Implant Prods. Liab. Litig.*,
2015 WL 5050214 (N.D. Ill. Aug. 25, 2015) ........................................................4

**Statutes**

Computer Fraud and Abuse Act, 18 U.S.C. § 1030................................................................20, 23

The Digital Millennium Copyright Act, 17 U.S.C. § 1201.................................................. *passim*

**Other Authorities**

Fed. R. Civ. P. 26............................................................................................................................6

Fed. R. Evid. 703 ............................................................................................................................3

## INTRODUCTION

Plaintiffs' hyperbolic attack on the expert testimony of Professor Daniel Rubinfeld is unwarranted and should be denied in its entirety. Professor Rubinfeld is an undisputedly qualified damages expert, and his supervision and reliance upon highly qualified support staff in this case was appropriate. The motion is full of unfortunate rhetoric—Plaintiffs refer to Professor Rubinfeld's 10-hour deposition, for example, as a "debacle" and attempt to smear him with insults, describing him as "bewildered" or "befuddled." But it ultimately does little more than establish that Plaintiffs' counsel are capable of conducting a deposition like an extended memory test and cherry-picking select instances where the witness's memory failed him.

Plaintiffs are unapologetic about the memory-test strategy, going so far as to boast in their motion about the number of times during the deposition that they refused to furnish Professor Rubinfeld with copies of his own reports. Mot. 12-13 & n.3. Indeed, hours elapsed on the record before Plaintiffs' counsel finally allowed Professor Rubinfeld to consult any of the five reports he issued in this MDL. Mot. Ex. H.1 (Day 1 Tr.) at 142.[1] Plaintiffs also boast about Professor Rubinfeld's remarks that "the last 24 hours were not my most enjoyable hours" and that Plaintiffs' counsel "made it a very exciting day." Mot. 3. This is not a basis for a motion to exclude—it is the kind of polite banter that virtually any witness near the end of a 10-hour memory test might offer.

Professor Rubinfeld is an unsurprising target for Plaintiffs' ire, given that his assignments included (among other things) (i) rebutting Authenticom's damages expert Catherine Lawton,

---

[1] In total, Professor Rubinfeld issued five reports addressing: (i) CDK and (ii) Reynolds counterclaim damages; (iii) the opinions disclosed by Authenticom's and (iv) MVSC's proposed damages experts; and (v) the opinion of another expert disclosed by Authenticom, Dr. Daniel O'Brien, concerning the statistical precision of CDK's DMCA counterclaim damages. *See* Mot. Ex. A, D, E, F, G. Those reports span 201 pages, exclusive of appendices. Most of the supposed memory test failures that Plaintiffs parade in an effort to embarrass and insult Professor Rubinfeld can be explained by the fact that he was juggling several opinions expressed in reports that Plaintiffs refused to show him for the first four hours of his deposition.

whose ███████████ is in shambles; and (ii) calculating damages for Defendants' counterclaims against Authenticom, which based on a conservative application of statutory minimums still exceed ████ million. Authenticom has no choice but to try to exclude these opinions, but in the event the Court grants Defendants' pending motion to exclude Ms. Lawton (Dkt. 879), then Plaintiffs' motion regarding Professor Rubinfeld's rebuttal to Ms. Lawton should be denied as moot. *See* Section II, *infra*. In any event, none of Plaintiffs' arguments support exclusion of Professor Rubinfeld's opinions—much less *all* of his opinions as Plaintiffs suggest.

First, Professor Rubinfeld appropriately supervised and used his staff at FTI, well within the bounds of applicable law, which Plaintiffs largely ignore.

Second, assuming for the sake of argument that Ms. Lawton's testimony is allowed to proceed, Plaintiffs' criticisms of Professor Rubinfeld's rebuttal opinions are meritless and, in any event, far narrower than Plaintiffs' repeated request to exclude "all" of Professor Rubinfeld's testimony would suggest.

Third, Professor Rubinfeld's estimates of damages that Defendants are entitled to recover on their counterclaims are reliable, conservative, and based on the best data available. With respect to the counterclaims against Authenticom, more data may once have existed, but unfortunately Authenticom destroyed it throughout this litigation. Authenticom cannot purge data and then seek to exclude Professor Rubinfeld's opinions for not relying on such data.

Finally, despite Plaintiffs' sweeping request that Professor's Rubinfeld's testimony should be excluded "in its entirety," there is no mention in their motion of any flaw in Professor Rubinfeld's rebuttal opinions to the report of Gordon Klein on behalf of MVSC.

## ARGUMENT

## I. PROFESSOR RUBINFELD'S RELIANCE ON STAFF WAS APPROPRIATE.

### A. Expert witnesses are permitted to make use of supervised assistants.

Plaintiffs' argument that Professor Rubinfeld's opinions should be excluded because he made use of assistants is meritless. This is a complex case involving millions of pages of documents and reams of data, so it is hardly remarkable that Professor Rubinfeld delegated detail work. And the fact that Professor Rubinfeld collaborated with his assistants would reasonably be expected to make Professor Rubinfeld's work *more* reliable, not less.

"An expert witness is permitted to use assistants in formulating his expert opinion." *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002). The reason is simple. An expert must use methods "that his profession would require of his out-of-court research." *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 111 F.3d 528, 537 (7th Cir. 1997); *see also* Fed. R. Evid. 703 (expert may rely on facts or data on which "experts in the particular field would reasonably rely"). As economists and other experts employ assistants in their work outside the context of litigation, it stands to reason that "[n]othing precludes an expert from using assistants to formulate the expert opinion and prepare the report." *Gilbane Bldg. Co. v. Downers Grove Cmty. High Sch. Dist. No. 99*, 2005 WL 838679, at *9 n.12 (N.D. Ill. Apr. 5, 2005).

