**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>ALL CASES | MDL No. 2817<br>Case No. 18-cv-00864<br><br>Hon. Robert M. Dow, Jr.<br>Magistrate Judge Jeffrey T. Gilbert<br><br>**PUBLIC-REDACTED** |

**MDL PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE
<u>EXPERT TESTIMONY OF ALLAN STEJSKAL</u>**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

    I.    BACKGROUND ................................................................................................. 2

    II.    LEGAL STANDARD .......................................................................................... 4

    III.    ARGUMENT ....................................................................................................... 5

        A.    Mr. Stejskal's Opinions Regarding DMS Switching Are Admissible and Reliable ....... 5

        B.    Mr. Stejskal's Opinions on Dealer Data Security are Reliable and Helpful to the Jury . 9

            1.    Mr. Stejskal's Opinion Regarding Dealers' Commitment to Data Security is Reliably Based on Over Two Decades of Industry Experience ........................................ 10

            2.    Mr. Stejskal's Extensive Experience Qualifies Him to Opine about the Security of Working with Third-Party Integrators ............................................................. 13

CONCLUSION ................................................................................................................. 15

i

**INTRODUCTION**

MDL Plaintiffs offer the testimony of industry expert, Allan Stejskal, to address several relevant facets of the automotive retail industry. Having worked in the industry for over two decades, Mr. Stejskal's experience is extensive. He has spent more than a decade working at leading Dealer Management System ("DMS") providers, including as General Manager of the nation's third largest DMS company, Dealertrack. Mr. Stejskal has also served two separate stints as a top executive at AutoNation – the largest automotive retail dealership in the United States – and occupied numerous other high-level roles across the industry. Mr. Stejskal is more than qualified to opine on customs and practices in the automotive retail industry.

Defendants CDK Global, LLC ("CDK") and The Reynolds & Reynolds Company ("Reynolds") turn a blind eye to Mr. Stejskal's vast experience and ignore the wealth of authority admitting similar industry expert testimony. Ignoring that Federal Rule of Evidence 702 contemplates "different kinds of experts, and many different kinds of expertise," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999), Defendants mischaracterize (at 4) Mr. Stejskal's experience as mere "personal observations" and wrongly contend that two sections of his opinion should be excluded because they are not based on empirical analysis. However, Defendants are misstating the *Daubert* standard. Mr. Stejskal reliably based his opinions on relevant industry expertise, which is both permissible and common under Rule 702.

Defendants challenge Mr. Stejskal's opinions only on two topics: *first*, his analysis of the difficulties dealers face when attempting to switch DMS providers; and *second*, his observations about dealerships' security practices. Neither challenge has merit. In both cases, Mr. Stejskal's opinion is relevant, based on his industry experience, and will assist the finder-of-fact. At most, Defendants' issues with Mr. Stejskal's analysis go to the weight of his testimony rather than its admissibility. The Court should deny Defendants' motion in its entirety.

I.      BACKGROUND

Mr. Stejskal has over 25 years of experience in the automotive retail industry and his experience covers all facets of the business: he has served in key executive roles on the DMS, dealer, and vendor sides of the automotive industry. Mr. Stejskal's report contains a detailed discussion of his experience and ongoing relationships with Defendants, as well as dealers, vendors, and other "stakeholders" in the industry. *See* Dkt. 889-12 (Stejskal Rep.) ¶¶ 1-10.

In particular, from 2007 to 2014, Mr. Stejskal was an executive at Dealertrack, the nation's third largest DMS provider (behind CDK and Reynolds). Among other roles, Mr. Stejskal was the General Manager running Dealertrack's DMS business from 2010 to 2012. *Id.* ¶ 5. In that role, Mr. Stejskal created Dealertrack's OpenTrack certified data integration program, which allows third parties to access dealer data stored on the Dealertrack DMS. *Id.* Mr. Stejskal also had responsibility for Dealertrack's Finance & Insurance vendor application, a role in which he oversaw Dealertrack's use of data integration services. *Id.* From 2017 to 2018, Mr. Stejskal served as CEO for the international DMS company, incadea, which is in over 100 counties abroad and is CDK's primary competitor in Europe and South America. *Id.* ¶ 7. Mr. Stejskal was also an executive for CDK (then ADP Dealer Services), where he was a Vice President from 1995 to 2000 and (as part of his responsibilities) ran CDK's nascent e-commerce division. *Id.* ¶ 2.

