```
 1                  IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   IN RE:                           )  No. 18 C 864
                                      )
 4   DEALER MANAGEMENT SYSTEMS        )  Chicago, Illinois
     ANTITRUST LITIGATION,            )  June 10, 2019
 5                                    )  9:35 A.M.

 6          TRANSCRIPT OF PROCEEDINGS - Status and Motions
       BEFORE THE HONORABLE JEFFREY T. GILBERT, Magistrate Judge
 7
     APPEARANCES:
 8
     For the Plaintiffs:        MILBERG TADLER PHILLIPS GROSSMAN, LLP
 9                              One Pennsylvania Plaza
                                19th Floor
10                              New York, New York 10119
                                BY:  MS. PEGGY J. WEDGWORTH
11
                                KELLOGG, HANSEN, TODD, FIGEL
12                                & FREDERICK, PLLC
                                1615 M Street, N.W.
13                              Suite 400
                                Washington, D.C.   20036
14                              BY:  MR. DEREK TAM HO
                                     MR. MICHAEL N. NEMELKA
15
                                ROBBINS GELLER RUDMAN & DOWD
16                              200 South Wacker Drive
                                31st Floor
17                              Chicago, Illinois  60606
                                BY:  MR. FRANK ANTHONY RICHTER
18
19   For Defendant CDK:         MAYER BROWN LLP
                                71 South Wacker Drive
20                              Chicago, Illinois   60606
                                BY:  MS. BRITT MARIE MILLER
21                                   MR. MATTHEW DAVID PROVANCE

22
                           PAMELA S. WARREN, CSR, RPR
23                           Official Court Reporter
                            219 South Dearborn Street
24                                  Room 2342
                             Chicago, Illinois   60604
25                               (312) 408-5100
```

```
1   APPEARANCES:   Continued

2   For Defendant Reynolds      GIBBS & BRUNS, L.L.P.
    and Reynolds Company:       1100 Louisiana Street
3                               Suite 5300
                                Houston, Texas  77002
4                               BY:  MR. ROSS M. MacDONALD
                                     MR. BRIAN T. ROSS
5
                                     MS. AUNDREA KRISTINE GULLEY
6                                    (Appearing telephonically)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        (Proceedings had in open court.)

 2             THE COURT:  Sorry, everybody.

 3        I know Ms. Gulley is on the phone too, so we will get

 4   everybody's appearances.  Just give me one second.

 5        Okay.  We'll call the case and get the appearances and

 6   started rolling here.

 7             THE CLERK:  18 C 864, In Re Dealer Management Systems

 8   Antitrust Litigation, for status and motion hearing.

 9             THE COURT:  Okay.  Good morning.  Plaintiffs first and

10   then defendants.

11             MS. WEDGWORTH:  Good morning, your Honor.  On behalf

12   of dealership class plaintiffs, Peggy Wedgworth for Miller

13   Tadler Phillips Grossman.

14             MR. HO:  Good morning, your Honor.  Derek Ho from

15   Kellogg Hansen on behalf of the individual and vendor class

16   plaintiffs.

17             MR. NEMELKA:  Good morning, your Honor.  Mike Nemelka

18   from Kellogg, Hansen on behalf of the individual and vendor

19   class.

20             MR. RICHTER:  Good morning, your Honor.  Frank

21   Richter, from Robbins Geller, dealership class plaintiffs

22   steering committee.

23             THE COURT:  Dealership class plaintiffs steering

24   committee.

25             And how is that different than Ms. Wedgworth?
```

1          MS. RICHTER:  Ms. Wedgworth is lead counsel for the

2    dealership class.

3          THE COURT:  Okay.  Back row.

4          MR. MacDONALD:  Good morning, your Honor.  Ross

5    MacDonald of Gibbs & Bruns for defendants Reynolds and Reynolds

6    Company.

7          MR. ROSS:  Good morning, your Honor.  Brian Ross also

8    from Gibbs & Bruns on behalf of the Reynolds and Reynolds

9    Company.

10          MS. MILLER:  Good morning, your Honor.  Britt Miller,

11    Mayer Brown LLP, on behalf of CDK Global, LLC, and Computerized

12    Vehicle Registration.

13          MR. PROVANCE:  Good morning, your Honor.  Matt

14    Provance also with Mayer Brown for CDK Global and Computerized

15    Vehicle Registration.

16          THE COURT:  And on the phone we have?

17          MS. GULLEY:  Good morning, your Honor.  This will be

18    Andi Gulley for the Reynolds and Reynolds Company.

19          THE COURT:  Thank you.

20          I'm sorry, Ms. Gulley, that we couldn't rearrange

21    this.  When you guys asked to rearrange it, I actually had a

22    trial scheduled for the 17th, 18th, and 19th, which precluded

23    me from moving this there, and so I just didn't want to -- I

24    didn't want to have to push it farther into June.

25          And then last week that case settled.  So I'm sorry.

1   But we since we already had this, and since you had

2   said you were okay to appear by phone -- I don't know what

3   you're doing, I hope I'm not interfering with your vacation,

4   but whatever, I thought for a variety of reasons we ought to go

5   forward with this as planned.  So thanks for appearing by

6   phone.

7   It sounds like you're on a landline also.  Are you?

8   MS. GULLEY:  Yes, I found some temporary office.  No

9   problem.  Thanks for letting me attend this way.

10  THE COURT:  Okay.  Great.

11  Okay.  I know we have a lot of things pending.  My

12  intention today, frankly, is to go through and rule on as much

13  as I can.

14  At the end of doing that, it is possible that all we

15  will have under advisement is motions that require some in

16  camera review, which we'll have to talk about.

17  So I don't have a particular order here, but I think

18  I'm happy to deal first with this joint motion, ECF 699.  It is

19  a joint motion by the -- CDK and the dealership class

20  plaintiffs to allow some late-served discovery subpoenas to go

21  forward, because both sides agree that they should be able to

22  do that.

23  Authenticom, the vendor class, and Cox, as well as

24  some other folks who were included with that group, who I don't

25  need to always name, indicated some opposition to this.  So I

1    issued -- I did issue an order that said, I think, you know, I

2    didn't see how this would delay the progress of the case.

3            But as I thought about it more, either Mr. Nemelka or

4    Mr. Ho, whoever is going to address this -- oh, I did start to

5    think, you know, when is enough enough?  And I -- I thought I

6    could see some principal distinctions here.

7            But, anyway, don't you -- somebody tell me what your

8    opposition is here.

9            MR. NEMELKA:  Thank you, your Honor.  Mike Nemelka.

10   I'll be speaking on behalf of our clients.

11           It is pretty simple.  It is actually that principle

12   that at some point discovery has to end.  And these are late-

13   served subpoenas.  And Infutor, in particular, has lodged what

14   we feel are meritorious objections on timeliness.  And so we

15   don't take a position on the subpoenas that the dealers want to

16   serve to the telecom companies, which is why we, you know, can

17   join the motion.  But our basis is pretty simple, that, you

18   know, at some point this needs to come to an end.

19           THE COURT:  Why don't you oppose the AT&T -- the

20   telephone carrier subpoenas?  Because nobody objects to them,

21   and it is just a -- it is just pushing paper back and forth.

22           MR. NEMELKA:  Right.  The telecom companies haven't

23   objected on timeliness yet, unlike Infutor.  And also they just

24   -- these are routine subpoenas that the telecom companies

25   respond to in the thousands every year that it is -- they have

1    offices set up to do this.  It is basic simple records that

2    they have available, much different from a -- the type of

3    subpoena that was issued to Infutor.

4            THE COURT:  Okay.  Who is going to speak to this from

5    the prospective of the defendants?

6            And before you speak, I have to say that I have

7    changed my mind a little bit on this.  I mean, I -- you know, I

8    know that Impact Group has produced.  Infutor Data Solutions

9    has objected.  I know that the subpoenas to the phone carriers

10   are more administrative, ministerial than the other ones.  But

11   I have to tell you what my leaning is after thinking about this

12   so that you know what you are dealing with.  I'm thinking about

13   denying the joint motion entirely, without the agreement of all

14   parties.  I'm -- you know, if -- including the telephone

15   carrier subpoenas.  Those haven't been served yet.  There is a

16   motion late to file them.  You guys served your subpoenas on

17   the last day of discovery.  That's usually not the way it is

18   done.

19           And given what I see in this case and the continuing

20   attempts to expand scope in some ways, a large part of me

21   feels, you know what, you're -- you got to wind this up.  I

22   keep hearing from Authenticom that, you know, there are -- it

23   is being delayed, we're pushing things out too long.  And while

24   I don't know how this particularly will push things out too

25   long, no doubt based on what I see in front of me, at least

1    Infutor, I'm going to have to deal with objections from a third

2    party, so that will delay what you are doing.  Potentially

3    somebody gets the document and says, ah-ha, they found

4    something that I didn't know before, and now I want to reopen

5    somebody's dep.  I don't know that I should be countenancing

6    any of that.

7             So, you know, your subpoenas were served on April

8    30th.  Discovery closed on that date.  Without disagreement of

9    the dealership class plaintiff, you wouldn't be able to serve

10   those.  And without your agreement, the dealership class

11   wouldn't be permitted to serve these additional subpoenas.

12            What happened there, did we drop her?

13            THE CLERK:  Ms. Gulley?

14            MS. GULLEY:  Yes.  Good morning.  Thank you.

15            THE COURT:  Okay.  Just -- you know what, I'm going to

16   give you Brenda's email right now because --

17            THE CLERK:  She has it.

18            THE COURT:  She has it?

19            Okay.  Because we have been having problems for weeks,

20   months, with our AT&T connection here.  So if we drop you, you

21   need to let Brenda know, and we'll get you back on.  Okay?

22            MS. GULLEY:  I have got her email.

23            THE COURT:  Okay.

24            Yeah, so that's my feeling.  Mr. Ross, you can wade in

25   to that now.  But -- I don't know, I'm just thinking, let's

1   move this thing forward so you can get to summary judgment,

2   trial, settlement, anything else, appeal.

3          Go ahead.  I want to tell you what I was thinking just

4   so that you had -- you weren't -- you knew what I was thinking.

5          MR. PROVANCE:  Thank you, your Honor.  This is Matt

6   Provance.

7          THE COURT:  Oh, you're doing it.  Okay.  Fine.

8          MR. PROVANCE:  Yes.  Thank you for sharing your views

9   on the matter.  That's helpful and informs our thinking.

10         One point I would like to make is that we did serve a

11  subpoena to Infutor.  It is towards the end of discovery.  It

12  is based on information that in our view we learned very late

13  in the discovery process.  And that was the main motivation for

14  the timing of our subpoena.

15         Our main interest here is simply that the discovery be

16  a two-way street.  That it go both ways.  At the last status

17  hearing Mr. Nemelka, I believe, stated on the record that he

18  was very interested in the AT&T and carrier subpoenas going

19  forward, although he couldn't join them formally.

20         To the extent he is taking an opposite position now, I

21  think that that's somewhat inconsistent.

22         But the plaintiffs have identified some limited

23  discovery that they would like to take from the carriers.  We

24  have identified, in our view, limited and targeted discovery

25  that we would like to take from a third-party, Infutor.

