**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: DEALER MANAGEMENT SYSTEMS ANTITRUST LITIGATION | MDL No. 2817 Case No. 18-cv-00864 |
| This Document Relates To: | Hon. Robert M. Dow, Jr. Magistrate Judge Jeffrey T. Gilbert |
| ALL CASES | **PUBLIC-REDACTED** |

**MDL PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION
TO EXCLUDE THE EXPERT TESTIMONY OF DR. KEVIN MURPHY**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT .................................................................................................................... 2

    I.  Dr. Murphy's Opinion That There Are No Damages Is Inadmissible Under *Story Parchment* ................................................................................................................ 2

    II.  Dr. Murphy's Opinion Is Inadmissible Because It Not Based on Sufficient Facts ...... 7

    III. Dr. Murphy's Pass-Through Analysis Should Be Excluded as Unreliable ................. 8

CONCLUSION ................................................................................................................ 10

## INTRODUCTION

Defendant CDK fails to refute MDL Plaintiffs' showing that three of the opinions of its damages expert, Dr. Kevin Murphy, should be excluded under Rule 702.

*First*, nearly a century of precedent starting with *Story Parchment* holds that conspirators that violate the antitrust laws cannot avoid liability on the grounds that they would have caused the same harm through unilateral conduct. Yet Dr. Murphy's expert opinion that CDK's conduct caused no harm because it would have closed its DMS even absent a conspiracy seeks to support that impermissible defense. CDK's claim that there is an exception to the rule if causation is disputed finds no basis in *Story Parchment* or the cases applying it. And such an exception would not help CDK, because there is no dispute that CDK's DMS closure caused increased prices, only about whether the closure was the product of conspiracy. CDK also argues that it can avoid *Story Parchment* because Dr. Murphy simply "took the[] opinions" of Plaintiffs' experts. But *Story Parchment* is not an evidentiary rule subject to a door-opening exception; it is a rule of substantive antitrust law. At any rate, Dr. Murphy mischaracterizes Plaintiffs' expert opinions. They opined that (1) CDK closed its system pursuant to a conspiracy with Reynolds, causing significant harm (a dramatic increase in DIS prices); and (2) even if Defendants' coordinated conduct were treated as unilateral, the damages would be similar if the conduct were unlawful under Section 2 rather than Section 1. Those opinions do not support Dr. Murphy's opinion that even if CDK closed its system pursuant to a conspiratorial agreement with Reynolds and harm flowed from that change, damages can be ignored because CDK *would have* closed its system in the absence of agreement.

*Second*, Dr. Murphy's "but-for-world" opinions are inadmissible because they are not based on sufficient facts or data. CDK fails to provide any factual support for Dr. Murphy's speculation that CDK would have undertaken the same blocking actions and price increases, at the same times, absent agreement with Reynolds. Dr. Murphy's conclusion in this regard is not based

on any data or analysis of CDK's profitability (or expected profitability). It is nothing more than assertion. Rule 702 requires more than an expert's *ipse dixit*.

*Third*, Dr. Murphy's pass-through regression analysis and his criticism of Dr. Michael Williams's pass-through regression analysis should be excluded because it assumes facts not present in this case. CDK again fails to provide any factual or legal support for Dr. Murphy's speculation that app prices must be included in determining the amount of overcharge passed on from vendors to dealers. Dr. Murphy's attempt to include app prices makes incorrect assumptions, generates results that are nonsensical, and is completely unreliable under Rule 702.

## ARGUMENT

### I. Dr. Murphy's Opinion That There Are No Damages Is Inadmissible Under *Story Parchment*

A. CDK does not question that an expert opinion that is "contrary to law [is] inadmissible." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc*., 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005). It is likewise beyond dispute that expert opinions are inadmissible – regardless of reliability – if they are legally irrelevant. *See Daubert v. Merrell-Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993); Fed. R. Evid. 702(a); Fed. R. Evid. 401. Under those principles, Dr. Murphy's core damages opinion – that the unlawful conspiracy between CDK and Reynolds produced no damages because CDK would have engaged in the same conduct (blocking independent DIS providers and dramatically increasing its own DIS prices) in a but-for world – is inadmissible because it is contrary to *Story Parchment*'s holding that once the jury finds damages "attributable to the unlawful combination," defendants cannot negate damages by showing that their conduct "would have been the same if they had been acting independently of one another, with the same resulting" harm to the plaintiff. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562

(1931).[1]  Such a showing "is irrelevant."  *Lee-Moore Oil Co. v. Union Oil Co. of California*, 599 F.2d 1299, 1302 (4th Cir. 1979).

