1      <u>**TRANSCRIBED FROM DIGITAL RECORDING**</u>

2      IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
3      EASTERN DIVISION

4   IN RE:            )
                      ) Case No. 18 CV 000864
5   DEALER MANAGEMENT SYSTEMS     )
  ANTITRUST LITIGATION,         ) Chicago, Illinois
6                       ) June 25, 2020
                      ) 10:35 a.m.
7

8             TRANSCRIPT OF PROCEEDINGS
  BEFORE THE HONORABLE JEFFREY T. GILBERT, MAGISTRATE JUDGE
9

10   TELEPHONIC APPEARANCES:

11   For Plaintiff
  Authenticom:          MR. DANIEL V. DORRIS
12                   MR. DEREK TAM HO
                  Kellogg, Hansen, Todd, Figel &
13                   Frederick, P.L.L.C.
                  1615 M Street, NW
14                   Suite 400
                  Washington, DC 20036
15                   (202)326-7900
                  Email: Ddorris@kellogghansen.com
16                           DHo@kellogghansen.com

17   For Defendant CDK:     MR. MATTHEW DAVID PROVANCE
                  MS. BRITT MARIE MILLER
18                   Mayer Brown LLP
                  71 S. Wacker Drive
19                   Chicago, IL 60606
                  (312) 701-8598
20                   Email: Mprovance@mayerbrown.com
                       Bmiller@mayerbrown.com

21      **PLEASE NOTIFY OF INCORRECT SPEAKER IDENTIFICATION**
       NOTE:   FAILURE TO STAND NEAR THE MICROPHONE OR USING
22      A SPEAKERPHONE MAKES PORTIONS UNINTELLIGIBLE AND
     INAUDIBLE
23

24

25

1  APPEARANCES:   (Continued)

2  For Defendant Reynolds
   And Reynolds Company:          MR. ROSS M. MACDONALD
3                                 MS. AUNDREA K. GULLEY
                                  MR. BRIAN T. ROSS
4                                 Gibbs & Bruns, L.L.P.
                                  1100 Louisiana Street
5                                 Suite 5300
                                  Houston, TX 77002
6                                 713-751-5231
                                  Email: Rmacdonald@gibbsbruns.com
7                                         AGulley@gibbsbruns.com
                                          Bross@gibbsbruns.com
8

9

10

11

12

13

14

15

16

17

18

19

20

21  Transcriber:

22              KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                      Official Court Reporter
23                 United States District Court
                219 South Dearborn Street, Suite 1426
24                    Chicago, Illinois  60604
                    Telephone:  (312) 435-5569
25              Kathleen_Fennell@ilnd.uscourts.gov

1    (Proceedings heard in open court:)

2    THE COURT:  (Inaudible) I'd like to get appearances

3    on the Liberty system.  I'd like to get appearances, and I

4    want you to try and remember, please, when you speak, when the

5    attorneys speak, say your name so that if somebody gets this

6    hearing transcribed, the court reporter will have a better

7    idea of who to attribute comments to.

8    So let's start with plaintiff Authenticom and start

9    on the plaintiffs' side, and then we'll do the defense side.

10    MR. DORRIS:  Good morning, your Honor.  This is Dan

11    Dorris on behalf of Authenticom.

12    THE COURT:  Okay.

13    MR. HO:  Good morning, Judge Gilbert.  This is Derek

14    Ho also from Kellogg Hansen also for Authenticom.

15    THE COURT:  On the defense side?

16    (Phone dialing.)

17    MR. MacDONALD:  (Inaudible) This is Ross MacDonald on

18    behalf of The Reynolds and Reynolds Company.

19    I believe also on the line are Brian Ross, Aundrea

20    Gulley also from Gibbs & Bruns also on behalf of The Reynolds

21    and Reynolds Company.

22    THE COURT:  Okay.  On behalf of CDK?

23    (Phone interruption).

24    MR. PROVANCE:  Good morning, your Honor.  Matt

25    Provance, Mayer Brown for CDK, and with me (inaudible).

1    THE COURT:  Okay.  I don't know what's going on here.

2   If somebody is trying to join the call on a cell phone or it's

3   noisy, please mute yourself.  I'll go for appearances again in

4   a second, but Mr. Provance, why don't you finish your

5   appearance.  And anybody else, we've got some interference

6   here, please mute yourself.

7    MR. PROVANCE:  Your Honor, this is Matt Provance,

8   Mayer Brown, for CDK Global, and with me is my colleague,

9   Britt Miller also from Mayer Brown.

10    THE COURT:  Okay.  I got appearances for the

11   plaintiff Authenticom, Dan Dorris and Derek Ho.

12    Anybody else join who wants to state an appearance on

13   the plaintiffs' side here?

14    Okay.  Anybody on the defense side?

15    Okay.  So based on the number -- I mean, I didn't

16   count everybody off, but there may be people on the line who

17   aren't stating their appearances, which is fine, it's a public

18   hearing.  I would ask, because we're getting some of that

19   interference, that if you're not speaking, please mute

20   yourself so we don't get a lot of static or interference.

21    Again, as I said at the beginning, if you speak,

22   please identify yourself first so that if the hearing is

23   transcribed, the court reporter can put names to statements.

24    Okay.  This is -- we're here on plaintiffs' motion to

25   clarify and reconsider my June 8th, 2020 order.  I read

1    plaintiffs' motion.  I also read the hurry-up response --

2    sorry about that -- filed by CDK and Reynolds and Reynolds,

3    and I understand what you guys are talking about.

4         I'm going to grant the motion to clarify, deny the

5    motion to reconsider, try and clarify some things and provide

6    a little guidance here.

7         One, we could not figure out -- and by we, I say me

8    and my law clerk who's also on the line, I know she dialed in

9    as well -- could not figure out from the written submissions

10   what document -- what documents were being withheld on the

11   basis of work product, either alone or in combination with an

12   attorney-client privilege, and I recognize this motion sat for

13   a long time, and maybe too long; I apologize for that.  A lot

14   of that's on me.

15        There were some of these motions that had

16   supplements, but I'm not sure if this was one or not, and I

17   really didn't want to have yet another submission after you

18   had submitted the stuff here, but I will tell you, we weren't

19   able to figure that out as you can see in my order.

20        To clarify, I did not intend for Authenticom to

21   produce documents right now that were covered by the

22   work-product privilege -- for documents that I said there's no

23   attorney-client privilege but there was an assertion of the

24   work-product privilege, I did not intend to overrule that

25   privilege in my -- in my opinion because I couldn't address it

1   really as to which documents were involved.

2           Now I have a much better idea of which documents are

3   involved, and I can address it.

4           Also, frankly, when we were reading the briefs, I

5   thought a little bit, I don't mean to be disrespectful here,

6   but I thought the work product arguments were a little bit

7   more of a throw-away argument, or at least they were not

8   developed in the same detail that the common interest or

9   attorney-client privilege arguments were developed, so it

10  just -- it seemed to me that they were a little bit to the

11  right of the decimal point.

12          But I did mean for Authenticom to produce common

13  interest documents or alleged or asserted common interest

14  documents for which I said there was no privilege, but I

15  realized that for some of those, I probably had to deal with

16  the work-product argument, but I didn't really know which ones

17  I had to deal with that argument for, if that makes sense.

18          And I wasn't going to issue kind of a blanket ruling

19  on work product without being able to understand exactly what

20  was happening.

21          I do think that after I give you a clarification here

22  though, I'd like Authenticom to produce the documents as soon

23  as possible that need to be produced.

24          You saw in -- you know, my process was I was going to

25  look at some documents, analyze them and try and give you some

1  sense of how I was analyzing them for privilege, and then it

2  was going to be up to the party withholding to go through the

3  documents and see whether or not the other documents that are

4  being withheld really should be in the same category of the

5  ones where I said there's no privilege applying and produce

6  those documents.

