PUBLIC VERSION

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| *In re Dealer Management Systems Antitrust Litigation*, MDL 2817 | No. 1:18-CV-864 |
| *This document relates to:* | Hon. Robert M. Dow, Jr. |
| THE DEALERSHIP PUTATIVE CLASS ACTION | Magistrate Judge Jeffrey T. Gilbert |

## CDK GLOBAL, LLC'S OPPOSITION TO THE
## DEALERSHIP COUNTER-DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

**PUBLIC VERSION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

LEGAL STANDARD ................................................................................................. 2

ARGUMENT .............................................................................................................. 3

I.     There Are No Grounds For Summary Judgment On The Contract Counterclaim. ....... 4

    A.    CDK Can Pursue Three Remedies For Its Contract Claim ............................................ 5

        1.    The Evidence Supports An Award of Injunctive Relief. ...................................... 8

            a.    CDK Will Suffer Irreparable Harm From Continued Breaches. ................ 8

            b.    The Balance of Hardships Tips in CDK's Favor. .................................... 12

            c.    An Injunction Is In The Public Interest ................................................... 12

        2.    The Evidence Supports An Award Of Declaratory Relief ................................. 13

        3.    The Court Should Award Nominal Damages. .................................................... 14

    B.    Neither Waiver Nor Unclean Hands Bars CDK's Contract Claim. ............................ 16

        1.    Counter-Defendants Have Not Shown Waiver. .................................................. 16

        2.    Counter-Defendants Have Not Shown Unclean Hands. ..................................... 18

II.    There Are No Grounds For Summary Judgment On The DMCA Counterclaim. ........ 21

    A.    There Are No "Group Pleading" Issues. ..................................................................... 22

    B.    Authenticom's Statutory Arguments, Which Counter-Defendants Incorporate By Reference, Fail. .................................................................................................... 23

    C.    Counter-Defendants' "Nexus" Argument Fails. ........................................................ 23

    D.    The Warrensburg Counter-Defendants' Specific DMCA Arguments Fail ................. 25

        1.    The Warrensburg Counter-Defendants Are Jointly Liable. ................................ 25

        2.    Relevant Facts For Liability ............................................................................... 26

        3.    CDK Made No "Judicial Admissions." .............................................................. 27

        4.    The Use of Profile Manager Violated The DMCA ............................................ 28

        5.    A Jury Could Find The Warrensburg Counter-Defendants Secondarily Liable For DMCA Violations. ........................................................ 31

    E.    The Continental Counter-Defendants' Specific DMCA Arguments Fail ................... 32

        1.    The Continental Counter-Defendants Are Jointly Liable. .................................. 32

        2.    Relevant Facts For Liability ............................................................................... 32

        3.    There Is Evidence of Contributory Liability ...................................................... 34

**PUBLIC VERSION**

**TABLE OF CONTENTS (continued)**

**Page**

  a. The Continental Counter-Defendants Knew Or Should Have Known Of Authenticom's Circumventing Activities. ...............................34

  b. Continental Assisted and Encouraged Authenticom's Violations. ............37

 4. There Is Evidence Of Vicarious Liability. ...........................................................38

  a. The Continental Counter-Defendants Had A Financial Interest In Authenticom's Conduct. .............................................................................38

  b. The Continental Counter-Defendants' Knowledge Is Disputed. ...............38

  c. Authenticom Asserts That The Continental Counter-Defendants Have The Right To Supervise Its Conduct. .................................................39

CONCLUSION ...................................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*7-Eleven, Inc. v. Violet Spear & Viannam, Inc.*,
  2012 U.S. Dist. LEXIS 66366 (ND. Ill. May 11, 2012) ..................................................... 8

*In re Aimster Copyright Litig.*,
  334 F.3d 643 (7th Cir. 2003) ............................................................................. 32, 33, 37

*Allen Bros., Inc. v. Abacus Direct Corp.*,
  2003 WL 21147985 (N.D. Ill. May 14, 2003) ................................................................ 13

*Allied Waste Transportation, Inc. v. John Sexton Sand & Gravel Corp.*,
  2016 WL 3443897 (N.D. Ill. June 23, 2016) ............................................................... 6, 7

*Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*,
  780 F.2d 589 (7th Cir. 1985) .................................................................................... 6

*Am. Suzuki Motor Corp. v. Bill Kummer, Inc.*,
  65 F.3d 1381 (7th Cir. 1995) .................................................................................. 15

*Anderson v. Liberty Lobby*,
  477 U.S. 242 (1986)............................................................................................... 2

*Apple, Inc. v. Motorola, Inc.*,
  869 F. Supp. 2d 901 (N.D. Ill. 2012) ....................................................................... 14

*Arista Records, LLC v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010)................................................................................... 34

*Authenticom, Inc. v. CDK Global, LLC*,
  874 F.3d 1019 (7th Cir. 2017) ..................................................................... 9, 31, 32

*Avila v. CitiMortgage, Inc.*,
  801 F.3d 777 (7th Cir. 2015) .................................................................................. 5

*Ballard v. Jewel Food Stores, Inc.*,
  2020 WL 616468 (N.D. Ill. Feb. 10, 2020) ................................................................ 2

*Bank of Chicago v. Park National Bank*,
  640 N.E.2d 1288 (Ill. App. 1994) ........................................................................... 15

*Barnard v. Hollingsworth*,
  83 N.E.2d 372 (Ill. App. 1948) .............................................................................. 15

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*BE & K Constr. Co. v. Will & Grundy Counties Bldg. Trades Council*,
   156 F.3d 756 (7th Cir. 1998) .............................................................................. 28

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
   881 F.3d 293 (4th Cir. 2018) .............................................................................. 36

*BrightStar Franchising LLC v. N. Nevada Care, Inc.*,
   2020 WL 635903 (N.D. Ill. Feb. 11, 2020) ........................................... 7, 8, 9, 11

*Central Brown Cnty. Water Auth. v. Consoer, Townsend, Envirodyne*,
   2013 WL 501419 (E.D. Wis. Feb. 11, 2013) ...................................................... 13

*Chamberlain Group, Inc. v. Skylink Technologies, Inc.*,
   381 F.3d 1178 (Fed. Cir. 2004) .................................................................... 22, 23

*Coexist Foundation, Inc. v. Fehrenbacher*,
   865 F.3d 901 (7th Cir. 2017) .............................................................................. 18

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) .............................................................................................. 7

*Ediciones Quiroga, S.L. v. Fall River Music, Inc.*,
   1998 WL 851574 (S.D.N.Y. Dec. 7, 1998) ........................................................ 35

*Empire Industries v. Winslyn Industries, LLC*,
   327 F. Supp. 3d 1101 (N.D. Ill. 2018) ............................................................... 18

*Epic Sys. Corp. v. Tata Consultancy Servs., Ltd.*,
   2016 WL 1179228 (W.D. Wis. Mar. 23, 2016) .................................................. 18

*Fabick, Inc. v. FABCO Equip., Inc.*,
   296 F. Supp. 3d 1022 (W.D. Wis. 2017) ............................................................ 19

*FirstMerit Bank, N.A. v. Quanstrom-Rose L.L.C.*,
   2013 WL 6577028 (N.D. Ill. Dec. 13, 2013) ..................................................... 17

*Frobe v. Village of Lindenhurst*,
   2013 WL 5433512 (N.D. Ill. Sept. 30, 2013) .................................................... 11

*Galesburg Clinic Ass'n v. West*,
   706 N.E.2d 1035 (Ill. App. 1999) ...................................................................... 15

*Gateway E. Ry. v. Terminal R.R. Ass'n of St. Louis*,
   35 F.3d 1134 (7th Cir. 1994) .............................................................................. 10

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*Gleicher, Friberg & Assocs. v. Univ. of Health Scis.*,
 586 N.E.2d 418 (Ill. App. 1991) .......................................................................... 7

*In re HA 2003, Inc.*,
 310 B.R. 710 (N.D. Ill. 2004) ............................................................................ 13

*Hentze v. Unverfehrt*,
 604 N.E.2d 536 (Ill. App. 1992) ........................................................................ 13

*In-N-Out Burgers v. Smashburger IP Holder LLC*,
 2018 WL 7891028 (C.D. Cal. Dec. 21, 2018) ............................................. 18, 19

*Int'l Union, Allied Indus. Workers of Am. v. Local Union No. 589, Allied Indus. Workers of Am.*,
 693 F.2d 666 (7th Cir. 1982) ............................................................................. 17

*Interlink Grp. Corp. USA v. Am. Trade & Fin. Corp.*,
 2014 WL 3578748 (D.N.J. July 18, 2014)............................................................ 5

*Jamsport Entm't, LLC v. Paradama Prods., Inc.*,
 2005 WL 14917 (N.D. Ill. Jan. 3, 2005) ............................................................ 34

*Jones v. Rempert*,
 2012 IL App (2d) 110208-U ............................................................................... 13

*JP Morgan Chase Bank, N.A. v. McDonald*,
 760 F.3d 646 (7th Cir. 2014) ............................................................................. 14

*Kaskel v. N. Tr. Co.*,
 328 F.3d 358 (7th Cir. 2003) ............................................................................. 14

*Kim v. InterDent, Inc.*,
 2010 WL 315011 (N.D. Cal. Aug. 3, 2010) ....................................................... 19

*Kreg Therapeutics, Inc. v. Vitalgo, Inc.*,
 2013 WL 1286681 (N.D. Ill. Mar. 28, 2013)..................................................... 10

*LaSalle Nat'l Bank v. Helry Corp.*,
 483 N.E.2d 958 (Ill. App. 1985) ........................................................................ 15

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
 387 F.3d 522 (6th Cir. 2004) ............................................................................. 23

*Long v. Kemper Life Ins.*,
 553 N.E.2d 439 (Ill. App. 1990) ........................................................................ 18

## TABLE OF AUTHORITIES (continued)

Page(s)

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
    629 F.3d 928 (9th Cir. 2010) ............................................. 22

*Midwest Television, Inc. v. Oloffson*,
    699 N.E.2d 230 (Ill. App. 1998) ........................................ 17

*Monotype Imaging, Inc. v. Bitstream, Inc.*,
    2005 WL 936882 (N.D. Ill. Apr. 21, 2005) ........................ 34

*Monotype Imaging, Inc. v. Bitstream, Inc.*,
    376 F. Supp. 2d 877 (N.D. Ill. 2005) ................................. 34

*Nappe v. Anschelewitz, Barr, Ansell & Bonello*,
    477 A.2d 1224 (N.J. 1984) ................................................. 5