The Court need look no further than Authenticom's proposed damages expert, Catharine Lawton, to see that Professor Rubinfeld's use of assistants is the ordinary practice in the field. Ms. Lawton's deposition was rife with the very complaints Plaintiffs levy at Professor Rubinfeld. Ms. Lawton testified ███████████████████████████████████████████████████ ██████████████████████████████████. For example:

- Ms. Lawton's ██████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████ █████████████. *See* Dkt. 880 at 15-16. At her

deposition, 

- Plaintiffs point to Professor Rubinfeld's

Dkt. 880 at 13.

This is but a sampling of Ms. Lawton's frequent refrain

.[2] Worse still, at times,

*See*

Ex. 1 at 358:17-364:13. Even so, Defendants moved to exclude Ms. Lawton's opinions due to their

fatal substantive flaws, not her reliance on staff.

To be sure, an expert should exercise adequate supervision over his or her staff. *Dura*, 285

F.3d at 613. Supervision ensures that the opinions ultimately disclosed in an expert report are

indeed the expert's. *See Stachon v. Woodward*, 2015 WL 6449490, at \*6 (N.D. Ind. Oct. 23, 2015)

(rejecting challenge to expert who "testified that [assistant] worked under his supervision"); *In re

Zimmer Nexgen Knee Implant Prods. Liab. Litig.*, 2015 WL 5050214, at \*5 n.3 (N.D. Ill. Aug. 25,

---

[2] *See also* Ex. 1 (Lawton Tr.) at 125:13-126:3 127:6-9, 128:9-11, 135:14-18, 136:2-5, 137:18-22, 141:19-22, 142:1-5, 146:6-10, 146:20-147:2, 148:17-19, 148:20-149:2, 149:10-13, 150:14-18, 169:8-21, 180:19-181:12, 228:5-229:4, 275:4-276:2, 366:9-21.

2015) (rejecting challenge to expert who "closely supervised" his research assistant); *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 934 (W.D. Wis. 2007) (rejecting challenge to two experts who "were positioned to supervise and independently evaluate the data collection being done by others who assisted them").

Professor Rubinfeld made clear that he supervised and reviewed his staff's work. *See* Mot. Ex. H.1 at 23:22-25 ("Q: So all of the data analysis that are contained in your rebuttal report you reviewed carefully; is that fair to say? A. Yes."). For instance, Professor Rubinfeld's "staff did the detail work" of categorizing dealers as franchise or non-franchise DMSs, but it was done "under [his] supervision," and Professor Rubinfeld directed the metrics for inclusion or exclusion. *Id.* at 130:16-131:12, 133:8-13. *See, e.g.*, *Astra Aktiebolag v. Andrx Pharm., Inc.*, 222 F. Supp. 2d 423, 492 (S.D.N.Y. 2002) (expert "is entitled to rely upon the work of his colleagues on experiments that he designed"). Similarly, for the quantification of Authenticom's automated polling (as relevant to Professor Rubinfeld's DMCA damages opinion), his staff again crunched the "actual numerical calculations" but did so based on the multistep methodology they had thoroughly discussed with him beforehand. Mot. Ex. H.1 at 244:11-245:10; *see also id.* at 246:19-248:3 (explaining they "actually went through in some detail kind of this exercise and we talked about each of the steps," including "ways in which we could be conservative and make sure that we didn't overestimate the number of violations, the number of polls that would be unauthorized").

Rather than attempt to point to any particular opinion or method in which Professor Rubinfeld's supervision of his staff was inadequate (because they cannot), Plaintiffs instead argue that Professor Rubinfeld's inability to recall particulars somehow proves overreliance on his staff. This is wrong. An expert deposition is not a memory test—any lapses in memory go to weight, not admissibility. "*Daubert* does not require that an expert have a perfect memory when asked specific

questions about a specific statistical entry, but that the methods used to get to the opinion are reliable." *Kelly v. Paschall*, 2005 WL 5988648, at *4 (W.D. Tex. Apr. 19, 2005); *see also Quad/Graphics, Inc. v. One2One Commc'ns, LLC*, 2011 WL 4478440, at *8 (E.D. Wis. Sept. 23, 2011). Indeed, even "painful[] confusion" in a deposition would not show that an expert's opinions are not his own, so long as the expert is conversant in the facts of the case and "state[s] a cogent opinion" regarding their implications. *Sunbeam Prods., Inc. v. Homedics, Inc.*, 670 F. Supp. 2d 873, 883 (W.D. Wis. 2009) (rejecting Rule 26 challenge).

Nor is there any basis to find that Professor Rubinfeld's assistants "exercise[d] professional judgment that is beyond the expert's ken." *See Dura*, 285 F.3d at 613. Plaintiffs do not challenge Professor Rubinfeld's qualifications to arrive at any one of his opinions—much less all of them. His qualifications to perform economic analysis cannot be disputed. *E.g.*, *ATA Airlines, Inc. v. Fed. Exp. Corp.*, 665 F.3d 882, 889 (7th Cir. 2011) ("Had the district judge read the relevant portions of Rubinfeld's guide, he would have realized that [a] regression analysis was fatally flawed."). And to the extent Professor Rubinfeld delegated technical work to his assistants, that was appropriate regardless of whether he is personally savvy in the programs and methods his assistants employed. *See, e.g.*, *McReynolds v. Sodexho Marriot Servs., Inc.*, 349 F. Supp. 2d 30, 36-37 (D.D.C. 2004) (expert did not have to be "personally an expert in STATA [a statistics program] in order to be a qualified expert under *Daubert*," because an expert may "rely[] on [his] assistants to carry out analyses that the expert designed," then review the output).