On the dealer side, Mr. Stejskal served two separate stints as a senior executive at AutoNation, the largest auto dealership in the United States, most recently from 2014 to 2016. *Id.* ¶¶ 3, 6. As a senior executive, Mr. Stejskal had responsibility for AutoNation's relationship with DMS companies, oversaw the DMS conversion process when AutoNation acquired new stores, and helped AutoNation digitize its operations. *Id.* In addition, from 2006 to 2007, Mr. Stejskal founded and was President of Open Secure Access ("OSA"), an industry coalition that advocated for dealer control over dealer data. *Id.* ¶¶ 4, 73-77. CDK was a key member of the OSA coalition.

*Id.* ¶ 77. During Mr. Stejskal's tenure as President, OSA garnered significant media attention and developed "Data Security Guidelines" to help dealers safeguard their data. *Id.* ¶¶ 73-77, 81.

Defendants do not dispute Mr. Stejskal's qualifications or experience as an industry expert. Nor do they challenge the bulk of Mr. Stejskal's expert report, including his analysis of the DMS market, Dkt. 889-12 (Stejskal Rep.) ¶¶ 24-33; competition in the DMS market, *id.* ¶¶ 34-39; third-party software applications, *id.* ¶¶ 49-58; and data integration services, *id.* ¶¶ 59-72, among other topics. Rather, Defendants' *Daubert* motion is limited to two discrete aspects of Mr. Stejskal's report: his analysis of DMS switching, *id.* ¶¶ 40-48; and dealer security practices, *id.* ¶¶ 78-81.

In reference to DMS switching, Mr. Stejskal's report details the obstacles facing dealers who attempt to switch DMS providers. The Defendants lock dealers into long-term contracts – usually five years in length – with onerous early termination penalties. *Id.* ¶ 40. The dealers whose contracts are up for renewal face "big hurdles" in switching DMS providers. *Id.* ¶ 41. Mr. Stejskal details the significant "hard costs" associated with switching, including up-front expenses for setup, training, and data conversion, which can equal "roughly six to twelve months of recurring DMS license fees." *Id.* ¶ 42. And most significantly, Mr. Stejskal describes the "soft costs" dealers face when they try to switch DMS providers, which result in lost productivity, lost sales, and employee turnover. *Id.* ¶¶ 43-47. As Mr. Stejskal explains, dealership employees often use the same system for years or even decades, *id.* ¶ 45, and "[b]ecause the DMS is so integrally tied to virtually every process within the dealership, switching DMSs is hugely disruptive to a dealership's operations," *id.* ¶ 44; *see also id.* ¶¶ 45-46.

On the topic of dealer security practices, Mr. Stejskal's report discusses "the general increasing level of awareness of computer security" in the dealer community and efforts dealer groups have taken in response. *Id.* ¶ 78. Based on his experience, Mr. Stejskal opines that "[m]any

3

of the systems that dealers use contain data that needs to be appropriately secured, and dealers are very cognizant of these requirements," and dealers "take the protection of this information in written and electronic form seriously and make it a point to train their staffs accordingly." *Id.* ¶ 80. Regarding dealers' use of third-party data integration services, Mr. Stejskal opines that "[t]here is nothing inherently insecure about dealers choosing to work with third-party data integrators," noting that in his "20-plus years in the automotive retail market, [he is] not aware of any data breaches caused by companies like Authenticom and DMI providing data integration services using this method." *Id.* ¶ 81.