1      Now if your Honor is of the view that there needs to

2  be a cutoff and the cutoff has taken place and we need to move

3  forward, the defendants are prepared to accept that.  We would

4  just ask that that rule be applied evenly to both sides, which

5  it appears that your Honor is inclined to do.

6      THE COURT:  Well, I would apply it evenly to the both

7  sides in the context of joint motion ECF 699.  This thread runs

8  through some of the other motions that are pending and that I

9  am going to have to deal with or will deal with today.  And,

10  you know, sometimes it bites one way or sometimes the other --

11  it bites the other.

12      But my ruling on ECF 699, which is this joint motion,

13  is -- and I will say, Mr. Provance, that I'm not such an ogre

14  that if -- and, you know, I don't -- I only see things at a

15  particular level.  I don't see things always at a granular

16  level, unless you bring me to the granular level.  So if all

17  parties here, including Authenticom, Cox, Auto Loop, and that

18  whole group, end up saying to you, I dropped my objection, I'm

19  okay with you going through that one because I really want to

20  see these AT&T subpoenas because I do agree -- I don't know if

21  he changed his position or not.  And, you know, changes in

22  position -- I know in this litigation everybody accuses

23  everybody else of changing their positions.  But I don't

24  necessarily see a principal distinction that Mr. Nemelka is

25  relying on.

1    Yes, I understand the AT&T stuff is easier to produce

2 and deal with, because we're not going to get a motion to quash

3 from them, than the Infutor stuff is, so I get there is a

4 distinction there potentially.  But I look at this more as a

5 tactical position.  We don't object to the dealership class

6 plaintiffs because we don't really want to aggravate our

7 co-plaintiffs any more than we need to aggravate them.  But we

8 do object to the defendants because we don't care about

9 aggravating the defendants.

10    But if everybody says, you know what, this stuff

11 is -- if Authenticom, Cox, et al., decide, you know what, I'm

12 willing to drop my principle here, quote unquote, and agree to

13 your subpoena going forward, defendants, so that we could get

14 the AT&T, Verizon, and Sprint stuff, because I think that's

15 really valuable too, I'm not going to block it.  If you, both

16 of you, decide to go forward, you're agreeing to do it, fine.

17 I'm hoping that doesn't spawn continued litigation.  But if you

18 guys are agreeing to it, I'll go with it.

19    But absent agreement of the parties on all fronts with

20 respect to the joint motion, I'm going to deny that motion.

21    MS. RICHTER:  Your Honor, may I get some clarification

22 on that?

23    THE COURT:  Yeah.

24    MR. RICHTER:  Frank Richter.

25    THE COURT:  Yes.

1     MS. RICHTER:  So this agreement kind of came about

2  because we had briefing for the wireless subpoenas due.  We had

3  arguments we believe good cause existed for extension of the

4  fact discovery.  And defendants then responded that they had

5  good cause for their subpoenas as well.  And that was the

6  result of the joint agreement.

7     You don't want to hear any argument as far as good

8  cause or briefing any further is the way we should understand

9  this order.

10     THE COURT:  Okay.  I have a visceral reaction to that,

11  but I want to cage my visceral reaction and consult here for a

12  second.

13     (Brief interruption.)

14     THE COURT:  Here's my ruling.  Okay?  My visceral

15  ruling was, heck no.  Okay?  My visceral ruling was you are

16  stuck with this because you agreed to go forward with this

17  joint motion.

18     However, I realize that you tried to tie my hands by

19  saying that this was an all-or-nothing agreement, Judge, so you

20  got to accept our agreement or not.  Okay?

21     You want to knock yourself out -- I mean, I will tell

22  you -- when did you seek leave --

23     MR. RICHTER:  I'm not requesting further briefing --

24     THE COURT:  Well, then why did you --

25     MR. RICHTER:  -- your Honor.

1     THE COURT:  -- are you raising the issue?

2     MR. RICHTER:  I just want to make sure --

3     THE COURT:  Just because you like to dot Is and cross

4  Ts?

5     MS. RICHTER:  Your Honor, just so we have

6  clarification for the parties, they say, well, we still want --

7  you know, defendants say, well, we would still like to brief

8  it.  We have an answer to that --

9     THE COURT:  Okay.  Here's my --

10     MR. RICHTER:  -- and that way we don't have any

11  confusion that's we're -- we're good to go, let's not -- let's

12  close the book on this, and we're done.  That's all I'm asking.

13     THE COURT:  Here's my response to your theoretical

14  question.  I'm ruling on 699.  It was a joint motion.  Okay?  I

15  recognize the joint motion said, this was an all-or-nothing

16  deal, Judge.  We want to tie your hands on this.  I'm denying

17  that motion, even though it was a joint motion because it is

18  opposed by the -- one class of plaintiffs.

19     If that now brings a motion for leave to serve these

20  subpoenas at a briefing schedule, you know, I'll decide that,

21  if, as, and when it is briefed.  And hopefully that's this

22  year.  But -- and I say that facetiously.  Okay?  But I'm not

23  going to rule on -- I'm not going elsewhere.

24     You need a briefing schedule on it?  Then file your

25  motion for leave -- do you have -- no, you don't even have the

1   motion for leave.  File it.  Give me a briefing schedule.  If

2   they want to brief the Infutor, knock your socks off.  I'm just

3   ruling on the joint motion that is in front of me now, and I'm

4   doing it.

5            MR. RICHTER:  Understood, your Honor.  Thank you.

6            THE COURT:  Understood?

7            MR. RICHTER:  Yep.

8            THE COURT:  Need any more clarification on that?

9            MS. RICHTER:  Absolutely not.

10           THE COURT:  Good.  Okay.

11           Next issue, motion that has been pending for a bit of

12   time, plaintiffs's motion to compel production of documents on

13   CDK's privilege log.  I think this is -- I don't even know what

14   the number of the motion -- I probably do.  Hold on.  I think

15   it is ECF 535.

16           Four issues here.  Emails to a large number of

17   recipients; emails to distribution lists where the list does

18   not identify everyone who received the email; communications to

19   third-party advisors, consultants, and agents.  I don't know

20   how many -- I might have said three issues.  There is five

21   issues.

22           Advice that is predominantly not legal in nature; and

23   implicit waiver.  Okay?

24           Here's my rulings on these.  Subject -- Topics 1 and 2

25   overlap, right?  Emails to a large number of recipients and

1   emails to distribution lists where the list does not identify

2   everyone who received the email.

3          As to both categories I agree with plaintiffs that CDK

4   has not met its burden of establishing privilege with respect

5   to all the recipients who received these emails.

6          With respect to the first category, the large number

7   of recipients, it seems that defendants can identify who

8   received the emails, but there is nothing in the briefing to

9   indicate why all those people are within the attorney-client

10  privilege.

11         With respect to the second group of emails, to the

12  distribution list, CDK can't even identify the recipients for

13  some of these lists.  I disagree with CDK that plaintiffs are

14  going back on some type of agreement that they reached or

15  reneging on some type of agreement that they reached to accept

16  these distribution lists because plaintiffs say, and I don't

17  say anything in the record to contradict this, that at the time

18  they were talking about that agreement, they did not know and

19  didn't -- hadn't discussed with the defendants that CDK could

20  not identify even the people who were -- to whom the email was

21  directed as part of a distribution list.

22         It is CDK's burden to show privilege.  It has not

23  shown privilege as to either group of email.  Again, because

24  the first one, they haven't told me why all those people are

25  within the privilege.  And, parenthetically, the more

1  people -- there is no -- CDK is right, there is no per se rule

2  that says, five people can be in a distribution list for a

3  privileged communication, but eight can't.  Or 20 can, but 25

4  can't.

5         But I don't even have a threshold showing by CDK that

6  the people to whom the emails in the first group are directed

7  are covered by the privilege.

8         And in the second, if you can't even identify who the

9  email went to, then you're not going to be able to identify

10  privilege.

11         So I'll grant the motion with respect to both those

12  categories of emails.

13         With respect to the next two categories,

14  communications to third-party advisors, consultants, and

15  agents, and advice that is predominantly not legal in nature, I

16  need more information.  These were briefed at a pretty high

17  level.  All I have is the privilege log really.  I don't have

18  the documents.

19         And so in order for -- and I think that's true.

20  Correct, CDK?

21         MR. PROVANCE:  Yes, your Honor, that's correct.  We

22  have not submitted those in camera.

23         THE COURT:  So that's always a painful process.  I'm

24  not going to spare you the pain of that process.  If I have to

25  go through each of these documents document by document,

1    instead I would convene a hearing in which I would go through

2    each document and see whether or not in all or in part the

3    document really is or is not something that fits within the

4    privilege.

5           My guess is that that will be a painful process, and

6    that all the documents will not fit within that category

7    because -- or all parts of a document won't fit within that

8    category because I just -- that's just my experience.

9           But the issue was addressed at a 10,000-foot level,

10   not on a -- you know, I agree with the plaintiffs that if

11   the -- I mean, I agree with both parties here.  Third-party

12   advisors, such as are identified in these briefs, can be within

13   the privilege if a communication that includes them is

14   necessary for the lawyers to provide the advice.

15          If it is not, and he can't make that case, then they

16   are not within the privilege.

17          I also agree that communications that are not

18   predominantly legal in nature, or stated another way, if it is

19   not an attorney-client communication within the law, then it is

20   not going to be protected.

21          So if I have to decide this issue, I'm going to set a

22   hearing on it.  And you guys are going to come in, and we'll

23   spend as much time as necessary going through document by

24   document.  I do want CDK to submit to me in camera ASAP the

25   documents that are subject to this.

1          Does anybody have a -- I mean, I know I have read your

2     brief, but is this ten documents?  50?  150?  2000?

3          CDK, how many are we talking about here?

4          MR. PROVANCE:  Your Honor, unfortunately, I don't have

5     the list in front of me, but I think it is probably in the

6     range of hundreds.  As you know, CDK produced a lot of

7     documents in this case and as a result our privilege log

8     contains a lot of entries.

9          THE COURT:  Okay.  Is there any benefit for me -- I

10    mean, I'm not going to decide -- I can't decide this on the

11    papers because I don't know what the documents say.  I mean, on

12    a broad basis, I agree that, you know, plaintiffs said, I don't

13    see how they are privileged, but all I have seen is a privilege

14    log.

15         From CDK's basis, from what you say, I could say,

16    yeah, I could see how some of this stuff is privileged.  Is it

17    all?  I mean, before you submit this to me in camera, you want

18    to go through these documents and redact what is actually

19    something that is privileged versus are you available for

20    squash on Saturday afternoon?

21         I mean, you know, this -- did you produce in a

22    redacted way or did you just claim privilege on the entire

23    document?

24         MR. PROVANCE:  Some of the documents at issue are

25    redacted.  Some of the documents at issue were withheld

1    entirely.

2         THE COURT:  Okay.  So for the one -- so you -- I guess

3    what you are telling me is -- I am interpreting what you are

4    telling me as you have already gone through the exercise to be

5    more scalpel-like in your invocation of privilege and not

6    macro, and so I need to look at these things and set a hearing.

7    Right?

8         MR. PROVANCE:  If I am interpreting your comments,

9    your Honor, I believe that's the way forward.