CDK argues (at 10) that this principle does not apply if there is a dispute about the "causal link between the defendant's conspiratorial conduct and damages."  No such exception exists: courts repeatedly have held that an antitrust defendant "is foreclosed *from challenging causation* simply on the basis that it could have achieved the same result through lawful means." *Va. Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 540 (4th Cir. 1998) (emphasis added); *see also Irvin Indus., Inc. v. Goodyear Aerospace Corp.*, 974 F.2d 241, 245-46 (2d Cir. 1992) ("The possibility that [the defendant] might have submitted a lawful bid, and, if so, the same damage might have resulted, cannot in and of itself negate causation as a matter of law."); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 777 n.15 (2d Cir. 2016) (rejecting same argument, as applied to antitrust injury, as "unsupported by precedent").  CDK ignores altogether this authority.

In addition, even if CDK's posited exception existed, it would not apply: Dr. Murphy does not question that CDK's decision to stop competing on openness and to block independent DIS providers had an "impact on integration prices"; he admits that it did.  Dkt. 875-11, Murphy Rep. ¶ 45; *see also id.* ¶ 39.  Rather, Dr. Murphy's opinion is about the "but-for" world: that "CDK would have undertaken the same conduct with substantially the same impact on integration prices as it did in the actual world." *Id.* ¶ 45.[2]  In other words, Dr. Murphy does not question that CDK's

---

[1] CDK ignores (at 10) the relevant holding and instead focuses on the part of *Story Parchment* holding that a jury need only determine the amount of antitrust damages by a "just and reasonable inference." *Id.* at 563.  But that point is not at issue here, because this *Daubert* motion does not concern whether Plaintiffs can establish the amount of their damages with sufficient specificity.

[2] Accordingly, CDK's authority is uniformly off point.  In *R.S.E., Inc. v. Pennsy Supply, Inc.*, 523 F. Supp. 954 (M.D. Pa. 1981), the plaintiff failed to "show that the damage claimed was *in fact* caused by the unlawful acts of the defendant and did not result *from some other factor.*" *Id.* at 964 (emphasis added).  As noted, there is no dispute that CDK's acts, not some other factor, caused the harm.  In *Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319 (S.D. Fla. 2006), the court found insufficient evidence that the defendant's conduct, rather than other independent factors, caused the plaintiffs' business to fail.

*conduct* caused the damages; he questions whether *the conspiracy* caused damages exclusively on the ground that CDK would have undertaken the same conduct unilaterally. *See id.* ¶¶ 71-72

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ That is precisely the argument that *Story Parchment* "rejected as unsound." 282 U.S. at 562. CDK's effort to distinguish *Lee-Moore Oil* fails for the same reason: Dr. Murphy does not question the causal link between *CDK's actual-world conduct* and damages; that is, he does not assert that other factors – an economic recession or change in market conditions – account for Plaintiffs' injury.

CDK's protest (at 11) that Plaintiffs seek to "preclude . . . debate" over causation ignores the legal principles that guide the causation inquiry. Akin to an argument that a direct purchaser suffered no harm because it passed through an overcharge, *contra Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968), the causation defense CDK advances – that there were no damages because CDK would have inflicted the same harm even if it had not conspired – is invalid under the federal antitrust laws, and Dr. Murphy's opinions are therefore inadmissible.[3]

---

*See id.* at 1346-47. In *Hare v. Potter*, 549 F. Supp. 2d 688 (E.D. Pa. 2007), the "plaintiff did not prove any loss in wages or benefits resulted from the defendant's unlawful actions." *Id.* at 695. *In re Steel Antitrust Litig.*, 2015 WL 5304629 (N.D. Ill. Sept. 9, 2015), supports Plaintiffs, not CDK: the plaintiffs' expert opinion regarding impact was admitted over the objection that it failed to adequately account for factors other than the conspiracy. *See id.* at *10 (plaintiffs' expert's model "narrowly identified the wrong (i.e. the conspiracy to restrict production) and translated the legal theory of the harmful event into an analysis of the economic impact *of that event*") (internal quotation marks and brackets omitted; emphasis in original). And defendants did not argue in *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14 (D.D.C. 2017), that they would have imposed the same overcharges if they had not conspired; rather, the court there found that plaintiffs had failed to show predominance in light of deficiencies in their experts' damages model. *See id.* at 102.