7          I can't get a sense from these briefs as to whether

8  or not that process is going to go forward or not, so I'd kind

9  of like to know that.

10          But I have looked now at the 17 documents that I now

11  understand were among the 35 or 38, depending upon what time

12  you look at this, that Authenticom was asserting the attorney

13  work-product privilege on, and I really, on those documents,

14  having looked at them with a work-product lens as opposed to

15  an attorney-client privilege lens or common-interest lens,

16  none of those documents is covered by the work-product

17  privilege.

18          There are a lot of reasons for that.  The -- you

19  know, No. 1, I guess, if you want to be formal about this,

20  it's Authenticom's burden to establish the existence of the

21  privilege, and the briefs really didn't do that; 2, though,

22  now that I'm looking at those, the documents had to be

23  prepared by or for the party in anticipation of litigation or

24  for trial, and litigation has to be imminent or reasonably

25  imminent when you're looking at the attorney work-product

1  privilege.

2      And I don't think the record establishes that from

3  these documents.  These are shared among the group.  You know,

4  sometimes more or less people that Authenticom said was in a

5  common interest group, which is an argument that I have

6  rejected.

7      Most of these documents are in 2016, which is, as I

8  understand it, at least two years before litigation was filed.

9  I looked particularly at the document that was referenced in

10 the briefs, which is Document 1103, AUTH_MDL_TRIV_1103.  I'm

11 familiar with this document from looking at it before.  This

12 is communications between a lawyer Cooley, who I think at the

13 time was engaged in some capacity of representing Authenticom,

14 and Gerchen Keller.

15     Gerchen Keller was, as I understand it, a litigation

16 finance firm that Authenticom was talking to about potentially

17 financing litigation, and in that context, the lawyer is

18 responding, and there's a whole bunch of other emails like

19 this that I dealt with in my opinion, is responding to the

20 questions of an analyst that Gerchen Keller is trying to get a

21 handle on, any number of issues in a claim that Authenticom

22 may file in the future, and this particular document talks

23 about valuation methodologies for purposes of damages.

24     I mean, this is the closest document frankly in your

25 pile, but I look at this document as being prepared primarily

1    for the purposes of a financial transaction between -- or a

2    potential financial transaction between Gerchen Keller and

3    Authenticom, not in anticipation of litigation or in imminent

4    anticipation of litigation.

5         I understand that the whole financing transaction was

6    in the context of potentially providing financing for

7    litigation.  It ends up being filed two years later.  But this

8    was not a litigation document or in anticipation of litigation

9    document per se.  It was really in anticipation of a financing

10   transaction.

11        Again, a financing transaction that, if it went

12   through, and I don't know if it went through or not, would

13   have been used to finance some kind of litigation.  But

14   reading all these documents, the nature of the litigation, the

15   claims, who would be involved, who would the defendants be was

16   in flux at this time.  One of the potential defendants, as I

17   said in my opinion, was SIS, which, you know, was a purported

18   member of the common interest group.

19        So I don't think this fits within what I would

20   understand to be work product, which is material prepared by

21   or for the lawyer or a lawyer's representative in anticipation

22   of litigation, and with litigation being imminent or imminent

23   as the case law defines it, or adversarial proceedings, and

24   the burden on establishing that is on the proponent of

25   withholding the document.

1    And -- I'm going to stop right away, and then I'll

2  hear from somebody who wants to say something, but that's

3  pretty much the analysis that I have on all 17 of these

4  documents.  They just don't seem to me to fit within the

5  work-product box.

6    I was going to ask Authenticom if there was some

7  briefing specific in the briefs that you filed on the motion

8  itself that dealt with this particular document.  You could

9  point me to the brief by ECF number and page number because I

10  really don't know that I saw your argument there, as opposed

11  to kind of going, as I said, kind of a side argument on work

12  product.

13    I'm going to say one more thing, and then I'll stop

14  just so you can hear where I'm coming from on these things.

15    So I think the 17 documents that I've looked at

16  should be produced and there's no grounds to withhold them.  I

17  understand there's about 18 other documents.

18    To me, the same kind of analysis applies.  If they're

19  in the same genre of these, and, you know, there's really

20  nothing different between those documents and these 17, I

21  would say those documents have to be produced, too.

22    I don't want to necessarily have to review 18 more

23  documents.  If Authenticom wants to get them to me quickly so

24  I can review them, fine.  You know, I don't think I need to

25  review them.  It's the same stuff that I'm looking at here,

1  just different emails on different dates talking about similar

2  things, but I don't want to preclude you from getting --

3  having me see if you think there's some difference here.

4        If you are willing to live with my ruling here or,

5  you know, or even appeal it on this, on the whole basis of

6  this, I would say the 18, if they look like this, also should

7  be produced, and I would want to set a date for the production

8  of the documents.

9        Okay.  Let me stop.  And I heard people trying to say

10  something, and I will hear from Authenticom or anybody else

11  that needs to be heard from on this.

12        MR. DORRIS:  Your Honor, this is Dan Dorris from

13  Authenticom.

14        And I just wanted to address those two documents in

15  terms of the specific briefing where they were addressed.  The

16  arguments we presented were necessarily in response to the

17  arguments that defendants made in their motion to compel, and

18  I think as this Court noted in its motion to compel, the

19  arguments were made very generally, and the arguments

20  presented to this Court that these documents were not made for

21  or by Authenticom, and we responded to that argument

22  specifically, not necessarily providing all of the context

23  around the documents.

24        I can say for these two specifically, I think it

25  would be helpful for the Court to know more context, which it

1  asked for in its order, and the timeline I think is important

2  here, and it may not be perfectly clear from the briefing.

3  The Authenticom suit was filed in July 2017, just a

4  couple months after that document you're referencing, and if

5  the Court -- another document that was submitted to the Court

6  *in camera* I think establishes quite clearly that there was

7  already contemplated litigation they were discussing, that's

8  PRIV_1103.  That's one of the 17 documents, and it references

9  a complaint that is already drafted, and that's in

10  October 2016, and that's true for every document at issue.

11  They all occur or almost all of them occur in the fall of 2016

12  after this contemplated litigation.  There may be one or two

13  that are a couple months earlier in July or August that are

14  more prefatory to what I just mentioned.

15  So I think the timeline is important, and the context

16  may not be clear to the Court, and I'm not sure whether you

17  would like additional information on this or if you consider

18  your ruling final; but I think that the important thing is

19  that the litigation was quite concretely anticipated, and they

20  were discussing actual litigation and which was filed just

21  months later.

22  And in response to this being primarily a commercial

23  transaction, I think the way we view how these documents were

24  created is the attorneys, and you referenced Marc Schildkraut

25  who was representing Authenticom at the time, developed his

1   own mental impressions of litigation.  That is work product.
2   His analysis of what you mentioned, the valuation, and then he
3   shared that with a third party.
4           So his mental impression of valuation, that is work
5   product.  The question for the Court is whether the sharing of
6   that with a third party waived that privilege, and we think
7   the Court laid out the proper standard in its opinion, which
8   is whether it substantially increased the ability for
9   adversaries to get that information, and we submit that it
10  didn't because it was shared in confidence with a third party
11  as part of the financing transaction.
12          But the mental impression itself was necessarily
13  created towards the litigation.
14          So I'll stop there for those two documents.  There's
15  a similar argument for all of the other 17, and I guess I'd
16  look for guidance from you whether you were interested in
17  hearing more or whether you consider that ruling final.
18          THE COURT:  I think I need a little bit of a
19  clarification here.  First of all, you referenced two
20  documents.  I'm not sure what you mean.  Are you referencing
21  the two emails that are included in document PRIV_1103, which
22  I have in front of me, or is there something else you're
23  talking about in terms of two documents?
24          MR. DORRIS:  The two documents at issue are 163,
25  which you discussed specifically -- maybe I have these mixed

1   up.  My apologies.

2          I'm not sure I've got -- the two documents at issue

3   are 163 and 1103.  I may have mixed up which one's which.