*Nestlé Purina Petcare Co. v. The Blue Buffalo Co.*,
    2016 WL 4272241 (E.D. Mo. Aug. 12, 2016) ..................... 19

*Oliva v. Ramirez*,
    2007 WL 2436305 (D.P.R. Aug. 21, 2007) ......................... 19

*Packers Trading Co. v. FTC*,
    972 F.2d 144 (7th Cir. 1992) ............................................. 18

*Pampered Chef v. Alexanian*,
    804 F. Supp. 2d 765 (N.D. Ill. 2011) ................................. 18

*Petrzilka v. Gorscak*,
    556 N.E.2d 1265 (Ill. App. 1990) ........................................ 7

*Pierce v. City of Chicago*,
    2012 WL 401026 (N.D. Ill. Feb. 7, 2012) .......................... 26

*Poulson v. Beez Bugeez, Inc.*,
    1986 WL 11457 (S.D.N.Y. Dec. 1986) ............................... 28

*Prima Tek II LLC v. Klerk's Plastic Industries*,
    525 F.3d 533 (7th Cir. 2008) ............................................. 14

*Purcell & Wardope Chartered v. Hertz Corp.*,
    530 N.E.2d 994 (Ill. App. 1988) ........................................ 14

*Q-Tips, Inc. v. Johnson & Johnson*,
    108 F. Supp. 845 (D.N.J. 1952) ........................................ 19

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

*Ragsdale v. Turnock,*
841 F.2d 1358 (7th Cir. 1988) ........................................................... 11

*Sinclar Broad. Grp. V. Colour Basis, LLC,*
2016 WL 3541204 (D. Md. June 29, 2016) .......................................... 22

*Sony Computer Entm't AM, Inc. v. Divineo, Inc.,*
457 F. Supp. 2d 957 (N.D. Cal. 2006) ................................................. 21

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
464 U.S. 417 (1984) ............................................................................. 36

*Sprenger v. Trout,*
866 A.2d 1035 (N.J. App. 2005) .......................................................... 18

*Stockwire Research Grp., Inc. v. Lebed,*
577 F. Supp. 2d 1262 (S.D. Fla. 2008) ................................................ 20

*Storage Technology Corp. v. Custom Hardware Engineering & Consulting, Inc.,*
421 F.3d 1307 (Fed. Cir. 2005) ...................................................... 22, 23

*Surgidev Corp. v. Eye Technology, Inc.,*
648 F. Supp. 661 (D. Minn. 1986) ....................................................... 17

*TAS Distributing Co. v. Cummins Engine Co.,*
491 F.3d 625 (7th Cir. 2007) ...................................................... 6, 7, 14

*Tirado v. Bank of America, N.A,*
2019 WL 4694990 (N.D. Ill. Sept. 26, 2019) ....................................... 6

*Transportation & Transit Associates, Inc. v. Morrison Knudsen Corp.,*
255 F.3d 397 (7th Cir. 2001) ................................................................. 6

*United States v. Apex Oil Co., Inc.,*
579 F.3d 734 (7th Cir. 2009) ................................................................. 6

*Universal City Studios, Inc. v. Corley,*
273 F.3d 429 (2d Cir. 2001) ................................................................ 22

*Viacom Int'l, Inc. v. YouTube, Inc.,*
676 F.3d 19 (2d Cir. 2012) .................................................................. 33

*Walgreen Co. v. Sara Creek Prop. Co., BV,*
966 F.2d 273 (7th Cir. 1992) ................................................................. 7

**PUBLIC VERSION**

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

*Wert v. Cohn*,
  2019 WL 1584563 (N.D. Ill. Apr. 12, 2019) ................................................................. 20

**Statutes**

17 U.S.C. § 1201(a)(1)(A) ................................................................................ 20, 22

17 U.S.C. § 1201(a)(3) .......................................................................................... 22

17 U.S.C. § 1201(a)(3)(A) ..................................................................................... 28

17 U.S.C. § 1203(c)(3)(A) ..................................................................................... 28

**Other Authorities**

Restatement (Second) of Contracts § 359 ................................................................ 7

Restatement (Second) of Contracts § 360 ................................................................ 7

Restatement (Second) of Contracts § 362 ................................................................ 6

**PUBLIC VERSION**

## RECORD CITATION FORMAT

| Abbr. | Reference | Docket Number |
|---|---|---|
| CDK Opp. to Auth. SJ | CDK Global, LLC's Opposition to Authenticom's Motion for Summary Judgment on CDK's Counterclaims, July 28, 2020 | Filed concurrently |
| Countercl. | CDK Global, LLC's Counterclaims, February 22, 2019 | Dkt. 522 |
| Dealer Ex. | Exhibits to the Declaration of Peggy J. Wedgworth, May 20, 2020 | Dkt. 968-1 |
| Defs. JSOAF | Defendants CDK Global, LLC's and The Reynolds & Reynolds Company's Statement of Additional Material Facts In Opposition to MDL Plaintiffs' Motions for Summary Judgment on Defendants' Councterclaims, July 28, 2020 | Filed concurrently |
| Defs. JSUF | CDK Global, LLC and The Reynolds & Reynolds Company's Joint Statement of Common Undisputed Material Facts in Support of their Motion for Summary Judgment Exhibits, May 20, 2020 | Dkt. 974 |
| Defs. JSUF Ex. | Exhibits to Declaration of Daniel T. Fenske, May 20, 2020 | Dkt. 975 |
| Mot. | Dealership Counter-Defendants' Memorandum in Support of Their Motion for Summary Judgment on CDK Global LLC's Counterclaims, May 20, 2020 | Dkt. 965 |
| Resp. Dealers SOF | CDK Global, LLC's Responses to Dealership Counter-Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment on CDK's Counterclaims, July 28, 2020 | Filed concurrently |
| Reynolds Opp. to Auth. SJ | Counterplaintiff The Reynolds and Reynold Company's Opposition to Counterdefendant Authenticom, Inc.'s Motion for Summary Judgment, July 28, 2020 | Filed concurrently |

PUBLIC VERSION

## INTRODUCTION

Counter-Plaintiff CDK Global, LLC ("CDK") develops and maintains a dealer management system ("DMS"), which it licenses to auto dealerships pursuant to a Managed Service Agreement ("MSA"). Counter-Defendants[1] all use CDK's DMS subject to substantially similar MSAs. Defs. JSOAF 87. The MSAs prohibit dealers from sharing credentials used to access the DMS (*i.e.*, usernames and passwords) with third parties. In particular, licensees, including Counter-Defendants, agree that they:

- "will not sell or otherwise provide, directly or indirectly, any of the Services or Software, or any portion thereof, to any third party";

- will "treat as confidential and will not disclose or otherwise make available any of the [CDK] Products (including, without limitation, screen displays or user documentation)" or any "proprietary data, information or documentation related thereto" in "any form" to persons "other than employees and agents of" the dealer; and,

- will not allow "ANY THIRD PARTY SOFTWARE TO ACCESS THE [CDK] DEALER MANAGEMENT SYSTEM EXCEPT AS OTHERWISE PERMITTED BY THIS AGREEMENT."

---

[1] "Counter-Defendants" are:

- ACA Motors, Inc., d/b/a Continental Acura; Continental Autos, Inc., d/b/a Continental Toyota; Continental Classic Motors, Inc., d/b/a Continental Autosports; 5800 Countryside, LLC, d/b/a Continental Mitsubishi; HDA Motors, Inc., d/b/a Continental Honda; H & H Continental Motors, Inc., d/b/a Continental Nissan; Naperville Zoom Cars, Inc., d/b/a Continental Mazda; and NV Autos, Inc., d/b/a Continental Audi (collectively, the "Continental Counter-Defendants");

- Stevens Jersey City Ford; Jericho Turnpike Sales LLC, d/b/a Ford & Lincoln of Smithtown; Patchogue 112 Motors, LLC, d/b/a Stevens Ford (collectively, the "Stevens Counter-Defendants");

- Cliff Harris Ford, LLC, d/b/a Warrensburg Ford; Marshall Chrysler Jeep Dodge, L.L.C. d/b/a Marshall Chrysler; and Warrensburg Chrysler Dodge Jeep, L.L.C. d/b/a Warrensburg Chrysler Dodge Jeep Ram Fiat (collectively, the "Warrensburg Counter-Defendants"); and

- Baystate Ford Inc.; Cherry Hill Jaguar; and Waconia Dodge, Inc.

Other papers in this case sometimes refer to Counter-Defendants as "Dealership Counter-Defendants." This brief uses the shorter form for ease of reference.

*Id.* Licensees also agree that the DMS remains at all times the exclusive and confidential property of CDK. Defs. JSOAF 88. These provisions protect CDK's intellectual property, its investments, and the integrity, reliability, and availability of the DMS and the data it houses.

Despite the MSA's plain language, and CDK's public efforts to discourage and prevent unauthorized third-party access, Counter-Defendants do not dispute that they shared login credentials with numerous third-party vendors, most notably Authenticom, Inc. ("Authenticom"), enabling those vendors to access CDK's DMS without authorization within the relevant limitations period. Counter-Defendants do not dispute that a jury could conclude that they violated the terms of their MSA. Two dealer groups—the Warrensburg Counter-Defendants and the Continental Counter-Defendants—went beyond credential sharing by circumventing, or assisting Authenticom in circumventing, technological security measures that CDK put into place to prevent third parties from accessing the DMS without authorization.

CDK brings counterclaims for breach of contract against Counter-Defendants, and under the Digital Millennium Copyright Act ("DMCA") against the Warrensburg Counter-Defendants and Continental Counter-Defendants only. Counter-Defendants now move for summary judgment on these claims. As explained below, the Court should deny the motion.

## LEGAL STANDARD

The Court may grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Counter-Defendants must show that no "reasonable jury could return a verdict for" for CDK, even when viewing the record in the light most favorable to CDK and drawing all reasonable inferences in its favor. *Ballard v. Jewel Food Stores, Inc*., 2020 WL 616468, at *4 (N.D. Ill. Feb. 10, 2020) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

PUBLIC VERSION

## ARGUMENT

Although Counter-Defendants offer a laundry list of arguments, their brief boils down to four main points.

***First***, without denying that there is a genuine issue over whether the MSAs permitted Authenticom and other third parties to access the DMS, Counter-Defendants challenge CDK's contract claim because CDK does not show "pecuniary damages" from the breach. Mot. 12. That is a question of remedy, not grounds for awarding summary judgment on the *claim*. Indeed, the principal remedy CDK seeks for breach of contract is an injunction—a remedy premised on monetary damages being inadequate relief. *Infra* Part I.A.