The cases on which Plaintiffs rely therefore offer no reason to exclude any portion of Professor Rubinfeld's opinions. They stand for the uncontroversial proposition that it is improper for an expert merely to sign his name on a report wholly written by someone else, without substantive review. *See Weitz Co., LLC v. Lloyd's of London*, 2007 WL 7131908, at *2 (S.D. Iowa

Sept. 28, 2007) (expert's deposition revealed that expert's assistant "was the sole author of the final report," and there was no evidence that expert "performed any underlying research or analysis or was involved in drafting the report"); *DataQuill Ltd. v. Handspring, Inc.*, 2003 WL 737785, at *4 (N.D. Ill. Feb. 28, 2003) (expert's report failed because it "did not follow a proper infringement analysis" in a patent case, and also because his opinion came solely from the litigant, such that "the party hiring him has put words in his mouth—or in this case, in his report"). Plaintiffs do not argue that Professor Rubinfeld did not write his report, or that he merely purports to hold opinions assigned him by counsel or his staff. Nor can they—Professor Rubinfeld was transparent about his process, pursuant to which he wrote much of the first draft of his reports and thoroughly reviewed portions drafted by his assistants:

> There were portions of materials where [my staff] would propose portions of a draft, particularly with respect to the – that tended to be true largely for footnotes and some of the more technical details, and other parts where I did the drafting, as you put it, from scratch, and then they would suggest edits. So we would – we would go back and forth working together as a team. So I did rely substantially on my staff, but I'm – I'm someone who likes to do his own writing. So by the time we were done, all the words were my own, and a lot of them were drafted by me from the beginning.

Mot. Ex. H.1 at 22:15-23:3.[3] Indeed, even if Professor Rubinfeld had not drafted his report, but was merely "involved, even to some limited extent," exclusion would not be warranted. *See Weitz*, 2007 WL 7131908 at *3; *see also Lee Valley Tools, Ltd. v. Industrial Blade Co.*, 288 F.R.D. 254, 266 (W.D.N.Y. 2013) ("Where the expert was directly involved in the research, analysis or drafting

---

[3] This testimony related specifically to Professor Rubinfeld's rebuttal report to Ms. Lawton's report. As to his response to Mr. Klein's damages report: Mot. Ex. H.1 (Day 1 Tr.) 198:25-199:11 (explaining that he drafted "[p]arts of it, and parts of it, like the footnotes, were largely drafted by my staff"; "it was collaboratively done. My staff and I were going back and forth on the draft. So it's very hard to – I mean, I can tell you I have responsibility for every word that's in the draft, but I did have substantial help from my staff in putting it together."); *see also id.* at 192:22-193:9. Plaintiffs' counsel did not inquire generally as to Professor Rubinfeld's process for writing his counterclaim reports, but as to one particular section, Professor Rubinfeld explained that "this was a paragraph that I – that my staff and I wrote, I wrote with the support of my staff." Mot. Ex. H.2 (Day 2 Tr.) at 422:23-423:7.

of the report, even with substantial assistance from a colleague or associate, his involvement in and knowledge of the report are matters of weight, not admissibility.").

Finally, even if Professor Rubinfeld had delegated too much to his staff, the proper remedy would not be to exclude any of Professor Rubinfeld's opinions (much less all of them), but rather to allow Plaintiffs to depose a member of his staff. Plaintiffs "can depose them in order to make sure they performed their tasks competently." *Dura*, 285 F.3d at 613; *see also Weitz*, 2007 WL 7131908, at *4-5 (although "the discovery deadline ha[d] passed," proper remedy was to require that expert's assistant be presented for deposition and supplemental expert discovery); *Lee Valley*, 288 F.R.D. at 266 (permitting opposing party to depose assistant who performed technical work).

### B. Plaintiffs' complaints about Professor Rubinfeld's errata are unwarranted and do not go the admissibility of his opinions.

An expert may "correct[] her testimony on the errata sheet" in order to "put[] her testimony back in line with her previously disclosed opinions." *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 605-06 (7th Cir. 2000). Plaintiffs have not pointed to anything in Professor Rubinfeld's errata that did more than correct momentary "lapses of memory" or offer "clarification," which are appropriate uses of post-deposition corrections. *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571-72 (7th Cir. 2015). If a change is "plausible" and explained by such things as "confusion, mistake, or lapse in memory," the change may bear on credibility, but not admissibility. *McCann v. Iroquois Mem. Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010).

But even if Professor Rubinfeld's errata purported to contradict unambiguous statements of fact, which is difficult to imagine for an expert, that would not warrant striking his errata as Plaintiffs suggest. Mot. 7. Plaintiffs rely on cases in the summary judgment context, in which a fact witness abuses the errata mechanism by walking back damning admissions to survive summary judgment. Such attempts raise the well-known "sham affidavit" problem. *See Thorn v.*

*Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000) (recognizing limitation on errata changes "by analogy to the cases which hold that a subsequent affidavit may not be used to contradict the witness's deposition"). The reason for this doctrine is unique to summary judgment: "If such contradictions were permitted, … the very purpose of the summary judgment motion—to weed out unfounded claims, specious denials, and sham defenses—would be severely undercut." *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-69 (7th Cir. 1996); *McCann*, 622 F.3d at 750-51 (explaining that rule is "designed to avoid sham factual issues").

Thus, *Thorn* and similar cases are applicable only "*at summary judgment* to prevent 'clever counsel' from unfairly manufacturing genuine disputes of material fact." *Holder v. Interlake Steamship Co.*, 2018 WL 1725694, at *4 (W.D. Wis. Apr. 10, 2018) (emphasis in original). They do not apply "[a]t every other stage of proceedings." *Id.*

## II. PROFESSOR RUBINFELD'S RESPONSE TO MS. LAWTON'S DAMAGES REPORT IS MOOT, OR ALTERNATIVELY, ADMISSIBLE.

### A. The Court need not address Plaintiffs' challenge to Professor Rubinfeld's rebuttal to Authenticom's damages expert.