## II. LEGAL STANDARD

Courts routinely allow "expert testimony regarding the customs, standards, and practices in a given industry." *Kucharski v. Orbis Corp.*, 2017 WL 1806581, at *4 (N.D. Ill. May 5, 2017); *see also Cage v. City of Chicago*, 979 F. Supp. 2d 787, 803-04 (N.D. Ill. 2013) ("[E]xperts may rely on their professional experience to offer opinion testimony."); *Baldonado v. Wyeth*, 2012 WL 3234240, at *3-6 (N.D. Ill. Aug. 6, 2012) (denying *Daubert* challenge to expert who "[brought] to bear her experience and training on the issue").

As the Supreme Court has recognized, "there are many different kinds of experts, and many different kinds of expertise." *Kumho Tire Co*, 526 U.S. at 150. The threshold requirements for admissibility established by Federal Rule of Evidence 702 are therefore "flexible," and similarly, "*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.* at 141-42. "[T]estimony derived from experience or training although different from testimony derived from controlled experimentation, is nonetheless admissible under Rule 702 as specialized or technical knowledge." *Hanks by Old Nat'l Tr. Co. v. Korea Iron & Steel Co.*, 993 F. Supp. 1204, 1208 (S.D. Ill. 1998); *United States v. Conn*, 297 F.3d 548, 556 (7th Cir. 2002) (quoting Advisory Committee notes to Rule 702: "[i]n certain fields, experience is the

4

predominant, if not the sole, basis for a great deal of reliable expert testimony"); *Ashley v. Schneider Nat'l Carriers, Inc.*, 2016 WL 3125056, at *8 (N.D. Ill. June 3, 2016) (expert's "40 years of experience in the trucking industry allows him to offer generalized facts based on his personal knowledge about [the] industry").

**III. ARGUMENT**

    **A.    MR. STEJSKAL'S OPINIONS REGARDING DMS SWITCHING ARE ADMISSIBLE AND RELIABLE**

Drawing from over two decades of experience, Mr. Stejskal opines on the difficulties dealers face when switching DMS providers. Dkt. 889-12 (Stejskal Rep.) ¶¶ 40-48. Under the well-established legal principles set forth above, that testimony is admissible.

As an initial matter, Defendants do not dispute that DMS switching costs are an important issue in this MDL. Dealer "lock in" limits dealers' ability to switch DMS providers in response to anti-competitive conduct by CDK and Reynolds, thus enhancing Defendants' considerable market power. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp.3d 931, 939, 963-64 (N.D. Ill. 2018) (describing high switching costs as a relevant factor in analyzing the applicable markets at issue in antitrust cases). Mr. Stejskal's opinion provides a detailed explanation to show the specific ways that DMS switching is difficult and disruptive for dealers. Dkt. 889-12 (Stejskal Rep.) ¶¶ 40-48; *see supra* at 3. That testimony will be helpful to lay jurors, who lack familiarity with the inner workings of automotive dealerships and the lost productivity and disruptions that come with switching DMS providers. *See*, *e.g.*, *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996) (expert testimony concerning how the relevant industry "actually operates" would provide "the jury a view of the evidence well beyond their everyday experience").

Defendants argue that Mr. Stejskal's testimony is inadmissible because it is based on "personal observation" and is "subjective" or "anecdotal." That is not a fair characterization of his

5

testimony: Mr. Stejskal's opinion is based on over two decades of experience as a high-level executive in the automotive industry. Courts routinely admit industry expert testimony based on such expertise and experience. *See*, *e.g.*, *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience."); *Kucharski*, 2017 WL 1806581, at *4-5 (admitting industry expert based on "substantial experience and expertise in the trucking industry").

In particular, Mr. Stejskal has extensive experience with the difficulties associated with DMS switching. As explained above, Mr. Stejskal has spent over a decade working for DMS providers, including CDK (then ADP Dealer Services) and Dealertrack, where he was responsible for running the nation's third largest DMS business. Dkt. 889-12 (Stejskal Rep.) ¶¶ 2, 5. He also served two stints as a senior executive at AutoNation, where he oversaw AutoNation's relationships with its DMS providers and the conversion of new dealerships that AutoNation acquired to the CDK DMS. *Id.* ¶ 3; Dkt. 889-14 (Stejskal Expert Dep.) at 62:15-62:17 ("[J]ust based on my experience, I know that it's difficult to go through the process of conversion."); *id.* 63:11-64:15 (describing DMS conversion process that Mr. Stejskal oversaw at AutoNation). Mr. Stejskal's extensive, firsthand experience with DMS switching proves a reliable basis for his opinion. *See*, *e.g.*, *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (admitting industry expert whose "explanations were based on [his] experience in the industry"). Defendants' cases are not to the contrary: they involve situations where the expert lacked industry experience, and was thus testifying as a lay witness.[1]