10        THE COURT:  Okay.

11        MR. PROVANCE:  If your Honor would like some sample of

12   the documents at issue --

13        THE COURT:  Sample is not going to do it, right?

14   Because it is -- this determination has to be made on a

15   document-by-document basis.  I don't see any way that -- I

16   mean, if this was a class certification motion in a TCPA case,

17   I could look at samples, but it is not.

18        I don't know how I am going to make an up or down call

19   on a document-by-document basis without seeing the documents.

20        MR. PROVANCE:  Understood.

21        THE COURT:  So I'd like you to -- you don't have to

22   say right now, but at least by the conclusion of the hearing

23   tell me when you're going to submit those documents in camera.

24   We could talk about when I'm going to have a hearing on this.

25   Okay?

1       MR. PROVANCE: Your Honor, I had a few points of

2 clarification, but I'm happy to wait until you have finished

3 your ruling.

4       THE COURT: Okay. There is just one more thing. I

5 don't buy plaintiffs's implicit waiver argument. That is a

6 complete belier of an argument. It does not work. I address

7 the issue of when a party puts advice of counsel in issue very

8 recently in a case called Derek versus Roche Diagnostics. It

9 is reported at 2019 Westlaw 1789883. Some of the reasoning and

10 language in that opinion is equally applicable here.

11       Plaintiffs's argument is just completely out to lunch.

12 I mean, the page 12 of the motion -- or the memorandum in

13 support of the motion says, quote, by relying on the text of

14 the agreements, these particular agreements you're looking at

15 -- you're talking about, which were drafted by counsel for

16 the -- for their defense, defendants have put the intent of

17 those agreements at issue.

18       That just makes no sense. I mean, that's a flyer

19 argument. You devote about a little over a page to it if you

20 look at all of it. There is no indication CDK is going to rely

21 on communications with counsel in support of its defense

22 relying, or at least in the briefs, with respect to this stuff.

23       I know you cite case law. And I know the case law

24 exists that part of the privilege and waiver issue is based on

25 fairness. I don't see any unfairness here.

1      And I don't think that by relying on the text of the

2   agreements that are drafted by counsel, which is the case in

3   every sophisticated business litigation, CDK has put the advice

4   of counsel defense at issue or its communications with counsel.

5      You guys, while I was speaking at the plaintiffs's

6   side, Ms. Wedgworth, Mr. Ho, and Mr. Nemelka were whispering.

7   So what do you have to say on that?  Am I misperceiving

8   something?

9      MS. WEDGWORTH:  Your Honor, it is just in one of the

10  depositions there -- well, maybe more than one actually --

11  there has been testimony that may cause that actually to

12  come -- be an issue in this case.  I appreciate your ruling.

13  And given what you said -- and I want to look at this case --

14  but we do have factual testimony where witnesses think one

15  thing went in the agreement, and then it is understood that

16  because of attorneys something else went in the agreement.

17      So it may be a factual issue in this case.  And I want

18  to review this particular case you have referenced in regard to

19  the testimony we have in this case.

20      THE COURT:  But none of that was in the briefing that

21  I reviewed, right.

22      MS. WEDGWORTH:  It had not happened at the time.

23      MR. NEMELKA:  Correct.

24      THE COURT:  Yeah, okay.

25      MS. WEDGWORTH:  The briefing predated it.  We were --

1  we thought that might be the case when we briefed this.  We

2  didn't have the testimony at the time.  We now do.

3       THE COURT:  Okay.  So listening to what you said in

4  some way critically, I would say I still -- from what you told

5  me, it didn't get me over the hump.  You know, there has to --

6  the fact that a corporate party spoke to a lawyer about what

7  was going to go in or not in the agreement, and this -- and

8  this case -- and I recognize that there is a lot of law in this

9  area, and some of it is not as clear as you would like it to

10  be.  But I don't know that that gets you the documents unless

11  and until we hear that the party relying on the privilege is

12  going to somehow put in issue those discussions.

13       So it is not a -- it is not necessarily a sword that

14  says, well, because lawyers were involved in the drafting, and

15  on advice of counsel, something did or did not go into the

16  agreement, therefore we get the entire agreement.  It might be

17  that you need more than that.

18       But, again, based on what I have seen, at least as the

19  issue has been presented to me now, I'm going to deny the

20  motion with respect to that.

21       So I'm happy to hear from Mr. Provance.  I'm granting

22  it on the first two categories on emails.

23       I'm holding it -- it remains under advisement with

24  respect to communications to third-party advisors, consultants,

25  and agents, and advice that is predominantly not legal in

1    nature pending submission of the relevant documents in camera

2    and a hearing at which the Court can address those documents

3    with the parties.  And it is denied as to the implicit waiver

4    argument.

5           Mr. Provance.

6           MR. PROVANCE:  Thank you, your Honor.

7           If I understand your ruling on the fifth issue,

8    implicit waiver, it sounds like you have ruled, so I will just

9    move on.  I was otherwise going to address some of the things

10   Ms. Wedgworth said, but I'm happy to just move on.

11          The next point I wanted to raise, I think you have

12   just clarified, which was whether your Honor wanted in camera

13   submission on both Categories 3, the third-party

14   communications; and, Category 4, the communications that are

15   putatively business in nature.

16          I believe you have just clarified that, and we'll get

17   those to you --

18          THE COURT:  Right.

19          MR. PROVANCE:  -- in short order.

20          On the second issue, your Honor, I just wanted to make

21   one point and clarify, if needed.  This is the issue regarding

22   distribution lists.  And the one thing -- factual nature I

23   wanted to point out is that all that was at issue on that part

24   of plaintiffs's motion were certain distribution lists, that at

25   the time documents were collected and reviewed, no longer

1    existed.  They're defunct.  And that was the reason that

2    defendants were not able, at least with using the tools that

3    were normally available to them in the ordinary course of

4    business, able to determine who was on those now defunct

5    distribution lists.

6            And the plaintiffs had the same problem with some of

7    their distribution lists.  So the agreement the parties made

8    was that for just those distribution lists that are now

9    defunct, they would not need to identify all of the recipients

10   that were on those lists.  It is a much different story for

11   distribution lists that still exist, we can look at them and

12   provide that information.  And, in fact, the defendants have.

13           So if your Honor is inclined to grant their motion and

14   require defendants to produce any communications involving now

15   defunct distribution lists, that issue is present on the other

16   side as well.  So we would ask in fairness, if that's the way

17   your Honor wants to rule, that you would order the plaintiffs

18   to do the same thing.

19           THE COURT:  I'm not going to do that because I don't

20   have that in front of me.  But that would be my same ruling.

21   If I have a situation in which an email is sent to a

22   distribution list and the -- and the custodian of that email

23   says it is privileged, and that party cannot identify to whom

24   the email went, my ruling is going to apply equally to

25   plaintiffs and to defendants.

1          So if you can't work this out with my ruling -- my

2     ruling necessarily would require plaintiffs to produce any

3     emails that they have claimed as privileged that fall within

4     this kind of a category, unless there is some distinction that

5     actually is meaningful, as opposed to just a distinction --

6     being a distinction without a difference, you know, as an -- so

7     I'm not going to rule on that now, Mr. Provance.  But you can

8     get me in short order if they won't agree.

9          This strikes me as one of those mutually assured

10    destruction kind of issues which, you know, what's good for the

11    goose is good for the gander on the plaintiffs's side.  And if

12    you are sitting on protecting things that are in the same

13    category that you're talking the other side should produce, and

14    I buy your argument, which I do, then you got to be prepared to

15    produce yourself too.  And you say they didn't ask for them

16    yet.  Okay.  Now they are going to ask for them.

17         And so you can either go one of two directions.  You

18    can say, we want all your emails protected under this category,

19    and we'll produce to you all of ours.  Or you could say, never

20    mind.  Now that the Judge says -- as one of my arguments that I

21    spent some pages on, I really don't like the impact of my

22    argument on what I'm going to have to produce, and I'm in a

23    never mind zone.

24         To me, if you do that, that was a waste of time.  It

25    was a waste of my time, and it was a waste of your time.  But

1    I'll deal with whatever I deal with in the next go-around here.

2    But I will tell you that I will attempt to rule the same when

3    the same facts are in front of me provided there are no

4    differences that I think are material to a ruling.

5         So we still need -- and I'll just kind of flag here

6    that somebody should remind me -- a date for submission.  And I

7    would have to set a hearing date, which I'm not sure I'm

8    completely prepared to do now.

9         But that's where we are on the motion to compel

10   documents off the privilege log.

11        I think that brings me to the issue that everybody

12   briefed, that motion to compel versus Authenticom.

13        No, I can quickly go to CDK's motion for a protective

14   order concerning plaintiffs's interrogatories on the

15   counterclaims, which is ECF 597.  I'm going to deny that motion

16   for a protective order and allow plaintiffs's interrogatories

17   on the counterclaims to go forward.

18        I agree with plaintiffs that given the way the case

19   schedule was put together in this case, and given the pendency

20   of the motion to dismiss the counterclaims during the period of

21   time where discovery was proceeding, that plaintiffs would be

22   prejudiced unfairly if after their motion to dismiss the

23   counterclaims was denied, they are denied the opportunity to

24   proceed with written discovery on the counterclaims.

25        Those interrogatories, as far as I can tell, were

1    served within the discovery time period.  And had they been

2    responded to would have -- they were served in time for them to

3    be responded to within the existing discovery time period,

4    which as per Judge St. Eve's statement, I think, was not

5    technically including the counterclaim discovery.

6         I disagree, in case this is the next question, that

7    CDK can now serve discovery after the close of discovery on the

8    counterclaims that it didn't serve before.  CDK made a

9    calculated decision to oppose the discovery that the plaintiffs

10   serve the written discovery without serving their own as a,

11   what's good for the goose, good for the gander kind of move.

12   But, again, consistent with my attempting to get this done, I'm

13   going to deny CDK's motion.

14        Plaintiffs can serve the interrogatories that they

15   served -- CD -- I am going -- if CDK asks me, now let me do

16   that, I'm going to say, no, because it wasn't served in time

17   during the discovery process, even in a protective way.

18        And one thing I needed to look at here was whether

19   there was any -- were there any particular interrog- -- so, I

20   mean, I noticed in the briefing here, and I'm not trying to

21   override this, for example, that counterdefendants offered to

22   completely withdraw Interrogatories Numbers 17 and 18 and

23   offered to accept summary responses to the interrogatories

24   which called for CDK to identify numerous instances of certain

25   events or conduct.

1          I mean, I'm not trying to override that.  You know, if

2     plaintiffs are still willing to say, we will withdraw these and

3     accept something else, I'm not saying now my ruling supersedes

4     that.

5          But what I am -- I'm just ruling on the timeliness

6     issue here, primarily, and whether plaintiffs could go forward

7     with this.  I do note in reading other motions that you have

8     pending, that there -- discovery has been going forward on the

9     counterclaims.  I mean, CDK has been taking copious -- probably

10    the wrong word -- extensive discovery maybe on Authenticom

11    about its access to defendants's -- and so has Reynolds -- the

12    defendants's systems.  So, you know, oral discovery has been

13    going forward on this.  But, you know, and this motion has been

14    pending since April, but it was probably fully briefed, I don't

15    know, in -- some time in May.