[3] *Schonfeld v. Hilliard*, 218 F.3d 164 (2d Cir. 2000), is nothing like this case: the court there found a plaintiff's claim of lost profits unduly speculative when it was based on a "seemingly endless list of assumptions," *id.* at 173 – no one made or credited an argument that the defendant could have caused the same harm through lawful conduct. *Dantzler v. Dictograph Prods., Inc.*, 309 F.2d 326 (4th Cir. 1962),

**B.**     CDK also argues (at 12-13) that Dr. Murphy's testimony is admissible notwithstanding *Story Parchment* because it is based on the opinions of Plaintiffs' experts. As a legal matter, Plaintiffs' expert opinions cannot open the door for CDK to side-step *Story Parchment* and avoid responsibility for the harm caused by its illegal conduct. *Story Parchment* is a substantive rule that categorically "foreclose[s]" the kind of "but for world" defense CDK intends to offer through Dr. Murphy's opinions because it is inconsistent with the antitrust laws' remedial framework. *Va. Vermiculite*, 156 F.3d at 540; *see Irvin*, 974 F.2d at 246 (such a defense "cannot" succeed "as a matter of law"); *Lee-Moore Oil*, 599 F.2d at 1302 (defense is based on an "erroneous view of private damage actions").

In any event, Plaintiffs' experts said nothing that supports or opens the door for Dr. Murphy's opinions. Dr. Israel offered the opinion that the damages flowing from CDK's DIS price increase are the same whether the conduct is unlawful under Section 1 (because it was part of a horizontal conspiracy) or Section 2 (because CDK unlawfully monopolized the market for DIS on CDK's DMS). That opinion is not challenged – and it is uncontroversial: even though the *legal* elements for proving liability under Section 1 and Section 2 differ, it is hardly surprising that Dr. Israel concluded that the damages flowing from CDK's conduct are the same whether liability is established under Section 1 or Section 2.[4] But Dr. Israel *never* said – or even suggested – that CDK's conduct *was* unilateral (on the contrary, he opined that it was pursuant to agreement with

---

likewise involved the failure to show "the causal connection between the losses [plaintiff] suffer[ed] and the *illegal acts* of the defendant." *Id.* at 330 (emphasis added). The causal connection is not disputed here.

[4] CDK also incorrectly claims (at 6) that Dr. Williams opined "that damages would be 'similar' if the Dealers' unilateral claim – which has been dismissed-were revived." Dr. Williams made no such statement and in fact made clear that he had not undertaken that analysis. *See* Dkt. 993-5, Williams Dep. 110:4-24. Rather, Dr. Williams stated that if the dealers' monopolization claims were revived, the models used in his analysis would allow him to make similar calculations for a Section 2 claim. *See* Dkt. 993-4, Williams Rep. n.281.

Reynolds) or that CDK would have acted in the same manner absent the conspiracy. Dr. Murphy's opinions cannot be justified as proper rebuttal to any opinion Plaintiffs' experts offered.[5]

To illustrate, suppose plaintiffs challenged the policy of three printer manufacturers (A, B, and C) to require buyers to purchase replacement ink cartridges from the manufacturers. Plaintiffs might challenge the policy as the product of an unlawful conspiracy; they might also challenge the conduct of manufacturer A on the ground that, even if unilateral, it constituted illegal tying. An expert might find the same overcharge damages flowing from A's sales whether or not A conspired. But that would *not* give A's expert license to opine that even if it conspired, no damages resulted because A would have instituted the tying policy unilaterally. And that is so even if unilateral tying would be lawful, and even if (in the judgment of an economist) unilateral tying would be in A's self-interest: having adopted the policy pursuant to an unlawful conspiracy, A is liable for the resulting price increase. *See In re Publ'n Paper Antitrust Litig*., 690 F.3d 51, 68 (2d Cir. 2012) ("the mere fact that following price increases announced by competitors may have been consistent with [defendant's] overall pricing strategy does not immunize [defendant] from liability if it had an illegal agreement . . . to adhere to that strategy"); *Oberndorf v. City and County of Denver*, 653 F. Supp. 304, 309 (D. Colo. 1986) ("If plaintiffs can prove a conspiracy among defendants to monopolize . . . [t]hat the 'same injury' would occur even if defendants did not conspire and merely pursued [the same conduct] in good faith is not relevant . . . ."). That principle controls here and requires exclusion of Dr. Murphy's "but-for" world opinion.[6]

---

[5] Dr. Murphy will be barred at trial from offering any opinion regarding damages from unlawful monopolization, as he did not disclose any opinion on that question. To be sure, if CDK acted unilaterally and that unilateral conduct was lawful, the resulting price increases would be *damnum absque injuria*, at least under the antitrust laws, even if they inflicted the same harm. But that has nothing to do with whether CDK may argue that even if its conduct was pursuant to an unlawful conspiracy and caused harm, it may avoid damages by arguing that it would have acted in the same way absent conspiracy.