4          THE COURT:  1103, 1103 has two emails -- actually

5   three emails, the lawyer at Cooley is sending some

6   spreadsheets to Gerchen Keller and Gerchen Keller asks a

7   question on damages, and then the lawyer responds by sending

8   essentially an excerpt from an ABA publication on antitrust

9   damages.

10          That one, per se, doesn't reference a complaint being

11   drafted or anything else, so --

12          MR. DORRIS:  Right.

13          THE COURT:  -- maybe you're talking about a 163

14   document, and I've got to find that one before I --

15          MR. DORRIS:  Yes.

16          THE COURT:  Do you know what exhibit that was to the

17   compendium of documents you sent?

18          MR. DORRIS:  I do not know --

19          MS. COOK:  Judge --

20          THE COURT:  Maybe my law clerk knows, yeah.

21          MS. COOK:  Yeah, it's at defendants' selection,

22   common interest Tab 2.

23          THE COURT:  Got it.  Okay.  Let me look at that.

24          Yep, I got it, okay.

25          MR. DORRIS:  And I'm referencing the second email

1   from the bottom.

2          THE COURT:  Mm-hmm.

3          Did you know, it says, are you making progress or

4   (inaudible).  I wonder because I planned to call you at 4:30

5   Eastern this afternoon?

6          MR. DORRIS:  Trying not to disclose too much --

7          THE COURT:  No, I know.  The one below that?  Okay.

8          MR. DORRIS:  Again, I was referencing this document

9   for the purpose of showing that the litigation was not only

10  contemplated but was in process as of October 2016.

11         THE COURT:  Okay.  And I disclosed that assertedly

12  privileged information (inaudible) brief because, you know, an

13  email that says I'll call after this, I'm not sure how this

14  fits into attorney work product, but I'll leave that aside.

15  I've been looking at the one at the bottom of that page and

16  the other one that you did say on the record one of these

17  emails references the complaint, and that's what you're

18  talking about on Page 2 of this document, right?

19         MR. DORRIS:  Yes.

20         THE COURT:  And what was Cooley's role at this point.

21         MR. DORRIS:  At this point, Mr. Schildkraut was

22  Authenticom counsel for what became this litigation, so he was

23  acting as counsel for this litigation.

24         THE COURT:  And it's Cooley that was drafting the

25  complaint, or you don't want to say?

1        MR. DORRIS:  Your Honor, I just don't know the answer

2    to that question.  I --

3        THE COURT:  That's fine.

4        MR. DORRIS:  I don't know who drafted it, but I could

5    figure it out if it was important to the Court.

6        THE COURT:  Yeah, yeah, yeah.  Okay.

7        MR. MacDONALD:  Your Honor, this is Ross MacDonald at

8    Gibbs & Bruns for the Reynolds and Reynolds Company.

9        Just to clarify something about Cooley, Cooley also

10   represents or has represented in the past Dominion Enterprises

11   and has represented them in this litigation, and they've been

12   deposed as a third-party witness.

13       So I obviously don't have the benefit of seeing the

14   documents in front of me, but I want to clarify that, you

15   know, just because Authenticom at one point had considered

16   retaining Cooley or briefly did retain Cooley just on the

17   emails that both Dominion and Authenticom, he was acting in

18   his capacity as an attorney for Authenticom and not Dominion.

19       THE COURT:  Yeah.

20       I have to say -- I hear -- okay.  I appreciate your

21   clarification, Mr. Dorris.  I really do.  You know, and the

22   context helps in all of these discussions, and, you know, the

23   context that you provided is helpful, and I looked at both of

24   these documents that you're referencing here.

25       I still don't think this moves the needle for me, and

1    I will tell you why.  I guess I could talk about both of these
2    together, 163 and 1103.

3           The context of these discussions were discussions or
4    communications between a lawyer you say for Authenticom, and
5    I'll accept that at this point, but maybe for other parties as
6    well, and a firm that Authenticom was attempting to engage or
7    talking about engaging to lend money in a transaction, the
8    money -- I get it because it's a litigation finance firm,
9    which is the way it's been described, would be used in some
10   way to fund litigation that Authenticom was contemplating at
11   that point.

12          I'm still not sure from anything what that litigation
13   was and how close the -- it resembled the litigation that
14   we're talking about here.  But let's assume that it has some
15   relation to this.

16          The October email is nine months before this.  The
17   other ones are six, seven months before this, and Gerchen
18   Keller is a party on the other side of the transaction, and
19   the lawyer is responding to some of Gerchen Keller's
20   questions.  I'm not sure how much -- let me just finish -- how
21   much in the western world depends on some of these
22   communications, but to me, I don't know how closely the
23   litigation that they were talking about resembles this, how
24   many parties were on the plaintiffs' side versus what actually
25   got filed.

1       I look at this as communications between people who

2   were trying to do a business deal together, so they're in

3   essentially the course of business, not the course of

4   litigation.

5       Litigation eventually got filed.  I don't know

6   whether Keller -- Gerchen Keller actually provided litigation

7   financing or not, but this was in the context of a lending

8   transaction, and I look at work product more in the context of

9   more closely related to litigation or the context of

10  litigation.

11      These folks at this point are not aligned.  They're

12  actually on opposite sides of a business transaction.  And to

13  me, this doesn't fit in the work product box, either 1103 or

14  163.  And, you know, that goes in more -- you know, in spades

15  for some of these other communications.  I view it, frankly,

16  you know, even if the work-product privilege applies here, I'm

17  not sure why it would in terms of some of the content of the

18  other 17 documents that I've looked at, but I -- my call in

19  looking at these 17, including 163 and 1103, that they're not

20  covered by the work product doctrine.

21      Somebody wanted to say something?  I don't know if it

22  was Mr. Ho.

23          MR. DORRIS:  Yeah, your Honor, it was Mr. Dorris.

24          THE COURT:  Dorris?

25          MR. DORRIS:  Yeah, two brief points.

1    One, the litigation that is being discussed is not

2    just kind of related.  It is the same thing.  It really is

3    referencing the complaint that was also filed six, nine months

4    later, maybe not the specific complaint, but the litigation.

5    THE COURT:  Let me ask you a question -- I'm going to

6    interrupt you there because I'd like a little bit more detail

7    on that if you can tell me.

8    The complaint that's being referenced, is Authenticom

9    a named plaintiff?  Is it the only named plaintiff?  Is it

10   against only the defendants who were sued in this case?  Is it

11   against other defendants?  Are there other named plaintiffs in

12   there with different claims?  How do the claims that were

13   ultimately filed relate to this draft complaint back in

14   October of 2016?

15   I don't want you to -- and -- I don't want to put you

16   in a position of disclosing anything that you can't disclose.

17   Potentially we can, if you're disclosing information that you

18   say is confidential, we could seal this transcript, but

19   that's -- you know, I wouldn't mind having some of that

20   additional -- different information, some of that information.

21   MR. DORRIS:  I don't have at my fingertips the

22   specific details in the earlier complaints.  I can say that

23   the gist of the complaint, the complaint and the harm that was

24   being attempted to be addressed by Authenticom is the same

25   thing that's now at issue in this litigation.  That's what I'm

1    referring to.

2            I have suspicions, but I wouldn't want to say

3    anything about that draft complaint without going back and

4    reviewing that specific complaint.

5            The other point briefly is I would refer the Court to

6    the cases cited in our brief.  That's ECF No. 571, Page 15,

7    footnote 11, and there are several cases there cited.  I think

8    a lot of courts, including courts in this district, accept

9    that an attorney's mental impressions developed about

10   litigation shared with litigation financing firms are --

11   remain protected work product, and --

12           THE COURT:  Let me --

13           MR. DORRIS:  I just think --

14           THE COURT:  I want to get to that document that

15   you're talking about.  Hold on for one second.

16           571 at Page 15, footnote 11.