***Second***, Counter-Defendants contend that CDK waived its right to enforce the MSA and has "unclean hands." Neither of these fact-laden defenses can be resolved at summary judgment, to the extent they apply at all. *Infra* Part I.B.

***Third***, tracking similar arguments in Authenticom's summary judgment motion, Counter-Defendants argue that CDK fails to establish the statutory elements of a DMCA "circumvention" claim, plus a made-up "nexus" element that better-reasoned case law rejects. As detailed in CDK's response to Authenticom, however, CDK satisfies all elements of a DMCA claim. *Infra* Part II.A & II.B.

***Finally***, the Warrensburg and Continental Counter-Defendants argue that they are not liable under the DMCA for various reasons, including a supposed lack of knowledge regarding Authenticom's illegal activities. But a jury could easily conclude on this record that the Warrensburg and Continental Counter-Defendants knew about and encouraged illegal conduct or (what is legally the same) deliberately turned a blind eye to it. *Infra* Part II.C, II.D, & II.E.

Counter-Defendants also argue that there is no evidence that they exercised control over the means Authenticom used to access the DMS. CDK agrees that the record shows no such

relationship, but *Authenticom itself* seeks summary judgment on the grounds that dealers supposedly "had the right to control all aspects of Authenticom's provision of data integration services," Dkt. 978 at 31-34. The Continental Counter-Defendants have not disavowed an "agency" argument. They cannot have it both ways; Authenticom cannot be their "agent" for some purposes but not others. Thus, unless Counter-Defendants are willing to stipulate to the lack of an agency relationship, the existence of such a relationship remains disputed and is not grounds for summary judgment. *Infra* Part II.E.

## I. There Are No Grounds For Summary Judgment On The Contract Counterclaim.

Sharing DMS login credentials with third parties like Authenticom creates grave risks for dealers, CDK, and third parties whose data is stored on the DMS. It also impacts the performance and integrity of the DMS itself. Cybersecurity expert Edward Stroz states that "███████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████ Dealer Ex. DDD (Stroz Rpt.) at 4. Scott Tenaglia, another expert who manages a portfolio of U.S. government-sponsored cyber R&D programs, concludes that Authenticom ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Dealer Ex. HHH (Tenaglia Rpt.) at 17. Consistent with that view, the Continental Counter-Defendants concede it is ███████████████████████████████████████████████████████████████ ████████████████████ Defs. JSOAF 90.[2]

---

[2] ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ *See* pp. 10-11 *infra*.

Sharing DMS credentials with third parties is not only bad security practice, but it also violates the express terms of the dealer's contract with CDK. Counter-Defendants do not move for summary judgment on the meaning of their MSAs, conceding that a reasonable jury could conclude that their credential sharing was barred by the MSA's provisions on third-party access. CDK has informed Counter-Defendants that it intends to seek an injunction, declaratory relief, and nominal damages as remedies for their contractual breaches. Dealer Ex. C; *see also* Countercl., Prayer for Relief.

### A. CDK Can Pursue Three Remedies For Its Contract Claim.

Counter-Defendants assert that CDK is not entitled to a trial on its breach of contract claim because CDK offers no evidence of "actual, pecuniary damage." Mot. 7-14. This argument assumes that Illinois law governs all contract claims. Mot. 6 & n.4. But the MSA the Warrensburg Counter-Defendants submitted is governed by New Jersey law. Resp. Dealers SOF 6 (citing Dealer Ex. RR § 17(I)). Under New Jersey law, "proof of actual damages is not necessary to survive summary judgment on a breach of contract claim." *Interlink Grp. Corp. USA v. Am. Trade & Fin. Corp.*, 2014 WL 3578748, at *7 (D.N.J. July 18, 2014) (quoting *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 477 A.2d 1224, 1228 (N.J. 1984)).

Counter-Defendants' "actual damages" argument fails under Illinois law as well. To establish a claim for breach of contract under Illinois law, a party must show that the breach caused a "resultant *injury* to the plaintiff." *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 786 (7th Cir. 2015) (emphasis added). To be sure, where a plaintiff is pursuing money damages for a breach, this means that a plaintiff must adduce evidence of the amount of that pecuniary loss. But if the plaintiff can show a non-pecuniary "resultant injury" from the contract breach, that plaintiff may seek

injunctive or declaratory relief or an award of nominal damages—the only relief CDK seeks from Counter-Defendants.[3]

Counter-Defendants' principal case, *TAS Distributing Co. v. Cummins Engine Co.*, 491 F.3d 625 (7th Cir. 2007), makes this clear. The plaintiff in *TAS* was "essentially . . . seeking the profits it allegedly had lost" from breach of the parties' all-reasonable-efforts provision, as well as specific performance of the contract. *Id.* at 631. The Seventh Circuit first held that the plaintiff could not "produce any evidence that proves its lost profits to a reasonable certainty" and therefore the plaintiff's damages claim "must fail." *Id.* at 635. Then, turning to the plaintiff's request for specific performance, the court recognized that this remedy exists "when damages constitute an *inadequate* remedy." *Id.* at 637 (emphasis added); *cf. United States v. Apex Oil Co., Inc.*, 579 F.3d 734, 736 (7th Cir. 2009) (specific performance is "a type of injunction"); *Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 594 (7th Cir. 1985) (characterizing specific performance as "a mandatory injunction to perform"). The court explained that "[s]pecific performance *or an injunction* will not be granted unless the terms of the contract are sufficiently certain to provide a basis for an appropriate order." *TAS*, 491 F.3d at 637 (citing Restatement (Second) of Contracts § 362 (emphasis added)).

---

[3] That said, the record shows CDK did suffer monetary harm from Counter-Defendants' conduct, even if CDK is not pursuing a damages *remedy*. Authenticom accessed the CDK DMS using Counter-Defendants' credentials for years, polling data for vendors who otherwise would have had to pay 3PA fees to CDK to obtain the data automatically. Defs. JSOAF 90-91. If Counter-Defendants had not breached their contracts, at least some of these vendors would have joined CDK's 3PA program to obtain data. That is the basis for the supposed damages Counter-Defendants seek on their antitrust claims. *See, e.g.*, Dkt. 198 (Consol. Compl.) ¶¶ 112-13; Defs. JSUF Ex. 80, Williams Reply Rpt. ¶ 106. CDK has elected not to seek those damages at trial because CDK did not think it worthwhile to pursue the expensive expert analysis needed to quantify those damages, and because those damages would do nothing to remedy harm arising from the serious risks to the DMS caused by hostile integration, which is CDK's principal concern in bringing its counterclaims. Only an injunction can eliminate that harm.

PUBLIC VERSION

The *TAS* court's extensive discussion of specific performance would make no sense if evidence of pecuniary damage were *always* required in a breach-of-contract action. After all, the Seventh Circuit had just concluded that there was no evidence to support such damages in that case. *See* 491 F.3d at 636. If, as Counter-Defendants now maintain, that means that the plaintiff is "not entitled to *any* relief," Mot. 16 (emphasis added), the Seventh Circuit would have said so. Instead, it addressed the specific performance request independently.[4]

Not only do Counter-Defendants fail to cite any Illinois case requiring CDK to establish pecuniary damages to obtain injunctive relief, but their proposed requirement would turn equitable principles on their head. Injunctive relief is designed for situations where damages are too difficult to quantify or otherwise will not remedy a breach. *See, e.g.*, Restatement (Second) of Contracts §§ 359, 360 (injunction appropriate if damages remedy is not "adequate," with adequacy judged by, *inter alia*, "the difficulty of proving damages with reasonable certainty"); *Walgreen Co. v. Sara Creek Prop. Co., BV*, 966 F.2d 273, 276-77 (7th Cir. 1992). Thus, inability to quantify damages is reason to *grant* an injunction—not deny one.

To be clear, CDK does not seek specific performance of any affirmative obligations, which would raise difficult questions of judicial supervision. *TAS*, 491 F.3d at 637. Nor is there any concern that the MSA's bar on sharing credentials with third-parties is not "sufficiently certain"

---

[4] Likewise, the cases Counter-Defendants cite to show the supposed need for pecuniary damages (Mot. 12-13) addressed damages claims, but not requests for injunctive or declaratory relief. In *Transportation & Transit Associates, Inc. v. Morrison Knudsen Corp.*, the plaintiff was "seeking only damages," and the court concluded that "[t]here is no point in litigating" such a claim "if the plaintiff is unprepared to demonstrate loss." 255 F.3d 397, 400-01 (7th Cir. 2001). In *Tirado v. Bank of America, N.A.*—and in the related *Miszczyszyn* and *Antonicic* cases (Mot. 12)—this Court addressed whether the plaintiff could "state a claim for actual damages." 2019 WL 4694990, at *8 (N.D. Ill. Sept. 26, 2019). And in *Allied Waste Transportation, Inc. v. John Sexton Sand & Gravel Corp.*, the plaintiff sought only actual damages and the court held that, because the value of the increased partnership share appeared to offset the plaintiff's required capital contribution, it was possible that the breach caused no harm. 2016 WL 3443897, at *20 (N.D. Ill. June 23, 2016).

to serve as the basis for an injunction. *Id*. CDK merely seeks an order enjoining Counter-Defendants from breaching the plain terms of their MSAs. Countercl., Prayer ¶ B. That remedy is straightforward and requires no ongoing judicial supervision. Indeed, courts often grant injunctions for breach of contract under Illinois law. *E.g.*, *BrightStar Franchising LLC v. N. Nevada Care, Inc.*, 2020 WL 635903, at *7 (N.D. Ill. Feb. 11, 2020); *Gleicher, Friberg & Assocs. v. Univ. of Health Scis.*, 586 N.E.2d 418, 425 (Ill. App. 1991); *Petrzilka v. Gorscak*, 556 N.E.2d 1265, 1268 (Ill. App. 1990).