Ms. Lawton's opinions should be excluded. As explained in the memorandum accompanying Defendants' motion (Dkt. 880), the admissibility of Ms. Lawton's damages model

████████████████████████████████████  ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

---

[4] Authenticom ███████████████ measure Authenticom's business by its number of connections. A connection is supposed to represent Authenticom polling one dealership rooftop DMS for one vendor—so if Authenticom polled 15 rooftops for a single vendor, that would be 15 connections, and if they polled those same 15 rooftops for two vendors, that would be 30 connections—but ███████████████ ██████████████████ there are numerous errors in how Authenticom ██████████████ define and count connections. *See generally* Dkt. 880.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████. The Court need not

consider Professor Rubinfeld's opinions in rebuttal to Ms. Lawton if her testimony is excluded.

*See, e.g.*, *Van v. Ford Motor Co.*, 332 F.R.D. 249, 272 (N.D. Ill. 2019) (motion to exclude rebuttal

opinions moot where court granted motion to exclude rebutted opinion); *PECO Pallet, Inc. v. Nw.*

*Pallet Supply Co.*, 2018 WL 10602201, at *4 (N.D. Ill. Oct. 25, 2018) (same).

### B.    Professor Rubinfeld's analysis of Ms. Lawton's but-for world is admissible.

If Ms. Lawton's opinions are not excluded, Professor Rubinfeld's rebuttal opinions are

admissible. His rebuttal opinion regarding Ms. Lawton's but-for world (as distinguished from his

critiques of her ████████) has two parts. First, Ms. Lawton failed to adequately define what would

have happened "but for" the alleged conspiracy. Mot. Ex. A (Authenticom Rebuttal Rpt.) ¶¶ 13,

51; *see also* Mot. Ex. H.1 at 156:25-157:9. ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ —

███████████████████████████████████████████████████████████████████████

████████████████████████. Dkt. 880 at 19-23.

Second, Professor Rubinfeld opines that—in addition to failing to adequately define what would have been different in the but-for world—Ms. Lawton fails to point to any reason to believe *anything* would have been different. Indeed, according to Ms. Lawton, ████████████████████ ██████████████████████████████████████████████████. The but-for world is therefore not meaningfully different from the actual world, and thus no damages are attributable to the conspiracy. It is this second part of Professor Rubinfeld's opinion with which Plaintiffs take issue, but their challenges fall flat.

Professor Rubinfeld relies in part on Defendants' other experts for their economic and cybersecurity opinions regarding Defendants' strong unilateral incentives to prohibit third-party access. Mot. Ex. A ¶¶ 55-59 & nn.25-27. This is unremarkable. As Plaintiffs ultimately acknowledge, applying various assumptions on the topic of liability to the issues of causation and damages is the ordinary and proper role of a damages expert. Mot. 12; *see In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 660 (N.D. Ill. 2006).

More to the point, however, Plaintiffs fail to mention that the core assumptions they claim are unfounded are drawn straight from *Plaintiffs'* experts' opinions. Specifically, ████████████ ██████████████████████████████████████████████████████████████████████ Professor Rubinfeld simply points out that "████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████," and further "████████████████████████ █████████████████████████████████████████████████████████████████████."

Mot. Ex. A ¶ 60. Indeed, Ms. Lawton says that even if CDK and Reynolds did not enter the alleged

conspiracy, ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████. *See* Dkt. 880 at 22-23.[5] Thus, as to Authenticom's conspiracy claims, "the appropriate but-for world is one in which CDK and Reynolds implement the same data security policies as they did in the real world." Mot. Ex. A ¶ 76. In sum, Professor Rubinfeld's rebuttal to Ms. Lawton's proffered but-for world is primarily an analysis of the implications of Ms. Lawton's and Dr. Israel's own opinions.

Similarly, Plaintiffs' argument that Professor Rubinfeld inadequately investigated his opinion is misguided. Mot. 10-12. As just explained, he assumes the existence of these unilateral incentives, based on opinions by Defendants' *and Plaintiffs'* experts. Plaintiffs' attempt to attack the factual assumptions underlying these opinions is misplaced at the *Daubert* stage: "Experts routinely opine based upon factual assumptions given to them," and the "validity of the expert's factual assumptions is not the focus under a pre-trial *Daubert* inquiry." *Wilbern v. Culver Franchising Sys., Inc.*, 2015 WL 5722825, at *11 (N.D. Ill. Sept. 29, 2015); *see also Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013) ("The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury.").

Plaintiffs' suggestion that *Story Parchment* undermines Professor Rubinfeld's opinion does not hold water. Plaintiffs incorporate this argument by reference to their motion to exclude Professor Murphy's testimony. Mot. 9-10. Defendants will do the same with their response to that motion, which explains that Plaintiffs confuse (a) damages causation with damages quantification, and (b) what Defendants "could" have done with what they "would" in fact have done (particularly

---

[5] Similarly, Dr. Israel opines that ████████████████████████████████████

████████████ Professor Rubinfeld found this informative for his rebuttal opinions as well. *See* Mot. Ex. A at 22 n.33.

where Plaintiffs' own experts opine that ████████████████████████████████████

████████. *See In re Steel Antitrust Litig.*, 2015 WL 5304629, at *10 (N.D. Ill. Sept. 9, 2015)

("[A] model that does not even attempt to identify and isolate 'damages' that are not the certain

result of the wrong cannot be used to establish" damages.). As further explained in the Brief in

Opposition to the Motion to Exclude Professor Murphy, it is not a legal error for a defense expert

to explain the consequences that follow from Plaintiffs' experts' opinions—in Professor

Rubinfeld's case, ██████████████████████████████████████████████████████████

████████████████████████, and from

████████████████████████████████████████████████████████████

████████████████████████████████████." Dkt. 880 at 20-23; Dkt. 878 at 15, 21. ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████.

### C. Professor Rubinfeld's critiques of Ms. Lawton's ████████ are admissible.

Plaintiffs take no serious issue with the merit of Professor Rubinfeld's critiques of Ms.