---

[1] *See In re Trasylol Prod. Liab. Litig.*, 2010 WL 1489793, at *9 (S.D. Fla. Feb. 24, 2010) (excluding expert opinion on corporate ethics where proffered expert lacked background in the subject); *Driver v. AppleIllinois, LLC*, 2011 WL 4007337, at *6 (N.D. Ill. Sept. 9, 2011) (excluding opinions that were "significantly broader than [the expert's] experience support[ed]").

6

Defendants (at 1, 5-6) spill much ink discussing Mr. Stejskal's comparison of DMS switching to a "trough of despair." Dkt. 889-12 (Stejskal Rep.) ¶ 44. But Rule 702 does not police turns of phrase. Mr. Stejskal's description is derived from his experience in the industry and consistent with the voluminous record evidence – including statements from Defendants' top executives. *Id.* ¶ 46 & n.62. And Mr. Stejskal's terminology is hardly an outlier. The record is rife with similarly colorful phrases describing the ordeal of DMS switching, which dealers and industry participants have compared to a heart transplant, knee replacement, lobotomy, and more.[2]

Defendants next argue (at 5–6) that Mr. Stejskal's opinion is inadmissible because he did not perform "quantitative analysis" regarding DMS switching frequency. That argument is a non-starter: "[a]n expert's testimony is not unreliable simply because it is founded on his experience rather than data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience*, training, or education.'" *Metavante Corp.*, 619 F.3d at 761; *see also Jesa Enters. Ltd. v. Thermoflex Corp.*, 268 F. Supp. 3d 968, 974 (E.D. Mich. 2017) (admitting automotive industry expert's testimony because it was "based on [the expert's] years of experience and [did] not lend itself to scientific evaluation").[3]

Defendants' remaining criticisms of Mr. Stejskal's DMS switching opinions fare no better. Focusing narrowly on Mr. Stejskal's employment at Dealertrack from 2007 to 2014, Defendants

---

[2] 

[3] *See also Chill v. Calamos Advisors LLC*, 417 F. Supp. 3d 208, 242 (S.D.N.Y. 2019) ("The fact that [an expert's] opinions are not rooted in quantifiable, scientific analysis is no bar to their admissibility."); *First Tennessee Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (admitting expert testimony based on the expert's "own practical experiences throughout forty years in the banking industry").

argue (at 8) that Mr. Stejskal's experience is "too stale" to provide "helpful insights to the jury." That would not be a ground for exclusion, even if true. *See Estate of Robinson ex rel. Irwin v. City of Madison, Wisconsin*, 2017 WL 564682, at *9 (W.D. Wis. Feb. 13, 2017) (whether qualifications are "stale" is "a matter that goes to the weight of Waller's opinions, not their admissibility"). But it is not true. For one, Defendants' market power in 2013 – the start date of Defendants' conspiracy – is directly relevant. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Moreover, Mr. Stejskal's experience does not end in 2014: Defendants ignore that after Mr. Stejskal left Dealertrack in 2014, he became CIO at AutoNation until 2016 (where he oversaw AutoNation's relationship with its DMS provider and DMS conversions). Dkt. 889-12 (Stejskal Rep.) ¶ 6. And after that, Mr. Stejskal was CEO of a leading international DMS provider and has remained closely involved in the automotive industry since then through his consulting company. *Id.* ¶¶ 7-8; *see Spearman Indus., Inc. v. St. Paul Fire and Marine Ins. Co.*, 138 F. Supp. 2d 1088, 1096 (N.D. Ill. 2001) ("[A] court should consider a proposed expert's full range of practical experience when determining whether that expert is qualified to render an opinion in a given area."); *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, 2017 WL 1196990, at *5-6 (N.D. Ill. Mar. 31, 2017) (rejecting attempt to "focus narrowly on one alleged gap in [the expert's] resume and ignore the rest of his experience"). Mr. Stejskal's knowledge of DMS switching is thus current and relevant.[4]