16         End of April.  Yeah, the last day of April or the 29th

17    of April.  So it hasn't been sitting there for too long.

18         But, anyway, whatever you want to do to make it easier

19    on CDK, I'm not saying don't do.  And whatever you referenced

20    in your briefs, I'm saying not do.

21         But in terms the of up or down as to whether or not

22    you can -- you are allowed within the interstices of discovery

23    scheduling to serve these when you served them, I'm siding with

24    plaintiffs on that versus CDK and denying the protective order.

25         Clarification on that?

1    MS. MILLER:  Your Honor, Britt Miller on behalf of

2    CDK.  Two quick questions.  One, obviously we did not prepare

3    responses pending the resolution of this motion.  So we'd ask

4    for 21 days to respond to the interrogatories in question.

5         And, two, I assume from the tenor of your ruling that

6    the ones that have been served are it.  There is no additional

7    ones that are coming.  There is no follow-up additional

8    interrogatories after they get whatever responses.  Certainly

9    we'll engage whatever meet and confer process may be necessary

10   as to the responses that we serve.  And if there is motion

11   practice on that, we'll certainly engage in it.  But to the

12   extent that these are permitted to go forward, these are it.

13        THE COURT:  Yes.  These are it.  And 21 days is fine.

14        MS. MILLER:  Thank you.

15        THE COURT:  It, with the qualification that you said,

16   that if you object to something and then you meet and confer

17   and then I have to deal with it, in the never ending discovery

18   dispute process here, I'll do it.  But I'm not saying they can

19   serve more or you could serve, I guess, any.

20        MS. MILLER:  Understood, your Honor.

21        THE COURT:  Okay.  That brings me to the issues that

22   you briefed on an expedited basis.  I will say, Mr. MacDonald,

23   I very much appreciate the email exchange that you had with

24   Mr. Nemelka in which you remind -- when Mr. Nemelka expressed a

25   desire to get this briefed in time for our June 10th.  You sent

1    an email saying, you know, Judge Gilbert has said he would like

2    to have at least a week to look at things.  And I didn't know

3    about that because the email that came to my courtroom deputy

4    had a proposed briefing schedule of June 5 and June 7, which

5    was plaintiffs's proposed briefing on this.

6          But I do appreciate at least your consideration of

7    saying, you know, maybe he should have a week to look at this

8    stuff, which he's asked for, in the give and take before filing

9    of the -- this motion.  That kind of went by the wayside in

10    some way.  But I do appreciate it.

11          And luckily for Mr. Nemelka, I didn't actually go into

12    the ECF system -- I forgot the briefs here, so I had to print

13    them at all home.  And I didn't see that you actually didn't

14    even file on June 7th, you actually filed on Saturday, June

15    8th.  But that was okay because I was able to read it

16    yesterday.  Okay?

17          I want to tell everybody here though -- and you can

18    tell that I have a little bit of an edge here, and I'm sorry

19    about it.  Okay?  I don't like the fact that I have so

20    many -- I have had so many motions under advisement, which is

21    why I'm trying to rule on as much as I can from the bench.

22          I do have an impression here that there are fights

23    here that don't need to be had.  I have had that impression

24    from the very beginning.  And I have had the -- I also have the

25    impression, you know, that sometimes positions are taken for

1    tactical reasons without fully thinking through the impact of

2    those positions on your own positions.  As an example, I'll

3    talk about these email distribution lists which I talked about

4    before.

5            So, you know, those types of things, just in my mind,

6    increase the stress and tension in your litigation, increase

7    the stress and tension on the Court, but that shouldn't really

8    be your concern.

9            But I do generally like to have more than a weekend to

10   think about something.  The reason that I said I adopted your

11   briefing schedule and also went forward here is I do agree

12   you're entitled to rulings as soon as you can get them, as soon

13   as humanly possible.

14           Had I known my trial from next week was going to

15   settle, I would have moved you there, so I would have had more

16   time to look at this.  But I didn't know that.  So -- but,

17   anyway, I noticed that.  Okay.  I noticed that.

18           With respect to the motion pending, I'm going to deny

19   the motion as to the reopening of the 30(b)(6) deposition as of

20   Datavast.  My view of the arguments being made -- and I read

21   the exhibits too, and I read the deposition testimony submitted

22   -- is that defendants's argument is weak and an overreach that

23   Datavast was a topic that was noticed for 30(b)(6) deposition.

24           This isn't an after-the-fact objection.  The objection

25   was raised by counsel at the deposition.  The deponent said he

1    wasn't prepared on that.  He was general counsel.  And so, you

2    know, he would have only been able to -- been required to

3    testify with respect to what he was prepared on.

4           I don't buy the defendants's argument in particular

5    that -- I have to find it.  Hold on for a second.

6         (Brief interruption.)

7           THE COURT:  Yeah.  Defendants kind of shoehorn into.

8    They say, well, our 30(b)(6) notice defined Authenticom to

9    include any related companies, divisions or subsidiaries, which

10   could include Datavast.  Okay.  I get that.  That's not

11   necessarily wrong.  Or accelerated.  And it included any

12   efforts by Authenticom to secure or protect dealer data or any

13   use of or agreements with third-party vendors to obtain data

14   maintained on a CDK or Reynolds DMS.

15          I don't think we're talking about securing or

16   protecting data really.  And if that really was what you were

17   talking about, that's a vague way of saying it for a 30(b)(6)

18   topic.  We're not really talking about obtaining data as much

19   as distributing data from the -- that Authenticom got.

20          So I don't think you could shoehorn Datavast into the

21   served topics.  And if this is the best that defendants can do

22   it -- on it, I think it falls short.  I don't think it is worth

23   reconvening a 30(b)(6) deposition to cover this topic with

24   Authenticom's general counsel, particularly when that topic, I

25   think, is being covered in other depositions.

1         I get why defendants want this information, and I get

2    why it is important to their defense and their counterclaims,

3    talking about Authenticom accessing their systems.  But I think

4    you're getting information on that.  And I think, you know,

5    again, in the overall theme of, we got to end this at some

6    point, I think this falls on the end of, we should end it.

7         If that was on day one of discovery, maybe I would

8    look at this differently.  But it is not.  And so I am going to

9    deny the motion as to reconvening the deposition as to

10   Datavast.

11        With respect to the polling client manager data, I

12   have -- I have some questions for Authenticom here.  I think

13   your argument -- well, first of all, let me dispense with a

14   couple of things and focus then on what needs to be focused on.

15        Timeliness.  Overrule that objection.  This issue has

16   been on the table for some time.  You have been chasing each

17   other on this for a while.  I read all the correspondence on

18   this.  I read the -- you know, what you were talking about.

19   And I don't think this was put to bed.  And I think,

20   particularly with the most recent statement, which is that we

21   can't even do this, it is impossible to do it, I just don't

22   think this was tied down.

23        Is this late in the process?  Yes.  But you have been

24   chasing each other around on this for a long time.  And some of

25   the delay, at least from what I can see, is Authenticom's

1    fault, not CDK's fault.

2          Would it have been best for CDK to not -- to tie this

3    down, you know, back in October or November?  Yes.

4          Did you do everything you could to help them tie it

5    down?  No.

6          So the timeliness document is not working for me.

7          The spoliation issue, not ripe right now.  I'm not

8    dealing with that.  And that really doesn't come into play with

9    respect to whether you should or shouldn't produce something.

10         But I'm having trouble figuring out exactly what

11   exists.  If something exists, my feeling is you have got to

12   produce it.  But I'm having -- you know, Authenticom really

13   argued the strawman here, which is we can't produce a report,

14   and we can't produce -- we shouldn't be required to create a

15   document that doesn't exist.  I agree with that.  It is not

16   clear to me that that's what the defendants are asking for

17   here.  It would be -- it sounds to me what the defendants are

18   asking for is a snapshot of what appears essentially on a

19   computer screen when somebody queries the database.

20         So they are not asking to prepare a report per se,

21   they are asking for information that is resident within your

22   system.  So it -- you possess it.  It is in your possession,

23   custody or control.  It is information in your system that is

24   either a seven-day period or it is whatever you had in November

25   of 2018.  I think the -- it is not clear to me from

1    Authenticom's response here whether anything exists.  Okay?

2    Whether there -- but I have seen what you have produced to them

3    as an example, which I think is exhibit -- I mean, it is quoted

4    in full in the defendant -- the 18 lines are quoted in full in

5    defendants's brief, but -- it's -- is it 16 or --

6              MR. HO:  It is an attachment to Exhibit 11.

7              THE COURT:  Right.  Yeah, it is the last -- yeah.  I

8    mean, I see that but I am having trouble figuring out what

9    exists and what is ephemeral or what's tangible.

10             And so I'm going to ask Authenticom at least to

11   explain to me whether -- in particular whether what the

12   defendants are asking for, which is the PCM log for the

13   originally requested seven-day period in November 2018 or a log

14   for the seven days between June 10th and June 16th, which I

15   know is not necessarily within -- you know, before the lawsuit

16   was filed.  But I think what they are trying to do is see how

17   does Authenticom's system interact with theirs or what kind of

18   data do you get.  I'm not 100 percent sure that I understand to

19   what use they end up putting that.  But I could see it being a

20   really nice visual in front of a jury, so I can understand why

21   they might want to see it.

22             But I'm just -- I'm trying to figure out what exists.

23   And I will tell you that if I don't understand what you are

24   saying, Mr. Nemelka or Mr. Ho, then I'm going to appoint a

25   special master to figure out what the heck you should produce,

1   if anything.  And you guys are going to split the costs of

2   paying for it because if it is too complicated for me to

3   understand, I'm not going to have days of it.

4          I might need to have a hearing.  I might need to have

5   an evidentiary hearing.  I might need to put your computer guy

6   on the stand.  But I'm going to bring in a special master who I

7   have appointed in other cases, Nora Grossman, who is an expert

8   on e-discovery.  And, frankly, when I have appointed her in the

9   past -- I have actually never had to have an evidentiary

10  hearing because she sits down with the parties, speaks the

11  lawyer language because she's a lawyer, and also speaks

12  technical language because she is a technician, and she figures

13  out how the parties can resolve the issue.  And I don't

14  ever have to deal with it.  But if I have to deal with it, I

15  will.

16         But can you answer my question?

17         Or Mr. Ho.

18         MR. HO:  I'm going to try, your Honor.  I think there

19  is two aspects to the question of what's available.  Temporally

20  my understanding is that what is available is information that

21  goes back seven days.  So seven days from today is information

22  that is essentially overwritten.  It rolls off after seven

23  days.  But it is -- the second aspect of the answer is,

24  importantly, it is not in the database.  It is not as if you

25  can query -- type in a query or run a search over a set of data

1    and pull out from a database the information that's being

2    sought.

3            This information is essentially imbedded in the

4    software program itself.  And that's why from a legal

5    standpoint more than -- so than a technical one, we think that

6    the rule that governs this is Rule 26(b)(2)(B), and that this

7    clearly falls within the ambit of data that's not reasonably

8    accessible without undue burden or cost.  Because some computer

9    programmer actually has to go into the software program and

10   find for every dealer or -- and every day the data that they

11   want.  And so seven days doesn't sound like a lot, but when

12   you're talking about hundreds and thousands of dealers, and you

13   have to do it dealer by dealer for every day, as you see they

14   have taken a snap -- the Exhibit 11 that was alluded to is one

15   dealer for one day.  So you'd have to do that many, many

16   different times.  And it is not something that can be done in

17   an automated way.