[6] *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) is inapposite because that case turned on the plaintiffs' failure to "disaggregate" damages between multiple theories of anti-competitive conduct, all but one of

## II.     Dr. Murphy's Opinion Is Inadmissible Because It Not Based on Sufficient Facts

Dr. Murphy's "but for world" opinion should also be excluded because it is not based on

sufficient facts.  *See* Fed. R. Evid. 702(c).  CDK points to nothing in the record – much less any

factual support in Dr. Murphy's report – which supports Dr. Murphy's conclusion that ████

████████████████████████████████████████████████████████████████

████████████████████████████████[7]████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

Moreover, Dr. Murphy's opinion that CDK would have imposed the same price increases

at the same times – absent collusion with Reynolds – rests on his assertion that it would have been

more profitable for CDK to unilaterally close its system and raise prices than to continue to exploit

its advantage over Reynolds in the DMS market.  Dkt. 875-14, Murphy Dep. 274:18-23.  But he

did not analyze any data to compare CDK's profitability when it was "open" (and gaining DMS

market share) versus its profitability after it "closed" (and started losing DMS market share), much

less CDK's expected profits from closing unilaterally absent collusion with Reynolds.  While CDK

cites (at 9) to Dr. Murphy's deposition testimony, that excerpt reflects only his *conclusion* that

CDK's decision to close would have been unilaterally profitable – not any data analysis that would

---

which were rejected by the district court.  *See id.* at 31-32.  Here, all parties agree on the conduct that caused the data overcharges: CDK's blocking of independent integrators and 3PA price increases.  *See In re Steel Antitrust Litig.*, 2015 WL 5304629, at *10 (distinguishing *Comcast* on this ground).

[7] For the reasons noted above, CDK's claim (at 5) that "Plaintiffs' experts establish the primary support for Dr. Murphy's opinion," because they purportedly concede that the "effects on [data integration services] prices that are the same with or without conspiracy," fails.  *See supra* at 5.  In addition, CDK states (at 7 & n.3) that Dr. Murphy relied "on the analysis of Dr. Michael Whinston, who assessed Defendants' unilateral incentives." ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

support that conclusion. *See Clark v. Takata Corp.*, 192 F.3d 750, 759 (7th Cir. 1999) (rejecting expert's "bare assertion," "connected to existing data only by [his] *ipse dixit*.").

## III.    Dr. Murphy's Pass-Through Analysis Should Be Excluded as Unreliable

Dr. Murphy's pass-through regression analysis and his criticism of Dr. Williams's pass-through regression analysis, *e.g.*, Dkt. 875-11, Murphy Rep. ¶¶ 105–114, should also be excluded because Dr. Murphy assumes facts not present in this case. CDK offers several criticisms of Dr. Williams's pass-through analysis,[8] but each ignores Dr. Williams's Reply Report.

CDK first argues (at 17-18) that Dr. Williams "needed to [but allegedly did not] test whether there was a correlation between App price and passed-on DIS fees." To the contrary, Dr. Williams did exactly that. *See* Dkt. 889-8, Williams Reply Rep. ¶¶ 97-99. ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████ Dkt. 875-11, Murphy Rep. at Ex.

22.[9] That Dr. Murphy found negative pass-through rates when using the total price demonstrates the unreliability of his pass-through analysis.

---

[8] Though Dr. Murphy criticizes Dr. Williams's pass-through analysis (which calculates DIS price increases passed on by vendors to dealers and is only applicable to the Dealership Class), CDK's *Daubert* motion (Dkt. 882) did not attack nor seek to preclude any pass-through analysis conducted by Dr. Williams.