17           MR. DORRIS:  At Page 14, footnote 11.

18           THE COURT:  14.

19           MR. DORRIS:  Or 15 of the ECF header, 14 of the

20   brief.

21           THE COURT:  Okay.

22        (Pause.)

23           THE COURT:  Okay.  I see that.  Go ahead.

24           MR. DORRIS:  And they just stand for the principle

25   that I was stating, which is in this case, an attorney

1  developed his mental impressions about litigation that was

2  concretely anticipated and ultimately filed months later, and

3  so that is protected work product.

4           When he communicates that to a third party, the

5  analysis is whether that communication was a waiver, whether

6  it substantially increased the risk that the adversaries here

7  would get that information, and because these were

8  confidential discussions between Authenticom and Gerchen

9  Keller, there was no material increase in risk or any increase

10  in risk that third parties would get Authenticom's counsel's

11  mental impression.

12           THE COURT:  Okay.

13           MR. MacDONALD:  And --

14           THE COURT:  Go ahead.

15           MR. MacDONALD:  Your Honor, Ross MacDonald again.

16           And, you know, defendants also in the brief cited at

17  least a couple cases that suggest the opposite.  The Viamedia

18  case that plaintiffs cited is at least a waiver question case,

19  but I think the issue comes down to in these cases to explain

20  why some rules that litigation finance documents are not

21  privileged and some courts come out the other way is really to

22  look at what you were talking about earlier, which is was the

23  document created for Authenticom or was it created for Gerchen

24  Keller?

25           And obviously we don't have -- that's step one, and

1  there's also step two, which is is it sort of a dual purpose

2  document that may have a purpose that's related to litigation

3  but also has an ancillary purpose or separate purpose that's

4  not related to litigation.

5      Obviously, we don't have the documents in front of

6  us, so I can't answer those questions, but judging from some

7  of your Honor's comments, it sounds to me like the

8  communications are really for the benefit of Gerchen Keller.

9  They're trying to answer Gerchen Keller's questions.  They're

10  providing advice to Gerchen Keller rather than being a

11  document that was created for Authenticom, which is I think

12  the key distinction.

13      THE COURT:  What if they've providing --

14      MR. DORRIS:  Your Honor --

15      THE COURT:  Hold on for one second.

16      This is Gilbert for the transcript.

17      What if they're creating -- what if the document was

18  created for the purpose of helping Gerchen Keller evaluate

19  whether it wanted to loan money to Authenticom for purposes of

20  litigation financing and the lawyers' purpose in doing that

21  was to help Authenticom get such financing?

22      MR. DORRIS:  Your Honor, this is Dan Dorris, and I

23  think that's one way, the way you just described it  and hold

24  these --

25      THE COURT:  No, wait.

1      MR. DORRIS:  -- to be privileged, but I think the
2   more fundamental way is that it's not about this specific
3   email.  This specific email that was sent for Gerchen Keller
4   was created for Gerchen Keller, and I think that's evident
5   from the document, but the analysis is what matters.  The work
6   product analysis is Authenticom's counsel's own work product
7   analysis of damages and relevant markets issued.

8      He developed that analysis as his counsel for
9   Authenticom in preparing for litigation.  That analysis was
10  created by Authenticom's counsel for Authenticom in litigation
11  that was filed.

12     That's the important part.  The email -- when the
13  email was shared, the only question is waiver.  The correct
14  lens isn't to look at whether this specific email was created
15  for Gerchen Keller.  It's who the analysis was created for
16  contained within the email.

17     THE COURT:  So you're -- you're saying there's no
18  question these documents were created for Gerchen Keller, but
19  that's not necessarily relevant.  What you're saying is the
20  emails contain mental impressions by the lawyer, a lawyer for
21  Authenticom, that's attorney work product that's in
22  anticipation of litigation, and -- and you would say even if
23  it's in anticipation of a financing transaction to fund
24  litigation in your footnote on almost the last page of your
25  brief.

1       And so you would say there's no question that this is

2   mental impressions of lawyers.  The only question is waiver in

3   giving it to Gerchen Keller to persuade them substantially

4   improves the risk that Gerchen Keller would turn around and

5   disclose it to defendants here.

6       I think Mr. MacDonald is just going to (inaudible)

7   through -- he would argue there's a different analysis the

8   Court should go through.  Was this document created by the

9   lawyer, by the lawyer or by the client at the lawyer's

10  direction for Authenticom, which is the client here, or was it

11  created for Gerchen Keller?

12      He would say if it was created for Gerchen Keller and

13  not Authenticom, then it's not privileged because it's not

14  attorney work product for Authenticom, it's attorney work

15  product for Gerchen Keller if it's attorney work product at

16  all.

17      You mentioned dual purpose, and I'm not sure where he

18  lands on dual purpose documents.  But, you know, we're talking

19  about -- again, in context, we're talking about a lawyer who

20  didn't end up filing the complaint that was contemplated

21  nine months before the complaint was filed by another lawyer,

22  but I hear what you're saying.  At the time he did this, he

23  was acting as counsel for Authenticom.

24      But my question was really to Mr. MacDonald the first

25  time and you jumped in, so I'd like Mr. MacDonald's reaction

1   to what I've just said in terms of the different arguments
2   and, you know, whether I'm getting something wrong or whether
3   he would say plaintiffs' analysis is wrong.

4          MR. MacDONALD:  Yes, your Honor.  This is Ross
5   MacDonald again.

6          I think your summary is correct.  Our point is that
7   before you get to a waiver analysis, there's a predicate
8   question of whether a document is attorney work product.  In
9   order to be attorney work product, it has to be by or for the
10  party claiming that it's their attorney work product made
11  in -- and made in anticipation of litigation.

12         And the Court, as I understand it, found that these
13  documents weren't made in anticipation of litigation, and it
14  appears at least from what Mr. Dorris just said that they
15  weren't made by or for Authenticom either.

16         And that's why I think there's a meaningful
17  distinction in these cases in how this works between, you
18  know, if a lawyer for a party sent a litigation finance
19  company a draft pleading, that draft pleading that was created
20  by or for the party and then it was shared with a third party,
21  that then becomes a question of waiver.

22         But here, you have to meet that first element of was
23  it attorney work product in the first place, and specifically
24  was it Authenticom's attorney work product.

25         The other thing is, and I appreciate that counsel is

1  kind of making new arguments attempting to kind of introduce

2  new evidence into the record on this hearing, but, you know,

3  the record as it sits, there isn't evidence, you know, even

4  who Mr. Schildkraut was working on behalf at this point in

5  time.  It seems it is Authenticom, but, you know, it's not

6  clear to us, and also, you know, it's just -- it's difficult

7  for us to respond to arguments on the fly without the

8  documents and given the (inaudible) we make these arguments.

9           MR. HO:  Judge Gilbert, this is Derek Ho.  May I make

10  a suggestion?

11          THE COURT:  Before you make a suggestion, I have some

12  more -- a couple more questions here that relate not just to

13  these particular Gerchen Keller documents.

14          Katie, can you give me the tab number again or

15  somebody give me the tab number again for 1103 because when I

16  moved to 163, even though the other documents in here are

17  marked with yellow tabs, I can't find that particular tab.

18          MS. COOK:  Judge, it's at the end of that in

19  defendants' selection regarding the communications with Lori

20  Generis.  It's Tab No. 7.

21          THE COURT:  Got it.  You're right.

22          Let me put aside the Gerchen Keller documents here

23  for a second.  What's -- what's Authenticom's arguments with

24  respect to these other I guess there are 16 documents now that

25  I've looked at here that generally involve communications

1  among a host of people who you said -- who you wanted to be

2  the common interest group who I said weren't.  I don't really

3  think they contain a whole lot of legal analysis.  They're

4  sending copies of news articles where some of them are talking

5  about what you want -- what this group wanted to -- what they

6  wanted the FTC to do rather than litigation that any of these

7  parties were going to be part of.

8          So why are these other documents, putting aside your

9  Gerchen Keller documents, why would these other documents be

10  subject to work product?