### 1. The Evidence Supports An Award of Injunctive Relief.

A court may issue a permanent injunction upon a showing of (1) irreparable harm that cannot be adequately compensated by money damages, (2) a balance of hardships that tips in favor of the plaintiff, and (3) consideration of the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). In their MSAs, Counter-Defendants expressly agreed that breaches of the contract's third-party access provisions would cause irreparable harm and entitle CDK to injunctive relief. Defs. JSOAF 89. They nevertheless dispute the first and third of these elements, but raise (at most) fact issues that the Court cannot resolve at this stage.[5]

### a. CDK Will Suffer Irreparable Harm From Continued Breaches.

The first element of a permanent injunction is whether damages can be "reliably estimated" such that money damages will be a "serious deficient remedy for the harm suffered." Opp. 17. As Counter-Defendants concede, harm to reputation and loss of customer goodwill are irreparable injuries justifying a permanent injunction. Mot. 17; *see also BrightStar*, 2020 WL 635903, at *8

---

[5] In opposing CDK's request for an injunction, *see* Mot. 16-18, Counter-Defendants repeatedly cite this Court's decision in *7-Eleven, Inc. v. Violet Spear & Viannam, Inc.*, 2012 U.S. Dist. LEXIS 66366 (ND. Ill. May 11, 2012) (not reported in Westlaw). It is unclear why. In *7-Eleven*, the plaintiff moved for summary judgment, but neither party "addressed the factors relating to issuance of a permanent injunction," and the Court merely declined to "enter one at this time." *Id*. at *15.

PUBLIC VERSION

("it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill"). CDK seeks an injunction to prohibit Counter-Defendants from sharing DMS credentials with and facilitating DMS access by unauthorized third parties, conduct that raises the risk of security incidents that would significantly harm CDK's reputation and could potentially expose it to legal liability. *See* Defs. JSOAF¶ 70, 92-93. Counter-Defendants' expert, Dr. Seth Nielson, comes to different conclusions, but that expert dispute is for trial, not summary judgment.

The record shows that cybersecurity risks are salient in the DMS industry in particular. In 2016, for example, hackers gained access to a DMS offered by one of CDK's competitors, DealerBuilt, and extracted almost 10 gigabytes of social security numbers, driver's licenses, credit card numbers, and other sensitive data for almost 70,000 consumers. That incident led to a Federal Trade Commission action; a settlement with the state of New Jersey, including a requirement that DealerBuilt maintain "enforcement mechanisms to approve or disapprove access requests based on [its] policies"; and significant reputational harm. Defs. JSOAF 70. ██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████. Defs. JSOAF 92. Other industry participants, including dealers, have made similar admissions. *Id.*

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ But the incident underscores the gravity of these

issues and shows why it is so important that CDK, as the custodian for dealer, consumer, and other data, ensures that access to the DMS is appropriately monitored and authorized.

Counter-Defendants respond that breaches of the MSA are unlikely to cause irreparable harm in the future because CDK has historically disabled user accounts associated with third-party access. Mot. 18. But that is no answer for two reasons. First, that CDK takes security seriously is no guarantee CDK will be able to detect *all* instances where a dealer breaches the contract. Because CDK is not involved in the dealers' arrangements with third parties, it necessarily is at a disadvantage in detecting breaches and enforcing the provisions of the MSA in those contexts. Second, it makes no sense (as a matter of equity or cybersecurity) to force *CDK* to bear the burden of detecting and mitigating harm caused by Counter-Defendants' breaches. *See* Dealer Ex. CCC, Stroz Reply ¶ 48. That is especially true because, as explained below, Counter-Defendants and other parties have worked with hostile integrators to bypass CDK's security measures, including its account reactivation measures, in the past.

Counter-Defendants also say that because CDK alleged damage in the form of lost revenue and investigation costs, CDK has admitted that all harm caused by their breaches is compensable. Mot. 18-19. That is a non sequitur. Even if CDK *had* calculated lost revenue and investigation costs and sought damages for that injury, money damages still would inadequately compensate CDK for the risks caused by enabling hostile integration. CDK's decision not to seek lost revenue or investigation costs, given the expense required to prove up those damages with adequate specificity and their value relative to the far greater system risks from hostile integration, does not change this fact.

The only case Counter-Defendants cite to show that CDK has pleaded itself out of an injunction is *Kreg Therapeutics, Inc. v. Vitalgo, Inc.*, 2013 WL 1286681 (N.D. Ill. Mar. 28, 2013),

which cuts squarely against them. In *Kreg*, this Court observed that an injunction was unnecessary because there was "no evidence" that the plaintiff had "suffered an injury to its reputation, or even that its loss of reputation is a presently existing actual threat." *Id*. at *18. In this case, there is evidence that Counter-Defendants' conduct materially increases cybersecurity and business risks to CDK. Such a threat "could 'constitute irreparable harm that is not compensable by an award of money damages.'" *Id*. (quoting *Gateway E. Ry. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994)).

Finally, Counter-Defendants argue that they are not currently providing credentials to third parties. Mot. 19. Yet the evidence they cite shows only that CDK is unable to *detect* third-party credential sharing. Resp. Dealers SOF 10-25. Notably, Counter-Defendants do not dispute that they shared login credentials with third-party hostile integrators to facilitate their access to the DMS in the past, and they surely know if they are enabling hostile access to the CDK DMS today. Yet none of Counter-Defendants submitted declarations to substantiate their claim that they no longer use hostile integrators. Worse still, we know that the Court should not take Counter-Defendants' word on this score. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Defs. JSOAF 91, 100-103; *see also* Part II.D.2 *infra*.

Even if Counter-Defendants had temporarily stopped breaching their contracts, it would not eliminate the need for an injunction. Counter-Defendants rely on cases addressing mootness principles, which is clearly distinguishable. *See* Mot. 20-21. *Frobe v. Village of Lindenhurst*, 2013

WL 5433512, at *3 (N.D. Ill. Sept. 30, 2013), held that a claim was moot only after the Attorney

General and State's Attorney admitted the challenged statute was unconstitutional and formally

declared that they would cease enforcing it in the future. Likewise, in *Ragsdale v. Turnock*, 841

F.2d 1358, 1365 (7th Cir. 1988), the defendant announced a "public policy of non-enforcement"

of the challenged requirement. In sharp contrast with each of these cases, Counter-Defendants have

never admitted that their conduct is improper or prohibited; never promised to stop sharing

credentials with third parties; and even now do not state that they intend to comply with their

contracts going forward. *Cf. Frobe*, 2013 WL 5433512, at *3 ("The party asserting mootness bears

the burden of persuasion.").[6]

### b. The Balance of Hardships Tips in CDK's Favor.

Counter-Defendants do not argue that the evidence favors them on the second permanent

injunction factor. Nor could they. There is no hardship in being required to comply with a

negotiated contract. Especially at summary judgment, therefore, this factor favors CDK. *Cf.*

*BrightStar*, 2020 WL 635903, at *8 (entering permanent injunction in plaintiffs' favor in contract

case where the defendants "do not identify any hardships they would face").

### c. An Injunction Is In The Public Interest.

There is no public benefit to allowing Counter-Defendants to disregard the contractual

obligations they assumed when licensing CDK's DMS. Not only were those obligations

---

[6] Counter-Defendants also argue that in recent years many vendors have become certified in CDK's
certified integration program, supposedly "nullifying" dealers' need to use data integrators. Mem. 20-21.
Although CDK agrees that certification provides significant value to app vendors and dealers compared to
hostile integration, the number of apps that are certified does not show that dealers are unlikely to share
passwords with third parties. First, some vendors in CDK's Global Partner Program ("3PA") may
impermissibly use data syndicators or third-party integrators for certain applications, even though that is
prohibited by their Managed Interface Agreement. *See, e.g.*, CDK's Response to *AutoLoop* Mot. for SJ
(filed concurrently) (discussing one such breach by MDL counter-defendant Loop, LLC). Second, that
few, some, or many apps are 3PA certified does prevent dealers from using hostile integration for apps
that are *not* certified.

voluntarily undertaken, but the public has a significant and overriding interest in ensuring that personal and confidential data in the DMS is transmitted safely and securely. As the Federal Trade Commission's complaint against DealerBuilt recognized, "[b]reached personal information, such as that stored in Respondent's backup database, is often used to commit identity theft and fraud"; "stolen financial information, such as the credit card numbers, expiration dates, and security codes that Respondent holds, can be used to commit fraud"; and dealers incurred "many hours handling breach response communications, identifying affected consumers, and responding to consumer complaints." *See* Defs. JSOAF 93. The record in this case similarly shows that consumers and all participants in the industry have a vested interest in strong cybersecurity. Defs. JSOAF 92.

Counter-Defendants briefly argue that the public interest would be "disserved" by a permanent injunction because four states have enacted statutes that supposedly prohibit DMS providers "from interfering with dealerships' efforts to grant access to their data by data integrators through the issuance of login credentials." Mot. 21. Those statutes do not address credential sharing specifically, and in any event many of their requirements are unconstitutional because they purport to override the express terms of CDK's existing contracts with dealers. Indeed, CDK is challenging those statutes on this and several other grounds. *See* Resp. Dealers. SOF 38. What is more, none of the Counter-Defendants is headquartered or has its principal place of business in a state with such a statute. Resp. Dealers SOF 2. The fact that almost all states, including Illinois and New Jersey, have not enacted similar statutes confirms that there are genuine disputes over the supposed "public interest" in dealers' ability to share DMS password credentials with whomever they like against the express wishes of the DMS provider.

### 2. The Evidence Supports An Award Of Declaratory Relief.

Even if CDK could not obtain an injunction, CDK is entitled to seek declaratory relief to clarify the rights of the parties to the MSAs. Countercl., Prayer ¶ A(1). Counter-Defendants' only

argument against such relief is that "CDK's breach of contract counterclaim fails without actual damages, so there is no basis for its redundant request for declaratory relief." Mot. 7. They offer no authority for this assertion, and their own case undermines it, recognizing that a key purpose of declaratory relief is to authorize judgments in cases where there *are no* quantifiable damages. *Central Brown Cnty. Water Auth. v. Consoer, Townsend, Envirodyne*, 2013 WL 501419, at *7 (E.D. Wis. Feb. 11, 2013) (cited at Mot. 16); *see also In re HA 2003, Inc.*, 310 B.R. 710, 721 (N.D. Ill. 2004) ("declaratory relief is appropriate without requiring the parties to commit a breach or sustain damages").[7]

### 3. The Court Should Award Nominal Damages.

Finally, even if neither of the foregoing remedies were available, CDK seeks nominal damages. *See, e.g.*, *Hentze v. Unverfehrt*, 604 N.E.2d 536, 640 (Ill. App. 1992) ("Having failed to establish a proper basis from which his damages could be computed, Hentze is entitled only to nominal damages."); *Jones v. Rempert*, 2012 IL App (2d) 110208-U, ¶ 24 ("in a contract case, a plaintiff is entitled to nominal damages even if he cannot show any injury from the breach"); *Allen Bros., Inc. v. Abacus Direct Corp.*, 2003 WL 21147985, at *3 (N.D. Ill. May 14, 2003) ("[I]f a plaintiff establishes breach but cannot establish actual damages, it may nevertheless recover nominal damages. . . . [T]he fact that only nominal damages are potentially available does not sound the death knell for [a] contract claim.").