Lawton's ████████ Instead, they point to a single valid rebuttal by Ms. Lawton ████████

████████████████████ in response to which Professor Rubinfeld withdrew the relevant portion

of his initial report. Mot. 13. That was proper. Professor Rubinfeld acknowledged ████████

████████ error and withdrew the relevant opinion, which rendered that narrow issue moot. *See*

*LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 2010 WL 3397358, at *12 (N.D. Ill. Aug. 24, 2010).

Plaintiffs' conclusory challenge to the remainder of Professor Rubinfeld's critiques of Ms.

Lawton's ███████ again revert to Plaintiffs' failed arguments about Professor Rubinfeld's memory and use of assistants. *See* Section I, *supra*.[6]

Also, contrary to Plaintiffs' suggestion that Professor Rubinfeld did not timely disclose his opinions about ████████████████████████████████████████, *see* Mot. 14-15, this criticism is plainly disclosed in Professor Rubinfeld's report. Professor Rubinfeld spent multiple pages of his report discussing his critiques that ███████████████████████ ████████████████████████████████████████████████ ██████ *See* Mot. Ex. A pp. at 30-32. █████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████. Mot. Ex. A at A-35- 36. Professor Rubinfeld further put Authenticom on notice that Table 6 included corrections for mischaracterizing Reynolds or CDK ███████████████████████████████████████ ████████ ████████████████████████████████████" with Reynolds, and adding that "Table 6 in Attachment 4 has a complete listing of a ████████ categorization of 'DMSs.'" *Id.* at 31 n.54. This gave Plaintiffs more than "adequate notice of the substance of [Professor Rubinfeld's] forthcoming testimony," sufficient for them to "prepare for a response." *Meyers v. Nat'l R.R. Passenger Corp. (Amtrak)*, 619 F.3d 729, 734 (7th Cir. 2010).

---

[6] Plaintiffs suggest in a footnote that Professor Rubinfeld somehow contradicted himself by offering both the opinion that Ms. Lawton's failure to define the but-for world results in zero damages, as well as the opinion that Ms. Lawton's ████████ suffers from flaws that reduce her quantified damages to a non-zero amount. Mot. 14 n.4. That is incorrect. As Professor Rubinfeld explained, the latter opinion was "condition[ed]" on the "assumptions which underlie Ms. Lawton's analysis," which Professor Rubinfeld rejects in the first instance, regarding the proper but-for world. Mot. Ex. H.1 at 155:11-21; *id.* Ex. A ¶ 20.

## III. PROFESSOR RUBINFELD'S DMCA DAMAGES OPINIONS ARE ADMISSIBLE.

### A. Professor Rubinfeld's analysis quantifying Authenticom's acts of circumvention to access Reynolds's DMS is reliable and conservative.

Plaintiffs claim that Professor Rubinfeld's DMCA damages opinion on behalf of Reynolds uses an imperfect data set (Authenticom's Salesforce database) to quantify Authenticom's polls on the Reynolds DMS. Mot. 16-17. But Seventh Circuit law is clear: "Whether [an expert] selected the best data set to use . . . is a question for the jury, not the judge," provided there is a "rational connection between the data and the opinion." *Manpower*, 732 F.3d at 809; *see also United States v. SuperValu, Inc.*, 2019 WL 1277031, at *5 (C.D. Ill. Mar. 20, 2019). Plaintiffs cannot seriously contend that Authenticom's Salesforce data—the only relevant data Authenticom produced and which it represented was the "data that it maintains in the ordinary course regarding its DMS connections"—bears no rational connection to quantifying Authenticom's DMS polling. Ex. 2. To the extent Authenticom maintains that the Salesforce data is a poor proxy, Authenticom's remedy is cross-examination, not exclusion. *See Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 372 F. Supp. 2d 1104, 1119-20 (N.D. Ill. 2005) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect only the weight to be assigned that opinion rather than its admissibility.").

Moreover, any such cross-examination will be weak. 

.[7] Furthermore, Professor Rubinfeld used the Salesforce data because he had no

---

[7] If anything, the use of the Salesforce data *under*counted the frequency of Authenticom connections to Reynolds's DMS. For example, the Saleforce data ████████████████████████████ (*See, e.g.,* Ex. 3; *see also* Dkt. 889 at Exs. 79, 80, 81, 87), ████████████████████████████ ████████████████████████████ ). *See, e.g.,* Ex. 4 (Munns Tr.) at 81:19-82:13. Professor

choice. The actual polling records that Authenticom suggests would have been more reliable, *see* Mot. 16, were systematically destroyed by Authenticom throughout this litigation. *See* Dkt. 711 at 1-4; Ex. 5 at 6 (explaining ███████████████████████████████████████████ ████████████████████); Ex. 6 (Clements Tr.) at 306:7-23 (████████████████████████████ ████████████).[8] Authenticom's failure to "provide any alternative data that would have been more reliable," or to "suggest how the data . . . could otherwise have been calculated," is fatal to its *Daubert* challenge. *See Cook Inc. v. Endologix, Inc.*, 2012 WL 3948614, at *5 (S.D. Ind. Sept. 10, 2012). While Authenticom at one time agreed to produce a separate log showing "Instances of DMS Access" (Ex. 2), ██████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████

Plaintiffs also incorrectly assert that Professor Rubinfeld did not account for the fact that CAPTCHA prompts did not appear on some DMSs. Mot. 17-18. To the contrary, █████████████

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████ ██████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████

---

Rubinfeld thus gave Authenticom the benefit of any doubt by relying on Salesforce data to calculate Authenticom's circumventions.

[8] Defendants previously raised Authenticom's destruction of its polling client manager data to the Court in a dispute over Authenticom's refusal to produce even the seven-day rolling sample of the data that it claimed it retained. Dkt. 711. Judge Gilbert denied the motion to compel on the basis that the seven-day sample would not be "materially helpful or statistically significant," Dkt. 719 at 2, but expressed no view as to whether it was proper for Authenticom to destroy the data in the first place, *id.* at 1 n.1.