Finally, Defendants (at 7) fault Mr. Stejskal for not discussing a third-party marketing presentation about DMS switching, which was provided to Dealertrack after Mr. Stejskal left the

---

[4] It is also notable that the difficulties facing dealers who want to switch DMSs – such as having to re-train employees on an entirely new system – have not lessened since 2014, as Defendants' own witnesses and documents attest. *See, e.g.*, Dkt. 889-12 (Stejskal Rep.) ¶¶ 43 & n.56, 44 & n.58.

8

company. *See* Dkt. 889-51.[5] The fact that Mr. Stejskal did not discuss one document cherry-picked by Defendants, out of the million-plus documents produced in this MDL, is not a proper basis for exclusion under *Daubert*. *See*, *e.g., Burbach Aquatics, Inc. v. City of Elgin, Ill.*, 2011 WL 204800, at *5 (N.D. Ill. Jan. 18, 2011) ("To the extent that [a party] believes that there are documents in the case to which [the proposed expert] may have given short shrift, [the party] is free to explore those documents in cross-examination.").[6] In addition, contrary to Defendants' assertion (at 8), Mr. Stejskal did not "walk[] back" his opinion on DMS switching at the deposition. Mr. Stejskal never said switching DMS providers is impossible or "not a viable option." Dkt. 889-14 (Stejskal Expert Dep.) at 171:23-172:6. Rather, he said that DMS switching entails substantial costs and difficulties. Dkt. 889-12 (Stejskal Rep.) ¶¶ 40-48; *see Collins Inkjet Corp. v. Eastman Kodak Co.*, 2014 WL 11516553, at *10 (S.D. Ohio Mar. 21, 2014), *aff'd*, 781 F.3d 264 (6th Cir. 2015) ("The fact that a select few customers have or are able to switch does not necessarily demonstrate that switching costs are not significant for the majority of the customers.").

### B. MR. STEJSKAL'S OPINIONS ON DEALER DATA SECURITY ARE RELIABLE AND HELPFUL TO THE JURY

Defendants' attempt (at 9-14) to exclude Mr. Stejskal's opinions on dealer data security is also misplaced. Defendants focus solely on two allegedly "highly disputed" opinions in Mr. Stejskal's report, which they erroneously contend (at 9) are not based on specialized knowledge

---

[5] 

[6]

9

or reliable supporting data. Defendants' arguments are incorrect, take Mr. Stejskal's opinions out of context, and mischaracterize and minimize his decades of experience in the automotive industry. *See supra* at 2-3. At most, Defendants' arguments go to the weight of Mr. Stejskal's testimony, not its admissibility. *See Spearman Indus.*, 138 F. Supp. 2d at 1096 (expert's level of specialized knowledge within his general area of expertise "goes to the weight of his testimony"); *Burbach*, 2011 WL 204800 at *4 (similar).

### 1. Mr. Stejskal's Opinion Regarding Dealers' Commitment to Data Security is Reliably Based on Over Two Decades of Industry Experience

Defendants (at 9 citing Stejskal Rep. ¶ 80) challenge Mr. Stejskal's opinion that "dealerships take the protection of [personally identifiable information] in written and electronic form seriously and make it a point to train their staffs accordingly." Tellingly, Defendants omit the first part of this paragraph, which provides the context for Mr. Stejskal's opinion and discusses dealers' specific concerns with data security.[7] Defendants' contention (at 10) that Mr. Stejskal has "no reliable basis" for this snippet of his report is inaccurate.