18           As Mr. Clements's deposition -- declaration

19   highlights, and this is Exhibit 1 to our opposition, this all

20   has to be done manually by someone who actually -- a computer

21   software person who will actually have to log in to the

22   program.  And we don't think that there is good cause to do

23   that.

24           As we highlighted in our opposition brief, we think

25   that this is exactly the kind of data that the Seventh Circuit

1  discovery program and the Sedona Conference and, you know, all

2  the kind of leading authorities about ESI say are presumptively

3  off limits because of the cost and burden involved.  And we

4  don't think that the defendants have made the kind of showing

5  that you would need to overcome that.

6      In particular, with respect to relevance, as your

7  Honor has already identified, it -- at best it seems like what

8  the defendants are after is a sense of the kind of information

9  that Authenticom keeps in this, again, very ephemeral way about

10 the way in which its system accesses the DMS.

11     There is not going to be data that covers the relevant

12 time period in this case.  It is only seven days long.  So at

13 best it is going to be a demonstrative or illustrative set of

14 data.  And, frankly, given the limitations on relevance, we

15 don't see how there could be good cause to over -- to justify

16 the imposition of this kind of a burden.

17     We have, as we pointed out, offered to do somewhat

18 more than the one day for one dealer that we have offered.  And

19 to the extent that a slightly broader sample or illustrative

20 set could be useful, we have offered to do that.

21     But seven days for all dealers would be a monumental

22 task for a company that has been, frankly, financially

23 decimated by the defendants.  We won't go into that again.  But

24 Authenticom is a small company, much smaller now than it was

25 before, and simply doesn't have the resources to do this kind

1    of highly time-intensive project.

2            THE COURT:  Okay.  Couple of questions before I ask

3    the defendants anything.  I saw the statement in Mr. Clements's

4    affidavit that Authenticom had to lay off two-thirds of their

5    work force during litigation.  So I -- you know, I'm not

6    without appreciation of that.

7            A couple of questions.  So what you're saying is that

8    the 18 lines in Exhibit 11, that was obtained by a computer

9    programmer going into one particular -- within a seven-day

10   period -- one particular dealer's information on the software,

11   taken a screenshot of that.  But that would have to be -- if we

12   took a seven-day period, then somebody would have to go through

13   all of the software that ran during that period of time for all

14   of Authenticom's customers and take those same essentially

15   screenshots to comply with the defendants's request, right?

16           MR. HO:  I will say I'm not a technical person, so I'm

17   not sure screenshot is exactly the right terminology.

18           THE COURT:  Okay.  Or a printout.

19           MR. HO:  But conceptually that's exactly right.

20           THE COURT:  Okay.  And how many, roughly, do you know?

21   You said hundreds or thousands.  There a difference between

22   hundreds or thousands.  We're talking about many dealers?

23           MR. HO:  Over time I would --

24           MR. NEMELKA:  I don't know exactly today.  Authenticom

25   used to service over 10,000 CDK and Reynolds dealers.  It has

1   been drastically reduced.  I think it is probably low

2   thousands.

3           THE COURT:  Okay.  And I take it by your response to

4   my question, CDK questions whether something exists in tangible

5   form that had been preserved from November of 2018.  Is that no

6   longer -- is that not the case?

7           MR. HO:  Your Honor, there were never reports

8   or -- these ephemeral data were never preserved or reduced to a

9   documentary form in the way that we would think you of it under

10  Rule 34.  With the exception of the one snapshot from December

11  of 2018 that we have then produced to the defendants in March

12  of 2019.  So all we would be talking about, as far as I know,

13  is the seven-day period rolling back from today.

14          THE COURT:  Okay.  I know they are going to have

15  a -- they will have a field day on that particular point, but

16  I'll listen to them.

17          Okay.  So we're talking about -- really just talking

18  about a seven-day period now as illustrative of what this would

19  look like.  And what you are telling me -- and I think I

20  understand this without having a terribly substantial technical

21  background -- what you are telling me is because this data

22  resides in the software that Authenticom runs on a daily and

23  hourly and minute-by-minute basis, in order to provide even a

24  seven-day snapshot of this kind of polling data, CDK --

25  Authenticom would have to go into the software and physically

1    go in, query through that to find each transaction where you

2    could find something that looks like those 18 lines that you

3    produced in March of 2019, would have to replicate that for

4    every dealer, who you had during that period of time, and what

5    software was being run.  And that's a very burdensome

6    labor -- time intensive and costly process for a small company

7    that's lost a lot of its employees, at least in its technical

8    side.

9         The relevance of all that data for all the dealers is

10   minimal in your view.  But you are offering to do something

11   that is much less burdensome.  And I wasn't sure what -- that

12   changed over time.  It seemed to me in the discussions you

13   had.

14        So what are you now offering to do for certain -- you

15   mention 24 or something.  I don't know what you're offering.

16        MR. HO:  Ten CDK dealers and ten Reynolds data --

17   dealer rather.

18        MR. NEMELKA:  Twenty.

19        MR. HO:  So 20 total.

20        THE COURT:  So you're offering to do what they're

21   asking for.

22        MR. HO:  For one day.

23        THE COURT:  Okay.  And who is arguing this for your

24   side there?

25        Mr. MacDonald?

1          MR. MacDONALD:  I am, your Honor.

2          THE COURT:  Okay.  So why is their offer not

3     sufficient?

4          MR. MacDONALD:  Well, as your Honor referenced, the

5     polling client manager that contains information about what

6     files Authenticom polls, how long it polled for, when it

7     polled, how it polled.  And Authenticom has told us they don't

8     otherwise track this information.

9          So polling client manager is really the only source of

10    instances -- of tracking instances Authenticom accesses

11    defendants's DMSs.  Now obviously there are illustrative

12    reasons we want this that you mentioned.  But also, as part of

13    our counterclaims, and defendants have counterclaims under the

14    Computer Fraud and Abuse Act, the Digital and Millennium

15    Copyright Act, and various other federal and state claims,

16    under those counterclaims defendants need to be able to show

17    instances of wrongful Authenticom access.  And Authenticom has

18    said they don't otherwise track this access.

19         And one of the problems we have is that, as you read

20    in the briefing, in the summer of 2018 Authenticom offered this

21    alternative log that they would produce to us to try to satisfy

22    us.  And we took the deposition of Authenticom's 30(b)(6)

23    witness in April of this year.  And it was the deposition

24    just -- this was a deposition just about data.  And the first

25    topic in that notice was solely this issue of that alternative

1    log they produced.  And their witness testified that that was

2    not -- this is a quote -- not an accurate representation of

3    polling and that we couldn't rely on it for any of the purposes

4    to try to -- tended to show DMS access.

5           So the data they have on DMS access is stored in their

6    PCM log.  They haven't retained it.  They only have seven days.

7    And now they say they can't export it.  And the alternative

8    data they gave us they say we can't rely on.

9           So if we don't get any better data -- and, again, this

10   is seven days, so it is going to be hard from that to do

11   extrapolation.  It is not going to be great.

12          But if we don't get slightly better data, we are going

13   to come in here in a few months, and they are going to have

14   Daubert challenges against our expert saying, oh, you guys

15   relied on bad data.  We told you it was bad data, but we don't

16   have anything else to rely on.  So we're between a rock and a

17   hard place on this issue.

18          Now on the technical issues, we agree, we acknowledge,

19   we put to the side the spoliation issues.  There are only seven

20   days of data.  It is in a log.  That's what their documents --

21   that's what their witnesses say.  It is kept on their system.

22   The witnesses said, you can log in, you can look at this log.

23   Whether you have to click on individual dealers or not, I'm not

24   sure.  But somebody could log in and look at the last seven

25   days of polls right now.

1          Now we're willing to accept this in multiple forms if

2     it can be copy and pasted into a document, and we can do that.

3     Your Honor mentioned screenshots.  We would accept it in the

4     form of screenshots that can be OCRd.

5          You know, if the manual difficulty of screenshots is

6     too high, and they want to set up a terminal for one of our

7     experts on the AEO basis to go in and manually create the log

8     themselves, we can do that.  If it is easier to have a special

9     master do it, we can do that.  Or we're open to alternative

10    solutions that would lessen the burden.  But this is the only

11    place they store the data.  That is what they have told us.

12    And this is data that we need.

13          THE COURT:  Okay.  I don't think I need a special

14    master here, thank God.  And thankfully for you -- although her

15    rates are not outrageous.  But I don't think I need a special

16    master here to understand this.  I either underestimated myself

17    or overestimated the complexity of the issue that you have

18    here.

19          I -- from -- based on what I can read in the

20    documents, I think -- or in your briefs, I think -- and based

21    on what I saw in some of the deposition transcripts, the parts

22    that you did submit to me -- and I think you were -- were you

23    talking about Dane Brown's deposition?

24          MR. MacDONALD:  No, this is Joe Noth's deposition.

25          THE COURT:  Okay.  Yeah, okay.  That's -- you also

1    submitted that too, I think.

2           I think you are -- defendants are developing

3    information that potentially they could use to support their

4    theory of unauthorized access to your system.  You describe

5    some of that information at pages 2 and 3 of your brief on this

6    issue, which the sealed portion of it is ECF 711.

7           Plaintiffs take you to task for saying, well, why are

8    they saying all this stuff?  They're just trying to dirty us

9    up.  True.

10          But it also to me illustrates the type of discovery

11   you're developing.  And while I understand your issue of

12   Daubert, you know, I don't know how that ends up coming out at

13   trial if the other side didn't produce or said I couldn't

14   produce the information, but they did give you a sampling.

15   That's beyond my pay grade, at least at this point, to decide.

16   But I do think you're entitled to some information on this

17   topic.

18          I agree with the plaintiffs that the burden on a small

19   or shrinking company of going through the so-called ephemeral

20   data to find this for hundreds, if not more, customers or even,

21   frankly, many, many tens of customers is burdensome and not

22   proportional to the needs of the case.  I think the proposal of

23   ten CDK dealers and ten Reynolds dealers for one day during

24   this period of time will provide the defendants with -- and I

25   don't care if it is a screenshot or however it is.  I mean, I

 1    am not going to micromanage that process.

 2            But the information to show the polling data for those

 3    CDK and Reynolds dealers, as best as I can determine what

 4    you're -- again, the relevance of this information is not that

 5    it is the recipe for Coke, it is for you to illustrate that

 6    this happens.  And yet another way, in addition to what you

 7    have already illustrated, and I'm -- I can't really, based on

 8    the testimony that you're getting, I can't see how this is not

 9    adequate for the purpose that you need it for.  What I do know

10    is that requiring lots more is not proportional to the needs of

11    the case.

12            And, again, we're talking about one day in 2019, I

13    think.  We're not talking about prior time.  But probably the

14    information is still helpful to you.

15            But I -- so, in substance, I think the information

16    that you're looking for has some relevance.  The burden on

17    CDK -- on Authenticom of producing a complete seven-day set of

18    information -- of this information, I'm convinced is unduly

19    burdensome and not proportional to the needs of the case from

20    what I understand the information will show and how it will be

21    used.