[9] The reason for this was explained in Dr. Williams's Reply Report, but ignored by CDK. Like the prices of most software products, App prices for vAuto and VinSoultions fell systematically over time in ways unrelated to the dramatic increases in the DIS fees firms passed through to Dealers. Dkt. 889-8, Williams Reply Rep. ¶ 100, Figures 19-22; *id.* ¶¶ 98-99. By adding (1) the unrelated decreases in App prices (which account for more than 80% of Dr. Murphy's "all-in" price, *id.* Figures 11-14), to (2) these vendors' DIS fees to dealers, Dr. Murphy obtained his incredible and unreliable negative pass-through rates. Notably,

Moreover, CDK fails to cite any cases in support of Dr. Murphy's inclusion of App prices in his pass-through regression analysis.[10]  In contrast, courts in this Circuit have accepted similar analyses with similar economic evidence to that used in Dr. Williams's analysis.  *See Loeb Indus., Inc. v. Sumitomo Corp.,* 306 F.3d 469, 487-88 (7th Cir. 2002) (reversing summary judgment ruling that price components were inseparable and "that the two [price] components 'offset' or that the premium somehow compensated for the defendants' manipulat[ion]" of the base price).[11]  Further, Dr. Murphy's unsupported argument that App prices must be included when determining pass-through damages (as opposed to using data integration fees charged by vendors to dealers to determine how much of the DIS price increases were passed through to dealers) fails because he falsely assumes that any reductions in App prices "correspond" to increases in data integration fees.  As explained above, the economic evidence in this case actually demonstrates that "different App prices have different price trends independent of changes in upstream data integration fees."[12]

███████████████████████████████████████████████████

████████████████████████████████████████████████████

---

Dr. Murphy's regression analysis also found a pass-through rate of over 1,000% for another vendor (HomeNet), which again defies evidence and logic.  Dkt. 875-11, Murphy Rep. ¶ 110 & Ex. 22.

[10] Instead, CDK argues (at 18) that in his deposition, Dr. Murphy offered a "comparable scenario" of the Social Security tax being incorrectly reported by an employer on a paycheck stub.  This example is inapposite.  In any event, the point is that the pass-through analysis in any given case is fact-specific, and it is precisely the facts in this case that Dr. Murphy has ignored.

[11] CDK's attempt (at 19 n.9) to distinguish similar cases equally fails.  *Allen v. Dairy Farmers of Am. Inc.*, 2013 WL 6909953, at *13 (D. Vt. Dec. 31, 2013) (damages analysis in a price-fixing case properly focuses on the "component of price Plaintiffs allege the conspiracy suppressed"); *Nat'l Constructors Ass'n v. Nat'l Elec. Contractors Ass'n*, 498 F. Supp. 510, 538-39 (D. Md. 1980) (overcharge calculated without need to examine the net price paid because "[t]he amount of the overcharge is ascertainable" by looking solely to the surcharge), *aff'd as modified*, 678 F.2d 492, 503 (4th Cir. 1982).

[12] Dkt. 889-8, Williams Reply Rep. ¶ 98.  CDK's half-hearted attempt (at 20) to support Dr. Murphy's argument with one vendor's report to the FTC does not provide a sufficient basis to support Dr. Murphy's broad assertion.  Instead, the weakness of his argument is highlighted by the fact that CDK could identify only a single inadmissible document in an effort to backfill support for Dr. Murphy's claim.

██████████████████████████████████████ In making this

comparison, CDK reveals a complete misunderstanding of Dr. Williams's pass-through regression

analysis.  Following the standard practice, Dr. Williams estimated the pass-through "elasticity,"

which equals (1) the percentage change in integration fees charged by a vendor to a dealer divided

by (2) the percentage change in DIS fees charged by CDK or Reynolds to that vendor.  In contrast,

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████[13]

## CONCLUSION

The Court should exclude Dr. Murphy's opinions as set forth in MDL Plaintiffs' motion.

Dated:  July 8, 2020                                 Respectfully submitted,

*/s/ Peggy J. Wedgworth*                    */s/ Derek T. Ho*

Peggy J. Wedgworth                           Derek T. Ho
**MILBERG PHILLIPS GROSSMAN LLP**   **KELLOGG, HANSEN, TODD,**
One Pennsylvania Plaza, 19th Floor    **FIGEL & FREDERICK, P.L.L.C.**
New York, NY 10119                         1615 M Street, NW, Suite 400
(212) 594-5300                                  Washington, D.C. 20036
pwedgworth@milberg.com                  (202) 326-7900
                                                         dho@kellogghansen.com

*MDL Co-Lead Counsel*

---

[13] ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████

<u>**CERTIFICATE OF SERVICE**</u>

I, Derek T. Ho, an attorney, hereby certify that on July 8, 2020 I caused a true and correct copy of the foregoing **MDL PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. KEVIN MURPHY** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system. Copies of the Under Seal filing were served on counsel of record via email.

*/s/ Derek T. Ho*
Derek T. Ho
**KELLOGG, HANSEN, TODD,**
 **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kelloghansen.com