11          And, you know, I appreciate Mr. MacDonald's point

12  incidentally that these were not exactly front and center in

13  the briefing, and, you know, the footnote you're directing me

14  to is on the page before your signature page, so, you know,

15  I -- I may have 15 pages and each one of those pages was very

16  important, but -- give me something on the other documents

17  which I don't think are covered by work product just in terms

18  of content as well.

19          MR. DORRIS:  Yes, your Honor.  This is Dan Dorris.

20          And on the waiver point, I would just reemphasize

21  that we were responding to the arguments made by defendants in

22  their motion to compel, which we believe also did not resolve

23  these issues.

24          So on the specific documents, the other ones, I think

25  a good exemplar and one that shows up several times in the

1   email chain and it shows in the first email chain, it says

2   subject nondisclosure agreement, which confirms there was no

3   waiver when shared with third parties and there was, in fact,

4   a nondisclosure agreement between the parties.

5           And that email is collecting information for use in

6   litigation and those --

7           THE COURT:  Give me.

8           MR. DORRIS:  -- emails follow October 16.

9           THE COURT:  Give me the -- give me if you can refer

10  if you have it, maybe you don't have it in front of you, but I

11  have a Kellogg Hansen document or, you know, binder that was

12  sent to me on July 2nd, 2019 under cover of a letter from

13  Mr. Ho, and it had a bunch of tabs, plaintiffs' selections,

14  defendants' selections on common interest or Zimmer, whatever.

15          Which tab are you looking at?

16          MR. DORRIS:  Yes, your Honor, and I think a good

17  example -- I'm trying to relay with the privilege numbers.

18  Just give me one moment.

19          MR. MacDONALD:  Your Honor, this is Ross MacDonald.

20          As Mr. Dorris searches for the number, they mentioned

21  a nondisclosure agreement now.  They had never previously made

22  an argument that there was some nondisclosure agreement

23  between any of these parties.

24          The witnesses, we asked about whether there were

25  common interests or nondisclosure agreements, all said that

1  they didn't have such an agreement or weren't aware of such an
2  agreement, as you cite in your order.  So I honestly don't
3  know what that is a reference to.
4          MR. DORRIS:  This is Dan Dorris.
5          Our brief does make the point of the nondisclosure
6  agreement.  That's ECF No. 517, Page 15, footnote 12, but says
7  certain counsel communications state they're the subject of a
8  nondisclosure agreement and cites two documents submitted to
9  the Court on that point *in camera*.
10         On the specific documents, so an example would be
11 125, which was one of the 17 documents before the Court --
12         THE COURT:  Okay, and can you -- you know --
13         MR. DORRIS:  I'm sorry, I don't have --
14         THE COURT:  Okay, wait.  I found it.  I found it.
15 It's defendants' selections to common interest, Tab 1, and
16 privileged document 125.
17         MR. DORRIS:  And before we go to this document, your
18 Honor, one suggestion I would like to make, and I think the
19 discussions here probably shows the need for it more than
20 anything else is that as the Court said in its order, the
21 defendants had stated very generally their arguments for work
22 product -- that the work product didn't exist and that the
23 Court couldn't rule on those arguments as they were presented
24 and it didn't have enough information.
25         And I submit that it would be more helpful for the

1  Court to come to the correct result to entertain further

2  briefing on the issue that flushes out what the Court did not

3  have.  I'm happy to do my best to do that on the fly today,

4  but, you know, I think written submissions would be more

5  beneficial to the Court.

6  THE COURT:  I don't know.  I mean, I'm looking at

7  this document that you say is 125.  That just is not work

8  product, okay?

9  I mean, the known lawyer mental impression thing

10  here, this is the -- a communication among and between members

11  of your so-called common interest group, I -- you know, I

12  won't, you know, put in the record about what you're sending,

13  but suffice it to say that what you're sending -- let me just

14  make sure of my statement before I get there.

15  So do me a favor.  Look at Authenticom MDL privilege

16  125 and look at the page of that document that has numbers --

17  Page 7 on the bottom and look at the email, the first full

18  email on that page that is Tony Petruzzelli who's from

19  AutoLoop.  Put into the record -- do you have it?

20  MR. DORRIS:  Yes.  Yes, I do, your Honor.

21  THE COURT:  Okay.  There's a To column there, just

22  put into the record, identify the people in the To and tell me

23  who they are and what their privilege is.

24  MR. DORRIS:  The To column is Benjamin Miller.  He's

25  an attorney at Davis Polk.

1          Steve at Authenticom would be Steve Cottrell,
2    Authenticom's CEO.
3          Nathan Jay would be AutoLoop, a plaintiff in this
4    litigation, the general counsel for that company.
5          Jennifer Wade was -- I apologize, I don't know her
6    specific role but was employed by DARCARS, a dealership.
7          THE COURT:  I don't think she's a lawyer.  Nathan Jay
8    guy is employed by who again did you say?
9          MR. DORRIS:  AutoLoop.  He's the general counsel of
10   one of the plaintiffs in the litigation.
11         THE COURT:  Right.
12         MR. DORRIS:  Jennifer Wade, I'm sorry, I don't have
13   much more than that she was --
14         THE COURT:  Yeah.
15         MR. DORRIS:  -- her email says DARCARS.
16         Next is Mark Queen, who was either the COO or CEO of
17   Elead, a company that at this time was a very active
18   participant in this common interest effort but was
19   subsequently acquired by CDK, which naturally changed their
20   position.
21         THE COURT:  Uh-huh.
22         MR. DORRIS:  Mark Kovack is an attorney at Davis
23   Polk, and keep in mind the Davis Polk attorneys being
24   referenced here, the Court has already denied the motion to
25   compel as to communications with Davis Polk who were potential

1    counsel for Authenticom.

2          The next one is Jon Leibowitz, another attorney at
3    Davis Polk.

4          And Rusty Friddell is the general counsel of one of
5    the absent class members, Dominion.

6          THE COURT:  Okay.  And this communication, this 125,
7    your argument as to why this is work product is?

8          MR. DORRIS:  The first email in the chain over on the
9    last page is an email from an attorney requesting that the
10   people on the email chain collect facts for use in
11   anticipation of litigation, and my estimate that this is --

12         THE COURT:  Why is that in anticipation of
13   litigation, as opposed to monitoring what are regulatory
14   agencies doing?  How are you going to be involved in
15   litigation involving that regulatory agency?

16         MR. DORRIS:  I --

17         THE COURT:  Part of an effort here -- hold on, a lot
18   of the effort was this group was to get the FTC to go after
19   CDK and/or Reynolds, right?  But you were not going to be a
20   party to that litigation.  You were going to be a bystander
21   cheering it on, right, or AutoLoop was or DARCARS was or any
22   of these other people were, right?

23         MR. DORRIS:  And this is why the context is
24   important, as you saw earlier the emails that at this time
25   there was private litigation contemplated, a draft complaint

1 referenced in the earlier emails in October 2016, and so there
2 are multiple avenues being explored here.

3      Certainly one of those is private litigation, and
4 this document is gathering facts for use as part of those
5 efforts, and it's the same as if an attorney outside counsel
6 emails his client and says can you help me find these facts
7 for use in litigation.  That's work product because it exposes
8 the attorney's mental impressions and strategy in litigation.

9      MR. MacDONALD:  Your Honor, this is Ross MacDonald.

10      If I can just correct a couple things.  Mr. Dorris
11 made a comment about how Elead only left the common interest
12 group because it was acquired by CDK.  That is not accurate.
13 Elead filed an affidavit saying they disavowed any interest in
14 the common interest group months -- months before it was
15 acquired by CDK, if not longer.

16      Secondly, something that your Honor just pointed out,
17 which I think is very relevant, is that to the extent any of
18 the asserted work product was actually in relation to an
19 effort to lobby a government agency like the FTC, as opposed
20 to this litigation, there is no work product protection.  And
21 we raised that argument in a brief on this issue.  This is ECF
22 585 at Page 15.