Counter-Defendants contend that "[i]n the absence of actual damages, CDK is precluded from seeking an award of nominal damages." Mot. 15-16. That argument fails because CDK has suffered actual injury, *see* p. 5 n.3 *supra*, and because the suggestion that CDK cannot seek

---

[7] In *Consoer*, the court did not award declaratory relief because the plaintiff "d[id] not seek" it and because there was "no need to declare the parties' rights under the contract since the work is completed and the parties have no ongoing relationship based on the contract." 2013 WL 501419, at *7. CDK does seek such relief and the parties' contractual relationship is continuing.

14

nominal damages without first showing actual damages is backwards. Actual damages are a *substitute* for nominal damages, not a predicate. As *TAS*, which Counter-Defendants repeatedly cite, explains, "when a party establishes that it is entitled to damages but fails to prove the amount of those damages to a reasonable degree of certainty, only nominal damages are recoverable at the discretion of the trial judge." 491 F.3d at 632.

The cases Counter-Defendants cite on nominal damages are inapposite. Mot. 15-16. In *Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901 (N.D. Ill. 2012), for example, Judge Posner, sitting by designation, stated that the plaintiff "doesn't want" nominal damages and "did not respond that summary judgment should be denied because Apple could obtain nominal damages if it proved infringement." *Id*. at 908. *Apple* also was not a contract case. It concerned Article III standing, with Judge Posner merely expressing "doubt" that a patentee could sue for nominal damages for infringement in federal court as a constitutional matter. *Id*. at 909 The Seventh Circuit has since held that nominal damages are sufficient for Article III purposes. *See JP Morgan Chase Bank, N.A. v. McDonald*, 760 F.3d 646, 650–51 (7th Cir. 2014).

Counter-Defendants' reliance on *Prima Tek II LLC v. Klerk's Plastic Industries*, 525 F.3d 533 (7th Cir. 2008), is also unavailing. Applying Illinois law, *Prima Tek* noted that the plaintiff "never sought damages," nominal or otherwise, and therefore affirmed the district court's decision to award summary judgment. *Id*. at 540-41; *see also Kaskel v. N. Tr. Co.*, 328 F.3d 358, 360 (7th Cir. 2003) ("Not having been harmed by the bank's breach of contract, she cannot recover damages (beyond nominal damages, which she does not seek) for the breach."). In *Purcell & Wardope Chartered v. Hertz Corp.*, 530 N.E.2d 994, 1004 (Ill. App. 1988), the counterclaimant did not defend its award as one for nominal damages but rather cross-appealed and sought what it said were its higher actual damages. Finally, in *Bank of Chicago v. Park National Bank*, the trial court

awarded damages of $1000, which were nominal in form but not in substance. 640 N.E.2d 1288, 1297 (Ill. App. 1994) ("the 'nominal' award must be reversed").

### B. Neither Waiver Nor Unclean Hands Bars CDK's Contract Claim.

Besides arguing incorrectly that CDK must show pecuniary harm, Counter-Defendants contend that the doctrines of waiver and unclean hands bar CDK's contract claim at summary judgment. *See* Mot. 22-30. They are wrong on both counts.

### 1. Counter-Defendants Have Not Shown Waiver.

Counter-Defendants say that CDK has waived its right to enforce the MSA's prohibitions on third-party access. Mot. 23-28. Waiver is the knowing relinquishment of a contractual right. *Galesburg Clinic Ass'n v. West*, 706 N.E.2d 1035, 1037 (Ill. App. 1999). It presents "a question of fact when the facts necessary to support waiver are disputed or reasonable minds could draw different inferences from the evidence." *Id*. Also, even if a party waives compliance with a contractual condition, the party may retract the waiver and insist on prospective compliance.[8] Under these principles, Counter-Defendants' waiver theory fails.

Counter-Defendants also miss the mark in arguing that CDK did not "attempt to enforce" MSA provisions on third-party access until "well after CDK reached its improper agreement with The Reynolds and Reynolds Company"—an agreement that supposedly began in September 2013 or later. Mot. 24. As CDK has explained, there is no evidence of an "improper" agreement between

---

[8] *See, e.g.*, *LaSalle Nat'l Bank v. Helry Corp.*, 483 N.E.2d 958, 963 (Ill. App. 1985) ("a lessor can insist on strict compliance at a future date even though it did not in the past"); *Barnard v. Hollingsworth*, 83 N.E.2d 372, 374 (Ill. App. 1948) ("Even if plaintiff had actual knowledge of the fact that defendant kept a dog on the premises at any time prior to service of notice requiring compliance, such knowledge would not prevent plaintiff from thereafter insisting upon a strict compliance with the lease, nor mean a waiver thereof after service of notice demanding compliance."); *cf. Am. Suzuki Motor Corp. v. Bill Kummer, Inc.*, 65 F.3d 1381, 1388 n.4 (7th Cir. 1995) (motorcycle manufacturer allowed dealer to ignore performance requirements in dealership agreement, but subsequent demand for performance under the contract "constitute[d] a retraction of the waiver") (applying Illinois law).

16

CDK and Reynolds. *See* Dkt. 966 at 17-51; Dkt. 973 at 17-23. Regardless, CDK began to enforce the MSA's prohibitions on third-party access before any supposed "conspiracy." CDK removed references to the propriety of credential sharing from its marketing materials in 2012, and continued to communicate the message that dealers should never share DMS login credentials with third parties or allow third parties to "screen scrape" their data thereafter. Resp. Dealers SOF 28. Counter-Defendants' own economic expert acknowledges that ████████████████████ ████████████████████████████████████████████████. Defs. JSUF Ex. 79, Williams Rpt. ¶ 67.

Counter-Defendants' "evidence" of waiver consists almost exclusively of decade-old statements from 2006 and 2007 by CDK's predecessor company, ADP. Mot. 24-25. Counter-Defendants also cite (1) a 2009 ADP email, (2) a July 2015 internal CDK email, in which a CDK employee corrected the misstatement that dealers have the "right" to share user IDs and passwords, and (3) an internal April 2017 email in which CDK's Senior Director of Client Data Services noted a *dealer*'s contention that CDK had waived its right to enforce the MSA's third-party provisions. Mot. 26-27. None of this suggests that CDK intentionally relinquished the right to enforce its contracts with Counter-Defendants in this litigation, especially because Counter-Defendants ignore CDK's parallel efforts to prevent unauthorized third-party access beginning no later than 2012. Resp. Dealers SOF 28, 32. The record, in short, does not come close to establishing an undisputed waiver.

Counter-Defendants also point to the fact that ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████



Far from "waiving" its right to enforce the terms of Continental's 2017 MSA, CDK made clear that it did not tolerate unauthorized access and, when the Continental Counter-Defendants ignored their contract, promptly began enforcing the MSA's terms.[9]

### 2. Counter-Defendants Have Not Shown Unclean Hands.

Counter-Defendants contend that an injunction would "unfairly benefit" CDK because CDK "historically engaged in the same conduct" as Counter-Defendants through two CDK subsidiaries, Digital Motorworks, Inc. and IntegraLink (collectively, "DMI"). Mot. 28-32. Earlier in the litigation, Judge Gilbert found it "difficult to see" how "the public interest would be served by allowing the [Counter-Defendants] to continue doing what they are doing" "because CDK or two of its subsidiaries engaged in similar but not identical conduct years ago." Dkt. 838 at 3. His skepticism was more than justified.

---

[9] Even if CDK's conduct were evidence of waiver as to the Continental Counter-Defendants—it is not—that would not show a waiver as to *other* Counter-Defendants. The only case Counter-Defendants cite (at Mot. 28) to show that CDK's conduct operated as a waiver against all dealers is *Surgidev Corp. v. Eye Technology, Inc.*, 648 F. Supp. 661 (D. Minn. 1986), which is triply inapposite. First, *Surgidev* applied California and Minnesota law. Second, it addressed equitable estoppel, a distinct defense not addressed in Counter-Defendants' motion. Finally, the case focused on the enforceability of covenants not to compete, an issue not implicated here. *See Midwest Television, Inc. v. Oloffson*, 699 N.E.2d 230, 236 (Ill. App. 1998) (distinguishing *Surgidev* where plaintiff's decision not to enforce terms of non-compete "involved unique circumstances that do not exist in [another] case").

*First*, unclean hands requires a "direct nexus" between the plaintiff's conduct and the activity the defendant seeks to enjoin. Mot. 29 (quoting *Int'l Union, Allied Indus. Workers of Am. v. Local Union No. 589, Allied Indus. Workers of Am.*, 693 F.2d 666, 672 (7th Cir. 1982)). This means that the conduct "must involve fraud, unconscionability or bad faith *toward the party proceeded against.*" *FirstMerit Bank, N.A. v. Quanstrom-Rose L.L.C.*, 2013 WL 6577028, at *2 (N.D. Ill. Dec. 13, 2013) (emphasis added); *see also Long v. Kemper Life Ins.*, 553 N.E.2d 439, 441 (Ill. App. 1990) ("The doctrine applies if the party seeking equitable relief is guilty of misconduct, fraud or bad faith toward the party against whom relief is sought if that misconduct is connected with the transaction at issue."); *Sprenger v. Trout*, 866 A.2d 1035, 1045 (N.J. App. 2005) ("the allegation of unclean hands here does not refer to a wrong perpetrated by plaintiff against defendants but rather by plaintiff against his own employer"). The means DMI used to access the Reynolds DMS in the early 2010s has no nexus, let alone a "direct" one, to the means Counter-Defendants used to facilitate third-party access to the CDK DMS for years in violation of their MSAs. Nor was anything DMI did with respect to the Reynolds DMS directed "toward" or "against" Counter-Defendants. *Long*, 553 N.E.2d at 441.[10]

The controlling decision in *Coexist Foundation, Inc. v. Fehrenbacher*, 865 F.3d 901 (7th Cir. 2017), makes this plain. There, the Seventh Circuit rejected an unclean hands defense where the party asserting it "was not the victim of" fraudulent conduct by the founder of the plaintiff