██████████████████████████████████████████████. Dkt. 889, Ex. 10 (Miracle Rpt.) ¶ 81 & n.72; Dkt. 886 at 16-17.

To the extent Authenticom suggests that some material number of Reynolds DMSs did not have CAPTCHA prompts during the relevant period, or had CAPTCHA prompts that went uncircumvented,[9] and that Professor Rubinfeld erroneously assumed otherwise, Reynolds can refute that contention at trial. At this stage, this factual dispute would not raise *Daubert* concerns even if Professor Rubinfeld's assumptions were "vulnerable," which they are not. *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 768 (7th Cir. 2013); *see also Wilbern*, 2015 WL 5722825, at *11.

### B. Professor Rubinfeld properly relies on Defendants' data security expert to determine the number of circumventions as to CDK's DMS.

For his opinions about CDK's DMCA damages, Professor Rubinfeld relies primarily on the analyses performed by Defendants' data security expert, Edward Stroz. *See* Mot. Ex. E (CDK Damages Rpt.), ¶ 78. There is nothing objectionable about Professor Rubinfeld's reliance on Mr. Stroz to determine the number of times that Authenticom and the Dealership Counter-Defendants circumvented CDK's security measures. *See, e.g.*, *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1303 (Fed. Cir. 2015) ("Experts routinely rely upon other experts hired by the party they represent for expertise outside their field.") (quotations and citation omitted). Moreover, Plaintiffs' challenges to the admissibility of Mr. Stroz's opinions are without merit for the reasons set forth in Defendants' response brief.

Plaintiffs' suggestion that Professor Rubinfeld blindly adopted Mr. Stroz's analyses without "checking his numbers" (Mot. 18) is characteristic of the unfortunate rhetoric that

---

[9] Any such suggestion would be unpersuasive. Professor Rubinfeld performed an alternative calculation ██
████████████████████ *See* Mot. Ex. F at ¶ 77.  Plaintiffs do not challenge this calculation, which demonstrated that Professor Rubinfeld did not overcount Authenticom's circumventions.

overwhelms their brief. Professor Rubinfeld submitted an entire report addressing the statistical precision of Mr. Stroz's results that includes a thorough discussion of his opinions and underlying methodology. *See* Mot. Ex. G (CDK Damages Reply), *e.g.*, ¶¶ 8-9, 19-21.[10]

And Plaintiffs' request to strike the chart in Professor Rubinfeld's report that calculates CDK's DMCA damages per "# of Violations" is frivolous. The chart accurately reflects that statutory damages under the DMCA are assessed per "violation." *See, e.g.*, *GC2 Inc. v. Int'l Game Tech., IGT, Doubledown Interactive LLC*, 391 F. Supp. 3d 828, 849 (N.D. Ill. 2019). This does not amount to "an improper legal opinion" that Authenticom or the Dealership Counter-Defendants violated the DMCA, Mot. 18, which Professor Rubinfeld's report and testimony make clear he is not offering in this case. *See* Mot. Ex. E ¶ 11; Mot. Ex. H.1 at 269:23-271:3.

### C. Professor Rubinfeld's DMCA damages opinions are not "simple math."

Plaintiffs assert that Professor Rubinfeld "reaches his DMCA damages figures through nothing other than multiplying the number of supposed DMCA violations by the statutory damages amount." Mot. 19. That is incorrect and ignores what Professor Rubinfeld actually did.

With respect to Reynolds, Professor Rubinfeld calculates a minimum number of circumventions by Authenticom to establish automated polling connections to Reynolds DMSs. To do so, he calculated total connections using Authenticom's data; backed out connections the data indicated were non-automated or temporarily exempted; and then performed statistical analysis to scale down the number by a "Reynolds specific, monthly factor" derived from an analysis of separate data on Authenticom's connection methods (a fraction of which were non-

---

[10] Professor Rubinfeld's testimony that, to his knowledge, his staff had not seen any "draft estimates" of Mr. Stroz's results before Professor Rubinfeld submitted his opening report is hardly the "gotcha" moment that Plaintiffs claim it was. *See* Mot. 18. Professor Rubinfeld has since appropriately clarified that his staff reviewed drafts of Appendix C to Mr. Stroz's report, which describes his methodology and analysis in detail. *See* Mot. Ex. I (changes to page 370, line 23).

automated). *See* Mot. Ex. F., pp. 22-24, 29-30. While his last step was to multiply the number of circumventions by the DMCA statutory minimum ($200) and maximum ($2,500), that does not reduce his analysis to "simple math."

Nor is Professor Rubinfeld's calculation of CDK's DMCA damages "simple math." While Professor Rubinfeld relied on Mr. Stroz for the number of circumventions by Authenticom and the Dealership Counter-Defendants, Professor Rubinfeld also submitted a reply report addressing the statistical precision of Mr. Stroz's results, which addresses, among other things, sampling error and forecast and specification uncertainty—hardly "simple math." Mot. Ex. G, ¶¶ 14-18, 24-28; *see In re Mentor Corp. ObTape Transobturator Sling Prod. Liab. Litig.*, 2010 WL 1782272, at *3 (M.D. Ga. Apr. 29, 2010) (expert's proposed testimony "regarding statistical principles is not within the understanding and experience of the average juror"). Plaintiffs cannot seriously dispute that this is proper testimony for an expert, as Authenticom has retained its own statistics expert to address the same issue. *See* Mot. Ex. G, ¶ 4.

Plaintiffs incorrectly accuse Professor Rubinfeld of calculation errors. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓." Mot. 19 (emphasis in original). But Mr. Stroz's report plainly says: "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *See* Dkt. 889, Ex. 10 (Miracle Rpt.) ¶¶ 117-19. Second, Professor Rubinfeld is not "double counting"

damages in his Table 5 as Plaintiffs suggest. Mot. 19-20. ███████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

█████████████████████████.