*First*, Mr. Stejskal has ample experience to opine on dealership security practices. Defendants belittle that experience, saying he worked at only "one dealer group," but that dealer group was AutoNation – the largest in the country with more than 300 rooftop locations, $21 billion in revenue, and 25,000 employees. *See* Dkt. 889-12 (Stejskal Rep.) at App'x. A. While at AutoNation, Mr. Stejskal built a security team of 15 professionals focusing on improved information security and data governance. *Id*. Further, over the course of his 25 years in the industry, Mr. Stejskal has constantly interacted and worked with dealerships large and small,

---

[7] Defendants do not challenge Mr. Stejskal's similar opinion in paragraph 78 on dealer security practices. Thus, Defendants undermine their own argument by designating Mr. Stejskal's opinion in paragraph 80 "highly disputed" and not doing the same for the virtually identical opinion in paragraph 78.

10

including during his time working for Defendant CDK, Dealertrack, and OSA, among others. *See supra* at 2-3 (discussing Mr. Stejskal's other relevant experience). Indeed, at Mr. Stejskal's deposition, defense counsel acknowledged that Mr. Stejskal has been "a vocal participant in discussions about data security in the automotive space for quite some time" and that his "views on these issues are well-documented."[8] Mr. Stejskal's experience provides a more than sufficient basis for him to opine on dealers' security practices. *See*, *e.g., Kucharski*, 2017 WL 1806581, at *4-5; *Spearman Indus., Inc.*, 138 F. Supp. 2d at 1096.

*Second*, Mr. Stejskal's opinions regarding dealers' approach to data security are further supported by record evidence in this case that he reviewed and contextualized. Mr. Stejskal cited (by way of example only) supporting testimony by several dealerships, the California New Car Dealers Association, and two companies that offer software and DMS services to dealers – all of whom attested to dealers' focus on security issues. Dkt. 889-12 (Stejskal Rep.) ¶¶ 80 n.105, 106.[9] Defendants argue (at 10-11) that Mr. Stejskal's testimony on dealer security practices is "so vague as to be unhelpful to a fact-finder." But Defendants cannot have it both ways: Mr. Stejskal's opinion cannot be "highly disputed" while also being too obvious. *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004) – which Defendants cite – is inapposite; the experts in that case "admitted" their opinions were "based on their personal, subjective views" and

---

[8] Dkt. 889-13 (Stejskal Fact Dep.) at 156:22-157:5. Mr. Stejskal has written and been quoted extensively about these issues. *See* Ex. 7, PX 1034 (*Digital Motorworks Supports Automotive E-Commerce Initiatives*, PR Newswire, Jun. 5, 2001); Ex. 8, PX 1035 (OSA Press Release, May 17, 2006); Ex. 9, PX 1036 (OSA Open Letter to the Industry); Ex. 10, PX 1037 (CDK-0012547) (Ralph Kisiel, *Dealer Security Stirs Insecurity*, Automotive News, Dec. 4, 2006); Ex. 11, PX 1038 (CDK-0012649) (Ralph Kisiel, *Computer Security Snags Honda*, Automotive News, Jan. 22, 2007); Ex. 12, PX 1040 (*Dealers Should Be In Control*, Automotive News, Feb. 12, 2007).

[9] Even CDK's own economic expert, Michael Whinston, testified that ███████████████████████████████████████████████████████████████████████████. That conclusion is hardly surprising, because dealers are obligated under law (including the Gramm-Leach-Bliley Act) to take reasonable steps to safeguard the consumer data entrusted to their care.

11

thus amounted to "unsupported speculation." *Id.* at 542-43. Here, Mr. Stejskal's opinions are grounded in 25 years of industry experience.

*Third*, Defendants' attempts (at 10) to manufacture alleged inconsistencies in Mr. Stejskal's opinions in this area are baseless. At the outset, any inconsistencies in an expert's opinion are not a basis for exclusion; rather, they are topics for "'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Daubert*, 509 U.S. at 596). In any event, Defendants have distorted Mr. Stejskal's purported "concessions."