22            I do think that the proposal of ten CDK and ten

23    Reynolds dealers is much more proportional to the needs of the

24    case and will provide the defendants with some of the

25    information they're getting, at least on an exemplar basis.

1          And my understanding really of what the defendants

2     want is an exemplar basis because whether it is a full seven

3     days or it is one day, you're looking -- you're not going to

4     get the entire history of the polling data, you're only going

5     to get a sample.  So the only question really is how large the

6     sample should be.  And, I mean, I don't know if ten is right or

7     12 is right or whatever.  But I think that's within the realm.

8          Hold on for one second.

9      (Brief interruption.)

10          THE COURT:  I'm thinking something.  Hold on.

11      (Brief interruption.)

12          THE COURT:  I take it, Mr. Ho, that the burden on

13     Authenticom really is in the process of querying the software

14     to get the information.  So hypothetically if you did, you

15     know, ten exemplars for CDK dealers and Reynolds for day one,

16     and then for day three you did ten different dealers, they

17     would get 20 dealers for CDK and 20 for Reynolds on different

18     days -- that would double your burden in the sense that you

19     have to look at two days.

20          Well, hold your answer to that for a second.

21          Mr. MacDonald.

22          MR. MacDONALD:  Yes, your Honor, I --

23          THE COURT:  Is your objection -- is your objection to

24     -- I mean, here's my problem with your argument.  You're not

25     getting a statistically significant sample in my view under any

1    scenario for the entire time period that this occurred.

2    Whether they give you seven days, whether they give you a

3    rolling seven days or not, that's not a statistically

4    significant sample, I think.  I mean, you know, I'm beyond my

5    pay grade on that too.

6            But what you are getting is an exemplar.  And the only

7    question is how large that exemplar should be.  So why is an

8    exemplar that shows ten CDK and ten Reynolds dealers on one

9    day, why is that materially less helpful to you, for example,

10   than seven days?

11           MR. MacDONALD:  Well, your Honor, I'm not a

12   statistician either, but my understanding is the larger the

13   sample we can get, the -- you know, anything that we do here,

14   since Authenticom doesn't really track or keep this

15   information, is going to be an attempted extrapolation.  There

16   is going to be some uncertainty there.

17           But a larger sample will give us slightly more comfort

18   in doing that sort of extrapolation to see kind of what they

19   are doing on a systemic basis, how often they are accessing our

20   systems, how often they are polling for certain types of files,

21   how often they are running certain types of scripts or running

22   circumvention on our security.  So the larger the sample, the

23   better off -- the better data we would have.

24           And I also wanted to say, to the extent that we're

25   limited to 20 CDK dealers or, you know, ten CDK and ten

1    Reynolds dealers, however it is, defendants will request that
2    we get to pick the dealers that are used.
3          THE COURT:  Okay.  I know you're not a statistician,
4    but I don't buy your argument because what your argument really
5    sounds like is an exemplar argument.  I mean, and you have got
6    testimony from Authenticom -- and I can't remember which
7    deposition it was in, but I read it.  Maybe it is Noth -- that
8    Authenticom queried the system for hundreds of people -- of
9    dealers, I think.  I mean, you have got that testimony, right?
10          MR. MacDONALD:  But the issue, your Honor, is that
11    under some of the statutory claims that we have brought, the
12    Digital Millennium Copyright Act, each instance, each query is
13    its own statutory violation.  So we need to be able to quantify
14    how many times they have queried our systems.  Authenticom has
15    not produced very good data on that, so we're trying to
16    extrapolate it from a variety of sources.  And this would be
17    one of our sources.
18          And, obviously, you know, a seven-day period in June
19    2019 is not the ideal data set, but it is better than nothing.
20    And it is better than just having kind of a limited set of
21    dealers.
22          THE COURT:  Yeah, I mean, I think -- I'm not sure how
23    much better than this snapshot is proportional to the needs of
24    the case.  Let me just look here for a second at what you said
25    in your briefs.  Your brief.

1          (Brief interruption.)

2          THE COURT:  Yeah, I mean, my guess from what -- you

3    know, I mean, I know plaintiffs say you gave me this

4    information to prejudice them.  I don't know, not really.  But

5    you're trying to give me a picture of why the polling data is

6    important because you have already established wholesale -- in

7    your view wholesale access to the CDK system.  So one of your

8    bullet points on page 3 says, Authenticom had CDK dealers

9    install a program called Profile Manager and used a system

10   administrator-level account to automatically re-enable DMS log-

11   in credentials that Authenticom was using to extract data from

12   CDK's DMS within minutes after CDK's security measures disabled

13   them.  And you cite the 30(b)(6) deposition of Brown, right?

14          MR. MacDONALD:  Yes.

15          THE COURT:  And that's really what we're talking about

16   here, right?

17          MR. MacDONALD:  Well, that's --

18          THE COURT:  To some extent.

19          MR. MacDONALD:  Well, seeing the actual scripts run is

20   to some extent also trying to quantify it.

21          THE COURT:  Right.  But you're never going to get all

22   the scripts that were run.  Instead you are going to testimony

23   that says this happened a lot, and here's an example of what it

24   looked like in June of 2019.

25          But you're never going to get, I don't think, today,

1   from data that disappears, what happened prior to that date.

2   So even if I were to give you seven days from today, yes, you

3   could argue that you could extrapolate that.  Everything else

4   is arbitrary in terms -- and I still haven't -- I mean, given

5   that it -- what you're asking for, I think, is illustrative,

6   I'm not sure how a larger sample, other than it is just a

7   bigger illustrative set, gets you anyplace.

8         I mean, how are you going to use this -- you say you

9   are going to give this to your experts, but your expert is not

10  here.  Or you tell me you're not a statistician.  I think

11  Authenticom would have an interesting time with an expert who

12  says, based upon a seven-day sample in June 2019, this is how

13  often I think this happened for a four- or five-year period.

14        MR. ROSS:  Your Honor, just to chime in briefly.  This

15  is Brian Ross.

16        Before -- part of the problem is that we don't know

17  what the numbers are for these most recent seven days.  But one

18  of the things that we would hope to do would be to establish a

19  bare minimum, a conservative estimate that our experts can

20  apply.  If you see a similar number of instances over June -- a

21  certain week in June 2019, and you combine that with testimony

22  where Authenticom is saying, we have lost customers, and we are

23  accessing your systems much less often nowadays than we were

24  back in the 2015 to 2017 period, then we would hope to

25  establish a floor in terms of quantifying these improper

1   instances of access.  So that would be one example.

2          Would that be ideal?  Of course not, but it would be a

3   -- certainly better than what we have to work with now on core

4   elements of our claims.

5          THE COURT:  Yeah.  And you all say you want to

6   identify the dealers.  So do you -- is part of your proposal --

7   I'm not going to give you a seven-day look at hundreds of

8   transactions.  I'm just not.  That's unduly burdensome, it

9   seems to me.  And I don't think it is proportional to the needs

10  of the case, as I understand what this is going to be used for,

11  even if it is a better sample for you for your expert.  Because

12  although I don't have hard data from Authenticom on this, I

13  have the Clements's affidavit.  And his affidavit at some level

14  convinces me that this is a labor intensive exercise for a

15  company that may not have the folks to do it.  And it has got

16  to be expensive.  And it has got to be real expensive.

17         Unless you want to pay for them to go through there

18  and reimburse them for the costs of doing this.

19         So I'm not going to give you seven days.

20         You hesitate.  You'll pay for it?

21         MR. MacDONALD:  Depending on the cost, we would

22  consider it, yes.  Or, you know, as I said earlier, we're

23  willing to have an expert do it if they will give us a terminal

24  and --

25         THE COURT:  I doubt that's happening.

1          Right, Mr. Nemelka -- Mr. Ho?

2          MR. HO:  We would certainly object to that, your

3  Honor.

4          THE COURT:  Yeah.

5          I mean, we're talking -- at a -- conservatively we're

6  talking about hundreds of dealers through this period of time.

7  Or at least a substantial number of more than ten.

8          I mean, another way to cut this is ten that you could

9  identify for the seven-day period.  I mean, I'm not sure how

10  much incremental burden that imposes on Authenticom.  Ten

11  dealers a day for seven days.

12          Or ten CDK, ten Reynolds for seven days.

13          MR. NEMELKA:  We'll multiply the effort by seven.

14          MR. HO:  And, your Honor, if I could just make one

15  observation about --

16          THE COURT:  How long -- do you know -- yeah, you can

17  in a second.

18          MR. HO:  Sure.

19          THE COURT:  Do you know just, because the party that

20  is raising the burden usually has to quantify the burden.  Do

21  you know for Mr. Clements's -- let's me see.  I'll look at

22  Clements's affidavit.  Hold on.

23      (Brief interruption.)

24          THE COURT:  Yeah, see, he talks about a -- he is

25  talking about the strawman here.  Rewriting the software to be

1    able to get a -- yeah, I'm getting to the point where maybe

2    I -- well, if --

3         (Discussion off the record.)

4         THE COURT:  Right.  I mean, do you have any idea as

5    you sit here today how much time it would take for ten CDK

6    dealers and ten Reynolds dealers?  I mean, because you're

7    making that proposal, you must have talked to somebody

8    technically to find out how -- and then you just multiply it by

9    seven.  So how much time is that?  Time and expense.

10        MR. NEMELKA:  They didn't give me a specific time.

11   They told me it would take about a week to get it to me because

12   I wanted to know about timing if this -- if this is something

13   that was offered or accepted.  So they said it would take them

14   about a week.  I don't know how they divided up their -- they

15   only have about three or four people now in their development,

16   and so I don't know how they would divide up -- how that

17   divides up man hours.

18        MR. HO:  But --

19        MS. MILLER:  Your Honor, this is Britt Miller.  And I

20   don't purport to have had a sneak peek at Authenticom software

21   so as to say how it operates.  But drawing on my limited

22   computer science background, I would think that you could -- if

23   you had identified the same ten dealers and you write the

24   script to be able to query the system for those ten CDK dealers

25   and those ten Reynolds dealers, you could run that query as and

1    against seven of the days and return the results.  I.e., you

2    wouldn't have to rewrite the program or rewrite the poll or

3    rewrite the query because it is the same query, just changing

4    the date.

5         THE COURT:  I would bet they are not talking about

6    writing a query, I would bet that they are talking about

7    manually going into the system and locating the stuff.  Because

8    Clements talks about the burden on actually writing a program

9    to do this.

10        Am I right?

11        MR. HO:  Yes, your Honor.

12        THE COURT:  Yeah.  I think what they are talking about

13   is putting somebody in front of a computer screen and looking

14   at this, you know what, the seven-day period, and extracting

15   from the software database this information.  And, again, this

16   is without prejudice to their argument that the, you know,

17   courts have said this, quote unquote, ephemeral data that

18   shouldn't have to be produced anyway.  It is kind of like just

19   scrolling stuff.