23      THE COURT:  We were kind of in the middle of
24 Mr. Dorris trying to make his case that this particular
25 document is privileged.  I mean, I see there are lawyers on

1  these things.  There are a bunch of other, you know, people

2  not affiliated with AutoLoop or Authenticom, and what about

3  this -- this appears to be a Crain's article that is

4  circulated, the first few pages of this thing by Petruzzelli

5  at AutoLoop.  That's work product because?

6          MR. DORRIS:  As I said --

7          THE COURT:  Is that a lawyer's mental impressions

8  when some nonlawyer circulates without comment a letter from

9  Crain's Business?

10          MR. DORRIS:  Standing by itself, no, no, of course

11  not, but when it's in response, we submit it was the response

12  to a request for information by the attorney, and keep in mind

13  the Court has already held that the Davis Polk attorneys

14  requesting information were Authenticom's potential counsel at

15  this time.

16          THE COURT:  It's all -- it's all a request for

17  information relating to potential -- the FTC potentially going

18  after somebody else in which you guys would have a cheering

19  interest, right?

20          MR. DORRIS:  I -- I believe that, like I said, the

21  context is important in these documents.  We would submit it's

22  work product because there were multiple angles being

23  evaluated and pursued by the parties at this time.  There was

24  a complaint being drafted, and there were efforts on multiple

25  fronts, and this was gathering information to further those

1  efforts.

2      THE COURT:  Mm-hmm.  I'm just looking again at my

3  order of June 8th.

4      (Pause.)

5      THE COURT:  Okay.  Here's where I am on this,

6  everybody.

7      When I first looked at all these things and gave you

8  the ruling on June 8th, I wasn't able to determine from the

9  briefs what was up really on the work product.  Who takes the

10  hit on that, Authenticom because they're raising the privilege

11  or defendants because they're attacking it?  It's really

12  Authenticom that takes the hit on that because they're raising

13  the privilege or trying to raise the privilege, and they've

14  got -- they have the burden of doing so.

15      I thought the way the issues were presented to me

16  were not -- they were not presented in the most helpful way

17  for me to resolve particularly the work-product privilege.

18  Part of that was just the way, kind of the two-step process

19  that I got all these documents.

20      Should Authenticom have done a better job with it?

21  Yes, but I need to try and turn in the right decision and not,

22  you know, do it on points or the procedural aspects of this.

23      I don't want people to have to fly by the seat of

24  their pants on an argument here which really is in the context

25  of a motion to clarify what I meant about whether documents

1    that Authenticom was saying were work-product privilege had to

2    be produced when I denied the request that they be considered

3    to be common interest or attorney-client privilege, and the

4    answer to that if it wasn't clear in my opinion is I knew at

5    the time that if there were work-product objections that you

6    guys couldn't work out based on what I said in the opinion, I

7    was going to have to deal with the work-product issue, and it

8    sounds like you can't work them out.

9         There are different levels in these documents.  I

10    don't think -- I don't think there's any way, shape, or form

11    that simply a nonlawyer sending a copy of an article in the

12    media to a bunch of people that includes lawyers is work

13    product.  I don't know whether there can be a whole lot of

14    debate about that, and so by any stretch of the imagination,

15    Authenticom's designation of these documents is a bit

16    overbroad.

17         But we're doing this on the telephone during COVID

18    time, and I want to make sure I'm making the right move here.

19    So my call on this is that I want you to give me the 18 other

20    documents so that this is comprehensive.

21         I don't want any more briefs.  This has been helpful

22    to me in at least giving me a sense of where each party is on

23    the work-product issue.  I'll look at those.  I'll look again

24    at the 17 with this loss that I've got here, and I'll set it

25    for a hearing at which, whether it's in person or, again, on

1  telephone, in which I go through the documents and give you a
2  final ruling on the work product.

3          In trying to give you a final ruling on the work
4  product, you don't have to produce the common interest
5  documents that are also work product.  If there are
6  attorney-client privilege documents that you can't, even if
7  your arguments shoehorn into the work product privilege, those
8  should be produced, you know, by next week sometime.

9          I suppose there's an option that Authenticom, after
10  hearing this discussion, might say there are certain documents
11  that aren't work-product privileged; but, you know, I don't
12  know why you'd do that because you're keeping the ball in the
13  air and while you keep the ball in the air, you don't have to
14  produce these documents to these other guys and (inaudible) in
15  the litigation.

16          I'm just trying to talk.

17          MR. DORRIS:  This is Mr. Dorris.  Sorry to interrupt
18  that.

19          I -- I did want to raise one point.  In principle, we
20  have no objection to producing the attorney-client-only
21  privileged documents immediately.  There is one procedural
22  issue that complicates that, and that is Authenticom still has
23  the right to appeal.  There are certain documents for which
24  there's not an attorney-client or work product.  There's
25  certain documents for which there's both the attorney-client

1    and work-product privilege asserted.

2          We understand the Court's order with respect to the

3    attorney-client privilege, but Authenticom may want to take an

4    appeal of that issue for the documents for the dual privilege,

5    and then we would ask that either the Court or the defendants

6    provide clarity that our willingness to produce the

7    attorney-client-only privileged documents does not in any way

8    prejudice our ability to appeal the Court's ruling on that

9    attorney-client issue as to the documents we have not yet

10   produced.

11         THE COURT:  Which really would be common-interest

12   documents, or would they also be --

13         MR. DORRIS:  Yeah, I mean -- right, to try to be a

14   little more clear.  There could be documents that Authenticom

15   does want to appeal the common-interest ruling, the Court's

16   common-interest ruling, and we wouldn't want our willingness

17   to produce some of the documents now to prejudice our ability

18   to bring that appeal in the future.

19         I think the appropriate way to accommodate that would

20   be for the defendants to agree that they would not argue that

21   our production of documents now in any way prejudices our

22   ability to make an appeal later.

23         THE COURT:  So I hear -- before I hear from

24   Mr. MacDonald, there are certain documents you'd be prepared

25   to produce immediately by next week, which are documents that

1    were withheld solely on the basis of the attorney-client

2    privilege and not on the basis of the work-product privilege;

3    but you would not want your production of those documents to

4    prejudice your ability to appeal my ruling on the

5    common-interest documents, and you want defendants to

6    acknowledge that they won't argue production of assertedly

7    attorney-client-privilege documents where I disagreed

8    prejudices your argument that I was wrong on the

9    common-interest privilege in whole or in part, right?

10            MR. DORRIS:  That's correct.

11            THE COURT:  And, Mr. MacDonald, do you want to do

12   that, or do you want to do it in all one fell swoop because

13   it's kind of confusing?

14            Go ahead.

15            MR. MacDONALD:  Yeah, this is Ross MacDonald again.

16            Just to clarify, Dan, are you suggesting that you

17   guys next week would produce all but the 35 documents over

18   which you're still maintaining a work-product-privilege

19   assertion, so any documents that only had an attorney-client

20   or only had a common-interest but didn't have a work-product

21   privilege asserted?

22            MR. DORRIS:  Yes.  We would produce all of the

23   documents where there's only an attorney-client privilege --

24   where there was only an attorney-client privilege asserted.

25            THE COURT:  Attorney-client privilege and/or common

1    interest, same thing?

2        MR. DORRIS:  Yes, yes.  Attorney client, common

3    interest, no work product.

4        THE COURT:  But how would your -- I'm confused

5    because you said you would want to potentially appeal the

6    common interest ruling, but you want to say production of

7    common-interest documents that you're not also claiming a work

8    product doesn't prejudice your ability to produce -- argue

9    that the common-interest ruling was wrong?

10       I'm not sure how producing common interest -- I

11   thought you were talking about attorney client but not common

12   interest.  I don't know if (inaudible).