---

[10] Counter-Defendants contend that unclean hands applies if the plaintiff's conduct is "tainted with bad faith relative to the matter in which he seeks relief." Mot. 30 (quoting *Packers Trading Co. v. FTC*, 972 F.2d 144, 148 (7th Cir. 1992)). But that is just another articulation of the nexus requirement: the plaintiff's wrongdoing must be tied to the "controversy in issue." *Packers Trading*, 972 F.2d at 148. In any event, *Packers Trading* applied federal law, which does not govern any of the MSAs, and addressed a single course of conduct, not conduct undertaken by a corporate subsidiary years before the relevant events. *See Epic Sys. Corp. v. Tata Consultancy Servs., Ltd.*, 2016 WL 1179228, at *2 (W.D. Wis. Mar. 23, 2016) ("all of the transactions at issue in *Packers Trading* occurred within a matter of a few hours, during which the court found that the plaintiff took advantage of a mistake").

corporation, yet "sought to have the court rely on" the founder's conduct toward third parties "as a reason for denying relief" to the plaintiff corporation. *Id*. at 909. In such circumstances, "[t]he doctrine of unclean hands simply does not apply." *Id*.[11]

*Second*, CDK entered into negotiations with Reynolds in 2013 over its hostile access to the Reynolds DMS. Defs. JSUF 102-105, 116. By the time of Counter-Defendants' misconduct in 2016, 2017, and 2018, CDK had ceased hostile integration on the Reynolds DMS. Defs. JSUF 119. DMI's allegedly improper conduct therefore lacks the required temporal nexus to the subject matter of this litigation. As a matter of law, defendants cannot base an unclean hands defense on conduct occurring years before the plaintiff filed suit.[12]

*Finally*, there are significant factual differences between DMI's conduct and the conduct of Counter-Defendants. CDK was unwilling to use hostile integration methods once it realized that DMI risked violating the DMCA or similar laws to gain access to the Reynolds DMS. Resp. Dealers SOF 34-35; *see also* Defs. JSUF 100. In contrast, Counter-Defendants continued to use Authenticom and other hostile integrators despite their circumvention of CDK's access controls,

---

[11] *Pampered Chef v. Alexanian* (cited at Mot. 30), is not to the contrary. It did not even hold that there was an unclean defense on the facts of that case, only a "tinge" of one, because defendants only "allude[d]" to the defense in their papers. 804 F. Supp. 2d 765, 801 (N.D. Ill. 2011). *Pampered Chef* also pre-dated *Fehrenbacher*'s articulation of the nexus requirement under Illinois law. The other cases on which Counter-Defendants rely are similarly unhelpful. *Empire Industries v. Winslyn Industries, LLC*, did not address *Fehrenbacher*. 327 F. Supp. 3d 1101, 1116 (N.D. Ill. 2018). And *In-N-Out Burgers v. Smashburger IP Holder LLC*, found a "sufficiently close" nexus only because the plaintiff's allegedly inequitable conduct (false advertising) *did* pertain to the defendant, because both parties sold competing products (hamburgers). 2018 WL 7891028, at *6 (C.D. Cal. Dec. 21, 2018).

[12] *See, e.g.*, *Nestlé Purina Petcare Co. v. The Blue Buffalo Co.*, 2016 WL 4272241, at *4 n.2 (E.D. Mo. Aug. 12, 2016) ("Blue Buffalo's proposed use of the unclean hands defense also appears to lack a temporal nexus to the claims against Blue Buffalo."); *Oliva v. Ramirez*, 2007 WL 2436305, at *5 (D.P.R. Aug. 21, 2007) ("defendants cannot base their unclean hands argument on inequitable conduct which had been discontinued for some time prior to suit"); *Q-Tips, Inc. v. Johnson & Johnson*, 108 F. Supp. 845, 870 (D.N.J. 1952) ("It must be held that plaintiff is not prevented from recovering judgment in the trade-mark suit by the doctrine of unclean hands, for plaintiff ceased using the objectionable circular prior to the commencement of that suit.").

in some cases even helping Authenticom violate the DMCA. *See* Part II.D & II.E *infra*. At a minimum, these differences make the unclean hands defense inappropriate for summary judgment. *See, e.g.*, *Fabick, Inc. v. FABCO Equip., Inc.*, 296 F. Supp. 3d 1022, 1058 (W.D. Wis. 2017) (denying summary judgment on unclean hands defense based on both factual disputes and lack of direct nexus); *Kim v. InterDent, Inc.*, 2010 WL 315011, at *13 (N.D. Cal. Aug. 3, 2010) ("There are numerous factual questions implicated by the unclean hands defense, and those questions cannot be resolved on summary judgment.").

*    *    *

As shown above, CDK is entitled to pursue injunctive, declaratory, and nominal relief, none of which requires CDK to first establish actual damages (which it does not seek). The injury or risk of injury from a cybersecurity breach—the real harm CDK seeks to remedy—is enough. Especially at summary judgment, Counter-Defendants cannot show waiver of CDK's rights under its present contracts through fragmentary statements that preceded the negotiation of those contracts by nearly a decade. Finally, Counter-Defendants cannot show their undisputed entitlement to an unclean hands defense, which suffers from both legal and factual flaws. For all these reasons, CDK's contract claims should proceed to trial.

## II.    There Are No Grounds For Summary Judgment On The DMCA Counterclaim.

The DMCA prohibits a defendant from "[1] circumvent[ing] [2] a technological measure that [3] effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A). The Warrensburg Counter-Defendants and Continental Counter-Defendants violated this provision by helping Authenticom evade CDK's technological measures and, as to the Warrensburg Counter-Defendants, by evading those technological measures themselves.

21

A.     There Are No "Group Pleading" Issues.

Counter-Defendants argue that CDK has engaged in "group pleading" by naming dealership groups, rather than the individual dealerships making up those groups, as defendants. Mot. 54-55. As their own brief observes, however, "the group pleading doctrine . . . has no application" on summary judgment. *Id.* (citing *Wert v. Cohn*, 2019 WL 1584563, at *14 (N.D. Ill. Apr. 12, 2019)). Nor does it apply here in any event, for the counterclaims allege specific counter-defendants within the same corporate family and contend that they are all liable for the claims in the pleadings. If Counter-Defendants mean to suggest that DMCA claims must be tied to a particular dealership within a corporate family to impose liability, their argument is inconsistent with the DMCA, which allows for joint-and-several liability. *Stockwire Research Grp., Inc. v. Lebed*, 577 F. Supp. 2d 1262, 1266 (S.D. Fla. 2008). Where entities share ownership and corporate functions, and the illegal acts are undertaken for the benefit of a dealership group, group members may be held jointly and severally liable. *See Sony Computer Entm't AM, Inc. v. Divineo, Inc.*, 457 F. Supp. 2d 957, 968 (N.D. Cal. 2006) (imposing joint and several liability under DMCA for entities with common owners and direction).

As explained below in Parts II.D.1 and II.E.1, personnel acting on behalf of the Warrensburg Counter-Defendants and Continental Counter-Defendants engaged in the acts that violated the DMCA. Indeed, the Warrensburg Counter-Defendants and Continental Counter-Defendants shared a single DMS server for all dealers in the respective dealership group. Defs. JSOAF 94, 99. Accordingly, CDK's evidence appropriately assigns Counter-Defendants' liability at the corporate group level for which individual dealers are jointly and several liable.[13]

---

[13] In addition, as discussed in Part II.D *infra*, there is evidence tying the DMCA violation by the Warrensburg Counter-Defendants to Marshall Chrysler Jeep Dodge, L.L.C. specifically.

**B.      Authenticom's Statutory Arguments, Which Counter-Defendants Incorporate By Reference, Fail.**

The Warrensburg Counter-Defendants and Continental Counter-Defendants claim that neither they nor Authenticom violated the DMCA's three statutory elements: *i.e.*, that they did not engage in "circumvention," that CDK's measures did not "effectively control access" within the meaning of the statute, and that CDK's measures did not protect access to a copyrighted work. Mot. 33 (citing Authenticom's summary judgment motion). In response to Authenticom's summary judgment motion, CDK details the evidence supporting each of these elements. *See* CDK Opp. to Auth. SJ § II. CDK incorporates that discussion by reference.

**C.      Counter-Defendants' "Nexus" Argument Fails.**

Counter-Defendants also argue that CDK has not shown that the challenged conduct "affect[ed] or threaten[ed] CDK's interest in its alleged copyrighted works." Mot. 34. This argument—which amounts to a claim that the DMCA incorporates an infringement "nexus" (Mot. 49)—is convoluted but ultimately misguided. As Authenticom makes essentially the same argument in its motion, CDK addresses it only briefly here.

***First***, as Reynolds's response to Authenticom's summary judgment motion details, § 1201(a)(1)(A) of the DMCA does not require a copyright infringement "nexus." The statute requires only that the defendant circumvent technological measures that control access to a copyrighted work. Non-binding decisions in *Chamberlain Group, Inc. v. Skylink Technologies, Inc.*, 381 F.3d 1178 (Fed. Cir. 2004), and *Storage Technology Corp. v. Custom Hardware Engineering & Consulting, Inc.*, 421 F.3d 1307 (Fed. Cir. 2005), have constructed a "nexus" requirement for § 1201(a)(1)(A), but as the Ninth Circuit has squarely held, those decisions are "contrary to the plain language of the statute." *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 950 (9th Cir. 2010). Although Counter-Defendants cite decisions from this District applying

a nexus requirement, *see* Mot. 52, each of those cases predates *MDY*. And, as explained in Reynolds's brief, the Ninth Circuit has by far the better reading of the DMCA. Indeed, Counter-Defendants' reading would render large portions of the statute irrelevant. *See* Reynolds Opp. to Auth. SJ § II.F. Relatedly, Counter-Defendants argue that Authenticom's access lacks a nexus because it was permitted under the "fair use" doctrine, Mot. 35-41, a subject addressed at length in Reynolds's brief. *See* Reynolds Opp. to Auth. SJ § II.G.[14]

  ***Second***, unlike *Chamberlain*, where the plaintiff placed no restrictions on the user's ability to access the plaintiff's product through third parties, 381 F.3d at 1183, here the MSA limits how dealers may share access to the DMS with third parties. *See* Defs. JSOAF 87. These express contractual restrictions undercut the supposed basis for the "nexus" requirement—that it is purportedly necessary to "balance" the rights of copyright holders and the public. *Chamberalain*, 381 F.3d at 1202-03. Indeed, the Federal Circuit has twice left open whether a nexus is required when, as here, a copyright holder imposes express access restrictions in the license agreement. *See Chamberlain*, 381 F.3d at 1202 n.17 ("we do not reach this issue"); *Storage Tech.*, 421 F.3d at 1317 ("In the absence of such language . . .").[15]

---

[14] Counter-Defendants also argue that because they have a license to use the DMS, CDK's efforts to block their access is "*not* protected by the DMCA." Mot. 35 (citing *Sinclar Broad. Grp. V. Colour Basis, LLC*, 2016 WL 3541204, at *4 (D. Md. June 29, 2016); *see also* Mem. 42-43 (discussing legislative history). The plain text of the DMCA, however, prohibits all circumventions of a technological measure "without the authority of the copyright owner," 17 U.S.C. § 1201(a)(3), making no distinction between circumventions intended to facilitate authorized access and circumventions intended to facilitate unauthorized access. *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 444 (2d Cir. 2001). Neither the Warrensburg Counter-Defendants nor the Continental Counter-Defendants had authority from CDK to automatically re-enable user accounts or to enable third parties to bypass CAPTCHA controls; CDK expressly prohibited that conduct in the MSA. Dictum in *Sinclair* is not to the contrary, for there the counter-plaintiff offered no admissible evidence that the counter-defendant engaged in circumvention at all. 2016 WL 3541204, at *4.