### D. Professor Rubinfeld Properly Assessed DMCA Damages Attributable To The Continental And Warrensburg Dealership Groups.

The Continental and Warrensburg Dealership Counter-Defendants complain that Professor Rubinfeld calculated statutory damages under the DMCA for each dealership group rather than at the individual rooftop level. Mot. 20. Assigning damages to Warrensburg and Continental at the dealership group level was appropriate, however, consistent with the evidence and allegations that each shares "common ownership, managers, and employees and therefore operate as a single business unit." Dkt. 522 (CDK Dealership Counterclaims) ¶¶ 15, 20.[11] As such, each dealership group may be held jointly and severally liable under the DMCA. *See, e.g.*, *Sony Computer Entm't Am., Inc. v. Divineo, Inc.*, 457 F. Supp. 2d 957, 959-60, 967-68 (N.D. Cal. 2006) (imposing joint and several liability under DMCA for entities operating under common ownership and direction).[12]

---

[11] The Continental dealership group produced a single corporate representative, Mark Johnson, to testify on behalf of all dealerships within the group. Ex. 7 (Johnson 30(b)(6) (Continental) Tr.) at 15:6-15. ██████. *Id.* at 86:9-87:24, 89:3-91:9. ███████████████████████████████████████████████████████████████ " *Id.* 88:1-15. ██████████████████████████████████████████████s. *Id.* 92:3-24. ████████████████████████████ . *See* Mot. Ex. O, Appx. C, n.1. ████████████████████████████████████████████████████████████████████████████ . *See* Ex. 8 (Dlr. Pls. Amd. Resp. & Obj. to First Rogs) at Exs. D, Q, and Y. █████████████████████████████████████████████ . *See* Mot. Ex. O, Appx. C, n.1. ██████████████████████████████████████████████████████████████████████████████ ███. *See* Ex. 9.

[12] The Court's dismissal of CDK's counterclaims against the Dealership Counter-Defendants for violations of the Computer Fraud and Abuse Act ("CFAA") does not suggest a different result. The Court held that CDK's allegations of $5,000 in losses necessary to pursue a claim under the CFAA could not be aggregated across *all* Dealership Counter-Defendants in the absence of allegations "indicating that Counter-Defendants were acting together." Dkt. 749 at 22; *see also id.* at 24. Here, Professor Rubinfeld did not aggregate DMCA

## IV.     PROFESSOR RUBINFELD CALCULATED A REASONABLE ROYALTY BASED ON AUTHENTICOM'S UNAUTHORIZED ACCESS TO CDK'S DMS.

As an alternative calculation of damages for CDK's trade secrets counterclaims (Counts III and V), ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████. Mot. Ex. E. ¶ 83. He found that "█████████████████████████████████

████████████████████████████████████████████████████████████

██████." *Id.* ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████. *Id.* ¶ 84.

Plaintiffs first argue that Professor Rubinfeld "adopted" the 15-factor test for pricing a hypothetical royalty negotiation set out in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), in his report, but failed to apply the factors. Mot. 21. This is another strawman that Plaintiffs created.

While Professor Rubinfeld cited the *Georgia-Pacific* case in a footnote in his report, it was not "necessary" to apply the *Georgia-Pacific* factors in *this* case "to come up with a reasonable hypothetical negotiation." Mot. Ex. H.1 at 272:24-275:5. Here, Professor Rubinfeld was able to use the actual, established prices that CDK has charged other third parties to access and extract data from its DMS through the 3PA program. *See* Mot. Ex. E, ¶¶ 83-85. When actual pricing data is available, it is "usually the best measure of a 'reasonable' royalty . . . because it removes the need to guess at the terms to which parties would hypothetically agree." *Monsanto Co. v.*

damages across *all* Dealership Counter-Defendants—he calculated damages separately for the Continental and Warrensburg dealership groups—and CDK has specifically alleged, with supporting evidence, that the entities comprising each dealership group acted in concert with each other.

*McFarling*, 488 F.3d 973, 978-79 (Fed. Cir. 2007). Indeed, there has never been a requirement

"that witnesses use any or all of the *Georgia–Pacific* factors when testifying about damages[.]"

*Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012); *accord Exmark*

*Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1352 (Fed. Cir. 2018);

*Saint Lawrence Commc'ns LLC v. ZTE Corp.*, 2017 WL 679623, at *3 (E.D. Tex. Feb. 21, 2017)

(denying *Daubert* motion based "'on an incorrect premise,' *i.e.*, that an expert cannot consider

evidence that does not explicitly fall within the *Georgia-Pacific* framework").

Plaintiffs' contentions that Professor Rubinfeld's royalty opinions otherwise "lack rigorous

analysis" are without merit. Mot. 22. ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████. Mot. Ex. E, ¶ 84. ███████████████████████████████

███████████████████████████████████████████████████.

*See id.* (discussing Ex. 10). Professor Rubinfeld's methodology is both reasonable and

conservative given that ███████████████████████████████████████

███████████████████████████████████████ Dkt. 889, Ex. 4 (Lawton Rpt.) at ¶¶

259, 275; Dkt. 889, Ex. 1 (Israel Rpt.) at Fig. 7, p. 105.[13]

---

[13] Therefore, cases like *Sloan Valve Co. v. Zurn Indus., Inc.*, 33 F. Supp. 3d 984 (N.D. Ill. 2014), are neither comparable nor instructive. In *Sloan*, the court found direct conflicts between binding appellate guidance and the expert's methodology, which bore "no resemblance to a reasonable royalty analysis." *Id.* at 1002. Nor is the basis for Professor Rubinfeld's royalty calculation derived from "an impermissible black box" devoid of any economic reasoning or supporting "math." *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *4-5 (N.D. Cal. Apr. 16, 2014). The methodology that Professor Rubinfeld used in this case is clearly disclosed and fully capable of testing through cross-examination.