Defendants argue (at 10) that Mr. Stejskal "conceded" that "[d]ealers do not always train their staffs appropriately on data security" and that "not all dealers have dedicated IT personnel." But Mr. Stejskal never said that every one of the more than 16,000 dealership locations in the United States *always* conducts extensive security training or that *every* dealer has dedicated IT personnel. No expert could make such an absolute statement; nor does that undermine Mr. Stejskal's opinion about the common practices among the dealerships he has observed across 25 years in the industry. Similarly, agreement that "[s]ome dealers do a better job than others in terms of data security" is utterly unremarkable and contradicts no opinion Mr. Stejskal offered. In particular, Mr. Stejskal never asserted that every dealer addresses data security equally – just as CDK and Reynolds could never say they engage in identical security practices. Rather, Mr. Stejskal testified that dealers are "very cognizant of their responsibilities from a data security perspective," and "clearly recognize that the vendors that they use . . . have a substantial responsibility . . . to secure that data." *See* Dkt. 889-14 (Stejskal Expert Dep.) at 112:7-113:5.

Finally, Defendants argue (at 10) Mr. Stejskal "conceded" that "[p]lenty of dealers do not monitor third parties effectively." But Mr. Stejskal made no such concession. Rather, the question

posed to him was whether "every dealer is going to be able to monitor third-party vendors in . . . *real time*." *See* Dkt. 889-13 (Stejskal Fact Dep.) at 173:10-12 (emphasis added). In answering *that* question, Mr. Stejskal responded that, "while AutoNation had more people, AutoNation also had more scale, so from a[n] ability to actually watch over the number of users that a single dealership has, it's, again, probably not . . . outside the realm of possibility that they can manage that effectively." *Id.* at 173:14-20.

### 2. Mr. Stejskal's Extensive Experience Qualifies Him to Opine about the Security of Working with Third-Party Integrators

Defendants' argument (at 11) that Mr. Stejskal's experience-based opinion that "there is nothing inherently insecure about dealers choosing to work with third-party data integrators" should be excluded is similarly unavailing. Dkt. 889-12 (Stejskal Rep.) ¶ 81.[10]

Despite Defendants' contentions (at 11) to the contrary, Mr. Stejskal need not be a "cybersecurity expert" to offer opinions that are grounded in his experience. Mr. Stejskal has many years of firsthand experience with the provision and use of data integration services, including working with third-party data integrators while at AutoNation (dealer side) and Dealertrack and CDK (vendor side) and creating and developing Dealertrack's OpenTrack data integration program. Dkt. 889-12 (Stejskal Rep.) ¶¶ 2, 3, 5-6, 73 & n.93. And the OSA group that Mr. Stejskal founded was focused on advocating and developing best practices for dealers to use the data integration providers of their choosing. *Id.* ¶¶ 4, 75-77.[11] Mr. Stejskal's experience provides a

---

[10] Mr. Stejskal explained that the OSA security guidelines "explicitly included the ability of dealers to provide third parties of their choosing with User IDs and passwords" and that in his "20-plus years in the automotive retail market, I am not aware of any data breaches caused by companies like Authenticom and DMI providing data integration services using this method." *Id*

[11] The cases cited by Defendants (at 14 n.8) are inapplicable because they involve experts excluded on the basis that they lacked relevant experience or based their opinion solely on materials produced in discovery without the application of any expert analysis. *See, e.g.*, *Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1340 (7th Cir. 1989) (excluding economist because he submitted a *six-sentence* affidavit that he reviewed discovery materials); *Jamsports Entm't. LLC v. Paradama Prods., Inc.*, 2005 WL

13

reliable basis for him to opine that the use of third-party data integrators – a fixture in the automotive industry for decades – has been a common practice that is not inherently insecure. *See Spearman Indus., Inc*, 138 F. Supp. 2d at 1096 (expert's "expertise in the broad subject of roofing" qualified him to opine on whether a storm was the cause of roof damage notwithstanding defendants' argument that engineering and aerodynamic principles were outside his expertise).