20        Right, Mr. Ho?

21        MR. HO:  Yes, your Honor.  I think of it as sort of --

22   it as sort of footprints in the sand.  I mean, they are only

23   there for seven days, and then they are washed away as in the

24   ordinary operation of the software program.  And that's exactly

25   the kind of data that we ordinarily think of as too burdensome

1  to have to preserve, maintain, and then produce in discovery.

2  And we think that that ordinary principle ought to apply here.

3       If I could just make one observation about your

4  Honor's point that I think is well taken, that this can only be

5  for illustrative purposes.  I mean, I'm not a statistician, but

6  a red flag, you know, is raised in my mind when I hear the

7  defendant saying, well, actually we'd like to pick the dealers

8  because a central principle of any kind of extrapolation is

9  that it be from a statistically random sample.  So they are

10  skewing the sample by their very request to decide which

11  dealers to choose, which leads me to think this really isn't

12  about experts or about extrapolation, it is, as your Honor

13  suggested, about trying to find as many illustrations as

14  possible that they can use, however they intend to, in front of

15  the jury.

16       THE COURT:  Yeah, I mean, I do think it is trial

17  presentation.  At least that's my gut here.  I don't think

18  you're -- you know, Mr. McDonald's -- I mean, Mr. Ross's ears

19  perking up and saying, well, we'll pay for it, we'll pay for

20  it.  We'll put an expert there.  We'll find all this stuff.

21       I still kind of envision, which hopefully they are not

22  going to be in front of me, the Daubert arguments about whether

23  -- what information in June of 2019 has to do with something

24  else.

25       But I suppose defendants would argue, since the

1   company is smaller and retrenched somewhat, it can only be

2   worse earlier on in the period.

3        MR. ROSS: And just to be clear, your Honor, one point

4   of clarification. Mr. Ho has mentioned this concept of who is

5   picking the dealers. Obviously the statistical significance of

6   this data is precisely why we wanted to get a production of a

7   full day or days, irrespective of anybody picking dealers. But

8   in a world where we are -- we understand the Court's comments.

9   And in a world where we are going to be limited to a limited

10  subset of dealers, that's why we would like at least the

11  flexibility to choose. And if -- if we decide to choose them

12  in a randomly generated way, we'll do that. But the --

13  ultimately that was why we thought we shouldn't be limited on

14  the number of dealers.

15       THE COURT: Well, and to say it differently, you don't

16  want them to pick them. You would rather -- if somebody is

17  going to pick, you would rather pick.

18       What -- do you know, Mr. Nemelka, what's the over and

19  under? What's the difference on whether I were to say, for

20  example, all the polling data for one day between June whatever

21  and whatever versus ten CDK dealers for one day? I guess

22  depending upon how many dealers you're running, it could be

23  hundreds as opposed to ten, right?

24       MR. NEMELKA: Yeah, it's -- that's just very

25  burdensome. It is the seven dealers -- excuse me -- the 20

1    dealers over seven days is much less burdensome than doing all

2    of one day by an order of magnitude.

3         THE COURT:  So might I assume if it takes one week for

4    ten and ten, it would take two weeks for 20 and 20, right?  Or

5    it would take two weeks for ten and ten over two days, right?

6    Probably, right?

7         MR. NEMELKA:  Probably, that's right.

8         MR. HO:  And, your Honor, more than just the number of

9    hours, this is a company that is on a -- you know, trying to

10   run a business at the same time and has been reduced to the

11   absolute bare number of people -- minimum number of people that

12   is required to continue to operate its business.  So to take

13   one of those people and say, you have got to spend a week or

14   two weeks trying to find data for these, even, 20 CDK and

15   Reynolds customers is still a very significant burden on

16   management.

17        MS. GULLEY:  Your Honor?

18        THE COURT:  Yes, Ms. Gulley.

19        MS. GULLEY:  Thank you.  Sorry.  I wasn't sure whether

20   there was a window.  I was waiting for a window.  Can I make

21   some comment for -- momentarily?

22        THE COURT:  Sure.  Now we will have a one, two, three,

23   three lawyers arguing for Reynolds and Reynolds.

24        MS. GULLEY:  I'm so sorry, your Honor.

25        THE COURT:  That's okay.  We have got two for CDK, so

1   we have got the whole family in here.

2            MS. GULLEY:  Okay.  Well, thank you.

3            So I just want to address a couple of issues that you

4   raised.  First of all, I appreciate that you are not addressing

5   the spoliation issue today.  Obviously there are bigger issues.

6   There are prima facie elements that the defendants say in

7   having to prove their counterclaims, you know, that where we

8   sent them hold orders long, long ago and have asked for the

9   type of data for a long time, which we're just learning the

10  data that we got wasn't good enough.

11           With respect to the burdens, we understand, you know,

12  that this employee situation with the reduced forces that

13  plaintiffs put in their recent motions has been something that

14  they have been putting in their motions since this case was in

15  front of the Seventh Circuit, and after which Mr. Cottrell made

16  his statement to the press that the company was well positioned

17  and battled.  That came after those layoffs when he made that

18  statement.  We have talked about this many times.

19           Nevertheless, we appreciate the burdens of this.

20  Reynolds and CDK have also had significant burdens.  In polling

21  the transactional data that the plaintiffs requested, Reynolds

22  has to essentially shut down its accounting system every night

23  for months to pull that, and to had to pay tens of thousands of

24  dollars to buy additional server space.

25           So as an order of magnitude, we're talking about two

1    weeks for them.  We have worked on this for months and months

2    and months because it goes to elements of the plaintiffs's

3    case, we have had to do that.  This goes to a core element of

4    the defendants's case.

5              I understand that now, given that the plaintiffs have

6    continued to delete that information on an ongoing basis since

7    the case began, we only have seven days, but seven days is

8    better than zero days.

9              THE COURT:  Okay.  I hear you.

10         (Brief interruption.)

11             THE COURT:  You know, there is nothing in -- I'm

12   re-reading the defendants's brief on this, which is sealed as

13   ECF 711.  And really the whole import of what defendants are

14   arguing there is the illustrative purpose of this data rather

15   than, you know, a huge -- I'm interpreting it as more of a -- I

16   don't know how this gets you -- there is no affidavit from an

17   expert that says, I need seven days of data, for example, for X

18   number of Y dealers.

19             What you say at page 7 is the PCM log, which is

20   ephemeral data, I'm convinced, even though it would only

21   contain data for a limited time period, may be the only means

22   through which defendants can understand Authenticom's polling

23   activities on a poll-by-poll dealer-by-dealer basis.  So it is

24   an attempt to understand kind of what's going on.  Maybe I'm

25   putting too much weight in that.

1    Okay.  I want to take a really quick break here.  We

2    have been going since 9:30.  I know I have an 11:15 criminal

3    hearing, which everybody has not yet arrived for.  My intention

4    is to end you there.

5    Was there anything else you wanted me to deal

6    with -- I understand -- I guess there is -- there are a couple

7    of things that I would like to deal with with you.  I want to

8    make sure I know when the documents are going to be produced.

9    I want to know of the remaining things under advisement what

10   your priorities are.

11   MS. MILLER:  All of that -- your Honor, this is Britt

12   Miller.  I'll let Mr. Provance speak as to when we can get the

13   documents to you.

14   As to other matters that remain under advisement,

15   Docket 539 and Docket 543, which are defendants's motions to

16   compel production, they were both listed on the May 15th status

17   hearing report --

18   THE COURT:  Uh-huh.

19   MS. MILLER:  -- which actually implicate a number of

20   issues that your Honor ruled on with respect to CDK today.

21   THE COURT:  Well, isn't 539 your motion to compel

22   Authenticom, which gets taken care of by what I am doing here

23   or is this more in --

24   MS. MILLER:  No, this is a -- this is the motion to

25   compel Authenticom to produce communications off of their log.

1      THE COURT:  Okay.

2      MS. MILLER:  So these are specifically as to the

3  documents that they have claimed privilege to.

4      THE COURT:  Okay.

5      MS. MILLER:  Same thing is true of 543 --

6      THE COURT:  Got it.

7      MS. MILLER:  -- which is as to Auto Loop and Cox

8  Automotive.  Again, we have asked for both of them either to

9  produce them or to put them for in camera review.

10     So to the extent your Honor is going to plan a

11  hearing, you might want to do it all at once.

12     THE COURT:  I don't think I am going to -- I don't

13  want that kind of punishment.

14     MS. MILLER:  Fair enough.  Fair enough.

15     So those are the other -- so in terms of primacy, I

16  would -- considering the crossover, I would suspect that those

17  two would be ones we would be looking for for rulings in the

18  relative short term.

19     THE COURT:  Okay.  And for those you would say I would

20  want the opposing party to send me the document -- I don't have

21  those documents in camera either, right?

22     MR. NEMELKA:  Correct.

23     MS. MILLER:  Correct.

24     (Discussion off the record.)

25     THE COURT:  Something we received as zip file

1  documents on.  Do you know which one that was?

2          MS. MILLER:  That may have been the last round of in

3  cameras with respect to the class plaintiffs's motions that you

4  have already ruled on.

5          THE COURT:  Okay.

6          MS. MILLER:  So I don't believe we have submitted --

7  either side has submitted the actual documents with respect to

8  these three motions.

9          MR. PROVANCE:  Your Honor, it is hard for us to know

10  for certain, but those may have been submitted in connection

11  with Docket 633, which is a separate motion to compel.

12          THE COURT:  Yeah, the clawback documents and FTC

13  privilege, right?

14          MS. MILLER:  Correct.

15          THE COURT:  And then in addition to those, I have got

16  -- I had this issue about briefs for refreshing data.  Has that

17  been taken care of?  You don't have to do that?

18          MS. MILLER:  There are a number of things that are

19  outstanding from the May 15th status.  We have produced -- a

20  number of people have produced their refresh data.  A number of

21  portions of that refresh are still outstanding as to certain

22  parties.  There are agreed dates by which folks expect to

23  produce that data.  But there may be issues following those

24  refreshes which may need to be produced or may need to be

25  addressed with your Honor.

1        There are also a handful of other items from the May

2  15th agenda, not motions, but issues that were raised that the

3  parties are still working through.  But if those are not

4  resolved, obviously, we will have to bring those to your Honor

5  as well.

6        THE COURT:  Okay.  Mr. Provance, what's your thought

7  on when you can get me the documents in camera?

8        MR. PROVANCE:  Your Honor, the short answer is that I

9  I will need to talk to my staff as well as probably our

10 discovery vendor.  But in general we'll move with all alacrity.

11       One --

12       THE COURT:  All deliberate speed.

13       Why don't you, plaintiffs, also talk to Mr. Provance

14 about when you can get me something with respect to what I

15 would need to look at with the -- off of log issues that you

16 have raised.

17       MR. NEMELKA:  On the corollary issue?

18       THE COURT:  Yeah.

19       MR. NEMELKA:  Yes.

20       MR. PROVANCE:  Okay.  Your Honor, if I have could

21 just --

22       THE COURT:  And send an email to Brenda as to when you

23 can do it.  I'll enter an order.

24       MR. PROVANCE:  If I could ask one question.  One thing

25 that we have learned in the process with your Honor is that

1    submitting documents in camera that were produced with

2    redactions are often difficult for the Court to understand.  We

3    could undertake an effort to identify documents that were

4    redacted, but then, you know, try some way to identify what we

5    have redacted, but make it so that you could still see it.  We

6    can explore those things.  But obviously it will take a little

7    bit longer to put those together.