13       MR. DORRIS:  I think the right way to view those two

14   privileges is they're the same.  The common-interest documents

15   are even why the attorney-client privilege is not waived, so

16   when I group them together, I'm referring to the

17   attorney-client privilege with the common-interest documents

18   as a common-interest document (inaudible).

19       THE COURT:  Okay.  So what you want -- so what you

20   want is defendants to agree that you're producing those

21   documents or the attorney-client documents, which is inclusive

22   of common-interest documents, but over which you're not also

23   maintaining a work-product objection.  If you produce all

24   those attorney-client documents, that doesn't affect your

25   ability to appeal the common-interest ruling even though

1   defendants already have those documents?

2        MR. DORRIS:  Let me try and put this -- sorry for not

3   explaining this as clearly as possible.

4        THE COURT:  No, it's possible I'm not understanding

5   you, and maybe my understanding doesn't matter because if

6   Mr. MacDonald wants to agree to something, far be it from me

7   to be the fly in the ointment.

8        So if you guys can agree and you guys want to talk on

9   the record here, that's fine.  I don't -- if I have a problem

10  with it, I'll let you know.

11       MR. DORRIS:  This is Mr. Dorris.

12       The agreement would be if we have two documents right

13  now, one being attorney-client-only privilege asserted, the

14  other being attorney-client plus work product, we are willing

15  to produce the attorney-client-only privileged document

16  because this Court has rejected that attorney-client-only

17  document.

18       However, for the document we have not yet produced

19  for which there was both attorney-client and work-product

20  privilege assertion, we would like to retain the ability to

21  appeal both the denial of work-product privilege and any

22  denial of attorney-client privilege, and are seeking -- and

23  are willing to make our production conditioned on defendants

24  agreeing that the production of attorney-client-privilege-only

25  documents does not somehow waive or foreclose our ability to

1  appeal the attorney-client-privilege issues for documents not
2  yet produced.

3       MR. MacDONALD:  Okay, Dan, this is Ross MacDonald
4  again.

5       I can't speak for CDK because I'm not in the same
6  room for them, but for Reynolds, our position is that on the
7  timeliness of an appeal, appeal of the attorney-client and
8  common-interest ruling, that deadline has passed because the
9  order on the attorney-client and common-interest rulings was
10  more than 14 days ago, and the motion for clarification didn't
11  seek clarification of the attorney-client and common-interest
12  privileges, just the work-product privilege.

13       But we can agree that the fact that you produced
14  these documents isn't going to act -- isn't going to otherwise
15  change your appellate rights or act as a waiver of the
16  privileges, if that makes sense.  So we're not going to argue
17  that, oh, they've produced them; therefore, they've waived
18  this privilege.  We agree not to do that.

19       MR. DORRIS:  This is Dan Dorris.

20       That's acceptable, and assuming we have the
21  commitment from CDK, we are willing to produce those documents
22  quickly.

23       MR. PROVANCE:  Yes, this is Matt Provance for CDK.
24       Similarly, we would agree that the act of producing
25  the documents that we've been discussing will not procedurally

1  alter the parties' positions with respect to any appeal, but

2  we would otherwise reserve our rights in that respect.

3        THE COURT:  Here's my suggestion, guys.  This is

4  Judge Gilbert.

5        Because there's a lot of lawyer talk here, I'm a

6  lawyer, too, and maybe because I'm not in the trenches with

7  you, I don't completely understand what you're saying.

8        I would suggest you would reduce this agreement to

9  writing and that once you've got that agreement in writing, if

10  it's acceptable, then Authenticom produce the documents that

11  we're talking about here.

12        I'm not weighing in on appeal or not appeal, but I

13  think you ought to put it on paper so that both sides are

14  signing off on the same language, as opposed to the dueling

15  languages that may be overlapping here.  And once you've done

16  that, Authenticom ought to produce whatever it's going to

17  produce.

18        I don't have enough to issue an order right now on

19  this, in other words, but I think you guys can agree to

20  anything you want to agree to and then get the documents

21  produced.  If you do have an agreement, then they can be

22  produced.

23        I want -- I have the 17 documents here, so I want the

24  additional 18.  There are no deliveries in the courthouse

25  right now, so you're going to have to FedEx them to -- I think

1  you FedEx them to me, or UPS or whatever, and those go up to

2  the clerk's office, and then they can deliver them to me or

3  they can deliver them to chambers and I could come in.

4       Katie, lawyers --

5       MS. COOK:  Yes, I think --

6       THE COURT:  Lawyers, am I right, there's no hard copy

7  deliveries right now to the district court, right?

8       MS. MILLER:  You're correct, your Honor.  This is

9  Britt Miller.

10      THE COURT:  Okay.  So I think if you UPS them or

11  FedEx them to me, I've gotten this before, it goes to the

12  clerk's office, and then Tom Bruton gets it to me, and he can

13  either get it to me at home or he can drop it off in my

14  chambers on 13, and I'm authorized to be in court on -- in the

15  courthouse on certain days, two days one week, three the next.

16  I can go in and get them.

17      I'd ask you for two copies because I want to be able

18  to review these for my law clerk, and I can do that as soon as

19  possible.  You can tell me now when you're going to do it.

20      If you can get them out today for, like, you know,

21  Friday or Monday delivery, I'll get them quickly.

22      MR. DORRIS:  And, your Honor, this is Dan Dorris.

23      Was I correct in hearing that you didn't want any

24  further written submissions with the 18 documents?

25      THE COURT:  I don't.  I really don't.  I mean, I'm

1    getting where you're coming from on this, what you've been

2    telling me is more color, and I get where CDK is coming from

3    on this, too, and I can go back and potential -- you know, I

4    can look at what you've said in your briefs already to

5    (inaudible) the crutches on this.

6          Work product is not new to me, and so by now

7    re-reviewing these documents with the additional arguments and

8    getting together an opinion so there's no mistake on any of

9    this, I think that's potentially consistent with what I said

10   on June 8th, which is I can't figure this out.  I'm not even

11   sure if it's still relevant.  You know, I can't make these

12   determinations based on the briefs I got on a blanket basis,

13   as opposed to individual documents, and if the parties can't

14   work it out, we'll revisit it.

15         And so that's what I've done.  I've granted your

16   motion to clarify.  I'll clarify my ruling on work product.  I

17   could also clarify, which is the last thing with your motion,

18   that my June 8th order was not intended to require production

19   of work-product-privilege documents or even as attorney-client

20   documents that also would being withheld on the basis of work

21   product until I got down to the nub of the matter on the work

22   product thing.

23         So if you get this stuff to my quickly, I will -- you

24   know, this stuff has sat for a long time.  I'm sorry about it.

25   It will sit a little more, and just trying to think if I want

1  to require you to have to brief more stuff.  That's what I'm

2  kind of mulling.

3         I mean, I think what you've given me orally gives me

4  the gist of your positions.  I mean, Mr. Dorris's explanation

5  of all the other documents other than the Gerchen Keller, your

6  basic position is this was a group of people who were talking

7  about pursuing litigation anywhere from nine, ten months

8  before to earlier, and these documents were prepared in

9  anticipation of litigation either by a lawyer or at the

10  lawyer's direction, and the litigation was sufficiently

11  imminent given the timeframe we've talked about that they all

12  should be covered, right?

13         MR. DORRIS:  Yes, that's correct, that at least since

14  the middle of 2016 and actually earlier, but the documents

15  were all from the middle of 2016.  They occurred during a

16  period where there was concrete private litigation

17  contemplated as well as other efforts.

18         Some of the documents that I think you will see refer

19  to recruiting potential plaintiffs and getting plaintiffs and

20  collecting facts for that litigation, and this is all part of

21  the same effort that ultimately became the suit that's in the

22  MDL.

23         THE COURT:  Yeah.  And Mr. MacDonald's position for

24  the defendants, as they say in *My Cousin Vinny*, he

25  said (inaudible) I don't want to say what he says on the

1 record, and that there's no --

2 MR. DORRIS: We've all seen it.

3 THE COURT: Yeah. It's a good movie.

4 And there's no way, given -- and you haven't seen the

5 documents obviously, but the position of the group, you know,

6 if it's FTC related, that's not the litigation here, and

7 you've got, you know, this group potentially who had divergent

8 interests, and all these people did not end up filing

9 litigation.