[15] The same is true of *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004), which Counter-Defendants also cite. *See id.* at 564 (Feikens, J., concurring in part) ("even if Defendant has circumvented the authentication sequence to gain access to the Printer Engine Program, or designed a chip with that as its main purpose, it has not violated the statute, because it has not given anyone access to the

*Finally*, even if it a "nexus" between the DMCA violations in this case and CDK's copyright interests were necessary, the evidence in the record easily suffices. As explained in CDK's response to Authenticom's summary judgment motion, each time Authenticom accesses the CDK DMS it makes unauthorized copies of CDK's copyrighted works, including its code, screen displays, and proprietary data compilations. This conduct has a direct nexus to CDK's copyright interest in the DMS. *See* CDK Opp. to Auth. SJ § II.E.

### D. The Warrensburg Counter-Defendants' Specific DMCA Arguments Fail.

The Warrensburg Counter-Defendants do not dispute that they enabled Authenticom's installation of the Profile Manager program in March 2017 as a way to re-enable accounts deactivated by CDK. 

. Dealer Ex. DDD, App. C ¶ 51.

Resp. Dealers SOF 62.

#### 1. The Warrensburg Counter-Defendants Are Jointly Liable.

The Warrensburg Counter-Defendants share common ownership (Cliff Harris), two General Managers, and the same DMS server. Defs. JSOAF 99. And, as discussed below, their common controller, Linda Smith, *id.*, is responsible for Profile Manager's installation on the Warrensburg Counter-Defendants' systems. It is thus entirely appropriate to hold the Warrensburg Counter-Defendants jointly and severally liable under the DMCA. *See supra* Part II.A.

---

program *who did not already have authority from Lexmark to use it*") (emphasis added; cited by Counter-Defendants at Mot. 42).

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████ In any event, as discussed in the next section, the record

shows that Ms. Smith was acting at least for the benefit of Marshall Chrysler Jeep Dodge, L.L.C.,

so the jury could assign responsibility to that dealer if necessary.

### 2. Relevant Facts For Liability.

The record shows that the Warrensburg Counter-Defendants worked with Authenticom to

install Authenticom's Profile Manager software to circumvent CDK's access controls. From this

evidence, a jury could conclude that the Warrensburg Counter-Defendants are primarily or

secondarily liable for DMCA violations.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



### 3. CDK Made No "Judicial Admissions."

The foregoing evidence shows—and a jury could conclude—that the Warrensburg Counter-Defendants are responsible for the installation and use of Profile Manager to circumvent CDK's technological measures. The Warrensburg Counter-Defendants nonetheless contend that allegations that they "actively encouraged Authenticom to circumvent CDK's security measures," Countercl. ¶ 113, and that Authenticom created Profile Manager, Countercl. ¶¶ 89, 150-51, are "binding judicial admissions" that the Warrensburg Counter-Defendants are not primarily liable for violating the DMCA. Mot. 75. Yet there is nothing inconsistent in maintaining that both the

Warrensburg Counter-Defendants and Authenticom are primary DMCA violators based on their joint use of Profile Manager.

Judicial admissions are "formal concessions" or "deliberate, clear, and unequivocal statements." Mot. 77 (citing *Pierce v. City of Chicago*, 2012 WL 401026, at *3 (N.D. Ill. Feb. 7, 2012)). CDK never conceded—even equivocally—that the Warrensburg Counter-Defendants were not primarily liable for the use of Profile Manager. To the contrary, in opposition to Counter-Defendants' motion to dismiss, CDK successfully argued that the counterclaims' allegations stated a primary liability claim against the Warrensburg Counter-Defendants. *See* Dkt. 749 at 28. That makes no sense if CDK's counterclaims unequivocally disclaimed primary liability, as Counter-Defendants assert.[16]

Counter-Defendants' argument echoes an equally strained interpretation of the pleadings in their motion to dismiss. There, they contended that the allegation that Counter-Defendants breached the MSA by "knowingly providing login credentials to [third-party] data extractors and, actively or passively, 'authorizing' them to access CDK's DMS to extract or insert data" (Countercl. ¶ 3) amounted to a concession that Authenticom *was* authorized to access the DMS. The Court rejected this formalistic argument, explaining "the use of the term 'authorizing' in scare quotes does not amount to a concession that . . . access to CDK's data was authorized." Dkt. 749 at 6-7. It should do the same here.

### 4. The Use of Profile Manager Violated The DMCA.

The Warrensburg Counter-Defendants argue that there is no evidence that the Profile Manager program ever re-enabled a disabled user account because the opinions of CDK's expert,

---

[16] *Compare Pierce*, 2012 WL 401026, at *5 ("it is difficult to imagine an admission that a defendant did not commit the acts alleged in the complaint being more deliberate, clear, and unequivocal than those contained in Plaintiff's motion and reply brief").

**PUBLIC VERSION**

Mr. Stroz, are inadmissible. Mot. 81-82. CDK has explained in detail why Mr. Stroz used a reliable methodology and why his opinions on the number of times Profile Manager re-enabled user accounts, including for the Warrensburg Counter-Defendants, is admissible. *See* Dkt. 995 (*Daubert* Opp. at 18-24). Mr. Stroz analyzed data to determine the number of times the Warrensburg Counter-Defendants ran Profile Manager; reviewed documents indicating how frequently CDK was deactivating suspicious accounts during that time period; and applied a conservative set of assumptions to conclude that Profile Manager re-enabled the Warrensburg Counter-Defendants' user accounts ███████████. Resp. Dealers SOF 63. The Warrensburg Counter-Defendants are free to challenge what they call Mr. Stroz's "faulty assumptions and unsupported projections," Mot. 82, on cross-examination. But a jury should decide this issue, not the Court on summary judgment.

Even absent Mr. Stroz's opinions, moreover, a jury could conclude that Profile Manager re-enabled user accounts on the Warrensburg Counter-Defendants' DMS. There is no reason to install Profile Manager *except* to re-enable accounts; that is the "sole purpose" of the application. Resp. Dealers SOF 59. ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████ Given this evidence, a jury could conclude that Profile Manager re-enabled a Warrensburg Counter-Defendant user

account at least once a day from March 20, 2017, when Profile Manager was installed on the Warrensburg Counter-Defendants' systems, to April 24, 2017, ███████████████ ██████████████████████████████████████████ That is especially true because where, as here, "the uncertainty as to the damages stems from the defendants' illegal conduct, the defendants should not benefit from the uncertainty they created." *BE & K Constr. Co. v. Will & Grundy Counties Bldg. Trades Council*, 156 F.3d 756, 770 (7th Cir. 1998).

The Warrensburg Counter-Defendants contend that summary judgment on the DMCA claim is proper "to the extent that [CDK] seeks recovery for instances where Profile Manager launched but did not re-enable disabled user accounts." Mot. 81.[17] The DMCA authorizes the plaintiff to recover statutory damages for each "act of circumvention." 17 U.S.C. § 1203(c)(3)(A). To "[c]ircumvent a technological measure" means to "descramble a scrambled work, decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A). These terms not only prohibit a defendant from successfully overriding a technological measure in any given instance but also from making a technological measure less *effective* at controlling access. As explained in CDK's response to Authenticom's summary judgment motion, a reasonable jury could conclude that each time Profile Manager launched, it "avoided" or "impaired" CDK's access control measures. *See* CDK Opp. to Auth. SJ § II.C.

---

[17] The Warrensburg Counter-Defendants also complain that CDK did not disclose "launch" damages in the pleadings. Mot. 79. However, CDK stated that counterclaim damages would be disclosed in expert reports, Dealer Ex. E (Response to Interrogatory No. 11), and it made timely disclosures in August 2019. Also, the only purported prejudice to the Warrensburg Counter-Defendants from CDK's pursuit of "launch" damages is that statutory damages could be large. Mot. 79 n.110. But that is not a form of unfair prejudice—that is a consequence of the Warrensburg Counter-Defendants' extensive DMCA violations. *Cf. Poulson v. Beez Bugeez, Inc.*, 1986 WL 11457, at *1 (S.D.N.Y. Dec. 1986) ("Amendments increasing the amount of damages do not ordinarily impose any prejudice on an opposing party . . . . Damages are proved at the trial, not in the pleadings.").

### 5. A Jury Could Find The Warrensburg Counter-Defendants Secondarily Liable For DMCA Violations.

Even if the jury does not find that the Warrensburg Counter-Defendants are primarily responsible for circumventing CDK's access controls through Profile Manager, the jury could find that the Warrensburg Counter-Defendants were secondarily liable for Authenticom's circumvention. As the Court held, the DMCA incorporates at least two species of secondary liability—vicarious liability (against a defendant who profits from another's violation) and contributory liability (against a defendant who induces or encourages another's violation). Dkt. 749 at 25-27. The Warrensburg Counter-Defendants do not challenge secondary liability on a contributory theory. Under the standards discussed in Part II.E.2 *infra*, the Warrensburg Counter-Defendants' assistance in installing Profile Manager and providing usernames and passwords clearly constitutes a material contribution to circumvention.