Plaintiffs finally suggest that Professor Rubinfeld should have done more to account for

███████████████████████████████████████████████████████████████████████

████.” Mot. 23. This is at most a matter for cross-examination, and one that will be easily

addressed. ██████████████████████████████████████████████████

████████████████████████████████████████████. ███████████████████████

██████████████████████████████████████████████████████████████

██████████████████. *See* Dkt. 889, Ex. 1 at Fig. 7, p. 105.

## V.     PROFESSOR RUBINFELD'S IMPAIRMENT OPINIONS ARE ADMISSIBLE.

As one alternative form of damages for CDK's CFAA claim, Professor Rubinfeld assessed

the impairment to CDK's systems caused by Authenticom's constant unauthorized access and

querying. Mot. Ex. E, ¶ 12, Table 1 & ¶¶ 102-05.[14] █████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████. *Id.* ¶ 103, Table 7. █████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████. Mot. Ex. E, ¶ 103, Table 7. ████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████. *Id.* ¶ 104 & Table 8.

Professor Rubinfeld also calculated system impairment costs incurred by Reynolds, but he

used a different methodology based on available information. █████████████████████

███████████████████████████████████████████████████████████████████████

---

[14] Professor Rubinfeld also calculated ██████████████████████████████████████████████
███████████████████████████████████████████████████████████████████. *See* Mot.
Ex. E, ¶ 12, Table 1 & ¶¶ 88-101. Plaintiffs do not challenge these calculations.

██████████████████████████████████████████████. Mot. Ex. F., ¶¶ 94-100 &

Table 6.████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████. *Id*. ¶¶ 104-06.

Plaintiffs point to language in Professor Rubinfeld's reports that certain costs incurred by

Reynolds to detect and remediate unauthorized access by Authenticom likely would have been

incurred "whether there was one or many unauthorized users." Mot. 24 (quoting Mot. Ex. F, ¶

101). This is yet another reason why Professor Rubinfeld's damages opinions are conservative,

however. The impairments to Reynolds's system caused by Authenticom and other hostile

integration vendors could well be characterized as "a single, indivisible injury" for which

Authenticom could be held jointly and severally liable in its entirety. *See Watts v. Laurent*, 774

F.2d 168, 179 (7th Cir. 1985). But that is not the approach that Professor Rubinfeld took.████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████

    ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████. *See* Dkt. 779 ¶¶38-48;

Mot. Ex. F at ¶ 103 & n.113 & n.11. ██████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████



. *See* Dkt. 966 at 6-7; Dkt. 974 ¶¶ 94-96, 133; Mot. Ex. F at ¶ 105.

*See Stollings*, 725 F.3d at 766-67 (where expert employed a "rough estimate" as an input, trial court "should have let the jury determine how the uncertainty" of that estimate affected the weight of the expert's testimony). Issues of this nature do not warrant exclusion of an expert's opinions.

Lastly, Plaintiffs assert that Professor Rubinfeld's calculation of CDK's avoidance damages is "facially arbitrary." Mot. 25. Plaintiffs provide no support for this statement.

If there is any evidence that Professor Rubinfeld's results are anything but conservative, it "is a matter to be explored on cross-examination; it does not go to admissibility." *Manpower*, 732 F.3d at 809 (citing *Walker v. Soo Line R.R. Co.,* 208 F.3d 581, 589 (7th Cir. 2000)).

## VI. PLAINTIFFS DO NOT CHALLENGE PROFESSOR RUBINFELD'S REBUTTAL OPINION REGARDING MVSC'S ALLEGED DAMAGES.

Plaintiffs move to exclude Professor Rubinfeld's "testimony in its entirety." Mot. 1. But they make no substantive mention of his rebuttal of Professor Gordon Klein, regarding MVSC's damages. Mot. Ex. D. While Plaintiffs generally attack Professor Rubinfeld's memory and use of assistants, they make no effort to tie those attacks to Professor Rubinfeld's MVSC opinions.

## CONCLUSION

For the reasons set forth above, Plaintiffs' motion should be denied.

Dated: May 29, 2020

Respectfully submitted,

/s/ *Aundrea K. Gulley*
Aundrea K. Gulley
Brian T. Ross
Brice A. Wilkinson
Ross M. MacDonald
GIBBS & BRUNS LLP
1100 Louisiana Street
Suite 5300
Houston, TX 77002
(713) 650-8805
agulley@gibbsbruns.com
bross@gibbsbruns.com
bwilkinson@gibbsbruns.com
rmacdonald@gibbsbruns.com

Michael P.A. Cohen
Leo D. Caseria
SHEPPARD MULLIN RICHTER & HAMPTON, LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, DC 20006
(202) 747-1900
mcohen@sheppardmullin.com
lcaseria@sheppardmullin.com

*Counsel for Defendant*
*The Reynolds and Reynolds Company*

/s/ *Britt M. Miller*
Britt M. Miller
Michael A. Scodro
Daniel T. Fenske
Matthew D. Provance
Jed Glickstein
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mscodro@mayerbrown.com
dfenske@mayerbrown.com
mprovance@mayerbrown.com
jglickstein@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant*
*CDK Global, LLC*

## CERTIFICATE OF SERVICE

I, Ross MacDonald, an attorney, hereby certify that on May 29, 2020, I caused a true and correct copy of the foregoing **DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DANIEL L. RUBINFELD** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties at the following email address: SERVICE-EXTERNAL-DMS-MDL@lists.kellogghansen.com.

*/s/ Ross M. MacDonald*
Ross M. MacDonald
GIBBS & BRUNS LLP
1100 Louisiana Street
Suite 5300
Houston, TX 77002
(713) 751-5231
rmacdonald@gibbsbruns.com