Defendants similarly miss the mark in their insistence (at 12-13) that, to provide admissible expert testimony, Mr. Stejskal must "analyze the technical manner in which . . . third-party 'integrator[s]' access[] dealer data."[12] Plaintiffs are entitled to offer experts on this topic from a *commercial* perspective, not just from a *technical* perspective. Mr. Stejskal need not explain the technical workings of data integration services to assist the jury; his experience with respect to the use of independent data integrators will help the jury evaluate Defendants' claims that they were justified in blocking those services because of purported security concerns. *Jesa Enter.*, 268 F. Supp. 3d at 974 ("[O]pinions about industry practices and customs are not unreliable simply because they have not been . . . confirmed through empirical analysis.").

At any rate, while Defendants characterize (at 9) Mr. Stejskal's opinion as "highly disputed," the evidence shows that his opinion is commonly held in the automotive industry, including among Defendants' own executives.[13] Indeed, Defendants' own witnesses have

---

14917, at *10 (N.D. Ill. Jan. 3, 2005) (excluding expert economist in similar circumstances); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 957 (N.D. Ill. 2009) (excluding opinion on the "lay definition of steam" because that was a consumer issue outside the scientific expert's expertise).

[12] Defendants (at 12-13) cite *United States v. Vitek Supply Corp.*, 144 F.3d 476, 486 (7th Cir. 1998) for the general proposition that "expert testimony must 'draw[] on some special skill, knowledge, or experience to formulate that opinion . . . rather than simply [be] an opinion broached by a purported expert.'" However, *Vitek* involved an expert witness opining that *scientific testing* revealed that the defendant manufacturer's pre-mixes contained illegal substances. 144 F.3d at 486. That case has no relevance to Mr. Stejskal's status an experience-based expert.

[13] [redacted]

14

repeatedly testified that independent integrators never caused a data breach.[14] CDK owns and operates two of the largest third-party data integrators in the market (DMI and IntegraLink), *see* Dkt. 889-12 (Stejskal Rep.) ¶ 66, and Defendants themselves purchased data integration services from independent data integrators, including Authenticom. As Reynolds's Vice President, Bob Schaefer, testified at his deposition:

Finally, Defendants attempt to minimize (at 13-14) the significance of the OSA Data Security Guidelines ("Guidelines"), by noting the Guidelines did not discuss the technical aspects of data integration and were "never ratified by any formal body." But that misses the point: the Guidelines provide an appropriate basis of support for Mr. Stejskal's expert opinion because they reflect that a prominent coalition of over 50 industry stakeholders, including CDK (ADP at the time), studied this issue and concluded that dealers should be entitled to use independent data integrators.[15] In any case, Mr. Stejskal's citation to the Guidelines is at most a subject for cross-examination, not a basis to exclude his opinions in a *Daubert* motion.

## CONCLUSION

For the aforementioned reasons, the Court should deny Defendants' motion in its entirety.

---



[14]

[15] *See* Dkt. 889-13 (Stejskal Fact Dep.) at 92:1-9 ("We wanted this to be a very cooperative . . . effort, and so we put together these draft security guidelines so that dealers, STAR, NADA, and even the independent automobile dealer association, DMS providers, everyone, the third-party companies, could all look at it, give their input so that we could come up with a standard that everyone could be comfortable with.").

15

Dated: May 29, 2020                              Respectfully submitted,

*/s/ Peggy J. Wedgworth*                         */s/ Derek T. Ho*
Peggy J. Wedgworth                               Derek T. Ho
**MILBERG PHILLIPS GROSSMAN LLP**     **KELLOGG, HANSEN, TODD,**
One Pennsylvania Plaza, 19th Floor       **FIGEL & FREDERICK, P.L.L.C.**
New York, NY 10119                               1615 M Street, NW, Suite 400
(212) 594-5300                                   Washington, D.C. 20036
pwedgworth@milberg.com                           (202) 326-7900
                                                 dho@kellogghansen.com

*MDL Co-Lead Counsel*

16

**CERTIFICATE OF SERVICE**

        I, Derek T. Ho, an attorney, hereby certify that on May 29, 2020 I caused a true and correct copy of the foregoing **MDL PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF ALLAN STEJSKAL** to be filed and served electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system. Copies of the Under Seal filing were served on counsel of record via email.

    */s/ Derek T. Ho*
Derek T. Ho
**KELLOGG, HANSEN, TODD,**
 **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900