8         THE COURT:  Yeah.  I mean, obviously, I'm going to

9    want to know what was redacted.  I don't know if it is a

10   problem just with me or with other judges.  But I am going to

11   want to know what's redacted in order to understand it.  It may

12   be highlighting it or something, I don't know.  But I -- that's

13   part of the process.

14        MR. PROVANCE:  That's certainly an understandable

15   request, and we'll build that in to our estimate of how quickly

16   we can get you the documents.

17        MS. WEDGWORTH:  Your Honor, if I may bring up, I think

18   ECF 294 and 308, going way back to July, August of 2018, we had

19   a motion where you ruled on the waiver part, but you didn't

20   rule on the underlying privilege part of those clawback

21   documents with the CDK production there, which got rolled into

22   the current clawback motions.

23        So when you do rule on the clawback motions, with

24   regard to CDK 294 and 308, which I think consist of roughly

25   1400 documents, still need to review for privilege.

1     And that I think rolls into the Docket 633, which

2  we -- which we have been discussing.

3     MR. PROVANCE:  Your Honor, this is Matt Provance.  I'm

4  not sure I agree with what Ms. Wedgworth just explained.  There

5  were a set of clawback motions filed last year.  Your Honor did

6  rule on the waiver portion.

7     As to substantive questions about whether those

8  documents were in fact privileged on a document-by-document

9  basis, your Honor instructed the parties to incorporate that

10  into broader challenges, because those clawback documents were

11  logged and part of defendants's privilege logs.  And if there

12  are challenges to those documents based on their privilege log

13  entries, they could have, should have, and I believe were

14  raised in connection with the parties's discussions about

15  privilege logs that took place in November of last year.

16     And so from the Court's perspective we believe the

17  motions that were teed up, the documents that were challenged,

18  the privilege log entries that were challenged, they

19  incorporate all of that.

20     THE COURT:  I think I agree with that.  I mean, as I

21  recall this was a kitchen sink 1400 documents.  I didn't have a

22  document-by-document challenge.  And I think I said something

23  after I dealt with the waiver issue that if the parties really

24  want to do this on document-by-document basis, you have got to

25  tee it up to me on a document-by-document basis.  And my

thought was that that's what was done with ECF 633.

I don't think -- if I am correct, and the 1400 documents from before was a kitchen sink basis -- and I'll go back and look at that, but I am not interested -- I don't think it was a -- I don't think I -- I think what I said at the time was I can't rule on this on a kitchen sink basis.

Isn't that right, Ms. Wedgworth?

MS. WEDGWORTH: I thought this was the one where you requested and received a sampling of those documents.

THE COURT: Yeah.

MS. WEDGWORTH: And when you looked at those, there was this issue about the redactions weren't in the documents, which delayed everything. So I thought we were still dealing with the issue of how the redactions work with the sampling you got.

To the extent they are rolled up into 633, we certainly want everything ruled on at one point. I don't think we have set aside the 1400, but they are included in the 633. And, nonetheless, the 294 and 308 on the docket are still open for that -- for the privilege.

THE COURT: How am I supposed to rule on the issues of privilege on a sample basis, without knowing whether the sample you gave me actually is really an exemplar for each and every other document, and without some writing on that? I mean, how -- I mean, I remember you gave me some samples or I asked for

1   some exemplars.  I think I asked for a hundred or something

2   like that.  And I had them in a box.  And when I went through

3   them, it didn't help me at all, so --

4           MS. WEDGWORTH:  I appreciate that question and

5   appreciate the answer is normally document by document.  In my

6   experience in other cases, and I thought maybe this is where

7   you were going when you requested the sample, many times

8   magistrates or judges rules -- rule on those sampling saying,

9   here is a scenario where this is in or out.  And then the

10  attorneys take that ruling and apply it to the rest of the

11  documents.

12          In this scenario, the Judge has already ruled that

13  this is coming in for whatever reason or this is -- this

14  remains on the privilege log.  And we will follow that example

15  in going through.  And that has worked in the past, and I -- I

16  didn't try to read into too much what you were doing with the

17  sampling.

18          But with the ruling from that sampling, we certainly

19  could adjust and figure out the rest of the production with the

20  understanding there are usually some documents that do not

21  cleanly fall into one of your previous rulings.

22          But, again, the issue that happened in one of the

23  hearings was when defense counsel produced that sampling, the

24  redactions didn't appear, it threw off the review of it, and we

25  left it at that.

1        MR. PROVANCE:  Your Honor, I won't belabor the point

2   because we have a full record on this.  We had prior hearings.

3   We can all go back and check what was said.

4        There have now been four motions to either clawback or

5   seek production of privileged documents against CDK.

6   Ms. Wedgworth on behalf of the dealers filed motions seeking

7   all certain categories of privileged documents that were

8   initially produced to the FTC but then clawed back.

9        But all those documents have now been logged.  And

10  they were logged before plaintiffs filed not only Docket 633,

11  but also their general omnibus motion challenging clawback

12  entries at Docket Number 535.

13       So in terms of specific documents, there has been a

14  full opportunity to challenge entries, challenge individual

15  documents.  And indeed the dealership class members and now the

16  individual plaintiffs as well have made many, many challenges.

17  And we have responded to them, and those issues are now fully

18  briefed.

19       MS. WEDGWORTH:  My -- a brief response, your Honor.  I

20  appreciate we're dragging this out.  I'm not clear in that

21  response that that 1400 -- those 1400 documents have been

22  logged.

23       Mr. Provance, are you representing they have been?

24       MR. PROVANCE:  So, first of all, I believe it is 2400

25  documents that were initially challenged by clawbacking.  And,

1    yes, all those documents were either logged in connection with

2    the initial clawback motion that the plaintiffs filed last

3    summer in 2018 or were produced or have been included on the

4    privilege logs that CDK has now provided across its entire

5    productions.

6          THE COURT:  Okay.  We're going to probably have to

7    leave it there right this minute.  I'm going to want you, given

8    that I have another hearing that has to start, and our

9    defendant is here -- I'd like you to jointly email Brenda a

10   date by which you're going to submit the in camera documents

11   that we talked about.

12         I'm taking under advisement this issue of the polling

13   data so I could think about it and decide which way I want to

14   go or whether I want to call you back in or whether I need an

15   evidentiary hearing on it.

16         How far do defendants want to push the issue?  Do you

17   want to bring in your experts?  I mean, is the primary basis to

18   get data for your experts or to get information that is -- that

19   you can as exemplar or illustration?  So, for example, if I

20   say, you know, the amount of burden that I'm going to put

21   Authenticom through is related to how deeply important this

22   information is to the defendants, do you want to bring in your

23   experts to testify about why they need this information and how

24   a seven-day sample from 2019 is going to be the be all or end

25   all of their analysis?  Do you want to have that?

1    And then do you want me to appoint the special master

2  so you can pay that special master to do this and go off and go

3  on that track?  Or do you want to accept some measure, ten or

4  20 of these over a day or two days, and take that for your

5  purposes?

6    I just -- I'm trying to gauge how important this issue

7  is in the grand scheme of things.  How much time I should spend

8  on it.  How much time you want to spend on it.

9    MR. MacDONALD:  Your Honor, we think this issue is

10  very important.  We want it for two reasons.  One is the

11  illustrative reason you talked about.  One is, as I said, one

12  of the elements of our claims is quantifying the number of

13  times they run scripts on our system.  And this is one of the,

14  if not the only, source of that information.

15    THE COURT:  So you have other sources of information.

16    MR. MacDONALD:  There --

17    THE COURT:  It is obvious from what you have got here.

18  And so why didn't you, in your motion, wax eloquent on the

19  quantification aspect as opposed to the illustrative aspect?

20    I mean, getting this information from a lot of

21  different ways.  You have got Authenticom people testifying

22  about how the fact that they did this on hundreds of occasions.

23  You have got your own systems that can show who -- probably how

24  many times you were hit.  You have got other data coming in.

25    So is this another pebble of information?  Is it a

1    boulder?  Is it outcome determinative?

2              MR. MacDONALD:  I don't believe --

3              THE COURT:  Or don't you know?

4              MR. MacDONALD:  I don't believe it is outcome

5    determinative.  But it is a substantial source of information.

6    This is the best information Authenticom keeps on this.

7              THE COURT:  It may be the best information that

8    Authenticom keeps on it, but do you have other information that

9    you can prove your case with?

10             MR. MacDONALD:  Well, we're going to -- if we don't

11   get this information, we're going to have to prove it with

12   other information.  But they are going to challenge that as not

13   reliable.  They are going to say your information isn't good

14   enough because you don't have access to the instance-by-

15   instance data, which is only kept on the --

16             THE COURT:  Yeah, but they are going to challenge that

17   on a seven-day sample too, right?

18             MR. MacDONALD:  That's true.  But then we have another

19   pillar to stand on.

20             THE COURT:  Okay.  So we're talking about how many

21   pillars you need to stand on, right?

22             MR. MacDONALD:  Well, you need at least three or four

23   for a chair.

24             THE COURT:  Okay.  A question whether a pedestal is

25   enough here.

1          Okay.  We're going to -- we're going to stop right
2    now.  I think I understand where we are.
3          I know I have to set another date to see you.  I have
4    other motions under advisement.
5          I think by and large the motions I now continue to
6    have under advisement, pending what you're going to tell me
7    about whether you work out everything on the issues in the
8    agenda, including depositions and stuff like that, are --
9    motions mostly are in camera review, redaction, clawback kind
10   of issues, which are terribly labor intensive.  So we would
11   have to set out some time for that.
12         But right now I think, unless there is anything else
13   somebody wants to raise quickly, I think we are going to break.
14         MS. WEDGWORTH:  Your Honor, just one brief thing.  We
15   have a third-party motion to compel that we briefed in the
16   Southern District of New York, which was transferred here on
17   May 30th.  It was assigned to Judge Tharp.  So we will be --
18   good news, bad news -- getting it to you, hopefully, this week.
19   So there is a pending motion to compel from a third-party
20   production.
21         THE COURT:  Well, that depends on whether Judge Tharp
22   wants to send it over here.
23         MS. WEDGWORTH:  Correct, your Honor.
24         THE COURT:  I think maybe it should go to Dow and then
25   to me.  I don't know.

1      MS. WEDGWORTH:  I suspect we have to get it in front

2  of Dow and then to you.

3      THE COURT:  Well, it is not yet on my brief motions

4  calendar, so -- okay.  Can we break?

5      MR. NEMELKA:  We thank you for your time.

6      MS. WEDGWORTH:  Thank you, your Honor.

7      MR. HO:  Thank you, your Honor.

8      MS. GULLEY:  Thank you, your Honor.

9      (Which concluded the proceedings:)

10                       CERTIFICATE

11      I HEREBY CERTIFY that the foregoing is a true, correct

12  and complete transcript of the proceedings had at the hearing

13  of the aforementioned cause on the day and date hereof.

14

15  /s/ Pamela S. Warren                June 10, 2019
    Official Court Reporter                  Date
16  United States District Court
    Northern District of Illinois
17  Eastern Division

18

19

20

21

22

23

24

25