10 And so this, you know, this was kind of a group of

11 people who was talking about a bunch of stuff, but even if

12 lawyers were involved, this is not the kind of work product or

13 traditional work product that you would say is insulated from

14 production, and maybe -- you could say what you really mean

15 because I don't know that I've characterized everything you

16 were saying right.

17 MR. MacDONALD: Your Honor, Ross MacDonald.

18 I believe you mostly characterized it correct. A

19 couple things I would just add is that some of these documents

20 were actually as far back as 2015.

21 THE COURT: Okay.

22 MR. MacDONALD: Go even further back, and

23 additionally to the extent, you know, there is something that

24 could be qualified as work product in one of these documents,

25 it has to be Authenticom's work product to be protectable.

1     Authenticom can't assert a privilege for something

2     that was Dominion's work product or DARCAR's work product, et

3     cetera, et cetera.

4          THE COURT:  Okay.  Or AutoLoop's.

5          MR. MacDONALD:  Yeah.

6          MR. DORRIS:  And I believe that is covered in the

7     briefing.  The rule says by or for.  If it is for Authenticom,

8     then it is also covered under the work product rule, but those

9     divergent positions are covered in the existing briefing

10    before the Court.

11         THE COURT:  Yeah.  No, I think, look, I mean, I have

12    enough information.  We've been on for almost an hour and a

13    half.  I don't want to -- I don't want to prolong this any

14    more.

15         I think I have what I need.  I'd like the documents.

16    Once I have those, we'll reconvene.  I'll try and do it as

17    soon as we can, and I'll be able to make, I think, a record

18    that if you decide to appeal it, Judge Dow will have it in a

19    better form than just the 17 documents or not, and I think

20    that's the way to go forward.

21         So let's do that.  Tell me when -- are you going to

22    get them out today so that they're delivered tomorrow so I can

23    get them delivered either tomorrow or Monday?

24         MR. DORRIS:  Your Honor, I think the early to end of

25    next week is probably more realistic, and the reason I say

1  that is we took your order to heart and have reviewed -- have

2  been reviewing the documents, the remaining

3  work-product-privilege documents, to see whether there are any

4  that we are willing to, in light of the Court's orders,

5  produce.  And there are some, but there are also a couple that

6  we are still trying to acquire more information to make that

7  decision.

8  So I don't have a set of documents today.  I think we

9  will get that to you quickly and can get them out to you early

10  to mid next week for delivery sometime this week.

11  THE COURT:  Okay.

12  MR. DORRIS:  The goal here is to narrow it.

13  THE COURT:  Yeah.  Why don't you send Brenda an

14  email, unless Mr. MacDonald wants me to set a firm date on

15  this, which I'd be receptive to.

16  You can send Brenda an email to say we just sent them

17  out today for tomorrow delivery so that we can make the

18  clerk's office aware that I'm going to get them.

19  So --

20  MR. MacDONALD:  Your Honor, Ross MacDonald again.

21  I think it makes sense to set a date just so that

22  everyone's aware of when they'll be sent, and then if

23  Authenticom after that date decides they want to withdraw

24  their privilege, they can obviously notify the Court and the

25  parties.

1          THE COURT:   Okay.  You said middle to end of next

2    week.  Wednesday?  Thursday?  Can you get them out by then?

3          MR. DORRIS:   Yes.  We can send them out by close of

4    business on Wednesday of next week for the earliest delivery.

5          THE COURT:   Okay.  We'll put that in our order.

6          And why don't you send me all 45 together, all right?

7    They don't have to be bound.  They can be -- send me two

8    copies of that with a binder clip, staple the ones that are

9    together, and I'll have all of them in one place rather than

10   having to go between two binders.

11         And I'll look for them.  You're not prejudicing

12   yourselves because next week is a crazy busy week with

13   criminal hearings.

14         Hold on for one second.

15         Yeah, I'll be off shortly.

16         Okay.  Let me -- and if it's less than 35 documents,

17   that's fine, too.  I'm not going to -- I'm not going to insist

18   that you send me 35 documents.

19         Okay.  So your motion to clarify is granted, and I'll

20   say how I clarified it.  Reconsidering, I would say denied

21   without prejudice.  I don't know where that's going to go if

22   you end up appealing whatever ruling I make.

23         You'll submit the documents, the work-product

24   documents that are still -- for which decisions still need to

25   be made, you'll send them by Wednesday of next week, and I

1    will get on that as soon as I can and then schedule a hearing

2    so that we can go over the documents and I can give you a

3    better sense, having thought about what you guys are saying

4    and also re-reading parts of your brief and also looking at

5    the documents again in light of this hearing.

6           Is this okay?  Or not okay.  Do I have to deal with

7    anything else?

8           MR. DORRIS:  Nothing from Authenticom, your Honor.

9           MR. PROVANCE:  Your Honor, this is Matt Provance.

10   May I raise just a brief housekeeping matter before we --

11          THE COURT:  Sure.

12          MR. PROVANCE:  CDK has a separate privilege log

13   motion that it filed in the cases that where it is only --

14   where it is the only defendant, and that motion is at Docket

15   543.

16          THE COURT:  Let me interrupt you.  Is this the

17   AutoLoop and Cox motion?

18          MR. PROVANCE:  Yes, your Honor, that's correct.

19          THE COURT:  Yeah, we're on it.  I mean, I'm sorry you

20   don't have a ruling on that now, but you're going to have a

21   ruling -- we got interrupted on that with another case, but I

22   know it's pending, and you're going to get something pretty

23   darned quickly.

24          MR. PROVANCE:  Thank you, your Honor.

25          I was actually just going to raise -- we had filed a

1    notice of partial resolution earlier this month, and we were
2    not able to deliver it, but I just wanted to make sure it was
3    received by the Court.

4              THE COURT:  Yeah, we -- well, we got something.
5    Katie, were we clear on how that dealt with things?

6              MS. COOK:  Yes.

7              THE COURT:  Yeah, I think that was right.  I
8    understood that.

9              MS. COOK:  And we are aware of the filing, and we
10   have it.

11             THE COURT:  Right.  And I believe we're going to
12   address it in our ruling.

13             So, okay, and we didn't lose it.  I know it's been
14   pending for a while.  I'm sorry, but you will hear from us
15   quickly.  I can't promise you necessarily this week, but
16   quickly.

17             MR. PROVANCE:  Thank you, your Honor.

18             THE COURT:  Okay.  We also know there's another one
19   out there, right?  Looking at our pending motions chart here,
20   which I think was recently fully briefed.  This is the one
21   about the settlement agreement, right, and disclosure?

22             MR. MacDONALD:  Yes, your Honor.  I believe that's
23   Reynolds' motion to compel a settlement between CDK and one of
24   the plaintiffs in this MDL, MVSC.

25             THE COURT:  Right, okay.  So I'm aware of that one,

1  too.

2          All right.  We're good.

3          Anything else housekeeping or otherwise?

4          No?  Okay, good.

5          All right, I'll talk to you when I talk to you.

6  Thanks.

7          MR. PROVANCE:  Thank you, your Honor.

8          MS. MILLER:  Thank you, your Honor.

9          MR. DORRIS:  Thank you.

10     (Which were all the proceedings heard.)

11                    CERTIFICATE

12     I certify that the foregoing is a correct transcript from

13  the digital recording of proceedings in the above-entitled

14  matter to the best of my ability, given the limitations of

15  using a digital-recording system.

16

/s/Kathleen M. Fennell              July 20, 2020

17  _____        _____
    Kathleen M. Fennell              Date
18  Official Court Reporter

19

20

21

22

23

24

25