The Warrensburg Counter-Defendants briefly claim that they cannot be held secondarily liable on a *vicarious* liability theory because they lack a financial interest in Authenticom's DMCA violations. Mot. 83-84. The Court declined to address a similarly cursory argument at the 12(b)(6) stage. *See* Dkt. 749 at 26 n.10. Even if the Court reaches the argument, the Warrensburg Counter-Defendants' own theory of the case is based on their purported direct financial interest in Authenticom's successful circumvention of CDK's access controls. They and the other dealer plaintiffs allege that Authenticom's inability to access the DMS forced vendors to turn to CDK's certified integration program, 3PA, supposedly causing the dealers to incur higher passed-through integration costs. Dkt. 198 ¶¶ 14, 130, 134. Moreover, if the Warrensburg Counter-Defendants had no interest in Authenticom's violations, there was no reason for Linda Smith to work so closely with Authenticom to re-enable its access throughout 2016 and 2017.

### E. The Continental Counter-Defendants' Specific DMCA Arguments Fail.

#### 1. The Continental Counter-Defendants Are Jointly Liable.

The Continental Counter-Defendants are eight family-owned car dealerships held through a holding company, J&J Partnership. Defs. JSOAF 94. These entities share common ownership and corporate functions, and the same employees are responsible for negotiating contracts with vendors and DMS providers. *Id.* The Continental Counter-Defendants produced a single Rule 30(b)(6) witness for all of their dealerships, IT Director Mark Johnson, who said he works for the owners for "all locations," *id.*, and who stated to the Illinois Automotive Dealers Association that ██████████████████████████████████████████████████████████████████████████████ ███████████ Resp. Dealers SOF 57 (emphasis added). The Continental Counter-Defendants are therefore jointly and severally liable for any DMCA violations Authenticom committed while acting for the benefit of or subject to control of the Continental Counter-Defendants. *See supra* Part II.A.

#### 2. Relevant Facts For Liability.

Johnson, the Continental Counter-Defendants' 30(b)(6) representative, closely followed disputes between CDK and Authenticom regarding third-party access during the 2016-2018 timeframe. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

Johnson was thus fully aware of the dispute over Authenticom's access to the CDK DMS when he received an email from CDK announcing CDK's CAPTCHA security measures on December 8, 2017. [REDACTED]

[REDACTED]

[REDACTED]



### 3. There Is Evidence of Contributory Liability.

The Continental Counter-Defendants raise a number of arguments against secondary liability on a contributory theory. None has merit.

> #### *a. The Continental Counter-Defendants Knew Or Should Have Known Of Authenticom's Circumventing Activities.*

The Continental Counter-Defendants claim ignorance of the fact that Authenticom was circumventing CDK's CAPTCHA through automated means. Mot. 57-63. But a jury could justifiably infer from Johnson's extensive, contemporaneous communications with and about Authenticom that when Johnson forwarded CDK's announcement about its CAPTCHA controls to Authenticom in December 2017, he knew—or at a minimum should have known—that Authenticom intended to circumvent CDK's attempts to deny Authenticom access.

The Continental Counter-Defendants make much of the fact that there is no evidence of anyone from Authenticom *expressly* telling Johnson that Authenticom planned to use automated means to circumvent CAPTCHA. But actual knowledge is not the standard. Rather, "[w]illful

blindness is knowledge, in copyright law . . . as it is in the law generally." *In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003). A person is "willfully blind" or engages in "conscious avoidance" where the person "was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 35 (2d Cir. 2012). "A deliberate effort to avoid guilty knowledge is all that the law requires to establish a guilty state of mind." *Aimster*, 334 F.3d at 650.

A jury could easily conclude that the evidence meets that standard. Johnson effectively concedes that he was willfully blind to Authenticom's access methods. ██████████████

███████████████████████████

██████████████ That is textbook willful blindness—or so a jury could conclude. *See also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010) ("The knowledge standard is an objective one; contributory infringement liability is imposed on persons who 'know or have reason to know' of the direct infringement."). The Continental Counter-Defendants' knowledge is a highly disputed fact question that is inappropriate for summary judgment.

Nor is there anything to the fact that CDK "lacks any expert evidence showing the Continental Counter-Defendants' knowledge of any alleged circumvention of CAPTCHA by Authenticom." Mot. 59. An expert should not opine on what a defendant "knew" or "should have known." Indeed, speculation about a party's knowledge or motives is one reason why this Court should exclude testimony by *Counter-Defendants'* economic expert. *See* Dkt. 882 (Williams *Daubert* Br.) at 12-13; *Jamsport Entm't, LLC v. Paradama Prods., Inc.*, 2005 WL 14917, at *10 (N.D. Ill. Jan. 3, 2005) ("There is nothing in Baade's expertise that suggests that he is any more competent than the average juror in interpreting these communications or in divining from them the intent of Clear Channel and others").

Finally, *Monotype Imaging, Inc. v. Bitstream, Inc.*, 376 F. Supp. 2d 877 (N.D. Ill. 2005) (cited at Mot. 60), proves CDK's point. That opinion followed a bench trial evaluating the plaintiff's DMCA claim on the merits. Previously, Judge St. Eve had *denied* summary judgment to the defendant on the DMCA claim. The same result is called for here. As Judge St. Eve explained in denying the summary judgment motion, "Plaintiffs are not required to prove that Bitstream knew of the alleged infringement" and "genuine issues of fact exist whether Bitstream intended to induce the alleged infringement." *Monotype Imaging, Inc. v. Bitstream, Inc.*, 2005 WL

936882, at *7 (N.D. Ill. Apr. 21, 2005). Here too, genuine issues of fact preclude summary judgment and require a full trial so the jury can evaluate the Continental Counter-Defendants' supposed lack of knowledge about Authenticom's illegal activities.

### b.    Continental Assisted and Encouraged Authenticom's Violations.

The Continental Counter-Defendants contend they cannot be liable under the DMCA because there is no evidence they participated in the underlying violation. Mot. 64-68. But the Continental Counter-Defendants were not passive bystanders to Authenticom's violations. █

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ *See* Part II.E.2 *supra*. Those are "affirmative steps" that encouraged or assisted Authenticom in accessing the DMS without CDK's permission. Mot. 66.

It does not matter for purposes of *secondary* liability whether Authenticom's use of dealer login credentials alone violated the DMCA. *See* Mot. 66. Authenticom needed those credentials to engage in hostile access This case does not involve a "mere allegation that the defendant provided the third party with the opportunity to engage in wrongful conduct." *Ediciones Quiroga, S.L. v. Fall River Music, Inc.*, 1998 WL 851574, at *37 (S.D.N.Y. Dec. 7, 1998) (quoted at Mot. 67). Rather, based on Johnson's knowledge about Authenticom's activities and CDK's contract, it was "substantially certain" (Mot. 66-67) that Authenticom would use the credentials Continental provided to bypass CDK's security measures.

In sum, through their willful blindness, the Continental Counter-Defendants "at the very least ha[d] constructive knowledge" that Authenticom was circumventing CDK's technological controls, *id.*, but they continued to provide Authenticom with login credentials to enable that

circumvention. Their reasons for doing so are clear. As Johnson flatly admitted, the Continental Counter-Defendants do not believe that CDK should have the right to control access to its DMS by third parties. Defs. JSOAF 95 ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████.

### 4. There Is Evidence Of Vicarious Liability.

The Continental-Counter Defendants claim that the record does not permit them to be held vicariously liable for Authenticom's violations on three grounds. With one potential exception, *see* Part II.E.4.c, all three rest on factual disputes.

#### a. The Continental Counter-Defendants Had A Financial Interest In Authenticom's Conduct.

As with the Warrensburg Counter-Defendants, *supra* Part II.D.5, the Continental Counter-Defendants had a financial interest in Authenticom's ability to continue accessing the DMS over CDK's objections. ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

#### b. The Continental Counter-Defendants' Knowledge Is Disputed.

The Continental Counter-Defendants claim that they cannot be vicariously liable because they lacked knowledge of the infringing activity. Mot. 71-72. But that argument fails just as it does for contributory liability. *See* Section II.E.2.i *supra*; *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 (1984) (constructive knowledge standing); *BMG Rights Mgmt. (US) LLC*

*v. Cox Commc'ns, Inc.*, 881 F.3d 293, 312-13 (4th Cir. 2018) (vicarious infringement requires only "reckless disregard" for copyright holder's rights).

> ### c. Authenticom Asserts That The Continental Counter-Defendants Have The Right To Supervise Its Conduct.

Finally, the Continental Counter-Defendants claim that they cannot be vicariously liable because there is no evidence that they have the ability to supervise Authenticom's conduct. Mot. 70-71. Authenticom says in its summary judgment filing that it is *undisputed* that "the dealers had the right to control all aspects of Authenticom's provision of data integration services." Dkt. 978 at 31-34. Counter-Defendants previously took this same position, moving to dismiss on the grounds that Authenticom was the "agent" of the dealers and had at least apparent authority to act on the dealers' behalf. Dkt. 674 at 2-3. The Court held that whether Authenticom was an "agent" was ultimately a question of fact. Dkt. 749 at 11.

To be clear, CDK disputes that Authenticom was acting as the dealers' agent when it hostilely accessed the CDK DMS. *See* CDK Opp. to Auth. SJ § I.B. If the Continental Counter-Defendants are now willing to stipulate to that fact, CDK agrees that they cannot be held vicariously liable for any of Authenticom's DMCA violations.[18] But if Counter-Defendants intend to argue with Authenticom that Authenticom *was* their agent under the MSA, they should not be permitted to deny that same control or supervision to avoid vicarious liability. In short, Counter-Defendants cannot have it both ways.

## CONCLUSION

The Court should deny Counter-Defendants' motion for summary judgment.

---

[18] The Continental Counter-Defendants still could be held secondarily liable on a contributory theory, as discussed above. *See Aimster*, 334 F.3d at 654 (explaining that vicarious liability principles apply "to the liability of a principal . . . for the torts committed by his agent," while contributory principles apply to "someone who benefits directly from the infringement that he encourages").

Dated: July 28, 2020

Respectfully submitted,

/s/ *Britt M. Miller*
Britt M. Miller
Michael A. Scodro
Daniel T. Fenske
Matthew D. Provance
Jed W. Glickstein
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
mscodro@mayerbrown.com
dfenske@ mayerbrown.com
mprovance@mayerbrown.com
jglickstein@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendant*
*CDK Global, LLC*

## CERTIFICATE OF SERVICE

I, Britt M. Miller, an attorney, hereby certify that on July 28, 2020, I caused a true and correct copy of the foregoing **CDK GLOBAL, LLC'S OPPOSITION TO THE DEALERSHIP COUNTER-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

/s/ *Britt M. Miller*
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com